No. 24-5538

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

---

**NEO4J, INC., et al.,**

***Plaintiff and Appellee,***

**v.**

**Suhy, et al.**; *Defendant and*

*Appellant.*

---

Appeal From a Judgment of the United States District Court
For the Northern District of California
Hon. Edward J. Davila
United States District Judge
N. D. Cal. No. 5:18-cv-07182 EJD

---

**APPELLANTS' EXCERPT OF RECORD**

**VOL. 7 OF 16**

**pp. 1534-1786**

---

John Mark Suhy Jr (Pro Se)
8814 Danewood Dr
Alexandria, VA 22308
jmsuhy@gmail.com
Tel.: (703) 862-7780

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | number of Neo4j® EE and was unwilling to do the testing to make such integration and compatibility guarantees because it became "too hard to demonstrate." Ratinoff Decl., Exh. 31 at 186:24-188:17, 188:23-189:23. | |
| | Fact 102: As a result, Defendants were leading consumers to believe they were downloading an exact copy of the same version of commercial-only releases of NEO4J® EE, which in actuality they were receiving an inferior ONgDB product that was not a true "drop in" replacement. *See supra* Facts 80-101. | |
| | Fact 103: Neo4j® EE has been subject to trademark policies and guidelines published on Plaintiffs' website, which along with the terms of the GPL, AGPL and Neo4j Sweden Software License, made clear that to the extent any authorized modifications are made to Neo4j® Software, such modified software should indicate so and no longer bear the Neo4j® Mark. Rathle Decl., ¶¶ 15-18. Exhs. 5-7. | |
| 2.  Defendants' statements actually deceive or has the tendency to deceive a substantial segment of its audience | Fact 104: Defendants intentionally made the false statements publicly on their website and on Twitter that ONgDB is a "free and open" drop-in replacement/equivalent under the AGPL to convince customers to adopt ONgDB over Neo4j® EE, and pay iGov, Graph Grid and/or AtomRain for related consulting and support services. *See supra* Facts 78-80, 83-84, 86-93. | |
| | Fact 105: Consumers chose ONgDB over Neo4j® EE based on Defendants' misrepresentations about ONgDB being "free and open" drop-in replacement/equivalent under the AGPL, including NextCentury and the MPO, Tufin, the IRS, Department of Homeland Security (DHS) and others.  Ratinoff Decl., Exhs. 35, 40, 48-51, 53, 100, 120, 127, 133-135; Exh. 3 at 54:17-55:1, 142:15-144:20, 227:3-8, Exh. 31 at 191:15-24, 194:23-25, 195:13-18, 196:22-197:24; Broad Decl., ¶¶ 20-24; Exhs. 12-13. | |
| 3. Defendants' deception is material | Fact 106: Defendants' false statements that ONgDB is a drop-in replacement/equivalent to paid-for, commercial licensed Neo4® EE was material to potential consumers' purchasing decision because Defendants were offering it for free under the AGPL, and unbeknownst to consumers, in violation of the Neo4j Sweden Software License and Neo4j Sweden's copyright. *See supra* Facts 78-93. | |
| | Fact 107: Defendants intentionally made the false statements publicly on their website and on Twitter that ONgDB is a "free and open" drop- | |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | in replacement/equivalent under the AGPL to convince customers to adopt ONgDB over Neo4j® EE.  *See supra* Facts 78-93. | |
| 4. Defendants caused the false statement to enter interstate commerce | Fact 108:  Defendants' false statements entered interstate commerce through the internet via their websites and Twitter, as well as emails sent to consumers.  Ratinoff Decl., Exhs. 18, 21, 25, 29, 42-46, 49-51, 54-55, 57-58, 60, 62-66, 67-70, 72-74, 93, 99-104, 108, 113-114. | |
| 5. Neo4j USA has been or is likely to be injured as a result of the false statement | Fact 109: Defendants' false statements diverted sales from Neo4j USA. Ratinoff Decl., Exhs. 35, 40, 47-51, 53, 100, 120, 127, 133-135; Exh. 3 at 54:17-55:1, 142:15-144:20, 227:3-8, Exh. 31 at 191:15-24, 194:23-25, 195:13-18, 196:22-197:24; Broad Decl., ¶¶ 20-24; Exhs. 12-13. | |
| | Fact 110: Neo4j USA lost multi-year deal with the IRS.  Broad Decl., ¶¶ 20-21. | |
| | Fact 111: Neo4j USA lost multi-year deal with Next Century/MPO adopting ONgDB, amounting to over over $2.2 million in lost revenue. Broad Decl., ¶¶ 22-24, Exhs. 12-13. | |
| **Claim 4: False Designation of Origin  Against GFI and the PT Defendants** | | |
| 1. used in commerce any word, false designation of origin, false or misleading description, or representation of fact | Fact 112:  Defendants' false and misleading statements that ONgDB is a "free and open" drop-in replacement under the AGPL for equivalent versions of paid-for commercially licensed Neo4® EE were made in commerce through the internet via their websites and Twitter, as well as emails sent to consumers. Ratinoff Decl., Exhs. 18, 21, 25, 29, 42-46, 49-51, 54-55, 57-58, 60, 62-66, 67-70, 72-74, 93, 99-104, 108, 113-114; *see also* Facts 78-80. | |
| | Fact 113:  Defendants' statements that ONgDB is a "free and open" drop-in replacement under the AGPL for equivalent versions of paid-for commercially licensed Neo4® EE were false and misleading because Defendants did not have the right to replace the Neo4j Sweden Software License with the AGPL.  *See* Facts 78-93. | |
| | Fact 114:  Defendants' statements ONgDB is a "free and open" drop-in replacement under the AGPL for equivalent versions of paid-for commercially licensed Neo4® EE were false and misleading because | |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | ONgDB was not of the same quality as if it were compiled by Plaintiffs. Rathle Decl. ¶¶ 19-22, 29-34; Ratinoff Decl., Exh. 3 at 216:2-218:6; Exh. 31 at 161:23-163:12, 168:14-169:6. | |
| | Fact 115:  Since GFI introduced modifications to ONgDB in an attempt to keep pace with the closed Neo4j® EE releases, the potential for stability and compatibility issues with ONgDB increases.  *See* Rathle Decl., ¶¶ 29-24; *see also* Ratinoff Decl., Exh. 31 at 158:18-160:5, 161:23-163:12; Exh. 3 at 223:1-224:9; Exh. 40. | |
| | Fact 116:  ONgDB does not include every closed enterprise feature in the equivalent version of Neo4j® EE.  Ratinoff Decl., Exh. 38 at 2:12-17, 4:15-22, 5:4-6:21; Exh. 3 at 127:19-128:17. | |
| | Fact 117:  GFI admitted that after ONgDB v3.5.4, it could not "reliably guarantee that it was a drop-in replacement" for the same version number of Neo4j® EE and was unwilling to do the testing to make such integration and compatibility guarantees.  Ratinoff Decl., Exh. 31 at 186:24-188:17, 188:23-189:23. | |
| 2. which is likely to cause confusion or mistake, or to deceive, as to sponsorship, affiliation, or the origin of the goods or services in question. | | |
| (a) strength of the mark | The Neo4j® Mark is inherently distinctive and Plaintiffs have used it in commerce since 2007, and as a result has gained strong brand recognition via various awards and recognition in the graph database software market.  Broad Decl., ¶¶ 2-19, Exhs. 1-11. | |
| (b) relatedness of the goods and similarity of sight, sound and meaning | Defendants promote ONgDB as Neo4j® EE except that they are free and licensed without restrictions under the AGPL.  Ratinoff Decl., Exhs. 18, 21, 25, 29, 42-46, 49-51, 54-55, 57-58, 60, 62-66, 67-70, 72-74, 93, 99-104, 108, 113-114. | |
| (c) evidence of actual confusion; | Fact 118: Defendants' interchangeable use of "Neo4j Enterprise" and "ONgDB" misleads consumers into mistakenly believing that ONgDB | |

19

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | and Neo4j® EE were one and the same. *Ratinoff Decl.*, Exhs. 35, 40, 42-44, 46-47, 53, 55-58, 76, 100, 130-131, 134-135. | |
| | Fact 119: Defendants' misrepresentations about ONgDB being "free and open" drop-in replacement/equivalent under the AGPL caused actual confusion over Defendants' unauthorized modification to the Neo4j Sweden Software License and justification for doing so. *See* Ratinoff Decl., Exhs. 40, 49, 55, 118-119, 131, 133-134. | |
| | Fact 120: GFI's use of the Neo4j® Mark to promote ONgDB resulted in customers choosing ONgDB over Neo4j® EE and encountering compatibility issues. Ratinoff Decl., Exh. 115-116; Exh 31 at 230:12-233:10; Exh. 3 at 207:12-209:3. | |
| | Fact 121: Consumers chose ONgDB over Neo4j® EE based on Defendants' misrepresentations about ONgDB being "free and open" drop-in replacement/equivalent under the AGPL, including NextCentury and the MPO, Tufin, the IRS, Department of Homeland Security (DHS) and others. Ratinoff Decl., Exhs. 35, 40, 47-51, 53, 100, 120, 127, 133-135; Exh. 3 at 54:17-55:1, 142:15-144:20, 224:13-23, 227:3-8, Exh. 31 at 191:15-24, 194:23-25, 195:13-18, 196:22-197:24; Exh. 38 at 23:14-24:4; Broad Decl., ¶¶ 20-24, Exhs. 12-13. | |
| (d) marketing channels and likelihood of expansion | Fact 122: Defendants continue to target the same potential users of graph database platforms and software and use the same channels via the internet. *See, e.g.,* Ratinoff Decl., Exhs. 14-15, 18, 25, 29, 37, 45-55, 57, 60-61, 65-66, 76-77, 118-119, 120, 127, 130-132, 134-135. | |
| | Fact 123: Neo4j USA and the PT Defendants competed for the same contracts in the government sector. Ratinoff Decl., Exhs. 42-51, 54-55, 100, 120, 127, 130-135; Broad Decl., ¶¶ 20-24, Exhs. 12-13. | |
| (e) intent | Fact 124: Defendants' use of the Neo4j® Mark to promote Plaintiffs' software with an improperly modified copyright license shows that they intend to copy them and confuse the public. *See supra* Facts 78-102. | |

**01-15-2021 - DEF CONS OPP TO PLAINTIFF'S MOTION - SUMMARY CROSS MOT MEMO P'S AND A's.pdf**

Filed 01/15/2021

DEFENDANTS' CONSOLIDATED, COMBINED OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT / NOTICE OF MOTION AND CROSS MOTION; MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OR POINTS AND AUTHORITIES IN SUPPORT

(Pacer Doc: #100)

Adron W. Beene SB# 129040
Adron G. Beene SB# 298088
Attorney at Law
1754 Technology Drive, Suite 228
San Jose, CA 95110
Tel: (408) 392-9233
adron@adronlaw.com

Attorneys for defendants:
PURETHINK LLC, a Delaware limited
liability company, IGOV INC., a Virginia
corporation, and JOHN MARK SUHY

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEO4J, INC., a Delaware corporation, and NEO4J SWEDEN AB, a Swedish corporation,<br>Plaintiffs,<br>v.<br><br>PURETHINK LLC, a Delaware limited liability company, IGOV INC., a Virginia corporation, and JOHN MARK SUHY, an individual,<br>Defendants. | CASE NO. 5:18-CV-7182 EJD<br>CASE NO. 5:19-CV-06226-EJD<br><br>**DEFENDANTS' CONSOLIDATED, COMBINED OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT / NOTICE OF MOTION AND CROSS MOTION MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OR POINTS AND AUTHORITIES IN SUPPORT** |
| **AND RELATED COUNTERCLAIMS** | |
| NEO4J, INC., a Delaware corporation, and NEO4J SWEDEN AB, a Swedish corporation,<br>Plaintiffs,<br>v.<br>GRAPH FOUNDATION, INC., an Ohio corporation, GRAPHGRID, INC., an Ohio corporation, and ATOMRAIN INC., a Nevada corporation,<br>Defendants. | Date: March 25, 2021<br>Time: 9:00 a.m.<br>Dept. Courtroom 4, 5th floor<br>Judge: Hon. Edward J. Davila |

# TABLE OF CONTENTS

I.   Introduction ................................................................................................. 1

II.   Defendants' Notice of Cross Motion and Cross Motion ...................................... 1

III.   Background Facts Germane to Phase 1. .......................................................... 1

   A.   PureThink ............................................................................................ 3

   B.   The Falling out (IRS) ............................................................................. 3

IV.   Statement Of Issues To Be Decided ................................................................ 8

V.   Standard for Summary Judgment .................................................................... 8

VI.   Standing .................................................................................................... 10

VII.   Trade Mark Causes of Action ...................................................................... 12

   A.   USA is not the owner of the Neo4j trademark and its registration does not

   mean USA owns the trademark to Neo4j. ............................................................ 12

   B.   Defendants' Nominative Use is Non Infringing. ........................................... 14

   C.   USA has not met its burden to show defendants' use is not nominative fair

   use. ..................................................................................................... 15

VIII.   Contract Liability Theory. ......................................................................... 17

IX.   Licensee Estoppel ....................................................................................... 20

   A.   USA is estopped to claim ownership in Sweden's Neo4J's Mark. ................... 21

X.   False Advertising Claims .............................................................................. 21

   A.   False Designation Of Origin Claim Is Not Valid As ONgDB Is based on

   Neo4J. .................................................................................................. 21

B.    There are disputed issues of fact on Elements of the False Advertising claims. ......................................................................................... 22

C.    USA cannot show empirically that ONgDB is not a "Drop In" replacement for the commercial version. ......................................................................... 23

D.    There is no false advertising based on the APGL ........................................ 27

E.    The Material Purchasing Issue Is The Price ................................................ 30

F.    Use of Content on the Github Site is Permitted ............................................ 31

XI.    Permanent Injunction ......................................................................................... 31

A.    Nominative Use Injunctions are Limited. ..................................................... 33

XII.    Cross Motion for Summary Judgment ................................................................ 33

A.    Trademark Infringment Claim ...................................................................... 33

B.    False Advertising Claims .............................................................................. 34

## TABLE OF AUTHORITIES

**Cases**

*American Council of Certified Podiatric Physicians & Surgeons v. American Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606 (6th Cir. 1999)................................ 30

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .............................. 9, 10

*Apple Inc. v. Psystar Corp.*, 658 F.3d 1150 (9th Cir. 2011) ......................... 30

*Automotriz del Golfo De California S.A. de C.V. v. Resnick*, 47 Cal.2d 792 (1957) .. 18

*Braxton-Secret v. A.H. Robins Co.*, 769 F.2d 528 (9th Cir. 1985) ................ 10

*Castrol, Inc., v. Quaker State Corp.*, 977 F.2d 57 (2d Cir. 1992) ................ 25

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)..................................... 9

*Chapman v. Pier 1 Imps. (U.S.), Inc.*, 631 F.3d 939 (9th Cir. 2011).......... 10, 11

*Chevron Corp. v. Pennzoil Co.*, 974 F.2d ll56 (9th Cir. 1992) ..................... 9

*Creative Labs, Inc. v. Cyrix Corp.*, 1997 U.S. Dist. LEXIS 14492 (N.D. Cal., May 7, 1997) .......................................................................... 26

*Dole Food Co. v. Patrickson,*  538 U.S. 468 (2003) ................................ 14

*Donald F. Duncan, Inc. v. Royal Tops Mfg. Co.*, 343 F.2d 655 (7th Cir. 1965) ........ 20

*Eastman Kodak Co. v. Image Technical Services, Inc.* 504 U.S. 451 (1992) ............ 10

*Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937 (2008) ......................... 20

*EFCO Corp. v. Symons Corp.*, 219 F.3d 734 (8th Cir. 2000)....................... 26

*Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837 (9th Cir.1987)........... 6, 12

*Hokto Kinoko Co. v. Concord Farms, Inc.,* 810 F.Supp.2d 1013 (C.D. Cal. 2011) aff'd 738 F.3d 1085 (9th Cir. 2013) ................................................ 13, 21

*In re Wella A.G.*, 787 F.2d 1549 (Fed. Cir. 1986)................................. 14

*Ixchel Pharma, LLC v. Biogen, Inc.,* 9 Cal. 5th 1130 (2020)....................... 19

*Jacobsen v. Katzer*, 535 F.3d 1373 (Fed. Cir. 2008) .............................. 30

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .................................................. 10

*Musick v. Burke*, 913 F.2d 1390 (9th Cir. 1990) .......................................................... 9

*Navajo Air, LLC v. Crye Precision, LLC,* 318 F.Supp.3d 640 (S.D.N.Y. 2018) ......... 21

*New Kids on the Block v. News America Pub., Inc.,* 971 F.2d 302 (9th Cir. 1992).... 15

*Pacific Supply Co-op. v. Farmers Union Central Exchange Inc.,* 318 F.2d 894 (9th
    Cir. 1963) ............................................................................................................... 21

*Pardi v. Kaiser Permanente Hosp., Inc.*, 389 F.3d 840 (9th Cir. 2004) ...................... 27

*Pizza Hut, Inc. v. Papa John's Intern., Inc.,* 227 F.3d 489 (5th Cir. 2000) ......... 22, 23

*Playboy Enterprises, Inc. v. Welles*, 279 F.3d 796 (9th Cir. 2002) ............................ 16

*Quabaug Rubber Co. v. Fabiano Shoe Co.,* 567 F.2d 154 (1st Cir.1977) ................... 13

*Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190 (9th Cir. 2012) ....... 8, 13, 34

*S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.*, 690 F.2d
    1235 (9th Cir. 1982) ................................................................................................ 9

*Schwinn Bicycle Co. v. Murray Ohio Mfg. Co.,* 339 F.Supp. 973 (M.D. Tenn. 1971),
    aff'd 470 F.2d 975 (6th Cir. 1972) ......................................................................... 12

*Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134 (9th Cir.1997) ............ 23, 26

*Spokeo, Inc. v. Robins,* 136 S. Ct. 1540 (2016) ......................................................... 10

*Sun Microsystems, Inc. v. Microsoft Corp.*, 999 F. Supp. 1301 (N.D. Cal. 1998) ...... 26

*Toyota Motor Sales, U.S.A., Inc. v. Tabari,* 610 F.3d 1171 (9th Cir. 2010) ....... passim

*Ultrapure Systems, Inc. v. Ham-Let Group,* 921 F.Supp. 659 (N.D. Cal. 1996) ........ 13

*Ultratech, Inc. v. Ensure NanoTech (Beijing), Inc.*, 108 F.Supp.3d 816 (N.D. Cal.
    2015) ..................................................................................................................... 18

*United States v. Diebold, Inc.*, 369 U.S. 654 (1992) .................................................... 9

*United States v. Hays*, 515 U.S. 737 (1995) ............................................................... 10

*Verisign, Inc. v. XYZ.COM LLC,* 848 F.3d 292 (4th Cir. 2017) ................................. 22

*Volkswagenwerk Aktiengesellschaft v. Church,* 411 F.2d 350 (9th Cir. 1969) aff'd

   413 F.2d 1126 (9th Cir. 1969) ................................................................. 15

*Winter v. Natural Resources Defense Council, Inc.,* 555 U.S. 7 (2008) ............... 31, 32

*Worden v. Cal. Fig Syrup Co.,* 187 U.S. 516 (1903)..................................................... 7

## Statutes

15 U.S.C. § 1051 et. seq ............................................................................................. 13

15 U.S.C. § 1125........................................................................................................... 23

16 C.F.R. § 14.15 ......................................................................................................... 16

Cal. Bus. and Prof. Code § 16600 ............................................................................... 19

Cal. Evid. Code § 622 .................................................................................................. 21

USCS Fed. Rules Civ. Proc. 56.................................................................................. 8, 9

## I.     Introduction

This is defendants combined opposition to Plaintiff's Neo4J Inc.'s ("USA")
motion for partial summary judgment and summary judgment, and cross motion for
summary judgment on Plaintiff Neo4J Inc.'s First Causes of Action for Trademark
Infringement, 15 U.S.C. 1114 and False Advertising and UCL claims in both cases.
While Plaintiff Neo4J Sweden AB ("Sweden") is listed as a moving party, they are
not a party to the 4 causes of action in Phase 1 and cannot bring the motion.

## II.    Defendants' Notice of Cross Motion and Cross Motion

Notice is hereby given that on March 25, 2021 at 9:00 a.m. before the
Honorable Edward J. Davila, in Courtroom 4, 5th Floor, 280 South First Street, San
Jose, CA 95113, defendants will move for Summary Judgment under Federal Rule
of Civil Procedure 56 against Neo4J, Inc.'s First Cause of Action for Trademark
Infringement and the Second, Third, and Fourth Causes of Action for False
Advertising and related State UCL claims in each case (Case No. 5:18-cv-07182-
EDJ and Case No. 5:19-CV-06226-EJD).

This motion is based on this Notice of Motion and Motion, the Memorandum
of Points and Authorities, Defendant's responses to  Neo4J Inc.'s Separate
Statement of Undisputed Facts attached as **Exhibit A**, Defendants' Separate
Statement of Undisputed Facts attached as **Exhibit B**, the Declarations of Adron
G. Beene, John Mark Suhy, John D. Pernick, and all pleadings records and files in
the two related actions and such other evidence and argument as may be presented
at the hearing on the motions.

## III.   Background Facts Germane to Phase 1.

Neo4j Sweden AB (FKA Network Engine for Objects in Lund AB) ("Sweden")
was involved in developing a graph database called Neo4j.  Sweden then released

the software for free under the Free Software Foundation's open source GPL (Neo4j
community) and AGPL (Neo4j Enterprise) licenses to the public.   Because Neo4j
was free and open source, its adoption and use grew dramatically attracting 3rd
parties who wanted to work with open source. Because it was open source it also
attracted joint authors called contributors who helped further add to the software.
It also led to over 2000 forks/derivatives of the Neo4j software.

As Neo4j's adoption grew, Sweden decided to monetize its efforts. However,
instead of offering a support model by the founders of the Neo4J software, Sweden
decided to license the software as a proprietary closed version which is a violation of
the GPL and AGPL licenses.

Sweden set up Neo Technology, Inc. which changed its name to Neo4J, Inc.
and licensed its software and trademarks on a non-exclusive basis to USA. (D Fact[1]
126) Although not the owner of the Neo4J trademark, USA improperly filed and
obtained a registration for the Neo4J trademark.

Historically, the difference between the Neo4j Enterprise AGPL open source
licensed distribution and the Neo4j Enterprise Commercially licensed distribution,
was via legal terms.  There were not any physical differences in the software.   The
commercial license put restrictions on the number of computer cpu cores and
number of server instances that could be used.  The Neo4j Enterprise open source
license had no such legal restrictions.

Neo4j Enterprise open source software under the AGPL license through
version 3.4 are still in use, and available under the AGPL license terms to this day.
Neo4j Enterprise versions 3.4 are also available under the AGPL License with the

---

[1] "D Fact" refers to defendants additional undisputed facts referenced in Defendants'
Separate Statement of Undisputed Facts attached as **Exhibit B**

commons clause restriction aimed at preventing users from selling Neo4j. The services restriction is not about providing professional services but using the software as a service known as SaaS. Sweden then abandonded the open source community as Neo4j Enterprise source code was removed from the public GitHub repositories starting with version 3.5.0.

## A.    PureThink

USA signed PureThink as a reseller under a Solution Partner Agreement ("SPA"). PureThink had quick initial success selling Neo4j to the US government leading to PureThink being a trusted partner to USA in the US government space.

PureThink and USA then entered into an exclusivity agreement and PureThink designed and developed a government package that would streamline government procurements via sole source procurements and address requirements specific to the US government which were not provided with the standard Neo4j Enterprise commercial packages.  The new offering was called Neo4j Government Edition (AKA Neo4j Enterprise Government Edition)

In total - PureThink sold commercial packages to NSA, FBI, Sandia Laboratories, IRS, and almost DHS. Neo4j USA offered to hire Mr. Suhy to continue to run the Government Edition under the Neo4j USA umbrella as it was becoming very valuable. Mr. Suhy declined.

## B.    The Falling out (IRS)

USA had been trying to get the Internal Revenue Service to purchase a Neo4j Enterprise commercial license for over a year.  As the procurement deadline loomed - the IRS communicated that it was not interested in purchasing a commercial license with support because they needed a solution built and not support for something that was not built or ready for production.

Instead of losing the opportunity to work with the IRS, Suhy told USA that he wanted to try another approach to be able to work with IRS.   The approach was to build the solution IRS needed during the first year, so that the follow up years could generate commercial license revenue. USA agreed, and Suhy / PureThink entered into an agreement with USA and signed a contract with IRS for consulting services to build out a solution for IRS.

As the initial contract was coming to an end, IRS was planning on pushing the solution built under the consulting contract to production.  IRS had learned that Neo4j Enterprise was available for free with no restrictions on cores or server instances under the AGPL open source license.  The US government has set a policy of using open source software to save taxpayer dollars. IRS asked Suhy about the Neo4J open source license.

For clarity, as USA obfuscates the issue, Sweden licenses Neo4J as open source under the GPL and APGL; USA does not. USA licenses Neo4j in object code on a commercial basis based on its license with Sweden. Defendants in this case are only involved in Sweden's open source version of Neo4J.

USA's sales team instructed Suhy to lie and tell IRS that they could not use the open source licensed distribution in production.   On phone calls they indicated that PureThink and USA would not make any revenue from licensing if IRS used the open source license.   Suhy refused to lie to the IRS.

USA then directly contacted the IRS and told them they could not use Neo4j Enterprise in production under the open source license.   Suhy refuted that statement. USA's position was false and inconsistent with the AGPL. And USA knows that the position is false and that the Neo4j Enterprise open sourced licensed

version was preferred and did not have limitations on cluster instances or cores, that the commercial licensed version had.

USA retaliated against PureThink and Suhy in a campaign that included interference with PureThink clients and targeting Suhy personally. USA then terminated PureThink's partner agreement and exclusivity agreement based on claims that were allowed by the IRS PT/USA agreement.

USA told the Government that PureThink could not provide any services on the open source Neo4J database as the SPA had a three year bar after termination. As USA was terminating PureThink, Suhy set up a new company called iGov Inc to focus on offering only open source solutions to the government.

iGov set up as a new company to build and sell, with the plan to support open source software including Sweden's Neo4J open source software and eventually supported the government use of the open source version of Neo4J. iGov has explained on its website and blog why people should use the free open source version of Neo4J. USA wants to stop that, even though they know its true, so they can sell licenses for basically the same software.

Suhy and GFI then worked to ensure a version of open source software survived for all the users to have access to a proper copy of Neo4J in open source.

As more people learned that Neo4j Enterprise was open source, Sweden, which owns Neo4j, tried to add commercial restrictions to the public downloads of Neo4j enterprise on USA's websites and implemented measures to make it harder for users to build the software themselves.

When the measures to deter users failed, Neo4j Sweden then changed its AGPL license to add a commons clause preventing resale of the open source software even though the copyright holder says the AGPL cannot be altered and

licensees can remove the improper restrictions. And this is after all the users and joint authors relied on the AGPL agreement as third-party beneficiaries of the express terms of the AGPL.

Neo4j Sweden released new versions of Neo4j Enterprise with the modified AGPL license to attract new users, many of whom adopted it because it was open source. Finally, when that measure did not stop the enterprise licensed distribution adoption, Sweden finally abandoned releasing enterprise as open source code and has attempted to shut down all use.

By this lawsuit, USA seeks to stop the defendants from doing what they are allowed to do. They are allowed to support Neo4J open source software. They are allowed to make derivatives of Neo4J software licensed as open source software. They are allowed to use all content, which included documentation, Sweden puts on the GitHub repository and fork the Neo4J software. They are allowed to fairly use the Neo4J trademark owned by Sweden to identify to people the software they support and GFI's open source Neo4J fork called ONgDB. They are allowed to fairly use the Neo4J trademark for comparative advertisements to provide consumers the right to fairly decide whether it's worth it to pay for USA's "commercial" version or use a free version.

This motion is part of Phase 1 which is limited to Trademark issues and certain trademark defenses (Dkt. No. 68 pg. 3.)

Under the agreement to limit the issues in Phase 1, the Unclean Hand defense was reserved to Phase 2. (Dkt. No. 82 ¶3) The Unclean Hands defense is a significant defense against the Trademark and Lanham Act and UCL claims in this action and was reserved for Phase 2 because it is intertwined with the counterclaims and other defenses. See *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.,*

826 F.2d 837, 847 (9th Cir.1987). ("Unclean hands is a defense to a Lanham Act infringement suit."); *Worden v. Cal. Fig Syrup Co.,* 187 U.S. 516, 528, 23 S.Ct. 161, 47 L.Ed. 282 (1903). All defenses must be considered before any final action may be taken.

On September 28, 2020 Plaintiffs filed a Third Amended Complaint. (Dkt. No. 90). The PT defendants filed a Third Amended Answer on October 19, 2020 (Dkt. No. 91) which they are allowed to do. Defendants asserted procedural issues with the answer moving to strike the 7th affirmative defense (Cancellation of Trademark Procured by Fraud) and the 9th Affirmative (Defense for Naked License Abandonment of Trademark). (Dkt. No 93.) USA claims a party may not assert affirmative defenses to a new complaint when they are dismissed with prejudice on a prior complaint. That motion is set for hearing February 11, 2021. USA does not challenge the affirmative defenses in this motion. But the evidence shows USA does not own the Neo4J trademark and did not use the trademark before it existed. (D Facts 125, 130) As USA paid Sweden under the License Agreement, there is a strong inference the Lars Nordwall, the COO of USA, knew USA did not own the Neo4J Trademark when he applied for the trademark claiming it did.  (D Facts 129, 130). He also knows USA did not use the trademark since 6/04/2006 which is before USA was formed on July 7, 2011. (D Fact 130). USA provides no evidence that Sweden controlled quality on Sweden's software the years before the software and trademark was licensed to USA. (D Fact 131). While USA has mentioned the parent controls the subsidiary concept on quality control, that is not accurate in this relationship. The subsidiary, Sweden owns the mark and the software. This is not a typical parent subsidiary downstream license or relationship. And the License Agreement from Sweden to USA has no quality control provisions. (D Fact 132)

Sweden did not control quality with users of Neo4J and allowed them to use the Neo4J trademark extensively without any quality controls.

## IV. Statement Of Issues To Be Decided

1. Whether there is a material fact whether USA owns the Neo4J mark which is an element of its trademark claim.

2. Whether there is a disputed material fact whether defendants use of the Neo4J mark is **not** nominative.

3. Whether there is a disputed issue of fact that USA has no standing on claims regarding defendants' use of **Sweden**'s Neo4J trademark and software.

4. Whether there is a disputed material fact that ONgDB is not falsely advertised and its origin is not falsely designating.

5. Whether there is a disputed material fact that consumers material decision is based on **price** and not defendants representations.

6. Whether a permanent injunction may issue before all defenses and claims are considered.

7. Whether a permanent injunction may issue preventing all nominative use of the Neo4J mark.

8. Whether any injunction is proper given the public consequences.

## V. Standard for Summary Judgment

Because of the intensely factual nature of trademark disputes, summary judgment is generally disfavored in the trademark arena. *Rearden LLC v. Rearden Commerce, Inc.* (9th Cir. 2012) 683 F.3d 1190, 1202. Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is to be granted cautiously, with due respect for a party's right to have its

factually grounded claims and defenses tried to a jury. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A court must view the facts and draw inferences in the manner most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1992); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d ll56, 1161 (9th Cir. 1992). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial, but it need not disprove the other party's case. *Celotex*, 477 U.S. at 323. When the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out that the non-moving party has failed to present any genuine issue of material fact as to an essential element of its case. See *Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir. 1990).

Once the moving party meets its burden, the burden shifts to the opposing party to set out specific material facts showing a genuine issue for trial. See *Liberty Lobby*, 477 U.S. at 248-49. A "material fact" is one which "might affect the outcome of the suit under the governing law ...." *Id.* at 248. A party cannot create a genuine issue of material fact simply by making assertions in its legal papers. *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.*, 690 F.2d 1235, 1238 (9th Cir. 1982). Rather, there must be specific, admissible, evidence identifying the basis for the dispute. See id. The Court need not "comb the record" looking for other evidence; it is only required to consider evidence set forth in the moving and opposing papers and the portions of the record cited therein. Fed. R. Civ. P. 56(c)(3); *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001). The court must view the evidence presented on the motion in the light most favorable to the opposing party: "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." [*Anderson v. Liberty Lobby, Inc.*, supra, 477

US at 255, 106 S.Ct. at 2513. At the summary judgment stage, the nonmovant's version of any disputed issue of fact is presumed correct. *Eastman Kodak Co. v. Image Technical Services, Inc.* (1992) 504 US 451, 112 S.Ct. 2072. A person's state of mind (motive, intent, knowledge, etc.) may be inferred from his or her conduct. But summary judgment is improper where conflicting inferences can be drawn from such conduct (i.e., where reasonable minds could disagree as to a person's motives, etc.). See, *Braxton-Secret v. A.H. Robins Co.* (9th Cir. 1985) 769 F2d 528, 531

## VI.   Standing

"The federal courts are under an independent obligation to examine their own jurisdiction, and standing is perhaps the most important of the jurisdictional doctrines." *United States v. Hays*, 515 U.S. 737, 742 (1995).

At an irreducible constitutional minimum, a plaintiff must show three elements to establish standing. *Chapman v. Pier 1 Imps. (U.S.), Inc.*, 631 F.3d 939, 956 (9th Cir. 2011). First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is concrete, particularized, and imminent, not conjectural or hypothetical. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); see also *Spokeo, Inc. v. Robins,* 136 S. Ct. 1540, 1548-49 (2016), as revised (May 24, 2016). In Spokeo, the Supreme Court made clear that "concrete" is not "necessarily synonymous with 'tangible,' " and indicated a "risk of real harm" could satisfy the concreteness requirement. *Id.* at 1549. Second, there must be a causal connection between the injury and the challenged conduct. Lujan, 504 U.S. at 560. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. Id. Ultimately, a plaintiff, as the party invoking federal jurisdiction, has the burden of establishing these elements. See id. at 561. "Even if a claim satisfies the three elements of standing to sue for past

illegal conduct, to sustain standing for injunctive relief, a claimant must also establish a 'real and immediate threat of repeated injury.' " *Chapman*, 631 F.3d at 956 (citing *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1081 (9th Cir. 2004) ).

Since USA does not own the Neo4J trademark, its lacks standing to bring an infringement claim. Much of USA's claims actually revolve around defendants' use and mention of **Sweden**'s open source software and trademark. Defendants do not use or support USA's software. Defendants' mention of USA software is for comparative advertisement which legally allowed fair use. USA cannot assert claims based on Defendants use of Sweden's software and trademark. While USA litters the pleadings and the motion with plaintiffs plural, the reference is false. Plaintiff Sweden is not the plaintiff in the First, Second, Third, Fourth, Fifth, or Sixth causes of Action. (Dkt No. 90). While USA asserts claims based on Sweden's DCMA claims, USA is not the owner of the software (D Fact 125) and therefore has no standing to assert the claim. This is also a phase 2 issue and premature to address at this point.

None of defendants' conduct with respect to the use and Sweden's software is germane to USA's claims. Use of Sweden's software is governed by AGPL license. USA is not the licensor of the AGPL software and has no standing to assert claims related to that license agreement. Sweden has declined to asserted any compulsory claims based on breach of the AGPL against defendants and has, necessarily, waived them. Similarly, USA attempts to join all the defendants as one party or groups of parties. They are not. Each defendant is independent and the claims may not be maintained in a goulash.

## VII.   Trade Mark Causes of Action

Summary adjudication should not be granted to USA on the trademark claims as there are at least disputed issues of fact showing USA is not the owner of the Neo4J mark and defendants use of the mark is nominative.

To prove trademark infringement, a plaintiff must show ownership of a protectable trademark and a likelihood of consumer confusion. *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 841 (9th Cir.1987). But when defendants use is nominative, the consumer confusion test does not apply. The test is whether USA can show defendants use is **not** nominative. *Toyota Motor Sales, U.S.A., Inc. v. Tabari* (9th Cir. 2010) 610 F.3d 1171, 1182–1183. While defendants asserted affirmative defenses on nomanitive use, the burden is actually on USA to show the use is not nominative.

### A.   USA is not the owner of the Neo4j trademark and its registration does not mean USA owns the trademark to Neo4j

USA's registration does not create ownership of the Neo4J mark. Sweden owns the Neo4j mark. (D Facts 125, 126, 127, 128) As only the owner of the mark may bring a claim for trademark infringement, USA cannot meet the first element of its Trademark Claims and its motion must be denied and summary judgment granted in defendants favor.

Although USA has a registered mark, that does not mean they are the owner of the Neo4J mark. Registration confers jurisdiction but the ownership right to a trademark is not conferred by registration. *Schwinn Bicycle Co. v. Murray Ohio Mfg. Co.* (M.D. Tenn. 1971) 339 F.Supp. 973, 979, aff'd (6th Cir. 1972) 470 F.2d 975

To prevail on its Lanham Act trademark claim, a plaintiff " 'must prove: (1) that it has a protectible ownership interest in the mark….." ; [citations omitted] *Rearden LLC v. Rearden Commerce, Inc.* (9th Cir. 2012) 683 F.3d 1190, 1202–1203

There is at least a factual dispute that USA does not have a protectible ownership interest in the Neo4J mark. (D Facts 126, 126, 127, 128, 129) Under the Lanham Act, while registration of a trademark creates a rebuttable presumption that the mark is valid, the presumption evaporates as soon as evidence of invalidity is presented. 15 U.S.C. § 1051 et seq. *Hokto Kinoko Co. v. Concord Farms, Inc.* (C.D. Cal. 2011) 810 F.Supp.2d 1013, 1022, aff'd (9th Cir. 2013) 738 F.3d 1085.

USA's presumption of ownership based on registration evaporates because of overwhelming evidence it does not own the Neo4J mark. The evidence shows Sweden owns the trademark and licensed the rights to the Neo4J trademark to USA. (D Facts 125, 126). And Sweden licensed the Neo4j mark to USA only on a non-exclusive basis. (D Fact 126). "Where the license is non-exclusive the licensee does not have standing to bring an infringement action." *Quabaug Rubber Co. v. Fabiano Shoe Co.,* 567 F.2d 154, 159–160 (1st Cir.1977). Also, USA lacks standing when provisions in the contract indicate that Sweden retains exclusive ownership of the mark. *DEP Corp. v. Interstate Cigar Co.*, 622 F.2d 621, 623 (2nd Cir.1980). *Ultrapure Systems, Inc. v. Ham-Let Group* (N.D. Cal. 1996) 921 F.Supp. 659, 665. Sweden retained exclusive ownership of the mark in the License Agreement. (D Fact 127). Sweden has in fact made trademark applications claiming ownership of the Neo4J mark throughout the world further providing evidence of Sweden's ownership of the Neo4J mark. (D Fact 128). USA has paid Sweden royalties for the license. (D Fact 129). As there is at least a triable issue of fact whether USA owns the Neo4J mark, USA cannot establish the first element of its trademark claims

and the motion should be denied. Since the fact of ownership is not disputable, summary judgment should, instead, be granted in defendants favor.

The related party concept does not save USA. The related party doctrine is only for registration and only allows the "owner" of the trademark to use its subsidiaries "use' of the mark in the application. *In re Wella A.G.* (Fed. Cir. 1986) 787 F.2d 1549, 1555. "A corporate parent which owns the shares of a subsidiary does not, for that reason alone, own or have legal title to the assets of the subsidiary …" *Dole Food Co. v. Patrickson* (2003) 538 U.S. 468, 475. Sweden owns the Mark, not USA.

### B.  Defendants' Nominative Use is Non Infringing.

Defendants have not infringed the Neo4J mark. Defendants used the Neo4J name to identify the entities, the Sweden open source software they support and used to fork ONgDB and for comparative advertising. This use is non-infringing fair use of the Neo4J mark. "We've long held that such use of the trademark is a fair use, namely nominative fair use. And fair use is, by definition, not infringement." *Toyota Motor Sales, U.S.A., Inc. v. Tabari* (9th Cir. 2010) 610 F.3d 1171, 1175

This is not the case where defendants are using a mark close to the Neo4J mark to identify a different product. Defendants are using the Neo4J mark to identify USA, the commercial Neo4J software and Sweden's open source Neo4J software.

Defendants are not attempting to capitalize on consumer confusion or to appropriate the cachet of one product for a different one. They are identifying Neo4J software products. Defendants have a freedom of speech to use the Neo4J mark. "Such nominative use of a mark—where the only word reasonably available to describe a particular thing is pressed into service—lies outside the strictures of

trademark law: Because it does not implicate the source-identification function that is the purpose of trademark, it does not constitute unfair competition; such use is fair because it does not imply sponsorship or endorsement by the trademark holder." *New Kids on the Block v. News America Pub., Inc.* (9th Cir. 1992) 971 F.2d 302, 307–308

 Defendants are permitted to advertise they provide services for Neo4J software product. *Volkswagenwerk Aktiengesellschaft v. Church* (9th Cir. 1969) 411 F.2d 350, 352, supplemented (9th Cir. 1969) 413 F.2d 1126. Defendants are permitted to comparatively advertise Neo4J software products. *Network Automation, Inc. v. Advanced Systems Concepts, Inc.* (9th Cir. 2011) 638 F.3d 1137, 1153. Defendants have a right to tell consumers they can use Sweden's Neo4J open source software for free instead of paying for USA's commercial license which USA advertises on its website as having the same great features as the open source software. (Beene Dec. Ex. 8)

## C. USA has not met its burden to show defendants' use is not nominative fair use.

 When the use is nominative, the plaintiff bears the burden of establishing that the use of the mark was not nominative fair use. *Toyota*, at 1182–1183. A defendant seeking to assert nominative fair use as a defense need only show that it used the mark to refer to the trademarked good… The burden then reverts to the plaintiff to show a likelihood of confusion. *Toyota,* at 1183. As Defendants use of Neo4J mark is to identify Neo4J software and the entities, the use is permissible nominative fair use.

Similarly, competitors may use a rival's trademark in advertising and other channels of communication if the use is not false or misleading. The Federal Trade Commission specifically supports comparative advertising. 16 C.F.R. §14.15.

The key issue on nominative fair use is whether the use suggests sponsorship or endorsement of the trademark owner. *Toyota*, at 1179. Here there is a dispute whether any of defendants' use suggests sponsorship or endorsement of Sweden (the actual trademark owner). iGov pointedly states on its website: As iGov Inc. is not a Neo4j Inc Partner, it is not prohibited from promoting open source Neo4j options such as the OngDB fork." (*see* Defendants' Response to Fact 24).  Nothing in defendants' nominative use suggests sponsorship or endorsement of either USA or Sweden. "So long as the site as a whole does not suggest sponsorship or endorsement by the trademark holder, such momentary uncertainty does not preclude a finding of nominative fair use." *Toyota* at 1179. Here all the defendants' websites, taken as a whole, do not suggest sponsorship or endorsement of the trademark holder.

No defendant uses the Neo4J name as a company name or a domain name. Use of Neo4J in metatags is nomantive. *Playboy Enterprises, Inc. v. Welles* (9th Cir. 2002) 279 F.3d 796, 803. Presumable this applies to twitter as well. A reasonable consumer would not be confused that defendants' websites are a USA site or sponsored by USA or Sweden. And the reasonable consumer in this context is a person looking to obtain a sophisticated Neo4J database. The reasonable consumer can determine if they want to pay USA for Neo4J software or obtain it for free in an open source version. As there are many versions of Neo4J in open source, which is permitted under the Github Terms of Service (Beene Dec. Ex. 9) and the AGPL license, there is a disputed issue over whether any consumer is confused over the

sponsorship or endorsement of Sweden. Given the tone and tenor of defendants position with respect to USA charging money for what a person can get for free, no reasonable jury could find they sponsor defendants.

While USA contends people are confused because they sought assistance from USA, that is simply the process of an open source Neo4J user, perhaps wanting more support or the commercial product which is the natural process of the dual channel distribution model Sweden set up. Defendants object to consumer confusion evidence as Hearsay, FRE §802.

Consumers can get an open source version for free or can pay USA for support and an alleged better product. The forked free version of the software offers the reasonable consumers a competitive option. Trademarks are not swords to prevent competition; USA does not have the right to eliminate the right of free speech. Defendants are using Sweden's free version of Neo4J software to provide consumers the better option of using free software. Defendants efforts are not unfair. USA's attempts to shut defendants down is unfair. The nominative fair use doctrine is designed to prevent this type of abuse of the rights granted by the Lanham Act. *Toyota* at 1180.

## VIII. Contract Liability Theory.

USA seeks to enforce an unlawful restrictive covenant barring PT, Suhy and iGov from using or supporting Sweden's open source software. USA cannot rely on the 36 month contract restrictions in §4.3.2 of the Solutions Partner Agreement ("SPA"). (The SPA is Ex. 4 to Ratinoff Dec.). The SPA terminated July 11, 2017 (Plaintiffs' Fact 7). The restrictions, invalid or not, expired July 11, 2020.

Suhy and iGov were not ever bound to the SPA under an alter ego theory. The SPA was not assignable without consent unless to a parent or subsidiary or

through a merger or sale of all or substantially all assets or stock. SPA 10.4 There is a dispute whether consent was asked for or given to assign the agreement to Suhy or iGov and there is no evidence of the exceptions to consent. (D Fact 9; Suhy Dec. ¶61).  And the alter ego doctrine is fundamentally misapplied by USA.

An individual can be liable for the action of a company and deemed an alter ego of a corporation if: (1) there is a unity of interest and ownership such that the separate personalities of the corporation and the individual no longer exist, and (2) an inequitable result will follow if the acts are treated as those of the corporation alone. *Automotriz Del Golfo De California S.A. de C.V. v. Resnick*, 47 Cal.2d 792, 796, 306 P.2d 1 (1957) Alter Ego liability is to hold an individual or entity liable for the actions of the company. The alter ego doctrine does not bind the individual or another entity to an agreement. Contrary to USA's suggestion, there was no finding the defendant was bound by the agreement in *Ultratech, Inc. v. Ensure NanoTech (Beijing), Inc.* (N.D. Cal. 2015) 108 F.Supp.3d 816, 826. In the pleading case, the defendant was alleged to be liable for the company's breach of contract on an alter ego theory. This does not mean or imply that unlawful restrictive contract terms may be applied to Suhy or iGov. Alter Ego liability would only apply to liability for the acts of PT-if there where any. Suhy and iGov are free to use open source software without restrictions. The facts supporting Alter Ego theory are disputed too.

There is a dispute on the unity of interest element (*see* Defendants' responses to Plaintiffs' Facts 10, 11) iGov did not use PT's computers, the website format was because that was the format Suhy was familiar with. There was no sale of assets or merger either. The fact they are at the same location operated by the same person is because Suhy is an individual who set up the two different entities and operates

them. Individuals and the entities they operate are not alter egos because of that fact.

There is a dispute on the second element of whether an inequitable result is achieved if Suhy and iGov are not made signatories to the PSA. Suhy and iGov deal in Sweden's open source version of Neo4J. As Sweden is the owner of Neo4j software and trademark, USA has no right to prevent third parties or anyone from dealing with Sweden's software and trademark. There is nothing inequitable about Suhy and iGov supporting licensee's use of Sweden's open source software. If there is an issue on the AGPL, that will be addressed in Phase 2 and it is Sweden's concern, not USA. USA cannot simply side step this issue by trying to enforce a patently unlawful contract restriction.

The §4.3.2 restriction in the SPA preventing a person or entity from using or supporting Sweden's open source software in unlawful as it violates California Business and Professions Code § 16600. Initially, the restriction is far too long at 36 months SPA 4.3.2 There is no geographic limitations. The term also seeks to prevent PT from dealing in all versions of Sweden's Neo4J open source software when the AGPL freely allows anyone to use the software. (D Fact 136) The purpose of USA' restriction is to prevent any terminated partner from supporting Sweden's open source version of Neo4J. (D Fact 137). Even the commons clause addition to the AGPL, valid or not, does not prevent professional services. (D Facts 155, 156) Thus, the SPA restriction is solely to reduce the people who can support Sweden's free software so USA can reduce competition and sell the same software for money. The restriction is patently invalid against Suhy. And the restriction is unlawful against PT or iGov as "This restriction harms competition far more than it helps rendering the restriction invalid." *Ixchel Pharma, LLC v. Biogen, Inc.,* (2020) 9

Cal.5th 1130, 1150. USA asserted the unlawful restriction to stop PT from getting business from the IRS. (D Fact 138) USA's use of an unlawful restriction is absolutely against public policy and supports a claim for interference with prospective economic advantage. *Edwards v. Arthur Andersen LLP*, 44 Cal.4th 937 (2008). PT, Suhy and iGov's supporting the open source software is not inequitable. USA's efforts to have and enforce an illegal covenant is unconscionable. Equity should never enforce such an agreement.

The termination of the trademark license to PT does not mean PT cannot use Sweden's trademarks or engage in nominative use of the Neo4J trademark. The SPA trademark license allowed PT to use USA's sublicensed trademark rights for selling USA's "commercial" software. PT is not using the Neo4J mark to sell USA's commercial software. (D Fact 139) PT is not violating the terminated license. PT is using the Neo4J mark which Sweden owns, to reference the companies and software products. This is not infringement, it is nominative use.

## IX. Licensee Estoppel

USA's claim all three PT defendants cannot attack the ownership of the mark based on licensee estoppel. As discussed above, Suhy and iGov are nor bound by the PSA. There is no dispute that USA terminated the SPA. Licensee estoppel only applies for the duration of the license. See *Donald F. Duncan, Inc. v. Royal Tops Mfg. Co.*, 343 F.2d 655, 658 (7th Cir. 1965) ("[A]n estoppel by a licensee to deny the validity of licensor's trademark expires with the license.") While a licensee, PT could not challenge USA's trademark rights. That does not mean they cannot challenge ownership after termination particularly for conduct that is after termination of the license having nothing to do with the license. A trademark license, once terminated, is not a permanent bar to challenges to the trademark on any claim made.

Finally, the doctrine of licensee estoppel is equitable in nature and not subject to rigid application. Estoppel may not be used to enforce a contract that contravenes public policy. *Navajo Air, LLC v. Crye Precision, LLC* (S.D.N.Y. 2018) 318 F.Supp.3d 640, 650–651, as amended (Aug. 2, 2018). As discussed above, the restricions violate the law. Equity should not allow USA to evade its jurisdictional requirement of trade mark ownership by estoppel.

### A.     USA is estopped to claim ownership in Sweden's Neo4J's Mark.

The proper use of licensee estoppel is to estop USA from claiming it owns the Neo4J mark when it is a licensee. The recitals in the License Agreement that USA owns all the intellectual property related to Neo4J, is conclusively presumed true. California Evidence Code §622. (The License Agreement is governed by California law). USA agreed Sweden owns the intellectual property, including marks for Neo4J. (D Fact 140) Under licensee estoppel, USA may not dispute that Sweden owns the Neo4J mark and they may not claim USA is the owner of the Neo4J mark. *Pacific Supply Co-op. v. Farmers Union Central Exchange Inc.* (9th Cir. 1963) 318 F.2d 894, 908.

## X.     False Advertising Claims

### A.     False Designation Of Origin Claim Is Not Valid As ONgDB Is based on Neo4J.

To establish a false designation of origin claim, Plaintiff must show: (1) the defendants used a false designation of origin; (2) the use occurred in interstate commerce; (3) that such false designation is likely to cause confusion, mistake or deception as to the origin, sponsorship, or approval of defendants' goods or services by another person; and (4) that plaintiff has been or is likely to be damaged. See 15 U.S.C. § 1125(a).

*Hokto Kinoko Co. v. Concord Farms, Inc.* (C.D. Cal. 2011) 810 F.Supp.2d 1013, 1039, aff'd (9th Cir. 2013) 738 F.3d 1085

Here there is an issue of fact on the false designation of origin element as

ONgDB is a fork of Sweden's open source software licensed under the AGPL. (D

Fact 149) The designation of origin is, therefore, not false. USA even admits, the

open source version has the same great features as the commercial version (D Fact

145). A jury can certainly determine if the origin is properly stated.

**B.     There are disputed issues of fact on Elements of the False**

**Advertising claims.**

A prima facie case of false advertising under section 43(a) requires the

plaintiff to establish:
> (1) A false or misleading statement of fact about a product;
> (2) Such statement either deceived, or had the capacity to deceive a
> substantial segment of potential consumers;
> (3) The deception is material, in that it is likely to influence the consumer's
> purchasing decision;
> (4) The product is in interstate commerce; and
> (5) The plaintiff has been or is likely to be injured as a result of the statement
> at issue.

*Pizza Hut, Inc. v. Papa John's Intern., Inc.* (5th Cir. 2000) 227 F.3d 489, 495

[citations omitted]

[F]ailure to establish any one" of these five elements is "fatal" to a plaintiff's

claim. *Id.* And importantly, [Plaintiff] must be able to point to at least one challenged statement

that satisfies all five Lanham Act requirements; as the parties agree, a Lanham Act claimant may

not mix and match statements, with some satisfying one Lanham Act element and some

satisfying others. *Verisign, Inc. v. XYZ.COM LLC* (4th Cir. 2017) 848 F.3d 292, 299 (Summary

Judgment for defendant affirmed where statements were opinions or harmless puffery)

In order to obtain monetary damages or equitable relief in the form of an

injunction, "a plaintiff must demonstrate that the commercial advertisement or

promotion is either literally false, or that [if the advertisement is not literally false,]

it is likely to mislead and confuse consumers." [Citations omitted] *Pizza Hut, Inc.,* at

495

> Essential to any claim under 15 U.S.C. 1125 section - 43(a) of the
> Lanham Act is a determination of whether the challenged statement is
> one of fact—actionable under  section 43(a)—or one of general
> opinion—not actionable under section 43(a). Bald assertions of
> superiority or general statements of opinion cannot form the basis of
> Lanham Act liability. [Citations omitted] Rather the statements at
> issue must be a "specific and measurable claim, capable of being
> proved false or of being reasonably interpreted as a statement of
> objective fact." [Citations omitted] *Coastal Abstract Serv., Inc. v. First
> Am. Title Ins. Co.,* 173 F.3d 725, 731 (9th Cir.1999); see also American
> Council, 185 F.3d at 614 (stating that "a Lanham Act claim must be
> based upon a statement of fact, not of opinion"). As noted by our court
> in Presidio: "[A] statement of fact is one that (1) admits of being
> adjudged true or false in a way that (2) admits of empirical
> verification." *Presidio,* 784 F.2d at 679; see also *Southland Sod Farms
> v. Stover Seed Co.,* 108 F.3d 1134, 1145 (9th Cir.1997)(stating that in
> order to constitute a statement of fact, a statement must make "a
> specific and measurable advertisement claim of product superiority").

*Pizza Hut, Inc. v. Papa John's Intern., Inc.* (5th Cir. 2000) 227 F.3d 489, 495–496

### C.    USA cannot show empirically that ONgDB is not a "Drop In" replacement for the commercial version.

USA argues that Defendants' description of certain versions of ONgDB as

"drop-in replacement" for certain versions of Neo4j EE is false advertising. Given

the general nature of the statement, it an opinion. USA makes two arguments in

their effort to establish falsity, one technological opinion and one contractual. Both

arguments fail.

Technologically, USA argues that describing ONgDB as a drop-in

replacement is false advertising because, according to USA, ONgDB was not of the

same quality and did not include all of the same features as Neo4j EE. That is a

misleading matter of opinion which does not satisfy the legal requirements.

Defendants made no statements about ONgDB's quality.  Quality has nothing to do

with whether a user can share data and queries on different versions of Neo4J

database. Nor did Defendants claim that ONgDB had the exact same features as Neo4j EE. They just described ONgDB as a "drop-in replacement." Brad Nussbaum explained what was meant by that description, and how its accuracy was verified, during his deposition:

> I think we provided an explanation of this. Drop-in, I think as everybody understands it in development, you know, essentially functions equivalently from one version to another. So if you took a Neo4j Enterprise version, let's say 3.5.4, the database format that it creates would work with ONgDB 3.5.4, so you can essentially write your data, and with Neo4j Enterprise, you can use that same data with ONgDB.

Nussbaum Depo., 158:7-14[2]

> Drop-in replacement refers more to compatibility of features, so we were able to take a Neo4j 3.5.4 version, create a database and just show that it worked with ONgDB at that same version. So I think that's exactly what we described, and I think that's exactly what we did.

Nussbaum Depo., 160:9-14.

In a truck analogy, different engines will drop in and replace the original engine. The drop in engine will connect to the existing chassis, transmission and other drive components. One engine can be a factory new engine, the other can be a rebuilt or even used engine found on craigslist. The truck will run with any of the drop in engines. USA is arguing that they added wifi and a special muffler to their truck so the engine is not a drop-in replacement. But adding bells and whistles, which not everyone wants, to the truck does not alter the drop in ability of an engine to run the truck. People are free to pay millions of dollars for USA's added availability if they want to. But the truck will drive with either engine. ONgDB is a drop in replacement for the functions required to operate the database. While

---

[2] True and correct copies of the cited pages of the deposition of Brad Nussbaum are attached as Exhibit A to the Declaration of John D. Pernick ("Pernick Decl.") filed herewith.

plaintiffs may attempt to disrupt the ability, defendants have not heard any ONgDB user claim the software is not drop in.

Significantly, USA has not presented any evidence that, technologically, ONgDB does not function as a drop-in replacement for Neo4j EE. None of the statements on which USA's false advertising claims are based either explicitly or implicitly represent that tests or studies were conducted to support the statements. Consequently, USA has the burden of presenting affirmative evidence that Defendants' description of ONgDB as a "drop-in replacement" are false. See, e.g., *Castrol, Inc., v. Quaker State Corp.*, 977 F.2d 57, 62-63 (2d Cir. 1992). And they must prove that falsity with empirical evidence. *Presidio*, at 679. USA has failed to meet that burden.

All USA provides is the declaration of Philip Rathle, Neo4j USA's Vice President of Products, who describes the various tests that are performed on USA's commercial software and claims that because of the testing and other work USA performs, he believes that ONgDB is of inferior quality and has an increased potential for instability and compatibility issues. Rathle Decl., ¶¶ 29-34. Based on that, Mr. Rathle opines that ONgDB 3.5.9 is not the "exact equivalent in both function and quality as the same version of official Neo4j(r) EE v3.5.9, and this would be true for any other version of ONgDB 3.5.x that Graph Foundation claims to be the equivalent version of Neo4j EE v3.5.x." Rathle Decl., ¶ 32

But Rathle did not actually test a version of ONgDB to determine if the database format created by a version of Neo4j EE would work with the version of ONgDB with the same version number. Indeed, Rathle did no actual testing of ONgDB at all. This lack of a test is significant. ONgDB is freely available. USA can test both engines to see if they worked. Rathle's lack of statements on testing

available databases implies the tests were made and USA did not like the results so they instead rely on conjecture instead of emperical results.  Defendants no longer have access to the commercial version which is why GFI no longer guarantee they test out. However, there is no evidence that ONgDB is *not* a drop in replacement. Instead of providing a demonstrable test, Rathlehe merely opines that ONgDB is not the "exact equivalent in both function and quality" as Neo4j EE.  But Defendants have never distributed any advertising or other statement claiming that it was. Drop in replacement is simply not "a specific and measurable advertisement claim of product superiority" *Southland Sod Farms v. Stover Seed Co.,* 108 F.3d 1134, 1145 (9th Cir.1997). The statement is to general and not actionable.

This is in stark contrast to each of the cases cited by USA: *Sun Microsystems, Inc. v. Microsoft Corp.*, 999 F. Supp. 1301 (N.D. Cal. 1998), *EFCO Corp. v. Symons Corp.,* 219 F.3d 734 (8th Cir. 2000), and *Creative Labs, Inc. v. Cyrix Corp.*, 1997 U.S. Dist. LEXIS 14492 (N.D. Cal., May 7, 1997). In each case, the plaintiff actually tested the defendant's product and presented evidence showing that the defendant's statements about its product was false.  Here, USA conducted no testing of ONgDB to determine whether it operated as a drop-in replacement of Neo4j EE.  Instead, USA ask the Court to just accept their assumption that because Neo4j undergoes significant testing and the creators of ONgDB do not have complete information about Neo4j EE, ONgDB could not be a drop-in replacement.  There is no basis for the Court to accept that assumption and for the Court to do so on summary judgment would be entirely improper.

Defendants do not contend Sweden's open source and free software is exactly the same as USA's costly version. Defendants say nothing about quality controls. But both database engines for the versions are derived from the same source:

Sweden's Neo4J software. So they are drop in replacements. USA even concedes the two versions have the same features when they compared the open source version to the commercial versions on their website [Community Edition is open source while Enterprise is "commercial"]. Referring to Enterprise USA stated: "The same great features as Community Edition…" (D Fact 145; Beene Dec Ex. 8) Given this admission, there is a dispute whether USA will be able to convince a jury of this.

### D. There is no false advertising based on the APGL

Contractually, USA's argument is based on their interpretation of the Neo4J Sweden Software License. USA is not a party to that agreement. In order to obtain summary judgment based on the interpretation of a contract, the contractual language at issue cannot be susceptible to more than one reasonable interpretation. "Where contractual language is susceptible to more than one reasonable interpretation, summary judgment is ordinarily improper because 'differing views of the intent of the parties will raise genuine issues of material fact.'" *Pardi v. KaiserPermanente Hospital, Inc.*, 389 F.3d 840, 848 (9th Cir. 2004) (quoting *San Diego Gas & Electric Co. v. Canadian Hunter Mktg Ltd.*, 132 F. 3d 1303, 1307 (9th Cir. 1997).

Here, the contractual issue is whether Section 7 of the Neo4J Sweden Software License permits GFI, as the "licensee" to remove the Commons Clause language. Section 7 states: "If the Program as you received it, or any part of it, contains a notice stating that it is governed by this License along with a term that is a further restriction, you may remove that term." To determine what is allowed under Section 7, it is necessary to review the definitions set out in the Neo4J Sweden Software License.

First, the Neo4J Sweden Software License defines the phrase "This License" as follows: "'This License' refers to version 3 of the GNU Affero General Public License." Neo4J Sweden Software License, Section 0. Thus, crucially, "This License" is defined as the AGPLv3 license, not the Neo4j Sweden Software License. This alone supports the validity of defendants' reference to the AGPL license. In other words, in the Neo4J Sweden Software License, the term "This License" means the AGPLv3 license without the Commons Clause. Neo4j Sweden could have changed this definition when it distributed software under the Neo4J Sweden Software License, but it did not.

Second, the Neo4J Sweden Software License defines "you" as the "licensee." Neo4J Sweden Software License, Section 0 ("Each licensee is addressed as 'you'.) In the First Amended Complaint, Neo4j Sweden specifically alleges that GFI received the Neo4j EE software files at issue as a licensee under the Neo4J Sweden Software License. First Amended Complaint, ¶ 120.

Third, Section 7 of the Neo4J Sweden Software License states: "If the Program as you received it, or any part of it, contains a notice stating that it is governed by this License along with a term that is a further restriction, you may remove that term." Neo4J Sweden Software License, Section 7. Substituting the matching language for the defined terms in this provision, Section 7 of the Neo4J Sweden Software License states: "If the Program as [GFI] received it, or any part of it, contains a notice stating that it is governed by [the AGPLv3 license] along with a term that is a further restriction, [GFI] may remove that term."

The Neo4J Sweden Software License states that the software is "subject to the terms of the GNU AFFERO GENERAL PUBLIC LICENSE Version 3, with the Commons Clause . . ." Therefore, the Neo4J Sweden Software License has a notice

stating that the software is governed by the AGPLv3 license plus a further restriction, i.e. the Commons Clause. Because the Neo4J software, i.e. "the Program", contained a notice stating that it is governed by "this License" (the AGPLv3 license) along with a term that is a further restriction (the Commons Clause), then, under Section 7, GFI as the licensee, i.e. "you", may remove that term. Removal of the Commons Clause is expressly permitted under the terms of the Neo4J Sweden Software License.

Importantly, USA does not offer an alternative interpretation of Section 7. And there is no interpretation that would not conflict with the express terms of the Neo4J Sweden Software License. They do not explain how, if "the License" is defined as the AGPLv3 license, a licensee would not be permitted to remove a further restriction such as the Commons Clause from the Neo4J Sweden Software License.

USA may argue that "This License" should be read as "the Neo4J Sweden Software License" instead of being read as it is defined. But that is not the language of the Neo4J Sweden Software License. Indeed, in its communications with Defendants, the Free Software Foundation, the copyright holder for the AGPLv3 license, confirmed the interpretation that a licensee may remove further restrictions when they are added to an AGPLv3 license. "All other non-permissive additional terms are considered "further restrictions" within the meaning of section 10. If the Program as you received it, or any part of it, contains a notice stating that it is governed by this License along with a term that is a further restriction, you may remove that term." Pernick Decl., Exh. B.

Because there is a reasonable interpretation of the Neo4J Sweden Software License that permits GFI, as the "licensee," to remove the Commons Clause term, summary judgment based on USA's offered interpretation would be improper.

Therefore, because the interpretation of Section 7, and GFI's right to remove the Commons Clause from the Neo4J Sweden Software License, cannot be decided on summary judgment, then USA cannot establish, on summary judgment, that Defendants' statements regarding ONgDB being a free and open source fork of Neo4J Enterprise were false.

USA contends the Sweden was free to control licensing conditions citing *Apple Inc. v. Psystar Corp.,* 658 F.3d 1150, 1159 (9th Cir. 2011) *Jacobsen v. Katzer*, 535 F.3d 1373, 1381 (Fed. Cir. 2008). While the statement is true, Sweden chose to control is license under the AGPL license model. And, the AGPL, by its terms, allows a licensee to remove restrictive terms. If Sweden did not want the Common Clause removed, they could have used a different license form. They chose to use the well-known AGPL license form and USA cannot complain of the impact of the terms Sweden choose.

### E. The Material Purchasing Issue Is The Price

If the statement is shown to be misleading, the plaintiff must also introduce evidence of the statement's impact on consumers, referred to as materiality. *American Council of Certified Podiatric Physicians and Surgeons v. American Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 614 (6th Cir.1999). Defendants made no false claims based on pricing. Yet USA concedes customers chose ONgDB based on pricing **alone**. Dkt. No. 98, p. 2:12-13; p. 32:6-10. They must admit this; its obvious. Information Analysis Incorporated's GSA price list has a $500,000 bid for a Neo4J term license. (Beene Dec. Exhibit 5, p.1.) Since the government has no concern over the common clause-as

they do not sell the software- they can decide to pay $500,000 for a term license or get a
unlimited perpetual right to use a free open source fork. There is no evidence the
purchasing decisions were based on representation about the Drop in capability or
the license terms. There is likewise no evidence that purchaser would have paid for
a commercial Neo4J version of the software given the availability of free ONgDB or
other forks of Neo4J. If purchasers decide to pay money for database software, they
can then look at alternative commercial options. As there is no evidence the
representations by defendants were material, they are not actionable.

### F.     Use of Content on the Github Site is Permitted

USA complains of use of its documentation. But any user of open source software
from Sweden's Neo4J GitHub repository are allowed to use all content on the site.
This is permitted under the GitHub license. (D Fact 147.; Beene Dec. Ex. 9) Sweden
elected to use a free GitHub repository to distribute the open source version of
Neo4J. Sweden's election to use a free repository comes with obligations to allow
users to use all content on that site. The content USA complains of, such as
documentation,  is linked on the GitHub site and by the terms of Sweden's
agreement with Github, all users have the right to use the content. As there is a
dispute of fact whether defendants may use the content Sweden posted on its
GitHub repository, USA has no right to complain of such use or block it.

## XI.   Permanent Injunction

A plaintiff seeking a preliminary injunction must establish that he is likely to
succeed on the merits, that he is likely to suffer irreparable harm in the absence of
preliminary relief, that the balance of equities tips in his favor, and that an
injunction is in the public interest. [Citations omitted] *Winter v. Natural Resources
Defense Council, Inc.* (2008) 555 U.S. 7, 20. The difference between a preliminary

and permanent injunction is likelihood of success is not an issue on a permanent injunction. While USA seeks a permanent injunction, they cannot until phase 2 is completed.

USA has requested a broad permanent injunction with 25 requests including one with 8 subparts. (Dkt. No. 98-4). First, USA's request for permanent injunction is premature until all affirmative defenses and claim are considered in phase 2. They have yet to succeed on all claims. Second, the request is overbroad seeking an injunction far beyond USA's licensed rights in the Neo4J trademark and the false advertising claims. Essentially, USA wants to shut defendants down with when it does not own the trademark and there is no false advertising. An injunction is never awarded as a matter of right. *Winter*, at 24. The court should pay particular regard for the public consequences. *Winter,* at 24.

USA does not want the public or the US government to know that you can get the same software for free so they can force people to pay them for the software. They want to keep defendants from tell consumers they can use free software. Under the AGPL, licensees are allowed to make copies and make derivatives of Neo4J. They have that right under the GitHub agreement too. Under the fair use standards, people can use the Neo4J name to identify the software, they can explain that USA is selling what you can get for free. They can explain that the open source version is supported to combat USA's false statements they are not. USA can tell people the AGPL does not allow restrictions which by its terms may be removed. USA can throw over a thousand of pages at defendants, but these fundamental rights may not be stopped.

USA does not have the right on the merits to an injunction, and given the public consequences no injunction should issue. In *Winter*, the District Court issued

an injunction which was affirmed by the 9th Circuit. The injunction was vacated because the consideration of the public interest was not taken into account. USA seeks an injunction to prevent defendants from telling the public there is a free resource for Neo4J software. The USA government should not waste taxpayer dollars to use software that is available for free. It is against the public benefit to remove the free version out of the consumers decision by silencing defendants with an injunction.

### A. Nominative Use Injunctions are Limited.

An injunction may only cover the specific harm alleged. *Toyota*, at 1172. USA has not shown that any of defendants' use is not nominative. USA may not prevent free speech with an overbroad trademark injunction. In *Toyota*, the district court enjoined the defendant from using "any ... domain name, service mark, trademark, trade name, meta tag or other commercial indication of origin that includes the mark LEXUS." This overbroad injunction was vacated in *Toyota*. The overbroad injunction vacated in *Toyota* is only part of the demand in USA's overreaching, overboard, vague and improper demand in USA's [Proposed] Permanent Injunction against Defendants (Dkt. No. 98-4). For these reasons, the injunction should be denied.

### XII. Cross Motion for Summary Judgment

### A. Trademark Infringment Claims

To prevail on its Lanham Act trademark claim, a plaintiff must prove they have an ownership interest in the mark and defendant infringed. *Rearden LLC v. Rearden Commerce, Inc.* (9th Cir. 2012) 683 F.3d 1190, 1202–1203. The simple fact is USA does not own the Neo4J mark. As USA does not own the Neo4J trademark, it cannot prove the first element of its Trademark infringement claims against

defendants. Alternatively, as discussed above, defendants fairly used the Neo4J mark nominatively and such use is not infringing. As USA cannot prove at least one of the two elements of its trademark infringement claim, summary judgment should be granted in defendants' favor.

### B. False Advertising Claims

An element of the false advertising claims is that the deception is material, in that it is likely to influence the consumer's purchasing decision. All the hodgepodge claims USA makes are not material to a database consumers purchasing decision. USA concedes consumers decide to adopt free open source software over commercial software because of price **alone**. Dkt. No. 98, p. 2:12-13; p. 32:6-10. Consumers of sophisticated databases do not read a website and decide to save $500,000 based on what the website says. There is no evidence they do. This point is obvious. Databases are complex, require sophisticated operations to load, migrate data, create queries and analysis results. Consumers can download ONgDB for free and decide if it fits there needs. They can evaluate USA's commercial Neo4J and see if its worth the money. As that is the buying process, with price the material difference, USA has no material facts to support the required element of a material deception. Accordingly, summary judgment should be granted against USA's False Advertising and UCL claims against defendants in both cases.

Dated: January 15, 2021

_____/s/ Adron G. Beene_____
Adron W. Beene SB# 129040
Adron G. Beene SB# 298088
Attorney At Law
Attorney for Defendants
PURETHINK LLC,
IGOV INC.,
and JOHN MARK SUHY

Dated:  January 15, 2021                    BERGESON, LLP


By:___/s/  John D. Pernick_____
       John D. Pernick

Attorneys for Defendant
GRAPH FOUNDATION, INC.


## Filer's Attestation

I, Adron G. Beene, am the ECF user whose credentials were utilized in the electronic filing of this document. In accordance with N.D. Cal. Civil Local Rule 5-1(i)(3), I hereby attest that all signatories hereto concur in this filing.
Dated: January 15, 2021


_____/s/ Adron G. Beene_____
    Adron W. Beene SB# 129040



01-15-2021 - DEF RESP TO NEO4J INC CONS SEP STMT OF UNDISPUTED MATR FACTS.pdf

Filed 01/15/2021

DEFENDANTS' RESPONSE TO NEO4J INC.'S CONSOLIDATED SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS

(Pacer Doc: #100)

# EXHIBIT A

(50 of 253), Page 50 of 253
Case: 24-5538, 12/23/2024, DktEntry: 18.8, Page 50 of 253
Case 5:18-cv-07182-EJD Document 100 Filed 01/15/21 Page 43 of 101

**DEFENDANTS' RESPONSE TO NEO4J INC.'S CONSOLIDATED SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS**

Defendants' object to Neo4J Inc's Separate Statement of Undisputed Material Facts as it violates this Court's Standing Order for Civil Cases dated May 3, 2019, Section V. B, as it is 20 pages long which is more than the 15-page limit and is not a short and concise statement of material facts. Furthermore, there is no attestation that: "I attest that the evidence cited herein fairly and accurately supports or disputes the facts asserted." As required under the Standing Order. And they could not so attest as, for example, many of the excerpts in Mr. Nussbaum's deposition cited are not included in Exhibit 31 to Mr. Ratinoff's 1198-page declaration.

Instead, the Separate Statement it is used to burden defendants and this Court with many immaterial facts in violation of the Standing Order and FRCP Rule 1. Defendants request Neo4J Inc.'s Separate Statement be stricken for violation of the Standing Order and the motion be denied.

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| **Claim 1: Trademark Infringement Against the PT Defendants and Their Nominative Fair Use Defense** | | |
| 1. Plaintiff Neo4j Inc. ("Neo4j USA") owns a protectable trademark | <u>Fact 1</u>: Neo4j USA is the owner of U.S. Trademark Registration No. 4,784,280 for the word mark "NEO4J" covering the goods and services in International Classes, 009, 035, 041, 042 and 045 (the "Neo4j® Mark"). Declaration of Jeffrey M. Ratinoff, ("Ratinoff Decl."), Exh. 1. | **DISPUTED:** Neo4j is not the owner, assignee, or exclusive licensee of the Neo4j mark, and therefore its ownership of U.S. Trademark Registration No. 4,784,280 is disputed. Declaration of Adron G. Beene ("Beene Dec."), Ex. 1 at §2.1.1., 2 and 3. |
| 2. The PT Defendants impermissibly used the Neo4j® Mark after Neo4j USA terminated the Partner Agreement | <u>Fact 2</u>: On September 30, 2014, Purethink and Neo4j USA entered into the Neo4j Solution Partner Agreement ("Partner Agreement"). Ratinoff Decl., Exh. 4. | **DISPUTED**: The PT defendants use of the Neo4J trademark is nominative to identify NEO4J as a company and the Neo4J software and for comparative advertisement. Declaration of John Mark Suhy ("Suhy Dec.") ¶2, |
| | <u>Fact 3</u>: Under the Partner Agreement, PureThink was granted a non-exclusive, non-transferable limited license to, *inter alia*, use the Neo4j® Mark solely to market and resell commercial licenses to Neo4j® Enterprise Edition ("Neo4j® EE") and related support services in exchange for shared revenue for the licenses that it resold. *Id.*, Exh. 4 at § 4.1; Exh. 3 at 60:10-61:17, 67:25-69:11. | **UNDISPUTED** |
| | <u>Fact 4</u>: PureThink further agreed to the terms of the limited license under the Partner Agreement to use the Neo4j® Mark in accordance | **UNDISPUTED** |

(51 of 253), Page 51 of 253
Case: 24-5538, 12/23/2024, DktEntry: 18.8, Page 51 of 253
Case 5:18-cv-07182-EJD   Document 100   Filed 01/15/21   Page 44 of 101

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | with Neo4j USA's "then-current trademark usage guidelines." *Id.*, Exh. 4 at § 4.1. | |
| | Fact 5: The Partner Agreement was subject to a 1-year term, and would automatically renew at additional 1-year periods subject to the notice and termination provision therein, thereby incorporating whatever was the operative trademark guidelines at that time. Ratinoff Decl., Exh. 4 at §7.1; Exh. 3 at 67:18-24.   As a result of the renewal provision, PureThink became bound by the October 13, 2015 version of Neo4j USA's trademark guidelines as of September 30, 2016. *See* Rathle Decl., ¶ 16, Exh. 5. | **UNDISPUTED** |
| | Fact 6: All rights and licenses to Neo4j® Software and the Neo4j® Mark would terminate upon the expiration or termination, and upon such an event, PureThink agreed to "cease using any trademarks, service marks and other designations of Plaintiffs." Ratinoff Decl., Exh. 4 at §7.3. | **UNDISPUTED** |
| | Fact 7: On July 11, 2017, Neo4j terminated the Partner Agreement thereby requiring PureThink to "cease using [Neo4j's] trademarks, service marks, and other designations…and remove from PureThink's website(s) marketing materials, [Neo4j's] trademarks and tradenames, including, without limitation, Neo4j" as required by Agreement. Ratinoff Decl., Exh. 12. | **DISPUTED**: Moving Party's reference to [Neo4j] is vague and misleading as the Partner Agreement provides "will cease using any trademarks, service marks and other designations of the *other party*" emphasis added. Ratinoff Decl., Exh. 4 at §7.3. Neo4J USA is not the owner, assignee or exclusively licensee of the mark and lacks standing to assert the mark. Beene Dec., Ex. 1. |
| | Fact 8: PureThink continued to use the Neo4j® Mark without Neo4j USA's authorization to send customers to iGov to obtain "Government Package for Neo4j" and "Government Development Package with Neo4j Enterprise." *See* Ratinoff Decl., Exh. 14.  It also promoted "Neo4j Enterprise" as genuine Neo4j® EE despite being compiled by Suhy. *See id.*, Exh. 16. | **DISPUTED:**   The PureThink references are to Sweden's open source versions of Neo4J and proper nominative use of Sweden's mark. Suhy Dec. ¶3 |
| | Fact 9: Under the Partner Agreement, PureThink agreed that all contractual restrictions would apply to any successor-in-interest, assign, and acquirer of substantially all of its assets.  Ratinoff Decl., Exh. 4 at § 10. | **UNDISPUTED** |
| | | **Additional Facts** |
| | | Under the Partner Agreement, assignment of the agreement, outside of a successor in interest required |

(52 of 253), Page 52 of 253
Case: 24-5538, 12/23/2024, DktEntry: 18.8, Page 52 of 253
Case 5:18-cv-07182-EJD   Document 100   Filed 01/15/21   Page 45 of 101

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | consent of Neo4J USA. Ratinoff Decl., Exh. 4 at §7.3. No evidence of consent to the assignment exists. Suhy Dec. ¶61. |
| | **Fact 10:** Suhy and PureThink formed iGov on or about June 23, 2017 to circumvent the restrictions in Section 4.3.1 of the Partner Agreement. Ratinoff Decl., Exhs. 10-11, 14-15, 17-19; PT Dkt. No. 22, ¶¶ 18-19; *see also* Exh. 3 at 46:12-16, PT Dkt. No. 72 at 8:22-25, 9:15-23. | **DISPUTED:** iGov was formed as a separate entity by Suhy for several reasons. Suhy Dec. ¶4., Beene Dec. Ex. 4 at 45:4-47:5. The restrictions are for purposes of non-competition and void. Suhy Dec. ¶4. |
| | **Fact 11:** Suhy is sole owner and employee of PureThink and iGov, used the same website template, and initially used the same offices and support telephone number for both entities. Ratinoff, Decl, Exh. 3 at 21:23-22:22, 23:16-18, 37:3-38:16, 39:6-40:23, 47:20-49:8, 52:9-11. | **DISPUTED** - PureThink and iGov used the same office address for a mailing address until iGov could setup a new office.   iGov did not "use" the office address other than for correspondence.<br><br>The support telephone number is a 3rd party number that neither PureThink or iGov owned.  The website template used was a commercial template. PureThink and iGov purchased the same template because Suhy was familiar with it. iGov did not use PT's computers.   Suhy Dec. ¶5. |
| | **Fact 12:** Suhy used both his iGov and PureThink email accounts to solicit customers that he had previously contacted under the Partner Agreement.  Ratinoff, Decl., Exhs. 19, 25, 29, 45-46, 54. | **DISPUTED:** All new business development was done using iGov Inc emails (Exhibit 19, 46, and 54). Exhibit 25, 29 were discussions and not solicitations.) The only entity who was a customer listed in this fact was Sandia National Laboratories.  They were a customer of PureThink and the communication was through PureThink.  (See Ratinoff, Decl. Exhibit 45). The solicitations were for use of Sweden's open source Neo4J. Suhy Dec. ¶6. |
| | **Fact 13:** iGov took over PureThink's business relationship with the IRS. Ratinoff, Decl, Exh. 3 at 53:4-54:25; Exh. 127. | **DISPUTED:** USA interfered with PT's potential business with the IRS. iGov did not take over PT's potential business relationship with the IRS. Suhy Dec. ¶7., Exhibit 1 |
| | **Fact 14:** The PureThink Defendants ("PT Defendants") claimed to be "the developer of the retired Neo4j Government Edition" in close connection with touting their prior relationship with Neo4j USA. Ratinoff Decl., Exhs. 15-19, 21, 62-64. | **DISPUTED:** Suhy and PureThink did develop the Neo4j Government Edition. the PT Defendants do not "tout" PT's prior relationship; they said it was terminated.   Suhy Dec. ¶8 |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | |
| | **Fact 15:** iGov used the Neo4j® Mark on its website without authorization to promote "Government Package for Neo4j" and "Government Development Package with Neo4j Enterprise," and related support services. *See* Ratinoff Decl., Exhs. 15-18, 21, 62-64. | **DISPUTED:** A nominative use does not require authorization. iGov references Sweden's Neo4J mark to reference Sweden's open source software called Neo4J to describe the software and uses USA's company name and products to identify them in comparative advertisement. Suhy Dec. ¶9 |
| | **Fact 16:** iGov's other unauthorized uses of the Neo4j® Mark on its website included: (1) using "https://igovsol.com/**neo4j**.html" as a URL to promote "Government Development Packages for **Neo4j**"; (2) prominently displaying a "Request Procurement Document Package" link with "**mailto:neo4j@igovsol.com**" embedded that creates an email addressed thereto upon activation; (3) encouraging consumers to obtain more information by sending an email to "**neo4j@igovsol.com**;" (4) using "Government Packages for Neo4j" and "Neo4j Enterprise" to describe iGov's patchwork binaries of Neo4J® EE; and (5) touting PT Defendants' prior relationship with Neo4j USA and to be "the developer of the retired Neo4j Government Edition." Ratinoff Decl., Exhs. 15-18, 21, 62-64, 67-69. | **DISPUTED:** Objection this is not a fact; it is argument. A nomantive use does not require authorization. USA does not own the trademark. D Fact . Beene Dec Exhibit 1,2,3. (4) "Government Packages for Neo4j" and "Neo4j Enterprise" were used to describe the government packages iGov provided support for around the free and open source neo4j database. Neo4j® Mark was never used. The email address is for Sweden's open source Neo4j for inquires for that product. The email address was discontinued in the hopes USA would discontinue this litigation. "Neo4j Enterprise" is needed to distinguish between the open source "Neo4j Community" and "Neo4j Enterprise" distributions, both of which are built when compiling the Neo4j source code. iGov does not "tout" PT's prior relationship; they said it was terminated. Suhy Dec. ¶10 |
| | **Fact 17:** iGov continues to offer "Neo4j enterprise open source licensed distributions" and interchangeability referring to "ONgDB Enterprise" and "Neo4j Enterprise" on its website. Ratinoff Decl., Exhs. 62-70 (highlighted in yellow). | **DISPUTED:** iGov offers support for both Neo4j Enterprise open source licensed distributions, and ONgDB Enterprise open source distributions. Neo4j Enterprise distributions below 3.5 are still in use and available to the public.<br><br>iGov no longer offers distributions from it's website and only recommends ONgDB Enterprise |

(54 of 253), Page 54 of 253
Case: 24-5538, 12/23/2024, DktEntry: 18.8, Page 54 of 253
Case 5:18-cv-07182-EJD Document 100 Filed 01/15/21 Page 47 of 101

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | distributions. iGov links to the GraphFoundation download page. Suhy Dec. ¶11 |
| 3. The PT Defendants used the Neo4j® Mark without Neo4j USA's authorization to promote ONgDB | Fact 18: After Graph Foundation ("GFI") released ONgDB in July 2018, iGov continued to use "https://igovsol.com/neo4j.html" as a URL address to promote ONgDB until it deactivated that page sometime after July 27, 2020. Ratinoff Decl., Exhs. 62-65; Exh. 13 at RFA No. 5. While iGov replaced this url with "https://igovsol.com/graph.html," the contents of the page remained the same. *Compare id.*, Exh. 65 *and* Exh. 66. | UNDISPUTED |
| | Fact 19: iGov used the neo4j@igovsol.com email address on its "neo4j.html" page (*id.*, Exhs. 62-65) and "downloads.html" page (*id.*, Exhs. 67-69) as means for consumers to inquire about ONgDB until sometime in July 2020. Ratinoff Decl., Exh. 13 at RFA Nos. 7-11. | DISPUTED: iGov used neo4j@igovsol.com and neo4j.html as a way to inquire about iGov support services and support for the neo4j open source database. 'neo4j' is Sweden's Github repository name for the official Sweden open source Neo4j repository. It was not just a means for consumers to inquire about ONgDB but of the services and support around open source neo4j and ongdb open source license support. Suhy Dec. ¶12 |
| | Fact 20: GFI used a "Download Neo4j Enterprise" hyperlink on its "downloads" page to redirect consumers to download links for ONgDB until July 27, 2020. Ratinoff Decl., Exhs. 66-68 (highlighted in red), Exh. 13 at RFA Nos. 10, 14. | UNDISPUTED |
| | Fact 21: iGov continues to promote "ONgDB Enterprise," "Neo4j Enterprise" and "Neo4j Enterprise Edition" versions 3.5.x as open source Neo4j® EE that can be used for free under the AGPL. Ratinoff Decl., Exhs. 62-74. | DISPUTED: Neo4j Enterprise and ONgDB Enterprise are open source and free to use under the open source AGPL license.<br><br>After versions 3.4.x – the term Neo4j Enterprise Edition was not applicable as Neo4j Inc stopped contributing to the enterprise code.<br><br>iGov does not promote Neo4j Enterprise Edition 3.5.x as being open source.<br><br>Many of the exhibits are showing the same page over and over from different snapshot dates but with |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | matching content giving the illusion that there were more pages than existed.<br><br>ONgDB 3.5.5 is a drop in replacement for Neo4j 3.5.5 (Community and Enterprise commercial.)<br><br>After reading this - iGov realizes that the next line needs to have the grammar cleaned up to say: "**The** AGPLv3 Open Source License, **has** no limitations on causal cluster instances, cores or production usage"<br><br>Suhy Dec. ¶13 |
| | **Fact 22:** iGov operated www.graphstack.io to further promote ONgDB using the Neo4j® Mark, and that "iGov Inc offers production support packages for Neo4j / ONgDB Enterprise open source distributions for US government agencies." Ratinoff Decl., Exh. 75. | **DISPUTED:** GraphStack is a graph development stack aimed at building out large scale AI and graph solutions. GraphStack is to promote iGov software packages and solution development, not specifically Neo4j. Both Neo4j and ONgDB will drop into GraphStack – so using the names is important to explain that GraphStack will work with both. Suhy Dec. ¶14 |
| | **Fact 23:** The GraphStack website used hyperlinks to redirect consumers to Neo4j USA's official release notes and "What's New" page in conjunction with encouraging consumers to download ONgDB as an alleged "[d]rop in replacement for Neo4j Core and Enterprise 3.5.3." Ratinoff Decl., Exh. 75; Exh. 13 [RFA Nos. 42-43]. | **UNDISPUTED** |
| 4. The PT Defendants knew their uses of the Neo4j® Mark were unauthorized and violated Neo4j USA's Trademark Guidelines | **Fact 24:** The trademark guidelines the PT Defendants had agreed to be bound by in the Partner Agreement prohibited the use of the Neo4j® Mark: (1) with anything other than "the software in the exact binary form that it is distributed by [Neo4j], without modification of any kind;" and (2) "in a web page title, titletag, metatag, or other manner with the intent or the likely effect of influencing search engine rankings or results listings." Ratinoff Decl., Exh. 4 at § 4.1; Rathle Decl., ¶¶ 15-16, Exh. 5; *see also* Exh. 4 at §7.1; Exh. 3 at 67:18-24 | **DISPUTED:** The Partner Agreement terminated on July 11, 2017 (Fact 7 above). Suhy and iGov are not parties to the Partner agreement. The PT defendants have not used USA's disputed trademark to market, sell or service and USA products. All marketing and services are limited to Sweden's open source Neo4J software and derivatives of such software as permitted under the GitHub Terms of Service and the AGPL. Suhy Dec. ¶15 |

6

(56 of 253), Page 56 of 253
Case: 24-5538, 12/23/2024, DktEntry: 18.8, Page 56 of 253
Case 5:18-cv-07182-EJD   Document 100   Filed 01/15/21   Page 49 of 101

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| 5. The PT Defendants did not use the Neo4j® Mark to describe Plaintiffs' products | **Fact 25:** The PT Defendants used the Neo4j® Mark to promote their "Government Package for Neo4j" and "Government Development Package with Neo4j Enterprise" rather than comparatively describe Plaintiffs' Neo4j® EE.  Ratinoff Decl., Exhs. 14-18, 21, 62-65. | **DISPUTED:**  PureThink and iGov did not use the USA's disputed Neo4j mark for promotion of USA's products. All promotions have been to marketing and service Sweden's open source Neo4J software and derivatives of such software as permitted under the GitHub Terms of Service and the AGPL. References to USA and its products are for comparative advertisement. Suhy Dec. ¶16<br><br>All exhibits referenced except for exhibit 14  (15, 16, 17, 18, 21, 62-65 ) are all for iGov Inc sites are iGov sites, but have been incorrectly referenced in this fact as being PT Defendants. Suhy Dec. ¶17 |
|  | **Fact 26:** The PT Defendants often used the Neo4® Mark to promote ONgDB instead of to comparatively describe Plaintiffs' Neo4j® EE. Ratinoff Decl., Exhs. 62-74; Exh. 13 [RFA Nos. 4-11, 14]. | **DISPUTED:** PureThink and iGov did not use the USA's disputed Neo4j mark for promotion of USA's products. All promotions have been to marketing and service Sweden's open source Neo4J software and derivatives of such software as permitted under the GitHub Terms of Service and the AGPL. References to USA and its products are for comparative advertisement. Suhy Dec. ¶16 |
|  | **Fact 27:** The PT Defendants used the Neo4j® Mark on iGov's website as (1) an URL address for a page promoting their "Neo4j Enterprise" packages and ONgDB; (2) an email address for customers to obtain more information about their "Neo4j Enterprise" packages while referring to ONgDB; and (3) a hyperlink to redirect consumers to download ONgDB.  Ratinoff Decl., Exhs. 14-18, 62-65, 67-69; Exh. 13 [RFA Nos. 4-11, 14, 33-34]. | **DISPUTED:**  PureThink and iGov did not use the USA's disputed Neo4j mark for promotion of USA's products. All promotions have been to marketing and service Sweden's open source Neo4J software and derivatives of such software as permitted under the GitHub Terms of Service and the AGPL. References to USA and its products are for comparative advertisement.  Suhy Dec. 16 |
| 6. Defendant's product was readily identifiable without use of plaintiffs' trademark | **Fact 28:** Rather than naming their version of Neo4j® EE something else without using the Neo4j® Mark, the PT Defendants used the mark to name and promote their "Neo4j Enterprise" packages and while referring to ONgDB, as well as using the Neo4j® Mark to offer related | **DISPUTED:** PureThink and iGov did not use the USA's disputed Neo4j mark for promotion of USA's products. All promotions have been to marketing and service Sweden's open source Neo4J |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | support services for ONgDB.   Ratinoff Decl., Exhs. 14-18, 62-65, 67-69; Exh. 13 [RFA Nos. 4-11, 14, 33-34]. | software and derivatives of such software as permitted under the GitHub Terms of Service and the AGPL. References to USA and its products are for comparative advertisement. Suhy Dec. ¶16  When Sweden's  Neo4j open source code is compiled from the official Sweden Neo4j Github repository - it creates 2 distributions called "Neo4j Community" and "Neo4j Enterprise".  Enterprise is a standard term for software used for business as in an "Enterprise" is a generic identifier.  Suhy Dec. ¶18 |
| | Fact 29: Rather than independently promoting ONgDB as a graph database software without use of Neo4j® Mark, the PT Defendants used the mark to promote ONgDB and related support services for ONgDB.  Ratinoff Decl., Exhs. 62-65, 67-74; Exh. 13 [RFA Nos. 4-11, 14]. | DISPUTED:   Objection this is not a fact its argument.  ONgDB is a fork of Sweden's open source Neo4j and nominatively identified as such.  Suhy Dec. ¶19 |
| 7. The PT Defendants prominently used the Neo4j® Mark beyond what was reasonably necessary | Fact 30: The PT Defendants extensively used the Neo4j® Mark (without proper trademark usage and notices) on their website, and in direct solicitations beyond describing "Neo4j Enterprise" packages and ONgDB as a forks of Neo4j® EE.  Ratinoff Decl., Exhs. 14-18, 24-26, 42-47, 62-65, 67-74; Exh. 13 [RFA Nos. 4-11, 14, 33-34]. | DISPUTED:  PureThink and iGov did not use the USA's disputed Neo4j mark for promotion of USA's products. All promotions have been to marketing and service Sweden's open source Neo4J software and derivatives of such software as permitted under the GitHub Terms of Service and the AGPL. References to USA and its products are for comparative advertisement. Suhy Dec. ¶16 |
| 8. The PT Defendant's use of the Neo4j® Mark suggested sponsorship or endorsement by Neo4j USA | Fact 31:   The PT Defendants claimed that (a) "By default, all Government Packages for Neo4j now comes with Neo4j Enterprise included under it's open source license!" [Ratinoff Decl., Exhs 14-15]; (b) "The packages on this page are compiled by iGov Inc using the official   Neo4j   source   code   repositories   located   at https://github.com/neo4j" [id., Exh. 16]; (c) "US Federal Government Packages for Neo4j Solutions" [id., Exh. 17]; (d) "Government Development Packages for Neo4j" [id.]; (5) "iGov Inc is now the only US Federal contractor providing Neo4j Enterprise binaries packaged with it's [sic] free Open Source license!" [id., Exh. 18]; (e) "Get the open source licensed Neo4j Enterprise distributions we package for our government customers" [id., Exh. 21]; (f) "We compile and packaged the open source licenced [sic] distributions from the same official Neo4j | DISPUTED Objection this fact does not suggest sponsorship or endorsement by Neo4J USA. USA claim is misleading. PT and iGov websites, taken as a whole do not suggest sponsorship or endorsement by USA.  Suhy does not have a website. PureThink and iGov did not use the USA's disputed Neo4j mark for promotion of USA's products. Suhy Dec. ¶20  All promotions have been to marketing and service Sweden's open source Neo4J software and derivatives of such software as permitted under the |

(58 of 253), Page 58 of 253
Case: 24-5538, 12/23/2024, DktEntry: 18.8, Page 58 of 253
Case 5:18-cv-07182-EJD   Document 100   Filed 01/15/21   Page 51 of 101

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | Github Repositories as Neo4j Inc uses for their paid commercial licensed builds" [*id.*]; (g) "I manage the Neo4j Enterprise open source distributions used by the Treasury, DHS, etc. If you don't know about Neo4j - here is their website: http://neo4j.com" [*id.*, Exh. 26]. *See also id.*, Exhs. 19-20, 62-66. | GitHub Terms of Service and the AGPL. References to USA and its products are for comparative advertisement. Suhy Dec. ¶16<br><br>The statements provided on the websites that PT "has ceased their partnership with Neo Technology" Ratinoff Decl. Exh. 14, that PT "has ceased their partnership with Neo4j Inc." *Id.* Exhs. 15, 17, 19, certainly reflects a total lack of sponsorship or endorsement. Suhy Dec. ¶21 |
| | <u>Fact 32:</u>  The PT Defendants also claimed on iGov's website that (a) "We only focus on only supporting 100% free and open source ONgDB Enterprise & Neo4j Enterprise open source licensed distributions." [Ratinoff Decl., Exh. 66]; (b) "ONgDB Enterprise is a drop In replacement for Neo4j Enterprise commercial packages downloaded from Neo4j.com" [*id.*]; (c) "The distributions we package for the federal government and community as a whole are drop in replacements for Neo4j Enterprise commercial packages you download from neo4j.com" [*id.*]; and (d) "ONgDB (AKA ONgDB Enterprise) 3.5.11 is Neo4j 3.5.11 Core + the enterprise features Neo4j Inc removed from the code base as of v3.5.  All ONgDB and Neo4j Enterprise AGPL distributions can be used in production, in closed source projects, and with no limitations on # of cores or causal cluster instances." [*id.*, Exh. 74]. *See also, id.* at Exhs. 62-65, 71-73. | **DISPUTED:** Objection this fact does not suggest sponsorship or endorsement by Neo4J USA. USA claim is misleading. PT and iGov websites, taken as a whole do not suggest sponsorship or endorsement by USA.  Suhy does not have a website. PureThink and iGov did not use the USA's disputed Neo4j mark for promotion of USA's products. Suhy Dec. ¶20<br><br>All promotions have been to marketing and service Sweden's open source Neo4J software and derivatives of such software as permitted under the GitHub Terms of Service and the AGPL. References to USA and its products are for comparative advertisement. Suhy Dec. ¶16<br><br>The statements provided on the websites that PT "has ceased their partnership with Neo Technology" Ratinoff Decl. Exh. 14, that PT "has ceased their partnership with Neo4j Inc." *Id.* Exhs. 15, 17, 19, certainly reflects a total lack of sponsorship or endorsement. Suhy Dec. ¶21 |
| | <u>Fact 33:</u>  The PT Defendants solicited customers about ONgDB stating that (a) "I can explain why the foundation was created and how we package Neo4j Enterprise (We call ONgDB) distributions that are being adopted at IRS…" [Ratinoff Decl., Exh. 24]; (b) "the Graph Foundation was setup to ensure Neo4j/ONgDB remains free and open.  It is Neo4j | **DISPUTED:** Objection this fact does not suggest sponsorship or endorsement by Neo4J USA. USA claim is misleading. PT and iGov websites, taken as a whole do not suggest sponsorship or endorsement |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | Core + Enterprise feature set added back in, so it is drop in replacement for a Neo instance of the same version. (Ex: 3.5.5)" [*id.*, Exh. 44]; (c) "ONgDB (Open Native Graph Database): Neo4j Enterprise OSS distribution downloads 3.5.8 will be up next week" and "ONgDB 3.5.8 is a drop-in replacement for Neo4j Enterprise 3.5.8" [*id.*, Exh. 46]; (d) "We compile Neo4j branded distributions for agencies who added Neo4j branded distributions instead of ONgDB branded distributions to their white lists. We have all versions of the Neo4j branded distributions up to 3.5 available" [*id.*,]; and (e) "Neo4j Enterprise open source distribution licenses and basic support. Aka: ONGDB" [*id.*, Exhs. 55, 131]. *See also, id.* Exhs. 43, 47, 54. | by USA. Suhy does not have a website. PureThink and iGov did not use the USA's disputed Neo4j mark for promotion of USA's products. Suhy Dec. ¶20

All promotions have been to marketing and service Sweden's open source Neo4J software and derivatives of such software as permitted under the GitHub Terms of Service and the AGPL. References to USA and its products are for comparative advertisement. Suhy Dec. ¶16

The statements provided on the websites that PT "has ceased their partnership with Neo Technology" Ratinoff Decl. Exh. 14, that PT "has ceased their partnership with Neo4j Inc." *Id.* Exhs. 15, 17, 19, certainly reflects a total lack of sponsorship or endorsement. Suhy Dec. ¶21 |
| | **Fact 34:** In its promotion of ONgDB software, iGov used hyperlinks on its website to redirect consumers to Neo4j USA's official release notes (https://neo4j.com/release-notes/neo4j-3-5-5/) and "What's New" page (https://neo4j.com/whats-new-in-neo4j/) until it removed those references sometime in July 2020. *See* Ratinoff, Exhs. 67-69 (highlighted in blue). | **DISPUTED:** Because ONgDB is a fork of Neo4j which the core code is unmodified, the release notes and whats new page are relevant and provide important information. Suhy Dec. ¶22

Objection this fact does not suggest sponsorship or endorsement by Neo4J USA. USA claim is misleading. PT and iGov websites, taken as a whole do not suggest sponsorship or endorsement by USA. Suhy does not have a website. PureThink and iGov did not use the USA's disputed Neo4j mark for promotion of USA's products. Suhy Dec. ¶20

All promotions have been to marketing and service Sweden's open source Neo4J software and derivatives of such software as permitted under the GitHub Terms of Service and the AGPL. References |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | to USA and its products are for comparative advertisement. Suhy Dec. ¶16<br><br>The statements provided on the websites that PT "has ceased their partnership with Neo Technology" Ratinoff Decl. Exh. 14, that PT "has ceased their partnership with Neo4j Inc." *Id.* Exhs. 15, 17, 19, certainly reflects a total lack of sponsorship or endorsement. Suhy Dec. ¶21<br><br>The Sweden GitHub repository for open source Neo4J provides content including USA's documentation. Under the GitHub Terms of Services, all users may use all content. Referring licensees to such documentation is permissive. Nevertheless, when Neo4j Inc complained - the links were removed. Suhy Dec. ¶23 |
| 8. The PT Defendant's use of the Neo4j® Mark caused actual consumer confusion | Fact 35: The PT Defendant's use of the Neo4j® Mark to promote ONgDB resulted in customers choosing ONgDB and encountering compatibility issues.  Ratinoff Decl., Exh. 115-116; Exh 31 at 230:12-233:10; Exh. 3 at 207:12-209:3. | **DISPUTED:** Objection, the evidence is hearsay and there is no showing the use of the Name Neo4J caused consumer confusion. Consumers choose ONgDB because of price. This fact is conceded by Plaintiffs. Dkt. 98, p. 2:12-13; p. 32:6-10<br><br>PureThink and iGov did not use the USA's disputed Neo4j mark for promotion of USA's products. Suhy Dec. ¶24<br><br>All promotions have been to marketing and service Sweden's open source Neo4J software and derivatives of such software as permitted under the GitHub Terms of Service and the AGPL. References to USA and its products are for comparative advertisement. Suhy Dec. ¶16<br><br>Exhibit 115:  Shows an anonymous user named "stephanie" asking about trying to use ONgDB with |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | Neo4j Desktop, it does not mention a specific version or anything more.  There is no way of knowing if there was a "compatibility" issue, in fact the issue could have been caused because of an incorrect version number and could have occurred with Neo4j Enterprise distributions packaged by Neo4j.  Furthermore, USA responds and in no way explains or tells the user that ONgDB is not even provided by them.  The omissions in Neo4j's response would actually cause confusion because they are not saying anything about ONgDB being a 3rd party product. The confusion is caused by USA and Sweden's dual channel marketing of commercial and open source software through two different companies with the same name.  Exhibit 116 is simply forwarding this post to Brad Nussbaum.  Suhy Dec. ¶25 |
| | **Fact 36:** Defendants' interchangeable use of "Neo4j Enterprise" and "ONgDB" in marketing ONgDB misleads consumers into mistakenly believing that ONgDB and Neo4j® EE were one and the same.  *See, e.g.,* Exhs. 35, 40, 42-44, 46, 53, 55, 76, 100, 130-131, 134-135. | **DISPUTED:**  Defendants only used "Neo4j Enterprise" and "ONgDB" in descriptive manners. Furthermore defendants focused on educating consumers, not misleading them.  Specific versions of Neo4j and ONgDB had no difference in source code before enterprise source was closed.  Suhy Dec. ¶25<br><br>Even for those distributions, defendants made all the facts clear and never misled consumers. The inference drawn is not supported by the evidence: **Exhibit 35:** shows no confusion or misleading of customers.   The user is asking a question on the ongdb github issue list and the content does not lead to any confusion.<br> **Exhibit 40:**  Exhibit 40 clearly shows that there is no confusion as the user was asking about compiling the binaries himself. There is nothing in the exhibit supporting that this user was mislead. |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | "where can I find the source of the binaries you provide? could you provide instructions on how to build your binaries myself?" **Exhibit 42:** Exhibit 42 shows actually shows that iGov is helping Perspecta Engineering Inc understand the differences between Neo4j and ONgDB.   Originally Perspecta had reached out to iGov and iGov responded explaining the facts and differences.   The statements in exhibits are true and not misleading. Suhy Dec. ¶27 |
| | <u>Fact 37:</u> The PT Defendant's use of the Neo4j® Mark to promote ONgDB as free open source and falsely it with commercially licensed Neo4j® EE created actual customer confusion.  Ratinoff Decl., Exh. 48-49, 117-120, 130-131, 134-135. | **DISPUTED:**  Defendants only used "Neo4j Enterprise" and "ONgDB" in descriptive manners. Furthermore defendants focused on educating consumers, not misleading them.  Specific versions of Neo4j and ONgDB had no difference in source code before enterprise source was closed.  Suhy Dec. ¶25

Even for those distributions, defendants made all the facts clear and never misled consumers. The inference drawn is not supported by the statement:

**Exhibit 35:** shows no confusion or misleading of customers.   The user is asking a question on the ongdb github issue list and the content does not lead to any confusion.

**Exhibit 40:**  Exhibit 40 clearly shows that there is no confusion as the user was asking about compiling the binaries himself. There is nothing in the exhibit supporting that this user was mislead. "where can I find the source of the binaries you provide? could you provide instructions on how to build your binaries myself?" **Exhibit 42:** Exhibit 42 shows actually shows that iGov is helping Perspecta Engineering Inc |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | understand the differences between Neo4j and ONgDB.   Originally Perspecta had reached out to iGov and iGov responded explaining the facts and differences.   The facts in exhibit are true and not misleading.  Suhy Dec. ¶27 |
| | **Fact 38:** Consumers who have downloaded ONgDB rather than official Neo4j® EE have experienced technical issues with ONgDB.  Ratinoff Decl., Exh. 121-124, 133. In one instance, Suhy sent a user to Neo4j USA's operations manual for assistance. *Id.,* Exh. 125. | DISPUTED: Mr. Suhy believes that the technical issues could be caused by Neo4j Core code that it does not modify or simply because an end-user did not read the instructions on configuring a specific feature.   Mr Suhy is not aware of a bug fix for this issue indicating it could have just been user error. The inference drawn is not supported by the statement:  In many of the exhibits Neo4j tries to show a problem, but does not show any proof that the problem was simply user error or configuration or an analysis of what the problem was.

Exhibit 121 does not give enough information to identify if there is a technical issue, and furthermore the user from the exhibit said that they figured out the problem on their own indicating it was user error.

Exhibit 122 seems to indicate that a plugin or misconfiguration of the JVM is the problem.

Exhibit 123 indicates that the user is using ONgDB 3.2.3 which would have had the same source code as the Neo4j Enterprise branded distribution. Furthermore it seems that the issue was with the a 3rd party plugin called "tinker pop" and therefore was not even specific to Neo4j or ONgDB.  Because the source code for Neo4j and ONgDB was the same for that specific 3.2.3 version - if there was a technical issue - then it would have also been present in the Neo4j Enterprise 3.2.3 version as well. |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | USA charges customers and provides technical support for its commercial Neo4J products because consumers have technical issues with their "commercial" Neo4J products as well. Technical issues with software is not indicative of any difference in the software.  Suhy Dec.  ¶28 |
| **Claim 2: Trademark Infringement Against Graph Foundation Inc.** | | |
| 1. Plaintiff Neo4j Inc. ("Neo4j USA") owns a protectable trademark | <u>Fact 39:</u> Neo4j USA is the owner of U.S. Trademark Registration No. 4,784,280 for the word mark "NEO4J" covering the goods and services in International Classes, 009, 035, 041, 042 and 045 (the "Neo4j® Mark").  Declaration of Jeffrey M. Ratinoff, ("Ratinoff Decl."), Exh. 1. | **DISPUTED:** Neo4j is not the owner, assignee, or exclusive licensee of the Neo4j mark, and therefore its ownership of U.S. Trademark Registration No. 4,784,280 is disputed. Beene Dec, Exh. 1 at §2.1.1., 2 and 3. |
| 3.  GFI used the Neo4j® Mark without Neo4j USA's authorization to promote ONgDB | <u>Fact 40:</u>  Defendants copied the code, removed the commercial restrictions imposed by the Neo4j Sweden Software License from Neo4j® EE version 3.4 and began promoting ONgDB as the open source Neo4j® EE 3.4 under the AGPL.  Ratinoff Decl., Exh. 24-26, 28-29, 37, 62, 86; *see also* Exh. 3 at 28:25-29:11, 171:23-172:23, 199:22-200:20; Exh. 31 at 87:24-90:9. | **DISPUTED:** Suhy did not remove commercial restrictions imposed by Neo4j.  He only followed the instructions of the License.txt copyright holder (free software foundation) making it verbatim. The commons clause restrictions were still in effect and referenced in 1000s of files which Mr Suhy did not modify because the other files were copyrighted to Neo4j Sweden.  Following the rules for the License.txt file did not remove any restrictions on the software. Suhy Dec.  ¶29 |
| | <u>Fact 41:</u> GFI copied the landing page on Plaintiffs' GitHub repository without any overt reference to ONgDB.  GFI Dkt. No. 89, ¶ 18, Exh. 18; Ratinoff Decl., Exh. 31 at 81:14-20. | **DISPUTED** The referenced GFI GitHub repository page expressly describes ONgDB as follows: ONgDB (Open Native Graph DB) - Neo4j fork with enterprise code base. ONgDB integrates Neo4j Open Core commits.  GFI Dkt. No. 89, Exh. 18. |
| | <u>Fact 42:</u> On January 17, 2019, GFI modified its landing page by changing the title to "ONgDB - Neo4j Enterprise Fork: Graphs for Everyone," adding references "ONgDB & Neo4j" and that "ONgDB & ***Neo4j Enterprise*** consist of modules from Neo4j Community Edition and modules licensed under AGPLv3 in this repository," but the content | **UNDISPUTED** that GFI's landing page was modified and that the modified page contained the quoted language. |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | still remained almost identical to Plaintiffs' GitHub landing page and contained wide-spread misuse of the Neo4j® Mark.  Dkt. No. 89, ¶¶ 19-21, Exhs. 19-21 (emphasis added). | DISPUTED that the landing page contained "wide-spread misuse" of the Neo4® Mark.  The Neo4j® Mark was never used, only the words neo4j and "Neo4j" were used to describe the fact that ONgDB is a fork of Neo4j which is an important descriptive element. |
| | Fact 43:  On April 14, 2020, GFI started to remove the Neo4j® Mark and Neo4j USA's URLs from that page.  Compare GFI Dkt. No. 89, Exh. 22 and Exhs. 23-28.  However, GFI's landing page was still titled "ONgDB - Neo4j Enterprise Fork: Graphs for Everyone," still started off stating "Neo4j is the world's leading Graph Database," encouraged consumers to "Learn more on the Neo4j website," and continued to use the Neo4j® Mark throughout. Id., ¶¶ 29-31 Exhs. 29-31. | UNDISPUTED that GFI's landing page was modified and that the modified page contained the quoted language.<br><br>DISPUTED that the landing page used the Neo4® Mark.  The Neo4j® Mark was never used, only the words neo4j and "Neo4j" were used to describe the fact that ONgDB is a fork of Neo4j which is an important descriptive element. |
| | Fact 44:   On April 21, 2020, GFI removed instances of the Neo4j® Mark and hyperlinks to Neo4j USA's website, but still used Plaintiffs' catch phrase "Graphs for Everyone" and mislabeling the Neo4j® Platform as the "neo4j project."  GFI Dkt. No. 89, Exhs. 32-33. | UNDISPUTED that GFI's landing page was modified and that the modified page contained the quoted language.<br><br>DISPUTED that the "neo4j project" is mislabeling.  The term "neo4j project" is used to describe the fact that ONgDB is a fork of Neo4j which is an important descriptive element. |
| | Fact 45: Rather than create its support documentation for ONgDB, GFI relied upon Neo4j USA's official documentation and used hyperlinks on its website to redirect users to Plaintiffs' official documentation, including Neo4j USA's copyrighted operation and developer manuals, located on its website.  Dkt. No. 89, ¶¶ 3-8, 13-16, Exhs. 3-8, 13-16; Ratinoff Decl., Exhs. 78-83, Exh. 129 [RFA Nos. 81-84, 88-89, 93-94, 98-100, 104, 108, 111, 123-126, 130-136]. | UNDISPUTED |
| | Fact 46: GFI's website directed users to Plaintiffs' change logs for each new release of ONgDB until GFI finally started its own change log with ONgDB v3.5.16.  Dkt. No. 89, ¶¶ 3-8, Exhs. 3-8; Ratinoff Decl., Exh. 84; Exh. 129 [RFA Nos. 87, 92, 97, 103, 107, 110]. | UNDISPUTED |
| | Fact 47: Up until April 14, 2020, GFI's GitHub landing page stated "To build the documentation see the Neo4j documentation" with an | UNDISPUTED |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | embedded hyperlink: https://github.com/neo4j/neo4j-documentation/. Dkt. No. 89, Exhs. 18-19, 23. | |
| | **Fact 48:** GFI's document repository on GitHub also uses hyperlinks that send consumers to Neo4j USA's official documentation on Neo4j USA's corporate website. Dkt. No. 89, ¶¶ 9-16; Ratinoff Decl., Exhs. 82-83; Exh. 31 at 276:19-279:12, 284:2-285:18; Exhs. 128-129 [RFA Nos. 81-84, 115-126]. | **UNDISPUTED** |
| | **Fact 49:** The Neo4j USA developer and operation manuals are copyrighted by Neo4j USA and subject to the License: Creative Commons 4.0, which contains a hyperlink to the Attribution-NonCommercial-ShareAlike 4.0 International Public License, which expressly prohibits the use of Plaintiffs' documents for commercial purposes. Ratinoff Decl., Exh. 85, Exh. 31 at 286:1-288:13. | **UNDISPUTED** |
| | **Fact 50:** GFI used the Neo4j® Mark in the title tags of webpages on its website featuring ONgDB. Ratinoff Decl., Exhs. 128-129 [RFA Nos. 85-86, 90-91, 95-96, 101-102, 105-106]. | **DISPUTED** The Neo4j® Mark was never used, only the words neo4j and "Neo4j" were used to describe the fact that ONgDB is a fork of Neo4j which is an important descriptive element. |
| | **Fact 51:** GFI did not seek or obtain Neo4j USA's authorization to use the Neo4j® Mark on GFI's website and GitHub repository in the foregoing manner. Ratinoff Decl., Exh. 31 at 181:6-182:3, Exh. 129 [RFA Nos. 5-9, 22-26, 69, 71, 73-76, 78]. | **UNDISPUTED** |
| | **Fact 52:** GFI used the Neo4j® Mark as a hashtag (#Neo4j) in tweets published from GFI's Twitter Account to promote ONgDB. Ratinoff Decl., Exhs. 89-92, 95-96, Exhs. 128-129 [RFA Nos. 149-150, 157-158, 165-166, 173-174, 181-182, 187-188]. | **DISPUTED** The Neo4j® Mark was never used, only the words neo4j and "Neo4j" and the hashtag "#Neo4j" were used to describe the fact that ONgDB is a fork of Neo4j which is an important descriptive element. |
| 4. GFI's ONgDB product was readily identifiable without the Neo4j® Mark | **Fact 53:** ONgDB can be readily identified as such or as "Open Native Graph Database" without use of the Neo4j® Mark. Ratinoff Decl., Exh. 31 at 27:17-29:9, 172:23-173:16, 175:5-20, 176:7-19, 178:13-179:25. | **DISPUTED:** ONgDB is a fork of the open source Neo4 database. It's important to explain this fact to potential end-users and is an important descriptive fact to show it is a drop in replacement for neo4j distributions. ONgDB does not modify the neo4j core code, and is therefore a superset of neo4j core and it's important to communicate this to potential end-users. Furthermore ONgDB only uses the |

(67 of 253), Page 67 of 253
Case: 24-5538, 12/23/2024, DktEntry: 18.8, Page 67 of 253
Case 5:18-cv-07182-EJD   Document 100   Filed 01/15/21   Page 60 of 101

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | descriptive term neo4j - it does not use the Neo4j® Mark<br><br>If Neo4j was not referenced then end-users would have no idea to what ONgDB forked. |
| | **Fact 54:** GFI issued tweets promoting ONgDB without using the Neo4j® mark or the mark as hashtag.  Ratinoff Decl., Exhs. 86, 88. | **UNDISPUTED** |
| 4. GFI did not use the Neo4j® Mark to describe Plaintiffs' Neo4j® products | **Fact 55:** GFI copied the landing page on Plaintiffs' GitHub repository without any overt reference to ONgDB and gratuitously used the Neo4j® Mark to describe and promote its own software. *See supra* Facts 41-44. | **DISPUTED**:  ONgDB is a fork of the open source Neo4 database.  It's important to explain this fact to potential end-users and is an important descriptive fact to show it is a drop in replacement for neo4j distributions.   ONgDB does not modify the neo4j core code, and is therefore a superset of neo4j core and it's important to communicate this to potential end-users. Furthermore ONgDB only uses the descriptive term neo4j - it does not use the Neo4j® Mark<br><br>If Neo4j was not referenced then end-users would have no idea to what ONgDB forked. |
| | **Fact 56:**  At the time that Plaintiffs filed suit, GFI's ONgDB repository still strongly resembled the landing page for Plaintiffs repository for the Neo4j® Platform, and repeatedly referred to "ONgDB & Neo4j" as if they were one and the same, and even used "Neo4j" *instead* of "ONgDB." *Compare* Ratinoff Decl., Exh. 58 *and* Exh. 59. | **DISPUTED**:  The GFI ONgDB depository page attached as Exhibit 58 starts with "ONgDB (Open Native Graph DB) – Neo4j fork with enterprise code base."  There is not a reference to ONgDB and Neo4j being one in the same.  ONgDB is a fork of the open source Neo4 database.  It's important to explain this fact to potential end-users and is an important descriptive fact to show it is a drop in replacement for neo4j distributions.   ONgDB does not modify the neo4j core code, and is therefore a superset of neo4j core and it's important to communicate this to potential end-users. Furthermore ONgDB only uses the descriptive term neo4j - it does not use the Neo4j® Mark |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | If Neo4j was not referenced then end-users would have no idea to what ONgDB forked. |
| | **Fact 57:** Rather than independently promoting ONgDB as a graph database software without use of Neo4j® Mark, GFI used the mark to promote ONgDB on its website and GitHub repository. *See supra* Facts 41-52. | **DISPUTED**: ONgDB is a fork of the open source Neo4 database.  It's important to explain this fact to potential end-users and is an important descriptive fact to show it is a drop in replacement for neo4j distributions.   ONgDB does not modify the neo4j core code, and is therefore a superset of neo4j core and it's important to communicate this to potential end-users. Furthermore ONgDB only uses the descriptive term neo4j - it does not use the Neo4j® Mark

If Neo4j was not referenced then end-users would have no idea to what ONgDB forked. |
| | **Fact 58:** GFI used a hashtag, **#Neo4j** that consists of nothing more than the Neo4j® Mark with a "#" before the mark to promote ONgDB on social media.  Ratinoff Decl., Exhs. 1, 89-96 and Exh. 31 at 233:17-237:21. | **DISPUTED** The Neo4j® Mark was never used, only the words neo4j and "Neo4j" and the hashtag "#Neo4j" were used to describe the fact that ONgDB is a fork of Neo4j which is an important descriptive element. |
| | **Fact 59:** GFI chose the following format that relied on using the Neo4j® Mark as a hashtag to announce its new releases of ONgDB:  "**#ONgDB (#FOSS#Neo4j** Enterprise) 3.5.x support release is out," with no attempt to differentiate ONgDB and Neo4j® EE as separate, competing products.[1]   Ratinoff Decl., Exhs. 89, 92, 94-95; Exh. 31 at 233:17-236:15, 240:12-241:25, 246:5-249:2. | **DISPUTED** The Neo4j® Mark was never used, only the words neo4j and "Neo4j" and the hashtag "#Neo4j" were used to describe the fact that ONgDB is a fork of Neo4j which is an important descriptive element.
Further, as is shown in the cited exhibits, each announcement contained the following statement distinguishing ONgDB from Neo4j EE:  "ONgDB is an open source fork of Neo4j Enterprise that is developed and released under AGPLv3 by The Graph Foundation." |
| | **Fact 60:** GFI issued a tweet that stated "**#ONgDB,** Open **#Neo4j** Enterprise," and in another instance "Our **#ONgDB/#Neo4j** Enterprise CI server is up and running builds…." Ratinoff Decl., Exhs. 91, 93. | **UNDISPUTED**-that the cited tweets contain the quoted language. |

---

[1] "FOSS" stands for free open source software. Ratinoff Decl., Exh. 31 at 233:17-234:3.

19

(69 of 253), Page 69 of 253

Case: 24-5538, 12/23/2024, DktEntry: 18.8, Page 69 of 253
Case 5:18-cv-07182-EJD   Document 100   Filed 01/15/21   Page 62 of 101

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | **DISPUTED** – that the cited language is the only language in the tweets.  Exh. 93 contains the following additional language distinguishing ONgDB from Neo4j EE:  "ONgDB is an open source fork of Neo4j Enterprise that is developed and released under AGPLv3 by The Graph Foundation."  And "What is ONgDB:  Open Native Graph DB is an open source fork of #Neo4j, that picks up prior to Neo4j, Inc.'s removal of enterprise code from the main Github repository." |
| | Fact 61: GFI used "**#Neo4j** Enterprise 3.5" to solicit end-users of official Neo4j® EE v3.5 to report bugs to GFI so that it could identify bugs in the closed enterprise directory for Neo4j® EE and attempt to mimic such fixes in ONgDB.  Ratinoff Decl., Exh. 61, Exh. 31 at 161:23-163:12, 169:13-172:13 | **DISPUTED** The hashtag "#Neo4j" was used to describe the fact that ONgDB is a fork of Neo4j which is an important descriptive element and to inform users who wanted to participate in the open source project where to report enterprise issues on open source.  Ratinoff Decl., Exh. 31 at 170:11-22. |
| | Fact 62: GFI used **#Neo4j** to promote ONgDB without reference to Neo4j® EE: "Latest **#ONgDB** apoc 3.5.0.8 procedure release is out. https://github.com/graphfoundatio... **#Neo4j**." Ratinoff Decl., Exh. 96. | **UNDISPUTED** – that the language appears on the exhibit.

**DISPUTED** – that there is no reference to Neo4j EE.  To the contrary, Exhibit 96 tweet contains the following language <u>distinguishing ONgDB from Neo4j EE:</u>  "ONgDB is an open source fork of Neo4j Enterprise that is developed and released under AGPLv3 by The Graph Foundation." |
| | Fact 63: GFI admitted intentionally used the Neo4j® Mark as a hashtag "to inform users about ONgDB" and to make it more likely that potential customers would come across ONgDB in conducting searches in relation to Neo4j® EE.  Ratinoff Decl., Exh. 31 at 174:14-176:19, 236:4-11, 237:9-239:7, 242:14- 243:21. | **DISPUTED** – GFI did not use the Neo4j Mark.  GFI used the hashtag "#Neo4j" was used to inform users in the neo4j community that ONgDB was available as a fork of Neo4j which is an important descriptive element and to inform users who wanted to participate in the open source project.  Ratinoff Decl., Exh. 31 at 236:3-11 |

(70 of 253), Page 70 of 253
Case: 24-5538, 12/23/2024, DktEntry: 18.8, Page 70 of 253
Case 5:18-cv-07182-EJD   Document 100   Filed 01/15/21   Page 63 of 101

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| 7. GFI prominently used the Neo4j® Mark beyond what was reasonably necessary | **Fact 64:** GFI copied the landing page on Plaintiffs' GitHub repository without any overt reference to ONgDB and despite making modifications continued to use the Neo4j® Mark on its GitHub repository beyond merely describing ONgDB as a fork of Neo4j® EE. *See supra* Facts 41-55; *see also* Dkt. No. 89 at ¶¶ 17-33, Exhs. 17-33. | **DISPUTED** The referenced GFI GitHub repository page expressly describes ONgDB as follows: ONgDB (Open Native Graph DB) - Neo4j fork with enterprise code base. ONgDB integrates Neo4j Open Core commits.  GFI Dkt. No. 89, Exh. 18.  The Neo4j® Mark was never used, only the words neo4j and "Neo4j" were used to describe the fact that ONgDB is a fork of Neo4j which is an important descriptive element. ONgDB is a fork of the open source Neo4 database. It's important to explain this fact to potential end-users and is an important descriptive fact to show it is a drop in replacement for neo4j distributions. ONgDB does not modify the neo4j core code, and is therefore a superset of neo4j core and it's important to communicate this to potential end-users. Furthermore ONgDB only uses the descriptive term neo4j - it does not use the Neo4j® Mark\n\nIf Neo4j was not referenced then end-users would have no idea to what ONgDB forked. |
| | **Fact 65:** At the time that Plaintiffs filed suit, GFI's ONgDB repository still strongly resembled the landing page for Plaintiffs repository for Neo4j® Software, and repeatedly referred to "ONgDB & Neo4j" as if they were one and the same, and even used "Neo4j" instead of "ONgDB." *Compare* Ratinoff Decl., Exh. 58 *and* Exh. 59. | **DISPUTED**:  The GFI ONgDB depository page attached as Exhibit 58 starts with "ONgDB (Open Native Graph DB) – Neo4j fork with enterprise code base."  There is not a reference to ONgDB and Neo4j being one in the same.  ONgDB is a fork of the open source Neo4 database.  It's important to explain this fact to potential end-users and is an important descriptive fact to show it is a drop in replacement for neo4j distributions.   ONgDB does not modify the neo4j core code, and is therefore a superset of neo4j core and it's important to communicate this to potential end-users. Furthermore ONgDB only uses the descriptive term neo4j - it does not use the Neo4j® Mark |

(71 of 253), Page 71 of 253
Case: 24-5538, 12/23/2024, DktEntry: 18.8, Page 71 of 253
Case 5:18-cv-07182-EJD Document 100 Filed 01/15/21 Page 64 of 101

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | If Neo4j was not referenced then end-users would have no idea to what ONgDB forked. |
| | Fact 66: GFI's (1) use of "neo4j," "neo4j enterprise" and "Neo4j Enterprise" without proper trademark notices; (2) use of embedded "Neo4j" links to Neo4j USA's website and GitHub repository; (3) hyperlinking to Plaintiffs' build instructions, support documentation and change logs all containing the Neo4j® Mark rather than creating and hosting their own with the ONgDB name; and (4) interchangeable use of "Neo4j Enterprise" with "ONgDB" to promote ONgDB on its website and GitHub goes beyond what is reasonably necessary to identify ONgDB as a fork of Neoj4® EE. *See supra* Facts 41-51, 56-58; *see also* Ratinoff Decl., Exhs. 37, 57-58; Dkt. No. 89, ¶¶ 3-16. | **DISPUTED** The Neo4j® Mark was never used, only the words neo4j and "Neo4j" were used to describe the fact that ONgDB is a fork of Neo4j which is an important descriptive element. ONgDB is a fork of the open source Neo4 database. It's important to explain this fact to potential end-users and is an important descriptive fact to show it is a drop in replacement for neo4j distributions. ONgDB does not modify the neo4j core code, and is therefore a superset of neo4j core and it's important to communicate this to potential end-users. Furthermore GFI only uses the descriptive term neo4j - it does not use the Neo4j® Mark<br><br>If Neo4j was not referenced then end-users would have no idea to what ONgDB forked. |
| | Fact 67: GFI used the Neo4j® Mark as a hashtag, **#Neo4j**, to promote ONgDB rather than to merely describe ONgDB as a fork of Neo4j® EE. *See supra* Facts 59-64. | **DISPUTED** GFI used the hashtag "#Neo4j" was used to inform users in the neo4j community that ONgDB was available as a fork of Neo4j which is an important descriptive element and to inform users who wanted to participate in the open source project. Ratinoff Decl., Exh. 31 at 236:3-11. GFI's tweets referenced in Facts 59-64 <u>contained the following additional language distinguishing ONgDB from Neo4j EE:</u> "ONgDB is an open source fork of Neo4j Enterprise that is developed and released under AGPLv3 by The Graph Foundation." See Responses to Facts 59-64. And Exhibit 93 also states: "What is ONgDB: Open Native Graph DB is an open source fork of #Neo4j, that picks up prior to Neo4j, Inc.'s removal of enterprise code from the main Github repository." |
| | Fact 68: GFI admitted that it could have referred to "Neo4j Enterprise" without using the Neo4j® Mark as a hashtag to identify the product. Ratinoff Decl., Exh. 31 at 236:4-15. | **DISPUTED** the cited testimony contains no such admission. The testimony is only that it is possible |

(72 of 253), Page 72 of 253

Case: 24-5538, 12/23/2024, DktEntry: 18.8, Page 72 of 253
Case 5:18-cv-07182-EJD  Document 100  Filed 01/15/21  Page 65 of 101

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | to write a tweet without a hashtag.  GFI did not use the Neo4j Mark.  GFI used the hashtag "#Neo4j" was used to inform users in the neo4j community that ONgDB was available as a fork of Neo4j which is an important descriptive element and to inform users who wanted to participate in the open source project.  Ratinoff Decl., Exh. 31 at 236:3-11 |
| | Fact 69:  GFI It also conceded that it could have used a format where it described ONgDB as being a fork of Neo4j® EE rather than simply inserting "#Neo4j Enterprise" with "#ONgDB."  See id., Exh. 31 at 243:23-245:12; Exh. 93. | DISPUTED the cited testimony relates to a different type of tweet that still used the hashtag "#Neo4j" was used to inform users in the neo4j community that ONgDB was available as a fork of Neo4j which is an important descriptive element and to inform users who wanted to participate in the open source project. |
| 8. GFI's  use of the Neo4j® Mark suggested sponsorship or endorsement by Neo4j USA | Fact 70:  GFI copied the landing page on Plaintiffs' GitHub repository without any overt reference to ONgDB and despite making modifications continued to use the Neo4j® Mark on its GitHub repository beyond merely describing ONgDB as a fork of Neo4j® EE. See supra Facts 41-55; see also Dkt. No. 89 at ¶¶ 17-33, Exhs. 17-33. | DISPUTED The referenced GFI GitHub repository page expressly describes ONgDB as follows: ONgDB (Open Native Graph DB) - Neo4j fork with enterprise code base. ONgDB integrates Neo4j Open Core commits.  GFI Dkt. No. 89, Exh. 18.  The Neo4j® Mark was never used, only the words neo4j and "Neo4j" were used to describe the fact that ONgDB is a fork of Neo4j which is an important descriptive element. ONgDB is a fork of the open source Neo4 database. It's important to explain this fact to potential end-users and is an important descriptive fact to show it is a drop in replacement for neo4j distributions. ONgDB does not modify the neo4j core code, and is therefore a superset of neo4j core and it's important to communicate this to potential end-users. Furthermore ONgDB only uses the descriptive term neo4j - it does not use the Neo4j® Mark<br><br>If Neo4j was not referenced then end-users would have no idea to what ONgDB forked. |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | See also Responses to Facts 41-55. |
| | Fact 71: At the time that Plaintiffs filed suit, GFI's ONgDB repository still strongly resembled the landing page for Plaintiffs repository for Neo4j® Software, and repeatedly referred to "ONgDB & Neo4j" as if they were one and the same, and even used "Neo4j" instead of "ONgDB." *Compare* Ratinoff Decl., Exh. 58 *and* Exh. 59. | **DISPUTED**: The GFI ONgDB depository page attached as Exhibit 58 starts with "ONgDB (Open Native Graph DB) – Neo4j fork with enterprise code base." There is not a reference to ONgDB and Neo4j being one in the same. ONgDB is a fork of the open source Neo4 database. It's important to explain this fact to potential end-users and is an important descriptive fact to show it is a drop in replacement for neo4j distributions. ONgDB does not modify the neo4j core code, and is therefore a superset of neo4j core and it's important to communicate this to potential end-users. Furthermore ONgDB only uses the descriptive term neo4j - it does not use the Neo4j® Mark<br><br>If Neo4j was not referenced then end-users would have no idea to what ONgDB forked. |
| | Fact 72: GFI (1) used "neo4j," "neo4j enterprise" and "Neo4j Enterprise" without proper trademark notices; (2) used embedded "Neo4j" links to Neo4j USA's website and GitHub repository; (3) stated on its GitHub repository for ONgDB for customers to "Learn more on the Neo4j website," and continued to use the Neo4j® Mark throughout that repository; (4) hyperlinked to Plaintiffs' build instructions, support documentation and change logs on GFI's website and GitHub repository all containing the Neo4j® Mark; (5) interchangeably used "Neo4j Enterprise" with "ONgDB" to promote ONgDB on its website and Github repository; and (6) used the Neo4j® as a hashtag on Twitter to promote ONgDB. *See supra* Facts 42-43, 56-70. | **DISPUTED** The Neo4j® Mark was never used, only the words neo4j and "Neo4j" were used to describe the fact that ONgDB is a fork of Neo4j which is an important descriptive element. ONgDB is a fork of the open source Neo4 database. It's important to explain this fact to potential end-users and is an important descriptive fact to show it is a drop in replacement for neo4j distributions. ONgDB does not modify the neo4j core code, and is therefore a superset of neo4j core and it's important to communicate this to potential end-users. Furthermore GFI only uses the descriptive term neo4j - it does not use the Neo4j® Mark<br><br>If Neo4j was not referenced then end-users would have no idea to what ONgDB forked |
| | Fact 73: GFI's intended audience in using the Neoj4® Mark as a hashtag were users of Neo4j® EE. Ratinoff Decl., Exh. 31 at 174:14-176:19, 236:4-11, 237:9-239:7, 242:14- 243:21. | **DISPUTED** the cited testimony contains no such admission. The testimony is only that it is possible |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | to write a tweet without a hashtag. GFI did not use the Neo4j Mark. GFI used the hashtag "#Neo4j" was used to inform users in the neo4j community that ONgDB was available as a fork of Neo4j which is an important descriptive element and to inform users who wanted to participate in the open source project. Ratinoff Decl., Exh. 31 at 236:3-11 |
| 9. GFI's use of the Neo4j® Mark caused actual consumer confusion | <u>Fact 74:</u> GFI's use of the Neo4j® Mark to promote ONgDB resulted in customers choosing ONgDB and encountering compatibility issues. Ratinoff Decl., Exh. 115-116; Exh 31 at 230:12-233:10; Exh. 3 at 207:12-209:3. | **DISPUTED** – The cited emails are hearsay and do not establish compatibility issues. Rather, Exhibit 115 demonstrates an attempt to use a desktop tool inappropriately with a server application. Ratinoff Decl., Exh. 31 at 232:5-25. Nothing in the email demonstrates that there would be any compatibility issues when ONgDB is used as a server application. |
| | <u>Fact 75:</u> GFI lead consumers to believe that ONgDB and Neo4j® EE were one and the same. *See, e.g.,* Exhs. 35, 40, 42-44, 46-47, 53, 55-58, 76, 100, 130-131, 134-135. | **DISPUTED**: Defendants consistently present ONgDB as an alternative to Neo4j EE. As is set out above, in numerous statements, on the GFI website and on Twitter, GFI describes ONgDB as "an open source fork of Neo4j Enterprise that is developed and released under AGPLv3 by The Graph Foundation." Ratinoff Decl., Exhs. 89, 92, 94, 95. GFI has also described, on its website, the distinction between ONgDB and the Neo4j EE software distributed by Neo4j, Inc., while also disassociating itself from Neo4j, Inc. Open Native Graph DB (ONgDB) is a fork of the neo4j project that continues development of the neo4j enterprise code base as a fully open source project after Neo4j, Inc. Open Core Shift that closed ongoing development and removed existing source code. Ratinoff Decl., Exh. 66. . |
| | <u>Fact 76:</u> GFI's use of the Neo4j® Mark to promote ONgDB as free open source and falsely comparing it with commercially licensed Neo4j® EE created actual customer confusion, and diverted sales from Neo4j USA, | **DISPUTED**: Plaintiffs present no evidence of a single person or entity that would have made that choice. Indeed, the evidence Plaintiffs provide with |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | including the IRS and Next Century/MPO.  Ratinoff Decl., Exh. 48-50, 117-120, 127, 131, 134-135; Broad Decl., ¶¶ 20-24, Exhs. 12-13. | respect to New Century, their one purported concrete example, is an email exchange showing that New Century had no response to Neo4j, Inc.'s proposal even though New Century stated in its email that it understood the issues regarding ONgDB's "legal viability."  Broad Decl., Exh. 13. |
| **Claim 3: False Advertising Against GFI and the PT Defendants** | | |
| 1. Defendants made a false statement of fact about a product in a commercial advertisement, which is (a) commercial speech; (b) made in commercial competition with Neo4j USA; (c) for the purpose of influencing consumers to buy their goods or services; and (d) sufficiently disseminated to the relevant purchasing public | **Fact 77:** Defendants made the following false statements interstate commerce via their websites and Twitter: (1) "ONgDB distributions are licensed under AGPLv3 as a free and open drop-in replacements of Neo4j Enterprise commercial licensed distributions with the same version number" [Ratinoff Decl., Exh. 57]; (2) "ONgDB and Neo4j Enterprise consists of modules from Neo4j Community Edition and modules licensed under the AGPLv3" [*id.*, Exh. 58]; (3) "ONgDB distributions are licensed under AGPLv3 as a free and open source alternative to currently available proprietary native graph offerings such as Neo4j Enterprise Edition" [*id.*, Exhs. 60, 113-114]; (4) "download ONgDB Enterprise as a drop in replacement for an existing commercial licensed distribution of the same version number." [*id.*, Exhs. 62-66]; (5) "ONgDB Enterprise is a drop in replacement for Neo4j Enterprise commercial packages downloaded from Neo4j.com" [*id.*, Exhs. 62-66, 71]; (6) "ONgDB Enterprise 3.5.5…. Drop in replacement for Neo4j Core and Enterprise 3.5.5. AGPLv3 Open Source License, no limitations on causal cluster instances, cores, or production usage" [*id.*, Exhs. 67-69, 75]; (7) "ONgDB is a drop in replacement for the Neo4j Community and Enterprise branded distributions" [*id.*, Exh. 72-74]; (8) "[ONgDB] is an open source fork of #Neo4j" [*id.*, Exh. 93]; and (9) "You can use the ONgDB fork of Neo4j which adds enterprise code back into neo4j core. It is 100% free and open." [*id.*, Exh. 98-104, 108]. | DISPUTED: Objection none of the evidence cited supports the alleged fact they are false. The legal standard is not correct. See, *Pizza Hut, Inc. v. Papa John's Intern., Inc.* (5th Cir. 2000) 227 F.3d 489, 495. The statements are all true: (1) "ONgDB distributions are licensed under AGPLv3 as a free and open drop-in replacements of Neo4j Enterprise commercial licensed distributions with the same version number"; (2) "ONgDB and Neo4j Enterprise consists of modules from Neo4j Community Edition and modules licensed under the AGPLv3"; (3) "ONgDB distributions are licensed under AGPLv3 as a free and open source alternative to currently available proprietary native graph offerings such as Neo4j Enterprise Edition"; (4) "download ONgDB Enterprise as a drop in replacement for an existing commercial licensed distribution of the same version number."; (5) "ONgDB Enterprise is a drop in replacement for Neo4j Enterprise commercial packages downloaded from Neo4j.com" ; (6) "ONgDB Enterprise 3.5.5…. Drop in replacement for Neo4j Core and Enterprise 3.5.5. AGPLv3 Open Source License, no limitations on causal cluster instances, cores, or production usage" (7) "ONgDB is a drop in replacement for the Neo4j Community and Enterprise branded distributions"; (8) |

(76 of 253), Page 76 of 253

Case: 24-5538, 12/23/2024, DktEntry: 18.8, Page 76 of 253
Case 5:18-cv-07182-EJD   Document 100   Filed 01/15/21   Page 69 of 101

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | "[ONgDB] is an open source fork of #Neo4j"; and (9) "You can use the ONgDB fork of Neo4j which adds enterprise code back into Neo4j core. It is 100% free and open." Suhy Dec. ¶30 |
| | **Fact 78:** The PT Defendants also stated on iGov's website that "[Neo4j Enterprise] is 100% free and open source" and "Neo4j Enterprise is released only under the standard AGPLv3 open source license that is managed by the free software foundation."  Ratinoff Decl*., Exhs. 67-70; *see also* Exh. 21. | DISPUTED: The PT Defendants did not all say this. Only iGov's website stated: that "[Neo4j Enterprise] is 100% free and open source" and "Neo4j Enterprise is released only under the standard AGPLv3 open source license that is managed by the free software foundation."  Defendants do not sell ONgDB, ONgDB is licensed under AGPL and AGPL is an open source license for free software. Suhy Dec. ¶31, Ratinoff Decl. Exh. 39, 11:635-638  ONgDB is a drop in replacement as explained in the deposition of Brad Nussbaum.  Nussbaum Depo., 158:7-14, 160: 9-14.  Pernick Dec. Ex. A. Plaintiffs have presented no evidence that ONgDB does not operate as a drop in replacement.  With respect to ONgDB being free and open, again, Plaintiffs argument that the removal of the Commons Clause language from the Neo4J Sweden Software License was improper is incorrect.  Substituting the matching language for the defined terms in this provision, Section 7 of the Neo4J Sweden Software License states:  "If the Program as [GFI] received it, or any part of it, contains a notice stating that it is governed by [the AGPLv3 license] along with a term that is a further restriction, [GFI] may remove that term." Pernick Dec. Ex. B |
| | **Fact 79:** Defendants actively encourage actual and potential users of commercially licensed Neo4j® EE to adopt ONgDB and obtain support services from iGov and GraphGrid instead of Plaintiffs. Ratinoff Decl., Exhs. 23, 28-29, 40, 42-54, 76-77, 126, 134-135. | **DISPUTED:** None of the evidence cited identifies any party that would have used Neo4j EE.  Further, Plaintiffs present no evidence that they competed with GraphGrid or provided similar services. |

(77 of 253), Page 77 of 253
Case: 24-5538, 12/23/2024, DktEntry: 18.8, Page 77 of 253
Case 5:18-cv-07182-EJD   Document 100   Filed 01/15/21   Page 70 of 101

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | Plaintiffs are misidentified as if they both do the same thing. Sweden is not a party to the cause of action. Sweden licenses the open source software USA does not. See APGL license. USA does not support open source software licensed by Sweden. Suhy Dec. 32 |
| | Fact 80:  Neo4j Sweden is the owner of all copyrights in Neo4j® CE and Neo4j® EE, including the source code and has licensed said copyrights to Neo4j USA.  Rathle Decl., ¶¶ 3-4. | **UNDISPUTED** |
| | Fact 81: Plaintiffs released Neo4j® EE v3.4 under a license that which included the terms from the AGPLv3 and additional restrictions provided by the Commons Clause ("Neo4j Sweden Software License"). Rathle Decl., ¶¶ 11-12, Exhs. 2-3. | **DISPUTED:**  Neo4J USA did no such thing. Neo4J Sweden release the open source software, not Neo4J USA. Ratinoff Decl. Exh. 39, 25:11-13 Suhy Dec. ¶33 |
| | Fact 82: The Neo4j Sweden Software License, while still allowing code to be publicly viewable and used within a certain licensed scope, prohibits commercial resale and certain commercial support services. Rathle Decl., ¶¶ 11-12, Exhs. 2-3. | **DISPUTED:**   Versions of Neo4j Enterprise open source distributions using AGPL only have no terms mentioning these prohibitions.  When the commons clause was added to AGPL, Sweden did not change license forms and used the AGPL form which bars additions and also allows licensees to remove non-permissive additional restriction. AGPL §7. Ratinoff Decl. Exh. 39, 6:331-7:393

Furthermore - the commons clause does not use the word "commercial". It only uses the word "sell". Ratinoff Decl. Exh. 39, 25:681-693

The author of the commons clause clarifies the intention and meaning of the commons clause as well. Support services are not barred as they do not consist entirely or substantially of the Software or Functionality of the Software as limited in the commons clause. The restriction of services is using the software as a service as in a SaaS implementation. Suhy Dec. ¶34 Ex. 2 |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | **Fact 83:** After Plaintiffs released Neo4j® EE v.3.4, the PT Defendants downloaded Neo4j's source code from Neo4j's GitHub repository, removed the commercial restrictions imposed by the Neo4j Sweden Software License, and began promoting it "free and open source" Neo4j Enterprise and offering commercial support services.  Ratinoff Decl., Exh. 3 at 171:23-172:23, 199:22-200:20; Exh. 21. | DISPUTED:  USA did no such thing. Sweden release the open source software not USA. Ratinoff Decl. Exh. 39, 25:11-13 Suhy Dec. ¶33 Suhy only removed the commons clause as allowed in the AGPL §7. Ratinoff Decl. Exh. 39, 6:331-7:393 Suhy did not remove any commercial restrictions. He simply ensured the LICENSE.txt file was verbatim as required by the copyright holder of the LICENSE.txt files : the free software foundation. Suhy did not modify any other files, and the commons commercial restrictions were still in effect.   Following the FSF copyright instructions for the AGPL License.txt file did not remove any restrictions from the distribution - as the restrictions were documented across the repository.  Following the rules for just the specific files did not remove legal terms from the distributions. Suhy Dec. ¶35 |
| | **Fact 84:** Rather than develop ONgDB as an independent fork based off an earlier open source version of Neo4j® EE, Defendants stripped the commercial restrictions out of the Neo4j Sweden Software License from Neo4j® EE version 3.4 and began promoting ONgDB as the open source equivalent of Neo4j® EE 3.4 under the AGPL.  Ratinoff Decl., Exh. 24-26, 28; *see also* Exh. 31 at 87:24-90:9. | DISPUTED:  PT, Suhy, and iGov Inc did not use the term "equivalent" in any references.   For Neo4j Enterprise versions below 3.5 - ONgDB was equivalent in features as it used the same unmodified source code.  So this statement would be true for specific versions of Neo4j and ONgDB.  PT, Suhy, and iGov always used the term drop in replacement which does not mean the features are all equivalent.

Furthermore - ONgDB is a current fork of Neo4j open source software licensed from Sweden, it pulls in all the Neo4j community commits from the official repository regularly keeping it up to date. This is allowed under the AGPL. Suhy Dec. ¶36 |
| | **Fact 85:** Plaintiffs officially released Neo4j® EE v.3.5 solely under a commercial license in November 2018, and were no longer publishing | DISPUTED:  PT, Suhy, and iGov Inc did not use the term "equivalent" in any references.   For Neo4j |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | source code for Neo4j® EE on GitHub under any open source license. Rathle Decl., ¶ 13, Exh. 4. | Enterprise versions below 3.5 - ONgDB was equivalent in features as it used the same unmodified source code.  So this statement would be true for specific versions of Neo4j and ONgDB.  PT, Suhy, and iGov always used the term drop in replacement which does not mean the features are all equivalent. Furthermore - ONgDB is a current fork of Neo4j open source software licensed from Sweden, it pulls in all the Neo4j community commits from the official repository regularly keeping it up to date. This is allowed under the AGPL. Suhy Dec. ¶36 |
| | **Fact 86:** Prior to its official release, Plaintiffs published several beta versions of Neo4j® EE v3.5 via their GitHub repository subject to the Neo4j Sweden Software License, with Neo4j® v3.5.0-RC1 being the last pre-release version available to Defendants via GitHub.  Rathle Decl., ¶ 14; *see also* Ratinoff Decl., Exh. 31 at 158:18-159:20. | **DISPUTED:** USA did not release version on GitHub. Only Sweden released the open source Neo4J software under the AGPL license. Ratinoff Decl. Exh. 39, 25:11-13 Suhy Dec. ¶33

There are no pre-release terms in the GitHub repository.  It's possible that a pre-release agreement was added to the compiled packages - but that would be in the actual download of the package, not the GitHub source code as they state. Furthermore - enterprise code was not available in v3.5.0-RC1 but it was available in 3.5.0-beta03. Suhy Dec. ¶37

Also - the License.txt files for the above mentioned releases clearly shows the license as being AGPL, complete with the AGPL preamble - and does not say anything about a "Neo4j Sweden Software License" Decl. Exh. 39, 12-13 |
| | **Fact 87:** GFI's release of ONgGB v3.5.1, which contained at least 182 source code files that had only been previously released under the Neo4j Sweden Software License in the last beta version of Neo4j® EE 3.5 made available by Plaintiffs via GitHub.  Ratinoff Decl., Exh. 38 at 6:22-7:1, 8:4-16:24; *see also* Rathle Decl., ¶ 29. | Disputed. USA does not release the open source software. Ratinoff Decl. Exh. 39, 25:11-13 Suhy Dec. ¶33 |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | **Fact 88:** In order for Defendants to call ONgDB "free and open source" Neo4j® EE, they again replaced the more restrictive Neo4j Sweden Software License with a generic copy of the AGPL and stripped out valid legal notices identifying Neo4j Sweden as the copyright holder and licensor in 28 LICENSE.txt files. Ratinoff Decl., Exhs. 39-40; Dkt. No. 91 at 19:9-25; Exh. 31 at 159:3-10; Rathle Decl., ¶ 30. | DISPUTED:  The AGPL license.txt file is copyrighted to the free software foundation.  Suhy followed the guidance from the free software foundation relating to the license being verbatim.  By following the FSF copyright guidance he did not remove the legal terms from the distribution as a whole.   There are 1000s of Neo4j files in the repository which clearly state the commons clause is still part of the license.  I.E.  Using the verbatim AGPL license content as instructed by the Free software foundation did not remove the commons license in any way as it was stated in many other places. There is no obligation to repeat Sweden's copyright notice on every file. And Sweden owns the copyright (undisputed Fact 80 above) USA has not standing to argue about the copyright notice. Phase 1 does not address the DCMA claim. Suhy Dec. ¶38 |
| | **Fact 89:** The Neo4j Sweden Software License did not permit a licensees such as Defendants to remove "further restrictions," i.e. the Commons Clause, imposed by Neo4j Sweden as the copyright holder and original licensor.  Rathle Decl., Exh. 3 at §§ 7, 10; GFI Dkt. No. 88 at 5:23-8:9. | DISPUTED:  Suhy only worked on the License.txt file which he believes is copyrighted to the Free software foundation.  When Suhy replaced the file with verbatim - it was following the copyright holder's instructions.  All the other files which Neo4j held the copyright for were not modified by Suhy and clearly stated that the commons clause was there. Suhy Dec. ¶35

Following the copyright holder's instructions for the License.txt file did not remove restrictions as these were mentioned in many other files in the github repository. Suhy Dec. ¶35 |
| | **Fact 90:** Defendants knew that they could not unilaterally replace the Neo4j Sweden Software License with the APGL without authorization. Ratinoff Decl., Exhs. 34-36, Exh. 31 at 183:14-184:24, 207:10-210:8. | DISPUTED:  Suhy did not replace the Neo4j Software License - He only followed the instructions given by the AGPL license copyright holder to make the actual license verbatim.   The Neo4j Sweden |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | Software License was still in effect as the commons clause was mentioned in many other neo4j files which Neo4j Inc owned the copyright for. Suhy Dec. ¶35 |
| | **Fact 91:** Defendants' statements that ONgDB v3.5.x was "100% free and open" with no limitations or restrictions imposed by commercial licensed Neo4j® EE v3.5.x and the like were false because they knew that Neo4j Sweden owned the copyright for Neo4j® EE and never gave permission to remove Commons Clause and offer it as ONgDB under the AGPL.    Ratinoff Decl., Exh. 55-56; Exh. 3 at 183:12-183:1, 187:12-188:5, 189:1-191:3, 235:21-237:14, 240:22-243:22. | DISPUTED:  Suhy only acted on License.txt files who's copyright is owned by the free software foundation.  Furthermore - Suhy only made AGPL license.txt files verbatim as the free software foundation required.  The commons clause was referenced and defined in almost every one of the thousands of enterprise code headers - all of which were left untouched by Suhy. Suhy Dec. ¶35 |
| | **Fact 92:** The Nussbaums also own GraphGrid and AtomRain, which share the same office and computers with GFI, and provide commercial training and consulting and support for users of ONgDB, and benefit from customers being able to use ONgDB for "free" and diverting available project funds to pay them for such services.  Ratinoff Decl., Exhs. 52-53; Exh. 31 at 22:24-23:3, 31:5-32:19, 35:3-13, 57:18-58:21, 65:20-70:16, 194:14-17; *see also* Exh. 28 ("If you are looking for a full shield of liability, we recommend using one of our supporters such as GraphGrid") and Exhs. 76, 134-135. | DISPUTED: GFI does not "share the same office" with GraphGrid and AtomRain.  GFI uses 111 South Buckeye Street for receiving mail and 111 Buckeye Street is leased by AtomRain and is used by AtomRain and GraphGrid for business activities.  Nussbaum Depo., 65:18-67:3. Pernick Dec. Ex. A |
| | **Fact 93:** Defendants removed the Commons Clause without Neo4j Sweden's authorization as the copyright holder in an attempt to allow iGov, AtomRain and GraphGrid to commercially use and support ONgDB.  Ratinoff Decl., Exh. 23-26, 28-29, 39, 76-77, 126, 134-135; Exh. 3 at 28:25-29:11; Rathle Decl., ¶¶ 29-30. | DISPUTED:  The free software foundation owns the copyright for the AGPL License.txt file and clearly states that the license must be verbatim.  Suhy Dec. 35. Suhy's commit message for the changes to the license files to be in line with the FSF requirements clearly states the reason for the change. Suhy Dec. 47. Furthermore - the commons clause does not say anything about commercial use and support, the commons clause author Heather Meaker clarifies the commons clause in her article and states they do not cover professional services: Suhy Dec. ¶34 Ex. 2 |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | **Fact 94:** ONgDB v3.5.1 and later versions are not 100% identical to equivalent version numbers of Neo4j® EE.  Ratinoff Decl., Exh. 31 at 158:18-163:5, 163:13-165:6; Exh. 3 at 124:2-126:2.  Rather, ONgDB is a patchwork of code from the last public beta, Neo4j® EE 3.5.0-RC1, and Neo4j® Community Edition held together by "glue code" authored by Suhy, Brad Nussbaum and other GFI contributors.  *See id.* | UNDISPUTED:   ONgDB 3.5 and later versions are not 100% identical to equivalent Neo4j enterprise versions and that claim was never made.<br><br>DISPUTED:  ONgDB is not a "patchwork" or "glue" of code - it has been proven in large production deployments.   After the enterprise code was closed - Suhy and other contributors continued it's development.   The enterprise code came from Neo4j - so it is calling the code it developed a patchwork of code. Suhy Dec. ¶39 |
| | **Fact 95:** By splicing together source code for ONgDB in that manner, GFI is creating software that is not of the same quality as if it were compiled by Plaintiffs because GFI does not have access to the same rigorous build infrastructure for official Neo4j® Software, which goes beyond what is built into Neo4j® CC and carries out tens of thousands of functional, performance, load, stress, and other tests to ensure quality. Rathle Decl. ¶¶ 31-34; Ratinoff Decl., Exh. 31 at 168:14-169:6. | **UNDISPUTED**:  GFI does not have access to Neo4j software build infrastructure and ONgDB 3.5 and later versions are not 100% identical to equivalent Neo4j enterprise versions and that claim was never made.<br>**DISPUTED**:  That GFI does not do its own quality testing of ONgDB.  To the contrary, GFI conducts about 64,000 tests for each build.  Nussbaum Depo., 166:18-168:13. |
| | **Fact 96:** GFI is dependent on what patches are made available in Neo4j® CE and sought to redirect users of official Neo4j® EE to GFI and identify bugs in the closed enterprise directory for Neo4j® EE. Ratinoff Decl., Exh. 61, Exh. 31 at 161:23-163:12, 169:13-172:12. | UNDISPUTED – GFI uses information from users of Neo4j software to identify bugs and uses open source patches made available in Neo4j CE.<br><br>DISPUTED – GFI is not dependent on information about Neo4j EE bugs to develop ONgDB.  To the contrary, GFI is no longer developing ONgDB versions as drop in replacements for Neo4j EE (and does not describe versions after 3.5.4 as such. Indeed, GFI has developed ONgDB 3.6 even though there is no Neo4j EE 3.6 and is developing ONgDB 4 independent from Neo4j EE 4.  Nussbaum Depo., 190:17-191:6. |
| | **Fact 97:** Since GFI introduced modifications and patches to ONgDB 3.5.x in an attempt to keep pace with the closed Neo4j® EE releases, | **DISPUTED** – GFI conducts tests on ONgDB to ensure its quality and compatibility. |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | the potential for stability and compatibility issues with ONgDB increases. Rathle Decl., ¶ 34; Ratinoff Decl., Exh. 31 at 161:23-163:12. | **UNDISPUTED** GFI has not verified that ONgDB versions after 3.5.4 are drop in replacements for the equivalent version of Neo4j EE |
| | <u>Fact 98</u>: Defendants had no way of knowing this after Plaintiffs closed off public access to the source code for enterprise-only features in November 2018 and had no visibility into Neo4j Sweden's proprietary testing and patches. Ratinoff Decl., Exh. 31 at 158:18-160:5; Exh. 3 at 223:1-224:9; Exh. 40; Rathle Decl., ¶¶ 31-34. | **DISPUTED:** Defendants are not sure what "this" means in the context of this statement. If it is referencing Fact 97 then it would be true.<br><br>Furthermore, defendants believe that the older approach for the enterprise features (which include the tests) is more stable and higher quality than newer re-implementations. See GitHub bug tickets. Suhy has not been advised by any user of ONgDB that is it incompatible with Neo4J commercial software. Suhy Dec. ¶40 |
| | <u>Fact 99</u>: Defendants knew that ONgDB 3.5.x does not include every closed enterprise feature in equivalent Neo4j® EE 3.5.x. Ratinoff Decl., Exh. 38 at 2:12-17, 4:15-22, 5:4-6:21; Exh. 3 at 127:19-128:17. | **UNDISPUTED:** Defendants did know that ONgDB did not include every closed enterprise feature and did not ever say that the 2 were equivalent. The defendants used the term "Drop in replacement" which has nothing to do with feature by feature equivalency. |
| | <u>Fact 100</u>: GFI admitted that ONgDB v3.5.4 is not 100% identical to official Neo4j® EE v3.5.4. Ratinoff Decl., Exh. 31 at 158:18-163:5, 163:13-165:6; Exh. 3 at 124:2-126:23. | **UNDISPUTED**: ONgDB 3.5.4 is not 100% identical to equivalent Neo4j enterprise versions and that claim was never made. |
| | <u>Fact 101</u>: GFI admitted that after ONgDB v3.5.4, it could not "reliably guarantee that it was a drop-in replacement" for the same version number of Neo4j® EE and was unwilling to do the testing to make such integration and compatibility guarantees because it became "too hard to demonstrate." Ratinoff Decl., Exh. 31 at 186:24-188:17, 188:23-189:23. | **DISPUTED** – GFI conducts tests on ONgDB to ensure its quality and compatibility.<br><br>**UNDISPUTED** GFI has not verified that ONgDB versions after 3.5.4 are drop in replacements for the equivalent version of Neo4j EE. Suhy has not been advised by any user of ONgDB that is it incompatible with Neo4J commercial software. Suhy Dec. ¶40 |
| | <u>Fact 102</u>: As a result, Defendants were leading consumers to believe they were downloading an exact copy of the same version of commercial-only releases of NEO4J® EE, which in actuality they were | DISPUTED: Suhy, PureThink and iGov never lead consumers into believing they were downloading an exact copy of the same commercial only releases. |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | receiving an inferior ONgDB product that was not a true "drop in" replacement. *See supra* Facts 80-101. | For versions when the enterprise code was present and no modifications were made in the source code - defendents made clear that Neo4j did not compile the code, even though the code was the same for Neo4j Enterprise and ONgDB.  The defendants knew that knowledgeable users only needed to know specific facts such as the code being unchanged in specific versions.  Furthermore ONgDB is a drop in replacement for Neo4j community and enterprise for all versions including 3.5.   Drop in replacement has nothing to do with feature parity.

Suhy believes that the original code for causal clustering and other features is actual superior to the feature rewrites Neo4j Inc made when it closed the Neo4j Enterprise code in 3.5

To the contrary, the statements are true.  First, ONgDB is a drop in replacement as explained in the deposition of Brad Nussbaum.  Nussbaum Depo., 158:7-14, 160: 9-14.  Pernick Dec. Ex. A. Plaintiffs have presented no evidence that ONgDB does not operate as a drop in replacement.  With respect to ONgDB being free and open, again, Plaintiffs argument that the removal of the Commons Clause language from the Neo4J Sweden Software License was improper is incorrect.  Pernick Dec. Ex. B Substituting the matching language for the defined terms in this provision, Section 7 of the Neo4J Sweden Software License states:  "If the Program as [GFI] received it, or any part of it, contains a notice stating that it is governed by [the AGPLv3 license] along with a term that is a further restriction, [GFI] may remove that term." Ratinoff Decl. Exh. 39, 6:331-7:393 |

842\3658210.3

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | Suhy has not been advised by any user of ONgDB that is it incompatible with Neo4J commercial software.  Suhy Dec. ¶40 |
| | **Fact 103:** Neo4j® EE has been subject to trademark policies and guidelines published on Plaintiffs' website, which along with the terms of the GPL, AGPL and Neo4j Sweden Software License, made clear that to the extent any authorized modifications are made to Neo4j® Software, such modified software should indicate so and no longer bear the Neo4j® Mark.  Rathle Decl., ¶¶ 15-18. Exhs. 5-7. | DISPUTED:  Those terms were only recently added.  Furthermore - Neo4j Inc never provided us with trademark policies and these policies were not found on their websites until recently. Furthermore - The neo4j word is only used in a descriptive manner.  The Neo4j® Mark was not used. Suhy Dec.41 USA trademark policies only cover its limited license to the trademark covering the commercial version of Neo4J. See Beene Dec. Exhibit 1. |
| 2.  Defendants' statements actually deceive or has the tendency to deceive a substantial segment of its audience | **Fact 104:** Defendants intentionally made the false statements publicly on their website and on Twitter that ONgDB is a "free and open" drop-in replacement/equivalent under the AGPL to convince customers to adopt ONgDB over Neo4j® EE, and pay iGov, Graph Grid and/or AtomRain for related consulting and support services. *See supra* Facts 78-80, 83-84, 86-93. | **DISPUTED:**  The statements referenced are true.  The statements made by Suhy and iGov were made to educate the community about ONgDB and Neo4j. Furthermore - the word drop-in replacement was used which is still true for all versions of ONgDB.  The term "drop in replacement/equivalent" not used in combination the way Neo4j fact suggests.  The term "drop in replacement" was used on its own. Suhy Dec.42 To the contrary, the statements are true.  First, ONgDB is a drop in replacement as explained in the deposition of Brad Nussbaum.  Nussbaum Depo., 158:7-14, 160: 9-14. Pernick Dec. Ex. A. Plaintiffs have presented no evidence that ONgDB does not operate as a drop in replacement.  With respect to ONgDB being free and open, again, Plaintiffs argument that the removal of the Commons Clause language from the Neo4J Sweden Software License was improper is incorrect.  Pernick Dec. Ex. B Substituting the matching language for the defined |

(86 of 253), Page 86 of 253
Case: 24-5538, 12/23/2024, DktEntry: 18.8, Page 86 of 253
Case 5:18-cv-07182-EJD   Document 100   Filed 01/15/21   Page 79 of 101

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | terms in this provision, Section 7 of the Neo4J Sweden Software License states: "If the Program as [GFI] received it, or any part of it, contains a notice stating that it is governed by [the AGPLv3 license] along with a term that is a further restriction, [GFI] may remove that term." Ratinoff Decl. Exh. 39, 6:331-7:393  The cited deposition testimony also demonstrates GFI's belief in the truth of these statements. Pernick Dec. Ex. A |
| | Fact 105: Consumers chose ONgDB over Neo4j® EE based on Defendants' misrepresentations about ONgDB being "free and open" drop-in replacement/equivalent under the AGPL, including NextCentury and the MPO, Tufin, the IRS, Department of Homeland Security (DHS) and others.  Ratinoff Decl., Exhs. 35, 40, 48-51, 53, 100, 120, 127, 133-135; Exh. 3 at 54:17-55:1, 142:15-144:20, 227:3-8, Exh. 31 at 191:15-24, 194:23-25, 195:13-18, 196:22-197:24; Broad Decl., ¶¶ 20-24; Exhs. 12-13. | DISPUTED: the representations made about being a drop-in replacement are true.  The term "drop in replacement/equivalent" was not used together in the manner Neo4j referenced.  Only the term "drop-in replacement" was used. Suhy Dec.42

To the contrary, the statements are true.  First, ONgDB is a drop in replacement as explained in the deposition of Brad Nussbaum.  Nussbaum Depo., 158:7-14, 160: 9-14.  Pernick Dec. Ex. A. Plaintiffs have presented no evidence that ONgDB does not operate as a drop in replacement.  With respect to ONgDB being free and open, again, Plaintiffs argument that the removal of the Commons Clause language from the Neo4J Sweden Software License was improper is incorrect.  Pernick Dec. Ex. B Substituting the matching language for the defined terms in this provision, Section 7 of the Neo4J Sweden Software License states:  "If the Program as [GFI] received it, or any part of it, contains a notice stating that it is governed by [the AGPLv3 license] along with a term that is a further restriction, [GFI] may remove that term." Ratinoff Decl. Exh. 39, 6:331-7:393  The cited deposition testimony also |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | demonstrates GFI's belief in the truth of these statements. Pernick Dec. Ex. A<br><br>Neo4j and ONgDB are highly technical products and the end-users who use them are knowledgeable about the technology.<br><br>Furthermore, defendants focused on educating the community with facts.  In the case of the IRS - defendants laid out the facts including differences, license, features, and future of ONgDB were all taken into consideration.<br><br>The agencies mentioned in this fact would not have have been effected by the commons clause restriction as they are using ONgDB for their projects and not creating or selling anything. Suhy Dec. 42<br><br>Plaintiffs present no evidence of a single person or entity that would have made that choice.  Indeed, the evidence Plaintiffs provide with respect to New Century, their one purported concrete example, is an email exchange showing that New Century had no response to Neo4j, Inc.'s proposal even though New Century stated in its email that it understood the issues regarding ONgDB's "legal viability."  Broad Decl., Exh. 13. |
| 3. Defendants' deception is material | Fact 106: Defendants' false statements that ONgDB is a drop-in replacement/equivalent to paid-for, commercial licensed Neo4® EE was material to potential consumers' purchasing decision because Defendants were offering it for free under the AGPL, and unbeknownst to consumers, in violation of the Neo4j Sweden Software License and Neo4j Sweden's copyright. *See supra* Facts 78-93. | DISPUTED:  ONgDB is a drop-in replacement for any Neo4j (community or enterprise) with the same version number.  ONgDB is a superset of Neo4j Core.  Furthermore:  the term "drop-in replacement/equivalent" was not used together as Neo4j says in the fact. |

(88 of 253), Page 88 of 253
Case: 24-5538, 12/23/2024, DktEntry: 18.8, Page 88 of 253
Case 5:18-cv-07182-EJD   Document 100   Filed 01/15/21   Page 81 of 101

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | **Fact 107:** Defendants intentionally made the false statements publicly on their website and on Twitter that ONgDB is a "free and open" drop-in replacement/equivalent under the AGPL to convince customers to adopt ONgDB over Neo4j® EE. *See supra* Facts 78-93. | DISPUTED:  The statements mentioned are true statements, not false.  Suhy and iGov clearly state that there are no limitations to cores and causal clustering - free and open would still apply to the AGPL with commons clause as all the terms in AGPL are still present.  Had Neo4j removed some terms from AGPL - then it may be harder to use the term free and open<br><br>Furthermore:  the term "drop-in replacement/equivalent" was not used together as Neo4j says in the fact.<br><br>To the contrary, the statements are true.  First, ONgDB is a drop in replacement as explained in the deposition of Brad Nussbaum.  Nussbaum Depo., 158:7-14, 160: 9-14.  Pernick Dec. Ex. A. Plaintiffs have presented no evidence that ONgDB does not operate as a drop in replacement.  With respect to ONgDB being free and open, again, Plaintiffs argument that the removal of the Commons Clause language from the Neo4J Sweden Software License was improper is incorrect.  Pernick Dec. Ex. B Substituting the matching language for the defined terms in this provision, Section 7 of the Neo4J Sweden Software License states:  "If the Program as [GFI] received it, or any part of it, contains a notice stating that it is governed by [the AGPLv3 license] along with a term that is a further restriction, [GFI] may remove that term." Ratinoff Decl. Exh. 39, 6:331-7:393  The cited deposition testimony also demonstrates GFI's belief in the truth of these statements. Pernick Dec. Ex. A |
| 4. Defendants caused the false | **Fact 108:**  Defendants' false statements entered interstate commerce through the internet via their websites and Twitter, as well as emails | DISPUTED:  Defendants statements were / are true. |

(89 of 253), Page 89 of 253

Case: 24-5538, 12/23/2024, DktEntry: 18.8, Page 89 of 253
Case 5:18-cv-07182-EJD   Document 100   Filed 01/15/21   Page 82 of 101

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| statement to enter interstate commerce | sent to consumers.  Ratinoff Decl., Exhs. 18, 21, 25, 29, 42-46, 49-51, 54-55, 57-58, 60, 62-66, 67-70, 72-74, 93, 99-104, 108, 113-114. | To the contrary, the statements are true.  First, ONgDB is a drop in replacement as explained in the deposition of Brad Nussbaum.  Nussbaum Depo., 158:7-14, 160: 9-14.  Pernick Dec. Ex. A. Plaintiffs have presented no evidence that ONgDB does not operate as a drop in replacement.  With respect to ONgDB being free and open, again, Plaintiffs argument that the removal of the Commons Clause language from the Neo4J Sweden Software License was improper is incorrect.  Pernick Dec. Ex. B Substituting the matching language for the defined terms in this provision, Section 7 of the Neo4J Sweden Software License states:  "If the Program as [GFI] received it, or any part of it, contains a notice stating that it is governed by [the AGPLv3 license] along with a term that is a further restriction, [GFI] may remove that term." Ratinoff Decl. Exh. 39, 6:331-7:393  The cited deposition testimony also demonstrates GFI's belief in the truth of these statements. Pernick Dec. Ex. A |
| 5. Neo4j USA has been or is likely to be injured as a result of the false statement | Fact 109: Defendants' false statements diverted sales from Neo4j USA. Ratinoff Decl., Exhs. 35, 40, 47-51, 53, 100, 120, 127, 133-135; Exh. 3 at 54:17-55:1, 142:15-144:20, 227:3-8, Exh. 31 at 191:15-24, 194:23-25, 195:13-18, 196:22-197:24; Broad Decl., ¶¶ 20-24; Exhs. 12-13. | DISPUTED:  Defendants statements were / are true. To the contrary, the statements are true.  First, ONgDB is a drop in replacement as explained in the deposition of Brad Nussbaum.  Nussbaum Depo., 158:7-14, 160: 9-14.  Pernick Dec. Ex. A. Plaintiffs have presented no evidence that ONgDB does not operate as a drop in replacement.  With respect to ONgDB being free and open, again, Plaintiffs argument that the removal of the Commons Clause language from the Neo4J Sweden Software License was improper is incorrect.  Pernick Dec. Ex. B Substituting the matching language for the defined terms in this provision, Section 7 of the Neo4J Sweden Software License states:  "If the Program as [GFI] received it, or any part of it, contains a notice |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | stating that it is governed by [the AGPLv3 license] along with a term that is a further restriction, [GFI] may remove that term." Ratinoff Decl. Exh. 39, 6:331-7:393  The cited deposition testimony also demonstrates GFI's belief in the truth of these statements. Pernick Dec. Ex. A<br><br>Plaintiffs present no evidence of a single person or entity that would have made that choice.  Indeed, the evidence Plaintiffs provide with respect to New Century, their one purported concrete example, is an email exchange showing that New Century had no response to Neo4j, Inc.'s proposal even though New Century stated in its email that it understood the issues regarding ONgDB's "legal viability."  Broad Decl., Exh. 13. |
| | Fact 110: Neo4j USA lost multi-year deal with the IRS.  Broad Decl., ¶¶ 20-21. | DISPUTED:  PureThink lost a multi-year deal with IRS, not Neo4j USA.  Suhy Dec. ¶7, Ex. 1 Furthermore - IRS created a competitive procurement  which Neo4j or Resellers could have competed on.  Mr. Suhy is not aware of Neo4j Inc or other resellers providing competitive responses to the procurement. Suhy Dec. ¶49 |
| | Fact 111: Neo4j USA lost multi-year deal with Next Century/MPO adopting ONgDB, amounting to over over $2.2 million in lost revenue. Broad Decl., ¶¶ 22-24, Exhs. 12-13. | DISPUTED:  Mr Suhy is not aware of Neo4j USA having a multi-year deal with Next Centry / MPO which it could have lost in the first place.<br><br>The evidence Plaintiffs provide with respect to New Century, their one purported concrete example, is an email exchange showing that New Century had no response to Neo4j, Inc.'s proposal even though New Century stated in its email that it understood the issues regarding ONgDB's "legal viability."  Broad Decl., Exh. 13. |
| Claim 4: False Designation of Origin  Against GFI and the PT Defendants | | |

(91 of 253), Page 91 of 253
Case: 24-5538, 12/23/2024, DktEntry: 18.8, Page 91 of 253
Case 5:18-cv-07182-EJD   Document 100   Filed 01/15/21   Page 84 of 101

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| 1. used in commerce any word, false designation of origin, false or misleading description, or representation of fact | **Fact 112:** Defendants' false and misleading statements that ONgDB is a "free and open" drop-in replacement under the AGPL for equivalent versions of paid-for commercially licensed Neo4® EE were made in commerce through the internet via their websites and Twitter, as well as emails sent to consumers. Ratinoff Decl., Exhs. 18, 21, 25, 29, 42-46, 49-51, 54-55, 57-58, 60, 62-66, 67-70, 72-74, 93, 99-104, 108, 113-114; *see also* Facts 78-80. | DISPUTED:  The statements made are not misleading or false.   ONgDB is a drop in replacement for Neo4j distributions.   ONgDB is free and open - it has no limitations on number of cores, number of cluster instances, etc - while Neo4j Enterprise commercial packages have legal terms limiting these features making them not free and open.<br><br>To the contrary, the statements are true.  First, ONgDB is a drop in replacement as explained in the deposition of Brad Nussbaum. Nussbaum Depo., 158:7-14, 160: 9-14.  Pernick Dec. Ex. A. Plaintiffs have presented no evidence that ONgDB does not operate as a drop in replacement.  With respect to ONgDB being free and open, again, Plaintiffs argument that the removal of the Commons Clause language from the Neo4J Sweden Software License was improper is incorrect.  Pernick Dec. Ex. B Substituting the matching language for the defined terms in this provision, Section 7 of the Neo4j Sweden Software License states:  "If the Program as [GFI] received it, or any part of it, contains a notice stating that it is governed by [the AGPLv3 license] along with a term that is a further restriction, [GFI] may remove that term." Ratinoff Decl. Exh. 39, 6:331-7:393  The cited deposition testimony also demonstrates GFI's belief in the truth of these statements. Pernick Dec. Ex. A |
| | **Fact 113:**  Defendants' statements that ONgDB is a "free and open" drop-in replacement under the AGPL for equivalent versions of paid-for commercially licensed Neo4® EE were false and misleading because Defendants did not have the right to replace the Neo4j Sweden Software License with the AGPL.  *See* Facts 78-93. | DISPUTED:  ONgDB is a free and open drop-in replacement.  iGov or Suhy talk about free and open meaning that there were no limitations on the number of cores or cluster instances. |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | Furthermore - Neo4j Sweden still uses the AGPL license with the AGPL preamble.  They added the commons clause restriction which defendants question - but they added this to the AGPL license which is known as a free and open source license. Had they removed the preamble or just copied the terms they liked from the AGPL into a new license then the story may be different. |
| | | To the contrary, the statements are true.  First, ONgDB is a drop in replacement as explained in the deposition of Brad Nussbaum. Nussbaum Depo., 158:7-14, 160: 9-14.  Pernick Dec. Ex. A. Plaintiffs have presented no evidence that ONgDB does not operate as a drop in replacement.  With respect to ONgDB being free and open, again, Plaintiffs argument that the removal of the Commons Clause language from the Neo4J Sweden Software License was improper is incorrect.  Pernick Dec. Ex. B Substituting the matching language for the defined terms in this provision, Section 7 of the Neo4J Sweden Software License states:  "If the Program as [GFI] received it, or any part of it, contains a notice stating that it is governed by [the AGPLv3 license] along with a term that is a further restriction, [GFI] may remove that term." Ratinoff Decl. Exh. 39, 6:331-7:393  The cited deposition testimony also demonstrates GFI's belief in the truth of these statements. Pernick Dec. Ex. A |
| | **Fact 114:**  Defendants' statements ONgDB is a "free and open" drop-in replacement under the AGPL for equivalent versions of paid-for commercially licensed Neo4® EE were false and misleading because ONgDB was not of the same quality as if it were compiled by Plaintiffs. Rathle Decl. ¶¶ 19-22, 29-34; Ratinoff Decl., Exh. 3 at 216:2-218:6; Exh. 31 at 161:23-163:12, 168:14-169:6. | DISPUTED:  These statements are true. They are also not misleading.  ONgDB is a superset of Neo4j as it forks and does not modify the core code.  All versions of ONgDB (even 3.5 ) are drop in replacements for neo4j community and enterprise versions of the same version number. |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | If different people compile the same code using the same build configuration - then there will not be any quality differences between the 2 compiled distributions. In fact - Neo4j does not technically compile their code, the build system they use from atlassian does the job. It should be noted that the GFI build system also uses atlassian tooling and automation.<br><br>To the contrary, the statements are true. First, ONgDB is a drop in replacement as explained in the deposition of Brad Nussbaum. Nussbaum Depo., 158:7-14, 160: 9-14. Pernick Dec. Ex. A. Plaintiffs have presented no evidence that ONgDB does not operate as a drop in replacement. With respect to ONgDB being free and open, again, Plaintiffs argument that the removal of the Commons Clause language from the Neo4J Sweden Software License was improper is incorrect. Pernick Dec. Ex. B Substituting the matching language for the defined terms in this provision, Section 7 of the Neo4J Sweden Software License states: "If the Program as [GFI] received it, or any part of it, contains a notice stating that it is governed by [the AGPLv3 license] along with a term that is a further restriction, [GFI] may remove that term." Ratinoff Decl. Exh. 39, 6:331-7:393  The cited deposition testimony also demonstrates GFI's belief in the truth of these statements. Pernick Dec. Ex. A<br><br>When ONgDB and Neo4j Enterprise share the same code base - the compiled distributions are identical from a functionality and feature perspective. Only the metadata timestamps of the compile time differ which has no effect on the quality. |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | ONgDB ensures that the same JVM and other parameters are used as the Neo4j compiled binaries - there are no quality differences because of the fact that the source code across versions using the same code are the same. |
| | **Fact 115:** Since GFI introduced modifications to ONgDB in an attempt to keep pace with the closed Neo4j® EE releases, the potential for stability and compatibility issues with ONgDB increases. *See* Rathle Decl., ¶¶ 29-24; *see also* Ratinoff Decl., Exh. 31 at 158:18-160:5, 161:23-163:12; Exh. 3 at 223:1-224:9; Exh. 40. | DISPUTED:  GFI does not modify the core code it keeps in sync from the Neo4j official GitHub repository.  The same can be said about Neo4j - and historically they have had many stability and other issues across different releases.  ONgDB skipped over some 4.x releases as it waited for Neo4j Inc to address issues and tickets relating to the releases before GFI felt it was stable enough to upgrade. GFI conducts about 64,000 tests for each build. Nussbaum Depo., 166:18-168:13. |
| | **Fact 116:**  ONgDB does not include every closed enterprise feature in the equivalent version of Neo4j® EE.  Ratinoff Decl., Exh. 38 at 2:12-17, 4:15-22, 5:4-6:21; Exh. 3 at 127:19-128:17. | DISPUTED:  Versions of Neo4j Enterprise below 3.5 had the same code and therefore has every equivalent feature of the corresponding ONgDB version that did not change the source code.   Only ONgDB 3.5 and higher do not include every enterprise feature and defendants don't claim that ongdb 3.5 and above have every feature.

See fact 32.
ONgDB (AKA ONgDB Enterprise) 3.5.11 is Neo4j 3.5.11 Core + <u>the enterprise features Neo4j Inc removed from the code base as of v3.5.</u> This shows we are not saying we have every feature - the features are only the ones removed from the code base as of v3.5 |
| | **Fact 117:**  GFI admitted that after ONgDB v3.5.4, it could not "reliably guarantee that it was a drop-in replacement" for the same version number of Neo4j® EE and was unwilling to do the testing to make such integration and compatibility guarantees.  Ratinoff Decl., Exh. 31 at 186:24-188:17, 188:23-189:23. | **DISPUTED** – GFI conducts tests on ONgDB to ensure its quality and compatibility.

**UNDISPUTED** GFI has not verified that ONgDB versions after 3.5.4 are drop in replacements for the equivalent version of Neo4j EE |
| 2. which is likely to cause confusion or mistake, or to | | |

842\3658210.3

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| deceive, as to sponsorship, affiliation, or the origin of the goods or services in question. | | |
| (a) strength of the mark | The Neo4j® Mark is inherently distinctive and Plaintiffs have used it in commerce since 2007, and as a result has gained strong brand recognition via various awards and recognition in the graph database software market.  Broad Decl., ¶¶ 2-19, Exhs. 1-11. | **DISPUTED**: The word Neo4J is used to describe various software versions and companies, so it is not distinct, and the recognition is not as a company brand but as a type of graph database widely distributed on GitHub under open source licenses. Suhy Dec. 50 |
| (b) relatedness of the goods and similarity of sight, sound and meaning | Defendants promote ONgDB as Neo4j® EE except that they are free and licensed without restrictions under the AGPL.   Ratinoff Decl., Exhs. 18, 21, 25, 29, 42-46, 49-51, 54-55, 57-58, 60, 62-66, 67-70, 72-74, 93, 99-104, 108, 113-114. | DISPUTED:  The website content clearly says that there are no restrictions in usage of cores or number of instances, something the commercial edition enforced via legal terms.  These features have no usage restrictions in ONgDB.<br><br>Exhibit 19 states:  "**They have no restrictions on the number of cluster instances or cores** that the commercial licensed packages impose!"<br><br>Exhibit 42 states: "More agencies are adopting it as they learn about it. ONgDB takes Neo4j core (which is open source) and adds enterprise features into it, all 100% free and open, with no **limits on cores or cluster instances** that 'commercial subscriptions' impose.<br><br>Exhibit 43 states:  1. You do not have to pay any licensing fees for the software you requested. Neo4j Enterprise < 3.5 and ONgDB (Open Native Graph Database) Enterprise (all versions) are available to use 100% free, in production.<br><br>Exhibit 43 states: |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | More agencies are adopting ONgDB over Neo4j as they learn that it is just the free and open Neo4j enterprise alternative. ONgDB takes Neo4j core (which is open source) and adds enterprise features into it, **all 100% free and open, with no limits on cores or cluster instances that 'commercial subscriptions' impose.**<br><br>The exhibits cited do not support the proposition. To the contrary, GFI consistently uses <u>language distinguishing ONgDB from Neo4j EE such as</u> "ONgDB is an open source fork of Neo4j Enterprise that is developed and released under AGPLv3 by The Graph Foundation."  See Responses to Facts 59-64.  And  Exhibit 93 also states:  "What is ONgDB:  Open Native Graph DB is an open source fork of #Neo4j, that picks up prior to Neo4j, Inc.'s removal of enterprise code from the main Github repository." |
| (c) evidence of actual confusion; | <u>Fact 118:</u> Defendants' interchangeable use of "Neo4j Enterprise" and "ONgDB" misleads consumers into mistakenly believing that ONgDB and Neo4j® EE were one and the same.  Ratinoff Decl., Exhs. 35, 40, 42-44, 46-47, 53, 55-58, 76, 100, 130-131, 134-135. | **DISPUTED:** Defendants to do mislead consumers about ONgDB and Neo4j Enterprise.  The statements are true for some versions of Neo4j Enterprise and ONgDB.   Defendants clearly communicate what ONgDB is, what it's origin is.  GFI consistently uses <u>language distinguishing ONgDB from Neo4j EE such as</u> "ONgDB is an open source fork of Neo4j Enterprise that is developed and released under AGPLv3 by The Graph Foundation."  See Responses to Facts 59-64.  And Exhibit 93 also states:  "What is ONgDB:  Open Native Graph DB is an open source fork of #Neo4j, that picks up prior to Neo4j, Inc.'s removal of enterprise code from the main Github repository." |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | Defendants have never mislead and tried to confuse people into thinking ONgDB is just another name for Neo4j Enterprise.  In fact defendants work hard at educating the community about the facts. The cited emails are hearsay and do not establish compatibility issues.  Rather, Exhibit 115 demonstrates an attempt to use a desktop tool inappropriately with a server application.  Ratinoff Decl., Exh. 31 at 232:5-25.  Nothing in the email demonstrates that there would be any compatibility issues when ONgDB is used as a server application. |
| | **Fact 119:** Defendants' misrepresentations about ONgDB being "free and open" drop-in replacement/equivalent under the AGPL caused actual confusion over Defendants' unauthorized modification to the Neo4j Sweden Software License and justification for doing so. *See* Ratinoff Decl., Exhs. 40, 49, 55, 118-119, 131, 133-134. | DISPUTED: the statements made are not misrepresentations.   ONgDB is a drop in replacement of Neo4j community and enterprise versions with the same version number. ONgDB is a superset of Neo4j and does not modify the Neo4j core code.  Furthermore - the combined term "drop-in replacement/equivalent" is not used. To the contrary, the statements are true.  First, ONgDB is a drop in replacement as explained in the deposition of Brad Nussbaum. Nussbaum Depo., 158:7-14, 160: 9-14. Pernick Dec. Ex. A. Plaintiffs have presented no evidence that ONgDB does not operate as a drop in replacement.  With respect to ONgDB being free and open, again, Plaintiffs argument that the removal of the Commons Clause language from the Neo4J Sweden Software License was improper is incorrect.  Pernick Dec. Ex. B Substituting the matching language for the defined terms in this provision, Section 7 of the Neo4J Sweden Software License states:  "If the Program as [GFI] received it, or any part of it, contains a notice stating that it is governed by [the AGPLv3 license] along with a term that is a further restriction, [GFI] may remove that term." Ratinoff Decl. Exh. 39, 6:331-7:393  The cited deposition testimony also |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | demonstrates GFI's belief in the truth of these statements. Pernick Dec. Ex. A<br>The cited emails are hearsay and do not establish compatibility issues.  Rather, Exhibit 115 demonstrates an attempt to use a desktop tool inappropriately with a server application.  Ratinoff Decl., Exh. 31 at 232:5-25.  Nothing in the email demonstrates that there would be any compatibility issues when ONgDB is used as a server application. |
| | Fact 120: GFI's use of the Neo4j® Mark to promote ONgDB resulted in customers choosing ONgDB over Neo4j® EE and encountering compatibility issues.  Ratinoff Decl., Exh. 115-116; Exh 31 at 230:12-233:10; Exh. 3 at 207:12-209:3. | To the contrary, the statements are true.  First, ONgDB is a drop in replacement as explained in the deposition of Brad Nussbaum.  Nussbaum Depo., 158:7-14, 160: 9-14.  Pernick Dec. Ex. A.  Plaintiffs have presented no evidence that ONgDB does not operate as a drop in replacement.  With respect to ONgDB being free and open, again, Plaintiffs argument that the removal of the Commons Clause language from the Neo4J Sweden Software License was improper is incorrect.  Pernick Dec. Ex. B  Substituting the matching language for the defined terms in this provision, Section 7 of the Neo4J Sweden Software License states:  "If the Program as [GFI] received it, or any part of it, contains a notice stating that it is governed by [the AGPLv3 license] along with a term that is a further restriction, [GFI] may remove that term." Ratinoff Decl. Exh. 39, 6:331-7:393  The cited deposition testimony also demonstrates GFI's belief in the truth of these statements. Pernick Dec. Ex. A<br>The cited emails are hearsay and do not establish compatibility issues.  Rather, Exhibit 115 demonstrates an attempt to use a desktop tool inappropriately with a server application.  Ratinoff Decl., Exh. 31 at 232:5-25.  Nothing in the email |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | demonstrates that there would be any compatibility issues when ONgDB is used as a server application. |
| | Fact 121: Consumers chose ONgDB over Neo4j® EE based on Defendants' misrepresentations about ONgDB being "free and open" drop-in replacement/equivalent under the AGPL, including NextCentury and the MPO, Tufin, the IRS, Department of Homeland Security (DHS) and others.  Ratinoff Decl., Exhs. 35, 40, 47-51, 53, 100, 120, 127, 133-135; Exh. 3 at 54:17-55:1, 142:15-144:20, 224:13-23, 227:3-8, Exh. 31 at 191:15-24, 194:23-25, 195:13-18, 196:22-197:24; Exh. 38 at 23:14-24:4; Broad Decl., ¶¶ 20-24, Exhs. 12-13. | DISPUTED:  USA concedes consumers decided to use ONgDB because it was free. Dkt. 98, p. 2:12-13; p. 32:6:10.

Price is the material concern on the purchase,  not the license or drop in capability. This is obvious in the analysis. Consumers can test whether the software is drop in and review the license. As users of ONgDB do not sell the software, whether the commons clause is valid or not has no impact. Under the AGPL, if you use the open source software internally, as for example what the IRS does, there is no issue with the commons clause. Consumers do not face any copyright infringement claim from Sweden as they are licensed under the AGPL. Suhy Dec. ¶44

The terms mentioned are not misrepresentations about ONgDB.  They are true.
Defendants do not use the term "drop-in replacement/equivalent".  ONgDB is free and open - it still contains all the AGPL terms that make it so. All the agencies listed use ONgDB for free. Furthermore - the commons clause would have no effect on the agencies mentioned from Mr Suhy's knowledge. Suhy Dec. ¶43

Plaintiffs present no evidence of a single person or entity that would have made that choice based on the statements in defendants' websites.

Most people do not make million dollar decision to decide on the use of a database from website statements.  Indeed, the evidence Plaintiffs provide |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | with respect to New Century, their one purported concrete example, is an email exchange showing that New Century had no response to Neo4j, Inc.'s proposal even though New Century stated in its email that it understood the issues regarding ONgDB's "legal viability." Broad Decl., Exh. 13. |
| (d) marketing channels and likelihood of expansion | **Fact 122:** Defendants continue to target the same potential users of graph database platforms and software and use the same channels via the internet. *See, e.g.,* Ratinoff Decl., Exhs. 14-15, 18, 25, 29, 37, 45-55, 57, 60-61, 65-66, 76-77, 118-119, 120, 127, 130-132, 134-135. | UNDISPUTED: Objection this fact does not support the claim. Because ONgDB is an unmodified fork of Neo4j Core code, and a superset of Neo4j Core - then anyone who is currently using Neo4j commercial or open source distributions can switch over to ONgDB. In other words - people that use Neo4j are the people who would want to switch to ONgDB if they wanted enterprise features with no limitations on cores or cluster instances for free. Suhy Dec. ¶45 |
| | **Fact 123:** Neo4j USA and the PT Defendants competed for the same contracts in the government sector. Ratinoff Decl., Exhs. 42-51, 54-55, 100, 120, 127, 130-135; Broad Decl., ¶¶ 20-24, Exhs. 12-13. | DISPUTED: To Mr Suhy's knowledge, Neo4j USA does not directly respond to contracts. Neo4j partners bid on a contracts. Purthink has no contracts with the government. Igov does not license software to the government. Suhy Dec. ¶46 |
| (e) intent | **Fact 124:** Defendants' use of the Neo4j® Mark to promote Plaintiffs' software with an improperly modified copyright license shows that they intend to copy them and confuse the public. *See supra* Facts 78-102. | DISPUTED: Defendants do not use the Neo4j® Mark, they use the neo4j word in a descriptive manner. Suhy Dec. ¶41<br>Defendants aim at educating the public not causing confusion. Mr. Suhy did not modify any copyrighted content which is owned by USA, it only updated Sweden's License.txt file which the free software foundation owns the copyright for under the express terms of the AGPL. Suhy Dec. ¶29<br><br>Furthermore - when Suhy made the AGPL license verbatim - the commit message clearly states the intention: |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | The commit which replaced the modified License.txt file copyrighted to the FSF has a commit message which clarifies the intent of replacing the modified license with the verbatim.<br><br>**"Updated the LICENSE.txt file to be pure AGPL as to not violate the fsf copyright and to be in line with the AGPL license."**<br><br>ONgDB is a drop in replacement as explained in the deposition of Brad Nussbaum.  Nussbaum Depo., 158:7-14, 160: 9-14.  Plaintiffs have presented no evidence that ONgDB does not operate as a drop in replacement. With respect to ONgDB being free and open, again, Plaintiffs argument that the removal of the Commons Clause language from the Neo4J Sweden Software License was improper is incorrect. Substituting the matching language for the defined terms in this provision, Section 7 of the Neo4J Sweden Software License states:  "If the Program as [GFI] received it, or any part of it, contains a notice stating that it is governed by [the AGPLv3 license] along with a term that is a further restriction, [GFI] may remove that term."  The cited deposition testimony also demonstrates GFI's belief in the truth of these statements. |

(102 of 253), Page 102 of 253
Case: 24-5538, 12/23/2024, DktEntry: 18.8, Page 102 of 253
Case 5:18-cv-07182-EJD   Document 100   Filed 01/15/21   Page 95 of 101

## Attestations

I attest that the evidence cited by defendants John Mark Suhy, Purethink, LLC and iGov, Inc. herein fairly and accurately supports or disputes the facts asserted.

Dated: 1/15/2021

/s/ Adron G. Beene
Adron G. Beene


I attest that the evidence cited by defendants Graph Foundation, Inc. herein fairly and accurately supports or disputes the facts asserted.

Dated: 1/15/2021

/s/ John D. Pernick
John D. Pernick

## FILER'S ATTESTATION

I, Adron G. Beene, am the ECF user whose credentials were utilized in the electronic filing of this document. In accordance with N.D. Cal. Civil Local Rule 5-1(i)(3), I hereby attest that all signatories hereto concur in this filing.
Dated: January 15, 2021

_/s/ Adron G. Beene_
Adron W. Beene SB# 129040
Adron G. Beene SB# 298088
Attorney At Law
1754 Technology Drive, Suite 228
San Jose, CA 95110
Tel: (408) 392-9233
Fax: (866) 329-0453
adron@adronlaw.com

Attorney for Defendants
PURETHINK LLC, a Delaware limited
liability company, IGOV INC., a Virginia
corporation, and JOHN MARK SUHY

**01-15-2021 – DEFENDANTS' CONSOLIDATED SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS.pdf**

Filed 01/15/2021

DEFENDANTS' CONSOLIDATED SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS (Exhibit B)

(Pacer Doc: #100)

**EXHIBIT B**

## DEFENDANTS' CONSOLIDATED SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| **Claim 1: Neo4J USA's Trademark Infringement Claim** | | |
| Plaintiff Neo4j Inc. ("USA") Does not own a protectable trademark in Neo4J which is a required element of a trademark claim | <u>Fact 125:</u> **USA Fka, Neo Techonolgy, Inc. does not own the trademark to Neo4J. Neo4J Sweden AB, Fka Network Engine for Objects in Lund AB) ("Sweden") owns the trademark to Neo4J.** Beene Dec ¶ 2-7 Exhibits 1, (recital 1, Section 1.6. (b), 1.7, 2.1 (non-exclusive license) Article 3 (Reservation of Rights [to Sweden]) 2 Royalty report on license, 3 (Sweden Neo4J trademark applications and registrations). Dkt. No 56 ¶91 (Neo Technologies, Inc. was incorporated in July 7, 2011 and changed its name to Neo4j, Inc. on August 7, 2017) | |
| | <u>Fact 126:</u> Sweden licensed its Neo4J software and trademarks on a **non-exclusive basis** to USA. Beene Dec ¶ 2-7 Exhibits 1, (recital 1, Section 1.6. (b), 1.7, 2.1 (non-exclusive license) Article 3 (Reservation of Rights [to Sweden]) 2 Royalty report on license, 3 (Sweden Neo4J trademark applications and registrations). | |
| | <u>Fact 127:</u> Sweden retained exclusive ownership of the mark in the license agreement. Beene Dec ¶ 2-7 Exhibit 1, (recital 1, Section 1.6. (b), 1.7, Article 3 (Reservation of Rights [to Sweden]) | |
| | <u>Fact 128:</u> Sweden has in fact made trademark applications claiming ownership of the Neo4J mark throughout the world further providing evidence of Sweden's ownership of the Neo4J mark. Beene Dec ¶ 7, Exhibit 3. | |
| | <u>Fact 129:</u> USA has paid Sweden royalties for the license. Beene Dec ¶ 6, Exhibits 2. | |
| Fraud on the PTO defense | <u>Fact 130:</u> Lars Nordwall, as the COO of USA, knew USA did not own the NEO4J trademark and did not use the trademark since 6/04/2006 which is before USA was formed on July 7, 2011.  Beene Dec. Ex. 6 (NEO4J trademark application, principle register) and Dkt. No 56 ¶91 (Neo Technologies, Inc. was incorporated in July 7, 2011 and changed its name to Neo4j, Inc. on August 7, 2017) | |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| Naked license defense | Fact 131: USA provides no evidence that Sweden controlled quality on Sweden's software the years before the software and trademark was licensed to USA. Declaration of John Mark Suhy (Suhy Dec.) ¶51. | |
| | Fact 132: The License Agreement from Sweden to USA has no quality control provisions. Beene Dec ¶ 2-7 Exhibit 1 (no quality control provision in license agreement.) | |
| Defendants did not infringe on USA's limited trademark license when referring to the open source software | Fact 133: Sweden is the licensor of the open source version of Neo4J under the AGPL and the owner of the Neo4J trademark. Fact 125 and Ratinoff Dec. Ex 39 at 25:11-13 | |
| Defendants use of Neo4J was nominative which is not infringing. | Fact 134: Defendants references Sweden's Neo4J mark to reference Sweden's open source software called Neo4J to describe the software and uses USA's company name and products to identify them in comparative advertisement.<br>Suhy Dec. ¶9 | |
| Defendants use of Neo4J does not suggest sponsorship or endorsement | Fact 135 Defendants websites, taken as a whole do not suggest sponsorship or endorsement by USA. Suhy does not have a website. Defendants did not use the USA's disputed Neo4j mark for promotion of USA's products. All promotions have been for marketing and service Sweden's open source Neo4J software and derivatives of such software as permitted under the GitHub Terms of Service and the AGPL. References to USA and its products are for comparative advertisement. Suhy Dec. ¶9, 16 | |
| PT defendants engaged in no conduct leading to an inequitable result to support Alter Ego Liability | Fact 136: The Partner Agreement seeks to prevent PT from dealing in all versions of Sweden's Neo4J open source software when USA is not the licensor under the AGPL and the AGPL freely allows anyone to use the software. Fact 133; Suhy Dec. ¶52 | |
| | Fact 137: The purpose of USA' restriction in the Partner Agreement is to prevent any terminated partner from supporting Sweden's open source version of Neo4J which is unlawful. Suhy Dec. ¶4, 53 | |
| | Fact 138: USA wrongfully and successfully asserted the unlawful restriction to interfere with PT efforts to get business from the IRS. Suhy Dec. ¶7, 54, Ex. 1 | |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| The PT Defendants did not used the Neo4j® Mark without Neo4j USA's authorization to promote ONgDB | <u>Fact 139:</u> The PT defendants are not using the Neo4J mark to sell USA's commercial software. Suhy Dec. ¶31 | |
| | <u>Fact 140:</u> USA agreed Sweden owns the intellectual property, including marks for Neo4J. Fact 125. | |
| | <u>Fact 141:</u> Here there is an issue of fact on the false designation of origin element as ONgDB is a fork of Sweden's open source software licensed under the AGPL. Suhy Dec. ¶19 | |
| | <u>Fact 142:</u> USA even admits, the open source version has the same great features as the commercial version. Suhy Dec. ¶55; Beene Dec. Ex. 8 | |
| | <u>Fact 143:</u> Whether ONgDB is a "drop in" replacement for USA's "commercial" Neo4J software, is a disputed issue of fact. | |
| | <u>Fact 144:</u> Data and queries, the key function of a databases, from either version work on both versions. Suhy Dec. ¶56 | |
| ONgDB is a Drop in replacement to versions of Neo4J | <u>Fact 145:</u> USA, in its website, stated that its commercial Enterprise version of Neo4J has "same great features" as the open source version of Neo4j.  Suhy Dec. ¶55, Ex 3 | |
| | <u>Fact 146:</u> ONgBD allows users of other versions of Neo4J (including older versions of commercial and open source) to drop in the files from the same version number and operate the same data and run queries on it, which is the core functionality of a database. Defendants have not heard of any consumer suggest otherwise. Suhy Dec. ¶57 | |
| Use of USA documentation is licensed Content and is not actionable on any claim. | <u>Fact 147:</u> Any user of open source software from Sweden's Neo4J GitHub repository are allowed to use all content on the site. This is permitted under the GitHub Terms of Service.  GitHub Terms of service A. 4 definition of Content and ¶ D 5 license. (including "You may grant further rights… " inferring rights to End Users under the GitHub license may **not** be limited.) Suhy Dec. ¶58 Beene Dec. Ex. 9. | |
| Defendants product and services are not readily identifiable without use of the Neo4J trademark | <u>Fact. 148:</u> Neo4J is a type of database that must be identified so consumers looking for the database may find it. Defendants properly used Neo4J to identify companies and products in marketing and | |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
|  | comparative advertisements to provide knowledgeable consumers with information for fair competition. Suhy Dec. ¶2, 59 |  |
| **2. False Advertising Claims 2nd, 3rd and 4th causes of action.** |  |  |
| ONgDB is based on the open source version of Neo4J licensed under the AGPL and is free. | <u>Fact 149:</u> ONgDB is a free fork of Neo4J software licensed under the Sweden's AGPL. Suhy Dec. ¶36 |  |
|  | <u>Fact 150:</u> The AGPL is a free open source license. AGPL Preamble, Ratinoff Dec. Ex. 39, 1-2 |  |
| Consumer did not materially rely on the defendants' representations to determine to use ONgDB software for free instead of paying USA money for a commercial version of Neo4J. | <u>Fact 151:</u> Sophisticated consumers of databases make purchase decisions based on price. Suhy Dec. ¶44; USA concedes consumers decided to use ONgDB because it was free. Dkt. 98, p.2:12-13 p. 32:6:10. Information Analysis Incorporated's GSA price list has a $500,000 bid for a Neo4J term license. (Beene Dec. Exhibit 5, p.1.) Beene Dec Ex. 7 |  |
| An ONgDB licensee that only internally uses the software does not violate the commons clause- valid or not. | <u>Fact 152:</u> The common clause, valid or not, only restricts licensees from selling the software. It does not prevent a licensee from internally using the software. Ratinoff Dec. Ex 39 at 25:11-13, Suhy Dec. ¶36, 60, Ex. 2 |  |
|  | <u>Fact 153:</u> Not all versions of Sweden's open source software are subject to the common clause. Suhy Dec. ¶61 |  |
|  | <u>Fact 154:</u> A licensee who wants to sell an open source Neo4J fork, may do so with a prior version of Neo4j where the license does not include the added common clause if they have concerns of the validity of the commons clause. Suhy Dec. ¶62 |  |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| The commons clauses added to the AGPL does not bar professional services. | Fact 155: Even if valid, the commons clause only bars services that "consists, entirely or substantially of the Software or the functionality of the Software."  Ratinoff Dec. Ex 39 at 25:681-693 | |
| | Fact 156: Professional services to support a licensee of open source Neo4j do not "consists, entirely or substantially of the Software or the functionality of the Software."  Ratinoff Dec. Ex 39 at 25:681-693, Suhy Dec. ¶36, 60, Ex.2 | |

## Attestation

I attest that the evidence cited by herein fairly and accurately supports or disputes the facts asserted. Dated:

1/15/2021

/s/ Adron G. Beene

Adron G. Beene

**01-15-2021 - DECL OF JOHN MARK SUHY ISO DEF CONS OPP AND MOT FOR SUM JUDGMENT.pdf**

Filed 01/15/2021

DECLARATION OF JOHN MARK SUHY IN SUPPORT OF DEFENDANTS
CONSOLIDATED OPPOSITION AND MOTION FOR SUMMARY JUDGMENT

(Pacer Doc: #100)

1  Adron W. Beene SB# 129040
   Adron G. Beene SB# 298088
2  Attorney at Law
   1754 Technology Drive, Suite 228
3  San Jose, CA 95110
   Tel: (408) 392-9233
4  Fax: (866) 329-0453
   adron@adronlaw.com
5

6  Attorneys for defendants:
   PURETHINK LLC, a Delaware limited
7  liability company, IGOV INC., a Virginia
   corporation, and JOHN MARK SUHY
8

9              UNITED STATES DISTRICT COURT
10           NORTHERN DISTRICT OF CALIFORNIA

11 NEO4J, INC., a Delaware corporation, and   CASE NO. 5:18-cv-7182 EJD
   NEO4J SWEDEN AB, a Swedish
12 corporation,
                                              **DECLARATION OF JOHN**
13 Plaintiffs,                                **MARK SUHY IN SUPPORT OF**
   v.                                         **DEFENDANTS**
14                                            **CONSOLIDATED OPPOSITION**
   PURETHINK LLC, a Delaware limited          **AND MOTION FOR SUMMARY**
15 liability company, IGOV INC., a Virginia   **JUDGMENT**
   corporation, and JOHN MARK SUHY, an
16 individual,                                Date: March 25, 2021
17 Defendants.                                Time: 9:00 a.m.
                                              Dept. Courtroom 4, 5th floor
18 AND RELATED COUNTERCLAIMS                  Judge: Hon. Edward J. Davila
19

20

21 I, John Mark Suhy, declare:

22

23     1.     I am a defendant and counter-claimant in this action. I have

24 personal knowledge of the facts set forth in this declaration.

25

2. The PT defendants use of the Neo4J trademark is nominative to identify NEO4J as a company and the Neo4J software and for comparative advertisement to provide knowledgeable consumers with information for fair competition.

3. The PureThink references are to Sweden's open source versions of Neo4J and proper nominative use of Sweden's mark.

4. iGov was formed as a separate entity by Suhy for several reasons. The restrictions are for purposes of non-competition and void.

5. PureThink and iGov used the same office address for a mailing address until iGov could setup a new office. iGov did not "use" the office address other than for correspondence. The support telephone number is a 3rd party number that neither PureThink or iGov owned. The website template used was a commercial template. PureThink and iGov purchased the same template because Suhy was familiar with it. iGov did not use PT's computers.

6. Solicitations to Sania National Laboratories were for use of Sweden's open source Neo4J.

7. USA interfered with PT's potential business with the IRS. iGov did not take over PT's potential business relationship with the IRS. A true and correct copy of an email showing USA's interference is attached as Exhibit 1.

8. Suhy and PureThink did develop the Neo4j Government Edition. the PT Defendants do not "tout" PT's prior relationship; they said it was terminated.

9.    iGov references Sweden's Neo4J mark to reference Sweden's open source software called Neo4J to describe the software and uses USA's company name and products to identify them in comparative advertisement.

10.    The email address is for Sweden's open source Neo4j for inquires for that product. The email address was discontinued in the hopes USA would discontinue this litigation. "Neo4j Enterprise" is needed to distinguish between the open source "Neo4j Community" and "Neo4j Enterprise" distributions, both of which are built when compiling the Neo4j source code. iGov does not "tout" PT's prior relationship; they said it was terminated.

11.    iGov offers support for both Neo4j Enterprise open source licensed distributions, and ONgDB Enterprise open source distributions. Neo4j Enterprise distributions below 3.5 are still in use and available to the public. iGov no longer offers distributions from it's website and only recommends ONgDB Enterprise distributions. iGov links to the GraphFoundation download page.

12.    iGov used neo4j@igovsol.com and neo4j.html as a way to inquire about iGov support services and support for the neo4j open source database. 'neo4j' is Sweden's Github repository name for the official Sweden open source Neo4j repository.  It was not just a means for consumers to inquire about ONgDB but of the services and support around open source neo4j and ongdb open source license support.

13.    Neo4j Enterprise and ONgDB Enterprise are open source and free to use under the open source AGPL license.  After versions 3.4.x – the term Neo4j Enterprise Edition was not applicable as Neo4j Inc stopped contributing to the enterprise code. iGov does not promote Neo4j Enterprise

1   Edition 3.5.x as being open source. Many of the exhibits are showing the

2   same page over and over from different snapshot dates but with matching

3   content giving the illusion that there were more pages than existed. ONgDB

4   3.5.5 is a drop in replacement for Neo4j 3.5.5 (Community and Enterprise

5   commercial.) After reading Plaintiffs' Fact 21 - iGov realizes that the next

6   line needs to have the grammar cleaned up to say: "The AGPLv3 Open

7   Source License, has no limitations on causal cluster instances, cores or

8   production usage"

9       14.    GraphStack is a graph development stack aimed at building out

10  large scale AI and graph solutions.  GraphStack is to promote iGov software

11  packages and solution development, not specifically Neo4j.  Both Neo4j and

12  ONgDB will drop into GraphStack – so using the names is important to

13  explain that GraphStack will work with both.

14      15.    Suhy and iGov are not parties to the Partner agreement. The PT

15  defendants have not used USA's disputed trademark to market, sell or

16  service and USA products. All marketing and services are limited to Sweden's

17  open source Neo4J software and derivatives of such software as permitted

18  under the GitHub Terms of Service and the AGPL.

19      16.    PureThink and iGov did not use the USA's disputed Neo4j mark

20  for promotion of  USA's products. All promotions have been to marketing and

21  service Sweden's open source Neo4J software and derivatives of such

22  software as permitted under the GitHub Terms of Service and the AGPL.

23  References to USA and its products are for comparative advertisement.

24

25

17.     All exhibits referenced in support of Plaintiffs' fact 26, except for exhibit 14, (which are Exh. 15, 16, 17, 18, 21, 62-65 ) are all for iGov Inc sites, but have been incorrectly referenced in fact 26 as being PT Defendants.

18.     When Sweden's  Neo4j open source code is compiled from the official Sweden Neo4j Github repository - it creates 2 distributions called "Neo4j Community" and "Neo4j Enterprise".  Enterprise is a standard term for software used for business as in an "Enterprise" is a generic identifier.

19.     ONgDB is a fork of Sweden's open source Neo4j, nominatively identified as such, and licensed under the AGPL.

20.     PT and iGov websites, taken as a whole do not suggest sponsorship or endorsement by USA.  Suhy does not have a website. PureThink and iGov did not use the USA's disputed Neo4j mark for promotion of USA's products.

21.     The iGov and PT websites state that PT has ceased their partnership with Neo Technology and Neo4j Inc. This shows a lack of sponsorship or endorsement.

22.     Because ONgDB is a fork of Neo4j which the core code is unmodified, the release notes and whats new page are relevant and provide important information.

23.     The Sweden GitHub repository for open source Neo4J provides content including USA's documentation. Under the GitHub Terms of Services, all users may use all content. Referring licensees to such documentation is permissive. Nevertheless, when Neo4j Inc complained  - the links were removed.

24.   PureThink and iGov did not use the USA's disputed Neo4j mark for promotion of USA's products.

25.   Regarding evidence purported to support Plaintiffs' fact 35, Ratinoff Decl. Exhibit 115 shows an anonymous user named "stephanie" asking about trying to use ONgDB with Neo4j Desktop, it does not mention a specific version or anything more.  There is no way of knowing if there was a "compatibility" issue, in fact the issue could have been caused because of an incorrect version number and could have occurred with Neo4j Enterprise distributions packaged by Neo4j.  Furthermore, USA responds and in no way explains or tells the user that ONgDB is not even provided by them.  The omissions in Neo4j's response would actually cause confusion because they are not saying anything about ONgDB being a 3rd party product. The confusion is caused by USA and Sweden's dual channel marketing of commercial and open source software through two different companies with the same name.  Ratinoff Decl. Exhibit 116 is simply forwarding this post to Brad Nussbaum.

26.   Defendants only used "Neo4j Enterprise" and "ONgDB" in descriptive manners. Furthermore defendants focused on educating consumers, not misleading them.  Specific versions of Neo4j and ONgDB had no difference in source code before enterprise source was closed.

27.   For distributions of "ONgDB" "Neo4j Enterprise" and "Neo4j EE", defendants made all the facts clear and never misled consumers. The inference drawn by Plaintiffs is not supported by the evidence:  Exhibit 35 shows no confusion or misleading of customers.   The user is asking a question on the ongdb github issue list and the content does not lead to any

1  confusion. Exhibit 40 clearly shows that there is no confusion as the user was

2  asking about compiling the binaries himself. There is nothing in the exhibit

3  supporting that this user was mislead. "where can I find the source of the

4  binaries you provide? could you provide instructions on how to build your

5  binaries myself?" Exhibit 42 shows that iGov is helping Perspecta

6  Engineering Inc understand the differences between Neo4j and ONgDB.

7  Originally Perspecta had reached out to iGov and iGov responded explaining

8  the facts and differences.  The statements in exhibits are true and not

9  misleading.

10      28.    The technical issues could be caused by Neo4j Core code that it

11  does not modify or simply because an end-user did not read the instructions

12  on configuring a specific feature.  I am not aware of a bug fix for this issue

13  indicating it could have just been user error. The inference drawn is not

14  supported by the statement:  In many of the exhibits Neo4j tries to show a

15  problem, but does not show any proof that the problem was simply user error

16  or configuration or an analysis of what the problem was. Exhibit 121 does not

17  give enough information to identify if there is a technical issue, and

18  furthermore the user from the exhibit said that they figured out the problem

19  on their own indicating it was user error. Exhibit 122 seems to indicate that a

20  plugin or misconfiguration of the JVM is the problem. Exhibit 123 indicates

21  that the user is using ONgDB 3.2.3 which would have had the same source

22  code as the Neo4j Enterprise branded distribution.  Furthermore it seems

23  that the issue was with the a 3rd party plugin called "tinker pop" and

24  therefore was not even specific to Neo4j or ONgDB.  Because the source code

25  for Neo4j and ONgDB was the same for that specific 3.2.3 version - if there

1    was a technical issue - then it would have also been present in the Neo4j

2    Enterprise 3.2.3 version as well. USA charges customers and provides

3    technical support for its commercial Neo4J products because consumers have

4    technical issues with their "commercial" Neo4J products as well. Technical

5    issues with software is not indicative of any difference in the software.

6        29.    I did not remove commercial restrictions imposed by Neo4j.  I

7    followed the instructions of the License.txt copyright holder (free software

8    foundation) making it verbatim.  The commons clause restrictions were still

9    in effect and referenced in 1000s of files which I did not modify because the

10   other files were copyrighted to Neo4j Sweden.  Following the rules for the

11   License.txt file did not remove any restrictions on the software.

12       30.    The following statements are all truthful: (1) "ONgDB

13   distributions are licensed under AGPLv3 as a free and open drop-in

14   replacements of Neo4j Enterprise commercial licensed distributions with the

15   same version number"; (2) "ONgDB and Neo4j Enterprise consists of modules

16   from Neo4j Community Edition and modules licensed under the AGPLv3"; (3)

17   "ONgDB distributions are licensed under AGPLv3 as a free and open source

18   alternative to currently available proprietary native graph offerings such as

19   Neo4j Enterprise Edition"; (4) "download ONgDB Enterprise as a drop in

20   replacement for an existing commercial licensed distribution of the same

21   version number."; (5) "ONgDB Enterprise is a drop in replacement for Neo4j

22   Enterprise commercial packages downloaded from Neo4j.com" ; (6) "ONgDB

23   Enterprise 3.5.5…. Drop in replacement for Neo4j Core and Enterprise 3.5.5.

24   AGPLv3 Open Source License, no limitations on causal cluster instances,

25   cores, or production usage" (7) "ONgDB is a drop in replacement for the Neo4j

Suhy Declaration ISO Consolidated Opposition and Motion for Summary Judgment    8

CASE NO. 5:18-cv-7182 EJD

1   Community and Enterprise branded distributions"; (8) "[ONgDB] is an open

2   source fork of #Neo4j"; and (9) "You can use the ONgDB fork of Neo4j which

3   adds enterprise code back into Neo4j core. It is 100% free and open."

4       31.    The PT Defendants did not all say what is represented in

5   Plaintiff's fact 78. Only iGov's website stated: that "[Neo4j Enterprise] is

6   100% free and open source" and "Neo4j Enterprise is released only under the

7   standard AGPLv3 open source license that is managed by the free software

8   foundation." Defendants do not sell ONgDB, ONgDB is licensed under AGPL

9   and AGPL is an open source license for free software. The PT defendants are

10  not using the Neo4J mark to sell USA's commercial software.

11      32.    None of the evidence cited identifies any party that would have

12  used Neo4j EE.  Further, Plaintiffs present no evidence that they competed

13  with GraphGrid or provided similar services.  Plaintiffs are misidentified as if

14  they both do the same thing. Sweden is not a party to the cause of action.

15  Sweden licenses the open source software; USA does not. See APGL license.

16  USA does not support open source software licensed by Sweden.

17      33.    Plaintiffs did not release Neo4j EE v3.4 under a license that

18  which included the terms from the AGPLv3 and additional restrictions

19  provided by the Commons Clause, as it was Neo4J Sweden who made the

20  release, and not Neo4J USA.

21      34.    The author of the commons clause, Heather Meeker, clarifies the

22  intention and meaning of the commons clause as well. Support services are

23  not barred as they do not consist entirely or substantially of the Software or

24  Functionality of the Software as limited in the commons clause. The

25  restriction of services is using the software as a service as in a SaaS

1  implementation. A true and correct print from comment from Neo4J's

2  Heather Meeker located on Sweden's Neo4J's repository on this issue is

3  attached as Exhibit 2.

4      35.   AGPL §7 allowed me to remove the commons clause from the

5  Neo4J Sweden Software License. I did not remove any commercial

6  restrictions.  I simply ensured the LICENSE.txt file was verbatim as

7  required by the copyright holder of the LICENSE.txt files : the free software

8  foundation.   I did not modify any other files, and the commons commercial

9  restrictions were still in effect.   Following the FSF copyright instructions for

10 the AGPL License.txt file did not remove any restrictions from the

11 distribution - as the restrictions were documented across the repository.

12 Following the rules for just the specific files did not remove legal terms from

13 the distributions. All the other files which Neo4j held the copyright for were

14 not modified by me and clearly stated that the commons clause was there.

15     36.   PT, Suhy, and iGov Inc did not use the term "equivalent" in any

16 references.   For Neo4j Enterprise versions below 3.5 - ONgDB was

17 equivalent in features as it used the same unmodified source code.  So this

18 statement would be true for specific versions of Neo4j and ONgDB.  PT,

19 Suhy, and iGov always used the term drop in replacement which does not

20 mean the features are all equivalent. Furthermore - ONgDB is a current free

21 fork of Neo4j open source software licensed from Sweden, it pulls in all the

22 Neo4j community commits from the official repository regularly keeping it up

23 to date. This is allowed under the AGPL.

24     37.   There are no pre-release terms in the GitHub repository.  It's

25 possible that a pre-release agreement was added to the compiled packages -

Suhy Declaration ISO Consolidated Opposition and Motion for Summary Judgment      10

CASE NO. 5:18-cv-7182 EJD

1   but that would be in the actual download of the package, not the GitHub

2   source code as they state. Furthermore - enterprise code was not available in

3   v3.5.0-RC1 but it was available in 3.5.0-beta03.

4       38.   The AGPL license.txt file is copyrighted to the free software

5   foundation.  Suhy followed the guidance from the free software foundation

6   relating to the license being verbatim.  By following the FSF copyright

7   guidance he did not remove the legal terms from the distribution as a whole.

8   There are 1000s of Neo4j files in the repository which clearly state the

9   commons clause is still part of the license.  I.E.  Using the verbatim AGPL

10  license content as instructed by the Free software foundation did not remove

11  the commons license in any way as it was stated in many other places. There

12  is no obligation to repeat Sweden's copyright notice on every file. And Sweden

13  owns the copyright (Undisputed Fact 80) USA has not standing to argue

14  about the copyright notice. Phase 1 does not address the DCMA claim.

15      39.   ONgDB is not a "patchwork" or "glue"  of code - it has been

16  proven in large production deployments.   After the enterprise code was

17  closed - I and other contributors continued it's development.    The enterprise

18  code came from Neo4j - so it is calling the code it developed a patchwork of

19  code.

20      40.   The older approach for the enterprise features (which include the

21  tests) is more stable and higher quality than newer re-implementations.  See

22  GitHub bug tickets. I have not been advised by any user of ONgDB that is it

23  incompatible with Neo4J commercial software.

24      41.   The neo4j word is only used in a descriptive manner.  The Neo4j®

25  Mark was not used.

Suhy Declaration ISO Consolidated Opposition and Motion for Summary Judgment        11

CASE NO. 5:18-cv-7182 EJD

42. The statements referenced are true. The statements made by Suhy and iGov were made to educate the community about ONgDB and Neo4j. Furthermore - the word drop-in replacement was used which is still true for all versions of ONgDB. The term "drop in replacement/equivalent" not used in combination the way Neo4j fact suggests. The term "drop in replacement" was used on its own.

43. The agencies mentioned in Plaintiff's fact 105 would not have have been effected by the commons clause restriction as they are using ONgDB for their projects and not creating or selling anything.

44. Price is the material concern on the purchase, not the license or drop in capability. This is obvious in the analysis. Consumers can test whether the software is drop in and review the license. As users of ONgDB do not sell the software, whether the commons clause is valid or not has no impact. Under the AGPL, if you use the open source software internally, as for example what the IRS does, there is no issue with the commons clause. Consumers do not face any copyright infringement claim from Sweden as they are licensed under the AGPL.

45. Because ONgDB is an unmodified fork of Neo4j Core code, and a superset of Neo4j Core - then anyone who is currently using Neo4j commercial or open source distributions can switch over to ONgDB.  In other words - people that use Neo4j are the people who would want to switch to ONgDB if they wanted enterprise features with no limitations on cores or cluster instances for free.

46. Neo4j USA does not directly respond to contracts. Neo4j partners bid on a contracts. Purthink has no contracts with the government. Igov does not license software to the government.

47. When I made the AGPL license verbatim - the commit message clearly stated the intention: The commit which replaced the modified License.txt file copyrighted to the FSF has a commit message which clarifies the intent of replacing the modified license with the verbatim. "Updated the LICENSE.txt file to be pure AGPL as to not violate the fsf copyright and to be in line with the AGPL license."

48. *Reserved*

49. IRS created a competitive procurement which Neo4j or Resellers could have competed on. I am not aware of Neo4j Inc or other resellers providing competitive responses to the procurement.

50. The word Neo4J is used to describe various software versions and companies, so it is not distinct, and the recognition is not as a company brand but as a type of graph database widely distributed on GitHub under open source licenses. For example the Wikipedia entry for Neo4j is for the graph software, not the company.

51. USA provides no evidence that Sweden controlled quality on Sweden's software the years before the software and trademark was licensed to USA.

52. The Partner Agreement seeks to prevent PT from dealing in all versions of Sweden's Neo4J open source software when USA is not the licensor under the AGPL and the AGPL freely allows anyone to use the software.

Suhy Declaration ISO Consolidated Opposition and Motion for Summary Judgment    13

CASE NO. 5:18-cv-7182 EJD

53.     The purpose of USA' restriction in the Partner Agreement is to prevent any terminated partner from supporting Sweden's open source version of Neo4J which is unlawful.

54.     USA wrongfully and successfully asserted the unlawful restriction to interfere with PT efforts to get business from the IRS.

55.     USA even admits, the open source version has the same great features as the commercial version.

56.     Data and queries, the key function of a databases, from either version work on both versions.

57.     ONgBD allows users of other versions of Neo4J (including older versions of commercial and open source) to drop in the files from the same version number and operate the same data and run queries on it, which is the core functionality of a database. Defendants have not heard of any consumer suggest otherwise.

58.     Any user of open source software from Sweden's Neo4J GitHub repository are allowed to use all content on the site. This is permitted under the GitHub Terms of Service.  GitHub Terms of service A. 4 definition of Content and ¶ D 5 license. (including "You may grant further rights… " inferring rights to End Users under the GitHub license may not be limited.)

59.     Neo4J is a type of database that must be identified so consumers looking for the database may find it.

60.     The common clause, valid or not, only restricts licensees from selling the software. It does not prevent a licensee from internally using the software.

61.    I never asked consent for the PSA to be assigned to iGov and never obtained consent from USA for an assignment. USA was terminating the PSA and there was no reason for an assignment. Purethink did not sell assets, stock to or merge with iGov. They are distinct entities. iGov does not market, sell or provide services to USA's software.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on January 15, 2021 in Reston, Virginia.

_____
John Mark Suhy

## FILER'S ATTESTATION

I, Adron G. Beene, am the ECF user whose credentials were utilized in the electronic filing of this document. In accordance with N.D. Cal. Civil Local Rule 5-1(i)(3), I hereby attest that all signatories hereto concur in this filing.
Dated: January 15, 2021

_/s/ Adron G. Beene_
Adron W. Beene SB# 129040
Adron G. Beene SB# 298088
Attorney At Law
1754 Technology Drive, Suite 228
San Jose, CA 95110
Tel: (408) 392-9233
Fax: (866) 329-0453
adron@adronlaw.com

Attorney for Defendants
PURETHINK LLC, a Delaware limited liability company, IGOV INC., a Virginia corporation, and JOHN MARK SUHY

Suhy Declaration ISO Consolidated Opposition and Motion for Summary Judgment    15

CASE NO. 5:18-cv-7182 EJD

**EXHIBIT 1**

12/11/2018      purethink Mail - FW: Termination of Neo4j Solution Partner PureThink LLC



John Mark Suhy <jmsuhy@purethink.com>

## FW: Termination of Neo4j Solution Partner PureThink LLC

**Dunn Michael C** <Michael.C.Dunn@irs.gov>          Wed, Jul 12, 2017 at 6:13 AM
To: "Suhy John M Jr [Contractor]" <John.M.SuhyJr@irs.gov>, "jmsuhy@purethink.com" <jmsuhy@purethink.com>
Cc: Hess Chris <Christopher.E.Hess@irs.gov>, Goss Renee Y <Renee.Y.Goss@irs.gov>, Rosenmerkel Lisa S <Lisa.S.Rosenmerkel@irs.gov>, Butler Jeff <Jeff.Butler@irs.gov>

Hello John Mark,

We received this notification from Jason (Neo4j), and so it's been passed onto Procurement too: Vivian and Genevieve. One question I have for this existing contract is if services are stopped due to what Neo4j states below regarding Purethink's inability to provide open-source version support in the below? Now this is me asking from an initial statement, and so there's probably also a need to either work through Renee to the Procurement folks and/or talk with them too, since I figured they're going to reach out after receiving this email from Jason.

"Regarding the consulting services, please be advised that PureThink is not authorized to provide consulting services and support on open source versions of Neo4j products… prohibit them from providing any consulting services on these products during the term of their agreement and for a period of thirty six (36) months following termination. Neo will work with IRS to ensure that it receives the correct product and services from an authorized Neo4j partner."

**Michael C. Dunn**

Data Management Division/Business Systems Planning

Research, Applied Analytics, & Statistics

(o) 202.803.9009

**From:** Dunn Michael C
**Sent:** July-12-17 6:03 AM
**To:** 'Jason Zagalsky' <jason@neo4j.com>
**Cc:** vvivian.d.daniels@irs.gov; John Broad <john.broad@neo4j.com>; Goss Renee Y <Renee.Y.Goss@irs.gov>
**Subject:** RE: Termination of Neo4j Solution Partner PureThink LLC

Hello, Thank Jason. I'm looping in Renee Goss, our COR on the Purethink contract.

**EXHIBIT 1**

12/11/2018                         purethink Mail - FW: Termination of Neo4j Solution Partner PureThink LLC

**Michael C. Dunn**

Data Management Division/Business Systems Planning

Research, Applied Analytics, & Statistics

(o) 202.803.9009

**From:** Jason Zagalsky [mailto:jason@neo4j.com]
**Sent:** July-11-17 7:49 PM
**To:** Dunn Michael C <Michael.C.Dunn@irs.gov>
**Cc:** vvivian.d.daniels@irs.gov; John Broad <john.broad@neo4j.com>
**Subject:** Termination of Neo4j Solution Partner PureThink LLC

July 11, 2017

Internal Revenue Service

Attn: Michael Dunn

Cc: Vivian Daniels

Department of Treasury

To: Michael Dunn

Re:      Termination of Neo4j Solution Partner PureThink LLC ("PureThink")

I write to inform you that Neo4j, Inc., formerly Neo Technology, Inc. ("Neo"), recently terminated its partnership agreement with PureThink. I understand that IRS has a relationship with PureThink relating to Neo's products. Because this change in PureThink's status may affect the services and support IRS receives, Neo wanted to notify IRS of this development and to offer Neo's assistance in transitioning IRS to an authorized Neo4j partner to ensure IRS continues to receive the support it requires in a manner that respects Neo's intellectual property rights and contractual relationships.

Neo understands that IRS entered into an agreement with PureThink in September 2016 to purchase a commercial license to Neo4j Government Edition and for consulting services and support. We understand that the term of that agreement expires on September 22, 2017. We further understand that IRS paid PureThink $229,000 for a Neo4j subscription and the consulting services.

Regarding IRS's purchase of a Neo4j subscription, Neo still has not received a purchase order from PureThink. As a result of PureThink's termination, please be advised that PureThink is no longer authorized to purchase a Neo4j subscription on behalf of IRS. Neo will work with IRS to purchase a subscription through an authorized Neo4j partner.

Regarding the consulting services, please be advised that PureThink is not authorized to provide consulting services and support on open source versions of Neo4j products. This prohibition applies not only to the APGL-licensed Enterprise Edition but also to the GPL-licensed Community Edition. While IRS has stated its intention to proceed with the AGPL-licensed Enterprise Edition, please understand that Neo's agreements with its partners, including PureThink, prohibit them from providing any consulting services on these products during the term of their agreement and for a period of thirty six (36) months following termination. Neo will work with IRS to ensure that it receives the correct product and services from an authorized Neo4j partner.

We appreciate that this news may come as a surprise to IRS, and Neo wanted to make sure that IRS was promptly notified of this action so that it can make the appropriate decisions. Neo is available to answer any questions you may have and to assist in transitioning your subscription and support to an authorized Neo4j partner. We appreciate your continued interest in Neo4j and look forward to continuing to work with you.

Please do not hesitate to reach out to me with any questions regarding this notification.

**EXHIBIT 1**

Sincerely,


**Jason Zagalsky**

Federal Technical Account Manager  |  Neo4j

410-280-9697  |  jason@neo4j.com




**EXHIBIT 1**

**Page 1662**

**EXHIBIT 2**

**heathermeeker** commented on Aug 23, 2018

Bear with a legal technicality, but the Commons Clause is not a restriction on performing services -- it can't be. The license grant for the software is in the underlying license, and the Commons Clause claws back one kind of commercial use right. So, picture the original grant as a Venn diagram circle, and the excluded right to Sell as a little circle inside that. Providing services was not in the big circle in the first place, so the small circle can't change it.

But perhaps you are thinking, can I use the software in order to provide my services? That's a reasonable question. In other words, is the right to use the software in support of professional services -- like development, maintenance, or analysis, clawed back by the exclusion? No, because that use is not a service that derives its value from the functionality of the software. Your professional services derive their value from your expertise, not what the software does. The exclusion has to cover services, though, or it would have a big loophole. Offering the software via SaaS as a substitute for distributing it, and selling that access, is the main kind of service that is meant to be limited. Your consulting is not an economic substitute for the software. SaaS is.

Of course, I'm not your lawyer, so technically I can't give you advice. The clause means what it means, and although I led the drafting of the clause, that doesn't mean I have authority to interpret documents. That's not how the law works -- in the end, only a court has that power, no matter who wrote the document. But I hope to be helpful and dispel any confusion.

**EXHIBIT 2**

**01-15-2021 - DECL OF JOHN D. PERNICK ISO DEF CONS OPP AND MOT FOR SUM JUDGMENT.pdf**

Filed 01/15/2021

DECLARATION OF JOHN D. PERNICK IN SUPPORT OF DEFENDANTS' CONSOLIDATED, COMBINED OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND CROSSMOTION

(Pacer Doc: #100)

1 Adron W. Beene SB# 129040
Adron G. Beene SB# 298088
2 Attorney at Law
1754 Technology Drive, Suite 228
3 San Jose, CA 95110
Tel: (408) 392-9233
4 Fax: (866) 329-0453
adron@adronlaw.com
5

6 Attorneys for defendants:
PURETHINK LLC, a Delaware limited
7 liability company, IGOV INC., a Virginia
corporation, and JOHN MARK SUHY
8

9 UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
10

| 11 | NEO4J, INC., a Delaware corporation, and NEO4J SWEDEN AB, a Swedish corporation, | CASE NO. 5:18-CV-7182 EJD CASE NO. 5:19-CV-06226-EJD |
|---|---|---|
| 12 | | |
| 13 | Plaintiffs, | |
| | v. | **DECLARATION OF JOHN D. PERNICK IN SUPPORT OF DEFENDANTS' CONSOLIDATED, COMBINED OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION** |
| 14 | | |
| 15 | PURETHINK LLC, a Delaware limited liability company, IGOV INC., a Virginia corporation, and JOHN MARK SUHY, an individual, | |
| 16 | | |
| 17 | Defendants. | |
| 18 | AND RELATED COUNTERCLAIMS | Date: March 25, 2021 |
| 19 | | Time: 9:00 a.m. |
| 20 | NEO4J, INC., a Delaware corporation, and NEO4J SWEDEN AB, a Swedish corporation, | Dept. Courtroom 4, 5th floor Judge: Hon. Edward J. Davila |
| 21 | Plaintiffs, | |
| 22 | v. | |
| 23 | GRAPH FOUNDATION, INC., an Ohio corporation, GRAPHGRID, INC., an Ohio corporation, and ATOMRAIN INC., a Nevada corporation, | |
| 24 | | |
| 25 | Defendants. | |

DECLARATION OF JOHN D. PERNICK ISO DEFENDANTS' CONSOLIDATED,
COMBINED OPPOSITION AND CROSS-MOTION
CASE NO. 5:18-cv-7182 EJD, 5:19-CV-06226-EJD

John D. Pernick declares as follows:

1.      I am an attorney at law duly licensed to practice before all courts of the State of California and duly admitted to practice before this Court.  I am a member of Bergeson, LLP, counsel of record for Defendant Graph Foundation, Inc., in the action entitled *Neo4j, USA, et. al v. Graph Foundation, Inc., et. al,* Case No. 5:19-cv-06226-EJD (the "GFI Action").  I make this declaration in support of Defendants' Consolidated Combined Opposition and Cross-Motion filed in the GFI Action and the related action, *Neo4j, USA, et. al. v. Purethink, LLC, et. al,* Case No. 5:18-cv-7182-EJD.

2.      I attended the Deposition of Bradley Nussbaum as the 30(b)(6) witness for Graph Foundation, Inc. in the GFI Action on October 16, 2020.  Attached as Exhibit A are true and correct copies of excerpts from the transcript of that deposition that are cited in Defendants' Consolidated Opposition and Cross Motion and supporting papers.

3.      Attached as Exhibit B is a true and correct copy of a document bates stamped IGOV0001570185.001-003 that was identified as Exhibit 15 in Mr. Nussbaum's 30(b)(6) deposition in the GFI Action.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 15th day of January, 2021, in Alameda, California

JOHN D. PERNICK

DECLARATION OF JOHN D. PERNICK ISO DEFENDANTS' CONSOLIDATED, COMBINED OPPOSITION AND CROSS-MOTION
CASE NO. 5:18-cv-7182 EJD, 5:19-CV-06226-EJD

1

## FILER'S ATTESTATION

2

3

I, Adron G. Beene, am the ECF user whose credentials were utilized in the electronic filing of this document. In accordance with N.D. Cal. Civil Local Rule 5-1(i)(3), I hereby attest that all signatories hereto concur in this filing.

4

Dated: January 15, 2021

5

_____ /s/ Adron G. Beene _____

Adron W. Beene SB# 129040

6

Adron G. Beene SB# 298088

Attorney At Law

7

1754 Technology Drive, Suite 228

San Jose, CA 95110

8

Tel: (408) 392-9233

Fax: (866) 329-0453

9

adron@adronlaw.com

10

Attorney for Defendants

PURETHINK LLC, a Delaware limited

11

liability company, IGOV INC., a Virginia

corporation, and JOHN MARK SUHY

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Filer's Attestation

CASE NO. 5:18-cv-7182 EJD

# EXHIBIT A

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA


| | |
|---|---|
| NEO4J, INC., a Delaware corporation, and NEO4J SWEDEN AB, a Swedish corporation, | ) CASE NO. ) 5:19-CV-06226-EJD ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) |
| GRAPH FOUNDATION, INC., an Ohio corporation, GRAPHGRID, INC., an Ohio corporation, and ATOMRAIN INC., a Nevada corporation, | ) ) ) ) ) |
| Defendants. | ) |

REMOTE VIA ZOOM


30(b)(6) DEPOSITION OF NEO4J INC


BY BRAD NUSSBAUM


---

9:17 A.M. PDT
FRIDAY, OCTOBER 16, 2020

---


By:  Denise Myers Byrd, CSR 8340, RPR


1

Case 5:18-cv-00182-EJD  Document 100-2  Filed 01/15/21  Page 6 of 19

```
 1        A.   So no.
 2        Q.   Does Graph Foundation share office space with
 3   another entity?
 4             MR. PERNICK:   Objection; vague.
 5             THE WITNESS:   Can you be specific about what
 6   you mean by share.
 7   BY MR. RATINOFF:
 8        Q.   Does Graph Foundation have an office, a
 9   physical office?
10             MR. PERNICK:   Objection; vague.
11   BY MR. RATINOFF:
12        Q.   Does Graph Foundation have a physical office
13   where it conducts its business?
14             MR. PERNICK:   Objection; vague.
15   BY MR. RATINOFF:
16        Q.   You can answer the question.
17        A.   I'm not sure how to answer the question.
18        Q.   Where does Graph Foundation conduct its
19   business?
20        A.   Graph Foundation uses 111 South Buckeye Street
21   for receiving mail and other important documents.
22   Otherwise it is a remote-working organization.
23        Q.   Is that a P.O. Box, 111 Buckeye Street?
24        A.   It is an office location that receives -- that
25   has a box to receive mail.
```

65

1    Q.  Are there any other businesses located at

2    111 -- I'm sorry -- 111 Buckeye Street?

3    A.  There are.

4    Q.  And what are those other businesses?

5    A.  To Graph Foundation's knowledge, AtomRain and

6    GraphGrid both use 111 Buckeye Street for business

7    activities.

8    Q.  And are you aware of one of those entities

9    leasing that office space?

10   A.  Yes.

11   Q.  Which entity leases the office space?

12   A.  To our knowledge, AtomRain Inc.

13   Q.  And does Graph Foundation conduct business out

14   of that office space?

15   A.  Graph Foundation would receive mail but

16   otherwise has no presence.  To operate, Graph Foundation

17   needs a place to receive mail.  I think that's about it.

18   Q.  You mentioned Graph Foundation is a

19   virtual -- or conducts its business virtually.

20   MR. PERNICK:  Objection; misstates testimony.

21   I believe he said remotely.

22   THE WITNESS:  Remotely.

23   MR. RATINOFF:  Okay, John, you can object, but

24   speaking objections --

25   MR. PERNICK:  I was just trying to help things

66

```
 1    along, Jeff.

 2            THE WITNESS:  Graph Foundation conducts its

 3    business remotely.

 4    BY MR. RATINOFF:

 5        Q.  And you use a computer to conduct business

 6    remotely for Graph Foundation?

 7        A.  Yes.

 8        Q.  And what computer do you use to conduct

 9    business for Graph Foundation remotely?

10        A.  A MacBook Pro.

11        Q.  And who owns the MacBook Pro?

12        A.  Me personally.

13        Q.  And do you use that computer to conduct

14    business for AtomRain as well?

15        A.  I use my MacBook for a lot of things.

16        Q.  Okay, that's not my question.

17            The question is do you use your MacBook Pro to

18    conduct business for AtomRain?

19        A.  Yes.

20        Q.  And do you use your MacBook Pro to conduct

21    business for GraphGrid?

22        A.  Yes.

23        Q.  And do you have access to your GraphGrid email

24    account on that laptop?

25        A.  Yes.
```

                                                        67

1    distributions with the same version

2    number."

3    Q.  Do you see that?

4    A.  Yes.

5    Q.  What did Graph Foundation mean by drop-in

6    replacement?

7    A.  I think we provided an explanation of this.

8    Drop-in, I think as everybody understands it in

9    development, you know, essentially functions

10   equivalently from one version to another.  So if you

11   took a Neo4j Enterprise version, let's say 3.5.4, the

12   database format that it creates would work with ONgDB

13   3.5.4, so you can essentially write your data, and with

14   Neo4j Enterprise, you can use that same data with ONgDB.

15   Q.  And just to clarify, that's Graph Foundation's

16   understanding of drop-in replacement?

17   A.  Yeah.  Yeah, that's on our site, so.

18   Q.  And as of ONgDB Version 3.5.4, it's Graph

19   Foundation's belief at that time it was a hundred

20   percent identical to Neo4j Enterprise 3.5.4?

21   A.  No, it was not one -- I mean, it couldn't be

22   100 percent identical because Neo4j was close source as

23   of 3.5.0-RC1, and so any time after that there have to

24   be some differences.  And so drop-in does not mean

25   identical; it refers more to compatibility.

158

1    Q.  So as of ONgDB 3.5.4, Graph Foundation had no

2    way of knowing whether that was identical to Neo4j's

3    3.5.4, correct?

4    A.  Yeah, there's no way to know that they're

5    100 percent identical, correct.

6    Q.  How is Graph Foundation able to represent that

7    3.5.4 was a drop-in replacement, ONgDB, that is, for

8    Neo4j 3.5.4?

9    A.  I think I described it earlier.  Drop-in

10   replacement refers more to compatibility of features, so

11   we were able to take a Neo4j 3.5.4 version, create a

12   database and just show that it worked with ONgDB at that

13   same version.  So I think that's exactly what we

14   described, and I think that's exactly what we did.

15   That's the only thing that we can really do absent

16   having the source code is just show that they are

17   compatible, they can both read the same database format

18   which is one of the most essential things to make it

19   drop-in.

20   Q.  Did the Graph Foundation do one for one -- let

21   me strike that.

22   So with ONgDB -- do you mind if I leave out the

23   dots -- it's a mouthful -- and just say 3-5-4 is easier?

24   A.  That's fine.

25   Q.  So ONgDB 3.5.4, does that -- did that contain

160

1      A.   I mean, that it's a fork of the repo so any of

2   the commits that had been made have all -- you know,

3   there's many contributors that have made those commits.

4           MR. RATINOFF:  Okay.  So let me put up another

5   document.

6           MR. PERNICK:  Actually, Jeff, can we just take

7   a quick break.  It's been about an hour, I think.

8           MR. RATINOFF:  Okay.  What's our time -- we can

9   go off the record.

10          THE VIDEOGRAPHER:  We are now going off the

11  record.  The time is 2:49 p.m.  This is the end of

12  Media 3.

13          (Brief Recess.)

14          (John Picone left the remote deposition.)

15          THE VIDEOGRAPHER:  We are now back on the

16  record.  The time is 3:10 p.m.

17  BY MR. RATINOFF:

18      Q.   Before we broke, we were talking about ONgDB

19  Version 3.5.4.  What type of testing does -- or did

20  Graph Foundation do as far as releasing 3.5.4?

21      A.   We would have done all of the standard tests

22  that are run, that are checked into the repository, so I

23  think there's about 64,000 tests that run for each

24  build.

25      Q.   So when you say -- I'm sorry, I don't mean to

166

1    keep interrupting you.  Please continue.

2         A.  And in addition to that, we also do a fair bit

3    of manual testing to confirm the integrity of each

4    release and make sure it's working right.

5         Q.  So when you say each release or build, you're

6    just referring to each version or sub version of the

7    software?

8         A.  Yeah, like 3.5.1, 3.5.4, 3.5.19, every release

9    that's made public.

10        Q.  And you said you run I think it was 16,000

11   tests.  Is that -- or was it 64,000?

12        A.  Yes.  And all of that's available on our

13   open source build system.

14        Q.  So that's testing that's done via GitHub?

15        A.  No.  It's testing that our build server runs.

16        Q.  Where is your build server?

17        A.  The tests are part of the source code.

18        Q.  So your build server is separate and apart from

19   GitHub?

20        A.  Yes.

21        Q.  And so you have a build server that you use to

22   build a new release and then put it up on GitHub after

23   you're done running your tests.  Am I correct?

24        A.  Well, release goes to content distribution

25   network and then releases are tagged in the repository

                                                        167

1  and the release repository links to the distributions on

2  the CDN.

3      Q.  Does the testing include a function that

4  includes function testing?

5      A.  Yes.

6      Q.  It includes performance testing?

7      A.  Yes.

8      Q.  And what other type of testing is done before

9  it's released, a particular version?

10     A.  Integration testing, stress testing, integrity

11 of the packaging.

12     Q.  That's all done by Graph Foundation?

13     A.  Yes.

14     Q.  And do you have any idea of what type of

15 testing Neo4j uses on its coded versions of Neo4j

16 software?

17     A.  Only the stuff that was public is what we would

18 know about.  We wouldn't know anything about their

19 private testing.

20     Q.  For example, Neo4j 3.5.4, you wouldn't have any

21 idea what testing is done before Neo4j released that

22 software?

23     A.  We know of all the tests that are committed

24 that are open source so there's quite a few.  The

25 open source code base contains tests.

                                                      168

1    you're welcome to confirm what version that was at.

2         MR. RATINOFF:  But that being said, I'm going

3    to go ahead and drop in this next exhibit.  I believe

4    it's going to be Exhibit 26.  You should see Tab 41.

5         (WHEREUPON, Exhibit 26 was marked for

6         identification.)

7    BY MR. RATINOFF:

8         Q.  Do you see that?  It should have a Bates number

9    at the bottom, N4J_018732.  It's a printout dated

10   6/10/2020 from the Graph Foundation's website.

11        Do you see that?

12        A.  Yes.

13        Q.  And this is the page for ONgDB 3.6.0-RC1,

14   correct?

15        A.  Yeah.  This is the landing page for ONgDB,

16   yeah.

17        Q.  And so there is no Neo4j 3.6, correct?

18        A.  To our knowledge, correct.  Neo4j's never

19   released a 3.6 version.

20        Q.  So at this point, ONgDB 3.6.0, this is in your

21   mind a divergent fork of Neo4j?

22        A.  Most definitely.

23        Q.  And it wouldn't be accurate to describe it as a

24   drop-in replacement at this point?

25        A.  3.6 is definitely not a drop-in replacement.

                                                        190

1     Q.  And you wouldn't describe 4.0 as a drop-in

2   replacement either?

3     A.  I mean, because Neo4j has released a 4.0, it's

4   possible that it can be, but it's very unlikely.  I

5   don't know that we want to take the effort to prove it

6   so that we can say it is such.

7     Q.  Okay.  Do you know offhand which entities are

8   using ONgDB currently?

9     MR. PERNICK:  I'm going to object; vague.

10     Are you asking him whether he knows every

11   entity or what entities he knows?

12     MR. RATINOFF:  What entity.

13     MR. PERNICK:  So --

14  BY MR. RATINOFF:

15     Q.  Let me ask the question:  Which entities are

16   you aware of that are currently using ONgDB?

17     A.  I think we know that there are -- that the IRS

18   is using it.  I think what we sent in some emails, I

19   think Tufin is using it.  There's handfuls of

20   individuals.  I think, like, our one donor, Liquan I

21   think is his name, I think he's using it.  He donated.

22   I think I had a small conversation with him about it.

23   There's various people in the Slack channel that we have

24   that are using it.

25     Q.  Okay.  Actually, before we -- I'm going to show

191

# EXHIBIT B

| From: | Benjamin Nussbaum (ben@atomrain.com) |
|---|---|
| To: | John Mark Suhy (jmsuhy@purethink.com) |
| CC: | Brad Nussbaum (brad@atomrain.com) |
| BCC: | |
| Subject: | Re: [gnu.org #1295811] Neo4j Inc recently added restrictive license conditions to AGPL license. |
| Attachments: | |
| Sent: | 05/22/2018 09:09:53 AM -0700 (PST) |

Good to have that confirmation. We can keep that as our advantage and decide if/when we make it known to Neo4j Inc that we received that answer.

--

**Benjamin Nussbaum**
President and Chief Technology Officer
Phone: (310) 433-9305
Email: ben@atomrain.com
⬡ AtomRain I Innovation for a Connected World

On May 22, 2018, at 11:41 AM, John Mark Suhy <jmsuhy@purethink.com> wrote:

I just got this - I just said this in slack an hour ago too....

---------- Forwarded message ---------
From: John Mark Suhy <jmsuhy@purethink.com>
Date: Tue, May 22, 2018 at 11:40 AM
Subject: Re: [gnu.org #1295811] Neo4j Inc recently added restrictive license conditions to AGPL license.
To: <licensing@fsf.org>

This helps, thank you for your time.

Respectfully,

John Mark Suhy

On Tue, May 22, 2018 at 11:38 AM Donald R Robertson III via RT <licensing@fsf.org> wrote:
> On Sat May 19 03:00:41 2018, jmsuhy@purethink.com wrote:
> I am not sure whom to bring this up to, but Neo4j Inc, recently added
> restrictive licensing conditions to their AGPL license.  It is my
> understanding that this is not allowed.
>
> Being such a high profile company, I wanted to bring it to your
> attention and ask if these additions are allowed by AGPL, and if not -
> who would be responsible for ensuring they remain compliant?
>
> The addition of "Commons Clause" License condition was added to their
> AGPL license file.  The link is below.
>
> https://github.com/neo4j/neo4j/blob/3.4/enterprise/server-
> enterprise/LICENSE.txt
>
> "Commons Clause" License Condition



GFI 30(b)(6)
Brad Nussbaum

**Ex 15**

10/16/2020  D Myers

> The Software is provided to you by the Licensor under the License, as
> defined below, subject to the following condition. Without limiting
> other conditions in the License, the grant of rights under the License
> will not include, and the License does not grant to you, the right to
> Sell the Software. For purposes of the foregoing, "Sell" means
> practicing any or all of the rights granted to you under the License
> to provide to third parties, for a fee or other consideration,
> a product or service that consists, entirely or substantially,
> of the Software or the functionality of the Software. Any license
> notice or attribution required by the License must also include
> this Commons Cause License Condition notice.
>
>
>
>
> John Mark Suhy
> PureThink
> jmsuhy@purethink.com
> 703-862-7780
> http://purethink.com

Thank you for your time. Both the GPL and AGPL prevent the addition of further restrictions:

"All other non-permissive additional terms are considered "further
restrictions" within the meaning of section 10.  If the Program as you
received it, or any part of it, contains a notice stating that it is
governed by this License along with a term that is a further restriction,
you may remove that term."

If the distribution includes code that is copyright to someone else, then you can follow the instructions at
<https://www.gnu.org/licenses/gpl-violation.html> for filing a violation report with the copyright holder. Only the copyright
holder has the power to enforce the terms of the license.

Thanks for checking in on this, and I hope this helps.
--
Sincerely,

Donald R. Robertson, III, J.D.
Licensing & Compliance Manager
Free Software Foundation
51 Franklin Street, Fifth Floor
Boston, MA 02110, USA
Phone +1-617-542-5942
Fax +1-617-542-2652 ex. 56


---

--
John Mark Suhy
PureThink
jmsuhy@purethink.com
703-862-7780
http://purethink.com
--
John Mark Suhy

PureThink
jmsuhy@purethink.com
703-862-7780
http://purethink.com

**01-15-2021 - DECL OF ADRON G. BEENE ISO DEF CONS OPP AND MOT FOR SUM JUDGMENT.pdf**

Filed 01/15/2021

DECLARATION OF ADRON G. BEENE IN SUPPORT OF DEFENDANTS'
CONSOLIDATED, COMBINED OPPOSITION TO PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT AND CROSSMOTION

(Pacer Doc: #100)

Adron W. Beene SB# 129040
Adron G. Beene SB# 298088
Attorney at Law
1754 Technology Drive, Suite 228
San Jose, CA 95110
Tel: (408) 392-9233
Fax: (866) 329-0453
adron@adronlaw.com

Attorneys for defendants:
PURETHINK LLC, a Delaware limited
liability company, IGOV INC., a Virginia
corporation, and JOHN MARK SUHY

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEO4J, INC., a Delaware corporation, and NEO4J SWEDEN AB, a Swedish corporation, <br> Plaintiffs, <br> v. <br><br> PURETHINK LLC, a Delaware limited liability company, IGOV INC., a Virginia corporation, and JOHN MARK SUHY, an individual, <br> Defendants. <br><br> AND RELATED COUNTERCLAIMS | CASE NO. 5:18-cv-7182 EJD <br><br> **DECLARATION OF ADRON G. BEENE IN SUPPORT OF DEFENDANTS CONSOLIDATED OPPOSITION AND MOTION FOR SUMMARY JUDGMENT** <br><br> Date: March 25, 2021 <br> Time: 9:00 a.m. <br> Dept. Courtroom 4, 5th floor <br> Judge: Hon. Edward J. Davila |

I, Adron G. Beene, declare:

    1.    I am an attorney for PT defendants and counter claimants in this action and am licensed to practice law in the State of California. I have personal knowledge of the facts set forth in this declaration.

2.      On January 13, 2020, I served Purethink LLC, IGOV Inc. and John Mark Suhy's First Set Of Requests for Production of Documents to Neo4j, Sweden AB ("Request"). Request for production number 1 to the Request is:

### REQUEST FOR PRODUCTION NO. 1:

All DOCUMENTS related to all trademark agreements sales, assignments, licenses or grants between YOU and Neo4J, Inc. of or related to the Neo4J trademark.

3.      On March 30, 2020, Neo4J Sweden AB produced documents in response to the Request.

4.      The production had no trademark assignment and only two duplicate copies of a non exclusive license agreement between Neo4J Sweden and Neo4j USA that covers trademarks. The agreement is designated AEO under the protective order in this case ("License Agreement"). A true and correct copy of the License Agreement is attached as Exhibit 1.

5.      SWEDEN produced no documents to support that Neo4j USA is the owner, assignee, or exclusive licensee of the Neo4J trademark.

6.      Attached as Exhibit 2 is a true and correct copy of a transaction report of royalty payments from Neo4J USA to Neo4J Sweden based on the License Agreement. This report has been designated AEO under the protective order in this case.

7.      Exhibit 3 is a true and correct printout of the Neo4J trademarks Neo4J Sweden AB has registered or applied for the word mark Neo4J in the European Union, Canada, Australia, Israel, International, and Sweden (Neo4J logo). These printout were downloaded on 1-6-2021 from publically available websites throught the Swedish Trademark Database website, the

EUIPO property office website, and the WIPO website. These are government websites or agencies which are reliable. The printouts have not been altered. These printouts show that Neo4J Sweden AB is the owner, applicant and/or holder of the trademark in these jurisdictions.

8.      Attached as Exhibit 4 is a true and correct copy of relevant pages from the transcript for the Deposition of PureThink LLC taken on October 22, 2020.

9.      Attached as Exhibit 5 is a GSA Price List for USA's Neo4J commercial software and related services from Information Analysis Incorporated who is believed to be a reseller for USA.

10.      Attached as Exhibit 6, is a true and correct copy of USA's trademark application for Neo4J which was downloaded from the PTO.

11.      Attached as Exhibit 7 is a true and correct copy of and email thread between Jason Zagalsky and David Mohr of USA which was produced in this litigation its bates stamped N4J_008109 and marked by USA as CONFIDENTIAL.

12.      Attached as Exhibit 8 is a true and correct screen shot of part of USA's website. This screen shot compare Neo4j Editions.

13.      Attached as Exhibit 9 is a true and correct copy of GitHub's Terms of Services downloaded from https://docs.github.com/en/free-pro-team@latest/github/site-policy/github-terms-of-service .

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on January 15, 2021 in Kenwood, California.

___ /s/ Adron G. Beene _____

Adron G. Beene

**EXHIBIT 1**


**REDACTED VERSION OF DOCUMENT SOUGHT
TO BE SEALED**

**EXHIBIT 2**

**REDACTED VERSION OF DOCUMENT SOUGHT
TO BE SEALED**

EXHIBIT 3

1/6/2021 EUIPO - eSearch



*Protect your intellectual property in the European Union*

# EUTM file information

# NEO4J
## 017550484

### Timeline

| Opposition proceedings 0 | Registered EUTM 06/01/2021 |
|---|---|

Examination

oppositions received

| 01/12/2017 EUTM application received | 27/01/2018 Examination completed | 30/01/2018 Application published 30/04/2018 | End of opposition period 11/05/2018 | EUTM registered and published 01/12/2027 | EUTM expiry date EUTM expiry date |
|---|---|---|---|---|---|

## Trade mark information

| | | | |
|---|---|---|---|
| Name | NEO4J | Filing date | 31/05/2018 | 01/12/2017 08/05/2018 |
| Filing number Basis | 017550484 | Registration date Expiry date | 01/12/2027 |
| Date of receipt | EUTM on which IA is based 01/12/2017 | Designation date Filing language | Swedish |
| Date of receipt of International Registra... | | | |
| IR number | | Classification ) Second language | English |
| Type | Vienna Classification 1428543 | Application reference Trade mark status | V5835EU00 Registered |
| Nature | Word | | |
| Nice classes | Individual | Acquired distinctiveness | No |
| | 9, 35, 41, 42 ( Nice | | |

## Goods and services

English (en)

**9**
Computer programs for managing, storing, and accessing data from a database, analyzing data in computer databases for business purposes, processing in the nature of updating data in computer databases, and visualizing in the nature of creating graphs from data stored in databases; computer programs for storing, managing, and querying data from databases on computers, computer networks, and global computer networks.

**35**
Consulting services and advice in the field of updating and maintenance of data in computer databases.

**41**
Educational services, namely, conducting training classes, certification training, workshops, tutorial sessions, and online classes in the fields of designing computer databases and updating and maintenance of data in computer

databases, and distributing course materials in connection therewith; providing training services in the fields of designing computer databases and updating and maintenance of data in computer databases, and distributing course materials in connection therewith.

https://euipo.europa.eu/eSearch/#details/trademarks/017550484 1/4

1/6/2021 EUIPO - eSearch

Providing a web site featuring technology that enables end users to store, manage, and query data from databases on **42** computers, computer networks, and global computer networks; cloud computing featuring software for use in managing, storing, and accessing data from a database, analyzing data in computer databases for business purposes, processing in the nature of updating data in computer databases, and visualizing in the nature of creating graphs from data stored in databases; Technical support services, namely, installation, administration, and troubleshooting of database applications; Computer services, namely, providing consultation services and advice in the fields of designing computer databases; Consulting services and advice in the field of maintaining the security and integrity of databases.

## Description

No data

## Owners

### Neo4j Sweden AB

| | | | | |
|---|---|---|---|---|
| ID | Sweden AB Legal entity | SE - Sweden n/a | Nordenskiöldsgatan 24 SE-21119 Malmö SUECIA | Area. |
| Organisation Legal status | Country | Malmö | | Hidden. You can set your contact details to be publicly available via the User Area. | Hidden. You can set your contact details to be publicly available via the User Area. |
| | State/county Town | 21119 | Hidden. You can set your contact details to be publicly available via the UserArea. | |
| 873122 | Post code Address | Nordenskiölds 24 | | |
| Neo4j | | Neo4j Sweden AB | | |

Correspondence address

## Representatives

### HANSSON THYRESSON AB

| | | | | |
|---|---|---|---|---|
| ID | Legal person Association | SE - Sweden n/a | HANSSON THYRESSON AB Norra Vallgatan 58 SE-201 20 Malmö SUECIA | details to be publicly available via the User Area. |
| Organisation Legal status | Country | Malmö | | Hidden. You can set your contact details to be publicly available via the User |
| Type | State/county Town | 201 20 | | |
| 11001 | Post code Address | Norra Vallgatan 58 | Hidden. You can set your contact details to be publicly available via the UserArea. | Area. |
| n/a | | Correspondence address | | |

## Correspondence

| From | Procedure | Filing number | Subject | Date | Actions | |
|---|---|---|---|---|---|---|
| | | | | | | IA 017550484_01 WIPO attachments 18/10/2018 |

1/6/2021 EUIPO - eSearch

https://euipo.europa.eu/eSearch/#details/trademarks/017550484 2/4

| From | Procedure | Filing number | Subject | Date | Actions | |
|---|---|---|---|---|---|---|
| | | | | | | IA 017550484_01 Created 18/10/2018 |

**Page 1693**

☐ IA 017550484_01 WIPO attachments 13/09/2018 ☐ IA 017550484_01 WIPO attachments 13/09/2018 ☐ IA 017550484_01 TRANIR 13/09/2018 ☐ IA 017550484_01 Letter to the EUIPO 07/09/2018 ☐ IA 017550484_01 Cover page 07/09/2018 ☐ IA 017550484_01 IRREGROUP 11/06/2018

☐ IA 017550484_01 M150 - Notification that the Office has forwarded the international application to the International Bureau

Showing 1 to 10 of 26 entries
04/06/2018 01/06/2018

☐ IA 017550484_01 M101 — Receipt of an International Application (Article 184(1) EUTMR)

## IR transformation ☐

No data

## Seniority ☐

No data

## Exhibition priority ☐

No data

## Priority ☐

No data

## Publications ☐

| Bulletin number | Date | Section | Description |
|---|---|---|---|
| 2018/020 | 30/01/2018 | A.1 | Applications published under Article 44 EUTMR |
| 2018/088 | 11/05/2018 | B.2 | Registrations with amendments since the application was published |
| 2018/199 | 19/10/2018 | C.3.6 | International trade marks |

Showing 1 to 3 of 3 entries

## Cancellation ☐

No data

## Recordals ☐

1/6/2021 EUIPO - eSearch
https://euipo.europa.eu/eSearch/#details/trademarks/017550484 3/4

| Bulletin number | Date | Section | Filing number | Title | Subtitle |
|---|---|---|---|---|---|
| | | | 013846202 | Representative | Change of name and professional address |
| | | | 014229929 | Proprietor | Change of name and address |

2018/199 19/10/2018 C.3.6 014996121 Trade mark International trade mark

Showing 1 to 3 of 3 entries

## Oppositions

No data

## Appeals

No data

## Decisions

No data

## Renewals

No data

## Trade mark relations

No data

## InternationalApplications

| ID | Status | IaReceipt | IaConfirmation | |
|----|--------|-----------|----------------|---|
| | | | | 017550484_01 IA REGISTERED AND PUBLISHED |

Showing 1 to 1 of 1 entries

| | Canadian Trademark |
|---|---|
| App.1901905 - NEO4J | |

# App.1901905 - NEO4J

Status: Trademark: Searched

(210) Serial number of the application
1901905

(541) Reproduction of the mark where the mark is represented in standard characters
NEO4J

(527) Indications regarding use requirements
Used in SWEDEN

Proposed Use in CANADA

Filed in EUIPO (EU) on December 01, 2017, under No. 017550484

(300) Data relating to priority under the Paris Convention and other data relating to registration of the mark in the country of origin
Priority Filing Date: December 01, 2017, Country or Offce: EUIPO (EU), Application No. 017550484 in association with the same kind of goods and in association with the same kind of services

(550) Indication relating to the nature or kind of mark
Trademark (Word Mark)

(731) Name and address of the applicant
Neo4j Sweden AB
Nordenskiöldsgatan 24
211 19 Malmö
SE

(740) Name and address of the representative
CHANTAL ST. DENIS
(O'BRIEN TM SERVICES INC)
262, chemin Eardley
Gatineau
QUEBEC
J9J2Y7
CA

(511) The International Classifcation of Goods and Services for the Purposes of the Registration of Marks (Nice Classifcation) and the list of goods and services classifed according thereto

9 - Computer programs for managing, storing, and accessing data from a database, analyzing data in computer databases for business purposes, processing in the nature of updating data in computer databases, and visualizing in the nature of creating graphs from data stored in databases; computer programs for storing, managing, and querying data from databases on computers, computer networks, and global computer networks.

35 - Consulting services and advice in the feld of updating and maintenance of data in computer databases.

41 - Educational services, namely, conducting training classes, certifcation training, workshops, tutorial sessions, and online classes in the felds of designing computer databases and updating and maintenance of data in computer databases, and distributing course materials in connection therewith; providing training services in the felds of designing computer databases and updating and maintenance of data in computer databases, and distributing course materials in connection therewith.

42 - Providing a web site featuring technology that enables end users to store, manage, and query data from databases on computers, computer networks, and global computer networks; cloud computing featuring software for use in managing, storing, and accessing data from a database, analyzing data in computer databases for business purposes, processing in the nature of updating data in computer databases, and visualizing in the nature of creating graphs from data stored in databases; Technical support services, namely, installation, administration, and troubleshooting of database applications; Computer services, namely, providing consultation services and advice in the felds of designing computer databases; Consulting services and advice in the feld of maintaining the security and integrity of databases.

https://www3.wipo.int/branddb/en/showData.jsp?ID=CATM.1901905-00 1 / 1

| | Australian Trademark |
|---|---|
| 1962657 - NEO4J | |

# 1962657 - NEO4J

Status: Protected: Registered/protected

(151) Date of the registration
2018-05-31

(180) Expected expiration date of the registration/renewal
2028-05-31

(210) Serial number of the application
1962657

(220) Date of fling of the application
2018-05-31

(270) Language(s) of the application
EN

(540) Mark
NEO4J

(550) Indication relating to the nature or kind of mark
Word

(731) Name and address of the applicant

Neo4j Sweden AB
SE

(750) Address for correspondence

Refer to WIPO address for Correspondence

(511) The International Classifcation of Goods and Services for the Purposes of the Registration of Marks (Nice Classifcation) and the list of goods and services classifed according thereto

9 Computer programs for managing, storing, and accessing data from a database, analyzing data in computer databases for business purposes, processing in the nature of updating data in computer databases, and visualizing in the nature of creating graphs from data stored in databases; computer programs for storing, managing, and querying data from databases on computers, computer networks, and global computer networks

35 Consulting services and advice in the feld of updating and maintenance of data in computer databases

41 Educational services, namely, conducting training classes, certifcation training, workshops, tutorial sessions, and online classes in the felds of designing computer databases and updating and maintenance of data in computer databases, and distributing course materials in connection therewith; providing training services in the felds of designing computer databases and updating and maintenance of data in computer databases, and distributing course materials in connection therewith

42 Hosting a web site featuring technology that enables end users to store, manage, and query data from databases on computers, computer networks, and global computer networks; cloud computing featuring software for use in managing, storing, and accessing data from a database, analyzing data in computer databases for business purposes, processing in the nature of updating data in computer databases, and visualizing in the nature of creating graphs from data stored in databases; technical support services, namely, installation, administration, and troubleshooting of database applications; computer services, namely, providing consultation services and advice in the felds of designing computer databases; consulting services and advice in the feld of maintaining the security and integrity of databases

(300) Data relating to priority under the Paris Convention and other data relating to registration of the mark in the country of origin
017550484 20171201 EM

https://www3.wipo.int/branddb/en/showData.jsp?ID=AUTM.1962657 1 / 1

| | Israel Trademark |
|---|---|
| 309985- NEO4J | |

## 309985- NEO4J

Status: active

(151) Date of the registration
2019-08-01

(210) Serial number of the application
309985

(220) Date of fling of the application
2018-05-31

(180) Expected expiration date of the registration/renewal
2028-05-31

(540) Mark

# NEO4J

(541) Reproduction of the mark where the mark is represented in standard characters
NEO4J

(550) Indication relating to the nature or kind of mark
Trademark/Service mark

(300) Data relating to priority under the Paris Convention and other data relating to registration of the mark in the country of origin
2017-12-01 017550484 European Union

(731) Name and address of the applicant

Neo4j Sweden AB
Nordenskiöldsgatan 24, SE-211 19 Malmö, Sweden

(511) The International Classifcation of Goods and Services for the Purposes of the Registration of Marks (Nice Classifcation) and the list of goods and services classifed according thereto

9 Computer programs for managing, storing, and accessing data from a database, analyzing data in computer databases for business purposes, processing in the nature of updating data in computer databases, and visualizing in the nature of creating graphs from data stored in databases; computer programs for storing, managing, and querying data from databases on computers, computer networks, and global computer networks.

35 Consulting services and advice in the feld of updating and maintenance of data in computer databases.

41 Educational services, namely, conducting training classes, certifcation training, workshops, tutorial sessions, and online classes in the felds of designing computer databases and updating and maintenance of data in computer databases, and distributing course materials in connection therewith; providing training services in the felds of designing computer databases and updating and maintenance of data in computer databases, and distributing course materials in connection therewith.

42 Hosting a web site featuring technology that enables end users to store, manage, and query data from databases on computers, computer networks, and global computer networks; cloud computing featuring software for use in managing, storing, and accessing data from a database, analyzing data in computer databases for business purposes, processing in the nature of updating data in computer databases, and visualizing in the nature of creating graphs from data stored in databases; technical support services, namely, installation, administration, and troubleshooting of database applications; computer services, namely, providing consultation services and advice in the felds of designing computer databases; consulting services and advice in the feld of maintaining the security and integrity of databases.

https://www3.wipo.int/branddb/en/showData.jsp?ID=ILTM.309985 1 / 1

(169 of 253), Page 169 of 263
Case: 24-5538, 12/23/2024, DktEntry: 18.8, Page 169 of 253
Case 5:18-cv-07182-EJD   Document 100-3   Filed 01/15/21   Page 17 of 125

| | International Trademark |
|---|---|
| 1428543 - NEO4J | |

## 1428543 - NEO4J

(151) Date of the registration
31.05.2018

(180) Expected expiration date of the registration/renewal
31.05.2028

(270) Language(s) of the application
English

(732) Name and address of the holder of the registration

Neo4j Sweden AB
Nordenskiöldsgatan 24
SE-211 19 Malmö (SE)

(811) Contracting State of which the holder is a national
SE

(740) Name and address of the representative

HANSSON THYRESSON AB
Box 73
SE-201 20 Malmö (SE)

(540) Mark
NEO4J

(541) Reproduction of the mark where the mark is represented in standard characters

(511) The International Classifcation of Goods and Services for the Purposes of the Registration of Marks (Nice Classifcation) and the list of goods and services classifed according thereto- NCL (11-2018)

09 Computer programs for managing, storing, and accessing data from a database, analyzing data in computer databases for business purposes, processing in the nature of updating data in computer databases, and  visualizing in the nature of creating graphs from data stored in databases; computer programs for storing,  managing, and querying data from databases on computers, computer networks, and global computer networks.

35 Consulting services and advice in the feld of updating and maintenance of data in computer databases.

41 Educational services, namely, conducting training classes, certifcation training, workshops, tutorial sessions, and online classes in the felds of designing computer databases and updating and maintenance of data in computer databases, and distributing course materials in connection therewith; providing training services in the felds of designing computer databases and updating and maintenance of data in computer databases, and distributing course materials in connection therewith.

42 Hosting a web site featuring technology that enables end users to store, manage, and query data from databases on computers, computer networks, and global computer networks; cloud computing featuring software for use in managing, storing, and accessing data from a database, analyzing data in computer databases for business purposes, processing in the nature of updating data in computer databases, and visualizing in the nature of creating graphs from data stored in databases; technical support services, namely, installation, administration, and troubleshooting of database applications; computer services, namely, providing consultation services and advice in the felds of designing computer databases; consulting services and advice in the feld of maintaining  the security and integrity of databases.

(821) Basic application
EM, 01.12.2017, 017550484.

(822) Basic registration
EM, 08.05.2018, 017550484.

(300) Data relating to priority under the Paris Convention and other data relating to registration of the mark in the country of origin
EM, 01.12.2017, 017550484.

(832) Designation(s) under the Madrid Protocol
AU, CN, GB, IL, JP, NO.

Case 5:18-cv-07182-EJD   Document 100-3   Filed 01/15/21   Page 18 of 125

(527) Indications regarding use requirements

GB.

https://www3.wipo.int/branddb/en/showData.jsp?ID=MAD.1428543 1 / 1

Case 5:18-cv-07182-EJD Document 100-3 Filed 01/15/21 Page 19 of 125

1/6/2021 Swedish Trademark Database

Detailed information

● **548681**

**Text in trademark:** neo4j



**Trademark:**
Figurative

**Trademark type:**

**Description:** The mark is made in the colors: Blue, white, green and black.

**Vienna class (figure class):** 01.13.01; 01.13.15;
01/26/06

**List of goods and services:**

**Class Goods / services**

9 Computer programs for managing, storing and accessing data from a
database, analyzing data in databases for business purposes,
processing in the capacity of updating data in databases, and
visualizing in the form of creating graphs from data stored in
databases; computer programs for storing, managing and requesting
data from databases on computers, computer networks and global
computer networks.

35 Consulting services and advice in updating and maintaining data in
databases.

41 Training services, namely conducting training courses, certification
training, workshops, tutorial sessions and online classes in the areas of
designing databases and updating and maintaining data in databases
and distributing course materials in connection therewith. provide
training services in the areas of database design and updating and
maintenance of data in databases, as well as distribution of course
materials in connection therewith.

● Registration

**Status:** Registered

**Valid until:** 2028-10-19

National trademark (SE)

**Trademark offices:**

**Application number:** 2017/08501 Receiving office date:

**Application date:** 2017-12-01

**Registration number:** 548681 Registration date: 2018-10-19 **Legal effect date:**

1/6/2021 Swedish Trademark Database

**Page 1704**

**Color:** Yes

**Applicant / owner:** Neo4j Sweden AB, 556713-1106, Nordenskiöldsgatan 24, 211 19 Malmö, Sweden

**Representative:** Hansson Thyresson AB, 556488-3329, Att: Lars Thyresson, Box 73, 201 20 Malmö, Sweden

**Diary information:**

Date:
2018-10-19 Registration certificate sent to info@hanssonthyresson.se
2018-10-19 The registration was announced
2018-10-17 Reply to injunction

**Correspondence (in Swedish):**

2018-10-19 011 Regbevis_2017-08501_2018-10-19 10-45-10
2018-10-17 442 Not Deferred Nyansökan_2017-08501_2018-10-17 12-43-33
2018-08-21 403 Postponement message_2017-08501_2018-08-21 12-46-13
2018-06-26 403 Postponement message_2017-08501_2018-06-26 07-28-54
2018-04-27 415 Tilläggsföreläggande_2017-08501_2018-04-27 13-34-29
2018-04-06 408 Order F2_2017-08501_2018-04-05 10-35-00
2017-12-01 Submission confirmation TMeFiling

**EXHIBIT 4**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA


NEO4J, INC., a Delaware
corporation; and NEO4J SWEDEN
AB, a Swedish corporation,

        Plaintiffs,

                         CASE NO.
vs.                    5:18-cv-07182-EJD

PURETHINK, LLC, a Delaware
limited liability company;
IGOV, INC., a Virginia
corporation; and JOHN MARK
SUHY, an individual,

        Defendants.
_____/

REMOTE VIDEOTAPED DEPOSITION OF
JOHN MARK SUHY
as representative of IGOV, INC.
pursuant to Federal Rule of Civil Procedure 30(b)(6)

**Confidential Pursuant to Protective Order**


DATE:        October 22, 2020

TIME:        9:12 a.m.

LOCATION:    Via videoconference


REPORTED BY:  BENJAMIN GERALD
              California CSR No. 14203
              Washington CSR No. 3468

1

JOHN MARK SUHY                                                    October 22, 2020

1      Q.  Okay.  But there were two separate agreements;

2   that was all I'm getting at.

3      A.  Yes.  Yes.

4      Q.  Okay.  And you formed iGov specifically because

5   of this, from your perspective, the -- the, quote,

6   breaking of that set of agreements with Neo4j?

7      A.  No, that's not the only reason.

8      Q.  Okay.  It was one of the reasons?

9      A.  Yes.

10     Q.  Okay.  And what were the other reasons for the

11  formation of iGov?

12     A.  I wanted to create something that I could build

13  and sell in the future.

14     Q.  And what were you contemplating building and

15  selling?

16     A.  The company.

17     Q.  And what would -- what would be the -- the

18  opportunity that the company was going to exploit so

19  that you could sell it later?

20     A.  Just leveraging my experience in government to

21  build up consulting and revenue, products.

22     Q.  And that would have gone beyond graph database

23  software?

24     A.  Oh, of course.

25     Q.  But graph database software would have been one

                                                              45

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS  408-287-7500

JOHN MARK SUHY                                    October 22, 2020

1   of the product offerings that iGov was then going to

2   provide to its customers?

3        A.  It would make up a part of a solution, just

4   like an alternator makes up a part of a car.

5        Q.  I see.

6        A.  For certain solutions.

7        Q.  Was iGov formed, at least in part, because of

8   certain restrictions that were imposed upon PureThink in

9   the partner agreement?

10       A.  Was iGov formed -- can you repeat that again?

11   I have to write this down.

12       Q.  Sure.  Was iGov formed, at least in part,

13   because of certain restrictions that were imposed upon

14   PureThink in the partner agreement?

15       A.  Well, it was formed because it wasn't under the

16   agreement, and so we could still offer graph solutions.

17   So I don't know.  I believe that would make that answer

18   yes, but I'm not sure if that's -- because I don't -- I

19   don't see it as avoiding anything, because there was no

20   agreement with iGov.  That agreement was only with

21   PureThink.  So there would be no reason to avoid

22   anything.

23       Q.  Right.  But, like you said, there was no

24   agreement with iGov, so it was not -- didn't have any

25   restrictions on it, like -- unlike PureThink, which did

                                                          46

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS  408-287-7500

JOHN MARK SUHY                                    October 22, 2020

1    have restrictions upon its activities?

2         A.  Yes, it did not sign a partnership agreement or

3    have any agreements with Neo.

4         Q.  Okay.

5         A.  That's correct.

6         Q.  Just give me one second, Mr. Suhy.

7         A.  Take your time.  Let me see what time it is on

8    the clock.

9         Q.  It's 10:10 Pacific.

10        A.  Thank you.

11             MR. PICONE:  Mr. Ratinoff, can you drop Tab 113

12   into the chat function, please?

13             (Exhibit 4 was marked for identification.)

14             THE WITNESS:  I see it.

15   BY MR. PICONE:

16        Q.  And what is that document?

17             MR. PICONE:  I'm sorry.  Mr. Gerald, can we

18   mark this as Exhibit 4, please.

19   BY MR. PICONE:

20        Q.  And then Mr. Suhy, what is that document that's

21   marked as Exhibit 4?

22        A.  This appears to be a website -- oops.  Sorry.

23   I just moved away from it.

24             This appears to be the website snapshot,

25   screenshot.

                                                        47

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS  408-287-7500

**EXHIBIT 5**

**Authorized Federal Acquisition Service**
**Information Technology Schedule Pricelist**
**General Purpose Commercial Information Technology**
**Equipment, Software and Services**

On-line access to contract ordering information, terms and conditions, up-to-date pricing, and the option to create an electronic delivery order system are available through GSA *Advantage!*®, a menu-driven database system. The INTERNET address for GSA *Advantage!*® is: GSAAdvantage.gov.

---

FSC Group 70, SIN 132-32

## TERM SOFTWARE LICENSES

FSC Group 71, SIN 134-34

## MAINTENANCE OF SOFTWARE AS A SERVICE

FSC Group 70, SIN 132-50

## TRAINING COURSES FOR INFORMATION
## TECHNOLOGY EQUIPMENT AND SOFTWARE (FPDS Code U012)

and

FSC Group 70, SIN 132-51

## INFORMATION TECHNOLOGY PROFESSIONAL SERVICES

(FPDS Code D302 - IT System Development Services    FPDS Code D306 - IT Systems Analysis Services
FPDS Code D307 – Automated Information Systems Design & Integration Services FPDS Code D308 – Programming Services)

Note 1:  All non-professional labor categories must be incidental to and used solely to support hardware, software, and/or professional services and cannot be purchased separately.
Note 2:  Offerors and Agencies are advised that the Group 70 – Information Technology Schedule is not to be used as a means to procure services which properly fall under the Brooks Act.  These services include, but are not limited to, architectural, engineering, mapping, cartographic production, remote sensing, geographic information systems, and related services.  FAR 36.6 distinguishes between mapping services of an A/E nature and mapping services which are not connected nor incidental to the traditionally accepted A/E Services.
Note 3:  This solicitation is not intended to solicit for the reselling of IT Professional Services, except for the provision of implementation, maintenance, integration, or training services in direct support of a product.  Under such circumstances the services must be performance by the publisher or manufacturer or one of their authorized agents.

---



# INFORMATION ANALYSIS INCORPORATED

**11240 Waples Mill Road, Suite 201 • Fairfax, Virginia 22030**

**Telephone: (703) 383-3000 • Fax: (703) 293-7979 • Internet: www.infoa.com**

DUNS Number: 016700718

## Contract Number:  **GS-35F-0062J**

Period Covered by Contract:  11/04/2013 thru 11/03/2018 (Opt III)

General Services Administration
Federal Acquisition Service

Pricelist Current through Modification #PO-0037, dated 06/10/2015

Information Analysis Incorporated is a small business.

For more information on ordering from Federal Supply Schedules click on the FSS Schedules button at fss.gsa.gov.



**Information
Analysis
Incorporated**

Contract No.  GS-35F-0062J  11/04/2013 – 11/03/2018

# *Table of Contents*

**Customer Information**.................................................................................. 1

1a.  Table of Awarded Special Item Number(s) with Appropriate Cross-Reference
to Item Descriptions and Awarded Prices ..................................................... 1

1b.  Identification of the Lowest-Priced Model Number ........................................ 1

1c.  Hourly Labor Rates, Commercial Job Titles, Experience, Functional Responsibility,
And Education ............................................................................................ 1

2.  Maximum Order ......................................................................................... 1

3.  Minimum Order .......................................................................................... 1

4.  Geographic Coverage (delivery area) .......................................................... 1

5.  Point of Production .................................................................................... 2

6.  Discount from List Prices or Statement of Net Price ...................................... 2

7.  Quantity Discounts .................................................................................... 2

8.  Prompt Payment Terms .............................................................................. 2

9a.  Notification that Government Purchase Cards are Accepted At or Below
the Micro-Purchase Threshold .................................................................... 2

9b.  Notification Whether Government Purchase Cards Are Accepted or Are Not
Accepted Above the Micro-Purchase Threshold ........................................... 2

10.  Foreign Items ............................................................................................ 3

11a.  Time of Delivery ........................................................................................ 3

11b.  Expedited Delivery ..................................................................................... 3

11c.  Overnight and 2-Day Delivery ..................................................................... 3

11d.  Urgent Requirements ................................................................................. 3

12.  F.O.B. Point(s) .......................................................................................... 3

13a.  Ordering Address ....................................................................................... 4

13b.  Ordering Procedures .................................................................................. 4

14  Payment Address(es) .................................................................................. 4

15.  Warranty Provision ..................................................................................... 5

16.  Export Packing Charges ............................................................................. 5

17.  Terms and Conditions of Government Purchase Card Acceptance ................. 5

18.  Terms and Conditions of Rental, Maintenance, and Repair ........................... 5

19.  Terms and Conditions of Installation............................................................ 5

20.  Terms and Conditions of Repair Parts Indicating Date of Parts Price Lists
and any Discounts from List Prices .............................................................. 5

20a.  Terms and Conditions for any Other Services ............................................... 5

21.  List of Service and Distribution Points.......................................................... 5

22.  List of Participating Dealers ........................................................................ 6

23.  Preventive Maintenance.............................................................................. 6

24a.  Special Attributes Such As Environmental Attributes..................................... 6



Information
Analysis
Incorporated

Contract No.  GS-35F-0062J  11/04/2013 – 11/03/2018

24b.  Section 508 Compliance ........................................................................... 6

25.    Data Universal Number System (DUNS) ................................................... 6

26     Notification Regarding Registration in Central Contractor Registration (CCR) Database .... 6

*Terms and Conditions Applicable to Term Software Licenses (Special Item Number 132-32) and Maintenance of Software as a Service (Special Item Number 132-34) of General Purpose Commercial Information Technology Software* ........... 7

1.  Inspection/ Acceptance ............................................................................. 7

2.  Enterprise User License Agreements Requirements (EULA) ..................... 7

3.  Guarantee/ Warranty ................................................................................ 7

4.  Technical Services .................................................................................... 8

5.  Software Maintenance .............................................................................. 8

6.  Periods of Term Licenses ......................................................................... 9

7.  Conversion from Term License to Perpetual License .............................. 9

8.  Term License Cessation ......................................................................... 10

9.  Utilization Limitations ............................................................................. 10

10.  Software Conversions ........................................................................... 11

11.  Descriptions and Equipment Compatibility ........................................... 12

12.   Right-to-Copy Pricing ........................................................................... 12

13.  Description of Term Software Licenses and Pricing .............................. 12

        13.a  Products ..................................................................................... 12

        13.b. Operating System and Browser Compatibility ........................... 12

        13.c  Pricing ........................................................................................ 13

*Terms and Conditions Applicable to Purchase Of Training Courses For General Purpose Commercial Information Technology Equipment And Software (Special Item Number 132-50)* ........................................................................ 16

1.  Scope ..................................................................................................... 16

2.  Order ...................................................................................................... 16

3.  Time of Delivery ..................................................................................... 16

4.  Cancellation and Rescheduling ............................................................. 16

5.  Follow-Up Support ................................................................................. 17

6.  Price for Training .................................................................................... 17

7.  Invoices and Payment ........................................................................... 17

8.  Format and Content of Training ............................................................. 17

9.  "No Charge" Training .............................................................................. 18

10. Description of Training Courses and Pricing .......................................... 18

        10.a  Open Enrollment ........................................................................ 18

        10.b  How to Enroll ............................................................................. 19

        10.c  Courses Offered ......................................................................... 19

        10.d  Price Per Student ....................................................................... 30

Telephone: (703) 383-3000 • FAX: (703) 293-7979 • www.infoa.com

ii



**Information Analysis Incorporated**

Contract No.  GS-35F-0062J  11/04/2013 – 11/03/2018

*Terms and Conditions Applicable to Information Technology (IT) Professional Services (Special Item Number 132-51)* ............................................................. 31

1.   Scope ................................................................................................................. 31
2.   Performance Incentives ...................................................................................... 31
3.   Order .................................................................................................................. 31
4.   Performance of Services .................................................................................... 32
5.   Stop-Work Order ................................................................................................ 32
6.   Inspection of Services ........................................................................................ 33
7.   Responsibilities of Contractor ............................................................................ 33
8.   Responsibilities of the Ordering Activity ............................................................ 33
9.   Independent Contractor ..................................................................................... 33
10.  Organizational Conflicts of Interest ................................................................... 33
11.  Invoices ............................................................................................................. 34
12.  Payments ........................................................................................................... 34
13.  Résumés ............................................................................................................ 35
14.  Incidental Support Costs .................................................................................... 35
15.  Approval of Subcontracts ................................................................................... 35
16.  Description of IT Services and Pricing ............................................................... 35
     16.1  IT Professional Services ............................................................................ 35
     16.2  Commercial Job Titles (Labor Categories) ................................................ 39
     16.3  Prices for On-Site IT Professional Services at Hourly Rates .................... 56
     16.4  Prices for Off-Site IT Professional Services at Hourly Rates ................... 58
     16.5  Forms Programming Services .................................................................... 60

USA Commitment to Promote Small Business Participation Procurement Programs ............... 61

Suggested Blanket Purchase Agreement (BPA) ..................................................... 62

Basic Guidelines for Using "Contractor Team Arrangements" ................................. 65



Information
Analysis
Incorporated

Contract No.  GS-35F-0062J  11/04/2013 – 11/03/2018

# *Customer Information*

## 1a.  TABLE OF AWARDED SPECIAL ITEM NUMBER(S) WITH APPROPRIATE CROSS-REFERENCE TO ITEM DESCRIPTIONS AND AWARDED PRICE(S)

| SIN | See |
|---|---|
| 132-32 TERM SOFTWARE LICENSES | Pages 7-15 |
| 132-34 MAINTENANCE OF SOFTWARE AS A SERVICE | Pages 7-15 |
| 132-50 TRAINING COURSES FOR INFORMATION TECHNOLOGY EQUIPMENT AND SOFTWARE | Pages 16-30 |
| 132-51 INFORMATION TECHNOLOGY PROFESSIONAL SERVICES | Pages 31-60 |

## 1b.  IDENTIFICATION OF THE LOWEST PRICE MODEL NUMBER AND LOWEST PRICE UNIT FOR THAT MODEL FOR EACH SPECIAL ITEM NUMBER AWARDED IN THE CONTRACT

| SIN | PART NO. AND ITEM | Price |
|---|---|---|
| 132-32 TERM SOFTWARE LICENSES | NT 201  Neo4j Discovery Bundle | $          33,368 |

## 1c.  HOURLY LABOR RATES, COMMERCIAL JOB TITLES, EXPERIENCE, FUNCTIONAL RESPONSIBILITY, AND EDUCATION

| SIN | See |
|---|---|
| 132-51 INFORMATION TECHNOLOGY PROFESSIONAL SERVICES | Pages 39-60 |

## 2.  MAXIMUM ORDER (All dollar amounts are exclusive of any discount for prompt payment)

SIN 132-32 – Term Software Licenses                                  $500,000 per order
SIN 132-34 – Maintenance of Software as a Service              $500,000 per order
SIN 132-50 - Training Courses for IT Equipment & Software     $25,000 per order
SIN 132-51 - Information Technology (IT) Professional Services  $500,000 per order

## 3.  MINIMUM ORDER

All SIN's                                                                             $100 per order

## 4.  GEOGRAPHIC COVERAGE (DELIVERY AREA)

Domestic delivery is delivery within the 48 contiguous states, Alaska, Hawaii, Puerto Rico, Washington DC, and U.S. Territories.  Domestic delivery also includes a port or consolidation point, within the aforementioned areas, for orders received from overseas activities.

Overseas delivery is delivery to points outside of the 48 contiguous states, Washington DC, Alaska, Hawaii, Puerto Rico, and U.S. Territories.

---


**Information Analysis Incorporated**

Contract No. GS-35F-0062J  11/04/2013 – 11/03/2018

Offerors are requested to check one of the following boxes:

[  ]  The Geographic Coverage will be domestic and overseas delivery.
[  ]  The Geographic Coverage will be overseas delivery only.
[ x ]  The Geographic Coverage will be domestic delivery only.

## 5. POINT(S) OF PRODUCTION

| | |
|---|---|
| SIN 132-32 | Sweden |
| SIN 132-50 AND 132-51 | Fairfax, VA, USA |

## 6. DISCOUNT FROM LIST PRICES OR STATEMENT OF NET PRICE

Prices shown are NET Prices.  Basic discounts have been deducted.

## 7. QUANTITY DISCOUNTS

None

## 8. PROMPT PAYMENT DISCOUNTS

PPD:  0.25%-20 days - Net 30 days from receipt of invoice or date of acceptance, whichever is later.

Information for Ordering Offices:  Prompt payment terms cannot be negotiated out of the contractual agreement in exchange for other concessions.

## 9a. NOTIFICATION THAT GOVERNMENT PURCHASE CARDS AT OR BELOW THE MICRO-PURCHASE THRESHOLD

Purchase card orders below the micro-purchase threshold (currently $2,500) will be accepted provided they exceed the minimum order limitation in paragraph 3 above.

## 9b.  NOTIFICATION WHETHER GOVERNMENT PURCHASE CARDS ARE ACCEPTED OR NOT ACCEPTED ABOVE THE MICRO-PURCHASE THRESHOLD

Purchase card orders exceeding the micro-purchase threshold will also be accepted, unless that order (or orders) is returned to the ordering office within 24 hours after receipt, with written notice stating the Contractor's intent not to provide the services called for and the reasons.  Upon receiving this notice, the Government may acquire the supplies or services from another source.

Orders should be placed with the Schedule Contractor that can provide the supply or service that represents the best value.  Before placing an order, ordering offices should consider reasonably available information about the supply or service offered under Schedule contracts by using the GSA *Advantage!*® on-line shopping service, or by reviewing the catalogs/pricelists of at least three Schedule Contractors and selecting the delivery and other options available under the schedule that meets the agency's needs.



**Information
Analysis
Incorporated**

Contract No.  GS-35F-0062J  11/04/2013 – 11/03/2018

## 10.   FOREIGN ITEMS

All software currently offered under SIN 132-32, which are manufactured by Neo Technologies, are developed in Sweden.

## 11a.  TIME OF DELIVERY

The Contractor shall deliver to destination within the number of calendar days after receipt of order (ARO), as set forth below.

| SPECIAL ITEM NUMBER | DELIVERY TIME (Days ARO) |
|---|---|
| SIN 132-32 | Normally 15 days or as negotiated between IAI and the Ordering Activity |
| SIN 132-34 | Normally 15 days or as negotiated between IAI and the Ordering Activity |
| SIN 132-50 | Normally 90 days or as negotiated between IAI and the Ordering Activity |
| SIN 132-51 | Normally 90 days or as negotiated between IAI and the Ordering Activity |

## 11b. EXPEDITED DELIVERY

Items available for expedited delivery are noted in this price list.  Contact contractor.

## 11c. OVERNIGHT AND 2-DAY DELIVERY

Overnight and 2-day delivery available. Contact contractor for rates for overnight and 2-day delivery.

## 11.d    URGENT REQUIREMENTS

When the Federal Supply Schedule contract delivery period does not meet the bona fide urgent delivery requirements of an ordering agency, agencies are encouraged, if time permits, to contact the Contractor for the purpose of obtaining accelerated delivery.  The Contractor shall reply to the inquiry within 3 workdays after receipt.  (Telephonic replies shall be confirmed by the Contractor in writing.)  If the Contractor offers an accelerated delivery time acceptable to the ordering agency, any order(s) placed pursuant to the agreed upon accelerated delivery time frame shall be delivered within this shorter delivery time and in accordance with all other terms and conditions of the contract.

## 12.    F.O.B. POINTS

F.O.B. Destination



**13a.    ORDERING ADDRESS**

Orders and EDI ordering questions should be directed to:

> Information Analysis Incorporated
> Attn: GSA Schedule Program Manager
> 11240 Waples Mill Road, Suite 201
> Fairfax, Virginia  22030
> Telephone:    (703) 383-3000, x7901
> Fax:              (703) 293-7979
> E-mail:          rderose@infoa.com

**13.b    ORDERING PROCEDURES**

For supplies and services, the ordering procedures, information on Blanket Purchase Agreements (BPA's) are found in Federal Acquisition Regulation (FAR) 8.405-3.

**14.    PAYMENT ADDRESS**

Payment may be made by check, wire transfer, or Government purchase card.

> Address checks to:
> Information Analysis Incorporated
> Attn: Accounting
> 11240 Waples Mill Road, Suite 201
> Fairfax, Virginia  22030

> Wire transfer information is available upon request.

> For payment by Government Purchase Card:
> Contact Matt Sands, Controller, at (703) 293-7925 or msands@infoa.com, for assistance.



**Information
Analysis
Incorporated**

Contract No.  GS-35F-0062J  11/04/2013 – 11/03/2018

15.     **WARRANTY PROVISION**

a.   For the purpose of this contract, commitments, warranties and representations include, in
     addition to those agreed to for the entire schedule contract:

    (1)   Time of delivery/installation quotations for individual orders;

    (2)   Technical representations and/or warranties of products concerning performance, total
     system performance and/or configuration, physical, design and/or functional characteristics
     and capabilities of a product/ equipment/ service/software package submitted in response
     to requirements which result in orders under this schedule contract.

    (3)   Any representations and/or warranties concerning the products made in any literature,
     description, drawings and/or specifications furnished by the contractor.

b.   The above is not intended to encompass items not currently covered by the GSA Schedule
     contract.

16.     **EXPORT PACKING CHARGES**

Not Applicable.

17.     **TERMS AND CONDITIONS OF GOVERNMENT PURCHASE CARD
        ACCEPTANCE**

See paragraph 9 above.

18.     **TERMS AND CONDITIONS OF RENTAL, MAINTENANCE, AND REPAIR**

Not Applicable.

19.     **TERMS AND CONDITIONS OF INSTALLATION**

Not Applicable.

20.     **TERMS AND CONDITIONS OF REPAIR PARTS INDICATIONG DATES OF
        PARTS PRICE LISTS AND DISCOUNTS FROM LIST PRICES**

Not Applicable.

20a.    **TERMS AND CONDITIONS FOR ANY OTHER SERVICES**

Not Applicable.

21.     **LIST OF SERVICE AND DISTRIBUTION POINTS**

Not Applicable.

Case 5.18-cv-07182-EJD   Document 100-3   Filed 01/15/21   Page 36 of 125



**Information
Analysis
Incorporated**

Contract No.  GS-35F-0062J  11/04/2013 – 11/03/2018

## 22.    LIST OF PARTICIPATING DEALERS

Not Applicable.

## 23.    PREVENTATIVE MAINTENANCE

Not Applicable.

## 24a.    SPECIAL ATTRIBUTES SUCH AS ENVIRONMENTAL ATTRIBUTES

None.

## 24b.    SECTION 508 COMPLIANCE

If applicable, Section 508 compliance information on the supplies and services in this contract are available in Electronic and Information Technology (EIT) at the following: www.infoa.com. The EIT standard can be found at: www.Section508.gov/.

## 25.    DATA UNIVERSAL NUMBER SYSTEM (DUNS) NUMBER

IAI's DUNS number is: 01-670-0718

## 26.    NOTIFICATION REGARDING REGISTRATION IN SYSTEM FOR AWARD MANAGEMENT (SAM) DATABASE

IAI is registered in the System for Award Management (SAM) database.



Information
Analysis
Incorporated

Contract No. GS-35F-0062J  11/04/2013 – 11/03/2018

---

**TERMS AND CONDITIONS APPLICABLE TO TERM SOFTWARE LICENSES (SPECIAL ITEM NUMBER 132-32) AND MAINTENANCE OF SOFTWARE AS A SERVICE (SPECIAL ITEM NUMBER 132-34) OF GENERAL PURPOSE COMMERCIAL INFORMATION TECHNOLOGY SOFTWARE**

## 1. INSPECTION/ACCEPTANCE

The Contractor shall only tender for acceptance those items that conform to the requirements of this contract. The ordering activity reserves the right to inspect or test any software that has been tendered for acceptance. The ordering activity may require repair or replacement of nonconforming software at no increase in contract price. The ordering activity must exercise its postacceptance rights (1) within a reasonable time after the defect was discovered or should have been discovered; and (2) before any substantial change occurs in the condition of the software, unless the change is due to the defect in the software.

## 2. ENTERPRISE USER LICENSE AGREEMENTS REQUIREMENTS (EULA)

The Contractor shall provide all Enterprise User License Agreements in an editable Microsoft Office (Word) format.

## 3. GUARANTEE/WARRANTY

a.    Unless specified otherwise in this contract, the Contractor's standard commercial guarantee/warranty as stated in the contract's commercial pricelist will apply to this contract.

**The Manufacturer's standard commercial warranty applies.**

### Manufacturer:  Neo Technology

<u>Limited Software Warranty.</u> Neo Technology represents and warrants to Licensee only (and not to any End User) that the Software when used for its intended purpose and in accordance with Neo Technology's instructions, will materially conform to Neo Technology's published specifications for a period of one (1) year from the date Licensee is first permitted to access and use the Software under Section 2(c) (Delivery and Acceptance) above. Licensee's sole and exclusive remedy, and Neo Technology's sole and exclusive liability for any breach of this warranty will be, at Neo Technology's sole discretion, to either fix the Software to remedy the defect or refund the applicable Software license fees paid by Licensee for the Software, in each case on condition that Licensee promptly notifies Neo Technology in writing of any alleged breach of this warranty within such one (1) year period. This warranty is null and void to the extent the Software: (i) fails to conform with this warranty as a result of its use with any third party hardware or software; or (ii) is used for an unintended purpose, is used other than in accordance with its published documentation or specifications, or is otherwise used in breach of this Agreement.

<u>Disclaimer of Warranties.</u> Except as expressly set forth above in this section: (i) the software and services are provided to licensee on an "as is" basis, with any and all faults, and without any warranty of any kind; and (ii) neo technology expressly disclaims all representations,

---



Information
Analysis
Incorporated

Contract No. GS-35F-0062J 11/04/2013 – 11/03/2018

warranties and conditions whether express, implied, statutory, or otherwise, including without limitation, the implied warranties of merchantability, fitness for a particular purpose, satisfactory quality, and non-infringement of third party rights. Neo technology does not warrant that the software or services will meet licensee's or its end users' requirements, or that the operation of the software will be uninterrupted or error-free, or that defects in the software or services will be corrected. Licensee expressly acknowledges and agrees that the use of the software and services and all results of such use is solely at licensee's and its end users' own risk. No oral or written information or advice given by neo technology or its authorized representatives shall create a warranty or in any way increase the scope of any warranty. Some jurisdictions may not allow the exclusion and/or limitation of implied warranties or conditions, or allow limitations on how long an implied warranty lasts, so the above limitations or exclusions may not apply to licensee. In such event, neo technology's warranties and conditions with respect to the software and services will be limited to the greatest extent permitted by applicable law in such jurisdiction.

b.     The Contractor warrants and implies that the items delivered hereunder are merchantable and fit for use for the particular purpose described in this contract. If no implied warranties are given, an express warranty of at least 60 days must be given in accordance with FAR 12.404(b)(2).

c.     Limitation of Liability. Except as otherwise provided by an express or implied warranty, the Contractor will not be liable to the ordering activity for consequential damages resulting from any defect or deficiencies in accepted items.

## 4. TECHNICAL SERVICES

The Contractor, without additional charge to the ordering activity, shall provide a hot line technical support number (800) 829-7614 for the purpose of providing user assistance and guidance in the implementation of the software. The technical support number is available from 12 a.m. to 11:59 p.m. EST

## 5 SOFTWARE MAINTENANCE

a.     Software Maintenance as it is defined (select software maintenance type):

___X___     1.     Software Maintenance as a Product.

Software maintenance as a product includes the publishing of bug/defect fixes via patches and updates/upgrades in function and technology to maintain the operability and usability of the software product. It may also include other no charge support that are included in the purchase price of the product in the commercial marketplace. No charge support includes items such as user blogs, discussion forums, on-line help libraries and FAQs (Frequently Asked Questions), hosted chat rooms, and limited telephone, email and/or web-based general technical support for user's self diagnostics.



**Information
Analysis
Incorporated**

Contract No.  GS-35F-0062J  11/04/2013 – 11/03/2018

Software maintenance as a product does NOT include the creation, design, implementation, integration, etc. of a software package.  These examples are considered software maintenance as a service.

Software Maintenance as a product is billed at the time of purchase.

__X__    2.  Software Maintenance as a Service.

Software maintenance as a service creates, designs, implements, and/or integrates customized changes to software that solve one or more problems and is not included with the price of the software.  Software maintenance as a service includes person-to-person communications regardless of the medium used to communicate: telephone support, on-line technical support, customized support, and/or technical expertise which are charged commercially.

Software maintenance as a service is billed in arrears in accordance with 31 U.S.C. 3324.

b.  Invoices for maintenance service shall be submitted by the Contractor on a quarterly or monthly basis, after the completion of such period.  Maintenance charges must be paid in arrears (31 U.S.C. 3324).

## 6.  PERIODS OF TERM LICENSES (SIN 132-32) AND MAINTENANCE (SIN 132-34)

a.       The Contractor shall honor orders for periods for the duration of the contract period or a lessor period of time.

b.       Term licenses may be discontinued by the ordering activity on thirty (30) calendar days written notice to the Contractor.

c.       Annual Funding.  When annually appropriated funds are cited on an order for term licenses and/or maintenance, the period of the term licenses shall automatically expire on September 30 of the contract period, or at the end of the contract period, whichever occurs first.  Renewal of the term licenses and/or maintenance orders citing the new appropriation shall be required, if the term licenses and/or maintenance is to be continued during any remainder of the contract period.

d.       Cross-Year Funding Within Contract Period.  Where an ordering activity's specific appropriation authority provides for funds in excess of a 12 month (fiscal year) period, the ordering activity may place an order under this schedule contract for a period up to the expiration of the contract period, notwithstanding the intervening fiscal years.

e.       Ordering activities should notify the Contractor in writing thirty (30) calendar days prior to the expiration of an order, if the term licenses and/or maintenance is to be terminated at that time.  Orders for the continuation of term licenses and/or maintenance will be required if the term licenses are to be continued during the subsequent period.

## 7.  CONVERSION FROM TERM LICENSE TO PERPETUAL LICENSE

## (Reserved)

a.       The ordering activity may convert term licenses to perpetual licenses for any or all software at any time following acceptance of software. At the request of the ordering activity the Contractor



Information
Analysis
Incorporated

Contract No. GS-35F-0062J 11/04/2013 – 11/03/2018

shall furnish, within ten (l0) calendar days, for each software product that is contemplated for conversion, the total amount of conversion credits which have accrued while the software was on a term license and the date of the last update or enhancement.

b. Conversion credits which are provided shall, within the limits specified, continue to accrue from one contract period to the next, provided the software remains on a term license within the ordering activity.

c. The term license for each software product shall be discontinued on the day immediately preceding the effective date of conversion from a term license to a perpetual license.

d. The price the ordering activity shall pay will be the perpetual license price that prevailed at the time such software was initially ordered under a term license, or the perpetual license price prevailing at the time of conversion from a term license to a perpetual license, whichever is the less, minus an amount equal to _____% of all term license payments during the period that the software was under a term license within the ordering activity.


## 8. TERM LICENSE CESSATION

**(Reserved)**

a. After a software product has been on a continuous term license for a period of _____ * months, a fully paid-up, non-exclusive, perpetual license for the software product shall automatically accrue to the ordering activity. The period of continuous term license for automatic accrual of a fully paid-up perpetual license does not have to be achieved during a particular fiscal year; it is a written Contractor commitment which continues to be available for software that is initially ordered under this contract, until a fully paid-up perpetual license accrues to the ordering activity. However, should the term license of the software be discontinued before the specified period of the continuous term license has been satisfied, the perpetual license accrual shall be forfeited.

b. The Contractor agrees to provide updates and maintenance service for the software after a perpetual license has accrued, at the prices and terms of Special Item Number l32-34, if the licensee elects to order such services. Title to the software shall remain with the Contractor.


## 9. UTILIZATION LIMITATIONS (SIN 132-32 AND SIN 132-34)

a. Software acquisition is limited to commercial computer software defined in FAR Part 2.101.

b. When acquired by the ordering activity, commercial computer software and related documentation so legend shall be subject to the following:

    (1) Title to and ownership of the software and documentation shall remain with the Contractor, unless otherwise specified.

    (2) Software licenses are by site and by ordering activity. An ordering activity is defined as a cabinet level or independent ordering activity. The software may be used by any subdivision of the ordering activity (service, bureau, division, command, etc.) that has access to the site the software is placed at, even if the subdivision did not participate in the acquisition of the software. Further, the software may be used on a sharing basis where multiple agencies have joint projects that can be satisfied by the use of the software placed at



**Information**
**Analysis**
**Incorporated**

Contract No.  GS-35F-0062J  11/04/2013 – 11/03/2018

one ordering activity's site.  This would allow other agencies access to one ordering activity's database.  For ordering activity public domain databases, user agencies and third parties may use the computer program to enter, retrieve, analyze and present data.  The user ordering activity will take appropriate action by instruction, agreement, or otherwise, to protect the Contractor's proprietary property with any third parties that are permitted access to the computer programs and documentation in connection with the user ordering activity's permitted use of the computer programs and documentation.  For purposes of this section, all such permitted third parties shall be deemed agents of the user ordering activity.

(3)       Except as is provided in paragraph 9.b(2) above, the ordering activity shall not provide or otherwise make available the software or documentation, or any portion thereof, in any form, to any third party without the prior written approval of the Contractor.  Third parties do not include prime Contractors, subcontractors and agents of the ordering activity who have the   ordering activity's permission to use the licensed software and documentation at the facility, and who have agreed to use the licensed software and documentation only in accordance with these restrictions.  This provision does not limit the right of the ordering activity to use software, documentation, or information therein, which the ordering activity may already have or obtains without restrictions.

(4)       The ordering activity shall have the right to use the computer software and documentation with the computer for which it is acquired at any other facility to which that computer may be transferred, or in cases of Disaster Recovery, the ordering activity has the right to transfer the software to another site if the ordering activity site for which it is acquired is deemed to be unsafe for ordering activity personnel; to use the computer software and documentation with a backup computer when the primary computer is inoperative; to copy computer programs for safekeeping (archives) or backup purposes; to transfer a copy of the software to another site for purposes of benchmarking new hardware and/or software; and to modify the software and documentation or combine it with other software, provided that the unmodified portions shall remain subject to these restrictions.

(5)       "Commercial Computer Software" may be marked with the  Contractor's standard commercial restricted rights legend, but the schedule contract and schedule pricelist, including this clause, "Utilization Limitations" are the only governing terms and conditions, and shall take precedence and supersede any different or additional terms and conditions included in the standard commercial legend.

## 10.  SOFTWARE CONVERSIONS (SIN 132-32  AND SIN 132-34)

Full monetary credit will be allowed to the ordering activity when conversion from one version of the software to another is made as the result of a change in operating system, or from one computer system to another.  Under a term license (132-32), conversion credits which accrued while the earlier version was under a term license shall carry forward and remain available as conversion credits which may be applied towards the perpetual license price of the new version.



Information
Analysis
Incorporated

Contract No. GS-35F-0062J 11/04/2013 – 11/03/2018

## 11. DESCRIPTIONS AND EQUIPMENT COMPATIBILITY

The Contractor shall include, in the schedule pricelist, a complete description of each software product and a list of equipment on which the software can be used. Also, included shall be a brief, introductory explanation of the modules and documentation which are offered.

## 12  RIGHT-TO-COPY PRICING

There is no Right-to-Copy pricing available. The federal government ordering activity has the right to copy one license – *at no charge or cost* - for backup/recovery purpose only.

## 13. DESCRIPTIONS OF SOFTWARE LICENSES AND PRICING

a.  Products

Neo4j by Neo Technology

Neo4j is a high-performance, NOSQL graph database. A graph database is a database that uses graph structures with nodes, edges, and properties to represent and store data, and is based on graph theory. Graph databases, unlike their NOSQL and relational brethren, are designed for lightning fast access to complex data found in social networks, recommendation engines and networked systems. Graphs inherently are a very intuitive way to represent relationships between data. Graph databases differ in that the data *is* the structure. This provides a level of flexibility and resilience that is a great match for today's fast moving business and agile development methods.

Neo4j encompasses all of the features of a mature and robust database. The programmer works with an object-oriented, flexible network structure rather than with strict and static tables – yet enjoys all of the benefits of a fully transactional, enterprise-strength database. For many applications, Neo4j offers performance enhancements of up to 1000 times or more compared to relational databases.

Serving customers in production for over a decade, Neo4j is touted as the world's leading graph database with the largest ecosystem of partners and tens of thousands of successful deployments.

b.  Operating System and Browser Compatibility

Operating Systems (OS)
Production Server – Linux, HP UX, Windows 2008
Development – Linux, HP UX, Windows 2008, Windows XP, Mac OS X

Browsers
Microsoft Internet Explorer 10 and higher
Safari 5 and higher
Google Chrome 21 and higher
Firefox 19 and higher
Opera 13 and higher



Information
Analysis
Incorporated

Contract No. GS-35F-0062J  11/04/2013 – 11/03/2018

c. Pricing

GSA Schedule 70 pricing for SIN 132-32 is discounted for the first year at a percentage off of the commercial list price. All future price increases shall adhere to the EPA clause GSAR 552.216-70 Economic Price Adjustment for compliance with the GSA terms and conditions of this Schedule 70 Contract Award.

Neo4j Bundles are available by Annual Subscription. All prices are Annual Subscription prices.

The Neo4j database runtime is called an "Instance". Clusters comprise multiple instances: normally three or more. Instances normally run on different machines / OSs, although multiple instances can be run on a single machine / OS. Each Neo4j instance runs inside of a corresponding Java Virtual Machine (JVM) instance.

For Neo4j instances running in virtualized environments, only the number of cores allotted to the virtual OS in which Neo4j is running need be licensed. For virtual machines running in EC2 and other virtualized Cloud platforms (such as SoftLayer, Oracle Cloud, et al.), "virtual cores" and "virtual CPUs" (vCPUs) each count as one core.

All Neo4j Bundles include a commercial license for Neo4j Enterprise Edition. The commercial license grants rights to the use of Neo4j Enterprise in commercial and/or federal and government projects on an annual / renewable basis, and includes Support in the GSA purchase price.

1. **Neo4j Enterprise Bundle** – Standard cluster for enterprise applications that are used by more than one department (or by a larger department), or by customer-facing applications. Neo4j Enterprise Bundle basic configuration includes:
   a. 3 Production Instances (up to 8 Cores per Instance).
   b. 3 Test Instances (no Core limit).
   c. Premium Support: 24 x 7 / 1-hour response time for Severity 1 issues, email and phone.
   d. **Unlimited number of licensed developers.**

| MFR Part # | Product Name / Description | Annual Subscription Price |
|---|---|---|
| NT 010 | Neo4j Enterprise Bundle Base | $ 189,188 |
| NT 011 | Additional Production Capacity (per Core) | 6,609 |
| NT 012 | Disaster Recovery (per Core) | 3,305 |
| NT 013 | Additional Test Instances (per Instance) | 4,957 |
| NT 014 | Additional Instance (up to 8 Cores) | 52,874 |
| NT 015 | 8-Core pack | 52,874 |
| NT 016 | 12-Core pack | 79,310 |
| NT 017 | 16-Core pack | 105,747 |
| NT 018 | 24-Core pack | 158,621 |



**Information Analysis Incorporated**

Contract No.  GS-35F-0062J  11/04/2013 – 11/03/2018

| NT 019 | 32-Core pack | 211,494 |
|---|---|---|

2. **Neo4j Business Bundles – Premium Support** – A small cluster for use by a single department, for internal employee-facing applications.  Neo4j Business Bundles – Premium Support include:
   a. Premium Support:  24 x 7 / 1-hour response time for Severity 1 issues, email and phone.
   b. **Unlimited number of licensed developers**.

| MFR Part # | Product Name / Description | Configuration | Annual Subscription Price |
|---|---|---|---|
| NT 001 | Neo4j Business Bundle 1 Premium | 3 Production Instances (up to 4 Cores per Instance)<br>3 Test Instances (no Core Limit) | $  106,573 |
| NT 002 | Neo4j Business Bundle 2 Premium | 2 Production Instances (up to 4 Cores per Instance)<br>2 Test Instances (no Core Limit) | 71,049 |
| NT 003 | Additional Production Capacity (per Core) | | 6,609 |
| NT 004 | Additional Instance (up to 4 Cores) | | 26,437 |
| NT 005 | Additional Test Instances (per Instance) | | 4,957 |

3. **Neo4j Business Bundles – Standard Support** – A small cluster for use by a single department, for internal employee-facing applications.  Neo4j Business Bundles – Standard Support include:
   a. Standard Support:  10 x 5 / 24-hour response time, email
   b. **Unlimited number of licensed developers.**

| MFR Part # | Product Name / Description | Configuration | Annual Subscription Price |
|---|---|---|---|
| NT 501 | Neo4j Business Bundle 1 Standard | 3 Production Instances (up to 4 Cores per Instance)<br>3 Test Instances (no Core Limit) | $   85,259 |
| NT 502 | Neo4j Business Bundle 2 Standard | 2 Production Instances (up to 4 Cores per Instance)<br>2 Test Instances (no Core Limit) | 56,839 |
| NT 503 | Additional Production Capacity (per Core) | | 5,287 |
| NT 504 | Additional Instance (up to 4 Cores) | | 21,149 |
| NT 505 | Additional Test Instances (per Instance) | | 3,966 |



**Information Analysis Incorporated**

Contract No.  GS-35F-0062J  11/04/2013 – 11/03/2018

4. **Neo4j Discovery Bundle** – A small single-instance configuration for internal departmental applications.  Neo4j Discovery Bundle basic configuration includes:
   a.  1 Production Instances (up to 4 Cores)
   b.  1 Test Instances (no Core limit)
   c.  Standard Support:  10 x 5 / 24-hour response time, email
   **d.  Unlimited number of licensed developers.**

| MFR Part # | Product Name / Description | Annual Subscription Price |
|---|---|---|
| NT 201 | Neo4j Discovery Bundle | $      29,741 |
| NT 202 | Additional Production Capacity (per Core [single Instance only]) | 6,609 |
| NT 203 | Additional Test Instances (per Instance) | 4,957 |

**Information Analysis Incorporated**

Contract No. GS-35F-0062J 11/04/2013 – 11/03/2018

## TERMS AND CONDITIONS APPLICABLE TO PURCHASE OF TRAINING COURSES FOR GENERAL PURPOSE COMMERCIAL INFORMATION TECHNOLOGY EQUIPMENT AND SOFTWARE (SPECIAL ITEM NUMBER 132-50)

### 1. SCOPE

a.      The Contractor shall provide training courses normally available to commercial customers, which will permit ordering activities users to make full, efficient use of general purpose commercial IT products.  Training is restricted to training courses for those products within the scope of this solicitation.

b.      The Contractor shall provide training at the Contractor's facility and/or at the ordering activity's location, as agreed to by the Contractor and the ordering activity.

### 2. ORDER

Written orders, EDI orders (GSA Advantage! and FACNET), credit card orders, and orders placed under blanket purchase agreements (BPAs) shall be the basis for the purchase of training courses in accordance with the terms of this contract.  Orders shall include the student's name, course title, course date and time, and contracted dollar amount of the course.

### 3. TIME OF DELIVERY

The Contractor shall conduct training on the date (time, day, month, and year) agreed to by the Contractor and the ordering activity.

### 4. CANCELLATION AND RESCHEDULING

a.      The ordering activity will notify the Contractor at least seventy-two (72) hours before the scheduled training date, if a student will be unable to attend.  The Contractor will then permit the ordering activity to either cancel the order or reschedule the training at no additional charge.  In the event the training class is rescheduled, the ordering activity will modify its original training order to specify the time and date of the rescheduled training class.

b.      In the event the ordering activity fails to cancel or reschedule a training course within the time frame specified in paragraph a, above, the ordering activity will be liable for the contracted dollar amount of the training course.  The Contractor agrees to permit the ordering activity to reschedule a student who fails to attend a training class within ninety (90) days from the original course date, at no additional charge.

c.      The ordering activity reserves the right to substitute one student for another up to the first day of class.

d.      In the event the Contractor is unable to conduct training on the date agreed to by the Contractor and the ordering activity, the Contractor must notify the ordering activity at least seventy-two (72) hours before the scheduled training date.

**Information
Analysis
Incorporated**

Contract No.  GS-35F-0062J  11/04/2013 – 11/03/2018

## 5.  FOLLOW-UP SUPPORT

The Contractor agrees to provide each student with unlimited telephone support for a period of one (1) year from the completion of the training course. During this period, the student may contact the Contractor's instructors for refresher assistance and answers to related course curriculum questions.

## 6.  PRICE FOR TRAINING

The price that the ordering activity will be charged will be the ordering activity training price in effect at the time of order placement, or the ordering activity price in effect at the time the training course is conducted, whichever is less.

## 7.  INVOICES AND PAYMENT

Invoices for training shall be submitted by the Contractor after ordering activity completion of the training course.  Charges for training must be paid in arrears (31 U.S.C. 3324).  PROMPT PAYMENT DISCOUNT, IF APPLICABLE, SHALL BE SHOWN ON THE INVOICE.

## 8.  FORMAT AND CONTENT OF TRAINING

a.      The Contractor shall provide written materials (i.e., manuals, handbooks, texts, etc.) normally provided with course offerings, printed and copied two-sided on paper containing 30% postconsumer materials (fiber).  Such documentation will become the property of the student upon completion of the training class.

b.      **If applicable** For hands-on training courses, there must be a one-to-one assignment of IT equipment to students.

c.      The Contractor shall provide each student with a Certificate of Training at the completion of each training course.

d.      The Contractor shall provide the following information for each training course offered:

(1)      The course title and a brief description of the course content, to include the course format (e.g., lecture, discussion, hands-on training);

(2)      The length of the course;

(3)      Mandatory and desirable prerequisites for student enrollment;

(4)      The minimum and maximum number of students per class;

(5)      The locations where the course is offered;

(6)      Class schedules; and

---



(7)      Price (per student, per class (if applicable)).

e.      For those courses conducted at the ordering activity's location, instructor travel charges (if applicable), including mileage and daily living expenses (e.g., per diem charges) are governed by Pub. L. 99-234 and FAR Part 31.205-46, and are reimbursable by the ordering activity on orders placed under the Multiple Award Schedule, as applicable, in effect on the date(s) the travel is performed. Contractors cannot use GSA city pair contracts.  The Industrial Funding Fee does NOT apply to travel and per diem charges.

f.      For Online Training Courses, a copy of all training material must be available for electronic download by the students.

## 9.  "NO CHARGE" TRAINING

The Contractor shall describe any training provided with equipment and/or software provided under this contract, free of charge, in the space provided below.

n/a

---

## 10. DESCRIPTION OF TRAINING COURSES AND PRICING

### 10.a.   Open Enrollment

To help you maximize use of the Adobe family of products, which are designed to save your organization time and money, and streamline your business processes, IAI offers a comprehensive line of training services, ranging from classroom workshops led by industry-experienced instructors, to on-demand, computer-based courseware.  IAI has the training solution that meets the needs of your developers and end-users.

IAI is an approved Adobe Systems Incorporated Enterprise Solutions Partner and systems integrator.  The training courses offered under this Schedule 70 were developed by IAI using the systems experience and close interaction with end users.

IAI also offers custom-designed courses and comprehensive training programs, outside the scope of this Schedule, to address the specific requirements of large organizations or those with unique training requirements.  As well, IAI can provide text-based workbooks and job-aids for ongoing reference.

Courses are available on a scheduled basis at Information Analysis, Inc. during each month.  These courses are offered on a first-come, first-serve schedule.  The class size is limited to 10 students.  A PC is provided for each student.  Class hours normally are 8:30 AM to 5:00 PM.  The courses are conducted at Information Analysis, Inc., 11240 Waples Mill Road, Suite 201, Fairfax, Virginia 22030.

All the Adobe Enterprise Courses can be held at your site.  The Enterprise Courses can be tailored to meet your objectives.  The courses require as a **minimum** the following facility and PC equipment:



Information
Analysis
Incorporated

Contract No.  GS-35F-0062J  11/04/2013 – 11/03/2018

- A suitable classroom or laboratory environment
- 1 PC per student –
  - Pentium 4 or later processor
  - Minimum of 256MB RAM
  - If you plan to use Entrust, you must use version 4.0 or above and it must be installed prior to class
- Laser Printer -- Local or LAN
- Network connection for each PC with cc:  Mail/Notes or MS Mail/Exchange
- Projector/TV monitor
- Screen
- White board or chalk board
- Instructor workspace

A maximum of 10 students per course is recommended.

## 10.b.   How to Enroll

1. Select the Course(s) that meet your needs, taking into consideration the course prerequisites and scheduled dates.

2. Call Al Weisner at (703) 293-7929 or fax your request to his attention at (703)293-7979 to enroll in class and verify course availability.

3. Process your agency's appropriate training authorization document for approval.

4. Forward approved training document via fax to (703)293-7979 and mail the original training authorization document or bring it the first day of class.

> Al Weisner
> Information Analysis, Inc.
> 11240 Waples Mill Road, Suite 201
> Fairfax, Virginia 22030
> (703) 293-7929
> Fax:  (703) 293-7979
> aweisner@infoa.com

## 10.c.   Courses Offered

Training courses currently offered by IAI are described on the following pages.



Information
Analysis
Incorporated

Contract No. GS-35F-0062J 11/04/2013 – 11/03/2018

| | |
|---|---|
| **Course:** | **Introduction to Adobe Forms Designer** |

**Duration:**  2 Days

**Recommended Number of Students:**  1 - 10

**Audience:**  Forms designers who are converting from paper to electronic forms.  Also, forms designers who have used traditional tools or word processors to build forms.

**Description:**  During this two-day class, students will focus on specific techniques for designing and creating a simple form.  Students will plan form layouts, select form objects, define page and form object properties, and edit and test.  Students will also learn how to enhance a form by adding graphics, tables, and multiple pages.

**Objectives:**  The student will be able to:

❑   Form design components

❑   Build a form including core approaches

❑   What are Objects and how are they used?

❑   Object manipulation

❑   Define form and page properties

❑   Define form object properties

❑   Use field properties to automate user input

❑   Print and save a form

❑   Add graphics, tables, and create a multiple-page form

❑   Create field help

❑   Learn to fill in the forms utilizing Form Client

**Prerequisite(s):**  Basic Windows skill set - "double-clicking," "clicking," and "drag and drop".

Case: 24-5538, 12/23/2024, DktEntry: 18.8, Page 203 of 253
Case 5:18-cv-07182-EJD   Document 100-3   Filed 01/15/21   Page 51 of 125

 **Information Analysis Incorporated**

Contract No. GS-35F-0062J  11/04/2013 – 11/03/2018

**Course:**  **Database-Connectivity Using Adobe Forms Designer**

**Duration:**  1 Day

**Recommended Number of Students:**  1 - 10

**Audience:**  Forms designers and database mangers that are converting from paper to electronic forms.

**Description:**  During this one-day class, students will be introduced to the interface and capabilities of the Form Designer.  Students will create a database-linked form using object-oriented design tools.  Students will also learn how to enhance a form by adding graphics and other design elements.

**Objectives:**  The student will be able to:

❑  Plan a form design

❑  Define form and page properties

❑  Define form object properties

❑  Use field properties to automate user input

❑  Work with databases – attaching, adding fields and security

❑  Create a multiple database linked form

❑  Add graphics, tables, and create a multiple-page form

❑  Create field help

❑  Learn to fill in the forms utilizing Form Client

**Prerequisite(s):**  Completion of Orientation to Adobe Form Designer and understanding of database fundamentals.

**Page 1736**



Information
Analysis
Incorporated

Contract No. GS-35F-0062J 11/04/2013 – 11/03/2018

| | |
|---|---|
| **Course:** | **Using the Routing In Adobe Forms Designer** |
| **Duration:** | 1 Day |
| **Recommended Number of Students:** | 1 - 10 |
| **Audience:** | This course is designed for form application developers and MIS professionals. |
| **Description:** | During this one-day class, students will learn how to set up a workflow using a routing map and add features to it. Students will also learn to assign attributes to stages and links, the two primary objects that make up a routing map. Students will learn form packaging, including how to specify such options as the contents of a form package, form components, databases and database records, recipient options, and security. |
| **Objectives:** | The student will be able to: |

    ❑    Setup a workflow in Form Designer/Form Client

    ❑    Create a routing map – stages & links

    ❑    Create a form package – database, database records, forms, & other files

    ❑    Create and use tracking database

    ❑    Perform role resolution

    ❑    Create and use event macros

**Prerequisite(s):**    Knowledge of form design and form application design.



Information
Analysis
Incorporated

Contract No. GS-35F-0062J 11/04/2013 – 11/03/2018

**Course:**      **Designing Intelligent Documents Using Adobe Enterprise Products**

**Duration:**      2 Days

**Recommended Number of Students:**      1 - 10

**Audience:**      Forms designers who are converting from paper to electronic forms.

**Description:**      During this two-day class, students will be introduced to the concept of an automated workflow and will tour the Form Designer Interface. Through hands-on labs, students will learn to use the Menu Editor to assign menus to form applications, and to attach functions and macros to those forms. Students will be taught how to use the Toolbar Editor to add customized toolbars to a form, edit buttons, and properties of those toolbars, and also create and add dialog boxes. Finally, students will be introduced to the VB Scripting and will examine examples of JScript and write simple routines.

**Objectives:**      The student will be able to:

- ❑    Use Form Designer as a workflow tool

- ❑    Use the Menu editor – creating, attaching functions, editing, and adding

- ❑    Use the Toolbar editor – creating, attaching functions, editing, and adding

- ❑ Use the Macro editor – creating, managing libraries, working with modules
  - ❑    Use the Dialog editor – creating dialog boxes

  - ❑    Use JScript

**Prerequisite(s):**      Knowledge of basic form design, knowledge of Visual Basic, Intelligent Forms Language, or another object-oriented/event–driven programming language.



**Information Analysis Incorporated**

Contract No. GS-35F-0062J 11/04/2013 – 11/03/2018

**Course:** **Orientation to Adobe Reader Extensions**

**Duration:** 1 Day

**Recommended Number of Students:** 1 - 10

**Audience:** Anyone responsible for adding Reader Extension Rights and the Reader Extension Server Administrator.

**Description:** This course is designed for individuals responsible for the adding the Reader Extension Rights to the PDF Forms. The course also includes instruction on Reader Extension Server Administration including adding users, deleting users, changing user's passwords, and granting user's permissions.

**Objectives:** The student will be able to:

- ❑ Understanding the Reader Extension Server Architecture

- ❑ Server Login with UserID and Password

- ❑ Identify and Select the Rights: Local save, Comments, Sign, & Submit

- ❑ Verify Turn On Rights

- ❑ Saving the Form

- ❑ Administrating the Reader Extension Server

- ❑ Adding New Users, Deleting Users, Changing User Password, & Updating User Information including User Rights

- ❑ Learn How and Why to Logoff

**Prerequisite(s):** Orientation to Adobe Form Designer 6.0.



Information
Analysis
Incorporated

Contract No. GS-35F-0062J  11/04/2013 – 11/03/2018

| Course: | **Adobe Forms Designer Intermediate Course** |
|---|---|

**Duration:** 1 Day

**Recommended Number of Students:** 1 - 10

**Audience:** Anyone responsible designing forms that has completed the Introduction to Adobe Forms Designer Course

**Description:** This course introduces the forms designer to Adobe Designer new capabilities. Participants will be able to identify 2D Barcode, JavaScript and other requirements.

**Objectives:** The student will be able to:

- ❑ Understand the differences between a print, interactive, and dynamic forms.
- ❑ What are Hyperlinks and how you use them in your forms
- ❑ Hyphenation – finally you can give your text a more appealing visual flow
- ❑ How to effectively use the new Page Break Controls
- ❑ Typography enhancements
- ❑ New Tab Order Tool – why this is important – can you say Section 508?
- ❑ Web service authentication – WSDL
- ❑ What is 2D Barcode?  How and when is it used
- ❑ Basic JavaScript
- ❑ Student Exercises – Hands on

| **Major Topics:** | **Topic** | **Class Hours** |
|---|---|---|
| | Introduction to Designer new capabilities | 1.0 |
| | Hyperlinks | 1.0 |
| | Hyphenation | 1.0 |
| | Typography enhancements | 1.0 |
| | New Tab Order Tool | 1.0 |
| | Web service authentication | 1.0 |
| | 2D Barcode | 3.0 |
| | Basic JavaScript | 4.0 |
| | Student Exercises | 3.0 |

**Prerequisite(s):** Introduction to Adobe Form Designer Course and 6 moths forms design experience.

---



Information
Analysis
Incorporated

Contract No. GS-35F-0062J 11/04/2013 – 11/03/2018

**Course:** **Adobe Forms Designer Advanced Course**

**Duration:** 2 Days

**Recommended Number of Students:** 1 - 10

**Audience:** Anyone responsible designing dynamic forms.

**Description:** This course introduces the form's designer to Adobe Designer's dynamic forms capabilities. Participants will be able to identify dynamic form requirements, provide dynamic forms utilizing text field expansion, subform, and table features to meet the user's dynamic forms requirements. This includes design Wizard based forms.

**Objectives:** The student will be able to:

❑ Understand the differences between a print, interactive, and dynamic form and how to apply these features to achieve a truly interactive dynamic form.

❑ Dynamic Form Features – Expanding Fields, Subforms, and Tables

❑ Expanding Text Fields – Fields that grow on demand

❑ Subforms/Nested Subforms – Use when/if needed

❑ Dynamic Tables – At your service

❑ Dynamic Tables – Adding/removing rows

❑ Pagination – Page breaks with headers/footers

❑ FormCalc/JAVA Scripting required

❑ Student Exercises – Hands on

**Major Topics:**

| Topic | Class Hours |
|---|---|
| Introduction to dynamic interactive forms | 1.0 |
| Expanding Text Fields | 1.0 |
| Subforms/Nested Subform | 4.0 |
| Dynamic Tables | 2.0 |
| Wizard Forms Project | 8.0 |

**Prerequisite(s):** Orientation to Adobe Form Designer Course and 6 moths forms design experience.

Case 5:18-cv-07182-EJD   Document 100-3   Filed 01/15/21   Page 57 of 125



Information
Analysis
Incorporated

Contract No.  GS-35F-0062J  11/04/2013 – 11/03/2018

| | |
|---|---|
| **Course:** | **Introduction to Acrobat Professional** |
| **Duration:** | 1 Day |

**Recommended Number of Students:**     1 - 10

| | |
|---|---|
| **Audience:** | The course is intended for anyone who wishes to create Acrobat documents for dissemination to other users, to review Acrobat documents and to use features of Acrobat to enhance the documents. |
| **Description:** | During this one-day course, students will be introduced to Acrobat Professional including User Interface, creating, navigating, and working with PDF Files. |
| **Objectives:** | The student will be able to: |

    ❑    Create an Acrobat document

    ❑    Navigate through a PDF file

    ❑    Select security options for their documents

    ❑    Control font usage in the document

    ❑    Create bookmarks and Thumbnails

    ❑    Markup documents for review

    ❑    Create and use indexes

    ❑    Printing

    ❑    Emailing

**Prerequisite(s):**     Basic Windows NT/2000/XP skills.

Case 5.18-cv-07182-EJD  Document 100-3  Filed 01/15/21  Page 58 of 125



Contract No.  GS-35F-0062J  11/04/2013 – 11/03/2018

| **Course:** | **Introduction to Adobe "Free" Reader** |
| --- | --- |

**Duration:**  ½ Day

**Recommended Number of Students:**  1 - 10

**Audience:**  Anyone responsible for filling out Adobe Forms.

**Description:**  This course introduces the user to filling in and printing forms.  Participants will learn to enter information, save, retrieve information, email, and print the completed form.

**Objectives:**  The student will be able to:

❑  Understand the overall architecture of Adobe "Free" Reader

❑  How to access the your forms

❑  Fill a form – entering data and working with records

❑  Change views and preferences

❑  Work with field types – data, graphic, signature, database lookup, and calculation

❑  Spell check

❑  Work with email – sending and receiving

**Prerequisite(s):**  Basic Windows skills.



Information
Analysis
Incorporated

Contract No. GS-35F-0062J 11/04/2013 – 11/03/2018

| **Course:** | **Building LiveCycle Enterprise Suite Applications** |
|---|---|
| **Duration:** | 3 Days |

**Recommended Number of Students:** 1 - 10

| **Audience:** | This course is for anyone with a programming background. To gain the most from this course, you should: |
|---|---|

- Be familiar with basic programming concepts, processes and constructs
- Have a basic understanding of XML terminology and structure
- Be familiar with building forms using Adobe LiveCycle Designer or the Workbench

| **Description:** | This course provides developers the skills needed to utilize Process Management and other solution components in building LiveCycle ES applications. The course gets developers up and running in creating, deploying and administering a process, as well as using other solution components in the application. |
|---|---|

| **Objectives:** | The student will be able to: |
|---|---|

- ❑ Introducing the Course
- ❑ Introducing Adobe LiveCycle ES (Enterprise Suite)
- ❑ Getting Started with Adobe LiveCycle Workbench ES
- ❑ Getting Started with LiveCycle Applications
- ❑ Using Forms in LiveCycle ES Applications
- ❑ Creating a Process
- ❑ Deploying a Process
- ❑ Monitoring and Troubleshooting Applications
- ❑ Implementing Business Rules to Control Process Flow
- ❑ Using the Forms Service within a Process
- ❑ Using the Rights Management Service within a Process
- ❑ Using the Reader Extensions Service
- ❑ Creating and Rendering Form Guides within a Process

**Prerequisite(s):** This course is for anyone with a programming background.



**Information Analysis Incorporated**

Contract No. GS-35F-0062J 11/04/2013 – 11/03/2018

**10.d Price Per Student**

| Course Identifier | Descriptive Title | Price per Student |
|---|---|---|
| TRAIN-1 | Introduction to Adobe Forms Designer | $1,360 |
| TRAIN-2 | Database-Connectivity Using Adobe Forms Designer | 680 |
| TRAIN-3 | Using the Routing in Adobe Forms Designer | 680 |
| TRAIN-4 | Designing Intelligent Documents Using Adobe Enterprise Products | 1,360 |
| TRAIN-6 | Orientation to Adobe Reader Extensions | 680 |
| TRAIN-7 | Adobe Forms Designer Intermediate Course | 1,360 |
| TRAIN-8 | Adobe Forms Designer Advanced Course | 1,360 |
| TRAIN-23 | Introduction to Acrobat Professional | 680 |
| TRAIN-24 | Introduction to Adobe "Free" Reader | 272 |
| TRAIN-40 | Building LiveCycle Enterprise Suite Applications | 2,055 |

Information
Analysis
Incorporated

Contract No. GS-35F-0062J 11/04/2013 – 11/03/2018

## TERMS AND CONDITIONS APPLICABLE TO INFORMATION TECHNOLOGY (IT) PROFESSIONAL SERVICES (SPECIAL ITEM NUMBER 132-51)

**1. SCOPE**

a. The prices, terms and conditions stated under Special Item Number 132-51 Information Technology Professional Services apply exclusively to IT Professional Services within the scope of this Information Technology Schedule.

b. The Contractor shall provide services at the Contractor's facility and/or at the ordering activity location, as agreed to by the Contractor and the ordering activity.

**2. PERFORMANCE INCENTIVES I-FSS-60 Performance Incentives (April 2000)**

a. Performance incentives may be agreed upon between the Contractor and the ordering activity on individual fixed price orders or Blanket Purchase Agreements under this contract.

b. The ordering activity must establish a maximum performance incentive price for these services and/or total solutions on individual orders or Blanket Purchase Agreements.

c. Incentives should be designed to relate results achieved by the contractor to specified targets. To the maximum extent practicable, ordering activities shall consider establishing incentives where performance is critical to the ordering activity's mission and incentives are likely to motivate the contractor. Incentives shall be based on objectively measurable tasks.

**3. ORDER**

a. Agencies may use written orders, EDI orders, blanket purchase agreements, individual purchase orders, or task orders for ordering services under this contract. Blanket Purchase Agreements shall not extend beyond the end of the contract period; all services and delivery shall be made and the contract terms and conditions shall continue in effect until the completion of the order. Orders for tasks which extend beyond the fiscal year for which funds are available shall include FAR 52.232-19 (Deviation – May 2003) Availability of Funds for the Next Fiscal Year. The purchase order shall specify the availability of funds and the period for which funds are available.

b. All task orders are subject to the terms and conditions of the contract. In the event of conflict between a task order and the contract, the contract will take precedence.



## 4.  PERFORMANCE OF SERVICES

a.      The Contractor shall commence performance of services on the date agreed to by the Contractor and the ordering activity.

b.      The Contractor agrees to render services only during normal working hours, unless otherwise agreed to by the Contractor and the ordering activity.

c.      The ordering activity should include the criteria for satisfactory completion for each task in the Statement of Work or Delivery Order.  Services shall be completed in a good and workmanlike manner.

d.      Any Contractor travel required in the performance of IT Services must comply with the Federal Travel Regulation or Joint Travel Regulations, as applicable, in effect on the date(s) the travel is performed. Established Federal Government per diem rates will apply to all Contractor travel.  Contractors cannot use GSA city pair contracts.

## 5.  STOP-WORK ORDER (FAR 52.242-15) (AUG 1989)

(a)      The Contracting Officer may, at any time, by written order to the Contractor, require the Contractor to stop all, or any part, of the work called for by this contract for a period of 90 days after the order is delivered to the Contractor, and for any further period to which the parties may agree.  The order shall be specifically identified as a stop-work order issued under this clause.  Upon receipt of the order, the Contractor shall immediately comply with its terms and take all reasonable steps to minimize the incurrence of costs allocable to the work covered by the order during the period of work stoppage.  Within a period of 90 days after a stop-work is delivered to the Contractor, or within any extension of that period to which the parties shall have agreed, the Contracting Officer shall either-

(1)      Cancel the stop-work order; or

(2)      Terminate the work covered by the order as provided in the Default, or the Termination for Convenience of the Government, clause of this contract.

(b)      If a stop-work order issued under this clause is canceled or the period of the order or any extension thereof expires, the Contractor shall resume work.  The Contracting Officer shall make an equitable adjustment in the delivery schedule or contract price, or both, and the contract shall be modified, in writing, accordingly, if-

(1)      The stop-work order results in an increase in the time required for, or in the Contractor's cost properly allocable to, the performance of any part of this contract; and

(2)      The Contractor asserts its right to the adjustment within 30 days after the end of the period of work stoppage; provided, that, if the Contracting Officer decides the facts justify the action, the Contracting Officer may receive and act upon the claim submitted at any time before final payment under this contract.



Information
Analysis
Incorporated

Contract No.  GS-35F-0062J  11/04/2013 – 11/03/2018

(c)     If a stop-work order is not canceled and the work covered by the order is terminated for the convenience of the Government, the Contracting Officer shall allow reasonable costs resulting from the stop-work order in arriving at the termination settlement.

(d)     If a stop-work order is not canceled and the work covered by the order is terminated for default, the Contracting Officer shall allow, by equitable adjustment or otherwise, reasonable costs resulting from the stop-work order.

## 6.  INSPECTION OF SERVICES

In accordance with FAR 52.212-4 CONTRACT TERMS AND CONDITIONS--COMMERCIAL ITEMS (MAR 2009) (DEVIATION 1 – FEB 2007) for Firm-Fixed Price orders and FAR 52.212-4 CONTRACT TERMS AND CONDITIONS-COMMERCIAL ITEMS (MAR 2009) (ALTERNATE 1 – OCT 2008) (DEVIATION 1 – FEB 2007) applies to Time-and-Materials and Labor-Hour Contracts orders place under this contract.

## 7.  RESPONSIBILITIES OF THE CONTRACTOR

The Contractor shall comply with all laws, ordinances, and regulations (Federal, State, City, or otherwise) covering work of this character. If the end product of a task order is software, then FAR 52.227-14 (Dec 2007) Rights in Data – General, may apply.

## 8.  RESPONSIBILITIES OF THE ORDERING ACTIVITY

Subject to security regulations, the ordering activity shall permit Contractor access to all facilities necessary to perform the requisite IT Professional Services.

## 9.  INDEPENDENT CONTRACTOR

All IT Professional Services performed by the Contractor under the terms of this contract shall be as an independent Contractor, and not as an agent or employee of the ordering activity.

## 10. ORGANIZATIONAL CONFLICTS OF INTEREST

a.      Definitions.

"Contractor" means the person, firm, unincorporated association, joint venture, partnership, or corporation that is a party to this contract.

"Contractor and its affiliates" and "Contractor or its affiliates" refers to the Contractor, its chief executives, directors, officers, subsidiaries, affiliates, subcontractors at any tier, and consultants and any joint venture involving the Contractor, any entity into or with which the Contractor subsequently merges or affiliates, or any other successor or assignee of the Contractor.

An "Organizational conflict of interest" exists when the nature of the work to be performed under a proposed ordering activity contract, without some restriction on ordering activities by the

---



Information
Analysis
Incorporated

Contractor and its affiliates, may either (i) result in an unfair competitive advantage to the Contractor or its affiliates or (ii) impair the Contractor's or its affiliates' objectivity in performing contract work.

b.      To avoid an organizational or financial conflict of interest and to avoid prejudicing the best interests of the ordering activity, ordering activities may place restrictions on the Contractors, its affiliates, chief executives, directors, subsidiaries and subcontractors at any tier when placing orders against schedule contracts.  Such restrictions shall be consistent with FAR 9.505 and shall be designed to avoid, neutralize, or mitigate organizational conflicts of interest that might otherwise exist in situations related to individual orders placed against the schedule contract.  Examples of situations, which may require restrictions, are provided at FAR 9.508.

## 11.  INVOICES

The Contractor, upon completion of the work ordered, shall submit invoices for IT Professional services.  Progress payments may be authorized by the ordering activity on individual orders if appropriate.  Progress payments shall be based upon completion of defined milestones or interim products.  Invoices shall be submitted monthly for recurring services performed during the preceding month.

## 12.  PAYMENTS

For firm-fixed price orders the ordering activity shall pay the Contractor, upon submission of proper invoices or vouchers, the prices stipulated in this contract for service rendered and accepted.  Progress payments shall be made only when authorized by the order.  For time-and-materials orders, the Payments under Time-and-Materials and Labor-Hour Contracts at FAR 52.212-4 (MAR 2009 (ALTERNATE I – OCT 2008) (DEVIATION I – FEB 2007) applies to time-and-materials orders placed under this contract.  For labor-hour orders, the Payment under Time-and-Materials and Labor-Hour Contracts at FAR 52.212-4 (MAR 2009 (ALTERNATE I – OCT 2008) (DEVIATION I – FEB 2007) applies to labor-hour orders placed under this contract. 52.216-31 (Feb 2007) Time-and-Materials/Labor-Hour Proposal Requirements-Commercial Item Acquisition As prescribed in 16.601(e)(3), insert the following provision:

(a)      The Government contemplates award of a Time-and-Materials or Labor-Hour type of contract resulting from this solicitation.

(b)      The offeror must specify fixed hourly rates in its offer that include wages, overhead, general and administrative expenses, and profit.  The offeror must specify whether the fixed hourly rate for each labor category applies to labor performed by-

   (1) The offeror;

   (2) Subcontractors; and/or

   (3) Divisions, subsidiaries, or affiliates of the offeror under a common control.



Information
Analysis
Incorporated

Contract No.  GS-35F-0062J  11/04/2013 – 11/03/2018

## 13.  RÉSUMÉS

Résumés shall be provided to the GSA Contracting Officer or the user ordering activity upon request.

## 14.  INCIDENTAL SUPPORT COSTS

Incidental support costs are available outside the scope of this contract.  The costs will be negotiated separately with the ordering activity in accordance with the guidelines set forth in the FAR.

## 15.  APPROVAL OF SUBCONTRACTS

The ordering activity may require that the Contractor receive, from the ordering activity's Contracting Officer, written consent before placing any subcontract for furnishing any of the work called for in a task order.

## 16.    DESCRIPTION OF IT PROFESSIONAL SERVICES AND PRICING

### 16.1    IT Professional Services

Information Analysis Incorporated offers IT professional services in the following general categories.  The range of services in each category are described by generally accepted functional titles, associated processes and procedures, and trade names of relevant hardware and software systems.  IAI has experience providing services to Federal Government customers in all listed areas.  Available services include:

 (1)  FPDS Code D302        **IT Systems Development Services**

- Program/Project Management
- Conceptual Design
- Conceptualizing Advanced Technology Requirements
- Business Systems Engineering
- Specification Development
- Site Surveys
- Cost Engineering
- Cost Estimating and Scheduling
- Planning, Analyzing and Scheduling Complex Systems
- Statistical Analysis
- Cost/Benefit Analysis
- Integrated Logistics Support



**Information Analysis Incorporated**

Contract No. GS-35F-0062J 11/04/2013 – 11/03/2018

(2) FPDS Code D306 **IT Systems Analysis Services**

- Functional Requirements Integration
  - Life Cycle Program Management
  - Risk Assessment and Mitigation
  - Independent Verification and Validation
  - Quality Assurance
  - Requirements Documentation
  - Cost-Benefit Analysis
- Computer Systems
  - Systems Engineering and Integration
  - Planning and Assessment
  - Requirements Analysis
  - Systems Design and Analysis
  - Systems Development
  - Configuration Management
  - User Interface Design and Development
  - Business Process Redesign
  - Test and Evaluation
- Software
  - Life Cycle Management
  - CASE Tools
  - Business Process Reengineering (Redesign)
  - Cold Fusion
- Test and Evaluation
  - Software Engineering QA
  - Cost-Benefit Analysis
  - Risk Analysis
- Site Surveys
  - Requirements Analysis
  - Project Planning
  - Inventory Control
  - CAD Drawing
  - Cable Plant LAN/WAN/MAN



Information
Analysis
Incorporated

Contract No. GS-35F-0062J 11/04/2013 – 11/03/2018

**(3)  FPDS Code D307          Automated Information Systems Design and Integration Services**

- Functional Requirements Integration
  - Life Cycle Program Management
  - Risk Assessment and Mitigation
  - Independent Verification and Validation
  - Quality Assurance
  - Requirements Documentation
  - Cost-Benefit Analysis
- Computer Systems
  - Systems Engineering and Integration
  - Planning and Assessment
  - Requirements Analysis
  - Systems Design and Analysis
  - Systems Development
  - Configuration Management
  - User Interface Design and Development
  - Business Process Redesign
  - Test and Evaluation
- Data Modeling and Standardization
  - Quality Assurance Process
  - Structured Analysis
  - Document Management System
  - Source Code Control
  - Configuration Management
  - Rapid Application Development
- Database Management and Development
- Database Administration
- Data Communications (Secure & Non-Secure)
  - Intranet Services
  - Internet
  - Firewalls
  - C-2 compliance
  - C4I compliance
- Shared Data Environment
  - Impact Studies
  - Needs Assessment
  - Document Management Services
  - Web Site Development and Maintenance
  - Independent Verification and Validation

---

Telephone: (703) 383-3000 • FAX: (703) 293-7979 • www.infoa.com

37



Information
Analysis
Incorporated

Contract No. GS-35F-0062J 11/04/2013 – 11/03/2018

(4) FPDS Code D308 **Programming Services**

- Database Development
- Application Development
- Languages
  - C & C++ (Visual)
  - Clipper
  - FoxPro
  - Lotus Notes
  - Progress
  - UNIX Shell Scripting (Bourne, Korn, C Shell)
  - Visual Basic
- Internet & Intranet
  - HTTP and Proxy Server
  - Security
  - Firewalls
  - E-Mail Server (SMTP and POP3)
  - Web Page Design (HTML, JAVA, Active-X)
  - Forms design and drawing service



Information
Analysis
Incorporated

Contract No. GS-35F-0062J 11/04/2013 – 11/03/2018

## 16.2. Commercial Job Titles (Labor Categories)

**Commercial Job Title:**      **Program Manager**

**Minimum/General Experience:** Twelve years proven program management, including at least eight years of ADP, telecommunications, or other advanced technology systems management experience. Must be capable of leading programs that involve the successful management of teams composed of information technology professionals and/or other technical disciplines who have been involved in analysis, design, integration, testing, documenting, converting, extending and implementing automated information and/or other advanced technology systems. Must have proven skills relevant to the delivery/task order to be managed.

**Functional Responsibility:** Performs day-to-day management of overall program/contract support operations, possibly involving multiple projects and groups of personnel at multiple locations. Organizes, directs, and coordinates the planning and production of all contract support activities. Must be capable of negotiating and making binding decisions for the company.

**Minimum Education:** Bachelor's degree or higher in engineering, scientific, computer science, operations research, business, or a related field.

**Commercial Job Title:**      **Project Manager (Level III)**

**Minimum/General Experience:** At least 5 years of direct supervision of ADP software development, integration maintenance projects, and/or telecommunications management experience including managing project teams or work groups. Demonstrated management and technical or administrative skill, and excellent interpersonal skills.

**Functional Responsibility:** Performs day-to-day management of assigned tasking that involve teams of data processing and other information systems/management professionals involved in analyzing, designing, integrating, testing, documenting, converting, extending, and implementing automated information and telecommunications systems. Demonstrates proven skills in those technical areas addressed by the tasks to be managed. Organizes, directs, and coordinates the planning and production of all activities associated with assigned projects

**Minimum Education:** Bachelor's degree in computer science or a related discipline, or equivalent experience.

**Commercial Job Title:**      **Project Manager (Level - II)**

**Minimum/General Experience:** At least 4 years of direct supervision of ADP software development, integration maintenance projects, and/or telecommunications management experience including managing project teams or work groups. Demonstrated management and technical or administrative skill, and excellent interpersonal skills.

---



Information
Analysis
Incorporated

Contract No. GS-35F-0062J 11/04/2013 – 11/03/2018

**Functional Responsibility:** Performs day-to-day management of assigned tasking that involve teams of data processing and other information systems/management professionals involved in analyzing, designing, integrating, testing, documenting, converting, extending, and implementing automated information and telecommunications systems. Demonstrates proven skills in those technical areas addressed by the tasks to be managed. Organizes, directs, and coordinates the planning and production of all activities associated with assigned projects

**Minimum Education:** Bachelor's degree in computer science or a related discipline, or equivalent experience.

**Commercial Job Title:** **Project Manager (Level - I)**

**Minimum/General Experience:** At least 4 years of direct supervision of ADP software development, integration maintenance projects, and/or telecommunications management experience including managing project teams or work groups. Demonstrated management and technical or administrative skill, and excellent interpersonal skills.

**Functional Responsibility:** Performs day-to-day management of overall program/contract support operations, possibly involving multiple projects and groups of personnel at multiple locations. Organizes, directs, and coordinates the planning and production of all contract support activities. Must be capable of negotiating and making binding decisions for the company.

**Minimum Education:** Bachelor's degree in computer science or a related discipline, or equivalent experience.

**Commercial Job Title:** **Team Leader**

**Minimum/General Experience:** Minimum of 5 years of professional work experience that provides the required knowledge and skill set. Demonstrated management and technical or administrative skill, and excellent interpersonal skills.

**Functional Responsibility:** Defines and directs technical specification and tasks to be performed by team members, defines target dates of tasks and subtasks. Provides guidance and assistance in coordinating output and ensuring the technical adequacy of the end product.

**Minimum Education:** Bachelor's degree in computer science or a related discipline, or equivalent experience.

**Commercial Job Title:** **Senior Conversion Analyst**

**Minimum/General Experience:** A minimum of 8 years of experience in computer programming and system design and development; 4 years of experience in systems architecture and application development; 3 years experience in implementing relevant applications in a mainframe or client-server environment; and technical training in application-specific areas.



Information
Analysis
Incorporated

Contract No.  GS-35F-0062J  11/04/2013 – 11/03/2018

**Functional Responsibility:** Supports the integration of certain enterprise applications. Provides system-wide computer programming, analysis, and design to implement applications. Possesses and applies a detailed understanding of application-specific requirements (such as, code, table and view structure, system interface and database requirements, and programming procedures for installations). Designs and develops computer programs that connect the application to external data sources and databases with internal tables and views. Additionally, position requires a detailed understanding of relational database structures.

**Minimum Education:**  Bachelor's degree in computer science or a related discipline, or equivalent experience.

**Commercial Job Title:**       **Configuration Manager**

**Minimum/General Experience:**  Four to 9 years experience establishing overall requirements, developing plans, implementing directives, and establishing and maintaining a disciplined environment to ensure configuration control. Exercised a high level of analytical ability in order to gather and interpret complex data, and to solve unusual and difficult technical, administrative, and managerial problems. Engaged in frequent contact with customers and CM personnel.

**Functional Responsibility:** Develops and administers configuration management for software and hardware systems, and implements instructions for assigned programs. Controls configuration baselines and interfaces through Engineering Change Proposal/Specification processing; fulfills such contract data requirements as preparing drafts, forwarding correspondence, preparing and processing CM required data items; and compiles, prepares, and maintains the master records for the establishment and change of configuration baselines, engineering release system, configuration item development record (including the configuration index and change status listing), and configuration status accounting.

**Minimum Education:**  Bachelor's degree in computer science or a related discipline, or equivalent experience.

**Commercial Job Title:**       **Data Base Administrator**

**Minimum/General Experience:**   Experience in areas related to the administration, planning, and development of computerized data bases.  Experience with data base management systems, system design and analysis, operating systems software, and internal and data manipulation languages.

**Functional Responsibility:** Works as part of a team, to execute various data base projects. Work may involve the development and maintenance of data base software, as well as problem resolution. Formulates and implements policies and procedures pertaining to data base management, security, maintenance, and utilization. Works directly with data base users, providing advice as to procedures, technical problems, priorities, and methodologies.


**Information Analysis Incorporated**

Contract No. GS-35F-0062J 11/04/2013 – 11/03/2018

**Minimum Education:** Bachelor's degree in computer science or a related discipline, or equivalent experience.


**Commercial Job Title:** Senior Programmer (Level II)

**Minimum/General Experience:** Four to 9 years of related experience performing routine design, coding, and documentation of application programs for computers and related equipment used for scientific or commercial projects.

**Functional Responsibility:** Analyzes, designs, codes, and documents complex applications for large-scale computers and related equipment appropriate to scientific and commercial projects. Performs technical tasks using both standard and nonstandard analysis, design, and programming methods and techniques. Determines customer requirements for the final program or system. Analyzes problems in terms of such factors as user requirements, input data and form, output data and form, available computer configuration, processing turnaround requirements, input and output checking, and overall problem-schedule requirements. Advises on computer requirements and limitations to help define automation needs. May provide advice on system design configurations, procedural and technical aspects of automated records, hardware acquisition, and maintenance. Develops and writes machine or other suitable source language instructions required for computer processing.

**Minimum Education:** Bachelor's degree in computer science or a related discipline, or equivalent experience.


**Commercial Job Title:** Senior Programmer (Level I)

**Minimum/General Experience:** Four to 9 years of related experience performing routine design, coding, and documentation of application programs for computers and related equipment used for scientific or commercial projects.

**Functional Responsibility:** Analyzes, designs, codes, and documents complex applications for large-scale computers and related equipment appropriate to scientific and commercial projects. Performs technical tasks using both standard and nonstandard analysis, design, and programming methods and techniques. Determines customer requirements for the final program or system. Analyzes problems in terms of such factors as user requirements, input data and form, output data and form, available computer configuration, processing turnaround requirements, input and output checking, and overall problem-schedule requirements. Advises on computer requirements and limitations to help define automation needs. May provide advice on system design configurations, procedural and technical aspects of automated records, hardware acquisition, and maintenance. Develops and writes machine or other suitable source language instructions required for computer processing.

**Minimum Education:** Bachelor's degree in computer science or a related discipline, or equivalent experience.



Contract No. GS-35F-0062J 11/04/2013 – 11/03/2018

**Commercial Job Title:**        **Programmer (Level – VI)**

**Minimum/General Experience:** Six years in coding/developing software in more than one programming language and operating system.

**Functional Responsibility:** Performs feasibility studies, logic design, and system flowcharts, analysis of input/output flow, hardware study, forms layout, and detailed flowcharting. Leads implementation of overall system design as generated by project manager. Estimates personnel requirements, distributes programming tasks, and prepares implementation schedule. Implements file design, storage estimation and allocation, actual coding error removal, logic optimization, system re-evaluation, and on-line testing. After user approval, makes final corrections and program and run-time documentation. Implements scientific and/or engineering computer applications that are mathematical in nature or support specific systems (e.g., communications, graphics, data base, or operational system interface).

**Minimum Education:** Bachelor's degree in computer science or a related discipline, or equivalent experience.

**Commercial Job Title:**        **Programmer (Level – V)**

**Minimum/General Experience:** Five years in coding/developing software in more than one programming language and operating system.

**Functional Responsibility:** Performs feasibility studies, logic design, and system flowcharts, analysis of input/output flow, hardware study, forms layout, and detailed flowcharting. Leads implementation of overall system design as generated by project manager. Estimates personnel requirements, distributes programming tasks, and prepares implementation schedule. Implements file design, storage estimation and allocation, actual coding error removal, logic optimization, system re-evaluation, and on-line testing. After user approval, makes final corrections and program and run-time documentation. Implements scientific and/or engineering computer applications that are mathematical in nature or support specific systems (e.g., communications, graphics, data base, or operational system interface).

**Minimum Education:** Bachelor's degree in computer science or a related discipline, or equivalent experience.

**Commercial Job Title:**        **Programmer (Level – IV)**

**Minimum/General Experience:** Four years in coding/developing software in more than one programming language and operating system.

**Functional Responsibility:** Performs feasibility studies, logic design, and system flowcharts, analysis of input/output flow, hardware study, forms layout, and detailed flowcharting. Leads implementation of overall system design as generated by project manager. Estimates personnel requirements, distributes programming tasks, and prepares implementation schedule. Implements



**Information
Analysis
Incorporated**

Contract No. GS-35F-0062J 11/04/2013 – 11/03/2018

file design, storage estimation and allocation, actual coding error removal, logic optimization, system re-evaluation, and on-line testing. After user approval, makes final corrections and program and run-time documentation. Implements scientific and/or engineering computer applications that are mathematical in nature or support specific systems (e.g., communications, graphics, data base, or operational system interface).

**Minimum Education:** Bachelor's degree in computer science or a related discipline, or equivalent experience.

**Commercial Job Title:** Programmer (Level – III)

**Minimum/General Experience:** Three years in coding/developing software in more than one programming language and operating system.

**Functional Responsibility:** Performs feasibility studies, logic design, and system flowcharts, analysis of input/output flow, hardware study, forms layout, and detailed flowcharting. Leads implementation of overall system design as generated by project manager. Estimates personnel requirements, distributes programming tasks, and prepares implementation schedule. Implements file design, storage estimation and allocation, actual coding error removal, logic optimization, system re-evaluation, and on-line testing. After user approval, makes final corrections and program and run-time documentation. Implements scientific and/or engineering computer applications that are mathematical in nature or support specific systems (e.g., communications, graphics, data base, or operational system interface).

**Minimum Education:** Bachelor's degree in computer science or a related discipline, or equivalent experience.

**Commercial Job Title:** Programmer (Level – II)

**Minimum/General Experience:** One year in coding/developing software in at least more than one programming language and operating system.

**Functional Responsibility:** Codes, tests, and debugs software modules consisting of multiple routines or procedures. Works from system specifications such as data flow diagrams or program design language (PDL). Generates own flowcharts or PDL for individual module implementation as required by supervisor. Assists programming staff with runtime error resolution and debugging tasks as required. Installs and maintains universal software libraries. Creates and installs executive procedures to aid in system implementation. Codes, tests, and debugs application source code and documents programs.

**Minimum Education:** Bachelor's degree in computer science or a related discipline, or equivalent experience. Associate's degree or certification in specialized computer training and five years pertinent experience in lieu of a degree.



Information
Analysis
Incorporated

Contract No. GS-35F-0062J 11/04/2013 – 11/03/2018

**Commercial Job Title:** **Programmer (Level – I)**

**Minimum/General Experience:** Six months in coding/developing software in at least more than one programming language and operating system.

**Functional Responsibility:** Codes, tests, and debugs applications software from system specifications in one computer language. Assignments are at the smallest routine or procedure level. Monitors computer workload and performance. Documents and reports specification problems and ambiguities through the code/test/debug cycle to supervisor. Performs production runs for systems requiring programmer operation or when operator staff limitation requires. This may involve data entry tasks. Utilizes operating system programs (utilities/editors), to create and maintain applications program files.

**Minimum Education:** Associate's degree or certification in specialized computer training and two years pertinent experience in lieu of a degree.

**Commercial Job Title:** **Senior Engineer**

**Minimum/General Experience:** Eight years of engineering experience or the equivalent technical knowledge and eight years experience in a technical field.

**Functional Responsibility:** Prepares detailed and complex engineering packages including specifications, drawings, and other documents required for development and procurement of equipment and materials in support of the client or Government agency. Involved in definition of project scope and development of novel concepts and approaches. Provides data to higher management to support commitments made and technical decisions reached that influence the scope and direction of projects. Develops engineering standards and procedures governing the installation of equipment, facilities and systems within the area of assigned responsibility. Plans, organizes, and supervises the work of engineering staff and other project-oriented personnel.

**Minimum Education:** Bachelor's degree or higher in engineering, a technical science, business, operations research, or equivalent.

**Commercial Job Title:** **Systems Engineer**

**Minimum/General Experience:** Seven years of experience in systems engineering, including three years of experience in analytical problem solving of workflow, organization and planning.

**Functional Responsibility:** Utilizing specialized knowledge and operating independently, determines system design needs based on user requirements and available approaches. Develops general and detailed system design specifications. Leads project team in new system development. Determines and assigns tasks, assesses risks, develops project plans/schedules. Reviews defined system problems and identified approaches, and makes final decision on approach or modification to be implemented for solution. Determines testing requirements; reviews specialized testing



Information
Analysis
Incorporated

Contract No. GS-35F-0062J  11/04/2013 – 11/03/2018

procedures and adjusts as necessary; and ensures proper accomplishment and documentation of testing.

**Minimum Education:** Bachelor's degree in computer science, math, engineering, or operations research.  Associate's degree or certification in specialized computer training and five years pertinent experience in lieu of Bachelor's degree.

**Commercial Job Title:**        **Software Engineer**

**Minimum/General Experience:**  Minimum five years experience managing full-life cycle test efforts.

**Functional Responsibility:** Oversees and directs the test activities of the test team. Responsibilities include managing development of test scripts, test procedures, implementation and documentation effort associated with IAI projects.  Position requires strong oral and written communication skills and the ability to coordinate with IAI senior management and IAI clients on a daily basis.  Strong project management skills are required, including familiarity with project management tools such as MS Project and Excel.  Position also requires strong background in use of automated test tools and development of automated test procedures and/or scripts.

**Minimum Education:**  Bachelor's degree or equivalent experience.

**Commercial Job Title:**        **Associate Software Engineer**

**Minimum/General Experience**:  Zero (0) to five (5) years of experience performing software engineering activities relative to the design and development of existing software and new or existing systems or subsystems software.

**Functional Responsibility:** Works under close supervision performing software engineering assignments relative to the modification and/or development of software systems. Assists more senior engineers in the formulation and development of systems or subsystems architecture, requirements, and design documents. Assists in performing software algorithm development, design, coding, and documentation work of systems. Assists in the evaluation of subcontractor software activities, so as to ensure compliance with software engineering standards.

**Minimum Education:**  Associate's degree or equivalent experience.



Information
Analysis
Incorporated

Contract No.  GS-35F-0062J  11/04/2013 – 11/03/2018

**Commercial Job Title:**        **Senior Test Manager**

**Minimum/General Experience:**  Minimum five years experience managing full-life cycle test efforts.

**Functional Responsibility:** Oversees and directs the test activities of the test team. Responsibilities include managing development of test scripts, test procedures, implementation and documentation effort associated with IAI projects.  Position requires strong oral and written communication skills and the ability to coordinate with IAI senior management and IAI clients on a

daily basis.  Strong project management skills are required, including familiarity with project management tools such as MS Project and Excel.  Position also requires strong background in use of automated test tools and development of automated test procedures and/or scripts.

**Minimum Education:**  Bachelor's degree in computer science or a related discipline, or equivalent experience.

**Commercial Job Title:**        **Senior Systems Analyst  (Level - IV)**

**Minimum/General Experience:**   Experience working on complex application problems involving all phases of systems analysis.  At least seven years of experience in analysis and design of business applications for complex large-scale or mid-tier computer systems, or LAN-based systems, to include experience in data base management systems (DBMS), and use of programming languages.   Knowledge of current storage and retrieval methods and demonstrated ability to formulate specifications for programmers to use in coding, testing, and debugging of computer programs.

**Functional Responsibility:** Utilizing specialized knowledge and operating independently, determines system design needs, based on user requirements and available approaches.  Develops general and detailed system design specifications and quality control documentation.   Develops project plans/schedules; communicates project status to upper management and customer. Responsible for project control.  Makes final decision on approach/modification for solution of problems if unresolved at lower level.  Conducts final review and assessment of existing operational systems for cost effectiveness, compliance to specifications and standards, and ability to meet future needs.  Maintains state-of-the-art knowledge of hardware/software technology.

**Minimum Education:**   Bachelor's degree in computer science or a related discipline, or equivalent experience.   Associate's degree or certification in specialized computer training and seven years pertinent experience in lieu of a degree.

**Commercial Job Title:**        **Senior Systems Analyst  (Level - III)**

**Minimum/General Experience:**   Experience working on complex application problems involving all phases of systems analysis.  At least six years of experience in analysis and design of business applications for complex large-scale or mid-tier computer systems, or LAN-based systems,



Information
Analysis
Incorporated

Contract No.  GS-35F-0062J  11/04/2013 – 11/03/2018

to include experience in data base management systems (DBMS), and use of programming languages.   Knowledge of current storage and retrieval methods and demonstrated ability to formulate specifications for programmers to use in coding, testing, and debugging of computer programs.

**Functional Responsibility:** Utilizing specialized knowledge and operating independently, determines system design needs, based on user requirements and available approaches.  Develops general and detailed system design specifications and quality control documentation.   Develops project plans/schedules; communicates project status to upper management and customer. Responsible for project control.  Makes final decision on approach/modification for solution of problems if unresolved at lower level.  Conducts final review and assessment of existing operational systems for cost effectiveness, compliance to specifications and standards, and ability to meet future needs.  Maintains state-of-the-art knowledge of hardware/software technology.

**Minimum Education:**  Bachelor's degree in computer science or a related discipline, or equivalent experience.   Associate's degree or certification in specialized computer training and six years pertinent experience in lieu of a degree.

**Commercial Job Title:**        **Senior Systems Analyst  (Level - II)**

**Minimum/General Experience:**  Experience working on complex application problems involving all phases of systems analysis.  At least five years of experience in analysis and design of business applications for complex large-scale or mid-tier computer systems, or LAN-based systems, to include experience in data base management systems (DBMS), and use of programming languages.   Knowledge of current storage and retrieval methods and demonstrated ability to formulate specifications for programmers to use in coding, testing, and debugging of computer programs.

**Functional Responsibility:** Utilizing specialized knowledge and operating independently, determines system design needs, based on user requirements and available approaches.  Develops general and detailed system design specifications and quality control documentation.   Develops project plans/schedules; communicates project status to upper management and customer. Responsible for project control.  Makes final decision on approach/modification for solution of problems if unresolved at lower level.  Conducts final review and assessment of existing operational systems for cost effectiveness, compliance to specifications and standards, and ability to meet future needs.  Maintains state-of-the-art knowledge of hardware/software technology.

**Minimum Education:**  Bachelor's degree in computer science or a related discipline, or equivalent experience.   Associate's degree or certification in specialized computer training and five years pertinent experience in lieu of a degree.

**Commercial Job Title:**        **Senior Systems Analyst  (Level - I)**

**Minimum/General Experience:**  Experience working on complex application problems involving all phases of systems analysis.  At least four years of experience in analysis and design of business



Information
Analysis
Incorporated

Contract No. GS-35F-0062J 11/04/2013 – 11/03/2018

applications for complex large-scale or mid-tier computer systems, or LAN-based systems, to include experience in data base management systems (DBMS), and use of programming languages. Knowledge of current storage and retrieval methods and demonstrated ability to formulate specifications for programmers to use in coding, testing, and debugging of computer programs.

**Functional Responsibility:** Utilizing specialized knowledge and operating independently, determines system design needs, based on user requirements and available approaches. Develops general and detailed system design specifications and quality control documentation. Develops project plans/schedules; communicates project status to upper management and customer. Responsible for project control. Makes final decision on approach/modification for solution of problems if unresolved at lower level. Conducts final review and assessment of existing operational systems for cost effectiveness, compliance to specifications and standards, and ability to meet future needs. Maintains state-of-the-art knowledge of hardware/software technology.

**Minimum Education:** Bachelor's degree in computer science or a related discipline, or equivalent experience. Associate's degree or certification in specialized computer training and four years pertinent experience in lieu of a degree.

**Commercial Job Title:** Systems Analyst (Level - IV)

**Minimum/General Experience:** Five years of computer experience in information systems design and management. Demonstrated ability to work on requirements that are moderately complex to analyze, plan, program, and implement. Experience in analysis and design of business applications for complex large-scale or mid-tier computer systems, or LAN-based systems, including experience in DBMS, and use of programming languages. Knowledge of current storage and retrieval methods; systems analysis experience designing technical applications on computer systems; and demonstrated ability to formulate specifications for computer programmers to use in coding, testing, and debugging of computer programs.

**Functional Responsibility:** Conducts studies analyzing user requirements, inclusive of cost versus benefit considerations. Identifies alternate system approaches, develops recommendations, and documents findings. Coordinates activities and work assignments of project personnel, monitoring daily progress of work against schedule. Supervises the testing and implementation of basic computer systems. Assists in development of project plans and schedules. Develops inputs to general and detailed system design specifications and quality control documentation.

**Minimum Education:** Bachelor's degree in computer science or a related discipline, or equivalent experience. Associate's degree or certification in specialized computer training and Five years pertinent experience in lieu of a degree.

**Commercial Job Title:** Systems Analyst (Level - III)

**Minimum/General Experience:** Four years of computer experience in information systems design and management. Demonstrated ability to work on requirements that are moderately complex to analyze, plan, program, and implement. Experience in analysis and design of business applications for complex large-scale or mid-tier computer systems, or LAN-based systems, including



Information
Analysis
Incorporated

Contract No.  GS-35F-0062J  11/04/2013 – 11/03/2018

experience in DBMS, and use of programming languages.  Knowledge of current storage and retrieval methods; systems analysis experience designing technical applications on computer systems; and demonstrated ability to formulate specifications for computer programmers to use in coding, testing, and debugging of computer programs.

**Functional Responsibility:**  Conducts studies analyzing user requirements, inclusive of cost versus benefit considerations.  Identifies alternate system approaches, develops recommendations, and documents findings.  Coordinates activities and work assignments of project personnel, monitoring daily progress of work against schedule.  Supervises the testing and implementation of basic computer systems.  Assists in development of project plans and schedules.  Develops inputs to general and detailed system design specifications and quality control documentation.

**Minimum Education:**   Bachelor's degree in computer science or a related discipline, or equivalent experience.   Associate's degree or certification in specialized computer training and four years pertinent experience in lieu of a degree.

**Commercial Job Title:**        Systems Analyst  (Level - II)

**Minimum/General Experience:**  Three years of computer experience in information systems design and management.  Demonstrated ability to work on requirements that are moderately complex to analyze, plan, program, and implement. Experience in analysis and design of business applications for complex large-scale or mid-tier computer systems, or LAN-based systems, including experience in DBMS, and use of programming languages.  Knowledge of current storage and retrieval methods; systems analysis experience designing technical applications on computer systems; and demonstrated ability to formulate specifications for computer programmers to use in coding, testing, and debugging of computer programs.

**Functional Responsibility:**  Conducts studies analyzing user requirements, inclusive of cost versus benefit considerations.  Identifies alternate system approaches, develops recommendations, and documents findings.  Coordinates activities and work assignments of project personnel, monitoring daily progress of work against schedule.  Supervises the testing and implementation of basic computer systems.  Assists in development of project plans and schedules.  Develops inputs to general and detailed system design specifications and quality control documentation.

**Minimum Education:**   Bachelor's degree in computer science or a related discipline, or equivalent experience.   Associate's degree or certification in specialized computer training and three years pertinent experience in lieu of a degree.

**Commercial Job Title:**        Systems Analyst  (Level - I)

**Minimum/General Experience:**  Two years of computer experience in assignments of a technical nature. One year of experience in analyzing and programming applications on large-scale or mid-tier computers (or LAN-based) with a minimum of one year of design and programming of moderately complex ADP systems.



**Information Analysis Incorporated**

**Functional Responsibility:** Under general supervision and utilizing standardized techniques, assists in analyzing user requirements and cost/benefit information. Assists in review of existing system; researches alternate systems and approaches, and documents findings. Acts as liaison in specified user areas; confers with users to define problems. Coordinates the testing and implementation of basic computer systems. Provides input to development of project plans and schedules and monitors project status.

**Minimum Education:** Bachelor's degree in computer science or a related discipline, or equivalent experience. Associate's degree or certification in specialized computer training and two years pertinent experience in lieu of a degree

**Commercial Job Title:** Technical Analyst

**Minimum/General Experience:** Minimum four years experience performing software development and analysis. Must have prior experience supervising the activity of other developers.

**Functional Responsibility:** The Technical Analyst assists the Project Manager by assuming responsibility for software analysis and development at the sub-system level. The Technical Analysis is responsible for definition of sub-system interfaces, ensuring that system design enhancements and modifications are designed and implemented consistent with architectural guidelines and meet customer requirements. The Technical Analyst is responsible for full life-cycle software development. Familiarity with top-down structured design and coding techniques is required. Position requires supervision of more junior team members and familiarity with industry standard Configuration Management and Quality Assurance procedures. Position requires strong oral and written communications skills and the ability to interface directly with clients and internal IAI development and support groups.

**Minimum Education:** Bachelor's degree in computer science or a related discipline, or equivalent experience.

**Commercial Job Title:** Information Engineering Specialist

**Minimum/General Experience:** Five years of experience in engineering, systems analysis, design, and programming. Experience in information systems development, functional and data requirement analysis, systems analysis and design, programming, program design, and documentation preparation.

**Functional Responsibility:** Applies a business-wide set of disciplines for planning, analysis, design, construction, and maintenance of information systems on a business-wide basis or across a major sector of the business. Performs business strategic systems planning, information planning, and analysis. Performs process and data modeling in support of the planning and analysis efforts using both manual and automated tools, such as I-CASE tools. Applies reverse engineering and reengineering disciplines to develop migration strategic and planning documents. Provides technical guidance in software engineering techniques and automated support tools.



Information
Analysis
Incorporated

Contract No.  GS-35F-0062J  11/04/2013 – 11/03/2018

**Minimum Education:**  Bachelor's degree in computer science or a related discipline, or equivalent experience.

**Commercial Job Title:**        **IT Consultant  (Level IV)**

**Minimum/General Experience:** Must have 10 years of experience in the ADP field.  At least 7 years of combined new and related older technical experience in the ADP field directly related to the required area of expertise. Good oral and written communication skills. Good investigative skills with ability to infer software and hardware dependencies. Must be able to communicate on technical issues.

**Functional Responsibility:**  Travels to the customer site to analyze and enhance the IT systems used within the organization. Performs interviews and other research. Provides technical, managerial, and administrative assistance for problem definition, analysis, requirements development and implementation, for complex to extremely complex systems in the subject matter area.  Makes recommendations and advises on organization-wide systems improvements, optimization or maintenance efforts, in the following representative areas:  information systems architecture; networking and networks; telecommunications including legacy and high-speed technologies, protocols, operations and management; automation including micro through mainframe hardware, computer languages, operating systems, database systems, security, decision support systems; risk management and electronic analysis, software including commercial software and software development, life-cycle management; modeling and simulation; graphics; data management; etc.

**Minimum Education:**  Bachelor's degree in computer science or a related discipline, or equivalent experience.

**Commercial Job Title:**        **IT Consultant  (Level III)**

**Minimum/General Experience:** Must have 8 years of experience in the ADP field.  At least 5 years of combined new and related older technical experience in the ADP field directly related to the required area of expertise. Good oral and written communication skills. Good investigative skills with ability to infer software and hardware dependencies. Must be able to communicate on technical issues.

**Functional Responsibility:**  Travels to the customer site to analyze and enhance the IT systems used within the organization. Performs interviews and other research. Provides technical, managerial, and administrative assistance for problem definition, analysis, requirements development and implementation, for complex to extremely complex systems in the subject matter area.  Makes recommendations and advises on organization-wide systems improvements, optimization or maintenance efforts, in the following representative areas:  information systems architecture; networking and networks; telecommunications including legacy and high-speed technologies, protocols, operations and management; automation including micro through mainframe hardware, computer languages, operating systems, database systems, security, decision support systems; risk management and electronic analysis, software including commercial software and software development, life-cycle management; modeling and simulation; graphics; data management; etc.



Information
Analysis
Incorporated

Contract No. GS-35F-0062J 11/04/2013 – 11/03/2018

**Minimum Education:** Bachelor's degree in computer science or a related discipline, or equivalent experience.

**Commercial Job Title:**      **IT Consultant (Level II)**

**Minimum/General Experience:** Must have 6 years of experience in the ADP field. At least 3 years of combined new and related older technical experience in the ADP field directly related to the required area of expertise. Good oral and written communication skills. Good investigative skills with ability to infer software and hardware dependencies. Must be able to communicate on technical issues.

**Functional Responsibility:** Travels to the customer site to analyze and enhance the IT systems used within the organization. Performs interviews and other research. Provides technical, managerial, and administrative assistance for problem definition, analysis, requirements development and implementation, for complex to extremely complex systems in the subject matter area. Makes recommendations and advises on organization-wide systems improvements, optimization or maintenance efforts, in the following representative areas: information systems architecture; networking and networks; telecommunications including legacy and high-speed technologies, protocols, operations and management; automation including micro through mainframe hardware, computer languages, operating systems, database systems, security, decision support systems; risk management and electronic analysis, software including commercial software and software development, life-cycle management; modeling and simulation; graphics; data management; etc.

**Minimum Education:** Bachelor's degree in computer science or a related discipline, or equivalent experience.

**Commercial Job Title:**      **IT Consultant (Level I)**

**Minimum/General Experience:** Must have 3 years of experience in the ADP field. Good oral and written communication skills. Good investigative skills with ability to infer software and hardware dependencies. Must be able to communicate on technical issues.

**Functional Responsibility:** Travels to the customer site to analyze and enhance the IT systems used within the organization. Performs interviews and other research. Provides technical, managerial, and administrative assistance for problem definition, analysis, requirements development and implementation, for complex to extremely complex systems in the subject matter area. Makes recommendations and advises on organization-wide systems improvements, optimization or maintenance efforts, in the following representative areas: information systems architecture; networking and networks; telecommunications including legacy and high-speed technologies, protocols, operations and management; automation including micro through mainframe hardware, computer languages, operating systems, database systems, security, decision support systems; risk management and electronic analysis, software including commercial software and software development, life-cycle management; modeling and simulation; graphics; data management; etc.



Information
Analysis
Incorporated

Contract No. GS-35F-0062J 11/04/2013 – 11/03/2018

**Minimum Education:** Bachelor's degree in computer science or a related discipline, or equivalent experience. Associate's degree or certification in specialized computer training and three years pertinent experience in lieu of a degree.

**Commercial Job Title:** Software Consultant (Level IV)

**Minimum/General Experience:** Ten years experience with software, such as software engineering, applications programming, and software maintenance.

**Functional Responsibility:** Provides technical, managerial, and administrative direction for problem definition, analysis, and requirements development. Makes recommendations and advises on improvements, optimization and maintenance efforts. Experienced in software development, integration, methodologies, and languages. Analyzes user and/or systems requirements and design specifications. Tests and refines software to produce the desired end result. Prepares required documentation, including project plans, software program, and user documentation. Knowledgeable of state-of-the-art technologies such as operating systems, communications software, education and training systems, database compilers, object technologies, and network and communications technologies.

**Minimum Education:** Requires a Master's degree and ten years experience (or equivalent combination of education and experience).

**Commercial Job Title:** Software Consultant (Level III)

**Minimum/General Experience:** Eight to ten years experience with software, such as software engineering, applications programming, and software maintenance.

**Functional Responsibility:** Provides technical, managerial, and administrative direction for problem definition, analysis, and requirements development. Makes recommendations and advises on improvements, optimization and maintenance efforts. Experienced in software development, integration, methodologies, and languages. Analyzes user and/or systems requirements and design specifications. Tests and refines software to produce the desired end result. Prepares required documentation, including project plans, software program, and user documentation. Knowledgeable of state-of-the-art technologies such as operating systems, communications software, education and training systems, database compilers, object technologies, and network and communications technologies.

**Minimum Education:** Requires a Bachelor's degree and eight to ten years experience (or equivalent combination of education and experience).

**Commercial Job Title:** Software Consultant (Level II)

**Minimum/General Experience:** Five to seven years experience with software, such as software engineering, applications programming, and software maintenance.



Information
Analysis
Incorporated

Contract No. GS-35F-0062J 11/04/2013 – 11/03/2018

**Functional Responsibility:** Provides technical, managerial, and administrative direction for problem definition, analysis, and requirements development. Makes recommendations and advises on improvements, optimization and maintenance efforts. Experienced in software development, integration, methodologies, and languages. Analyzes user and/or systems requirements and design specifications. Tests and refines software to produce the desired end result. Prepares required documentation, including project plans, software program, and user documentation. Knowledgeable of state-of-the-art technologies such as operating systems, communications software, education and training systems, database compilers, object technologies, and network and communications technologies.

**Minimum Education:** Requires a Bachelor's degree and five to seven years experience (or equivalent combination of education and experience).

**Commercial Job Title:**     Software Consultant  (Level I)

**Minimum/General Experience:**  Two to four years experience with software, such as software engineering, applications programming, and software maintenance.

**Functional Responsibility:** Provides technical, managerial, and administrative direction for problem definition, analysis, and requirements development. Makes recommendations and advises on improvements, optimization and maintenance efforts. Experienced in software development, integration, methodologies, and languages. Analyzes user and/or systems requirements and design specifications. Tests and refines software to produce the desired end result. Prepares required documentation, including project plans, software program, and user documentation. Knowledgeable of state-of-the-art technologies such as operating systems, communications software, education and training systems, database compilers, object technologies, and network and communications technologies.

**Minimum Education:** Requires a Bachelor's degree and two to four years experience (or equivalent combination of education and experience).

**Commercial Job Title:**     Technical Writer/Editor  Level – III

**Minimum/General Experience:**   Four years of experience performing technical writing, research, and editing functions.  Knowledge of contemporary word processing and publishing applications.

**Functional Responsibility:** Assists in collecting and organizing information for preparation of user manuals, training materials, installation guides, proposals, newsletters, promotional publications, articles for publication, and reports.  Edits functional descriptions, system specifications, user manuals, special reports, or any other customer deliverables and documents.  Assists in performing administrative functions.  Must demonstrate the ability to work independently or under only general direction

**Minimum Education:** Bachelors degree or equivalent.

---

Telephone: (703) 383-3000 • FAX: (703) 293-7979 • www.infoa.com


**Information Analysis Incorporated**

Contract No. GS-35F-0062J  11/04/2013 – 11/03/2018

## 16.3.    PRICES FOR ON-SITE IT PROFESSIONAL SERVICES AT HOURLY RATES

| Labor Category - On-Site/Client Site | Rate |
|---|---|
| Program Director | $  170.36 |
| Project Manager  (Level III) | 176.37 |
| Project Manager  (Level II) | 157.72 |
| Project Manager  (Level I) | 97.63 |
| Team Leader | 76.72 |
| Senior Conversion Analyst | 113.56 |
| Configuration Manager | 96.53 |
| Data Base Administrator | 90.29 |
| Senior Programmer  (Level II) | 74.75 |
| Senior Programmer  (Level I) | 56.08 |
| Programmer (Level VI) | 85.17 |
| Programmer (Level V) | 77.08 |
| Programmer (Level IV) | 72.29 |
| Programmer (Level III) | 64.26 |
| Programmer (Level II) | 50.46 |
| Programmer (Level I) | 26.24 |
| Senior Engineer | 95.43 |
| Systems Engineer | 87.86 |
| Software Engineer | 151.95 |
| Associate Software Engineer | 114.56 |
| Senior Test Manager | 123.29 |
| Senior Systems Analyst (Level IV) | 90.86 |



**Information Analysis Incorporated**

Contract No.  GS-35F-0062J  11/04/2013 – 11/03/2018

| Labor Category - On-Site/Client Site (continued) | Rate |
|---|---|
| Senior Systems Analyst (Level III) | $  89.32 |
| Senior Systems Analyst (Level II) | 80.48 |
| Senior Systems Analyst (Level I) | 65.43 |
| Systems Analyst (Level IV) | 91.95 |
| Systems Analyst (Level III) | 79.44 |
| Systems Analyst (Level II) | 72.53 |
| Systems Analyst (Level I) | 56.40 |
| Technical Analyst | 85.17 |
| Information Engineering Specialist | 83.63 |
| IT Consultant  (Level IV) | 124.87 |
| IT Consultant  (Level III) | 112.11 |
| IT Consultant  (Level II) | 85.54 |
| IT Consultant  (Level I) | 41.48 |
| Software Consultant  (Level IV) | 182.38 |
| Software Consultant  (Level III) | 135.37 |
| Software Consultant  (Level II) | 131.81 |
| Software Consultant  (Level I) | 131.03 |
| Technical Writer | 37.97 |


Information
Analysis
Incorporated

Contract No.  GS-35F-0062J  11/04/2013 – 11/03/2018

### 16.4.        PRICES FOR OFF-SITE IT PROFESSIONAL SERVICES AT HOURLY RATES

| Labor Category - Off-Site/Contractor Site | Rate |
|---|---|
| Program Director | $    191.41 |
| Project Manager  (Level III) | 164.27 |
| Project Manager  (Level II) | 159.52 |
| Project Manager  (Level I) | 109.70 |
| Team Leader | 118.29 |
| Senior Conversion Analyst | 127.60 |
| Configuration Manager | 108.45 |
| Data Base Administrator | 92.36 |
| Senior Programmer  (Level II) | 83.98 |
| Senior Programmer  (Level I) | 60.94 |
| Programmer (Level VI) | 100.30 |
| Programmer (Level V) | 90.77 |
| Programmer (Level IV) | 76.56 |
| Programmer (Level III) | 72.19 |
| Programmer (Level II) | 68.37 |
| Programmer (Level I) | 29.50 |
| Senior Engineer | 124.45 |
| Systems Engineer | 103.47 |
| Software Engineer | -- |
| Associate Software Engineer | -- |
| Senior Test Manager | 114.83 |
| Senior Systems Analyst (Level IV) | 102.08 |

Case: 24-5538, 12/23/2024, DktEntry: 18.8, Page 241 of 253

Case 5:18-cv-07182-EJD   Document 100-3   Filed 01/15/21   Page 89 of 125



**Information
Analysis
Incorporated**

Contract No.  GS-35F-0062J  11/04/2013 – 11/03/2018

| Labor Category - Off-Site/Contractor Site (continued) | Rate |
|---|---|
| Senior Systems Analyst (Level III) | $   97.22 |
| Senior Systems Analyst (Level II) | 90.42 |
| Senior Systems Analyst (Level I) | 73.51 |
| Systems Analyst (Level IV) | 98.56 |
| Systems Analyst (Level III) | 95.71 |
| Systems Analyst (Level II) | 81.49 |
| Systems Analyst (Level I) | 63.38 |
| Technical Analyst | 95.71 |
| Information Engineering Specialist | 93.96 |
| IT Consultant  (Level IV) | 140.30 |
| IT Consultant  (Level III) | 114.70 |
| IT Consultant  (Level II) | 87.54 |
| IT Consultant  (Level I) | 46.61 |
| Software Consultant  (Level IV) | -- |
| Software Consultant  (Level III) | -- |
| Software Consultant  (Level II) | -- |
| Software Consultant  (Level I) | -- |
| Technical Writer | 42.65 |



Contract No. GS-35F-0062J  11/04/2013 – 11/03/2018

## 16.5.   Forms Programming Service

| Service Offered | Price Per Page (One Side) |
|---|---|
| Design and Drawing of Forms in Adobe (formerly Jetform) Format | $  269.64 |

**Information Analysis Incorporated**

## USA COMMITMENT TO PROMOTE
## SMALL BUSINESS PARTICIPATION
## PROCUREMENT PROGRAMS
## PREAMBLE

Information Analysis Incorporated provides commercial products and services to the Federal Government. We are committed to promoting participation of small, small disadvantaged and women-owned small businesses in our contracts. We pledge to provide opportunities to the small business community through reselling opportunities, mentor-protégé programs, joint ventures, teaming arrangements, and subcontracting.

### COMMITMENT

To actively seek and partner with small businesses.

To identify, qualify, mentor and develop small, small disadvantaged and women-owned small businesses by purchasing from these businesses whenever practical.

To develop and promote company policy initiatives that demonstrate our support for awarding contracts and subcontracts to small business concerns.

To undertake significant efforts to determine the potential of small, small disadvantaged and women-owned small business to supply products and services to our company.

To insure procurement opportunities are designed to permit the maximum possible participation of small, small disadvantaged, and women-owned small businesses.

To attend business opportunity workshops, minority business enterprise seminars, trade fairs, procurement conferences, etc., to identify and increase small businesses with whom to partner.

To publicize in our marketing publications our interest in meeting small businesses that may be interested in subcontracting opportunities.

We signify our commitment to work in partnership with small, small disadvantaged and women-owned small businesses to promote and increase their participation in Federal Government contracts. To accelerate potential opportunities please contact Mr. Matthew Sands, (703) 383-3000, or by e-mail at: msands@infoa.com, fax number, (703) 293-7979..



## SUGGESTED BLANKET PURCHASE AGREEMENT (BPA)

**BEST VALUE**
**BLANKET PURCHASE AGREEMENT**
**FEDERAL SUPPLY SCHEDULE**

**(Insert Customer Name)**

In the spirit of the Federal Acquisition Streamlining Act,   ordering activity   and Information Analysis Incorporated enter into a cooperative agreement to further reduce the administrative costs of acquiring commercial items from the General Services Administration (GSA) Federal Supply Schedule Contract(s) _____.

Federal Supply Schedule contract BPAs eliminate contracting and open market costs such as: search for sources; the development of technical documents, solicitations and the evaluation of offers.  Teaming Arrangements are permitted with Federal Supply Schedule Contractors in accordance with Federal Acquisition Regulation (FAR) 9.6.

This BPA will further decrease costs, reduce paperwork, and save time by eliminating the need for repetitive, individual purchases from the schedule contract.  The end result is to create a purchasing mechanism for the Government that works better and costs less.

Signatures

_____         _____
Ordering Activity                    Date            Contractor                      Date



Information
Analysis
Incorporated

Contract No.  GS-35F-0062J  11/04/2013 – 11/03/2018

BPA NUMBER_____

## (CUSTOMER NAME)
## BLANKET PURCHASE AGREEMENT

Pursuant to GSA Federal Supply Schedule Contract Number(s)_____, Blanket Purchase Agreements, the Contractor agrees to the following terms of a Blanket Purchase Agreement (BPA) EXCLUSIVELY WITH (ordering actovoty):

(1)  The following contract items can be ordered under this BPA. All orders placed against this BPA are subject to the terms and conditions of the contract, except as noted below:

**MODEL NUMBER/PART NUMBER**         **\*SPECIAL BPA DISCOUNT/PRICE**

_____         _____
_____         _____

(2)  Delivery:

**DESTINATION**                                        **DELIVERY SCHEDULE/DATES**

_____         _____
_____         _____

(3)  The ordering activity estimates, but does not guarantee, that the volume of purchases through this agreement will be _____.

(4)  This BPA does not obligate any funds.

(5)  This BPA expires on _____ or at the end of the contract period, whichever is earlier.

(6)  The following office(s) is hereby authorized to place orders under this BPA:

**OFFICE**                                                  **POINT OF CONTACT**


_____         _____
_____         _____


(7)  Orders will be placed against this BPA via Electronic Data Interchange (EDI), FAX, or paper.

(8)  Unless otherwise agreed to, all deliveries under this BPA must be accompanied by delivery tickets or sales slips that must contain the following information as a minimum:

---

Telephone: (703) 383-3000 • FAX: (703) 293-7979 • www.infoa.com

**Page 1778**



**Information**
**Analysis**
**Incorporated**

Contract No. GS-35F-0062J 11/04/2013 – 11/03/2018

(a) Name of Contractor;

(b) Contract Number;

(c) BPA Number;

(d) Model Number or National Stock Number (NSN);

(e) Purchase Order Number;

(f) Date of Purchase;

(g) Quantity, Unit Price, and Extension of Each Item (unit prices and extensions need not be shown when incompatible with the use of automated systems; provided, that the invoice is itemized to show the information); and

(h) Date of Shipment.

(9) The requirements of a proper invoice are specified in the Federal Supply Schedule contract. Invoices will be submitted to the address specified within the purchase order transmission issued against this BPA.

(10) The terms and conditions included in this BPA apply to all purchases made pursuant to it. In the event of an inconsistency between the provisions of this BPA and the Contractor's invoice, the provisions of this BPA will take precedence.

**Information Analysis Incorporated**

## BASIC GUIDELINES FOR USING
## "CONTRACTOR TEAM ARRANGEMENTS"

Federal Supply Schedule Contractors may use "Contractor Team Arrangements" (see FAR 9.6) to provide solutions when responding to a ordering activity requirements.

These Team Arrangements can be included under a Blanket Purchase Agreement (BPA).  BPAs are permitted under all Federal Supply Schedule contracts.

Orders under a Team Arrangement are subject to terms and conditions or the Federal Supply Schedule Contract.

Participation in a Team Arrangement is limited to Federal Supply Schedule Contractors.

Customers should refer to FAR 9.6 for specific details on Team Arrangements.

Here is a general outline on how it works:

- The customer identifies their requirements.

- Federal Supply Schedule Contractors may individually meet the customers needs, or -

- Federal Supply Schedule Contractors may individually submit a Schedules "Team Solution" to meet the customer's requirement.

- Customers make a best value selection.

---

**EXHIBIT 6**

PTO Form 1478 (Rev 9/2006)
OMB No. 0651-0009 (Exp 12/31/2014)

# Trademark/Service Mark Application, Principal Register

**Serial Number: 86267006**
**Filing Date: 04/30/2014**

## The table below presents the data as entered.

| Input Field | Entered |
|---|---|
| **SERIAL NUMBER** | 86267006 |
| **MARK INFORMATION** | |
| *MARK | NEO4J |
| **STANDARD CHARACTERS** | YES |
| **USPTO-GENERATED IMAGE** | YES |
| **LITERAL ELEMENT** | NEO4J |
| **MARK STATEMENT** | The mark consists of standard characters, without claim to any particular font, style, size, or color. |
| **REGISTER** | Principal |
| **APPLICANT INFORMATION** | |
| *OWNER OF MARK | Neo Technology |
| *STREET | 111 E. 5th Ave. |
| *CITY | San Mateo |
| *STATE (Required for U.S. applicants) | California |
| *COUNTRY | United States |
| *ZIP/POSTAL CODE (Required for U.S. applicants only) | 94401 |
| **LEGAL ENTITY INFORMATION** | |
| TYPE | corporation |
| STATE/COUNTRY OF INCORPORATION | Delaware |
| **GOODS AND/OR SERVICES AND BASIS INFORMATION** | |
| INTERNATIONAL CLASS | 009 |
| *IDENTIFICATION | Computer programs used to manage, store, access, analyze, process, and visualize data; a computer database used by end users or other computer programs to store, manage, and query data on computers, computer networks, and global computer networks; cloud-based services to manage, store, access, analyze, process, and visualize data; training, certification, support, consulting, and associated documentation sold therewith. |
| FILING BASIS | SECTION 1(a) |
| FIRST USE ANYWHERE DATE | At least as early as 06/04/2006 |
| FIRST USE IN COMMERCE DATE | At least as early as 05/28/2007 |
| SPECIMEN FILE NAME(S) | |
| ORIGINAL PDF FILE | SPE0-1-69181222240-001452141_._NEO_Screen_Shot.pdf |

| | |
|---|---|
| **CONVERTED PDF FILE(S)** (1 page) | \\TICRS\EXPORT16\IMAGEOUT16\862\670\86267006\xml1\APP0003.JPG |
| **SPECIMEN DESCRIPTION** | Screenshot of webpage where customers can access Applicant's goods. |
| **INTERNATIONAL CLASS** | 041 |
| **\*IDENTIFICATION** | Educational services, namely, conducting training classes, certification training, consulting services, workshops, tutorials, and online classes in the fields of computer data and databases, and distributing course materials in connection therewith; providing training services in the use of computer data and databases, and distributing course materials in connection therewith. |
| **FILING BASIS** | SECTION 1(a) |
| **FIRST USE ANYWHERE DATE** | At least as early as 06/04/2006 |
| **FIRST USE IN COMMERCE DATE** | At least as early as 05/28/2007 |
| **SPECIMEN FILE NAME(S)** | |
| **ORIGINAL PDF FILE** | SPE0-2-69181222240-001452141_._NEO_Screen_Shot.pdf |
| **CONVERTED PDF FILE(S)** (1 page) | \\TICRS\EXPORT16\IMAGEOUT16\862\670\86267006\xml1\APP0004.JPG |
| **SPECIMEN DESCRIPTION** | Screenshot of webpage where customers can access Applicant's services. |
| **INTERNATIONAL CLASS** | 042 |
| **\*IDENTIFICATION** | Computer services, namely, providing consultation services and advice in the fields of computer data and databases. |
| **FILING BASIS** | SECTION 1(a) |
| **FIRST USE ANYWHERE DATE** | At least as early as 06/04/2006 |
| **FIRST USE IN COMMERCE DATE** | At least as early as 05/28/2007 |
| **SPECIMEN FILE NAME(S)** | |
| **ORIGINAL PDF FILE** | SPE0-3-69181222240-001452141_._NEO_Screen_Shot.pdf |
| **CONVERTED PDF FILE(S)** (1 page) | \\TICRS\EXPORT16\IMAGEOUT16\862\670\86267006\xml1\APP0005.JPG |
| **SPECIMEN DESCRIPTION** | Screenshot of webpage where customers can access Applicant's services. |

## ATTORNEY INFORMATION

| | |
|---|---|
| **NAME** | Molly Garhart |
| **STREET** | 410B Washington Blvd |
| **CITY** | San Francisco |
| **STATE** | California |
| **COUNTRY** | United States |
| **ZIP/POSTAL CODE** | 94129 |
| **PHONE** | 415-717-6444 |
| **EMAIL ADDRESS** | molly@garhartlaw.com |
| **AUTHORIZED TO COMMUNICATE VIA EMAIL** | Yes |

## CORRESPONDENCE INFORMATION

| | |
|---|---|
| **NAME** | Molly Garhart |
| **STREET** | 410B Washington Blvd |

| CITY | San Francisco |
|---|---|
| STATE | California |
| COUNTRY | United States |
| ZIP/POSTAL CODE | 94129 |
| PHONE | 415-717-6444 |
| EMAIL ADDRESS | molly@garhartlaw.com |
| AUTHORIZED TO COMMUNICATE VIA EMAIL | Yes |
| **FEE INFORMATION** | |
| NUMBER OF CLASSES | 3 |
| FEE PER CLASS | 325 |
| *TOTAL FEE DUE | 975 |
| *TOTAL FEE PAID | 975 |
| **SIGNATURE INFORMATION** | |
| SIGNATURE | /Lars Nordwall/ |
| SIGNATORY'S NAME | Lars Nordwall |
| SIGNATORY'S POSITION | COO |
| DATE SIGNED | 04/29/2014 |

PTO Form 1478 (Rev 9/2006)
OMB No. 0651-0009 (Exp 12/31/2014)

## Trademark/Service Mark Application, Principal Register

**Serial Number: 86267006**
**Filing Date: 04/30/2014**

## To the Commissioner for Trademarks:

**MARK:** NEO4J (Standard Characters, see mark)
The literal element of the mark consists of NEO4J.
The mark consists of standard characters, without claim to any particular font, style, size, or color.

The applicant, Neo Technology, a corporation of Delaware, having an address of
  111 E. 5th Ave.
  San Mateo, California 94401
  United States

requests registration of the trademark/service mark identified above in the United States Patent and Trademark Office on the Principal Register established by the Act of July 5, 1946 (15 U.S.C. Section 1051 et seq.), as amended, for the following:

  International Class 009: Computer programs used to manage, store, access, analyze, process, and visualize data; a computer database used by end users or other computer programs to store, manage, and query data on computers, computer networks, and global computer networks; cloud-based services to manage, store, access, analyze, process, and visualize data; training, certification, support, consulting, and associated documentation sold therewith.

In International Class 009, the mark was first used by the applicant or the applicant's related company or licensee or predecessor in interest at least as early as 06/04/2006, and first used in commerce at least as early as 05/28/2007, and is now in use in such commerce. The applicant is submitting one(or more) specimen(s) showing the mark as used in commerce on or in connection with any item in the class of listed goods and/or services, consisting of a(n) Screenshot of webpage where customers can access Applicant's goods..

**Original PDF file:**
SPE0-1-69181222240-001452141_._NEO_Screen_Shot.pdf
**Converted PDF file(s)** (1 page)
Specimen File1

  International Class 041: Educational services, namely, conducting training classes, certification training, consulting services, workshops, tutorials, and online classes in the fields of computer data and databases, and distributing course materials in connection therewith; providing training services in the use of computer data and databases, and distributing course materials in connection therewith.

In International Class 041, the mark was first used by the applicant or the applicant's related company or licensee or predecessor in interest at least as early as 06/04/2006, and first used in commerce at least as early as 05/28/2007, and is now in use in such commerce. The applicant is submitting one(or more) specimen(s) showing the mark as used in commerce on or in connection with any item in the class of listed goods and/or services, consisting of a(n) Screenshot of webpage where customers can access Applicant's services..

**Original PDF file:**
SPE0-2-69181222240-001452141_._NEO_Screen_Shot.pdf
**Converted PDF file(s)** (1 page)
Specimen File1

  International Class 042: Computer services, namely, providing consultation services and advice in the fields of computer data and databases.

In International Class 042, the mark was first used by the applicant or the applicant's related company or licensee or predecessor in interest at least as early as 06/04/2006, and first used in commerce at least as early as 05/28/2007, and is now in use in such commerce. The applicant is submitting one(or more) specimen(s) showing the mark as used in commerce on or in connection with any item in the class of listed goods and/or services, consisting of a(n) Screenshot of webpage where customers can access Applicant's services..

**Original PDF file:**

[SPE0-3-69181222240-001452141_._NEO_Screen_Shot.pdf](#)
**Converted PDF file(s)** (1 page)
[Specimen File1](#)


The applicant's current Attorney Information:

    Molly Garhart
    410B Washington Blvd
    San Francisco, California 94129
    United States

The applicant's current Correspondence Information:

    Molly Garhart

    410B Washington Blvd

    San Francisco, California 94129

    415-717-6444(phone)

    molly@garhartlaw.com (authorized)

A fee payment in the amount of $975 has been submitted with the application, representing payment for 3 class(es).

### Declaration

The signatory believes that: if the applicant is filing the application under 15 U.S.C. Section 1051(a), the applicant is the owner of the trademark/service mark sought to be registered; the applicant or the applicant's related company or licensee is using the mark in commerce on or in connection with the goods/services in the application, and such use by the applicant's related company or licensee inures to the benefit of the applicant; the specimen(s) shows the mark as used on or in connection with the goods/services in the application; and/or if the applicant filed an application under 15 U.S.C. Section 1051(b), Section 1126(d), and/or Section 1126(e), the applicant is entitled to use the mark in commerce; the applicant has a bona fide intention to use or use through the applicant's related company or licensee the mark in commerce on or in connection with the goods/services in the application. The signatory believes that to the best of the signatory's knowledge and belief, no other person has the right to use the mark in commerce, either in the identical form or in such near resemblance as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion or mistake, or to deceive. The signatory being warned that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. Section 1001, and that such willful false statements and the like may jeopardize the validity of the application or any registration resulting therefrom, declares that all statements made of his/her own knowledge are true and all statements made on information and belief are believed to be true.

### Declaration Signature

Signature: /Lars Nordwall/  Date: 04/29/2014
Signatory's Name: Lars Nordwall
Signatory's Position: COO
RAM Sale Number: 86267006
RAM Accounting Date: 04/30/2014

Serial Number: 86267006
Internet Transmission Date: Wed Apr 30 11:29:20 EDT 2014
TEAS Stamp: USPTO/BAS-XX.XXX.XXX.XXX-201404301129201
10368-86267006-5001bb4210194dd9b41292eb8
534cbbc4418ed99f2b1dc9ec82aece41c5f60de-
CC-9456-20140429001452141121