No. 24-5538

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

---

**NEO4J, INC., et al.,**

*Plaintiff and Appellee,*

v.

**Suhy, et al.**; *Defendant and*

*Appellant.*

---

Appeal From a Judgment of the United States District Court
For the Northern District of California
Hon. Edward J. Davila
United States District Judge
N. D. Cal. No. 5:18-cv-07182 EJD

---

**APPELLANTS' EXCERPT OF RECORD**

**VOL. 8 OF 16**

**pp. 1787-2085**

---

John Mark Suhy Jr (Pro Se)
8814 Danewood Dr
Alexandria, VA 22308
jmsuhy@gmail.com
Tel.: (703) 862-7780

# NEO4J







**EXHIBIT 7**


**REDACTED VERSION OF DOCUMENT SOUGHT
TO BE SEALED**

# EXHIBIT 8

# Compare Neo4j Editions

## Choose the Edition that Matches Your Business Needs

### Community Edition

Ideal for learning Neo4j and smaller do-it-yourself projects that do not require high levels of scaling or professional services and support. Download Community Edition →

### Enterprise Edition

The same great features as Community Edition, with enterprise-grade availability, management, and scale-up and scale-out capabilities. Try Neo4j Enterprise →

### Neo4j Aura

The simplest way to run the world's most popular graph database in the cloud without having to worry about managing underlying infrastructure complexities. Learn More →

**EXHIBIT 9**

1/9/2021                                    GitHub Terms of Service - GitHub Docs

GitHub.com / Site policy / GitHub Terms of Service

# GitHub Terms of Service

**In this article**

Summary
The GitHub Terms of Service
A. Definitions
B. Account Terms
C. Acceptable Use
D. User-Generated Content
E. Private Repositories
F. Copyright Infringement and DMCA Policy
G. Intellectual Property Notice
H. API Terms
I. GitHub Additional Product Terms
J. Beta Previews
K. Payment
L. Cancellation and Termination
M. Communications with GitHub
N. Disclaimer of Warranties
O. Limitation of Liability
P. Release and Indemnification
Q. Changes to These Terms
R. Miscellaneous

Thank you for using GitHub! We're happy you're here. Please read this Terms of Service agreement carefully before accessing or using GitHub. Because it is such an important contract between us and our users, we have tried to make it as clear as possible. For your convenience, we have presented these terms in a short non-binding summary followed by the full legal terms.

## Summary

| Section | What can you find there? |
| --- | --- |
| A. Definitions | Some basic terms, defined in a way that will help you understand this agreement. Refer back up to this section for clarification. |
| B. Account Terms | These are the basic requirements of having an Account on GitHub. |

1/9/2021                                          GitHub Terms of Service - GitHub Docs

| Section | What can you find there? |
|---|---|
| C. Acceptable Use | These are the basic rules you must follow when using your GitHub Account. |
| D. User-Generated Content | You own the content you post on GitHub. However, you have some responsibilities regarding it, and we ask you to grant us some rights so we can provide services to you. |
| E. Private Repositories | This section talks about how GitHub will treat content you post in private repositories. |
| F. Copyright & DMCA Policy | This section talks about how GitHub will respond if you believe someone is infringing your copyrights on GitHub. |
| G. Intellectual Property Notice | This describes GitHub's rights in the website and service. |
| H. API Terms | These are the rules for using GitHub's APIs, whether you are using the API for development or data collection. |
| I. Additional Product Terms | We have a few specific rules for GitHub's features and products. |
| J. Beta Previews | These are some of the additional terms that apply to GitHub's features that are still in development. |
| K. Payment | You are responsible for payment. We are responsible for billing you accurately. |
| L. Cancellation and Termination | You may cancel this agreement and close your Account at any time. |
| M. Communications with GitHub | We only use email and other electronic means to stay in touch with our users. We do not provide phone support. |
| N. Disclaimer of Warranties | We provide our service as is, and we make no promises or guarantees about this service. Please read this section carefully; you should understand what to expect. |
| O. Limitation of Liability | We will not be liable for damages or losses arising from your use or inability to use the service or otherwise arising under this agreement. Please read this section carefully; it limits our obligations to you. |
| P. Release and Indemnification | You are fully responsible for your use of the service. |
| Q. Changes to these Terms of Service | We may modify this agreement, but we will give you 30 days' notice of material changes. |
| R. Miscellaneous | Please see this section for legal details including our choice of law. |

## The GitHub Terms of Service

1/9/2021          GitHub Terms of Service - GitHub Docs

Effective date: November 16, 2020

## A. Definitions

**Short version:** *We use these basic terms throughout the agreement, and they have specific meanings. You should know what we mean when we use each of the terms. There's not going to be a test on it, but it's still useful information.*

1     An "Account" represents your legal relationship with GitHub. A "User Account" represents an individual User's authorization to log in to and use the Service and serves as a User's identity on GitHub. "Organizations" are shared workspaces that may be associated with a single entity or with one or more Users where multiple Users can collaborate across many projects at once. A User Account can be a member of any number of Organizations.

2     The "Agreement" refers, collectively, to all the terms, conditions, notices contained or referenced in this document (the "Terms of Service" or the "Terms") and all other operating rules, policies (including the GitHub Privacy Statement, available at github.com/site/privacy) and procedures that we may publish from time to time on the Website. Most of our site policies are available at docs.github.com/categories/site-policy.

3     "Beta Previews" mean software, services, or features identified as alpha, beta, preview, early access, or evaluation, or words or phrases with similar meanings.

4     "Content" refers to content featured or displayed through the Website, including without limitation code, text, data, articles, images, photographs, graphics, software, applications, packages, designs, features, and other materials that are available on the Website or otherwise available through the Service. "Content" also includes Services. "User-Generated Content" is Content, written or otherwise, created or uploaded by our Users. "Your Content" is Content that you create or own.

5     "GitHub," "We," and "Us" refer to GitHub, Inc., as well as our affiliates, directors, subsidiaries, contractors, licensors, officers, agents, and employees.

6     The "Service" refers to the applications, software, products, and services provided by GitHub, including any Beta Previews.

7     "The User," "You," and "Your" refer to the individual person, company, or organization that has visited or is using the Website or Service; that accesses or uses any part of the Account; or that directs the use of the Account in the performance of its functions. A User must be at least 13 years of age. Special terms may apply for business or government Accounts (See Section B(5): Additional Terms).

8     The "Website" refers to GitHub's website located at github.com, and all content, services, and products provided by GitHub at or through the Website. It also refers to GitHub-owned subdomains of github.com, such as education.github.com and pages.github.com. These Terms also govern GitHub's conference websites, such as githubuniverse.com, and product websites, such as atom.io. Occasionally, websites owned by GitHub may provide different or additional terms of service. If those additional terms conflict with this Agreement, the more specific terms apply to the relevant page or service.

**Page 1798**

## B. Account Terms

**Short version:** *User Accounts and Organizations have different administrative controls; a human must create your Account; you must be 13 or over; you must provide a valid email address; and you may not have more than one free Account. You alone are responsible for your Account and anything that happens while you are signed in to or using your Account. You are responsible for keeping your Account secure.*

### 1. Account Controls

- Users. Subject to these Terms, you retain ultimate administrative control over your User Account and the Content within it.

- Organizations. The "owner" of an Organization that was created under these Terms has ultimate administrative control over that Organization and the Content within it. Within the Service, an owner can manage User access to the Organization's data and projects. An Organization may have multiple owners, but there must be at least one User Account designated as an owner of an Organization. If you are the owner of an Organization under these Terms, we consider you responsible for the actions that are performed on or through that Organization.

### 2. Required Information

You must provide a valid email address in order to complete the signup process. Any other information requested, such as your real name, is optional, unless you are accepting these terms on behalf of a legal entity (in which case we need more information about the legal entity) or if you opt for a paid Account, in which case additional information will be necessary for billing purposes.

### 3. Account Requirements

We have a few simple rules for User Accounts on GitHub's Service.

- You must be a human to create an Account. Accounts registered by "bots" or other automated methods are not permitted. We do permit machine accounts:
- A machine account is an Account set up by an individual human who accepts the Terms on behalf of the Account, provides a valid email address, and is responsible for its actions. A machine account is used exclusively for performing automated tasks. Multiple users may direct the actions of a machine account, but the owner of the Account is ultimately responsible for the machine's actions. You may maintain no more than one free machine account in addition to your free User Account.
- One person or legal entity may maintain no more than one free Account (if you choose to control a machine account as well, that's fine, but it can only be used for running a machine).
- You must be age 13 or older. While we are thrilled to see brilliant young coders get excited by learning to program, we must comply with United States law. GitHub does not target our Service to children under 13, and we do not permit any Users under 13 on our Service. If we learn of any User under the age of 13, we will terminate that User's Account immediately. If you are a resident of a country outside the United States, your country's minimum age may be older; in such a case, you are responsible for complying with your country's laws.

- Your login may only be used by one person — i.e., a single login may not be shared by multiple people. A paid Organization may only provide access to as many User Accounts as your subscription allows.
- You may not use GitHub in violation of export control or sanctions laws of the United States or any other applicable jurisdiction. You may not use GitHub if you are or are working on behalf of a Specially Designated National (SDN) or a person subject to similar blocking or denied party prohibitions administered by a U.S. government agency. GitHub may allow persons in certain sanctioned countries or territories to access certain GitHub services pursuant to U.S. government authorizations. For more information, please see our Export Controls policy.

### 4. User Account Security

You are responsible for keeping your Account secure while you use our Service. We offer tools such as two-factor authentication to help you maintain your Account's security, but the content of your Account and its security are up to you.

- You are responsible for all content posted and activity that occurs under your Account (even when content is posted by others who have Accounts under your Account).
- You are responsible for maintaining the security of your Account and password. GitHub cannot and will not be liable for any loss or damage from your failure to comply with this security obligation.
- You will promptly notify GitHub if you become aware of any unauthorized use of, or access to, our Service through your Account, including any unauthorized use of your password or Account.

### 5. Additional Terms

In some situations, third parties' terms may apply to your use of GitHub. For example, you may be a member of an organization on GitHub with its own terms or license agreements; you may download an application that integrates with GitHub; or you may use GitHub to authenticate to another service. Please be aware that while these Terms are our full agreement with you, other parties' terms govern their relationships with you.

If you are a government User or otherwise accessing or using any GitHub Service in a government capacity, this Government Amendment to GitHub Terms of Service applies to you, and you agree to its provisions.

If you have signed up for GitHub Enterprise Cloud, the Enterprise Cloud Addendum applies to you, and you agree to its provisions.

## C. Acceptable Use

**Short version:** *GitHub hosts a wide variety of collaborative projects from all over the world, and that collaboration only works when our users are able to work together in good faith. While using the service, you must follow the terms of this section, which include some restrictions on content you can post, conduct on the service, and other limitations. In short, be excellent to each other.*

Your use of the Website and Service must not violate any applicable laws, including copyright or trademark laws, export control or sanctions laws, or other laws in your jurisdiction. You are responsible for making sure that your use of the Service is in compliance with laws and any applicable regulations.

**Page 1800**

You agree that you will not under any circumstances violate our Acceptable Use Policies or Community Guidelines.

## D. User-Generated Content

**Short version:** *You own content you create, but you allow us certain rights to it, so that we can display and share the content you post. You still have control over your content, and responsibility for it, and the rights you grant us are limited to those we need to provide the service. We have the right to remove content or close Accounts if we need to.*

### 1. Responsibility for User-Generated Content

You may create or upload User-Generated Content while using the Service. You are solely responsible for the content of, and for any harm resulting from, any User-Generated Content that you post, upload, link to or otherwise make available via the Service, regardless of the form of that Content. We are not responsible for any public display or misuse of your User-Generated Content.

### 2. GitHub May Remove Content

We have the right to refuse or remove any User-Generated Content that, in our sole discretion, violates any laws or GitHub terms or policies. User-Generated Content displayed on GitHub for mobile may be subject to mobile app stores' additional terms.

### 3. Ownership of Content, Right to Post, and License Grants

You retain ownership of and responsibility for Your Content. If you're posting anything you did not create yourself or do not own the rights to, you agree that you are responsible for any Content you post; that you will only submit Content that you have the right to post; and that you will fully comply with any third party licenses relating to Content you post.

Because you retain ownership of and responsibility for Your Content, we need you to grant us — and other GitHub Users — certain legal permissions, listed in Sections D.4 — D.7. These license grants apply to Your Content. If you upload Content that already comes with a license granting GitHub the permissions we need to run our Service, no additional license is required. You understand that you will not receive any payment for any of the rights granted in Sections D.4 — D.7. The licenses you grant to us will end when you remove Your Content from our servers, unless other Users have forked it.

### 4. License Grant to Us

We need the legal right to do things like host Your Content, publish it, and share it. You grant us and our legal successors the right to store, archive, parse, and display Your Content, and make incidental copies, as necessary to provide the Service, including improving the Service over time. This license includes the right to do things like copy it to our database and make backups; show it to you and other users; parse it into a search index or otherwise analyze it on our servers; share it with other users; and perform it, in case Your Content is something like music or video.

This license does not grant GitHub the right to sell Your Content. It also does not grant GitHub the right to otherwise distribute or use Your Content outside of our provision of the Service, except that as part of the right to archive Your Content, GitHub may permit our partners to store and archive Your

**Page 1801**

Content in public repositories in connection with the GitHub Arctic Code Vault and GitHub Archive Program.

## 5. License Grant to Other Users

Any User-Generated Content you post publicly, including issues, comments, and contributions to other Users' repositories, may be viewed by others. By setting your repositories to be viewed publicly, you agree to allow others to view and "fork" your repositories (this means that others may make their own copies of Content from your repositories in repositories they control).

If you set your pages and repositories to be viewed publicly, you grant each User of GitHub a nonexclusive, worldwide license to use, display, and perform Your Content through the GitHub Service and to reproduce Your Content solely on GitHub as permitted through GitHub's functionality (for example, through forking). You may grant further rights if you adopt a license. If you are uploading Content you did not create or own, you are responsible for ensuring that the Content you upload is licensed under terms that grant these permissions to other GitHub Users.

## 6. Contributions Under Repository License

Whenever you add Content to a repository containing notice of a license, you license that Content under the same terms, and you agree that you have the right to license that Content under those terms. If you have a separate agreement to license that Content under different terms, such as a contributor license agreement, that agreement will supersede.

Isn't this just how it works already? Yep. This is widely accepted as the norm in the open-source community; it's commonly referred to by the shorthand "inbound=outbound". We're just making it explicit.

## 7. Moral Rights

You retain all moral rights to Your Content that you upload, publish, or submit to any part of the Service, including the rights of integrity and attribution. However, you waive these rights and agree not to assert them against us, to enable us to reasonably exercise the rights granted in Section D.4, but not otherwise.

To the extent this agreement is not enforceable by applicable law, you grant GitHub the rights we need to use Your Content without attribution and to make reasonable adaptations of Your Content as necessary to render the Website and provide the Service.

## E. Private Repositories

**Short version:** *We treat the content of private repositories as confidential, and we only access it as described in our Privacy Statement—for security purposes, to assist the repository owner with a support matter, to maintain the integrity of the Service, to comply with our legal obligations, if we have reason to believe the contents are in violation of the law, or with your consent.*

## 1. Control of Private Repositories

Some Accounts may have private repositories, which allow the User to control access to Content.

GitHub Terms of Service - GitHub Docs

## 2. Confidentiality of Private Repositories

GitHub considers the contents of private repositories to be confidential to you. GitHub will protect the contents of private repositories from unauthorized use, access, or disclosure in the same manner that we would use to protect our own confidential information of a similar nature and in no event with less than a reasonable degree of care.

## 3. Access

GitHub personnel may only access the content of your private repositories in the situations described in our Privacy Statement.

You may choose to enable additional access to your private repositories. For example:

- You may enable various GitHub services or features that require additional rights to Your Content in private repositories. These rights may vary depending on the service or feature, but GitHub will continue to treat your private repository Content as confidential. If those services or features require rights in addition to those we need to provide the GitHub Service, we will provide an explanation of those rights.

Additionally, we may be compelled by law to disclose the contents of your private repositories.

GitHub will provide notice regarding our access to private repository content, unless for legal disclosure, to comply with our legal obligations, or where otherwise bound by requirements under law, for automated scanning, or if in response to a security threat or other risk to security.

## F. Copyright Infringement and DMCA Policy

If you believe that content on our website violates your copyright, please contact us in accordance with our Digital Millennium Copyright Act Policy. If you are a copyright owner and you believe that content on GitHub violates your rights, please contact us via our convenient DMCA form or by emailing copyright@github.com. There may be legal consequences for sending a false or frivolous takedown notice. Before sending a takedown request, you must consider legal uses such as fair use and licensed uses.

We will terminate the Accounts of repeat infringers of this policy.

## G. Intellectual Property Notice

**Short version:** *We own the service and all of our content. In order for you to use our content, we give you certain rights to it, but you may only use our content in the way we have allowed.*

### 1. GitHub's Rights to Content

GitHub and our licensors, vendors, agents, and/or our content providers retain ownership of all intellectual property rights of any kind related to the Website and Service. We reserve all rights that are not expressly granted to you under this Agreement or by law. The look and feel of the Website and Service is copyright © GitHub, Inc. All rights reserved. You may not duplicate, copy, or reuse any portion of the HTML/CSS, Javascript, or visual design elements or concepts without express written permission from GitHub.

2. GitHub Trademarks and Logos

If you'd like to use GitHub's trademarks, you must follow all of our trademark guidelines, including those on our logos page: https://github.com/logos.

3. License to GitHub Policies

This Agreement is licensed under this Creative Commons Zero license. For details, see our site-policy repository.

## H. API Terms

**Short version:** *You agree to these Terms of Service, plus this Section H, when using any of GitHub's APIs (Application Provider Interface), including use of the API through a third party product that accesses GitHub.*

Abuse or excessively frequent requests to GitHub via the API may result in the temporary or permanent suspension of your Account's access to the API. GitHub, in our sole discretion, will determine abuse or excessive usage of the API. We will make a reasonable attempt to warn you via email prior to suspension.

You may not share API tokens to exceed GitHub's rate limitations.

You may not use the API to download data or Content from GitHub for spamming purposes, including for the purposes of selling GitHub users' personal information, such as to recruiters, headhunters, and job boards.

All use of the GitHub API is subject to these Terms of Service and the GitHub Privacy Statement.

GitHub may offer subscription-based access to our API for those Users who require high-throughput access or access that would result in resale of GitHub's Service.

## I. GitHub Additional Product Terms

**Short version:** *You need to follow certain specific terms and conditions for GitHub's various features and products, and you agree to the Supplemental Terms and Conditions when you agree to this Agreement.*

Some Service features may be subject to additional terms specific to that feature or product as set forth in the GitHub Additional Product Terms. By accessing or using the Services, you also agree to the GitHub Additional Product Terms.

## J. Beta Previews

**Short version:** *Beta Previews may not be supported or may change at any time, you may receive confidential information through those programs that must remain confidential while the program is private, and we'd love your feedback to make our Beta Previews better.*

1. Subject to Change

Beta Previews may not be supported and may be changed at any time without notice. In addition, Beta Previews are not subject to the same security measures and auditing to which the Service has been and is subject. **By using a Beta Preview, you use it at your own risk.**

## 2. Confidentiality

As a user of Beta Previews, you may get access to special information that isn't available to the rest of the world. Due to the sensitive nature of this information, it's important for us to make sure that you keep that information secret.

**Confidentiality Obligations.** You agree that any non-public Beta Preview information we give you, such as information about a private Beta Preview, will be considered GitHub's confidential information (collectively, "Confidential Information"), regardless of whether it is marked or identified as such. You agree to only use such Confidential Information for the express purpose of testing and evaluating the Beta Preview (the "Purpose"), and not for any other purpose. You should use the same degree of care as you would with your own confidential information, but no less than reasonable precautions to prevent any unauthorized use, disclosure, publication, or dissemination of our Confidential Information. You promise not to disclose, publish, or disseminate any Confidential Information to any third party, unless we don't otherwise prohibit or restrict such disclosure (for example, you might be part of a GitHub-organized group discussion about a private Beta Preview feature).

**Exceptions.** Confidential Information will not include information that is: (a) or becomes publicly available without breach of this Agreement through no act or inaction on your part (such as when a private Beta Preview becomes a public Beta Preview); (b) known to you before we disclose it to you; (c) independently developed by you without breach of any confidentiality obligation to us or any third party; or (d) disclosed with permission from GitHub. You will not violate the terms of this Agreement if you are required to disclose Confidential Information pursuant to operation of law, provided GitHub has been given reasonable advance written notice to object, unless prohibited by law.

## 3. Feedback

We're always trying to improve of products and services, and your feedback as a Beta Preview user will help us do that. If you choose to give us any ideas, know-how, algorithms, code contributions, suggestions, enhancement requests, recommendations or any other feedback for our products or services (collectively, "Feedback"), you acknowledge and agree that GitHub will have a royalty-free, fully paid-up, worldwide, transferable, sub-licensable, irrevocable and perpetual license to implement, use, modify, commercially exploit and/or incorporate the Feedback into our products, services, and documentation.

## K. Payment

**Short version:** *You are responsible for any fees associated with your use of GitHub. We are responsible for communicating those fees to you clearly and accurately, and letting you know well in advance if those prices change.*

### 1. Pricing

Our pricing and payment terms are available at github.com/pricing. If you agree to a subscription price, that will remain your price for the duration of the payment term; however, prices are subject to

change at the end of a payment term.

## 2. Upgrades, Downgrades, and Changes

- We will immediately bill you when you upgrade from the free plan to any paying plan.
- If you change from a monthly billing plan to a yearly billing plan, GitHub will bill you for a full year at the next monthly billing date.
- If you upgrade to a higher level of service, we will bill you for the upgraded plan immediately.
- You may change your level of service at any time by choosing a plan option or going into your Billing settings. If you choose to downgrade your Account, you may lose access to Content, features, or capacity of your Account. Please see our section on Cancellation for information on getting a copy of that Content.

## 3. Billing Schedule; No Refunds

**Payment Based on Plan** For monthly or yearly payment plans, the Service is billed in advance on a monthly or yearly basis respectively and is non-refundable. There will be no refunds or credits for partial months of service, downgrade refunds, or refunds for months unused with an open Account; however, the service will remain active for the length of the paid billing period. In order to treat everyone equally, no exceptions will be made.

**Payment Based on Usage** Some Service features are billed based on your usage. A limited quantity of these Service features may be included in your plan for a limited term without additional charge. If you choose to purchase paid Service features beyond the quantity included in your plan, you pay for those Service features based on your actual usage in the preceding month. Monthly payment for these purchases will be charged on a periodic basis in arrears. See GitHub Additional Product Terms for Details.

**Invoicing** For invoiced Users, User agrees to pay the fees in full, up front without deduction or setoff of any kind, in U.S. Dollars. User must pay the fees within thirty (30) days of the GitHub invoice date. Amounts payable under this Agreement are non-refundable, except as otherwise provided in this Agreement. If User fails to pay any fees on time, GitHub reserves the right, in addition to taking any other action at law or equity, to (i) charge interest on past due amounts at 1.0% per month or the highest interest rate allowed by law, whichever is less, and to charge all expenses of recovery, and (ii) terminate the applicable order form. User is solely responsible for all taxes, fees, duties and governmental assessments (except for taxes based on GitHub's net income) that are imposed or become due in connection with this Agreement.

## 4. Authorization

By agreeing to these Terms, you are giving us permission to charge your on-file credit card, PayPal account, or other approved methods of payment for fees that you authorize for GitHub.

## 5. Responsibility for Payment

You are responsible for all fees, including taxes, associated with your use of the Service. By using the Service, you agree to pay GitHub any charge incurred in connection with your use of the Service. If you dispute the matter, contact GitHub Support. You are responsible for providing us with a valid means of payment for paid Accounts. Free Accounts are not required to provide payment information.

**Page 1806**

1/9/2021                                    GitHub Terms of Service - GitHub Docs

## L. Cancellation and Termination

**Short version:** *You may close your Account at any time. If you do, we'll treat your information responsibly.*

### 1. Account Cancellation

It is your responsibility to properly cancel your Account with GitHub. You can cancel your Account at any time by going into your Settings in the global navigation bar at the top of the screen. The Account screen provides a simple, no questions asked cancellation link. We are not able to cancel Accounts in response to an email or phone request.

### 2. Upon Cancellation

We will retain and use your information as necessary to comply with our legal obligations, resolve disputes, and enforce our agreements, but barring legal requirements, we will delete your full profile and the Content of your repositories within 90 days of cancellation or termination (though some information may remain in encrypted backups). This information can not be recovered once your Account is cancelled.

We will not delete Content that you have contributed to other Users' repositories or that other Users have forked.

Upon request, we will make a reasonable effort to provide an Account owner with a copy of your lawful, non-infringing Account contents after Account cancellation, termination, or downgrade. You must make this request within 90 days of cancellation, termination, or downgrade.

### 3. GitHub May Terminate

GitHub has the right to suspend or terminate your access to all or any part of the Website at any time, with or without cause, with or without notice, effective immediately. GitHub reserves the right to refuse service to anyone for any reason at any time.

### 4. Survival

All provisions of this Agreement which, by their nature, should survive termination *will* survive termination — including, without limitation: ownership provisions, warranty disclaimers, indemnity, and limitations of liability.

## M. Communications with GitHub

**Short version:** *We use email and other electronic means to stay in touch with our users.*

### 1. Electronic Communication Required

For contractual purposes, you (1) consent to receive communications from us in an electronic form via the email address you have submitted or via the Service; and (2) agree that all Terms of Service, agreements, notices, disclosures, and other communications that we provide to you electronically

**Page 1807**

satisfy any legal requirement that those communications would satisfy if they were on paper. This section does not affect your non-waivable rights.

### 2. Legal Notice to GitHub Must Be in Writing

Communications made through email or GitHub Support's messaging system will not constitute legal notice to GitHub or any of its officers, employees, agents or representatives in any situation where notice to GitHub is required by contract or any law or regulation. Legal notice to GitHub must be in writing and served on GitHub's legal agent.

### 3. No Phone Support

GitHub only offers support via email, in-Service communications, and electronic messages. We do not offer telephone support.

## N. Disclaimer of Warranties

**Short version:** *We provide our service as is, and we make no promises or guarantees about this service. Please read this section carefully; you should understand what to expect.*

GitHub provides the Website and the Service "as is" and "as available," without warranty of any kind. Without limiting this, we expressly disclaim all warranties, whether express, implied or statutory, regarding the Website and the Service including without limitation any warranty of merchantability, fitness for a particular purpose, title, security, accuracy and non-infringement.

GitHub does not warrant that the Service will meet your requirements; that the Service will be uninterrupted, timely, secure, or error-free; that the information provided through the Service is accurate, reliable or correct; that any defects or errors will be corrected; that the Service will be available at any particular time or location; or that the Service is free of viruses or other harmful components. You assume full responsibility and risk of loss resulting from your downloading and/or use of files, information, content or other material obtained from the Service.

## O. Limitation of Liability

**Short version:** *We will not be liable for damages or losses arising from your use or inability to use the service or otherwise arising under this agreement. Please read this section carefully; it limits our obligations to you.*

You understand and agree that we will not be liable to you or any third party for any loss of profits, use, goodwill, or data, or for any incidental, indirect, special, consequential or exemplary damages, however arising, that result from

- the use, disclosure, or display of your User-Generated Content;
- your use or inability to use the Service;
- any modification, price change, suspension or discontinuance of the Service;
- the Service generally or the software or systems that make the Service available;
- unauthorized access to or alterations of your transmissions or data;
- statements or conduct of any third party on the Service;

- any other user interactions that you input or receive through your use of the Service; or
- any other matter relating to the Service.

Our liability is limited whether or not we have been informed of the possibility of such damages, and even if a remedy set forth in this Agreement is found to have failed of its essential purpose. We will have no liability for any failure or delay due to matters beyond our reasonable control.

## P. Release and Indemnification

**Short version:** *You are responsible for your use of the service. If you harm someone else or get into a dispute with someone else, we will not be involved.*

If you have a dispute with one or more Users, you agree to release GitHub from any and all claims, demands and damages (actual and consequential) of every kind and nature, known and unknown, arising out of or in any way connected with such disputes.

You agree to indemnify us, defend us, and hold us harmless from and against any and all claims, liabilities, and expenses, including attorneys' fees, arising out of your use of the Website and the Service, including but not limited to your violation of this Agreement, provided that GitHub (1) promptly gives you written notice of the claim, demand, suit or proceeding; (2) gives you sole control of the defense and settlement of the claim, demand, suit or proceeding (provided that you may not settle any claim, demand, suit or proceeding unless the settlement unconditionally releases GitHub of all liability); and (3) provides to you all reasonable assistance, at your expense.

## Q. Changes to These Terms

**Short version:** *We want our users to be informed of important changes to our terms, but some changes aren't that important — we don't want to bother you every time we fix a typo. So while we may modify this agreement at any time, we will notify users of any material changes and give you time to adjust to them.*

We reserve the right, at our sole discretion, to amend these Terms of Service at any time and will update these Terms of Service in the event of any such amendments. We will notify our Users of material changes to this Agreement, such as price increases, at least 30 days prior to the change taking effect by posting a notice on our Website or sending email to the primary email address specified in your GitHub account. Customer's continued use of the Service after those 30 days constitutes agreement to those revisions of this Agreement. For any other modifications, your continued use of the Website constitutes agreement to our revisions of these Terms of Service. You can view all changes to these Terms in our Site Policy repository.

We reserve the right at any time and from time to time to modify or discontinue, temporarily or permanently, the Website (or any part of it) with or without notice.

## R. Miscellaneous

### 1. Governing Law

Except to the extent applicable law provides otherwise, this Agreement between you and GitHub and any access to or use of the Website or the Service are governed by the federal laws of the United

GitHub Terms of Service - GitHub Docs

States of America and the laws of the State of California, without regard to conflict of law provisions. You and GitHub agree to submit to the exclusive jurisdiction and venue of the courts located in the City and County of San Francisco, California.

## 2. Non-Assignability

GitHub may assign or delegate these Terms of Service and/or the GitHub Privacy Statement, in whole or in part, to any person or entity at any time with or without your consent, including the license grant in Section D.4. You may not assign or delegate any rights or obligations under the Terms of Service or Privacy Statement without our prior written consent, and any unauthorized assignment and delegation by you is void.

## 3. Section Headings and Summaries

Throughout this Agreement, each section includes titles and brief summaries of the following terms and conditions. These section titles and brief summaries are not legally binding.

## 4. Severability, No Waiver, and Survival

If any part of this Agreement is held invalid or unenforceable, that portion of the Agreement will be construed to reflect the parties' original intent. The remaining portions will remain in full force and effect. Any failure on the part of GitHub to enforce any provision of this Agreement will not be considered a waiver of our right to enforce such provision. Our rights under this Agreement will survive any termination of this Agreement.

## 5. Amendments; Complete Agreement

This Agreement may only be modified by a written amendment signed by an authorized representative of GitHub, or by the posting by GitHub of a revised version in accordance with Section Q. Changes to These Terms. These Terms of Service, together with the GitHub Privacy Statement, represent the complete and exclusive statement of the agreement between you and us. This Agreement supersedes any proposal or prior agreement oral or written, and any other communications between you and GitHub relating to the subject matter of these terms including any confidentiality or nondisclosure agreements.

## 6. Questions

Questions about the Terms of Service? Contact us.

---

### Did this doc help you?

Privacy policy



### Help us make these docs great!

All GitHub docs are open source. See something that's wrong or unclear? Submit a pull request.

15/16

1/9/2021

GitHub Terms of Service - GitHub Docs

⇅ **Make a contribution**

Or, learn how to contribute.

○ © 2021 GitHub, Inc.  Terms  Privacy  Security  Status  Help  Contact GitHub  Pricing  Developer API  Training  About

**01-19-2021 - NOTICE OF ERRATA FOR EXHIBIT 31 TO THE DECL OF JEFFREY M. RATINOFF ISO PLAINT CONS MOT FOR SUM JUDGMENT.pdf**

Filed 01/19/2021

NOTICE OF ERRATA FOR EXHIBIT 31 TO THE DECLARATION OF JEFFREY M. RATINOFF IN SUPPORT OF PLAINTIFFS' CONSOLIDATED MOTION FOR SUMMARY JUDGMENT

(Pacer Doc: #103)

John V. Picone III, Bar No. 187226
jpicone@hopkinscarley.com
Jeffrey M. Ratinoff, Bar No. 197241
jratinoff@hopkinscarley.com
HOPKINS & CARLEY
A Law Corporation
The Letitia Building
70 South First Street
San Jose, CA 95113-2406

*mailing address:*
P.O. Box 1469
San Jose, CA 95109-1469
Telephone:     (408) 286-9800
Facsimile:     (408) 998-4790

Attorneys for Plaintiff and Counter-Defendants
NEO4J, INC. and NEO4J SWEDEN AB

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEO4J, INC., a Delaware corporation, and NEO4J SWEDEN AB, a Swedish corporation,<br><br>        Plaintiffs,<br><br>    v.<br><br>PURETHINK LLC, a Delaware limited liability company, IGOV INC., a Virginia corporation, and JOHN MARK SUHY, an individual,<br><br>        Defendants. | CASE NO. 5:18-cv-07182-EJD<br><br>**NOTICE OF ERRATA FOR EXHIBIT 31 TO THE DECLARATION OF JEFFREY M. RATINOFF IN SUPPORT OF PLAINTIFFS' CONSOLIDATED MOTION FOR SUMMARY JUDGMENT**<br><br>Date:      March 25, 2021<br>Time:      9:00 a.m.<br>Dept.:     Courtroom 4, 5th Floor<br>Judge:     Hon. Edward J. Davila |
| AND RELATED COUNTERCLAIM. | |
| NEO4J, INC., a Delaware corporation, and NEO4J SWEDEN AB, a Swedish corporation,<br><br>        Plaintiffs,<br><br>    v.<br><br>GRAPH FOUNDATION, INC., an Ohio corporation, GRAPHGRID, INC., an Ohio corporation, and ATOMRAIN INC., a Nevada corporation,<br><br>        Defendants. | CASE NO.  5:19-CV-06226-EJD |

842\3690948.1

NOTICE OF ERRATA FOR EXHIBIT 31 TO THE DECLARATION OF JEFFREY M. RATINOFF IN SUPPORT OF PLAINTIFFS' CONSOLIDATED MOTION FOR SUMMARY JUDGMENT; CASE NOS. 5:18-CV-07182-EJD AND 5:19-CV-06226-EJD

1      Plaintiffs and Counter-Defendants Neo4j, Inc. and Neo4j Sweden AB ("Plaintiffs")

2  respectfully submit the attached corrected **Exhibit 31** to the Declaration of Jeffrey M. Ratinoff in

3  Support of Plaintiffs' Consolidated Motion for Summary Judgment ("Ratinoff Declaration") filed

4  on December 11, 2020. *See* PT Dkt. No. 98-1 at ¶ 33; GFI Dkt. No. 93-1 at ¶ 33. The original

5  Exhibit 31 to the Ratinoff Declaration inadvertently omitted certain pages to the Rule 30(b)(6)

6  Deposition of Graph Foundation, Inc. that were cited in Plaintiffs' moving papers and Separate

7  Statement of Material Undisputed Facts. The corrected Exhibit 31 to the Ratinoff Declaration

8  includes these pages.

9  Dated: January 19, 2021              HOPKINS & CARLEY
                                  A Law Corporation

10

11

12                           By: */s/ Jeffrey M. Ratinoff*
                                Jeffrey M. Ratinoff
13                                Attorneys for Plaintiff and Counter-
                                Defendants
14                                NEO4J, INC. and NEO4J SWEDEN AB

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE • PALO ALTO

842\3690948.1

NOTICE OF ERRATA FOR EXHIBIT 31 TO THE DECLARATION OF JEFFREY M. RATINOFF IN SUPPORT OF PLAINTIFFS'
CONSOLIDATED MOTION FOR SUMMARY JUDGMENT; CASE NOS. 5:18-CV-07182-EJD AND 5:19-CV-06226-EJD

# CORRECTED EXHIBIT 31 TO DECLARATION OF JEFFREY M. RATINOFF IN SUPPORT OF PLAINTIFFS' CONSOLIDATED MOTION FOR SUMMARY JUDGMENT

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


NEO4J, INC., a Delaware ) CASE NO.
corporation, and NEO4J ) 5:19-CV-06226-EJD
SWEDEN AB, a Swedish )
corporation, )
)
              Plaintiffs, )
)
   vs. )
)
GRAPH FOUNDATION, INC., an )
Ohio corporation, )
GRAPHGRID, INC., an Ohio )
corporation, and ATOMRAIN )
INC., a Nevada corporation, )
)
            Defendants. )


REMOTE VIA ZOOM


30(b)(6) DEPOSITION OF NEO4J INC


BY BRAD NUSSBAUM


_____

9:17 A.M. PDT

FRIDAY, OCTOBER 16, 2020

_____



By: Denise Myers Byrd, CSR 8340, RPR


1

1    data structures.  I don't have a ton of formal training.

2         Q.  So you consider yourself more self taught?

3         A.  You know, with a strong engineering background,

4    but, yeah, I mean, I can't take all the credit for just

5    teaching myself.  There's a lot of it that, you know,

6    I've learned through the years just developing.

7         Q.  Where did you do your engineering studies?

8         A.  University of Southern California.

9         Q.  But you didn't graduate from USC?

10        A.  No.

11        Q.  How many years did you attend?

12        A.  I can't remember if it was just one or one and

13   a half.  I did two years of community college at Santa

14   Monica prior to transferring, so I transferred my junior

15   year, completed that, and then the recession hit the

16   following year and then I think I started working and

17   didn't go back.  So, yeah, it would have just been one

18   year at USC and two years prior.

19        Q.  You mentioned the recession so that was right

20   around 2008?

21        A.  That's right, yeah.  I think my first year was

22   '08-'-9 or '09-'10 -- no, it was '08-'09 as a junior.

23   Yeah, '08-'09 was my junior year.

24        Q.  Where did you start working?  You mentioned you

25   did go back to school.



22

1    A.  Well, Ben and I founded AtomRain March of '09

2    so that's kind of when I moved into the software world

3    and we started a business together.

4         Am I getting into too many personal things here

5    for GFI?  Like relevance?  I don't know if I am, but I'm

6    not sure how much you want to personally ask me about my

7    life.  If I'm getting too personal, just let me know.

8         Q.  That's okay.  We just need to know sort of your

9    level of understanding of things.  That's all we're

10   doing.

11        A.  Okay.  Okay.

12        Q.  If your counsel thinks we're going too far

13   afield, he'll jump in.

14        A.  Okay.

15        Q.  You mentioned AtomRain.  Is that AtomRain Inc.

16   or AtomRain LLC that you formed?

17        A.  Initially it was AtomRain Inc.

18        Q.  Are you aware --

19        MR. PERNICK:  I do want to keep this with

20   respect to Mr. Nussbaum being the witness for GFI.

21   AtomRain isn't here; AtomRain is not the witness.  I

22   understood the inquiries into his technical background,

23   but I thought we were moving on to Topic Number 1 with

24   respect to formation.

25        MR. RATINOFF:  All right, that's fair.  We'll

23

1    maybe touch on a few things later when Jeff gets on

2    board.

3    BY MR. RATINOFF:

4        Q.   Okay.  Let me go ahead and move on to Topic 1

5    on the formation of Graph Foundation.

6             Do you recall when you formed Graph Foundation

7    or when -- let me strike that.

8             When was Graph Foundation founded?

9        A.   Yeah, I think I looked this up, and I'm pretty

10   sure we have it everywhere as June 2018.  I can pull up

11   the exact incorporation document.

12       Q.   I'll do that, actually.  Thank you, though.  I

13   appreciate that.

14       A.   All right.  I have some of these in front of me

15   because, honestly, I'm not going to remember this stuff

16   exactly.

17       Q.   Well, that's -- I'm going to ask you questions.

18   If you don't remember --

19       A.   Yeah, I have effective June 21, 2018.

20       Q.   Okay.  And so I just put up Tab 2 so we'll mark

21   that as Exhibit 3.

22             (WHEREUPON, Exhibit 3 was marked for

23             identification.)

24   BY MR. RATINOFF:

25       Q.   Why don't you take a quick look at that time

                                                           24

1   and let me know if that's what you had in mind as the

2   founding document.

3       A.  Seems to be pretty big.  It's taking a while.

4   If it says State of Ohio corporate registration,

5   that's --

6       Q.  It's actually -- the title of the document

7   should be in your chat as Tab 2.  It's the Articles of

8   Incorporation of Graph Foundation Inc.

9           Do you see that?

10      A.  Oh, okay.  Yeah, okay.  So 22nd of June, okay.

11  So I guess my State of Ohio certificate is June 21st and

12  this is signed June 22nd.  I'm not exactly sure which

13  one.

14      Q.  You recognize the document?

15      A.  Yes.  Yeah, this is what our lawyer here in

16  Ohio drafted.

17      Q.  And then what's -- the signature page -- I

18  think it's the third page -- you see there's two

19  signatures there?

20      A.  Yes.

21      Q.  The date?

22      A.  My signature and Ben's signature, yeah.

23      Q.  Okay.  All right.  Thank you.

24          Leading up to the formation, did you have any

25  discussions with anybody about forming Graph Foundation,

25

1     Q.  I'm just asking yes or no.

2          Did you talk to Mr. Suhy about forming Graph

3     Foundation prior to forming Graph Foundation?

4     A.  I mean, I guess it feels vague to me because

5     forming is a very vague word.  So he was -- so to answer

6     specifically, we did not consult him about how to

7     structure the foundation as a nonprofit with any of

8     these articles here; that came just from our lawyer.  We

9     did not consult him about any of the mission.  So when

10    we filed for a nonprofit status with the IRS and we

11    posted a mission and what we were about, we did not

12    consult him about any of those things.  So he was not

13    consulted, I guess, in any material way about, like,

14    what you could call the actual formation of the corp.

15    Q.  Who -- what led you to form Graph Foundation?

16    Strike that.

17          When did you come up with the idea to form

18    Graph Foundation?

19    A.  Must have been, like, early 2018, maybe late

20    2017, but probably early 2018.

21    Q.  Whose idea was it to form Graph Foundation?

22    A.  Primarily mine, but Ben was also very on board

23    with it.

24    Q.  Why did you decide to form Graph Foundation?

25    A.  I think we see a strong need for graph

27

1   technology to be open and available to a broader

2   community. I think that we both, you know, sort of come

3   up through a lot of the open source world where, you

4   know, the Linux Foundations, the Apache Foundations, the

5   Free Software Foundations of the world have sort of

6   shaped and enabled everybody to do really great things.

7   And I think being in the graph space we see, you know,

8   just the potential for greater work to be done by having

9   technology that's developed and opened collaboratively.

10  I think that's what led us to write the mission

11  statement that we did about generally making graph

12  technology available. We see a lot of avenues where

13  that can be applied.

14      Q.  Was there a specific graph technology that you

15  had in mind?

16      A.  I think generally, you know, there's a lot of

17  years to be played out, so, you know, Ben and I see that

18  there are many different technologies, graph

19  technologies that this may be applicable to. I think we

20  listed several in our mission statement.

21          But, you know, there's certainly areas in data

22  processing and algorithms in -- you know, especially in

23  AI. There's a lot of capabilities that I think we see

24  graph having a big impact, and so we see the foundation

25  as being a place that, you know, may one day be able to

28

1  provide an overall benefit to humanity through those

2  things.

3      Q.  Was Neo4j the primary driver for forming Graph

4  Foundation?

5      A.  Neo4j was definitely one driver.  We see an

6  open source database, certainly something that can store

7  data as a graph, as being a key part and it's definitely

8  where we put a lot of our time and effort in the early

9  days.

10      Q.  And did you discuss with Mr. Suhy about forming

11  Graph Foundation to promote open source Neo4j?

12          MR. PERNICK:  Objection; vague as to time.

13  BY MR. RATINOFF:

14      Q.  Prior to the formation of Graph Foundation.

15      A.  I mean, discuss is a very broad word so could

16  you be more specific?

17      Q.  Did you talk to Mr. Suhy within three months of

18  forming Graph Foundation about forming Graph Foundation?

19      A.  I mean, there must have been some conversations

20  about it, but I don't really think he was very -- I'm

21  not really sure what he offered, if anything, toward

22  like the overall -- I don't think he offered anything in

23  the discussions.  I don't remember him really having

24  much of a drive on the open source side.  I remember

25  him -- you know, he's very practical when it comes to

29

1    business, so I think the foundation has always just

2    been, you know, really for me and Ben to decide on.

3            MR. RATINOFF:  I would like to upload a

4    document.  This is going to be Tab 4.

5            (WHEREUPON, Exhibit 4 was marked for

6        identification.)

7    BY MR. RATINOFF:

8        Q.  Let me know when that's up on your chat.

9            Do you see this document that I put up?  It

10   should be an email from John Mark Suhy dated

11   May 5th -- I'm sorry -- May 21, 2018.  Do you see that?

12       A.  Yeah.

13       Q.  "Subject:  Quick Notes on fork."

14       A.  Yeah, I see it.

15       Q.  And looking at the "to" line, there's a Brad

16   Nussbaum, brad@atomrain.com.  Do you see that email

17   address?

18       A.  Yep.  Yep.

19       Q.  Is that an email address that you use

20   currently?

21       A.  Yes.

22       Q.  And were you using that email address back in

23   2018, in May?

24       A.  Yes.

25       Q.  And the other address, Benjamin Nussbaum,

30

1    that's your brother Ben?

2        A.  Yes.

3        Q.  And that's his email address, ben@atomrain.com?

4        A.  Yes.

5        Q.  Prior to forming Graph Foundation, when you

6    were in the preformation stage, were you using your

7    AtomRain account to communicate about forming Graph

8    Foundation?

9        A.  We've -- we've spoken with John Mark with our

10   AtomRain accounts.

11       Q.  So the answer is --

12       A.  I don't know if it's --

13       Q.  Sometimes I'm asking very simple yes-or-no

14   questions, and I appreciate you wanting to elaborate,

15   but I think it will go a lot smoother if you just answer

16   my questions as they're asked.  I'm going to ask it one

17   more time.

18           Did you use your AtomRain email address to

19   discuss forming Graph Foundation with John Mark?

20       A.  You're saying like prior to us ever having a

21   Graph Foundation email?

22       Q.  Yes.

23       A.  I mean, prior to having a Graph Foundation

24   email and prior to Graph Foundation existing, John Mark

25   and, you know, Ben and I communicated with our AtomRain

31

BRAD NUSSBAUM Case 5:20-cv-05282-EJD Document 103 Filed 01/19/21 Page 14 of 136 October 16, 2020

1  emails as the main form, I would say.

2      Q.  At this time in May of 2018, were you an

3  employee of AtomRain?

4      A.  Yes.

5      Q.  And what was your -- what was your position at

6  AtomRain at that time?

7      A.  I was the CEO.

8      Q.  Do you still hold that position at AtomRain?

9      A.  Yes.

10     Q.  And was Ben also an employee of AtomRain at

11  that time in May 2018?

12     A.  Yes.

13     Q.  What was his role at that time?

14     A.  He's the CTO.

15     Q.  And is he still the CTO?

16     A.  Yes.

17     Q.  Were you also employed by anyone else at that

18  time besides AtomRain in May of 2018?

19     A.  No.

20     Q.  Okay.  Turning back to this email, which I

21  believe would be Exhibit 4.

22         MR. RATINOFF:  Mark this as Exhibit 4.  It's

23  got the Bates number IGOV0001570192, and I'll represent

24  this is produced by iGov in the related litigation.  It

25  was not produced by your attorney.

32

BRAD5NUSSBAUM182-EJD   Document 103   Filed 01/19/21   Page 15 of 136   October 16, 2020

1    reference in this email?

2        A.   In reference in this email, I don't know.

3        Q.   Do you know who GraphGrid is?

4        A.   Yes.  GraphGrid is a company that I founded

5    along with my brother.

6        Q.   And was it founded prior to this email in May

7    of 2018?

8        A.   GraphGrid was a product that was in AtomRain

9    that has been known and around for -- well, since 2015.

10   We spun it out of AtomRain.  I don't -- that's getting

11   into I don't know if it's GFI specific stuff right now,

12   but, yeah, there's a formation date for GraphGrid

13   that's -- I think we spun it out sometime in 2018.

14       Q.   Okay.  Moving on down to the next paragraph

15   where Mr. Suhy says:

16            "Just something to think about, I

17       could literally reach out to MariaDB.org

18       and ask them if they can give you a copy

19       of their bylaws."

20       Do you see that?

21       A.   Yes.

22       Q.   Did Mr. Suhy to your knowledge reach out to

23   MariaDB and obtain the bylaws?

24       A.   No.

25       Q.   Do you know what MariaDB is?

35

BRAD NUSSBAUM Case 5:22-cv-01082-EJD Document 103 Filed 01/19/21 Page 16 of 36   October 16, 2020

1     A.   No.

2     Q.   And Greystone Group did not contribute anything

3  to Graph Foundation?

4     A.   No.

5     Q.   And Tylor Data Services didn't contribute

6  anything to Graph Foundation?

7     A.   They did not contribute.

8     Q.   Why were they put on the website?

9     A.   I think there were discussions being held at

10  the time, probably at the time this was developed, that

11  maybe were forward-looking.  You know, sometimes when

12  sites are developed, there's forward-looking thinking

13  and things are just in motion because a lot of stuff was

14  in motion.  So it probably got on here optimistically

15  and then it didn't really pan out and so they were later

16  removed to clean it up.

17     Q.   Okay.  Thank you.

18          So another thing we talked about before break

19  was you had mentioned that GraphGrid had been spun off

20  from AtomRain and you weren't sure about the date, I

21  believe.  Is that correct?  Strike that.

22          You believe it was sometime in 2018 that

23  GraphGrid was spun off from AtomRain.

24     A.   Yeah, sometime in 2018.  Yes, sometime in 2018.

25  ///

57

```
 1              (WHEREUPON, Exhibit 8 was marked for
 2        identification.)
 3    BY MR. RATINOFF:
 4        Q.   Sorry, I'm going to drop another document here.
 5    It doesn't have a tab number.  This should be GraphGrid
 6    Articles of Incorporation.
 7        A.   I have it.
 8        Q.   And I'll represent to you I just printed this
 9    off of the Ohio Secretary of State's office as the State
10    of Ohio Certificate.  Do you see where I'm looking?
11        A.   Yeah.  It's -- it's from our law firm and it
12    looks right, so I have no reason to believe this isn't
13    our certificate.
14        Q.   And the effective date is, you can see there on
15    the first page, April 25, 2018?
16        A.   Okay.
17        Q.   Does that sound right?
18        A.   That sounds -- that sounds very right, yeah.
19        Q.   So GraphGrid Inc. was incorporated prior to
20    Graph Foundation being incorporated, correct?
21        A.   Yes.
22             MR. RATINOFF:  I'm going to drop the next
23    document -- oh, by the way, I would like to mark that
24    Articles of Incorporation as Exhibit 8.
25    ///
```

58

1    A.   So no.

2    Q.   Does Graph Foundation share office space with

3    another entity?

4         MR. PERNICK:  Objection; vague.

5         THE WITNESS:  Can you be specific about what

6    you mean by share.

7    BY MR. RATINOFF:

8    Q.   Does Graph Foundation have an office, a

9    physical office?

10        MR. PERNICK:  Objection; vague.

11   BY MR. RATINOFF:

12   Q.   Does Graph Foundation have a physical office

13   where it conducts its business?

14        MR. PERNICK:  Objection; vague.

15   BY MR. RATINOFF:

16   Q.   You can answer the question.

17   A.   I'm not sure how to answer the question.

18   Q.   Where does Graph Foundation conduct its

19   business?

20   A.   Graph Foundation uses 111 South Buckeye Street

21   for receiving mail and other important documents.

22   Otherwise it is a remote-working organization.

23   Q.   Is that a P.O. Box, 111 Buckeye Street?

24   A.   It is an office location that receives -- that

25   has a box to receive mail.

65

1    Q.  Are there any other businesses located at

2  111 -- I'm sorry -- 111 Buckeye Street?

3    A.  There are.

4    Q.  And what are those other businesses?

5    A.  To Graph Foundation's knowledge, AtomRain and

6  GraphGrid both use 111 Buckeye Street for business

7  activities.

8    Q.  And are you aware of one of those entities

9  leasing that office space?

10   A.  Yes.

11   Q.  Which entity leases the office space?

12   A.  To our knowledge, AtomRain Inc.

13   Q.  And does Graph Foundation conduct business out

14  of that office space?

15   A.  Graph Foundation would receive mail but

16  otherwise has no presence.  To operate, Graph Foundation

17  needs a place to receive mail.  I think that's about it.

18   Q.  You mentioned Graph Foundation is a

19  virtual -- or conducts its business virtually.

20       MR. PERNICK:  Objection; misstates testimony.

21  I believe he said remotely.

22       THE WITNESS:  Remotely.

23       MR. RATINOFF:  Okay, John, you can object, but

24  speaking objections --

25       MR. PERNICK:  I was just trying to help things

66

1  along, Jeff.

2      THE WITNESS:  Graph Foundation conducts its

3  business remotely.

4  BY MR. RATINOFF:

5      Q.  And you use a computer to conduct business

6  remotely for Graph Foundation?

7      A.  Yes.

8      Q.  And what computer do you use to conduct

9  business for Graph Foundation remotely?

10      A.  A MacBook Pro.

11      Q.  And who owns the MacBook Pro?

12      A.  Me personally.

13      Q.  And do you use that computer to conduct

14  business for AtomRain as well?

15      A.  I use my MacBook for a lot of things.

16      Q.  Okay, that's not my question.

17      The question is do you use your MacBook Pro to

18  conduct business for AtomRain?

19      A.  Yes.

20      Q.  And do you use your MacBook Pro to conduct

21  business for GraphGrid?

22      A.  Yes.

23      Q.  And do you have access to your GraphGrid email

24  account on that laptop?

25      A.  Yes.

67

1    Q.   Do you have access to your AtomRain email on

2  that laptop?

3    A.   Yes.

4    Q.   And do you have access to your Graph Foundation

5  email on that laptop?

6    A.   Yes.

7    Q.   Thank you.

8      Are you aware of any other computers that are

9  used for Graph Foundation business?

10   A.   No.

11   Q.   Does Ben have a laptop or computer issued from

12  Graph Foundation?

13   A.   No.

14   Q.   What computer does Ben use to conduct business

15  for Graph Foundation?

16   A.   His MacBook.

17   Q.   And does he also use that MacBook to conduct

18  business for AtomRain?

19   A.   Yes.

20   Q.   And does he also use that MacBook to conduct

21  business for GraphGrid?

22   A.   Yes.

23   Q.   And did you personally purchase your laptop,

24  your MacBook Pro?

25   A.   What do you mean by personally?

                                                    68

1    Q.  Did you use your own money to pay for the

2  MacBook Pro, personal funds?

3    A.  Which MacBook Pro?  The one at the time this

4  started or the one that I have now?

5    Q.  Oh, so you've had more than one MacBook Pro?

6    A.  We -- you know, I get upgrades.  The one that I

7  have now, no, I did not purchase.

8    Q.  Who purchased the MacBook Pro you're currently

9  using?

10    A.  AtomRain Inc.

11    Q.  When did that laptop get purchased?

12    A.  Just like a month or so ago.

13    Q.  And what happened --

14    A.  Oh, no.  Yeah, yeah, maybe two months ago.  A

15  month or two ago.

16    Q.  What computer were you using prior to your

17  current MacBook Pro?

18    A.  Another MacBook Pro.

19    Q.  What happened to that MacBook Pro, the prior

20  one?

21    A.  Nothing.  I mean, it was just -- I upgraded.

22    Q.  Do you still have that prior MacBook Pro?

23    A.  Yeah, it's around.

24    Q.  Did you use any other computers since Graph

25  Foundation was formed to conduct Graph Foundation

69

1   business?

2      A.  No.

3      Q.  Just the two MacBook Pros you talked about?

4      A.  Just the two.

5      Q.  And the first one you had, who purchased that

6   for you?

7      A.  I don't remember.  It was either -- depending

8   on where the business was at the time, it was either me

9   or it was the company.  I forget.

10      Q.  The company being AtomRain?

11      A.  Yeah.

12      Q.  And has your brother used any other computers

13   besides the MacBook Pro you mentioned to conduct Graph

14   Foundation business?

15      A.  I don't think so.  I think he's on the same

16   one.

17      Q.  Okay.  So going back and looking at this

18   balance sheet that we were just reviewing, at the same

19   spot -- I believe my screen share should still be on.

20      A.  Yes.

21      Q.  So looking at the donations, you'll see the

22   last page I believe -- sorry.

23      Under Chase checking account, you see last

24   funds transfer from AtomRain and 3/26/2020?

25      A.  Okay, yes.

70

1   accurate.

2       Q.  Looking at the blue section, it says JMSuhy

3   initial commit.  Do you see that?

4       A.  Yes.

5       Q.  And do you know -- do you understand who

6   JM Suhy is?

7       A.  Yes.

8       Q.  And who is JM Suhy?

9       A.  To my knowledge, that's John Mark's user on

10  GitHub.

11      Q.  And you see there's a date there on August 29,

12  2018?

13      A.  August, yeah, 29, yeah.

14      Q.  So is it fair to say that Graph Foundation had

15  a GitHub account as of August 29, 2018?

16      A.  Well, yeah, I think that's how those commits

17  are tracked.  There's a difference between the actual

18  commit that goes to get repo and what shows up in

19  GitHub, but I think that date is when it's actually

20  merged into GitHub.

21      Q.  But in order to be merged in the Graph

22  Foundation's GitHub, Graph Foundation would have to have

23  a GitHub account, correct?

24      A.  Right.  Yeah.

25      Q.  All right.  And does this at all refresh your

81

1        What specifically are you looking for?

2        Q.   Well, did he start up the ONgDB fork on

3   GitHub's repository?

4        A.   Well, if what we're looking at here, Neo4j-OE

5   or something, that's not the ONgDB fork.  This doesn't

6   look like much of anything.  I don't even think there's

7   about more than seven files here.  I'm pretty sure ONgDB

8   is well over a million.

9        Q.   Okay, let's go ahead and move on, then.

10       MR. RATINOFF:  All right.  I'm going to drop

11  another.  It should be Tab 46, and this should be

12  Exhibit 14.

13       (WHEREUPON, Exhibit 14 was marked for

14       identification.)

15  BY MR. RATINOFF:

16       Q.   We'll mark this Exhibit 14.  And the Bates

17  number starting with GFI000287 which was produced by

18  your counsel.

19       Do you have the document in front of you,

20  Exhibit 14?

21       A.   Yes.

22       Q.   Looking at Exhibit 14, there's an HTML address.

23  You have to hover your cursor over it, but if you -- it

24  says Graph Foundation admin.  When you hover over that,

25  it should say admin@graphfoundation.org.



83

1    A.  Uh-huh.  Yeah.

2    Q.  That's a Graph Foundation email that Graph

3  Foundation owns?

4    A.  Correct.  Yes.

5    Q.  Does Graph Foundation still use that email

6  address?

7    A.  Yes.

8    Q.  And you searched for documents in this case in

9  that email account?

10    A.  Yes.

11    Q.  So looking at the date of this email, it says

12  July 16, 2018.  Do you see that?

13    A.  Yes.

14    Q.  Does that help refresh your recollection as to

15  whether Graph Foundation had their own ONgDB up on

16  GitHub at that time?

17    A.  Did we?

18    Q.  I'm asking you.

19    A.  I don't think this gives me anything to

20  refresh.  Sorry, what do you mean by get up on GitHub?

21  You mean like does this help establish a date point in

22  time when the ONgDB repository was created?

23    Q.  Yes.

24    A.  No, this would not do that.

25    Q.  All right.  Let's go to the bottom, looking at

84

1    Q.  It's fair to say it says forwarded message, so

2    this is forwarded from iGov to Graph Foundation?

3    A.  Right.

4    Q.  Do you have an understanding of why it was

5    forwarded to Graph Foundation?

6    A.  They must have felt we could better answer or

7    give better details than they could.

8    Q.  About GraphStack?

9    A.  I'm assuming about the state of, like, an

10   open source version of Neo.  It looks like they want to

11   get information like -- it looks like they're

12   redirecting them to the root source of, like, how to

13   best get involved with the open source project.

14   Q.  Okay.  So then looking at the first paragraph

15   of the top email, that's the July 16, 2018, email, it

16   says:

17              "I received your question from

18         iGov.  We're consolidating support of

19         the open source Neo4j graph database

20         distributions under a nonprofit

21         organization:  Graph Foundation."

22         Do you see that?

23   A.  Right.  Yes.

24   Q.  And then the next paragraph, "I can help you

25   answer your questions."  And then I want you to take a

87

1    look at the following paragraph that says:

2                "The naming you'll see for the

3           build on the foundation site is ONgDB.

4           This is a fully AGPL fork of the open

5           source Neo4J GitHub repository with

6           all restrictive marks from Neo4j Inc.

7           removed."

8           Do you see that?

9      A.   Yes.

10     Q.   So at this point is Graph Foundation saying

11   that there's a fork of Neo4j called ONgDB available as

12   of July 16, 2018?

13     A.   I'm not sure what the state was on this site

14   then that we were directing them to.  It would seem that

15   there was something there.  I don't know what the state

16   was.  Maybe we had pre-built -- there was a point in

17   time where we were -- I don't know, I don't know when

18   that was.  Yeah, I don't know.  There must be something

19   up there for him then.  I'm not sure what was up there.

20     Q.   What do you mean by this is a fully AGPL fork

21   of the open source Neo4j GitHub repository with all

22   restrictive marks from Neo4j removed?

23     A.   I think it was, like, in January or March 2018

24   when the Commons Clause came in to, like, 3.4, something

25   like that.  I don't know the exact date.  So I think

88

1    this is when some of the Commons Clause stuff was going

2    on.  So I think all -- all that would mean by

3    restrictive marks is that we were conveying the

4    open source code as the pure open source under AGPL.

5         Q.  So with an AGPL license without the

6    Commons Clause?

7         A.  Right.  Yeah.  Because I think we -- yeah, we

8    had removed the Commons Clause I think at this point.

9         Q.  Is that what you're saying in the next

10   sentence?

11              "We've taken the necessary steps

12        to make sure we keep the repository

13        fully AGPL which is the license that

14        Neo4j has released it under, but then

15        added additional sections to the AGPL

16        license."

17        Are you referring to the Commons Clause there?

18        A.  Yeah, we're referring to Neo4j Inc. adding the

19   Commons Clause in to the AGPL license, yeah.

20        Q.  It says:

21              "Which in our conversations with

22        FSF (Free Software Foundation) is not

23        legal to do when using the AGPL

24        license."

25        Do you see that?

89

1    A.  Yeah.  I think our understanding of this, you

2    know --

3        Q.  I'm just asking you --

4        A.  -- has evolved since then, but, yeah, I see

5    this.  I see this, yeah.

6        Q.  So as of July 16, 2018, had you had any

7    conversations with the Free Software Foundation

8    regarding Neo4j adding the Commons Clause to AGPL?

9        A.  We did not, no, not the Graph Foundation.

10       Q.  Did you personally have any conversations with

11   the Free Software Foundation whether it was legal for

12   Neo4j to add the Commons Clause to the AGPL?

13       A.  No.  I think I saw a conversation about it, but

14   we did not.

15       Q.  Saw, what do you mean by saw a conversation?

16       A.  I think I saw an email about a conversation.

17   I'm not sure how I saw that.

18       Q.  You don't remember who that email was from?

19       A.  I remember there was a conversation.  I'm not

20   sure what we were telling them, though.  I never spoke

21   to the Free Software Foundation direct.

22       Q.  Have you ever spoken to the Free Software

23   Foundation about whether Neo4j was able to add the

24   Commons Clause, quote, unquote, legally?

25       A.  I have not, no.

90

```
 1            (WHEREUPON, Exhibit 15 was marked for

 2       identification.)

 3  BY MR. RATINOFF:

 4       Q.  So we'll mark this document which was produced

 5  by iGov.  Do you have what's Tab 56 in front of you?

 6       A.  Yes.

 7       Q.  Okay.  And so we'll call this Exhibit 15 now.

 8  It's got the Bates number IGOV0001570185.001 on the

 9  first page.  So again, this is dated May 22, 2018.  I

10  think that was around the same time we looked at that

11  earlier email and you had mentioned that Graph

12  Foundation wasn't in existence yet officially, correct?

13       A.  Sorry, that was too much.  What are you asking?

14       Q.  You see the date May 22, 2018?

15       A.  Yes.

16       Q.  So you didn't have a Graph Foundation email at

17  this point, right?

18       A.  I don't think Graph Foundation was formed so

19  definitely no.

20       Q.  And we looked at a prior email where you were

21  discussing forming Graph Foundation, correct, around

22  this time?

23       A.  I would say I don't think --

24            MR. PERNICK:  Objection, misstates testimony.

25            THE WITNESS:  I don't think we were doing that.
```

                                                        97

1    I don't think that's quite the right way to say that.

2         MR. RATINOFF:  Well, let's go back to -- I know

3    your counsel made an objection, and just make sure you

4    let me finish my question, give like a slight pause, let

5    Mr. Pernick have a chance to object if he needs to.

6         MR. PERNICK:  Especially since I generally have

7    to press my unmute button so it takes a little bit

8    longer.

9         The objection is misstates testimony.

10        MR. RATINOFF:  I'm going to strike the

11   testimony -- there was a lot of talk over -- so I'll

12   start over again.  In case he wants to object, just give

13   him a second.

14        JOHN PICONE:  Jeff -- Mr. Pernick, if you have

15   your spacebar, if you press it, it will unmute

16   temporarily.  I found that's an effective method.

17        MR. PERNICK:  I wasn't able to get that to work

18   in our test run, but it is working now.

19        JOHN PICONE:  As long as your cursor is on the

20   Zoom application it will work.

21        MR. PERNICK:  Thank you.

22        MR. RATINOFF:  Technology is great.

23   BY MR. RATINOFF:

24     Q.  Let's look again -- I think we looked at this

25   email address before, brad@atomrain.com.  That's your

                                                        98

1    email address, right?

2        A.  Yes.

3        Q.  You have no reason to believe you didn't

4    receive this email?

5        A.  No.  I received it, yeah.

6        Q.  And looking over this email, is this the email

7    you referenced from -- maybe seen from John Mark

8    earlier?

9        A.  It sounds about right.  This seems like an

10   email that came from Free Software Foundation discussing

11   this topic, yes.  I forget what they said, but yes.

12       Q.  Do you see anywhere in here where Free Software

13   Foundation's giving legal advice to Mr. Suhy?

14       A.  I think my view on that was that they -- I

15   think they didn't -- I don't think they could give us

16   legal advice or I don't think they said it was legal

17   advice.  I think it was, like, an opinion.  So I

18   don't -- you know, giving legal advice is not something

19   that they would do so I don't think that makes sense,

20   but I don't see what they're saying here.  I would have

21   to read it.

22       Q.  Okay.  Well, why don't you go ahead and do

23   that.

24       A.  I think they're giving us advice on the further

25   restrictions clause in Section 7, and I think they're

                                                          99

1    that I ever saw.  I think there was only ever one.

2           MR. PERNICK:  Jeff, we've been going for about

3    an hour and a half.  Can we take a brief five-minute

4    break.

5           MR. RATINOFF:  Sure.  Let me show one more

6    document.

7           MR. PERNICK:  Okay, no problem.  Nothing dire.

8           MR. RATINOFF:  Thank you for the reminder,

9    though.

10          (WHEREUPON, Exhibit 16 was marked for

11      identification.)

12   BY MR. RATINOFF:

13      Q.  Do you have that in front of you?  So this

14   would be the document produced by iGov, Bates number

15   IGOV0001570125.001, and this is Exhibit 16.

16          And do you recognize this email?

17      A.  Yes.

18      Q.  So you've seen this email before?

19      A.  I'm sorry.  I thought you meant do I know

20   what's in front of me.  You're asking if I -- I'm sorry.

21   What are you asking me?

22      Q.  I'm asking whether you've seen this email

23   before.

24      A.  This looks like a conversation happening with

25   the Free Software Foundation by John Mark.

108

1    Q.   And this is the same Donald Robertson that we

2    saw to your knowledge in the last email that we were

3    looking at?

4        A.   Yeah, it looks like it.

5        Q.   And then -- but you don't know -- you don't

6    know whether you've seen this email or not, before or

7    not?

8        A.   This may have been, like, one of the other

9    emails I mentioned; like, it was probably forwarded to

10   me at one point, but I don't know.  I'd have to go find

11   it.

12       Q.   Okay.  Maybe we'll have you do that after the

13   deposition.  But for the time being, we have this email

14   from the Free Software Foundation to John Mark which you

15   see here.

16           Looking at first where it says "snip" under

17   June 20th, do you see that?

18       A.   Yes, uh-huh.

19       Q.    "1) As the copyright holder,

20            is Neo4j Inc. allowed to add the

21            specific additional terms mentioned

22            above to the license.txt file

23            (containing the AGPL license terms)

24            and enforce these new additions?"

25            Do you see is that?

109

1     Q.   Yeah.

2     A.   I mean, I guess because our goal is to make

3  ONgDB available publicly, so 3.5 was the next version.

4     Q.   And that's because Neo4j released its

5  Version 3.5?

6     A.   Are you asking a question about our versioning?

7     Q.   Well, is there a significant difference between

8  version -- I'm sorry -- Neo4j 3.4 and 3.5?

9     A.   I mean, there are definitely differences.

10        MR. RATINOFF:   Okay.   I'm going to put Tab 13

11  back up.   So this will be Exhibit 18.

12        (WHEREUPON, Exhibit 18 was marked for

13        identification.)

14  BY MR. RATINOFF:

15     Q.   Do you have Tab 13 up on your screen?

16     A.   Yes, I have it up.

17     Q.   And this again was produced with the Bates

18  number N4J_018661.   It was printed out from the

19  internet, from Twitter's website, on 5/20/2020.

20        This is, again, I believe Graph Foundation's

21  Twitter account, correct?

22     A.   Yes, this is our Twitter account.

23     Q.   Do you have any reason to believe these tweets

24  that are included in this document are accurate as far

25  as being from Graph Foundation's account?

137

1        A.  They look accurate to me.

2        Q.  Do you see the first tweet right here at the

3   top?  It says:

4                "It's official:  #Neo4j

5             Enterprise is closed source.  As of

6             November 2, 2018, Neo4j Inc. has

7             moved all enterprise modules of the

8             3.5 release to a private repository."

9        A.  Yep.

10       Q.  Do you see that?

11       A.  I see that.

12       Q.  What did that mean?

13       A.  I think exactly what it says.

14       Q.  Why did Graph Foundation tweet that?

15       A.  I think it's a factual statement.  Enterprise

16  is closed source.  I think that's true.  There were

17  commits that I know that I reversed as of November 2nd,

18  2018, that removed all the enterprise code and all the

19  enterprise modules, yeah, to the private repository, so

20  that's true.  And, yeah, they even announced I think

21  that they were open core.

22       Q.  Was there a prior release Version 3.5 that had

23  enterprise modules that were not part of the enterprise

24  repository?

25       A.  Was there a prior release.  Like -- well, so

138

1    A.  Yeah.  Yeah.

2         MR. RATINOFF:  I'm going to put up another

3    document.  This is -- Tab 25 will be Exhibit 19.

4         (WHEREUPON, Exhibit 19 was marked for

5         identification.)

6    BY MR. RATINOFF:

7         Q.  Let me know if you have that up.

8         A.  Yep, I've got it.

9         Q.  So looking at this email, it shows ben@atomrain

10   and brad@atomrain.com.  Do you see those two email

11   addresses?

12        A.  Yes.

13        Q.  Those are the email addresses we discussed

14   earlier that belong to you and your brother, correct?

15        A.  Yes.

16        Q.  This is johnmarksuhy@purethink.com.  I don't

17   know if we've seen that address before.  Do you

18   recognize it?

19        A.  Yeah.  Yeah.

20        Q.  So this is a document that was produced by

21   Mr. Suhy's counsel.  And do you have any reason to

22   believe this isn't an accurate email that you received?

23        A.  No, no reason.

24        Q.  Do you see the subject there, graphstack.io -

25   avoid trademark issues?

                                                    147

1    good way, and I don't think Neo was too receptive of

2    being in a position of wanting to help find a solution,

3    kind of filed a lawsuit against us, so I don't think

4    there was really much opportunity to discuss it.

5         MR. RATINOFF:  Okay.  So let me move on to

6    another exhibit.

7         (WHEREUPON, Exhibit 21 was marked for

8         identification.)

9    BY MR. RATINOFF:

10        Q.  This will be Exhibit 21, I believe.  This was

11   produced as Bates number N4J-GFI_000092.  This is a

12   printout from Graph Foundation's website as of

13   September 24, 2019.

14        Do you have any reason to believe this isn't a

15   correct printout of what was on Graph Foundation's

16   website as of that date?

17        A.  No reason, no.

18        Q.  And looking at Licensing, do you see that

19   heading right there?

20        A.  Yes.

21        Q.  And it says:

22             "ONgDB distributions are

23             licensed under AGPLv3 as a free and

24             open drop-in replacements of Neo4j

25             Enterprise commercial licensed

                                                    157

1           distributions with the same version

2           number."

3           Do you see that?

4     A.  Yes.

5     Q.  What did Graph Foundation mean by drop-in

6  replacement?

7     A.  I think we provided an explanation of this.

8  Drop-in, I think as everybody understands it in

9  development, you know, essentially functions

10  equivalently from one version to another.  So if you

11  took a Neo4j Enterprise version, let's say 3.5.4, the

12  database format that it creates would work with ONgDB

13  3.5.4, so you can essentially write your data, and with

14  Neo4j Enterprise, you can use that same data with ONgDB.

15     Q.  And just to clarify, that's Graph Foundation's

16  understanding of drop-in replacement?

17     A.  Yeah.  Yeah, that's on our site, so.

18     Q.  And as of ONgDB Version 3.5.4, it's Graph

19  Foundation's belief at that time it was a hundred

20  percent identical to Neo4j Enterprise 3.5.4?

21     A.  No, it was not one -- I mean, it couldn't be

22  100 percent identical because Neo4j was close source as

23  of 3.5.0-RC1, and so any time after that there have to

24  be some differences.  And so drop-in does not mean

25  identical; it refers more to compatibility.

158

1    Q.  Okay.  You mentioned release I guess -- let me

2    start over.

3         You mentioned Neo4j 3.5.0-RC1.  Is that a

4    pre-release version of Neo4j 3.5?

5    A.  Yes, it's a release candidate.

6    Q.  And that was available on Neo4j's GitHub?

7    A.  Yes.

8    Q.  And was Neo4j 3.5.0-RC1, was that released

9    under the AGPL plus Commons Clause by Neo4j?

10   A.  Yes.

11   Q.  Is that -- is 3.5.0-RC1, is that the code base

12   that ONgDB 3.5.4 is based on?

13   A.  What do you mean by based on?

14   Q.  Well, you mentioned that it couldn't be

15   identical because the last version that was available

16   before one closed was 3.5.0-RC1.

17   A.  Right.

18   Q.  So ONgDB 3.5.4 isn't 100 percent identical to

19   Neo4j 3.5.4, correct?

20   A.  Correct, they're not 100 percent identical.

21   Q.  So if they're not 100 percent identical, what

22   is -- what is the same between ONgDB 3.5.4 and Neo4j

23   3.5.4?

24   A.  It's a great question.  Neo4j source is closed

25   so we don't know.

159

1    Q.  So as of ONgDB 3.5.4, Graph Foundation had no

2    way of knowing whether that was identical to Neo4j's

3    3.5.4, correct?

4    A.  Yeah, there's no way to know that they're

5    100 percent identical, correct.

6    Q.  How is Graph Foundation able to represent that

7    3.5.4 was a drop-in replacement, ONgDB, that is, for

8    Neo4j 3.5.4?

9    A.  I think I described it earlier.  Drop-in

10   replacement refers more to compatibility of features, so

11   we were able to take a Neo4j 3.5.4 version, create a

12   database and just show that it worked with ONgDB at that

13   same version.  So I think that's exactly what we

14   described, and I think that's exactly what we did.

15   That's the only thing that we can really do absent

16   having the source code is just show that they are

17   compatible, they can both read the same database format

18   which is one of the most essential things to make it

19   drop-in.

20   Q.  Did the Graph Foundation do one for one -- let

21   me strike that.

22   So with ONgDB -- do you mind if I leave out the

23   dots -- it's a mouthful -- and just say 3-5-4 is easier?

24   A.  That's fine.

25   Q.  So ONgDB 3.5.4, does that -- did that contain

160

1  additional or different source code from Neo4j 3.5.4?

2      A.  We have no way of knowing, but we assume that

3  they were different.  Neo4j could have used our code

4  because it's open, but we could not have used their code

5  because it's closed.  So they could have used our code

6  to make their release.  We assume that they didn't, but

7  we can't see their code.

8      Q.  So ONgDB 3.5.4 contains source code that's not

9  authored by Neo4j, correct?

10     A.  Yes, that's correct.

11     Q.  Do you understand what the term glue code is?

12     A.  Yes.

13     Q.  What's your understanding of glue code?

14     A.  That it's mostly code that's used to maintain

15  compatibility between interfaces.

16     Q.  So ONgDB 3.5.4 contains glue code.  Is that a

17  fair statement?

18     A.  It certainly contains some code that's needed

19  to maintain compatibility with core, which we bring in,

20  which is part of common, so it does contain some of that

21  for shifting interfaces as well as fixes and

22  enhancements.

23     Q.  So how did -- how did you, meaning Graph

24  Foundation, create 3.5.4 if Neo4j was no longer

25  releasing its code at that time?

161

1      A.  We merged in all of the core commits for 3.5.4,

2  so that's everything for community, and then, based on

3  whatever feedback was given from the community,

4  developed any of the fixes that we could for releasing

5  the enterprise code.

6      Q.  Okay.  So the fixes that you put into 3.5.4,

7  they were authored by non-Neo4j coders; is that correct?

8      A.  Yes.

9      Q.  And so -- and Graph Foundation would have no

10  way for certain to know whether it actually included

11  every fix that Neo4j put in its Neo4j 3.5.4, correct?

12      A.  I'm sorry.  Could you repeat.

13      Q.  Sure.  So Graph Foundation would have no way to

14  know for certain whether -- strike that.

15      Graph Foundation -- you mentioned fixes for the

16  community, and in reference to that, you did not include

17  patches that came from Neo4j per se, correct?

18      A.  We did not include patches that came -- are you

19  asking if we have code?  What do you mean by we did not

20  include patches that came from Neo4j?

21      Q.  You mentioned there were fixes that were put in

22  place through ONgDB repository, correct?

23      A.  Yes.

24      Q.  And where did those fixes come from?

25      A.  Oh, from community contributors.

162

1   Q.  And Graph Foundation would have no way of

2   knowing whether there were patches included in Neo4j's

3   close portion of enterprise 3.5.4, correct?

4   A.  Right.  We wouldn't know what code changes

5   they're making to their source because it's private.

6   Q.  So the only way you would understand what the

7   potential fixes there were would be looking at Neo4j's

8   changelog for each version?

9   A.  We could use what was reported on GitHub, so

10  some people report issues on GitHub still.  We can use

11  what our community users report to us, and we can

12  include fixes that are in core.

13  Q.  So you mention there was enterprise features

14  that were taken to be closed after 3.5.  Which features

15  were those?

16  A.  I'm sorry.  What did you say I mentioned?

17  Q.  You said that when Neo4j took its enterprise

18  portion of the software to close core or private, I

19  guess was maybe the word you used, which features were

20  taken private?

21  A.  Everything in the enterprise directory.

22  Q.  Were there key features in the enterprise

23  software that were taken private in your mind?

24  A.  Yes.

25  Q.  What were those key features?

163

1      A.  Causal clustering, backups, restore,

2   monitoring, security, advanced Cypher.  You know, that's

3   about -- I think that's the list.

4      Q.  So ONgDB 3.5.4 had those features in it,

5   correct?

6      A.  Yes.

7      Q.  And -- but those weren't necessarily the same

8   exact code for those features in Neo4j 3.5.4, correct?

9      A.  That's right, they wouldn't have been a hundred

10  percent identical.

11     Q.  Where did the code for those features in ONgDB

12  3.5.4 come from?

13     A.  They started out open source and then changes

14  in enhancements would have been made thereafter by

15  commits to Graph Foundation.

16     Q.  Okay.  But the base code of those features came

17  from Neo4j 3.5.0-RC1?

18     A.  That would have been I suspect the start of it.

19        MR. RATINOFF:  I'm sorry.  Can you read that

20  answer back, please.

21        (Record Read.)

22  BY MR. RATINOFF:

23     Q.  What do you mean by the start of it?

24     A.  I mean that that's -- that that was like the

25  state of the code as of 3.5.0-RC1 was the last time that

164

1    Neo made any public contribution, so thereafter
2    everything would have been from the open source
3    community.
4         Q.  For those particular enterprise features that
5    you mentioned?
6         A.  Yes.
7         Q.  Give me one second.  You mentioned
8    contributions from the community.  So Graph Foundation
9    relied on open source contributors to fix issues with
10   various versions of ONgDB?
11        A.  Yes.
12        Q.  And were those -- when you say open source
13   community, does that include Neo4j contributors?
14        A.  Yes.
15        Q.  And that would also include Graph Foundation
16   contributors?
17        A.  Yes.
18        Q.  So you would have to go to Neo4j's GitHub
19   repository to find the open source contributions to
20   Neo4j's software?
21        A.  You can see it on our repo too.
22        Q.  You would be able to see Neo4j contributors'
23   open source contribution on Graph Foundation's GitHub?
24        A.  Yeah, because it's a fork.
25        Q.  What do you mean by that?

165

1  and the release repository links to the distributions on

2  the CDN.

3      Q.  Does the testing include a function that

4  includes function testing?

5      A.  Yes.

6      Q.  It includes performance testing?

7      A.  Yes.

8      Q.  And what other type of testing is done before

9  it's released, a particular version?

10     A.  Integration testing, stress testing, integrity

11 of the packaging.

12     Q.  That's all done by Graph Foundation?

13     A.  Yes.

14     Q.  And do you have any idea of what type of

15 testing Neo4j uses on its coded versions of Neo4j

16 software?

17     A.  Only the stuff that was public is what we would

18 know about.  We wouldn't know anything about their

19 private testing.

20     Q.  For example, Neo4j 3.5.4, you wouldn't have any

21 idea what testing is done before Neo4j released that

22 software?

23     A.  We know of all the tests that are committed

24 that are open source so there's quite a few.  The

25 open source code base contains tests.

168

1    Q.  But you wouldn't have any insight into the

2    testing that's done on the closed source components of

3    Neo4j 3.5.4?

4    A.  Correct.  If it's closed source, we don't

5    know -- we don't have the code and we don't know their

6    methods.

7         MR. RATINOFF:  Okay.  Let me see.  I want to

8    put this exhibit up.  Hopefully I will guess the right

9    number.

10        (WHEREUPON, Exhibit 22 was marked for

11        identification.)

12   BY MR. RATINOFF:

13   Q.  So we'll mark Tab 21 as Exhibit 22.  This is --

14   first page bearing Bates number N4J_018667, and this is

15   a printout from Graph Foundation's Twitter account dated

16   7/19/2020.

17        Do you have this document in front of you?  Do

18   you recognize this document?

19   A.  Yep.

20   Q.  What is it?

21   A.  It's a tweet from our account.

22   Q.  "Our" being Graph Foundation?

23   A.  Yeah, Graph Foundation account.

24   Q.  It says:

25        "Please report all #Neo4j

169

BRAD5NUSSBAUM182-EJD Document 103 Filed 01/19/21 Page 50 of 136 October 16, 2020

1   Enterprise 3.5 issues to the ONgDB

2   GitHub."

3   Do you see that?

4   A.  Yep.

5   Q.  And continues after the web address:

6   "...so we can more effectively

7   track bugs related to open source

8   enterprise code versus open core

9   community."

10   A.  Right.

11   Q.  Why did Graph Foundation tweet this?

12   A.  Yeah, so a lot of -- a lot of users tend

13   to -- you know, in the past have reported issues to

14   Neo4j's repo that affected enterprise and community code

15   because it was open source, they were both open source,

16   but as soon as Neo4j took enterprise away, there's no

17   longer an open source project there so they kind of left

18   a hole and users didn't really know where to be

19   redirected to to report enterprise issues on

20   open source.  So this was to try to redirect them, to

21   inform them where open source development was being

22   maintained and where they can track bugs.

23   Q.  So you're asking Neo4j users to go to ONgDB's

24   GitHub repository to report bugs?

25   A.  That are related to enterprise, yeah.

170

1    Q.  Neo4j Enterprise, correct?

2    A.  The -- yeah, as we understand it, the

3  enterprise -- open source enterprise, yeah.

4    Q.  You don't think that's confusing the customers

5  out there to redirect Neo4j bugs to -- I'm sorry -- to

6  Graph Foundation's GitHub repository?

7         MR. PERNICK:  Objection; vague.  Can you

8  restate that.

9         MR. RATINOFF:  Sure.

10 BY MR. RATINOFF:

11   Q.  So did you think that your tweet would confuse

12 anyone as to where to report bugs to Neo4j software?

13        MR. PERNICK:  Objection; vague; calls for

14 speculation.

15        THE WITNESS:  Yeah, I can't speak to other

16 people's -- how they would interpret this.  I can see

17 what my intent with it was which is what I think I said.

18 BY MR. RATINOFF:

19   Q.  I'm asking you I guess what -- I appreciate

20 your prior testimony, but what I'm asking you is did it

21 occur to you when tweeting this that it may confuse

22 Neo4j users to report their bugs to Graph Foundation's

23 GitHub repository rather than Neo4j's repository?

24        MR. PERNICK:  Objection; vague.

25        THE WITNESS:  I felt that it was fairly clear

171

1  that enterprise no longer existed, open source, and that

2  was the sole reason that anybody would report an

3  enterprise issue on Neo4j's GitHub.  If enterprise is no

4  longer open source, there's no reason to report anything

5  on their GitHub, so I feel like it's very clear to

6  redirect open source enterprise users to the right

7  place.

8  BY MR. RATINOFF:

9      Q.  The right place being Graph Foundation's

10  GitHub?

11      A.  Yeah, where open source enterprise was being

12  worked on.

13      Q.  Okay.  So you're basically soliciting users of

14  Neo4j Enterprise, which is closed, to report their

15  issues to Graph Foundation's GitHub repository, correct?

16          MR. PERNICK:  Objection; vague.

17  BY MR. RATINOFF:

18      Q.  Strike that question.  Let me ask another

19  question.

20          I noticed you use Neo4j hashtag there.  Do you

21  see that?

22      A.  Yeah.

23      Q.  Why would you use a Neo4j hashtag there?

24      A.  It's a topic relevant to Neo4j users.

25      Q.  Okay.  So you use the hashtag to raise the

172

BRAD5 NUSSBAUM 82-EJD  Document 103   Filed 01/19/21   Page 53 of 136   October 16, 2020

1   prominence of this tweet to Neo4j users; is that

2   correct?

3        MR. PERNICK:  Objection; vague.

4        THE WITNESS:  I think that's restating it.  I

5   think I -- I think it's relevant to people in the Neo4j

6   community.  I mean, Neo4j users, you know, Neo4j

7   community at large.

8   BY MR. RATINOFF:

9      Q.  But wouldn't Neo4j Enterprise users not be in

10  the community since it's closed source?

11     A.  Well, they would still be in the community;

12  they need redirected.  A lot of people were just finding

13  out about all of the open core changes and people needed

14  a place to be redirected to, so I think they needed to

15  be informed about their option.  Seems pretty clear to

16  me.

17     Q.  Okay.  But you're not giving them an options

18  tweet.  You're redirecting users of close source to

19  report their issues to Graph Foundation's GitHub,

20  correct?

21        MR. PERNICK:  Objection; vague.

22        THE WITNESS:  I think I stated what we're

23  doing.

24  BY MR. RATINOFF:

25     Q.  Okay.

173

1    A.   Did you want me to restate what we're doing?

2    Q.   Sure, if it answers the question.

3    A.   Maybe you have to re-ask your question, then.

4         MR. RATINOFF:  Can you please read my question

5    back.

6         (Record Read.)

7         MR. PERNICK:  Objection; vague.

8         THE WITNESS:  Can you just ask that as a

9    question.

10   BY MR. RATINOFF:

11   Q.   I'll strike the question.  I didn't quite hear

12   all of it, but it didn't sound like -- there was some

13   extra word in there.

14        So let me ask you this:  Do you understand what

15   hashtags are?

16   A.   I understand that a hashtag is used to make or

17   create a topic so that people that want to go read about

18   a topic or, you know, look at things that are related to

19   a certain topic, yeah, it's a way to tag things.

20   Q.   So by tagging Neo4j, if someone's searching

21   Twitter for #Neo4j, it would be more likely this tweet

22   would come up, correct?

23   A.   Yes, if they're interested in -- if they're a

24   Neo4j user or if they're looking at, you know, things

25   relating to Neo4j that are happening, this would be

                                                    174

1    something that's happening around Neo4j.

2        Q.  And I notice there's no hashtag next to ONgDB.

3    Why is that?

4        A.  I'm not sure.

5        Q.  So you use the #Neo4j to make it more likely

6    for a person interested in Neo4j Enterprise to have seen

7    this tweet, correct?

8            MR. PERNICK:  Objection; vague.

9            THE WITNESS:  I think like what I said, we use

10   the hashtag so that Neo4j users can be informed.

11   BY MR. RATINOFF:

12       Q.  So my question is it's more likely that a Neo4j

13   user will find this tweet because he used the hashtag

14   Neo4j, correct?

15           MR. PERNICK:  Same objection; vague.

16           THE WITNESS:  I mean, that assumes -- yeah,

17   that assumes that Neo4j users are looking at that

18   hashtag, but anybody that is looking at the Neo4j

19   hashtag can become informed and that includes Neo4j

20   users.

21   BY MR. RATINOFF:

22       Q.  So it's more likely that a Neo4j user would

23   find this tweet by using the Neo4j hashtag versus using

24   just the word Neo4j, correct?

25           MR. PERNICK:  Objection; vague; calls for

                                                        175

1   speculation.

2        THE WITNESS:  I mean, we can't -- I mean, we

3   can't really speculate about how people find us.  I

4   mean, what we can do is try to give information to as

5   many places as possible.

6   BY MR. RATINOFF:

7        Q.  I understand that, but what I'm saying is is

8   you've already explained your understanding of what a

9   hashtag is.  What I'm asking you is by using a hashtag

10  with Neo4j, it's raising the prominence of this tweet to

11  people looking for Neo4j versus had you simply

12  referenced Neo4j without the hashtag, correct?

13       A.  It places that tweet in a topic so it is

14  possible that more people would see it as a result.

15       Q.  So you used the hashtag Neo4j to make it more

16  likely that this tweet would be seen by Neo4j users,

17  correct?

18       A.  Yes because our objective is to inform.  We

19  want Neo4j users to be informed about their options.

20       Q.  But you're not giving an option here.  You're

21  just asking to report bugs in Neo4j Enterprise to Graph

22  Foundation, correct?

23       MR. PERNICK:  Objection; vague.  The document

24  speaks for itself.

25       THE WITNESS:  So the option that they knew of

176

1   today was one.  Prior to this, they only had one option

2   which was the Neo4j repo, so in our mind we were giving

3   them a second option which is to inform them that

4   there's another place that they can report open source

5   enterprise issues, and I think that's exactly what we

6   said, effectively track bugs related to open source

7   enterprise, and that would no longer apply to Neo4j's

8   code base because it was no longer open source

9   enterprise.  So I think that's clear.

10          MR. RATINOFF:  Let me put up Tab 23.  And this

11  was attached as Exhibit K to the first set of RFAs,

12  John, so I just wanted to let you know.  So I'm only

13  going to ask a couple questions about this since it's

14  already been subject to RFAs and been authenticated.

15          (WHEREUPON, Exhibit 23 was marked for

16  identification.)

17  BY MR. RATINOFF:

18      Q.  So this starts with the Bates number

19  N4J-GFI_000078, and this is a printout from the Graph

20  Foundation website dated September 24, 2019.

21          Do you recognize this document?

22      A.  Yes.

23      Q.  Okay.  What is it?

24      A.  It's a blog post.

25      Q.  Did you author this blog post?

                                                      177

1    A. Yes.

2    Q. Why did you put this post up on Graph

3 Foundation's website?

4    A. Because it's relevant to Graph Foundation.

5    Q. Other than being relevant, was there a specific

6 reason why you drafted this post?

7    A. Well, I mean, I think the post speaks for

8 itself. It's informative, I think it's an informative

9 post so to inform people.

10    Q. Okay. I'm asking the reason why you did it,

11 not what it does to people. So I'll ask it a different

12 way.

13    Why did you author this post and put it up on

14 Graph Foundation's website at this time, which is

15 January 31, 2019?

16    A. To inform people of the changes that happened

17 and to let them know what was happening in the community

18 in response to it.

19    Q. And when you came up with the name ONgDB, it

20 stood for not just Open Native Graph Database, but in

21 your mind did it also stand for open Neo4j graph

22 database?

23    A. It stood for Open Native Graph DB, and then I

24 think there was an early version of this blog that

25 included some developer humor as a throwback to GNU and

178

1   the Free Software Foundation and its recursive name that

2   I think was cited as part of the original claim that I

3   guess was offensive to Neo, and so we decided, like,

4   that joke might have been in bad taste so we removed it.

5       Q.  Okay.  So in other words, it was just a joke

6   that you -- and you can look at the specific page.  It's

7   4 out of 8 and it's in the second paragraph at the end.

8       A.  Yeah.

9       Q.  It says:

10              "As a throwback to those early

11          days and our beginnings on GNU

12          (remember GNU's not Unix), we decided

13          on the name ONgDB."

14          That's -- do you see where I'm at?

15      A.  Yes, I see where you're at.

16      Q.  The last part of that says "but also ONgDB's

17  Neo4j Graph DB"?

18      A.  Correct.

19      Q.  So that was just a joke?

20      A.  Yes.  We apparently should have resisted the

21  double meaning because it was a bad joke in bad taste.

22          The thing that we cared about was -- it stands

23  for Open Native Graph DB.  That's what we always cared

24  about.  We felt like it needed to be open and it needed

25  to be native and it was a graph.

                                                    179

1  them what would be okay in terms of doing a fork?

2      A.  Unfortunately, because they caused the

3  confusion, they didn't have great answers.  They were

4  sort of the source of it all.

5      Q.  That wasn't my question.

6          My question was did you ever think to go to

7  Neo4j to ask how you can refer to Neo4j as a project?

8      A.  No.  No.  Because I think that they had moved

9  to a place -- I don't know.  Everything -- I don't think

10 there was really much to be -- to be done in terms of,

11 like, how do we talk about the project, Neo4j Community

12 versus Enterprise.  I don't know.  We didn't think -- we

13 didn't think about it.

14     Q.  And you never went to their website to see if

15 there was any guidance on how to refer to Neo4j as a

16 fork?

17     A.  No.  I don't see why that -- I don't see why

18 they would really have an answer on it.

19     Q.  Well, but you remember those trademark

20 guidelines you saw, right, that you looked at?

21     A.  Yeah.

22     Q.  So at least as of when the complaint was filed,

23 Neo4j provided guidance to people that fork Neo4j

24 software, correct?

25         MR. PERNICK:  Objection; misstates the

                                                        181

1    document.  The document speaks for itself.

2         THE WITNESS:  I think we said what we said

3    because it made sense of how to describe the project.

4    BY MR. RATINOFF:

5         Q.  But that's not the question.

6         So my question is, there is guidance that

7    you're now aware of on Neo4j's website explaining how to

8    refer to Neo4j as a fork, correct?

9         A.  So -- sorry.  Are you saying, like, as of today

10   there is guidance?

11        Q.  Yes.

12        A.  Yeah, as of today there is guidance on Neo4j's

13   website that does talk about, like, how to talk about a

14   fork of Neo4j, which is interesting that they put that

15   up there, I guess.

16        Q.  Okay.  And you also testified earlier that you

17   read those trademark guidelines around sometime after

18   the complaint was filed, right?

19        A.  When the case was filed, yeah.

20        Q.  And then you said you testified I believe you

21   went to Neo4j's website and actually found the

22   guidelines, right?

23        A.  Yes, uh-huh.

24        Q.  And you read the guidelines at that time?

25        A.  Yes.

182

1    Q.  Did Graph Foundation change the way it was

2    referring to Neo4j based on those guidelines?

3         MR. PERNICK:  Objection; asked and answered.

4         THE WITNESS:  I don't think the guidelines

5    actually give us a way to talk about the open source

6    Neo4j graph database, do they?  I think it just says you

7    can't do that.  I don't think it -- I don't know.  Do

8    they actually give you a way to do that?

9         MR. RATINOFF:  You reviewed them so you can

10   tell me.  I can bring the exhibit back up.  We'll move

11   on.  If I have time I'll come back to that.

12        Let's go ahead and put this one up here.  This

13   should be Tab 31.

14        (WHEREUPON, Exhibit 24 was marked for

15        identification.)

16   BY MR. RATINOFF:

17   Q.  Let me know when you've got that.  Do you have

18   Tab 31 in front of you?

19   A.  Yes.

20   Q.  So this was printed out on June 10, 2020, from

21   Graph Foundation's GitHub.  You can see that down at the

22   footer there.  And right next to that is Bates number

23   N4J_018645.  Do you see that?

24   A.  Yes.

25   Q.  Do you have any reason to believe this isn't an

183

1    accurate printout from Graph Foundation's GitHub

2    repository?

3         A.   No reason.  It looks right.

4         Q.   All right.  Let's mark this as Exhibit 24.

5              And then looking at the second text box here,

6    it says "Brad Nussbaum commented February 13th."

7              Is that you?

8         A.   Yes.

9         Q.   So -- and that's your user name on GitHub?

10        A.   Yes.

11        Q.   Okay.  Moving down, it says -- you have an

12   entry here on April 13, 2020.  Do you see that?

13        A.   Yes.

14        Q.   It says:

15              "The Graph Foundation can only

16              change the license of source code

17              where it holds the copyright."

18        A.   Yes.

19        Q.   So you understand that only a licensor can

20   change the source code -- I'm sorry -- change the

21   license for its source code, correct?

22        A.   I understand that the Graph Foundation can only

23   change the license of the source code that it holds the

24   copyright to.

25              MR. RATINOFF:  Okay, I'm just trying to skip a

184

1     A.  Yes, I see that.

2     Q.  So what Graph Foundation means by that is it's

3  made fixes that it's aware of in the open -- strike

4  that.

5        Previously you testified that the fixes would

6  come from the community.  Is that also true with

7  Version 3.5.14?

8     A.  Yes.

9     Q.  And was ONgDB 3.5.14 a drop-in replacement for

10  Neo4j 3.5.14?

11     A.  I don't know -- I don't know.  It might -- it

12  might still be.  I'd have to go back and look at the

13  list.  Some of these we stopped noting -- if it was, we

14  noted it as such or the language on the site was as

15  such.

16     Q.  But there's no -- there's no way to know

17  whether the important improvements and fixes in 3.5.14

18  were made in Neo4j's 3.5.14, assuming there is a 3.5.14?

19     A.  Sorry.  No way to know what?

20        MR. PERNICK:  Can you restate that, Jeff.

21        MR. RATINOFF:  Thank you.  That was my --

22  strike that.

23  BY MR. RATINOFF:



24     Q.  What's the -- what's the last version of ONgDB

25  that Graph Foundation believes is a drop-in replacement

186

1   for a closed version of Neo4j?

2      A.  I mean, I think we changed it pretty early on

3   in the 3.5 cycle because after some period of time it

4   gets harder and harder to verify that just because the

5   source code can drift more and more.  So I have to go

6   back and look at what exact date we took that language

7   off of the site, but it's no longer on our current site

8   to describe ONgDB that way.  We changed it to be an

9   open source alternative, so yeah.

10      Q.  You can't pinpoint which version that occurred?

11      A.  I mean, it must have been some time

12   between -- I don't know.  I don't know when it was, when

13   that changed.  I could try to find out, but I don't

14   know.  I'm sure it was between 3.5.4 and 3.5.11.  I

15   think that those are -- yeah, 3.5.4 might have been the

16   last time that we referred to it that way.

17      Q.  But you're not sure?

18      A.  Actually, it's probably pretty close because

19   3.5.4 was October 2019.  Yeah, I don't think we were

20   referring to it all the way then, so by 3.5.11 we

21   weren't.  I think 3.5.4 was the last release I see on

22   here that probably had it.

23      Q.  So looking at the bottom of Tab 39, you see

24   there's a list of different versions of ONgDB.

25      A.  Yes.

187

1     Q.  So as of versions listed here starting

2  after -- I'm sorry, which version was it where you

3  believe -- 3.5.11?

4     A.  It would have been after 3.5.4, I think.

5     Q.  3.5.4.  So after 3.5.4, all these subsequent

6  versions that Graph Foundation no longer referred to

7  ONgDB as a drop-in replacement for the equivalent

8  version of Neo4j?

9     A.  So the statement about it being drop-in

10  replacement was on the main page describing it and we

11  would have taken that language down at a point in time,

12  and that point in time is probably when we felt like

13  it -- we no longer could, you know, maybe reliably

14  guarantee that it was a drop-in replacement.  So the

15  language did get dropped, and I think it's somewhere

16  around the time where we either felt it could no longer

17  be reliably described that way, yeah.

18     Q.  And that was sometime between 3.5.4 and 3.5.11?

19     A.  Well, yeah, yeah.

20     Q.  Yes, it was sometime between --

21     A.  Yeah.  Yes, sometime between that period, I

22  believe.

23     Q.  Why couldn't Graph Foundation continue to refer

24  to ONgDB as a drop-in replacement for Neo4j?

25     A.  I think for the same reasons we said that it

188

```
 1     could be and that, you know, we think it can be a
 2     drop-in replacement as long as the compatibility is
 3     there and other systems can integrate with it on its
 4     interfaces effectively.  I think at some point we become
 5     less and less sure as time moves on and we don't see the
 6     source code from Neo and there's possible drift, so
 7     we -- early on we were able to do, you know, some degree
 8     of testing, although we dropped it into existing 3.5.4
 9     releases.
10           I don't think we -- we had a desire to do that
11     testing for every single release, and so I think for us,
12     later on, it just -- it felt like a harder thing to try
13     to guarantee, and what we wanted to focus on was telling
14     folks that this is going to be divergent and it's going
15     to be forking and not always have to guarantee that it's
16     going to be a drop-in replacement.
17           I mean, just to fast forward, like 4.0, we've
18     seen -- you know, there's so many changes that have
19     happened to core in 4.0 that the odds of ONgDB's 4.0
20     being a drop-in are just very small.  So I think early
21     on, in the early days, we used it because we could
22     demonstrate it and it was true, and as things move on we
23     dropped it because it's just too hard to demonstrate.
24     Q.  Well, I don't want you to guess when that was.
25     If you want, on a break, if it's okay with your counsel,
```

189

1  you're welcome to confirm what version that was at.

2       MR. RATINOFF:  But that being said, I'm going

3  to go ahead and drop in this next exhibit.  I believe

4  it's going to be Exhibit 26.  You should see Tab 41.

5       (WHEREUPON, Exhibit 26 was marked for

6       identification.)

7  BY MR. RATINOFF:

8       Q.  Do you see that?  It should have a Bates number

9  at the bottom, N4J_018732.  It's a printout dated

10  6/10/2020 from the Graph Foundation's website.

11       Do you see that?

12       A.  Yes.

13       Q.  And this is the page for ONgDB 3.6.0-RC1,

14  correct?

15       A.  Yeah.  This is the landing page for ONgDB,

16  yeah.

17       Q.  And so there is no Neo4j 3.6, correct?

18       A.  To our knowledge, correct.  Neo4j's never

19  released a 3.6 version.

20       Q.  So at this point, ONgDB 3.6.0, this is in your

21  mind a divergent fork of Neo4j?

22       A.  Most definitely.

23       Q.  And it wouldn't be accurate to describe it as a

24  drop-in replacement at this point?

25       A.  3.6 is definitely not a drop-in replacement.

190

1    Q.  And you wouldn't describe 4.0 as a drop-in

2    replacement either?

3    A.  I mean, because Neo4j has released a 4.0, it's

4    possible that it can be, but it's very unlikely.  I

5    don't know that we want to take the effort to prove it

6    so that we can say it is such.

7    Q.  Okay.  Do you know offhand which entities are

8    using ONgDB currently?

9    MR. PERNICK:  I'm going to object; vague.

10    Are you asking him whether he knows every

11    entity or what entities he knows?

12    MR. RATINOFF:  What entity.

13    MR. PERNICK:  So --

14    BY MR. RATINOFF:

15    Q.  Let me ask the question:  Which entities are

16    you aware of that are currently using ONgDB?

17    A.  I think we know that there are -- that the IRS

18    is using it.  I think what we sent in some emails, I

19    think Tufin is using it.  There's handfuls of

20    individuals.  I think, like, our one donor, Liquan I

21    think is his name, I think he's using it.  He donated.

22    I think I had a small conversation with him about it.

23    There's various people in the Slack channel that we have

24    that are using it.

25    Q.  Okay.  Actually, before we -- I'm going to show

191

1   and accurate printout from AtomRain's website?

2        MR. PERNICK:  So Mr. Nussbaum is not here to

3   testify on behalf of AtomRain.

4        MR. RATINOFF:  I understand.  I'm asking him

5   whether -- he's got his own personal knowledge since he

6   works for AtomRain, so to the extent he knows

7   personally, I think that's fairly imputed on Graph

8   Foundation.  I'm not going to be asking questions from

9   AtomRain's perspective.

10       MR. PERNICK:  Okay.

11       THE WITNESS:  Yes, this appears to be a

12   printout of AtomRain's site.

13  BY MR. RATINOFF:

14       Q.  And AtomRain, is that a company that utilizes

15  ONgDB?

16       A.  To the best of my knowledge, does work --

17  consulting work that involves Neo4j and ONgDB.

18       Q.  So I'm just going to run through these various

19  entities here.  I'll start with Sony pictures.  Do you

20  know if Sony pictures is using ONgDB?

21       A.  No.  And I doubt any of these -- most of these

22  companies are probably not.  A few of them might be.

23       Q.  Okay.  So which ones do you understand are

24  using ONgDB?

25       A.  I think Tufin and the IRS, yeah.

194

1    Q.   The Department of Defense?

2    A.   I don't think so, no.

3    Q.   No entities fall within the Department of

4    Defense?

5    A.   I'm sorry.  No what?

6    Q.   No entities or agencies fall within the

7    Department of Defense?

8    A.   No.

9    Q.   US Air Force using ONgDB to your knowledge?

10   A.   Not that I know of.

11   Q.   UBS, are they using ONgDB?

12   A.   No.

13   Q.   WiserCare, are they using ONgDB?

14   A.   Again, none of these except for Tufin and IRS

15   are the ones that I know are.  Oh, yeah, and Cyber GRX

16   is on this list.

17   Q.   Cyber GRX?

18   A.   Yeah.

19   Q.   Where is that?  Okay, I see.  They've got the

20   little logo in the middle there.

21        I think you had mentioned some other entities

22   that aren't on here.  Do you know who Next Century is?

23   A.   Next Century?

24   Q.   Yeah.

25   A.   Like, do I personally know who they are as a

195

1   company, or are you asking if I know that they're using

2   ONgDB?

3       Q.  Do you know -- well, I guess one follows the

4   other.  Do you know who at Next Century is, as a

5   company?

6       A.  The name sounds familiar.  I think there was an

7   email or something from them.  Are they a gov company or

8   something?

9       Q.  I don't know.  I'm just asking if you know who

10  they are.

11      Do you know if they're a user of ONgDB?

12      A.  I don't, no.

13      Q.  AdForm, do you know who AdForm is?

14      A.  I think I had one email with them, yes.  I

15  mean, I know they are a company.

16      Q.  Are they using ONgDB?

17      A.  I don't know.

18      Q.  How about Soft Strategy, do you know who

19  Soft Strategy is?

20      A.  Soft Strategy, the name sounds familiar.  I

21  don't know them deeply or anything.

22      Q.  Okay.  I've lost my chat apparently so I'm just

23  going to throw this up again.  And this was previously

24  marked as Exhibit -- unfortunately, I don't have the

25  exhibit number.  Tab 10 was previously marked as

    196

(99 of 299), Page 99 of 299 Case: 24-5538, 12/23/2024, DktEntry: 18.9, Page 99 of 299
Case 5:22-cv-01282-EJD Document 103 Filed 01/19/21 Page 73 of 136
BRAD NUSSBAUM                                                    October 16, 2020

```
 1    Exhibit 9.  I just re-dropped it here for your
 2    convenience.  And I'll direct your attention to page 17
 3    out of 180.  Are you there?
 4         A.  Yes.
 5         Q.  It states toward the bottom of the page:
 6              "GFI has identified the
 7         following entities or individuals
 8         that may have downloaded ONgDB."
 9         Do you see that?
10         A.  Yes.
11         Q.  So there's -- Next Century is listed there,
12    Soft Strategy, AdForm.  Do you see those three names?
13         A.  Yes.
14         Q.  Does that refresh your recollection as to
15    whether they're using ONgDB?
16         A.  So these are individuals that we -- that we've
17    shared emails with, so I mean, I think our assumption is
18    that they're using ONgDB still, but GFI doesn't track
19    that usage.  So at some point in time they've contacted
20    us or made it seem like they would use it.
21         Q.  Then you already mentioned Tufin, I believe you
22    testified, is using ONgDB and so is the US Department of
23    Treasury, correct?
24         A.  Yeah.  Yes.
25         Q.  Is there any other government agencies that
```

197

1    you're aware of that are using ONgDB?

2        A.  No.

3            MR. RATINOFF:  Okay.  Let me go ahead and jump

4    ahead here.  I'm going to go ahead and drop in another

5    exhibit.

6            (WHEREUPON, Exhibit 28 was marked for

7        identification.)

8    BY MR. RATINOFF:

9        Q.  Do you see this email?

10       A.  Yes.

11       Q.  It looks like it's an email to you.

12       A.  Yes.

13       Q.  It says "Hello Brad."  I'm going to skip to the

14   second sentence.  It says:

15               "I am currently leading the

16           Graph Database team responsible for

17           deploying an ONgDB-based solution

18           into production."

19           Do you see that?

20       A.  Yes.

21       Q.  Does that refresh your recollection as to

22   whether Next Century is using ONgDB?

23       A.  I mean, I guess that's what he said so I assume

24   that's correct.  I assume they are.

25       Q.  Have you had any further correspondence with

198

1   Q.  So you never had, like, a video conference or

2   telephone call after COVID hit?

3       A.  No.

4       MR. PERNICK:  Can you restate -- were you

5   asking just with respect to him or with anyone ever?

6       MR. RATINOFF:  Well, with AdForm.  I'll ask the

7   question to be clearer.

8   BY MR. RATINOFF:

9       Q.  After this email, you never had any telephone

10  calls or Zoom conferences with AdForm?

11      A.  No.  I don't remember -- this one I just

12  remember kind of dying somewhere around that time, but

13  there might have been, like, one or two more exchanges,

14  but I think it just kind of died at some point.

15      MR. RATINOFF:  Okay, I'm just going to drop

16  this next one in.  It's Tab 103.  Mark this as

17  Exhibit 30.

18      (WHEREUPON, Exhibit 30 was marked for

19      identification.)

20  BY MR. RATINOFF:

21      Q.  Do you recognize this as Exhibit 30?  Sir?  Are

22  you still reading the document?  Sorry.

23      A.  Yes.  Yep, I've got it.

24      Q.  Actually, if you hover your cursor over your

25  name at the top there, it should be a hyperlink.  If you

200

1   hover over there, it should say -- I'll just do a screen

2   share so we'll be on the literal same page.

3       A.  Yeah.

4       Q.  So you should be seeing the same email now.

5       A.  Yes.

6       Q.  And if I hover over your name there, it says

7   mailto:brad@graphgrid.com.

8       A.  Yes.

9       Q.  Do you see that?

10      A.  Yes.

11      Q.  Below your email address is

12  brad@graphfoundation.org.  Do you see that?

13      A.  Yes.

14      Q.  Do you use your GraphGrid email sometimes to

15  communicate about Graph Foundation business?

16      A.  No.

17      Q.  So why is there a graphfoundation.org address

18  on that prior email and you've got your response from

19  brad@graphgrid?

20      A.  Because I think we answered all the questions

21  they had that were about open source and they wanted

22  help with a five-day boot camp, I think.  They wanted

23  some kind of services and the foundation doesn't offer

24  any services.

25      Q.  So that would be GraphGrid that offers that

201

```
 1    services?
 2         A.  Yeah, GraphGrid does offer services like that
 3    so it was a redirect.
 4         Q.  You didn't forward this email to your GraphGrid
 5    account, though, right?
 6         A.  I believe it was, yeah.
 7         Q.  Oh, okay.  Does it say forward?
 8         A.  It was included or sent in there.  I don't -- I
 9    don't know.
10         Q.  Did this training ever happen, this boot camp?
11         A.  No.  No, it didn't.
12         MR. RATINOFF:  Okay.  Let me go ahead and mark
13    the next exhibit.  This is Tab 48 which I'll mark as
14    Exhibit 31.  So my screen share should stop.  You should
15    be able to download this new document.
16         (WHEREUPON, Exhibit 31 was marked for
17         identification.)
18    BY MR. RATINOFF:
19         Q.  Can you see this document?  It should be an
20    email that's from Benjamin Nussbaum to John Mark Suhy
21    and cc'd to Bradley Nussbaum.  Do you see that?
22         A.  Yes.
23         Q.  And again, these are your AtomRain email
24    addresses.  Is there any reason to believe you didn't
25    receive this email in your AtomRain email account?
```

202

```
1      Q.  Did AtomRain -- did you at AtomRain ever hand

2    off potential users to Graph Foundation?

3           MR. PERNICK:  Objection; vague.

4           THE WITNESS:  What do you mean by hand off

5    potential users?

6    BY MR. RATINOFF:

7      Q.  Well, I'll use the words -- I'm using the words

8    in the email that was sent to you which you said you

9    received.

10          So what did you understand "To continue the

11   conversation, do you want to hand off to someone at the

12   foundation," what did you understand that to mean?

13          MR. PERNICK:  Objection; vague; calls for

14   speculation.

15          THE WITNESS:  I think at times we tried to

16   figure out whether or not -- because, obviously, all of

17   us are wearing a lot of hats, so I think if a

18   conversation was better to be handled by somebody from

19   the foundation, I think that's -- that's all that was

20   intended was to say should somebody from the foundation

21   be contacting them about discussing the open source

22   project.

23          MR. RATINOFF:  Okay.  I'm going to drop another

24   document in here.  This is Tab 50, and I'm going to mark

25   this as Exhibit 32.
```



204

```
 1              (WHEREUPON, Exhibit 32 was marked for
 2         identification.)
 3    BY MR. RATINOFF:
 4         Q.  Do you have this open?  This is an email that
 5    was produced by your attorney.  It's dated February 19,
 6    2019, and the beginning Bates number GFI000071.
 7              Do you recognize this email?
 8         A.  Yes.
 9         Q.  I'm hovering over your email address.  It looks
10    to be from your Graph Foundation email account; is that
11    correct?
12         A.  Yes.
13         Q.  You can scroll down.  This is a pretty lengthy
14    email chain so kind of takes off from where the other
15    one ended.  So I'm going to have you scroll down to your
16    email that you sent on February 19, 2019, at 9:07.
17              Do you see that?
18         A.  Okay.
19         Q.  It says:
20              "Our intent is to move ONgDB
21              forward in a fully open source
22              manner governed by The Graph
23              Foundation (nonprofit)."
24              Do you see that?
25         A.  Yes.
```

205

1    Q.  Has Graph Foundation applied for a copyright

2    for any source code that's in ONgDB?

3    A.  Have we applied for a copyright?  What do you

4    mean by that?

5    Q.  Literally filing a copyright application for

6    source code for ONgDB.

7    A.  Oh, no, we have not filed a copyright

8    application.  I'm not sure if we would need to file

9    that.

10   Q.  Moving up to the next email -- this would be

11   from Shahak Nagiel -- I hope I said his name

12   correctly -- February 19, 2019, at 10:46.

13       Do you see that?

14   A.  Yes.

15   Q.  He says:

16           "Nice to meet you as well.

17       Could you please elaborate on this

18       sentence:  'And when Neo4j realized

19       that the additional Commons Clause

20       didn't prevent usage of enterprise

21       features, it made the ultimate

22       decision to remove all enterprise

23       modules.'"

24       Do you see that?

25   A.  Yes.

207

1    Q.  And what did you understand that to mean?

2    A.  I think that's a quote that's taken from my

3    blog post, but I'm not sure.  I'm not sure where that's

4    from, actually, but -- actually, I'm not sure where that

5    came from.

6         I think -- I think it means that at some point

7    I believe that Neo4j realized that a developer had just

8    put in the Commons Clause and didn't really understand

9    licensing and they were still hoping to appear

10   open source and deceive the community, because I think

11   open source has gained them a lot, but then at some

12   point they kind of realized that, you know, they

13   couldn't pretend to be under AGPL any more and still

14   secretively, like, try to tack on the Commons and

15   somehow be closed.  So this is just a simplified way of

16   saying that they realized it didn't work and so they

17   close-sourced it.

18   Q.  You're just speculating why Neo4j went close

19   core, correct?

20   A.  Not why they went close core, but I would say

21   speculating -- yeah, yeah, I would say speculating.

22   That was our belief that they realized it must not have

23   worked.

24   Q.  So you have no personal knowledge as to why

25   Neo4j added the Commons Clause?

208

 1          A.   No.

 2          Q.   You have no personal knowledge as to why Neo4j

 3     went open core with its community and closed on

 4     enterprise?

 5          A.   No, not more than what they said publicly.

 6     Yeah, we speculated that it was because of that.

 7          Q.   So then the last would be the top, the last

 8     email in the string says:

 9                    "The Free Software Foundation,

10               which owns the rights to AGPLv3

11               license and its use, reviewed the

12               Commons Clause that had been added

13               and determined that it was not valid.

14               AGPLv3 has clauses preventing

15               additional clauses from being added

16               and still licensing under the AGPLv3

17               license."

18          Do you see that?

19          A.   Yes.

20          Q.   The Free Software Foundation didn't actually

21     determine that the Commons Clause was improperly added,

22     correct?

23          A.   No, I think they determined that.

24          Q.   They didn't give a legal opinion.  That was

25     your prior testimony.

                                                              209

1     A.   Correct.  I don't think I told him that they

2   gave a legal opinion, did I?

3     Q.   You're just extrapolating?

4     A.   Yeah, correct.  I think I'm surmising the

5   response that was given to us.

6     Q.   They never expressly stated that the

7   Commons Clause not to be valid, correct?

8     A.   They never expressed a legal opinion.

9     Q.   Is there an email anywhere where the Free

10   Software Foundation made a determination that the

11   Commons Clause added to the Neo4j AGPL was invalid?

12        MR. PERNICK:  Objection; asked and answered.

13        THE WITNESS:  Yeah, I think I answered.  I

14   think what they responded stands on its own.

15        MR. RATINOFF:  Can you please read back the

16   question.  I'm entitled to an answer.  It's actually a

17   different question because he's using the word valid.

18   I'm just using the language.

19        (Record Read.)

20        MR. PERNICK:  Objection; asked and answered and

21   vague.

22        THE WITNESS:  Yeah, I mean, this is obviously a

23   way of giving a summary that's maybe more plain

24   language.  So the Free Software Foundation did not use

25   those exact words, but the answer they did give us

210

1   might have something in another one that he forwarded,

2   I'm not sure.  It may have been something that I just

3   heard over the phone too.  I heard of a discussion that

4   happened.

5        So of my present knowledge, I'm aware of a

6   discussion that happened within the IRS and that they

7   went through a process and they ultimately determined

8   that they could use ONgDB.

9        Q.  How did you learn that?

10       A.  I think, like I said, it was either through a

11  series of calls and/or there may have been an email

12  forwarded to some account.  I personally learned about

13  it in some way.

14       Q.  How did you personally learn it?  Was it from

15  John Mark?

16       A.  I believe he was one of the individuals that

17  was involved in the discussions.  I don't know if it was

18  him that actually forwarded things out or I was talking

19  with on calls.  I'm not sure.  Maybe I learned of it

20  secondhand through Ben, but I became aware of it.

21       MR. RATINOFF:  So then I'm going to go ahead

22  and drop down Tab 53, and this will be Exhibit 34.

23       (WHEREUPON, Exhibit 34 was marked for

24       identification.)

25  BY MR. RATINOFF:



218

1    Q.  I'll just represent this was produced by your

2    counsel.  And it's cut off the rest of the trailing

3    email here, but if you look at the -- if you look at the

4    date and timestamp in the words there, do you agree it

5    matches up to the prior Exhibit 33?  That would be

6    Tab 51 in your chat.

7    A.  Yeah, this looks like my response to him.  Yes.

8    Q.  You have no reason to believe it's not your

9    response to the prior email asking for an additional

10   opinion?

11   A.  No.

12   Q.  And here you state:

13        "ONgDB is currently in use

14        at US Treasury (IRS).  Their legal

15        counsel conducted a thorough

16        evaluation of the licensing

17        situation and arrived at the

18        conclusion that Graph Foundation

19        distributions of ONgDB could be used

20        without needing a Neo4j Inc. license."

21   Do you see that?

22   A.  Yes.

23   Q.  So you just said at this time you didn't have

24   any personal knowledge of that opinion, correct?

25   A.  No.  I think I said I did, I heard of it.

219

 1        Q.  Right, but you never heard directly from the
 2   IRS that -- about their conclusion that Graph Foundation
 3   distributions of ONgDB could be used without needing a
 4   Neo4j Inc. license, correct?
 5        A.  I -- no.  I mean, I heard the general
 6   conclusion that I stated right in here.  This is the
 7   conclusion that I heard.
 8        Q.  But you didn't hear that from the IRS?
 9        A.  Sorry.  What are you getting at?  I mean, I
10   heard it through individuals that were in the
11   conversations.
12            So what are you trying to say, that that's not
13   good enough or --
14        Q.  I'm just asking a question.  I don't need to
15   explain what the purpose of my question is.
16        A.  Okay.
17        Q.  Let me ask you the question again.
18        A.  Okay.
19        Q.  Did you directly receive a communication from
20   the IRS expressing that the IRS could use ONgDB without
21   needing a license from Neo4j?
22        A.  I personally do not recall receiving a direct
23   communication from my Graph Foundation email from the
24   IRS.
25        Q.  Okay.  I'm not asking about your Graph

                                                        220

1   answer without it being couched in a different way.  I

2   mean my question is being misstated.  I didn't say

3   direct communication, I didn't say email.  I said simply

4   personally communicated with.  That can mean email,

5   telephone or whatever.

6          MR. PERNICK:  We understand the question.  Did

7   he have a communication from an IRS person with this

8   information, whether in an email, a cc of an email,

9   anything.  The answer right now is he doesn't recall.

10          MR. RATINOFF:  Well, I want to hear his answer.

11   I would like to have the question read back and then

12   I'll get his answer, now that you've completely coached

13   him.

14          (Record Read.)

15          THE WITNESS:  Based on what I recall, no, I did

16   not directly communicate with them.  I believe it came

17   through a forward from or a conversation through some

18   other person that was directly there.

19          MR. RATINOFF:  Okay, I'm going to put up the

20   next exhibit.  This is Tab 54 which would be Exhibit 35.

21          (WHEREUPON, Exhibit 35 was marked for

22      identification.)

23   BY MR. RATINOFF:

24      Q.  Do you see this email?  It should end with the

25   email at the top February 19, 2019, 11:57:33 a.m.

226

1           Do you see that?

2       A.   It's coming up.  Okay.

3       Q.   So let's go ahead and go down to the second

4   email in this chain.  It's on February 19, 2019, at

5   15:04.  Do you see that?

6       A.   Okay.

7       Q.   Is it fair to say that this is the direct

8   response to the last email we were discussing,

9   Exhibit 33 -- I'm sorry -- Exhibit 34?  Yes?

10      A.   Yes.

11      Q.   And Shahak says:

12           "Aha, any chance I could get

13       a copy of that?"

14       Do you see that?

15      A.   Yes.

16      Q.   Your response is:

17           "It was an internal review so

18       there isn't a document that can be

19       distributed."

20       Do you see that?

21      A.   Yes.

22      Q.   And then is that statement it was an internal

23   review based on your knowledge gained through someone

24   else other than the IRS?

25      A.   More than likely yes.  As per what we just said

227

1    before, I think yeah.

2        Q.  You said there might be an email, and now that

3    you're saying in this email, Exhibit 35, it was an

4    internal review so there isn't a document that can be

5    distributed.  So you never received an actual written

6    evaluation from the IRS, either directly or indirectly,

7    about whether they could use ONgDB without any Neo4j

8    license, correct?

9        A.  This statement simply means that the decision

10   that the IRS made, they determined -- they did so

11   internally and those conversations are not intended for

12   public distribution or just generally to be re-sent.

13       Q.  And you weren't privy to those conversations

14   with the IRS, correct?

15       A.  What do you mean by I was privy to them?  I

16   think we've established that I did know these

17   conversations were happening and I understood the

18   outcome.

19       Q.  Right.  My question is you didn't participate

20   personally in the internal IRS discussions regarding

21   evaluating whether ONgDB could be used without a Neo4j

22   license, correct?

23       A.  Correct.  I did not participate in the

24   discussions.

25       Q.  Okay.  Thank you.

                                                        228

1    MR. RATINOFF:  Let me go ahead and drop the

2    next Tab 44.

3        (WHEREUPON, Exhibit 36 was marked for

4        identification.)

5    BY MR. RATINOFF:

6    Q.  Do you see Tab 44?  We'll mark this as

7    Exhibit 36.

8    A.  Before we move on, just for the record, when

9    you say participate, I want to make sure that it's very

10   clear that you meant, like, actively participating in

11   the discussion, not participating in the extent we were

12   just discussing about receiving information that we

13   still need to confirm.

14   Q.  Okay, I'm going to strike that.  There's no

15   question pending so the record will say what the record

16   says.

17       THE WITNESS:  John, can you make a note that to

18   maybe go back and look at that.

19       MR. PERNICK:  Brad, if we need to clarify a

20   question, I can address it or we can address it in

21   review.

22   BY MR. RATINOFF:

23   Q.  So you should be looking at a printout from

24   community.neo4j.com.  Do you see what's in front of you?

25   The first Bates number page would be N4J-GFI_00008.

229

1         Do you see that?

2     A.   I'm sorry.  Where are we at?

3     Q.   It should be Tab 44 in the chat.

4     A.   Yes, I have that open.

5     Q.   Do you recognize this document?

6     A.   Not immediately.

7     Q.   Take a second to review it and let me know when

8   you're finished.

9     A.   Okay.  Yeah, all right.

10    Q.   You're done looking at it?

11    A.   Yes.

12    Q.   Do you recognize Exhibit 36?

13    A.   Yes.

14    Q.   What is Exhibit 36?

15    A.   I think this is a conversation that is taken

16  from the Neo4j online community site.

17    Q.   And how did you come to learn of this?

18    A.   I think this was shared in the case at some

19  point.

20        MR. RATINOFF:  And let me go ahead and mark the

21  next exhibit.  It should be Tab 45 coming up on your

22  chat.

23        (WHEREUPON, Exhibit 37 was marked for

24     identification.)

25  BY MR. RATINOFF:

                                                          230

1    Q.  And then I'll mark this as Exhibit 37.  This

2    was produced by iGov, and it's got the Bates number

3    IGOV0001570054.  And I'll direct you to the top cc line.

4    It says Brad Nussbaum and it's brad@atomrain.com.

5         Do you see that email?

6    A.  Yes.

7    Q.  Do you have any reason to believe you didn't

8    receive this email in your AtomRain account?

9    A.  No.

10   Q.  And if you go ahead and look down at the web

11   address in the bottom email, do you see that?

12   A.  Yes.

13   Q.  And so this -- let's go back to Exhibit -- the

14   prior exhibit here, the Neo4j Desktop versus Neo4j

15   Server.  Do you see that?

16        Would you agree, other than the last portion of

17   the web address in the prior exhibit, it's the same

18   address, web address?

19   A.  It appears to be the same.

20   Q.  If you're not comfortable, feel free to click

21   on it.

22   A.  Yes, it looks the same.

23   Q.  So you said it was produced in the case, but do

24   you believe now that you received this -- reviewed this

25   posting on Neo4j's community site via this email?

231

1    A.  I received this email.  This would have come

2    into my account.  I see Ben responded to it.  I'm not

3    sure if this is one I missed.  I probably saw it.  I

4    don't know, is this something I responded to?

5    Q.  Going back to the Neo4j Desktop versus Neo4j

6    Server, the prior exhibit, do you see where it says "Do

7    the terms of use for 'Neo4j Desktop' apply to the ONgDB

8    server which I downloaded under AGPLv3 license"?  Do you

9    see that?

10   A.  Yes.

11   Q.  What -- what do you understand that to mean?

12   A.  I think they're asking whether they can use the

13   Neo4j desktop tool, which is a tool, as I understand it.

14   I think they're trying to figure out if they can use

15   that with ONgDB.

16   Q.  Is there an ONgDB server?

17   A.  ONgDB is a server application.

18   Q.  So there's not -- I'm sorry.  Go ahead.

19   A.  Just like Neo4j is a server.

20   Q.  It's not a stand-alone ONgDB server that

21   someone or anyone can use, you actually have to create

22   your own using the software?

23   A.  No, there's a stand-alone server.  That's what

24   we distribute.  That's the same as the Neo4j server.

25   They're both server technologies.

232

1     Q.  As of November 16, 2018, did Graph Foundation

2  have an ONgDB desktop application?

3     A.  No, Graph Foundation does not have a Neo4j -- a

4  desktop application.

5     Q.  Has Graph Foundation ever tested to see whether

6  the Neo4j desktop application would work with ONgDB?

7     A.  I don't think I have ever tested that, no.

8     Q.  When you say I, you mean Graph Foundation?

9     A.  Yeah, Graph Foundation has not tested that.

10  No, that's not something we support currently.

11     MR. RATINOFF:  Okay.  Let me go ahead and put

12  the next exhibit up.  It should be Exhibit 38.  Tab 58

13  is Exhibit 38.

14     (WHEREUPON, Exhibit 38 was marked for

15     identification.)

16  BY MR. RATINOFF:

17     Q.  Let me know when you've had a chance to review

18  Exhibit 38.

19     A.  I've got it.

20     Q.  Do you recognize this printout?

21     A.  Yes.

22     Q.  Is this a tweet that was put out by the Graph

23  Foundation on March 17, 2019?

24     A.  Yes.

25     Q.  Okay.  Looking at the tweet here, there's -- it

233

1    says #ONgDB, then in parens it's #FOSS.  What does FOSS

2    stand for?

3        A.   Free open source software.

4        Q.   Then there's a #Neo4j Enterprise.

5        A.   Yes.

6        Q.   So are you using that hashtag to refer to the

7    Neo4j's Enterprise Edition?

8           MR. PERNICK:  Objection; vague.

9           THE WITNESS:  I'm sorry.  What?  I think we're

10   including hashtags again because there's topics ONgDB

11   free open source software and Neo4j in this tweet.

12   BY MR. RATINOFF:

13       Q.   So you're referring to ONgDB Version 3.5.3 in

14   this tweet?

15       A.   ONgDB 3.5.3.  Yeah, it's a support release.

16       Q.   And you're not referring to Neo4j Enterprise

17   3.5.3?

18       A.   Correct.

19       Q.   Why did you use a hashtag in the middle of

20   ONgDB 3.5.3?

21          MR. PERNICK:  I'm sorry.  Can you repeat that.

22          THE WITNESS:  What do you mean in the middle

23   of --

24   BY MR. RATINOFF:

25       Q.   You've got ONgDB -- let me ask the question

234

```
 1   again.
 2        So you see it says ONgDB and there's the parens
 3   with Neo4j hashtag and then after the close parens it's
 4   3.5.3.  Do you see that?
 5        A.  Uh-huh.
 6        Q.  Why are you referring to Neo4j Enterprise in
 7   the middle of ONgDB 3.5.3?
 8        A.  To help give people that don't know what ONgDB
 9   is an opportunity to learn about it and learn more, to
10   get a quick idea of what it is.
11        Q.  So you're using the Neo4j hashtag to draw
12   attention to ONgDB 3.5.3?
13        MR. PERNICK:  Objection; vague; misstates
14   testimony.
15        THE WITNESS:  I think what I said is that it's
16   a topic that Neo4j users may be interested in to see
17   that there are -- there are releases coming out
18   consistently of ONgDB.  That's how users know that
19   software is being maintained.
20        MR. RATINOFF:  That wasn't my question.  I'll
21   ask it again.  Actually, why don't you go ahead and read
22   it back, please.
23        (Record Read.)
24        MR. PERNICK:  Objection; misstates testimony.
25        THE WITNESS:  I don't think that's a question.
```

235

BY MR. RATINOFF:

Q. Well, actually, it is, and I'll just ask it again.

So are you using Neo4j -- the Neo4j hashtag to draw users to ONgDB 3.5.3?

A. I think the answer I've given applies. We're using the Neo4j hashtag to inform users about ONgDB, Neo4j users that may be interested in understanding that there's a free open-source version that's being maintained and released. That's something generally that people in the open source community want to know.

Q. Could you have referred to Neo4j Enterprise without the hashtag?

A. Is it possible to write a tweet without a hashtag, yes.

Q. That's not my question.

Would it have been sufficient to put this tweet out with using Neo4j Enterprise without the hashtag?

MR. PERNICK: Objection; vague.

THE WITNESS: The Neo4j hashtag is a hashtag that has been used for many years for people in the Neo4j community and around the project to see important things around the project.

BY MR. RATINOFF:

Q. You're not directing people to Neo4j, you're

236

1    directing people to ONgDB with the Neo4j hashtag,

2    correct?

3         A.   The Neo4j hashtag is a topic.  Neo4j is a topic

4    in this case, so we're directing people that are

5    interested in that topic to ONgDB and the support

6    release.

7         Q.   I'm sorry.  Go ahead.

8         A.   No, that was it.

9         Q.   You understand Neo4j is a trademark of Neo4j

10   Inc., correct?

11        A.   I think we've established that I understand now

12   that Neo4j is a trademark, yes.

13        Q.   I think we established you knew that before the

14   lawsuit, too, so let me ask that again.

15             You understood at this time of this tweet that

16   Neo4j was a trademark owned by Neo4j Inc., correct?

17        A.   Yes.  Yes, Neo4j is a trademark, yes, of Neo4j

18   Inc.

19        Q.   And you knew that at the time you made this

20   tweet on March 17, 2019, correct?

21        A.   Yes.

22        Q.   And I know you keep changing my question.  What

23   do you mean it's a topic of discussion?  Neo4j hashtag

24   is a topic of discussion, what do you mean by that?

25        A.   Do you see on the left how it says # Explore?

237

1   On Twitter's site, you use hashtags to explore topics of

2   interest.  You hashtag something when you want to be

3   able to find topics of interest.  So Neo4j for a long

4   time has been understood by the community as a topic on

5   Twitter.  People talk about what they're doing in the

6   community by hashtagging Neo4j in their tweets.

7       Q.  In order for someone to search this topic,

8   would they tag just Neo4j in the search Twitter window

9   right here?  I'm looking right above where you're

10  referring to.

11      A.  There are a lot of ways that people can search

12  Twitter and find information.  Tagging is one way that

13  you can help surface information that's relevant to the

14  right people, as I understand it.

15      Q.  So would I have to type in #Neo4j to search

16  Twitter to come up with this tweet?

17      A.  You could just be looking at all -- a lot of

18  the tweets that are under that hashtag.  I don't know

19  all the ways that Twitter surfaces what you do when

20  you -- you know, you put a hashtag in something, but it

21  uses it to help direct people to relevant information.

22      Q.  So if I click on the Neo4j hashtag, is it your

23  understanding that would just bring up all the tweets

24  that have Neo4j hashtag in it?

25      A.  I think that's roughly how that works.  It

238

1   might be filtered based on preferences and stuff.  I

2   don't think it's the exact, like, time list or anything.

3       Q.  So if you use Neo4j without the hashtag and

4   someone in another tweet clicked on #Neo4j, it wouldn't

5   necessarily pull up this tweet, right?

6       A.  Without doing a hashtag, it would just be a

7   text field.

8       Q.  Is there anything in this tweet that

9   differentiates ONgDB from -- I'm sorry, strike that.

10      Is there anything in this tweet that

11  differentiates ONgDB 3.5.3 from Neo4j Enterprise?

12      MR. PERNICK:  Object.  The document speaks for

13  itself.

14      THE WITNESS:  What we've linked here says it's

15  open source.  I think it's free open source.  I think,

16  you know, it's different and it says ONgDB so it looks

17  to me like it's different.  It's talking about ONgDB

18  3.5.3.

19  BY MR. RATINOFF:

20      Q.  That's in the link, but in the top here there's

21  nothing that suggests Neo4j Enterprise is a separate

22  product from ONgDB 3.5.3, right?

23      MR. PERNICK:  Objection; misstates the

24  document.  The document speaks for itself.

25      MR. RATINOFF:  He can speak to what the

239

1    document means to him.

2         THE WITNESS:  To me, I read the document and it

3    says ONgDB 3.5.3, so I think it's talking about ONgDB

4    3.5.3, and then in parentheses saying this is free

5    open source Neo4j Enterprise.  So if you look at other

6    tweets and if you look at the site, you can get an idea

7    more about what's there.  Not every tweet is meant to be

8    self-encompassing in every way.  If you look at the

9    Graph Foundation Twitter feed in context, you'll see

10   other tweets about changes that have been happening, so

11   this naturally rolls out in that story.

12        MR. RATINOFF:  Let me go ahead and mark -- the

13   next exhibit will be Exhibit 39.  It will be Tab 60.

14        (WHEREUPON, Exhibit 39 was marked for

15        identification.)

16   BY MR. RATINOFF:

17        Q.  Do you have that?  Do you have Tab 60 which

18   is -- I'm going to mark as Exhibit 39 in front of you?

19        A.  Okay, I see it.

20        Q.  So this is a printout from Twitter, a tweet

21   from the Graph Foundation dated May 10, 2019.  Do you

22   have any reason to believe this wasn't sent out at that

23   point?

24        A.  No.

25        Q.  And again, this looks like a very similar tweet

240

1    to the one we just looked at in Exhibit 38.  It seems to

2    be referencing just a different version of ONgDB.

3         Is that fair?

4         A.  Yes.

5         Q.  And so again, you're using a Neo4j hashtag in

6    between words -- or ONgDB and 3.5.4, correct?

7         A.  Yes.

8         Q.  And why are you using a Neo4j hashtag in this

9    tweet?

10        A.  I think this -- so this is just a template for

11   how we send out our releases.  Again, support releases

12   are something that shows activity on a project, so this

13   is consistently drawing everybody and bringing awareness

14   that the project is being maintained and developed.

15        Q.  Is it fair to say, though, you could have drawn

16   attention to ONgDB without #Neo4j?

17        A.  I think the three things that we decided we

18   wanted to try to raise awareness in was ONgDB as our

19   main tag, free open source software as a tag that people

20   look at when they're just looking for FOSS, because it's

21   a thing, and then to everybody in the Neo4j community,

22   so those three things are things that we felt, you know,

23   for people on Twitter we wanted to try to raise

24   awareness to the maintenance of the project and that it

25   existed and that it was being developed.

                                                          241

1    Q.   So you believe that ONgDB wasn't really readily

2    identifiable at this point as a standalone product?

3    A.   I mean, ONgDB has -- you know, like anything,

4    it was -- it's newly created and so you -- you know, you

5    have to let people know that it exists, just like --

6    just like anything so people that are in the community

7    that -- there's a lot of people in the community that

8    didn't -- that may to this day still don't know that

9    they have options and they have choice.  You know, it's

10   a sad thing that Neo has never told anybody they have a

11   choice, so we do what we can to try to tell people they

12   have choice and freedom.

13       Q.   Although -- strike that.

14       Let me ask this question:  So by using a Neo4j

15   hashtag, you were hoping to draw more attention to the

16   ONgDB; is that correct?

17       MR. PERNICK:  Objection; vague.

18       THE WITNESS:  I think you've asked that before.

19   BY MR. RATINOFF:

20       Q.   Different document.

21       A.   I think the answer is the same.

22       Q.   Okay.  Well, let me ask the question again

23   because this is a new document.

24       So it's Exhibit 39.  You're using the Neo4j

25   hashtag to draw more attention to ONgDB's new release,

242

1    correct?

2        A.  I think I've given a description of why we use

3    hashtags.  We use hashtags so that people that are

4    looking at that hashtag that are interested in Neo4j can

5    also learn about ONgDB and the support releases that

6    we're making so that they can see an actively maintained

7    project.

8            MR. RATINOFF:  Can you read my question back

9    because I don't think that was an answer.

10           (Record Read.)

11           MR. PERNICK:  I believe he's answered the

12   question, Jeff.

13           MR. RATINOFF:  I'll ask a new question.

14   BY MR. RATINOFF:

15       Q.  So using -- by using the #Neo4j, Graph

16   Foundation's would make it more likely that this tweet

17   would come up under a search for Neo4j, correct?

18       A.  Based on my understanding of Twitter, somebody

19   that is looking for Neo4j directly or has interest in

20   Neo4j through related things would be able to become

21   aware of this tweet by hashtagging it.

22       Q.  Thank you.

23           MR. RATINOFF:  The next is Exhibit 61.  Tab 61.

24   I apologize.  And this will be marked as Exhibit 40.

25   ///

243

```
 1              (WHEREUPON, Exhibit 40 was marked for
 2         identification.)
 3    BY MR. RATINOFF:
 4         Q.  Let me know when you've had a chance to review
 5    it.
 6         A.  Okay, I have it.
 7         Q.  Do you recognize this document?
 8         A.  Yes.
 9         Q.  What is it?
10         A.  It's a tweet from the Graph Foundation.
11         Q.  Do you have any reason to believe this isn't an
12    accurate printout of Graph Foundation tweet from
13    October 9, 2019?
14         A.  No.
15         Q.  So looking at this tweet, is it fair to say
16    it's different than the last two we looked at?
17         A.  Yes.
18         Q.  And is it fair to say in the body of the tweet,
19    this one uses the Neo4j hashtag in a different way?
20         A.  Yes.
21         Q.  And how is it different?
22         A.  I mean, hashtags are often used in sentences,
23    so it's used in a different part of a sentence than the
24    previous one.
25         Q.  You're not using the Neo4j hashtag format in
```

244

1    ONgDB in 3.5.11, correct?

2        A.  Correct, we did not use this exact same format

3    as the previous ones.

4        Q.  And then below you're saying "What is ONgDB?"

5    Do you see that?

6        A.  Yes.

7        Q.  "Open Native Graph DB is an open source fork of

8    Neo4j," right?

9        A.  Yes.

10       Q.  And that's the main difference in the use of

11   the hashtag?

12       A.  Yeah.  It's a completely different tweet.

13           MR. RATINOFF:  Okay.  I'm going to mark the

14   next exhibit.  This is Tab 62.  You should get this in

15   your chat here momentarily.  This will be Exhibit 41.

16           (WHEREUPON, Exhibit 41 was marked for

17           identification.)

18           MR. RATINOFF:  Let me know when you've had a

19   chance to download it.

20           THE WITNESS:  I have it.

21   BY MR. RATINOFF:

22       Q.  This is a printout of a tweet dated

23   November 27, 2019, on the Graph Foundation Twitter

24   account.  Is that a fair description?

25       A.  Yes.

245

1    Q.  Do you have any reason to believe this tweet

2  wasn't sent out by the Graph Foundation on November 27,

3  2019?

4    A.  No.

5    Q.  And is it fair to say this tweet reverted back

6  to the prior format in Exhibits 38 and 39?

7    A.  This appears to be a condensed format that we

8  use.

9    Q.  So again, you're using Neo4j hashtag -- I'm

10  sorry -- #Neo4j in the middle of ONgDB 3.5.12?

11    A.  In this template, yes.

12    Q.  There's no reference to Neo4j -- I'm sorry,

13  strike that.

14      And there's no reference in the top of this

15  tweet stating that ONgDB is a fork in the Neo4j

16  Enterprise, correct?

17      MR. PERNICK:  Objection; misstates the

18  document.  The document speaks for itself.

19      THE WITNESS:  This tweet has what it has.

20  BY MR. RATINOFF:

21    Q.  Okay.  So it's got the Neo4j hashtag next to

22  the word Enterprise and it's right in the middle of

23  #ONgDB 3.5.12, correct?

24    A.  The hashtag is in, yes, in parentheses in

25  between, sure, yes.

246

1    Q.  Again, you're using the hashtag here to allow

2    people to search for Neo4j hashtag to find this tweet,

3    correct?

4    A.  I think it's the same as the other -- it's the

5    same answer as the other ones.  This is essentially the

6    same document.  I don't know what we answered the other

7    ones.  This is no different than the other two.  These

8    are all the same template.

9    Q.  Understood.  So you're using in this particular

10   tweet the #Neo4j to bring people's attention to ONgDB

11   3.5.12?

12   A.  Yes, we are using -- we are using this tweet to

13   bring awareness to the latest release that -- the

14   support release that came out and including the tags

15   that we have in our condensed version on topics that we

16   want people that are interested to be able to see.

17      MR. RATINOFF:  I'm going to mark Exhibit 63

18   [sic].  I'm sorry, it's getting late.  I know it's later

19   there for you so thanks for hanging with us.

20      (WHEREUPON, Exhibit 42 was marked for

21      identification.)

22   BY MR. RATINOFF:

23   Q.  And I'll mark this as Exhibit 42.  This is a

24   printout of a tweet from the Graph Foundation account

25   dated January 18, 2020.

247

```
 1          Do you have any reason to believe this isn't a

 2   correct copy of the tweet that was issued by the Graph

 3   Foundation on this date?

 4       A.  No.

 5          MR. RATINOFF:  I'm sorry.  Denise, did you get

 6   that?

 7          THE REPORTER:  I did.

 8   BY MR. RATINOFF:

 9       Q.  And this is again following the same format as

10   the prior Exhibit 41 that we just discussed, correct?

11       A.  Yes.

12       Q.  And again, the #Neo4j has been inserted between

13   ONgDB and 3.5.14?

14       A.  Yes.

15       Q.  And the reason why you're using the hashtag

16   Neo4j is to get those who are interested in Neo4j to

17   find ONgDB?

18       A.  I'm sorry.  Can you repeat this?  What was it?

19          MR. RATINOFF:  Can you read the question back,

20   please.

21          (Record Read.)

22          THE WITNESS:  I don't know if that's exactly

23   how I said it, but I mean, that's -- that's roughly

24   right.  We want to enable -- we want to make aware -- we

25   want to enable Neo4j users to become aware that there is
```

248

```
 1    another option that's open source and that is
 2    maintained.
 3            MR. PERNICK:  Jeff, can we take a quick break.
 4            MR. RATINOFF:  Yeah, let me just do one more
 5    document and then I think I want to have a quick
 6    discussion off the record.  I'm kind of at a stopping
 7    point not necessarily for the day, but --
 8            MR. PERNICK:  Okay.
 9            MR. RATINOFF:  Then this is Exhibit -- I'm
10    sorry -- Tab 64, which you'll get momentarily, which
11    I'll mark as Exhibit 43.  Let me know when you've had a
12    chance to review it.
13            (WHEREUPON, Exhibit 43 was marked for
14        identification.)
15    BY MR. RATINOFF:
16        Q.  And this is a tweet from May 19, 2020, from a
17    Graph Foundation Twitter account.  Do you have any
18    reason to believe this isn't an accurate and correct
19    printout of this tweet?
20        A.  No.
21        Q.  And in this particular tweet I note there's a
22    Neo4j hashtag which is in a different format than the
23    last one, correct?
24        A.  Correct.
25        Q.  And the Neo4j hashtag here is just by itself,
```

249

```
 1              COURT REPORTER'S CERTIFICATE

 2

 3         I, DENISE MYERS BYRD, CA CSR 8340, RPR, the officer

 4   before whom the foregoing proceeding was conducted, do hereby

 5   certify that the witness whose testimony appears in the

 6   foregoing proceeding was duly sworn by me; that the testimony

 7   of said witness was taken down by me in stenotype to the best

 8   of my ability and thereafter transcribed under my supervision;

 9   and that the foregoing pages, inclusive, constitute a true and

10   accurate transcription of the testimony of the witness.

11         Before completion of the deposition, review of the

12   transcript [X] was [ ] was not requested.  If requested, any

13   changes made by the deponent (and provided to the reporter)

14   during the period allowed are appended hereto.

15         I further certify that I am neither counsel for,

16   related to, nor employed by any of the parties to this action,

17   and further, that I am not a relative or employee of any

18   attorney or counsel employed by the parties thereof, nor

19   financially or otherwise interested in the outcome of said

20   action.  Signed this 9th day of October 2020.

21

22

23

                                Denise Myers Byrd

24                              CSR 8340, RPR, CLR 102409-02

25
```

253

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA


NEO4J, INC., a Delaware
corporation; and NEO4J SWEDEN
AB, a Swedish corporation,

            Plaintiffs,

vs.                                    CASE NO.
                                       5:19-cv-06226-EJD

GRAPH FOUNDATION, INC., an
Ohio corporation; GRAPHGRID,
INC., an Ohio corporation;
and ATOMRAIN, INC., a Nevada
corporation,

            Defendants.
_____/


REMOTE VIDEOTAPED DEPOSITION OF
BRAD NUSSBAUM
as representative of GRAPH FOUNDATION, INC.
pursuant to Federal Rule of Civil Procedure 30(b)(6)


VOLUME II


DATE:          November 9, 2020

TIME:          10:03 a.m.

LOCATION:      via videoconference


REPORTED BY:   BENJAMIN GERALD
               California CSR No. 14203
               Washington CSR No. 3468

256

1    Q.  Okay.  So similar question:  One of the things

2  that you had said you would check into after your last

3  deposition is whether there were any other

4  communications by you with other customers besides

5  Next Century regarding the Free Software Foundation's

6  alleged determination that the Commons Clause was an

7  improper addition to the AGPL.

8       Do you recall that?

9    A.  I didn't recall anything about looking for

10  other customers, though I don't believe that there -- I

11  mean, I'm not sure what even you mean by "customers,"

12  but I don't -- I don't think from the Foundation's

13  standpoint there were other organizations that we -- we

14  talked to about this.

15       What I recall from our past conversation was

16  looking into what information we received in dialog from

17  the IRS about the AGPL.

18    Q.  Okay.  But you didn't go and look to see

19  whether there was any other communications about the IRS

20  opinion?

21       MR. PERNICK:  You mean the IRS now, or the Free

22  Software Foundation?

23       MR. RATINOFF:  Well, he just mentioned IRS, so

24  I'm --

25       MR. PERNICK:  Okay.  I just wanted to make

266

1   sure.

2          THE WITNESS:  Yeah.  From our last

3   conversation, I -- I did discuss with Ben, because he

4   was the one involved, how the conversations occurred

5   within the IRS.

6   BY MR. RATINOFF:

7       Q.  And what did you learn?

8       A.  I learned that there was one call that he was

9   on where the IRS lawyers asked him some questions,

10  mostly a conversation with John Mark, and I think he got

11  asked maybe -- or he answered maybe one question, he had

12  said.  Yeah.

13      Q.  When did that call --

14      A.  It was also not --

15      Q.  Sorry.  Go ahead.

16      A.  It was also not a conversation that was under

17  any capacity as the Foundation at that time.  He had

18  said that the conversation was because we were --

19  because AtomRain was doing consulting work inside of the

20  IRS.

21      Q.  Okay.  Do you know when that conversation

22  occurred?

23      A.  I don't.  It was by phone, and I think Ben said

24  he took it from a tree stand while he was hunting

25  sometime in the fall, so...

267

1    Q.   Good way to scare away the deer.

2    A.   I don't know how he does it.  He manages to

3    pull it off somehow.

4    Q.   Good stuff.  Okay.

5         You said IRS counsel; do you recall, or did Ben

6    tell you who from the IRS was on that call?

7    A.   No, he didn't mention any names.

8    Q.   And you said John -- there was a conversation

9    with John Mark; are you referring to the same telephone

10   call with the IRS?

11   A.   Yeah.  John Mark was -- I think he had

12   organized the call because he was leading those

13   discussions there.

14   Q.   Okay.  But -- but Ben was not attending that

15   call on behalf of Graph Foundation, correct?

16   A.   No.  He was attending it because of the work

17   done through AtomRain.

18   Q.   And did Ben tell you when the IRS conveyed on

19   that call?

20   A.   They didn't convey anything.  They asked

21   questions.  There were no conclusions that were stated

22   on that particular call.  It was more of a fact-finding

23   call or just information gathering.  And then they

24   ultimately, you know, made their -- their decisions and

25   their -- their decisions afterwards.

268

```
 1        Q.   Okay.  But you weren't privy to -- strike that.
 2             Graph Foundation wasn't privy to those
 3   decisions made by the IRS, correct?
 4        A.   We learned about the decisions, you know,
 5   following that call and the eventual use of ONgDB by the
 6   IRS.  So the Graph Foundation found out about it because
 7   of our relationship with AtomRain.
 8        Q.   Okay.  And what did Graph Foundation find out?
 9        A.   That the IRS decided to move forward with using
10   ONgDB, and they accepted their use was under AGPL.
11        Q.   Graph Foundation was never privy to the actual
12   internal deliberations of the IRS, correct?
13        A.   What does it mean to be "privy to the internal
14   deliberations"?
15        Q.   Did Graph Foundation have any inside
16   information -- sorry.  Strike that.
17             Graph Foundation didn't have any insight into
18   the IRS' deliberative process on whether they could use
19   ONgDB under the AGPL, correct?
20        A.   Correct.  They -- they conducted whatever
21   internal process that they did with their legal counsel
22   and came to their conclusions.
23        Q.   Okay.  And then going back to the original
24   question on this Exhibit 32, was there any other
25   communications that you were able to locate from Graph
```

269

1    apparently, it wasn't.  Okay.

2         So this will be Tab 40, and we'll go ahead and

3    mark this as Exhibit 45.

4         (Exhibit 45 was marked for identification.)

5    BY MR. RATINOFF:

6    Q.  Let me know when you have a chance to open this

7    and take a look at it.

8    A.  Yup.  I've got it.

9    Q.  Okay.  So this is a printout, you can see down

10   at the -- the gutter, from Graph Foundation's website on

11   October 13, 2020.

12        Do you see that?

13   A.  Yes.

14   Q.  Okay.  And do you have any reason to believe

15   this printout is -- is not a true and accurate

16   representation of this page on Graph Foundation's

17   website as of that date?

18   A.  No.

19   Q.  Okay.  ONgDB 3.5.19, is that the last 3.5

20   version that Graph Foundation published?

21   A.  I think it might be the latest one on the

22   site --

23   Q.  And --

24   A.  -- as of today.

25   Q.  And was there, to your knowledge, a Neo4j

276

```
 1   Enterprise 3.5.19, as well?

 2        A.  Yes.

 3        Q.  Okay.  So I am going to go ahead and share this

 4   now.  So I want to cover a couple of things on it and

 5   make sure this gets captured.  You can keep looking -- I

 6   think this is going to pull up on your screen over

 7   your -- what you're looking at, so I want you to refer

 8   to the screen share.  All right.  You should be able to

 9   see -- should -- you should see Exhibit 45 on my screen

10   as I scroll.

11        Do you see that?

12        A.  Uh-huh.

13        Q.  Okay.  So I'm going to go ahead and hover over

14   this docs, HTML link; do you see that?

15        A.  Yes.

16        Q.  And that leads to

17   github.com/graphfoundation/ongdb/wiki/ongdb-3.5-docs.

18        Do you see that?

19        A.  Yes.

20        Q.  I'm going to go ahead and click on that.  It's

21   going to bring up my browser.  I'm going to have to

22   switch over.  Give me one second here to switch over.

23        Okay.  You should now be looking at the target

24   site, which should be

25   github.com/graphfoundation/ongdb/wiki.
```

277

1      Do you see that?

2   A.  Yes.

3   Q.  All right.  I've overcome that technological

4   challenge.  Now I'm going to go ahead and click on the

5   number one line here, "ONgDB Docs."  I'm going to go

6   ahead and click on that, and we're going to go to what

7   appears to be a web page with the title "Docs."  The

8   address is github.com/graphfoundation/ongdb/wiki/docs.

9      Do you see that?

10  A.  Yes.

11  Q.  Okay.  And this is -- sorry.  Strike that.

12     What are we looking at now?

13  A.  A wiki page for finding docs for ONgDB.

14  Q.  Is this essentially a document repository on

15  Graph Foundation's GitHub repository?

16  A.  It's a wiki page with a location to find docs

17  for ONgDB.

18  Q.  All right.  So I'm going to go ahead and click

19  on this link under -- it says "LTS release."

20     Do you see that?

21  A.  Yes.

22  Q.  And then underneath it's a hyperlink, which

23  doesn't bring up what it is, but it's ONgDB 3.5.

24  A.  Yes.

25  Q.  I'm going to go ahead and click on that.

278

1          And can you tell me what we just went to after

2     clicking that hyperlink?

3          A.  The site title is called "Neo4j Operations

4     Manual v3.5."

5          MR. RATINOFF:  And that -- for the record,

6     that's -- the web address we just went to is

7     neo4j.com/docs/operations-manual/3.5/, correct?

8          THE WITNESS:  Yes.

9     BY MR. RATINOFF:

10         Q.  So we're not looking at the

11    Graph-Foundation-generated document, correct?

12         A.  Correct.

13         Q.  This -- this wasn't an operations manual that

14    Graph Foundation created, correct?

15         A.  Correct.

16         Q.  And do you recall, at our last deposition, we

17    were talking about the Creative Commons license?

18         A.  Vaguely, yes.

19         Q.  And what's your understanding of the Creative

20    Commons license?

21         A.  I'm not sure I have a very thorough one.

22         Q.  Do you recall we had a discussion about

23    commercial restrictions in the Creative Commons license?

24         A.  I remember -- I remember you mentioned it, yes.

25         Q.  Well, let me just ask you this:  What's your

279

(147 of 299), Page 147 of 299
Case: 24-5538, 12/23/2024, DktEntry: 18.9, Page 147 of 299
BRAD NUSSBAUM
Case 5:21-cv-01582-EJD   Document 103   Filed 01/19/21   Page 121 of 126
November 9, 2020

1    that.

2          Let me go ahead and go back to -- we're going

3    to go back to the

4    github.com/graphfoundation/ongdb/wiki/docs.  I'm just

5    going to go ahead and go down to where it says "Older

6    Releases."

7          Do you see that?

8      A.  Yes.

9      Q.  I'm going to go ahead and click on that.  And

10   if you see that link I clicked took us to

11   neo4j.com/docs/operations manual -- I'm sorry.  Let me

12   re-read that.

13         neo4j.com/docs/operations-manual/3.4/.

14         Do you see that?

15     A.  Yes.

16     Q.  And what is at that URL address?

17     A.  What is the URL address?

18     Q.  What -- what did the URL address take us to?

19     A.  The Neo4j operations manual 3.4.

20     Q.  And do you see where it says, "This is the

21   operations manual for Neo4j version 3.4, authored by the

22   Neo4j team"?

23     A.  Yes, I see that.

24     Q.  So this manual was authored by Neo4j, correct?

25     A.  As stated by the site.

284

 1     Q.  Sorry.  Graph Foundation didn't author an

 2  operations manual for ONgDB version 3.4, correct?

 3     A.  Based on how we established authoring last

 4  time, yes, that's correct.

 5     Q.  And then you'll see there's a link here again

 6  to the Creative Commons 4.0.

 7     Do you see that?

 8     A.  Yes.

 9     Q.  And we'll go to that license again.  It takes

10  us back to neo4j.com/docs/license/.

11     Do you see that?

12     A.  Yes.

13     Q.  Okay.  And can we agree this is the same

14  license we were just looking at?

15     A.  Yes.

16     Q.  And then under "non-commercial," it says, "You

17  may not use the material for commercial purposes"?

18     A.  Yes.

19     Q.  Okay.  Just give me one second here.  I'll go

20  ahead and stop sharing.

21     MR. RATINOFF:  I'm just going to go ahead and

22  drop a new exhibit in.  I just wanted to make sure we

23  have an exhibit to mark for the Creative Commons

24  license.  So let me know when you see what should be

25  Tab 91.1.

285

```
 1              THE VIDEOGRAPHER:  And this would be
 2   Exhibit 46?
 3              MR. RATINOFF:  Correct.  So I'd like to mark
 4   this as Exhibit 46.
 5              (Exhibit 46 was marked for identification.)
 6   BY MR. RATINOFF:
 7        Q.  Let me know when you have that in front of you.
 8              Mr. Nussbaum?  Are you able to look at --
 9        A.  I have it.
10        Q.  Okay.  Thank you.  All right.
11              Can you go ahead and look at this and look at
12   the bottom in the gutter there?  It's -- this is a web
13   archive capture.  You can see the dates 2019-08-2018.
14              Do you see that?  I'm sorry.  Strike that?
15              It's 2019-08-20; do you see that?
16        A.  Yes.
17        Q.  I'll represent to you this was printed out from
18   the web archive, and this is a capture that was on
19   August 20, 2019, from -- which I believe is the same
20   page we were looking at, neo4j.com/docs/license.
21              Do you see that?
22        A.  Yes.
23              MR. PERNICK:  Objection.
24              Okay.  I didn't understand that question, but
25   Brad, if you did, that's fine.
```

286

1    THE WITNESS:  I think he was just saying it's

2    from the Neo4j site as of that date.

3    MR. PERNICK:  Okay.  Got it.

4    THE WITNESS:  Did I understand it wrong?

5    BY MR. RATINOFF:

6    Q.  No, I think -- I think you got it.

7    MR. PERNICK:  All right.  Thank you.

8    BY MR. RATINOFF:

9    Q.  Can we agree that this is the same license we

10   were just looking at live on Neo4j's website?

11   MR. PERNICK:  I'm going to object to the extent

12   you're asking him to review it word for word, but he can

13   give you his understanding without having a

14   word-for-word comparison.

15   THE WITNESS:  I generally see the same

16   structure and content, the same sections.

17   BY MR. RATINOFF:

18   Q.  So I'm going to try to narrow down -- you

19   mentioned that you had spoken to counsel about this

20   license, and I'm not asking about those communications,

21   but was it prior to August 2019 that you had

22   conversations with counsel regarding the Creative

23   Commons license?

24   A.  Any conversations we had would have gone back

25   to the formation, prior to formation when we reviewed

287

1    the AGPL Commons and the like.  So I guess that would

2    have put conversations at April/May of 2018.

3         Q.  So if you had any conversations about the Neo4j

4    Creative Commons license, it would have been around the

5    time of Graph Foundation's formation in June of 2018; is

6    that correct?

7         A.  I mean, that may not have been the only time.

8    That's certainly the time that we were talking about,

9    you know, the validity of the licenses that were at

10   play.  Again, I don't recall this one getting much

11   focus.  I don't think the way that we were using it was

12   deemed to apply to the material as this license states,

13   so I don't think it was applicable.

14        Q.  And you had mentioned -- I think we talked

15   about this last time, about the applicability of the

16   Commons Clause.

17             Are you relying on a formal opinion of counsel

18   to support your position that removal of the Commons

19   Clause from Neo4j's AGPL was appropriate?

20             MR. PERNICK:  Objection.  Jeff, are you asking

21   whether we're asserting an advice-of-counsel defense?

22             MR. RATINOFF:  Yeah, I am.

23             MR. PERNICK:  So we have not asserted an

24   advice-of-counsel defense.

25             MR. RATINOFF:  Okay.

                                                          288

```
 1                       CERTIFICATE

 2        I, BENJAMIN GERALD, Certified Shorthand Reporter,

 3   Certificate No. 14203, for the State of California do

 4   hereby certify:

 5        That prior to being examined, the witness named in

 6   the foregoing deposition was by me duly sworn to testify

 7   to the truth, the whole truth, and nothing but the truth

 8   in the within-entitled cause;

 9        That said deposition was taken shorthand at the

10   time and place herein named;

11        That the deposition is a true record of the

12   witness's testimony as reported to the best of my

13   ability by me, and was thereafter transcribed to

14   typewriting by computer under my direction;

15        That request [X] was [ ] was not made to read and

16   correct said deposition.

17        I further certify that I am not interested in

18   the outcome of said action, nor am I connected with, nor

19   related to any of the parties in said action, nor to

20   their respective counsel.

21        Witness my hand this 11th day of October, 2020.

22

23                    _____

24                    BENJAMIN GERALD, CSR No. 14203

                      STATE OF CALIFORNIA

25
```

308

**01-19-2021 - NOTICE OF ERRATA FOR SEP STMT OF UNDISPUTED ISO PLAINT CONS MOT FOR SUM JUDGMENT AND RESPE TO DEF REQ TO STRIKE SAME.pdf**

Filed 01/19/2021

NOTICE OF ERRATA FOR SEPARATE STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF PLAINTIFFS' CONSOLIDATED MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO DEFENDANTS' REQUEST TO STRIKE SAME

(Pacer Doc: #104)

John V. Picone III, Bar No. 187226
jpicone@hopkinscarley.com
Jeffrey M. Ratinoff, Bar No. 197241
jratinoff@hopkinscarley.com
HOPKINS & CARLEY
A Law Corporation
The Letitia Building
70 South First Street
San Jose, CA  95113-2406

*mailing address:*
P.O. Box 1469
San Jose, CA 95109-1469
Telephone:    (408) 286-9800
Facsimile:    (408) 998-4790

Attorneys for Plaintiffs and Counter-Defendants
NEO4J, INC. and NEO4J SWEDEN AB

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEO4J, INC., a Delaware corporation, and NEO4J SWEDEN AB, a Swedish corporation,<br><br>        Plaintiffs,<br><br>    v.<br><br>PURETHINK LLC, a Delaware limited liability company, IGOV INC., a Virginia corporation, and JOHN MARK SUHY, an individual,<br><br>        Defendants. | CASE NO.  5:18-cv-07182-EJD<br><br>**NOTICE OF ERRATA FOR SEPARATE STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF PLAINTIFFS' CONSOLIDATED MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO DEFENDANTS' REQUEST TO STRIKE SAME**<br><br>Date:     March 25, 2021<br>Time:    9:00 a.m.<br>Dept.:   Courtroom 4, 5th Floor<br>Judge:  Hon. Edward J. Davila |
| AND RELATED COUNTERCLAIM. | |
| NEO4J, INC., a Delaware corporation, and NEO4J SWEDEN AB, a Swedish corporation,<br><br>        Plaintiffs,<br><br>    v.<br><br>GRAPH FOUNDATION, INC., an Ohio corporation, GRAPHGRID, INC., an Ohio corporation, and ATOMRAIN INC., a Nevada corporation,<br><br>        Defendants. | CASE NO.  5:19-CV-06226-EJD |

842\3690949.1

NOTICE OF ERRATA FOR SEPARATE STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF PLAINTIFFS' CONSOLIDATED MOTION FOR SUMMARY JUDGMENT; CASE NOS. 5:18-CV-07182-EJD AND 5:19-CV-06226-EJD

1    Plaintiffs and Counter-Defendants Neo4j, Inc. and Neo4j Sweden AB ("Plaintiffs")

2  respectfully submit the attached Corrected Separate Statement of Undisputed Facts, which was

3  originally attached as Exhibit A to Plaintiffs' Consolidated Motion for Summary Judgment filed

4  on December 11, 2020. *See* PT Action Dkt. No. 98; GFI Action, Dkt. No. 93.  The Corrected

5  Separate Statement of Undisputed Facts includes the certification required by the Court's Standing

6  Order, which was inadvertently omitted in the original Separate Statement of Undisputed Facts.

7    Plaintiffs further submit that the Defendants' request to strike the original Separate

8  Statement of Undisputed Facts and the denial of Plaintiffs' Motion for Summary Judgment based

9  on an alleged violation of the Court's 15-page limit on separate statements, and any further attempt

10 to do so with the Corrected Separate Statement of Undisputed Facts, is unwarranted.  While the

11 parties' stipulation on the consolidated nature of the pending motions included a reduction of the

12 page limits for the parties' respective consolidated briefs, there was no such reduction in limitations

13 imposed on a separate statement of facts.  *See* PT Action Dkt. No. 68 at ¶ 5, GFI Action, Dkt. No.

14 68 at ¶ 5.  As a result, Plaintiffs were entitled to file a 15-page separate statement in the PT Action

15 and a 15-page separate statement in the GFI Action.  In the spirit of judicial economy and to avoid

16 unnecessary duplication, however, Plaintiffs filed a 20-page consolidated Separate Statement of

17 Undisputed Facts, which is 10 less than the aggregate total technically permitted.   To the extent

18 that Plaintiffs may have misunderstood the limits as applied in the context of a consolidated motion

19 filed in two separate actions, Plaintiffs respectfully request that the Court retroactively grant

20 Plaintiffs leave for the 5 additional pages.

21    Further, the Court should not strike Plaintiffs' submission based on a perceived technical

22 procedural violation, and instead should evaluate the evidence, as necessary, in the course of

23 resolving the parties' respective summary motions on their merits.  *See Starr Indem. & Liab. Co.

24 v. Rolls-Royce Corp.*, No. CV-14-02100-TUC-BGM, 2019 WL 1326536, at *1 (D. Ariz. Mar. 25,

25 2019), aff'd, 822 F. App'x 582 (9th Cir. 2020) (denying motion to strike a separate statement of

26 facts that was in violation of local rules); *Doctors Med. Ctr. of Modesto, Inc. v. Principal Life Ins.

27 Co.*, No. 1:10–cv–00452–LJOSKO, 2011 WL 831421, at *3 (E.D.Cal. Mar. 3, 2011) (recognizing

28 that public policy favors "the disposition of cases on their merits rather than on technical violations

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE • PALO ALTO

842\3690949.1

NOTICE OF ERRATA FOR SEPARATE STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF PLAINTIFFS' CONSOLIDATED
MOTION FOR SUMMARY JUDGMENT; CASE NOS. 5:18-CV-07182-EJD AND 5:19-CV-06226-EJD

**Page 1941**

Case 5:18-cv-07182-EJD   Document 104   Filed 01/19/21   Page 3 of 23

of procedural rules"); *cf Henry v. Gill Industries, Inc.*, 983 F.2d 943, 950 (9th Cir.1993) (motion for summary judgment cannot be granted simply because the opposing party violated a local rule).

Finally, Defendants have not articulated any resulting prejudice. To the contrary, their responsive statement increased the length of the Separate Statement from 20 pages to 53 pages (PT Dkt. No. 100, Exhibit A), largely due to Defendants' improper inclusion of attorney argument. Defendants also submitted an additional 5-page statement (PT Dkt. No. 100, Exhibit B), which impermissibly reasserts their fraud in the procurement and naked licensing affirmative defenses previously stricken with prejudice by the Court (PT Action Dkt. Nos. 70, 85), and are currently subject to Plaintiffs' pending motion to strike the PT Defendants' Answer to the Third Amended Complaint wherein they also impermissibly reasserted these defenses (PT Action Dkt. Nos. 93-96).

Dated: January 19, 2021

HOPKINS & CARLEY
A Law Corporation


By: */s/ Jeffrey M. Ratinoff*
   Jeffrey M. Ratinoff
   Attorneys for Plaintiff and Counter-Defendants
   NEO4J, INC. and NEO4J SWEDEN AB

842\3690949.1

- 3 -

NOTICE OF ERRATA FOR SEPARATE STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF PLAINTIFFS' CONSOLIDATED MOTION FOR SUMMARY JUDGMENT; CASE NOS. 5:18-CV-07182-EJD AND 5:19-CV-06226-EJD

## NEO4J INC.'S CORRECTED CONSOLIDATED SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| **Claim 1: Trademark Infringement Against the PT Defendants and Their Nominative Fair Use Defense** | | |
| 1. Plaintiff Neo4j Inc. ("Neo4j USA") owns a protectable trademark | <u>Fact 1</u>: Neo4j USA is the owner of U.S. Trademark Registration No. 4,784,280 for the word mark "NEO4J" covering the goods and services in International Classes, 009, 035, 041, 042 and 045 (the "Neo4j® Mark"). Declaration of Jeffrey M. Ratinoff, ("Ratinoff Decl."), Exh. 1. | |
| 2. The PT Defendants impermissibly used the Neo4j® Mark after Neo4j USA terminated the Partner Agreement | <u>Fact 2</u>: On September 30, 2014, Purethink and Neo4j USA entered into the Neo4j Solution Partner Agreement ("Partner Agreement"). Ratinoff Decl., Exh. 4. | |
| | <u>Fact 3</u>: Under the Partner Agreement, PureThink was granted a non-exclusive, non-transferable limited license to, *inter alia*, use the Neo4j® Mark solely to market and resell commercial licenses to Neo4j® Enterprise Edition ("Neo4j® EE") and related support services in exchange for shared revenue for the licenses that it resold. *Id.*, Exh. 4 at § 4.1; Exh. 3 at 60:10-61:17, 67:25-69:11. | |
| | <u>Fact 4</u>: PureThink further agreed to the terms of the limited license under the Partner Agreement to use the Neo4j® Mark in accordance with Neo4j USA's "then-current trademark usage guidelines." *Id.*, Exh. 4 at § 4.1. | |
| | <u>Fact 5</u>: The Partner Agreement was subject to a 1-year term, and would automatically renew at additional 1-year periods subject to the notice and termination provision therein, thereby incorporating whatever was the operative trademark guidelines at that time. Ratinoff Decl., Exh. 4 at §7.1; Exh. 3 at 67:18-24.  As a result of the renewal provision, PureThink became bound by the October 13, 2015 version of Neo4j USA's trademark guidelines as of September 30, 2016. *See* Rathle Decl., ¶ 16, Exh. 5. | |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | **Fact 6:** All rights and licenses to Neo4j® Software and the Neo4j® Mark would terminate upon the expiration or termination, and upon such an event, PureThink agreed to "cease using any trademarks, service marks and other designations of Plaintiffs."  Ratinoff Decl., Exh. 4 at §7.3. | |
| | **Fact 7:** On July 11, 2017, Neo4j terminated the Partner Agreement thereby requiring PureThink to "cease using [Neo4j's] trademarks, service marks, and other designations…and remove from PureThink's website(s) marketing materials, [Neo4j's] trademarks and tradenames, including, without limitation, Neo4j" as required by Agreement. Ratinoff Decl., Exh. 12. | |
| | **Fact 8:** PureThink continued to use the Neo4j® Mark without Neo4j USA's authorization to send customers to iGov to obtain "Government Package for Neo4j" and "Government Development Package with Neo4j Enterprise."  *See* Ratinoff Decl., Exh. 14.  It also promoted "Neo4j Enterprise" as genuine Neo4j® EE despite being compiled by Suhy. *See id.*, Exh. 16. | |
| | **Fact 9:** Under the Partner Agreement, PureThink agreed that all contractual restrictions would apply to any successor-in-interest, assign, and acquirer of substantially all of its assets.  Ratinoff Decl., Exh. 4 at § 10. | |
| | **Fact 10:** Suhy and PureThink formed iGov on or about June 23, 2017 to circumvent the restrictions in Section 4.3.1 of the Partner Agreement. Ratinoff Decl., Exhs. 10-11, 14-15, 17-19; PT Dkt. No. 22, ¶¶ 18-19; *see also* Exh. 3 at 46:12-16, PT Dkt. No. 72 at 8:22-25, 9:15-23. | |
| | **Fact 11:** Suhy is sole owner and employee of PureThink and iGov, used the same website template, and initially used the same offices and support telephone number for both entities. Ratinoff, Decl, Exh. 3 at 21:23-22:22, 23:16-18, 37:3-38:16, 39:6-40:23, 47:20-49:8, 52:9-11. | |
| | **Fact 12:** Suhy used both his iGov and PureThink email accounts to solicit customers that he had previously contacted under the Partner Agreement.  Ratinoff, Decl., Exhs. 19, 25, 29, 45-46, 54. | |
| | **Fact 13:** iGov took over PureThink's business relationship with the IRS. Ratinoff, Decl, Exh. 3 at 53:4-54:25; Exh. 127. | |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | Fact 14: The PureThink Defendants ("PT Defendants") claimed to be "the developer of the retired Neo4j Government Edition" in close connection with touting their prior relationship with Neo4j USA. Ratinoff Decl., Exhs. 15-19, 21, 62-64. | |
| | Fact 15: iGov used the Neo4j® Mark on its website without authorization to promote "Government Package for Neo4j" and "Government Development Package with Neo4j Enterprise," and related support services. *See* Ratinoff Decl., Exhs. 15-18, 21, 62-64. | |
| | Fact 16: iGov's other unauthorized uses of the Neo4j® Mark on its website included: (1) using "https://igovsol.com/**neo4j**.html" as a URL to promote "Government Development Packages for **Neo4j**"; (2) prominently displaying a "Request Procurement Document Package" link with "**mailto:neo4j@igovsol.com**" embedded that creates an email addressed thereto upon activation; (3) encouraging consumers to obtain more information by sending an email to "**neo4j@igovsol.com**;" (4) using "Government Packages for Neo4j" and "Neo4j Enterprise" to describe iGov's patchwork binaries of Neo4J® EE; and (5) touting PT Defendants' prior relationship with Neo4j USA and to be "the developer of the retired Neo4j Government Edition." Ratinoff Decl., Exhs. 15-18, 21, 62-64, 67-69. | |
| | Fact 17: iGov continues to offer "Neo4j enterprise open source licensed distributions" and interchangeability referring to "ONgDB Enterprise" and "Neo4j Enterprise" on its website. Ratinoff Decl., Exhs. 62-70 (highlighted in yellow). | |
| 3. The PT Defendants used the Neo4j® Mark without Neo4j USA's authorization to promote ONgDB | Fact 18: After Graph Foundation ("GFI") released ONgDB in July 2018, iGov continued to use "https://igovsol.com/neo4j.html" as a URL address to promote ONgDB until it deactivated that page sometime after July 27, 2020. Ratinoff Decl., Exhs. 62-65; Exh. 13 at RFA No. 5. While iGov replaced this url with "https://igovsol.com/graph.html," the contents of the page remained the same. *Compare id.*, Exh. 65 *and* Exh. 66. | |
| | Fact 19: iGov used the neo4j@igovsol.com email address on its "neo4j.html" page (*id.*, Exhs. 62-65) and "downloads.html" page (*id.*, Exhs. 67-69) as means for consumers to inquire about ONgDB until sometime in July 2020. Ratinoff Decl., Exh. 13 at RFA Nos. 7-11. | |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | **Fact 20:** GFI used a "Download Neo4j Enterprise" hyperlink on its "downloads" page to redirect consumers to download links for ONgDB until July 27, 2020.  Ratinoff Decl., Exhs. 66-68 (highlighted in red), Exh. 13 at RFA Nos. 10, 14. | |
| | **Fact 21:** iGov continues to promote "ONgDB Enterprise," "Neo4j Enterprise" and "Neo4j Enterprise Edition" versions 3.5.x as open source Neo4j® EE that can be used for free under the AGPL.  Ratinoff Decl., Exhs. 62-74. | |
| | **Fact 22:** iGov operated www.graphstack.io to further promote ONgDB using the Neo4j® Mark, and that "iGov Inc offers production support packages for Neo4j / ONgDB Enterprise open source distributions for US government agencies."  Ratinoff Decl., Exh. 75. | |
| | **Fact 23:** The GraphStack website used hyperlinks to redirect consumers to Neo4j USA's official release notes and "What's New" page in conjunction with encouraging consumers to download ONgDB as an alleged "[d]rop in replacement for Neo4j Core and Enterprise 3.5.3." Ratinoff Decl., Exh. 75; Exh. 13 [RFA Nos. 42-43]. | |
| 4. The PT Defendants knew their uses of the Neo4j® Mark were unauthorized and violated Neo4j USA's Trademark Guidelines | **Fact 24:**  The trademark guidelines the PT Defendants had agreed to be bound by in the Partner Agreement prohibited the use of the Neo4j® Mark: (1) with anything other than "the software in the exact binary form that it is distributed by [Neo4j], without modification of any kind;" and (2) "in a web page title, titletag, metatag, or other manner with the intent or the likely effect of influencing search engine rankings or results listings." Ratinoff Decl., Exh. 4 at § 4.1; Rathle Decl., ¶¶ 15-16, Exh. 5; *see also* Exh. 4 at §7.1; Exh. 3 at 67:18-24 | |
| | | |
| 5. The PT Defendants did not use the Neo4j® Mark to describe Plaintiffs' products | **Fact 25:** The PT Defendants used the Neo4j® Mark to promote their "Government Package for Neo4j" and "Government Development Package with Neo4j Enterprise" rather than comparatively describe Plaintiffs' Neo4j® EE.  Ratinoff Decl., Exhs. 14-18, 21, 62-65. | |
| | **Fact 26:** The PT Defendants often used the Neo4® Mark to promote ONgDB instead of to comparatively describe Plaintiffs' Neo4j® EE. Ratinoff Decl., Exhs. 62-74; Exh. 13 [RFA Nos. 4-11, 14]. | |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | Fact 27: The PT Defendants used the Neo4j® Mark on iGov's website as (1) an URL address for a page promoting their "Neo4j Enterprise" packages and ONgDB; (2) an email address for customers to obtain more information about their "Neo4j Enterprise" packages while referring to ONgDB; and (3) a hyperlink to redirect consumers to download ONgDB.  Ratinoff Decl., Exhs. 14-18, 62-65, 67-69; Exh. 13 [RFA Nos. 4-11, 14, 33-34]. | |
| 6. Defendant's product was readily identifiable without use of plaintiffs' trademark | Fact 28: Rather than naming their version of Neo4j® EE something else without using the Neo4j® Mark, the PT Defendants used the mark to name and promote their "Neo4j Enterprise" packages and while referring to ONgDB, as well as using the Neo4j® Mark to offer related support services for ONgDB.   Ratinoff Decl., Exhs. 14-18, 62-65, 67-69; Exh. 13 [RFA Nos. 4-11, 14, 33-34]. | |
| | Fact 29: Rather than independently promoting ONgDB as a graph database software without use of Neo4j® Mark, the PT Defendants used the mark to promote ONgDB and related support services for ONgDB.  Ratinoff Decl., Exhs. 62-65, 67-74; Exh. 13 [RFA Nos. 4-11, 14]. | |
| 7. The PT Defendants prominently used the Neo4j® Mark beyond what was reasonably necessary | Fact 30: The PT Defendants extensively used the Neo4j® Mark (without proper trademark usage and notices) on their website, and in direct solicitations beyond describing "Neo4j Enterprise" packages and ONgDB as a forks of Neo4j® EE.  Ratinoff Decl., Exhs. 14-18, 24-26, 42-47, 62-65, 67-74; Exh. 13 [RFA Nos. 4-11, 14, 33-34]. | |
| 8. The PT Defendant's use of the Neo4j® Mark suggested sponsorship or endorsement by Neo4j USA | Fact 31:   The PT Defendants claimed that (a) "By default, all Government Packages for Neo4j now comes with Neo4j Enterprise included under it's open source license!" [Ratinoff Decl., Exhs 14-15]; (b) "The packages on this page are compiled by iGov Inc using the official   Neo4j   source   code   repositories   located   at https://github.com/neo4j" [id., Exh. 16]; (c) "US Federal Government Packages for Neo4j Solutions" [id., Exh. 17]; (d) "Government Development Packages for Neo4j" [id.]; (5) "iGov Inc is now the only US Federal contractor providing Neo4j Enterprise binaries packaged with it's [sic] free Open Source license!" [id., Exh. 18]; (e) "Get the open source licensed Neo4j Enterprise distributions we package for our government customers" [id., Exh. 21]; (f) "We compile and packaged the open source licenced [sic] distributions from the same official Neo4j | |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | Github Repositories as Neo4j Inc uses for their paid commercial licensed builds" [*id.*]; (g) "I manage the Neo4j Enterprise open source distributions used by the Treasury, DHS, etc. If you don't know about Neo4j - here is their website: http://neo4j.com" [*id.*, Exh. 26]. *See also id.*, Exhs. 19-20, 62-66. | |
| | **Fact 32:** The PT Defendants also claimed on iGov's website that (a) "We only focus on only supporting 100% free and open source ONgDB Enterprise & Neo4j Enterprise open source licensed distributions." [Ratinoff Decl., Exh. 66]; (b) "ONgDB Enterprise is a drop In replacement for Neo4j Enterprise commercial packages downloaded from Neo4j.com" [*id.*]; (c) "The distributions we package for the federal government and community as a whole are drop in replacements for Neo4j Enterprise commercial packages you download from neo4j.com" [*id.*]; and (d) "ONgDB (AKA ONgDB Enterprise) 3.5.11 is Neo4j 3.5.11 Core + the enterprise features Neo4j Inc removed from the code base as of v3.5.  All ONgDB and Neo4j Enterprise AGPL distributions can be used in production, in closed source projects, and with no limitations on # of cores or causal cluster instances." [*id.*, Exh. 74]. *See also, id.* at Exhs. 62-65, 71-73. | |
| | **Fact 33:** The PT Defendants solicited customers about ONgDB stating that (a) "I can explain why the foundation was created and how we package Neo4j Enterprise (We call ONgDB) distributions that are being adopted at IRS…" [Ratinoff Decl., Exh. 24]; (b) "the Graph Foundation was setup to ensure Neo4j/ONgDB remains free and open.  It is Neo4j Core + Enterprise feature set added back in, so it is drop in replacement for a Neo instance of the same version. (Ex: 3.5.5)" [*id.*, Exh. 44]; (c) "ONgDB (Open Native Graph Database): Neo4j Enterprise OSS distribution downloads 3.5.8 will be up next week" and "ONgDB 3.5.8 is a drop-in replacement for Neo4j Enterprise 3.5.8" [*id.*, Exh. 46]; (d) "We compile Neo4j branded distributions for agencies who added Neo4j branded distributions instead of ONgDB branded distributions to their white lists. We have all versions of the Neo4j branded distributions up to 3.5 available" [*id.*,]; and (e) "Neo4j Enterprise open source distribution licenses and basic support. Aka: ONGDB" [*id.*, Exhs. 55, 131]. *See also, id.* Exhs. 43, 47, 54. | |
| | **Fact 34:** In its promotion of ONgDB software, iGov used hyperlinks on its website to redirect consumers to Neo4j USA's official release notes (https://neo4j.com/release-notes/neo4j-3-5-5/) and "What's New" page (https://neo4j.com/whats-new-in-neo4j/) until it removed | |

(163 of 299), Page 163 of 299
Case: 24-5538, 12/23/2024, DktEntry: 18.9, Page 163 of 299
Case 5:18-cv-07182-EJD Document 104 Filed 01/19/21 Page 10 of 23

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | those references sometime in July 2020. *See* Ratinoff, Exhs. 67-69 (highlighted in blue). | |
| 8. The PT Defendant's use of the Neo4j® Mark caused actual consumer confusion | Fact 35: The PT Defendant's use of the Neo4j® Mark to promote ONgDB resulted in customers choosing ONgDB and encountering compatibility issues. Ratinoff Decl., Exh. 115-116; Exh 31 at 230:12-233:10; Exh. 3 at 207:12-209:3. | |
| | Fact 36: Defendants' interchangeable use of "Neo4j Enterprise" and "ONgDB" in marketing ONgDB misleads consumers into mistakenly believing that ONgDB and Neo4j EE were one and the same. *See, e.g.,* Exhs. 35, 40, 42-44, 46, 53, 55, 76, 100, 130-131, 134-135. | |
| | Fact 37: The PT Defendant's use of the Neo4j® Mark to promote ONgDB as free open source and falsely it with commercially licensed Neo4j® EE created actual customer confusion. Ratinoff Decl., Exh. 48-49, 117-120, 130-131, 134-135. | |
| | Fact 38: Consumers who have downloaded ONgDB rather than official Neo4j® EE have experienced technical issues with ONgDB. Ratinoff Decl., Exh. 121-124, 133. In one instance, Suhy sent a user to Neo4j USA's operations manual for assistance. *Id.,* Exh. 125. | |
| **Claim 2: Trademark Infringement Against Graph Foundation Inc.** | | |
| 1. Plaintiff Neo4j Inc. ("Neo4j USA") owns a protectable trademark | Fact 39: Neo4j USA is the owner of U.S. Trademark Registration No. 4,784,280 for the word mark "NEO4J" covering the goods and services in International Classes, 009, 035, 041, 042 and 045 (the "Neo4j® Mark"). Declaration of Jeffrey M. Ratinoff, ("Ratinoff Decl."), Exh. 1. | |
| 3. GFI used the Neo4j® Mark without Neo4j USA's authorization to promote ONgDB | Fact 40: Defendants copied the code, removed the commercial restrictions imposed by the Neo4j Sweden Software License from Neo4j® EE version 3.4 and began promoting ONgDB as the open source Neo4j® EE 3.4 under the AGPL. Ratinoff Decl., Exh. 24-26, 28-29, 37, 62, 86; *see also* Exh. 3 at 28:25-29:11, 171:23-172:23, 199:22-200:20; Exh. 31 at 87:24-90:9. | |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | **Fact 41:** GFI copied the landing page on Plaintiffs' GitHub repository without any overt reference to ONgDB.  GFI Dkt. No. 89, ¶ 18, Exh. 18; Ratinoff Decl., Exh. 31 at 81:14-20. | |
| | **Fact 42:** On January 17, 2019, GFI modified its landing page by changing the title to "ONgDB - Neo4j Enterprise Fork: Graphs for Everyone," adding references "ONgDB & Neo4j" and that "ONgDB & **Neo4j Enterprise** consist of modules from Neo4j Community Edition and modules licensed under AGPLv3 in this repository," but the content still remained almost identical to Plaintiffs' GitHub landing page and contained wide-spread misuse of the Neo4j® Mark.  Dkt. No. 89, ¶¶ 19-21, Exhs. 19-21 (emphasis added). | |
| | **Fact 43:**  On April 14, 2020, GFI started to remove the Neo4j® Mark and Neo4j USA's URLs from that page.  *Compare* GFI Dkt. No. 89, Exh. 22 *and* Exhs. 23-28.  However, GFI's landing page was still titled "ONgDB - Neo4j Enterprise Fork: Graphs for Everyone," still started off stating "Neo4j is the world's leading Graph Database," encouraged consumers to "Learn more on the Neo4j website," and continued to use the Neo4j® Mark throughout.  *Id.*, ¶¶ 29-31 Exhs. 29-31. | |
| | **Fact 44:**   On April 21, 2020, GFI removed instances of the Neo4j® Mark and hyperlinks to Neo4j USA's website, but still used Plaintiffs' catch phrase "Graphs for Everyone" and mislabeling the Neo4j® Platform as the "neo4j project."  GFI Dkt. No. 89, Exhs. 32-33. | |
| | **Fact 45:** Rather than create its support documentation for ONgDB, GFI relied upon Neo4j USA's official documentation and used hyperlinks on its website to redirect users to Plaintiffs' official documentation, including Neo4j USA's copyrighted operation and developer manuals, located on its website.  Dkt. No. 89, ¶¶ 3-8, 13-16, Exhs. 3-8, 13-16; Ratinoff Decl., Exhs. 78-83, Exh. 129 [RFA Nos. 81-84, 88-89, 93-94, 98-100, 104, 108, 111, 123-126, 130-136]. | |
| | **Fact 46:** GFI's website directed users to **Plaintiffs'** change logs for each new release of ONgDB until GFI finally started its own change log with ONgDB v3.5.16.  Dkt. No. 89, ¶¶ 3-8, Exhs. 3-8; Ratinoff Decl., Exh. 84; Exh. 129 [RFA Nos. 87, 92, 97, 103, 107, 110]. | |
| | **Fact 47:** Up until April 14, 2020, GFI's GitHub landing page stated "To build  the  documentation  see  the  Neo4j  documentation"  with  an | |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | embedded hyperlink: https://github.com/neo4j/neo4j-documentation/. Dkt. No. 89, Exhs. 18-19, 23. | |
| | <u>Fact 48:</u> GFI's document repository on GitHub also uses hyperlinks that send consumers to Neo4j USA's official documentation on Neo4j USA's corporate website.  Dkt. No. 89, ¶¶ 9-16; Ratinoff Decl., Exhs. 82-83; Exh. 31 at 276:19-279:12, 284:2-285:18; Exhs. 128-129 [RFA Nos. 81-84, 115-126]. | |
| | <u>Fact 49:</u> The Neo4j USA developer and operation manuals are copyrighted by Neo4j USA and subject to the License: Creative Commons 4.0, which contains a hyperlink to the Attribution-NonCommercial-ShareAlike 4.0 International Public License, which expressly prohibits the use of Plaintiffs' documents for commercial purposes.  Ratinoff Decl., Exh. 85, Exh. 31 at 286:1-288:13. | |
| | <u>Fact 50:</u> GFI used the Neo4j® Mark in the title tags of webpages on its website featuring ONgDB. Ratinoff Decl., Exhs. 128-129 [RFA Nos. 85-86, 90-91, 95-96, 101-102, 105-106]. | |
| | <u>Fact 51:</u> GFI did not seek or obtain Neo4j USA's authorization to use the Neo4j® Mark on GFI's website and GitHub repository in the foregoing manner.  Ratinoff Decl., Exh. 31 at 181:6-182:3, Exh. 129 [RFA Nos. 5-9, 22-26, 69, 71, 73-76, 78]. | |
| | <u>Fact 52:</u> GFI used the Neo4j® Mark as a hashtag (#Neo4j) in tweets published from GFI's Twitter Account to promote ONgDB.  Ratinoff Decl., Exhs. 89-92, 95-96, Exhs. 128-129 [RFA Nos. 149-150, 157-158, 165-166, 173-174, 181-182, 187-188]. | |
| 4. GFI's ONgDB product was readily identifiable without the Neo4j® Mark | <u>Fact 53:</u> ONgDB can be readily identified as such or as "Open Native Graph Database" without use of the Neo4j® Mark.  Ratinoff Decl., Exh. 31 at 27:17-29:9, 172:23-173:16, 175:5-20, 176:7-19, 178:13-179:25. | |
| | <u>Fact 54:</u> GFI issued tweets promoting ONgDB without using the Neo4j® mark or the mark as hashtag.  Ratinoff Decl., Exhs. 86, 88. | |
| 4. GFI did not use the Neo4j® Mark to describe Plaintiffs' Neo4j® products | <u>Fact 55:</u> GFI copied the landing page on Plaintiffs' GitHub repository without any overt reference to ONgDB and gratuitously used the Neo4j® Mark to describe and promote its own software.  *See supra* Facts 41-44. | |

9

(166 of 299), Page 166 of 299
Case: 24-5538, 12/23/2024, DktEntry: 18.9, Page 166 of 299
Case 5:18-cv-07182-EJD Document 104 Filed 01/19/21 Page 13 of 23

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | **Fact 56:** At the time that Plaintiffs filed suit, GFI's ONgDB repository still strongly resembled the landing page for Plaintiffs repository for the Neo4j® Platform, and repeatedly referred to "ONgDB & Neo4j" as if they were one and the same, and even used "Neo4j" *instead* of "ONgDB." *Compare* Ratinoff Decl., Exh. 58 *and* Exh. 59. | |
| | **Fact 57:** Rather than independently promoting ONgDB as a graph database software without use of Neo4j® Mark, GFI used the mark to promote ONgDB on its website and GitHub repository. *See supra* Facts 41-52. | |
| | **Fact 58:** GFI used a hashtag, **#Neo4j** that consists of nothing more than the Neo4j® Mark with a "#" before the mark to promote ONgDB on social media. Ratinoff Decl., Exhs. 1, 89-96 and Exh. 31 at 233:17-237:21. | |
| | **Fact 59:** GFI chose the following format that relied on using the Neo4j® Mark as a hashtag to announce its new releases of ONgDB: "**#ONgDB (#FOSS#Neo4j** Enterprise) 3.5.x support release is out," with no attempt to differentiate ONgDB and Neo4j® EE as separate, competing products.[1] Ratinoff Decl., Exhs. 89, 92, 94-95; Exh. 31 at 233:17-236:15, 240:12-241:25, 246:5-249:2. | |
| | **Fact 60:** GFI issued a tweet that stated "**#ONgDB**, Open **#Neo4j** Enterprise," and in another instance "Our **#ONgDB**/**#Neo4j** Enterprise CI server is up and running builds…." Ratinoff Decl., Exhs. 91, 93. | |
| | **Fact 61:** GFI used "**#Neo4j** Enterprise 3.5" to solicit end-users of official Neo4j® EE v3.5 to report bugs to GFI so that it could identify bugs in the closed enterprise directory for Neo4j® EE and attempt to mimic such fixes in ONgDB. Ratinoff Decl., Exh. 61, Exh. 31 at 161:23-163:12, 169:13-172:13 | |
| | **Fact 62:** GFI used **#ONgDB** to promote ONgDB without reference to Neo4j® EE: "Latest **#ONgDB** apoc 3.5.0.8 procedure release is out. https://github.com/graphfoundatio… **#Neo4j**." Ratinoff Decl., Exh. 96. | |
| | **Fact 63:** GFI admitted intentionally used the Neo4j® Mark as a hashtag "to inform users about ONgDB" and to make it more likely that potential customers would come across ONgDB in conducting searches | |

---

[1] "FOSS" stands for free open source software. Ratinoff Decl., Exh. 31 at 233:17-234:3.

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | in relation to Neo4j® EE.  Ratinoff Decl., Exh. 31 at 174:14-176:19, 236:4-11, 237:9-239:7, 242:14- 243:21. | |
| 7. GFI prominently used the Neo4j® Mark beyond what was reasonably necessary | Fact 64: GFI copied the landing page on Plaintiffs' GitHub repository without any overt reference to ONgDB and despite making modifications continued to use the Neo4j® Mark on its GitHub repository beyond merely describing ONgDB as a fork of Neo4j® EE.  See supra Facts 41-55; see also Dkt. No. 89 at ¶¶ 17-33, Exhs. 17-33. | |
| | Fact 65: At the time that Plaintiffs filed suit, GFI's ONgDB repository still strongly resembled the landing page for Plaintiffs repository for Neo4j® Software, and repeatedly referred to "ONgDB & Neo4j" as if they were one and the same, and even used "Neo4j" instead of "ONgDB." Compare Ratinoff Decl., Exh. 58 and Exh. 59. | |
| | Fact 66: GFI's (1) use of "neo4j," "neo4j enterprise" and "Neo4j Enterprise" without proper trademark notices; (2) use of embedded "Neo4j" links to Neo4j USA's website and GitHub repository; (3) hyperlinking to Plaintiffs' build instructions, support documentation and change logs all containing the Neo4j® Mark rather than creating and hosting their own with the ONgDB name; and (4) interchangeable use of "Neo4j Enterprise" with "ONgDB" to promote ONgDB on its website and GitHub goes beyond what is reasonably necessary to identify ONgDB as a fork of Neoj4® EE.  See supra Facts 41-51, 56-58; see also Ratinoff Decl., Exhs. 37, 57-58; Dkt. No. 89, ¶¶ 3-16. | |
| | Fact 67:  GFI used the Neo4j® Mark as a hashtag, #Neo4j, to promote ONgDB rather than to merely describe ONgDB as a fork of Neo4j® EE.  See supra Facts 59-64. | |
| | Fact 68:  GFI admitted that it could have referred to "Neo4j Enterprise" without using the Neo4j® Mark as a hashtag to identify the product. Ratinoff Decl., Exh. 31 at 236:4-15. | |
| | Fact 69:  GFI It also conceded that it could have used a format where it described ONgDB as being a fork of Neo4j® EE rather than simply inserting "#Neo4j Enterprise" with "#ONgDB."  See id., Exh. 31 at 243:23-245:12; Exh. 93. | |
| 8. GFI's use of the Neo4j® Mark suggested | Fact 70: GFI copied the landing page on Plaintiffs' GitHub repository without any overt reference to ONgDB and despite making modifications continued to use the Neo4j® Mark on its GitHub | |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| sponsorship or endorsement by Neo4j USA | repository beyond merely describing ONgDB as a fork of Neo4j® EE. *See supra* Facts 41-55; *see also* Dkt. No. 89 at ¶¶ 17-33, Exhs. 17-33. | |
| | Fact 71: At the time that Plaintiffs filed suit, GFI's ONgDB repository still strongly resembled the landing page for Plaintiffs repository for Neo4j® Software, and repeatedly referred to "ONgDB & Neo4j" as if they were one and the same, and even used "Neo4j" instead of "ONgDB." *Compare* Ratinoff Decl., Exh. 58 *and* Exh. 59. | |
| | Fact 72: GFI (1) used "neo4j," "neo4j enterprise" and "Neo4j Enterprise" without proper trademark notices; (2) used embedded "Neo4j" links to Neo4j USA's website and GitHub repository; (3) stated on its GitHub repository for ONgDB for customers to "Learn more on the Neo4j website," and continued to use the Neo4j® Mark throughout that repository; (4) hyperlinked to Plaintiffs' build instructions, support documentation and change logs on GFI's website and GitHub repository all containing the Neo4j® Mark; (5) interchangeably used "Neo4j Enterprise" with "ONgDB" to promote ONgDB on its website and Github repository; and (6) used the Neo4j® as a hashtag on Twitter to promote ONgDB. *See supra* Facts 42-43, 56-70. | |
| | Fact 73: GFI's intended audience in using the Neoj4® Mark as a hashtag were users of Neo4j® EE. Ratinoff Decl., Exh. 31 at 174:14-176:19, 236:4-11, 237:9-239:7, 242:14- 243:21. | |
| 9. GFI's use of the Neo4j® Mark caused actual consumer confusion | Fact 74: GFI's use of the Neo4j® Mark to promote ONgDB resulted in customers choosing ONgDB and encountering compatibility issues. Ratinoff Decl., Exh. 115-116; Exh 31 at 230:12-233:10; Exh. 3 at 207:12-209:3. | |
| | Fact 75: GFI lead consumers to believe that ONgDB and Neo4j® EE were one and the same. *See, e.g.,* Exhs. 35, 40, 42-44, 46-47, 53, 55-58, 76, 100, 130-131, 134-135. | |
| | Fact 76: GFI's use of the Neo4j® Mark to promote ONgDB as free open source and falsely comparing it with commercially licensed Neo4j® EE created actual customer confusion, and diverted sales from Neo4j USA, including the IRS and Next Century/MPO. Ratinoff Decl., Exh. 48-50, 117-120, 127, 131, 134-135; Broad Decl., ¶¶ 20-24, Exhs. 12-13. | |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| **Claim 3: False Advertising Against GFI and the PT Defendants** | | |
| 1. Defendants made a false statement of fact about a product in a commercial advertisement, which is (a) commercial speech; (b) made in commercial competition with Neo4j USA; (c) for the purpose of influencing consumers to buy their goods or services; and (d) sufficiently disseminated to the relevant purchasing public | <u>Fact 77:</u> Defendants made the following false statements interstate commerce via their websites and Twitter: (1) "ONgDB distributions are licensed under AGPLv3 as a free and open drop-in replacements of Neo4j Enterprise commercial licensed distributions with the same version number" [Ratinoff Decl., Exh. 57]; (2) "ONgDB and Neo4j Enterprise consists of modules from Neo4j Community Edition and modules licensed under the AGPLv3" [*id.*, Exh. 58]; (3) "ONgDB distributions are licensed under AGPLv3 as a free and open source alternative to currently available proprietary native graph offerings such as Neo4j Enterprise Edition" [*id.,* Exhs. 60, 113-114]; (4) "download ONgDB Enterprise as a drop in replacement for an existing commercial licensed distribution of the same version number." [*id.,* Exhs. 62-66]; (5) "ONgDB Enterprise is a drop in replacement for Neo4j Enterprise commercial packages downloaded from Neo4j.com" [*id.,* Exhs. 62-66, 71]; (6) "ONgDB Enterprise 3.5.5…. Drop in replacement for Neo4j Core and Enterprise 3.5.5. AGPLv3 Open Source License, no limitations on causal cluster instances, cores, or production usage" [*id.,* Exhs. 67-69, 75]; (7) "ONgDB is a drop in replacement for the Neo4j Community and Enterprise branded distributions" [*id.,* Exhs. 72-74]; (8) "[ONgDB] is an open source fork of #Neo4j" [*id.*, Exh. 93]; and (9) "You can use the ONgDB fork of Neo4j which adds enterprise code back into Neo4j core. It is 100% free and open." [*id.,* Exh. 98-104, 108]. | |
| | <u>Fact 78:</u> The PT Defendants also stated on iGov's website that "[Neo4j Enterprise] is 100% free and open source" and "Neo4j Enterprise is released only under the standard AGPLv3 open source license that is managed by the free software foundation."  Ratinoff Decl., Exhs. 67-70; *see also* Exh. 21. | |
| | <u>Fact 79:</u> Defendants actively encourage actual and potential users of commercially licensed Neo4j® EE to adopt ONgDB and obtain support services from iGov and GraphGrid instead of Plaintiffs. Ratinoff Decl., Exhs. 23, 28-29, 40, 42-54, 76-77, 126, 134-135. | |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | Fact 80:  Neo4j Sweden is the owner of all copyrights in Neo4j® CE and Neo4j® EE, including the source code and has licensed said copyrights to Neo4j USA.  Rathle Decl., ¶¶ 3-4. | |
| | Fact 81: Plaintiffs released Neo4j® EE v3.4 under a license that which included the terms from the AGPLv3 and additional restrictions provided by the Commons Clause ("Neo4j Sweden Software License"). Rathle Decl., ¶¶ 11-12, Exhs. 2-3. | |
| | Fact 82: The Neo4j Sweden Software License, while still allowing code to be publicly viewable and used within a certain licensed scope, prohibits commercial resale and certain commercial support services. Rathle Decl., ¶¶ 11-12, Exhs. 2-3. | |
| | Fact 83: After Plaintiffs released Neo4j® EE v3.4, the PT Defendants downloaded Neo4j's source code from Neo4j's GitHub repository, removed the commercial restrictions imposed by the Neo4j Sweden Software License, and began promoting it "free and open source" Neo4j Enterprise and offering commercial support services.  Ratinoff Decl., Exh. 3 at 171:23-172:23, 199:22-200:20; Exh. 21. | |
| | Fact 84: Rather than develop ONgDB as an independent fork based off an earlier open source version of Neo4j® EE, Defendants stripped the commercial restrictions out of the Neo4j Sweden Software License from Neo4j® EE version 3.4 and began promoting ONgDB as the open source equivalent of Neo4j® EE 3.4 under the AGPL.  Ratinoff Decl., Exh. 24-26, 28; *see also* Exh. 31 at 87:24-90:9. | |
| | Fact 85: Plaintiffs officially released Neo4j® EE v.3.5 solely under a commercial license in November 2018, and were no longer publishing source code for Neo4j® EE on GitHub under any open source license. Rathle Decl., ¶ 13, Exh. 4. | |
| | Fact 86: Prior to its official release, Plaintiffs published several beta versions of Neo4j® EE v3.5 via their GitHub repository subject to the Neo4j Sweden Software License, with Neo4j® v3.5.0-RC1 being the last pre-release version available to Defendants via GitHub.  Rathle Decl., ¶ 14; *see also* Ratinoff Decl., Exh. 31 at 158:18-159:20. | |
| | Fact 87: GFI's release of ONgGB v3.5.1, which contained at least 182 source code files that had only been previously released under the Neo4j Sweden Software License in the last beta version of Neo4j® EE 3.5 | |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | made available by Plaintiffs via GitHub.  Ratinoff Decl., Exh. 38 at 6:22-7:1, 8:4-16:24; *see also* Rathle Decl., ¶ 29. | |
| | Fact 88: In order for Defendants to call ONgDB "free and open source" Neo4j® EE, they again replaced the more restrictive Neo4j Sweden Software License with a generic copy of the AGPL and stripped out valid legal notices identifying Neo4j Sweden as the copyright holder and licensor in 28 LICENSE.txt files. Ratinoff Decl., Exhs. 39-40; Dkt. No. 91 at 19:9-25; Exh. 31 at 159:3-10; Rathle Decl., ¶ 30. | |
| | Fact 89: The Neo4j Sweden Software License did not permit a licensees such as Defendants to remove "further restrictions," i.e. the Commons Clause, imposed by Neo4j Sweden as the copyright holder and original licensor.  Rathle Decl., Exh. 3 at §§ 7, 10; GFI Dkt. No. 88 at 5:23-8:9. | |
| | Fact 90: Defendants knew that they could not unilaterally replace the Neo4j Sweden Software License with the APGL without authorization. Ratinoff Decl., Exhs. 34-36, Exh. 31 at 183:14-184:24, 207:10-210:8. | |
| | Fact 91: Defendants' statements that ONgDB v3.5.x was "100% free and open" with no limitations or restrictions imposed by commercial licensed Neo4j® EE v3.5.x and the like were false because they knew that Neo4j Sweden owned the copyright for Neo4j® EE and never gave permission to remove Commons Clause and offer it as ONgDB under the AGPL.    Ratinoff Decl., Exh. 55-56; Exh. 3 at 183:12-183:1, 187:12-188:5, 189:1-191:3, 235:21-237:14, 240:22-243:22. | |
| | Fact 92: The Nussbaums also own GraphGrid and AtomRain, which share the same office and computers with GFI, and provide commercial training and consulting and support for users of ONgDB, and benefit from customers being able to use ONgDB for "free" and diverting available project funds to pay them for such services.  Ratinoff Decl., Exhs. 52-53; Exh. 31 at 22:24-23:3, 31:5-32:19, 35:3-13, 57:18-58:21, 65:20-70:16, 194:14-17; *see also* Exh. 28 ("If you are looking for a full shield of liability, we recommend using one of our supporters such as GraphGrid") and Exhs. 76, 134-135. | |
| | Fact 93: Defendants removed the Commons Clause without Neo4j Sweden's authorization as the copyright holder in an attempt to allow iGov, AtomRain and GraphGrid to commercially use and support ONgDB.  Ratinoff Decl., Exh. 23-26, 28-29, 39, 76-77, 126, 134-135; Exh. 3 at 28:25-29:11; Rathle Decl., ¶¶ 29-30. | |

(172 of 299), Page 172 of 299
Case: 24-5538, 12/23/2024, DktEntry: 18.9, Page 172 of 299
Case 5:18-cv-07182-EJD   Document 104   Filed 01/19/21   Page 19 of 23

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | |
| | Fact 94: ONgDB v3.5.1 and later versions are not 100% identical to equivalent version numbers of Neo4j® EE. Ratinoff Decl., Exh. 31 at 158:18-163:5, 163:13-165:6; Exh. 3 at 124:2-126:2. Rather, ONgDB is a patchwork of code from the last public beta, Neo4j® EE 3.5.0-RC1, and Neo4j® Community Edition held together by "glue code" authored by Suhy, Brad Nussbaum and other GFI contributors. *See id.* | |
| | Fact 95: By splicing together source code for ONgDB in that manner, GFI is creating software that is not of the same quality as if it were compiled by Plaintiffs because GFI does not have access to the same rigorous build infrastructure for official Neo4j® Software, which goes beyond what is built into Neo4j® CC and carries out tens of thousands of functional, performance, load, stress, and other tests to ensure quality. Rathle Decl. ¶¶ 31-34; Ratinoff Decl., Exh. 31 at 168:14-169:6. | |
| | Fact 96: GFI is dependent on what patches are made available in Neo4j® CE and sought to redirect users of official Neo4j® EE to GFI and identify bugs in the closed enterprise directory for Neo4j® EE. Ratinoff Decl., Exh. 61, Exh. 31 at 161:23-163:12, 169:13-172:12. | |
| | Fact 97: Since GFI introduced modifications and patches to ONgDB 3.5.x in an attempt to keep pace with the closed Neo4j® EE releases, the potential for stability and compatibility issues with ONgDB increases. Rathle Decl., ¶ 34; Ratinoff Decl., Exh. 31 at 161:23-163:12. | |
| | Fact 98: Defendants had no way of knowing this after Plaintiffs closed off public access to the source code for enterprise-only features in November 2018 and had no visibility into Neo4j Sweden's proprietary testing and patches. Ratinoff Decl., Exh. 31 at 158:18-160:5; Exh. 3 at 223:1-224:9; Exh. 40; Rathle Decl., ¶¶ 31-34. | |
| | Fact 99: Defendants knew that ONgDB 3.5.x does not include every closed enterprise feature in equivalent Neo4j® EE 3.5.x. Ratinoff Decl., Exh. 38 at 2:12-17, 4:15-22, 5:4-6:21; Exh. 3 at 127:19-128:17. | |
| | Fact 100: GFI admitted that ONgDB v3.5.4 is not 100% identical to official Neo4j® EE v3.5.4. Ratinoff Decl., Exh. 31 at 158:18-163:5, 163:13-165:6; Exh. 3 at 124:2-126:23. | |
| | Fact 101: GFI admitted that after ONgDB v3.5.4, it could not "reliably guarantee that it was a drop-in replacement" for the same version | |

842\3658210.3

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | number of Neo4j® EE and was unwilling to do the testing to make such integration and compatibility guarantees because it became "too hard to demonstrate." Ratinoff Decl., Exh. 31 at 186:24-188:17, 188:23-189:23. | |
| | <u>Fact 102</u>: As a result, Defendants were leading consumers to believe they were downloading an exact copy of the same version of commercial-only releases of NEO4J® EE, which in actuality they were receiving an inferior ONgDB product that was not a true "drop in" replacement. *See supra* Facts 80-101. | |
| | <u>Fact 103</u>: Neo4j® EE has been subject to trademark policies and guidelines published on Plaintiffs' website, which along with the terms of the GPL, AGPL and Neo4j Sweden Software License, made clear that to the extent any authorized modifications are made to Neo4j® Software, such modified software should indicate so and no longer bear the Neo4j® Mark. Rathle Decl., ¶¶ 15-18. Exhs. 5-7. | |
| 2. Defendants' statements actually deceive or has the tendency to deceive a substantial segment of its audience | <u>Fact 104</u>: Defendants intentionally made the false statements publicly on their website and on Twitter that ONgDB is a "free and open" drop-in replacement/equivalent under the AGPL to convince customers to adopt ONgDB over Neo4j® EE, and pay iGov, Graph Grid and/or AtomRain for related consulting and support services. *See supra* Facts 78-80, 83-84, 86-93. | |
| | <u>Fact 105</u>: Consumers chose ONgDB over Neo4j® EE based on Defendants' misrepresentations about ONgDB being "free and open" drop-in replacement/equivalent under the AGPL, including NextCentury and the MPO, Tufin, the IRS, Department of Homeland Security (DHS) and others. Ratinoff Decl., Exhs. 35, 40, 48-51, 53, 100, 120, 127, 133-135; Exh. 3 at 54:7-55:1, 142:15-144:20, 227:3-8, Exh. 31 at 191:15-24, 194:23-25, 195:13-18, 196:22-197:24; Broad Decl., ¶¶ 20-24; Exhs. 12-13. | |
| 3. Defendants' deception is material | <u>Fact 106</u>: Defendants' false statements that ONgDB is a drop-in replacement/equivalent to paid-for, commercial licensed Neo4® EE was material to potential consumers' purchasing decision because Defendants were offering it for free under the AGPL, and unbeknownst to consumers, in violation of the Neo4j Sweden Software License and Neo4j Sweden's copyright. *See supra* Facts 78-93. | |
| | <u>Fact 107</u>: Defendants intentionally made the false statements publicly on their website and on Twitter that ONgDB is a "free and open" drop- | |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | in replacement/equivalent under the AGPL to convince customers to adopt ONgDB over Neo4j® EE. *See supra* Facts 78-93. | |
| 4. Defendants caused the false statement to enter interstate commerce | Fact 108:  Defendants' false statements entered interstate commerce through the internet via their websites and Twitter, as well as emails sent to consumers.  Ratinoff Decl., Exhs. 18, 21, 25, 29, 42-46, 49-51, 54-55, 57-58, 60, 62-66, 67-70, 72-74, 93, 99-104, 108, 113-114. | |
| 5. Neo4j USA has been or is likely to be injured as a result of the false statement | Fact 109: Defendants' false statements diverted sales from Neo4j USA. Ratinoff Decl., Exhs. 35, 40, 47-51, 53, 100, 120, 127, 133-135; Exh. 3 at 54:17-55:1, 142:15-144:20, 227:3-8, Exh. 31 at 191:15-24, 194:23-25, 195:13-18, 196:22-197:24; Broad Decl., ¶¶ 20-24; Exhs. 12-13. | |
| | Fact 110: Neo4j USA lost multi-year deal with the IRS.  Broad Decl., ¶¶ 20-21. | |
| | Fact 111: Neo4j USA lost multi-year deal with Next Century/MPO adopting ONgDB, amounting to over over $2.2 million in lost revenue. Broad Decl., ¶¶ 22-24, Exhs. 12-13. | |
| **Claim 4: False Designation of Origin  Against GFI and the PT Defendants** | | |
| 1. used in commerce any word, false designation of origin, false or misleading description, or representation of fact | Fact 112:  Defendants' false and misleading statements that ONgDB is a "free and open" drop-in replacement under the AGPL for equivalent versions of paid-for commercially licensed Neo4® EE were made in commerce through the internet via their websites and Twitter, as well as emails sent to consumers. Ratinoff Decl., Exhs. 18, 21, 25, 29, 42-46, 49-51, 54-55, 57-58, 60, 62-66, 67-70, 72-74, 93, 99-104, 108, 113-114; *see also* Facts 78-80. | |
| | Fact 113:  Defendants' statements that ONgDB is a "free and open" drop-in replacement under the AGPL for equivalent versions of paid-for commercially licensed Neo4® EE were false and misleading because Defendants did not have the right to replace the Neo4j Sweden Software License with the AGPL.  *See* Facts 78-93. | |
| | Fact 114:  Defendants' statements ONgDB is a "free and open" drop-in replacement under the AGPL for equivalent versions of paid-for commercially licensed Neo4® EE were false and misleading because | |

842\3658210.3

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | ONgDB was not of the same quality as if it were compiled by Plaintiffs. Rathle Decl. ¶¶ 19-22, 29-34; Ratinoff Decl., Exh. 3 at 216:2-218:6; Exh. 31 at 161:23-163:12, 168:14-169:6. | |
| | Fact 115: Since GFI introduced modifications to ONgDB in an attempt to keep pace with the closed Neo4j® EE releases, the potential for stability and compatibility issues with ONgDB increases. *See* Rathle Decl., ¶¶ 29-24; *see also* Ratinoff Decl., Exh. 31 at 158:18-160:5, 161:23-163:12; Exh. 3 at 223:1-224:9; Exh. 40. | |
| | Fact 116: ONgDB does not include every closed enterprise feature in the equivalent version of Neo4j® EE. Ratinoff Decl., Exh. 38 at 2:12-17, 4:15-22, 5:4-6:21; Exh. 3 at 127:19-128:17. | |
| | Fact 117: GFI admitted that after ONgDB v3.5.4, it could not "reliably guarantee that it was a drop-in replacement" for the same version number of Neo4j® EE and was unwilling to do the testing to make such integration and compatibility guarantees. Ratinoff Decl., Exh. 31 at 186:24-188:17, 188:23-189:23. | |
| 2. which is likely to cause confusion or mistake, or to deceive, as to sponsorship, affiliation, or the origin of the goods or services in question. | | |
| (a) strength of the mark | The Neo4j® Mark is inherently distinctive and Plaintiffs have used it in commerce since 2007, and as a result has gained strong brand recognition via various awards and recognition in the graph database software market. Broad Decl., ¶¶ 2-19, Exhs. 1-11. | |
| (b) relatedness of the goods and similarity of sight, sound and meaning | Defendants promote ONgDB as Neo4j® EE except that they are free and licensed without restrictions under the AGPL. Ratinoff Decl., Exhs. 18, 21, 25, 29, 42-46, 49-51, 54-55, 57-58, 60, 62-66, 67-70, 72-74, 93, 99-104, 108, 113-114. | |
| (c) evidence of actual confusion; | Fact 118: Defendants' interchangeable use of "Neo4j Enterprise" and "ONgDB" misleads consumers into mistakenly believing that ONgDB | |

19

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | and Neo4j® EE were one and the same.  Ratinoff Decl., Exhs. 35, 40, 42-44, 46-47, 53, 55-58, 76, 100, 130-131, 134-135. | |
| | Fact 119: Defendants' misrepresentations about ONgDB being "free and open" drop-in replacement/equivalent under the AGPL caused actual confusion over Defendants' unauthorized modification to the Neo4j Sweden Software License and justification for doing so.  *See* Ratinoff Decl., Exhs. 40, 49, 55, 118-119, 131, 133-134. | |
| | Fact 120: GFI's use of the Neo4j® Mark to promote ONgDB resulted in customers choosing ONgDB over Neo4j® EE and encountering compatibility issues.  Ratinoff Decl., Exh. 115-116; Exh 31 at 230:12-233:10; Exh. 3 at 207:12-209:3. | |
| | Fact 121: Consumers chose ONgDB over Neo4j® EE based on Defendants' misrepresentations about ONgDB being "free and open" drop-in replacement/equivalent under the AGPL, including NextCentury and the MPO, Tufin, the IRS, Department of Homeland Security (DHS) and others.  Ratinoff Decl., Exhs. 35, 40, 47-51, 53, 100, 120, 127, 133-135; Exh. 3 at 54:17-55:1, 142:15-144:20, 224:13-23, 227:3-8, Exh. 31 at 191:15-24, 194:23-25, 195:13-18, 196:22-197:24; Exh. 38 at 23:14-24:4; Broad Decl., ¶¶ 20-24, Exhs. 12-13. | |
| (d) marketing channels and likelihood of expansion | Fact 122: Defendants continue to target the same potential users of graph database platforms and software and use the same channels via the internet.  *See, e.g.,* Ratinoff Decl., Exhs. 14-15, 18, 25, 29, 37, 45-55, 57, 60-61, 65-66, 76-77, 118-119, 120, 127, 130-132, 134-135. | |
| | Fact 123: Neo4j USA and the PT Defendants competed for the same contracts in the government sector.  Ratinoff Decl., Exhs. 42-51, 54-55, 100, 120, 127, 130-135; Broad Decl., ¶¶ 20-24, Exhs. 12-13. | |
| (e) intent | Fact 124: Defendants' use of the Neo4j® Mark to promote Plaintiffs' software with an improperly modified copyright license shows that they intend to copy them and confuse the public.  *See supra* Facts 78-102. | |

I attest that the evidence cited herein fairly and accurately supports the facts as asserted by Plaintiffs Neo4, Inc. and Neo4j Sweden AB.

Dated:  January 19, 2021                    By:  */s/ Jeffrey M. Ratinoff*
                                                        Jeffrey M. Ratinoff, Attorney for Plaintiffs Neo4j, Inc. and Neo4j Sweden AB

**02-16-2021 - CONS REPL ISO PLAINT MOT FOR SUM JUDGMENT AND OPP TO DEF CROSSMOTION FOR SUM JUDGMENT.pdf**

Filed 02/06/2021

CONSOLIDATED REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' CROSSMOTION FOR SUMMARY JUDGMENT

(Pacer Doc: #109)

1  John V. Picone III, Bar No. 187226
   jpicone@hopkinscarley.com
2  Jeffrey M. Ratinoff, Bar No. 197241
   jratinoff@hopkinscarley.com
3  HOPKINS & CARLEY
   A Law Corporation
4  The Letitia Building
   70 South First Street
5  San Jose, CA  95113-2406

6  *mailing address:*
   P.O. Box 1469
7  San Jose, CA 95109-1469
   Telephone:    (408) 286-9800
8  Facsimile:    (408) 998-4790

9  Attorneys for Plaintiff and Counter-Defendants
   NEO4J, INC. and NEO4J SWEDEN AB
10

11              UNITED STATES DISTRICT COURT

12           NORTHERN DISTRICT OF CALIFORNIA

13  NEO4J, INC., a Delaware corporation, and       CASE NO.  5:18-cv-07182-EJD
    NEO4J SWEDEN AB, a Swedish
14  corporation,                                    **CONSOLIDATED REPLY IN SUPPORT
                                                    OF PLAINTIFFS' MOTION FOR
15               Plaintiffs,                        SUMMARY JUDGMENT AND
                                                    OPPOSITION TO DEFENDANTS' CROSS-
16          v.                                      MOTION FOR SUMMARY JUDGMENT**

17  PURETHINK LLC, a Delaware limited              Date:     April 15, 2021
    liability company, IGOV INC., a Virginia       Time:     9:00 a.m.
18  corporation, and JOHN MARK SUHY, an            Dept.:    Courtroom 4, 5th Floor
    individual,                                     Judge:    Hon. Edward J. Davila
19               Defendants.

20  AND RELATED COUNTERCLAIM.

21

22

23

24

25

26

27

28

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE • PALO ALTO

842\3690595.10

CONSOLIDATED REPLY ISO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO
DEFENDANTS' CROSS-MOTION; CASE NO. 5:18-CV-07182-EJD

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ........................................................................................... 1

II.    EVIDENTIARY OBJECTIONS.................................................................... 1

III.   LEGAL ARGUMENT ................................................................................... 2

       A.     Neo4j USA Has Standing to Assert its Lanham Act Claims Against
              Defendants ......................................................................................... 2

       B.     Defendants Do Not Establish that the Neo4j® Mark is Invalid.............. 4

              1.     Defendants Fail to Meet Their Burden of Proof Establishing that the
                     Registration for the Neo4j® Mark was Fraudulently Obtained................. 5

              2.     Defendants Fail to Establish the Naked Licensing of the Neo4j®
                     Mark ........................................................................................... 8

       C.     Defendants Have Not Engaged in Nominative Fair Use of the Neo4j®
              Mark .................................................................................................. 9

              1.     The Undisputed Facts Establish that Defendants Impermissibly
                     Used the Neo4j® Mark to Refer to Their Products and Services............. 10

              2.     The Undisputed Facts Establish that Defendants Used the Neo4j®
                     Mark More Than Was Reasonably Necessary and Not for the
                     Purpose of Comparative Advertising........................................................ 12

              3.     Defendants Misappropriate the Cachet of the Neo4j® Mark ................. 14

       D.     Defendants Fail to Address their Liability for Infringement as Ex-Licensees...... 16

       E.     Defendants' Licensee Estoppel Arguments are Meritless ..................... 17

       F.     Plaintiffs are Entitled to Summary Judgment on Neo4j USA's False
              Advertising Claims Under the Lanham Act and the UCL ...................... 18

              1.     The Terms of the Neo4j Sweden Software License Do Not Give a
                     Licensee the Right to Remove Restrictions Imposed by the
                     Copyright Holder and Licensor of the Underlying Software.................... 18

              2.     Defendants' Claims that ONgDB is a Drop-in Replacement for
                     Equivalent versions of official Neo4j® EE are Demonstratively
                     False ......................................................................................... 22

              3.     Defendants Falsely Advertising ONgDB as a Free version of
                     Neo4j® EE licensed under the APGL is Material to Customers'
                     Decisions..................................................................................... 23

       G.     False Designation of Origin ................................................................ 24

       H.     Plaintiffs are Entitled to Either Preliminary or Permanent Injunctive Relief....... 25

       I.     The Court Should Deny Defendants' Cross-Motion for Summary Judgment...... 25

IV.    CONCLUSION............................................................................................. 25

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE • PALO ALTO

842\3690595.10                                    - i -

CONSOLIDATED REPLY ISO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO
DEFENDANTS' CROSS-MOTION; CASE NO. 5:18-CV-07182-EJD

Page 1965

1

## TABLE OF AUTHORITIES

2

Page

3

**Cases**

4

*Adidas America, Inc. v. Athletic Propulsion Labs, LLC,*
5
    120 U.S.P.Q.2d 1303, 2016 WL 3896826 (D. Or. 2016) ........................................ 3

6

*AECOM Energy & Constr., Inc. v. Ripley,*
    348 F.Supp.3d 1038 (C.D. Cal. 2018) .............................................................. 24

7

*Align Tech., Inc. v. Strauss Diamond Instruments, Inc.,*
8
    2019 WL 1586776 (N.D. Cal. Apr. 12, 2019) ...................................................... 10

9

*Altera Corp. v. Clear Logic, Inc.,*
10
    424 F.3d 1079 (9th Cir. 2005) ........................................................................ 21

11

*Am. Auto. Ass'n of N. California, Nevada & Utah v. Gen. Motors LLC,*
    367 F. Supp. 3d 1072 (N.D. Cal. 2019) ............................................................ 5

12

*Apple Inc. v. Psystar Corp.,*
13
    658 F.3d 1150 (9th Cir. 2011) ........................................................................ 20

14

*In re Bose Corp.,*
15
    580 F.3d 1240 (Fed.Cir.2009) ........................................................................ 6

16

*Brookfield Commc'ns Inc. v. West Coast Ent. Corp.,*
    174 F.3d 1036 (9th Cir.1999) ................................................................... 11, 15

17

*Cont'l Distilling Corp. v. Old Charter Distillery Co.,*
18
    188 F.2d 614 (D.C. Cir. 1950) ........................................................................ 8

19

*Copperweld Corp. v. Independence Tube Corp.,*
    467 U.S. 752 (1984) .................................................................................... 8

20

*DEP Corp. v. Interstate Cigar Co.,*
21
    622 F.2d 621 (2nd Cir.1980) .......................................................................... 3

22

*Dep't of Parks & Rec. v. Bazaar Del Mundo, Inc.,*
23
    448 F.3d 1118 (9th Cir. 2006) ........................................................................ 11

24

*Dole Food Co. v. Patrickson,*
    538 U.S. 468 (2003) .................................................................................... 8

25

*Experience Hendrix, L.L.C. v. Hendrixlicensing.com, Ltd.,*
26
    2010 WL 2104239 (W.D. Wash. May 19, 2010) ................................................ 11

27

*Far Out Prods., Inc. v. Oskar,*
28
    247 F.3d 986 (9th Cir. 2001) ..................................................................... 4, 6

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE • PALO ALTO

842\3690595.10

- ii -

CONSOLIDATED REPLY ISO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO
DEFENDANTS' CROSS-MOTION; CASE NO. 5:18-CV-07182-EJD

**Page 1966**

**TABLE OF AUTHORITIES**
(continued)

Page

*Halicki Films, LLC v. Sanderson Sales & Mktg.*,
547 F.3d 1213 (9th Cir. 2008) ................................................................................... 2

*Hansen v. United States*,
7 F.3d 137 (9th Cir. 1993) (per curiam) ................................................................... 2

*Heaton Distributing Co. v. Union Tank Car Co.*,
387 F.2d 477 (8th Cir. 1967) ................................................................................... 17

*Hokto Kinoko Co. v. Concord Farms, Inc.*,
738 F.3d 1085 (9th Cir. 2013) .......................................................................... 5, 8, 9

*Hokto Kinoko Co. v. Concord Farms, Inc.*,
810 F.Supp.2d 1013 (C.D. Cal. 2011), *aff'd*, 738 F.3d 1085 (9th Cir. 2013) ........... 3

*Horphag Research Ltd. v. Garcia*,
475 F.3d 1029 (9th Cir. 2007) ....................................................................... 9, 14, 15

*Idaho Potato Commission v. M & M Produce Farm & Sales*,
335 F.3d 130 (2d Cir. 2003) .................................................................................... 17

*Jacobsen v. Katzer*,
535 F.3d 1373 (Fed. Cir. 2008) ............................................................................... 20

*McSherry v. City of Long Beach*,
584 F.3d 1129 (9th Cir. 2009) ................................................................................... 2

*Micro Star v. Formgen Inc.*,
154 F.3d 1107 (9th Cir. 1998) ................................................................................. 21

*Milenbach v. C.I.R.*,
318 F.3d 924 (9th Cir.2003) .................................................................................... 21

*Minden Pictures, Inc. v. John Wiley & Sons, Inc.*,
795 F.3d 997 (9th Cir. 2015) ................................................................................... 19

*New Kids on the Block v. News Am. Pub., Inc.*,
971 F.2d 302 (9th Cir. 1992) .............................................................................. 13, 14

*Playboy Enterprises, Inc. v. Netscape Commc'ns Corp.*,
354 F.3d 1020 (9th Cir. 2004) ................................................................................... 9

*Playboy Enters., Inc. v. Welles*,
279 F.3d 796 (9th Cir. 2002) ................................................................................... 13

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ● PALO ALTO

842\3690595.10

- iii -

CONSOLIDATED REPLY ISO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO
DEFENDANTS' CROSS-MOTION; CASE NO. 5:18-CV-07182-EJD

**Page 1967**

1

2

**TABLE OF AUTHORITIES**
(continued)

Page

3

4

*Pom Wonderful LLC v. Hubbard*,
   775 F.3d 1118 (9th Cir. 2014).................................................................................. 10

5

*Pony Exp. Courier Corp. of Am. v. Pony Exp. Delivery Serv.*,
   872 F.2d 317 (9th Cir. 1989)...................................................................................... 6

6

7

*Quabaug Rubber Co. v. Fabiano Shoe Co.*,
   567 F.2d 154 (1st Cir.1977) ....................................................................................... 3

8

9

*Rearden LLC v. Rearden Commerce, Inc.*,
   683 F.3d 1190 (9th Cir. 2012).................................................................................... 5

10

*Rise Basketball Skill Dev. LLC v. K Mart Corp.*,
   2017 WL 4865561 (N.D. Cal. Oct. 27, 2017).......................................................... 10

11

12

*Scat Enterprises, Inc. v. FCA US LLC*,
   2017 WL 5749771 (C.D. Cal. June 8, 2017) ............................................................. 7

13

14

*Schwinn Bicycle Co. v. Murray Ohio Mfg. Co.*,
   339 F.Supp. 973 (M.D. Tenn. 1971).......................................................................... 5

15

*Segal v. Silberstein*,
   156 Cal.App.4th 627 (2007) .................................................................................... 20

16

17

*Southland Sod Farms v. Stover Seed Co.*,
   108 F.3d 1134 (9th Cir. 1997).................................................................................. 22

18

19

*State St. Glob. Advisors Tr. Co. v. Visbal*,
   431 F.Supp.3d 322 (S.D.N.Y. 2020)........................................................................ 11

20

*Storm Impact, Inc. v. Software of the Month Club*,
   44 U.S.P.Q.2d 1441, 1997 WL 566378 (N.D. Ill. 1997) ......................................... 21

21

22

*STX, Inc. v. Bauer USA, Inc.*,
   43 U.S.P.Q.2d 1492 (N.D. Cal. June 5, 1997) ........................................................ 17

23

24

*Toyota Motor Sales, U.S.A., Inc. v. Tabari*,
   610 F.3d 1171 (9th Cir. 2010).................................................................................... 9

25

*TrafficSchool.com, Inc. v. Edriver Inc.*,
   653 F.3d 820 (9th Cir. 2011)...................................................................................... 4

26

27

*U.S. v. King Features Entm't, Inc.*,
   843 F.2d 394 (9th Cir. 1988).................................................................................... 18

28

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE • PALO ALTO

842\3690595.10

- iv -

CONSOLIDATED REPLY ISO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO
DEFENDANTS' CROSS-MOTION; CASE NO. 5:18-CV-07182-EJD

**Page 1968**

**TABLE OF AUTHORITIES**
(continued)

Page

*Ultratech, Inc. v. Ensure NanoTech (Beijing), Inc.*,
  108 F.Supp.3d 816 (N.D. Cal. 2015) ........................................................... 17

*Universal Sales Corp. v. Cal., Press Mfg. Co.*,
  20 Cal.2d 751 (1942) ................................................................................. 21

*Villiarimo v. Aloha Island Air, Inc.*,
  281 F.3d 1054 (9th Cir. 2002) ...................................................................... 2

*Vuitton et Fils S.A. v. J. Young Enters., Inc.*,
  644 F.2d 769 (9th Cir. 1981) ......................................................................... 4

*W. Fla. Seafood, Inc. v. Jet Restaurants, Inc.*,
  31 F.3d 1122 (Fed. Cir. 1994) ....................................................................... 7

*In re Wella A.G.*,
  787 F.2d 1549 (Fed. Cir. 1986) ..................................................................... 7

*In re Wella A.G.*,
  858 F.2d 725 (Fed. Cir. 1988) ....................................................................... 7

*Wetzel's Pretzels, LLC v. Johnson*,
  797 F.Supp.2d 1020 (C.D. Cal. 2011) ......................................................... 17

*Zalkind v. Ceradyne, Inc.*,
  194 Cal.App.4th 1010 (2011) ................................................................. 19, 20

*Zobmondo Entm't, LLC v. Falls Media, LLC*,
  602 F.3d 1108 (9th Cir. 2010) ....................................................................... 4

**Statutes**

15 U.S.C.
  § 1055 ................................................................................................. 6, 8, 9
  § 1114 .......................................................................................................... 3
  § 1114(1) ...................................................................................................... 2
  § 1114(1)(a) ................................................................................................. 3
  § 1115(a) ...................................................................................................... 4
  § 1117(a) .................................................................................................... 11
  § 1125(a) ...................................................................................................... 3
  § 1125(a)(1) ................................................................................................. 4
  § 1127 .......................................................................................................... 2

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE • PALO ALTO

842\3690595.10                                    - v -

CONSOLIDATED REPLY ISO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO
DEFENDANTS' CROSS-MOTION; CASE NO. 5:18-CV-07182-EJD

**Page 1969**

**TABLE OF AUTHORITIES**
**(continued)**

Page

Cal. Civ. Code
    § 1638 .......................................................................................................................... 13, 19
    § 1639 .................................................................................................................................. 13
    § 1641 .......................................................................................................................... 19, 20

**Other Authorities**

Trademark Manual of Examining Procedure
    § 1201.03(b) ........................................................................................................................ 6
    § 1201.03(c) ........................................................................................................................ 6
    § 1201.07(b) ........................................................................................................................ 7
    § 1201.07(b)(i) .................................................................................................................... 7
    § 1201.07(b)(ii) ................................................................................................................... 7
    § 903.05 ............................................................................................................................... 6

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE • PALO ALTO

842\3690595.10

- vi -

CONSOLIDATED REPLY ISO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO
DEFENDANTS' CROSS-MOTION; CASE NO. 5:18-CV-07182-EJD

**Page 1970**

## I.  INTRODUCTION

Defendants' Opposition fails to establish a disputed issue of fact with respect to Neo4j USA's trademark claims.  This is because they offer no admissible evidence that would allow a jury to conclude that they engaged in fair use of the Neo4j® Mark in promoting their pirated versions of Neo4j® EE.  Instead, Defendants attempt to revive their already-stricken naked licensing and fraud in the procurement defenses to attack the validity of the Neo4j® Mark.  Aside from ignoring this Court's orders striking them, they fail to comprehend that Neo4j USA rightfully owns the registration for that mark because of Plaintiffs' status as related companies due to their parent-subsidiary relationship.  Defendants also argue that they were fairly using the Neo4j® Mark merely for comparative advertising.   Their unsubstantiated arguments do not change the fact that Defendants repeatedly use the Neo4j® Mark on their websites to promote ONgDB rather than merely describe Plaintiffs' Neo4j® EE.  Their use of the Neo4j® Mark also goes well beyond what is reasonably necessary, and suggests sponsorship or endorsement by Plaintiffs.   Defendants therefore cannot rely upon a nominative fair use defense, entitling Neo4j USA to entry of summary judgment in its favor.

Defendants' primary argument in opposition to Neo4j USA's Section 43(a) claims is that they were entitled to remove the commercial restrictions imposed by the Neo4j Sweden Software License and promote ONgDB as a no-cost "drop in" replacement for Neo4j® EE.  As previously recognized by this Court, the plain language of the Neo4j Sweden Software License does not permit those restrictions to be removed by licensees.  Defendants' promotion of ONgDB is thus false and misleading as a matter of law.  Defendants further concede that price is material to consumers decision to choose ONgDB rather than pay for a license for Neo4j® EE.  Consequently, Neo4j USA is also entitled to summary judgment on its false advertising and designation of origin claims.

## II.  EVIDENTIARY OBJECTIONS

Defendants offer over five pages of "background facts" in support of their opposition and cross-motion for summary judgment that are not supported by any admissible evidence.  *See* Opp. at 1:23-6:18. Defendants then acknowledge that "[a] party cannot create a genuine issue of material fact simply by making assertions in its legal papers. [] Rather, there must be specific, admissible,

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE • PALO ALTO

842\3690595.10                                    - 1 -

CONSOLIDATED REPLY ISO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO
DEFENDANTS' CROSS-MOTION; CASE NO. 5:18-CV-07182-EJD

Page 1971

1   evidence identifying the basis for the dispute." *Id.* at 9:15-19 (citations omitted).  Thus, by their

2   own admission, the Court should disregard this section.

3       Defendants' responsive separate statements are also problematic (Neo4j USA's further

4   responses are attached hereto as Exhibits A and B) because they almost exclusively rely on the

5   declaration of John Mark Suhy, which consists of uncorroborated argument and immaterial "facts"

6   lacking any foundation, inadmissible opinion testimony and self-serving denials lacking any

7   evidentiary value.  It is well-settled that, "[w]hen the non-moving party relies only on its own

8   affidavits to oppose summary judgment, it cannot rely on conclusory allegations … to create an

9   issue of material fact." *Hansen v. United States*, 7 F.3d 137, 138 (9th Cir. 1993) (per curiam);

10  "Summary judgment requires facts, not simply unsupported denials or rank speculation." *McSherry*

11  *v. City of Long Beach*, 584 F.3d 1129, 1138 (9th Cir. 2009).  The Court also need not find "a 'genuine

12  issue' where the only evidence presented is 'uncorroborated and self-serving' testimony." *Villiarimo*

13  *v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002).  Thus, the Court should disregard

14  Suhy's declaration and the "facts" that rely upon it.  Plaintiffs' specific evidentiary objections to this

15  declaration are included in a chart attached hereto as Exhibit C.

16  **III.   LEGAL ARGUMENT**

17      **A.    Neo4j USA Has Standing to Assert its Lanham Act Claims Against Defendants**

18          Defendants' standing and ownership arguments do nothing more than attempt to re-litigate

19  their unsuccessful arguments made in opposing Plaintiffs' prior dispositive motions.  *Compare* Opp.

20  at 7:10-8:2, 11:5-11:16, 12:15-14:9; *and* Dkt. Nos. 70, 85.[1]  In doing so, they confuse the legal

21  principles of standing and validity.  To have standing under the Lanham Act, a plaintiff must prove

22  that he is "(1) the owner of a federal mark registration, (2) the owner of an unregistered mark, or (3)

23  a nonowner with a cognizable interest in the allegedly infringed trademark." *Halicki Films, LLC v.*

24  *Sanderson Sales & Mktg.*, 547 F.3d 1213, 1225 (9th Cir. 2008).  In particular, trademark claims

25  under 15 U.S.C. § 1114(1) may be brought **by the registrant of the trademark**, and the registrant's

26  "legal representatives, predecessors, successors, and assigns." 15 U.S.C. § 1127.

27          Defendants do not dispute that Neo4j Sweden is a wholly owned subsidiary controlled by

28

---

[1] All docket references are to the PureThink Action unless otherwise referenced as "GFI Dkt."

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE • PALO ALTO

842\3690595.10                          - 2 -
CONSOLIDATED REPLY ISO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO
DEFENDANTS' CROSS-MOTION; CASE NO. 5:18-CV-07182-EJD

**Page 1972**

1   Neo4j USA, or that Neo4j USA is the *registrant* of the Neo4j® Mark. *See* Fact 1; *see also* Opp. at

2   7:21-23, Dkt. No. 72 at 24:24-25:1. Conversely, Defendants fail to offer any admissible evidence

3   contesting that Neo4j USA has a cognizable interest in stopping Defendants' infringement of the

4   Neo4j® Mark. Moreover, since both Neo4j USA and Neo4j Sweden are parties to this action and

5   have a unity of interest in enforcing the Neo4j® Mark, they have standing. *See Hokto Kinoko Co.*

6   *v. Concord Farms, Inc*., 810 F.Supp.2d 1013, 1046 (C.D. Cal. 2011), *aff'd*, 738 F.3d 1085 (9th Cir.

7   2013) (granting summary judgment in favor of plaintiffs on defense for failure to join indispensable

8   party where subsidiary brought infringement action and parent company that purported to be the

9   actual owner of the marks was also a party).

10      Defendants also misapprehend the holdings in *Quabaug Rubber Co. v. Fabiano Shoe Co*.,

11  567 F.2d 154 (1st Cir.1977) and *DEP Corp. v. Interstate Cigar Co.*, 622 F.2d 621 (2nd Cir.1980) as

12  supporting their standing argument. *See* Opp. at 13:10-21. Both cases recognize that the *registrant*

13  has standing to file a trademark infringement suit under 15 U.S.C. § 1114(1)(a). Yet, *Quabaug* is

14  distinguishable because the licensee bringing the Section 1114 claim was not the owner of the

15  registration for the mark, instead it had a non-exclusive license *from the registrant of the mark*. *See*

16  567 F.2d at 158-160. The circumstances in *DEP* were even more attenuated where plaintiff lacked

17  direct ties to the owner of the registration and merely had a sub-license from one of the registrant's

18  distributors that expressly precluded it from enforcing the mark. 622 F.2d at 621-623. These are

19  critical distinctions because Neo4j USA is the proper registrant for the Neo4j® Mark and the owner

20  thereof under the related company doctrine.

21      Even assuming *arguendo* that Neo4j USA were not the owner of the registration for the

22  Neo4j® Mark, it is well-established that one does not need to be the owner to have standing to assert

23  such claims under Section 43(a). *See* 15 U.S.C. § 1125(a); *see also Quabaug,* 567 F.2d at 160 ("one

24  who may suffer adverse consequences from a violation of section 1125(a) has standing to sue

25  regardless of whether he is the registrant of a trademark"); *Adidas America, Inc. v. Athletic*

26  *Propulsion Labs, LLC*, 120 U.S.P.Q.2d 1303, 2016 WL 3896826, *3-4 (D. Or. 2016) (Adidas

27  America, a nonexclusive licensee of Adidas AG, had standing to sue under Section 43(a)). Similarly,

28  even if the registration was invalid, which it is not, Plaintiffs' common law rights in the Neo4j®

842\3690595.10                                                       - 3 -

CONSOLIDATED REPLY ISO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO
DEFENDANTS' CROSS-MOTION; CASE NO. 5:18-CV-07182-EJD

1   Mark would still persist. *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001).

2        Defendants' argument that Neo4j USA does not have standing because its Lanham Act

3   claims revolve around their use and mention of software owned by Neo4j Sweden bearing the

4   Neo4j® Mark, and that Neo4j Sweden licenses it under the AGPL is unsupported and is wrong. *See*

5   PT Opp. at 11:5-24. As the Court recognized, the "GPL and AGPL are copyright licenses, not

6   trademark licenses." *See* Dkt. No. 85 at 7:27. Defendants' breach of the Neo4j Sweden Software

7   License is a separate issue from their infringement of the Neo4j® Mark.[2] The trademark claims

8   asserted by Neo4j are based on Defendants' improper use of the Neo4j® Mark in the promotion of

9   ***Defendants' software***, not their use of the underlying copyrighted source code.

10       Finally, there is no standing issue created by Neo4j USA raising Defendants' unauthorized

11   removal of the Commons Clause from the Neo4j Sweden Software License to establish their false

12   and misleading advertisement of ONgDB as "free and open source" Neo4j® EE. The Lanham Act

13   confers standing on "any person who believes that he or she is or is likely to be damaged by such

14   act." 15 U.S.C. § 1125(a)(1). Here, there is uncontroverted evidence that Defendants compete with

15   Neo4j USA for the same customers and a nexus between Neo4j USA losing business and

16   Defendants' false and misleading promotion of ONgDB. *See, e.g.,* Fact 93, 110-111; *see also* Dkt.

17   No. 98-1, Exhs. 42-54, 100, 103. Defendants' standing arguments thus fail. *See TrafficSchool.com,*

18   *Inc. v. Edriver Inc.,* 653 F.3d 820, 825 (9th Cir. 2011) (plaintiff alleging competitive injury under

19   the false advertising prong of Section 43(a) "need only believe that [it] is likely to be injured").

20      **B.**    **Defendants Do Not Establish that the Neo4j® Mark is Invalid**

21       The registration for the Neo4j® Mark is prima facie evidence of the validity of the mark and

22   the registrant's ownership of the mark. *See* 15 U.S.C. § 1115(a). Importantly, this "presumption

23   of validity is a strong one, and the burden on the defendant necessary to overcome that presumption

24   at summary judgment is heavy." *Zobmondo Entm't, LLC v. Falls Media, LLC*, 602 F.3d 1108, 1115

25   (9th Cir. 2010); *see also Vuitton et Fils S.A. v. J. Young Enters., Inc.*, 644 F.2d 769, 775 (9th Cir.

26   1981) (defendant bears the burden of establishing the invalidity of a registration and the court draws

27

28

---

[2] Defendants also ignore that Neo4j Sweden obtained a stipulated judgment in its favor on its DMCA and breach of license claims against GFI. GFI Dkt. No. 65 at ¶¶ 118-128; GFI Dkt. No. 110.

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE • PALO ALTO

842\3690595.10          - 4 -

CONSOLIDATED REPLY ISO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO
DEFENDANTS' CROSS-MOTION; CASE NO. 5:18-CV-07182-EJD

1    any inference from the facts in favor of the registrant of the mark).  While Defendants claim to

2    contest Neo4j USA's ownership of the Neo4j® Mark, they are actually challenging the validity of

3    the registration for that mark.[3]  *See Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1203

4    (9th Cir. 2012) ("[i]t is axiomatic in trademark law that the standard test of ownership is priority of

5    use") (internal quotes and citation omitted); *accord Am. Auto. Ass'n of N. California, Nevada &*

6    *Utah v. Gen. Motors LLC*, 367 F. Supp. 3d 1072, 1088 (N.D. Cal. 2019).  Specifically, Defendants

7    attempt to rebut the presumption of validity offering "facts" that were identical to those

8    underpinning their fraud in the procurement and naked licensing defenses that this Court ***previously***

9    ***struck with prejudice*** (Dkt. Nos. 70, 85)*,* which Defendants improperly revived in their Answer to

10   the TAC (Dkt. No. 91) and now raise here (PT Dkt. 100, Exhibit B at D Fact 130-132).[4]

11
12       1.       **Defendants Fail to Meet Their Burden of Proof Establishing that the**
                 **Registration for the Neo4j® Mark was Fraudulently Obtained**

13       To invalidate the registration for the Neo4j® Mark based on fraud in the procurement,

14   Defendants must offer undisputed evidence that: "(1) a false representation regarding a material fact;

15   (2) the registrant's knowledge or belief that the representation is false; (3) the registrant's intent to

16   induce reliance upon the misrepresentation; (4) actual, reasonable reliance on the misrepresentation;

17   and (5) damages proximately caused by that reliance." *Hokto Kinoko Co. v. Concord Farms, Inc.*,

18   738 F.3d 1085, 1098 (9th Cir. 2013).  Notably, Defendants offer no evidence establishing a knowing

19   intent to deceive by Neo4j USA, or reliance by and any alleged damage to them.  *See* D Fact 130.

20       As for the first element, it is immaterial whether Neo4j USA existed at the time of claimed

21   first use.  Indeed, the PT Defendants previously conceded this was not grounds for invalidating the

22

23   [3] Defendants rely upon *Schwinn Bicycle Co. v. Murray Ohio Mfg. Co.,* 339 F.Supp. 973, 979 (M.D.
     Tenn. 1971), a non-controlling 50-year old case, for the proposition "that the ownership to a

24   trademark is not conferred by registration." *See* Opp. at 12:20-23. That court made no such ruling
     and Defendants misconstrue the meaning "ownership," which the court noted "stems from prior

25   appropriation and use." *See id.* The *Schwinn* court also made clear that challenging the validity of

26   the registration was the appropriate way to rebut the presumptions conferred by a registration.

27   [4] Defendants' violation of the Court's orders and local rules, as well as the doctrines of claim
     preclusion and the law of case are discussed in detail in Plaintiffs' pending motion to strike their

28   answer to the TAC wherein they impermissibly reasserted these defenses. *See* Dkt. Nos. 93-96.

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE • PALO ALTO

842\3690595.10                                   - 5 -
CONSOLIDATED REPLY ISO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO
DEFENDANTS' CROSS-MOTION; CASE NO. 5:18-CV-07182-EJD

1   registration for the Neo4j® Mark. *See* Dkt. No. 70 at 8:4-18. This is because an applicant's claimed

2   date of first use cannot form the basis for cancellation of registration so long as the first use in fact

3   preceded the application date. *Pony Exp. Courier Corp. of Am. v. Pony Exp. Delivery Serv.*, 872

4   F.2d 317, 319 (9th Cir. 1989). Defendants also do not offer evidence that Neo4j USA failed to use

5   the Neo4j word mark in commerce prior to the April 30, 2014 filing date of the application. Nor

6   can they do so because Neo4j USA was using the Neo4j® Mark in interstate commerce before that

7   date. Fact 1 (Reply Ratinoff Decl., Exhs. A-D). Further, Neo4j USA was ***legally entitled*** to rely on

8   Neo4j Sweden's prior use of the Neo4j® Mark. *See* 15 U.S.C. § 1055 ("Where a [] mark sought to

9   be registered is [] used legitimately by related companies, such use shall inure to the benefit of the

10  registrant or applicant for registration, and such use shall not affect the validity of such mark or of

11  its registration…."); *see also* Trademark Manual of Examining Procedure ("TMEP") § 903.05.

12       Neo4j USA's purported failure to disclose that Neo4j Sweden was the owner of the rights to

13  the Neo4j word mark to the USPTO is also not a material omission. The USPTO's rules did not

14  require Neo4j USA to disclose that information in the application. *See* TMEP § 1201.03(c) ("Either

15  a parent corporation or a subsidiary corporation may be the proper applicant, depending on the facts

16  concerning ownership of the mark. The USPTO will consider the filing of the application in the

17  name of either the parent or the subsidiary to be the expression of the intention of the parties as to

18  ownership in accord with the arrangements between them."); *see also* TMEP § 1201.03(b) ("where

19  the application states that use of the mark is by a related company or companies, the USPTO does

20  not require an explanation of how the applicant controls the use of the mark").

21       As for the second element, Defendants baselessly ***speculate*** there is a "strong inference" that

22  Neo4j USA's COO allegedly knew that Neo4j USA did not own rights in the Neo4j word mark at

23  the time it filed the application. *See* D Fact 130. This does not invalidate the resulting registration

24  because "absent the requisite intent to mislead the USPTO, even a material misrepresentation would

25  not qualify as fraud under the Lanham Act warranting cancellation." *In re Bose Corp.*, 580 F.3d

26  1240, 1243 (Fed.Cir.2009); *see also Far Out Prods.*, 247 F.3d at 996 (an affidavit was fraudulent

27  only if the affiant acted with scienter). Indeed, Defendants offer no admissible evidence of any

28  intent to deceive by either Mr. Nordwall or Neo4j USA, and Defendants apparently knew that such

Hopkins & Carley
Attorneys At Law
San Jose • Palo Alto

842\3690595.10                                    - 6 -

CONSOLIDATED REPLY ISO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO
DEFENDANTS' CROSS-MOTION; CASE NO. 5:18-CV-07182-EJD

**Page 1976**

evidence does not exist since they did not bother to take their depositions during discovery. *See Scat Enterprises, Inc. v. FCA US LLC*, 2017 WL 5749771, at *2 (C.D. Cal. June 8, 2017) (cancellation claim failed because "[m]erely demonstrating that Plaintiff made a misrepresentation is insufficient to establish that Plaintiff possessed the requisite intent to deceive").

Defendants also misconstrue the scope and application of the related companies' doctrine by arguing that it is "only for registration and only allows the 'owner' of the trademark to use its subsidiaries 'use' of the mark in the application." Opp. at 14:3-6. Defendants' reliance on Judge Nies' concurring opinion from *In re Wella A.G.*, 787 F.2d 1549, 1554 (Fed. Cir. 1986) ("*Wella I*") to support this proposition is improper since the Federal Circuit subsequently reversed the TTAB's decision that was based on the same concurring opinion. *See In re Wella A.G.*, 858 F.2d 725 (Fed. Cir. 1988) ("*Wella II*"). In the *Wella* cases, a foreign corporation applied to register a WELLA mark and the USPTO cited prior registrations owned by its subsidiaries as confusingly similar under § 2(d) as owned "by another." The *Wella II* court **rejected** Judge Nies' "additional views" that there can be only one "owner" of a mark and nothing in the Lanham Act confers a right to register on a non-owner, whether a licensee or subsidiary. *Wella II*, 858 F.2d at 727. The *Wella II* court further held that because the parent owned substantially all of the stock of the subsidiary, it controlled the subsidiary's actions and thus were the "same source" such that there was no likelihood of confusion and the marks could be registered accordingly. *Id.* at 728-29. Defendants do note cite any undisputed evidence that Plaintiffs used the Neo4j® Mark in a manner that deceived the public.

Again, it is undisputed that Neo4j USA wholly owns and controls Neo4j Sweden. *See* Fact 1; *see also* Dkt. No. 98-2 at 1:17-18. Further, Mr. Nordwall's declaration indicates that Neo4j USA relied upon the related company provisions in the Lanham Act to register the Neo4j word mark. Dkt. No. 100-3, Exh. 6 (p. 101 of 125). Thus, Plaintiffs' unity of control over the Neo4j® Mark is presumed. *See* TMEP §§ 1201.07(b), 1201.07(b)(i), 1201.07(b)(ii); *see also W. Fla. Seafood, Inc. v. Jet Restaurants, Inc.*, 31 F.3d 1122, 1126-27 (Fed. Cir. 1994) (separate entities operating as a single entity in the eyes of the consuming public may be treated as such for trademark purposes).

The Supreme Court has recognized that "a corporation may adopt the subsidiary form of organization for valid management and related purposes" and that this structure "may improve

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE • PALO ALTO

842\3690595.10                                    - 7 -

CONSOLIDATED REPLY ISO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO
DEFENDANTS' CROSS-MOTION; CASE NO. 5:18-CV-07182-EJD

**Page 1977**

management, avoid special tax problems arising from multistate operations, or serve other legitimate interest." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 772-73 (1984) ("[a]t least when a subsidiary is wholly owned … the ultimate interests of the subsidiary and the parent are identical"). Here, the Intercompany Agreement relied upon by Defendants simply reflects the intercompany division of assets, including trademarks, between Neo4j USA and Neo4j Sweden as parent and wholly-owned subsidiary, and does not damage the validity of the mark either at the time of registration or thereafter. *See* 15 U.S.C. § 1055 ("***Where a registered mark … is or may be used legitimately by related companies***, such use shall inure to the benefit of the registrant …, ***and such use shall not affect the validity of such mark*** …, provided such mark is not used in such a manner as to deceive the public.") (emphasis added); *see also Cont'l Distilling Corp. v. Old Charter Distillery Co.*, 188 F.2d 614, 620 (D.C. Cir. 1950) ("[a] court of equity… does not hesitate to disregard a corporate entity and to recognize that all the assets of a solvent wholly owned subsidiary are equitably owned by the parent corporation"). Thus, any alleged failure by Neo4j USA to disclose the internal management of intellectual property within its wholly controlled corporate group is immaterial and cannot be used by Defendants to invalidate the registration for the Neo4j® Mark.[5]

## 2. Defendants Fail to Establish the Naked Licensing of the Neo4j® Mark

Defendants' attempt to revive their failed naked license defense based on Plaintiffs allegedly failing to offer evidence that Neo4j Sweden controlled the quality of Neo4j®-branded software used by third parties fares no better. *See* D Fact 131. As discussed above, Defendants have the burden of producing uncontroverted evidence to rebut the presumption of validity. This is also an ***argument*** that the Court rejected in striking their naked licensing defense with prejudice. *See* Dkt. No. 85 at 7:27-10:17. It is also controverted by the Court's prior ruling that "the GPL and AGPL are copyright

---

[5] Defendants cite to dicta in *Dole Food Co. v. Patrickson*, 538 U.S. 468 (2003) to suggest that Neo4j USA does not have legal title to Neo4j Sweden's assets, *i.e.*, the Neo4j® Mark. This case is not instructive because it addressed the issue whether a corporation is deemed an instrumentality of a foreign state where that state owns less than a majority of shares for purposes of sovereign immunity, and did not involve the ownership of trademark rights or take into account the aforementioned provisions of the Lanham Act. Further, the fact that Neo4j Sweden registered marks for "Neo4j" outside the United States is irrelevant for purposes of determining the validity of a U.S. registration, and is consistent Plaintiffs' parent-subsidiary relationship. *See Hokto Kinoko*, 738 F.3d at 1097-99.

CONSOLIDATED REPLY ISO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' CROSS-MOTION; CASE NO. 5:18-CV-07182-EJD

**Page 1978**

1   licenses, not trademark licenses" and that "[n]aked licensing does not occur when there is no

2   trademark license at issue." *Id.* at 7:27-8:25. As a result, they cannot invalidate the Neo4j® Mark

3   based on third party modifications to source code licensed under the GPL or AGPL. *See id.*

4       Likewise, Defendants' suggestion that an absence of quality control provisions in the

5   Intercompany Agreement amounts to the naked licensing of the Neo4j® Mark is wrong. *See* Fact

6   132. This "fact" does not overcome the legal presumption that Neo4j USA and Neo4j Sweden

7   continue to operate as "related companies" and their continued combined use of the Neo4j® Mark

8   "shall not affect the validity of such mark." 15 U.S.C. § 1055; *see also See Hokto Kinoko*, 738 F.3d

9   at 1098 (no naked licensing where subsidiary used parent company's trademark). Moreover,

10   Defendants ignore that Plaintiffs offered uncontroverted evidence that they work closely to ensure

11   that the software bearing the Neo4j® Mark is of the highest quality. *See* Dkt. No. 98-2 at ¶¶ 19-22.

12       Finally, Defendants do not offer any admissible evidence establishing consumer confusion

13   resulting from the licensing arrangement between Neo4j USA and Neo4j Sweden. Nor can they do

14   so because it is entirely permissible for a related company such as Neo4j Sweden to use the Neo4j®

15   Mark alongside Neo4j USA. *See Hokto Kinoko*, 738 F.3d at 1098 ("[e]ven absent formal quality

16   control provisions, a trademark owner does not abandon its trademark where the particular

17   circumstances of the licensing arrangement suggests that the public will not be deceived") (internal

18   quotes and citation omitted). As a result, the Court should again reject this defense.

19   **C.    Defendants Have Not Engaged in Nominative Fair Use of the Neo4j® Mark**

20       In order to rely upon nominative fair use, (1) defendant's product must be one not readily

21   identifiable without use of plaintiffs' trademark; (2) only so much of that mark may be used as is

22   reasonably necessary to identify defendant's product; and (3) defendant must do nothing that would,

23   in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder. *Toyota*

24   *Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1175-76 (9th Cir. 2010). Plaintiffs need only

25   negate one of these elements to defeat Defendants' reliance on the nominative fair defense. *See*

26   *Playboy Enterprises, Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1030 (9th Cir. 2004)

27   (because defendants use of plaintiff's mark ran afoul of the first prong for nominative use, no need

28   to consider the other two); *see also Horphag Research Ltd. v. Garcia*, 475 F.3d 1029, 1041 (9th Cir.

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE • PALO ALTO

842\3690595.10                                  - 9 -

CONSOLIDATED REPLY ISO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO
DEFENDANTS' CROSS-MOTION; CASE NO. 5:18-CV-07182-EJD

**Page 1979**

1    2007) (defendant's use must meet all three fair use prongs). Despite Plaintiffs setting forth how

2    Defendants' use of the Neo4® Mark to promote ONgDB software does not meet each element,

3    Defendants only unsuccessfully attempt to address the third. *See* Opp. at 15:15-17:17.

### 1.    The Undisputed Facts Establish that Defendants Impermissibly Used the Neo4j® Mark to Refer to Their Products and Services

6        Defendants cannot rely on a nominative fair use defense where they use the Neo4j® Mark

7    to refer to Defendants' products rather than Plaintiffs' products. *Align Tech., Inc. v. Strauss Diamond*

8    *Instruments, Inc.*, 2019 WL 1586776, at *5-7 (N.D. Cal. Apr. 12, 2019) ("[i]n nominative fair use,

9    the defendant uses the trademarked term not to describe its product but to describe the plaintiff's

10   [product]"). Defendants do not dispute that they used Neo4j® Mark to promote "Government

11   Packages for Neo4j" and "Government Development Package with Neo4j Enterprise." *See* Fact 8,

12   15-16, 25, 27. Instead, Defendants argue that they cannot be held liable for trademark infringement

13   because did not use the Neo4j® Mark "for the promotion of [Neo4j] USA's products" and were

14   instead referring to "Sweden's open source software called Neo4j." *See* Opp. at 11:5-13, 14:17-20.

15       This is a distinction without a difference because the Neo4j® Mark is registered as a standard

16   character mark, and as a result Neo4j USA's exclusive right to use the mark "is extremely broad,

17   covering the word in all types of depictions." *Pom Wonderful LLC v. Hubbard,* 775 F.3d 1118,

18   1125 (9th Cir. 2014); *accord Rise Basketball Skill Dev. LLC v. K Mart Corp.*, 2017 WL 4865561,

19   at *3 (N.D. Cal. Oct. 27, 2017) (citing same) ("ownership of a word mark entitles the owner

20   exclusive rights in the word for the class of goods specified in the trademark"). This argument also

21   echoes their failed defense that Plaintiffs cannot use the Neo4j® Mark as both a company name for

22   Neo4j USA and Neo4j Sweden, as well as the name of its software products. *See* Dkt. No. 70 at

23   9:3-10:24. In this regard, the Court held that "[t]he Lanham Act expressly recognizes that a

24   registered mark "may be used legitimately by related companies." *See id.* at 10:8-11. More

25   importantly, a review of iGov's website shows the overly-repetitive use of the Neo4j® Mark to

26   promote its recompiled patchwork binaries. Fact 15-17, 19, 26-28, 30-32, 34.

27       Defendants also argue that their promotion of iGov's patchwork binaries "have been to

28   marketing and service [sic] Sweden's open source Neo4J software and derivatives of such software

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE • PALO ALTO

842\3690595.10                          - 10 -

CONSOLIDATED REPLY ISO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO
DEFENDANTS' CROSS-MOTION; CASE NO. 5:18-CV-07182-EJD

**Page 1980**

1   as permitted under the GitHub Terms of Service and the AGPL." *See* Fact 25-28. It is immaterial

2   that the underlying source code used by iGov was licensed by Neo4j Sweden under the AGPL

3   because it is not a trademark license and does not give licensees "any rights to use the [Neo4j®

4   Mark]." Dkt. No. 85 at 7:27-8:2. Likewise, there is nothing in the GitHub Terms of Service (GTOS)

5   that expressly or implicitly contemplates a user licensing their trademark to other GitHub users, and

6   Defendants cite no evidence establishing that Plaintiffs agreed to license the Neo4j® Mark to third

7   parties under any GTOS. *See Dep't of Parks & Rec. v. Bazaar Del Mundo, Inc.*, 448 F.3d 1118,

8   1129-30 (9th Cir. 2006) (normally a mark owner intentionally enters into an express license, and for

9   an implied license to exist, there must be "evidence of an agreement or course of conduct by the

10  parties to contract for a trademark license"). To the contrary, the GTOS warns them that "use of the

11  Website and Service must not violate any applicable laws, including copyright or trademark

12  laws…." Dkt. No. 100-3, Exh. 9 at § C. It also does not include trademarks in the definition of

13  "Content" that other users may have a right to use under the GTOS, and a plain reading of this

14  definition makes clear that it is intended to cover copyrightable works. *Id.*, §§ A.4, D.5.

15      Further, Defendants do not refute their use of the Neo4j® Mark in the URL

16  "https://igovsol.com/neo4j.html" to promote their patchwork binaries of Neo4J® EE. Fact 16. They

17  even ***admit*** that "iGov continued to use "https://igovsol.com/neo4j.html" as a URL address to

18  promote ONgDB until it deactivated that page sometime after July 27, 2020." Fact 18. Thus, they

19  cannot claim this is fair use. *See Brookfield Commc'ns Inc. v. West Coast Ent. Corp.*, 174 F.3d

20  1036, 1064-65 (9th Cir.1999) ("[u]sing another trademark in one's metatags is much like posting a

21  sign with another's trademark in front of one's store"); *see also Experience Hendrix, L.L.C. v.

22  Hendrixlicensing.com, Ltd.*, 2010 WL 2104239, at *6 (W.D. Wash. May 19, 2010) (use of plaintiff's

23  HENDRIX mark in defendants' URL addresses and business names did not describe plaintiffs'

24  products but rather defendants' products); *State St. Glob. Advisors Tr. Co. v. Visbal*, 431 F.Supp.3d

25  322, 342 (S.D.N.Y. 2020) (holding that use of a trademark in a URL is not fair use). The fact that

26  iGov ceased using this URL after July 27, 2020 – almost two years ***after*** Plaintiffs filed suit – does

27  not absolve it of liability for past infringement of the Neo4j® Mark. *See* 15 U.S.C. § 1117(a).

28      Similarly, Defendants do not refute that they used neo4j@igovsol.com as means for

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE • PALO ALTO

842\3690595.10                                    - 11 -

CONSOLIDATED REPLY ISO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO
DEFENDANTS' CROSS-MOTION; CASE NO. 5:18-CV-07182-EJD

**Page 1981**

1   consumers to inquire about the patchwork of ONgDB binaries claimed be equivalent to Neo4j® EE.

2   Fact 16, 19 (Dkt. No. 93-1, Exhs. 15-16, 62-64, 67-69 [purple highlights]).  Instead, they argue they

3   the email address is for inquiries about "Sweden's open source Neo4j," as "as a way to inquire about

4   iGov support services and support for the neo4j open source database," and "a means to inquire

5   about ONgDB" and "ongdb open source license support." Fact 16, 19.  This is still not fair use

6   because they are using the goodwill associated with the Neo4j® Mark to promote their patchwork

7   binaries for ONgDB, rather than merely referring to Plaintiffs' unmodified software.

8   Finally, Defendants claim that their use of the Neo4j® Mark *ad nauseam* throughout iGov's

9   website was merely for "comparative advertisement" purposes.  *See* Fact 25-27.  A review of

10  Defendants' website from 2018 through 2020, the contents of which are not disputed, completely

11  undermines this claim.  *See* Fact 15-21, 25-27 (cited webpages).  Defendants' website does not

12  independently promote ONgDB as a graph database software with minimal or nominative use of the

13  Neo4j® Mark, and Defendants used the mark to promote ONgDB and related support services for

14  ONgDB.  *See* Fact 29.  For example, Defendants do not dispute that iGov used a "Download Neo4j

15  Enterprise" hyperlink on its 'downloads' page to redirect consumers to download links for ONgDB

16  until July 27, 2020."  Fact 20; *see also* Fact 27(3).  Thus, there is no disputed issue of fact that

17  Defendants used the Neo4j® Mark to impermissibly promote their products, and therefore cannot

18  rely upon nominative fair use to preclude the Court from entering summary judgment against them.

19          **2.     The Undisputed Facts Establish that Defendants Used the Neo4j®**
           **Mark More Than Was Reasonably Necessary and Not for the Purpose**
20         **of Comparative Advertising**

21  Defendants completely ignore incontrovertible evidence that they use the Neo4j® Mark far

22  more than what is reasonably necessary to describe ONgDB 3.5 as a divergent fork of official

23  Neo4j® EE.  Rather, any reasonable jury would conclude from the undisputed evidence that

24  Defendants extensively used the Neo4j® Mark (albeit without proper trademark usage and notices)

25  on their websites and in direct solicitations to customers to describe their patchwork of binaries as

26  official Neo4j® EE, except with a fraudulently altered license. *See* Fact 28-30.  No matter how hard

27  Mr. Suhy ***argues*** in his declaration to the contrary, Defendants go far beyond what is reasonably

28  necessary and are not engaging in comparative advertising.  *See id.*  It constitutes a misuse of the

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE • PALO ALTO

842\3690595.10                                    - 12 -

CONSOLIDATED REPLY ISO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO
DEFENDANTS' CROSS-MOTION; CASE NO. 5:18-CV-07182-EJD

1   Neo4j® Mark that defeats its source-identification function.  *See Playboy Enters., Inc. v. Welles*,

2   279 F.3d 796, 804 (9th Cir. 2002) (holding that "[t]he repeated depiction of 'PMOY '81' is not

3   necessary to describe" a former "Playmate of the Year" on her website).

4   Likewise, Defendants can only use the Neo4j® Mark "in advertising and other channels of

5   communication *if the use is not false or misleading.*"  *See New Kids on the Block v. News Am. Pub.,*

6   *Inc.*, 971 F.2d 302, 307 (9th Cir. 1992) (emphasis added).  This is not the case here because as

7   detailed below, Defendants are misleadingly promoting ONgDB *as Neo4j® EE* except without the

8   commercial limitations imposed by the Commons Clause in the Neo4j Sweden Software License.

9   Defendants' suggestion that they are fairly using the Neo4j® Mark to advertise their support and

10  consulting services for either ONgDB or official Neo4j® EE is equally problematic.  In this regard,

11  Defendants argue that the Commons Clause does not prevent their offering of such services and

12  "they have a right to tell consumers they can use Sweden's Neo4J open source software for free

13  instead of paying for USA's commercial license."  *See* Opp. at 15:11-12, 19:19-21; Suhy Decl.,

14  ¶ 23, Exh. 2.  The evidence relied upon by Defendants supporting this argument is unauthenticated

15  and inadmissible hearsay, as well as is irrelevant and lacks foundation because Ms. Meeker was not

16  speaking on behalf of Plaintiffs, was not specifically discussing the Neo4j® Sweden Software

17  License, and is not a party to that agreement.  *See* F.R.E. 602, 801 et seq.

18  More importantly, it contradicts the plain language of the Commons Clause, which states

19  this "License does not grant to you, the right to Sell the Software" and defines "Sell" as "practicing

20  any or all of the rights granted to you under the License to provide to third parties, for a fee or other

21  consideration (*including without limitation fees for hosting or consulting/ support services related*

22  *to the Software*), a product or service whose value derives, entirely or substantially, from the

23  functionality of the Software."  Dkt. No. 98-1, Exh. 39 (emphasis added).  Where "the language [of

24  a contract] is clear and explicit, and does not involve an absurdity," the language must govern the

25  contract's interpretation.  Cal. Civ. Code § 1638; *see also* Cal. Civ. Code § 1639.  Such is case here.

26  This further begs the question that if Defendants believed the services they offer do not

27  violate the Commons Clause, then why remove the clause in the first place?  The answer is simple:

28  Defendants are advertising paid services "aimed at building a solution around Neo4j," the value of

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE • PALO ALTO

842\3690595.10                                      - 13 -
CONSOLIDATED REPLY ISO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO
DEFENDANTS' CROSS-MOTION; CASE NO. 5:18-CV-07182-EJD

**Page 1983**

1   which is entirely derived from Neo4j® EE's enhanced features and functionality over Neo4j® CE.

2   *See, e.g.,* Dkt. No. 98-1, Exh. 62-66 ("there is no reason you should be using community edition …

3   you should use the enterprise edition under it's open source license"), ("iGov Development

4   Packages $25K+ … 100% of the cost goes into services aimed at building a solution around Neo4j"

5   and "iGov Inc provides umbrella support across all the components of your Neo4j solution,

6   including Neo4j itself"), ("[w]e only focus on only supporting 100% free and open source ONgDB

7   Enterprise").  The undisputed facts thus establish that Defendants use the Neo4j® Mark more than

8   reasonably necessary to identify their product and services, and do so in a false and misleading

9   manner.  As a result, they cannot establish the second prong of nominative fair use.

10                    **3.      Defendants Misappropriate the Cachet of the Neo4j® Mark**

11              Defendants offer no admissible evidence refuting they made the statements on their website

12  and directly to customers suggesting sponsorship or endorsement of Defendants' "Neo4j Enterprise"

13  and ONgDB products by Neo4j USA.  *See* Fact 31-33.  Defendants also offer no admissible evidence

14  refuting that they used hyperlinks to redirect consumers to Neo4j USA's official release and

15  Plaintiffs' other documentation in promoting ONgDB.  *See* Fact 34.  Instead, Defendants argue that

16  their website makes clear that they are not affiliated with Neo4j USA, and without citing to any

17  admissible evidence, that "[a] reasonable consumer would not be confused that defendants' websites

18  are … sponsored by [Plaintiffs]."  Dkt. 100 at 16:18-20.

19              Defendants miss the mark by focusing on website affiliation, while ignoring their use of the

20  Neo4j® Mark misleadingly suggests Plaintiffs' sponsorship or approval of their "Neo4j Enterprise,"

21  "Government Package for Neo4j" and ONgDB products.  This is because they are misappropriating

22  the goodwill associated with the Neo4j® Mark and "appropriate[ing] the cachet of one product for

23  a different one." *See New Kids on the Block*, 971 F.2d at 308-309; *see also Horphag*, 475 F.3d at

24  1038.  Defendants' representations about their products on their website and directly to customers

25  in conjunction with the use of Neo4j® Mark would lead any reasonable consumer to assume they

26  are getting official Neo4j® EE as free open source software, when in fact, it is receiving an

27  improperly licensed, non-identical build of that software not compiled by Plaintiffs.  Fact 31-34.

28              Neo4j USA is not required to prove actual customer confusion to negate the third prong of

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ● PALO ALTO

842\3690595.10                                                    - 14 -
CONSOLIDATED REPLY ISO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO
DEFENDANTS' CROSS-MOTION; CASE NO. 5:18-CV-07182-EJD

**Page 1984**

1   Defendants' nominative fair use defense. *Brookfield*, 174 F.3d at 1050 (absence of actual confusion

2   is not dispositive and is "generally unnoteworthy"). Nonetheless, Defendants fail to adequately

3   refute all of the evidence of customer confusion cited by Plaintiffs. *See, e.g.*, Fact 36 (only

4   addressing 3 of the 14 cited exhibits showing Suhy misleading consumers into believing that

5   ONgDB and Neo4j® EE were one and the same); Fact 37 (not addressing any cited evidence

6   showing Suhy creating customer confusion by falsely equating ONgDB with commercially licensed

7   Neo4j® EE, and claiming it is "free and open source"). One example of customer confusion

8   Defendants ignore is the RFQ for Northrup Grumman signed by Suhy states "Neo4j Enterprise open

9   source distribution licenses and basic support. Aka ONGDB." Fact 36-37 (Dkt. No. 98-1, Exh. 55

10  at p. 4 of 5, Exh. 3 at 235:21-237:14, Exhs. 130-131). Perhaps the best example of Defendants

11  capitalizing on consumer confusion that they ignore is their misrepresentations to Next Century

12  about the Commons Clause being invalid and that ONgDB was a drop-in equivalent to Neo4j® EE

13  except it was free to use under the APGL. Fact 36 and 37 (Dkt. No. 98-1, Exhs. 47-49); Fact 76

14  (Dkt. No. 98-1, Exh. 48-50, 120); Dkt. No. 98-3, ¶¶ 20-24, Exhs. 12-13); Fact 111.

15      Lastly, Defendants' attempt to downplay the customer issues cited by Neo4j USA by arguing

16  that the issues are user error or are inherent in Neo4j Sweden's code and miss the mark. *See* Fact.

17  No. 38; *see also* Opp. at 17:4-7. The fact that consumers sought help from either Plaintiffs or other

18  users of Neo4j® software when they encounter issues with ONgDB implicates the source-

19  identification function of the Neo4j® Mark, and thus supports a strong inference of uncertainty and

20  confusion in the minds of consumers caused by Defendants. *See Horphag*, 475 F.3d at 1038. Their

21  hearsay objection to this evidence is also unsustainable. *See* Opp. at 17:4-8; Fact 35. For example,

22  when asked about why Defendants found a user complaining to Neo4j USA that ONgDB was not

23  compatible with Neo4j® Desktop was funny (Dkt. No. 98-2, Exhs. 115-116), GFI confirmed actual

24  confusion because it was ***not compatible*** (*id.,* Exh 31 at 230:12-233:10), and iGov effectively

25  conceded that Neo4j® EE appealed to less sophisticated customers than they originally believed

26  (*id.,* Exh. 3 at 207:12-209:3). Fact 35. This means there is a broader customer base that is more

27  likely to be confused by Defendants' use of Neo4j® Mark in promoting ONgDB. Accordingly, the

28  Court should grant partial summary judgment in favor of Neo4j USA on its trademark infringement

842\3690595.10

- 15 -

CONSOLIDATED REPLY ISO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO
DEFENDANTS' CROSS-MOTION; CASE NO. 5:18-CV-07182-EJD

1    claims based on Defendants' *unfair* use of the Neo4j® Mark to promote their products.

2    **D.    Defendants Fail to Address their Liability for Infringement as Ex-Licensees**

3    Defendants do not dispute that they agreed to certain restrictions in exchange for a non-

4    exclusive license to the Neo4j® Mark under Section § 4.1 of the Neo4j Solution Partner Agreement

5    ("SPA"), and agreed to be bound by the additional restrictions imposed by Neo4j USA's trademark

6    usage guidelines.  Fact 2-5.  They also do not dispute that they agreed to cease using the Neo4j®

7    Mark upon termination, or refute that they continued to use the Neo4j® Mark after termination.

8    Fact 6-8. Defendants then ignore that their subsequent usage of the Neo4j® Mark to first promote

9    their patchwork binaries, and then ONgDB as genuine Neo4j® EE violated these guidelines.[6]

10   Compare Dkt No. 98 at 21:20-23:10 and Opp. at 17:19-20:14.  They further ignore the controlling

11   authority cited by Plaintiffs that an ex-licensee's continued use of a trademark alone establishes a

12   likelihood of consumer confusion and thus concede infringement of the Neo4j® Mark.  *See id.*

13   Instead, Defendants argue that the open source restrictions in Section 4.3.2 of the SPA are

14   unenforceable. Opp. at 19:12-20:7.  This is irrelevant because Neo4j USA is not seeking to enforce

15   these restrictions in Section 4.3.2, and issue of whether that provision violates public policy is a

16   Phase 2 issue.  To the extent that that provision may later found to be invalid does not negate the

17   presumed consumer confusion created by Defendants' status as a hold-over infringer of the Neo4j®

18   Mark.[7]  *See* Fact Dkt. No. 98-1, Exh. 4 at § 10.6 (severability).  In this regard, Defendants *admit*

19   PureThink's successors-in-interest are bound by the SPA (Fact 9) and *repeatedly admitted* to

20   forming iGov to circumvent the restrictions imposed by the SPA irrespective of their validity (Fact

21   10).  Defendants websites also make this clear (Fact 10 [Dkt. No. 98-1, Exhs. 14-16]), and Suhy

22   testified that iGov continued PureThink's business relationship with the IRS (Fact 13 [Dkt. No. 98-

23   1, Exh. 3 at 53:4-11]).  Yet, Defendants fail to reconcile that California law does not permit

24   PureThink from circumventing *all* of its legal obligations under the SPA by forming iGov (Dkt. No.

25   ───────────────

26   [6] Defendants attempt to dispute their continued usage of Neo4j® Mark by arguing they were only
     referring to "Sweden's open source versions of Neo4J and proper nominative use of Sweden's

27   mark."  Fact Nos. 8, 24.  As detailed above, this is a meritless distinction.

28   [7] For this same reason, Defendants' reliance on licensee estoppel based on the SPA being against
     public policy is untenable.  *See* Opp. 21:1-6.

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE • PALO ALTO

842\3690595.10                                    - 16 -
CONSOLIDATED REPLY ISO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO
DEFENDANTS' CROSS-MOTION; CASE NO. 5:18-CV-07182-EJD

**Page 1986**

(201 of 299), Page 201 of 299
Case: 24-5538, 12/23/2024, DktEntry: 18.9, Page 201 of 299
Case 5:18-cv-07182-EJD   Document 109   Filed 02/16/21   Page 24 of 103

1   23:24-24:6).  As the owner of PureThink and iGov, Suhy and his customer contacts are the main

2   assets.  His use of the same website template, and the same offices and support telephone number

3   simply confirms that no reasonable finder of fact would conclude otherwise.  *See* Fact 11-14.

4        Thus, iGov and Suhy are imputed with the knowledge of Neo4j USA's guidelines and the

5   presumption that they are precluded from using the Neo4® Mark resulting in a violation thereof.

6   *See Ultratech, Inc. v. Ensure NanoTech (Beijing), Inc.*, 108 F.Supp.3d 816, 826-27 (N.D. Cal. 2015).

7   Likewise, they are equally guilty of creating consumer confusion by promoting recompiled software

8   as being identical to official Neo4j® EE or otherwise affiliated with or endorsed by Plaintiffs.  *See*

9   *Wetzel's Pretzels, LLC v. Johnson*, 797 F.Supp.2d 1020, 1028 (C.D. Cal. 2011).

10       **E.   Defendants' Licensee Estoppel Arguments are Meritless**

11       Defendants raise two licensee estoppel arguments in their opposition – none are germane to

12   the Phase 1 claims and defenses.  First, they argue that licensee estoppel does not bar Defendants

13   from attacking Neo4j USA's ownership of the Neo4j® Mark.  Opp. at 20:16-25.  While Plaintiffs

14   did not assert licensee estoppel against Defendants in their moving papers, this doctrine bars a

15   former licensee from challenging the licensor's mark based upon facts that arose before or during

16   the term of the license.  *See Heaton Distributing Co. v. Union Tank Car Co.*, 387 F.2d 477 (8th Cir.

17   1967) (subsequent validity challenges by former licensees not allowed); *Idaho Potato Commission*

18   *v. M & M Produce Farm & Sales,* 335 F.3d 130, 135 (2d Cir. 2003) ("licensee estoppel provides

19   that when a licensee enters into an agreement to use the intellectual property of a licensor, the

20   licensee effectively recognizes the validity of that property"); *see also STX, Inc. v. Bauer USA, Inc.*,

21   43 U.S.P.Q.2d 1492 (N.D. Cal. June 5, 1997).  Since Defendants cite facts from 2010 and 2014,

22   before they entered the license, they are estopped from challenging the validity of the Neo4j® Mark.

23       Second, they erroneously argue that because Neo4j USA is a licensee of the Neo4j® Mark,

24   it is estopped from "disput[ing] that Sweden owns the Neo4j mark."  Opp. at 21:8-16.  The doctrine

25   is inapplicable here because, as discussed above, Neo4j USA *is the owner of that registration*, not

26   a licensee thereof.  Dkt No. 98 at Exh. 1.  Defendants further contend that because Neo4j USA

27   claims it is the owner of the Neo4j® Mark, a dispute exists. Opp. at 21:13-14. Defendants ignore

28   that there is no dispute between Neo4j USA and Neo4j Sweden regarding the ownership or validity

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE • PALO ALTO

842\3690595.10                                    - 17 -

CONSOLIDATED REPLY ISO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO
DEFENDANTS' CROSS-MOTION; CASE NO. 5:18-CV-07182-EJD

1   of the Neo4j® Mark, and they are in agreement that Neo4j USA is the owner of the registration of

2   Neo4j® Mark.  Fact 1; Rathle Decl. ¶¶ 3-4; Broad Decl. ¶ 3.  Simply put, there is nothing to estop.

3   **F.     Plaintiffs are Entitled to Summary Judgment on Neo4j USA's False
          Advertising Claims Under the Lanham Act and the UCL**

4

5          Neo4j USA's moving papers address all five elements necessary to prove a false advertising

6   claim under Section 43(a) of the Lanham Act and the UCL.  Defendants only address the falsity and

7   materiality elements thereby conceding Neo4j USA established the other three elements.  *See* Opp.

8   at 22:8-23:12.  As discussed below, Defendants cannot refute the falsity of their advertisements in

9   question, which they do not deny making, and the deception caused by those statements is material

10  to consumers' decision to use ONgDB for free rather than pay for license to use Neo4j® EE.

11          **1.     The Terms of the Neo4j Sweden Software License Do Not Give a
                 Licensee the Right to Remove Restrictions Imposed by the Copyright
                 Holder and Licensor of the Underlying Software**

12

13          Defendants do not dispute that their marketing of ONgDB as "free and open source" Neo4j®

14  EE is primarily based on their (mis)interpretation of the Neo4j Sweden Software License and the

15  form AGPL upon which it was based.  They also concede that the falsity of that assertion hinges on

16  the interpretation of these license agreements.  *See* Opp. at 27:8-24; *see also* Fact 77-78, 81-84, 88-

17  91, 93. Contrary to Defendants, "[s]ummary judgment is appropriate when the contract terms are

18  clear and unambiguous, even if the parties disagree as to their meaning." *U.S. v. King Features*

19  *Entm't, Inc.,* 843 F.2d 394, 398 (9th Cir. 1988). While interpretation of these agreements is disputed,

20  their terms are not ambiguous as previously recognized by the Court.  *See* Dkt. No. 88 at 6:19-8:4.

21  Since Neo4j USA has asserted false advertising claims under the Lanham Act and the UCL, it

22  necessarily requires such a determination of the underlying license agreement to establish falsity.

23          Defendants justify their removal of the Commons Clause from Neo4j Sweden Software

24  License based on the erroneous assumption that "This License" as defined in that agreement means

25  the form AGPL without the commons clause.  *See* Opp. 28:1-9; *see also* Fact 88-91 ("Suhy did not

26  replace the Neo4j Software License … He only followed the instructions given by the AGPL license

27  copyright holder to make the actual license verbatim"); Fact 93 ("[t]he [FSF] owns the copyright for

28  the AGPL License.txt file and clearly states that the license must be verbatim").  This is wrong

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE • PALO ALTO

842\3690595.10                                  - 18 -

CONSOLIDATED REPLY ISO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO
DEFENDANTS' CROSS-MOTION; CASE NO. 5:18-CV-07182-EJD

1    because third parties do not have standing to enforce FSF's copyright.  *See Minden Pictures, Inc. v.*

2    *John Wiley & Sons, Inc.*, 795 F.3d 997 (9th Cir. 2015) (only the copyright owner, assignee or an

3    exclusive licensee of a right enumerated by §106 has standing to bring an infringement action); *see*

4    *also* GFI Dkt. No. 88 at 6:12-18 (citing same).

5        Further, the terms of the Neo4j Sweden Software License and their intent are not determined

6    by Suhy's email exchanges with the Free Software Foundation ("FSF").  *See* Opp. 29:14-23.  They

7    are irrelevant and inadmissible hearsay because FSF is not the actual licensor or a party to the actual

8    license.  Suhy conceded as much in his deposition.  Dkt. 98-1 at 187:12-188:15.  In any case, the

9    FSF did not bless Suhy's removal of the Commons Clause.  *See* Dkt. No. 100-2, Exh. B.  Suhy

10   admitted that the FSF did not seem to understand his questions, which prompted him to send second

11   a second email.  Dkt. No. 98-1, Exh. 3 at 183:2-184:10.  In response, the FSF did not agree with his

12   interpretation and stated that it could not give him legal advice.  *Id.,* Exh. 34 ("[i]f a work was

13   previously available under a free license, and later that license is changed, users can always use that

14   earlier version under the terms of the free license"); *see also* Exh. 3 at 189:1-191:3, 192:18-193:24.

15       Defendants then twist the definition of "License" and misconstrue the NOTICE provision at

16   the beginning of the Neo4j Sweden License to justify removing the Commons Clause.  *See* Opp. at

17   28:1-9, 28:23-29:13.   Defendants' arguments violate the cardinal principles of contract

18   interpretation.  In this regard, where "the language [of a contract] is clear and explicit, and does not

19   involve an absurdity," the language must govern the contract's interpretation.  Cal. Civ. Code §

20   1638.  In addition, "the meaning of a contract must be derived from reading the whole of the contract,

21   with individual provisions interpreted together, in order to give effect to all provisions and to avoid

22   rendering some meaningless." *Zalkind v. Ceradyne, Inc.*, 194 Cal.App.4th 1010, 1027 (2011); *see*

23   *also* Cal. Civ. Code § 1641 ("if reasonably practicable" a contract must be interpreted as a whole,

24   "so as to give effect to every part ... each clause helping to interpret the other").

25       The NOTICE provision clearly states that Neo4j® EE is developed and owned by Neo4j

26   Sweden... and is subject to the terms of the [AGPL], ***with the Commons Clause as follows***...." *See*

27   Dkt. No. 98-2, Exh. 3 (emphasis added).  The only logical way to read this and give effect to the

28   entirely of the agreement is that Neo4j Sweden is offering Neo4j® EE under a ***new license*** that

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE • PALO ALTO

842\3690595.10                                          - 19 -

CONSOLIDATED REPLY ISO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO
DEFENDANTS' CROSS-MOTION; CASE NO. 5:18-CV-07182-EJD

1   incorporates the terms of the AGPL with the additional terms in the Common Clause. *See* Cal. Civ.

2   Code. § 1641; *see also Segal v. Silberstein*, 156 Cal.App.4th 627, 633 (2007) ("[w]hen interpreting

3   contracts, the language used controls if it is clear and explicit"). Defendants also ignore that their

4   view nullifies the entire purpose of a license agreement by negating Neo4j Sweden's exclusive right

5   to control the modification and distribution of copyrighted code under the terms of its choosing. *See*

6   GFI Dkt. No. 88 at 7:10-8 (citing *Apple Inc. v. Psystar Corp.*, 658 F.3d 1150, 1159 (9th Cir. 2011)

7   and *Jacobsen v. Katzer*, 535 F.3d 1373, 1381 (Fed. Cir. 2008)).

8          Defendants' claim that Section 7 explicitly grants a licensee permission to remove additional

9   restrictions added by the original licensor, i.e. copyright holder, fares no better. *See* Opp. at 28:15-

10  29:7. In making that claim, the cite to the clause "If the Program as you received it, or any part of

11  it, contains a notice stating that it is governed by this License along with a term that is a further

12  restriction, you may remove that term." *Id.* This clause, however, cannot be read in isolation.

13  Rather, it must be put in context within the surrounding clauses in Section 7 and the Neo4j Sweden

14  Software License. *See* Cal. Civ. Code. § 1641; *Zalkind*, 194 Cal.App.4th at 1027. Notably, the

15  excerpt cited by them is preceded by the following in Section 7: "Notwithstanding any other

16  provision of this License, *for material you add to a covered work*, *you* may (if authorized by the

17  copyright holders of that material) supplement the terms of this License with terms: [six enumerated

18  terms omitted]…." *See* Dkt. No. 98-2, Exh. 3 at §7 (emphasis added). Defendants do not dispute

19  that "you" is defined as the "licensee," i.e. Defendants, in Section 0 of the Neo4j Sweden Software

20  License. *See* Opp. 28:10-14; *see also* Dkt. No. 98-2, Exh. 3 at §0. Thus, Section 7 clearly governs

21  the actions of *licensees* alone, ergo the repeated use of the defined term "you" and the fact that

22  subject matter of Section 7 pertains to what additional permissions and restrictions *licensees* may

23  place on a covered work when adding source code and redistributing it as required by the license.

24         The clause cited by Defendants is also immediately preceded by a clause stating that a

25  licensee who adds material to the original work may add any of the six enumerated "additional

26  restrictions" and that any other "non-permissive additional terms" are "further restrictions" *as

27  defined by Section 10*. *See* Dkt. No. 98-12, Exh. 3 at §7. In this regard, Section 10 makes clear that

28  only *licensees* are precluded from adding further restrictions: "*You* may not impose any further

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ● PALO ALTO

842\3690595.10                                    - 20 -

CONSOLIDATED REPLY ISO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO
DEFENDANTS' CROSS-MOTION; CASE NO. 5:18-CV-07182-EJD

1  restrictions on the exercise of the rights granted or affirmed under this License." *See id.* at §10

2  (emphasis added).  Since the Neo4j Sweden Software License – and the AGPL – defines "you" as

3  the *licensee*, it only prohibits *licensees*, such as Defendants, from imposing further restrictions, but

4  does not prohibit Neo4j Sweden as the *licensor* of the *Program* from doing so.  *See* GFI Dkt. No.

5  88 at 7:6-9 (holding that "read correctly, Sections 7 and 10 prohibit a *licensee* from imposing further

6  restrictions, but do not prohibit a *licensor* from doing so") (emphasis in original); Reply Ratinoff

7  Decl., Exh. I, ¶ 5 (affirming that the Neo4j Sweden Software License with the Common Clause is

8  valid, and GFI's removal thereof and distribution of ONgDB violated that license and the DMCA).

9      Defendants' strained view that licensees may alter or remove terms from the Neo4j Sweden

10  Software License also goes against Neo4j Sweden's express intent of precluding others from

11  commercially benefiting from the software and the express language of terms such as the Commons

12  Clause. *See* Dkt. No. 98-2, ¶¶ 11-14.  A licensor's intent to limit the commercialization of its

13  software generally should be given effect as intended by the *licensor*, not the licensee.  *See Altera*

14  *Corp. v. Clear Logic, Inc.*, 424 F.3d 1079, 1091 (9th Cir. 2005) (giving broad interpretation of "use"

15  clause that effectuated licensor's intent to prevent competitors from benefitting from its software);

16  *see also Micro Star v. Formgen Inc.*, 154 F.3d 1107 (9th Cir. 1998) (term in a license allowing users

17  of a computer game to develop enhancements, but barring the resale of the enhancements for a profit,

18  was enforceable); *Storm Impact, Inc. v. Software of the Month Club*, 44 U.S.P.Q.2d 1441, 1997 WL

19  566378 (N.D. Ill. 1997) (distribution for commercial purposes was infringement where terms of

20  license limited use to non-commercial purposes).

21      Finally, the Commons Clause must be harmonized with the balance of the Neo4j Sweden

22  Software License.  Aside from its obligation to ascertain whether a contract is clear or ambiguous,

23  a Court has a duty to construe a contract to avoid a forfeiture, if at all possible. *Milenbach v. C.I.R.*,

24  318 F.3d 924, 936 (9th Cir.2003) ("[w]here there are two possible interpretations of a contract, one

25  that leads to a forfeiture and one that avoids it, California law requires the adoption of the

26  interpretation that avoids forfeiture, if at all possible"); *accord Universal Sales Corp. v. Cal., Press*

27  *Mfg. Co.*, 20 Cal.2d 751, 771 (1942).  As detailed above, accepting Defendants' interpretation would

28  result in a forfeiture of Neo4j Sweden's right to license Neo4j® EE as it sees fit.  As such, there is

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE • PALO ALTO

842\3690595.10                                    - 21 -

CONSOLIDATED REPLY ISO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO
DEFENDANTS' CROSS-MOTION; CASE NO. 5:18-CV-07182-EJD

1   no disputed issue of fact that Defendants' statements, such as "ONgDB distributions are licensed

2   under AGPLv3 as a free and open drop-in replacements of Neo4j Enterprise commercial licensed

3   distributions with the same version number" are demonstratively false.  *See* Fact 77-78.

4   
5   
      **2.**     **Defendants' Claims that ONgDB is a Drop-in Replacement for Equivalent versions of official Neo4j® EE are Demonstratively False**

6         Defendants argue their advertising ONgDB as a "drop-in replacement" for Neo4j® EE is

7   merely an opinion, and cannot support a false advertising claim because the statement does not

8   expressly mention the quality or features of ONgDB. Opp. at 23:15-25:2.  Their arguments are

9   legally and factually incorrect.  As acknowledged by Defendants, Neo4j USA "may show that this

10   statement was literally false, either on its face or by necessary implication, or that the statement was

11   literally true but likely to mislead or confuse **consumers**."  *Southland Sod Farms v. Stover Seed Co.*,

12   108 F.3d 1134, 1139 (9th Cir. 1997) (emphasis added); *accord* Opp. at 22:23-23:1.  Thus, whether

13   Defendants believe these statements were an opinion or factually true is irrelevant.

14         Defendants primarily rely upon GFI's testimony about ONgDB version 3.5.4 to refute that

15   their representations were a drop in replacement for Neo4j® EE version 3.5.4 were false and/or

16   misleading.  This does nothing to refute that Defendants' subsequent versions of ONgDB were not

17   true drop-in replacements and such statements were false or likely to mislead or confuse consumers.

18   To be sure, GFI *again* confirmed that it "is no longer developing ONgDB versions as drop in

19   replacements for Neo4j EE [] and does not describe versions after 3.5.4 as such."  *See* Fact 96-97,

20   101.  This is because GFI "no longer could … reliably guarantee that [ONgDB] was a drop-in

21   replacement" and was unwilling to do the testing to make such integration and compatibility

22   guarantees because it became "too hard to demonstrate" with the code become more divergent.  Fact

23   101 (Dkt. No. 98-1, Exh. 31 at 188:5-17, 188:23-189:23).  Notwithstanding GFI's admission, iGov

24   ***continues to*** makes drop-in replacement claims for ONgDB v3.5.5 and ONgDB v3.5.11.  *See* Dkt.

25   No. 98-1, Exhs. 64-69, 71-74 [green highlights]; Exh. 46 ("All ONgDB distributions are drop-in

26   replacements for Neo4j Enterprise and Neo4j Community as they use the same code base and

27   versioning.  Ex: ONgDB 3.5.8 is a drop-in replacement for Neo4j Enterprise 3.5.8 and so on.").

28   Since the producer of ONgDB says otherwise, any reasonable jury would conclude Defendants'

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ● PALO ALTO

842\3690595.10        - 22 -

CONSOLIDATED REPLY ISO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO
DEFENDANTS' CROSS-MOTION; CASE NO. 5:18-CV-07182-EJD

**Page 1992**

1    post-version 3.5.4 representations were false or misleading.

2          Defendants' effort to create a disputed issue of fact concerning the actual qualitative

3    differences between ONgDB versus Neo4j® EE also falls flat.  Defendants attempt to downplay

4    their drop-in replacement statements by arguing that Plaintiffs failed to offer actual empirical testing

5    to show that ONgDB is of inferior quality and has an increased potential for instability.  Opp. 25:3-

6    26:10.  Defendants admit to having no visibility into enterprise-only source code after Neo4j®

7    v3.5.0-RC1 and the testing Plaintiffs employed with subsequent versions.  Fact 95, 98 (Dkt. No. 98-

8    1, Exh. 31 at 158:18-160:5; Exh. 3 at 223:1-224:9).  Defendants also fail to offer evidence that the

9    testing done by GFI is equivalent to Plaintiffs' rigorous testing regiment.  As a result, Mr. Suhy's

10   declaration insisting that ONgDB is of the same quality has no evidentiary value.  *See* Dkt. No. 100-

11   1 at ¶¶ 39-40.  The fact that GFI admitted it stopped calling ONgDB a drop-in replacement for

12   equivalent versions of Neo4® EE after version 3.5.4 also negates Defendants' assertions to the

13   contrary.  As noted above, Neo4j USA must either show that these statements are demonstratively

14   false *or likely to mislead or confuse consumers*.  The unrefuted evidence concerning Defendants'

15   statements, at minimum, would lead any reasonable jury to find the latter since ONgDB is not 100%

16   identical, contains glue code, does not include every feature, and is not subject to the same level of

17   quality control as Neo4j® EE as conceded by GFI.  *See* Fact 95-97, 99-101.

18          **3.      Defendants Falsely Advertising ONgDB as a Free version of Neo4j® EE**
             **licensed under the APGL is Material to Customers' Decisions**
19

20          Defendants concede that price is material to customers' decision to choosing ONgDB by

21   arguing that customers can decide to pay $500,000 for Neo4j® EE or ONgDB for *free* without the

22   commercial limitations imposed by the Commons Clause.  *See* Opp. at 30:18-31:2.  Defendants then

23   argue that they made no false claims based on pricing.  *See id.*  This is undermined by undisputed

24   evidence that Defendants' websites and tweets contain statements that ONgDB is licensed under

25   AGPL as a free drop-in replacement for Neo4j® EE available under a paid commercial license.  *See*

26   Fact 77-78.  To be sure, Defendants' main selling point for ONgDB is that the money customers

27   save by not having to pay Plaintiffs for a license to Neo4j® EE can be used to pay iGov for support

28   and development services.  *See* Dkt. No. 98-1, Exhs. 62-66; *see also* Exhs. 42-43, 76-77.

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE • PALO ALTO

842\3690595.10                              - 23 -
CONSOLIDATED REPLY ISO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO
DEFENDANTS' CROSS-MOTION; CASE NO. 5:18-CV-07182-EJD

**Page 1993**

1    Defendants' additional argument that purchasing decisions were based on price - "there is

2    no evidence that a customer would have paid for a commercial Neo4J version of the software given

3    the availability of free ONgDB," defies logic.  *See* Opp. at 31:2-6.  Indeed, had Defendants not

4    illegally replaced the Neo4j Sweden Software License with the AGPL, they could not offer ONgDB

5    as a free, no-cost "drop-in" replacement.  Defendants' additional argument that there is no evidence

6    of materiality ignores that "where a statement is literally false … both actual deception and

7    materiality are presumed." *AECOM Energy & Constr., Inc. v. Ripley*, 348 F.Supp.3d 1038, 1056

8    (C.D. Cal. 2018).  They also ignore evidence that customers chose ONgDB over Neo4j® EE for this

9    reason.  *See* Fact 105-106.  Simply arguing that the statements are true or that Defendants never

10   used the terms "drop in replacement/equivalent" together do nothing to refute this fact.  *See id.*  To

11   the contrary, in their email exchanges with Next Century, Defendants assure that it can use ONgDB

12   under the AGPL at no-cost, and did not need to worry about the Commons Clause or have to obtain

13   a paid license from Plaintiffs.  *See* Dkt. No. 98-1, Exh. 48-50. Next Century then ***chose*** ONgDB

14   over Neo4j® EE: "I work with Shahak Nagiel who wrote to you earlier regarding the possibility of

15   using OngDB instead of the enterprise edition of Neo4j. I am currently leading the Graph Database

16   team responsible for deploying an OngDB-based solution into production." *Id.*, Exh. 120; *see also*

17   Dkt. No. 98-3, ¶¶ 22-23; Exh. 12-13.  Therefore, Neo4j USA is entitled to summary judgment on its

18   false advertising claims against Defendants as there are no disputed facts as to falsity and materiality.

19   **G.    False Designation of Origin**

20   Defendants' only response to Plaintiffs' argument in response to Neo4j USA's false

21   designation of origin claim is that there is an issue of fact on whether Defendants' statements

22   concerning ONgDB being "free and open source" Neo4j® EE under the AGPL are false.  Opp. at

23   22:1-5.  This is entirely based on Defendants erroneous belief that they could replace the Neo4j

24   Sweden Software License with a form AGPL.  *See id.*  As detailed above, their position is untenable

25   and not supported by the language of either of those agreements.  Plaintiffs are therefore entitled to

26   summary judgment on their Section 43(a) false designation of origin claim against Defendants.

27   **H.    Plaintiffs are Entitled to Either Preliminary or Permanent Injunctive Relief**

28   Defendants argue that Neo4j USA is not entitled to injunctive relief because their unclean

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE • PALO ALTO

842\3690595.10                                      - 24 -

CONSOLIDATED REPLY ISO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO
DEFENDANTS' CROSS-MOTION; CASE NO. 5:18-CV-07182-EJD

**Page 1994**

1    hands defense may preclude it and the requested injunction is "overbroad." Opp. at 31:21-33:18

2    However, they do not explain how this defense, even if they were to succeed on it, would stop Neo4j

3    USA from obtaining an injunction to halt their infringement of the Neo4j® Mark and false

4    advertising of ONGDB. This is because it does not apply to these claims, which is why it was

5    relegated to Phase 2. *See* Dkt. No. 81, ¶¶ 1-3. Even if the unclean hands defense were applicable,

6    Defendants offer no explanation beyond insisting their discredited view of the APGL and do not

7    explain why the Court could not issue it as a preliminary injunction until their defense is adjudicated.

8    ### I.    The Court Should Deny Defendants' Cross-Motion for Summary Judgment

9         Defendants cross-move for summary judgment on Neo4j USA's trademark claims based the

10   same theories that Neo4j USA does not own the Neo4j® Mark and they merely use mark for

11   comparative advertising. Opp. at 33:21-34:4. As detailed above, they fail to meet their burden of

12   proof on their invalidity defense, and fail to create a disputed issue of fact on the validity of the

13   registration for the Neo4j® Mark. Likewise, Defendants' misuse of the Neo4j® Mark to promote

14   their patchwork binaries of Neo4j® EE source code and ONGDB does not qualify as nominative fair

15   use. Defendants also cross-move on Neo4j USA's false advertising claims based an alleged lack of

16   evidence that consumers do not chose ONgDB because of price. *Id.* at 34:6-19. This makes no sense

17   because they concede that customers choose ONgDB over Neo4j® EE because the former costs

18   nothing, and Next Century chose it for this precise reason. As discussed above, the undisputed

19   evidence establishes falsity because Defendants removed the Commons Clause in order to promote

20   ONgDB as no-cost Neo4j® EE. The Court should therefore deny Defendants' cross-motion.

21   ### IV.    CONCLUSION

22        For the reasons set forth herein and in their moving papers, Plaintiffs respectfully request

23   that the Court (1) grant partial summary judgment in favor of Neo4j USA on its Lanham Act and

24   UCL claims; (2) enter either a preliminary or permanent injunction as set forth in the previously

25   filed proposed order; and (3) deny Defendants' cross-motion for summary judgment.

26   Dated: February 16, 2021                    HOPKINS & CARLEY
                                                  A Law Corporation

27                                               By: */s/ Jeffrey M. Ratinoff*
                                                      Jeffrey M. Ratinoff
                                                      Attorneys for Plaintiffs NEO4J, INC. and
                                                      NEO4J SWEDEN AB

842\3690595.10                           - 25 -

CONSOLIDATED REPLY ISO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO
DEFENDANTS' CROSS-MOTION; CASE NO. 5:18-CV-07182-EJD

**02-16-2021 – PLAINT REPLY SEP STMT OF UNDISPUTED MATERIAL FACTS.pdf**

Filed 02/06/2021

PLAINTIFFS' REPLY SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS

(Pacer Doc: #109)

**PLAINTIFFS' REPLY SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS**

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| **Claim 1: Trademark Infringement Against the PT Defendants and Their Nominative Fair Use Defense** | | |
| 1. Plaintiff Neo4j Inc. ("Neo4j USA") owns a protectable trademark | <u>Fact 1</u>: Neo4j USA is the owner of U.S. Trademark Registration No. 4,784,280 for the word mark "NEO4J" covering the goods and services in International Classes, 009, 035, 041, 042 and 045 (the "Neo4j® Mark"). Declaration of Jeffrey M. Ratinoff, ("Ratinoff Decl."), Exh. 1. | **DISPUTED:** Neo4j is not the owner, assignee, or exclusive licensee of the Neo4j mark, and therefore its ownership of U.S. Trademark Registration No. 4,784,280 is disputed. Declaration of Adron G. Beene ("Beene Dec."), Ex. 1 at §2.1.1., 2 and 3. |
| | <u>Additional Fact</u>: Neo4j Sweden is a wholly owned subsidiary of and controlled by Neo4j USA, and is a "related company" as referenced in the US application for the Neo4j® Mark. Rathle, Decl. at 1:17-18; Broad Decl. at ¶¶ 19-21; Beene Decl., Exh. 6 (p. 101 of 125). Neo4j USA actively offered licenses to Neo4j® software via its website from at least as early as July 2011 and immediately before it filed the application for the Neo4j® Mark. *Id.*, Exhs. A-D. | |
| 2. The PT Defendants impermissibly used the Neo4j® Mark after Neo4j USA terminated the Partner Agreement | <u>Fact 2</u>: On September 30, 2014, PureThink and Neo4j USA entered into the Neo4j Solution Partner Agreement ("Partner Agreement"). Ratinoff Decl., Exh. 4. | **DISPUTED**: The PT defendants use of the Neo4J trademark is nominative to identify NEO4J as a company and the Neo4J software and for comparative advertisement. Declaration of John Mark Suhy ("Suhy Dec.") ¶2, |
| | <u>Additional Fact</u>: Defendants admitted that PureThink entered into this agreement with Neo4j USA. Dkt. No. 90, ¶29; Dkt. No. 91, ¶ 29. | |
| | <u>Fact 3</u>: Under the Partner Agreement, PureThink was granted a non-exclusive, non-transferable limited license to, *inter alia*, use the Neo4j® Mark solely to market and resell commercial licenses to Neo4j® Enterprise Edition ("Neo4j® EE") and related support services in exchange for shared revenue for the licenses that it resold. *Id.*, Exh. 4 at § 4.1; Exh. 3 at 60:10-61:17, 67:25-69:11. | **UNDISPUTED** |
| | <u>Fact 4</u>: PureThink further agreed to the terms of the limited license under the Partner Agreement to use the Neo4j® Mark in accordance | **UNDISPUTED** |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | with Neo4j USA's "then-current trademark usage guidelines." *Id.*, Exh. 4 at § 4.1. | |
| | <u>Fact 5:</u> The Partner Agreement was subject to a 1-year term, and would automatically renew at additional 1-year periods subject to the notice and termination provision therein, thereby incorporating whatever was the operative trademark guidelines at that time. Ratinoff Decl., Exh. 4 at §7.1; Exh. 3 at 67:18-24.  As a result of the renewal provision, PureThink became bound by the October 13, 2015 version of Neo4j USA's trademark guidelines as of September 30, 2016. *See* Rathle Decl., ¶ 16, Exh. 5. | **UNDISPUTED** |
| | <u>Fact 6:</u> All rights and licenses to Neo4j® Software and the Neo4j® Mark would terminate upon the expiration or termination, and upon such an event, PureThink agreed to "cease using any trademarks, service marks and other designations of Plaintiffs." Ratinoff Decl., Exh. 4 at §7.3. | **UNDISPUTED** |
| | <u>Fact 7:</u> On July 11, 2017, Neo4j terminated the Partner Agreement thereby requiring PureThink to "cease using [Neo4j's] trademarks, service marks, and other designations…and remove from PureThink's website(s) marketing materials, [Neo4j's] trademarks and tradenames, including, without limitation, Neo4j" as required by Agreement. Ratinoff Decl., Exh. 12. | **DISPUTED**: Moving Party's reference to [Neo4j] is vague and misleading as the Partner Agreement provides "will cease using any trademarks, service marks and other designations of the *other party*" emphasis added. Ratinoff Decl., Exh. 4 at §7.3. Neo4J USA is not the owner, assignee or exclusively licensee of the mark and lacks standing to assert the mark. Beene Dec., Ex. 1. |
| | <u>Fact 8:</u> PureThink continued to use the Neo4j® Mark without Neo4j USA's authorization to send customers to iGov to obtain "Government Package for Neo4j" and "Government Development Package with Neo4j Enterprise." *See* Ratinoff Decl., Exh. 14.  It also promoted "Neo4j Enterprise" as genuine Neo4j® EE despite being compiled by Suhy. *See id.*, Exh. 16. | **DISPUTED:**   The PureThink references are to Sweden's open source versions of Neo4J and proper nominative use of Sweden's mark. Suhy Dec. ¶3 |
| | <u>Fact 9:</u> Under the Partner Agreement, PureThink agreed that all contractual restrictions would apply to any successor-in-interest, assign, and acquirer of substantially all of its assets. Ratinoff Decl., Exh. 4 at § 10. | **UNDISPUTED** |
| | | **Additional Facts** |
| | **DISPUTED:** Section 7.3 of the Partner Agreement relates to its termination, and does not contain an assignment provision.  Suhy's testimony that there is no evidence of consent is inadmissible argument. | Under the Partner Agreement, assignment of the agreement, outside of a successor in interest required consent of Neo4J USA. Ratinoff Decl., Exh. 4 at |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | §7.3. No evidence of consent to the assignment exists. Suhy Dec. ¶61. |
| | **Fact 10:** Suhy and PureThink formed iGov on or about June 23, 2017 to circumvent the restrictions in Section 4.3.1 of the Partner Agreement. Ratinoff Decl., Exhs. 10-11, 14-15, 17-19; PT Dkt. No. 22, ¶¶ 18-19; *see also* Exh. 3 at 46:12-16, PT Dkt. No. 72 at 8:22-25, 9:15-23. | **DISPUTED:** iGov was formed as a separate entity by Suhy for several reasons. Suhy Dec. ¶4., Beene Dec. Ex. 4 at 45:4-47:5. The restrictions are for purposes of non-competition and void. Suhy Dec. ¶4. |
| | **Fact 11:** Suhy is sole owner and employee of PureThink and iGov, used the same website template, and initially used the same offices and support telephone number for both entities: Ratinoff, Decl, Exh. 3 at 21:23-22:22, 23:16-18, 37:3-38:16, 39:6-40:23, 47:20-49:8, 52:9-11. | **DISPUTED** - PureThink and iGov used the same office address for a mailing address until iGov could setup a new office.   iGov did not "use" the office address other than for correspondence.

The support telephone number is a 3rd party number that neither PureThink or iGov owned.  The website template used was a commercial template. PureThink and iGov purchased the same template because Suhy was familiar with it. iGov did not use PT's computers.   Suhy Dec. ¶5. |
| | **Fact 12:** Suhy used both his iGov and PureThink email accounts to solicit customers that he had previously contacted under the Partner Agreement.  Ratinoff, Decl., Exhs. 19, 25, 29, 45-46, 54. | **DISPUTED:**  All new business development was done using iGov Inc emails (Exhibit 19, 46, and 54). Exhibit 25, 29 were discussions and not solicitations.)
The only entity who was a customer listed in this fact was Sandia National Laboratories.  They were a customer of PureThink and the communication was through PureThink. (See Ratinoff, Decl. Exhibit 45). The solicitations were for use of Sweden's open source Neo4J. Suhy Dec. ¶6. |
| | **Additional Facts:** Exh. 19 was sent to the NGA and Exh. 54 was sent to the USAF via Suhy's iGov account, both which were originally PureThink relationships. Reply Ratinoff Decl., Exh. E at Resp. Nos. 5.24, 6.23-6.24, 13.5.  Exh. 46 was sent to the US Army via Suhy's iGov account, and was originally a PureThink relationship.   Reply Ratinoff Decl., Exh. E at Resp. 8.16. | |
| | **Fact 13:** iGov took over PureThink's business relationship with the IRS. Ratinoff, Decl, Exh. 3 at 53:4-54:25; Exh. 127. | **DISPUTED**: USA interfered with PT's potential business with the IRS. iGov did not take over PT's potential business relationship with the IRS. Suhy Dec. ¶7., Exhibit 1 |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | **Additional Fact:** Suhy established a relationship with the IRS via PureThink, and continued that relationship via iGov. *See* Reply Ratinoff Decl., Exh. E, Resp. No. 1.16(a)-(b), 8.3-8.4, 14.3-14.4. | |
| | <u>Fact 14</u>: The PureThink Defendants ("PT Defendants") claimed to be "the developer of the retired Neo4j Government Edition" in close connection with touting their prior relationship with Neo4j USA. Ratinoff Decl., Exhs. 15-19, 21, 62-64. | **DISPUTED:** Suhy and PureThink did develop the Neo4j Government Edition. the PT Defendants do not "tout" PT's prior relationship; they said it was terminated. Suhy Dec. ¶8 |
| | <u>Fact 15:</u> iGov used the Neo4j® Mark on its website without authorization to promote "Government Package for Neo4j" and "Government Development Package with Neo4j Enterprise," and related support services. *See* Ratinoff Decl., Exhs. 15-18, 21, 62-64. | **DISPUTED:** A nominative use does not require authorization. iGov references Sweden's Neo4J mark to reference Sweden's open source software called Neo4J to describe the software and uses USA's company name and products to identify them in comparative advertisement. Suhy Dec. ¶9 |
| | <u>Fact 16:</u> iGov's other unauthorized uses of the Neo4j® Mark on its website included: (1) using "https://igovsol.com/**neo4j**.html" as a URL to promote "Government Development Packages for **Neo4j**"; (2) prominently displaying a "Request Procurement Document Package" link with "**mailto:neo4j@igovsol.com**" embedded that creates an email addressed thereto upon activation; (3) encouraging consumers to obtain more information by sending an email to "**neo4j@igovsol.com**;" (4) using "Government Packages for Neo4j" and "Neo4j Enterprise" to describe iGov's patchwork binaries of Neo4J® EE; and (5) touting PT Defendants' prior relationship with Neo4j USA and to be "the developer of the retired Neo4j Government Edition." Ratinoff Decl., Exhs. 15-18, 21, 62-64, 67-69. | **DISPUTED:** Objection this is not a fact; it is argument. A nomantive use does not require authorization. USA does not own the trademark. D Fact . Beene Dec Exhibit 1,2,3. (4) "Government Packages for Neo4j" and "Neo4j Enterprise" were used to describe the government packages iGov provided support for around the free and open source neo4j database. Neo4j® Mark was never used. The email address is for Sweden's open source Neo4j for inquires for that product. The email address was discontinued in the hopes USA would discontinue this litigation. "Neo4j Enterprise" is needed to distinguish between the open source "Neo4j Community" and "Neo4j Enterprise" distributions, both of which are built when compiling the Neo4j source code. iGov does not "tout" PT's prior relationship; they said it was terminated. Suhy Dec. ¶10 |
| | **Additional Fact:** The Neo4j® Mark is a registered standard character mark covering the word in all types of depictions, including Plaintiffs' | |

842\3697141.3

4

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | exclusive right of use in connection with the Neo4j® products and services. Ratinoff Decl., Exh. 1; PT Dkt. No. 70 at 9:3-10:24. The AGPL is not a trademark license, and thus does not permit Defendants to use the Neo4j® Mark to promote their recompiled binaries. *See* Rathle Decl., ¶¶ 15-18, Exhs. 5-7; PT Dkt. No. 85 at 7:27-8:2. | |
| | <u>Fact 17:</u> iGov continues to offer "Neo4j enterprise open source licensed distributions" and interchangeability referring to "ONgDB Enterprise" and "Neo4j Enterprise" on its website.   Ratinoff Decl., Exhs. 62-70 (highlighted in yellow). | **DISPUTED:**  iGov offers support for both Neo4j Enterprise open source licensed distributions, and ONgDB Enterprise open source distributions. Neo4j Enterprise distributions below 3.5 are still in use and available to the public.<br><br>iGov no longer offers distributions from it's website and only recommends ONgDB Enterprise distributions. iGov links to the GraphFoundation download page. Suhy Dec. ¶11 |
| 3.  The PT Defendants used the Neo4j® Mark without Neo4j USA's authorization to promote ONgDB | <u>Fact 18:</u>  After Graph Foundation ("GFI") released ONgDB in July 2018, iGov continued to use "https://igovsol.com/neo4j.html" as a URL address to promote ONgDB until it deactivated that page sometime after July 27, 2020.  Ratinoff Decl., Exhs. 62-65; Exh. 13 at RFA No. 5.  While iGov replaced this url with "https://igovsol.com/graph.html," the contents of the page remained the same. *Compare id.*, Exh. 65 *and* Exh. 66. | **UNDISPUTED** |
| | <u>Fact 19:</u>   iGov used the neo4j@igovsol.com email address on its "neo4j.html" page (*id.*, Exhs. 62-65) and "downloads.html" page (*id.*, Exhs. 67-69) as means for consumers to inquire about ONgDB until sometime in July 2020.  Ratinoff Decl., Exh. 13 at RFA Nos. 7-11. | **DISPUTED:**  iGov used neo4j@igovsol.com and neo4j.html as a way to inquire about iGov support services and support for the neo4j open source database.  'neo4j' is Sweden's Github repository name for the official Sweden open source Neo4j repository.  It was not just a means for consumers to inquire about ONgDB but of the services and support around open source neo4j and ongdb open source license support. Suhy Dec. ¶12 |
| | **Additional Facts:** Suhy testified that he used the neo4j@igovsol.com for "any questions relating to the open-source Neo4j project around graphs. Anything where somebody would want consulting around that project" without Neo4j's authorization. Reply Ratinoff Decl., Exh. F at 41:4-16. The AGPL is not a trademark license, and thus does not permit | |

(216 of 299), Page 216 of 299
Case: 24-5538, 12/23/2024, DktEntry: 18.9, Page 216 of 299
Case 5:18-cv-07182-EJD  Document 109  Filed 02/10/21  Page 39 of 103

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | Defendants to use the Neo4j® Mark with their recompiled binaries. *See* Rathle Decl., ¶¶ 15-18, Exhs. 5-7; PT Dkt. No. 85 at 7:27-8:2. | |
| | **Fact 20:** GFI used a "Download Neo4j Enterprise" hyperlink on its "downloads" page to redirect consumers to download links for ONgDB until July 27, 2020.  Ratinoff Decl., Exhs. 66-68 (highlighted in red), Exh. 13 at RFA Nos. 10, 14. | **UNDISPUTED** |
| | **Additional Fact:** This should state that iGov, not GFI used the hyperlink as admitted by the PT Defendants in requests for admissions. | |
| | **Fact 21:** iGov continues to promote "ONgDB Enterprise," "Neo4j Enterprise" and "Neo4j Enterprise Edition" versions 3.5.x as open source Neo4j® EE that can be used for free under the AGPL.  Ratinoff Decl., Exhs. 62-74. | **DISPUTED:** Neo4j Enterprise and ONgDB Enterprise are open source and free to use under the open source AGPL license.<br><br>After versions 3.4.x – the term Neo4j Enterprise Edition was not applicable as Neo4j Inc stopped contributing to the enterprise code.<br><br>iGov does not promote Neo4j Enterprise Edition 3.5.x as being open source.<br><br>Many of the exhibits are showing the same page over and over from different snapshot dates but with matching content giving the illusion that there were more pages than existed.<br><br>ONgDB 3.5.5 is a drop in replacement for Neo4j 3.5.5 (Community and Enterprise commercial.)<br><br>After reading this - iGov realizes that the next line needs to have the grammar cleaned up to say:  "**The AGPLv3 Open Source License, has** no limitations on causal cluster instances, cores or production usage"<br><br>Suhy Dec. ¶13 |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | **Fact 22:** iGov operated www.graphstack.io to further promote ONgDB using the Neo4j® Mark, and that "iGov Inc offers production support packages for Neo4j / ONgDB Enterprise open source distributions for US government agencies." Ratinoff Decl., Exh. 75. | **DISPUTED:** GraphStack is a graph development stack aimed at building out large scale AI and graph solutions. GraphStack is to promote iGov software packages and solution development, not specifically Neo4j. Both Neo4j and ONGDB will drop into GraphStack – so using the names is important to explain that GraphStack will work with both. Suhy Dec. ¶14 |
| | **Fact 23:** The GraphStack website used hyperlinks to redirect consumers to Neo4j USA's official release notes and "What's New" page in conjunction with encouraging consumers to download ONgDB as an alleged "[d]rop in replacement for Neo4j Core and Enterprise 3.5.3." Ratinoff Decl., Exh. 75; Exh. 13 [RFA Nos. 42-43]. | **UNDISPUTED** |
| 4. The PT Defendants knew their uses of the Neo4j® Mark were unauthorized and violated Neo4j USA's Trademark Guidelines | **Fact 24:** The trademark guidelines the PT Defendants had agreed to be bound by in the Partner Agreement prohibited the use of the Neo4j® Mark: (1) with anything other than "the software in the exact binary form that it is distributed by [Neo4j], without modification of any kind;" and (2) "in a web page title, titletag, metatag, or other manner with the intent or the likely effect of influencing search engine rankings or results listings." Ratinoff Decl., Exh. 4 at § 4.1; Rathle Decl., ¶¶ 15-16, Exh. 5; *see also* Exh. 4 at §7.1; Exh. 3 at 67:18-24 | **DISPUTED:** The Partner Agreement terminated on July 11, 2017 (Fact 7 above). Suhy and iGov are not parties to the Partner agreement. The PT defendants have not used USA's disputed trademark to market, sell or service and USA products. All marketing and services are limited to Sweden's open source Neo4J software and derivatives of such software as permitted under the GitHub Terms of Service and the AGPL. Suhy Dec. ¶15 |
| 5. The PT Defendants did not use the Neo4j® Mark to describe Plaintiffs' products | **Fact 25:** The PT Defendants used the Neo4j® Mark to promote their "Government Package for Neo4j" and "Government Development Package with Neo4j Enterprise" rather than comparatively describe Plaintiffs' Neo4j® EE. Ratinoff Decl., Exhs. 14-18, 21, 62-65. | **DISPUTED:** PureThink and iGov did not use the USA's disputed Neo4j mark for promotion of USA's products. All promotions have been to marketing and service Sweden's open source Neo4J software and derivatives of such software as permitted under the GitHub Terms of Service and the AGPL. References to USA and its products are for comparative advertisement. Suhy Dec. ¶16

All exhibits referenced except for exhibit 14  (15, 16, 17, 18, 21, 62-65 ) are all for iGov Inc sites are iGov sites, but have been incorrectly referenced in this fact as being PT Defendants. Suhy Dec. ¶17 |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | **Additional Fact:** The Neo4j® Mark is a registered standard character mark covering the word in all types of depictions. *Id.*, Exh. 1. | |
| | Fact 26: The PT Defendants often used the Neo4® Mark to promote ONgDB instead of to comparatively describe Plaintiffs' Neo4j® EE. Ratinoff Decl., Exhs. 62-74; Exh. 13 [RFA Nos. 4-11, 14]. | **DISPUTED:** PureThink and iGov did not use the USA's disputed Neo4j mark for promotion of USA's products. All promotions have been to marketing and service Sweden's open source Neo4J software and derivatives of such software as permitted under the GitHub Terms of Service and the AGPL. References to USA and its products are for comparative advertisement. Suhy Dec. ¶16 |
| | **Additional Fact:** The Neo4j® Mark is a registered standard character mark covering the word in all types of depictions. *Id.*, Exh. 1. | |
| | Fact 27: The PT Defendants used the Neo4j® Mark on iGov's website as (1) an URL address for a page promoting their "Neo4j Enterprise" packages and ONgDB; (2) an email address for customers to obtain more information about their "Neo4j Enterprise" packages while referring to ONgDB; and (3) a hyperlink to redirect consumers to download ONgDB. Ratinoff Decl., Exhs. 14-18, 62-65, 67-69; Exh. 13 [RFA Nos. 4-11, 14, 33-34]. | **DISPUTED:** PureThink and iGov did not use the USA's disputed Neo4j mark for promotion of USA's products. All promotions have been to marketing and service Sweden's open source Neo4J software and derivatives of such software as permitted under the GitHub Terms of Service and the AGPL. References to USA and its products are for comparative advertisement. Suhy Dec. 16 |
| | **Additional Fact:** The Neo4j® Mark is a registered standard character mark covering the word in all types of depictions. *Id.*, Exh. 1. | |
| 6. Defendant's product was readily identifiable without use of plaintiffs' trademark | Fact 28: Rather than naming their version of Neo4j® EE something else without using the Neo4j® Mark, the PT Defendants used the mark to name and promote their "Neo4j Enterprise" packages and while referring to ONgDB, as well as using the Neo4j® Mark to offer related support services for ONgDB. Ratinoff Decl., Exhs. 14-18, 62-65, 67-69; Exh. 13 [RFA Nos. 4-11, 14, 33-34]. | **DISPUTED:** PureThink and iGov did not use the USA's disputed Neo4j mark for promotion of USA's products. All promotions have been to marketing and service Sweden's open source Neo4J software and derivatives of such software as permitted under the GitHub Terms of Service and the AGPL. References to USA and its products are for comparative advertisement. Suhy Dec. ¶16

When Sweden's Neo4j open source code is compiled from the official Sweden Neo4j Github repository - it creates 2 distributions called "Neo4j Community" and "Neo4j Enterprise". Enterprise is |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | a standard term for software used for business as in an "Enterprise" is a generic identifier.  Suhy Dec. ¶18 |
| | **Additional Fact:** The Neo4j® Mark is a registered standard character mark covering the word in all types of depictions.  *Id.*, Exh. 1. | |
| | **Fact 29:** Rather than independently promoting ONgDB as a graph database software without use of Neo4j® Mark, Defendants used the mark to promote ONgDB and related support services for ONgDB.  Ratinoff Decl., Exhs. 62-65, 67-74; Exh. 13 [RFA Nos. 4-11, 14]. | **DISPUTED:**  Objection this is not a fact its argument.  ONgDB is a fork of Sweden's open source Neo4j and nominatively identified as such.  Suhy Dec. ¶19 |
| 7. The PT Defendants prominently used the Neo4j® Mark beyond what was reasonably necessary | **Fact 30:** The PT Defendants extensively used the Neo4j® Mark (without proper trademark usage and notices) on their website, and in direct solicitations beyond describing "Neo4j Enterprise" packages and ONgDB as a forks of Neo4j EE.  Ratinoff Decl., Exhs. 14-18, 24-26, 42-47, 62-65, 67-74; Exh. 13 [RFA Nos. 4-11, 14, 33-34]. | **DISPUTED:** PureThink and iGov did not use the USA's disputed Neo4j mark for promotion of USA's products. All promotions have been to marketing and service Sweden's open source Neo4J software and derivatives of such software as permitted under the GitHub Terms of Service and the AGPL. References to USA and its products are for comparative advertisement. Suhy Dec. ¶16 |
| | **Additional Fact:** The Neo4j® Mark is a registered standard character mark covering the word in all types of depictions.  *Id.*, Exh. 1. | |
| 8. The PT Defendant's use of the Neo4j® Mark suggested sponsorship or endorsement by Neo4j USA | **Fact 31:**   The PT Defendants claimed that (a) "By default, all Government Packages for Neo4j now comes with Neo4j Enterprise included under it's open source license!" [Ratinoff Decl., Exhs 14-15]; (b) "The packages on this page are compiled by iGov Inc using the official Neo4j source code repositories located at https://github.com/neo4j" [*id.*, Exh. 16]; (c) "US Federal Government Packages for Neo4j Solutions" [*id.*, Exh. 17]; (d) "Government Development Packages for Neo4j" [*id.*]; (5) "iGov Inc is now the only US Federal contractor providing Neo4j Enterprise binaries packaged with it's [sic] free Open Source license!" [*id.*, Exh. 18]; (e) "Get the open source licensed Neo4j Enterprise distributions we package for our government customers" [*id.*, Exh. 21]; (f) "We compile and packaged the open source licenced [sic] distributions from the same official Neo4j Github Repositories as Neo4j Inc uses for their paid commercial licensed builds" [*id.*]; (g) "I manage the Neo4j Enterprise open source distributions used by the Treasury, DHS, etc. If you don't know about Neo4j - here is their website: http://neo4j.com" [*id.*, Exh. 26].  *See also id.*, Exhs. 19-20, 62-66. | **DISPUTED** Objection this fact does not suggest sponsorship or endorsement by Neo4J USA. USA claim is misleading. PT and iGov websites, taken as a whole do not suggest sponsorship or endorsement by USA. Suhy does not have a website. PureThink and iGov did not use the USA's disputed Neo4j mark for promotion of USA's products. Suhy Dec. ¶20<br><br>All promotions have been to marketing and service Sweden's open source Neo4J software and derivatives of such software as permitted under the GitHub Terms of Service and the AGPL. References to USA and its products are for comparative advertisement. Suhy Dec. ¶16<br><br>The statements provided on the websites that PT "has ceased their partnership with Neo Technology" |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | Ratinoff Decl. Exh. 14, that PT "has ceased their partnership with Neo4j Inc." *Id.* Exhs. 15, 17, 19, certainly reflects a total lack of sponsorship or endorsement. Suhy Dec. ¶21 |
| | **Additional Fact:** The Neo4j® Mark is a registered standard character mark covering the word in all types of depictions. *Id.*, Exh. 1. | |
| | Fact 32:  The PT Defendants also claimed on iGov's website that (a) "We only focus on only supporting 100% free and open source ONgDB Enterprise & Neo4j Enterprise open source licensed distributions." [Ratinoff Decl., Exh. 66]; (b) "ONgDB Enterprise is a drop In replacement for Neo4j Enterprise commercial packages downloaded from Neo4j.com" [*id.*]; (c) "The distributions we package for the federal government and community as a whole are drop in replacements for Neo4j Enterprise commercial packages you download from neo4j.com" [*id.*]; and (d) "ONgDB (AKA ONgDB Enterprise) 3.5.11 is Neo4j 3.5.11 Core + the enterprise features Neo4j Inc removed from the code base as of v3.5.  All ONgDB and Neo4j Enterprise AGPL distributions can be used in production, in closed source projects, and with no limitations on # of cores or causal cluster instances." [*id.*, Exh. 74]. *See also, id.* at Exhs. 62-65, 71-73. | **DISPUTED:** Objection this fact does not suggest sponsorship or endorsement by Neo4J USA. USA claim is misleading. PT and iGov websites, taken as a whole do not suggest sponsorship or endorsement by USA.  Suhy does not have a website. PureThink and iGov did not use the USA's disputed Neo4j mark for promotion of USA's products. Suhy Dec. ¶20

All promotions have been to marketing and service Sweden's open source Neo4J software and derivatives of such software as permitted under the GitHub Terms of Service and the AGPL. References to USA and its products are for comparative advertisement. Suhy Dec. ¶16

The statements provided on the websites that PT "has ceased their partnership with Neo Technology" Ratinoff Decl. Exh. 14, that PT "has ceased their partnership with Neo4j Inc." *Id.* Exhs. 15, 17, 19, certainly reflects a total lack of sponsorship or endorsement. Suhy Dec. ¶21 |
| | **Additional Facts:** As recognized by the Court, "read correctly, Sections 7 and 10 prohibit a *licensee* from imposing further restrictions, but do not prohibit a *licensor* from doing so." *See* GFI Dkt. No. 88 at 7:6-9 (emphasis in original). This is also confirmed by the Stipulated Judgment entered in the GFI Action. Reply Ratinoff Decl., Exh. I (GFI Dkt. No. 110). Defendants promoted ONgDB as Neo4j® EE except that ONgDB is free and without commercial restrictions only because they removed the Commons Clause. Rathle Decl., ¶¶ 5-13, 27, 29, Exh. 3. | |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | **Fact 33:** The PT Defendants solicited customers about ONgDB stating that (a) "I can explain why the foundation was created and how we package Neo4j Enterprise (We call ONgDB) distributions that are being adopted at IRS…" [Ratinoff Decl., Exh. 24]; (b) "the Graph Foundation was setup to ensure Neo4j/ONgDB remains free and open.  It is Neo4j Core + Enterprise feature set added back in, so it is drop in replacement for a Neo instance of the same version. (Ex: 3.5.5)" [*id.*, Exh. 44]; (c) "ONgDB (Open Native Graph Database): Neo4j Enterprise OSS distribution downloads 3.5.8 will be up next week" and "ONgDB 3.5.8 is a drop-in replacement for Neo4j Enterprise 3.5.8" [*id.*, Exh. 46]; (d) "We compile Neo4j branded distributions for agencies who added Neo4j branded distributions instead of ONgDB branded distributions to their white lists. We have all versions of the Neo4j branded distributions up to 3.5 available" [*id.*,]; and (e) "Neo4j Enterprise open source distribution licenses and basic support. Aka: ONGDB" [*id.*, Exhs. 55, 131]. *See also, id.* Exhs. 43, 47, 54. | **DISPUTED:** Objection this fact does not suggest sponsorship or endorsement by Neo4J USA. USA claim is misleading. PT and iGov websites, taken as a whole do not suggest sponsorship or endorsement by USA.  Suhy does not have a website. PureThink and iGov did not use the USA's disputed Neo4j mark for promotion of USA's products. Suhy Dec. ¶20

All promotions have been to marketing and service Sweden's open source Neo4J software and derivatives of such software as permitted under the GitHub Terms of Service and the AGPL. References to USA and its products are for comparative advertisement. Suhy Dec. ¶16

The statements provided on the websites that PT "has ceased their partnership with Neo Technology" Ratinoff Decl. Exh. 14, that PT "has ceased their partnership with Neo4j Inc." *Id.* Exhs. 15, 17, 19, certainly reflects a total lack of sponsorship or endorsement. Suhy Dec. ¶21 |
| | **Fact 34:**  In its promotion of ONgDB software, iGov used hyperlinks on its website to redirect consumers to Neo4j USA's official release notes (https://neo4j.com/release-notes/neo4j-3-5-5/) and "What's New" page (https://neo4j.com/whats-new-in-neo4j/) until it removed those references sometime in July 2020.  *See* Ratinoff, Exhs. 67-69 (highlighted in blue). | **DISPUTED:**  Because ONgDB is a fork of Neo4j which the core code is unmodified, the release notes and whats new page are relevant and provide important information.  Suhy Dec. ¶22

Objection this fact does not suggest sponsorship or endorsement by Neo4J USA. USA claim is misleading. PT and iGov websites, taken as a whole do not suggest sponsorship or endorsement by USA. Suhy does not have a website. PureThink and iGov did not use the USA's disputed Neo4j mark for promotion of USA's products. Suhy Dec. ¶20 |

(222 of 299), Page 222 of 299
Case: 24-5538, 12/23/2024, DktEntry: 18.9, Page 222 of 299
Case 5:18-cv-07182-EJD   Document 109   Filed 02/16/21   Page 45 of 103

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | All promotions have been to marketing and service Sweden's open source Neo4J software and derivatives of such software as permitted under the GitHub Terms of Service and the AGPL. References to USA and its products are for comparative advertisement. Suhy Dec. ¶16<br><br>The statements provided on the websites that PT "has ceased their partnership with Neo Technology" Ratinoff Decl. Exh. 14, that PT "has ceased their partnership with Neo4j Inc." *Id.* Exhs. 15, 17, 19, certainly reflects a total lack of sponsorship or endorsement. Suhy Dec. ¶21<br><br>The Sweden GitHub repository for open source Neo4J provides content including USA's documentation. Under the GitHub Terms of Services, all users may use all content. Referring licensees to such documentation is permissive. Nevertheless, when Neo4j Inc complained  - the links were removed. Suhy Dec. ¶23 |
| 8. The PT Defendant's use of the Neo4j® Mark caused actual consumer confusion | **Fact 35:** The PT Defendant's use of the Neo4j® Mark to promote ONgDB resulted in customers choosing ONgDB and encountering compatibility issues.  Ratinoff Decl., Exh. 115-116; Exh 31 at 230:12-233:10; Exh. 3 at 207:12-209:3. | **DISPUTED:** Objection, the evidence is hearsay and there is no showing the use of the Name Neo4J caused consumer confusion. Consumers choose ONgDB because of price. This fact is conceded by Plaintiffs. Dkt. 98, p. 2:12-13; p. 32:6-10<br><br>PureThink and iGov did not use the USA's disputed Neo4j mark for promotion of USA's products. Suhy Dec. ¶24<br><br>All promotions have been to marketing and service Sweden's open source Neo4J software and derivatives of such software as permitted under the GitHub Terms of Service and the AGPL. References |

12

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | to USA and its products are for comparative advertisement. Suhy Dec. ¶16<br><br>Exhibit 115: Shows an anonymous user named "stephanie" asking about trying to use ONgDB with Neo4j Desktop, it does not mention a specific version or anything more. There is no way of knowing if there was a "compatibility" issue, in fact the issue could have been caused because of an incorrect version number and could have occurred with Neo4j Enterprise distributions packaged by Neo4j. Furthermore, USA responds and in no way explains or tells the user that ONgDB is not even provided by them. The omissions in Neo4j's response would actually cause confusion because they are not saying anything about ONgDB being a 3rd party product. The confusion is caused by USA and Sweden's dual channel marketing of commercial and open source software through two different companies with the same name. Exhibit 116 is simply forwarding this post to Brad Nussbaum. Suhy Dec. ¶25 |
| | **Fact 36:** Defendants' interchangeable use of "Neo4j Enterprise" and "ONgDB" in marketing ONgDB misleads consumers into mistakenly believing that ONgDB and Neo4j® EE were one and the same. *See, e.g.,* Exhs. 35, 40, 42-44, 46, 53, 55, 76, 100, 130-131, 134-135. | **DISPUTED:** Defendants only used "Neo4j Enterprise" and "ONgDB" in descriptive manners. Furthermore defendants focused on educating consumers, not misleading them. Specific versions of Neo4j and ONgDB had no difference in source code before enterprise source was closed. Suhy Dec. ¶25<br><br>Even for those distributions, defendants made all the facts clear and never misled consumers. The inference drawn is not supported by the evidence: **Exhibit 35:** shows no confusion or misleading of customers. The user is asking a question on the |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | ongdb github issue list and the content does not lead to any confusion. **Exhibit 40:** Exhibit 40 clearly shows that there is no confusion as the user was asking about compiling the binaries himself. There is nothing in the exhibit supporting that this user was mislead. "where can I find the source of the binaries you provide? could you provide instructions on how to build your binaries myself?" **Exhibit 42:** Exhibit 42 shows actually shows that iGov is helping Perspecta Engineering Inc understand the differences between Neo4j and ONgDB.  Originally Perspecta had reached out to iGov and iGov responded explaining the facts and differences.   The statements in exhibits are true and not misleading. Suhy Dec. ¶27 |
| | Fact 37: The PT Defendant's use of the Neo4j® Mark to promote ONgDB as free open source and falsely [equate] it with commercially licensed Neo4j® EE created actual customer confusion. Ratinoff Decl., Exh. 48-49, 117-120, 130-131, 134-135. | **DISPUTED:** Defendants only used "Neo4j Enterprise" and "ONgDB" in descriptive manners. Furthermore defendants focused on educating consumers, not misleading them.  Specific versions of Neo4j and ONgDB had no difference in source code before enterprise source was closed.  Suhy Dec. ¶25 Even for those distributions, defendants made all the facts clear and never misled consumers. The inference drawn is not supported by the statement: **Exhibit 35:** shows no confusion or misleading of customers.   The user is asking a question on the ongdb github issue list and the content does not lead to any confusion. **Exhibit 40:** Exhibit 40 clearly shows that there is no confusion as the user was asking about compiling |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | the binaries himself. There is nothing in the exhibit supporting that this user was mislead. "where can I find the source of the binaries you provide? could you provide instructions how to build your binaries myself?" **Exhibit 42:** Exhibit 42 shows actually shows that iGov is helping Perspecta Engineering Inc understand the differences between Neo4j and ONgDB.  Originally Perspecta had reached out to iGov and iGov responded explaining the facts and differences.   The facts in exhibit are true and not misleading.  Suhy Dec. ¶27 |
| | **Fact 38:** Consumers who have downloaded ONgDB rather than official Neo4j® EE have experienced technical issues with ONgDB.  Ratinoff Decl., Exh. 121-124, 133. In one instance, Suhy sent a user to Neo4j USA's operations manual for assistance. *Id.*, Exh. 125. | DISPUTED:  Mr. Suhy believes that the technical issues could be caused by Neo4j Core code that it does not modify or simply because an end-user did not read the instructions on configuring a specific feature.   Mr Suhy is not aware of a bug fix for this issue indicating it could have just been user error. The inference drawn is not supported by the statement:  In many of the exhibits Neo4j tries to show a problem, but does not show any proof that the problem was simply user error or configuration or an analysis of what the problem was.  Exhibit 121 does not give enough information to identify if there is a technical issue, and furthermore the user from the exhibit said that they figured out the problem on their own indicating it was user error.  Exhibit 122 seems to indicate that a plugin or misconfiguration of the JVM is the problem.  Exhibit 123 indicates that the user is using ONgDB 3.2.3 which would have had the same source code as the Neo4j Enterprise branded distribution. |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | Furthermore it seems that the issue was with the a 3rd party plugin called "tinker pop" and therefore was not even specific to Neo4j or ONgDB.  Because the source code for Neo4j and ONgDB was the same for that specific 3.2.3 version - if there was a technical issue - then it would have also been present in the Neo4j Enterprise 3.2.3 version as well.<br><br>USA charges customers and provides technical support for its commercial Neo4J products because consumers have technical issues with their "commercial" Neo4J products as well. Technical issues with software is not indicative of any difference in the software.  Suhy Dec.  ¶28 |
| Claim 2: Trademark Infringement Against Graph Foundation Inc. | | |
| 1. Plaintiff Neo4j Inc. ("Neo4j USA") owns a protectable trademark | Fact 39: Neo4j USA is the owner of U.S. Trademark Registration No. 4,784,280 for the word mark "NEO4J" covering the goods and services in International Classes, 009, 035, 041, 042 and 045 (the "Neo4j® Mark").  Declaration of Jeffrey M. Ratinoff, ("Ratinoff Decl."), Exh. 1. | DISPUTED: Neo4j is not the owner, assignee, or exclusive licensee of the Neo4j mark, and therefore its ownership of U.S. Trademark Registration No. 4,784,280 is disputed. Beene Dec, Exh. 1 at §2.1.1., 2 and 3. |
| 3. GFI used the Neo4j® Mark without Neo4j USA's authorization to promote ONgDB | Fact 40: Defendants copied the code, removed the commercial restrictions imposed by the Neo4j Sweden Software License from Neo4j® EE version 3.4 and began promoting ONgDB as the open source Neo4j® EE 3.4 under the AGPL.  Ratinoff Decl., Exh. 24-26, 28-29, 37, 62, 86; see also Exh. 3 at 28:25-29:11, 171:23-172:23, 199:22-200:20; Exh. 31 at 87:24-90:9. | DISPUTED: Suhy did not remove commercial restrictions imposed by Neo4j.  He only followed the instructions of the License.txt copyright holder (free software foundation) making it verbatim. The commons clause restrictions were still in effect and referenced in 1000s of files which Mr Suhy did not modify because the other files were copyrighted to Neo4j Sweden.  Following the rules for the License.txt file did not remove any restrictions on the software. Suhy Dec.  ¶29 |
| | Additional Facts:  GFI testified that Defendants removed the Commons Clause from the Neo4j Sweden Software License for Neo4j EE v3.4 and offered it as ONgDB.  Ratinoff Decl., Exh. 31 at 87:24-89:8. The AGPL and the Neo4j Sweden Software License also requires | |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | each copy of the software subject to the license to bear copyright notices. Rathle Decl., Exh. 3 at §§ 4-5. | |
| | **Fact 41:** GFI copied the landing page on Plaintiffs' GitHub repository without any overt reference to ONgDB. GFI Dkt. No. 89, ¶ 18, Exh. 18; Ratinoff Decl., Exh. 31 at 81:14-20. | **DISPUTED** The referenced GFI GitHub repository page expressly describes ONgDB as follows: ONgDB (Open Native Graph DB) - Neo4j fork with enterprise code base. ONgDB integrates Neo4j Open Core commits. GFI Dkt. No. 89, Exh. 18. |
| | **Additional Fact:** There was no overt difference between GFI's original landing page for ONgDB and Plaintiffs' landing page on GitHub. Compare Dkt. No. 89, Exh. 18 *and* Ratinoff Decl., Exh. 59. | |
| | **Fact 42:** On January 17, 2019, GFI modified its landing page by changing the title to "ONgDB - Neo4j Enterprise Fork: Graphs for Everyone," adding references "ONgDB & Neo4j" and that "ONgDB & *Neo4j Enterprise* consist of modules from Neo4j Community Edition and modules licensed under AGPLv3 in this repository," but the content still remained almost identical to Plaintiffs' GitHub landing page and contained wide-spread misuse of the Neo4j® Mark. Dkt. No. 89, ¶¶ 19-21, Exhs. 19-21 (emphasis added). | **UNDISPUTED** that GFI's landing page was modified and that the modified page contained the quoted language.<br><br>**DISPUTED** that the landing page contained "wide-spread misuse" of the Neo4® Mark. The Neo4j® Mark was never used, only the words neo4j and "Neo4j" were used to describe the fact that ONgDB is a fork of Neo4j which is an important descriptive element. |
| | **Fact 43:** On April 14, 2020, GFI started to remove the Neo4j® Mark and Neo4j USA's URLs from that page. *Compare* GFI Dkt. No. 89, Exh. 22 *and* Exhs. 23-28. However, GFI's landing page was still titled "ONgDB - Neo4j Enterprise Fork: Graphs for Everyone," still started off stating "Neo4j is the world's leading Graph Database," encouraged consumers to "Learn more on the Neo4j website," and continued to use the Neo4j® Mark throughout. *Id.*, ¶¶ 29-31, Exhs. 29-31. | **UNDISPUTED** that GFI's landing page was modified and that the modified page contained the quoted language.<br><br>**DISPUTED** that the landing page used the Neo4® Mark. The Neo4j® Mark was never used, only the words neo4j and "Neo4j" were used to describe the fact that ONgDB is a fork of Neo4j which is an important descriptive element. |
| | **Fact 44:** On April 21, 2020, GFI removed instances of the Neo4j® Mark and hyperlinks to Neo4j USA's website, but still used Plaintiffs' catch phrase "Graphs for Everyone" and mislabeling the Neo4j® Platform as the "neo4j project." GFI Dkt. No. 89, Exhs. 32-33. | **UNDISPUTED** that GFI's landing page was modified and that the modified page contained the quoted language.<br><br>**DISPUTED** that the "neo4j project" is mislabeling. The term "neo4j project" is used to describe the fact |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | that ONgDB is a fork of Neo4j which is an important descriptive element. |
| | **Additional Fact:** The Neo4j® Mark is a registered standard character mark covering the word in all types of depictions.  *Id.*, Exh. 1. | |
| | Fact 45: Rather than create its support documentation for ONgDB, GFI relied upon Neo4j USA's official documentation and used hyperlinks on its website to redirect users to Plaintiffs' official documentation, including Neo4j USA's copyrighted operation and developer manuals, located on its website.  Dkt. No. 89, ¶¶ 3-8, 13-16, Exhs. 3-8, 13-16; Ratinoff Decl., Exhs. 78-83, Exh. 129 [RFA Nos. 81-84, 88-89, 93-94, 98-100, 104, 108, 111, 123-126, 130-136]. | **UNDISPUTED** |
| | Fact 46: GFI's website directed users to **Plaintiffs'** change logs for each new release of ONgDB until GFI finally started its own change log with ONgDB v3.5.16.  Dkt. No. 89, ¶¶ 3-8, Exhs. 3-8; Ratinoff Decl., Exh. 84; Exh. 129 [RFA Nos. 87, 92, 97, 103, 107, 110]. | **UNDISPUTED** |
| | Fact 47: Up until April 14, 2020, GFI's GitHub landing page stated "To build the documentation see the Neo4j documentation" with an embedded hyperlink: https://github.com/neo4j/neo4j-documentation/. Dkt. No. 89, Exhs. 18-19, 23. | **UNDISPUTED** |
| | Fact 48: GFI's document repository on GitHub also uses hyperlinks that send consumers to Neo4j USA's official documentation on Neo4j USA's corporate website.  Dkt. No. 89, ¶¶ 9-16; Ratinoff Decl., Exhs. 82-83; Exh. 31 at 276:19-279:12, 284:2-285:18; Exhs. 128-129 [RFA Nos. 81-84, 115-126]. | **UNDISPUTED** |
| | Fact 49: The Neo4j USA developer and operation manuals are copyrighted by Neo4j USA and subject to the License: Creative Commons 4.0, which contains a hyperlink to the Attribution-NonCommercial-ShareAlike 4.0 International Public License, which expressly prohibits the use of Plaintiffs' documents for commercial purposes. Ratinoff Decl., Exh. 85, Exh. 31 at 286:1-288:13. | **UNDISPUTED** |
| | Fact 50: GFI used the Neo4j® Mark in the title tags of webpages on its website featuring ONgDB. Ratinoff Decl., Exhs. 128-129 [RFA Nos. 85-86, 90-91, 95-96, 101-102, 105-106]. | **DISPUTED** The Neo4j® Mark was never used, only the words neo4j and "Neo4j" were used to describe the fact that ONgDB is a fork of Neo4j which is an important descriptive element. |
| | **Additional Fact:** The Neo4j® Mark is a registered standard character mark covering the word in all types of depictions.  *Id.*, Exh. 1. | |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | **Fact 51:** GFI did not seek or obtain Neo4j USA's authorization to use the Neo4j® Mark on GFI's website and GitHub repository in the foregoing manner.  Ratinoff Decl., Exh. 31 at 181:6-182:3, Exh. 129 [RFA Nos. 5-9, 22-26, 69, 71, 73-76, 78]. | **UNDISPUTED** |
| | **Fact 52:** GFI used the Neo4j® Mark as a hashtag (#Neo4j) in tweets published from GFI's Twitter Account to promote ONgDB.  Ratinoff Decl., Exhs. 89-92, 95-96, Exhs. 128-129 [RFA Nos. 149-150, 157-158, 165-166, 173-174, 181-182, 187-188]. | **DISPUTED** The Neo4j® Mark was never used, only the words neo4j and "Neo4j" and the hashtag "#Neo4j" were used to describe the fact that ONgDB is a fork of Neo4j which is an important descriptive element. |
| | **Additional Fact:** The Neo4j® Mark is a registered standard character mark covering the word in all types of depictions.  *Id.*, Exh. 1. | |
| 4. GFI's ONgDB product was readily identifiable without the Neo4j® Mark | **Fact 53:** ONgDB can be readily identified as such or as "Open Native Graph Database" without use of the Neo4j® Mark.  Ratinoff Decl., Exh. 31 at 27:17-29:9, 172:23-173:16, 175:5-20, 176:7-19, 178:13-179:25. | **DISPUTED:** ONgDB is a fork of the open source Neo4 database.  It's important to explain this fact to potential end-users and is an important descriptive fact to show it is a drop in replacement for neo4j distributions.   ONgDB does not modify the neo4j core code, and is therefore a superset of neo4j core and it's important to communicate this to potential end-users. Furthermore ONgDB only uses the descriptive term neo4j - it does not use the Neo4j® Mark

If Neo4j was not referenced then end-users would have no idea to what ONgDB forked. |
| | **Fact 54:** GFI issued tweets promoting ONgDB without using the Neo4j® mark or the mark as hashtag.  Ratinoff Decl., Exhs. 86, 88. | **UNDISPUTED** |
| 4. GFI did not use the Neo4j® Mark to describe Plaintiffs' Neo4j® products | **Fact 55:** GFI copied the landing page on Plaintiffs' GitHub repository without any overt reference to ONgDB and gratuitously used the Neo4j® Mark to describe and promote its own software.  *See supra* Facts 41-44. | **DISPUTED:** ONgDB is a fork of the open source Neo4 database.  It's important to explain this fact to potential end-users and is an important descriptive fact to show it is a drop in replacement for neo4j distributions.   ONgDB does not modify the neo4j core code, and is therefore a superset of neo4j core and it's important to communicate this to potential end-users. Furthermore ONgDB only uses the descriptive term neo4j - it does not use the Neo4j® Mark |

842\3697141.3

19

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | If Neo4j was not referenced then end-users would have no idea to what ONgDB forked. |
| | **Additional Fact:** The Neo4j® Mark is a registered standard character mark covering the word in all types of depictions. *Id.*, Exh. 1. | |
| | Fact 56: At the time that Plaintiffs filed suit, GFI's ONgDB repository still strongly resembled the landing page for Plaintiffs repository for the Neo4j® Platform, and repeatedly referred to "ONgDB & Neo4j" as if they were one and the same, and even used "Neo4j" *instead* of "ONgDB." *Compare* Ratinoff Decl., Exh. 58 *and* Exh. 59. | **DISPUTED**: The GFI ONgDB depository page attached as Exhibit 58 starts with "ONgDB (Open Native Graph DB) – Neo4j fork with enterprise code base." There is not a reference to ONgDB and Neo4j being one in the same. ONgDB is a fork of the open source Neo4 database. It's important to explain this fact to potential end-users and is an important descriptive fact to show it is a drop in replacement for neo4j distributions. ONgDB does not modify the neo4j core code, and is therefore a superset of neo4j core and it's important to communicate this to potential end-users. Furthermore ONgDB only uses the descriptive term neo4j - it does not use the Neo4j® Mark<br><br>If Neo4j was not referenced then end-users would have no idea to what ONgDB forked. |
| | Fact 57: Rather than independently promoting ONgDB as a graph database software without use of Neo4j® Mark, GFI used the mark to promote ONgDB on its website and GitHub repository. *See supra* Facts 41-52. | **DISPUTED**: ONgDB is a fork of the open source Neo4 database. It's important to explain this fact to potential end-users and is an important descriptive fact to show it is a drop in replacement for neo4j distributions. ONgDB does not modify the neo4j core code, and is therefore a superset of neo4j core and it's important to communicate this to potential end-users. Furthermore ONgDB only uses the descriptive term neo4j - it does not use the Neo4j® Mark<br><br>If Neo4j was not referenced then end-users would have no idea to what ONgDB forked. |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | **Fact 58:** GFI used a hashtag, **#Neo4j** that consists of nothing more than the Neo4j® Mark with a "#" before the mark to promote ONgDB on social media.  Ratinoff Decl., Exhs. 1, 89-96 and Exh. 31 at 233:17-237:21. | **DISPUTED** The Neo4j® Mark was never used, only the words neo4j and "Neo4j" and the hashtag "#Neo4j" were used to describe the fact that ONgDB is a fork of Neo4j which is an important descriptive element. |
| | **Additional Fact:** The Neo4j® Mark is a registered standard character mark covering the word in all types of depictions.  *Id.*, Exh. 1. | |
| | **Fact 59:** GFI chose the following format that relied on using the Neo4j® Mark as a hashtag to announce its new releases of ONgDB:  "**#ONgDB** (**#FOSS#Neo4j** Enterprise) 3.5.x support release is out," with no attempt to differentiate ONgDB and Neo4j® EE as separate, competing products.[1]   Ratinoff Decl., Exhs. 89, 92, 94-95; Exh. 31 at 233:17-236:15, 240:12-241:25, 246:5-249:2. | **DISPUTED** The Neo4j® Mark was never used, only the words neo4j and "Neo4j" and the hashtag "#Neo4j" were used to describe the fact that ONgDB is a fork of Neo4j which is an important descriptive element.  Further, as is shown in the cited exhibits, each announcement contained the following statement distinguishing ONgDB from Neo4j EE: "ONgDB is an open source fork of Neo4j Enterprise that is developed and released under AGPLv3 by The Graph Foundation." |
| | **Additional Fact:** The Neo4j® Mark is a registered standard character mark covering the word in all types of depictions.  *Id.*, Exh. 1. | |
| | **Fact 60:** GFI issued a tweet that stated "**#ONgDB**, Open **#Neo4j** Enterprise," and in another instance "Our **#ONgDB/#Neo4j** Enterprise CI server is up and running builds…." Ratinoff Decl., Exhs. 91, 93. | **UNDISPUTED**-that the cited tweets contain the quoted language.<br><br>**DISPUTED** – that the cited language is the only language in the tweets.  Exh. 93 contains the following additional language distinguishing ONgDB from Neo4j EE: "ONgDB is an open source fork of Neo4j Enterprise that is developed and released under AGPLv3 by The Graph Foundation."  And "What is ONgDB:  Open Native Graph DB is an open source fork of #Neo4j, that picks up prior to Neo4j, Inc.'s removal of enterprise code from the main Github repository." |

---

[1] "FOSS" stands for free open source software. Ratinoff Decl., Exh. 31 at 233:17-234:3.

21

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | **Fact 61:** GFI used "**#Neo4j** Enterprise 3.5" to solicit end-users of official Neo4j® EE v3.5 to report bugs to GFI so that it could identify bugs in the closed enterprise directory for Neo4j® EE and attempt to mimic such fixes in ONgDB. Ratinoff Decl., Exh. 61, Exh. 31 at 161:23-163:12, 169:13-172:13. | **DISPUTED** The hashtag "#Neo4j" was used to describe the fact that ONgDB is a fork of Neo4j which is an important descriptive element and to inform users who wanted to participate in the open source project where to report enterprise issues on open source. Ratinoff Decl., Exh. 31 at 170:11-22. |
| | **Fact 62:** GFI used **#Neo4j** to promote ONgDB without reference to Neo4j® EE: "Latest **#ONgDB** apoc 3.5.0.8 procedure release is out. https://github.com/graphfoundatio... **#Neo4j**." Ratinoff Decl., Exh. 96. | **UNDISPUTED** – that the language appears on the exhibit.<br><br>**DISPUTED** – that there is no reference to Neo4j EE. To the contrary, Exhibit 96 tweet contains the following language <u>distinguishing ONgDB from Neo4j EE:</u> "ONgDB is an open source fork of Neo4j Enterprise that is developed and released under AGPLv3 by The Graph Foundation." |
| | **Fact 63:** GFI admitted intentionally used the Neo4j® Mark as a hashtag "to inform users about ONgDB" and to make it more likely that potential customers would come across ONgDB in conducting searches in relation to Neo4j® EE. Ratinoff Decl., Exh. 31 at 174:14-176:19, 236:4-11, 237:9-239:7, 242:14- 243:21. | **DISPUTED** – GFI did not use the Neo4j Mark. GFI used the hashtag "#Neo4j" was used to inform users in the neo4j community that ONgDB was available as a fork of Neo4j which is an important descriptive element and to inform users who wanted to participate in the open source project. Ratinoff Decl. Exh. 31 at 236:3-11 |
| | **Additional Fact:** The Neo4j® Mark is a registered standard character mark covering the word in all types of depictions. *Id.*, Exh. 1. | |
| 7. GFI prominently used the Neo4j® Mark beyond what was reasonably necessary | **Fact 64:** GFI copied the landing page on Plaintiffs' GitHub repository without any overt reference to ONgDB and despite making modifications continued to use the Neo4j® Mark on its GitHub repository beyond merely describing ONgDB as a fork of Neo4j® EE. *See supra* Facts 41-55; *see also* Dkt. No. 89 at ¶¶ 17-33, Exhs. 17-33. | **DISPUTED** The referenced GFI GitHub repository page expressly describes ONgDB as follows: ONgDB (Open Native Graph DB) - Neo4j fork with enterprise code base. ONgDB integrates Neo4j Open Core commits. GFI Dkt. No. 89, Exh. 18. The Neo4j® Mark was never used, only the words neo4j and "Neo4j" were used to describe the fact that ONgDB is a fork of Neo4j which is an important descriptive element. ONgDB is a fork of the open source Neo4 database. It's important to explain this fact to potential end-users and is an important descriptive fact to show it |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | is a drop in replacement for neo4j distributions. ONgDB does not modify the neo4j core code, and is therefore a superset of neo4j core and it's important to communicate this to potential end-users. Furthermore ONgDB only uses the descriptive term neo4j - it does not use the Neo4j® Mark<br><br>If Neo4j was not referenced then end-users would have no idea to what ONgDB forked. |
| | **Fact 65:** At the time that Plaintiffs filed suit, GFI's ONgDB repository still strongly resembled the landing page for Plaintiffs repository for Neo4j® Software, and repeatedly referred to "ONgDB & Neo4j" as if they were one and the same, and even used "Neo4j" instead of "ONgDB." *Compare* Ratinoff Decl., Exh. 58 *and* Exh. 59. | **DISPUTED**: The GFI ONgDB depository page attached as Exhibit 58 starts with "ONgDB (Open Native Graph DB) – Neo4j fork with enterprise code base." There is not a reference to ONgDB and Neo4j being one in the same. ONgDB is a fork of the open source Neo4 database. It's important to explain this fact to potential end-users and is an important descriptive fact to show it is a drop in replacement for neo4j distributions. ONgDB does not modify the neo4j core code, and is therefore a superset of neo4j core and it's important to communicate this to potential end-users. Furthermore ONgDB only uses the descriptive term neo4j - it does not use the Neo4j® Mark<br><br>If Neo4j was not referenced then end-users would have no idea to what ONgDB forked. |
| | **Fact 66:** GFI's (1) use of "neo4j," "neo4j enterprise" and "Neo4j Enterprise" without proper trademark notices; (2) use of embedded "Neo4j" links to Neo4j USA's website and GitHub repository; (3) hyperlinking to Plaintiffs' build instructions, support documentation and change logs all containing the Neo4j® Mark rather than creating and hosting their own with the ONgDB name; and (4) interchangeable use of "Neo4j Enterprise" with "ONgDB" to promote ONgDB on its website and GitHub goes beyond what is reasonably necessary to identify ONgDB as a fork of Neoj4® EE. *See supra* Facts 41-51, 56-58; *see also* Ratinoff Decl., Exhs. 37, 57-58; Dkt. No. 89, ¶¶ 3-16. | **DISPUTED** The Neo4j® Mark was never used, only the words neo4j and "Neo4j" were used to describe the fact that ONgDB is a fork of Neo4j which is an important descriptive element. ONgDB is a fork of the open source Neo4 database. It's important to explain this fact to potential end-users and is an important descriptive fact to show it is a drop in replacement for neo4j distributions. ONgDB does not modify the neo4j core code, and is therefore a superset of neo4j core and it's important |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | to communicate this to potential end-users. Furthermore GFI only uses the descriptive term neo4j - it does not use the Neo4j® Mark<br><br>If Neo4j was not referenced then end-users would have no idea to what ONgDB forked. |
| | **Additional Fact:** The Neo4j® Mark is a registered standard character mark covering the word in all types of depictions. *Id.*, Exh. 1. | |
| | **Fact 67:** GFI used the Neo4j® Mark as a hashtag, **#Neo4j**, to promote ONgDB rather than to merely describe ONgDB as a fork of Neo4j® EE. *See supra* Facts 59-64. | **DISPUTED** GFI used the hashtag "#Neo4j" was used to inform users in the neo4j community that ONgDB was available as a fork of Neo4j which is an important descriptive element and to inform users who wanted to participate in the open source project. Ratinoff Decl., Exh. 31 at 236:3-11.  GFI's tweets referenced in Facts 59-64 <u>contained the following additional language distinguishing ONgDB from Neo4j EE:</u>  "ONgDB is an open source fork of Neo4j Enterprise that is developed and released under AGPLv3 by The Graph Foundation."  See Responses to Facts 59-64.  And Exhibit 93 also states:  "What is ONgDB: Open Native Graph DB is an open source fork of #Neo4j, that picks up prior to Neo4j, Inc.'s removal of enterprise code from the main Github repository." |
| | **Additional Fact:** The Neo4j® Mark is a registered standard character mark covering the word in all types of depictions. Ratinoff Decl., Exh. 1.  GFI admitted that it used Neo4j® Mark as a hashtag for the purpose of promoting ONgDB.  *Id.,* Exh. 31 at 174:11-23; 176:15-18, 233:17-236:15, 240:12-241:25, 242-243:21, 246:5-249:2. | |
| | **Fact 68:** GFI admitted that it could have referred to "Neo4j Enterprise" without using the Neo4j® Mark as a hashtag to identify the product. Ratinoff Decl., Exh. 31 at 236:4-15. | **DISPUTED** the cited testimony contains no such admission.  The testimony is only that it is possible to write a tweet without a hashtag.  GFI did not use the Neo4j Mark.  GFI used the hashtag "#Neo4j" was used to inform users in the neo4j community that ONgDB was available as a fork of Neo4j which is an important descriptive element and to inform |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | users who wanted to participate in the open source project. Ratinoff Decl., Exh. 31 at 236:3-11 |
| | **Additional Fact:** The Neo4j® Mark is a registered standard character mark covering the word in all types of depictions. Ratinoff Decl., Exh. 1. GFI further testified that the reason it used the Neo4j® Mark as a hashtag was to bring ONgDB to the attention of users of Neo4j® via searches. *Id.,* Exh. 31 at 236:17-239:7, 241:15-243:7, 243:15-22. | |
| | Fact 69: GFI It also conceded that it could have used a format where it described ONgDB as being a fork of Neo4j® EE rather than simply inserting "#Neo4j Enterprise" with "#ONgDB." Ratinoff Decl., Exh. 31 at 243:23-245:12; Exh. 93. | **DISPUTED** the cited testimony relates to a different type of tweet that still used the hashtag "#Neo4j" was used to inform users in the neo4j community that ONgDB was available as a fork of Neo4j which is an important descriptive element and to inform users who wanted to participate in the open source project. |
| 8. GFI's use of the Neo4j® Mark suggested sponsorship or endorsement by Neo4j USA | Fact 70: GFI copied the landing page on Plaintiffs' GitHub repository without any overt reference to ONgDB and despite making modifications continued to use the Neo4j® Mark on its GitHub repository beyond merely describing ONgDB as a fork of Neo4j® EE. *See supra* Facts 41-55; *see also* Dkt. No. 89 at ¶¶ 17-33, Exhs. 17-33. | **DISPUTED** The referenced GFI GitHub repository page expressly describes ONgDB as follows: ONgDB (Open Native Graph DB) - Neo4j fork with enterprise code base. ONgDB integrates Neo4j Open Core commits. GFI Dkt. No. 89, Exh. 18. The Neo4j® Mark was never used, only the words neo4j and "Neo4j" were used to describe the fact that ONgDB is a fork of Neo4j which is an important descriptive element. ONgDB is a fork of the open source Neo4 database. It's important to explain this fact to potential end-users and is an important descriptive fact to show it is a drop in replacement for neo4j distributions. ONgDB does not modify the neo4j core code, and is therefore a superset of neo4j core and it's important to communicate this to potential end-users. Furthermore ONgDB only uses the descriptive term neo4j - it does not use the Neo4j® Mark

If Neo4j was not referenced then end-users would have no idea to what ONgDB forked.

See also Responses to Facts 41-55. |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | **Additional Fact:** There was no overt difference between GFI's original landing page for ONgDB and Plaintiffs' landing page on GitHub. Compare Dkt. No. 89, Exh. 18 *and* Ratinoff Decl., Exh. 59. | |
| | **Fact 71:** At the time that Plaintiffs filed suit, GFI's ONgDB repository still strongly resembled the landing page for Plaintiffs repository for Neo4j® Software, and repeatedly referred to "ONgDB & Neo4j" as if they were one and the same, and even used "Neo4j" instead of "ONgDB." *Compare* Ratinoff Decl., Exh. 58 *and* Exh. 59. | **DISPUTED**: The GFI ONgDB depository page attached as Exhibit 58 starts with "ONgDB (Open Native Graph DB) – Neo4j fork with enterprise code base." There is not a reference to ONgDB and Neo4j being one in the same. ONgDB is a fork of the open source Neo4 database. It's important to explain this fact to potential end-users and is an important descriptive fact to show it is a drop in replacement for neo4j distributions. ONgDB does not modify the neo4j core code, and is therefore a superset of neo4j core and it's important to communicate this to potential end-users. Furthermore ONgDB only uses the descriptive term neo4j - it does not use the Neo4j® Mark<br><br>If Neo4j was not referenced then end-users would have no idea to what ONgDB forked. |
| | **Fact 72:** GFI (1) used "neo4j," "neo4j enterprise" and "Neo4j Enterprise" without proper trademark notices; (2) used embedded "Neo4j" links to Neo4j USA's website and GitHub repository; (3) stated on its GitHub repository for ONgDB for customers to "Learn more on the Neo4j website," and continued to use the Neo4j® Mark throughout that repository; (4) hyperlinked to Plaintiffs' build instructions, support documentation and change logs on GFI's website and GitHub repository all containing the Neo4j® Mark; (5) interchangeably used "Neo4j Enterprise" with "ONgDB" to promote ONgDB on its website and Github repository; and (6) used the Neo4j® as a hashtag on Twitter to promote ONgDB. *See supra* Facts 42-43, 56-70. | **DISPUTED** The Neo4j® Mark was never used, only the words neo4j and "Neo4j" were used to describe the fact that ONgDB is a fork of Neo4j which is an important descriptive element. ONgDB is a fork of the open source Neo4 database. It's important to explain this fact to potential end-users and is an important descriptive fact to show it is a drop in replacement for neo4j distributions. ONgDB does not modify the neo4j core code, and is therefore a superset of neo4j core and it's important to communicate this to potential end-users. Furthermore GFI only uses the descriptive term neo4j - it does not use the Neo4j® Mark<br><br>If Neo4j was not referenced then end-users would have no idea to what ONgDB forked |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | **Additional Fact:** The Neo4j® Mark is a registered standard character mark covering the word in all types of depictions. *Id.*, Exh. 1. | |
| | Fact 73: GFI's intended audience in using the Neoj4® Mark as a hashtag were users of Neo4j® EE. Ratinoff Decl., Exh. 31 at 174:14-176:19, 236:4-11, 237:9-239:7, 242:14- 243:21. | **DISPUTED** the cited testimony contains no such admission. The testimony is only that it is possible to write a tweet without a hashtag. GFI did not use the Neo4j Mark. GFI used the hashtag "#Neo4j" was used to inform users in the neo4j community that ONgDB was available as a fork of Neo4j which is an important descriptive element and to inform users who wanted to participate in the open source project. Ratinoff Decl., Exh. 31 at 236:3-11 |
| 9. GFI's use of the Neo4j® Mark caused actual consumer confusion | Fact 74: GFI's use of the Neo4j® Mark to promote ONgDB resulted in customers choosing ONgDB and encountering compatibility issues. Ratinoff Decl., Exh. 115-116; Exh 31 at 230:12-233:10; Exh. 3 at 207:12-209:3. | **DISPUTED** – The cited emails are hearsay and do not establish compatibility issues. Rather, Exhibit 115 demonstrates an attempt to use a desktop tool inappropriately with a server application. Ratinoff Decl., Exh. 31 at 232:5-25. Nothing in the email demonstrates that there would be any compatibility issues when ONgDB is used as a server application. |
| | Fact 75: GFI lead consumers to believe that ONgDB and Neo4j® EE were one and the same. *See, e.g.,* Exhs. 35, 40, 42-44, 46-47, 53, 55-58, 76, 100, 130-131, 134-135. | **DISPUTED**: Defendants consistently present ONgDB as an alternative to Neo4j EE. As is set out above, in numerous statements, on the GFI website and on Twitter, GFI describes ONgDB as "an open source fork of Neo4j Enterprise that is developed and released under AGPLv3 by The Graph Foundation." Ratinoff Decl., Exhs. 89, 92, 94, 95. GFI has also described, on its website, the distinction between ONgDB and the Neo4j EE software distributed by Neo4j, Inc., while also disassociating itself from Neo4j, Inc. Open Native Graph DB (ONgDB) is a fork of the neo4j project that continues development of the neo4j enterprise code base as a fully open source project after Neo4j, Inc. Open Core Shift that closed ongoing development and removed existing source code. |

842\3697141.3

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | Ratinoff Decl., Exh. 66. . |
| | **Fact 76:** GFI's use of the Neo4j® Mark to promote ONgDB as free open source and falsely comparing it with commercially licensed Neo4j® EE created actual customer confusion, and diverted sales from Neo4j USA, including the IRS and Next Century/MPO.  Ratinoff Decl., Exh. 48-50, 117-120, 127, 131, 134-135; Broad Decl., ¶¶ 20-24, Exhs. 12-13. | **DISPUTED**:  Plaintiffs present no evidence of a single person or entity that would have made that choice.  Indeed, the evidence Plaintiffs provide with respect to New Century, their one purported concrete example, is an email exchange showing that New Century had no response to Neo4j, Inc.'s proposal even though New Century stated in its email that it understood the issues regarding ONgDB's "legal viability."  Broad Decl., Exh. 13. |
| | **Additional Facts:** As recognized by the Court, "read correctly, Sections 7 and 10 prohibit a *licensee* from imposing further restrictions, but do not prohibit a *licensor* from doing so." *See* GFI Dkt. No. 88 at 7:6-9 (emphasis in original); *see also* Rathle Decl., ¶¶ 11, 27, 29, Exh. 3.  This is also confirmed by the Stipulated Judgment entered in the GFI Action. Reply Ratinoff Decl., Exh. I (GFI Dkt. No. 110).  Next Century chose ONgDB after Defendants told them that they could use it under the AGPL for free, and did not need paid license from Plaintiffs, which they could only state because they removed the Commons Clause and its commercial restrictions.  Ratinoff Decl., Exh. 48-50, 120. | |
| **Claim 3: False Advertising Against GFI and the PT Defendants** | | |
| 1. Defendants made a false statement of fact about a product in a commercial advertisement, which is (a) commercial speech; (b) made in commercial competition with Neo4j USA; (c) for the purpose of influencing consumers to buy their goods or services; and (d) | **Fact 77:** Defendants made the following false statements interstate commerce via their websites and Twitter: (1) "ONgDB distributions are licensed under AGPLv3 as a free and open drop-in replacements of Neo4j Enterprise commercial licensed distributions with the same version number" [Ratinoff Decl., Exh. 57]; (2) "ONgDB and Neo4j Enterprise consists of modules from Neo4j Community Edition and modules licensed under the AGPLv3" [*id.*, Exh. 58]; (3) "ONgDB distributions are licensed under AGPLv3 as a free and open source alternative to currently available proprietary native graph offerings such as Neo4j Enterprise Edition" [*id.*, Exhs. 60, 113-114]; (4) "download ONgDB Enterprise as a drop in replacement for an existing commercial licensed distribution of the same version number." [*id.*, Exhs. 62-66]; (5) "ONgDB Enterprise is a drop in replacement for Neo4j Enterprise commercial packages downloaded from Neo4j.com" [*id.*, Exhs. 62-66, | DISPUTED: Objection none of the evidence cited supports the alleged fact they are false. The legal standard is not correct. See, *Pizza Hut, Inc. v. Papa John's Intern., Inc.* (5th Cir. 2000) 227 F.3d 489, 495.
The statements are all true: (1) "ONgDB distributions are licensed under AGPLv3 as a free and open drop-in replacements of Neo4j Enterprise commercial licensed distributions with the same version number"; (2) "ONgDB and Neo4j Enterprise consists of modules from Neo4j Community Edition and modules licensed under the AGPLv3"; (3) "ONgDB distributions are licensed under AGPLv3 as a free and open source alternative to currently |

(239 of 299), Page 239 of 299
Case: 24-5538, 12/23/2024, DktEntry: 18.9, Page 239 of 299
Case 5:18-cv-07182-EJD Document 109 Filed 02/16/21 Page 62 of 103

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| sufficiently disseminated to the relevant purchasing public | 71]; (6) "ONgDB Enterprise 3.5.5…. Drop in replacement for Neo4j Core and Enterprise 3.5.5. AGPLv3 Open Source License, no limitations on causal cluster instances, cores, or production usage" [*id.*, Exhs. 67-69, 75]; (7) "ONgDB is a drop in replacement for the Neo4j Community and Enterprise branded distributions" [*id.*, Exh. 72-74]; (8) "[ONgDB] is an open source fork of #Neo4j" [*id.*, Exh. 93]; and (9) "You can use the ONgDB fork of Neo4j which adds enterprise code back into Neo4j core. It is 100% free and open." [*id.*, Exh. 98-104, 108]. | available proprietary native graph offerings such as Neo4j Enterprise Edition"; (4) "download ONgDB Enterprise as a drop in replacement for an existing commercial licensed distribution of the same version number."; (5) "ONgDB Enterprise is a drop in replacement for Neo4j Enterprise commercial packages downloaded from Neo4j.com" ; (6) "ONgDB Enterprise 3.5.5…. Drop in replacement for Neo4j Core and Enterprise 3.5.5. AGPLv3 Open Source License, no limitations on causal cluster instances, cores, or production usage" (7) "ONgDB is a drop in replacement for the Neo4j Community and Enterprise branded distributions"; (8) "[ONgDB] is an open source fork of #Neo4j"; and (9) "You can use the ONgDB fork of Neo4j which adds enterprise code back into Neo4j core. It is 100% free and open." Suhy Dec. ¶30 |
| | <u>Fact 78:</u> The PT Defendants also stated on iGov's website that "[Neo4j Enterprise] is 100% free and open source" and "Neo4j Enterprise is released only under the standard AGPLv3 open source license that is managed by the free software foundation." Ratinoff Decl., Exhs. 67-70; *see also* Exh. 21. | <u>DISPUTED:</u> The PT Defendants did not all say this. Only iGov's website stated: that "[Neo4j Enterprise] is 100% free and open source" and "Neo4j Enterprise is released only under the standard AGPLv3 open source license that is managed by the free software foundation." Defendants do not sell ONgDB, ONgDB is licensed under AGPL and AGPL is an open source license for free software. Suhy Dec. ¶31, Ratinoff Decl. Exh. 39, 11:635-638<br><br>ONgDB is a drop in replacement as explained in the deposition of Brad Nussbaum. Nussbaum Depo., 158:7-14, 160: 9-14. Pernick Dec. Ex. A. Plaintiffs have presented no evidence that ONgDB does not operate as a drop in replacement. With respect to ONgDB being free and open, again, Plaintiffs argument that the removal of the Commons Clause language from the Neo4J Sweden Software License was improper is incorrect. Substituting the matching |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | language for the defined terms in this provision, Section 7 of the Neo4J Sweden Software License states: "If the Program as [GFI] received it, or any part of it, contains a notice stating that it is governed by [the AGPLv3 license] along with a term that is a further restriction, [GFI] may remove that term." Pernick Dec. Ex. B |
| | **Additional Facts:** As recognized by the Court, "read correctly, Sections 7 and 10 prohibit a *licensee* from imposing further restrictions, but do not prohibit a *licensor* from doing so." *See* GFI Dkt. No. 88 at 7:6-9 (emphasis in original); *see also* Rathle Decl., ¶¶ 11, 27, 29, Exh. 3. This is also confirmed by the Stipulated Judgment entered in the GFI Action. Reply Ratinoff Decl., Exh. I (GFI Dkt. No. 110). | |
| | Fact 79: Defendants actively encourage actual and potential users of commercially licensed Neo4j® EE to adopt ONgDB and obtain support services from iGov and GraphGrid instead of Plaintiffs. Ratinoff Decl., Exhs. 23, 28-29, 40, 42-54, 76-77, 126, 134-135. | **DISPUTED:** None of the evidence cited identifies any party that would have used Neo4j EE. Further, Plaintiffs present no evidence that they competed with GraphGrid or provided similar services.

Plaintiffs are misidentified as if they both do the same thing. Sweden is not a party to the cause of action. Sweden licenses the open source software USA does not. See APGL license. USA does not support open source software licensed by Sweden. Suhy Dec. 32 |
| | Fact 80: Neo4j Sweden is the owner of all copyrights in Neo4j® CE and Neo4j® EE, including the source code and has licensed said copyrights to Neo4j USA. Rathle Decl., ¶¶ 3-4. | **UNDISPUTED** |
| | Fact 81: Plaintiffs released Neo4j® EE v3.4 under a license that which included the terms from the AGPLv3 and additional restrictions provided by the Commons Clause ("Neo4j Sweden Software License"). Rathle Decl., ¶¶ 11-12, Exhs. 2-3. | **DISPUTED:** Neo4J USA did no such thing. Neo4J Sweden release the open source software, not Neo4J USA. Ratinoff Decl. Exh. 39, 25:11-13 Suhy Dec. ¶33 |
| | Fact 82: The Neo4j Sweden Software License, while still allowing code to be publicly viewable and used within a certain licensed scope, prohibits commercial resale and certain commercial support services. Rathle Decl., ¶¶ 11-12, Exhs. 2-3. | **DISPUTED:** Versions of Neo4j Enterprise open source distributions using AGPL only have no terms mentioning these prohibitions. When the commons clause was added to AGPL, Sweden did not change license forms and used the AGPL form which bars additions and also allows licensees to remove non- |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | permissive additional restriction. AGPL §7. Ratinoff Decl. Exh. 39, 6:331-7:393<br><br>Furthermore - the commons clause does not use the word "commercial". It only uses the word "sell". Ratinoff Decl. Exh. 39, 25:681-693<br><br>The author of the commons clause clarifies the intention and meaning of the commons clause as well. Support services are not barred as they do not consist entirely or substantially of the Software or Functionality of the Software as limited in the commons clause. The restriction of services is using the software as a service as in a SaaS implementation. Suhy Dec. ¶34 Ex. 2 |
| | **Additional Facts:** The Common Clause states the Neo4j® Sweden Software License "does not grant to you, the right to Sell the Software. For purposes of the foregoing, 'Sell' means practicing any or all of the rights granted to you under the License to provide to third parties, for a fee or other consideration, a product or service that consists, entirely or substantially, of the Software or the functionality of the Software." Rathle Decl., Exh. 3.  The ex post facto statement allegedly made by Heather Meeker is contrary to the foregoing and inadmissible hearsay and lacks foundation.  Contrary to Suhy, it was not posted on Plaintiffs' GitHub repository or made on behalf of Plaintiffs.  *See* Reply Ratinoff Decl., Exh. G. | |
| | **Fact 83:** After Plaintiffs released Neo4j® EE v3.4, the PT Defendants downloaded Neo4j's source code from Neo4j's GitHub repository, removed the commercial restrictions imposed by the Neo4j Sweden Software License, and began promoting it "free and open source" Neo4j Enterprise and offering commercial support services.  Ratinoff Decl., Exh. 3 at 171:23-172:23, 199:22-200:20; Exh. 21. | DISPUTED:  USA did no such thing. Sweden release the open source software not USA. Ratinoff Decl. Exh. 39, 25:11-13 Suhy Dec. ¶33<br>Suhy only removed the commons clause as allowed in the AGPL §7. Ratinoff Decl. Exh. 39, 6:331-7:393<br>Suhy did not remove any commercial restrictions. He simply ensured the LICENSE.txt file was verbatim as required by the copyright holder of the LICENSE.txt files : the free software foundation. Suhy did not modify any other files, and the |

31

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | commons commercial restrictions were still in effect.   Following the FSF copyright instructions for the AGPL License.txt file did not remove any restrictions from the distribution - as the restrictions were documented across the repository.  Following the rules for just the specific files did not remove legal terms from the distributions. Suhy Dec. ¶35 |
| | **Fact 84:** Rather than develop ONgDB as an independent fork based off an earlier open source version of Neo4j® EE, Defendants stripped the commercial restrictions out of the Neo4j Sweden Software License from Neo4j® EE version 3.4 and began promoting ONgDB as the open source equivalent of Neo4j® EE 3.4 under the AGPL.  Ratinoff Decl., Exh. 24-26, 28; *see also* Exh. 31 at 87:24-90:9. | DISPUTED:  PT, Suhy, and iGov Inc did not use the term "equivalent" in any references.   For Neo4j Enterprise versions below 3.5 - ONgDB was equivalent in features as it used the same unmodified source code.  So this statement would be true for specific versions of Neo4j and ONgDB.  PT, Suhy, and iGov always used the term drop in replacement which does not mean the features are all equivalent.<br><br>Furthermore - ONgDB is a current fork of Neo4j open source software licensed from Sweden, it pulls in all the Neo4j community commits from the official repository regularly keeping it up to date. This is allowed under the AGPL. Suhy Dec. ¶36 |
| | **Fact 85:** Plaintiffs officially released Neo4j® EE v.3.5 solely under a commercial license in November 2018, and were no longer publishing source code for Neo4j® EE on GitHub under any open source license. Rathle Decl., ¶ 13, Exh. 4. | DISPUTED:  PT, Suhy, and iGov Inc did not use the term "equivalent" in any references.   For Neo4j Enterprise versions below 3.5 - ONgDB was equivalent in features as it used the same unmodified source code.  So this statement would be true for specific versions of Neo4j and ONgDB.  PT, Suhy, and iGov always used the term drop in replacement which does not mean the features are all equivalent. Furthermore - ONgDB is a current fork of Neo4j open source software licensed from Sweden, it pulls in all the Neo4j community commits from the official repository regularly keeping it up to date. This is allowed under the AGPL. |

(243 of 299), Page 243 of 299
Case: 24-5538, 12/23/2024, DktEntry: 18.9, Page 243 of 299
Case 5:18-cv-07182-EJD Document 109 Filed 02/10/21 Page 66 of 103

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | Suhy Dec. ¶36 |
| | **Fact 86:** Prior to its official release, Plaintiffs published several beta versions of Neo4j® EE v3.5 via their GitHub repository subject to the Neo4j Sweden Software License, with Neo4j® v3.5.0-RC1 being the last pre-release version available to Defendants via GitHub. Rathle Decl., ¶ 14; *see also* Ratinoff Decl., Exh. 31 at 158:18-159:20. | **DISPUTED:** USA did not release version on GitHub. Only Sweden released the open source Neo4J software under the AGPL license. Ratinoff Decl. Exh. 39, 25:11-13 Suhy Dec. ¶33

There are no pre-release terms in the GitHub repository. It's possible that a pre-release agreement was added to the compiled packages - but that would be in the actual download of the package, not the GitHub source code as they state. Furthermore - enterprise code was not available in v3.5.0-RC1 but it was available in 3.5.0-beta03. Suhy Dec. ¶37

Also - the License.txt files for the above mentioned releases clearly shows the license as being AGPL, complete with the AGPL preamble - and does not say anything about a "Neo4j Sweden Software License" Decl. Exh. 39, 12-13 |
| | **Fact 87:** GFI's release of ONgGB v3.5.1, which contained at least 182 source code files that had only been previously released under the Neo4j Sweden Software License in the last beta version of Neo4j® EE 3.5 made available by Plaintiffs via GitHub. Ratinoff Decl., Exh. 38 at 6:22-7:1, 8:4-16:24; *see also* Rathle Decl., ¶ 29. | Disputed. USA does not release the open source software. Ratinoff Decl. Exh. 39, 25:11-13 Suhy Dec. ¶33 |
| | **Fact 88:** In order for Defendants to call ONgDB "free and open source" Neo4j® EE, they again replaced the more restrictive Neo4j Sweden Software License with a generic copy of the AGPL and stripped out valid legal notices identifying Neo4j Sweden as the copyright holder and licensor in 28 LICENSE.txt files. Ratinoff Decl., Exhs. 39-40; Dkt. No. 91 at 19:9-25; Exh. 31 at 159:3-10; Rathle Decl., ¶ 30. | DISPUTED: The AGPL license.txt file is copyrighted to the free software foundation. Suhy followed the guidance from the free software foundation relating to the license being verbatim. By following the FSF copyright guidance he did not remove the legal terms from the distribution as a whole. There are 1000s of Neo4j files in the repository which clearly state the commons clause is still part of the license. I.E. Using the verbatim AGPL license content as instructed by the Free software foundation did not remove the commons license in any way as it was stated in many other |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | places. There is no obligation to repeat Sweden's copyright notice on every file. And Sweden owns the copyright (undisputed Fact 80 above) USA has not standing to argue about the copyright notice. Phase 1 does not address the DCMA claim. Suhy Dec. ¶38 |
| | **Additional Fact:** The AGPL and the Neo4j Sweden Software License requires each copy of the software subject to the license to bear copyright notices.  Rathle Decl., Exh. 3 at §§ 4-5. | |
| | **Fact 89:** The Neo4j Sweden Software License did not permit a licensees such as Defendants to remove "further restrictions," i.e. the Commons Clause, imposed by Neo4j Sweden as the copyright holder and original licensor.  Rathle Decl., Exh. 3 at §§ 7, 10; GFI Dkt. No. 88 at 5:23-8:9. | DISPUTED:  Suhy only worked on the License.txt file which he believes is copyrighted to the Free software foundation.  When Suhy replaced the file with verbatim - it was following the copyright holder's instructions.  All the other files which Neo4j held the copyright for were not modified by Suhy and clearly stated that the commons clause was there. Suhy Dec. ¶35

Following the copyright holder's instructions for the License.txt file did not remove restrictions as these were mentioned in many other files in the github repository. Suhy Dec. ¶35 |
| | **Fact 90:** Defendants knew that they could not unilaterally replace the Neo4j Sweden Software License with the APGL without authorization. Ratinoff Decl., Exhs. 34-36, Exh. 31 at 183:14-184:24, 207:10-210:8. | DISPUTED:  Suhy did not replace the Neo4j Software License - He only followed the instructions given by the AGPL license copyright holder to make the actual license verbatim.   The Neo4j Sweden Software License was still in effect as the commons clause was mentioned in many other neo4j files which Neo4j Inc owned the copyright for. Suhy Dec. ¶35 |
| | **Fact 91:** Defendants' statements that ONgDB v3.5.x was "100% free and open" with no limitations or restrictions imposed by commercial licensed Neo4j® EE v3.5.x and the like were false because they knew that Neo4j Sweden owned the copyright for Neo4j® EE and never gave permission to remove Commons Clause and offer it as ONgDB under | DISPUTED:  Suhy only acted on License.txt files who's copyright is owned by the free software foundation.  Furthermore - Suhy only made AGPL license.txt files verbatim as the free software foundation required.  The commons clause was |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | the AGPL.  Ratinoff Decl., Exh. 55-56; Exh. 3 at 183:12-183:1, 187:12-188:5, 189:1-191:3, 235:21-237:14, 240:22-243:22. | referenced and defined in almost every one of the thousands of enterprise code headers - all of which were left untouched by Suhy. Suhy Dec. ¶35 |
| | **Fact 92:** The Nussbaums also own GraphGrid and AtomRain, which share the same office and computers with GFI, and provide commercial training and support for users of ONgDB, and benefit from customers being able to use ONgDB for "free" and diverting available project funds to pay them for such services.  Ratinoff Decl., Exhs. 52-53; Exh. 31 at 22:24-23:3, 31:5-32:19, 35:3-13, 57:18-58:21, 65:20-70:16, 194:14-17; *see also* Exh. 28 ("If you are looking for a full shield of liability, we recommend using one of our supporters such as GraphGrid") and Exhs. 76, 134-135. | DISPUTED: GFI does not "share the same office" with GraphGrid and AtomRain.  GFI uses 111 South Buckeye Street for receiving mail and 111 Buckeye Street is leased by AtomRain and is used by AtomRain and GraphGrid for business activities.  Nussbaum Depo., 65:18-67:3. Pernick Dec. Ex. A |
| | **Fact 93:** Defendants removed the Commons Clause without Neo4j Sweden's authorization as the copyright holder in an attempt to allow iGov, AtomRain and GraphGrid to commercially use and support ONgDB.  Ratinoff Decl., Exh. 23-26, 28-29, 39, 76-77, 126, 134-135; Exh. 3 at 28:25-29:11; Rathle Decl., ¶¶ 29-30. | DISPUTED:  The free software foundation owns the copyright for the AGPL License.txt file and clearly states that the license must be verbatim.  Suhy Dec. 35. Suhy's commit message for the changes to the license files to be in line with the FSF requirements clearly states the reason for the change. Suhy Dec. 47. Furthermore - the commons clause does not say anything about commercial use and support, the commons clause author Heather Meaker clarifies the commons clause in her article and states they do not cover professional services: Suhy Dec. ¶34 Ex. 2 |
| | **Additional Facts:** The Common Clause states the Neo4j® Sweden Software License "does not grant to you, the right to Sell the Software. For purposes of the foregoing, 'Sell' means practicing any or all of the rights granted to you under the License to provide to third parties, for a fee or other consideration, a product or service that consists, entirely or substantially, of the Software or the functionality of the Software." Rathle Decl., Exh. 3.  The ex post facto statement allegedly made by Heather Meeker is contrary to the foregoing and inadmissible hearsay and lacks foundation.  Contrary to Suhy's sworn statement, it was not posted on Plaintiffs' GitHub repository or made on behalf of Plaintiffs. *See* Reply Ratinoff Decl., Exh. G.

GFI promoted "training, advisory and production support through our commercial sponsors such as GraphGrid" for ONgDB.  Ratinoff Decl., | |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | Exh. 52. iGov promoted similar services for government agencies that adopt ONgDB. *See, e.g., id.,* Exhs. 62-66. | |
| | <u>Fact 94:</u> ONgDB v3.5.1 and later versions are not 100% identical to equivalent version numbers of Neo4j® EE. Ratinoff Decl.*, Exh. 31 at 158:18-163:5, 163:13-165:6; Exh. 3 at 124:2-126:2. Rather, ONgDB is a patchwork of code from the last public beta, Neo4j® EE 3.5.0-RC1, and Neo4j® Community Edition held together by "glue code" authored by Suhy, Brad Nussbaum and other GFI contributors. *See id.* | UNDISPUTED:  ONgDB 3.5 and later versions are not 100% identical to equivalent Neo4j enterprise versions and that claim was never made.<br><br>DISPUTED:  ONgDB is not a "patchwork" or "glue"  of code - it has been proven in large production deployments.   After the enterprise code was closed - Suhy and other contributors continued it's development.   The enterprise code came from Neo4j - so it is calling the code it developed a patchwork of code. Suhy Dec. ¶39 |
| | <u>**Additional Fact:**</u> Suhy testified in his deposition that he and other developers needed to author code to implement enterprise features into ONgDB.  *See* Ratinoff Decl., Exh. 3 at 124:2-127-23. | |
| | <u>Fact 95:</u> By splicing together source code for ONgDB in that manner, GFI is creating software that is not of the same quality as if it were compiled by Plaintiffs because GFI does not have access to the same rigorous build infrastructure for official Neo4j® Software, which goes beyond what is built into Neo4j® CC and carries out tens of thousands of functional, performance, load, stress, and other tests to ensure quality. Rathle Decl. ¶¶ 31-34; Ratinoff Decl., Exh. 31 at 168:14-169:6. | **UNDISPUTED**:  GFI does not have access to Neo4j software build infrastructure and ONgDB 3.5 and later versions are not 100% identical to equivalent Neo4j enterprise versions and that claim was never made.<br>**DISPUTED**:  That GFI does not do its own quality testing of ONgDB.  To the contrary, GFI conducts about 64,000 tests for each build.  Nussbaum Depo., 166:18-168:13. |
| | <u>Fact 96:</u> GFI is dependent on what patches are made available in Neo4j® CE and sought to redirect users of official Neo4j® EE to GFI and identify bugs in the closed enterprise directory for Neo4j® EE. Ratinoff Decl., Exh. 61, Exh. 31 at 161:23-163:12, 169:13-172:12. | UNDISPUTED – GFI uses information from users of Neo4j software to identify bugs and uses open source patches made available in Neo4j CE.<br><br>DISPUTED – GFI is not dependent on information about Neo4j EE bugs to develop ONgDB.  To the contrary, GFI is no longer developing ONgDB versions as drop in replacements for Neo4j EE (and does not describe versions after 3.5.4 as such. Indeed, GFI has developed ONgDB 3.6 even though there is no Neo4j EE 3.6 and is developing ONgDB |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | 4 independent from Neo4j EE 4. Nussbaum Depo., 190:17-191:6. |
| | **Fact 97:** Since GFI introduced modifications and patches to ONgDB 3.5.x in an attempt to keep pace with the closed Neo4j® EE releases, the potential for stability and compatibility issues with ONgDB increases. Rathle Decl., ¶ 34; Ratinoff Decl., Exh. 31 at 161:23-163:12. | **DISPUTED** – GFI conducts tests on ONgDB to ensure its quality and compatibility.<br><br>**UNDISPUTED** GFI has not verified that ONgDB versions after 3.5.4 are drop in replacements for the equivalent version of Neo4j EE |
| | Fact 98: Defendants had no way of knowing this after Plaintiffs closed off public access to the source code for enterprise-only features in November 2018 and had no visibility into Neo4j Sweden's proprietary testing and patches. Ratinoff Decl., Exh. 31 at 158:18-160:5; Exh. 3 at 223:1-224:9; Exh. 40; Rathle Decl., ¶¶ 31-34. | **DISPUTED:** Defendants are not sure what "this" means in the context of this statement. If it is referencing Fact 97 then it would be true.<br><br>Furthermore, defendants believe that the older approach for the enterprise features (which include the tests) is more stable and higher quality than newer re-implementations. See GitHub bug tickets. Suhy has not been advised by any user of ONgDB that is it incompatible with Neo4J commercial software. Suhy Dec. ¶40 |
| | Fact 99: Defendants knew that ONgDB 3.5.x does not include every closed enterprise feature in equivalent Neo4j® EE 3.5.x. Ratinoff Decl., Exh. 38 at 2:12-17, 4:15-22, 5:4-6:21; Exh. 3 at 127:19-128:17. | **UNDISPUTED:** Defendants did know that ONgDB did not include every closed enterprise feature and did not ever say that the 2 were equivalent. The defendants used the term "Drop in replacement" which has nothing to do with feature by feature equivalency. |
| | Fact 100: GFI admitted that ONgDB v3.5.4 is not 100% identical to official Neo4j® EE v3.5.4. Ratinoff Decl., Exh. 31 at 158:18-163:5, 163:13-165:6; Exh. 3 at 124:2-126:23. | **UNDISPUTED:** ONgDB 3.5.4 is not 100% identical to equivalent Neo4j enterprise versions and that claim was never made. |
| | Fact 101: GFI admitted that after ONgDB v3.5.4, it could not "reliably guarantee that it was a drop-in replacement" for the same version number of Neo4j® EE and was unwilling to do the testing to make such integration and compatibility guarantees because it became "too hard to demonstrate." Ratinoff Decl., Exh. 31 at 186:24-188:17, 188:23-189:23. | **DISPUTED** – GFI conducts tests on ONgDB to ensure its quality and compatibility.<br><br>**UNDISPUTED** GFI has not verified that ONgDB versions after 3.5.4 are drop in replacements for the equivalent version of Neo4j EE. |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | Suhy has not been advised by any user of ONgDB that is it incompatible with Neo4J commercial software. Suhy Dec. ¶40 |
| | **Fact 102**: As a result, Defendants were leading consumers to believe they were downloading an exact copy of the same version of commercial-only releases of NEO4J® EE, which in actuality they were receiving an inferior ONgDB product that was not a true "drop in" replacement. *See supra* Facts 80-101. | DISPUTED: Suhy, PureThink and iGov never lead consumers into believing they were downloading an exact copy of the same commercial only releases. For versions when the enterprise code was present and no modifications were made in the source code - defendents made clear that Neo4j did not compile the code, even though the code was the same for Neo4j Enterprise and ONgDB. The defendants knew that knowledgeable users only needed to know specific facts such as the code being unchanged in specific versions. Furthermore ONgDB is a drop in replacement for Neo4j community and enterprise for all versions including 3.5. Drop in replacement has nothing to do with feature parity. |
| | | Suhy believes that the original code for causal clustering and other features is actual superior to the feature rewrites Neo4j Inc made when it closed the Neo4j Enterprise code in 3.5 |
| | | To the contrary, the statements are true. First, ONgDB is a drop in replacement as explained in the deposition of Brad Nussbaum. Nussbaum Depo., 158:7-14, 160: 9-14. Pernick Dec. Ex. A. Plaintiffs have presented no evidence that ONgDB does not operate as a drop in replacement. With respect to ONgDB being free and open, again, Plaintiffs argument that the removal of the Commons Clause language from the Neo4J Sweden Software License was improper is incorrect. Pernick Dec. Ex. B Substituting the matching language for the defined terms in this provision, Section 7 of the Neo4J Sweden Software License states: "If the Program as |

(249 of 299), Page 249 of 299
Case: 24-5538, 12/23/2024, DktEntry: 18.9, Page 249 of 299
Case 5:18-cv-07182-EJD   Document 109   Filed 02/10/21   Page 72 of 103

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | [GFI] received it, or any part of it, contains a notice stating that it is governed by [the AGPLv3 license] along with a term that is a further restriction, [GFI] may remove that term." Ratinoff Decl. Exh. 39, 6:331-7:393<br><br>Suhy has not been advised by any user of ONgDB that is it incompatible with Neo4J commercial software.  Suhy Dec. ¶40 |
| | **Additional Fact:** Defendants confirm above that GFI "is no longer developing ONgDB versions as drop in replacements for Neo4j EE [] and does not describe versions after 3.5.4 as such." Fact 96-97, 101. This is because GFI "no longer could … reliably guarantee that [ONgDB] was a drop-in replacement" and was unwilling to do the testing to make such integration and compatibility guarantees because it became "too hard to demonstrate" with the code become more divergent.  Ratinoff Decl., Exh. 31 at 188:5-17, 188:23-189:23).  As recognized by the Court, "read correctly, Sections 7 and 10 prohibit a *licensee* from imposing further restrictions, but do not prohibit a *licensor* from doing so." *See* GFI Dkt. No. 88 at 7:6-9 (emphasis in original); *see also* Rathle Decl., ¶¶ 11, 27, 29, Exh. 3.  This is also confirmed by the Stipulated Judgment entered in the GFI Action. Reply Ratinoff Decl., Exh. I (GFI Dkt. No. 110). | |
| | <u>Fact 103:</u> Neo4j® EE has been subject to trademark policies and guidelines published on Plaintiffs' website, which along with the terms of the GPL, AGPL and Neo4j Sweden Software License, made clear that to the extent any authorized modifications are made to Neo4j® Software, such modified software should indicate so and no longer bear the Neo4j® Mark.  Rathle Decl., ¶¶ 15-18. Exhs. 5-7. | DISPUTED:  Those terms were only recently added.  Furthermore - Neo4j Inc never provided us with trademark policies and these policies were not found on their websites until recently. Furthermore - The neo4j word is only used in a descriptive manner.  The Neo4j® Mark was not used. Suhy Dec.41<br>USA trademark policies only cover its limited license to the trademark covering the commercial version of Neo4J. See Beene Dec. Exhibit 1. |
| | **Additional Fact:** The Neo4j® Mark is a registered standard character mark covering the word in all types of depictions.  *Id.*, Exh. 1. Defendants do not dispute that at least PureThink and Suhy were on | |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | notice of the October 13, 2015 guidelines. PureThink agreed to be bound by them via Partner Agreement. *See* Fact 5. Defendants also admitted to becoming aware of the guidelines as a result of this lawsuit. *See* Raitnoff Decl., Exh. 3 at 67:18-70:1; Reply Ratinoff Decl., Exh. H at 152:5-153:1, 181:19-182:25. | |
| 2. Defendants' statements actually deceive or has the tendency to deceive a substantial segment of its audience | **Fact 104:** Defendants intentionally made the false statements publicly on their website and on Twitter that ONgDB is a "free and open" drop-in replacement/equivalent under the AGPL to convince customers to adopt ONgDB over Neo4j® EE, and pay iGov, Graph Grid and/or AtomRain for related consulting and support services. *See supra* Facts 78-80, 83-84, 86-93. | **DISPUTED:** The statements referenced are true. The statements made by Suhy and iGov were made to educate the community about ONgDB and Neo4j. Furthermore - the word drop-in replacement was used which is still true for all versions of ONgDB. The term "drop in replacement/equivalent" not used in combination the way Neo4j fact suggests. The term "drop in replacement" was used on its own. Suhy Dec.42 <br><br> To the contrary, the statements are true. First, ONgDB is a drop in replacement as explained in the deposition of Brad Nussbaum. Nussbaum Depo., 158:7-14, 160: 9-14. Pernick Dec. Ex. A. Plaintiffs have presented no evidence that ONgDB does not operate as a drop in replacement. With respect to ONgDB being free and open, again, Plaintiffs argument that the removal of the Commons Clause language from the Neo4J Sweden Software License was improper is incorrect. Pernick Dec. Ex. B Substituting the matching language for the defined terms in this provision, Section 7 of the Neo4J Sweden Software License states: "If the Program as [GFI] received it, or any part of it, contains a notice stating that it is governed by [the AGPLv3 license] along with a term that is a further restriction, [GFI] may remove that term." Ratinoff Decl. Exh. 39, 6:331-7:393 The cited deposition testimony also demonstrates GFI's belief in the truth of these statements. Pernick Dec. Ex. A |
| | **Additional Facts:** Defendants confirm above that GFI "is no longer developing ONgDB versions as drop in replacements for Neo4j EE [] and does not describe versions after 3.5.4 as such." Fact 96-97, 100. | |

(251 of 299), Page 251 of 299
Case: 24-5538, 12/23/2024, DktEntry: 18.9, Page 251 of 299
Case 5:18-cv-07182-EJD Document 109 Filed 02/16/21 Page 74 of 103

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | This is because GFI "no longer could … reliably guarantee that [ONgDB] was a drop-in replacement" and was unwilling to do the testing to make such integration and compatibility guarantees because it became "too hard to demonstrate" with the code become more divergent. Ratinoff Decl., Exh. 31 at 188:5-17, 188:23-189:23. As recognized by the Court, "read correctly, Sections 7 and 10 prohibit a *licensee* from imposing further restrictions, but do not prohibit a *licensor* from doing so." *See* GFI Dkt. No. 88 at 7:6-9 (emphasis in original); *see also* Rathle Decl., ¶¶ 11, 27, 29, Exh. 3. This is also confirmed by the Stipulated Judgment entered in the GFI Action. Reply Ratinoff Decl., Exh. I (GFI Dkt. No. 110). | |
| | Fact 105: Consumers chose ONgDB over Neo4j® EE based on Defendants' misrepresentations about ONgDB being "free and open" drop-in replacement/equivalent under the AGPL, including NextCentury and the MPO, Tufin, the IRS, Department of Homeland Security (DHS) and others. Ratinoff Decl., Exhs. 35, 40, 48-51, 53, 100, 120, 127, 133-135; Exh. 3 at 54:17-55:1, 142:15-144:20, 227:3-8, Exh. 31 at 191:15-24, 194:23-25, 195:13-18, 196:22-197:24; Broad Decl., ¶¶ 20-24; Exhs. 12-13. | DISPUTED: the representations made about being a drop-in replacement are true. The term "drop in replacement/equivalent" was not used together in the manner Neo4j referenced. Only the term "drop-in replacement" was used. Suhy Dec.42<br><br>To the contrary, the statements are true. First, ONgDB is a drop in replacement as explained in the deposition of Brad Nussbaum. Nussbaum Depo., 158:7-14, 160: 9-14. Pernick Dec. Ex. A. Plaintiffs have presented no evidence that ONgDB does not operate as a drop in replacement. With respect to ONgDB being free and open, again, Plaintiffs argument that the removal of the Commons Clause language from the Neo4J Sweden Software License was improper is incorrect. Pernick Dec. Ex. B Substituting the matching language for the defined terms in this provision, Section 7 of the Neo4J Sweden Software License states: "If the Program as [GFI] received it, or any part of it, contains a notice stating that it is governed by [the AGPLv3 license] along with a term that is a further restriction, [GFI] may remove that term." Ratinoff Decl. Exh. 39, 6:331-7:393 The cited deposition testimony also demonstrates GFI's belief in the truth of these statements. Pernick Dec. Ex. A |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | Neo4j and ONgDB are highly technical products and the end-users who use them are knowledgeable about the technology.<br><br>Furthermore, defendants focused on educating the community with facts.  In the case of the IRS - defendants laid out the facts including differences, license, features, and future of ONgDB were all taken into consideration.<br><br>The agencies mentioned in this fact would not have have been effected by the commons clause restriction as they are using ONgDB for their projects and not creating or selling anything. Suhy Dec. 42<br><br>Plaintiffs present no evidence of a single person or entity that would have made that choice.  Indeed, the evidence Plaintiffs provide with respect to New Century, their one purported concrete example, is an email exchange showing that New Century had no response to Neo4j, Inc.'s proposal even though New Century stated in its email that it understood the issues regarding ONgDB's "legal viability."  Broad Decl., Exh. 13. |
| | **Additional Facts:** Defendants confirm above that GFI "is no longer developing ONgDB versions as drop in replacements for Neo4j EE [] and does not describe versions after 3.5.4 as such." Fact 96-97, 100. This is because GFI "no longer could … reliably guarantee that [ONgDB] was a drop-in replacement" and was unwilling to do the testing to make such integration and compatibility guarantees because it became "too hard to demonstrate" with the code become more divergent. Ratinoff Decl., Exh. 31 at 188:5-17, 188:23-189:23).<br><br>As recognized by the Court, "read correctly, Sections 7 and 10 prohibit a *licensee* from imposing further restrictions, but do not prohibit a *licensor* from doing so." *See* GFI Dkt. No. 88 at 7:6-9 (emphasis in original); *see also* Rathle Decl., ¶¶ 11, 27, 29, Exh. 3. Next Century | |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | chose ONgDB after Defendants told them that they could use it under the AGPL for free, and did not need paid license from Plaintiffs, which they could only state because they removed the Commons Clause and its commercial restrictions. Ratinoff Decl., Exh. 48-50, 120. | |
| 3. Defendants' deception is material | **Fact 106:** Defendants' false statements that ONgDB is a drop-in replacement/equivalent to paid-for, commercial licensed Neo4® EE was material to potential consumers' purchasing decision because Defendants were offering it for free under the AGPL, and unbeknownst to consumers, in violation of the Neo4j Sweden Software License and Neo4j Sweden's copyright. *See supra* Facts 78-93. | DISPUTED: ONgDB is a drop-in replacement for any Neo4j (community or enterprise) with the same version number. ONgDB is a superset of Neo4j Core. Furthermore: the term "drop-in replacement/equivalent" was not used together as Neo4j says in the fact. |
| | **Additional Facts:** Next Century chose ONgDB after Defendants told them that they could use it under the AGPL for free, and did not need paid license from Plaintiffs, which they could only state because they removed the Commons Clause and its commercial restrictions. *Id*. Exh. 48-50, 120; *see also* Dkt. No. 98-3, ¶¶ 22-23; Exh. 12-13. | |
| | Fact 107: Defendants intentionally made the false statements publicly on their website and on Twitter that ONgDB is a "free and open" drop-in replacement/equivalent under the AGPL to convince customers to adopt ONgDB over Neo4j® EE. *See supra* Facts 78-93. | DISPUTED: The statements mentioned are true statements, not false. Suhy and iGov clearly state that there are no limitations to cores and causal clustering - free and open would still apply to the AGPL with commons clause as all the terms in AGPL are still present. Had Neo4j removed some terms from AGPL - then it may be harder to use the term free and open

Furthermore: the term "drop-in replacement/equivalent" was not used together as Neo4j says in the fact.

To the contrary, the statements are true. First, ONgDB is a drop in replacement as explained in the deposition of Brad Nussbaum. Nussbaum Depo., 158:7-14, 160: 9-14. Pernick Dec. Ex. A. Plaintiffs have presented no evidence that ONgDB does not operate as a drop in replacement. With respect to ONgDB being free and open, again, Plaintiffs argument that the removal of the Commons Clause |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | language from the Neo4J Sweden Software License was improper is incorrect.  Pernick Dec. Ex. B Substituting the matching language for the defined terms in this provision, Section 7 of the Neo4J Sweden Software License states:  "If the Program as [GFI] received it, or any part of it, contains a notice stating that it is governed by [the AGPLv3 license] along with a term that is a further restriction, [GFI] may remove that term." Ratinoff Decl. Exh. 39, 6:331-7:393  The cited deposition testimony also demonstrates GFI's belief in the truth of these statements. Pernick Dec. Ex. A |
| 4. Defendants caused the false statement to enter interstate commerce | **Fact 108:**  Defendants' false statements entered interstate commerce through the internet via their websites and Twitter, as well as emails sent to consumers.  Ratinoff Decl., Exhs. 18, 21, 25, 29, 42-46, 49-51, 54-55, 57-58, 60, 62-66, 67-70, 72-74, 93, 99-104, 108, 113-114. | DISPUTED:  Defendants statements were / are true. To the contrary, the statements are true.  First, ONgDB is a drop in replacement as explained in the deposition of Brad Nussbaum.  Nussbaum Depo., 158:7-14, 160: 9-14.  Pernick Dec. Ex. A. Plaintiffs have presented no evidence that ONgDB does not operate as a drop in replacement.  With respect to ONgDB being free and open, again, Plaintiffs argument that the removal of the Commons Clause language from the Neo4J Sweden Software License was improper is incorrect.  Pernick Dec. Ex. B Substituting the matching language for the defined terms in this provision, Section 7 of the Neo4J Sweden Software License states:  "If the Program as [GFI] received it, or any part of it, contains a notice stating that it is governed by [the AGPLv3 license] along with a term that is a further restriction, [GFI] may remove that term." Ratinoff Decl. Exh. 39, 6:331-7:393  The cited deposition testimony also demonstrates GFI's belief in the truth of these statements. Pernick Dec. Ex. A |
| 5. Neo4j USA has been or is likely to be injured as a result | **Fact 109:** Defendants' false statements diverted sales from Neo4j USA. Ratinoff Decl., Exhs. 35, 40, 47-51, 53, 100, 120, 127, 133-135; Exh. 3 | DISPUTED:  Defendants statements were / are true. |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| of the false statement | at 54:17-55:1, 142:15-144:20, 227:3-8, Exh. 31 at 191:15-24, 194:23-25, 195:13-18, 196:22-197:24; Broad Decl., ¶¶ 20-24; Exhs. 12-13. | To the contrary, the statements are true. First, ONgDB is a drop in replacement as explained in the deposition of Brad Nussbaum. Nussbaum Depo., 158:7-14, 160: 9-14. Pernick Dec. Ex. A. Plaintiffs have presented no evidence that ONgDB does not operate as a drop in replacement. With respect to ONgDB being free and open, again, Plaintiffs argument that the removal of the Commons Clause language from the Neo4J Sweden Software License was improper is incorrect. Pernick Dec. Ex. B Substituting the matching language for the defined terms in this provision, Section 7 of the Neo4J Sweden Software License states: "If the Program as [GFI] received it, or any part of it, contains a notice stating that it is governed by [the AGPLv3 license] along with a term that is a further restriction, [GFI] may remove that term." Ratinoff Decl. Exh. 39, 6:331-7:393  The cited deposition testimony also demonstrates GFI's belief in the truth of these statements. Pernick Dec. Ex. A

Plaintiffs present no evidence of a single person or entity that would have made that choice. Indeed, the evidence Plaintiffs provide with respect to New Century, their one purported concrete example, is an email exchange showing that New Century had no response to Neo4j, Inc.'s proposal even though New Century stated in its email that it understood the issues regarding ONgDB's "legal viability." Broad Decl., Exh. 13. |
|  | **Additional Facts:** Defendants confirm above that GFI "is no longer developing ONgDB versions as drop in replacements for Neo4j EE [] and does not describe versions after 3.5.4 as such." Fact 96-97, 100. This is because GFI "no longer could … reliably guarantee that [ONgDB] was a drop-in replacement" and was unwilling to do the testing to make such integration and compatibility guarantees because it became "too hard to demonstrate" with the code become more |  |

(256 of 299), Page 256 of 299
Case: 24-5538, 12/23/2024, DktEntry: 18.9, Page 256 of 299
Case 5:18-cv-07182-EJD Document 109 Filed 02/10/21 Page 79 of 103

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | divergent. Ratinoff Decl., Exh. 31 at 188:5-17, 188:23-189:23).  As recognized by the Court, "read correctly, Sections 7 and 10 prohibit a *licensee* from imposing further restrictions, but do not prohibit a *licensor* from doing so." *See* GFI Dkt. No. 88 at 7:6-9 (emphasis in original); *see also* Rathle Decl., ¶¶ 11, 27, 29, Exh. 3. Next Century chose ONgDB after Defendants told them that they could use it under the AGPL for free, and did not need paid license from Plaintiffs, which they could only say after removing the Commons Clause. *Id.* Exh. 48-50, 120; *see also* Dkt. No. 98-3, ¶¶ 22-23; Exh. 12-13. | |
| | **Fact 110**: Neo4j USA lost multi-year deal with the IRS.  Broad Decl., ¶¶ 20-21. | DISPUTED:  PureThink lost a multi-year deal with IRS, not Neo4j USA.  Suhy Dec. ¶7, Ex. 1 Furthermore - IRS created a competitive procurement  which Neo4j or Resellers could have competed on.  Mr. Suhy is not aware of Neo4j Inc or other resellers providing competitive responses to the procurement. Suhy Dec. ¶49 |
| | **Additional Facts:** Defendants testified in their depositions that the IRS is using ONgDB instead of Neo4j® EE. *See* Ratinoff Decl., Exh. 3 at 142:15-144:15, 224:13-224:23; Exh. 31 at 191:15-24, 194:23-25. iGov also was paid six figures by the IRS for providing support services for ONgDB. *Id.*, Exh. 3 at 227:9-24. | |
| | Fact 111: Neo4j USA lost multi-year deal with Next Century/MPO adopting ONgDB, amounting to over over $2.2 million in lost revenue. Broad Decl., ¶¶ 22-24, Exhs. 12-13. | DISPUTED:  Mr Suhy is not aware of Neo4j USA having a multi-year deal with Next Centry / MPO which it could have lost in the first place.

The evidence Plaintiffs provide with respect to New Century, their one purported concrete example, is an email exchange showing that New Century had no response to Neo4j, Inc.'s proposal even though New Century stated in its email that it understood the issues regarding ONgDB's "legal viability."  Broad Decl., Exh. 13. |
| | **Additional Facts:** Defendants emails show that Next Century chose ONgDB after Defendants told them that they could use it under the AGPL for free, and did not need paid license from Plaintiffs.  Ratinoff Decl., Exh. 48-50, 120.  Suhy participated in Defendants' email exchange with Next Century, and thus has knowledge its decision to use ONgDB instead of Neo4j® EE.  *See id.* | |
| **Claim 4: False Designation of** | | |

46

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| **Origin Against GFI and the PT Defendants** | | |
| 1. used in commerce any word, false designation of origin, false or misleading description, or representation of fact | **Fact 112:** Defendants' false and misleading statements that ONgDB is a "free and open" drop-in replacement under the AGPL for equivalent versions of paid-for commercially licensed Neo4® EE were made in commerce through the internet via their websites and Twitter, as well as emails sent to consumers. Ratinoff Decl., Exhs. 18, 21, 25, 29, 42-46, 49-51, 54-55, 57-58, 60, 62-66, 67-70, 72-74, 93, 99-104, 108, 113-114; *see also* Facts 78-80. | DISPUTED:  The statements made are not misleading or false.   ONgDB is a drop in replacement for Neo4j distributions.   ONgDB is free and open - it has no limitations on number of cores, number of cluster instances, etc - while Neo4j Enterprise commercial packages have legal terms limiting these features making them not free and open.

To the contrary, the statements are true.  First, ONgDB is a drop in replacement as explained in the deposition of Brad Nussbaum. Nussbaum Depo., 158:7-14, 160: 9-14.  Pernick Dec. Ex. A. Plaintiffs have presented no evidence that ONgDB does not operate as a drop in replacement.  With respect to ONgDB being free and open, again, Plaintiffs argument that the removal of the Commons Clause language from the Neo4J Sweden Software License was improper is incorrect.  Pernick Dec. Ex. B Substituting the matching language for the defined terms in this provision, Section 7 of the Neo4J Sweden Software License states:  "If the Program as [GFI] received it, or any part of it, contains a notice stating that it is governed by [the AGPLv3 license] along with a term that is a further restriction, [GFI] may remove that term." Ratinoff Decl. Exh. 39, 6:331-7:393  The cited deposition testimony also demonstrates GFI's belief in the truth of these statements. Pernick Dec. Ex. A |
| | **Fact 113:**  Defendants' statements that ONgDB is a "free and open" drop-in replacement under the AGPL for equivalent versions of paid-for commercially licensed Neo4® EE were false and misleading | DISPUTED:  ONgDB is a free and open drop-in replacement.  iGov or Suhy talk about free and open meaning that there were no limitations on the number of cores or cluster instances. |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | because Defendants did not have the right to replace the Neo4j Sweden Software License with the AGPL. *See* Facts 78-93. | Furthermore - Neo4j Sweden still uses the AGPL license with the AGPL preamble. They added the commons clause restriction which defendants question - but they added this to the AGPL license which is known as a free and open source license. Had they removed the preamble or just copied the terms they liked from the AGPL into a new license then the story may be different.

To the contrary, the statements are true. First, ONgDB is a drop in replacement as explained in the deposition of Brad Nussbaum. Nussbaum Depo., 158:7-14, 160: 9-14. Pernick Dec. Ex. A. Plaintiffs have presented no evidence that ONgDB does not operate as a drop in replacement. With respect to ONgDB being free and open, again, Plaintiffs argument that the removal of the Commons Clause language from the Neo4J Sweden Software License was improper is incorrect. Pernick Dec. Ex. B Substituting the matching language for the defined terms in this provision, Section 7 of the Neo4J Sweden Software License states: "If the Program as [GFI] received it, or any part of it, contains a notice stating that it is governed by [the AGPLv3 license] along with a term that is a further restriction, [GFI] may remove that term." Ratinoff Decl. Exh. 39, 6:331-7:393 The cited deposition testimony also demonstrates GFI's belief in the truth of these statements. Pernick Dec. Ex. A |
| | **Additional Facts:** As recognized by the Court, "read correctly, Sections 7 and 10 prohibit a *licensee* from imposing further restrictions, but do not prohibit a *licensor* from doing so." *See* GFI Dkt. No. 88 at 7:6-9 (emphasis in original); *see also* Rathle Decl., ¶¶ 11, 27, 29, Exh. 3. This is also confirmed by the Stipulated Judgment entered in the GFI Action. Reply Ratinoff Decl., Exh. I (GFI Dkt. No. 110). | |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | **Fact 114:** Defendants' statements ONgDB is a "free and open" drop-in replacement under the AGPL for equivalent versions of paid-for commercially licensed Neo4® EE were false and misleading because ONgDB was not of the same quality as if it were compiled by Plaintiffs. Rathle Decl. ¶¶ 19-22, 29-34; Ratinoff Decl., Exh. 3 at 216:2-218:6; Exh. 31 at 161:23-163:12, 168:14-169:6. | DISPUTED: These statements are true. They are also not misleading. ONgDB is a superset of Neo4j as it forks and does not modify the core code. All versions of ONgDB (even 3.5 ) are drop in replacements for neo4j community and enterprise versions of the same version number.

If different people compile the same code using the same build configuration - then there will not be any quality differences between the 2 compiled distributions. In fact - Neo4j does not technically compile their code, the build system they use from atlassian does the job. It should be noted that the GFI build system also uses atlassian tooling and automation.

To the contrary, the statements are true. First, ONgDB is a drop in replacement as explained in the deposition of Brad Nussbaum. Nussbaum Depo., 158:7-14, 160: 9-14. Pernick Dec. Ex. A. Plaintiffs have presented no evidence that ONgDB does not operate as a drop in replacement. With respect to ONgDB being free and open, again, Plaintiffs argument that the removal of the Commons Clause language from the Neo4J Sweden Software License was improper is incorrect. Pernick Dec. Ex. B Substituting the matching language for the defined terms in this provision, Section 7 of the Neo4J Sweden Software License states: "If the Program as [GFI] received it, or any part of it, contains a notice stating that it is governed by [the AGPLv3 license] along with a term that is a further restriction, [GFI] may remove that term." Ratinoff Decl. Exh. 39, 6:331-7:393 The cited deposition testimony also demonstrates GFI's belief in the truth of these statements. Pernick Dec. Ex. A |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | When ONgDB and Neo4j Enterprise share the same code base - the compiled distributions are identical from a functionality and feature perspective.  Only the metadata timestamps of the compile time differ which has no effect on the quality.<br><br>ONgDB ensures that the same JVM and other parameters are used as the Neo4j compiled binaries - there are no quality differences because of the fact that the source code across versions using the same code are the same. |
| | **Additional Facts:** Defendants confirm above that GFI "is no longer developing ONgDB versions as drop in replacements for Neo4j EE [] and does not describe versions after 3.5.4 as such." Fact 96-97, 100. This is because GFI "no longer could … reliably guarantee that [ONgDB] was a drop-in replacement" and was unwilling to do the testing to make such integration and compatibility guarantees because it became "too hard to demonstrate" with the code become more divergent. Ratinoff Decl., Exh. 31 at 188:5-17, 188:23-189:23. | |
| | <u>Fact 115:</u>  Since GFI introduced modifications to ONgDB in an attempt to keep pace with the closed Neo4j® EE releases, the potential for stability and compatibility issues with ONgDB increases.  *See* Rathle Decl., ¶¶ 29-24; *see also* Ratinoff Decl., Exh. 31 at 158:18-160:5, 161:23-163:12; Exh. 3 at 223:1-224:9; Exh. 40. | DISPUTED:  GFI does not modify the core code it keeps in sync from the Neo4j official GitHub repository.   The same can be said about Neo4j - and historically they have had many stability and other issues across different releases.  ONgDB skipped over some 4.x releases as it waited for Neo4j Inc to address issues and tickets relating to the releases before GFI felt it was stable enough to upgrade. GFI conducts about 64,000 tests for each build. Nussbaum Depo., 166:18-168:13. |
| | <u>Fact 116:</u>  ONgDB does not include every closed enterprise feature in the equivalent version of Neo4j® EE.  Ratinoff Decl., Exh. 38 at 2:12-17, 4:15-22, 5:4-6:21; Exh. 3 at 127:19-128:17. | DISPUTED:  Versions of Neo4j Enterprise below 3.5 had the same code and therefore has every equivalent feature of the corresponding ONgDB version that did not change the source code.   Only ONgDB 3.5 and higher do not include every enterprise feature and defendants don't claim that ongdb 3.5 and above have every feature.<br><br>See fact 32. |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | ONgDB (AKA ONgDB Enterprise) 3.5.11 is Neo4j 3.5.11 Core + the enterprise features Neo4j Inc removed from the code base as of v3.5. This shows we are not saying we have every feature - the features are only the ones removed from the code base as of v3.5 |
| | Fact 117: GFI admitted that after ONgDB v3.5.4, it could not "reliably guarantee that it was a drop-in replacement" for the same version number of Neo4j® EE and was unwilling to do the testing to make such integration and compatibility guarantees. Ratinoff Decl., Exh. 31 at 186:24-188:17, 188:23-189:23. | DISPUTED – GFI conducts tests on ONgDB to ensure its quality and compatibility.  UNDISPUTED GFI has not verified that ONgDB versions after 3.5.4 are drop in replacements for the equivalent version of Neo4j EE |
| 2. which is likely to cause confusion or mistake, or to deceive, as to sponsorship, affiliation, or the origin of the goods or services in question. | | |
| (a) strength of the mark | The Neo4j® Mark is inherently distinctive and Plaintiffs have used it in commerce since 2007, and as a result has gained strong brand recognition via various awards and recognition in the graph database software market.  Broad Decl., ¶¶ 2-19, Exhs. 1-11. | DISPUTED: The word Neo4J is used to describe various software versions and companies, so it is not distinct, and the recognition is not as a company brand but as a type of graph database widely distributed on GitHub under open source licenses. Suhy Dec. 50 |
| | Additional Facts: The Neo4j® Mark is a registered standard character mark covering the word in all types of depictions.  Ratinoff Decl., Exh. 1.  The Court already rejected Defendants' company name versus software "confusion argument." See PT Dkt. No. 70 9:3-10:24. | |
| (b) relatedness of the goods and similarity of sight, sound and meaning | Defendants promote ONgDB as Neo4j® EE except that they are free and licensed without restrictions under the AGPL.  Ratinoff Decl., Exhs. 18, 21, 25, 29, 42-46, 49-51, 54-55, 57-58, 60, 62-66, 67-70, 72-74, 93, 99-104, 108, 113-114. | DISPUTED:  The website content clearly says that there are no restrictions in usage of cores or number of instances, something the commercial edition enforced via legal terms.  These features have no usage restrictions in ONgDB. |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | Exhibit 19 states:  **They have no restrictions on the number of cluster instances or cores** that the commercial licensed packages impose!" |
| | | Exhibit 42 states: "More agencies are adopting it as they learn about it. ONgDB takes Neo4j core (which is open source) and adds enterprise features into it, all 100% free and open, with no **limits on cores or cluster instances** that 'commercial subscriptions' impose. |
| | | Exhibit 43 states:  1. You do not have to pay any licensing fees for the software you requested. Neo4j Enterprise < 3.5 and ONgDB (Open Native Graph Database) Enterprise (all versions) are available to use 100% free, in production. |
| | | Exhibit 43 states: More agencies are adopting ONgDB over Neo4j as they learn that it is just the free and open Neo4j enterprise alternative. ONgDB takes Neo4j core (which is open source) and adds enterprise features into it, **all 100% free and open, with no limits on cores or cluster instances that 'commercial subscriptions' impose.** |
| | | The exhibits cited do not support the proposition.  To the contrary, GFI consistently uses <u>language distinguishing ONgDB from Neo4j EE such as</u> "ONgDB is an open source fork of Neo4j Enterprise that is developed and released under AGPLv3 by The Graph Foundation."  See Responses to Facts 59-64.  And  Exhibit 93 also states:  "What is ONgDB:  Open Native Graph DB is an open source fork of #Neo4j, that picks up prior to Neo4j, Inc.'s |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | removal of enterprise code from the main Github repository." |
| | **Additional Facts:** As recognized by the Court, "read correctly, Sections 7 and 10 prohibit a *licensee* from imposing further restrictions, but do not prohibit a *licensor* from doing so." *See* GFI Dkt. No. 88 at 7:6-9 (emphasis in original). This is also confirmed by the Stipulated Judgment entered in the GFI Action. Reply Ratinoff Decl., Exh. I (GFI Dkt. No. 110). | |
| (c) evidence of actual confusion; | **Fact 118:** Defendants' interchangeable use of "Neo4j Enterprise" and "ONgDB" misleads consumers into mistakenly believing that ONgDB and Neo4j® EE were one and the same. Ratinoff Decl.*,* Exhs. 35, 40, 42-44, 46-47, 53, 55-58, 76, 100, 130-131, 134-135. | **DISPUTED:** Defendants to do mislead consumers about ONgDB and Neo4j Enterprise. The statements are true for some versions of Neo4j Enterprise and ONgDB. Defendants clearly communicate what ONgDB is, what it's origin is. GFI consistently uses language distinguishing ONgDB from Neo4j EE such as "ONgDB is an open source fork of Neo4j Enterprise that is developed and released under AGPLv3 by The Graph Foundation." See Responses to Facts 59-64. And Exhibit 93 also states: "What is ONgDB: Open Native Graph DB is an open source fork of #Neo4j, that picks up prior to Neo4j, Inc.'s removal of enterprise code from the main Github repository." Defendants have never mislead and tried to confuse people into thinking ONgDB is just another name for Neo4j Enterprise. In fact defendants work hard at educating the community about the facts. The cited emails are hearsay and do not establish compatibility issues. Rather, Exhibit 115 demonstrates an attempt to use a desktop tool inappropriately with a server application. Ratinoff Decl., Exh. 31 at 232:5-25. Nothing in the email demonstrates that there would be any compatibility issues when ONgDB is used as a server application. |
| | **Fact 119:** Defendants' misrepresentations about ONgDB being "free and open" drop-in replacement/equivalent under the AGPL caused | DISPUTED: the statements made are not misrepresentations. ONgDB is a drop in |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | actual confusion over Defendants' unauthorized modification to the Neo4j Sweden Software License and justification for doing so. *See* Ratinoff Decl., Exhs. 40, 49, 55, 118-119, 131, 133-134. | replacement of Neo4j community and enterprise versions with the same version number. ONgDB is a superset of Neo4j and does not modify the Neo4j core code.  Furthermore - the combined term "drop-in replacement/equivalent" is not used.<br>To the contrary, the statements are true.  First, ONgDB is a drop in replacement as explained in the deposition of Brad Nussbaum. Nussbaum Depo., 158:7-14, 160: 9-14.  Pernick Dec. Ex. A. Plaintiffs have presented no evidence that ONgDB does not operate as a drop in replacement.  With respect to ONgDB being free and open, again, Plaintiffs argument that the removal of the Commons Clause language from the Neo4J Sweden Software License was improper is incorrect.  Pernick Dec. Ex. B Substituting the matching language for the defined terms in this provision, Section 7 of the Neo4J Sweden Software License states:  "If the Program as [GFI] received it, or any part of it, contains a notice stating that it is governed by [the AGPLv3 license] along with a term that is a further restriction, [GFI] may remove that term." Ratinoff Decl. Exh. 39, 6:331-7:393  The cited deposition testimony also demonstrates GFI's belief in the truth of these statements. Pernick Dec. Ex. A<br>The cited emails are hearsay and do not establish compatibility issues.  Rather, Exhibit 115 demonstrates an attempt to use a desktop tool inappropriately with a server application.  Ratinoff Decl., Exh. 31 at 232:5-25.  Nothing in the email demonstrates that there would be any compatibility issues when ONgDB is used as a server application. |
| | Fact 120: GFI's use of the Neo4j® Mark to promote ONgDB resulted in customers choosing ONgDB over Neo4j® EE and encountering compatibility issues.  Ratinoff Decl., Exh. 115-116; Exh 31 at 230:12-233:10; Exh. 3 at 207:12-209:3. | To the contrary, the statements are true.  First, ONgDB is a drop in replacement as explained in the deposition of Brad Nussbaum.  Nussbaum Depo., |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | 158:7-14, 160: 9-14.  Pernick Dec. Ex. A. Plaintiffs have presented no evidence that ONgDB does not operate as a drop in replacement.  With respect to ONgDB being free and open, again, Plaintiffs argument that the removal of the Commons Clause language from the Neo4J Sweden Software License was improper is incorrect.  Pernick Dec. Ex. B Substituting the matching language for the defined terms in this provision, Section 7 of the Neo4J Sweden Software License states:  "If the Program as [GFI] received it, or any part of it, contains a notice stating that it is governed by [the AGPLv3 license] along with a term that is a further restriction, [GFI] may remove that term." Ratinoff Decl. Exh. 39, 6:331-7:393  The cited deposition testimony also demonstrates GFI's belief in the truth of these statements. Pernick Dec. Ex. A<br>The cited emails are hearsay and do not establish compatibility issues.  Rather, Exhibit 115 demonstrates an attempt to use a desktop tool inappropriately with a server application.  Ratinoff Decl., Exh. 31 at 232:5-25.  Nothing in the email demonstrates that there would be any compatibility issues when ONgDB is used as a server application. |
| | Fact 121: Consumers chose ONgDB over Neo4j® EE based on Defendants' misrepresentations about ONgDB being "free and open" drop-in replacement/equivalent under the AGPL, including NextCentury and the MPO, Tufin, the IRS, Department of Homeland Security (DHS) and others.  Ratinoff Decl., Exhs. 35, 40, 47-51, 53, 100, 120, 127, 133-135; Exh. 3 at 54:17-55:1, 142:15-144:20, 224:13-23, 227:3-8, Exh. 31 at 191:15-24, 194:23-25, 195:13-18, 196:22-197:24; Exh. 38 at 23:14-24:4; Broad Decl., ¶¶ 20-24, Exhs. 12-13. | DISPUTED: USA concedes consumers decided to use ONgDB because it was free. Dkt. 98, p. 2:12-13; p. 32:6:10.<br><br>Price is the material concern on the purchase,  not the license or drop in capability. This is obvious in the analysis. Consumers can test whether the software is drop in and review the license. As users of ONgDB do not sell the software, whether the commons clause is valid or not has no impact. Under the AGPL, if you use the open source software internally, as for example what the IRS does, there is |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | no issue with the commons clause. Consumers do not face any copyright infringement claim from Sweden as they are licensed under the AGPL. Suhy Dec. ¶44

The terms mentioned are not misrepresentations about ONgDB.  They are true.
Defendants do not use the term "drop-in replacement/equivalent".  ONgDB is free and open - it still contains all the AGPL terms that make it so.  All the agencies listed use ONgDB for free.  Furthermore - the commons clause would have no effect on the agencies mentioned from Mr Suhy's knowledge. Suhy Dec. ¶43

Plaintiffs present no evidence of a single person or entity that would have made that choice based on the statements in defendants' websites.

Most people do not make million dollar decision to decide on the use of a database from website statements.  Indeed, the evidence Plaintiffs provide with respect to New Century, their one purported concrete example, is an email exchange showing that New Century had no response to Neo4j, Inc.'s proposal even though New Century stated in its email that it understood the issues regarding ONgDB's "legal viability."  Broad Decl., Exh. 13. |
| | **Additional Facts:** As noted by the Court, "read correctly, Sections 7 and 10 prohibit a *licensee* from imposing further restrictions, but do not prohibit a *licensor* from doing so." *See* GFI Dkt. No. 88 at 7:6-9 (emphasis in original). This is also confirmed by the Stipulated Judgment entered in the GFI Action. Reply Ratinoff Decl., Exh. I (GFI Dkt. No. 110).  Next Century chose ONgDB after Defendants said they could use ONgDB under the AGPL for free, and did not need a paid license from Plaintiffs, which Defendants could only state because they | |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | removed the Commons Clause.  Ratinoff Decl., Exh. 48-50, 120; *see also* Rathle Decl., ¶¶ 5-13, 27, 29, Exh. 3. | |
| (d) marketing channels and likelihood of expansion | Fact 122: Defendants continue to target the same potential users of graph database platforms and software and use the same channels via the internet.  *See, e.g.,* Ratinoff Decl., Exhs. 14-15, 18, 25, 29, 37, 45-55, 57, 60-61, 65-66, 76-77, 118-119, 120, 127, 130-132, 134-135. | UNDISPUTED:  Objection this fact does not support the claim. Because ONgDB is an unmodified fork of Neo4j Core code, and a superset of Neo4j Core - then anyone who is currently using Neo4j commercial or open source distributions can switch over to ONgDB.   In other words - people that use Neo4j are the people who would want to switch to ONgDB if they wanted enterprise features with no limitations on cores or cluster instances for free. Suhy Dec. ¶45 |
| | Fact 123: Neo4j USA and the PT Defendants competed for the same contracts in the government sector.  Ratinoff Decl., Exhs. 42-51, 54-55, 100, 120, 127, 130-135; Broad Decl., ¶¶ 20-24, Exhs. 12-13. | DISPUTED:  To Mr Suhy's knowledge, Neo4j USA does not directly respond to contracts.  Neo4j partners bid on a contracts. Purthink has no contracts with the government. Igov does not license software to the government. Suhy Dec. ¶46 |
| (e) intent | Fact 124: Defendants' use of the Neo4j® Mark to promote Plaintiffs' software with an improperly modified copyright license shows that they intend to copy them and confuse the public.  *See supra* Facts 78-102. | DISPUTED:  Defendants do not use the Neo4j® Mark, they use the neo4j word in a descriptive manner.  Suhy Dec. ¶41 Defendants aim at educating the public not causing confusion.  Mr. Suhy did not modify any copyrighted content which is owned by USA, it only updated Sweden's  License.txt file which the free software foundation owns the copyright for under the express terms of the AGPL.  Suhy Dec. ¶29 Furthermore - when Suhy made the AGPL license verbatim - the commit message clearly states the intention: The commit which replaced the modified License.txt file copyrighted to the FSF has a commit message which clarifies the intent of replacing the modified license with the verbatim. |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | **"Updated the LICENSE.txt file to be pure AGPL as to not violate the fsf copyright and to be in line with the AGPL license."** <br><br> ONgDB is a drop in replacement as explained in the deposition of Brad Nussbaum. Nussbaum Depo., 158:7-14, 160: 9-14. Plaintiffs have presented no evidence that ONgDB does not operate as a drop in replacement. With respect to ONgDB being free and open, again, Plaintiffs argument that the removal of the Commons Clause language from the Neo4J Sweden Software License was improper is incorrect. Substituting the matching language for the defined terms in this provision, Section 7 of the Neo4J Sweden Software License states: "If the Program as [GFI] received it, or any part of it, contains a notice stating that it is governed by [the AGPLv3 license] along with a term that is a further restriction, [GFI] may remove that term." The cited deposition testimony also demonstrates GFI's belief in the truth of these statements. |
| | **Additional Facts:** As recognized by the Court, "read correctly, Sections 7 and 10 prohibit a *licensee* from imposing further restrictions, but do not prohibit a *licensor* from doing so." *See* GFI Dkt. No. 88 at 7:6-9 (emphasis in original). This is also confirmed by the Stipulated Judgment entered in the GFI Action. Reply Ratinoff Decl., Exh. I (GFI Dkt. No. 110). Defendants promoted ONgDB as Neo4j® EE except that ONgDB is free and without commercial restrictions only because they removed the Commons Clause. Rathle Decl., ¶¶ 5-13, 27, 29, Exh. 3. | |

## Attestation

I attest that the evidence cited herein by Plaintiffs fairly and accurately supports or disputes the facts asserted.

Dated:  February 16, 2021                    By: /s/ Jeffrey M. Ratinoff
                                                            Jeffrey M. Ratinoff
                                                            Attorney for Plaintiffs and Counter-Defendants
                                                            Neo4j, Inc. and Neo4j Sweden AB

**02-16-2021 – PLAINTIFFS' RESPONSE TO DEFENDANT'S CONSOLIDATED SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS.pdf**

Filed 02/16/2021

PLAINTIFFS' RESPONSE TO DEFENDANT'S CONSOLIDATED SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS

(Pacer Doc: #109)

**PLAINTIFFS' RESPONSE TO DEFENDANT'S CONSOLIDATED SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS**

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| **Claim 1: Neo4J USA's Trademark Infringement Claim** | | |
| Plaintiff Neo4j Inc. ("USA") Does not own a protectable trademark in Neo4J which is a required element of a trademark claim | <u>Fact 125:</u> **USA Fka, Neo Techonolgy, Inc. does not own the trademark to Neo4J. Neo4J Sweden AB, Fka Network Engine for Objects in Lund AB) ("Sweden") owns the trademark to Neo4J.** Beene Dec ¶ 2-7 Exhibits 1, (recital 1, Section 1.6. (b), 1.7, 2.1 (non-exclusive license) Article 3 (Reservation of Rights [to Sweden]) 2 Royalty report on license, 3 (Sweden Neo4J trademark applications and registrations). Dkt. No 56 ¶91 (Neo Technologies, Inc. was incorporated in July 7, 2011 and changed its name to Neo4j, Inc. on August 7, 2017) | **DISPUTED:** This is not a material fact. Neo4j USA is the owner of the U.S. registration for the Neo4j® Mark. Ratinoff Decl., Exh. 1. Neo4j Sweden is a wholly owned subsidiary of and controlled by Neo4j USA, and is considered a "related company" as referenced in the U.S. application for the Neo4j® Mark. Rathle, Decl. at 1:17-18; Broad Decl. at ¶¶ 19-21; Beene Decl., Exh. 6 (p. 101 of 125). |
| | <u>Fact 126:</u> Sweden licensed its Neo4J software and trademarks on a **non-exclusive basis** to USA. Beene Dec ¶ 2-7 Exhibits 1, (recital 1, Section 1.6. (b), 1.7, 2.1 (non-exclusive license) Article 3 (Reservation of Rights [to Sweden]) 2 Royalty report on license, 3 (Sweden Neo4J trademark applications and registrations). | **DISPUTED:** Defendants' stated interpretation of the Amended and Restated License Agreement mischaracterizes the express terms thereof.<br><br>**UNDISPUTED:** Under Section 2.1 of the referenced agreement, Neo4j Sweden granted Neo4j USA a non-exclusive worldwide license to Neo-Sweden Intellectual Property Rights (as defined in Section 1.6), and royalty payments are required as set forth in Section 4.1 and Exhibit B. *See* Beene Dec, Exh. 1. |
| | <u>Fact 127:</u> Sweden retained exclusive ownership of the mark in the license agreement. Beene Dec ¶ 2-7 Exhibit 1, (recital 1, Section 1.6. (b), 1.7, Article 3 (Reservation of Rights [to Sweden]) | **DISPUTED:** This is not a material fact. Neo4j USA is the owner of the U.S. registration for the Neo4j® Mark in the United States. Ratinoff Decl., Exh. 1. Neo4j Sweden is a wholly owned subsidiary of and controlled by Neo4j USA, and is considered a "related company" as referenced in that application. Rathle, Decl. at 1:17-18; Broad Decl. at ¶¶ 19-21; Beene Decl., Exh. 6 (p. 101 of 125). |
| | <u>Fact 128:</u> Sweden has in fact made trademark applications claiming ownership of the Neo4J mark throughout the world further providing evidence of Sweden's ownership of the Neo4J mark. Beene Dec ¶ 7, Exhibit 3. | **DISPUTED:** Whether Neo4j Sweden holds trademark registrations for "Neo4j" outside the United States, is irrelevant and immaterial. Neo4j USA is the owner of the U.S. registration for the Neo4j® Mark. Ratinoff Decl., Exh. 1. |

1

842\3697513.6

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | **Fact 129:** USA has paid Sweden royalties for the license. Beene Dec ¶ 6, Exhibits 2. | **UNDISPUTED:** Neo4j USA has paid Neo4j Sweden royalties as required by the referenced agreement. |
| Fraud on the PTO defense | **Fact 130:** Lars Nordwall, as the COO of USA, knew USA did not own the NEO4J trademark and did not use the trademark since 6/04/2006 which is before USA was formed on July 7, 2011.  Beene Dec. Ex. 6 (NEO4J trademark application, principle register) and Dkt. No 56 ¶91 (Neo Technologies, Inc. was incorporated in July 7, 2011 and changed its name to Neo4j, Inc. on August 7, 2017) | **DISPUTED:** This is pure speculation with no cited admissible evidence of Mr. Nordwall's intent.  Neo4j Sweden is a wholly owned subsidiary of and controlled by Neo4j USA, and is considered a "related company" as referenced in Neo4j USA's application for the Neo4j® Mark.  Rathle, Decl. at 1:17-18; Broad Decl., ¶¶ 19-21; Beene Decl., Exh. 6 at p. 101 of 125. |
| Naked license defense | **Fact 131:** USA provides no evidence that Sweden controlled quality on Sweden's software the years before the software and trademark was licensed to USA. Declaration of John Mark Suhy (Suhy Dec.) ¶51. | **DISPUTED:**  This is defense was stricken with prejudice, and which Defendants otherwise have the evidentiary burden to establish a lack of quality would control.  The cited paragraph from the Suhy Dec is inadmissible argument and lacks foundation.  Neo4j Sweden is a wholly owned subsidiary of and controlled by Neo4j USA.  Rathle, Decl. at 1:17-18; Broad Decl., ¶¶ 19-21.  Plaintiffs work closely together ensure that software bearing the Neo4j® Mark is of the highest quality.  Rathle Decl., ¶¶ 2-3, 19-22. |
| | **Fact 132:** The License Agreement from Sweden to USA has no quality control provisions. Beene Dec ¶ 2-7 Exhibit 1 (no quality control provision in license agreement.) | **DISPUTED:** The cited paragraphs to the Beene Dec are not admissible evidence and do not establish any lack of quality control.  Neo4j Sweden is a wholly owned subsidiary of and controlled by Neo4j USA.  Rathle, Decl. at 1:17-18.  Plaintiffs work closely together ensure that the software bearing the Neo4j® Mark is of the highest quality.  *Id.*, ¶¶ 2-3, 19-22. |
| Defendants did not infringe on USA's limited trademark license when referring to the open source software | **Fact 133:** Sweden is the licensor of the open source version of Neo4J under the AGPL and the owner of the Neo4J trademark. Fact 125 and Ratinoff Dec. Ex 39 at 25:11-13 | **DISPUTED:** Neo4j Sweden licensed Neo4j® EE under the AGPL through version 3.3.  Rathle Decl., ¶¶ 5-11.  Subsequent versions of Neo4j EE were no longer licensed on an open source basis.  *Id.*, ¶¶ 12-13.  Neo4j USA is the owner of the U.S. registration for the Neo4j® Mark.  Ratinoff Decl., Exh. 1. |
| Defendants use of Neo4J was nominative which is not infringing. | **Fact 134:** Defendants references Sweden's Neo4J mark to reference Sweden's open source software called Neo4J to describe the software | **DISPUTED:**  The cited statement is inadmissible argument and lacks foundation.  The Neo4j® Mark is a registered standard character mark covering the word in all types of depictions, including Plaintiffs' |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | and uses USA's company name and products to identify them in comparative advertisement. Suhy Dec. ¶9 | exclusive right of use in connection with the Neo4j® products and services. Ratinoff Decl., Exh. 1; PT Dkt. No. 70 at 9:3-10:24. Defendants' repetitive use of the Neo4j® Mark on their websites to promote their recompiled patchwork binaries goes beyond what is reasonably necessary for purposes of comparative advertising. *Id.*, Exhs. 14-18, 62-75. |
| Defendants use of Neo4J does not suggest sponsorship or endorsement | <u>Fact 135</u> Defendants websites, taken as a whole do not suggest sponsorship or endorsement by USA.  Suhy does not have a website. Defendants did not use the USA's disputed Neo4j mark for promotion of USA's products. All promotions have been for marketing and service Sweden's open source Neo4J software and derivatives of such software as permitted under the GitHub Terms of Service and the AGPL. References to USA and its products are for comparative advertisement. Suhy Dec. ¶9, 16 | **DISPUTED:**  The cited statements are inadmissible argument and lack foundation.  The Neo4j® Mark is a registered standard character mark covering the word in all types of depictions, including Plaintiffs' exclusive right of use in connection with the Neo4j® products and services.  Ratinoff Decl., Exh. 1; PT Dkt. No. 70 at 9:3-10:24.  Defendants' repetitive use of the Neo4j® Mark on their websites to promote their recompiled patchwork binaries goes beyond what is reasonably necessary for purposes comparative advertising.  *Id.*, Exhs. 14-18, 62-75. The GitHub Terms of Service do not expressly license a user's trademarks to other GitHub users and no admissible evidence is offered establishing that Plaintiffs agreed to such terms. *See* Beene Decl., ¶ 13 Exh. 9 at §§ C., A.4, D.5. |
| PT defendants engaged in no conduct leading to an inequitable result to support Alter Ego Liability | <u>Fact 136:</u> The Partner Agreement seeks to prevent PT from dealing in all versions of Sweden's Neo4J open source software when USA is not the licensor under the AGPL and the AGPL freely allows anyone to use the software. Fact 133; Suhy Dec. ¶52 | **DISPUTED**: The cited statement is inadmissible argument.  PureThink voluntarily agreed to the restrictions imposed by the Partner Agreement.  *See* Ratinoff Decl., Exh. 4. Neo4j Sweden authorized Neo4j USA to license its software in the United States. *See* Beene Decl., Exh. 1 at §2.1.1(a); Rathle Decl., ¶ 4. |
| | <u>Fact 137:</u> The purpose of USA' restriction in the Partner Agreement is to prevent any terminated partner from supporting Sweden's open source version of Neo4J which is unlawful. Suhy Dec. ¶4, 53 | **DISPUTED**: The cited statements are inadmissible argument, lack foundation, and are immaterial.  While their validity is a Phase 2 issue, Suhy and PureThink admittedly formed iGov to circumvent the restrictions in Section 4.3.1 of the Partner Agreement. Ratinoff Decl., Exhs. 10-11, 14-15, 17-19; PT Dkt. No. 22, ¶¶ 18-19; *see also* Exh. 3 at 46:12-16, PT Dkt. No. 72 at 8:22-25, 9:15-23. |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | **Fact 138:** USA wrongfully and successfully asserted the unlawful restriction to interfere with PT efforts to get business from the IRS. Suhy Dec. ¶7, 54, Ex. 1 | **DISPUTED**: The cited statement is inadmissible argument, lacks foundation and is immaterial because the validity of the restrictions and any alleged interference are a Phase 2 issues. *See* PT Dkt. No. 68. |
| The PT Defendants did not used the Neo4j® Mark without Neo4j USA's authorization to promote ONgDB | **Fact 139:** The PT defendants are not using the Neo4J mark to sell USA's commercial software. Suhy Dec. ¶31 | **DISPUTED**: The Neo4j® Mark is registered as a standard character mark and is evidence of Plaintiffs' exclusive right to use in connection with Neo4j® products and services.  Ratinoff Decl., Exh. 1; PT Dkt. No. 70 at 9:3-10:24. Defendants' repeatedly used the Neo4j® Mark to promote their recompiled patchwork of binaries and ONgDB.  *See* Ratinoff Decl., Exhs. 14-18, 62-75. The AGPL is not a trademark license, and thus does not grant Defendants the right to use the Neo4j® Mark with their recompiled binaries. *See* Rathle Decl., ¶¶ 15-18, Exhs. 5-7; PT Dkt. No. 85 at 7:27-8:2. |
| | **Fact 140:** USA agreed Sweden owns the intellectual property, including marks for Neo4J. Fact 125. | **DISPUTED**: This is not a material fact.  Neo4j USA is the owner of the U.S. registration for the Neo4j® Mark.  Ratinoff Decl., Exh. 1. Neo4j Sweden is a wholly owned subsidiary of and controlled by Neo4j USA, and is considered a "related company" as referenced in the U.S. application for the Neo4j® Mark. Rathle, Decl. at 1:17-18; Broad Decl. at ¶¶ 19-21; Beene Decl., Exh. 6 (p. 101 of 125). |
| | **Fact 141:** Here there is an issue of fact on the false designation of origin element as ONgDB is a fork of Sweden's open source software licensed under the AGPL. Suhy Dec. ¶19 | **DISPUTED:**  The cited statement is inadmissible argument and lacks foundation.  It is indisputable that ONgDB is not a "free and open source" fork of Neo4j® EE because Defendants impermissibly replaced the more restrictive Neo4j Sweden Software License with a generic copy of the AGPL and stripped out valid legal notices identifying Neo4j Sweden as the copyright holder and licensor. Rathle Decl., ¶¶ 11-14, 27-30; Exh. 3 at §§ 7, 10; Ratinoff Decl., Exhs. 24-26, 28, 39; Exh. 31 at 87:24-90:9, 159:3-10; GFI Dkt. No. 110 and No. 88 at 5:23-8:9. |
| | **Fact 142:** USA even admits, the open source version has the same great features as the commercial version. Suhy Dec. ¶55; Beene Dec. Ex. 8 | **DISPUTED:**  The cited statement is inadmissible argument and lacks foundation. The alleged website printout has no URL address and is unverifiable, and |

842\3697513.6

4

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | actually states that Neo4j® EE has additional features, such as enterprise-grade availability, management and scale-up and scale-out capabilities. *See* Beene Dec. Ex. 8; *see also* Rathle Decl., ¶¶ 5-9. |
| | **Fact 143:** Whether ONgDB is a "drop in" replacement for USA's "commercial" Neo4J software, is a disputed issue of fact. | **DISPUTED**: This is unsupported argument, and not a material fact supported by admissible evidence. |
| | **Fact 144:** Data and queries, the key function of a databases, from either version work on both versions. Suhy Dec. ¶56 | **DISPUTED**: This statement is vague and ambiguous, lacks foundation as it is unclear what software and versions thereof are being referred to in the cited paragraph. To the extent that it refers to the open source and commercial versions of Neo4j® software in preceding paragraph, Neo4j® EE has additional commercial-grade features that are not offered with open source Neo4j® CE. *See* Suhy Dec., ¶ 55; *see also* Rathle Decl., ¶¶ 5-9. |
| ONgDB is a Drop in replacement to versions of Neo4J | **Fact 145:** USA, in its website, stated that its commercial Enterprise version of Neo4J has "same great features" as the open source version of Neo4j. Suhy Dec. ¶55, Ex 3 | **DISPUTED**: The cited statement lacks foundation and there is no Exhibit 3 to the Suhy Declaration. Neo4j® EE has additional commercial-grade features that is not offered with open source Neo4j® CE. *See* Beene Dec. Ex. 8; *see also* Rathle Decl., ¶¶ 5-9. |
| | **Fact 146:** ONgBD allows users of other versions of Neo4J (including older versions of commercial and open source) to drop in the files from the same version number and operate the same data and run queries on it, which is the core functionality of a database. Defendants have not heard of any consumer suggest otherwise. Suhy Dec. ¶57 | **DISPUTED**: This statement is vague and ambiguous as to which software and versions thereof Suhy is referring. He testified that only in "certain versions" of Neo4j® EE and ONgDB can a user copy the data directories between two software instances. Reply Ratinoff Decl., Exh. F 120:18-122:25. Yet, Suhy tweeted that they must be identical versions. Ratinoff Decl., Exh. 104.<br><br>GFI admitted that after ONgDB version 3.5.4, it could not "reliably guarantee that it was a drop-in replacement" for the same version number of Neo4j® EE and was unwilling to do the testing to make such integration and compatibility guarantees because it became "too hard to demonstrate." Ratinoff Decl., Exh. 31 at 186:24-188:17, 188:23-189:23. |
| Use of USA documentation is | **Fact 147:** Any user of open source software from Sweden's Neo4J GitHub repository are allowed to use all content on the site. This is | **DISPUTED**: This is inadmissible argument, not a material fact. There is nothing in the GitHub Terms |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| licensed Content and is not actionable on any claim. | permitted under the GitHub Terms of Service. GitHub Terms of service A. 4 definition of Content and ¶ D 5 license. (including "You may grant further rights… " inferring rights to End Users under the GitHub license may **not** be limited.) Suhy Dec. ¶58 Beene Dec. Ex. 9. | of Service (GTOS) that expressly or implicitly contemplates a user licensing their trademarks to other GitHub users. To the contrary, the GTOS warns them that "use of the Website and Service must not violate any applicable laws, including copyright or trademark laws…." Beene, Exh. 9 at § C. It also does not include trademarks in the definition of "Content" that other users may have a right to use under the GTOS. *Id.*, ¶ 13, Exh. 9 at §§ A.4, D.5. There is also no admissible evidence is offered establishing that Plaintiffs agreed to such terms. *Id.* |
| Defendants product and services are not readily identifiable without use of the Neo4J trademark | Fact. 148: Neo4J is a type of database that must be identified so consumers looking for the database may find it. Defendants properly used Neo4J to identify companies and products in marketing and comparative advertisements to provide knowledgeable consumers with information for fair competition. Suhy Dec. ¶2, 59 | **DISPUTED:** The cited statements are inadmissible argument, lack foundation and not a material facts. ONgDB can be readily identified as "Open Native Graph Database" without use of Neo4j® Mark. Ratinoff Decl., Exh. 31 at 27:17-29:9, 178:13-179:25, Exhs. 86, 88. Defendants' use the Neo4j® Mark to promote their own recompiled patchwork of binaries beyond what is reasonably necessary for identifying ONgDB as a fork of Neo4j® EE or for purposes of comparative advertising. *Id.*, Exhs. 14-18, 62-75. |
| **2. False Advertising Claims 2nd, 3rd and 4th causes of action.** | | |
| ONgDB is based on the open source version of Neo4J licensed under the AGPL and is free. | Fact 149: ONgDB is a free fork of Neo4J software licensed under the Sweden's AGPL. Suhy Dec. ¶36 | **DISPUTED:** The cited "evidence" is inadmissible argument, not a material fact. The undisputed facts show that ONgDB is not a free fork of Neo4j® EE under Sweden's AGPL because Defendants impermissibly replaced the more restrictive Neo4j Sweden Software License with a generic copy of the AGPL and stripped out valid legal notices identifying Neo4j Sweden as the copyright holder and licensor. Rathle Decl., ¶¶ 11-14, 27-30; Exh. 3 at §§ 7, 10; Ratinoff Decl., Exhs. 24-26, 28, 39; Exh. 31 at 87:24-90:9, 159:3-10; GFI Dkt. No. 88 at 5:23-8:9. |
| | Fact 150: The AGPL is a free open source license. AGPL Preamble, Ratinoff Dec. Ex. 39, 1-2 | **DISPUTED:** The cited evidentiary support is a printout of a GitHub commit showing Defendants' replacement of the Neo4j Sweden Software License |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | with the AGPL. Ratinoff Decl., ¶ 41. The AGPL preamble actually states that it "is a free, copyleft license for software and other kinds of works…" *See* Rathle Decl., Exh. 1. |
| Consumer did not materially rely on the defendants' representations to determine to use ONgDB software for free instead of paying USA money for a commercial version of Neo4J. | Fact 151: Sophisticated consumers of databases make purchase decisions based on price. Suhy Dec. ¶44; USA concedes consumers decided to use ONgDB because it was free. Dkt. 98, p.2:12-13 p. 32:6:10. Information Analysis Incorporated's GSA price list has a $500,000 bid for a Neo4J term license. (Beene Dec. Exhibit 5, p.1.) Beene Dec Ex. 7 | **UNDISPUTED**: Price is a material factor in customers' decision to choosing ONgDB because Defendants advertised it as a "free" version of Neo4j® EE.<br><br>**DISPUTED**: ONgDB is not a "free" version of Neo4j® EE because Defendants impermissibly replaced the commercially restrictive Neo4j Sweden Software License with a generic copy of the AGPL. Rathle Decl., ¶¶ 11-14, 27-30; Exh. 3 at §§ 7, 10; Ratinoff Decl., Exhs. 24-26, 28, 39; Exh. 31 at 87:24-90:9, 159:3-10; GFI Dkt. No. 88 at 5:23-8:9. Defendants admitted that potential customers of ONgDB and Neo4j® EE are less sophisticated than they originally believed. Ratinoff Decl., Exh. 3 at 207:12-209:3. The cited GSA price list is irrelevant, is not properly authenticated and lacks foundation. |
| An ONgDB licensee that only internally uses the software does not violate the commons clause- valid or not. | Fact 152: The common clause, valid or not, only restricts licensees from selling the software. It does not prevent a licensee from internally using the software. Ratinoff Dec. Ex 39 at 25:11-13, Suhy Dec. ¶36, 60, Ex. 2 | **DISPUTED**: The Neo4j Sweden Software License imposes limits on licensees' right to "sell" the licensed source code (including without limitation fees for hosting or consulting/ support services related to the Software) underlying Neo4j® EE and offering professional services that are substantially derived from Neo4j® EE or the functionality thereof. Rathle Decl., ¶¶ 11-13, Exh. 3. |
| | Fact 153: Not all versions of Sweden's open source software are subject to the common clause. Suhy Dec. ¶61 | **UNDISPUTED:** However, this is not a material fact, and is inadmissible because Paragraph 61 if the Suhy Dec. does not support this statement. |
| | | **Additional Fact:** Neo4j® EE was offered under a paid-for commercial license and under the AGPL prior to version 3.4.  Neo4j® EE v3.4 and several pre-release versions of Neo4j® EE v3.5 were subject to the Commons Clause. Rathle Decl., ¶¶ 7-14. |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | **Fact 154:** A licensee who wants to sell an open source Neo4J fork, may do so with a prior version of Neo4j where the license does not include the added common clause if they have concerns of the validity of the commons clause. Suhy Dec. ¶62 | **DISPUTED**: There is no evidentiary support offered because the Suhy Dec does not contain a Paragraph 62. A licensee may "sell" source code licensed under the AGPL so long as any modifications are redistributed and all copyrights and license terms are retained therewith. Rathle Decl., Exh. 1, §§ 4, 5. 3. The AGPL is not a trademark license, and thus does not grant a licensee the right to use the Neo4j® Mark. *See* PT Dkt. No. 85 at 7:27-8:2. |
| The commons clauses added to the AGPL does not bar professional services. | **Fact 155:** Even if valid, the commons clause only bars services that "consists, entirely or substantially of the Software or the functionality of the Software." Ratinoff Dec. Ex 39 at 25:681-693 | **DISPUTED:** The statement is incomplete representation of the Commons Clause, which states: "For purposes of the foregoing, 'Sell' means practicing any or all of the rights granted to you under the License to provide to third parties, for a fee or other consideration (<u>including without limitation fees for hosting or consulting/ support services related to the Software</u>), a product or service whose value derives, entirely or substantially, from the functionality of the Software." Rathle Decl., Exh. 3. |
| | **Fact 156:** Professional services to support a licensee of open source Neo4j do not "consists, entirely or substantially of the Software or the functionality of the Software." Ratinoff Dec. Ex 39 at 25:681-693, Suhy Dec. ¶36, 60, Ex.2 | **DISPUTED**: This is inadmissible argument, not a material fact. It is also vague and ambiguous as to which version of Neo4j® software and the type of professional services are being referred to in this context. The Neo4j Sweden Software License restricts third-parties from selling Neo4j® EE and offering professional services that are substantially derived from Neo4j® EE or the functionality thereof. Rathle Decl., ¶¶ 11-13, Exh. 3. The AGPL is not a trademark license, and thus does not grant Defendants the right to use the Neo4j® Mark with their recompiled binaries. *See* Rathle Decl., ¶¶ 15-18, Exhs. 5-7; PT Dkt. No. 85 at 7:27-8:2. |

## Attestation

I attest that the evidence cited herein by Plaintiffs fairly and accurately supports or disputes the facts asserted.

Dated: February 16, 2021   By:  */s/ Jeffrey M. Ratinoff*

Jeffrey M. Ratinoff, Attorney for Plaintiffs and Counter-Defendants Neo4j, Inc. and Neo4j Sweden AB

**02-16-2021 – PLAINT EVIDENTIARY OBJ TO DECL JOHN MARK.pdf**

Filed 02/06/2021

Plaintiffs' Evidentiary Objections to the Declaration of John Mark Suhy

(Pacer Doc: #109)

(279 of 299), Page 279 of 299

Case: 24-5538, 12/23/2024, DktEntry: 18.9, Page 279 of 299
Case 5:18-cv-07182-EJD   Document 109   Filed 02/16/21   Page 102 of 103

### Plaintiffs' Evidentiary Objections to the Declaration of John Mark Suhy

| Suhy Declaration Paragraph | Basis of Evidentiary Objection |
|---|---|
| Para 2, 3 and 4 (PT nominative use of TM and reasons for forming iGov) | FRE 701 (Improper opinion testimony, improper legal conclusion); |
| Para 6 (iGov's intent) | FRE 701 (Improper opinion testimony); FRE 602 (no foundation for iGov's intent, or to what solicitations are being referred) |
| Para 7, 46, 49, 52, 53, 54; and Exh. 1 (Alleged interference and Partner Agreement restrictions) | FRE 701 (Improper opinion testimony, improper legal conclusion); FRE 401 (IRS issues are irrelevant and immaterial to Phase 1 issues) |
| Para 8 (Development of Neo4j Government Edition) | FRE 602 (No foundation for iGov's development and where they stated PT's relationship with Neo4j USA was terminated) |
| Para 9 (iGov's intent in referencing Neo4j's TM) | FRE 701 (Improper opinion testimony, improper legal conclusion and argument); FRE 602 (no foundation for alleged "references" to the Neo4j® Mark) |
| Para 10 (PT's intent regarding use of Neo4j's mark in PT's email address) | FRE 701 (Improper opinion testimony, improper legal conclusion and argument); FRE 602 (no foundation for purposes of email address); FRE 401 (PT's intent in using mark is irrelevant and immaterial) |
| Para 11 (iGov's software offerings) | FRE 602 (no foundation for existing open source distributions or what evidence is being referred to) |
| Para 12 (iGov's use of Neo4j's trademark) | FRE 701 (Improper opinion testimony); FRE 602 (no foundation for purposes of email address); FRE 401 (PT's intent in using mark is irrelevant and immaterial) |
| Para 13, 14, 15 and 16 (Use of Neo4j software under the AGPL, Graphstack and the partner agreement) | FRE 701 (Improper opinion testimony); FRE 602 (no foundation for iGov's or PT's open source and contractual claims); FRE 401 (PT's intent in using mark is irrelevant and immaterial) |
| Para 18 (Neo4j Sweden's distributions). | FRE 602 (No foundation for how Neo4j Sweden compiles it software and creates distributions, and vague as to which version(s) thereof are referenced) |
| Para 19, 22 (ONgDB) | FRE 701 (Improper opinion testimony); FRE 602 (no foundation for the open source, forking and licensing averments) |
| Para 20 and 21 (PT & iGov websites and ONgDB) | FRE 602 (no foundation for referenced websites and specific statements thereon); FRE 802 (what PT and iGov websites said is hearsay); FRE 701 (Improper opinion testimony and legal conclusion as to whether their use of the Neo4j® Mark is nominative fair use) |

| Para 20 (ONgDB) | FRE 602 (no foundation for referenced websites and specific statements thereon); FRE 802 (what PT and iGov websites said is hearsay); FRE 701 (Improper opinion testimony and legal conclusion as to whether their use of the Neo4j® Mark is nominative fair use) |
|---|---|
| Para 23, 24, 25, 26, 27 and 28 (Consumer confusion, PT and iGov's use of trademark) | FRE 701 (Improper opinion testimony and legal conclusions as to terms of service and licensing, and as to whether their use of the Neo4j® Mark is nominative fair use); FRE 602 (no foundation); FRE 602, 701 (improper speculation as to alleged lack of consumer confusion and source of technical issues) |
| Para 29 and 30 (Removal of commercial restriction and veracity of statements) | FRE 701 (Improper opinion testimony); FRE 602 (no foundation for referenced files and vague as to which files and version(s) of software is being referred to) |
| Para 31, 32, 33, 34, 35, 36, 37 and 38; and Exhibit 2 (Defendants' statements, interpretation of the AGPL, and GitHub policy) | FRE 602 (no foundation); FRE 802 (FSF and Heather Meek's statements are inadmissible hearsay); FRE 701 (Improper opinion testimony and legal conclusion regarding AGPL interpretation, standing and the requirements of the DMCA and Copyright Act); FRE 401 (PT's meaning and intent in making "drop in replacement" is irrelevant and immaterial); FRE 901a (lack of authentication of Exh. 2) |
| Para 39, and 40 (Defendants' statement re ONgDB and nature of Neo4j Sweden's source code) | FRE 602 (no foundation regarding content and nature Neo4j enterprise code); FRE 701 (Improper opinion testimony regarding content and nature Neo4j enterprise code) |
| Para 41, 42, 43, 44 and 45 (Use of the Neo4j® Mark, price, use of ONgDB and AGPL) | FRE 602, 701 (no foundation and speculative as to technical and pricing averments, and customers' purchasing decisions); FRE 701 (Improper opinion testimony re AGPL interpretation and characterization of ONgDB, as well as improper opinion testimony and legal conclusion as to whether use of the Neo4j® Mark qualifies as nominative fair use) |
| Para 47 (AGPL and FSF) | FRE 802 (FSF and other third party statements are hearsay); FRE 701 (Improper opinion testimony re AGPL interpretation and copyrights) |
| Para 50, 51, 55, 56, 57, 58, 59, and 60 (Use of Neo4j® Mark, quality control, technical and legal claims re ONgDB, GitHub terms of service and the Commons Clause) | FRE 701 (Improper opinion testimony); FRE 602 (no foundation for iGov's or PT's open source, technical and/or contractual averments) FRE 602, 701 (no foundation and impermissible speculation regarding customers) |

**02-16-2021 - REP DECL OF JEFFREY M. RATINOFF ISO PLAINT CONS MOTION FOR SUM
JUDGMENT AND OPPTO DEFENDANTS' CROSSMOTION FOR SUMMARY
JUDGMENT.pdf**

Filed 02/16/2021

REPLY DECLARATION OF JEFFREY M.
RATINOFF IN SUPPORT OF PLAINTIFFS' CONSOLIDATED MOTION
FOR SUMMARY JUDGMENT AND
OPPOSITION TO DEFENDANTS' CROSSMOTION FOR SUMMARY JUDGMENT

(Pacer Doc: #109)

1   John V. Picone III, Bar No. 187226
    jpicone@hopkinscarley.com
2   Jeffrey M. Ratinoff, Bar No. 197241
    jratinoff@hopkinscarley.com
3   HOPKINS & CARLEY
    A Law Corporation
4   The Letitia Building
    70 South First Street
5   San Jose, CA 95113-2406

6   *mailing address:*
    P.O. Box 1469
7   San Jose, CA 95109-1469
    Telephone:    (408) 286-9800
8   Facsimile:    (408) 998-4790

9   Attorneys for Plaintiff and Counter-Defendants
    NEO4J, INC. and NEO4J SWEDEN AB
10

11              UNITED STATES DISTRICT COURT

12            NORTHERN DISTRICT OF CALIFORNIA

13   NEO4J, INC., a Delaware corporation, and       CASE NO.  5:18-cv-07182-EJD
     NEO4J SWEDEN AB, a Swedish
14   corporation,                                   **REPLY DECLARATION OF JEFFREY M.
                                                    RATINOFF IN SUPPORT OF
15              Plaintiffs,                          PLAINTIFFS' CONSOLIDATED MOTION
                                                    FOR SUMMARY JUDGMENT AND
16        v.                                        OPPOSITION TO DEFENDANTS' CROSS-
                                                    MOTION FOR SUMMARY JUDGMENT**
17   PURETHINK LLC, a Delaware limited
     liability company, IGOV INC., a Virginia       Date:      April 15, 2021
18   corporation, and JOHN MARK SUHY, an            Time:      9:00 a.m.
     individual,                                    Dept.:     Courtroom 4, 5th Floor
19              Defendants.                         Judge:     Hon. Edward J. Davila

20
     AND RELATED COUNTERCLAIM.
21

22

23

24

25

26

27

28

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE • PALO ALTO

842\3703619.1

REPLY DECLARATION OF JEFFREY M. RATINOFF IN SUPPORT OF PLAINTIFFS' CONSOLIDATED MOTION FOR SUMMARY
JUDGMENT AND OPPOSITION TO DEFENDANTS' CROSS-MOTION; CASE NO. 5:18-CV-07182-EJD

**Page 2068**

I, Jeffrey M. Ratinoff, declare as follows:

1.     I am an attorney at law, duly licensed to practice before all courts of the State of California, and am of counsel with Hopkins & Carley, a Law Corporation, attorney of record for Plaintiff Neo4j, Inc. and Neo4j Sweden AB (collectively "Plaintiffs") in the above-captioned matter.  I make this declaration in support of Plaintiffs' Consolidated Reply in Support of Plaintiffs' Motion for Summary Judgment and Opposition to Defendants' Cross-Motion for Summary Judgment concurrently filed herewith.

2.     The facts stated herein are based on my personal knowledge, except with respect to those matters stated to be on information and belief, and as to those matters, I believe them to be true.  If called upon to testify as a witness in this matter, I could and would do so competently.

3.     Attached hereto as **Exhibit A** is a true and correct copy of Neo4j USA's webpage, http://www.neotechnology.com, archived on August 23, 2011, which was downloaded from the Wayback Machine website, a digital archive of the World Wide Web (https://web.archive.org).

4.     Attached hereto as **Exhibit B** is a true and correct copy of Neo4j USA's webpage, http://neotechnology.com/products/price-list/, archived on August 23, 2011, which was downloaded from the Wayback Machine website, a digital archive of the World Wide Web (https://web.archive.org).

5.     Attached hereto as **Exhibit C** is a true and correct copy of Neo4j USA's webpage, http://neotechnology.com/neo4j-graph-database/, archived on March 26, 2014, which was downloaded from the Wayback Machine website, a digital archive of the World Wide Web (https://web.archive.org).

6.     Attached hereto as **Exhibit D** is a true and correct copy of Neo4j USA's webpage, http://neotechnology.com/products/price-list/, archived on March 26, 2014, which was downloaded from the Wayback Machine website, a digital archive of the World Wide Web (https://web.archive.org).

7.     Attached hereto as **Exhibit E,** is a true and correct copy of relevant excerpts from Purethink LLC and iGov Inc.'s Amended Response To Neo4j, Inc.'s First Set of Interrogatories to Purethink LLC and iGov Inc., and John Mark Suhy's verification thereof.  The redacted

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE • PALO ALTO

842\3703619.1                                   - 1 -

REPLY DECLARATION OF JEFFREY M. RATINOFF IN SUPPORT OF PLAINTIFFS' CONSOLIDATED MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' CROSS-MOTION; CASE NO. 5:18-CV-07182-EJD

**Page 2069**

1   portions contain personal contact information for potential witnesses, and are not cited to or

2   relevant to the parties' pending motions.

3        8.      Attached hereto as **Exhibit F** are true and correct copies of additional relevant

4   pages from the transcript for the Rule 30(b)(6) Deposition of iGov taken on October 22, 2020.

5        9.      Attached hereto as **Exhibit G**, is a true and correct copy of an issue posted on

6   FOSSA's GitHub repository at https://github.com/fossas/commons-clause/issues/4 on August 22,

7   2018, which I printed out on February 4, 2021.  It appears to contain the post by Heather Meeker

8   attached as Exhibit 2 to the Declaration of John Mark Suhy in Support of Defendants

9   Consolidated Opposition and Motion for Summary Judgment.

10       10.     Attached hereto as **Exhibit H** are true and correct copies of additional pages from

11  the transcript for the Rule 30(b)(6) Deposition of Graph Foundation Inc. taken on October 16,

12  2020.

13       11.     Attached hereto as **Exhibit I** is a true and correct copy of the Stipulated Judgment

14  and Permanent Injunction (Dkt. No. 110) entered by the Court in *Neo4j, Inc., et al. v.  Graph*

15  *Foundation, Inc., et al.*, United States District Court for the Northern District of California, Case

16  No. 5:19-CV-06226-EJD.

17       I declare under penalty of perjury under the laws of the United States of America that the

18  foregoing is true and correct, and that this declaration was executed on this 16th day of February

19  2021, at San Jose, California.

20

21                                    */s/ Jeffrey M. Ratinoff*
                                      Jeffrey M. Ratinoff

22

23

24

25

26

27

28

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ● PALO ALTO

842\3703619.1                                        - 2 -

REPLY DECLARATION OF JEFFREY M. RATINOFF IN SUPPORT OF PLAINTIFFS' CONSOLIDATED MOTION FOR SUMMARY
JUDGMENT AND OPPOSITION TO DEFENDANTS' CROSS-MOTION; CASE NO. 5:18-CV-07182-EJD

**Page 2070**

# EXHIBIT A

http://neotechnology.com/                                          Go

673 captures
19 May 2001 - 6 Nov 2019

JUL  **AUG**  SEP
◀  **23**  ▶
2010  2011  2012

▼ About this capture


Contact Us  |  Blog

**HOME**  |  SOLUTIONS  |  PRODUCT  |  SERVICES  |  CUSTOMERS  |  COMMUNITY  |  ABOUT US

# The Leader in
# Graph Databases

## The World's Leading NOSQL Graph Database

Neo4j is the world's leading high performance, scalable graph database. Based on more than 8 years of R&D, it has been in 24/7 production since 2003. Neo4j scales to billions of entities on a single machine, with searches up to 1000 times faster than traditional relational databases.

**Learn More**



**Upcoming Webinar**

Introduction to graph databases

**Join Us**



**New Releases**

Neo4j 1.4.1 "Kiruna Stol"

**Get the Details**

**Announcing**

Spring Data Graph

**Learn More**

| Products & Solutions | Community | About Us | Subscribe to our Newsletter |
|---|---|---|---|
| Solutions | Neo4j.org | Overview | Your email address |
| Neo4j Executive Overview | Download Neo4j | Company Blog | |
| Product Guide | Neo4j Blog | Press Page | Subscribe |
| Price List | Discussion Forums | Jobs | |
| | Documentation | | Contact Us for Information |
| | Wiki | | |

Copyright © 2011 - Neo Technology | Site Credits

# EXHIBIT B

http://neotechnology.com/products/price-list/   Go

JUL **AUG** SEP
◀ **23** ▶
2010 **2011** **2012**

84 captures
23 Aug 2011 - 20 May 2014



▼ About this capture

Contact Us | Blog

**HOME** | **SOLUTIONS** | **PRODUCT** | **SERVICES** | **CUSTOMERS** | **COMMUNITY** | **ABOUT US**

Executive Overview     Product Licensing Guide     Price List

# Neo4j Price List

## Price List

Neo Technology offers two commercial editions based on the Neo4j open source graph database.

Both commercial editions can be used in closed-source environments. They are available under a subscription model. Prices are per instance. New releases are included as long as the subscription or annual support and maintenance fees are paid.

| Feature | Neo4j Community | Neo4j Advanced | Neo4j Enterprise |
|---|---|---|---|
| **Licensing** | | | |
| License | Open source (GPLv3) | Commercial and AGPL | Commercial and AGPL |
| Can be used with closed source software | Yes, except OEM | Yes, with commercial license | Yes, with commercial license |
| **Functionality** | | | |
| Neo4j high performance graph database | Yes | Yes | Yes |
| Batch inserter for bulk uploads | Yes | Yes | Yes |
| Shell for console access | Yes | Yes | Yes |
| Graph algorithm package | Yes | Yes | Yes |
| Native language bindings1 | Yes | Yes | Yes |
| Web frameworks integration2 | Yes | Yes | Yes |
| Neo4j Server | Yes | Yes | Yes |
| **Operations and Monitoring** | | | |
| SNMP & JMX monitoring | | Yes | Yes |
| Neo4j Web Management console | Basic | Full | Enterprise |
| **High load & high availability** | | | |
| Online backup of running instance | | | Yes |
| Online failover to warm spare | | | Yes |
| Read slave replication | | | Yes |
| Read/write slave replication | | | Yes |
| High availability with master failover | | | Yes |
| **Support & Services** | | | |
| Support hours | | 5x10 | 7x24 |
| Response time | | 24h | 1h |
| Communication channel | | Email | Phone |
| Technical alerts | | Yes | Yes |



http://neotechnology.com/products/price-list/

**84 captures**
23 Aug 2011 - 20 May 2014

JUL **AUG** SEP
◀ **23** ▶
2010 **2011** 2012

| OEM and Volume discount: | Contact Sales | Contact Sales | Contact Sales |

1 Native bindings to Ruby, Python, Scala, Clojure and Groovy
2 Integration with Spring Framework, Grails, Rails, Django, PHP and more
3 Available to Early Access Program customers





**Products & Solutions**

Solutions
Neo4j Executive Overview
Product Guide
Price List

**Community**

Neo4j.org
Download Neo4j
Neo4j Blog
Discussion Forums
Documentation
Wiki

**About Us**

Overview
Company Blog
Press Page
Jobs

**Subscribe to our Newsletter**

Your email address

Subscribe

Contact Us for Information

Copyright © 2011 - Neo Technology | Site Credits

# EXHIBIT C



NEOTECHNOLOGY.COM    NEO4J.ORG | GRAPHCONNECT.COM       🇺🇸 🇩🇪   Search Site  src



neotechnology graphs are everywhere

| **NEO4J GRAPH DB** | CUSTOMERS | PARTNERS | EVENTS | **COMMUNITY** | ABOUT | CONTACT US |  |

# Neo4j
## World's Leading Graph Database

Neo4j is a robust and proven database technology built from the ground up for use in mission-critical systems with highly inter-connected data models.



# Curses!
This video can't ▭ with your current

Intro to Neo4j(38:14)

## Key benefits of Neo4j

### ☐ Minutes-to-Milliseconds Performance

Over relational database and other NOSQL alternatives, Neo4j turns complex joins into simple & fast graph traversals.

### ☐ Fully ACID, Robust & Scalable

Neo4j is an enterprise database with full ACIDity, support for high-availability clustering, and transaction support.

### ☐ Drastically-Accelerated Development Cycles

Thanks to its flexible data model and Cypher, an intuitive graph query language, Neo4j is easy to use.

### ☐ Extreme Business Responsiveness

Schemaless, unlike relational, Neo4j is flexible, yet, unlike other NOSQL databases, offers structure and meaning.

## Neo4j Enterprise Edition

Neo4j Enterprise Edition is built to perform at scale for startups to enterprise implementations. Commercial subscriptions include the permission to integrate the enterprise editions in closed-source software products, service and support by Neo Technology.

Learn more about Neo4j's Commercial Subscriptions »

### Latest Neo4j News

#### Neo4j 2.0.1 Community Released on Windows Azure VM Depot

We have released a Linux distribution of Neo4j 2.0.1 community on Windows Azure's VM Depot website. Users of Windows Azure are now able to copy a platform image of Neo4j 2.0.1 directly from the VM Depot. Once provisioned, a fresh Neo4j database instance is made available via HTTP through port 7474. Check out the slides below for instructions on

### Neo4j White Papers



#### Graph Databases: The Super Fast New Way to Access Social Data

A new type of database significantly changes the standard direction taken by NOSQL. Graph databases, unlike their NOSQL and relational brethren, are designed for lightning-fast access

how to setup and provision the virtual machine

Read More »

to complex data found in social networks, recommendation engines and networked systems. Get the White Paper »



### NoSQL, Big Data, and Graphs

It used to be that databases were just tasked with digitizing forms and automating business processes. The data was often tabular – take an accounting ledger, for example –and the processes being modeled were reasonably static. Today, the types of data that we are interested in are much more diverse and dynamic. Get the White Paper »

---

© 2014 Neo Technology Inc.
All Rights Reserved
Privacy Policy
Terms

**PRODUCTS**
Neo4j Executive Overview
Neo4j Use Cases
Services
Price List
Resources
Hardware Sizing Calculator
Download Neo4j

**RELATED SEARCHES**
Graph Databases
Customer Stories
Press Release
Video
German Edition
French Edition

**ABOUT US**
About Neo Technology
Jobs
Staff
Book Store
Press

---

**USA:** 1-855-636-4532  **UK:** +44 808 189 0493  **GERMANY:** +49 800 010 1090  **FRANCE:** +33 (0)8 05 08 00 31

Your email address      Subscribe

# EXHIBIT D



 graphs are everywhere

NEO4J GRAPH DB     CUSTOMERS     PARTNERS     EVENTS     COMMUNITY     ABOUT     CONTACT US

## Neo4j Commercial Subscriptions

– Neo4j Commercial Subscriptions –

| Need help deciding?<br>**Contact Sales** | Community<br><br>**Open Source** | Personal<br>**Startups with<br>up to 3 employees and<br>$100K in annual revenue**<br><br>Free | Startups<br>**< $10M in funding<br>< $5M in annual revenue**<br><br>$12K / €12K | Business &<br>Enterprise<br>**Medium Business<br>to Global 2000**<br><br>Contact Sales |
|---|---|---|---|---|
| **Graph Database<br>Features** | | | | |
| Property Graph<br>Model | ✓ | ✓ | ✓ | ✓ |
| Native Graph<br>Processing | ✓ | ✓ | ✓ | ✓ |
| Native Graph<br>Storage | ✓ | ✓ | ✓ | ✓ |
| ACID | ✓ | ✓ | ✓ | ✓ |
| Cypher – Graph Query<br>Language | ✓ | ✓ | ✓ | ✓ |
| Language Drivers<br>(most popular languages) | ✓ | ✓ | ✓ | ✓ |
| REST API | ✓ | ✓ | ✓ | ✓ |
| High-Performance<br>Native API | ✓ | ✓ | ✓ | ✓ |
| HTTPS (via Plug-in) | ✓ | ✓ | ✓ | ✓ |
| **Performance &<br>Scalability** | | | | |
| High-Performance Cache | – | ✓ | ✓ | ✓ |
| Clustering | – | ✓ | ✓ | ✓ |
| Online Backup | – | ✓ | ✓ | ✓ |
| Advanced Monitoring | – | ✓ | ✓ | ✓ |
| **Maintenance** | | | | |

| | | | | |
|---|---|---|---|---|
| Certified for Windows | – | ✓ | ✓ | ✓ |
| Certified for Linux | – | ✓ | ✓ | ✓ |
| Maintenance Releases & Schedules Fixes | ✓ | ✓ | ✓ | ✓ |
| Emergency Patches | – | – | – | Available |

**Support**

| | | | | |
|---|---|---|---|---|
| Community Support | ✓ | ✓ | ✓ | ✓ |
| Commercial Email Support | – | – | ✓ | ✓ |
| Commercial Phone Support | | – | – | ✓ |
| Support Hours | – | – | 10 x 5 | Up to 24 x 7 |

**License**

| | | | | |
|---|---|---|---|---|
| Commercial License | – | ✓ | ✓ | ✓ |
| Production Instances | – | 3* | 3* | 3+ |
| Test Instances | – | 3* | 3* | 3+ |
| # of Developers | – | up to 2 developers | 2 developers* | 3+ developers |

PRICES ABOVE ARE QUOTED IN US DOLLARS FOR THE US AND CANADIAN MARKETS; FOR PRICING OUTSIDE THESE AREAS PLEASE CONTACT SALES.

*Contact Neo about larger clusters, or more developers.

Join the **Partner Graph**

If you are looking to embed & redistribute Neo4j with your software, please Contact Us.

© 2014 Neo Technology Inc.
All Rights Reserved
Privacy Policy
Terms

**PRODUCTS**
Neo4j Executive Overview
Neo4j Use Cases
Services
Price List
Resources
Hardware Sizing Calculator
Download Neo4j

**RELATED SEARCHES**
Graph Databases
Customer Stories
Press Release
Video
German Edition
French Edition

**ABOUT US**
About Neo Technology
Jobs
Staff
Book Store
Press

**USA:** 1-855-636-4532  **UK:** +44 808 189 0493  **GERMANY:** +49 800 010 1090  **FRANCE:** +33 (0)8 05 08 00 31

Your email address    Subscribe

# EXHIBIT E

Adron W. Beene SB# 129040
Adron G. Beene SB# 298088
Attorney at Law
1754 Technology Drive, Suite 228
San Jose, CA 95110
Tel: (408) 392-9233
Fax: (866) 329-0453
adron@adronlaw.com

Attorneys for Defendants and Counter
Claimants:
PURETHINK LLC, a Delaware limited
liability company, IGOV INC., a Virginia
corporation, and JOHN MARK SUHY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEO4J, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>PURETHINK LLC, a Delaware limited liability company, IGOV INC., a Virginia corporation, and JOHN MARK SUHY, an individual,<br><br>Defendants.<br><br>AND RELATED COUNTERCLAIM. | CASE NO. 5:18-cv-07182-EJD<br><br>**PURETHINK LLC AND IGOV INC.'S AMENDED RESPONSE TO NEO4J, INC.'S FIRST SET OF INTERROGATORIES TO PURETHINK LLC AND IGOV INC.** |

**PROPOUNDING PARTY:**      **NEO4J, INC.**

**RESPONDING PARTY:**      **PURETHINK LLC and IGOV INC.**

**DISCOVERY:**      **Interrogatories**

**SET:**      **One – Amended Response**

## OBJECTIONS TO DEFINITIONS

1.      Responding party objects to the definition of "YOU," or "YOUR" as they are overbroad Defendants and Counter-Claimants PureThink LLC and iGov Inc., will provide information in their custody and control and without distinguishing between which party may or may not have specific information regarding the responses as, for example, iGov Inc. has no agreements with plaintiff.

2.      Responding parties object to the definition "IDENTIFY" and "IDENTITY" as it is overbroad and overly burdensome, and plaintiffs may review the same documents and information to derive the information. Responding parties will meet and confer over specific requests if required.

## RESPONSE TO INTERROGATORIES

### INTERROGATORY NO. 1:

*IDENTIFY all facts and DOCUMENTS supporting YOUR contention in Paragraph 14 of YOUR COUNTERCLAIM that "a separate agreement came into place for the new Neo4j version for the government which was supposed to protect the investment PureThink was making and was going to make," and the four (4) persons most knowledgeable about such facts.*

### RESPONSE:

-   1.1 Removed.

-   1.2 Before April 2015, John Mark Suhy had several verbal discussions over phone and skype with Erik Nolten regarding setting up an exclusivity agreement between PureThink and Neo Technology Inc. to help streamline US government procurements.

-   1.3 On or about April 10, 2015, Erik Nolten voiced concern about giving exclusivity

agreement among other subjects.

See file: INTEROGS-PURETHINK-IGOV-1/000001-000063.pdf

- 1.14 On or about  March 18, 2016 – Bryce Merki Sasaki from Neo4j Inc, posted a blog post on the official Neo4j.com blog. In the post John Mark Suhy was introduced as "John Mark Suhy, the CTO of PureThink – the exclusive provider of Neo4j Government Edition to U.S. federal, state, Department of Defense and intelligence agencies."

See file: INTEROGS-PURETHINK-IGOV-1/000125-000129.pdf

- 1.15 On or about April 11, 2016 – John Broad introduced John Mark Suhy to David Clark, the CTO of FactGem. In the introduction John Broad introduced John Mark Suhy as follows: "@Clark, John Mark is CTO of our partner PureThink, the partner exclusively offering the Government Edition to the US Federal Sector."

See file: INTEROGS-PURETHINK-IGOV-1/000067-000067.pdf

- 1.16 Once the exclusivity agreement for Neo4j Government Edition was in place: FBI, Sandia Laboratories, and IRS all procured the Government Edition through PureThink as was expected, and shown by the following facts:

    a. GraphAware Inc.

       PureThink and John Mark Suhy were working with GraphAware on several potential opportunities including a cyber threat intelligence prototype.

    b. IRS –  PureThink was awarded a contract with IRS which it completed. It was awarded a follow up contract which was canceled due to Neo4j Inc. interference.