IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| NEO4J, INC., a Delaware corporation, and NEO4J SWEDEN AB, a Swedish corporation,<br><br>  Plaintiffs-ctr-defendants-Appellees,<br><br>v.<br><br>JOHN MARK SUHY,<br><br>  Defendant-ctr-claimant-Appellant.<br><br>and<br><br>PURETHINK LLC, a Delaware limited liability company; and IGOV, INC., a Virginia corporation,<br><br>  Defendants. | No. 24-5538<br><br>District No. 5:18-cv-07182-EJD<br>U.S. District Court for the Northern District of California<br><br><br>**DECLARATION OF JEFFREY M. RATINOFF IN SUPPORT OF APPELLEES' OPPOSITION TO APPELLANT JOHN MARK SUHY'S EMERGENCY MOTION TO STAY ENFORCEMENT OF JUDGMENT PENDING APPEAL** |

I, Jeffrey M. Ratinoff, declare as follows:

1.    I am an attorney at law, duly licensed to practice before all courts of the State of California and admitted to this Court, and am a partner of Spencer Fane LLP, attorneys of record for Plaintiffs-Appellees Neo4j, Inc. ("Neo4j USA"), and Neo4j Sweden AB ("Neo4j Sweden," collectively "Appellees"). I make this declaration in support of Appellees' Opposition to Appellant John Mark Suhy's Emergency Motion for Stay.

2.    The facts stated herein are based on my personal knowledge, except with respect to those matters stated to be on information and belief, and as to those matters, I believe them to be true. If called upon to testify as a witness in this matter, I could and would do so competently.

3.    Attached hereto as **Exhibit 1** is a true and correct copy of the Summons to Answer Debtor Interrogatories and/or Production of Documents served on Defendant John Mark Suhy ("Suhy") in the Circuit Court of Fairfax County, Virginia, and filed on or about October 17, 2024

4.    Attached hereto as **Exhibit 2** is a true and correct copy of a Motion to Stay Enforcement of Judgment Without a Bond, filed by Suhy in the Circuit Court of Fairfax County, Virginia on or about October 23, 2024

5.      Attached hereto as **Exhibit 3** is a true and correct copy of an Order by the Circuit Court of Fairfax County, Virginia denying Suhy's Motion to Stay Enforcement of Judgment Without a Bond, entered on or about November 8, 2024.

6.      Attached hereto as **Exhibit 4** is a true and correct copy of the Emergency Motion to Stay Enforcement of Judgment Pending Appeal Without Bond, filed by Suhy with the District Court on December 2, 2024.

7.      Attached hereto as **Exhibit 5** is a true and correct copy of Exhibit E to the Emergency Motion to Stay Enforcement of Judgment Pending Appeal Without Bond, filed by Suhy with the District Court on December 2, 2024.

8.      Attached hereto as **Exhibit 6** is a true and correct copy of Plaintiffs' Opposition to Defendant John Mark Suhy's Emergency Motion to Stay Enforcement of Judgment Pending Appeal Without Bond, filed by Appellees with the District Court on December 9, 2024.

9.      Attached hereto as **Exhibit 7** is a true and correct copy of Defendant's Reply to Plaintiffs' Opposition to Defendant John Mark Suhy's Emergency Motion to Stay Enforcement of Judgment Pending Appeal Without Bond, filed by Suhy with the District Court on December 9, 2024.

10.      Attached hereto as **Exhibit 8** is a true and correct copy of the Order Denying Motion to Stay of Judgment Pending Without Bond, filed by the District Court on December 10, 2024.

2

11.    Attached hereto as **Exhibit 9** is a true and correct copy of a title/transaction history report generated by DataTree for the property located at 4202 Adrienne Dr, Alexandria, VA 22309-2612, generated on December 4, 2024 and with the relevant information highlighted in yellow.

12.    Attached hereto as **Exhibit 10** is a true and correct copy of a title/transaction history report generated by DataTree for the property located at 8814 Danewood Dr, Alexandria, VA 22308-2824, generated on December 4, 2024 and with the relevant information highlighted in yellow.

13.    Attached hereto as **Exhibit 11** is a true and correct copy of a property detail report generated by DataTree for the property located at 8814 Danewood Dr, Alexandria, VA 22308-2824, generated on December 4, 2024 and with the relevant information highlighted in yellow.is a true and correct copy of the Order Granting Motion to Withdraw, entered by the District Court on October 21, 2024.

14.    Attached hereto as **Exhibit 12** are true and correct copies of relevant pages from the transcript for the Deposition of John Mark Suhy in his individual capacity and as Rule 30(b)(6) designee for PureThink LLC and iGov Inc. taken on November 29, 2022.

15.    Attached hereto as **Exhibit 13** are true and correct copies of relevant pages from the transcript for the Deposition of Turin Pollard as Rule 30(b)(6) designee for Greystones Consulting Group taken on December 1, 2022.

16.     Attached hereto as **Exhibit 14** are true and correct copies of relevant pages from the transcript for the Deposition of Michael Stavrianos as Rule 30(b)(6) designee for ASR Analytics, LLC taken on November 7, 2022.

17.     Attached hereto as **Exhibit 15** is a true and correct copy of the Stipulation to the Amount of Plaintiffs' Lost Profits and Defendants' Profits (EFC No. 234), filed in the District Court on December 12, 2023.

18.     Attached hereto as **Exhibit 16** is a true and correct copy of "Table B-4A. U.S. Courts of Appeals—Median Time Intervals in Months for Civil and Criminal Appeals Terminated on the Merits, by Circuit, During the 12-Month Period Ending September 30, 2023," published by the Administrative Office of the U.S. Courts, which I downloaded from www.uscourts.gov.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration was executed on this 2nd day of January, 2025, at San Jose, California.

 */s/ Jeffrey M. Ratinoff*
Jeffrey M. Ratinoff

4

## <u>CERTIFICATE OF SERVICE (CM/ECF)</u>

I HEREBY CERTIFY that on January 2, 2025, I electronically filed the

foregoing **DECLARATION OF JEFFREY M. RATINOFF IN SUPPORT OF**

**APPELLEES' OPPOSITION TO APPELLANT JOHN MARK SUHY'S**

**EMERGENCY MOTION TO STAY ENFORCEMENT OF JUDGMENT**

**PENDING APPEAL** with the Clerk of Court using the CM/ECF system which

will send notification of such filing to the following email addresses:

> **John Mark Suhy**
> jmsuhy@gmail.com
>
> **Rick Sanders**
> rick@sfconservancy.org

> */s/   Jeffrey M. Ratinoff*
> Jeffrey M. Ratinoff

# EXHIBIT 1

**VIRGINIA:**    **IN THE CIRCUIT COURT OF FAIRFAX COUNTY**

Neo4j, Inc., et al.

Plaintiff

vs.                                    Civil Action No. CL FILED

Purethink, LLC, et al.                  Previous Chancery No. 2024 OCT 17 P 12: 24

Defendant                                                J. FALCON
                                                   CLERK CIRCUIT COURT
**SERVE:** 8814 Danewood Drive,                      FAIRFAX, VA
Alexandria, VA 22308

**FRIDAY MOTIONS DAY – PRAECIPE/NOTICE**

**Moving Party:** ☒ Plaintiff  ☐ Defendant  ☐ Other

**Title of Motion:** Summons to Answer Debtor Interrogatories/Req for Docs    ☒ Attached   ☐ Previously Filed

**DATE TO BE HEARD:** January 17, 2025    **Time Estimate** (combined no more than 30 minutes): 5

**Time to be Heard:**  ☒ 9:00 a.m. with a Judge

☐ 10:00 a.m. (Civil Action Cases) Does this motion require 2 weeks notice? ☐ Yes ☐ No

☐ 11:30 a.m. (DOMESTIC/Family Law Cases) Does this motion require 2 weeks notice? ☐ Yes ☐ No

Case continued from: _____    continued to: _____
                        (Date)                              (Date)

Judge _____ must hear this motion because (check one reason below):

☐ The matter is on the docket for presentation of an order reflecting a specific ruling previously made by that Judge.
☐ This Judge has been assigned to this entire case by the Chief Judge; or,
☐ The Judge has advised counsel that all future motions, or this specific motion, should be placed on this Judge's Docket; or,
☐ This matter concerns a demurrer filed in a case where that Judge previously granted a demurrer in favor of demurrant.

**PRAECIPE by:** A. Charles Dean            Gross, Romanick, Dean & DeSimone, P.C.
                 Printed Attorney Name/ Moving Party Name              Firm Name

3975 University Dr., Suite 410, Fairfax, VA 22030
                        Address

| 703-273-1400 | | 74814 | adean@grddlaw.com |
| Tel. No. | Fax No. | VSB No. | E-Mail Address |

**CERTIFICATIONS**

I certify that I have in good faith conferred or attempted to confer with other affected parties in an effort to resolve the subject of the motion without Court action, pursuant to Rule 4:15(b) of the Rules of the Supreme Court of Virginia; and, I have read, and complied with, each of the Instructions for Moving Party on the reverse side of this form.

_____
Moving Party/Counsel of Record

**CERTIFICATE OF SERVICE**

I certify on the 17th day of October, 2024, a true copy of the foregoing Praecipe was

☒ mailed  ☐ faxed  ☐ delivered to all counsel of record pursuant to the provisions of Rule 4:15(e) of the Rules of the Supreme Court of Virginia.    to defendant

_____
Moving Party/Counsel of Record

CCR-E-10 (July 2021)

## INSTRUCTIONS FOR MOVING PARTY

**DATE/TIME:** All motions should be noticed for the 10:00 a.m. Civil Action Docket or the 11:30 a.m. Domestic/Family Law Docket (All Divorce cases, adoptions and Juvenile & Domestic Relations Court Appeals) unless the moving party believes the motion will be uncontested. All motions believed to be uncontested should be noticed for 9:00 a.m.. **A minimum of two weeks' notice is required for all motions for Summary Judgment, Demurrers, Pleas in Bar, motions pertaining to discovery disputes and other motions for which any party desires to file a memorandum.** A memorandum of points and authorities of five pages or less must accompany any of these pleadings and any other motion placed on the Two-Week Docket. If either party believes it necessary to file a memorandum exceeding five double-spaced pages, then the parties must utilize the Briefing Schedule procedure: contact opposing counsel or the opposing party and by agreement conduct a telephone conference call with the Calendar Control Judge, (703) 246-2221; or, if agreement is not possible, give advance notice of an appearance before the Calendar Control Judge to establish a Briefing Schedule.

**Each side should bring a draft proposed order to Court on the day of the hearing, as the ruling must be reduced to an order that day, absent leave of Court.** Cases may only be removed from the docket by the Court or by counsel for the moving party or the moving party. One Week Motions may be removed from the docket up until 4:00 p.m. on the Thursday preceding the hearing date, by contacting the Motions Clerk: (703) 246-4355. Two Week Motions may not be continued or removed from the docket after 4:00 p.m. on the Friday preceding the hearing date, without leave granted by the Judge assigned to hear the motion, for good cause shown.

If a hearing on any motion must take longer than thirty (30) minutes, the moving and responding parties, or their counsel, should appear before the Calendar Control Judge to request a hearing for a day other than a Friday. See, "Motions Requiring More than 30 Minutes" in "Friday Motions Docket Procedures" on the Court's website at https://www.fairfaxcounty.gov/circuit/sites/circuit/files/assets/documents/pdf/civil-friday-motions-docket-procedures.pdf

**MOTIONS TO RECONSIDER:** Do not set a Motion to Reconsider for a hearing. (See Friday Motions Docket Procedures, available from the Clerk's Office, the Bar Association office or on the Court's website at the address above.

**CERTIFICATIONS OF MOVING PARTY/COUNSEL:** Rule 4:15 (b) of the Rules of the Supreme Court of Virginia provides in pertinent part that "Absent leave of court, and except as provided in paragraph (c) of this Rule, reasonable notice shall be in writing and served at least seven days before the hearing. Counsel of record shall make a reasonable effort to confer before giving notice of a motion to resolve the subject of the motion **and to determine a mutually agreeable hearing date and time.**"

**CERTIFICATE OF SERVICE:** Pursuant to Rule 4:15 (e), a motions pleading shall be deemed served when it is actually received by, or in the office of, counsel of record through delivery, mailing, or facsimile transmission; not when it is mailed or sent.

## INFORMATION FOR MOVING PARTY

**CONCILIATION PROGRAM:** The Fairfax Circuit Court strongly encourages use of conciliation procedures to resolve motions. The Fairfax Bar Association's Conciliation Program conducts conciliation without charge by experienced litigators, who meet in person or by telephone with all interested parties. To request conciliation, fax a Request for Conciliation form to the Fax Hotline, (703) 273-1274; e-mail a request for conciliation to: ffxconciliation@aol.com; or leave a voice mail message at (703) 627-1228. You will be contacted before the hearing date by a representative of the Conciliation Program.

CCR-E-10 (July 2021)

## FAIRFAX CIRCUIT COURT

FILED

**CIVIL ACTION NO:** _____     **DOCKETED JUDGMENT NO.** 663772

2024 OCT 17 P 12: 24

## SUMMONS TO ANSWER
## DEBTOR INTERROGATORIES &/OR PRODUCTION OF DOCUMENTS

CHRISTOPHER J. FALCON
CLERK CIRCUIT COURT
FAIRFAX, VA

A judgment was rendered in the United States District Court for the Northern District of California
<div style="text-align:center">(Place of Judgment)</div>

on August 15, 2024 _____, in favor of (1) Neo4j, Inc. and (2) Neo4j Sweden AB _____
<div>(Date of Judgment)</div>

_____, Judgment Creditor(s) against

(1) Purethink, LLC, (2) iGov, Inc., and (3) John Mark Suhy _____, Judgment Debtor(s) for $ 597,000.00
with interest thereon from the 15th day of August , 2024 , until paid, and $ 0 costs and
attorney fees. *(Amounts must match the judgment exactly as it was docketed in this court)* THEREFORE, upon application
of said execution creditor, I COMMAND YOU TO SUMMON the said
John Mark Suhy, individually and as authorized agent for iGov, Inc. and Purethink, LLC
<div style="text-align:center">(Name & Address of person to be summoned)</div>

8814 Danewood Drive, Alexandria, VA 22308

Judgment Debtor(s) to appear before:

☒ **Fairfax Circuit Court 4110 Chain Bridge Road Fairfax Virginia 22030**

on Friday at 9:00 a.m. on January 17th, 2025 _____

☐ Commissioner in Chancery

Name & Address of Commissioner:

to appear at _____ a.m./p.m. on _____

To ☒ answer interrogatories ☒ and produce records in accordance with the attachment
as may be legally propounded by counsel for said execution creditor or by said Court in order to ascertain the
estate of the said Judgment Debtor(s) upon which the aforesaid execution is a lien, or any real estate to which
the said Judgment Debtor(s) is/are entitled. And have then and there this writ.

Failure to appear in response to this summons, or if you fail to answer questions put to you at the
hearing, or if you make answers deemed by the Court presiding to be evasive, You may be subject to arrest and
imprisonment until such time as you shall make proper answers.

Given under my hand, this _____ day of _____, _____.

_____
Counsel's Signature

A. Charles Dean
_____
Counsel's Printed Name & VSB #
VSB #74814
_____
Address:
3975 University Dr., Suite 410
_____
Fairfax, VA 22030
_____
Daytime Telephone Number

CHRISTOPHER J. FALCON, CLERK

By: _____
        Deputy Clerk

CCR G-101                                                                    January 2024

**VIRGINIA:**

## IN THE FAIRFAX COUNTY CIRCUIT COURT

FILED

2024 OCT 17 P 12: 24

GAYLE A. WILSON
CLERK, CIRCUIT COURT
FAIRFAX, VA

| | |
|---|---|
| NEO4J, Inc. et al. | ) |
|     Plaintiffs/Judgment Creditors, | ) |
| | ) |
| vs. | ) |
| | ) **CASE NO.** |
| PURETHINK, LLC, et al. | ) |
|     Defendants/Judgment Debtors | ) |

### CERTIFICATE

**State of Virginia**
**County of Fairfax, to wit:**

This day appeared before me Samira Romero, a Notary Public in and for said State and County, A. Charles Dean, attorney for Plaintiff, who gave oath before me in due form of law:

    1.  that he is the attorney for Plaintiff in the above-styled matter;

    2.  that Plaintiff has not proceeded against the execution debtor under Section 8.01-506 and 8.01-506.1 of the Virginia Code within the last six months preceding this Certificate.

    3.  that the above-styled judgment has not been fully satisfied;

    4.  that Interrogatories are necessary to obtain satisfaction of the above styled matter.

_____
A. Charles Dean

Subscribed and sworn to before me this __17th__ day of __October__, 2024.

_____
Notary Public

My Commission Expires: 7-31-27

Samira N. Romero
NOTARY PUBLIC
Commonwealth of Virginia
Reg. # 7502094
My Commission Expires
July 31, 2027

## INDIVIDUAL DOCUMENT LIST

The following described books of accounts and other writings are required to be produced by **JOHN MARK SUHY**, individually before the **FAIRFAX COUNTY CIRCUIT COURT** at the time and date shown on the Summons to Answer Debtor Interrogatories &/or Production of Documents. This request pertains to any and all documents and records in your possession, custody or control whether located in Virginia or elsewhere. Furthermore, this request relates to all accounts, property or other assets regardless of whether such assets are physically located in Virginia or elsewhere:

1.   All check books, checking account statements, check logs and registers;

2.   All certificates of deposit;

3.   All written records pertaining to any bank accounts maintained by you, whether individually or as the trustee of any trust, including ledgers and deposit statements;

4.   All written records pertaining to any bank account maintained for your benefit;

5.   All written evidences of any debt or other obligation owed or payable to you (e.g., promissory notes, checks, money orders, drafts, installment contracts, royalty agreements);

6.   All ATM, Cash or Money Cards;

7.   All deeds or other evidences of ownership regarding any real or personal property presently owned or possessed by you, whether located in Virginia or elsewhere;

8.   All deeds of trust executed by you in any capacity relative to any property;

9.   All bills of sale or certificates of title owned or possessed by you relative to any property;

10.   All deeds of trust naming you as trustee or beneficiary, relative to any property;

11.   All books of accounts receivable or accounts payable, owned, maintained or possessed by you;

12.   All stock certificates, bonds, securities, or other writing evidencing any ownership interest in a corporation, LLC, LLP or other business or corporate form, including but not limited to partnerships and joint ventures;

13.   All documents pertaining to any trusts or annuities;

14.   All evidences of any judgments rendered either in your favor or against you by any court, tribunal or administrative agency;

1 of 2

15. All evidences of any lawsuits or other legal proceedings in any court, tribunal or administrative agency in which you are or were a party;

16. All insurance policies, including but not limited to bonding agreements;

17. All tax returns filed by you (whether individually or jointly) in the past five (5) years in any jurisdiction;

18. All customer lists, including current contact information;

19. All income and expense statements;

20. All titles to vehicles, construction equipment, boats, airplanes or other personal property;

21. All licenses issued by any local, state or administrative agency;

22. All leases executed by you for any real or personal property;

23. All letters of credit in which you are either the beneficiary or the account party;

24. All trust documents in which you are named as the trustee or as a beneficiary;

25. Your social security card, driver's license and passport (whether issued by the United States or another country);

26. All savings bonds issued by any government entity; and

27. All documents pertaining to any safe deposit boxes, lockbox or other secure facility in which you store any financial or historical information;

28. Any document evidencing any cryptocurrency or digital currency holdings owned or controlled, directly or indirectly by you, including wallet addresses and transaction history for the past twelve (24) months.

## CORPORATE DOCUMENT LIST

The following described books of accounts and other documents from **IGOV, INC.** (the "Corporation") are required to be produced before the **FAIRFAX COUNTY CIRCUIT COURT** at the time and date shown on the Summons to Answer Debtor Interrogatories &/or Production of Documents:

1.     All federal, local and state tax returns filed by the Corporation in the past two (2) years;

2.     All Quickbooks records for the Corporation for the past two (2) years;

3.     All credit card statements, check books, check logs and check registers of the Corporation for the period of January 1, 2023 through the present;

4.     List of all assets of the Corporation;

5.     All certificates of deposit or other savings and investment instruments held by the Corporation;

6.     All passbooks or other written records pertaining to any savings and/or checking accounts maintained by the Corporation for the period of January 1, 2023 through the present;

7.     All written evidences of any debt or other obligation owed or payable to the Corporation (e.g., promissory notes, checks, money orders, drafts, installment contracts, payable to the Corporation or Other Companies);

8.     All deeds to any real or personal property presently owned or possessed by the Corporation;

9.     All leases to any real or personal property presently owned or possessed by the Corporation;

10.     All deeds of trust of mortgages executed by the Corporation relative to any property;

11.     All deeds of trust naming the Corporation as trustee(s) or beneficiary(ies), relative to any property;

12.     All bills of sale or certificates of title owned or possessed by the Corporation or relative to any property;

13.     All books of accounts receivable or accounts payable, owned, maintained or possessed by the Corporation;

14.     All stock certificates, bonds and securities owned by the Corporation;

15.     All stock certificates, bonds and securities issued by the Corporation;

16.     All documents pertaining to any trusts or annuities owned or controlled by the Corporation;

17.     All evidences of any judgments by the Corporation or against the Corporation or any lawsuits brought by the Corporation or brought against the Corporation;

18.     All evidences of the Corporation's ownership or interests in any partnership, limited partnership, joint venture or corporation;

19.     All insurance policies owned by or payable to the Corporation;

20.     All certificates of title and registration documents for all vehicles in which the Corporation has any ownership interest;

21.     All client lists of the Corporation, including lists with client names, addresses and telephone numbers;

22.     All lists of companies that do business with the Corporation; including lists with names, addresses and phone numbers of the contact person at these companies;

23.     The Articles of Incorporation, By-Laws, and Corporate Agreements for the Corporation, including any and all Amendments to each of these documents (or, if the Corporation is not organized as incorporated entities, provided equivalent records of LLC, LLP or other unincorporated entity, such as Articles of Organization or Operating Agreements);

24.     All Minutes of the Board of Directors and Shareholder meetings for the Corporation, from the first meeting until the present (or, if the Corporation is not organized as incorporated entities, provided equivalent records of LLC, LLP or other unincorporated entity, such as Minutes of the Board of Managers and Members meetings);

25.     Any and all income and expense statements of the Corporation from January 1, 2023 to the present;

26.     Any and all documents evidencing transfer of funds between the Corporation and any third parties in the last two years;

27.     Any and all bank statements for accounts in the name of the Corporation from January 1, 2023 to the present;

28.     List of creditors of the Corporation, including a summary of debts owed;

29.     Any and all payroll records of the Corporation from January 1, 2023 to the present;

30.     List of inventory of the Corporation;

31.     Copy of all credit applications submitted by the Corporation from January 1, 2023 to the present;

32.     All agreements, correspondence, records and writings by or between the Corporation and any third parties between January 1, 2023 and present;

33.     All licenses, correspondence and notices issued by or on behalf of any governmental agency, bureau or department to the Corporation;

34.     All letters of credit in which the Corporation is either the beneficiary or the account party.

35.     Any documents which evidence any cryptocurrency or digital currency holdings owned or controlled, directly or indirectly, by the Corporation, including wallet addresses and transaction history for the past twelve (24) months.

## CORPORATE DOCUMENT LIST

The following described books of accounts and other documents from **PURETHINK, LLC** (the "Corporation") are required to be produced before the **FAIRFAX COUNTY CIRCUIT COURT** at the time and date shown on the Summons to Answer Debtor Interrogatories &/or Production of Documents:

1.     All federal, local and state tax returns filed by the Corporation in the past two (2) years;

2.     All Quickbooks records for the Corporation for the past two (2) years;

3.     All credit card statements, check books, check logs and check registers of the Corporation for the period of January 1, 2023 through the present;

4.     List of all assets of the Corporation;

5.     All certificates of deposit or other savings and investment instruments held by the Corporation;

6.     All passbooks or other written records pertaining to any savings and/or checking accounts maintained by the Corporation for the period of January 1, 2023 through the present;

7.     All written evidences of any debt or other obligation owed or payable to the Corporation (e.g., promissory notes, checks, money orders, drafts, installment contracts, payable to the Corporation or Other Companies);

8.     All deeds to any real or personal property presently owned or possessed by the Corporation;

9.     All leases to any real or personal property presently owned or possessed by the Corporation;

10.     All deeds of trust of mortgages executed by the Corporation relative to any property;

11.     All deeds of trust naming the Corporation as trustee(s) or beneficiary(ies), relative to any property;

12.     All bills of sale or certificates of title owned or possessed by the Corporation or relative to any property;

13.     All books of accounts receivable or accounts payable, owned, maintained or possessed by the Corporation;

14.     All stock certificates, bonds and securities owned by the Corporation;

15.     All stock certificates, bonds and securities issued by the Corporation;

16.     All documents pertaining to any trusts or annuities owned or controlled by the Corporation;

17.     All evidences of any judgments by the Corporation or against the Corporation or any lawsuits brought by the Corporation or brought against the Corporation;

18.     All evidences of the Corporation's ownership or interests in any partnership, limited partnership, joint venture or corporation;

19.     All insurance policies owned by or payable to the Corporation;

20.     All certificates of title and registration documents for all vehicles in which the Corporation has any ownership interest;

21.     All client lists of the Corporation, including lists with client names, addresses and telephone numbers;

22.     All lists of companies that do business with the Corporation; including lists with names, addresses and phone numbers of the contact person at these companies;

23.     The Articles of Incorporation, By-Laws, and Corporate Agreements for the Corporation, including any and all Amendments to each of these documents (or, if the Corporation is not organized as incorporated entities, provided equivalent records of LLC, LLP or other unincorporated entity, such as Articles of Organization or Operating Agreements);

24.     All Minutes of the Board of Directors and Shareholder meetings for the Corporation, from the first meeting until the present (or, if the Corporation is not organized as incorporated entities, provided equivalent records of LLC, LLP or other unincorporated entity, such as Minutes of the Board of Managers and Members meetings);

25.     Any and all income and expense statements of the Corporation from January 1, 2023 to the present;

26.     Any and all documents evidencing transfer of funds between the Corporation and any third parties in the last two years;

27.     Any and all bank statements for accounts in the name of the Corporation from January 1, 2023 to the present;

28.     List of creditors of the Corporation, including a summary of debts owed;

29.     Any and all payroll records of the Corporation from January 1, 2023 to the present;

30.     List of inventory of the Corporation;

31.     Copy of all credit applications submitted by the Corporation from January 1, 2023 to the present;

32.     All agreements, correspondence, records and writings by or between the Corporation and any third parties between January 1, 2023 and present;

33.     All licenses, correspondence and notices issued by or on behalf of any governmental agency, bureau or department to the Corporation;

34.     All letters of credit in which the Corporation is either the beneficiary or the account party.

35.     Any documents which evidence any cryptocurrency or digital currency holdings owned or controlled, directly or indirectly, by the Corporation, including wallet addresses and transaction history for the past twelve (24) months.

## REQUEST FOR HEARING – EXEMPTION CLAIM

Commonwealth of Virginia     VA. CODE § 8.01-546.1       Case No. ...............................

..................................................... Fairfax County Circuit ....................................................... Court

...............................................   Neo4j, Inc., et. al   ............................................... v. ............................................... John Mark Suhy ...............................................

PLAINTIFF/JUDGMENT CREDITOR             DEFENDANT/JUDGMENT DEBTOR

I claim that the exemption(s) that are checked below apply in this case:

### MAJOR EXEMPTIONS UNDER FEDERAL AND STATE LAW

[There is no exemption solely because you are having difficulty paying your bills.]

|  |  |  |
|---|---|---|
| .............. | 1. | Social Security benefits and Supplemental Security Income (SSI) (42 U.S.C. § 407). |
| .............. | 2. | Veteran's benefits (38 U.S.C. § 5301). |
| .............. | 3. | Federal civil service retirement benefits (5 U.S.C. § 8346). |
| .............. | 4. | Annuities to survivors of federal judges (28 U.S.C. § 376(n)). |
| .............. | 5. | Longshore and Harbor Workers' Compensation Act (33 U.S.C. § 916). |
| .............. | 6. | Black lung benefits (30 U.S.C. §§ 931 (b)(2)(F) and 932(a)). |

Exemptions listed under 1 through 6 above may not be applicable in child support and alimony cases (42 U.S.C. § 659).

| .............. | 7. | Seaman's, master's or fisherman's wages, except for child or spousal support and maintenance (46 U.S.C.A. § 11109). |
|---|---|---|
| .............. | 8. | Unemployment compensation benefits (§ 60.2-600, Code of Virginia). |

This exemption may not be applicable in child support cases (§ 60.2-608, Code of Virginia).

| .............. | 9. | Portions or amounts of wages subject to garnishment (§ 34-29, Code of Virginia). |
|---|---|---|
| .............. | 10. | Public assistance payments (§ 63.2-506, Code of Virginia). |
| .............. | 11. | a. Homestead – $5,000, or $10,000 if the householder is 65 years of age or older, worth of cash, personal articles or real property and, in addition, real or personal property used as the principal residence of the householder or the householder's dependents not exceeding $50,000 in value (§§ 34-4, Code of Virginia) [Attach list of items claimed]. |
|  |  | b. Property of disabled veterans – additional $10,000 worth of cash, personal articles or real property (§ 34-4.1, Code of Virginia) [Attach list of items claimed]. |

Exemptions listed under 11 may not be claimed in certain cases such as payment of child or spousal support, or the purchase of the article which is being taken or levied on (§ 34-5, Code of Virginia).

| .............. | 12. | Certain specific articles — see description on reverse side (§§ 34-26 and 34-27, Code of Virginia) [Attach list of articles claimed]. |
|---|---|---|
| .............. | 13. | Workers' Compensation (§ 65.2-531, Code of Virginia). |
| .............. | 14. | Growing crops (§ 8.01-489, Code of Virginia). |
| .............. | 15. | Benefits from group life insurance policies (§ 38.2-3339, Code of Virginia). |
| .............. | 16. | Proceeds from industrial sick benefits insurance (§ 38.2-3549, Code of Virginia). |
| .............. | 17. | Assignments of certain salary and wages (§ 8.01-525.10, Code of Virginia). |
| .............. | 18. | Pre-need funeral contracts (§ 54.1-2823, Code of Virginia). |
| .............. | 19. | Benefits for victims of crime (§ 19.2-368.12, Code of Virginia). |
| .............. | 20. | Certain retirement benefits (§ 34-34, Code of Virginia). |
| .............. | 21. | Other (describe exemption): ....................................................................................... |

I request a court hearing to decide the validity of my claim. Notice of the hearing should be given to me at:

...............................................................................................................................................

ADDRESS                               TELEPHONE NUMBER

The statements made in this request are true to the best of my knowledge and belief.

..........................................             _____

DATE                              SIGNATURE OF DEFENDANT/JUDGMENT DEBTOR

FORM DC-407 REVERSE 07/24

# NOTICE TO DEBTOR — HOW TO CLAIM EXEMPTIONS

The attached paper is a legal process which has been issued by the court clerk on request of a creditor who holds a judgment against you or claims that you owe him money or property. This allows the Sheriff either to take or to "levy upon" (make a list of) certain property in your possession for future sale.

The law provides that some types of property and funds (including some wages) cannot be taken by legal process. Such property is exempt. The Sheriff may not take or "levy on" certain property (§§ 34-26 and 34-27 of the Code of Virginia). Some of these items are:

The family Bible; wedding and engagement rings; family portraits and family heirlooms not to exceed $5,000 in value; a lot in a burial ground; all wearing apparel of the householder not to exceed $1,000 in value; all household furnishings including, but not limited to, beds, dressers, floor coverings, stoves, refrigerators, washing machines, dryers, sewing machines, pots and pans for cooking, plates, and eating utensils, not to exceed $5,000 in value; firearms, not to exceed a total of $3,000 in value; all animals owned as pets, such as cats, dogs, birds, squirrels, rabbits and other pets not kept or raised for sale or profit; medically prescribed health aids; tools, books, instruments, implements, equipment and machines, including motor vehicles, vessels, and aircraft, which are necessary for use in the course of the householder's occupation or trade not exceeding $10,000 in value, except that a perfected security interest on such personal property shall have priority over the claim of exemption under this part ("occupation," includes enrollment in any public or private elementary, secondary, or vocational school or institution of higher education); motor vehicles, not held as exempt as necessary for use in the course of the householder's occupation or trade owned by the householder, not to exceed a total of $10,000 in value, except that a perfected security interest on a motor vehicle shall have priority over the claim of exemption under this part; those portions of a tax refund or government payment attributable to the Child Tax Credit or Additional Child Tax Credit pursuant to § 24 of the Internal Revenue Code of 1986, as amended, or the Earned Income Credit pursuant to § 32 of the Internal Revenue Code of 1986, as amended; unpaid spousal or child support.

The value of an item claimed as exempt shall be the fair market value of the item less any prior security interest. The monetary limits, where provided, are applicable to the total value of property claimed as exempt.

Exemptions which may apply are listed on the other side of this form and the items listed above can be claimed under No. 12. Please read these carefully.

If you believe that any of your property that the Sheriff wants to take or "levy upon" is exempt, you should tell the Sheriff the property that you believe is exempt and which exemption applies. You should also identify any property which belongs to someone else and who is the owner of such property. A false statement may be punished as contempt under §18.2-456(5) of the Code of Virginia.

If the Sheriff "levies on" or takes property that you believe is exempt, you should promptly (i) fill out the REQUEST FOR HEARING—EXEMPTION CLAIM form and (ii) deliver or mail the form to the clerk's office of this court. If the attached paper is an Attachment Summons, you have the right to a prompt hearing within ten business days from the date that you file your request for a hearing with the court. In all other cases, you must *ask* for a prompt hearing before the "Return Date" on the attached papers. If the attached paper is a Writ of Fieri Facias, the property may be sold by the Sheriff before the "Return Date;" therefore, if you wish to claim an exemption, you should ask immediately for a prompt hearing on your claim. At a prompt hearing, the only thing that you may do is explain why your property is exempt. If you do not come to court on the date and at the time set and prove that your property is exempt, you may lose some of your rights regarding your property.

If the Sheriff takes your property, you may post a bond to recover your property; however, once you post a bond, the creditor may post a bond to have the property kept from you. If you retain possession of any property "levied on," *it is your responsibility not* to sell, damage, or otherwise dispose of such property "levied on" until the proceedings are finished.

If the attached paper is an Attachment Summons, a Warrant of Distress, an Order of Seizure in Distress, a Warrant in Detinue or an Order for Detinue Seizure, no judgment has been entered against you yet. On the "Return Date" shown on the attached paper, your case will be tried or scheduled for trial. At that time, you may tell the judge any defenses you may have to the creditor's claims.

It may be helpful to you to *promptly* seek the advice of an attorney regarding this and other exemption rights.

## THE REQUEST FOR HEARING—EXEMPTION CLAIM FORM IS PRINTED ON THE OTHER SIDE.

FORM DC-407 FRONT 07/24

# REQUEST FOR HEARING – EXEMPTION CLAIM

Case No. ...................................

Commonwealth of Virginia        VA. CODE § 8.01-546.1

................................................ Fairfax County Circuit .................................................................... Court

...................................................... v. ......................................................................

    Neo4j, Inc., et. al                                          Purethink, LLC
    PLAINTIFF/JUDGMENT CREDITOR                      DEFENDANT/JUDGMENT DEBTOR

I claim that the exemption(s) that are checked below apply in this case:

## MAJOR EXEMPTIONS UNDER FEDERAL AND STATE LAW

[There is no exemption solely because you are having difficulty paying your bills.]

............    1.   Social Security benefits and Supplemental Security Income (SSI) (42 U.S.C. § 407).
............    2.   Veteran's benefits (38 U.S.C. § 5301).
............    3.   Federal civil service retirement benefits (5 U.S.C. § 8346).
............    4.   Annuities to survivors of federal judges (28 U.S.C. § 376(n)).
............    5.   Longshore and Harbor Workers' Compensation Act (33 U.S.C. § 916).
............    6.   Black lung benefits (30 U.S.C. §§ 931 (b)(2)(F) and 932(a)).

Exemptions listed under 1 through 6 above may not be applicable in child support and alimony cases (42 U.S.C. § 659).

............    7.   Seaman's, master's or fisherman's wages, except for child or spousal support and maintenance (46 U.S.C.A.
                     § 11109).
............    8.   Unemployment compensation benefits (§ 60.2-600, Code of Virginia).

This exemption may not be applicable in child support cases (§ 60.2-608, Code of Virginia).

............    9.   Portions or amounts of wages subject to garnishment (§ 34-29, Code of Virginia).
............   10.   Public assistance payments (§ 63.2-506, Code of Virginia).
............   11.   a. Homestead – $5,000, or $10,000 if the householder is 65 years of age or older, worth of cash, personal
                        articles or real property and, in addition, real or personal property used as the principal residence of the
                        householder or the householder's dependents not exceeding $50,000 in value (§§ 34-4, Code of Virginia)
                        [Attach list of items claimed].
                     b. Property of disabled veterans – additional $10,000 worth of cash, personal articles or real property
                        (§ 34-4.1, Code of Virginia) [Attach list of items claimed].

Exemptions listed under 11 may not be claimed in certain cases such as payment of child or spousal support, or the purchase of the
article which is being taken or levied on (§ 34-5, Code of Virginia).

............   12.   Certain specific articles — see description on reverse side (§§ 34-26 and 34-27, Code of Virginia) [Attach list
                     of articles claimed].
............   13.   Workers' Compensation (§ 65.2-531, Code of Virginia).
............   14.   Growing crops (§ 8.01-489, Code of Virginia).
............   15.   Benefits from group life insurance policies (§ 38.2-3339, Code of Virginia).
............   16.   Proceeds from industrial sick benefits insurance (§ 38.2-3549, Code of Virginia).
............   17.   Assignments of certain salary and wages (§ 8.01-525.10, Code of Virginia).
............   18.   Pre-need funeral contracts (§ 54.1-2823, Code of Virginia).
............   19.   Benefits for victims of crime (§ 19.2-368.12, Code of Virginia).
............   20.   Certain retirement benefits (§ 34-34, Code of Virginia).
............   21.   Other (describe exemption): ........................................................................

I request a court hearing to decide the validity of my claim. Notice of the hearing should be given to me at:

.............................................................................................................
                    ADDRESS                                          TELEPHONE NUMBER

The statements made in this request are true to the best of my knowledge and belief.

.............................................                    _____
              DATE                                          SIGNATURE OF DEFENDANT/JUDGMENT DEBTOR

FORM DC-407 REVERSE 07/24

# NOTICE TO DEBTOR — HOW TO CLAIM EXEMPTIONS

The attached paper is a legal process which has been issued by the court clerk on request of a creditor who holds a judgment against you or claims that you owe him money or property. This allows the Sheriff either to take or to "levy upon" (make a list of) certain property in your possession for future sale.

The law provides that some types of property and funds (including some wages) cannot be taken by legal process. Such property is exempt. The Sheriff may not take or "levy on" certain property (§§ 34-26 and 34-27 of the Code of Virginia). Some of these items are:

The family Bible; wedding and engagement rings; family portraits and family heirlooms not to exceed $5,000 in value; a lot in a burial ground; all wearing apparel of the householder not to exceed $1,000 in value; all household furnishings including, but not limited to, beds, dressers, floor coverings, stoves, refrigerators, washing machines, dryers, sewing machines, pots and pans for cooking, plates, and eating utensils, not to exceed $5,000 in value; firearms, not to exceed a total of $3,000 in value; all animals owned as pets, such as cats, dogs, birds, squirrels, rabbits and other pets not kept or raised for sale or profit; medically prescribed health aids; tools, books, instruments, implements, equipment and machines, including motor vehicles, vessels, and aircraft, which are necessary for use in the course of the householder's occupation or trade not exceeding $10,000 in value, except that a perfected security interest on such personal property shall have priority over the claim of exemption under this part ("occupation," includes enrollment in any public or private elementary, secondary, or vocational school or institution of higher education); motor vehicles, not held as exempt as necessary for use in the course of the householder's occupation or trade owned by the householder, not to exceed a total of $10,000 in value, except that a perfected security interest on a motor vehicle shall have priority over the claim of exemption under this part; those portions of a tax refund or government payment attributable to the Child Tax Credit or Additional Child Tax Credit pursuant to § 24 of the Internal Revenue Code of 1986, as amended, or the Earned Income Credit pursuant to § 32 of the Internal Revenue Code of 1986, as amended; unpaid spousal or child support.

The value of an item claimed as exempt shall be the fair market value of the item less any prior security interest. The monetary limits, where provided, are applicable to the total value of property claimed as exempt.

Exemptions which may apply are listed on the other side of this form and the items listed above can be claimed under No. 12. Please read these carefully.

If you believe that any of your property that the Sheriff wants to take or "levy upon" is exempt, you should tell the Sheriff the property that you believe is exempt and which exemption applies. You should also identify any property which belongs to someone else and who is the owner of such property. A false statement may be punished as contempt under §18.2-456(5) of the Code of Virginia.

If the Sheriff "levies on" or takes property that you believe is exempt, you should promptly (i) fill out the REQUEST FOR HEARING—EXEMPTION CLAIM form and (ii) deliver or mail the form to the clerk's office of this court. If the attached paper is an Attachment Summons, you have the right to a prompt hearing within ten business days from the date that you file your request for a hearing with the court. In all other cases, you must *ask* for a prompt hearing before the "Return Date" on the attached papers. If the attached paper is a Writ of Fieri Facias, the property may be sold by the Sheriff before the "Return Date;" therefore, if you wish to claim an exemption, you should ask immediately for a prompt hearing on your claim. At a prompt hearing, the only thing that you may do is explain why your property is exempt. If you do not come to court on the date and at the time set and prove that your property is exempt, you may lose some of your rights regarding your property.

If the Sheriff takes your property, you may post a bond to recover your property; however, once you post a bond, the creditor may post a bond to have the property kept from you. If you retain possession of any property "levied on," *it is your responsibility not* to sell, damage, or otherwise dispose of such property "levied on" until the proceedings are finished.

If the attached paper is an Attachment Summons, a Warrant of Distress, an Order of Seizure in Distress, a Warrant in Detinue or an Order for Detinue Seizure, no judgment has been entered against you yet. On the "Return Date" shown on the attached paper, your case will be tried or scheduled for trial. At that time, you may tell the judge any defenses you may have to the creditor's claims.

It may be helpful to you to *promptly* seek the advice of an attorney regarding this and other exemption rights.

**THE REQUEST FOR HEARING—EXEMPTION CLAIM FORM IS PRINTED ON THE OTHER SIDE.**

FORM DC-407 FRONT 07/24

**REQUEST FOR HEARING – EXEMPTION CLAIM**

Commonwealth of Virginia       VA. CODE § 8.01-546.1

Case No. ..............................

.............................................................. Fairfax County Circuit ................................................................. Court

Neo4j, Inc., et. al                          v.                    iGov, Inc.
............................................                  ..................................................
PLAINTIFF/JUDGMENT CREDITOR                        DEFENDANT/JUDGMENT DEBTOR

I claim that the exemption(s) that are checked below apply in this case:

## MAJOR EXEMPTIONS UNDER FEDERAL AND STATE LAW
[There is no exemption solely because you are having difficulty paying your bills.]

|  |  |  |
|---|---|---|
| ............... | 1. | Social Security benefits and Supplemental Security Income (SSI) (42 U.S.C. § 407). |
| ............... | 2. | Veteran's benefits (38 U.S.C. § 5301). |
| ............... | 3. | Federal civil service retirement benefits (5 U.S.C. § 8346). |
| ............... | 4. | Annuities to survivors of federal judges (28 U.S.C. § 376(n)). |
| ............... | 5. | Longshore and Harbor Workers' Compensation Act (33 U.S.C. § 916). |
| ............... | 6. | Black lung benefits (30 U.S.C. §§ 931 (b)(2)(F) and 932(a)). |

Exemptions listed under 1 through 6 above may not be applicable in child support and alimony cases (42 U.S.C. § 659).

| ............... | 7. | Seaman's, master's or fisherman's wages, except for child or spousal support and maintenance (46 U.S.C.A. § 11109). |
| ............... | 8. | Unemployment compensation benefits (§ 60.2-600, Code of Virginia). |

This exemption may not be applicable in child support cases (§ 60.2-608, Code of Virginia).

| ............... | 9. | Portions or amounts of wages subject to garnishment (§ 34-29, Code of Virginia). |
| ............... | 10. | Public assistance payments (§ 63.2-506, Code of Virginia). |
| ............... | 11. | a. Homestead – $5,000, or $10,000 if the householder is 65 years of age or older, worth of cash, personal articles or real property and, in addition, real or personal property used as the principal residence of the householder or the householder's dependents not exceeding $50,000 in value (§§ 34-4, Code of Virginia) [Attach list of items claimed]. |
|  |  | b. Property of disabled veterans – additional $10,000 worth of cash, personal articles or real property (§ 34-4.1, Code of Virginia) [Attach list of items claimed]. |

Exemptions listed under 11 may not be claimed in certain cases such as payment of child or spousal support, or the purchase of the article which is being taken or levied on (§ 34-5, Code of Virginia).

| ............... | 12. | Certain specific articles — see description on reverse side (§§ 34-26 and 34-27, Code of Virginia) [Attach list of articles claimed]. |
| ............... | 13. | Workers' Compensation (§ 65.2-531, Code of Virginia). |
| ............... | 14. | Growing crops (§ 8.01-489, Code of Virginia). |
| ............... | 15. | Benefits from group life insurance policies (§ 38.2-3339, Code of Virginia). |
| ............... | 16. | Proceeds from industrial sick benefits insurance (§ 38.2-3549, Code of Virginia). |
| ............... | 17. | Assignments of certain salary and wages (§ 8.01-525.10, Code of Virginia). |
| ............... | 18. | Pre-need funeral contracts (§ 54.1-2823, Code of Virginia). |
| ............... | 19. | Benefits for victims of crime (§ 19.2-368.12, Code of Virginia). |
| ............... | 20. | Certain retirement benefits (§ 34-34, Code of Virginia). |
| ............... | 21. | Other (describe exemption): ..................................................................................... |

I request a court hearing to decide the validity of my claim. Notice of the hearing should be given to me at:

..............................................................................................................................
ADDRESS                                                         TELEPHONE NUMBER

The statements made in this request are true to the best of my knowledge and belief.

..................................................           ....................................................
DATE                                                         SIGNATURE OF DEFENDANT/JUDGMENT DEBTOR

FORM DC-407 REVERSE 07/24

# NOTICE TO DEBTOR — HOW TO CLAIM EXEMPTIONS

The attached paper is a legal process which has been issued by the court clerk on request of a creditor who holds a judgment against you or claims that you owe him money or property. This allows the Sheriff either to take or to "levy upon" (make a list of) certain property in your possession for future sale.

The law provides that some types of property and funds (including some wages) cannot be taken by legal process. Such property is exempt. The Sheriff may not take or "levy on" certain property (§§ 34-26 and 34-27 of the Code of Virginia). Some of these items are:

The family Bible; wedding and engagement rings; family portraits and family heirlooms not to exceed $5,000 in value; a lot in a burial ground; all wearing apparel of the householder not to exceed $1,000 in value; all household furnishings including, but not limited to, beds, dressers, floor coverings, stoves, refrigerators, washing machines, dryers, sewing machines, pots and pans for cooking, plates, and eating utensils, not to exceed $5,000 in value; firearms, not to exceed a total of $3,000 in value; all animals owned as pets, such as cats, dogs, birds, squirrels, rabbits and other pets not kept or raised for sale or profit; medically prescribed health aids; tools, books, instruments, implements, equipment and machines, including motor vehicles, vessels, and aircraft, which are necessary for use in the course of the householder's occupation or trade not exceeding $10,000 in value, except that a perfected security interest on such personal property shall have priority over the claim of exemption under this part ("occupation," includes enrollment in any public or private elementary, secondary, or vocational school or institution of higher education); motor vehicles, not held as exempt as necessary for use in the course of the householder's occupation or trade owned by the householder, not to exceed a total of $10,000 in value, except that a perfected security interest on a motor vehicle shall have priority over the claim of exemption under this part; those portions of a tax refund or government payment attributable to the Child Tax Credit or Additional Child Tax Credit pursuant to § 24 of the Internal Revenue Code of 1986, as amended, or the Earned Income Credit pursuant to § 32 of the Internal Revenue Code of 1986, as amended; unpaid spousal or child support.

The value of an item claimed as exempt shall be the fair market value of the item less any prior security interest. The monetary limits, where provided, are applicable to the total value of property claimed as exempt.

Exemptions which may apply are listed on the other side of this form and the items listed above can be claimed under No. 12. Please read these carefully.

If you believe that any of your property that the Sheriff wants to take or "levy upon" is exempt, you should tell the Sheriff the property that you believe is exempt and which exemption applies. You should also identify any property which belongs to someone else and who is the owner of such property. A false statement may be punished as contempt under §18.2-456(5) of the Code of Virginia.

If the Sheriff "levies on" or takes property that you believe is exempt, you should promptly (i) fill out the REQUEST FOR HEARING—EXEMPTION CLAIM form and (ii) deliver or mail the form to the clerk's office of this court. If the attached paper is an Attachment Summons, you have the right to a prompt hearing within ten business days from the date that you file your request for a hearing with the court. In all other cases, you must *ask* for a prompt hearing before the "Return Date" on the attached papers. If the attached paper is a Writ of Fieri Facias, the property may be sold by the Sheriff before the "Return Date;" therefore, if you wish to claim an exemption, you should ask immediately for a prompt hearing on your claim. At a prompt hearing, the only thing that you may do is explain why your property is exempt. If you do not come to court on the date and at the time set and prove that your property is exempt, you may lose some of your rights regarding your property.

If the Sheriff takes your property, you may post a bond to recover your property; however, once you post a bond, the creditor may post a bond to have the property kept from you. If you retain possession of any property "levied on," *it is your responsibility not* to sell, damage, or otherwise dispose of such property "levied on" until the proceedings are finished.

If the attached paper is an Attachment Summons, a Warrant of Distress, an Order of Seizure in Distress, a Warrant in Detinue or an Order for Detinue Seizure, no judgment has been entered against you yet. On the "Return Date" shown on the attached paper, your case will be tried or scheduled for trial. At that time, you may tell the judge any defenses you may have to the creditor's claims.

It may be helpful to you to *promptly* seek the advice of an attorney regarding this and other exemption rights.

**THE REQUEST FOR HEARING—EXEMPTION CLAIM FORM IS PRINTED ON THE OTHER SIDE.**

FORM DC-407 FRONT 07/24

# EXHIBIT 2

**V I R G I N I A :**     **IN THE CIRCUIT COURT OF FAIRFAX COUNTY**

Neo4j Inc

_____
<div align="center">Plaintiff</div>
<div align="center">vs.</div>

Civil Action No.   CL 2024-0014686

John Mark Suhy
_____

Previous Chancery No.   CH _____

<div align="center">Defendant</div>

**SERVE:**

<div align="center">

### FRIDAY MOTIONS DAY – PRAECIPE/NOTICE

</div>

**Moving Party:**  ☐ Plaintiff   ☒ Defendant   ☐ Other

**Title of Motion:** MOTION TO STAY ENFORCEMENT OF JUDGMENT WITHOUT A BOND   ☒ Attached   ☐ Previously Filed

**DATE TO BE HEARD:** 11/08/2024   **Time Estimate** (combined no more than 30 minutes): 15 minutes

**Time to be Heard:**   ☐ 9:00 a.m. **with** a Judge

☒ 10:00 a.m. (Civil Action Cases)  Does this motion require 2 weeks notice? ☒ Yes  ☐ No

☐ 11:30 a.m. (DOMESTIC/Family Law Cases) Does this motion require 2 weeks notice? ☐ Yes  ☐ No

**Case continued from:** _____   continued to: _____
<div align="center">(Date)                                           (Date)</div>

**Judge** _____ **must** hear this motion because (check one reason below):

☐ The matter is on the docket for presentation of an order reflecting a specific ruling previously made by that Judge.
☐ This Judge has been assigned to this entire case by the Chief Judge; or,
☐ The Judge has advised counsel that all future motions, or this specific motion, should be placed on this Judge's Docket; or,
☐ This matter concerns a demurrer filed in a case where that Judge previously granted a demurrer in favor of demurrant.

**PRAECIPE** by:   John Mark Suhy          (Pro Se)
<div align="center">Printed Attorney Name/ Moving Party Name                    Firm Name</div>

8814 Danewood Dr , Alexandria, VA 22308
<div align="center">Address</div>

703-862-7780                                        jmsuhy@gmail.com
<div align="center">Tel. No.          Fax No.          VSB No.          E-Mail Address</div>

<div align="center">

**CERTIFICATIONS**

</div>

I certify that I have in good faith conferred or attempted to confer with other affected parties in an effort to resolve the subject of the motion without Court action, pursuant to Rule 4:15(b) of the Rules of the Supreme Court of Virginia; and, I have read, _and_ complied with, each of the Instructions for Moving Party on the reverse side of this form.

<div align="right">_____
Moving Party/Counsel of Record</div>

<div align="center">

**CERTIFICATE OF SERVICE**

</div>

I certify on the 23rd day of October , 2024 , a true copy of the foregoing Praecipe was

☒ mailed ☐ faxed ☐ delivered to all counsel of record pursuant to the provisions of Rule 4:15(e) of the Rules of the Supreme Court of Virginia.

<div align="right">_____
Moving Party/Counsel of Record</div>

Clear

CCR-E-10 (July 2021)

1

2 IN THE CIRCUIT COURT OF FAIRFAX COUNTY, VIRGINIA

3

4 NEO4J, INC.                                    Case No.: CL-2024-0014686
  Plaintiff,

5 v.
  JOHN MARK SUHY

6 Defendant.

7

8 **<u>MOTION TO STAY ENFORCEMENT OF JUDGMENT WITHOUT A BOND</u>**

9 Comes now, John Mark Suhy, the Defendant, and moves this Honorable

10 Court for an Order staying enforcement of the judgment entered against him,

11 pending the outcome of an appeal to the United States Court of Appeals for

12 the Ninth Circuit. In support of this Motion, the Defendant states the

13 following:

14

15

16 **I. INTRODUCTION**

17 A judgment was entered against the Defendant, along with iGov Inc and

18 Purethink LLC, in the United States District Court for the Northern District

19 of California, Case No. 5:18-cv-07182-EJD, as documented in Document 251,

20 filed on August 15, 2024. The judgment holds the parties jointly and severally

21 liable, and it has been domesticated in the Fairfax County Circuit Court. (See

22 Exhibit C).

23

24

25 Defendant has filed an appeal in the United States Court of Appeals for the

1

Ninth Circuit, Neo4j, Inc., et al. v. Suhy, et al., Case No. 24-5538, where it is currently pending. (See Exhibit D).

This case exemplifies how Neo4j Inc., a multi-billion-dollar corporation, is using its vast resources to harass and intimidate a single open-source advocate. Neo4j, which initially gained prominence through the open-source community, shifted its strategy to maximize profits by imposing restrictive licensing terms, including the unauthorized addition of the "Commons Clause" to the Free Software Foundation's (FSF) GPLv3 license. The specific license in this case, the AGPLv3, is a member of the GPLv3 family with an additional requirement for network access.

The Free Software Foundation's GPLv3 License is central to the dispute.

As an open-source advocate and developer, Defendant created the competing free and open-source forks of Neo4j's software called ONgDB and DozerDB in response to these actions. (See Declaration #2 of John Mark Suhy, attached as Exhibit E).

These free and open source forks have gained significant traction, and according to Neo4j's own admissions in court filings, ONgDB alone has cost the company millions of dollars.

This lawsuit is not about licensing but about Neo4j trying to eliminate competition by exerting financial and legal pressure. Neo4j is exerting

significant legal and financial pressure on Defendant, which could lead to bankruptcy and limit Defendant's ability to support these open-source projects, which are gaining traction within a large and growing community as alternatives to Neo4j's software and challenge their business model.

The damages in this case stem from Defendant's modification of AGPL license files, which are copyrighted to the Free Software Foundation (FSF), not Neo4j Inc., and include the FSF's preamble. The AGPL makes it clear that the FSF holds the 2007 copyright, stating that "[e]veryone is permitted to copy and distribute verbatim copies of this license document, but changing it is not allowed." (See Exhibit F, attached). Defendant adhered to these instructions by making the license verbatim.

The court concluded that Defendant's removal of the Commons Clause and labeling the software as "open source" influenced the Maryland Procurement Office (MPO) to adopt ONgDB as a free alternative.

Removal of the Commons Clause: The court found that Defendant removed the Commons Clause from the ONgDB fork of Neo4j EE v3.4 and replaced it with the vanilla AGPL license, facilitating the MPO's adoption of ONgDB. (Findings of Fact and Conclusions of Law, p. 5, lines 13–21.) Although this did not change the software's free nature for non-commercial use, it was central to the damages.

3

MPO's Adoption of ONgDB: The court determined that the removal of the Commons Clause, combined with the availability of ONgDB as a free and unrestricted alternative, directly influenced the MPO's decision to adopt ONgDB instead of purchasing a commercial Neo4j EE license. (Findings of Fact and Conclusions of Law, p. 15, lines 9–28; p. 16, lines 1–16.)

False Advertising and DMCA Violations: The court concluded that Defendant's promotion of ONgDB as a "drop-in replacement" and "open source" after removing the Commons Clause constituted false advertising and DMCA violations, further contributing to the MPO's decision. (Findings of Fact and Conclusions of Law, p. 5, lines 13–21; p. 6, lines 14–24.)

Lost Licensing Revenue: Damages were calculated based on Neo4j's lost opportunity to license the commercial version of Neo4j EE to the MPO, which used ONgDB for free. (Findings of Fact and Conclusions of Law, p. 16, lines 1–16; p. 19, lines 9–20.)

Right before trial, the Free Software Foundation (FSF) sent Neo4j a cease-and-desist letter demanding the removal of the Commons Clause. (See Exhibit A).

Following the Free Software Foundation's cease-and-desist letter, Neo4j, Inc. complied by removing all infringing tags, branches, files, and source code containing the Commons Clause from their public repository. This validated Defendant's actions, which are the basis for the damages in this case. (See Declaration of John Mark Suhy, #3 Exhibit E).

Despite this, Neo4j continues to pursue aggressive legal actions against Defendant, including issuing a garnishment of $628,335.50 on October 17, 2024, against Greystones Consulting Group LLC as garnishee. (See Neo4j, Inc. v. John Mark Suhy, Case No. CL-2024-0014686). This amounts to legal bullying.

If the garnishment proceeds, Defendant will be forced into bankruptcy, harming him, his family, and other creditors, including Neo4j. (See Declaration of John Mark Suhy, #4 Exhibit E).

## II. RELIEF REQUESTED

Requiring the Defendant to post a bond would likely result in bankruptcy which threatens the loss of his security clearance, causing undue financial harm to both the Defendant and his family. Given these extraordinary circumstances, Defendant respectfully requests that this Court intervene to stay the judgment's enforcement without bond pending the resolution of Defendant's appeal before the Ninth Circuit.

Neo4j's actions are not about recovering damages but silencing a critic and competitor. The Court's involvement is crucial to ensure justice.

This case raises important issues for the open-source software community, and a stay without bond is crucial to prevent irreparable harm to the Defendant while these issues are addressed on appeal.

For these reasons, and as further detailed in the accompanying Memorandum of Points and Authorities, Defendant respectfully requests this Court to stay all collection efforts and enforcement of the judgment without requiring the posting of a bond due to financial hardship, the public importance of the appeal, and the disproportionate impact enforcement would have on Defendant and his family, as compared to the minimal impact on Plaintiff.

Respectfully submitted
John Mark Suhy
Pro Se
Dated: October 23rd, 2024

By: _____ /s/ John Mark Suhy

8814 Danewood Dr
Alexandria, VA 22308

Tel: (703) 862-7780
Email: jmsuhy@gmail.com

6

1

IN THE CIRCUIT COURT OF FAIRFAX COUNTY, VIRGINIA

2

3  NEO4J, INC.                              Case No.: CL-2024-0014686
   Plaintiff,
4  v.
   JOHN MARK SUHY
5  Defendant.

6

7  **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
   MOTION TO STAY ENFORCEMENT OF JUDGMENT WITHOUT A BOND**

8

9  **I. INTRODUCTION**

10      This memorandum is submitted in support of Defendant John Mark Suhy's

11  Motion to Stay Enforcement of Judgment Without a Bond. Defendant

12  respectfully requests that this Court stay the enforcement of the judgment

13  entered against him, pending the outcome of his appeal to the United States

14  Court of Appeals for the Ninth Circuit.

15      The enforcement of this judgment would cause undue financial hardship on

16  the Defendant, possibly leading to bankruptcy. Given the substantial public

17  interest in the legal issues surrounding the case, particularly regarding open-

18  source licensing, and the Defendant's inability to post a bond without

19  suffering significant harm, this Court should exercise its equitable powers to

20  grant a stay without bond.

21

22  **II. LEGAL ARGUMENTS**

23      **1. Equitable Grounds for Stay Without Bond**

24

25

1

The Court has the equitable power to stay the enforcement of a judgment without requiring the posting of a bond when circumstances justify such relief. Courts have discretion to waive bond requirements when the financial burden on the defendant is disproportionate to the potential harm to the plaintiff. Numerous federal courts have recognized this discretion, allowing stays without bond when imposing a bond would cause undue hardship. See In re Nassau County Strip Search Cases, 783 F.3d 414, 418 (2d Cir. 2015); Dillon v. City of Chicago, 866 F.2d 902, 904 (7th Cir. 1988); Fed. Prescription Serv. Inc. v. Am. Pharm. Ass'n, 636 F.2d 755, 759 (D.C. Cir. 1980).

In this case, the Defendant faces significant financial hardship and would likely be forced into bankruptcy if required to post a bond. Additionally, the Free Software Foundation (FSF), the copyright holder of the GPLv3 license, has validated the Defendant's removal of the Commons Clause, reinforcing the merits of his appeal. Thus, equity supports granting a stay without a bond. (See Declaration of John Mark Suhy, #3 and #6 Exhibit E)

## 2. Financial Hardship and Potential Bankruptcy

Enforcement of the judgment would cause the Defendant to suffer irreparable financial harm, including bankruptcy. The Defendant is unable to post a bond due to his current financial situation and the imminent threat of garnishment, which would result in the loss of critical financial resources, including his government security clearance.

Under Virginia Code § 8.01-676.1(J), the Court has discretion to waive the bond requirement in cases of financial hardship. Federal courts have similarly waived bond requirements when defendants have demonstrated limited financial resources. See Federal Prescription Serv., Inc. v. Am. Pharm. Ass'n, 636 F.2d 755, 759 (D.C. Cir. 1980). In this case, the Defendant's current financial hardship, combined with the potential loss of his security clearance and livelihood, provides ample justification for waiving the bond requirement.

## 3. Merits of the Appeal

The appeal raises critical issues regarding the interpretation and application of the GPLv3 license, which underpins much of the open-source software ecosystem. The Free Software Foundation has confirmed that Neo4j's addition of the Commons Clause violated the terms of the GPLv3 license, and the Defendant's removal of the clause was justified to maintain the integrity of the license. This appeal, therefore, addresses significant legal issues that affect not only the Defendant but also the broader open-source community. The district court's findings regarding the removal of the Commons Clause and its impact on the Maryland Procurement Office's (MPO) decision to use ONgDB are based on factual errors, particularly the assumption that the MPO would have purchased a commercial Neo4j EE license had the Commons Clause remained. This assumption overlooks the fact that the software was available for free use regardless of the clause, and the MPO

chose ONgDB primarily due to pricing concerns. These factual errors further support the likelihood of success on appeal.

## 4. Legal Bullying and Disproportionate Impact

Neo4j, a billion-dollar corporation, is using its vast financial resources to overwhelm the Defendant, a pro se litigant, with legal pressure. The judgment amount of over $600,000 is minimal for Neo4j but represents a catastrophic financial burden for the Defendant. Courts have recognized the disproportionate impact of judgments in cases where one party is financially disadvantaged, and this Court should consider that enforcing the judgment would disproportionately harm the Defendant while causing minimal prejudice to Neo4j. See O'Donnell v. CBS Broadcasting Inc., 247 F. Supp. 3d 411, 419 (S.D.N.Y. 2017).

## 5. Minimal Prejudice to Plaintiff

Staying enforcement of the judgment would cause minimal prejudice to Neo4j. The Plaintiff will still be able to pursue collection efforts against the Defendant's two companies, PureThink and iGov, which are not requesting a stay. Moreover, the Plaintiff is a financially robust company, and the judgment amount will have little impact on their overall financial status. In contrast, immediate garnishment of the Defendant's wages will result in bankruptcy, depriving Neo4j of any potential recovery if the appeal is unsuccessful. This would also harm the Defendant's other creditors and could disrupt his government security clearance, further compounding the harm.

### 6. Public Interest

Granting a stay would cause minimal prejudice to Neo4j. The Plaintiff can still pursue collection efforts against the Defendant's companies, PureThink and iGov, which are not requesting a stay. Furthermore, Neo4j is financially stable and will not suffer substantial harm if the enforcement is delayed. In contrast, immediate enforcement would cause severe financial harm to the Defendant, including bankruptcy, depriving Neo4j of any meaningful recovery if the appeal is unsuccessful.

## III. CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court grant the Motion to Stay Enforcement of Judgment without requiring the posting of a bond, in light of the significant financial hardship, the public interest in the legal issues at stake, and the minimal prejudice to the Plaintiff.

Respectfully submitted
John Mark Suhy
Pro Se
Dated: October 23rd, 2024

By: _____ /s/ John Mark Suhy Jr.

8814 Danewood Dr
Alexandria, VA 22308

Tel: (703) 862-7780
Email: jmsuhy@gmail.com

5

1

## CERTIFICATE OF SERVICE

2

I hereby certify that on October 23rd, 2024 a true and correct copy of the Motion to Stay
Enforcement of Judgment Without a Bond, the Memorandum of Points and Authorities, and all
accompanying Exhibits were duly served by sending such copies via certified mail to the
following:

3

4

A. Charles Dean, Esq.

5

Dean & DeSimone, P.C.
3975 University Drive, Suite 410

6

Fairfax, Virginia 22030

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

John Mark Suhy
Pro Se
Dated: October 23rd, 2024

By: _____ /s/ *John Mark Suhy*

8814 Danewood Dr
Alexandria, VA 22308

Tel: (703) 862-7780
Email: jmsuhy@gmail.com

1

**IN THE CIRCUIT COURT OF FAIRFAX COUNTY, VIRGINIA**

**NEO4J, INC.**
Plaintiff,

v.

**JOHN MARK SUHY**
Defendant.

Case No.: CL-2024-0014686

**ORDER STAYING ENFORCEMENT OF JUDGMENT WITHOUT BOND**

This matter came before the Court on the Defendant, John Mark Suhy's, **Motion to Stay Enforcement of Judgment Without Bond**. After considering the motion and the arguments of the parties, the Court finds that there is sufficient basis to grant the Defendant's request.

Accordingly, it is hereby **ORDERED** that:

1. The enforcement of the judgment entered against John Mark Suhy in this case is **stayed** pending the resolution of the Defendant's appeal before the United States Court of Appeals for the Ninth Circuit;

2. The Defendant is **not required** to post a bond as a condition of this stay;

3. All collection efforts, including garnishment proceedings, are **suspended** until the conclusion of the appellate process.

**IT IS SO ORDERED.**

**Entered this _____ day of _____, 2024.**

**Judge's Signature: _____**
Judge, Circuit Court of Fairfax County

IN THE CIRCUIT COURT OF FAIRFAX COUNTY, VIRGINIA

NEO4J, INC.
Plaintiff,
v.
JOHN MARK SUHY
Defendant.

Case No.: CL-2024-0014686

**DECLARATION OF JOHN MARK SUHY**

I, John Mark Suhy, declare under penalty of perjury under the laws of the United States of America and the Commonwealth of Virginia that the following is true and correct to the best of my knowledge:

1. I am the Defendant in the above-referenced case.

2. I am an open-source advocate and developer who created the competing free and open source forks of Neo4j software called ONgDB and DozerDB.

3. Following the Free Software Foundation's issuance of the cease-and-desist letter, Neo4j, Inc. complied by removing all infringing content, including tags, branches, files, and source code from their public repository that contained the Commons Clause within the AGPL license.

4. I am the primary breadwinner for my family, while my wife works part-time, and my salary is essential for covering our family's living expenses. The garnishment of my wages would significantly impact our ability to meet those obligations, and it is highly likely that I will be forced into bankruptcy if the garnishment proceeds. This would not only harm me, my family, and other creditors, including Neo4j, but also jeopardize my government security clearances, which are vital to my employment.

5. The Free Software Foundation (FSF) and the Free Software Conservancy have communicated their intent to file amicus briefs in my appeal before the 9th Circuit Court.

6. Attached as Exhibit A is a true and accurate copy of the cease-and-desist letter sent by the Free Software Foundation to Neo4j, Inc. on November 13, 2023. This letter was provided to me by the Free Software Foundation.

7. Attached as Exhibit B is a true and accurate copy of the Findings of Fact and Conclusions of Law from the United States District Court for the Northern District of California, Case No. 5:18-cv-07182-EJD, dated July 22, 2024.

8. Attached as Exhibit C is a true and accurate copy of the Judgment from the United States District Court for the Northern District of California, Case No. 5:18-cv-07182-EJD, dated August 15, 2024.

9. Attached as Exhibit D is a true and accurate copy of the Notice of Appeal filed in the United States District Court for the Northern District of California, Case No. 5:18-cv-07182-EJD, dated September 8, 2024.

10. Attached as Exhibit F is a true and correct copy of the AGPLv3 license as it appeared in the Neo4j official repository before Neo4j removed it following the Free Software Foundation's cease-and-desist letter, dated November 13, 2023.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 23rd day of October, 2024.

**/s/ John Mark Suhy**

John Mark Suhy
8814 Danewood Dr
Alexandria, VA 22308
(703) 862-7780
jmsuhy@gmail.com

# EXHIBIT A

Free Software Foundation (FSF) Cease-and-Desist Letter to Neo4j, Inc.

Dated: November 13, 2023



**FREE SOFTWARE**
**F O U N D A T I O N**

Page 1

November 13, 2023

Neo4j, Inc.
400 Concar Dr.
San Mateo, CA 94402, USA
Attention: Legal Department

Re:     Neo4J Cease and Desist

We have learned of your continued use of the Free Software Foundation's ("FSF") rights related to the GNU Affero General Public License version 3 ("GNU AGPLv3") in a confusing and unauthorized manner. The FSF holds the copyright to the GNU AGPLv3, including all rights to make derivative works, as well as trademark rights to "GNU AFFERO GENERAL PUBLIC LICENSE" and related marks used in it, including:

* FSF (USPTO 87909272, EUIPO 003119691);
* Free Software Foundation (USPTO 87909237, EUIPO 003120334);
* GNU (USPTO 85380218)

While we are pleased when people use the GNU AGPLv3 to distribute and license software, we want to ensure that software freedom is protected as intended. The FSF allows everyone to use its licenses to grant and protect the fundamental freedoms to use programs for any purpose, study and change them, and sell or give away copies of programs or their modified versions. However, the FSF does *not* allow the making or distributing of altered versions of the licenses, including the GNU AGPLv3, resulting in unauthorized derivative works. Nor do we allow others to use our registered or common law trademarks without authorization.

We are referring to the README file[1] distributed by Neo4j releases 3.4.0-3.5.3. Among other issues, it clearly states in the "Extending" section that the software is available under the GNU AGPLv3. However, you then inappropriately use our marks in the "Licensing" section, where it states that some of the modules of Neo4j Enterprise are "licensed under AGPLv3 with the Commons Clause." You are not authorized to use any of our marks including "GNU," "AGPL," and "Affero General Public License," or any other variation of those marks in connection with any licenses other than to refer to the unmodified licenses as published by us. You are also not permitted to make unauthorized derivative works of the GNU AGPLv3 by adding additional text to the license as was done in LICENSE.txt accompanying aforementioned releases.

Your distribution of these releases has caused and continues to cause confusion among consumers since the README distributed by you clearly states that each of these releases is

51 Franklin St. 5th Floor Boston MA 02110 U.S.A
tel: 1.617.542.5942 | fax: 1.617.542.2652 | www.fsf.org



**FREE SOFTWARE**
F O U N D A T I O N                                                    Page 2

"licensed under the [GNU] AGPLv3," but confusingly suggests that the Commons Clause would restrict a licensee's rights under our license.

The GNU AGPLv3 by its terms, including as reproduced by you in the LICENSE.txt, permits all licensees to remove any additional terms that are "further restrictions" under the GNU AGPLv3. The text of the GNU AGPLv3 makes this clear as it says, "[i]f the Program as you received it, or any part of it, contains a notice stating that it is governed by this License along with a term that is a further restriction, you may remove that term[,]" and the GNU AGPLv3 clearly defines the phrase "this License" to mean "version 3 of the GNU Affero General Public License." It is well known that the "Commons Clause" is a "further restriction" under the terms of the GNU AGPLv3 and therefore all licensees under the GNU AGPLv3 are permitted to remove it[2].

We encourage you to clarify the situation by making it unambiguous that these software releases are licensed under the GNU AGPLv3 and users who already received copies of the software are allowed to remove any further restriction. You can do this by simply stating that the releases are licensed under the GNU AGPLv3 without any further restrictions and removing all references to the "Commons Clause."

However, if your altered version of the license is an attempt to create a proprietary license, you are not allowed to use any of the FSF's family of GNU General Public Licenses or any of the FSF's trademarks, registered or unregistered, for that purpose. The FSF has no wish to advise or request drafting a new proprietary software license, but we realize that we cannot forbid you from doing so. Thus, we believe that in such case it is our duty to minimize the harm resulting from confusing users with attempts to release proprietary software under a license using the name, text, and trademarks associated with free software.

The conditions on which we authorize the creation of derivative works of our licenses are stated in our FAQ[3]. Our FAQ clearly outlines the steps required, including removing specific sections of the license text and removing any references to our marks. These conditions avoid confusing uses of the GNU AGPLv3 and the FSF's trademarks included in it.

We hope to cooperate to resolve this matter amicably. Neo4j software mentioned above is publicly available on Github as of this writing and also advertised by Neo4j, Inc. [4][5] (the latter not mentioning 3.4 release). If Neo4j, Inc. is currently making any other unauthorized use of any of FSF's copyrights or trademark rights related to the GNU AGPLv3, the above requests apply to such other copies and uses as well. Please confirm in writing within 14 days from the receipt of this letter that you have taken steps to remedy this situation.

Sincerely,

Zoë Kooyman,
Executive Director
Free Software Supporter

51 Franklin St. 5th Floor Boston MA 02110 U.S.A
tel: 1.617.542.5942 | fax: 1.617.542.2652 | www.fsf.org

 **FREE SOFTWARE** FOUNDATION

Page 3

[1] README.asciidoc available at
https://github.com/neo4j/neo4j/tree/3.4#readme and related tagged releases

[2] "Can I modify the GPL and make a modified license?" available at
https://www.gnu.org/licenses/gpl-faq.html#ModifyGPL

[3] "I'd like to license my code under the GPL, but I'd also like to make it clear that it can't be
used for military and/or commercial uses. Can I do this?" available at
https://www.gnu.org/licenses/gpl-faq.html#NoMilitary

[4] "Neo4j Debian Packages" available at https://debian.neo4j.com/

[5] "Neo4j RPM Packages" available at https://yum.neo4j.com/

51 Franklin St. 5th Floor Boston MA 02110 U.S.A
tel: 1.617.542.5942 | fax: 1.617.542.2652 | www.fsf.org

# EXHIBIT B

Findings of Fact and Conclusions of Law, Northern District of California,
Case No. 5:18-cv-07182-EJD

Date: July 22, 2024

1

2

3

4        UNITED STATES DISTRICT COURT

5        NORTHERN DISTRICT OF CALIFORNIA

6             SAN JOSE DIVISION

7

8    NEO4J, INC., et al.,                    Case No.   5:18-cv-07182-EJD

9              Plaintiffs,

10                                           **FINDINGS OF FACT AND**
                                             **CONCLUSIONS OF LAW**
        v.

11   PURETHINK, LLC, et al.,

12             Defendants.

13        Plaintiffs Neo4j, Inc. ("Neo4j USA") and Neo4j Sweden AB ("Neo4j Sweden")

14   (collectively, "Plaintiffs") brought the present lawsuit against Defendants PureThink LLC

15   ("PureThink"), iGov Inc. ("iGov"), and John Mark Suhy ("Suhy") (collectively, "Defendants")

16   alleging claims under the Lanham Act and the Digital Millennium Copyright Act ("DMCA"),

17   among other claims, related to Plaintiffs' proprietary software.  Third Am. Compl., ECF No. 90.

18        The Court previously found Defendants liable as to Neo4j USA's first, second, third, and

19   fourth Lanham Act and unfair competition claims.  Order Granting Mot. for Partial Summ. J; Den.

20   Cross-Mot. for Summ. J. ("First MSJ Order"), ECF No. 118.  The Court also found Defendants

21   liable as to Neo4j Sweden's eighth cause of action for violation of the DMCA.  Order Granting

22   Mot. to Strike Expert Report and Exclude Expert Testimony; Granting Mot. for Partial Summ. J.

23   ("Second MSJ Order"), ECF No. 216.  The only issue remaining before the Court is damages.

24        The Court held a bench trial on November 14, 2023, and November 28, 2023, and heard

25   oral arguments and evidence presented by both Parties.  ECF Nos. 225, 229.  The Court also

26   received pre-trial and post-trial submissions of the Parties' proposed findings of fact and

27   conclusions of law.  See Pls.' Proposed Findings of Fact and Conclusions of Law ("Pls.' FFCL"),

28   Case No.: 5:18-cv-07182-EJD

*United States District Court*
*Northern District of California*

<div style="writing-mode: vertical">United States District Court<br>Northern District of California</div>

1  ECF No. 238; Defs.' Proposed Findings of Fact and Conclusions of Law ("Defs.' FFCL"), ECF

2  No. 237.

3       Having considered the Parties' submissions and evidence, the Court makes the following

4  findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).[1]

5  **I.**    **FINDINGS OF FACT**

6       The Court finds the following facts based on factual findings from the Court's two prior

7  summary judgment orders, facts stipulated to by the Parties, and all other relevant evidence in the

8  record.

9      **A.**    **The Parties**

10     1.    Plaintiff Neo4j USA is a corporation specializing in graph database management

11 systems. First MSJ Order 2. Plaintiff Neo4j Sweden is a wholly owned subsidiary of Neo4j USA

12 and owns all copyrights relating to the Neo4j graph database platform, including the source code.

13 *Id.*

14     2.    Defendant Suhy is the founder and sole employee, member, and manager of

15 Defendant PureThink, which is a single person limited liability software and information

16 technology consulting company specializing in supporting agencies within the U.S. Government

17 that use Neo4j graph database software. Stip. of Undisputed Facts for Trial ("Undisputed Facts")

18 ¶ 15, ECF No. 227. Suhy also formed Defendant iGov, a software development and consulting

19 company, to offer paid support services for open source Neo4j software to the IRS and other

20 government agencies. First MSJ Order 4.

21     **B.**    **The Neo4j Platforms**

22     3.    Neo4j USA originally offered a free and open-source version of the Neo4j platform

23 known as the Neo4j Community Edition ("Neo4j CE") under the GNU General Public License

24 version 3 ("GPL") license. Undisputed Facts ¶ 5. The Neo4j CE source code was available to the

25

26 ───────────────

27 [1] Any findings of fact that constitute conclusions of law shall be deemed to have been found by the Court as a matter of law.  Likewise, any conclusions of law that constitute findings of fact shall be deemed to have been found by the Court as a matter of fact.

28 Case No.: <u>5:18-cv-07182-EJD</u>
FINDINGS OF FACT AND CONCLUSIONS OF LAW
<div align="center">2</div>

1    public on GitHub pursuant to the GPL.  First MSJ Order 3.  Neo4j CE is limited in its feature set

2    and does not come with technical or administrative support.  Undisputed Facts ¶ 5.  Neo4j CE under

3    the GPL license remains publicly available and free.  *See id.* ¶ 12.

4         4.      Neo4j USA also offered a more advanced commercial version which included

5    additional features and support services, known as the Neo4j Enterprise Edition ("Neo4j EE").

6    Undisputed Facts ¶ 6.  Neo4j EE was originally offered under both a paid-for commercial license

7    and the free GNU Affero General Public License ("APGL").  *Id.*

8         5.      In May 2018, Neo4j USA released Neo4j EE version ("v") 3.4, which they

9    continued to offer under an open-source license; however, they replaced the AGPL with a stricter

10   license, which included additional restrictions provided by the new Commons Clause.  First MSJ

11   Order 3.  The Commons Clause prohibited the non-paying public from engaging in commercial

12   resale and certain commercial support services.  *Id.*  This stricter license is referred to as the

13   "Neo4j Sweden Software License."  *Id.*

14        6.      In November 2018, Neo4j USA released Neo4j EE v3.5 under a commercial

15   license only.  Undisputed Facts ¶ 11.  Moving forward, Plaintiffs were no longer publishing open

16   source code for new versions of Neo4j EE.  First MSJ Order 3.

      **C.**     **Former Partnership Agreement Between the Parties**

18        7.      In 2014, PureThink and Neo4j USA entered into the Neo Technologies Solution

19   Partner Agreement ("Partnership Agreement").  Undisputed Facts ¶ 17.  In conjunction with its

20   business, Neo4j USA owns several federally registered trademarks, including the word mark

21   "NEO4J" ("Neo4j Mark").  First MSJ Order 2.  Under the Partnership Agreement, PureThink had

22   a non-exclusive, non-transferable limited license to use the Neo4j Mark solely to market and resell

23   commercial licenses to Neo4j EE and related support services in exchange for shared revenue for

24   the licenses that it resold.  *Id.* at 3.

25        8.      In the hopes of increased sales, PureThink developed the Neo4j Government

26   Edition ("Gov't Edition"), which was a package designed to use Neo4j EE to streamline the

27   government's procurements.  *Id.* at 4.

28   Case No.: 5:18-cv-07182-EJD
FINDINGS OF FACT AND CONCLUSIONS OF LAW

United States District Court
Northern District of California

9.      After a dispute concerning Suhy's use, distribution, and marketing of Neo4j's open source products, rather than the commercial products, and his marketing of consulting services focused on those products to the Internal Revenue Services ("IRS"), Neo4j USA terminated the Partnership Agreement on July 11, 2017. *Id.* at 4. Neo4j USA demanded that PureThink no longer use Neo4j's trademarks, service marks, and other designations, as well as remove marketing materials and Neo4j's trademarks and tradenames from PureThink's website. *Id.*

10.      Suhy incorporated iGov to continue supporting open source Neo4j software without being bound by restrictions in the Partnership Agreement, which he believed to be unlawful. *Id.*

**D.**     **Defendants' Conduct Following the Partnership Agreement Termination**

11.      Suhy and iGov continued marketing the Gov't Edition and using the Neo4j Mark after the Partnership Agreement was terminated. First MSJ Order 4. For example, the iGov website used "https://igovsol.com/neo4j.html" as a URL to promote "Government Development Packages for Neo4j"; displayed a "Request Procurement Document Package" link with "mailto:neo4j@igovsol.com" embedded that creates an email addressed thereto upon activation; encouraged consumers to obtain more information by sending an email to "neo4j@igovsol.com"; and used "Government Packages for Neo4j" and "Neo4j Enterprise" to describe iGov's modified version of the Neo4j EE software. *Id.* at 5.

12.      After Plaintiffs released Neo4j EE v3.4—which replaced the AGPL with the Neo4j Sweden Software License—Suhy helped form Graph Foundation, Inc. ("the Graph Foundation").[2] First MSJ Order 6.

13.      The Graph Foundation began promoting a software called ONgDB, which it referred to as "free and open source." First MSJ Order 6. Suhy created ONgDB using Neo4j EE v3.4 as a base, which was subject to the Neo4j Sweden Software License, but he removed the stricter Neo4j Sweden Software License and replaced it with the AGPL. *Id.*; Am. Dep.

---

[2] The Graph Foundation is not a defendant in this matter.

Case No.: 5:18-cv-07182-EJD
FINDINGS OF FACT AND CONCLUSIONS OF LAW
4

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Designations, Ex. 2, Dep. of John Mark Suhy ("Suhy Dep.") 171:23–172:23, ECF No. 226. Doing

2    so removed certain legal notices identifying Neo4j Sweden as the copyright holder and licensor

3    and removed the Commons Clause, effectively allowing Defendants to commercially use and

4    support ONgDB. First MSJ Order 6. Suhy testified that he believed he was permitted to remove

5    the Commons Clause based on his research of existing case law, research of other companies who

6    had removed similar information, and consultations with the Graph Foundation and the IRS.[3]

7    Suhy Dep. 196:22–199:21; Trial Tr. Vol. II 328:9–19, ECF No. 233; Trial Ex. 1012, ECF No.

8    242-38.

9         14.    Following the creation of ONgDB, Suhy provided hyperlinks to potential users of

10   Neo4j EE to view and download ONgDB from the Graph Foundation's website and GitHub

11   repository using his iGov and PureThink email addresses. Undisputed Facts ¶¶ 42, 43. iGov's

12   website also provided links to potential users of Neo4j EE to download ONgDB directly from

13   iGov and from the Graph Foundation's website. *Id.* ¶¶ 44, 45. The "landing page" for ONgDB on

14   GitHub was very similar to that of Neo4j EE. First MSJ Order 7. It was titled "ONgDB – Neo4j

15   Enterprise Fork: Graphs for Everyone," and contained numerous references to Neo4j throughout.

16   *Id.*

17        15.    Defendants also made a series of representations regarding ONgDB, including

18   communicating to potential customers that ONgDB v3.5 was "100% free and open" with no

19   limitations or restrictions imposed by the Neo4j EE v3.5 commercial license. First MSJ Order 7.

20   iGov also promoted ONgDB and asserted that "ONgDB is a drop in replacement for the Neo4j

21   Community and Enterprise branded distributions." *Id.* Defendants have made similar statements

22   directly to potential customers, such as characterizing ONgDB as a "100% open source and a drop

23

24   ─────────────────────
     [3] Plaintiffs argue that Suhy's statement regarding consulting the IRS is contradicted by the IRS
25   representative's deposition. Pls.' FFCL 9 n.2. However, Suhy specifically stated that he
     discussed his ability to *remove* the Commons Clause with the IRS, whereas, in the section cited to
26   by Plaintiffs, the IRS representative testified that he did not know of any conversation with Suhy
     regarding Neo4j USA's ability to *add* the Commons Clause. *Compare* Trial Tr. Vol. II 328:9–19,
27   *with* Dep. Designations, Ex. 5, Dep. of Internal Revenue Service Through its Designee Michael C.
     Dunn ("Dunn Dep.") 97:17–98:21, ECF No. 210.
28   Case No.: 5:18-cv-07182-EJD
     FINDINGS OF FACT AND CONCLUSIONS OF LAW
                                    5

1    in replacement for the same Neo4j version." *Id.*

2        16.    Relying on these and other facts, the Court made three findings relevant to the

3    present Findings of Fact and Conclusions of Law.

4        17.    First, the Court found that the following conduct constituted trademark

5    infringement: (1) extensively using "Neo4j' and "Neo4j Enterprise" on iGov and PureThink

6    websites without proper trademark notices; (2) using embedded "Neo4j" links to Neo4j USA's

7    website and GitHub repository on their websites; (3) hyperlinking to Plaintiffs' build instructions,

8    support documentation and change logs containing the Neo4j Mark rather than creating and

9    hosting their own with the ONgDB name; and (4) using of "Neo4j Enterprise" and "ONgDB"

10   interchangeably to promote ONgDB on their websites.  First MSJ Order 21.  The Court found that

11   Defendants were not using "Neo4j" to refer to Plaintiffs' products; they were using it to create the

12   misleading perception that Defendants' products were Plaintiffs' products. *Id.* at 20.

13       18.    Second, the Court found that Defendants' claims that ONgDB was a "drop-in

14   replacement" or "open source" constituted false advertising and false designation of origin. *Id.* at

15   28–32.

16       19.    Third, the Court found that Suhy's removal of the copyright management

17   information ("CMI"), that is, the removal of the Commons Clause and replacement of the Neo4j

18   Sweden Software license with a generic open source APGL license, violated the DMCA.  Second

19   MSJ Order 23.

20       **E.    Damages**

21       20.    Given that the Court has determined liability, the only issue remaining is damages.

22   Central to Plaintiffs' claims for damages are offers made to, and rejected by, (1) the Maryland

23   Procurement Office ("MPO"), and (2) the IRS.

24            **1.    MPO**

25       21.    The MPO, on behalf of the National Security Agency ("NSA"), tasked third party

26   company Next Century to analyze available graph database technologies for a project referred to

27   as the "KMS Project."  Stip. to the Amount of Pls.' Lost Profits and Defs.' Profits ("Stip. to

28   Case No.: 5:18-cv-07182-EJD
     FINDINGS OF FACT AND CONCLUSIONS OF LAW
                    6

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

1  Amount") ¶¶ 1, 8, ECF No. 234. The KMS Project was essentially a continuation of prior projects
2  where the MPO had similarly tasked Next Century with analyzing available graph database
3  technologies, including projects referred to as "Task Order 39" and "Blue Rocket Task Order 50."
4  Dep. Designations, Ex. 4, Dep. of Jim Weyant as a Representative of CACI International, Inc.
5  ("Weyant Dep.") 92:23–94:12, 96:4–11, 103:21–104:3, 108:2–19, ECF No. 210.

6      22.    Next Century was looking for enterprise-only features, such as causal clustering
7  and multi-data centers, which were offered by both Neo4j EE and ONgDB. Stip. to Amount ¶ 2.

8      23.    In June 2018, Next Century sought information from Neo4j USA regarding certain
9  Neo4j EE features, including causal clustering. Trial Ex. 103, ECF No. 241-27. In response,
10  Neo4j USA confirmed those features required a commercial subscription for Neo4j EE, and the
11  pricing for it was based on the number of servers in the cluster, cores per server, and RAM per
12  server. Id. Neo4j USA informed Next Century that their prices started at $111,000 per year for a
13  3-server cluster with standard support. Id. This price rose to $199,000, by April 2019. Trial Ex.
14  17, ECF No. 239-4.

15      24.    Next Century obtained additional information about the pricing of Neo4j USA's
16  Neo4j EE software bundles from iGov's website and learned that iGov offered the same software
17  for free under the AGPL bundled with iGov's consulting services. Stip. to Amount ¶ 3.

18      25.    In October 2018, Next Century exchanged emails with Suhy regarding
19  representations made on iGov's website that ONgDB was an open source version of Neo4j EE that
20  provided the same enterprise-only features for free. Id. ¶ 4.

21      26.    Suhy told Next Century that they could use ONgDB under the AGPL without
22  restrictions or paying Plaintiffs for a commercial license, as advertised on the iGov's website.
23  Undisputed Facts ¶ 114.

24      27.    As a result of Next Century's communications with Suhy, Next Century
25  downloaded ONgDB v3.4 and began evaluating it against Neo4j EE v3.4. Id. ¶ 15.

26      28.    In a series of emails with Next Century ending on January 4, 2019, Suhy confirmed
27  that ONgDB v3.5 would have feature parity with the enterprise features of Neo4j EE v3.5 and

28  Case No.: 5:18-cv-07182-EJD
FINDINGS OF FACT AND CONCLUSIONS OF LAW
7

United States District Court
Northern District of California

1    would also be available without restrictions on the number of clusters, instances, and cores, and

2    without paying Neo4j USA for a commercial license. *Id.* ¶ 16. This led Next Century to upgrade

3    from ONgDB v3.4 to ONgDB v3.5 for use in the KMS Project. *Id.*

4          29.    By February 2019, the MPO had chosen to use ONgDB v3.5 over Neo4j EE v3.5

5    for continued development work for the KMS Project. *Id.* ¶ 117. On February 5, 2019, Next

6    Century informed Neo4j USA of this decision, stating, "[w]e have found that open-sourced (non-

7    commercial) builds from the Neo4j source code provide the clustering and security requirements

8    needed in our environment." *Id.* ¶ 118.

9          30.    However, Next Century was still researching other graph databases, including

10   Neo4j EE. Weyant Dep. 92:19–25. Next Century and Neo4j USA continued their discussions,

11   and in March 2019, Next Century gave Neo4j USA the required specifications for its ongoing

12   KMS Project and asked Neo4j USA to provide a quote for use in a production environment. Trial

13   Ex. 116, ECF No. 241-40. Although Next Century cautioned that they did not "have a firm grasp

14   on what the (eventual) production posture will be," Next Century provided Neo4j with some

15   information "for now." Trial Ex. 116.

16         31.    On April 19, 2019, Neo4j USA sent a 3-year Neo4j EE Enterprise Bundle offer

17   based on those requirements ("April 2019 Offer"). Trial Ex. 118, ECF No. 241-42. Under this

18   proposal, Next Century and the MPO had the option to (a) purchase three one-year subscriptions

19   on an incremental basis for a total of $2,667,000; or (b) purchase a 3-year subscription for a total

20   of $2,266,950, which reflects a 15% multi-year, paid up front discount. *Id.*

21         32.    On April 29, 2019, Next Century confirmed that it shared Neo4j USA's proposal

22   with the MPO and was instructed by the MPO to continue using ONgDB. Trial Ex. 119, ECF No.

23   241-43.

24         33.    A few months later, as a follow up to a meeting between Neo4j USA and Next

25   Century that occurred in May 2019, Neo4j USA emailed Next Century stating that they were

26   prepared to offer "a more robust capability that provides the same SLA as your Neo4j CE based

27   solution for a much lower price point than what we originally proposed based on your initial stated

28   Case No.: 5:18-cv-07182-EJD
FINDINGS OF FACT AND CONCLUSIONS OF LAW

8

United States District Court
Northern District of California

1    requirements." Trial Ex. 120, ECF No. 241-44.

2        34.    That same day, Next Century informed Neo4j USA that the MPO was not

3    interested in the Neo4j EE proposal for the KMS project. *Id.* The reason for the MPO continuing

4    to use ONgDB over Neo4j EE was price. *Id.*; Stip. to Amount ¶ 101.

5        35.    The project immediately following the expiration of the KMS Project, referred to as

6    "Route 66," continued on to deploy an ONgDB-based solution, and the subcontracts and renewals

7    that followed continued deploying ONgDB-based solutions until as recently as October 2022.

8    Weyant Dep. 116:25–117:5, 126:12–127:23.

9        36.    While the MPO declined Neo4j USA's offer in this instance, MPO has purchased

10   six other one-year commercial licenses from Neo4j USA between 2014 and 2022, which ranged

11   from $9,300 to $248,310, as well as one two-year commercial license for $66,249. Trial Ex. 15, at

12   lines 337–43, ECF No. 240.

13       37.    The Parties stipulated to the calculations as to the profits Neo4j USA would have

14   generated had the MPO accepted their April 2019 Offer as written, which range from $1,786,542

15   to $2,370,598. Stip. to Amount ¶¶ 21–24.

16           **2.    IRS**

17       38.    In April 2018, Suhy submitted a bid for a new contract issued by the IRS for a

18   project referred to as the "CKGE Project" on behalf of eGovernment Solutions, Inc. ("eGov"),

19   another entity that he had an ownership interest in at the time.[4]  Under Suhy's proposal, eGov

20   would perform "all operations and maintenance duties for all components of the CKGE

21   framework," including working with Neo4j components. Trial Ex. 181, ECF No. 242-5;

22   Undisputed Facts ¶¶ 61, 62.

23       39.    In May 2018, the IRS publicly posted an intent to award the sole source contract

24   for the CKGE Project to eGov. Trial Tr. Vol. I 79:20–23, ECF No. 231. Under this contract,

25   eGov would perform all operations and maintenance duties for all components of the CKGE

26

27   ─────────────────────────
     [4] eGov is not a Defendant in this matter.

28   Case No.: 5:18-cv-07182-EJD
     FINDINGS OF FACT AND CONCLUSIONS OF LAW
                        9

United States District Court
Northern District of California

1    framework. Trial Ex. 124, ECF No. 241-48. At that time, the CKGE Project had been using the

2    publicly available Neo4j EE v3.2. Dep. Designations, Ex. 5, Dep. of Internal Revenue Service

3    Through its Designee Michael C. Dunn ("Dunn Dep.") 99:3–100:10, ECF No. 210.

4         40.    Neo4j USA saw this public post and emailed the IRS on May 22, 2018. Trial Ex.

5    126, ECF No. 241-50; Trial Tr. Vol. I 79:20–82:8. Neo4j USA believed that the CKGE Project

6    would require Neo4j EE v3.4, so they contacted the IRS to inform them of the licensing changes

7    to the Neo4j EE v3.4, namely the addition of the Commons Clause, and encourage them to

8    purchase a commercial license and support services for that license from Neo4j USA. Trial Tr.

9    Vol. I 81:22–82:8. That same day, Suhy sent an email to the IRS opining that Neo4j Sweden could

10   not lawfully add the Commons Clause to the license governing Neo4j EE v3.4. Trial Ex. 128,

11   ECF No. 241-52. The IRS subsequently declined the invitation to purchase the Neo4j EE v3.4

12   license, informing Neo4j USA that their budget was "extraordinarily limited in all avenues," and

13   they would be sticking with the publicly available Neo4j EE v3.2 that they had been using. Trial

14   Ex. 128; Trial Ex. 131. However, the IRS welcomed Neo4j USA to provide a demonstration of

15   the 3.4 version for planning purposes. *Id.*

16        41.    On May 24, 2018, the IRS officially awarded eGov the new contract to further

17   develop and support the CKGE Project. Trial Ex. 182, ECF No. 242-6; Trial Ex. 183, ECF No.

18   242-7. The project proceeded using the publicly available Neo4j EE v3.2. Dunn Dep. 99:3–

19   100:10.

20        42.    In June 2018, the IRS had asked Suhy about switching from Neo4j EE v3.2 to the

21   Neo4j 3.3.1 CE because, given the amount of users and the demand requirements, "it wasn't

22   necessary to have any of the Enterprise features." Dunn. Dep. 110:11–101:4; Trial Ex. 129, ECF

23   No. 241-53. [5] Suhy responded by suggesting that, instead of switching to Neo4j CE v3.3.1, the

24   _____

25   [5] The Court took into consideration the Parties' stipulation that the IRS used at least one Neo4j
     enterprise-only feature, node ID, via ONgDB in CKGE, Stip. to Amount ¶ 41, and weighed that

26   fact against the IRS representative's email and testimony stating that they were not seeking
     enterprise features at the time, Dunn. Dep. 110:11–101:4; Trial Ex. 129, as well as Suhy's

27   testimony consistent with this evidence, Trial Tr. Vol. II 322:5–323:5. The Court also notes that it
     has considered and rejected Plaintiffs' blanket assertion that Suhy's testimony disagreeing with

28   Case No.: 5:18-cv-07182-EJD
     FINDINGS OF FACT AND CONCLUSIONS OF LAW
     10

1    IRS should adopt the open fork software managed by eGov for the CKEG project, which was later

2    released as ONgDB. Trial Ex. 129. The IRS accepted Suhy's advice and planned to integrate

3    ONgDB rather than switch to Neo4j CE v3.3.1. Dunn. Dep. 102:3–15.

4         43.     Meanwhile, the IRS had been continuing its discussions with Neo4j USA about

5    Neo4j EE v3.4 "for planning purposes." Trial Ex. 128, 131. After some back and forth, on July

6    18, 2018, Neo4j USA provided IRS a quote for $156,000 for a one-year Neo4j EE subscription

7    and $397,800 for three years to use in the CKGE Project ("July 2018 Offer"), with the

8    understanding that the IRS was "just looking for budgetary pricing at the moment." Trial Ex. 131,

9    ECF No. 241-55. On July 27, 2018, the IRS replied that the quote was helpful "for planning

10    purposes," but informed Neo4j USA again that they still did not intend to purchase the

11    subscription at that time. *Id.*

12         44.     In August 2018, approximately one month after the IRS had declined to purchase a

13    Neo4j EE v3.4 license for the second time, the IRS followed up on their June 2018 plan to

14    integrate ONgDB instead of Neo4j CE v3.3.1. Trial Ex. 132, ECF No. 241-56. The IRS asked

15    Suhy if it would be easier to switch to ONgDB in the CKGE Project at that time, or if they should

16    wait and deploy the CKGE with Neo4j EE v3.3.2 and then later transition. Trial Ex. 132. Suhy

17    recommended that the IRS integrate ONgDB v3.4 at that time rather than continue using Neo4j

18    EE v3.3.2 in the CKGE framework, claiming that "ONgDB open source licenses come directly

19    from the Graph Foundation as well, not from Neo4j Inc." Trial Ex. 132, 133.

20         45.     Based on Suhy's recommendation, the IRS instructed him to "[g]o ahead and

21    integrate the ONgDB into the CKGE framework we'll deploy" on August 14, 2018. Trial Ex.

22    133, ECF No. 241-57.

23         46.     The IRS had a team dedicated to supporting ONgDB, and Suhy's contract for the

24    CKGE Project did not specifically require him to provide support for ONgDB. Trial Tr. Vol. II

25

26    ———————————————

27    this, and other stipulated facts, renders him an unreliable witness in all regards. Pls.' FFCL 3 n.1,
9 n.2, 35. The Court will continue to exercise its discretion to give appropriate weight to Suhy's
testimony in light of other evidence in the record.

28    Case No.: 5:18-cv-07182-EJD
FINDINGS OF FACT AND CONCLUSIONS OF LAW
11

*United States District Court*
*Northern District of California*

1    316:16–17; 320:11–321:25.[6] However, Suhy did provide input in the architecture design and

2    hardware requirements needed to run ONgDB installations on multiple servers within the CKGE.

3    *Id.*; Undisputed Facts ¶ 32.

4          47.     After the Court's preliminary injunction requiring that the IRS remove ONgDB

5    from their servers, the IRS switched back to Neo4j CE. Trial Tr. Vol. I 277:18–278:14, 280:22.

6          48.     The Parties stipulated to the calculations as to the profits Neo4j USA would have

7    generated had the IRS accepted their July 2018 Offer as written, along with additional commercial

8    subscriptions for every integration of ONgDB that followed, ranging from $2,646,557 to

9    $3,069,646 in lost profits. Stip. to Amount ¶¶ 60, 63.

10         49.     The Parties also stipulated that iGov and Suhy gained $1,316,000 in profits from

11   the IRS under the CKGE Contract, as well as an additional $246,082.55 for work performed under

12   IRS subcontracts. *Id.* ¶¶ 68, 71.

13   **II.**    **CONCLUSIONS OF LAW**

14         The Court previously found Defendants liable under the Lanham Act's prohibition of

15   trademark infringement and false advertising and designation of origin, as well as the DMCA's

16   prohibition of copyright infringement. *See* First MSJ Order; Second MSJ Order. Plaintiffs now

17   seek relief in the form of monetary damages under the Lanham Act and the DMCA, as well as a

18   permanent injunction. Pls.' FFCL. The Court will address each request below.

19       **A.**    **Monetary Damages**

20         Under the Lanham Act, the court may, "in its discretion and subject to the principles of

21   equity," award monetary damages in the form of actual damages, the defendant's illicit profits,

22   and attorneys' fees. *Jason Scott Collection, Inc. v. Trendily Furniture*, LLC, 68 F.4th 1203, 1220

23   (9th Cir. 2023), *cert. denied*, 144 S. Ct. 550 (2024) (internal quotation marks omitted) (quoting 15

24   U.S.C. § 1117(a)). Courts "assess trademark damages in the same manner as tort damages: the

25

26   _____

27   [6] The Court weighed the IRS representative's testimony on this point, Dunn Dep. 97:17–98:21, against Suhy's testimony and the other evidence in the record, including Suhy's contract, Trial Ex. 1011, ECF No. 242-37.

28   Case No.: 5:18-cv-07182-EJD
     FINDINGS OF FACT AND CONCLUSIONS OF LAW
     12

United States District Court
Northern District of California

1    reasonably foreseeable harms caused by the wrong." *Id.* (internal quotation marks omitted)

2    (quoting *Skydive Ariz., Inc. v. Quattrocchi*, 673 F.3d 1105, 1110, 1113 (9th Cir. 2012)).

3         To recover actual damages sustained by a plaintiff, the plaintiff must prove both (1) the

4    fact of the damages and (2) the amount of damages. *Skydive Arizona, Inc. v. Quattrocchi*, 673

5    F.3d 1105, 1112 (9th Cir. 2012); *see also eAdGear, Inc. v. Liu*, No. CV-11-05398 JCS, 2012 WL

6    2367805, at *18 (N.D. Cal. June 21, 2012), *report and recommendation adopted*, No. C-11-05398

7    RMW JCS, 2012 WL 4005454 (N.D. Cal. Sept. 11, 2012). Once the fact of damages is

8    established, plaintiffs are held to a lower standard of proof regarding the exact amount of actual

9    damages. *Skydive Arizona*, 673 F.3d at 1112.

10        Regarding a defendant's profits, a plaintiff may recover an infringing defendant's profits as

11   a measure of the plaintiff's own damages or on a theory of disgorgement. *Sky Billiards, Inc. v.*

12   *Loong Star, Inc.*, No. EDCV14921JGBSPX, 2016 WL 6661175, at *6 (C.D. Cal. Mar. 17, 2016)

13   (citing *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1407 (9th Cir. 1993)). "[A] trademark

14   defendant's mental state is a highly important consideration in determining whether an award of

15   profits is appropriate." *Romag Fasteners, Inc v. Fossil, Inc.*, 590 U.S. 212, 219 (2020).

16        Attorneys' fees may be awarded at a court's discretion in "exceptional cases." 15 U.S.C. §

17   1117(a). Courts determine whether a case is "exceptional" by examining the totality of the

18   circumstances and "evaluating whether the case is one that stands out from others with respect to

19   the substantive strength of the party's litigating position . . . or the unreasonable manner in which

20   the case was litigated based on a preponderance of the evidence." *Jason Scott Collection*, 68 F.4th

21   at 1223.

22        Similarly, under the DMCA, a plaintiff may also recover "the actual damages suffered . . .

23   as a result of the violation, and any profits of the violator that are attributable to the violation and

24   are not taken into account in computing the actual damages." 17 U.S.C. § 1203(c)(2). Actual

25   damages may consist of lost licensing fees and renewal fees, as well as lost profits. *See Polar*

26   *Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 707–08 (9th Cir. 2004) (affirming an actual

27   damages award based on the copyright holder's actual price quote to the infringer). A plaintiff

28   Case No.: 5:18-cv-07182-EJD
     FINDINGS OF FACT AND CONCLUSIONS OF LAW
                                    13

United States District Court
Northern District of California

1    may also recover hypothetical-license damages as actual damages. *Id*

2        Here, Plaintiffs argue that Defendants' trademark infringement, false advertising and false

3    designation of origin, and copyright infringement caused Plaintiffs to lose potential licensing

4    contracts with, and caused Defendants to gain illicit profits from, the MPO and the IRS.[7]

5    Plaintiffs also argue that Defendants' conduct makes this case "exceptional" and gives rise to

6    attorneys' fees and prejudgment interest.

7        The Court will address in turn Plaintiffs' requests for monetary damages regarding: (1) the

8    MPO offer, (2) the IRS offer, (3) attorneys' fees, and (4) prejudgment interest.  Where the Court

9    finds monetary damages appropriate, the Court will also address Defendants' argument that any

10   award should be reduced pursuant to the DMCA's innocent copyright infringer defense.

11               **1.    MPO**

12       Plaintiffs argue that Defendants' trademark infringement, false advertising and false

13   designation of origin, and copyright infringement caused Plaintiffs to lose potential licensing

14   revenue after the MPO rejected their April 2019 Offer for a Neo4j EE commercial license

15   subscription and instead adopted ONgDB for free. *See* Pls.' FFCL 29–31.  Plaintiffs seek an

16   award of $2,370,598 in lost licensing revenue. *Id.* at 30.  Given that Defendants did not generate

17   any profit from these circumstances, Plaintiffs do not seek damages in the form of Defendants'

18   illicit profits. *See id.* at 29–31.

19       To reiterate, in order to recover actual damages, Plaintiffs must prove both (1) the fact of

20   the damages and (2) the amount of damages. *Skydive Arizona*, 673 F.3d at 1112.  Once the fact of

21   damages is established, plaintiffs are held to a lower standard of proof regarding the exact amount

22   of actual damages. *Id.*

23       For the reasons explained below, the Court finds that, although there is evidence that

24   Defendants' conduct caused the MPO to integrate ONgDB v3.5 for free rather than pay for a

25   Neo4j EE commercial license, there is insufficient evidence to show that the MPO would have

26

---

27   [7] Plaintiffs' briefing does not request independent damages for the unfair competition claims. *See* Pls.' FFCL 28.

28   Case No.: 5:18-cv-07182-EJD
     FINDINGS OF FACT AND CONCLUSIONS OF LAW
                                    14

United States District Court
Northern District of California

1  accepted the specific prices quoted in Plaintiffs' April 2019 Offer but for Defendants' conduct.

2  <div style="text-align:center"><strong>a.  Fact of Damages</strong></div>

3  The Court finds that Defendants' (1) trademark infringement, (2) false advertising and

4  designation of origin, and (3) copyright infringement caused Neo4j USA damages in the form of

5  lost licensing revenue from the MPO.

6  First, the evidence shows that Defendants' trademark infringement violation contributed to

7  the MPO choosing ONgDB over Neo4j EE.

8  The Court previously found that the following conduct was likely to create customer

9  confusion and thus gave rise to trademark infringement: (1) marketing without proper trademark

10  notices products called "Neo4j Enterprise" and "Government Package for Neo4j" to create the

11  misleading perception that Defendants' products were Plaintiffs' products; (2) using the Neo4j

12  Mark in their URLs and email addresses; (3) using embedded "Neo4j" links to Neo4j USA's

13  website and GitHub repository on their websites; (4) hyperlinking to Plaintiffs' build instructions,

14  support documentation and change logs containing the Neo4j Mark rather than creating and

15  hosting their own with the ONgDB name; and (5) using of "Neo4j Enterprise" and "ONgDB"

16  interchangeably to promote ONgDB on their websites.  First MSJ Order 19–22.

17  Here, the KMS Project required the enterprise features found in both Neo4j EE and

18  ONgDB.  Undisputed Facts ¶ 111.  The MPO learned about the pricing of Neo4j Enterprise

19  software bundles offered by Neo4j USA and iGov from iGov's website, and subsequently

20  exchanged emails with Suhy regarding representations made on iGov's website that ONgDB was

21  an open source version of Neo4j EE that provided the same enterprise-only features for free.  *Id.*

22  ¶¶ 3, 4.  Suhy also informed Next Century that the MPO could use ONgDB under the AGPL

23  without restrictions or paying Plaintiffs for a commercial license, as advertised on the iGov's

24  website.  *Id.* ¶ 5.  As a result of Next Century's communications with Suhy, Next Century

25  downloaded ONgDB v3.4 and began evaluating against Neo4j EE v3.4.  *Id.* ¶ 6.  The MPO

26  subsequently chose to integrate ONgDB v3.4 for free instead of Neo4j EE v3.4, and later upgraded

27  to ONgDB v3.5 instead of purchasing Neo4j EE v3.5.  *Id.*  This series of events makes clear that

28  Case No.: 5:18-cv-07182-EJD
FINDINGS OF FACT AND CONCLUSIONS OF LAW

<div style="text-align:center">15</div>

United States District Court
Northern District of California

1    the trademark infringements on iGov's website led to the MPO learning of ONgDB and ultimately

2    choosing ONgDB v3.5 over Neo4j EE v3.5.

3           Second, the evidence shows that Defendants' false advertising and false designation of

4    origin violation contributed to the MPO choosing to integrate ONgDB over Neo4j EE.

5           The Court previously found that Defendants' characterization of ONgDB as a "drop-in

6    replacement" and "open source" are material statements that were false or likely to mislead

7    consumers. First MSJ Order 28–32.

8           Here, for similar reasons, the Court finds that Defendants' advertisement of ONgDB to

9    Next Century as a "drop-in replacement" and "open source" contributed to the MPO integrating

10   ONgDB rather than Neo4j EE. As discussed above, the KMS Project required the enterprise

11   features found in both Neo4j EE and ONgDB, and the MPO ultimately chose ONgDB in part on

12   the belief that it was a "drop-in replacement" and "open source" version of Neo4j EE. Undisputed

13   Facts ¶ 111.

14          Third, the evidence shows that Defendants' DMCA violation contributed to the MPO

15   choosing ONgDB over Neo4j EE.

16          The Court previously found that Defendants' removal of the Commons Clause and

17   replacement of the Neo4j Sweden Software license with a generic open source APGL license

18   violated the DMCA. Second MSJ Order 16–24.

19          Again here, the evidence shows that the KMS Project required the enterprise features

20   found in both Neo4j EE and ONgDB, and the MPO ultimately chose ONgDB in part because it

21   offered the same features as Neo4j EE, but for free. Because Defendants' removal of the

22   Commons Clause allowed the MPO to use ONgDB v3.5 for free rather than pay for a Neo4j EE

23   v3.5 commercial license, the DMCA violation necessarily contributed to the MPO choosing

24   ONgDB over Neo4j EE.

25          Based on the foregoing, the Court finds sufficient evidence that Defendants' Lanham Act

26   and DMCA violations caused the MPO to implement ONgDB instead of purchasing a commercial

27   license from Neo4j USA.

28   Case No.: 5:18-cv-07182-EJD
     FINDINGS OF FACT AND CONCLUSIONS OF LAW

### b.    Amount of Damages

While Plaintiffs have proven the fact of damages, the Court finds the evidence insufficient to establish that this conduct caused Plaintiffs to lose $2,370,598 in potential licensing revenue. However, the Court finds sufficient evidence to show that the MPO would have accepted an offer for a lesser amount.

### i.    Insufficient Evidence to Support Damages Requested

Most notably, the evidence shows that the April 2019 Offer was not final.  When Next Century provided the information to generate the April 2019 quote, they informed Neo4j USA that they did not "have a firm grasp on what the (eventual) production posture will be," but provided Neo4j with some information "for now."  Trial Ex. 116, ECF No. 241-40.  A few months later, after a meeting between Neo4j USA and Next Century, Neo4j USA emailed Next Century stating that they were prepared to offer a "much lower" quote—in Neo4j USA representative's own words, Neo4jUSA was willing to offer "a more robust capability that provides the same SLA as your Neo4j CE based solution for a *much lower price* point than what we originally proposed based on your initial stated requirements."  Trial Ex. 120 (emphasis added).  Plaintiffs have provided no evidence for the Court to presume what amount this new quote may have been.

Further, there is no evidence that the MPO had the budget to accept the April 2019 Offer for the KMS Project; to the contrary, the only evidence regarding funding is evidence showing that the MPO's prior similar projects with Next Century never budgeted for a commercial license. Weyant Dep. 30:6–17, 37:6–13, 67:11–21, 92:23–94:12, 96:4–11, 108:2–19, 103:21–104:3.

Finally, while the Parties' stipulation states that the MPO's willingness to purchase a commercial license for Neo4j EE for the KMS Project is supported by its history of purchasing other Neo4j EE commercial licenses, the Court finds this support tenuous.  It is true that the MPO has a history of purchasing Neo4j EE commercial licenses, and this fact serves to support Plaintiffs' argument.  Undisputed Facts ¶ 18.  However, there is a significant price disparity between the licenses purchased and the April 2019 Offer.  The evidence shows that between 2014 and 2022, the MPO purchased six one-year commercial licenses from Neo4j USA, which ranged

Case No.: 5:18-cv-07182-EJD
FINDINGS OF FACT AND CONCLUSIONS OF LAW
17

United States District Court
Northern District of California

1    from $9,300 to $248,310, as well as one two-year commercial license for $66,249.  Trial Ex. 15, at

2    lines 337–43.  In total, the MPO has spent $929,208.00 in various licenses across the course of

3    eight years.  But here, the April 2019 Offer gave the MPO the option to purchase three one-year

4    subscriptions for a total of $2,667,000 or purchase a three-year subscription for a total of

5    $2,266,950.  Undisputed Facts ¶ 17.  There is no evidence of any comparable purchases or other

6    evidence of the MPO's budget which would support Plaintiffs' argument that the MPO had the

7    ability to accept a multi-million dollar licensing package.  Considering this extreme price

8    disparity, there is insufficient evidence to support the damages sought by Plaintiffs.

9           Together, these facts demonstrate the lack of evidence sufficient to show that the MPO

10   would have accepted the April 2019 Offer as written but for Defendants' conduct.  While

11   Plaintiffs are correct that the Court had previously found that the circumstances surrounding the

12   April 2019 Offer gave rise to a presumption of injury under the Lanham Act, the Court cannot

13   presume that Plaintiffs would have generated over two million dollars in revenue given these

14   facts.[8]

15                    ii.        **Sufficient Evidence to Show Lesser Amount of Damages**

16          However, Plaintiffs are correct that they have a lower burden of proof in calculating the

17   exact amount of actual damages here.  *Skydive Arizona*, 673 F.3d at 1112.  Calculations need not

18   rely on, for example, empirical quantification or expert testimony—they must only be supported

19   by "reasonable inferences and assessments, based upon substantial evidence in the record."  *Id.* at

20   1113.  While there is insufficient evidence to establish that the MPO would have accepted the

21   April 2019 Offer as written, the evidence of other purchases and the ongoing negotiations does

22   support a conclusion that the MPO would have been more likely to accept an offer of a lower

23   amount but for Defendants' conduct.

24

25   _____

26   [8] To clarify, the Court did not make a finding as to the specific amount of actual damages incurred
     by the loss of the MPO contract in its First MSJ Order, as Plaintiffs argue.  *See* Pls.' FFCL 22.
     While the Court found that Plaintiffs provided evidence sufficient to show an injury arising from

27   Defendants' Lanham Act violations, the issue of calculating monetary damages was not presented
     before the Court at that time.  First MSJ Order 16.

28   Case No.: 5:18-cv-07182-EJD
     FINDINGS OF FACT AND CONCLUSIONS OF LAW
                                          18

United States District Court
Northern District of California

1        Aside from Neo4j USA's multi-million dollar offer, the only other estimate in the evidence

2    is in Neo4j USA's initial communications with Next Century in June 2018, where Neo4j USA

3    informed Next Century that the Enterprise Edition bundles started at $111,000 per year for a 3-

4    server cluster with standard support.  Trial Ex. 103.  By the time Neo4j USA made its April 2019

5    Offer, this starting bundle price rose to $199,000, with optional add-ons for an increased price.

6    Trial Ex. 17.  This number is also reflected in the breakdown of Neo4j USA's April 2019 Offer.

7    Trial Ex. 118.

8        The Court finds sufficient evidence to show that the MPO would have at least purchased

9    this starting bundle for $199,000 but for Defendants' conduct.  This price reflects the lowest

10   possible bundle price, therefore even a "much lower quote" would not have fell below this

11   amount.  *See* Steven Boyles Expert Report, Trial Ex. 209, Expert Report of Steven B. Boyles, at

12   41 n.169, ECF No. 244-3.  This price also falls within the range of other licenses that the MPO has

13   purchased from Neo4j USA, and it is an amount that could have conceivably been allocated from

14   Next Century's awards in similar prior projects.  Trial Ex. 15, at lines 337–43; Weyant Dep. 30:6–

15   17.  The Court notes that it cannot be certain whether this base configuration would have

16   ultimately been enough to fit the MPO's specific needs for the KMS Project—it is possible that

17   the KMS Project required additional servers or machines; but as discussed above, there is no

18   evidence regarding exactly what the MPO required beyond the base package given Neo4j USA's

19   email indicating that the specifications used for the April 2019 quote had changed.

20       Finding that the evidence shows the MPO likely would have purchased, at a minimum, the

21   starting bundle for $199,000 but for Defendants' conduct, the Court now considers how many

22   years of that subscription the MPO would have purchased.  Neo4j USA's April 2019 offer was

23   limited to the KMS Project, which terminated in September 2019, and Neo4jUSA did not make

24   any additional offers.  *See* Trial Ex. 103.  However, the evidence also shows that the project

25   immediately following the expiration of the KMS Project, referred to as "Route 66," continued on

26   to deploy an ONgDB-based solution, and the subcontracts and renewals that followed continued

27   deploying ONgDB-based solutions until as recently as October 2022.  Weyant Dep. 116:25–117:5,

28   Case No.: 5:18-cv-07182-EJD
     FINDINGS OF FACT AND CONCLUSIONS OF LAW
                                    19

126:12–127:23.[9]  There is also evidence that the MPO has historically renewed other Neo4j EE license subscriptions.  Trial Ex. 15, at lines 337–43.  Taken together, the evidence supports a finding that, if the MPO had implemented a Neo4j EE subscription in the KMS Project, the projects immediately following would have done the same until October 2022; thus, the MPO would have renewed this contract for at least three years following the April 2019 Offer for a total of $597,000.

Therefore, in consideration of Plaintiffs' lower burden of proof in calculating the exact amount of actual damages, *Skydive Arizona*, 673 F.3d at 1112, the Court exercises its discretion in evaluating the evidence and equities and awards $597,000 in actual damages.

### c. Innocent Infringer

Defendants argue that any monetary award should be reduced or remitted because Suhy's DMCA violation was "innocent" pursuant to 17 U.S.C. § 1203(c).  Defs.' FFCL 11.  Defendants argue that Suhy had no reason to believe that removing the Commons Clause would violate the DMCA, highlighting that Suhy read the AGPL license, studied information, and spoke with the Free Software Foundation, the copyright holder of the AGPL, which confirmed that the addition could be removed.  *Id.*

The Court finds Defendants' arguments irrelevant to its award of damages here.  The Court found that the actual damages arising out of the lost MPO contract was the result of not only Defendants' DMCA violation, but also Defendants' violation of the Lanham Act.  Thus, even if the Court were to find that Suhy was an innocent copyright infringer because he believed he could lawfully remove the Commons Clause, this would not alter the actual damages award arising from the Lanham Act violations.  Therefore, the Court finds it unnecessary to address Defendants' DMCA innocent copyright infringer arguments.

* * *

---

[9] While the MPO increased the number of servers and machines once ONgDB was placed into production, there is no evidence that this increase met or exceeded the specifications in Neo4j USA's April 2019 Offer. Weyant Dep. 118:7–24.

Case No.: 5:18-cv-07182-EJD
FINDINGS OF FACT AND CONCLUSIONS OF LAW
20

The Court finds that Plaintiffs have provided evidence sufficient to show the fact of damages, but not sufficient to show the amount Plaintiffs requested. Therefore, the Court exercises its discretion to award Plaintiffs $597,000 in actual damages.

**2.    IRS**

Plaintiffs argue that Suhy's trademark infringement, false advertising and false designation of origin, and copyright infringement caused Plaintiffs to lose potential licensing revenue after the IRS rejected their July 2018 Offer for a Neo4j EE v§3.4 commercial subscription and instead adopted ONgDB for free. Pls.' FFCL 30. Plaintiffs seek an award of $3,069,646 in potential licensing revenue, as well as $1,562,082.55 in Defendants' illicit profits. *Id.* at 31.

Again here, to recover actual damages, Plaintiffs must prove both (1) the fact of the damages and (2) the amount of damages. *Skydive Arizona*, 673 F.3d at 1112.

For the reasons explained below, the Court finds that Plaintiffs fail at the first step—there is insufficient evidence to show that Suhy's conduct caused Plaintiffs to lose potential licensing revenue or caused Suhy to gain illicit profits.

**a.    Fact of Damages**

The Court finds insufficient evidence to show that Defendants' (1) trademark infringement, (2) false advertising and designation of origin, or (3) copyright infringement caused Neo4j USA damages in the form of lost licensing revenue from the IRS.

First, the Court finds insufficient evidence to show that Suhy's trademark infringement contributed to Plaintiffs losing potential licensing revenue from their July 2018 Offer.

There is simply no evidence that the IRS ever came across or experienced the online conduct that the Court found constituted trademark infringement, i.e., marketing "Neo4j Enterprise" and "Government Package for Neo4j" without proper trademark notices; using the Neo4j Mark in their URLs and email addresses; using embedded "Neo4j" links on their websites; hyperlinking to Plaintiffs' materials containing the Neo4j Mark; or using of "Neo4j Enterprise" and "ONgDB" interchangeably to promote ONgDB on their websites. First MSJ Order 19–22. For those same reasons, the Court finds that there is no evidence to show that Suhy and eGov were

Case No.: 5:18-cv-07182-EJD
FINDINGS OF FACT AND CONCLUSIONS OF LAW
21

1    The Court finds that Plaintiffs have provided evidence sufficient to show the fact of

2    damages, but not sufficient to show the amount Plaintiffs requested.  Therefore, the Court

3    exercises its discretion to award Plaintiffs $597,000 in actual damages.

### 2.    IRS

5    Plaintiffs argue that Suhy's trademark infringement, false advertising and false designation

6    of origin, and copyright infringement caused Plaintiffs to lose potential licensing revenue after the

7    IRS rejected their July 2018 Offer for a Neo4j EE v§3.4 commercial subscription and instead

8    adopted ONgDB for free.  Pls.' FFCL 30.  Plaintiffs seek an award of $3,069,646 in potential

9    licensing revenue, as well as $1,562,082.55 in Defendants' illicit profits.  *Id.* at 31.

10    Again here, to recover actual damages, Plaintiffs must prove both (1) the fact of the

11    damages and (2) the amount of damages.  *Skydive Arizona*, 673 F.3d at 1112.

12    For the reasons explained below, the Court finds that Plaintiffs fail at the first step—there

13    is insufficient evidence to show that Suhy's conduct caused Plaintiffs to lose potential licensing

14    revenue or caused Suhy to gain illicit profits.

### a.    Fact of Damages

16    The Court finds insufficient evidence to show that Defendants' (1) trademark infringement,

17    (2) false advertising and designation of origin, or (3) copyright infringement caused Neo4j USA

18    damages in the form of lost licensing revenue from the IRS.

19    First, the Court finds insufficient evidence to show that Suhy's trademark infringement

20    contributed to Plaintiffs losing potential licensing revenue from their July 2018 Offer.

21    There is simply no evidence that the IRS ever came across or experienced the online

22    conduct that the Court found constituted trademark infringement, i.e., marketing "Neo4j

23    Enterprise" and "Government Package for Neo4j" without proper trademark notices; using the

24    Neo4j Mark in their URLs and email addresses; using embedded "Neo4j" links on their websites;

25    hyperlinking to Plaintiffs' materials containing the Neo4j Mark; or using of "Neo4j Enterprise"

26    and "ONgDB" interchangeably to promote ONgDB on their websites.  First MSJ Order 19–22.

27    For those same reasons, the Court finds that there is no evidence to show that Suhy and eGov were

28    Case No.: 5:18-cv-07182-EJD
FINDINGS OF FACT AND CONCLUSIONS OF LAW

United States District Court
Northern District of California

1    awarded their contract due to any of the conduct the Court found gave rise to trademark

2    infringement.

3         **Second**, the Court finds insufficient evidence to show that Suhy's false advertising and

4    false designation of origin violation contributed to Plaintiffs losing potential licensing revenue

5    from their July 2018 Offer.

6         Plaintiffs argue that Suhy's characterization of ONgDB as an "open source license" that

7    "come[s] directly from the Graph Foundation" caused the IRS to reject their July 2018 Offer. *See*

8    Pls.' FFCL 29–30. However, the evidence shows that Suhy made these statements months after

9    the IRS had already rejected Neo4j USA's July 2018 Offer, and more importantly, these

10   statements were made to convince the IRS to integrate ONgDB instead of another open source

11   Neo4j CE license, not Neo4j EE v3.4.

12        A brief reiteration of the relevant timeline will aid the Court's discussion on this point.

13        *May 2018*

14        In May 2018, the IRS publicly posted an intent to award the sole source contract for the

15   CKGE Project to eGov. Trial Tr. Vol. I 79:20–23. At that time, the CKGE Project had been using

16   the publicly available Neo4j EE v3.2. Dunn Dep. 99:3–100:10, ECF No. 210, Ex. 5. Neo4j USA

17   saw this public post and emailed the IRS. Trial Ex. 126; Trial Tr. Vol. I 79:20–82:8. Neo4j USA

18   believed that the CKGE Project would require Neo4j EE v3.4, so they informed the IRS of the

19   licensing changes to Neo4j EE v3.4, namely the addition of the Commons Clause, and encouraged

20   them to purchase a commercial license and support services from Neo4j USA. Trial Tr. Vol. I

21   81:22–82:8. That same day, Suhy contacted the IRS to share his opinion that Neo4j Sweden was

22   not permitted to add the Commons Clause to the license governing Neo4j EE v3.4. Trial Ex. 128.

23   The following day, the IRS declined the invitation to purchase the Neo4j EE v3.4 license,

24   informing Neo4j USA that their budget was "extraordinarily limited in all avenues," and they

25   would be sticking with the publicly available Neo4j EE v3.2 that they had been using. Trial Ex.

26   128; Trial Ex. 131. However, the IRS welcomed Neo4j USA to provide a demonstration of Neo4j

27   EE 3.4 for planning purposes. *Id.*

28   Case No.: 5:18-cv-07182-EJD
     FINDINGS OF FACT AND CONCLUSIONS OF LAW
                                     22

United States District Court
Northern District of California

United States District Court
Northern District of California

1    On May 24, 2018, the IRS carried forward with its plan to award eGov the contract for the

2    CKGE Project. Trial Ex. 182; Trial Ex. 183. The project proceeded using the publicly available

3    Neo4j EE v3.2. Dunn Dep. 99:3–100:10.

4    *June 2018*

5    In June 2018, the IRS had asked Suhy about switching from Neo4j EE v3.2 to the Neo4j

6    3.3.1 CE (the open-source community edition) because, given the amount of users and the demand

7    requirements, "it wasn't necessary to have any of the Enterprise features." Dunn. Dep. 110:11–

8    101:4. Suhy suggested that the IRS should adopt the open fork software managed by eGov for the

9    CKEG project, later released as ONgDB, instead of switching to Neo4j CE 3.3.1. Trial Ex. 129.

10   The IRS ultimately followed Suhy's advice and made a plan to integrate what would later be

11   called ONgDB. Dunn. Dep. 102:3–15.

12   *July 2018*

13   Meanwhile, the IRS had been continuing its discussions with Neo4j USA about Neo4j EE

14   v3.4 "for planning purposes." Trial Ex. 128, 131. After some back and forth, Neo4j USA

15   provided its July 2018 Offer, with the understanding that the IRS was "just looking for budgetary

16   pricing at the moment." Trial Ex. 131. On July 27, 2018, the IRS replied that the quote was

17   helpful "for planning purposes," but informed Neo4j again that they still did not intend to follow

18   up with a new acquisition at that time. Trial Ex. 131.

19   *August 2018*

20   In August 2018, approximately one month after the IRS declined to purchase a Neo4j EE

21   v3.4 license for the second time, the IRS revisited its June 2018 plan to integrate ONgDB instead

22   of Neo4j CE v3.3.1. Trial Ex. 132. When asked about when to integrate ONgDB, Suhy

23   recommended that the IRS integrate ONgDB v3.4 sooner rather than later, claiming that "ONgDB

24   open source licenses come directly from the Graph Foundation as well, not from Neo4j Inc." Trial

25   Ex. 132, 133. The Court later found that this statement constituted false advertising and false

26   designation of origin. First MSJ Order 28–32. Based on Suhy's recommendation, the IRS

27   instructed him to integrate the ONgDB into the CKGE framework on August 14, 2018. Trial Ex.

28   Case No.: 5:18-cv-07182-EJD
     FINDINGS OF FACT AND CONCLUSIONS OF LAW
     23

133.

The evidence clearly shows that Suhy's representations caused the IRS to integrate ONgDB; however, the evidence also shows that the IRS chose ONgDB over Neo4j *CE v3.3.1*, not Neo4j *EE v3.4*.[10] The IRS did not need Neo4j v3.4 features for the CKGE Project—they were considering a switch to the free and publicly available Community Edition software when Suhy recommended ONgDB. Dunn. Dep. 110:11–101:4; Trial Ex. 129, ECF No. 241-53. And notably, since removing ONgDB after the Court's preliminary injunction, the IRS has returned to the Community Edition across the board with no evidence of any issues or need for additional features. Trial Tr. Vol. I 277:18–278:14, 280:22. While the IRS invited Neo4j USA to demonstrate Neo4j EE v3.4, the evidence shows that this invitation was to gain information "for planning purposes." Trial Ex. 131. Neo4j USA understood that the IRS was merely looking for "budgetary pricing" when it allowed Neo4j USA to demo the software for them and provide a quote. *Id.*

The Court also finds the evidence insufficient to prove that Defendants' profits from the CKEG contract were the result of his statements. Suhy's contract for the CKGE Project did not require him to provide support for ONgDB—the IRS had a team dedicated to supporting ONgDB. Trial Tr. Vol. II 316:16–17; 320:11–321:25. While Suhy voluntarily provided input in the architecture design and hardware requirements needed to run ONgDB installations on multiple servers within the CKGE, his income from the project was not dependent on that support. *Id.* Even if Suhy was required under his contract to provide the support services for whichever

---

[10] The Court notes that, pursuant to Rule 52, it reached its conclusion by weighing the Parties' stipulation that the IRS decided to not allocate $156,000 for a license to use Neo4j EE in the CKGE platform because ONgDB was a free and open, unrestricted alternative, with the other evidence cited to in this section. *See, e.g., In re Jagar*, No. 13-46850 CN, 2015 WL 4327902, at *1 (Bankr. N.D. Cal. July 15, 2015), *aff'd*, No. 4:14-AP-04037-CN, 2017 WL 1371297 (B.A.P. 9th Cir. Apr. 12, 2017), *aff'd*, 742 F. App'x 310 (9th Cir. 2018) ("When considering a Rule 52(c) motion, this court must take an unbiased view of all of the evidence, direct and circumstantial, and accord it such weight as the court believes it is entitled to receive.") (internal quotation marks omitted); *see also Zivkovic v. S. California Edison Co.*, 302 F.3d 1080, 1090 (9th Cir. 2002) (stating that it is the obligation of the trier of fact to resolve conflicting evidence).

Case No.: 5:18-cv-07182-EJD
FINDINGS OF FACT AND CONCLUSIONS OF LAW
24

United States District Court
Northern District of California

1    software the IRS chose, the Court reiterates that the IRS was considering ONgDB and Neo4j *CE*

2    *v3.3.1*, thus Suhy would have been able to provide support to both, as Neo4j CE was a publicly

3    available software.

4        Third, the Court finds insufficient evidence to show that Suhy's DMCA violation, that is,

5    his removal of the Commons Clause, contributed to Plaintiffs losing potential licensing revenue

6    from their July 2018 Offer. Again here, the evidence clearly shows that the IRS did not need the

7    enterprise features. Dunn. Dep. 110:11–101:4.[11] Thus, for all the reasons described above, the

8    evidence does not support Plaintiffs' argument that Suhy's profits resulted from his removal of the

9    Commons Clause in ONgDB v3.5.

<div align="center">

**b.    Amount of Damages**

</div>

11       Because the Court finds insufficient evidence to show the fact of damages, the Court finds

12   it unnecessary to address the Parties' arguments regarding the amount of damages.

<div align="center">* * *</div>

14       The Court finds that Plaintiffs have failed to provide sufficient evidence to show the fact of

15   damages resulting from their July 2018 Offer. Therefore, the Court awards no damages as to the

16   July 2018 Offer.

<div align="center">

**3.    Attorneys' Fees**

</div>

18       Section 35(a) of the Lanham Act provides that "[t]he court in exceptional cases may award

19   reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). Similarly, the DMCA

20   provides in relevant part that "the court may . . . award a reasonable attorney's fee to the prevailing

21   party as part of the costs." 17 U.S.C. § 505. An "exceptional" case under either statute "is simply

22   one that stands out from others" where there is a showing "that a defendant engaged in malicious,

23   fraudulent, deliberate or willful infringement." *SunEarth, Inc. v. Sun Earth Solar Power Co.*, 839

---

[11] Again here, the Court took into consideration the Parties' stipulation that Defendants' removal of the Commons Clause from the license governing ONgDB enabled the IRS to use ONgDB for free rather than pay for a commercial license to Neo4j EE, Stip. to Amount ¶ 48, and weighed that fact against the IRS representative's email and testimony stating that they were not seeking enterprise features at the time. Dunn. Dep. 110:11–101:4; Trial Ex. 129.

Case No.: 5:18-cv-07182-EJD
FINDINGS OF FACT AND CONCLUSIONS OF LAW
25

F.3d 1179, 1180 (9th Cir. 2016) (internal quotation marks omitted) (quoting *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1409 (9th Cir. 1993), *superseded by statute on other grounds*, Trademark Amendments Act of 1999, Pub. L. No. 106–43, 113 Stat. 218)); *see also, e.g., Jason Scott Collection, Inc. v. Trendily Furniture, LLC*, 68 F.4th 1203, 1223 n.13 (9th Cir. 2023); *Dish Network, L.L.C. v. SatFTA,* No. 5:08-CV-01561 JF PSG, 2011 WL 856268, at *7 (N.D. Cal. Mar. 9, 2011). Courts "should examine the totality of the circumstances to determine if the case was exceptional, exercising equitable discretion in light of the nonexclusive factors identified in *Octane Fitness* and *Fogerty*, and using a preponderance of the evidence standard." *SunEarth*, 839 F.3d at 1181 (internal quotation marks omitted) (quoting *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014)). These factors include "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Octane Fitness*, 572 U.S. at 554 n.6 (internal quotation marks omitted) (quoting *Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994)). Courts generally understand the term "exceptional" to mean cases in which the infringement can be characterized as "malicious, fraudulent, deliberate or willful." *Derek Andrew, Inc. v. Poof Apparel Corp.*, 528 F.3d 696, 702 (9th Cir. 2008). But ultimately, "[t]here is no precise rule or formula for making these determinations, but instead equitable discretion should be exercised in light of the[se] considerations." *Fogerty*, 510 U.S. at 534 (internal quotation marks omitted).

Here, Plaintiffs argue that this is an "exceptional" case because Defendants' violations of the Lanham Act and the DMCA were willful. In support, Plaintiffs highlight the Court's prior findings that Defendants' use of the Neo4j Mark created the misleading perception that Defendants' products were Plaintiffs' products, Defendants' statements that ONgDB was "open source" and a "drop in replacement" were false, and that Defendants' removal of the Commons Clause was unlawful under Neo4j USA's copyright. Pls.' FFCL 31–32. Plaintiffs also argue that Defendants litigated this case in an unreasonable manner by repeatedly reasserting legal arguments, claims, and defenses that the Court previously dismissed with prejudice or otherwise

Case No.: 5:18-cv-07182-EJD
FINDINGS OF FACT AND CONCLUSIONS OF LAW
26

United States District Court
Northern District of California

determined to be meritless. *Id.* at 33–34.

Upon consideration of the totality of the circumstances and the factors referenced in *SunEarth*, the Court finds that this is not an "exceptional" case warranting attorneys' fees.

First, while some of Defendants' conduct in this case could be considered frivolous, such as re-litigating settled issues or raising affirmative defenses without a proper basis, the Court does not find this conduct egregious enough to be considered "exceptional." *See, e.g., TransPerfect Glob., Inc. v. MotionPoint Corp.*, No. C 10-2590 CW, 2014 WL 6068384, at *8 (N.D. Cal. Nov. 13, 2014) (finding "frivolous arguments" and other missteps, only some of which were inadvertent, too minor to justify a fee award).

Next, the evidence shows that Suhy's conduct was largely motivated by his belief in the freedom and liberty of open-source software rather than financial or other motivation. Trial Tr. Vol. II 251:11–21; 299:25–17. As the Court discussed above, Suhy did not make any financial gains from his interactions with the MPO, and the IRS's choice between Neo4j CE or ONgDB did not impact his ability to continue his work with the IRS.

Further, while some of Defendants' arguments in this case, as noted above, were objectively unreasonable, the Court observes that this case dealt with issues lacking the benefit of a body of established case law to guide Defendants' conduct or litigation strategy, particularly the legal implications of removing a Commons Clause. Thus, Defendants' conduct, when viewed in the totality of the limited legal landscape surrounding this case, does not make this case "exceptional."

Moreover, the Court weighs the equities and finds that the monetary award of $597,000 plus the prejudgment interest and injunctive relief described below is sufficient to advance considerations of compensation and deterrence.

Finally, the Court is unpersuaded by Plaintiffs' arguments that the conduct here constitutes "exceptional" malicious, fraudulent, deliberate or willful infringement. Plaintiffs' reliance on the Court's findings that Defendants violated the Lanham Act and the DMCA does not aid the Court in its analysis here—liability does not automatically trigger an award of attorneys' fees.

In consideration of the above, the Court finds that Plaintiffs have failed to show that this

Case No.: 5:18-cv-07182-EJD
FINDINGS OF FACT AND CONCLUSIONS OF LAW
27

United States District Court
Northern District of California

1    case "stands out" from others and denies Plaintiffs' request for attorneys' fees.

2        Given that the Court has not awarded attorneys' fees, the Court finds it unnecessary to

3    address Plaintiffs' remaining arguments regarding whether Defendants' counsel should be held

4    jointly and severally liable for those fees.

5            **4.    Prejudgment Interest**

6        "An award of pre-judgment interest in a case under federal law is left to the sound

7    discretion of the trial court." *Twin City Sportserv., Inc. v. Charles O. Finley & Co.*, 676 F.2d

8    1291, 1310 (9th Cir. 1982). "Awards of pre-judgment interest are governed by considerations of

9    fairness and are awarded when it is necessary to make the wronged party whole." *United States v.*

10   *Cal. State Bd. of Equalization,* 650 F.2d 1127, 1132 (9th Cir. 1981), *aff'd mem.*, 456 U.S. 901

11   (1982) (citation omitted). Courts may, in their discretion, award prejudgment interest under the

12   DMCA if necessary "to effectuate the legislative purpose of making copyright holders whole and

13   removing incentives for copyright infringement." *Polar Bear Prods., Inc. v. Timex Corp.*, 384

14   F.3d 700, 716–18 (9th Cir. 2004), *as amended on denial of reh'g and reh'g en banc* (Oct. 25,

15   2004), *opinion amended on denial of reh'g*, No. 03-35188, 2004 WL 2376507 (9th Cir. Oct. 25,

16   2004). Although not specifically provided in the statute, Courts may also award prejudgment

17   interest under the Lanham Act under the federal common law, which "authorizes the award of such

18   interest in appropriate cases to victims of violations of federal law." *Cyclone USA, Inc. v. LL&C*

19   *Dealer Servs., LLC*, No. CV 03-992-AJW, 2010 WL 2132378, at *1 (CD. Cal. May 24, 2010)

20   (quoting *Gorenstein Enters., Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431, 436 (7th Cir. 1989)).

21       Here, the Court exercises its discretion and awards prejudgment interest on the $597,000

22   award using the agreed-upon treasury-bill rate. *See* Stip. to Amount 1 (stipulating to Mr. Boyles's

23   interest calculations); *see also S.E.C. v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1083 (9th

24   Cir. 2010) ("The treasury-bill rate is the rate typically used in most cases for prejudgment interest

25   calculation."). The Court finds prejudgment interest appropriate under these circumstances to

26   make Plaintiffs whole and remove incentives for any future infringement.

27       The Court grants Plaintiffs leave to provide a declaration from Mr. Boyles on the final

28   Case No.: 5:18-cv-07182-EJD

United States District Court
Northern District of California

Case 5:18-cv-07182-EJD   Document 248   Filed 07/22/24   Page 29 of 33

prejudgment interest calculations pursuant to the Parties' stipulated method and in accordance

with this Order by **August 5, 2024**.

### B.   Injunctive Relief

Under the Lanham Act, a district court has the power to grant injunctions according to the

rules of equity and to prevent the violation of a trademark holder's rights. 15 U.S.C. §§ 1116(a),

1125(a); *see also Interstellar Starship Servs., Ltd. v. Epix, Inc.*, 304 F.3d 939, 948 (9th Cir. 2002);

*Levi Strauss & Co. v. Shilon*, 121 F.3d 1309, 1314 (9th Cir. 1997). The Lanham Act entitles a

trademark owner to an injunction if the owner's rights are being violated. *Penpower Tech. Ltd. v.*

*S.P.C. Tech.*, 627 F. Supp. 2d 1083, 1094 (N.D. Cal. 2008); *see also Century 21 Real Estate Corp.*

*v. Sandlin,* 846 F.2d 1175, 1180–81 (9th Cir. 1988) ("Injunctive relief is the remedy of choice for

trademark and unfair competition cases, since there is no adequate remedy at law for the injury

caused by a defendant's continuing infringement."). The DMCA also permits the Court to "grant

temporary and permanent injunctions on such terms as it deems reasonable to prevent or restrain a

violation" of Section 1202(b). 17 U.S.C. §§ 502(a), 1203(b)(1).

Here, the Court had previously granted a preliminary injunction upon finding that Plaintiffs

established a likelihood of success on the merits. First MSJ Order 32–34. The Ninth Circuit

affirmed the Court's ruling. *Neo4j, Inc. v. PureThink, LLC*, No. 21-16029, 2022 WL 781037 (9th

Cir. Mar. 14, 2022). Now, Plaintiffs have proven success on the merits, and Defendants consent

to a permanent injunction. Def.'s FFCL 10. Therefore, the Court finds good cause to convert the

preliminary injunctions entered in this action into a permanent injunction.

### III.   CONCLUSIONS AND ORDERS

The Court **AWARDS** $597,000 in actual damages, subject to prejudgment interest. All

other requests for damages and attorneys' fees are **DENIED**.

Plaintiffs are **ORDERED** to provide the Court an amended proposed judgment and revised

prejudgment interest calculations consistent with the Court's Findings of Fact and Conclusions of

Law by **August 5, 2024**.

The Court **GRANTS** Plaintiffs' unopposed request for a permanent injunction.

Case No.: 5:18-cv-07182-EJD
FINDINGS OF FACT AND CONCLUSIONS OF LAW
29

United States District Court
Northern District of California

Accordingly, consistent with the prior preliminary injunctions, *see* First MSJ Order; Second MSJ Order, Defendants are **HEREBY ENJOINED** from the following:

(1) Infringing U.S. Trademark Registration No. 4,784,280 for the word mark "NEO4J" covering the goods and services in International Classes, 009, 035, 041, 042 and 045 (the "Neo4j Mark").

(2) Advertising, promoting, representing or referring to ONgDB as a free and open source drop-in replacement of Neo4j Enterprise Edition distributions with the same version number, and any similar statement that may lead consumers to believe that ONgDB is a Neo4j USA or Neo4j Sweden product, or is identical to a Neo4j USA or Neo4j Sweden product.

(3) Advertising, promoting, representing, or referring to Neo4 Enterprise or Neo4j Enterprise Edition being released only under the AGPL.

(4) Representing that Neo4j Sweden AB's addition of the Commons Clause to the license governing Neo4j Enterprise Edition violated the terms of AGPL or that removal of the Commons Clause is lawful, and similar statements.

(5) Advertising, displaying or distributing products, literature or any other materials that use the Neo4j Mark to advertise or promote ONgDB in any way that suggests sponsorship or endorsement by Neo4j USA or Neo4j Sweden or that may lead consumers to believe that ONgDB is a Neo4j USA or Neo4j Sweden product, or is identical to a Neo4j USA or Neo4j Sweden product.

(6) Affixing, applying, annexing, or using in connection with the sale of any goods, a false description or representation including words or other symbols tending to falsely describe or represent such goods as being Neo4j products and from offering such goods in commerce.

(7) Assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in Paragraphs 1-6 above.

(8) Making further use of or fork any source code first released under the Neo4j Sweden

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Software License, including Neo4j EE v3.4, Neo4j EE v3.5, or any subsequent versions,

2    subversions or derivatives thereof.

3  (9)  Making further use of or fork any source code first released under a commercial license,

4    including Neo4j EE v3.5, Neo4j EE v4.x, Neo4j EE 5.x, or any subsequent versions,

5    subversions or derivatives thereof.

6  (10)  Offering for sale, advertising or promoting ONgDB, GraphStack GDB and GDB (and

7    any derivative or similar software created and/or maintained by Defendants), or any other

8    software containing Neo4j EE source code with a DMCA Violation or that was first

9    released subject to the Neo4j Sweden Software License.

10  (11)  Stating, claiming, advertising, or representing that Neo4j Sweden AB's inclusion of the

11    Commons Clause to the license governing Neo4j EE violated the terms of the GNU

12    Affero General Public License, version 3 ("AGPLv3"), or make similar statements

13    interpreting the terms of the AGPLv3.

14  (12)  Stating, claiming, advertising, or representing that the Free Software Foundation ("FSF")

15    or that any government agency determined and/or confirmed that (a) the inclusion of the

16    Commons Clause to any license governing Neo4j EE violated the terms of AGPLv3;

17    and/or (b) the Commons Clause can be removed from any software license governing

18    Neo4j EE and/or ONgDB.

19  (13)  Offering for sale or providing for any paid development, support, maintenance or hosting

20    services for ONgDB, GraphStack GDB, GDB (and any derivative or similar software

21    created and/or maintained by Defendants), or any other software containing Neo4j EE

22    source code with a DMCA Violation or that was first released subject to the Neo4j

23    Sweden Software License. However, nothing herein prevents Defendants from offering

24    paid consulting services for installations of Neo4j EE software, but only where the

25    customer receiving such services has a commercial license and has fully paid the

26    commercial license fees to Plaintiffs.

27  (14)  Making any statement and/or representations to any third party, affirmatively or in

28  Case No.: 5:18-cv-07182-EJD
FINDINGS OF FACT AND CONCLUSIONS OF LAW
31

response to an inquiry, that state or imply that they can provide access to or can obtain any software containing any Neo4j EE source code with a DMCA Violation, that is subject to the Neo4j Sweden Software License, or not otherwise permitted for use by this Order.

(15) Having any expressed or implied license to use and making any further use of any of Plaintiffs' source code, object code, machine code and software that is subject to a commercial license or paid commercial subscription, including but not limited to Neo4j EE v3.4, and all versions and subversions thereof; Neo4j EE v3.5, and all versions and subversions thereof; Neo4j EE v4.x, and all versions and subversions thereof; and Neo4j EE v5.x, and all versions and subversions thereof. Nothing herein, however, restricts Defendants from purchasing a commercial license or subscription to Neo4j EE software from Plaintiffs or their authorized resellers.

(16) Defendants may only make further use of the following publicly available Neo4j open source code, subject to the terms of their respective open source licenses: (i) Neo4j CE Source Code under the GNU General Public License, v3 ("GPL"); (ii) Neo4j EE v3.2.14 source code released under the AGPLv3; (iii) Neo4j EE v3.3.10 source code released under the AGPLv3; (iv) Neo4j EE v3.4.0.RC02 source code released under the AGPLv3. Nothing herein, however, shall be construed as a license or otherwise permit Defendants to use any source code, patches or source code commits for Neo4j EE v3.3 or Neo4j EE v3.4 that were first released under the Neo4j Sweden Software License. Further, nothing herein shall be construed as a license or otherwise permit Defendants to use or fork, any of Plaintiffs' source code that was first released as Neo4j EE v3.5 or otherwise under the Neo4j Sweden Software License, including but not limited to, all beta releases, release candidates, production releases, stable releases, and official releases, or any subsequent versions, subversions, patches or derivatives thereof.

Case No.: 5:18-cv-07182-EJD
FINDINGS OF FACT AND CONCLUSIONS OF LAW
32

United States District Court
Northern District of California

Case 5:18-cv-07182-EJD   Document 248   Filed 07/22/24   Page 33 of 33

**IT IS SO ORDERED.**

Dated: July 22, 2024

EDWARD J. DAVILA
United States District Judge

Case No.: 5:18-cv-07182-EJD
FINDINGS OF FACT AND CONCLUSIONS OF LAW
33

# EXHIBIT C

Judgment, Northern District of California, Case No. 5:18-cv-07182-EJD

Date: August 15, 2024

1

2

3

4　　　　　　　　　　　UNITED STATES DISTRICT COURT

5　　　　　　　　　　NORTHERN DISTRICT OF CALIFORNIA

6

| | |
|---|---|
| NEO4J, INC., et al., | Case No. 5:18-cv-07182-EJD |
| Plaintiffs, | |
| v. | **JUDGMENT** |
| | Re: Dkt. Nos. 118, 216, 248 |
| PURETHINK, LLC, et al., | |
| Defendants. | |

In accordance with the Court's Orders at ECF Nos. 118, 216, and 248, the Court ENTERS

Judgment as follows:

      1.　　Judgment is entered in favor of Plaintiff Neo4j, Inc., on its First Cause of Action

for Trademark Infringement, 15 U.S.C. § 1114, against Defendants for their infringement of the

NEO4J Mark. ECF No. 118.

      2.　　Judgment is entered in favor of Plaintiff Neo4j, Inc., on its Second Cause of Action

for False Designation of Origin and False Advertising, 15 U.S.C. § 1125(a), against all

Defendants. ECF No. 118.

      3.　　Judgment is entered in favor of Plaintiff Neo4j, Inc., on its Third Cause of Action

for Unfair Competition, 15 U.S.C. § 1125(a), against all Defendants for their infringement of the

NEO4J Mark. ECF No. 118.

      4.　　Judgment is entered in favor of Plaintiff Neo4j, Inc., on its Fourth Cause of Action

for Unfair Competition, Cal. Bus. Prof. Code §§ 17200, et seq., against all Defendants. ECF No.

118.

      5.　　Judgment is entered in favor of Plaintiffs on their Eighth Cause of Action for

Unauthorized Distribution of Altered Copyright Management Information, 17 U.S.C. § 1202(b)(1)

and 17 U.S.C. § 1202(b)(3), against all Defendants. ECF No. 216.

United States District Court
Northern District of California

(84 of 273); Page 84 of 273 Case: 24-5538, 01/02/2025, DktEntry: 28.2, Page 84 of 273
Case 5:18-cv-07182-EJD   Document 251   Filed 08/15/24   Page 2 of 2

1       6.    Plaintiffs are HEREBY AWARDED $597,000 in actual damages plus $57,288 in

2   prejudgment interest, less the stipulated $26,000 deduction, and a permanent injunction as

3   described in ECF No. 248.  Defendants are jointly and severally liable for the payment of all such

4   amounts.  Each Party shall bear its own attorneys' fees and costs.

5       The Clerk of Court shall close the file in this matter.

6       **IT IS SO ORDERED.**

7   Dated: August 15, 2024

8
9       EDWARD J. DAVILA
    United States District Judge

United States District Court
Northern District of California

2

# EXHIBIT D

Notice of Appeal, Northern District of California, Case No. 5:18-cv-07182-EJD

Date: September 8, 2024

1  Adron W. Beene SB# 129040
   Adron G. Beene SB# 298088
2  Attorneys-at-Law
   7960 Soquel Drive, Ste B #296
3  Aptos, CA 95003
   Tel: (408) 392-9233
4  adron@adronlaw.com

5
   Attorneys for defendants:
6  PURETHINK LLC, a Delaware limited
   liability company, IGOV INC., a Virginia
7  corporation, and JOHN MARK SUHY

8
                    UNITED STATES DISTRICT COURT
9               NORTHERN DISTRICT OF CALIFORNIA

10
   NEO4J, INC., et al.,                  CASE NO. 5:18-CV-7182 EJD
11  Plaintiffs,
                                          **DEFENDANT JOHN MARK**
12  v.                                    **SUHY'S NOTICE OF APPEAL**
                                          **(with Circuit Rule 3-2**
13  PURETHINK LLC, et al.,                **Representation Statement**
    Defendants.                           **attached)**
14

15

16       Defendant JOHN MARK SUHY appeals to the United States Court of

17  Appeals for the Ninth Circuit from the "Judgment Re: Dkt. Nos. 118, 216, 248" Dkt.

18  No. 251, filed on August 15, 2024, attached hereto as Exhibit A. This notice of

19  appeal is intended to encompass all rulings, decisions, findings, and orders that are

20  appealable and adverse to John Mark Suhy.

21  Dated: September 8, 2024

                                    _____/s/ Adron G. Beene_____
22                                  Adron W. Beene SB# 129040
                                    Adron G. Beene SB# 298088
23                                  Attorneys-at-Law
                                    7960 Soquel Drive, Ste B #296
24                                  Aptos, CA 95003
                                    Tel: (408) 392-9233
25                                  adron@adronlaw.com

## CIRCUIT RULE 3-2 REPRESENTATION STATEMENT

**Appellants:**

JOHN MARK SUHY, Defendant

**Represented By:**

**Trial Counsel**
**Adron W. Beene**
adron@adronlaw.com
**Adron G. Beene**
adronjr@adronlaw.com
Attorneys-at-Law
7960 Soquel Drive, Ste B #296
Aptos, CA 95003
408-392-9233

**For Appellate Purposes**
**John Mark Suhy**
jmsuhy@gmail.com
Pro se
8814 Danewood Drive
Alexandria, VA 22308
Tel: (703) 862-7780

**Appellees:**

NEO4J, INC., a Delaware corporation, and NEO4J SWEDEN AB, a Swedish
corporation, Plaintiffs

**Represented By:**

**John V. Picone , III**
jpicone@spencerfane.com
**Jeffrey Michael Ratinoff**
jratinoff@spencerfane.com
SPENCER FANE LLP
225 West Santa Clara Street
Suite 1500
San Jose, California 95113
Telephone: 408.286.5100
Facsimile: 408.286.5722

Dated: September 8, 2024

                _____*/s/ Adron G. Beene*_____
                Adron W. Beene SB# 129040
                Adron G. Beene SB# 298088
                Attorneys-at-Law
                7960 Soquel Drive, Ste B #296
                Aptos, CA 95003
                Tel: (408) 392-9233
                adron@adronlaw.com

# EXHIBIT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEO4J, INC., et al., | Case No. 5:18-cv-07182-EJD |
| Plaintiffs, | |
| v. | **JUDGMENT** |
| PURETHINK, LLC, et al., | Re: Dkt. Nos. 118, 216, 248 |
| Defendants. | |

In accordance with the Court's Orders at ECF Nos. 118, 216, and 248, the Court ENTERS Judgment as follows:

1.      Judgment is entered in favor of Plaintiff Neo4j, Inc., on its First Cause of Action for Trademark Infringement, 15 U.S.C. § 1114, against Defendants for their infringement of the NEO4J Mark. ECF No. 118.

2.      Judgment is entered in favor of Plaintiff Neo4j, Inc., on its Second Cause of Action for False Designation of Origin and False Advertising, 15 U.S.C. § 1125(a), against all Defendants. ECF No. 118.

3.      Judgment is entered in favor of Plaintiff Neo4j, Inc., on its Third Cause of Action for Unfair Competition, 15 U.S.C. § 1125(a), against all Defendants for their infringement of the NEO4J Mark. ECF No. 118.

4.      Judgment is entered in favor of Plaintiff Neo4j, Inc., on its Fourth Cause of Action for Unfair Competition, Cal. Bus. Prof. Code §§ 17200, et seq., against all Defendants. ECF No. 118.

5.      Judgment is entered in favor of Plaintiffs on their Eighth Cause of Action for Unauthorized Distribution of Altered Copyright Management Information, 17 U.S.C. § 1202(b)(1) and 17 U.S.C. § 1202(b)(3), against all Defendants. ECF No. 216.

6. Plaintiffs are HEREBY AWARDED $597,000 in actual damages plus $57,288 in prejudgment interest, less the stipulated $26,000 deduction, and a permanent injunction as described in ECF No. 248. Defendants are jointly and severally liable for the payment of all such amounts. Each Party shall bear its own attorneys' fees and costs.

The Clerk of Court shall close the file in this matter.

**IT IS SO ORDERED.**

Dated: August 15, 2024

EDWARD J. DAVILA
United States District Judge

United States District Court
Northern District of California

2

# EXHIBIT E

Declaration of John Mark Suhy in Support of Motion to Stay Enforcement
of Judgment

Date: October 23, 2024

**IN THE CIRCUIT COURT OF FAIRFAX COUNTY, VIRGINIA**

**NEO4J, INC.**
Plaintiff,

v.

**JOHN MARK SUHY**
Defendant.

Case No.: CL-2024-0014686

**DECLARATION OF JOHN MARK SUHY**

I, John Mark Suhy, declare under penalty of perjury under the laws of the United States of America and the Commonwealth of Virginia that the following is true and correct to the best of my knowledge:

1. I am the Defendant in the above-referenced case.

2. I am an open-source advocate and developer who created the competing free and open source forks of Neo4j software called ONgDB and DozerDB.

3. Following the Free Software Foundation's issuance of the cease-and-desist letter, Neo4j, Inc. complied by removing all infringing content, including tags, branches, files, and source code from their public repository that contained the Commons Clause within the AGPL license.

4. I am the primary breadwinner for my family, while my wife works part-time, and my salary is essential for covering our family's living expenses. The garnishment of my wages would significantly impact our ability to meet those obligations, and it is highly likely that I will be forced into bankruptcy if the garnishment proceeds. This would not only harm me, my family, and other creditors, including Neo4j, but also jeopardize my government security clearances, which are vital to my employment.

5. The Free Software Foundation (FSF) and the Free Software Conservancy have communicated their intent to file amicus briefs in my appeal before the 9th Circuit Court.

6. Attached as Exhibit A is a true and accurate copy of the cease-and-desist letter sent by the Free Software Foundation to Neo4j, Inc. on November 13, 2023. This letter was provided to me by the Free Software Foundation.

7. Attached as Exhibit B is a true and accurate copy of the Findings of Fact and Conclusions of Law from the United States District Court for the Northern District of California, Case No. 5:18-cv-07182-EJD, dated July 22, 2024.

8. Attached as Exhibit C is a true and accurate copy of the Judgment from the United States District Court for the Northern District of California, Case No. 5:18-cv-07182-EJD, dated August 15, 2024.

9. Attached as Exhibit D is a true and accurate copy of the Notice of Appeal filed in the United States District Court for the Northern District of California, Case No. 5:18-cv-07182-EJD, dated September 8, 2024.

10. Attached as Exhibit F is a true and correct copy of the AGPLv3 license as it appeared in the Neo4j official repository before Neo4j removed it following the Free Software Foundation's cease-and-desist letter, dated November 13, 2023.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 23rd day of October, 2024.

**/s/ John Mark Suhy**

John Mark Suhy
8814 Danewood Dr
Alexandria, VA 22308
(703) 862-7780
jmsuhy@gmail.com

# EXHIBIT F

AGPLv3 License from Neo4j's Official Repository
Retrieved prior to its removal following the Free Software Foundation's
cease-and-desist letter on November 13, 2023

📖 neo4j / **neo4j**

<> **Code**    ⊙ Issues 214    ⌥ Pull requests 2    ⊙ Actions    🗔 Projects    📖 Wiki    ⊙ Sec

⑁ 3.4 ▾      ···

neo4j / enterprise / neo4j-enterprise / **LICENSE.txt**

🐾 **digitalstain** Updates enterprise LICENSE.txt and NOTICE.txt  ···    ⏱ **History**

⧍ **3 contributors**   😀 😀 🐾

| Raw | Blame |   🖵 ✎ 🗑 |

693 lines (568 sloc)   35.1 KB

```
 1   NOTICE
 2   This package contains software licensed under different
 3   licenses, please refer to the NOTICE.txt file for further
 4   information and LICENSES.txt for full license texts.
 5
 6   Neo4j Enterprise object code can be licensed independently from
 7   the source under separate commercial terms. Email inquiries can be
 8   directed to: licensing@neo4j.com. More information is also
 9   available at:https://neo4j.com/licensing/
10
11   The software ("Software") is developed and owned by Neo4j Sweden AB
12   (referred to in this notice as "Neo4j") and is subject to the terms
13   of the GNU AFFERO GENERAL PUBLIC LICENSE Version 3, with the Commons Clause as follows:
14
15
16
17                    GNU AFFERO GENERAL PUBLIC LICENSE
18                      Version 3, 19 November 2007
19
20    Copyright (C) 2007 Free Software Foundation, Inc. <http://fsf.org/>
21    Everyone is permitted to copy and distribute verbatim copies
22    of this license document, but changing it is not allowed.
23
24                              Preamble
25
26      The GNU Affero General Public License is a free, copyleft license
27    for software and other kinds of works, specifically designed to ensure
```

```
28    cooperation with the community in the case of network server software.
29
30        The licenses for most software and other practical works are
31    designed to take away your freedom to share and change the works.  By
32    contrast, our General Public Licenses are intended to guarantee your
33    freedom to share and change all versions of a program--to make sure it
34    remains free software for all its users.
35
36        When we speak of free software, we are referring to freedom, not
37    price.  Our General Public Licenses are designed to make sure that you
38    have the freedom to distribute copies of free software (and charge for
39    them if you wish), that you receive source code or can get it if you
40    want it, that you can change the software or use pieces of it in new
41    free programs, and that you know you can do these things.
42
43        Developers that use our General Public Licenses protect your rights
44    with two steps: (1) assert copyright on the software, and (2) offer
45    you this License which gives you legal permission to copy, distribute
46    and/or modify the software.
47
48        A secondary benefit of defending all users' freedom is that
49    improvements made in alternate versions of the program, if they
50    receive widespread use, become available for other developers to
51    incorporate.  Many developers of free software are heartened and
52    encouraged by the resulting cooperation.  However, in the case of
53    software used on network servers, this result may fail to come about.
54    The GNU General Public License permits making a modified version and
55    letting the public access it on a server without ever releasing its
56    source code to the public.
57
58        The GNU Affero General Public License is designed specifically to
59    ensure that, in such cases, the modified source code becomes available
60    to the community.  It requires the operator of a network server to
61    provide the source code of the modified version running there to the
62    users of that server.  Therefore, public use of a modified version, on
63    a publicly accessible server, gives the public access to the source
64    code of the modified version.
65
66        An older license, called the Affero General Public License and
67    published by Affero, was designed to accomplish similar goals.  This is
68    a different license, not a version of the Affero GPL, but Affero has
69    released a new version of the Affero GPL which permits relicensing under
70    this license.
71
72        The precise terms and conditions for copying, distribution and
73    modification follow.
74
75                        TERMS AND CONDITIONS
```

```
76
77      0. Definitions.
78
79      "This License" refers to version 3 of the GNU Affero General Public
80   License.
81
82      "Copyright" also means copyright-like laws that apply to other kinds
83   of works, such as semiconductor masks.
84
85      "The Program" refers to any copyrightable work licensed under this
86   License.  Each licensee is addressed as "you".  "Licensees" and
87   "recipients" may be individuals or organizations.
88
89      To "modify" a work means to copy from or adapt all or part of the work
90   in a fashion requiring copyright permission, other than the making of an
91   exact copy.  The resulting work is called a "modified version" of the
92   earlier work or a work "based on" the earlier work.
93
94      A "covered work" means either the unmodified Program or a work based
95   on the Program.
96
97      To "propagate" a work means to do anything with it that, without
98   permission, would make you directly or secondarily liable for
99   infringement under applicable copyright law, except executing it on a
100  computer or modifying a private copy.  Propagation includes copying,
101  distribution (with or without modification), making available to the
102  public, and in some countries other activities as well.
103
104     To "convey" a work means any kind of propagation that enables other
105  parties to make or receive copies.  Mere interaction with a user through
106  a computer network, with no transfer of a copy, is not conveying.
107
108     An interactive user interface displays "Appropriate Legal Notices"
109  to the extent that it includes a convenient and prominently visible
110  feature that (1) displays an appropriate copyright notice, and (2)
111  tells the user that there is no warranty for the work (except to the
112  extent that warranties are provided), that licensees may convey the
113  work under this License, and how to view a copy of this License.  If
114  the interface presents a list of user commands or options, such as a
115  menu, a prominent item in the list meets this criterion.
116
117     1. Source Code.
118
119     The "source code" for a work means the preferred form of the work
120  for making modifications to it.  "Object code" means any non-source
121  form of a work.
122
123     A "Standard Interface" means an interface that either is an official
```

2/9/2021    Case 5:19-cv-07626-EJD   Document 10904   Filed 02/16/21   Page 169 of 240

```
124  standard defined by a recognized standards body, or, in the case of
125  interfaces specified for a particular programming language, one that
126  is widely used among developers working in that language.
127
128    The "System Libraries" of an executable work include anything, other
129  than the work as a whole, that (a) is included in the normal form of
130  packaging a Major Component, but which is not part of that Major
131  Component, and (b) serves only to enable use of the work with that
132  Major Component, or to implement a Standard Interface for which an
133  implementation is available to the public in source code form.  A
134  "Major Component", in this context, means a major essential component
135  (kernel, window system, and so on) of the specific operating system
136  (if any) on which the executable work runs, or a compiler used to
137  produce the work, or an object code interpreter used to run it.
138
139    The "Corresponding Source" for a work in object code form means all
140  the source code needed to generate, install, and (for an executable
141  work) run the object code and to modify the work, including scripts to
142  control those activities.  However, it does not include the work's
143  System Libraries, or general-purpose tools or generally available free
144  programs which are used unmodified in performing those activities but
145  which are not part of the work.  For example, Corresponding Source
146  includes interface definition files associated with source files for
147  the work, and the source code for shared libraries and dynamically
148  linked subprograms that the work is specifically designed to require,
149  such as by intimate data communication or control flow between those
150  subprograms and other parts of the work.
151
152    The Corresponding Source need not include anything that users
153  can regenerate automatically from other parts of the Corresponding
154  Source.
155
156    The Corresponding Source for a work in source code form is that
157  same work.
158
159    2. Basic Permissions.
160
161    All rights granted under this License are granted for the term of
162  copyright on the Program, and are irrevocable provided the stated
163  conditions are met.  This License explicitly affirms your unlimited
164  permission to run the unmodified Program.  The output from running a
165  covered work is covered by this License only if the output, given its
166  content, constitutes a covered work.  This License acknowledges your
167  rights of fair use or other equivalent, as provided by copyright law.
168
169    You may make, run and propagate covered works that you do not
170  convey, without conditions so long as your license otherwise remains
171  in force.  You may convey covered works to others for the sole purpose
```

2/9/2021          Case 5:19-cv-07026-EJD   Document 109-4   Filed 02/16/21   Page 170 of 240

172  of having them make modifications exclusively for you, or provide you
173  with facilities for running those works, provided that you comply with
174  the terms of this License in conveying all material for which you do
175  not control copyright.  Those thus making or running the covered works
176  for you must do so exclusively on your behalf, under your direction
177  and control, on terms that prohibit them from making any copies of
178  your copyrighted material outside their relationship with you.
179
180     Conveying under any other circumstances is permitted solely under
181  the conditions stated below.  Sublicensing is not allowed; section 10
182  makes it unnecessary.
183
184     3. Protecting Users' Legal Rights From Anti-Circumvention Law.
185
186     No covered work shall be deemed part of an effective technological
187  measure under any applicable law fulfilling obligations under article
188  11 of the WIPO copyright treaty adopted on 20 December 1996, or
189  similar laws prohibiting or restricting circumvention of such
190  measures.
191
192     When you convey a covered work, you waive any legal power to forbid
193  circumvention of technological measures to the extent such circumvention
194  is effected by exercising rights under this License with respect to
195  the covered work, and you disclaim any intention to limit operation or
196  modification of the work as a means of enforcing, against the work's
197  users, your or third parties' legal rights to forbid circumvention of
198  technological measures.
199
200     4. Conveying Verbatim Copies.
201
202     You may convey verbatim copies of the Program's source code as you
203  receive it, in any medium, provided that you conspicuously and
204  appropriately publish on each copy an appropriate copyright notice;
205  keep intact all notices stating that this License and any
206  non-permissive terms added in accord with section 7 apply to the code;
207  keep intact all notices of the absence of any warranty; and give all
208  recipients a copy of this License along with the Program.
209
210     You may charge any price or no price for each copy that you convey,
211  and you may offer support or warranty protection for a fee.
212
213     5. Conveying Modified Source Versions.
214
215     You may convey a work based on the Program, or the modifications to
216  produce it from the Program, in the form of source code under the
217  terms of section 4, provided that you also meet all of these conditions:
218
219        a) The work must carry prominent notices stating that you modified

```
220      it, and giving a relevant date.
221
222      b) The work must carry prominent notices stating that it is
223      released under this License and any conditions added under section
224      7.  This requirement modifies the requirement in section 4 to
225      "keep intact all notices".
226
227      c) You must license the entire work, as a whole, under this
228      License to anyone who comes into possession of a copy.  This
229      License will therefore apply, along with any applicable section 7
230      additional terms, to the whole of the work, and all its parts,
231      regardless of how they are packaged.  This License gives no
232      permission to license the work in any other way, but it does not
233      invalidate such permission if you have separately received it.
234
235      d) If the work has interactive user interfaces, each must display
236      Appropriate Legal Notices; however, if the Program has interactive
237      interfaces that do not display Appropriate Legal Notices, your
238      work need not make them do so.
239
240    A compilation of a covered work with other separate and independent
241  works, which are not by their nature extensions of the covered work,
242  and which are not combined with it such as to form a larger program,
243  in or on a volume of a storage or distribution medium, is called an
244  "aggregate" if the compilation and its resulting copyright are not
245  used to limit the access or legal rights of the compilation's users
246  beyond what the individual works permit.  Inclusion of a covered work
247  in an aggregate does not cause this License to apply to the other
248  parts of the aggregate.
249
250    6. Conveying Non-Source Forms.
251
252    You may convey a covered work in object code form under the terms
253  of sections 4 and 5, provided that you also convey the
254  machine-readable Corresponding Source under the terms of this License,
255  in one of these ways:
256
257      a) Convey the object code in, or embodied in, a physical product
258      (including a physical distribution medium), accompanied by the
259      Corresponding Source fixed on a durable physical medium
260      customarily used for software interchange.
261
262      b) Convey the object code in, or embodied in, a physical product
263      (including a physical distribution medium), accompanied by a
264      written offer, valid for at least three years and valid for as
265      long as you offer spare parts or customer support for that product
266      model, to give anyone who possesses the object code either (1) a
267      copy of the Corresponding Source for all the software in the
```

product that is covered by this License, on a durable physical
medium customarily used for software interchange, for a price no
more than your reasonable cost of physically performing this
conveying of source, or (2) access to copy the
Corresponding Source from a network server at no charge.

c) Convey individual copies of the object code with a copy of the
written offer to provide the Corresponding Source.  This
alternative is allowed only occasionally and noncommercially, and
only if you received the object code with such an offer, in accord
with subsection 6b.

d) Convey the object code by offering access from a designated
place (gratis or for a charge), and offer equivalent access to the
Corresponding Source in the same way through the same place at no
further charge.  You need not require recipients to copy the
Corresponding Source along with the object code.  If the place to
copy the object code is a network server, the Corresponding Source
may be on a different server (operated by you or a third party)
that supports equivalent copying facilities, provided you maintain
clear directions next to the object code saying where to find the
Corresponding Source.  Regardless of what server hosts the
Corresponding Source, you remain obligated to ensure that it is
available for as long as needed to satisfy these requirements.

e) Convey the object code using peer-to-peer transmission, provided
you inform other peers where the object code and Corresponding
Source of the work are being offered to the general public at no
charge under subsection 6d.

  A separable portion of the object code, whose source code is excluded
from the Corresponding Source as a System Library, need not be
included in conveying the object code work.

  A "User Product" is either (1) a "consumer product", which means any
tangible personal property which is normally used for personal, family,
or household purposes, or (2) anything designed or sold for incorporation
into a dwelling.  In determining whether a product is a consumer product,
doubtful cases shall be resolved in favor of coverage.  For a particular
product received by a particular user, "normally used" refers to a
typical or common use of that class of product, regardless of the status
of the particular user or of the way in which the particular user
actually uses, or expects or is expected to use, the product.  A product
is a consumer product regardless of whether the product has substantial
commercial, industrial or non-consumer uses, unless such uses represent
the only significant mode of use of the product.

  "Installation Information" for a User Product means any methods,

316  procedures, authorization keys, or other information required to install
317  and execute modified versions of a covered work in that User Product from
318  a modified version of its Corresponding Source.  The information must
319  suffice to ensure that the continued functioning of the modified object
320  code is in no case prevented or interfered with solely because
321  modification has been made.
322
323     If you convey an object code work under this section in, or with, or
324  specifically for use in, a User Product, and the conveying occurs as
325  part of a transaction in which the right of possession and use of the
326  User Product is transferred to the recipient in perpetuity or for a
327  fixed term (regardless of how the transaction is characterized), the
328  Corresponding Source conveyed under this section must be accompanied
329  by the Installation Information.  But this requirement does not apply
330  if neither you nor any third party retains the ability to install
331  modified object code on the User Product (for example, the work has
332  been installed in ROM).
333
334     The requirement to provide Installation Information does not include a
335  requirement to continue to provide support service, warranty, or updates
336  for a work that has been modified or installed by the recipient, or for
337  the User Product in which it has been modified or installed.  Access to a
338  network may be denied when the modification itself materially and
339  adversely affects the operation of the network or violates the rules and
340  protocols for communication across the network.
341
342     Corresponding Source conveyed, and Installation Information provided,
343  in accord with this section must be in a format that is publicly
344  documented (and with an implementation available to the public in
345  source code form), and must require no special password or key for
346  unpacking, reading or copying.
347
348     7. Additional Terms.
349
350     "Additional permissions" are terms that supplement the terms of this
351  License by making exceptions from one or more of its conditions.
352  Additional permissions that are applicable to the entire Program shall
353  be treated as though they were included in this License, to the extent
354  that they are valid under applicable law.  If additional permissions
355  apply only to part of the Program, that part may be used separately
356  under those permissions, but the entire Program remains governed by
357  this License without regard to the additional permissions.
358
359     When you convey a copy of a covered work, you may at your option
360  remove any additional permissions from that copy, or from any part of
361  it.  (Additional permissions may be written to require their own
362  removal in certain cases when you modify the work.)  You may place
363  additional permissions on material, added by you to a covered work,

364  for which you have or can give appropriate copyright permission.

365

366      Notwithstanding any other provision of this License, for material you
367  add to a covered work, you may (if authorized by the copyright holders of
368  that material) supplement the terms of this License with terms:

369

370          a) Disclaiming warranty or limiting liability differently from the
371          terms of sections 15 and 16 of this License; or

372

373          b) Requiring preservation of specified reasonable legal notices or
374          author attributions in that material or in the Appropriate Legal
375          Notices displayed by works containing it; or

376

377          c) Prohibiting misrepresentation of the origin of that material, or
378          requiring that modified versions of such material be marked in
379          reasonable ways as different from the original version; or

380

381          d) Limiting the use for publicity purposes of names of licensors or
382          authors of the material; or

383

384          e) Declining to grant rights under trademark law for use of some
385          trade names, trademarks, or service marks; or

386

387          f) Requiring indemnification of licensors and authors of that
388          material by anyone who conveys the material (or modified versions of
389          it) with contractual assumptions of liability to the recipient, for
390          any liability that these contractual assumptions directly impose on
391          those licensors and authors.

392

393      All other non-permissive additional terms are considered "further
394  restrictions" within the meaning of section 10.  If the Program as you
395  received it, or any part of it, contains a notice stating that it is
396  governed by this License along with a term that is a further restriction,
397  you may remove that term.  If a license document contains a further
398  restriction but permits relicensing or conveying under this License, you
399  may add to a covered work material governed by the terms of that license
400  document, provided that the further restriction does not survive such
401  relicensing or conveying.

402

403      If you add terms to a covered work in accord with this section, you
404  must place, in the relevant source files, a statement of the
405  additional terms that apply to those files, or a notice indicating
406  where to find the applicable terms.

407

408      Additional terms, permissive or non-permissive, may be stated in the
409  form of a separately written license, or stated as exceptions;
410  the above requirements apply either way.

411

2/9/2021    Case 5:19-cv-06226-EJD    Document 109-14    Filed 02/16/21    Page 105 of 240

8. Termination.

You may not propagate or modify a covered work except as expressly
provided under this License.  Any attempt otherwise to propagate or
modify it is void, and will automatically terminate your rights under
this License (including any patent licenses granted under the third
paragraph of section 11).

However, if you cease all violation of this License, then your
license from a particular copyright holder is reinstated (a)
provisionally, unless and until the copyright holder explicitly and
finally terminates your license, and (b) permanently, if the copyright
holder fails to notify you of the violation by some reasonable means
prior to 60 days after the cessation.

Moreover, your license from a particular copyright holder is
reinstated permanently if the copyright holder notifies you of the
violation by some reasonable means, this is the first time you have
received notice of violation of this License (for any work) from that
copyright holder, and you cure the violation prior to 30 days after
your receipt of the notice.

Termination of your rights under this section does not terminate the
licenses of parties who have received copies or rights from you under
this License.  If your rights have been terminated and not permanently
reinstated, you do not qualify to receive new licenses for the same
material under section 10.

9. Acceptance Not Required for Having Copies.

You are not required to accept this License in order to receive or
run a copy of the Program.  Ancillary propagation of a covered work
occurring solely as a consequence of using peer-to-peer transmission
to receive a copy likewise does not require acceptance.  However,
nothing other than this License grants you permission to propagate or
modify any covered work.  These actions infringe copyright if you do
not accept this License.  Therefore, by modifying or propagating a
covered work, you indicate your acceptance of this License to do so.

10. Automatic Licensing of Downstream Recipients.

Each time you convey a covered work, the recipient automatically
receives a license from the original licensors, to run, modify and
propagate that work, subject to this License.  You are not responsible
for enforcing compliance by third parties with this License.

An "entity transaction" is a transaction transferring control of an
organization, or substantially all assets of one, or subdividing an

460  organization, or merging organizations.  If propagation of a covered
461  work results from an entity transaction, each party to that
462  transaction who receives a copy of the work also receives whatever
463  licenses to the work the party's predecessor in interest had or could
464  give under the previous paragraph, plus a right to possession of the
465  Corresponding Source of the work from the predecessor in interest, if
466  the predecessor has it or can get it with reasonable efforts.
467
468      You may not impose any further restrictions on the exercise of the
469  rights granted or affirmed under this License.  For example, you may
470  not impose a license fee, royalty, or other charge for exercise of
471  rights granted under this License, and you may not initiate litigation
472  (including a cross-claim or counterclaim in a lawsuit) alleging that
473  any patent claim is infringed by making, using, selling, offering for
474  sale, or importing the Program or any portion of it.
475
476      11. Patents.
477
478      A "contributor" is a copyright holder who authorizes use under this
479  License of the Program or a work on which the Program is based.  The
480  work thus licensed is called the contributor's "contributor version".
481
482      A contributor's "essential patent claims" are all patent claims
483  owned or controlled by the contributor, whether already acquired or
484  hereafter acquired, that would be infringed by some manner, permitted
485  by this License, of making, using, or selling its contributor version,
486  but do not include claims that would be infringed only as a
487  consequence of further modification of the contributor version.  For
488  purposes of this definition, "control" includes the right to grant
489  patent sublicenses in a manner consistent with the requirements of
490  this License.
491
492      Each contributor grants you a non-exclusive, worldwide, royalty-free
493  patent license under the contributor's essential patent claims, to
494  make, use, sell, offer for sale, import and otherwise run, modify and
495  propagate the contents of its contributor version.
496
497      In the following three paragraphs, a "patent license" is any express
498  agreement or commitment, however denominated, not to enforce a patent
499  (such as an express permission to practice a patent or covenant not to
500  sue for patent infringement).  To "grant" such a patent license to a
501  party means to make such an agreement or commitment not to enforce a
502  patent against the party.
503
504      If you convey a covered work, knowingly relying on a patent license,
505  and the Corresponding Source of the work is not available for anyone
506  to copy, free of charge and under the terms of this License, through a
507  publicly available network server or other readily accessible means,

then you must either (1) cause the Corresponding Source to be so
available, or (2) arrange to deprive yourself of the benefit of the
patent license for this particular work, or (3) arrange, in a manner
consistent with the requirements of this License, to extend the patent
license to downstream recipients.  "Knowingly relying" means you have
actual knowledge that, but for the patent license, your conveying the
covered work in a country, or your recipient's use of the covered work
in a country, would infringe one or more identifiable patents in that
country that you have reason to believe are valid.

  If, pursuant to or in connection with a single transaction or
arrangement, you convey, or propagate by procuring conveyance of, a
covered work, and grant a patent license to some of the parties
receiving the covered work authorizing them to use, propagate, modify
or convey a specific copy of the covered work, then the patent license
you grant is automatically extended to all recipients of the covered
work and works based on it.

  A patent license is "discriminatory" if it does not include within
the scope of its coverage, prohibits the exercise of, or is
conditioned on the non-exercise of one or more of the rights that are
specifically granted under this License.  You may not convey a covered
work if you are a party to an arrangement with a third party that is
in the business of distributing software, under which you make payment
to the third party based on the extent of your activity of conveying
the work, and under which the third party grants, to any of the
parties who would receive the covered work from you, a discriminatory
patent license (a) in connection with copies of the covered work
conveyed by you (or copies made from those copies), or (b) primarily
for and in connection with specific products or compilations that
contain the covered work, unless you entered into that arrangement,
or that patent license was granted, prior to 28 March 2007.

  Nothing in this License shall be construed as excluding or limiting
any implied license or other defenses to infringement that may
otherwise be available to you under applicable patent law.

  12. No Surrender of Others' Freedom.

  If conditions are imposed on you (whether by court order, agreement or
otherwise) that contradict the conditions of this License, they do not
excuse you from the conditions of this License.  If you cannot convey a
covered work so as to satisfy simultaneously your obligations under this
License and any other pertinent obligations, then as a consequence you may
not convey it at all.  For example, if you agree to terms that obligate you
to collect a royalty for further conveying from those to whom you convey
the Program, the only way you could satisfy both those terms and this
License would be to refrain entirely from conveying the Program.

13. Remote Network Interaction; Use with the GNU General Public License.

   Notwithstanding any other provision of this License, if you modify the
Program, your modified version must prominently offer all users
interacting with it remotely through a computer network (if your version
supports such interaction) an opportunity to receive the Corresponding
Source of your version by providing access to the Corresponding Source
from a network server at no charge, through some standard or customary
means of facilitating copying of software.  This Corresponding Source
shall include the Corresponding Source for any work covered by version 3
of the GNU General Public License that is incorporated pursuant to the
following paragraph.

   Notwithstanding any other provision of this License, you have permission
to link or combine any covered work with a work licensed under version 3
of the GNU General Public License into a single combined work, and to
convey the resulting work.  The terms of this License will continue to
apply to the part which is the covered work, but the work with which it is
combined will remain governed by version 3 of the GNU General Public
License.

   14. Revised Versions of this License.

   The Free Software Foundation may publish revised and/or new versions of
the GNU Affero General Public License from time to time.  Such new
versions will be similar in spirit to the present version, but may differ
in detail to address new problems or concerns.

   Each version is given a distinguishing version number.  If the
Program specifies that a certain numbered version of the GNU Affero
General Public License "or any later version" applies to it, you have
the option of following the terms and conditions either of that
numbered version or of any later version published by the Free
Software Foundation.  If the Program does not specify a version number
of the GNU Affero General Public License, you may choose any version
ever published by the Free Software Foundation.

   If the Program specifies that a proxy can decide which future
versions of the GNU Affero General Public License can be used, that
proxy's public statement of acceptance of a version permanently
authorizes you to choose that version for the Program.

   Later license versions may give you additional or different
permissions.  However, no additional obligations are imposed on any
author or copyright holder as a result of your choosing to follow a
later version.

15. Disclaimer of Warranty.

    THERE IS NO WARRANTY FOR THE PROGRAM, TO THE EXTENT PERMITTED BY
APPLICABLE LAW.  EXCEPT WHEN OTHERWISE STATED IN WRITING THE COPYRIGHT
HOLDERS AND/OR OTHER PARTIES PROVIDE THE PROGRAM "AS IS" WITHOUT WARRANTY
OF ANY KIND, EITHER EXPRESSED OR IMPLIED, INCLUDING, BUT NOT LIMITED TO,
THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR
PURPOSE.  THE ENTIRE RISK AS TO THE QUALITY AND PERFORMANCE OF THE PROGRAM
IS WITH YOU.  SHOULD THE PROGRAM PROVE DEFECTIVE, YOU ASSUME THE COST OF
ALL NECESSARY SERVICING, REPAIR OR CORRECTION.

    16. Limitation of Liability.

    IN NO EVENT UNLESS REQUIRED BY APPLICABLE LAW OR AGREED TO IN WRITING
WILL ANY COPYRIGHT HOLDER, OR ANY OTHER PARTY WHO MODIFIES AND/OR CONVEYS
THE PROGRAM AS PERMITTED ABOVE, BE LIABLE TO YOU FOR DAMAGES, INCLUDING ANY
GENERAL, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF THE
USE OR INABILITY TO USE THE PROGRAM (INCLUDING BUT NOT LIMITED TO LOSS OF
DATA OR DATA BEING RENDERED INACCURATE OR LOSSES SUSTAINED BY YOU OR THIRD
PARTIES OR A FAILURE OF THE PROGRAM TO OPERATE WITH ANY OTHER PROGRAMS),
EVEN IF SUCH HOLDER OR OTHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF
SUCH DAMAGES.

    17. Interpretation of Sections 15 and 16.

    If the disclaimer of warranty and limitation of liability provided
above cannot be given local legal effect according to their terms,
reviewing courts shall apply local law that most closely approximates
an absolute waiver of all civil liability in connection with the
Program, unless a warranty or assumption of liability accompanies a
copy of the Program in return for a fee.

                    END OF TERMS AND CONDITIONS

            How to Apply These Terms to Your New Programs

    If you develop a new program, and you want it to be of the greatest
possible use to the public, the best way to achieve this is to make it
free software which everyone can redistribute and change under these terms.

    To do so, attach the following notices to the program.  It is safest
to attach them to the start of each source file to most effectively
state the exclusion of warranty; and each file should have at least
the "copyright" line and a pointer to where the full notice is found.

        <one line to give the program's name and a brief idea of what it does.>
        Copyright (C) <year>  <name of author>

2/9/2021 Case 5:19-cv-06226-EJD Document 109-4 Filed 02/11/21 Page 240 of 240

```
652     This program is free software: you can redistribute it and/or modify
653     it under the terms of the GNU Affero General Public License as
654     published by the Free Software Foundation, either version 3 of the
655     License, or (at your option) any later version.
656
657     This program is distributed in the hope that it will be useful,
658     but WITHOUT ANY WARRANTY; without even the implied warranty of
659     MERCHANTABILITY or FITNESS FOR A PARTICULAR PURPOSE.  See the
660     GNU Affero General Public License for more details.
661
662     You should have received a copy of the GNU Affero General Public License
663     along with this program.  If not, see <http://www.gnu.org/licenses/>.
664
665  Also add information on how to contact you by electronic and paper mail.
666
667    If your software can interact with users remotely through a computer
668  network, you should also make sure that it provides a way for users to
669  get its source.  For example, if your program is a web application, its
670  interface could display a "Source" link that leads users to an archive
671  of the code.  There are many ways you could offer source, and different
672  solutions will be better for different programs; see section 13 for the
673  specific requirements.
674
675    You should also get your employer (if you work as a programmer) or school,
676  if any, to sign a "copyright disclaimer" for the program, if necessary.
677  For more information on this, and how to apply and follow the GNU AGPL, see
678  <http://www.gnu.org/licenses/>.
679
680
681  "Commons Clause" License Condition
682
683  The Software is provided to you by the Licensor under the License, as
684  defined below, subject to the following condition. Without limiting
685  other conditions in the License, the grant of rights under the License
686  will not include, and the License does not grant to you, the right to
687  Sell the Software.  For purposes of the foregoing, "Sell" means
688  practicing any or all of the rights granted to you under the License
689  to provide to third parties, for a fee or other consideration,
690  a product or service that consists, entirely or substantially,
691  of the Software or the functionality of the Software. Any license
692  notice or attribution required by the License must also include
693  this Commons Cause License Condition notice.
```

# EXHIBIT 3

*Cc : Tr atty 11/8/24*

**VIRGINIA:**

**IN THE CIRCUIT COURT OF FAIRFAX COUNTY**
NEO4J, INC., et al.                )
                                   )
v.                                 )        **Case No. CL2024-14686**
                                   )
PURETHINK, LLC, et al.             )

<u>ORDER</u>

**THIS MATTER** came before the Circuit Court of Fairfax County on the Motion of the Judgment Debtor John Mark Suhy to Stay Enforcement of Judgment without a Bond and the Motion of the Judgment Creditors for Sanctions.

**UPON CONSIDERATION WHEREOF** and after review of the pleadings and oppositions filed herein and after hearing the arguments of counsel for the Judgment Creditors and the arguments of the Judgment Debtor John Mark Suhy, *pro se*; it is hereby

**ORDERED** that the Motion to Stay Enforcement of Judgment without a Bond is DENIED; and it is further

**ORDERED** that the Motion for Sanctions is *deemed withdrawn* and it is further

**ORDERED** that _____

_____

**ENTERED THIS** ___8th___ **DAY OF NOVEMBER, 2024.**

Richard Z. Jardine
**Judge**
FAIRFAX COUNTY CIRCUIT COURT

<endorsements on following page>
PAGE ONE OF TWO

I ASK FOR THIS:

_____

Jeffrey S. Romanick, VA Bar # 34761
A. Charles Dean, VA Bar #74814
GROSS, ROMANICK, DEAN & DESIMONE, P.C.
3975 University Drive, Suite 410
Fairfax, VA 22030
(703) 273-1400 (telephone)
(703) 385-9652 (facsimile)
*Counsel for Judgment Creditors*

SEEN & _____ :

_____

John Mark Suhy
Judgment Debtor, *Pro Se*

PAGE TWO OF TWO

A COPY TESTE:
CHRISTOPHER J. FALCON, CLERK
BY: _____
          Deputy Clerk
Date: _____
Original retained in the office of
the Clerk of the Circuit Court of
Fairfax County, Virginia
CHRISTOPHER J. FALCON, CLERK

# EXHIBIT 4

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

NEO4J, INC., et al.,
Plaintiff,
v.
JOHN MARK SUHY
Defendant.

CASE NO. 5:18-CV-7182 EJD

## EMERGENCY MOTION TO STAY ENFORCEMENT OF JUDGMENT PENDING APPEAL WITHOUT BOND

I.    INTRODUCTION

A judgment was entered against the Defendant, along with iGov Inc. and Purethink LLC, in the United States District Court for the Northern District of California, Case No. 5:18-cv-07182-EJD, as documented in Document 251, filed on August 15, 2024. The judgment holds the parties jointly and severally liable, and it has been domesticated in the Fairfax County Circuit Court. (See Exhibit C).

Defendant has filed an appeal in the United States Court of Appeals for the Ninth Circuit, Neo4j, Inc., et al. v. Suhy, et al., Case No. 24-5538, where it is currently pending. (See Exhibit D).

This case exemplifies how Neo4j Inc., a billion-dollar corporation, is using its resources to silence an open-source advocate. Neo4j gained prominence through the open-source community but later sought to maximize profits by imposing restrictive licensing terms, including the unauthorized addition of the "Commons Clause" to the Free Software Foundation's (FSF) AGPLv3 license.

As an open-source advocate, Defendant created competing free and open-source forks of Neo4j's software—ONgDB and DozerDB—to preserve software freedom. These projects have gained significant traction, providing cost-effective alternatives to Neo4j's commercial offerings and challenging its business model.

The damages in this case stem from Neo4j's assertion that Defendant's modifications to the AGPL license, including removing the Commons Clause, influenced the Maryland Procurement Office (MPO) to adopt ONgDB. However, the FSF sent Neo4j a cease-and-desist letter confirming that its use of the Commons Clause violated the AGPL's terms. Neo4j subsequently complied by removing the infringing tags, branches, and source code, validating the Defendant's actions. (See

Exhibit A and Declaration #3 of John Mark Suhy, attached as Exhibit E.)

Despite this, Neo4j continues to pursue aggressive legal actions, including wage garnishment, threatening Defendant's livelihood and forcing him toward bankruptcy. These actions represent legal overreach and underline the disproportionate impact enforcement would have on Defendant compared to minimal harm to Neo4j.

Defendant respectfully requests this Court to stay all collection efforts and enforcement of the judgment without requiring a bond due to financial hardship, the public importance of the appeal, and the disproportionate impact enforcement would have on Defendant and his family.

## II.   BACKGROUND

### A. Judgment and Appeal

Judgment was entered on August 15, 2024 (ECF No. 251).

Defendant filed a timely appeal, which will raise significant legal issues concerning licensing, trademark claims, and damages.

**B. Wage Garnishment**

Neo4j has initiated garnishment proceedings with a return date set for December 13, 2024, as documented in Exhibit G. Immediate enforcement would severely harm Defendant by jeopardizing his ability to maintain employment and support his family.

C. **Financial Context**

Defendant is the primary breadwinner, and garnishment would force him into bankruptcy, depriving Neo4j of meaningful recovery and placing other creditors at a disadvantage.

**III.    LEGAL STANDARD**

Federal Rule of Civil Procedure 62(b) provides that "[a] party may obtain a stay by providing a bond or other security." While the rule establishes a bond as the default mechanism for obtaining a stay, courts have consistently held that they retain equitable discretion to grant unsecured stays in appropriate circumstances. This discretion is exercised where the appellant demonstrates financial hardship, enforcement would impose undue harm, or alternative measures can adequately protect the opposing party's rights. See Fed. Presc. Serv. v. Am. Pharm. Ass'n, 636 F.2d 755, 758 (D.C. Cir. 1980); Poplar Grove Planting & Refining Co. v. Bache Halsey Stuart, Inc., 600 F.2d 1189, 1191 (5th Cir. 1979).

Federal courts have further clarified that Rule 62 does not limit a district court's discretion to grant unsecured stays or impose alternative terms for a stay. See Rivera v. Home Depot U.S.A. Inc., 16-cv-7552 (KBF) (S.D.N.Y. Jun. 25, 2018); Aristocrat Technologies v. International Game Techno, No. C06-03717 MJJ (N.D. Cal. Jan. 9, 2008).

In this case, Defendant respectfully requests that the Court exercise its discretion under Rule 62(b) to stay enforcement of the judgment without requiring a bond. Defendant's financial circumstances render a bond unduly burdensome, and immediate enforcement would cause irreparable harm, including the potential loss of employment due to wage garnishment and the resulting impact on Defendant's government security clearance.

Furthermore, the Free Software Foundation (FSF), the copyright holder of the AGPLv3 license central to this dispute, issued a cease-and-desist letter confirming that Neo4j's addition of the Commons Clause violated the AGPL's terms. Neo4j's subsequent removal of the infringing files and code validates Defendant's actions in removing the Commons Clause, which are at the heart of the judgment. The FSF's

authoritative position highlights the substantial merit of Defendant's

appeal and underscores the equitable considerations favoring a stay

without bond.

IV.    **ARGUMENT**

**1. Equitable Grounds for Stay Without Bond**

This Court has the equitable authority to stay enforcement of a

judgment without requiring the posting of a bond when the

circumstances warrant such relief. Numerous federal courts have

recognized and exercised this discretion. See, e.g., In re Nassau County

Strip Search Cases, 783 F.3d 414, 417 (2d Cir. 2015) (noting that courts

may waive bond requirements where equity supports it); Dillon v. City

of Chicago, 866 F.2d 902 (7th Cir. 1988) (holding that bond

requirements may be modified based on financial hardship and other

equitable factors); Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n,

636 F.2d 755, 758 (D.C. Cir. 1980) (finding that district courts may

grant stays without bond under appropriate circumstances); Poplar

Grove Planting & Ref. Co. v. Bache Halsey Stuart, Inc., 600 F.2d 1189,

1190–91 (5th Cir. 1979) (emphasizing that bond requirements are not

absolute and may be adjusted); Trans World Airlines, Inc. v. Hughes,

515 F.2d 173, 176 (2d Cir. 1975) (recognizing the court's discretion to waive or modify bond requirements under equitable circumstances).

The court has discretion to authorize unsecured stays where equity and the facts of the case justify such relief, even though Rule 62 provides for a supersedeas bond as a default mechanism. See Rivera v. Home Depot U.S.A. Inc., 16-cv-7552 (KBF) (S.D.N.Y. Jun. 25, 2018).

Furthermore, the Northern District of California has explicitly recognized that Rule 62 does not limit a district court's discretion to grant unsecured stays where equity so demands. See Aristocrat Technologies v. International Game Tech., No. C06-03717 MJJ (N.D. Cal. Jan. 9, 2008).

Courts have consistently held that requiring a bond is unnecessary where the defendant demonstrates limited financial resources or where enforcement would impose severe hardship. Here, Defendant's financial circumstances render the imposition of a bond an undue burden. Immediate garnishment of Defendant's wages would force him into bankruptcy, leaving his family without adequate financial support and

7

jeopardizing his government security clearance, which is essential to his employment and livelihood.

In addition to financial hardship, Defendant's appeal raises substantial legal and factual issues. The Free Software Foundation (FSF), the copyright holder of the AGPLv3 license central to this case, issued a cease-and-desist letter confirming that Neo4j's addition of the Commons Clause violated the AGPL's terms. The FSF letter supports the position that Neo4j's licensing practices raised significant concerns, which were central to the Defendant's actions in removing the Commons Clause. While not legally binding, the FSF's authoritative perspective underscores the complexity of the licensing dispute. Neo4j subsequently removed the infringing files, tags, and code from its repository, validating the Defendant's actions in removing the Commons Clause. These actions are now central to the judgment. The FSF's authoritative position demonstrates the merit of Defendant's appeal, which raises significant questions about licensing and intellectual property rights that could set important legal precedents.

Immediate enforcement of the judgment would irreparably harm the Defendant while providing no meaningful benefit to Neo4j, a billion-

8

dollar corporation. Neo4j faces no material prejudice from a temporary stay of enforcement, as its financial position remains unaffected by the delay. In contrast, enforcement would impose extraordinary harm on the Defendant, including the potential loss of employment and financial ruin.

These extraordinary circumstances justify equitable relief to preserve the status quo while the appellate court reviews these significant issues. A stay without bond would ensure fairness and equity in light of the Defendant's demonstrated hardship, the merit of his appeal, and the lack of prejudice to Neo4j. Neo4j, as a billion-dollar corporation, faces no material risk from a delay in enforcement, as the judgment amount is negligible in the context of its financial position.

## 2. Financial Hardship and Irreparable Harm

The Defendant faces immediate and severe financial consequences if enforcement of the judgment proceeds. The garnishment order issued on October 15, 2024, threatens to force the Defendant into bankruptcy, a scenario that would devastate his family, jeopardize his government security clearance essential to his employment, and irreparably harm his ability to recover financially.

Requiring a bond in this situation would exacerbate the hardship, as the Defendant is unable to satisfy the judgment or post a bond without triggering bankruptcy. A stay would allow the Defendant to preserve critical financial resources and maintain his security clearance, enabling him to continue supporting his family and addressing his financial obligations. Should the appeal succeed, the Defendant would be in a far stronger position to address any resulting obligations without resorting to bankruptcy.

This is not a hypothetical concern; the garnishment directly threatens the Defendant's livelihood and could result in the loss of his clearance, leading to job loss and compounding financial ruin. These consequences would harm not only the Defendant and his family but also other creditors, including Neo4j, who would likely receive nothing in a bankruptcy proceeding.

Federal courts have recognized the discretion to waive bond requirements in cases of demonstrated financial hardship. See, e.g., Fed. Presc. Serv. v. Am. Pharm. Ass'n, 636 F.2d 755 (D.C. Cir. 1980). In such cases, courts have prioritized equity and practicality to ensure that enforcement does not cause irreparable harm or undermine the

appeal process. The Defendant's financial position and the catastrophic consequences of immediate garnishment clearly demonstrate the need for this Court to exercise its discretion to waive the bond requirement and stay enforcement of the judgment.

## 3. Merits of the Appeal

The appeal raises critical issues regarding the interpretation and application of the GPLv3 license, which underpins a vast array of open-source projects that form the foundation of much of the internet's infrastructure. The Free Software Foundation (FSF), the copyright holder of the GPLv3, has confirmed that Neo4j's addition of the Commons Clause violated the GPLv3's terms, and the Defendant's removal of the clause was justified. This action was crucial to maintaining the integrity of the GPLv3, which is designed to protect users' freedom to use and modify software, including the Defendant's open-source projects, ONgDB and DozerDB.

The FSF letter supports the position that Neo4j's addition of the Commons Clause raised significant licensing concerns, which were central to the Defendant's actions. While not legally binding, the FSF's authoritative perspective underscores the complexity of the licensing

dispute and highlights the significant public interest in ensuring

compliance with the GPLv3's terms. This perspective demonstrates the

merit of Defendant's appeal and further supports the importance of

appellate review.

The district court, however, made factual errors that contribute to the

Defendant's appeal. For example, the court concluded that the removal

of the Commons Clause allowed ONgDB to be offered for free, enabling

the MPO to choose ONgDB over Neo4j EE. (See Exhibit B, p. 14, lines

23-25; p. 15, line 1). This is incorrect. As acknowledged in Exhibit B,

the MPO continued to use ONgDB over Neo4j EE because of price. (See

Exhibit B, p. 9, lines 2-4). The Commons Clause limited resale and

commercial services, but it did not prevent the free use of the software,

which is the basis for the MPO's decision to use ONgDB. (See Exhibit

F, p. 15).

Additionally, the court's calculation of damages is flawed. The court

assumed that the MPO would have purchased Neo4j EE had the

Commons Clause remained, but the court itself noted that the MPO

chose ONgDB due to pricing concerns. While the Court found that the

removal of the Commons Clause contributed to the MPO's decision to

12

use ONgDB over Neo4j EE, other factors, such as budget constraints and the MPO's historical preference for open-source solutions, likely played a significant role in the outcome. Furthermore, the MPO required enterprise-level features, which were available at no cost through ONgDB regardless of the presence of the Commons Clause.

Moreover, the court made speculative guesses about what the MPO might have paid for Neo4j EE, with no factual support for these figures. The court's damages assessment, therefore, relied on both an erroneous assumption that the removal of the Commons Clause impacted the MPO's decision and speculative figures that are unsupported by evidence. (See Exhibit B pp. 17-20).

Moreover, the court acknowledged that Defendants' removal of the Commons Clause allowed the MPO to use ONgDB for free, but it did not account for the fact that ONgDB was still available to the MPO at no cost even with the Commons Clause. This further undermines the court's rationale for awarding damages based on lost licensing revenue from the MPO.

13

The appeal also addresses the court's misinterpretation of the Defendant's actions under the GPLv3, as confirmed by the FSF's cease-and-desist letter, which emphasized that the Commons Clause violated the GPLv3's terms. This alone highlights the merit of the appeal and underscores its significance for the open-source community. A ruling that upholds the district court's decision would set a damaging precedent for open-source projects worldwide and severely undermine the GPLv3's protections.

Given these substantial errors, the appeal is meritorious and crucial not only for the Defendant but also for the broader open-source ecosystem.

## 4. Imbalance of Resources and Disproportionate Impact

Neo4j, a billion-dollar corporation, has utilized its substantial resources to overwhelm the Defendant, a pro se litigant. Despite Neo4j's own violations of the GPLv3 license, as confirmed by the Free Software Foundation (FSF) in its cease-and-desist letter, the company continues to pursue excessive damages against the Defendant.

14

The judgment amount of over $600,000 is negligible for Neo4j but represents a catastrophic financial burden for the Defendant, who is the primary provider for his family. Enforcing the judgment would irreparably harm the Defendant, forcing him into bankruptcy and jeopardizing his livelihood, while Neo4j would suffer no significant prejudice from a temporary stay.

Courts routinely consider the inequities between parties and the disproportionate impact of enforcement when modifying or waiving bond requirements. Granting a stay in this instance is consistent with those equitable principles and ensures that enforcement does not unjustly harm the Defendant while the appeal is pending.

**5. Minimal Prejudice to Plaintiff**

Granting a stay would cause minimal, if any, prejudice to Neo4j. The judgment amount is immaterial in the context of Neo4j's overall financial position as a billion-dollar corporation. Moreover, Neo4j's operations and business objectives will remain unaffected by a temporary delay in enforcement.

In contrast, immediate garnishment would push the Defendant into bankruptcy, depriving Neo4j of meaningful recovery if the appeal is

unsuccessful. Bankruptcy would also harm the Defendant's other

creditors, who would likely receive nothing, and disrupt the

Defendant's government security clearance, causing additional

financial and professional harm.

The disproportionate consequences for the Defendant compared to the

negligible impact on Neo4j underscore the need for a stay to preserve

fairness and equity while the appeal is pending.


## 6. Public Interest

The public interest is strongly in favor of granting the stay. The

outcome of this case will have far-reaching implications for the open-

source software community and the principles underlying free software

licensing. A ruling in favor of Neo4j would allow companies to impose

unauthorized restrictions on GPLv3-licensed software, undermining

decades of work by the Free Software Foundation and jeopardizing the

free and open nature of software like Linux, which is licensed under

GPLv3.


This case has attracted the attention of the Free Software Foundation

and the broader open-source community because it concerns

fundamental rights to modify and redistribute software. The

16

Defendant's actions, as confirmed by the FSF, were in defense of these rights and freedoms, and the public interest supports allowing the appeal to proceed. The Free Software Foundation (FSF) and Free Software Conservancy have communicated their intent to file amicus briefs in the 9th Circuit Court. (See Declaration #5 of John Mark Suhy, attached as Exhibit E.)

This aligns with cases like Nken v. Holder, 556 U.S. 418, 433 (2009), where the court considered the broader public interest as one of the key factors when determining whether to grant a stay.

## V.   RELIEF REQUESTED

Defendant respectfully requests that this Court:

1. Issue a temporary stay of enforcement to preserve the status quo while this motion is considered;

2. Grant a stay of enforcement without bond pending resolution of the appeal; and

3. Expedite consideration of this motion.

1

2

3                                                      Respectfully submitted

4                                                        John Mark Suhy
5                                                              Pro Se
                                                     Dated: December 2nd, 2024
6
                                          By: _____ */s/ John Mark Suhy Jr.*
7
8                                                         8814 Danewood Dr
                                                        Alexandria, VA 22308
9
                                                         Tel: (703) 862-7780
10                                                   Email: jmsuhy@gmail.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF SERVICE

I hereby certify that, on December 2, 2024, a true and correct copy of the foregoing Motion, Exhibits, and declaration of John Mark Suhy was filed with the Clerk of the Court for the United States District Court for the Northern District of California using the PACER system. This filing will send notification of such filing to all counsel of record and registered participants.

Date: December 2, 2024
/s/ John Mark Suhy Jr.
John Mark Suhy Jr.
8814 Danewood Dr
Alexandria, VA 22308
jmsuhy@gmail.com
703-862-7780

# EXHIBIT 5

# EXHIBIT E

Declaration of John Mark Suhy in Support of Motion to Stay Enforcement

of Judgment

Date: December 2, 2024

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEO4J, INC., et al.,<br><br>Plaintiff,<br><br>v.<br><br>JOHN MARK SUHY<br><br>Defendant. | CASE NO. 5:18-CV-7182 EJD |

**DECLARATION OF JOHN MARK SUHY**

I, John Mark Suhy, declare under penalty of perjury under the laws of the United States of America and the Commonwealth of Virginia that the following is true and correct to the best of my knowledge:

1. I am the Defendant in the above-referenced case.

2. I am an open-source advocate and developer who created the competing free and open source forks of Neo4j software called ONgDB and DozerDB.

3. Following the Free Software Foundation's issuance of the cease-and-desist letter, Neo4j, Inc. complied by removing all infringing content, including tags, branches, files, and source code from their public repository that contained the Commons Clause within the AGPL license.

4. I am the primary breadwinner for my family, while my wife works part-time, and my salary is essential for covering our family's living expenses. The garnishment of my wages would significantly impact our ability to meet those obligations, and it is highly likely that I will be forced into bankruptcy if the garnishment proceeds. This would not only harm me, my family, and other creditors, including Neo4j, but also jeopardize my government security clearances, which are vital to my employment.

5. The Free Software Foundation (FSF) and the Free Software Conservancy have communicated their intent to file amicus briefs in my appeal before the 9th Circuit Court.

6. Attached as Exhibit A is a true and accurate copy of the cease-and-desist letter sent by the Free Software Foundation to Neo4j, Inc. on November 13, 2023. This letter was provided to me by the Free Software Foundation.

7. Attached as Exhibit B is a true and accurate copy of the Findings of Fact and Conclusions of Law from the United States District Court for the Northern District of California, Case No. 5:18-cv-07182-EJD, dated July 22, 2024.

8. Attached as Exhibit C is a true and accurate copy of the Judgment from the United States District Court for the Northern District of California, Case No. 5:18-cv-07182-EJD, dated August 15, 2024.

9. Attached as Exhibit D is a true and accurate copy of the Notice of Appeal filed in the United States District Court for the Northern District of California, Case No. 5:18-cv-07182-EJD, dated September 8, 2024.

10. Attached as Exhibit F is a true and correct copy of the AGPLv3 license as it appeared in the Neo4j official repository before Neo4j removed it following the Free Software Foundation's cease-and-desist letter, dated November 13, 2023.

11. Attached as Exhibit G is the wage garnishment summons issued by Fairfax County circuit court against Defendants' employer.   It shows the return date as being Dec 13th, 2024

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 2nd day of December 2024.

---

**/s/ John Mark Suhy**

John Mark Suhy
8814 Danewood Dr
Alexandria, VA 22308
(703) 862-7780
jmsuhy@gmail.com

---

# EXHIBIT 6

**SPENCER FANE LLP**
John V. Picone III, CA Bar No. 187226
jpicone@spencerfane.com
Jeffrey M. Ratinoff, CA Bar No. 197241
jratinoff@spencerfane.com
225 West Santa Clara Street
Suite 1500
San Jose, California 95113
Telephone:     408.286.5100
Facsimile:     408.286.5722

Attorneys for Plaintiffs and Counter-Defendants
NEO4J, INC. and NEO4J SWEDEN AB

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEO4J, INC., a Delaware corporation; NEO4J SWEDEN, AB, <br><br> *Plaintiffs*, <br><br> v. <br><br> PURETHINK LLC, a Delaware limited liability company; IGOV INC., a Virginia corporation; and JOHN MARK SUHY, an individual, <br><br> *Defendants*. <br><br> AND RELATED COUNTERCLAIMS. | Case No. 5:18-cv-07182-EJD <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANT JOHN MARK SUHY'S EMERGENCY MOTION TO STAY ENFORCEMENT OF JUDGMENT PENDING APPEAL WITHOUT BOND** |

(139 of 273), Page 139 of 273
Case: 24-5538, 01/02/2025, DktEntry: 28.2, Page 139 of 273
Case 5:18-cv-07182-EJD    Document 264    Filed 12/09/24    Page 2 of 18

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................................. 1

II.   PROCEDURAL BACKGROUND ...................................................................... 2

III.  RELEVANT FACTS RELATING TO SUHY'S FINANCIAL CONDITION ................ 3

IV.   LEGAL STANDARD .......................................................................................... 4

V.    ARGUMENT ...................................................................................................... 6

    A.    The First and Second Factors Go Against Waiving the Bond Requirement .......... 6

    B.    Suhy's Alleged Inability to Post a Bond or Satisfy the Judgment Weighs Heavily Against the Third *Dillon* Factor ................................................................ 7

    C.    The Fourth *Dillon* Factor Weighs Against Waiving the Bond Requirement ........ 9

    D.    The Fifth Factor Does Not Support the Waiver of the Bond Requirement ......... 10

    E.    The Stated Grounds for Suhy's Appeal are Meritless and Further Support the Need for Him to Post a Bond .......................................................................... 10

        1.    The Ninth Circuit Previously Affirmed that Suhy's Removal of the Commons Clause was Improper ............................................................. 10

        2.    Suhy is Bound by Stipulated Facts that MPO Chose ONgDB Over Neo4j® EE Because It Could Avoid Paying a License Fee to Plaintiffs ............................................................................................... 11

        3.    Suhy Stipulated to Facts Supporting the Court's Determination of the Amount of Plaintiffs' Lost Licensing Fees ....................................... 12

    F.    Any Alleged "Imbalance of Resources and Disproportionate Impact" is Inconsequential to a Potential Waiver of Rule 62(b)'s Bond Requirement ......... 12

    G.    Not Requiring Suhy to Post a Bond Would Irreparably Harm Plaintiffs ............. 13

    H.    There is No Public Interest Affected by Requiring Suhy to Post a Bond ........... 13

VI.   CONCLUSION ................................................................................................. 14

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

*AngioScore, Inc. v. TriReme Medical, Inc.,*
    No. 12-CV-03393-YGR, 2015 WL 13387576.................................................. 5, 6, 7

5

*Aristocrat Techs. v. Int'l Game Tech.,*
    No. C06-03717 MJJ, 2008 WL 114985 (N.D. Cal. Jan. 10, 2008)........................... 6

6

*Block v. City of Los Angeles,*
    253 F.3d 410 (9th Cir.2001)............................................................................... 12

7

8

*Clark v. Hidden Valley Lake Ass'n,*
    No. 16-CV-02009-SI, 2018 WL 2412136 (N.D. Cal. May 29, 2018) ............................ 8, 9, 10

9

10

*Cotton ex rel. McClure v. City of Eureka,*
    860 F. Supp. 2d 999 (N.D. Cal. 2012) .............................................................. 5, 7, 8

11

*Dillon v. City of Chicago,*
    866 F.2d 902 (7th Cir.1988)...........................................................................*passim*

12

13

*Erickson Prods. Inc. v. Kast,*
    No. 13-CV-05472-DMR, 2022 WL 698148 (N.D. Cal. Feb. 10, 2022) ...................... 8, 9

14

*Geddes v. United Fin. Grp.,*
    559 F.2d 557 (9th Cir. 1977)............................................................................... 9

15

16

*Hines v. California Pub. Utils. Comm'n,*
    No. C 07-04145 CW, 2010 WL 3565498 (N.D. Cal. Sept. 10, 2010) ................................ 5, 8

17

*Inhale, Inc. v. Starbuzz Tobacco, Inc.,*
    No. 11-cv-3838-ODW, 2013 WL 361109 (C.D. Cal. Jan. 30, 2013) ...................... 9

18

19

*Int'l Petroleum Prod. & Additives Co., Inc. v. Black Gold S.A.R.L.,*
    115 F.4th 1202 (9th Cir. 2024)........................................................................ 10, 13

20

*Int'l Telemeter, Corp. v. Hamlin Int'l Corp.,*
    754 F.2d 1492 (9th Cir. 1985)............................................................................. 5

21

22

*Lowery v. Rhapsody Int'l, Inc.,*
    No. 16-CV-01135-JSW, 2022 WL 267442 (N.D. Cal. Jan. 28, 2022) ................................ 8, 9

23

*Max Sound Corp. v. Google LLC,*
    No. 5:14-CV-04412-EJD, 2019 WL 480544 (N.D. Cal. Feb. 7, 2019) ...................*passim*

24

*N.L.R.B. v. Westphal,*
    859 F.2d 818 (9th Cir. 1988)........................................................................ 5, 12, 14

25

26

*Neo4j, Inc. v. PureThink,*
    LLC, No. 5:18-CV-07182-EJD, 2021 WL 2483778 (N.D. Cal. May 18, 2021),
    *aff'd,* No. 21-16029, 2022 WL 501120 (9th Cir. Feb. 18, 2022), *amended on*
    *denial of reh'g,* No. 21-16029, 2022 WL 781037 (9th Cir. Mar. 14, 2022) ...................... 4

27

28

*Nken v. Holder*,
556 U.S. 418 (2009) ........................................................................................ 13

*Popular Grove Planting and Refining Co., Inc. v. Bache Halsey Stuart, Inc.*,
600 F.2d 1189 (5th Cir. 1979) ........................................................................... 5

*Rachel v. Banana Republic, Inc.*,
831 F.2d 1503 (9th Cir.1987) ....................................................................... 5, 12

*Ram v. Infinity Select Ins.*,
807 F. Supp. 2d 843 (N.D. Cal. 2011) ............................................................. 12

*Richardson v. United States*,
841 F.2d 993 (9th Cir. 1988) ........................................................................... 11

*Sarver v. The Hurt Locker LLC*,
No. 10-cv-09034-JHN, 2012 WL 12892147 (C.D. Cal. Feb. 2, 2012) ................... 9

*Townsend v. Holman Consulting Corp.*,
929 F.2d 1358 (9th Cir. 1990) ........................................................................... 5

*United States v. Park Place Assoc.*,
563 F.3d 907 (9th Cir. 2009) ........................................................................... 11

*Walnut Creek Manor, LLC v. Mayhew Ctr.*,
LLC, No. C 07-5664 CW, 2010 WL 653561 (N.D. Cal. Feb. 22, 2010) ................. 8

*Zoellner v. City of Arcata*,
No. 3:18-CV-04471-JSC, 2024 WL 4700633 (N.D. Cal. Nov. 5, 2024) ................. 5

**Statutes**

Cal. Bus. Prof. Code §§ 17200, *et seq.* ............................................................. 2

**Other Authorities**

17 U.S.C. 1202(b) .............................................................................................. 2

Federal Rules of Civil Procedure 62(a) .............................................................. 4

Federal Rule of Civil Procedure 62(b) ....................................................... *passim*

Federal Rule of Civil Procedure 62(c) ............................................................... 6

Ninth Circuit Rule 36-3 .................................................................................... 11

PLAINTIFFS' OPPOSITION TO SUHY'S EMERGENCY MOTION TO STAY     Case No. 5:18-cv-07182-EJD

## I.    INTRODUCTION

The Emergency Motion filed by Defendant John Mark Suhy ("Suhy") is another attempt to frustrate efforts by Plaintiffs Neo4j Inc. ("Neo4j USA") and Neo4j Sweden AB ("Neo4j Sweden, collectively "Neo4j" or "Plaintiffs") to recoup the lost licensing revenue caused by Suhy's violations of the Lanham Act and the DMCA.  During the pendency of this case, Suhy sold his house for which the proceeds remain unaccounted for.  After the Court's summary judgment findings that Suhy violated the Lanham Act were affirmed by the Ninth Circuit in March 2022, Suhy sold intellectual property assets owned by him and iGov valued over $1.3 million to his current employer, Greystones Consulting Group, LLC ("Greystones").  Suhy also transferred iGov's outstanding government subcontracts over to Greystones, which he continued to provide services under as an employee of Greystones.  Thus, Suhy's claim that he does not have the financial resources to post a bond is untenable, if not false.

Suhy's motion also amounts to forum shopping and an improper second bite of the apple. Suhy, a Virginia resident, previously filed a motion for a stay without posting a bond in the Virginia Circuit Court for Fairfax County, which was recently denied. Suhy raises identical arguments here – none of which meet the applicable legal standard under Federal Rule of Civil Procedure 62(b) ("Rule 62(b)") for imposing a stay of execution pending appeal without the required supersedeas bond.  Courts in this District and the Ninth Circuit employ a five-factor test to determine whether to waive the bond requirement under this rule.  Suhy's arguments based on equity, imbalance of resources, disproportionate impact and an alleged lack of prejudice to Plaintiffs are neither among nor address these five factors.

Conversely, Suhy's unsupported claims of financial hardship cut against the applicable five factors and amplify the need for him to post a supersedeas bond sufficient to secure Plaintiffs from further loss.  Accordingly, the Court should deny Suhy's motion and order him to post a supersedeas bond in the amount of $843,043 should he wish to stay execution, which is equal to 1.25 times the amount of the Judgment, interest and costs, should he still wish to stay enforcement of the Judgment while his appeal is pending.

/ / /

## II.    PROCEDURAL BACKGROUND

On November 28, 2018, Neo4j USA filed suit against Defendants for violations of the Lanham Act and California's Unfair Competition Law, Cal. Bus. Prof. Code §§ 17200, *et seq.* ("UCL"). These claims were primarily based on Defendants' infringement of the Neo4j Mark in promoting ONgDB software and false advertising in relation thereto. *See* ECF No. 1.  Neo4j USA later amended its complaint to add Neo4j Sweden as a plaintiff and assert claims against Defendants for violations of Section 1202(b) of the DMCA.

On May 18, 2021, the Court granted Plaintiffs' motion for partial summary judgment in favor of Neo4j USA wherein it found Defendants liable for trademark infringement, false advertising and false designation of origin under the Lanham Act and for violating the UCL. ECF No. 118 ("First MSJ Order").  The Court also imposed a preliminary injunction against Defendants prohibiting further unlawful conduct. *Id.*  Defendants immediately appealed the First MSJ Order. ECF No. 121. The Ninth Circuit heard the appeal on an expedited basis pursuant to its rules on appeals of preliminary injunctions and affirmed the Court's underlying rulings on liability in conjunction with the issuance of the preliminary injunction. ECF Nos. 140, 141.

On October 25, 2023, this Court granted a second motion for partial summary judgment in favor of Plaintiffs wherein it found Defendants liable for violating Section 1202(b) of the DMCA. ECF No. 216 ("Second MSJ Order"). The Court held a bench trial on November 14, 2023, and November 28, 2023, and heard oral arguments and evidence presented by both Parties. ECF Nos. 225, 229.  The Court also received pre-trial and post-trial stipulations of fact, including the amount of lost licensing fees caused by Defendants' violations of the Lanham Act and DMCA. *See* ECF Nos. 227, 230, 234).

On July 22, 2024, the Court issued its Findings of Fact and Conclusions of Law (ECF No. 248) and a final judgment on August 15, 2024, wherein it awarded Plaintiffs $597,000 in actual damages plus $57,288 in prejudgment interest, less a stipulated $26,000 deduction, and a permanent injunction (ECF No. 251, "the Judgment").  The Clerk of the Court subsequently awarded Plaintiffs $46,146.02 in costs that Suhy did not contest.  ECF No. 257.

/ / /

PLAINTIFFS' OPPOSITION TO SUHY'S EMERGENCY MOTION TO STAY      Case No. 5:18-cv-07182-EJD

1    On September 5, 2024, Plaintiffs domesticated the judgment in Virginia where Defendants

2    reside and began collection efforts.  Three days later, Suhy appealed the Judgment to the United

3    States Court of Appeals for the Ninth Circuit. ECF No. 255.

4    On October 15, 2024, Plaintiffs served a notice of garnishment Suhy's current employer,

5    Greystones. *See* ECF No. 263-7.  Greystones's response is due on December 13, 2024.  Plaintiffs

6    also served Suhy with debtor interrogatories to determine location, type and value of all monies

7    and assets owned by Suhy.  His responses are due on January 17, 2025.

8    On October 23, 2024, Suhy filed a motion to stay enforcement of the Judgment without a

9    bond with the Circuit Court of Fairfax County in Virginia.  Declaration of Jeffrey M. Ratinoff in

10    Support of Plaintiffs' Opposition to Defendants' Motion to Stay ("Ratinoff Decl."), Ex. 1. Suhy

11    raised identical arguments in that motion that he is asserting before this Court. *See id.*  On

12    November 8, 2024, that court denied Suhy's motion. *Id.*, Ex. 2.

13    Between November 6 and November 27, 2024, the parties engaged in a mediation process

14    through the Ninth Circuit's program.  *See* Ratinoff Decl., Exs. 3-4.  Despite Plaintiffs' best efforts,

15    mediation was unsuccessful.  Suhy has not posted a supersedeas bond with the Court and now seeks

16    to have this Court stay enforcement of the Judgment pending appeal without posting one.

17    **III.    RELEVANT FACTS RELATING TO SUHY'S FINANCIAL CONDITION**

18    At the time Plaintiffs filed suit against Defendants, Suhy owned real property located at

19    4202 Adrienne Drive, Alexandria, Viriginia.  Ratinoff Decl., Ex. 5. On January 28, 2020, Suhy

20    purchased real property located at 8814 Danewood Drive, Alexandria, Virginia for $644,000. *Id.*,

21    Ex. 6. That property was last valued at $798,150 by the tax assessor in 2024.  *Id.*, Ex. 7.  Suhy then

22    sold the Adrienne Drive property for $600,000 on May 28, 2020.  *Id.*, Ex. 5.  Suhy fails to explain

23    what happened to the proceeds from that sale or why the Danewood Drive property cannot be used

24    to satisfy the Judgment.

25    During the pendency of this litigation, Suhy generated $1,316,000 in revenue supporting

26    the IRS's use of ONgDB.  ECF No. 234 at ¶ 68. ASR Analytics also paid Suhy and iGov a total of

27    $246,082.55 for supporting ONgDB. ECF No. 234 at ¶ 71.  Suhy does not account for the

28    disposition of any of this revenue during this litigation.

3

(145 of 273), Page 145 of 273
Case: 24-5538, 01/02/2025, DktEntry: 28.2, Page 145 of 273
Case 5:18-cv-07182-EJD     Document 264     Filed 12/09/24     Page 8 of 18

1    After this Court found Suhy liable for violating the Lanham Act, he transferred and

2    otherwise obfuscated money and assets that could satisfy the Judgment.  Between May and July

3    2022, Suhy shut down iGov and hollowed out that entity after the Ninth Circuit affirmed that Suhy

4    violated the Lanham Act.  In May 2022, Suhy went to work for Greystones, which took over iGov's

5    contracts with the IRS and ASR Analytics, and all the work Suhy performed under those contracts

6    thereafter was for the benefit of Greystones.  Ratinoff Decl., Ex. 8 [Suhy Depo Vol. 2] at 343:12-

7    16, 345:11-346:1, 347:17-349:25 (employed by Greystones in May 2022); ECF No. 210, Ex. 7

8    [Pollard Depo] at 66:8-68:25, 167:11-168:21 (transfer of IRS contracts); ECF No. 210, Ex. 7

9    [Pollard Depo] at 160:5-162:18, 163:23-167:10, 180:12-183:5, 185:2-20, 186:5-10, 206:24-207:12

10   (transfer of ASR contracts); ECF No. 210, Ex. 6 [Stavrianos Depo] at 115:4-116:16, 173:24-174:21

11   (transfer of ASR contracts); Ratinoff Decl., Ex. 8 [Suhy Depo Vol. 2] at 284:24-286:10, 292:14-

12   293:12 (transfer of ASR contracts).  Suhy also expressly promised Greystones that he "only would

13   be dedicated to them" and would no longer pursue work on behalf of iGov.  Ratinoff Decl., Ex. 8

14   [Suhy Depo Vol. 2] at 349:21-25.

15   Between May and July 2022, Suhy sold off intellectual property owned by him to

16   Greystones for $1.3 million. ECF No. 210, Ex. 7 [Pollard Depo] at 169:8-170:8-11, 171:22-172:21.

17   This too appears to bear badges of fraud because this occurred during the litigation, after the 9th

18   Circuit affirmed this Court's findings that Suhy violated the Lanham Act. *See Neo4j, Inc. v.*

19   *PureThink*, LLC, No. 5:18-CV-07182-EJD, 2021 WL 2483778, at *1 (N.D. Cal. May 18, 2021),

20   *aff'd*, No. 21-16029, 2022 WL 501120 (9th Cir. Feb. 18, 2022), *amended on denial of reh'g*, No.

21   21-16029, 2022 WL 781037 (9th Cir. Mar. 14, 2022). Suhy fails to explain what happened to the

22   proceeds from this sale or why they cannot be used to post a bond or otherwise satisfy the Judgment.

23   Finally, Suhy effectively shut down PureThink on January 31, 2021, after he failed to pay

24   the annual registration fee to the Virginia Secretary of State.  Ratinoff Decl., Ex. 9.  Suhy has not

25   explained the disposition of any assets owned by PureThink.

26   ## IV.    LEGAL STANDARD

27   Federal Rules of Civil Procedure 62(a) provides a 30-day automatic stay on executing and

28   enforcing a judgment unless the court orders otherwise. Fed. R. Civ. P. 62(a). If a party appeals,

1    then it "may obtain a stay by providing a bond or other security." Fed. R. Civ. P. 62(b). "The

2    purpose of a supersedeas bond is to secure the appellees from a loss resulting from the stay of

3    execution and a full supersedeas bond should therefore be required." *Rachel v. Banana Republic,*

4    *Inc.*, 831 F.2d 1503, 1505 n. 1 (9th Cir.1987); *accord N.L.R.B. v. Westphal*, 859 F.2d 818, 819 (9th

5    Cir. 1988). Consequently, a supersedeas bond should be sufficient to pay the judgment plus

6    interest, costs, and any other relief that the appellate court may award. *See Cotton ex rel. McClure*

7    *v. City of Eureka*, 860 F. Supp. 2d 999, 1027-28 (N.D. Cal. 2012).

8         The trial court, however, has the inherent discretion to stay execution of a judgment without

9    security or with an alternate form of security. *See Townsend v. Holman Consulting Corp.*, 929 F.2d

10   1358, 1367 (9th Cir. 1990); *Int'l Telemeter, Corp. v. Hamlin Int'l Corp.*, 754 F.2d 1492, 1495 (9th

11   Cir. 1985). The moving party carries the burden to "objectively demonstrate" that relief from the

12   bond requirement is justified. *Popular Grove Planting and Refining Co., Inc. v. Bache Halsey*

13   *Stuart, Inc.*, 600 F.2d 1189, 1191 (5th Cir. 1979) (cited by Suhy); *accord Hines v. California Pub.*

14   *Utils. Comm'n*, No. C 07-04145 CW, 2010 WL 3565498, at *1 (N.D. Cal. Sept. 10, 2010) (citing

15   same in denying motion for stay pending appeal without posting a supersedeas bond); *Zoellner v.*

16   *City of Arcata*, No. 3:18-CV-04471-JSC, 2024 WL 4700633, at *2 (N.D. Cal. Nov. 5, 2024) (same).

17        When analyzing whether a bond waiver is justified, courts in the Northern District of

18   California and the Ninth Circuit consider the following five factors enumerated in *Dillon v. City of*

19   *Chicago*, 866 F.2d 902, 904–905 (7th Cir.1988):

20        (1) the complexity of the collection process; (2) the amount of time required to
         obtain a judgment after it is affirmed on appeal; (3) the degree of confidence
21       that the district court has in the availability of funds to pay the judgment; (4)
         whether the defendant's ability to pay the judgment is so plain that the cost of
22       a bond would be a waste of money; and (5) whether the defendant is in such a
         precarious financial situation that the requirement to post a bond would place
23       other creditors of the defendant in an insecure position.
24

25   *Max Sound Corp. v. Google LLC*, No. 5:14-CV-04412-EJD, 2019 WL 480544, at *2 (N.D. Cal.

26   Feb. 7, 2019) (citing *Dillon v. City of Chicago*, 866 F.2d 902, 904–905 (7th Cir. 1988); *accord*

27   *AngioScore, Inc. v. TriReme Medical, Inc.*, No. 12-CV-03393-YGR, 2015 WL 13387576, at *2

28

PLAINTIFFS' OPPOSITION TO SUHY'S EMERGENCY MOTION TO STAY         Case No. 5:18-cv-07182-EJD

1     (N.D. Cal. Oct. 23, 2015) (citing *Dillion*).[1]

2         Suhy does not substantively address any of the five *Dillon* factors.[2]  Rather, Suhy attempts

3 to satisfy the factors used to determine the waiver of the bond normally required to stay a

4 preliminary injunction pending appeal. *See* Motion at 7:18-17:13.  As previously held by this Court,

5 "[t]hat is not correct.  *Max Sound Corp.*, No. 5:14-CV-04412-EJD, 2019 WL 480544, at *2 (courts

6 in the Ninth Circuit and in this District "have held that the preliminary injunction test specifically

7 applies to a stay of injunctive relief pursuant to Federal Rule of Civil Procedure 62(c), and is

8 irrelevant in a case involving a monetary judgment") (internal quotations and citation omitted).  To

9 the extent that Suhy's arguments can be applied to the *Dillon* factors, as detailed below, such

10 arguments go against waiving the supersedeas bond requirement and Suhy fails to carry his burden.

11 **V.**      **ARGUMENT**

12       **A.**      **The First and Second Factors Go Against Waiving the Bond Requirement**

13         Suhy offers no argument or evidence in relation to the first and second *Dillon* factors.

14 However, both the potential complexity of the collection process and the possible amount of time

15 required to obtain a judgment after any affirmance on appeal make clear he cannot establish either

16 *Dillon* factor in his favor.

17         As detailed above, Suhy transferred assets generated from the sale of intellectual property

18 ─────────────────────

19 [1] Without citing to any supporting authority, Suhy asserts that "Courts have consistently held that

20 requiring a bond is unnecessary where the defendant demonstrates limited financial resources or

21 where enforcement would impose severe hardship." Motion at 7:18-8:2. This is an incorrect

statement of the law as reflected by the application of the *Dillon* factors by this Court and other

22 courts in the Ninth Circuit.  As discussed below, Suhy's alleged limited financial resources is the

23 primary reason why courts require the imposition of a bond as a condition for a stay pending appeal.

24 [2] None of the out-of-circuit authorities cited by Suhy supporting his "equitable grounds" arguments

25 contradict or negate the application of the *Dillon* factors by Courts in the Ninth Circuit and this

26 District.  *See* Motion at 6:8-7:8. Suhy's reliance on *Aristocrat Techs. v. Int'l Game Tech.*, No. C06-

03717 MJJ, 2008 WL 114985 (N.D. Cal. Jan. 10, 2008) is also misplaced as the court **required** the

27 posting of supersedeas bond in excess of the judgment to stay its execution pending appeal.  *See*

28 Motion at 7:10-16.

PLAINTIFFS' OPPOSITION TO SUHY'S EMERGENCY MOTION TO STAY     Case No. 5:18-cv-07182-EJD

valued at $1.3 million during the pendency of the litigation. As a result, Neo4j USA will be required to engage in additional legal proceedings to undue that fraudulent transaction. Likewise, Neo4j USA will be required to engage in a lengthy process of tracing the proceeds of Suhy's sale of the Adrienne Drive property and potentially having to undo any subsequent fraudulent transfer or hiding of those proceeds.

Lastly, Suhy's alleged inability to secure a bond or satisfy the judgment "suggest the collection process may be arduous and the availability of sufficient funds in future years... is questionable." *AngioScore, Inc.*, 2015 WL 13387576, at *2 (defendants' claims of financial hardship go against the first and second *Dillon* factors in considering waiving the bond requirement). Consequently, the first and second *Dillon* factors weigh against waiving the supersedeas bond requirement.

### B.     Suhy's Alleged Inability to Post a Bond or Satisfy the Judgment Weighs Heavily Against the Third *Dillon* Factor

Suhy's "ability to pay the judgment is but one of many factors the Court is to consider in connection with a request to waive a supersedeas bond." *See Cotton*, 860 F. Supp. 2d at 1029. In this regard, Suhy argues that execution of the Court's judgment will impose an undue hardship upon him, including unspecified "financial circumstances" that would lead to bankruptcy and "the potential loss of employment due to wage garnishment and the resulting impact on Defendant's government security clearance."[3] Motion at 7:20-8:2, 9:19-10:14. Suhy offers no objective evidence to support these assertions.

Instead, Suhy submitted a declaration that conclusory states that the enforcement of the judgment, including the garnishment of his wages, would "significantly impact" his ability to cover his family's living expenses. ECF No. 263-5 at ¶ 4. Suhy does not provide evidence of what amount of money is required to meet those financial obligations, what cash he has on hand, what his spouse earns or could earn as part-time versus full-time employee, or what assets he owns and other

---

[3] Suhy's characterization of Plaintiffs' enforcement efforts as "aggressive legal actions" and "legal overreach" is wrong. *See* Motion at 3:4-10. Wage garnishment is a routine method of enforcing a judgment and is expressly authorized by statute.

1   information that would allow an objective determination of whether the garnishment of his wages

2   would require him to seek bankruptcy protection. Suhy's failure to offer such evidence alone

3   warrants the denial of his motion. *Hines*, 2010 WL 3565498, at *1 (denying motion to stay

4   judgment pending an appeal without posting a bond because defendant failed to offer evidence

5   concerning her financial condition that would establish the claimed undue hardship); *Walnut Creek*

6   *Manor, LLC v. Mayhew Ctr.*, LLC, No. C 07-5664 CW, 2010 WL 653561, at *7 (N.D. Cal. Feb.

7   22, 2010) (same); *see also Cotton*, 860 F. Supp. 2d at 1029 (denying motion for stay and waiver of

8   supersedeas bond where defendants only addressed one of the five *Dillon* factors in arguing

9   financial condition).

10      More importantly, Suhy's claim of financial hardship strongly weighs against the third

11   factor.  *See Max Sound Corp*, No. 5:14-CV-04412-EJD, 2019 WL 480544, at *2 (finding that

12   party's "financial insecurity weighs in favor of requiring a bond or security" and denying motion

13   to stay judgment without a bond); *see also Lowery v. Rhapsody Int'l, Inc.*, No. 16-CV-01135-JSW,

14   2022 WL 267442, at *2 (N.D. Cal. Jan. 28, 2022) (Defendant's claim of undue financial hardship

15   "directly undermines the Court's confidence in Defendant's ultimate ability to pay the judgment.");

16   *Clark*, 2018 WL 2412136, at *3 ("the Court's lack of confidence that defendant has funds available

17   to pay the judgment weighs against waiver").  Judge Ryu's denial of motion based on similar facts

18   in *Erickson Prods. Inc. v. Kast*, No. 13-CV-05472-DMR, 2022 WL 698148, at *4 (N.D. Cal. Feb.

19   10, 2022) is particularly instructive here given the factual similarities.

20      In *Erickson,* a *pro se* defendant, Kast, filed a motion to stay the proceedings and

21   enforcement of a $450,000 judgment for copyright infringement without posting a bond pursuant

22   to Fed. R. Civ. P. 62(b).  2022 WL 698148, at *1, *3.  Kast argued that he satisfied the *Dillon*

23   factors on the grounds, *inter alia*, that Kast's only income was from social security income, the

24   lawsuit "placed a stigma on his professional licenses preventing him from earning a living," and

25   was unable to obtain a bond "because of his precarious financial condition and because [he] cannot

26   earn a living"; and Kast was a severe financial burden to his fiancé to whom he owed more than $1

27   million.  Judge Ryu found that

28      Kast's arguments do not support waiver of the bond requirement; to the

contrary, his assertions that his financial condition is "precarious" and that he is unable to "earn a living" weigh in favor of requiring a bond, since "[t]he purpose of the supersedeas bond is to protect the prevailing party from the risk of a later uncollectible judgment."

*Erickson*, 2022 WL 698148, at *4 (N.D. Cal. Feb. 10, 2022) (quoting *Max Sound Corp.*, No. 5:14-CV-04412-EJD, 2019 WL 480544, at *2).

Here, Suhy similarly argues without waiving the bond requirement, he will suffer financial hardship, a potential loss of employment and will impose a financial burden on his family.  *See* ECF No. 263-at 7:20-8:2, 9:19-10:14.  Just as the defendant in *Erickson,* his claims **reinforce** the need to post a supersedeas bond to protect Plaintiffs' interest in the eventual collection of the judgment. *See, e.g., Inhale, Inc. v. Starbuzz Tobacco, Inc.*, No. 11-cv-3838-ODW, 2013 WL 361109, at *2 (C.D. Cal. Jan. 30, 2013) ("The fact that Inhale 'does not have sufficient liquid assets' to cover the award of attorneys' fees and costs is precisely why it must post a supersedeas bond.");

As this Court previously recognized in *Max Sound Corp.*, it cannot put Plaintiffs' right to enforce the Judgment "at risk solely on the basis of [Suhy's] ability to pay" because "it may be an abuse of discretion to do so." 2019 WL 480544, at *2 (internal quotations and citations omitted); *accord Sarver v. The Hurt Locker LLC*, No. 10-cv-09034-JHN, 2012 WL 12892147, at *3 (C.D. Cal. Feb. 2, 2012); *see also Geddes v. United Fin. Grp.*, 559 F.2d 557, 561 (9th Cir. 1977) (finding that the trial court abused its discretion in staying an execution of judgment based on the ability to pay).  An unsecured stay would also prevent Plaintiffs from receiving responses to the outstanding debtor interrogatories and discovering all monies and assets in Suhy's possession, while making it much easier for him to squander or hide them.

### C.    The Fourth *Dillon* Factor Weighs Against Waiving the Bond Requirement

Suhy also cannot satisfy the fourth *Dillon* factor for reasons similar to the third factor.  Suhy's alleged "'financial frailty' indicates that a bond is necessary to protect [Plaintiffs'] interests, and that it will not be a waste of money."  *Clark v. Hidden Valley Lake Ass'n*, No. 16-CV-02009-SI, 2018 WL 2412136, at *3 (N.D. Cal. May 29, 2018) (denying defendant's motion to stay enforcement of the judgment without posting a supersedeas bond)  at *3; *accord Lowery*, 2022 WL 267442, at *2 (finding that defendant's claim of undue financial hardship "means that [it's] ability

1    to pay the final judgment is not so plain as to make a bond a waste of money").

2          **D.**    **The Fifth Factor Does Not Support the Waiver of the Bond Requirement**

3         Finally, Suhy has not identified any creditors (other than Plaintiffs) that the requirement to

4    post a bond would place in an insecure position. *See* ECF No. 263-5 at ¶ 4. Nor has he explained

5    how requiring a supersedeas bond would affect those other unnamed creditors even if they did exist.

6    As such, the fifth *Dillon* factor does not support Suhy's request for a stay without first posting a

7    supersedeas bond. *Clark*, 2018 WL 2412136, at *3 (finding that the fifth *Dillon* factor did not

8    support a waiver because defendant failed to identify any other creditors or explain how requiring

9    a bond would affect those creditors).

10        **E.**    **The Stated Grounds for Suhy's Appeal are Meritless and Further Support**
11              **the Need for Him to Post a Bond**

12        Suhy argues that the Court should waive the bond requirement because he is likely to

13   succeed on his appeal. This is based on the following "critical errors" that Suhy claims were made

14   by this Court: (1) Neo4j Sweden's addition of the Commons Clause to the Neo4j Sweden Software

15   License violated the terms of the AGPLv3; (2) a factual error in determining "that the removal of

16   the Commons Clause allowed ONgDB to be offered for free, enabling the MPO to choose ONgDB

17   over Neo4j EE;" and (3) the calculation of the licensing fee the MPO would have paid for Neo4j

18   EE was speculative. While the merits of Suhy's appeal are not relevant to the five *Dillon* factors,

19   he is unlikely to succeed on any of these stated grounds. As a result, it is even more important that

20   any stay of execution be conditioned on Suhy posting a sufficient bond to protect Plaintiffs. *See*

21   *Int'l Petroleum Prod. & Additives Co., Inc. v. Black Gold S.A.R.L.*, 115 F.4th 1202, 1213 (9th Cir.

22   2024) (recognizing a bond sufficient to protect the prevailing party from a later uncollectible

23   judgment is "especially" important "where 'the chances of success' on appeal are 'dim'…")

24           **1.**    **The Ninth Circuit Previously Affirmed that Suhy's Removal of the**
25                **Commons Clause was Improper**

26        Suhy's primary grounds for appeal is that this Court's interpretation of Sections 7 and 10

27   of the Neo4j Sweden Software License (and the AGPL upon which it was based), which were at

28   the heart of the parties' dispute as to whether Suhy's removal of the Commons Clause from that

PLAINTIFFS' OPPOSITION TO SUHY'S EMERGENCY MOTION TO STAY    Case No. 5:18-cv-07182-EJD

license, was erroneous.[4] *See* ECF No. 118 at 24:7-25:19; *see also* ECF No. 216 at 20:17-23:6. However, the Ninth Circuit previously affirmed this Court's determination that these contractual provisions prohibited a licensee from imposing further restrictions, but do not prohibit Neo4j Sweden as the copyright holder and licensor from doing so. *See* ECF No. 140.

Suhy cannot succeed because the law of case doctrine precludes him from again appealing on these grounds. *See Richardson v. United States*, 841 F.2d 993, 996 (9th Cir. 1988) ("Under the 'law of the case' doctrine, a court is ordinarily precluded from reexamining an issue previously decided by the same court, or a higher court, in the same case."); *accord United States v. Park Place Assoc.*, 563 F.3d 907, 925 (9th Cir. 2009) ("when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case"). To be sure, the Ninth Circuit expressly affirmed that "Defendants' representation that ONgDB is a 'free and open-source' version of Neo4j® EE was literally false, because Section 7 of the Sweden Software License only permits a downstream licensee to remove 'further restrictions' added by an upstream licensee to the original work." ECF No. 140 at 3. The Ninth Circuit removed all doubt as to the conclusiveness of its decision by indicating that the opinion was precedential for the purpose of the doctrine of law of the case "as provided by Ninth Circuit Rule 36-3." *See id.* at 1.

### 2. Suhy is Bound by Stipulated Facts that MPO Chose ONgDB Over Neo4j® EE Because It Could Avoid Paying a License Fee to Plaintiffs

Suhy's planned argument on appeal that this Court committed a factual error in determining "that the removal of the Commons Clause allowed ONgDB to be offered for free, enabling the MPO to choose ONgDB over Neo4j EE" will also fail based on the law of the case. In addition, Suhy *stipulated* to the fact that "Defendants' removal of the Commons Clause from the license governing ONgDB enabled Next Century and the MPO to use ONgDB for free rather than pay for a commercial license to Neo4j® EE." ECF No. 234 at ¶ 7. Suhy further stipulated to facts

---

[4] Suhy also argues that his appeal is "meritorious" because the Free Software Foundation (FSF) as the copyright holder of the AGPL is now supporting Suhy's interpretation that the Court previously rejected. Motion at 7:4-8:22. Suhy then admits that FSF's position "is not legally binding." Motion at 8:13-14. Thus, Suhy concedes that the FSF's view has no bearing on the merits of his appeal.

1   establishing that the MPO required the enterprise features found in both Neo4j® EE and ONgDB,

2   and chose ONgDB over Neo4j® EE, in part, on the belief that it was a "drop-in replacement" and

3   "open source" version of Neo4j® EE.  ECF No. 227 at ¶¶ 111-118.  Suhy is bound by these

4   stipulated facts, and therefore cannot now argue on appeal that the Court somehow committed a

5   factual error in determining that Suhy's infringement of the Neo4j Mark and false advertising

6   caused Plaintiffs' damages with respect to the MPO.  *See Block v. City of Los Angeles*, 253 F.3d

7   410, 419 n. 2 (9th Cir.2001) ("[a] party is normally bound by its stipulation of facts"); *accord Ram*

8   *v. Infinity Select Ins.*, 807 F. Supp. 2d 843, 855 (N.D. Cal. 2011).

9             **3.      Suhy Stipulated to Facts Supporting the Court's Determination of the**
10                      **Amount of Plaintiffs' Lost Licensing Fees**

11          Suhy's intent to argue that the Court "made speculative guesses about what the MPO might

12   have paid for Neo4j EE, with no factual support for these figures" on appeal is also destined to fail.

13   *See* Motion at 13:8-10.  After Neo4j presented uncontested expert testimony concerning the amount

14   of Plaintiffs' damages, Suhy stipulated to facts establishing that Neo4j USA's lost profits resulting

15   from the MPO's use of ONgDB over Neo4j® EE ranged between $1,786,542 and 2,370,598. *See*

16   ECF No. 234 at ¶¶ 21-24; *see also* ECF No. 248 at ¶ 37 (citing same).  Suhy is bound by such

17   stipulated facts, and thus cannot now argue that the Court erred in awarding a lower amount in

18   damages to Plaintiffs.  *See Block*, 253 F.3d at 419 fn. 2; *Ram*, 807 F. Supp. 2d at 855.

19        **F.      Any Alleged "Imbalance of Resources and Disproportionate Impact" is**
20                 **Inconsequential to a Potential Waiver of Rule 62(b)'s Bond Requirement**

21          Without citing to any evidentiary support or controlling legal authority, Suhy argues that

22   because Neo4j USA is "a billion-dollar company" the amount of the judgment is "negligible for

23   Neo4j" while a significant financial burden for Suhy. *See* Motion at 14:17-15:8. This alleged

24   "imbalance of resources and disproportionate impact" is irrelevant to determining whether the

25   Court should waive the supersedeas bond requirement under Rule 62(b). The Ninth Circuit has

26   made clear that "[t]he purpose of a supersedeas bond is to secure the appellees from a loss resulting

27   from the stay of execution and a full supersedeas bond should therefore be required." *Westphal*,

28   859 F.2d at 819; *accord Rachel*, 831 F.2d at 1505 n. 1.  As detailed above, Suhy's financial

1    condition reinforces the need to post a bond sufficient to pay the judgment, interest and costs

2    awarded to effectuate any stay during appeal—irrespective of Plaintiffs' financial condition.

3    **G.    Not Requiring Suhy to Post a Bond Would Irreparably Harm Plaintiffs**

4        Suhy asserts that there would be minimal prejudice to Neo4j because the judgment amount

5    is immaterial in the context of Neo4j's overall financial position.  Aside from being irrelevant, Suhy

6    offers no evidence of Neo4j USA and Neo4j Sweden's respective financial positions.  Even if

7    Plaintiffs were "billion-dollar" corporations, $600,000 represents a sizeable expenditure.

8        Contrary to Suhy, Plaintiffs will suffer irreparable harm if the Court were to stay

9    enforcement without requiring him to post a sufficient bond.  Since Suhy's likelihood of success

10   on appeal is "dim," Suhy has "every incentive to squander or conceal assets while his appeal

11   remain[s] pending." *Int'l Petroleum Prod.*, 115 F.4th at 1213.  Indeed, Suhy has already transferred

12   assets valued at $1.3 million to his current employer, Greystones.  After Suhy began working for

13   Greystones, ASR Analytics terminated several subcontracts with Suhy and iGov and reassigned

14   them to Greystones, which Suhy continues to perform work under.  Thus, it is highly likely that

15   Suhy will further obfuscate his assets.  Suhy also ignores the millions of dollars in attorneys' fees

16   and costs Plaintiffs have expended in obtaining injunctive relief to prevent Suhy from engaging in

17   further violations of the Lanham Act and DMCA, and those additional fees and costs it will need

18   to defend responding to Suhy's meritless appeal.  Accordingly, the imposition of a stay without

19   first requiring Suhy to post a sufficient supersedeas bond will severely prejudice Plaintiffs.

20   **H.    There is No Public Interest Affected by Requiring Suhy to Post a Bond**

21       Suhy lastly argues that there is a strong public interest in granting the stay without requiring

22   a bond because this case allegedly "will have far-reaching implications for the open-source

23   software community" and that the FSF has a vested policy interest in the outcome of Suhy's appeal

24   of this Court's already-affirmed interpretation of the Neo4j Sweden Software License.  Such

25   considerations are irrelevant to determining whether a waiver the supersedeas bond requirement is

26   appropriate under Rule 62(b).[5]

27   _____

28   [5] Suhy mistakenly relies upon *Nken v. Holder*, 556 U.S. 418, 433 (2009) to argue that the Court
     should consider the broader public interest when considering a stay. This case addressed a stay of

PLAINTIFFS' OPPOSITION TO SUHY'S EMERGENCY MOTION TO STAY        Case No. 5:18-cv-07182-EJD

Moreover, the time for FSF to have voiced its policy concerns has long since passed. After this Court first determined that Sections 7 and 10 of the Neo4j Sweden Software License precluded Suhy from removing the Commons Clause on November 13, 2020, Suhy pleaded with the FSF to intervene and even offered to pay for their attorneys' fees. *See* ECF No. at 241-67 [Trial Ex. 147] and Trial Tr. at 376:4-378:5. The FSF did not take Suhy up on his offer at that time. Three years later, after the close of discovery and on the eve of trial, Suhy colluded with the FSF to manufacture the letter that he is now relying on in the present motion. *See* Trial Tr. at 192:2-202:9. Notably, the Court previously excluded this same letter from evidence at trial as irrelevant and inadmissible hearsay. *See id.*

Finally, there is a strong public interest embodied in Rule 62(b) ensuring that parties who obtain monetary judgments and their ability to enforce them are not jeopardized by a defendants' appeal thereof. *Westphal*, 859 F.2d at 819; *accord Max Sound Corp.*, No. 5:14-CV-04412-EJD, 2019 WL 480544, at *2 (recognizing that "[t]he purpose of the supersedeas bond is to 'protect the prevailing party from the risk of a later uncollectible judgment.'") (citing same).

## VI. CONCLUSION

For the foregoing reasons, Plaintiffs respectively request that the Court deny Suhy's request for a stay of execution of the Judgment pending appeal and waiving the bond requirement. Plaintiffs also respectfully request that the Court condition a stay on Suhy posting a supersedeas bond in the amount of $843,043.00, which is roughly equal to 1.25 times the amount of the judgment, interest and costs.

Dated: December 9, 2024

SPENCER FANE LLP

By: */s/ Jeffrey M. Ratinoff*
John V. Picone III
Jeffrey M. Ratinoff
Attorneys for Plaintiffs and Counter-Defendants
NEO4J, INC. and NEO4J SWEDEN AB

---

an immigration removal order pending appeal, and is not applicable to a stay of execution of a civil monetary judgment. It is worth noting, however, the Supreme Court emphasized that "[a] stay is not a matter of right, even if irreparable injury might otherwise result." *Id.* at 433 (internal quotations and citation omitted).

# EXHIBIT 7

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEO4J, INC., a Delaware corporation; NEO4J SWEDEN, AB, Plaintiffs, v. PURETHINK LLC, a Delaware limited liability company; IGOV INC., a Virginia corporation; and JOHN MARK SUHY, an individual, Defendants. | CASE NO. 5:18-CV-7182-EJD **DEFENDANT'S REPLY TO PLAINTIFFS' OPPOSITION TO EMERGENCY MOTION TO STAY ENFORCEMENT OF JUDGMENT PENDING APPEAL WITHOUT BOND** |

## I.    INTRODUCTION

Defendant John Mark Suhy submits this reply to address inaccuracies in Plaintiffs' Opposition. Plaintiffs' arguments rely on incorrect factual assertions and unverified claims that fail to undermine the equitable basis of this motion. It is critical to correct the record for the benefit of this Court and the forthcoming appeal, which addresses significant legal questions.

## II.    NO CONTRACT TRANSFERS OR $1.3 MILLION INTELLECTUAL PROPERTY SALE

Plaintiffs inaccurately assert that, "Between May and July 2022, Suhy sold off intellectual property owned by him to Greystones for $1.3 million." This assertion is incorrect and unsupported by any credible evidence.

Similarly, Plaintiffs' claim that contracts were transferred from iGov to Greystones is also false. No contracts were transferred. Instead, Greystones obtained new contracts that replaced the prior ones. Plaintiffs' reliance on unsubstantiated deposition testimony highlights the speculative nature of their claims.

## III. PURETHINK'S STATUS WAS MISREPRESENTED

Plaintiffs erroneously assert that PureThink was "effectively shut down" in 2021 due to non-renewal of its registration in Virginia. This statement is demonstrably false. PureThink is a Delaware corporation, and its non-renewal in Virginia does not equate to its dissolution or cessation of operations. Plaintiffs could have easily verified this information but instead made claims that are unsupported by evidence. This oversight illustrates a broader pattern of misstatements in their opposition.

## IV. NO COLLUSION WITH THE FREE SOFTWARE FOUNDATION

Plaintiffs' accusations of collusion with the Free Software Foundation (FSF) are without merit. The FSF is an internationally recognized organization that acts independently to protect open-source software principles. Their late

2

involvement in this case resulted from internal organizational delays. Plaintiffs' suggestion otherwise is speculative and unfounded.

Notably, Neo4j complied with the FSF's cease-and-desist letter, which confirms that the addition of the Commons Clause to the AGPL violated the terms of the license. (See Declaration of John Mark Suhy, Exhibit E to Defendant's Motion to Stay, filed December 2, 2024, ¶3). Neo4j's post-trial decision to comply with the FSF's demands demonstrates the validity of the FSF's position and undermines Plaintiffs' claims that this issue is without merit.

Neo4j's compliance further underscores the broader importance of this case. At its core, this litigation impacts not only the immediate parties but also the future integrity of open-source licensing and compliance.

The public interest in this case transcends the immediate parties. The FSF's intervention highlights the significance of preserving the integrity of the GPLv3 license, a cornerstone of the global open-source ecosystem. Allowing copyright holders to retroactively impose restrictive clauses, as Plaintiffs attempted with the Commons Clause, would undermine the trust and principles underpinning open-source software. Open-source projects under the GPLv3, such as ONgDB and many others, play a vital role in fostering innovation and reducing costs for public and private entities alike, including government agencies like the

3

Maryland Procurement Office. If this judgment were enforced without careful appellate review, it could set a precedent discouraging the use and development of open-source alternatives, thereby increasing costs for taxpayers and limiting competition in critical markets.

Moreover, this case raises broader legal implications, such as how compliance with open-source licenses like the GPLv3 is enforced and interpreted in commercial contexts. Upholding the judgment could jeopardize the viability of open-source contributions, discourage innovation, and create a chilling effect within the community. These concerns are not abstract but directly impact the future of open-source development, economic efficiency, and software freedom worldwide.

## V. EQUITABLE CONSIDERATIONS WARRANT A STAY

Enforcing the judgment would cause irreparable harm to me and my family, including potential financial ruin. Granting a stay ensures that the appeal can proceed without irreparably harming me and my family, while imposing no meaningful prejudice on Neo4j, a billion-dollar corporation. The judgment amount is negligible in the context of Neo4j's financial position but represents a severe financial burden for me as an individual pro se litigant.

(161 of 273), Page 161 of 273 Case: 24-5538, 01/02/2025, DktEntry: 28.2, Page 161 of 273

Case 5:18-cv-07182-EJD    Document 266    Filed 12/09/24    Page 5 of 7

The balance of equities strongly supports granting the requested relief. Such

relief will protect against immediate harm while preserving the opportunity for

appellate review of substantial legal and public interest issues.

I remain committed to complying with the Court's processes while seeking

equitable relief to ensure the appeal can proceed fairly.

## VI.    CONCLUSION

For the reasons stated, I respectfully request that this Court grant a stay of

enforcement of the judgment pending appeal without requiring a bond. Such relief

is critical not only to prevent irreparable harm but also to ensure that significant

legal and public interest issues are given due consideration.

Respectfully submitted

John Mark Suhy
Pro Se
Dated: December 9th, 2024

By: _____ */s/ John Mark Suhy Jr.*

8814 Danewood Dr
Alexandria, VA 22308

5

Tel: (703) 862-7780
Email: jmsuhy@gmail.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

### CERTIFICATE OF SERVICE

I hereby certify that on December 9, 2024, I electronically filed the foregoing document with the Clerk of the Court for the United States District Court for the Northern District of California using the CM/ECF system, which will send notification of such filing to all counsel of record.

Date: December 9, 2024
/s/ John Mark Suhy Jr.
John Mark Suhy Jr.
8814 Danewood Dr
Alexandria, VA 22308
jmsuhy@gmail.com
703-862-7780

# EXHIBIT 8

1

2

3

4                          UNITED STATES DISTRICT COURT

5                          NORTHERN DISTRICT OF CALIFORNIA

6                                  SAN JOSE DIVISION

7

8    NEO4J, INC., et al.,                        Case No.   5:18-cv-07182-EJD

9                        Plaintiffs,             **ORDER DENYING EMERGENCY
                                                 MOTION TO STAY ENFORCEMENT
10          v.                                   OF JUDGMENT PENDING APPEAL
                                                 WITHOUT BOND**
11   PURETHINK, LLC, et al.,

12                       Defendants.             Re: Dkt. No. 263

13

14          Before the Court is pro se Defendant John Mark Suhy's ("Suhy") motion pursuant to

15   Federal Rule of Civil Procedure 62(b) to stay the enforcement of the Court's Judgment, ECF No.

16   251, without a bond pending his appeal in the Ninth Circuit.  Mot., ECF No. 263.  Plaintiffs,

17   Neo4j, Inc., et al. ("Neo4j"), filed an opposition, and Suhy filed a reply.  Opp'n ECF No. 264;

18   Reply, ECF No. 266.

19          For the reasons explained below, the Court **DENIES** Suhy's motion, subject to any further

20   request by Suhy to impose alternative security or present additional evidence.

21   I.     **LEGAL STANDARD**

22          Under Rule 62(b), after a judgment has been entered, "a party may obtain a stay [of the

23   proceedings to enforce the judgment] by providing a bond or other security."  A district court in its

24   discretion may determine that the party requesting the stay need not provide such a supersedeas

25   bond.  *United States v. Moyer*, 2008 WL 3478063, at *12 (N.D. Cal. Aug. 12, 2008).

26          In the Ninth Circuit, when examining whether to stay the enforcement of a monetary

27   judgment without a bond, district courts have largely adopted the factors laid out in *Dillon v. City*

28   Case No.: 5:18-cv-07182-EJD
     ORDER DEN. MOT. TO STAY ENFORCEMENT OF J. WITHOUT BOND

1    *of Chicago*, 866 F.2d 902 (7th Cir. 1988).  *See, e.g., Moyer*, 2008 WL 3478063, at *12; *Cotton ex*

2    *rel. McClure v. City of Eureka, Cal.*, 860 F. Supp. 2d 999, 1028 (N.D. Cal. 2012).

3            Under the *Dillon*, courts consider:

4                    (1) the complexity of the collection process; (2) the amount of time
               required to obtain a judgment after it is affirmed on appeal; (3) the
5               degree of confidence that the district court has in the availability
               of funds to pay the judgment; (4) whether the defendant's ability to pay
6               the judgment is so plain that the cost of a bond would be a waste of
               money; and (5) whether the defendant is in such a precarious financial
7               situation that the requirement to post a bond would place other
               creditors of the defendant in an insecure position.
8
    *Dillon*, 866 F.2d at 904–05 (citations and quotations omitted).
9
10           Notably, the standard for examining whether to stay the enforcement of an injunctive

11   judgment without a bond is different and inapplicable here.  Rule 62(d); *see also Fed. Prescription*

12   *Serv., Inc. v. Am. Pharm. Ass'n*, 636 F.2d 755, 759 (D.C. Cir. 1980) (examining Rule 62(d)

13   requirements for stay of injunction upon appeal, including equitable considerations).

14   **II.    DISCUSSION**

15           Suhy asks the Court to stay the enforcement of the Judgment's monetary award pending

16   appeal without a bond because enforcement would cause a financial hardship, place his

17   employment in jeopardy, and risk sending him into bankruptcy proceedings.  *See* Mot.

18           As an initial matter, Suhy does not engage with the applicable *Dillon* factors.  Instead,

19   Suhy argues that the Court should apply the factors used to weigh a preliminary injunction, i.e.,

20   financial hardship, undue harm, or alternative measures to protect the opposing party's rights.  *See*

21   Mot. 4 (citing)).  However, "courts in this circuit have held that the preliminary injunction test

22   specifically applies to a stay of injunctive relief pursuant to Federal Rule of Civil Procedure 62(c),

23   and is irrelevant in a case involving a monetary judgment."  *Sarver v. Hurt Locker LLC*, 2012 WL

24   12892147, at *2 (C.D. Cal. Feb. 2, 2012).   Because Suhy seeks to stay the enforcement of a

25   monetary judgment, the Court declines to apply the preliminary injunction factors here.

26   Nevertheless, given Suhy's status as a pro se litigant, the Court will examine Suhy's arguments

27   under the rubric of the *Dillon* factors where applicable.

28   Case No.: 5:18-cv-07182-EJD
     ORDER DEN. MOT. TO STAY ENFORCEMENT OF J. WITHOUT BOND
                                              2

United States District Court
Northern District of California

United States District Court
Northern District of California

1      As to the first and second *Dillon* factors, the Court cannot discern any arguments or facts

2  alleged in Suhy's motion or declaration that would be relevant to the complexity of the collection

3  process or the amount of time required to obtain a judgment.

4      As to the third and fourth factors, Suhy's motion leads the Court to believe that he does not

5  have the funds available to pay the Judgment, as one of Suhy's primary arguments is that

6  enforcing the Judgment now will cause a financial hardship for himself and his family. Mot. 4–

7  11. Although financial hardship is an equitable factor that courts may weigh in favor of issuing a

8  stay without a bond for injunctive judgments, the opposite is true for monetary judgments. Under

9  *Dillon* and its progeny, financial hardship weighs against issuing a stay without a bond, as it

10 signals a greater risk that the judgment will become uncollectable for the prevailing party. *See*

11 *Sarver*, 2012 WL 12892147, at *2 ("The purpose of the supersedeas bond is to 'protect[ ] the

12 prevailing [party] from the risk of a later uncollectible judgment and compensates him for delay in

13 the entry of the final judgment.'") (quoting *NLRB v. Westphal*, 859 F.2d 818, 819 (9th Cir. 1988)).

14 Suhy's apparent financial hardship is unfortunate, but the Court cannot put Neo4j's right to obtain

15 its Judgment "at risk solely on the basis of [Suhy's] ability to pay. Indeed, it may be an abuse of

16 discretion to do so." *Id.* (citing *Geddes v. United Fin. Grp.*, 559 F.2d 557, 560–61 (9th Cir.

17 1977)). [1]

18     As to the final factor, Suhy argues that enforcing the Judgment will force him into

19 bankruptcy, which would place his other creditors in an insecure position. *See* Mot. 4, 7, 9, 10.

20 However, Suhy does not provide any specific information to support this argument. The only

21 evidence presented is Suhy's declaration that "it is highly likely that I will be forced into

22

23 _____

24 [1] The Court notes Suhy's argument that enforcement of the Judgment through wage garnishment
   may impact his government security clearance and therefore jeopardize his ability to maintain

25 employment. Mot. 5, 8, 9, 10. This argument alone is insufficient for the Court to issue a stay
   without a bond, particularly because Suhy has failed to provide any information as to how wage

26 garnishment would impact his security clearance or the likelihood of it impacting his security
   clearance. However, if Suhy's income source is jeopardized, enforcing the Judgment through

27 wage garnishment could potentially increase the risk that the Judgment will become uncollectable
   in the future—a fact that Neo4j may want to consider when deciding when and how to enforce the
   Judgment.

28 Case No.: 5:18-cv-07182-EJD
   ORDER DEN. MOT. TO STAY ENFORCEMENT OF J. WITHOUT BOND
                                    3

1   bankruptcy if the garnishment proceeds."  Decl. of John Mark Suhy ¶ 4, ECF No. 263-5.  Suhy's

2   declaration does not, for example, identify any specific third-party creditors or describe his current

3   assets and other financial obligations.  Currently, the Court is unable to determine how likely it is

4   that enforcing the Judgment would place him in bankruptcy proceedings, and what impact that

5   would have on which third-party creditors.

6       Accordingly, the Court finds that Suhy has not made the showing necessary to stay the

7   enforcement of the Judgment pending appeal without a bond.  "In some instances, '[t]he posting of

8   adequate security other than a bond may waive the supersedeas bond requirement.'"  *Sarver*, 2012

9   WL 12892147, at *3 (quoting *Biltmore Assocs., L.L.C., as Tr. v. Twin City Fire Ins. Co.*, No. 205-

10   CV-04220-PHX-FJM, 2007 WL 2422053, at *1 (D. Ariz. Aug. 22, 2007)) (collecting cases).

11   However, Suhy has not offered any form of substitute security.

12   **III.     CONCLUSION**

13       Therefore, the Court **DENIES** Suhy's motion to stay the enforcement of the Judgment

14   without a bond.  The Court will grant Suhy leave to file an additional motion proposing an

15   alternative security or providing evidence to satisfy the *Dillon* factors if he wishes.

16       **IT IS SO ORDERED.**

17   Dated: December 10, 2024

18

19

20                                  EDWARD J. DAVILA
                                  United States District Judge

21

22

23

24

25

26

27

28   Case No.: 5:18-cv-07182-EJD
     ORDER DEN. MOT. TO STAY ENFORCEMENT OF J. WITHOUT BOND

# EXHIBIT 9

# Transaction History Report

**4202 Adrienne Dr, Alexandria, VA 22309-2612**
APN: 1101-11-0024

Reference ID: 5516923-0003
Fairfax County Data as of: 11/20/2024

## Current Owner: Garcia Paul / Garcia Amanda

Vesting: Married Couple / Tenant By Entirety
2023 - Present

### LIENS

| Date | Type | Verified | Amount | Borrower(s) | Lender | Loan Type | Type / Term | Rate | Document # |
|------|------|----------|--------|-------------|--------|-----------|-------------|------|-----------|
| 07/18/2023 | Trust Deed/Mortgage | | $617,625 | Garcia Paul / Garcia Amanda | Rocket Mortgage LLC | Veterans Affairs | Est / 30 Years | 6.790 | 3.2023.32553 |

### CONVEYANCES

| Date | Rec Date | Verified | Price | Type | Title Company | Buyer | Seller | Document # |
|------|----------|----------|-------|------|---------------|-------|--------|-----------|
| 07/17/2023 | 07/18/2023 | | $820,000 | Confirmed | First American Title | Garcia Paul / Garcia Amanda | Arndt Tara Joelle | 1.2023.32553 |

## Prior Owner: Arndt Tara Joelle / Arndt George William III

2020 - 2023

### LIENS

| Date | Type | Verified | Amount | Borrower(s) | Lender | Loan Type | Type / Term | Rate | Document # |
|------|------|----------|--------|-------------|--------|-----------|-------------|------|-----------|
| 05/29/2020 | Trust Deed/Mortgage | | $613,800 | Arndt Tara Joelle / Arndt George William III | McLean Mortgage Corp | Veterans Affairs | Est / 30 Years | 3.300 | 26263.1304 |
| ⌃ 08/07/2023 | Release | | | | | | | | 6.2023.36310 |

### CONVEYANCES

| Date | Rec Date | Verified | Price | Type | Title Company | Buyer | Seller | Document # |
|------|----------|----------|-------|------|---------------|-------|--------|-----------|
| 05/28/2020 | 05/29/2020 | | $600,000 | | Mbh Settlement Group L C | Arndt Tara Joelle / Arndt George William III | Suhy JR John Mark | 2020049275.001 |

## Prior Owner: Suhy Dorothee S / Suhy John M JR

2007 - 2020

### LIENS

| Date | Type | Verified | Amount | Borrower(s) | Lender | Loan Type | Type / Term | Rate | Document # |
|------|------|----------|--------|-------------|--------|-----------|-------------|------|-----------|
| 12/17/2010 | Trust Deed/Mortgage | | $401,000 | Suhy Dorothee S / Suhy John H JR | Navy FCU | Conventional | Fix / | | 2010049041.002 |
| ⌃ 07/07/2020 | Release | | | | | | | | 2020066666.001 |
| 02/01/2007 | Release | | | | | | | | 2007003099.004 |
| 01/17/2007 | Trust Deed/Mortgage | ✓ | $417,000 | Suhy Dorothee S / Suhy John M JR | Navy FCU | Conventional | Fix / | | 2007001410.005 |
| ⌃ 01/25/2011 | Release | | | | | | | | 2011003405.001 |

### CONVEYANCES

| Date | Rec Date | Verified | Price | Type | Title Company | Buyer | Seller | Document # |
|------|----------|----------|-------|------|---------------|-------|--------|-----------|
| 01/11/2007 | 01/17/2007 | ✓ | $475,000 | Confirmed | Attorney Only | Suhy Dorothee S / Suhy John M JR | Ali, Tuba F | 2007001410.004 |



© 2024 First American Financial Corporation and/or its affiliates. All rights reserved. NYSE: FAF

**Prior Owner: Ali, Tuba F**

Unknown - 2007

## LIENS

| Date | Type | Verified | Amount | Borrower(s) | Lender | Loan Type | Type / Term | Rate | Document # |
|------|------|----------|--------|-------------|--------|-----------|-------------|------|------------|
| 10/19/2005 | Trust Deed/Mortgage | | $41,950 | Ali Tuba F | Pentagon FCU | Conventional | Fix / | | 2005042428.001 |
| ⌃ 03/22/2007 | Release | | | | | | | | 2007008230.016 |

 © 2024 First American Financial Corporation and/or its affiliates. All rights reserved. NYSE: FAF          PAGE 2 OF 2

# EXHIBIT 10

# Transaction History Report

**8814 Danewood Dr, Alexandria, VA 22308-2824**
APN: 1111-17040002

Reference ID: 5516923-0003
Fairfax County Data as of: 11/20/2024

## Current Owner: Suhy Dorothee Salagnac / Suhy John
Vesting: Husband And Wife / Tenant By Entirety
2020 - Present

### LIENS

| Date | Type | Verified | Amount | Borrower(s) | Lender | Loan Type | Type / Term | Rate | Document # |
|---|---|---|---|---|---|---|---|---|---|
| 02/10/2020 | Trust Deed/Mortgage | | $510,400 | Suhy Dorothee Salagnac / Suhy John | Weichert Financial Services | Conventional | Est / 30 Years | 3.740 | 26078.2059 |

### CONVEYANCES

| Date | Rec Date | Verified | Price | Type | Title Company | Buyer | Seller | Document # |
|---|---|---|---|---|---|---|---|---|
| 01/28/2020 | 02/10/2020 | | $644,000 | | Commonwealth Land Ttl Ins Co | Suhy Dorothee Salagnac / Suhy John | Jarvis Paul F Beth J | 2020011056.001 |

## Prior Owner: Jarvis Paul F Beth J
Unknown - 2020

### LIENS

| Date | Type | Verified | Amount | Borrower(s) | Lender | Loan Type | Type / Term | Rate | Document # |
|---|---|---|---|---|---|---|---|---|---|
| 01/03/2013 | Subordination | | | Jarvis Paul F & Beth J | Access Cap Mtg | | | | 2013000352.008 |
| 01/03/2013 | Trust Deed/Mortgage | | $417,000 | Jarvis Paul F / Jarvis Beth J | Access Cap Mtg | Conventional | / 30 Years | 3.1250 | 2013000352.007 |
| ⌃ 03/10/2020 | Release | | | | | | | | 2020019911.001 |
| ⌃ 03/24/2020 | Release | | | | | | | | 2020024330.001 |
| 11/14/2011 | Trust Deed/Mortgage | | $31,000 | Jarvis Beth J / Jarvis Paul F | US Bank NA ND | Conventional | Var / | | 2011044934.006 |
| ⌃ 02/26/2020 | Release | | | | | | | | 2020015767.001 |
| 11/14/2011 | Trust Deed/Mortgage | | $408,000 | Jarvis Beth J / Jarvis Paul F | Access Capital Mortgage Inc | Conventional | Fix / | | 2011044934.005 |
| ⌃ 03/27/2013 | Release | | | | | | | | 2013013843.013 |
| 12/14/2010 | Trust Deed/Mortgage | | $408,000 | Jarvis Beth J / Jarvis Paul F | Access Capital Mortgage Inc | Conventional | Fix / | | 2010048316.003 |
| ⌃ 02/03/2012 | Release | | | | | | | | 2012005450.017 |
| 04/08/2009 | Trust Deed/Mortgage | | $416,048 | Jarvis Beth J / Jarvis Paul F | Wells Fargo Bank | Conventional | Fix / | | 2009010094.005 |
| ⌃ 01/18/2011 | Release | | | | | | | | 2011002073.002 |
| 03/17/2008 | Release | | | | | | | | 2008006646.004 |
| 02/25/2008 | Trust Deed/Mortgage | | $417,000 | Jarvis Beth J / Jarvis Paul F | Wells Fargo Bank | Conventional | Fix / | | 2008004326.001 |
| ⌃ 04/29/2009 | Release | | | | | | | | 2009012761.019 |
| 10/19/2006 | Trust Deed/Mortgage | | $103,000 | Jarvis Beth H / Jarvis Paul F | Wells Fargo Bank | Conventional | Fix / | | 2006032603.004 |



© 2024 First American Financial Corporation and/or its affiliates. All rights reserved. NYSE: FAF

| Date | Type | Amount | Names | Lender | Loan Type | Doc Number |
|---|---|---|---|---|---|---|
| ⌃ 04/02/2008 | Release | | | | | 2008008591.010 |
| 09/06/2005 | Trust Deed/Mortgage | $10,000 | Jarvis Beth J / Jarvis Paul F | Pentagon FCU | Conventional  Fix / | 2005036473.005 |
| ⌃ 01/08/2009 | Release | | | | | 2009000393.010 |



© 2024 First American Financial Corporation and/or its affiliates. All rights reserved. NYSE: FAF

# EXHIBIT 11

# Property Detail Report

## 8814 Danewood Dr, Alexandria, VA 22308-2824
APN: 1111-17040002

Reference ID: 1000000-1
Fairfax County Data as of: 11/20/2024

## Owner Information

| | | | | |
|---|---|---|---|---|
| Owner Name: | Suhy Dorothee Salagnac / Suhy John | | | |
| Vesting: | Husband And Wife / Tenant By Entirety | | | |
| Mailing Address: | 8814 Danewood Dr, Alexandria, VA 22308-2824 | | Occupancy: | Owner Occupied |

## Location Information

| | | | | | | |
|---|---|---|---|---|---|---|
| Legal Description: | Fort Hunt Estates Lt 2 Sec 4 | | | County: | Fairfax, VA |
| APN: | 1111-17040002 | Alternate APN: | | Census Tract / Block: | 415800 / 1000 |
| Munic / Twnshp: | Mt Vernon Dist #1 | Twnshp-Rng-Sec: | | Legal Lot / Block: | 2 / 1 |
| Subdivision: | Fort Hunt Estates | Tract #: | | Legal Book / Page: | |
| Neighborhood: | Stratford On The P... | School District: | Fairfax County Public Schools | | |
| Elementary School: | Fort Hunt Elementa... | Middle School: | Sandburg Middle Sc... | High School: | West Potomac High... |
| Latitude: | 38.71813 | Longitude: | -77.0633 | | |

## Last Transfer / Conveyance - Current Owner

| | | | | | |
|---|---|---|---|---|---|
| Transfer / Rec Date: | 01/28/2020 / 02/10/2020 | Price: | $644,000 | Transfer Doc #: | 2020011056.001 |
| Buyer Name: | Suhy Dorothee Salagnac / Suhy John | Seller Name: | Jarvis Paul F Beth J | Deed Type: | Deed |

## Last Market Sale

| | | | | | |
|---|---|---|---|---|---|
| Sale / Rec Date: | 01/28/2020 / 02/10/2020 | Sale Price / Type: | $644,000 / | Deed Type: | Deed |
| Multi / Split Sale: | | Price / Sq. Ft.: | $420 | New Construction: | |
| 1st Mtg Amt / Type: | $510,400 / Conventional | 1st Mtg Rate / Type: | 3.74 / Estimated | 1st Mtg Doc #: | 26078.2059 |
| 2nd Mtg Amt / Type: | | 2nd Mtg Rate / Type: | | Sale Doc #: | 2020011056.001 |
| Seller Name: | Jarvis Paul F Beth J | | | | |
| Lender: | Weichert Financial Services | | | Title Company: | Commonwealth Land... |

## Prior Sale Information

| | | | | | |
|---|---|---|---|---|---|
| Sale / Rec Date: | | Sale Price / Type: | | Prior Deed Type: | |
| 1st Mtg Amt / Type: | | 1st Mtg Rate / Type: | | Prior Sale Doc #: | N/A |
| Prior Lender: | | | | | |

## Property Characteristics

| | | | | | |
|---|---|---|---|---|---|
| Gross Living Area: | 2,033 Sq. Ft. | Total Rooms: | 8 | Year Built / Eff: | 1980 |
| Living Area: | 1,534 Sq. Ft. | Bedrooms: | 4 | Stories: | 1 |
| Total Adj. Area: | | Baths (F / H): | 3 / | Parking Type: | Basement Garage |
| Above Grade: | 1,534 Sq. Ft. | Pool: | | Garage #: | |
| Basement Area: | 499 Sq. Ft. | Fireplace: | 1 | Garage Area: | |
| Style: | Split Foyer | Cooling: | Central | Porch Type: | Open Porch |
| Foundation: | | Heating: | Heat Pump | Patio Type: | Wood Deck |
| Quality: | | Exterior Wall: | Aluminum/Brick | Roof Type: | |
| Condition: | | Construction Type: | Frame | Roof Material: | Composition Shingle |

## Site Information

| | | | | | |
|---|---|---|---|---|---|
| Land Use: | SFR | Lot Area: | 10,501 Sq. Ft. | Zoning: | 130 |
| State Use: | | Lot Width / Depth: | | # of Buildings: | 1 |
| County Use: | 011 - Single-Family, Detached | Usable Lot: | | Res / Comm Units: | 1 / |
| Site Influence: | Buildable | Acres: | 0.241 | Water / Sewer Type: | Public / Public |
| Flood Zone Code: | X | Flood Map #: | 24033C0305E | Flood Map Date: | 09/16/2016 |
| Community Name: | Fairfax County | Flood Panel #: | 0305E | Inside SFHA: | False |

## Tax Information

| | | | | | |
|---|---|---|---|---|---|
| Assessed Year: | 2024 | Assessed Value: | $798,150 | Market Total Value: | $798,150 |
| Tax Year: | 2024 | Land Value: | $325,000 | Market Land Value: | $325,000 |
| Tax Area: | 60100 | Improvement Value: | $473,150 | Market Imprv Value: | $473,150 |
| Property Tax: | $9,801.57 | Improved %: | 59.28% | Market Imprv %: | 59.28% |
| Exemption: | | Delinquent Year: | | | |

DataTree

# EXHIBIT 12

UNITED STATES DISTRICT COURT
NORTHER DISTRICT OF CALIFORNIA


NEO4J, INC., a Delaware
corporation; and NEO4J
SWEDEN AB, a Swedish
corporation,                          CASE NO.
                                      5:18-cv-07182-EJD
            Plaintiffs,
vs.
PureThink, LLC, a Delaware
limited liability company;
IGOV, INC., a Virginia
corporation; and JOHN MARK
SUHY, an individual,
            Defendants.
_____/


 REMOTE VIDEOTAPED DEPOSITION OF JOHN MARK SUHY, JR.
   INDIVIDUALLY AND AS PERSON MOST KNOWLEDGEABLE
       PURSUANT TO FED. R. CIV. P. 30(b)(1)
          FOR IGOV INC. AND PURETHINK LLC


DATE:          November 29, 2022

TIME:          8:06 a.m. PST

LOCATION:      Via Zoom Videoconference

REPORTED       KAREN L. BUCHANAN
BY:            CSR No. 10772
               CLR No. 031106-04


1

```
 1                        --oOo--

 2              THE VIDEOGRAPHER:  Good morning.  We are

 3      now on the remote video record, ladies and

 4      gentlemen, on Tuesday, November 29th, 2022.  The

 5      time on the video screen is 8:06 a.m. Pacific time.

 6              My name is Carey Mook.  I'm in association

 7      with Bell & Myers Court Reporters in San Jose,

 8      California.  The phone number is (408)287-7500.

 9              This is in the matter pending before the

10      United States District Court, Northern District of

11      California, in the case captioned Neo4j, Inc., et

12      al, versus PureThink LLC, et al., Case No.

13      5:18-cv-07182-EJD.

14              This is the beginning of media No. 1,

15      Volume I of the personal and 30(b)(6) deposition by

16      John Mark Suhy.  This deposition is being taken on

17      behalf of the plaintiffs and is being held over Zoom

18      videoconference.

19              Starting with the questioning attorney, I

20      will ask counsel to identify yourselves and whom you

21      represent and if co-counsel or your client are in

22      attendance, and then the Court Reporter will

23      administer the oath.

24              MR. RATINOFF:  Yes.  This is Jeffrey

25      Ratinoff for Plaintiffs Neo4j Inc. and Neo4j Sweden
```

7

JOHN MARK SUHY                                              November 29, 2022

1    AB.  Although he's not on the line right now, my

2    other counsel at Hopkins & Carley, John Picone, will

3    also be attending at some point today.

4             MR. BEENE:  Adron Beene, Jr., for

5    Defendants John Mark Suhy, PureThink LLC and iGov

6    Inc.  Mr. Suhy is in attendance today as the

7    deponent.

8                     JOHN MARK SUHY, JR.,

9    being duly sworn by the Certified Shorthand Reporter

10   to tell the truth, the whole truth, and nothing but

11   the truth, testified as follows:

12            EXAMINATION BY MR. RATINOFF:

13        Q.  Good morning, Mr. Suhy.  How are you?

14        A.  Good morning.  I'm good.  How about you?

15        Q.  I'm well, thank you.  You have been deposed

16   in this case before, correct?

17        A.  Yes.

18        Q.  And do you remember at the beginning of the

19   depo we talked about some ground rules about how the

20   deposition is going to proceed?

21        A.  Yes.

22        Q.  Okay.  I just want to go through them real

23   quick, since you have been deposed before.

24            We're going to proceed in a

25   question-and-answer format.  It's important that you

                                                            8

JOHN MARK SUHY                                                    November 29, 2022

1    allow me to finish my question and then pause so if

2    your counsel has any objections he can assert those,

3    and then you can go ahead and answer unless you're

4    instructed not to answer a particular question.  Do

5    you understand this?

6         A.  Yes.

7         Q.  And then your testimony is going to be

8    reported in booklet form.  You'll have a chance to

9    review that testimony once the transcript is issued,

10   and you can make any corrections that you believe

11   need to be made.  Do you understand?

12        A.  Yes.

13        Q.  And if you do make corrections, I'll be

14   able to use those corrections and ask you about them

15   at trial if we use your deposition testimony at

16   trial.  Do you understand this?

17        A.  Yes, I do.

18        Q.  And we're going to go ahead and we're going

19   to be deposing you both in your personal capacity --

20   do you understand what that means?

21        A.  Not exactly.

22        Q.  Okay.  That means what you personally know,

23   your personal knowledge.  Do you understand what I

24   mean by that?

25        A.  Yes.

                                                              9

JOHN MARK SUHY                                    November 29, 2022

1     A.  Yes.  And they also are stored in Spark,

2  and you can store graph models in post-grids.  Graph

3  models --

4     Q.  I understand that, but I'm asking

5  specifically about ONgDB.  Amongst other things, you

6  can store graph models in ONgDB?

7     A.  I don't know if I would use that

8  terminology, but yes.

9     Q.  I'm just repeating what you testified to.

10    A.  I said that you can store data that's in a

11  graph model in ONgDB, so -- but storing graph

12  models, the way that you're saying it doesn't make

13  sense, is what I'm saying.  But I think I understand

14  what you're saying.  I just don't want to answer you

15  if I'm assuming you're saying one thing.  I've

16  learned that.

17         But you can store graph models on plain

18  text.  You can store it in CSVs.  You can store them

19  in any different data formats or data -- databases,

20  date sources.

21    Q.  ONgDB being one of them?

22    A.  Yes.  ONgDB, Neo4j, Spark.

23    Q.  Thank you.  I just asked about ONgDB.

24         So looking at Period of Performance on the

25  first page, it looks like the base here was

                                                      284

JOHN MARK SUHY                                    November 29, 2022

1    exercised as well as this option year 1, being this

2    document.

3            To your knowledge, has option year 2 been

4    exercised for this task?

5        A.  Not with us, it hasn't been, from what I

6    remember.

7        Q.  What do you mean by not from us?

8        A.  This contract, there is no -- I don't think

9    they were exercising this anymore, this contract.

10       Q.  Okay.  Did you complete the option year 1

11   through 9/29/2022?

12       A.  I believe -- I believe so.

13       Q.  Graystones didn't take over this contract

14   during option year 1?

15           (Reporter interruption.)

16   BY MR. RATINOFF:

17       Q.  Graystones.

18       A.  Graystones didn't take over anything.  They

19   have a new contract, from what I understand.  So

20   that's what I'm saying.  I believe this contract is

21   still active.

22       Q.  You're still doing work under this on

23   behalf of iGov?

24       A.  No.  I'm not doing anything as iGov

25   anymore.

                                                        285

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS  408-287-7500

JOHN MARK SUHY                                    November 29, 2022

1     Q.  So this contract, to your knowledge, has

2   been -- has it been assigned to Graystones, this

3   task order?

4     A.  It has not been assigned.  I believe they

5   have a new contract that they negotiated.

6     Q.  Are you performing work for ASR on behalf

7   of Graystones?

8     A.  Yes.  I'm an employee of Graystones, yep.

9   And I -- I'm still -- I'm still someone that has the

10  expertise, so they come to me under Graystones.

11    Q.  Are you performing work on behalf of

12  Graystones for emerging compliance issues as

13  described in this task order?

14    A.  Well, they have a separate task order, so I

15  would have to see what theirs are.  They have a

16  contract that's new, I believe.  And I don't know

17  what theirs -- what they -- what theirs says.

18    Q.  So you don't know what task you're working

19  under for Graystones with respect to ASR?

20    A.  Well, I know that -- I know that whenever

21  we're given work, we usually will dedicate a certain

22  amount of time for each of the -- like ECI is one of

23  them.  And that corporate -- the corporate tool, the

24  one that you referenced with -- Tylor Data Source is

25  another one.  So it's really just time that we help

286

November 29, 2022

1    out and offer consulting or advice.  And whenever we

2    do that, we put in the time for that, and it is time

3    tracked.

4         Q.  Time tracked by ASR?

5         A.  I believe by ASR and by Graystones in

6    separate systems.

7         Q.  And you submit your time to those entities?

8         A.  I submit my time to Graystones, yes.  And I

9    believe that they're synched with ASR, yes.  Yes to

10   both.

11        Q.  And prior to doing work for Graystones on

12   task orders for ASR, did you submit your time

13   directly to ASR?

14        A.  Yes.  And we did not have a time system.

15   We used theirs.  iGov used theirs to track time.  So

16   everything was entered into theirs.  It wasn't

17   entered into one and then sent with another.

18        Q.  And let me go ahead and show you what's

19   previously marked as Exhibit 141.

20        A.  I've got that open.

21        Q.  Okay.  Do you recognize what was previously

22   marked as Exhibit 141?

23        A.  Yes.

24        Q.  What is this document?

25        A.  It's a Subcontractor Task Order No. 0002

                                                           287

1    graph.  I don't know if they're using ONgDB.  If

2    they are, I would think that they would have -- you

3    know, they would be following the rules for it.  But

4    it might be Neo4j Community.  I'm not positive.  But

5    I would have thought that it would have been a

6    version of ONgDB, if that's what they were using at

7    that time.  I don't know.  That's -- AtomRain would

8    know.

9         Q.  To your knowledge, is AtomRain still

10   working on this project?

11        A.  Yes.

12        Q.  Under a separate contract with ASR?

13        A.  I believe they have a contract with ASR.

14        Q.  And did you receive -- did you have to do

15   work under this task order in the base year, 2020 to

16   2021?

17        A.  Yes.

18        Q.  And did you do work in option year 1 under

19   this task order?

20        A.  Yes, I believe so.

21        Q.  You billed that time to ASR, correct?

22        A.  Yes.

23        Q.  And did you complete option year 1 through

24   September 2022?

25        A.  I don't know if I completed it.  If I -- I

                                                        292

JOHN MARK SUHY                                          November 29, 2022

1    would have to look at my time sheets to see when --

2    the last time I actually worked on it under this

3    contract.

4        Q.  The reason being that Graystones took over

5    the work on corporate graph database for iGov?

6        A.  I don't know if they took over.  They have

7    a new contract, from what I understand.  This

8    contract I believe is still active.  I'm just not

9    working on it.  I'm not focusing on iGov.

10       Q.  But you're working on the corporate graph

11   database now on behalf of Graystones, correct?

12       A.  Yes.  A very small amount of time.

13   30 minutes sometimes in a day.  Nothing major.

14           AtomRain is the core developer on that.

15       Q.  And then for your work for ASR, you would

16   receive a 1099 reflecting your compensation,

17   correct?

18       A.  I believe so.  Everyone should be given

19   1099s.

20       Q.  Okay.  I'm going to mark what's been marked

21   as 517.  It's been a while.  I think we're up to 219

22   (sic).

23       A.  Yes, I have that open.  I'm looking at it.

24           (Reporter interruption.)

25           (Plaintiffs' Exhibit 220 was marked for

                                                        293

1    Air Force Advanced Battle Management Systems IDIQ

2    contract?

3         A.  I'm seeing this now.  I don't remember ever

4    seeing this.

5         Q.  So you're not doing any work for Graystones

6    on any Air Force contracts currently?

7         A.  Yeah.  I'm trying to think if they have a

8    contract with the Air Force at all.  No, not that

9    I -- not that I -- I don't think so.

10        Q.  Did you do any work for Graystones in 2021?

11        A.  I don't believe so.

12        Q.  Are you doing any work for Graystones in

13   2022?

14        A.  Well, I'm an employee now.

15        Q.  When did you become an employee in 2022?

16        A.  I don't remember the exact date.

17        MR. RATINOFF:  Okay.  Let me go ahead and

18   put the next exhibit in the tab.  I'm sorry.  The

19   next tab is 522.  This will be marked as

20   Exhibit 233.

21        (Plaintiffs' Exhibit 233 was marked for

22   identification.)

23        THE WITNESS:  Yes, I have that open.

24   BY MR. RATINOFF:

25        Q.  Do you recognize what's been marked as --

                                                    343

JOHN MARK SUHY                                                November 29, 2022

```
 1    you've been paid?
 2         A.  That sounds like a lot for just starting
 3    off, so I don't know.  I would have to look at this
 4    and see what that means.  Unless I had been working
 5    before then, but it wouldn't be that amount.  I
 6    don't know.  It doesn't -- something seems off.  It
 7    seems like a lot more than I've been paid, but I'm
 8    not positive.  I would have no reason to think there
 9    is a mistake from the system.  It could be an entry
10    mistake.  I have no idea.
11         Q.  Okay.  Are you paid a salary by Graystones?
12         A.  Yes.
13         Q.  So you're not working by the hour?
14         A.  No, we track hours, but I have a flat
15    salary.
16         Q.  What's your annual salary with Graystones?
17         A.  Um -- right now, I believe it -- I have to
18    look at the document.  I thought it was -- actually,
19    I don't want to say.  I have to go look at the
20    employment agreement.
21         Q.  Oh, you have an employment agreement?
22         A.  Yes.
23         Q.  Okay.  So you have an employment agreement
24    with Graystones for your current employment?
25         A.  I believe that's what it's called.  You
```

345

1    have to have that in order to be an employee.

2           MR. RATINOFF:  Adron, that was a response

3    to one of our requests that I identified in my

4    e-mail.  Is that something you would be able to

5    produce for the Graystones deposition?

6           THE WITNESS:  The employment agreement?

7           MR. RATINOFF:  No, I'm talking to your

8    counsel now, Mr. Beene.

9           MR. BEENE:  We objected to that.

10          MR. RATINOFF:  On what basis?  I mean your

11   client is being evasive -- your client is being

12   evasive about pay stubs, so I just need to know what

13   his salary is, and he doesn't want to tell me that.

14   So just produce these, and that will save a whole

15   lot of time.  Otherwise I'll -- well, it's fine.  It

16   I'm not going to waste time on it.  It should have

17   just been produced.

18          MR. BEENE:  No, we objected to all this.

19   We don't think the Graystones line is -- you're

20   just -- it's overreaching.

21          MR. RATINOFF:  Okay.  We'll talk about it

22   off the record.  It's fine.  I don't want to use my

23   deposition time up.

24   BY MR. RATINOFF:

25          Q.  So Mr. Suhy, you don't have any reason to

                                                      346

1    believe that these pay stubs reflect what was

2    deposited in your account -- don't -- I'm sorry.

3    Strike that.

4            So you have no reason to believe that these

5    pay stubs are not accurate, other than you just said

6    you needed to check your bank account?

7        A.  Yeah.  I'd need to check my bank account.

8    Then I can tell you if they're accurate.

9        Q.  But you wouldn't think that Graystones

10   would issue you inaccurate pay stubs, correct?

11       A.  I wouldn't think they would, but I don't

12   know about Paychex.  There could be any sort of bug

13   in their system.

14       Q.  Of course.

15       A.  I don't understand what "Year to Date," why

16   that's so high.  That's what I'm saying.

17       Q.  When did you start working for Graystones?

18       A.  I don't remember.  It was in 2022, you

19   know, in the past few months.

20       Q.  Okay.  Looking at --

21       A.  I don't know exactly.

22       Q.  Let's look at the bottom.  Do you see the

23   first pay stub here, it says pay period of May 16th,

24   2022, to May 31st, 2022?  Do you see that?

25       A.  That sounds right.  And just to confirm, I

347

1    did work for them in 2019.  I'm talking about just

2    my employment in 2022.  It sounds like May then

3    would be when I started.

4         Q.  Okay.  So now that you know it's May, so

5    that's approximately six months ago, do you think

6    that the gross earnings of $35,830 is accurate?

7         A.  I would have to look at this and calculate

8    it.  I don't want to say if it's accurate or not.

9         Q.  And you don't know what your salary is?

10        A.  No, I don't remember.  Because we had an

11   agreement that I would have a lower salary, and then

12   it would go up.  And so I don't know what the salary

13   is at this time.  It was a salary that would move,

14   depending on certain goals.  So that's why.  It's

15   not that I don't know my salary, what we agreed

16   upon.  It starts off at one point, and then it

17   slowly grows.  I have no idea what it's at right

18   now.

19        Q.  What's the work that you were doing for

20   Graystones between May 2022 and November 2022?

21        A.  A lot of work.  Consulting, building up the

22   new product, doing business development.  Basically

23   anything to help them grow.

24        Q.  And is that -- does that include work under

25   the ASR task orders we've previously discussed?

348

JOHN MARK SUHY                                    November 29, 2022

1    A.  No.  They have new task orders that --

2    they're something different.  I believe you have

3    them.

4    Q.  But you're doing work under those new task

5    orders for Graystones, correct?

6    A.  Yes.

7    Q.  And that work would be included in this --

8    in your salary under your employment agreement?

9    A.  It should.  I don't know how you'd

10   associate that, because I'm on a salary now,

11   salaried.

12   Q.  Did you enter into an agreement with

13   Graystones about assigning your iGov task orders

14   issued by SR as part of your agreement to come on

15   board as an employee with Graystones?

16   A.  No.  I believe I offered that.  It wasn't

17   a -- it wasn't a part of any deal.  And I don't

18   believe that anything was ever actually assigned.  I

19   believe they ended up just going in and getting

20   their own contracts.

21   Q.  Why would you give up your iGov contracts

22   to work for Graystones?

23   A.  I made a promise that I would be only

24   dedicated to them, so there is no reason for me to

25   focus on iGov right now.

349

1           MR. BEENE:  As stated under the

2    stipulation.

3           MR. RATINOFF:  Yes.

4           MR. BEENE:  Okay.

5           MR. RATINOFF:  And as provided by the

6    Federal Rules of Procedure.

7           THE VIDEOGRAPHER:  Okay.  Jeffrey, do you

8    have a video order?

9           MR. RATINOFF:  Yeah.  I'd like the video

10   and also the transcript.  I'd like a rush on the

11   transcript itself.  I won't need the video for a

12   while.

13          THE VIDEOGRAPHER:  Okay.  Okay.  This is

14   the end of video 1 of 1 and concludes today's

15   proceedings.  We are now off the record.  The time

16   is 6:36.

17          (Whereupon, the deposition of JOHN MARK

18   SUHY, JR., individually and as 30(b)(6), was

19   adjourned at 6:36 p.m. PST.)

20

21                      --o0o--

22

23

24

25

                                                          408

JOHN MARK SUHY                                          November 29, 2022

DECLARATION OF DEPONENT

I, JOHN MARK SUHY, JR., declare under penalty of
perjury that I have reviewed the foregoing
transcript; that I have made any corrections,
additions, or deletions in my testimony that I
deemed necessary; and that the foregoing is a true
and correct transcription of my testimony in this
matter.


Dated this _____ day of _____, 2022,
at _____, _____.
    [City]                    [State]


_____

JOHN MARK SUHY, JR.

409

JOHN MARK SUHY                                                    November 29, 2022

```
 1                    REPORTER'S CERTIFICATE
                The undersigned Certified Shorthand
 2    Reporter licensed in the State of California does
      hereby certify:
 3              I am authorized to administer oaths or
      affirmations pursuant to Code of Civil Procedure,
 4    Section 2093(b), and prior to being examined, the
      witness was duly administered an oath by me.
 5              I am not a relative or employee or attorney
      or counsel of any of the parties, nor am I a
 6    relative or employee of such attorney or counsel,
      nor am I financially interested in the outcome of
 7    this action.
                I am the deposition officer who
 8    stenographically recorded the testimony in the
      foregoing deposition, and the foregoing transcript
 9    is a true record of the testimony given by the
      witness.
10              Before completion of the deposition, review
      of the transcript [x] was [^ ] was not requested.
11    If requested, any changes made by the deponent (and
      provided to the reporter) during the period allowed
12    are appended hereto.
                In witness whereof, I have subscribed my
13    name this 5th day of December, 2022.
14
15              _____
16              Karen L. Buchanan, CSR 10772
17
18
19
20
21
22
23
24
25
```

                                                              410

**BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS   408-287-7500**

# EXHIBIT 13

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


NEO4J, INC., et al.

              Plaintiffs,

-vs-                    Case No. 5:18-cv-07182-EJD

PURETHINK LLC, et al.

              Defendants.

_____/



VIDEO-RECORDED

DEPOSITION OF TURIN POLLARD

30(b)(6) WITNESS

FOR GREYSTONES CONSULTING GROUP



Date:                  December 1, 2022

Time:                  3:01 p.m.

Location:              Zoom Videoconference


Stenographically       Cambria L. Denlinger

Reported By:           CSR #14009

TURIN POLLARD, 30(b)(6)                                December 1, 2022

1    counsel for defendants Purethink, iGov, Inc., and John

2    Mark Suhy.  Mr. Suhy is in attendance today.

3           MR. RHODES:  My name is Lewis Rhodes.  I'm the

4    counsel for Greystones, and Turin Pollard is our

5    employee who is providing corporate testimony.  Our CEO

6    Sheila Duffy is attending via the same link with

7    Mr. Suhy.

8                        TURIN POLLARD,

9    being first duly sworn by the Certified Shorthand

10   Reporter to tell the truth, the whole truth, and nothing

11   but the truth, testified as follows:

12                        EXAMINATION

13   BY MR. RATINOFF:

14       Q.  Good afternoon, Mr. Pollard.  How are you?

15       A.  Good.  How are you?

16       Q.  Doing well; thank you.  Have you ever been

17   deposed before?

18       A.  No.

19       Q.  Okay.  Well, I'm sure you've already talked

20   about this with your counsel, but I just want to make

21   sure we're on the same page so I'm just going to go

22   through a few basic ground rules for the deposition.

23          You understand you just took an oath under the

24   penalty of perjury?

25       A.  Yes.

                                                              7

TURIN POLLARD, 30(b)(6)                              December 1, 2022

1      Q.  And you understand that your -- this oath that

2  you've taken is the same as if you were providing

3  testimony live in a court?

4      A.  Yes.

5      Q.  We're going to proceed in a question-and-answer

6  format.  It's important that you allow me to finish my

7  question, and then maybe leave a couple seconds before

8  you answer because one of the other attorneys may just

9  object.  And they're just going to say "objection form,"

10  or they may say "objection privilege."  Depending on

11  what the objection is, if it's form, you can go ahead

12  and answer; that's just for the record for the attorneys

13  to argue about later on.  Do you understand?

14      A.  Yes.

15      Q.  So unless you're instructed not to answer, I'll

16  expect an answer to my question.  Is that fair?

17      A.  Okay.

18      Q.  Also, the court reporter is taking your

19  deposition testimony in booklet form, so it's going to

20  be in what's called a transcript.  Even though you're

21  speaking live, it's going to be on paper.  So it's very

22  important if I'm asking a question and you say yeah, nay

23  and you shake your head or nod your head, it's not going

24  to be recorded properly.  So it's important that you say

25  "yes" or "no" or provide a full answer.  Do you

                                                        8

TURIN POLLARD, 30(b)(6)                              December 1, 2022

1     Q.  Correct.  And are you familiar with this

2 document?

3     A.  Yes.

4     Q.  And what is your understanding of this

5 document?

6     A.  As the title says, this is a subpoena to

7 provide the deposition that we're currently doing.

8     Q.  And you understand today you're testifying, not

9 on behalf of just yourself and your personal knowledge,

10 but also testifying on behalf of Greystones' collective

11 knowledge?

12    A.  Yes.

13    Q.  And do you understand that there's a --

14 starting on page 3 of Attachment A, there's certain

15 topics of examination?  Why don't you go ahead and let

16 me know when you're at page 3 of Attachment A.

17    A.  Yeah, I'm there.

18    Q.  Okay.  And you'll see that starting on page 3

19 there's a topic of examination number 1 and it goes

20 through topic of examination 11.  Do you see that?

21    A.  Yes.

22    Q.  And have you read through these topics before?

23    A.  Yes.

24    Q.  When did you first review these topics?

25    A.  Shortly after this document was served to

18

(202 of 273), Page 202 of 273    Case: 24-5538, 01/02/2025, DktEntry: 28.2, Page 202 of 273
Case 5:18-cv-07182-EJD    Document 221-10    Filed 02/05/25    Page 203 of 730
CONFIDENTIAL - ATTORNEYS' EYES ONLY

TURIN POLLARD, 30(b)(6)                              December 1, 2022

1    to big data analytics.

2          Q.  Did you look in that failed bids folder in

3    responding to the document request we looked at earlier

4    in the second subpoena?

5          A.  Personally, no.

6          Q.  Did anyone that you're aware of?

7          A.  I don't know.

8          Q.  And for the IRS, how many contracts or

9    opportunities that were bid on were you referring to?

10         A.  I am aware of one bid that went in this week.

11   There may have been previous -- there may have been bids

12   submitted previous to my employment that didn't result

13   in an award so I'm not sure if those even exist.

14         Q.  What bid are you referring to that was

15   submitted this week?

16         A.  We submitted a response to a sources sought or

17   request for information on GSA.

18         Q.  What do you mean by sources sought on GSA?

19         A.  The General Services Administration conducts

20   requests for information or sources sought requests on

21   behalf of federal customers.

22         Q.  What was the scope of this sources sought

23   opportunity you're referring to?

24         A.  The application of the Greystones Analytic

25   Platform to support lead case analysis -- lead case

66

TURIN POLLARD, 30(b)(6)                                    December 1, 2022

1    analysts.

2         Q.   At the IRS?

3         A.   At the IRS.

4         Q.   What's a lead case analysis?

5         A.   I'm sorry.  It should be lead case analyst.

6    That's a job title, and it appears to be exactly what it

7    says.

8         Q.   Is that -- are you familiar with the acronym

9    RAAS, R-A-A-S, at the IRS?

10        A.   Yes.

11        Q.   What's your understanding of that acronym?

12        A.   RAAS is an organization within IRS.

13        Q.   Do you know what RAAS stands for?

14        A.   Research analysis services.  I forget what the

15   second A is.

16        Q.   Analytics.  Does that sound right?

17        A.   That sounds right.

18        Q.   But we're talking about an organization within

19   the IRS when we say RAAS?

20        A.   Correct.

21        Q.   Was this opportunity in relation to work that

22   RAAS was doing -- or is doing?

23        A.   Not to the best of my knowledge.

24        Q.   What department within the -- what group within

25   the IRS was putting out a request for information?

                                                              67

(204 of 273), Page 204 of 273    Case: 24-5538, 01/02/2025, DktEntry: 28.2, Page 204 of 273
Case 5:18-cv-07182-EJD    Document 221-10    Filed 03/15/24    Page 705 of 730
CONFIDENTIAL - ATTORNEYS' EYES ONLY

TURIN POLLARD, 30(b)(6)                    December 1, 2022

```
 1         A.   I believe that was part of the investigative

 2    services.

 3         Q.   Investigative services, is that a group or a

 4    division within the IRS?

 5         A.   Apparently.

 6         Q.   That's who was asking for -- asking for quotes

 7    or -- RFIs, request for information; correct?

 8         A.   RFI is a request for information; yes.

 9         Q.   That was a precursor to an RFQ, request for

10    quote?

11         A.   Possibly.

12         Q.   Or it could be, essentially, seen as a bid?

13         A.   There is an explicit disclaimer on it that it

14    is not a request for bid.

15         Q.   Sort of exploring what might be out there for

16    them to put out a solicitation for?

17         A.   Yes.

18         Q.   Was Mr. Suhy involved in preparing that

19    submission?

20         A.   Yes.

21         Q.   Why was he involved?

22         A.   In his current employment as Chief Technical

23    Officer at Greystones Group.

24         Q.   His title is Chief Technical Officer, CTO?

25         A.   Yes.
```

68

(205 of 273), Page 205 of 273 Case: 24-5538, 01/02/2025, DktEntry: 28.2, Page 205 of 273
Case 5:18-cv-07182-EJD CONFIDENTIAL - ATTORNEYS' EYES ONLY 06 of 730

TURIN POLLARD, 30(b)(6)                                    December 1, 2022

1    proposals we were interested in responding to.

2         Q.   Meaning they didn't ask for something that

3    Greystones was capable of providing?

4         A.   Correct.

5         Q.   And are you familiar with a company called ASR

6    Analytics?

7         A.   Yes.

8         Q.   Who is or what is ASR Analytics?

9         A.   The ASR Analytics is a G-Com subsidiary company

10   with work at the Department of Treasury and other

11   federal civilian customers.

12        Q.   Is Greystones' normal specialty working with

13   entities within the Department of Defense?

14        A.   Greystones' specialty is across the entire

15   federal government.

16        Q.   But historically most of its contracts have

17   been within the DOD?

18        A.   Correct.

19        Q.   It hasn't had any separate contracts with any

20   other civilian agencies?

21        A.   Not recently.

22        Q.   And does Greystones currently have a

23   relationship with ASR Analytics?

24        A.   Yes.

25        Q.   And what is that relationship?

160

TURIN POLLARD, 30(b)(6)                                    December 1, 2022

1          A.   We are a subcontractor for supporting IRS.

2          Q.   And how did that subcontract come about?

3          A.   After we hired Mr. Suhy -- after we hired

4    Mr. Suhy, we were issued a subcontract with several

5    delivery orders on it under one of their contracts with

6    the IRS.

7          Q.   One of their blanket purchase awards?

8          A.   I believe it's through a BPA, yes.

9          Q.   Okay.  BPA, blanket purchase award.  We can use

10   "BPA," and you know what we're talking about?

11         A.   Yes.

12         Q.   Okay.  Shortens things up a bit.  So was this

13   BPA -- sorry.  Was the subcontract that Greystones

14   was -- or took over, was that -- that was from Mr. Suhy?

15         A.   Can you restate -- rephrase that?

16         Q.   Sure.  So there's a master -- so you have a

17   blanket purchase order, right, and then --

18         A.   ASR has a blanket purchase award.

19         Q.   Right.  And then within that there's various

20   contracts that it's awarded; correct?

21         A.   If we can use contracts and task orders

22   interchangeably, then yes.

23         Q.   I'll be more precise.  They'll be issued a task

24   order, and then -- and it's under that blanket purchase

25   award, and then ASR may subcontract the task order out;

                                                              161

BELL & MYERS COURT REPORTERS & LEGAL VIDEOGRAPHERS  (408) 287-7500

(207 of 273), Page 207 of 273 Case: 24-5538, 01/02/2025, DktEntry: 28.2, Page 207 of 273
Case 5:18-cv-07182-EJD CONFIDENTIAL - ATTORNEYS' EYES ONLY 08 of 730

TURIN POLLARD, 30(b)(6)                                    December 1, 2022

1    correct?

2         A.   Correct.

3         Q.   And at the time Mr. Suhy was hired by

4    Greystones, he was -- through iGov, was under a

5    subcontract, a master subcontract with ASR; correct?

6              MR. RHODES:   Object to the form.

7              THE WITNESS:   IGov -- as I understand it, iGov

8    has a subcontract with ASR.

9    BY MR. RATINOFF:

10        Q.   Still has a subcontract with ASR?

11        A.   To the best of my knowledge.

12        Q.   So when you hired Mr. Suhy, he had a

13   subcontract with ASR.  At that same time did Greystones

14   have a subcontract with ASR?

15        A.   At the time of Mr. Suhy's hire, no.

16        Q.   So Greystones was able to get a subcontract

17   with ASR because of Mr. Suhy?

18        A.   Because we were employing him, yes.

19        Q.   So, essentially, the subcontract that ASR gave

20   Greystones was the same subcontract that iGov had at

21   that time?

22             MR. RHODES:  Object to the form.

23             THE WITNESS:  No.

24   BY MR. RATINOFF:

25        Q.   Different scope of work?

                                                      162

TURIN POLLARD, 30(b)(6)                              December 1, 2022

1          A.  I can't speak to iGov's scope of work.

2          Q.  I'll mark the next exhibit.  This will be

3    Exhibit 249.

4              (Whereupon, Exhibit 249 was marked for

5              identification.)

6              MR. RHODES:  Turin, do you need to take a short

7    break?  You look like you're getting a little bit

8    gassed.

9              MR. RATINOFF:  I'm happy to take a break.

10             THE WITNESS:  Yeah, let's go ahead and take 10

11   minutes.

12   BY MR. RATINOFF:

13         Q.  It's 7:44 your time so five to?

14         A.  Sure five of 8:00.

15             THE VIDEOGRAPHER:  We're going to go off the

16   video record.  The time is 7:45 p.m. Eastern time.

17   Going off the record.

18             (Whereupon a recess was taken.)

19             THE VIDEOGRAPHER:  This is the start of Media

20   Label Number 3, and we're going back on the video

21   record.  The time is 8:00 p.m. Eastern time.

22   BY MR. RATINOFF:

23         Q.  Okay.  Before we broke, I put a document in the

24   chat, Tab 539, which will be marked Exhibit 249.

25             Let me know when you've had a chance to look at

                                                        163

(209 of 273), Page 209 of 273 Case: 24-5538, 01/02/2025, DktEntry: 28.2, Page 209 of 273
Case 5:18-cv-07182-EJD CONFIDENTIAL ATTORNEYS EYES ONLY 10 of 730

TURIN POLLARD, 30(b)(6)                              December 1, 2022

1    that.

2        A.  Tab 539, Master Subcontract Agreement ASR

3    Analytics.

4        Q.  Greystones Consulting Group.

5        A.  Yes.

6        Q.  Okay.  Is this one of the contracts that you

7    reviewed for production in response to the subpoena and

8    in preparation for your deposition?

9        A.  Yes.

10       Q.  And I think you just testified before we broke

11   about Greystones getting a subcontract with ASR

12   Analytics; correct?

13       A.  Correct.

14       Q.  Is this the subcontract that you were referring

15   to?

16       A.  Yes.

17       Q.  Okay.  You'll see under prime contract number,

18   one of them is GS-10F-0062R.  That would be referring to

19   the contract, the master -- the prime contract awarded

20   to ASR; correct?

21       A.  Typically, yes.

22       Q.  And you'll see that in the first whereas on the

23   same page it says:

24           Prime contract is entered into a contractual

25       agreement awarded November 7, 2018, with the

                                                    164

1          U.S. Department of Treasury, Internal Revenue

2          Service (IRS), Office of Research Applied

3          Analytics and Statistics.

4              The client, RAAS or government contract

5    number, and you'll see it's the same contract number.

6          A.  Yes.

7          Q.  Okay.  And then I guess we have the official --

8    or at least on this document, RAAS being Research

9    Applied Analytics and Statistics; that's your

10   understanding of RAAS?

11         A.  Yes.

12         Q.  And then looking at the next page, 657, you'll

13   see the signature of looks like a Docusign by Ms. Duffy.

14   Is that her Docusign signature under Greystones

15   Consulting Group?

16         A.  To the best of my knowledge.

17         Q.  And to the best of your knowledge, this is an

18   authorized individual from ASR Analytics who signed this

19   contract?

20         A.  Yes.

21         Q.  And has -- this contract itself isn't for a

22   specific task; correct?

23         A.  As I understand it, this -- this is a

24   subcontract, and then task orders are placed underneath

25   it.

                                                       165

TURIN POLLARD, 30(b)(6)                          December 1, 2022

1      Q.  To your knowledge, this master subcontract

2  wasn't signed by -- from iGov?

3      A.  Correct.

4      Q.  So in Greystones' view, it's a new master

5  subcontract between Greystones and ASR; correct?

6      A.  Correct.

7      Q.  And when Mr. Suhy came on as a W2 employee, was

8  he asked to do all of his work for ASR under this master

9  subcontract?

10     A.  Yes.

11     Q.  So he was essentially asked to stop work for

12  iGov under the subcontract iGov had with ASR?

13     A.  Correct.

14     Q.  Was Mr. Suhy compensated for that?

15         MR. RHODES:  Objection to form.

16  BY MR. RATINOFF:

17     Q.  Did ASR pay iGov to cease working on its master

18  subcontract with ASR?

19     A.  Not to the best of my knowledge.

20     Q.  What were the terms of Mr. Suhy's employment

21  coming on board?

22         Mr. Beene:  Objection to form.

23         THE WITNESS:  He has a standard employment

24  agreement like the rest of Greystones' W2 employees.

25  BY MR. RATINOFF:

                                                       166

1    Q.  Was Mr. Suhy asked to stop performing work for

2   iGov?

3         MR. RHODES:  Object to form.

4   BY MR. RATINOFF:

5    Q.  As a condition of his employment?

6    A.  As part of our employment agreement, we're not

7   allowed to work for -- we're not allowed to have other

8   employers.

9    Q.  And that would apply to Mr. Suhy?

10    A.  Correct.

11    Q.  And are you aware of Mr. Suhy having another

12   contract with the IRS through an entity called

13   E-Government Solutions?

14    A.  I'm aware that he had one, yes.

15    Q.  What do you mean by "had"?

16    A.  IGov and Mr. Suhy, as an employee of iGov, had

17   a contract through E-Gov that was fully funded, and it

18   was paid up front.

19    Q.  Do you understand the term of that contract

20   that goes into 2023?

21    A.  Yes.

22    Q.  And is Mr. Suhy allowed to continue performing

23   under that contract via iGov under his condition of

24   employment at Greystones?

25         MR. RHODES:  Form.

167

(213 of 273), Page 213 of 273 Case: 24-5538, 01/02/2025, DktEntry: 28.2, Page 213 of 273
Case 5:18-cv-07182-EJD Document 212-10 Filed 03/12/24 Page 714 of 730

TURIN POLLARD, 30(b)(6)                                December 1, 2022
CONFIDENTIAL - ATTORNEYS'EYES ONLY

```
 1            MR. BEENE:  Objection to form.

 2            THE WITNESS:  Mr. Suhy is still supporting IRS

 3    RAAS.

 4    BY MR. RATINOFF:

 5         Q.  Through the contracts he has via E-Government

 6    Solutions?

 7         A.  Through the contract with ASR.

 8         Q.  So is Mr. Suhy no longer permitted to provide

 9    services under the contract between E-Government

10    Solutions and the IRS of which ARS is a contractor?

11            MR. RHODES:  Objection to form.

12            THE WITNESS:  Since that contract was already

13    fully funded, he is still allowed to provide services,

14    but he is not paid for any work.

15    BY MR. RATINOFF:

16         Q.  When you say "paid for any work," you mean paid

17    by Greystones?

18         A.  Correct, because he was already paid by iGov.

19         Q.  But he still has obligations until that

20    contract terminates to perform work under it; correct?

21         A.  Correct.

22         Q.  Is there a provision in his employment

23    agreement that addresses that?

24         A.  I'm not sure if it's in the employment

25    agreement or an addendum to.
```

168

(214 of 273), Page 214 of 273 Case: 24-5538, 01/02/2025, DktEntry: 28.2, Page 214 of 273
Case 5:18-cv-07182-EJD  CONFIDENTIAL - ATTORNEYS' EYES ONLY  15 of 730
TURIN POLLARD, 30(b)(6)                          December 1, 2022

```
1            MR. BEENE:  Same objection.
2   BY MR. RATINOFF:
3       Q.  Has Greystones purchased any intellectual
4   property from Purethink?
5            MR. BEENE:  Objection to form.
6            THE WITNESS:  No.
7   BY MR. RATINOFF:
8       Q.  Has Greystones purchased any intellectual
9   property from Mr. Suhy?
10           MR. BEENE:  Objection to form.
11           THE WITNESS:  Yes.
12  BY MR. RATINOFF:
13      Q.  What is that intellectual property that
14  Greystones has purchased?
15           MR. RHODES:  I'm going to object on this as
16  being outside of the scope of the corporate designation.
17  This has nothing to do with anything related to any
18  ONgDB or Neo4j or otherwise.
19           Mr. Suhy's worked on other projects completely
20  unrelated, and if he sold personal IP that he brought to
21  Greystones, it's off the reservation as far as what's on
22  the subpoena for cooperate -- your topic list.
23           MR. RATINOFF:  I disagree.  Mr. Suhy has an
24  intellectual property that is called GraphStack, which
25  he may characterize as being beyond Neo4j, but it was
```

                                                        170

(215 of 273), Page 215 of 273 Case: 24-5538, 01/02/2025, DktEntry: 28.2, Page 215 of 273
Case 5:18-cv-07182-EJD CONFIDENTIAL - ATTORNEYS' EYES ONLY 16 of 730
TURIN POLLARD, 30(b)(6)                                December 1, 2022

```
 1   developed with Neo4j --

 2            MR. RHODES:  If you want to ask your question

 3   specifically related to GraphStack, if it's anyhow tied

 4   to that, but any other generic IP is outside of the

 5   scope of the topics.

 6            MR. RATINOFF:  Well, also Mr. Suhy is subject

 7   to a summary judgement order finding liability for

 8   trademark infringement.  If he's transferred any

 9   personal property during the course of this litigation,

10   especially after that was entered, it would be a

11   fraudulent transfer potentially, so I'm entitled to that

12   discovery.

13            So I'm going to the ask the question, and if

14   you instruct the witness not to answer, I may bring that

15   up to the court.  So I'll ask the witness about his

16   personal knowledge if that's what you're saying, but he

17   still has to answer the question.

18            I'm going to ask the question again, and you

19   can instruct him, and I'll ask if he's going to take

20   your instruction.

21   BY MR. RATINOFF:

22      Q.  What was the IP that Greystones purchased from

23   Mr. Suhy?

24            MR. BEENE:  Objection to form.

25            MR. RHODES:  You can answer, Turin.
```

171

(216 of 273), Page 216 of 273 Case: 24-5538, 01/02/2025, DktEntry: 28.2, Page 216 of 273
Case 5:18-cv-07182-EJD  Document 215  Filed 04/08/25  Page 17 of 730
TURIN POLLARD, 30(b)(6)                                    December 1, 2022

1           THE WITNESS:  Okay.  The IP that we bought from

2   Mr. Suhy was the -- was components of the Greystones

3   Analytic Platform.

4   BY MR. RATINOFF:

5        Q.  What components were those?

6        A.  That would be the gatekeeper and software

7   fabric and several modules of analytic tools and log

8   management and analysis tools.

9        Q.  Was it your understanding that was part of

10  something called GraphStack?

11       A.  No.

12       Q.  Was that, to your knowledge, anything having to

13  do with something called Government Packages for Neo4j?

14       A.  No.

15       Q.  Did that intellectual property include any sort

16  of PISMA compliance modules or software?

17       A.  I'm not sure.

18       Q.  How much did Greystones pay for that

19  intellectual property?

20           MR. RHODES:  Objection to form.

21           MR. BEENE:  Objection to form.

22           THE WITNESS:  Approximately $1.3 million.

23  BY MR. RATINOFF:

24       Q.  Was that intellectual property developed by

25  Mr. Suhy working for Greystones as an independent

                                                           172

TURIN POLLARD, 30(b)(6)                          December 1, 2022

```
 1   contractor?

 2          MR. BEENE:  Objection to form.

 3          THE WITNESS:  No.

 4   BY MR. RATINOFF:

 5       Q.  That was something he developed independently

 6   from Greystones?

 7          MR. RHODES:  Form.

 8          THE WITNESS:  Yes.

 9   BY MR. RATINOFF:

10       Q.  And does that include any patents?

11       A.  Not to the best of my knowledge.

12       Q.  Just source code?

13       A.  And associated documentation.

14       Q.  Material subject to copyrights?

15       A.  Broadly.

16       Q.  Were there any particular copyrights that were

17   purchased as part of that deal?

18       A.  I don't know.

19       Q.  Is there a written agreement, a purchase

20   agreement for that intellectual property?

21       A.  Yes.

22       Q.  At the time that Greystones purchased that

23   intellectual property, did it have an understanding that

24   Mr. Suhy had a summary judgment entered against him

25   personally?
```

                                                            173

TURIN POLLARD, 30(b)(6)                    December 1, 2022

1     Q.  Did he tell you that the court determined that

2  the removal of the commons clause by anyone but Neo4j

3  would be improper?

4     A.  Yes.

5     Q.  When did he tell you that?

6     A.  I believe the first time we discussed that

7  would be in the first half of this calendar year.

8     Q.  Was it after there was an appellate court

9  decision in relation to this case?

10     A.  I'm not sure.

11     Q.  Mr. Suhy ever talk about -- strike that.

12         Let me switch gears here.  Okay.  You mentioned

13  there was some task orders under the ASR subcontract

14  that was entered into; correct?

15     A.  Correct.

16     Q.  And I'll go ahead and put in what is Tab 540.

17         (Whereupon, Exhibit 250 was marked for

18          identification.)

19  BY MR. RATINOFF:

20     Q.  I'll represent to you this is a document

21  produced by ASR.  It's got the beginning Bates number

22  ASR 02025, and ends with 02027.

23     A.  02025.  02027 yep.

24     Q.  I think this is going to be Exhibit 249.

25         THE REPORTER:  I think it's 250.

                                                        180

1          MR. RATINOFF:  Sorry.  I'll have this marked

2    Exhibit 250 titled subcontractor task order number

3    0001_MOD01.  Do you recognize this document?

4          A.  This appears to be a modification to a task

5    order under the ASR BPA contract.

6          Q.  And in particular, the master subcontract we

7    just looked at as Exhibit 249?

8          A.  I believe so, yes.

9          Q.  No reason to believe anything other than what

10   this is?

11         A.  Correct.

12         Q.  And you'll see it says:

13             The subcontract agreement places and

14          terminates subcontract agreement

15          ASR_RAAS_DAIS-IGOV-001_TO-001 with iGov, Inc.,

16          which is hereby reassigned to Greystones

17          Consulting Group, LLC.

18             Do you see that?

19         A.  Yep.

20         Q.  And then at the bottom you'll see there's a

21   couple of signatures on page 3, 2027 Bates number?

22         A.  Yep.

23         Q.  The name Turin Pollard, and then there's a

24   signature there.  Do you see that?

25         A.  That's correct.

181

(220 of 273), Page 220 of 273 Case: 24-5538, 01/02/2025, DktEntry: 28.2, Page 220 of 273
Case 5:18-cv-07182-EJD Document 219 Filed 08/08/24 Page 22 of 730

TURIN POLLARD, 30(b)(6)                                    December 1, 2022

1    Q.   Is that your signature?

2    A.   That is.

3    Q.   And next to that is a representative of ASR;

4  correct?

5    A.   Correct.

6    Q.   To your knowledge, this is a correct copy of

7  the agreement you signed with ASR, specifically this

8  task order?

9    A.   Without comparing it to our files, I would have

10  to agree, yes.

11    Q.   Okay.  I'll represent to you it's the same as

12  what you produced, except for as redacted.  I'm happy to

13  provide that to you, but this is much more useable.  If

14  you have any doubts about the authenticity of this

15  agreement, I'm happy to show you that document.

16        So if you can say for certain this is a

17  contract you signed on behalf of Greystones and ASR,

18  that's fine, but if not, let me know.

19    A.   That appears to be.

20    Q.   No reason to doubt it's not?

21        And so do you understand this was a task order

22  that was originally contracted by with iGov; correct?

23        MR. RHODES:  Objection to form.

24        THE WITNESS:  Correct.

25  BY MR. RATINOFF:

182

(221 of 273), Page 221 of 273 Case: 24-5538, 01/02/2025, DktEntry: 28.2, Page 221 of 273
Case 5:18-cv-07182-EJD Document 210 Filed 06/08/23 Page 221 of 730
CONFIDENTIAL - ATTORNEYS'EYES ONLY

1      Q.  This is a task order that Greystones took over

2   as part of his hiring of Mr. Suhy; correct?

3         MR. RHODES:  Objection to form.

4         THE WITNESS:  This is a task order issued to

5   Greystones, yes.

6   BY MR. RATINOFF:

7      Q.  Which was previously issued to iGov?

8         MR. RHODES:  Objection to form.

9         THE WITNESS:  Since we have a separate master

10  subcontract agreement, this is a separate task order.

11  BY MR. RATINOFF:

12     Q.  Okay.  But I'm asking about not the

13  subcontract.  I'm asking about this task order.  This is

14  a task order that says it replaces and terminates

15  subcontract agreement with iGov and is reassigned to

16  Greystones Consulting Group.  Is that inaccurate?

17     A.  I agree the document says that.

18     Q.  And you signed it?

19     A.  Correct.

20     Q.  And you read it before you signed it?

21     A.  Correct.

22     Q.  Made sure everything was correct before you

23  signed it?

24     A.  Our contracts and legal reviewed it for

25  compliance before I signed it.

183

TURIN POLLARD, 30(b)(6)                        December 1, 2022

1      Q.  They told you it was okay to sign it?

2      A.  Correct.

3      Q.  All right.  Looking at the purpose of task

4   order description of work, you'll see on the bottom of

5   the first page it says:  Emerging compliance issues.

6          And there's a very long description, but

7   looking at just the title, do you have an understanding

8   of what emerging compliance issues relates to at the

9   IRS?

10     A.  Compliance with tax law, specifically tax

11  filings.

12     Q.  And is that a task that AtomRain is also

13  currently working on to your knowledge?

14     A.  I'm not sure.

15     Q.  Who would know the answer to that?

16     A.  AtomRain and ASR since it would be their

17  contractual relationship.

18         MR. RHODES:  Objection; form.

19  BY MR. RATINOFF:

20     Q.  But if you were required to work with AtomRain

21  under this task order, the person performing the work

22  under the task order would probably know the answer to

23  that question; right?

24         MR. RHODES:  Objection to form.

25         THE WITNESS:  Yes.

                                                   184

TURIN POLLARD, 30(b)(6)                                December 1, 2022

1    BY MR. RATINOFF:

2        Q.   And is the person performing the work under

3    this task order Mr. Suhy?

4        A.   Yes.

5        Q.   And you'll see he's listed there as being -- on

6    the page 2 -- as the only authorized personnel to

7    perform work under this contract; correct?

8        A.   Where are you looking?

9        Q.   Second page.

10       A.   Authorized personnel in all categories.  Yes,

11   he is authorized to work on this contract.

12       Q.   Going back to the first page, it says, option

13   year two exercised.  It's from September 30, 2019, to

14   September 29, 2023.

15       A.   Correct.

16       Q.   And then there's two other option years on

17   here.

18       A.   Correct.

19       Q.   Through 2025?

20       A.   Yes.

21       Q.   And is it Greystones' understanding that

22   assuming that these option years are exercised, Mr. Suhy

23   would continue to be the only authorized personnel on

24   the contract?

25            MR. RHODES:  Objection to form.

                                                           185

BELL & MYERS COURT REPORTERS & LEGAL VIDEOGRAPHERS  (408) 287-7500

```
 1   BY MR. RATINOFF:

 2       Q.  You can answer the question.

 3       A.  How we will staff this in the future has not

 4   been determined.

 5       Q.  But as of this current option year, it will be

 6   Mr. Suhy as provided in here?

 7       A.  Yes.

 8       Q.  And then Greystones will receive payment for

 9   the work that Mr. Suhy does under this task order?

10       A.  Correct.

11       Q.  Let me go ahead and mark the next exhibit,

12   Tab 541.

13           (Whereupon, Exhibit 251 was marked for

14           identification.)

15   BY MR. RATINOFF:

16       Q.  Have you seen this document before?

17       A.  I believe so.

18       Q.  Okay.  It's document subcontractor task order

19   number 0002_MOD01.  I'll have it marked as Exhibit 251.

20           I'll represent to you it was produced by ASR,

21   and it was produced by your counsel with redactions.  So

22   I'm using the one without redactions, if that's okay.

23       A.  I'll defer to counsel.

24       Q.  Well, let's just look at your signature at the

25   bottom or what should be your signature.
```

186

CONFIDENTIAL - ATTORNEYS EYES ONLY

TURIN POLLARD, 30(b)(6)                                December 1, 2022

```
 1                    REPORTER'S CERTIFICATE

 2         I, Cambria Denlinger, California Certified

 3    Shorthand Reporter No. 14009, certify;

 4    That the foregoing proceedings were taken before me at

 5    the time and place therein set forth, at which time the

 6    witness declared under penalty of perjury; that the

 7    testimony of the witness and all objections made at the

 8    time of the examination were recorded stenographically

 9    by me and were thereafter transcribed under my direction

10    and supervision; that the foregoing is a full, true and

11    correct transcript of my shorthand notes so taken and of

12    the testimony so given;

13    That before completion of the deposition, review of the

14    transcript ( X ) was ( ) was not requested; ( ) that

15    the witness has failed or refused to approve the

16    transcript.

17    I further certify that I am not financially interested

18    in the action, and I am not a relative or employee of

19    any attorney of the parties, nor of any of the parties.

20    I declare under penalty of perjury under the laws of

21    California that the foregoing is true and correct.

22    Dated this 5th of December, 2022

23

24

25                   CAMBRIA L. DENLINGER
                     CSR NO. 14009

                                                          221
```

BELL & MYERS COURT REPORTERS & LEGAL VIDEOGRAPHERS   (408) 287-7500

# EXHIBIT 14

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA


NEO4J, INC., et al.,

              Plaintiffs,

vs.                                    CASE NO.
                                       5:18-cv-07182-EJD

PURETHINK, LLC, et al.,

              Defendants.
_____/


VIDEOTAPED DEPOSITION OF
MICHAEL STAVRIANOS
as representative of ASR ANALYTICS, LLC


DATE:          November 7, 2022

TIME:          10:28 a.m. Eastern Time

LOCATION:      via videoconference


REPORTED BY:   BENJAMIN GERALD
               California CSR No. 14203
               Washington CSR No. 3468
               Texas CSR No. 11912

1

1   Defendants John Mark Suhy, iGov, Inc., and

2   PureThink LLC, and Defendant John Mark Suhy is in

3   attendance.

4          MS. EMBRY:  This is Rebecca Embry of Landman,

5   Crosi, Ballaine & Ford for non-party deponent

6   Michael Stavrianos, and attending is general counsel,

7   Vanessa Champion, by phone.

8                    --o0o--

9              MICHAEL STAVRIANOS,

10      as representative of ASR ANALYTICS, LLC,

11  being duly sworn by the Certified Shorthand Reporter to

12  tell the truth, the whole truth, and nothing but the

13  truth, testified as follows:

14                    --o0o--

15                  EXAMINATION

16  BY MR. RATINOFF:

17      Q.  Good morning, Mr. Stavrianos.  How are you?

18      A.  I'm good.  How are you?

19      Q.  As you know, I'm representing the plaintiffs in

20  this lawsuit you've been asked to provide testimony in,

21  and I do appreciate you giving us your time today.  I'll

22  try to make this as quick and painless as possible,

23  but -- and I'm definitely aware of the time differences,

24  so I know it's 10:30 there.  Our lunch time is going to

25  be a little bit different, but I want to be respectful

12

```
 1    of yours, so if you want to break around 12:30-ish your

 2    time for a short lunch, I'm happy to do that, or if you

 3    need an hour, whatever, just let me know.

 4           Otherwise, I'm just going to take breaks every

 5    hour, maybe 5-10 minutes depending on how we're doing,

 6    and if there's any time you need a break, as long as

 7    there's not a question pending that needs to be

 8    answered, I'm happy to take a break whenever you want,

 9    so just ask.

10        A.  Okay.

11        Q.  And have you ever been deposed before?

12        A.  I have not.

13        Q.  Well, let's go through a few -- I'm sure your

14    counsel's has already done this, but I need to make sure

15    we're on the same page.

16           You're taking a deposition, and you've been

17    sworn in under oath, under penalty of perjury.  This is

18    just as if you were testifying live in court.

19           Do you understand this?

20        A.  Yes.

21        Q.  And your testimony's going to be transcribed

22    into booklet form.  It will show my question and your

23    answers, and at the end of deposition, within about 5-10

24    days, you'll receive a transcript, and you'll have an

25    opportunity to read that transcript and make any
```

13

```
 1    record.  The time is 10:49 a.m.

 2    BY MR. RATINOFF:

 3        Q.  Okay.  So you should have before you

 4    Exhibit 120, which is a subpoena to testify at

 5    deposition.

 6            Do you have that in front of you now?

 7        A.  I do.

 8        Q.  And do you recognize Exhibit 120?

 9        A.  Let me just finish reviewing it.  One moment.

10            Okay.  Yes, I recognize this document.

11        Q.  Okay.  And what is it?

12        A.  It's a subpoena.

13        Q.  And do you understand this subpoena was served

14    on ASR Analytics, LLC?

15        A.  Yes.

16        Q.  And do you understand today that you're going

17    to be providing testimony on the topics of examination

18    which start on Page 3 of Attachment A?

19        A.  Yes.

20        Q.  And are you familiar with Topics 1 through 14?

21        A.  I have read them, yes.

22        Q.  And do you understand that you're going to be

23    providing testimony today on each one of these topics?

24        A.  Yes.

25        Q.  And are you prepared today to provide testimony
```

25

1    on each one of these 14 topics?

2         A.   Yes, I think so.

3         Q.   And do you understand that your testimony on

4    these topics doesn't necessarily include what you know

5    personally, but it's what is known to the company,

6    ASR Analytics?  Do you understand this?

7              MS. EMBRY:  Objection to form.

8              THE WITNESS:  Yes.

9    BY MR. RATINOFF:

10        Q.   Did you understand my question?

11        A.   I think so.

12        Q.   Okay.  Well, I want to make sure you do, so

13   what -- what did you understand my question to be?

14        A.   That I am speaking not only regarding my own

15   recollection, but those of the company, ASR Analytics.

16        Q.   Thank you.

17             Just -- just to be clear, too, if there is an

18   objection to form, and you don't say, "I don't

19   understand the question," I'm going to assume that you

20   do understand the question, and I'm just going to go

21   ahead and wait for your answer; is that okay?

22        A.   Yes.

23             MR. RATINOFF:  And then I'd like to go ahead

24   and drop another document in the chat.  This is going to

25   be marked as Exhibit 121.

                                                        26

```
 1        Q.   And the same with Tylor Data Services?

 2        A.   Yes, I believe so.

 3        Q.   And was -- or sorry.

 4             Is this agreement still in effect with iGov?

 5        A.   Yes, it is.

 6        Q.   And is it set to terminate at a particular

 7   time?

 8        A.   I guess this may be a -- an amendment to that

 9   comment a moment ago.

10             I don't recall whether this contract exists

11   between ASR Analytics and iGov today, or if it was

12   novated or modified to be between ASR and Greystones.

13        Q.   Okay.   What's -- what's Greystones?

14        A.   Greystones is, to my understanding, a firm that

15   acquired some portion or all of the businesses that

16   John Mark Suhy operated.

17        Q.   Okay.   So when you say "acquired," you mean

18   Greystones acquired iGov?

19        A.   I believe so.   I'm -- I -- yeah, I believe so.

20        Q.   And do you know approximately when that took

21   place?

22        A.   Approximately in 2022 at some point.

23        Q.   And you believe there may have been a

24   modification -- or I think you used the word

25   "novation" -- to this contract to reflect Greystones'
```

115

1   acquisition of iGov?

2           MR. BEENE:  Objection to form.

3           THE WITNESS:  I don't recall if that has

4   happened, but I do recall that some of the contracts

5   with John Mark Suhy were in the process of being

6   modified or novated.

7   BY MR. RATINOFF:

8       Q.  With the idea that Mr. Suhy would continue

9   performing his -- his core capabilities, but under the

10  Greystones banner versus iGov; is that fair?

11      A.  Yes, that's fair.

12      Q.  So -- so this contract in some way, shape, or

13  form is still in effect, whether it's iGov being the

14  subcontractor or Greystones; is that correct?

15      A.  That's correct.  That's why I indicated earlier

16  that it, in effect, is still active.

17      Q.  Okay.  And then what other entities were you

18  referring to as being acquired by Greystones?

19      A.  I don't know.  As you've noted earlier, there

20  are multiple business entities that were part -- that

21  were in some way connected to John Mark Suhy, and I

22  don't know the distinction between them or their

23  relationship to Greystones.

24      Q.  If there is any amendments to this agreement or

25  novations reflecting the substitution, I guess to put it

                                                        116

1    Q.  And does Maven have the capability to produce

2    reports on the number of hours billed on a particular

3    task by a contractor?

4    A.  Yes, it does.

5    Q.  Were you ever asked in response to the subpoena

6    to generate a report on -- on the hours spent by

7    Mr. Suhy on his various task orders?

8    A.  We did produce a report showing payments to

9    Mr. Suhy and the corresponding hours.  I don't believe

10   it broke out the detail by task order.

11          MR. RATINOFF:  Okay.  Let me go ahead and mark

12   the next exhibit.  It's coming in the chat here

13   momentarily.  This would be exhibit -- I believe we're

14   at --

15          THE REPORTER:  That would be 144.

16          MR. RATINOFF:  144.  Thank you.

17          (Exhibit 144 was marked for identification.)

18   BY MR. RATINOFF:

19   Q.  This is a document produced by about ASR with

20   the Bates number ASR 01956, invoice number 303 from

21   iGov.

22   A.  Okay.  Got it, and I've looked at it.

23   Q.  Okay.  Do you understand what Exhibit 144 is?

24   A.  Yes.

25   Q.  And what's your understanding?

172

1    A.  It appears to be another invoice for work

2  performed by John Mark Suhy under a set of task order

3  contracts.

4    Q.  Okay.  And then looking at the "Part

5  Number/Description," we see "IDT."

6        Is that short for IDT Innovation, that task we

7  were just talking about?

8    A.  That's my assumption, yes.

9    Q.  And then "KG" being short for Knowledge Graph?

10   A.  Yes.

11   Q.  And "CG" for Corporate Graph?

12   A.  Yes.

13   Q.  And "ECI," Emerging Compliance Issues?

14   A.  Yes.

15   Q.  And those were the four tasks that, at least as

16  of July of 2020, that Mr. Suhy was still working under?

17   A.  Yes.

18   Q.  And has he continued to work on -- on all four

19  of those task orders on behalf of ASR as you sit here

20  today?

21   A.  Yes.  My hesitation is I don't know if he's

22  actively providing support under IDT Innovation, though

23  he may be in a very low level of effort.

24   Q.  Understood.  And then you had mentioned that a

25  spreadsheet was generated reflecting all the payments

173

1  made by Mr. Suhy and the hours; is that correct?

2      A.  Yes.

3          MR. RATINOFF:  Okay.  Let me go ahead and put

4  the next document in the chat, and this would be

5  Exhibit 145.

6          (Exhibit 145 was marked for identification.)

7          THE WITNESS:  Got it.  I have looked at it.

8  BY MR. RATINOFF:

9      Q.  Okay.  Was this the spreadsheet you were

10  referring to that was generated as far as all the

11  payments made to Mr. Suhy under the iGov task orders?

12      A.  Yes.

13      Q.  And it shows that the last entry on here was on

14  July 27, 2022; is that correct?

15      A.  Correct.  That's correct.

16      Q.  Have any payments been made to iGov since that

17  time under any of these four task orders we've just been

18  talking about?

19      A.  My understanding is they have not, because this

20  was generated within the last couple weeks, and there

21  were no other payments as of that point.

22      Q.  But Mr. Suhy is continuing to work under those

23  task orders with the expectation to receive payment for

24  the work?

25      A.  I believe so, yes.

174

```
 1     person, did he ever explain why he didn't want to have

 2     Amanda at AtomRain anymore be his back up?

 3         A.  I don't recall any explanation beyond what is

 4     explained here about AtomRain potentially being a

 5     competitor going forward.

 6         Q.  As of July 2022, was AtomRain still a

 7     subcontractor for ASR under the BPA DAIS award?

 8         A.  Yes.

 9         Q.  How would they be a competitor then if they

10     were still subcontracting?

11         A.  I am interpreting this to mean that for future

12     RFQs from the IRS that were not issued under the DAIS

13     BPA, for example, that AtomRain might be a competitor to

14     John Mark Suhy.

15         Q.  Oh, I see.  So a competitor to John Mark Suhy,

16     not ASR?

17         A.  That's my understanding.  I'm maybe

18     interpreting.

19         Q.  Did you have an understanding of how AtomRain

20     would be a competitor to Mr. Suhy as of July 2022?

21         A.  Again, my interpretation is that it would

22     relate to future RFQs that, I guess, other firms would

23     be eligible to bid on.

24         Q.  And you'll see at the bottom of the page,

25     Mr. Suhy says, "I don't work as closely as I used to
```

206

1    with AtomRain now that I've joined Greystones" -- and

2    then it continues -- "so it only makes sense to make

3    that change anyway."

4         Does this help refresh your recollection as to

5    when you may have found out that Mr. Suhy had sold his

6    company to Greystones?

7         A.   It certainly refreshes my memory that it would

8    have been no later than July 8, 2022.

9         Q.   As opposed to August, which we talked about

10   earlier?

11        A.   Right, I think before I said no later than

12   August.

13        Q.   Has AtomRain ever informed you that they were

14   also sued by Neo4j?

15        A.   I don't recall that phrasing being used, but I

16   do recall hearing that there were legal issues between

17   AtomRain and Neo4j.

18        Q.   Did anyone at AtomRain ever tell you how those

19   issues were resolved?

20        A.   Yes, in very general terms.

21        Q.   And what were those terms that were conveyed to

22   you?

23        A.   That some agreement was reached as to what

24   technology could be used permissibly within AtomRain's

25   products.

207

DECLARATION OF DEPONENT

I, MICHAEL STAVRIANOS, declare under penalty of perjury that I have reviewed the foregoing transcript; that I have made any corrections, additions, or deletions in my testimony that I deemed necessary; and that the foregoing is a true and correct transcription of my testimony in this matter.


Dated this _____ day of _____, 20__,
at _____, _____.
       [City]                      [State]


                    _____
                    MICHAEL STAVRIANOS



                         --o0o--

222

MICHAEL STAVRIANOS - ASR ANALYTICS, LLC                    November 7, 2022

1                    CERTIFICATE

2          I, BENJAMIN GERALD, Certified Shorthand Reporter,

3    Certificate No. 14203, for the State of California do

4    hereby certify:

5          That prior to being examined, the witness named in

6    the foregoing deposition was by me duly sworn to testify

7    to the truth, the whole truth, and nothing but the truth

8    in the within-entitled cause;

9          That said deposition was taken shorthand at the

10   time and place herein named;

11         That the deposition is a true record of the

12   witness's testimony as reported to the best of my

13   ability by me, and was thereafter transcribed to

14   typewriting by computer under my direction;

15         That request [X] was [ ] was not made to read and

16   correct said deposition.

17         I further certify that I am not interested in

18   the outcome of said action, nor am I connected with, nor

19   related to any of the parties in said action, nor to

20   their respective counsel.

21         Witness my hand this 14th day of November, 2022.

22

23

24         BENJAMIN GERALD

25         California CSR No. 14203

                                                          223

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS  408-287-7500

# EXHIBIT 15

1   John V. Picone III, Bar No. 187226
    jpicone@hopkinscarley.com
2   Jeffrey M. Ratinoff, Bar No. 197241
    jratinoff@hopkinscarley.com
3   HOPKINS & CARLEY
    A Law Corporation
4   The Letitia Building
    70 South First Street
5   San Jose, CA  95113-2406
    *mailing address:*
6   P.O. Box 1469
    San Jose, CA 95109-1469
7   Telephone:     (408) 286-9800
    Facsimile:     (408) 998-4790
8
    Attorneys for Plaintiffs and Counter-Defendants
9   NEO4J, INC. and NEO4J SWEDEN AB

10  Adron W. Beene, Bar No. 129040
    adron@adronlaw.com
11  Adron G. Beene SB# 298088
    adronjr@adronlaw.com
12  Attorney at Law
    7960 Soquel Drive Suite #296
13  Aptos, CA 95003
    Tel: (408) 392-9233
14
    Attorneys for Defendants and Counterclaimants
15  PURETHINK LLC, IGOV INC., and JOHN
    MARK SUHY

16

17                  UNITED STATES DISTRICT COURT

18                 NORTHERN DISTRICT OF CALIFORNIA

19  NEO4J, INC., a Delaware corporation,        CASE NO.  5:18-cv-07182-EJD
    NEO4J SWEDEN, AB, a Swedish
20  corporation,                                **STIPULATION TO THE AMOUNT OF
                                                PLAINTIFFS' LOST PROFITS AND
21          Plaintiffs,                         DEFENDANTS' PROFITS**

22          v.                                  Trial Date: November 14, 2023

23  PURETHINK LLC, a Delaware limited
    liability company, IGOV INC., a Virginia
24  corporation, and JOHN MARK SUHY, an
    individual,
25
            Defendants.
26

27  AND RELATED COUNTERCLAIMS.

28

**<u>STIPULATION</u>**

This Stipulation is made between Plaintiffs and Counter-Defendants Neo4j, Inc. ("Neo4j USA") and Neo4j Sweden AB (collectively "Plaintiffs") and Defendants and Counterclaimants PureThink LLC, iGov Inc. and John Mark Suhy (collectively, "Defendants") through their respective counsel as follows:

WHEREAS, on November 28, 2023 at trial, Plaintiffs offered Steven Boyles an expert witness to provide his opinions and conclusions on the actual damages in the form of net lost profits that Plaintiffs incurred as a result of Defendants' violations of the DMCA and Lanham Act that were the subject of the Court's orders granting Plaintiffs' motions for summary judgment. *See* Dkt. Nos. 118, 216, 229.

WHEREAS, on November 28, 2023 at trial, Plaintiffs also offered Steven Boyles an expert witness to provide his opinions and conclusions on the gross profits that Defendants generated from providing support and development services to the IRS through contracts with eGovernment Solutions and ASR Analytics, LLC. *See* Dkt. Nos. 118, 216, 229.

WHEREAS, Plaintiffs and Defendants (collectively, the "Parties") agreed that in lieu of Mr. Boyles testifying in full regarding the basis for his opinions and calculations of the amount of actual damages that Plaintiffs incurred as a result of Defendants' violations of the DMCA and Lanham Act, and the gross profits that Defendants generated from providing support and development services to the IRS, the parties would stipulate to those calculations and their underlying basis, as well as his conclusions and interest calcuations through December 1, 2023.

ACCORDINGLY, the Parties HEREBY STIPULATE to the following undisputed facts, calculations and conclusions for incorporation into the trial record without the necessity of supporting testimony or exhibits:

1.      The Maryland Procurement Office (a/k/a the National Security Agency, the NSA and the MPO) tasked Next Century to analyze available graph database technologies, including Neo4j® EE.

2.      Next Century and the MPO required the enterprise-only features, such as causal clustering and multi-data centers, offered by both Neo4j® EE and ONgDB.

3. Next Century learned about the pricing of Neo4j Enterprise software bundles offered by Neo4j USA and iGov from iGov's website.

4. In October 2018, Next Century exchanged emails with Suhy regarding representations made on iGov's website that ONgDB v3.4 was an open source version of Neo4j® EE that provided the same enterprise-only features for free.

5. Suhy told Next Century that the MPO could use ONgDB v3.4 under the AGPL without restrictions or paying Plaintiffs for a commercial license, as advertised on the iGov's website.

6. As a result of Next Century's communications with Suhy, Next Century downloaded ONgDB v3.4 and began evaluating against Neo4j® EE v3.4.

7. Defendants' removal of the Commons Clause from the license governing ONgDB enabled Next Century and the MPO to use ONgDB for free rather than pay for a commercial license to Neo4j® EE.

8. In a series of emails with Next Century ending on January 4, 2019, Suhy confirmed that ONgDB v3.5 would have feature parity with the enterprise features of Neo4j® EE v3.5, and would also be available without restrictions on the number of clusters, instances and cores and without paying Neo4j USA for a commercial license. This led Next Century to upgrade from ONgDB v3.4 to ONgDB v3.5 for use in the KMS Project.

9. By February 2019, the MPO had chosen to use ONgDB v3.5 over Neo4j® EE v3.5 for continued development work for the MPO for use in the KMS Project.

10. On February 5, 2019, Next Century informed Neo4j USA of this decision, stating, "[w]e have found that open-sourced (non-commercial) builds from the Neo4j source code provide the clustering and security requirements needed in our environment."

11. In March 2019, Next Century gave Neo4j USA the required specifications for its ongoing KMS Project with the MPO and ask for Neo4j USA for a quote for use in a production environment.

12. On April 19, 2019, Jason Zagalsky of Neo4j USA sent a 3-year Neo4j Enterprise Edition Enterprise Bundle based on those requirements (TX118).

13.     On April 29, 2019, Next Century confirmed that it shared Neo4j USA's proposal with the MPO, and was instructed by the MPO to continue using ONgDB. The reason for the MPO continuing to use ONgDB over Neo4j® EE was price.

14.     On July 21, 2019, Next Century informed Neo4j USA that the MPO was not interested in the Neo4j® EE proposal. Again, the deciding factor between ONgDB and Neo4j® EE was price.

15.     Next Century continued to use ONgDB v3.5, which was placed into a production environment for the MPO in or about October 2020.

16.     The hypothetical negotiation between Neo4j USA on one hand, and Next Century and the MPO on the other hand for a commercial license to Neo4j® EE for use in the KMS Project would have occurred in April 2019 (TX118).

17.     Under the April 19, 2019 proposal (TX118), Next Century and the MPO had the option to (a) purchase three one-year subscriptions on an incremental basis for a total of $2,667,00 ("MPO Undiscounted Fee"); or (b) purchase a 3-year subscription for a total of $2,266,950, which reflects a 15% multi-year, paid up front discount ("MPO Discounted Fee").

18.     The MPO's willingness to pay for a commercial license for Neo4j® EE for the KMS Project is supported by its history of purchasing both discounted multi-year commercial licenses for Neo4j® EE and purchasing 1-year commercial licenses and renewing those licenses at undiscounted amounts (TX15, Lines 337-343).

19.     Neo4j USA's sale of a commercial license to Next Century and the MPO for the KMS Project would have been through its reseller, Intellipeak.  As a result, a reseller fee of 7% would be applied to the total discounted amount of a multi-year deal with Next Century and the MPO, as well as to the purchase of a one-year subscription and each subsequent renewal thereof.

20.     In 2018, employee commissions paid by Neo4j USA on commercial license sales averaged 15.26%.  In 2019, employee commissions paid by Neo4j USA on commercial license sales averaged 13.27%.   The employee commission cost would apply to the entire MPO Discounted Fee, while the employee commissions cost would only apply to the first year's revenue of year-to-year renewals on the MPO Undiscounted Fee.

21.     As reflected by **Exhibit 1** (Slide 13) hereto, Neo4j USA's net lost profits for the KMS Project based on the MPO Discounted Fee and the 2018 employee commission fee of 15.26% is $**1,786,542**.  Using the one-year treasury rate, which ranged between .07% and 5.36% and compounding interest on an annual basis, the total prejudgment interest accrued on this amount through December 1, 2023 is **$132,308**.

22.     As reflected by **Exhibit 1** (Slide 13) hereto, Neo4j USA's net lost profits for the KMS Project based on the MPO Discounted Fee and the 2019 employee commission fee of 13.27% is $**1,828,497**. Using the one-year treasury rate, which ranged between .07% and 5.36% and compounding interest on an annual basis, the total prejudgment interest accrued on this amount through December 1, 2023 is **$135,282**.

23.     As reflected by **Exhibit 1** (Slide 13) hereto, Neo4j USA's net lost profits for the KMS Project based on the MPO Undiscounted Fee and the 2018 employee commission fee of 15.26% is **$2,354,145**.  Using the one-year treasury rate, which ranged between .07% and 5.36% and compounding interest on an annual basis, the total prejudgment interest accrued on this amount through December 1, 2023 is **$139,069**.

24.     As reflected by **Exhibit 1** (Slide 13) hereto, Neo4j USA's net lost profits for the KMS Project based on the MPO Undiscounted Fee and the 2019 employee commission fee of 13.27% is **$2,370,598**. Using the one-year treasury rate, which ranged between .07% and 5.36% and compounding interest on an annual basis, the total prejudgment interest accrued on this amount through December 1, 2023 is **$140,288**.

25.     Suhy submitted a bid for a new contract issued by the IRS via another entity that he had an ownership interest in at the time, eGovernment Solutions, Inc. ("eGov Sol" or "eGov Solutions").

26.     Under the proposal for the new contract signed by Suhy, the scope of work required iGov to perform "all operations and maintenances duties for all components of the CKGE framework…."   iGov would also be "responsible for ensuring any open source products within the CKGE conform to their license-terms" and iGov would "need to work with the following components: React, Angularjs, Neo4j…."

27.     On May 22, 2018, Neo4j USA informed the IRS, including those in RAAS, that Neo4j Sweden added Commons Clause to Neo4j® EE 3.4, and the resulting need to obtain a commercial subscription if they intended to use that software in the CKGE platform.

28.     On May 22, 2018, Suhy sent an email to the IRS claiming Neo4j Sweden could not add the Commons Clause to the license governing Neo4j® EE v3.4.

29.     On May 24, 2018, the RAAS division of the IRS awarded eGov Solutions the new contract, Order No. 2032H8-18-P-00151, as amended Order No. 2032H8-18-P-00168, to further develop and support the CKGE in May 2018 ("CKGE Contract").

30.     In July 2018, Jason Zagalsky of Neo4j USA, met with employees of the IRS, and then provided a requested quote of $156,000 for one-year subscription and a $397,800 for a 3-year subscription for a Neo4j® EE v3.4 based on then-current requirements of CKGE.

31.     As of August 2018, the IRS understood that Neo4j® CE had a performance limitation to only 4 cores, while Neo4j® EE had enterprise-only features, came with professional services and subscriptions, and was priced based on number of cores.

32.     Under the CKGE Contract, Suhy provided input in the architecture design and hardware requirements needed to run ONgDB installations on multiple servers within the CKGE.

33.     In August 2018, Suhy recommended that the IRS integrate ONgDB v3.4 rather than Neo4j® EE v3.4 in the CKGE framework, and claimed that "ONgDB open source licenses come directly from the Graph Foundation as well, not from Neo4j Inc."

34.     Based on Suhy's recommendation, Mike Dunn at the IRS instructed him to "[g]o ahead and integrate the ONgDB into the CKGE framework we'll deploy" on August 14, 2018.

35.     While working at the IRS, Mr. Suhy helped the IRS upload ONgDB source code into the IRS's internal repository.

36.     The IRS decided to not allocate $156,000 for a license to use Neo4j® EE in the CKGE platform because ONgDB was a free and open, unrestricted alternative.

37.     Under the CKGE contract, Suhy and iGov were responsible for supporting, maintaining and updating ONgDB in an internal GitLab repository for the RAAS at the IRS.

38.     Under the CKGE contract, Suhy and iGov helped the IRS upgrade the CKGE

1   platform to ONgDB v3.5 in April 2019 and integrated subsequent subversions through at least

2   April 2022.

3         39.     After April 2022, the IRS started calling ONgDB v3.5 just "GDB" due to the

4   injunction entered against GFI and its rollback of ONgDB source code.

5         40.     GDB was merely a name change because it was still based on Neo4j® EE v3.5

6   source code that was improperly licensed under the AGPL without the Commons Clause, which

7   Suhy continued to be responsible for maintaining on the IRS's internal Gitlab repository.

8         41.     The IRS used at least one Neo4j® enterprise-only feature, node ID, via ONgDB in

9   CKGE.

10        42.     The IRS understood that Neo4j® EE can run Cypher queries significantly faster

11   than Neo4j® CE, which is advantageous in terms of productivity.

12        43.     The initial hardware available to run Neo4j® EE in the IRS's pre-CKGE platform

13   were for one server with at least 16 cores and 1 terabyte of RAM under the September 23, 2016

14   contract award to PureThink.

15        44.     As of December 2018, the CKGE (a/k/a "main graph") was running, or was

16   expected to be running, on at least two production servers and one development server utilizing

17   ONgDB.  Each machine was comprised of a DL380 with 32 cores and 256GB of RAM at

18   minimum.

19        45.     Between 2019 and 2022, the IRS was running ONgDB on three production servers,

20   and one development server in the CKGE.

21        46.     Each machine in the CKGE running ONgDB between December 2018 and

22   November 2022 was comprised of a DL380 with 32 cores and 256GB of RAM.

23        47.     As of November 2022, the IRS switched to running ONgDB on two production

24   servers in the CKGE.  Thereafter, the IRS would only want the bare-minimum Neo4j® EE package

25   for two nodes, each with 16 cores and 256GB RAM for the CKGE.

26        48.     Defendants' removal of the Commons Clause from the license governing ONgDB

27   enabled the IRS to use ONgDB for free rather than pay for a commercial license to Neo4j® EE

28   beyond the CKGE.

49.     Between December 2018 and 2021, one instance of ONgDB was running on its own server in YK1 at the IRS.  In 2022, two instance of ONgDB in production and two instances of ONgDB in development/test in YK1 at the IRS.

50.     Starting in 2019 and continuing through 2022, the IRS ran separate instances of ONgDB in additional projects, including Corporate Graph, Excise Graph, COVID Graph, Policy Net, Individual Graph, CPEO Graph and Ghost Preparer.

51.     The minimum server specifications for YK1, Corporate Graph, Excise Graph, COVID Graph project, Policy Net, Individual Graph, CPEO Graph and Ghost Preparer running ONgDB were DL380 with 12 cores and 256GB of RAM.

52.     The IRS's willingness to pay for a commercial license for Neo4j® EE for the CKGE and other projects that used ONgDB is supported by its history of purchasing 1-year commercial licenses to Neo4j® EE at discounted amounts and renewing those licenses in other instances (TX15, Lines 263-277).

53.     August 1, 2018 and August 1, 2019 are two hypothetical negotiation dates for when the IRS would have purchased a commercial license for Neo4j® EE to be used in the CKGE due to a change in hardware specifications and requirements.

54.     The IRS would have purchased a commercial subscription based off a modified Enterprise Bundle for $156,000 from the October 1, 2017 price list (TX16) at the first hypothetical negotiation for the CKGE.

55.     During the second hypothetical negotiation for the CKGE, the IRS would have purchased a commercial subscription for an Enterprise Bundle with additional cores to match the new hardware specifications of the CKGE, plus at least one test machine as reflected in **Exhibit 2** hereto (Slide 17).

56.     Neo4j USA would have offered Discovery Bundle pricing to the IRS from period-correct price list (TX16-TX19) for each project beyond the CKGE that used ONgDB on less than 3 machines.  The hypothetical negotiation dates for when the IRS would have purchased a commercial license for Neo4j® EE for those projects are attached hereto as **Exhibit 3** (Slide 19), and a summary of the gross revenue lost for each project is attached hereto as **Exhibit 4** (Slide 20).

57.     Despite having a history of purchasing commercial subscriptions for Neo4j® EE with year-to-year renewals, with no multi-year subscriptions, the IRS may have negotiated an additional 15% discount on the subscription price during the aforementioned hypothetical negotiations as reflected in **Exhibit 5** (Slide 22) attached hereto.

58.     Neo4j USA's sale of commercial licenses for Neo4j® EE would have been through its reseller, Intellipeak, and would receive a 7% reseller fee after any negotiated discount on the subscription fee.  **Exhibit 6** (Slide 24) hereto reflects the application of the 7% reseller fee in the scenario where the IRS was successful in negotiating an additional 15% discount on the already-discounted subscription price.  **Exhibit 7** (Slide 26) reflects the application of the 7% reseller fee in the scenario where the IRS fails to negotiate an additional 15% discount on the already-discounted subscription price.

59.     The first-year revenue generated from Neo4j USA's sale of commercial licenses for Neo4j® EE to the IRS also would have been subject to the payment of employee commissions at the 2018 average rate of 15.26% or the 2019 average rate of 13.27%.

60.     The left column of the left-hand table in **Exhibit 8** (Slide 28) hereto reflects the application of a 15.26% employee commission applied to the first year of subscription for each IRS project that used ONgDB after the application of a 7% reseller fee and an additional negotiated 15% subscription fee discount, for a total of **$2,627,641** in lost profits that Neo4j USA incurred as a result of the IRS's use of ONgDB.  Using the one-year treasury rate, which ranged between .07% and 5.36% and compounding interest on an annual basis, the total prejudgment interest accrued on this amount through December 1, 2023 is **$126,727**.

61.     The right column of the left-hand table in **Exhibit 8** (Slide 28) hereto reflects the application of a 15.26% employee commission applied to the first year of subscription for each IRS project that used ONgDB after the application of a 7% reseller fee with no additional subscription fee discount, for a total of **$3,069,646** in lost profits that Neo4j USA incurred as a result of the IRS's use of ONgDB.  Using the one-year treasury rate, which ranged between .07% and 5.36% and compounding interest on an annual basis, the total prejudgment interest accrued on this amount through December 1, 2023 is **$147,136**.

62. The left column of the right-hand table in **Exhibit 8** (Slide 28) hereto reflects the application of a 13.27% employee commission applied to the first year of subscription for each IRS project that used ONgDB after the application of a 7% reseller fee and an additional negotiated 15% subscription fee discount, for a total of **$2,646,557** in lost profits that Neo4j USA incurred as a result of the IRS's use of ONgDB. Using the one-year treasury rate, which ranged between .07% and 5.36% and compounding interest on an annual basis, the total prejudgment interest accrued on this amount through December 1, 2023 is **$127,867**.

63. The right column of the right -hand table in **Exhibit 8** (Slide 28) hereto reflects the application of a 13.27% employee commission applied to the first year of subscription for each IRS project that used ONgDB after the application of a 7% reseller fee with no additional subscription fee discount, for a total of **$3,091,392** in lost profits that Neo4j USA incurred as a result of the IRS's use of ONgDB. Using the one-year treasury rate, which ranged between .07% and 5.36% and compounding interest on an annual basis, the total prejudgment interest accrued on this amount through December 1, 2023 is **$148,431**.

64. After the IRS awarded the CKGE Contract to eGov Solutions, it made an initial $300,000 payment to eGov Solutions in July 2018. At that time, the money received from the IRS on the CKGE Contract was to be paid in its entirety to Mr. Suhy, at his sole discretion.

65. eGov Solutions maintained a Wells Fargo bank account for all the payments received from the IRS ("the Wells Fargo Account"), which Suhy had access to and was authorized to disburse the payments made by the IRS as he saw fit.

66. At some point, Suhy asked eGov Sol to make the payments received from the IRS to iGov rather than personally.

67. eGov Solutions considered all the payments made by the IRS under the CKGE Contract into the Wells Fargo Account to belong Suhy and later iGov.

68. The IRS paid a total of $1,316,000 to eGov Solutions over the course of five years under the CKGE Contract, which was deposited into the Wells Fargo Account. iGov and Suhy, in turn, realized **$1,316,000** in profits under the CKGE Contract. Using the one-year treasury rate, which ranged between .07% and 5.36% and compounding interest on an annual basis, the total

prejudgment interest accrued on this amount through December 1, 2023 is **$91,044**.

69.     ASR Analytics LLC ("ASR") engaged Suhy via iGov as a subcontractor to provide support, consulting and development services for the CKGE and other projects that involved implementations of ONgDB at the IRS between 2019 and 2022.

70.     The subcontracts and task orders provided by ASR to iGov included: (1) Knowledge Graph API (KG-API) for CKGE; (2) Support for Corporate Graph Database; (3) Emerging Compliance Issues; and (4) IDT Innovation, all of which required iGov and Suhy to provide support, consulting and development services for the CKGE and other implementations of ONgDB at the IRS between 2019 and 2022.

71.     ASR Analytics paid iGov a total of **$246,082.55** for work performed under these subcontracts and task orders at the IRS.  Using the one-year treasury rate, which ranged between .07% and 5.36% and compounding interest on an annual basis, the total prejudgment interest accrued on this amount through December 1, 2023 is **$12,393**.

72.     On February 16, 2021, the Court entered a Stipulated Judgment and Permanent Injunction in favor of Plaintiffs in a related action, *Neo4j, Inc. et al. vs. Graph Foundation, Inc. et al.*, Case No. 5:19-cv-06226-EJD (N.D. Cal.). As reflected by the Stipulated Judgment and Permanent Injunction, Plaintiffs did not receive any payments from the defendants in that related action in conjunction with the entry thereof.

Dated:  December 12, 2023                    HOPKINS & CARLEY
                                             A Law Corporation

                                             By: */s/ Jeffrey M. Ratinoff*
                                                 John V. Picone III
                                                 Jeffrey M. Ratinoff
                                                 Attorneys for Plaintiffs and
                                                 Counter-Defendants
                                                 NEO4J, INC. and NEO4J SWEDEN AB


Dated:  December 12, 2023                     */s/ Adron W. Beene*
                                             Adron W. Beene
                                             Adron G. Beene
                                             Attorneys for Defendants and Counter-
                                             Claimants
                                             PURETHINK LLC, IGOV INC., and
                                             JOHN MARK SUHY

**ATTESTATION OF E-FILED SIGNATURE**

Pursuant to Local Rule 5-1(i)(3), I hereby certify that I have obtained the concurrence in the filing of this document from all signatories for whom a signature is indicated by a "conformed" signature (/s/) within this electronically filed document and I have on file records to support this concurrence for subsequent production to the Court if so ordered or for inspection upon request.

Dated:  December 12, 2023

HOPKINS & CARLEY
A Law Corporation


By: /s/ Jeffrey M. Ratinoff
    John V. Picone III
    Jeffrey M. Ratinoff
    Attorneys for Plaintiffs and
    Counter-Defendants
    NEO4J, INC. and NEO4J SWEDEN AB

# EXHIBIT 1

# Next Century – MPO Lost Profits
## Calculated Lost Profits

|  | Discounted Fee | Undiscounted Fee |
|---|---|---|
| Subscription Fee | $ 2,266,950 | $ 2,667,000 |
| Reseller Fee (7%) | $ (158,687) | $ (186,690) |
| Subtotal | $ 2,108,264 | $ 2,480,310 |
| EE Commissions (15.26%) | $ (321,721) | $ (126,165) |
| Lost Net Profits | **$ 1,786,542** | **$ 2,354,145** |
| Lost Net Profits with EE Commissions at 13.27% | **$ 1,828,497** | **$ 2,370,598** |

➢ The Employee Commissions cost on the Undiscounted Fee is only applied to the first year's revenue of year-to-year renewals

13

# EXHIBIT 2

# Internal Revenue Service Lost Profits
## Lost Revenue – CKGE Example

### CKGE (Main Graph)

| Period | Total Machines | Base Price | Additional Core Price | Test Machine Price | Total List Price |
|---|---|---|---|---|---|
| 8/1/18 – 7/31/19 | 1 | $  144,000 | $  - | $  12,000 | $  156,000 |
| 8/1/19 – 7/31/20 | 3 | 199,000 | 180,000 | 24,000 | 403,000 |
| 8/1/20 – 7/31/21 | 3 | 199,000 | 180,000 | 24,000 | 403,000 |
| 8/1/21 – 7/31/22 | 3 | 199,000 | 180,000 | 24,000 | 403,000 |
| 8/1/22 – 7/31/23 | 2 | 199,000 | 180,000 | 24,000 | 403,000 |
| Totals | | $  940,000 | $  720,000 | $  108,000 | $  1,768,000 |

➢ 1st Hypothetical Negotiation for pre-CKGE platform: July 2018 (Dkt. No. 227, UDF No. 66; TX131)

➢ 2nd Hypothetical Negotiation for CKGE: July 2019 (Dkt. No. 227, UDF Nos. 80-81)

Dkt. No. 227, UDF Nos. 79-86; TX16-TX19 (Price Lists)

17

**EXHIBIT 3**

# Internal Revenue Service Lost Profits
## Assumed Hypothetical Negotiation Date for Other Instances

| Project | Initial Hypothetical Negotiation Date |
|---|---|
| YK1 | 8/1/2019 |
| Corporate | 8/1/2019 |
| Excise | 8/1/2020 |
| Covid | 8/1/2020 |
| Policy Net | 8/1/2021 |
| Individual | 8/1/2021 |
| CPEO | 8/1/2022 |
| Ghost Prep | 8/1/2022 |

Dkt. No. 227, UDF Nos. 87-108

19

**EXHIBIT 4**

# Internal Revenue Service Lost Profits

## Gross Lost Revenue - Summary

| Project | Period Beginning | | | | | Total |
|---|---|---|---|---|---|---|
| | 8/1/2018 | 8/1/2019 | 8/1/2020 | 8/1/2021 | 8/1/2022 | |
| CKGE | $ 156,000 | $ 403,000 | $ 403,000 | $ 403,000 | $ 403,000 | $ 1,768,000 |
| YK1 | | 124,000 | 134,000 | 134,000 | 268,000 | 660,000 |
| Corporate | | 64,000 | 74,000 | 74,000 | 74,000 | 286,000 |
| Excise | | | 74,000 | 74,000 | 74,000 | 222,000 |
| Covid | | | 74,000 | 74,000 | 74,000 | 222,000 |
| Policy Net | | | | 74,000 | 74,000 | 148,000 |
| Individual | | | | 74,000 | 74,000 | 148,000 |
| CPEO | | | | | 74,000 | 74,000 |
| Ghost Prep | | | | | 74,000 | 74,000 |
| Totals | $ 156,000 | $ 591,000 | $ 759,000 | $ 907,000 | $ 1,189,000 | $ 3,602,000 |

Dkt. No. 227, UDF Nos. 87-108; TX16-TX19 (Price Lists)

20

**EXHIBIT 5**

# Internal Revenue Service Lost Profits
## Lost Revenue – Net of Discounts

| Project | Total List | Reduction for Applicable Price List | Discount for Test Machine | Adjusted List | After 15% Discount |
|---|---|---|---|---|---|
| CKGE | $ 1,768,000 | $ - | $ 64,000 | $ 1,704,000 | $ 1,471,800 |
| YK1 | 660,000 | 20,000 | 8,000 | 632,000 | 537,200 |
| Corporate | 286,000 | 30,000 | | 256,000 | 217,600 |
| Excise | 222,000 | | | 222,000 | 188,700 |
| Covid | 222,000 | | | 222,000 | 188,700 |
| Policy Net | 148,000 | | | 148,000 | 125,800 |
| Individual | 148,000 | | | 148,000 | 125,800 |
| CPEO | 74,000 | | | 74,000 | 62,900 |
| Ghost Prep | 74,000 | | | 74,000 | 62,900 |
| Totals | $ 3,602,000 | $ 50,000 | $ 72,000 | $ 3,480,000 | $ 2,981,400 |

➤ Assumed IRS would not pay for additional test machines with CKGE and YK1
➤ Deduction of price increase for Discovery Bundle for YK1 and Corporate
➤ While history of year-to-year renewals with no multi-year subscriptions, assumes the IRS would still negotiate an annual 15% discount

**EXHIBIT 6**

# Internal Revenue Service Lost Profits
## Saved Expenses – Reseller Margin

| Project | Net Revenue | Reseller Margin | Net of Reseller Margin |
|---|---|---|---|
| CKGE | $ 1,471,800 | $ 103,026 | $ 1,368,774 |
| YK1 | 537,200 | 37,604 | 499,596 |
| Corporate | 217,600 | 15,232 | 202,368 |
| Excise | 188,700 | 13,209 | 175,491 |
| Covid | 188,700 | 13,209 | 175,491 |
| Policy Net | 125,800 | 8,806 | 116,994 |
| Individual | 125,800 | 8,806 | 116,994 |
| CPEO | 62,900 | 4,403 | 58,497 |
| Ghost Prep | 62,900 | 4,403 | 58,497 |
| Totals | $ 2,981,400 | $ 208,698 | $ 2,772,702 |

➢ Net Revenue is after application of negotiated discounted subscription fee and 15% additional discount
➢ Applying Intellipeak's reseller margin of 7% of Net Revenue

24

**EXHIBIT 7**

# Internal Revenue Service Lost Profits
## Saved Expenses – Reseller Margin

| Project | Net Revenue | Reseller Margin | Net of Reseller Margin |
|---|---|---|---|
| CKGE | $ 1,704,000 | $ 119,280 | $ 1,584,720 |
| YK1 | 632,000 | 44,240 | 587,760 |
| Corporate | 256,000 | 17,920 | 238,080 |
| Excise | 222,000 | 15,540 | 206,460 |
| Covid | 222,000 | 15,540 | 206,460 |
| Policy Net | 148,000 | 10,360 | 137,640 |
| Individual | 148,000 | 10,360 | 137,640 |
| CPEO | 74,000 | 5,180 | 68,820 |
| Ghost Prep | 74,000 | 5,180 | 68,820 |
| Totals | $ 3,480,000 | $ 243,600 | $ 3,236,400 |

➢ Net Revenue assumes <u>no</u> negotiated additional 15% subscription fee discount

➢ Applying Intellipeak's reseller margin of 7% of Net Revenue

26

**EXHIBIT 8**

# Internal Revenue Service Lost Profits

## Calculated Lost Profits

| Project | Lost Profits | |
|---|---|---|
| | Discounted Subscription Fee | Undiscounted Subscription Fee |
| CKGE | $ 1,299,951 | $ 1,507,659 |
| YK1 | 484,638 | 570,162 |
| Corporate | 194,648 | 228,997 |
| Excise | 166,564 | 195,958 |
| Covid | 166,564 | 195,958 |
| Policy Net | 108,067 | 127,138 |
| Individual | 108,067 | 127,138 |
| CPEO | 49,570 | 58,318 |
| Ghost Prep | 49,570 | 58,318 |
| Totals | $ 2,627,641 | $ 3,069,646 |

| Project | Lost Profits | |
|---|---|---|
| | Discounted Subscription Fee | Undiscounted Subscription Fee |
| CKGE | $ 1,308,926 | $ 1,517,708 |
| YK1 | 486,588 | 572,457 |
| Corporate | 195,654 | 230,182 |
| Excise | 167,728 | 197,328 |
| Covid | 167,728 | 197,328 |
| Policy Net | 109,231 | 128,508 |
| Individual | 109,231 | 128,508 |
| CPEO | 50,734 | 59,688 |
| Ghost Prep | 50,734 | 59,688 |
| Totals | $ 2,646,557 | $ 3,091,392 |

➢ Based on 15.26% Employee Commission Rate.

➢ Based on 13.27% Employee Commission Rate.

28

# EXHIBIT 16

**Table B-4A.**
**U.S. Courts of Appeals—Median Time Intervals in Months for Civil and Criminal Appeals Terminated on the Merits, by Circuit, During the 12-Month Period Ending September 30, 2023**

| Circuit | Total | By Consolidation | Terminated on the Merits — Median Time Intervals From | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Filing of Notice of Appeal to Filing of Appellee's Last Brief | | Filing of Appellee's Last Brief to Oral Argument or Submission on Briefs | | Oral Argument to Last Opinion or Final Order | | Submission on Briefs to Last Opinion or Final Order | | Filing of Notice of Appeal to Last Opinion or Final Order | | Filing in Lower Court to Last Opinion or Final Order in Appeals Court | |
| | | | Appeals | Interval | Appeals | Interval | Appeals | Interval | Appeals | Interval | Appeals | Interval | Appeals | Interval |
| TOTAL | 20,180 | 1,596 | 9,963 | 5.7 | 9,963 | 4.4 | 4,726 | 2.6 | 13,858 | 0.4 | 18,584 | 10.2 | 18,584 | 34.0 |
| DC | 346 | 54 | 155 | 6.8 | 155 | 2.9 | 124 | 3.8 | 168 | 0.7 | 292 | 9.9 | 292 | 30.1 |
| 1st | 534 | 30 | 301 | 7.8 | 301 | 2.5 | 170 | 3.9 | 334 | 2.7 | 504 | 14.5 | 504 | 41.9 |
| 2nd | 1,538 | 147 | 880 | 6.5 | 880 | 6.3 | 623 | 1.1 | 768 | 0.1 | 302 | 13.3 | 302 | 42.7 |
| 3rd | 1,358 | 73 | 691 | 6.0 | 691 | 3.1 | 190 | 3.7 | 1,095 | 1.1 | 1,285 | 8.7 | 1,285 | 43.4 |
| 4th | 2,351 | 126 | 448 | 5.2 | 448 | 7.5 | 310 | 2.8 | 1,915 | 0.2 | 2,225 | 10.1 | 2,225 | 37.3 |
| 5th | 3,215 | 427 | 1,343 | 4.9 | 1,343 | 4.4 | 775 | 1.6 | 2,013 | 0.4 | 2,788 | 8.5 | 2,788 | 26.9 |
| 6th | 1,699 | 118 | 1,118 | 5.1 | 1,118 | 3.3 | 266 | 2.6 | 1,315 | 1.0 | 1,581 | 9.5 | 1,581 | 36.3 |
| 7th | 1,051 | 65 | 668 | 5.5 | 668 | 3.0 | 406 | 3.2 | 580 | 0.2 | 986 | 10.2 | 986 | 36.2 |
| 8th | 1,965 | 288 | 783 | 4.4 | 783 | 3.9 | 366 | 4.0 | 1,311 | 0.2 | 1,677 | 5.9 | 1,677 | 29.0 |
| 9th | 3,266 | 165 | 1,845 | 7.0 | 1,845 | 5.2 | 907 | 1.4 | 2,194 | 0.2 | 3,101 | 12.8 | 3,101 | 33.6 |
| 10th | 926 | 23 | 584 | 4.9 | 584 | 4.2 | 296 | 4.1 | 607 | 1.6 | 903 | 10.0 | 903 | 32.1 |
| 11th | 1,931 | 80 | 1,147 | 5.3 | 1,147 | 4.5 | 293 | 4.3 | 1,558 | 1.0 | 1,851 | 10.6 | 1,851 | 34.9 |
| **Prisoner Petitions** | | | | | | | | | | | | | | |
| | 5,524 | 225 | 1,249 | 7.0 | 1,249 | 4.6 | 503 | 2.2 | 4,796 | 0.3 | 5,299 | 7.2 | 5,299 | 30.1 |
| DC | 23 | 1 | 5 | 11.4 | 5 | 2.7 | 5 | 3.5 | 17 | 0.8 | 22 | 11.8 | 22 | 27.4 |
| 1st | 96 | 1 | 23 | 8.7 | 23 | 2.1 | 5 | 4.6 | 88 | 4.9 | 95 | 14.1 | 95 | 32.1 |
| 2nd | 328 | 26 | 80 | 8.6 | 80 | 5.2 | 7 | 1.1 | 255 | 0.1 | 302 | 6.6 | 302 | 39.4 |
| 3rd | 468 | 5 | 105 | 7.7 | 105 | 3.0 | 47 | 4.1 | 433 | 0.7 | 463 | 4.9 | 463 | 44.6 |
| 4th | 685 | 21 | 45 | 17.0 | 45 | 5.8 | 30 | 2.5 | 623 | 0.2 | 664 | 7.3 | 664 | 33.5 |
| 5th | 750 | 119 | 144 | 4.3 | 144 | 6.9 | 41 | 0.8 | 549 | 0.4 | 631 | 6.7 | 631 | 23.9 |
| 6th | 479 | 17 | 139 | 6.4 | 139 | 3.7 | 82 | 2.1 | 418 | 0.6 | 462 | 6.5 | 462 | 34.5 |
| 7th | 325 | 7 | 139 | 7.9 | 139 | 3.1 | 44 | 4.4 | 280 | 0.3 | 318 | 9.1 | 318 | 31.2 |
| 8th | 500 | 9 | 64 | 4.6 | 64 | 3.1 | 38 | 4.5 | 474 | 0.2 | 491 | 2.6 | 491 | 12.9 |
| 9th | 1,103 | 12 | 292 | 9.3 | 292 | 5.8 | 17 | 0.2 | 963 | 0.1 | 1,091 | 11.9 | 1,091 | 33.4 |
| 10th | 282 | 2 | 76 | 4.3 | 76 | 3.9 | 128 | 1.2 | 238 | 1.8 | 260 | 6.7 | 260 | 21.0 |
| 11th | 505 | 5 | 137 | 7.8 | 137 | 4.9 | 42 | 5.5 | 458 | 0.5 | 500 | 7.8 | 500 | 34.0 |

## Table B-4A. (September 30, 2023—Continued)

| Circuit | Total | By Consolidation | Terminated on the Merits — Median Time Intervals From | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Filing of Notice of Appeal to Filing of Appellee's Last Brief | | Filing of Appellee's Last Brief to Oral Argument or Submission on Briefs | | Oral Argument to Last Opinion or Final Order | | Submission on Briefs to Last Opinion or Final Order | | Filing of Notice of Appeal to Last Opinion or Final Order | | Filing in Lower Court to Last Opinion or Final Order in Appeals Court | |
| | | | Appeals | Interval | Appeals | Interval | Appeals | Interval | Appeals | Interval | Appeals | Interval | Appeals | Interval |
| **Other Civil Appeals** | | | | | | | | | | | | | | |
| Total | 7,572 | 834 | 5,180 | 5.1 | 5,180 | 4.6 | 2,984 | 2.8 | 3,754 | 0.6 | 6,738 | 11.9 | 6,738 | 31.8 |
| DC | 279 | 49 | 127 | 6.5 | 127 | 2.9 | 101 | 3.9 | 129 | 0.8 | 230 | 9.8 | 230 | 29.6 |
| 1st | 240 | 10 | 162 | 6.1 | 162 | 2.5 | 96 | 4.0 | 134 | 2.6 | 230 | 12.7 | 230 | 29.7 |
| 2nd | 771 | 73 | 529 | 6.3 | 529 | 6.0 | 418 | 1.2 | 280 | 0.1 | 698 | 13.1 | 698 | 36.2 |
| 3rd | 541 | 45 | 395 | 5.4 | 395 | 3.1 | 111 | 3.3 | 385 | 2.1 | 496 | 11.5 | 496 | 32.1 |
| 4th | 675 | 52 | 241 | 4.0 | 241 | 7.7 | 185 | 2.8 | 438 | 0.3 | 623 | 12.4 | 623 | 30.0 |
| 5th | 782 | 114 | 593 | 4.2 | 593 | 4.7 | 470 | 2.2 | 198 | 1.4 | 668 | 10.7 | 668 | 31.3 |
| 6th | 556 | 63 | 457 | 4.3 | 457 | 3.6 | 167 | 3.0 | 326 | 1.5 | 493 | 10.0 | 493 | 32.0 |
| 7th | 409 | 26 | 322 | 4.8 | 322 | 3.1 | 230 | 3.4 | 153 | 0.2 | 383 | 10.3 | 383 | 34.2 |
| 8th | 649 | 233 | 315 | 4.1 | 315 | 4.9 | 221 | 4.1 | 195 | 0.2 | 416 | 11.6 | 416 | 27.7 |
| 9th | 1,598 | 117 | 1,174 | 6.4 | 1,174 | 5.3 | 610 | 1.6 | 871 | 0.2 | 1,481 | 13.1 | 1,481 | 30.7 |
| 10th | 364 | 19 | 311 | 4.3 | 311 | 4.5 | 181 | 5.8 | 164 | 2.2 | 345 | 12.5 | 345 | 34.7 |
| 11th | 708 | 33 | 554 | 4.4 | 554 | 4.6 | 194 | 4.3 | 481 | 1.6 | 675 | 11.3 | 675 | 32.7 |
| **Criminal Appeals** | | | | | | | | | | | | | | |
| Total | 7,084 | 537 | 3,534 | 6.5 | 3,534 | 3.8 | 1,239 | 2.4 | 5,308 | 0.5 | 6,547 | 10.3 | 6,547 | 41.0 |
| DC | 44 | 4 | 23 | 9.0 | 23 | 3.0 | 18 | 3.6 | 22 | 0.2 | 40 | 10.0 | 40 | 37.2 |
| 1st | 198 | 19 | 116 | 9.9 | 116 | 2.5 | 67 | 3.3 | 112 | 2.2 | 179 | 17.0 | 179 | 59.1 |
| 2nd | 439 | 48 | 271 | 8.5 | 271 | 6.8 | 158 | 0.8 | 233 | 0.2 | 391 | 16.0 | 391 | 55.4 |
| 3rd | 349 | 23 | 191 | 6.7 | 191 | 3.3 | 49 | 4.7 | 277 | 1.6 | 326 | 10.7 | 326 | 64.1 |
| 4th | 991 | 53 | 162 | 6.8 | 162 | 7.3 | 84 | 2.8 | 854 | 0.3 | 938 | 11.0 | 938 | 48.9 |
| 5th | 1,683 | 194 | 606 | 6.0 | 606 | 3.5 | 223 | 0.8 | 1,266 | 0.4 | 1,489 | 8.3 | 1,489 | 24.7 |
| 6th | 664 | 38 | 522 | 6.1 | 522 | 2.9 | 55 | 2.3 | 571 | 1.2 | 626 | 10.6 | 626 | 42.2 |
| 7th | 317 | 32 | 207 | 6.8 | 207 | 2.8 | 138 | 2.7 | 147 | 0.1 | 285 | 11.0 | 285 | 48.3 |
| 8th | 816 | 46 | 404 | 4.6 | 404 | 3.6 | 128 | 3.6 | 642 | 0.5 | 770 | 7.8 | 770 | 46.7 |
| 9th | 565 | 36 | 379 | 8.0 | 379 | 5.0 | 169 | 1.4 | 360 | 0.3 | 529 | 12.5 | 529 | 48.2 |
| 10th | 300 | 2 | 197 | 6.4 | 197 | 3.5 | 93 | 3.2 | 205 | 1.0 | 298 | 10.1 | 298 | 35.6 |
| 11th | 718 | 42 | 456 | 6.2 | 456 | 4.4 | 57 | 4.2 | 619 | 1.0 | 676 | 11.6 | 676 | 40.9 |

# Table B-4A. (September 30, 2023—Continued)

| Circuit | Total | By Consolidation | Terminated on the Merits, Median Time Intervals From | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Filing of Notice of Appeal to Filing of Appellee's Last Brief | | Filing of Appellee's Last Brief to Oral Argument or Submission on Briefs | | Oral Argument to Last Opinion or Final Order | | Submission on Briefs to Last Opinion or Final Order | | Filing of Notice of Appeal to Last Opinion or Final Order | | Filing in Lower Court to Last Opinion or Final Order in Appeals Court | |
| | | | Appeals | Interval | Appeals | Interval | Appeals | Interval | Appeals | Interval | Appeals | Interval | Appeals | Interval |

NOTE: This table does not include data for the U.S. Court of Appeals for the Federal Circuit.