24-5538-CV

---

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

NEO4J, INC., ET AL.,

*Plaintiffs-Appellees,*

v.

SUHY, ET AL.,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA.

---

**BRIEF OF SOFTWARE FREEDOM CONSERVANCY, INC. AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS-APPELLANTS**

---

Aaron Williamson
Williamson Legal PLLC
1421 18th Ave. N
St. Petersburg, FL 33704
+1-773-727-8363

Richard G. Sanders
Software Freedom Conservancy, Inc.
1831 12th Ave. S., Ste. 164
Nashville, TN 37203
+1-615-734-0770

*Attorneys for Amicus Curiae*
*Software Freedom Conservancy, Inc.*

---

## DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure,

Software Freedom Conservancy, Inc., by and through its undersigned counsel,

hereby certifies that it is a nonprofit corporation with no parent corporation and no

stockholders.

_____s/Aaron Williamson_____

Aaron Williamson
Williamson Legal PLLC
*Attorney for Software Freedom
Conservancy, Inc.*
1421 18th Ave. N
St. Petersburg, FL 33704
+1-773-727-8363

# **TABLE OF CONTENTS**

DISCLOSURE STATEMENT ............................................................... i

TABLE OF CONTENTS .................................................................... ii

TABLE OF AUTHORITIES ............................................................. iii

STATEMENT OF INTEREST ............................................................ 1

INTRODUCTION ............................................................................. 3

    I.    The GPL inspired the global software freedom movement ................... 4

    II.   The GPL is the cornerstone of a collaborative software development revolution that has reshaped the modern IT economy ........................... 7

    III.  The lower court's opinion threatens to undermine the GPL and the entire movement it has inspired .............................................. 9

ARGUMENT ................................................................................. 11

    I.    The AGPLv3's purpose is to create and preserve software freedom .. 11

    II.   Section 7 of the NSSL gives licensees the absolute right to remove improper "further restrictions," including the Commons Clause ......... 13

        A.  Section 7 permits licensees to remove improper "further restrictions" ....................................................................... 15

        B.  Section 10 of the NSSL does not limit Section 7 ............................ 17

        C.  Section 7's definition of "further restriction" is to be read into Section 10, not the other way around ............................................. 20

        D.  In drafting the NSSL, Neo4j voluntarily adopted the entirety of the AGPL, including the Preamble, and the Court should not save it from its poor choices ....................................................... 22

        E.  Any ambiguity must be resolved in favor of Defendants-Appellants ....................................................................... 25

    III.  This court's prior 2022 memorandum opinion in this matter is not law of the case ............................................................. 27

CONCLUSION .............................................................................. 28

ii

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Coria v. Garland*, 114 F.4th 994 (9th Cir. 2024) .....................................21

*Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085 (9th Cir. 2013) .................27

*Del Rey Fuel, LLC v. Bellingham Marine Indus.*, 2012 U.S. Dist. LEXIS 200997 (C.D. Cal. Apr. 10, 2012)...............................................................24

*Epic Communications, Inc. v. Richwave Technology, Inc.*, 237 Cal. App. 4th 1342 (2015)........................................................................................24

*Hewlett-Packard Co. v. Oracle Corp.*, 65 Cal. App. 5th 506 (2021)......................25

McCaskey v. California State Automobile Assn, 189 Cal. App. 4th 947 (2010) .. 18, 19

*Ramos v. Amazon.com, Inc.*, No. 2:24-CV-00089-HDV-E, 2024 WL 4882638 (C.D. Cal. Nov. 25, 2024)...............................................................23

*RCA Corp. v. Hunt*, 133 Cal. App. 3d 903 (1982) ......................................25

*Richey v. Metaxpert LLC*, 407 F. App'x 198 (9th Cir. 2010)................................21

*Schindler Elevator Corp. v. U.S. ex rel. Kirk*, 563 U.S. 401 (2011) ......................21

*Yvanova v. New Century Mortgage Corp.*, 62 Cal. 4th 919 (2016) .........................18

**Statutes**

17 U.S.C. § 1201 ......................................................................28

Cal. Civ. Code § 1651 .................................................................24

Cal. Civ. Code § 1652 .......................................................... 17, 19, 24

Cal. Civ. Code § 1653 .................................................................20

Cal. Civ. Code § 1654 .................................................................24

**STATEMENT OF INTEREST**

Software Freedom Conservancy ("SFC")[1] is a nonprofit organization centered around ethical technology. Its mission is to ensure the right to repair, improve, and reinstall software. SFC promotes and defends these rights through fostering free and open source software ("FOSS") projects, driving initiatives that actively make technology more inclusive, and advancing policy strategies that defend FOSS, including the use of "copyleft" public licenses such as the one at issue in this case, the Affero GNU General Public License ("AGPL"), as well as several other GNU General Public Licenses that share the same terms as those at issue in this case. SFC also fosters software freedom by serving as fiscal sponsor to over three dozen FOSS projects, some of which use the AGPL and its close relatives, the GNU General Public License ("GPL") and the GNU Lesser General Public License ("LGPL"), to license their software.

