IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| NEO4J, INC., a Delaware corporation, and NEO4J SWEDEN AB, a Swedish corporation,<br><br>     Plaintiffs-ctr-defendants-Appellees,<br><br>v.<br><br>JOHN MARK SUHY,<br><br>     Defendant-ctr-claimant-Appellant.<br><br>and<br><br>PURETHINK LLC, a Delaware limited liability company; and IGOV, INC., a Virginia corporation,<br><br>     Defendants. | No. 24-5538<br><br>District No. 5:18-cv-07182-EJD<br>U.S. District Court for the Northern District of California<br><br><br>**DECLARATION OF JEFFREY M. RATINOFF IN SUPPORT OF APPELLEES' OPPOSITION TO MOTION FOR LEAVE TO FILE AMICUS CURIAE BRIEF BY SOFTWARE FREEDOM CONSERVANCY, INC.** |

I, Jeffrey M. Ratinoff, declare as follows:

1.      I am an attorney at law, duly licensed to practice before all courts of the State of California and admitted to this Court, and am a partner of Spencer Fane LLP, attorneys of record for Plaintiffs-Appellees Neo4j, Inc. ("Neo4j USA"), and Neo4j Sweden AB ("Neo4j Sweden," collectively "Appellees").   I make this declaration in support of Appellees' Opposition to Motion for Leave to File Amicus Curiae Brief by Software Freedom Conservancy, Inc.

2.      The facts stated herein are based on my personal knowledge, except with respect to those matters stated to be on information and belief, and as to those matters, I believe them to be true.  If called upon to testify as a witness in this matter, I could and would do so competently.

3.      Attached hereto as **Exhibit 1** is a true and correct copy of the trial court's Order Granting Plaintiffs' Motion for Partial Summary Judgment; Denying Defendants' Cross-Motion for Summary Judgment, entered on May 18, 2021 (Dkt. No. 118).

4.      Attached hereto as **Exhibit 2** is Memorandum Disposition issued by this Court in *Neo4j, Inc. et al. v. PureThink LLC et al.*, Ninth Circuit Case No. 21-16029 and filed with the trial court on February 18, 2022 (Dkt. No. 140).

5.      Attached hereto as **Exhibit 3** is an Order Denying Petition for Panel Hearing and Amending the Memorandum Disposition issued by this Court in *Neo4j,*

1

*Inc. et al. v. PureThink LLC et al.*, Ninth Circuit Case No. 21-16029 and filed with the trial court on March 14, 2022 (Dkt. No. 141).

6.    Attached hereto as **Exhibit 4** is a true and correct copy of the relevant excerpts of Appellants' Opening Brief filed in *Neo4j, Inc. et al. v. PureThink LLC et al.*, Ninth Circuit Case No. 21-16029 (2021).

7.    Attached hereto as **Exhibit 5** is a true and correct copy of the relevant excerpts of Appellees' Answering Brief filed in *Neo4j, Inc. et al. v. PureThink LLC et al.*, Ninth Circuit Case No. 21-16029 (2021).

8.    Attached hereto as **Exhibit 6** is a true and correct copy of the relevant excerpts of Appellants' Reply Brief filed in *Neo4j, Inc. et al. v. PureThink LLC et al.*, Ninth Circuit Case No. 21-16029 (2021).

9.    Attached hereto as **Exhibit 7** is a true and correct copy of the Expert Report of Bradley M. Kuhn 22 December 2022 (without exhibits), served in the underlying district court case.

10.    Attached hereto as **Exhibit 8** is a true and correct copy of the Stipulation of Undisputed Facts for Trial, filed with the trial court on November 20, 2023 (Dkt. No. 227).

11.    Attached hereto as **Exhibit 9** is a true and correct copy the Stipulated Judgment and Permanent Injunction, entered on February 16, 2021 in *Neo4j Inc. et*

2

*al. v. Graph Foundation, Inc., et al*., Northern District of California Case No. 5:19-cv-06226-EJD.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration was executed on this 21st day of January, 2025, at San Jose, California.

 */s/ Jeffrey M. Ratinoff*
Jeffrey M. Ratinoff

## <u>CERTIFICATE OF SERVICE (CM/ECF)</u>

I HEREBY CERTIFY that on January 21, 2025, I electronically filed the foregoing DECLARATION OF JEFFREY M. RATINOFF IN SUPPORT OF APPELLEES' OPPOSITION TO MOTION FOR LEAVE TO FILE AMICUS CURIAE BRIEF BY SOFTWARE FREEDOM CONSERVANCY, INC**.** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following email addresses:

**John Mark Suhy**
jmsuhy@gmail.com

**Rick Sanders**
rick@sfconservancy.org

**Aaron Kyle Williamson**
aaron@williamson.legal


*/s/  Jeffrey M. Ratinoff*
Jeffrey M. Ratinoff

# EXHIBIT 1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

NEO4J, INC., et al.,

           Plaintiffs,

     v.

PURETHINK, LLC, et al.,

           Defendants.

Case No. 5:18-cv-07182-EJD

**ORDER GRANTING PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY
JUDGMENT; DENYING
DEFENDANTS' CROSS-MOTION FOR
SUMMARY JUDGMENT**

Re: Dkt. Nos. 98, 100

Plaintiffs Neo4j, Inc. ("Neo4j USA") and Neo4j Sweden AB ("Neo4j Sweden," and

collectively, "Plaintiffs") brought the present lawsuit against Defendants PureThink LLC, iGov

Inc., and John Mark Suhy ("Defendants") alleging trademark and copyright infringement, among

other claims, related to Plaintiffs' proprietary software.  Currently before the Court is Plaintiffs'

Motion for Partial Summary Judgment as to Neo4j USA's Lanham Act and related California

Unfair Competition Law ("UCL") claims against Defendants.  Dkt. No. 98 ("Motion").  Also,

before the Court is Defendants' Consolidated Cross-Motion for Summary Judgment as to the same

subset of claims.  Dkt. No. 100 ("Cross-Motion").

Both the Motion and Cross-Motion were originally filed on a consolidated basis with the

corresponding motions in the related action against Defendants Graph Foundation, Inc.,

GraphGrid, Inc., and AtomRain, Inc.  *See Neo4j, Inc. v. Graph Foundation, Inc.*, Case No. 5:19-

cv-06226-EJD ("GFI Action").  Before the Motions were fully briefed, however, the parties to the

GFI Action reached a settlement and the Court entered a stipulated judgment terminating the case.

1  *See* GFI Action, Dkt. No. 110.

2     The Court took the Motion and Cross-Motion under submission for decision without oral

3  argument pursuant to Civil Local Rule 7-1(b).  Having considered all the papers filed in support of

4  or in opposition to the Motion and Cross-Motion, the Court GRANTS Plaintiffs' Motion and

5  DENIES Defendants' Cross-Motion.

6  **I.    Background**

7       **A.   Plaintiffs' Business**

8     Neo4j USA is a Delaware corporation with its principal place of business in San Mateo,

9  California, specializing in graph database management systems.  Neo4j USA's platform helps

10  organizations make sense of their data by revealing how people, processes and digital systems are

11  interrelated.  Declaration of John Broad ("Broad Decl."), ¶¶ 2-3.  Neo4j USA has more than 400

12  commercial customers, including global enterprises such as Walmart, Comcast, Cisco, and eBay,

13  and also does substantial business with government agencies, including agencies within the United

14  States Government.  *Id.* ¶ 4.

15     Neo4j USA is the parent corporation of Neo4j Sweden, which in turn is a wholly owned

16  subsidiary of Neo4j USA.  Declaration of Philip Rathle ("Rathle Decl."), ¶ 3.  Neo4j Sweden

17  owns of all copyrights related to the Neo4j graph database platform, including the source code,

18  and has licensed those copyrights to Neo4j USA.  *Id.* ¶¶ 3-4.  In conjunction with its business,

19  Neo4j USA filed for and obtained several federally registered trademarks, including U.S.

20  Trademark Registration No. 4,784,280 for the word mark "NEO4J" covering the goods and

21  services in International Classes, 009, 035, 041, 042 and 045 (the "Neo4j Mark").  Dkt. No. 98-1,

22  Declaration of Jeffrey M. Ratinoff in Support of Neo4j, Inc. and Neo4j Sweden AB's

23  Consolidated Motion for Summary Judgment ("Ratinoff Decl."), Ex. 1.  In its registration

24  application, Neo4j USA claimed first use of the Neo4j Mark was in June 2006 and first use in

25  commerce in May 2007 based on the use of that mark by Neo4j Sweden, Neo4j USA's

26  predecessor-in-interest and related company.  *See id.*

27

28  Case No.: 5:18-cv-07182-EJD
ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT;
DENYING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

2

United States District Court
Northern District of California

1     Plaintiffs originally offered a free and open source version of the Neo4j platform, meaning

2   that the source code was available to the public on GitHub pursuant to the GNU General Public

3   License version 3 ("GPL").  Rathle Decl., ¶¶ 4-5.  This version was known as the Neo4j

4   Community Edition ("Neo4j CE").  *Id.*  Neo4j CE is limited in its feature set and does not come

5   with technical or administrative support.  *Id.* ¶¶ 5-6.  Plaintiffs also offered a more advanced

6   commercial version with included additional features and support services, known as the Neo4j

7   Enterprise Edition ("Neo4j EE").  *Id* ¶ 8.  Neo4j EE was originally offered under both a paid-for

8   commercial license and the free GNU Affero General Public License, version 3 ("APGL").  *Id.* ¶

9   9.  In May 2018, Plaintiffs released Neo4j EE version 3.4, which they continued to offer under an

10  open source license; however, they replaced the AGPL with a stricter license, which included the

11  terms from the AGPLv3 and additional restrictions provided by the Commons Clause ("Neo4j

12  Sweden Software License").  *Id.*, ¶ 11, Ex. 3.  The new terms prohibited the non-paying public

13  from engaging in commercial resale and certain commercial support services.  In November 2018,

14  Plaintiffs released Neo4j EE version 3.5 under a commercial license only.  From that point on,

15  Plaintiffs were no longer providing Neo4j EE on an open source basis.  Rathle Decl., ¶ 13 Ex. 4.

### B.  Plaintiffs Partnership with PureThink

17     PureThink is a software and information technology consulting company founded by Mr.

18  Suhy, which specializes in supporting agencies within the U.S. Government.  *See* Ratinoff Decl.,

19  Ex. 2.  Neo4j USA contracted with PureThink to sell and support the commercial version of Neo4j

20  pursuant to a Solution Partner Agreement ("SPA").  *Id.*, Ex. 4.  Under this agreement, PureThink

21  had a non-exclusive, non-transferable limited license to, inter alia, use the Neo4j Mark solely to

22  market and resell commercial licenses to Neo4j EE and related support services in exchange for

23  shared revenue for the licenses that it resold.  *Id.*, Ex. 4 at § 4.1.  The SPA was subject to a 1-year

24  term and would automatically renew at additional 1-year periods subject to the notice and

25  termination provision therein, thereby incorporating whatever was the Neo4j USA's "then-current

26  trademark usage guidelines."  *Id.*, Ex. 4 at §7.1; Ex. 3 at 67:18-24.  All rights and licenses to the

United States District Court
Northern District of California

1    Neo4j Platform and the Neo4j Mark under the SPA terminate upon the expiration or termination,

2    and upon such an event, PureThink expressly agreed to "cease using any trademarks, service

3    marks and other designations of Plaintiffs." *Id.*, Ex. 4 at §7.3.

4         In the hopes of increased sales, PureThink developed the Neo4j Government Edition

5    ("Gov't Edition"), which was a package designed to streamline government procurements. *See*

6    *Id.*, Ext. 5-6.  PureThink focused mainly on selling Gov't Edition packages to various government

7    agencies. *Id.*  PureThink initially marketed Gov't Edition to the IRS, however, the IRS indicated

8    that it would require a prototype before purchasing a full subscription.  To secure the IRS's

9    business, Mr. Suhy told the IRS that it could use the open source version of Neo4j EE and pay

10   PureThink for consulting services instead of buying a commercial subscription from Neo4j USA.

11   *Id.*, Ex. 8. The facts regarding what PureThink said and offered to the IRS are disputed and are

12   relevant to the breach of contract claims which are not at issue in this motion.

13        It is undisputed that on May 30, 2017, Neo4j USA sent PureThink notice that Mr. Suhy's

14   use, distribution, and marketing of Neo4j's open source products and his marketing of consulting

15   services focused on those products constitute a material breach of the SPA. *Id.*, Ex. 9.  The notice

16   triggered a 30-day cure period, during which Mr. Suhy incorporated a new company, iGov Inc., in

17   order to support open source Neo4j software without being bound by restrictions in the SPA that

18   he believed to be unlawful. *Id.*, Ex 11; Dkt. No. 72, Second Amended Counterclaim, ¶ 20.  On

19   July 11, 2017, Neo4j USA terminated the SPA, demanding that PureThink "cease using [Neo4j's]

20   trademarks, service marks, and other designations . . . and remove from PureThink's website(s)

21   marketing materials, [Neo4j's] trademarks and tradenames, including, without limitation, Neo4j."

22   Ratinoff Decl., Ex. 12.

23                          **C.  Defendants' Use of the Neo4j Mark**

24        After the partnership agreement terminated, Mr. Suhy and iGov continued marketing the

25   Gov't Edition to government agencies. *See id.*, Exs. 14-15.  Around this time, PureThink and

26   iGov put the following statement on their websites:

27   Case No.: 5:18-cv-07182-EJD
28   ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT;
     DENYING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT
                                            4

United States District Court
Northern District of California

> The principle [sic] behind PureThink and the Government Package has created a new corporate entity called iGov Inc, which is not a Neo4j Solution Partner. Because iGov Inc is not a solution partner, it can offer packages at great cost savings to US Government Agencies as it has no restrictions on working with Neo4j Enterprise open source licenses!
> * * *
> iGov Inc's new Government Package for Neo4j can be added to any Neo4j instance making it a "Government Edition". By default, all Government Packages for Neo4j now comes with Neo4j Enterprise included under it's [sic] open source license!

*Id.* The iGov website contained numerous uses of the Neo4j Mark, including references to "Government Package for Neo4j" and "Government Development Package with Neo4j Enterprise." *Id.*, Exs. 14-19. iGov advertised itself as "the only US Federal contractor providing Neo4j Enterprise binaries packaged with it's free Open Source license!" *See id.*, Ex. 17 ("iGov Inc's Government Development Package with Neo4j Enterprise . . . Comes with same physical Neo4j Enterprise software").

The website also (1) uses "https://igovsol.com/neo4j.html" as a URL to promote "Government Development Packages for Neo4j"; (2) displays "Request Procurement Document Package" link with "mailto:neo4j@igovsol.com" embedded that creates an email addressed thereto upon activation; (3) encourages consumers to obtain more information by sending an email to "neo4j@igovsol.com;" and (4) uses "Government Packages for Neo4j" and "Neo4j Enterprise" to describe iGov's modified version of the Neo4j EE software. Ratinoff Decl., Exs. 15-18, 21, 62-64, 67-69. The parties do not dispute that the website used the Neo4j Mark in these ways, however, they disagree about whether the uses were authorized.

The "Neo4j Enterprise" software that iGov packaged and sold was a modified version of the open source Neo4j EE software, which was only publicly available through Neo4j EE v3.3. It did not include several "closed-source" features of Neo4j EE that were only available under the Neo4j USA's commercial license. In May 2018, Plaintiffs released Neo4j EE v3.4 but replaced the AGPL with the Neo4j Sweden Software License, a stricter license which included additional restrictions provided by the Commons Clause. Rathle Decl. ¶ 11, Ex. 2. The Commons Clause

United States District Court
Northern District of California

1   prohibited resale and commercial support services.  *Id.*

2        Following the release of version 3.4, Mr. Suhy told Plaintiffs that he was forming a non-

3   profit "for a community fork of Neo4j to get things started, and to ensure it's [sic] long term

4   success."  Ratinoff Decl., Ex. 27.  He worked with Brad and Ben Nussbaum, owners of Atom Inc.

5   and GraphGrid, Inc., to form Graph Foundation, Inc.  *Id.*, Ex. 29 ("Our team: iGov Inc, GraphGrid

6   [], and AtomRain [].  We work together as one company.  We all are the founders of the Graph

7   Foundation.").  Once formed, GFI began promoting a software called "ONgDB."  *Id.*, Ex. 28.

8   Defendants and GFI used Neo4j EE version 3.4, which was openly available subject to the Neo4j

9   Sweden Software License, as a base for ONgDB, but they replaced the Neo4j Sweden Software

10  License with the AGPL.  *See id.*, Exs. 24-26, 28; see also Ex. 3 at 28:25-29:11; Ex. 31 at 87:24-

11  90:9.  After Graph Foundation ("GFI") released ONgDB in July 2018, iGov continued to use

12  "https://igovsol.com/neo4j.html" as a URL address to promote ONgDB until it deactivated that

13  page sometime after July 27, 2020.  Ratinoff Decl., Exs. 62-65; Ex. 13 at RFA No. 5.  While iGov

14  replaced this URL with "https://igovsol.com/graph.html," the contents of the page remained the

15  same.  Compare *id.*, Ex. 65 and Ex. 66.  GFI further used a "Download Neo4j Enterprise"

16  hyperlink on its "downloads" page, which redirected consumers to download links for ONgDB

17  until July 27, 2020.  *Id.*, Exs. 66-68.

18       In November 2018, Plaintiffs released Neo4j EE v3.5 solely under a commercial license.

19  *Id.*, Ex. 4.  In January 2019, GFI released ONgDB v3.5.1, which contained at least 182 source

20  code files that had only been previously released under the Neo4j Sweden Software License in a

21  publicly available beta version of Neo4j EE 3.5.  Defendants continued to promote ONgDB as

22  "free and open source" by replacing the Neo4j Sweden Software License with the AGPL in certain

23  LICENSE.txt files alongside the source code.  *Id.*, Exs. 39-40; Dkt. No. 91 at 19:9-25; Ex. 31 at

24  159:3-10; Rathle Decl. ¶ 30.  Doing so removed certain legal notices identifying Neo4j Sweden as

25  the copyright holder and licensor, and removed the Commons Clause, effectively allowing

26  Defendants to commercially use and support ONgDB.  The "landing page" for ONgDB on GitHub

27

28  Case No.: 5:18-cv-07182-EJD
    ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT;
    DENYING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT
    6

United States District Court
Northern District of California

1    was very similar to that of Neo4j EE.  It was titled "ONgDB – Neo4j Enterprise Fork: Graphs for

2    Everyone," and contained numerous references to Neo4j throughout.  Defendants communicated

3    to potential customers that ONgDB v3.5.x was "100% free and open" with no limitations or

4    restrictions imposed by commercial licensed Neo4j EE v3.5.x.  *See* Ratinoff Decl., Exs. 42-47; *see*

5    *also* Ex. 126.  Defendants made various representations about ONgDB relevant to Plaintiffs'

6    copyright and contract claims that are not pertinent to the trademark claims at issue here.

7            Defendants do not claim that ONgDB is identical to its Neo4j counterpart versions.

8    Rather, it combines the last public Neo4j EE code (beta version of Neo4j EE 3.5), the Neo4j CE

9    code, and "glue code" authored by Mr. Suhy and other contributors.  *Id.*, Ex. 31 at 158:18-163:5,

10   163:13-165:6; Ex. 3 at 124:2-126:23.  Nevertheless, the GFI website stated "ONgDB distributions

11   are licensed under AGPLv3 as a free and open drop-in replacements of Neo4j Enterprise

12   commercial licensed distributions with the same version number."  *Id.*, Ex. 57.  On its

13   "downloads" page, GFI specifically described "ONgDB Enterprise 3.5.5" as a "Drop in

14   replacement for Neo4j Core and Enterprise 3.5.5."  *Id.*, Exs. 67- 69.  GFI instructed potential users

15   of Neo4j EE on its "neo4j" page to "simply download ONgDB Enterprise as a drop in replacement

16   for an existing commercial licensed distribution of the same version number" and still does so on

17   the successor "graph" page.  *Id.*, Exs. 63-66.

18           Similarly, iGov also continues to assert that "ONgDB is a drop in replacement for the

19   Neo4j Community and Enterprise branded distributions."  *Id.*, Ex. 71-74.  iGov also continues to

20   offer "commercial equivalent support packages for Neo4j Enterprise open source licensed

21   distributions," and interchangeability refers to "ONgDB Enterprise" and "Neo4j Enterprise" on its

22   website.  *See id.*, Exs. 62-70.  Defendants have made similar statements directly to potential

23   customers, such as "[ONgDB] is 100% open source and a drop in replacement for the same Neo4j

24   version."  *Id.*, Ex. 43; *see also* Exs. 44-46, 76-77.

25           GFI used hyperlinks on its website to redirect users to Plaintiffs' operation and developer

26   manuals located on Plaintiffs' website.  Dkt. No. 89, ¶¶ 3-8, 13-16; Ratinoff Decl., Exs. 78-83.

27   Case No.: 5:18-cv-07182-EJD

28   ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT;
     DENYING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT
                                                7

United States District Court
Northern District of California

United States District Court
Northern District of California

1  For example, GFI's webpage for ONgDB v3.5.3 stated, "Look for 3.5 Operations manual here"

2  with an embedded hyperlink to https://neo4j.com/docs/operations-manual/3.5.  Dkt. No. 89, ¶ 7;

3  Ratinoff Decl., Exs. 82-83.  Similarly, on GFI's GitHub repository the word "ONgDB 3.5" under

4  the heading "LTS release" contains an embedded hyperlink that redirects users to Neo4j USA's

5  copyrighted "Neo4j Operations Manual v3.5" located on Neo4j, USA's website.  *Id.*, ¶¶ 9-10; Exs.

6  82-83; Ex. 31 at 276:19-279:15, 284:2-285:18.

7  　　　　Defendants also regularly used the Neo4j Mark as a hashtag on twitter.  For example, GFI

8  announced its release of a new ONgDB version by tweeting "#ONgDB (#FOSS#Neo4j

9  Enterprise) 3.5.x support release is out."  *Id.*, 89, 92, 94-95; Ex. 31 at 233:17-236:15, 240:12-

10  241:25.  Mr. Suhy regularly retweeted those posts, increasing their circulation.  *See id.* Exs. 105-

11  111.

12  　　　　　　　　　**D.  Customer Response**

13  　　　　By December 2020, just under two years after the release of ONgDB v3.5.1, the ONgDB

14  software had been downloaded over 14,000 times, signaling its widespread success.  *See id.*, Exs.

15  113-114.  Plaintiffs generally contend that Defendants' actions with respect to ONgDB and use of

16  the Neo4j Mark have caused significant consumer confusion.

17  　　　　For example, consumers have encountered compatibility issues, technical problems or

18  glitches with ONgDB and sought assistance from Plaintiffs.  *See e.g.*, *id.*, Ex. 115; Ex. 121

19  ("Unable to connect to Neo4j/ONgDB Browser when port forwarding"); Ex. 122 ("ONgDB neoj

20  not starting up"); Ex. 123 ("I also tried ONgdb (neo4j) with different gremlin server versions");

21  Ex. 124 ("I'm having some difficulty loading a Cypher file into Neo4J . . . note that I am using an

22  recent ONGDB build, rather than straight Neo4J; I do not believe this will make any substantial

23  difference."); *see also* Ex. 133.

24  　　　　Furthermore, consumers have expressed uncertainty about the propriety of Defendants'

25  modification to the Neo4j Sweden Software License.  This has caused some confusion about

26  whether and when a commercial license from Neo4j USA is necessary to use, modify or

27  Case No.: 5:18-cv-07182-EJD

28  ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT;
DENYING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

1   redistribute the software in a commercial setting.  *See id.*, Exs. 49, 117, 118.

2   **E.  Relevant Procedural Background**

3   On April 10, 2020, the Court granted the parties' stipulation concerning the claims,

4   counterclaims and affirmative defenses ("Phase 1 Issues") that would be subject to the first

5   motions for summary judgment/adjudication filed by each party.  Dkt. No. 68.  The Phase 1 Issues

6   include Plaintiffs' claims for trademark infringement, false designation of origin and false

7   advertising, and unfair competition, as well as Defendants' counterclaims and affirmative defenses

8   related to abandonment of trademark, cancellation of trademark, and fair use.  *Id.*  The parties have

9   since clarified the scope of and have modified that schedule several times.

10  On May 21, 2020, the Court granted Plaintiffs' Motion for Judgment on the Pleadings,

11  dismissing with prejudice Defendants' affirmative defense and counterclaim for "cancellation of

12  trademark procured by fraud," and dismissing without prejudice Defendants' counterclaim and

13  affirmative defense based on abandonment of trademark by naked licensing.  Dkt. No. 70.

14  Defendants filed a Second Amended Counterclaim and First Amended Answer, realleging the

15  naked licensing defense and counterclaim.  Plaintiffs brought another motion to dismiss and strike,

16  and on August 20, 2020, the Court granted it, dismissing with prejudice Defendants' tenth cause

17  of action based on naked licensing and striking the related affirmative defense.  Dkt. No. 85.

18  The parties stipulated to the filing of Plaintiffs' Third Amended Complaint.  Defendants

19  filed an Answer to the TAC, which reasserted the affirmative defenses based on cancellation of

20  trademark and abandonment by naked licensing.  Dkt. No. 91.  Plaintiffs filed a motion to strike

21  those affirmative defenses, which the Court granted on March 3, 2021.  Dkt. No. 110.

22  On December 11, 2020, Plaintiffs filed the present Motion for Summary Judgment as to

23  the Phase 1 Issues ("Motion").  On January 15, 2021, Defendants filed a combined Cross-Motion

24  for Summary Judgment and Opposition ("Cross-Motion").  Both of those motions applied to this

25  action as well as the GFI Action, however, the parties to the GFI Action reached a settlement

26  before the motions were fully briefed.  Plaintiffs then filed a combined Reply in support of their

27  Case No.: 5:18-cv-07182-EJD

28  ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT;
    DENYING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

9

United States District Court
Northern District of California

1  Motion and Opposition to Defendants' Cross-Motion ("Plaintiffs' Reply"), and Defendants' filed

2  a final Reply in support of their Cross-Motion ("Defendants' Reply").

3  **II.     Legal Standard**

4  Summary judgement is appropriate where the moving party "shows that there is no

5  genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

6  Fed. R. Civ. P. 56(a).  A dispute is "genuine" if there is sufficient evidence that a reasonable fact

7  finder could find for the nonmoving party.  *eOnline Glob., Inc. v. Google LLC*, 387 F. Supp. 3d

8  980, 984 (N.D. Cal. 2019).  A fact is "material" if it could change the outcome of the case.  *Id.*

9  The Court must read the evidence and draw all reasonable inferences in the light most favorable to

10  the nonmoving party.  *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011).

11  Where the moving party will bear the ultimate burden of proof at trial, such as with

12  Plaintiffs' Motion in this case, the moving party "must prove each element essential of the claims

13  upon which it seeks judgment by undisputed facts" in order to succeed.  *eOnline Global, Inc.*, 387

14  F. Supp. 3d at 984 (citing *First Pac. Networks, Inc. v. Atl. Mut. Ins. Co.*, 891 F. Supp. 510, 513

15  (N.D. Cal. 1995).  This showing "must be sufficient for the court to hold that no reasonable trier of

16  fact could find other than for the moving party."  *t'Bear v. Forman*, 359 F. Supp. 3d 882, 905

17  (N.D. Cal. 2019) (quoting *First Pacific Networks, Inc.*, 891 F. Supp. at 513).  Only then must the

18  nonmoving party "present significant probative evidence tending to support its claim or defense"

19  to defeat the motion.  *C.A.R. Transp. Brokerage Co. v. Darden Restaurants, Inc.*, 213 F.3d 474,

20  480 (9th Cir. 2000).

21  If the moving party will not bear the ultimate burden of persuasion at trial, like Defendants

22  on their Cross-Motion, then it must carry both the burden of production and the burden of

23  persuasion on its motion for summary judgment.  *Friedman v. Live Nation Merch., Inc.*, 833 F.3d

24  1180, 1188 (9th Cir. 2016) (citing *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210

25  F.3d 1099, 1102 (9th Cir. 2000)).  To carry the burden of production, the moving party "must

26  either produce evidence negating an essential element of the nonmoving party's claim . . . or show

27

Case No.: 5:18-cv-07182-EJD

28  ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT;
DENYING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

10

United States District Court
Northern District of California

1   that the nonmoving party does not have enough evidence of an essential element to carry its

2   ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co.*, 210 F.3d at 1102–03.  To

3   successfully carry the burden of persuasion, the moving party must show the court that no genuine

4   dispute of material fact exists. *Id.* at 1102.  "If the moving party does not carry its initial burden of

5   production, then the nonmoving party need not produce any evidence to defeat the motion.  But, if

6   the moving party does carry the burden of production, then the nonmoving party must identify

7   with reasonable particularity enough evidence supporting its claim or defense to create a genuine

8   dispute of material fact to defeat the motion." *eOnline Global, Inc.*, 387 F. Supp. 3d at 984

9   (citations omitted) (citing *Nissan Fire & Marine Ins. Co.*, 210 F.3d at 1102–03).  Otherwise, the

10   moving party will win on its motion. *Nissan Fire & Marine Ins. Co.*, 210 F.3d at 1103.

11       In both types of motions, the evidence presented by the nonmoving party must be enough

12   for a jury to return a verdict for the nonmoving party. *In re Oracle Corp. Sec. Litig.*, 627 F.3d

13   376, 387 (9th Cir. 2010).  "If the nonmoving party's 'evidence is merely colorable or is not

14   significantly probative,' then summary judgment may be granted." *eOnline Global, Inc.*, 387 F.

15   Supp. 3d at 984.

16   **III.   Discussion**

17        **A.  Standing**

18       "To establish standing to sue for trademark infringement under the Lanham Act, a plaintiff

19   must show that he or she is either (1) the owner of a federal mark registration, (2) the owner of an

20   unregistered mark, or (3) a nonowner with a cognizable interest in the allegedly infringed

21   trademark." *Halicki Films, LLC v. Sanderson Sales & Mktg.*, 547 F.3d 1213, 1225 (9th Cir. 2008)

22   (citing 5 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition §§ 27:20–21,

23   32:3, 32:12 (4th ed.2008) (noting that standing to sue for trademark infringement under the

24   Lanham Act extends to owners of registered and unregistered marks, and nonowners with a

25   protectable interest in the mark)).  Trademark claims under 15 U.S.C. § 1114(1) may be brought

26   by the registrant of the trademark, and the registrant's "legal representatives, predecessors,

27

28   Case No.: 5:18-cv-07182-EJD
ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT;
DENYING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

1    successors, and assigns." 15 U.S.C. § 1127.

2    Neo4j USA is the registrant of the Neo4j Mark. Defendants argue that despite being the

3    registrant of the mark, Neo4j USA does not actually own the mark. As discussed further in

4    Section B(i) *infra*, the Court disagrees with that assessment. As it pertains to standing, Defendants

5    argue that because "[Neo4j] USA does not own the Neo4J trademark, its lacks standing to bring an

6    infringement claim." Cross-Motion at 11. Defendants do not cite any case law to support this

7    argument, nor do they address the fact that 15 U.S.C. § 1114 expressly contemplates that the

8    registrant of a trademark may bring suit for infringement.

9    Moreover, even if Neo4j USA was not the owner of the mark, Defendants do not raise any

10   argument that Neo4j USA is not a "nonowner with a cognizable interest in the allegedly infringing

11   trademark." *See Halicki Films, LLC*, 547 F.3d at 1225. As the registrant of the Neo4j Mark and

12   parent company of Neo4j Sweden—which, according to Defendants, is the true owner of the

13   mark—Neo4j USA undoubtedly has a cognizable interest in the mark. *See Hem & Thread, Inc. v.*

14   *Wholesalefashionsquare.com*, No. 2:19-CV-283-CBM-AFM, 2019 WL 3017669, at *2 (C.D. Cal.

15   Mar. 27, 2019) (finding standing to bring claim under 15 U.S.C. § 1125 where plaintiff was not

16   the owner or registrant but had "express authority and permission" to use the mark in commerce

17   and therefore had a cognizable interest in the trademark).

18   Defendant further argues that "[n]one of defendants' conduct with respect to the use [of]

19   [Neo4j] Sweden's software is germane to [Neo4j] USA's claims" because "[u]se of [Neo4j]

20   Sweden's software is governed by AGPL license" and because Neo4j USA is not the licensor, it

21   "has no standing to assert claims related to that license agreement." Cross-Motion at 11.

22   Defendants' use of the software and any dispute about the terms or limitations of the AGPL are

23   relevant to Plaintiffs' copyright claims, which are not at issue in this summary judgment motion.

