No. 24-5538

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

NEO4J, INC., NEO4J SWEDEN AB,

*Plaintiffs-Appellees,*

v.

JOHN MARK SUHY,

*Defendant-Appellant.*

On Appeal from the United States District Court
For the Northern District of California
No. 5:18-cv-07182-EJD
Hon. Edward J. Davila

_____

**APPELLEES' EXCERPTS OF RECORD**
**Volume 2 of 18**

_____

John V. Picone III (State Bar No. 187226)
jpicone@spencerfane.com
Jeffrey M. Ratinoff (State Bar No. 197241)
jratinoff@spencerfane.com
Jeremy A. Moseley (MT Bar No. 44830177)
jmoseley@spencerfane.com

*Attorneys for Appellees*
Neo4j, Inc. and Neo4j Sweden AB

| UNITED STATES DISTRICT COURT<br>NORTHERN DISTRICT OF CALIFORNIA<br>Form CAND 133 (Rev. 10/2021) | **BILL OF COSTS**<br>*Please follow the instructions on page 3 when completing this form.* | **COURT USE ONLY**<br>OBJECTION DEADLINE:<br>OBJECTION FILED: Yes ☐     No ☒ |
|---|---|---|

| 1. CASE NAME<br><br>Neo4j, Inc. and Neo4j Sweden, AB v. PureThink LLC, iGov Inc. and John Mark Suhy | 2. CASE NUMBER<br><br>5:18-cv-07182-EJD | 3. DATE JUDGMENT ENTERED<br><br>August 15, 2024 | 4. PARTY AGAINST WHOM JUDGMENT WAS ENTERED<br>PureThink LLC, iGov Inc. and John Mark Suhy |
|---|---|---|---|

| 5. NAME OF CLAIMING PARTY<br><br>Plaintiffs Neo4j, Inc. and Neo4j Sweden AB | 6. NAME OF ATTORNEY FOR CLAIMING PARTY (or indicate "PRO SE")<br><br>Jeffrey M. Ratinoff, Spencer Fane LLP | 7. PHONE AND EMAIL OF CLAIMING PARTY, IF PRO SE |
|---|---|---|

8. REQUEST TO TAX THE FOLLOWING AS COSTS:                (SHADED AREAS ARE FOR COURT USE ONLY)

| COST ITEM | AMOUNT CLAIMED | LIST SUPPORTING DOCUMENTATION | *Amt Allowed* | *Disallowed* | *Disallowance Reason* |
|---|---|---|---|---|---|
| **a. FEES OF THE CLERK AND FOR SERVICE OF PROCESS** | | | | | |
| Filing Fees and Docket Fees, Civil LR 54-3(a)(1), 18 U.S.C. 1923 | $400.00 | Ratinoff Decl., Ex. 1 to ECF No. 1 (Receipt Number 0971- 12880258)<br><br>Ratinoff Decl., Ex. 2: 2018 11 28 Payment Confirmation | 400.00 | | |
| Service of Process, Civil LR 54-3(a)(2) | $160.00 | Ratinoff Decl., Ex. 3: Statement from Same Day Process Service, Inc. (Invoice Nos. 105359 and 105360) | | 160.00 | E – Disallowed as outside the ambit of Civil LR 54-3 |
| **b. REPORTERS' TRANSCRIPTS** | | | | | |
| Transcripts for appeal, Civil LR 54-3(b)(1) | $2606.30 | Ratinoff Decl., Ex. 4: Invoice for 2023 11 14 and 2023 11 28 Trial Transcripts | | 2606.30 | E - Disallowed as outside the ambit of Civil LR 54-3 |
| Rulings from the bench, Civil LR 54-3(b)(2) | | | | | |
| Other transcripts (by order or stipulation), Civil LR 54-3(b)(3) | | | 1556.00 | 1050.30 | E – Disallowed as outside the ambit of Civil LR 54-3 |
| **c. DEPOSITIONS** | | | | | |
| Deposition transcript/video recording, Civil LR 54-3(c)(1) | $3,553.50 | Ratinoff Decl., Ex. 5: Inv. No. 116245 from Bell & Meyers - Deposition of John Mark Suhy (Pt 1) transcript | 1715.00 | 1848.50 | E – Disallowed as outside the ambit of Civil LR 54-3 |
| | $860.00 | Ratinoff Decl., Ex. 6: Inv. No. 116306 from Bell & Meyers - Deposition of John Mark Suhy (Pt 1) video invoice | 0.00 | 860.00 | E – Disallowed as outside the ambit of Civil LR 54-3 |
| | $1,434.50 | Ratinoff Decl., Ex. 7: Inv. No. 202028 from Bell & Meyers - Deposition of Jim Weyant | 1035.00 | 399.50 | E – Disallowed as outside the ambit of Civil LR 54-3 |
| | $1,603.50 | Ratinoff Decl., Ex. 8: Inv. No. 202095 from | 1077.00 | 526.50 | E – Disallowed as outside the |

Case 5:18-cv-07182-EJD   Document 257   Filed 09/16/24   Page 2 of 5

| | | | | |
|---|---|---|---|---|
| | | Bell & Meyers - Deposition of Mariano Pelliza | | | ambit of Civil LR 54-3 |
| | $2,680.75 | Ratinoff Decl., Ex. 9: Inv. No. 202144 from Bell & Meyers - Deposition of Ashwani Mayur | 1059.00 | 1621.75 | E – Disallowed as outside the ambit of Civil LR 54-3 |
| | $3,304.10 | Ratinoff Decl., Ex. 10: Inv. No. 202181 from Bell & Meyers - Deposition of Michael Stavrianos | 1611.00 | 1693.10 | E – Disallowed as outside the ambit of Civil LR 54-3 |
| | $4,633.75 | Ratinoff Decl., Ex. 11: Inv. No. 202224 from Bell & Meyers - Deposition of Michael C. Dunn | 2103.00 | 2530.75 | E – Disallowed as outside the ambit of Civil LR 54-3 |
| | $3,924.70 | Ratinoff Decl., Ex. 12: Inv. No. 202239 from Bell & Meyers - Deposition of Turin Pollard | 1719.50 | 2205.20 | E – Disallowed as outside the ambit of Civil LR 54-3 |
| | $4,915.50 | Ratinoff Decl., Ex. 13: Inv. No. 202245 from Bell & Meyers - Deposition of John Mark Suhy (Pt 2) | 3110.50 | 1805.00 | E – Disallowed as outside the ambit of Civil LR 54-3 |
| | | *See also* Ratinoff Decl., Ex. 26 for calculations of each invoice by category under Civil LR 54-3(c) | | | |
| Deposition exhibits, Civil LR 54-3(c)(3) | $540.55 | Ratinoff Decl., Ex. 5: Inv. No. 116245 from Bell & Meyers - Deposition of John Mark Suhy (Pt 1) transcript | 475.55 | 65.00 | E – Disallowed as outside of ambit of Civil LR 54-3 |
| | $57.80 | Ratinoff Decl., Ex. 7: Inv. No. 202028 from Bell & Meyers - Deposition of Jim Weyant | 57.80 | 0.00 | |
| | $343.00 | Ratinoff Decl., Ex. 8: Inv. No. 202095 from Bell & Meyers - Deposition of Mariano Pelliza | 345.40 | 0.00 | |
| | $128.10 | Ratinoff Decl., Ex. 9: Inv. No. 202144 from Bell & Meyers - Deposition of Ashwani Mayur | 128.10 | 0.00 | |
| | $233.95 | Ratinoff Decl., Ex. 10: Inv. No. 202181 from Bell & Meyers - Deposition of Michael Stavrianos | 233.95 | 0.00 | |
| | $194.60 | Ratinoff Decl., Ex. 11: Inv. No. 202224 from Bell & Meyers - Deposition of Michael C. Dunn | 194.60 | 0.00 | |
| | $341.00 | Ratinoff Decl., Ex. 12: Inv. No. 202239 from Bell & Meyers - Deposition of Turin Pollard | 341.00 | 0.00 | |
| | $185.15 | Ratinoff Decl., Ex. 13: Inv. No. 202245 from Bell & Meyers - Deposition of John Mark Suhy (Pt 2) | 185.15 | 0.00 | |
| | | *See also* Ratinoff Decl., Ex. 26 for calculations of each invoice by category under Civil LR 54-3(c) | | | |
| Notary & reporter attendance fees, Civil LR 54-3(c)(4),(5) | $487.50 | Ratinoff Decl., Ex. 5: Inv. No. 116245 from Bell & Meyers - Deposition of John Mark Suhy | 0.00 | 487.50 | E – Disallowed as outside the ambit of Civil LR 54-3 |

| | | | | | |
|---|---|---|---|---|---|
| | | (Pt 1) transcript | | | |
| | $1,225.00 | Ratinoff Decl., Ex. 6: Inv. No. 116306 from Bell & Meyers - Deposition of John Mark Suhy (Pt 1) video invoice | 0.00 | 1225.00 | E – Disallowed as outside the ambit of Civil LR 54-3 |
| | $1,371.50 | Ratinoff Decl., Ex. 7: Inv. No. 202028 from Bell & Meyers - Deposition of Jim Weyant | 0.00 | 1371.50 | E – Disallowed as outside the ambit of Civil LR 54-3 |
| | $1,244.00 | Ratinoff Decl., Ex. 8: Inv. No. 202095 from Bell & Meyers - Deposition of Mariano Pelliza | 0.00 | 1244.00 | E – Disallowed as outside the ambit of Civil LR 54-3 |
| | $1,281.50 | Ratinoff Decl., Ex. 9: Inv. No. 202144 from Bell & Meyers - Deposition of Ashwani Mayur | 0.00 | 1281.50 | E – Disallowed as outside the ambit of Civil LR 54-3 |
| | $1,779.00 | Ratinoff Decl., Ex. 10: Inv. No. 202181 from Bell & Meyers - Deposition of Michael Stavrianos | 0.00 | 1779.00 | E – Disallowed as outside the ambit of Civil LR 54-3 |
| | $2,024.00 | Ratinoff Decl., Ex. 11: Inv. No. 202224 from Bell & Meyers - Deposition of Michael C. Dunn | 0.00 | 2024.00 | E – Disallowed as outside the ambit of Civil LR 54-3 |
| | $2,054.00 | Ratinoff Decl., Ex. 12: Inv. No. 202239 from Bell & Meyers - Deposition of Turin Pollard | 0.00 | 2054.00 | E – Disallowed as outside the ambit of Civil LR 54-3 |
| | $2,564.00 | Ratinoff Decl., Ex. 13: Inv. No. 202245 from Bell & Meyers - Deposition of John Mark Suhy (Pt 2) | 0.00 | 2564.00 | E – Disallowed as outside the ambit of Civil LR 54-3 |
| | | *See also* Ratinoff Decl., Ex. 26 for calculations of each invoice by category under Civil LR 54-3(c) | | | |
| **d. REPRODUCTION, EXEMPLIFICATION** | | | | | |
| Government records, Civil LR 54-3(d)(1) | | | | | |
| Disclosure/formal discovery documents, Civil LR 54-3(d)(2) | $10,321.13 | Ratinoff Decl., Ex. 14 - 2019 07 31 Catalyst Inv 1197590 for eDiscovery and Document Processing | 681.00 | 9640.13 | E – Disallowed as outside the ambit of Civil LR 54-3; C - Disallowed as excessive expense |
| | $3,837.50 | Ratinoff Decl., Ex. 15 - 2019 08 15 Catalyst Inv 1198365 for eDiscovery and Document Processing | 775.00 | 3062.50 | E – Disallowed as outside the ambit of Civil LR 54-3; C - Disallowed as excessive expense |
| | $975.00 | Ratinoff Decl., Ex. 16 - 2022 06 09 OpenText Inv 9003191469 for eDiscovery and Document Processing | 975.00 | 0.00 | |
| | $3,687.50 | Ratinoff Decl., Ex. 17 - 2022 09 21 OpenText Inv 9003347797 for eDiscovery and Document Processing | 2500.00 | 1187.50 | E – Disallowed as outside the ambit of Civil LR 54-3; C - Disallowed as excessive expense |
| | $1,750.00 | Ratinoff Decl., Ex. 18 - 2022 10 20 OpenText Inv 9003397301 for eDiscovery and Document Processing | 1750.00 | 0.00 | |

SJ 2098537.1

Case 5:18-cv-07182-EJD   Document 257   Filed 09/16/24   Page 4 of 5

|  |  |  |  |  |  |
|---|---|---|---|---|---|
|  | $2,562.50 | Ratinoff Decl., Ex. 19 - 2022 11 10 OpenText Inv 9003511136 for eDiscovery and Document Processing | 2562.50 | 0.00 |  |
|  | $7,435.00 | Ratinoff Decl., Ex. 20 - 2022 12 13 OpenText Inv 9003625708 for eDiscovery and Document Processing | 3395.00 | 4040.00 | E – Disallowed as outside the ambit of Civil LR 54-3; C – Disallowed as excessive expense |
|  | $6,875.00 | Ratinoff Decl., Ex. 21 - 2023 01 13 OpenText Inv 9003698572 for eDiscovery and Document Processing | 3750.00 | 3125.00 | E – Disallowed as outside the ambit of Civil LR 54-3; C – Disallowed as excessive expense |
| Trial exhibits, Civil LR 54-3(d)(4) | $14,973.97 | Ratinoff Decl., Ex. 22: [ECF No. 180] ORDER For Modification of Case Schedule after Trial Setting Conference at 3:26-4:3.<br><br>Ratinoff Decl., Ex. 23: Court's Request for Trial Exhibit and Witness Binders<br><br>Ratinoff Decl., Ex. 24: 2023 11 20 Array Inv No X84103 for Trial Exhibit and Witness Binders<br><br>Ratinoff Decl., Ex. 25: 2023 11 30 Array Inv No X84609 for Additional Witness Binders | 12,409.97 | 2564.00 | A – No supporting documentation provided |
| Visual aids, Civil LR 54(d)(5) |  |  |  |  |  |
| **e. WITNESS FEES AND EXPENSES** |  |  |  |  |  |
| Total from itemized Witness Fees worksheet,* Civil LR 54(e) |  |  |  |  |  |
| **f. COURT-APPOINTED PROFESSIONALS, INTERPRETERS** |  |  |  |  |  |
| Fees for special masters & receivers, Civil LR 54-3(f) |  |  |  |  |  |
| Court-appointed experts, 28 USC § 1920(6) |  |  |  |  |  |
| Interpreters and special interpretation services, 28 USC §§ 1828, 1920(6) |  |  |  |  |  |
| **g. MISCELLANEOUS COSTS** |  |  |  |  |  |
| Costs on appeal, Civil LR 54-3(g) & FRAP 39 |  |  |  |  |  |
| Costs of bonds and security, Civil LR 54-3(h) |  |  |  |  |  |
| **TOTAL AMOUNT** | $98,548.85 |  | $ 46,146.02 | $ 52,402.83 |  |

SJ 2098537.1

| 9. ADDITIONAL COMMENTS, NOTES, ETC: |
|---|

| 10. **AFFIDAVIT PURSUANT TO 28 USC § 1924**: I declare under penalty of perjury that the foregoing costs are correct and were necessarily incurred in this action and that the services for which fees have been charged were actually and necessarily performed.<br>**Name of Attorney/Claiming Party**:  Jeffrey M. Ratinoff/Plaintiffs Neo4j, Inc. and Neo4j Sweden AB | 11. Costs are taxed in the amount of     $46,146.02          and included in the judgment.<br><br>Mark B. Busby                                            •<br>Clerk of Court |
|---|---|
| SIGNATURE: _[signature]_                              DATE: 08/29/2024 | BY: _[signature]_          Deputy Clerk          DATE: 09/16/2024 |

1   John V. Picone III, Bar No. 187226
    jpicone@hopkinscarley.com
2   Jeffrey M. Ratinoff, Bar No. 197241
    jratinoff@hopkinscarley.com
3   HOPKINS & CARLEY
    A Law Corporation
4   The Letitia Building
    70 South First Street
5   San Jose, CA  95113-2406

6   *mailing address:*
    P.O. Box 1469
7   San Jose, CA 95109-1469
    Telephone:     (408) 286-9800
8   Facsimile:     (408) 998-4790

9   Attorneys for Plaintiffs and Counter-Defendants
    NEO4J, INC. and NEO4J SWEDEN AB

10

11                  UNITED STATES DISTRICT COURT

12              NORTHERN DISTRICT OF CALIFORNIA

13  NEO4J, INC., a Delaware corporation,      CASE NO.  5:18-cv-07182-EJD
    NEO4J SWEDEN, AB,
14                                            **ADMITTED TRIAL EXHIBIT LIST AND**
                                              **JOINT CERTIFICATION OF ADMITTED**
15                Plaintiffs,                 **TRIAL EXHIBITS**

16         v.

17  PURETHINK LLC, a Delaware limited          **(TX4 - TX170)**
    liability company, IGOV INC., a Virginia
18  corporation, and JOHN MARK SUHY, an
    individual,

19                Defendants.

20  ───────────────────────────────
    AND RELATED COUNTERCLAIMS.
21

22

23

24

25

26

27

28

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ◆PALO ALTO

4856-3278-8638.1
ADMITTED TRIAL EXHIBIT LIST AND JOINT CERTIFICATION
OF ADMITTED TRIAL EXHIBITS                                    CASE NO. 5:18-CV-07182-EJD

1   Plaintiffs and Counter-Defendants Neo4j, Inc. and Neo4j Sweden AB (collectively
2   "Plaintiffs") and Defendants and Counterclaims PureThink LLC, iGov Inc. and John Mark Suhy
3   (collectively "Defendants") (collectively, the "Parties"), through their respective counsel,
4   HEREBY CERTIFY, pursuant to Civil L.R. 5(g)(A), that following constitutes the list of exhibits
5   admitted by the Court either during the trial or via stipulation and order in this Action and the
6   attached exhibits are true and correct copies of those admitted exhibits.

7

| Exhibit | Description | Date Admitted | Witness(es) |
|---------|-------------|---------------|-------------|
| 4 | 2018-05-17 Rathle announcement published on Neo4j USA's website regarding the release of Neo4j® CE and Neo4j® EE version 3.4 and introduction of Commons Clause | 11/14/2023 | Jason Zagalsky* John Mark Suhy |
| 6 | 2018-11-15 Announcement regarding the release of Neo4j CE and Neo4j EE v3.5 published by Rathle on Neo4j USA's website | 11/14/2023 | Jason Zagalsky* |
| 8 | 2020-01-29 Press release issued by Neo4j USA titled "Neo4j Marks Another Year of Product, Customer and Community Momentum" | 11/14/2023 | Jason Zagalsky* |
| 15 | (*Sealed Document*) Excel Spreadsheet - 2022-11-14 Neo4j Monthly Closed Won Report as of 2022-11-14 | 11/14/2023 | Kelly Zawalski* Steven Boyles |
| 16 | (*Sealed Document*) 2017-10-01 Neo4j USA Price List, Effective Oct 1, 2017 (Confidential - AEO) | 11/14/2023 | Jason Zagalsky* |
| 17 | (*Sealed Document*) 2019-04-01 Neo4j USA Price List, Effective April 1, 2019 (Confidential - AEO) | 11/14/2023 | Jason Zagalsky* |
| 18 | (*Sealed Document*) 2020-04-01 Neo4j USA Price List, Effective April 1, 2020 (Confidential - AEO) | 11/14/2023 | Jason Zagalsky* |
| 19 | (*Sealed Document*) 2021-07-01 Neo4j USA Price List, Effective July 1, 2021 (Confidential - AEO) | 11/14/2023 | Jason Zagalsky* |
| 34 | 2016-09-23 IRS Order for Supplies or Services, Order No. TIRNO-16-P-00202, to PureThink for implementation of Neo4j Government Edition for $229,000 | 11/28/2023 | John Mark Suhy* |
| 51 | 07/12/17 Email exchange between John Mark Suhy and Michael Dunn of the IRS regarding PureThink continuing to fulfill its contractual obligations | 11/28/2023 | Pursuant to Stipulation |

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE • PALO ALTO

4856-3278-8638.1

ADMITTED TRIAL EXHIBIT LIST AND JOINT CERTIFICATION
OF ADMITTED TRIAL EXHIBITS                                    CASE NO. 5:18-CV-07182-EJD

SER_0130

| Exhibit | Description | Date Admitted | Witness(es) |
|---|---|---|---|
| 52 | 07/27/17 Email from Daniels Vivan to John Mark Suhy enclosing RFQ and SOW to John Mark Suhy for CKGE support contract | 11/28/2023 | Pursuant to Stipulation |
| 57 | 2018-02-15 Letter from the Department of Treasurer to John Mark Suhy enclosing Neo4j, Inc.'s September 19, 2017 Agency-Level Protest of the IRS's sole-source award to iGov | 11/14/2023 | Jason Zagalsky* |
| 58 | 2018-03-26 Suhy Email to Nussbaum re graphstack.io – avoid trademark issues | 11/28/2023 | John Mark Suhy* |
| 59 | 2018 May 19-21 Rathle/Suhy Email String re Touching base, and attachment – purethink Mail – IRS breakdown.pdf; April-2016-eail-number5-agreement.pdf | 11/28/2023 | John Mark Suhy* |
| 60 | 2018-05-21 Suhy Email to Nussbaum re Quick notes on fork | 11/28/2023 | John Mark Suhy* |
| 61 | 05/22/18 Email exchange between John Mark Suhy and Donald Robertson of FSF regarding the removal of the Commons Clause from the Neo4j Sweden Software License | 11/28/2023 | Pursuant to Stipulation |
| 62 | 06/20/18 Email exchange between John Mark Suhy and Donald Robertson FSF regarding the removal of the Commons Clause from the Neo4j Sweden Software License | 11/28/2023 | Pursuant to Stipulation |
| 65 | 08/21/18 Continued email exchange between John Mark Suhy and Donald Robertson of FSF regarding the removal of the Commons Clause from the Neo4j Sweden Software License | 11/28/2023 | Pursuant to Stipulation |
| 66 | 2018-08-10 Suhy email to Rodrigue re Checkin In | 11/28/2023 | John Mark Suhy* |
| 69 | 08/22/18 Email from John Mark Suhy to Lee Smales at the Department of the Air Force where Suhy points him to ONgDB via the GFI website and confirms IRS is using ONgDB | 11/28/2023 | Pursuant to Stipulation |
| 83 | 07/10/20 Letter from John Mark Suhy to Traci Brinkley enclosing Agency-Level Delivery Order Protest Objection Solicitation 2032H5-20-F-00394 | 11/28/2023 | John Mark Suhy* |
| 86 | 2017-11-01 archive of PureThink LLC's webpage, http://purethink.com/ from Wayback Machine, which states that iGov was formed by the "principle behind PureThink" | 11/14/2023 | Jason Zagalsky* |

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ PALO ALTO

4856-3278-8638.1                                                                - 2 -
ADMITTED TRIAL EXHIBIT LIST AND JOINT CERTIFICATION
OF ADMITTED TRIAL EXHIBITS                                        CASE NO. 5:18-CV-07182-EJD

SER_0131

| Exhibit | Description | Date Admitted | Witness(es) |
|---|---|---|---|
| 87 | 2018-01-13 Printout of iGov's webpage, https://igovsol.com/about.html, which states that iGov was formed by the "principle behind PureThink" | 11/14/2023 | Jason Zagalsky* |
| 88 | 2018-01-13 Copy of printout of iGov's webpage, https://igovsol.com/neo4j.html, showing use of Neo4j Mark in "Government Development Packages for Neo4j" | 11/14/2023 | Jason Zagalsky* |
| 89 | 2018-12-04 archive of iGov's webpage, https://igovsol.com/neo4j.html, from Wayback Machine showing infringement of Neo4j Mark and encouraging download of ONgDB from GFI | 11/14/2023 | Jason Zagalsky* John Mark Suhy |
| 91 | 2019-10-01 capture of iGov's webpage, https://igovsol.com/index.html, encouraging users to adopt ONgDB for free over Neo4j EE | 11/14/2023 | Jason Zagalsky* |
| 103 | 2018-06-14 Email from Jason Zagalsky to Michael Smolyak re commercial license needed for certain enterprise-only features | 11/14/2023 | Jason Zagalsky* |
| 104 | 10/01/18 Email from Dian Griffith to Seth Cooper and Shahak Nagiel of Next Century, referencing links to iGov's website regarding its packages for Neo4j and pricing | 11/28/2023 | Pursuant to Stipulation |
| 105 | 10/17/18 Email from Diane Griffith to Shahak Nagiel discussing iGov's representations regarding the iGov/Graphstack free version of Neo4j Enterprise having the same enterprise-only features as commercially licensed Neo4j EE | 11/28/2023 | Pursuant to Stipulation |
| 106 | 10/22/18 Email exchange between John Mark Suhy and Shahak Nagiel of Next Century Corp where Suhy points him to ONgDB 3.4 via the GFI github repository and confirms IRS is using ONgDB | 11/28/2023 | Pursuant to Stipulation |
| 107 | 10/26/18 Email from John Mark Suhy to Shahak Nagiel confirming that iGov-packaged Neo4j enterprise distributions and ONgDB include the enterprise-only multi-data centers feature | 11/28/2023 | Pursuant to Stipulation |
| 108 | 01/04/19 Email from John Mark Suhy to Shahak Nagiel regarding working on and anticipated release of ONgDB 3.5.1 | 11/28/2023 | Pursuant to Stipulation |
| 109 | 02/01/19 Email from Shahak Nagiel to Jim Weyant re Neo4j PoC Status re going with open source alternative (ONgDB) to Neo4j EE | 11/28/2023 | Pursuant to Stipulation |

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ◆ PALO ALTO

4856-3278-8638.1
ADMITTED TRIAL EXHIBIT LIST AND JOINT CERTIFICATION
OF ADMITTED TRIAL EXHIBITS

- 3 -

CASE NO. 5:18-CV-07182-EJD

SER_0132

| Exhibit | Description | Date Admitted | Witness(es) |
|---|---|---|---|
| 110 | 2019-02-05 Email from Shahak Nagiel to Jason Zagalsky Re: Neo4j licensing informing him that open-sourced builds from the Neo4j source code provided the needed clustering and security requirements | 11/14/2023 | Jason Zagalsky* |
| 111 | 02/19/19 Email from Ben Nussbaum to John Mark Suhy re NextCentury questions re licensing of ONgDB | 11/28/2023 | Pursuant to Stipulation |
| 112 | 02/19/19 Email from Ben Nussbaum to Shahak Nagel after intro from John Mark Suhy discussing ONgDB v.3.5 | 11/28/2023 | Pursuant to Stipulation |
| 113 | Oct 22, 2018-Feb 19, 2019 Nagiel/Nussbaum/Suhy Email String re Neo4j licensing | 11/28/2023 | John Mark Suhy* |
| 114 | 02/21/19 Email from Shahak Nagiel to multiple recipients at Next Century instructing to only use ONgDB and delete all Neo4j EE binaries/containers | 11/28/2023 | Pursuant to Stipulation |
| 115 | 03/05/19 Email from Shahak Nagiel to Marco de Palma,  Todd Hughes and Jim Weyant regarding how to address use of ONgDB over Neo4j EE in public forums | 11/28/2023 | Pursuant to Stipulation |
| 116 | 2019-04-01 Email exchange between Jason Zagalsky and Shahak Nagiel confirming required specifications for a Neo4j EE proposal and scheduling meeting with NextCentury and MPO re same | 11/14/2023 | Jason Zagalsky* |
| 117 | 2019-04-01 Email exchange between Jason Zagalsky and Shahak Nagiel confirming Next Century would continue to use ONgDB instead of Neo4j EE | 11/14/2023 | Jason Zagalsky* |
| 118 | (*Sealed Document*) 04/29/19 Email from Shahak Nagiel to Jason Zagalsky confirming that NextCentury shared Neo4j USA's proposal with MPO and confirming that NextCentury continued to use ONgDB, and attachment:  Prepared Proposal for Maryland Procurement Office KMS Project (OCEO) | 11/14/2023 | Jason Zagalsky*  Steven Boyles |
| 119 | 2019-04-29 Email from Shahak Nagiel to Jason Zagalsky confirming that NextCentury shared Neo4j USA's proposal with MPO and confirming that NextCentury continued to use ONgDB | 11/14/2023 | Jason Zagalsky* |

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ PALO ALTO

4856-3278-8638.1                                    - 4 -
ADMITTED TRIAL EXHIBIT LIST AND JOINT CERTIFICATION
OF ADMITTED TRIAL EXHIBITS                          CASE NO. 5:18-CV-07182-EJD

SER_0133

| Exhibit | Description | Date Admitted | Witness(es) |
|---|---|---|---|
| 120 | 07/21/19 Email from Shahak Nagiel to Jason Zagalsky (copying Jim Weyant) confirming that the MPO was not interested in paying for a commercial license for Neo4j EE | 11/28/2023 | Pursuant to Stipulation |
| 121 | 01/23/20 Email exchange between Brad Nussbaum and Michael Smolyak confirming that MPO still using ONgDB and interested in version 4.0 | 11/28/2023 | Pursuant to Stipulation |
| 122 | 10/27/20 Email from Michael Smolyak to Tammy Turpin regarding moving ONgDB into production at MPO | 11/28/2023 | Pursuant to Stipulation |
| 123 | 03/29/17 Email from Michael Dunn to John Mark Suhy regarding meeting with Jason Zagalsky and John Broad of Neo4j USA and need for 12-core enterprise license in production | 11/28/2023 | Pursuant to Stipulation |
| 124 | 10/04/17 Email exchange between Michael Dunn and John Mark Suhy regarding iGov and eGovernment Solutions supporting the CKGE platform | 11/28/2023 | Pursuant to Stipulation |
| 125 | 2018-05-22 Suhy Email to Dunn re Neo4j latest happenings, and attachment – fsf-agpl-confirmation.pdf | 11/28/2023 | John Mark Suhy* |
| 126 | 05/22/18 Email from Jason Zagalsky to Michael Dunn regarding sole-source order with eGov Sol for consulting and support of CKGE | 11/14/2023 | Jason Zagalsky* |
| 127 | 05/22/18 Email from John Mark Suhy to Michael Dunn regarding Neo4j Sweden adding Commons Clause to AGPL in Neo4j EE 3.4 | 11/28/2023 | Pursuant to Stipulation |
| 128 | 2018-05-31 Email exchange between Lisa Rosenmerkel and Jason Zagalsky regarding scheduling a meeting regarding the IRS's needs relating to Neo4j software | 11/14/2023 | Jason Zagalsky* |
| 129 | 06/15/18 Email exchange between Michael Dunn and John Mark Suhy regarding the IRS switching from Neo4j EE 3.2 to Neo4j CE 3.4 in light of change to licensing in Neo4j EE 3.4 | 11/28/2023 | Pursuant to Stipulation |
| 130 | 2018-06-29 Suhy Email to Dunn re Final Project Name:  Open Native Graph DB | 11/28/2023 | John Mark Suhy* |
| 131 | 2018-07-27 Email exchange between Lisa Rosenmerkel and Jason Zegalsky regarding proposal for Neo4j EE subscription bundle for CKGE environment | 11/14/2023 | Jason Zagalsky* |

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ◆ PALO ALTO

4856-3278-8638.1                                                          - 5 -
ADMITTED TRIAL EXHIBIT LIST AND JOINT CERTIFICATION
OF ADMITTED TRIAL EXHIBITS

CASE NO. 5:18-CV-07182-EJD

SER_0134

| Exhibit | Description | Date Admitted | Witness(es) |
|---|---|---|---|
| 132 | 2018/08/13 Suhy/Dunn Email String re transition risk question from our ckge neo4j 3.3.2 to ONgdb | 11/28/2023 | John Mark Suhy* |
| 133 | 08/14/18 Email from Michael Dunn to John Mark Suhy instructing him to integrate ONgDB into the CKGE framework | 11/28/2023 | Pursuant to Stipulation |
| 134 | 08/14/18 Email from Michael C. Dunn to John Mark Suhy confirming he will proceed with ONgDB and also inviting Raul Tikekar to discuss using ONgDB in YK1 platform | 11/28/2023 | Pursuant to Stipulation |
| 137 | 12/11/18 Email exchange between John Mark Suhy and Patrick Martin discussing hardware requirements for CKGE and YK1 | 11/28/2023 | Pursuant to Stipulation |
| 138 | 03/11/19 Email exchange between Martin Patrick and John Mark Suhy regarding ONgDB sever instances in CKGE | 11/28/2023 | Pursuant to Stipulation |
| 139 | 04/24/19 Email exchange between Martin Patrick and John Mark Suhy with Suhy providing download link for ONgDB Enterprise 3.5.3 on IRS repository | 11/28/2023 | Pursuant to Stipulation |
| 141 | 09/10/19 Cancellation of Meeting from Michael Dunn to Patrick Martin, Michael Young, John Mark Suhy, Joshua Porter, Jonathan Edelson and Joseph Ansaldi re disc of BETA, STAGE, PROD domains | 11/28/2023 | Pursuant to Stipulation |
| 143 | 09/17/19 Email exchange between Joshua Porter at the IRS and John Mark Suhy regarding updating ONgDB at the IRS from version 3.5.3 to version 3.5.9 | 11/28/2023 | Pursuant to Stipulation |
| 144 | 09/20/19 Email from Michael Dunn to a number of individuals with the IRS, including John Mark Suhy, Michael Stavrianos and Brian Bird regarding new ONgDB libraries available on internal IRS repository | 11/28/2023 | Pursuant to Stipulation |
| 145 | 11/12/19 Email exchange between Hai Huynh and John Mark Suhy regarding downloading ONgDB 3.5.11 from internal IRS repository and running on IRS laptop | 11/28/2023 | Pursuant to Stipulation |
| 146 | 09/28/20 Order for Supplies or Services Contract No. 2032H5-19-A-00011 to ASR Analytics for Corporate Graph Database | 11/28/2023 | Pursuant to Stipulation |
| 147 | 11/17/20 Suhy Email to donald@fsf.org, craigt@fsf.org, and licensing@fsf.org re Nov 13th 2020 Court opinion on AGPL - may need FSF involvement | 11/28/2023 | John Mark Suhy* |

4856-3278-8638.1

- 6 -

ADMITTED TRIAL EXHIBIT LIST AND JOINT CERTIFICATION
OF ADMITTED TRIAL EXHIBITS

CASE NO. 5:18-CV-07182-EJD

| Exhibit | Description | Date Admitted | Witness(es) |
|---|---|---|---|
| 150 | 2021-02-16 Stipulated Judgment and Permanent Injunction Order, ECF No. 110 | 11/28/2023 | John Mark Suhy* |
| 154 | 10/01/18 Subcontract Agreement between ASR Analytics, LLC and iGov, Inc. for prime contract #2032H8-18-C-00037 to Tylor Data Services, LLC for consulting services including technical guidance and deployment support related to the CKGE | 11/28/2023 | Pursuant to Stipulation |
| 155 | 11/07/18 Master Subcontract Agreement between ASR Analytics and iGov, Inc. for Contract No. GS10F0062R / 2032-H5-19-A-00011 for RAAS Data Analytics and Innovation Support (DAIS) | 11/28/2023 | Pursuant to Stipulation |
| 158 | 03/29/19 Email from John mark Suhy to Michael Stavrianos enclosing resume for Cyber RFQ (KG-API engagement) | 11/28/2023 | Pursuant to Stipulation |
| 160 | 6/6/2019 Invoice #212 sent by iGov to ASR for work on Tylor Data Services, LLC:IRS RAAS Graph Analytics in the amount of $1,750 | 11/28/2023 | Pursuant to Stipulation |
| 161 | 12/06/19 Email from Deborah Tylor to John Mark Suhy, Alexander Seo Sook, Michael Stavrianos and Lauren Szczerbisnski re KGAPI milestones | 11/28/2023 | Pursuant to Stipulation |
| 162 | 07/27/20 Volume 1 - Technical Proposal (RFQ-20-U0016) - ASR Analytics for RAAS Data Analytics and Innovation Support (DAIS) made under Blanket Purchase Agreement for KG-API | 11/28/2023 | Pursuant to Stipulation |
| 163 | 06/04/20 Modification 001 to Master Subcontract Agreement for iGov's work at IRS on RAAS Data Analytics and Innovation Support (DAIS) | 11/28/2023 | Pursuant to Stipulation |
| 164 | 10/05/20 Subcontractor Task Order Number 0001 under ASR-RAAS_DAIS-iGov-0001 for Emerging Compliance Issues totaling $29,538.00 | 11/28/2023 | Pursuant to Stipulation |
| 165 | 10/07/20 Subcontractor Task Order Number 0002 under ASR-RAAS_DAIS-iGov-0001 for Support for Support for Corporate Graph Database totaling $25,993.44 | 11/28/2023 | Pursuant to Stipulation |
| 166 | 11/09/21 Subcontractor Task Order Number 0001 - Modification 01 under ASR-RAAS_DAIS-iGov-0001 for Emerging Compliance Issues totaling $35,470.90 | 11/28/2023 | Pursuant to Stipulation |
| 167 | 11/09/21 Subcontractor Task Order Number 0002 - Modification 01 under ASR-RAAS_DAIS-iGov-0001 for Support for Support for Corporate Graph Database totaling $21,131.60 | 11/28/2023 | Pursuant to Stipulation |

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ◆ PALO ALTO

4856-3278-8638.1

- 7 -

ADMITTED TRIAL EXHIBIT LIST AND JOINT CERTIFICATION
OF ADMITTED TRIAL EXHIBITS

CASE NO. 5:18-CV-07182-EJD

SER_0136

| Exhibit | Description | Date Admitted | Witness(es) |
|---|---|---|---|
| 168 | 3/5/2021 Invoice #267 sent by iGov to ASR for work on TIRS:DAIS BPA (lOT Innovation, Knowledge Graph, Corporate Graph, Emerging Compliance Issues) in the amount of $14,474.12 | 11/28/2023 | Pursuant to Stipulation |
| 169 | 7/7/2022 Invoice #303 sent by iGov to ASR for work on IRS:DAIS BPA (IDT, KG, CG, ECI) in the amount of $6,490.42 | 11/28/2023 | Pursuant to Stipulation |
| 170 | 07/07/22 Master Subcontract Agreement between ASR Analytics and Greystones Consulting Group, LLC for Contract No. GS10F0062R / 2032-H5-19-A-00011 for RAAS Data Analytics and Innovation Support (DAIS) | 11/28/2023 | Pursuant to Stipulation |
| 171 | 10/04/22 Subcontractor Task Order Number 0001_MOD 01 under ASR-RAAS_DAIS-Greystones-0001 for Emerging Compliance Issues, replacing Subcontract Agreement with iGov Inc. | 11/28/2023 | Pursuant to Stipulation |
| 172 | 11/01/22 Subcontractor Task Order Number 0002_MOD 01 under ASR_RAAS_DAIS-Greystones-0001 for Support for Corporate Graph Database, replacing Subcontract Agreement with iGov Inc. | 11/28/2023 | Pursuant to Stipulation |
| 173 | 11/02/22 ASR Analytics LLC Transaction List by Vendor 1/1/2015 - 07/27/2022 for payments made to iGov totaling 246,082.55, which the parties stipulated accurately reflected amounts ASR paid iGov through 07/27/2022 | 11/28/2023 | Pursuant to Stipulation |
| 180 | 12/31/18 Stock Purchase Agreement between John Mark Suhy and Ashwani Mayur and Nikhil Budhiraja where Suhy sells his shares in eGov Sol to other shareholders for $20,000 and the proceeds from the CKGE Contract with the IRS | 11/28/2023 | Pursuant to Stipulation |
| 181 | 04/06/18 eGovernment Solutions Inc.'s quote for CKGE Contract prepared by John Mark Suhy | 11/28/2023 | Pursuant to Stipulation |
| 182 | 2018-05-24 Order for Supplies or Services Order No. 2032H8-18-P-00151, 1st year of CKGE Contract for $300,000 | 11/28/2023 | John Mark Suhy* and Pursuant to Stipulation |
| 183 | 05/31/18 Amendment of Solicitation/Modification of Contract to correct Order No. 2032H8-18-P-00151 to 2032H8-18-P-00168 for CKGE Contract | 11/28/2023 | Pursuant to Stipulation |

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ◆ PALO ALTO

4856-3278-8638.1                                  - 8 -
ADMITTED TRIAL EXHIBIT LIST AND JOINT CERTIFICATION
OF ADMITTED TRIAL EXHIBITS                        CASE NO. 5:18-CV-07182-EJD

SER_0137

| Exhibit | Description | Date Admitted | Witness(es) |
|---------|-------------|---------------|-------------|
| 184 | 05/24/19 Amendment of Solicitation/Modification of Contract to exercise option year 1 in the amount of $200,000.00 with a period of performance is 5/24/2019 - 5/23/2020 for CKGE Contract | 11/28/2023 | Pursuant to Stipulation |
| 185 | 09/26/19 Amendment of Solicitation/Modification of Contract to modify funding for option year 1 by $216,000 for CKGE Contract | 11/28/2023 | Pursuant to Stipulation |
| 186 | 05/24/20 Amendment of Solicitation/Modification of Contract to exercise option year 2 in the amount of $200,000 for a period of performance of 5/24/2020 to 5/23/2021 for CKGE Contract | 11/28/2023 | Pursuant to Stipulation |
| 187 | 05/24/21 Amendment of Solicitation/Modification of Contract to exercise option year 3 in the amount of $200,000 for a period of performance of 5/24/2021 to 5/23/2022 for CKGE Contract | 11/28/2023 | Pursuant to Stipulation |
| 188 | 05/24/22 Amendment of Solicitation/Modification of Contract to exercise option year 4 in the amount of $200,000 for a period of performance of 5/24/2022 to 5/23/2023 for CKGE Contract | 11/28/2023 | Pursuant to Stipulation |
| 189 | 2018-2022 Ex 110 - Combined Invoicing Docs (Nos. 817, 827, 901, 955, 960, 912) for CKGE Contract totaling $1,316,000 | 11/28/2023 | Pursuant to Stipulation |
| 190 | 2018 E-Gov Solutions 1099 to iGov (2018) for $285,700.00 | 11/28/2023 | Pursuant to Stipulation |
| 191 | 2019 E-Gov Solutions 1099 to iGov (2019) for $199,850.00 | 11/28/2023 | Pursuant to Stipulation |
| 192 | 2020 E-Gov Solutions 1099 to iGov (2020) for $193,000.00 | 11/28/2023 | Pursuant to Stipulation |
| 193 | 2021 E-Gov Solutions 1099 to iGov (2021) for $197,000.00 | 11/28/2023 | Pursuant to Stipulation |
| 194 | 2018-2022 Combined Wells Fargo Bank Statements for eGovernment Solutions account where IRS deposits and payments to iGov were made | 11/28/2023 | Pursuant to Stipulation |
| 195 | 10/25/22 LinkedIn profile for Richard Starr - Attorney - Irving Starr Esq., P.C., counsel of record for Defendants | 11/28/2023 | Pursuant to Stipulation |
| 197 | Wells Fargo Statements for eGovernment Solutions Account No. 5581518783 | 11/28/2023 | Pursuant to Stipulation |
| 198 | Various checks from Wells Fargo Account No. 5581518783 signed by John Mark Suhy | 11/28/2023 | Pursuant to Stipulation |

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ◆ PALO ALTO

4856-3278-8638.1                                    - 9 -
ADMITTED TRIAL EXHIBIT LIST AND JOINT CERTIFICATION
OF ADMITTED TRIAL EXHIBITS                          CASE NO. 5:18-CV-07182-EJD

SER_0138

| Exhibit | Description | Date Admitted | Witness(es) |
|---|---|---|---|
| 199 | Various checks from Wells Fargo Account No. 5581518783 signed by John Mark Suhy | 11/28/2023 | Pursuant to Stipulation |
| 200 | 2014 PureThink LLC Profit & Loss Statement, January through December 2014 | 11/28/2023 | Pursuant to Stipulation |
| 201 | 2015 PureThink LLC's Profit and Loss Statement for 2015 | 11/28/2023 | Pursuant to Stipulation |
| 202 | 2016 Purethink LLC's Profit and Loss Statement for 2016 | 11/28/2023 | Pursuant to Stipulation |
| 203 | 2018 iGov Inc. Profit and Loss Statement for 2018 | 11/28/2023 | Pursuant to Stipulation |
| 204 | 2019 iGov Inc Profit and Loss Statement for 2019 | 11/28/2023 | Pursuant to Stipulation |
| 205 | 2020 iGov Inc Profit and Loss Statement for 2020 | 11/28/2023 | Pursuant to Stipulation |
| 206 | 2021 iGov Inc Profit and Loss Statement for 2021 | 11/28/2023 | Pursuant to Stipulation |
| 209 | (*Sealed Document*) 2022-12-22 Expert Report of Steven B. Boyles | 11/28/2023 | Steven Boyles* |
| 210 | 2017-05-24 Suhy Email to Brown re Opinion | 11/28/2023 | John Mark Suhy* |
| 211 | 2020-06-24 iGov Protest Letter to US GAO re Delivery Order Protest of iGov, Inc. Under Solicitation No. 05GA0A20F0012 | 11/28/2023 | John Mark Suhy* |
| 212 | 2021-05-09 iGov Letter to National Institutes of Health re Sole source intention protest: iGov Inc. Under Notice #: NOI-RML-2072678, National Institutes of Health, Department of Health and Human Services | 11/28/2023 | John Mark Suhy* |
| 213 | (*Sealed Document*) 2015-10-01 Neo Tech Price List (USD) | 11/28/2023 | John Mark Suhy* |
| 1002 | Dec-19 AGPL LICENSE.txt files for the ONgDB v3.4 source code branch | 11/28/2023 | John Mark Suhy* |
| 1010 | 2019-03-01 Commit from the GitHub.com web browser, by Mr. Suhy | 11/28/2023 | John Mark Suhy* |
| 1011 | Statement of Work for the CKGE contract with IRS | 11/28/2023 | John Mark Suhy* |

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ◆ PALO ALTO

4856-3278-8638.1                    - 10 -
ADMITTED TRIAL EXHIBIT LIST AND JOINT CERTIFICATION
OF ADMITTED TRIAL EXHIBITS                              CASE NO. 5:18-CV-07182-EJD

SER_0139

| Exhibit | Description | Date Admitted | Witness(es) |
|---------|-------------|---------------|-------------|
| 1012 | 2019 Feb 19-22 Nagiel/Nussbaum Email String re Neo4j Licensing | 11/28/2023 | John Mark Suhy* |
| 1027 | 2019-05-22 Emails between Zagalsky and Dunn on Commons Clause | 11/14/2023 | Jason Zagalsky* |
| 1043 | 2016 August 12-15 Nordwall/Suhy Email String re Checking In - Updates | 11/28/2023 | John Mark Suhy* |
| 1044 | 2016-04-28 Broad/Suhy Email String re For IRS - Idea | 11/28/2023 | John Mark Suhy* |
| 1064 | 2017-08-08 Email from Michael Dunn to Jason Zagalsky re: License | 11/14/2023 | Jason Zagalsky* |
| 1097 | Webpage: https://igovsol.com/downloads.html, dated 10/2/2019 | 11/28/2023 | John Mark Suhy* |
| 1098 | Webpage: https://web.archive.org/web/20171102094315/http://purethink.com:80/, dated 11/8/2018 | 11/28/2023 | John Mark Suhy* |
| 1101 | Oct 22, 2018-Feb 19, 2019 Nagiel/Nussbaum/Suhy Email String re Neo4j licensing | 11/28/2023 | John Mark Suhy* |

Dated:  January 26, 2024

HOPKINS & CARLEY
A Law Corporation

By: /s/ Jeffrey M. Ratinoff
John V. Picone III
Jeffrey M. Ratinoff
Attorneys for Plaintiffs and
Counter-Defendants
NEO4J, INC. and NEO4J SWEDEN AB

Dated:  January 26, 2024

/s/ Adron W. Beene
Adron W. Beene
Adron G. Beene
Attorneys for Defendants and Counter-
Claimants
PURETHINK LLC, IGOV INC., and
JOHN MARK SUHY

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ◆ PALO ALTO

4856-3278-8638.1
ADMITTED TRIAL EXHIBIT LIST AND JOINT CERTIFICATION
OF ADMITTED TRIAL EXHIBITS

- 11 -

CASE NO. 5:18-CV-07182-EJD

SER_0140

**ATTESTATION OF E-FILED SIGNATURE**

Pursuant to Local Rule 5-1(i)(3), I hereby certify that I have obtained the concurrence in the filing of this document from all signatories for whom a signature is indicated by a "conformed" signature (/s/) within this electronically filed document and I have on file records to support this concurrence for subsequent production to the Court if so ordered or for inspection upon request.

Dated:  January 26, 2024

HOPKINS & CARLEY
A Law Corporation


By: */s/ Jeffrey M. Ratinoff*
    John V. Picone III
    Jeffrey M. Ratinoff
    Attorneys for Plaintiffs and
    Counter-Defendants
    NEO4J, INC. and NEO4J SWEDEN AB

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ PALO ALTO

4856-3278-8638.1
ADMITTED TRIAL EXHIBIT LIST AND JOINT CERTIFICATION
OF ADMITTED TRIAL EXHIBITS

- 12 -

CASE NO. 5:18-CV-07182-EJD

SER_0141

1  John V. Picone III, Bar No. 187226
   jpicone@hopkinscarley.com
2  Jeffrey M. Ratinoff, Bar No. 197241
   jratinoff@hopkinscarley.com
3  HOPKINS & CARLEY
   A Law Corporation
4  The Letitia Building
   70 South First Street
5  San Jose, CA  95113-2406
   *mailing address:*
6  P.O. Box 1469
   San Jose, CA 95109-1469
7  Telephone:     (408) 286-9800
   Facsimile:     (408) 998-4790
8
   Attorneys for Plaintiffs and Counter-Defendants
9  NEO4J, INC. and NEO4J SWEDEN AB

10 Adron W. Beene, Bar No. 129040
   adron@adronlaw.com
11 Adron G. Beene SB# 298088
   adronjr@adronlaw.com
12 Attorney at Law
   7960 Soquel Drive Suite #296
13 Aptos, CA 95003
   Tel: (408) 392-9233
14
   Attorneys for Defendants and Counterclaimants
15 PURETHINK LLC, IGOV INC., and JOHN
   MARK SUHY
16

17                    UNITED STATES DISTRICT COURT

18               NORTHERN DISTRICT OF CALIFORNIA

19 NEO4J, INC., a Delaware corporation,        CASE NO.  5:18-cv-07182-EJD
   NEO4J SWEDEN, AB, a Swedish
20 corporation,                                **STIPULATION TO THE AMOUNT OF**
                                               **PLAINTIFFS' LOST PROFITS AND**
21               Plaintiffs,                   **DEFENDANTS' PROFITS**

22        v.                                   Trial Date: November 14, 2023

23 PURETHINK LLC, a Delaware limited
   liability company, IGOV INC., a Virginia
24 corporation, and JOHN MARK SUHY, an
   individual,
25
                 Defendants.
26

27 AND RELATED COUNTERCLAIMS.

28

4885-7955-3940.2

**STIPULATION**

This Stipulation is made between Plaintiffs and Counter-Defendants Neo4j, Inc. ("Neo4j USA") and Neo4j Sweden AB (collectively "Plaintiffs") and Defendants and Counterclaimants PureThink LLC, iGov Inc. and John Mark Suhy (collectively, "Defendants") through their respective counsel as follows:

WHEREAS, on November 28, 2023 at trial, Plaintiffs offered Steven Boyles an expert witness to provide his opinions and conclusions on the actual damages in the form of net lost profits that Plaintiffs incurred as a result of Defendants' violations of the DMCA and Lanham Act that were the subject of the Court's orders granting Plaintiffs' motions for summary judgment. *See* Dkt. Nos. 118, 216, 229.

WHEREAS, on November 28, 2023 at trial, Plaintiffs also offered Steven Boyles an expert witness to provide his opinions and conclusions on the gross profits that Defendants generated from providing support and development services to the IRS through contracts with eGovernment Solutions and ASR Analytics, LLC. *See* Dkt. Nos. 118, 216, 229.

WHEREAS, Plaintiffs and Defendants (collectively, the "Parties") agreed that in lieu of Mr. Boyles testifying in full regarding the basis for his opinions and calculations of the amount of actual damages that Plaintiffs incurred as a result of Defendants' violations of the DMCA and Lanham Act, and the gross profits that Defendants generated from providing support and development services to the IRS, the parties would stipulate to those calculations and their underlying basis, as well as his conclusions and interest calcuations through December 1, 2023.

ACCORDINGLY, the Parties HEREBY STIPULATE to the following undisputed facts, calculations and conclusions for incorporation into the trial record without the necessity of supporting testimony or exhibits:

1. The Maryland Procurement Office (a/k/a the National Security Agency, the NSA and the MPO) tasked Next Century to analyze available graph database technologies, including Neo4j® EE.

2. Next Century and the MPO required the enterprise-only features, such as causal clustering and multi-data centers, offered by both Neo4j® EE and ONgDB.

3. Next Century learned about the pricing of Neo4j Enterprise software bundles offered by Neo4j USA and iGov from iGov's website.

4. In October 2018, Next Century exchanged emails with Suhy regarding representations made on iGov's website that ONgDB v3.4 was an open source version of Neo4j® EE that provided the same enterprise-only features for free.

5. Suhy told Next Century that the MPO could use ONgDB v3.4 under the AGPL without restrictions or paying Plaintiffs for a commercial license, as advertised on the iGov's website.

6. As a result of Next Century's communications with Suhy, Next Century downloaded ONgDB v3.4 and began evaluating against Neo4j® EE v3.4.

7. Defendants' removal of the Commons Clause from the license governing ONgDB enabled Next Century and the MPO to use ONgDB for free rather than pay for a commercial license to Neo4j® EE.

8. In a series of emails with Next Century ending on January 4, 2019, Suhy confirmed that ONgDB v3.5 would have feature parity with the enterprise features of Neo4j® EE v3.5, and would also be available without restrictions on the number of clusters, instances and cores and without paying Neo4j USA for a commercial license. This led Next Century to upgrade from ONgDB v3.4 to ONgDB v3.5 for use in the KMS Project.

9. By February 2019, the MPO had chosen to use ONgDB v3.5 over Neo4j® EE v3.5 for continued development work for the MPO for use in the KMS Project.

10. On February 5, 2019, Next Century informed Neo4j USA of this decision, stating, "[w]e have found that open-sourced (non-commercial) builds from the Neo4j source code provide the clustering and security requirements needed in our environment."

11. In March 2019, Next Century gave Neo4j USA the required specifications for its ongoing KMS Project with the MPO and ask for Neo4j USA for a quote for use in a production environment.

12. On April 19, 2019, Jason Zagalsky of Neo4j USA sent a 3-year Neo4j Enterprise Edition Enterprise Bundle based on those requirements (TX118).

13. On April 29, 2019, Next Century confirmed that it shared Neo4j USA's proposal with the MPO, and was instructed by the MPO to continue using ONgDB. The reason for the MPO continuing to use ONgDB over Neo4j® EE was price.

14. On July 21, 2019, Next Century informed Neo4j USA that the MPO was not interested in the Neo4j® EE proposal. Again, the deciding factor between ONgDB and Neo4j® EE was price.

15. Next Century continued to use ONgDB v3.5, which was placed into a production environment for the MPO in or about October 2020.

16. The hypothetical negotiation between Neo4j USA on one hand, and Next Century and the MPO on the other hand for a commercial license to Neo4j® EE for use in the KMS Project would have occurred in April 2019 (TX118).

17. Under the April 19, 2019 proposal (TX118), Next Century and the MPO had the option to (a) purchase three one-year subscriptions on an incremental basis for a total of $2,667,00 ("MPO Undiscounted Fee"); or (b) purchase a 3-year subscription for a total of $2,266,950, which reflects a 15% multi-year, paid up front discount ("MPO Discounted Fee").

18. The MPO's willingness to pay for a commercial license for Neo4j® EE for the KMS Project is supported by its history of purchasing both discounted multi-year commercial licenses for Neo4j® EE and purchasing 1-year commercial licenses and renewing those licenses at undiscounted amounts (TX15, Lines 337-343).

19. Neo4j USA's sale of a commercial license to Next Century and the MPO for the KMS Project would have been through its reseller, Intellipeak.  As a result, a reseller fee of 7% would be applied to the total discounted amount of a multi-year deal with Next Century and the MPO, as well as to the purchase of a one-year subscription and each subsequent renewal thereof.

20. In 2018, employee commissions paid by Neo4j USA on commercial license sales averaged 15.26%.  In 2019, employee commissions paid by Neo4j USA on commercial license sales averaged 13.27%.  The employee commission cost would apply to the entire MPO Discounted Fee, while the employee commissions cost would only apply to the first year's revenue of year-to-year renewals on the MPO Undiscounted Fee.

21.     As reflected by **Exhibit 1** (Slide 13) hereto, Neo4j USA's net lost profits for the KMS Project based on the MPO Discounted Fee and the 2018 employee commission fee of 15.26% is **$1,786,542**.  Using the one-year treasury rate, which ranged between .07% and 5.36% and compounding interest on an annual basis, the total prejudgment interest accrued on this amount through December 1, 2023 is **$132,308**.

22.     As reflected by **Exhibit 1** (Slide 13) hereto, Neo4j USA's net lost profits for the KMS Project based on the MPO Discounted Fee and the 2019 employee commission fee of 13.27% is **$1,828,497**. Using the one-year treasury rate, which ranged between .07% and 5.36% and compounding interest on an annual basis, the total prejudgment interest accrued on this amount through December 1, 2023 is **$135,282**.

23.     As reflected by **Exhibit 1** (Slide 13) hereto, Neo4j USA's net lost profits for the KMS Project based on the MPO Undiscounted Fee and the 2018 employee commission fee of 15.26% is **$2,354,145**.  Using the one-year treasury rate, which ranged between .07% and 5.36% and compounding interest on an annual basis, the total prejudgment interest accrued on this amount through December 1, 2023 is **$139,069**.

24.     As reflected by **Exhibit 1** (Slide 13) hereto, Neo4j USA's net lost profits for the KMS Project based on the MPO Undiscounted Fee and the 2019 employee commission fee of 13.27% is **$2,370,598**. Using the one-year treasury rate, which ranged between .07% and 5.36% and compounding interest on an annual basis, the total prejudgment interest accrued on this amount through December 1, 2023 is **$140,288**.

25.     Suhy submitted a bid for a new contract issued by the IRS via another entity that he had an ownership interest in at the time, eGovernment Solutions, Inc. ("eGov Sol" or "eGov Solutions").

26.     Under the proposal for the new contract signed by Suhy, the scope of work required iGov to perform "all operations and maintenances duties for all components of the CKGE framework…."   iGov would also be "responsible for ensuring any open source products within the CKGE conform to their license-terms" and iGov would "need to work with the following components: React, Angularjs, Neo4j…."

27.     On May 22, 2018, Neo4j USA informed the IRS, including those in RAAS, that Neo4j Sweden added Commons Clause to Neo4j® EE 3.4, and the resulting need to obtain a commercial subscription if they intended to use that software in the CKGE platform.

28.     On May 22, 2018, Suhy sent an email to the IRS claiming Neo4j Sweden could not add the Commons Clause to the license governing Neo4j® EE v3.4.

29.     On May 24, 2018, the RAAS division of the IRS awarded eGov Solutions the new contract, Order No. 2032H8-18-P-00151, as amended Order No. 2032H8-18-P-00168, to further develop and support the CKGE in May 2018 ("CKGE Contract").

30.     In July 2018, Jason Zagalsky of Neo4j USA, met with employees of the IRS, and then provided a requested quote of $156,000 for one-year subscription and a $397,800 for a 3-year subscription for a Neo4j® EE v3.4 based on then-current requirements of CKGE.

31.     As of August 2018, the IRS understood that Neo4j® CE had a performance limitation to only 4 cores, while Neo4j® EE had enterprise-only features, came with professional services and subscriptions, and was priced based on number of cores.

32.     Under the CKGE Contract, Suhy provided input in the architecture design and hardware requirements needed to run ONgDB installations on multiple servers within the CKGE.

33.     In August 2018, Suhy recommended that the IRS integrate ONgDB v3.4 rather than Neo4j® EE v3.4 in the CKGE framework, and claimed that "ONgDB open source licenses come directly from the Graph Foundation as well, not from Neo4j Inc."

34.     Based on Suhy's recommendation, Mike Dunn at the IRS instructed him to "[g]o ahead and integrate the ONgDB into the CKGE framework we'll deploy" on August 14, 2018.

35.     While working at the IRS, Mr. Suhy helped the IRS upload ONgDB source code into the IRS's internal repository.

36.     The IRS decided to not allocate $156,000 for a license to use Neo4j® EE in the CKGE platform because ONgDB was a free and open, unrestricted alternative.

37.     Under the CKGE contract, Suhy and iGov were responsible for supporting, maintaining and updating ONgDB in an internal GitLab repository for the RAAS at the IRS.

38.     Under the CKGE contract, Suhy and iGov helped the IRS upgrade the CKGE

- 6 -

platform to ONgDB v3.5 in April 2019 and integrated subsequent subversions through at least April 2022.

39.  After April 2022, the IRS started calling ONgDB v3.5 just "GDB" due to the injunction entered against GFI and its rollback of ONgDB source code.

40.  GDB was merely a name change because it was still based on Neo4j® EE v3.5 source code that was improperly licensed under the AGPL without the Commons Clause, which Suhy continued to be responsible for maintaining on the IRS's internal Gitlab repository.

41.  The IRS used at least one Neo4j® enterprise-only feature, node ID, via ONgDB in CKGE.

42.  The IRS understood that Neo4j® EE can run Cypher queries significantly faster than Neo4j® CE, which is advantageous in terms of productivity.

43.  The initial hardware available to run Neo4j® EE in the IRS's pre-CKGE platform were for one server with at least 16 cores and 1 terabyte of RAM under the September 23, 2016 contract award to PureThink.

44.  As of December 2018, the CKGE (a/k/a "main graph") was running, or was expected to be running, on at least two production servers and one development server utilizing ONgDB.  Each machine was comprised of a DL380 with 32 cores and 256GB of RAM at minimum.

45.  Between 2019 and 2022, the IRS was running ONgDB on three production servers, and one development server in the CKGE.

46.  Each machine in the CKGE running ONgDB between December 2018 and November 2022 was comprised of a DL380 with 32 cores and 256GB of RAM.

47.  As of November 2022, the IRS switched to running ONgDB on two production servers in the CKGE.  Thereafter, the IRS would only want the bare-minimum Neo4j® EE package for two nodes, each with 16 cores and 256GB RAM for the CKGE.

48.  Defendants' removal of the Commons Clause from the license governing ONgDB enabled the IRS to use ONgDB for free rather than pay for a commercial license to Neo4j® EE beyond the CKGE.

49.     Between December 2018 and 2021, one instance of ONgDB was running on its own server in YK1 at the IRS.  In 2022, two instance of ONgDB in production and two instances of ONgDB in development/test in YK1 at the IRS.

50.     Starting in 2019 and continuing through 2022, the IRS ran separate instances of ONgDB in additional projects, including Corporate Graph, Excise Graph, COVID Graph, Policy Net, Individual Graph, CPEO Graph and Ghost Preparer.

51.     The minimum server specifications for YK1, Corporate Graph, Excise Graph, COVID Graph project, Policy Net, Individual Graph, CPEO Graph and Ghost Preparer running ONgDB were DL380 with 12 cores and 256GB of RAM.

52.     The IRS's willingness to pay for a commercial license for Neo4j® EE for the CKGE and other projects that used ONgDB is supported by its history of purchasing 1-year commercial licenses to Neo4j® EE at discounted amounts and renewing those licenses in other instances (TX15, Lines 263-277).

53.     August 1, 2018 and August 1, 2019 are two hypothetical negotiation dates for when the IRS would have purchased a commercial license for Neo4j® EE to be used in the CKGE due to a change in hardware specifications and requirements.

54.     The IRS would have purchased a commercial subscription based off a modified Enterprise Bundle for $156,000 from the October 1, 2017 price list (TX16) at the first hypothetical negotiation for the CKGE.

55.     During the second hypothetical negotiation for the CKGE, the IRS would have purchased a commercial subscription for an Enterprise Bundle with additional cores to match the new hardware specifications of the CKGE, plus at least one test machine as reflected in **Exhibit 2** hereto (Slide 17).

56.     Neo4j USA would have offered Discovery Bundle pricing to the IRS from period-correct price list (TX16-TX19) for each project beyond the CKGE that used ONgDB on less than 3 machines.  The hypothetical negotiation dates for when the IRS would have purchased a commercial license for Neo4j® EE for those projects are attached hereto as **Exhibit 3** (Slide 19), and a summary of the gross revenue lost for each project is attached hereto as **Exhibit 4** (Slide 20).

57. Despite having a history of purchasing commercial subscriptions for Neo4j® EE with year-to-year renewals, with no multi-year subscriptions, the IRS may have negotiated an additional 15% discount on the subscription price during the aforementioned hypothetical negotiations as reflected in **Exhibit 5** (Slide 22) attached hereto.

58. Neo4j USA's sale of commercial licenses for Neo4j® EE would have been through its reseller, Intellipeak, and would receive a 7% reseller fee after any negotiated discount on the subscription fee. **Exhibit 6** (Slide 24) hereto reflects the application of the 7% reseller fee in the scenario where the IRS was successful in negotiating an additional 15% discount on the already-discounted subscription price. **Exhibit 7** (Slide 26) reflects the application of the 7% reseller fee in the scenario where the IRS fails to negotiate an additional 15% discount on the already-discounted subscription price.

59. The first-year revenue generated from Neo4j USA's sale of commercial licenses for Neo4j® EE to the IRS also would have been subject to the payment of employee commissions at the 2018 average rate of 15.26% or the 2019 average rate of 13.27%.

60. The left column of the left-hand table in **Exhibit 8** (Slide 28) hereto reflects the application of a 15.26% employee commission applied to the first year of subscription for each IRS project that used ONgDB after the application of a 7% reseller fee and an additional negotiated 15% subscription fee discount, for a total of **$2,627,641** in lost profits that Neo4j USA incurred as a result of the IRS's use of ONgDB. Using the one-year treasury rate, which ranged between .07% and 5.36% and compounding interest on an annual basis, the total prejudgment interest accrued on this amount through December 1, 2023 is **$126,727**.

61. The right column of the left-hand table in **Exhibit 8** (Slide 28) hereto reflects the application of a 15.26% employee commission applied to the first year of subscription for each IRS project that used ONgDB after the application of a 7% reseller fee with no additional subscription fee discount, for a total of **$3,069,646** in lost profits that Neo4j USA incurred as a result of the IRS's use of ONgDB. Using the one-year treasury rate, which ranged between .07% and 5.36% and compounding interest on an annual basis, the total prejudgment interest accrued on this amount through December 1, 2023 is **$147,136**.

62.     The left column of the right-hand table in **Exhibit 8** (Slide 28) hereto reflects the application of a 13.27% employee commission applied to the first year of subscription for each IRS project that used ONgDB after the application of a 7% reseller fee and an additional negotiated 15% subscription fee discount, for a total of **$2,646,557** in lost profits that Neo4j USA incurred as a result of the IRS's use of ONgDB.  Using the one-year treasury rate, which ranged between .07% and 5.36% and compounding interest on an annual basis, the total prejudgment interest accrued on this amount through December 1, 2023 is **$127,867**.

63.     The right column of the right -hand table in **Exhibit 8** (Slide 28) hereto reflects the application of a 13.27% employee commission applied to the first year of subscription for each IRS project that used ONgDB after the application of a 7% reseller fee with no additional subscription fee discount, for a total of **$3,091,392** in lost profits that Neo4j USA incurred as a result of the IRS's use of ONgDB.  Using the one-year treasury rate, which ranged between .07% and 5.36% and compounding interest on an annual basis, the total prejudgment interest accrued on this amount through December 1, 2023 is **$148,431**.

64.     After the IRS awarded the CKGE Contract to eGov Solutions, it made an initial $300,000 payment to eGov Solutions in July 2018.  At that time, the money received from the IRS on the CKGE Contract was to be paid in its entirety to Mr. Suhy, at his sole discretion.

65.     eGov Solutions maintained a Wells Fargo bank account for all the payments received from the IRS ("the Wells Fargo Account"), which Suhy had access to and was authorized to disburse the payments made by the IRS as he saw fit.

66.     At some point, Suhy asked eGov Sol to make the payments received from the IRS to iGov rather than personally.

67.     eGov Solutions considered all the payments made by the IRS under the CKGE Contract into the Wells Fargo Account to belong Suhy and later iGov.

68.     The IRS paid a total of $1,316,000 to eGov Solutions over the course of five years under the CKGE Contract, which was deposited into the Wells Fargo Account.  iGov and Suhy, in turn, realized **$1,316,000** in profits under the CKGE Contract.  Using the one-year treasury rate, which ranged between .07% and 5.36% and compounding interest on an annual basis, the total

1    prejudgment interest accrued on this amount through December 1, 2023 is **$91,044**.

2    69.    ASR Analytics LLC ("ASR") engaged Suhy via iGov as a subcontractor to provide

3    support, consulting and development services for the CKGE and other projects that involved

4    implementations of ONgDB at the IRS between 2019 and 2022.

5    70.    The subcontracts and task orders provided by ASR to iGov included: (1)

6    Knowledge Graph API (KG-API) for CKGE; (2) Support for Corporate Graph Database; (3)

7    Emerging Compliance Issues; and (4) IDT Innovation, all of which required iGov and Suhy to

8    provide support, consulting and development services for the CKGE and other implementations

9    of ONgDB at the IRS between 2019 and 2022.

10    71.    ASR Analytics paid iGov a total of **$246,082.55** for work performed under these

11    subcontracts and task orders at the IRS.  Using the one-year treasury rate, which ranged between

12    .07% and 5.36% and compounding interest on an annual basis, the total prejudgment interest

13    accrued on this amount through December 1, 2023 is **$12,393**.

14    72.    On February 16, 2021, the Court entered a Stipulated Judgment and Permanent

15    Injunction in favor of Plaintiffs in a related action, *Neo4j, Inc. et al. vs. Graph Foundation, Inc. et*

16    *al.*, Case No. 5:19-cv-06226-EJD (N.D. Cal.).  As reflected by the Stipulated Judgment and

17    Permanent Injunction, Plaintiffs did not receive any payments from the defendants in that related

18    action in conjunction with the entry thereof.

19    Dated:  December 12, 2023                 HOPKINS & CARLEY
                                               A Law Corporation
20
                                               By: */s/ Jeffrey M. Ratinoff*
21                                                 John V. Picone III
                                                   Jeffrey M. Ratinoff
22                                                 Attorneys for Plaintiffs and
                                                   Counter-Defendants
23                                                 NEO4J, INC. and NEO4J SWEDEN AB

24

25    Dated:  December 12, 2023                 */s/ Adron W. Beene*
                                               Adron W. Beene
26                                             Adron G. Beene
                                               Attorneys for Defendants and Counter-
27                                             Claimants
                                               PURETHINK LLC, IGOV INC., and
28                                             JOHN MARK SUHY

4885-7955-3940.2                              - 11 -
STIPULATION TO THE AMOUNT OF PLAINTIFFS' LOST PROFITS AND DEFENDANTS' PROFITS; CASE NO. 5:18-CV-07182-EJD

## ATTESTATION OF E-FILED SIGNATURE

Pursuant to Local Rule 5-1(i)(3), I hereby certify that I have obtained the concurrence in the filing of this document from all signatories for whom a signature is indicated by a "conformed" signature (/s/) within this electronically filed document and I have on file records to support this concurrence for subsequent production to the Court if so ordered or for inspection upon request.

Dated:  December 12, 2023

HOPKINS & CARLEY
A Law Corporation


By: */s/ Jeffrey M. Ratinoff*
John V. Picone III
Jeffrey M. Ratinoff
Attorneys for Plaintiffs and
Counter-Defendants
NEO4J, INC. and NEO4J SWEDEN AB

**EXHIBIT 1**

SER_0154

# Next Century – MPO Lost Profits
## Calculated Lost Profits

| | Discounted Fee | Undiscounted Fee |
|---|---|---|
| Subscription Fee | $ 2,266,950 | $ 2,667,000 |
| Reseller Fee (7%) | $ (158,687) | $ (186,690) |
| Subtotal | $ 2,108,264 | $ 2,480,310 |
| EE Commissions (15.26%) | $ (321,721) | $ (126,165) |
| **Lost Net Profits** | **$ 1,786,542** | **$ 2,354,145** |
| **Lost Net Profits with EE Commissions at 13.27%** | **$ 1,828,497** | **$ 2,370,598** |

➢ The Employee Commissions cost on the Undiscounted Fee is only applied to the first year's revenue of year-to-year renewals

13

SER_0155

# EXHIBIT 2

SER_0156

# Internal Revenue Service Lost Profits
## Lost Revenue – CKGE Example

### CKGE (Main Graph)

| Period | Total Machines | Base Price | Additional Core Price | Test Machine Price | Total List Price |
|---|---|---|---|---|---|
| 8/1/18 – 7/31/19 | 1 | $ 144,000 | $ - | $ 12,000 | $ 156,000 |
| 8/1/19 – 7/31/20 | 3 | 199,000 | 180,000 | 24,000 | 403,000 |
| 8/1/20 – 7/31/21 | 3 | 199,000 | 180,000 | 24,000 | 403,000 |
| 8/1/21 – 7/31/22 | 3 | 199,000 | 180,000 | 24,000 | 403,000 |
| 8/1/22 – 7/31/23 | 2 | 199,000 | 180,000 | 24,000 | 403,000 |
| Totals | | $ 940,000 | $ 720,000 | $ 108,000 | $ 1,768,000 |

➢ 1st Hypothetical Negotiation for pre-CKGE platform: July 2018 (Dkt. No. 227, UDF No. 66; TX131)

➢ 2nd Hypothetical Negotiation for CKGE: July 2019 (Dkt. No. 227, UDF Nos. 80-81)

Dkt. No. 227, UDF Nos. 79-86; TX16-TX19 (Price Lists)

17

# EXHIBIT 3

Case 5:18-cv-07182-EJD   Document 234   Filed 12/12/23   Page 19 of 28

# Internal Revenue Service Lost Profits
## Assumed Hypothetical Negotiation Date for Other Instances

| Project | Initial Hypothetical Negotiation Date |
|---|---|
| YK1 | 8/1/2019 |
| Corporate | 8/1/2019 |
| Excise | 8/1/2020 |
| Covid | 8/1/2020 |
| Policy Net | 8/1/2021 |
| Individual | 8/1/2021 |
| CPEO | 8/1/2022 |
| Ghost Prep | 8/1/2022 |

Dkt. No. 227, UDF Nos. 87-108

SER_0159

**EXHIBIT 4**

# Internal Revenue Service Lost Profits
## Gross Lost Revenue - Summary

| Project | Period Beginning 8/1/2018 | 8/1/2019 | 8/1/2020 | 8/1/2021 | 8/1/2022 | Total |
|---|---|---|---|---|---|---|
| CKGE | $ 156,000 | $ 403,000 | $ 403,000 | $ 403,000 | $ 403,000 | $ 1,768,000 |
| YK1 | | 124,000 | 134,000 | 134,000 | 268,000 | 660,000 |
| Corporate | | 64,000 | 74,000 | 74,000 | 74,000 | 286,000 |
| Excise | | | 74,000 | 74,000 | 74,000 | 222,000 |
| Covid | | | 74,000 | 74,000 | 74,000 | 222,000 |
| Policy Net | | | | 74,000 | 74,000 | 148,000 |
| Individual | | | | 74,000 | 74,000 | 148,000 |
| CPEO | | | | | 74,000 | 74,000 |
| Ghost Prep | | | | | 74,000 | 74,000 |
| Totals | $ 156,000 | $ 591,000 | $ 759,000 | $ 907,000 | $ 1,189,000 | $ 3,602,000 |

Dkt. No. 227, UDF Nos. 87-108; TX16-TX19 (Price Lists)

SER_0161

# EXHIBIT 5

SER_0162

Case 5:18-cv-07182-EJD   Document 234   Filed 12/12/23   Page 22 of 28

# Internal Revenue Service Lost Profits
## Lost Revenue – Net of Discounts

| Project | Total List | Reduction for Applicable Price List | Discount for Test Machine | Adjusted List | After 15% Discount |
|---|---|---|---|---|---|
| CKGE | $  1,768,000 | $          - | $    64,000 | $  1,704,000 | $  1,471,800 |
| YK1 | 660,000 | 20,000 | 8,000 | 632,000 | 537,200 |
| Corporate | 286,000 | 30,000 | | 256,000 | 217,600 |
| Excise | 222,000 | | | 222,000 | 188,700 |
| Covid | 222,000 | | | 222,000 | 188,700 |
| Policy Net | 148,000 | | | 148,000 | 125,800 |
| Individual | 148,000 | | | 148,000 | 125,800 |
| CPEO | 74,000 | | | 74,000 | 62,900 |
| Ghost Prep | 74,000 | | | 74,000 | 62,900 |
| Totals | $  3,602,000 | $    50,000 | $    72,000 | $  3,480,000 | $  2,981,400 |

- ➢ Assumed IRS would not pay for additional test machines with CKGE and YK1
- ➢ Deduction of price increase for Discovery Bundle for YK1 and Corporate
- ➢ While history of year-to-year renewals with no multi-year subscriptions, assumes the IRS would still negotiate an annual 15% discount

22

# EXHIBIT 6

SER_0164

# Internal Revenue Service Lost Profits
## Saved Expenses – Reseller Margin

| Project | Net Revenue | Reseller Margin | Net of Reseller Margin |
|---|---|---|---|
| CKGE | $ 1,471,800 | $ 103,026 | $ 1,368,774 |
| YK1 | 537,200 | 37,604 | 499,596 |
| Corporate | 217,600 | 15,232 | 202,368 |
| Excise | 188,700 | 13,209 | 175,491 |
| Covid | 188,700 | 13,209 | 175,491 |
| Policy Net | 125,800 | 8,806 | 116,994 |
| Individual | 125,800 | 8,806 | 116,994 |
| CPEO | 62,900 | 4,403 | 58,497 |
| Ghost Prep | 62,900 | 4,403 | 58,497 |
| **Totals** | **$ 2,981,400** | **$ 208,698** | **$ 2,772,702** |

➤ Net Revenue is after application of negotiated discounted subscription fee and 15% additional discount

➤ Applying Intellipeak's reseller margin of 7% of Net Revenue

24

SER_0165

# EXHIBIT 7

# Internal Revenue Service Lost Profits
## Saved Expenses – Reseller Margin

| Project | Net Revenue | Reseller Margin | Net of Reseller Margin |
|---|---|---|---|
| CKGE | $ 1,704,000 | $ 119,280 | $ 1,584,720 |
| YK1 | 632,000 | 44,240 | 587,760 |
| Corporate | 256,000 | 17,920 | 238,080 |
| Excise | 222,000 | 15,540 | 206,460 |
| Covid | 222,000 | 15,540 | 206,460 |
| Policy Net | 148,000 | 10,360 | 137,640 |
| Individual | 148,000 | 10,360 | 137,640 |
| CPEO | 74,000 | 5,180 | 68,820 |
| Ghost Prep | 74,000 | 5,180 | 68,820 |
| **Totals** | **$ 3,480,000** | **$ 243,600** | **$ 3,236,400** |

- ➢ Net Revenue assumes <u>no</u> negotiated additional 15% subscription fee discount
- ➢ Applying Intellipeak's reseller margin of 7% of Net Revenue

26

SER_0167

# EXHIBIT 8

SER_0168

# Internal Revenue Service Lost Profits
## Calculated Lost Profits

| Project | Lost Profits | |
| --- | --- | --- |
| | Discounted Subscription Fee | Undiscounted Subscription Fee |
| CKGE | $ 1,299,951 | $ 1,507,659 |
| YK1 | 484,638 | 570,162 |
| Corporate | 194,648 | 228,997 |
| Excise | 166,564 | 195,958 |
| Covid | 166,564 | 195,958 |
| Policy Net | 108,067 | 127,138 |
| Individual | 108,067 | 127,138 |
| CPEO | 49,570 | 58,318 |
| Ghost Prep | 49,570 | 58,318 |
| Totals | $ 2,627,641 | $ 3,069,646 |

| Project | Lost Profits | |
| --- | --- | --- |
| | Discounted Subscription Fee | Undiscounted Subscription Fee |
| CKGE | $ 1,308,926 | $ 1,517,708 |
| YK1 | 486,588 | 572,457 |
| Corporate | 195,654 | 230,182 |
| Excise | 167,728 | 197,328 |
| Covid | 167,728 | 197,328 |
| Policy Net | 109,231 | 128,508 |
| Individual | 109,231 | 128,508 |
| CPEO | 50,734 | 59,688 |
| Ghost Prep | 50,734 | 59,688 |
| Totals | $ 2,646,557 | $ 3,091,392 |

➢ Based on 15.26% Employee Commission Rate.

➢ Based on 13.27% Employee Commission Rate.

SER_0169

1   John V. Picone III, Bar No. 187226
    jpicone@hopkinscarley.com
2   Jeffrey M. Ratinoff, Bar No. 197241
    jratinoff@hopkinscarley.com
3   HOPKINS & CARLEY
    A Law Corporation
4   The Letitia Building
    70 South First Street
5   San Jose, CA  95113-2406
    *mailing address:*
6   P.O. Box 1469
    San Jose, CA 95109-1469
7   Telephone:     (408) 286-9800
    Facsimile:      (408) 998-4790
8
    Attorneys for Plaintiffs and Counter-Defendants
9   NEO4J, INC. and NEO4J SWEDEN AB

10  Adron W. Beene, Bar No. 129040
    adron@adronlaw.com
11  Adron G. Beene SB# 298088
    adronjr@adronlaw.com
12  Attorney at Law
    7960 Soquel Drive Suite #296
13  Aptos, CA 95003
    Tel: (408) 392-9233
14
    Attorneys for Defendants and Counterclaimants
15  PURETHINK LLC, IGOV INC., and JOHN
    MARK SUHY
16
                    UNITED STATES DISTRICT COURT
17
                  NORTHERN DISTRICT OF CALIFORNIA
18

| 19 | NEO4J, INC., a Delaware corporation, NEO4J SWEDEN, AB, a Swedish corporation, | CASE NO.  5:18-cv-07182-EJD |
|---|---|---|
| 20 | | **STIPULATION AND [PROPOSED] ORDER TO ADMIT DEPOSITION TESTIMONY AND CORRESPONDING TRIAL EXHIBITS** |
| 21 | Plaintiffs, | |
| 22 | v. | |
| 23 | PURETHINK LLC, a Delaware limited liability company, IGOV INC., a Virginia corporation, and JOHN MARK SUHY, an individual, | |
| 24 | | |
| 25 | Defendants. | Trial Date: November 14, 2023 |
| 26 | | |
| 27 | AND RELATED COUNTERCLAIMS. | |
| 28 | | |

4888-0598-0305.1
STIPULATION AND [PROPOSED] ORDER TO ADMIT DEPOSITION TESTIMONY AND CORRESPONDING
TRIAL EXHIBITS; CASE NO. 5:18-CV-07182-EJD

**STIPULATION**

This Stipulation is made between Plaintiffs and Counter-Defendants Neo4j, Inc. and Neo4j Sweden AB (collectively "Plaintiffs") and Defendants and Counterclaimants PureThink LLC, iGov Inc. and John Mark Suhy (collectively, "Defendants").  Plaintiffs and Defendants (collectively, the "Parties") through their respective counsel HEREBY STIPULATE as follows:

WHEREAS, the Parties agreed in their Amended Joint Final Pretrial Statement that they would not contest the authenticity of any documents that were marked as exhibits during the party and non-party depositions taken in the case unless the party contesting the authenticity made such an objection during that deposition.  Dkt. No. 220 at 40:4-6.

WHEREAS, the Parties agreed in their Amended Joint Final Pretrial Statement that deposition designations may be submitted for the Court's consideration without having them read in open court where in the interest of judicial economy. Dkt. No. 220 at 40:7-8.

WHEREAS, Plaintiffs filed their Deposition Designations on September 28, 2023 (Dkt. No. 210), and Exhibit 2 thereto as amended on November 16, 2023 (Dkt. No. 226).

WHEREAS, Defendants filed their Counter-Deposition Designations without any objections to Plaintiffs' Designations on November 7, 2023.  Dkt. No. 222.

WHEREAS, on November 14, 2023, the Parties stipulated on the record that Plaintiffs' Deposition Designations and Defendants' Counter-Designations would be admitted into evidence without the need to read or play the live testimony during trial.

WHEREAS, on November 14, 2023, the Parties stipulated on the record that Plaintiffs' Trial Exhibits would be admitted into evidence without the need to read or play the corresponding designated deposition testimony during trial.

ACCORDINGLY, the Parties HEREBY STIPULATE that Plaintiffs' Deposition Designations and Defendants' Counter-Designations be admitted into evidence without the need to read or play the live testimony during trial.  The Parties FURTHER STIPULATE that the following Trial Exhibits and corresponding designated deposition testimony SHALL BE ADMITTED into evidence at trial:

/ / /

4888-0598-0305.1
STIPULATION AND [PROPOSED] ORDER TO ADMIT DEPOSITION TESTIMONY AND CORRESPONDING
TRIAL EXHIBITS; CASE NO. 5:18-CV-07182-EJD

SER_0171

| Ex. No. | Date | Description | Authenticating/Related Testimony |
|---|---|---|---|
| 34 | 09/23/16 | IRS Order for Supplies or Services, Order No. TIRNO-16-P-00202, to PureThink for implementation of Neo4j Government Edition for $229,000 (Depo Ex. 159) | Dkt. No. 226, Ex. 2 (Suhy Vol 2) at 74:12-75:18; Dkt. No. 210, Ex. 5 (Dunn) at 40:5-43:1 |
| 51 | 07/12/17 | Email exchange between John Mark Suhy and Michael Dunn of the IRS regarding PureThink continuing to fulfill its contractual obligations (Depo Ex. 162) | Dkt. No. 210, Ex. 5 (Dunn) at 65:2-66:2. 69:8-19 |
| 52 | 07/27/17 | Email from Daniels Vivan to John Mark Suhy enclosing RFQ and SOW to John Mark Suhy for CKGE support contract (Depo Ex. 163) | Dkt. No. 210, Ex. 5 (Dunn) at 69:20-71:23 |
| 61 | 05/22/18 | Email exchange between John Mark Suhy and Donald Robertson of FSF regarding the removal of the Commons Clause from the Neo4j Sweden Software License (Depo Ex. 22) | Dkt. No. 210, Ex. 1 (Suhy Vol 1) at 169:3-170:3, 182:11-184:10, 187:12-188:15 |
| 62 | 06/20/18 | Email exchange between John Mark Suhy and Donald Robertson FSF regarding the removal of the Commons Clause from the Neo4j Sweden Software License (Depo Ex. 23) | Dkt. No. 210, Ex. 1 (Suhy Vol 1) at 189:1-191:3 |
| 65 | 08/21/18 | Continued email exchange between John Mark Suhy and Donald Robertson of FSF regarding the removal of the Commons Clause from the Neo4j Sweden Software License (Depo Ex. 24) | Dkt. No. 210, Ex. 1 (Suhy Vol 1) at 192:18-193:24, 195:17-196:1, 196:22-201:16. |
| 69 | 08/22/18 | Email from John Mark Suhy to Lee Smales at the Department of the Air Force where Suhy points him to ONgDB via the GFI website and confirms IRS is using ONgDB (Depo Ex. 19) | Dkt. No. 210, Ex. 1 (Suhy Vol 1) at 142:13-145:12. |
| 83 | 07/10/20 | Letter from John Mark Suhy to Traci Brinkley enclosing Agency-Level Delivery Order Protest Objection Solicitation 2032H5-20-F-00394 (Depo Ex. 210) | Dkt. No. 226, Ex. 2 (Suhy Vol 2) at 147:3-149:17 |
| 104 | 10/01/18 | Email from Dian Griffith to Seth Cooper and Shahak Nagiel of Next Century, referencing links to iGov's website regarding its packages for Neo4j and pricing (Depo Ex. 43) | Dkt. No. 210, Ex. 4 (Weyant) at 35:7-37:13, 38:25-39:18, 39:24-42:3, 42:16-44:23 |

STIPULATION AND [PROPOSED] ORDER TO ADMIT DEPOSITION TESTIMONY AND CORRESPONDING
TRIAL EXHIBITS; CASE NO. 5:18-CV-07182-EJD

| Ex. No. | Date | Description | Authenticating/Related Testimony |
|---|---|---|---|
| 105 | 10/17/18 | Email from Diane Griffith to Shahak Nagiel discussing iGov's representations regarding the iGov/Graphstack free version of Neo4j Enterprise having the same enterprise-only features as commercially licensed Neo4j EE (Depo Ex. 44) | Dkt. No. 210, Ex. 4 (Weyant) at 44:24-48:10, 48:19-49:1, 49:18-51:14 |
| 106 | 10/22/18 | Email exchange between John Mark Suhy and Shahak Nagiel of Next Century Corp where Suhy points him to ONgDB 3.4 via the GFI github repository and confirms IRS is using ONgDB (Depo Ex. 45) | Dkt. No. 210, Ex. 4 (Weyant) at 51:23-56:21, 57:6-59:17 |
| 107 | 10/26/18 | Email from John Mark Suhy to Shahak Nagiel confirming that iGov-packaged Neo4j enterprise distributions and ONgDB include the enterprise-only multi-data centers feature (Depo Ex. 46) | Dkt. No. 210, Ex. 4 (Weyant) at 59:18-60:15, 60:19-20, 60:25-62:12 |
| 108 | 01/04/19 | Email from John Mark Suhy to Shahak Nagiel regarding working on and anticipated release of ONgDB 3.5.1 (Depo Ex. 47) | Dkt. No. 210, Ex. 4 (Weyant) at 62:13-65:17 |
| 109 | 02/01/19 | Email from Shahak Nagiel to Jim Weyant re Neo4j PoC Status re going with open source alternative (ONgDB) to Neo4j EE (Depo Ex. 48) | Dkt. No. 210, Ex. 4 (Weyant) at 65:18-67:21, 68:1-4, 68:11-70:19, 73:21-74:3 |
| 111 | 02/19/19 | Email from Ben Nussbaum to John Mark Suhy re NextCentury questions re licensing of ONgDB (Depo Ex. 30) | Dkt. No. 210, Ex. 1 (Suhy Vol 1) at 218:8-221:5 |
| 112 | 02/19/19 | Email from Ben Nussbaum to Shahak Nagel after intro from John Mark Suhy discussing ONgDB v.3.5 (Depo Ex. 31) | Dkt. No. 210, Ex. 1 (Suhy Vol 1) at 221:24-224:23 |
| 113 | 02/19/19 | Email from Shahak Nagiel to Brad Nussbaum regarding Suhy's comments about Neo4j Sweden adding the Commons Clause in the referenced GitHub thread (Depo Ex. 50) | Dkt. No. 210, Ex. 4 (Weyant) at 83:21-84:11, 86:4-87:15, 87:21-88:3 |
| 114 | 02/21/19 | Email from Shahak Nagiel to multiple recipients at Next Century instructing to only use ONgDB and delete all Neo4j EE binaries/containers (Depo Ex. 52) | Dkt. No. 210, Ex. 4 (Weyant) at 89:24-90:19, 91:1-17 |
| 115 | 03/05/19 | Email from Shahak Nagiel to Marco de Palma, Todd Hughes and Jim Weyant regarding how to address use of ONgDB over Neo4j EE in public forums (Depo Ex. 53) | Dkt. No. 210, Ex. 4 (Weyant) at 91:24-92:25, 93:7-95:11, 95:19-97:17 |

- 4 -

SER_0173

| Ex. No. | Date | Description | Authenticating/Related Testimony |
|---------|------|-------------|----------------------------------|
| 120 | 07/21/19 | Email from Shahak Nagiel to Jason Zagalsky (copying Jim Weyant) confirming that the MPO was not interested in paying for a commercial license for Neo4j EE (Depo Ex. 57) | Dkt. No. 210, Ex. 4 (Weyant) at 110:4-111:24 |
| 121 | 01/23/20 | Email exchange between Brad Nussbaum and Michael Smolyak confirming that MPO still using ONgDB and interested in version 4.0 (Depo Ex. 58) | Dkt. No. 210, Ex. 4 (Weyant) at 111:25-112:11, 114:11-118:1, 118:7-10 |
| 122 | 10/27/20 | Email from Michael Smolyak to Tammy Turpin regarding moving ONgDB into production at MPO (Depo Ex. 60) | Dkt. No. 210, Ex. 4 (Weyant) at 125:14-127:23 |
| 123 | 03/29/17 | Email from Michael Dunn to John Mark Suhy regarding meeting with Jason Zagalsky and John Broad of Neo4j USA and need for 12-core enterprise license in production (Depo Ex. 160) | Dkt. No. 210, Ex. 5 (Dunn) at 47:4-23, 48:16-49:14, 49:19-50:25 |
| 124 | 10/04/17 | Email exchange between Michael Dunn and John Mark Suhy regarding iGov and eGovernment Solutions supporting the CKGE platform (Depo Ex. 214) | Dkt. No. 226, Ex. 2 (Suhy Vol 2) at 188:10-193:25 |
| 127 | 05/22/18 | Email from John Mark Suhy to Michael Dunn regarding Neo4j Sweden adding Commons Clause to AGPL in Neo4j EE 3.4 (Depo Ex. 165) | Dkt. No. 210, Ex. 5 (Dunn) at 96:6-98:21 |
| 129 | 06/15/18 | Email exchange between Michael Dunn and John Mark Suhy regarding the IRS switching from Neo4j EE 3.2 to Neo4j CE 3.4 in light of change to licensing in Neo4j EE 3.4 (Depo Ex. 166) | Dkt. No. 210, Ex. 5 (Dunn) at 101:9-104:12 |
| 132 | 08/13/18 | Email exchange between John Mark Suhy and Michael Dunn recommending that the IRS move from Neo4j EE 3.3.2 to ONgDB 3.4.x in the CKGE framework (Depo Ex. 169) | Dkt. No. 210, Ex. 5 (Dunn) at 126:5-138:2, 138:22-141:24 |
| 133 | 08/14/18 | Email from Michael Dunn to John Mark Suhy instructing him to integrate ONgDB into the CKGE framework (Depo Ex. 170) | Dkt. No. 210, Ex. 5 (Dunn) at 142:15-143:20 |
| 134 | 08/14/18 | Email from Michael C. Dunn to John Mark Suhy confirming he will proceed with ONgDB and also inviting Raul Tikekar to discuss using ONgDB in YK1 platform (Depo Ex. 171) | Dkt. No. 210, Ex. 5 (Dunn) at 145:2-146:21 |

4888-0598-0305.1
- 5 -
STIPULATION AND [PROPOSED] ORDER TO ADMIT DEPOSITION TESTIMONY AND CORRESPONDING
TRIAL EXHIBITS; CASE NO. 5:18-CV-07182-EJD

SER_0174

| Ex. No. | Date | Description | Authenticating/Related Testimony |
|---------|------|-------------|----------------------------------|
| 137 | 12/11/18 | Email exchange between John Mark Suhy and Patrick Martin discussing hardware requirements for CKGE and YK1 (Depo Ex. 173) | Dkt. No. 210, Ex. 5 (Dunn) at 152:19-161:22 |
| 138 | 03/11/19 | Email exchange between Martin Patrick and John Mark Suhy regarding ONgDB sever instances in CKGE (Depo Ex. 174) | Dkt. No. 210, Ex. 5 (Dunn) at 161:23-165:13 |
| 141 | 09/10/19 | Cancellation of Meeting from Michael Dunn to Patrick Martin, Michael Young, John Mark Suhy, Joshua Porter, Jonathan Edelson and Joseph Ansaldi re disc of BETA, STAGE, PROD domains (Depo Ex. 175) | Dkt. No. 210, Ex. 5 (Dunn) at 181:11-184:18 |
| 143 | 09/17/19 | Email exchange between Joshua Porter at the IRS and John Mark Suhy regarding updating ONgDB at the IRS from version 3.5.3 to version 3.5.9 (Depo Ex. 178) | Dkt. No. 210, Ex. 5 (Dunn) at 193:2-198:15 |
| 144 | 09/20/19 | Email from Michael Dunn to a number of individuals with the IRS, including John Mark Suhy, Michael Stavrianos and Brian Bird regarding new ONgDB libraries available on internal IRS repository (Depo Ex. 149) | Dkt. No. 210, Ex. 5 (Dunn) at 207:7-210:4 |
| 145 | 11/12/19 | Email exchange between Hai Huynh and John Mark Suhy regarding downloading ONgDB 3.5.11 from internal IRS repository and running on IRS laptop (Depo Ex. 181) | Dkt. No. 210, Ex. 5 (Dunn) at 210:13-211:20, 213:1-216:8 |
| 146 | 09/28/20 | Order for Supplies or Services Contract No. 2032H5-19-A-00011 to ASR Analytics for Corporate Graph Database (Depo Ex. 185) | Dkt. No. 210, Ex. 5 (Dunn) at 238:19-240:4, 241:10-242:14 |
| 154 | 10/01/18 | Subcontract Agreement between ASR Analytics, LLC and iGov, Inc. for prime contract #2032H8-18-C-00037 to Tylor Data Services, LLC for consulting services including technical guidance and deployment support related to the CKGE (Depo Ex. 134) | Dkt No. 210, Ex. 6 (Stavrianos) at 102:8-103:24, 105:1-17, 105:23-106:7 |
| 155 | 11/07/18 | Master Subcontract Agreement between ASR Analytics and iGov, Inc. for Contract No. GS10F0062R / 2032-H5-19-A-00011 for RAAS Data Analytics and Innovation Support (DAIS) (Depo Ex. 135) | Dkt No. 210, Ex. 6 (Stavrianos) at 108:10-111:1, 111:24-114:8, 115:4-116:16 |

STIPULATION AND [PROPOSED] ORDER TO ADMIT DEPOSITION TESTIMONY AND CORRESPONDING
TRIAL EXHIBITS; CASE NO. 5:18-CV-07182-EJD

SER_0175

| Ex. No. | Date | Description | Authenticating/Related Testimony |
|---|---|---|---|
| 158 | 03/29/19 | Email from John mark Suhy to Michael Stavrianos enclosing resume for Cyber RFQ (KG-API engagement) (Depo Ex. 133) | Dkt No. 210, Ex. 6 (Stavrianos) at 91:7-92:6, 93:23-96:19, 97:23-99:20 |
| 160 | 6/6/2019 | Invoice #212 sent by iGov to ASR for work on Tylor Data Services, LLC:IRS RAAS Graph Analytics in the amount of $1,750 (Depo Ex. 142) | Dkt No. 210, Ex. 6 (Stavrianos) at 166:2-167:15 |
| 161 | 12/06/19 | Email from Deborah Tylor to John Mark Suhy, Alexander Seo Sook, Michael Stavrianos and Lauren Szczerbisnski re KGAPI milestones (Depo Ex. 150) | Dkt No. 210, Ex. 6 (Stavrianos) at 189:6-190:3, 190:10-20 |
| 162 | 07/27/20 | Volume 1 - Technical Proposal (RFQ-20-U0016) - ASR Analytics for RAAS Data Analytics and Innovation Support (DAIS) made under Blanket Purchase Agreement for KG-API (Depo Ex. 137) | Dkt No. 210, Ex. 6 (Stavrianos) at 124:3-126:13, 127:5-128:5, 128:12-16, 129:8-130:18, 138:1-25, 139:13-25 |
| 163 | 06/04/20 | Modification 001 to Master Subcontract Agreement for iGov's work at IRS on RAAS Data Analytics and Innovation Support (DAIS) (Depo Ex. 136) | Dkt No. 210, Ex. 6 (Stavrianos) at 119:1-121:14, 121:19-123:24 |
| 164 | 10/05/20 | Subcontractor Task Order Number 0001 under ASR-RAAS_DAIS-iGov-0001 for Emerging Compliance Issues totaling $29,538.00 (Depo Ex. 138) | Dkt No. 210, Ex. 6 (Stavrianos) at 140:14-143:9, 143:15-143:20, 144:1-14 |
| 165 | 10/07/20 | Subcontractor Task Order Number 0002 under ASR-RAAS_DAIS-iGov-0001 for Support for Support for Corporate Graph Database totaling $25,993.44 (Depo Ex. 139) | Dkt No. 210, Ex. 6 (Stavrianos) at 144:15-146:14, 147:13-149:23 |
| 166 | 11/09/21 | Subcontractor Task Order Number 0001 - Modification 01 under ASR-RAAS_DAIS-iGov-0001 for Emerging Compliance Issues totaling $35,470.90 (Depo Ex. 140) | Dkt No. 210, Ex. 6 (Stavrianos) at 151:8-155:17 |
| 167 | 11/09/21 | Subcontractor Task Order Number 0002 - Modification 01 under ASR-RAAS_DAIS-iGov-0001 for Support for Support for Corporate Graph Database totaling $21,131.60 (Depo Ex. 141) | Dkt No. 210, Ex. 6 (Stavrianos) at 157:2-159:4, 159:14-160:8. 160:24-162:11, 162:15-163:23 |
| 168 | 3/5/2021 | Invoice #267 sent by iGov to ASR for work on TIRS:DAIS BPA (IOT Innovation, Knowledge Graph, Corporate Graph, Emerging Compliance Issues) in the amount of $14,474.12 (Depo Ex. 143) | Dkt No. 210, Ex. 6 (Stavrianos) at 167:16-169:17 |

4888-0598-0305.1

- 7 -

STIPULATION AND [PROPOSED] ORDER TO ADMIT DEPOSITION TESTIMONY AND CORRESPONDING
TRIAL EXHIBITS; CASE NO. 5:18-CV-07182-EJD

SER_0176

| Ex. No. | Date | Description | Authenticating/Related Testimony |
|---|---|---|---|
| 169 | 7/7/2022 | Invoice #303 sent by iGov to ASR for work on IRS:DAIS BPA (IDT, KG, CG, ECI) in the amount of $6,490.42 (Depo Ex. 144) | Dkt. No. 210, Ex. 6 (Stavrianos) at 172:11-173:17, 173:24-174:2 |
| 170 | 07/07/22 | Master Subcontract Agreement between ASR Analytics and Greystones Consulting Group, LLC for Contract No. GS10F0062R / 2032-H5-19-A-00011 for RAAS Data Analytics and Innovation Support (DAIS) (Depo Ex. 249) | Dkt. No. 210, Ex. 7 (Pollard) at 163:23-166:10, 167:1-168:21 |
| 171 | 10/04/22 | Subcontractor Task Order Number 0001_MOD 01 under ASR-RAAS_DAIS-Greystones-0001 for Emerging Compliance Issues, replacing Subcontract Agreement with iGov Inc. (Depo Ex. 250) | Dkt. No. 210, Ex. 7 (Pollard) at 180:16-183:5, 183:13-184:11, 185:2-20, 186:5-7 |
| 172 | 11/01/22 | Subcontractor Task Order Number 0002_MOD 01 under ASR_RAAS_DAIS-Greystones-0001 for Support for Corporate Graph Database, replacing Subcontract Agreement with iGov Inc. (Depo Ex. 251) | Dkt. No. 210, Ex. 7 (Pollard) at 186:13-188:23, 189:13-19 |
| 173 | 11/02/22 | ASR Analytics LLC Transaction List by Vendor 1/1/2015 - 07/27/2022 for payments made to iGov totaling 246,082.55, which the parties stipulated accurately reflected amounts ASR paid iGov through 07/27/2022 (Depo Ex. 145) | Dkt. No. 210, Ex. 6 (Stavrianos) at 173:24-177:2; Dkt. No. 226, Ex. 2 (Suhy Vol 2) at 296:6-298:3. |
| 180 | 12/31/18 | Stock Purchase Agreement between John Mark Suhy and Ashwani Mayur and Nikhil Budhiraja where Suhy sells his shares in eGov Sol to other shareholders for $20,000 and the proceeds from the CKGE Contract with the IRS (Depo Ex. 100) | Dkt. No. 210, Ex. 3 (Mayur) at 24:9-11, 30:8-34:15, 34:21-37:14 |
| 181 | 04/06/18 | eGovernment Solutions Inc.'s quote for CKGE Contract prepared by John Mark Suhy (Depo Ex. 102) | Dkt. No. 210, Ex. 3 (Mayur) at 47:14-50:13. |
| 182 | 05/24/18 | Order for Supplies or Services Order No. 2032H8-18-P-00151, 1st year of CKGE Contract for $300,000  (Depo Ex. 103) | Dkt. No. 210, Ex. 3 (Mayur) at 50:14-54:3. |
| 183 | 05/31/18 | Amendment of Solicitation/Modification of Contract to correct Order No. 2032H8-18-P-00151 to 2032H8-18-P-00168 for CKGE Contract  (Depo Ex. 104) | Dkt. No. 210, Ex. 3 (Mayur) at 54:10-56:15 |

- 8 -

| Ex. No. | Date | Description | Authenticating/Related Testimony |
|---|---|---|---|
| 184 | 05/24/19 | Amendment of Solicitation/Modification of Contract to exercise option year 1 in the amount of $200,000.00 with a period of performance is 5/24/2019 - 5/23/2020 for CKGE Contract  (Depo Ex. 105) | Dkt. No. 210, Ex. 3 (Mayur) at 56:15-58:12, 58:18-59:5 |
| 185 | 09/26/19 | Amendment of Solicitation/Modification of Contract to modify funding for option year 1 by $216,000 CKGE Contract (Depo Ex. 106) | Dkt. No. 210, Ex. 3 (Mayur) at 59:18-61:15, 61:19-63:12 |
| 186 | 05/24/20 | Amendment of Solicitation/Modification of Contract to exercise option year 2 in the amount of $200,000 for a period of performance of 5/24/2020 to 5/23/2021 for CKGE Contract  (Depo Ex. 107) | Dkt. No. 210, Ex. 3 (Mayur) at 63:13-66:15 |
| 187 | 05/24/21 | Amendment of Solicitation/Modification of Contract to exercise option year 3 in the amount of $200,000 for a period of performance of 5/24/2021 to 5/23/2022 for CKGE Contract (Depo Ex. 108) | Dkt. No. 210, Ex. 3 (Mayur) at 67:7-69:15 |
| 188 | 05/24/22 | Amendment of Solicitation/Modification of Contract to exercise option year 4 in the amount of $200,000 for a period of performance of 5/24/2022 to 5/23/2023 for CKGE Contract (Depo Ex. 109) | Dkt. No. 210, Ex. 3 (Mayur) at 69:12-70:23 |
| 189 | 2018-2022 | Ex 110 - Combined Invoicing Docs (Nos. 817, 827, 901, 955, 960, 912) for CKGE Contract totaling $1,316,000 (Depo Ex. 110) | Dkt. No. 210, Ex. 3 (Mayur) at 71:17-78:13 |
| 190 | 2018 | E-Gov Solutions 1099 to iGov (2018) for $285,700.00 (Depo Ex. 111) | Dkt. No. 210, Ex. 3 (Mayur) at 80:13-82:2, 82:10-83:13 |
| 191 | 2019 | E-Gov Solutions 1099 to iGov (2019) for $199,850.00 (Depo Ex. 112) | Dkt. No. 210, Ex. 3 (Mayur) at 84:16-85:8, 86:1-87:3, 87:18-25, 88:5-89:24, 90:9-25 |
| 192 | 2020 | E-Gov Solutions 1099 to iGov (2020) for $193,000.00 (Depo Ex. 113) | Dkt. No. 210, Ex. 3 (Mayur) at 91:17-93:5 |
| 193 | 2021 | E-Gov Solutions 1099 to iGov (2021) for $197,000.00 (Depo Ex. 114) | Dkt. No. 210, Ex. 3 (Mayur) at 93:6-95:6. |
| 194 | 2018-2022 | Combined Wells Fargo Bank Statements for eGovernment Solutions account where IRS deposits and payments to iGov were made (Depo Ex. 115) | Dkt. No. 210, Ex. 3 (Mayur) at 95:7-96:13, 99:8-102:4, 102:19-107:3, 109:8-111:24 |
| 195 | 10/25/22 | LinkedIn profile for Richard Starr - Attorney - Irving Starr Esq., P.C., counsel of record for Defendants (Depo Ex. 116) | Dkt. No. 210, Ex. 3 (Mayur) at 114:9-115:25, 116:3-9 |

4888-0598-0305.1

STIPULATION AND [PROPOSED] ORDER TO ADMIT DEPOSITION TESTIMONY AND CORRESPONDING
TRIAL EXHIBITS; CASE NO. 5:18-CV-07182-EJD

Case 5:18-cv-07182-EJD   Document 230   Filed 11/28/23   Page 10 of 11

| Ex. No. | Date | Description | Authenticating/Related Testimony |
|---|---|---|---|
| 197 | | Wells Fargo Statements for eGovernment Solutions Account No. 5581518783 (Depo Ex. 217) | Dkt. No. 226, Ex. 2 (Suhy Vol 2) at 243:2-244:16, 244:21-245:3, 245:13-246:9, 247:5-248:20 |
| 198 | | Various checks from Wells Fargo Account No. 5581518783 signed by John Mark Suhy (Depo Ex. 218) | Dkt. No. 226, Ex. 2 (Suhy Vol 2) at 251:4-252:8, 252:16-253:6, 253:24-254:9 |
| 199 | | Various checks from Wells Fargo Account No. 5581518783 signed by John Mark Suhy (Depo Ex. 219) | Dkt. No. 226, Ex. 2 (Suhy Vol 2) at 259:7-264:17, 266:9-18 |
| 200 | 2014 | PureThink LLC Profit & Loss Statement, January through December 2014 (Depo Ex. 197) | Dkt. No. 226, Ex. 2 (Suhy Vol 2) at 56:20-59:3 |
| 201 | 2015 | PureThink LLC's Profit and Loss Statement for 2015 (Depo Ex. 198) | Dkt. No. 226, Ex. 2 (Suhy Vol 2) at 59:6-61:8 |
| 202 | 2016 | Purethink LLC's Profit and Loss Statement for 2016 (Depo Ex. 199) | Dkt. No. 226, Ex. 2 (Suhy Vol 2) at 61:9-63:23 |
| 203 | 2018 | iGov Inc. Profit and Loss Statement for 2018  (Depo Ex. 33) | Dkt. No. 210, Ex. 1 (Suhy Vol 1) at 227:9-24 |
| 204 | 2019 | iGov Inc Profit and Loss Statement for 2019  (Depo Ex. 223) | Dkt. No. 226, Ex. 2 (Suhy Vol 2) at 309:21-312:24 |
| 205 | 2020 | iGov Inc Profit and Loss Statement for 2020 (Depo Ex. 225) | Dkt. No. 226, Ex. 2 (Suhy Vol 2) at 314:4-316:15 |
| 206 | 2021 | iGov Inc Profit and Loss Statement for 2021 (Depo Ex. 227) | Dkt. No. 226, Ex. 2 (Suhy Vol 2) at 318:9-319:17 |

Dated:  November 21, 2023

HOPKINS & CARLEY
A Law Corporation

By: */s/ Jeffrey M. Ratinoff*
John V. Picone III
Jeffrey M. Ratinoff
Attorneys for Plaintiffs and
Counter-Defendants
NEO4J, INC. and NEO4J SWEDEN AB

Dated:  November 17, 2023

*/s/ Adron W. Beene*
Adron W. Beene
Adron G. Beene
Attorneys for Defendants and Counter-Claimants
PURETHINK LLC, IGOV INC., and
JOHN MARK SUHY

4888-0598-0305.1
- 10 -
STIPULATION AND [PROPOSED] ORDER TO ADMIT DEPOSITION TESTIMONY AND CORRESPONDING
TRIAL EXHIBITS; CASE NO. 5:18-CV-07182-EJD

SER_0179

1         **PURSUANT TO STIPULATION, IT IS SO ORDERED.**

2

3   Dated:   November 28, 2023

4                          EDWARD J. DAVILA
                        United States District Court Judge

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 11 -

4888-0598-0305.1
STIPULATION AND [PROPOSED] ORDER TO ADMIT DEPOSITION TESTIMONY AND CORRESPONDING
TRIAL EXHIBITS; CASE NO. 5:18-CV-07182-EJD

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**TITLE:  *NEO4J, INC., et al. v. PURETHINK LLC, et al.***
**CASE NUMBER**:  **5:18-CV-07182 EJD**

## Civil Minutes and Trial Log

Date:   November 28, 2023

Time in Court:  9:12-9:55 AM; 11:15 AM – 11:55 AM; 1:05-2:26 PM; 2:40-5:07 PM ; 5:18-5:38 PM

**(TOTAL TIME:  6 hr, 31 min)**

Courtroom Deputy Clerk: Cheré Robinson
Court Reporter:  Irene Rodriguez

---

**APPEARANCES:**
Plaintiff Attorney(s) present:   John Picone, Jeffrey Ratinoff
Also present:  Paralegal – Danny Zapeda

Defendant Attorney(s) present:   Adron W. Beene, Adron G. Beene

---

**PROCEEDINGS:  Trial (Day 2)**

Bench Trial held.

*See* attached Trial Log.

**The following exhibits are marked for identification:**
Plaintiffs:     209, 34, 182, 113, 130, 132, 125, 58, 60, 59, 66, 210, 83, 147, 211, 212, 213
Defendants:   150, 1011, 1044, 1043, 1101, 1097, 1098, 1002, 1010, 1012

**The following exhibits are admitted into evidence:**
Plaintiffs:     **209, 34, 182, 113, 130, 132, 125, 58, 60, 59, 66, 210, 83, 147, 211, 212, 213**
Defendants:   **150, 1011, 1044, 1043, 1101, 1097, 1098, 1002, 1010, 1012**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

HONORABLE EDWARD J. DAVILA

Case Name:  *NEO4J, Inc., et al. v. PureThink LLC, et al.*
Case No:  5:18-CV-07182 EJD

**TRIAL LOG**

| TRIAL DATE: November 28, 2023 | | | REPORTER(S):<br>Irene Rodriguez | CLERK:<br>Cheré Robinson |
|---|---|---|---|---|

| PLF | DEFT | TIME | DESCRIPTION |
|---|---|---|---|
| | | 9:12 am | Court in Session |
| | | 9:13 am | Counsel addresses new defense exhibits 1107 and 1108 |
| | | | Plaintiff objects to the introduction to Exs. 1107 and 1008. |
| | | 9:27 am | Court sustains objections re |
| | | 9:28 am | Defense calls Witness # 3 Steven Boyle |
| | | | Witness Stephen Boyle sworn |
| | | | Defense objects to witness demonstrative aide |
| | | 9:47 am | Ex. 209 – Expert Report of Steven Boyle |
| | | 9:43 am | Ex. 208 – CV of Steven Boyle - displayed |
| | | 9:46 am | Plaintiff moves for witness to testify as damages expert |
| | | 9:47 am | Court permits witness Steven Boyle to testify as damages expert |
| | | | Plaintiff continues direct examination of Steven Boyle |
| | | 9:55 am | Court breaks for 1 hr, 20 min |
| | | 11:15 am | Court in session |
| 209 | | 11:17 am | ADMITTED INTO EVIDENCE – 2022-12-22 Expert Report of Steven B. Boyle |
| | | | Counsel stipulate to certain dollar amounts or ranges listed in witness demonstrative aide |

| TRIAL DATE: November 28, 2023 | | | REPORTER(S): Irene Rodriguez | CLERK: Cheré Robinson |
|---|---|---|---|---|
| PLF | DEFT | TIME | DESCRIPTION | |
| | | 11:19 am | Court directs counsel to file stipulation as to agreement regarding amounts certain dollar amounts or range(s) listed in witness demonstrative aide slide deck.  Counsel notes they agree to certain amounts, not to causation | |
| | | 11:21 am | Plaintiff continues direct examination of Steven Boyle | |
| | | | Slide 11 of demonstrative aide – Next Century – MPO Lost Profits, Lost Revenues Table | |
| | | 11:25 am | Slide 15 of demonstrative aide – Next Century – MPO Lost Profits, Calculated Lost Profits Table | |
| | | 11:31 am | Ex. 118 – previously admitted | |
| | | 11:33 am | Ex. 15 – previously admitted | |
| | | 11:39 am | Slide 19 of demonstrative aide | |
| | | 11:41 am | Slide 17 of demonstrative aide – Internal Revenue Service Lost Profits, Lost Revenue – CDGE Example | |
| | | 11:42 am | Slide 20 of demonstrative aide – Internal Revenue Service Lost Profits, Gross Lost Revenue – Summary | |
| | | 11:45 am | Slide 22 of demonstrative aide - Internal Revenue Service Lost Profits, Lost revenue – Net of Discounts | |
| | | 11:46 am | Slide 24 of demonstrative aide – Internal Revenue Service Lost Profits, Saved Expenses – Reseller Margin | |
| | | 11:47 am | Slide 25 of demonstrative aide – Internal Revenue Service Lost Profits, Saved Expenses – Employee Commissions | |
| | | 11:48 am | Slide 26 of demonstrative aide - Internal Revenue Service Lost Profits, Saved Expenses – Reseller Margin | |
| | | 11:49 am | Slide 27 of demonstrative aide – Internal Revenue Service Lost Profits, Saved Expenses – Employee Commissions | |
| | | 11:50 am | Slide 28 of demonstrative – calculated lost profts | |
| | | 11:51 am | Plaintiff completes direct examination of Steven Boyle | |
| | | | Witness #3 Steven Boyle excused | |

| TRIAL DATE: November 28, 2023 | | | REPORTER(S):<br>Irene Rodriguez | CLERK:<br>Cheré Robinson |
|---|---|---|---|---|
| **PLF** | **DEFT** | **TIME** | **DESCRIPTION** | |
| | | 11:52 am | Counsel agrees to fact that graphic nation did not pay any money with respect to settlement | |
| | 150 | 11:54 am | ADMITTED INTO EVIDENCE - 2021-02-16 Stipulated Judgment and Permanent Injunction Order, ECF No. 110 | |
| | | 11:55 am | Court breaks for 1 hr, 10 min | |
| | | 1:05 pm | Court in session | |
| | | | Counsel addresses additional stipulations regarding an election of actual damages vs. statutory damages and prejudgment interest | |
| | | 1:07 pm | Defense calls Witness #4 John Mark Suhy | |
| | | | Witness Sworn | |
| | | | Defense begins direct examination of Witness #4 John Mark Suhy | |
| Obj | 1011 | 1:22 pm | Offered into Evidence - Foundation to be laid | |
| | 1011 | 1:26 pm | ADMITTED INTO EVIDENCE – Statement of Work re IRS Contract | |
| | 1044 | 1:34 pm | ADMITTED INTO EVIDENCE – 2016-04-28 Broad/Suhy Email String re For IRS - Idea | |
| | 1043 | 1:30 pm | ADMITTED INTO EVIDENCE – August 12-15, 2016, Nordwall/Suhy Email String re Checking In – Updates | |
| | 1101 | 2:09 pm | ADMITTED INTO EVIDENCE – Oct 22, 2018-Feb 19, 2019 Nagiel/Nussbaum/Suhy Email String re Neo4j licensing | |
| | 1097 | 2:22 pm | ADMITTED INTO EVIDENCE – Webpage: https://igovsol.com/downloads.html, dated 10/2/2019 | |
| | 1098 | 2:24 pm | ADMITTED INTO EVIDENCE – Webpage: https//web.archive.org/ web/20171102094315/http://purethink:80/, dated 11/8/2018 | |
| | | 2:26 pm | Court breaks for 14 min | |
| | | 2:40 pm | Court in session | |
| | | | Defense continues direct examination of John Mark Suhy | |
| | 1002 | 2:41 pm | ADMITTED INTO EVIDENCE:  GNU AFFERO GENERAL PUBLIC LICNESE Version 3, 19 November 2007 | |

| TRIAL DATE: November 28, 2023 | | | REPORTER(S):<br>Irene Rodriguez | CLERK:<br>Cheré Robinson |
|---|---|---|---|---|
| PLF | DEFT | TIME | DESCRIPTION | |
| | 1010 | 2:43 pm | ADMITTED INTO EVIDENCE:  2019-03-01 Commit from the GitHub.com web browser, by Mr. Suhy | |
| | | 2:46 pm | Court queries witness | |
| | | 2:49 pm | Court completes query | |
| | | | Defense continues direct examination of John Mark Suhy | |
| | 1012 | 2:56 pm | ADMITTED INTO EVIDENCE – 2019 Feb 19-22 Nagiel/Nussbaum Email String re Neo4j Licensing | |
| | | 3:05 pm | Defense completes direct examination of John Mark Suhy | |
| | | | Court queries witness | |
| | | 3:08 pm | Court completes query | |
| | | 3:10 pm | Plaintiff begins cross-examination of John Mark Suhy | |
| 34 | | 3:13 pm | ADMITTED INTO EVIDENCE – 2016-09-23 IRS Order for Supplies or Services, Order No. TIRNO-16-P-00202, to PureThink for implementation of Neo4j Government Edition for $229,000 | |
| 182 | | 3:16 pm | ADMITTED INTO EVIDENCE – 2018-05-24 Order for Supplies or Services Order No. 2032H8-18-P-00151, 1st year of CKGE Contract for $300,000 | |
| | | 3:20 pm | Document Displayed: ECF No. 227 – 2023-11-20 Stipulation of Facts for Trial | |
| | | 3:30 pm | Ex. 4, previously admitted | |
| | | 3:38 pm | Deposition Transcript of Michael Dunn | |
| | | 3:40 pm | Ex. 1101, previously admitted | |
| 113 | | 3:42 pm | ADMITTED INTO EVIDENCE – Oct 22, 2018-Feb 19, 2019, Nagiel/Nussbaum/Suhy Email String re Neo4j licensing | |
| | | 3:46 pm | Ex. 1010, previously admitted | |
| 130 | | 3:49 pm | ADMITTED INTO EVIDENCE – 2018-06-29 Suhy Email to Dunn re Final Project Name:  Open Native Graph DB | |

| TRIAL DATE: November 28, 2023 | | | REPORTER(S): Irene Rodriguez | CLERK: Cheré Robinson |
|---|---|---|---|---|
| PLF | DEFT | TIME | DESCRIPTION | |
| 132 | | 3:50 pm | ADMITTED INTO EVIDENCE – 2018/08/13 Suhy/Dunn Email String re transition risk question from our ckge neo4j 3.3.2 to ONgdb | |
| 125 | | 3:54 pm | ADMITTED INTO EVIDENCE – 2018-05-22 Suhy Email to Dunn re Neo4j latest happenings, and attachment – fsf-agpl-confirmation.pdf | |
| | | 4:12 pm | Begin 2020-10-22 Video Deposition Testimony of John Mark Suhy – 171:23-173:21; 178-1-179:8; 181:24-188:15; 189:4-192:17; 192:18-193:24; 195:6-196-1; 196:22-201:16 | |
| | | 4:33 pm | End Video Deposition Testimony of John Mark Suhy | |
| | | | Plaintiff continues cross-examination of John Mark Suhy | |
| | | 4:34 pm | Ex. 89, previously admitted | |
| 58 | | 4:39 pm | ADMITTED INTO EVIDENCE – 2018-03-26 Suhy Email to Nussbaum re graphstack.io – avoid trademark issues | |
| 60 | | 4:41 pm | ADMITTED INTO EVIDENCE – 2018-05-21 Suhy Email to Nussbaum re Quick notes on fork | |
| 59 | | 4:43 pm | ADMITTED INTO EVIDENCE – 2018 May 19-21 Rathle/Suhy Email String re Touching base, and attachment – purethink Mail – IRS breakdown.pdf; April-2016-eail-number5-agreement.pdf | |
| 66 | | 4:46 pm | ADMITTED INTO EVIDENCE – 2018-08-10 Suhy email to Rodrigue re Checkin In | |
| 210 | | 4:54 pm | ADMITTED INTO EVIDENCE – 2017-05-24 Suhy Email to Brown re Opinion | |
| 83 | | 5:03 pm | ADMITTED INTO EVIDENCE - 07/10/20 Letter from John Mark Suhy to Traci Brinkley enclosing Agency-Level Delivery Order Protest Objection Solicitation 2032H5-20-F-00394 | |
| | | 5:07 pm | Court breaks for 11 min | |
| | | 5:18 pm | Court in session | |
| | | | Plaintiff continues cross-examination of John Mark Suhy | |
| 147 | | 5:20 pm | ADMITTED INTO EVIDENCE:  11/17/20 Email from John Mark Suhy to donald@fsf.org, craigt@fsf.org, and licensing@fsf.org re Nov 13th 2020 Court opinion on AGPL - may need FSF involvement | |

| TRIAL DATE: November 28, 2023 | | | REPORTER(S):<br>Irene Rodriguez | CLERK:<br>Cheré Robinson |
|---|---|---|---|---|
| PLF | DEFT | TIME | DESCRIPTION | |
| 211 | | 5:23 pm | ADMITTED INTO EVIDENCE - 2020-06-24 iGov Protest Letter to US GAO re Delivery Order Protest of iGov, Inc. Under Solicitation No. 05GA0A20F0012 | |
| 212 | | 5:25 pm | ADMITTED INTO EVIDENCE - 2021-05-09 iGov Letter to National Institutes of Health re Sole source intention protest: iGov Inc. Under Notice #: NOI-RML-2072678, National Institutes of Health, Department of Health and Human Services | |
| 213 | | 5:28 pm | ADMITTED INTO EVIDENCE – 2015-10-01 Neo Tech Price List (USD) | |
| | | 5:29 pm | Plaintiff completes cross-examination of John Mark Suhy | |
| | | | Witness #4 John Mark Suhy excused | |
| | | 5:30 pm | Court and counsel discuss exhibits and closings | |
| | | | Counsel proposes amending Findings and Conclusions and waiving closing arguments | |
| | | 5:33 pm | The Court will receive amended findings and conclusions from the parties and accepts waiver of closing arguments | |
| | | | The Court directs counsel to meet and confer and stipulate to a briefing schedule for filing of the proposed amended findings and conclusions | |
| | | | Counsel will further meet and confer and file any additional stipulation related to admission of exhibits | |
| | | 5:38 pm | Court concluded | |

1  John V. Picone III, Bar No. 187226
   jpicone@hopkinscarley.com
2  Jeffrey M. Ratinoff, Bar No. 197241
   jratinoff@hopkinscarley.com
3  HOPKINS & CARLEY
   A Law Corporation
4  The Letitia Building
   70 South First Street
5  San Jose, CA  95113-2406
   *mailing address:*
6  P.O. Box 1469
   San Jose, CA 95109-1469
7  Telephone:     (408) 286-9800
   Facsimile:     (408) 998-4790
8
   Attorneys for Plaintiffs and Counter-Defendants
9  NEO4J, INC. and NEO4J SWEDEN AB

10 Adron W. Beene, Bar No. 129040
   adron@adronlaw.com
11 Adron G. Beene SB# 298088
   adronjr@adronlaw.com
12 Attorney at Law
   7960 Soquel Drive Suite #296
13 Aptos, CA 95003
   Tel: (408) 392-9233
14
   Attorneys for Defendants and Counterclaimants
15 PURETHINK LLC, IGOV INC., and JOHN
   MARK SUHY
16

17                 UNITED STATES DISTRICT COURT

18               NORTHERN DISTRICT OF CALIFORNIA

19 NEO4J, INC., a Delaware corporation,        CASE NO.  5:18-cv-07182-EJD
   NEO4J SWEDEN, AB, a Swedish
20 corporation,                                **STIPULATION OF UNDISPUTED FACTS FOR TRIAL**

21              Plaintiffs,                     Trial Date: November 14, 2023

22       v.

23 PURETHINK LLC, a Delaware limited
   liability company, IGOV INC., a Virginia
24 corporation, and JOHN MARK SUHY, an
   individual,
25
                Defendants.
26

27 AND RELATED COUNTERCLAIMS.

28

4859-6727-0801.2

STIPULATION OF UNDISPUTED FACTS FOR TRIAL; CASE NO. 5:18-CV-07182-EJD

**STIPULATION**

This Stipulation is made between Plaintiffs and Counter-Defendants Neo4j, Inc. and Neo4j Sweden AB (collectively "Plaintiffs") and Defendants and Counterclaimants PureThink LLC, iGov Inc. and John Mark Suhy (collectively, "Defendants") through their respective counsel as follows:

WHEREAS, Plaintiffs and Defendants (collectively, the "Parties") included a list of relevant facts to which the parties would stipulate for incorporation into the trial record without the necessity of supporting testimony or exhibits in their Amended Joint Pretrial Statement (Dkt. No. 220), which included factual findings from the Court's May 18, 2021 summary judgment order (Dkt. No. 118) and October 15, 2023 summary judgment order (Dkt. No. 216).

WHEREAS, the Parties agreed that those factual findings supporting the Court's findings of Defendants' liability under the Lanham Act and DMCA are settled, subject to any rights Defendants have in appealing the Court's orders, and thus do not need to be restated for purposes of trial.

WHEREAS, the Parties agreed that they would file a separate stipulation indicating which of those facts have been removed from the prior list and those that they agree shall be incorporated into the trial record without the necessity of supporting testimony or exhibits.

ACCORDINGLY, the Parties HEREBY STIPULATE to the following amended list of relevant undisputed facts for incorporation into the trial record without the necessity of supporting testimony or exhibits:

1.      Neo4j USA is the parent corporation of Neo4j Sweden, which in turn is a wholly owned subsidiary of Neo4j USA.

2.      Removed.

3.      Removed.

4.      Removed.

5.      Prior to May 2018, Neo4j Sweden offered a free and open source version of the Neo4j® graph database platform, Neo4j® Community Edition ("Neo4j® CE"), under the GNU General Public License version 3 ("GPL") license. Neo4j® CE is limited in its feature set and does not come with technical or administrative support.

6.      Plaintiffs also offered a more advanced commercial version, which included additional features and support services, known as the Neo4j Enterprise Edition ("Neo4j® EE"). Prior to May 2018, Plaintiffs offered Neo4j® EE under both a paid-for commercial license and for free under the GNU Affero General Public License, version 3 ("APGL").

7.      Removed.

8.      Removed.

9.      Removed.

10.     Neo4j® EE v3.4 included advanced scalability, availability, security, and operational features that were not previously available.

11.     In November 2018, Plaintiffs officially released Neo4j® EE v3.5 solely under a commercial license.

12.     Prior to the official release of Neo4j® EE v3.5, Plaintiffs published several beta versions via their GitHub repository subject to the Neo4j Sweden AGPL Software License. Neo4j® EE v3.5.0-RC1 was the last pre-release version available to Defendants via GitHub. *Id.* Thereafter, only the source code for Neo4j® CE was made publicly available under the GPL via Github.

13.     Removed.

14.     Removed.

15.     John Mark Suhy founded PureThink in 2002, which is a software and information technology consulting company specializing in supporting agencies within the U.S. Government that use Neo4j® graph database software.

16.     PureThink is a single person company filing as an s-corporation for tax purposes.  Since at least September 1, 2014, Suhy has been the sole employee, member and manager of PureThink.

17.     On September 30, 2014, PureThink and Neo4j USA entered into the Neo Technologies Solution Partner Agreement ("Partner Agreement" or "SPA").

/ / /

/ / /

18. Neo4j Government Edition ("Gov't Edition") consisted of Neo4j® EE and certain FISMA security plug-ins provided by PureThink, and a framework provided by GraphAware.

19. PureThink marketed Gov't Edition to the IRS, however, the IRS indicated that it would require a prototype before purchasing a full subscription.

20. Removed.

21. On September 23, 2016, the IRS's Office of Research, Applied Analytics and Statistics ("RAAS") awarded PureThink a one-year contract for the "Implementation of the Government Neo4j project" for $229,000.

22. Removed.

23. Removed.

24. Mr. Suhy has been the sole employee, officer and director of iGov since he formed the corporation.

25. Removed.

26. Removed.

27. Removed.

28. Removed.

29. Removed.

30. Removed.

31. Removed.

32. Removed.

33. Prior to replacing the Neo4j Sweden Software License with the AGPL, Suhy sought guidance from the FSF, which told him "[t]he copyright holder on a work is the one with the power to enforce the terms of the license" and "[i]f a work was previously available under a free license, and later that license is changed, users can always use that earlier version under the terms of the free license." The FSF also warned that "we cannot provide you with legal advice" and that he should "talk with legal counsel."

/ / /

4859-6727-0801.2
- 4 -
STIPULATION OF UNDISPUTED FACTS FOR TRIAL; CASE NO. 5:18-CV-07182-EJD

34.     Prior to replacing the Neo4j Sweden Software License with the AGPL, Suhy did not seek independent legal advice from any attorney.

35.     Removed.

36.     Removed.

37.     Removed.

38.     Removed.

39.     Removed.

40.     Removed.

41.     Removed.

42.     Mr. Suhy provided hyperlinks to potential users of Neo4j® EE to view and download ONgDB from GFI's website and GitHub repository from his jmsuhy@purethink.com email account.

43.     Mr. Suhy provided hyperlinks to potential users of Neo4j® EE to download ONgDB from GFI's website and GitHub repository from his jmsuhy@igovsol.com email account.

44.     iGov's website provided links to potential users of Neo4j® EE to download ONgDB directly from iGov and from GFI's website.

45.     iGov and Mr. Suhy operated www.graphstack.io, which provided information about ONgDB and hyperlinks for consumers to directly download ONgDB v.3.5.x and ONgDB v.3.6.x.

46.     Removed.

47.     Removed.

48.     Removed.

49.     Removed.

50.     Removed.

51.     Removed.

52.     Removed.

53.     Removed.

1    54.    Removed.

2    55.    Removed.

3    56.    Removed.

4    57.    Removed.

5    58.    Neo4j Sweden owns of all copyrights related to the Neo4j graph database

6    platform, including the source code, and has licensed those copyrights to Neo4j USA.

7    59.    Neo4j Sweden did not give Mr. Suhy permission to replace the Neo4j Sweden

8    Software License with verbatim copies of the AGPL in the 28 LICENSE.txt files in ONgDB

9    v3.4 and ONgDB v3.5.

10    60.    Suhy knowingly distributed Neo4j® EE source code without the Neo4j Sweden

11    Software License with the understanding that it would result in the infringement of Neo4j

12    Sweden's copyrights.

13    61.    Suhy submitted a bid for a new contract issued by the IRS via another entity

14    that he had an ownership interest in at the time, eGovernment Solutions, Inc. ("eGov Sol" or

15    "eGov Solutions").

16    62.    Under the proposal for the new contract signed by Suhy, the scope of work

17    required iGov to perform "all operations and maintenances duties for all components of the

18    CKGE framework…."    iGov would also be "responsible for ensuring any open source

19    products within the CKGE conform to their license-terms" and iGov would "need to work with

20    the following components: React, Angularjs, Neo4j…."

21    63.    On May 22, 2018, Neo4j USA informed the IRS, including those in RAAS, that

22    Neo4j Sweden added Commons Clause to Neo4j® EE 3.4, and the resulting need to obtain a

23    commercial subscription if they intended to use that software in the CKGE platform.

24    64.    On May 22, 2018, Suhy sent an email to the IRS claiming Neo4j Sweden could

25    not add the Commons Clause to the license governing Neo4j® EE v3.4.

26    65.    On May 24, 2018, the RAAS division of the IRS awarded eGov Solutions the

27    new contract, Order No. 2032H8-18-P-00151, as amended Order No. 2032H8-18-P-00168, to

28    further develop and support the CKGE in May 2018 ("CKGE Contract").

- 6 -

66.     In July 2018, Jason Zagalsky, a sales representative from Neo4j USA, met with employees of the IRS, and then provided a quote of $156,000 for one-year subscription and a $397,800 for a 3-year subscription for a Neo4j® EE v3.4 based on then-current requirements of CKGE.

67.     As of August 2018, the IRS understood that Neo4j® CE had a performance limitation to only 4 cores, while Neo4j® EE had enterprise-only features, came with professional services and subscriptions, and was priced based on number of cores.

68.     Under the CKGE Contract, Suhy provided input in the architecture design and hardware requirements needed to run ONgDB installations on multiple servers within the CKGE.

69.     In August 2018, Suhy recommended that the IRS integrate ONgDB v3.4 rather than Neo4j® EE v3.4 in the CKGE framework, and claimed that "ONgDB open source licenses come directly from the Graph Foundation as well, not from Neo4j Inc."

70.     Based on Suhy's recommendation, Mike Dunn at the IRS instructed him to "[g]o ahead and integrate the ONgDB into the CKGE framework we'll deploy" on August 14, 2018.

71.     While working at the IRS, Mr. Suhy helped the IRS upload ONgDB source code into the IRS's internal repository.

72.     The IRS decided to not allocate $156,000 for a license to use Neo4j® EE in the CKGE platform because ONgDB was a free and open, unrestricted alternative.

73.     Under the CKGE contract, Suhy and iGov were responsible for supporting, maintaining and updating ONgDB in an internal GitLab repository for the RAAS at the IRS.

74.     Under the CKGE contract, Suhy and iGov helped the IRS upgrade the CKGE platform to ONgDB v3.5 in April 2019 and integrated subsequent subversions through at least April 2022.

75.     After April 2022, the IRS started calling ONgDB v3.5 just "GDB" due to the injunction entered against GFI and its rollback of ONgDB source code.

/ / /

76. GDB was merely a name change because it was still based on Neo4j® EE v3.5 source code that was improperly licensed under the AGPL without the Commons Clause, which Suhy continued to be responsible for maintaining on the IRS's internal Gitlab repository.

77. The IRS used at least one Neo4j® enterprise-only feature, node ID, via ONgDB in CKGE.

78. The IRS understood that Neo4j® EE can run Cypher queries significantly faster than Neo4j® CE, which is advantageous in terms of productivity.

79. The initial hardware available to run Neo4j® EE in the IRS's pre-CKGE platform were for one server with at least 16 cores and 1 terabyte of RAM under the September 23, 2016 contract award to PureThink.

80. As of December 2018, the CKGE (a/k/a "main graph") was running, or was expected to be running, on at least two production servers and one development / test server utilizing ONgDB. Each machine was comprised of a DL380 with 32 cores and 256GB of RAM at minimum.

81. As of March 2019, the IRS was running ONgDB on three production servers, and one development server in the CKGE, totaling four instances of ONgDB.

82. In 2020, the IRS continued to run ONgDB on at least three production servers in the CKGE with four total instances of ONgDB.

83. In 2021, the IRS continued to run ONgDB on at least three production servers in the CKGE with four total instances of ONgDB.

84. In 2022, the IRS continued to run ONgDB on at least two production servers in the CKGE with at least three total instances of ONgDB.

85. Each machine in the CKGE running ONgDB was comprised of a DL380 with 32 cores and 256GB of RAM.

86. As of November 2022, the IRS would only want the bare-minimum Neo4j® EE package for two nodes, each with 16 cores and 256GB RAM for the CKGE.

87. On August 14, 2018, Mike Dunn asked Suhy to inform the YK1 team of the switch to ONgDB v3.4.x into the CKGE framework "we'll deploy."

88.     By December 2018, the IRS's YK1 began using one instance of ONgDB.

89.     The minimum server specifications for YK1 at the IRS was a DL380 with 12 cores and 256GB of RAM.

90.     In 2019, one instance of ONgDB was running on its own server in YK1 at the IRS.

91.     In 2020, one instance of ONgDB was in production and running on its own server in YK1 at the IRS.

92.     In 2021, one instance of ONgDB was in production and running on its own server in YK1 at the IRS.

93.     In 2022, two instance of ONgDB in production and two instances of ONgDB in development/test in YK1 at the IRS.

94.     Starting in 2019 and continuing through 2022, the IRS ran a separate instance of ONgDB in development in a project called "Corporate Graph."

95.     The minimum server specifications for Corporate Graph are DL380 with 12 cores and 256GB of RAM.

96.     Starting in 2020 and continuing through 2022, the IRS ran one instance of ONgDB in production in a project called "Excise Graph."

97.     The minimum server specifications for Excise Graph are DL380 with 12 cores and 256GB of RAM.

98.     Starting in summer of 2020 and continuing through September/October 2021, the IRS ran one separate instance of ONgDB in development for its COVID Graph project.

99.     Starting in September/October 2021 and continuing through October 2022, the IRS ran one separate instance of ONgDB in production for its COVID Graph project.

100.    The minimum server specifications for COVID Graph are DL380 with 12 cores and 256GB of RAM.

101.    Starting in 2021 and continuing through 2022, the IRS ran one separate instance of ONgDB in development for a project called "Policy Net."

/ / /

102. The minimum server specifications for Policy Net are DL380 with 12 cores and 256GB of RAM.

103. Starting in 2021 and continuing through 2022, the IRS ran one separate instance of ONgDB in development called "Individual Graph."

104. The minimum server specifications for Individual Graph are DL380 with 12 cores and 256GB of RAM.

105. In 2022, the IRS ran one separate instance of ONgDB in development in a project called "CPEO Graph."

106. The minimum server specifications for CPEO Graph are DL380 with 12 cores and 256GB of RAM.

107. In 2022, the IRS ran one separate instance of ONgDB in development called "Ghost Preparer."

108. The minimum server specifications for Ghost Preparer graph are DL380 with 12 cores and 256GB of RAM.

109. Between September 2019 and September 2022, Neo4j sold commercial subscriptions of Neo4j® EE to divisions at the IRS other than RAAS for a total price of approximately $1,380,000. These licensed products include a new subscription to Neo4j's Enterprise Bundle in 2019 (as well as renewal subscriptions in 2020, 2021, and 2022).

110. The Maryland Procurement Office (a/k/a the National Security Agency, the NSA and the MPO) tasked Next Century to analyze available graph database technologies, including Neo4j® EE.

111. Next Century and the MPO required the enterprise-only features, such as causal clustering and multi-data centers, offered by both Neo4j® EE and ONgDB.

112. Next Century learned about the pricing of Neo4j Enterprise software bundles offered by Neo4j USA and iGov from iGov's website.

113. In October 2018, Next Century exchanged emails with Suhy regarding representations made on iGov's website that ONgDB v3.4 was an open source version of Neo4j® EE that provided the same enterprise-only features for free.

114.   Suhy told Next Century that the MPO could use ONgDB v3.4 under the AGPL without restrictions or paying Plaintiffs for a commercial license, as advertised on the iGov's website.

115.   As a result of Next Century's communications with Suhy, Next Century downloaded ONgDB v3.4 and began evaluating against Neo4j® EE v3.4.

116.   In a series of emails with Next Century ending on January 4, 2019, Suhy confirmed that ONgDB v3.5 would have feature parity with the enterprise features of Neo4j® EE v3.5, and would also be available without restrictions on the number of clusters, instances and cores and without paying Neo4j USA for a commercial license.  This led Next Century to upgrade from ONgDB v3.4 to ONgDB v3.5.

117.   By February 2019, the MPO had chosen to use ONgDB v3.5 over Neo4j® EE v3.5 for continued development work for the MPO.

118.   On February 5, 2019, Next Century informed Neo4j USA of this decision, stating, "[w]e have found that open-sourced (non-commercial) builds from the Neo4j source code provide the clustering and security requirements needed in our environment."

119.   In March 2019, Next Century gave Neo4j USA the required specifications for its ongoing project with the MPO and ask for Neo4j USA for a quote for use in a production environment.

120.   On April 19, 2019, Jason Zagalsky of Neo4j USA sent a 3-year Neo4j Enterprise Edition Enterprise Bundle for $2,266,950 based on those requirements.   This included a commercial license and technical support for (a) 12 Production Machines (up to 12 cores and 256GB of RAM per Machine); and (b) 12 Test Machines (up to 12 cores and 256GB of RAM per Machine). Neo4j USA also provided a 15% multi-year discount.

121.   On April 29, 2019, Next Century confirmed that it shared Neo4j USA's proposal with the MPO, and was instructed by the MPO to continue using ONgDB.   The reason for the MPO continuing to use ONgDB over Neo4j® EE was price.

/ / /

/ / /

4859-6727-0801.2

- 11 -

STIPULATION OF UNDISPUTED FACTS FOR TRIAL; CASE NO. 5:18-CV-07182-EJD

122.    On July 21, 2019, Next Century informed Neo4j USA that the MPO was not interested in the Neo4j® EE proposal. Again, the deciding factor between ONgDB and Neo4j® EE was price.

123.    Next Century continued to use ONgDB v3.5, which was placed into a production environment for the NSA in or about October 2020.

124.    Neo4j USA has a past history of entering into licensing arrangements with the MPO, including one transaction in November 2019 wherein the MPO obtained a license for Neo4j® EE v3.5 discovery bundle for another project, which included one production machine with 12 cores and 256GB of RAM (as well as one test machine) at a price of $59,250.

Dated:  November 20, 2023

HOPKINS & CARLEY
A Law Corporation

By: */s/ Jeffrey M. Ratinoff*
John V. Picone III
Jeffrey M. Ratinoff
Attorneys for Plaintiffs and
Counter-Defendants
NEO4J, INC. and NEO4J SWEDEN AB

Dated:  November 20, 2023

*/s/ Adron W. Beene*
Adron W. Beene
Adron G. Beene
Attorneys for Defendants and Counter-
Claimants
PURETHINK LLC, IGOV INC., and
JOHN MARK SUHY

1

### ATTESTATION OF E-FILED SIGNATURE

2   Pursuant to Local Rule 5-1(i)(3), I hereby certify that I have obtained the concurrence in

3 the filing of this document from all signatories for whom a signature is indicated by a

4 "conformed" signature (/s/) within this electronically filed document and I have on file records to

5 support this concurrence for subsequent production to the Court if so ordered or for inspection

6 upon request.

7 Dated:  November 20, 2023     HOPKINS & CARLEY
                A Law Corporation

8

9              By: */s/ Jeffrey M. Ratinoff*
                John V. Picone III

10             Jeffrey M. Ratinoff
              Attorneys for Plaintiffs and

11             Counter-Defendants
              NEO4J, INC. and NEO4J SWEDEN AB

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4859-6727-0801.2

STIPULATION OF UNDISPUTED FACTS FOR TRIAL; CASE NO. 5:18-CV-07182-EJD

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**TITLE:  *NEO4J, INC., et al. v. PURETHINK LLC, et al.***
**CASE NUMBER**:  **5:18-CV-07182 EJD**

## Civil Minutes and Trial Log

Date:   November 14, 2023

Time in Court:  9:14-9:41 AM; 10:00-11:28 AM; 11:41 AM – 12:32 PM; 1:39-2:38 PM; 3:04-4:32 PM

**(TOTAL TIME:  5 hr, 12 min)**

Courtroom Deputy Clerk: Cheré Robinson
Court Reporter:  Irene Rodriguez

---

**APPEARANCES:**
Plaintiff Attorney(s) present:     John Picone, Jeffrey Ratinoff, Arthur Rothrock
Also present:  Paralegal – Danny Zapeda

Defendant Attorney(s) present:   Adron W. Beene, Adron G. Beene

---

**PROCEEDINGS:  Trial (Day 1)**

Bench Trial  held.  Further Trial set for November 28, 2023, at 9:00 AM.

*See* attached Trial Log.

**The following exhibits are marked for identification:**
Plaintiffs: 8, 4, 6, 86, 87, 88, 57, 89, 91, 126, 128, 131, 16, 17, 18, 19, 103, 110, 116, 118, 119, 15
Defendants: 1027, 117, 1064

**The following exhibits are admitted into evidence:**
Plaintiffs:     **8, 4, 6, 86, 87, 88, 57, 89, 91, 126, 128, 131, 16, 17, 18, 19, 103, 110, 116, 118, 119, 15**
Defendants:     **1027, 117, 1064**

**Cheré Robinson**
**Courtroom Deputy**
**Original: Efiled**
**CC:**

**SER_0201**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

HONORABLE EDWARD J. DAVILA

Case Name:  *NEO4J, Inc., et al. v. PureThink LLC, et al.*
Case No:  5:18-CV-07182 EJD

**TRIAL LOG**

| TRIAL DATE: November 14, 2023 | | | REPORTER(S): Irene Rodriguez | CLERK: Cheré Robinson |
|---|---|---|---|---|
| PLF | DEFT | TIME | DESCRIPTION | |
|  |  | 9:14 am | Court in Session | |
|  |  | 9:20 am | Housekeeping matters addressed:  Deposition Designations and Depo Transcripts | |
|  |  | 9:41 am | Court breaks for 19 min | |
|  |  | 10:00 am | Court in session | |
|  |  | 10:01 am | Counsel will provide submission of undisputed facts – truncated down from what appears | |
|  |  |  | Plaintiff seeks leave to add 1 exhibit and 4 deposition excerpts | |
|  |  | 10:02 am | Court Grants leave and directs counsel to submit a filing which identifies which additional exhibit and deposition exhibits Plaintiff will submit. Counsel may request exhibit to be filed under seal. | |
|  |  | 10:03 am | Plaintiff begins opening statement | |
|  |  | 10:09 am | Plaintiff concludes opening statement | |
|  |  |  | Defense begins opening statement | |
|  |  | 10:28 am | Defense concludes opening statement | |
|  |  |  | Plaintiff calls Witness #1 Jason Zagalsky | |
|  |  | 10:29 am | Witness sworn | |
|  |  | 10:30 am | Plaintiff begins direct examination of Jason Zagalsky | |
| 8 |  | 10:54 am | ADMITTED INTO EVIDENCE:  2020-01-29 Press release issued by Neo4j USA titled "Neo4j Marks Another Year of Product, Customer and Community Momentum" | |

| TRIAL DATE: November 14, 2023 | | | REPORTER(S):<br>Irene Rodriguez | CLERK:<br>Cheré Robinson |
|---|---|---|---|---|
| PLF | DEFT | TIME | DESCRIPTION | |
| 4 | | 11:02 am | ADMITTED INTO EVIDENCE:  2018-05-17 Rathle announcement published on Neo4j USA's website regarding the release of Neo4j® CE and Neo4j® EE version 3.4 and introduction of Commons Clause | |
| 6 | | 11:09 am | ADMITTED INTO EVIDENCE:  2018-11-15 Announcement regarding the release of Neo4j CE and Neo4j EE v3.5 published by Rathle on Neo4j USA's website | |
| 86 | | 11:13 am | ADMITTED INTO EVIDENCE:  2017-11-01 archive of PureThink LLC's webpage, http://purethink.com/ from Wayback Machine, which states that iGov was formed by the "principle behind PureThink" | |
| 87 | | 11:17 am | ADMITTED INTO EVIDENCE:  2018-01-13 Printout of iGov's webpage, https://igovsol.com/about.html, which states that iGov was formed by the "principle behind PureThink" | |
| 88 | | 11:20 am | ADMITTED INTO EVIDENCE:  2018-01-13 Copy of printout of iGov's webpage, https://igovsol.com/neo4j.html, showing use of Neo4j Mark in "Government Development Packages for Neo4j" | |
| 57 | | 11:27 am | ADMITTED INTO EVIDENCE:  2018-02-15 Letter from the Department of Treasurer to John Mark Suhy enclosing Neo4j, Inc.'s September 19, 2017 Agency-Level Protest of the IRS's sole-source award to iGov | |
| | | 11:28 am | Court breaks for 13 min | |
| | | 11:41 am | Court in session | |
| | | 11:42 am | Plaintiff continues direct examination of Jason Zagalsky | |
| | | | Ex. 4 – previously admitted | |
| 89 | | 11:46 am | ADMITTED INTO EVIDENCE:  2018-12-04 archive of iGov's webpage, https://igovsol.com/neo4j.html, from Wayback Machine showing infringement of Neo4j Mark and encouraging download of ONgDB from GFI | |
| | | 11:47 am | Ex. 6, previously admitted | |
| 91 | | 11:50 am | ADMITTED INTO EVIDENCE:  2019-10-01 capture of iGov's webpage, https://igovsol.com/index.html, encouraging users to adopt ONgDB for free over Neo4j EE | |
| 126 | | 12:00 pm | ADMITTED INTO EVIDENCE:  2018-05-22 Email from Jason Zagalsky to Michael Dunn regarding sole-source order with eGov Sol for consulting and support of CKGE | |

| TRIAL DATE: November 14, 2023 | | | REPORTER(S):<br>Irene Rodriguez | CLERK:<br>Cheré Robinson |
|---|---|---|---|---|
| **PLF** | **DEFT** | **TIME** | **DESCRIPTION** | |
| 128 | | 12:03 pm | ADMITTED INTO EVIDENCE:  2018-05-31 Email exchange between Lisa Rosenmerkel and Jason Zagalsky regarding scheduling a meeting regarding the IRS's needs relating to Neo4j software | |
| 131 | | 12:10 pm | ADMITTED INTO EVIDENCE:  2018-07-27 Email exchange between Lisa Rosenmerkel and Jason Zegalsky regarding proposal for Neo4j EE subscription bundle for CKGE environment | |
| 16 | | 12:22 pm | ADMITTED INTO EVIDENCE:  (Sealed Document) 2017-10-01 Neo4j USA Price List, Effective Oct 1, 2017 | |
| 17 | | 12:26 pm | ADMITTED INTO EVIDENCE:  (Sealed Document) 2019-04-01 Neo4j USA Price List, Effective April 1, 2019 | |
| | | 12:32 pm | Court breaks for 1 hr, 7 mins | |
| | | 1:39 pm | Court in session | |
| | | | Plaintiff continues direct examination of Jason Zagalsky | |
| 18 | | 1:40 pm | ADMITTED INTO EVIDENCE:  (Sealed Document) 2020-04-01 Neo4j USA Price List, Effective April 1, 2020 | |
| 19 | | 1:44 pm | ADMITTED INTO EVIDENCE:  (Sealed Document) 2021-07-01 Neo4j USA Price List, Effective July 1, 2021 | |
| 103 | | 2:01 pm | ADMITTED INTO EVIDENCE:  2018-06-14 Email from Jason Zagalsky to Michael Smolyak re commercial license needed for certain enterprise-only features | |
| 110 | | 2:08 pm | ADMITTED INTO EVIDENCE:  2019-02-05 Email from Shahak Nagiel to Jason Zagalsky Re: Neo4j licensing informing him that open-sourced builds from the Neo4j source code provided the needed clustering and security requirements | |
| 116 | | 2:20 pm | ADMITTED INTO EVIDENCE:  2019-04-01 Email exchange between Jason Zagalsky and Shahak Nagiel confirming required specifications for a Neo4j EE proposal and scheduling meeting with NextCentury and MPO re same | |
| 118 | | 2:28 pm | ADMITTED INTO EVIDENCE:  (Sealed Document) 2019-04-29 04/29/19 Email from Shahak Nagiel to Jason Zagalsky confirming that NextCentury shared Neo4j USA's proposal with MPO and confirming that NextCentury continued to use ONgDB, and attachment:  Prepared Proposal for Maryland Procurement Office KMS Project | |
| | | 2:29 pm | Sealed session begins | |

| TRIAL DATE: November 14, 2023 | | REPORTER(S):<br>Irene Rodriguez | | CLERK:<br>Cheré Robinson | |

| PLF | DEFT | TIME | DESCRIPTION |
|---|---|---|---|
|  |  |  | Plaintiff questions witness re Ex. 118 |
|  |  | 2:33 pm | Ex. 17 – previously admitted. |
|  |  | 2:35 pm | Sealed session ends. |
| 119 |  | 2:37 pm | ADMITTED INTO EVIDENCE:  2019-04-29 Email from Shahak Nagiel to Jason Zagalsky confirming that NextCentury shared Neo4j USA's proposal with MPO and confirming that NextCentury continued to use ONgDB |
|  |  | 2:38 pm | Court breaks for 26 min |
|  |  | 3:04 pm | Court in session |
|  |  | 3:05 pm | Defense begins cross-examination of Jason Zagalsky |
|  | 1027 | 3:22 pm | ADMITTED INTO EVIDENCE:  2019-05-22 Emails between Zagalsky and Dunn on Commons Clause |
|  |  | 3:32 pm | Ex. 128, previously admitted |
|  | 117 | 3:37 pm | ADMITTED INTO EVIDENCE:  2019-04-01 Email exchange between Jason Zagalsky and Shahak Nagiel confirming Next Century would continue to use ONgDB instead of Neo4j EE |
|  | 1064 | 3:43 pm | ADMITTED INTO EVIDENCE:  2017-08-08 Email from Michael Dunn to Jason Zagalsky re: License |
|  |  | 3:47 pm | Ex. 110, previously admitted |
|  |  | 3:56 pm | Defense completes cross-examination of Jason Zagalsky |
|  |  |  | Witness #1 Jason Zagalsky excused |
|  |  |  | Plaintiff calls Witness #2 Kelly Zawalski |
|  |  | 3:57 pm | Witness sworn. |
|  |  | 3:58 pm | Plaintiff begins direct examination of Kelly Zawalski |
|  |  | 4:09 pm | Sealed session begins |
| 15 |  | 4:11 pm | ADMITTED INTO EVIDENCE:  (Sealed Document) Excel Spreadsheet - 2022-11-14 Neo4j Monthly Closed Won Report as of 2022-11-14 |

**Cheré Robinson**
**Courtroom Deputy**
**Original: Efiled**
**CC:**

| TRIAL DATE: November 14, 2023 | | | REPORTER(S):<br>Irene Rodriguez | CLERK:<br>Cheré Robinson |
|---|---|---|---|---|
| PLF | DEFT | TIME | DESCRIPTION | |
| | | 4:18 pm | Plaintiff completes direct examination of Kelly Zawalski | |
| | | | Sealed session ends | |
| | | 4:19 pm | Defense begins direct examination of Kelly Zawalski | |
| | | 4:24 pm | Defense completes cross-examination of Kelly Zawalski | |
| | | | Court queries witness | |
| | | 4:28 pm | Witness #2 Kelly Zawalski excused | |
| | | | Court addresses trial schedule with counsel | |
| | | | Court cancels November 21, 2023, Trial Date | |
| | | 4:32 pm | Court is Adjourned | |
| | | | Trial continued to November 28, 2023 | |

**Cheré Robinson**
**Courtroom Deputy**
**Original: Efiled**
**CC:**

**SER_0206**

1
John V. Picone III, Bar No. 187226
jpicone@hopkinscarley.com

2
Jeffrey M. Ratinoff, Bar No. 197241
jratinoff@hopkinscarley.com

3
Arthur E. Rothrock, Bar No. 312704
arothrock@hopkinscarley.com

4
HOPKINS & CARLEY
A Law Corporation

5
The Letitia Building
70 South First Street

6
San Jose, CA  95113-2406

7
*mailing address:*
P.O. Box 1469

8
San Jose, CA 95109-1469
Telephone:     (408) 286-9800

9
Facsimile:     (408) 998-4790

10
Attorneys for Plaintiffs and Counter-Defendants
NEO4J, INC. and NEO4J SWEDEN AB

11

12
UNITED STATES DISTRICT COURT

13
NORTHERN DISTRICT OF CALIFORNIA

14
NEO4J, INC., a Delaware corporation,
NEO4J SWEDEN, AB,

CASE NO.  5:18-cv-07182-EJD

15
Plaintiffs,

**PLAINTIFFS' DEPOSITION
DESIGNATIONS FOR USE AT TRIAL**

16

17
v.

18
PURETHINK LLC, a Delaware limited
liability company, IGOV INC., a Virginia

19
corporation, and JOHN MARK SUHY, an
individual,

20
Defendants.

21

22
AND RELATED COUNTERCLAIMS.

23

24

25

26

27

28

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ PALO ALTO

4893-6450-2146.1

PLAINTIFFS' DEPOSITION DESIGNATIONS

CASE NO. 5:18-CV-07182-EJD

1    Pursuant to the Court's April 6, 2023 Order for Modification of Case Schedule After Trial

2    Setting Conference, Plaintiffs Neo4j, Inc. and Neo4j Sweden AB  hereby file the following

3    deposition transcript excerpts and testimony (highlighted in green) they intend to introduce at trial:

| Exhibit No. | Deposition Transcript |
|---|---|
| 1. | Remote Videotaped Deposition of John Mark Suhy, Individually and as a Representative of iGov, Inc. and PureThink LLC Pursuant to Federal Rule of Civil Procedure 30(b)(6) and by Stipulation (Dkt. No. 155), Vol. 1[1] |
| 2. | Remote Videotaped Deposition of John Mark Suhy, Individually and as a Representative of iGov, Inc. and PureThink LLC Pursuant to Federal Rule of Civil Procedure 30(b)(6) and by Stipulation (Dkt. No. 155), Vol. 2 |
| 3. | Remote Videotaped Deposition of Ashwani Mayur as a Representative of eGovernment Solutions Pursuant to Federal Rules of Civil Procedure 45 and 30(b)(6) |
| 4. | Videotaped Deposition of Jim Weyant as a Representative of CACI International, Inc. Pursuant to Federal Rules of Civil Procedure 45 and 30(b)(6)[2] |
| 5. | Remote Videotaped Deposition of Internal Revenue Service Through its Designee Michael C. Dunn Pursuant to Federal Rules of Civil Procedure 45 and 30(b)(6) |
| 6. | Videotaped Deposition of Michael Stavrianos as a Representative of ASR Analytics, LLC Pursuant to Federal Rules of Civil Procedure 45 and 30(b)(6) |
| 7. | Video-Recorded Deposition of Turin Pollard as a Representative of Greystones Consulting Group, LLC Pursuant to Federal Rules of Civil Procedure 45 and 30(b)(6)[3] |

Dated:  September 28, 2023                          HOPKINS & CARLEY
                                                   A Law Corporation



                                                   By: /s/ Jeffrey M. Ratinoff
                                                   John V. Picone III
                                                   Jeffrey M. Ratinoff
                                                   Arthur E. Rothrock
                                                   Attorneys for Plaintiffs and
                                                   Counter-Defendants
                                                   NEO4J, INC. and NEO4J SWEDEN AB

[1] Counsel for Defendants confirmed that these excerpts need not be filed under seal.

[2] Counsel for CACI confirmed that these excerpts need not be filed under seal.

[3] Counsel for Greystones confirmed that these excerpts need not be filed under seal.

4893-6450-2146.1

# EXHIBIT 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA


NEO4J, INC., a Delaware
corporation; and NEO4J SWEDEN
AB, a Swedish corporation,

      Plaintiffs,

                              CASE NO.
vs.                          5:18-cv-07182-EJD

PURETHINK, LLC, a Delaware
limited liability company;
IGOV, INC., a Virginia
corporation; and JOHN MARK
SUHY, an individual,

      Defendants.
_____/

REMOTE VIDEOTAPED DEPOSITION OF
JOHN MARK SUHY
as representative of IGOV, INC.
pursuant to Federal Rule of Civil Procedure 30(b)(6)

**Confidential Pursuant to Protective Order**


DATE:        October 22, 2020

TIME:        9:12 a.m.

LOCATION:   Via videoconference


REPORTED BY:  BENJAMIN GERALD
California CSR No. 14203
Washington CSR No. 3468

1

JOHN MARK SUHY                                    October 22, 2020

```
 1    John Mark Suhy individually.

 2            THE VIDEOGRAPHER:  The court reporter will now

 3    administer the oath, and then we can again.

 4                    --o0o--

 5                    JOHN MARK SUHY,

 6    being duly sworn by the Certified Shorthand Reporter to

 7    tell the truth, the whole truth, and nothing but the

 8    truth, testified as follows:

 9                    --o0o--

10                    EXAMINATION

11    BY MR. PICONE:

12        Q.  Good morning, Mr. Suhy.  Can you state your

13    full name, please.

14        A.  John Mark Suhy, Jr.

15        Q.  Where do you live?

16        A.  I live in Alexandria, Virginia.

17        Q.  What's your address?

18        A.  8814 Danewood Drive, Alexandria, Virginia

19    22308.

20        Q.  Have you ever had your deposition taken before?

21        A.  Yes.

22        Q.  In what context?

23        A.  I was in a car accident years ago, and I had to

24    be deposed for it.

25        Q.  And that's the only time?
```

                                                          13

JOHN MARK SUHY                                              October 22, 2020

1    A.  I don't remember any other times.

2    Q.  Okay.  I'm going to go over just a couple of

3    the basics of a deposition.  You've been doing very well

4    so far in allowing me to finish my question before you

5    answer, and I will likewise do my best to let you finish

6    your answer before I pose another question.

7         You've also been doing very well with respect

8    to answering audibly.  We have to answer audibly.  We

9    can't shake our heads or use non-verbal communication

10   because Mr. Gerald can't record that.

11        You know the oath you took today means that

12   your testimony is given under penalty of perjury.

13        Do you understand that?

14   A.  Yes.

15   Q.  Okay.  And once the deposition is completed,

16   the transcript will be put in a booklet form, and it

17   will be sent to you, and you will be allowed it make any

18   changes or corrections to your testimony, but you should

19   be aware that, if you do make changes or corrections, I

20   will be able to comment on those changes or corrections.

21        Do you understand that?

22   A.  Yes.

23   Q.  All right.  This is -- I think is the most

24   important one:  If at any time you don't understand a

25   question that I pose, just simply ask me to clarify it,

                                                          14

JOHN MARK SUHY                                        October 22, 2020

```
 1    and I'll do my best to make it more clear.  But if you
 2    don't ask me, I'm going to assume that you understood
 3    the question and that you answered it fully and
 4    truthfully.
 5           Do you agree to ask me to clarify if you have
 6    any questions about the content of my question?
 7       A.  Yes.
 8       Q.  Okay.  I typically take a break about every
 9    hour, but if you need a break before that period, just
10    let me know, and the only I think ask you with respect
11    to breaks is that if a question is pending when you
12    request a break, I just ask you to answer the question
13    before we go off the record.
14           Also, you know, we're going to have breaks, and
15    we're going to have lunch breaks, and the witness (sic)
16    is not going to re-swear you in.  You remain under oath
17    the entire deposition regardless of whether we take a
18    break or we extend to another day.
19           Do you understand that?
20       A.  Yes.
21       Q.  Okay.  Is there any reason that you can't give
22    your best and most truthful testimony today?
23       A.  No.
24       Q.  Okay.  And you understand today that you're
25    testifying on behalf of iGov?
```

15

JOHN MARK SUHY                                              October 22, 2020

```
 1          Q.  Okay.  What was your first job after college?

 2          A.  I believe it was with a company called Core

 3     Express.

 4          Q.  And what did you do there?

 5          A.  I did software development.

 6          Q.  Okay.  How long did you work there?

 7          A.  About one to two years.

 8          Q.  Where did you go next?

 9          A.  I believe I started PureThink after that.

10          Q.  And so what was -- what was the approximate

11     time you started PureThink, the date?  I just need a

12     year.

13          A.  2012 -- or I'm sorry, not '12.  2002, I

14     believe.

15          Q.  So you graduated from George Mason around 2000?

16          A.  That sounds right, yes.

17          Q.  Okay.

18              MR. PICONE:  Mr. Ratinoff, can you drop Tab 109

19     into the chat box, please?

20              And Mr. Gerald, this will be Exhibit 2.

21              (Exhibit 2 was marked for identification.)

22     BY MR. PICONE:

23          Q.  And it is identified by production numbers

24     N4J 00156 through 158.

25              Mr. Suhy, do you see that document that's been
```

21

JOHN MARK SUHY                                                October 22, 2020

```
 1    marked as Exhibit 2?
 2         A.  Yes, I do.
 3         Q.  Okay.  What is it?
 4         A.  It's the Commonwealth of Virginia State
 5    Corporation Commission document for the articles
 6    submitted on behalf of iGov, Inc.
 7         Q.  Okay.  And that document is dated, I believe,
 8    June 23, 2017.
 9             Does that comport with your memory regarding
10    when iGov was founded?
11         A.  Yes, that sounds right.
12         Q.  Okay.  And at the time of its founding, what
13    role did you play in iGov?
14         A.  Well, I created the company, and am a director
15    and CTO, I believe.  But I was -- it was -- I created
16    the company.
17         Q.  I see.  So you were the founder and -- and CTO
18    at the time of its founding in 2017?
19         A.  Yes.
20         Q.  Did you have any employees at the time of its
21    founding, other than you?
22         A.  No.
23         Q.  Okay.  So you -- did you have any contractors
24    or any other people contributing to the work of iGov at
25    the time of its founding?
```

                                                              22

JOHN MARK SMITH                                    October 22, 2020

1     A.  I'm trying to think if we had help from

2   contracting.

3         Nothing major, but I don't know offhand.  We

4   might have had someone that helped us with

5   administration tasks and whatnot, but I don't remember

6   if they actually were just helping us, or if we had paid

7   them.

8     Q.  So you may have had a volunteer helping with

9   admin, but you can't recall one way or the other whether

10  or not they received any compensation for that help?

11    A.  Yeah, if they received anything, it would have

12  been a small amount, like a few hundred dollars.

13    Q.  Okay.

14    A.  It wouldn't have been a W-2, or anything like

15  that.

16    Q.  Understood.  Since its founding in 2017, has --

17  has iGov had any employees, other than you?

18    A.  No employees.

19    Q.  Okay.  Have you hired any contractors or

20  contributors to help iGov's operations since its

21  founding in 2017?

22    A.  Contractors meaning people or businesses?

23    Q.  Primarily people.  Let's leave it -- to start

24  with that.

25    A.  No.

                                                    23

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS   408-287-7500

JOHN MARK SUHY                                                    October 22, 2020

```
 1        Q.  Okay.  How about businesses or entities?  Have
 2   you contracted with them to help iGov in its operations?
 3        A.  Yes.
 4        Q.  And can you give me a list, or is that too
 5   much?
 6        A.  I can.  One moment.  Let me write this down.
 7        Q.  Let me help you with that.  To that extent
 8   that, you know, if you hired, you know, financial people
 9   or accountants to help with your accounting, things like
10   that, I don't necessarily need those.  I was thinking
11   more with operational people who -- who helped with
12   iGov's core mission.
13        A.  We've only hired -- or not hired, but
14   subcontracted work for development to assist me in
15   software development --
16        Q.  Okay.
17        A.  -- but no one to help with the operations.
18        Q.  Okay.  So who -- who's helped you with the
19   software development?
20        A.  AtomRain.
21        Q.  And when did you engage AtomRain to help you
22   with soft -- software development?
23        A.  I don't know the date off -- offhand, but it
24   was -- I don't know the date, but I can find it.
25        Q.  Is it -- is it -- can you give me an
```

                                                                   24

1    approximate year?  I don't need the day and time, I'm

2    just wondering how long they helped you.

3         A.  At least 2018, I believe.  But I don't know for

4    sure unless I actually go and look at the -- the

5    documents I have.

6         Q.  Okay.  And did you pay them to help you?

7         A.  Yes.

8         Q.  Okay.  And how much did you pay them,

9    approximately?

10        A.  Between 50,000 to -- or a hundred thousand.

11   I'm not sure exactly, but those -- I can get all those

12   documents for you.

13        Q.  Okay.  And what was the -- the nature of the

14   software development work that AtomRain provided to

15   iGov?

16        A.  Development of back-end software and

17   user-interface software applications.

18        Q.  Was this back-end software and UI work, was

19   that related to any particular software product that

20   iGov was developing?

21        A.  It was for a tool that we had to design for a

22   client, and it was based on -- or part of the tool was

23   called GraphStack, which is -- I guess you could call it

24   a -- I don't know if you'd call it a product.  It's

25   consulting, a bunch of toolings that allow you to build

25

JOHN MARK SUHY                                             October 22, 2020

 1    software applications.

 2         Q.   Were those software applications in the graph

 3    database space?

 4         A.   One small piece of the application was a graph

 5    database.

 6         Q.   And generally, what were the other pieces of

 7    the -- of the -- of the tooling?

 8         A.   There was an API which was in charge of

 9    communicating data back and forth to a user interface,

10    and on the back end, it used elastic search, PostgreSQL,

11    ONgDB -- I'm trying to think of -- Hazelcast, Spring

12    Boot, and Java.   There's quite a bit of technologies

13    behind what we're building that make up the -- the

14    custom product --

15         Q.   And--

16         A.   -- for delivery.

17         Q.   -- was -- was ONgDB, was that the graph

18    database that you had earlier referenced?

19         A.   Yes.

20         Q.   Okay.  Was there a specific version of ONgDB

21    that was included in the GraphStack tooling application?

22         A.   It wasn't included in the GraphStack, but we --

23    we set it up for the end user, and whatever the newest

24    version -- we always -- we always kept it up to date

25    with the newest version of ONgDB.

                                                          26

JOHN MARK SUHY                                                    October 22, 2020

1          MR. PICONE:  Mr. Starr, what you can do is, the

2    protective order gives you the opportunity to, I

3    believe, designate the transcript either in whole or in

4    part under any of the various designations, confidential

5    attorney's eyes only, and we can agree to have the

6    entirety of the deposition be treated as confidential

7    from the outset and marked confidential, or whatever

8    designation you think is appropriate, and then revisit

9    the issue with respect to separate parts of it after the

10   transcript's been received.  I'm really -- whatever you

11   think it appropriate, I'm fine with.

12         MR. STARR:  Okay.  Okay.  What I would prefer

13   to do is, we'll -- when we review the transcript, let's

14   treat it as attorney-eyes only until such time when we

15   review the transcript.  I'm not out to hold anything

16   back, but we can then categorize whatever we think is

17   confidential or attorney-eyes only at that point.

18         MR. PICONE:  That's fine.

19         MR. STARR:  Thank you.

20   BY MR. PICONE:

21      Q.  Go ahead, Mr. Suhy.  Who was the -- who was

22   the -- the identity of the client for this particular

23   project?

24      A.  The Internal Revenue Service.

25      Q.  And just so we're clear, when we talk about

                                                              28

JOHN MARK SUHY                                           October 22, 2020

1    ONgDB, what is that?

2         A.   ONgDB is a fork of Neo4j.

3         Q.   And at what version of Neo4j did ONgDB fork?

4         A.   I believe it start -- well, it's a continuous

5    fork.   It's still pulling in code from Neo4j, and I

6    believe that started at 3.4.   You can find out the

7    actual -- or which versions are up and public by going

8    to the graphfoundation.org.

9         Q.   So it's your recollection that the fork started

10   with version 3.4 of Neo4j?

11        A.   I believe that's when the fork started, yes.

12        Q.   Okay.  And you mentioned that it's a continuous

13   fork.  So as of -- as of today, you're still pulling in

14   Neo4j code into ONgDB?

15        A.   Well, I'm not, but it is being -- it is being

16   pulled in.

17        Q.   By the Graph Foundation?

18        A.   Yes.

19        Q.   Okay.  And are you aware of where Graph

20   Foundation is getting that code that they are

21   incorporating into ONgDB?

22        A.   Yes.

23        Q.   And where is that?

24        A.   It's on github.com.

25        Q.   And what repository is the code that is being

                                                        29

JOHN MARK SUHY                                            October 22, 2020

1    Q.  Okay.

2    A.  Yeah, I don't think so.

3    Q.  So when you first started iGov in 2017, its

4    initial address was 1902 Campus Commons Drive,

5    Suite 101, Reston, Virginia?

6    A.  Yes.

7    Q.  Okay.  And was that also PureThink's address as

8    well at some -- at any time?

9    A.  Yes.  It was an address I used for mailing,

10   basically.

11   Q.  Okay.  Did you have office space there?

12   A.  It was a shared office.  I could go in and use

13   meeting rooms, but I didn't have any dedicated office

14   space just for us.

15   Q.  And did you have telephone service through that

16   shared office space?

17   A.  All of the telephone service we had was VoIP,

18   so it could come to us anywhere virtually.

19   Q.  I see.  So you had a phone number for that

20   office space, but the -- that phone number would connect

21   to any -- any device that you designated?

22   A.  Yes.

23   Q.  Okay.  And the phone number that you had for

24   this office space was the same for both PureThink and

25   for iGov?

37

```
 1        A.  I don't believe so.  We had -- PureThink had
 2   its own number, and then iGov -- iGov got another phone
 3   number.  Now, our support number that we had, that's
 4   from -- what's the name of it -- of Zendesk, that's the
 5   only one where we -- we had the -- we only had one
 6   number, and so any time a ticket could come in, it could
 7   forward to an email address.
 8        Q.  I see.
 9        A.  But that was only -- that was only a support
10   number that was -- and I think we -- we fixed that so we
11   have separate numbers now.
12        Q.  That was the (855) 971-7771 phone number that
13   was, at the time, the same support number for PureThink
14   and iGov?
15        A.  I believe so.  I don't remember if that's the
16   exact number, but it sounds right.
17        Q.  Okay.
18            MR. PICONE:  Mr. Ratinoff, can you drop Tab 110
19   into the chat function?
20            And Mr. Gerald, this will be, I believe,
21   Exhibit Number 3.
22            (Exhibit 3 was marked for identification.)
23            THE WITNESS:  I see it.
24   BY MR. PICONE:
25        Q.  Okay.
```

                                                                    38

JOHN MARK SUEN                                                    October 22, 2020

1          MR. PICONE:  And Mr. Starr, I'm going to assume

2     that you -- you have the exhibit referenced, unless --

3     unless you say otherwise, okay?

4          MR. STARR:  (Nonverbal response.)

5     BY MR. PICONE:

6          Q.  Do you recognize this document that's been

7     marked as Exhibit 3?

8          A.  Yes, I do.

9          Q.  Okay.  And what is it?

10         A.  It looks to be a screenshot of the iGov

11    website.

12         Q.  And did you create the iGov website?

13         A.  Yes, I did.  I used a template.

14         Q.  Okay.  Were there any contributors to the iGov

15    website?

16         A.  No, just me.

17         Q.  And were you responsible for any changes to the

18    iGov website after you created it?

19         A.  Yes, I was.

20         Q.  Okay.  Were there any other persons responsible

21    for any changes to the iGov website after it was

22    created?

23         A.  No.

24         Q.  Was this website created around the same time

25    as the founding in June of 2017?

                                                          39

1      A.  I believe so, but I'm not sure.

2      Q.  Okay.

3      A.  But it should have been.

4      Q.  Okay.  And if you see, I believe it's in the

5   third page, it has phone numbers there.  It says General

6   Contact.

7      A.  Yes.

8      Q.  Okay.  And it has an email address of

9   info@igovsol.com?

10     A.  Yes.

11     Q.  Okay.  And below that, it says "Customer

12  Support," and that's the (855) 979-7771 Zendesk number?

13     A.  Yes.

14     Q.  And that number, you believe, was shared by

15  PureThink as well?

16     A.  It wasn't shared; it was reused.

17     Q.  What does that mean?

18     A.  It means Zendesk charges a lot of money now,

19  and I had that number available.  Since PureThink didn't

20  have any more customers because of what Neo did, I had

21  to reuse that number from Zendesk, or else I would have

22  had to upgrade to the bigger plan.  It would have cost

23  more.

24     Q.  Okay.  So before you used the general contact

25  email address of info@igovsol.com, you used to use the

                                                         40

JOHN MARK SUHY                                                  October 22, 2020

```
 1   have restrictions upon its activities?
 2        A.  Yes, it did not sign a partnership agreement or
 3   have any agreements with Neo.
 4        Q.  Okay.
 5        A.  That's correct.
 6        Q.  Just give me one second, Mr. Suhy.
 7        A.  Take your time.  Let me see what time it is on
 8   the clock.
 9        Q.  It's 10:10 Pacific.
10        A.  Thank you.
11             MR. PICONE:  Mr. Ratinoff, can you drop Tab 113
12   into the chat function, please?
13             (Exhibit 4 was marked for identification.)
14             THE WITNESS:  I see it.
15   BY MR. PICONE:
16        Q.  And what is that document?
17             MR. PICONE:  I'm sorry.  Mr. Gerald, can we
18   mark this as Exhibit 4, please.
19   BY MR. PICONE:
20        Q.  And then Mr. Suhy, what is that document that's
21   marked as Exhibit 4?
22        A.  This appears to be a website -- oops.  Sorry.
23   I just moved away from it.
24             This appears to be the website snapshot,
25   screenshot.
```

                                                                 47

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS   408-287-7500

JOHN MARK SUHY                                              October 22, 2020

1      Q.  From?

2      A.  It looks like PureThink.

3      Q.  Okay.  And were you responsible for creating

4   PureThink's website?

5      A.  Yes, I was.

6      Q.  Okay.  And was anyone else responsible for the

7   content of PureThink's website?

8      A.  No.

9      Q.  Is -- is PureThink's website still up and

10  visible to the public?

11     A.  It's supposed to be.

12     Q.  So to your knowledge then, if I navigated to

13  the URL --

14     A.  There should be a website there.

15     Q.  Okay.  And why is that website still active?

16     A.  Well, because I plan on growing PureThink as

17  well, once I recover.

18     Q.  And did you use the same template to create

19  PureThink's website that you used to create the iGov

20  website?

21     A.  Yes.

22     Q.  Okay.  And so you incorporated a lot of the

23  content from PureThink's website into the iGov website?

24     A.  The template is a UI template that you pay for,

25  and the -- the content, usually I go in and rewrite it,

                                                           48

1    but it's possible I copied and pasted certain things,

2    like NAICS codes, or potentially -- I'm trying to think

3    what else it could have been.

4        Q.   How about the statement regarding why iGov was

5    founded?  Because that, to me, looked pretty similar.

6        A.   I'm sure that it is the same.  I'm sure

7    something was changed, because iGov wouldn't have said

8    "PureThink."

9        Q.   Right.  No, I get that.  You changed the name,

10   obviously.

11       And are you familiar with an entity called

12   eGovernment Solutions?

13       A.   Yes, I am.

14       Q.   And what is eGovernment Solutions?

15       A.   It's a software consulting company.

16       Q.   And are you part of eGovernment Solutions?

17       A.   I don't have any ownership.  I act as their

18   facility clearance officer -- or a facility security

19   officer, and acting CTO until they can find someone.

20       Q.   Does eGovernment Solutions pay you for those

21   contributions?

22       A.   Yes, I get paid a small amount.

23       Q.   Okay.  Who owns eGovernment Solutions?

24       A.   Two people own it:  Nikhil Budhiraja and

25   Ashwani Mayur.

49

JOHN MARK SUHY                                                    October 22, 2020

1      A.  I don't know.  I can get that for you, though.

2      Q.  Okay.  Did -- at any time did PureThink

3  transfer any money to iGov?

4      A.  No.

5      Q.  At any time, did -- did PureThink transfer any

6  assets, such as computer systems, office equipment,

7  anything to iGov?

8      A.  No, no.

9      Q.  So my understanding is that you were the only

10  employee of both PureThink and iGov; is that right?

11      A.  Yes, that's correct.

12      Q.  Okay.  So when you formed iGov, did you get a

13  new computer, or did you just take your PureThink

14  computer with you?

15      A.  I got a new computer.

16      Q.  Okay.  And you left your old computer at --

17  well, your old computer's still with PureThink, then?

18      A.  Yes.  It's still -- I have it, but it's -- yes.

19      Q.  Right.  I understand that you're the company,

20  so I get that.

21      A.  Yeah.  Yeah.  In fact, I think -- I think that

22  old computer is -- I mean, it's not -- it's not worth

23  anything.

24      Q.  Sure.  Did iGov take over any of PureThink's

25  customers?

                                                              52

SER_0229

JOHN MARK SUHY                                                    October 22, 2020

```
 1          A.   No.   They didn't take over meaning -- taking --
 2     how would you describe taking over?
 3          Q.   Sure.   And that's a fair question.
 4               So for example, my understanding is that
 5     PureThink had a business relationship with the Internal
 6     Revenue Service.
 7          A.   Uh-huh.
 8          Q.   And that that relationship is now maintained by
 9     iGov; is that right?
10          A.   Relationship, but not the contract.   We still
11     work with -- with the IRS.
12          Q.   So PureThink had a contract with the IRS and
13     iGov had a contract with the IRS; is that right?
14          A.   Separately, yes.
15          Q.   Separate.
16          A.   Yeah.
17          Q.   Two different contracts?
18          A.   Yes.
19          Q.   Was the nature of the services provided by both
20     entities the same, generally?
21          A.   The original contract with PureThink was to
22     build out and support the -- the Government Edition.
23     They scrapped that contract, and the work we're doing
24     now is -- is all over the board.   In fact, there's
25     another company that supports their graphs, and so we do
```

                                                                  53

JOHN MARK SUHY                                                    October 22, 2020

1  mostly development of innovative new technologies.

2          So no, I would say they're -- they're -- in

3  name, they -- they are, if you go and look at the public

4  records, but what we do is not the same anymore.

5      Q.  So initially, PureThink was hired to help build

6  out Neo4j's Government Edition and -- I'm sorry.  Go

7  ahead.  You were about to answer.

8      A.  No, no.  I just cleared my throat.

9      Q.  Okay.  So is that right, that PureThink was

10 hired to build out the Government Edition?

11     A.  No.  PureThink was hired to implement -- to

12 bring in the Government Edition and build out a solution

13 that they needed specifically for IRS.

14     Q.  Right.  But that would -- the Government

15 Edition would be part of that solution?

16     A.  Yes, it was part of it.

17     Q.  And now iGov supports a variety of other

18 services; is included within that list of services

19 support for any graph software implementation?

20     A.  So we're in charge of supporting anything we

21 build, and some of the tools we build use graph; some of

22 them don't.

23     Q.  And the tools that you build that use graph,

24 what graph solution does that apply to?

25     A.  Currently, ONgDB, but we'll -- might be moving

                                                              54

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS   408-287-7500

SER_0231

JOHN MARK SUHY                                                  October 22, 2020

1    to another open-source technology.

2        Q.  Is that possible move to another open-source

3    technology related in any way to -- to Graph Foundation

4    or iGov's own solution?

5        A.  No, we found -- we found --

6            MR. STARR:  Excuse me a sec, John.  I'm not

7    sure I understand the question.  I'm sorry.

8            MR. PICONE:  Right.  Mr. Suhy testified that --

9    that they were possibly moving to another open-source

10   graph technology, and I just wanted to know if that was

11   related to the Graph Foundation or AtomRain or iGov.

12           THE WITNESS:  So, no.  This is another

13   open-source solution that's on GitHub.  It's part of the

14   community.

15   BY MR. PICONE:

16       Q.  Is it related to Neo4j in any way?

17       A.  No.

18       Q.  What about other PureThink customers, such as

19   DHS, the Air Force, Northrop Grumman, Accenture; did any

20   of those customers come to iGov after it was formed?

21       A.  I don't remember Northrop Grumman ever being

22   with PureThink, but no.  We -- we only -- iGov is only

23   working around IRS.

24       Q.  Okay.  So iGov currently has no other clients,

25   other than the IRS?

                                                               55

```
 1   break.
 2          THE VIDEOGRAPHER:  The time is 11:42 a.m., and
 3   we're off the record.
 4          (Off the record from 11:42 a.m. to 12:04 p.m.)
 5          THE VIDEOGRAPHER:  The time is 12:04 p.m.;
 6   we're on the record.
 7          MR. PICONE:  Mr. Ratinoff, can you put up
 8   Tab 4?  This will be Exhibit 10.
 9          (Exhibit 10 was marked for identification.)
10          MR. PICONE:  And for the record, this has been
11   previously marked as Exhibit 4 to the Graph Foundation
12   30(b)(6) deposition.
13   BY MR. PICONE:
14       Q.  Mr. Suhy, do you see what's been marked as
15   Exhibit 10?
16       A.  Yes, I have it open.
17       Q.  And -- and what is it?
18       A.  It's an email from me to Ben and Brad Nussbaum.
19       Q.  All right.  You sent this on May 21, 2018?
20       A.  Yes.
21       Q.  Okay.  I notice that your -- that your
22   PureThink email address is used here; is that also an
23   artifact of the collective inbox that you have on your
24   phone?
25       A.  Yes, most likely this was sent by the -- my
```

                                                        92

1    phone.

2        Q.  Okay.  So your phone would have the PureThink

3    signature block, automated signature block?

4        A.  Yes.  It should have it.

5        Q.  Who's Steve Baker?

6        A.  Steve Baker is someone who used to work at

7    Neo4j.

8        Q.  Okay.  Was he doing another fork of Neo4j

9    Enterprise?

10       A.  No --

11       Q.  What was --

12       A.  -- not that I know of.  I don't know what he

13   works on.

14       Q.  In your message, you say, "Assume that Steve

15   Baker and team are doing another fork in parallel."

16           What are you referring to?

17       A.  I don't know, because I -- I talked to Steve

18   afterwards, and he's not -- he's doing something

19   completely different.

20       Q.  So you were just speculating that he was going

21   to do a Neo4j fork in your message to the Nussbaums?

22       A.  Let me -- I haven't read through this all yet,

23   so let me read it first.

24           Okay.  I've read through it.

25       Q.  Okay.

                                                        93

JOHN MARK SUHY                                                    October 22, 2020

1    Q.  Does -- so you're using Neo4j in your URL as of

2    October 2nd, 2019, right?

3    A.  I know we used it in the URL name, the same as

4    the email address, but I don't know if this date is

5    accurate.  Just because it says that, doesn't mean -- I

6    mean, it's quite -- quite easy to make it so it says

7    anything there, any URL, but it looks like it.  I

8    don't -- I mean, we used Neo4j, the GitHub project name,

9    we used that for the email and the site at some point.

10   I just don't know if it's on -- that date is correct.

11   Q.  Okay.  Assuming this document hasn't been

12   altered or corrupted in any way, you have no reason to

13   suspect that this is not accurate, because you did, in

14   fact, use the Neo4j name in the email address and the

15   URL for the website?

16   A.  Yes, just the date would be the question.  But

17   the document looks, from doing a quick glance over, it

18   looks like it would be from our site.

19   Q.  Okay.

20       MR. PICONE:  Tab 127, please.  This will be

21   Exhibit 14.

22       (Exhibit 14 was marked for identification.)

23       THE WITNESS:  I've got it.

24   BY MR. PICONE:

25   Q.  Okay.  And what is this document?

116

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS   408-287-7500

SER_0235

JOHN MARK SUHY                                                October 22, 2020

```
 1        A.  This looks like a printout of the iGov website,
 2   or one of the pages.
 3        Q.  And it's dated July 27, 2020; do you see that?
 4        A.  Okay.  I see that.
 5        Q.  Okay.  And do you see the use of the
 6   neo4j@igovsol.com email address in the "Request
 7   Procurement Document Package" tab?
 8        A.  Yes, I do.
 9        Q.  And do you see the same Neo4j inclusion in the
10   URL down in the lower left-hand corner of the first
11   page?
12        A.  Yes, I do.
13        Q.  So if the date on this document is accurate,
14   that would mean that, as of July 27, 2020, that iGov was
15   still using the Neo4j name in its URL and its email
16   address.
17        A.  Yes.  If the date was accurate, and the content
18   was accurate, then of course.
19        Q.  Okay.
20        A.  But I'm saying that I don't know that that's
21   true.  Why not -- well, the Internet Archive would be
22   the easy way to -- because I trust and accept anything
23   from the archive.  It's a separate organization and
24   they're -- they're -- how would you say it?  They're
25   unbiased.  At least I believe --
```

117

SER_0236

1      Q.  They don't have an interest?

2      A.  Yeah.  They don't -- they don't have an

3  interest.

4      Q.  Right.  So I'm just saying, assuming the date

5  is accurate, then that would confirm that iGov was still

6  using Neo4j --

7      A.  Yes.

8      Q.  -- on its website?

9         Okay.

10     A.  Assuming that, yes.

11        MR. PICONE:  Tab 132, please.

12        This will be Exhibit 15, please.

13        (Exhibit 15 was marked for identification.)

14  BY MR. PICONE:

15     Q.  And do you see what's been marked as Exhibit 15

16  on your screen, Mr. Suhy?

17     A.  Yes, I do.

18     Q.  And again, assuming this -- the date is

19  accurate of October 18, 2020, it shows that the email

20  address for the "Request Procurement Document Package"

21  has been changed to info@igovsol.com.

22        Do you see that?

23     A.  Yes, I see that.

24     Q.  And were you the person that changed that email

25  address on iGov's website?

SER_0237

JOHN MARK SUHY                                                    October 22, 2020

1    documents and website has been removed.

2         Do you see that?

3    A.   I'm just looking.

4         Yes, I see that they're no longer there.

5    Q.   So sometime between October 2, 2019, and

6    July 15, 2020, you removed the links to Neo4j's website

7    and documents; is that fair?

8    A.   Yes, assuming those dates are correct.

9    Q.   Right.

10   A.   That's what these show.

11   Q.   Okay.

12        MR. PICONE:  Tab 170, please.

13        (Exhibit 19 was marked for identification.)

14   BY MR. PICONE:

15   Q.   Do you see what's been marked -- I'm sorry,

16   Exhibit 19?

17   A.   Is Tab 170 an email?

18   Q.   Yes, it's an email from you to -- it looks like

19   a Lee Smales or Smalls.

20        Do you see that?

21   A.   I see that.

22   Q.   And that's dated August 22, 2018.

23        Do you see that?

24   A.   Yes, I do.

25   Q.   Okay.  Who is Mr. or Ms. Smales?

                                                              142

JOHN MARK SUHY                                              October 22, 2020

1        A.   I would have to read this first, because I have

2    no idea offhand.

3            Okay.  So I have no idea.  It might have been

4    just somebody that I reached out to.  I reach out to a

5    lot of people.

6        Q.   Okay.  And so there, you tell Lee Smales that,

7    "You may want to reference the Neo4j Enterprise

8    open-source distribution which has the name 'ONgDB

9    Enterprise.'"

10           Do you see that?

11       A.   Yes, I do.

12       Q.   Okay.  And you say, "US Treasury and other

13   agencies use this."

14           When you say "US Treasury," are you referring

15   to the IRS?

16       A.   Yes.  I believe others within Treasury are

17   using it, as well.

18       Q.   And what other agencies within Treasury are

19   using ONgDB?

20       A.   I don't know.  I just know that they're -- I've

21   heard conversations from other teams that mentioned that

22   they were going to be using it, as well.  Just in phone

23   conversations.  I'm not positive though.  You'd have to

24   ask them.

25       Q.   So that statement's not entirely accurate then,

                                                        143

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS   408-287-7500

1   because you don't really know of other agencies within

2   Treasury use --

3        A.   The US -- no, it's accurate.  "US Treasury and

4   other agencies."

5        Q.   Okay.  I'm just wondering:  Who's the other

6   agency, aside from US Treasury?

7        A.   Well, we know that DHS was -- was starting to

8   work with it.  Who else?  We know that there was other

9   agencies that weren't US government that were using it,

10  other companies.  I'm trying to think of who they were.

11  I don't recall offhand, but I believe they're all in the

12  documents we sent.

13       Q.   All right.  So the ones you can remember right

14  now are IRS and DHS?

15       A.   It's US Treasury.

16       Q.   US Treasury.

17       A.   Yes.

18       Q.   And --

19       A.   IRS is just a -- is a component.  And I believe

20  DHS was.

21       Q.   Okay.  So --

22       A.   They were evaluating it.  Evaluating it.  When

23  I say "using," it could be evaluating it, downloaded it,

24  using it for development, I don't know.  All we know

25  is -- is when people are reach out to us or mention

144

JOHN MARK SUHY                                                    October 22, 2020

1    something on a phone call.

2        Q.  Okay.  You say -- this looks like you were

3    responding to an official request for proposal or some

4    type of other governmental procurement mechanism.

5    Because you cite to the actual line in the email that

6    says other "FOSS products," and you say "Neo4j," and you

7    highlight "Neo4j."

8            Do you see that?

9        A.  Yes, I do.

10       Q.  And you -- your suggested change is

11   Neo4j/ONgDB, right?

12       A.  That's what I put, yes.

13       Q.  Okay.  And you weren't concerned that this

14   would cause any confusion for the Air Force, and I'm

15   referencing the "USAF" in the fbo.gov hyperlink below

16   that.

17           You weren't concerned that using Neo4j/ONgDB

18   would cause any confusion at the Air Force?

19       A.  Well, what I'm saying is that you can't just

20   say Neo4j; you have to say Neo4j, ONgDB is a fork of it,

21   and since it's a fork of it, that means that has to be

22   considered as well as an order.  So -- now, the

23   confusion, I believe, might have been caused by your

24   sales teams -- or not yours, but Neo's sales teams.

25           But this is very clear.  Whenever I write

145

JOHN MARK SUHY                                                    October 22, 2020

```
 1   group, the team, but that's it.  Nothing -- I'm not a
 2   director, I'm not any treasurer, or anything like that.
 3       Q.  Has iGov ever been a targeted sponsor of Graph
 4   Foundation?
 5       A.  I believe that I asked if we could be one
 6   because I was volunteering, and I believe they had added
 7   us, but I don't remember.  But we didn't -- we didn't
 8   pay anything.
 9       Q.  So you didn't give them any money, make any
10   donations?
11       A.  No, no.  Just my time as a committer and
12   helping the community.
13           MR. PICONE:  Tab 5, please.
14           And this will be exhibit --
15           THE VIDEOGRAPHER:  20.
16           MR. PICONE:  20.  Thank you, Mr. Sayler.
17           (Exhibit 20 was marked for identification.)
18   BY MR. PICONE:
19       Q.  Mr. Suhy, do you see Exhibit 20 on your screen?
20       A.  Yes, I do.
21       Q.  And what is this?
22       A.  It looks like an email from me to Ben Nussbaum.
23       Q.  Right.  It's entitled "Neo4j Procurement,"
24   right?
25       A.  Yes, it is.
```

                                                                    152

JOHN MARK SUHY                                                    October 22, 2020

1          Q.  All right.  And this -- you sent this message

2    to Mr. Nussbaum at 7 -- July 25, 2018?

3          A.  Yes.

4          Q.  And you used your PureThink email address, and

5    that, again, was the artifact of the collective mailbox

6    that you had on your phone; is that right?

7          A.  Yes, most likely.  I use my phone for almost

8    everything.

9          Q.  Okay.  You say the "Air Force wants Neo4j

10   Enterprise."  And you say, "They do not realize that

11   Neo4j Enterprise is dual licensed and therefore unique

12   for procurement."

13              What do you mean by that?

14         A.  Let me read the whole message, and I'll be able

15   to bring in context.

16         Q.  Sure.

17         A.  Okay.  I've read it.  Can you ask the question

18   again?

19         Q.  Sure.  You said that, "Air Force wants Neo4j

20   Enterprise.  They do not realize that enterprise is dual

21   license and therefore unique for procurement."

22              What do you mean by that?

23         A.  What I mean is -- I believe what I meant is

24   this -- since -- my understanding of the federal

25   procurement laws around brand-name justification breaks

                                                          153

JOHN MARK SUHY     October 22, 2020

1   down in the situation where you have a dual-licensed

2   product like Neo4j, and the reason why is that the US

3   government has open-source initiatives, and they care

4   about past performance and many other -- many other

5   pieces or -- you know, or qualities from their vendors.

6   But if they knew and were told by Neo4j, "Hey, there is

7   an open source version that you can have someone else

8   support," they may not have procured it and actually

9   said Neo4j Enterprise, they might have said Neo4j

10  software -- you know, based software or forks.

11          And so it's a unique -- it's a unique area

12  where, if you came -- especially depending on when this

13  was written, a compiled version of Neo4j that was done

14  by us or an agency or anybody would have the same exact

15  features as the ones they could download from you.  And

16  that is very -- that's a slippery slope, because that

17  means that anybody who compiles competes against you.

18          So that's why it's unique.  And we haven't

19  seen -- or at least I tried to research to see if there

20  was any other times that this has happened, and I was

21  not able to find any.

22      Q.  So in July of 2018, Neo4j was -- was licensed

23  under the AGPLv3, but it had a Commons Clause addition

24  to it, right?

25      A.  I don't remember when that was added.

154

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS   408-287-7500

JOHN MARK SUHY                                                    October 22, 2020

1      Q.   But at some time they did add that Commons

2   Clause to the license that was available for Neo4j?

3      A.   Yes.

4      Q.   Okay.  And that -- and that addition restricted

5   the use of the open-source version to non-commercial

6   activities; is that your understanding?

7      A.   Well, it didn't restrict anything because it

8   was invalid.

9      Q.   Right.  But the actual language of the -- of

10  the Commons Clause said that it was for -- that the

11  license was for non-commercial purposes; is that right?

12     A.   I don't believe so.  You would have to show it

13  to me.  But I believe it -- I believe it was talking

14  about selling or something.  I don't remember.  I don't

15  remember it saying non-commercial.

16     Q.   Okay.  But it did restrict your ability to sell

17  the software; is that what you remember?

18     A.   I believe it had something.  You know, I'd be

19  more comfortable reading it with you, so --

20     Q.   Sure.  I can --

21     A.   I believe it was --

22          (Unintelligible Cross-talk.)

23          THE WITNESS:  I remember it was something about

24  limiting commercial, but I don't remember what it was

25  exactly.  It was sales or consulting or something.

                                                          155

1    That's -- that's what I remember.

2    BY MR. PICONE:

3        Q.  And so were you aware that AtomRain was a --

4    was a partner of Neo4j in 2018?

5        A.  I knew they were a partner; I did not know when

6    they stopped becoming a partner.

7        Q.  And so were you suggesting that -- that iGov

8    and Graph Foundation bid this contract, or something

9    else?

10       A.  I don't know actually, even from reading it.

11   It might have been -- it could have been that we just

12   work together.  I don't know, because it doesn't say

13   specifically.  I don't think -- I don't think that --

14   well, I don't want to say any -- any guesses.

15           I don't remember what it was, but I'm sure that

16   other emails have the context in it.

17       Q.  Okay.

18       A.  I don't remember what -- but somebody was going

19   to go after it.  That -- that's the gist of the email.

20   I just don't know.

21           See, a lot of times, I'll just reference, just

22   to be friendly, I'll go and reference it and say,

23   "Here's something that, you know, can help out."  This

24   one looks like I wanted to do some sort of work with

25   them, but I don't remember the details of it.  But I

156

JOHN MARK SUHY                                                    October 22, 2020

```
 1        Q.   Okay.
 2             MR. PICONE:   Tab 137, please.
 3             And this is Exhibit 22.
 4             (Exhibit 22 was marked for identification.)
 5   BY MR. PICONE:
 6        Q.   Let me know when you --
 7        A.   I see it.
 8        Q.   Okay.
 9        A.   I see it.
10        Q.   And what is that that you're looking at, as
11   Exhibit 22?
12        A.   This is an email from Donald Robertson at
13   fsf.org to jmsuhy at PureThink.
14        Q.   Okay.   And his response to you is on the 22nd
15   of May 2018, right?
16        A.   Yes.
17        Q.   Because on Saturday May 19th, you wrote to him,
18   "I'm not sure whom to bring this up, but Neo4j recently
19   added restrictive licensing conditions to their AGPL
20   license."
21             Do you see that?
22        A.   I see that.
23        Q.   And you wrote that?
24        A.   Yes, I believe I did this.   Yup.
25        Q.   Okay.   And you copied the Commons Clause
```

169

SER_0247

JOHN MARK SUHY                                          October 22, 2020

1    license condition that was added to Neo4j's license?

2        A.  Yes.  It looks like at the bottom of the

3    initial email.

4        Q.  Okay.  And that was -- you got that off of the

5    GitHub Neo4j 3.5 Enterprise license.txt file?

6        A.  I don't remember where we got it, because I do

7    remember that Neo tried to backdate the Commons Clause

8    and then removed it, so it could have been in any files

9    that were -- there's more than one license.txt file.

10   They put that same license.txt file in multiple

11   directories, but it's all supposed to be just the AGPL

12   license.

13       Q.  But you have an URL there.

14       A.  I probably would have taken it from there so

15   they could have seen it.

16       Q.  Okay.  So you see that the Commons Clause

17   condition says that the licensee does not have the right

18   to sell the software.

19           Do you see that?

20       A.  I see it says selling -- yes.  Yup.  I see

21   that.

22       Q.  And then they define "sell" as what they mean

23   by selling; do you see that there?

24       A.  "Licenses not grant to you the right to sell

25   the software.  For purposes of foregoing, 'sell'

                                                        170

JOHN MARK SUHY                                                    October 22, 2020

1    means" -- yup.  I see it.

2        Q.  Okay.  So you can't provide the software you

3    obtained via this license, at least under the Commons

4    Clause, for money, right?  That's what they use as the

5    definition of "sell"?

6        A.  I don't know what you meant for it.  "Sell"

7    could be selling it as a product.  I don't know if it

8    means hosting it for someone.  It's not clear at all.

9        Q.  Yeah.  You see the Commons Clause says, "'Sell'

10   means practicing any or all of the rights granted to you

11   under the license to provide to third parties, for a fee

12   or other consideration, a product or service that

13   consists entirely or substantially of the software or

14   the functionality of the software."

15           Do you see that?

16       A.  I see it, but it doesn't make sense to me

17   because the AGPL specifically counters that.

18       Q.  Right.  I'm not talking about the AGPL; I'm

19   talking about this particular clause, right, that you --

20   that you sent to Mr. Robertson and the actual text.

21       A.  Yeah, that's what is says.  I would have copied

22   it exactly.  I wouldn't have changed it.

23       Q.  Okay.  So did you -- you obtained Neo4j 3.4 and

24   used that, at least in part, to create 3.4 of ONgDB,

25   right?

                                                              171

JOHN MARK SUHY                                                October 22, 2020

 1      A.  I believe so.  I don't know the exact start
 2 date -- or, you know, the start version number when I
 3 started that.
 4      Q.  So if you obtained the 3.4 open-source Neo4j
 5 source code, and it included this Commons Clause, did
 6 you -- did you remove that clause from the license.txt
 7 file as part of your work in creating ONgDB 3.4?
 8      A.  What I did is, I read the AGPL license, and it
 9 said it needs to be verbatim, and it needs to -- it
10 can't have further restrictions, and so I copied over
11 the default license onto that, over that specific one,
12 so ONgDB would be in compliance with the AGPL license.
13 I didn't -- and I believe that in the actual commit tag,
14 when I -- when I did that overwrite, I specifically said
15 this is the reason, so we can be in compliance.
16      Q.  So just so I get this right, you copied the
17 text from the AGPL Version 3 over to from the Free
18 Software Foundation's website, and then copied that over
19 the Commons Clause, so essentially removing it from the
20 Neo4j license?
21      A.  That was the effect of it.  I copied the actual
22 file, the license.txt, but yes, that's -- in the end,
23 it's the same.  It removed it by copying it, yeah.
24      Q.  All right.  So you've bought a car before,
25 right?

                                                          172

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS  408-287-7500

SER_0250

Q.  Mr. Suhy, it's a simple question, and if your

testimony is you don't understand, then that's your

testimony.  But I want it clear on the record that you

don't understand that concept.

A.  The way you're saying it --

Q.  The question --

A.  -- I don't know the answer, because I don't

know contract law, but I'm assuming that when you

have -- I'm hoping that that's the case.

MR. STARR:  Let's not assume, Mr. Suhy.  If you

don't know the answer, you don't know the answer.

Please don't guess.  That's not helping anybody.

THE WITNESS:  Okay.

BY MR. PICONE:

Q.  So then one more time, just so it's clear for

the record.

If you have an agreement with another party,

and you are not allowed to unilaterally change the terms

and conditions of the agreement after the fact because

you don't like the terms and conditions that you agreed

to.

You don't understand that?

A.  No, I understand that.

Q.  Okay.

A.  So what's the question?

178

JOHN MARK SUEU                                    October 22, 2020

1       Q.   The question is, do you have the right to

2   unilaterally change the terms and conditions after the

3   fact because you don't like them?

4       A.   Only if that agreement allowed is to is the

5   answer.

6       Q.   If the agreement does not allow you to do it,

7   then the answer is --

8       A.   No, you can't --

9            (Unintelligible Cross-talk.)

10           THE REPORTER:  Guys, we're really stepping all

11  over each other, and it's making it damn near impossible

12  for me to get anything down here.  So if we could keep

13  to one at --

14           MR. STARR:  You know, I'm going to object to

15  the question as confusing.

16           (Unintelligible Cross-talk.)

17           THE REPORTER:  Guys --

18           MR. PICONE:  One more time.

19  BY MR. PICONE:

20      Q.   If you were a party to an agreement, and the

21  agreement does not allow you to unilaterally change the

22  terms and condition after the fact because you don't

23  like them, you have no right to do that, do you?

24      A.   Agreement.  Give me one second.

25           MR. STARR:  Again, I'm going to object to the

                                                        179

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS   408-287-7500

1    witness not to answer:  One is it to protect a

2    privilege, and one is the stop the deposition and seek a

3    protective order.

4         So I encourage you to withdraw that objection,

5    and we can get an answer to this question.

6         MR. STARR:  I will instruct him to answer the

7    question if he can, if he understands it.  And if not,

8    he should explain that he doesn't understand it, and we

9    move on.  We're not going to have him badgered and go

10   back and forth on this.

11        MR. PICONE:  If he doesn't understand, if

12   that's his testimony, he doesn't understand, that's

13   fine.  If he can answer the question, then he can answer

14   the question, but I want a clear answer.  Either he

15   doesn't understand or yes or no.  And we're going to do

16   this all night until we get an answer to that.

17   BY MR. PICONE:

18        Q.  So again, Mr. Suhy, if you were --

19        MR. STARR:  I don't think we're going to be

20   here all night.  I'm going to have to take objection to

21   that statement.  There is going to be a point where

22   we're going to end this deposition before all night.

23   BY MR. PICONE:

24        Q.  One more time, Mr. Suhy.

25            If you are party to an agreement with another

                                                      181

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS  408-287-7500

**SER_0253**

1   party and you agree on the terms and conditions, you

2   cannot, by yourself, decide to alter the terms and

3   conditions of that agreement, can you?

4       A.  I believe that's true.  You used the word

5   "unilaterally" before, which I didn't understand.

6           So yes, when you have a contract, both people

7   would have to be agreeing on the contract to make a

8   change.  Unless there's some law that I don't know

9   about, states, like you were saying.

10      Q.  Okay.  That's all I was asking.

11          I'm going to back to Exhibit 22.

12      A.  Which one is that?  Because I only see tab --

13      Q.  That's Tab 137.

14      A.  Got it.  Okay.

15      Q.  So I'm not clear as to where Mr. Robertson

16  responds to you.  Is that below your signature line that

17  says, "Thank you for your time.  Both AGPL and GPL

18  prevent further restrictions."

19          Is that his -- his response to you?

20      A.  I don't know if I wrote that or if he wrote

21  that.  Commons Clause.

22      Q.  It looks like he wrote it, because it's

23  directly underneath your signature block.

24      A.  Yeah.  It looks -- that's what I would think,

25  too.  Yeah.  It says -- down on the third page, it says,

                                                          182

1    "Sincerely," Donald Robertson.

2         Q.   Okay.  So he tells you that "the GPL and AGPL

3    prevent the addition further restrictions," and then he

4    cites some portion of the AGPL.

5              Do you see that quoted language there?

6         A.   Yes, I do.

7         Q.   And then it says, "Only the copyright holder

8    has the power to enforce the terms of the license."

9              Do you see that?

10        A.   "Copyright holder."

11             Yes, I see that.

12        Q.   So in the situation where you're downloading

13   Neo4j source code from GitHub, who's the copyright

14   holder of that source code?

15        A.   Whoever wrote it and maintained the copyright.

16   I would assume that Neo4j owns all of the copyright, but

17   I'm not sure of that.

18        Q.   I think that would be a good assumption.  I

19   think you're right.

20        A.   Uh-huh.

21        Q.   So he's telling you that only Neo4j has the

22   power to enforce the terms of the license, right?

23        A.   It looks like he's saying contact Neo4j and

24   tell them someone's added these restrictions and they'll

25   deal with it, is how I read it.  Meaning it wasn't an

                                                          183

JOHN MARK SUHY                                              October 22, 2020

1   understanding of the question.

2        Q.  Right.  So you -- what did you interpret

3   that --

4        A.  Now --

5        Q.  -- to mean?

6        A.  -- now I'm saying that.  When I first read

7   it -- when I first read it, I wasn't sure if he was

8   talking about the copyright holder, Neo4j Sweden or

9   Neo4j, but as I read it now, in this instance, it feels

10  like he didn't understand it.  But I'm not sure.

11       Q.  Okay.

12       A.  The way -- the way that the first read it is

13  that the copyright holder, basically at the very top,

14  "All other non-permissive additional terms are

15  considered 'further restrictions,'" that's what --

16  that's the one thing I wanted to make sure about, that

17  and the verbatim.

18       Q.  Right.

19       A.  So the second line, I don't know exactly, but

20  the first line answered -- you know, he confirmed what I

21  wanted to know.  The second line, I don't know now

22  exactly now what it is, what he was saying.

23       Q.  Right.

24       A.  I understand --

25       Q.  Right.

                                                       184

JOHN MARK SUHY                                              October 22, 2020

1          A.  I don't know what that means.

2          Q.  It entitles you to take out the Commons Clause?

3          A.  Entitles me -- I don't understand.  I just know

4     that the rules say do this, and that's what I followed.

5     So I don't know if the term "entitle" or "titleized" or

6     whatever it was, "deputized" -- I don't understand that,

7     but I do know that what I read means if we don't want to

8     be in trouble, if we keep it the way it is, we'll be in

9     trouble by them.  So we have to follow these rules in

10    order not to be in trouble by the Free Software

11    Foundation.

12         Q.  Right.  But the agreement, when you download

13    Neo4j's software that includes the Commons Clause,

14    you're taking a license to that software.  The Free

15    Software Foundation's not a party to that agreement,

16    right?

17         A.  Well, you have all the terms of the AGPL that

18    specifically say you can remove stuff.  So I think that

19    that license, that's why they put it in there, so if

20    somebody does do something like what Neo4j did, you can

21    fix it easily, and they tell you what to do.

22         Q.  So -- but only the copyright holder has the

23    power to enforce the license, right?  According to

24    Mister --

25         A.  Yes.  That's what he says.  Yes.

                                                          187

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS   408-287-7500

**SER_0257**

JOHN MARK SUHY                                                    October 22, 2020

1        Q.  Right.  And you're generally in agreement with

2   that, right?

3        A.  Yeah, I believe so.  I couldn't go sue someone

4   that -- because they're using Neo4j.  I don't have the

5   copyright.  That's my understanding.

6        Q.  Right.  And so when you download the Neo4j

7   software from GitHub and you take it pursuant to the

8   licenses and the license.txt file, if it includes the

9   Commons Clause, that doesn't automatically bring the

10   Free Software Foundation into that license agreement;

11   it's between the copyright holder, Neo4j, and whomever

12   is downloading the software, right?

13        The Free Software Foundation is not involved in

14   that transaction; that's what I'm driving at.

15        A.  No, they're not.

16        Q.  Okay.

17        A.  But there are terms in AGPL that they left in.

18   Had Neo4j removed certain terms in AGPL and kept the

19   commons, maybe it would have been different.  But you

20   know, you're reading something that says one thing, and

21   then underneath it says it's the opposite, and then the

22   third thing that says remove it if it's there.  I'm sure

23   that's probably why they said it needs to be verbatim,

24   but I don't know.

25        MR. PICONE:  I'm going to move to strike that.

                                                              188

SER_0258

JOHN MARK SUHY                                          October 22, 2020

```
1              Tab 138, please, and this will be Exhibit 23.
2              (Exhibit 23 was marked for identification.)
3    BY MR. PICONE:
4         Q.  Do you have what's been marked as Exhibit 23,
5    Mr. Suhy?
6         A.  Yes, I do.
7         Q.  Okay.  And what is that?
8         A.  That's an email from me to licensing@fsf.org.
9         Q.  And so this is about a month after you received
10   your initial response in Exhibit 22 from Mr. Robertson,
11   and you're following up?
12        A.  It looks that way, yes.
13        Q.  All right.  And so why did you follow-up?  I
14   thought you said that -- that his initial response in
15   Exhibit 22 provided enough information for you to
16   believe that you could remove the Commons Clause.
17        A.  I don't know why I followed up, but during that
18   time, I'd been doing lots of research, and I might have
19   had more questions to ask him.  I'm reading through it
20   right now.
21        Q.  Okay.
22        A.  Let me see.
23        Q.  I'll let you read through it.
24        A.  Okay.
25        Q.  Right.  So it seems like you're adding --
```

189

JOHN MARK SUHY                                                   October 22, 2020

1  trying to give him more context about what you're trying

2  to do, because you're going to create an open force --

3  excuse me, open-source Neo4j graph database; is that

4  right?

5      A.  That's what it looks like -- that's what it

6  looks like it's saying, yes.

7      Q.  Okay.  And you're focused in on the Enterprise

8  Edition, which is under AGPLv3, right?

9      A.  Yes, that's the only one that's under that.

10     Q.  Right.  And your concern was that -- that Neo4j

11 was the copyright holder of that software; is that

12 right?

13     A.  I don't know if I had that concern; I believe I

14 just wanted to get more clarification so I could use

15 that, but I don't -- I don't remember the context of why

16 I responded.

17     Q.  Yeah.  That's --

18     A.  I think I was expecting him to say, "Oh, this

19 is absolutely right," and then I would have that beyond

20 all the other research that showed that I should do

21 that.  That would be the final piece, but I don't even

22 remember if he responded back to this or not.  You would

23 have it, if so.

24     Q.  You do recall though that you believed that

25 Neo4j was the copyright holder of the software, right?

                                                          190

SER_0260

JOHN MARK SUHY                                                          October 22, 2020

1          I didn't mean to insert "concern" in there.
2    Sorry.
3          A.   Yeah.
4          Q.   And then you provide him a summary of the
5    modifications that Neo4j added.  Specifically, it sounds
6    like that you call out the Commons Clause license
7    condition; is that right?
8          A.   Yup.  That's what it says.
9          Q.   Okay.  And so you have some follow-up
10   questions.  And you have two specific follow-up
11   questions, and the first question is, "As the copyright
12   holder, is Neo4j, Inc. allowed to add the specific
13   additional terms mentioned above to the license.txt file
14   and enforce these new additions?"  And the second
15   question, you ask, "In our fork, are we allowed to
16   remove the additional terms and comments they have added
17   to the license.txt files that go beyond the standard
18   AGLv3 licence content," because, "Neo4j is telling us we
19   can't change those files."
20          One question:  Who at Neo4j told you you
21   couldn't change those files?
22          A.   I don't remember anybody saying we couldn't
23   change those.
24          Q.   If you --
25          A.   Go ahead.

                                                              191

JOHN MARK SUHY                                        October 22, 2020

1    Q.  If you look below the number 2 in the message

2  on the second page, it says, "Neo4j, Inc. is telling us

3  that we cannot change these license.txt files."

4    A.  I have no idea.  It might have been sometime in

5  the lawsuits.  I don't know.  At some point, somebody

6  said that, or I inferred it by the fact that you sent

7  new terms that said that we illegally removed them or

8  whatnot in one of the amended complaints.  But I don't

9  know exactly what I was talking about.

10   Q.  Okay.  So you don't remember anybody

11  specifically at Neo4j saying you can't do that?

12   A.  I mean, it's possible it was in the forum under

13  GitHub.  I don't know.  I don't remember.

14   Q.  Okay.  Did you talk to any lawyers at this time

15  in 2018 about this issue?

16   A.  I don't think so.  I don't remember, but I

17  don't think so.

18        MR. PICONE:  All right.  Tab 57, please.  And

19  this will be Exhibit 24.

20        (Exhibit 24 was marked for identification.)

21        THE WITNESS:  I see it.

22  BY MR. PICONE:

23   Q.  Okay.  What is that?

24   A.  This is an email from licensing-comment@fsf.org

25  to me.

                                                      192

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS   408-287-7500

JOHN MARK VESEY                                                      October 22, 2020

1    Q.  Do you remember receiving this message?

2    A.  I do now from seeing it, yes.

3    Q.  So this is a couple months later that -- that

4    Mr. Robertson responds to you, right?  This is in August

5    of 2018?

6    A.  I don't remember what the original -- can you

7    tell me what the original -- the first email -- or the

8    email this is responding to?

9    Q.  I think the first response was -- your first

10   question was in May 2019.  Mr. Robertson responded

11   shortly thereafter in June.  Let me see.

12   A.  Oh, I see it.  The date -- I'm assuming that a

13   month -- you know, he responded back at some point.

14   Q.  Yeah.

15   A.  I didn't remember if it was a month.

16       Yes?  So -- sorry.  So what was the question.

17   Q.  Sure.  So it looks like Mr. Robertson says to

18   you, "I apologize for the delay in responding."

19       Do you see that -- that appears to be his text?

20   Do you agree with that?

21   A.  Yes, I do.

22   Q.  And he also wants to tell you that he can't

23   provide you with legal advice, right?

24   A.  Yes, I see that.

25   Q.  He wants to provide useful information, but he

193

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS   408-287-7500

SER_0263

JOHN MARK SUHY                                                  October 22, 2020

```
 1   license specifically counteracts the Commons Clause.  So
 2   it would still be the free AGPL license.  By adding it
 3   in, it falls of as soon as you add it, because the terms
 4   below it basically say get rid of it.  You know, get rid
 5   of it.
 6       Q.  So you interpret Mr. Robertson's sentence that
 7   says, "If a work was previously available under a free
 8   license and later that license is changed, users can
 9   always use that earlier version under the terms of the
10   free license."
11           So you interpret that to mean that you are
12   entitled to remove any additions to the AGPL?
13       A.  No, because I'm not clear if, when he says "the
14   earlier version" is for the license or the software.  So
15   I don't think this -- this was very useful information
16   to me.
17       Q.  Okay.  And then he -- he says, "Also, as noted
18   before," and he re-quotes the section of the AGPL and
19   GPL about further restrictions.
20           Do you see that?
21       A.  Yes, I do.
22       Q.  And then he closes with saying, "I can't give
23   you legal advice on how that would work for your
24   particular situation, but I hope that this information
25   proves useful to you."
```

195

JOHN MARK SUHY                                                    October 22, 2020

1    A.  Yes, I see that.

2    Q.  Okay.  So what did you -- what did you globally

3    interpret Mr. Robertson's message to you regarding your

4    specific questions that you had provided in your

5    subsequent question to him?

6    A.  Well, I believe that he's saying you can remove

7    the additional restriction terms, and that's why he kept

8    quoting it over and over again.  If you received it

9    containing notice saying it's governed by this license,

10   meaning AGPL, along with the term that says further

11   restriction, you remove that term.

12         I mean, that seems pretty clear to me.  Remove

13   the terms that's are restriction.  And this doesn't even

14   talk about the -- about the verbatim, which I don't -- I

15   guess we just lost track of that.

16   Q.  Right.  But so that's how you interpreted his

17   message to you, this entitled you or gave you the right

18   to take out the Commons Clause?

19   A.  It's not only his message; it just supported

20   the concept that I should remove it in order to be in

21   compliance with AGPL.

22   Q.  Did you take Mr. Robertson's advice and consult

23   a lawyer about this issue?

24   A.  No, I did not, I don't believe.  I've consulted

25   many people.  I don't know if they were lawyers.  More

                                                              196

JOHN MARK SUHY                                                    October 22, 2020

```
 1   of the community.
 2        Q.   Yeah.  I'd like to follow-up on that.
 3             So you said -- you said this -- this
 4   correspondence, series of messages between you and
 5   Mr. Robertson, was one of the pieces of information that
 6   gave you the right to remove the Commons Clause from the
 7   Neo4j license.
 8             What other information did you rely on to make
 9   that determination?
10        A.   I relied on the terms in the AGPL that
11   specifically say remove it and verbatim.
12        Q.   So your own analysis of the terms of the AGPL,
13   is that -- is that another piece in addition to this
14   correspondence with Mr. Robertson?
15        A.   I believe so.  Because no one -- I'm the one
16   that made the decision based on the license itself and
17   along with his emails, so...
18        Q.   Is there anything else, other than the emails
19   and your analysis of the AGPL?
20        A.   Well, obviously, research, and I would have
21   gone through cases, and there's not many.  I did look
22   at -- I did look at Elastic and analyzed kind of what
23   they did, and they specifically, I believe, changed to
24   Apache so they wouldn't run into this issue.  So there
25   was quite a bit of research I did before doing this.  It
```

                                                                    197

JOHN MARK SUHY                                               October 22, 2020

1   wasn't just off the cuff.

2       Q.  So you said research, cases, and Elastic.

3   That's what I wrote down.

4       A.  Uh-huh.

5       Q.  So when you say "research," what are you

6   talking about?  Just generalized Internet research?

7       A.  Yes.  Researching any types of court cases I

8   could find.  Researching others that have tried this,

9   and unfortunately, the ones that did it successfully had

10  to switch licenses, and I believe that there was a

11  discussion about the terms actually being the reason.

12  You'll have to go look it up, but if you look up --

13  you'll know what to do.

14      But I believe there was actually a discussion

15  from one of the articles that talked about why it

16  doesn't work with AGPL and it kind of --

17      Q.  Did you say the --

18      A.  -- that was --

19      Q.  I'm sorry.  I didn't mean to interrupt.

20      Did you save any of this research?

21      A.  I don't know.  I need to go look, but I'm not

22  sure.

23      Q.  When you said you looked at Elastic, which is

24  that a reference to?

25      A.  Elastic is a company that has -- well, it had

                                                        198

SER_0267

JOHN MARK SUHY                                                    October 22, 2020

1  an open-source search database, and it adopted -- I

2  think it adopted the Commons Clause.  I can't remember

3  if it was Redis or Elastic.  I'm sorry.  It might have

4  been Redis.  It's either Redis or Elastic.

5      Q.  It's a company --

6      A.  Yeah, it's a company.  It's one of those.  It

7  might not have been Elastic.  It might have been Redis,

8  but one of those companies I believe had a similar

9  situation with the Commons, and they ended up having to

10 switch away from AGPL first in order to apply it.

11 That's my recollection.

12     Q.  Okay.  And you said you looked at cases; do you

13 remember any specific cases you looked at?

14     A.  I don't remember the specifics.  I just went in

15 and was searching for AGPL terms and seeing if there's

16 any cases or -- I don't know what you call it --

17 precedent that talked about AGPL.  I remember there was

18 quite a few, but nothing -- nothing specific, I don't

19 think, that talked about Commons.  I'm assuming we'll be

20 the first ones setting precedent on this, if that's the

21 right term.

22     Q.  So other than the correspondence with

23 Mr. Robertson, your own analysis of the AGPL, some

24 generalized research that you really can't remember the

25 boundaries of and you may not have saved, and reference

                                                              199

1  to a specific example of a company that's either Elastic

2  or Redis, is -- is that the body of information that you

3  relied on to make the decision that you could remove the

4  Commons Clause from the Neo4j software?

5       A.  No, that's the decision to put the default

6  verbatim AGPL inside the license.  I replaced it.  I

7  didn't change anything else on any source code files or

8  anything.

9       Q.  Right.  But you basically replaced the Neo4j

10  AGPL with Commons with just a copy of AGPL, having the

11  effect of removing the Commons Clause, right?

12       A.  Exactly.  And when I do a commit on a -- so you

13  can make changes, but they have to be accepted by the

14  repository owner, meaning the Graph Foundation.  So just

15  because you change something, it still needs to be

16  accepted and brought into it, so...

17       Q.  Right.  And so --

18       A.  I don't know if they've done any research is

19  what I mean.  I don't know if they did research before

20  accepting the commits on that.  You'd have to ask them.

21       Q.  Right.  And I'm asking just -- I'm just trying

22  to understand the body of information that you relied

23  upon to make your decision to replace the AGPL plus

24  Commons with just the AGPL having the effect of removing

25  the Commons Clause.

                                                        200

SER_0269

JOHN MARK SUHY                                                October 22, 2020

```
 1            And right now I have a list of information:  I
 2   have correspondence with Mr. Robertson, I have your own
 3   analysis of the AGPL, the language of the license, I
 4   have some generalized research and investigation into
 5   cases, but you can't remember the names of the cases nor
 6   the scope of the research, and you have a reference to
 7   two specific examples you believe were Elastic or Redis.
 8            Is there any other information --
 9      A.  One of those.  One of those would be.  I don't
10   know if it's both of them.
11      Q.  Right.  It would be one of those.
12      A.  It would be one example.  Yup.
13      Q.  Is that the entire body of information that you
14   relied upon to make the decision to change the
15   licenses -- license.txt files?
16      A.  I would say -- I would say yes.  Yup.
17      Q.  Okay.
18            MR. PICONE:  Tab 52, please.
19            (Exhibit 25 was marked for identification.)
20   BY MR. PICONE:
21      Q.  Do you have that, Mr. Suhy?
22      A.  I'm looking at it right now.
23      Q.  Do you want to take a moment to look at it?
24   It's several pages.  It looks like some type of
25   open-forum discussion.
```

201

SER_0270

JOHN MARK SUEU                                          October 22, 2020

1    4:15 Pacific, please?

2           THE VIDEOGRAPHER:  The time is 4:03 p.m.; we're

3    off the record.

4           (Off the record from 4:03 p.m. to 4:22 p.m.)

5           THE VIDEOGRAPHER:  The time is 4:22 p.m.; we're

6    on the record.

7           MR. PICONE:  Tab 45, please.  And this is

8    Exhibit 26.

9           (Exhibit 26 was marked for identification.)

10          THE WITNESS:  I've got that open.

11   BY MR. PICONE:

12      Q.  And what is that document that's been marked

13   Exhibit 26?

14      A.  This is an email from Ben Nussbaum to me.

15      Q.  And what is the -- what is the message he's

16   sending you?  What is he trying to communicate?  That's

17   the better question.

18      A.  I need to see what that link is to get the

19   context.  Someone -- oh --

20      Q.  Let's see.

21      A.  -- I can click on that link.  Is that allowed?

22      Q.  I don't know if that will -- if that link's

23   alive.  Let me see.

24          Why don't we -- why don't you put up Tab 44,

25   and I'll represent to you that that is where the link

                                                        207

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS  408-287-7500

1  will take you.

2      A.  Okay.  And it was live, just so you know.

3      Q.  It was?

4      A.  Yes.

5      Q.  Did it take you to Tab 44?

6      A.  It didn't look the same, but it took me to it.

7  Like, it -- it loaded and it talked about the desktop,

8  and it looks like the content's the same.

9      Q.  Okay.  Yeah.

10         MR. PICONE:  And again, we can tab exhibit --

11  excuse me -- Tab 44 as Exhibit 27.

12         (Exhibit 27 was marked for identification.)

13  BY MR. PICONE:

14      Q.  And Exhibit 27, do you see someone named

15  Stephanie in November of 2018 is asking about the Neo4j

16  Desktop and whether that applies to ONgDB Server?

17      A.  Yes, I see that.

18      Q.  First of all, what is Neo4j Desktop?

19      A.  Neo4j Desktop is a -- it's a client-side

20  application that let's you quickly spin up and kind of

21  use -- let's beginners use Neo4j easily from their

22  desktop.  It's like -- I don't know, a utility tool.

23      Q.  Right.

24      A.  It has lots of plug-ins and whatnot.

25      Q.  So going back to Exhibit 26 there.  You said,

208

JOHN MARK SUHY                                                    October 22, 2020

1   "I thought you would like this.  Someone having issues

2   using ONgDB with Neo4j Desktop."

3        Why did you think Mr. Nussbaum would be

4   interested in that?

5        A.  I don't remember the exact reason, but it would

6   be interesting that people are starting to adopt ONgDB.

7        Q.  Why was Stephanie trying to use Neo4j Desktop

8   with ONgDB?

9        A.  Oh, I have no idea.

10       Q.  And Ben Nussbaum writes back to you, says,

11  "That's unfortunate, but LOL."  Is that "laugh out

12  loud"?

13       A.  I believe so, yes.

14       Q.  "That they posted it to a Neo4j site."

15       Why was that funny?

16       A.  Well, it's interesting that there's -- most

17  people that would adopt ONgDB are well-versed and

18  already know Neo, but it's -- I wouldn't say "funny" is

19  the word.  It's interesting that normal people now are

20  trying to use -- not normal people -- people that aren't

21  technically inclined are starting to try to use tools

22  that it won't work with, like Neo4j Desktop with it.  I

23  don't know why it would be funny, but it's definitely

24  interesting.  That means there's a community of people

25  who, you know, who are starting to learn about this, and

                                                              209

1    Enterprise?

2        A.  For the Enterprise source code we had?  Yes,

3    and we used all those tests, as well.

4        Q.  So you didn't know about any changes after they

5    closed Enterprise to the clustering tests?

6        A.  No.

7            MR. PICONE:  Tab 48, please.

8            (Exhibit 30 was marked for identification.)

9    BY MR. PICONE:

10       Q.  Do you see that, Mr. Suhy?

11       A.  Yes, I do.

12           MR. PICONE:  And just for the record, this was

13   also marked as Exhibit 31 to the Graph Foundation

14   30(b)(6).

15   BY MR. PICONE:

16       Q.  And what is this message?

17       A.  This is an email from Ben Nussbaum to myself,

18   and Brad Nussbaum was copied.

19       Q.  And are you responding to a message from -- it

20   appears to be a gentleman or a person named Shahak,

21   S-H-A-H-A-K; N-A-G-I-E-L, Nagiel.

22       A.  Let me read through this.

23       Q.  That's at the bottom of the string, Mr. Suhy,

24   that I'm reading from.

25       A.  Yes.  It's a response from -- yes.

218

1    Q.   So you're responding to Mr. Nagiel -- I'm

2    assuming it's a man -- but Shahak Nagiel saying, "Check

3    out this issue," and you sent him a link to Graph

4    Foundation ONgDB issues link, right?

5    A.   I don't -- I'm going to have to read the entire

6    email thread, so give me a second.  Unless you want

7    to -- let's see.

8         Well, I see -- I see that I responded to an

9    issue.  So yes, I see that.

10   Q.   Yeah.  And -- and then you refer him to the

11   link, and then he says, "Thanks, John.  That helps, but

12   this basically means that all the Enterprise changes

13   moving forward (big fixes and new features alike) are

14   completely forked off from Neo4jer proper, right?  Any

15   concerns about the long-term

16   consistency/parity/maintainability?"

17   A.   Which page is that?  I'm just trying to scroll

18   down.

19   Q.   Sure.  So if you look at the numbers in

20   the -- in the --

21   A.   Like in the Bates stamp?

22   Q.   Yeah, the Bates stamp numbers.  It's .001 and

23   the top of 002.

24   A.   Okay.  Give me one second.  "If you're

25   using" -- "this basically means" -- yes, I see that.

219

JOHN MARK SUHY                                                                October 22, 2020

```
 1        Q.  So you're saying that Graph Foundation will be
 2   managing Enterprise features moving forward.  So that
 3   means the Graph Foundation, while it's not going to have
 4   insight into the change, "big fixes and new features
 5   alike," since you're completely forked off from Neo4j --
 6   let me break that question into smaller questions.
 7             So you're telling Mr. Nagiel that the Graph
 8   Foundation will be managing Enterprise features moving
 9   forward; that means independently, right?  You're not
10   going to have any insight into what Neo4j's doing, since
11   it's closed now?
12        A.  Well, just because they're closed doesn't mean
13   we don't have insight.  As I said before, they do a lot
14   of the features, the infrastructure to support the new
15   Enterprise feature in Community.
16        Q.  Right.  But you didn't tell Mr. Nagiel that
17   right here in this message; you just said to him that
18   Graph Foundation will be managing Enterprise features,
19   and that if you have any concerns or don't see us
20   keeping up, just go back to Neo4j.
21             Right?  That's what you told him?
22        A.  Are you paraphrasing it --
23        Q.  Yeah.
24        A.  -- or is that just something I'm looking at?
25        Q.  No, I'm paraphrasing it.
```

220

**SER_0276**

JOHN MARK SUHY                                                    October 22, 2020

```
 1        A.   Okay.  Yes.

 2        Q.   Right.  So that's what you were trying to tell

 3   him, is that if you don't see us keeping up, just go to

 4   Neo4j?  And I'm paraphrasing.

 5        A.   Yes.

 6        Q.   Okay.  And then he asks another question about

 7   the Community portion of the code base being merged from

 8   Neo4j, repo for every release, and you didn't respond to

 9   him, did you; you instead forwarded the message to

10   Mr. Nussbaum?

11        A.   It looks like I did not, but I'm trying to find

12   that specific -- if you have a question -- he

13   responded -- I don't see myself responding to him.

14   Well, I see something down at the bottom.  I can't tell.

15   I can't tell in this thread if I responded to him or not

16   after that.  Let's see.

17             Yeah, I can't tell from this.  If you want to

18   guide me where to look --

19        Q.   Sure.  I'll help you out a little bit.

20             If you can bring up 48.1, and this will be --

21             THE VIDEOGRAPHER:  The videographer would like

22   to say that you did not identify the -- the Tab 48 as

23   Exhibit 30 yet.

24             MR. PICONE:  Oh.  So Tab 48 will be Exhibit 30.

25   Thank you, Mr. Sayler.  And 48.1 will be Exhibit 31.
```

221

JOHN MARK SUEN                                                    October 22, 2020

1              (Exhibit 31 was marked for identification.)

2    BY MR. PICONE:

3         Q.   Can you see Tab 48.1?

4         A.   .0001?

5         Q.   No, it's just Tab 48.1.  It should be up on --

6    it should be up on your screen.

7         A.   I'm looking at Tab 48, but I don't see the .01.

8    I'm sorry.

9              Are you talking about inside -- the -- I'm

10   looking inside Tab 48 for a page?

11        Q.   No, I'm talking about a separate tab.  It's

12   Tab 48.1.

13        A.   Oh, you sent another one in the -- I see.

14   Sorry.

15        Q.   Sorry about that.

16        A.   I've got that open now.

17        Q.   And this appears to be an email thread between

18   Mr. Nussbaum, Mr. Nagiel, you, and -- and Ms. Griffith?

19        A.   Yes.

20        Q.   And this appears to be a continuation of the

21   thread we just looked at in Exhibit 30; would you agree

22   to that?

23        A.   Let me go back to it and see if it does.  I

24   recognize the same names, so I think -- yes.  Shahak --

25   I believe it is, yeah.

                                                          222

JOHN MARK SUHY                                                    October 22, 2020

Q.  And so then Mr. Nussbaum accepts your
invitation to continue the discussion, and he responds
to Shahak saying that they're going to move ONgDB in a
fully open-source manner.

So I wanted to ask you about what you
understood Mr. Nussbaum to mean when he said, "ONgDB 3.5
restores the Neo4j Enterprise source code that was
removed by Neo4j and continues development forward from
there."

How did that happen?

A.  That is the fork of ONgDB brought in the
commits for the 3.5 enterprise code, and made them part
of the commit history.  Moving forward, there wouldn't
be any more commits that would update or override it, so
it would be moving forward from that point.

Q.  So it would be a completely separate fork from
Neo4j Enterprise after version 3.5?

A.  Well, it would be a fork like any other fork,
except we would be -- we -- there's no pulling in
Enterprise, because they don't post commits anymore.
They didn't remove the Enterprise code, they just
stopped posting commits to it, meaning when we pull in
all the changes from Neo4j Core, there's no commits for
Enterprise for that or do stuff for the code.  It's what
that means, I believe.

223

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS  408-287-7500

SER_0279

JOHN MARK SUHY                                                October 22, 2020

1      Q.   And so when you say "commits," would that be a

2  synonym for updates, changes, modifications, fixes?

3  Could that be among the things that are in the commits?

4      A.   Yes, those are among the things that are in

5  commits.

6      Q.   So after 3.5, ONgDB would no longer include any

7  of the Neo4j 3.4 commits to the Enterprise code?

8      A.   Yes, they would not -- they would not have any

9  commits to the Enterprise code.

10      Q.   Okay.  Did NextCentury ever become a customer

11  and begin using ONgDB?  Do you know?

12      A.   I'm not sure.

13      Q.   Do you know what version of ONgDB currently is

14  in use at the IRS, if it is?

15      A.   I believe it would be 3.5.something.  Not the

16  newest, but it's not the oldest.  I don't know offhand

17  what version it is exactly, but it would be

18  3.5.something.  Between -- I think the current release

19  is at, like, 20?  So it would be in between there.

20      Q.   So 3.5.1 and 3.5.20, somewhere in between

21  there?

22      A.   Yes.  I believe they might be using older

23  versions, as well.  I don't know all the uses.

24      MR. PICONE:  Tab 135, please.  And this will be

25  Exhibit 32.

                                                        224

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS   408-287-7500

JOHN MARK SUHY                                              October 22, 2020

```
 1    their name?

 2          A.  Oh, I'm sure they did.  I just don't remember.

 3          Q.  Okay.  Are you aware of the customer base

 4    that -- that uses ONgDB, other than the IRS?

 5          A.  I'm only aware that there's 10,000 or more

 6    downloads, but not the whole customer base, or whatever

 7    you would call it.  The user base.  I don't think

 8    they're customers.  It's free, so it would be users.

 9              MR. PICONE:  Tab 143, please.

10              (Exhibit 33 was marked for identification.)

11              THE WITNESS:  I've got that open.

12    BY MR. PICONE:

13          Q.  And what is that document?

14          A.  That looks like the iGov, Inc. profit and loss

15    report for 2018.

16          Q.  So this is the first full year for iGov in its

17    operation, right?

18          A.  Yes, I believe.  Yup.

19          Q.  Okay.  So where did the revenue come from, the

20    income, the $285,792.49?  There's no detail there.

21          A.  Consulting.

22          Q.  For -- for whom?

23          A.  I'd have to get the list, but it was mainly

24    around IRS.  And I believe some consulting for being

25    FSO, but I don't have the details.  I can get them.
```

227

SER_0281

```
 1                    DECLARATION OF DEPONENT

 2

 3    I, JOHN MARK SUHY, declare under penalty of perjury that

 4    I have reviewed the foregoing transcript; that I have

 5    made any corrections, additions, or deletions in my

 6    testimony that I deemed necessary; and that the

 7    foregoing is a true and correct transcription of my

 8    testimony in this matter.

 9

10

11    Dated this _____ day of _____, 20__,

12    at _____, _____.
             [City]                    [State]

13

14                    _____

15                    JOHN MARK SUHY

16

17

18                         --o0o--

19

20

21

22

23

24

25

                                                        260
```

SER_0282

JOHN MARK SUHY                                                    October 22, 2020

```
1                        CERTIFICATE
2          I, BENJAMIN GERALD, Certified Shorthand Reporter,
3     Certificate No. 14203, for the State of California do
4     hereby certify:
5          That prior to being examined, the witness named in
6     the foregoing deposition was by me duly sworn to testify
7     to the truth, the whole truth, and nothing but the truth
8     in the within-entitled cause;
9          That said deposition was taken shorthand at the
10    time and place herein named;
11         That the deposition is a true record of the
12    witness's testimony as reported to the best of my
13    ability by me, and was thereafter transcribed to
14    typewriting by computer under my direction;
15         That request [X] was [ ] was not made to read and
16    correct said deposition.
17         I further certify that I am not interested in
18    the outcome of said action, nor am I connected with, nor
19    related to any of the parties in said action, nor to
20    their respective counsel.
21         Witness my hand this 29th day of October, 2020.
22
23
24
          BENJAMIN GERALD
          CSR No. 14203
25
```

261

SER_0283

# EXHIBIT 2

SER_0284

UNITED STATES DISTRICT COURT
NORTHER DISTRICT OF CALIFORNIA


NEO4J, INC., a Delaware
corporation; and NEO4J
SWEDEN AB, a Swedish
corporation,                        CASE NO.
                                    5:18-cv-07182-EJD

            Plaintiffs,

vs.

PureThink, LLC, a Delaware
limited liability company;
IGOV, INC., a Virginia
corporation; and JOHN MARK
SUHY, an individual,

            Defendants.
_____/


 REMOTE VIDEOTAPED DEPOSITION OF JOHN MARK SUHY, JR.
   INDIVIDUALLY AND AS PERSON MOST KNOWLEDGEABLE
        PURSUANT TO FED. R. CIV. P. 30(b)(1)
          FOR IGOV INC. AND PURETHINK LLC


DATE:          November 29, 2022

TIME:          8:06 a.m. PST

LOCATION:      Via Zoom Videoconference

REPORTED       KAREN L. BUCHANAN
BY:            CSR No. 10772
               CLR No. 031106-04


1

SER_0285

JOHN MARK SUHY                                          November 29, 2022

1  AB.  Although he's not on the line right now, my

2  other counsel at Hopkins & Carley, John Picone, will

3  also be attending at some point today.

4        MR. BEENE:  Adron Beene, Jr., for

5  Defendants John Mark Suhy, PureThink LLC and iGov

6  Inc.  Mr. Suhy is in attendance today as the

7  deponent.

8              JOHN MARK SUHY, JR.,

9  being duly sworn by the Certified Shorthand Reporter

10 to tell the truth, the whole truth, and nothing but

11 the truth, testified as follows:

12             EXAMINATION BY MR. RATINOFF:

13     Q.  Good morning, Mr. Suhy.  How are you?

14     A.  Good morning.  I'm good.  How about you?

15     Q.  I'm well, thank you.  You have been deposed

16 in this case before, correct?

17     A.  Yes.

18     Q.  And do you remember at the beginning of the

19 depo we talked about some ground rules about how the

20 deposition is going to proceed?

21     A.  Yes.

22     Q.  Okay.  I just want to go through them real

23 quick, since you have been deposed before.

24        We're going to proceed in a

25 question-and-answer format.  It's important that you

8

1  allow me to finish my question and then pause so if

2  your counsel has any objections he can assert those,

3  and then you can go ahead and answer unless you're

4  instructed not to answer a particular question.  Do

5  you understand this?

6      A.  Yes.

7      Q.  And then your testimony is going to be

8  reported in booklet form.  You'll have a chance to

9  review that testimony once the transcript is issued,

10  and you can make any corrections that you believe

11  need to be made.  Do you understand?

12      A.  Yes.

13      Q.  And if you do make corrections, I'll be

14  able to use those corrections and ask you about them

15  at trial if we use your deposition testimony at

16  trial.  Do you understand this?

17      A.  Yes, I do.

18      Q.  And we're going to go ahead and we're going

19  to be deposing you both in your personal capacity --

20  do you understand what that means?

21      A.  Not exactly.

22      Q.  Okay.  That means what you personally know,

23  your personal knowledge.  Do you understand what I

24  mean by that?

25      A.  Yes.

9

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS  408-287-7500

JOHN MARK SUHY                                          November 29, 2022

1    Q.   And you're also going to be testifying on

2 behalf of PureThink LLC as a corporate

3 representative, and you're going to be testifying as

4 a corporate representative of iGov Inc.  Do you

5 understand this as well?

6    A.   Yes.

7    Q.   And do you understand that your testimony

8 about those corporations, companies and corporation

9 will be not just about what you personally know but

10 what the company itself knows, meaning from its

11 documents and other employees?  Do you understand

12 this?

13    A.   Yes.

14    Q.   And is there any reason today you don't

15 believe you can testify to the best of your ability?

16    A.   No.  I should point out that I have

17 attention deficit, so if I start to lose focus or

18 I'm having issues, I'll let you know.

19    Q.   Please do.  If I don't hear from you, I'll

20 assume that you're able to understand my questions

21 and able to answer them to your best ability.  Is

22 that fair?

23    A.   Yes.

24    Q.   And if any time you need to take a break,

25 please let me know.  If there is a question pending,

                                                    10

1   work for you?

2       A.  Yes, whatever the Court Reporters, whatever

3   we have to do for lunch, I'll do it at the same

4   time.

5       Q.  Great.  Thanks.  And you understand you've

6   taken an oath today under the penalty of perjury?

7       A.  Yes.

8       Q.  And do you understand that's as if the same

9   as you were testifying in front of a judge or jury?

10      A.  Yes.

11      Q.  Okay.  Let's go ahead and proceed.

12          Could you please state your full name for

13   the record.

14      A.  John Mark Suhy, Jr.

15      Q.  And are you represented by counsel today?

16      A.  Yes, I am.

17      Q.  And who is your counsel?

18      A.  Adron Beene.

19          MR. RATINOFF:  I'm going to go ahead, and

20   this has been premarked.  We left off I believe at

21   Exhibit 191, so it will be marked as Exhibit 192.

22          (Plaintiffs' Exhibit 192 was marked for

23   identification.)

24          MR. RATINOFF:  And you'll see the exhibits

25   in the chat.  It may take you a minute to open it

                                                    12

JOHN MARK DEL            November 29, 2022

1          MR. RATINOFF:  Let me go ahead and put this
2    next exhibit in the chat.  This will be marked as
3    Exhibit 195.
4          (Plaintiffs' Exhibit 195 was marked for
5    identification.)
6          MR. BEENE:  Objection.  It hasn't been
7    marked.
8          MR. RATINOFF:  Sorry?
9          MR. BEENE:  There is no marking on it as an
10   exhibit.
11         MR. RATINOFF:  Yeah.  I'm going to mark it.
12         MR. BEENE:  When?
13         MR. RATINOFF:  Now.  I'm marking for
14   identification the document that I just dropped in
15   the chat.  I've been doing this for like six depos
16   that you've been at.  I don't know why you're
17   mentioning that, but okay.
18   BY MR. RATINOFF:
19         Q.  Do you see the document that's been dropped
20   in the chat, Bates number at the top is 00012000?
21         A.  Yes, I have that open.
22         Q.  That's a Bates number that your counsel put
23   on this document and produced in this litigation.
24   Is that fair?
25         A.  If you say so.

                                                      48

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS  408-287-7500

JOHN MARK SUHY    November 29, 2022

1    Q.  Do you have any reason to believe this

2    wasn't produced by the litigation?

3    A.  It seems like it would have been responsive

4    for some -- one of the requests.

5    Q.  Do you understand what this document that's

6    been marked as Exhibit 195 is?

7    A.  I'm looking right now.  I believe this is a

8    requisition of Neo4j Enterprise.

9    Q.  This is a subscription, commercial

10   subscription that PureThink sold to the Maryland

11   Procurement Office under the Partner Agreement?

12   A.  Yes, it is.

13   Q.  That's your signature on the first page in

14   the lower left-hand corner?

15   A.  Yes, that's my signature.

16   Q.  And then you'll see on the next page, there

17   is an item No. 1, "Neo4j Enterprise plus software.

18   Instances Purchased:  3 Productions, 3 test, 3

19   Development.  License Term:  1 year."  Do you see

20   that?

21   A.  Yes, I do.

22   Q.  Is that reflective of the sale of a

23   commercial subscription of Neo4j Enterprise under

24   the Partner Agreement?

25   A.  I believe so, yes.

49

JOHN MARK SUHY                                    November 29, 2022

```
 1        Q.   And then the price of that one-year
 2   subscription was 229,000?
 3        A.   Yes.
 4        Q.   And under the Partner Agreement, PureThink
 5   was entitled to 25-percent commission on that, that
 6   sale?
 7        A.   Yes.
 8        Q.   And you didn't tell the Maryland
 9   Procurement Office that Neo4j could be used under
10   the AGPL without a commercial subscription before
11   signing this, correct?
12        A.   Before signing this, no.
13        Q.   And did the Maryland Procurement Office
14   renew this subscription?
15        A.   No, they did not.
16        Q.   Do you know why they didn't?
17        A.   I'm not positive.
18        Q.   What do you mean, you're not positive?
19        A.   I'm not positive right now what the reason
20   was, but I believe part of it was -- I'm trying to
21   remember when we spoke with them.  Part of it was
22   that they could use the Community Edition.
23             Another part of it, I believe, was about
24   scalability, and how it scales could not meet their
25   needs.
```

50

1       But there was -- there was a discussion.
2  You can ask for a debrief.  I just don't remember
3  the details of what it was exactly right now.
4      Q.  And going back to Sandia, did they renew
5  their subscription to Neo4j after the three-year
6  Discovery bundle expired?
7      A.  No, they did not.
8      Q.  Do you know why they didn't?
9      A.  I don't recall offhand.  I don't recall
10 that.
11     Q.  I believe the FBI was another entity that
12 you mentioned that PureThink sold a commercial
13 subscription of Neo4j under the Partner Agreement.
14     A.  Yes.
15         MR. RATINOFF:  I'm going to go ahead and
16 mark this exhibit that I've dropped in the chat.  I
17 believe this should be 196.
18         (Plaintiffs' Exhibit 196 was marked for
19 identification.)
20         MR. BEENE:  Objection.  This exhibit was
21 not marked.
22         THE WITNESS:  Okay.  It's open.
23 BY MR. RATINOFF:
24     Q.  This document is entitled Order for
25 Supplies or Services.  It's Bates number is 12503 at

51

1   the top.  Do you see that?

2        A.  Yes, I do.

3        Q.  This is produced by PureThink in this

4   litigation.  Do you have any reason to believe that

5   it wasn't?

6        A.  No.

7        Q.  And do you have an understanding of what

8   this document is?

9        A.  I'm looking over it.  It's an Order For

10  Supplies or Services, so for a Neo4j Commercial --

11  like their contract subscription.

12       Q.  And is this the commercial subscription

13  that you were earlier referring to that was sold to

14  the FBI under the Partner Agreement?

15       A.  Yes.

16            MR. RATINOFF:  I'd just like to remark this

17  exhibit as Exhibit 196, if Counsel doesn't have any

18  objections.

19            MR. BEENE:  I'd like to see a exhibit

20  stamp.

21            MR. RATINOFF:  The exhibit stamp gets put

22  on after the deposition.  Come on.  Really?

23            MR. BEENE:  Generally, it happens during

24  the deposition.

25            MR. RATINOFF:  No.  That's not how it works

                                                        52

1   in video depos.  We've been doing this for months.

2   Come on.

3   BY MR. RATINOFF:

4       Q.  Looking down at it, it says details --

5   actually strike that.

6           Under item No. 1, it says "Neo Graph

7   database software."  Do you see that?

8       A.  Yes.

9       Q.  And was that Neo4j Enterprise commercial

10  subscription that was sold to the FBI, is that

11  reflected there?

12      A.  Yes, the Government Edition, but yes, it

13  was a commercial subscription through the Partner

14  Agreement.

15      Q.  And the Enterprise meaning a one-year

16  subscription was for 222,000?

17          (Reporter interruption.)

18          THE WITNESS:  Yes, I see that.

19  BY MR. RATINOFF:

20      Q.  And that's the amount for a one-year

21  commercial subscription to either the Government

22  Edition or Neo4j Enterprise Edition that was sold to

23  the FBI, correct?

24      A.  Yes.  It seems discounted.  I believe it

25  was higher.  But yes, that's for --

53

1      Q.   And so since this is under the Partner

2   Agreement, PureThink would have been entitled to a

3   25-percent commission, correct?

4      A.   Correct.

5      Q.   I assume that PureThink was paid that

6   commission; is that correct?

7      A.   Yes.

8      Q.   And it was also paid the commission under

9   the MPO order form, as well?

10     A.   The NPO (sic)?   I'm not sure what that is.

11     Q.   Maryland Procurement Office.

12     A.   Yes.

13     Q.   Does the Maryland Procurement Office, is

14  that another name for the National Security Agency?

15     A.   I don't know if that office is another name

16  for it or if it's an office that helps.   I'm not

17  sure how they're related.

18     Q.   Do you have an understanding that the

19  Maryland Procurement Office is affiliated with the

20  National Security Agency?

21     A.   I believe so, yes.

22     Q.   Is it okay if we just refer to the Maryland

23  Procurement Office as MPO?   Is that fair?

24     A.   Yes.

25     Q.   So, so far, we've got the MPO, the FBI, and

                                                        54

1      Q.  Do you recall when that happened?

2      A.  I believe -- I'm not positive of the

3   months.

4      Q.  Did that happen while the Partner Agreement

5   was in effect?

6      A.  We were working on it when it was in

7   effect.  But I don't know when -- what the date was

8   that that the situation with Jason Zagalsky

9   occurred.

10          MR. RATINOFF:  I'd like to go ahead and

11   drop the next document in the chat, which will be

12   marked as Exhibit, I believe, 197.

13          (Plaintiffs' Exhibit 197 was marked for

14   identification.)

15          THE WITNESS:  But there is no exhibit, so

16   is this tab 501?

17          MR. RATINOFF:  Sure.  That's right.

18          THE WITNESS:  It's open.

19   BY MR. RATINOFF:

20      Q.  Okay.  And what's been identified as

21   Exhibit 197 or will be identified as Exhibit 197 is

22   a Profit and Loss Statement, January through

23   December 2014, for PureThink LLC.  And you'll see

24   there is an iGov Bates number at the bottom.  Do you

25   see that?

                                                        56

JOHN MARK SUHY                                    November 29, 2022

1     A.  Yes, I do.

2     Q.  Do you recognize what will be marked as

3  Exhibit 197?

4     A.  It looks like a Profit and Loss report for

5  PureThink.

6     Q.  Any reason --

7     A.  2014.

8     Q.  Any reason to believe this isn't a correct

9  copy of Purethink's Profit and Loss Statement for

10  2014?

11    A.  I don't believe so.  It looks -- it looks

12  like something I would have created.

13    Q.  Okay.  So you created this document?

14    A.  I believe so.

15    Q.  It wasn't created by an accountant for

16  PureThink?

17    A.  I don't know if it was.  It would have been

18  created by the software that was used for

19  accounting, and I did a lot of the accounting.

20    Q.  For PureThink?

21    A.  I'm not sure -- I'm not sure who created

22  this.  I looks like something I would have.  It

23  looks like a standard report generated by accounting

24  software.

25    Q.  And says under "Ordinary Income/Expense,

57

JOHN MARK SUHY                                                   November 29, 2022

1    Sale - Software, 229,000."  Do you see that?

2        A.  Yes.

3        Q.  Do you understand for 2014 what that number

4    is referring to as far as income?

5        A.  It would have been -- since PureThink was

6    only focused -- once we partnered with Neo4j, it

7    would have been Neo4j Commercial license revenue

8    or -- I'm assuming that's what it was.

9        Q.  And then aside from that, there is a

10   consulting income.  What's a consulting income for?

11       A.  I don't remember offhand.

12       Q.  But that would be separate from the

13   software license sale?

14       A.  It looks to be, yes.

15       Q.  And then you look at under Expenses, there

16   is a software reseller license cost for 171,750.  Do

17   you see that?

18       A.  Yes, I do.

19       Q.  And what is that expense in reference to?

20       A.  I'm assuming that that's the money that

21   goes to Neo4j as -- under the Partner Agreement.

22   25 percent of the total stays with us.

23       Q.  Okay.  So the licensee would be -- would

24   pay PureThink the full amount for the commercial

25   license, and then PureThink would remit 75 percent

                                                              58

SER_0299

JOHN MARK SUHY                                                    November 29, 2022

 1    of that to Neo4j under the Partner Agreement?  Is
 2    that fair?
 3         A.  Yes.  In this scenario, yes.
 4            MR. RATINOFF:  Now, we were looking at the
 5    MPO order form.  24 -- I'm sorry.  Strike that.
 6    Okay.  And then let me move on to Exhibit -- what
 7    will be marked as Exhibit 198.
 8            (Plaintiffs' Exhibit 198 was marked for
 9    identification.)
10            MR. RATINOFF:  I'll put this in the chat
11    for you.
12            MR. BEENE:  Okay.  It's open.
13    BY MR. RATINOFF:
14         Q.  Yes.  This is another document.  It's Bates
15    numbered iGov, got an iGov Bates number.  It's
16    entitled "PureThink LLC Profit and Loss, January
17    through December 2015."  Do you recognize this
18    document?
19         A.  Yes.
20         Q.  What is it?
21         A.  It's a Profit and Loss report for 2015 for
22    PureThink.
23         Q.  Okay.  And then looking at the -- under
24    Income, it says "Sales - Software, $320,987.50."  Do
25    you see that?

                                                           59

JOHN MARK SUHY                                                    November 29, 2022

```
 1        A.  Yes.

 2        Q.  And that income would be for commercial

 3   software licenses for Neo4j Enterprise or Government

 4   Edition that PureThink sold under the Partner

 5   Agreement?

 6        A.  I believe so.  That was the only thing we

 7   were focusing on.

 8        Q.  And looking under the expense, it says

 9   "Software reseller license cost."  Do you see that

10   it's for $242,715.52?

11        A.  Yes, I see that.

12        Q.  And that would be for the 75 percent that

13   would be owed to Neo4j under the Partner Agreement?

14        A.  I assume that's what that's for.

15        Q.  No reason to believe it isn't?

16        A.  Not off the top of my head, no.

17        Q.  And I believe the FBI and Sandia contracts

18   were for -- from the year 2015, so the sales would

19   be for those licenses?

20        A.  That sounds right.

21        Q.  Any reason to believe it isn't?

22        A.  I would have to go in and look at my

23   documents to verify it, but it sounds -- sounds like

24   that's the reason for these numbers.

25        Q.  PureThink wasn't doing anything else at the
```

                                                                  60

SER_0301

JOHN MARK SUHY                                                    November 29, 2022

```
 1   time, though?
 2        A.   Nothing major, no.
 3        Q.   It wasn't selling any -- it wasn't selling
 4   any other software other than the Neo4j Government
 5   Edition?
 6        A.   I don't believe so.  I think we were just
 7   focused on the Government Edition at this time
 8   period, yeah.
 9            MR. RATINOFF:  Okay.  We can go ahead and
10   mark the next exhibit.  It's -- it will be marked as
11   Exhibit 199.
12            (Plaintiffs' Exhibit 199 was marked for
13   identification.)
14   BY MR. RATINOFF:
15        Q.   It should be tab 503 in the chat.
16        A.   Okay.  It's open.
17        Q.   Okay.  What we've marked as Exhibit 199 is
18   a document entitled "PureThink LLC Profit and Loss,
19   January through December 2016."
20        A.   Yes, I see that.
21        Q.   And it's got a Bates number at the bottom,
22   IGOV 1569057.001 on the first page?
23        A.   Yes, I see that.
24        Q.   And do you recognize this document?
25        A.   Yes.  It looks like the same as the other
```

61

1  documents but for 2016.

2      Q.  So Purethink's Profit and Loss Statement

3  for that year, 2016?

4      A.  Yes.  I'm just looking at it to see.  It

5  looks like it's marked for -- "Sales - Software" is

6  probably the wrong category for it.

7      Q.  Category for what?

8      A.  Category for whatever that is.  This would

9  have been -- I'm looking at the expense.  Since

10  there was no expenses, this might have been for IRS,

11  which was the consulting project.  I'm not positive,

12  but it looks -- if it was, it definitely is

13  miscategorized.

14      Q.  So PureThink didn't sell software in 2016?

15      A.  I have to go look and see, because I know

16  that when we started IRS, that was a consulting

17  project.  So I don't -- I think that was in 2016.

18  I'm not sure, but that's what it looks like this

19  might be representing.

20      Q.  This document was prepared by PureThink,

21  correct?

22      A.  Yeah.  I believe I would have done this,

23  yeah.

24      Q.  And as you note, there is no software

25  license fee that was under Expenses that we saw in

62

SER_0303

1    the prior Profit and Loss Statements, correct?

2        A.   Yes.  That's why I think this is for IRS,

3    which wasn't a software license sale.  That's why I

4    believe that that's what this represents.

5        Q.   But there is only a mark for -- I'm sorry,

6    the only income here is showing sales for software

7    and not consulting, correct?

8            MR. BEENE:  Objection to form.

9    BY MR. RATINOFF:

10       Q.   You can answer the question.

11       A.   Well, now, this is -- this definitely is

12   for consulting.

13       Q.   But it's listed as sales and software in

14   this document, correct?

15       A.   It says "Sales - Software"; that's correct.

16       Q.   Now, I'd like to show you the 2017

17   Profit and Loss Statement, but one wasn't produced.

18   Did PureThink prepare a Profit and Loss Statement

19   for 2017?

20       A.   We should have, because that's what I used

21   for taxes, so . . . .

22       Q.   So PureThink was still in business in 2017?

23       A.   Yes.  PureThink is still in business now.

24       Q.   So it should -- it filed its tax return in

25   2017?

                                                      63

SER_0304

JOHN MARK SUHY                                              November 29, 2022

 1    previously talked about that PureThink entered into

 2    contracts with under the Partner Agreement, correct?

 3         A.  No, that's not correct.

 4         Q.  No?  Why is that not correct?

 5         A.  IRS was entered into a new agreement for

 6    consulting.

 7         Q.  But you entered into a contract with the

 8    IRS?

 9         A.  Yes.

10         Q.  Let me get that and make sure we're on the

11    same page here.  Just give me a second.

12         Okay.  Let me go ahead and put in this next

13    exhibit that was previously marked as Exhibit 159.

14    That should make your counsel happy.

15         A.  Yes.  It's open.

16         Q.  Okay.  Do you recognize what was -- what is

17    marked as Exhibit 159?

18         A.  Yes, I do.

19         Q.  What is it?

20         A.  It's an Order For Supplies or Services.

21         Q.  Is this the contract that you were

22    referring to that PureThink entered into with the

23    IRS?

24         A.  Yes.

25         Q.  You're saying it was for consulting

                                                            74

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS   408-287-7500

1  services and not for software?

2      A.  It is for consulting services, yep.

3      Q.  And it says "Implementation" under item

4  No. 1, "Implementation of the Government Edition

5  Neo4j project"?

6      A.  Yes.

7      Q.  And so under this contract, PureThink

8  provided Neo4j -- I'm sorry, provided the IRS with

9  Neo4j Government Edition under the AGPL?

10     A.  Yes.  Since they wouldn't have had a

11  commercial, this would have fallen under the AGPL.

12     Q.  And this is -- this document, Order For

13  Supplies or Services, is dated September 23rd, 2016,

14  correct?

15     A.  Yes, that's correct.

16     Q.  And at that time, the Partner Agreement was

17  in effect between Neo4j and PureThink, correct?

18     A.  Yes, it was.

19     Q.  And did you get approval from Neo4j before

20  entering into this Order For Supplies and Services?

21     A.  Yes.

22     Q.  Who gave that approval?

23     A.  I believe Lars Nordwall, John Broad.

24     Q.  Sorry, did you say John or Sean?

25     A.  John Broad.  And I believe they went and

                                                      75

1      Q.  And you were at the IRS deposition of Mike

2  Dunn, correct?

3      A.  Yes, I was.

4      Q.  And you heard him testify that the reason

5  why they canceled this award was because it was

6  improperly designated as sole source; isn't that

7  correct?

8      A.  I don't remember hearing that.  And it

9  definitely could have been sole sourced because of

10  all the facts around it, so -- I'm also aware Mike

11  Dunn is not a procurement person.

12      MR. RATINOFF:  Okay.  Let's go ahead and

13  mark this next document.  It will be tab 491, and it

14  will get marked as Exhibit 209.

15      (Plaintiffs' Exhibit 209 was marked for

16  identification.)

17      THE WITNESS:  It's downloading slowly.

18  BY MR. RATINOFF:

19      Q.  Yeah.  It's a large document.

20      A.  Yes, it's open.

21      Q.  Okay.  Do you recognize what will be marked

22  as Exhibit 209?

23      A.  Yes.

24      Q.  And what is it?

25      A.  Looks like a pre-award protest.

143

JOHN MARK SUHR                                          November 29, 2022

1          Q.   And is this the protest that you were just

2    referring to?

3          A.   Yes, I was.

4          Q.   Do you see it says, "By this protest

5    (defined below)," first page, 3 out or 13, first

6    page of the protest, it says, "By this protest

7    (defined below) Neo also objects to the Agency's

8    sole source justification and the Agency's intended

9    award."  Do you see that?

10         A.   On page 3?

11         Q.   It's page 1 of the actual protest.  It

12   would be page 3 of the document that's been marked

13   as Exhibit 209.

14         A.   Yes.

15         Q.   And in your experience in government

16   contracting, are interested parties permitted to

17   protest awards?

18         A.   Yes.

19         Q.   And that's provided by regulation or

20   statute, to your knowledge?

21         A.   I believe it's in the FAR, Federal

22   Acquisition Regulations.

23              (Reporter interruption.)

24              THE WITNESS:  I believe that's defined in

25   the FAR, the Federal Acquisition Regulations.  I

                                                          144

JOHN MARK SUHR                                                  November 29, 2022

```
 1    believe that's a FAR.
 2    BY MR. RATINOFF:
 3         Q.   And by FAR, you're talking about a
 4    government regulation; is that correct?  Federal --
 5         A.   Procurement rules, laws.
 6         Q.   And you also see here, it says, ". . . this
 7    pre-award protest challenging the intended award by
 8    the Department of Treasury . . . ."  Do you see
 9    that?
10         A.   Yes, I do.
11         Q.   So that means that IRS was intending to
12    award but had not officially awarded it yet to iGov;
13    is that correct?
14         A.   They were going to make the award, and
15    there was a time set aside for protest.  So it
16    was -- it was going to be made.
17         Q.   Okay.  So this was -- this protest, to your
18    knowledge, was filed within that protest period?
19         A.   I'm not sure.
20         Q.   In your experience, it wouldn't be
21    considered if it wasn't filed within that period,
22    right?
23         A.   This is an agency-level protest.  There's
24    different types of protests.
25         Q.   But I'm talking about in your experience,
```

                                                                    145

SER_0309

1   agency-level protests.

2        A.  I don't have much experience with

3   agency-level protests.

4        Q.  Have you ever done an agency-level protest

5   before?

6        A.  I'm not sure if the protests I've done

7   before were agency but -- I believe they were

8   agency.  But I'm not sure what the rules are.  I

9   believe each agency has different rules.  And you

10  were asking if this was done in the time period.  I

11  don't know, is the answer.

12       Q.  And you attained this -- a copy of this

13  protest by FOIA request?

14       A.  I believe so.

15           (Reporter interruption.)

16           MR. RATINOFF:  A FOIA, Capital F-O-I-A.

17  It's an acronym.

18           THE WITNESS:  I believe so.  Freedom of

19  Information -- Freedom of Information something.

20  BY MR. RATINOFF:

21       Q.  Act.

22       A.  Act.

23       Q.  Is that correct?

24       A.  Sounds right.

25       Q.  And then have you ever protested -- filed a

146

1  an agency-level protest with the IRS?

2      A.  IRS?  I don't remember.  I'm not sure.

3      MR. RATINOFF:  Let me go ahead and mark the

4  next exhibit.  This will be tab 492 in the chat.

5  Exhibit 210, it will be marked as.

6      (Plaintiffs' Exhibit 210 was marked for

7  identification.)

8      THE WITNESS:  And it looks like we have.

9  BY MR. RATINOFF:

10     Q.  Do you recognize this document that's

11  been -- or will be marked as Exhibit 210?

12     A.  I'm just looking at what this is for.  Yes,

13  I recognize this.

14     Q.  What is it?

15     A.  It's a protest for AlphaSix Corporation.

16  It's selling Neo4j software, and this is a protest

17  stating that there is other alternatives, I believe.

18  But it's a protest to that award.

19     Q.  And looking at the very bottom of this

20  document, the Bates number IGOV00002851648.012, is

21  that your signature?

22     A.  Yes, it is.

23     Q.  And that -- it says FAR 33.103(d)(4).  Do

24  you see that?

25     A.  Yes.

147

JOHN MARK SUHY                                              November 29, 2022

```
 1          Q.  Is that the same provision that Neo4j filed
 2     its protest?
 3          A.  I have no idea.  I'm not a lawyer.
 4          Q.  But you prepared this document and cited it
 5     to that statute, correct?
 6          A.  Yes.  But I don't remember what that
 7     statute was.  I don't remember that.  I would have
 8     done due diligence and made sure it was correct, but
 9     as for what that means, I have no idea what that
10     statute is.
11          Q.  Okay.  Why don't you go ahead and look back
12     at the last exhibit we were just looking at.
13          A.  Which tab would that be?
14          Q.  Tab 491.
15          A.  Okay.  I'm there.
16          Q.  And if you look on page 2 of the protest.
17          A.  Page 2, the actual page 2?
18          Q.  Yeah.
19          A.  Okay.
20          Q.  And it says, "Neo requests an independent
21     review of this potest at a level above the
22     Contracting Officer, pursuant to FAR 33.103(d)(4)."
23     Do you see that?
24          A.  Yes.
25          Q.  Same statute or rule that you've cited in
```

                                                            148

SER_0312

1    your protest, right?

2         A.  Seems to be, yeah.

3         Q.  So you filed a protest under the same

4    provision as Neo4j?

5         A.  I don't know what that means.

6         Q.  Well, it's the same statute, right?

7         A.  Yeah, but I'm not a lawyer.  The way you

8    stated it, I don't know if that's what we did or

9    not.

10        Q.  You signed the document, right, what's been

11   marked as Exhibit 210, tab 492?

12        A.  Yes.

13        Q.  So everything in this e-mail that you said

14   you would have done -- I'm sorry, in this protest,

15   you would have done due diligence before signing,

16   correct?

17        A.  Yes, I would have.

18        Q.  And what was the result of this protest?

19        A.  The result was they did not award -- oh, is

20   this our 491?  So is that the protest from Neo4j or

21   for iGov?

22        Q.  No.  I'm talking about your protest, the

23   one that you filed that's dated July 8th, 2020.

24        A.  Oh, I'm not sure.  I don't remember.

25        Q.  You don't know if the contract was canceled

                                                          149

JOHN MARK SUHY                                                    November 29, 2022

```
 1              THE VIDEOGRAPHER:  Off the record?
 2              MR. RATINOFF:  Sure.  Let's go off the
 3   record.
 4              THE VIDEOGRAPHER:  We are now off the
 5   record at 12:29.
 6              (Break taken from 12:29 to 12:31 p.m.)
 7              THE VIDEOGRAPHER:  We are now on the record
 8   at 12:31.
 9   BY MR. RATINOFF:
10        Q.  Okay.  I'm going to turn back to
11   Exhibit 202, which was marked as -- originally as
12   tab 485.  It's the amended interrogatory responses.
13   And if you could turn your attention to page 11.
14        A.  One moment.  I'm at page 11.
15        Q.  Okay.  And you'll see interrogatory No. 2,
16   it says:
17              "Identify all facts and documents
18              supporting your contention in
19              Paragraph 15 of your Counterclaim that
20              PureThink" -- sorry, "PureThink spent
21              an equivalent of 650,000 to design,
22              develop, and build a new Neo4j
23              Government Package software based on
24              Mr. Nordwall's representations that
25              PureThink would have continuing
```

170

JOHN MARK SUHY                                         November 29, 2022

```
 1              exclusivity with the government sales

 2              and support contracts."

 3              Do you see that?

 4      A.   Yes, I do.

 5      Q.   And you understand that's referring to the

 6   exclusivity agreement we just talked about in the

 7   counterclaims?

 8      A.   Yes.

 9      Q.   And you'll see -- I'm sorry, in response

10   2.2, it says, "PureThink spent an equivalent of

11   $650,000 to" -- sorry, "spent an equivalent of

12   $650,000."  What do you mean by "equivalent"?

13      A.   So we didn't spend money.  We dedicated

14   full time to building out this framework that would

15   surround Neo4j Enterprise and make it into what was

16   called the Neo4j for Government Edition.  So it was

17   a suite of software, addressed FISMA, modules,

18   documentation, business plan.  It was our full

19   focus.

20              And I needed to make sure that before we

21   focused 100 percent, dropped everything else and

22   focused on this that we were on the same line, that

23   we understood each other, that hey, we're building

24   this Government Edition, it's going to take off,

25   because it allows us to do sole sourcing.  And that
```

171

```
 1    is my main focus, and that's -- all my time is being
 2    invested into that.
 3         Q.  And also, according to this interrogatory
 4    response:
 5              "Development of the Neo4j Government
 6              Edition software business development
 7              and marketing activities continued up
 8              until about June 2017."
 9         A.  Okay.
10         Q.  So you're saying that the $650,000 included
11    work from May of 2015 to June of 2017.  Is that the
12    time period for that amount?
13         A.  That sounds right.
14         Q.  And the work that you're saying that that
15    $650,000 is based on is for the development of the
16    Neo4j Government Edition software, business
17    development and marketing activities, correct?
18         A.  Yes.  It's -- we could have been doing
19    consulting and made that money, but instead it was
20    focused on this.  So it was an investment on my side
21    and the company's side, PureThink.
22         Q.  Weren't you required to market and develop
23    business under the Partner Agreement?
24         A.  Not -- not like this.  This is -- this is a
25    new agreement, and it was for us to run -- it's for
```

172

SER_0316

JOHN MARK SUHY                                              November 29, 2022

 1    issue that it wasn't going to work with the

 2    government because of the FAR rules and that we had

 3    to come up with a different approach to get Neo4j

 4    into the government.  And that's where this

 5    agreement came.

 6              And that's why it took so much dedication

 7    to it.  No other teams or companies would go and

 8    dedicate this much effort into something that was

 9    not guaranteed to bring revenue.  I mean this is an

10    investment, and I don't think the Partner Agreement

11    says you have to drop all your business and only

12    focus on this, and we did for this, and we did it

13    because of the exclusivity agreement.

14    BY MR. RATINOFF:

15        Q.  Looking at the financial statements that we

16    did for PureThink in 2014, you testified, I believe,

17    that revenue generated in 2014 was based on only

18    sales of Neo4j Enterprise Edition, correct?

19        A.  Yes, in which we only got the

20    revenue 25,000 -- we made 25,000 or 25 percent of

21    whatever that total sale was, which was not a lot.

22        Q.  But between 2014 and 2015, April, PureThink

23    was solely focused on developing business under the

24    Partner Agreement, correct?

25        A.  I believe so.  Yes.  That was our -- that

                                                              174

JOHN MARK SUHY                                        November 29, 2022

1    was our focus.

2        Q.  And in looking at the next page in the

3    interrogatory responses, 2.3, it says:

4              "The hourly rate Neo4j charged for

5              resources that were at or below the

6              expertise level of John Mark Suhy was

7              $300 an hour for a subject matter

8              expert."

9        A.  Yes.

10       Q.  "These rates are used to justify many of

11   the costs."

12       A.  Yes.

13       Q.  Did you take $300 and multiply that by a

14   certain number of hours to come up with $650,000?

15   In other words, if I divide $650,000 by 300 and got

16   approximately 2166 hours, that's what you're saying

17   is the time you spent on Neo4j Government Edition?

18       A.  I believe that's part of it.  Remember that

19   when we're doing business development and marketing

20   and whatnot, that time is not something that's

21   covered under those hourly rates.  The $300 an hour

22   rate is something that Neo4j charges and what we

23   could have done consulting for instead of doing

24   this.

25       Q.  Do you understand that Neo4j charged $300

                                                      175

1    an hour to its customers, but that's not what its

2    actual employees who do the consulting make?

3         A.   Well, I don't know any of that.

4         Q.   Isn't it normal in business that if a

5    company charges consulting rates, it's not paying

6    its employee the same amount that it's charging the

7    client?

8              MR. BEENE:   Objection to form.

9              THE WITNESS:   I'm one person, and this is

10   PureThink.  So everything would come back to me

11   anyway in some way or another.

12   BY MR. RATINOFF:

13        Q.   But you don't charge your clients $300 an

14   hour for consulting, do you?

15        A.   It depends on what we're doing, and it

16   depends on if they can afford us.  Sometimes we will

17   give them much less rates just because we feel that

18   it's worthwhile being involved with them so we can,

19   you know, identify their opportunities.  So there is

20   always a balance.

21        Q.   But you don't know whether Neo4j charges

22   its clients $300 an hour and then in turn pays its

23   employees $300 for work per hour, correct?

24        A.   I have no idea about how Neo4j operates.

25        Q.   So then are you saying that you have a way

176

SER_0319

1   of tracking the 2166 hours plus that you spent

2   between May of 2015 and 2017?

3       A.   Yeah.   I basically was working full time

4   and more than eight hours a day just to get

5   everything done.   And that's how we came up with the

6   dates, the times, the amounts, everything.

7       Q.   Do you have time sheets to evidence that

8   time spent?

9       A.   Hmm -- not time sheets, but I'm sure that

10  you get repos and commits, and all the documents and

11  whatnot would kind of show that.   Writing a 15-page

12  marketing document on how we're going to approach

13  government and whatnot takes days to do.

14      Q.   But you didn't actually keep any official

15  records to track that time, did you?

16      A.   I don't believe we would have needed to,

17  because it was full time, fully dedicated.

18      Q.   Do you have --

19      A.   We're not charging -- you know, usually you

20  track -- you track hours when you're charging

21  someone and billing the rates.   This was an

22  investment on our end, so there would have been no

23  need to do that.   So our goal was to be 100-percent

24  focused on this.

25      Q.   So the $650,000 is essentially just an

177

1    A.  Yes.  I see it.

2    Q.  And so you're using Neo4j's $300 an hour to

3  calculate the $650,000; is that correct?

4    A.  I believe some of it, yes.

5    Q.  Okay.  So the 650,000 isn't necessarily all

6  at $300 an hour.  It could vary based on whether it

7  be technical work versus marketing and business

8  development.  Is that fair?

9    A.  It could be different amounts, but we had

10  to drop everything.  And, you know, we could have

11  only focused on being subject matter experts, but

12  instead we had to go and focus on building the

13  marketing plans, doing everything.  And so it's --

14  $300 an hour is what we -- what we missed out on

15  because we focused on this.

16    Q.  Did you ever tell Neo4j that your hourly

17  rate for this type of work would be $300 an hour?

18    A.  I have no idea.  I don't remember those

19  discussions.  Because we would have been going

20  directly to clients, not having them pay us.

21    MR. RATINOFF:  We'll have marked the next

22  exhibit.  Have it marked as Exhibit 212.

23    (Plaintiffs' Exhibit 212 was marked for

24  identification.)

25  BY MR. RATINOFF:

181

1   related to their GSA for staffing.

2          You know, the goal is to get business out

3   of this, and that's why sometimes you do stuff for

4   free.  And I do a lot of stuff for zero dollars.

5   You know, if it leads to us making money, then

6   that's the whole purpose of the investment is we

7   aren't doing it for the current -- the now.  We're

8   doing it for the future.

9       Q.  All right.  I want to go ahead and move on

10  to -- we talked about the protest and then the

11  cancellation of the -- or the pre-award protest.

12  And you believe that the -- sorry.  Let me start

13  over.

14          So it's PureThink's contention that it lost

15  out on continuing with the Government Edition?

16      A.  Well, it did, because they, Neo4j, canceled

17  the Government Edition and told our clients that

18  they couldn't work with us.

19      Q.  Did you give back all the work that you did

20  to Neo4j, all the working documents and the business

21  development and all the work that you did?  Did you

22  just say here you go, it's yours?

23      A.  I don't believe so.  I don't think that

24  would be theirs.

25      Q.  So you kept all that work?

186

JOHN MARK SUHY                                          November 29, 2022

1    the different modules that we had created.  I have

2    no idea if they took our work and integrated it.

3           Because I do remember that -- what is his

4    name, the lead, the head of the software

5    development, I'm forgetting right now, for Neo4j

6    said that there is a lot of the features they wanted

7    to integrate into Neo4j Enterprise that we had done

8    with this.  I don't know if they took our work or if

9    they just created it from the beginning.

10          MR. RATINOFF:  And then on this next

11   exhibit, it's going to be marked for identification

12   as Exhibit 214, tab 504, will be in your chat.

13          (Plaintiffs' Exhibit 214 was marked for

14   identification.)

15          THE WITNESS:  I'm looking at this.

16   BY MR. RATINOFF:

17     Q.  And this is an e-mail.  The last e-mail in

18   exchange is dated October 4th, 2017.  It's from

19   Michael Dunn to John Mark Suhy at egovsol.com.  And

20   the Bates on the first page is -- ends with

21   3249.001.  Do you see that?

22     A.  Yes, I do.

23     Q.  Is this an e-mail exchange you had with

24   Mr. Dunn?

25     A.  Yes, it looks to be.

188

JOHN MARK SUHY                                                November 29, 2022

1       Q.   And why did you send this e-mail to

2   Mr. Dunn?  At the beginning here, it says, "Hello

3   Michael.  Here is some information for market

4   research regarding eGovernment Solutions, Inc."

5       A.   It sounds like I was giving him information

6   for market research.

7       Q.   Why were you giving him market research

8   information about eGovernment Solutions?

9       A.   Usually the government will reach out

10  saying they're doing market research and ask you for

11  information.  And that's what it looks like they

12  did, and that was the response.

13      Q.   And at this time, were you part owner of

14  eGovernment Solutions?

15      A.   October 2017?  I might have been.  I don't

16  remember when I sold my shares.  But I might have

17  been.

18      Q.   But you were working under the eGovernment

19  Solutions name at this point, correct?

20          MR. BEENE:  Objection to form.

21          THE WITNESS:  I was answering from

22  eGovernment Solutions, so it seems to be that's what

23  this e-mail is from.

24  BY MR. RATINOFF:

25      Q.   And then it says, if you go down towards

                                                    189

SER_0324

1    the bottom of the first page:

2              "The current CKGE environment will

3         require any potential vendor to

4         provide 2 critical components:  1) the

5         Government Package/Suite for Neo4j and

6         2) professional services for continued

7         development."

8    And it continues:

9              "Other vendors may be able to offer

10        the professional services, but only

11        iGov Inc. can fulfill the Government

12        Package/Suite for Neo4j requirement."

13        What are you referring to as the Government

14   Package/Suite for Neo4j requirement?

15      A.  I believe we're talking about the bisma and

16   all the auditing that needs to be put in place, and

17   that knowledge we gained by working with IRS at the

18   beginning.  We knew how to apply that, so we could

19   reapply everything.

20        I don't think any other vender -- and I

21   think it would be obvious that other vendors that

22   would come in would not have that knowledge that

23   would be able to help them wrap up and get moving.

24   So it was basically because of me and my knowledge.

25      Q.  And that's the knowledge that you gained

190

1  working as PureThink under the PureThink/IRS

2  contract we talked about earlier, correct?

3          MR. BEENE:  Objection to form.

4          THE WITNESS:  It's knowledge, but not

5  necessarily software.

6  BY MR. RATINOFF:

7      Q.  And it says, "The same team members," and

8  this is on the second page, halfway down:

9          "The same team members from the past

10          contract would be able to stay on

11          under eGovernment Solutions Inc.  All

12          of the development environment, tools,

13          et cetera would also be maintained

14          meaning there would be no ramp-up

15          time."

16      A.  I see that.

17      Q.  When you say the same team members, are you

18  talking about PureThink on the past contract that we

19  previously discussed between the IRS and PureThink?

20      A.  No.  I believe I'm talking about myself

21  only.

22      Q.  Okay.  But you're talking about the work

23  that you performed for the IRS under PureThink and

24  the contract we discussed earlier, correct?

25      A.  Yes.  I believe I would be showing them

191

JOHN MARK SUHY                                       November 29, 2022

 1   that, hey, I have all this experience that I bring
 2   to the table with this company.
 3       Q.   And it says "All of the development
 4   environment tools, et cetera will also be maintained
 5   meaning there would be no ramp-up time."  Are you
 6   referring to the work that you previously did with
 7   the IRS under PureThink?
 8       A.   Yes.  The software that they actually
 9   owned, they have a lot of work product.
10       Q.   And that was what you developed for the
11   IRS, correct?
12       A.   Some of it was.  Some of it was done by
13   other teams, and we helped them integrate it.
14       Q.   Then at the bottom, it says:
15            "I am a minority partner in
16            eGovernment Solutions, and a majority
17            partner (only partner) in iGov Inc.
18            IGov Inc. holds the rights and sells
19            and supports the Neo4j Government
20            Package/Suite."
21            Do you see that?
22       A.   Yes.
23       Q.   And are you at this time now clearly still
24   an owner or part owner of eGovernment Solutions at
25   this time?

                                                    192

JOHN MARK SUHY   November 29, 2022

1    A.   Yes.   If I said that, then I was still an

2    owner.

3    Q.   And it says, "iGov holds the rights and

4    sells and supports the Neo4j Government

5    Package/Suite."

6    A.   Yes, that's a solution that's an offering.

7    It's not a product.   The Neo4j Government Edition

8    was the product.   The Neo4j Government Package/Suite

9    is a suite of services and support focused on FISMA,

10   addressing other needs that U.S. governments need.

11   And it's important because if you're using

12   Neo4j Community, whatever version you're using, you

13   need to follow these security guidelines and

14   whatnot.   And that's what -- that's the expertise

15   that I bring to the table now, because I gained all

16   that knowledge, you know, what requirements are

17   needed for IRS, what their 508 compliance

18   requirements are and whatnot.

19   Q.   And you gained that knowledge through the

20   prior work that you did under PureThink with the

21   PureThink/IRS contract that we talked about,

22   correct?

23   MR. BEENE:   Objection to form.

24   THE WITNESS:   That as well as I've have

25   other contracts with IRS years before, subcontracts.

193

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS   408-287-7500

1   besides the number at this time?

2       A.  Not for this.  They would have stated it in

3   the description.

4       Q.  All right.  Let's take a look at

5   Exhibit 105 --

6       A.  Okay.

7       Q.  -- previously marked.

8       A.  Okay.  I'm looking at it.

9       Q.  Okay.  And do you see the effective date of

10  this Amendment of Solicitation/Modification of

11  Contract is May 24, 2019?

12      A.  Yes, I see that.

13      Q.  Do you understand what this document is?

14      A.  I understand it's an Amendment of

15  Solicitation/Modification of Contract.

16      Q.  Do you know what contract this is referring

17  to?

18      A.  It says 2032H8-18-P-00168.

19      Q.  Do you understand what the actual contract

20  is that's being amended?

21      A.  I believe it's the award that eGovernment

22  Solutions won and that this is for -- this is to

23  exercise option year 1.

24      Q.  And that's for an additional $200,000 for

25  the year from May 24, 2019, to May 23rd, 2020?

205

JOHN MARK SUNG                                                    November 29, 2022

 1        A.  Yep.  That's the next -- the first option
 2   year, they said we're going.
 3        Q.  And to your knowledge; the IRS paid
 4   eGovernment Solutions 300,000 for the first year?
 5        A.  Well, they should have.  I believe they
 6   did.
 7        Q.  To your knowledge, did eGovernment
 8   Solutions get $200,000 in conjunction with this
 9   option year exercise, 200,000?
10        A.  Yes, they should have.  I don't think IRS
11   has ever missed a payment.
12        Q.  Yeah, that would be pretty bad for the
13   agency that collects taxes to miss payments, right?
14   You don't have to answer that.
15        A.  Oh, sorry.
16        Q.  That was a rhetorical question.  Sorry.
17   Just trying to lighten up the mood a little bit.
18        All right.  Let me mark the next exhibit,
19   or actually, it's been premarked.  So take a look at
20   what was previously marked as Exhibit 106.  Do you
21   recognize what's been previously marked as
22   Exhibit 106?
23        A.  Amendment of solicitation of the contract.
24   Yes, I see this.
25        Q.  What do you understand this document to be?

                                                              206

1    A.  This is a modification to add funding to

2    option year 1.

3    Q.  Of the eGovernment Solutions contract that

4    we've been talking about?

5    A.  Yes.

6    Q.  And is that your signature at the bottom of

7    the first page?

8    A.  Yes.

9    Q.  And what was the purpose of the increase of

10   funding for option year 1?

11   A.  I believe this is for us to build a user

12   interface in the micro service for something called

13   the LB&I, Large Business -- Large -- International,

14   I guess, component or division for IRS.

15   Q.  Looking at the next page, you'll see, "The

16   modification will require the contractor to perform

17   the following."

18   A.  Mm-hmm.

19   Q.  Are those bullet points there, one, two,

20   three, four, five bullet points your understanding

21   of what the additional work required?

22   A.  Yes.  And the way they wrote that, they're

23   not technical, so it's not 100-percent correct.  But

24   yes, I know what they're talking about.

25   Q.  And it says, "Integrate corporate graph

207

SER_0331

JOHN MARK SUHY                                              November 29, 2022

1        A.  The environment, the CKGE environment is a

2   platform and services, and we don't manage the data

3   sources.  The data sources would be by the team,

4   meaning I would have to ask them what they were

5   using.

6        Q.  So the platform would be built on top of

7   the various data sources which would include ONgDB

8   at this time, correct?

9        A.  If there was a data source with ONgDB, we

10  can connect to it and we could display and let you

11  explore it.  Same with any other graph database

12  software.

13       Q.  Okay.  Let me go ahead and mark the next

14  exhibit.  It's actually already marked.  This will

15  be in your chat here marked as Exhibit 107.

16           By the way, before we get there, was it

17  your understanding that the IRS paid eGovernment

18  Solutions the additional 216,000 for the option year

19  increase?

20       A.  Yes.  All those should have been paid.  I

21  don't remember them ever not paying something.

22           I've got the new EX. 107 open.

23       Q.  This was previously marked at Mr. Mayur's

24  deposition.  Do you recognize this document?

25       A.  Yep.  This is another Amendment of

                                                          211

1   Solicitation/Modification of Contract.

2        Q.  And it was for the same eGovernment

3   Solutions contract that we've been talking about

4   that was initially awarded in May of 2018?

5        A.  Let me check.  Well, that depends on if

6   it's the same contract from legal speak between

7   00151 and 168.  But this is the same work.

8        Q.  There is no other contract that the IRS

9   awarded eGovernment Solutions, right, just one?

10       A.  Well, there was the contract that ended in

11  00151.

12       Q.  But it was for the same work, correct?

13       A.  Yes, but you said contract.  And this

14  specifically says contract number is 00168.  The

15  first one was not 00168.  So to me, it looks like

16  they're separate contracts.

17       Q.  But we looked at the exhibit that changed

18  the number, right?

19       A.  Yes, we did.

20       Q.  So it's fair to say it's the same contract

21  based on the change that the IRS made, correct?

22       A.  I wouldn't -- I wouldn't categorize it as

23  that, because they seem to have two different

24  contract numbers.  You would keep the IDs the same

25  if they were the same contracts.  But I'm not a

                                                      212

```
 1          Q.  What's a Smart ID?
 2          A.  I have no idea.
 3          Q.  All right.  Going back to Exhibit 107, do
 4   you understand this to be the exercise of option
 5   year 2 for the eGovernment Solutions contract?
 6          A.  Yes.  That's what it says.
 7          Q.  And that's your understanding of what this
 8   is?
 9          A.  Yes.
10          Q.  And that was for $200,000?
11          A.  Yes.
12          Q.  And that money, to your knowledge, was paid
13   to eGovernment Solutions?
14          A.  Yes.
15          Q.  And then let me take a look at -- okay.
16   Let me drop in Exhibit 108.  Do you recognize what's
17   previously marked as Exhibit 108?
18          A.  Yes.
19          Q.  And is this the exercise of option year 3
20   for eGovernment Solutions under the IRS contract?
21          A.  That looks to be the case, yes.
22          Q.  And it's for $200,000?
23          A.  Yes.
24          Q.  And to your knowledge, that $200,000 was
25   paid to eGovernment Solutions?
```

214

JOHN MARK SUIT                                    November 29, 2022

```
 1          A.  Yes.
 2          Q.  And then Exhibit 109, previously marked.  I
 3   just dropped that into the chat.  It's also titled
 4   Amendment of Solicitation/Modification of Contract.
 5   It's dated May 24, 2022.
 6          A.  Yes.
 7          Q.  Do you recognize this document?
 8          A.  Yes.
 9          Q.  Is this the exercise of option year 4 for
10   the eGovernment Solutions IRS contract we've been
11   talking about?
12          A.  That's what it says, yes.
13              (Zoom audio and/or video frozen.)
14   BY MR. RATINOFF:
15          Q.  I just said it wouldn't be anything else.
16          A.  That's what it says.  It says the purpose
17   of this modification is to exercise option year 4.
18          Q.  To your knowledge, was that $200,000
19   identified here paid to eGovernment Solutions?
20          A.  Yes.
21          Q.  And was this -- is this the last option
22   year on the contract between eGovernment Solutions
23   and iGov -- I'm sorry, the IRS and eGovernment
24   Solutions?
25          A.  Let me look at -- I believe so.  Yes.
```

215

JOHN MARK SUHY                                                        November 29, 2022

```
 1   iGov right now, it's a lot of trouble to fix that
 2   damage that's been done.  I believe that IRS
 3   associates risk with iGov because of this pestering
 4   and intimidation from Neo4j and specifically
 5   focusing on me and my company.  So I just don't
 6   think it's worth focusing on anymore right now.
 7        Q.  All right.
 8        A.  iGov.
 9        Q.  And eGovernment Solutions isn't going to
10   competitively bid?
11        A.  I have no idea what they're going to do.
12        Q.  You're no longer affiliated with
13   eGovernment Solutions?
14        A.  No.  I'm affiliated.  I help them still on
15   their FSO, and I help -- well, I used to help with
16   the bisdev.  I'm still the subcontractor to finish
17   this contract.  But if they go after it next year,
18   it's not going to be with me.  But they can make
19   their choices however they want to go.
20        Q.  I'm going to drop into the chat what was
21   previously marked as Exhibit 100.  Do you recognize
22   Exhibit 100?
23        A.  I'm still opening it or downloading it.
24        Q.  Yeah.  It's a large one.
25        A.  Yes.
```

                                                                              217

JOHN MARK SUHY                                              November 29, 2022

1        Q.   And what do you understand Exhibit 100 to
2   be?
3        A.   This is me giving back my shares to eGov
4   and them buying me out.
5        Q.   And what were the terms of the buyout?
6        A.   They would be in the contract.  I would
7   have to go read it all for you.  If you let me do
8   that, I can read it all and tell you.
9        Q.   Let's focus on a couple of sections here.
10       A.   Okay.
11       Q.   You'll see at paragraph 5 --
12       A.   Paragraph 5.
13       Q.   -- it says, "Re:  Treasury contract
14   2032H8-18-P-0015 (aka CKGE Knowledge Environment
15   contract) dated 5/24/2018."  Is that referring to
16   the eGovernment Solutions contract with the IRS we
17   have been discussing?
18       A.   Yeah, referring -- yes, 00151, that
19   contract.
20       Q.   And then in addition to that at paragraph
21   3.1 above, there is a $20,000 payment, correct?
22       A.   Can you say that again?  I'm sorry.
23       Q.   So section 3 is Terms of Payment.
24       A.   Oh, I see.
25       Q.   And it says you were paid $20,000 for your

                                                        218

JOHN MARK SUHY                                                    November 29, 2022

1    shares, as well; is that correct?

2        A.  Yes, that's correct.

3        Q.  And then under 5.1, it says:

4             "eGovernment Solutions Inc. hereby

5        hires John Mark Suhy as an independent

6        Contractor for all options that are

7        exercised on the CKGE contract.  His

8        compensation is $200,000 per year paid

9        when eGovernment Solutions gets paid."

10           So at this time, the IRS had already made

11   the $300,000 initial base contract payment to

12   eGovernment Solutions, correct?

13       A.  I believe so.

14       Q.  If you look at the date of this agreement,

15   it was signed, it looks like, or at least effective

16   date is December 31st, 2018.  Do you see that down

17   in section 7.1?

18       A.  Okay.  I see that.

19       Q.  Okay.  So your interest in iGov -- or I'm

20   sorry, your interest in eGovernment Solutions was

21   sold based on this agreement on December 31st, 2018,

22   correct?

23       A.  Yes.  That looks correct.

24       Q.  And by sections 5.1 through 5.3, was it

25   your understanding that you were still entitled to

                                                          219

JOHN MARK SHAIP                                          November 29, 2022

1    each $200,000 payment that was made in conjunction

2    with each option year on the eGovernment Solutions

3    contract?

4         A.  Only if I actually did the work.  Because

5    they have to -- they have to legally meet those

6    requirements.  So if I didn't do anything, if I

7    didn't accept them using us or using me, they would

8    have had to go and find someone to do this.

9         Q.  But you actually did the work for each

10   option years 1 through 4, correct?

11        A.  Yes, I did.

12        Q.  And under this agreement, you were entitled

13   to the $200,000 that was paid by the IRS for each

14   option year of the contract, correct?

15        A.  Well, my salary was $200,000.  It covered

16   this and other services.  But I allowed them to not

17   pay me the salary.  For some reason, this or some

18   other projects had fallen through.  But that

19   was our -- that was the agreed amount.  It says

20   right there.

21        Q.  The payments were ultimately made to iGov

22   and not you personally, correct?

23        A.  They came to iGov, and I worked through

24   iGov.

25        Q.  But there is no reference to iGov in this

                                                          220

1   agreement, correct?

2       A.  I'd have to search and see.  Give me

3   moment.

4       Q.  Well, it says in 5.1, it says:

5           "EGovernment Solutions Inc. hereby

6           hires John Mark Suhy as an independent

7           contractor for all option years that

8           are exercised on the CKGE contract.

9           This compensation will be $200,000 per

10          year when eGovernment Solutions gets

11          paid."

12          There is no reference to iGov in that

13   section, correct?

14      A.  Yes.  We must have had another agreement,

15   which most likely doesn't have a signature, just

16   like everything else.  But it's still a contract,

17   it's still an agreement.  Because it --

18      Q.  So there is another agreement you entered

19   into with eGovernment Solutions that assigned the

20   payments under this agreement from you to iGov?

21      A.  Just a verbal agreement that I would like

22   them to hire iGov.

23      Q.  Why did you do that?

24      A.  I don't remember the exact reasons.  But

25   it's -- I always like to do things as an entity that

221

JOHN MARK SUHY                                          November 29, 2022

```
 1   you can focus on and build up.  So most likely it
 2   was because I wanted to build up iGov and sell it at
 3   some point.
 4        Q.  And then I want to --
 5        A.  I don't remember exactly what the reasons
 6   were, but we did discuss it, you know, and we agreed
 7   that yes, we'll do that, then.
 8        Q.  Okay.  And you mentioned that Mr. Mayur
 9   didn't sign this.  But you understood this agreement
10   was executed between all of the parties involved,
11   the shareholders?
12        A.  I'm not sure what you mean.
13        Q.  Well, you said that you understood this
14   agreement to be executed.  That's right?
15        A.  Yes.  Well, we got paid, so . . . .
16        Q.  Okay.  Let me go ahead and mark the next
17   exhibit.  Actually, it's already been marked.  This
18   was previously marked as Exhibit 110.
19        A.  Okay.  I'm looking at that.
20        Q.  Do you recognize the documents that are
21   comprised of Exhibit 110?
22        A.  Yes.  They look to be invoices.
23        Q.  These are invoices for payment -- or I'm
24   sorry, what are these invoices for?
25        A.  The first one says "CDW Graphic
```

                                                           222

SER_0341

JOHN MARK SUHY                                          November 29, 2022

1    Environment," which again is a mis- -- it's not

2    called CDW Graphic Environment.  It's just initiated

3    that was what was on the award.  So the IRS has made

4    a few mistakes in describing things.

5         Q.  But you understand this is an invoice, at

6    least the one that ends in 68, the first one,

7    invoice No. 817 is for the initial 300,000 due under

8    the eGovernment Solutions/IRS contract that we've

9    just been discussing?

10        A.  Yeah.  That looks to be the case.

11        Q.  And then did you generate this document?

12        A.  I believe I did.

13        Q.  And submitted it to the IRS?

14        A.  I believe I did, yeah, on behalf of

15   eGovernment Solutions.

16        Q.  Looking at the next page, invoice 827, and

17   is this an invoice for the eGov Solutions/IRS

18   contract option year 1?

19        A.  Yes, it looks to be.

20        Q.  And this is for the $200,000 on that option

21   year?

22        A.  Yes.

23        Q.  You generated this document, invoice 827?

24        A.  I believe I did for eGovernment Solutions.

25        Q.  And it was submitted to the IRS under the

                                                      223

SER_0342

1    eGovernment Solutions/IRS contract?

2         A.   Yes.

3         Q.   And the IRS paid the $200,000?

4         A.   Yes.  I believe they paid everything.

5         Q.   And invoice 901, next page, is this the

6    invoice for option year 3 -- I'm sorry, strike that.

7              This is invoice 901 for option year 1

8    modification.  Is that what we were previously

9    discussing as being a modification to add additional

10   work to the eGovernment Solutions/IRS contract?

11        A.   I'm not sure if that references this, this

12   additional work.

13        Q.   Well, it says under line the item, "CDW

14   Graphic Environment Continued Option Year 1

15   Modification.  Item code:  101B."  Do you see that?

16        A.   I see that.

17        Q.   And for 216,000?

18        A.   I see that.

19        Q.   Isn't that the amount of what the option

20   year 1 increase was for?

21        A.   I don't remember if this was what -- were

22   all the option years 200,000?

23        Q.   Okay.  Why don't we go ahead and just take

24   a quick look at -- let's see.  It was Exhibit 105.

25   Why don't you go just take a quick look at

                                                          224

1  Exhibit 105 and see if that helps.

2       A.  Okay.  Let me get this open.  Bear with me.

3  All right.

4       Q.  Looking at Exhibit 105, do you now

5  understand this invoice is reflecting the

6  modification to option year 1 for the eGovernment

7  Solutions/IRS contract?

8       A.  I see that.  But the prices don't line up.

9       Q.  How so?

10      A.  Well, that invoice says 216,000, and

11 Ex. 105 says 200,000.

12      Q.  If you actually go down, let's see -- so

13 why would you invoice for 216,000?

14      A.  I have no idea if it's a mistake or

15 something else.

16      Q.  You know what, I apologize.  I meant to

17 show you Exhibit 106.  That's my fault.  A lot of

18 exhibits.  So please take a look at Exhibit 106, and

19 let me know if that helps you.

20      A.  This looks like it was just the increase,

21 the option year, by 216,000, yes.

22      Q.  So then going back to Exhibit 110, the

23 invoice we were looking at, which was invoice 901,

24 this is the invoice 901 for that option year

25 modification, correct?

                                                    225

```
 1        A.  Yes, it looks to be.  The numbers line up.
 2        Q.  And 216,000, same number?
 3        A.  Yes.
 4        Q.  This money was paid to eGovernment
 5   Solutions?
 6        A.  Yes.
 7        Q.  And going on to Exhibit -- I'm sorry, the
 8   same exhibit, 110, invoice 955.  This is an
 9   invoice -- are you there?
10        A.  Yes.
11        Q.  This is the invoice that you generated to
12   send to the IRS for option year 2 under the
13   eGovernment Solutions/IRS contract?
14        A.  Yes, I believe so.  Yeah.
15        Q.  To your knowledge, the IRS paid the 200,000
16   to eGovernment Solutions?
17        A.  Yes.
18        Q.  Looking at invoice 960.
19        A.  I'm looking at it.
20        Q.  Do you recognize invoice 960 as being an
21   invoice you generated for option year 3 under the
22   eGovernment Solutions/IRS contract?
23        A.  That looks right.
24        Q.  And this is for $200,000?
25        A.  Yes.
```

226

1    Q.   And the IRS paid that $200,000 for option

2  year 3 to eGovernment Solutions?

3    A.   Yes.

4    Q.   And finally looking at invoice 912.

5    A.   I'm looking at it.

6    Q.   And is this the invoice you generated to

7  send to the IRS for option year 4 under the

8  eGovernment Solutions/IRS contract?

9    A.   It looks correct.  But we don't actually

10  send anything to IRS.  This is just an option to

11  upload.  I don't believe you even need to have

12  invoices, because IRS has its own system for

13  payments.  So I don't believe this was sent

14  anywhere.  I believe it was just uploaded as a

15  reference, so when we look in their antiquated

16  system for showing procurements, we could remember

17  what it was for.

18    Q.   So this is uploaded to the IRS, these

19  invoices?

20    A.   Yes.  I believe they were on the website.

21  It could have been another government agency that

22  runs it for all -- for different agencies, but I

23  think it's just for IRS, the website.

24    Q.   And going to the last page of this exhibit,

25  it ends with a Bates number 74, did you generate

                                                    227

JOHN MARK SIMS                                                    November 29, 2022

1    you've got your numbers right, but our numbers are

2    right.  Everything that we made comes in.  We

3    generate reports and pay the taxes.  You can do that

4    without 1099s.  You could make a mistake, though, so

5    1099s are good to help you verify.

6              MR. RATINOFF:  Okay.  Let me mark -- it's

7    already been premarked in a previous deposition as

8    Exhibit 111.

9              THE WITNESS:  I've got that open.

10   BY MR. RATINOFF:

11        Q.  Okay.  Do you recognize this document?

12        A.  Yeah.  That looks like a 1099.

13        Q.  Issued by eGovernment Solutions?

14        A.  EGovernment Solutions to iGov Inc.

15        Q.  And that's for 2018?

16        A.  Yes.

17        Q.  And then the 285,700 would be for the money

18   received that year from eGovernment Solutions?

19        A.  That would have been paying me for my

20   services, consulting, SFO duties and whatnot.

21        Q.  During that year, you performed services

22   for the IRS under the eGovernment Solutions/IRS

23   contract, correct?

24        A.  That's correct.

25        Q.  And that work would have been reflected in

231

JOHN MARK SUHY                                                    November 29, 2022

1    this 1099?

2        A.  Yes, that would have been part of it.

3        Q.  And the other part is what?

4        A.  FSO services and business development.

5        Q.  You don't have any time sheets, though, to

6    reflect the division of that labor though, do you?

7        A.  There is no need.  This is -- we agreed on

8    fixed prices.  Usually that's the easiest way to do

9    things.  And that's how IRS pays, as well.

10       Q.  So the IRS paid $300,000 in 2018 under the

11   eGovernment Solutions contract, correct?

12       A.  Yes.

13       Q.  And you were paid by eGovernment Solutions

14   285,700, correct?

15       A.  Yes.

16       Q.  And the difference between the 285-plus

17   thousand was that -- and the 300,000, was that

18   expenses that you mentioned that were paid out?

19       A.  I believe so.  It could have been that we

20   had other help.  Whenever I need help on something,

21   it costs money.  So it could have been that, as

22   well.  I'm not positive.

23       Q.  And then I'll mark Exhibit 112, or it's

24   been marked already.  Just let me know when you've

25   had a chance to look at it.

                                                    232

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS  408-287-7500

1   A.   Yes, I'm looking at that right now.

2   Q.   And do you understand what Exhibit 112 is?

3   A.   Yes.  This is a 1099 Misc.

4   Q.   This is issued to iGov by eGovernment

5   Solutions?

6   A.   Yes.

7   Q.   And this is for work that you performed

8   under the eGovernment Solutions/iGov -- I'm sorry,

9   eGovernment Solutions/IRS contract?

10   A.   This is for work done, consulting done on

11   that, FSO services and business development

12   services.

13   Q.   So the IRS, I think that year prior to the

14   amendment, paid $200,000 to eGovernment Solutions,

15   correct?

16   A.   Let me look and see for 2019 what was paid.

17   Option year 1 was 200,000.  Option year 1

18   modification, though, was 216,000.

19   Q.   So the total for 2019 was 416,000 that was

20   paid by the IRS to eGovernment Solutions?

21   A.   I'm not positive, but it looks like -- let

22   me see.  From looking at these invoices, it looks

23   like there was a 200,000 for invoice 827, and then

24   there was invoice 901, which was 216,000.

25   Q.   Those are both --

233

JOHN MARK SUTER                                                  November 29, 2022

```
 1        A.  That's 2020, so never mind.
 2        Q.  As far as Exhibit 112 goes, you have no
 3   reason to believe this wasn't sent to iGov by
 4   eGovernment Solutions?
 5        A.  I don't think it was mailed.  These are
 6   generated by your tax software.  And it's possible
 7   that they e-mailed it to us or provided it by e-mail
 8   or didn't provide it at all.  I don't remember.
 9        Q.  You have no reason to believe this is an
10   incorrect amount?
11        A.  No, no.  It looks right.
12        Q.  Let me mark Exhibit -- I'm sorry, this one
13   has already been previously marked as Exhibit 113.
14        A.  Okay.  I'm looking at that.
15        Q.  Do you have an understanding of what
16   Exhibit 113 is?
17        A.  Yes.  It's a 1099-NEC for 2020.  I have no
18   idea what that means.
19        Q.  Okay.  To your knowledge, were you paid
20   193,000 by eGovernment Solutions in 2020?
21        A.  I have no reason to think why that wasn't
22   true, but I would have to look at our accounting to
23   see the numbers.  For all of these, I would have to
24   just verify it to say for sure yes.  But it looks
25   like.
```

234

1      Q.  So this is something that might be
2  reflected in iGov's financial statements?
3      A.  Yes.
4      Q.  But you have no reason to believe this is
5  incorrect 1099 for 2020?
6      A.  It's not a 1099 Misc.  It's a 1099-NEC,
7  which I have no idea what that means.
8      Q.  But it's still a 1099-NEC, correct?
9      A.  Yes.
10     Q.  It's not for employment income?
11     A.  I don't know what -- I'm not familiar with
12  what they all mean.  I just have a vague
13  understanding.
14     Q.  To your knowledge, you were paid 193,000 by
15  eGovernment Solutions for work as an independent
16  contractor?
17     A.  They paid that to iGov Inc. for services.
18  I don't know what the term "independent contractor"
19  means.  iGov Inc. is a company.  It's a corporation.
20     Q.  As working as a contractor for eGovernment
21  Solutions on the IRS/eGovernment Solutions contract,
22  correct?
23     A.  That's one of the things that iGov does for
24  them, yes.
25     Q.  Can iGov as an entity act as an FSO?

                                                      235

JOHN MARK SUHY                                             November 29, 2022

```
 1    just pick whichever one you want, whatever is
 2    available in Exhibit 110, just -- we can start at
 3    the top.  That's fine.
 4         A.  Okay.  I'm looking at it.
 5         Q.  And there's -- actually, scratch that.  Let
 6    me move on.
 7              So then going and looking at -- I see
 8    where -- sorry.  I got sidetracked there.
 9              Okay.  So then I don't think I showed you
10    Exhibit 114 yet, so let me do that.  This was
11    previously marked as Exhibit 114.
12         A.  It's not opening.  Maybe I've got to close
13    all my other exhibits.  I have to close everything,
14    because it's no longer opening.
15         Q.  That's fine.  I don't think we're going to
16    be going back to anything as of now.
17         A.  I've got that open.
18         Q.  Okay.  So previously marked Exhibit 114, do
19    you recognize what this document is?
20         A.  Yes.  It says it's a 1099-NEC.
21         Q.  And this is issued by eGovernment Solutions
22    to iGov?
23         A.  Yes, that's correct.
24         Q.  And the amount of employee compensation
25    being 197,000?
```

                                                            237

JOHN MARK SUHY                                                    November 29, 2022

1       A.  That sounds right.
2       Q.  And that's for work done under the
3  eGovernment Solutions/IRS contract?
4       A.  And FSO services and then business
5  development services.
6       Q.  But again, you don't have any time sheets
7  to reflect the breakdown of that work versus what
8  was done for the IRS?
9       A.  No.  We -- we put everything together.
10  IRS, they can only subcontract a certain amount of
11  it, and so I could calculate how much that would
12  have been.
13       Q.  You testified that the IRS, for instance in
14  2021, made a $200,000 payment to eGovernment
15  Solutions.
16       A.  Yes.
17       Q.  And it makes that payment pursuant to the
18  renewal, correct?
19       A.  When they exercise an option year, yes.
20       Q.  And they do that as a lump-sum payment,
21  correct?
22       A.  Yes.
23       Q.  And then you perform the work after that
24  for that option year after that payment is made,
25  correct?

                                                        238

1      A.  Yes.

2      Q.  Do you submit any time sheets to the IRS to

3   reflect how much of that $200,000 worth of work you

4   do?

5      A.  It's fixed price.  They don't require that.

6   That's one of the benefits of a fixed price is they

7   miss -- they don't have to deal with the risk.  Time

8   and materials could easily make it 500, $600,000.

9      Q.  So you could have worked five hours or

10   5,000 hours that year, and you would still be paid

11   the $200,000 for 2021 by the IRS?

12      A.  Exactly.  And that's why -- that's why the

13   agreement between eGovernment and iGov was the same,

14   because if we were doing time and materials, it

15   could have made it so that eGovernment Solutions

16   could have owed a lot of money that they just didn't

17   have.  If it was time and materials, though, it

18   would have been -- it would have passed through, and

19   iGov would have done time and materials, as well.

20      Q.  But that didn't happen?

21      A.  This is not a time and materials contract.

22      Q.  Okay.  Now, I don't have a 1099 for 2022,

23   because I think we can agree those don't come out

24   until after the close of the calendar year, correct?

25      A.  I believe so.

239

1    know if it's based on it.

2              MR. RATINOFF:  All right.  Let me mark the

3    next exhibit, Exhibit 505.  I'm sorry.  This is tab

4    505.  It will be marked as Exhibit 217.

5              (Plaintiffs' Exhibit 217 was marked for

6    identification.)

7              THE WITNESS:  Yes.  I'm looking at that

8    now.

9    BY MR. RATINOFF:

10       Q.  Okay.  I'll represent to you this is

11   produced by eGovernment Solutions.  It starts at

12   Bates number 151.  Do you understand what what's

13   been marked as 217 is?

14       A.  Tab 505, it's a Wells Fargo transaction

15   history.

16       Q.  And do you recognize the account number for

17   this transaction history?

18       A.  I don't remember account numbers, but there

19   is only one Wells Fargo account that I had access

20   to.

21       Q.  Is this the account that -- is this the

22   account you had access to at eGovernment Solutions?

23       A.  Yes.  I believe I may have had access to

24   this just when I was a partner, and it just stayed

25   there.  But I'm not positive when this was created.

243

JOHN MARK SUTO                                                    November 29, 2022

```
1           Q.  Do you have signing authority on this
2   account?
3           A.  I should have it, but I'm not positive.
4           Q.  You sign checks on this account?
5           A.  Yes, I've signed checks.  I've always
6   signed checks after verifying that I have the
7   permission to do so.  So if there is a check that
8   needs to be submitted, I would always call and get
9   permission.
10          Q.  Permission from who?
11          A.  Ashwani, usually.
12          Q.  Ashwani Mayur?
13          A.  Yes.
14          Q.  And to your knowledge, were all the
15  payments made by the IRS deposited in this account?
16          A.  I believe so.
17          Q.  And you mentioned there was expenses paid
18  on behalf of eGovernment Solutions.  Would those
19  also be paid from this account?
20          A.  I'm not positive.
21          Q.  So for instance, let's go to the next page,
22  152, there is a -- there is an IRS Treas
23  miscellaneous payment for 216,000 dated January 9th,
24  2020.  Do you see that?
25          A.  Yes, I see that.
```

244

1      Q.  That's the 216,000 for that amendment to
2   option year 1?
3      A.  Yep, this seems right.
4      Q.  And below that, you'll see there is GoDaddy
5   payments?
6      A.  Yes, I had that.
7      Q.  Are those GoDaddy payments made on behalf
8   of eGovernment Solutions or iGov?
9      A.  Everything here would be just for
10  eGovernment Solutions.
11     Q.  And I want you to take a look at page 152.
12     A.  That's what I was just looking at.
13     Q.  And you'll see on January 15, 2020, a
14  payment was made to AtomRain for $101,400.  Do you
15  see that?
16     A.  Yes, I see that.
17     Q.  Was that payment made to AtomRain on behalf
18  of iGov?
19     A.  This would have been -- iGov wouldn't have
20  used eGovernment Solutions' bank accounts.  They're
21  completely different entities.  EGovernment
22  Solutions would have paid AtomRain directly.
23     Q.  Did iGov subcontract out work under the
24  eGovernment Solutions/IRS contract to AtomRain?
25     A.  It looks like from this that eGovernment

245

1    Solutions subcontracted out to AtomRain.

2        Q.  Are you aware of any subcontractor

3    agreement between eGovernment Solutions and

4    AtomRain?

5        A.  I'm not sure.  I don't remember.

6        Q.  Did you recommend that eGovernment

7    Solutions hire AtomRain to do additional work on the

8    eGovernment Solutions/IRS contract?

9        A.  Yes.  That would have come from me.

10       Q.  So essentially, you hired them?

11       A.  I didn't hire them.  I would have gone

12   to -- I treat companies as entities, and I try to

13   keep everything separate from anything else.  And I

14   would have gone to them and said these are the

15   experts.  We should subcontract them, because I

16   don't have enough time to do a lot of the work they

17   want.  And then they would have said okay, and then

18   we would have an agreement.  Or they might have got

19   an agreement with AtomRain.  I don't remember.

20       Q.  So you're not aware of there being an

21   actual agreement with AtomRain between eGovernment

22   Solutions and AtomRain?

23       A.  I'm not sure if it was a handshake deal or

24   a written agreement.  I wasn't an owner at this

25   point, so I don't remember if they would have had

                                                246

JOHN MARK SUHY                                              November 29, 2022

 1   lawyers come in and verify everything.  But they do

 2   take -- when I make a recommendation, if I say look,

 3   we need to do this, they usually listen.  But they

 4   don't have to.

 5        Q.  Okay.  I'm going to go ahead and put what

 6   was previously marked as an Exhibit 115.

 7        A.  After this, I'm going to have to use the

 8   bathroom again.  Sorry.

 9        Q.  Sure.  No problem.

10        A.  I'm looking at it now.

11            (Reporter interruption.)

12   BY MR. RATINOFF:

13        Q.  It's 115.  And this is also a Wells Fargo

14   business checking printout from eGovernment

15   Solutions production.  It's eGov Production 81 is

16   the first Bates number.

17        A.  Yes, I'm looking at it.

18        Q.  At the bottom of the first page, it says

19   Account Number.

20        A.  I do not see that.  The first page, bottom

21   right?

22        Q.  Yeah.  There is a little line, vertical

23   line, and it says Account Number, and under it, it

24   says eGovernment Solutions.

25        A.  I see that.

                                                    247

```
 1      Q.  And your understanding is that these bank
 2  statements are from the same account that we were
 3  just discussing?
 4      A.  Yes, because I believe there is only one
 5  Wells Fargo account.  But I'm not positive.  I know
 6  it added other bank accounts, as well.  I believe it
 7  is.  The easy way is to check this account number
 8  and the previous one you looked at to see if they
 9  match.
10      Q.  Why don't you go ahead and do that just so
11  we're clear.  Tab 505 and Exhibit 115.  Tab 505 has
12  now been marked as Exhibit 217.
13      A.  I'm looking right now.  505.  Yep.  They're
14  the same number, account number.
15      Q.  And that's the same account that you had
16  signing authority on?
17      A.  I don't know if I had signing authority,
18  but yes, the same account.
19      Q.  But you had access to it?
20      A.  Yeah, I had access to it.
21      Q.  And then let's go ahead and look at page
22  134, eGov Production 134.  It's going to be -- it's
23  going to be page 54 of 56 of the PDF.
24      A.  Are we talking about EX 155?
25      Q.  Yeah.  EX 155, if you go to 54 out of 56.
```

248

1    A.  All right.  115 on there?  Okay.  Well,

2    this says account balance calculation sheet.  Is

3    that --

4    Q.  No.  It's going to be -- it's going to be

5    54 out of 56 with the Bates numbers eGov Production

6    134 at the very bottom.

7    A.  I'm confused.  What is the name of the file

8    I should be looking at?

9    Q.  EX 155.

10   A.  Combined statements.  Okay.  So I'm going

11   down to -- you said down to the bottom?

12   Q.  Page 54 out of 56 in the PDF.  The Bates

13   number at the bottom should be eGov Production 134.

14   A.  I'm there.

15   Q.  You'll see there is a payment made by IRS

16   Treas on June 13th, 2022?

17   A.  Yes, I see that.

18   Q.  200,000?

19   A.  I see that.

20   Q.  And that's the payment for option year 4?

21   A.  Based on the date, I believe so.

22   Q.  So going down to the next page, 135.

23   A.  Okay.

24   Q.  $200,000 from IRS Treas dated June 15,

25   2021.  Do you see that?

249

1    A.  I see that.

2    Q.  That's for option year 3 under the

3    IRS/eGovernment Solutions contract?

4    A.  Okay.

5    Q.  Yes?

6    A.  Okay.  Are you asking me a question?

7    Q.  Yeah.

8    A.  It seems like it would be, yes.

9    Q.  Same amount that was due under option year

10   3?

11   A.  I have to go back and keep looking at it,

12   but it sounds right.  Everything was 200,000, so

13   yes.

14   Q.  Everything but the first year of 300,000?

15   A.  Yes.

16   Q.  And obviously 216,000 for the option year 1

17   increase, correct?

18   A.  Yes.

19   Q.  Okay.  We can take a break now.  Thanks for

20   your patience.  We can come back -- if everyone is

21   okay, we can do -- I guess it's 5:30 your time, so

22   5:35?

23       THE VIDEOGRAPHER:  Okay.  We're off the

24   record at 2:28.

25       (Break taken from 2:28 to 2:36 p.m.)

                                              250

JOHN MARK SUHY                                                                          November 29, 2022

```
 1              THE VIDEOGRAPHER:  We are now on the record
 2      at 2:36.
 3      BY MR. RATINOFF:
 4          Q.  Mr. Suhy, I just want to put the next
 5      exhibit into the chat.  It will be tab 507.  This
 6      is --
 7          A.  It's downloading.
 8              MR. RATINOFF:  Let me know when you're
 9      ready.
10              While you're doing that, this will be
11      marked as exhibit -- where are we at?  218.
12              (Plaintiffs' Exhibit 218 was marked for
13      identification.)
14              THE WITNESS:  Yes.  I've got it open.
15      BY MR. RATINOFF:
16          Q.  Okay.  And these were checks, printouts of
17      checks that were provided by eGovernment Solutions.
18      You'll see there is a Bates number, EGOVS ending in
19      the Bates number 150.  Do you see that?
20          A.  Yes.
21          Q.  If you look at the top, you'll see there is
22      an account number 5581518783.
23          A.  I don't see that account number.
24          Q.  It's at the very top.  You can also see it
25      on the chat.  You'll see there is an account number
```

251

1   on the chat as well as the 5581518783.

2        A.  I see it, yes.

3        Q.  That's the same account number that we've

4   been talking about in the bank statements, the

5   Wells Fargo account?

6        A.  Yes.

7        Q.  And is this your signature on this check?

8        A.  Yes.

9        Q.  And this is for at least part payment for

10   the work that you did for eGovernment Solutions on

11   the IRS contract?

12       A.  I believe so.  I would have had to call up

13   and get permission from Ashwani for each of these.

14   So I would have to see how it linked up, but I

15   believe that's what it's for.

16       Q.  Let's go down to the next check.  This one

17   is on Bates number 151.

18       A.  Yes.

19       Q.  And it's dated January 24, 2020.  Do you

20   see that?

21       A.  Yes.

22       Q.  It's for 5,000?

23       A.  Yes, I see that.

24       Q.  And then is that your signature?

25       A.  Yes, it is.

SER_0364

1    Q.  And it says, "Pay to the order of Irving

2    Starr, Esquire."  Who is that?

3    A.  That's a legal, for lawyers.  So I have an

4    agreement with eGovernment Solutions that they can

5    help pay for some of the legal fees directly and put

6    it into escrow for me to use.  And we have an

7    agreement that there will be no -- I forgot the name

8    of it, no -- what's it called when you work with

9    someone?  You can have a conflict of interest.  So

10   this is -- this is something that I'd asked them for

11   permission for and they gave me.  And then they gave

12   me permission to sign it.

13        The reason why is I'm the only one that

14   happened to have checks.  So once they get checks,

15   they're able to do everything on their own.  But I

16   was the only one that had checks from the account

17   creation.

18   Q.  You say legal fees.  Whose legal fees are

19   you referring to that this is payment for?

20   A.  Well, this is just -- this is going into a

21   trust.  So this would be for -- I believe this

22   was -- I don't remember if this was for the lawsuit

23   or for something else.

24   Q.  So this is a lawyer or a law firm that iGov

25   retained, Irving Starr?  That's your counsel in this

253

 1   case, correct?

 2        A.   Yes.

 3        Q.   So Irving Starr, they were retained by

 4   iGov, not eGovernment Solutions, correct?

 5        A.   Retained by, I guess you would say, myself.

 6        Q.   Right.  Irving Starr, you're not writing a

 7   check for services provided to eGovernment

 8   Solutions, correct?

 9        A.   No.  This is where I had asked them if they

10   could put a deposit into a legal trust for me to use

11   for other -- you know, by helping out with this, it

12   would let me focus on, you know, helping them with

13   business development and whatnot.

14        Q.   So were they helping pay for your legal

15   fees in this case?

16        A.   Hmm -- I don't know if I consider it

17   helping pay for the legal fees.  I just asked them

18   to put that amount in the trust, and it was

19   something that I didn't bill them for.  So I don't

20   think they actually -- they would have subtracted

21   this out of what we would have billed.

22        Q.   You said you had an agreement with

23   eGovernment Solutions to pay for services provided

24   by Irving Starr?

25        A.   Yes.  Well, yes, to put money into the

                                                            254

1          MR. BEENE:  If you want to do that right
2     now, that's fine.
3          MR. RATINOFF:  Yeah, it will kind of close
4     off this line of questioning.
5     BY MR. RATINOFF:
6          Q.  What I put in the chat as Exhibit 145 is a
7     spreadsheet produced by ASR reflecting the payments
8     made between June 28, 2019, July 27, 2022, the total
9     amount being $246,082.55.  Your counsel and I talked
10    about this being a fair and accurate representation
11    of what ASR paid you under the Master Subcontract
12    Agreement.  Is that acceptable?
13         A.  I believe so.  I'd like to verify it if
14    we're going to stipulate to something.  I can -- I
15    can -- unless you have another --
16         MR. RATINOFF:  I'm asking your counsel.
17    I'm just making a record of our stipulation.
18         MR. BEENE:  Let's go off record for one
19    second.
20         MR. RATINOFF:  Okay.
21         THE VIDEOGRAPHER:  Okay.  We are off the
22    record at 3:38.
23         (Break taken from 3:38 to 3:40 p.m.)
24         THE VIDEOGRAPHER:  We are now on the record
25    at 3:40.

                                                   296

1    MR. BEENE:  Okay.  So defendants stipulate

2  that Exhibit 145 accurately reflects the payments

3  from ASR to iGov.

4    MR. RATINOFF:  Under the Master Subcontract

5  Agreement and Task Orders?

6    THE WITNESS:  I believe that's what they're

7  for.

8    MR. RATINOFF:  Do you need to go back off

9  the record?

10    MR. BEENE:  No.

11    THE WITNESS:  I don't know which ones --

12  which subcontractor tasks they're for.  But those

13  are all -- those all pertain to iGov.

14    MR. RATINOFF:  I appreciate that.  I just

15  wanted to confirm with your counsel that it's okay

16  to proceed with that addition.

17    Mr. Beene?

18    MR. BEENE:  We'll have to go off the

19  record.

20    MR. RATINOFF:  Okay.  Just to be clear, all

21  I'm asking is that if they weren't payments made by

22  ASR, it would have had to be pursuant through a

23  contract.  So I'm assuming there is no other

24  contract.  The Master Subcontract and the other

25  contract we looked at, the subcontract for Tylor

297

1   Data, and then the Task Orders.  That's all I'm

2   asking.

3            MR. BEENE:  And my client just went on the

4   record saying there is a lack of clarity on that, so

5   I have to talk to him about that clarity.

6            MR. RATINOFF:  Okay.  Gotcha.  Let's just

7   take a full five-minute break to give everyone a

8   chance to stretch their legs.

9            THE VIDEOGRAPHER:  Okay.  We're off the

10   record at 3:42.

11            (Break taken from 3:42 to 3:48 p.m.)

12            THE VIDEOGRAPHER:  We're now on the record

13   at 3:48.

14            MR. RATINOFF:  Just to be clear on the

15   record, we discussed the specific exhibits

16   representing the various subcontracts that iGov is

17   working on with ASR's Exhibits 134, 135, as amended

18   by 136.

19            MR. BEENE:  And Defendants stipulate that

20   the payments reflected in Exhibit 145 from ASR to

21   iGov are those payments applicable to the contracts

22   represented by Exhibits 135, 136 and 134.

23            MR. RATINOFF:  Agreed.  All right.  That

24   was probably easier than doing it via written

25   stipulation.  It would have taken us a week.

298

JOHN MARK SUHY                                          November 29, 2022

```
 1   very specific question about what you wrote in this
 2   e-mail.  So I'm going to strike your response, and
 3   I'm going to ask you the question one more time.
 4   And I want you to --
 5       A.  That answer is to the previous question.
 6       Q.  I know it's late, but I'm going to ask for
 7   more time because you're wasting my time.
 8           MR. BEENE:  Let's go off the record.
 9           THE WITNESS:  I think you're wasting my
10   time.
11           MR. BEENE:  Let's go off the record.
12           THE WITNESS:  Okay.
13           THE VIDEOGRAPHER:  Jeffrey, do you want to
14   go off the record?
15           MR. RATINOFF:  Yeah, that's fine.
16           THE VIDEOGRAPHER:  We are now off the
17   record at 5:23.
18           (Break taken from 5:23 to 5:31 p.m.)
19           THE VIDEOGRAPHER:  We are now on the record
20   at 5:31.
21   BY MR. RATINOFF:
22       Q.  Mr. Suhy, before we broke you mentioned
23   that at that time ONgDB was based on the identical
24   code to Neo4j Enterprise, correct?
25       A.  It was based on the full code base of
```

                                                              363

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS   408-287-7500

JOHN MARK SUHY                                        November 29, 2022

1    Neo4j, which includes Community and Enterprise as

2    submodules, I guess you'd call them.

3         Q.  And at that time, was it your understanding

4    that Neo4j was suiteing (phonetic) the copyrights to

5    the source code for Neo4j Enterprise?

6         A.  Yes.  To the source code, yes.

7         Q.  And that was the same source code that was

8    used in ONgDB 3.4.x?

9         A.  Yes.

10        Q.  Thank you.  All right.  I'm going to give

11   you the next exhibit here.  This was previously

12   marked as Exhibit 170.

13        A.  All right.  I have it open.

14        Q.  You'll see this e-mail was produced by

15   iGov.  There is a Bates number ending in 3216 on the

16   first page, .001.  Do you see that?

17        A.  Yes, I see that.

18        Q.  And you'll see it was produced from your

19   egovsol.com account.  Do you see that?

20        A.  Yes.

21        Q.  And do you understand it's an e-mail to be

22   a continuation of the conversation and e-mail that

23   you were having with Mr. Dunn about switching to

24   ONgDB 3.4.x?

25        A.  I'm not sure if this is a continuation or

                                                      364

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS   408-287-7500

SER_0371

1    something new.  Let's see the subject line.  Could

2    you give me one moment?

3        Q.  Sure.

4        A.  I'm -- well, the subjects are the same, so

5    I would say this would be a continuation.

6            MR. BEENE:  Don't guess, please.  Make sure

7    you read the whole document.

8            THE WITNESS:  Let me read the whole doc and

9    see.  Okay.  I've read it.

10   BY MR. RATINOFF:

11       Q.  Is it fair to say this is a continuation of

12   your e-mail exchange with Mr. Dunn on recommending

13   going with ONgDB 3.4.x over Neo4j?

14       A.  Well, this is a continuation of the e-mail.

15   I'm not sure if you categorized it correctly.

16       Q.  Okay.  But this is the e-mail where you

17   recommended to Mr. Dunn on August 13th of 2018 at

18   11:58 a.m., "I think we should use ONgDB 3.4.x for

19   the launch," correct?

20       A.  Yes, I said that.

21       Q.  And then eventually Mr. Dunn in the last

22   e-mail in the top here says, "John Mark, go ahead

23   and integrate the ONgDB into the CKGE framework

24   we'll deploy."  Do you see that?

25       A.  I see that.

                                                    365

Q.  After that, did you provide a version of
ONgDB to the IRS to use in the CKGE framework?

A.  I believe he -- he didn't say it correctly.
You don't -- you don't deploy it to the framework.
You just have your own data sources, and the
framework has tools that can connect to it.

Q.  So then did you start using ONgDB at the
IRS in relationship to the CKGE framework or
environment, whatever you like to call it?

A.  I didn't.  The teams did, the teams that
manage graphs, I'm sure.  Because this says let's go
ahead and do it.

Q.  Where did ONgDB software come from for the
IRS?  Was it downloaded from the iGov website?

A.  The Graph Foundation.

Q.  And at that time, was the IRS using an
internal gitlab repository to maintain its graph
database software it was using?

A.  I don't remember at that time if they had
it.

Q.  At some point did the IRS begin using an
internal gitlab repository to maintain versions of
ONgDB?

A.  No, not to maintain versions, but I think
it was to be able to run their own code scans.  So

366

SER_0373

 1    any time they had software, they had source course
 2    available.  They wanted it to be in there so they
 3    can run code scan tools.
 4        Q.  What are code scan tools?
 5        A.  They're tools that can do static secure
 6    code.  So it can do static code scanning.  It can
 7    identify specific types of vulnerabilities that you
 8    can recognize by looking at actual source code.
 9        Q.  So they --
10        A.  Tools for that.
11        Q.  So before using that version of ONgDB, it
12    would be loaded into the gitlab, and the IRS would
13    scan it to make sure it didn't have any security
14    vulnerabilities?
15        A.  Sorry, repeat that again.
16        Q.  Yeah.  So for instance, if there was a new
17    version of ONgDB to be used, it would be uploaded to
18    the gitlab in the IRS, and they would run scans on
19    it to make sure it was secure and didn't have any
20    security vulnerabilities?  Is that what you're
21    saying?
22        A.  That's one thing they would do, yes.  But
23    it wasn't mandatory to do it.  It was more that,
24    hey, they have a tool that will scan all the repos,
25    let's make sure everything is there in case there

                                                    367

JOHN MARK SUHY                                                          November 29, 2022

1    was something that wasn't reported to us in gitlab.

2        Q.  Did you ever upload any version of ONgDB to

3    the IRS's gitlab repository?

4        A.  I believe I'm the one that did it, but I

5    don't remember.  I'm the one that's responsible for

6    making sure that any of the software that's being

7    used can all be found in a certain area, in a

8    certain location.  So I think I would have done

9    that.

10       Q.  Is that something you continued to do

11   throughout the eGovernment Solutions contract?

12       A.  No.  I think it was something that I

13   started to help with, and then since it's unpaid,

14   just no time to keep doing it.

15       Q.  To this day, you have access to that gitlab

16   repository that the IRS maintains?

17       A.  I believe so.  I should have it.  I haven't

18   checked it for a while, so . . . .

19       Q.  And do you know whether the IRS switched

20   over to ONgDB for its YK1 platform?

21       A.  I'm not positive.

22       Q.  Take a look at what's been previously

23   marked as Exhibit 174.  Oh, I'm sorry.  I think I

24   put the wrong e-mail in.  Let me back up here.

25   Yeah.  Why don't you hold off on that one.  Let me

                                                                    368

1    put it --

2         A.  Let me close these down so I can open up

3    new ones.

4              MR. RATINOFF:  While you're doing that, let

5    me put in tab 456.  This will be marked as, I

6    believe, Exhibit 234.

7              (Plaintiffs' Exhibit 234 was marked for

8    identification.)

9              THE WITNESS:  Okay.

10   BY MR. RATINOFF:

11        Q.  Do you have an internal IRS e-mail address?

12        A.  Yes, I do.

13        Q.  And you use that address for work that you

14   do for the IRS under the various contracts that

15   you're working under?

16        A.  Yes.

17        Q.  And do you know who Rahul Tikekar is?

18        A.  Yes.

19        Q.  And who is he?

20        A.  He is an IRS employee.

21        Q.  And is he responsible for the YK1 platform?

22        A.  I'm not sure who's responsible for it, but

23   he's involved in it.

24        Q.  And you'll see in this e-mail dated

25   September 21, 2018, you write:

369

```
1              "I uploaded the ONgDB 3.4.5 instance
2         with the same configuration settings,
3         plugins, et cetera, into my directory
4         on the server you gave me access to,
5         and everything works just fine."
6    A.   Yes, I see that.
7    Q.   Does this refresh your recollection about
8  the YK1 platform beginning to use ONgDB 3.4.5 in
9  September of 2018?
10   A.   No.  Because I'm not sure if they ended up
11 using it.  That's what I'm not -- unsure of.  They
12 could have been using Neo4j Community.  You're going
13 to have to ask.
14   Q.   So you defer to the IRS on that?
15   A.   Yes.  I have no idea what they ended up
16 using.
17         But as I said, I help out as much as I can
18 and wanted to make anything we had available.
19 They're obviously talking about something that
20 they're having an issue with on the server, and I'm
21 talking about what I uploaded.
22   Q.  I don't have a question pending, sir, thank
23 you.  You've already answered my question.
24        All right.  Let's go back to Exhibit 174,
25 which I uploaded in the chat.
```

370

SER_0377

```
 1        A.   Okay.
 2        Q.   And do you know who Patrick Martin is?
 3        A.   Yes.  Let me review this, please.  Okay.
 4   I've read through it.
 5        Q.   Do you understand what this e-mail is?
 6        A.   Yes, I've got a sense for it.
 7        Q.   Any reason to believe this wasn't an e-mail
 8   exchange between yourself and Patrick Martin?
 9        A.   No.
10        Q.   This was produced by the IRS with Bates
11   number 1738, beginning Bates number.  Do you have an
12   understanding what Patrick Martin was asking you
13   about, "Within this CKGE is ONgDB" -- "Within this
14   CKGE is ONgDB installed on all the database servers
15   or the AS servers or both?"
16        A.   Yes, I see that.
17        Q.   What's he referring to?
18        A.   Well, everyone references anything with
19   Neo4j as ONgDB, first of all, which is not correct
20   all the time.  And he's asking if it's installed on
21   database servers or application AS servers or
22   application servers.
23        Q.   And then you respond to him, "The GDB
24   servers host a single ONgDB node (instance)."  Do
25   you see that?
```

371

SER_0378

1   A.  Yes.  So that would be correct, then, if I

2   said that.

3   Q.  So each, when you say each server, you're

4   talking about servers running one instance of ONgDB

5   software?

6   A.  Yes.  The "each server" was a virtual

7   server.  It might have been the same exact hardware,

8   but they're split out into virtual servers.

9   Q.  And those are running ONgDB software?

10   A.  That's what it says.  I don't know if it's

11   Community or Enterprise.  But yes, that's what it

12   says.  So that would have been -- whatever that date

13   is, then I would say that based on this, they were

14   using ONgDB.  The version, and if it was Community

15   or Enterprise, I don't know.

16   Q.  And then you'll see, it says, "I actually

17   have a mapping document in the CKGE docs — I'll send

18   you the direct link to that on gitlab."  Do you see

19   that?

20   A.  Yes, I do.

21   Q.  Did you keep a mapping document with the

22   IRS so they could track which servers were running

23   ONgDB?

24   A.  I didn't keep that, but there was one that

25   somebody had managed, and that's what I was

372

JOHN MARK SUHY                                                November 29, 2022

```
 1    one.
 2         Q.  I'm asking in September of 2019, were there
 3    two instances of ONgDB running on separate servers
 4    within the CKGE environment?
 5         A.  I don't remember at that time.
 6         Q.  So you'd defer to the IRS on that?
 7         A.  Yes.
 8         Q.  I'm going to go ahead and put the next
 9    exhibit in.  I know we're running short on time.
10         A.  I've got it open.
11         Q.  This was previously marked as Exhibit 181.
12         A.  Got it.  Let me read through this all.
13    Okay.
14         Q.  Okay.  Do you have any reason to believe
15    that wasn't an e-mail that you exchanged, that you
16    participated in?
17         A.  No.
18         Q.  Okay.  And just for the record, this is
19    produced by the IRS, the last Bates number on the
20    first page of 473.
21             And you'll see if you go down to the e-mail
22    from yourself to an Aaron Katch and a Hai Huynh,
23    hopefully I pronounced that correct, and the subject
24    is "Re: Re:  Graph for local install."  Do you see
25    that?
```

378

SER_0380

1    A.  Yes, I do.

2    Q.  And you'll see you're referring to the

3 latest ONgDB for Windows, and there is a URL there,

4 a cdwgit.web.irs.gov.  Do you see that?

5    A.  Yes, I do.

6    Q.  And the reference is graphstack-dist, and

7 at the end it says ONgDB.

8    A.  Yes, I see that.

9    Q.  What is that URL referring to?

10   A.  I believe that's a shared folder for

11 different technologies that are available to them.

12 ONgDB would have been one.  They would have had

13 forward slash, like, Elastic, forward slash

14 Keycloak.

15   Q.  But in this case, it's referring to ONgDB?

16   A.  Yes, this one is referring to ONgDB.

17   Q.  And then you'll see below it says Direct

18 link to 3.5.11.

19   A.  Yes.

20   Q.  Okay.  And you'll see a URL there that ends

21 with ongdb-enterprise-3.5.11-windows.zip.

22   A.  Yes.

23   MR. BEENE:  Can we get a time check?

24   THE VIDEOGRAPHER:  Hold on.

25   MR. RATINOFF:  We're off the record.

379

1        THE VIDEOGRAPHER:  All right.  We are now

2  off the record at 5:53.

3        (Break taken from 5:53 to 5:56 p.m.)

4        THE VIDEOGRAPHER:  We are now on the record

5  at 5:56.

6        MR. BEENE:  Defendants are agreeing to

7  extend the deposition by an additional 10 minutes

8  for a total of eight hours and 40 minutes.

9        MR. RATINOFF:  And I appreciate that

10  courtesy, Counsel.

11  BY MR. RATINOFF:

12    Q.  Okay.  So turning back to Exhibit 181, we

13  were looking at that URL that says Direct Link to

14  3.5.11.  That's referring to ONgDB Enterprise

15  version 3.5.11, correct?

16    A.  Yes, Windows version.

17    Q.  And that's something that you put up on the

18  gitlab for the IRS's use?

19    A.  Yes.  It would have been brought in by

20  Graph Foundation, and then I would have put it up

21  there as the shared folder, help everyone figure out

22  where everything is.

23    Q.  Okay.  Thank you.  And moving on to my next

24  exhibit, this is previously marked as Exhibit 151.

25  And I'll represent to you this is an e-mail that was

                                                    380

DECLARATION OF DEPONENT


   I, JOHN MARK SUHY, JR., declare under penalty of
perjury that I have reviewed the foregoing
transcript; that I have made any corrections,
additions, or deletions in my testimony that I
deemed necessary; and that the foregoing is a true
and correct transcription of my testimony in this
matter.



   Dated this _____ day of _____, 2022,
at _____, _____.
       [City]                    [State]


          _____

          JOHN MARK SUHY, JR.

409

JOHN MARK SUHY                                                   November 29, 2022

REPORTER'S CERTIFICATE

The undersigned Certified Shorthand Reporter licensed in the State of California does hereby certify:

I am authorized to administer oaths or affirmations pursuant to Code of Civil Procedure, Section 2093(b), and prior to being examined, the witness was duly administered an oath by me.

I am not a relative or employee or attorney or counsel of any of the parties, nor am I a relative or employee of such attorney or counsel, nor am I financially interested in the outcome of this action.

I am the deposition officer who stenographically recorded the testimony in the foregoing deposition, and the foregoing transcript is a true record of the testimony given by the witness.

Before completion of the deposition, review of the transcript [x] was [^ ] was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

In witness whereof, I have subscribed my name this 5th day of December, 2022.



KAREN L. BUCHANAN

CSR No. 10772

CLR No. 031106-04

410

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS   408-287-7500