No. 24-5538

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____

NEO4J, INC., NEO4J SWEDEN AB,

*Plaintiffs-Appellees*,

v.

JOHN MARK SUHY,

*Defendant-Appellant.*

On Appeal from the United States District Court
For the Northern District of California
No. 5:18-cv-07182-EJD
Hon. Edward J. Davila

_____

## APPELLEES' EXCERPTS OF RECORD
## Volume 3 of 18

_____

John V. Picone III (State Bar No. 187226)
jpicone@spencerfane.com
Jeffrey M. Ratinoff (State Bar No. 197241)
jratinoff@spencerfane.com
Jeremy A. Moseley (MT Bar No. 44830177)
jmoseley@spencerfane.com

*Attorneys for Appellees*
Neo4j, Inc. and Neo4j Sweden AB

# EXHIBIT 3

UNITED STATES DISTRICT COURT
NORTHER DISTRICT OF CALIFORNIA


NEO4J, INC., a Delaware
corporation; and NEO4J
SWEDEN AB, a Swedish
corporation,                          CASE NO.
                                      5:18-cv-07182-EJD
            Plaintiffs,
vs.
PURETHINK, LLC, a Delaware
limited liability company;
IGOV INC., a Virginia
corporation; and JOHN MARK
SUHY, an individual,
            Defendants.
_____/


    REMOTE VIDEOTAPED DEPOSITION OF ASHWANI MAYUR
AS PERSON MOST KNOWLEDGEABLE FOR EGOVERNMENT SOLUTIONS


 DATE:         October 25, 2022

 TIME:         8:03 a.m.

 LOCATION:     Via Zoom Videoconference

 REPORTED      KAREN L. BUCHANAN
 BY:           CSR No. 10772
               CLR No. 031106-04

1

SER_0387

ASHWANI MAYUR                                          October 15, 2022

```
 1              (Reporter interruption.)
 2         MR. GOLDSTEIN:  The deponent, eGov
 3    Solutions.
 4         THE VIDEOGRAPHER:  Thank you.  Will the
 5    Court Reporter please swear in the witness at this
 6    time.
 7                   ASHWANI MAYUR,
 8    being duly sworn by the Certified Shorthand Reporter
 9    to tell the truth, the whole truth, and nothing but
10    the truth, testified as follows:
11         THE WITNESS:  Yes, I do.
12         THE VIDEOGRAPHER:  Thank you.  Please
13    proceed.
14              EXAMINATION BY MR. RATINOFF:
15      Q.  Okay.  Mr. Mayur, would you please state
16    your full name for the record.
17      A.  Ashwani Mayur.
18      Q.  And are you here today on behalf of
19    eGovernment Solutions?
20      A.  That is correct.
21      Q.  And are you represented by counsel today?
22      A.  Yes.
23      Q.  And who is your counsel?
24      A.  Mr. Jeffrey Goldstein.
25      Q.  Have you ever been deposed before?
```

                                                              7

1     A.  I do.

2     Q.  Okay.  And the other thing that's very

3  important is that your answers be audible, meaning

4  that you -- if it's a yes-or-no question, that you

5  answer "yes" or "no."  You don't shake your head or

6  nod your head, because even though this is being

7  videotaped, the court reporter doesn't transcribe

8  body language.  Does that make sense?

9     A.  Yes, I do.

10     Q.  And now you were just given an oath.  That

11  oath that you took is the same as if you were

12  testifying live in court before a judge or a jury.

13         Do you understand?

14     A.  I understand.

15     Q.  And that the oath is under the penalty of

16  perjury.  Do you understand what that means?

17     A.  I don't, but I have no reason to lie.

18     Q.  Okay.  Penalty of perjury is there is laws

19  in the books that say you can't lie under oath, and

20  if you do, you could be punished criminally.  Do you

21  understand that?

22     A.  I understand.

23     Q.  And I'm sure you're here today to give your

24  full and best and most truthful testimony, correct?

25     A.  That is correct.

9

```
 1    been marked as Exhibit 95.  Do you recognize this
 2    document?
 3         A.  Yes, I do.
 4         Q.  And what is it?
 5         A.  This is the subpoena document which I
 6    received from your end.
 7         Q.  And you understand this is why you're here
 8    to testify today?
 9         A.  Yes.
10         Q.  And you understand you're testifying on
11    behalf of eGovernment Solutions?
12         A.  That is correct.
13         Q.  And you understand that you're not just
14    testifying about what you personally know but what
15    anyone who is associated, i.e., employees of
16    eGovernment Solutions, might know?
17         A.  That is correct.
18         Q.  I'll have you go ahead and go to page 2 of
19    attachment A.  Just let me know when you're there.
20         A.  Yes.
21         Q.  You'll see starting at page 2 scrolling
22    through the document to page 5, there is a list of
23    14 deposition topics of examination.  Do you see
24    that?
25         A.  Yes.
```

13

1      Mr. Goldstein?

2          A.  In the morning.  It was a call.

3          Q.  Understood.

4              (Reporter interruption.)

5      BY MR. RATINOFF:

6          Q.  And were any -- was there anyone else on

7      these telephone calls with your attorney?

8          A.  No.

9          Q.  And did you talk to anyone else in

10     preparation for this deposition?

11         A.  I did talk to my CPA firm.

12         Q.  Your accountant?

13         A.  Yes.

14         Q.  And do you know who John Mark Suhy is?

15         A.  Yes.

16         Q.  And did you talk to John Mark Suhy prior to

17     this deposition after receiving this subpoena?

18         A.  Yes, I did.  When I received the subpoena,

19     I wanted to find out what it is.

20         Q.  Okay.  What did you talk to Mr. Suhy about?

21         A.  Because he is the one who is running the

22     project, so I just wanted to figure out what exactly

23     it is.  And after talking to him, I decided I would

24     like to go to Jeff, my attorney.  And once I spoke

25     to Jeff, since then I did not connect with John Mark

                                                        15

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS   408-287-7500

ASHWANI MAYUR                                          October 15, 2022

```
1         Q.  Have you reviewed these topics before?

2         A.  Yes, I did.

3         Q.  And do you know you're going to be

4    testifying on each of those topics?

5         A.  That is correct.

6         Q.  Is there anything in these 14 topics that

7    you don't believe you're able to provide testimony

8    on?

9         A.  No.  I believe I will be able to provide

10   testimony based on my best knowledge.

11        Q.  On all of these topics, all 14?

12        A.  I'm sorry, repeat that.

13        Q.  You're prepared to testify on all 14

14   topics?

15        A.  Yes.

16        Q.  And then prior to the deposition today, did

17   you meet with your counsel to prepare?

18        A.  Yes.  We had a couple of calls.

19        Q.  And approximately how long were those

20   calls?

21        A.  All together, maybe three, four hours.

22        Q.  And when you said your counsel, you mean

23   Mr. Goldstein?

24        A.  That is correct.

25        Q.  When is the last time you met with
```

                                                        14

1    Suhy.

2        Q.  And I'm sure your attorney will jump in,

3    but I don't want you to tell me what you spoke with

4    your lawyer.  Okay.  So then when was that

5    conversation that you had with Mr. Suhy?

6        A.  It should be three, four weeks back, I

7    guess, the last conversation.  Once we had the

8    document, then you and I went back and forth about

9    the date.  That was the last time I spoke to him.

10       Q.  Did you ask Mr. Suhy about any documents?

11       A.  No.

12       Q.  You mentioned a project.  What project were

13   you referring to?

14       A.  Department of Treasury IRS project.

15           (Reporter interruption.)

16           THE WITNESS:  The Department of Treasury

17   IRS project.

18           MR. RATINOFF:  I'm going to go ahead and

19   drop the next document into the chat.  Mark this as

20   Exhibit 96.

21           (Plaintiffs' Exhibit 96 was marked for

22   identification.)

23   BY MR. RATINOFF:

24       Q.  Just let me know when you've had a chance

25   to download it and open it and take a look.

                                                    16

1   copy files?

2       A.  The only hard copies we have is the company

3   legal documents, anything along that line.  But in

4   regards to this particular project, because I

5   believe this is what is being told to me, that this

6   is a clear project, and John Mark Suhy was

7   responsible from very beginning talking to the

8   client, collecting anything.  We have a location in

9   Alexandria where we have documents, but any of those

10  documents were maintained by John Mark Suhy.  I

11  never saw any document ever as of today.

12      Q.  And when you say any documents, you're

13  referring to documents related to the IRS project?

14      A.  Correct.  Any physical document.

15      Q.  And did you have access to electronic

16  documents in the Google cloud that you mentioned in

17  relation to the IRS project?

18      A.  No, I did not.

19      Q.  So eGov Solution does not have access to

20  any documents related to the IRS project?

21      A.  Any of the documents, even if it came to

22  the eGovernment Solution e-mail, that would be with

23  John Mark Suhy's e-mail.

24      Q.  Did you ask Mr. Suhy to look for any

25  documents when you received Exhibit 96?

20

October 15, 2022

```
1        A.  So my partner reached out to him, and we
2   took the access, and then we searched all of those.
3        Q.  Oh, so you needed to ask Mr. Suhy for
4   permission to access to his e-mail account?
5        A.  Because the two-way authentication, he is
6   still working on that project, so we had to ask him
7   so that we can -- we did not want to stop his
8   access.
9        Q.  Okay.  So you asked Mr. Suhy to give you
10  access to his egovsol.com account?
11       A.  That is correct.
12       Q.  And you had no way of getting access
13  without asking him to get the two-factor
14  authentication done, if I understand correctly?
15       A.  I'm not familiar if I can research that.
16  My partner did that.
17       Q.  But you were unable to get access to his
18  eGov Solutions account without his -- I'm sorry, let
19  me start over.
20            So you were unable to get access to that
21  e-mail account without going through Mr. Suhy?
22       A.  I -- I believe so.  I mean as I mentioned,
23  my partner, he did it.  And there is a code from
24  Mr. John Mark Suhy.  He gave us the code.  He gave
25  the code to my partner, and then he searched the
```

21

1     isn't the Articles of Incorporation for eGovernment

2     Solutions?

3         A.  I'm sorry.  Repeat that again.

4         Q.  You don't have any reason to believe this

5     isn't the Articles of Incorporation for --

6         A.  No, no, no.  I never saw this document,

7     because when the company was registered, Nikhil and

8     I, we were not partners in the company.

9         Q.  Okay.  So who founded eGovernment

10    Solutions?

11        A.  John Mark Suhy and Benjamin Siegler.

12        Q.  If you go to page 7 out of 8.  There is no

13    numbering, so I'm just using the PDF page.  You'll

14    see it says Articles of Incorporation Virginia Stock

15    Corporation.  Do you see that?

16        A.  Uh-huh.  Yes, I do.

17        Q.  And you'll see "The initial directors are:

18    John Mark Suhy."

19        A.  That is correct.

20        Q.  So he was the original director of

21    eGovernment Solutions in 2009 when it was founded?

22        A.  That is -- I believe that is correct.

23    That's per the document.

24            MR. RATINOFF:  And then I'm going to go

25    ahead and put the next document in the chat.

24

```
 1        Q.  Okay.  And what time was that?
 2        A.  I believe it should be 2013 or 2014.
 3        Q.  So it was definitely -- but it was after?
 4   I'm looking back at Exhibit 99, and Mr. Siegler is
 5   listed as of January 29, 2014, so the buyout would
 6   have been in 2014?
 7        A.  That sounds about right.
 8        Q.  And then was there a point in time where
 9   Mr. Suhy was bought out of his shares of eGovernment
10   Solutions?
11        A.  That is correct.  That is December 31st,
12   2018.
13        Q.  And what was the reason for buying Mr. Suhy
14   out of his shares of eGovernment Solutions?
15        A.  Well, for many, many years nothing happened
16   in the company.  And Mr. Suhy's interest had always
17   been in projects.  And as I mentioned, my partner,
18   Nikhil, my present partner, Nikhil and I, we have a
19   background which is related to staffing.  And we
20   wanted to do something in the federal space.  We
21   wanted to identify some projects where we can
22   realize the company to do staffing, technology
23   staffing, to partner with the larger contracting
24   companies which are based out of this area.  So that
25   is the time Mr. Suhy decided to sell his shares to
```

30

1    us.

2        Q.  And was there a purchase price discussed?

3        A.  Yes.

4        Q.  And do you recall what that purchase price

5    was?

6        A.  I believe it was $20,000.

7        Q.  And then how did -- how did the remaining

8    shareholders and Mr. Suhy come to that number?

9        A.  So at that time, I think the IRS project

10   was also won in the eGovernment Solution, which

11   everything was done by Mr. Suhy.  And when we

12   decided that, hey, we would like to buy the share

13   and the agreement was this project belongs to you,

14   we have no idea what it is, and you can continue to

15   use it.  If we get the money from IRS, we will pay

16   it to you without keeping anything out of that.

17   That was the agreement with him.  And we decided

18   that 20,000 is a fair share.

19       Q.  And was there a written agreement that

20   reflected the purchase of Mr. Suhy's shares?

21       A.  Yes.

22           MR. RATINOFF:  All right.  Please go ahead

23   and take a look at the chat.  I dropped another

24   document in there.  This will be Exhibit 100.

25           (Plaintiffs' Exhibit 100 was marked for

31

SER_0398

1    identification.)

2             THE WITNESS:  It's downloading.  One

3    second.

4    BY MR. RATINOFF:

5        Q.  The title of this document is Stock

6    Purchase Agreement, so let me know when you've had a

7    chance to open it and take a look at it.

8        A.  Yes.  Now I have.

9        Q.  And do you recognize what has been marked

10   as Exhibit 100?

11       A.  The buy-sell agreement?

12       Q.  Yeah.  The title is Stock Purchase

13   Agreement.  That's Exhibit 100.

14       A.  Yes.

15       Q.  And do you recognize this document?

16       A.  Yes.

17       Q.  What is it?

18       A.  This is a Stock Purchase Agreement which --

19   where we agreed to buy Mr. Suhy's stock from the

20   company, shares from the company.

21       Q.  And then you mentioned the purchase price

22   of 20,000.  If you look at section 2.1 --

23       A.  Yes.

24       Q.  -- that's reflected there in that section,

25   the purchase price.

                                              32

1          A.   That is correct.

2          Q.   And I'm looking at -- I don't know if it's

3     a section or paragraph, I'll call it section,

4     section 4, it says "John Mark Suhy will continue to

5     act as Facility Security Officer or assistant

6     Facility Security Officer for eGovernment Solutions,

7     Inc."  Do you see that?

8          A.   Yes.

9          Q.   What's a Facility Security Officer?

10         A.   So my understanding is if you're doing any

11    project for the federal government and you need

12    certain clearance for that, there are secret, top

13    secret, different kind of clearances.

14             This project required a secret level

15    clearance, I believe.  John Mark was the only one at

16    that time who had the clearance in the company.  So

17    you have to identify some individual who can work as

18    a security officer.  What does that means is it

19    doesn't matter who the owner is, if I'm not cleared,

20    I'm not supposed to look at any of the documents

21    coming for that project.

22         Q.   So it was necessary for him to remain the

23    Facility Security Officer to keep servicing IRS

24    under the contract you mentioned?

25         A.   That is correct.  That is my impression.

33

SER_0400

1          Q.   Okay.   And if we look at the next page,
2     there is a paragraph 5.
3          A.   Mm-hmm.
4          Q.   It says Treasury Contract 2032H, as in
5     hotel, 8-18-P, as in papa, dash 00151.   Do you see
6     that?
7          A.   Yes.
8          Q.   Is that the project that you had mentioned
9     earlier?
10         A.   That is correct.
11         Q.   I think the numbers are kind of a mouthful.
12    So is it okay -- it says aka CKGE Knowledge
13    Environment contract right next to that number I
14    just read off.   Do you see that?
15         A.   That is correct.
16         Q.   Can we just call it the "CKGE contract" for
17    short?   Do you understand if we use that word,
18    that's that contract?
19              MR. BEENE:   Objection to form.
20    BY MR. RATINOFF:
21         Q.   Can we call the Treasury Contract
22    2032H8-18-P-00151 the "CKGE contract" for short?
23         A.   Is that a question for me?
24         Q.   Yes.
25         A.   Yes, you can.

                                                        34

1        Q.  You'll understand what I'm talking about?

2        A.  Yes.  The project from the -- the contract

3   from the IRS.

4        Q.  Now, you mentioned Mr. Suhy would keep

5   working on the contracts.  Looking at paragraph 511

6   or section 5.1, it says:

7              "EGovernment Solutions, Inc., hereby

8              hires John Mark Suhy as an independent

9              contractor for all option years that

10             are exercised on the CKGE contract."

11             Do you see that?

12       A.  Yes, I do.

13       Q.  And it says, "His compensation will be

14   200,000 per year paid when eGovernment Solutions

15   gets paid"?

16       A.  That is correct.

17       Q.  When it says eGovernment Solutions gets

18   paid, that means paid by the IRS under the CKGE

19   contract?

20       A.  That is correct.

21       Q.  And again, the reason I think you testified

22   earlier that the money would be paid to Mr. Suhy is

23   he was the only one in eGovernment Solutions that

24   was able to fulfill that contract?

25       A.  That is correct.

35

1    Q.  And looking at paragraph 5.2 or section

2  5.2, "eGovernment Solutions will give John Mark Suhy

3  the authority to drive the direction of the project,

4  (Section 5)," I assume that's referring to the CKGE

5  contract; is that correct?

6    A.  That's correct.

7    Q.  And from that point up until this contract

8  and the Stock Purchase Agreement, did Mr. Suhy have

9  full authority on the CKGE contract?

10    A.  Yes.

11    Q.  And the purpose of this agreement was to

12  allow him to continue to have full authority under

13  that contract as an independent contractor?

14    A.  That is correct.

15    Q.  Now, looking at paragraph 5.3, it mentions

16  option years.  And then there is a list of years 1,

17  2, 3 and 4.  What does that mean as far as option

18  years?

19    A.  So my impression is when this project was

20  won, John Mark Suhy did mention that there would be

21  an extension on this project.  There would be

22  multiple years.  And I believe it goes to five

23  years.

24    So we wanted to be fair, if anything coming

25  out of the project, any money -- because he is the

36

1   one who won that, he was the one who is working on

2   it, so anything that comes from IRS, we felt

3   obligated, we wanted to give to him.  Now, if the

4   money would come, we will pay him.  If the money

5   would not come, I will assume that service is not

6   provided to IRS, so there is no more money coming.

7       Q.   But as far as if the IRS did pay the full

8   amount that was due in the contract, that money

9   would be in turn paid to Mr. Suhy?

10      A.   That is correct.

11      Q.   And so eGovernment Solutions didn't take a

12  commission or anything off of any payments from the

13  IRS?

14      A.   No.

15      Q.   And in looking at paragraph 6, it says:

16           "Profit on any future contracts with

17           the Department of Treasury the CACI

18           Army contract (prime award, teaming,

19           or subcontracts) shall be subject to a

20           1/3 commission on Net Profit to John

21           Mark Suhy."

22           Do you see that paragraph or section?

23      A.   Yes.

24      Q.   Was the Department of Treasury future --

25  sorry.  Were there any other Department of Treasury

37

1    Q.  Okay.  So it was a staffing contract?

2    A.  That is correct.

3    Q.  It wasn't a contract for the installation

4    of any type of software?

5    A.  I'm not aware of that.

6    Q.  Okay.

7    A.  It is a 250 million -- I don't want to give

8    any amount.  It's a large contract with the Army, so

9    I'm sure they would have hundreds of technologies

10   there.

11   Q.  Okay.  And what was Mr. Suhy's role with

12   that contract?

13   A.  So in the beginning, because we are a small

14   business, we wanted to convey to CACI that we would

15   be able to fulfill some of those positions in some

16   specific technology.  And he is the one who brought

17   in that contract.

18   Q.  Okay.  And then for some reason, there

19   seems to be two copies of the agreement in this

20   document.  So I'm going to scroll down to what's the

21   signature page.  And you'll see there are some

22   signatures on the left column.  Do you see that?

23   A.  Yes.

24   Q.  And is that Mr. Suhy's signature, to your

25   knowledge?

                                                    39

1   A.  I believe that is his signature.

2   Q.  Is that Mr. Budhiraja's signature?

3   A.  Yes.

4   Q.  I notice there is two spots for your

5   signature.  Do you see that?

6   A.  That is correct.  I think I may have missed

7   it.

8   Q.  Did you end up signing this document, this

9   Stock Purchase Agreement?

10   A.  Yes.

11   Q.  Just -- I'll represent that we received a

12   copy of this from you, also from Mr. Suhy, and

13   neither had your signature on it.  Do you have a

14   copy of it with your signature?

15   A.  I can sign one, I'm sure.

16   Q.  But it was understood this contract was

17   fully executed?

18   A.  Yes.

19   Q.  And Mr. Suhy transferred his shares in the

20   company to the remaining shareholders?

21   A.  That is correct.

22   Q.  And how were those shares distributed

23   between the remaining shareholders?

24   A.  I think there is some more documents here.

25   I think Nikhil and I are equal partners on that now.

40

SER_0406

1    Q.  And if you keep scrolling down here, it's

2    page 12 out of 14, and in the PDF, it's Stock Ledger

3    eGovernment Solutions.

4    A.  Yes.

5    Q.  And that shows, if you look at it, that

6    12/26/2018, Mr. Suhy's one-third share was

7    distributed it looks like here -- I'm trying to --

8    well, strike that.

9         Is this Stock Ledger, was this accurate as

10   far as up to the time of the sale?

11   A.  That is correct.

12   Q.  And again, it looks like there is two

13   signatures here, but yours is missing.  Do you see

14   that?

15   A.  Yeah, I see that.

16   Q.  Do you have a signed copy of the Stock

17   Ledger with your signature?

18   A.  I can check.  If not, I can sign it, I'm

19   sure.

20   Q.  But this -- to your knowledge, this is an

21   accurate Stock Ledger as of 2018?

22   A.  Yes.

23   Q.  And then going back to CKGE contract, at

24   the time that the Stock Purchase Agreement was

25   signed, was there anyone else working on that

41

October 15, 2022

1   contract on behalf of eGovernment Solutions?

2        A.  I believe there may be another company

3   which was working, but John Mark Suhy would know all

4   about that.

5        Q.  As of 2018, you think there may have been

6   another company working on that contract on

7   eGovernment Solutions' behalf?

8        A.  So recently I was looking at the document,

9   and one of the e-mails from John Mark Suhy mentioned

10  there is a company who was supporting him in the

11  beginning.

12       Q.  Do you recall the name of that company?

13       A.  I think it's called AtomRain.

14       Q.  Is the CKGE contract still active?

15       A.  I have to check that.  I mean we have to

16  check that with John Mark Suhy.  The only thing I

17  remember is we received the last money.  The moment

18  the money comes, John Mark Suhy takes the money out.

19  So I would not know anything about the project.

20       Q.  And other than being the FSO, Facilities

21  Security Officer -- we'll just call it FSO, if

22  that's okay.

23       A.  I'm okay with that.

24       Q.  Did Mr. Suhy retain any other position at

25  eGovernment Solutions after he sold his shares?

42

1      A.  So in regard to this particular project, he

2   is the one who is conducting it.

3      Q.  But did he have any -- was he retaining any

4   other positions at eGovernment Solutions as an

5   officer, like treasurer, vice president after?

6      A.  No.

7      Q.  So the only position he held was FSO after

8   the Stock Purchase Agreement was signed?

9      A.  Please repeat that again.

10      Q.  So after the Stock Purchase Agreement was

11   signed, the only position he held at eGovernment

12   Solutions was FSO?

13      A.  That is correct.

14      Q.  Did he ever stay on as the chief technology

15   officer for eGovernment Solutions?

16      A.  I believe he must have used that term.  But

17   is there an official letter for that?  No, there is

18   not.

19          (Reporter interruption.)

20          THE WITNESS:  So as I said, he is an FSO,

21   but he might have used the term chief technology

22   officer.  But there is no project, nothing going on

23   other than this particular project.  So for this

24   particular project, he can call himself anything.

25   BY MR. RATINOFF:

43

SER_0409

1    currently working on?

2         A.   So we have three individuals working

3    with -- as a subcontract with a different

4    department.

5         Q.   And do any of those contracts involve

6    Mr. Suhy?

7         A.   No.   They were building staffing projects.

8         Q.   Do any of those contracts involve Neo4J

9    software?

10        A.   No.

11             (Reporter interruption.)

12             MR. RATINOFF:   Neo4J software.

13             THE REPORTER:   Thank you.

14             MR. RATINOFF:   Okay.   I'm going to go ahead

15   and mark the next exhibit as I put it in the chat as

16   Exhibit 102.

17             (Plaintiffs' Exhibit 102 was marked for

18   identification.)

19   BY MR. RATINOFF:

20        Q.   This is a document that was produced by

21   eGovernment Solutions.   And it starts with a Bates

22   number of EGOVS with the number 1.   Are you in

23   there?

24        A.   Which page should I look?

25        Q.   Just the first page will be fine, thanks.

47

SER_0410

1    I mean take a look at the whole document too.

2         A.   This is IRS Price Quotation Sheet?

3         Q.   Correct.  Do you remember this document?

4         A.   I did see this document, first time in the

5    last two weeks.

6         Q.   Okay.  But it was produced by eGovernment

7    Solutions?

8         A.   It is produced by John Mark Suhy on behalf

9    of eGovernment Solutions.

10        Q.   So you got -- you asked Mr. Suhy for

11   documents related to the CKGE contract, correct?

12        A.   I believe my attorney asked for them.

13        Q.   And this is the -- one of the documents you

14   received?

15        A.   That is correct.

16        Q.   And to your knowledge, does this quotation

17   relate to the IRS project we've been talking about?

18        A.   I believe so.

19        Q.   And was this a quote prior to that contract

20   being issued that was submitted by eGovernment

21   Solutions?

22        A.   I mean as I mentioned, I just see this

23   document a few weeks back, so I guess that is

24   correct.

25        Q.   Going and looking at what's marked as Bates

48

SER_0411

1    numbers number 11, do you want to go to that?

2         A.  I'm on that page.

3         Q.  Okay.  It says "Offeror name:  EGovernment

4    Solutions, Inc."

5         A.  Yes.

6         Q.  Do you see that?

7         A.  Yes.

8         Q.  So is it fair to say this document was

9    submitted to the IRS on behalf of eGovernment

10   Solutions?

11        A.  That is correct.

12        Q.  Looking at the next page, Bates No. 12.

13        A.  Mm-hmm.

14        Q.  Sorry, you'll have to use an audible "yes"

15   or "no."

16        A.  Yes.  Sorry.

17        Q.  No problem.  I know it's hard.  Sometimes

18   we slip into normal conversation.

19             Looking at the signature name here, it says

20   "Insert print name:  John Mark Suhy," and there is

21   an April 3rd, 2018, is the date.  Do you see that?

22        A.  I do see that.

23        Q.  Is that Mr. Suhy's signature?

24        A.  I believe that's his signature.

25        Q.  Mr. Suhy was signing this quote on behalf

49

1  eGovernment Solutions, correct?

2      A.  That is correct.

3      Q.  And to eGovernment Solutions' knowledge,

4  this was submitted to the IRS?

5      A.  Yes.

6      Q.  But no one else in the company had any

7  input into this quote, just Mr. Suhy?

8      A.  That is correct.

9      Q.  And we were talking about it a little

10  earlier.  To eGovernment -- sorry, eGovernment

11  Solution's knowledge, this quote was accepted by the

12  IRS?

13      A.  That's correct.

14          MR. RATINOFF:  And now I'm going to go

15  ahead and put the next exhibit into the chat.  I

16  believe this would be Exhibit 103.

17          (Plaintiffs' Exhibit 103 was marked for

18  identification.)

19  BY MR. RATINOFF:

20      Q.  Let me know when you've had a chance to --

21      A.  I'm looking at it right now.

22      Q.  Let me know when you're done.

23      A.  Yes.

24      Q.  Okay.  Looking at what's been marked as

25  Exhibit 103, it says "Order for Supplies or

50

SER_0413

1  Services." And you'll see there is a box 3, and it's

2  got the order No. 20232H8-18-P-00151.  Do you see

3  that?

4        A.  Yes, I do.

5        Q.  And is that the same contract number that

6  was referenced in the Stock Purchase Agreement?

7        A.  That is correct.

8        Q.  And then what's your understanding of what

9  this order for supplies or services is?

10        A.  This is a project which was won by John

11  Mark Suhy on behalf of eGovernment Solutions for

12  IRS.

13        Q.  And that is what we've been calling the

14  CKGE --

15        A.  That is correct.

16        Q.  -- contract?

17        A.  Yes.

18        Q.  And this is the same contract that is in

19  the Stock Purchase Agreement?

20        A.  That is correct.

21        Q.  And looking at the next page, you'll see

22  there is a list of Line Item Table.

23        A.  Yes.

24        Q.  If you look at the item number 1, it's CDW

25  Graphic Environment Continued development and

51

SER_0414

1    operations, et cetera.  Do you see that?

2         A.  Yes, I do.

3         Q.  And the base is listed as the year or the

4    dates, 5/24/18 to 5/23 -- and it looks like there's

5    a typo, 2029.

6         A.  I see that.

7         Q.  Is it your understanding this line item 1

8    with the price of 300,000 was the first year of the

9    IRS contract for the Stock Purchase Agreement?

10        A.  That's correct.

11        Q.  And I believe you mentioned there was some

12   option years listed in the Stock Purchase Agreement;

13   is that correct?

14        A.  That's correct.

15        Q.  And looking at items 1001, 2001, 3001 and

16   4001, is that the option years that were referring

17   to in the contract?

18        A.  That is correct.

19        Q.  And when I say contract, I mean the Stock

20   Purchase Agreement.  Sorry.

21        A.  Yes.

22        Q.  And the price or the value of each one of

23   those option years is $200,000, correct?

24        A.  That is correct.

25        Q.  And as you testified before with the Stock

52

SER_0415

1    Purchase Agreement, the idea was that if each one of

2    these option years is exercised for $200,000, that

3    money would be ultimately paid to Mr. Suhy?

4         A.   That is correct.

5         Q.   And as of the time of the -- you'll see the

6    date on this is at the very bottom.  It's signed on

7    May 31st, 2018.

8         A.   Which page?

9         Q.   I'm sorry.  I jumped ahead there.  Strike

10   that question.  Let me go back.  Sorry.  On the

11   first page.

12        A.   Same document?

13        Q.   Yeah.  Same document.  First page, you'll

14   see it was signed on May -- it's very small under

15   the 22 box, it's a signature that says digitally

16   signed dated 2018.05.24.  Do you understand to be

17   May 24, 2018?

18        A.   Yes.  I see that.

19        Q.   And is that your understanding of when the

20   contract was awarded?

21        A.   I believe that may be the correct date.

22        Q.   And was there a $300,000 payment made to

23   eGovernment Solutions by the IRS after this contract

24   was awarded?

25        A.   Yes.

                                                    53

1     Q.  And was the entire $300,000 then paid to

2  Mr. Suhy?

3     A.  That is correct.

4     Q.  We've been going for about an hour.  Are

5  you doing okay, or do you need to take a break?

6     A.  I'm doing fine.

7     Q.  We'll go a few more questions and take a

8  break, because I know there's other folks on this

9  that probably do want to take a break.

10        MR. RATINOFF:  Okay.  The next document is

11  going to be marked as Exhibit 104.

12        (Plaintiffs' Exhibit 104 was marked for

13  identification.)

14  BY MR. RATINOFF:

15     Q.  I'm going to drop this in the chat.  You'll

16  see this document is entitled Amendment

17  Solicitation/Modification of Contract.

18     A.  I see that.

19     Q.  And I'll represent to you this is provided

20  to us by your counsel.

21     A.  What?  I didn't get that.

22     Q.  This document, you'll see there is a Bates

23  number on the bottom.  This is produced by your

24  counsel.  Do you understand that?

25     A.  Yes.

54

1    Q.  And do you recognize what's been marked as

2    Exhibit 104?

3    A.  I'm sorry.  I'm looking at some specific

4    number?

5    Q.  Yeah.  Look at -- I'll help you out here.

6    If you take a look at Box 10A, it says Modification

7    for Contract Order Number.

8    A.  Yes, that is correct.

9    Q.  And then looking down actually at Box 14, I

10   think it's a little bit more descriptive.  It says,

11   "The purpose of this modification is to correct OF

12   347 block 3 order number Smart ID from

13   2032H8-18-P-00151 to 2032H8-18-P-00168."

14       Do you see that?

15   A.  Yes, I do.

16   Q.  And do you understand that this amendment

17   was changing the contract number for the CKGE

18   contract?

19   A.  Based on the document, it looks like that

20   is the case.  But I never saw this document before.

21   When I say before, it means before the subpoena.

22   Q.  And did you obtain this document from

23   Mr. Suhy?

24   A.  My counsel did.

25   Q.  And you see the name and address of the

55

SER_0418

1    contractor says eGovernment Solutions?

2        A.  That is correct.

3        Q.  So to your knowledge, this was an amendment

4    to the original CKGE contract we've been talking

5    about?

6        A.  Based on the document, that sounds right.

7    That sounds right.

8        Q.  But you don't have any reason to believe

9    it's not correct?

10       A.  No, I don't.

11       Q.  And based on what this document states, you

12   understand that the contract number -- just the

13   contract number has been changed by this amendment,

14   correct?

15       A.  Yes.

16           MR. RATINOFF:  The next document I'm going

17   to mark is Exhibit 105.

18           (Plaintiffs' Exhibit 105 was marked for

19   identification.)

20   BY MR. RATINOFF:

21       Q.  I just dropped that in the chat.  And this

22   document is entitled Amendment of

23   Solicitation/Modification of Contract, and it starts

24   with the Bates number EGOVS000030.  Do you see that?

25       A.  Yes, I do see that.

56

```
 1            Q.   And I'll represent to you this is produced
 2      by your counsel.
 3            A.   That is correct.
 4            Q.   And what is your understanding of this
 5      document?
 6            A.   It looks like the initial price has
 7      increased from 300,000 to 500,000.
 8            Q.   Okay.  And that's by 200,000 essentially?
 9            A.   That is correct.
10            Q.   And it says on the second page, it sounds
11      like you might already be there, it says, "Option to
12      extend services."  Do you see that?
13            A.   Yes.
14            Q.   Is it your understanding that this is the
15      option 1 year in the CKGE contract that we've been
16      talking about?
17            A.   I believe so.
18            Q.   You can see, "The purpose for this
19      modification," box 14, "is to exercise option year 1
20      in the amount of $200,000 with the period of
21      performance is 5/24/19 to 5/23/2020."  Do you see
22      that?
23            A.   Yes.  Looking at this document, that sounds
24      right.
25            Q.   And looking back -- just so we're on the
```

57

SER_0420

1  same page, looking back at Exhibit 100, I don't know
2  if you have that handy, it would be tab 366 in the
3  chat if you needed to go back and look at that.  I'm
4  sorry.  365.  Do you have that open?
5      A.  I do have it open.
6      Q.  Okay.  So just so we're clear -- I'm sorry.
7  I'm off by one.  It is 366.  I'm looking at -- I'm
8  looking at the Stock Purchase Agreement,
9  Exhibit 100, and you'll see there is an option
10  year 1, 5/24/2019 to 5/23/2020.  Do you see that?
11  It's in section 5.3.
12      A.  I do see that.
13      Q.  So is it fair to say that what we've been
14  looking at as an amendment is the option year 1
15  that's referenced in the Stock Purchase Agreement?
16      A.  I'm afraid I didn't understand the
17  question.
18      Q.  So I'm just asking whether it's your
19  understanding that Exhibit 105 which says option
20  year 1 for $200,000 is the same option year that's
21  referred to in section 5.3 in the Stock Purchase
22  Agreement.
23      A.  That is correct.
24      Q.  Turning back to Exhibit 105, the amendment,
25  it references $200,000.  Was that money, 200,000,

58

1   paid by the IRS to eGov Solutions?

2       A.   Yes.

3       Q.   And to your knowledge, was that $200,000,

4   was that paid to Mr. Suhy?

5       A.   Yes.  We paid it to him.

6           MR. RATINOFF:  Okay.  I think I want to

7   take just a quick five-minute break, because I know

8   the Court Reporter and videographer probably

9   appreciate that, if you don't mind.  So let's take a

10  five-minute break.  It's 9:14 my time, so come back

11  at 9:20 Pacific.  Does that work for everyone?

12          THE WITNESS:  Yeah, that works for me.

13          THE VIDEOGRAPHER:  Thank you.  We're now

14  going off the video record.  The time is 9:14 a.m.

15          (Break taken from 9:14 to 9:22 a.m.)

16          THE VIDEOGRAPHER:  We are now back on the

17  video record.  The time is 9:22 a.m.

18          MR. RATINOFF:  All right.  I'm going to go

19  ahead and put another document in the chat.  This is

20  going to be marked as Exhibit 106.

21          (Plaintiffs' Exhibit 106 was marked for

22  identification.)

23  BY MR. RATINOFF:

24      Q.   And the title of this document is also a

25  Amendment of Solicitation/Modification of Contract,

59

1   and it's got an Amendment Modification No. 10.  Do

2   you see that, Box 2, with an effective date of

3   September 26th, 2019?  And this bears the Bates

4   number EGOVS000034.  That's the beginning Bates

5   number.  Do you see that document that's been marked

6   as Exhibit 106?

7        A.  I do see the document.

8        Q.  And do you have an understanding what this

9   document is?

10       A.  That is correct.

11       Q.  Okay.  Let me point you to contract order

12   No. 2032H8-18-P-00168.

13       A.  Yes.

14       Q.  Do you see that number?  And you recall

15   that we talked about an amendment to the -- to a

16   contract that was Exhibit 103, so you understand --

17   strike that.

18           Do you understand that this is a further

19   amendment of the CKGE contract we've been talking

20   about?

21       A.  Yes, I do understand.

22       Q.  And if you look at under box 14, it says:

23           "The purpose for this modification

24           is to increase the funding for option

25           year 1 by $216,000 and revise the

60

SER_0423

1                    Statement of Work.  The total
2                    obligated on the order is changed from
3                    500,000 by 216,000 to [a total of]
4                    716,000."
5                    Do you see that?
6           A.   Yes, I do see that.
7           Q.   For the record, I added "total" in there.
8      That's not actually in the document.
9                    So do you understand that this document
10     increased the option year 1 from 200,000 to 416,000?
11          A.   Yes.
12          Q.   And looking at the date signed box, 15B,
13     and the date is 09/26/2019, do you understand that
14     to be Mr. Suhy's signature?
15          A.   That is correct.
16          Q.   And do you know why the IRS increased the
17     contract option year 1 by 216,000?
18          A.   No, I don't remember that.
19          Q.   And was there an additional payment for
20     option year 1 made to eGov Solutions by the IRS for
21     216,000?
22          A.   Yes.
23          Q.   And after eGovernment Solutions received
24     that 216,000, where did that money go?
25          A.   That money was paid to John Mark Suhy.