The AGPL and other copyleft public licenses are instrumental to the community of FOSS users, developers, and organizations that SFC serves. Because the AGPL is used by thousands of FOSS projects, its interpretation and application

---

[1] Neither party's counsel authored any part of this brief. Neither the parties nor their counsel contributed financial support intended to fund the preparation or submission of the brief. No other individuals or organizations contributed financial support intended to fund the preparation or submission of the brief.

1

have wide-ranging impacts far beyond this case. SFC's interest in this case is to ensure that this important license is applied in a way that is true to the text and purpose of the license, serves the needs of the FOSS community, and is consistent with applicable precedent.

SFC files this brief pursuant to Rule 29(a) of the Federal Rules of Appellate Procedure and upon the accompanying Motion for Leave to File Amicus Brief.

2

## INTRODUCTION

The case before this Court is not merely one of contractual interpretation; it touches the very heart of the global movement for software freedom—a movement built on the idea that software is not simply a commodity to be owned, but a tool for empowerment and equality. At the center of this movement stand the GNU General Public Licenses ("GPLs"), legal instruments of exceptional significance that guarantee software freedom for software users and developers, just as the United States Constitution guarantees liberties to all. Like the Constitution itself, the GPL is more than just text; it has a spirit—an animating force that brings liberty to millions of software users and developers across the world. The Plaintiffs-Appellees in this case have wielded one of these licenses, the GNU Affero General Public License version 3 ("AGPLv3") [2] in a manner contrary to its text and spirit. In blessing the Plaintiffs-Appellees' self-contradictory license, the lower court's opinion threatens to undermine the purpose and utility of the this and other GPLs for millions of authors and software users worldwide.

---

[2] Except where a specific version number is referenced, the abbreviations "AGPL" and "AGPLv3" are used interchangeably in this brief to refer to AGPLv3. Likewise, "GPL" is used to refer to GPLv3 and "LGPL" to LGPLv3 unless otherwise specified. The Preamble is effectively identical in relevant part across all three of these licenses.

3

I.      **The GPL inspired the global software freedom movement.**

The movement for software freedom is at once vastly transformative yet almost invisible to many. So much of what we take for granted today and hope for tomorrow—the Internet, cloud computing, integration of computers into consumer devices, smartphones, video streaming—relies, to a large extent, on the fruits of this movement. At its heart, this movement champions the belief that technology should be open, accessible, and empowering to all, rather than controlled by a few corporations or powerful entities. This charismatic vision is perhaps most clearly embodied in the preamble to the flagship GPL, the GNU General Public License version 3 ("GPLv3"), which has quietly served as a catalyst for a global revolution in software development and usage.

The preamble to the GPLv3 is not only a legal instrument but an inspiring call to action. It challenges us to think about the future of technology in a way that diverges from the practices of the past, promoting a vision where freedom and cooperation drive innovation instead of secrecy and monopolistic control. The words of the preamble remind us that the software we build and use shapes our future in profound ways, and that we have the power—and responsibility—to shape that future in a direction that benefits society as a whole.

As the preamble makes clear, the purpose of the GPLs is to establish a software ecosystem not only free in price but free in principle. Its very structure is

4

a guarantee of four fundamental freedoms: the freedom to run the licensed software for any purpose, to study and modify the software, to redistribute the software, and to share modified versions of the software. These freedoms are the foundation of the GPLs, and they have been preserved in every version since its inception in 1989, culminating in GPLv3. This license, along with its close companions, the GNU Lesser General Public License version 3 ("LGPLv3") and AGPLv3, has become the cornerstone of the development of free and open-source software ("FOSS"),[3] which is now ubiquitous wherever software is used.

These licenses are the work of many hands. The first versions were largely the brainchild of Richard Stallman and the Free Software Foundation, which fostered the free software movement in its infancy. GPLv3, however, was co-created by stakeholders from throughout the FOSS community. This public

---

[3] AGPLv3 is the fourth-most commonly used FOSS license worldwide. *See Innovation Graph—Licenses: License Rankings Globally*, GitHub, https://innovationgraph.github.com/global-metrics/licenses#license-rankings (last visited Dec. 27, 2024). GPLv3 is the third-most commonly used license. *Id.* In the US alone, these licenses together were used by 65,815 software authors on the popular code-hosting platform GitHub during the first quarter of 2024. *GitHub Innovation Graph License Data*, GitHub, https://github.com/github/innovationgraph/blob/main/data/licenses.csv (last visited Dec. 27, 2024).