24   Defendants' use of the trademark, not the software, is pertinent to Plaintiffs' trademark

25   infringement and false advertising claims, and Defendants' do not contend that the AGPL

26   constituted a trademark license.

27   Case No.: 5:18-cv-07182-EJD

28   ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT;
     DENYING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT
     12

United States District Court
Northern District of California

United States District Court
Northern District of California

1   Thus, the Court concludes that Neo4j USA has standing to pursue its trademark claims.

2   **B. Trademark Infringement**

3   To prevail on its claim under 15 U.S.C. § 1114, Neo4j USA must prove (1) an ownership

4   interest in a protectable mark; and (2) that Defendants' use of the mark is likely to cause consumer

5   confusion. *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1144 (9th

6   Cir. 2011). "The core element of trademark infringement is the likelihood of confusion, i.e.,

7   whether the similarity of the marks is likely to confuse customers about the source of the

8   products." *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1290 (9th Cir. 1992).

9   Furthermore, although disfavored in trademark infringement cases, summary judgment

10  may be entered when no genuine issue of material fact exists. *See Surfvivor Media, Inc. v.*

11  *Survivor Prods.*, 406 F.3d 625, 630 (9th Cir. 2005). Whether likelihood of confusion is more a

12  question of law or one of fact can depend on the circumstances of each particular case. *DC*

13  *Comics v. Towle*, 989 F. Supp. 2d 948, 956 (C.D. Cal. 2013), *aff'd,* 802 F.3d 1012 (9th Cir. 2015)

14  (citing *Alpha Indus., Inc. v. Alpha Steel Tube & Shapes, Inc.*, 616 F.2d 440, 443 (9th Cir. 1980)).

15  A question of fact may be resolved as a matter of law if reasonable minds cannot differ and the

16  evidence permits only one conclusion. *Id.* (citing *Sanders v. Parker Drilling Co.*, 911 F.2d 191,

17  194 (9th Cir. 1990).

18  **i. Ownership**

19  "Registration of a mark is prima facie evidence of the validity of the mark, the registrant's

20  ownership of the mark, and the registrant's exclusive right to use the mark in connection with the

21  goods specified in the registration." *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1124 (9th

22  Cir. 2014) (citing 15 U.S.C. § 1115(a)); *see also Align Tech., Inc. v. Strauss Diamond Instruments,*

23  *Inc.*, No. 18-CV-06663-TSH, 2019 WL 1586776, at *4 (N.D. Cal. Apr. 12, 2019) (same). Under

24  the Lanham Act, registration of a trademark creates a rebuttable presumption that the mark is

25  valid, but the presumption evaporates as soon as evidence of invalidity is presented. 15 U.S.C. §

26  1051. This "presumption of validity is a strong one, and the burden on the defendant necessary to

27

28  ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT;
    DENYING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

1    overcome that presumption at summary judgment is heavy." *Zobmondo Ent., LLC v. Falls Media,*

2    *LLC*, 602 F.3d 1108, 1115 (9th Cir. 2010).

3         The parties do not dispute that Neo4j USA is the registrant of the mark. *See* Cross-Motion

4    at 5 ("Defendants are not attacking the registration."). Thus, there is no dispute that Neo4j USA

5    benefits from a presumption of ownership and a presumption that the mark is valid. *Pom*

6    *Wonderful LLC*, 775 F.3d at 1124. Nevertheless, Defendants argue that Neo4j USA is not the

7    *owner* of the trademark. Under section 1 of the Lanham Act, only the owner of a mark is entitled

8    to apply for registration. 15 U.S.C. § 1051 ("The owner of a trademark . . . may request

9    registration of its trademark on the principal register hereby established by paying the prescribed

10   fee and filing in the Patent and Trademark Office an application and a verified statement"). If one

11   who is not the owner seeks registration, the application must be denied and any registration which

12   issues is invalid. *Smith v. Tobacco By-Prod. & Chem. Corp.*, 243 F.2d 188 (C.C.P.A. 1957).

13   Thus, although Defendants state that they challenge ownership and not registration, the distinction

14   is without difference.

15        Defendants contend that Neo4j Sweden is the actual owner of the Neo4j Mark because it

16   was undisputedly the first to use the mark. Defendants point to a License Agreement between

17   Neo4j Sweden and Neo4j USA ("License Agreement"), by which Neo4j Sweden granted Neo4j

18   USA a non-exclusive license to use the mark in the United States. Dkt. No. 101, Declaration of

19   Adron G. Beene In Support Of Defendants And Counterclaimants' Administrative Motion To File

20   Exhibits Under Seal ("Beene Decl."), Ex. 1 ("Neo-Sweden has agreed to grant to Neo-US and

21   Neo-US has agreed to receive, a non-exclusive license under such Neo-Sweden Intellectual

22   Property Rights on the terms and conditions of this Agreement"). The License Agreement was

23   executed in August 2010, approximately six years before Neo4j USA's registration of the Neo4j

24   Mark in the United States.

25        Plaintiffs argue that "the [License] Agreement relied upon by Defendants simply reflects

26   the intercompany division of assets, including trademarks, between Neo4j USA and Neo4j

27   Case No.: 5:18-cv-07182-EJD

28   ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT;
     DENYING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

14

1  Sweden as parent and wholly-owned subsidiary, and does not damage the validity of the mark

2  either at the time of registration or thereafter." Plaintiffs' Reply at 8. Plaintiffs cite 15 U.S.C. §

3  1055, also referred to as the related companies doctrine, in support of their general proposition that

4  Neo4j USA was entitled to rely on Neo4j Sweden's first use of the mark in its registration.

5  Section 1055 states:

6      "Where a registered mark or a mark sought to be registered is or may be
       used legitimately by related companies, such use shall inure to the benefit
7      of the registrant or applicant for registration, and such use shall not affect
       the validity of such mark or of its registration, provided such mark is not
8      used in such manner as to deceive the public. If first use of a mark by a
       person is controlled by the registrant or applicant for registration of the
9      mark with respect to the nature and quality of the goods or services, such
       first use shall inure to the benefit of the registrant or applicant, as the case
10     may be."

11

12 *Id.* "The term 'related company' means any person whose use of a mark is controlled by the

13 owner of the mark with respect to the nature and quality of the goods or services on or in

14 connection with which the mark is used." 15 U.S.C. § 1127. Given that the registrant of a

15 trademark must be the owner of the trademark and given that "related companies" specifically

16 refers to entities under the control of the owner, Section 1055 only benefits the owner of a mark.

17 Thus, Neo4j USA was only entitled to rely on Neo4j Sweden's prior use if Neo4j USA was the

18 owner of the Neo4j Mark at the time. Likewise, Neo4j USA must have been the owner of the

19 Neo4j Mark at the time it registered for the registration to be valid.

20      Both Plaintiffs and Defendants rely on and dispute the relevance of *In re Wella A.G.*, 787

21 F.2d 1549, 1555 (Fed. Cir. 1986) (*Wella I*) and *In re Wella A.G.*, 858 F.2d 725 (Fed. Cir. 1988)

22 ("*Wella II*"). In *Wella I*, the Federal Circuit considered whether a foreign parent corporation,

23 Wella A.G., could properly register a trademark which was "the same or similar" to trademarks

24 already registered in the U.S. by Wella A.G.'s subsidiary, Wella U.S. The registration had been

25 rejected by the examining attorney and TTAB because it was "confusingly similar" to the existing

26 Wella U.S. registered marks under Section 2(d). The Federal Circuit reversed and remanded,

27

28 Case No.: 5:18-cv-07182-EJD
   ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT;
   DENYING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT
                                              15

United States District Court
Northern District of California

United States District Court
Northern District of California

1  finding that the Board had misinterpreted and misapplied Section 2(d). *Wella I*, 787 F. 2d at 1553.

2  Specifically, the Circuit held that the correct question under Section 2(d) is whether there is any

3  likelihood of consumer confusion from allowing both the parent and the subsidiary companies to

4  register the same or similar marks. *Id.* at 1552–53. Given the fact that Wella A.G. wholly

5  controlled Wella U.S., and that the entities operated as one brand in the view of consumers, the

6  registration was unlikely to result in any consumer confusion. *Id.*

7       Judge Nies wrote separately in *Wella I* to express certain "additional views." *Id.* at 1554.

8  Judge Nies agreed with the majority's analysis regarding Section 2(d) but felt there was a different

9  potentially dispositive question regarding ownership of U.S. rights in the Wella marks. According

10  to Judge Nies, Wella A.G.'s registration could also properly be denied because Wella U.S., and

11  not Wella A.G., appeared to own the U.S. rights to the marks. *Id.* She explained that the

12  registrant must be the owner of the marks, that there could only be one owner of the marks, and

13  that therefore, Wella A.G. had no right to register the marks unless it was the owner, despite its

14  status as the parent company of Wella U.S. *Id.* at 1555.

15       On remand, the Board held that there was no likelihood of confusion, but nonetheless

16  rejected the application again based on Judge Nies' concurrence, finding that the parent and

17  subsidiary could not both own the Wella trademarks. On a second appeal, the Federal Circuit

18  chastised the Board for considering the ownership issue. *Wella II*, 858 F.2d at 728 ("the unusual

19  nature of our limiting instruction to the Board--we did not merely reverse the Board's denial of

20  registration but explicitly told the Board what it could consider on remand--should have led the

21  Board to realize that the majority of the court did not view the additional issue Judge Nies had

22  raised as something for the Board to address on remand."). The Federal Circuit, therefore,

23  rejected the idea that a trademark registered by a parent company could be invalidated simply

24  based on the fact that the company's wholly owned subsidiary technically owned the marks.

25  While the facts of the *Wella* cases are not precisely similar to the facts at issue in this case, the

26  Court finds it instructive that the Federal Circuit did not find it necessary to determine ownership

27  Case No.: 5:18-cv-07182-EJD

28  ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT;
DENYING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

1    of a mark as between a parent and wholly owned subsidiary when deciding whether registration of

2    the mark was valid. *See W. Fla. Seafood, Inc. v. Jet Restaurants, Inc.*, 31 F.3d 1122, 1126–27

3    (Fed. Cir. 1994) (separate entities operating as a single entity in the eyes of the consuming public

4    may be treated as such for trademark purposes).

5    The Trademark Manual of Examining Procedure ("TMEP"), which governs the

6    application for trademark registrations, is also instructive. The TMEP expressly states that

7    "[e]ither a parent corporation or a subsidiary corporation may be the proper applicant, depending

8    on the facts concerning ownership of the mark." § 1201.03(c) Wholly Owned Related Companies,

9    TMEP5th 1201.03(c). Furthermore, it states that the PTO "will consider the filing of the

10   application in the name of either the parent or the subsidiary *to be the expression of the intention*

11   *of the parties as to ownership* in accord with the arrangements between them." *Id.* (emphasis

12   added). Under these rules, the fact that Neo4j USA registered the Neo4j Mark can, therefore, be

13   understood as evidence of the intention of the parties as to ownership of the mark. Thus, while the

14   License Agreement tends to show that Plaintiffs considered Neo4j Sweden to be the owner of the

15   Neo4j Mark in 2010, the fact that Neo4j USA registered the mark tends to show that the parties

16   considered Neo4j USA to be the owner of the mark in 2015. It is also clear that Defendants

17   understood Neo4j USA to be the owner of the mark when they signed the SPA, by which Neo4j

18   USA granted PureThink a non-exclusive license to use the mark.

19   The TMEP further explains that "[w]here the mark is used by a related company, the

20   owner is the party who controls the nature and quality of the goods sold or services rendered under

21   the mark." § 1201.01 Claim of Ownership May Be Based on Use By Related Companies,

22   TMEP5th 1201.01. It is undisputed that Neo4j USA wholly owns and controls Neo4j Sweden and

23   did so at the time of the registration. *See* Fact 1; Dkt. No. 98-2 at 1:17-18; Neo4j USA is also the

24   only party who exercises control over the mark in the United States. Thus, the Court finds that the

25   License Agreement alone is insufficient to rebut the presumption of ownership from which Neo4j

26   USA benefits as the registrant of the Neo4j Mark, especially where significant evidence supports

27

28

Case No.: 5:18-cv-07182-EJD
ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT;
DENYING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

17

1    that presumption.

2    **ii. Customer Confusion and Nominative Fair Use**

3        Typically, Plaintiffs would need to establish that Defendants' use of the mark is likely to

4 confuse consumers, under the eight factor analysis in *Sleekcraft*. *See Fortune Dynamic, Inc. v.*

5 *Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1030 (9th Cir. 2010); *AMF Inc. v.*

6 *Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979)). When a nominative fair use defense is

7 raised, however the fair-use analysis replaces the likelihood-of-consumer confusion analysis set

8 forth in *Sleekcraft*. *See Playboy Enterprises, Inc. v. Welles*, 279 F.3d 796, 801 (9th Cir. 2002).

9        A defendant may raise a nominative fair use defense if "the use of the trademark does not

10 attempt to capitalize on consumer confusion or to appropriate the cachet of one product for a

11 different one." *New Kids on the Block v. News Am. Pub., Inc.*, 971 F.2d 302, 308–09 (9th Cir.

12 1992). The nominative fair use analysis is appropriate where a defendant has used the plaintiff's

13 mark to describe the plaintiff's product, *even if the defendant's ultimate goal is to describe his*

14 *own product.*" *Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1151 (9th Cir. 2002). To establish a

15 nominative fair use defense, a defendant must prove the following three elements:

16        First, the [plaintiff's] product or service in question must be one not readily
identifiable without use of the trademark; second, only so much of the mark
17        or marks may be used as is reasonably necessary to identify the [plaintiff's]
product or service; and third, the user must do nothing that would, in
18        conjunction with the mark, suggest sponsorship or endorsement by the
trademark holder.
19

20 *Id.* (citing *New Kids on the Block*, 971 F.2d at 308). "This test 'evaluates the likelihood of

21 confusion in nominative use cases.'" *Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171,

22 1176 (9th Cir. 2010) (quoting *Horphag Rsch. Ltd. v. Garcia*, 475 F.3d 1029, 1041 (9th Cir. 2007).

23 Plaintiffs need only negate one of these elements to defeat Defendants' reliance on the nominative

24 fair defense. *See Playboy Enterprises, Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1030

25 (9th Cir. 2004) (because defendants use of plaintiff's mark ran afoul of the first prong for

26 nominative use, no need to consider the other two); *see also Horphag Research Ltd. v. Garcia*,

27

28 Case No.: 5:18-cv-07182-EJD
ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT;
DENYING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT
18

United States District Court
Northern District of California

1    475 F.3d 1029, 1041 (9th Cir. 2007) (defendant's use must meet all three fair use prongs).

2         In this case, Defendants claim to be "using the Neo4J mark to identify [Neo4j] USA, the

3    commercial Neo4J software and Sweden's open source Neo4J software." Cross-Motion at 14.

4    Plaintiffs first argue that Defendants cannot rely on a fair use defense because PureThink was a

5    licensee of the Neo4J Mark under the SPA, until the SPA terminated. Plaintiffs cite to several

6    cases in which courts found a likelihood of confusion where a former licensee continued using a

7    trademark after the license agreement terminated. *See, e.g.*, *State of Idaho Potato Comm'n v. G &*

8    *T Terminal Packaging, Inc.*, 425 F.3d 708, 721 (9th Cir. 2005) ("courts have held that an ex-

9    licensee's continued use of a trademark is enough to establish likelihood of confusion"). None of

10   those cases, however, involved a nominative fair use defense, and the Court is not persuaded that

11   nominative fair use cannot apply in the context of a dispute between a licensor and former

12   licensee.

13        Plaintiffs next argue that Defendants have not engaged in nominative fair use because

14   Defendants used the Neo4j Mark to refer to Defendants' own products, rather than Plaintiffs'

15   products. It is undisputed that PureThink and iGov initially marketed a product called "Neo4j

16   Enterprise," and a "Government Package for Neo4j," before rebranding Neo4j Enterprise as

17   ONgDB. *See* Cross-Motion, Ex. A Defendants' Response to Neo4j Inc.'s Consolidated Separate

18   Statement Of Undisputed Material Facts ("Defendants' Statement of Facts"), at 4 (disputing Fact

19   16 by explaining that "'Government Packages for Neo4j' and 'Neo4j Enterprise' were used to

20   describe the government packages iGov provided support for around the free and open source

21   neo4j database."). While Defendants claim that these products consisted of genuine open source

22   Neo4j EE software, neither product was in fact a Neo4j USA product. Rather, "Neo4j Enterprise"

23   consisted of the last public Neo4j EE code (beta version of Neo4j EE 3.5), the Neo4j CE code, and

24   "glue code" authored by Mr. Suhy and other contributors. Ratinoff Decl., Ex. 31 at 158:18-163:5,

25   163:13-165:6; Ex. 3 at 124:2-126:23. Moreover, Defendants assured potential customers both on

26   iGov's website and in direct email communications that "Neo4j Enterprise" was the "same official

27   Case No.: 5:18-cv-07182-EJD

28   ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT;
     DENYING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

19

United States District Court
Northern District of California

1    Neo4j Github Repositories as Neo4j Inc uses for their paid commercial licensed builds" except

2    distributed under an open source license.  *See, e.g.*, *id.*, Exs. 15, 18-19, 21.

3          Thus, Defendants were not using "Neo4j" to refer to Plaintiffs' products, they were using it

4    to create the misleading perception that Defendants' products *were* Plaintiffs' products. *See*

5    *Adobe Sys. Inc. v. A & S Elecs., Inc.*, 153 F. Supp. 3d 1136, 1143 (N.D. Cal. 2015) (not fair use

6    because defendant's use of Adobe's marks was not intended to describe Adobe's product, but

7    rather to make it appear that the software was sanctioned by Adobe for sale and distribution).  Any

8    reasonable consumer reading about "Neo4j Enterprise" would conclude that they are getting

9    official Neo4j EE, or in the case of the "Government Package for Neo4j," consumers would

10   conclude they are getting Neo4j EE in a specialized government package.  Thus, because

11   Defendants used "Neo4j Enterprise" and "Government Package for Neo4j" to refer to their own

12   products, they do not benefit from a nominative fair use defense as to those uses. *Align*

13   *Technology, Inc.*, 2019 WL 1586776, at *5 ("[i]n nominative fair use, the defendant uses the

14   trademarked term not to describe its product but to describe the plaintiff's [product]").

15          The same is true of iGov's use of the Neo4j Mark in its email address and URL.

16   Defendants do not refute their use of the Neo4j Mark in the URL https://igovsol.com/neo4j.html to

17   promote "Neo4j Enterprise," and later to promote ONgDB. *See* Defendants' Statement of Facts at

18   4 (failing to substantively refute Fact 16); *id.* at 5 (not disputing that "iGov continued to use

19   'https://igovsol.com/neo4j.html' as a URL address to promote ONgDB until it deactivated that

20   page sometime after July 27, 2020.").  Similarly, Defendants do not refute that they used

21   neo4j@igovsol.com as means for consumers to inquire about ONgDB. *Id.* (Fact 19).  Instead,

22   they argue that the email address is for inquiries about "Sweden's open source Neo4j," as "a way

23   to inquire about iGov support services and support for the neo4j open source database," and "a

24   means to inquire about ONgDB" and "[ONgDB] open source license support." *Id.*

25          Nothing about the use of the Neo4j Mark in the URL or email can be reasonably

26   interpreted to refer to Plaintiffs' products.  Indeed, the URL brings users to a page marketing

27   Case No.: 5:18-cv-07182-EJD

28   ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT;
     DENYING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

1  Defendants' products, and the email address is offered to answer questions about Defendants'

2  products.  Thus, Defendants' use of the Neo4j Mark in their URLs or email addresses are not

3  protected by the nominative fair use defense.  S*ee Brookfield Commc'ns, Inc. v. W. Coast Ent.*

4  *Corp.*, 174 F.3d 1036, 1064–65 (9th Cir. 1999) ("[u]sing another trademark in one's metatags is

5  much like posting a sign with another's trademark in front of one's store"); *see also Experience*

6  *Hendrix, L.L.C. v. Hendrixlicensing.com, Ltd.*, No. C09-285Z, 2010 WL 2104239, at *6 (W.D.

7  Wash. May 19, 2010) (use of plaintiff's HENDRIX mark in defendants' URL addresses and

8  business names did not describe plaintiffs' products but rather defendants' products); *State St.*

9  *Glob. Advisors Tr. Co. v. Visbal*, 431 F. Supp. 3d 322, 342 (S.D.N.Y. 2020) (holding that use of a

10  trademark in a URL is not fair use).

11  By contrast, to the extent Defendants offer "support services" targeted at software that

12  Neo4j Sweden or Neo4j USA provide on an open source basis, use of the Neo4j Mark to explain

13  those services could potentially benefit from a fair-use defense because such uses reference

14  Plaintiffs' products, not Defendants'.  Likewise, Defendants are permitted to describe their

15  product as an unaffiliated or independent "fork" of Neo4j source code because that phrasing

16  makes clear that the product is not itself a Neo4j product.  Defendants can also comparatively

17  advertise ONgDB in relation to Neo4J USA's products, however, the trademark guidelines

18  provided on Neo4j USA's website would likely apply to these uses.  *Network Automation, Inc.*,

19  638 F.3d at 1153.

20  Defendants further argue that they "have a right to tell consumers they can use Sweden's

21  Neo4J open source software for free instead of paying for USA's commercial license."  Cross-

22  Motion at 15.  Although Defendants have the right to comparatively advertise their products and

23  refer to Plaintiffs' products in the process, they still cannot use the Neo4j Mark more than

24  necessary and cannot falsely suggest endorsement by Neo4j USA.  *See Toyota Motor Sales,*

25  *U.S.A., Inc.*, 610 F.3d at 1176.  Defendants' use goes beyond what is necessary to identify

26  ONgDB as a fork of Neo4j by (1) extensively using of "Neo4j' and "Neo4j Enterprise" on iGov

27  Case No.: 5:18-cv-07182-EJD

28  ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT;
DENYING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

21

1   and PureThink websites without proper trademark notices; (2) using embedded "Neo4j" links to

2   Neo4j USA's website and GitHub repository on their websites; (3) hyperlinking to Plaintiffs'

3   build instructions, support documentation and change logs containing the Neo4j Mark rather than

4   creating and hosting their own with the ONgDB name; and (4) using of "Neo4j Enterprise" and

5   "ONgDB" interchangeably to promote ONgDB on their websites. The Court finds that these

6   embedded links to Plaintiffs' sites and links to Plaintiffs' documentation, along with the repeated

7   references to "Neo4j," including in the title of the products themselves, create the misleading

8   perception that Defendants and Plaintiffs are affiliated. Thus, the Court finds these undisputed

9   facts sufficient to establish that Defendants' use of the Neo4j Mark falsely suggests endorsement

10  by Neo4j USA, and therefore, is not nominative fair use.

11      Finally, Plaintiffs argue that Defendants' use of the Neo4j Mark on Twitter constitutes

12  infringement and not nominative fair use because Defendants' tweets do not differentiate between

13  Plaintiffs' products and Defendants' products. For example, on January 23, 2019, GFI tweeted

14  ""#ONgDB (Open #Neo4j Enterprise) 3.4.12 support release is out." Ratinoff Decl., Ex. 105. All

15  of the tweets that Plaintiffs point to, however, are from GFI, not Defendants. The GFI Action

16  have settled and there are no arguments that the tweets may be attributed to Defendants in this

17  action.

18      The Court finds that Plaintiffs have satisfied their burden of proving each essential element

19  of their trademark infringement claim. Defendants have not produced sufficient evidence that a

20  jury could find in their favor. Thus, the Court GRANTS Plaintiffs' Motion as to trademark

21  infringement and DENIES Defendants' Cross-Motion as to the same.

22                  **C. False Advertising Under the Lanham Act and UCL**

23      The elements of a Lanham Act false advertising claim are: "(1) a false statement of fact by

24  the defendant in a commercial advertisement about its own or another's product; (2) the statement

25  actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the

26  deception is material, in that it is likely to influence the purchasing decision; (4) the defendant

27

United States District Court
Northern District of California

1   caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to

2   be injured as a result of the false statement, either by direct diversion of sales from itself to

3   defendant or by a lessening of the goodwill associated with its products." *Align Technology, Inc.*,

4   2019 WL 1586776, at *13 (citing *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139

5   (9th Cir. 1997)).

6      Defendants do not dispute that statements made via their websites, email, and social media

7   qualify as commercial advertisements under element one. Likewise, they do not raise any

8   argument to dispute that statements made through these channels were placed into interstate

9   commerce, as required under element four. *See Healthport Corp. v. Tanita Corp. of Am.*, 563 F.

10  Supp. 2d 1169, 1178 (D. Or. 2008), *aff'd,* 324 F. App'x 921 (Fed. Cir. 2009) (holding that

11  statements made on website were advertisements placed into interstate commerce);

12  *SuccessFactors, Inc. v. Softscape, Inc.*, 544 F. Supp. 2d 975, 982 (N.D. Cal. 2008) (likelihood of

13  success on interstate commerce element met where defendant had disseminated the misleading

14  statement via email and on its website).

15     Proof establishing these Lanham Act claims will also establish Neo4j USA's UCL claim.

16  "State common law claims of unfair competition and actions pursuant to California Business and

17  Professions Code § 17200 are 'substantially congruent' to claims made under the Lanham Act."

18  *Cleary v. News Corp.*, 30 F.3d 1255, 1262–63 (9th Cir. 1994); *Acad. of Acad. of Motion Picture*

19  *Arts & Scis. v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1457 (9th Cir. 1991) (same).

20                          **i. False Statement**

21     "To demonstrate falsity within the meaning of the Lanham Act, a plaintiff may show that

22  the statement was literally false, either on its face or by necessary implication, or that the

23  statement was literally true but likely to mislead or confuse consumers." *Southland Sod Farms*,

24  108 F.3d at 1139. Plaintiffs argue that Defendants have made the following misrepresentations in

25  the advertisement and promotion of ONgDB in interstate commerce via their websites and Twitter.

26

27  Case No.: 5:18-cv-07182-EJD

28  ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT;
    DENYING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT
                                    23

United States District Court
Northern District of California

1    Plaintiffs argue that Defendants have made numerous misrepresentations in their

2 advertisement and promotion of ONgDB.  These statements generally fall into two groups: (1)

3 statements that ONgDB and Neo4j Enterprise are "free and open source" versions of or

4 alternatives to commercially licensed Neo4j EE; and (2) statements that ONgDB is a "drop-in

5 replacement for an existing commercial licensed distribution of the same version number" of

6 Neo4j EE.  *See* Motion at 29-30 (listing ten discreet statements that Plaintiffs allege are false).

7    With respect to the first group of statements, Plaintiffs argue that Defendants'

8 representations that ONgDB is "free and open source" is false because "the Neo4j Sweden

9 Software License did not permit Defendants to remove the commercial restrictions imposed by the

10 Commons Clause."  Motion at 30.  The parties agree that the truth or falsity of Defendants'

11 statements hinge on "the interpretation of Section 7 [of the Neo4j Sweden Software License], and

12 GFI's right to remove the Commons Clause from the Neo4j Sweden Software License."  Cross-

13 Motion at 30; *see also* Plaintiffs' Reply at 18 ("Defendants do not dispute that their marketing of

14 ONgDB as 'free and open source' Neo4j® EE is primarily based on their (mis)interpretation of

15 the Neo4j Sweden Software License and the form AGPLE upon which it was based.").

16    Defendants argue that there is a reasonable interpretation of the Neo4j Sweden Software

17 License that permits licensees, like GFI or Defendants, to remove the Commons Clause and

18 redistribute the software under the standardized AGPL license.  Cross-Motion at 27-30.  The

19 Court disagrees.  In fact, the Court considered precisely this question in the GFI Action and found

20 as follows:

21    Neither of the two provisions in the form AGPLv3 that Defendants point to
give licensees the right to remove the information at issue.  Section 10 of
22    the AGPLv3, which is incorporated into the Neo4J Sweden Software
License, states: "You may not impose any further restrictions on the
23    exercise of rights granted or affirmed under this License."  . . . Section 7
states: "[i]f the Program as you received it, or any part of it, contains a notice
24    stating that it is governed by this License along with a term that is a further
restriction, you may remove that term."  [] Defendants argue that these
25    provisions mean that "there can be no liability for removing the further
licensing restrictions which Neo4j incorporated into the license," namely
26    the Commons Clause. [] As Plaintiffs point out, however, the AGPLv3
defines "you" as the licensee, not the licensor.  Ex. 1 at § 0 ("Each licensee

27 Case No.: 5:18-cv-07182-EJD
28 ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT;
DENYING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

24

United States District Court
Northern District of California

is addressed as 'you'"). Thus, read correctly, Sections 7 and 10 prohibit a *licensee* from imposing further restrictions, but do not prohibit a *licensor* from doing so.

Indeed, it would be contrary to principles of contract and copyright law to interpret these provisions as limiting Neo4J Sweden's exclusive right to license its copyrighted software under terms of its choosing. *See Apple Inc. v. Psystar Corp.*, 658 F.3d 1150, 1159 (9th Cir. 2011) ("copyright owners may choose to simply exclude others from their work" or "use their limited monopoly to leverage the right to use their work on the acceptance of specific conditions"). Even "[c]opyright holders who engage in open source licensing have the right to control the modification and distribution of copyrighted material." *Jacobsen v. Katzer*, 535 F.3d 1373, 1381 (Fed. Cir. 2008). The Court, therefore, rejects the notion that the terms drawn from the AGPLv3, on which the Neo4j Sweden Software License is based, somehow limit the rights of Neo4j Sweden to include the Commons Clause or any other additional restriction in its own copyright license.

*Neo4j, Inc. v. Graph Found., Inc.*, No. 5:19-CV-06226-EJD, 2020 WL 6700480, at *4 (N.D. Cal. Nov. 13, 2020).

Despite this Court's prior ruling on point, Defendants maintain that because the definition of "License" in the Neo4j Sweden Software License is actually the AGPL, licensees may remove any terms in the license that are not in the AGPL pursuant to Section 7. Defendants do not raise any new evidence or arguments to support their interpretation. Defendants also fail to address the Court's reasoning that "further restriction" refers only to further restrictions imposed by a licensee, not the licensor. Thus, the Court finds that Plaintiffs have established that Defendants' statements regarding ONgDB as "free and open source" versions of Neo4j EE are false.

The next group of statements Plaintiffs challenge are those that refer to ONgDB as a "drop-in replacement" for Neo4j EE. Plaintiffs argue that ONgDB is not a true drop-in replacement for equivalent versions of Neo4j EE because ONgDB contains source code filed that were wrongly licensed under the AGPL in violation of Neo4j Sweden's copyright and because the software was not of the same quality and did not contain all of the features of Neo4j EE. Motion at 31. Defendants do not argue that ONgDB was of the same quality or that it did offer all of the features of Neo4j EE, rather, they argue that the phrase "drop-in replacement" was not meant to

Case No.: 5:18-cv-07182-EJD
ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT;
DENYING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT
25

1   signify that the two products were identical.  Cross-Motion at 23-24.

2        In response to an interrogatory, iGov asserted that "no claim is made that ONgDB matches

3   every feature of Neo4j Enterprise Edition."  Ratinoff Decl., Ex. 38 (Defendant iGov Inc.'s

4   Amended Response to Neo4j Sweden AB's Second Set of Interrogatories to iGov Inc) at 17.  iGov

5   further explains that "'[d]rop-in replacement' as used by [iGov] means the ability for a user to

6   copy their data from a neo4j instance and place into an ONgDB instance of the same version and

7   have it function with ONgDB using the cypher language version defined in neo4j core for that

8   version."  *Id.*  Similarly, in his deposition, GFI representative Brad Nussbaum explained that

9   "Drop-in replacement refers more to compatibility of features, so we were able to take a Neo4j

10  3.5.4 version, create a database and just show that it worked with ONgDB at that same version."

11  Ratinoff Decl., Ex. 31 at 160:9-14.

12       Plaintiffs first argue that even if "drop-in replacement" merely indicates compatibility,

13  iGov's representations related to ONgDB versions 3.5 and later are still false.  Mr. Nussbaum

14  admitted in his deposition that after Neo4j EE 3.5 was released entirely closed source, GFI "no

15  longer could . . . reliably guarantee that [ONgDB] was a drop-in replacement" and was unwilling

16  to do the testing to make such compatibility guarantees because it was "too hard to demonstrate"

17  with the Neo4j EE code becoming more divergent.  Fact 101 (Dkt. No. 98-1, Ex. 31 at 188:5-17,

18  188:23-189:23).  Despite GFI's admission that there is no way to prove compatibility without

19  access to the Neo4j EE source code of the same version, iGov continues to make drop-in

20  replacement claims for later versions.  *See, e.g.*, Ratinoff Decl., Ex. 46 ("ONgDB 3.5.8 is a drop-in

21  replacement for Neo4j Enterprise 3.5.8 and so on").  The Court agrees that in light of the

22  undisputed fact that Neo4j EE v3.5 and later versions were all closed source, ONgDB's

23  representations that the equivalent versions of ONgDB were "drop-in replacements" could not be

24  verified and were therefore false or misleading.