                                                       61

1    Q.  So for option year 1, Mr. Suhy was paid by
2    eGovernment Solutions a total of 416,000?
3    A.  That is correct.
4    Q.  And at this point in time, was eGovernment
5    Solutions paying anyone else to work on the CKGE
6    contract?
7    A.  So in the last couple of weeks, I went back
8    and I checked all of our payments which were
9    outgoing, because this account was -- all of the
10   money coming in from IRS, John Mark Suhy was allowed
11   to use this account to pay to himself for iGov.  And
12   I recently noticed in 2019, all of the money went to
13   iGovsol.
14   Q.  So the bank account that this payment went
15   to, Mr. Suhy had access to; is that correct?
16   A.  Yes.
17   Q.  But this is an eGovernment Solutions
18   account?
19   A.  That is correct.
20   Q.  What is -- the eGovernment Solutions
21   account that the payments were made, did anyone else
22   have access to that account?
23   A.  I did.
24   Q.  So just you and Mr. Suhy?
25   A.  Yes.

62

1    Q.   And Mr. Suhy was allowed to make whatever

2  payments out of that account was needed; is that

3  correct?

4    A.   Because all of the money coming from the

5  IRS project was his money, so we had him access to

6  that account.

7    Q.   So that account was specifically set up

8  just for the IRS project?

9    A.   That is the only project the company had at

10  that time, and that account had no other income

11  other than the IRS project.  So we let him operate

12  that account.

13    MR. RATINOFF:  Okay.  I'm going to go ahead

14  and put the next document in the chat.  This will be

15  marked as Exhibit 107.

16    (Plaintiffs' Exhibit 107 was marked for

17  identification.)

18    THE WITNESS:  I see that.

19  BY MR. RATINOFF:

20    Q.   This is also entitled Amendment of

21  Solicitation/Modification Contract, in box 2,

22  Amendment 14.  Box 3, Effective Date of May 24,

23  2020.  Bates number at the bottom of the first page

24  is EGOVSOL -- I'm sorry, EGOVS, and the last two

25  digits are 42.  Do you see that?

63

```
 1        A.   Yes.
 2        Q.   And I'll represent to you this was produced
 3   by your counsel in response to the subpoena.
 4        A.   That is correct.
 5        Q.   And do you have an understanding of what
 6   this document is?
 7        A.   I believe this is an extension for another
 8   year and a payment amount for that.
 9        Q.   And looking at box 14, it says:
10             "The purpose of this modification is
11             to exercise CLIN 2001A option year 2
12             for a period of performance of
13             5/24/2020 through 5/23/2021."
14             And then it further states that it's fully
15   funded in the amount of 200,000; is that correct?
16        A.   That's correct.
17        Q.   And is it your understanding that this was
18   the contract extension for option year 2 that was
19   referenced in the Stock Purchase Agreement which was
20   Exhibit 100?
21        A.   That is correct.
22        Q.   And you'll see box 14, the last sentence
23   says, "The purchase order funding is hereby
24   increased from 716,000 by 200,000 to 916,000."  Do
25   you see that?
```

64

```
 1              A.   Correct.
 2              Q.   So was that 200,000 that's contemplated by
 3    this document, was that paid by the IRS to
 4    eGovernment Solutions?
 5              A.   That is correct.
 6              Q.   If you look at the next page, you'll see
 7    there is a Line Item Table referencing that $200,000
 8    payment.  Do you see that?
 9              A.   Page No. 4?
10              Q.   Yeah.  2 of 4, the next page.  You'll see
11    there is a box that says Line Item Table.
12              A.   Yes, I do.
13              Q.   And it references a unit price of 200,000?
14              A.   Yes.
15              Q.   And that amount was -- that was paid after
16    it was paid by the IRS to eGovernment Solutions, was
17    that then paid to Mr. Suhy?
18              A.   That is correct.  And this is for the year
19    2020.
20              Q.   Correct.  The second year option.
21              A.   Yes.
22              Q.   And it looks like the total paid out thus
23    far on the IRS CKGE contract was 916,000.  Is that
24    correct, as of this time?
25              A.   That is correct.
```

65

Q.  And then each time a payment was paid from eGovernment Solutions to Mr. Suhy in relation to the CKGE contract, how were those payments made?

A.  John Mark Suhy wrote the checks or he went to the bank branch and he -- I guess he cashed it via a draft or something like this.  Because when I went back, I did see some of the check numbers are different than the others.  So my assumption is he went there and he put in some form and got the money.

Q.  And did -- how did -- how did eGovernment Solutions book the payments?

A.  So end of the year when we go back and we saw what are the money taken out, we would put that in the books.

Q.  It would be booked as -- I'm sorry, let me ask the question.  How were the payments treated to Mr. Suhy by eGovernment Solutions?

MR. GOLDSTEIN:  Just for the record, object just on the scope issue.  I'm not sure how far you're going to go into this, but I don't think that's within the scope of any of the particular subject areas of the notice.  But the witness can answer the question, but I don't want to get too far afield.

66

1    BY MR. RATINOFF:

2        Q.  Okay.  You can answer the question.  I

3    probably don't remember what it was, so I'll just

4    reask it, and I'm sure Counsel will just make the

5    same objection quickly.  Actually, let's go ahead

6    and move on.  I'll come back to that.

7            MR. RATINOFF:  I think I'm going to mark

8    the next exhibit as Exhibit 108.

9            (Plaintiffs' Exhibit 108 was marked for

10   identification.)

11   BY MR. RATINOFF:

12       Q.  I'm sorry.  I just put the wrong document

13   in there.  Just bear with me a second.  You'll see

14   it's tab 378.  It should be the last document in the

15   chat.  I'm going to mark that as Exhibit 108.

16           THE WITNESS:  Is it 378 or 379?

17   BY MR. RATINOFF:

18       Q.  378.  Got too many windows open.  It's the

19   blessing of having two screens or two monitors.  You

20   can see it all, but you can put more up.

21           Okay.  So what's been marked as Exhibit 108

22   has the beginning Bates number of 58, and then it

23   would be Amendment 16 for box 2.  Do you see that?

24       A.  Yes.

25       Q.  The effective date is 5/24/21.  Do you see

67

1  that?

2      A.  Yes.

3      Q.  And this was produced by your counsel on

4  behalf of eGovernment Solutions.  Is that your

5  understanding?

6      A.  That is correct.

7      Q.  And do you understand what this document

8  is?

9      A.  Yes.

10     Q.  And what is that?

11     A.  That's another option year, the contract

12  for another 200,000.

13     Q.  And when you say the contract, you're

14  talking about the CKGE contract that's referenced in

15  the Stock Purchase Agreement?

16     A.  That is correct.

17     Q.  And looking at box 14, it says:

18          "The purpose of this modification is

19          to exercise CLIN 3001 option year 3

20          for a period of performance of

21          5/24/2021 through 5/23/2022."

22          And it says it's "fully funded in the

23  amount of $200,000."  Do you see that?

24     A.  Yes.

25     Q.  So for the option year 3 of the CKGE

68

October 15, 2022

1    contract, the IRS paid eGovernment Solutions

2    200,000?

3        A.  That is correct.

4        Q.  And then again that money for the Stock

5    Purchase Agreement was then paid to Mr. Suhy?

6        A.  That is correct.

7        Q.  And at this point through option year 3

8    with all the modifications, the total amount paid to

9    eGovernment Solutions was 1,116,000; is that

10   correct?

11       A.  That is correct.

12           MR. RATINOFF:  Okay.  I already dropped it

13   into the chat, so that's going to be tab 379.  So

14   just go back one, the PDF.  I'm going to mark that

15   as Exhibit 109.

16           (Plaintiffs' Exhibit 109 was marked for

17   identification.)

18   BY MR. RATINOFF:

19       Q.  Let me know if you've got it open.

20       A.  Yes, I see that document.

21       Q.  And this one is -- in box 2, it shows

22   amendment 17.  Do you see that?

23       A.  Yes.

24       Q.  And the effective date is 5/24/2022.

25       A.  That's correct.

69

1    Q.  And I'll represent to you this was produced

2    by your counsel on behalf of eGovernment Solutions.

3    Is that your understanding?

4    A.  Yes.

5    Q.  And then do you know what this document is?

6    A.  This is another option year where another

7    200,000 was awarded for the same project.

8    Q.  And looking at box 14, it says option year

9    4.  Is that the same option year 4 that was

10   referenced in the Stock Purchase Agreement?

11   A.  That is correct.

12   Q.  And the $200,000 that's referenced in here

13   on page 2 of 3, was that paid by the IRS to

14   eGovernment Solutions?

15   A.  That is correct.

16   Q.  And through option year 4 with all the

17   amendments we've looked at, the total then paid to

18   eGovernment Solutions was 1,316,000?

19   A.  That is correct.

20   Q.  And are you aware -- I think there was only

21   four option years in the original Stock Purchase

22   Agreement, correct?

23   A.  That is correct.

24   Q.  Are you aware if there has been any

25   renewals or additional option years that have been

70

SER_0433

October 15, 2022

1    awarded for the CKGE contract?

2         A.  I wouldn't know that.

3         Q.  Who would know that?

4         A.  John Mark Suhy.

5         Q.  Since the Stock Purchase Agreement doesn't

6    contemplate any additional option years, how would

7    any additional option years be handled by

8    eGovernment Solutions?

9         A.  I would ask John Mark Suhy to use another

10   entity and not use eGovernment Solutions, because

11   the promise was to complete this project, because it

12   was awarded to eGovernment Solutions.

13        Q.  So at this point in time, then, you would

14   consider eGovernment Solutions' relationship

15   finished with John Mark Suhy?

16        A.  In regard to this project, yes.

17        MR. RATINOFF:  Okay.  I'm going to go ahead

18   and mark the next exhibit as Exhibit 110.

19        (Plaintiffs' Exhibit 110 was marked for

20   identification.)

21   BY MR. RATINOFF:

22        Q.  And this is a series of invoices that were

23   produced by eGovernment Solutions and the beginning

24   Bates number is 68.

25        A.  I see this.

71

1      Q.  And do you have an understanding of what

2   this document -- or I should restart that.

3          Do you understand what this file system of

4   combined documents or docs is?

5      A.  Yes.

6      Q.  And what's your understanding?

7      A.  These are the invoices produced by

8   eGovernment Solutions to the IRS, and my counsel

9   received these from John Mark Suhy.

10     Q.  Okay.  So they state eGovernment Solutions

11  on them, but they were actually generated by

12  Mr. Suhy?

13     A.  That is correct.

14     Q.  And it's your understanding that these were

15  submitted on behalf of eGovernment Solutions to the

16  IRS for payment under the CKGE contract?

17     A.  That is correct.

18     Q.  So looking at invoice 817, and it says

19  "Contact Name:  John Mark Suhy," invoice date is

20  June 15, 2018.  Do you see that?

21     A.  Yes.

22     Q.  And this was for the $300,000 initial

23  payment that we talked about in the first year of

24  the CKGE contract, correct?

25     A.  That is correct.

72

1    Q.  And then looking at the next invoice, 827,

2    was this invoice also created by Mr. Suhy and issued

3    to the IRS on behalf of eGovernment Solutions?

4    A.  Yes.

5    Q.  And Mr. Suhy was authorized to issue this

6    invoice on behalf of eGovernment Solutions?

7    A.  Yes.

8    Q.  And do you have an understanding of what

9    this invoice is for?

10    A.  That is the continuation of the same

11    project, option year 1.

12    Q.  Looking at invoice -- the next one, 901,

13    with a date of January 4, 2020, you'll see that the

14    invoice is in the amount of $216,000.

15    A.  I do see that.

16    Q.  Okay.  And what's your understanding of

17    this invoice?

18    A.  That is the continuation of the same

19    project.  I believe there was some modification.

20    Q.  Okay.  This is the $216,000 modification

21    that we were previously talking about with respect

22    to option year 1?

23    A.  Correct.

24    Q.  And Mr. Suhy was authorized by eGovernment

25    Solutions to issue this invoice to the IRS?

73

SER_0436

1          A.   Yes.

2          Q.   And looking at invoice 955, do you see

3    that?

4          A.   I do see that.

5          Q.   Okay.   And this is dated May 27th, 2020.

6          A.   Correct.

7          Q.   And do you have an understanding what this

8    invoice is?

9          A.   This is the continuation of the same

10   project.

11         Q.   The CKGE contract?

12         A.   Contract, yes.

13         Q.   And you'll see it says option year 2.

14         A.   Yes, I do see that.

15         Q.   For 200,000?

16         A.   Yes.

17         Q.   And is this the invoice that was issued for

18   the renewal for option year 2 to the IRS?

19         A.   That is correct.

20         Q.   And Mr. Suhy was authorized to issue this

21   invoice to the IRS on behalf of eGovernment

22   Solutions?

23         A.   That is correct.

24         Q.   Going to the next invoice, 960, do you see

25   that?

74

1      A.  Yes, I see that.

2      Q.  And the date on this invoice is June 3rd,

3  2021?

4      A.  Yes.

5      Q.  Looking at line item 5, it says "Option

6  Year 3," and continues with the date, and "CDW

7  Graphic Environment . . . Continued development and

8  operations."  Do you see that?

9      A.  I do see that.

10      Q.  What's your understanding of this invoice?

11      A.  It's a continuation of the same project,

12  option year 3.

13      Q.  And that's the same option year 3 that we

14  looked at in the amendment and also talked about

15  with the Stock Purchase Agreement?

16      A.  That is correct.

17      Q.  And was Mr. Suhy responsible for issuing

18  this invoice to the IRS on behalf of eGovernment

19  Solutions?

20      A.  Yes.

21      Q.  And looking at invoice 912, the next

22  invoice.  Do you see that?

23      A.  I do see that.

24      Q.  The date on that is May 31st, 2020.

25      A.  That is correct.

75

October 15, 2022

1   Q.   And do you have an understanding of what

2   this invoice is?

3   A.   This is option year 4, continuation of the

4   same project.

5   Q.   This is the line item says "Option year 4,

6   200,000."  This is the 200,000 option year 4 that

7   was referenced in the Stock Purchase Agreement?

8   A.   Yes.

9   Q.   And also with that memo we just looked at,

10   105, Exhibit 105?

11   A.   That is correct.

12   Q.   And to your and eGovernment Solutions'

13   knowledge, those invoices we just went through were

14   all issued to the IRS by Mr. Suhy?

15   A.   That is correct.

16   Q.   Looking at the last page of this document,

17   it says "Related Documents - PO."  Do you see that?

18   A.   I do see that.

19   Q.   And what is this summary that's titled

20   Related Documents?

21   A.   Honestly, I didn't see that back at this

22   time.  Looking at it, it looks like it may be

23   something we received from the IRS by John Mark

24   Suhy.

25   Q.   So this wasn't generated by eGovernment

76

SER_0439

October 15, 2022

1    Solutions?

2        A.  No.

3        Q.  It was either generated by John Mark or the

4    IRS?

5        A.  That is correct.

6        Q.  And you'll see that -- you'll see there is

7    an invoice number column, the first in the Invoice

8    and Credit Memos section.  Do you see that?

9        A.  Yes.

10       Q.  You'll see starting at the bottom, invoice

11   817, 300,000, that's marked paid?

12       A.  That is correct.

13       Q.  That was, in fact, paid to eGovernment

14   Solutions by the IRS?

15       A.  That is correct.

16       Q.  And looking at invoice 827 for 200,000 --

17           (Reporter interruption.)

18   BY MR. RATINOFF:

19       Q.  I'm sorry.  Let me start over.

20           In looking at the next invoice, No. 827,

21   the line for that, it has a $200,000 number there.

22   Do you see that?

23       A.  Is that for me?

24       Q.  Is it your understanding that the IRS

25   paid --

77

1    A.  Yes.

2    Q.  -- that?  And the same with the line item

3  or invoice 901 for 216,000, the IRS paid?

4    A.  Yes.

5    Q.  And the same for invoice 955, $200,000 was

6  paid, as well?

7    A.  That is correct.

8    Q.  And then for invoice 960, it's listed as

9  $200,000 being paid, as well; is that correct?

10    A.  Yes.

11    Q.  And finally for invoice 912, that $200,000

12  was recently paid, correct?

13    A.  That is correct.

14    Q.  If you look at the next ones that are

15  rejected in the invoice history, do you have any

16  understanding why there is two $300,000 invoices for

17  the same number that were rejected?

18    A.  I'm not aware of that.  I don't understand

19  exactly why that is in there.

20    Q.  Do you believe either Mr. Suhy or the IRS

21  would have an understanding?

22    A.  That is correct.

23    Q.  It wasn't clear to me.  Did this document

24  come from Mr. Suhy, or did you ask Mr. Suhy for

25  invoices and payments and you received this

                                                          78

SER_0441

1  document, the related document?

2       A.  My counsel received this document from John

3  Mark Suhy.

4       Q.  Why did your counsel have to ask John Mark

5  Suhy for these invoices?  Do you know why?

6       A.  I believe we wanted to make sure that

7  whatever money we had received or that we have

8  invoiced were there.

9       Q.  So it's up to Mr. Suhy to account for all

10  the invoices issued to the IRS and payments received

11  by the IRS are accounted for for the CKGE contract?

12       A.  That is correct.

13       Q.  And then how did eGov Solutions account for

14  the payments that were made to Mr. Suhy for tax

15  purposes?

16           MR. GOLDSTEIN:  I'm just going to object.

17  I think that's outside the scope of the deposition

18  subpoena, Jeff, internal accounting within the

19  company.

20           MR. RATINOFF:  Well, it relates --

21           MR. GOLDSTEIN:  Might be a different topic

22  area.

23           MR. RATINOFF:  It relates to payments that

24  were made to Mr. Suhy.  So I think it's fairly

25  within the scope.  I can look --

79

1        MR. GOLDSTEIN:  I think the company is --

2   without testifying for Mr. Mayur or the company, the

3   documents and information are already there about

4   the payments that have come in and the payments

5   having gone out.  But you know what, unless there

6   is -- I can tell you he hasn't gone back and looked

7   at the company tax returns.

8        MR. RATINOFF:  I guess the agreement is

9   that the Stock Purchase Agreement states that he was

10  treated as an independent contractor.  So I guess

11  I'll just ask that question.

12  BY MR. RATINOFF:

13     Q.  Was Mr. Suhy with the CKGE contract, was he

14  treated as an independent contractor throughout?

15     A.  Yes.

16     Q.  Is it your understanding that independent

17  contractors are paid as and issued a 1099 every

18  year; is that correct?

19     A.  I can check with my accountant, and I can

20  confirm that.

21     Q.  Did eGovernment Solutions issue payments to

22  Mr. Suhy for payments made under the CKGE contract?

23     A.  I believe we did.

24        MR. RATINOFF:  Sorry.  I'm just trying to

25  figure out what exhibit I'm at.  Exhibit 111.  So

                                                      80

1   let me go ahead and mark this next document as

2   Exhibit 111.

3        (Plaintiffs' Exhibit 111 was marked for

4   identification.)

5   BY MR. RATINOFF:

6        Q.  Go ahead and take a look at Exhibit 111.

7        A.  I have that in front of me.

8        Q.  Do you understand what Exhibit 111 is?

9        A.  It's a 1099 prepared for iGov Inc. for

10  2018.

11       Q.  What's iGov Inc.?

12       A.  That is a company owned by John Mark Suhy.

13       Q.  And at some point, was there a decision

14  or -- sorry, at some point was there an agreement

15  made between eGovernment Solutions and Mr. Suhy that

16  the payments for the CKGE contract would go to iGov

17  Inc. instead of Mr. Suhy?

18       A.  There is no formal agreement, but yes,

19  anything coming from that particular project was

20  supposed to be paid to him.  And he said pay it to

21  iGov Sol -- iGov Inc., so we paid it to iGov Inc.

22       Q.  So all the payments in the Stock Purchase

23  Agreement that we've been talking about were

24  actually paid to iGov Inc. rather than to Mr. Suhy

25  personally, correct?

81

1      A.  I think nothing was paid to Mr. Suhy

2  personally.

3     Q.  So all of the payments that were received

4  by the IRS and then were in turn paid to Mr. Suhy

5  were actually paid to his entity iGov Inc., correct?

6      MR. GOLDSTEIN:  Object to the form of the

7  question of the question.  I think you got a little

8  confused on that in the middle, Jeff.

9  BY MR. RATINOFF:

10     Q.  Okay.  So once the IRS paid eGovernment

11  Solutions under the CKGE contract, the payments that

12  were contemplated by the Stock Purchase Agreement

13  were actually made to iGov Inc. instead of Mr. Suhy.

14  Is that how it worked?

15     A.  That's a question for me or for Jeff?

16     Q.  It's for you.

17     A.  Oh, yes.  It was paid to iGov Inc.

18     Q.  So looking at what we just marked as

19  Exhibit 111, it's a 2018 1099.  It's -- the amount

20  is 285,700.  Do you see that?

21     A.  Yes.

22     Q.  And previously we talked about there being

23  a $300,000 payment being made by the IRS; is that

24  correct?

25     A.  Yes.

82

1    Q.  So it's fair to say that there is a slight

2    discrepancy in the amount of money that was paid by

3    the IRS and that was in turn paid to Mr. Suhy; is

4    that correct?

5    A.  I did mention earlier that AtomRain was

6    also paid in year 1.

7    Q.  Okay.  So they were paid -- in year 1 of

8    the CKGE project, AtomRain was paid 10,000?

9    A.  That is correct.

10   Q.  So doing the math, that would increase the

11   total amount, if you take this 1099 into

12   consideration, it would be 295,000; is that correct?

13   A.  Yes.

14   Q.  And 700, obviously.  That leaves -- I know

15   it's only a small amount, but what happened to the

16   rest of that 300,000?

17   A.  I think that maybe the payment which goes

18   for the accountant or QuickBooks or a couple of

19   payments around that.  And there may be still money

20   sitting in that account.  So any payment which is in

21   regards to this particular project, as I mentioned,

22   it was -- there may be a few thousand here and

23   there, as we mentioned on there.

24   Q.  So that 4300 difference, if we take into

25   account what was paid on the 1099 and what was paid

83

1  to AtomRain would have been used for other expenses,

2  or it could be still in the account.  Is that your

3  testimony?

4      A.  I'm sorry.  Could you repeat the question?

5      Q.  So I just did the quick math.  There is

6  about a $4,300 difference in the $300,000 that was

7  paid by the IRS versus what was paid out to

8  iGov Inc. and AtomRain.  So you're saying that the

9  4300 would either still be in the bank account or

10  used to pay for other expenses?

11      A.  I can check with my accountant and confirm

12  exactly what happened to those $4,300.

13      Q.  And I assume that eGovernment Solutions

14  issued a 1099 also to AtomRain.

15      A.  I have to check that with my accountant.

16          MR. RATINOFF:  I'm going to go ahead and

17  drop in the next exhibit.  This will be Exhibit 112.

18          (Plaintiffs' Exhibit 112 was marked for

19  identification.)

20          THE WITNESS:  I have that open in front of

21  me.

22  BY MR. RATINOFF:

23      Q.  Okay.  This is a document that was produced

24  by your counsel yesterday.  It's got the beginning

25  Bates number 141.  Do you have an understanding of

84

1    what 112 is?

2         A.   Yes.

3         Q.   And what is that?

4         A.   This is a 1099 generated for iGov Inc. for

5    2019 for $199,850.

6         Q.   So the IRS had paid eGovernment Solutions

7    $200,000 for that year, correct?

8         A.   Yes.

9         Q.   So the difference would be likely due to

10   other expenses that were paid out before paying iGov

11   Inc.?

12        A.   I believe there was a difference of $150.

13        Q.   And this 1099 was issued to Mr. Suhy on

14   behalf of iGov -- sorry.  Strike that.

15             So this 1099 was issued to iGov Inc. as

16   option year 2 under the Stock Purchase Agreement?

17        A.   That is correct.

18        Q.   I'm sorry.  Let me strike that question.  I

19   think this might be option year 1, so let me back

20   up.  I went to law school, I didn't go to accounting

21   school, so you have to bear with me.  Lawyers

22   usually go -- or people go to law school because

23   they don't like math.  I'm sure Jeff would agree

24   with that.

25             All right.  So let me start over so the

85

SER_0448

```
 1    record is a little more clear.  So Exhibit 112 is a

 2    2019 1099, and this was issued to iGov Inc., as part

 3    of the option year 1 payment by the IRS as

 4    contemplated by the Stock Purchase Agreement; is

 5    that correct?

 6         A.   That is correct.

 7         Q.   I believe we talked about for option year 1

 8    there was an additional $216,000 payment from the

 9    IRS in option year 1.

10         A.   That is correct.

11         Q.   And I note that this 1099 that was issued

12    to iGov Inc. is only for 199,850.  Where did the

13    other 216,000 go?

14         A.   That money was received in 2020, not in

15    2019.  Because we are an S corp, we go with the

16    calendar year, financial year.  So we have not

17    received that money in 2019.  That money was

18    still --

19              (Reporter interruption.)

20              THE WITNESS:  That money -- that money was

21    received on January 9th, 2020, because the financial

22    year for the government is different than the

23    financial year for eGovernment Solutions.

24    BY MR. RATINOFF:

25         Q.   I understand.  So even though the invoice
```

86

October 15, 2022

1   was issued in December of 2019, the payment wasn't

2   actually received from the IRS until 2020.

3       A.  That's correct.

4       Q.  So that money should then be reflected in

5   the following year's iGov -- I'm sorry.  EGov, iGov.

6       So the 216,000 that was received as an

7   increase in option year 1 would have actually been

8   reflected in the 2020 1099 issued to iGov Inc.,

9   correct?

10      MR. GOLDSTEIN:  Objection to form.

11      You can go ahead and answer.

12  BY MR. RATINOFF:

13      Q.  If you know.

14      A.  I'm sorry, Jeff.

15      MR. GOLDSTEIN:  I said objection to the

16  form.  You can go ahead and answer.

17  BY MR. RATINOFF:

18      Q.  I'll just reask the question.  So the

19  260,000 -- I'm sorry, $216,000 payment for option

20  year 1 increase was received in January of 2020,

21  correct?

22      A.  That is correct.

23      Q.  So that payment, to the extent it was paid

24  out to Mr. Suhy, would be then reflected in a 1099

25  for 2020, correct?

87

SER_0450

1      MR. GOLDSTEIN:  Object to the form the of

2  the question.

3      But you can go ahead and answer.  Ash, you

4  can go ahead and answer.

5      THE WITNESS:  So the part portion of that

6  was paid to iGov.

7  BY MR. RATINOFF:

8      Q.  I'm sorry, what was the other portion --

9  who was the other portion paid to?

10      A.  I believe one of the portions was paid to

11  AtomRain.

12      Q.  And do you recall the amount?

13      A.  $101,400.

14      Q.  To AtomRain?

15      A.  Yes.

16      Q.  And then doing the quick math -- so let me

17  just make I've got all the numbers lined up here.

18  So the IRS paid a total of 416,000 for option

19  year 1, correct?

20      A.  Yes.

21      Q.  And -- but the actual second payment for

22  216,000 was paid in 2020, correct?

23      A.  Yes.

24      Q.  And then of that 216,000, approximately

25  100,000 was paid to AtomRain in 2020; is that

88

1    correct?

2          A.  Yes.

3          Q.  And then where did the other 100 --

4    approximately 116,000 from that payment received in

5    January of 2020 go?

6          A.  There was a payment paid to Irving Starr.

7          Q.  I'm sorry, can you repeat that?

8          A.  The payment were made to -- there are some

9    checks cut by John Mark to Irving Starr, I-R-V-I-N-G

10   S-T-A-R (sic).

11         Q.  What is that or who is that?

12         A.  I have the check with John Mark Suhy on

13   that.

14         Q.  I'm sorry, can you just spell that one more

15   time?

16         A.  E-R-V-I-N-G (sic).

17         Q.  E-R-I-N-G?

18         A.  E-R-V-I-N-G.

19         Q.  Irving.  Okay.  What was the last name?

20         A.  Starr, S-T-A-R (sic).

21         Q.  Irving Starr.  Is that a person, to your

22   knowledge?

23         A.  I was always under the impression that was

24   a company name.

25         Q.  A company name.  Okay.

                                                      89

1    A.  That's my impression.

2    Q.  Do you understand what that company is?

3    A.  No.  I have to check with John Mark Suhy on

4  that.

5    Q.  Would there have been a 1099 issued to

6  Irving Starr for that --

7    A.  I would have to check with my accountant on

8  that.

9    Q.  So is it fair to say that none of the

10  $216,000 that was paid by the IRS in option year 1

11  in the amendment went to Mr. Suhy?

12    A.  All these checks, AtomRain and Irving

13  Starr, were incurred by Mr. Suhy.

14    Q.  So eGovernment Solutions didn't ask any

15  questions about why the money was being paid to them

16  instead of Mr. Suhy?

17    A.  No, we did not.

18    Q.  But it was eGovernment Solutions'

19  understanding that those payments were made to

20  AtomRain and Irving Starr for work done on the CKGE

21  contract, correct?

22    A.  That is the impression we have.

23    Q.  You had no other reason to believe that the

24  payments were for something else?

25    A.  No.

90

October 15, 2022

```
 1        Q.  Okay.  The next exhibit would be
 2   Exhibit 114 (sic).  Let me know when you've had a
 3   chance to take a look at that.
 4        A.  I've had a look.
 5        Q.  I'll represent to you this was produced by
 6   your counsel yesterday.  It's got the Bates number
 7   ending in 142.  Do you have an understanding of what
 8   Exhibit 114 is?
 9        A.  This is a 1099 for year 2020 to iGov, Inc.,
10   $193,000.
11        Q.  I apologize.  You know what, I have
12   mismarked this.
13            MR. RATINOFF:  Karen, should this be
14   Exhibit 113?
15            THE REPORTER:  Hold on a moment, please.
16            Yes.
17            MR. RATINOFF:  Okay.  Let me start over
18   again, since I mismarked that.  What's been dropped
19   in the tab 383 with the Bates number EGOVS000142 was
20   produced by your counsel yesterday, and it's been
21   marked as Exhibit 113.
22            (Plaintiffs' Exhibit 113 was marked for
23   identification.)
24   BY MR. RATINOFF:
25        Q.  Do you understand what Exhibit 113 is?
```

91

1    A.  Yes.

2    Q.  What do you understand Exhibit 113 to be?

3    A.  So this is a 1099 for year 2020 to iGov

4  Inc.

5    Q.  And this is reflecting the payment of

6  option year -- I believe it would be 2, is that

7  correct, to Mr. Suhy under the Stock Purchase

8  Agreement?

9    A.  Correct.

10    Q.  And again, this payment was made to

11  iGov Inc. or on behalf of iGov Inc. for Mr. Suhy's

12  benefit?

13    A.  Yes.

14    Q.  And again, it looks like the amount is

15  193,000, and the payment made by the IRS was

16  200,000.

17    A.  That is correct.

18    Q.  And so do you know what happened to the

19  other 7,000?

20    A.  I think it's still lying in the account.

21    Q.  But that would be money that would be owed

22  to Mr. Suhy if he wished to withdraw it?

23    A.  Correct.

24    Q.  And to your knowledge, this 1099 was issued

25  to Mr. -- or, sorry, to iGov Inc.?

92

SER_0455

```
 1        A.   Yes.
 2        Q.   And I will ask the same question for the
 3   prior one, Exhibit 112.  That was also issued to
 4   iGov Inc.?
 5        A.   That is correct.
 6             MR. RATINOFF:  Moving on to what should be
 7   Exhibit 114, I'm going to drop this in the chat.
 8             (Plaintiffs' Exhibit 114 was marked for
 9   identification.)
10             THE WITNESS:  I have that in front of me.
11   BY MR. RATINOFF:
12        Q.   Okay.  I just put in the chat a document
13   that was produced yesterday by your counsel.  Ending
14   Bates number is 143, or the Bates number on the only
15   page is 143.
16             Do you understand what Exhibit 114 is?
17        A.   That is a 1099 for the year 2021, generated
18   for iGov Inc. for the amount of 197,000.
19        Q.   Was this reflecting option year 3 under the
20   CKGE contract referenced in the Stock Purchase
21   Agreement?
22        A.   No.  That should be the option year 4.  No,
23   no, that's correct.  Option year 3.
24        Q.   Yeah, option year 4 would be 2022, correct?
25        A.   That is correct.
```

93

October 15, 2022

1    Q.   Okay.   So option year 3 is 2021?

2    A.   Yes.

3    Q.   So then we talked about earlier $200,000

4    was paid to eGovernment Solutions for option year 3,

5    correct?

6    A.   That is correct.

7    Q.   And then of that 200,000, 197,000 was paid

8    to iGov Inc., correct?

9    A.   That is correct.

10   Q.   Okay.   And then what happened to the

11   $3,000?   That's sitting in the account?

12   A.   That is correct.

13   Q.   Is that money -- it essentially belongs to

14   Mr. Suhy if he wants to withdraw it?

15   A.   That is correct.

16   Q.   Obviously we're not through 2022 yet, but

17   would a 1099 issued to iGov Inc. reflect any payment

18   to Mr. Suhy made under the Stock Purchase Agreement

19   that was received money received from the IRS?

20   A.   That is correct.

21   Q.   And has Mr. Suhy withdrawn any amount for

22   option year 4?

23   A.   Yes.

24   Q.   Do you know off the top of your head what

25   that amount is?

94

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS   408-287-7500

1        A.   189,000.

2        Q.   And of that 189,000 -- I'm sorry, the

3   difference between 189,000 and the $200,000 payment

4   received from the IRS, is that money sitting in the

5   account still?

6        A.   Yes.

7             MR. RATINOFF:   I'm going to go ahead and

8   mark the next exhibit as 115.

9             (Plaintiffs' Exhibit 115 was marked for

10  identification.)

11  BY MR. RATINOFF:

12       Q.   Let me know when you've had a chance to

13  take a look at what's been marked as Exhibit 115.

14       A.   I have that in front of me.

15       Q.   And I'll represent to you this is produced

16  by your counsel.   I believe it was last week.   It

17  starts with Bates number 81, and it goes all the way

18  through to Bates number 136.   The full Bates number

19  is EGov Production 136, the last page.

20            Do you understand what's contained in this

21  exhibit?

22       A.   These are the statements from the bank,

23  from the eGovernment Solutions bank.

24       Q.   Okay.   And this is the account that

25  Mr. Suhy has access to?

95

1     A.   That is correct.

2     Q.   And this is the account that was used to

3  receive all of the payments from the IRS for the

4  CKGE contract?

5     A.   That is correct.

6     Q.   It's also the account that all the payments

7  to iGov Inc. were made from?

8     A.   That's correct.

9     Q.   And it's also the account that payments

10  were made to AtomRain?

11     A.   Yes.

12     Q.   As well as Irving Starr?

13     A.   That is correct.

14     Q.   I notice there is a bunch of black boxes

15  where those things are blocked out.  We call it

16  redacted.  Did you apply those redactions to this

17  document?

18     A.   I believe my counsel must have done that.

19     Q.   Okay.  Do you have any idea what's behind

20  the redactions?

21     A.   I would have go back and check on the

22  statement, because there are so many of those.

23     Q.   Okay.  Do you know why these redactions

24  were made?

25     A.   I believe they may not be relevant.

96

1          MR. GOLDSTEIN:  It sounds familiar, but I

2   don't recall at the moment seeing it.  But it's

3   certainly possible I've seen that already.

4          MR. RATINOFF:  All right.  I'll send it

5   over your way when we get off line here, just so you

6   have it at the top of your inbox.

7   BY MR. RATINOFF:

8       Q.  All right.  So let's go ahead and return

9   back to the document.  And I'm looking at page 82,

10  which is -- this is the July 2018 bank statement.

11  The Bates number at the bottom of the page I'm

12  referring is 82.  You'll see there is a July 26th

13  date.  It's a deposit of 300,000.  Do you see that?

14      A.  Yes.

15      Q.  Is that the -- does that reflect the

16  $300,000 payment that was received for the base year

17  for the IRS CKGE contract?

18      A.  I believe so.

19      Q.  Then going to page 86, you'll see there is

20  two payments made in -- this is an August 2018

21  statement.  There's two payments, one August 1st for

22  10,000, and one on August 3rd for 139,000.  Do you

23  see that?

24      A.  Yes.

25      Q.  And to your knowledge, were those payments

99

SER_0460

Case 5:18-cv-07182-EJD   Document 210   Filed 09/28/23   Page 254 of 780   October 15, 2022

1   that were made to iGov Inc.?

2        A.   To my knowledge, 10,000 is for AtomRain,

3   and the 139,000 is for iGov.

4        Q.   And then in October of 2018, it's the Bates

5   number 90, there is $146,700 payment.  Do you see

6   that?

7        A.   Yes, I do see that.

8        Q.   Is that the remaining amount received from

9   the IRS that was paid to Mr. Suhy?

10        A.   That is correct.  To iGov.

11        Q.   I was just going to say reflected in the

12   iGov 1099.

13        A.   That is correct.

14            (Reporter interruption.)

15   BY MR. RATINOFF:

16        Q.   So I just wanted to make sure I got the

17   math correct.  So there was a $139,000 payment made

18   to iGov Inc. in 2018, and then an additional

19   146,700, and that total, it would be 285,700.  And I

20   believe that's the amount of the 1099 to iGov Inc.;

21   is that correct?

22        A.   That is correct.

23        Q.   And the other 10,000 was paid to AtomRain?

24        A.   Yes.

25        Q.   And then moving on to what's going to be

100

October 15, 2022

1    Bates number 94, it's the July -- I'm sorry, the

2    June 30th, 2019, statement.

3        A.   I do see that.

4        Q.   And you'll see on June 5th, there was a

5    $200,000 payment, looks like it was made by the IRS;

6    is that correct?

7        A.   That is correct.

8        Q.   And that was for the first of two payments

9    for option year 1?

10       A.   Yes.

11       Q.   And then there is two checks, one for

12   $74,850, and one for 125,000, both paid on

13   June 25th, 2019.  Do you see that?

14       A.   That is correct.  I see that.

15       Q.   And were both those payments made to iGov

16   Inc.?

17       A.   That is correct.

18       Q.   Doing the math, I believe that adds up to

19   199,850; is that correct?

20       A.   That is correct.

21       Q.   And then that was the same number that was

22   reflected in the 1099 to iGov in 2019?