drafting process sought and incorporated the input of the world's largest

technology companies and grassroots free software developer communities.[4]

The GPLs are therefore not merely legal contracts; they collectively function

as a social contract that defines the relationships between developers, users, and

technology. At their core, the GPLs establish a covenant grounded in shared

values: freedom, collaboration, and the collective good. By choosing to release

software under a GPL, developers make a conscious commitment to ensuring that

their work remains open and accessible, enabling others to contribute, modify, and

improve upon it. This creates a virtuous cycle of knowledge-sharing and mutual

benefit, where technology evolves not through proprietary control but through

community effort and collective ownership. Remarkably, many developers

_____

[4] The GPLv3 drafting process included a comment process open to the general
public as well as four specialized committees to give more involved input and
feedback. Partial lists of the members of the four committees responsible for
drafting GPLv3 were published by the Free Software Foundation. *See* Free
Software Foundation, *Committee A Members*, https://gplv3.fsf.org/discussion-
committees/A/committee-A-bios/ (last visited Jan. 10, 2025); Free Software
Foundation, *Members of Committee B*, https://gplv3.fsf.org/discussion-
committees/B/memberlist/ (last visited Jan. 10, 2025); Free Software Foundation,
*Members of Committee C*, https://gplv3.fsf.org/discussion-
committees/C/memberlist-public/ (last visited Jan. 10, 2025); Free Software
Foundation, *Committee D Members*, https://gplv3.fsf.org/discussion-
committees/D/members/ (last visited Jan. 10, 2025).

perform this work on a volunteer basis, self-organizing into voluntary collectives, all for the common good and the satisfaction of solving interesting problems in code. The GPL, therefore, establishes a social framework where participants respect and uphold the principles of software freedom, working together to build tools that serve the public interest rather than private profit. In this way, the GPL transcends its legal structure, fostering a culture of trust, cooperation, and social responsibility that has enabled transformative innovations across the globe.

## II.    The GPL is the cornerstone of a collaborative software development revolution that has reshaped the modern IT economy.

The impact of the GPL cannot be overstated. It has shaped the development of revolutionary software, including the Linux-based operating systems, and has been instrumental in the proliferation of free software worldwide. The GPL has fostered a community where the sharing of knowledge and code is the standard— where software is not hoarded but distributed freely, so all may benefit. By 2005, the GPL had emerged as the most important software license of its time, and its evolution into GPLv3, released in 2007,[5] fortified its mission with added protections against emerging threats to user freedoms that were not foreseen when

---

[5] *See* Free Software Foundation, *Welcome to GPLv3*, https://gplv3.fsf.org/ (last visited Jan. 10, 2025).

7

their forebears (version 2 of the same licenses) were drafted years before. Today, software licensed under the GPLv3 family of licenses is used by millions of people around the world.

Thanks to the GPLs, communities of developers and users have come together to build alternatives to proprietary software that have fundamentally altered the landscape of computing. Perhaps one of the most well-known and far-reaching successes is the Android operating system, which is built on the Linux kernel, a product of one of the GPLs. Android now powers billions of devices around the world, enabling people to access information, communicate, and innovate in ways that were once unimaginable.[6] This is just one example of how the GPLs have made possible software that is not only widespread, but transformative.

Another remarkable example is Debian, a free operating system based upon Linux that forms the backbone of much of the modern information technology infrastructure. Debian's development is entirely community-driven, with thousands of volunteers contributing their time, skills, and knowledge to its evolution.[7]

---

[6] Sameer Samat, *Living in a multi-device world with Android*, Google, https://blog.google/products/android/io22-multideviceworld/ (May 11, 2022).

[7] *See Debian Developers' Corner*, Debian, https://www.debian.org/devel/ (last visited Jan. 10, 2025).

Contributors to Debian do so under a social contract committed to software freedom and must even pass a test that ensures they understand the principles of software freedom to participate in the project's governance—a testament to the project's commitment to maintaining the integrity of its values. It is this kind of collaboration and shared responsibility that has helped shape the very foundations of the internet and global computing as we know it today.

These examples demonstrate that the GPLs are not just licenses; they form the foundations of a movement that has enabled communities to build remarkable, world-changing alternatives to proprietary software. GPL-licensed software underpins much of the modern world. As we stand at the crossroads of a rapidly evolving technological landscape, it is vital that we recognize and protect the values embodied in the GPLs, which continue to drive the most inclusive, innovative, and empowering aspects of modern computing.