25       With respect to Defendants' "drop-in replacement" statements about earlier versions,

26  Plaintiffs argue that Defendants' interpretation of what "drop-in replacement" implies is irrelevant.

27  Case No.: 5:18-cv-07182-EJD

28  ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT;
    DENYING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

    26

United States District Court
Northern District of California

United States District Court
Northern District of California

1   For the purpose of this false advertising claim, Plaintiffs can prove either that the statement was

2   "literally false" or that the statement was "likely to mislead or confuse consumers." *See Southland*

3   *Sod Farms*, 108 F.3d at 1139;.  The Court therefore considers whether there is a genuine dispute

4   of fact about whether Defendants' "drop in replacement" claims were likely to mislead or confuse

5   consumers.

6          Although the phrase "drop-in replacement" on its own may not necessarily indicate that the

7   software systems were identical, in context, that is precisely what Defendants' statements implied.

8   For example, in an email to a Northwestern University representative, Mr. Suhy stated: "I would

9   recommend using the Neo4j Enterprise fork called ONgDB (Open Native Graph Database) if you

10  want all the enterprise features with no limitations on cores, cluster instances, etc. . . . It is Neo4j

11  Core + Enterprise feature set added back in, so it is drop in replacement for a Neo instance of the

12  same version." *Id.*, Ex. 44.[1]  Similarly, on the "Downloads" page of the iGov website, iGov

13  provides a link to download ONgDB Enterprise 3.5.5, calling it a "[d]rop in replacement for Neo4j

14  Core and Enterprise 3.5.5 AGPLv3 Open Source License, no limitations on causal cluster

15

16  _____

    [1] *See also*, *id.*, Ex. 43 (email sent by Mr. Suhy to a representative from the Securities and

17  Exchange Commission, Mr. Suhy represented that ONgDB "is just the Neo4j code

18  (https://github.com/neo4j/neo4j) combined with the enterprise code.  It is 100% open source and a

19  drop in replacement for the same Neo4j version."); Ex. 46 (emails with U.S. army, in which Mr.

20  Suhy states that "[a]ll ONgDB distributions are drop-in replacements for Neo4j Enterprise and

21  Neo4j Community as they use the same code base and versioning. Ex: ONgDB 3.5.8 is a drop-in

22  replacement for Neo4j Enterprise 3.5.8 and so on."); Ex. 19 (Sending comparison chart to the

23  National Geospatial Intelligence Agency, asserting that the open source version packaged by iGov

24  is the "same physical software" as Neo4j EE); Ex 21 ("We compile and packaged the open source

25  licen[sed] distributions from the same official Neo4j Github Repositories as Neo4j Inc uses for

26  their paid commercial licensed builds.").

27  Case No.: 5:18-cv-07182-EJD

28  ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT;
    DENYING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

instances, cores, or production usage." *Id.*, Ex. 67. The site links to Neo4j USA's release notes and website for the same version. Elsewhere on the website, iGov asserts that "commercial packages available from Neo4j Inc and their partners are essentially support offerings . . . [i]f you do not need support for your ONgDB Enterprise or Neo4j Enterprise open source licensed distribution, then simply download ONgDB Enterprise as a drop in replacement for an existing commercial licensed distribution of the same version number." *Id.*, Ex. 62. It further provides a chart comparing Neo4j EE and "Neo4j Enterprise open source license," which is captioned: "There are no physical differences between Neo4j Enterprise commercial and AGPL open source licenses!" *Id.*, Ex. 67. The chart purports to show the differences between the two software products but does not identify or disclaim that there may be source code differences or that ONgDB is not an identical replica of Neo4j EE.

The Court finds that the use of "drop-in replacement" in these instances clearly implies that ONgDB "has all the enterprise features" and is essentially the same software as Neo4j EE. No reasonable consumer would understand these statements to indicate mere compatibility with Neo4j EE. Thus, the Court concludes that the "drop-in replacement" claims are false or likely to mislead consumers for the purposes of Plaintiffs' false advertising claim.

### ii. Actual Deception or Tendency to Deceive

For the same reasons that Defendants' statements regarding ONgDB as "free and open source" and as a "drop-in replacement" for Neo4j are likely to mislead consumers, they also have a tendency to deceive. Moreover, Plaintiffs offer evidence that consumers who chose ONgDB and encountered technical issues reached out to Neo4j USA for help, indicating that those consumers thought they were operating genuine Neo4j EE. *See, e.g.*, Ratinoff Decl. Ex. 115, 121-124. Thus, the Court finds sufficient evidence that Defendants' misstatements caused actual deception or had a tendency to deceive.

### iii. Materiality

"A finding of consumer deception does not amount to a Lanham Act violation unless the

United States District Court
Northern District of California

1    deception 'is material, in that it is likely to influence the purchasing decision.'" *R & A Synergy*

2    *LLC v. Spanx, Inc.*, No. 2:17-CV-09147-SVW-AS, 2019 WL 4390564, at \*12 (C.D. Cal. May 1,

3    2019) (quoting *Southland Sod Farms*, 108 F.3d at 1139).

4         It is undisputed that Defendants made the statements at issue to convince customers to

5    adopt ONgDB over Neo4j EE. Because Defendants misrepresented ONgDB as a free version of

6    Neo4j EE licensed under the APGL, there is no doubt that this price differential (free versus paid)

7    was likely to influence customers purchasing decisions. *See Hinojos v. Kohl's Corp.*, 718 F.3d

8    1098, 1106–1107 (9th Cir. 2013), *as amended on denial of reh'g and reh'g en banc* (July 8, 2013)

9    (recognizing under the UCL that price is material to purchasing decisions). Thus, the Court finds

10   that Defendants' statements suggesting that customers could obtain a "free and open source drop

11   in replacement" for Neo4j EE were material.

12                **iv. Injury**

13         "Under the Lanham Act, the plaintiff must "plead (and ultimately prove) an injury to a

14   commercial interest in sales or business reputation proximately caused by the defendant's

15   misrepresentations." *Clorox Co. v. Reckitt Benckiser Grp. PLC*, 398 F. Supp. 3d 623, 644 (N.D.

16   Cal. 2019). "Lost sales for the plaintiff because of the defendant's false advertising is the

17   'paradigmatic direct injury from false advertising.'" *Id.* (quoting *Lexmark Int'l, Inc. v. Static

18   Control Components, Inc.*, 572 U.S. 118, 134 S. Ct. 1377, 1393, 188 L. Ed. 2d 392 (2014)).

19         Plaintiffs maintain that there is undisputed evidence that Defendants' false statements

20   diverted sales from Neo4j USA. *See, e.g.*, Ratinoff Decl., Exs. 47-50, 53, 120, 127; Ex. 3 at 53:4-

21   54:25, 224:13-23; Broad Decl., ¶¶ 20-24. Indeed, Neo4j USA lost multi-year deal when Next

22   Century adopted ONgDB via the Maryland Procurement Office, amounting to over \$2.2 million in

23   lost revenue. Broad Decl., ¶¶ 22-24, Exs. 12-13. Defendants claim that Plaintiffs have failed to

24   establish that customers like Next Century would have purchased a Neo4j subscription but for

25   Defendants' offering ONgDB as a "free and open source drop-in replacement." The Court does

26   not find this argument persuasive. Commercial injury is generally presumed "in false comparative

27

28   Case No.: 5:18-cv-07182-EJD
ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT;
DENYING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

United States District Court
Northern District of California

1   advertising cases, where it's reasonable to presume that every dollar defendant makes has come

2   directly out of plaintiff's pocket." *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 831 (9th

3   Cir. 2011); *see also Lexmark Intern., Inc.*, 134 S. Ct. at 1393 ("diversion of sales to a direct

4   competitor may be the paradigmatic direct injury from false advertising"). Defendants provide no

5   evidence to dispute Plaintiffs' evidence that customers chose ONgDB based on Defendants

6   misrepresentations at the commercial detriment to Plaintiffs.

7       Thus, the Court finds that Plaintiffs have established each element of their claims for false

8   advertising under the Lanham Act and that Defendants have not raised any disputed issues of

9   material fact on which a jury could find in Defendants' favor. The Court GRANTS Plaintiffs'

10  Motion as to the false advertising claim.

11      Because the Court finds that summary judgment is appropriate as to the Lanham Act

12  claims, the Court also GRANTS Plaintiffs' Motion as to the related UCL claim. *See Cleary*, 30

13  F.3d at 1262–63.

14                     **D. False Designation of Origin**

15      Similar to the a false advertising claim, a false designation of origin claim under Section

16  1125(a)(1)(A) requires that Plaintiffs show: (1) the defendants used a false designation of origin;

17  (2) the use occurred in interstate commerce; (3) that such false designation is likely to cause

18  confusion, mistake or deception as to the origin, sponsorship, or approval of defendants' goods or

19  services by another person; and (4) that plaintiff has been or is likely to be damaged. *Hokto*

20  *Kinoko Co. v. Concord Farms, Inc.*, 810 F. Supp. 2d 1013, 1039 (C.D. Cal. 2011), *aff'd,* 738 F.3d

21  1085 (9th Cir. 2013) (citing 15 U.S.C. § 1125(a)).

22      Plaintiffs argue that Defendants' holding out of ONgDB as free and open source Neo4j EE

23  constitutes a false designation of origin under the first element. Defendants argue that "there is an

24  issue of fact on this element because "ONgDB is a fork of Sweden's open source software

25  licensed under the AGPL . . . [and] [t]he designation of origin is, therefore, not false." Cross-

26  Motion at 22. Plaintiffs, however, do not challenge statements in which Defendants refer to

27  Case No.: 5:18-cv-07182-EJD

28  ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT;
    DENYING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

                                      30

1    ONgDB as a "fork" or Neo4j core source code.  Rather, Plaintiffs take issue with Defendants

2    identifying ONgDB as "free and open source" Neo4j EE.  As discussed above, Defendants' claim

3    that ONgDB *is* free and open source Neo4j is false because it relies on an interpretation of the

4    Neo4j Sweden Software License that this Court has rejected.  *See* Section C(i) *supra*.

5         Defendants do not raise any arguments regarding the remaining elements of a false

6    designation of origin claim.  Nevertheless, Plaintiffs must still establish each element of the claim

7    to warrant summary judgment.  There is no dispute that Defendants used the Neo4j Mark to

8    falsely imply origin in interstate commerce (element 2).  Plaintiffs have also established that they

9    have been or are likely to be damaged, as discussed in Section C(iv) *supra* (element 4).

10        As to the likelihood of confusion, "[t]he Ninth Circuit has held that the *Sleekcraft* test is

11   appropriate to determine likelihood of confusion regarding a claim for false designation of origin.

12   *Cisco Sys., Inc. v. Shenzhen Usource Tech. Co.*, No. 5:20-CV-04773-EJD, 2020 WL 5199434, at

13   *7 (N.D. Cal. Aug. 17, 2020) (citing *Accuride Int'l, Inc. v. Accuride Corp.*, 871 F.2d 1531, 1536

14   (9th Cir. 1989)).  The *Sleekcraft* factors include: "(1) [T]he similarity of the marks; (2) the strength

15   of the plaintiff's mark; (3) the proximity or relatedness of the goods or services; (4) the

16   defendant's intent in selecting the mark; (5) evidence of actual confusion; (6) the marketing

17   channels used; (7) the likelihood of expansion into other markets; and (8) the degree of care likely

18   to be exercised by purchasers of the defendant's product.  *Align Technology, Inc.*, 2019 WL

19   1586776, at *8 (citing *Fortune Dynamic, Inc.*, 618 F.3d at 1030).

20        For reasons similar to why the Court rejected Defendants' nominative fair use defense, the

21   Court also finds that the *Sleekcraft* factors weigh in favor of finding a likelihood of confusion to

22   establish the third element of Plaintiffs' false designation of origin claim.  Specifically, it is

23   undisputed that the Defendants used the Neo4j Mark (factor 1), which Plaintiffs' have used in

24   commerce since 2007 and which enjoys strong brand recognition in the graph database software

25   market (factor 2).  *See* Broad Decl. ¶¶ 2-19; Ratinoff Decl., Ex. 72 (iGov website recognizing that

26   Neo4j is the "world's leading Graph Database").  There is also no dispute as to the relatedness of

27   Case No.: 5:18-cv-07182-EJD

28   ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT;
     DENYING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

United States District Court
Northern District of California

1   the products, given that Defendants hold out ONgDB as a free and open source drop-in

2   replacement for Neo4j EE (factor 3).  Although Defendants may assert that their intent was to

3   describe their own products, the evidence also makes clear that Defendants intended to convince

4   consumers to buy Defendants' products instead of Neo4j EE commercial licenses; in other words,

5   Defendants used the Neo4j Mark to unfairly compete with Plaintiffs (factor 4).  As noted above,

6   Plaintiffs have introduced evidence of actual customer confusion (factor 5).  The evidence also

7   shows that both Plaintiffs and Defendants were attempting to gain the business of various

8   government entities, and even bid for the same contracts.  This particularly weighs in Plaintiffs'

9   favor because, as Defendants recognize, government entities prefer cost-effective and open source

10  products where possible (factor 6-8).

11        Thus, the Court finds that Plaintiffs have established each element of their false

12  designation of origin claim.  Defendants have not offered any evidence of a factual dispute

13  sufficient to withstand summary judgment.  The Court, therefore, GRANTS Plaintiffs' Motion as

14  to the false designation of origin claim.

15              **E.  Injunctive Relief**

16        The Lanham Act vests the Court with the "power to grant injunctions according to

17  principles of equity and upon such terms as the court may deem reasonable, to prevent the

18  violation of any right" of the trademark owner.  15 U.S.C. § 1116(a); *see Century 21 Real Est.*

19  *LLC v. Ed/Var Inc.*, No. 5:13-CV-00887 EJD, 2014 WL 3378278, at *6 (N.D. Cal. July 10, 2014)

20  (issuing a permanent injunction after granting summary judgment on plaintiff's Lanham Act

21  claims).  To obtain an injunction, a plaintiff must show: "(1) that it has suffered an irreparable

22  injury; (2) that remedies available at law, such as monetary damages, are inadequate to

23  compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and

24  defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved

25  by a permanent injunction."  *La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*, 762 F.3d 867,

26  879 (9th Cir. 2014).  "The decision to grant or deny such relief is an act of equitable discretion by

27  

28  
Case No.: 5:18-cv-07182-EJD
ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT;
DENYING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT
32

United States District Court
Northern District of California

the district court." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 388, 126 S. Ct. 1837, 1838, 164 L. Ed. 2d 641 (2006).

Plaintiffs argue that they have established all the necessary elements and are entitled to injunctive relief. First, Neo4j USA has suffered and will continue to suffer irreparable harm because Defendants' trademark infringement, false advertising, and false designation of origin damage Plaintiffs' reputation and the goodwill of the Neo4j Mark. When a plaintiff demonstrates a likelihood of confusion, it is generally presumed that the plaintiff will suffer irreparable injury if injunctive relief is not granted." *Sun Microsystems, Inc. v. Microsoft Corp.*, 999 F. Supp. 1301, 1311 (N.D. Cal. 1998). Thus, the Court agrees that Plaintiffs face irreparable harm, not compensable by money damages alone, in the absence of injunctive relief.

The balance of hardships and public interest factors are less straightforward. Plaintiffs argue that requiring Defendants to comply with the law will impose no cognizable hardship on Defendants and that the public interest is served by preventing consumer confusion. Motion at 35 (citing *Diller v. Barry Driller, Inc.*, No. CV 12-7200 ABC EX, 2012 WL 4044732, at *10 (C.D. Cal. Sept. 10, 2012) ("no hardship to cease intentionally infringing someone else's trademark rights"); *Stark v. Diageo Chateau & Est. Wines Co.*, 907 F. Supp. 2d 1042, 1067 (N.D. Cal. 2012) ("Preventing consumer confusion serves the public interest")). Indeed, "[t]he public has an interest in avoiding confusion between two companies' products." *Internet Specialties W., Inc. v. Milon-DiGiorgio Enterprises, Inc.*, 559 F.3d 985, 993 (9th Cir. 2009). However, Defendants argue that they have a legitimate First Amendment interest in using the Neo4j Mark to identify Plaintiffs' products and to comparatively advertise their own products. Cross-Motion at 32. Indeed, iGov's business depends on marketing ONgDB, which does include some or all Neo4j CE open source code.

Given the First Amendment interests involved, the Court "may not enjoin nominative use of the mark altogether." *Toyota Motor Sales, U.S.A., Inc.*, 610 F.3d at 1176. In *Toyota*, the Court held that if a defendant fails to satisfy all the *New Kids* factors for a nominative fair use defense,

Case No.: 5:18-cv-07182-EJD
ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT; DENYING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

33

1    "the district court may order defendants to modify their use of the mark so that all three factors are

2    satisfied." *Id.* In other words, the Court may order that if Defendants' products are not "readily

3    identifiable" without use of the Neo4j Mark, Defendants may not use more of the mark than

4    necessary, nor use the mark in any way that suggests sponsorship or endorsement by Plaintiffs.

5    *See New Kids on the Block*, 971 F.2d at 308–09). But the Court "must [e]nsure that [the

6    injunction] is tailored to eliminate only the specific harm alleged." *Toyota Motor Sales, U.S.A.,*

7    *Inc.*, 610 F.3d at 1176 (striking down overbroad injunction which prevented "truthful and non-

8    misleading speech").

9        Moreover, the Court recognizes that there are still additional "Phase 2" claims, issues, and

10   defenses to be adjudicated in this case. Among other defenses, Defendants have raised an

11   "unclean hands" defense, which was reserved for Phase 2 summary judgment motions.

12   Defendants argue that "[a]ll defenses must be considered before any final action may be taken."

13   Cross-Motion at 6. The Court agrees that it would be improper to impose permanent relief at this

14   stage in the case.

15       Thus, the Court GRANTS Plaintiffs' request for injunctive relief and issues a preliminary

16   injunction enjoining Defendants' use of the Neo4j Mark only to the extent necessary to prevent

17   unlawful use, as detailed below, without prejudice to Plaintiffs renewing their request for a

18   permanent injunction at the conclusion of the case.

19   **IV.    Conclusion**

20       For the reasons stated above, the Court hereby GRANTS Plaintiffs' Motion for Partial

21   Summary Judgment as to Neo4j USA's first, second, third, and fourth causes of action for

22   trademark infringement, false designation of origin and false advertising, federal unfair

23   competition, and state unfair competition, respectively.

24       IT IS FURTHER ORDERED that the Court DENIES Defendants' Cross-Motion as to the

25   same claims.

26       IT IS FURTHER ORDERED that the Court enters the following PRELIMINARY

27   Case No.: 5:18-cv-07182-EJD

28   ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT;
     DENYING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

INJUNCTION against Defendants as follows.

Defendants and their owners, principals, agents, managers, officers, directors, members, servants, employees, successors, assigns, and all other persons acting in concert and participation with them (collectively, the "Enjoined Parties") ARE HEREBY ENJOINED from:

1. Infringing U.S. Trademark Registration No. 4,784,280 for the word mark "NEO4J" covering the goods and services in International Classes, 009, 035, 041, 042 and 045 (the "Neo4j Mark").

2. Advertising, promoting, representing or referring to ONgDB as a free and open source drop-in replacement of Neo4j Enterprise Edition distributions with the same version number, and any similar statement that may lead consumers to believe that ONgDB is a Neo4j USA or Neo4j Sweden product, or is identical to a Neo4j USA or Neo4j Sweden product.

3. Advertising, promoting, representing, or referring to Neo4 Enterprise or Neo4j Enterprise Edition being released only under the AGPL.

4. Representing that Neo4j Sweden AB's addition of the Commons Clause to the license governing Neo4j Enterprise Edition violated the terms of AGPL or that removal of the Commons Clause is lawful, and similar statements.

5. Advertising, displaying or distributing products, literature or any other materials that use the Neo4j Mark to advertise or promote ONgDB in any way that suggests sponsorship or endorsement by Neo4j USA or Neo4j Sweden or that may lead consumers to believe that ONgDB is a Neo4j USA or Neo4j Sweden product, or is identical to a Neo4j USA or Neo4j Sweden product.

6. Affixing, applying, annexing, or using in connection with the sale of any goods, a false description or representation including words or other symbols tending to falsely describe or represent such goods as being Neo4j products and from offering such goods in commerce.

United States District Court
Northern District of California

7. Assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in Paragraphs 1-6 above.

Within three business days of the date of this Order, the Enjoined Parties shall remove all infringing material and enjoined uses of the Neo4j Mark from all websites, webpages, and GitHub repositories owned or managed by the Enjoined Parties.

**IT IS SO ORDERED.**

Dated: May 18, 2021

EDWARD J. DAVILA
United States District Judge

United States District Court
Northern District of California

Case No.: 5:18-cv-07182-EJD
ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT;
DENYING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

36

# EXHIBIT 2

**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

FEB 18 2022

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| NEO4J, INC.; NEO4J SWEDEN AB,<br><br>    Plaintiffs-counter-<br>    defendants-Appellees,<br><br>    v.<br><br>PURETHINK, LLC; IGOV, INC.; JOHN<br>MARK SUHY,<br><br>    Defendants-counter-<br>    claimants-Appellants. | No.   21-16029<br><br>D.C. No. 5:18-cv-07182-EJD<br><br>MEMORANDUM[*] |

Appeal from the United States District Court
for the Northern District of California
Edward J. Davila, District Judge, Presiding

Argued and Submitted February 7, 2022
San Francisco, California

Before: HURWITZ and VANDYKE, Circuit Judges, and ERICKSEN,[**] District
Judge.

Neo4j, Inc. ("Neo4j USA") sued John Mark Suhy and three corporations,

PureThink, LLC, iGov, Inc., and Graph Foundation, Inc. (collectively,

---

[*]     This disposition is not appropriate for publication and is not precedent
except as provided by Ninth Circuit Rule 36-3.

[**]     The Honorable Joan N. Ericksen, United States District Judge for the
District of Minnesota, sitting by designation.

"Defendants"), asserting claims under the Lanham Act, 15 U.S.C. §§ 1114, 1125(a), and California law. The district court entered a preliminary injunction enjoining Defendants from infringing the registered NEO4J mark[1] and from making misrepresentations to consumers about their products. Reviewing for abuse of discretion, *see Dev'l Servs. Network v. Douglas*, 666 F.3d 540, 544 (9th Cir. 2011), we affirm.

    1.    Because Neo4j USA registered the NEO4J mark, U.S. Trademark Registration No. 4,784,280, the district court correctly held it has standing to sue for infringement. *See* 15 U.S.C. § 1114(1) (infringers "shall be liable in a civil action by the registrant"); *Halicki Films, LLC v. Sanderson Sales & Mktg.*, 547 F.3d 1214, 1226–28 (9th Cir. 2008).

    2.    The court did not abuse its discretion by enjoining Defendants from infringing the NEO4J mark in the names of their own products. Defendants' use of the NEO4J mark was not nominative fair use, as it referred to their competing products, "Neo4j Enterprise" and "Government Package for Neo4j," not Neo4j® Enterprise Edition. *See Toyota Motor Sales, USA, Inc. v. Tabari*, 610 F.3d 1171, 1183 (9th Cir. 2010) (holding that nominative use of a trademark requires that the mark "refer to the trademarked good" not the defendant's good); *New Kids on the*

---

[1]    We use the term "NEO4J" to refer to the word mark registered by Neo4j USA. We use the term "Neo4j®" to denote the Neo4j USA-licensed platforms, Neo4j® Community Edition and Neo4j® Enterprise Edition.

*Block v. News Am. Publ'g, Inc.*, 971 F.2d 302, 308 (9th Cir. 1992).

3.   Nor did the court abuse its discretion by enjoining Defendants from "[a]dvertising, promoting, representing or referring to ONgDB as a free and open source drop-in replacement of Neo4j Enterprise Edition," and making other false representations about ONgDB to consumers. Lanham Act falsity is established either if a "statement was literally false, either on its face or by necessary implication," or if a "statement was literally true but likely to mislead or confuse consumers." *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997). Defendants' representation that ONgDB is a "free and open-source" version of Neo4j® EE was literally false, because Section 7 of the Sweden Software License only permits a downstream licensee to remove "further restrictions" added by an upstream licensee to the original work. Defendants' advertisements of ONgDB as a "drop-in replacement" for Neo4j® EE were also false, even taking Defendants' own definition of the term—"compatibility." And, even if the "drop-in replacement" representations were not literally false, substantial evidence showed that consumers were confused by Defendants' use of the term.

4.   The district court did not abuse its discretion by enjoining Defendants from suggesting Neo4j USA endorsement of their products. Defendants argue that two of the eight factors identified in *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979)—the "type of goods and the degree of care likely to be

3

exercised by the purchaser" and "evidence of actual confusion"—weigh in their favor. But the "presence or absence of a particular factor does not necessarily drive the determination of a likelihood of confusion." *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1290–91 (9th Cir. 1992). A particularly strong showing of some factors will suffice to demonstrate confusion. *See Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1125 (9th Cir. 2014). It was not an abuse of discretion for the district court to rely on the other six *Sleekcraft* factors in entering the preliminary injunction.

**AFFIRMED.**

## United States Court of Appeals for the Ninth Circuit

### Office of the Clerk
95 Seventh Street
San Francisco, CA 94103

## Information Regarding Judgment and Post-Judgment Proceedings

**Judgment**
- This Court has filed and entered the attached judgment in your case. Fed. R. App. P. 36.  Please note the filed date on the attached decision because all of the dates described below run from that date, not from the date you receive this notice.

**Mandate (Fed. R. App. P. 41; 9th Cir. R. 41-1 & -2)**
- The mandate will issue 7 days after the expiration of the time for filing a petition for rehearing or 7 days from the denial of a petition for rehearing, unless the Court directs otherwise.  To file a motion to stay the mandate, file it electronically via the appellate ECF system or, if you are a pro se litigant or an attorney with an exemption from using appellate ECF, file one original motion on paper.

**Petition for Panel Rehearing  (Fed. R. App. P. 40; 9th Cir. R. 40-1)**
**Petition for Rehearing En Banc (Fed. R. App. P. 35; 9th Cir. R. 35-1 to -3)**

**(1)  A.  Purpose (Panel Rehearing):**
- A party should seek panel rehearing only if one or more of the following grounds exist:
  - ▶  A material point of fact or law was overlooked in the decision;
  - ▶  A change in the law occurred after the case was submitted which appears to have been overlooked by the panel; or
  - ▶  An apparent conflict with another decision of the Court was not addressed in the opinion.
- Do not file a petition for panel rehearing merely to reargue the case.

**B.  Purpose (Rehearing En Banc)**
- A party should seek en banc rehearing only if one or more of the following grounds exist:

▶ Consideration by the full Court is necessary to secure or maintain uniformity of the Court's decisions; or
▶ The proceeding involves a question of exceptional importance; or
▶ The opinion directly conflicts with an existing opinion by another court of appeals or the Supreme Court and substantially affects a rule of national application in which there is an overriding need for national uniformity.

**(2)** **Deadlines for Filing:**
- A petition for rehearing may be filed within 14 days after entry of judgment. Fed. R. App. P. 40(a)(1).
- If the United States or an agency or officer thereof is a party in a civil case, the time for filing a petition for rehearing is 45 days after entry of judgment. Fed. R. App. P. 40(a)(1).
- If the mandate has issued, the petition for rehearing should be accompanied by a motion to recall the mandate.
- *See* Advisory Note to 9th Cir. R. 40-1 (petitions must be received on the due date).
- An order to publish a previously unpublished memorandum disposition extends the time to file a petition for rehearing to 14 days after the date of the order of publication or, in all civil cases in which the United States or an agency or officer thereof is a party, 45 days after the date of the order of publication.  9th Cir. R. 40-2.

**(3)** **Statement of Counsel**
- A petition should contain an introduction stating that, in counsel's judgment, one or more of the situations described in the "purpose" section above exist. The points to be raised must be stated clearly.

**(4)** **Form & Number of Copies (9th Cir. R. 40-1; Fed. R. App. P. 32(c)(2))**
- The petition shall not exceed 15 pages unless it complies with the alternative length limitations of 4,200 words or 390 lines of text.
- The petition must be accompanied by a copy of the panel's decision being challenged.
- A response, when ordered by the Court, shall comply with the same length limitations as the petition.
- If a pro se litigant elects to file a form brief pursuant to Circuit Rule 28-1, a petition for panel rehearing or for rehearing en banc need not comply with Fed. R. App. P. 32.

- The petition or response must be accompanied by a Certificate of Compliance found at Form 11, available on our website at www.ca9.uscourts.gov under *Forms*.
- You may file a petition electronically via the appellate ECF system. No paper copies are required unless the Court orders otherwise. If you are a pro se litigant or an attorney exempted from using the appellate ECF system, file one original petition on paper. No additional paper copies are required unless the Court orders otherwise.

**Bill of Costs (Fed. R. App. P. 39, 9th Cir. R. 39-1)**
- The Bill of Costs must be filed within 14 days after entry of judgment.
- See Form 10 for additional information, available on our website at www.ca9.uscourts.gov under *Forms*.

**Attorneys Fees**
- Ninth Circuit Rule 39-1 describes the content and due dates for attorneys fees applications.
- All relevant forms are available on our website at www.ca9.uscourts.gov under *Forms* or by telephoning (415) 355-7806.

**Petition for a Writ of Certiorari**
- Please refer to the Rules of the United States Supreme Court at www.supremecourt.gov

**Counsel Listing in Published Opinions**
- Please check counsel listing on the attached decision.
- If there are any errors in a published opinion, please send an email or letter **in writing within 10 days** to:
  ► Thomson Reuters; 610 Opperman Drive; PO Box 64526; Eagan, MN 55123 (Attn: Maria Evangelista (maria.b.evangelista@tr.com));
  ► and electronically file a copy of the letter via the appellate ECF system by using "File Correspondence to Court," or if you are an attorney exempted from using the appellate ECF system, mail the Court one copy of the letter.

(51 of 169), Page 51 of 169 Case: 24-5538, 01/21/2025, DktEntry: 39.2, Page 51 of 169
Case 5:18-cv-07182-EJD Document 140 Filed 02/18/22 Page 8 of 8
(8 of 8)

Case: 21-16029, 02/18/2022, ID: 12374325, DktEntry: 45-2, Page 4 of 4

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 10. Bill of Costs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form10instructions.pdf*

**9th Cir. Case Number(s)**

**Case Name**

The Clerk is requested to award costs to *(party name(s))*:

I swear under penalty of perjury that the copies for which costs are requested were actually and necessarily produced, and that the requested costs were actually expended.

**Signature**          **Date**

*(use "s/[typed name]" to sign electronically-filed documents)*

| COST TAXABLE | REQUESTED *(each column must be completed)* | | | |
|---|---|---|---|---|
| DOCUMENTS / FEE PAID | No. of Copies | Pages per Copy | Cost per Page | TOTAL COST |
| Excerpts of Record* | | | $ | $ |
| Principal Brief(s) *(Opening Brief; Answering Brief; 1st, 2nd , and/or 3rd Brief on Cross-Appeal; Intervenor Brief)* | | | $ | $ |
| Reply Brief / Cross-Appeal Reply Brief | | | $ | $ |
| Supplemental Brief(s) | | | $ | $ |
| Petition for Review Docket Fee / Petition for Writ of Mandamus Docket Fee / Appeal from Bankruptcy Appellate Panel Docket Fee | | | | $ |
| | | | **TOTAL:** | $ |

***Example:** Calculate 4 copies of 3 volumes of excerpts of record that total 500 pages [Vol. 1 (10 pgs.) + Vol. 2 (250 pgs.) + Vol. 3 (240 pgs.)] as:*
*No. of Copies: 4; Pages per Copy: 500; Cost per Page: $.10 (or actual cost IF less than $.10); TOTAL: 4 x 500 x $.10 = $200.*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

# EXHIBIT 3

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

MAR 14 2022

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| NEO4J, INC.; NEO4J SWEDEN AB, <br><br> Plaintiffs-counter-<br>defendants-Appellees, <br><br> v. <br><br> PURETHINK, LLC; IGOV, INC.; JOHN MARK SUHY, <br><br> Defendants-counter-<br>claimants-Appellants. | No.   21-16029 <br><br> D.C. No. 5:18-cv-07182-EJD <br> Northern District of California, <br> San Jose <br><br> ORDER |

Before:  HURWITZ and VANDYKE, Circuit Judges, and ERICKSEN,[*] District Judge.

The memorandum disposition filed on February 18, 2022 is amended as follows:

- At page 1, lines 1–2, the phrase "and three corporations, PureThink, LLC, iGov, Inc., and Graph Foundation, Inc." is replaced by "and, as relevant here, two corporations, PureThink, LLC, and iGov, Inc."