23       A.   That is correct.

24       Q.   Then moving on to the January 31st, 2020,

25   statement that's -- I'm sorry.  Looking at page or

101

SER_0462

1    Bates number 99.  Let me know when you're there.

2        A.  I'm there.

3        Q.  And you'll see there is a January 9th

4    payment of 216,000 that looks like from the IRS.  Do

5    you see that?

6        A.  I do see that.

7        Q.  Is that the earlier payment that we were

8    talking about that was invoiced in December of 2019

9    but paid in 2020?

10       A.  That is correct.

11       Q.  And then moving down to January 2015 -- I'm

12   sorry, January 15, 2020, there is looks like a wire

13   transfer to AtomRain for $101,400.  Do you see that?

14       A.  I do see that.

15       Q.  Is that the payment you had mentioned --

16       A.  Excuse me.

17       Q.  Bless you.

18       A.  Thank you.

19       Q.  Let me ask that again.  So is that the

20   payment that you previously mentioned was made to

21   AtomRain?

22       A.  That is correct.

23       Q.  And then there is another $5,000 withdrawal

24   or check dated January 31st, 2020.  Do you see that?

25       A.  I do see that.

102

1    Q.   And do you know what that $5,000 payment

2    was for?

3    A.   That is to Irving Starr.

4    Q.   And then scrolling down to the next month's

5    statement, this would be February 2020, looking on

6    the page with the Bates number 103.

7    A.   I do see that.

8    Q.   And there's a payment or check cashed on

9    February 5th, 2020, for $25,835.  Do you see that?

10   A.   I do see that.

11   Q.   Do you know who that check was issued to?

12   A.   Irving Starr.

13   Q.   Is Irving Starr a law firm?

14   A.   Um -- I'm not quite familiar, because I

15   never saw this name.  I mean I started looking at

16   all the payments in the last few days.  That's the

17   first time I heard this name.  But my assumption is

18   that was related to his particular project.  John

19   Mark must have used Irving Starr.

20   Q.   You're not sure what Irving Starr was used

21   for for the project?

22   A.   No, I'm not aware of that.

23   Q.   Okay.  Moving on to what's Bates page

24   no. 106, this would be the April 2020 statement.

25   A.   I do see that.

103

1      Q.   There's a $20,000 cash or deposited check

2    dated 4/20/2020.  Do you see that?

3      A.   I do see that.

4      Q.   Who was that $20,000 paid to?

5      A.   Again, Irving Starr.

6      Q.   So there is a -- I'm looking at page 109,

7    which is the May 2020 statement.  Looks like it's

8    all redacted, but it looks like there were several

9    withdrawals or debits.  Without providing the

10   amounts, I guess, do you know what those were about?

11     A.   I wouldn't know that.  I would have to go

12   back and check the statement.

13     Q.   Okay.  And moving on to -- actually, before

14   I get there, let me just make sure I've got all

15   these numbers lined up.  So we've got a -- for 2020,

16   so we've got a payment from -- I'm sorry, a payment

17   to AtomRain for 100 -- actually, let me back up for

18   a second.  Let's try again.  We'll come back to

19   that.  Let's get through the rest of these

20   statements, and we'll come back.

21          Looking at Bates number page 113, this

22   would be the June 2020 statement, you'll see there

23   is a June 17, 2020, payment.  Looks to be from the

24   IRS for $200,000.  Do you see that?

25     A.   I do see that.

104

1    Q.  And is that the payment for option year 2?

2    A.  That is correct.

3    Q.  That's option year 2 under the CKGE

4    contract, correct?

5    A.  That is correct.

6    Q.  And also listed as option 2 in the Stock

7    Purchase Agreement?

8    A.  That is correct.

9    Q.  And then we go on to the August 2020 bank

10   statement.  I'm looking at page 117, Bates number

11   117.

12   A.  I do see that.

13   Q.  And there's a payment made on August 10th,

14   2020, for 25,000.  Do you see that?

15   A.  I do see that.

16   Q.  Who was that payment made to?

17   A.  Irving Starr.

18   Q.  And then there was another payment made on

19   8/24 for 125,000.  Do you see that?

20   A.  Yes.

21   Q.  Was that a payment made to iGov Inc.?

22   A.  That is correct.

23   Q.  And that was payment in part for option

24   year 2 in the Stock Purchase Agreement?

25   A.  That is correct.

105

1   Q.  And then in October 2020, I'm looking at

2   the statement on Bates number 122, there is a

3   payment that looks like it was made on October 28th,

4   2020, for 30,000.  Do you know who that payment was

5   made to?

6   A.  Irving Starr.

7   Q.  And then there was the payment made on

8   December 28th, would be on Bates number 127, it's

9   the December 2020 payment.

10   A.  I do see that.

11   Q.  You see that?  Okay.  Who was that $68,000

12   payment made to?

13   A.  iGov.

14   Q.  So if we put that $125,000 payment that we

15   talked about earlier and the 68,000 that was paid

16   here, that comes out to 193,000; is that correct?

17   A.  That's correct.

18   Q.  And that's -- I believe that was the same

19   amount that was on the 2020 1099 that eGovernment

20   Solutions issued to iGov Inc., correct?

21   A.  Yes.

22   Q.  Then for the rest of 2020, I just want to

23   make sure I got my numbers, we've got a total of

24   101,400 for AtomRain.

25   A.  That is --

106

SER_0467

1    Q.   That was -- that was a payment made in

2   January of 2020, correct?

3    A.   Yes.

4    Q.   And we've got a series of payments made to

5   Irving Starr in the amount of 500 -- I'm sorry,

6   5,000.  I don't want to do this.  I'm going to go

7   ahead and share my screen here just to make sure

8   we're on the same page, because I don't want to put

9   you on the spot for the math, because I'm sure your

10   counsel is going to object.

11        MR. GOLDSTEIN:  Can I just say it seems to

12   me this is all interesting for us, but this all

13   seems like something that the parties in the lawsuit

14   could actually figure out and stipulate to, how much

15   money went to the iGov entity or to other entities

16   or persons within the John Mark community.

17        MR. RATINOFF:  That's fair.  I mean if

18   you're stipulating that you agree that John Mark has

19   the ability to have access to bank statements from

20   this account, that's fine.  We're deposing him next

21   month.

22        MR. GOLDSTEIN:  I think that's true, and I

23   think the numbers are what the numbers are.  And it

24   seems like between counsel involved in the actual

25   underlying case, they could come up with a number.

107

1        MR. GOLDSTEIN:  I think that's clear.

2        MR. RATINOFF:  He can obtain information

3   from it.  And -- but again, it's also subject to the

4   subpoenas, so the lawyers can work it out at the end

5   of the day and not take any more of the witness'

6   time.

7   BY MR. RATINOFF:

8        Q.  So then moving on to -- let me get back.

9   Too many open PDFs.  We're looking back now to the

10  bank statements, Exhibit 115.  Going to move on to

11  the following year, so we're now in 2021.  There's

12  a -- looks like we don't have a page showing a

13  deposit, or maybe I'm be misreading this, from the

14  IRS.  So let me just start with the December 2021

15  statement which would be -- I'm looking at Bates

16  number 130.  There's $197,000 payment, and that's

17  dated 12/22/2021.  Do you see that?

18       A.  I do see that.

19       Q.  And was that the payment made from

20  eGovernment Solutions to iGov for option year 3?

21       A.  Yes.

22       Q.  And option year 3 that's reflected in the

23  Stock Purchase Agreement?

24       A.  That's correct.

25       Q.  And also option year 3 is reflected in the

109

1  IRS amendments, contract amendment?

2      A.  Yeah.  That is correct.

3      Q.  And moving on, I think there is sort of a

4  different format here.  So to do this, it's reverse

5  chronological order.  So I'm going to scroll all the

6  way down to the very end here, page 136, Bates

7  number 136.  I'm just going to scroll from the

8  bottom to -- looks like -- okay, there we go.  On

9  Bates number 135, there's a payment of June -- dated

10  June 15, 2021, for 200,000.  Do you see that?

11      A.  Yes, I do see that.

12      Q.  And that's the option year 3 payment from

13  the IRS; is that correct?

14      A.  That is correct.

15      Q.  And moving up to the Bates number 134 we

16  just talked about, I believe it was the $197,000

17  payment to iGov after the IRS made that option

18  year 3 payment, correct?

19      A.  That is correct.

20      Q.  And then moving on to 2022, so this would

21  be the same page at the top, there's a June 13,

22  2022, payment of $200,000.  Do you see that?

23      A.  I do see that.

24      Q.  And was that payment from the IRS?

25      A.  That is correct.

110

1          Q.   And that was the option year 4 payment

2     under the Stock Purchase Agreement?

3          A.   That is correct.

4          Q.   And also the option year 4 under the IRS

5     contract amendment?

6          A.   Yes.

7          Q.   And then there is $189,000 payment that was

8     made on June 27th, 2022.   Do you see that?

9          A.   I do see that.

10         Q.   And was that payment made to iGov?

11         A.   That is correct.

12         Q.   That was the payment that was contemplated

13    to Mr. Suhy or being made to Mr. Suhy under option

14    year 4 under the Stock Purchase Agreement?

15         A.   That is correct.

16         Q.   You see there is a little check with a

17    magnifying glass?   Do you see that?

18         A.   Yes.

19         Q.   No. 103?

20         A.   Yes.

21         Q.   Is that something you would be able to

22    click on and see an image of the check, who it was

23    actually made out to and cashed by?

24         A.   That has been made to iGov.

25         Q.   Okay.   But if you were to click on that,

                                                        111

1      MR. RATINOFF:  Yeah.  That works fine.

2      THE WITNESS:  I'm okay with that.

3      THE VIDEOGRAPHER:  All right.  Thank you.

4  We're now going off the video record.  The time is

5  10:41 a.m.

6      (Break taken from 10:41 to 11:06 a.m.)

7      THE VIDEOGRAPHER:  We are now back on the

8  video record.  The time is 11:06 a.m.

9      MR. RATINOFF:  Okay.  I think when we left

10  off, we were just going through the last of that

11  bank statement which was Exhibit 115.  And I think

12  you had mentioned there was a payee of that account

13  that was Irving Starr, and I don't think we got the

14  spelling quite correct.

15      So I'm just going to put something in the

16  chat.  I'm going to mark this as Exhibit 116.

17      (Plaintiffs' Exhibit 116 was marked for

18  identification.)

19  BY MR. RATINOFF:

20      Q.  And I went ahead and went on the LinkedIn

21  and found it.  And Irving Starr, there is a

22  Mr. Starr, as listed here in his profile.  And if

23  you look at this, it says attorney at Irving Starr,

24  Esq., PC.  Is that Irving Starr, starting with an I,

25  I-R-V-I-N-G, second word Starr with two Rs, is that

114

1    who the payee you were referring to was when you

2    mentioned Irving Starr?

3        A.  The spellings are matching, I believe.  So

4    I believe that is the right person or entity.

5        Q.  Okay.  But from the spelling standpoint,

6    for the Court Reporter, when you previously

7    mentioned Irving Starr, it was spelled I-R-V-I-N-G,

8    second word S-T-A-R-R, on those checks that you were

9    talking about that we discussed payments made out of

10   the account, correct?

11       A.  That is correct.  I-R-V-I-N-G, S-T-A-R-R.

12       Q.  Did those checks also -- and again, I guess

13   we'll actually get them, but just for the deposition

14   record, do those checks also have the "ESQ" or "PC"

15   on them?

16       A.  They do.

17       Q.  So the checks were made out to Irving Starr

18   E-S-Q, period, comma, P, period, C comma -- period,

19   correct?

20       A.  These are handwritten checks by John Mark,

21   but that sounds right.

22       Q.  And again, you don't know what Irving Starr

23   was being paid for out of that eGovernment Solutions

24   account?

25       A.  No, I don't.  My assumption would be for

115

1   the project somewhere.  But that's an assumption.

2   Bu I wouldn't know that.

3       Q.  And eGovernment Solutions has never

4   retained an attorney named Richard Starr?

5       A.  No.

6       Q.  And it's never retained a law firm -- I'm

7   sorry.  eGovernment Solutions has never retained a

8   law firm called Irving Starr, Esquire, PC?

9       A.  No.

10      Q.  Would it be an unusual for a lawyer to be

11  paid to do the work on a contract with the IRS?

12      MR. GOLDSTEIN:  Objection to the form of

13  the question.

14      You can go ahead and answer.

15  BY MR. RATINOFF:

16      Q.  In your experience.  Let me start over.

17      In your experience, is it common for an

18  attorney to be paid for work performed on a

19  government contract for software?

20      MR. GOLDSTEIN:  Objection to the form of

21  the question.

22      You can go ahead and answer.

23      THE WITNESS:  I don't have any answer to

24  that.  But as I mentioned, I presume everything done

25  is for the project.

116

BY MR. RATINOFF:

Q.   So from eGovernment Solutions' perspective, the money that it paid out from the IRS payments was made in conjunction with the CKGE contract, correct?

A.   That is correct.

Q.   All right.  We mentioned AtomRain.  I'm sorry.  You had mentioned AtomRain.  Do you know what AtomRain is?

A.   This is a company -- honestly, I don't know.  The only thing I know is it's a company that John Mark used to do some kind of work on this project, because he needed some help.

Q.   And do you know anyone who is affiliated with AtomRain?

A.   Nothing on top of my head.  I don't remember talking to anybody or connecting with anyone.

Q.   Do you recognize the name Brad Nessbaum?

A.   There is one e-mail in my account.  I have to go back and check.  But I never connected with the person.

Q.   You recognize the name Nessbaum or Nessbaum?

A.   The last name I recollect.

Q.   Do you have any understanding of anyone

117

ASHWANI MAYUR                                                  October 15, 2022

```
 1    named Nessbaum who's affiliated with AtomRain?
 2         A.   Recently when I went through all of the
 3    documents that we shared with you, there was one
 4    e-mail which popped up.  That's the only thing I
 5    know.
 6         Q.   So eGovernment Solutions has never employed
 7    anyone named Brad Nessbaum?
 8         A.   No.
 9         Q.   eGovernment Solutions, has it ever employed
10    anyone named Ben Nessbaum?
11         A.   No, unless John Mark employed anyone on
12    behalf of eGov.
13         Q.   But eGovernment Solutions doesn't have any
14    record of anyone being on payroll with the last name
15    of Nessbaum?
16         A.   No.
17         Q.   Has eGovernment Solutions ever issued a
18    1099 to either a Brad or Ben Nessbaum?
19         A.   Not that I'm aware of.
20         Q.   But earlier you said that there may have
21    been a 1099 issued to AtomRain, correct?
22         A.   No.  I mentioned there is a payment which
23    went to AtomRain.  I can check with my accountant if
24    a 1099 is issued or not.
25         Q.   Do you know if any payments were made to
```

118

1  AtomRain by eGovernment Solutions after February of

2  2021?

3      A.  After February 2021, I don't believe so.  I

4  think there are only two payments, which I already

5  mentioned.  One was 10,000; one was $101,400.

6          (Reporter interruption.)

7          THE WITNESS:  The other one was $101,400.

8  But none of them -- that was in 2020, and the first

9  one was in 2018.  There was no payment that went to

10  anybody other than iGov in 2021 and 2018.

11  BY MR. RATINOFF:

12      Q.  So did Mr. Suhy have authority -- I'm

13  sorry.  Strike that.

14          Did Mr. Suhy have permission from

15  eGovernment Solutions to retain additional

16  contractors to work on the CKGE project as needed?

17      A.  Yes.

18          MR. RATINOFF:  I'm going to go ahead and

19  put the next exhibit in the chat.  And this should

20  be Exhibit 117.

21          (Plaintiffs' Exhibit 117 was marked for

22  identification.)

23          THE WITNESS:  I see that.

24  BY MR. RATINOFF:

25      Q.  Okay.  And this exhibit, 117, is an e-mail

                                                    119

1    A.  I don't think so.

2    Q.  And moving to a different area, we talked a

3  little bit about iGov Inc. in the context of those

4  1099s.  What's your understanding of what iGov Inc.

5  is?

6    A.  My understanding is iGov Inc. is an entity

7  owned by John Mark Suhy.

8    Q.  And do you understand what iGov Inc. does?

9    A.  Different projects.  That's all I know

10 right now.

11   Q.  But the only project that eGovernment

12 Solutions has a relationship on with iGov Inc. is

13 the CKGE contract?

14   A.  That is correct.  That's the only project.

15   Q.  And does iGov Inc. lease any office space

16 from eGovernment Solutions?

17   A.  Yes.  It is the same office.

18   Q.  What do you mean by "the same office"?

19   A.  I mean it's a one-room office.  eGovernment

20 Solutions has its own company.  So iGov shares that

21 office with us.

22   Q.  What is a HUBZone company?

23       (Reporter interruption.)

24 BY MR. RATINOFF:

25   Q.  What is a HUBZone company?

124

October 15, 2022

1    Q.  We would have to ask Mr. Suhy that?

2    A.  Yes.  See, this whole project was literally

3  a black box for us.  Because it is a clear project,

4  I'm not supposed to know anything.  So we never

5  asked.

6    Q.  What was the benefit for eGovernment

7  Solutions to allow John Mark Suhy to keep the

8  contract under eGovernment Solutions' name?

9        MR. BEENE:  Objection to form.

10  BY MR. RATINOFF:

11    Q.  Why did -- strike that.

12        Why did eGovernment Solutions allow

13  Mr. Suhy to continue working under the eGovernment

14  name?

15    A.  I guess he won the project through

16  eGovernment Solutions, and we wanted to honor it.

17  And it would have taken him forever to take the

18  project on his company.  So we didn't see any harm,

19  so we left it on that.

20    Q.  Did eGovernment Solutions get any

21  nonmonetary benefits out of the CKGE contract?

22    A.  No.  We had -- we had or we have no

23  intention of taking.  It is his money, so . . . .

24    Q.  So essentially, it was just eGovernment

25  Solutions acted as a conduit for Mr. Suhy?

137

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS   408-287-7500

1    A.   So he won the project while he was partner,

2    and then he was moving away.  So that was his

3    project.  So we let him take the project as his.

4    Q.   And he had complete control over this CKGE

5    contract?

6    A.   That is correct.

7    Q.   And any decisions he made under that

8    contract, eGovernment Solutions was okay with him

9    making those decisions?

10        MR. GOLDSTEIN:  Objection to the form of

11   the question.

12        You can go ahead and answer.

13        THE WITNESS:  I have -- I don't understand

14   the question.

15   BY MR. RATINOFF:

16   Q.   So Mr. Suhy had autonomy to make decisions

17   in relation to the CKGE contract?

18   A.   I believe, because he is the one who knew

19   about the project, so he is the one who can make any

20   decision on that.

21   Q.   But from eGovernment Solutions'

22   perspective, he had complete autonomy to make those

23   decisions?

24   A.   Um --

25   Q.   In other words, eGovernment Solutions

138

SER_0480

1   didn't have any say in any sort of aspect to how the

2   CKGE contract was performed?

3        A.   That is correct.

4        MR. RATINOFF:  Okay.  I don't have any

5   further questions.  Obviously, as stated on the

6   record, this is a few documents we think should be

7   produced.  I'll make these bank statements to be a

8   little more intelligible on that.

9        MR. BEENE:  I just have a few questions.

10   This is counsel for defense.

11        EXAMINATION BY MR. BEENE:

12        Q.   The first one is did Mr. Nikhil Budhiraja

13   control the authentication policy for e-mail

14   accounts at eGov Solutions?

15        MR. RATINOFF:  Objection.  Form.

16        THE WITNESS:  I'm not sure what does that

17   mean.

18        MR. RATINOFF:  Hold on.  We're having an

19   earthquake here.

20        THE REPORTER:  Yeah, we sure are.  It's a

21   decent one.

22        MR. RATINOFF:  Let's go off the record.

23   Let's go off the record, please.

24        THE VIDEOGRAPHER:  We are now going off the

25   video record.  The time is 11:42 a.m.

139

SER_0481

DECLARATION OF DEPONENT


   I, ASHWANI MAYUR, declare under penalty of
perjury that I have reviewed the foregoing
transcript; that I have made any corrections,
additions, or deletions in my testimony that I
deemed necessary; and that the foregoing is a true
and correct transcription of my testimony in this
matter.


    Dated this _____ day of _____, 2022,
at _____, _____.
      [City]                    [State]


                    _____

                    ASHWANI MAYUR

143

SER_0482

```
 1                    REPORTER'S CERTIFICATE

 2          The undersigned Certified Shorthand Reporter

 3     licensed in the State of California does hereby certify:

 4          I am authorized to administer oaths or

 5     affirmations pursuant to Code of Civil Procedure,

 6     Section 2093(b), and prior to being examined, the

 7     witness was duly administered an oath by me.

 8          I am not a relative or employee or attorney or

 9     counsel of any of the parties, nor am I a relative or

10     employee of such attorney or counsel, nor am I

11     financially interested in the outcome of this action.

12          I am the deposition officer who

13     stenographically recorded the testimony in the foregoing

14     deposition, and the foregoing transcript is a true

15     record of the testimony given by the witness.

16          Before completion of the deposition, review of

17     the transcript [ ] was [x] was not requested.  If

18     requested, any changes made by the deponent (and

19     provided to the reporter) during the period allowed are

20     appended hereto.

21          In witness whereof, I have subscribed my

22     name this 28th day of October, 2022.

23

24

25

               Karen L. Buchanan, CSR 10772
```

144

# EXHIBIT 4

SER_0484

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA


NEO4J, INC., et al.,

          Plaintiff,

vs.                       CASE NO.
                              5:18-cv-07182-EJD
PURETHINK LLC, et al.,

          Defendants.
_____/


VIDEOTAPED DEPOSITION OF
JIM WEYANT
as representative of CACI INTERNATIONAL, INC.
pursuant to Federal Rule of Civil Procedure 30(b)(6)


**CONFIDENTIAL PORTIONS**


DATE:         September 16, 2022

TIME:         8:16 a.m. Pacific Time

LOCATION:    via videoconference


REPORTED BY:  BENJAMIN GERALD
              California CSR No. 14203
              Washington CSR No. 3468
              Texas CSR No. 11912

1

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA


NEO4J, INC., et al.,

        Plaintiff,

vs.                                    CASE NO.
                                       5:18-cv-07182-EJD

PURETHINK LLC, et al.,

        Defendants.

_____/


VIDEOTAPED DEPOSITION OF
JIM WEYANT
as representative of CACI INTERNATIONAL, INC.
pursuant to Federal Rule of Civil Procedure 30(b)(6)


**ATTORNEYS' EYES ONLY PORTIONS**


DATE:          September 16, 2022

TIME:          8:16 a.m. Pacific Time

LOCATION:      via videoconference


REPORTED BY:  BENJAMIN GERALD
              California CSR No. 14203
              Washington CSR No. 3468
              Texas CSR No. 11912

1

JIM WEYANT, 30(b)(6)   Confidential   September 16, 2022

```
 1                    --oOo--

 2              JIM WEYANT,

 3   as representative of CACI INTERNATIONAL, INC. pursuant

 4   the Federal Rule of Civil Procedure 30(b)(6), being duly

 5   sworn by the Certified Shorthand Reporter to tell the

 6   truth, the whole truth, and nothing but the truth,

 7   testified as follows:

 8                    --oOo--

 9                  EXAMINATION

10   BY MR. RATINOFF:

11       Q.  Good morning.  Could you please state your full

12   name for the record.

13       A.  Good morning.  My name is James Franklin

14   Weyant, II.

15       Q.  Mr. Weyant, thank you for joining us today.  I

16   appreciate your time.  I know it's Friday and we have a

17   time difference, so our lunches are going to be at a

18   different point.

19           Have you been deposed before?

20       A.  I have not.

21       Q.  Okay.  So I'm going to go through some kind of

22   ground rules just to get you familiar with the process.

23   I'm sure you've done some preparation, so some of this

24   may not come as a surprise.

25           I know we're several hours apart.  Your
```

10

1     lunchtime's coming up sooner, so if you want a break --

2     we need to take maybe a five-minute break every hour,

3     but if you want to take your lunch before our lunchtime,

4     please let me know.  We can do a little bit longer of a

5     break.  So I believe it's already 11:15 where you're at

6     or 11:20, so I'll be cognizant of that.

7          We're going to proceed in an

8     question-and-answer format.  I'm going to ask questions.

9     It's important to allow me to finish my questions and

10    give your attorney a time to respond if there's an

11    objection to that question, so maybe just a

12    couple-second pause.  That way, we don't speak over each

13    other, and the court reporter can properly transcribe

14    the deposition.

15         It's going to be put into what's called a

16    transcript, so it will be a written conversation of

17    question and answer of us.  You'll have a chance to

18    review that transcript before you sign off on it, and be

19    able to note any changes or corrections, and to the

20    extent you're making any changes or corrections, we're

21    going to be able to comment on that in court if the

22    transcript is used in court.

23         Do you understand that?

24       A.  I understand.

25       Q.  Okay.  And you understand you've been sworn

11

SER_0488

1    under the penalty of perjury to provide truthful

2    testimony?

3        A.   I understand.

4        Q.   Okay.  And it's -- just so you know, this is

5    the equivalent of testifying in front of a court live in

6    front of a jury, and this deposition and the videotape

7    of the deposition can be presented in front of a jury at

8    trial.

9            Do you understand?

10       A.   I understand.

11       Q.   And is there any reason why you can't provide

12   your full and truthful testimony today?

13       A.   No reason.

14       Q.   All right.  Let me go ahead and ask you -- I'm

15   going to -- if you have your chat open, I'm going to

16   start dropping documents which we're going to call

17   exhibits, and these are going to be part of the record,

18   so as soon as you get this in chat, please go ahead and

19   open it.

20           MR. RATINOFF:  I'd like to mark this first

21   exhibit, which is a resume for Jim Weyant.

22           (Exhibit 40 was marked for identification.)

23   BY MR. RATINOFF:

24       Q.   Did I pronounce that correctly?  Is it

25   "Way-ant" or "Why-ant"?

                                                        12

1    A.   "Why-ant," please.

2    Q.   "Why-ant."

3         This is a resume of Jim Weyant.  This would be

4    Exhibit 40.

5         Mr. Weyant, do you recognize this document?

6    A.   Looks like a LinkedIn resume, yes.

7    Q.   Okay.  And is this LinkedIn resume up to date

8    to your knowledge?

9    A.   Yes.

10   Q.   And what is your educational background,

11   starting with college?

12   A.   Starting from college, in 1992, I graduated the

13   United States Naval Academy.  I spent six years on

14   initial active duty and then went to the private sector

15   while staying in the Reserves.  Held positions in the

16   corporate arena with two different companies prior to

17   9/11, then went back on active duty from 2003 to 2006 in

18   two different roles for the Navy.  Went back in the

19   Reserves, then rejoined the corporate world, and in

20   2000 -- from 2006 to 2011 with a small company, and then

21   joined Next Century in 2011, and I've been there since.

22   We were acquired by CACI in October 2019.

23   Q.   Okay.  Thank you.

24        So starting with Next Century, what was your

25   Next Century?

13

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS   408-287-7500

SER_0490

September 16, 2022

```
 1        A.   Next Century was a mid-size software
 2   development company headquartered in the Annapolis
 3   Junction area, initially in Columbia and --
 4   (unintelligible.)
 5            THE REPORTER:  I'm sorry, sir.  You dropped off
 6   at the end, and I did not get your complete answer.
 7   Please repeat.
 8            THE WITNESS:  The final part of that answer was
 9   that Next Century was headquartered initially in
10   Columbia, and then we went to Annapolis Junction, where
11   we are today.
12   BY MR. RATINOFF:
13        Q.   Okay.  And -- and how long were you with Next
14   Century for?
15        A.   I joined in December of 2011, and Next Century
16   was acquired by CACI in October of 2019.
17        Q.   So in October 2019, is that correct, it was
18   acquired by CACI?
19        A.   Correct.
20        Q.   And what was your role in Next Century prior to
21   the acquisition?
22        A.   Prior to the acquisition, I was a program
23   manager and vice president.
24        Q.   And -- and what type of programs did you
25   manage?
```

14

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS   408-287-7500

1      A.   We managed software development programs for

2   government customers.

3      Q.   And when you -- or when Next Century was

4   acquired by CACI, did you continue in the same role?

5      A.   Yes, with the exception that we relinquished

6   the titles of -- of -- you know -- (unintelligible.)

7           THE REPORTER:  I'm sorry.  "Relinquished the

8   titles of" -- you're dropping off a little at points in

9   your answer, sir, so if you could keep your voice up,

10  I'd appreciate it.

11          THE WITNESS:  Okay.

12          Yes, the same role, with the exception of the

13  title of vice president.

14  BY MR. RATINOFF:

15     Q.   Understood.  And was that acquisition a

16  complete assimilation of Next Century?

17     A.   Yes.

18     Q.   So --

19     A.   We were a wholly-owned subsidiary, but...

20     Q.   Sorry.  I misspoke.

21          So Next Century remained a wholly-owned

22  subsidiary?

23     A.   Yes.

24     Q.   Okay.  And does it still remain as a

25  wholly-owned subsidiary of CACI?

                                                    15

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS  408-287-7500

SER_0492

1      A.   Yes.

2      Q.   And at the time of the acquisition, were the

3    employees that were employed by Next Century -- would --

4    do they stay on with Next Century or become employees of

5    CACI?

6      A.   Employees became employees of CACI.

7      Q.   Okay.  Thank you.

8           I'm going to put the next document in the chat

9    for you to open up.

10          MR. RATINOFF:  This is a subpoena to testify at

11   a deposition in a civil action to CACI

12   International, Inc.  I'd like to mark this as

13   Exhibit 41.

14          (Exhibit 41 was marked for identification.)

15   BY MR. RATINOFF:

16     Q.   And let me know, sir, when you've had a chance

17   to see the document or download it.

18     A.   I downloaded it, and I can see it.

19     Q.   Okay.  And just take a quick look, and if you

20   go to what's called Attachment A, and it would be

21   page -- starting at Page 3 of Attachment A and just let

22   me know when you're there.

23     A.   I'm there.

24     Q.   Okay.  And have you seen this document before?

25     A.   I have.

                                                          16

SER_0493

Case 5:19-cv-07123-EJD   Document 210   Filed 09/28/23   Page 297 of 789

HIGHLY CONFIDENTIAL (SUBJECT TO) - Confidential                    September 16, 2022

```
 1        Q.  Okay.  And when did you see this document?

 2        A.  Oh, approximately one month ago.

 3        Q.  And are you familiar with the topics of

 4   examination that are listed 1 through 14?

 5        A.  I am.

 6        Q.  And do you understand that you're here to

 7   testify today, not just in your personal capacity, but

 8   as a representative of Next Century and CACI?

 9        A.  I understand.

10        Q.  And that your testimony on these topics is not

11   just your personal knowledge, but what would be the

12   knowledge of Next Century and CACI?

13        A.  Yes, I understand.

14        Q.  And are you prepared to testify on all 14 of

15   these topics today?

16        A.  I am.

17        Q.  And did you, prior to this deposition, spend

18   any time preparing?

19        A.  Yes, I did.

20        Q.  And what did you do to prepare for this

21   deposition?

22        A.  I reviewed the topics of examination, I met

23   with Gregg, I was asked to review emails, which I did,

24   and -- and we also had a meeting with one of the

25   developers.
```

                                                          17

**BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS   408-287-7500**

Case 5:19-cv-07123-JD   Document 210   Filed 09/28/23   Page 299 of 790

IN WITNESS (Vol. 2)   Confidential   September 16, 2022

Q.  Okay.  Thank you.  I appreciate that.  It's a
Herculean effort, and again, I appreciate your time.
All right.  Let's go ahead and start with Next Century's
work.

    We talked about you being a program manager at
Next Century; what type of programs did you manage?

    A.  We -- I managed software development programs
for government customers.

    Q.  And who were those government customers?

    A.  National Security Agency.

    Q.  (Unintelligible.)

    Apologies.  Even the sign on my door didn't
stop someone.

    MR. RATINOFF:  Can we have the question read
back and -- so we'll have a cleaner record?

    (The following record was read:

    Question:  And who were those government
    customers?)

    THE WITNESS:  National Security Agency.

BY MR. RATINOFF:

    Q.  Okay.  Is it okay if we call National Security
Agency "the NSA" for short?

    A.  Yes.

    Q.  Okay.  We understand what that means.

    Is the National Security Agency sometimes

19

1  referred to as "the Maryland Procurement Office"?

2      A.  Yes.

3      Q.  Okay.  And sometimes also referred to as "the

4  MPO"?

5      A.  Yes.

6      Q.  So if we use "MPO" or "NSA," we understand

7  we're talking about the same government agency, correct?

8      A.  Yes.

9      Q.  Okay.  I'll try to use one, but I may slip, and

10  I'm sure you'll probably do the same, but as long as we

11  understand what we're talking about, then that's --

12  that's okay.

13      And what type of work did Next Century -- well,

14  let me start with, when did Next Century start working

15  with the NSA?

16      A.  Approximately 2005.

17      Q.  And so that's prior to your time there?

18      A.  Correct.

19      Q.  Okay.  Was Next Century working with the NSA in

20  2018?

21      A.  Yes.

22      Q.  And what type of work was Next Century doing

23  for the NSA in 2018?

24      A.  We were doing analytical software -- custom

25  analytical software development for this -- for the NSA.

                                                      20

Case: 24-5538, 02/24/2025, DktEntry: 52.4, Page 113 of 300

Case 5:19-cv-07210-EJD   Document 210   Filed 09/28/23   Page 290 of 780

SIM WITANT (30(B)(6))   Confidential   September 16, 2022

```
 1        Q.  Okay.  And when did that contract actually
 2   begin?
 3        A.  Contract -- there were multiple contracts that
 4   we managed and were involved in.
 5        Q.  Did any of those contracts involve the use of
 6   graph database software?
 7        A.  Yes.
 8        Q.  Okay.  And how many of those contracts involved
 9   graph database software?
10        A.  So --
11        Q.  Circa 2018.  Sorry.
12        A.  Okay.  To my knowledge, one that I was involved
13   was one -- one contract where we were a subcontractor,
14   to clarify.
15        Q.  Okay.  So you were a subcontractor on -- on a
16   project for the NSA in 2018.
17             Who was the prime contractor?
18        A.  The prime contractor was Praxis Engineering.
19        Q.  Could you spell that for the record, please?
20        A.  Sure:  Papa, Romeo, Alpha, X-ray, India,
21   Sierra.
22        Q.  And when did that contract begin?
23        A.  August of 2018.
24        Q.  And what was Next Century tasked with under
25   that subcontract?
```

21

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS   408-287-7500

```
1        A.  We were tasked with an analysis of alternatives

2   of various technologies that the NSA wanted to consider

3   for implementation.

4        Q.  And what technologies were under consideration

5   with that project?

6        A.  There were multiple threads.  And I assume you

7   want to focus on the graph database portion of it?

8        Q.  Yes, please.

9            And so what -- so there was a project in 2018

10  that involved consideration of various graph database

11  software systems?

12       A.  Correct.

13       Q.  Did the contract call for a specific graph

14  database software program to be used?

15       A.  No.

16       Q.  And why not?

17           MR. NIVALA:  Could we define the contract at

18  this time?

19           MR. RATINOFF:  Sure.  Okay.

20  BY MR. RATINOFF:

21       Q.  Did the contract have a name that Next Century

22  was involved in in 2018 with the NSA?

23       A.  Next Century was a subcontractor to Praxis on a

24  contract called Blue Rocket, Task Order 39.

25       Q.  So "Blue Rocket" was the code name for that
```

22

Case 5:19-cv-07182-EJD  Document 210   Filed 09/28/23   Page 292 of 780    September 16, 2022

```
 1              (The following was deemed attorneys' eyes

 2         only.)

 3              MR. RATINOFF:  Did we have a question pending,

 4    or not?

 5              (The following record was read:

 6         Question:  So Blue Rocket was the code name for

 7         that particular contract or project?

 8         Answer:  Yes.)

 9    BY MR. RATINOFF:

10         Q.  Okay.  So we were talking about Project Blue

11    Rocket; is that correct?

12         A.  Yes.

13         Q.  And what was Project Blue Rocket?

14         A.  Blue Rocket was the name of the contract; Task

15    Order 39 is the name of the project.

16         Q.  Okay.  So Password 39 was the specific project

17    that Next Century was contracted for?

18         A.  Correct.

19         Q.  And what was Password 39?

20         A.  Task -- Task Order 39.

21         Q.  Oh, "task order."  I apologize.  Okay.

22              What was Task Order 39?

23         A.  Task Order 39 was an analysis of alternatives

24    for new technologies that the NSA customer wanted to

25    consider for research and prototyping effort.
```

28

1          THE REPORTER:  Sorry.  "Prototyping..."

2          THE WITNESS:  Effort.

3   BY MR. RATINOFF:

4       Q.  And what technology would be considered for

5   Task 39 (sic)?

6       A.  So the task order had multiple threads of -- of

7   effort, five main lanes.  Specific to graph technologies

8   that we were talking about before the break, that was

9   one of the lanes of effort.

10      Q.  Okay.  And did Task Order 39 specify a

11  particular graph database technology?

12      A.  No.

13      Q.  And was it the assignment to Next Century to

14  determine what graph database software would work for

15  Task Order 39?

16      A.  Next Century was tasked to conduct an analysis

17  of alternatives of graph database technologies to see if

18  they were viable for implementation at the NSA.

19      Q.  And was this -- sorry.  Strike that.

20          What graph database technologies did Next

21  Century consider for Task Order 39?

22      A.  Several, including -- so there was -- Neo4j was

23  one, Oracle was a second one, DataStax and JanusGraph

24  were others that were the primary thrust.  There were

25  several others that I don't have the names of that --

29

SER_0500

1    that were also under initial consideration.

2        Q.  And when were these all under consideration

3    when -- under -- let me strike that.

4        A.  In August 2018, when we were working the task

5    order.

6        Q.  And what was the -- what was the total amount

7    of the contract at Task Order 39?

8        A.  The dollar amount?

9        Q.  Yes.

10        A.  I don't have that off the top of my head.

11        Q.  Was it -- was it a six-figure award?

12        A.  Yes.

13        Q.  Was it a seven-figure award?

14        A.  Not Task Order 39, no.

15        Q.  Was it, to your best recollection, a

16    mid-six-figure award?

17        A.  Approximately.

18        Q.  And what was the term of that Task Order 39 as

19    far as was it -- was it a year?  Six months?

20        A.  Yeah, so the period of performance, the

21    timeline was August of 2018 through February of 2019.