**III.    The lower court's opinion threatens to undermine the GPL and the entire movement it has inspired.**

The case before this Court threatens to undo much of what the GPLs were designed to protect. The lower court's ruling, which allows the AGPL's fundamental purpose to be circumvented by legal sleight of hand, undermines the very freedoms that have made the GPLs a pillar of the software world. *See* 1-ER-3, 3-38. The ruling allows for a reversal of these freedoms by permitting a party to

9

invoke the AGPL's language and preamble while effectively discarding its soul and undermining the work of thousands of developers. Because the language at issue in the AGPL is shared among all of the GPL licenses, the district court's ruling, if left to stand, could have serious repercussions for software freedom.

The AGPL's purpose is to make software free not only in terms of price but in terms of principle: free as in "freedom" not only free as in "free beer." A key element of this freedom is the freedom to sell the software. In the words of the preamble, the "General Public Licenses are designed to make sure that you have the freedom to distribute copies of free software (and charge for them if you wish), that you receive source code or can get it if you want it, that you can change the software or use pieces of it in new free programs, and that you know you can do these things." 3-ER-478, 478. The AGPL itself ensures these freedoms by giving licensees the right to remove any "further restrictions" that would impinge upon them. 3-ER-488, 496. Yet, the lower court's judgment would override this essential freedom by reading it out of the AGPL (and many other GPLs in the process).

The Court need not allow the purpose of the AGPL—and the work of those who rely upon it—to be nullified so heedlessly. Instead, it can uphold the license's plain meaning and fundamental principles, ensuring that the AGPL continues to serve its vital mission of protecting freedom in the software world. The Plaintiffs-Appellees could have easily avoided undermining these principles by merely

10

drafting a license that achieved their goals. Instead, they tacked on separate terms that contradict the spirit and terms of the GPLs, thereby incorporating insincere appeals to freedom and self-contradicting terms, and trading on the AGPL's well-deserved goodwill. We urge the Court to interpret the AGPL in a manner that respects both its letter and its spirit, protecting the freedoms it guarantees and ensuring that the expectations of millions of developers and users worldwide are met.

## ARGUMENT

### I. The AGPLv3's purpose is to create and preserve software freedom.

The so-called "Neo4j Sweden Software License" ("NSSL") at issue in this case, 3-ER-488, 488-502, incorporates and adopts the AGPL wholesale, including the AGPL's preamble (the "Preamble"), which sets forth the license's purpose with absolute clarity: "our General Public Licenses are intended guarantee your freedom to share and change all versions of a program—to make sure it remains free software for all its users." *See* Preamble[8] ¶ 3; 3-ER-488, 489. The Preamble

---

[8] Because the NSSL's preamble and AGPLv3's preamble are identical, this Brief will henceforth refer to both preambles simultaneously as the "Preamble." While the copy of the NSSL found in the Excerpts of Record is somewhat difficult to parse because it reflects Plaintiffs-Appellees' removal of the Commons Clause, *see* 3-ER-488, 488-502, the district court is clear that the NSSL is nothing more than the AGPLv3 with the addition of the Commons Clause. *See* 1-ER-3, 5.

11

contrasts this purpose to "[t]he licenses for most software and other practical works," which are "designed to take away your freedom to share and change the works." *Id*.

The Preamble goes on to define what it means by "free software":

When we speak of free software, we are referring to freedom, not price. Our General Public Licenses are designed to make sure that you have the freedom to distribute copies of free software (*and charge for them if you wish*), that you receive source code or can get it if you want it, that you can change the software or use pieces of it in new free programs, and that you know you can do these things.

*Id.* (emphasis added).

The intent of the license could not be clearer: every licensee should have the freedom to use, copy, modify, and share the licensed software freely. This includes the freedom to charge a fee when providing the software and associated services to others. The freedom to charge for distribution, support, and warranty protection is effectuated in Section 4 of the AGPL: "You may charge any price or no price for each copy that you convey, and you may offer support or warranty protection for a fee." NSSL § 4; AGPLv3 § 4.

The NSSL provisions primarily at issue in this case—Sections 4, 7, and 10—are identical to the corresponding provisions of AGPLv3, GPLv3, and LGPLv3. Consequently, the court's interpretation of these provisions will impact the licensors and users of software licensed under all of these licenses.

12

## II. Section 7 of the NSSL gives licensees the absolute right to remove improper "further restrictions," including the Commons Clause.

In this case, the district court moved mountains to arrive at an interpretation of the NSSL that preserved the interests of the Plaintiffs-Appellees and licensor, Neo4j Sweden AB ("Neo4j"). In doing so, the district court opinion ignores the license's plain language, its express purpose, and basic rules of contract interpretation—all of this to save Neo4j from its own catastrophic drafting.