- At page 2, line 1, footnote 1 has been added, which reads, "An action stating substantially the same claims against another corporation, Graph Foundation, Inc. ("GFI"), settled."

- At page 2, line 14, the phrase "not Neo4j® Enterprise Edition" has been deleted.

- At page 2, footnote 2, the phrase "to denote the Neo4j USA-licensed platforms, Neo4j® Community Edition and Neo4j® Enterprise

---

[*]    The Honorable Joan N. Ericksen, United States District Judge for the District of Minnesota, sitting by designation.

Edition" has been replaced by "to denote the licensed platforms at issue."

- At page 3, lines 2–3, the phrase "and others" has been added.

- At page 3, line 9, the word "Defendants'" has been replaced by "The".

- At page 3, line 12, the word "Defendants'" has been replaced by "And".

- At page 3, line 13, the phrase "even taking Defendants' own definition of the term—'compatibility'" has been deleted.

The petition for panel rehearing, Dkt. 47, is **DENIED**. No future petitions for rehearing or rehearing en banc will be entertained.

**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

MAR 14 2022

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| NEO4J, INC.; NEO4J SWEDEN AB, <br><br> Plaintiffs-counter-<br>defendants-Appellees, <br><br> v. <br><br> PURETHINK, LLC; IGOV, INC.; JOHN MARK SUHY, <br><br> Defendants-counter-<br>claimants-Appellants. | No. 21-16029 <br><br> D.C. No. 5:18-cv-07182-EJD <br><br> AMENDED MEMORANDUM[*] |

Appeal from the United States District Court
for the Northern District of California
Edward J. Davila, District Judge, Presiding

Argued and Submitted February 7, 2022
San Francisco, California

Before: HURWITZ and VANDYKE, Circuit Judges, and ERICKSEN,[**] District
Judge.

Neo4j, Inc. ("Neo4j USA") sued John Mark Suhy and, as relevant here, two

corporations, PureThink, LLC and iGov, Inc. (collectively, "Defendants"), asserting

---

[*]     This disposition is not appropriate for publication and is not precedent
except as provided by Ninth Circuit Rule 36-3.

[**]     The Honorable Joan N. Ericksen, United States District Judge for the
District of Minnesota, sitting by designation.

claims under the Lanham Act, 15 U.S.C. §§ 1114, 1125(a), and California law.[1]  The

district court entered a preliminary injunction enjoining Defendants from infringing

the registered NEO4J mark[2] and from making misrepresentations to consumers

about their products.  Reviewing for abuse of discretion, *see Dev'l Servs. Network*

*v. Douglas*, 666 F.3d 540, 544 (9th Cir. 2011), we affirm.

      1.    Because Neo4j USA registered the NEO4J mark, U.S. Trademark

Registration No. 4,784,280, the district court correctly held it has standing to sue for

infringement.  *See* 15 U.S.C. § 1114(1) (infringers "shall be liable in a civil action

by the registrant"); *Halicki Films, LLC v. Sanderson Sales & Mktg.*, 547 F.3d 1214,

1226–28 (9th Cir. 2008).

      2.    The court did not abuse its discretion by enjoining Defendants from

infringing the NEO4J mark in the names of their own products.  Defendants' use of

the NEO4J mark was not nominative fair use, as it referred to their competing

products, "Neo4j Enterprise" and "Government Package for Neo4j."  *See Toyota*

*Motor Sales, USA, Inc. v. Tabari*, 610 F.3d 1171, 1183 (9th Cir. 2010) (holding that

nominative use of a trademark requires that the mark "refer to the trademarked good"

not the defendant's good); *New Kids on the Block v. News Am. Publ'g, Inc.*, 971 F.2d

---

[1]    An action stating substantially the same claims against another corporation, Graph Foundation, Inc. ("GFI"), settled.

[2]    We use the term "NEO4J" to refer to the word mark registered by Neo4j USA. We use the term "Neo4j®" to denote the licensed platforms at issue.

302, 308 (9th Cir. 1992).

    3.    Nor did the court abuse its discretion by enjoining Defendants and others from "[a]dvertising, promoting, representing or referring to ONgDB as a free and open source drop-in replacement of Neo4j Enterprise Edition," and making other false representations about ONgDB to consumers. Lanham Act falsity is established either if a "statement was literally false, either on its face or by necessary implication," or if a "statement was literally true but likely to mislead or confuse consumers." *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997). The representation that ONgDB is a "free and open-source" version of Neo4j® EE was literally false, because Section 7 of the Sweden Software License only permits a downstream licensee to remove "further restrictions" added by an upstream licensee to the original work. And advertisements of ONgDB as a "drop-in replacement" for Neo4j® EE were also false. And, even if the "drop-in replacement" representations were not literally false, substantial evidence showed that consumers were confused by Defendants' use of the term.

    4.    The district court did not abuse its discretion by enjoining Defendants from suggesting Neo4j USA endorsement of their products. Defendants argue that two of the eight factors identified in *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979)—the "type of goods and the degree of care likely to be exercised by the purchaser" and "evidence of actual confusion"—weigh in their

favor.  But the "presence or absence of a particular factor does not necessarily drive the determination of a likelihood of confusion."  *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1290–91 (9th Cir. 1992).  A particularly strong showing of some factors will suffice to demonstrate confusion.  *See Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1125 (9th Cir. 2014).  It was not an abuse of discretion for the district court to rely on the other six *Sleekcraft* factors in entering the preliminary injunction.

**AFFIRMED.**

# EXHIBIT 4

No. 21-16029

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

### NEO4J, INC., et al.,

*Plaintiff and Appellee,*

v.

### PURETHINK, LLC, et al.,

*Defendant and Appellant.*

---

Appeal From a Judgment of the United States District Court
For the Northern District of California
Hon. Edward J. Davila
United States District Judge
N. D. Cal. No. 5:18-cv-07182 EJD

---

### APPELLANTS' OPENING BRIEF

---

ADRON W. BEENE, CA Bar # 129040
ADRON G. BEENE, CA Bar # 298088
1754 Technology Drive, Ste. 228
San Jose, CA 95110
Tel.: (408) 392-9233
Fax: (866) 329-0453
adron@adronlaw.com

Joseph A. Hearst, CA Bar # 130286
1569 Solano Ave. #525
Berkeley, CA 94707
Telephone: (510) 528-6863
Facsimile: (510) 280-2556
jahearst@pacbell.net

Attorneys for defendants, cross-complainants and appellants John Mark
Mr. Suhy, PureThink,LLC and iGov, Inc.

## TABLE OF CONTENTS

I.       INTRODUCTION .................................................................................1

II.      JURISDICTIONAL STATEMENT ....................................................3

III.     ISSUES PRESENTED .........................................................................3

IV.      STATEMENT OF THE CASE ............................................................4

V.       STATEMENT OF FACTS ...................................................................7

VI.      SUMMARY OF ARGUMENT ...........................................................15

VII.     ARGUMENT .....................................................................................17

         A.   Standard Of Review. .................................................................17

         B.   Neo4j USA Lacks An Ownership Interest That Would Give It Standing
              To Sue For Trademark Infringement ........................................18

         C.   Assuming For The Sake Of Argument That Neo4j Usa Had Standing,
              There Was No Infringement Because Defendants' Use Of The Mark
              Was Nominative Fair Use. ........................................................22

         D.   The Court's Finding That Defendants Engaged In False Advertising And
              False Designation Of Origin Overlooks How Consumers Would View
              The Igov Website. .....................................................................34

         E.   References To Ongdb As "Free And Open-Source" Are Accurate. ........36

         F.   Descriptions Of Ongdb As A "Drop-In" Replacement For An Existing
              Commercially Licensed Distribution Of The Same Version Number
              Of Neo4j Are Accurate ...............................................................40

         G.   The Court's Finding Of False Designation Of Origin Is Fatally
              Flawed. .......................................................................................43

VIII.    CONCLUSION ...................................................................................47

ii

## I.  INTRODUCTION

Plaintiff-appellee Neo4j Sweden AB ("Neo4j Sweden") creates software packages for graph databases, which its parent, appellee Neo4j, Inc. ("Neo4j USA"), distributes and services in this country.  Until recently, the software came in three "flavors": 1) Neo4j Community Edition, which was licensed under the Free Software Foundation's ("FSF's") GPL ("General Public License") open-source license by Neo4j Sweden; 2) Neo4j Enterprise Edition, which was licensed under the FSF's AGPL ("Affero General Public License") by Neo4j Sweden; and 3) Neo4j Enterprise Edition, with a commercial license that Neo4j USA sells.  The source code for these editions was published and available on GitHub.  There were historically no source code differences between the Neo4j Enterprise open-source and commercial offerings.

Appellant John Mark Suhy and his company, appellant PureThink, Inc., were "Solution Partners" with Neo4j.  After a falling out with the Neo4j entities centering around Mr. Suhy's negotiations with the IRS regarding open-source usage rights, Mr. Suhy became a volunteer contributor for a "fork" of Neo4j Enterprise run by the Graph Foundation Inc. ("GFI").[1]  Neo4j USA then sued Mr.

---

[1]     Wikipedia defines a "fork" in software as follows:

"In software engineering, a project fork happens when developers take a copy of source code from one software package and start independent development on it,

*Footnote continues on next page*

1

Suhy and his businesses, PureThink and another entity Mr. Suhy created, iGov, Inc., for trademark infringement and related claims. The trial court granted summary judgment on the trademark claims and entered a preliminary injunction forbidding Mr. Suhy and his companies from using the Neo4j mark in any manner defined by the court in its ruling.

The court found that Neo4j USA could bring an action for trademark infringement under 15 U.S.C. § 1114 as the registrant of the mark, notwithstanding that Neo4j USA is not the actual owner of the mark, which it licenses on a non-exclusive basis from Neo4j Sweden. The court also found that defendants' use of the Neo4j mark exceeded that permitted under the nominative fair use doctrine, and that Mr. Suhy and his entities had engaged in false advertising using Neo4j's trademarks.

The court's actions ignored or papered over numerous factual disputes concerning who owned the mark and had a right to bring a trademark action and concerning defendants' use of the Neo4j mark. The trademark analysis in this case is exceedingly complex, involving as it does different, similarly-named corporate entities using the mark, sometimes on free and open-source versions of the

_____

creating a distinct and separate piece of software … Free and open-source software is that which, by definition, may be forked from the original development team without prior permission, and without violating copyright law."
https://en.wikipedia.org/wiki/Fork_(software_development).

software and sometimes on commercial versions, as well as the scope of defendants' undisputed right to use and describe the open-source versions of Neo4j. This complexity is especially apparent with respect to the question whether defendants engaged in nominative fair use of the mark to describe their own use of the open-source versions of the software. The court should have denied the summary judgment and should not have enjoined defendants based upon that summary judgment.

## II. JURISDICTIONAL STATEMENT

This is an action brought under the Lanham Act and federal copyright statutes. The court had federal question jurisdiction pursuant to 28 U.S.C. § 1331. The court had pendent jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

The appeal is from a preliminary injunction; jurisdiction lies in this Court under 28 U.S.C. § 1292(a)(1). The appeal was filed within 30 days of entry of the preliminary injunction and is timely under Rule 4, Fed. Rules App. Proc. *See* 9-ER-2160.

## III. ISSUES PRESENTED

1. Where the evidence shows that a non-exclusive licensee has registered a trademark, but the actual owner of the mark does not control the use of the mark, does the licensee have standing to assert trademark infringement?

3

2. Where the authors of a "fork" of open-source software use the trademark identifying the core of that software to describe their own fork, does the use of the trademark constitute nominative fair use?

3. Where authors of a fork of software describe the fork as an open-source version of named commercial software which also has open-source versions, is there consumer confusion that would justify an injunction against the use of the name that describes both the open-source and commercial versions?

4. Does a description of an open-source fork stating that it uses open source versions of named software and that the products with which defendants worked were drop in replacements for the commercial version mislead consumers, where it is undisputed that defendants' fork *was* based upon open-source versions of the named software and that the products with which defendants worked could run queries just as the commercial version of the software did?

### IV. STATEMENT OF THE CASE

Neo4j USA commenced this action in November 2018. Neo4j Sweden later joined in the copyright cause of action. They filed their third amended complaint ("TAC"), the operative complaint in this appeal, in September 2020. The TAC states claims for trademark infringement under 15 U.S.C. § 1114 (Lanham Act § 32), false designation of origin and false advertising under 15 U.S.C. § 1125(a)

4

(Lanham Act § 43(a)), unfair competition under California law, defamation, invasion of privacy (based upon alleged recording of Neo4j employees by defendant-appellant John Mark Mr. Suhy) and Neo4j's sole claim for copyright infringement under the Digital Millennium Copyright Act, 17 U.S.C. § 1202(b). 2-ER-71-84. All of the causes of action involving trademark and state law unfair competition in the TAC are alleged on behalf of Neo4j USA only. 2-ER-71-89.

In their answer to the original complaint, defendants stated affirmative defenses that the trademark registration was obtained by fraud and that the trademark had been abandoned through naked licensing. The court granted motions for judgment on the pleadings on these affirmative defenses. After these defenses were again raised in the answer to the third amended complaint, the court again struck those defenses.[2] *See* 1-ER-11. Defendants also filed a cross-complaint, which is still pending.

By stipulation approved by the court, the parties agreed to file summary judgment motions on Neo4j USA's trademark-related claims, as well as defendants' counterclaims and affirmative defenses related to abandonment of

---

[2]     The questions whether plaintiffs' registration had been obtained through fraud before the Trademark Trial and Appeal Board (which requires actual fraudulent intent) and whether plaintiffs' registration was invalid because not obtained by the actual owner are different from those presented in this appeal, and the trial court's resolution of the fraud issue does not foreclose the issues regarding standing and trademark validity discussed in this brief.

trademark, cancellation of trademark and fair use, in a Phase One, reserving other claims for a Phase Two. Certain defenses to trademark infringement, such as unclean hands, are also reserved for Phase Two.

Plaintiffs filed their motion for summary judgment as to the Phase One issues on December 11, 2020; defendants filed their opposition and their own motion for summary judgment on January 15, 2021. By order dated May 18, 2021, the court granted summary judgment to plaintiffs and preliminarily enjoined defendants from: (1) infringing on the Neo4j mark, (2) referring to ONgDB (Open Native graph Database, the name for the fork of Neo4j Mr. Suhy helps with as a volunteer contributor) as a "free and open-source drop-in replacement of Neo4j Enterprise Edition," (3) representing that the Neo4j Enterprise Edition had been released only under the AGPL ("Affero General Public License"), or (4) representing that Neo4j Sweden's addition of what the parties refer to as the Commons Clause to the AGPL violated the terms of the AGPL, (5) distributing any advertisement or literature that used the Neo4j mark to advertise or promote ONgDB in "any way that suggests sponsorship or endorsement by Neo4j USA or Sweden," (6) advertising or representing in any way "tending to falsely describe or represent [defendants'] goods as being Neo4j products" or offering such goods in commerce, and (7) aiding any other person or entity in engaging in the conduct enjoined. 1-ER-37.

PureThink, iGov and Mr. Suhy filed their notice of appeal on June 16, 2021.
9-ER-2159.

## V. STATEMENT OF FACTS

Neo4j Sweden created and supports a graph platform for connected data
distributed under the Neo4j mark. Sweden's software initially, and for many years,
was distributed free under the Free Software Foundation's open-source GPL
(General Public License) and AGPL (Affero General Public License) licenses. 6-
ER-1378, ¶¶ 5-7. Because Neo4j was free and open-source, its use grew widely;
contributors created more than 2000 forks/derivatives of the Neo4j software.

Neo4j Sweden decided to monetize its software by creating commercial
versions of its program. Neo4j Sweden organized Neo Technology, Inc. in the
United States, which eventually changed its name to Neo4j, Inc. ("Neo4j USA").
Neo4j USA then became the corporate parent of Neo4j Sweden. Neo4j Sweden
granted Neo4j USA a non-exclusive license to use the Neo4j mark in the United
States. 11-ER-2414. Notwithstanding that it was neither an owner nor exclusive
licensee, Neo4j USA obtained a United States registration for the Neo4j mark. 2-
ER-189.

Prior to November 2018, Neo4j offered free open-source versions known as
Neo4j Community Edition (sometimes, hereafter "Neo4j CE") under the GPL open
source license and Neo4j Enterprise Edition (sometimes, hereafter "Neo4j EE")

under the AGPL open source license. 6-ER-1368 ¶¶ 12-14; 6-ER-1369 ¶¶ 6-8.

Neo4j USA also offered a commercial edition with commercial support also

(confusingly) named Neo4j Enterprise Edition (sometimes, hereafter "Neo4j

CEE"). 6-ER-1368, ¶¶ 5-8. Historically, there was no difference between Neo4j

EE under its AGPL open-source license and Neo4j EE under its commercial

license; the latter was simply packaged and sold as a support solution. *See* 6-ER-

1369 ¶ 9. Until Neo4j Enterprise 3.5.0 was released, Neo4j Enterprise open-source

distributions and Neo4j Enterprise commercially licensed distributions were

compiled from the same official Neo4j public GitHub repository. 6-ER-281.

Up through the "beta" and testing versions of Neo4j EE version 3.4, all

Neo4j EE products were offered on an open-source basis under the AGPL license;

later, when Neo4j officially released Neo4J EE 3.4, it added restrictions on the

AGPL through what the parties referred to as the "Commons Clause." *See* 6-ER-

1370, ¶ 11. The new terms prohibited the non-paying public from engaging in

commercial resale and certain support services.[3] 6-ER-1370, ¶ 11; *see* 6-ER-1415

(text of Commons Clause). Neo4j USA released Neo4j EE versions 3.5 and later

under a commercial license only, and Neo4j Sweden no longer released the

enterprise source code to the public on the Neo4j GitHub repository. 6-ER-1371, ¶

---

[3]     The propriety of adding the Commons Clause to the AGPL license was a
matter of dispute and is discussed further in the Argument.

Case: 21-16029, 08/16/2021, ID: 12202844, DktEntry: 14, Page 13 of 52

13.  Neo4j software under the unmodified AGPL license, through version 3.4 beta and testing versions, is still in use and available under that license at GitHub to this day.  *See* 6-ER-1369, ¶ 9.

John Mark Suhy's company, PureThink, became a Neo4j reseller under a Solution Partner Agreement ("SPA") with Neo4j USA in 2014, receiving a non-exclusive license to use the Neo4j mark.  2-ER-197.  PureThink, with Neo4j's approval, designed and developed a government edition that would streamline government procurements.  PureThink offered this software package under the name Neo4j Government Edition and had an exclusive agreement to resell it to the government.  *See* 8-ER-2085.

Neo4j USA had been trying to get the IRS to purchase a Neo4j EE commercial license.  *See* 1-ER-6.  As the procurement deadline loomed, the IRS informed PureThink that it was not interested in purchasing a commercial license with support.  Rather than lose the possibility of a subscription from the IRS, Mr. Suhy informed Neo4j USA that he wanted to build the solution the IRS needed during the first year, so that follow up years could generate commercial license revenues.  USA agreed, and PureThink entered into an agreement with the IRS and signed a contract for consulting services to build out a solution for them.  9-ER-2087, 2090.

As the initial IRS contract was ending, the IRS informed Mr. Suhy that government policy was to use open-source software to save taxpayer dollars. The IRS asked Mr. Suhy about the Neo4j open-source license. Neo4j USA instructed Mr. Suhy to lie and tell the IRS that it could not use open-source versions of the software. USA contacted the IRS and informed it that it could not use Neo4j EE in any version. Mr. Suhy, on the other hand, refused to lie and informed the IRS that Neo4j EE was available under an open-source license for version 3.4 and earlier, leading to a rift between Mr. Suhy and Neo4j USA. As a result, Neo4j USA terminated the SPA agreement with PureThink.

Neo4j USA retaliated against Mr. Suhy and informed the IRS that PureThink could not provide any services on open-source versions of Neo4j because the SPA had a three-years-after-termination bar on providing services. 7-ER-1660-62. Because the IRS was still only interested in open-source versions, Mr. Suhy set up a new company, iGov, Inc., to be able to work with open-source versions of the software.

After PureThink's termination, Mr. Suhy and iGov changed direction and focused on offering consulting services focused on Neo4j and forks of Neo4j such as GFI's ONgDB. Mr. Suhy created a new offering called the Government Package for Neo4j which was marketed to government agencies as a consulting package. *See* 2-ER-235. It provided consulting, support, and tools focused

specifically on government needs relating to solutions development around Neo4j open-source software.

iGov's website stated:

> The principle [*sic*] behind PureThink and the Government Package has created a new corporate entity called iGov Inc**., which is not a Neo4j Solution Partner.  Because iGov Inc. is not a solution partner**, it can offer packages at great cost saving to US Government Agencies as it has no restrictions on working with Neo4j Enterprise **open-source licenses**.
>
> **...**
>
> iGov Inc's new Government Package for Neo4j can be added to any Neo4j instance making it a "Government Edition."  By default, all Government Packages for Neo4j now come[] with Neo4j Enterprise included under it's [*sic*] open-source license!

2-ER-235 (emphasis added).

The iGov website noted that it offered a "Government Package for Neo4j" and "Government Development Package with Neo4j Enterprise."  2-ER-235; 2-ER-253.  The website stated that iGov was "the only US Federal contractor providing Neo4j Enterprise binaries packaged with it's [*sic*] free Open-source License!"  2-ER-264.  The website also used Neo4j in URLs and displayed a "Request Procurement Document Package" link with an email address of mailto:Neo4j@igovsol.com.  5-ER-946.

The court below stated that "[i]t is undisputed that PureThink and iGov initially marketed a product called 'Neo4j Enterprise,' and a 'Government Package for Neo4j,' before rebranding Neo4j Enterprise as ONgDB."  1-ER-21.  This

11

statement mischaracterizes both what iGov and PureThink marketed and who controlled ONgDB. iGov offered consulting services, not software products. There is no evidence that iGov ever offered Neo4j Enterprise alone—it marketed the "Government Package for Neo4j" by stating, in part, that "iGov Inc.'s open-source enterprise packages provide a better value than Neo4j Enterprise commercial support subscriptions because 100% of the cost goes to support and development services, not un[n]ecessary and more restrictive commercial licenses," and "[w]e offer the same support features and SLAs as the Neo4j Enterprise commercial subscriptions offered by Neo4j Inc. partners, *but for the open-source licenses enterprise distributions*." 4-ER-935; 5-ER-937 (emphasis added). In other words, the iGov website made clear that it was *not* offering the commercially-licensed version of Neo4j EE, but rather a consulting package focused on open-source-licensed versions of Neo4j EE or forks such as GFI's ONgDB. Further, the website stated that iGov packages included an optional Neo4j Enterprise distribution that iGov had compiled for the community from the unmodified source code taken directly from Neo4j Sweden's official GitHub repository. 2-ER-276, 279.

Following release of Neo4j EE version 3.5, which Neo4j USA offered only in a commercial version, Brad and Ben Nussbaum, owners of Atom Rain, Inc. and GraphGrid, Inc., formed Graph Foundation, Inc. ("GFI"), the purpose of which

12

was to develop Neo4j on a non-profit basis using open-source versions of the software.[4] 2-ER-314, 315 . The fork of Neo4j which GFI eventually created was named ONgDB (Open Native Graph Database).

The Court's statement that PureThink and iGov had "rebranded" Neo4j Enterprise as ONgDB is not supported by the record. GFI created and controlled ONgDB; there is no evidence PureThink or iGov had anything to do with the way GFI might have marketed ONgDB. Rather, the iGov website recommended ONgDB for clients who did not need the support solutions offered either by iGov or Neo4j USA. 4-ER-935. The website suggested that consumers who did not want to obtain a commercial license for Neo4j Enterprise could use ONgDB as a fork of Neo4j that offered many of the same features as Neo4j Enterprise. 4-ER-935.

GFI began promoting ONgDB, which was available for free. 6-ER-1315, 1322. Mr. Suhy, as a volunteer contributor, replaced the modified AGPL license (*i.e.*, the AGPL license with the Commons Clause) under which Neo4j Sweden released Neo4j EE 3.4 with the unmodified AGPL because he believed that the

---

[4]   The Neo4J entities sued GFI at the same time as PureThink, iGov and Mr. Suhy. GFI settled out shortly before the summary judgment was entered.

13

Commons Clause was not a permitted change for the AGPL.[5] 3-ER-478; 7-ER-1651, ¶ 29. The propriety of this change is discussed in the Argument.

The "landing page" for GFI's ONgDB website was titled "ONgDB—Neo4j Enterprise Fork: Graphs for everyone." 4-ER-861. Mr. Suhy promoted GFI's ONgDB fork of Neo4j as "100% free and open" without the limitations imposed by the commercially licensed edition of Neo4jEE v. 3.5.x. *See, e.g.*, 4-ER-871. GFI's ONgDB website further declared that "ONgDB distributions are licensed under AGPLv3 as a free and open drop-in replacements of Neo4j Enterprise commercial licensed distributions with the same version number." 4-ER-915. On the "downloads" page, GFI again described ONgDB 3.5.5 as a "drop-in replacement for Neo4j Core and Enterprise 3.5.5."[6] iGov's website made similar statements—but noted that ONgDB was a drop in replacement for Neo4j Community and Neo4j Enterprise commercial distributions. 5-ER-1012. Neo4j Community Edition does not have enterprise features.

By December 2020, ONgDB v 3.5.1 had been downloaded over 14,000 times. *See* 1-ER-10. Neo4j USA provided evidence that a handful of customers

---

[5] Mr. Suhy only removed the Commons Clause from license texts that indicated that the Free Software Foundation held the copyright and which had directions to users to insert the AGPL content verbatim. 7-ER-1651, ¶ 29. Other contributors later may have removed the Commons Clause from other licenses.

[6] The parties disagreed about what a "drop-in replacement" actually means— we discuss this dispute in the Argument.

14

who encountered issues with ONgDB have directed questions to Neo4j USA.  5-
ER-1138, 1162, 1170, 1186.

## VI. SUMMARY OF ARGUMENT

The court determined that Neo4j USA had standing to bring a trademark
infringement claim notwithstanding that it is not the owner or exclusive licensee of
the Neo4j mark.  It did so based upon the "related companies doctrine," which, in
certain circumstances, allow uses by a related entity to inure to the benefit of the
trademark registrant.  But the related companies doctrine does not apply here
because Neo4j Sweden, the owner of the mark, did not control the use of the mark
by Neo4j USA.

Even assuming that Neo4j USA had standing, the court's conclusion that
defendants had infringed misapplied the nominative fair use doctrine.  Under that
doctrine, a use of a trademark to describe plaintiffs' mark by the defendants is not
infringing.  The court rejected application of the doctrine here because it believed
that defendants were misusing plaintiffs' mark to dupe consumers into believing
that the products and services defendants offered were somehow affiliated with
plaintiffs.  However, the court overlooked the context of how open-source software
is used.  Defendants here described their offerings as based on open-source
versions of Neo4j.  That was an accurate description of what plaintiffs offered, and
the language of defendants' websites made clear that defendants worked only with

15

open-source versions of Neo4j. Thus, the nominative fair use doctrine should have prevented a finding of infringement.

The court also found that defendants had engaged in false advertising, largely based upon its conclusion that: (1) statements made by defendants to the effect that the products with which defendants worked were free and open source versions of or alternatives to commercially licensed versions of Neo4j, and (2) statements that descriptions of the products with which defendants worked were "drop in" replacements for Neo4j were misleading. The first conclusion is faulty because the defendants made clear on their websites and elsewhere that defendants were not affiliated with Neo4j USA. The second conclusion is erroneous because the court assumed that the phrase "drop in replacement" meant that the products with which defendants worked were feature-for-feature duplicates of Neo4j commercial versions, whereas it is a jury question what the phrase meant. The fact that defendants described the product offered by GFI as a drop in replacement for both commercial and open source versions of Neo4j, where those versions differ in features, implies that defendants were not offering feature-for-feature replacements.

Finally, the court's finding that defendants had engaged in false designation of origin is faulty because, applying the *Sleekcraft* factors, there is little likelihood

16

of consumer confusion. For that reason, the court should not have held defendants liable for false designation of origin.

## VII.   ARGUMENT

### A.   Standard Of Review.

A grant of summary judgment is reviewed de novo. We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. … The court must not weigh the evidence or determine the truth of the matter but only determine whether there is a genuine issue for trial.

*MAI Systems Corp. v. Peak Computing, Inc.*, 991 F.2d 511, 516 (9th Cir. 1993).

"Because of the intensely factual nature of trademark disputes, summary judgment is generally disfavored in the trademark arena." *Interstellar Starship Servs, Ltd. v. Epix Inc.*, 184 F.3d 1107, 1109 (9th Cir. 1999).

This Court usually reviews a preliminary injunction under an abuse of discretion standard, which means that it reviews questions of law *de novo* and determinations of fact under the clearly erroneous standard. *E.g.*, *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1123 (9th Cir. 2014). In this instance, however, the court's preliminary injunction is "inextricably bound up" with its legal resolution of the summary judgment; this Court therefore exercises plenary review. *MAI Systems*, 991 F.2d at 516.

### D. The Court's Finding That Defendants Engaged In False Advertising And False Designation Of Origin Overlooks How Consumers Would View The iGov Website.

In addition to finding trademark infringement under 15 U.S.C. § 1114, the court below determined that defendants had engaged in false designation of origin and false advertising under 15 U.S.C. § 1125. A plaintiff need not have a direct ownership interest in a mark to bring a claim for false advertising under § 1125. Rather, to maintain a claim under § 1125(a), the plaintiff must show that it has a commercial interest in the allegedly misused mark that is "likely to be damaged" by the defendant's use of the mark. *Waits v. Frito-Lay, Inc.*, 978 F.2d 1093, 1109 (9th Cir. 1992).

The court below stated that "[d]efendants have made numerous misrepresentations in their advertisement and promotion of ONGDB." 1-ER-26. According to the court, these misrepresentations consist of two separate types: (1) that ONgDB and Neo4j Enterprise are "free and open-source" versions of or alternatives to commercially licensed Neo4j EE; and (2) statements that ONgDB is a "drop-in replacement" for an existing commercial license distribution of the same version number of Neo4j. 1-ER-26. In each instance, the court ignored that defendants did not have a product called ONgDB (GFI did), and how defendants might legitimately describe a consulting package focused on Neo4j open source licenses and ONgDB.

34

Before turning to the court's reasoning, it is necessary to point out that the evidence on which the court relied for these conclusions consists largely of statements made on the *GFI website*, not on the iGov or PureThink sites. *See* 1-ER-26, referring to pp. 29-30 of plaintiffs' memo, which in turn cites to 4-ER 919, 927, *etc.* The iGov website does contain statements "similar" to those the court relies upon, to the effect that a user who did not "need ONgDB Enterprise or Neo4j Enterprise open-source licensed distribution" could "simply download ONgDB Enterprise … as a drop-in replacement for an existing commercial licensed distribution of the same version number." 4-ER-935. But this statement does not imply that ONgDB is a feature-for-feature replacement for the commercial enterprise versions of Neo4j, since it states that ONgDB is a "drop-in replacement" *for users who don't need the support offered for commercial editions*.

Furthermore, the iGov website also states "ONgDB is a drop in replacement for the Neo4j Community and Enterprise branded distributions." 5-ER-1012. Since Neo4j Enterprise has many features not present in Neo4j Community, it is difficult to see how users could believe that, by calling ONgDB a drop-in replacement, iGov was asserting that ONgDB was a feature-for-feature copy of Neo4j Enterprise.

### E.    References to ONgDB As "Free and Open-Source" Are Accurate.

Moreover, the court's determination that references to ONgDB and Neo4j Enterprise as "free and open-source" versions of Neo4j somehow misrepresent what consumers are actually receiving does not, in fact, describe how these references are misleading.  The versions of Neo4j which GFI's ONgDB fork uses are *not* the commercial versions of that software, and nothing in the descriptions of that software on the iGov website implies that they are.  Rather, the iGov website accurately describes ONgDB as a fork of the *free* versions of Neo4j.

Neo4j USA, having decided that it wishes to monetize a software program that had previously been free and open-source, is now attempting to shut down any uses of the free and open-source versions, without removing any of those versions from Neo4j Sweden's free and open-source iterations on GitHub.

Consumers interested in Neo4j have options: They can obtain an open-source forked version of the software for free (without service); they can compile Neo4j Enterprise directly from the official Neo4j Sweden GitHub repository or have someone do it for them; or they can pay for the commercial version of the software, with service provided by Neo4j USA.  Neo4j USA *cannot* prevent those who create forks of the free software from informing users that (1) there are forks of the Neo4j software that are not subject to expensive licenses and (2) the "open-

36

source" forks of Neo4j can be obtained without obtaining a license from Neo4j USA.