22        Q.  And what was the scope of the -- of the

23    contract for August of 2018 to February of 2019?

24        A.  Scope of the contract, or scope of the task

25    order?

30

SER_0501

Case 5:19-cv-07123-JD  Document 210  Filed 09/28/23  Page 295 of 780

September 16, 2022

1    Q.   Scope of the task order.

2    A.   The scope of the task order was to conduct an

3  analysis of alternatives of multiple technologies,

4  including graph database technologies, for consideration

5  by the NSA to implement into their analytical software.

6    Q.   And then what did Next Century do as an

7  evaluation to rate graph database software that you

8  identified?

9    A.   Our team conducted research and evaluation of

10  multiple graph database technologies.

11    Q.   And that included Neo4j?

12    A.   Yes.

13    Q.   Okay.   And how did that analysis start as far

14  as narrowing down the graph database software programs

15  you were considering?

16    A.   The analysis started with the teams reviewing

17  other implementations of graph database technologies at

18  the NSA and in other -- other applications to assess the

19  performance, the security, lessons learned, and costs of

20  the wide range of initial technologies under

21  consideration.

22    Q.   Had Next Century used Neo4j before?

23    A.   I am aware of one other project that had at

24  least considered Neo4j.

25    Q.   And this is prior to August of 2018?

31

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS   408-287-7500

September 16, 2022

1    highlights for purposes of marking as an exhibit.  Okay.

2         And looking at this email, there's a Bates

3    number at the bottom, it says "CACI" and then four

4    zeros, and then "5431" on that first page.

5         Do you see that?

6    A.  I do.

7    Q.  And do you understand this email was produced

8    by CACI in response to Neo4j's subpoena?

9    A.  I understand.

10   Q.  And do you know who Michael Smolyak is?

11   A.  I do.

12   Q.  Did I pronounce his name correctly?

13   A.  Smolyak.

14   Q.  Smolyak.  Okay.

15        Who's Michael Smolyak?

16   A.  Michael Smolyak's an engineer that works for

17   Next Century/CACI.

18   Q.  And do you know who Jason Zagalsky is?

19   A.  I do.

20   Q.  And who is he?

21   A.  He was the federal sales rep for Neo4j.

22   Q.  Okay.  And going to bottom -- going to bottom

23   of -- which would be the start of the email chain, and

24   it would be Bates numbered at the bottom 5432, and then

25   moving up to 5431, you'll see there's an email dated

33

1   research also being used for the Task Order 39 project?

2       A.  Those two projects were independent of each

3   other and did not support one another.

4       Q.  Okay.  Was Michael -- was Michael Smolyak, was

5   he working on both of those projects?

6       A.  Yes.

7           MR. RATINOFF:  All right.  I'm going to drop

8   the next exhibit here.  This would be, I believe,

9   Exhibit 43.

10          (Exhibit 43 was marked for identification.)

11  BY MR. RATINOFF:

12      Q.  This document as the Bates number at the

13  beginning, you'll see it as 5178.  This document, I'll

14  represent to you, is produced by CACI in response to the

15  subpoena.

16          Do you have any reason to believe this isn't a

17  true and correct copy of what was produced?

18      A.  I have no reason to believe it's not that.

19      Q.  I'm sorry.  You broke up there.  Could you just

20  repeat your answer?

21      A.  I have no reason to believe this is not a

22  correct document.

23      Q.  Okay.  Who's -- who's Diane Griffith?

24      A.  Diane Griffith is another engineer that was

25  employed by Next Century and then CACI after the

                                                        35

SER_0504

1   acquisition.

2        Q.   Okay.  And was she working on Task Order 39 as

3   of October 2018?

4        A.   Yes.

5        Q.   And then who's Seth Cooper?

6        A.   Seth Cooper was a technical writer employed by

7   Next Century.

8        Q.   Okay.  And was Seth Cooper also working on Task

9   Order 39 at this time?

10        A.   Yes.

11        Q.   And then who's Shahak -- is Nagiel?  Is that

12   correct?

13        A.   Nagiel, correct.

14        Q.   Nagiel.  Who's Shahak Nagiel?

15        A.   He's also an engineer who's employed by Next

16   Century.

17        Q.   And was he, at this time, working on Task

18   Order 39?

19        A.   Yes.

20        Q.   And I'll ask the same for Sean Graff; who's

21   that?

22        A.   Same answer:  Engineer employed by Next

23   Century.

24        Q.   Also working on the Task Order 39?

25        A.   Yes.

36

1    Q.   And then Rebecca Butterfield, was she also an

2    employee of Next Century?

3    A.   Yes.

4    Q.   Was she also working on Task Order 39?

5    A.   Yeah.

6    Q.   And did Task Order 39 provide a budget for

7    paying for a license for whatever graph database

8    software Next Century selected?

9    A.   No.

10    Q.   Was that something that Next Century was -- if

11    it had to pay for a license, would have to do at its own

12    cost?

13    A.   Yes.

14    Q.   So cost was a consideration as far as which

15    database software Next Century would -- would choose?

16    A.   Can I ask Gregg a question?

17    Q.   Well, unless it's something that's going to be

18    attorney-client privilege information, I think you need

19    to answer the question.  Unless you don't understand the

20    question.  I can re-ask it.

21    A.   Okay.  Yeah.  Repeat the question, please.

22         MR. RATINOFF:  Can you read the question back,

23    please?

24         (The following record was read:

25         Question:  So cost was a consideration as far

37

SER_0506

1    as which database software Next Century would

2    choose?)

3        MR. NIVALA:  Well, let me interpose an

4    objection at this point.  I think that the question

5    assumes facts that aren't -- aren't in evidence.  It

6    assumes that --

7        MR. RATINOFF:  Okay.  Hold on, Gregg.

8        MR. NIVALA:  -- costs --

9        MR. RATINOFF:  Gregg?

10       MR. NIVALA:  -- database --

11       MR. RATINOFF:  Gregg, I know -- I know this has

12   been a friendly deposition, but I just want to remind

13   you that you can only object as to form.  You can't do

14   speaking objections.

15       MR. NIVALA:  Got it.

16       MR. RATINOFF:  So, you know, you can you can

17   instruct the witness not to answer if it's privileged,

18   but if you have an objection to the question itself, I

19   think you're limited to doing it to form per the rules.

20   Most courts these days subscribe to that.

21       So let me -- let me ask a different question

22   and come back to that one.  I'll just note the witness

23   didn't answer it.

24   BY MR. RATINOFF:

25       Q.  So my prior question to that was the budget

                                                    38

SER_0507

1  under Task Order 39.

2       If Next Century were to choose a graph database

3  software for that project, who would bear the cost of a

4  license for that software?

5       A.  The budget was supplied by the government.  The

6  cost of research would be borne by the contractor,

7  unless there was decisions and discussions with

8  government to modify the contract to provide the budget

9  for licensing.

10      Q.  So as -- as written, Task Order 39 would have

11  required Next Century to pay for a license as part of

12  its scope of work under Task Order 39?

13      A.  At the time of award, it was unknown by either

14  the government or the prime or Next Century which

15  database would be a viable option, and again, for

16  research and evaluation of multiple databases, there

17  were multiple factors evaluated between performance,

18  security, lessons learned, and cost.

19      Q.  Sorry.  There was a plane flying overhead.  I

20  wanted to mute my mic.  Unfortunately, we're pretty

21  close to the flight path for San Jose International

22  here, and so I may just mute my mic here once in a

23  while.

24      Anyway, so -- so cost of a license for

25  whichever graph database software was being considered

39

SER_0508

1    was a factor in the decision-making process, correct?

2        A.  Yes.

3        Q.  Okay.  So turning to what I believe was marked

4    as Exhibit 43, which is an October 1st email -- 2018

5    email from Diane Griffith.

6            She says, "I did not talk to Neo4j.  I used GSA

7    pricing I was able to find published already for intro

8    into (sic) their pricing.  Neo4j" -- (unintelligible.)

9            THE REPORTER:  I'm sorry.  You're slurring it a

10   little bit.  Can you please start over?

11           MR. RATINOFF:  Okay.  Sure.  No problem.

12   BY MR. RATINOFF:

13       Q.  Do you see at the beginning of the email where

14   it says, "I do not" -- I'm sorry -- "I did not talk to

15   Neo4j.  I used GSA pricing I was able to find published

16   already for their intro pricing (sic)."

17           Do you see that sentence?

18       A.  I do.

19       Q.  And so was Ms. Griffith -- was she researching

20   pricing in relation to Neo4j for Task Order 39?

21       A.  Yes.

22       Q.  And was that a task she was assigned to perform

23   by Next Century?

24       A.  Yes.

25       Q.  And was she instructed to go to iGov Solutions?

                                                          40

1    You can see it -- she says -- let me strike that

2    question.

3            Do you see where she says, "Where I found the

4    GSA pricing link was off of a blog entry by iGov

5    Solutions"?  Do you see that sentence?

6        A.  I do.

7        Q.  And was this something that Next Century

8    directed her to look at?

9        A.  No.

10       Q.  She found it, and it is part of her job in

11   evaluating Neo4j?

12       A.  Yes.

13       Q.  And was it helpful to have that GSA pricing for

14   Next Century's evaluation of Neo4j for --

15       A.  Yes.

16       Q.  -- Task Order 39?

17       A.  Yes.

18       Q.  And did she circulate the price list among the

19   folks working on Task Order 39 at Next Century?

20       A.  I don't know.

21       Q.  But the recipients on this email, just for the

22   record, were also working on Task Order 39?

23       A.  Yes.

24       Q.  And then I'm just going to have you click on

25   this first link where it says "blog.igovsol.com," and

                                                          41

1    then it's a string.

2            Do you see that?

3    A.  Right.

4    Q.  I'm going to go ahead and share -- actually,

5    what's the best way to share screen here?  Should I

6    have --

7            THE REPORTER:  May we go off the record for one

8    moment?

9            MR. RATINOFF:  Sure.

10           THE VIDEOGRAPHER:  All right.  We are not going

11   off the video record.  The time is 9:10 a.m.

12           (Off the record from 9:10 a.m. to 9:12 a.m.)

13           THE VIDEOGRAPHER:  We are now back on the video

14   record.  The time is 9:12 a.m.

15   BY MR. RATINOFF:

16   Q.  Okay.  You should be able to see, I believe,

17   a -- the -- do you see an email we're looking at?  It

18   should be Tab 302.  We've marked that as Exhibit 43.

19           Do you see that?

20   A.  I do.

21   Q.  Okay.  So I'm just going to go ahead and click

22   on -- and you can do the same so you can confirm for

23   yourself.  I'm going to go ahead and click on this first

24   link there that's "https://blog.igovsol.com," et cetera.

25           Go ahead and click on that.  I'm going to share

                                                          42

1  that screen now.  Let me know if you end up at the same

2  thing.

3      A.  Yup.

4      Q.  Do you see it says "Neo4j Enterprise commercial

5  Prices" at the top of the website?  Do you see that?

6      A.  I see that.

7      Q.  Okay.  And you scroll down, and you'll see,

8  towards the middle of the scroll, you'll see "Neo4j

9  Enterprise Bundle."

10          Do you see that?

11      A.  I see it.

12      Q.  Okay.  If you keep scrolling, you'll see that

13  there's "Neo4j Enterprise Base Bundle:  189,188."

14      A.  I do.

15      Q.  Okay.  And you'll see at the bottom there's

16  pricing based on core packs.

17      A.  I see it.

18      Q.  And also business model pricing.

19          So it's -- it's fair to say this website

20  provided Next Century with some basic pricing

21  information on Neo4j Enterprise software bundles; is

22  that correct?

23      A.  If Diane read it, yes.

24      Q.  Okay.  Just going back -- just going back to

25  the email we were looking at, Exhibit 43, she says, "I

43

1   was able to find published already" -- I'm sorry.

2          "I used GSA pricing I was able to find

3   published already for intros to their pricing.  Neo4j

4   prices by instances and cores, but has bundles."

5          Is it fair to say that Next Century did look at

6   this pricing -- the pricing of Neo4j Enterprise,

7   correct?

8       A.  I would say that's fair.

9       Q.  All right.  And did the NSA provide any

10  guidance on -- on pricing for the graph database

11  software or the -- strike that.

12         Were you provided any instructions from the NSA

13  on pricing considerations for the graph database

14  software that was being considered?

15      A.  The NSA asked us to provide an analysis of

16  alternatives that considered cost as one of the many

17  factors, and we were tasked to provide -- not provide --

18  to consider cost as one of the factors.

19      Q.  Okay.  And then -- and then performance was

20  another important factor?

21      A.  Yes.

22      Q.  And security was also another important factor?

23      A.  Yes.

24         MR. RATINOFF:  Okay.  I'm going to take the

25  next document here and mark this as Exhibit 43 -- I'm

44

SER_0513

1    sorry -- Exhibit 44.

2          (Exhibit 44 was marked for identification.)

3    BY MR. RATINOFF:

4        Q.   And let me know when you've got the it's Bates

5    number -- the starting Bates number would be CACI0000 --

6    I think I got all of them -- 4994.

7        A.   I have it up.

8        Q.   Okay.  And I think we've already discussed

9    Diane Griffith and Shahak.

10          Peter Loats and Jim Mantheiy, were they also

11   Next Century employees at that time?

12       A.   Yes.

13       Q.   So in October 2018, what -- what had Next

14   Century done at that point in evaluating various graph

15   database software programs it was considering for the

16   NSA?

17       A.   At that point, we had done initial research on

18   a wide range of graph database technologies and had a

19   requirement to deliver to the customer an initial --

20   initial evaluation, which they then reviewed.

21       Q.   Okay.  So at that point -- and when I say "at

22   that point," as of the middle October of 2018, had Next

23   Century provided any feedback to the NSA on whether it

24   had narrowed down its -- its decision on which graph

25   database program it would go with?

45

SER_0514

1    A.   So let's -- let's -- let's be clear.  Let me

2  first -- we had not -- at that point, we would have just

3  provided the initial evaluation of the wide range of --

4  of databases, the initial list.

5    Q.   Okay.  So then we were talking about important

6  features.  I'll just go ahead and point you to what's

7  been marked as Exhibit 44, an email; subject, "Neo4j

8  licensing."

9        Do you have that in front of you?

10   A.   I do.

11   Q.   It says at the top of this email, "Up front,

12  some reasons why we may need the Neo4j distro that has

13  the (sic) license giving access to the Neo4j Enterprise

14  features," and in parentheses, "so Neo4j commercial

15  license or the enterprise free bundle from

16  iGov/GraphStack," close parens, comma, "can be found

17  here, but the (sic) reasons that apply include" -- and

18  then there's a list of features there.

19        Do you see that?

20   A.   Yes, I do.

21   Q.   Okay.  And when we were talking about important

22  features listed here, first casual -- sorry -- causal

23  clustering; was that an important feature that Next

24  Century was looking for in the software it was

25  considering?

46

```
 1      A.   Yes.

 2      Q.   Okay.  Do you know what HA availability is?

 3      A.   I understand the concept, yes.

 4      Q.   Okay.  Let me ask -- let me ask a quick side

 5   question.

 6           Did -- at that time, did Next Century

 7   understand that Neo4j offered multiple programs -- or

 8   sorry.  Strike that.

 9           Did -- at that time, in October 2018, did Next

10   Century understand that Neo4j offered a Community

11   Edition?

12      A.   I would say yes.

13      Q.   Okay.  And then it also understood that Neo4j

14   also offered an Enterprise Edition?

15      A.   Yes.

16      Q.   And did Next Century understand, in October of

17   2018, that the Enterprise Edition offered by Neo4j

18   required a paid commercial license?

19      A.   I would say yes.

20      Q.   And -- and then there was -- was it Next

21   Century's understanding that there were certain features

22   that were included in the Enterprise Edition of Neo4j

23   that weren't offered in the Community Edition?

24      A.   Yes.

25      Q.   And did Next Century believe those -- those
```

47

SER_0516

1    enterprise-only features were needed for the NSA project

2    it was working on?

3         A.   In October 2018, we would not have known that.

4         Q.   From the NSA's perspective, you mean?

5         A.   No, I mean from the evaluation of alternatives,

6    at that point in the evaluation, we would not have known

7    what the agency needed in terms of capabilities.

8         Q.   Okay.  But from Next Century's perspective, was

9    casual (sic) clustering important?

10        A.   Yes.

11        Q.   And then was intracluster encryption to secure

12   traffic between nodes and data centers, was that also an

13   important feature that Next Century wanted in its

14   software that it was going to go chose?

15        A.   Next Century wasn't choosing any software; we

16   were evaluating softwares (sic) for government to

17   decide.

18        Q.   Apologies.  Another plane flying by.

19             Okay.  But was intracluster encryption, was

20   that a feature that Next Century viewed as being

21   important?

22        A.   Yes.

23        Q.   And then what is "unlock number of cores

24   allowed"?  What does that mean?

25        A.   That means an additional capability to expand

                                                            48

1   on the ability of the software to scale.

2       Q.  And then was it Next Century's understanding

3   that these bullet points within the email --

4   (unintelligible.)

5           THE REPORTER:  I'm so sorry, Counsel.  You

6   broke up.  Can you please repeat?  Apologies.

7           MR. RATINOFF:  Excuse me.  Sure.

8   BY MR. RATINOFF:

9       Q.  Just looking at this list of six bullet points,

10  was it Next Century's understanding that these six

11  bullet points were referencing enterprise-only features

12  in the Neo4j software?

13          MR. BEENE:  I'm going to object to the

14  identification of those as enterprise-only.

15          What enterprise are we talking about?

16          MR. RATINOFF:  Counsel, you can object to form.

17  There's no speaking objections.  Thank you.

18  BY MR. RATINOFF:

19      Q.  Do you understand what Neo4j Enterprise is?

20      A.  Yes.

21      Q.  Okay.  And what's your understanding of Neo4j

22  Enterprise as -- as offered by Neo4j, Inc. or Sweden?

23      A.  The original software with additional features

24  in the Community Edition.

25      Q.  And it's your understanding that those features

                                                        49

**BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS   408-287-7500**

1  are only in Enterprise, and can only be obtained by a

2  paid commercial subscription from Neo4j?  Strike that

3  question.  I don't know.  I think I've already kind of

4  covered that, so let's go back to the email.

5      Do you see there's a reference in that first

6  paragraph to -- to "the enterprise free bundle from

7  iGov/GraphStack"?  Do you see that?

8      A.  I do.

9      Q.  And what's that referring to?

10      A.  Reading the email, it looks like it's referring

11  to a bundled solution available from iGov.

12      Q.  And what was -- as of October 2018, what was

13  Next Century's understanding of what iGov was offering

14  as an enterprise free bundle?

15      A.  An alternative to the Neo4j Enterprise

16  solution.

17      Q.  And how was it an alternative?

18      A.  Similar features, less cost.

19      Q.  And when you say "less cost," there was no cost

20  for a license to iGov's offering of Neo4j Enterprise,

21  correct?

22      A.  Not to my knowledge.

23      Q.  So looking down at the quoted -- after these

24  bullet points it says, quote, "Right now the only

25  difference between the paid Neo4j Enterprise

50

SER_0519

1   (commercial) binary and Neo4j Enterprise (open source)

2   binary (we complied from source) is that intracluster

3   encryption is still offered" -- I'm sorry -- "is still

4   off by default in the AGPLv3 version."

5        Do you see that?

6   A.  I do.

7   Q.  Okay.  So was it Next Century's understanding

8   from iGov that it was offering essentially an equivalent

9   version of Neo4j Enterprise under the AGPL?

10   A.  Yes.

11   Q.  And that the features offered in iGov's Neo4j

12   Enterprise was the same as the Neo4j Enterprise software

13   that was offered by Neo4j at the enterprise level?

14   A.  Yes.

15   Q.  Okay.  And did -- at this point, had Next

16   Century reached out to -- when I say "at this point," as

17   of October 2018, did Next Century reach out to iGov or

18   Mr. Suhy regarding their alternate offering of Neo4j

19   Enterprise?

20   A.  I don't know the answer to that question.

21   Q.  Okay.  Let me see if I can help you refresh

22   your recollection.

23   MR. RATINOFF:  I've dropped in what has been --

24   it starts with the Bates number CACI00004966.

25      (Exhibit 45 was marked for identification.)

51

SER_0520

1          (The confidential testimony resumed.)

2          THE VIDEOGRAPHER:  We are now back on the video

3     record.  The time is 9:39 a.m.

4          Please proceed, Counsel.

5          MR. RATINOFF:  Thank you.

6     BY MR. RATINOFF:

7          Q.  Okay.  So before we broke, I put up an email

8     that was dated October 22, 2018, it was from a

9     Mr. John Mark Suhy to Shahak -- sorry --

10         A.  Nagiel.

11         Q.  Nagiel.  Thank you -- and Diane Griffith.

12             Do you have that in front of you?

13         A.  I do.

14         Q.  Okay.  And do you understand this email was

15     produced by CACI in response to the subpoena?

16         A.  Yes.

17         Q.  And do you know who John Mark Suhy is?

18         A.  I do.

19         Q.  Okay.  Who is he?  At least to the company's

20     knowledge at the time, in 2018.

21         A.  He was a leader in the iGov Foundation.

22         Q.  Okay.  What was your understanding of what iGov

23     is or was?

24         A.  My limited understanding is a foundation

25     dedicated to open-source technologies.

                                                    54

1    Q.  Okay.  And was there a specific -- well, let

2   me -- let me back up for a second.

3         Do you understand what Graph Foundation is?

4    A.  I do.

5    Q.  Okay.  And what is your understanding of

6   graph -- the Graph Foundation?

7    A.  Again, a foundation designed to advance

8   open-source graph technology.

9    Q.  And did you understand that Mr. Suhy was

10   involved in both iGov and the Graph Foundation?

11    A.  Yes.

12    Q.  Okay.  And why did Next Century reach out to

13   Mr. Suhy?  And let me point you to -- if you look at the

14   bottom of this email -- strike that question.

15         If you go to the last page of this email,

16   CACI -- it ends with 4967.

17    A.  I see it.

18    Q.  And you'll see it says, "Hi John, I'm trying to

19   better understand the licensing nuances of Neo4j

20   Enterprise Edition, and came across some posts you made

21   on StackOverflow."

22         Do you see that?

23    A.  Yes.

24    Q.  Why did Next Century reach out to Mr. Suhy in

25   regards to the licensing nuances of Neo4j Enterprise

                                                    55

1    Edition?

2        A.  Within part of our research effort, as part of

3    the task order requirements on Task Order 39.

4        Q.  And why -- why did Next Century in particular

5    reach out to Mr. Suhy?

6        A.  Because of the posts that were on the site.

7        Q.  Okay.  And what was it about these posts that

8    Next Century was interested in finding more about from

9    Mr. Suhy?

10       A.  Our government customer was interested in

11   open-source technologies.

12       Q.  And because open source is generally -- it

13   doesn't require to pay license?

14       A.  Correct.

15       Q.  And was it your understanding that Mr. Suhy was

16   involved with a particular graph database program called

17   ONgDB?

18       A.  Yes.

19       Q.  Okay.  And what was your -- or Next Century's

20   understanding of what ONgDB was in October of 2018?

21       A.  An open-source version of Neo4j capability.

22       Q.  Okay.  And we did talk -- (unintelligible.)

23           THE REPORTER:  Sorry.  Broke up a bit, Counsel.

24   Please repeat.

25           MR. RATINOFF:  Hold on.  A plane's flying over.

                                                            56

```
 1    BY MR. RATINOFF:
 2        Q.  Just so we -- earlier, I think before break,
 3    talked about Neo4j offering different levels of its
 4    software.
 5            So which -- which -- sorry.  Strike that.
 6            MR. RATINOFF:  What was the original question?
 7    I'm sorry.  Before I cut that one off.
 8            (The following record was read:
 9            Question:  Okay.  And what was your -- or Next
10            Century's understanding of what ONgDB was in
11            October of 2018?
12            Answer:  An open-source version of Neo4j
13            capability.
14            Question:  Okay.  And we did talk --)
15            THE REPORTER:  And that's where it broke up.
16            MR. RATINOFF:  Okay.  Got it.
17    BY MR. RATINOFF:
18        Q.  So you mentioned Neo4j.  We spoke about there's
19    different versions of Neo4j.
20            Which -- which version of Neo4j did you
21    understand ONgDB to be equal to?
22        A.  At the time, it would contain features both
23    from the Community Edition and at least some of the
24    Enterprise Edition.
25        Q.  And when we refer to "the Enterprise Edition,"
```

57

SER_0524

1    you mean Neo4j Enterprise Edition?

2        A.  Correct.

3        Q.  And as far as -- I think as you mentioned, you

4    mean the paid-for, enterprise-only level of features

5    with respect to Neo4j Enterprise?

6        A.  To my knowledge.

7        Q.  And was it Next Century's understanding in

8    October of 2018 that a paid license wasn't required

9    for -- I'm sorry -- for ONgDB?

10       A.  Correct.

11       Q.  And turning back to the email we were just

12   talking about, I'm going to scroll back up to the top

13   email, which would be the response to the one we just

14   spoke about where Mr. Suhy says, "We actually package

15   these feature's source code back into the open source

16   distributions, turning features such as causal

17   clustering encryption back on."

18           Do you see that?

19       A.  Yes.

20       Q.  Okay.  Was causal clustering encryption, to

21   Next Century's understanding, an enterprise-level

22   feature?

23       A.  Yes.

24       Q.  And that was a feature that was important to

25   its evaluation of graph database software for the Task

58

IN WITNESS (15.2.0)  Confidential  September 16, 2022

```
 1   Order 39?
 2        A.  Yes.
 3        Q.  It says, in the email, "Not to mention the US
 4   Treasury has now adopted ONgDB enterprise, which is the
 5   same code base."
 6            Was it Next Century's understanding that,
 7   from -- at least from Mr. Suhy, that ONgDB and Neo4j
 8   Enterprise were -- shared the same code base?
 9        A.  Yes.
10        Q.  And what license did Next Century understand
11   that ONgDB was distributed under?
12        A.  The -- (unintelligible.)
13            THE REPORTER:  I'm sorry.  One more time?
14            THE WITNESS:  GPLv3 license.
15   BY MR. RATINOFF:
16        Q.  AGPL Version 3; is that correct?
17        A.  Yes.
18            MR. RATINOFF:  Okay.  I'm going to mark the
19   next exhibit as 46, I believe.  Oops.  I just dropped a
20   highlighted one.  Let me try that again.  I have too
21   many windows open, even with two screens.
22            (Exhibit 46 was marked for identification.)
23            MR. RATINOFF:  All right.  So the most recent
24   one that I dropped should be the one marked as the
25   exhibit.
```

59

SER_0526

September 16, 2022

1   BY MR. RATINOFF:

2       Q.  Okay.  And you see -- I'm going to go ahead and

3   just point to -- this is the last four digits, the Bates

4   numbers, 4931, it was produced by CACI in response to

5   the subpoena.

6           Do you have any reason to believe this wasn't a

7   true and correct copy of the email that was produced?

8       A.  No reason to believe otherwise.

9       Q.  Now, if you scroll down to the bottom of this

10  email, which would be the start of the email thread,

11  4933 being the page, and you'll see this is referencing

12  the prior email we were talking about, I believe.

13          And scrolling up to the October 22, 2018,

14  10:10 p.m. email, do you see that?

15      A.  I do.

16      Q.  Okay.  At this point, do you know what version

17  of Neo4j Next Century was considering?

18      A.  No.

19      Q.  And didn't -- was Next Century looking at ONgDB

20  version 3.4 at this time?

21      A.  I would say yes, looking at the email.

22      Q.  So the equivalent version of Neo4j Next Century

23  would be looking at would have been Neo4j 3.4, correct?

24      A.  I don't know the answer to that question.

25      Q.  As -- as of October 2018, was Next Century

                                                        60

1    considering both Neo4j Enterprise and ONgDB as a

2    potential graph database program to be using for Task

3    Order 39?

4        A.  Neo4j (sic) was evaluating Neo4j, ONgDB, and

5    other graph database technologies as part of our Task

6    Order 39.

7        Q.  And both Neo4j Enterprise and ONgDB were being

8    considered as of October 2018?

9        A.  They were both being evaluated as of

10   October 2018.

11       Q.  Okay.  And then moving up to this email that's

12   dated Friday October 26, 2018, in Exhibit 46, I believe,

13   it says, "Hi John.  Can you comment on the iGov-packaged

14   enterprise distribution specifically with respect to

15   multi-data centers," and then there's a block quote

16   below that says, "Have you verified this works without

17   a" -- "the commercial license?"

18          Do you see that?

19   A.  Yes.

20   Q.  Was multi-data centers a feature that was

21   important in the evaluation of -- of Neo4j and ONgDB?

22   A.  It was.

23   Q.  And was it your -- Next Century's understanding

24   that multi-data centers was an enterprise-only feature

25   in Neo4j?

61

SER_0528

1  A.  Yes.

2  Q.  And was it your understanding that ONgDB also

3  offered multi-data centers as a feature?

4  A.  Yes.

5  Q.  And was this based in part on the next email

6  where Mr. Suhy confirmed, "Yes, the open source

7  enterprise distribution we package has this feature.

8  (ONgDB does as well)"?

9  A.  Yes.

10  Q.  And that was consistent with Next Century's

11  understanding at the time?

12  A.  Yes.

13  MR. RATINOFF:  Okay.  I'm going to mark the

14  next exhibit as, I believe, 47.

15  (Exhibit 47 was marked for identification.)

16  MR. RATINOFF:  I'm assuming by Ben's silence I

17  am correct.

18  THE REPORTER:  You are correct, Counsel.

19  MR. RATINOFF:  All right.  So this email starts

20  with the Bates number CACI 3832.

21  BY MR. RATINOFF:

22  Q.  Do you have that in front of you?

23  A.  Yes.

24  Q.  Okay.  And it starts with the Bates -- sorry.

25  And so this email that was produced in response

62

1  to the subpoena issued to CACI.

2        Do you have any reason to believe this isn't a

3  correct copy of that email that was produced?

4     A.  No reason to believe otherwise.

5     Q.  Okay.  Now, if you -- I'll point you to page

6  marked 3834, which should be the third page in this

7  document.

8        I just want to confirm that this is the email

9  that we were just previously talking about, and this is

10  a continuation of that thread; is that a fair

11  representation?

12     A.  Yes.

13     Q.  And then we'll scroll up now back to what would

14  be the first page of this email, or the last couple

15  emails in the thread at 3832.  You'll see Mr. Nagiel

16  says, "Hi John, happy new year.  Any idea when the 3.5.0

17  release of the ONgDB is expected?"

18        Do you see that?

19     A.  I do.

20     Q.  And was Next Century inquiring into ONgDB

21  3.5 -- I'm sorry.  Strike that.

22        Why was Next Century inquiring into the release

23  of ONgDB -- ONgDB 3.5.0?

24     A.  As a continuation of the requirement assigned

25  to us under Task Order 39 for the evaluation of graph

63

1    databases.

2         Q.  So as of January 2019, had Next Century been

3    using ONgDB to the exclusion of Neo4j Enterprise?

4         A.  I don't know that it was to the exclusion of

5    Neo4j.

6         Q.  But at that time, Next Century hadn't obtained

7    an commercial license for a copy of -- or an

8    installation of Neo4j Enterprise, correct?

9         A.  Correct.

10        Q.  Okay.  And was Next Century inquiring about

11   ONgDB 3.5 because Neo4j had also recently released

12   Neo4j 3.5?

13        A.  I don't know the answer to that question.

14        Q.  Was it important for Next Century's evaluation

15   to be using the same versions of Neo4j Enterprise and

16   ONgDB?

17        A.  Yes.

18        Q.  That was for parity reasons?

19        A.  Yes.

20        Q.  And when I say "parity," I mean

21   enterprise-level features.

22        A.  Yes.

23        Q.  So it was important that ONgDB continue to --

24   to have parity in enterprise features with Neo4j

25   Enterprise for the evaluation process?

                                                          64

SER_0531

```
 1        A.   Yes.

 2        Q.   And did Next Century, in early 2019, obtain a

 3   version of ONgDB that was 3.5.1 as referenced in this

 4   top email?

 5        A.   I can't tell that from the email.

 6        Q.   Did Next Century upgrade its -- whatever

 7   version of ONgDB it was using in January of 2019 to

 8   ONgDB 3.5, and it could have been any sub-version of

 9   that?

10        A.   Yeah, I can't tell that from that email, but we

11   would strive for parity.

12        Q.   You have no reason to believe that, if ONgDB

13   3.5.1 was released, that Next Century would move to that

14   version if it was equal to the current version of Neo4j

15   Enterprise?

16        A.   Yes, we would have -- we would have leveraged

17   the most current version available.

18           MR. RATINOFF:  And let me go ahead and mark the

19   next email, which I'm going to drop here.

20           (Exhibit 48 was marked for identification.)

21   BY MR. RATINOFF:

22        Q.   Just let me know when you're able to open it.

23        A.   I see it.

24        Q.   Okay.  Now, this has been marked with a Bates

25   number of -- last four digits are 3635, and I'll
```

65

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS  408-287-7500

1  represent to you this was produced by CACI in response

2  to the subpoena issued by Neo4j.

3      Do you have any reason to believe this isn't a

4  true and correct copy of that email?

5      A.  I have no reason to believe otherwise.

6      Q.  Let's scroll down to the -- the last page or

7  second to last page of this email, 3636.

8      Do you see there's an email from a David Fauth

9  to -- addressed to you?

10     A.  Yup, I see it.

11     Q.  Okay.  Do you know who David Fauth is?

12     A.  I do.

13     Q.  Who is he?

14     A.  He was an employee of Neo4j.

15     Q.  And do you know Mr. Fauth personally?

16     A.  I do.

17     Q.  And how do you know Mr. Fauth?

18     A.  We worked together from 2006 to 2011 at a

19  previous company.

20     Q.  Okay.  And did -- would you say you have a

21  personal friendship with him?

22     A.  Yes.

23     Q.  And there's an email from Mr. Fauth asking, "Do

24  you have any insight into the PoC using Neo4j?  Is it

25  near the end and is there a decision pending?"

66

SER_0533

September 16, 2022

1          Do you see that?

2      A.   I do.

3      Q.   And what is your understanding of what

4   Mr. Fauth was referring to?

5      A.   He would have been referring to the evaluation

6   efforts under the Blue Rocket Task Order 39.

7      Q.   Okay.  And this is -- I think you mentioned

8   that, at least as of initially starting, Task Order 39

9   was set to conclude in February of 2019, correct?

10     A.   Correct.

11     Q.   Okay.  And was there an extension provided by

12  the NSA at that time to continue with that project in

13  February?

14     A.   Yes.

15     Q.   And did Next Century receive additional funding

16  in conjunction with that extension?

17     A.   Yes.

18     Q.   And did that additional funding include or did

19  it budget for a paid license for graph database software

20  to be used?

21     A.   No.

22     Q.   As of February 1st, he -- had Next Century

23  narrowed down the candidates of graph database software

24  in its evaluation?

25     A.   The department narrowed down the choices.

67

SER_0534

1    Q.  Did you find there was any performance

2   differences at that time between Neo4j Enterprise and

3   ONgDB in your evaluation?

4    A.  To my knowledge, not significant differences.

5        THE REPORTER:  You know, I'm getting it, sir,

6   and I'll speak up -- I'm not shy -- but if you could

7   lean in a little bit, it would -- it would help.  Your

8   microphone is dropping it a bit at the end.  Thank you.

9        THE WITNESS:  Okay.

10  BY MR. RATINOFF:

11   Q.  Okay.  So going up to the top email, and it

12  looks like Mr. Fauth is no longer a recipient of this

13  email.

14       Do you see that?

15   A.  I do.

16   Q.  And it look like it's from Mr. Nagiel to you.

17   A.  Yes.

18   Q.  And he says, "What I haven't told him yet (but

19  will likely need to do" -- "but would (sic) likely need

20  to soon) is that we're pursuing an open-source

21  alternative (the same Neo4j source code but built and

22  licensed separately) which bundles all the same features

23  as the Neo4j Enterprise version but without cost (sic)."

24       Do you see that sentence?

25   A.  I do.

69

1    Q.   And was it your understanding that he was

2    referring to ONgDB?

3    A.   Yes.

4    Q.   And does that help clarify whether, at that

5    time, Next Century was looking at ONgDB over Neo4j

6    Enterprise?

7    A.   Yes.

8    Q.   So as of February 2019, at least internally,

9    Next Century had decided to choose ONgDB over Neo4j

10   Enterprise?

11   A.   Next Century did not make any decisions on any

12   of these technologies.  We provided government the

13   decision -- government the information to make the

14   decision.

15   Q.   And what information did Next Century provide

16   at this time to the government as far as the -- Neo4j

17   versus ONgDB?

18   A.   We evaluated security, performance, lessons

19   learned, and cost.

20   Q.   And did Next Century, at that time, provide a

21   recommendation to the government as far as which

22   software it would recommend --

23        MR. NIVALA:  I think at this point that I'd

24   like to ask that we go back on AEO designation.

25        MR. RATINOFF:  Okay.  Adron, is that okay if

70

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS   408-287-7500

SER_0536

1    Q.  And -- I'm sorry.  I didn't mean to cut you

2  off.

3    A.  -- and would have gotten feedback in February

4  as well.

5    Q.  And what was the feedback that was received in

6  February 2019 from the NSA?

7    A.  We would have -- I don't know.  I don't know

8  specifically when or exactly what they would have given

9  us regarding graph database technology evaluation at

10  that time.

11    Q.  And that -- you don't personally know, but Next

12  Century would have some record of that?

13    A.  I'm -- in writing, at that point, no.  It would

14  have been verbal feedback from meetings.

15    Q.  Okay.  And is there a reason why -- referring

16  back to the email we were looking at, I believe -- is it

17  Exhibit 47?

18        THE REPORTER:  The last was 48.

19        MR. RATINOFF:  48.  I'm sorry.

20  BY MR. RATINOFF:

21    Q.  Looking back at Exhibit 48, where Mr. Nagiel

22  said, "We haven't told him yet (sic)," is he referring

23  to Neo4j?

24    A.  Yes.

25    Q.  So he's telling you that he hasn't told Neo4j

                                                    73

1 that they're pursuing ONgDB over Neo4j Enterprise; is

2 that correct?

3  A. Correct.

4    MR. RATINOFF:  Okay.  I'm going to show another

5 email.  It's got -- it's to Neo4j folks, so technically

6 it's not internal, and I'm sure Mr. Beene would prefer

7 his client to be involved.  I have to say -- but maybe

8 it's a good time for you to take your lunch break.  I

9 know it's after 1:00 o'clock your time, and we can come

10 back on the record as -- as confidential, if that's okay

11 with Gregg.