The NSSL is nothing more than the AGPLv3 with a supplemental provision called the "Commons Clause" carelessly appended to it. The Commons Clause is an additional restriction, forbidden by the NSSL's own language, that purports to forbid licensees from charging money for copies of the covered software. Neo4j changed nothing else about the AGPLv3, making no attempt to harmonize the Commons Clause and the AGPLv3. Neo4j thus created a self-contradicting agreement, because the Commons Clause purports to forbid what the NSSL expressly permitted: the right to sell copies of the covered software for money. "You [the licensee] may charge any price or no price for each copy that you convey."[9] NSSL § 4 ¶ 2; AGPLv3 § 4 ¶ 2.

---

[9] It should be noted that this contradiction does not arise when the Commons Clause is used in conjunction with other FOSS licenses, such as the MIT License

13

Section 7 of the NSSL—which is identical to Section 7 of the AGPLv3—gives licensees the unqualified right to remove improper "further restrictions" whenever they encounter them. NSSL § 7 ¶ 4; AGPLv3 § 7 ¶ 4. Neo4j could have drafted a license without this language, but chose not to. Yet, the district court held that this unqualified right was, in fact, qualified by Section 10 of the agreement, which forbade licensees from *adding* improper "further restrictions." NSSL § 10 ¶ 3; AGPLv3 § 10 ¶ 3. The district court inferred that, because *licensees* could not add "further restrictions," the *licensor* was allowed to, and so Neo4j, as the licensor, was permitted to add the Commons Clause. 1-ER-3, 26-27. The district court therefore concluded that this inferred right of the licensor to add "further restrictions" had to take precedence over the explicit right of licensees to them. *Id* at 27.

The district court's conclusion not only disregards the contract's text and purpose, but California's statutory canons of contract interpretation. In so doing, it threatens to disrupt an entire software ecosystem founded upon on the AGPLv3 and other GPL agreements that share the language of its Sections 7 and 10.

---

and the Apache Public License, that are expressly designed to allow commercial-use restrictions and for which the Commons Clause was apparently designed.

14

**A. Section 7 permits licensees to remove improper "further restrictions."**

Section 7 of the NSSL (which is naturally identical to Section 7 of the AGPL), titled "Additional Terms," governs when the NSSL may be supplemented with additional terms, and when a licensee is free to remove those additional terms from the license. *See* NSSL § 7; AGPLv3 § 7. After dealing with the addition and removal of "additional permissions" (terms that exempt licensees from certain conditions of the license), Section 7 sets forth a few narrow categories of *restrictions* that licensees may impose upon materials that they (the licensees) add to the licensed work (such as warranty disclaimers and limitations on the use of the licensees' trademarks). *Id.* The license goes on to define "[a]ll other non-permissive additional terms" (i.e., those not authorized by Section 7) as "further restrictions." *Id.* It authorizes licensees to remove all "further restrictions" from any copy of the program they receive:

> If the Program as you received it, or any part of it, contains a notice stating that it is governed by this License along with a term that is a further restriction, you may remove that term.

*Id.* There is no question that Commons Clause is not authorized by Section 7. The Commons Clause thus constitutes a "further restriction."

15

This right to remove "further restrictions" is unqualified: the licensee may remove all restrictions placed upon the program except those enumerated in Section 7 of the AGPLv3. This clause makes no distinction between restrictions imposed by the initial licensor and those imposed by licensees: if the restriction is not permitted by Section 7, it may be removed. The breadth of this right is emphasized by the phrase, "as you received it." It does not matter how the licensee found the licensed software. It could be from an obscure repository, or in a computing device found at a garage sale, or from the licensor itself—the right to remove "further restrictions" applies to them all.

The reason for all this is clear from the Preamble, which is the only statement of intent found in the NSSL, and which Neo4j cribbed wholesale from the AGPLv3. The license's central purpose is software freedom: the freedom to distribute copies of software, to charge for those copies, to obtain the source code for the software, and the right to know that "you" have these rights. "Further restrictions" limit freedom and work against this purpose. If the licensor could simply add further restrictions, it could nullify this purpose (contrary to the clear directions of the Preamble) with the stroke of a pen.

The district court reached the opposite conclusion. Its reasoning is not explicit, but it is clearly based on the observation that, under Section 10, "you" (defined as the licensee) are prohibited from adding "further restrictions";

16

therefore, the court infers, the licensor must be permitted to add "further restrictions." 1-ER-3, 26-27. By making the inferential leap that the licensor's inferred right to add "further restrictions" is somehow absolute, the district court conjures an exception to Section 7's unqualified right to remove "further restrictions." Nothing in the text of the NSSL—which Neo4j drafted—suggests such an exception. Licensees may remove any "further restriction" no matter their source.