As the court pointed out, plaintiffs' arguments about whether ONgDB is free and open-source largely depend upon whether defendants properly removed the so-called Commons Clause that Neo4j Sweden added to versions 3.4 and later of Neo4j under the AGPL. 1-ER-8, 26-27; *see* 6-ER-1415 (text of Commons Clause). However, defendants argued that, the software is free and open-source and by its own terms, the AGPL license (even with the Commons Clause added by Neo4j Sweden) allowed defendants to inform possible consumers that it was possible—indeed desirable—to use versions of Neo4j EE versions 3.4 and earlier, but did not indicate that iGov or GFI's ONgDB were offerings by Neo4j USA.

In any event, the court's conclusion concerning removal of the Commons Clause is fatally flawed. The court noted that AGPL versions 3.4 and later (which are incorporated into the Neo4j Sweden software license) state, in Section 7, that

> non-permissive additional terms [in this License] are considered 'further restrictions' within the meaning of section 10. If the Program as you received it, or any part of it, contains a notice stating that it is governed by this License along with a term that is a further restriction, you may remove that term "You may not impose any further restrictions on the exercise of rights granted or affirmed under this License.

Furthermore, section 10 states that "[y]ou may not impose any further restrictions on the exercise of the rights granted or affirmed under this License." 1-ER 26; 6-ER-1411-13.

Together, these provisions state that if a licensee receives the work (*i.e.*, Neo4j in any version covered by the license, including Neo4j EE 3.4 and later) with restrictive "non-permissive additional terms," they can be removed under section 7. Thus, defendants argued below that the Commons Clause which Neo4j Sweden added to the AGPL license from versions 3.4 onward could be removed as more restrictive than the AGPL license itself.

The court rejected this argument on the grounds that the license states that "[e]ach licensee is addressed as 'you'," and therefore "Sections 7 and 10 [of the AGPL] prohibit a *licensee* from imposing further restrictions, but do not prohibit a *licensor* [*i.e.*, Neo4j USA, in the court's view] from doing so." 1 ER-26-27. But even assuming the court's construction is correct, the court overlooks the way the license uses "you." The license states "[i]f the Program as *you* received it, or any part of it, contains a notice stating that it is governed by this License along with a term that is a further restriction, *you* may remove that term." 6-ER-1412 (emphasis added). Even if the AGPL permitted Neo4j to add the Commons Clause, the court does not explain why the licensee was prohibited from removing more restrictive terms.

Moreover, the court's construction has a glaring flaw. The court did not ask who was the copyright holder. Under the AGPL, the Free Software Foundation is the holder of the copyright. This is made clear in the Preamble, which states that

the FSF has a 2007 copyright on the document, and that "[e]veryone is permitted to copy and distribute verbatim copies of this license document, but changing it is not allowed." 6-ER-1408. Thus, when the AGPL states that each licensee is addressed as "you," that designation included Neo4j Sweden as a licensee of the copyright holder *and* those who sub-licensed from it. And there is no doubt that anyone using the AGPL to copyright their work is prohibited from adding more restrictive terms and that "downstream" users thus had a right to remove those restrictive terms.

In any event, the district court's conclusions do not distinguish between Neo4j Sweden—which imposes the Commons Clause—and Neo4j USA, which seeks to take advantage of that clause. As noted, Sweden is *not* the plaintiff on any of the trademark-related claims. Thus, Neo4j USA is attempting to enforce rights granted to Neo4j Sweden, with no showing that Neo4j USA had been assigned any of the rights granted under the license which included the Commons Clause.

While the question whether it was illegitimate for ONgDB to have removed the Commons Clause may be difficult, there can be no argument that Neo4j USA had any right to determine whether the Commons Clause applies to the versions of ONgDB offered in the United States. If Neo4j Sweden wished to prove that instances of Neo4j as described on the ONgDB website were not genuine editions of Neo4j, it could have registered the mark and brought a claim for infringement.

What it could *not* do was require that instances of the Commons Clause should be applied to software offered by Neo4j USA even though Neo4j Sweden was the author of the versions listed on the website and there was no showing that Neo4j USA had any ownership interest in the versions which involved the Commons Clause.

### F. Descriptions Of ONgDB As A "Drop-In" Replacement For An Existing Commercially Licensed Distribution Of The Same Version Number of Neo4j Are Accurate.

One of the most contentious of the disputes between Neo4j USA and defendants has to do with defendants' descriptions of ONgDB as a "drop-in replacement" for Neo4j EE. As the court recognized, plaintiffs argued that "because the software was not of the same quality and did not contain all of the features of Neo4j EE," it was misleading for defendants to describe it as a "drop-in" replacement.[13] 1-ER-27. Even assuming that plaintiffs' characterization of ONgDB as being of inferior quality or lacking certain features is accurate, the court's resolution of the issue usurps the role of the jury.

We note first that the assertion that ONgDB was an inferior product was based upon a claim from Philip Rathle, the Vice President of Products at Neo4j

---

[13]    As noted, the court overlooked the fact that iGov made statements that ONgDB is a drop in replacement for both Community and Enterprise editions. 5-ER-1012. This implies that ONgDB is *not* a feature-for-feature reproduction of Neo4j, since the Enterprise and Community editions have different features.

*Sleekcraft.*  This Court should therefore remand for a determination of the

likelihood of consumer confusion under *Sleekcraft.*

## VIII.  CONCLUSION

For the foregoing reasons this Court should reverse the summary judgment

entered against appellants and vacate the preliminary injunction based upon it, with

a remand to the district court to set the issues for trial.

Respectfully submitted,

Dated:  August 16, 2021                    _____/s/_____

Joseph A. Hearst

Counsel for Appellants John

Mark Mr. Suhy, PureThink,

LLC

And iGov, Inc.

47

# EXHIBIT 5

## No. 21-16029

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____

NEO4J, INC., NEO4J SWEDEN AB,

*Plaintiffs-Appellees*,

v.

PURETHINK, LLC, IGOV, INC., JOHN MARK SUHY,

*Defendants-Appellants*.

On Appeal from the United States District Court
For the Northern District of California
No. 5:18-cv-07182-EJD
Hon. Edward J. Davila

_____

## APPELLEES' ANSWERING BRIEF

_____

Allonn E. Levy (State Bar No. 187251)
appeals@hopkinscarley.com
John V. Picone III (State Bar No. 187226)
jpicone@hopkinscarley.com
Jeffrey M. Ratinoff (State Bar No. 197241)
jratinoff@hopkinscarley.com
HOPKINS & CARLEY, ALC
70 S First Street
San Jose, CA  95113-2406
Telephone:    (408) 286-9800

*Attorneys for Appellees*
Neo4j, Inc. and Neo4j Sweden AB

## DISCLOSURE STATEMENT

Pursuant to FRAP 26.1, the undersigned, counsel of record for Neo4j, Inc. ("Neo4j") certifies that Neo4j, Inc., as of this date, does not have a parent corporation and that no publicly held corporation holds 10% or more of its stock

The undersigned, counsel of record for Neo4j Sweden AB ("Neo4j Sweden") certifies that Neo4j, Inc., as of this date, is the parent corporation of Neo4j Sweden and that no publicly held corporation holds 10% or more of Neo4j Sweden's stock.

Date: October 28, 2021

HOPKINS & CARLEY
A Law Corporation

*/s/ Allonn E. Levy*

Allonn E. Levy, Esq.

*Attorneys for Appellee*
Neo4j, Inc. and Neo4j Sweden AB

## STATEMENT REGARDING ORAL ARGUMENT

Appellees do not believe oral argument would aid in the Court's decisional process and therefore does not request oral argument.  However, if the Court finds oral argument would be beneficial, Appellees would be honored to attend and present argument.

Date:  October 28, 2021

HOPKINS & CARLEY
A Law Corporation

*/s/ Allonn E. Levy*
_____
Allonn E. Levy, Esq.

*Attorneys for Appellee*
Neo4j, Inc. and Neo4j Sweden AB

-ii-

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT ...........................................................i

STATEMENT REGARDING ORAL ARGUMENT ........................... ii

TABLE OF CONTENTS.................................................................. iii

TABLE OF AUTHORITIES ...........................................................vi

I.     INTRODUCTION ................................................................1

II.    JURISDICTIONAL STATEMENT .....................................1

III.   STATUTORY AUTHORITIES ...........................................1

IV.    STATEMENT OF THE CASE .............................................2

       A.     Procedural Facts ......................................................2

       B.     Substantive Undisputed Facts .................................2

              1.     Identification of Relevant Entities and Individuals ..................2

              2.     Evolution of Neo4j-Branded Software and Appellants'
                     Pirated Versions Thereof ............................................4

              3.     Appellees Registered the NEO4J Mark ....................8

              4.     It is Undisputed that Appellants Use Appellees' Source-
                     Identifying NEO4J Mark to Market their Inferior
                     Software ...............................................................8

              5.     Appellants Falsely Advertise That ONgDB Replaces
                     Neo4j® EE And Is Free and Open Source .............12

              6.     Appellants Appeal the Interim Order Based Upon The
                     Ordered Injunctive Relief ......................................13

V.     SUMMARY OF THE ARGUMENT ...................................14

VI.    STANDARD OF REVIEW .................................................16

VII.   ARGUMENT........................................................................17

       A.     Appellants Demonstrate No Error in the Trial Court's Finding
              That Neo4j USA had Standing to Assert its Lanham Act Claims .....17

              1.     Standing Exists Under §1114(1) of the Lanham Act
                     Based Upon the Unchallenged Finding That Neo4j USA
                     is the Owner of the Registration for the NEO4J Mark ...........18

## TABLE OF CONTENTS
### (continued)

Page

2.     Standing Exists Under §1125(a) of the Lanham Act
Based Upon the Unchallenged Finding That Neo4J is a
"Nonowner With a Cognizable Interest" in the Mark ............19

3.     The Related Companies Doctrine is Irrelevant to
Appellant's Standing Challenge .............................................20

    a.     Had Appellants Properly Raised the Issue of
Ownership, They Nevertheless Fail to Assign
Error to the Legal Framework Used by the Trial
Court ...............................................................................21

    b.     Appellants' Sole Evidentiary Challenge – The
Neo4J License – Fails to Overcome the
Presumption of Validity.................................................23

B.     Appellants Demonstrate No Error In the Trial Court's
Conclusion That Appellants Failed to Defeat Neo4j USA's
Infringement Claim Through Nominative Fair Use..........................27

1.     The Unchallenged Threshold Finding that Appellants Did
Not Use the NEO4J Mark to Identify Appellees'
Products is Dispositive.............................................................29

    a.     Appellants' Promotion of iGov "Neo4j Enterprise"
and iGov "Government Package for Neo4j"
Described Appellants' Products ....................................30

    b.     Appellants Other Uses of the NEO4J Mark on
iGov's Website Similarly Did Not Describe
Appellee's Products ......................................................34

2.     Appellants Fail to Establish Any Error in the Trial
Court's Analysis under the Three-Prong New Kids Test........36

    a.     Appellants Fail to Challenge the Trial Court's
Finding that Appellants Used the NEO4J Mark
More Than Was Reasonably Necessary ........................36

**TABLE OF CONTENTS**
**(continued)**

|  |  | **Page** |

b. The Trial Court's Finding that Appellants Used the
NEO4J Mark to Suggest Endorsement of "Neo4j
Enterprise" is Supported by Undisputed Record
Evidence ......................................................................37

(1) Endorsement of iGov's "Neo4j Enterprise"........39

(2) Endorsement of ONgDB ....................................43

C. The Trial Court's Finding of False Advertising in Appellants'
Promotion of ONgDB Was Supported by Undisputed Record
Evidence ............................................................................47

1. Appellants' Assertions that ONgDB was "Free and
Open-Source" Neo4j EE Were False......................................48

2. Appellants' Assertions that ONgDB was a "Drop-In"
Replacement for Neo4j EE Were False or Misleading............54

D. Appellants Demonstrate No Error in the Trial Court's Finding
of Consumer Confusion in Granting Summary Judgment on
False Designation of Origin ..............................................59

VIII. CONCLUSION............................................................................63

CERTIFICATE OF COMPLIANCE FOR BRIEFS

CERTIFICATE OF SERVICE

ADDENDUM

## C. The Trial Court's Finding of False Advertising in Appellants' Promotion of ONgDB Was Supported by Undisputed Record Evidence

A false advertising claim under § 1125(a) requires proof that (1) defendant made a false statement of fact in a commercial advertisement about its own or another's product; (2) the statement actually deceives or has the tendency to deceive a substantial segment of its audience; (3) the deception is material; (4) defendant caused the false statement to enter interstate commerce, and (5) plaintiff has been or is likely to be injured as a result of the false statement. *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997). Proof establishing this claim will also establish a violation of the UCL. *Cleary v. News Corp.*, 30 F.3d 1255, 1263 (9th Cir. 1994) (UCL claims are "substantially congruent to claims made under the Lanham Act").

The trial court found Appellants engaged in false advertising in the promotion of ONgDB by making: "(1) statements that ONgDB and Neo4j Enterprise are 'free and open source' versions of or alternatives to commercially licensed Neo4j EE; and (2) statements that ONgDB is a 'drop-in replacement for an existing commercial licensed distribution of the same version number' of Neo4j EE." 1-SER-26–32 (24:1-30:13). Appellants only assign error to its finding that such statements were false. AOB, pp.34-43.

Appellants first argue that trial court ignored ONgDB was GFI's product,

-47-

and Appellants were merely offering a support package for it. AOB, p.34. As

detailed in Sect. VII.B.2. *et seq*., Appellants offered ONgDB via their website with

that package. More importantly, § 1125(a) expressly states that liability attaches

where a false statement is made "about its own ***or another's product***." *Southland*

*Sod Farms*, 108 F.3d at 1139 (emphasis). Thus, it is irrelevant that ONgDB

originated from GFI before Appellants marketed and offered it.

Next, Appellants argue the trial court's findings were primarily based on

misstatements made on GFI's website. AOB, p.35. Separately from the implied

concession that some misstatements *were* present on Appellant's site, the statement

contradicts the record, which shows iGov's website was replete with express

misstatements of ONgDB being a "drop in" replacement for Neo4j EE. 3-SER-

368–455 (green highlights); 1-SER-26 (24:1-6); 1-SER-29–30 (27:6-28:11)

(falsely stating ONgDB had same features as Neo4j® EE) (citing 2-ER-266–274,

2-SER-147–148, 2-SER-323–329, 2-SER-331–334, 3-SER-368–372, 3-SER-422–

427). Suhy also published numerous Tweets making similar statements. 3-SER-

486–495, 3-SER-497–501 (yellow highlights); 5-ER-1099–1100. These

misstatements are analyzed below.

### 1. Appellants' Assertions that ONgDB was "Free and Open-Source" Neo4j EE Were False

The trial court found that Appellants' representations regarding ONgDB as

"'free and open source' versions of Neo4j EE" were false because the plain

language of the Neo4j Sweden Software License did not permit them to remove the Commons Clause. 1-SER-26–27 (24:7-25:19). Appellants conceded that the falsity of their "'free and open source' versions" statements hinged on the interpretation of Section 7 of that license agreement. *Id.* at 24:11-15. They repeat that concession here. AOB, p.37-38.

Seeking to establish error, Appellants first argue that specific clauses in Sections 7 and 10 allowed them as licensees to remove "further restrictions" added by Neo4j Sweden. AOB, pp.37-38. This runs contrary to the express terms of the license, which must be interpreted as a whole to "so as to give effect to every part ... each clause helping to interpret the other." Cal. Civ. Code § 164; *Wapato Heritage, L.L.C. v. United States*, 637 F.3d 1033, 1039 (9th Cir. 2011).

Appellants isolate a clause within Section 10 that "***You*** may not impose any further restrictions on the exercise of the rights granted or affirmed under this License" and argue that this means that the licensor cannot add restrictions. AOB, pp.37-38. This ignores that the Neo4j Sweden Software License (and the AGPL) expressly defines "you" as ***the licensee***. 6-ER-1408 at §0 ("'The Program' refers to any copyrighted work under this License. Each licensee is addressed as 'you'"). Thus, Section 10 prohibits ***a licensee*** from imposing further restrictions, but does not prohibit Neo4j Sweden ***as the licensor*** of the Program from doing so. 6-ER-1413 at §10.

Appellants' assertion that Section 7 explicitly grants a licensee permission to remove further restrictions added by Neo4j Sweden as the licensor and copyright holder fares no better.[19] AOB, pp.37-38.  In making that claim, they cite to the clause "If the Program as you received it, or any part of it, contains a notice stating that it is governed by this License along with a term that is a further restriction, you may remove that term." *Id*.  This clause also cannot be read in isolation. Rather, it must be put in context within the surrounding clauses Section 7:

> Notwithstanding any other provision of this License, for material ***you*** add to a covered work, ***you*** may (if authorized by the copyright holders of that material) supplement the terms of this License with [the following six additional] terms ….
>
>                \* \* \*
>
> All other non-permissive additional terms are considered "***further restrictions***" within the meaning of section 10. If the Program as ***you*** received it, or any part of it, contains a notice stating that it is governed by this License along with a term that is a ***further restriction***, ***you*** may remove that term.

6-ER-1411–1412 at §7 (emphasis added).

_____

[19] Appellants also assert that Neo4j USA is improperly seeking to enforce Neo4j Sweden's copyright.  AOB, pp.39-40.  Not so.  The interpretation of the terms of the Neo4j Sweden Software License are merely necessary to determine the falsity of the advertisements based thereon – another point Appellant conceded below.  1-SER-26 (24:10-15 [parties agree issue turns on the interpretation of Section 7 of the license]).

When read in full, Section 7 clearly governs the actions of licensees alone, ergo the repeated use of the defined term "you," and thus pertains to what additional restrictions licensees may place on a covered work when adding source code and redistributing it as required by the license. Indeed, the sentence relied upon by Appellants is immediately proceeded by a sentence stating that a licensee who adds material to the original work may add any of the six enumerated "additional restrictions" and that any other "nonpermissive additional terms" are "further restrictions" *as defined by Section 10*. As noted above, Section 10 makes clear that only licensees are precluded from adding further restrictions. Thus, reading these provisions together, Section 7 only permits a *downstream licensee* to remove "further restrictions" placed by an *upstream licensee* that has added to the original work, which do not fall within the six enumerated additional terms.

Appellants' contrary read also contradicts Neo4j Sweden's expressed intent of precluding others from commercially benefiting from its software. 6-ER-1370 (¶11); 6-ER-1415 ("the grant of rights under the License will not include, and the License does not grant to you, the right to Sell the Software"); *see also* 6-ER-1370–1371 (¶12 ["Plaintiffs made the decision to modify the license terms used to distribute Neo4j® EE to prevent third parties from monetizing its software while not contributing back to the software or companies who are producers of the software"]). A licensor's intent to limit the commercialization of its software

-51-

should be given effect as intended by the ***licensor***, not the licensee. *Altera Corp. v. Clear Logic, Inc.*, 424 F.3d 1079, 1090-91 (9th Cir. 2005) (interpreting terms to effectuate licensor's intent to prevent competitors from benefitting from its software); *see also Micro Star v. Formgen Inc.*, 154 F.3d 1107 (9th Cir. 1998); *Storm Impact, Inc. v. Software of the Month Club*, 44 U.S.P.Q.2d 1441, 1997 WL 566378 (N.D. Ill. 1997) (distribution for commercial purposes infringes where license terms limit use to non-commercial purposes).

Appellants' strained reading is also illogical. It would nullify Neo4j Sweden's exclusive right, as copyright holder, to license Neo4j® EE under the terms of its choosing. *See Jacobsen v. Katzer*, 535 F.3d 1373, 1381 (Fed. Cir. 2008) ("[c]opyright holders who engage in open source licensing have the right to control the modification and distribution of copyrighted material"); 1-SER-26–27 (24:16-25:19) (citing same); *Apple Inc. v. Psystar Corp.*, 658 F.3d 1150, 1159 (9th Cir. 2011) (copyright owners may condition use). Thus, just as the trial court previously held (*Neo4j, Inc. v. Graph Found., Inc.,* No. 5:19-CV-06226-EJD, 2020 WL 6700480, at *4 (N.D. Cal. Nov. 13, 2020)), it again correctly held that nothing in the license prohibited Neo4j Sweden from adding the Commons Clause, nor authorized Appellants to remove it. 1-SER-26–27 (24:7-25:12).

Appellants further suggest that the trial court's reasoning was "flawed" because Neo4j Sweden violated the terms of the Free Software Foundation's

("FSF") copyright in the form AGPL license. AOB, pp.38-39. In doing so,

Appellants argue "you" means Neo4j Sweden. This is not supported by the plain

text, which clearly delineates that the license governs the rights of copyright holder

of "the Program," and not copyright holder of the underlying form. 6-ER-1408 at

§0 (Definitions), §2 (Basic Permissions). Even ignoring the inconsistencies

Appellants create with the defined term "you," they lack standing to enforce FSF's

copyright – and copyright enforcement in the form is not relevant to interpretation

and enforcement of Neo4j Sweden's license. *See Minden Pictures, Inc. v. John

Wiley & Sons, Inc.*, 795 F.3d 997 (9th Cir. 2015) (only the copyright owner,

assignee or an exclusive licensee of a right enumerated by §106 has standing to

bring an infringement action); *see also* 2-SER-282 (FSF confirmed "[o]nly the

copyright holder has the power to enforce the terms of the license"); 10-ER-2317–

2319 (189:1-191:3) (Suhy admits that Neo4j Sweden is the copyright owner of

Neo4j® EE).

Finally, Appellants argue its representations to the public were not

misleading because iGov's website stated that ONgDB is a free fork of Neo4j®

EE. AOB, p.36. Not only is this argument impermissibly raised for the first time

here (7-ER-1539–1580, 7-ER-2149–2158), but it also contradicts the record.

Appellants did not develop ONgDB as an independent fork[20] from properly licensed open source Neo4j® EE in compliance with the terms analyzed above. Rather, Appellants simply **stripped the restrictions** they did not wish to follow and used the code to create ONgDB in violation thereof. 1-SER-8–9 (6:2-7:6); 10-ER-2265–2323 (28:25-29:11, 171:23-172:23, 187:12-188:5, 199:22-200:20); 2-SER-185–188 (87:24-90:9); 2-SER-199 (159:3-10); 2-SER-153–155; 4-ER-856–858; 3-SER-575 (19:9-25); 6-ER-1374–1375 (¶¶27-30).

In sum, Appellants misguided interpretation of the Neo4j Sweden Software License does not withstand scrutiny. The trial court was correct in concluding that Appellants' representations that ONgDB was a "'free and open source' versions of Neo4j EE" were false.

### 2. Appellants' Assertions that ONgDB was a "Drop-In" Replacement for Neo4j EE Were False or Misleading

To demonstrate falsity under the Lanham Act, "a plaintiff may show that the statement was literally false, either on its face or by necessary implication, or that the statement was literally true but likely to mislead or confuse consumers." *Southland Sod Farms*, 108 F.3d at 1139. The trial court found the undisputed

---

[20] "In software development, a fork is a new application developed from an existing one. When an application is "forked," it creates a new, separate program, rather than a new development branch." https://techterms.com/definition/fork

# VIII.

# CONCLUSION

The trial court correctly concluded that Appellants' unauthorized use of Appellee's Mark to promote their own products was a trademark violation. Their false and misleading representations, made to promote Appellants' products, created likely confusion, actual confusion, and suggested a false origin for Appellants' products. These conclusions were amply supported by undisputed evidence and no reasonable jury would have ruled otherwise. This Court should, therefore, affirm.

Respectfully submitted,

Dated: October 28, 2021

*/s/ Allonn E. Levy*

Allonn E. Levy (CA Bar No. 187251)
HOPKINS & CARLEY
70 S. First Street
San Jose, CA 95113
Telephone: (408) 286-9800
Facsimile: (408) 998-4790
appeals@hopkinscarley.com

*Attorneys for Appellees*
Neo4j, Inc. and Neo4j Sweden AB

## CERTIFICATE OF COMPLIANCE FOR BRIEFS

I hereby certify that this motion complies with the type-volume limitations of FED. R. APP. P. 27(d)(2)(A) because this motion contains 13,948 words, excluding the parts of the motion exempted by FED. R. APP. P. 32(f).

This motion complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this motion has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Times New Roman font.

Date: October 28, 2021

HOPKINS & CARLEY
A Law Corporation

*/s/ Allonn E. Levy*

Allonn E. Levy, Esq.

*Attorneys for Appellee*
Neo4j, Inc. and Neo4j Sweden AB

# CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on October 28, 2021. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Date: October 28, 2021

HOPKINS & CARLEY
A Law Corporation

/s/ Allonn E. Levy
_____
Allonn E. Levy, Esq.

*Attorneys for Appellee*
Neo4j, Inc. and Neo4j Sweden AB

# EXHIBIT 6

No. 21-16029

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

**NEO4J, INC., et al.,**

*Plaintiff and Appellee,*

v.

**PURETHINK, LLC, et al.**,

*Defendant and Appellant.*

Appeal From a Judgment of the United States District Court
For the Northern District of California
Hon. Edward J. Davila
United States District Judge
N. D. Cal. No. 5:18-cv-07182 EJD

## APPELLANTS' REPLY BRIEF

ADRON W. BEENE, CA Bar # 129040
ADRON G. BEENE, CA Bar # 298088
1754 Technology Drive, Ste. 228
San Jose, CA 95110
Tel.: (408) 392-9233
Fax: (866) 329-0453
adron@adronlaw.com

Joseph A. Hearst, CA Bar # 130286
1569 Solano Ave. #525
Berkeley, CA 94707
Telephone: (510) 528-6863
Facsimile: (510) 280-2556
jahearst@pacbell.net

Attorneys for defendants, cross-complainants and appellants John Mark Suhy, PureThink, LLC and iGov, Inc.

# TABLE OF CONTENTS

I.      INTRODUCTION.......................................................................................1

II.     ARGUMENT ...........................................................................................2

        A.   NEO4J USA IS NOT THE OWNER OF THE NEO4J MARK AND
             THUS IS NOT ENTITLED TO SUE UNDER 15 U.S.C. § 1114.............2

        B.   USES OF THE NEO4J NAME BY IGOV WERE NOMINATIVE FAIR
             USE...........................................................................................6

        C.   THE TRIAL COURT'S FINDING THAT DEFENDANTS HAD
             ENGAGED IN FALSE ADVERTISING OVERLOOKED FACTUAL
             DISPUTES. ............................................................................14

        D.   THE COURT ERRED IN FINDING A LIKELIHOOD OF CONSUMER
             CONFUSION. ..........................................................................19

III.    CONCLUSION ......................................................................................21

'ONgDB Enterprise' and 'Neo4j Enterprise' on its website." Appellees' Br., 45. The pages on the website which Neo4j USA cites for this claim include statements that ONgDB and Neo4j Enterprise were "free and open-source" versions of the Neo4j graph databases. *See* 3-SER 269. The website is replete with statements that ONgDB and Neo4j Enterprise are free and open-source, in contrast with the Neo4j commercially licensed versions. In fact, the pages to which Neo4j refers are intended to let customers "know your options" and discusses the "3 main Neo4j offerings available including the free open-source option." *See e.g.*, 3 SER 270-72, 274.

The claim that the content on web pages intended to show why customers should choose ONgDB or Neo4j Enterprise *instead of* the commercial builds of Neo4j "impermissibly suggested affiliation with and endorsement by Appellees" (Appellees' Br., 46) is thus far-fetched. The issue of whether the website suggested endorsement is one that a jury should make.

### C. The Trial Court's Finding That Defendants Had Engaged In False Advertising Overlooked Factual Disputes.

In the opening brief, defendants argued that the court wrongly determined that defendants had engaged in false advertising when they asserted that ONgDB was a "free and open-source" version of Neo4j. Defendants also attacked the court's contention that defendants' description of OngDB as a "drop in"

replacement for Neo4j commercial versions was false advertising. Plaintiffs'
responses to these arguments do not withstand analysis.

### 1. Defendants Were Permitted—Indeed, Obligated—To Remove The "Commons Clause."

Neo4j USA argues that ONgDB is not a "free and open-source" version of
Neo4j EE because GFI was not permitted to remove the "Commons Clause" Neo4j
Sweden added to the Affero General Public License ("AGPL") that governed
versions of Neo4j EE prior to version 3.5. Appellees' Br., 48-52. Neo4j USA
asserts that the AGPL license "must be interpreted as a whole … 'so as to give
effect to every part … each clause helping to interpret the other.'" Appellees' Br.,
49, *quoting* Cal. Civ. Code § 164. Then Neo4j USA simply parrots the trial court's
statement that Neo4j Sweden was permitted to impose the Commons Clause
because it was a "licensor," while the prohibition against removal or addition of
any terms refers only to a "licensee."

Neo4j USA itself fails to discuss the entire contract, including in particular
the clause at the beginning stating that the Free Software Foundation is the holder
of the copyright, and that "[e]veryone is permitted to copy and distribute verbatim
copies of this license document, but changing it is not allowed." 6-ER-1408.
Neo4j USA is thus a licensee, because it is not a copyright holder. Indeed, Neo4j
USA implicitly concedes this when it claims that "Section 7 [of the AGPL] only
permits a ***downstream licensee*** to remove 'further restrictions' placed by an

*upstream licensee.*" Appellees' Br., 51. Neo4j USA is an upstream licensee, not an original licensor.

Moreover, Neo4j USA largely ignores that only Neo4j Sweden is the upstream licensee and has standing to complain about the removal of the Commons Clause, referring to the argument only in a footnote. Appellees' Br., 50, fn. 19. The issue is not simply that the interpretation of the terms of the Neo4j Sweden Software License [*i.e.*, the AGPL] is necessary to determine if defendants' advertisements were faulty, as Neo4j USA contends, but rather whether Neo4j USA is entitled to enforce rights that belong to Neo4j Sweden. In the same vein, the claim that defendants "lack standing to enforce FSF's copyright" (Appellees' Br., 53) is unavailing. Defendants are not attempting to enforce FSF's copyright—they are instead contending that the AGPL gave them permission to remove restrictive license terms not included in the AGPL.

Plaintiffs contend that reading the license in the manner defendants have suggested would "nullify Neo4j Sweden's exclusive right, as copyright holder, to license Neo4j® under the terms of its choosing." Appellees' Br., p. 52. But nothing prevented Neo4j Sweden from licensing using any terms it wished. What it could *not* do, however, was license its software pursuant to the AGPL under terms not permitted by the AGPL. If Neo4j Sweden did not like the AGPL's terms, it was under no obligation to use that license. Mixed in the morass of

licensing is a more fundamental issue. Free and open-source software may come with many different open-source license agreement types. There is GPL, AGPL, Apache, MIT, BSD, *etc*. *See* https://opensource.org/licenses/alphabetical. Some licenses are more restrictive and some more permissive. But the type of license does not change the fact the license is "free" and includes "open-source software."

<div align="center">

**2.    It Was, At Worst, A Jury Question Whether Describing ONgDB As A "Drop In Replacement" Was Accurate.**

</div>

Plaintiffs argue that descriptions of ONgDB as a "drop in replacement" were false or misleading because ONgDB is not a feature-for-feature copy of Neo4j EE 3.5 and later. Plaintiffs argue that there is "no evidence showing that a jury could find consumers did not understand their statements as at least assuring compatibility with Neo4j EE." Appellees' Br., 55. But of course it was plaintiffs' burden to show that no reasonable juror could believe that the statement had the meaning defendants ascribe to it. And plaintiffs do not even acknowledge that the claim that ONgDB does not replicate the features of Neo4j EE 3.5 and later is based solely on the say-so of Neo4j USA's Mr. Rathle, who did no empirical testing to confirm his opinion. *See* 6-ER-1375-76. Yet Neo4j was required to prove falsity with empirical evidence. *Presidio Enters., Inc. v. Warner Bros. Distrib. Corp.*, 784 F.2d 674, 679 (5th Cir.1986). There is no evidence in the record to show that data and queries on both versions do not work. Even though

<div align="center">

17

</div>

and offered a product with "lesser features" (Appellees' Br., 62) has been dealt with above, but the court should note that defendants carefully explained to prospective users what features they would and would not get if they opted to purchase services from iGov. *E.g.*, 2-ER-268-273.

## III.   CONCLUSION

For the foregoing reasons and for the reasons stated in the opening brief this Court should reverse the preliminary injunction and vacate the summary judgment on which it is based, with a remand to the district court to set the issues for trial.

Respectfully submitted,

Dated:  December 3, 2021            _____/s/_____

Joseph A. Hearst

Counsel for Appellants John Mark Mr. Suhy, PureThink, LLC and iGov, Inc.