12    MR. NIVALA:  Yeah, that's okay with me.

13    MR. RATINOFF:  Okay.  So do we want to -- how

14 long of a lunch do you want to take?  I mean, the

15 shorter lunch is, the quicker you'll be done.

16    MR. NIVALA:  20 minutes?

17    MR. RATINOFF:  You want to just say we'll be

18 back 1:30 East Coast time?

19    MR. NIVALA:  Yeah, that's good for me.

20    Is that good for you, Jim?

21    THE WITNESS:  Sounds good.

22    MR. RATINOFF:  Thank you.

23    THE VIDEOGRAPHER:  Thank you.  We are now going

24 off the video record.  The time is 10:09 a.m.

25    ///

                     74

IN WEYANT (30(B)(6)) - Confidential                    September 16, 2022

1       (The confidential testimony resumed.)

2                  AFTERNOON SESSION

3       (All Parties having been duly noted for the

4       record, proceedings resumed at 10:33 a.m.)

5                     --o0o--

6       THE VIDEOGRAPHER:  We are now back on the video

7   record.  The time is 10:33 a.m.

8   BY MR. RATINOFF:

9       Q.  Okay.  Are we ready to continue?

10      A.  (Nonverbal response.)

11          MR. RATINOFF:  All right.  The witness has

12  given a thumbs up.  Okay.  I'm going to go ahead and

13  mark the next email as 49.

14          (Exhibit 49 was marked for identification.)

15  BY MR. RATINOFF:

16      Q.  And the beginning Bates number on this document

17  is CACI00003597.

18          And Mr. Weyant, let me know when you have a

19  chance to look at this email chain.

20      A.  Okay.  I have it up.

21      Q.  Okay.  And I'll represent to you this was

22  produced by CACI in response to the subpoena issued by

23  Neo4j.

24          Do you have any concerns regarding whether it's

25  a true and correct copy of what was produced?

76

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS   408-287-7500

```
 1        A.   No concerns.
 2        Q.   And if you want to scroll down to what would be
 3   the bottom page marked 3598, the last four digits of the
 4   Bates number, it would actually be the second page of
 5   this email.  Let me know when you're there.
 6        A.   3598?
 7        Q.   Yeah, it should be the second page --
 8        A.   Yup.
 9        Q.   -- of the --
10        A.   Got it.
11        Q.   Okay.  You'll see there's a Monday, January 14,
12   2109, email from Jason Zagalsky.
13        A.   I see it.
14        Q.   Okay.  And he says, "I understand that your
15   current funding expires in February and you are
16   currently putting together a proposal for funding to
17   continue the project."
18             That was back in January, so we were talking
19   about February, so just to confirm that the project was
20   continued and additional funding was granted, correct,
21   as of February 2019?
22        A.   That's correct.
23        Q.   And at that -- at that time, when the renewal
24   was up, there was no recommendation to provide a
25   subscription -- or to purchase a subscription for Neo4j
```

77

1    Enterprise, correct?

2        A.  That is correct.

3        Q.  Okay.  Scrolling up to -- it's the email

4    actually starts on the first page, but then it continues

5    to the top of the second page, so it's the bottom of

6    3597, it's an email from Jason Zagalsky to --

7        A.  Got it.

8        Q.  Okay.  And that's dated February 5th, 2019, and

9    the next page, it says, "When we spoke briefly last" --

10   sorry -- "When we spoke briefly last month, you had

11   indicated you were using the free open-source version of

12   Neo4j and planned to continue."

13       And is that in reference to ONgDB?

14       A.  Yes.

15       Q.  And then you see a reference to "Gary" in

16   various places in this email.

17       Do you understand that's gary.mann@neo4j.com?

18       A.  I understand.

19       Q.  Okay.  And do you know who Gary Mann is?

20       A.  To my knowledge, he's a tech rep for Neo4j.

21       Q.  Okay.  And was Next Century working with Gary

22   at that time?

23       A.  Yes.

24       Q.  And what was Gary doing for Next Century?

25       A.  Providing technical assistance to engineers who

78

SER_0541

1    were working on the task order.

2        Q.   Okay.  And was he providing support in

3    conjunction with Next Century's use of ONgDB?

4        A.   I don't know.

5        Q.   But he'd be providing support with respect to

6    Neo4j software, correct?

7        A.   Correct.

8        Q.   Okay.  And since Next Century viewed Neo4j and

9    ONgDB as being equivalent, that support would be helpful

10   for both Neo4j and ONgDB, correct?

11       A.   Yes.

12       Q.   And it says here in the second paragraph -- the

13   first -- yeah, it's the second paragraph on the second

14   page, it says, "Indeed, Gary has been helping you and

15   your team with security clustering questions, and thus

16   it is clear you are using Neo4J EE."

17            Do you see that?

18       A.   I do see that.

19       Q.   And did you understand that "Neo4J EE" refers

20   to Neo4j Enterprise?

21       A.   I understand.

22       Q.   And is it okay if I refer to "Neo4J EE" as

23   the -- as a shorthand --

24       A.   Yes.

25       Q.   -- for Neo4J Enterprise?

79

1    A.  Yes.

2    Q.  Okay.  And then there's a reference to

3    "security and clustering."

4         And would you agree with the statement that

5    those were enterprise features with Neo4J EE?

6    A.  Yes.

7    Q.  And those are also features in ONgDB at that

8    time?

9    A.  Yes.

10   Q.  Okay.  And then moving up to the -- to the --

11   what would be the last email on the first page of the

12   chain from Mr. Nagiel to Mr. Zagalsky.

13        "Hi Jason, thanks for the message, and thanks

14   again to Gary for his assistance in addressing our

15   questions.  Neo4j's strengths helped us" -- sorry.  Let

16   me start over -- "Neo4j's strengths helped convince us

17   and the customer that it is the right graph product for

18   their requirements."

19        Do you see that sentence?

20   A.  I do.

21   Q.  Okay.  So is it fair to say, at this time,

22   February 5th, 2019, that Next Century and the NSA had

23   determined that ONgDB was the preferred graph database

24   software for the Task Order 39?

25        A.  Can you repeat the question again?

80

September 16, 2022

```
 1        Q.  As of -- as of February 5th, 2019, is it fair
 2   to say that Next Century had determined that ONgDB was
 3   the best software for the Task Order 39 requirements?
 4        A.  Next Century did not make that determination.
 5   We gave the customer the evaluation results, and they
 6   made the determination.
 7        Q.  And they determined that ONgDB was the
 8   preferred software for the project?
 9        A.  Yes.
10        Q.  It says, "Neo4j's strengths helped us" --
11   "helped convince us and the customer that it was the
12   right graph product for their requirements."
13           So is it fair to say that Next Century also
14   agreed that ONgDB was the preferred graph database
15   software for the project?
16        A.  Yes, based on the customer requirements.
17        Q.  And the only difference between ONgDB and Neo4j
18   at that point was the paid license required for Neo4j
19   Enterprise from Next Century's perspective?
20        A.  Yes, to our knowledge.
21        Q.  And then it says in the next paragraph,
22   "Indeed, we have (almost) reached the end of this task
23   order, and have been demonstrating our integration with
24   a small Neo4j development cluster.  We have found that
25   the open-sourced (non-commercial) builds from the Neo4j
```

81

1    source code provides the clustering and security

2    requirements needed in our environment."

3         Do you see that?

4    A.  Yes, I do.

5    Q.  Okay.  And is that sentence actually referring

6    to ONgDB and not Neo4j Enterprise?

7    A.  Correct.

8    Q.  And was there any internal discussions at that

9    time regarding the -- the license governing ONgDB

10   internal to Next Century?

11   A.  Not to my knowledge.

12   Q.  Was there any discussions between Next Century

13   and either the Graph Foundation or -- sorry.  Strike

14   that.

15        What -- did Next Century have discussions with

16   Graph Foundation regarding the -- the licensing of ONgDB

17   in February of 2019?

18   A.  There were discussions.  I do not know if they

19   were in February 2019.

20   Q.  Okay.  And what was the subject of those

21   discussions?

22   A.  It was referenced back to the foundation's work

23   with the Department of Treasury, specifically IRS,

24   regarding their -- their evaluation of the license.

25   Q.  And that's -- to be clear, that's the license

82

ATTORNEYS' EYES ONLY — Confidential          September 16, 2022

```
 1   to ONgDB?
 2        A.  Yes.
 3        Q.  And was there any particular issues with the
 4   licensing with ONgDB that Next Century was concerned
 5   about?
 6        A.  Not to my knowledge.
 7        Q.  Your personal knowledge, correct?
 8        A.  Correct.
 9        Q.  But that's not to say that Next Century wasn't
10   aware of potential issues with the licensing of ONgDB?
11        A.  Next Century, based on the information
12   available in the evaluation that it researched, felt
13   comfortable making recommendations and evaluation
14   comments to the customer that the open-source version
15   would meet their requirements.
16        Q.  When you say "the open-source version," you're
17   referring to ONgDB as an open-source version of Neo4j
18   Enterprise?
19        A.  Yes.
20        Q.  All right.
21             MR. RATINOFF:  I think we're up to Exhibit 50.
22   I'm going to drop this into the chat here for your
23   reference.
24             (Exhibit 50 was marked for identification.)
25             ///
```

83

SER_0546

1    BY MR. RATINOFF:

2        Q.  And let me know when you've had a chance to

3    open it and take a quick look.

4        A.  Okay.

5        Q.  Okay.  So I'll represent to you this is an

6    email thread that was produced by CACI in response to

7    the subpoena should by Neo4j.  It begins with a Bates

8    number ending with 3512.

9            Do you have any reason to believe this isn't a

10   true and correct copy of what was produced by CACI?

11       A.  No reason to believe otherwise.

12       Q.  Okay.  And taking a look at the top here, top

13   email, where Mr. Nagiel says, "Thanks your for your

14   perspective.  I did run across this GitHub thread (which

15   John was involved in) that seemed to discuss the issue.

16   However, there does not seem to be a resolution there

17   (certainly not from the Neo4j perspective, which defends

18   their use of both the AGPL and the Commons Clause)."

19           Do you see that sentence there?

20       A.  I do.

21       Q.  Does that refresh your recollection as far as

22   any internal discussions at Next Century concerning the

23   AGPL and the licensing of ONgDB?

24       A.  That was discussions between Shahak and -- and

25   Mr. Nussbaum.

                                                          84

ATM WITNANT (30(b)(6)   Confidential                                    September 16, 2022

1       Q.  Sure.  I understand, but you're testifying --

2   you understand that you're testifying today as far as

3   Next Century's general knowledge, not just your personal

4   knowledge?

5       A.  Sure.  I think the way I heard the question was

6   an internal discussion, and this one does involve

7   someone external to the company, is my interpretation.

8       Q.  Oh, I'm sorry.  I didn't realize -- maybe my

9   question wasn't as sharp as it could have been, so let

10  me -- let me ask you a different question.

11          Were you involved in discussions in Next

12  Century regarding -- and you'll see the reference to the

13  Commons Clause -- with respect to the license for ONgDB?

14      A.  Next Century did have discussions on the

15  Commons Clause and AGPL.

16      Q.  Okay.  And what was the gist of those

17  discussions?

18      A.  The gist of those discussions was that there

19  were not issues with recommend -- recommending to the

20  customer ONgDB.

21      Q.  Why did --

22      A.  (Unintelligible.)

23      Q.  Sorry.

24          THE REPORTER:  Sorry.  I didn't catch the end

25  of that.  Stepped over it.  Please repeat.

                                                        85

IN RE AVR (15.20)   Confidential                    September 16, 2022

1          THE WITNESS:  The open-source version.

2          THE REPORTER:  Thank you.

3   BY MR. RATINOFF:

4       Q.  Why did Next Century reach out to the Graph

5   Foundation regarding the AGPL and the Commons Clause?

6       A.  Next Century engineers were doing everything

7   they could to be thorough in the evaluation,

8   recommendations, and inputs to the government and were

9   doing a lot of research, and I'm sure that they, in the

10  Internet research that was done, found the iGov

11  resources out there for ONgDB.

12      Q.  Okay.  And scrolling down to what would be the

13  bottom of the -- towards the bottom of the first page,

14  3512, you'll see an email from Mr. Nagiel to -- looks to

15  be to Brad.

16          And do you know who Brad -- Brad is?

17      A.  Yes, I do.

18      Q.  Okay.  Who -- who is your understanding of who

19  Brad is?  I'm sorry.

20          What's your understanding of who Brad is?

21      A.  Brad is a leader within the Graph Foundation

22  organization.

23      Q.  Okay.  And to be clear, that's Brad Nussbaum?

24      A.  Correct.

25      Q.  You'll see it says, "The (sic) Neo4j sales guys

                                                      86

SER_0549

1    actually contacted us recently specifically about the

2    Commons Clause modifier to the AGPLv3 license, pointing

3    out that we may be in violation of it (if we were using

4    open-source builds of their software -- including, by

5    extension, ONgDB)."

6          Do you see that?

7    A.   I do.

8    Q.   So were you -- was Next Century contacted by

9    Neo4j concerning their use of ONgDB under the AGPL?

10   A.   Yes.

11   Q.   Was it pointed out to Next Century that the

12   Commons Clause had certain restrictions in the use of

13   Neo4j Enterprise software?

14        A.   On behalf of Next Century, in reviewing this

15   thread, I would say yes.

16        Q.   Okay.  Was Next Century made aware that -- that

17   the Commons Clause had been removed from the license

18   that was governing the Neo4j software that was being

19   marketed as ONgDB?

20        A.   I don't know the answer to that question.

21   Q.   Did the license to ONgDB have the Commons

22   Clause in it to Next Century's knowledge?

23   A.   Not to my knowledge.

24   Q.   And was it Next Century's understanding that

25   either the Graph Foundation or iGov had removed the

87

1    Commons Clause from the license governing the Neo4j

2    source code used in ONgDB?

3        A.  I believe yes.

4            MR. RATINOFF:  Okay.  I'd like to drop the next

5    exhibit into the chat for your reference.

6            (Exhibit 51 was marked for identification.)

7    BY MR. RATINOFF:

8        Q.  This is Tab 310, so Bates number ending in

9    3524.  I believe this is Exhibit 51.

10       A.  I've got it up.

11       Q.  Okay.  And I'll represent to you this is

12   produced by CACI in response to the subpoena issued by

13   Neo4j.

14           Do you have any concerns regarding its

15   authenticity, that it's not a true and correct copy of

16   what was produced?

17       A.  No concerns.

18       Q.  And does this help frame the issue as far as

19   what the discussions internally were with -- with the

20   licensing of ONgDB?

21       A.  Yes.

22       Q.  And you'll see a Todd Hughes; was he an

23   employee of Next Century?

24       A.  Yes, he was.

25       Q.  And he was working on the Task Order 39?

                                                        88

SER_0551

1     A.  No, he was not.

2     Q.  Okay.  Who was Todd Hughes, or what was

3  Todd Hughes's role at that time?

4     A.  He was Next Century's chief technology officer.

5     Q.  And why was he emailing you and others?

6     A.  In his role as our CTO, he had broad oversight

7  over company -- the company's technical aspects of -- of

8  various projects.  He did not -- he did not charge to

9  that task order.

10     Q.  Was he brought in -- or sorry.  Strike that.

11        Was he involved in any discussions due to the

12  potential concerns over the licensing of ONgDB under the

13  AGPL?

14     A.  He was brought in to provide oversight and

15  guidance in the -- in the way ahead.

16     Q.  Because there was some internal concern

17  regarding the -- how ONgDB was licensed without the

18  Commons Clause?

19     A.  He was brought in to help the team provide

20  recommendations and inputs in the evaluation to the

21  government; that would have included awareness of

22  licensing challenges that engineers may not have thought

23  about in their day-to-day work.

24        MR. RATINOFF:  Okay.  I'm going to drop in the

25  next exhibit.  That would be Exhibit 52.

                                                        89

1           (Exhibit 52 was marked for identification.)

2    BY MR. RATINOFF:

3        Q.   And this is an email that was produced by CACI

4    with the Bates number starting with -- or ending with

5    the four digits 3476.

6           Do you have any reason to believe this is --

7    this is not a true and correct copy of what was produced

8    by CACI in response to Neo4j's subpoena?

9        A.   No concerns.

10       Q.   And when you look at the -- basically the

11   contents of this message, it says, "Please ensure that,

12   from this point forward, we are only using

13   binaries/containers released by ONgDB, not" -- with an

14   underline emphasis -- "by Neo4j.  This applies to all

15   lanes, all servers (shared and local), and both networks

16   (high and low).  I suggest deleting all Neo4j

17   binaries/containers to help with this."

18          Do you see that?

19       A.   I do.

20       Q.   Why was -- why was this email sent to -- it

21   looks like a whole host of Next Century folks, including

22   yourself?  I'm sorry.  I misspoke.  It doesn't look like

23   you're on this email.  Let me strike that.  You might be

24   the only person not on this email.

25       A.   Yeah.

                                                          90

1      Q.  Why did -- why did Next Century want to remove

2  all instances of Neo4j per this email?

3      A.  We would have gotten guidance from the

4  government that they wanted to move ahead with ONgDB.

5      Q.  And there was a concern internally about

6  co-mingling Neo4j and ONgDB?

7      A.  If the government gave us direction to pursue

8  ONgDB, yes, we would have wanted to make sure that

9  project and the code associated with that task order

10  were co-mingled appropriately -- not co-mingled.

11      Q.  And did the government indicate it preferred

12  ONgDB, due to its being open source, over Neo4j?

13      A.  Yes.

14      Q.  And to your knowledge, would all instances of

15  Neo4j Enterprise have been deleted from -- from all lane

16  servers and networks at Next Century at that point?

17      A.  Yes, to my knowledge on this project.

18          MR. RATINOFF:  Okay.  I would like to drop the

19  next exhibit into the chat for your reference.

20          (Exhibit 53 was marked for identification.)

21          MR. RATINOFF:  I believe we're at Exhibit 43.

22          THE REPORTER:  53.

23          MR. RATINOFF:  I'm sorry.  53.  Thank you.

24          So I'd like to mark this next email starting

25  with the Bates number 34 -- or, sorry, Bates number 3446

91

September 16, 2022

1    as Exhibit 53.

2    BY MR. RATINOFF:

3        Q.  Let me know when you've got it.

4        A.  Okay.

5        Q.  Okay.  And I'll represent to you this is

6    produced by CACI in response to the subpoena issued by

7    Neo4j.

8            Do you have any concerns regarding it being a

9    true and correct copy of what was produced?

10       A.  No concerns.

11       Q.  And if you go down to the last email -- or what

12   would be the first, I guess, in this thread, it would be

13   on Page 3448 --

14       A.  Yup.

15       Q.  -- you'll see that Zagalsky says, "Hi Todd,

16   following up on our discussion at your office a few

17   weeks ago.  Shall we schedule a phone call to discuss

18   next steps this week?"

19           So even though, per Task Order 39, ONgDB had

20   been selected as the graph database software to be used,

21   was Next Century still discussing the potential of using

22   Neo4j Enterprise with Neo4j?

23       A.  Yes, and let's clarify:  At this point, in

24   March of 2019, we're now into what's known as Blue

25   Rocket Task Order 50.

92

SER_0555

1          (The following was deemed attorneys' eyes

2          only.)

3          MR. RATINOFF:  Okay.  It looks to me that

4   Mr. Suhy is no longer on the call or the video, so let's

5   go ahead and continue as AEO.

6   BY MR. RATINOFF:

7          Q.  What was Task Order 50?

8          A.  Task Order 50 was a project underneath the Blue

9   Rocket contract which was an extension of the first

10  analysis of alternatives and evaluations of various

11  technologies, to include graph database technologies

12  along with other, unrelated work.

13         Q.  So at this point, was the -- the goal of Task

14  Order 50 to -- to determine whether the, at this point,

15  software that was selected, ONgDB, would be adequate for

16  the underlying purpose of the -- of the Blue Rocket?

17         A.  At this point, there was -- there were still

18  evaluations going on.  ONgDB was the preferred

19  technology, but in any project like this, there was

20  ongoing evaluation that was not ruling out Neo4j, either

21  Community or Enterprise Edition, for -- for further

22  evaluation depending on the additional prototyping that

23  was going on under the Task Order 50 requirements.

24         Q.  As of the time of Task Order 50, had a

25  development environment been created that was running

94

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS  408-287-7500

1  instances of ONgDB?

2       A.  Yes.

3       Q.  Would you be able to, at a high level, describe

4  the -- the structure of the development environment?

5       A.  At a very high level, in a non-technical

6  manner, the development environment provides the

7  engineers and their government counterparts a playground

8  of sorts to continue testing with actual data on the

9  other -- on -- on secure networks in a -- in an

10  evaluation and testing mode, and it would have included

11  ONgDB as part of a larger architecture.

12       Q.  What was the system architecture that was being

13  used to run ONgDB at that time in terms of servers,

14  instances of software?

15       A.  I'm afraid I can't get into that.

16       Q.  Okay.  Is that due to being classified

17  information?

18       A.  Yes.

19       MR. RATINOFF:  All right.  Let me go ahead and

20  turn back to what I think was marked as Exhibit 53; is

21  that correct?  Got a thumbs up.  All right.

22  BY MR. RATINOFF:

23       Q.  So before we started talking about Task

24  Order 50 -- by the way, just before we move on, was Task

25  Order 50 what you referred to as being the renewal,

                                                         95

Case 5:19-cv-07651-EJD   Document 210   Filed 09/28/23   Page 351 of 780

September 16, 2022

1    before we took our break, of the Task Order 39, or the

2    continuation?

3         A.   Continuation, yes.  Same -- yes.

4         Q.   So when we talked about the funding earlier,

5    the funding was actually under Task Order 50 after the

6    Task Order 39 concluded?

7         A.   Right, there was separate funding allocated for

8    Task Order 50.

9         Q.   So as of March 2019, you were operating under

10   the requirements of Task Order 50, correct?

11        A.   Correct.

12        Q.   And then turning to this email that I put up,

13   you're copied on personally, and it says, "The concern

14   here, of course, is that if we are" -- "we say we're

15   using ONgDB but they sense that we're active on

16   Neo4j-related discussions, then that could provide them

17   with potential legal ammunition that we're really still

18   using Neo4j," question mark.

19             Was there still concern within Next Century at

20   this time regarding using ONgDB versus Neo4j?

21        A.   Could you repeat the question one more time?

22        Q.   Sure.

23             MR. RATINOFF:  Would you mind reading it back?

24             (The following record was read:

25             Question:  And then turning to this email I put

                                                           96

September 16, 2022

1    up, you're copied on personally, and it says,

2    "The concern here, of course, is that if we

3    are" -- "we say we're using ONgDB but they

4    sense that we're active on Neo4j-related

5    discussions, then that could provide them with

6    potential legal ammunition that we're really

7    still using Neo4j," question mark.

8    Was there still concern within Next Century at

9    this time regarding using ONgDB versus Neo4j?)

10   THE WITNESS:  My opinion on this answer is that

11   we were trying to take the high road and be transparent

12   that, while the government had made the decision to move

13   with ONgDB, that we were not -- we did not want to be in

14   a position where the government thought we -- or excuse

15   me -- where Neo4j thought that we were lying to them

16   rather than concern over what -- what -- what the actual

17   software in place was.

18   BY MR. RATINOFF:

19       Q.  And was there concerns that Next Century might

20   be in some sort of legal hot water, so to speak, if it

21   continued to use ONgDB as opposed to Neo4j Enterprise

22   Edition?

23       A.  I think I'm being asked to speculate on

24   Shahak's person opinion there, and if we can

25   differentiate between his comment and what Next

97

SER_0559

1   Century's perspective was, I can answer that.

2       Q.  Sure.  I asked you what Next Century's concerns

3   were, if any.

4       A.  Next Century's concerns at this point were to

5   make sure that we were providing information to our

6   customers that is complete and accurate to our

7   knowledge, and evaluating software, whether it's a

8   commercial enterprise solution -- excuse me -- community

9   enterprise solution or the -- or the licensed version,

10  or the alternative, ONgDB, that the licensing thing

11  that -- we're a software company, not a law firm -- that

12  we were providing information to the customer that would

13  be above reproach and not able to be questioned.

14      Q.  Okay.  Thank you.

15          MR. RATINOFF:  So I'm going to drop in the next

16  document, and I've got a few questions and documents

17  that, you know, we're just going to get into Neo4j AEO

18  material, so I would -- I'm sure Adron is concerned

19  about these emails being confidential, so I'll represent

20  I'm going to do some AEO questioning, and then after

21  that, it would be up to Gregg whether to go back to

22  confidential.

23          (Exhibit 54 was marked for identification.)

24  BY MR. RATINOFF:

25      Q.  Okay.  I've just dropped another document into

98

1    the chat.  If you wouldn't mind opening it and letting

2    me know when you've had a chance to review.  It starts

3    with the ending Bates number 3301.

4         A.  Okay.  I have it up.

5         Q.  I'll represent to you this was produced by CACI

6    in response to the subpoena issued by Neo4j.

7              Any -- do you have any concerns regarding it

8    being a true and correct copy of that email produced?

9         A.  No concerns.

10        Q.  And if you take a look at the email, if you go

11   down to what's been marked as CACI00003302 --

12        A.  Yes.

13        Q.  -- starting at the -- it says, "Jason we don't

14   have a firm grasp on what the (eventual) production

15   posture will be, but we are" -- "but for now we are

16   building a staging environment with."

17             Do you see that?

18        A.  I do.

19        Q.  To Next Century's knowledge, is this an

20   accurate description of the development environment that

21   it was using for ONgDB at this time?

22        A.  Yes.

23        Q.  So when it says, "One 'RKS' cluster with three

24   nodes, each node having approximately 96 gigabytes of

25   RAM and seven cores."

                                                        99

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS  408-287-7500

1          Do you see that?

2     A.   I do.

3     Q.   And the next line it says, "One 'KE'

4  cluster" -- (unintelligible.)

5          THE REPORTER:  Sorry, Counsel.  You broke up.

6  Please repeat.

7  BY MR. RATINOFF:

8     Q.   And would you agree, when it says, '"KE'

9  cluster with likely similar specs as above," it's

10  referring to the -- the RKS cluster?

11     A.   Yes.

12     Q.   And at this time, had Next Century asked Neo4j

13  for a quote on Neo4j Enterprise?

14     A.   Yes, I know we asked for a quote on behalf of

15  the government to deliver to them, and it does appear

16  it's about this time, yes.

17     Q.   Why -- why did Next Century ask Neo4j for a

18  quote at this time, March of 2019?

19     A.   The government would have asked us to.

20     Q.   That's despite already deciding to use ONgDB?

21     A.   It had not made a final decision.  They were

22  still in evaluation and prototyping and researching.

23     Q.   Okay.  And then going back to the very top of

24  this document, so it would be the last email in the

25  chain -- I'm sorry.  It's the preceding email where

                                                    100

September 16, 2022

1    Mr. Nagiel says, "Regarding the architecture:  No, the

2    customer is interested in a multi-master configuration."

3        A.  Where -- what page are you on again?

4        Q.  It's on the first page.  It's the -- it would

5    be the email that's Monday, March -- I'm sorry --

6    April 1st, 2019, at 5:20 p.m.

7        A.  I got it.  Okay.

8        Q.  What's a multi-master configuration?

9        A.  That is database structure and overall

10   architecture that -- I'm trying to use my words

11   carefully -- facilitates multiple -- multiple hosts, if

12   you would.

13       Q.  And was that something that Next Century was

14   able to do because it was using the enterprise-level

15   version of Neo4j vis-à-vis ONgDB?

16       A.  That configuration is -- is part of a larger

17   customer architecture well beyond just the database --

18   specific databases, graph or otherwise.

19       Q.  But it -- the graph program that Next Century

20   was working with would need to be able to be compatible

21   with that configuration?

22       A.  The requirements in Task Order 50 had us moving

23   towards a state in the customer's mission architecture

24   that would have necessitated that the graph portion of

25   the solution could integrate with other types of

101

SER_0563

1    databases.

2            And I'm trying to be clear here, but it's --

3    we're getting into things that -- that the customer

4    would be uncomfortable with disclosing.

5        Q.  Yeah, I understand you're -- you're careful

6    because of the classified nature, so I understand.  Let

7    me see if I can ask it a different way.

8            Was ONgDB found to be compatible with the

9    greater architecture that you were working with then at

10   that time?

11       A.  At that time, the initial results for ONgDB

12   were favorable, but the testing at that point was

13   incomplete, and evaluation at that point was incomplete.

14       Q.  And was it because of the specific

15   enterprise-level features in ONgDB that allowed you to

16   integrate it into that larger system?

17       A.  They were helpful, yes.

18           MR. RATINOFF:  Okay.  The next exhibit, I

19   believe we're at 55.

20           (Exhibit 55 was marked for identification.)

21           MR. RATINOFF:  I'll just note for the record

22   this document has been designated as AEO at Neo4j's

23   request, because it contains highly confidential

24   commercial and sensitive information.

25           THE WITNESS:  I have it up.

102

September 16, 2022

```
1    BY MR. RATINOFF:

2        Q.  Okay.  And I'll represent to you this was

3    produced by CACI in response to the subpoena issued by

4    Neo4j.

5            Do you have any reason to believe this isn't a

6    true and correct copy of the email and the attachment

7    referenced?

8        A.  No concerns.

9        Q.  Okay.  And we -- we were just talking about the

10   proposal that Neo4J was preparing.

11           Is this the proposal that was referenced in the

12   prior email that was provided to Next Century from -- by

13   Neo4j?

14       A.  Yes, it is.

15       Q.  And then going to the actual proposal itself,

16   which would be the attachment to the email, it says,

17   "KMS Project."  I know we're getting into some sensitive

18   areas, so, you know, don't -- I don't want you to

19   violate any obligations you have under classified

20   designation.

21           But can you explain, at least at a high level,

22   what the KMS Project is?

23       A.  The MPO KMS Project is equivalent to Blue

24   Rocket Task Order 50.

25       Q.  So it's just another name for it?
```

103

1     A.   Yeah, and the subset of that task order that

2   had requirements for graph in addition to other work, as

3   I believe we discussed before.

4     Q.   Okay.   And would you agree this proposal

5   pertains to a commercial license or subscription to

6   Neo4j Enterprise?

7     A.   Yes.

8     Q.   And looking at the -- the requirements, does

9   this roughly match what was previously discussed between

10   Mister -- I'm sorry -- Zagalsky and Nagiel, Mr. Nagiel?

11     A.   Yes.

12     Q.   And was this proposal also passed on to the --

13   to your government clients after receiving it from

14   Mr. Zagalsky?

15     A.   Yes, it was.

16     Q.   And this is what was requested by the NSA?

17     A.   Yes, it was.

18     Q.   Did Next Century provide any comments or

19   opinions on the -- I'm sorry.   Strike that.   I don't

20   think you'll want to get into that for classified

21   reasons, so I won't put you in that bad position.

22          And there's a reference to Matt; who's -- who's

23   Matt?

24     A.   Matt is the primary government technical

25   director that the team interfaced with, an NSA civilian

                                                        104

1    employee.

2        Q.  Okay.  Can you provide his last name, or is

3    that something that's not --

4            MR. NIVALA:  I'm going to object to that.

5            MR. RATINOFF:  And that's based on being

6    classified?

7            MR. NIVALA:  Typically, NSA employees deal only

8    in their first names in our experience, and I think you

9    can -- I'm just going to object and direct the witness

10   not to answer.

11           MR. RATINOFF:  Okay.

12   BY MR. RATINOFF:

13       Q.  So when we say "Matt," we'll understand that

14   that is your -- the -- your interface at the NSA on --

15   on -- at this point, order 50 -- sorry -- Task Order 50?

16       A.  Correct.

17       Q.  And was Matt as the individual at the NSA that

18   Next Century interfaced with for Task Order 39?

19       A.  Did you say Task Order 39?

20       Q.  Yes.

21       A.  Matt was one of several government technical

22   engineers that we interfaced with.  He was the primary

23   for this portion of the work.

24       Q.  And there's also a reference to any feedback

25   from him -- (unintelligible.)

                                                        105

```
 1              THE REPORTER:  Sorry.  Broke up, Counsel.  One

 2   more time.

 3   BY MR. RATINOFF:

 4        Q.  Okay.  There's a reference to, "Have you

 5   received any feedback from him following the meeting?"

 6   Actually, strike that.

 7              It says, "Thanks again for setting up the

 8   meeting with Matt this week."

 9              Did Next Century set up a meeting with Neo4j

10   and -- and NSA, or this Matt at the NSA and yourselves?

11        A.  Yes, we did.

12        Q.  And was the discussion regarding the proposal?

13        A.  In part, yes.

14              MR. RATINOFF:  All right.  I'm going to mark

15   the next exhibit as Exhibit...

16              THE REPORTER:  That would be 56.

17              (Exhibit 56 was marked for identification.)

18              MR. RATINOFF:  56.

19   BY MR. RATINOFF:

20        Q.  Let me know when you've had a chance to review

21   Exhibit 56.

22        A.  Got it.

23        Q.  And I'll represent to you this email was

24   produced in response to the subpoena issued by Neo4j,

25   CACI Bates number ending with 3132.
```

106

1    A.   No concerns.

2    Q.   No concerns with this being a true and correct

3 copy?

4    A.   No concerns.

5    Q.   Okay.  And then here this is an April 29, 2019,

6 and Mr. Nagiel says, "I imported (high side) your

7 proposal and shared with Matt.  Unfortunately --

8 although not surprisingly -- he has not...responded."

9        So is it fair to say that actually that meeting

10 didn't discuss the proposal since it seems to be

11 referring to forwarding it on without comment from Matt?

12    A.   We had a low-side meeting with Matt, Jason,

13 Shahak, and another Neo4j VP, I believe, which

14 discussed, in part, the proposal among other technical

15 topics, and Neo4j capabilities, and then subsequent to

16 that, the proposal was submitted to Matt via email on

17 the other net.

18    Q.   And at this point, was Neo4j Enterprise still

19 being viewed as an alternative or potential alternative

20 to ONgDB?

21    A.   Being viewed as?

22    Q.   As an alternative, yes.

23    A.   Yes.

24    Q.   And the big difference being, at this point,

25 price?

107

SER_0569

1      A.  Yes.

2      Q.  And again, there was no allocation in the

3  budget at that point for Task Order 50 for a commercial

4  subscription to Neo4j?  Strike that.  Let me ask it a

5  different way.

6        Was the -- earlier, you testified that Task

7  Order 50 didn't budget in a -- a subscription to graph

8  database software, correct?

9      A.  Correct.

10     Q.  And that's still -- is that subject to change

11 depending on the ultimate selection of software?

12     A.  That would be between the prime proxies in the

13 government if they chose to make a mod to the contract

14 to fund a commercial license.

15     Q.  So that was still a possibility depending on

16 other considerations in performance and, you know, with

17 the software?

18     A.  Multiple factors, including performance in

19 software, yes.

20     Q.  And it says in this email as well, "We continue

21 to use ONgDB for our development purposes based on the

22 customer's direction."

23       So as of April 29, 2019, you were instructed by

24 the NSA to use ONgDB for the requirements of Task

25 Order 50?

108

1          A.   Yes.

2               MR. RATINOFF:   Okay.   I think at this point I

3     don't have anymore specific AEO questions related to

4     Neo4j pricing.   I'll leave it up to Gregg if he's okay

5     with continuing as confidential.

6               MR. NIVALA:   Yeah, sorry.   I was -- for some

7     reason I wouldn't unmute there.

8               Yeah, I have no objection to continuing as

9     confidential.

10              MR. RATINOFF:   Okay.

11              THE REPORTER:   You know, Counsel, we've been

12    going for about an hour anyway.   This might be a good

13    time for five for me, if that's okay.

14              MR. RATINOFF:   Sure.   No problem.   So would we

15    just come back at -- let's see.   It's 11:27 my time.

16    Why don't we just say 11:35.

17              THE VIDEOGRAPHER:   Sounds good.

18              MR. NIVALA:   Sounds good.

19              THE VIDEOGRAPHER:   Okay.   We are now going off

20    the video record.   The time is 11:27 a.m.

21              (A short recess was taken.)

22              (End of attorneys' eyes only portion of

23              testimony.)

24                        --o0o--

25

                                                        109

SER_0571

```
1              (The confidential testimony resumed.)

2              THE VIDEOGRAPHER:  We are now back on the video

3      record.  The time is 11:36 a.m.

4              MR. RATINOFF:  Okay.  I'd like to put a new

5      exhibit up on the chat here for you to take a look at.

6              (Exhibit 57 was marked for identification.)

7      BY MR. RATINOFF:

8          Q.  This is bearing the beginning Bates number

9      CACI00002845.

10             Do you have that up in front of you now?

11         A.  I do.

12         Q.  And have you had a chance to take a quick look

13     at it?

14         A.  (Nonverbal response.)

15         Q.  Any reason to believe this wasn't a true and

16     correct copy of what was produced by CACI in response to

17     Neo4J's subpoena?

18         A.  No concerns.

19         Q.  Okay.  Just looking at the date here of

20     July 21, 2019, you'll see Mr. Nagiel says, "Last I spoke

21     with Matt about the subject, he was not interested in

22     pursuing the EE option at this time."

23             Do you see that?

24         A.  I do.

25         Q.  Is that referring -- "the EE option" is
```

110

ATX WITNESS (17.10)   Confidential   September 16, 2022

1    Neo4J EE?

2        A.   Correct.

3        Q.   With respect to the proposal that was

4    previously submitted by Neo4j?

5        A.   Correct.

6        Q.   So as of April 21, 2019, your instructions from

7    the NSA were continue to use ONgDB as the graph database

8    software in Task Order 50?

9        A.   You said April 21st or July 21st?

10       Q.   Sorry.   July 21, 2019.

11       A.   Correct.   At that time, yes, they were

12   directing us to continue our evaluations on ONgDB.

13       Q.   And did Matt tell you exactly why he wasn't

14   interested in pursuing the EE option?

15       A.   There were meetings where they continued the

16   evaluation in the development environment, and ONgDB was

17   continuing to provide performance that they felt was

18   acceptable.

19       Q.   And that included the enterprise-level

20   features:   Clustering, and security, and the other --

21       A.   Yes.

22       Q.   The big differentiator between Neo4j still at

23   this point was price?

24       A.   Yes.

25            MR. RATINOFF:   And then the next exhibit I am

                                                        111

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS   408-287-7500

1   going to put up, Exhibit 58.

2         (Exhibit 58 was marked for identification.)