Perhaps the district court concluded that Sections 7 and 10 are hopelessly contradictory and that it must resolve that contradiction in favor of one or the other term. If so, the it makes no attempt to reconcile these two provisions, as required by California law: "Repugnancy in a contract must be reconciled, if possible, by such an interpretation as will give some effect to the repugnant clauses, subordinate to the general intent and purpose of the whole contract." Cal. Civ. Code § 1652.

### B. Section 10 of the NSSL does not limit Section 7.

The district court's interpretation of Sections 7 and 10 fails to give "some effect" to Section 7 because it effectively reads licensees' right to remove "further restrictions" out of the NSSL. Section 10 already makes it illegal for a licensee to add a "further restriction," so such restrictions are already void. Limiting the right to remove further restrictions to only those added by other licensees is thus

17

pointless: Section 10 already forbids such restrictions. NSSL § 10; AGPLv3 § 10. To give Section 7 "some effect," therefore, it must be interpreted as written: to give licensees the right to remove any "further restriction," including those added by the licensor. Licensors are still free to add further restrictions to the NSSL. Unlike those added by licensees, such restrictions are merely voidable, not void, and the licensors do not breach the agreement in doing so. *See Yvanova v. New Century Mortgage Corp.*, 62 Cal. 4th 919, 929-930 (2016) ("A void contract is without legal effect.... A voidable transaction, in contrast, 'is one where one or more parties have the power, by a manifestation of election to do so, to avoid the legal relations created by the contract, or by ratification of the contract to extinguish the power of avoidance.'").

*McCaskey v. California State Automobile Association* is both instructive and distinguishable. 189 Cal. App. 4th 947 (2010). In that case, the plaintiff-employees were subject to contracts that described their employment as "at will," but which also reduced their production quotas. *See id*. at 969-70. When they failed to meet their old production quotas (but meet their new ones), the defendant-employer fired them, pointing to the at-will provision. The court disagreed. If the at-will provision took precedence over the new production quotas, the new quotas would be read out of the employment agreement. *See id*. at 970. In that case, a general right had to be tempered by a more specific provision in order to give both

18

provisions "some effect." In this case, to give "some effect" to the conflicting provision, a general right must be given full effect despite the presence of a narrower implicit right that goes to the same subject matter (of "further restrictions"). In both cases, the key is that each seemingly "repugnant" provision is given "some effect."

Even if there were some question about how to reconcile Section 7's right to remove further restrictions and Section 10's implicit right to add them, their reconciliation must be "subordinate to the general intent and purpose of the whole contract." Cal Civ. Code § 1652. In *McCaskey*, the purpose of the lower production quotas was to induce the plaintiff-employees to continue working for the defendant-employer until retirement. 189 Cal. App. 4th at 965. Firing these employees before then defeated the purpose of the lower quotas. *See id*. Here, one need not look far for the NSSL's purpose because it is spelled out in the Preamble: "to guarantee your freedom to share and change all versions of a program--to make sure it remains free software for all its users." Preamble ¶ 2. It is, therefore, "designed to make sure that you have the freedom to distribute copies of free software (and charge for them if you wish)," among other things. *Id*. ¶ 3. The right to remove a further restriction is essential to this purpose. Indeed, "free software" is not "free" without this right.

19

If this court finds that licensees' right to remove further restrictions ultimately cannot be reconciled with the licensor's apparent right to add them, then the right to remove must predominate over the right to add. "Words in a contract which are wholly inconsistent with its nature, or with the main intention of the parties, are to be rejected." Cal. Civ. Code § 1653. Again, the NSSL's nature and primary intention, set forth in the Preamble, is to promote software freedom. Preamble ¶¶ 2-3. "Further restrictions" are repugnant to software freedom because they interfere with the incentives to adopt and share "free" (as in freedom) software.

Instead of reconciling the two provisions by reference to the Preamble, the District Court appealed to a copyright owner's general right to license its work as it sees fit. 1-ER-3, 27. Amicus does not dispute the existence of such a right, but nothing in the authorities cited by Neo4j or the District Court suggests that this right trumps ordinary rules of contract interpretation.

**C. Section 7's definition of "further restriction" is to be read into Section 10, not the other way around.**

The only explicit link between Sections 7 and 10 is the language in Section 7 that defines "further restriction": "All other non-permissive additional terms [besides those expressly authorized] are considered 'further restrictions' within the meaning of section 10." NSSL § 7; AGPLv3 § 7.