# EXHIBIT 7

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Neo4j, Inc., , a Delaware corporation,<br><br>    Plaintiff,<br><br><br>    v.<br><br><br>PureThink, LLC, a Delaware limited liability company,<br><br>IGOV, INC., a Virginia corporation, and<br><br>JOHN MARK SUHY, an individual.<br><br>    Defendants. | CASE NO. 5:18-cv-07182<br><br><br><br><br><br>**EXPERT REPORT OF**<br><br>**BRADLEY M. KUHN** |

EXPERT REPORT OF BRADLEY M. KUHN
22 DECEMBER 2022

1

## Introduction

1. I am providing this expert report in support of Defendants: PureThink, LLC, IGOV, Inc. and John Mark Suhy.

2. This expert report primarily discusses the issues of the removal of the Commons Clause ("CC") from the "Neo4j Sweden Software License" and Suhy's and/or PureThink, LLC's and/or IGOV, Inc.'s redistribution of the Neo4j software under the AGPLv3 with CC removed.

3. I am appearing as an expert in this case *pro bono publico*. I have asked Defendants' counsel only to cover direct costs of travel expenses to attend depositions and/or the trial (— should I be deposed and/or appear as a witness at trial in this case).

## Qualifications

4. I am currently employed as the Policy Fellow of the Software Freedom Conservancy, Inc. ("SFC"), a 501(c)(3) not-for-profit organization founded in New York. SFC is a nonprofit organization centered around ethical technology. SFC's mission is to ensure the right to repair, improve and reinstall software. SFC promotes and defends these rights through fostering free and open source software (FOSS) projects, driving initiatives that actively make technology more inclusive, and advancing policy strategies that defend FOSS (such as copyleft).

5. My interest in computing began as a child, when I received my first computer as a gift from my parents and began to regularly write new software for it and share that software with my friends, who helped me improve it.

6. As an undergraduate, I studied Computer Science at Loyola College in Maryland (now called the Loyola University Maryland). I received from there in 1995 a summa cum laude Bachelor's Degree in Computer Science, and the James D. Rozics Computer Science Medal, which is an award given to the year's top student in Computer Science at each graduation. I was furthermore elected into Upsilon Pi Epsilon (the National Computer Science Honors Society) and the Phi Beta Kappa honors society, which is the USA's oldest academic honors society for the liberal arts.

7. From 1991 through 2001, I worked consistently on a part-time (while studying) and then a full-time (when not in school) basis as a system administrator and software developer. I administered, configured, programmed, and debugged a variety of Unix and Unix-like operating systems[1] and software for those

---

[1] Unix was a computer operating system developed by AT&T in the early 1970s. Many systems were later developed that operated similarly like Unix, and are typically called "Unix-like" operating systems.

2

systems. My work experience spans the wide array of possible occupations that are typical for individuals trained in computer science.

8. From 1991-1995, while working as a programmer for the Baltimore Rh Typing Laboratories, Inc. (aka BRT Laboratories), I downloaded, configured, modified, and installed numerous Free and Open Source[2] (FOSS) programs. I became at that time an active participant in Usenet[3], and, at the encouragement of my employer, began sharing code that I improved with others who sought to solve similar tasks, and collaborated with other developers online to improve that code.

9. I have continued my code contributions to FOSS on a semi-regular basis since that time. I have submitted patches — derivative modification of the software, sent back to the original author for later inclusion – to various projects. I have also served as the co-maintainer of FOSS projects at times.

10. In 1992, I began using the Linux-based systems. I downloaded in 1992 the "Soft Landing System", an early GNU/Linux distribution put together by volunteers, and installed it on my personal computer. My professors saw the value in this software, and requested that I install this software throughout the computer lab at my undergraduate institution. I did so, and was later employed by Loyola's computer science department to continue maintaining, modifying and administering these systems until I graduated.

11. In 1997, I began a graduate program in Computer Science at the University of Cincinnati. In early 2001, I graduated from that program, completing a Master's Degree with thesis. My thesis dealt with programming language topics related to the Open Source and Free Software programming language named Perl. This work required me to participate heavily in the Perl community and contribute libraries and modification to the internals of the Perl language implementation. The original inventor and author of Perl, Larry Wall, served on my thesis committee. My thesis was later used by Wall as one of the justifications for the launch of another related Open Source project, called the Parrot Virtual Machine.

12. In 1996, I began volunteering for the Free Software Foundation, Inc. ("FSF"). Initially, Richard M. Stallman, President of the FSF, asked me to serve as a webmaster for the FSF and GNU websites. (GNU is an independent project that is fiscally sponsored by the FSF.)

13. As webmaster, I assisted in creation and editing of the initial "license list" page on the GNU website. This page, a version of which is still available today on the GNU website, explains the details of various software licenses and whether they meet GNU's criteria for Free Software licenses — meaning they give

---

[2] The term "Open Source" did not come into common usage until 1999, so it is somewhat anachronistic to use it referring to events that took place before then. However, I include here as it is a term more familiar to those outside of the field of computer science.

[3] Usenet was a worldwide discussion forum that was widely used by scientists, researchers, and programmers in the 1980s and early 1990s.

users the freedom to copy, share, modify and redistribute the software — and whether the licenses are compatible with the FSF's own licenses. In assisting Dr. Stallman with this type of work, as I have done on a regular basis from the late 1990s through October 2019, I first developed and then improved my expertise interpreting the requirements and details of FOSS licenses.

14. As time went on in my career, I began to specialize specifically in the specific sub-area of FOSS licenses called "copyleft licensees". Copyleft licenses are FOSS licenses that have specific requirements that assure users' and consumers' right to copy, modify, and redistribute the software — both non-commercially and commercially (i.e., as part of a business endeavor).

15. In 2000, I was hired to work for the FSF, initially remotely from Cincinnati, and then on-site in Boston upon completion of my Master's thesis in 2001. I was promoted multiple times, and eventually became Executive Director of the FSF, a role which I served in until March 2005.

16. During my time as an employee of FSF, I assisted in various types of work related to software licensing and compliance with the GNU General Public License ("GPL"), the GNU Lesser General Public License ("LGPL") and other related and similar licenses. It was typical by the time of my departure that I led the resolution of thirty or more GPL violation matters each year, including a number that were made public, such as the OpenTV GPL violation and the original Linksys WRT54G violation.

17. In 2006, I volunteered to be the President of the SFC. Once the SFC began to receive funding, I became SFC's first employee. I have held multiple roles and positions at SFC.

18. In 2006 and 2007, I participated in the public process to comment on, evaluate, and make suggestions for the new version of the GPL (version 3). This work included many direct discussions with the GPLv3 drafters themselves.

19. In March 2010, I was elected to the Board of Directors of the FSF. I held a position on FSF's Board of Directors until October 2019. My CV is attached as Exhibit L and list of publications is provided as Exhibit M. A true and correct copy of my Expert Report in an enforcement action is attached as Exhibit N.

20. Throughout my long affiliation with the FSF, and also through my daily work at SFC, my primary focus and expertise centers around issues related to "copyleft" licenses such as the GPL and the Affero General Public License ("AGPL").

21. While Executive Director of the FSF circa 2002, I was involved in many discussions internally at the FSF and with the public about what was then called the "web services loophole" in the GPL. Namely, since the copyleft terms of the traditional GPL triggered only on software *distribution*, and typical deployment on a

4

website (for server-side software) did not involve distribution to the software's users, no copyleft requirements were triggered.

22. Circa early 2002, based on the Computer Science concept called a "quine", I invented what is now known as the "Affero Clause". This idea was written up by others and used as part of the AGPL, version 1 ("AGPLv1"). The Affero Clause requires that users of software via a web interface must have the opportunity to request and receive the "Corresponding Source" of the software.

23. During the early stages of the public comment process for the GPLv3, I was involved in various discussions regarding whether the Affero Clause would be incorporated into GPLv3 itself, or if it would remain a separate license from the main GPLv3.

24. As part of the public comment process for drafting the GPLv3 (and, ultimately, the AGPLv3), four public, invite-only committees ("A" – "D") were formed for draft discussion. I was invited to participate in "Committee D".

25. After the drafters of GPLv3 decided that the Affero Clause would not be included, and after the GPLv3 was officially published, I worked directly with the drafters to suggest and propose text for AGPLv3 §13 — the only term of AGPLv3 that differs from the GPLv3, and the section which includes the "Affero Clause".

26. During my time as an employee at the FSF from the late 1990s until March 2005, I led and participated in many discussions with the general public about concerns, ideas, and issues related to copyleft licensing. I have continued that work both as a volunteer and employee at other organizations since then.

27. A key issue of study and concern was the issue of "Further Restrictions" that licensors attempted to place outside of the requirements of the GPL.

28. The issue of "Further Restrictions", and what terms copyleft licenses should incorporate to prevent the imposition of "Further Restrictions" became one of the many issues on which I developed expertise.

5

## History of The "Further Restrictions" Copyleft Licensing Issue

29. The FOSS ecosystem depends heavily on the ability of third parties to understand their rights and engage in the unfettered freedom and right to copy, modify and redistribute software, in both non-commercial and commercial contexts.

30. A key policy tenet of copyleft licensing is assuring that copyleft license texts cannot be used to impose "Further Restrictions" on downstream recipients.

31. Imposition of Further Restrictions completely undermines the entire purpose of a copyleft license. Copyleft licenses are drafted carefully to guarantee rights of both individuals and firms that may receive the copyleft-licensed software after it has passed through (and been modified, repurposed, reconfigured and improved by) many different other entities.

32. The functioning of the FOSS ecosystem relies on individuals and firms to determine that when they receive a copy of FOSS software licensed under a specific FOSS license, that they can feel confident that the rights embodied in that license are unfettered and that there is no ambiguity or confusion about those rights.

33. Copyleft licenses go even a step further: they are designed and drafted to assure that no one in that entire distribution chain can change the terms of the license. The terms of the licenses guarantee that everyone who receives the software under that license has the precise same rights and permissions as everyone else.

34. Starting as early as 1996, and possibly earlier, I became aware in my work as a FOSS activist that there was a problematic practice in copyleft licenses. At the time, activists tended to call this the "no military use problem", because the issue came up most with regard to software authors who were also anti-war activists.

35. It was common throughout the late 1990s and into the early 2000s for anti-war activists who were also software authors to license their software under licenses that gave wide permissions, but prohibited any use by the any military (or, sometimes, specifically the USA military).

36. While many FOSS activists (including myself) were sympathetic to their concerns about FOSS being used in the military industrial complex, we nonetheless felt strongly that the rights and permissions to copy, modify and redistribute should remain unfettered — even for those who applied the software to activities that some of us found abhorrent. Thus, restrictions on military use, or really any specific application of the software, was never included in any widely adopted copyleft license.

37. However, it became quite common between circa 1996–2005 for anti-war activists to license their software under a potentially ambiguous license —- often formulated as "GPL, but military use is prohibited" (or some similar formulation).

38. During my time as an employee of the FSF from 1997–2004, I regularly handled community discussions, requests, and (most importantly) complaints from users who expressed that this Further Restriction of "military use prohibited" was problematic for the copyleft ecosystem for various reasons.

39. While the "military use prohibited" clauses were the most common, during the time frame of 1997–2004, I recall seeing many different formulations of Further Restrictions tacked onto the GPLv2 in various ways. I specifically recall seeing Further Restriction targeted at specific companies, or (quite ironically), I recall at least once seeing "GPL, non-commercial use only" as a license for software.

40. During this period, my standard answer (which as FSF's Executive Director, I made the official response for all such inquiries) was to inform those who complained and/or inquired that software under such a license (— one that referenced the main GPL, version 2 ("GPLv2") text but then added a Further Restriction – ) was software that was ultimately *not FOSS*.

41. Our reasoning for this conclusion was that the license might be construed and/or perceived as somewhat ambiguous. On one hand, the GPLv2 assured even the military's right to copy, modify, and redistributed the software — provided they continued to provide all who received distribution of the software the Corresponding Source. On the other hand, a term had been added to the overarching license that contradicted those terms. Furthermore, the GPLv2 explicitly prohibited the imposition of Further Restrictions, but provided no remedy for what downstream recipients should do in that situation. Users were simply advised to completely avoid software under such a license.

42. Frustrated at the lack of a better solution, everyone that I knew involved in copyleft license policy (including various past and current employees, Directors, and others at the FSF itself) agreed that this issue should be resolved by a provision in future versions of the GPL.

43. The problem continued in the FOSS community after I left the employment of the FSF in March 2005. On or about 2006-08-14, a (now defunct) project named "GPU" was actively covered in the press because the project has had added an Further Restriction prohibiting military use. A true and correct copy of an article written by the (then) journalist Tina Gasperson for linux.com is included in Exhibit A.

7

### The Public GPLv3 Drafting Process and Relevant Historical Records Online

44. The GPLv3/AGPLv3 drafting process was (primarily) a public process run by the FSF from circa late 2005 through the release of the AGPLv3 on 2007-11-19. The FSF released a comprehensive archive of all public materials related to the drafting process. Then entire archive can be downloaded from:

`https://gplv3.fsf.org/gplv3-archive.tar.gz`

That large archive file is linked from `https://www.fsf.org/licensing/gplv3-archive`. For purposes of this report, I extracted all exhibits and materials regarding the GPLv3/AGPLv3 drafting process from that archive, which I verified on 2022-12-20 was downloadable from FSF's website. I refer to this archive in the remainder of this report as the "GPLv3 Archive".

45. On 2006-01-16, the FSF released the first public discussion draft of the GPLv3. Exhibit B is a true and correct copy of the document the following file found in the GPLv3 archive:

`gplv3.fsf.org/gpl-draft-2006-01-16.txt/download`.

46. On or about 2006-07-26, the FSF released the second public discussion draft of the GPLv. A true and correct copy of the FSF's published change-tracked markup (from discussion draft 1) — which includes footnotes for rationale of changes. Exhibit C is a true and correct this copy of the following file found in the GPLv3 archive: `gplv3.fsf.org/gpl3-dd1to2-markup-rationale.pdf/download`.

47. On 2006-08-03, the FSF published a supplementary opinion on the "Additional Terms" section of GPLv3 at `https://gplv3.fsf.org/additional-terms-dd2.html` Exhibit D is a true and correct copy of that document, which appears in the GPLv3 Archive:

`gplv3.fsf.org/additional-terms-dd2.pdf/download`

48. On 2007-03-28, the FSF released the third public discussion draft of the GPLv3. A true and correct copy of the FSF's published change-tracked markup (from discussion draft 2) is found in Exhibit F, which is found in the GPLv3 Archive at: `gplv3.fsf.org/gpl3-dd2to3.pdf/download`.

49. On 2007-11-19, the FSF released the Affero GPL version 3 ("AGPLv3"). A true and correct copy of the AGPLv3, as downloaded from `https://www.gnu.org/licenses/agpl-3.0.txt` is in Exhibit H.

50. While the FSF began providing on 2021-11-17 the comprehensive archive file ("GPLv3 Archive") for archival convenience of researchers and licensing practitioners, to my knowledge and recollection, the FSF has *also* continuously made available these aforementioned discussion drafts, license texts, and rationale documents in an easily accessible and browsable format on the website `https://gplv3.fsf.org` — from their publication dates until present day.

**History of AGPLv3§7¶3 and its Prohibition On "Further Restrictions"**

51. The first public discussion draft of GPLv3, released on 2006-01-16, presented to the public the first attempt at the "Further Restrictions" clause: "No other additional conditions are permitted in your terms; therefore, no other conditions can be present on any work that uses this License."

52. I recall that there was substantial discussion between publication of the first and second discussion draft — informed by experiences that the FSF, I, and others had advising the community (described above in ¶ 41 and earlier paragraphs) — about developing a method for GPLv3 that would liberate downstream users and redistributors to address the problem themselves.

53. In the second discussion draft of GPLv3, the FSF presented a Further Restriction clause that stated: "Additional requirements are allowed only as stated in subsection 7b. If the Program as you received it purports to impose any other additional requirement, you may remove that requirement" (Exhibit C, page 20).

54. In the contemporaneously published public rationale document for this draft term, the FSF stated: "Here we are particularly concerned about the practice of program authors who purport to license their works under the GPL with an additional requirement that contradicts the terms of the GPL, such as a prohibition on commercial use. Such terms can make the program non-free, and thus contradict the basic purpose of the GNU GPL; but even when the conditions are not fundamentally unethical, adding them in this way invariably makes the rights and obligations of licensees uncertain" (Exhibit C, page 20).

55. In a follow-up opinion a few weeks later, the FSF wrote: "if a user receives GPL'd code that purports to include an additional requirement not in the [GPLv3§]7b list, the user may remove that requirement. Here we were particularly concerned to address the problem of program authors who purport to license their works in a misleading and possibly self-contradictory fashion, using the GPL together with unacceptable added restrictions that would make those works non-free software" (Exhibit D, page 3).

56. In the third public discussion draft of GPLv3, the FSF presented a modified "Further Restrictions Clause" as follows: "If the Program as you received it, or any part of it, purports to be governed by this License, supplemented by a term that is a further restriction, you may remove that term" (Exhibit F, page 15). This clause is carried forward, without further modification, into the fourth discussion draft in 2007-05-31, and to the final official release of GPLv3 on 2007-06-29.

57. As with any public comment process, there were differing views throughout the drafting process on the relative merits of the Further Restrictions Clause. Ultimately, as can be seen in the final draft, the Clause

9

was *included*. In my opinion, the drafting process bore out the best option for the copyleft community. The FSF clearly agreed, since they included the Clause in the final version of the license.

58. Other participants clearly agreed as well. For example, on 2007-06-01, the day after the release of the fourth discussion draft, User "frx", whom I recall was a regular public commentor throughout the GPLv3 drafting process, submitted comment 3,220 in the GPLv3 process – commenting specifically on the Further Restrictions Clause: "I'm glad to see that this is explicitly stated: every attempt to license a work under the terms of GPLv3 with further restrictions is equivalent to licensing under the plain GPLv3. This is good, since there are unfortunately many people that license works in inconsistent manners (such as GPLv2 + additional restrictions); creating a rule that resolves this kind of inconsistencies for the better is a good thing to do". A record of this comment is available at:

`https://gplv3.fsf.org/comments/rt/readsay.html?filename=gplv3-draft-4&id=3220`

A true and correct copy of that comment can be found in Exhibit E.

59. The AGPLv3 contains the same Further Restrictions Clause — unmodified from the version as it appeared in third public discussion draft of GPLv3.

60. The public who uses the text of the AGPLv3 and GPLv3 have been on notice by the FSF since (at least) 2007-03-28 that this term is an important and essential part of the license. Furthermore, the FSF transparently and publicly communicated the intent and expectations for utilization of the Further Restrictions Clause in their license drafting rationale documents that led up to the final draft of that Clause.

61. I conclude based on these documents, plus my recollection of the GPLv3 and AGPLv3 drafting process in which I participated, and my extensive work with the FSF and SFC in copyleft licensing, that the Further Restrictions Clause was specifically design to allow removal of an additional term when a licensor chose to use the text of the GPLv3 and/or AGPLv3 along with a term that the licensee viewed as a "Further Restriction".

### On Removal and Modification of FOSS Terms By Downstream Users

62. In the world of proprietary software licensing, it is undoubtedly exceedingly rare that a downstream user has permission to modify the terms upon redistribution.

63. In FOSS, this practice is quite common. Such modification of terms occurs both implicitly and explicitly.

64. Implicitly, it is widely understood that certain non-copyleft licenses, such as the widely used MIT license, are "Compatible" with copyleft licenses such as the AGPLv3.

65. Individual developers, commercial software firms, and hobbyists routinely include MIT-licensed software in larger AGPLv3'd works. When doing so, they implicitly relicense those MIT-licensed works under the AGPLv3.

66. Authors of MIT-licensed works encourage other developers and firms to incorporate these works not only in AGPLv3'd works, but also in proprietary software works as well. In effect, their license implicitly encourages such incorporation.

67. Copyleft licenses, being more complex, have explicit terms for Compatibility that require downstream users to take explicit actions to combine works under different licensing terms.

68. For example, the Lesser General Public License, v2.1 (LGPLv2.1) in its §3 states: "You may opt to apply the terms of the ordinary GNU General Public License instead of this License to a given copy of the Library. To do this, you must alter all the notices that refer to this License, so that they refer to the ordinary GNU General Public License, version 2, instead of to this License".

69. LGPLv2.1 is just one example where the downstream user is required and encouraged to make changes to the license notices of a copyleft license.

70. As such, changing and modifying license notices based on instructions given in a larger document is customary and normal activity for FOSS developers, and has been so at least since the publication of LGPLv2.1 in February 1999.

### The "Further Restrictions" And Their Removal

71. I have reviewed the document `enterprise/neo4j-enterprise/LICENSE.txt`.

This document appears on `https://github.com/neo4j/neo4j` at 2018-05-20 in

Git revision `47d845925e639297ab2564965ba68105d897e818`.

A true and correct copy of this license, appears as Exhibit G. This is the entirety of AGPLv3 as published by the FSF in Exhibit H, with the addition of the further restrictions outlined in the Commons Clause ("CC"). I understand from this litigation that the Court prefers to refer to this document as the "Neo4j Sweden Software License". For consistency, this report also refers to this document by that name.

72. In my professional opinion, the Neo4j Sweden Software License is structured and presented precisely in the manner that the Further Restrictions Clause anticipated.

11

73. Specifically, I believe that the AGPLv3 contemplated this precise situation: namely, a licensor licenses under the unmodified text of the AGPLv3, but also includes another term that contradicts, limits, and/or restricts the permissions granted under the AGPLv3.

74. If I had encountered the "Neo4j Sweden Software License" during the normal course of my work as a FOSS activist and FOSS licensing expert, I would have felt removal of the CC portion, upon redistribution of the software, was permitted by the AGPLv3's Further Restrictions Clause.

75. In my opinion, when John Mark Suhy encountered the Neo4j Sweden Software License, his removal of the CC and redistribution of the Covered Work under pure AGPLv3 would be considered customary, permissible, and even widely encouraged in the field of FOSS.

### Neo4j's Own Licensing Choice Permitted Removal of "Commons Clause"

76. In my opinion, the Neo4j Sweden Software License itself gave Suhy, PureThink, LLC, and IGOV, Inc. this permission explicitly. Specifically, even if one firm is the only copyright holder and therefore sole licensor of the work[4], the Neo4j Sweden Software License has the entire the AGPLv3 entirely *intact*, *including* its Further Restrictions Clause.

77. Akin to text of the LGPLv2.1, the Neo4j Sweden Software License states the two following facts:

- "[This software] is subject to the terms of the GNU AFFERO GENERAL PUBLIC LICENSE Version 3, with the Commons Clause as follows:" . . .

- "If the Program as you received it, or any part of it, contains a notice stating that it is governed by this License along with a term that is a further restriction, you may remove that term"

78. In my opinion, given the common FOSS practices of either explicitly or implicitly changing terms upon redistribution within the confines and requirements stated in the license, any reasonable party would determine that the Neo4j Sweden Software License intends — given that it was intentionally drafted to include the Further Restrictions Clause — that the CC can be removed by anyone who engages in redistribution (be it commercial or non-commercial) of the software covered by the Neo4j Sweden Software License.

### Other Licensing Options for Neo4j Software

79. In the FOSS community, the "GNU Affero General Public License" and "GNU General Public License" are well-known brands (owned by the FSF). These are held in high esteem by software developers who care about the political issue of software rights and freedom.

---

[4] ¶ 99 and following discusses the potential outcomes if, in fact, there is *not* a sole licensor of the work

12

80. Developers routinely look to confirm that software is licensed under the AGPLv3 or GPLv3 before using or relying on the software.

81. Based on my personal knowledge and discussions with staff and Board members of the FSF, the FSF is aware of the power of their brand recognition and, as an organization, the FSF cares deeply that developers can rely on the permissions and clauses in all versions of the GPL.

82. The FSF is a very small non-profit organization with extremely limited resources. I recall from my experience as a past employee that the FSF simply does not have sufficient resources to police trademark infringement of its registered trademark on "GNU" and its common-law trademark on "GNU Affero General Public License".

83. I believe that the Further Restrictions Clause was, in part, included in the GPLv3 and AGPLv3 to assure that the community could rely on the fact that if the text of the entire AGPLv3 was included in the licensing of some software, that Further Restrictions could not be placed on that software.

84. The FSF does permit licensors to reuse various portions of their license texts, *provided that* the licensors do not use the brand names of the GNU licenses, and do not include the preamble text.

85. Specifically, the FSF states in their GPL FAQ: "You can legally use the GPL terms (possibly modified) in another license provided that you call your license by another name and do not include the GPL preamble, and provided you modify the instructions-for-use at the end enough to make it clearly different in wording and not mention GNU". Exhibit I is a true and correct copy the relevant FAQ text as found at:

`https://www.gnu.org/licenses/gpl-faq.en.html#ModifyGPL`.

86. According to The Internet Archive, similar text has appeared on FSF's GNU website since 2012-01-07. Exhibit J is a true and correct copy of the relevant FAQ text as it was indexed by the Internet Archive at the following link:

`https://web.archive.org/web/20120107170516/https://www.gnu.org/licenses/gpl-faq.en.html#ModifyGPL`

87. I confirm that in the field of FOSS licensing, FSF's policy is well-known and oft discussed. Commonly, provisions, terms, and clauses from the GPL routinely are reused in other FOSS (and non-FOSS) licenses, with permission from the FSF via their public statement quoted in ¶ 85.

88. Given this, it is reasonable and customary for FOSS developers and firms that use FOSS to rely on FOSS licensing information as presented when text from the AGPLv3 is involved. Specifically, when software users and/or redistributors encounters the full, unmodified text of the AGPLv3 (even with a Further Restriction),

13

the users and/or redistributors customarily believe in good faith that the choice of licensing in this manner was intentional.

89.  Users and/or redistributors are keenly aware that software providers do have the option to construct their own license using terms similar to the AGPLv3 under a different name and without the preamble. Therefore, if a license that has the full text of the unmodified AGPLv3, users and/or redistributors have a good faith basis to exercise any and all clauses of the AGPLv3 — including the Further Restrictions Clause and its permission to strike and remove additional restriction clauses.

### MongoDB's Modified AGPLv3

90.  MongoDB, Inc. ("MongoDB") is well-known and has a software offering (itself also called MongoDB) that competes with the Neo4j software in the field of NoSQL database software.

91.  For many, MongoDB licensed their primary software product under the terms of the AGPLv3.

92.  On 2018-10-16, MongoDB announced that the product would be licensed under a new licensed, which they named the Server-Side Public License ("SS Public License"). A true and correct copy of that license appears in Exhibit K, which was printed from:

`https://www.mongodb.com/licensing/server-side-public-license`

93.  The SS Public License is textually nearly identical to the AGPLv3; however, MongoDB clearly followed the requirements of the FSF described in ¶ 85.

94.  While the FOSS community widely rejected the SS Public License, MongoDB was widely considered to be operating under the permissions and rules established by the FSF for reuse of their license text.

95.  It is notable that the release and promotion (widely covered in the technology press) of the SS Public License was nearly contemporaneous with the surreptitious licensing change that created Neo4j Sweden Software License.

96.  In my opinion, it seems highly unlikely that the drafters of the Neo4j Sweden Software License were unaware of MongoDB's approach to their license change. As such, drafters of the Neo4j Sweden Software License was almost surely aware that they had the options presented under ¶ 85 to produce a fully modified AGPLv3 — sans the preamble and with no mention of FSF's trademark "GNU" — instead of the Neo4j Sweden Software License.

97.  In my opinion, this speaks to clear intentionally in choosing a license that included the Further Restrictions Clause. In my opinion, after my many years of carefully monitoring use of the AGPLv3 and its

14

modifications in the industry, the Neo4j Sweden Software License was structured and promoted to give users the **incorrect** impression that the CC could not be removed from those terms — even though the Further Restrictions Clause was present. The Neo4j Sweden Software License also gives the impression to the unwary that the software is still available under the AGPLv3, as it had been before.

98. In essence, my opinion is that the Neo4j Sweden Software License attempted to inappropriately capitalize on the goodwill, power, and notoriety of the "GNU" and "AGPLv3" brands while also frightening commercial redistributors with the addition of the CC. In my opinion, the Neo4j Sweden Software License unfairly confuses users by including the entire text of the AGPLv3 (unmodified). I firmly believe that Neo4j hoped that no one would notice the Further Restrictions Clause remained included, and thereby realize that CC could, in fact, be removed and that commercial activity by downstream redistributors could therefore continue under pure AGPLv3.

### Violation of AGPLv3 If Not Sole Licensor

99. I am very familiar with the business model of "Proprietary Relicensing" — whereby a single firm holds rights to relicense all copyrights contained in a work so that they can simultaneously issue a copyleft license and a proprietary one. I first encountered this business model in the early 1990s when it was employed by a company called MySQL AB (now owned by Oracle), and have often seen it utilized since then by many companies, including MongoDB and with the Neo4j software.

100. Permission to engage in Proprietary Relicensing is completely predicated on universal collection of permissions and rights sufficient to act as sole licensor of the Covered Work under AGPLv3.

101. This process runs counter to the typical method of FOSS contribution, which is often called "inbound=outbound". In the inbound=outbound FOSS contribution method, third-party contributors license their works under the project's primary license (in the case of the Neo4j software, AGPLv3). The upstream project coordinator is then bound by AGPLv3 as a redistributor of these third party works. The upstream project coordinator is often a major (and sometimes even majority) author of the entire work, but typically substantial portions are copyrighted by other contributors and licensed to the upstream project coordinator only under the project's license.

102. To engage in Proprietary Relicensing, a firm must studiously, diligently and carefully avoid the standard inbound=outbound approach to FOSS collaboration. Typically, firms accomplish this task by requiring all contributors to formally and officially assent to a Copyright Assignment Agreement or a Contributor Licensing Agreement that grants (either exclusive or non-exclusive) rights to the firm to issue licenses for the work other than the project's outbound FOSS license.

103. If a firm fails to properly gather such rights from all contributors — going back to the very beginning of the project — then the copyleft license (in this case, the AGPLv3) explicitly prohibits the firm from engaging in Proprietary Relicensing.

104. If rights from every contributor to the Covered Work that constitutes the Neo4j software offerings were not properly gathered and consolidated under the control of a single entity, then distribution of the Neo4j software under any license other than AGPLv3 is, itself, a violation of the AGPLv3. In that case, every license issued that is not strictly AGPLv3 would, in my opinion, constitute a violation of the license.

105. Specifically, if the primary authors of the Neo4j software failed to universally collect relicensing permission for all secondary authors and contributors to the Covered Work, then addition of CC to the Neo4j Sweden Software License is outright prohibited for this additional reason — a reason orthogonal to downstream users' right to remove CC pursuant to AGPLv3's Further Restrictions Clause.

106. Meanwhile, assent from all contributors to issue licenses other than AGPLv3 was properly collected and consolidated into one entity, then that provides further indication that a license other than AGPLv3 could confidently be issued.

107. For example, with such collected and consolidate rights, assents and permissions, the rights holder could instead follow MongoDB's example and issue an entirely new public license for their software — provided they followed the rules and permissions granted to them by the FSF ¶ 85.

## Conclusion

108. Based on all the material that I have reviewed, combined with my detailed knowledge and familiarity with FOSS licensing and how firms typically use FOSS licensing and engage in and with contributors and downstream redistributors, I conclude the following:

109. In my opinion, the Neo4j Sweden Software License intentionally includes the Further Restrictions Clause as a term of that license.

110. In my opinion, there is widespread understanding in the FOSS community of the purpose and function of the Further Restrictions Clause. As such, Suhy acted in a reasonable, customary, good faith, and correct manner when removing CC from the Neo4j Sweden Software License and licensing the software under AGPLv3 to his customers and/or the public.

111. In my opinion, given the extensive publicity of MongoDB's SS Public License, FSF's FAQ, and other widely understood licensing knowledge regarding AGPLv3, those who promulgated the Neo4j Sweden Soft-

16

ware License were (or should have been) aware that they could construct their own license, picking and choosing their preferred clauses from the AGPLv3 under the rules outlined by the FSF in ¶ 85.

112. In my opinion, it is reasonable, customary, in good faith, and correct for redistributors to believe that the Neo4j Sweden Software License intentionally included the Further Restrictions Clause. The authors of the Neo4j Sweden Software License should have expected that the Further Restrictions Clause would be used to remove CC from the Neo4j Sweden Software License. If they wanted to prevent that behavior, they should have (and could have, provided they had sufficient rights to all contributions to be licensed) removed the Further Restrictions Clause.