3   BY MR. RATINOFF:

4       Q.   This is an email produced by CACI, and it is

5   the beginning Bates number CACI00006260.

6       A.   Got it.

7       Q.   And I'll represent to you this is produced by

8   CACI in response to Neo4j's subpoena.

9         Do you have any reason to believe this isn't a

10  true and correct copy of an email produced by CACI?

11      A.   No concerns.

12      Q.   And going down to the beginning of this email

13  thread, it's addressed to Brad Nussbaum.

14        Do you see that?  It says, "Hello Brad."

15      A.   Yes, I see it.

16      Q.   Okay.  And there's a -- a reference in the

17  second paragraph, "I am currently leading the Graph

18  Database team responsible for deploying an ONgDB-based

19  solution into production."

20        Is this referring to the same deployment or

21  development of ONgDB that we were discussing with

22  respect to Task Order 50?

23      A.   At this point, we were operating under another

24  prime contractor.

25      Q.   Okay.  I'm going to ask more questions about

112

1          (The following was deemed attorneys' eyes

2      only.)

3          MR. RATINOFF:  Okay.

4          THE REPORTER:  Okay.  Can you hold on one

5      second everybody?

6          Thank you.  Please continue.

7          MR. BEENE:  This is Adron confirming that this

8      has been designated AEO, and that Mr. Suhy has left the

9      deposition.

10     BY MR. RATINOFF:

11         Q.  So as of January 2020, had Task Order 50

12     concluded?

13         A.  Yes, it had.

14         Q.  All right.  When did Task Order 50 conclude?

15         A.  October of 2019.

16         Q.  Okay.  And then with --

17         A.  Correction.  September of 2019.

18         Q.  What was the -- or sorry.  Strike that.

19         Why did Task Order 50 conclude in

20     September 2019?

21         A.  The government made the decision to move the

22     work from one contract to another, which was not unusual

23     for them at the time.

24         Q.  When you say the "contract," you're talking

25     about the prime contract?

114

1    A.  Correct.

2    Q.  So Next Century's role at this point was still

3    the same?

4    A.  No.

5    Q.  What was different about its role as of

6    September 2019?

7    A.  So in -- at the end of September 2019, Task

8    Order 50 concluded under Praxis on the Blue Rocket

9    contract.  In October, the government switched prime

10   contractors to a contract called Road Rally;

11   specifically, Road Rally Route 66 was the cover term for

12   the contract.  At the time, a place -- a company called

13   WaveStrike was the prime contractor to the government,

14   and Next Century was a subcontractor to WaveStrike.

15   Q.  And was Next Century's continuing role to -- to

16   work on development of the graph database software

17   portion of the -- of the KMS Project?

18   A.  The KMS Project per se concluded with Task

19   Order 50.  Under WaveStrike, Next Century had a

20   diminished role, much more diminished role, and had

21   much-limited interaction with government personnel in

22   the overall direction of the project, and -- and the

23   technical capabilities that were being delivered.

24   Q.  But Next Century was still working on

25   delivering a graph database solution with ONgDB at that

115

September 16, 2022

1    time?

2         A.  Next Century was still involved, yes, and

3    Michael Smolyak was our -- was our main representative.

4         Q.  And was there a new contract -- subcontract

5    granted to Next Century at that time?

6         A.  Next Century was under subcontract to

7    WaveStrike on the Road Rally Route 66 contract.

8         Q.  Sorry.  What was of the last?  You dropped off

9    there?

10        A.  Yeah.  Sorry.  Road Rally Route 66.

11        Q.  And did Next Century receiving funding under

12   Road Rally Route 66?

13        A.  Yes, and at that time, Next Century was also

14   acquired by CACI, so technically, CACI received the

15   funding.

16        Q.  So this is -- so right at the transition

17   from -- from the Task Order 50 to Route 66, there's also

18   the change in ownership with Next Century?

19        A.  Correct.  That all happened in October of 2019.

20        Q.  So from the -- from the project standpoint,

21   CACI was now the subcontractor of the Road Rally

22   Route 66 project?

23        A.  Correct, with Next Century as a wholly-owned

24   subsidiary.

25        Q.  So then as of January of 2020, Next Century was

116

1    operating under the -- the Road Rally Route 66 project?

2        A.  Yes.

3        Q.  And that included the, quote, "deploying an

4    ONgDB-based solution into production"?

5        A.  Yes.

6        Q.  And when you say deploying into production,

7    does that mean moving from the development phase to a

8    more robust platform with a -- for the NSA?

9        A.  Yes, where the solution folded into a much

10   larger architecture.

11       Q.  Is that -- when it goes into production, is

12   that more of a now usable system for the client versus

13   when it's in a development phase?

14       A.  Yes.

15       Q.  And did the requirements as far as the number

16   of servers and the instances of the software being

17   installed, cores, et cetera, did that also change?

18       A.  Yes.

19       Q.  And normally when -- just in -- the company's

20   experience, when you go from development to production,

21   it's usually a much larger deployment of the software;

22   is that correct?

23       A.  In some cases, yes.

24       Q.  In this case, was there an increase in the

25   number of servers and instances of ONgDB?

117

1      A.  Yes.

2      Q.  And can you say how many machines were running

3  or had ONgDB installed in the production environment?

4          MR. NIVALA:  I'm going to object -- object to

5  that and direct the witness not to answer.

6  BY MR. RATINOFF:

7      Q.  Can you -- is it fair to say that the number of

8  machines that had ONgDB installed increased from the

9  development phase?

10     A.  Yes.

11     Q.  And that would have been beyond the number of

12  machines that Neo4j had original proposed?

13     A.  I can't speak to that one.

14     Q.  Due to being it classified information?

15     A.  Yes.

16     Q.  But it would be a number greater than what was

17  proposed by Neo4j?

18     A.  I can't speak to that one.

19     Q.  Can you say how many CPU cores were increased

20  in the production environment?

21          MR. NIVALA:  I'm going to object that -- object

22  to that and direct the -- the witness not to answer.

23          MR. RATINOFF:  Based on?

24          MR. NIVALA:  Classified nature of the answer.

25          ///

118

September 16, 2022

1     Q.  And then in the last email, which would be the

2  top, it says -- and this is from you -- "Let's carefully

3  review the SGOAT proposal language because simply

4  stating 'KMS decided on Neo4j' could be perceived as

5  misleading."

6     Why did you feel that was misleading?

7     A.  Because in our proposal, we want to make sure

8  that everything is above reproach and accurate.

9     Q.  And then what was inaccurate about saying KMS

10  decided on Neo4j?

11     A.  KMS did not decide on Neo4j.

12     Q.  It decided on ONgDB?

13     A.  Correct.

14     MR. RATINOFF:  Okay.  The next exhibit would be

15  Exhibit 60.

16     (Exhibit 60 was marked for identification.)

17  BY MR. RATINOFF:

18     Q.  This is an email with the Bates number ending

19  in 5838.  It was produced in response to the subpoena

20  issued to CACI by Neo4j.

21     Do you have any reason to believe this isn't a

22  true and correct copy of that -- an email that was

23  produced by CACI?

24     A.  No, I don't.

25     Q.  Just starting at top, there's a domain,

125

1  Novetta.com.

2          Who's Novetta.com?

3      A.  So WaveStrike was purchased by a company called

4  Novetta somewhere in the -- that same time frame.

5      Q.  Okay.  So they're -- so Novetta basically was

6  working as the prime at this time, October of 2020, with

7  Route 66?

8      A.  Yes, they -- yes, you have that right.

9      Q.  And you'll see here, Michael Smolyak writes, "I

10 was deploying the Graph database (ONgDB) to the

11 production environment."

12         So at this time, in October of 10 -- sorry --

13 October 27, 2020, had ONgDB been moved to production

14 with the NSA?

15     A.  Yes, it had.

16     Q.  Okay.  And CACI, at this point, had -- or was

17 assisting with moving ONgDB from the development

18 environment to the production environment?

19     A.  Correct.

20     Q.  And when did the -- when did CACI complete its

21 contract to move ONgDB to production and Route 66 of

22 Road Rally?

23     A.  CACI was a sub on Road Rally and still is

24 today.  The task order expired in September of 2020 and

25 renewed through the coming fiscal year 2021.  I hope

126

September 16, 2022

1    that answered your question.

2         Q.   So what month in 2021 was it renewed?

3         A.   I'm sorry?

4         Q.   You said -- you said the Road Rally subcontract

5    was renewed in 2021.

6         A.   Correct.

7         Q.   When in 2021?

8         A.   On the government fiscal year.

9         Q.   So September -- I'm sorry, beginning of October

10   of 2021?

11        A.   Correct.

12        Q.   And how long was that contract for?

13        A.   It runs on a government fiscal-year basis --

14        Q.   So --

15        A.   -- so a 12-month period that would have ended

16   in September of this year.

17        Q.   So this month, it would -- that contract ran

18   out?

19        A.   Correct.

20        Q.   And would that still -- would that contract

21   still involve working with ONgDB in an production

22   environment?

23        A.   Yes, in part.

24        Q.   And has that contract been renewed for the next

25   fiscal year, 2023?

                                                         127

JIM WEYANT 30(b)(6) Confidential                    September 16, 2022

```
 1                     DECLARATION OF DEPONENT

 2

 3     I, JIM WEYANT, declare under penalty of perjury that I

 4     have reviewed the foregoing transcript; that I have made

 5     any corrections, additions, or deletions in my testimony

 6     that I deemed necessary; and that the foregoing is a

 7     true and correct transcription of my testimony in this

 8     matter.

 9

10

11     Dated this _____ day of _____, 20__,

12     at _____, _____.
              [City]                    [State]
13

14                      _____

15                      JIM WEYANT

16

17

18                          --o0o--

19

20

21

22

23

24

25

                                                            138
```

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS   408-287-7500

SER_0583

JIM WEYANT, 30(b)(6) - AEO                    September 16, 2022

```
1                      CERTIFICATE
2       I, BENJAMIN GERALD, Certified Shorthand Reporter,
3  Certificate No. 14203, for the State of California do
4  hereby certify:
5       That prior to being examined, the witness named in
6  the foregoing deposition was by me duly sworn to testify
7  to the truth, the whole truth, and nothing but the truth
8  in the within-entitled cause;
9       That said deposition was taken shorthand at the
10 time and place herein named;
11      That the deposition is a true record of the
12 witness's testimony as reported to the best of my
13 ability by me, and was thereafter transcribed to
14 typewriting by computer under my direction;
15      That request [X] was [ ] was not made to read and
16 correct said deposition.
17      I further certify that I am not interested in
18 the outcome of said action, nor am I connected with, nor
19 related to any of the parties in said action, nor to
20 their respective counsel.
21      Witness my hand this 29th day of September, 2022.
22
23
24                    _____
25                    BENJAMIN GERALD
                      CSR No. 14203
                                                   139
```

JIM WEYANT, 30(b)(6) - Confidential                    September 16, 2022

```
 1                        CERTIFICATE

 2       I, BENJAMIN GERALD, Certified Shorthand Reporter,

 3   Certificate No. 14203, for the State of California do

 4   hereby certify:

 5       That prior to being examined, the witness named in

 6   the foregoing deposition was by me duly sworn to testify

 7   to the truth, the whole truth, and nothing but the truth

 8   in the within-entitled cause;

 9       That said deposition was taken shorthand at the

10   time and place herein named;

11       That the deposition is a true record of the

12   witness's testimony as reported to the best of my

13   ability by me, and was thereafter transcribed to

14   typewriting by computer under my direction;

15       That request [X] was [ ] was not made to read and

16   correct said deposition.

17       I further certify that I am not interested in

18   the outcome of said action, nor am I connected with, nor

19   related to any of the parties in said action, nor to

20   their respective counsel.

21       Witness my hand this 29th day of September, 2022.

22

23

24   _____
     BENJAMIN GERALD

25   CSR No. 14203

                                                     139
```

# EXHIBIT 5

SER_0586

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA


| | |
|---|---|
| NEO4J, INC., a Delaware corporation; and NEO4J SWEDEN AB, a Swedish corporation, | ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) |
| PURETHINK, LLC, a Delaware limited liability company; IGOV, INC., a Virginia corporation; and JOHN MARK SUHY, an individual, | ) ) ) ) ) |
| Defendants. | ) ) |

CASE NO.
5:18-cv-07182-EJD


***EXHIBITS ONLY DESIGNATED CONFIDENTIAL***

REMOTE VIDEOTAPED DEPOSITION OF INTERNAL REVENUE

SERVICE THROUGH ITS DESIGNEE MICHAEL C. DUNN

PAGES 1 - 293

_____

8:10 A.M.

Thursday, November 17, 2022

_____


REPORTED BY:    Shelley M. Sailor, CSR No. 10254

1

November 17, 2022

```
 1              THE VIDEOGRAPHER:  Yes.
 2              MR. TEPPER:  Okay.  This is Jonathan
 3    Tepper, Department of Treasury, Internal Revenue
 4    Service Chief Counsel's Office, Public Contracts and
 5    Technology Law Branch.
 6              MR. BREWSTER:  Good morning.  This is
 7    Albert Brewster, Department of Treasury, IRS Office
 8    of Chief Counsel, Small Business and Self-Employed
 9    Division area counsel.
10              THE VIDEOGRAPHER:  Thank you so much.  Will
11    the court reporter please swear the witness at this
12    time.
13              MICHAEL C. DUNN,
14    called as a witness by the Plaintiffs and who,
15    having been by me duly sworn, was thereupon examined
16    and testified as hereinafter set forth.
17              EXAMINATION BY MR. RATINOFF
18        Q.  Good morning.
19        A.  Good morning.
20        Q.  Are you represented by counsel today?
21        A.  I am.
22        Q.  And that would be Mr. Tepper?
23        A.  Yeah.
24        Q.  And Mr. Brewster?
25        A.  Yeah.
```

9

1      Q.  Okay.  And have you ever been deposed

2   before?

3      A.  I haven't.

4      Q.  Okay.  So let me go through a few kind of

5   ground rules just to get you familiar with the

6   process.  You may have already had some

7   conversations with your counsel about it, but I just

8   want to make sure we're on the same page.

9          So you just took an oath under the penalty

10   of perjury.  Do you understand that your testimony

11   has the same force and effect as if you were

12   testifying in front of the judge and jury?

13      A.  Yes.

14      Q.  Okay.  We're going to proceed in a

15   question-and-answer format.  I'm going to ask the

16   questions, and you'll provide answers.  If a

17   question isn't clear or you don't understand it,

18   please let me know, and I can rephrase it.  If you

19   don't say anything and go ahead and answer, I'm just

20   going to assume you understood the question.  Is

21   that fair?

22      A.  Sure.

23      Q.  And it's also not sufficient that you nod

24   your head or shake your head in response to a

25   question.  Even though it's on video, the court

10

1   ask you a couple of quick questions.  Your full name

2   is Michael Dunn.  Is that correct?

3       A.  Yeah.  Michael Christopher Dunn.

4       Q.  And where are you currently located?

5       A.  Melbourne, Florida.

6       Q.  And is that your residence?

7       A.  Yes.

8       Q.  Is that your permanent residence in

9   Florida?

10      A.  It is.

11      Q.  And you're currently employed with the IRS?

12      A.  I am.

13  BY MR. RATINOFF:

14      Q.  Do you have what's marked as Exhibit 157

15  open?

16      A.  I do.

17      Q.  And have you -- do you recognize this

18  document that's been marked as Exhibit 157?

19      A.  Yes.  I -- yeah.  I believe this is the one

20  that Jonathan sent me.

21      Q.  Okay.  The Subpoena to Testify in a

22  Deposition in a Civil Action?

23      A.  Yes.

24      Q.  And you understand you're here today to

25  testify on behalf of the IRS in response to this

14

MICHAEL C. DUNN                                November 17, 2022

```
 1    subpoena?

 2         A.  I do.  I am.

 3         Q.  Let's go ahead and go down to Attachment A,

 4    and you'll see on page 3 there's a heading that

 5    says, "Topics of Examination."  Just let me know

 6    when you're there.

 7         A.  I'm there.

 8         Q.  And are you familiar with these topics of

 9    examination?  There's 12 of them.

10         A.  I looked -- yes.  I was able to look over

11    them.  Yes.

12         Q.  And you understand that you're here today

13    to provide testimony on these topics on behalf of

14    the IRS?

15         A.  I am.

16         Q.  And do you have authorization from the IRS

17    to provide testimony on all 12 topics?

18         A.  As far as I know.  Yes.

19         Q.  And as far as the topics go, do you

20    understand that you're not just providing your

21    personal knowledge -- I'm sorry.  Strike that.

22         Do you understand that today you're being

23    asked not just testimony based on your personal

24    knowledge but that on which the IRS understands and

25    knows?
```

15

SER_0591

November 17, 2022

```
 1        Q.  So in August of 2001 you started with the
 2   IRS?
 3        A.  I did.  Yes.
 4        Q.  What was your first position at the IRS?
 5        A.  Program evaluation risk analyst.
 6        Q.  And what did that job entitle -- or entail?
 7        A.  A range of things dealing, as you can
 8   imagine, with program evaluation, you're studying
 9   outcomes, treatments, processes, et cetera, based on
10   objectives.  Risk analysis came into play with
11   dealing with analysis, different types of
12   qualitative and quantitative analyses.  We also did
13   surveys, data analysis, et cetera.
14        Q.  And how long were you in that position at
15   the IRS?
16        A.  Until what, 2017, I think.  2016, 2017 I
17   officially moved into my current unit and took over
18   there.  Or started there.
19        Q.  What's your current unit?
20        A.  Within the Research, Applied Analytics and
21   Statistics unit.  It is the Data Management
22   Division.
23        Q.  I've seen an acronym R-A-A-S, RAAS.  Is
24   that --
25        A.  Yeah.  That's the parent organization.  DMD
```

21

SER_0592

1    would be the initialism for Data Management

2    Division.

3        Q.  So the Data Management Division is within

4    the RAAS?

5        A.  Correct.  Yes.

6        Q.  And what does the Data Management Division

7    do?

8        A.  Two primary functions in my view based on

9    the mission.  One is providing a centralized data

10   source for research and analytics in the IRS.  So

11   that is dealing with the provisioning of data for

12   use.  The second is providing the infrastructure to

13   do the analytics.  So storage and compute in a

14   simple sense.

15       Q.  Essentially maintain taxpayer information,

16   and then providing a tool to provide analysis of

17   that information?

18       A.  Or tools, yes, in the environment to work

19   with them.  Yes.

20       Q.  Now, what does the RAAS, the larger entity,

21   do?

22       A.  It -- there are several different facets.

23   One is the -- one of the functions is the director

24   of RAAS serves as the chief data analytics officer

25   for the IRS.  The units within there have different

22

1    areas of work.  The Statistics of Income Division is

2    led by the chief statistical officer for the

3    Treasury, and they are responsible for the official

4    statistics that go out to the external public, if

5    you will.  There are other units that deal with

6    modeling, different forms of analysis that are done

7    either under the request of RAAS or in partnership

8    with other units across the IRS.  And that could

9    take a variety of forms.  I can try to get into

10   those if you want to.

11       Q.  I think that high level is probably good

12   enough since we're mostly talking about the DMD.  Is

13   that --

14       A.  DMD, yes.  Data Management Division.

15       Q.  Not the DMV but DMD.

16       A.  Not the DMV.  DMD.  Yes, sir.

17       Q.  You mentioned that the DMD provides

18   analytical tools.  Is that throughout the IRS beyond

19   the RAAS?

20       A.  Yes.  So there are users from outside of

21   RAAS who use those resources.

22       Q.  So in other words, the resources provided

23   by DMD are made available throughout the entire IRS?

24       A.  Yes.  They can be.  Yes.

25       Q.  And approximately how many employees are

                                                      23

MICHAEL C. DUNN                                    November 17, 2022

1    within the DMD?

2        A.  I want to say 75 or 80 offhand.

3        Q.  And what's your official title within the

4    DMD?

5        A.  Technical advisor.

6        Q.  And what's the -- just the GS equivalent?

7        A.  GS-15.

8        Q.  And did you come in as a GS-15, or that's

9    just the current level you're at?

10       A.  When I came in to the IRS or to the DMD?

11       Q.  To the DMD.

12       A.  Yeah.  I think I officially came in as a

13   15.  Yeah.  Yeah.  Yeah.

14       Q.  GS-15 is basically a high-level manager

15   level under the GS scale?

16       A.  Technically not a manager position.  It's

17   almost like, you know, do whatever work is needed

18   where there's no set -- there's not necessarily a

19   set program area that you're over with employees or

20   anything like that.

21       Q.  What are your general job responsibilities

22   as I believe program manager, is that --

23       A.  Versus a program manager?

24       Q.  Yeah.

25       A.  So a program manager in DMD is typically

24

1   dealing with a particular program of work or -- or

2   area of responsibility.  So my particular areas of

3   responsibility have been doing activities under

4   what's called the business systems planner roles and

5   responsibilities, BSP, and that involves liaisoning

6   with our IT unit, helping with supporting, you know,

7   processes with them, handling some other sort of

8   security, and sort of work request processing with

9   IT.  And then of late I work on some strategic

10  planning initiatives.  I have some responsibilities

11  over CKGE sort of day to day and some planning

12  activities.  I support some security and privacy

13  work.  Let's see.  And other duties as assigned as

14  they call it.

15      Q.  You keep referring to the acronym CKGE.

16  Just so we're on the same page, what does CKGE stand

17  for?

18      A.  CDW Knowledge Graph Environment.

19      Q.  And then CDW stands for Compliance Data

20  Warehouse?

21      A.  Yes.  That's correct.

22      Q.  And Compliance Data Warehouse is where all

23  of the data you mentioned that RAAS is responsible

24  for is stored?

25      A.  Not all of it.  Because when you use the

25

SER_0596

MICHAEL C. DUNN                                      November 17, 2022

1    word CDW, it can refer to the Sybase database.  So

2    that's usually the -- call that almost 80 or 90

3    percent of the data that DMD manages.  There is a

4    separate amount of data that's over in another

5    infrastructure that we manage.  You could loosely

6    call it all CDW but typically -- and this is not --

7    it is not even done -- let me say this:

8            The term CDW is not even used by people in

9    the IRS consistently.  Some people refer to the

10   whole thing that I'm talking about DMD as CDW, some

11   people are referring to just the database.  So I try

12   to use just the database.  And then DMD being sort

13   of the, you know, additional resources

14   infrastructure.  Does that make sense?

15       Q.  Sure.  And when you say CDW in the context

16   of the CKGE, you're talking about just the database.

17   Correct?

18       A.  Yeah.  What it's supposed to be implying is

19   the data is coming out from CDW and being used in

20   that environment.  So that's why it was labeled that

21   way.

22       Q.  And the CKGE is one of the analytical tools

23   used to analyze the data drawn from the CDW?

24       A.  Yes.

25       Q.  All right.  We'll probably get into a

26

1    conversations with counsel.

2        A.  Okay.

3        Q.  You can tell me if you were asked -- I just

4    want to know if you've been asked to gather any

5    other documents --

6        A.  No.  No.  If that's the question, I wasn't

7    gathering any documents, no, of late.

8        Q.  So the only documents that you were asked

9    to look at or provide were contract documents?

10       A.  Yeah.  Well, I wasn't asked to provide

11   contract documents as much as just kind of going

12   over what might be contracts that are relevant.

13       Q.  Okay.  You weren't asked to provide any

14   technical documents on the -- what you call the

15   infrastructure of the CKGE?

16       A.  No.  But I tried to gather some

17   information.

18       Q.  All right.  Let me go ahead and go on,

19   then, since you have not seen that subpoena.  We

20   have multiple subpoenas.  We try to keep the

21   documents and the testimony separate.  So let's kind

22   of go ahead and start with -- I think you testified

23   you started in the DMD around 2016, 2017?

24       A.  Yeah.  I was part-time down there sort of,

25   but I was working still in RAAS.  So I worked with

29

SER_0598

1    DMD folks over the years.

2         Q.   You were in within RAAS --

3         A.   Yeah.  Yeah.  Yes.  Yeah.  So I've been in

4    RAAS in its technical form since 2001.  So I've

5    always been in RAAS.  But I moved from one division

6    down to DMD at that time.

7         Q.   Understood.  Okay.  And through your work

8    at RAAS -- again, I'm not clear when you gained this

9    knowledge.  During your work with RAAS, did you

10   become familiar with Neo4j software?

11        A.   Yes.

12        Q.   And when did you first become aware of

13   Neo4j software?

14        A.   Probably 2015, 2014.  We were working on a

15   project with Elder Research, and they used or

16   brought in the Neo4j Community Edition for us to

17   do -- or the project was to do some graph analytics

18   work, graph data -- put stuff in graph database.  It

19   was their idea to store some stuff so that we could

20   do some analytics.

21        Q.   So your understanding of Neo4j software is

22   it's a graph database analytics software?

23        A.   Yes.

24        Q.   And what does this mean -- strike that.

25             What do you understand a graph database

                                                          30

SER_0599

1  analytics software to do?

2       A.  So a graph database is storing the data in

3  graph form.  And then, you know, the database might

4  have, you know, Neo4j, the graph databases usually

5  have some type of query function or using some

6  language.  And then, you know, analytics could be

7  used through that query language.  Inherently they

8  may have some other algorithms in there.  It just

9  depends.  So that's what I would think of offhand as

10  a graph database.

11       Q.  Okay.  When you say -- so a graph database,

12  is that something that is independent of whatever

13  analytics software you're using?

14       A.  It can be.

15       Q.  In the case of Neo4j, is the graph database

16  in a common form such as Cypher?

17       A.  Say that one more time.

18       Q.  Do you know what Cypher is?

19       A.  Yes.

20       Q.  What's your understanding of Cypher?

21       A.  The Cypher query language.  It's a type of

22  query language used to interface with the data in

23  Neo4j or, you know -- yeah.

24       Q.  Cypher is used to extrapolate data from the

25  database, the graph database?

31

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS   408-287-7500

1    interact with the data and pull that data out, and

2    they can be used in a couple of different forms.

3    The two primary forms that we've been using it in

4    over the years is just visualization of the results

5    through a UI.  And then as I said, there are a small

6    group of people that will use other tools to

7    interact with the database, graph database, and then

8    pull that data out and then work with it.

9         Q.   Thank you for clarifying that.

10        A.   Okay.

11        Q.   Now, you said you first became familiar

12   with Neo4j software.  When did you actually first

13   become familiar with the company Neo4j?  I know that

14   there's the software and then there's the company

15   that provides the software.  So --

16        A.   You know, in all honesty, I think it may

17   have been around the same time.  I don't remember --

18   I don't remember anything more particular than

19   around that time.  Using some other stuff.  So I

20   would say then -- the best of my knowledge is around

21   then.

22        Q.   Around then meaning 2015, 2016?

23        A.   2014, whenever the Elder Research project

24   kind of kicked off.

25        Q.   And I know I mentioned the name earlier,

                                                                34

November 17, 2022

```
1    John Mark Suhy.  Do you know who John Mark Suhy is?
2        A.  I do.  Yes.
3        Q.  And when did you first meet John Mark Suhy?
4        A.  I -- I -- I think it was -- let's see.
5    Maybe '16, the fall of '16.  It was at a Neo4j --
6    I'm pretty sure of this.  In my mind, it was at a
7    Neo4j event in D.C. and the -- one of the Neo4j,
8    I'll call them sales manager for lack of a better
9    word, introduced us because we had -- I believe we
10   had called or emailed Neo4j to just find out about,
11   you know, what options Neo4j had, and then they
12   connected us with John Mark Suhy.
13       Q.  What do you mean, what options are you
14   talking about?  Different versions of Neo4j
15   software?
16       A.  Yeah.  I think we had just reached out
17   about, if I remember right -- I can't remember if it
18   was email.  I'm pretty sure it was email, but it was
19   basically just finding out about what the other
20   options like, you know, the commercial one or such.
21   Just generally finding out about that.  And then I
22   think we got invited to the event.  The sales
23   manager introduced us to John Mark Suhy, PureThink
24   as I think it was called the Government Edition or
25   something like that.
```

35

SER_0602

1    Q.  So a different version of Neo4j when you

2    mean Government Edition?

3    A.  Yeah.  I believe, if I remember right, it

4    was sort of they said he was the partner of Neo4j

5    for the government, and I think it was called the

6    Government Edition, if I remember right.

7    Q.  But it was Enterprise-level software?

8    A.  Yeah.  Because I think we -- yeah.  I think

9    it was -- yeah.  It was not the Community Edition.

10   It was -- I mean, I wouldn't recognize it as the

11   Community Edition.  But it was -- yeah.  It was --

12   it was sort of through -- well, it was through

13   PureThink that was doing the, I guess the product in

14   my mind.

15   Q.  Okay.  And why was the IRS looking -- I

16   assume at the time it was -- based on your

17   testimony, it was using Community Edition.  Why was

18   it looking to, for a better word, upgrade to

19   Enterprise Edition?

20   A.  So pretty much for two things in my mind,

21   was the user interface and the FISMA security

22   capabilities for sort of accounts management.

23   Q.  What's FISMA?

24   A.  Federal information -- oh, shoot.  Federal

25   Information Security and something Act.  It's

36

1   name in the chat.

2       Q.   Federal Information Security Modernization

3   Act.  Does that sound correct?

4       A.   That sounds correct.  Let's go with it.

5       Q.   All right.  I'll take your word for it.

6   And did the IRS enter into -- strike that.

7            Did the IRS purchase a license to what you

8   call the Neo4j Government Edition?

9       A.   Yeah.  I believe we had a contract with

10  PureThink that was prototyping, piloting out,

11  testing how it worked, et cetera.  So that was

12  through PureThink.

13      Q.   Okay.  And did that include an actual

14  license, a commercial license for Neo4j's software?

15      A.   I don't remember ever -- I mean, I don't

16  remember us ever, like, being delivered anything.

17  It was through whatever John Mark Suhy -- yeah, I

18  don't remember -- I don't remember anything like,

19  you know, some kind of data rights or something

20  being sent over to us.

21      Q.   Was there any discussion about how many

22  cores the contract would include?

23      A.   I can't remember.  I remember only -- the

24  only -- what I remember about cores and such was

25  when we were talking with the Neo4j folks and we

                                                        39

1    were talking about the licensing of Enterprise

2    itself and how the cores and such -- you know, how

3    many cores and sizing you get for the price.  I

4    remember that conversation.

5         Q.  Let me go ahead and mark the next exhibit.

6    I believe we're at 159.

7              (Exhibit 159 is introduced.)

8              THE WITNESS:  Okay.

9    BY MR. RATINOFF:

10        Q.  Do you have what's been marked as Exhibit

11   159 open?

12        A.  I do.

13        Q.  It says dated 9/23/2016.  Then there's the

14   contract number TIRNO-16-P-00202.

15        A.  Yes.

16        Q.  Do you recognize what's been marked as

17   Exhibit 159?

18        A.  I'm familiar with it.  I can't remember it

19   specifically from that time, but it looks like our

20   contract with PureThink and how it would be set up.

21   Yeah.  Vivian Daniels has the core.  Yeah.

22        Q.  Okay.  Who is Vivian Daniels?

23        A.  She was the contracting officer

24   representative.  Hang on.  I can't see.  So she's

25   IRS contracting officer representative.

                                                    40

Q.   Then do you see under Schedule 17 it

says -- and then under item 0001 it says,

"Implementation of Government Edition Neo4j

project"?

A.   What page?

Q.   On the first page.

A.   Oh.  Just up there.  Yeah.

Q.   Does that help --

A.   Yeah.  Implementation of the Government

Edition Neo4j project.  Yeah.

Q.   And you'll see there's a unit price of

$229,000?

A.   Uh-huh.

Q.   Yes?

A.   Yes.  I do.

Q.   And was that payment for -- made for the

Government Edition for Neo4j?

A.   Yes.  To PureThink.

Q.   And was it your understanding that this

contract included a license to use the Neo4j

Government Edition?

A.   Yeah.  I would think so.  Whatever the

agreement was with PureThink and Neo4j.  But we got,

you know, we were able to use the Government

Edition, which would include the Neo4j database that

41

SER_0606

1    came with it during this period of performance.

2         Q.   When you mean the Neo4j database, are you

3    referring to Neo4j Enterprise database software?

4         A.   Yeah.   I would if that's what came with --

5    and which I'm assuming came with the Government

6    Edition.   So yeah.

7         Q.   So the Government Edition didn't come with

8    Community Edition, then.

9         A.   No.   I'm -- I'm certain of that.   Yeah.   So

10   it must have been the Enterprise Edition if those

11   were the two flavors.

12        Q.   And then you see -- if you go to the next

13   page under "Statement of Work."

14        A.   Yes.

15        Q.   Do you see "Introduction/Overview," it says

16   this contract will provide -- and then I guess

17   that's a typo-- provide facilitate the deployment,

18   for testing and feasibility of the Neo4j Edition NGE

19   via a one-year use of Neo4j Government Edition?

20        A.   Yes.

21        Q.   Which both the software use and

22   professional services?

23        A.   That's correct.

24        Q.   So you understand, then, that it was a

25   one-year license, then, for Neo4j Enterprise?

42

SER_0607

```
1        A.   That's correct.
2        Q.   And to your knowledge, did Mr. Suhy -- I
3   guess -- let me backtrack a little bit.
4             You mentioned PureThink.  What's PureThink?
5        A.   PureThink was, my mind, John Mark Suhy's
6   company that was in partnership with Neo4j, Inc.
7        Q.   And are you aware of any other -- or were
8   you aware of anyone else affiliated with PureThink
9   at that time in 2016?
10       A.   No.
11       Q.   So essentially PureThink was John Mark Suhy
12  in your mind?
13       A.   Yeah.  That's fine.  I agree.
14       Q.   And then this is signed by Genevieve
15  Colvin.  Who is Genevieve Colvin?
16       A.   She would probably -- she would have been
17  the contracting officer representative.  Wait a
18  minute.  Sorry.  Sorry.
19            She would have been the contracting
20  officer.  So she would sign it as via procurement.
21       Q.   And as far as -- and you mentioned the
22  CKGE.  Did the CKGE exist at the time of this
23  contract in September --
24       A.   It did not.  No.  It did not.
25       Q.   So was this contract a precursor so to
```

43

1   speak for the CKGE?

2       A.  Yeah.  I think so.  Yeah.  Yeah.  I'm good

3   with that.  Yes.

4       Q.  So what was the purpose of this contract

5   beyond obviously just using the Neo4j Government

6   Edition?

7       A.  Primarily I would say three things.  One is

8   the ability to work with user interface and be able

9   to customize that to the desires of the

10  stakeholders.  That was primarily, probably the

11  primary interest.  The second would be the ability

12  to take two -- the Community Editions that we had

13  were in two separate instances, and the interest was

14  to combine them into one.  So essentially be able to

15  just put them in one so that one user interface

16  could work with them.  And third would be the

17  security, logging, infrastructure, that kind of

18  stuff.  So that's how I would kind of put the three

19  priorities out there.

20      Q.  And was this being done within the DMD at

21  this point?

22      A.  It would have been -- yes.  In the

23  infrastructure.  Yes.

24      Q.  Okay.  And then what was -- it sounds like

25  from at least the contract it's the development and

44

SER_0609

1    testing of the Government Edition.  What was the

2    next step envisioned after this year contract was

3    up?

4         A.  Yeah.  If -- I think the next step would

5    have been if all of that was going well and people

6    and stakeholders and decision-makers were happy, I

7    think the idea would be we would have moved off of

8    what we had into that new, you know, call it

9    environment, if you will.  Or at least a stack of

10   those components.

11        Q.  And that actual stack of those components,

12   was Mr. Suhy able to implement them successfully for

13   the IRS under the contract?

14        A.  I mean, we were still -- it was still being

15   worked on, but we were, I think, making headway.

16   Yes.

17        Q.  And when you say headway, was this moving

18   towards what is now the CKGE?

19        A.  Yeah.  It would have -- it would have been

20   sort of essentially the taking what we had and

21   putting it into a new form.  And that sort of became

22   sort of the, you know, the beginning of the first

23   project if you will.

24        Q.  And then I want to turn your attention back

25   to Exhibit 159.  If you go down to page 4, it says

45

1  "Government" -- there's a heading "Government

2  Furnished Property."

3      A.  Yep.  I see it now.  Yes.

4      Q.  It says at least one Linux OS server with

5  at least 16 cores and 1 terabyte of RAM --

6      A.  Yeah.

7      Q.  -- and available hard drive space as

8  needed.

9      A.  Yes.

10      Q.  And was that at that time the basic

11  hardware requirement for this project?

12      A.  Yeah.  I don't know if it was the

13  requirement as much as what we had available and we

14  thought would be sufficient.  And maybe with some

15  buffer.

16      Q.  During the course of this year contract,

17  was this ended up being sufficient specification for

18  the hardware?

19      A.  Yeah.  If I remember right, you know, the

20  testing and everything showed that -- I mean, it was

21  probably even maybe a little bit more in terms of

22  what would have been cores than would have been

23  necessary given how the user interface would

24  function with the graph database.  But that being

25  said, you know, I don't know -- that's sort of an

46

```
1    estimate, but I would say that to me is a decent
2    enough size to say it was working within that, that
3    set of infrastructure.
4              (Exhibit 160 is introduced.)
5    BY MR. RATINOFF:
6         Q.  I'm going to go ahead and mark the next
7    exhibit.  This should be Exhibit 160.  Just let me
8    know when you've had a chance to download it and
9    take a quick look.
10        A.  I'm open.  Yes.
11        Q.  Just marked Exhibit 160.  It's an email
12   from yourself to Mr. Suhy dated March 29, 2017.  And
13   that's the top email.  You'll see there's a prior
14   email from Mr. Suhy addressed to you.
15        A.  Okay.
16        Q.  Is that an email exchange between you and
17   Mr. Suhy?
18        A.  Yes.  I saw it.  Yes.
19        Q.  Yes, this is an email -- I'm sorry.
20             Yes, this is an email exchange between
21   you --
22        A.  Oh.  Yes.  Sorry.  Yes, it is an email
23   exchange.
24        Q.  Just for your reference, you'll see there's
25   a number at the bottom that says IGOV00 and there's
```

47

November 17, 2022

1   a whole bunch of numbers there.

2       A.  Okay.

3       Q.  I may refer to numbers like that as Bates

4   number, and this Bates number represents that this

5   email was actually pursued by Mr. Suhy or one of

6   Mr. Suhy's entities.  Do you understand?

7       A.  I do.  Yes.

8       Q.  And you'll also see some what we'll call

9   Bates numbers that will have an IRS prefix, and

10  those will mean that those are actually produced by

11  the IRS.

12      A.  Yes.  That's good.  Yes.

13      Q.  Just so we know where these are coming

14  from.