20

There is no reason to infer, as the district court seems to, that this language limits the definition of a "further restriction" in Section 7 to those prohibited under Section 10. The natural interpretation of this language is that, when Section 10 refers to "further restrictions," it means the same as Section 7: all "non-permissive additional terms" besides the few categories listed as acceptable in Section 7. This interpretation is consistent with the way courts and congress universally use the phrase "within the meaning of": to mean "as that term is used in" a statute or agreement. *See, e.g., Schindler Elevator Corp. v. U.S. ex rel. Kirk*, 563 U.S. 401, 404, 131 S. Ct. 1885, 1889, 179 L. Ed. 2d 825 (2011) ( "We must decide whether a federal agency's written response to a request for records under the Freedom of Information Act (FOIA), 5 U.S.C. § 552, constitutes a 'report' *within the meaning of* the public disclosure bar."); *Coria v. Garland*, 114 F.4th 994, 1000 (9th Cir. 2024) (immigration removal order qualifies "as a 'final order of removal' within the meaning of § 1252(a)(2)(C)," a statute that does not define "final order of removal"); *Richey v. Metaxpert LLC*, 407 F. App'x 198, 199 (9th Cir. 2010) ("Manning argues that a smart phone is a 'computer' within the meaning of the non-competition agreement and that Richey is violating the terms of the noncompetition agreement.").

Read this way, this clause informs licensees that, when Section 10 prohibits them from adding "further restrictions" to the license, that means the term includes

21

"all non-permissive additional terms" besides those restrictions that Section 7 permits them to include. It does not, even by implication, import any limitation from Section 10 into Section 7. As its title makes clear, Section 7 relates to "Additional Terms" in general, while Section 10 relates to "Licensing of Downstream Recipients." Inferring limitations on Section 7 from the scope of Section 10 is not only unnecessary, but complicates an otherwise straightforward reading of the license.

**D. In drafting the NSSL, Neo4j voluntarily adopted the entirety of the AGPL, including the Preamble, and the Court should not save it from its poor choices.**

The truth is that Neo4j "wrote" the NSSL but seeks salvation from the consequences of the language it chose. By adopting the AGPLv3 wholesale (with only the addition of the Commons Clause), Neo4j chose to license its software under a license agreement that is guided by the Preamble, gives licensees the right to remove additional restrictions, and permits licensees to sell copies of the software for money.

A licensor is free to apply contradictory and self-defeating license terms to its software; the courts are not bound to save it from the consequences of that choice. Rather, as this court has said, courts must seek to "give effect to the mutual intent of the parties as it existed at the time of contracting, which should be

22

inferred, if possible, solely from the written provisions of the contract, assuming the language is clear and explicit, and does not involve an absurdity." *Ramos v. Amazon.com, Inc.*, No. 2:24-CV-00089-HDV-E, 2024 WL 4882638, at *3 (C.D. Cal. Nov. 25, 2024). "To fulfill that directive, courts will look to (a) the ordinary and popular meaning of the terms; (b) give effect to surrounding provisions to avoid superfluity; (c) the contract as a whole; and (d) avoid an absurd or inequitable result." *Id*. "In cases of uncertainty not removed by canons of contract interpretation, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist." *Id* (citing Int'l Bhd. of Teamsters, Local 396 v. NASA Servs., 957 F.3d 1038, 1042 (9th Cir. 2020)).

The District Court failed to consider that the Commons Clause itself contradicts Section 4 of the NSSL, which says, "You may charge any price or no price for each copy that you convey." NSSL § 4 ¶ 2. Unlike the interaction between Sections 7 and 10, this is true "repugnancy." The NSSL cannot both permit licensees to charge money for copies of the covered software, and also forbid charging money for copies of the covered software. Under California's canons of construction, this repugnancy must be resolved by reference to the NSSL's purpose, as expressed in the Preamble, to promote software freedom, including the right to charge money for copies: "Our General Public Licenses are designed to make sure that you have the freedom to distribute copies of free

23

software (and charge for them if you wish)…" Preamble ¶ 3. The Commons Clause contains no contrary statement of purpose. As between a provision that comports with the express intent of the NSSL and one that contradicts it, this repugnancy must be resolved in favor of the former. *See* Cal. Civ. Code § 1652; *Epic Communications, Inc. v. Richwave Technology, Inc*., 237 Cal. App. 4th 1342, 1350-1352 (2015).

Neo4j might object that, because it added the Commons Clause to the AGPLv3, it intended for the Commons Clause to predominate. But licensees do not know Neo4j's subjective intent. The burden is on the drafter to prepare a contract free of contradiction and ambiguity, and failing that, the contract must be construed against the drafter. Cal. Civ. Code § 1654. Neo4j might also object that, since the Commons Clause is appended to a pre-existing license, it should be interpreted as predominating over the pre-existing license, the way a purchase order's specific terms predominate over the pre-printed terms and conditions on the back of the form. *See* Cal. Civ. Code § 1651. But the NSSL is not "specially drafted and prepared for [a] transaction at issue," because it applies to all who license the software thereunder, not any specific transaction. *See Del Rey Fuel, LLC v. Bellingham Marine Indus*., 2012 U.S. Dist. LEXIS 200997, *11-12 (C.D. Cal. Apr. 10, 2012) (explaining Cal. Civ. Code § 1651).