113. In my opinion, if a single firm failed to diligently and formally collect explicit, written relicensing permission from all contributors to all code that was licensed under AGPLv3, that distribution of the Neo4j software under the Neo4j Sweden Software License is in violation of AGPLv3 (wholly unrelated to the Further Restrictions Clause). If such rights have not been diligently and carefully collected and consolidated, no entity may engage in Proprietary Relicensing business nor issue the Neo4j Sweden Software License legitimately. In other words, without such consolidation of rights, the only legitimate license of the Neo4j software is AGPLv3.

I declare under penalty of perjury under the laws of the United States of America that all statements and affirmations made herein of my own knowledge are true and correct, and all statements made on information and belief are believed to be true and correct.

Executed on 22 December 2022

By: _____

# EXHIBIT 8

John V. Picone III, Bar No. 187226
jpicone@hopkinscarley.com
Jeffrey M. Ratinoff, Bar No. 197241
jratinoff@hopkinscarley.com
HOPKINS & CARLEY
A Law Corporation
The Letitia Building
70 South First Street
San Jose, CA  95113-2406
*mailing address:*
P.O. Box 1469
San Jose, CA 95109-1469
Telephone:    (408) 286-9800
Facsimile:    (408) 998-4790

Attorneys for Plaintiffs and Counter-Defendants
NEO4J, INC. and NEO4J SWEDEN AB

Adron W. Beene, Bar No. 129040
adron@adronlaw.com
Adron G. Beene SB# 298088
adronjr@adronlaw.com
Attorney at Law
7960 Soquel Drive Suite #296
Aptos, CA 95003
Tel: (408) 392-9233

Attorneys for Defendants and Counterclaimants
PURETHINK LLC, IGOV INC., and JOHN
MARK SUHY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEO4J, INC., a Delaware corporation, NEO4J SWEDEN, AB, a Swedish corporation,<br><br>                    Plaintiffs,<br><br>          v.<br><br>PURETHINK LLC, a Delaware limited liability company, IGOV INC., a Virginia corporation, and JOHN MARK SUHY, an individual,<br><br>                    Defendants. | CASE NO.  5:18-cv-07182-EJD<br><br>**STIPULATION OF UNDISPUTED FACTS FOR TRIAL**<br><br>Trial Date: November 14, 2023 |
| AND RELATED COUNTERCLAIMS. | |

4859-6727-0801.2

STIPULATION OF UNDISPUTED FACTS FOR TRIAL; CASE NO. 5:18-CV-07182-EJD

## STIPULATION

This Stipulation is made between Plaintiffs and Counter-Defendants Neo4j, Inc. and Neo4j Sweden AB (collectively "Plaintiffs") and Defendants and Counterclaimants PureThink LLC, iGov Inc. and John Mark Suhy (collectively, "Defendants") through their respective counsel as follows:

WHEREAS, Plaintiffs and Defendants (collectively, the "Parties") included a list of relevant facts to which the parties would stipulate for incorporation into the trial record without the necessity of supporting testimony or exhibits in their Amended Joint Pretrial Statement (Dkt. No. 220), which included factual findings from the Court's May 18, 2021 summary judgment order (Dkt. No. 118) and October 15, 2023 summary judgment order (Dkt. No. 216).

WHEREAS, the Parties agreed that those factual findings supporting the Court's findings of Defendants' liability under the Lanham Act and DMCA are settled, subject to any rights Defendants have in appealing the Court's orders, and thus do not need to be restated for purposes of trial.

WHEREAS, the Parties agreed that they would file a separate stipulation indicating which of those facts have been removed from the prior list and those that they agree shall be incorporated into the trial record without the necessity of supporting testimony or exhibits.

ACCORDINGLY, the Parties HEREBY STIPULATE to the following amended list of relevant undisputed facts for incorporation into the trial record without the necessity of supporting testimony or exhibits:

1.      Neo4j USA is the parent corporation of Neo4j Sweden, which in turn is a wholly owned subsidiary of Neo4j USA.

2.      Removed.

3.      Removed.

4.      Removed.

5.      Prior to May 2018, Neo4j Sweden offered a free and open source version of the Neo4j® graph database platform, Neo4j® Community Edition ("Neo4j® CE"), under the GNU General Public License version 3 ("GPL") license. Neo4j® CE is limited in its feature set and does not come with technical or administrative support.

4859-6727-0801.2

STIPULATION OF UNDISPUTED FACTS FOR TRIAL; CASE NO. 5:18-CV-07182-EJD

6.      Plaintiffs also offered a more advanced commercial version, which included additional features and support services, known as the Neo4j Enterprise Edition ("Neo4j® EE"). Prior to May 2018, Plaintiffs offered Neo4j® EE under both a paid-for commercial license and for free under the GNU Affero General Public License, version 3 ("APGL").

7.      Removed.

8.      Removed.

9.      Removed.

10.     Neo4j® EE v3.4 included advanced scalability, availability, security, and operational features that were not previously available.

11.     In November 2018, Plaintiffs officially released Neo4j® EE v3.5 solely under a commercial license.

12.     Prior to the official release of Neo4j® EE v3.5, Plaintiffs published several beta versions via their GitHub repository subject to the Neo4j Sweden AGPL Software License. Neo4j® EE v3.5.0-RC1 was the last pre-release version available to Defendants via GitHub. *Id.* Thereafter, only the source code for Neo4j® CE was made publicly available under the GPL via Github.

13.     Removed.

14.     Removed.

15.     John Mark Suhy founded PureThink in 2002, which is a software and information technology consulting company specializing in supporting agencies within the U.S. Government that use Neo4j® graph database software.

16.     PureThink is a single person company filing as an s-corporation for tax purposes. Since at least September 1, 2014, Suhy has been the sole employee, member and manager of PureThink.

17.     On September 30, 2014, PureThink and Neo4j USA entered into the Neo Technologies Solution Partner Agreement ("Partner Agreement" or "SPA").

/ / /

/ / /

18.    Neo4j Government Edition ("Gov't Edition") consisted of Neo4j® EE and certain FISMA security plug-ins provided by PureThink, and a framework provided by GraphAware.

19.    PureThink marketed Gov't Edition to the IRS, however, the IRS indicated that it would require a prototype before purchasing a full subscription.

20.    Removed.

21.    On September 23, 2016, the IRS's Office of Research, Applied Analytics and Statistics ("RAAS") awarded PureThink a one-year contract for the "Implementation of the Government Neo4j project" for $229,000.

22.    Removed.

23.    Removed.

24.    Mr. Suhy has been the sole employee, officer and director of iGov since he formed the corporation.

25.    Removed.

26.    Removed.

27.    Removed.

28.    Removed.

29.    Removed.

30.    Removed.

31.    Removed.

32.    Removed.

33.    Prior to replacing the Neo4j Sweden Software License with the AGPL, Suhy sought guidance from the FSF, which told him "[t]he copyright holder on a work is the one with the power to enforce the terms of the license" and "[i]f a work was previously available under a free license, and later that license is changed, users can always use that earlier version under the terms of the free license." The FSF also warned that "we cannot provide you with legal advice" and that he should "talk with legal counsel."

/ / /

34. Prior to replacing the Neo4j Sweden Software License with the AGPL, Suhy did not seek independent legal advice from any attorney.

35. Removed.

36. Removed.

37. Removed.

38. Removed.

39. Removed.

40. Removed.

41. Removed.

42. Mr. Suhy provided hyperlinks to potential users of Neo4j® EE to view and download ONgDB from GFI's website and GitHub repository from his jmsuhy@purethink.com email account.

43. Mr. Suhy provided hyperlinks to potential users of Neo4j® EE to download ONgDB from GFI's website and GitHub repository from his jmsuhy@igovsol.com email account.

44. iGov's website provided links to potential users of Neo4j® EE to download ONgDB directly from iGov and from GFI's website.

45. iGov and Mr. Suhy operated www.graphstack.io, which provided information about ONgDB and hyperlinks for consumers to directly download ONgDB v.3.5.x and ONgDB v.3.6.x.

46. Removed.

47. Removed.

48. Removed.

49. Removed.

50. Removed.

51. Removed.

52. Removed.

53. Removed.

54.     Removed.

55.     Removed.

56.     Removed.

57.     Removed.

58.     Neo4j Sweden owns of all copyrights related to the Neo4j graph database platform, including the source code, and has licensed those copyrights to Neo4j USA.

59.     Neo4j Sweden did not give Mr. Suhy permission to replace the Neo4j Sweden Software License with verbatim copies of the AGPL in the 28 LICENSE.txt files in ONgDB v3.4 and ONgDB v3.5.

60.     Suhy knowingly distributed Neo4j® EE source code without the Neo4j Sweden Software License with the understanding that it would result in the infringement of Neo4j Sweden's copyrights.

61.     Suhy submitted a bid for a new contract issued by the IRS via another entity that he had an ownership interest in at the time, eGovernment Solutions, Inc. ("eGov Sol" or "eGov Solutions").

62.     Under the proposal for the new contract signed by Suhy, the scope of work required iGov to perform "all operations and maintenances duties for all components of the CKGE framework…."   iGov would also be "responsible for ensuring any open source products within the CKGE conform to their license-terms" and iGov would "need to work with the following components: React, Angularjs, Neo4j…."

63.     On May 22, 2018, Neo4j USA informed the IRS, including those in RAAS, that Neo4j Sweden added Commons Clause to Neo4j® EE 3.4, and the resulting need to obtain a commercial subscription if they intended to use that software in the CKGE platform.

64.     On May 22, 2018, Suhy sent an email to the IRS claiming Neo4j Sweden could not add the Commons Clause to the license governing Neo4j® EE v3.4.

65.     On May 24, 2018, the RAAS division of the IRS awarded eGov Solutions the new contract, Order No. 2032H8-18-P-00151, as amended Order No. 2032H8-18-P-00168, to further develop and support the CKGE in May 2018 ("CKGE Contract").

66.     In July 2018, Jason Zagalsky, a sales representative from Neo4j USA, met with employees of the IRS, and then provided a quote of $156,000 for one-year subscription and a $397,800 for a 3-year subscription for a Neo4j® EE v3.4 based on then-current requirements of CKGE.

67.     As of August 2018, the IRS understood that Neo4j® CE had a performance limitation to only 4 cores, while Neo4j® EE had enterprise-only features, came with professional services and subscriptions, and was priced based on number of cores.

68.     Under the CKGE Contract, Suhy provided input in the architecture design and hardware requirements needed to run ONgDB installations on multiple servers within the CKGE.

69.     In August 2018, Suhy recommended that the IRS integrate ONgDB v3.4 rather than Neo4j® EE v3.4 in the CKGE framework, and claimed that "ONgDB open source licenses come directly from the Graph Foundation as well, not from Neo4j Inc."

70.     Based on Suhy's recommendation, Mike Dunn at the IRS instructed him to "[g]o ahead and integrate the ONgDB into the CKGE framework we'll deploy" on August 14, 2018.

71.     While working at the IRS, Mr. Suhy helped the IRS upload ONgDB source code into the IRS's internal repository.

72.     The IRS decided to not allocate $156,000 for a license to use Neo4j® EE in the CKGE platform because ONgDB was a free and open, unrestricted alternative.

73.     Under the CKGE contract, Suhy and iGov were responsible for supporting, maintaining and updating ONgDB in an internal GitLab repository for the RAAS at the IRS.

74.     Under the CKGE contract, Suhy and iGov helped the IRS upgrade the CKGE platform to ONgDB v3.5 in April 2019 and integrated subsequent subversions through at least April 2022.

75.     After April 2022, the IRS started calling ONgDB v3.5 just "GDB" due to the injunction entered against GFI and its rollback of ONgDB source code.

/ / /

76.     GDB was merely a name change because it was still based on Neo4j® EE v3.5 source code that was improperly licensed under the AGPL without the Commons Clause, which Suhy continued to be responsible for maintaining on the IRS's internal Gitlab repository.

77.     The IRS used at least one Neo4j® enterprise-only feature, node ID, via ONgDB in CKGE.

78.     The IRS understood that Neo4j® EE can run Cypher queries significantly faster than Neo4j® CE, which is advantageous in terms of productivity.

79.     The initial hardware available to run Neo4j® EE in the IRS's pre-CKGE platform were for one server with at least 16 cores and 1 terabyte of RAM under the September 23, 2016 contract award to PureThink.

80.     As of December 2018, the CKGE (a/k/a "main graph") was running, or was expected to be running, on at least two production servers and one development / test server utilizing ONgDB.  Each machine was comprised of a DL380 with 32 cores and 256GB of RAM at minimum.

81.     As of March 2019, the IRS was running ONgDB on three production servers, and one development server in the CKGE, totaling four instances of ONgDB.

82.     In 2020, the IRS continued to run ONgDB on at least three production servers in the CKGE with four total instances of ONgDB.

83.     In 2021, the IRS continued to run ONgDB on at least three production servers in the CKGE with four total instances of ONgDB.

84.     In 2022, the IRS continued to run ONgDB on at least two production servers in the CKGE with at least three total instances of ONgDB.

85.     Each machine in the CKGE running ONgDB was comprised of a DL380 with 32 cores and 256GB of RAM.

86.     As of November 2022, the IRS would only want the bare-minimum Neo4j® EE package for two nodes, each with 16 cores and 256GB RAM for the CKGE.

87.     On August 14, 2018, Mike Dunn asked Suhy to inform the YK1 team of the switch to ONgDB v3.4.x into the CKGE framework "we'll deploy."

88.     By December 2018, the IRS's YK1 began using one instance of ONgDB.

89.     The minimum server specifications for YK1 at the IRS was a DL380 with 12 cores and 256GB of RAM.

90.     In 2019, one instance of ONgDB was running on its own server in YK1 at the IRS.

91.     In 2020, one instance of ONgDB was in production and running on its own server in YK1 at the IRS.

92.     In 2021, one instance of ONgDB was in production and running on its own server in YK1 at the IRS.

93.     In 2022, two instance of ONgDB in production and two instances of ONgDB in development/test in YK1 at the IRS.

94.     Starting in 2019 and continuing through 2022, the IRS ran a separate instance of ONgDB in development in a project called "Corporate Graph."

95.     The minimum server specifications for Corporate Graph are DL380 with 12 cores and 256GB of RAM.

96.     Starting in 2020 and continuing through 2022, the IRS ran one instance of ONgDB in production in a project called "Excise Graph."

97.     The minimum server specifications for Excise Graph are DL380 with 12 cores and 256GB of RAM.

98.     Starting in summer of 2020 and continuing through September/October 2021, the IRS ran one separate instance of ONgDB in development for its COVID Graph project.

99.     Starting in September/October 2021 and continuing through October 2022, the IRS ran one separate instance of ONgDB in production for its COVID Graph project.

100.    The minimum server specifications for COVID Graph are DL380 with 12 cores and 256GB of RAM.

101.    Starting in 2021 and continuing through 2022, the IRS ran one separate instance of ONgDB in development for a project called "Policy Net."

/ / /

- 9 -

102. The minimum server specifications for Policy Net are DL380 with 12 cores and 256GB of RAM.

103. Starting in 2021 and continuing through 2022, the IRS ran one separate instance of ONgDB in development called "Individual Graph."

104. The minimum server specifications for Individual Graph are DL380 with 12 cores and 256GB of RAM.

105. In 2022, the IRS ran one separate instance of ONgDB in development in a project called "CPEO Graph."

106. The minimum server specifications for CPEO Graph are DL380 with 12 cores and 256GB of RAM.

107. In 2022, the IRS ran one separate instance of ONgDB in development called "Ghost Preparer."

108. The minimum server specifications for Ghost Preparer graph are DL380 with 12 cores and 256GB of RAM.

109. Between September 2019 and September 2022, Neo4j sold commercial subscriptions of Neo4j® EE to divisions at the IRS other than RAAS for a total price of approximately $1,380,000. These licensed products include a new subscription to Neo4j's Enterprise Bundle in 2019 (as well as renewal subscriptions in 2020, 2021, and 2022).

110. The Maryland Procurement Office (a/k/a the National Security Agency, the NSA and the MPO) tasked Next Century to analyze available graph database technologies, including Neo4j® EE.

111. Next Century and the MPO required the enterprise-only features, such as causal clustering and multi-data centers, offered by both Neo4j® EE and ONgDB.

112. Next Century learned about the pricing of Neo4j Enterprise software bundles offered by Neo4j USA and iGov from iGov's website.

113. In October 2018, Next Century exchanged emails with Suhy regarding representations made on iGov's website that ONgDB v3.4 was an open source version of Neo4j® EE that provided the same enterprise-only features for free.

114. Suhy told Next Century that the MPO could use ONgDB v3.4 under the AGPL without restrictions or paying Plaintiffs for a commercial license, as advertised on the iGov's website.

115. As a result of Next Century's communications with Suhy, Next Century downloaded ONgDB v3.4 and began evaluating against Neo4j® EE v3.4.

116. In a series of emails with Next Century ending on January 4, 2019, Suhy confirmed that ONgDB v3.5 would have feature parity with the enterprise features of Neo4j® EE v3.5, and would also be available without restrictions on the number of clusters, instances and cores and without paying Neo4j USA for a commercial license. This led Next Century to upgrade from ONgDB v3.4 to ONgDB v3.5.

117. By February 2019, the MPO had chosen to use ONgDB v3.5 over Neo4j® EE v3.5 for continued development work for the MPO.

118. On February 5, 2019, Next Century informed Neo4j USA of this decision, stating, "[w]e have found that open-sourced (non-commercial) builds from the Neo4j source code provide the clustering and security requirements needed in our environment."

119. In March 2019, Next Century gave Neo4j USA the required specifications for its ongoing project with the MPO and ask for Neo4j USA for a quote for use in a production environment.

120. On April 19, 2019, Jason Zagalsky of Neo4j USA sent a 3-year Neo4j Enterprise Edition Enterprise Bundle for $2,266,950 based on those requirements. This included a commercial license and technical support for (a) 12 Production Machines (up to 12 cores and 256GB of RAM per Machine); and (b) 12 Test Machines (up to 12 cores and 256GB of RAM per Machine). Neo4j USA also provided a 15% multi-year discount.

121. On April 29, 2019, Next Century confirmed that it shared Neo4j USA's proposal with the MPO, and was instructed by the MPO to continue using ONgDB. The reason for the MPO continuing to use ONgDB over Neo4j® EE was price.

/ / /

/ / /

122.    On July 21, 2019, Next Century informed Neo4j USA that the MPO was not interested in the Neo4j® EE proposal. Again, the deciding factor between ONgDB and Neo4j® EE was price.

123.    Next Century continued to use ONgDB v3.5, which was placed into a production environment for the NSA in or about October 2020.

124.    Neo4j USA has a past history of entering into licensing arrangements with the MPO, including one transaction in November 2019 wherein the MPO obtained a license for Neo4j® EE v3.5 discovery bundle for another project, which included one production machine with 12 cores and 256GB of RAM (as well as one test machine) at a price of $59,250.

Dated:  November 20, 2023

HOPKINS & CARLEY
A Law Corporation

By: */s/ Jeffrey M. Ratinoff*
John V. Picone III
Jeffrey M. Ratinoff
Attorneys for Plaintiffs and
Counter-Defendants
NEO4J, INC. and NEO4J SWEDEN AB

Dated:  November 20, 2023

*/s/ Adron W. Beene*
Adron W. Beene
Adron G. Beene
Attorneys for Defendants and Counter-
Claimants
PURETHINK LLC, IGOV INC., and
JOHN MARK SUHY

**ATTESTATION OF E-FILED SIGNATURE**

Pursuant to Local Rule 5-1(i)(3), I hereby certify that I have obtained the concurrence in the filing of this document from all signatories for whom a signature is indicated by a "conformed" signature (/s/) within this electronically filed document and I have on file records to support this concurrence for subsequent production to the Court if so ordered or for inspection upon request.

Dated:  November 20, 2023

HOPKINS & CARLEY
A Law Corporation


By: */s/ Jeffrey M. Ratinoff*
    John V. Picone III
    Jeffrey M. Ratinoff
    Attorneys for Plaintiffs and
    Counter-Defendants
    NEO4J, INC. and NEO4J SWEDEN AB

# EXHIBIT 9

1    John V. Picone III, Bar No. 187226
     jpicone@hopkinscarley.com
2    Jeffrey M. Ratinoff, Bar No. 197241
     jratinoff@hopkinscarley.com
3    HOPKINS & CARLEY
     A Law Corporation
4    The Letitia Building
     70 S First Street
5    San Jose, CA 95113-2406

6    *mailing address:*
     P.O. Box 1469
7    San Jose, CA 95109-1469
     Telephone:     (408) 286-9800
8    Facsimile:      (408) 998-4790

9    Attorneys for Plaintiffs
     NEO4J, INC. and NEO4J SWEDEN AB

10

11            UNITED STATES DISTRICT COURT

12         NORTHERN DISTRICT OF CALIFORNIA

13    NEO4J, INC., a Delaware corporation; and    CASE NO. 5:19-cv-06226-EJD
     NEO4J SWEDEN AB, a Swedish
14    corporation,                     ~~[PROPOSED]~~ STIPULATED JUDGMENT
                                  AND PERMANENT INJUNCTION
15             Plaintiffs,

16          v.

17    GRAPH FOUNDATION, INC., an Ohio
     corporation, GRAPHGRID, INC., an Ohio
18    corporation, and ATOMRAIN INC., a
     Nevada corporation,
19
            Defendants.
20

21        Plaintiffs Neo4j, Inc. and Neo4j Sweden AB (collectively "Neo4j" or "Plaintiffs"), and

22 Graph Foundation, Inc. ("GFI"), AtomRain and GraphGrid (GFI, AtomRain and GraphGrid

23 collectively "Defendants" and with Plaintiffs collectively "Parties"), through their undersigned

24 counsel, hereby stipulate and move this Court for entry of judgment and a permanent injunction

25 ("Stipulated Judgment"):

26        Accordingly, IT IS HEREBY ADJUDGED AND ORDERED that:

27        1.      Neo4j and Defendants have entered into a Confidential Settlement Agreement to

28 resolve this action and these parties have agreed on terms of this Stipulated Judgment.

2.     On Plaintiffs' claims for (a) trademark infringement, 15 U.S.C. § 1114; (b) false designation of origin and false advertising, 15 U.S.C. § 1125(a); (c) federal unfair competition, 15 U.S.C. § 1125(a); (d) state unfair competition, Cal. Bus. Prof. Code §§ 17200 et seq.; (e) violations of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1202(b); and (f) breach of license agreement, Plaintiffs shall recover the injunctive and equitable relief against Defendants herein.

3.     Defendants affirm and acknowledge that Neo4j, Inc. is the rightful owner in the United States of all right, title and interest in and to U.S. Trademark Registration No. 4,784,280 for the word mark "NEO4J" covering the goods and services in International Classes, 009, 035, 041, 042 and 045 (the "Neo4j® Mark"). Defendants affirm and acknowledge that the Neo4j® Mark and its registration are valid and subsisting. Defendants agree and affirm that they will not at any time or for any reason challenge either the validity of the Neo4j® Mark, its registration or the ownership thereof, or assist any third party in challenging the validity of the Neo4j® Mark or the registration thereof.

4.     Defendants also declare and affirm that Neo4j, Inc. is the owner of U.S. Trademark Application No. 90056224 for the word mark "NEO4J." Defendants affirm and acknowledge that the word mark "NEO4J" subject to that application valid and subsisting. Furthermore, Defendants agree and affirm that they will abandon all efforts to oppose this application and will not challenge the validity or ownership thereof, or the validity or ownership of any resulting registration thereof, or assist any third party in opposing this application or challenging the validity or ownership of the mark subject to this application or the validity of any resulting registration thereof.

5.     Defendants further declare and affirm that Plaintiffs' inclusion of the Commons Clause in the Neo4j Sweden Software License, and example of which is attached hereto as Exhibit A, is valid; and Defendants' removal, replacement and/or omission thereof, and related copyright management information from source code to which Plaintiffs hold the copyright, was not authorized by Plaintiffs, allowed by the terms of the Neo4j Sweden Software License and violated the DMCA, 17 U.S.C § 1202(b) ("DMCA Violation").

6.     Defendants agree and affirm that they will not assist or encourage John Mark Suhy, PureThink LLC and iGov Inc. or any third party in challenging the validity of the Neo4j Sweden

Software License, or in the copying and distribution of source code with a DMCA Violation, including ONgDB version 3.4, ONgDB version 3.5, ONgDB version 3.6 and any subversions or derivatives thereof, or that has been subject to the Neo4j Sweden Software License, including Neo4j® Enterprise Edition 3.4, Neo4j® Enterprise Edition 3.5, or any subsequent versions, subversions, or derivatives thereof.

7.      Defendants, as well as their shareholders, directors, officers, agents, employees, parents, subsidiaries, successors and assigns, and all those acting under their direction, control or on their behalf, as well as any entity that is spun-off from or formed by them, or acquires or merges with any Defendant are hereby permanently enjoined as follows:

(a)      Defendants may not make further use of, or fork any source code first released under the Neo4j Sweden Software License, including Neo4j® Enterprise Edition 3.4, Neo4j® Enterprise Edition 3.5, or any subsequent subversions or derivatives thereof.

(b)      Defendants shall not offer for sale, advertise, promote, represent or refer to ONgDB as follows:

     i.  A free and open source drop-in replacement of Neo4j® Enterprise Edition distributions with the same version number;

     ii.  A drop-in replacement for commercially licensed Neo4j® Enterprise Edition;

     iii.  A drop-in replacement for Neo4j® Enterprise Edition under the GNU Affero General Public License, version 3 ("AGPLv3"), without limitations on causal cluster instances, cores, or production usage;

     iv.  A fork of the Neo4j® graph database platform that adds enterprise code back into Neo4j® core; and

     v.  One hundred percent (100%) free and open source version of Neo4j® Enterprise Edition version 3.4, Neo4j® Enterprise Edition version 3.5, or any version of Neo4j® Enterprise Edition released by Neo4j thereafter.

(c)      Defendants shall not represent that Neo4j Sweden AB's inclusion of the Commons Clause to the license governing Neo4j® Enterprise Edition violated the terms of AGPLv3, or make similar statements.

(d)     Defendants shall not represent that the Free Software Foundation (FSF) or that any government agency determined and/or confirmed that (a) the inclusion of the Commons Clause to any license governing Neo4j® Enterprise Edition violated the terms of AGPLv3; and/or (b) the Commons Clause can be removed from any software license governing Neo4j® Enterprise Edition and/or ONgDB.

(e)     Defendants may only make further use of the following publicly available open source code, subject to the terms of their respective open source licenses: (i) Neo4j Community Edition Source Code under the GNU General Public License, version 3 ("GPL"); (ii) Neo4j® Enterprise Edition version 3.2.14 source code released under the AGPLv3; (iii) Neo4j® Enterprise Edition version 3.3.10 source code released under the AGPLv3; (iv) Neo4j® Enterprise Edition version 3.4.0.RC02 source code released under the AGPLv3.  Nothing herein, however, shall be construed as a license or otherwise entitle Defendants to use any source code, patches or source code commits for Neo4j® Enterprise Edition version 3.3 or Neo4j® Enterprise Edition version 3.4 that were first released under the Neo4j Sweden Software License.  Further, nothing herein shall be construed as a license or otherwise entitle Defendants to use or fork, any of Plaintiffs' source code that was first released as Neo4j® Enterprise Edition version 3.5 or otherwise under the Neo4j Sweden Software License, including but not limited to, all beta releases, release candidates, production releases, stable releases, and official releases, or any subsequent subversions, patches or derivatives thereof.

(f)     Defendants may not make representations about the AGPLv3, and shall instead refer to the Free Software Foundation's website for any interpretation of its meaning.

(g)     Defendants may continue to use the name "ONgDB" for its products so long as (i) it states on any website and/or any public statement that the name stands for "Open Native Graph DB" and removes all references to ONgDB in reference to Plaintiffs and the Neo4j® Mark, other than what is allowed in Paragraph 7(r); and (ii) restarts the version number for ONgDB to version 1.0.

(h)     Within three (3) days of entry of this Stipulated Judgment, Defendants shall permanently remove, take down, destroy and prevent further access to all source code, object code,

1   binaries, build files, build scripts and distributions from its repositories located at

2   https://github.com/graphfoundation and https://hub.docker.com/r/graphfoundation that contains

3   any Neo4j® Enterprise Edition source code with a DMCA Violation or that was first released

4   subject to the Neo4j Sweden Software License, including ONgDB version 3.4, ONgDB version

5   3.5, ONgDB version 3.6, and any subversions thereof.

6        (i)     Within seven (7) days of entry of this Stipulated Judgment, Defendants shall

7   permanently remove, take down, destroy and prevent further access to any version of ONgDB (or

8   any similar software created and/or maintained by Defendants that is within their possession,

9   custody or control) that contains any Neo4j® Enterprise Edition source code with a DMCA

10  Violation or that was first released subject to the Neo4j Sweden Software License, including

11  ONgDB version 3.4, ONgDB version 3.5, ONgDB version 3.6 and any subversions or derivatives

12  thereof. This removal and destruction shall be effectuated regardless of where that code resides,

13  e.g., Defendants' websites (i.e., https://www.graphfoundation.org/projects/ongdb/,

14  https://www.graphgrid.com/gdp/, https://www.graphgrid.com/ongdb/, and

15  https://www.atomrain.com/products/, and any the Content Delivery Services invoked therein),

16  AWS, AWS Gov Cloud, Docker, GitHub and/or any other source code repository or host service.

17       (j)     Within ten (10) days of entry of this Stipulated Judgment, Defendants shall

18  identify in writing any known third-party commercial and/or governmental use of any version of

19  ONgDB containing any Neo4j Enterprise Edition source code with a DMCA Violation, that was

20  first released subject to the Neo4j Sweden Software License, or not otherwise permitted for use by

21  Paragraph 7(e).

22       (k)     Defendants shall not offer any development, support, maintenance or hosting

23  services for any version of ONgDB that includes any Neo4j® Enterprise Edition source code with

24  a DMCA Violation or that was first released subject to the Neo4j Sweden Software License,

25  including ONgDB version 3.4, ONgDB version 3.5, ONgDB version 3.6 and any subversions or

26  derivatives thereof. Defendants can offer consulting services for commercial installations of

27  Neo4j® software, but only where the third party receiving such services has a commercial license

28  and has fully paid the commercial license fees to Plaintiffs. Should Defendants continue to offer

ONgDB consulting services alongside consulting services with Neo4j® software as permitted herein, then any advertising of Defendant's services related to Neo4j® software is subject to adhering to Plaintiffs' then-current Trademark Policy.

(l)    Defendants will not make any negative or disparaging comments or representations about Plaintiffs, and their founders, officers, directors, investors, employees, customers, products, partnership practices, licensing practices or pricing.

(m)    Defendants will take down, delete and otherwise remove all webpages, posts on GitHub, discussion forums, social media posts and blog posts (and all links thereto) that they own, control, or have the ability and/or right to remove wherein they (i) reference Plaintiffs, their licensing policies and practices, (ii) make the same or similar statements referenced in Paragraph 7(b) above, or (iii) use the Neo4j® Mark. Defendants also shall not use the Neo4j® Mark as a hashtag on their respective websites or in any posts made on Twitter, Facebook or similar social media sites.

(n)    Defendants shall not make use of, or direct others to use, any of Plaintiffs' documents or materials, such as software documentation, guides, manuals, change logs, release notes and/or other publicly available technical information to create, maintain, market, use, and/or sell ONgDB (or the equivalent). Any links to Plaintiffs' documentation in Defendants' software shall be removed, or replaced with ONgDB documentation, bearing in mind that Plaintiffs' documentation is licensed under the Creative Commons Attribution-NonCommercial-ShareAlike 4.0 International (CC BY-NC-SA 4.0) and its use by third parties, such as Defendants and their customers, would be restricted to noncommercial purposes.

(o)    Defendants shall not make any statement and/or representations to any third party, affirmatively or in response to an inquiry, that state or imply that they can provide access to or can obtain any software containing any Neo4j® Enterprise Edition source code with a DMCA Violation, that is subject to the Neo4j Sweden Software License, or not otherwise permitted for use by Paragraph 7(e).

(p)    Defendants shall not have any expressed or implied license to use and shall not make any further use of any of Plaintiffs' trademarks, including U.S. Trademark Registration

No. 4775253 for "CYPHER," Trademark Registration No. 4784280 for "NEO4J," U.S. Trademark Registration No. 4824877 for "NEO TECHNOLOGY," U.S. Trademark Registration No. 5250026 for the Neo4j Logo, and U.S. Trademark Application No. 90056224 for "NEO4J" (collectively "Plaintiffs' US Marks"), other than what is permitted in Paragraph 7(r).

(q)     Defendants (and those acting in concert with them) will also permanently remove Plaintiffs' US Marks from their websites, marketing literature, social media sites, and any other public facing resource, including all software interfaces, including, but not limited to, GUIs and command lines.