15      A.  Okay.  I gotcha.

16      Q.  And then if you look -- if you look in this

17  third paragraph here, it says, In terms of the

18  working-side:  Jason and John did stop by yesterday;

19  I told them we have been really happy with how

20  things are going and working with you and things are

21  going well for continued interest and arrangement

22  for this capability.  Who are you referring to as

23  Jason and John?

24      A.  I believe they're the Neo4j -- is it Jason

25  Zelenski or Zakowski?

48

```
 1        Q.  Zagalsky?

 2        A.  Okay.  And then John Broad.  Brode --

 3   Broad?

 4        Q.  Yeah.  There is a John Broad in here, too.

 5        A.  Okay.  Then that would have been them.

 6        Q.  Okay.  And do you recall why they had

 7   stopped by?

 8        A.  Yeah.  They said that they were -- to

 9   summarize, they were having disputes with John Mark

10   over signing some -- either it was signing or they

11   said that they were having issues with John Mark and

12   there was disputes going on.  And they wanted to

13   kind of talk about, you know, just purchasing of the

14   Enterprise Edition.

15        Q.  And you'll see -- I'm sorry.  I didn't mean

16   to cut you off.

17        A.  No.  Sorry.  Go ahead.  I said that's what

18   I remember.

19        Q.  And the next sentence says, My main point

20   of emphasis I want to express is that we (IRS) want

21   to go into production with this environment within

22   this contract period, and we're assuming we have

23   proper licensing and paid for 12-core production

24   Enterprise-license services; as part of that is the

25   unlimited, quote, "DEV" environment use.
```

49

1    A.  That's right.

2    Q.  Is that sentence something that you had

3  told Jason and John?

4    A.  Yeah.  I think.  My feeling of the

5  conversation with Jason and John is what would it

6  cost for a 12-core license.  And how would that -- I

7  think if I remember right, there was some -- there

8  was a presentation of three nodes of four, and I

9  think I was talking to them about being able to have

10  that as one node of 12.  So along those lines, I

11  think we were talking about sort of what's the

12  pricing of that, if that was feasible or not.

13    Q.  And then you say, we're assuming we have a

14  proper licensing and paid for 12-core production

15  Enterprise license.  Is that what you understood at

16  the time that you had under the contract that we

17  just talked about in Exhibit 159?

18    A.  I think so.  Yes.

19    Q.  And when you say that you want to go into

20  production you were assuming -- or it was the IRS's

21  desire to have the same level of cores for

22  production license?

23    A.  Yeah.  Basically for us to be able to have

24  that -- we wanted, you know, at least 12 cores.

25  Yes.

50

SER_0615

1   a break, too.

2       Q.  Yeah.  I know the videographer and court

3   reporter would also appreciate that.  So let me go

4   ahead and put one more exhibit in the chat here.

5   We'll mark it, ask a few questions, and then we can

6   take a quick break for everyone.

7       A.  Okay.  I see it.  916?  916?

8       Q.  916, no.  It should be -- oh, yeah.  The

9   end of the Bates number.  Gotcha.  I was looking at

10  tab 444, but yes.  That is correct.  So this is

11  going to be -- we'll just call it Exhibit 161, then.

12      A.  Okay.  I opened it up.  Yes.

13          (Exhibit 161 is introduced.)

14  BY MR. RATINOFF:

15      Q.  You'll see this is an email, and this

16  represents Neo4j --

17      A.  Yes.

18      Q.  -- Zagalsky --

19      A.  Yes.

20      Q.  -- yourself and --

21          (Reporter interruption.)

22  BY MR. RATINOFF:

23      Q.  We've got to kind of give each other a

24  chance.  You know, we've kind of been going fast and

25  furious here, so I'll slow down just a little bit.

                                                    55

SER_0616

1   Sorry about that.  Let me start over again.

2        I just marked what's Exhibit 161.  It's an

3   email from Jason Zagalsky of Neo4j to yourself,

4   Ms. Daniels, who I think we talked about, as well as

5   John Broad.  And the subject is "Termination of

6   Neo4j Solution Partner PureThink LLC."  And it's

7   dated July 11, 2017.  Does this -- do you recognize

8   this email?

9        A.  I -- yeah.  I do.

10       Q.  And what does -- what did it mean to you?

11       A.  So I believe that was Jason just

12   officially, you know, letting us know that they had

13   terminated the partnership and sort of giving us

14   notice of that situation.

15       Q.  And then it says in the third paragraph

16   regarding the IRS's purchase of a Neo4j subscription

17   Neo still has not received a purchase order from

18   PureThink.  Do you have an understanding of what

19   that is in reference to?

20       A.  I think.  I think this goes back to there

21   was a dispute between -- this is what I think part

22   of the dispute may be, but this is, again, tell me

23   if I'm speculating but --

24       Q.  I don't want you to speculate.  So if

25   you're speculating then --

56

November 17, 2022

1    A.  Well -- I -- I think -- my belief is that

2  this was regarding part of the dispute that John

3  Mark had not paid for or sent money to Neo4j based

4  on, you know, what was contracted to PureThink.  So

5  if I could summarize it like that.

6    Q.  Are you referring to payment for the

7  license for the Neo4j Government Edition?

8    A.  Yeah.  I think so.  Yes.

9    Q.  And if you look to the next -- I guess it's

10  the paragraph that says, "Regarding the consulting

11  services."  Do you see that paragraph?

12    A.  Yes.

13    Q.  And it says while the IRS has stated its

14  intention to proceed with the AGPL-licensed

15  Enterprise Edition, please understand that Neo's

16  agreements with its partners, including PureThink,

17  prohibit them from providing any consulting services

18  on these products during the term of their agreement

19  for a period of 36 months following termination.  Do

20  you see that?

21    A.  Right.

22    Q.  And what was your understanding of what

23  those restrictions were?

24    A.  This was about PureThink not being able to

25  operate and do work with anything to do with Neo4j.

57

SER_0618

1    Q.   And what did the IRS do when it received

2 this letter?

3    A.   I -- so when I got the letter, I told the

4 director of DMD about the situation, and then --

5 well, Vivian got the letter, too, so I think -- I

6 believe -- I'm going to -- I believe that the

7 director of DMD, you know, was not -- wanted to have

8 either procurement or an official statement that

9 PureThink could not do the work.  Meaning our

10 contract was with PureThink, and so we would have to

11 have, you know, something official through the

12 procurement channels that says that they can't

13 finish their work.

14    Q.   And when you say finish their work, you

15 mean under the contract --

16    A.   Under this period of performance, this

17 contract.  Yes.

18    Q.   And going back to I think it was

19 Exhibit 159, that contract expired or was set to

20 expire about when?

21    A.   September.  September of that year.

22    Q.   So a year contract.  So September to

23 September -- September 2016 to September 2017.

24    A.   Yeah.

25    Q.   Okay.  And then -- but Mr. Suhy did

58

SER_0619

1  actually continue to perform under that contract.

2  Correct?

3      A.  Yes.

4      Q.  So the IRS never officially took the

5  position that he couldn't continue to work on that

6  contract?

7      A.  Not that I know of or was told of or

8  anything.  No.

9      Q.  And so PureThink was -- finished out its

10  obligations under that contract?

11     A.  Yes.

12     Q.  And why did the IRS not -- why did the IRS

13  decide to continue to work with Mr. Suhy and

14  PureThink?

15     A.  From my understanding and direction, it was

16  that the, you know, officially the procurement has

17  to be the channel in which the work stoppage is

18  formally, you know, announced or take action of.  So

19  even though it was sent to them, I mean, we -- we

20  let them know, but my director's stance was that we

21  had to have, you know, procurement say that the, you

22  know, the work could not continue and stop it.

23     Q.  And they never said one way or the other?

24     A.  No.  Never heard.  No.

25          MR. RATINOFF:  All right.  This is a good

                                                    59

1    that up.

2        Q.   Okay.  Were we actually on the record?

3        THE REPORTER:  Yes.

4        THE WITNESS:  I think so.  Yeah, I waited

5    until that to bring it up.  But that was it.  But I

6    just remembered that so I wanted to bring it up.

7        (Off the record.)

8        THE WITNESS:  Do you need me to repeat it?

9    BY MR. RATINOFF:

10       Q.   No.  No.  I think we got it.

11            So going back to the July, August time

12   period, was the IRS looking to continue working with

13   Mr. Suhy after the expiration of the contract with

14   PureThink?

15       A.   Yeah.  I think we were.  And we felt

16   like -- again, sort of the -- one of the primary

17   things that was of interest was dealing with the

18   user interface.  And there seemed to be, from what I

19   remember of all the stakeholders, you know, that

20   that was moving along nicely with being able to

21   customize it, et cetera.  So there was interest to

22   continue working with those elements of what I'll

23   call at that time was, for lack of a better term,

24   the Government Edition.  Those stack elements.

25       Q.   And at this point did the CKGE, at least in

                                                        61

SER_0621

```
 1   concept, exist at that time?
 2        A.  Primarily, you know, in that formative
 3   stage, there is that set of technology and what was
 4   happening.  Yes.  And I think -- I don't know if
 5   people were using the term "CKGE" at that time.  I
 6   believe people were still -- we may have been using
 7   something along those lines, but the idea of using
 8   that -- you know, the UI and all of that as sort of
 9   a new basis was there amongst the project members.
10   Does that make sense?
11        Q.  Yeah.  I think it does.  Was there a new
12   contract -- I'm not best at government contracting,
13   but was there a new RFQ put out at that point for
14   the next phase?
15        A.  Well, yeah.  So what -- so -- understood
16   that what was happening with PureThink and all of
17   that was -- whatever was happening was not tenable.
18   And so the original intent was through, I think it
19   was -- I think it was eGov or iGov, a company that
20   John Mark had -- a small business company that John
21   Mark had that was separate through his professional
22   services was at the beginning sort of what we were
23   going to request for professional services to
24   continue primarily, again, working on the UI, the
25   security features, et cetera.  And -- and I don't --
```

                                                      62

SER_0622

1   at that time, the decision by our director was to

2   use that money that we had for those professional

3   services instead of getting an Enterprise Edition

4   where we wouldn't have -- we would only have the

5   database -- those database elements and not the UI

6   and the rest of it.  And that was primarily the main

7   interest at that time.  And so that's what we were

8   going out with a contract.  Originally it was sole

9   source.  It was a sole source that went through

10  procurement, and I believe Neo4j contested that.

11  And then we ended up going through, again, sort of,

12  I believe it's 8A or one of the small business was

13  what procurement likes to go first through one of

14  John -- out for open bid for those professional

15  services dealing with -- dealing with technology to

16  do CKGE.

17       Q.  Okay.  So I know there's some similar

18  company names that you mentioned, but in the IRS's

19  mind, all of those companies were essentially John

20  Mark Suhy, that's who you were --

21       A.  He was --

22            (Reporter interruption.)

23  BY MR. RATINOFF:

24       Q.  I've got to finish my question.  Let me

25  start over.  We'll clear up the record.

                                                      63

November 17, 2022

1      So from the IRS's perspective, the company
2  names were sort of less important as to continuing
3  to work with John Mark Suhy.  That's what was
4  important to the IRS at that point?
5      A.  That was our primary interest starting off,
6  and then -- so I would say yes.  It was his skill
7  set was -- was something that we were interested in
8  leveraging.
9      Q.  So any disputes he had through PureThink
10  with Neo4j was irrelevant to continue working with
11  them?
12      A.  I don't -- I don't want to say relevant.
13  If we put forward the solicitation, and he is able
14  to bid on it, so I guess there is some relevancy on
15  whether he was able to work with -- I guess in this
16  case with Neo4j itself and whatever that would be.
17  But I think that was secondary to with his skills of
18  using the security.  Those elements of the
19  Government Edition that were not Neo4j itself.
20  Those capabilities were the primary interest and his
21  skill set in doing that.
22      Q.  And you mentioned iGov.  That's iGov, Inc.?
23      A.  Yes.  I believe it's Inc.  Yeah.  IGov.
24      Q.  Let me go ahead and mark this next exhibit.
25      (Exhibit 162 is introduced.)

64

November 17, 2022

1    BY MR. RATINOFF:

2        Q.   This should be tab 445, which I'll mark as

3    Exhibit 162.   You'll see this is an email exchange,

4    looks like it's between several folks at the IRS

5    including yourself if you take a look at the whole

6    document.   The last email is from Mr. Suhy to

7    yourself and then Chris Hess, Lisa Rosenmerkel,

8    Renee Goss, Genevieve Colvin, Vivian Daniels, and

9    then a couple of -- I guess another Mr. Suhy and

10   Jeff Butler.   Are those all -- other than Mr. Suhy,

11   those are all IRS employees?

12       A.   Yes.

13       Q.   And do you know what this email exchange is

14   about?

15       A.   Let me -- I'm looking at it now.   Okay.

16   Okay.   I've read it.   Okay.

17       Q.   And do you have any reason to believe this

18   isn't a true and correct copy of an email exchange

19   between Mr. Suhy and various stakeholders at the

20   IRS?

21       A.   No.   No issues.

22       Q.   And you'll see in the email where it reads

23   July 12th -- sorry.   Yes.   July 12th at 11:31 a.m.

24   It's at the bottom of 544 dash 001?

25       A.   Right.

65

November 17, 2022

```
 1        Q.  Mr. Suhy says, "Our lawyer just pointed out
 2   that since iGov has no limitations on supporting or
 3   provides services for Neo4j Enterprise open source
 4   licenses, we can just have iGov, Inc. assume over
 5   all the objections of the current contract now
 6   instead of waiting for the next procurement."
 7           Then it continues to the next page.
 8           "Nothing would change, we would have the
 9   same team, locations and would keep working as we
10   always have.  IGov owns the new Government Package
11   for Neo4j as well."
12           Do you see that?
13        A.  Yes.
14        Q.  And did the IRS do its own determination
15   whether it was okay to work with iGov as opposed to
16   PureThink based on the notice that Neo4j sent?
17        A.  I did not do anything other than rely on
18   procurement folks to do -- so as far as I know, we
19   just -- as I said sort of up there at the beginning,
20   you know, I'll let procurement talk about regarding
21   the statement of work arrangements, et cetera.  So I
22   didn't do anything -- I don't remember doing
23   anything else.
24        Q.  And what did procurement decide at that
25   point working with iGov?
```

66

SER_0626

```
 1        A.  I -- I don't remember hearing anything from

 2   them.

 3        Q.  Who would make the decision, then, to work

 4   with iGov at that point?  Would that be procurement?

 5        A.  Yeah.  If you're talking about under the

 6   same contract vehicle, procurement would have to do

 7   all that.  We have -- I have no say in that.

 8        Q.  And then who is Chris Hess?

 9        A.  Chris Hess is a manager in RAAS.

10        Q.  Is that in one of your reports?

11        A.  No.  No.  Not my reports.  No.  He's a

12   programmer manager in RAAS, a colleague in another

13   division who was working with this project.

14        Q.  And Lisa Rosenmerkel, who is Lisa

15   Rosenmerkel?

16        A.  She was associate director of DMD.

17        Q.  So at the time, she was someone you would

18   report to?

19        A.  Yes.  I did.

20        Q.  Is she still with the IRS?

21        A.  She is not.

22        Q.  When did she leave?

23        A.  Just recently.  Well, formally just

24   recently.  Before that she had been gone for at

25   least a year or two at main Treasury, and before
```

                                                        67

1   that she had been gone a year or two on different

2   details within the IRS.  So I think she probably

3   left, I'm just going to say '19.  2019.

4        Q.  Renee Goss, what does Renee Goss do?

5        A.  She was a contracting officer

6   representative here in RAAS.

7        Q.  Would she be within procurement, what you

8   call procurement?

9        A.  Yes.

10        Q.  So she would have been one of the persons

11   to make the decision as far as whether it was okay

12   to continue working with PureThink or start working

13   with iGov?

14        A.  I think that's fair.  Yes.

15        Q.  And we talked about Vivian Daniels.  Was

16   she also in procurement?

17        A.  She was in procurement.  Yes.

18        Q.  Was she also decision-maker with respect to

19   procurement?

20        A.  Yes.  She was -- I believe Vivian was the

21   contracting officer or contract specialist there in

22   procurement, and Genevieve Colvin I believe was the

23   contracting officer in procurement.

24        Q.  Gotcha.  And then Jeff Butler, was he also

25   in procurement?

68

SER_0628

```
 1          A.   No.   He was the director of DMD.

 2          Q.   So he would be the person that Lisa

 3     would -- reported to?

 4          A.   Correct.

 5          Q.   So the hierarchy would have been Jeff,

 6     Lisa, and then yourself more or less?

 7          A.   Yes.   Yes.   That's fine.   Yeah.

 8          Q.   And then I guess looking at your email on

 9     July 12, 2017, I would like to know from my

10     perspective that I appreciate your communication and

11     involvement helping clarify and work on options.

12     I'll let procurement talk to anything regarding the

13     nature of the SOW arrangements and needs.

14               That's what you're referring to as

15     different procurement?

16          A.   Yes.

17          Q.   Mr. Suhy confirms there would be no work

18     stoppage under the 2016 contract?

19          A.   That's how I interpreted it.   Yes.

20          Q.   And then you mentioned there is a new

21     contract, which you said it was sole sourced to

22     iGov.   Is that correct?

23          A.   No.   It was not -- Neo4j disputed that and

24     so it was not executed.   And then we started a new

25     procurement process for new competition.   It went
```

69

SER_0629

1  out as -- I call it, you know -- I don't want to use

2  the -- it went out as a bid.

3      Q.  Okay.  So just to back up, there was a sole

4  source RFQ put out in what, July, August of 2017?

5      A.  Yeah.  That seems about right.

6      Q.  And that was -- that was the sole source to

7  iGov.  Correct?

8      A.  Correct.  That was using iGov, the sole

9  source to them for the professional services.

10     Q.  Okay.  And then this -- but professional

11 services using Neo4j Enterprise software?

12     A.  Not necessarily.  No.

13     Q.  At that time the Government Edition that

14 the IRS was using included Neo4j Enterprise.

15 Correct?

16     A.  But we weren't -- we weren't using the

17 Government Edition.  It was still in, call it

18 development.  So as long as you're okay with that,

19 then yeah.  It wasn't the regular use by other

20 people.  It was just being developed, worked on,

21 et cetera.

22     Q.  But the version at Neo4j that was being

23 used in development was Neo4j Enterprise.

24     A.  Yes.  As far as I know in that edition.

25 Yes.

70

SER_0630

Q.  All right.  And then I'm going to go ahead and drop another document into the chat here.  So be Exhibit 163.  It's a lengthy document.  And I just wanted to see if this refreshes your recollection.

(Exhibit 163 is introduced.)

BY MR. RATINOFF:

Q.  It's not letting me drag it into the chat. Hold on just a second.  Let me give it one more time.  Here we go.

A.  I see it.

Q.  I believe this will be Exhibit 163.  You'll see it's an email from Ms. Daniels to Mr. Suhy dated 2017?

A.  Yeah.  Yes.  I do.  I see it.

Q.  And it's -- the subject's SF18 TIRNO-17-Q-00209.  Is that -- is that the sole source contract we were just talking about that's referenced in the subject of this email?

A.  I would think so.  Yeah.

Q.  If you scroll down, I'm looking at -- its quite a ways down.  It would be actually 9 out of 12 in the PDF itself.  The Bates number at the bottom is 1570513.001.  Do you see that?

A.  What page is it?

Q.  9 out of 12 in the PDF.

71

1    A.   Okay.  I'm there.

2    Q.   The title is "Statement of Work/Performance

3  Work."

4    A.   Yep.

5    Q.   And then it says in

6  "Introduction/Overview," "The contract will

7  facilitate the continued development and O&M support

8  needs of DMD's CDW Knowledge Graph Environment

9  (CKGE)."  Do you see that?

10    A.   Yes.  I do.

11    Q.   Does that help refresh your recollection as

12  to where the CKGE was at at that time?

13    A.   Yeah.  It would -- that environment that

14  was being -- that had been started under PureThink.

15    Q.   Okay.  Then going down to the last

16  paragraph, "The CKGE framework."  Do you see that?

17    A.   Right.

18    Q.   So "The CKGE framework includes Neo4j's

19  Enterprise Edition open source version, Elastic

20  Search capabilities, and micros-service components

21  useful for supporting graph-related research."  Do

22  you see that?

23    A.   Yes.  Yes.

24    Q.   So at that time the IRS was using Neo4j

25  Enterprise under an open source license?

72

SER_0632

November 17, 2022

1    A.  I don't know if it -- in my mind, it would

2    have been whatever the edition was that was part of

3    the Government Edition that had been started by

4    PureThink.

5    Q.  You mentioned that this contract was

6    awarded to iGov.  Is that correct?

7    A.  No.  This was -- this was not.

8    Q.  Okay.  What I mean is it was awarded but

9    then protested by Neo4j.

10   A.  Yes.  So this -- if this was a statement of

11   work, which I'm assuming it is, it would have gone

12   out to iGov, and that's what was protested.  So yes.

13   Q.  Okay.  So it was never awarded.  It was

14   just the statement of work was protested.

15   A.  I actually think the -- I think it was

16   going to be awarded, and I thought that's what was

17   protested.  Saying that other people could work on,

18   if I remember right -- I believe I do in my mind.

19   That other people -- Neo4j said something to the

20   effect of other people could be work -- could have

21   the technical skills to work with Neo4j.  That's

22   what was the point of dispute.

23   Q.  And IRS sided with Neo4j on that?

24   A.  Yes.  That is true.  There is other people

25   that can work on Neo4j.  So we just did an award

73

SER_0633

1    contract.

2        Q.  But then the work was eventually awarded to

3    Mr. Suhy via a different contract vehicle?

4        A.  Yes.  It was a new procurement order that

5    had started -- or was executed for sort of open

6    competition.  I believe it was AA companies or small

7    business companies originally, but it was open

8    competition, and it was awarded to eGov for

9    professional services to work, you know, to further

10   the development of CKGE.

11       Q.  Okay.  When you say eGov, you mean

12   eGovernment Solutions?

13       A.  Yes.  That's fine.  That's correct.

14       Q.  I will probably refer to it as eGovernment

15   Solutions just because it's so -- you say eGov and

16   iGov is so similar, if that's okay.

17       A.  Fair enough.

18       Q.  I think the court reporter would appreciate

19   that.

20       A.  Fair enough.  Yeah.  EGovernment.  That's

21   fine.

22       Q.  Let me go ahead and drop in the next

23   exhibit.  This has previously been marked as

24   Exhibit 103.

25              (Previously marked Exhibit 103 is

74

MICHAEL C. DUNN                                      November 17, 2022

1    referenced.)

2            THE WITNESS:  Jonathan just put something

3    into the chat.

4            MR. RATINOFF:  Yeah.  I appreciate it,

5    Jonathan, but we can't have him testifying on your

6    behalf, though.  I don't think the IRS wants the

7    lawyers to be up on the stand and have the privilege

8    waived.

9            MR. TEPPER:  We do not.  I just wanted to

10   provide clarification if needed.

11   BY MR. RATINOFF:

12       Q.  All right.  Thank you.  I didn't think that

13   was your intent.

14           I just put in what was previously marked as

15   Exhibit 103.  The title of the document is Order for

16   Supplies or Services.  The date of the order is

17   05/24/2018, Order No. 2032H8-18-P-00151 with the

18   issuing office being Vivian Daniels at the IRS

19   procurement office.  Do you see that?

20       A.  Okay.  Sorry.  Let me -- I had so many tabs

21   of exhibits.  Let me -- let me just go back and make

22   sure I'm looking at -- okay.  I think I got it.

23   Okay.  I see -- did you say it was a procurement

24   order dated 05/24/18?  Is that the one you're

25   talking about?

                                                    75

MICHAEL C. DUNN                                        November 17, 2022

1    Q.  Yes.

2    A.  Okay.  I got it open.

3    Q.  Okay.  Now, this Order for Supplies or

4  Services, is this the contract that you mentioned

5  was awarded to eGovernment Solutions?

6    A.  That's correct.  Yes.

7    Q.  And then the actual name of the contractor

8  being Mr. Suhy?

9    A.  Correct.

10    Q.  And this was to continue the work that

11  Mr. Suhy had been doing for the CKG under the prior

12  contract?

13    A.  Yes.  Yes.  Continuing on with that type of

14  work.

15    Q.  Did Mr. Suhy in between July, August 2017

16  from the time this contract was awarded, was he

17  continuing to work with the IRS?

18    A.  No.  After the period of performance for

19  PureThink, he was not.

20    Q.  But then he started up with the same work

21  again in May of 2018?

22        MR. BEENE:  Objection to form.

23        THE WITNESS:  He -- I'm not sure what --

24  let me -- I'm not sure what the object to form is --

25  ///

76

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS   408-287-7500

November 17, 2022

```
 1   BY MR. RATINOFF:
 2       Q.  Don't worry about it.
 3       A.  -- but --
 4       Q.  We're going to argue later on if we're
 5   going to use your testimony.  So let me ask the
 6   question again so the record is clear.
 7           The Order for Supplies or Services we're
 8   looking at, once this was awarded to eGovernment
 9   Solutions, Mr. Suhy continued the work that he was
10   doing on the CKGE with Neo4j?
11           MR. BEENE:  Same objection.
12           THE WITNESS:  He continued to work.  I
13   believe at that time we were not using -- we had not
14   started to use Neo4j.  I believe we had -- they
15   brought up ONgDB.  And so we worked -- so
16   eventually -- and it was not immediate, given some
17   background clearances and other stuff that had to be
18   reactivated and all that.  But around that point in
19   time, I believe ONgDB was discussed with us along
20   with GraphGrid as sort of the larger set of
21   technical capabilities.  So I don't -- I cannot say
22   with certainty that that version of Enterprise
23   Edition that was prior was used when the work
24   started up again.
25   ///
```

77

SER_0637

BY MR. RATINOFF:

    Q.   Okay.   That wasn't quite what I was asking --

    A.   Okay.

    Q.   Let me ask a different question.   So when the Order for Supplies or Services was awarded to Mr. Suhy at eGovernment Solutions, Mr. Suhy began working again with the development of the CKGE platform.   Correct?

    A.   Yes.   Correct.   Sorry if I overcomplicated it.

    Q.   And at that time, the IRS was still using some form of Neo4j Enterprise software?

    A.   Yeah.   We were still using the prior graph database and UIs that we had before.   We were still continuing to let users work with that.

    Q.   And then you were -- okay.   And then at that point the CKGE was still in development phase?

    A.   Correct.   Yes.

    Q.   So there was only -- when you said development phase, what does that mean in terms of versus production?

    A.   So it was not for regular use.   So I contrast that with sort of those two, you know, those two things I was talking about that we started

78

1   off with.  We were allowing users to use that

2   regularly.  The disc work that John Mark Suhy was

3   picking back up on was just him working with the

4   project team members on requirements of feedback on

5   how things were progressing with the UI, changes,

6   working on understanding how to bring in the two

7   separate graph database data that was separate into

8   one and starting to work on some of the security

9   audit features.  So that -- he was working on that

10  with the project team, some testers were testing it

11  eventually later on.  So it was very -- there was,

12  you know, nobody was regularly using it as a tester

13  or anything like that.  Does that make sense?  I

14  don't know if I'm explaining it.

15      Q.  Sure.  Sure.  When you say the user

16  interface, you're talking about the user interface

17  that's integrated with the Neo4j graph database.

18      A.  No.  No.  This is a separate user interface

19  that came with the Government Edition that sort of

20  sits above the graph database, in fact above a

21  middle tier that's sort of like a micro services

22  layer.  So the UI sits above that.  That's the user

23  interface that we started work on under PureThink

24  and was the main interest to get that user interface

25  to what the stakeholders and project team wanted so

79

SER_0639

1   that user -- we could eventually have users work

2   with it.  So not the one that's integrated in -- not

3   the browser UI that essentially comes with Neo4j.

4   This is a separate -- I'll call it application.

5        Q.  But ultimately the application would allow

6   the user to interface with Neo4j through those

7   layers that you discussed.

8        A.  Yes.  Correct.

9        Q.  And you had mentioned -- I know you talked

10   about ONgDB.  We'll get there.  But prior to the

11   time the IRS started using ONgDB, was there -- did

12   it become aware of any licensing changes that Neo4j

13   made to its Enterprise Edition?  So this would be,

14   you know, around the same time that Mr. Suhy and the

15   IRS entered into the purchase order that we looked

16   at as Exhibit 103.

17        A.  I -- I don't know separately, but I think

18   through at least conversations at that point there

19   was -- it was presented or told to us about the

20   Enterprise Editions.  There were some additional or

21   I guess I would call it additional licensing

22   requirements for the Enterprise Edition.  But I -- I

23   don't -- I don't know -- I don't feel like we

24   were -- we did anything separately 'cause we weren't

25   really doing -- I mean we weren't -- whatever was

80

1  with PureThink, that product, when the period of

2  performance ended, was just sitting there.

3       Q.  Okay.  So then in May of -- they've got --

4  in May of 2018, the IRS was using some form of Neo4j

5  Enterprise in the CKGE.  Correct?

6       A.  When -- so we were not using that CKGE

7  stack once the PureThink -- pure performance ended.

8  It was just sitting there.  We were using what we

9  had already before PureThink.

10      Q.  Okay.  But was that Neo4j Enterprise or

11 Community Edition?

12      A.  It was originally the Community Edition.  I

13 think, if I remember right, in the fall -- let me

14 remember.  Yeah.  I think in the fall we made -- the

15 direction was to just get off of -- if the -- if the

16 Neo4j edition that was with PureThink had been, you

17 know, stood up, instantiated, to remove that.  So

18 whatever was with the PureThink edition, I remember

19 that going through and people just making sure that

20 we didn't have the PureThink one in use anywhere.

21      Q.  Okay.  Let me go ahead and mark the next

22 exhibit.  This will be Exhibit 164.

23           (Exhibit 164 is introduced.)

24           THE WITNESS:  Okay.

25 ///

81

November 17, 2022

```
 1   BY MR. RATINOFF:
 2        Q.  This is a document that was produced by
 3   Neo4j.  It's an email from Mr. Zagalsky to yourself
 4   and copying Vivian Daniels and Renee Gross.  I'm
 5   sorry, Goss.
 6        A.  Yes.
 7        Q.  It's dated May 22nd, 2018.  Do you have
 8   that in front of you?
 9        A.  Yes.  I do.
10        Q.  Do you recall receiving this email?
11        A.  I don't recall receiving it offhand, but I
12   don't have any reason to not believe I didn't get
13   it.
14        Q.  That's your email address?
15        A.  So that's my email and I'm good.
16        Q.  Now, the first paragraph, it says, "It has
17   come to our attention that you intend to place a
18   HUBZone set-aside sole source order with eGoverment
19   Solutions, Inc. as described in Solicitation
20   5000007221."
21        A.  Yes.
22        Q.  And "to procure consulting services for the
23   CKGE project, including consulting services around
24   the open source version of Neo4j Enterprise
25   Edition."  Do you see that?
```

82

SER_0642

MICHAEL O. DUNN                                          November 17, 2022

1      A.  Yes.

2      Q.  Is that an accurate description of what we

3  just looked at, Exhibit 103 was?

4      A.  Yes.  That makes sense.  Yes.

5      Q.  So then the actual contract with

6  eGovernment Solutions we looked at, that was

7  actually a sole source contract.  Correct?

8      A.  No.  No.  It was -- as far as I know,

9  procurement did it as an open competition.

10     Q.  Were you aware of any other competitors

11 that bid on the --

12     A.  I don't think anybody -- I -- I don't think

13 anybody else bid.  I remember doing the market

14 research, and I remember other entities that I put

15 on market research.  So as far as I know, this was

16 not a sole source.

17     Q.  But that's a question procurement would

18 have the answer to for sure?

19     A.  I guess so.  Yeah.  Because, I mean, nobody

20 else bid on it from what I remember.  But I -- I

21 don't -- I -- I don't believe it was a sole source.

22 I don't ever remember doing anything sole source

23 after that dispute of the one we had just talked

24 about.  So the eGovernment Solutions was procured

25 through a HUBZone, and I believe it was, you know,

                                                    83

 1    CKGE, which is that stack that came out of the

 2    Government Edition development work.

 3        Q.  Okay.  So just so we're clear, when

 4    eGovernment Solutions got the award, it was to

 5    essentially start work on the CKGE that had been

 6    left off with PureThink.  Is that correct?

 7        A.  That's correct.  Yes.  Those components.

 8    Yes.  But didn't necessarily mean that it was -- I

 9    don't remember at the time particularly what we were

10    going to do with the Neo4j.  I don't know if we

11    were -- I think there was even discussion, I

12    believe -- now I'm speculating.  Never mind.

13        Q.  Okay.  Yeah.  We don't want you to do that.

14        So in May of 2018 when Mr. Suhy was brought

15    back, was part of his statement of work was for him

16    to continue working on integrating the UI in Neo4j

17    into what was going to be the CKGE?

18        A.  Yeah.  It's just I don't know -- I can't

19    remember what exactly was going to be the subject of

20    Neo4j, though.  And by that I mean what version or

21    anything we were going to use.  It was -- again,

22    sort of the primary focus was on the user interface

23    and some of the security stuff, and I don't even

24    know if it -- what version of Neo4j it was even

25    discussed as what to use or not to use at that

                                                          85

 1   point.  It was really just getting his professional

 2   services back so that we could primarily start

 3   working on the UI at the beginning.  That was the

 4   primary, the important thing and some of the

 5   security stuff.

 6        Q.  Okay.  And then you'll see that there's a

 7   reference to -- looking -- going back to

 8   Exhibit 164.  So if you look at the page where it

 9   says -- let's see where we're at.  You'll see a

10   reference to the Commons Clause.  You see that?

11        A.  Yes.

12        Q.  There's a --

13        A.  Wait.  I'm sorry.  What was the attachment?

14   I had to delete a bunch just so I could --

15        Q.  Oh.  Sure.  No problem.  So looking at --

16   in the chat it would have been tab 449, which I've

17   marked as Exhibit 164.  That's not going to show,

18   but that's what I'm going to refer to as 164.  If

19   you look at page 2 of 3, there's a -- it's -- the

20   Bates number at the bottom is 19999.  Do you see

21   that?

22        A.  Now, I'm still -- I'm sorry.  I'm trying

23   to --

24        Q.  I can share my screen if --

25        A.  If you could do that, because I'm trying to

                                                        86

1   interest in that, it didn't matter what else we had,

2   really, because there was hardly any other -- you

3   know, we had users and interested users, but it was

4   about the user interface, people wanted changes to

5   that, there were issues with doing accounts

6   management, and how the old UI is, so we wanted

7   something improved.  So those were the primary areas

8   of work that were the most important.  And I don't

9   ever necessarily remember us talking specifically

10   about Enterprise Edition this or Enterprise Edition

11   that.

12          I will say I don't think anybody -- and I

13   feel this from the directors and anybody, there

14   was -- there was openness.  It was just not really,

15   you know, for whatever product.  It wasn't really

16   particular to any particular product.  It was just

17   the primary interest was working on the user

18   interfaces and those priorities that I mentioned.

19       Q.  So the user interface was important for --

20   to get people to be able to use graph database

21   software such as Neo4j.  Correct?

22       A.  Yeah.  Any -- to -- yes.  I think that's

23   perfectly good statement.

24       Q.  But in other words, the user interface

25   wasn't useful other than to interface with group

93

1    it's probably 2019, 2020.  I'm still in 2018.

2            So for 2018's purpose, or at that time

3    the -- let me actually, maybe this will help.

4    Actually, let me ask you about this email real

5    quick, and then we can move to that.

6            You'll see this is an email from Mr. Suhy

7    to yourself --

8        A.  Okay.

9        Q.  -- dated May 22nd, 2018.

10       A.  Okay.  Yes.  I see it.

11           (Exhibit 165 is introduced.)

12   BY MR. RATINOFF:

13       Q.  We'll mark it Exhibit 165.  This email was

14   produced by Mr. Suhy or one of his entities.  Do you

15   have any reason to believe this isn't an email that

16   was sent to you by Mr. Suhy?

17       A.  I don't think -- no.  I don't.

18       Q.  No reason to believe this isn't a true and

19   correct copy of an email?

20       A.  No.  I don't.  No issues.

21       Q.  Do you understand why Mr. Suhy was sending

22   you this email from your perspective?

23       A.  I have to --

24       Q.  Go ahead and take a minute.

25       A.  Okay.  I've read it.  Yeah.  So he's -- if

                                                    96

1  I'm reading this right, he's describing sort of

2  using what's called the Neo4j Enterprise open source

3  version and what that means as it relates to AGPL

4  and then the Free Software Foundation's guidance on

5  the matter, et cetera.

6      Q.  And did you have an understanding between

7  what we were just looking at as Exhibit 164 and 165

8  that there was two different versions of Neo4j 3.4

9  Enterprise Edition?

10     A.  There were two different versions?  I

11  don't --

12     Q.  Let me ask it a different way.

13         Did you understand that there was two

14  different licensing models for Neo4j 3.4 Enterprise

15  Edition?

16     A.  I can't say that I did.  No.

17     Q.  Did the IRS have any -- or did the IRS look

18  into anything related to whether Neo4j could add the

19  Commons Clause to its Enterprise Edition software

20  under the AGPL?

21     A.  I -- I don't believe it was done.  No.

22     Q.  So did the IRS ever contact the Free

23  Software Foundation to see if Neo4j was wronging

24  Mr. Suhy in adding the Commons Clause to the AGPL?

25     A.  I never did and I don't know any -- I don't

97

1   remember anybody else contacting them or anything.

2   No.

3       Q.   Did the IRS take anything that Mr. Suhy

4   represented as far as Neo4j adding the Commons

5   Clause, that being improper?  Just assumed that

6   Mr. Suhy was correct?

7       A.   I -- I don't -- I don't feel like anybody

8   assumed -- the way I would express it is I don't

9   feel like anybody assumed necessarily one way or the

10  other.

11      Q.   You mean -- you say assume.  You mean the

12  IRS --

13      A.   Yeah.  Yeah.  Reading his -- reading his

14  email or that kind of stuff, you know, taking a

15  particular side at that point or anything.

16      Q.   So as of that time in May 2018, the IRS

17  didn't have an opinion on or position on whether

18  Neo4j adding the Commons Clause to the AGPL version

19  3.4 was improper or not?

20      A.   I don't think so.  No.  I don't feel that

21  way.

22      Q.   Hold on just a second.  I'll put the next

23  exhibit in.  This maybe will help clarify what

24  version the IRS was using at that point.