24

By stepping in to salvage Neo4j's catastrophic drafting, the district court is forced to adopt an interpretation that cannot be squared with the balance of the NSSL. As detailed above, Section 7 allows licensees to remove "further restrictions" regardless of who added them, and Section 4 allows licensees to charge a fee for distribution of the software, services, and warranty protection. To conclude that the NSSL cannot be read to allow licensees to toss out terms added by the original licensor, the district court must render these provisions inoperable.

### E. Any ambiguity must be resolved in favor of Defendants-Appellants.

As argued above, the NSSL unambiguously authorizes licensees to remove "further restrictions" regardless of their source. But to the extent that this court finds any ambiguity in these terms, that ambiguity should be resolved in favor of the licensees.

Contracts are interpreted by the courts "with a view toward effectuating the purposes of which the contract was designed." *RCA Corp. v. Hunt*, 133 Cal. App. 3d 903, 906 (1982). Courts may look to recitals such as those found in the Preamble to ascertain this purpose. *See generally Hewlett-Packard Co. v. Oracle Corp.*, 65 Cal. App. 5th 506, 533, 280 Cal. Rptr. 3d 21, 45 (2021) (interpreting contracting parties' intent by reference to recitals).

25

The express purpose of the NSSL is to "guarantee" that a program subject to its terms "remains free software for all its users," which among other things means that each licensee ("you") may "distribute copies of [the] software (and charge for them if you wish)." Preamble ¶ 3. Section 7 upholds this purpose by permitting the licensee to remove any restriction besides those carefully enumerated in the license. This ensures that a licensor cannot use the AGPLv3 against its purposes, to convey software that is not "free software." To hold otherwise would be to sow confusion amongst the countless licensees of AGPLv3 programs who depend on the license to do what it says on the tin.

The district court's interpretation of the NSSL ignores, and thereby undermines, the stated purpose of the license. *See* 1-ER-3, 26-27. By its reading, the licensed program not only will not "remain[] free software for all its users"—it may never be free software to begin with. This court should not contort the text of this important license to preserve the interests of a single party who wielded it unwisely. The mishmash "Neo4J Sweden Software License" is two-faced, and that is Neo4j's doing and not the Defendants-Appellants'; it is Neo4j that must be held accountable for any ensuing confusion.

26

IV.    **This court's prior 2022 memorandum opinion in this matter is not law of the case.**

On February 18, 2022, this Court issued a memorandum opinion on Defendant-Appellants' appeal of the district court's granting of a preliminary injunction. This opinion was later corrected on May 18, 2022. Although the opinion accepted the district court's interpretation of Section 7's right to remove "further restrictions," the opinion is not law of the case. This is because "[i]n general … our decisions at the preliminary injunction phase do not constitute the law of the case." *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1090 (9th Cir. 2013).

## CONCLUSION

In light of the history, purpose, and text of Sections 7 and 10 of the Neo4j Sweden Software License (NSSL), together with the applicable statutory rules of contract interpretation, this Court should find that licensees of the NSSL (and by extension the AGPLv3) have the right to remove "further restrictions," as that term is used in Sections 7 and 10—regardless of who purported to impose them. As a consequence, any of Appellees' claims dependent on the district court's contrary finding should be reversed, including the claims for false advertising and for violations of the Digital Millennium Copyright Act, 17 U.S.C. § 1201 et seq.

Dated: January 10, 2025                    Respectfully submitted,

St. Petersburg, FL                         _____s/Aaron Williamson_____

                                           Aaron Williamson
                                           Williamson Legal PLLC
                                           *Attorney for Software Freedom*
                                           *Conservancy, Inc.*
                                           1421 18th Ave. N
                                           St. Petersburg, FL 33704
                                           +1-773-727-8363

28

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 24-5538-CV

I am the attorney or self-represented party.

**This brief contains** | 6,102 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

☐ complies with the word limit of Cir. R. 32-1.

☐ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

☐ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

☐ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.

☐ a party or parties are filing a single brief in response to multiple briefs.

☐ a party or parties are filing a single brief in response to a longer joint brief.

☐ complies with the length limit designated by court order dated _____.

☐ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Aaron Williamson | **Date** | 1/10/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** | *Rev. 12/01/22*

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using ACMS on January 10, 2025.

All participants in the case are registered ACMS users and will be served by ACMS.

Dated: January 10, 2025            _____s/ Aaron Williamon_____

St. Petersburg, FL                  Aaron Williamson
Williamson Legal PLLC
*Attorney for Software Freedom*
*Conservancy, Inc.*
1421 18th Ave. N
St. Petersburg, FL 33704
+1-773-727-8363

30