(r)     If Defendants continue to attempt to fork any of Plaintiffs' source code subject to the terms herein, their description of that source code and/or software, if it includes the Neo4j® Mark, may only be made by the following statement: "ONgDB (or any equivalent) is an independent fork of [Neo4j® Enterprise Edition version 3.2.14, Neo4j® Enterprise Edition version 3.3.10, and/or Neo4j® Enterprise Edition Source Code version 3.4.0.RC02 licensed under the AGPLv3 and/or Community Edition licensed under the GPL]. ONgDB and [Defendants to insert name of specific Defendant(s)] is not affiliated in any way with Neo4j, Inc. or Neo4j Sweden AB. Neo4j, Inc. and Neo4j Sweden AB do not sponsor or endorse ONgDB and [Defendants to insert name of the specific Defendant(s)]. Neo4j Sweden AB is the owner of the copyrights for Neo4j® software and commercial use of any source code from Neo4j® Enterprise Edition beyond [Neo4j® Enterprise Edition version 3.2.14, Neo4j® Enterprise Edition version 3.3.10, and/or Neo4j® Enterprise Edition Source Code version 3.4.0.RC02] is prohibited and could subject the user to claims of copyright infringement."

8.     Neo4j, Inc. and AtomRain Inc. agree that the Neo4j Solution Partner Agreement between AtomRain Inc. and Neo4j, Inc. was previously terminated and no surviving terms remain in effect or enforceable other than any confidentiality obligations that remain.

9.     As between Plaintiffs, on one hand, and Defendants, on the other, each shall bear its own costs and attorneys' fees except as specified below in Paragraph 11.

10.     The Parties waive any rights to appeal this Stipulated Judgment.

/ / /

11. This Stipulated Judgment adjudicates all claims in this litigation and is a final judgment. However, the Court expressly retains jurisdiction over any action to enforce this Stipulated Judgment and the underlying Confidential Settlement Agreement concurrently entered into by the Parties herewith. In any such action, the prevailing party shall be entitled to reasonable attorneys' fees and costs. The Parties request that in any future action to enforce or resolve any disputes regarding this Stipulated Judgment and the underlying Confidential Settlement Agreement, the Court refer the matter to Hon. Edward Davila for all purposes provided he is available.

Dated: February 15, 2021
HOPKINS & CARLEY
A Law Corporation

By: */s/ Jeffrey M. Ratinoff*
John V. Picone III
Jeffrey M. Ratinoff
Attorneys for Plaintiffs
NEO4J, INC. and NEO4J SWEDEN AB

Dated: February 15, 2021
BERGESON, LLP

By: */s/ John D. Pernick*
John D. Pernick
Attorneys for Defendant
GRAPH FOUNDATION, INC.

Dated: February 15, 2021
SKAGGS FAUCETTE LLP

By: */s/ Jeffrey E. Faucette*
Jeffrey E. Faucette
Attorneys for Defendants GRAPHGRID,
INC. and ATOMRAIN INC.

PURSUANT TO STIPULATION, IT IS SO ORDERED AND ADJUDICATED.

Dated: ___February 16___, 2021

EDWARD J. DAVILA
United States District Court Judge

**EXHIBIT A**

neo4j / **neo4j**

<> Code | Issues 214 | Pull requests 2 | Actions | Projects | Wiki | Sec

3.4 ▾ ...

neo4j / enterprise / neo4j-enterprise / **LICENSE.txt**

**digitalstain** Updates enterprise LICENSE.txt and NOTICE.txt ... **History**

3 contributors

Raw | Blame

693 lines (568 sloc) | 35.1 KB

```
NOTICE
This package contains software licensed under different
licenses, please refer to the NOTICE.txt file for further
information and LICENSES.txt for full license texts.

Neo4j Enterprise object code can be licensed independently from
the source under separate commercial terms. Email inquiries can be
directed to: licensing@neo4j.com. More information is also
available at:https://neo4j.com/licensing/

The software ("Software") is developed and owned by Neo4j Sweden AB
(referred to in this notice as “Neo4j”) and is subject to the terms
of the GNU AFFERO GENERAL PUBLIC LICENSE Version 3, with the Commons Clause as follows:

                    GNU AFFERO GENERAL PUBLIC LICENSE
                       Version 3, 19 November 2007

 Copyright (C) 2007 Free Software Foundation, Inc. <http://fsf.org/>
 Everyone is permitted to copy and distribute verbatim copies
 of this license document, but changing it is not allowed.

                            Preamble

  The GNU Affero General Public License is a free, copyleft license
for software and other kinds of works, specifically designed to ensure
```



```
28    cooperation with the community in the case of network server software.
29
30      The licenses for most software and other practical works are
31    designed to take away your freedom to share and change the works.  By
32    contrast, our General Public Licenses are intended to guarantee your
33    freedom to share and change all versions of a program--to make sure it
34    remains free software for all its users.
35
36      When we speak of free software, we are referring to freedom, not
37    price.  Our General Public Licenses are designed to make sure that you
38    have the freedom to distribute copies of free software (and charge for
39    them if you wish), that you receive source code or can get it if you
40    want it, that you can change the software or use pieces of it in new
41    free programs, and that you know you can do these things.
42
43      Developers that use our General Public Licenses protect your rights
44    with two steps: (1) assert copyright on the software, and (2) offer
45    you this License which gives you legal permission to copy, distribute
46    and/or modify the software.
47
48      A secondary benefit of defending all users' freedom is that
49    improvements made in alternate versions of the program, if they
50    receive widespread use, become available for other developers to
51    incorporate.  Many developers of free software are heartened and
52    encouraged by the resulting cooperation.  However, in the case of
53    software used on network servers, this result may fail to come about.
54    The GNU General Public License permits making a modified version and
55    letting the public access it on a server without ever releasing its
56    source code to the public.
57
58      The GNU Affero General Public License is designed specifically to
59    ensure that, in such cases, the modified source code becomes available
60    to the community.  It requires the operator of a network server to
61    provide the source code of the modified version running there to the
62    users of that server.  Therefore, public use of a modified version, on
63    a publicly accessible server, gives the public access to the source
64    code of the modified version.
65
66      An older license, called the Affero General Public License and
67    published by Affero, was designed to accomplish similar goals.  This is
68    a different license, not a version of the Affero GPL, but Affero has
69    released a new version of the Affero GPL which permits relicensing under
70    this license.
71
72      The precise terms and conditions for copying, distribution and
73    modification follow.
74
75                          TERMS AND CONDITIONS
```

```
 76
 77       0. Definitions.
 78
 79       "This License" refers to version 3 of the GNU Affero General Public
 80   License.
 81
 82       "Copyright" also means copyright-like laws that apply to other kinds
 83   of works, such as semiconductor masks.
 84
 85       "The Program" refers to any copyrightable work licensed under this
 86   License.  Each licensee is addressed as "you".  "Licensees" and
 87   "recipients" may be individuals or organizations.
 88
 89       To "modify" a work means to copy from or adapt all or part of the work
 90   in a fashion requiring copyright permission, other than the making of an
 91   exact copy.  The resulting work is called a "modified version" of the
 92   earlier work or a work "based on" the earlier work.
 93
 94       A "covered work" means either the unmodified Program or a work based
 95   on the Program.
 96
 97       To "propagate" a work means to do anything with it that, without
 98   permission, would make you directly or secondarily liable for
 99   infringement under applicable copyright law, except executing it on a
100   computer or modifying a private copy.  Propagation includes copying,
101   distribution (with or without modification), making available to the
102   public, and in some countries other activities as well.
103
104       To "convey" a work means any kind of propagation that enables other
105   parties to make or receive copies.  Mere interaction with a user through
106   a computer network, with no transfer of a copy, is not conveying.
107
108       An interactive user interface displays "Appropriate Legal Notices"
109   to the extent that it includes a convenient and prominently visible
110   feature that (1) displays an appropriate copyright notice, and (2)
111   tells the user that there is no warranty for the work (except to the
112   extent that warranties are provided), that licensees may convey the
113   work under this License, and how to view a copy of this License.  If
114   the interface presents a list of user commands or options, such as a
115   menu, a prominent item in the list meets this criterion.
116
117       1. Source Code.
118
119       The "source code" for a work means the preferred form of the work
120   for making modifications to it.  "Object code" means any non-source
121   form of a work.
122
123       A "Standard Interface" means an interface that either is an official
```

(158 of 169), Page 158 of 169
Case: 24-5538, 01/21/2025, DktEntry: 39.2, Page 158 of 169
2/9/2021                neo4j-enterprise/LICENSE.txt
Case 5:19-cv-06226-EJD    Document 110-4  Filed 02/11/2021  Page 13 of 24

124  standard defined by a recognized standards body, or, in the case of
125  interfaces specified for a particular programming language, one that
126  is widely used among developers working in that language.

127

128    The "System Libraries" of an executable work include anything, other
129  than the work as a whole, that (a) is included in the normal form of
130  packaging a Major Component, but which is not part of that Major
131  Component, and (b) serves only to enable use of the work with that
132  Major Component, or to implement a Standard Interface for which an
133  implementation is available to the public in source code form.  A
134  "Major Component", in this context, means a major essential component
135  (kernel, window system, and so on) of the specific operating system
136  (if any) on which the executable work runs, or a compiler used to
137  produce the work, or an object code interpreter used to run it.

138

139    The "Corresponding Source" for a work in object code form means all
140  the source code needed to generate, install, and (for an executable
141  work) run the object code and to modify the work, including scripts to
142  control those activities.  However, it does not include the work's
143  System Libraries, or general-purpose tools or generally available free
144  programs which are used unmodified in performing those activities but
145  which are not part of the work.  For example, Corresponding Source
146  includes interface definition files associated with source files for
147  the work, and the source code for shared libraries and dynamically
148  linked subprograms that the work is specifically designed to require,
149  such as by intimate data communication or control flow between those
150  subprograms and other parts of the work.

151

152    The Corresponding Source need not include anything that users
153  can regenerate automatically from other parts of the Corresponding
154  Source.

155

156    The Corresponding Source for a work in source code form is that
157  same work.

158

159    2. Basic Permissions.

160

161    All rights granted under this License are granted for the term of
162  copyright on the Program, and are irrevocable provided the stated
163  conditions are met.  This License explicitly affirms your unlimited
164  permission to run the unmodified Program.  The output from running a
165  covered work is covered by this License only if the output, given its
166  content, constitutes a covered work.  This License acknowledges your
167  rights of fair use or other equivalent, as provided by copyright law.

168

169    You may make, run and propagate covered works that you do not
170  convey, without conditions so long as your license otherwise remains
171  in force.  You may convey covered works to others for the sole purpose

```
172    of having them make modifications exclusively for you, or provide you
173    with facilities for running those works, provided that you comply with
174    the terms of this License in conveying all material for which you do
175    not control copyright.  Those thus making or running the covered works
176    for you must do so exclusively on your behalf, under your direction
177    and control, on terms that prohibit them from making any copies of
178    your copyrighted material outside their relationship with you.
179
180      Conveying under any other circumstances is permitted solely under
181    the conditions stated below.  Sublicensing is not allowed; section 10
182    makes it unnecessary.
183
184      3. Protecting Users' Legal Rights From Anti-Circumvention Law.
185
186      No covered work shall be deemed part of an effective technological
187    measure under any applicable law fulfilling obligations under article
188    11 of the WIPO copyright treaty adopted on 20 December 1996, or
189    similar laws prohibiting or restricting circumvention of such
190    measures.
191
192      When you convey a covered work, you waive any legal power to forbid
193    circumvention of technological measures to the extent such circumvention
194    is effected by exercising rights under this License with respect to
195    the covered work, and you disclaim any intention to limit operation or
196    modification of the work as a means of enforcing, against the work's
197    users, your or third parties' legal rights to forbid circumvention of
198    technological measures.
199
200      4. Conveying Verbatim Copies.
201
202      You may convey verbatim copies of the Program's source code as you
203    receive it, in any medium, provided that you conspicuously and
204    appropriately publish on each copy an appropriate copyright notice;
205    keep intact all notices stating that this License and any
206    non-permissive terms added in accord with section 7 apply to the code;
207    keep intact all notices of the absence of any warranty; and give all
208    recipients a copy of this License along with the Program.
209
210      You may charge any price or no price for each copy that you convey,
211    and you may offer support or warranty protection for a fee.
212
213      5. Conveying Modified Source Versions.
214
215      You may convey a work based on the Program, or the modifications to
216    produce it from the Program, in the form of source code under the
217    terms of section 4, provided that you also meet all of these conditions:
218
219        a) The work must carry prominent notices stating that you modified
```

it, and giving a relevant date.

b) The work must carry prominent notices stating that it is
released under this License and any conditions added under section
7.  This requirement modifies the requirement in section 4 to
"keep intact all notices".

c) You must license the entire work, as a whole, under this
License to anyone who comes into possession of a copy.  This
License will therefore apply, along with any applicable section 7
additional terms, to the whole of the work, and all its parts,
regardless of how they are packaged.  This License gives no
permission to license the work in any other way, but it does not
invalidate such permission if you have separately received it.

d) If the work has interactive user interfaces, each must display
Appropriate Legal Notices; however, if the Program has interactive
interfaces that do not display Appropriate Legal Notices, your
work need not make them do so.

  A compilation of a covered work with other separate and independent
works, which are not by their nature extensions of the covered work,
and which are not combined with it such as to form a larger program,
in or on a volume of a storage or distribution medium, is called an
"aggregate" if the compilation and its resulting copyright are not
used to limit the access or legal rights of the compilation's users
beyond what the individual works permit.  Inclusion of a covered work
in an aggregate does not cause this License to apply to the other
parts of the aggregate.

  6. Conveying Non-Source Forms.

  You may convey a covered work in object code form under the terms
of sections 4 and 5, provided that you also convey the
machine-readable Corresponding Source under the terms of this License,
in one of these ways:

a) Convey the object code in, or embodied in, a physical product
(including a physical distribution medium), accompanied by the
Corresponding Source fixed on a durable physical medium
customarily used for software interchange.

b) Convey the object code in, or embodied in, a physical product
(including a physical distribution medium), accompanied by a
written offer, valid for at least three years and valid for as
long as you offer spare parts or customer support for that product
model, to give anyone who possesses the object code either (1) a
copy of the Corresponding Source for all the software in the

268    product that is covered by this License, on a durable physical
269    medium customarily used for software interchange, for a price no
270    more than your reasonable cost of physically performing this
271    conveying of source, or (2) access to copy the
272    Corresponding Source from a network server at no charge.

274      c) Convey individual copies of the object code with a copy of the
275    written offer to provide the Corresponding Source.  This
276    alternative is allowed only occasionally and noncommercially, and
277    only if you received the object code with such an offer, in accord
278    with subsection 6b.

280      d) Convey the object code by offering access from a designated
281    place (gratis or for a charge), and offer equivalent access to the
282    Corresponding Source in the same way through the same place at no
283    further charge.  You need not require recipients to copy the
284    Corresponding Source along with the object code.  If the place to
285    copy the object code is a network server, the Corresponding Source
286    may be on a different server (operated by you or a third party)
287    that supports equivalent copying facilities, provided you maintain
288    clear directions next to the object code saying where to find the
289    Corresponding Source.  Regardless of what server hosts the
290    Corresponding Source, you remain obligated to ensure that it is
291    available for as long as needed to satisfy these requirements.

293      e) Convey the object code using peer-to-peer transmission, provided
294    you inform other peers where the object code and Corresponding
295    Source of the work are being offered to the general public at no
296    charge under subsection 6d.

298    A separable portion of the object code, whose source code is excluded
299    from the Corresponding Source as a System Library, need not be
300    included in conveying the object code work.

302    A "User Product" is either (1) a "consumer product", which means any
303    tangible personal property which is normally used for personal, family,
304    or household purposes, or (2) anything designed or sold for incorporation
305    into a dwelling.  In determining whether a product is a consumer product,
306    doubtful cases shall be resolved in favor of coverage.  For a particular
307    product received by a particular user, "normally used" refers to a
308    typical or common use of that class of product, regardless of the status
309    of the particular user or of the way in which the particular user
310    actually uses, or expects or is expected to use, the product.  A product
311    is a consumer product regardless of whether the product has substantial
312    commercial, industrial or non-consumer uses, unless such uses represent
313    the only significant mode of use of the product.

315    "Installation Information" for a User Product means any methods,

316    procedures, authorization keys, or other information required to install
317    and execute modified versions of a covered work in that User Product from
318    a modified version of its Corresponding Source.  The information must
319    suffice to ensure that the continued functioning of the modified object
320    code is in no case prevented or interfered with solely because
321    modification has been made.
322
323       If you convey an object code work under this section in, or with, or
324    specifically for use in, a User Product, and the conveying occurs as
325    part of a transaction in which the right of possession and use of the
326    User Product is transferred to the recipient in perpetuity or for a
327    fixed term (regardless of how the transaction is characterized), the
328    Corresponding Source conveyed under this section must be accompanied
329    by the Installation Information.  But this requirement does not apply
330    if neither you nor any third party retains the ability to install
331    modified object code on the User Product (for example, the work has
332    been installed in ROM).
333
334       The requirement to provide Installation Information does not include a
335    requirement to continue to provide support service, warranty, or updates
336    for a work that has been modified or installed by the recipient, or for
337    the User Product in which it has been modified or installed.  Access to a
338    network may be denied when the modification itself materially and
339    adversely affects the operation of the network or violates the rules and
340    protocols for communication across the network.
341
342       Corresponding Source conveyed, and Installation Information provided,
343    in accord with this section must be in a format that is publicly
344    documented (and with an implementation available to the public in
345    source code form), and must require no special password or key for
346    unpacking, reading or copying.
347
348       7. Additional Terms.
349
350       "Additional permissions" are terms that supplement the terms of this
351    License by making exceptions from one or more of its conditions.
352    Additional permissions that are applicable to the entire Program shall
353    be treated as though they were included in this License, to the extent
354    that they are valid under applicable law.  If additional permissions
355    apply only to part of the Program, that part may be used separately
356    under those permissions, but the entire Program remains governed by
357    this License without regard to the additional permissions.
358
359       When you convey a copy of a covered work, you may at your option
360    remove any additional permissions from that copy, or from any part of
361    it.  (Additional permissions may be written to require their own
362    removal in certain cases when you modify the work.)  You may place
363    additional permissions on material, added by you to a covered work,

(163 of 169), Page 163 of 169    Case: 24-5538, 01/21/2025, DktEntry: 39.2, Page 163 of 169
2/9/2021    Case 5:19-cv-06226-EJD    Document 113.4 Filed 02/10/21    Page 18 of 24

for which you have or can give appropriate copyright permission.

Notwithstanding any other provision of this License, for material you
add to a covered work, you may (if authorized by the copyright holders of
that material) supplement the terms of this License with terms:

    a) Disclaiming warranty or limiting liability differently from the
    terms of sections 15 and 16 of this License; or

    b) Requiring preservation of specified reasonable legal notices or
    author attributions in that material or in the Appropriate Legal
    Notices displayed by works containing it; or

    c) Prohibiting misrepresentation of the origin of that material, or
    requiring that modified versions of such material be marked in
    reasonable ways as different from the original version; or

    d) Limiting the use for publicity purposes of names of licensors or
    authors of the material; or

    e) Declining to grant rights under trademark law for use of some
    trade names, trademarks, or service marks; or

    f) Requiring indemnification of licensors and authors of that
    material by anyone who conveys the material (or modified versions of
    it) with contractual assumptions of liability to the recipient, for
    any liability that these contractual assumptions directly impose on
    those licensors and authors.

  All other non-permissive additional terms are considered "further
restrictions" within the meaning of section 10.  If the Program as you
received it, or any part of it, contains a notice stating that it is
governed by this License along with a term that is a further restriction,
you may remove that term.  If a license document contains a further
restriction but permits relicensing or conveying under this License, you
may add to a covered work material governed by the terms of that license
document, provided that the further restriction does not survive such
relicensing or conveying.

  If you add terms to a covered work in accord with this section, you
must place, in the relevant source files, a statement of the
additional terms that apply to those files, or a notice indicating
where to find the applicable terms.

  Additional terms, permissive or non-permissive, may be stated in the
form of a separately written license, or stated as exceptions;
the above requirements apply either way.

   8. Termination.

   You may not propagate or modify a covered work except as expressly
provided under this License.  Any attempt otherwise to propagate or
modify it is void, and will automatically terminate your rights under
this License (including any patent licenses granted under the third
paragraph of section 11).

   However, if you cease all violation of this License, then your
license from a particular copyright holder is reinstated (a)
provisionally, unless and until the copyright holder explicitly and
finally terminates your license, and (b) permanently, if the copyright
holder fails to notify you of the violation by some reasonable means
prior to 60 days after the cessation.

   Moreover, your license from a particular copyright holder is
reinstated permanently if the copyright holder notifies you of the
violation by some reasonable means, this is the first time you have
received notice of violation of this License (for any work) from that
copyright holder, and you cure the violation prior to 30 days after
your receipt of the notice.

   Termination of your rights under this section does not terminate the
licenses of parties who have received copies or rights from you under
this License.  If your rights have been terminated and not permanently
reinstated, you do not qualify to receive new licenses for the same
material under section 10.

   9. Acceptance Not Required for Having Copies.

   You are not required to accept this License in order to receive or
run a copy of the Program.  Ancillary propagation of a covered work
occurring solely as a consequence of using peer-to-peer transmission
to receive a copy likewise does not require acceptance.  However,
nothing other than this License grants you permission to propagate or
modify any covered work.  These actions infringe copyright if you do
not accept this License.  Therefore, by modifying or propagating a
covered work, you indicate your acceptance of this License to do so.

   10. Automatic Licensing of Downstream Recipients.

   Each time you convey a covered work, the recipient automatically
receives a license from the original licensors, to run, modify and
propagate that work, subject to this License.  You are not responsible
for enforcing compliance by third parties with this License.

   An "entity transaction" is a transaction transferring control of an
organization, or substantially all assets of one, or subdividing an

460  organization, or merging organizations.  If propagation of a covered
461  work results from an entity transaction, each party to that
462  transaction who receives a copy of the work also receives whatever
463  licenses to the work the party's predecessor in interest had or could
464  give under the previous paragraph, plus a right to possession of the
465  Corresponding Source of the work from the predecessor in interest, if
466  the predecessor has it or can get it with reasonable efforts.
467
468    You may not impose any further restrictions on the exercise of the
469  rights granted or affirmed under this License.  For example, you may
470  not impose a license fee, royalty, or other charge for exercise of
471  rights granted under this License, and you may not initiate litigation
472  (including a cross-claim or counterclaim in a lawsuit) alleging that
473  any patent claim is infringed by making, using, selling, offering for
474  sale, or importing the Program or any portion of it.
475
476    11. Patents.
477
478    A "contributor" is a copyright holder who authorizes use under this
479  License of the Program or a work on which the Program is based.  The
480  work thus licensed is called the contributor's "contributor version".
481
482    A contributor's "essential patent claims" are all patent claims
483  owned or controlled by the contributor, whether already acquired or
484  hereafter acquired, that would be infringed by some manner, permitted
485  by this License, of making, using, or selling its contributor version,
486  but do not include claims that would be infringed only as a
487  consequence of further modification of the contributor version.  For
488  purposes of this definition, "control" includes the right to grant
489  patent sublicenses in a manner consistent with the requirements of
490  this License.
491
492    Each contributor grants you a non-exclusive, worldwide, royalty-free
493  patent license under the contributor's essential patent claims, to
494  make, use, sell, offer for sale, import and otherwise run, modify and
495  propagate the contents of its contributor version.
496
497    In the following three paragraphs, a "patent license" is any express
498  agreement or commitment, however denominated, not to enforce a patent
499  (such as an express permission to practice a patent or covenant not to
500  sue for patent infringement).  To "grant" such a patent license to a
501  party means to make such an agreement or commitment not to enforce a
502  patent against the party.
503
504    If you convey a covered work, knowingly relying on a patent license,
505  and the Corresponding Source of the work is not available for anyone
506  to copy, free of charge and under the terms of this License, through a
507  publicly available network server or other readily accessible means,

508  then you must either (1) cause the Corresponding Source to be so
509  available, or (2) arrange to deprive yourself of the benefit of the
510  patent license for this particular work, or (3) arrange, in a manner
511  consistent with the requirements of this License, to extend the patent
512  license to downstream recipients.  "Knowingly relying" means you have
513  actual knowledge that, but for the patent license, your conveying the
514  covered work in a country, or your recipient's use of the covered work
515  in a country, would infringe one or more identifiable patents in that
516  country that you have reason to believe are valid.
517
518      If, pursuant to or in connection with a single transaction or
519  arrangement, you convey, or propagate by procuring conveyance of, a
520  covered work, and grant a patent license to some of the parties
521  receiving the covered work authorizing them to use, propagate, modify
522  or convey a specific copy of the covered work, then the patent license
523  you grant is automatically extended to all recipients of the covered
524  work and works based on it.
525
526      A patent license is "discriminatory" if it does not include within
527  the scope of its coverage, prohibits the exercise of, or is
528  conditioned on the non-exercise of one or more of the rights that are
529  specifically granted under this License.  You may not convey a covered
530  work if you are a party to an arrangement with a third party that is
531  in the business of distributing software, under which you make payment
532  to the third party based on the extent of your activity of conveying
533  the work, and under which the third party grants, to any of the
534  parties who would receive the covered work from you, a discriminatory
535  patent license (a) in connection with copies of the covered work
536  conveyed by you (or copies made from those copies), or (b) primarily
537  for and in connection with specific products or compilations that
538  contain the covered work, unless you entered into that arrangement,
539  or that patent license was granted, prior to 28 March 2007.
540
541      Nothing in this License shall be construed as excluding or limiting
542  any implied license or other defenses to infringement that may
543  otherwise be available to you under applicable patent law.
544
545      12. No Surrender of Others' Freedom.
546
547      If conditions are imposed on you (whether by court order, agreement or
548  otherwise) that contradict the conditions of this License, they do not
549  excuse you from the conditions of this License.  If you cannot convey a
550  covered work so as to satisfy simultaneously your obligations under this
551  License and any other pertinent obligations, then as a consequence you may
552  not convey it at all.  For example, if you agree to terms that obligate you
553  to collect a royalty for further conveying from those to whom you convey
554  the Program, the only way you could satisfy both those terms and this
555  License would be to refrain entirely from conveying the Program.

```
556
557        13. Remote Network Interaction; Use with the GNU General Public License.
558
559        Notwithstanding any other provision of this License, if you modify the
560      Program, your modified version must prominently offer all users
561      interacting with it remotely through a computer network (if your version
562      supports such interaction) an opportunity to receive the Corresponding
563      Source of your version by providing access to the Corresponding Source
564      from a network server at no charge, through some standard or customary
565      means of facilitating copying of software.  This Corresponding Source
566      shall include the Corresponding Source for any work covered by version 3
567      of the GNU General Public License that is incorporated pursuant to the
568      following paragraph.
569
570        Notwithstanding any other provision of this License, you have permission
571      to link or combine any covered work with a work licensed under version 3
572      of the GNU General Public License into a single combined work, and to
573      convey the resulting work.  The terms of this License will continue to
574      apply to the part which is the covered work, but the work with which it is
575      combined will remain governed by version 3 of the GNU General Public
576      License.
577
578        14. Revised Versions of this License.
579
580        The Free Software Foundation may publish revised and/or new versions of
581      the GNU Affero General Public License from time to time.  Such new
582      versions will be similar in spirit to the present version, but may differ
583      in detail to address new problems or concerns.
584
585        Each version is given a distinguishing version number.  If the
586      Program specifies that a certain numbered version of the GNU Affero
587      General Public License "or any later version" applies to it, you have
588      the option of following the terms and conditions either of that
589      numbered version or of any later version published by the Free
590      Software Foundation.  If the Program does not specify a version number
591      of the GNU Affero General Public License, you may choose any version
592      ever published by the Free Software Foundation.
593
594        If the Program specifies that a proxy can decide which future
595      versions of the GNU Affero General Public License can be used, that
596      proxy's public statement of acceptance of a version permanently
597      authorizes you to choose that version for the Program.
598
599        Later license versions may give you additional or different
600      permissions.  However, no additional obligations are imposed on any
601      author or copyright holder as a result of your choosing to follow a
602      later version.
603
```

```
604    15. Disclaimer of Warranty.
605
606    THERE IS NO WARRANTY FOR THE PROGRAM, TO THE EXTENT PERMITTED BY
607    APPLICABLE LAW.  EXCEPT WHEN OTHERWISE STATED IN WRITING THE COPYRIGHT
608    HOLDERS AND/OR OTHER PARTIES PROVIDE THE PROGRAM "AS IS" WITHOUT WARRANTY
609    OF ANY KIND, EITHER EXPRESSED OR IMPLIED, INCLUDING, BUT NOT LIMITED TO,
610    THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR
611    PURPOSE.  THE ENTIRE RISK AS TO THE QUALITY AND PERFORMANCE OF THE PROGRAM
612    IS WITH YOU.  SHOULD THE PROGRAM PROVE DEFECTIVE, YOU ASSUME THE COST OF
613    ALL NECESSARY SERVICING, REPAIR OR CORRECTION.
614
615    16. Limitation of Liability.
616
617    IN NO EVENT UNLESS REQUIRED BY APPLICABLE LAW OR AGREED TO IN WRITING
618    WILL ANY COPYRIGHT HOLDER, OR ANY OTHER PARTY WHO MODIFIES AND/OR CONVEYS
619    THE PROGRAM AS PERMITTED ABOVE, BE LIABLE TO YOU FOR DAMAGES, INCLUDING ANY
620    GENERAL, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF THE
621    USE OR INABILITY TO USE THE PROGRAM (INCLUDING BUT NOT LIMITED TO LOSS OF
622    DATA OR DATA BEING RENDERED INACCURATE OR LOSSES SUSTAINED BY YOU OR THIRD
623    PARTIES OR A FAILURE OF THE PROGRAM TO OPERATE WITH ANY OTHER PROGRAMS),
624    EVEN IF SUCH HOLDER OR OTHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF
625    SUCH DAMAGES.
626
627    17. Interpretation of Sections 15 and 16.
628
629    If the disclaimer of warranty and limitation of liability provided
630    above cannot be given local legal effect according to their terms,
631    reviewing courts shall apply local law that most closely approximates
632    an absolute waiver of all civil liability in connection with the
633    Program, unless a warranty or assumption of liability accompanies a
634    copy of the Program in return for a fee.
635
636                    END OF TERMS AND CONDITIONS
637
638            How to Apply These Terms to Your New Programs
639
640    If you develop a new program, and you want it to be of the greatest
641    possible use to the public, the best way to achieve this is to make it
642    free software which everyone can redistribute and change under these terms.
643
644    To do so, attach the following notices to the program.  It is safest
645    to attach them to the start of each source file to most effectively
646    state the exclusion of warranty; and each file should have at least
647    the "copyright" line and a pointer to where the full notice is found.
648
649        <one line to give the program's name and a brief idea of what it does.>
650        Copyright (C) <year>  <name of author>
651
```

```
652      This program is free software: you can redistribute it and/or modify
653      it under the terms of the GNU Affero General Public License as
654      published by the Free Software Foundation, either version 3 of the
655      License, or (at your option) any later version.
656
657      This program is distributed in the hope that it will be useful,
658      but WITHOUT ANY WARRANTY; without even the implied warranty of
659      MERCHANTABILITY or FITNESS FOR A PARTICULAR PURPOSE.  See the
660      GNU Affero General Public License for more details.
661
662      You should have received a copy of the GNU Affero General Public License
663      along with this program.  If not, see <http://www.gnu.org/licenses/>.
664
665    Also add information on how to contact you by electronic and paper mail.
666
667      If your software can interact with users remotely through a computer
668    network, you should also make sure that it provides a way for users to
669    get its source.  For example, if your program is a web application, its
670    interface could display a "Source" link that leads users to an archive
671    of the code.  There are many ways you could offer source, and different
672    solutions will be better for different programs; see section 13 for the
673    specific requirements.
674
675      You should also get your employer (if you work as a programmer) or school,
676    if any, to sign a "copyright disclaimer" for the program, if necessary.
677    For more information on this, and how to apply and follow the GNU AGPL, see
678    <http://www.gnu.org/licenses/>.
679
680
681    "Commons Clause" License Condition
682
683    The Software is provided to you by the Licensor under the License, as
684    defined below, subject to the following condition. Without limiting
685    other conditions in the License, the grant of rights under the License
686    will not include, and the License does not grant to you, the right to
687    Sell the Software.  For purposes of the foregoing, "Sell" means
688    practicing any or all of the rights granted to you under the License
689    to provide to third parties, for a fee or other consideration,
690    a product or service that consists, entirely or substantially,
691    of the Software or the functionality of the Software. Any license
692    notice or attribution required by the License must also include
693    this Commons Cause License Condition notice.
```