25      A.   Okay.  Email dated 6/14/2018?

98

SER_0649

1      Q.  Yeah.

2      A.  Okay.  Yep.

3      Q.  Okay.  And then you'll see this is produced

4  by iGov, and it's an email that's dated June 14,

5  2018.  It's from yourself -- at least the last email

6  is from yourself to Mr. Suhy.  And you'll see below

7  there's an ongoing exchange between yourself and

8  Mr. Suhy.

9      A.  Yeah.  Switching to community?

10      Q.  Yeah.  Let's go ahead and go all the way

11  down to the bottom.

12      A.  Okay.

13      Q.  First, do you have any reason to believe

14  this email exchange, that this is a true and correct

15  copy of the email exchange you had with Mr. Suhy?

16      A.  I don't have any issues.

17      Q.  Okay.  So then looking at the first email

18  in the chain, which would be at the bottom --

19      A.  Yes.

20      Q.  -- June 14th, 2018.

21      A.  Okay.

22      Q.  It's from you.  It says, we got a few

23  questions regarding this option switch our CKG

24  instance from having 3.2 Enterprise to 331 Community

25  Edition.

                                                    99

```
 1        A.  Okay.
 2        Q.  Does that help refresh your recollection as
 3   to what the IRS was using in the CKGE as far as
 4   Neo4j software goes as of June of 2018?
 5        A.  Sure.  If that is that was it, yeah.  Then
 6   that's it.
 7        Q.  So as of June 2018, CKGE was using 3.2
 8   Enterprise Edition of Neo4j?
 9        A.  Yeah.  It would have had that.  Yeah.  Yep.
10   That will work.
11        Q.  Then why were you asking Mr. Suhy about
12   switching from 32 Enterprise to 3.3.1 Community
13   Edition?
14        A.  Kind of -- I would think back to sort of
15   what I was talking which was given the amount of
16   users, the demand requirements, just it wasn't
17   necessary to have any of the Enterprise features.
18   And so, you know, I think we may have been, you
19   know, just wondering just to use the Community
20   Edition instead of whatever was happening with the
21   Enterprise Edition or moving forward.
22            So that's my general view is the
23   requirements of Neo4j from our standpoint I don't
24   believe required any of those Enterprise features
25   about the clustering or any of that.  So I would
```

100

1    have been asking him sort of, well, what would it

2    take to just switch out from one -- you know, to the

3    Community Edition.  Like technically level of

4    effort, what would it have been.

5        Q.  And then you'll see Mr. Suhy responds.  I

6    think he quotes the Commons Clause again, which we

7    saw in the prior exhibit.

8        A.  Okay.

9        Q.  By the way, I don't think I actually marked

10   this exhibit.  I believe this would be Exhibit 166.

11           (Exhibit 166 is introduced.)

12   BY MR. RATINOFF:

13       Q.  Turning back to Exhibit 166, you'll see

14   there's an email response to your questions for

15   Mr. Suhy.  And if you go to the bottom of, it's

16   231.001, so it's really the first page.

17       A.  Okay.  I think I see it.  Yes.

18       Q.  And Mr. Suhy says, "I don't think you

19   should consider moving to Community."

20       A.  Yeah.

21       Q.  And if you see it, he references, "You will

22   be much safer adopting the open fork we manage than

23   moving to Neo4j's Community Edition."

24           What did you understand that to mean?

25       A.  That there was this open fork version that

101

1   was, I guess, available or out there for potential

2   use.

3      Q.  Why would the IRS move to a open fork Neo4j

4   Enterprise versus just using Neo4j Community Edition

5   if it didn't need new features?

6      A.  I don't know.  I think that was what John

7   Mark Suhy's, you know, reply to me was.  Again, I

8   was thinking of just using the Community Edition.  I

9   think he was suggesting not just using the open

10   fork, which would have been, I guess, an open source

11   version with the, you know, those Enterprise

12   features or whatever Enterprise features were

13   available as part of that fork.  So I think that's

14   him, you know, arguing back to, you know, his advice

15   is to go this way versus Community Edition.

16      Q.  But you went ahead and took his advice as

17   far as sticking with Enterprise Edition?

18      A.  I don't -- I'm not sure at this time what

19   the decision was.  What I remember was it was around

20   the topic of ONgDB.  And that's why I remember most,

21   you know, and GraphGrid and stuff.  But -- I mean,

22   yeah, so I don't know -- I don't know what we

23   were -- if we were using -- I don't think we did

24   the -- I'm trying to remember when some of the

25   events about ONgDB and what was happening with that,

102

1    what time that was, and I can't remember that.

2         Q.  Yeah.  We'll get there.  I'm just trying to

3    go in a linear fashion.

4         A.  I know.  I'm sorry.

5         Q.  That's okay.

6         A.  I'm trying to fit things together.  But

7    what I see there is whatever was happening was that

8    discussion.  And again, I was -- I was looking at it

9    from the point of Community Edition just being

10   sufficient.  And I think he was arguing that this

11   open source fork one was available and would have

12   these, you know, would have these additional

13   features.

14        Q.  Then as far as, as far as the Enterprise

15   Edition went, did you have an understanding at that

16   time that a commercial subscription to Neo4j

17   Enterprise would come with support?

18        A.  Yes.  Yes.  I believe there was some

19   professional services -- yeah.  As far as I know,

20   yes, in my mind.  There was some degree of

21   professional services, or I call professional

22   services that comes with the licensing.

23        Q.  So if you buy a commercial license, it's

24   not just -- for Neo4j Enterprise, it was not just

25   about additional features.  It's also about -- it

103

SER_0654

1   also includes support services.  Correct?

2        A.  Yes.

3        Q.  So there's more of a benefit than just the

4   features themselves to the purchasing a commercial

5   subscription to Neo4j Enterprise, then.  Correct?

6   In other words, if you're not using the features,

7   you're still getting additional benefits.

8        A.  From like the professional services help,

9   those kinds of stuff, yes.  So I think you can

10  get -- those are -- those are additional features --

11  those are additional benefits to it than just the

12  features.  Yes.

13       Q.  And then moving on to the bottom of this,

14  you'll see -- I think you might have referenced this

15  before, but it says, "I.e., GraphStack (renamed from

16  Neo4j Government Edition) is a competing platform

17  alternative to Neo4j Enterprise commercial

18  packages - with exact feature set because of the

19  open source nature of Neo4j."

20       What was your understanding of what

21  Mr. Suhy was referring to, this GraphStack?

22       A.  Sorry.  I'm just looking over it.  Okay.

23  So the GraphStack at that point was, I would assume,

24  involving that version of Neo4j.  And I don't know

25  at that time how -- I really don't know how I would

104

1    BY MR. RATINOFF:

2        Q.  Okay.  At that time in June of 2018, had

3    the IRS adopted GraphStack for the CKGE --

4        A.  I -- I don't think so because -- and I may

5    be getting ahead of you.  So tell me if I stop.  But

6    the -- there was a process that happened with

7    GraphGrid and discussions about GraphGrid, and then

8    we moved forward with submitting GraphGrid, which

9    included GraphStack elements and ONgDB.  I feel like

10   it was later in the summer or sometime, but I feel

11   like it took -- it was not -- I don't feel like

12   everything happened at that time period.  I feel

13   like we're still back to like -- there's still time

14   ahead before we settle ultimately -- as you probably

15   know, you know, we settled on getting GraphGrid and

16   all of that bundle.  So that's sort of where I'm at.

17       Q.  Okay.  And then during that time did you

18   have any -- did the IRS have any conversations with

19   Neo4j about possibly adopting, at least as part of

20   that project, Neo4j Enterprise under a commercial

21   license?

22       A.  I don't -- no.  I don't -- I don't think at

23   that time -- I don't remember much -- I didn't and I

24   don't remember other people talking to Neo4j at all

25   during that time.  No.

108

1    Q.  Okay.  Let me go ahead and mark the next

2  exhibit.  That will be Exhibit 167.

3          (Exhibit 167 is introduced.)

4          THE WITNESS:  Is the end of it 061?

5  BY MR. RATINOFF:

6    Q.  Yeah.  The first page would be 061

7  through -- it's quite a long email --

8    A.  Okay.

9    Q.  -- 067.

10    A.  Okay.

11    Q.  What I just marked as Exhibit 167 is an

12  email chain between -- it looks like it's between --

13  well, there's multiple emails in it, but the last

14  email is between Lisa Rosenmerkel and Jason Zagalsky

15  of Neo4j.  Do you see that?

16    A.  Yep.  Okay.  Yep.  I do.

17    Q.  And then if we scroll down to 063, there's

18  an email from Lisa that says, "Jason - Thanks for

19  reaching out.  As I am sure you will understand

20  given the state of the IRS budget, our resources are

21  extraordinarily limited in all avenues.  Those

22  restricted resources prevent us from moving beyond

23  Neo4j v. 3.2 at this time."  Do you see that?

24    A.  What page?  I'm sorry.  It's cutting off

25  the -- all I see is like N4J_020061, and I don't see

109

MICHAEL V. DUNN                                    November 17, 2022

1   anything else.

2        Q.  Yeah.  If you scroll down, it would be page

3   3 of 7 of the PDF.

4        A.  Okay.  Cool.  Okay.  I'm there.

5        Q.  Then you'll see there's a prior email --

6   actually just start from beginning here.  If you go

7   to the bottom, you'll see -- we previously looked at

8   that email from Jason that he sent to you on

9   May 22nd, 2018.  You see that at the very bottom?

10       A.  Yes.

11       Q.  Starting page 064.

12       A.  Okay.

13       Q.  Then we'll move up here.  You'll see that

14  Jason follows up with you requesting confirmation.

15  You see that?

16       A.  Yes.  I do.  I do.  I do.  Yeah.  The time

17  is Tuesday, May 22nd.

18       Q.  Yeah, 6:59 p.m.

19       A.  Okay.  I'm there.

20       Q.  And then in response to that email from

21  Jason to you, Lisa says, Thanks for reaching out.

22  As I'm sure you'll understand given the state of the

23  IRS budget, et cetera.  Do you see that?

24       A.  Yes.  I do.

25       Q.  There's a reference to Neo4j 3.2.

                                                        110

1    A.  Okay.

2    Q.  So back to May 2018, it looks like the IRS,

3    whatever it was working with at the time in the

4    graph environment, it was using Neo4j Enterprise 32.

5    Does that sound fair?

6    A.  I think that's -- that's perfectly fair.

7    Q.  And then at this point you'll see that Lisa

8    says, if your team would be up for providing a demo

9    of the products you recommend we consider when

10   resources become available, we will gladly set that

11   up.  Do you see that?

12   A.  Yep.

13   Q.  And if you keep going up, you'll see that

14   Lisa -- it is the email from Lisa to Jason dated

15   May 25th, 2018 at 10:40 -- I'm sorry, 10:04 a.m.  Do

16   you see that?

17   A.  Wait.  The 25th at 10:04.  Yes.  I'm there

18   on page 2.

19   Q.  It says, "Hi Jason - I think both meetings

20   sound good."  And "I would at the very least like to

21   loop in Chris Hess and Jeff Butler."

22   A.  Okay.

23   Q.  And moving up you'll see -- I'm just trying

24   to refresh your recollection to see if this is now

25   bringing back in your memory if you had an actual

111

November 17, 2022

1   Q.  All right.  Do you recall having a meeting

2   with Jason within the next couple months after May,

3   so say July 2018?

4   A.  No.

5   Q.  Let me go ahead and drop this next exhibit.

6   It will be Exhibit 168.

7        (Exhibit 168 is introduced.)

8        THE WITNESS:  Okay.  File 130?

9   BY MR. RATINOFF:

10   Q.  Yeah.

11   A.  Okay.

12   Q.  I'm sorry.  You said file 130?

13   A.  Yes.  I'm looking at file --

14   Q.  Oh.  Bates number ending in 130.  Correct.

15   Let me just get it clear for the record so we're

16   talking about the same thing.

17        So I just marked as Exhibit 168 an email

18   that ends in a chain dated July 27th, 2018.  Bates

19   number at the bottom of the first page is 20130.

20   This is an email produced by Neo4j.  And you'll go

21   ahead and look now -- let's go down to the bottom of

22   this email chain, so this is going to be starting

23   page 133 or Bates number ending in 133.  And you'll

24   see --

25   A.  Okay.  Very bottom.  Right.

113

Q.   Sure.  And it starts off actually on 132.
It's an original appointment from Michael Dunn sent
on May 24th, 2018, and you'll see there's a list of
recipients including yourself, Lisa, Jeff Butler,
there is a JC Garnish, Brian Raub, Jason --

A.   Yep.

Q.   -- and Chris Hess and then Matthew Scoffic.

A.   Yep.  Matt Scoffic.  Yes.

Q.   Subject:  Discussion of Neo4j options.

A.   Yep.  Yes.

Q.   Do you have a recollection now of setting
up a meeting with Neo4j in July of 2018 to talk
about Neo4j products and seeing a demo of the newer
Neo4j Enterprise software?

A.   I still don't.  No.  Was I there?

Q.   I don't know.

A.   I said --

Q.   I assume that, you know, is it a safe
assumption that you were the one who organized the
meeting if you're the sender of the appointment?

A.   I'm -- on that email, it looks like I
sent -- on that, yeah, on that email looks like I
sent it out to everybody, and then I said Lisa is
going to pick everybody up at the guard's desk.  So
I -- I don't think I was there.

114

SER_0661

1    Q.   Okay.  Going up to Lisa's next email, it

2    says, "Hi Jason - I spoke with Mike about your

3    concerns regarding the amount of storage included in

4    the quote information.  Mike estimates we are

5    currently using about 300 gigabytes."  Do you see

6    that?

7        A.   Yes.  I see that line.

8        Q.   Do you have an understanding what she's

9    referring to your estimate?  I'm assuming Mike is

10   you.  Is that correct?

11       A.   Yeah.  Must have been me.  I can't think of

12   anybody else.

13       Q.   300 gigabytes, is that in reference to

14   memory?

15       A.   Probably, because if that was the size of

16   the graph -- the data together, I think we were

17   estimating like how much would be in memory or how

18   much storage it would be.  So that -- that seems to

19   fit with sort of the size of the data we were

20   talking about.

21       Q.   Okay.  By the way, I just noticed this

22   document wasn't designated as confidential, so I

23   just want to make sure -- maybe we can substitute

24   during the break or get it stamped, but I wanted to

25   let everyone know that this document should be

115

SER_0662

NEO4J v. PURETHINK                                              November 17, 2022

```
 1    designated by Neo4j as confidential.  I'm really
 2    sure why it's not actually stamped on the document.
 3    It should be treated as such under the protective
 4    order.
 5            Then you'll see Jason responds to Lisa,
 6    "For large memory configs, we build in blocks of 24
 7    cores/256 gigabytes RAM.  So even if you don't need
 8    more than 12 cores, with 512 gigabytes of memory
 9    (gives you some headroom on the 300 gigabytes you
10    have), you will be licensed for up to 48 cores, if
11    you want to cut your servers back from 1 terabyte of
12    RAM to 512 gigabytes of RAM."
13            (Reporter interruption.)
14    BY MR RATINOFF:
15       Q.  So looking at the email where Lisa says we
16    build -- sorry -- where Jason says we build in
17    blocks of 24 cores, then there's a reference to 300
18    gigabytes, do you have a better understanding of
19    what the 300 gigabytes was in reference to as far as
20    the server memory versus storage memory?
21       A.  Yeah.  Let me just read it -- I think I
22    agree.  Yeah.  So when I told Lisa 300 gigabytes, it
23    was -- it was -- when I would have thought that I
24    would have replied to her was how big of, you know,
25    RAM or storage, and since to bring the graph into
```

116

1   memory, if you brought the whole graph in, we are

2   essentially saying, well, we have about 300

3   gigabytes of data, so that's what would be brought

4   in.  I figure she's passing that on to Jason and

5   kind of talking about those parameters.  And then

6   Jason is replying sort of, okay, taking that

7   information, here's how we would price that out

8   and -- and sort of here's what the pricing would be.

9       Q.  Okay.  From what Jason's written here, is

10  that a pretty comprehensive estimate of what the

11  CKGE needs were at that time?

12      A.  Yeah.  Because this is the way that I'm

13  reading it is we were talking about the size, 300

14  gigabytes.  And then where he says even if you don't

15  need more than 12 cores.  So I'm assuming we were

16  still talking about like 12 cores.  Or somebody was

17  telling him about 12 cores that brought it up.  I

18  mean, I remember -- like I said, going back in time,

19  I was using 12 cores.  So I'm sure it was discussed

20  then, and he's replying yeah, even if not 12 cores,

21  here's the options.

22      Q.  Okay.  And then so as of -- I know we

23  talked about cores in 2017, but in July of 2018, was

24  the IRS still using only 12 cores for the CKGE

25  platform?

117

1    wanted to, I don't -- I don't know if we would be

2    using 12 cores.  My belief is we wouldn't.  Maybe

3    four.  Maybe -- maybe eight.  I don't know.  Because

4    we are talking about dozens of people an hour maybe

5    logging in and running a query or two.  So it wasn't

6    that many concurrently, if that makes sense.

7         Q.  Okay.  But that's as of approximately

8    July --

9         A.  Yeah.  As of that time.  Yes.

10        Q.  But things changed as CKGE became more

11   widespread adopted amongst the folks --

12        A.  Yeah.  Over the years.  Yeah.

13        Q.  That would require additional cores and

14   memory and such when the number of users increased?

15        A.  Yes.  I think it could.  Yes.

16        Q.  Okay.  I know we've been going for awhile.

17   Probably a good time -- I'm going to switch topics,

18   so maybe take a break right now.  And actually, if

19   you don't mind, before we do that, just a real quick

20   question.

21        At the very end of the email Lisa says --

22   and this would be the top email.  Lisa says to

23   Jason, "Thank you for providing the pricing.  It

24   will be an important component for planning

25   purposes."

120

MICHAEL C. DUNN                                    November 17, 2022

1      Do you have an understanding of why pricing
2  was important to the IRS for planning purposes at
3  that time?
4      A.  Well, if -- if there was availability of
5  money ahead, if we had the money ahead, would -- you
6  know, and we felt like we, you know, needed some
7  additional capabilities, my -- my -- I'm
8  interpreting her as we have this in case something
9  changes ahead for us, and that way we know sort of
10  the cost and what you get with it, et cetera.
11      Q.  So in other words, there's an understanding
12  that the paid commercial license with Neo4j wouldn't
13  necessarily increase whatever amount was budgeted
14  for the CKGE if the IRS were to go forward with a
15  paid subscription?
16      A.  I'm sorry.  Can you say it one more time,
17  please?
18      Q.  Sure.  So another way of looking at it is a
19  commercial subscription to Neo4j Enterprise would
20  necessarily increase whatever budget was needed for
21  continuing to develop the CKGE platform.  Correct?
22      A.  Yeah.  We would have to have additional
23  money.
24      Q.  At that time did the IRS -- or did your
25  particular division see if any additional money was

                                                    121

SER_0666

1   available for commercial subscription for Neo4j

2   Enterprise?

3       A.  So I feel like that was -- where she was

4   talking about I have spoken at length with Jeff, so

5   my -- you know, they would have been talking about

6   what monies were available, what were already

7   obligated.  So I'm assuming that that was part of

8   that conversation.

9       Q.  But you weren't part of that conversation.

10      A.  I don't -- she was saying she spoke -- she

11  had her own conversations with Jeff.  I mean, I -- I

12  was part of conversations about, you know, as we

13  were discussing there, how much sizing and

14  et cetera, usage.  I feel like -- I don't know if --

15  I don't remember being there with Lisa -- I remember

16  being there in a number of conversations about sort

17  of using the money and how much money we had and

18  talking to Jeff, but I don't know if that was that

19  exact conversation.

20      Q.  Okay.  So you aren't privy to any

21  conversation where it was decided that an additional

22  156,000 per year for Neo4j Enterprise subscription

23  would have been a problem as far as obtaining funds?

24      A.  I was in a conversation with Jeff and

25  others that were providing sort of the pros and cons

122

SER_0667

November 17, 2022

1   of different, you know, options or what -- what

2   could be done.  So I was in at least one meeting

3   with Jeff and others as we were discussing it.  And

4   I don't know if that was -- let me see if I -- it

5   must have been somewhere around there because this

6   was what, June?

7       Q.  July.

8       A.  July 27th.

9       Q.  2018.

10      A.  Yeah.  So I would have been -- I would have

11  been involved at least a conversation.  And I know I

12  was involved with one conversation where we were

13  talking about just the options, and Jeff was sort of

14  listening to different people's view.  And then I

15  think Jeff -- Jeff would have decided at that point,

16  you know, we didn't have -- we didn't have the, you

17  know -- I think it was in the context of, you know,

18  what about the options of any open source and how to

19  use that money.  And I think Jeff determined that at

20  that point not to spend on the Enterprise Edition.

21  And -- and either look at other options.

22      Q.  Other options being just continuing to use

23  open source Neo4j for free?

24      A.  Yeah.  One of those -- I don't think -- I

25  don't think there was any -- I don't think at that

123

1   time we were talking about any other graph databases

2   and stuff.  So I feel like it was just what to do

3   with that, and he was thinking about how to spend

4   the different money.

5              MR. RATINOFF:  Okay.  All right.  I think

6   this is a good time to take a break.  It's 11:42.  I

7   know it's sort of lunchtime or past lunchtime.  Do

8   you want to take a little bit longer break right

9   now?  I still have quite a bit of ground to cover,

10  so I want to make sure you're doing okay on your

11  end.

12             THE WITNESS:  I'm okay.  I'm just -- I'm

13  just hoping to answer your questions as fast as I

14  can so I can get back to work.

15             MR. RATINOFF:  Understood.  So I know we're

16  kind of at lunchtime on the West Coast, too.  It's

17  11:43.  Does everyone want to just take a half an

18  hour break?  Is that fair?

19             MR. TEPPER:  Before we make a determination

20  about a half-hour break or anything, I'm going to

21  ask, you know, Michael what time does -- you know,

22  because it's 2:42 where we are.  What time do you

23  typically finish up your day?

24             THE WITNESS:  Well, it would be -- you

25  know, I guess I can normally clock off at 3:30.  But

                                                      124

```
 1                    AFTERNOON SESSION
 2           THE VIDEOGRAPHER:  We are now back on the
 3    video record.  The time is 12:16 p.m.
 4    BY MR. RATINOFF:
 5       Q.  Let's go ahead and pick up where we left
 6    off.  I believe we were in the summer of 2018.
 7    Definitely in summer of 2018 the IRS had gone
 8    forward with working with Mr. Suhy via eGovernment
 9    Solutions.  Correct?
10       A.  Correct.  I think at the time we're at the
11    award has been made, and he's, you know, being
12    on-boarded and starting to talk about sort of ideas
13    and stuff.
14       Q.  Okay.  And then the ideas as far as where
15    the CKGE environment was going as far as --
16       A.  Yeah.  Yes, sir.  What the interests were,
17    you know those kinds of things, what the project
18    team was interested in, plans, that kind of stuff.
19       Q.  And so was he being asked or he was taking
20    input from the IRS to come up with some sort of
21    architecture for what the CKGE environment would
22    look like?
23       A.  Yes.
24       Q.  All right.  Let me -- as far as the CKGE
25    environment, it was still decided to use some form
```

126

1    of Neo4j graph database software.  Is that the graph

2    database for the CKGE?

3        A.  Yes.  Sorry.  Yes.  Because, again, I'm

4    trying to remember when GraphGrid and all that came

5    into context, which was either around this time or,

6    you know, shortly -- shortly thereafter where we

7    started getting into ONgDB.  But whatever we had at

8    that time would have been sitting there.  But I

9    believe John Mark would have been cleared, because

10   he would have still had his clearance.  So we would

11   have been sort of -- sort of talking about, you

12   know, plans, future requirements, all of that, and

13   would have been, you know, talking about whatever --

14   whatever graph that database, whatever version it

15   was that we had.

16       Q.  Okay.  So let me pinpoint that time for

17   you.  Here's what I'm dropping in the chat.

18       A.  Okay.

19       Q.  It should be tab 454, which I'm going to

20   mark as Exhibit 169.  You'll see it's an email

21   exchange between yourself and Mr. Suhy.

22       A.  Okay.

23           (Exhibit 169 is introduced.)

24   BY MR. RATINOFF:

25       Q.  With the last email dated August 13th,

127

1    2018.  You see that?

2         A.  Okay.  I got it up.  Yes.

3         Q.  Do you have any reason to believe this

4    isn't a true and correct copy of an email exchange

5    between yourself and Mr. Suhy?

6         A.  I have no issues.  Yes.

7         Q.  And just for the record, this was an email

8    that was produced by iGov, Inc.?

9         A.  Okay.  Yes.

10        Q.  You'll see at the very bottom of the email

11   exchange -- at the very beginning I guess, so that

12   would be on 217.0002.

13        A.  Okay.  I'm there.

14        Q.  You ask John Mark would it be easier to go

15   ahead and use ONgDB now in CKGE or wait and deploy

16   CKGE with Neo4j 3.3.2 we have, and then later

17   transition to ONgDB.  Why were you asking him that?

18        A.  I mean I -- go ahead and use ...  Maybe

19   just level of effort and complexity.  Sort of

20   proposing cons of each.  Because my assumption would

21   be by this time the topic of ONgDB is there and the

22   decision was made, I'm assuming at this time, that

23   we were -- we would go with ONgDB.  If not, it was

24   just talking about sort of the pros and cons of it.

25        Q.  And what was your understanding of what

128

SER_0672

November 17, 2022

1    ONgDB was at that point?

2        A.  At that point, my understanding was ONgDB

3    was an open source available graph database that

4    was -- that used the GitHub core source code

5    compiled and then additional plug-ins were added to

6    it and made available through The Graph Foundation's

7    website.  Or through there.  Sorry.

8        Q.  Okay.  Let's break that down.  So as far as

9    when you say ONgDB core source code, are you

10   referring to Neo4j Community Edition?

11       A.  I didn't -- it was not the binaries.  It

12   was my understanding from -- and this was from John

13   Mark Suhy.  I believe at that time because we were

14   talking about GraphGrid, and it was part of the

15   GraphGrid bundle.  Ben Nussbaum may have been on the

16   line, too, but it was a description that there

17   was -- it was not the binaries.  It was the source

18   code itself that came from a GitHub repository that

19   Neo4j had.  And that source code was taken and

20   compiled into binaries and added the plug-in to make

21   the ONgDB version that was made available.  Does

22   that make sense?

23       Q.  Sure.  So it was your understanding that

24   ONgDB was based on Neo4j source code.  Correct?

25       A.  Yes.  Git -- sorry.  Go ahead.

129

SER_0673

1    Q.  So the Neo4j source code, Neo4j would own

2    the copyright to that.  Correct?

3    A.  Yes.  I would assume it would be available

4    based on whatever Neo4j allowed it to be used from.

5    Q.  When you are talking about the plug-ins,

6    are you referring to Enterprise-level features that

7    are enabled by plug-ins?

8    A.  Yeah.  I think so.  That makes sense.

9    Q.  Okay.  So your understanding was then ONgDB

10   was essentially the feature equivalent of Neo4j

11   Enterprise at that time?

12   A.  I don't know if I could say it was one for

13   one.  I just understood that there were the

14   Enterprise -- there were Enterprise features that

15   were added to the core -- the Neo4j core source

16   code, compiled, and then added to it to make the

17   ONgDB in that those were, or I guess somehow could

18   be connected to Enterprise version.  I feel like

19   that that term was used or at least the types of,

20   you know, with the -- I guess clustering and all

21   that stuff.  So I'd say yes, I think.  I would think

22   it had similar features.

23   Q.  Okay.  Features meaning Enterprise-level

24   features?

25   A.  Yeah.

130

SER_0674

Q. Then as far as -- going back to the Neo4j
Community Edition, I had asked you whether you
understood there was a limitation of cores, and
maybe I wasn't as artful about it. But did you
understand Neo4j Community Edition only allowed up
to the use of, from a performance standpoint, four
cores?

A. I can't remember that, but I don't see any
reason that I would have known that at some prior
point in time. So I would say yes, probably at that
point I would have known or been aware of it. Yes.

Q. Did you have any understanding of whether
there was any limitations on the number of cores you
could use with ONgDB?

A. No. I -- I did not -- I don't remember
ever hearing about limitations of cores.

Q. But you understood that as far as
purchasing a Neo4j Enterprise subscription, the
pricing would be based on the number of cores at
least in part. Correct?

A. Yeah, I think so based on what we went over
today and stuff, yeah, it would be, there is a core
element to the Enterprise pricing. Yes.

Q. In addition to obviously the add-ons, like
the support and whatnot.

131

1    A.  Yes.

2    Q.  All right.  So turning back to this email,

3  Mr. Suhy recommends to go with ONgDB version 3.4.x.

4  Was that the current version of ONgDB at that time

5  that you were aware of?

6    A.  Yes.  What -- yeah.

7    Q.  And what license -- and what licenses did

8  you understand that ONgDB was offered under?

9    A.  I -- I don't know if it was -- I can't

10  remember exactly what the ONgDB -- if The Graph

11  Foundation had a particular licensing, I can't

12  remember what that would be.  But I understood it to

13  be, you know, open source in that the -- the

14  requirements it was stated that, you know, we would

15  meet our requirements and we could use it.

16    Q.  For free.

17    A.  Yes.  For free.  It was -- it was

18  downloadable from The Graph Foundation website.  You

19  could use it for free.

20    Q.  Was the -- to your knowledge, was it

21  licensed under the AGPL version 3?  ONgDB, that is?

22    A.  It probably was.  I can't remember exactly,

23  but I don't -- that probably makes sense.

24    Q.  And if you remember before the break we

25  were talking about couple of emails, one sent by

132

SER_0676

1   Jason and one sent by Mr. Suhy.  There was reference

2   to Commons Clause.  Do you recall those emails?

3       A.  Yes.

4       Q.  And were you aware of whether at that time

5   that The Graph Foundation or Mr. Suhy had removed

6   the Commons Clause from the license that was

7   governing ONgDB 3.4?

8       A.  Yeah, because I don't -- yes.  Because I

9   don't remember it being discussed.  So it would have

10  been removed or whatever, was taken from the source

11  code off of GitLab, whatever that was releasable by.

12  That's how I understood was carried forward from

13  that.

14      Q.  I didn't get -- I didn't quite follow that.

15  I apologize.  To clarify, so you understood -- so

16  you understood that the license that ONgDB was under

17  was the AGPL version 3 but with the Commons Clause

18  removed by Mr. Suhy?

19      A.  Yeah.  I don't -- I don't remember if he

20  removed it.  I don't remember it being discussed.  I

21  just remember the description of taking the core

22  source code from GitLab, compiling it, and then, as

23  we discussed, adding the additional capabilities

24  that would be the ONgDB release.  So I can't

25  remember the Commons Clause being part of the

133

1    discussion.  I can't remember if he said that he

2    took it out or what, but I can't say that.  Yeah.  I

3    just can't say that.  In my mind, I'm tracing it

4    from the GitLab source code, whatever that licensing

5    was, and then released by ONgDB under their

6    licensing.

7        Q.  Okay.  So you understood that ONgDB was

8    released under a license issued from The Graph

9    Foundation?

10       A.  Yeah.  Well, yes.  In this sense, that for

11   a member of the ONgDB or Graph Foundation website,

12   they were saying they were releasing it under

13   this -- this licensing agreement.  The Graph

14   Foundation itself.

15       Q.  So you understood The Graph Foundation was

16   the licensor for the ONgDB?

17       A.  Yes.  That was -- that was -- yes.  I think

18   so.  Yeah.

19       Q.  And it wasn't -- Neo4j was not the

20   licensee -- sorry.  Strike that.

21           So in other words, Neo4j was not the

22   licensor for ONgDB.

23       A.  Say that one more time, please.

24       Q.  So Neo4j, in your mind, was not the

25   licensor of ONgDB.  Meaning Neo4j -- Neo4j wasn't --

134

1   wasn't -- wasn't the -- wasn't the entity that was

2   licensing ONgDB.

3        A.  Right.  The Graph Foundation was.

4        Q.  I see.  Okay.  And where did you -- how did

5   you come to that conclusion?

6        A.  Well -- well, I mean, we had -- I remember

7   having conversations with John Mark Suhy walking

8   through, talking about the Graph Foundation, the

9   licensing, the entity itself and so -- you know, it

10  was sort of -- I was -- I guess I was looking at it

11  as -- as what the Graph Foundation was doing.

12       Q.  But to your knowledge, the actual software

13  functionally, ONgDB, was Neo4j Enterprise?

14       A.  My understanding it was not the Enterprise.

15  It was the core source code from GitLab, Neo4j's

16  GitLab, whatever that licensing was of that core

17  source code brought over, and then the additional

18  elements, whatever elements ONgDB, The Graph

19  Foundation added onto that.  That's how I understood

20  from my point of view who was -- who was

21  distributing and licensing it and the follow-through

22  from whatever the licensing was of the Neo4j core

23  that was off of GitLab.  That's how I understood it.

24       Q.  Okay.  And as far as the -- you said the

25  core, then there was the additional features that

135

SER_0679

November 17, 2022

1   Graph Foundation enabled.  Was it your understanding

2   that they were creating Enterprise features that are

3   equivalent to what was in Neo4j Enterprise

4   independently?

5       A.  Yeah.  I would -- I think -- yeah.  I mean,

6   I understood that they were adding in things that

7   the Neo4j, Inc. Enterprise Edition had as Enterprise

8   features.  They were in ONgDB.  That was being added

9   to the core that was compiled.

10      Q.  Okay.  So then the source code for the

11  Enterprise features didn't, in your mind, come from

12  Neo4j?

13      A.  No.  I don't think.  I mean, I -- I -- no.

14  I can't offhand think that, oh, they downloaded them

15  somehow or what have you from Neo4j itself.

16      Q.  Did the IRS ever do any independent

17  investigation to determine whether ONgDB was

18  entirely based on Neo4j's source code?

19      A.  I don't believe so.  I think the conver --

20  not on the source code.  It was a walk-through,

21  again, with sort of John Mark Suhy, I think Ben

22  Nussbaum was there at least for one, describing sort

23  of what The Graph Foundation was, what they were

24  doing, the process to what was distributed.  And the

25  only thing I remember is adding in plug-ins and code

136

1    to the core, and that became sort of the ONgDB.  So

2    that was -- that was the group, you know, having

3    John Mark walk through that process, and then

4    understanding The Graph Foundation was established

5    as an entity and, you know, making the product

6    available, you know, as open source.  I can't hear

7    you.

8         Q.  I apologize.  I had a bus going by.  I'm

9    right on the street.  So I tried to mute that while

10   you were testifying.

11        So what are your conversations with

12   Mr. Suhy about The Graph Foundation?  What did he

13   tell you about The Graph Foundation?

14        A.  Well, I believe he would have walked

15   through sort of the entity itself.  You know, the

16   elements of sort of it being, you know, what they

17   were trying to do, the formal setup of it, and then

18   what the -- you know, what the ONgDB product, I'll

19   call it product, was and how it was made and under

20   what reasoning and basis.  That's about what I

21   remember just going through that.  Not just myself

22   but, you know, there were others who listened in and

23   sort of wanted to know about it and its setup.

24        Q.  And was it your understanding that Mr. Suhy

25   was one of founders of Graph Foundation?

137

SER_0681

1    A.  Yeah.  That's how I would -- I would --

2  yeah.

3    Q.  Now, as far as The Graph Foundation, when I

4  asked about your understanding, did he tell you it

5  was an open source organization, or how did he

6  describe The Graph Foundation?

7    A.  An open source foundation -- I mean, I feel

8  like -- I mean, it was a foundation that was

9  crowd-sourcing the ONgDB development and making it

10  available for, you know, as open source use for

11  people.

12    Q.  Did he tell you that it was formed

13  partially in response to Neo4j Enterprise Edition

14  license?

15    A.  I don't know if he would have -- I can't

16  remember if he said it specifically, but I guess --

17  I mean, it -- you know, I'm -- I understood it

18  was -- it was their interest to make -- you know, do

19  an open source product.  And so I would guess I --

20  it makes sense that I guess they were -- it was

21  contention with Neo4j.

22    Q.  Okay.  And so looking back at this email on

23  August 13th, 2018, looks like you write, "Thanks

24  John Mark.  Making sure Lisa is looped in on this,

25  and ask her if we're okay to go ahead and just use

138

November 17, 2022

```
 1    ONgDB from now on in the CKGE environment."
 2            Do you see that?
 3       A.  Yes.
 4       Q.  Why were you referring to Lisa on the
 5    decision to go forward on ONgDB?
 6       A.  Because that -- that type of decision
 7    needs, you know, either her or Jeff to make that
 8    decision.  I can't make that call.
 9       Q.  And did they make the decision to go
10    forward with ONgDB?
11       A.  Probably.  I mean at the -- I can't
12    remember that we didn't.  Does the email tell us?
13       Q.  I might have one for you.  We'll get there.
14    You can't remember offhand.
15       A.  Sorry.  Sorry.  Not to get ahead.  But I
16    would think that -- I don't -- in my mind, it has to
17    be around that time frame.  So that we would have
18    switched over to ONgDB.  Because I feel like it was
19    during the summer where we had these conversations
20    about ONgDB and then ultimately GraphGrid and that
21    kind of stuff.
22       Q.  So then going back to this email, you'll
23    see Mr. Suhy responds to your email addressing, it
24    looks like to Lisa Rosenmerkel, and you'll see he
25    says about two-thirds of the way down, "ONgDB open
```

139

1   source licenses come directly from The Graph

2   Foundation as well, not from Neo4j, Inc., which is a

3   huge benefit based on their past behavior."  Do you

4   see that?

5        A.  Yeah.  It's -- yeah.  Right.  So that's --

6   I mean that -- I guess in my mind that's where I'm

7   thinking, well, what is, what is The Graph

8   Foundation, you know, making this product available,

9   what is the data rights or whatever you call it, the

10  licensing, The Graph Foundation is.

11       Q.  So you took the representation that ONgDB

12  open source licenses were coming from Graph

13  Foundation and not Neo4j?

14       A.  Yeah.  I think ONgDB coming from Graph

15  Foundation.

16       Q.  You mean the licenses themselves, not just

17  the software?

18       A.  Yeah, because I -- if I remember, yes.  I

19  mean, I would -- I would -- I think I would have

20  assumed that.  Yes.

21       Q.  Again, so you took this at face value, that

22  ONgDB open source licenses come directly from Graph

23  Foundation and not from Neo4j, Inc.

24       A.  Well, I don't -- I don't know if it was at

25  face value, and this is why I say that is, you know,

                                                      140

SER_0684