No. 24-5538
_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

NEO4J, INC., NEO4J SWEDEN AB,

*Plaintiffs-Appellees*,

v.

JOHN MARK SUHY,

*Defendant-Appellant.*

On Appeal from the United States District Court
For the Northern District of California
No. 5:18-cv-07182-EJD
Hon. Edward J. Davila

_____

## APPELLEES' EXCERPTS OF RECORD
## Volume 4 of 18

_____

John V. Picone III (State Bar No. 187226)
jpicone@spencerfane.com
Jeffrey M. Ratinoff (State Bar No. 197241)
jratinoff@spencerfane.com
Jeremy A. Moseley (MT Bar No. 44830177)
jmoseley@spencerfane.com

*Attorneys for Appellees*
Neo4j, Inc. and Neo4j Sweden AB

1  in hearing I guess -- having to walk through the

2  development of the ONgDB, seeing the -- being told

3  this is where the Neo4j source code is coming from,

4  not GitLab.  So it was walking through that.  That

5  was -- at least I don't remember anybody having --

6  you know, that was sort of what I remember everybody

7  sort of basing a decision on with that.

8       Q.  You say basing a decision on.  You mean

9  going with ONgDB in CKGE?

10      A.  Yes.

11      Q.  Again, I want to be really precise in my

12  question.  I'm not asking about the source code or

13  GitLab or GitHub.  From the IRS's perspective, you

14  understood from Mr. Suhy that ONgDB's open source

15  licenses were coming from Graph Foundation and not

16  from Neo4j, Inc.

17      A.  Yes.

18      Q.  As far as it says the upgrade would be a

19  low risk move in our opinion, now that upgrade

20  meaning what you had asked originally was Neo4j

21  Enterprise 3.3 to ONgDB 3.4?

22      A.  Yeah, because I'm asking can we just go

23  ahead and -- yeah.  I can't think of what else it

24  would be about where he says that.

25      Q.  And as far as at that time, I think there's

141

SER_0686

MICHAEL C. DUNN                                    November 17, 2022

1    a reference to deployment of the CKGE.  Was that the

2    point in time where CKGE sort of moved out of its

3    development phase into a more production

4    environment?

5         A.  No.  Unfortunately not.  We did -- I -- in

6    my opinion, we did not get to bringing in regular

7    users until the spring of 2019 at this time.

8              (Simultaneous speaking.)

9              THE WITNESS:  Yeah.  It was -- it was done

10   in phases, so not everybody was brought on until

11   let's say the end of the summer of 2019.  But in my

12   opinion, we started people for regular use in the

13   spring.  So as you said, about six months or so

14   later.  So I think that makes sense.

15             (Exhibit 170 is introduced.)

16   BY MR. RATINOFF:

17        Q.  Let me go ahead and put the next exhibit in

18   the chat here.  So be Exhibit 170.

19             What I have put in there is an email also

20   produced by iGov in this litigation.

21        A.  Okay.

22        Q.  You'll see it's an email from --

23   starting -- or ending from yourself to Mr. Suhy

24   amongst others, cc's, dated August 14th, 2018.  And

25   it you'll look, you'll see at the bottom it's sort

                                                    142

November 17, 2022

1  of a continuation of the original thread.

2       A.  Yeah.  Yes.

3       Q.  You would agree with that?

4       A.  Yes.

5       Q.  And do you have any reason to believe this

6  email isn't true and correct copy of an exchange

7  between you and Mr. Suhy among others?

8       A.  I don't.

9       Q.  Then looking at the top here it says, "John

10  Mark, go ahead and integrate the ONgDB into the CKGE

11  framework we'll deploy"?

12       A.  That's right.  Yes.

13       Q.  So safe to say that you got approval from

14  Jeff and Lisa to tell John Mark to go ahead and

15  integrate ONgDB?

16       A.  I do.  Yes.

17       Q.  And then at that point that's essentially

18  when CKGE started using ONgDB was in about August

19  2018?

20       A.  Yes.  I would agree with that.

21       Q.  See, I told you I would be able to help get

22  your memory squared away.

23       A.  Look, I'm completely perplexed at how bad

24  my memory is.

25       Q.  No.  You know, the lawyers in the case

143

November 17, 2022

```
1    BY MR. RATINOFF:
2        Q.   Next exhibit I am going to drop in here
3    will be Exhibit 171.
4        A.   Did you just put it in?
5        Q.   I did.   Should be tab 455.2.   It's got the
6    same title, transition risk question from our CKGE
7    Neo4j 3.3.2 to ONgDB.   Do you see that?
8        A.   Correct.   Yes.   I see it.
9        Q.   And you'll see it's, like I said, a
10   continuation.   You would agree this is the same
11   email conversation you're having with Mr. Suhy?
12       A.   Yes.
13       Q.   All right.   So Exhibit 171, if you go ahead
14   and look down at the email where it says, "can you
15   also" -- and this is the August 14th email just in
16   the later chain.   August 14th, 2018 at 12:52.   You
17   see where it says after John Mark, go ahead and
18   integrate the ONgDB into the CKGE framework we'll
19   deploy.   Can you also loop in Rahul on the topic so
20   he's aware of the options and ideas for YK1
21   transition.
22       A.   Right.
23       Q.   I think you mentioned Rahul before.   Is
24   that correct?   And can you spell his last name?   Are
25   you able to do that now?
```

145

November 17, 2022

1    A.  Yeah.  T-i-k-e-k-a-r.  And I forgot to put

2    all these names into the chat during the break, so I

3    apologize.

4    Q.  We can always take care of that later.

5    Okay.  What was Rahul's role in reference

6    to YK1?

7    A.  So Rahul works on the YK1 project.  So this

8    was referencing letting him know that, you know, go

9    ahead about being -- you know, going ahead and, you

10    know, using ONgDB and seeing if he wanted to start

11    looking at it.

12    Q.  And to your knowledge, following the next

13    email, Mr. Suhy responds directed to Rahul, "We can

14    talk more when I come over there, or feel free to

15    give me a call anytime."

16    A.  Right.  Yes.

17    Q.  Is it your understanding that Mr. Suhy and

18    Mr. Rahul talked about using the ONgDB in the YK1

19    platform?

20    A.  Yes.  I'm confident -- yeah.  I believe

21    they did.  Yes.  I'm confident.

22    Q.  And as a result of that conversation, did

23    YK1 similarly adopt ONgDB at 3.4?

24    A.  Not at -- not at that time.  I think Rahul

25    and them started to look at it.  And the reason I

146

MICHAEL C. DUNN                                          November 17, 2022

1   say that is YK1 need -- it did not -- they didn't

2   have -- there was no existing -- they weren't using

3   existing graph database.  They were using Oracle and

4   some stuff.  So I think there would have had to have

5   been some evaluation and such.  And that's what

6   Rahul was talking about is are you interested in

7   looking at this.

8       Q.  At that time, was the YK1 using a

9   combination of Oracle and some form of Neo4j

10  software?

11      A.  Yeah.  I can't remember -- there was a time

12  when there was a project that worked on YK1.  There

13  were two data scientists who worked with YK1 to

14  create a graph database that YK1 started to use.  I

15  don't remember if it was this early or whether it

16  was sometime starting in 2019, because the people on

17  this email are not those people that worked on that

18  project.  So I can't say -- I cannot say what Rahul

19  did with it at that time.

20      Q.  But eventually the YK1 did switch over to

21  ONgDB?

22      A.  It did.  Yes.

23      Q.  And as far as -- what was the purpose of

24  the YK1?  Actually, before I get there, is it more

25  appropriate to call the CKGE and the YK1 a platform

147

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS  408-287-7500

November 17, 2022

1  or environment?  What's the preferred term?

2      A.  So people -- CKGE is more of an

3  environment.  So it has, you know, different

4  activities going on with different technology

5  stacks.  They call YK1 an application.  So if you're

6  okay with that, I'll call YK1 an application and

7  CKGE an environment.

8      Q.  Okay.  Then what was the purpose of YK1?

9      A.  Jonathan will have to make sure that I

10  don't say anything sensitive but unclassified.

11      It is for looking at entity -- taxpayer

12  entity relationships through the tax forms for

13  enforcement research purposes.  Is that good enough?

14      Q.  Sure.  Using graphs to establish

15  relationships between data?

16      A.  Yeah.  So it's still a graph -- it's still

17  trying to work with graph data or present graph data

18  to end users.

19      Q.  So similar idea of using at some point at

20  least ONgDB to -- to be the graph database and then

21  having a user interface to be able to work with that

22  data and visualize it?

23      A.  Yes.  YK1, though, was -- had been around

24  for many years.  So they already had their own user

25  interface database, et cetera.  So they already had

148

SER_0692

November 17, 2022

 1   sort of a -- sort of a baseline technology to

 2   work -- to do what they needed to do.  But they were

 3   presenting data in a graph form.

 4       Q.  Okay.  And as far as at this point, or

 5   going into the fall of 2018, the CKGE environment,

 6   was it running on multiple servers?

 7       A.  I think it -- it -- I think yes in the

 8   sense that there was starting to stand up sort of

 9   copies of the stack.  So while CKGE is an

10   environment, there's a stack of technology that,

11   let's say we call prod and a stack of the same

12   technology that we call beta.  So I believe it

13   started with one server.  At some point we probably

14   were using multiple servers for like a backup or,

15   you know, standing up that GraphStack in such a way

16   it creates like a beta or stage kind of environment,

17   too.

18           (Exhibit 172 is introduced.)

19   BY MR. RATINOFF:

20       Q.  Okay.  Let me go ahead and put the next

21   exhibit into the chat.  It's should be tab 457,

22   which I'll mark as Exhibit 172.

23       A.  Okay.  I have it open.

24       Q.  And then you'll see this is an email now

25   with production IRS-PROD then ending Bates number of

                                                    149

November 17, 2022

1    129 the first page.  You see that?

2         A.  Wait.  I'm sorry.

3         Q.  What are you looking at?  I marked as

4    Exhibit 172, it's an email.  There is some sort

5    of -- I can't really interpret what the from is, but

6    it's sent to you, Patrick Martin, Guoging Weng, and

7    the title is "Neo4j-Enterprise on Athena/Minerva."

8    Do you see that?

9         A.  Yes.

10        Q.  And I'm representing this was produced by

11   the IRS in response to the first subpoena that was

12   issued in this case.  You understand this was a

13   document that was produced by the IRS?

14        A.  Yes.

15        Q.  Any reason to believe it's not a true and

16   correct copy of an email that was produced by the

17   IRS?

18        A.  I have no issue.

19        Q.  So going to the very beginning of the email

20   exchange, this would be the bottom email on 131?

21        A.  Right.

22        Q.  October 23rd, 2018.  You'll see there's a

23   question -- or an email from Patrick Martin that

24   says, "Hey Gene and Link, We need to remove all the

25   Neo4j-Enterprise installs from our servers.  I saw

150

1  we have Neo4j-Enterprise installed on both Athena

2  and Minerva" --

3      A.  Minerva.

4      Q.  -- "and wanted to make sure they weren't in

5  use anymore before removing them."

6      A.  Okay.  Yes.

7      Q.  And what are they referring to here as far

8  as Athena and Minerva?

9      A.  Two servers.

10     Q.  Are those the two servers that you

11 mentioned?  There was a production server and a beta

12 server for running graphs?

13     A.  Well, yeah.  I was trying to illustrate it

14 as two stacks, but yes.  Think of two stacks and I

15 don't know -- I believe those were the servers that

16 we were using, Minerva and Athena.

17     Q.  As of October 2018?

18     A.  Yes.

19     Q.  Who is Patrick Martin, by the way?

20     A.  Patrick Martin is an IRS employee who

21 worked in DMD.

22     Q.  He's no longer with the IRS?

23     A.  No.  He is with the IRS, just not in DMD at

24 the moment.  He provided like system administration

25 duties.

151

November 17, 2022

1    Q.  Like IT basically?

2    A.  Yeah.  I mean, working on the server

3  itself, you know, operating system installs, those

4  kinds of things.  So he had that kind of function.

5    Q.  All right.  Then do you know why the IRS

6  was wanting to move Neo4j Enterprise from those

7  servers?

8    A.  Probably just -- it looks like we weren't

9  using them and just get rid of them.  They were

10  probably left on there.

11    Q.  That's because the IRS had moved to ONgDB?

12    A.  Yeah.  We would have been using that.  So

13  the way I'm interpreting this is that they are

14  talking about cleaning up.  Where it says, like I

15  think it's an old project, I say remove it.  So this

16  was probably me saying yeah, I don't know why it's

17  there, what it's being used for.  And yes, at this

18  time I'm still assuming we were using ONgDB.

19        (Exhibit 173 is introduced.)

20  BY MR. RATINOFF:

21    Q.  And then I'm going to go ahead and put the

22  next exhibit in the chat.  This will be marked as

23  Exhibit 173.  And what I've put -- marked as

24  Exhibit 173 is an email exchange between Mr. Suhy

25  and Mr. Martin with you copied.  First email.

152

MICHAEL C. DUNN                                                November 17, 2022

```
 1   Starting on December 6, 2018 through December 11th,
 2   2018 with the title "CKGE memory usage."
 3        A.  Yes.  I see it.
 4        Q.  Any reason to believe this wasn't a true
 5   and correct copy of this email exchange that was
 6   produced by the IRS?
 7        A.  No.  I don't.
 8        Q.  Okay.  Starting at the beginning of this
 9   email exchange, it says, "Hey John Mark, Between the
10   environment and the future growth of adding YK1,
11   what memory usage are you estimating for production
12   servers?  We had talked about dedicating all DL 380s
13   instead of the current half VM/half DL380 we have
14   now.  Would four DL380s with 256GB or 512GB be
15   sufficient?"
16             Starting with what's a DL380?
17        A.  It's a type of server.  It's a HP.  DL380
18   just represents the type of server.
19        Q.  At that time in December of 2018 for the
20   CKGE, was it running on at least one DL380?
21        A.  See, I don't know if it was 380.  I can't
22   remember what Minerva and Athena were.  I thought
23   those were 580s.  So -- that's my -- that's my view.
24   Both of those I believe were 580s.  So my
25   interpretation of this is -- and I know Patrick was
```

153

November 17, 2022

1  working on sort of requirements, sizing, and I think

2  he's talking back and forth about with, you know,

3  with four DL380s would this information be

4  sufficient.  You know, instead of the half or VM.

5  So I think they're talking about adding servers to

6  the environment and then how they would be used.

7       Q.  So in other words, because CKGE was going

8  into production, there was going to be a need to add

9  additional servers for the number of users?

10      A.  Yes.  And also I saw the word "Kafka" in

11  there.  I was just trying to go back and -- yeah.

12  It said, I can tell you regarding SS drives.  This

13  is John Mark.  It will be important event around the

14  ETL-related stack components (Kafka, et cetera)."

15  So how -- so the GraphStack, as I mentioned -- we

16  were talking about that earlier.  So the GraphStack

17  is made up of a number of components.  He was

18  talking about Kafka there.  There's Keycloak,

19  Prometheus -- there's a number of software

20  components that make up that bundle.  And so

21  Elasticsearch being another component.  So all --

22  all of those have to be taken into account from a

23  sizing standpoint, so not just the graph database

24  itself.  Does that make sense?

25      Q.  Sure.  So because there was other RAAS on

154

SER_0698

November 17, 2022

1    the environment, there needed to be a sufficient

2    service to run not just the graph database but also

3    the other components of the environment.

4         A.  Yes.  That's how I see it and would have

5    seen it at that time, and they sort of back and

6    forth on that.

7         Q.  And Mr. Suhy had input on hardware

8    requirements as part of his work?

9         A.  He did.  He did.  Yes.

10        Q.  And then you go off to the -- it would be

11   the first page.  It's the email where Patrick Martin

12   says, "Let's start with CKGE.  Would you expect four

13   DL380, 32-core, 256 gigabyte RAM to be enough or

14   would four DL380, 32-core, 512 RAM be more

15   appropriate."  And then he talks about could there

16   be a mix -- or a mix if needed of Prod1 and 2 need

17   to be 512 and Prod3 /Dev/Test could be 256.  Do you

18   see that?

19        A.  Yes.  I do.  At 9:04 a.m.

20        Q.  Correct.

21        A.  Correct.

22        Q.  He's referring to four DL380s, so that

23   means four DL380 servers?

24        A.  Correct.

25        Q.  And that would be each one of those having

155

SER_0699

November 17, 2022

```
 1    32 cores and 256 gigabytes of RAM?
 2         A.  Yes.  That's right.
 3         Q.  The same would be the alternative of four
 4    DL380s with 32 cores each and then 512 RAM --
 5         A.  Correct.  Yeah.  I think it asks about
 6    either/or.
 7         Q.  Sure.  Was it determined at that time that
 8    there would be a need for four servers to run the
 9    CKGE environment?
10         A.  Yeah.  I believe it was both production and
11    all of that that that entailed, and then something I
12    saw that I just wanted to -- yeah, where Prod1 and
13    2.  So sort of being able to work in both of those
14    stacks.  And then there's a Prod3/Dev/Test.  So,
15    which I'm interpreting as a separate server.  So
16    three, three servers.
17         Q.  Okay.  So there would be three servers and
18    each consisting -- well, Prod1 and 2 and 3, were
19    those three different servers, or are those three
20    different clusters?
21         A.  Yeah, I don't know if -- if Prod1 and 2
22    would be on the same server or not or whether they
23    would be on separate servers.
24         Q.  But there is a -- sorry.  Strike that.
25              So at that time the design, architectural
```

156

1    design for the CKGE environment was to have three

2    production servers?  Would that be the accurate way

3    to describe it?

4         A.  Yeah.  I mean, I can't think of -- and what

5    I remember is and how this is being discussed is

6    Prod1, Prod2 being two stacks.  And the way that I

7    remember it being set up is we had copies of the

8    database, and so Prod1 and 2, 1 may have been --

9    let's say 1 was the primary.  That's the way people

10   were normally going to use it.  Prod2 may have had a

11   stack, and it was in case Prod1, you know, something

12   happened to it as backup.

13        Q.  Okay.  So would that be like a hot backup

14   for Prod1 theoretically?

15        A.  Is it a hot backup.  I don't -- I

16   believe -- I don't know.  I don't know if I would

17   call it a hot backup.  But I -- I think it -- I

18   think you could through the user interface, if

19   something happened to Prod1, it would -- it would

20   switch to Prod2.  So in that sense, you know, it's a

21   hot backup.  And in that way.  So I believe the

22   configuration was set up like that.  Yes.

23        Q.  All right.  So that each Prod launch the

24   stack and Prod1 and Prod2 each would be running a

25   separate instance of ONgDB?

157

SER_0701

1     A.  At that time we were -- only one of them

2  was actively used.  We started later on using

3  another instance of ONgDB which would allow users

4  that were connecting directly to the graph database

5  using R and Python.  And so in this case I think it

6  was just some redundancy.

7     Q.  But in order to have redundancy between

8  Prod1 and 2, each one would be running ONgDB?

9     A.  Each one.  Yes.  I'm sorry if I

10  misunderstood.  Yes.  Each one of them had an

11  instance of ONgDB.  Yes.

12     Q.  How would -- at this point, how did

13  Prod3/Dev/Test fit into that architecture?

14     A.  Since it's Prod/Dev/Test, this would be,

15  you know, being able to use it as some kind of just

16  testing on changes0, on what would -- you would be

17  sort of doing changes and other kinds of activities

18  that were not static that the end users would be

19  working with.

20     Q.  Okay.  And since there was a question about

21  using four servers, would then there be one server,

22  one DL380 for Prod1, one DL380 for Prod2, then the

23  other two would be used to support the

24  Prod3/Dev/Test?  Is that accurate?

25     A.  Yeah.  And it looks like in the last

158

November 17, 2022

1    sentence where "Take into consideration future

2    planning and some growth such as YK1," it's sort of

3    having four servers be good enough.  You know, right

4    now and looking ahead.

5        Q.  Okay.  So I guess my question is would the

6    other two servers be used to support Prod3 Dev and

7    Test, or it would just be -- the fourth one would

8    just be a spare?

9        A.  Yeah.  It was either a spare or it was

10   anticipating a YK1.  I know with the Elasticsearch,

11   the Elasticsearch that we use is set up in its own

12   little cluster.  So could have been using that

13   server for that and then just, as we said, spare.

14   You know, just some extra capacity.

15       Q.  So when you say Elasticsearch, you're

16   talking about Elasticsearch, I think earlier you

17   testified about small incidence of ONgDB, that would

18   be sort of a separate instance.  Is that what you're

19   referring to with Elasticsearch?

20       A.  No.  Sorry.  The Elasticsearch is a

21   software product that takes in data, indexes it, and

22   makes it available to search.  And so it's part of

23   the GraphStack that John Mark was bringing, you

24   know, it was part of the bundle.  And so that's a

25   separate software component.

159

November 17, 2022

```
 1          Q.  But it's interconnected with ONgDB as far
 2     as getting the data?
 3          A.  No.  It's -- the pipeline -- there is --
 4     there is some relationship, but you can load the
 5     data separately and operate it separately.  So
 6     how -- so the use of the Elasticsearch was in the
 7     UI.  So that when the end user was going to be
 8     searching for entities, they would first see the
 9     results in the UI through the Elasticsearch
10     retrieval.  And then if they were interested, that
11     node, that node -- that entity was being stored in
12     ONgDB.  And if they were interested, you click a
13     button, and then it would open up another tab of the
14     UI, query the ONgDB, and pull the, you know,
15     predetermined graph results up for visualization.
16          Q.  Okay.  So that -- would that -- that would
17     be a separate server from Prod1, Prod2, and
18     Prod3/Dev and Test?
19          A.  Unless they were -- unless they're -- I
20     can't say that because they could be accounting for
21     that in this -- in this estimation.
22          Q.  Okay.
23          A.  They could be saying for all of this, you
24     know, how many servers would be useful.
25          Q.  And then going back to the Prod3 Dev and
```

160

1    Test, that would be running another instance of

2    ONgDB?

3         A.  Yes.  I would think yes.

4         Q.  And to your knowledge, was this, at least

5    in December of 2018 or shortly thereafter, was

6    this -- were these servers adopted in this

7    structure, Prod1, Prod2, and Prod3?

8         A.  I would think so.  Yeah.  If they were --

9    if Patrick and John Mark were working on it, I

10   would -- they would be working towards getting that

11   set up.  So I don't see any reason not to believe

12   around this time.

13        Q.  Okay.  And then do you know as of now what

14   the initial server requirements or specs were for

15   CKGE?  Let's just say beginning of 2019.

16        A.  Not offhand.  I mean, this would give me

17   my -- probably the best view here.  I don't have any

18   other ideas offhand of anything different than this.

19        Q.  So at minimum, then, the design for CKGE

20   would have been having the four DL380s, at least 32

21   cores, and 256 gigs each?

22        A.  Yeah.  I think that's fair.

23        Q.  All right.  Let me go ahead and drop in the

24   next exhibit.

25             (Exhibit 174 is introduced.)

161

1   BY MR. RATINOFF:

2       Q.  So this is another email exchange produced

3   by the IRS.  You'll see the first page ending with

4   1738, and it's a email exchange between Mr. Suhy and

5   Mr. Martin.  A short one.  You'll see at the bottom

6   Patrick is asking John Mark within the CKGE is ONgDB

7   installed on all the DB servers or AS servers or

8   both.  Do you have an understanding what he means

9   between DB servers versus AS servers?

10      A.  Not --

11      Q.  Maybe the next email of Mr. Suhy's response

12  will help.

13      A.  Okay.  I see what you're going up -- okay.

14  Applications servers.  Okay.  So the GDB servers

15  versus the application servers.  The ES servers --

16  what is ES.

17      Q.  So it says ES --

18      A.  Oh.  Elasticsearch.  Okay.  Elasticsearch.

19  Yes.  Sorry.

20      Q.  So from this email exchange, is it fair to

21  say, then, that there were separate servers running

22  ONgDB from what you referred to as the Elasticsearch

23  and then the other applications in the stack?  Is

24  that accurate?

25      A.  Yeah.  I think so.  Yes.

162

SER_0706

November 17, 2022

1    Q.   So there was dedicated -- multiple

2  dedicated graph database servers running ONgDB.   Is

3  that correct?

4    A.   Yes.   That's how I'm -- how I'm reading it.

5    Q.   Then you'll see that Mr. Suhy at the top of

6  that email on March 11th, 2019 at 10:35 a.m. says,

7  "I actually have a mapping document in the CKGE

8  docs.   I'll send you the direct link to that on

9  GitLab."

10    A.   Yes.   I see it.

11    Q.   Is there -- is there like a document

12  repository with CKGE documents that's kept by your

13  group?

14    A.   There is a GitLab project repository.   So

15  yes, there are that contain, you know, the code and

16  information, those kinds of things.   So that's

17  what's -- when it says GitLab, it's talking about

18  the GitLab project server that he was putting this

19  file and information on.

20    Q.   Okay.   So then there's an actual GitLab in

21  terms of GitLab repository that the CKGE environment

22  is kept on as far as you said source code and then

23  related documents to the --

24    A.   Yes.   Yes.

25    Q.   And by the reference here mapping document,

163

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS   408-287-7500

November 17, 2022

```
 1   what do you understand the mapping document to be?
 2   The server architecture mapping document.
 3       A.  Yeah.  It -- yeah.  I -- I believe the
 4   mapping document is saying what server or where on
 5   the server the different -- these different files.
 6   So that AS server hosts these job apps.  So he's
 7   essentially saying 1 through 6 there, you know, is
 8   found on -- it would be on this server, you know.
 9   And showing that mapping.
10       Q.  Okay.  And would that mapping document also
11   show the number of GDB --
12           (Reporter interruption.)
13   BY MR. RATINOFF:
14       Q.  Let me ask it again.
15           And then would the mapping document also
16   show the number of GDB servers each host a single
17   ONgDB node?
18       A.  Yeah.  I would think that it would.
19       Q.  And is that mapping document something that
20   would be easily available to you if you wanted to go
21   and look in to see what the current server structure
22   is for the CKG environment?
23       A.  Well, I don't know what kept up on that --
24   I mean, if -- if the mapping document is kept up to
25   date and we knew the file name or whatever it is,
```

164

November 17, 2022

1   then you could go find it.  But I don't -- I don't

2   know in my own mind and I don't have permission to,

3   you know, do a lot of things, I could not just

4   naturally go into the GitLab project and find it.

5   So you would -- one would need to know the name or

6   location, et cetera.  Because the GitLab project has

7   any number of sub-project folders.  Does that make

8   sense?

9       Q.  Sure.  Mr. Suhy as an individual you would

10  probably ask to see that document, hey, I need to

11  see a mapping document of the servers for CKGE, you

12  would ask Mr. Suhy?

13      A.  Yes.

14      Q.  Is there anyone else at the IRS that you

15  would ask to locate that document?

16      A.  I could, you know -- there could be --

17  yeah.  I think other people to look for that mapping

18  document.  I don't know how easy it would be for

19  them necessarily, but I think that they -- there are

20  at least one if not two people that would know how

21  to, you know, understand how to try to look.

22      Q.  Aside from Mr. Suhy.

23      A.  Yes.  Correct.

24      Q.  Who are those two people?

25      A.  Puru Komaravolu and Alexis Spande.  Both

165

November 17, 2022

1   IRS employees.

2        Q.   And Puru I think you mentioned you had

3   spoken --

4        A.   Yeah.

5        Q.   -- to him earlier about bad things about

6   CKGE.  Was the server mapping one of the things you

7   talked to him about?

8        A.   No.  I did not talk to him about that.  I

9   talked to him about basically, you know, were the

10  graph database installed in a docking container or

11  are they on bare metal.  You know, we were talking

12  about sizing, that kind of stuff.  So I didn't talk

13  to him about a mapping document.

14       Q.   But as of this email March of 2019 that

15  we're looking at, how many -- how many graph

16  database servers -- let me actually start over.

17            So GDB stands for graph database?

18       A.   Yes.  Correct.

19       Q.   So at that time in March of 2019, how many

20  graph database servers were running ONgDB in CKGE?

21       A.   I would think at least three.  We may have

22  had -- I believe at that time there was another

23  project team that wanted to test out some ideas for

24  a project, and I believe they were using it.  So my

25  estimation would be four.

166

Case 5:18-cv-07182-EJD   Document 210   Filed 09/28/23   Page 500 of 790

November 17, 2022

```
 1        Q.   Okay.  So in 2019 there was four separate
 2   servers running ONgDB?
 3        A.   Not separate servers but instances of
 4   ONgDB.
 5        Q.   Okay.  And did that change in 2020?
 6        A.   Yes.  Okay.  So around the summer of 2019,
 7   there was another project that stood up dealing with
 8   what I'll call a corp graph, corporate graph.  And
 9   so they were starting with I believe it was 20 --
10   yeah, sometime around there would have been another
11   corporate graph.  They may have started a little bit
12   earlier than that, but somewhere around there the
13   corporate graph project stood up, and they were
14   their own project.
15        Q.   Okay.  So in the beginning of 2019 there
16   was four instances of ONgDB running within the CKGE
17   environment, and then you're saying there was a
18   fifth instance that was set up for the corporate
19   graph environment?
20        A.   Yeah.  It must have been sometime around
21   there, because the -- because the corporate graph
22   project started I believe in the fall of 2018.  And
23   eventually at some point in there, they would have
24   been, you know, starting to test out graph ideas and
25   using their own graph instance.
```

167

SER_0711

1      Q.   And then did that change -- I know you said
2   that was the middle of 20 -- I'm sorry, 2019, so
3   moving on to 2020, was the setup the same with the
4   four instances running ONgDB for the CKGE, and then
5   the fifth for a corporate graph, did that change in
6   2020, or was it still the same?
7      A.   There -- there should have been at least --
8   I believe at that time YK1 and excise graph were
9   switched over and using ONgDB at some point at that
10  time.  So that would have been at what, two more.
11     Q.   And the YK1 would have been a separate
12  server?
13     A.   Yes.  That would have been its own
14  instance.  Yes.
15     Q.   And then what was -- what was the other
16  one, I'm sorry, you mentioned?
17     A.   Excise graph.  E-x-c-i-s-e.
18     Q.   What is excise graph?
19     A.   It's a separate graph that a particular
20  unit uses to look at excise tax relationships.
21     Q.   And is that running its own instance of
22  ONgDB?
23     A.   Yes.
24     Q.   So let me just make sure I got my math
25  correct.  This is as of 2020, there was four

168

November 17, 2022

1   instances running on the CKGE environment.  There

2   was a fifth instance for corporate graph.  And then

3   there was a sixth would have been for YK1, and then

4   a seventh for excise?

5        A.  So four for -- and when I'm -- this may be

6   help.  The first ones that we talked about, let's

7   call those the main graph.

8        Q.  Okay.  That's production 1, 2, and 3?

9        A.  Yes.  And, you know, the development stuff.

10  So that includes main graph.  So then -- so then

11  there was another project.  Analytics project.

12  We'll call them -- just call it a fraud project.

13  And then the excise graph.  The YK1 at some point

14  was started during that time, was developing the YK1

15  graph.  And then at the same time the corporate

16  graph was being worked on.  Development.

17       Q.  Okay.  So we've got the main graph, the

18  excise graph, the YK1 graph, and then the corporate

19  graph.

20       A.  Yes.  And so the regular use or what we

21  could call production was excise, the main graph,

22  and at some point at that time YK1 would have been

23  in production, meaning regularly used.  The

24  corporate graph and the other ones were just test --

25  they were still just testing out stuff.

169

SER_0713

MICHAEL A. DUNN                                      November 17, 2022

1      Q.  Okay.  As far as main graph goes, when you

2   say main graph, that's main graph in the CKGE

3   environment.

4      A.  Yeah, and the reason I was doing that is in

5   fact a corporate graph is part of CKGE as an

6   environment as if you drew a little line.  So I just

7   wanted to help trying to -- try using the same

8   terms, and I didn't want to confound stuff.  So

9   that's why it's just easier.  People call it the

10  main graph.

11     Q.  Okay.  How many instances of ONgDB was the

12  main graph running in 2019?

13     A.  I would say three.

14     Q.  Then was that the same in 2021?  I'm sorry,

15  2020, the main graph was running three instances of

16  ONgDB?

17     A.  Yeah, I don't think -- yes.  Because at

18  that time we were using one for the investigators,

19  one of the analyst graph, and then there would have

20  been like a backup or something.  So those would

21  have been sort of the production.

22     Q.  Okay.  And in addition to production, there

23  may have been some testing or development use --

24     A.  Yes.

25     Q.  -- on a separate server?

170

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS  408-287-7500

SER_0714

1    A.  Yes.  Yeah.

2    Q.  So potentially four -- four instances of

3  ONgDB in relation to main graph.  Three being

4  production, one being some sort of testing --

5    A.  At least one if not maybe two.

6    Q.  And then moving to 2020 -- that was for

7  2020.  So for 2021, did things change as far as the

8  number of instances for main graph, excise, YK1, and

9  corporate graph?

10    A.  Yeah, I don't -- I don't remember any

11  changes.  I was trying to think is there any -- I

12  believe, not in production.  I think there may have

13  been some other projects using ONgDB to do some

14  testing or ideas like that, but production was

15  staying in my mind around three.  And then there

16  was -- let's see, 2020, '21, so around that time we

17  started another graph project called COVID graph.

18    Q.  I'm sorry, that was 2021?

19    A.  Yeah.  It would have been after the Cares

20  Act.  So that would have been when COVID first hit.

21  So when was that.  Let's say the summer of 2020.  So

22  that would have been like 2020 starting and then

23  doing, you know, starting to test things out,

24  et cetera, going into '21.

25    Q.  And these are all running ONgDB.

171

```
 1        A.   Yes.
 2        Q.   Okay.  So then -- so for 2021, just to make
 3   sure I've got everything down, we've got main graph
 4   running three production instances of ONgDB plus one
 5   or two additional development/testing environments
 6   on ONgDB.  You've got one instance of ONgDB for the
 7   excise graph, one instance of ONgDB for YK1, and one
 8   instance for corporate graph, plus an additional
 9   instance of ONgDB for the COVID.
10        A.   Yes.  And then --
11        Q.   That's for 2021.  So then --
12        A.   Well, I'm trying to use what I understood
13   now from what we have up, you know, existing that I
14   was told and working back in time.  So around 2021
15   we had policy net, which uses ONgDB.  That was a
16   development project that's sort of happening.  Just
17   call it policy net.  And then, let's see, I'm trying
18   to remember when some of these projects -- because I
19   don't work with all these projects, so I'm trying to
20   like, in my own mind, remember when things started.
21   As I said, I -- you know, I just don't work on all
22   these projects.  I don't really know what they're
23   doing.  At least in '21 there was another instance
24   of what is called the individual graph that started
25   to be a project.  And then -- now, these two I think
```

172

November 17, 2022

1   were this year.  So that's what I have -- that's

2   what I have working backwards from what I see or was

3   told now.

4        Q.  Did you take notes on everything that we've

5   been talking about?

6        A.  Have I taken notes while we're talking?

7        Q.  Yeah.  Are you doing this all from what you

8   were told or do you actually have some notes

9   reflecting --

10       A.  No.  I actually have some notes I try to

11  write down when talking with the team here.

12       Q.  Okay.  Jonathan, I just wanted to make sure

13  I could get a copy of those notes.  Obviously

14  there's a lot of complicated data, and since he's

15  taking the notes during the deposition, I would ask

16  that those be produced.

17       A.  Can I send you -- well, they're on

18  handwritten.  I don't have a scanner.  Can I take a

19  picture of them and send them to you?

20       Q.  Yeah.  If you could do that on a break so

21  we can --

22          MR. TEPPER:  No.  We actually will not.

23  We'll have to discuss whether we disclose those or

24  not.

25  ///

173

November 17, 2022

```
 1    BY MR. RATINOFF:
 2         Q.  Well, I think they're fair game, and we can
 3    about that off the record.
 4         A.  Look, this was just my notes as I was -- it
 5    was being described to me over our telephone
 6    conversation.
 7         Q.  Okay.  Who were you talking to?
 8         A.  Puru Komaravolu.
 9         Q.  All right.  So then let's see here.  Okay.
10    So then I might have to go back and start from the
11    beginning just to make sure we've got everything
12    accurate.
13              Is it easier for you to work backwards, or
14    would it be easier to start -- I just want to go
15    through it one more time just so we're clear.
16         A.  Yeah.  Let me start what -- when I asked
17    sort of how many instances we had now, and you can
18    see what you have.  So --
19         Q.  Start with 2022, and we're going to work
20    backwards?
21         A.  Sure.  Okay.  So --
22         Q.  Just to be clear for the record, this is
23    instances of ONgDB.
24         A.  Correct.
25         Q.  Okay.
```

174

SER_0718

November 17, 2022

1      A.  So main graph, there are two instances

2  right now of main graph.  There is one instance of

3  COVID.  Those are in production.  There are -- for

4  YK1, there are two instances in production, two

5  instances dev/test.  Tell me when you're ready.

6      Q.  Go ahead.  This is for 2022 instances of

7  ONgDB.  We've got main graph, COVID, and YK1 so far.

8      A.  And then one instance of excise graph.

9      Q.  That's in production?

10      A.  Yes.  And then the ones in -- considered

11  development are individual graph, CPEO, ghost

12  preparer, corporate, and policy net.

13      Q.  And then so for CPEO, ghost, corporate, and

14  policy, those are all in dev -- ONgDB dev

15  environment?

16      A.  Yes.  And similar with individual graph.

17      Q.  Got it.  As of 2022, are you aware of what

18  version ONgDB each one of these instances is?

19      A.  Yes.  The code is -- has Neo4j 3.5.2.6.

20      Q.  Okay.  So let's go through -- for all of

21  these instances we've just gone through it's 3.5.6?

22      A.  Yes.

23      Q.  Okay.  So for main graph two instances of

24  ONgDB 3.5.6?

25      A.  Correct.

175

1    (Reporter asks for clarification.)

2    MR. RATINOFF:  It's 3.5.6.

3    THE WITNESS:  It's 2.6.  Sorry.  It's

4  3.5.2.6.

5    (Discussion off the stenographic record.)

6    THE WITNESS:  Wait.  Here.  Let me type it

7  in.  3.5.2.6.

8  BY MR. RATINOFF:

9    Q.  So for each one of the instances of ONgDB

10  we've gone over for 2022, each one of these

11  instances as running ONgDB version 3.5.2.6?

12    A.  Yes.  But it's not ONgDB because everything

13  is compiled inside the IRS.  I believe John Mark

14  didn't want to call it ONgDB because it's not being

15  received by The Graph Foundation.  Or compiled by

16  The Graph Foundation.  So it's not being called

17  ONgDB.  It's just graph database.

18    Q.  Okay.  Is it possible that the version is

19  actually 3.5.26?

20    A.  It could be.  I could have mistaken it.  I

21  was writing it down over the phone.

22    Q.  Okay.  I have a document we'll get to.  I

23  think we can clarify that.  Okay.  So then going

24  back, that takes care of 2022.  So going to 2021,

25  let's go ahead and do that.

176

1   A.  So everything would have existed except for

2   I believe the CPEO and graph preparer were not

3   started then.

4   Q.  And did main graph in 2021 have two or

5   three instances in production?

6   A.  Yeah.  I don't think it had any more, any

7   less than two.  I don't remember that.

8   Q.  All right.  So then main graph had two

9   instances.  COVID would have had one instance.

10   A.  Yeah.  And COVID would have only gone to

11   production in September, October 2021.

12   Q.  It would have still been using ONgDB.  It

13   just would have been in dev and test?

14   A.  Yeah.  It would have been in that phase.

15   Yes.

16   Q.  For YK1, was it running two instances in

17   2021 in production?

18   A.  I don't know.  I just asked what was now.

19   Q.  Okay.  It would have been at least one

20   instance?

21   A.  Yeah.  I would have assumed there has to be

22   at least one instance since they were using -- in

23   2021 they were using a graph database.

24   Q.  And then for excise in 2021, it would have

25   been one instance in production?

177

1    A.  Correct.

2    Q.  And then for individual graph, was it still

3  one instance in dev?

4    A.  As far as I know.  Yes.

5    Q.  And then the CPBO was that -- that was in

6  dev in 2021?

7    A.  As far as I know.  Yes.  Wait.  Did you say

8  CPEO?

9    Q.  CPBO.

10    A.  CPEO.  Charlie, Peter, echo, omega.

11    Q.  Got it.

12    A.  I don't think -- as far as I remember, they

13  hadn't started at that time.  You know, as I said,

14  I'm not -- I don't -- I don't manage or directly

15  involved with these projects, so I'm giving you sort

16  of my take on it and what I understand.

17    Q.  That's taken from Puru who you talked to?

18    A.  Yes.  As of right now.  Yes.

19    Q.  And then on the corporate, was corporate in

20  2021?

21    A.  Correct.

22    Q.  That was one instance of ONgDB?

23    A.  Correct.

24    Q.  And then policy, was that in existence in

25  2021?

178

```
 1          A.  Yes.
 2          Q.  And that was also dev?
 3          A.  Yes.
 4          Q.  And then for all of these instances in 2021
 5   that we just talked about, what version of ONgDB
 6   were they running?
 7          A.  I don't know.
 8          Q.  It was something either that was -- it was
 9   a 3.5 instance of ONgDB?
10          A.  I don't know.  I really -- I don't.  I only
11   know of as of right now because of just asking.  So
12   I don't -- I don't know -- I would -- I don't know.
13          Q.  Okay.  How would you be able to find out
14   what the historical version of ONgDB was?  Could
15   GitLab provide that information?
16          A.  I don't know if it would.  I mean, the best
17   person would be John Mark Suhy.
18          Q.  Because he was primarily responsible for
19   keeping ONgDB in the GitLab?
20          A.  Yeah.  He was the primary person with, you
21   know, working with the software, coming in that
22   represented sort of that bundle coming from
23   GraphGrid.
24          Q.  Okay.  Now, we talked about Athena and
25   Minerva as servers.  Were those legacy servers, not
```

179

MICHAEL C. DUNN                                                    November 17, 2022

```
1    to drop in here -- thank you.  I know that I know is
2    very complicated.
3              THE REPORTER:  Before you go, could we take
4    a short break?
5              MR. RATINOFF:  Sure.
6              THE VIDEOGRAPHER:  We are now going off the
7    video record.  The time is 1:47 p.m.
8              (Recess taken.)
9              THE VIDEOGRAPHER:  We are now back on the
10   video record.  The time is 1:55 p.m.
11             (Exhibit 175 is introduced.)
12             MR. RATINOFF:  Before we took a break, I
13   just dropped what will be the next exhibit in the
14   chat.  Forgive me.  I need to go back.  Look to see
15   where we're at exhibit-wise.  I believe we're at
16   174.
17             THE REPORTER:  175.
18   BY MR. RATINOFF:
19        Q.  175.
20        A.  Does the end of the PDF say 1321?
21        Q.  Yes.
22        A.  Okay.  I opened it up.
23        Q.  Okay.  This is a short one.  You'll see
24   what's been marked as Exhibit 175 is a calender
25   appointment sent by yourself to a host of
```

                                                                           181

 1   recipients, including Mr. Suhy amongst others,

 2   dated -- or the calendar appointment is for

 3   September 17th, 2019.  And it talks about in the

 4   title, although it says "cancelled," it says,

 5   "disc" -- I assume short for discussion -- "BETA,

 6   STAGE, production domains and satellites."  Is that

 7   correct?

 8        A.  Right.  Yeah, discussion of.  Yes.

 9        Q.  We were talking about -- I think you said

10   there was some change later on, but as of 2019 I

11   believe you said there was -- and you'll look in the

12   three domains, one being production at the bottom,

13   multiple servers.  So 2019 there was three

14   production servers, I believe you said.

15        A.  Yes.  Yeah.  Yeah.

16        Q.  Sorry.  Go ahead.

17        A.  I was just going to say yeah, this is --

18   this is me talking about it in domains.  So taking

19   the servers and trying to start -- my thought is

20   organizing things moving ahead so that you have like

21   this beta, this staging.  So the staging is about

22   ready -- everything would be -- whatever is being

23   updated to production would be, you know, reviewed

24   on staging and then, you know, if everything is good

25   there, then it can be passed on to production and

                                                    182

November 17, 2022

 1   whatever is done.  And then data being what's called

 2   a staging server is like, as it says, trial and

 3   error.  So this is me talking about these ideas.

 4        Q.  Okay.  But basically you earlier testified

 5   that main graph had three production instances.  So

 6   you'll see here there's a bullet point says,

 7   "Production (multiple servers) main broken out into

 8   three store instances."

 9            So that's consistent what your earlier

10   testimony was?

11        A.  Yeah.  It's the three in that form.  Or at

12   least I'm calling it domains to try break everything

13   up into sort of some, in my mind, logical fashion or

14   suggesting that.  So yeah, there were -- there

15   were -- this is saying three graph store instances,

16   then we have three.  That would have been main graph

17   that we're talking about there.

18        Q.  Three instances of ONgDB.

19        A.  Yes.  Yes.  They would have each had their

20   own instance -- or three instances of ONgDB.

21        Q.  Now, on staging there's a Athena in

22   parenthesis.  I think we go talked about that

23   earlier whether, you know, it was used in a

24   particular role.  Is that consistent with your

25   understanding, that Athena was being used as a

183

MICHAEL C. DUNN                                          November 17, 2022

```
 1   staging server at that time?
 2        A.  Yes.  At least part of it was for this
 3   staging -- some stacker in instance of GraphStack so
 4   that everything that's being updated, the UI, you
 5   know, the Elasticsearch, the data that's stored in
 6   the ONgDB, all of that passes through that.  And the
 7   idea was it's sort of a checkpoint.
 8        Q.  And that would be running one instance of
 9   ONgDB?
10        A.  Yeah.  I can't think why it would be more.
11   So it would be one.  What I don't know is at this
12   time whether this is my aspiration.  I feel like I'm
13   talking about moving forward and trying to put
14   things into this structure.
15        Q.  But at the time there was these three
16   instances in main graph production.
17        A.  Yes.  I believe so.  Yeah.  Three instances
18   of ONgDB in production.
19        Q.  Okay.  Then as far as the stacks on those
20   servers go, let me see if I can refresh your
21   recollection on that.  I'm dropping in the next
22   exhibit.
23            (Exhibit 176 is introduced.)
24            THE WITNESS:  I've got it open.
25   ///
```

184

November 17, 2022

```
1    which I think we talked about being a -- at least at
2    one point a dev -- becoming a dev server.  You'll
3    see this is going back to that same September 2019
4    time period we were talking about earlier.  I just
5    dropped in a new exhibit tab 462.
6              (Exhibit 178 is introduced.)
7              THE WITNESS:  I see it.  I'm on it.
8    BY MR. RATINOFF:
9        Q.  That will be marked as Exhibit 178.  Let me
10   know when you've had a chance to take a look at this
11   email.  I think you'll see the title of this is
12   "Athena CKGE-v2 resync" -- or, I'm sorry, "rsync."
13       A.  Right.
14       Q.  It's dated, the last email, September 17th,
15   2019.  This is produced by the IRS with the Bates
16   number ending in 2201.
17       A.  That's correct.
18       Q.  Do you believe this is a true and correct
19   copy of an email produced by the IRS?
20       A.  No issue.
21       Q.  And you'll see that you're at least copied
22   on this email exchange?
23       A.  Yep.  I do.  Yes.
24       Q.  And then you'll see there's a reference in
25   the very first email, which would be on
```

193

1    September 17th at 2:58 p.m. at the bottom, "Hey John

2    Mark, do you happen to have a newer version of ONgDB

3    available?  We are using 3.5.3 for everything, but

4    it looks like there was a bug fix in 3.5.6 that

5    could help address some issues we're having."

6        A.  Yes.  I see that.

7        Q.  Okay.  I'm just trying to make sure I've

8    got the version number correct.  So I think you said

9    you thought that the 2022 ONgDB was 3.5.2.6.  Do you

10    think because -- at least in September of 2019, is

11    it fair to say that there is a later version being

12    run in 2022?

13        A.  The way that I am interpreting this is my

14    understanding was ONgDB had its own numbering

15    scheme, and so they're referring to the ONgDB

16    version.  I don't know -- I don't know how that

17    relates to anything Neo4j so --

18        Q.  Understood.  I think we had some confusion

19    whether -- when you talked about what version of

20    ONgDB all the servers were running in 2022, you said

21    you thought it was 3.5.2.6 --

22        A.  Sorry.  I missed -- I didn't mean to imply

23    that.  It was the -- what I said with 3.5 and if

24    it's 2.6, that's the Neo4j version that's found

25    within the code.  It's not the ONgDB version.  It's

194

1   what -- does that make sense?

2       Q.  So you're saying that -- okay.  So you're

3   saying that for in 2022 that the version of ONgDB

4   that was being run on the servers showed up as being

5   Neo4j source code version 3.5.2.6?  Is that fair?

6       A.  Yes.  Yes.  As long as -- my understanding

7   is we're not supposed to use ONgDB term now.  We're

8   using graph database.  But your main point there is

9   what I understand when I talked with Puru, and he

10  looked at the code base of the graph database, and

11  it's referred to as Neo4j 3.5, and if it's 2.6,

12  that's what it would be.  Does that make sense?

13      Q.  Yeah.  I think so.  And you said the

14  different name.  So from the IRS's perspective, the

15  program is the same, it's just the names have

16  changed from ONgDB to GDB.  Is that correct?

17      A.  Yeah.  The way that I understand it from

18  John Mark is that we have all the source code that

19  makes up this graph database, and because it's

20  compiled inside the IRS, because we wanted a copy of

21  the source code from the distribution, his statement

22  was you can't call it GraphStack GDB nor ONgDB

23  because ONgDB is compiled by The Graph Foundation,

24  released by them.  So I'm trying to use the names

25  that -- as I understand how to call them.

195

SER_0730

November 17, 2022

```
 1        Q.   Okay.

 2        A.   Does that make sense?

 3        Q.   Sure.  So then actually what software is

 4   being run on the servers in 2022 is what would be

 5   called internally GDB 3.5.2.6.

 6        A.   Yeah, but I don't think we call them by

 7   that versioning.  We just have the GDB version.  I

 8   don't even know myself what GDB version we would

 9   have.  I think John -- there was still discussion

10   what to call it because it's compiled internally.

11   But it's -- the Neo4j source code says Neo4j 3.5.2.6

12   is what I understand from Puru.

13        Q.   Did he say whether that was Neo4j

14   Enterprise source code?

15        A.   He couldn't tell.

16        Q.   As far as you know, it was a derivative of

17   what was previously called ONgDB?

18        A.   Or at least the process is the same.  I

19   don't -- I don't know how -- how it aligns back to,

20   because I understood in March or April of this year

21   when John Mark Suhy mentioned that what we have is

22   not ONgDB anymore because the ONgDB version is

23   version 1 that's available through The Graph

24   Foundation, and we were using some version, at that

25   time I thought he said GraphStack, but it's compiled
```

196

SER_0731

November 17, 2022

1  through I thought the GraphStack.  But now because

2  we have the source code that -- brought in and he's

3  compiling it, we're just calling it GDB.

4      Q.  Okay.  So then in other words, the IRS

5  didn't roll back ONgDB 1.0.  They kept using

6  whatever source code it had on hand at that time in

7  March or April that Mr. Suhy kept on updating.

8      A.  Yes.  We did not -- all I remember from

9  March and April was John Mark said that whatever,

10  you know, whatever happened with the legal issues,

11  that's when I found out that something happened, was

12  in March or April of this year.  And we weren't

13  using ONgDB.  He was bringing in a GraphStack, and

14  so we couldn't call it ONgDB.  That's what I

15  understood.

16      Q.  Okay.  So other than the name, though, were

17  you aware of any changes to --

18      A.  I wasn't -- yeah.  I wasn't -- oh.  Sorry.

19      Q.  I was going to say so there wasn't a

20  switch-over to official Neo4j Enterprise 3.5.2.6 at

21  that time.

22      A.  No.  No.  We didn't switch to Enterprise or

23  anything at that time.  I just understood that the

24  version that we were using in March or April was --

25  I called it GraphStack GDB or something, and then

197

SER_0732

1    later this past summer mentioned that with the code

2    being, as I said, brought in and compiled there, it

3    just needed to be another name.  That's how I was

4    interpreting it.

5        Q.  So where did that Neo4j source code that is

6    now maintained internally come from?

7        A.  John Mark Suhy.

8        Q.  And to your knowledge, what license is that

9    source code under?  Is it under the AGPL?

10       A.  As far as I know.  Yeah.  I haven't been

11   informed of any other requirements.

12       Q.  And it's not under the AGPL clause

13   comments?

14       A.  I'm not -- as far as I know, no.  I have

15   not been told that or brought up or anything.  No.

16       Q.  Okay.  I'm going to go ahead and mark the

17   next exhibit.  Sorry.  I'm trying to do this as

18   quickly as possible.

19           (Exhibit 179 is introduced.)

20           THE WITNESS:  Okay.  I have it up.

21   BY MR. RATINOFF:

22       Q.  This will be Exhibit 179, and this is an

23   email that was also produced by the IRS.  And you'll

24   see it is -- there's a scrambled from, but you see

25   it's to yourself and LuLu.  I can't remember if you

                                                      198

MICHAEL C. DUNN                                    November 17, 2022

```
 1        A.  Yes.  Yes.  That's correct.
 2        Q.  Or what's now called GDB?
 3        A.  Yes.
 4        Q.  You'll be happy to know I'm going to skip
 5   over a few exhibits.  Now, we talked a little bit
 6   about YK1.  Was there an initiative -- or is there
 7   an initiative to merge YK1 into CKGE?
 8        A.  Yeah.  There have been for a couple of
 9   years.  And the original integration is -- has been
10   sort of back-end stuff, accounts management or
11   logging.  Those have been thrown around as ideas.
12   At the current time even it's -- nothing's happened.
13   It's sort of operated as its own entity.  There's --
14   I don't think they've integrated anything.  But by
15   integration, as I said, that's starting off to be
16   sort of back-end stuff, accounts management,
17   bringing in the YK1 UI and seeing if it could be
18   part of the app.  That's where the home page is
19   where people go to when they first log in to the CKG
20   UI.  Those kinds of things.
21        Q.  As of now, as you said, I guess starting in
22   I think, according to my notes, starting in 2019 at
23   least, the YK1 was running ONgDB independently on
24   its own server and still is to this day.  Correct?
25        A.  Correct.  It's still is on its own sort of
```

204

November 17, 2022

1    environment.  And as far as I know, they're running

2    it on its own server or -- whatever they have it

3    installed on in YK1, those two prod and two dev

4    tests.

5         Q.  And has Mr. Suhy been involved in

6    supporting the ONgDB installations in the YK1

7    servers?

8         A.  Probably early on.  I would think yes.  The

9    way that it happened was there was a particular task

10   order to have some contractors help develop that YK1

11   database.  They were doing the work.  John Mark Suhy

12   may have consulted with them, helped them as part of

13   his eGov services.  But there was a -- there was a

14   separate group that stood up the first version, and

15   there's been separate people actually just updating

16   the data since then.

17        Q.  Okay.  As far as the YK1's version of

18   ONgDB, do they obtain that, the updates on the

19   software from the same source of CKG from the GitLab

20   that you mentioned?

21        A.  They would -- yeah, you would get it from

22   the same source here internally when it's brought

23   in.

24        Q.  So which would be brought in by Mr. Suhy,

25   then.

205

November 17, 2022

1    A.  Yes.  He's still the primary one.  Yes.

2    Q.  So he still has the primary responsibility

3  for maintaining the -- what was ONgDB and is now

4  GDB?

5    A.  Yes.  Or -- yes.

6    Q.  What contract is that under?

7    A.  It's still eGov.

8    Q.  The one we talked about earlier today?

9    A.  That's correct.  Yes.

10   Q.  Okay.  We've been going for I don't know

11  how long.  Want to take a quick five-minute break?

12  I think Shelley's saying yes.

13   A.  Okay.

14   Q.  I'm going to switch topics here, and I'm

15  actually getting closer to end here, which is good

16  news.  So I think it would be a good time to take a

17  break.  Also I noticed it's getting dark there on

18  the East Coast.  It's a little dark on the video.

19  So I don't know if you have another light you can

20  put on when we come back.

21   A.  Yeah.  Let me see what I can do.  I see

22  what you're saying.  Okay.  Yeah.  Let me see if I

23  can work on something.

24       MR. RATINOFF:  It's 2:37 now.  Let's come

25  back at 5:45.  Little longer than five minutes.

206

MICHAEL C. DUNN                                    November 17, 2022

1           THE WITNESS:  Okay.

2           THE VIDEOGRAPHER:  We are now going off the

3      video record.  The time is 2:37 p.m.

4           (A recess was taken.)

5           THE VIDEOGRAPHER:  We are now back on the

6      video record.  The time is 2:56 p.m.

7           (Previously marked Exhibit 149 is

8      referenced.)

9      BY MR. RATINOFF:

10         Q.  I just want to keep moving along here.  I

11     know it's late on your end.  I'm going to drop the

12     next document in the chat.  This is previously

13     marked as Exhibit 149.  It's an email produced by

14     the IRS.  The last email being I believe dated on

15     September 28th, 2019.  The subject is "ONgDB

16     deepwalk and new graph analytics library,

17     et cetera."  You'll see there's a Bates number 1292.

18     So I'll represent to you this is produced by the

19     IRS.  And do you believe this is a true and correct

20     copy produced by the IRS other than the exhibit

21     sticker on there?

22         A.  Yep.  No issue.

23         Q.  Okay.  Then taking a look at the email that

24     you sent in the beginning here, you'll see that it's

25     sent a whole host of folks.  It says, "Hi, The team

                                                        207

1    has updated some stuff for ONgDB."  And then you'll

2    see that there is a third bullet point that says,

3    "ONgDB 3.5.9 is now the master."

4         A.  Yes.  I do.

5         Q.  And then there's that URL.  Obviously it's

6    inactive, but it's among the words in there.  It's

7    cdwgit.web.irs.gove/ongdb/distributions/tree/master.

8         A.  Correct.  Yes.  I see that.

9         Q.  Is that referring to whatever that at the

10   time was the most current version of ONgDB that the

11   IRS was using?

12        A.  Yes.  It would have been.

13        Q.  And that main root of that URL is pointing

14   to the internal GitLab that the IRS maintains?

15        A.  That's correct.

16        Q.  And is that where Mr. Suhy would maintain

17   the most recent version at the time of ONgDB on

18   behalf of CKGE?

19        A.  Yes.  I would -- yeah.  I would think so.

20        Q.  So when you're referring to the master, you

21   mean that's just the most recent version of ONgDB

22   that at that time everyone should be using in the

23   CKGE environment?

24        A.  Yes.  I would think so.  Yeah.  I don't

25   know why the term "master."  Maybe because that's

                                                      208

MICHAEL C. DUNN                                    November 17, 2022

1    the, that's the -- on the end of the Git URL it has

2    master, so that's probably why I use master.  I

3    don't know why else I would have used it.

4        Q.  And up until the time that the name was

5    changed to GDB, Mr. Suhy maintained the source code

6    for ONgDB on behalf of the IRS?

7        A.  Yes.  What I don't know is if these were

8    the ONgDB downloaded binaries at the time and not

9    the full source code.  So either way, my view, that

10   would have contained the ONgDB file that people

11   would use.

12       Q.  So, for instance, if they wanted to run

13   their own instance on a laptop, that's where they

14   would go to find the latest version of --

15       A.  Yes.  Yes.

16       Q.  And it was important for them to be running

17   whatever version that the actual CKGE environment

18   was running independently on their laptops for

19   compatibility?

20       A.  Yeah.  I know that there were -- I believe

21   some people had for probably I guess development

22   purposes or what, if it was down to a laptop, I

23   don't know how many people actually had it on their

24   laptops.  But this would have also been, I would

25   think, where if you were replacing or updating one

209

SER_0739

MICHAEL C. DUNN                                        November 17, 2022

 1    of the servers, you would get that.  So it's
 2    essentially putting to -- you know, pointing
 3    everybody to where the master is or the most current
 4    version.
 5         Q.  Okay.  Then I'm going to go ahead and put
 6    the next exhibit in here.
 7              (Exhibit 181 is introduced.)
 8              THE WITNESS:  Okay.  I see it.
 9              MR. RATINOFF:  This will be tab 474.  I
10    believe we are at Exhibit 150 --
11              (Reporter clarifies number.)
12    BY MR. RATINOFF:
13         Q.  181.  So I've just dropped in will be
14    marked as Exhibit 181.  It's an email exchange that
15    was produced by the IRS with the email -- sorry --
16    the Bates number of 473 at the end there on the
17    first page.  Subject is "Graph for local install,"
18    sent on 11/12/2019 to Mr. Suhy.  The last email
19    there.  Do you see that?
20         A.  I do.
21         Q.  Any reason to believe that this is not a
22    true and correct copy of an email produced by the
23    IRS?
24         A.  Yep.  No issues.
25         Q.  Then looking at Mr. Suhy's email on the

                                                          210

November 17, 2022

MICHAEL C. DUNN

1    bottom of the first page, Bates number 473, "Here is

2    how to run it on your local laptop.  Download the

3    latest ONgDB for Windows."  It looks like a similar

4    URL to the last exhibit we were looking at.

5    Correct?

6         A.  Correct.  Yes.

7         Q.  And then there's an actual direct link to

8    3.5.11?

9         A.  Correct.

10        Q.  And that would be whatever the latest

11   version that was made available by Mr. Suhy to RAAS

12   as of November 2019.  Is that accurate?

13        A.  Correct.

14        Q.  So to best of your knowledge, at least as

15   of towards the end of 2019, the latest version of

16   ONgDB that was running on the CKGE environment would

17   have been version 3.5.11?

18        A.  That makes sense to me.

19        Q.  No reason to believe otherwise?

20        A.  No reason to believe otherwise.  Yes.

21        Q.  And going from November of 2019 -- I think

22   we talked about this a little bit earlier.

23   Unfortunately, I don't have any documents that were

24   produced by the IRS after early 2020, so I don't

25   know if you in your conversations with your

211

November 17, 2022

1          So at least in 2020, the version would have

2   been at least what version was being used at the end

3   of 2020, which was 3.5.11?

4       A.  That makes sense.  Yes.  I agree with that.

5       Q.  Okay.  So -- but it's possible in 2020 that

6   ONgDB was operated from 3.5.11 to a more recent

7   subversion, but you just don't know as you sit here

8   today what that version --

9       A.  That's correct.  That's correct.  I don't.

10      Q.  And same thing for 2021, all the servers

11  that we were talking about, including CKGE, YK1,

12  et cetera, earlier, those would be running at least

13  a version 3.5.11, if not something later of ONgDB?

14      A.  Well, I believe sometime around -- did you

15  say '21?

16      Q.  Yes.  2021.

17      A.  Sorry.

18      Q.  So in 2021, all of the servers -- strike

19  that.

20          All of the instances of ONgDB that were

21  being run at the IRS, including CKGE, as of 2021

22  would have been at least using ONgDB version 3.5.11.

23      A.  Yes.  I believe so.  Yes.

24      Q.  Including CKGE?

25      A.  Correct.  Yes.

213

MICHAEL C. DUNN                                          November 17, 2022

1      Q.  Okay.  And then for 2020 -- okay.  That was

2   2021.  I think you were going to 2022.  We talked

3   about this earlier.  So you said sometime between

4   March and -- well, strike that.

5          So sometime between 2020 and 2022, there

6   was an upgrade to -- sorry.  Let me start over

7   again.  I'm trying to figure out how to best

8   articulate this.

9          You previously testified that there was a

10  change in name of the version of graph database

11  software being used on the CKGE amongst other

12  instances of ONgDB.  Correct?

13     A.  Correct.

14     Q.  So as of -- and I believe you said it was

15  somewhere in March or April of 2022?

16     A.  Correct.  Yes.

17     Q.  Okay.  So up until that March/April 2022,

18  all of the servers running instances of ONgDB that

19  we were talking about were running what was called

20  ONgDB.  Actually, that's a bad question.  Strike

21  that.

22          So up until March/April of 2022, all of the

23  instances of ONgDB that you had identified in 2021

24  were still running ONgDB in 2022.  Correct?

25     A.  I believe so.  I don't know -- I don't know

                                                        214

November 17, 2022

1   when the ONgDB was switched over to something that

2   wasn't labeled ONgDB except for in March and April.

3   So does that make sense?

4       Q.  So you don't exactly when that switch in

5   nomenclature was made, but at least prior to let's

6   say March of 2022, CKGE, for instance, was running

7   some version of ONgDB?

8       A.  I was at least referring to it as ONgDB.

9   So that's when John Mark Suhy told us that, as I

10  said, it wasn't ONgDB.  So I was referring to it,

11  other people were referring to it as ONgDB up until

12  March and April until that -- John Mark Suhy

13  contacted us and said that.

14      Q.  Did he explain why the name had to be

15  different?

16      A.  Yeah, I believe -- well, I don't know quite

17  what I remember except for just the name change.  If

18  he said anything.  I do -- I -- I believe there was

19  a discussion about there was a settlement or

20  something the previous year based on the legal case,

21  which I didn't even know was over.  But that what we

22  had now was not the ONgDB version that The Graph

23  Foundation was releasing.  It was, as I said, I

24  think we called it GraphStack GDB.  And I forgot the

25  number or what version it was.

215

Q.   So as far as the -- when Mr. Suhy asked you to stop calling it ONgDB, did he say there was going to be any functional changes in the operation of the software?

A.   Nope.  He did not.

Q.   It was just a name change as far as you knew?

A.   As far as I -- yes.  Correct.

Q.   So it wasn't like he brought in an entirely new set of binaries to install on the CKGE instances?

A.   I don't know that.  Yeah.  I don't know because we didn't get into sort of the binaries and if they were different.  I was just -- I was understanding that as things get upgraded or bug fixes or whatever, different versions are made available.  But I just don't know when -- you know, I don't know that, myself, anything about the underlying binaries.  I would defer to John Mark Suhy on that.

Q.   Okay.  There's no one else at the IRS who would be better to talk to than Mr. Suhy?

A.   I don't know -- I don't know about how detailed the specifics would be.  There could be some people who might know, but I can't -- I don't

216

MICHAEL C. DUNN                                          November 17, 2022

1    know for certain.

2         Q.   So Mr. Suhy is the only person that comes

3    to mind with certainty who would be able to answer

4    that question?

5         A.   Yeah.  Towards certainty.  Yes.

6         Q.   And would the IRS have any issue with

7    Mr. Suhy providing that information?

8         A.   Let me ask Jonathan and them on that

9    question, because I don't think I could say yes or

10   no on that.

11        Q.   Okay.  I'll have that conversation with

12   him --

13        A.   Okay.  Yeah.

14        Q.   -- with Mr. Beene and Mr. Tepper.

15        A.   That's above my pay grade.

16        Q.   Yeah.  I wasn't trying to put you on the

17   spot.

18        A.   I understand.

19        Q.   I just need to know who to talk to.  All

20   right.  Let me go ahead and let me ask you -- let me

21   switch gears.

22             Are you familiar with a project called the

23   Knowledge API or the KGAPI project?

24        A.   I am familiar with it.  Yes.

25        Q.   And what is that project?

                                                        217

1    A.   It's a project that is doing pattern

2  matching on graph data that allow users not having

3  to know Cypher and not starting with an

4  anchor-based, you know, entity to find the number of

5  sub-graphs or networks that match that pattern.

6    Q.   Okay.  And was that a project that -- or a

7  prime contract that was awarded to Tyler Data

8  Services?

9    A.   As far as I know, yes.  It wasn't -- these

10 are not projects I'm directly involved with, so I'm

11 giving you what I know.  But yes, that was Tyler

12 Data Services.

13   Q.   And are you aware of Mr. Suhy also being a

14 contractor in relation to that project?

15   A.   Yes.  I am.

16   Q.   And was the KPG -- I'm sorry.

17        The KGAPI project, was that something that

18 worked with ONgDB?

19   A.   It did.  It used GDB stored data.  Yes.  It

20 queried -- - I believe it queries one of the main

21 graphs.

22   Q.   When you say main graphs, you mean as far

23 as main graph in production?

24   A.   Yes.  As far as I know it uses one of the

25 main graphs in production.  I could -- as far as I

218

MICHAEL C. DUNN                                              November 17, 2022

1    were -- you know, who could be using this.  So I
2    would have been telling Ovi that okay, GraphGrid was
3    approved.  If you're interested, you at least are on
4    the change -- or the approval form to be able to use
5    it if you wanted to.
6         Q.  And then are you familiar with the term "IT
7    whitelist"?
8         A.  Yes.
9         Q.  What's an IT whitelist?
10        A.  That would be the websites or those kinds
11   of external, you know, external to the IRS sites
12   that people can download from.  So the whitelist
13   essentially is Cyber opening up or, you know, you
14   have the permission to download from there.
15        Q.  Sort of there's been a determination it's
16   legitimate software, not some sort of spyware or
17   something like that?
18        A.  Yeah.  So in this case, I believe the
19   sequence in some way was, you know, this is
20   approved, and I would assume a whitelist or a IRS
21   whitelist is to get the -- wherever you would
22   download from whitelisted so you could get, in this
23   case, we'll say GraphGrid's, the software that
24   you're going to work with.
25        Q.  But you weren't -- you weren't contracted

                                                           223

1  that.  So John Mark Suhy, I believe around that time

2  or maybe slightly before, had joined Graystone's,

3  and Graystone's grid started -- they wanted to have

4  conversations about -- I guess the GraphStack

5  components were being absorbed by Graystone, for --

6  for lack of a better word, their own product.  And

7  so we were going, you know, it was around -- I think

8  it was involving sort of those discussions, and I

9  was showing him what -- I believe this is the 2020

10  list.  That -- I'm trying to see if there's any

11  other dating.

12         Yeah.  So this would have been the 2020

13  list.  So I was showing him what GraphStack

14  components were listed in there and what we had on

15  record.  And also underscoring that, you know,

16  GraphStack was approved in the IRS as a bundled

17  component of GraphGrid.  So I was -- I think we

18  had -- it was a phone conversation or something, and

19  I said, well, I'm sending you what we have.  So

20  that's probably why there's no context or anything.

21  It's just me forwarding whatever I had.

22       Q.  Gotcha.  You mentioned Graystone's.  What's

23  Graystone's?

24       A.  I believe Graystone's is a company -- well,

25  obviously they are a company.  They are a company

227

MICHAEL G. DUNN                                          November 17, 2022

1    and John Mark Suhy has joined them, I don't know, I

2    think sometime this summer.

3         Q.   And does Graystone's have any independent

4    contracts within RAAS?

5         A.   No.  They have no contracts.

6         Q.   And you mentioned there was a Graystone's

7    product that they were absorbing.  Is it called Gray

8    Raven?  Does that sound familiar?

9         A.   No.  I don't know if Gray Raven is -- I --

10   they were -- I thought the name they were thinking

11   about or discussing was GrayStack, but maybe it is

12   Gray Raven.  I don't know.

13        Q.   And what did he tell you about the

14   circumstances of why he joined Graystone's?

15             MR. BEENE:  Objection to relevancy.  Object

16   to the form.

17   BY MR. RATINOFF:

18        Q.   You can answer.

19        A.   Okay.  So I can answer?

20        Q.   Yes.  He assert his objections for the

21   record and then you can answer.

22        A.   Okay.  I gotcha.  Why did he join?  As far

23   as I know -- remember, it was just -- I don't

24   know -- I can't -- I don't know if I have a specific

25   idea about why.  I know he had talked about joining

                                                          228

SER_0750

1    a company.  They thought that they, you know, were

2    sort of, call them kindred spirits, and I don't know

3    if there was any -- I don't remember anything else

4    as a reason.

5         Q.  Did he say anything to you about no longer

6    doing work for the IRS because he was going over to

7    Graystone's?

8         A.  No.  He didn't.

9         Q.  Did he assure you that he was going to

10   continue fulfilling his obligations under the

11   current eGovernment Solutions contract?

12        A.  Yes.

13        Q.  Did he indicate whether GrayStone's is

14   going to take over eGovernment Solutions' contract?

15        A.  No.  And I remember, you know, referring

16   them to a contracting officer.  I mean, I don't -- I

17   can't do anything with that.  So if, you know, if

18   eGov was absorbed into Graystone's, they need to

19   deal with that with the contracting officer.  I

20   believe I've told them that.

21        Q.  Okay.  So he did say that he needed to have

22   them take over his contract and --

23        A.  Oh.  I'm sorry.  No.  I don't mean to imply

24   that.  No.  I don't remember the contract -- as far

25   as I know, you know, we still have the contract --

229

MICHAEL C. DUNN                                    November 17, 2022

```
1        Q.   But not GraphGrid.
2        A.   Yeah, no.   This is -- we haven't had any
3   discussions about this in quite awhile.
4        Q.   So we were talking about the Nussbaums.
5   Are you -- so you're familiar with Brad and Ben
6   Nussbaum.   Correct?
7        A.   I am.   Yes.
8        Q.   That was in part due to The Graph
9   Foundation conversations you had with Mr. Suhy we
10  talked earlier today?
11       A.   That was the very beginnings.   Yes.
12       Q.   And are your aware of another entity called
13  AtomRain?
14       A.   I am.
15       Q.   And what's your understanding of what
16  AtomRain is?
17       A.   I believe AtomRain is just a separate
18  company to GraphGrid.
19       Q.   Okay.   And that's a company that Ben and
20  Brad Nussbaum are also involved with?
21       A.   Yes.
22       Q.   And what's your understanding of their role
23  at AtomRain?   "They" being the Nussbaums.
24       A.   As far as I understand, the principals of
25  it.   CTO, CEO, those kinds of things.
```

235

MICHAEL C. DUNN                                    November 17, 2022

```
 1        Q.  Has the IRS specifically -- RAAS entered
 2   into any sort of contracts or purchase orders with
 3   AtomRain?
 4        A.  I -- yes.  They have.
 5        Q.  And is there more than one?
 6        A.  I don't know if there are -- I don't know
 7   how many there are in what way.  I don't have any
 8   direct oversight on that.
 9        Q.  Okay.  Are they -- are they currently -- is
10   AtomRain currently a contractor at the IRS?
11        A.  As far as I know.  Yes.
12        Q.  And is AtomRain working on any projects
13   relating to the CKGE?
14        A.  As far as I know, yes.
15        Q.  And what projects are those?
16        A.  I believe they're working on the corp
17   graph, and I believe that they're working on the --
18   I believe it's the ghost preparer.  But again, I
19   don't manage those -- I don't do any -- so -- but I
20   believe those are at least two.  They're also, as
21   far as I know, still listed as sort of people on the
22   eGov contract.  But, you know, that's handled
23   through eGov.  So their names would be on that,
24   still on that contract, I believe.
25        Q.  And are you aware of any AtomRain employees
```

236

Case 5:18-cv-07182-EJD   Document 210   Filed 09/28/23   Page 546 of 789   November 17, 2022

```
 1   working as subcontractors with ASR Analytics?
 2         A.  Yeah.  I believe those are -- that's what I
 3   was referring to as their projects.  I believe that
 4   they're working -- I believe that ghost preparer is
 5   a partnership with ASR.
 6         Q.  And is the court graph, is that an
 7   ONgDB-based database?
 8         A.  It is.
 9         Q.  How long has that court graph been around?
10         A.  That's the corporate graph we talked
11   about --
12         Q.  Oh.  Corporate.  I thought you said court
13   graph.
14         A.  Oh, sorry.  Corporate graph.  Yeah, sorry.
15         Q.  Gotcha.  Okay.  So corporate graph.  So we
16   talked about that already as existing for a few
17   years and running at least one instance of ONgDB.
18         A.  Yes.
19         Q.  And also you mentioned ghost preparer as
20   being also something that was running ONgDB in the
21   dev environment?
22         A.  Yes.  That's correct.
23         Q.  And at this point is -- corporate graph is
24   running GDB now?
25         A.  Yes.  It is.  Correct.
```

237

1       Q.   And then same with the ghost preparer, is

2  also running GDB?

3       A.   Yes.

4       Q.   And, let's see, I think there's something

5  that Mr. Tepper just provided during this

6  deposition.  Let me see if I've got the right one.

7  These contract numbers are all kind of the same.

8  Let me find the right one here.  Here we go.

9            I'm going to go ahead and drop this next

10  document into the chat.

11            (Exhibit 185 is introduced.)

12            THE WITNESS:  Okay.  I see it.

13  BY MR. RATINOFF:

14       Q.   It's a long one.  I'm going to point you to

15  some specific places, but go ahead and take a look

16  to familiarize yourself.  While you're doing that, I

17  believe -- go back.  I'll just ask Shelley.  What

18  exhibit are we at?  184?

19            THE REPORTER:  We are at 185.

20  BY MR. RATINOFF:

21       Q.   185.  I'm always one behind.  Exhibit 185.

22       A.   Okay.

23       Q.   Do you recognize what's been marked as

24  Exhibit 185?

25       A.   Yeah.  It looks like a procurement order.

238

MICHAEL C. DUNN                                      November 17, 2022

1    I don't think I've ever seen it before.

2         Q.  Does the contract number look like an IRS

3    contract number?

4         A.  It does.  Yes.

5         Q.  And then you'll see it was awarded to ASR

6    Analytics?

7         A.  Okay.  Yes.  I do.

8         Q.  You mentioned they're a contractor

9    currently working in RAAS?

10        A.  They are.  Yes.

11        Q.  Are they also -- are they specifically

12   working on the CKGE?

13        A.  They do.  Yes.

14        Q.  You'll see if we go down to I think it

15   would be page 6 out of 67 in the PDF, because

16   there's no page number.  The heading says,

17   "Performance Work Statement"?

18        A.  Yes.  I see it.

19        Q.  Okay.  Just move down here.  You see

20   there's a scope of engagement?

21        A.  Yes.

22        Q.  That's on page 7 of 67.  It says, "This

23   engagement involves contractor support for Corporate

24   Graph Database Modules.  Specifically, the

25   contractor shall provide analytical support to RAAS'

239

November 17, 2022

1   Data Exploration and Testing Division."

2          Is this the corporate graph database

3   contract you were just referring to?

4          A.  Yes.  It is.

5          Q.  And then going to page 17.

6          A.  Okay.  I'm there.

7          Q.  Yeah.  17 of actually -- I'm sorry.  Page

8   28 out of 67.  Apologies.

9          A.  Okay.  I'm there.

10         Q.  Okay.  The heading is "Knowledge, Skills

11  and Capabilities Required."

12         A.  Yes.

13         Q.  You see a list of names here, one of them

14  being Amanda Bouman?

15         A.  Yes.

16         Q.  Is she -- to your knowledge, is Amanda

17  Bouman an AtomRain employee?

18         A.  Yes.  As far as I know.  Yes.

19         Q.  And then Elizabeth Trenholme, is she also

20  an AtomRain employee?

21         A.  Yes.  As far as I know.  Yes.

22         Q.  And Mr. Nussbaum, Benjamin Nussbaum is also

23  an AtomRain employee?

24         A.  Correct.  Yes.

25         Q.  And those are -- all three of those are

240

1  currently working as subcontractors under this

2  contract?

3       A.  Yes.  Yes.  If the option years -- as far

4  as I know, they would be if the option years are

5  continuing.  Again, I don't do anything really with

6  this contract.  So as long as the option years are

7  still current -- I believe Amanda Bouman is working

8  on the corporate graph, so I believe it's still

9  active as far as I know.

10      Q.  You'll see underneath the names that we

11 just looked at there's a -- "The government desires

12 a balanced team of key and non-key personnel

13 proposed by the contractor."

14          And then it continues on to the next

15 paragraph.  "Experience with IRS data file

16 structures and formats; IRS business processes and

17 systems architecture; ETL/T processes; SAP IQ or

18 column data stores; Bash; Open Native Graph Database

19 (ONgDB)" as being one of those file structures and

20 formats.  Is this accurate?

21      A.  Yes.  As far as I know.  Yeah.

22      Q.  So the individuals listed above would need

23 to be able to work with ONgDB within the CKGE

24 environment?

25      A.  That's how I would interpret it.  Yes.  Or

241

Case 5:18-cv-07182-EJD   Document 210   Filed 09/28/23   Page 551 of 780

November 17, 2022

1  at least one of them.

2  Q.  Or in this case the corporate graph

3  environment which --

4  A.  Yes.  This is for the corporate graph

5  project.  Right?  So this would be using these

6  capabilities or working with this for that project.

7  Q.  And then up until approximately I guess

8  March of 2022, that corporate graph database was

9  running ONgDB.  Correct?

10  A.  As far as I know.  Yes.

11  Q.  And then it switched over, in name at

12  least, to GDB sometime between March and April of

13  2022?

14  A.  As far as I know.  Yes.

15  Q.  No reason to believe not --

16  A.  No.  Not that I'm aware of.  No.  I don't

17  know the specifics, though.  But that's as

18  reasonable to me as anything else.

19  Q.  And you mentioned you were aware of -- I

20  think you testified you were aware of some

21  litigation that you didn't know if it was resolved

22  or not.  Do you recall mentioning that?

23  A.  Yes.  I do.  Yes.  Back to the March and

24  April time frame?

25  Q.  Yeah.

242

1    A.  Yes.

2    Q.  And what litigation were you referring to?

3    A.  I believe this dispute that you all are

4  involved in.

5    Q.  Were you ever aware of any dispute between

6  Neo4j and AtomRain and Graph Foundation?

7    A.  I -- yes.  I guess in the sense that I --

8  well, yeah, I guess so with the Graph Foundation.

9  Yeah.  I think.  At the very beginning many years

10  ago, I thought it was all involved.

11    Q.  Did you have any understanding from the

12  Nussbaums whether that dispute had been resolved?

13    A.  I believe in March and April it came across

14  that it got resolved and -- and -- with The Graph

15  Foundation.

16    Q.  Okay.  And that's one of the reasons that

17  precipitated the name change?

18    A.  Yeah.  It seemed like it.  Yes.

19    Q.  Just to be clear, that was March, April

20  2022?

21    A.  That's correct.

22    Q.  Did anyone from AtomRain or Graph

23  Foundation or GraphGrid inform you that an

24  injunction had been entered against them in 2021?

25    A.  No.

243

Case 5:18-cv-07182-EJD   Document 210   Filed 09/28/23   Page 553 of 789

November 17, 2022

1  And I was -- I asked some questions that I was

2  gathering for my director and everybody to just

3  understand about sort of what the legal -- what the

4  rights of The Graph Foundation were.  Because as I

5  understand it, The Graph Foundation, as far as I

6  know, still had or available for download ONgDB

7  version 1, which had some statement about that this

8  product was something from July or something like

9  that of last year.  And so I was -- I just asked the

10  questions about -- with the idea that ONgDB

11  version 2 was going to soon be sent out.  I was

12  asking about sort of, you know, the basis of that,

13  how did it match up with the settlement.  And Ben

14  Nussbaum, you know, replied with sort of saying that

15  no, it would adhere to the policies.  I don't think

16  he could get specific because of a NDA.  So that's

17  where it ended.

18      Q.  NDA with who?

19      A.  I don't know.  He just said an NDA.  I

20  don't remember with anybody specifically.  But I

21  just remember that as being sort of stated.

22      Q.  Now, you mentioned ONgDB 1.0.  What was

23  your understanding of what ONgDB 1.0 was or is?

24      A.  It is -- the way I -- the way I understand

25  it is it has a certain -- it's using a certain Neo4j

251

SER_0761

1  code base that is -- from the description meets the

2  terms of the settlement, and so it got re-labeled as

3  version 1.

4      Q.  Do you have any understanding as to whether

5  the ONgDB version 1, the rollback of the source code

6  is older, an older version than what the IRS is

7  currently using?

8      A.  I can't remember what -- I believe on their

9  website they have the version number that's there.

10  But I can't remember what number it is compared to

11  what I just said the Neo4j code that I just

12  mentioned earlier.

13      Q.  Okay.  Other than the actual number, is it

14  your understanding that ONgDB 1.0 was using older

15  Neo4j source code than what the IRS is currently

16  using?

17      A.  I would -- I think so based on my

18  recollection.  I believe so.

19      Q.  And what was -- what was the explanation

20  for what ONgDB 2.0 would be?

21      A.  I believe that it's using -- well, I can't

22  remember anything specifically, but ONgDB version 2

23  would use some Community Edition or something like

24  that that would have the plug-ins added to it, or at

25  least -- well, no.  No.  I think maybe the Community

252

```
 1   Edition with whatever else they're going to add to

 2   it, which I don't really know because haven't heard

 3   about it any further.  Maybe that's what it is.

 4   Sorry.  I'm trying to remember things.  The

 5   Community Edition would be the part of ONgDB

 6   version 2, and there would be, I think, some

 7   additional features added to it.  But as I said, I

 8   don't know what those are.  And I think we had a --

 9   awhile ago asked for whatever it was, the release

10   notes, and I can't even remember if that was -- if

11   anything was sent back.

12        Q.  Does the IRS -- sorry.  Strike that.

13            What is the current plan with the CKGE as

14   far as continuing with GDB?

15        A.  I think that the -- we're looking at the

16   other options.  Reached out to Neo4j to look at the

17   Enterprise Edition.  Part of it is going to be

18   dependent upon other parties in the IRS and sort

19   of -- there's a separate unit in IT that is looking

20   to build out a platform.  And so it could be -- it

21   could somehow be evolved into that through some

22   project life cycle process, whatever.  And I don't

23   know, it depends -- I don't know.  That's so

24   generalized, I don't even know if I could get more

25   specific than that.
```

253

November 17, 2022

254

Q.  And then as far as the current level of performance with, for instance, the CKGE production or main graph, I guess is what you used, are you using any, to your knowledge, Enterprise-level features?

A.  The only feature that I know that would be listed in the Enterprise when looking at Community versus Enterprise is there's a node ID that the Enterprise automatically does.  And so that would -- that would be the feature that would be the different -- or that feature would be, of the Enterprise features, the one that, you know, we would want to use or we would have to do a work-around if we had the Community Edition.

Q.  So currently the main graph isn't operating any clusters?

A.  No.  We still -- the -- the instances are sort of stand-alone and, you know, they're not really clustered for workload distribution.  It's sort of, you know, a UI goes here, analyst graph, people go here.

Q.  Are you using horizontal scaling in any of the graphs databases with main graph?

A.  What do you mean by horizontal scaling, just so I make sure I know.

SER_0764

1   so it's just installed on the server.  So it's using

2   whatever is needed amongst the size.  So there was

3   no way that they could say, oh, it's using four

4   cores, six cores, or what have you.

5        Q.  Based on the emails that we looked at

6   earlier, there was at least 12 cores being used from

7   the start.  Correct?  Sorry.  Let me rephrase that.

8        A.  Yeah.  Go ahead.

9        Q.  The capability of 12 cores was something

10  that was originally contemplated?

11       A.  Yes.  Sp -- sorry.  I interrupted you.

12       Q.  Let me -- I know you want to get out of

13  here --

14       A.  No.  No.  Shelley's going to kill me if I

15  keep interrupting.

16       Q.  So then the number of cores that originally

17  the IRS is looking at was 12, and that was in the

18  development phase.  Was there a greater need once

19  CKGE went into production for more than 12 cores?

20       A.  I -- I don't know because, again, it's sort

21  of -- the way that it's installed on the bare metal,

22  it's just using the cores.  And I asked, there was

23  the answer from Puru Komaravolu in this instance was

24  he's not able to tell how many are used typically or

25  anything.  So it was left with just an answer --

257

November 17, 2022

1    basically, well, if we wanted the Enterprise

2    Edition, sort of what would be the bare minimum.

3    Bare minimum to be able to put what we wanted into

4    production, what would be the bare minimum, and he

5    said 2 by 16.  So two nodes each with 16 cores.

6        Q.  Okay.  When you say two nodes, you mean two

7    graph instances or two instances --

8        A.  Yeah.  We would -- again, not -- I don't

9    think anybody's interested in the clustering, so it

10   would be sort of two, two separate instances, each

11   with 16 cores is sort of the bare minimum.

12       Q.  Then when we talked about that email

13   earlier -- I think it was a December 12 -- I'm

14   sorry, December 11th email where I think Mr. Martin

15   was asking about the DL38 server capabilities, you

16   were looking at servers with 32 cores.  Correct?

17       A.  Yeah.  Those -- those servers may just come

18   with those cores.

19       Q.  And you just may not -- strike that.

20           In other words, probably at least in

21   guesstimation would only be half of those 16,

22   correct, that would be used?

23       A.  You could.  It's hard to tell back then.

24   But, you know, given right now with the size, I

25   would say it could be less, because the graph has

258

SER_0766

November 17, 2022

1  grown over those years back, you know, 2019, 2018,

2  2020.  You know, it's just the size of the graph.

3       Now, back to your point earlier was well

4  the number of users has grown.  So right now we have

5  about -- I think about 6,000 logins a month.  And

6  they're all using a set Cypher query define.

7  They're not doing their own Cypher writing.  So it's

8  a set -- oh, shoot.  I'm sorry.  I'm late for a

9  church meeting, but I'll handle them.

10       Q.  I'm sorry.  I apologize for that.

11       A.  That's okay.  What was I gonna say.  Oh,

12  user.  So back then we had a few hundred, probably

13  maybe less than a handful of people per hour.  My

14  working rule of thumb has been probably about maybe

15  200 an hour now logins.  You know, if you take the

16  6,000 logins per month.  So that's not necessarily

17  you need people or anything.  So it's just a rough

18  order.  But, you know, if Puru -- if the discussion

19  was sort of let's go with two 16-core instances,

20  then that's, you know, sort of the best that I can

21  understand right now.  And that would include the

22  main -- I believe the idea would be to include the

23  main graph, YK1, you know, all in that sort of

24  setup.

25       Q.  So then just current needs, you're saying

259

1    there are 6,000, approximately 6,000 logins based on

2    that 200 per day, and so you're saying current need

3    would be two instances of 16 cores?

4        A.  Not -- sorry.  Not 200 a day.  Probably

5    around 200 an hour.

6        Q.  200 per hour.  Sorry.  Thank you for

7    correcting me.  So just to be clear, when you say

8    Puru said two instances at 16-core, he was referring

9    to the current need?

10       A.  Yes.  The current need.

11       Q.  And were you able to get any more

12   information along those lines with respect to any

13   other graph instances, such as corporate graph or

14   COVID?

15       A.  Um, I believe if -- so COVID, while it's in

16   production, that data is eventually just going to

17   bleed into the main graph.  It's very limited use

18   and it's use is dwindling.  You know, I'm not sure

19   that that's really a key factor.  So the main graph

20   really is.  And then the corporate graph and

21   individual graphs may present more -- more demand

22   for increasing.  I just don't know what that would

23   be.  Because part of it is where these projects end

24   up with what they're doing.  It may just drop.  Or

25   it may be stand-alone or the data may just be added,

260

1   for example, into the main graph as just additional

2   data elements, and the same users just work with it.

3   So it's -- it's hard to know.

4        Q.  Okay.  As far as the, for instance,

5   corporate graph, it would require at least the same

6   minimum one instance, 16 cores.  Is that fair?

7        A.  I don't know.  I really don't know.

8   Because I don't even know -- I'm not even sure what

9   the size of the graph or anything.  I'm just not

10   part of that project.  So I don't know right now

11   what -- how to answer that based on like, you know,

12   your question.

13        Q.  Okay.  So the only ones you can really

14   provide more specifics are the main graph and YK1?

15        A.  Yes.  Yeah.  Those are the two primary ones

16   that I think would be in that sort of, you know,

17   minimum is the way that it was presented to me.

18        Q.  Okay.  So two instances at 16 cores each.

19   What about the memory, did you get information on

20   what minimum memory RAM would be on that?

21        A.  256.

22        Q.  256.  And would YK1 at least as of now need

23   its own instance?

24        A.  My understanding would be it would sort of

25   be brought into the same instance and just as a

261

MICHAEL C. DUNN                                            November 17, 2022

```
 1    different schema.
 2         Q.  But as of now, it's still separate.
 3         A.  That's correct.  As of now, everything is
 4    still separate.
 5         Q.  And are you aware that Enterprise Edition
 6    has a faster Cypher ability?
 7         A.  Not -- I don't -- no.  I don't know if I
 8    know it that way.  I mean I -- no.  I understand
 9    from discussions with people that the Community
10    Edition shows faster queries.  But I don't know
11    anything specific about the Enterprise Edition.
12         Q.  You have no understanding that Cypher
13    queries with Enterprise can run 50 to 100 percent
14    faster than --
15         A.  I do not.  It wasn't -- sorry.  Go ahead.
16         Q.  I was going to say if that were the case,
17    then Enterprise Edition would be advantageous, being
18    faster than the Community Edition for the work that
19    the IRS is doing.  Correct?
20         A.  It could if that, if it -- I mean, the
21    question would be is, is the Community Edition speed
22    fast enough.  And, you know, we're -- our users are,
23    you know, just query results, reading the data,
24    looking at it through the UI for the most part, and
25    I don't know -- and they're using a set -- a
```

                                                              262

November 17, 2022

1   predefined Cypher query.  I think what you're saying

2   could make sense, but I don't know.  Because it --

3   you know, I don't know if it would matter.  I don't

4   know if end user would know.

5        Q.  Okay.  But if you're an end user and you're

6   able to run your queries faster, you can be more

7   productive.  Isn't that a fair?

8        A.  Yeah.  I would say if it would be faster to

9   return the results and they can work with it faster,

10  I would hope that it speeds up whatever they're

11  doing.

12            MR. RATINOFF:  I am just about done.  I

13  know you've been very patient.  I really appreciate

14  that.  It's already 7:15 there, so I do appreciate

15  your time.  I think at this point I have no further

16  questions.  Although, I do have a few outstanding

17  issues I need to talk to Mr. Tepper about, some

18  documents that we didn't receive in response to

19  subpoena as well as a couple questions I wasn't able

20  to get answers to.  But I think at this point

21  Mr. Beene's going to want to ask you a couple

22  questions.  I assume everyone would like to take a

23  quick break before that happens?

24            MR. BEENE:  That's fine.

25            MR. RATINOFF:  Can I get a time check where

263

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS   408-287-7500

SER_0771

MICHAEL C. DUNN                                                November 17, 2022

1    A.  I believe that would be part of their

2  duties and what they would -- they could do.  Yes.

3    Q.  And for the individual graph, do you know

4  what entity is providing that type of service?

5    A.  Whoever is on the contract for the

6  individual graph.

7    Q.  Is that -- that's not John Mark Suhy.

8  Correct?

9        MR. RATINOFF:  Objection to form.

10        THE WITNESS:  As far as I know, John Mark

11  Suhy's not on that contract or being paid as far as

12  I know.

13  BY MR. BEENE:

14    Q.  Do you know who the entity with the role of

15  maintaining the corporate graph is?

16    A.  I believe the one person that I interacted

17  with is Amanda Bouman.  I believe she was doing the

18  work.  Now, as of late when -- when the corporate

19  graph first stood up, I believe -- I believe she was

20  there.  But John Mark Suhy was working on it

21  whenever that started.  But of late, at least, I

22  don't know, past year, two years, I believe whenever

23  ASR -- I guess if ASR Analytics took over in 2020,

24  it's been since then.

25    Q.  And when you meant -- for reference to John

                                                       274

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS   408-287-7500

1  Mark Suhy in the beginning, you mean in 2016 as part

2  that 2016 order.   Is that correct?

3       A.   No.   It would be the eGovernment.   I

4  believe the project team modified the eGovernment

5  task order for that first year so that they could

6  start looking at the corporate graph project.

7  That's when the corporate graph project started.

8  And so that was under eGovernment Solutions until

9  the end of that year and I believe would have been

10  what, 2020, I believe that's when the project team

11  started the new contract.

12       Q.   And the COVID graph, do you know what

13  entity has the responsibility for maintaining that

14  graph database?

15       A.   Nobody now.   It just sits there.   But it

16  was brilliant.   They had the contract.

17       Q.   Which entity maintains the ghost preparer

18  database?

19       A.   I believe that's the project team.   I

20  believe that's the ASR Analytics.   I believe that's

21  who has the project.   I don't know.   Again, these

22  are projects that I don't directly deal with, so

23  some of my understanding could be wrong.   But I

24  believe that ASR Analytics has that.

25       Q.   And then YK1 graph, do you know who

275

SER_0773

1  maintains the YK1 graph?

2      A.  I believe it's ASR Ana -- well, I

3  believe -- I believe a it's ASR Analytics person

4  who's working with the contractor that has the YK1

5  contract AtImpact.  That's the vendor name,

6  AtImpact.

7      Q.  Do you know who is responsible for

8  maintaining the software under the GraphGrid

9  whitelist?

10        MR. RATINOFF:  Objection to form.

11        THE WITNESS:  Who is maintaining it?  I

12  mean, I've always worked through John Mark Suhy, who

13  is always working under those software components

14  that we were using.

15  BY MR. BEENE:

16      Q.  Does KG allow you to work with Spark or

17  other databases?

18      A.  I believe it still does.  Yes.

19      Q.  Okay.  I would like to mark for

20  identification as Exhibit 188.  This is a IRS price

21  quotation sheet.

22        (Exhibit 188 is introduced.)

23        THE WITNESS:  Okay.  I see it.

24  BY MR. BEENE:

25      Q.  Does this document reflect the scope that

276

DECLARATION OF WITNESS


I, MICHAEL C. DUNN, hereby declare I am the
deponent in the within matter; that I have read the
foregoing deposition and know the contents thereof,
and I declare that the same is true of my knowledge
except as to the matters which are therein stated
upon my information or belief, and as to those
matters, I believe it to be true.
I declare under the penalties of perjury of
the State of California that the foregoing is true
and correct.


Executed this _____ day of
_____, 20_____, at
_____, _____.
(City)                          (State)




MICHAEL C. DUNN




292

SER_0775

```
 1                REPORTER'S CERTIFICATE
 2         I, SHELLEY M. SAILOR, duly authorized to
 3    administer oaths pursuant to Section 2093(b) of the
 4    California Code of Civil Procedure, do hereby
 5    certify that the witness, MICHAEL C. DUNN, in the
 6    foregoing deposition was by me duly sworn to testify
 7    the truth in the within-entitled cause; that
 8    deposition was taken at the time and place therein
 9    named; that testimony was reported by me and
10    thereafter transcribed under my direction; that the
11    foregoing is a complete and accurate record of said
12    testimony; and that the witness was given an
13    opportunity to read and correct said deposition and
14    to subscribe the same.  Should the signature of the
15    witness not be affixed, the witness shall not have
16    availed himself of the opportunity to sign or the
17    signature has been waived.  I further certify that I
18    am not of counsel nor attorney for any of the
19    parties in the foregoing deposition and caption
20    named nor in any way interested in the outcome of
21    the cause named in said caption.
22         Reading and Signing was REQUESTED.
23    DATED:  November 27, 2022
24
25         SHELLEY M. SAILOR, CSR 10254
```

293

**EXHIBIT 6**

SER_0777

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

NEO4J, INC., et al.,

      Plaintiffs,

vs.                                          CASE NO.
                                             5:18-cv-07182-EJD

PURETHINK, LLC, et al.,

      Defendants.
_____/

VIDEOTAPED DEPOSITION OF
MICHAEL STAVRIANOS
as representative of ASR ANALYTICS, LLC

DATE:          November 7, 2022

TIME:          10:28 a.m. Eastern Time

LOCATION:      via videoconference

REPORTED BY:   BENJAMIN GERALD
               California CSR No. 14203
               Washington CSR No. 3468
               Texas CSR No. 11912

1

1   Defendants John Mark Suhy, iGov, Inc., and

2   PureThink LLC, and Defendant John Mark Suhy is in

3   attendance.

4          MS. EMBRY:  This is Rebecca Embry of Landman,

5   Crosi, Ballaine & Ford for non-party deponent

6   Michael Stavrianos, and attending is general counsel,

7   Vanessa Champion, by phone.

8                      --o0o--

9              MICHAEL STAVRIANOS,

10        as representative of ASR ANALYTICS, LLC,

11   being duly sworn by the Certified Shorthand Reporter to

12   tell the truth, the whole truth, and nothing but the

13   truth, testified as follows:

14                     --o0o--

15                   EXAMINATION

16   BY MR. RATINOFF:

17       Q.  Good morning, Mr. Stavrianos.  How are you?

18       A.  I'm good.  How are you?

19       Q.  As you know, I'm representing the plaintiffs in

20   this lawsuit you've been asked to provide testimony in,

21   and I do appreciate you giving us your time today.  I'll

22   try to make this as quick and painless as possible,

23   but -- and I'm definitely aware of the time differences,

24   so I know it's 10:30 there.  Our lunch time is going to

25   be a little bit different, but I want to be respectful

                                                        12

1   of yours, so if you want to break around 12:30-ish your

2   time for a short lunch, I'm happy to do that, or if you

3   need an hour, whatever, just let me know.

4          Otherwise, I'm just going to take breaks every

5   hour, maybe 5-10 minutes depending on how we're doing,

6   and if there's any time you need a break, as long as

7   there's not a question pending that needs to be

8   answered, I'm happy to take a break whenever you want,

9   so just ask.

10   A.   Okay.

11   Q.   And have you ever been deposed before?

12   A.   I have not.

13   Q.   Well, let's go through a few -- I'm sure your

14   counsel's has already done this, but I need to make sure

15   we're on the same page.

16          You're taking a deposition, and you've been

17   sworn in under oath, under penalty of perjury.  This is

18   just as if you were testifying live in court.

19          Do you understand this?

20   A.   Yes.

21   Q.   And your testimony's going to be transcribed

22   into booklet form.  It will show my question and your

23   answers, and at the end of deposition, within about 5-10

24   days, you'll receive a transcript, and you'll have an

25   opportunity to read that transcript and make any

13

Case 5:18-cv-01882-EJR Document 210   Filed 09/28/23   Page 573 of 730   November 7, 2022

1    record.  The time is 10:49 a.m.

2    BY MR. RATINOFF:

3        Q.  Okay.  So you should have before you

4    Exhibit 120, which is a subpoena to testify at

5    deposition.

6            Do you have that in front of you now?

7        A.  I do.

8        Q.  And do you recognize Exhibit 120?

9        A.  Let me just finish reviewing it.  One moment.

10           Okay.  Yes, I recognize this document.

11       Q.  Okay.  And what is it?

12       A.  It's a subpoena.

13       Q.  And do you understand this subpoena was served

14   on ASR Analytics, LLC?

15       A.  Yes.

16       Q.  And do you understand today that you're going

17   to be providing testimony on the topics of examination

18   which start on Page 3 of Attachment A?

19       A.  Yes.

20       Q.  And are you familiar with Topics 1 through 14?

21       A.  I have read them, yes.

22       Q.  And do you understand that you're going to be

23   providing testimony today on each one of these topics?

24       A.  Yes.

25       Q.  And are you prepared today to provide testimony

                                                          25

1   on each one of these 14 topics?

2       A.   Yes, I think so.

3       Q.   And do you understand that your testimony on

4   these topics doesn't necessarily include what you know

5   personally, but it's what is known to the company,

6   ASR Analytics?   Do you understand this?

7           MS. EMBRY:   Objection to form.

8           THE WITNESS:   Yes.

9   BY MR. RATINOFF:

10      Q.   Did you understand my question?

11      A.   I think so.

12      Q.   Okay.   Well, I want to make sure you do, so

13  what -- what did you understand my question to be?

14      A.   That I am speaking not only regarding my own

15  recollection, but those of the company, ASR Analytics.

16      Q.   Thank you.

17          Just -- just to be clear, too, if there is an

18  objection to form, and you don't say, "I don't

19  understand the question," I'm going to assume that you

20  do understand the question, and I'm just going to go

21  ahead and wait for your answer; is that okay?

22      A.   Yes.

23          MR. RATINOFF:   And then I'd like to go ahead

24  and drop another document in the chat.   This is going to

25  be marked as Exhibit 121.

                                                    26

1  for documents that were asked for by this document

2  subpoena?

3      A.  No, I don't believe so.  By and large, that

4  effort was led by our counsel.

5      Q.  Did ASR Analytics provide access to email

6  accounts to its counsel?

7      A.  I'm not aware of any steps that were taken to

8  provide additional access to ASR email addresses.

9      Q.  How did ASR Analytics search for documents that

10  were responsive to this subpoena?

11      A.  I don't know.

12      Q.  Was there anyone at ASR Analytics involved in

13  the search for documents in response to this subpoena?

14      A.  What do you mean by "involved in"?

15      Q.  Meaning did anyone at ASR Analytics assist in

16  the search for documents that were produced in response

17  to this subpoena?

18      MS. EMBRY:  And just for clarification, when

19  you say "ASR," are you referring to GCOM as well?

20  BY MR. RATINOFF:

21      Q.  Yeah, I think that's -- well, let me ask you

22  this:  ASR Analytics, is that currently an independent

23  company?

24      A.  ASR Analytics was acquired by GCOM at the end

25  of 2021.

29

1  Q. When you say "acquired," what do you mean by
2  "acquired"?
3  A. Purchased.
4  Q. So a hundred percent ownership was purchased by
5  GCOM?
6  A. That's correct.
7  Q. Is GCOM a company name, or is that an acronym?
8  A. It is a company name. I believe the full name
9  is GCOM Software, Inc., but I could be wrong about that.
10  Q. Does ASR Analytics, LLC still exist as an
11  independent company?
12  A. My understanding is that it does continue to
13  exist as a legal entity.
14  Q. So it continues to exist as a limited liability
15  company?
16  A. I don't know.
17  Q. And what's your current role at Analytica --
18  I'm sorry -- ASR Analytics?
19       MS. EMBRY: Objection to form.
20       THE WITNESS: So again, ASR Analytics is now
21  apart of GCOM. I can answer the question, but just
22  recognize that that is a --
23  BY MR. RATINOFF:
24  Q. Understood. So just to be clear,
25  ASR Analytics, LLC still exists as an independent legal

30

SER_0784

1   entity, correct?

2        A.   Correct.

3        Q.   And who's in charge of ASR Analytics, LLC

4   internally?

5        A.   I would say ASR Analytics is controlled -- is

6   operated by a group of partners.

7        Q.   And are you one of those partners?

8        A.   Yes.

9        Q.   And how many other partners are there?

10       A.   Ten others.

11       Q.   What's your current title at ASR Analytics?

12       A.   My -- my title -- yeah.  Up until the time of

13   the acquisition, and for all intents and purposes

14   continuing, is founding principle.

15       Q.   Okay.  So when you received the subpoena --

16   "you" being ASR Analytics -- was GCOM the one to search

17   for and collect documents in response to the subpoena?

18       A.   Yes.

19       Q.   And who at GCOM is responsible for that

20   document collection?

21       A.   I believe it was coordinated by

22   Vanessa Champion.

23       Q.   And were employees or -- of ASR Analytics asked

24   to provide access to their emails in conjunction with

25   searching for documents in response to this subpoena?

                                                          31

1    of the founding principals of ASR Analytics?

2         A.   That's right.

3         Q.   And why did you found ASR Analytics?

4              MS. EMBRY:   Objection to form.

5              THE WITNESS:   Because two colleagues and I

6    wanted to try something new.

7    BY MR. RATINOFF:

8         Q.   So these are colleagues at IBM that you -- you

9    formed or founded ASR Analytics with?

10        A.   Correct.

11        Q.   And were there just three original founders of

12   ASR Analytics including yourself?

13        A.   Yes.

14        Q.   And who are the two other founders?

15        A.   Peter Arena, and Stephen -- with a P-H, he'll

16   want you to know -- Rhody.

17        Q.   And how do you spell -- are they still founding

18   principals of ASR Analytics?

19        A.   Peter --

20             MS. EMBRY:   Objection to form.

21             THE WITNESS:   Peter Arena is still with the

22   company; Stephen Rhody is not.

23   BY MR. RATINOFF:

24        Q.   And what does ASR Analytics do?

25        A.   We provide analytic consulting services to

                                                        39

SER_0786

1   government clients.

2        Q.  And the IRS is one of those clients currently?

3        A.  Yes.

4        Q.  And what other clients does ASR Analytics have

5   besides the IRS?

6        A.  Many others.  Mostly either state departments

7   of revenue or colleges and universities.

8        Q.  So it's not just federal agencies, but also

9   state agencies, correct?

10       A.  Correct.

11       Q.  And so is it fair to say that ASR Analytics

12   specializes in tax matters?  Is that fair?

13            MS. EMBRY:  Objection to form.

14            THE WITNESS:  What do you mean by "tax

15   matters"?

16   BY MR. RATINOFF:

17       Q.  Well, you said that ASR Analytics works with

18   the IRS and then state revenue agencies.

19            I'm assuming those are the state equivalents of

20   the IRS; is that correct?

21       A.  That's correct.

22       Q.  So how do you describe ASR Analytics' work with

23   those tax agencies?

24       A.  Yeah, I would say the majority of ASR's work

25   involves tax analytics.

40

1    A.  I'm almost certain it was between 2006 and

2    2007.

3        Q.  Okay.  So the IRS has been a long-time client

4    of ASR Analytics?

5        A.  Correct.

6        Q.  Is it fair to say ASR Analytics has a very

7    lengthy relationship with the IRS?

8            MS. EMBRY:  Objection to form.

9            THE WITNESS:  Relative to our history as a

10   company, we have a long relationship with them.

11           MR. RATINOFF:  And I'm going to go ahead and

12   mark the next exhibit as 124.

13           (Exhibit 124 was marked for identification.)

14   BY MR. RATINOFF:

15       Q.  And this is a -- I'll represent to you a press

16   release that was downloaded off of ASR Analytics'

17   website with a date of December 6, 2018, entitled,

18   "Using Data Science to Improve Tax Compliance

19   Administration, ASR Awarded BPA Contract Under

20   161 Million IRS DAIS Vehicle."

21           Do you recognize this press release?

22       A.  Let me just scan through it real quick.

23           Yes, I -- I recognize this.

24       Q.  And do you have any reason to believe this

25   isn't a true and correct copy of a press release issued

45

1  by ASR Analytics on December 6, 2018?

2     A.  No.

3     Q.  And do you have an understanding of what

4  contract is being referred to in this press release?

5     A.  Yes.

6     Q.  Okay.  And what is your understanding?

7     A.  It's referring to the Data Analytics and

8  Innovation Services Blanket Purchase Agreement from the

9  IRS.

10    Q.  Is that what "DAIS" stands for?

11    A.  Correct.

12    Q.  And what is -- what is a DAIS?

13    A.  It is a blanket purchase agreement,

14  multiple-award contract vehicle issued by a research

15  organization at the IRS.

16    Q.  And that's the Office of Research Applied

17  Analytics and Statistics?

18    A.  That's correct.

19    Q.  And that's generally referred to as the

20  R-A-A-S?

21    A.  Or RAAS, depending on who you're talking to.

22    Q.  That was my next question.  You got ahead of

23  me.

24        So generally, instead of the long form of

25  Research Applied Analytics and Statistics is either

46

 1    referred to as R-A-A-S or RAAS by those working around

 2    the RAAS?

 3        A.  Correct.  Usually RAAS.

 4        Q.  Usually RAAS.  Okay.  So we'll be on the same

 5    page if we say "RAAS."  Got it.

 6            Okay.  Now, what's the -- what is the

 7    blanket -- and you'll have to excuse my ignorance.  I

 8    know government contracting is a very -- it's a little

 9    bit of an art, little bit of a science.  It's very

10    different from commercial contracts.

11            But what's -- what's a blanket purchase

12    agreement?

13        A.  So speaking as not a procurement expert, my

14    understanding of a blanket purchase agreement is a

15    contract that the government establishes with one or

16    more contractors that then enables them to compete and

17    award individual task orders within the BPA, or blanket

18    purchase agreement.

19        Q.  So the blanket purchase agreement operates as

20    sort of a preferred vendor award at the onset; is that

21    fair?

22        A.  That's fair.

23        Q.  And then once multiple vendors are awarded --

24    are awarded under the BPA, they can then -- then they

25    still have to compete for actual specific contracts

                                                    47

1    A.  I'm sorry.  I didn't catch the question.

2    Q.  Oh, okay.  I'll ask it again.

3        So it was an accurate statement at the time

4    that -- in 2018, that there had been an approximately

5    15-year partnership with the IRS' RAAS organization,

6    between the RAAS organization and ASR Analytics?

7    A.  Yeah.  That's probably a bit on the

8    overestimate side given that ASR had only existed for

9    14 years at that time.

10   Q.  Well, that might feed back to your prior --

11   prior work at IBM then?

12   A.  Perhaps, or -- yeah.

13   Q.  Or it's just a PR --

14   A.  Yeah.  We rounded up to the nearest five.

15   Q.  Understood.  And then there's five bullet

16   points listed here.

17       Were these particular areas where a task order

18   could be issued that ASR Analytics would be able to bid

19   on?

20       MS. EMBRY:  Objection to form.

21       THE WITNESS:  I am not certain, but I believe

22   these were areas of scope defined in the BPA contract.

23   BY MR. RATINOFF:

24   Q.  And did ASR Analytics view itself of being

25   capable of providing services in relation to these five

                                                        49

1 areas of focus?

2  A. Yes.

3  Q. And what is authentication, identity theft, and

4 fraud protection under the BPA?

5  A. You want me to sort of describe what those

6 things are?

7  Q. Yes, please.

8  A. All right. So identity theft is when an

9 individual submits a tax return professing to be someone

10 else in an attempt to steal their refund, and the IRS

11 uses various methods to prevent that, to detect returns

12 that are submitted by identity thieves.

13   Fraud protection is just a general term that

14 would encompass identity theft, but also other types of

15 fraud in an attempt to not pay the appropriate tax

16 liability.

17   And authentication is the process of a taxpayer

18 confirming their identity to the IRS.

19  Q. And was ASR Analytics awarded any task orders

20 that fell within the authentication, identity theft, and

21 fraud protection area after receiving the BPA?

22  A. Yes.

23  Q. And approximately when was that task order

24 awarded?

25  A. There wasn't a single task order awarded that

50

Case 5:18-cv-07182-EJD Document 210 Filed 09/28/23 Page 585 of 730 November 7, 2022

1   related to this set of items.

2       Q.  When you say "set of items," are you talking

3   about all five bullet points, or just authentication,

4   identity theft, and fraud protection?

5       A.  I was just referring to authentication,

6   identity theft, and fraud protection.

7       Q.  So when you say not specific -- I'm sorry.

8       Your testimony was there wasn't -- you didn't

9   receive a task order that was necessarily specific to --

10  to these items; is that correct?

11      A.  That's right.  I can't sort of say a task order

12  for authentication, identity theft, and fraud protection

13  was awarded on any specific date.

14      Q.  But just a task order that touched upon those

15  areas was awarded after the BPA?

16      A.  Correct.

17      Q.  And did that -- do you recall what the name of

18  that task order was that you're referring to?

19      A.  I think there was a contract -- a task order

20  award for what was labeled "identity theft innovation"

21  that was awarded -- let me think -- I believe it would

22  have been mid-2019.  I'm -- I'm pretty sure.

23      Q.  And did that identity theft innovation task

24  order involve the use of graph database software?

25      A.  I believe there was a task that -- that

51

1   included a variety of analytic methods, including graph.

2       Q.   So one of the analytic methods that you can use

3   for authentication, identity theft, and fraud protection

4   is graph database software?

5           MS. EMBRY:  Objection to form.

6           THE WITNESS:  Can you be more specific about

7   how you are applying graph there, or...

8   BY MR. RATINOFF:

9       Q.   Well, can you use graph database software to

10  enhance the IRS' ability to detect identity theft, for

11  instance?

12      A.   Yes, I believe you could.

13      Q.   And is that something ASR Analytics actually

14  did for the IRS?

15      A.   We have used graph methods to attempt to detect

16  identity theft.

17      Q.   For the IRS?

18      A.   For the IRS.

19      Q.   And graph methods requires using graph database

20  software; is that correct?

21      A.   I think that's fair, yes.

22      Q.   Okay.  Are you familiar with Neo4j graph

23  database software?

24      A.   I have heard the name, yes.

25      Q.   Has ASR Analytics ever used Neo4j graph

52

1   database software in any projects it's done for the IRS?

2       A.  I don't know.

3       Q.  You don't know personally, or ASR Analytics

4   doesn't know?

5       A.  I don't know personally.

6       Q.  But you can't answer on behalf of ASR Analytics

7   with certainty?

8       A.  I guess I would say I cannot answer -- can you

9   define what you mean by "Neo4j software" more clearly?

10      Q.  Well, what's your understanding of Neo4j

11  software, what it does?

12      A.  I know that there are different Neo4j products.

13  For example, I heard of Community Edition.  I heard of

14  Enterprise Edition.  I personally don't know if, at any

15  point in the however many, 16-17 years of work we've

16  done with the IRS, we have ever used any component of

17  Neo4j software.

18      Q.  And more specifically, under the 2018 BPA, has

19  ASR Analytics ever used Neo4j software in any iteration

20  with its work with the IRS?

21      A.  Not that I know of.

22      Q.  Previously, we talked about ONgDB, which is

23  also a graph database software, correct?

24      A.  Correct.

25      Q.  And has ASR Analytics used ONgDB in any

53

SER_0795

1   capacity under the 2018 BPA with the IRS?

2       A.  Yes, my understanding is we have.

3       Q.  And in preparing the -- I guess it would be an

4   RFQ; is that correct, for the BPA?  Let me back up.

5           To get the BPA, ASR Analytics had to prepare an

6   RFQ, correct?

7       A.  No.

8       Q.  No?  Okay.

9           How -- how do -- how do you -- how do you bid

10  for the BPA contract?

11      A.  We write a proposal in response to an RFQ.

12      Q.  And so when you write a proposal for an RFQ, in

13  particular with this 2018 BPA, were there subcontractors

14  that were contemplated in drafting the proposal for the

15  2018 BPA?

16          MS. EMBRY:  Objection to form.

17          THE WITNESS:  There were subcontractors that

18  were contemplated, period, for response to the BPA.

19  BY MR. RATINOFF:

20      Q.  And did you -- I'm sorry.  Strike that.

21          Was iGov one of those subcontractors that was

22  contemplated in the 2018 DAIS BPA?

23      A.  Yes.

24      Q.  And were there any other subcontractors besides

25  iGov that were contemplated within the scope of that

54

proposal?

        A.   Yes.

        Q.   And who were they?

        A.   My recollection is that there were a handful of
subcontractors, including iGov, Tylor Data, Analytica,
Eastport Analytics, and AtomRain, and I think that's
all.

            MS. EMBRY:  Hey, Jeffery?  We've been going
over an hour.  I just want to check in with Mike and
with everyone else, and we can see if anyone's in need
of a break.

            Mike, how are you doing?  Do you want to take a
break, or how are you doing?

            MR. RATINOFF:  I'm happy --

            THE WITNESS:  I'm okay for now.

            MR. RATINOFF:  Why don't we -- I just have a
couple more questions, and then I think we can take a
break before I get to my next exhibit, if that's okay.

            MS. EMBRY:  Yes.

            MR. RATINOFF:  All right.
BY MR. RATINOFF:

        Q.   So tailer data:  Who's tailer data?

        A.   Tylor Data.

        Q.   Sorry.  Tylor Data?

        A.   T-Y-L-O-R.

                                                        55

1    Q.  T-Y-L-O-R.  Got it.

2    A.  They are a small business.

3    Q.  And what was their role -- or what was their

4    contemplated role in the proposal for the BPA?

5    A.  I don't recall a narrowly-defined role that

6    they would play.

7    Q.  Did they bring an expertise to the table?

8    A.  Yes.

9    Q.  And what was that expertise?

10   A.  Primarily in advanced analytic methods for

11   community detection.

12   Q.  And did that involve working with the graph

13   database software?

14   A.  What do you mean by "the graph database

15   software"?

16   Q.  With graph database software.  Not anything

17   specific.

18   A.  Oh, yes.

19   Q.  And then AtomRain, what was their expertise

20   that they brought to the table in the proposal?

21   A.  They were viewed as having especially

22   technology expertise surrounding graph analytics.

23   Q.  And when you say "graph analytics," you mean

24   using graph database software?

25   A.  Among other things.

56

1    Q.  What were the other things that they brought to

2 the table?

3    A.  Understanding how to manage the technology

4 infrastructure to support graph analytics.

5    Q.  And do you know who owns AtomRain?

6    A.  I don't know the details of their ownership.

7    Q.  Are you familiar with Brad -- a person named

8 Brad Nussbaum?

9    A.  Sorry, say the first name again?

10    Q.  Brad Nussbaum.

11    A.  Yes.

12    Q.  And is Brad Nussbaum affiliated with AtomRain?

13    A.  Yes.  To my knowledge, yes.

14    Q.  And what do you understand of Brad Nussbaum's

15 role at AtomRain?

16    A.  I believe that he is one of the co-owners of

17 AtomRain, but I'm not certain.

18    Q.  And are you familiar with a Ben Nussbaum?

19    A.  Yes.

20    Q.  And who's Ben Nussbaum?

21    A.  I believe he's another owner of AtomRain.

22    Q.  And then you also mentioned iGov as being one

23 of the contemplated subcontractors, correct?

24    A.  Correct.

25    Q.  And that's Mister -- Mr. Suhy's company?

57

1    A.  Correct.  That's my understanding.

2    Q.  Did Mr. Suhy assist in preparing the proposal

3  for the DAIS BPA?

4    A.  Can you define what you mean by "assist"?

5    Q.  Assist in drafting the proposal.

6    MS. EMBRY:  Objection to form.

7    THE WITNESS:  In a very limited capacity.

8  BY MR. RATINOFF:

9    Q.  And what capacity was that?

10    A.  As I recall, he provided input, usually short

11  text descriptions of work that he had performed or

12  capabilities that his firm had.

13    Q.  When you say "work that he performed," are you

14  talking about work that he had already performed for the

15  IRS?

16    A.  Not exclusively.

17    Q.  Why did ASR Analytics involve iGov in its

18  proposal for the DAIS BPA?

19    MR. BEENE:  Objection to form.

20    MS. EMBRY:  Join.

21    THE WITNESS:  What was that, Becky?

22    MS. EMBRY:  I join.  Objection to form.

23  BY MR. RATINOFF:

24    Q.  You can still answer the question.

25    A.  Sorry.  Could you repeat the question?

58

SER_0800

1      MR. RATINOFF:  Yeah.  Can you read the question

2  back, please?  Maybe it is a bad one.

3          (The following record was read:

4          Question:  Why did ASR Analytics involve iGov

5          in its proposal for the DAIS BPA?)

6  BY MR. RATINOFF:

7      Q.  Just to be clear for the record, when I say

8  DAIS, I'm saying -- that's the acronym D-A-I-S.

9          We all understand that?

10     A.  Yes, I understand.

11     Q.  Okay.  Let me re-ask -- let me just re-ask the

12 question, clean up the record.

13         Why did -- why did ASR Analytics select iGov to

14 participate in the proposal for the DAIS BPA?

15     A.  I suppose we felt it would strengthen the

16 capabilities of our team.

17     Q.  How so?

18     A.  It would add relevant expertise to our

19 offering.

20     Q.  What expertise are you referring to?

21     A.  Generally, graph database and graph analysis

22 expertise.

23     Q.  Did iGov have a pre-existing relationship with

24 the IRS that -- that ASR Analytics felt would also be

25 helpful?

59

SER_0801

1      A.  I believe so.  I -- I believe that -- yeah, I

2   believe so.

3      Q.  And what was your understanding of iGov's

4   relationship with the IRS at that time?

5      A.  I'm not certain about the timeline, but my

6   recollection is that they had a contract in place with a

7   division of the IRS supporting graph software.

8      Q.  When you say "they," you mean iGov?

9      A.  Correct.

10          MR. RATINOFF:  All right.  I think this is a

11   good time to take a break.

12          Do you need 5-10 minutes?

13          MS. EMBRY:  How -- how about ten minutes?

14          MR. RATINOFF:  Sure.

15          MS. EMBRY:  That okay?  So we'll be back at --

16   do you want to just say we'll come back at 12:00 our

17   time?

18          MR. RATINOFF:  Yeah, that's fine.

19          THE VIDEOGRAPHER:  Thank you.  We are now going

20   off the video record.  The time is 11:48 a.m.

21          (Off the record from 11:48 a.m. to 12:02 p.m.)

22          THE VIDEOGRAPHER:  We are now back on the video

23   record.  The time is 12:02 p.m.

24   BY MR. RATINOFF:

25      Q.  All right.  I wanted to go ahead and mark the

                                                          60

SER_0802

1    BY MR. RATINOFF:

2        Q.  Okay.  I've marked what is Exhibit 127.  It's

3    an email chain produced by ASR about with the beginning

4    Bates number ASR 00558, which the last email being from

5    Mr. Suhy to yourself, February 9, 2018.

6            MS. EMBRY:  I think that's a different exhibit

7    than what we're looking at.

8            MR. RATINOFF:  Oh, I apologize.  Let me --

9    you're right.  I've got too many windows open.  Let me

10   start over again.  Strike that.

11           Okay.  What's been marked as Exhibit 127 is an

12   email produced by ASR with the beginning Bates number

13   ASR 01734, and that's an email from Mr. Suhy to yourself

14   dated January 17, 2018.

15           THE WITNESS:  I'm with you.

16   BY MR. RATINOFF:

17       Q.  Okay.  And you'll see Mr. Suhy's referring

18   to -- in the second email below -- or the second to last

19   in the chain, January 11, 2018, at 8:30 p.m., you wrote,

20   "Hi John Mark, I had a good discussion with Chris Hess

21   today, and he liked the concept of coordinating ASR's

22   Spark work with iGov's Neo and other open-source work,

23   but he said that Mike Dunn had already initiated the

24   process of issuing a new solicitation in place of the

25   one that was targeted to iGov last year, so you should

67

SER_0803

1    be seeing an RFP in the next couple of weeks."

2        Do you see that?

3    A.  Yes.

4    Q.  All right.  And who is Chris Hess?

5    A.  Chris Hess is a manager in the RAAS

6    organization, an IRS employee.

7    Q.  And then who's Mike Dunn?

8    A.  Mike Dunn is also a manager within RAAS,

9    another IRS employee.

10   Q.  And here it says, "I had a good discussion,"

11   with Mr. Hess regarding "iGov's Neo and other

12   open-source work."

13       So it sounds like you talked about Neo4j with

14   Mr. Hess; is that fair?

15       MS. EMBRY:  Objection to form.

16       THE WITNESS:  I would say no.

17   BY MR. RATINOFF:

18   Q.  Okay.  And then what are you referring to as

19   "iGov's Neo" in this email?

20   A.  I'm referring to the work that iGov was doing

21   with RAAS at the time.

22   Q.  And what was your understanding of that work?

23   A.  That it involved developing and managing graph

24   database and analysis software.

25   Q.  And that software being Neo4j?

68

November 7, 2022

1    A.  No, not necessarily.

2    Q.  Why did you refer to "Neo" in this email?

3    A.  Because he was trying to use descriptive

4 language to refer to a set of technology that I was not

5 familiar with.

6    Q.  What's "ASR's Spark work" that you're referring

7 to in this email?

8    A.  This is work that ASR was doing in

9 collaboration with Tylor Data under a separate contract

10 which involved using Spark software to do graph database

11 analysis.

12    Q.  And how does Spark software work with graph

13 database analysis?

14         MS. EMBRY:  Objection to form.

15         THE WITNESS:  I would say Spark -- I guess I

16 don't know the technical details of how it conducts

17 graph analysis.

18 BY MR. RATINOFF:

19    Q.  Is Spark a graph database software?

20    A.  I don't believe that's its primary function.

21    Q.  What's Spark's primary function?

22    A.  I -- yeah, that's probably beyond my technical

23 knowledge.

24    Q.  Okay.  Well, what were you able to convey to

25 Chris Hess about ASR's Spark work with iGov's Neo and

69

**SER_0805**

1  open-source work?

2     A.  The work that we were doing in Spark was about

3  identifying patterns within graph data.

4     Q.  So the graph database software would generate

5  graph data, and then Spark would be used to analyze that

6  data; is that correct?

7     A.  I'm not certain how the graph data was

8  generated.

9     Q.  But Spark would be using graph database data to

10  conduct its analysis?

11     A.  That's my understanding.

12     Q.  All right.  I'd like to go ahead and now look

13  at the email in front of you that I had previously

14  mentioned.

15         (Exhibit 128 was marked for identification.)

16         THE WITNESS:  Okay.  Got it open.  Let me take

17  a look.

18  BY MR. RATINOFF:

19     Q.  And you'll see this is a continuation of the

20  same email chain that we were just speaking about.

21         MR. RATINOFF:  And just for the record, this

22  has been marked as Exhibit 127 (sic) that has a

23  beginning Bates number of ASR 01737.  It's an email

24  ending from Mr. Suhy to the witness, dated January 18,

25  2018.

70

SER_0806

1    AtomRain, not GraphGrid, correct?

2        A.  That's right.

3        Q.  Did ASR work with Mr. Suhy on any other

4    proposals besides the DAIS BPA?

5        A.  I believe he had some involvement in task

6    orders that followed the BPA; in other words, in

7    proposals for task orders that were issued under the

8    BPA.

9        Q.  And when you say "the BPA," you're talking

10   about the DAIS BPA?

11       A.  Correct.

12           MR. RATINOFF:  Okay.  I'd like to mark the next

13   exhibit as Exhibit 129.

14           (Exhibit 129 was marked for identification.)

15           THE WITNESS:  Okay.  Let me read through this

16   one.

17           Okay.

18   BY MR. RATINOFF:

19       Q.  All right.  So what's been marked as

20   Exhibit 129 is an email with the beginning Bates number

21   ASR 00568.  The end of the chain is an email from

22   Mr. Suhy to yourself dated May 2nd, 2018.

23           Do you recognize this email?

24       A.  Yes.

25       Q.  And what's your understanding of what this

73

Case 5:18-cv-07182-EJD   Document 210   Filed 09/28/23   Page 600 of 730  November 7, 2022

1    is adopting."

2         Do you have an understanding of what he's

3    referring to?

4         A.  A general understanding.

5         Q.  And what's that?

6         A.  It's really just based on what he's written on

7    the page.  It helps me to understand what it is that the

8    Graph Foundation is doing.

9         Q.  Did Mr. Suhy ask ASR Analytics to sponsor the

10   Graph Foundation?

11        A.  He did bring the topic up with me at one point.

12        Q.  Okay.  And what was the -- what was the context

13   that that was brought up in?

14        A.  I don't remember exactly.

15        Q.  Did he ask ASR Analytics to sponsor the Graph

16   Foundation?

17            MR. BEENE:  Objection to form.

18            THE WITNESS:  I don't think so.

19   BY MR. RATINOFF:

20        Q.  But he just offered to add ASR Analytics to the

21   sponsor page of Graph Foundation; is that correct?

22        A.  That's correct.

23        Q.  And does this email help refresh your

24   recollection as far as what Graph Foundation's primary

25   mission was as far as -- I think you described it as

86

1    open graph database software?

2        A.  I guess reading this sentence tells me his

3    understanding of what the organization was doing.

4        Q.  Yeah, I'm asking for your understanding of what

5    the organization was doing.

6            Does this help refresh your recollection?

7        A.  I suppose it does.

8        Q.  Okay.  And how so?

9        A.  I -- only in that, when I read this sentence,

10    it tells me that the Graph Foundation, quote, maintains

11    the Open Neo4j distributions.

12        Q.  And do you have an understanding of what those

13    Open Neo4j -- sorry.

14            Do you have an understanding of what those Open

15    Neo4j distributions were maintained by the Graph

16    Foundation?

17        A.  Not in any substantive sense.

18        Q.  How about non-substantive?  Do you have an

19    understanding?

20        A.  I assume it's referring to maintaining software

21    that can be distributed.

22        Q.  Okay.  But do you understand that software to

23    be related to Neo4j software?

24        A.  What do you mean by "related"?

25        Q.  Well, it says Open Neo4j distributions.

87

SER_0809

1   You understand that Neo4j, the company, offers

2   Neo4j -- I think you said Community Edition and

3   Enterprise Edition -- graph database software, correct?

4   MS. EMBRY:  Objection to form.

5   Go ahead.

6   THE WITNESS:  Correct.

7   BY MR. RATINOFF:

8   Q.  And so do you have an understanding of Graph

9   Foundation being involved with some form of Neo4j

10  software?

11  A.  In a general sense.

12  Q.  And what is that general sense?

13  A.  That they were involved in creating and

14  maintaining an open-source alternative to Neo4j.

15  Q.  And that alternative would be ONgDB?

16  A.  Yes.

17  Q.  And so it was your understanding that ONgDB was

18  some sort of open-source Neo4j, or version of

19  open-source Neo4j?

20  MR. BEENE:  Objection to form.

21  THE WITNESS:  My understanding is that it was

22  an open-source software -- that it was open-source

23  software that originated from an open-source version of

24  Neo4j.

25  ///

88

SER_0810

1    BY MR. RATINOFF:

2        Q.  And you're referring to ONgDB as being the --

3    what --

4        A.  Yeah.

5        Q.  -- based on -- okay.  Hold on.  Let me make

6    sure I get the question out.

7            So your understanding is that ONgDB was based

8    on a form of open-source Neo4j; is that correct?

9        A.  Correct.

10       Q.  Did anyone at the Graph Foundation ever explain

11   how it was based on an open-source version of Neo4j?

12           MS. EMBRY:  I'm sorry.  I didn't hear the whole

13   question.  Did you hear it, Mike?

14           THE WITNESS:  Could you repeat it?

15           MR. RATINOFF:  Sure.  Ben, could you read that

16   one back if you got it?

17           (The following record was read:

18           Question:  Did anyone at the Graph Foundation

19           ever explain how it was based on an open-source

20           version of Neo4j?)

21           THE WITNESS:  No.

22   BY MR. RATINOFF:

23       Q.  And then to your knowledge, was ASR added to

24   the Graph Foundation's website as a sponsor?

25       A.  I don't recall.

89

1      THE WITNESS:  I wouldn't have had a strong

2  objection to it.  I wouldn't have cared much one way or

3  the other.

4  BY MR. RATINOFF:

5      Q.  It just wasn't that important to ASR?

6      A.  No.

7          MR. RATINOFF:  Okay.  I'd like to go ahead and

8  put the next exhibit in the chat.

9          (Exhibit 133 was marked for identification.)

10          THE WITNESS:  Okay.  Let me take a look at

11  this.

12  BY MR. RATINOFF:

13      Q.  And while you're doing that, I'll just state

14  for the record that this was an email that was produced

15  by ASR in response to the subpoena.  It's got the

16  beginning Bates number ASR 00719.  It's an email from

17  Mr. Suhy to the witness dated March 29, 2019.

18          Just let me know when you've had a chance to

19  review the email.

20      A.  Okay.  Got it.

21      Q.  Okay.

22          MR. RATINOFF:  And Ben, this would be

23  Exhibit 133, correct?

24          THE REPORTER:  That is correct, Counsel.

25          ///

91

```
 1    BY MR. RATINOFF:
 2         Q.  Okay.  Do you recognize this document?
 3         A.  I do.
 4         Q.  And what is it?
 5         A.  It's an email exchange between me and John Mark
 6    Suhy regarding, I guess, two different topics.
 7         Q.  Okay.  So let's start with the first topic.
 8              What's -- what's the first topic that comes to
 9    your mind?
10         A.  The first is requesting his resume for -- for
11    what appears to be an RFQ.
12         Q.  You're talking about where it says "cyber RFQ"?
13         A.  Uh-huh.
14         Q.  Sorry, the court reporter --
15         A.  Sorry.
16         Q.  Yeah, it needs to be "yes" or "no," or words.
17    Nodding the head, shaking the head, uh-huhs, uh-huhs,
18    they don't really work with the transcript.
19         A.  Yes.
20         Q.  Okay.  And do you understand what the cyber RFQ
21    is?
22         A.  I think I know what it is referring to.
23         Q.  Is it referring to a task order under the DAIS
24    BPA?
25         A.  I believe so.
```

92

1    Q.  Is that something that was ultimately awarded

2  to ASR as a -- as a task order?

3    A.  If it is the task order I'm thinking of, it

4  was.

5    Q.  What task order was that?

6    A.  That is the identity theft innovation task

7  order that I referred to earlier.

8    Q.  And that's a task order -- that's referring to

9  the identity theft task order, something that Mr. Suhy

10  assisted ASR in obtaining?

11      MS. EMBRY:  Objection to form.

12      THE WITNESS:  What do you mean by "assisted"?

13  BY MR. RATINOFF:

14    Q.  Did Mr. Suhy participate in -- in responding to

15  the task order that was issued by the IRS that you

16  called the ID theft task order?

17    A.  Aside from providing a resume, I don't recall.

18    Q.  By providing a resume though, would it have

19  been to be included in the proposal in response to the

20  task order?

21    A.  It -- it is possible that it was included in

22  the response.

23    Q.  And then there's a reference to the KG-API

24  engagement structure in the subject.

25      Do you understand what that's referring to?

93

SER_0814

1   A.  Yes.

2   Q.  And what is the KG-API engagement structure?

3   A.  That is -- the KG-API engagement is the

4  contract between the IRS and Tylor Data that I

5  referenced earlier.

6   Q.  So that's not a contract that was under the

7  DAIS BPA?

8   A.  That's right.  It was not.

9   Q.  So Tylor Data was the prime contractor on the

10  KG-API engagement?

11   A.  Correct.

12   Q.  And was -- and AS -- I'm sorry.  Strike that.

13       And ASR was a subcontractor under -- under

14  tailer?

15   A.  Under Tylor Data.

16   Q.  Sorry.  Tylor.

17   A.  Yes.

18   Q.  And was Mr. Suhy also a subcontractor under

19  that particular engagement?

20   A.  Yes.

21   Q.  When I mean (sic) Mr. Suhy, I mean through

22  iGov; is that correct?

23   A.  Yes, I believe so.

24   Q.  And why was Mr. Suhy involved in the KG-API

25  contract?

94

1          MS. EMBRY:  Objection to form.

2  BY MR. RATINOFF:

3          Q.   Do you have an understanding of what Mr. Suhy

4  was involved in the KG-API contract?

5          A.   I believe it was because the owner of Tylor

6  Data felt his involvement would -- would be beneficial

7  to the project.

8          Q.   And what was your understanding of the benefits

9  he would be providing to the contract?

10         A.   This is the project that was referenced earlier

11  that involved Spark software, and I believe John Mark

12  Suhy's involvement would enable the use -- non-technical

13  term -- enable the coordination of that Spark software

14  with the RAAS IT environment.

15         Q.   And when you -- more specifically with the

16  Spark software interface with the CKGE environment?

17         A.   I'm not certain.

18         Q.   We talked about it a little bit earlier, I

19  believe, but the Spark software would interface with

20  graph database software, right?

21         A.   Yes, I believe so.

22         Q.   And then at the time, as of March 2019, that

23  graph database software being used by RAAS was ONgDB?

24         A.   Yes.

25         Q.   So Mr. Suhy's role would be to assist in -- I

95

1    think you used the word "interfacing" the Spark software

2    with ONgDB?

3        A.  Yes.

4            MR. BEENE:  Objection to form.

5    BY MR. RATINOFF:

6        Q.  Sorry.  I want to make sure your answer's

7    clear.

8        A.  Yes.

9        Q.  And you understood my question?

10       A.  Yes.

11       Q.  And then -- was Mr. Suhy then -- would he act

12   as a subcontractor directly to -- to Tylor, or -- sorry.

13   Strike that.

14           Was Mr. Suhy acting -- sorry.  Let me start

15   over.  Got two thoughts.  Trying not to ask a compound

16   question.  Anyway.

17           Was Mr. Suhy being asked to act as a

18   subcontractor to ASR under -- under the prime contract?

19       A.  Yes.

20       Q.  And was it your understanding that, at the

21   time, Mr. Suhy's normal hourly rate was $150 an hour for

22   consulting on graph database software?

23       A.  Only in that that's stated in this email.

24       Q.  Did you have an understanding at that time of

25   what Mr. Suhy's general hourly rate was for any work

96

1   that he performed in conjunction with ASR?

2        A.   I don't believe I did.

3        Q.   Does 150 an hour sound about right?

4             MS. EMBRY:   Objection to form.

5             THE WITNESS:   What do you mean by "about

6   right"?

7   BY MR. RATINOFF:

8        Q.   Does it sound about normal for someone with his

9   qualifications?

10            MS. EMBRY:   Objection to form.   I'm sorry.

11            MR. RATINOFF:   Yeah, can I -- let me just

12   finish, Counsel.

13            MS. EMBRY:   Yeah.

14            MR. RATINOFF:   Let me ask again.

15   BY MR. RATINOFF:

16        Q.   In ASR's experience with using consultants with

17   graph database software, was approximately $150 an hour

18   a fair rate for someone with Mr. Suhy's skill set?

19            MS. EMBRY:   Objection to form.

20            THE WITNESS:   I would say it's approximately

21   right.

22   BY MR. RATINOFF:

23        Q.   And then going down and looking at the bottom

24   of Mr. Suhy's resume -- it's the Bates number -- that's

25   the number in the bottom right-hand corner, it's

97

1  ASR 00721.

2      Do you see that?

3  A.  Yes.

4  Q.  And Mr. Suhy represents under Other Relevant

5  Experience and Focus, "Developed the platform which

6  IRS's CKGE platform is built on top of."

7      Do you see that?

8  A.  I do.

9  Q.  And do you have an understanding of what

10  platform Mr. Suhy's referring to?

11  A.  In general?

12  Q.  Yes.

13  A.  Yeah, I think he's referring to the ONgDB

14  platform.

15  Q.  So "the ONgDB platform" meaning -- or sorry.

16  Strike that.

17      So your understanding is the ONgDB platform is

18  what the CKGE platform is built on top of?

19  A.  I don't know the technical architecture of the

20  solution, but my understanding is that CKGE uses ONgDB

21  technology.

22  Q.  And what is the CKGE platform?

23  A.  In layman's terms, it is a -- an environment

24  for building and managing graph data and analysis tools.

25  Q.  And does ASR Analytics work with the IRS on the

98

1    CKGE platform?

2         MS. EMBRY:  Objection to form.

3         THE WITNESS:  What do you mean by work on the

4    platform?

5    BY MR. RATINOFF:

6         Q.  Does -- does ASR Analytics provide any

7    consulting in relation to the IRS' CKGE platform?

8         MS. EMBRY:  Objection to form.

9         Go ahead.

10        THE WITNESS:  We provide consulting to analyze

11   data within the CKGE environment.

12   BY MR. RATINOFF:

13        Q.  So you just referred to it as a CKGE -- CKGE

14   environment; is that the same as CKGE platform?  Just

15   another way of describing it?

16        A.  Yeah.  Yes.  The two terms are synonymous in my

17   mind.

18        Q.  So there's not a CKGE platform, and it's

19   separate from a CKGE environment?

20        A.  No difference in my mind.

21        Q.  And then going up on the resume here, back up

22   to the Summary of Qualifications, so it would be the

23   first page of the resume on ASR 00720, do you have an

24   understanding of what he's referring to as the,

25   "Designer and maintainer of GraphStack"?

99

1    A.  I generally understand that GraphStack is the

2  technology platform that John Mark maintains and uses.

3    Q.  Okay.  And do you have an understanding of

4  whether GraphStack incorporates ONgDB?

5    A.  I don't know exactly.

6    Q.  And do you have an idea -- or sorry.  Strike

7  that.

8         Are you familiar with the website

9  graphstack.io?

10    A.  I am not.

11    Q.  And it says right above there, "ONgDB," and

12  then parentheses, "Neo4j enterprise open source fork."

13         Does that help you recall what ONgDB is in

14  relation to Neo4j?

15         MS. EMBRY:  Objection to form.

16         THE WITNESS:  It is consistent with my general

17  understanding that I stated earlier that ONgDB

18  originated from an earlier open-source version of Neo4j.

19  BY MR. RATINOFF:

20    Q.  And that understanding's based on

21  representations that were made to you by Mr. Suhy?

22         MR. BEENE:  Objection to form.

23         THE WITNESS:  I don't recall the exact origin

24  of that understanding, but I would say it was based on

25  conversations I had with various individuals.

100

1  that I think relates to what we're talking about, and

2  then I think it might be a good place to take a break.

3  Thank you for bringing that up.  I think everyone

4  else -- well, actually, Ben might be on the East Coast,

5  but I think everyone else is on the West Coast.  Maybe

6  someone on the most part of the team here, the

7  videographer, and -- all right.

8          Let me go ahead and drop this next one in the

9  chat.  This is -- I believe we're up to Exhibit 134.

10          (Exhibit 134 was marked for identification.)

11          THE WITNESS:  This is the -- labeled

12  "Subcontract Agreement"?

13  BY MR. RATINOFF:

14      Q.  Yes, this is a subcontract agreement between

15  what appears to be Tylor Data Services and --

16      A.  Okay.  Let me -- just got it open.  Let me read

17  through this.

18      Q.  Let me go ahead and get everything on the

19  record here.

20          So this is what's been marked as Exhibit 134.

21  It was produced by ASR with the beginning Bates number

22  ASR 01764, and this is a document entitled, "Subcontract

23  Agreement."

24      A.  Okay.  I've scanned through this.

25      Q.  Okay.  Do you recognize this document?

102

**SER_0822**

1    A.  Yes.

2    Q.  Okay.  What is it?

3    A.  It's a subcontract agreement between ASR and

4  iGov.

5    Q.  Okay.  And is this the subcontract agreement

6  that related to the prime contract that Tylor Data

7  Services was awarded with respect to the KG-API project?

8    A.  Yes.

9    Q.  And this is the subcontract that ASR entered

10  with Mr. Suhy to assist with that project that you

11  previously testified about?

12    A.  Correct.

13    Q.  And this related to providing consulting in

14  relation to ONgDB interfacing with Spark?

15    A.  That's right.

16    Q.  And just -- just to be clear, there -- there

17  was a separate subcontract then between Tylor Data

18  Services and ASR, which this fell under then; is that

19  fair?

20    A.  That's correct.

21    Q.  But for -- for purposes of billing, Mr. Suhy

22  would submit bills to ASR rather than Tylor for the work

23  performed on the KG-API project?

24    A.  That's right.

25    Q.  And is this contract still -- subcontract still

103

1   in effect today as you sit here?

2       A.   I believe it is, yes.

3       Q.   And just going to the last page, that's just to

4   confirm that the bottom is your signature under "ASR"?

5       A.   It is.

6       Q.   And that's Mr. Suhy's signature under "iGov" to

7   your knowledge?

8       A.   To my knowledge, yes.

9       Q.   And what's the -- what's the term of this

10   subcontract, meaning, like, when does it terminate?

11       A.   Let me look back here.

12            So this contract, the prime contract with Tylor

13   Data Services, I believe expired on September 30, 2021.

14       Q.   So this prime contract has expired?

15       A.   This prime contract has expired.

16       Q.   Has it been renewed?

17       A.   No.

18       Q.   So the KG-API contract -- or project expired;

19   that would mean the subcontract then would no longer be

20   in effect?

21       A.   I suppose that's right.  This subcontract is no

22   longer in effect.

23       Q.   And I'm sorry; when was the date that it

24   expired?

25       A.   I believe September 30, 2021.

104

 1      Q.   And just to be clear, it says under Services to

 2   Be Performed By Contractor, "Subcontractor will provide

 3   the consulting services of John Mark Suhy in support of

 4   ASR's first tier contract," and, "Consulting services

 5   will include technical guidance and development (sic)

 6   support related to the Compliance Data Warehouse

 7   Knowledge Graph Environment (CKGE)."

 8         Is that the type of work that Mr. Suhy did

 9   perform prior to the expiration or termination of the

10   prime contract?

11      A.   Just to clarify the record, I think you said,

12   "and development support," but the contract reads, "and

13   deployment support."

14      Q.   Oh, I apologize.   Thank you.

15      A.   That's okay.

16         But yes, that's an accurate description of the

17   type of work that he did under this subcontract.

18      Q.   And the reason why is he brought knowledge of

19   the CKGE's use of ONgDB?

20         MR. BEENE:  Objection to form.

21         MS. EMBRY:  Objection to form.

22   BY MR. RATINOFF:

23      Q.   One of the -- one of the things -- one of the

24   reasons why Mr. Suhy was brought on as a subcontractor

25   was because of his knowledge and experience with the use

                                                        105

1   of ONgDB in the CKGE environment?

2          MR. BEENE:  Objection to form.

3          THE WITNESS:  It was due to his knowledge of

4   the CKGE environment, yes.

5   BY MR. RATINOFF:

6      Q.  Which used ONgDB?

7      A.  To my understanding, yes.

8          MR. RATINOFF:  All right.  I think it's a good

9   time to break.  I know -- I'm sure you're probably

10  hungrier than we are on the West Coast, but we can take

11  a little lunch break too.

12         How long do you need?  I'm happy to go short or

13  long, whatever's preferential to you.

14         MS. EMBRY:  Mike, what do you prefer?

15         THE WITNESS:  I don't need a lot of time.  I

16  mean, what's -- what's normal in these?

17         MR. RATINOFF:  The shorter the break, the

18  sooner we get done.

19         MS. EMBRY:  Yeah.  That's kind of --

20         MR. RATINOFF:  So it's really up to you.  If

21  you need a full hour to recharge, or half an hour,

22  that's -- as long as that's okay with everyone else, I'm

23  fine with a half an hour.

24         MS. EMBRY:  Is 30 minutes enough, Mike?

25         THE WITNESS:  Sure, 30 minutes is fine.

106

```
 1                        AFTERNOON SESSION
 2              (All Parties having been duly noted for the
 3              record, proceedings resumed at 2:04 p.m.)
 4                        --o0o--
 5              THE VIDEOGRAPHER:  We are now back on the video
 6     record.  The time is 2:04 p.m.
 7     BY MR. RATINOFF:
 8         Q.  All right.  Ready to get going again?
 9         A.  Ready to go.
10         Q.  All right.  Let's go ahead and drop another
11     document in the chat.  I believe this will be
12     Exhibit 135.
13              (Exhibit 135 was marked for identification.)
14     BY MR. RATINOFF:
15         Q.  Got the thumbs up from Ben.
16              And what I've put in the chat here is a
17     document marked "Master Subcontractor Agreement" -- or
18     sorry -- titled.
19              Let me know when you've had a chance to review
20     the document?
21         A.  Okay.  Got it pulled up.  Give me a minute or
22     two to look through here.
23         Q.  I'm just going to ask you some few basic
24     questions, so just let me know when you've had a chance
25     to familiarize yourself with the document.
```

108

1    A.  Okay.  Just give me a minute or two.  I'm going

2    through the PWS's, but there are attachments on this

3    one, I think.

4         Got a lot of government contracts.  They're

5    definitely long.

6         Okay.  I think I got it.

7    Q.  All right.  Do you recognize what's been marked

8    as Exhibit 135?

9    A.  Yes.

10   Q.  And what is it?

11   A.  It is a master subcontract agreement between

12   ASR and iGov related to the DAIS BPA.

13   Q.  And that's the -- the 2018 press release that

14   we talked about earlier?  That's the contract being

15   referenced here?

16   A.  Yes.

17   Q.  And the contract number's 2032H5-19-A-00011?

18   A.  Correct.

19   Q.  And that's the prime contract number, meaning

20   the actual BPA that was awarded to ASR?

21   A.  Yes.

22   Q.  And then I -- you'll see there's a dated as of

23   November 7, 2018, as being the effective date?

24   A.  Yes.

25   Q.  And is that the same date that the BPA award

109

SER_0828

1    was given to ASR?

2         A.   I believe it was, yes.

3         Q.   And what was the reason for entering into this

4    agreement with iGov?

5         A.   ASR established a master subcontractor

6    agreement with each subcontractor that we teamed with on

7    the DAIS BPA following BPA contract award so that we

8    would be able to engage them as needed on task order

9    contracts.

10        Q.   Okay.  And then going to the next page, Page 2,

11   there's a signature.  It appears to be of a

12   Jeremy Howard on behalf of ASR Analytics.

13        A.   Yes.

14        Q.   And who's Jeremy Howard?

15        A.   He is one of my partners at ASR.

16        Q.   And then under "iGov," there's a signature

17   block for Mr. Suhy?

18        A.   Yes.

19        Q.   And that's your understanding, to be his

20   signature?

21        A.   Yes, to my understanding.

22        Q.   Okay.  And so this document is, to your

23   knowledge, a true and correct copy of the master

24   subcontract agreement for ASR Analytics in relation to

25   iGov for the DAIS BPA?

110

1          A.   Yes, it is.

2          Q.   And you'll note it's dated June 30, 2019, for

3     Mr. Suhy's signature, and then October 7, 2019, for

4     Mr. Howard's, but the effective date is November 7,

5     2018.

6               What's the reason for there being such a delay

7     in executing the agreement?

8          A.   I don't know.

9          Q.   Was Mr. Suhy, on behalf of iGov, providing any

10    subcontracting services prior to June of 2019?

11              MS. EMBRY:   Objection to form.

12              THE WITNESS:   Could you repeat the question?

13    BY MR. RATINOFF:

14         Q.   Yeah.   Actually, I wasn't finished.

15              MS. EMBRY:   Oh.

16              MR. RATINOFF:   Counsel, if you wouldn't mind,

17    let me finish my question.

18    BY MR. RATINOFF:

19         Q.   So let me start over again.

20              Had Mr. Suhy performed any subcontracting work

21    prior to June 30th, 2019, on any task orders that were

22    issued in relation to the -- the BPA DAIS contract?

23         A.   Not to my knowledge.

24         Q.   So this agreement was a prerequisite before he

25    could actually provide any subcontracting services in

                                                       111

SER_0830

1   relation to the -- the -- it actually looks like it's

2   called the RAAS Data Analytics Innovation Support

3   Contract?

4        A.   A prerequisite in the sense that, as normal

5   course of business, we would put this sort of master

6   subcontract in place before engaging anyone on a task

7   order level.

8        Q.   Okay.   And so then what would happen after this

9   agreement was entered?   Task -- individual task orders

10  would be issued to the subcontract under this agreement?

11       A.   That's usually the process, yes.

12       Q.   And then scrolling down to Page 3, at the

13  bottom there's a heading, "TO Team Lead Business Rules."

14            What's -- what does -- what does "TO Team Lead

15  Business Rules" mean?

16       A.   So we had several and have several team members

17  that support ASR under the DAIS contract, and when we

18  originally created the team and -- and even when we

19  established these master subcontract agreements, we

20  wanted to define some areas of responsibility, or you

21  could call them "swim lanes," for the various members of

22  our team so that there would be some ground rules for

23  who would have either a lead role or a role at all on

24  task orders that involved different domain areas.

25       Q.   Okay.   And so then Mr. Suhy's recognized --

112

1  described here as a subcontractor.  Core capabilities

2  would have been his expertise in the development and

3  management of technology infrastructure supporting the

4  CDW Knowledge Graph Environment -- CKGE for short -- and

5  custom development of graph/network analysis algorithms

6  supporting analytical efforts.

7          Is that a fair representation of what he was

8  expected to provide expertise in?

9      A.  Yes.

10      Q.  And that's what we talked about earlier, as far

11  as having knowledge of developing the CKGE environment

12  and the use of ONgDB?

13          MR. BEENE:  Objection to form.

14          MS. EMBRY:  Same objection.

15  BY MR. RATINOFF:

16      Q.  Did I inaccurately state your prior testimony?

17      A.  No, that's an accurate description.

18      Q.  And then it says -- oh, before I get there,

19  just so the record's clear then, Mr. Suhy's

20  subcontractor core capabilities was based on his

21  experience with the CKGE environment, correct?

22      A.  Yes.

23      Q.  And part of that expertise was his knowledge of

24  the CKGE environment's use of ONgDB software; is that

25  correct?

113

1    A.  So also for the record, I don't have a clear

2  understanding from a technical standpoint of the

3  distinction between, quote, the CKGE environment, and,

4  quote, ONgDB, but I think of the two of them as closely

5  related and perhaps part of the same thing.

6      So given that, I would agree.  We thought of

7  John Mark Suhy's expertise as including CKGE and the

8  ONgDB software.

9    Q.  And then it says, "This expertise is

10  complemented by two additional prospective teaming

11  partners (i.e., AtomRain and Tylor Data Services) that

12  have closely related areas of expertise."

13      You had mentioned that there was lanes, so were

14  AtomRain and Tylor bringing additional lanes of

15  expertise to this project apart from Mr. Suhy?

16    A.  I don't know that they were bringing entirely

17  distinct skill sets, which is, I guess, why they are

18  described as complementary in this -- in this phrase.

19    Q.  Okay.  So then as far as AtomRain goes, you

20  mentioned they were also a contemplated subcontractor in

21  the DAIS BPA bid, correct?

22    A.  Correct.

23    Q.  Did they also enter into a separate master

24  subcontractor agreement similar to this one?

25    A.  To my knowledge, yes, they did.

114

Case 5:18-cv-01882-EJS Document 210    Filed 09/28/23    Page 626 of 730    November 7, 2022

1    Q.  And the same with Tylor Data Services?

2    A.  Yes, I believe so.

3    Q.  And was -- or sorry.

4        Is this agreement still in effect with iGov?

5    A.  Yes, it is.

6    Q.  And is it set to terminate at a particular

7    time?

8    A.  I guess this may be a -- an amendment to that

9    comment a moment ago.

10       I don't recall whether this contract exists

11   between ASR Analytics and iGov today, or if it was

12   novated or modified to be between ASR and Greystones.

13   Q.  Okay.  What's -- what's Greystones?

14   A.  Greystones is, to my understanding, a firm that

15   acquired some portion or all of the businesses that

16   John Mark Suhy operated.

17   Q.  Okay.  So when you say "acquired," you mean

18   Greystones acquired iGov?

19   A.  I believe so.  I'm -- I -- yeah, I believe so.

20   Q.  And do you know approximately when that took

21   place?

22   A.  Approximately in 2022 at some point.

23   Q.  And you believe there may have been a

24   modification -- or I think you used the word

25   "novation" -- to this contract to reflect Greystones'

115

1    acquisition of iGov?

2             MR. BEENE:  Objection to form.

3             THE WITNESS:  I don't recall if that has

4    happened, but I do recall that some of the contracts

5    with John Mark Suhy were in the process of being

6    modified or novated.

7    BY MR. RATINOFF:

8        Q.  With the idea that Mr. Suhy would continue

9    performing his -- his core capabilities, but under the

10   Greystones banner versus iGov; is that fair?

11       A.  Yes, that's fair.

12       Q.  So -- so this contract in some way, shape, or

13   form is still in effect, whether it's iGov being the

14   subcontractor or Greystones; is that correct?

15       A.  That's correct.  That's why I indicated earlier

16   that it, in effect, is still active.

17       Q.  Okay.  And then what other entities were you

18   referring to as being acquired by Greystones?

19       A.  I don't know.  As you've noted earlier, there

20   are multiple business entities that were part -- that

21   were in some way connected to John Mark Suhy, and I

22   don't know the distinction between them or their

23   relationship to Greystones.

24       Q.  If there is any amendments to this agreement or

25   novations reflecting the substitution, I guess to put it

                                                      116

1    MR. RATINOFF:  This is -- will be marked as

2  Exhibit 36 -- I'm sorry -- 136.

3  BY MR. RATINOFF:

4    Q.  That's what happens when you try to type and

5  speak at the same time.

6    So yeah.  Exhibit 136, this would be a document

7  entitled -- oh, are you going to be able to open it?

8    A.  Let me make sure I have the right one here.

9    Q.  Yeah.  It should say -- you know what?  I

10  apologize.  I did drop the wrong document in there, so

11  let me -- let me start over again.

12    A.  Okay.

13    Q.  This'll be -- it'll be Tab 417 in the chat.

14    A.  Okay.

15    Okay.  I've got it open here.  Let me look

16  through this.

17    Q.  And the title of this document should be,

18  "Modification 001 to Master Subcontract Agreement."

19    A.  Uh-huh.  Yes.

20    Q.  And that's got a beginning Bates number of

21  ASR 01898, which is produced by ASR.

22    Do you recognize this document that's been

23  marked as Exhibit 136?

24    A.  Let me take a look through it.

25    Q.  Okay.

119

1     A.  Okay.

2     Q.  Okay.  Do you recognize what's been marked as

3 Exhibit 136?

4     A.  Yes.

5     Q.  And what is it?

6     A.  It is a modification to the master subcontract

7 agreement that we looked at in a previous document.

8     Q.  And what was the purpose for this modification?

9     A.  It looks like this was put in place in

10 anticipation of a task order RFQ that -- that was going

11 to be released under the DAIS BPA.

12     Q.  Okay.  And to your knowledge, was that task

13 order awarded to ASR?

14     A.  If I'm correctly interpreting the name of this

15 opportunity, then yes, this was ultimately awarded to

16 ASR.

17     Q.  And what was the name of the opportunity that

18 came to mind?

19     A.  That came to mind?  It is referred to in this

20 document as "Employment Tax Innovation Lab Support For

21 the Data Management Division and Data Exploration and

22 Testing Organization."

23        My understanding is that this ultimately was

24 released and awarded under the name "Emerging Compliance

25 Issues."

120

1    Q.  Okay.  I believe you mentioned that earlier

2    before our -- our break, Emerging Compliance Issues,

3    correct?

4    A.  That's the name.  I don't recall if I mentioned

5    it before the break.

6    Q.  Gotcha.  And what is that -- or what does that

7    task order involve?

8    A.  As this paragraph accurately states, it

9    involves support for two different organizations within

10   RAAS:  One with the acronym DMD, and one with the

11   acronym DET, and the work covers a fair amount of ground

12   divided between these two organizations.  There's

13   probably, if I remember correctly, a dozen or more

14   separate work streams.

15   Q.  Okay.  And where does Mr. Suhy's expertise fit

16   into that task order?

17          MR. BEENE:  Objection to form.

18   BY MR. RATINOFF:

19   Q.  Where does Mr. Suhy's expertise fit into the

20   Emerging Compliance Issues task order?

21   A.  So or the DET side of the project, a portion of

22   that work involves analysis of graph databases, and his

23   expertise would fall into that work stream.

24   Q.  Okay.  And did that -- those graph databases

25   that you mentioned for the DET, did that involve the use

121

SER_0838

1    of ONgDB?

2         A.   I, again, am not entirely clear on the

3    technical definition of "ONgDB," but I believe it would

4    be fair to say yes.

5         Q.   So the data -- the graph databases -- the

6    analysis of graph databases would be -- in other words,

7    that's analyzing graphs that are generated with ONgDB?

8         A.   Analyzing graphs that were generated using a

9    variety of tools, including ONgDB.

10        Q.   And would the same be true for -- for the work

11   on the side of the Data Management Division?  I think

12   you called it "DMD."

13        A.   DMD?  No, that portion of the project is

14   primarily focused on data ingest and bringing new data

15   sources into the CDW data warehouse.

16        Q.   And then how does -- how does this CDW --

17   that's the acronym, I believe.

18        A.   Uh-huh.

19        Q.   How does that interface with the CKGE to your

20   knowledge?

21        A.   There's probably a variety of ways that you

22   could say there's relationships there, but mainly I

23   would say data from CDW is used to construct graph

24   databases in CKGE.

25        Q.   So the data in -- that's stored in the CDW is

                                                        122

SER_0839

1  drawn -- or -- I'm trying to use the laymen terms, so

2  you know, if you need to correct me, that's fine.

3       So the CKGE draws raw data from the CDW; is

4  that a fair description?

5       A.  That's fair, yes.

6       Q.  And then within the CKGE, the data is put into

7  graphs using ONgDB?

8       A.  It is put into graphs using various tools,

9  including ONgDB.

10      Q.  But the actual construction of the graphs is

11  done by ONgDB, as opposed to visualization of the graphs

12  which might be done by a different tool?

13      A.  I would say that's correct, although I would

14  say other tools have also been used to develop graph

15  databases.

16      Q.  And what other tools are those?

17      A.  Our programming language has been used to

18  develop graph databases, Python has been used.  I --

19  there are other projects that use Oracle and SQL and

20  Cytoscape, but I'm into the sure how those are used in

21  relation to graph databases.

22      Q.  But in terms of the CKGE, it's primarily ONgDB

23  that's the main graphing tool?

24      A.  I think that's correct.

25           MR. RATINOFF:  All right.  Let me go ahead and

123

SER_0840

1    mark the next document as exhibits exhibit let's see

2    where we're at here -- 137.

3            (Exhibit 137 was marked for identification.)

4    BY MR. RATINOFF:

5        Q.   Now, this is a 45-page document, so for the

6    time being, if you could just familiarize yourself

7    generally with it, and then I'll point you to some

8    specific portions of it that I would like to talk about.

9            MS. EMBRY:   Yeah, but Mike, if you need to look

10   at it, you should take that opportunity.

11   BY MR. RATINOFF:

12       Q.   Oh, absolutely, yeah.   That's fine.

13       A.   Okay.

14            Okay.

15       Q.   Okay.   Do you recognize what's been marked as

16   Exhibit 137?

17       A.   Yes.

18       Q.   Okay.   What is it?

19       A.   This appears to be a technical proposal that

20   ASR submitted in response to a task order under the DAIS

21   BPA.

22       Q.   And then going to page -- it would be, I guess,

23   the second page in PDF, so this is the letter addressed

24   to Mr. Rodney Walters, and then below you'll see the --

25   the signature.

124

Case 5:18-cv-07182-EJD   Document 210   Filed 09/28/23   Page 634 of 730   November 7, 2022

1    Do you recognize that signature at the end of

2 the letter?

3    A.  Yes.

4    Q.  Is that your signature?

5    A.  It is.

6    Q.  So you submitted this -- this response to an

7 RFP on behalf of ASR?

8    A.  Yes.

9    Q.  You were familiar with the contents of this

10 document at the time you signed it?

11    A.  Yes.

12    Q.  You weren't kidding when you said government

13 contracts are long.

14    All right.  Let me go ahead -- go ahead and

15 turn your attention to page -- let's see.  Where are we

16 at?  And actually, let's stick with the letter.

17    And it says, "We have deep expertise" -- and

18 this is the second paragraph, for the record.

19    "We have deep expertise with the integration

20 and delivery of Compliance Data Warehouse (CDW) data,

21 and we helped RAAS to develop the CDW Knowledge Graph

22 Environment (CKGE) environment.  As part of our

23 Knowledge Graph-Application Programming Interface

24 (KG-API) work with Data Management Division (DMD) and

25 Data Exploration and Testing (DET) division."

125

1    So just to be clear, this is the KG-API project
2  that ASR was working with Tylor Data; is that correct?
3    A.  That's correct.
4    Q.  And then the prior reference to the CKGE
5  environment, is that actually referring to the work that
6  Mr. Suhy did for the IRS?
7    A.  Yes.
8    Q.  So this proposal was envisioning using
9  Mr. Suhy's expertise and experience along with Tylor
10  Data's to get the -- get the work?
11    A.  Among many other capabilities.
12    Q.  Their capabilities, or ASR's?
13    A.  Both.
14    Q.  So both ASR and iGov?
15    A.  And Tylor Data.
16    Q.  And Tylor Data.
17    A.  And others.
18    Q.  Who were the others?
19    A.  Who --
20    Q.  AtomRain -- was AtomRain one of the
21  subcontractors envisioned supporting this proposal?
22    A.  I believe so, but let me look at the document.
23       Yes, they were.
24    Q.  Okay.  And then moving to -- and I know there's
25  different page numbers here, so I'm going to use the PDF

126

1  page numbers, so this would be 11 out of 45 --

2      A.  Uh-huh.  Yes.

3      Q.  -- and this would be, I guess Page 2 of 1 of

4  the documents.

5          And it says, "Team ASR includes experts in

6  graph analytics (Deb Tylor, Rudra Chakraborty)" -- I'm

7  not sure if I'm pronouncing that correctly.

8          MR. RATINOFF:  That's -- for the spelling is

9  C-H-A-K-R-A-B-O-R-T-Y.

10          THE WITNESS:  Uh-huh.

11  BY MR. RATINOFF:

12      Q.  So those two individuals, are they with

13  Tylor -- Tylor Data?

14      A.  Deb Tylor is with Tylor Data data;

15  Rudra Chakraborty is with ASR.

16      Q.  And then, "graph application development,

17  (Ben Nussbaum, Amanda Bouman)," B-O-U-M-A-N.

18          Those are both AtomRain employees?

19      A.  Yes.

20      Q.  And what is meant by "graph application

21  development"?

22      A.  You mean how we intended it as used in this

23  proposal?

24      Q.  Yes.

25      A.  I can't be certain what we were thinking at the

127

1  time, but I imagine we meant building tools to analyze

2  graph data.

3      Q.  And that graph data being generated by ONgDB

4  among other graph database programs?

5      A.  Correct.

6      Q.  And next it says, "system administration

7  (Judith Nyamia)," N-Y-A-M-I-A.

8      A.  Uh-huh.  Yes.

9      Q.  John Mark Suhy.

10         Who's Judith Nyamia, or Nyamia?

11     A.  She is an employee of Analytica.

12     Q.  And then, of course, John Mark Suhy is here on

13  behalf of iGov?

14     A.  Yes.

15     Q.  Now Greystones?

16     A.  Yes.

17     Q.  And the rest of the names in here, are they all

18  ASR employees?

19     A.  In this paragraph?

20     Q.  Yes.

21     A.  Rebecca Myhre is.  Veronica Krejci is an

22  Analytica employee.

23     Q.  What role did Analytica have within this

24  proposal?

25     A.  Primarily support around administration in the

128

1    DMD portion of the project.

2        Q.  And then as far as the system administration in

3    reference to John Mark Suhy, what was that role

4    envisioned to be?

5        A.  I'm not certain.  I imagine we were trying to

6    demonstrate complete coverage of various domain areas

7    and mapped the names as best fit.

8        Q.  And then moving on to page -- it would be 17

9    out of 45, also Page 8 within the document, it appears

10   to be.

11       A.  Okay.

12       Q.  And then it says -- this is way down at the

13   bottom.  It's the last bullet point.  It says, "Team ASR

14   developed the KG-API, a suite of tools coupled with a

15   web-based user interface that enables users to search

16   graph databases for user-specific (sic) patterns and

17   then view the resulting patterns in CKGE Graph

18   Explorer."

19           So the KG-API suite of tools, is that basically

20   what would be referred to as a "graph visualizer," or is

21   that not an accurate description?

22       A.  I don't think that's accurate.  Yeah, that's

23   not how I would think of KG-API's primary functionality.

24       Q.  Okay.  What is meant by, as is stated in the

25   document, being "coupled with a web-based user interface

129

1    that enables users to search graph databases"?

2       A.   It's referring to a user interface of the

3    KG-API application that allows users to specify a graph

4    pattern so that it can be searched for in a graph

5    database.

6       Q.   Okay.   And how -- and would that graph database

7    be generated by a graph database tool like ONgDB?

8       A.   Yes, like ONgDB.

9       Q.   Which was what -- what was used in the CKGE

10   Graph Explorer?

11      A.   You're saying ONgDB is what was used in the

12   CKGE Graph Explorer?

13      Q.   Yeah.

14      A.   It was used to generate those graph databases,

15   you're saying?

16      Q.   Right, that would be visible in the CKGE Graph

17   Explorer.

18      A.   I believe that's correct.

19      Q.   And then it says -- in the same paragraph it

20   says, "ASR is now working with RAAS to develop a true

21   API in the Spark environment which, will enable the IRS

22   to rapidly build custom pipelines for graph data

23   creation and analysis using the Neo4j Spark Connector,

24   Apache Hive, and Metabase."

25          What does that mean?

130

SER_0847

1    Q.   And then going to Page 39 out of 45, you'll see

2    it's -- A-10 is the page number, but the title's, "A6,

3    Elizabeth Trenholme."  That's T-R-E-N-H-O-L-M-E.

4         Do you see that?

5    A.   Yes.

6    Q.   And who's Elizabeth Trenholme?

7    A.   She is an employee of AtomRain.

8    Q.   And why was she included in this proposal?

9    A.   I believe because she had experience using

10   graph tools in the IRS RAAS environment.

11   Q.   And one of those tools being ONgDB?

12   A.   Yes.

13   Q.   And again, this is your signature at the bottom

14   of this resume?

15   A.   It is.

16   Q.   Certificating that, to your knowledge, this was

17   an accurate representation of Ms. Trenholme's

18   experience?

19   A.   Yes.

20   Q.   And then just quickly scrolling back to

21   Ms. Bouman's resume, I know there's -- this could be

22   marketing words, but the first bullet point back to

23   that, it says, "Ms. Bouman understands and follows CKGE

24   ecosystem templates, patterns, and best practices for

25   ETL between CDW and ONgDB within the CKGE environment."

138

1    I know we were earlier speaking about using

2    different words for the relationship between CDW and the

3    CKGE environment, but is this a pretty accurate

4    description of how -- how the CKGE ecosystem works?

5         MS. EMBRY:  Jeff, where were you reading from?

6         MR. RATINOFF:  It's in the first bullet point

7    in Ms. Bouman's resume, A-8.

8         THE WITNESS:  And is there -- you're asking --

9    sorry.

10   BY MR. RATINOFF:

11       Q.  Yeah, let me re-ask it.  I think that was a

12   pretty vague question.

13       So as far as the relationship between CDW and

14   ONgDB in the CKGE environment, is this a fair

15   representation of how they interact?

16       A.  I think so, yes.

17       Q.  And what does "ETL" stand for?

18       A.  Extract, transform, and load.

19       Q.  And what does that mean in the context of the

20   interface between CDW and ONgDB within the CKGE

21   environment?

22       A.  I think it is stating that, in the CKGE

23   environment, data is extracted and transformed and

24   then -- from CDW and then loaded into graph databases

25   within the CKGE environment.

139

1    Q.  So the CDW does all the work; for instance, all

2    the tax payer information that may be used in creating a

3    graph; is that fair?

4    A.  Yeah, the CDW contains lots of information, but

5    inclusive of tax pair information.

6    Q.  And I think it's -- is it fair to say that CDW

7    is -- contains pentabytes (sic) of data, an order of

8    magnitude?

9    A.  I think it's petabytes, but yes.

10   Q.  Petabytes.  Got it.  Okay.  I know it was a

11   very large order of magnitude, so...

12   A.  It's a lot.

13   Q.  It is a lot.

14       MR. RATINOFF:  All right.  Let me go ahead and

15   mark the next exhibit.  This is going to be in your chat

16   here in a minute.  This will be marked as Exhibit 138.

17       (Exhibit 138 was marked for identification.)

18   BY MR. RATINOFF:

19   Q.  Oh, and before we even get there, this proposal

20   that we were just talking about, that was the Emerging

21   Compliance Issues, I think is how you described it?

22   A.  Yes.

23   Q.  And that was actually award to ASR, correct?

24   A.  Correct.

25   Q.  Okay.  Let me know when you've had a chance to

                                                          140

1   look at what's been marked as Exhibit 138.

2       A.   Okay.   And this is the one that starts with

3   "Subcontractor Task Order Number 0001"?

4       Q.   Correct.

5       A.   Okay.   Let me take a look.

6            Okay.

7       Q.   So do you recognize what's been marked as

8   Exhibit 138?

9       A.   Yes.

10      Q.   Okay.   This is Bates number ASR 01752, produced

11   by ASR in response to subpoena.

12            What is your understanding of this document?

13      A.   This is a subcontract between ASR and iGov at

14   the task-order level under DAIS, specifically for the

15   Emerging Compliance Issues task order.

16      Q.   So this relates to what was ultimately awarded

17   in response to what we were just looking at,

18   Exhibit 137?

19      A.   That's correct.

20      Q.   And it's contemplated that both, I assume, that

21   the task order awarded to ASR, and in turn, the

22   subcontract awarded to -- or the task order awarded to

23   iGov could go as far as 2025?

24      A.   That's correct.

25      Q.   And this is for the base year of that -- that

141

1    task order?

2         A.   That's correct.

3         Q.   And then looking at paragraph -- I think it's

4    on the next page, actually.  Excuse me.  It's in the

5    second to last paragraph that is in that box.  It starts

6    with, "In addition to."

7         A.   Uh-huh.  Yes.

8         Q.   You'll see that, "The recent adoption of graph

9    database technology by the IRS has rapidly led to the

10   new" -- sorry -- "to new insights and is now being used

11   by over 3,000 employees" -- excuse me -- "in

12   Examination, Collection, Criminal Investigation, and

13   even cybersecurity functions."

14        Do you have an understanding of that's being --

15   what that's referring to?

16        A.   Yes, generally.  This language is, I believe,

17   taken directly from the IRS' request for quotations.

18        Q.   And is this referring to the CKGE environment?

19        A.   I believe it's referring to the CKGE

20   environment inclusive of tools that have been developed

21   to analyze that data.

22        Q.   I'm sorry; you said "inclusive"?

23        A.   "Inclusive of."

24        Q.   Gotcha.  And one of those tools being ONgDB?

25        A.   I suppose so, yes.

142

1    Q.  And then in the beginning of that box, I think

2  it looks like it might parrot the language of what we

3  looked at in that prior modification, the "DMD manages a

4  large-scale data, analytics, and computing environment.

5  The scope involves analytical support to RAAS' Data

6  Exploration and testing division," et cetera.

7        So actually, this task order relates to that

8  modification one to the subcontractor master agreement?

9    A.  Yes, that's right.

10    Q.  All right.  I think I'm able to connect all the

11  government contracting dots.  It's a little complicated.

12  Took me a couple of tries going through the document.

13    A.  Well done.

14    Q.  Thank you.  Pat myself on the back.

15        And as far as the award goes on Page 2, is

16  the -- is that, the $29,538, is that basically the max

17  amount that can be paid under this task order?

18    A.  That is the maximum amount that could be paid

19  to -- from ASR to John Mark Suhy's firm under this task

20  order barring any modification.

21    Q.  And to your knowledge, was the full amount paid

22  to Mr. Suhy?

23    A.  I don't know.

24    Q.  And then I'm going to go ahead and put the next

25  exhibit in the chat.

143

SER_0853

1      Oh, actually, I'm sorry.  Before I do, I just

2   wanted to confirm at the bottom of Page 3, is that your

3   signature on under "ASR Analytics"?

4      A.  It is.

5      Q.  And is this Mr. Suhy's signature to your

6   knowledge?

7      A.  It does appear to be, yes.

8      Q.  And to your knowledge, was this task order

9   fulfilled by Mr. Suhy?

10      A.  Well, this task order is still active, but this

11   base year, to my knowledge, yes, was fulfilled.

12      Q.  And so he fully performed whatever was called

13   for within the base year under this task order?

14      A.  Yes.  To my recollection, yes.

15      Q.  Okay.  So moving on to what's been dropped in

16   the chat.  This will be Exhibit 139.

17          (Exhibit 139 was marked for identification.)

18          THE WITNESS:  Okay.  Let me take a look.

19   BY MR. RATINOFF:

20      Q.  Sure.

21      A.  This starts with "Subcontractor Task Order

22   Number 0002"?

23      Q.  Correct.

24      A.  Okay.

25      Q.  And just while you're doing that, I will state

144

1    for the record, this is a document with the beginning

2    Bates number 01758.  As noted, "Subcontractor Task Order

3    Number 0002" is the title of the document, which I've

4    marked as Exhibit 139.

5         A.   Okay.

6         Q.   And do you recognize what's been marked as

7    Exhibit 139?

8         A.   Yes.

9         Q.   What do you understand this document to be?

10         A.   This appears to be a subcontract agreement

11   between ASR and iGov at the task-order level under the

12   DAIS BPA, specifically for the Corporate Graph Database

13   task order.

14         Q.   And when you say "the Corporate Graph Database

15   task order," is that a different task order than the one

16   the IRS awarded ASR?

17         A.   It is, yes.

18         Q.   And when was that awarded to ASR?

19         A.   I believe it was awarded in September of 2020.

20         Q.   And it's described under "Purpose of Task

21   Order/Description of Work."

22              "This engagement involves Subcontractor support

23   to ASR for Corporate Graph Database modules.

24   Specifically, the Subcontractor will support ASR to

25   provide analytical support of (sic) the IRS Office of

145

SER_0855

1    Research, Applied Analytics and Statistics" -- I'll just

2    say "RAAS" for short -- "Data Exploration...Testing

3    Division," et cetera.

4            Is that -- is that a fair representation of

5    what this task required Mr. Suhy to provide services on?

6        A.  Yes.

7        Q.  And at a high level, what -- what was this

8    task -- sorry -- what was the Corporate Graph Database

9    modules being referred to here?

10       A.  I'm not sure what the term "modules" is used to

11   mean, but the Corporate Graph Database project, as I

12   understand it, is developing user-interface driven tools

13   to visualize and analyze corporate organizational

14   structures.

15       Q.  And then when you say using graphs, you mean

16   graphs generated by programs such as ONgDB?

17       A.  I don't know how the graphs for this project

18   are generated, but I would assume that's correct.

19       Q.  Okay.  Maybe this will help clarify things.

20   Moving on to the next page.  The same box, but

21   continuing on.

22           By the way, I notice it says, "The recent

23   adoption of the graph database technology by the IRS has

24   rapidly led to new insights and is now used by over

25   4,000 employees."  I think the other one said 3,000.

146

SER_0856

1    Is it 3,500?  I mean, do you have -- was that

2    something that ASR wrote?

3    A.  No, these -- as I mentioned, these narratives

4    in the Description of Work section are typically things

5    we take directly from the government's RFQ, so more

6    likely than not, two different authors in the government

7    either wrote them at different times or had different

8    numbers.

9    Q.  Understood.  And I think you testified this was

10   under a different task order than the emerging

11   compliance issue, so that -- that makes sense.  Right

12   hand not talking to the left.

13   Okay.  It says -- further on, it says, "RAAS

14   graph data models are accessible by employees through a

15   web-based user interface (UI) that provides

16   authentication, query, visualization, datasheet views,

17   and other functionality.  Many of these services are

18   messaged through GraphGrid, a microservices-based

19   application programming interface that includes ONgDB."

20   Do you see that?

21   A.  Yes.

22   Q.  Would that more articulately describe the

23   relationship of ONgDB with GraphGrid and then in terms

24   of CKGE that we've been trying to nail down today?

25   A.  I believe so.  I -- I did not write this, but I

147

SER_0857

1   don't have any reason to question that it's an accurate

2   description, and it does provide a more precise

3   explanation of what GraphGrid is.

4       Q.   And from this document, do you have a better

5   understanding in your own words what GraphGrid does?

6       A.   I believe so, yeah.

7       Q.   And what -- what is that understanding now?

8       A.   I would say it is that GraphGrid is an API that

9   allows developers to interact with different

10   microservices, including ONgDB.

11       Q.   What are microservices?

12       A.   Again, you're pushing at the boundary of my

13   technical understanding, but I understand it to be

14   discrete, functional components within a technology

15   architecture.

16       Q.   In this case, being components of GraphGrid?

17       A.   That's my understanding.

18       Q.   And one of those components being ONgDB?

19       A.   That's my understanding, yes.

20       Q.   And then moving on, this is -- so this would

21   be, again, a DAIS award under that task order, support

22   for Corporate Graph Database?

23       A.   Correct.

24       Q.   And then the amount here is, at least for the

25   base here is 25 -- $25,993.44?

148

SER_0858

1    A.  Correct.

2    Q.  And that's -- that would be the maximum amount

3  that would be awarded for this particular contract

4  period to iGov?

5    A.  Correct.

6    Q.  And that's based on Mr. Suhy's stated hourly

7  rate of $147.69?

8    A.  Correct, along with an estimated level of

9  effort.

10   Q.  "Effort" meaning the 176 hours?

11   A.  Correct.

12   Q.  And did Mr. Suhy perform all the tasks required

13  under this task order for that base contract period of

14  September 2020 to September 2021?

15   A.  As far as I know, he provided all of the

16  support that was requested.

17   Q.  And then at the bottom, this is your signature

18  on the left under "ASR Analytics"?

19   A.  It is, yes.

20   Q.  And this is Mr. Suhy's signature under "iGov"?

21   A.  Yes, to my knowledge.

22   Q.  No reason to believe it's not?

23   A.  No reason to believe it's not.

24       MR. RATINOFF:  All right.  I know we've going

25  for a little over an hour, so I want to make sure I give

149

1    Let's do that.

2            THE VIDEOGRAPHER:  Thank you.  We are now going

3    off the video record.  The time is 3:19 p.m.

4            (Off the record from 3:19 p.m. to 3:32 p.m.)

5            THE VIDEOGRAPHER:  We are now back on the video

6    record.  The time is 3:32 p.m.

7    BY MR. RATINOFF:

8        Q.  All right.  Let's go ahead and continue.  I'm

9    going to drop a new exhibit in the chat.  This will be

10   marked as Exhibit 140.  It was produced by ASR,

11   beginning Bates number ASR 01755, and it's titled,

12   "Subcontractor Task Order Number 0001 - Modification

13   01."

14           (Exhibit 140 was marked for identification.)

15   BY MR. RATINOFF:

16       Q.  Please let me know when you've had a chance to

17   review.

18       A.  Sorry.  I was on mute.  I will.  I'm looking at

19   it now.

20           Okay.

21       Q.  And do you recognize what's been marked as

22   Exhibit 140?

23       A.  Yes.

24       Q.  Okay.  What do you understand Exhibit 140 to

25   be?

                                                        151

Case 5:18-cv-01882-EJD Document 210 Filed 09/28/23 Page 653 of 730 November 7, 2022

1    A.  This is a modification to our subcontract, to
2    the subcontract between ASR and iGov for work on the
3    Emerging Compliance Issues project.
4    Q.  So this is essentially amending the original
5    task order by exercising option year one?
6    A.  Correct.
7    Q.  Option year one being from September 2021 to
8    September 2022?
9    A.  Correct.
10   Q.  And this Emerging Compliance Issues is again
11   the same task order that we've been talking about that
12   ASR was awarded by the IRS?
13   A.  It's one of the ones we've been discussing,
14   yes.
15   Q.  And we're working under the -- the DAIS BPA,
16   correct?
17   A.  Correct.
18   Q.  And then going down to the second page, you'll
19   see the hourly rate.  It looks like it was changed from
20   147.69 to 150.94; is that correct?
21   A.  Correct.
22   Q.  And that's just reflecting inflation, I guess
23   would be the best explanation?
24   A.  Yeah.  Government contracts often have a small
25   escalation rate built in.

152

1    Q.   And then modification amount -- so then the

2  award amount underneath there is the original -- I think

3  the task order we talked about, the 29,000-plus, and

4  then the modification now is -- would be an additional

5  $35,470.90; is that accurate?

6    A.   That's correct.

7    Q.   And that reflects the increase of hours from

8  200 to 235 for this period?

9    A.   Correct.   Sorry.

10    Q.   And then it lacks like this expired not too

11  long ago, in September -- or ended in September 2021.

12         Did Mr. Suhy, during that one year period,

13  perform all the tasks he was required to do under this

14  task order?

15    A.   He did.   My understanding is he performed all

16  of the tasks he was asked to perform.   I don't know if

17  that exhausted all of the hours that were part of the --

18  that were within the ceiling.

19    Q.   And that would be under timekeeping and

20  invoicing, he would have to submit invoices to reflect

21  the amount of hours he spent on this particular project?

22    A.   That's correct.

23    Q.   And I know there's a reference to timesheets

24  here.   It says, "directly from the hours reported on the

25  approved timesheets."

153

1      Were there timesheets created by Mr. Suhy

2  separate from the invoices he submitted?

3      A.  Yes, I believe there were.

4      Q.  And how were those submitted?  Were they

5  electronically submitted by Mr. Suhy?

6      A.  Yes, electronically submitted.

7      Q.  Is that through a portal that ASR provided for

8  him to log his time in?

9      A.  Yes, that's correct.

10      Q.  And then he would still be required to provide

11  an invoice reflecting that time performed under the task

12  order?

13      A.  That's correct.

14      Q.  And then ASR would just match the time entries

15  to -- to the invoice to make sure that everything was

16  accurate?

17      A.  Correct.

18      Q.  And then again at the bottom, is that your

19  signature under "ASR Analytics"?

20      A.  It is, yes.

21      Q.  And to your knowledge, Mr. Suhy signed this

22  under "iGov"?

23      A.  I have no reason to believe that's not his

24  signature.

25      Q.  And I notice there's an option here, two, which

154

1   would be -- and this is back on Page 1 -- for

2   September 30, 2022, to September 29, 2023.

3           To your knowledge, has that option year two

4   been exercised under this task order?

5       A.  I believe it has.

6       Q.  And would it -- there been a similar sub --

7   sub -- sorry -- Subcontractor Task Order Number 001

8   in -- and presumably it would be modification two?

9       A.  Yes, that would be my understanding.

10      Q.  And it would have been exercised around the

11  expiration of this -- this modification?

12      A.  Around that date, assuming we're on top of

13  things as we should be.

14      Q.  Understood.  But to your knowledge, Mr. Suhy's

15  continuing to work under this general task order for

16  Emerging Compliance Issues at the IRS on behalf of ASR?

17      A.  Yes.

18      Q.  And would you be able to produce the -- the

19  additional modification to this task order?

20      A.  I think Becky's on mute.

21      Q.  Well, I'll --

22          MS. EMBRY:  Objection just to the extent that,

23  you know, any -- any requests you have, you know, submit

24  to us in writing, and we will take them under

25  advisement.

                                                    155

```
 1    what is -- oh.  Sorry.  My Acrobat is acting up.
 2           This would be a document produced by ASR with
 3    the beginning Bates number zero -- ASR 01761, titled,
 4    "Subcontractor Task Order Number 0002 - Modification
 5    01," and again, this is marked as Exhibit 141.
 6           Please take a look at it, and let me know when
 7    you're ready.
 8        A.  I'm looking at it now.
 9           Okay I'm familiar with this document.
10        Q.  And what is your understanding of what this
11    document is?
12        A.  This is a modification to a subcontract between
13    ASR and iGov for the Corporate Graph Database task
14    order.
15        Q.  And that's the one we were previously
16    discussing in reference to the original task order for
17    the base year?
18        A.  Yes.
19        Q.  And then this would be the -- the box on the
20    first page, option year one, from September 28, 2021, to
21    September 27, 2022?
22        A.  Correct.
23        Q.  And then looking down here again, similar bump
24    in hourly rate for Mr. Suhy?
25        A.  Correct.
```

157

1    Q.   But with a lower expectation on hours?

2    A.   Correct.

3    Q.   At least from the base year on this particular

4    task order?

5    A.   Correct.

6    Q.   And the contemplated maximum amount for this

7    task order modification period would be $21,131.60?

8    A.   Correct.

9    Q.   And to your knowledge, did -- did Mr. Suhy

10   fulfill all his obligations under this task order

11   modification one?

12   A.   As with the last one, my understanding is he

13   provided all the support that he was asked to provide,

14   and again, I don't know if that matched the

15   originally-estimated hours.

16   Q.   And then looking at it, there's an option year

17   number two from September 28, 2022, to September 27,

18   2023.

19        To your knowledge, has that option year two

20   been exercised?

21   A.   To my knowledge, it has.  I know that this

22   option was exercised by the IRS, and to the earlier

23   discussion, it may be that the documents were in the

24   process -- the subcontracts were in the process of

25   execution at the time earlier requests were made.

                                                        158

SER_0866

1    Q.  Okay.  But to your knowledge, as of now, this

2    similar modification has been executed between ASR and

3    Mr. Suhy?

4    A.  That's my understanding.

5        MR. RATINOFF:  Okay.  So counsel, I'd just ask

6    that your most recent option year task order be produced

7    as well.  That was also called for by the subpoena.

8        MS. EMBRY:  The document subpoena predates that

9    date, just for the record.

10       MR. RATINOFF:  Yeah, but you have a continuing

11   obligation, I believe, under the federal rules, but we

12   can talk about it offline.

13   BY MR. RATINOFF:

14   Q.  And then looking at signature on Page 3, under

15   "ASR Analytics," that's your signature, correct?

16   A.  That's correct.

17   Q.  And then the signature under "iGov," Mr. Suhy,

18   it would be his signature to your knowledge?

19   A.  Yes.

20   Q.  And you talked about Greystones earlier.

21       For these particular tasks, the Emerging

22   Compliance Issues and the support for corporate

23   database, would those be the type of tasks that there

24   would be some sort of transfer, at least in name, to

25   Greystones from iGov?

159

1       MR. BEENE:  Objection to form.

2       THE WITNESS:  They are in that class of task

3  that I had in mind.

4  BY MR. RATINOFF:

5       Q.  So in other words, Mr. Suhy would be continuing

6  to perform those tasks as required, but it may not be on

7  behalf of iGov, correct?

8       A.  Correct.

9       Q.  And instead, it would be on behalf of the

10  subcontractor, Greystones?

11       MR. BEENE:  Objection to form.

12       THE WITNESS:  I don't know the exact

13  organizational contractual structure that would be in

14  place on their side.

15  BY MR. RATINOFF:

16       Q.  But from ASR's perspective, the important fact

17  is that Mr. Suhy will be continuing to perform the tasks

18  required under these task orders; is that correct?

19       MR. BEENE:  Objection to form.

20       MR. RATINOFF:  Counsel, just let me finish my

21  question.

22  BY MR. RATINOFF:

23       Q.  So let me ask that again.

24       So under support for Corporate Graph Database,

25  which is a task that continues to be performed for the

                                                    160

1    IRS by Mr. Suhy, correct?

2        A.   Correct.

3            MR. BEENE:  Objection to form.

4    BY MR. RATINOFF:

5        Q.   You can answer.

6        A.   Correct.

7        Q.   And from ASR's perspective, it's -- the

8    important performance issue is that Mr. Suhy continues

9    to perform the tasks under these particular task orders;

10   isn't that also correct?

11       A.   I --

12           MS. EMBRY:  Objection to form.

13           Go ahead.

14           THE WITNESS:  The important part is that we

15   continue to provide this capability to our client, and

16   Mr. Suhy is one individual who can provide that support.

17   BY MR. RATINOFF:

18       Q.   So it's important to have some continuity for

19   ASR as far as the actual personnel performing the tasks

20   under these task orders?

21       A.   Yes.

22       Q.   And for the -- the task order for support for

23   corporate database that was awarded from the IRS to ASR,

24   is AtomRain also performing task orders under that?

25       A.   Sorry.  Give me one moment.  I'm having a

161

1   little bit of a technology issue here.  The Zoom window

2   disappeared on me.  Give me one moment.

3           Okay.  I'm back.  I did hear the question, and

4   yes, AtomRain is also providing support through this

5   task order.

6       Q.   And when we say "this task order," we're

7   talking about support for Corporate Graph Database?

8       A.   Correct.

9       Q.   And is AtomRain also currently providing

10  support for the Emerging Compliance Issues task order?

11      A.   They are, yes.

12      Q.   And are both those task orders, does that

13  relate to their provision of services in relation to --

14  sorry.  Strike that.

15          For the support to -- for graph -- Corporate

16  Graph Database, does that involve AtomRain providing

17  support in relation to the CKGE environment?

18      A.   When you say "support in relation to

19  the...environment," can you describe that further?

20      Q.   Sure.  Let me ask you this:  What -- what type

21  of support is AtomRain providing for the task order

22  support for Corporate Graph Database on behalf of ASR?

23      A.   They are largely building an application that

24  allows business users to view and analyze organizational

25  structures for businesses.

162

1    Q.  Okay.  And are those organizational structures

2  analyzed in the form of graphs?

3    A.  Yes, I believe so.

4    Q.  And those graphs would be generated by graph

5  database software such as ONgDB?

6    A.  That's my understanding.

7    Q.  And then for the emerging corporate -- I'm

8  sorry, Emerging Compliance Issues, you mentioned

9  AtomRain is currently tasked with providing support for

10 ASR on that task order with the IRS, correct?

11   A.  Correct.

12   Q.  And what type of support are they providing

13 under Emerging Compliance Issues?

14   A.  They are primarily developing user interface

15 features in Graph Explorer.

16   Q.  And then the Graph Explorer, I think it was

17 referenced in the -- in the proposal; is that correct,

18 that we looked at earlier?

19   A.  I believe it was, yes.

20   Q.  And that Graph Explorer provides a

21 visualization of graphs generated by programs such as

22 ONgDB; is that also correct?

23   A.  That's correct.

24   Q.  And who are the individuals at AtomRain that

25 are providing support under the Emerging Compliance

163

SER_0871

BY MR. RATINOFF:

Q.   This will be Exhibit 142.

A.   Okay.  I've got it open.  Let me take a look.

Okay.  I've got it.

Q.   Okay.  This was produced by ASR with the Bates number ASR 01901.  It's indicated as being an invoice number 212 from iGov to ASR Analytics.  It looks like the date on it is June 6th, 2019.

Do you have an understanding of what this invoice is?

A.   I think I do, yes.

Q.   And what -- what is that?

A.   It appears to be an invoice from iGov for services performed in relation to what we've been calling the KG-API project.

Q.   And that's the project that tailer data services was the prime contractor on?

A.   That's right, Tylor Data Services.

Q.   And that's the -- I think we looked at it earlier.  I don't have the exhibit number on hand, but it's the subcontract between ASR and Mr. Suhy related to the KPGAI -- did I get that right?  Too many acronyms.

A.   That's right, that relates to the KG-API contract.

Q.   KG-API, thank you.

166

Case 5:18-cv-07182-EJD   Document 210   Filed 09/28/23   Page 665 of 730   November 7, 2022

1    And so just to be clear, he would submit

2  invoices like this for when he performed services under

3  that particular subcontract to ASR?

4    A.  That's correct.

5    Q.  And then ASR would in turn bill Tylor Data

6  Services?

7    A.  That's correct.

8    Q.  And then after Tylor Data Services would pay

9  ASR, then Mr. Suhy would be paid?

10    A.  That's generally correct.  I don't know if it

11  always followed that sequence.

12    Q.  And then these type of invoices would be

13  verified against timesheets Mr. Suhy would submit to

14  ASR?

15    A.  Yes.

16    Q.  All right.  I'm going to go ahead and put the

17  next exhibit here.

18    (Exhibit 143 was marked for identification.)

19    THE WITNESS:  Okay.  I've got it open.

20  BY MR. RATINOFF:

21    Q.  All right.  This will be Exhibit 143.  It's

22  produced by ASR with the Bates number ASR 01915, invoice

23  number 267 is the title.

24    A.  Okay.  Got it.  Yeah.  I've looked at it.

25    Q.  Do you recognize this document?

167

1      A.   Yes.

2      Q.   Okay.  What's your understanding of what

3   Exhibit 143 is?

4      A.   I'll -- I'll clarify when I say I recognize the

5   document:  I don't know that I've actually seen this one

6   before, but I -- I can tell exactly what it is.

7      Q.   Okay.  So is this a -- is this an exemplar of a

8   typical invoice that iGov would submit under its various

9   subcontracts with -- with ASR?

10      A.   Yes.

11      Q.   And this is -- payment to Mr. Suhy would be

12   based on these invoices?

13      A.   Correct.

14      Q.   And in this case, you'll see down in the "Part

15   Number/Description," it says, "IRS: DAIS BPA," and

16   that's meaning the general BPA contract we talked about

17   earlier, correct?

18      A.   Correct.

19      Q.   And then there's some references in the

20   parentheses after that.  One is "IDT Innovation."

21          What's IDT Innovation?

22      A.   That's one of the task order contracts awarded

23   under the DAIS BPA to ASR.

24      Q.   Okay.  And what -- what is the IDT Innovation

25   task order?

168

1    A.  So that's the one that we talked about first

2  that involves a variety of tasks around identity theft

3  detection using a variety of methods, including, as we

4  discussed, graph analysis.

5    Q.  And "graph analysis" meaning graphs generated

6  by ONgDB?

7    A.  Among other tools, yes.

8    Q.  And I know we looked at some task orders for

9  Emerging Compliance Issues and Corporate Graph.

10        Was there also task orders issued to Mr. Suhy

11  under IDT Innovation?

12    A.  I don't recall specifically, but I would assume

13  that there were.

14    Q.  And would those have been on similar terms as

15  far as hourly rate and number of hours as the other task

16  orders we've looked at?

17    A.  Yes.

18    Q.  And then it says -- the next one is Knowledge

19  Graph.

20        Do you have an understanding what that is

21  referring to?

22    A.  I'm not sure, actually.  I have a guess.

23    Q.  Okay.  Well, I don't want you to guess, but you

24  have a reasonable basis to surmise what that is, maybe

25  we can do this a different way.

169

1    There's a reference to Corporate Graph. I

2  believe -- is that consistent with what we were just

3  talking about the task orders, number two?

4    A.  Yes.

5    Q.  And then Emerging Compliance Issues is -- that

6  would be the task order one?

7    A.  Correct.

8    Q.  Okay.  So process of elimination, it looks like

9  we've got three different task orders:  You've got the

10  IDT Innovation, Corporate Graph, and then Emerging

11  Compliance Issues.

12        So does that help bracket what other task order

13  Knowledge Graph might be referring to?

14    A.  My assumption is that it is referring to the

15  Knowledge Graph API project, but that is not a DAIS BPA

16  task order, which is what confuses me about the label on

17  the invoice.

18    Q.  Okay.  We can back to that Knowledge Graph API.

19        Was it acceptable for Mr. Suhy to just bill

20  generally for all the different tasks as one entry and

21  total number of hours?

22        MR. BEENE:  Objection to form.

23        THE WITNESS:  I would not have objected to it

24  provided the rest of the invoice was accurate.

25        ///

170

SER_0876

1   BY MR. RATINOFF:

2       Q.  How did -- how did ASR differentiate between

3   allocating hours between the various different task

4   orders that Mr. Suhy was working on?

5       A.  Sorry.  Could you repeat the question?

6       Q.  Sure.  Did -- was -- was it necessary for ASR

7   to -- I'm sorry.  Let me -- let me try again.

8       Did -- so you said it was okay for Mr. Suhy to

9   generally invoice ASR for the various tasks he was

10  supposed to be doing, correct?

11      A.  Correct.

12      Q.  How did ASR allocate the total amount of hours

13  and the equivalent of dollars to the various task

14  orders?

15      A.  So this would have been handled by our

16  accounting staff, but I'm fairly certain they would have

17  looked to the timesheets to determine the breakout of

18  hours across projects.

19      Q.  Okay.  So then Mr. Suhy would have to actually

20  specify the hours per task order within the time-entry

21  system?

22      A.  That's right.

23      Q.  What is the time-entry system that -- that ASR

24  uses?

25      A.  We use a system called Mavenlink, all one word.

171

1    Q.  And does Maven have the capability to produce

2  reports on the number of hours billed on a particular

3  task by a contractor?

4    A.  Yes, it does.

5    Q.  Were you ever asked in response to the subpoena

6  to generate a report on -- on the hours spent by

7  Mr. Suhy on his various task orders?

8    A.  We did produce a report showing payments to

9  Mr. Suhy and the corresponding hours.  I don't believe

10  it broke out the detail by task order.

11        MR. RATINOFF:  Okay.  Let me go ahead and mark

12  the next exhibit.  It's coming in the chat here

13  momentarily.  This would be exhibit -- I believe we're

14  at --

15        THE REPORTER:  That would be 144.

16        MR. RATINOFF:  144.  Thank you.

17        (Exhibit 144 was marked for identification.)

18  BY MR. RATINOFF:

19    Q.  This is a document produced by about ASR with

20  the Bates number ASR 01956, invoice number 303 from

21  iGov.

22    A.  Okay.  Got it, and I've looked at it.

23    Q.  Okay.  Do you understand what Exhibit 144 is?

24    A.  Yes.

25    Q.  And what's your understanding?

172

1    A.  It appears to be another invoice for work

2    performed by John Mark Suhy under a set of task order

3    contracts.

4    Q.  Okay.  And then looking at the "Part

5    Number/Description," we see "IDT."

6         Is that short for IDT Innovation, that task we

7    were just talking about?

8    A.  That's my assumption, yes.

9    Q.  And then "KG" being short for Knowledge Graph?

10   A.  Yes.

11   Q.  And "CG" for Corporate Graph?

12   A.  Yes.

13   Q.  And "ECI," Emerging Compliance Issues?

14   A.  Yes.

15   Q.  And those were the four tasks that, at least as

16   of July of 2020, that Mr. Suhy was still working under?

17   A.  Yes.

18   Q.  And has he continued to work on -- on all four

19   of those task orders on behalf of ASR as you sit here

20   today?

21   A.  Yes.  My hesitation is I don't know if he's

22   actively providing support under IDT Innovation, though

23   he may be in a very low level of effort.

24   Q.  Understood.  And then you had mentioned that a

25   spreadsheet was generated reflecting all the payments

173

SER_0879

1   made by Mr. Suhy and the hours; is that correct?

2       A.  Yes.

3           MR. RATINOFF:  Okay.  Let me go ahead and put

4   the next document in the chat, and this would be

5   Exhibit 145.

6           (Exhibit 145 was marked for identification.)

7           THE WITNESS:  Got it.  I have looked at it.

8   BY MR. RATINOFF:

9       Q.  Okay.  Was this the spreadsheet you were

10  referring to that was generated as far as all the

11  payments made to Mr. Suhy under the iGov task orders?

12      A.  Yes.

13      Q.  And it shows that the last entry on here was on

14  July 27, 2022; is that correct?

15      A.  Correct.  That's correct.

16      Q.  Have any payments been made to iGov since that

17  time under any of these four task orders we've just been

18  talking about?

19      A.  My understanding is they have not, because this

20  was generated within the last couple weeks, and there

21  were no other payments as of that point.

22      Q.  But Mr. Suhy is continuing to work under those

23  task orders with the expectation to receive payment for

24  the work?

25      A.  I believe so, yes.

174

1    Q.   And is it simply because he hasn't submitted

2  any new invoices to ASR that there's no further payments

3  other than what's reflected on this document?

4    A.   That would be my understanding.

5    Q.   To your knowledge, have any invoices since July

6  of 2020 been submitted by Greystones to ASR?

7    A.   To my understanding, they -- there have not

8  been any.

9    Q.   Has Mr. Suhy entered time into the timekeeping

10  system since July of 2022?

11    A.   I don't know the answer to that.

12    Q.   But as you sit here today, the -- the payments

13  made between June 6th, 20 -- sorry -- June 28, 2019, and

14  July 27, 2022, have been made to Mr. Suhy in response to

15  the invoice submitted to ASR, correct?

16    A.   Correct.

17    Q.   Okay.  Let me -- you've mentioned -- let me

18  make sure I've got the acronym correct.  Or actually, I

19  think it was just API.

20         You said there was a Knowledge Graph API

21  contract that was not under the DAIS BPA; is that

22  correct?

23    A.   That's correct.

24    Q.   What is the Knowledge Graph API project?

25    A.   That's the prime contract with Tylor Data,

175

1    between Tylor Data and the IRS.

2         Q.  Is it different from the one we were previously

3    talking about?

4         A.  No.

5         Q.  Okay.  I believe you said that that contract

6    had expired recently; is that correct?

7         A.  The contract that we were looking at documents

8    for did expire.

9         Q.  But has there been a new contract with the IRS

10   and Tylor Data --

11        A.  Yes.

12        Q.  -- or tailer data?  Sorry.

13        A.  You had it.  Tylor Data, yes.

14        Q.  Tylor Data.  Thank you.  I think the spelling

15   keeps throwing me off.  I'm used to the E-R.  Okay.

16        And ASR is now -- actually, when was that new

17   contract awarded to Tylor Data Services -- or software?

18        A.  I believe it immediately followed the

19   expiration of the preceding contract, so that would be

20   September of 2021.

21        Q.  And did ASR -- was ASR engaged as a

22   subcontractor on that one, the new award, as well?

23        A.  Yes, though in a somewhat lesser capacity than

24   the original contract.

25        Q.  And in turn, Mr. Suhy was brought in as a

176

1   subcontractor on behalf of ASR with that new contract?

2       A.   That's correct.

3           MR. RATINOFF:  All right.  Let me go ahead

4   and -- I'm going to change topics.  I don't know if you

5   want to take a quick five-minute break.  Have we been

6   going for about an hour?

7           THE WITNESS:  About 45 minutes.

8           MR. RATINOFF:  Okay.  I can continue.  I just

9   was going to change topics, so I thought maybe this

10  would be a good time to take a quick five-minute break,

11  but I'm happy to go on, whatever everyone else wants to

12  do.

13          THE WITNESS:  I see Carrie nodding vigorously.

14  I'm happy to take a break.

15          THE VIDEOGRAPHER:  No, I'm good.  I'm fine, to

16  be honest.

17          THE WITNESS:  Okay.  I'm fine.

18          MR. RATINOFF:  Okay.  Let's go on a little bit

19  longer then.  I'm trying to get you out of here as

20  quickly as possible.  We're getting there.

21          THE WITNESS:  Okay.

22  BY MR. RATINOFF:

23      Q.  All right.  Let me see.  Let me drop the next

24  document in the chat.  I'm having all kinds of trouble

25  with Acrobat.  It's saying it's all out of memory.  I

177

1    apologize for the silence.

2            (Exhibit 146 was marked for identification.)

3            THE WITNESS:  Okay.  I've got it.  I'm looking

4    through it now.  Apologies if there's a little bit of

5    background noise here.

6    BY MR. RATINOFF:

7        Q.  This will be marked as Exhibit 146, I believe.

8        A.  Okay.

9        Q.  So I've marked as Exhibit 146 an email from

10   Mr. Suhy to a host of people, including yourself, and

11   then there's also -- it looks like another -- a few

12   other ASR folks here:  Aaron Taylor, Logan Montrone, and

13   then Lauren Szczerbinski.

14           Did I get it?

15       A.  Close.

16       Q.  Close?

17       A.  Szczerbinski.

18       Q.  Szczerbinski?

19       A.  Szczerbinski.

20       Q.  Szczerbinski.  Got it.  Okay.

21           And were those all individuals that were

22   working on task orders issued by the IRS?

23       A.  Yes.

24       Q.  And in this particular instance, do you have an

25   understanding of what this email's referring to as far

178

1   as what task order was being worked on as of January 4,

2   2019?

3       A.  Yes.

4       Q.  And what is that understanding?

5       A.  This appears to relate to work on the KG-API

6   task order.

7       Q.  And then with respect to the KG-PI -- KG-API

8   task order, this shows that ONgDB was used in some

9   capacity by ASR in conjunction with that task order,

10  correct?

11      A.  Yes, it does appear that Tylor Data and ASR

12  were using ONgDB for tasks under KG-API.

13      Q.  And in this particular instance, it appears

14  that they were using ONgDB version 3.4.11; is that

15  accurate?

16      A.  I see the hyperlink to a file that includes

17  those numbers, but I -- I don't know enough about

18  versioning to know -- well, I was not personally

19  involved in this technical work, so I can't be certain

20  what it -- what version it is.

21      Q.  Do you have an understanding of why Mr. Suhy

22  was offering or directing ASR to download ONgDB to

23  replicate the configuement -- or sorry -- configuration

24  at IRS complete with APOC and graph algorithms library

25  setup?

179

SER_0885

1         THE VIDEOGRAPHER:  We are now going off the

2   video record.  The time is 4:32 p.m.

3         (Off the record from 4:32 p.m. to 4:41 p.m.)

4         THE VIDEOGRAPHER:  We are now back on the video

5   record.  The time is 4:41 p.m.

6         MR. RATINOFF:  Okay.  Let me go ahead and put

7   the next exhibit in the chat.

8         (Exhibit 150 was marked for identification.)

9   BY MR. RATINOFF:

10      Q.  This will be Exhibit 150.

11      A.  Okay.

12      Q.  Another email produced by the IRS, with ASR

13  individuals, including the witness being a recipient,

14  dated 12/6/2019, and ends with the Bates number 334 on

15  the first page.

16      A.  Okay.  I'll take a look through it.

17          Okay.

18      Q.  Okay.  Do you recognize this email?

19      A.  Yes, I recognize it.

20      Q.  No reason to believe you didn't receive it at

21  your IRS email address?

22      A.  No.

23      Q.  Do you understand what's being referred to as

24  the -- in the subject as being "milestones - O&M"?

25      A.  I think so.

189

1    Q.  And for clarification, there's a reference to

2  the O&M project in the first paragraph.

3    A.  Right.

4    Q.  What's the O&M project?

5    A.  I -- I was assuming that this -- that the O&M

6  project is talking about operations and maintenance of

7  the KG-API application, but I -- I don't remember

8  hearing that term used frequently, so I'm reading

9  between the lines a bit.

10    Q.  Okay.  And under Item Number 1, "Data transfer

11  methods between ONgDB and HDFS/Spark," do you see that?

12    A.  Yes.

13    Q.  Is that -- is that a task that relates to the

14  KG-API project?

15    A.  It is an activity that was contemplated, and I

16  think is being performed under the KG-API project.

17    Q.  So that was a goal of the KG -- KG-API project,

18  to allow data transfer between ONgDB and HDFS, and

19  Spark?

20    A.  Yes, I think that's accurate.

21    Q.  What's the HDFS stand for?

22    A.  I believe it's for Hadoop Data File Server.

23    Q.  And on number four it's listed as either a

24  milestone or task of integration into CKGE.

25          And do you understand what that's referring to?

190

SER_0887

1    the next exhibit.  This will be Exhibit 155.

2            (Exhibit 155 was marked for identification.)

3            THE WITNESS:  Okay.  Let me take a look.

4    BY MR. RATINOFF:

5        Q.  While you're doing that, this is an email -- or

6    email chain that was produced by ASR in response to the

7    subpoena with beginning Bates number ASR 00910, the last

8    email being an email from Mr. Suhy dated July 8, 2022,

9    to the witness, as well as a Jake Brooks,

10   Jeremy Wiedemeier.  Both have GCOM email addresses.

11       A.  Okay.  One more minute here.

12       Q.  Sure, no problem.

13       A.  Okay.  Got it.

14       Q.  All right.  Who is Jake Brooks?

15       A.  Jake Brooks is an ASR employee who manages the

16   Emerging Compliance Issues task order.

17       Q.  And then who's Jeremy Wiedemeier?  Is that how

18   you pronounce it?

19       A.  Yes.

20       Q.  I got one right.

21       A.  Jeremy Wiedemeier is an ASR employee who

22   supports a variety of task orders at the IRS.

23       Q.  And then I notice that you're all using

24   gcomsoft.com email addresses as of July 2022.

25           Do you see that?

                                                    204

1    A.   Yes.

2    Q.   Is that generally how you email now, is with

3  GCOM Soft versus Analytica -- I'm sorry -- ASR email

4  addresses?

5    A.   It is, yes.

6    Q.   Part of the acquisition, just merging onto the

7  same email system?

8    A.   Yeah, that's right.

9    Q.   And then moving on down to -- let's go down to

10  the bottom here, which would be the first email from

11  Mr. Suhy to yourself, July 8, 2022.

12        And he says, "Whenever I go on vacation, I

13  always have someone to back me up.  That has been Amanda

14  from AtomRain in the past, but I think we need to switch

15  to have someone at ASR be on the team.  With the

16  re-compete coming up, I suspect it might be important.

17  I suspect AtomRain may try to compete with Analytica as

18  a team member."

19        Do you see that?

20    A.   Yes.

21    Q.   Do you have an understanding of why Mr. Suhy

22  was asking for a replacement backup for Amanda?

23    A.   I think so.  I only know what I read in this

24  email.

25    Q.   Sure.  And if he emailed you asking you for a

                                                         205

1   person, did he ever explain why he didn't want to have

2   Amanda at AtomRain anymore be his back up?

3      A.  I don't recall any explanation beyond what is

4   explained here about AtomRain potentially being a

5   competitor going forward.

6      Q.  As of July 2022, was AtomRain still a

7   subcontractor for ASR under the BPA DAIS award?

8      A.  Yes.

9      Q.  How would they be a competitor then if they

10  were still subcontracting?

11     A.  I am interpreting this to mean that for future

12  RFQs from the IRS that were not issued under the DAIS

13  BPA, for example, that AtomRain might be a competitor to

14  John Mark Suhy.

15     Q.  Oh, I see.  So a competitor to John Mark Suhy,

16  not ASR?

17     A.  That's my understanding.  I'm maybe

18  interpreting.

19     Q.  Did you have an understanding of how AtomRain

20  would be a competitor to Mr. Suhy as of July 2022?

21     A.  Again, my interpretation is that it would

22  relate to future RFQs that, I guess, other firms would

23  be eligible to bid on.

24     Q.  And you'll see at the bottom of the page,

25  Mr. Suhy says, "I don't work as closely as I used to

206

SER_0890

November 7, 2022

 1   with AtomRain now that I've joined Greystones" -- and

 2   then it continues -- "so it only makes sense to make

 3   that change anyway."

 4          Does this help refresh your recollection as to

 5   when you may have found out that Mr. Suhy had sold his

 6   company to Greystones?

 7      A.  It certainly refreshes my memory that it would

 8   have been no later than July 8, 2022.

 9      Q.  As opposed to August, which we talked about

10   earlier?

11      A.  Right, I think before I said no later than

12   August.

13      Q.  Has AtomRain ever informed you that they were

14   also sued by Neo4j?

15      A.  I don't recall that phrasing being used, but I

16   do recall hearing that there were legal issues between

17   AtomRain and Neo4j.

18      Q.  Did anyone at AtomRain ever tell you how those

19   issues were resolved?

20      A.  Yes, in very general terms.

21      Q.  And what were those terms that were conveyed to

22   you?

23      A.  That some agreement was reached as to what

24   technology could be used permissibly within AtomRain's

25   products.

207

1   that they are currently performing.

2   BY MR. RATINOFF:

3       Q.  To your knowledge as you sit here today, do you

4   know what version of ONgDB the IRS is using with the

5   CKGE environment?

6       A.  I do not.

7       Q.  Is there someone at ASR who would know that

8   answer?

9       A.  I don't know for certain.

10      Q.  Is there someone at ASR -- I think you

11  mentioned were managing the various projects, one being

12  the Knowledge Graph environment, I think; is that

13  correct?

14      A.  A different one, but yes.

15      Q.  Okay.  So on the Corporate Graph sub-task -- or

16  sorry -- task, is AtomRain performing work under that

17  task order?

18      A.  Yes.

19      Q.  And that involves the IRS' use of ONgDB?

20      A.  Yes.

21      Q.  And then with the Emerging Compliance Issues,

22  does that also involve -- sorry.  Strike that.

23          Does the Emerging Compliance Issues -- I

24  believe you testified that AtomRain's performing work

25  under that task order as well, correct?

211

SER_0892

1   A.  Correct.

2   Q.  And that also does relate to the IRS' use of

3   ONgDB?

4   A.  Yes, as we've discussed before in this -- to

5   the extent that ONgDB is used to create graph data that

6   is used on those projects.

7   Q.  And do you have individuals at ASR that are

8   managing each of those task orders and the subcontracts

9   under those task orders, correct?

10   A.  I'm sorry.  Yes.

11   Q.  And those would probably be the persons to ask

12   what version of ONgDB is being used -- being used at the

13   IRS as of now?

14   MS. EMBRY:  Objection to form.

15   BY MR. RATINOFF:

16   Q.  In relation to those task orders.

17   A.  They would be the ones most likely to know the

18   version of ONgDB that is being used in relation to those

19   task orders.

20   MR. RATINOFF:  Okay.  All right.  I have no

21   further questions at this time pending -- I'm sure

22   Mr. Beene will have some questions, and I may ask a

23   couple follow-up.

24   ///

25   ///

212

DECLARATION OF DEPONENT

I, MICHAEL STAVRIANOS, declare under penalty of perjury
that I have reviewed the foregoing transcript; that I
have made any corrections, additions, or deletions in my
testimony that I deemed necessary; and that the
foregoing is a true and correct transcription of my
testimony in this matter.


Dated this _____ day of _____, 20__,
at _____, _____.
      [City]                    [State]


      _____

MICHAEL STAVRIANOS



--o0o--

222

SER_0894

MICHAEL STAVRIANOS - ASR ANALYTICS, LLC                    November 7, 2022

```
 1                        CERTIFICATE

 2          I, BENJAMIN GERALD, Certified Shorthand Reporter,

 3     Certificate No. 14203, for the State of California do

 4     hereby certify:

 5          That prior to being examined, the witness named in

 6     the foregoing deposition was by me duly sworn to testify

 7     to the truth, the whole truth, and nothing but the truth

 8     in the within-entitled cause;

 9          That said deposition was taken shorthand at the

10     time and place herein named;

11          That the deposition is a true record of the

12     witness's testimony as reported to the best of my

13     ability by me, and was thereafter transcribed to

14     typewriting by computer under my direction;

15          That request [X] was [ ] was not made to read and

16     correct said deposition.

17          I further certify that I am not interested in

18     the outcome of said action, nor am I connected with, nor

19     related to any of the parties in said action, nor to

20     their respective counsel.

21          Witness my hand this 14th day of November, 2022.

22

23

24          BENJAMIN GERALD

25          California CSR No. 14203

                                                          223
```

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS   408-287-7500

SER_0895

**EXHIBIT 7**

SER_0896

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


NEO4J, INC., et al.

        Plaintiffs,

-vs-                Case No. 5:18-cv-07182-EJD

PURETHINK LLC,et al.

        Defendants.

_____/


VIDEO-RECORDED

DEPOSITION OF TURIN POLLARD

30(b)(6) WITNESS

FOR GREYSTONES CONSULTING GROUP


Date:               December 1, 2022

Time:              3:01 p.m.

Location:         Zoom Videoconference


Stenographically   Cambria L. Denlinger

Reported By:       CSR #14009

CONFIDENTIAL - ATTORNEYS' EYES ONLY

TURIN POLLARD, 30(b)(6)                                December 1, 2022

1   counsel for defendants Purethink, iGov, Inc., and John

2   Mark Suhy.  Mr. Suhy is in attendance today.

3           MR. RHODES:  My name is Lewis Rhodes.  I'm the

4   counsel for Greystones, and Turin Pollard is our

5   employee who is providing corporate testimony.  Our CEO

6   Sheila Duffy is attending via the same link with

7   Mr. Suhy.

8                    TURIN POLLARD,

9   being first duly sworn by the Certified Shorthand

10  Reporter to tell the truth, the whole truth, and nothing

11  but the truth, testified as follows:

12                    EXAMINATION

13  BY MR. RATINOFF:

14      Q.  Good afternoon, Mr. Pollard.  How are you?

15      A.  Good.  How are you?

16      Q.  Doing well; thank you.  Have you ever been

17  deposed before?

18      A.  No.

19      Q.  Okay.  Well, I'm sure you've already talked

20  about this with your counsel, but I just want to make

21  sure we're on the same page so I'm just going to go

22  through a few basic ground rules for the deposition.

23          You understand you just took an oath under the

24  penalty of perjury?

25      A.  Yes.

                                                          7

SER_0898

TURIN POLLARD, 30(b)(6)                                      December 1, 2022

1      Q.  And you understand that your -- this oath that

2   you've taken is the same as if you were providing

3   testimony live in a court?

4      A.  Yes.

5      Q.  We're going to proceed in a question-and-answer

6   format.  It's important that you allow me to finish my

7   question, and then maybe leave a couple seconds before

8   you answer because one of the other attorneys may just

9   object.  And they're just going to say "objection form,"

10  or they may say "objection privilege."  Depending on

11  what the objection is, if it's form, you can go ahead

12  and answer; that's just for the record for the attorneys

13  to argue about later on.  Do you understand?

14     A.  Yes.

15     Q.  So unless you're instructed not to answer, I'll

16  expect an answer to my question.  Is that fair?

17     A.  Okay.

18     Q.  Also, the court reporter is taking your

19  deposition testimony in booklet form, so it's going to

20  be in what's called a transcript.  Even though you're

21  speaking live, it's going to be on paper.  So it's very

22  important if I'm asking a question and you say yeah, nay

23  and you shake your head or nod your head, it's not going

24  to be recorded properly.  So it's important that you say

25  "yes" or "no" or provide a full answer.  Do you

                                                                    8

TURIN POLLARD, 30(b)(6)                                    December 1, 2022

1   time please let me know, or if there's any time during

2   the deposition you need to take a break, as long as

3   there's not a question pending -- which I would ask for

4   an answer for first -- I'm happy to take a break.  Is

5   that fair?

6        A.  Yes.

7        Q.  And then once I'm done questioning you,

8   Mr. Beene may have some questions for you as well, and

9   then I may have a couple follow-ups.  Just want to let

10  you know that's how this is going to proceed.  Does that

11  sound fair to you?

12       A.  Yes.

13       Q.  Is there any reason today why you would be

14  unable to testify truthfully and to the best of your

15  ability?

16       A.  No.

17       Q.  Are you on any kind of medication, or is there

18  any reason why you wouldn't be able to provide your

19  truthful and best testimony today?

20       A.  No.

21       Q.  Okay.  Can you please again state your full

22  name for the record?

23       A.  Turin Pollard.

24       Q.  And are you an employee of Greystones?

25       A.  Yes.

                                                          10

TURIN POLLARD, 30(b)(6)                                    December 1, 2022

1      Q.   What is your current role at Greystones?

2      A.   Vice president of business development.

3      Q.   And how long have you been at Greystones?

4      A.   Almost a year.

5      Q.   And just for the record, the full name of your

6   employer is Greystones Consulting Group, LLC; is that

7   correct?

8      A.   I believe that's correct, yes.

9      Q.   Okay.  Is it okay if we just refer to your

10   employer as Greystones for short if we're talking about

11   the same thing?  Is that fair?

12      A.   Yes.

13      Q.   And about when did you start at Greystones?

14      A.   Mid December of 2021.

15      Q.   Where were you employed before Greystones?

16      A.   Delphinus Engineering.

17      Q.   What does Delphinus Engineering do?

18      A.   They're an engineering firm providing services

19   to the United States Navy.

20      Q.   What was your job at Delphinus?

21      A.   Director of business development -- I'm sorry.

22   Business development manager was the correct title.

23      Q.   How long were you employed there?

24      A.   Just over two years.

25      Q.   Where were you employed prior to that time at

                                                            11

Case 5:18-cv-07182-EJD   Document 210   Filed 09/29/22   Page 694 of 730
CONFIDENTIAL ATTORNEYS' EYES ONLY
TURIN POLLARD, 30(b)(6)                        December 1, 2022

1    Q.  Correct.  And are you familiar with this

2  document?

3    A.  Yes.

4    Q.  And what is your understanding of this

5  document?

6    A.  As the title says, this is a subpoena to

7  provide the deposition that we're currently doing.

8    Q.  And you understand today you're testifying, not

9  on behalf of just yourself and your personal knowledge,

10  but also testifying on behalf of Greystones' collective

11  knowledge?

12    A.  Yes.

13    Q.  And do you understand that there's a --

14  starting on page 3 of Attachment A, there's certain

15  topics of examination?  Why don't you go ahead and let

16  me know when you're at page 3 of Attachment A.

17    A.  Yeah, I'm there.

18    Q.  Okay.  And you'll see that starting on page 3

19  there's a topic of examination number 1 and it goes

20  through topic of examination 11.  Do you see that?

21    A.  Yes.

22    Q.  And have you read through these topics before?

23    A.  Yes.

24    Q.  When did you first review these topics?

25    A.  Shortly after this document was served to

18

TURIN POLLARD, 30(b)(6)                                    December 1, 2022

1      Q.  Did you speak with anyone, other than your
2  counsel, in preparing to testify on topics of
3  examination 1 through 11?
4      A.  Yes.
5      Q.  Who did you speak with?
6      A.  Sheila Duffy and John Mark Suhy.
7      Q.  Did you speak to them together at the same
8  time?
9      A.  Yes.
10     Q.  Did you ever speak to either separately about
11 the topics of examination?
12     A.  No.
13     Q.  And when did you speak with Ms. Duffy and
14 Mr. Suhy?
15     A.  We met this morning.
16     Q.  And this is the only time you met with Mr. Suhy
17 and Ms. Duffy in preparation for this deposition today?
18     A.  We have met previously in the run-up to the
19 original November 14th date.
20     Q.  Okay.  And that was just one time?
21     A.  I believe so, yes.
22     Q.  Let's start with the earlier meeting.  When did
23 that take place?
24     A.  Early November.
25     Q.  Was there anyone else present in that meeting

                                                              21

TURIN POLLARD, 30(b)(6)                                    December 1, 2022

1   besides Ms. Duffy and Mr. Suhy and yourself?

2        A.  I believe Mr. Rhodes was also in that meeting.

3        Q.  Are you certain?

4        A.  No.

5        Q.  What did you talk about during that meeting?

6        A.  The responsive documents that we provided to

7   you.

8        Q.  So you just discussed the documents that were

9   produced in response to another subpoena?

10       A.  In response to this subpoena.

11       Q.  Approximately how long did you meet with

12  Ms. Duffy and Mr. Suhy in this first meeting?

13       A.  Approximately an hour.

14       Q.  And let's go ahead and talk about this meeting

15  today, this morning.  Approximately how long did you

16  meet with -- did you meet with anyone else -- sorry.

17  Let me start over.

18           Was anyone else present in the meeting today

19  besides yourself, Ms. Duffy and Mr. Suhy?

20       A.  Mr. Rhodes was also in that meeting.

21       Q.  And approximately how long did you meet for?

22       A.  Again, approximately an hour.

23       Q.  I believe you said you started at Greystones in

24  2021?

25       A.  That's correct.

                                                            22

CONFIDENTIAL - ATTORNEYS EYES ONLY

TURIN POLLARD, 30(b)(6)             December 1, 2022

1    Q.  What was the month?

2    A.  December.

3    Q.  You'll notice in many of these topics, it asks

4  for information from January 1, 2018, to the present.

5  Do you see that?

6    A.  Yes.

7    Q.  And you weren't at the company between

8  January 1, 2018, and approximately early December of

9  2021; correct?

10   A.  Correct.

11   Q.  Did you do any inquiries into what the company

12  was doing with respect to any of these topics during

13  that time period?

14   A.  In what context?

15   Q.  For instance, let's look at Topic Number 1:

16       Details about each installation of

17       deployment, development, implementation, and use

18       of ONgDB, GraphStack GDB, and/or the Greystones

19       Analytics Platform from January 1, 2018 to the

20       present...

21       Then it continues.  Did you inquire with

22  anyone at Greystones about the Greystones Analytics

23  Platform as it was used between January 1, 2018, through

24  the time that you started employment at Greystones?

25   A.  In what context?

23

SER_0905

Case 5:18-cv-07182-EJD Document 210 Filed 09/29/22 Page 698 of 730
CONFIDENTIAL — ATTORNEYS EYES ONLY

TURIN POLLARD, 30(b)(6)                              December 1, 2022

1    the use of something called GreyRAVEN?

2         A.  Yes.

3         Q.  Is another name for GreyRAVEN Greystones

4    Analytics Platform?

5         A.  No.

6         Q.  So GreyRAVEN has never been called at any time

7    Greystones Analytic Platform?

8         A.  Only by people who are making mistakes about

9    what words they use.

10        Q.  So if someone refers to Greystones Analytics

11   Platform, they could actually be meaning GreyRAVEN?

12        A.  Only if they're misspeaking.

13        Q.  And did the -- any of the Air Force contracts

14   call for the use of Greystones Analytic Platform as you

15   understand it?

16        A.  No.

17        Q.  Did the Air Force contracts that you're

18   referring to relate to the use of GreyRAVEN?

19        A.  Yes.

20        Q.  And do you know what ONgDB is?

21        A.  Open native graph database.

22        Q.  And what is open native graph database?

23        A.  That is a graph database software application.

24        Q.  And did the GreyRAVEN product at least use in

25   part ONgDB?

                                                         32

TURIN POLLARD, 30(b)(6)                          December 1, 2022

1    graph software.  I have never seen the code for it or

2    any system documentation, so I -- I don't know.

3        Q.  So you don't know whether GraphStack GDB is

4    based on Neo4j source code?

5        A.  That's correct.

6        Q.  Do you understand that ONgDB is based on the

7    Neo4j source code?  And, again, this is you as the

8    company, not just you personally.

9        A.  My understanding is that ONgDB was based on an

10   open source implementation or an open source Neo4j.

11       Q.  And you understand what the basis for that open

12   source licensing was for the Neo4j source code for

13   ONgDB?

14       A.  Yes.

15       Q.  And what's that understanding?

16       A.  My understanding is that that was under the

17   AGPL.

18       Q.  What does the AGPL stand for?

19       A.  I forget what the A stands for.  G is I believe

20   general purpose license or GNU public license.  I would

21   have to go look at the definition of that acronym to be

22   certain.

23       Q.  Okay.  If I represent it stands for the GNU

24   AFFERO general public license, Version 3.  Does that

25   sound correct in your estimation?

                                                          41

BELL & MYERS COURT REPORTERS & LEGAL VIDEOGRAPHERS  (408) 287-7500

TURIN POLLARD, 30(b)(6)                                    December 1, 2022

1    marketing Neo4j software?

2         A.  No.

3         Q.  Has Greystones ever had an interest in

4    marketing ONgDB software?

5         A.  No.

6         Q.  I'm going to go ahead and give you the next

7    email.

8              (Whereupon, Exhibit 240 was marked for

9              identification.)

10   BY MR. RATINOFF:

11        Q.  This will be marked as Exhibit 240.  It's a

12   September 14, 2018 email with the from

13   sduffy@greystonesgroup.com to a John Mark Suhy

14   jmsuhy@purethink.com.  Do you see that?

15        A.  Yes.

16        Q.  Again, that's Ms. Duffy's email address?

17        A.  Yes.

18        Q.  And do you understand that to be from one of

19   Mr. Suhy's email addresses?

20        A.  There is an email here from one of Mr. Suhy's

21   email addresses, yes.

22        Q.  That's purethink.com?

23        A.  Yes.

24        Q.  Do you know what purethink.com is?  Just the

25   company -- let me ask that again.

                                                              61

TURIN POLLARD, 30(b)(6)                          December 1, 2022

1           Do you know of a company name "Purethink"?

2      A.   As one of Mr. Suhy's companies, yes.

3      Q.   And you have any reason to believe this wasn't

4  an email sent by Ms. Duffy?

5      A.   No.

6      Q.   When you'll look below, there's a prior email

7  to the one at the top.  It says it's from Mr. Suhy, same

8  email address, to Benjamin Nussbaum at ben@atomrain.com.

9      A.   Yes.

10      Q.   Do you understand that's Mr. Nussbaum's

11  AtomRain email address?

12      A.   Yes.

13      Q.   And then you'll see the initial email says:

14  Notes from meeting.  Who uses Neo4j?

15      A.   Yes.

16      Q.   Why was Greystones meeting with Mr. Suhy and

17  Mr. Nussbaum talking about who uses Neo4j?

18      A.   I'm not sure.

19      Q.   Ms. Duffy would know this, though?

20      A.   Probably.

21      Q.   She sent the email; correct?

22      A.   Apparently.

23      Q.   And appears that she was at a meeting that

24  occurred sometime in September of 2018 with Mr. Nussbaum

25  and Mr. Suhy; correct?

                                                    62

BELL & MYERS COURT REPORTERS & LEGAL VIDEOGRAPHERS  (408) 287-7500

Case 5:18-cv-07182-EJD Document 210 Filed 02/23/23 Page 702 of 730

TURIN POLLARD, 30(b)(6)                    December 1, 2022

1      A.  Apparently.

2      Q.  Did you ask Ms. Duffy, in preparation for this

3  deposition, whether she had met with Mr. Suhy or

4  Mr. Nussbaum to talk about Neo4j?

5      A.  Specifically, no.  Ms. Duffy met with both of

6  those individuals to discuss the market for data

7  analytics on many occasions.

8      Q.  So this might have been one of those occasions?

9      A.  Yes.

10     Q.  And when you say "data analytics," you're

11  talking about use of graph database software, for

12  example?

13     A.  That would be one example.

14     Q.  And why was Greystones particularly interested

15  in these government customers or federal clients that

16  bought Neo4j or from Purethink?  It looks like Ms. Duffy

17  is asking which one of these is Purethink still involved

18  in.  Do you see that?  It's in the original email from

19  Mr. Suhy to Mr. Nussbaum and Ms. Duffy.

20     A.  Are you referring to the capitalized:  Is this

21  either a Purethink or AtomRain customer?

22     Q.  I was looking at the one above, but yeah,

23  that's fair.  That's fine.  You understand that to be

24  Ms. Duffy responding to those questions in the line

25  below as she referred to in her email?

63

TURIN POLLARD, 30(b)(6)                    December 1, 2022

1    to big data analytics.

2        Q.  Did you look in that failed bids folder in

3    responding to the document request we looked at earlier

4    in the second subpoena?

5        A.  Personally, no.

6        Q.  Did anyone that you're aware of?

7        A.  I don't know.

8        Q.  And for the IRS, how many contracts or

9    opportunities that were bid on were you referring to?

10       A.  I am aware of one bid that went in this week.

11   There may have been previous -- there may have been bids

12   submitted previous to my employment that didn't result

13   in an award so I'm not sure if those even exist.

14       Q.  What bid are you referring to that was

15   submitted this week?

16       A.  We submitted a response to a sources sought or

17   request for information on GSA.

18       Q.  What do you mean by sources sought on GSA?

19       A.  The General Services Administration conducts

20   requests for information or sources sought requests on

21   behalf of federal customers.

22       Q.  What was the scope of this sources sought

23   opportunity you're referring to?

24       A.  The application of the Greystones Analytic

25   Platform to support lead case analysis -- lead case

                                                        66

BELL & MYERS COURT REPORTERS & LEGAL VIDEOGRAPHERS  (408) 287-7500

CONFIDENTIAL ATTORNEYS' EYES ONLY

TURIN POLLARD, 30(b)(6)                    December 1, 2022

1    analysts.

2        Q.   At the IRS?

3        A.   At the IRS.

4        Q.   What's a lead case analysis?

5        A.   I'm sorry.  It should be lead case analyst.

6    That's a job title, and it appears to be exactly what it

7    says.

8        Q.   Is that -- are you familiar with the acronym

9    RAAS, R-A-A-S, at the IRS?

10       A.   Yes.

11       Q.   What's your understanding of that acronym?

12       A.   RAAS is an organization within IRS.

13       Q.   Do you know what RAAS stands for?

14       A.   Research analysis services.  I forget what the

15   second A is.

16       Q.   Analytics.  Does that sound right?

17       A.   That sounds right.

18       Q.   But we're talking about an organization within

19   the IRS when we say RAAS?

20       A.   Correct.

21       Q.   Was this opportunity in relation to work that

22   RAAS was doing -- or is doing?

23       A.   Not to the best of my knowledge.

24       Q.   What department within the -- what group within

25   the IRS was putting out a request for information?

                                                    67

TURIN POLLARD, 30(b)(6)                                    December 1, 2022

```
 1        A.   I believe that was part of the investigative

 2   services.

 3        Q.   Investigative services, is that a group or a

 4   division within the IRS?

 5        A.   Apparently.

 6        Q.   That's who was asking for -- asking for quotes

 7   or -- RFIs, request for information; correct?

 8        A.   RFI is a request for information; yes.

 9        Q.   That was a precursor to an RFQ, request for

10   quote?

11        A.   Possibly.

12        Q.   Or it could be, essentially, seen as a bid?

13        A.   There is an explicit disclaimer on it that it

14   is not a request for bid.

15        Q.   Sort of exploring what might be out there for

16   them to put out a solicitation for?

17        A.   Yes.

18        Q.   Was Mr. Suhy involved in preparing that

19   submission?

20        A.   Yes.

21        Q.   Why was he involved?

22        A.   In his current employment as Chief Technical

23   Officer at Greystones Group.

24        Q.   His title is Chief Technical Officer, CTO?

25        A.   Yes.
```

68

BELL & MYERS COURT REPORTERS & LEGAL VIDEOGRAPHERS  (408) 287-7500

TURIN POLLARD, 30(b)(6)                                 December 1, 2022

1    proposals we were interested in responding to.

2         Q.   Meaning they didn't ask for something that

3    Greystones was capable of providing?

4         A.   Correct.

5         Q.   And are you familiar with a company called ASR

6    Analytics?

7         A.   Yes.

8         Q.   Who is or what is ASR Analytics?

9         A.   The ASR Analytics is a G-Com subsidiary company

10   with work at the Department of Treasury and other

11   federal civilian customers.

12        Q.   Is Greystones' normal specialty working with

13   entities within the Department of Defense?

14        A.   Greystones' specialty is across the entire

15   federal government.

16        Q.   But historically most of its contracts have

17   been within the DOD?

18        A.   Correct.

19        Q.   It hasn't had any separate contracts with any

20   other civilian agencies?

21        A.   Not recently.

22        Q.   And does Greystones currently have a

23   relationship with ASR Analytics?

24        A.   Yes.

25        Q.   And what is that relationship?

                                                           160

BELL & MYERS COURT REPORTERS & LEGAL VIDEOGRAPHERS  (408) 287-7500

**SER_0914**

Case 5:18-cv-07182-EJD   Document 210   Filed 02/29/22   Page 707 of 730
CONFIDENTIAL ATTORNEYS EYES ONLY

TURIN POLLARD, 30(b)(6)                                    December 1, 2022

1      A.  We are a subcontractor for supporting IRS.

2      Q.  And how did that subcontract come about?

3      A.  After we hired Mr. Suhy -- after we hired

4  Mr. Suhy, we were issued a subcontract with several

5  delivery orders on it under one of their contracts with

6  the IRS.

7      Q.  One of their blanket purchase awards?

8      A.  I believe it's through a BPA, yes.

9      Q.  Okay.  BPA, blanket purchase award.  We can use

10  "BPA," and you know what we're talking about?

11      A.  Yes.

12      Q.  Okay.  Shortens things up a bit.  So was this

13  BPA -- sorry.  Was the subcontract that Greystones

14  was -- or took over, was that -- that was from Mr. Suhy?

15      A.  Can you restate -- rephrase that?

16      Q.  Sure.  So there's a master -- so you have a

17  blanket purchase order, right, and then --

18      A.  ASR has a blanket purchase award.

19      Q.  Right.  And then within that there's various

20  contracts that it's awarded; correct?

21      A.  If we can use contracts and task orders

22  interchangeably, then yes.

23      Q.  I'll be more precise.  They'll be issued a task

24  order, and then -- and it's under that blanket purchase

25  award, and then ASR may subcontract the task order out;

                                                              161

CONFIDENTIAL ATTORNEYS' EYES ONLY

TURIN POLLARD, 30(b)(6)                                    December 1, 2022

1    correct?

2         A.   Correct.

3         Q.   And at the time Mr. Suhy was hired by

4    Greystones, he was -- through iGov, was under a

5    subcontract, a master subcontract with ASR; correct?

6              MR. RHODES:  Object to the form.

7              THE WITNESS:  IGov -- as I understand it, iGov

8    has a subcontract with ASR.

9    BY MR. RATINOFF:

10        Q.   Still has a subcontract with ASR?

11        A.   To the best of my knowledge.

12        Q.   So when you hired Mr. Suhy, he had a

13   subcontract with ASR.  At that same time did Greystones

14   have a subcontract with ASR?

15        A.   At the time of Mr. Suhy's hire, no.

16        Q.   So Greystones was able to get a subcontract

17   with ASR because of Mr. Suhy?

18        A.   Because we were employing him, yes.

19        Q.   So, essentially, the subcontract that ASR gave

20   Greystones was the same subcontract that iGov had at

21   that time?

22             MR. RHODES:  Object to the form.

23             THE WITNESS:  No.

24   BY MR. RATINOFF:

25        Q.   Different scope of work?

                                                        162

CONFIDENTIAL - ATTORNEYS' EYES ONLY

TURIN POLLARD, 30(b)(6)                                    December 1, 2022

1      A.  I can't speak to iGov's scope of work.

2      Q.  I'll mark the next exhibit.  This will be

3   Exhibit 249.

4          (Whereupon, Exhibit 249 was marked for

5          identification.)

6          MR. RHODES:  Turin, do you need to take a short

7   break?  You look like you're getting a little bit

8   gassed.

9          MR. RATINOFF:  I'm happy to take a break.

10         THE WITNESS:  Yeah, let's go ahead and take 10

11  minutes.

12  BY MR. RATINOFF:

13     Q.  It's 7:44 your time so five to?

14     A.  Sure five of 8:00.

15         THE VIDEOGRAPHER:  We're going to go off the

16  video record.  The time is 7:45 p.m. Eastern time.

17  Going off the record.

18         (Whereupon a recess was taken.)

19         THE VIDEOGRAPHER:  This is the start of Media

20  Label Number 3, and we're going back on the video

21  record.  The time is 8:00 p.m. Eastern time.

22  BY MR. RATINOFF:

23     Q.  Okay.  Before we broke, I put a document in the

24  chat, Tab 539, which will be marked Exhibit 249.

25         Let me know when you've had a chance to look at

                                                              163

TURIN POLLARD, 30(b)(6)                          December 1, 2022

1    that.

2         A.  Tab 539, Master Subcontract Agreement ASR

3    Analytics.

4         Q.  Greystones Consulting Group.

5         A.  Yes.

6         Q.  Okay.  Is this one of the contracts that you

7    reviewed for production in response to the subpoena and

8    in preparation for your deposition?

9         A.  Yes.

10        Q.  And I think you just testified before we broke

11   about Greystones getting a subcontract with ASR

12   Analytics; correct?

13        A.  Correct.

14        Q.  Is this the subcontract that you were referring

15   to?

16        A.  Yes.

17        Q.  Okay.  You'll see under prime contract number,

18   one of them is GS-10F-0062R.  That would be referring to

19   the contract, the master -- the prime contract awarded

20   to ASR; correct?

21        A.  Typically, yes.

22        Q.  And you'll see that in the first whereas on the

23   same page it says:

24             Prime contract is entered into a contractual

25        agreement awarded November 7, 2018, with the

                                                        164

TURIN POLLARD, 30(b)(6)                    December 1, 2022

1      U.S. Department of Treasury, Internal Revenue

2      Service (IRS), Office of Research Applied

3      Analytics and Statistics.

4          The client, RAAS or government contract

5   number, and you'll see it's the same contract number.

6      A.  Yes.

7      Q.  Okay.  And then I guess we have the official --

8   or at least on this document, RAAS being Research

9   Applied Analytics and Statistics; that's your

10  understanding of RAAS?

11     A.  Yes.

12     Q.  And then looking at the next page, 657, you'll

13  see the signature of looks like a Docusign by Ms. Duffy.

14  Is that her Docusign signature under Greystones

15  Consulting Group?

16     A.  To the best of my knowledge.

17     Q.  And to the best of your knowledge, this is an

18  authorized individual from ASR Analytics who signed this

19  contract?

20     A.  Yes.

21     Q.  And has -- this contract itself isn't for a

22  specific task; correct?

23     A.  As I understand it, this -- this is a

24  subcontract, and then task orders are placed underneath

25  it.

                                                    165

CONFIDENTIAL ATTORNEYS' EYES ONLY
TURIN POLLARD, 30(b)(6)                                    December 1, 2022

1       Q.  To your knowledge, this master subcontract
2   wasn't signed by -- from iGov?
3       A.  Correct.
4       Q.  So in Greystones' view, it's a new master
5   subcontract between Greystones and ASR; correct?
6       A.  Correct.
7       Q.  And when Mr. Suhy came on as a W2 employee, was
8   he asked to do all of his work for ASR under this master
9   subcontract?
10      A.  Yes.
11      Q.  So he was essentially asked to stop work for
12  iGov under the subcontract iGov had with ASR?
13      A.  Correct.
14      Q.  Was Mr. Suhy compensated for that?
15          MR. RHODES:  Objection to form.
16  BY MR. RATINOFF:
17      Q.  Did ASR pay iGov to cease working on its master
18  subcontract with ASR?
19      A.  Not to the best of my knowledge.
20      Q.  What were the terms of Mr. Suhy's employment
21  coming on board?
22          Mr. Beene:  Objection to form.
23          THE WITNESS:  He has a standard employment
24  agreement like the rest of Greystones' W2 employees.
25  BY MR. RATINOFF:

                                                              166

CONFIDENTIAL ATTORNEYS' EYES ONLY
TURIN POLLARD, 30(b)(6)                    December 1, 2022

1      Q.   Was Mr. Suhy asked to stop performing work for

2   iGov?

3           MR. RHODES:   Object to form.

4   BY MR. RATINOFF:

5      Q.   As a condition of his employment?

6      A.   As part of our employment agreement, we're not

7   allowed to work for -- we're not allowed to have other

8   employers.

9      Q.   And that would apply to Mr. Suhy?

10     A.   Correct.

11     Q.   And are you aware of Mr. Suhy having another

12  contract with the IRS through an entity called

13  E-Government Solutions?

14     A.   I'm aware that he had one, yes.

15     Q.   What do you mean by "had"?

16     A.   IGov and Mr. Suhy, as an employee of iGov, had

17  a contract through E-Gov that was fully funded, and it

18  was paid up front.

19     Q.   Do you understand the term of that contract

20  that goes into 2023?

21     A.   Yes.

22     Q.   And is Mr. Suhy allowed to continue performing

23  under that contract via iGov under his condition of

24  employment at Greystones?

25          MR. RHODES:   Form.

                                                          167

BELL & MYERS COURT REPORTERS & LEGAL VIDEOGRAPHERS  (408) 287-7500

CONFIDENTIAL ATTORNEYS' EYES ONLY

TURIN POLLARD, 30(b)(6)                          December 1, 2022

1          MR. BEENE:  Objection to form.

2          THE WITNESS:  Mr. Suhy is still supporting IRS

3   RAAS.

4   BY MR. RATINOFF:

5      Q.  Through the contracts he has via E-Government

6   Solutions?

7      A.  Through the contract with ASR.

8      Q.  So is Mr. Suhy no longer permitted to provide

9   services under the contract between E-Government

10  Solutions and the IRS of which ARS is a contractor?

11         MR. RHODES:  Objection to form.

12         THE WITNESS:  Since that contract was already

13  fully funded, he is still allowed to provide services,

14  but he is not paid for any work.

15  BY MR. RATINOFF:

16     Q.  When you say "paid for any work," you mean paid

17  by Greystones?

18     A.  Correct, because he was already paid by iGov.

19     Q.  But he still has obligations until that

20  contract terminates to perform work under it; correct?

21     A.  Correct.

22     Q.  Is there a provision in his employment

23  agreement that addresses that?

24     A.  I'm not sure if it's in the employment

25  agreement or an addendum to.

                                                      168

BELL & MYERS COURT REPORTERS & LEGAL VIDEOGRAPHERS  (408) 287-7500

SER_0922

CONFIDENTIAL - ATTORNEYS' EYES ONLY

TURIN POLLARD, 30(b)(6)                           December 1, 2022

1              MR. BEENE:  Same objection.

2     BY MR. RATINOFF:

3        Q.  Has Greystones purchased any intellectual

4     property from Purethink?

5              MR. BEENE:  Objection to form.

6              THE WITNESS:  No.

7     BY MR. RATINOFF:

8        Q.  Has Greystones purchased any intellectual

9     property from Mr. Suhy?

10             MR. BEENE:  Objection to form.

11             THE WITNESS:  Yes.

12     BY MR. RATINOFF:

13       Q.  What is that intellectual property that

14     Greystones has purchased?

15             MR. RHODES:  I'm going to object on this as

16     being outside of the scope of the corporate designation.

17     This has nothing to do with anything related to any

18     ONgDB or Neo4j or otherwise.

19             Mr. Suhy's worked on other projects completely

20     unrelated, and if he sold personal IP that he brought to

21     Greystones, it's off the reservation as far as what's on

22     the subpoena for cooperate -- your topic list.

23             MR. RATINOFF:  I disagree.  Mr. Suhy has an

24     intellectual property that is called GraphStack, which

25     he may characterize as being beyond Neo4j, but it was

                                                        170

TURIN POLLARD, 30(b)(6)                                    December 1, 2022

1    developed with Neo4j --

2            MR. RHODES:  If you want to ask your question

3    specifically related to GraphStack, if it's anyhow tied

4    to that, but any other generic IP is outside of the

5    scope of the topics.

6            MR. RATINOFF:  Well, also Mr. Suhy is subject

7    to a summary judgement order finding liability for

8    trademark infringement.  If he's transferred any

9    personal property during the course of this litigation,

10   especially after that was entered, it would be a

11   fraudulent transfer potentially, so I'm entitled to that

12   discovery.

13           So I'm going to the ask the question, and if

14   you instruct the witness not to answer, I may bring that

15   up to the court.  So I'll ask the witness about his

16   personal knowledge if that's what you're saying, but he

17   still has to answer the question.

18           I'm going to ask the question again, and you

19   can instruct him, and I'll ask if he's going to take

20   your instruction.

21   BY MR. RATINOFF:

22       Q.  What was the IP that Greystones purchased from

23   Mr. Suhy?

24           MR. BEENE:  Objection to form.

25           MR. RHODES:  You can answer, Turin.

                                                              171

BELL & MYERS COURT REPORTERS & LEGAL VIDEOGRAPHERS  (408) 287-7500

TURIN POLLARD, 30(b)(6)                    December 1, 2022

1          THE WITNESS:  Okay.  The IP that we bought from

2   Mr. Suhy was the -- was components of the Greystones

3   Analytic Platform.

4   BY MR. RATINOFF:

5       Q.  What components were those?

6       A.  That would be the gatekeeper and software

7   fabric and several modules of analytic tools and log

8   management and analysis tools.

9       Q.  Was it your understanding that was part of

10  something called GraphStack?

11      A.  No.

12      Q.  Was that, to your knowledge, anything having to

13  do with something called Government Packages for Neo4j?

14      A.  No.

15      Q.  Did that intellectual property include any sort

16  of PISMA compliance modules or software?

17      A.  I'm not sure.

18      Q.  How much did Greystones pay for that

19  intellectual property?

20          MR. RHODES:  Objection to form.

21          MR. BEENE:  Objection to form.

22          THE WITNESS:  Approximately $1.3 million.

23  BY MR. RATINOFF:

24      Q.  Was that intellectual property developed by

25  Mr. Suhy working for Greystones as an independent

172

BELL & MYERS COURT REPORTERS & LEGAL VIDEOGRAPHERS  (408) 287-7500

CONFIDENTIAL ATTORNEYS' EYES ONLY

TURIN POLLARD, 30(b)(6)                                    December 1, 2022

1    contractor?

2         MR. BEENE:  Objection to form.

3         THE WITNESS:  No.

4    BY MR. RATINOFF:

5         Q.  That was something he developed independently

6    from Greystones?

7         MR. RHODES:  Form.

8         THE WITNESS:  Yes.

9    BY MR. RATINOFF:

10        Q.  And does that include any patents?

11        A.  Not to the best of my knowledge.

12        Q.  Just source code?

13        A.  And associated documentation.

14        Q.  Material subject to copyrights?

15        A.  Broadly.

16        Q.  Were there any particular copyrights that were

17   purchased as part of that deal?

18        A.  I don't know.

19        Q.  Is there a written agreement, a purchase

20   agreement for that intellectual property?

21        A.  Yes.

22        Q.  At the time that Greystones purchased that

23   intellectual property, did it have an understanding that

24   Mr. Suhy had a summary judgment entered against him

25   personally?

                                                        173

TURIN POLLARD, 30(b)(6)                    December 1, 2022

1     Q.  And did Mr. Nussbaum ever inform Greystones

2  that it needed to stop using any particular version of

3  ONgDB?

4     A.  I don't know.

5     Q.  Are you familiar with a licensing provision

6  called the "commons clause"?

7     A.  Broadly.

8     Q.  What's your understanding of the commons

9  clause?

10    A.  If I'm remembering my open source licensing

11 correctly, the commons clause is part of the AGPL and

12 says that if you use this -- if you use software covered

13 under it, you can't remove that license from your

14 product.

15    Q.  Okay.  Where did you get that understanding

16 from?

17    A.  That is my personal recollection from previous

18 research into open source software.

19    Q.  Is that something you had a conversation with

20 Mr. Suhy about?

21    A.  Mr. Suhy has talked about the commons clause.

22    Q.  What did he tell you about the commons clause?

23    A.  That it was the point of this litigation, and

24 whether or not the open source versions of Neo4j had

25 been handled correctly.

179

TURIN POLLARD, 30(b)(6)                                    December 1, 2022

```
 1        Q.  Did he tell you that the court determined that
 2   the removal of the commons clause by anyone but Neo4j
 3   would be improper?
 4        A.  Yes.
 5        Q.  When did he tell you that?
 6        A.  I believe the first time we discussed that
 7   would be in the first half of this calendar year.
 8        Q.  Was it after there was an appellate court
 9   decision in relation to this case?
10        A.  I'm not sure.
11        Q.  Mr. Suhy ever talk about -- strike that.
12            Let me switch gears here.  Okay.  You mentioned
13   there was some task orders under the ASR subcontract
14   that was entered into; correct?
15        A.  Correct.
16        Q.  And I'll go ahead and put in what is Tab 540.
17            (Whereupon, Exhibit 250 was marked for
18            identification.)
19   BY MR. RATINOFF:
20        Q.  I'll represent to you this is a document
21   produced by ASR.  It's got the beginning Bates number
22   ASR 02025, and ends with 02027.
23        A.  02025.  02027 yep.
24        Q.  I think this is going to be Exhibit 249.
25            THE REPORTER:  I think it's 250.
```

180

BELL & MYERS COURT REPORTERS & LEGAL VIDEOGRAPHERS  (408) 287-7500

TURIN POLLARD, 30(b)(6)                                    December 1, 2022

1          MR. RATINOFF:  Sorry.  I'll have this marked

2    Exhibit 250 titled subcontractor task order number

3    0001_MOD01.  Do you recognize this document?

4          A.  This appears to be a modification to a task

5    order under the ASR BPA contract.

6          Q.  And in particular, the master subcontract we

7    just looked at as Exhibit 249?

8          A.  I believe so, yes.

9          Q.  No reason to believe anything other than what

10   this is?

11         A.  Correct.

12         Q.  And you'll see it says:

13             The subcontract agreement places and

14          terminates subcontract agreement

15          ASR_RAAS_DAIS-IGOV-001_TO-001 with iGov, Inc.,

16          which is hereby reassigned to Greystones

17          Consulting Group, LLC.

18             Do you see that?

19         A.  Yep.

20         Q.  And then at the bottom you'll see there's a

21   couple of signatures on page 3, 2027 Bates number?

22         A.  Yep.

23         Q.  The name Turin Pollard, and then there's a

24   signature there.  Do you see that?

25         A.  That's correct.

                                                          181

BELL & MYERS COURT REPORTERS & LEGAL VIDEOGRAPHERS  (408) 287-7500

TURIN POLLARD, 30(b)(6)                                    December 1, 2022

1      Q.  Is that your signature?

2      A.  That is.

3      Q.  And next to that is a representative of ASR;

4  correct?

5      A.  Correct.

6      Q.  To your knowledge, this is a correct copy of

7  the agreement you signed with ASR, specifically this

8  task order?

9      A.  Without comparing it to our files, I would have

10  to agree, yes.

11      Q.  Okay.  I'll represent to you it's the same as

12  what you produced, except for as redacted.  I'm happy to

13  provide that to you, but this is much more useable.  If

14  you have any doubts about the authenticity of this

15  agreement, I'm happy to show you that document.

16          So if you can say for certain this is a

17  contract you signed on behalf of Greystones and ASR,

18  that's fine, but if not, let me know.

19      A.  That appears to be.

20      Q.  No reason to doubt it's not?

21          And so do you understand this was a task order

22  that was originally contracted by with iGov; correct?

23          MR. RHODES:  Objection to form.

24          THE WITNESS:  Correct.

25  BY MR. RATINOFF:

182

SER_0930

TURIN POLLARD, 30(b)(6)                                    December 1, 2022

1    Q.  This is a task order that Greystones took over
2    as part of his hiring of Mr. Suhy; correct?
3         MR. RHODES:  Objection to form.
4         THE WITNESS:  This is a task order issued to
5    Greystones, yes.
6    BY MR. RATINOFF:
7         Q.  Which was previously issued to iGov?
8         MR. RHODES:  Objection to form.
9         THE WITNESS:  Since we have a separate master
10   subcontract agreement, this is a separate task order.
11   BY MR. RATINOFF:
12        Q.  Okay.  But I'm asking about not the
13   subcontract.  I'm asking about this task order.  This is
14   a task order that says it replaces and terminates
15   subcontract agreement with iGov and is reassigned to
16   Greystones Consulting Group.  Is that inaccurate?
17        A.  I agree the document says that.
18        Q.  And you signed it?
19        A.  Correct.
20        Q.  And you read it before you signed it?
21        A.  Correct.
22        Q.  Made sure everything was correct before you
23   signed it?
24        A.  Our contracts and legal reviewed it for
25   compliance before I signed it.

183

BELL & MYERS COURT REPORTERS & LEGAL VIDEOGRAPHERS  (408) 287-7500

TURIN POLLARD, 30(b)(6)                    December 1, 2022

1     Q.  They told you it was okay to sign it?

2     A.  Correct.

3     Q.  All right.  Looking at the purpose of task

4  order description of work, you'll see on the bottom of

5  the first page it says:  Emerging compliance issues.

6         And there's a very long description, but

7  looking at just the title, do you have an understanding

8  of what emerging compliance issues relates to at the

9  IRS?

10    A.  Compliance with tax law, specifically tax

11 filings.

12    Q.  And is that a task that AtomRain is also

13 currently working on to your knowledge?

14    A.  I'm not sure.

15    Q.  Who would know the answer to that?

16    A.  AtomRain and ASR since it would be their

17 contractual relationship.

18         MR. RHODES:  Objection; form.

19 BY MR. RATINOFF:

20    Q.  But if you were required to work with AtomRain

21 under this task order, the person performing the work

22 under the task order would probably know the answer to

23 that question; right?

24         MR. RHODES:  Objection to form.

25         THE WITNESS:  Yes.

184

BELL & MYERS COURT REPORTERS & LEGAL VIDEOGRAPHERS  (408) 287-7500

```
      TURIN POLLARD, 30(b)(6)                         December 1, 2022
```

```
 1    BY MR. RATINOFF:
 2         Q.  And is the person performing the work under
 3    this task order Mr. Suhy?
 4         A.  Yes.
 5         Q.  And you'll see he's listed there as being -- on
 6    the page 2 -- as the only authorized personnel to
 7    perform work under this contract; correct?
 8         A.  Where are you looking?
 9         Q.  Second page.
10         A.  Authorized personnel in all categories.  Yes,
11    he is authorized to work on this contract.
12         Q.  Going back to the first page, it says, option
13    year two exercised.  It's from September 30, 2019, to
14    September 29, 2023.
15         A.  Correct.
16         Q.  And then there's two other option years on
17    here.
18         A.  Correct.
19         Q.  Through 2025?
20         A.  Yes.
21         Q.  And is it Greystones' understanding that
22    assuming that these option years are exercised, Mr. Suhy
23    would continue to be the only authorized personnel on
24    the contract?
25              MR. RHODES:  Objection to form.
```
                                                            185

CONFIDENTIAL ATTORNEYS EYES ONLY
TURIN POLLARD, 30(b)(6)                                          December 1, 2022

1    BY MR. RATINOFF:

2         Q.  You can answer the question.

3         A.  How we will staff this in the future has not

4    been determined.

5         Q.  But as of this current option year, it will be

6    Mr. Suhy as provided in here?

7         A.  Yes.

8         Q.  And then Greystones will receive payment for

9    the work that Mr. Suhy does under this task order?

10        A.  Correct.

11        Q.  Let me go ahead and mark the next exhibit,

12   Tab 541.

13            (Whereupon, Exhibit 251 was marked for

14            identification.)

15   BY MR. RATINOFF:

16        Q.  Have you seen this document before?

17        A.  I believe so.

18        Q.  Okay.  It's document subcontractor task order

19   number 0002_MOD01.  I'll have it marked as Exhibit 251.

20            I'll represent to you it was produced by ASR,

21   and it was produced by your counsel with redactions.  So

22   I'm using the one without redactions, if that's okay.

23        A.  I'll defer to counsel.

24        Q.  Well, let's just look at your signature at the

25   bottom or what should be your signature.

                                                          186

BELL & MYERS COURT REPORTERS & LEGAL VIDEOGRAPHERS  (408) 287-7500

TURIN POLLARD, 30(b)(6)                          December 1, 2022

1        A.   This appears to be signed by me.

2        Q.   And then Mr. Stavrianos on behalf of ASR

3    Analytics?

4        A.   Correct.

5        Q.   And you had your contract folks, legal, review

6    this before you signed it?

7        A.   Correct.

8        Q.   You reviewed it yourself as well?

9        A.   Yes.

10       Q.   Then you signed it after you got approval from

11   who you needed approval from?

12       A.   Yes.

13       Q.   And then you'll see the purpose of task order

14   description of work:  Support for corporate graph

15   database.  Do you see that?

16       A.   Yes.

17       Q.   And if you go to the second page at the bottom

18   of the paragraph, last -- second to last sentence it

19   says:

20            RAAS graph data models are accessible by

21        employees through a web-based user interface

22        that provides authentication, query,

23        visualization, data sheet views, and other

24        functionality.  Many of these services are

25        messaged through GraphGrid, a micro services

                                                        187

BELL & MYERS COURT REPORTERS & LEGAL VIDEOGRAPHERS  (408) 287-7500

TURIN POLLARD, 30(b)(6)                              December 1, 2022

1      application programming interface that includes

2      ONgDB.

3      A.   That's what it says.

4      Q.   Doesn't say "based," based on ONgDB.  It says

5   it includes ONgDB.

6      A.   Right.   That's what it says.

7           MR. RHODES:   Objection to form.

8   BY MR. RATINOFF:

9      Q.   And you read this when you signed it?

10     A.   Yes.

11     Q.   Do you understand that the scope of this task

12   order requires work in relation to ONgDB at the IRS?

13     A.   Can you repeat that please?

14          MR. RATINOFF:   Can you read the question back

15   please?

16          (Record read.)

17          THE WITNESS:   I'm not sure if this task

18   actually involves using ONgDB.

19     Q.   But as far as you know, the description in this

20   task is accurate?

21     A.   The description in this task is an accurate

22   reflection of the task order issued by RAAS to ASR and

23   flowed down to us at the time of task order award.

24     Q.   Okay.  So this is the IRS's description of what

25   the work would be under this task order?

                                                      188

BELL & MYERS COURT REPORTERS & LEGAL VIDEOGRAPHERS  (408) 287-7500

SER_0936

TURIN POLLARD, 30(b)(6)                                December 1, 2022

1      A.  As of the award of the base year.  As of

2   solicitation of the base year, which would be prior to

3   the award by some amount.

4      Q.  But it would be approximately right on or about

5   September 2020?

6      A.  It would be some amount before.  I don't know

7   how quickly they can get these out.

8      Q.  Okay.  But you weren't involved in the original

9   issuance of the task order; correct?

10      A.  Correct.

11      Q.  So we'd have to ask ASR that question?

12      A.  Correct.

13      Q.  And then as far as authorized personnel on this

14   task order, the only person authorized to do work is

15   Mr. Suhy on behalf of Greystones; correct?

16      A.  Correct.

17      Q.  Then whatever work Mr. Suhy does, payment will

18   be made to Greystones?

19      A.  Correct.

20      Q.  I've got just two more exhibits that I just

21   need to get you to tell me what they were because your

22   counsel heavily redacted them.  And then I propose we'll

23   take a short break, and I'll take a look at the

24   PowerPoint, and I guess there was some sort of code

25   comparison done at some point and I'll ask you about

                                                        189

CONFIDENTIAL – ATTORNEYS EYES ONLY
TURIN POLLARD, 30(b)(6)                                    December 1, 2022

```
 1                 REPORTER'S CERTIFICATE
 2        I, Cambria Denlinger, California Certified
 3   Shorthand Reporter No. 14009, certify;
 4   That the foregoing proceedings were taken before me at
 5   the time and place therein set forth, at which time the
 6   witness declared under penalty of perjury; that the
 7   testimony of the witness and all objections made at the
 8   time of the examination were recorded stenographically
 9   by me and were thereafter transcribed under my direction
10   and supervision; that the foregoing is a full, true and
11   correct transcript of my shorthand notes so taken and of
12   the testimony so given;
13   That before completion of the deposition, review of the
14   transcript ( X ) was (  ) was not requested; (  ) that
15   the witness has failed or refused to approve the
16   transcript.
17   I further certify that I am not financially interested
18   in the action, and I am not a relative or employee of
19   any attorney of the parties, nor of any of the parties.
20   I declare under penalty of perjury under the laws of
21   California that the foregoing is true and correct.
22   Dated this 5th of December, 2022
23
24
25        CAMBRIA L. DENLINGER
          CSR NO. 14009
                                                        221
```

BELL & MYERS COURT REPORTERS & LEGAL VIDEOGRAPHERS   (408) 287-7500

SER_0938

1   John V. Picone III, Bar No. 187226
    jpicone@hopkinscarley.com
2   Jeffrey M. Ratinoff, Bar No. 197241
    jratinoff@hopkinscarley.com
3   Arthur E. Rothrock, Bar No. 312704
    arothrock@hopkinscarley.com
4   HOPKINS & CARLEY
    A Law Corporation
5   The Letitia Building
    70 South First Street
6   San Jose, CA  95113-2406

7   *mailing address:*
    P.O. Box 1469
8   San Jose, CA 95109-1469
    Telephone:    (408) 286-9800
9   Facsimile:    (408) 998-4790

10  Attorneys for Plaintiffs and Counter-Defendants
    NEO4J, INC. and NEO4J SWEDEN AB

11

12                  UNITED STATES DISTRICT COURT

13              NORTHERN DISTRICT OF CALIFORNIA

14  NEO4J, INC., a Delaware corporation, and       CASE NO.  5:18-cv-07182-EJD
    NEO4J SWEDEN AB, a Swedish
15  corporation,                                   **PLAINTIFFS' REPLY IN SUPPORT OF
                                                   THEIR MOTION FOR SUMMARY
16                  Plaintiffs,                     JUDGMENT ON THEIR DMCA CLAIM
                                                   AND DEFENDANTS' BREACH OF
17          v.                                     CONTRACT COUNTERCLAIM AND
                                                   UNCLEAN HANDS DEFENSE**
18  PURETHINK LLC, a Delaware limited
    liability company, IGOV INC., a Virginia       Date:   July 27, 2023
19  corporation, and JOHN MARK SUHY, an            Time:   9:00 a.m.
    individual,                                    Dept.:  Courtroom 4, 5th Floor
20                                                 Judge:  Hon. Edward J. Davila
                    Defendants.
21

22  AND RELATED COUNTERCLAIM.

23

24

25

26

27

28

4890-7686-1031.5
PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON THEIR DMCA CLAIM AND DEFENDANTS'
BREACH OF CONTRACT COUNTERCLAIM AND UNCLEAN HANDS DEFENSE                           5:18-CV-07182-EJD

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ......................................................................................... 1

II.  OBJECTION TO DEFENDANTS' USE OF THE KUHN REPORT ................ 1

III.  OBJECTION TO DEFENDANTS' RESPONSIVE SEPARATE STATEMENT ............ 2

IV.  THE COURT SHOULD GRANT SUMMARY JUDGMENT FOR PLAINTIFFS ON THEIR DMCA CLAIM ....................................................................... 2

    A.  The Law of the Case Bars Defendants From Rearguing that the Neo4j Sweden Software License Permitted Them to Remove the Commons Clause ...................................................................................... 2

    B.  It is Undisputed that Suhy Impermissibly Removed Neo4j Sweden's CMI ........... 3

    C.  Defendants' Interpretation of AGPL Remains Untenable ................................. 5

    D.  Defendants Cannot use the FSF's Alleged Copyright in the AGPL to Excuse the Improper Removal of Neo4j Sweden's CMI ........................................ 6

    E.  It is Undisputed that Defendants Knowingly Distributed Neo4j Sweden's Copyrighted Works with its CMI Removed and Knew that this Would Result in Copyright Infringement ....................................................... 6

V.  DEFENDANTS' UNCLEAN HANDS DEFENSE FAILS AS A MATTER OF LAW .................................................................................................. 8

VI.  THE COURT SHOULD GRANT SUMMARY JUDGMENT IN FAVOR OF NEO4J USA ON PURETHINK'S BREACH OF EXCLUSIVITY CONTRACT CLAIM ................................................................................................... 10

    A.  Defendants' Opposition Confirms the Lack of Mutual Assent ....................... 10

    B.  Defendants Cannot Invent an Oral Agreement to Prevent Summary Judgment ................................................................................ 13

    C.  Defendants Fail to Establish a Breach of the Alleged Exclusivity Agreement ................................................................................ 14

    D.  PureThink Fails to Provide Competent Evidence of Its Alleged Damages .......... 14

VII.  CONCLUSION ...................................................................................... 15

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ REDWOOD CITY

4890-7686-1031.5

- i -

PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON THEIR DMCA CLAIM AND DEFENDANTS' BREACH OF CONTRACT COUNTERCLAIM AND UNCLEAN HANDS DEFENSE     5:18-CV-07182-EJD

SER_0940

# TABLE OF AUTHORITIES

Page

CASES

*Aquino v. Cnty. of Monterey Sheriff's Dep't*,
No. 5:14-CV-03387-EJD, 2018 WL 3845718 (N.D. Cal. Aug. 12, 2018) ................................. 3

*Banner Entm't, Inc. v. Sup. Court*,
62 Cal. App. 4th 348 (1998) ................................................................................................... 11

*Bullard v. Wastequip Mfg. Co. LLC*,
2015 WL 12766467 (C.D. Cal. Apr. 14, 2015) ...................................................................... 13

*Bustamante v. Intuit, Inc.*,
141 Cal. App. 4th 199 (2006) ................................................................................................. 12

*Codding v. Pearson Educ., Inc.*,
2019 WL 5864579 (N.D. Cal. Nov. 8, 2019), *aff'd*, 842 F. App'x 70 (9th Cir. 2021)............. 15

*Columbia Pictures Indus., Inc. v. Fung*,
710 F.3d 1020 (9th Cir. 2013).................................................................................................. 8

*Davidson v. ConocoPhillips Co.*,
2009 WL 2136535 (N.D. Cal. July 10, 2009)......................................................................... 14

*F.T.C. v. Publ'g Clearing House, Inc.*,
104 F.3d 1168 (9th Cir. 1997).................................................................................................. 13

*GoE3 LLC v. Eaton Corp.*,
798 F. App'x 998 (9th Cir. 2020) ............................................................................................ 13

*Hansen v. United States*,
7 F.3d 137 (9th Cir. 1993)........................................................................................................ 13

*Herrington v. County of Sonoma*,
12 F.3d 901 (9th Cir. 1993)....................................................................................................... 3

*Hohs v. Allstate Ins. Co.*,
2010 WL 11706760 (N.D. Cal. Feb. 10, 2010) ....................................................................... 13

*ICONICS, Inc. v. Massaro*,
192 F.Supp.3d 254 (D. Mass. 2016) ......................................................................................... 4

*Jacobsen v. Katzer*,
535 F.3d 1373 (Fed. Cir. 2008)................................................................................................... 8

*Kahn Creative Partners, Inc. v. Nth Degree, Inc.*,
2011 WL 1195680 (C.D. Cal. Mar. 29, 2011) ......................................................................... 14

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ◆ REDWOOD CITY

4890-7686-1031.5

- ii -

PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON THEIR DMCA CLAIM AND DEFENDANTS'
BREACH OF CONTRACT COUNTERCLAIM AND UNCLEAN HANDS DEFENSE                    5:18-CV-07182-EJD

SER_0941

**TABLE OF AUTHORITIES**
(continued)

Page

*Kennedy v. Allied Mut. Ins. Co.*,
  952 F.2d 262 (9th Cir. 1991)...........................................................................3

*McGlinchy v. Shell Chem. Co.*,
  845 F.2d 802 (9th Cir. 1988).......................................................................14, 15

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
  545 U.S. 913 (2005)........................................................................................8

*Neo4j, Inc. v. Graph Found., Inc.*,
  2020 WL 6700480 (N.D. Cal. Nov. 13, 2020).........................................4, 6, 9

*Netbula, LLC v. Bindview Dev. Corp.*,
  516 F. Supp. 2d 1137 (N.D. Cal. 2007) ......................................................11

*Performance Plastering v. Richmond Am. Homes of California, Inc.*,
  153 Cal.App. 4th 659 (2007) ......................................................................12

*Pickern v. Pier 1 Imports (U.S.), Inc.*,
  457 F.3d 963 (9th Cir. 2006)......................................................................13

*Pinkette Clothing, Inc. v. Cosm. Warriors Ltd.*,
  894 F.3d 1015 (9th Cir. 2018).......................................................................9

*RHUB Commc'ns, Inc. v. Karon, No. 16-CV-06669-BLF*,
  2019 WL 8267743 (N.D. Cal. Nov. 22, 2019)............................................12

*S. Cal. Darts Ass'n v. Zaffina*,
  762 F.3d 921 (9th Cir. 2014)........................................................................8

*Scott v. Harris*,
  550 U.S. 372 (2007)....................................................................................12

*Sneller v. City of Bainbridge Island*,
  606 F.3d 636 (9th Cir. 2010)......................................................................10

*Stanford Hosp. & Clinics v. Multinat'l Underwriters, Inc.*,
  2008 WL 5221071 (N.D. Cal. Dec. 12, 2008) ...........................................14

*Tveter v. AB Turn–O–Matic*,
  633 F.2d 831 (9th Cir. 1980)........................................................................9

*Warner Constr. Corp. v. City of Los Angeles*,
  2 Cal.3d 285 (1970) ...................................................................................12

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ REDWOOD CITY

**TABLE OF AUTHORITIES**
(continued)

Page

*Wasco Prods., Inc. v. Southwall Techs., Inc.*,
  435 F.3d 989 (9th Cir. 2006)..................................................................................13

*Wolsey, Ltd. v. Foodmaker, Inc.*,
  144 F.3d 1205 (9th Cir. 1998)...........................................................................12, 13

**STATUTES**

Cal. Civ. Code § 1636 ..............................................................................................11

Cal. Civ. Code § 1639 ..............................................................................................11

Cal. Civ. Proc. Code § 1856(f)-(g)...........................................................................11

**OTHER AUTHORITIES**

17 U.S.C. § 1202(b) ...............................................................................................4, 6

17 U.S.C. § 1202(b)(3)...............................................................................................7

Fed. Rule Civ. Proc. 11 ...........................................................................................10

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ REDWOOD CITY

4890-7686-1031.5

PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON THEIR DMCA CLAIM AND DEFENDANTS'
BREACH OF CONTRACT COUNTERCLAIM AND UNCLEAN HANDS DEFENSE                    5:18-CV-07182-EJD

**SER_0943**

## I.    INTRODUCTION

Defendants' Opposition reads more as rambling recap of Phase 1 than a meaningful effort to address Plaintiffs' legal arguments and identify disputed issues of material fact.  All of their arguments seeking to justify Suhy's removal of Neo4j Sweden's CMI are identical to those already rejected by this Court and the Ninth Circuit.  Defendants do not refute the undisputed evidence establishing they intentionally removed Neo4j Sweden's CMI when creating ONgDB.  There is also no dispute that Defendants helped distribute that infringing software and encouraged end-users to infringe Neo4j's copyright by violating the now-removed commercial restrictions. Consequently, Plaintiffs are entitled to summary judgment establishing Defendants' violation of their DMCA claim.

Likewise, in apparent recognition that none of the allegations supporting their unclean hands defense bears the necessary relationship to Neo4j USA's Lanham Act claims, Defendants brazenly re-assert the same fraud and trademark cancelation theories that the Court previously dismissed with prejudice and expressly warned could not be raised to support *any* affirmative defense.  Defendants even attempt to reargue that Neo4j USA does not really own the Neo4j Mark despite this Court's prior determination that it was the owner for purposes of registration in the United States.  Without any other allegations showing that Neo4j USA's trademark usage amounted to inequitable conduct related thereto, Defendants' unclean hands defense fails as a matter of law.

Finally, Defendants fail to offer any competent evidence establishing that there was any mutual assent to an alleged exclusivity agreement relating to the Gov't Edition.  If anything, their Opposition confirms that the parties had divergent views regarding whether the April 11, 2015 "To whom it may concern" letter was an actual binding agreement separate and apart from the SPA.  To the extent that any such agreement ever existed, the undisputed evidence establishes that there was no meeting of the minds with respect to Neo4j USA's cancelation rights.  Accordingly, the Court should grant summary judgment in favor of Neo4j USA on PureThink's breach of contract claim.

## II.    OBJECTION TO DEFENDANTS' USE OF THE KUHN REPORT

Plaintiffs object to Defendants' reliance on the December 22, 2022 Expert Report of Bradley M. Kuhn ("the Kuhn Report"), which is attached as Exhibit 33 to the Declaration of Adron G. Beene, Dkt. No. 188-2 ("Beene Decl.").  Defendants' Opposition relies on the Kuhn Report

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ◆ REDWOOD CITY

4890-7686-1031.5                                                          - 1 -
PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON THEIR DMCA CLAIM AND DEFENDANTS'
BREACH OF CONTRACT COUNTERCLAIM AND UNCLEAN HANDS DEFENSE                        5:18-CV-07182-EJD

SER_0944

1   to support the same arguments they made in opposition to Plaintiffs' Motion to Strike that report and

2   exclude Mr. Kuhn's testimony.  *Compare* Dkt. No. 186 at 6:15-8:10 *and* Dkt. No. 188 ("Opp.") at

3   11:18-13:19 (DMCA); *compare* Dkt. No. 186 at 8:11-9:14 *and* Opp. at 14:12-15:16 (DMCA);

4   *compare* Dkt. No. 186 at 13:6-21 *and* Opp. at 16:12-25 (DMCA); *compare* Dkt. No. 186 at 9:17-

5   10:25 *and* Opp. at 17:9-19:6 (Unclean Hands); *compare* Dkt. No. 186 at 13:16-14:11 *and* Opp. at

6   19:20-20:23 (Unclean Hands).  Accordingly, for the reasons detailed in Plaintiffs' pending Motion

7   to Strike (Dkt. Nos. 181, 189), the Court should exclude the Kuhn Report pursuant to *Daubert*, and

8   disregard Defendants' arguments based thereon in ruling on the present summary judgment motion.

9   **III.    OBJECTION TO DEFENDANTS' RESPONSIVE SEPARATE STATEMENT**

10        Plaintiffs object to Defendants' 43-page Response to Plaintiffs' Separate Statement of

11   Undisputed Material Facts.  Section V.B.2. of the Court's Standing Order provides that where an

12   opposing party contends that a fact is in dispute, it must cite to evidence in the record establishing

13   the dispute. However, Defendants' responsive statement largely consists of attorney argument that

14   either does not refute the evidence cited by Plaintiffs, or is unsupported by evidence that would be

15   admissible at trial; and/or seeks to dispute facts that this Court previously found to be undisputed in

16   Dkt. No. 118.  Section V.B.2. further provides that a responsive statement add no more than five (5)

17   pages to the moving parties' statement.  Since Plaintiffs' original statement was only 15 pages,

18   Defendants' additional 23 pages over this limit amounts to an improper attempt to evade Civil L.R.

19   7-3(a)'s 25-page limit on opposition briefs.  The Court should thus strike Defendants' response.

20   **IV.    THE COURT SHOULD GRANT SUMMARY JUDGMENT FOR PLAINTIFFS ON THEIR DMCA CLAIM**

21

22        **A.    The Law of the Case Bars Defendants From Rearguing that the Neo4j Sweden Software License Permitted Them to Remove the Commons Clause**

23        Defendants erroneously argue that the law of the case doctrine does not bar them from re-

24   litigating whether the "further restrictions" provision in Sections 7 and 10 of the Neo4j Sweden

25   License permitted them to remove the Commons Clause because this Court only granted partial

26   summary judgment.  Defendants made the same arguments in opposition to Plaintiffs' pending

27   Motion to Strike.  Compare Dkt. No. 186 at 4:12-6:8 and Dkt. No. 188 at 10:6-11:17.  In the interest

28   of judicial economy, Plaintiffs incorporate by reference, the portions of that motion addressing these

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ REDWOOD CITY

4890-7686-1031.5    - 2 -

PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON THEIR DMCA CLAIM AND DEFENDANTS'
BREACH OF CONTRACT COUNTERCLAIM AND UNCLEAN HANDS DEFENSE    5:18-CV-07182-EJD

SER_0945

1    same untenable arguments.  See Dkt. No. 181 at 7:15-13:8, 20:1-21:6; Dkt No. 189 at 2:9-6:27.

2         Defendants then reassert the same arguments and untenable interpretation of these provisions

3    they previously made in opposition to Plaintiffs' Phase 1 motion for summary judgment.  *Compare*

4    Opp. at 15:17-16:6 *and* Dkt. No. 100 at 28:15-29:27.  However, the parties previously agreed that

5    their respective interpretations of the Neo4j Sweden Software License should be decided on summary

6    judgment.  *See* Dkt. No. 118 at 24:7-15.  The Court then determined that the license did not permit

7    downstream licensees, such as Defendants, to remove the Commons Clause and redistribute Neo4j®

8    EE under the AGPL license.  Dkt. No. 118 at 24:16-25:19.  Since Defendants filed an interlocutory

9    appeal, the resulting affirmation of that ruling is now the law of the case.  *See Herrington v. County*

10   *of Sonoma*, 12 F.3d 901, 904 (9th Cir. 1993) ("[t]he law of the case doctrine states that the decision

11   of an appellate court on a legal issue must be followed in all subsequent proceedings in the same

12   case") (internal quotations omitted); *Aquino v. Cnty. of Monterey Sheriff's Dep't*, No. 5:14-CV-

13   03387-EJD, 2018 WL 3845718, at *1 (N.D. Cal. Aug. 12, 2018) (citing same in recognizing decision

14   on an interlocutory appeal of the summary judgment order "was now law of the case").  To be sure,

15   the Ninth Circuit *affirmed that its opinion was precedential for the purpose of the law of the case.*

16   Dkt. No. 140 at 3.  Consequently, Defendants cannot re-litigate this issue for a third time.

17        **B.    It is Undisputed that Suhy Impermissibly Removed Neo4j Sweden's CMI**

18        Defendants do not dispute that Suhy removed Neo4j Sweden's CMI without authorization.[1]

19   _____

20   [1] Based on Exhibits 1-4 to Suhy's declaration, Defendants now claim that Suhy did not remove the

     Commons Clause when he created ONgDB 3.4 from Neo4j® EE v3.4.  *See* UDF Nos. 12, 14, 42,

21   45.  The Court should disregard these documents because (a) Defendants did not produce them

22   during discovery; and (b) Suhy generated them for the sole purpose of opposing this motion.  These

23   newly created documents are also unreliable because the permanent injunction entered against GFI

24   required it to remove all versions of ONgDB that contained DMCA violations in February 2022.

     Moreover, Defendants cannot create a disputed issue of fact by submitting a sham declaration and

25   manufacturing evidence that contradicts Suhy's prior deposition testimony.  *See Kennedy v. Allied*

26   *Mut. Ins. Co*., 952 F.2d 262, 266 (9th Cir. 1991).  In this regard, Suhy testified that when he created

27   ONgDB v3.4 from Neo4j® EE v3.4, he replaced the Neo4j Sweden Software License found in

28   LICENSE.txt files with "verbatim" copies of the AGPL to remove the Commons Clause.  Dkt. No.

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ REDWOOD CITY

4890-7686-1031.5                          - 3 -

1   Instead, they argue that the removal of the Commons Clause did not violate §1202(b) because "Neo4J

2   Sweden does not own the CMI as it claims." Opp. at 12:7-15. This is absurd given Defendants do

3   not dispute that prior to making Neo4j® EE a commercial-only product, Neo4j Sweden released

4   certain source code files for Neo4j® EE governed by LICENSE.txt files, consisting of the Neo4j

5   Sweden Software License (AGPL + Commons) that contained following CMI: (a) the Commons

6   Clause, which they admit "prohibited the non-paying public from engaging in commercial resale and

7   support services;" (b) a NOTICE provision identifying *Neo4j Sweden* as the copyright holder and

8   the licensor of Neo4j® EE; and (c) the title, terms and conditions for use of the work, and other

9   identifying information and how to obtain a commercial license for Neo4j® EE. *See* Exhibit A hereto

10  (hereafter referred to as "UDF") Nos. 4-9, 12-15. More importantly, the Court already held that

11  when Suhy replaced the LICENSE.txt files with the form AGPL, he removed *all* of the foregoing

12  CMI in those files. *See* Dkt. No. 118 at 6:2-7:6; *see also* Dkt. No. 98-2, ¶¶ 11, 27, 29-30.

13         Defendants further suggest they did not violate the DMCA because the NOTICE.txt files in

14  ONgDB still identified Neo4j Sweden as the copyright holder and referenced the Commons Clause.

15  *See* UDF Nos. 6, 14-15; Dkt. No. 188-1 ("Suhy Decl.") at ¶¶ 22-24 and Exs. 7-9. This does not

16  insulate Defendants from liability because §1202(b) prohibits *any removal __or__ alteration* of the title

17  of the work, terms and conditions for use of the copyrighted work and other conspicuous displays

18  identifying the owner of these copyrighted works. *See ICONICS, Inc. v. Massaro*, 192 F.Supp.3d 254

19  (D. Mass. 2016) (copyright headers of individual source code files constituted CMI because they

20  conveyed information about copyright owner, and certain terms of use for the file, and were conveyed

21  along with source code files precisely to keep identifying information together with the code).

22  Indeed, this Court *rejected* a similar argument made by GFI. *See Neo4j, Inc. v. Graph Found., Inc*.,

23  2020 WL 6700480, at *5 (N.D. Cal. Nov. 13, 2020) (holding that "moving the CMI into separate

24  NOTICE.txt files constitutes altering the CMI, and conveying the Neo4j Sweden Software License

25  without the Commons Clause constitutes removing CMI").

26

27  _____

    98-1, Ex. 3 at 28:25-29:11, 172:4-23; Dkt. No. 183-1, Ex. 1 at 199:22-201:16. The Court also

28  found the same. *See* Dkt. No. 118 at 5:21-6:11 (citing Dkt. No. 98-1, Ex. 3 at 28:25-29:11).

4890-7686-1031.5                                    - 4 -

PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON THEIR DMCA CLAIM AND DEFENDANTS'
BREACH OF CONTRACT COUNTERCLAIM AND UNCLEAN HANDS DEFENSE                    5:18-CV-07182-EJD

Defendants also fail to reconcile that the referenced source code headers and NOTICE.txt files do not contain the Commons Clause.  Rather, they merely direct a user to the LICENSE.txt files that originally contained those terms and conditions.  *See* Suhy Decl., ¶ 18 and Ex. 3 (NOTICE.txt files for ONgDB v3.4); ¶ 19 and Ex. 4 (source code headers for ONgDB v3.4); *id.,* ¶ 22 and Ex. 7 (NOTICE.txt files for ONgDB v3.5); ¶ 23 and Ex. 8 (source code headers for ONgDB v3.5).  After Suhy replaced the Neo4j Sweden Software License with the generic AGPL, the Commons Clause and its terms and conditions ceased to exist in those LICENSE.txt files, thereby rendered the cross-referencing meaningless.  Dkt. No. 98-2, ¶ 11 and Ex. 3 (LICENSE.txt file for Neo4j v3.4); *id.,* ¶ 27 (confirming replacement of same with AGPL in ONgDB v3.4); Dkt. No. 98-1, ¶ 41 and Ex. 39 (commit showing replacement of LICENSE.text files with AGPL for ONgDB v3.5); Dkt. No. 98-2, ¶¶ 29-30 (referencing same); *accord* Suhy Decl., ¶¶ 21, 24-25 and Exs. 6, 9-10 (confirming same).

Finally, none of the other CMI that Suhy removed from the LICENSE.txt files amounted to "further restrictions" even under his erroneous reading of the Neo4j Sweden Software License. Accordingly, it remains undisputed that Suhy intentionally removed Neo4j Sweden's CMI without authorization by replacing the Neo4j Sweden Software License with "verbatim" copies of the AGPL in Neo4j® EE v3.4 and Neo4j® EE v3.5.  *See* Dkt. No. 118 at 6:7-11, 6:21-26; *see also* UDF No. 14 ("The only files Mr. Suhy touched were the AGPL LICENSE.txt files ...."); UDF No. 15 ("UNDISPUTED that Mr. Suhy knew that Neo4j Sweden owned the copyright for Neo4j EE"); UDF No. 16 ("**UNDISPUTED** that Neo4j Sweden never gave Suhy permission to remove Commons Clause"); UDF No. 19 ("Suhy corrected that violation with the removal of the commons clause"); UDF No. 44 ("Mr. Suhy removed the commons clause from only the AGPL License files...").

### C.    Defendants' Interpretation of AGPL Remains Untenable

Defendants argue that the "you" as used throughout the Neo4j Sweden Software License means both a licensee of the form AGPL ***and*** the licensee of the computer program subject to an independent copyright when it is licensed under AGPL.  Opp. at 5:22-6:10, 12:7-15.  They further argue that "This License" as used in the Neo4j Sweden Software License means the form AGPL. *Id.* at 6:5-10.  This somehow implies that "the AGPL gives permission for the licensee to remove additional restrictions" and "[t]he right to remove additional terms is triggered when the Program

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ REDWOOD CITY

4890-7686-1031.5

- 5 -

PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON THEIR DMCA CLAIM AND DEFENDANTS'
BREACH OF CONTRACT COUNTERCLAIM AND UNCLEAN HANDS DEFENSE                           5:18-CV-07182-EJD

SER_0948

1   owner uses the GPL/AGPL." *Id.* at 12:7-15.  Based on that false assumption, Defendants then argue

2   that Suhy could remove the Commons Clause "because Neo4j Sweden's "addition of the Commons

3   Clause is not a verbatim copy of the AGPL…." *Id.* at 12:16-13:3.  Defendants are wrong again.  The

4   Court considered rejected the same arguments during Phase 1.  *See* Dkt. No. 118 at 24:16-25:19.  In

5   particular, it held that Section 0 defines "you" (*i.e.* Defendants) as the downstream licensee of "the

6   Program" (*i.e.* Neo4j® EE") and not the licensee of any copyright the Free Software Foundation

7   ("FSF") may have in the form AGPL.  *Id.*

8
9           **D.      Defendants Cannot use the FSF's Alleged Copyright in the AGPL to Excuse
                       the Improper Removal of Neo4j Sweden's CMI**

10          Defendants insist that they were justified in removing the Commons Clause because the FSF

11  owns the copyright to the AGPL.  Opp. at 2:18-3:10, 13:17-15:10.  Defendants similarly argue that

12  because "Neo4J Sweden does not own the copyright to the AGPL, [it] cannot meet the requirements

13  for a DCMA claim (ownership of the copyright)."  Opp. at 13:8-9.  Defendants even claim that Suhy

14  was justified in removing the Commons Clause to prevent Neo4j Sweden's infringement of the FSF's

15  copyright.  *Id.* at 13:17-19.  FSF's copyright in the AGPL is immaterial to Plaintiffs' DMCA claim.

16          Defendants asserted the same argument during Phase 1.  Dkt. No. 100 at 5:23-6:3, 29:14-23

17  and Dkt. No. 100, Ex. A at 42-43 (UDF No. 113).  This Court **rejected** ""the notion that the terms

18  drawn from the AGPLv3, on which the Neo4j Sweden Software License is based, somehow limit the

19  rights of Neo4j Sweden to include the Commons Clause or any other additional restriction in its own

20  copyright license.'"  Dkt. No. 118 at 24:16-25:12, *quoting Neo4j, Inc*., 2020 WL 6700480, at *4

21  ("Defendants argue that Plaintiffs were not permitted to alter the form license agreement under the

22  terms of the [FSF's] copyright over the form AGPLv3. But whether Plaintiffs acted in accordance

23  with the copyright covering the AGPLv3 is not at issue before this Court, as Defendants are not

24  entitled to enforce the FSF's copyright.").  Thus, Defendants are not absolved from liability under

25  §1202(b) because Suhy thought he was preventing the infringement of the FSF's copyright.

26          **E.      It is Undisputed that Defendants Knowingly Distributed Neo4j Sweden's
                       Copyrighted Works with its CMI Removed and Knew that this Would Result
27                     in Copyright Infringement**

28          Plaintiffs' moving papers explain how Defendants distributed Neo4j® EE without the Neo4j

4890-7686-1031.5                                                 - 6 -

PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON THEIR DMCA CLAIM AND DEFENDANTS'
BREACH OF CONTRACT COUNTERCLAIM AND UNCLEAN HANDS DEFENSE                          5:18-CV-07182-EJD

1   Sweden Software License re-branded as ONgDB in violation of §1202(b)(3).  *See* Dkt. No. 183 at

2   10:26-11:13.  Defendants do not deny that they did so via the iGov and Graphstack websites, which

3   by itself is a DMCA violation.  *See* UDF Nos. 22-23.  Instead, Defendants argue they were not

4   responsible for the downloads of ONgDB through GFI's website and GitHub repository because they

5   did not control them. Opp. at 17:1-7.  This is a distinction without a difference because Defendants

6   admit that they provided potential users with hyperlinks to download ONgDB with the DMCA

7   violations from GFI's website and GitHub repository.  *See* UDF No. 20 ("UNDISPUTED that Mr.

8   Suhy provided hyperlinks references for users of the website to view the source code and download

9   distributions."); *see also* UDF Nos. 19, 21-22.

10      This amounts to distribution especially since Suhy was one who ***created*** infringing versions

11   of ONgDB on GFI's GitHub repository where others were free to download the software.  *See* Dkt.

12   No. 118 at 5:21-7:6, 24:7-25:19; *accord* Dkt. No. 98-1, Ex. 3 at 172:4-23, 200:9-16; *id.,* Exs. 24-26.

13   It is also undisputed that Suhy was integral to the IRS' adoption and continuing use of ONgDB in

14   the CKGE Platform.  *See* UDF No. 33-35 (Defendants do not cite to any contravening evidence).  To

15   be sure, Suhy told potential customers that he assigned ONgDB to GFI and was responsible for

16   managing the ONgDB distributions used by the IRS.  *See* Dkt. No. 98-1, Exs. 24, 26 (yellow

17   highlights); *see also id.,* Ex. 40 ("I just wanted to let you know that for ONgDB 3.5 - we merged the

18   build framework and enterprise code back into the code repository like it used to be").

19      Plaintiffs' moving papers detail how Defendants knew or had reason to know their removal

20   of the Commons Clause would result in end-users infringing Neo4j Sweden's right to limit the use

21   of Neo4j® EE to paid subscribers.  Dkt. No. 183 at 11:16-14:6.  Defendants do not substantively

22   address these arguments, thus conceding they had the requisite knowledge and intent.

23      Last of all, Defendants admit that the Commons Clause "prohibited the non-paying public

24   from engaging in commercial resale and support services." *See* UDF Nos. 4-5.  Defendants built their

25   entire business around inducing others to use "free and open source" ONgDB and pay Defendants

26   for support services that they clearly understood violated the now-removed Commons Clause.  *See*

27   Dkt. No. 118 at 6:18-26 (Defendants' replacement of Neo4j Sweden Software License with the

28   AGPL "removed certain legal notices identifying Neo4j Sweden as the copyright holder and licensor,

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ REDWOOD CITY

4890-7686-1031.5                                    - 7 -
PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON THEIR DMCA CLAIM AND DEFENDANTS'
BREACH OF CONTRACT COUNTERCLAIM AND UNCLEAN HANDS DEFENSE                    5:18-CV-07182-EJD

1   and removed the Commons Clause, effectively allowing Defendants to commercially use and support

2   ONgDB"); *see also* UDF No. 43.  This amounts to copyright infringement.  *See Jacobsen v. Katzer*,

3   535 F.3d 1373, 1382 (Fed. Cir. 2008) (the use and distribution of software in violation of an open

4   source license constitutes copyright infringement); *see also Metro-Goldwyn-Mayer Studios Inc. v.*

5   *Grokster, Ltd*., 545 U.S. 913, 930 (2005) ("[o]ne infringes contributorily by intentionally inducing

6   or encouraging direct infringement," which includes providing a service "with the object of

7   promoting its use to infringe copyright") *accord Columbia Pictures Indus., Inc. v. Fung,* 710 F.3d

8   1020, 1037-38 (9th Cir. 2013) (liability for copyright infringement on an inducement theory is where

9   the product or service was used to infringe the plaintiff's copyrights).  Accordingly, the Court should

10   grant summary judgment in favor of Plaintiffs on their DMCA claim.

11   **V.      DEFENDANTS' UNCLEAN HANDS DEFENSE FAILS AS A MATTER OF LAW**

12   Defendants previously represented to the Court ***twice*** that they are not asserting an unclean

13   hands defense to Neo4j Sweden's DMCA claim. *See* Dkt. No. 91 at 16:20-19:7; Dkt. No. 169 at

14   10:4-8.  Their opposition reconfirms that this defense is limited to Neo4j USA's trademark

15   infringement claims, and to succeed thereon, they "must show that plaintiff used the trademark to

16   deceive consumers."  Opp. at 17:9-19.  Defendants then attempt to equate ***Neo4j Sweden's*** alleged

17   misuse of the AGPL with respect to Neo4j® EE with ***Neo4j USA's*** use of the Neo4j Mark to sell that

18   software.  *Id.* at 17:20-20:23.  This does not save their unclean hands defense because Defendants

19   concede that Neo4j Sweden is the licensor of source code for Neo4j® EE under the Neo4j Sweden

20   Software License (Dkt. No. 118 at 2:16-18; UDF Nos. 13, 15 and 58), and these licenses "are

21   copyright licenses, not trademark licenses" (Dkt. No. 85 at 7:27-8:7; UDF No. 59).  Consequently,

22   Neo4j Sweden's copyright-based licensing practices do not bear the requisite "immediate and

23   necessary" relationship to Neo4j USA's trademark infringement claims as a matter of law.[2]  *See S.*

24   _____

25   [2] Defendants also argue that Neo4j Sweden "does not own the complete code to [Neo4j® EE]"
26   because it did not produce any contributor license agreements in response to Defendants' discovery
27   requests. Dkt. No. 188 at 20:4-11. This is pure speculation since Neo4j Sweden objected to those
    requests as overbroad, and limited its response to Neo4j® EE v4.0.  *See* Beene Decl., Ex. 32 at RFP
28   Nos. 4-5. Thus, the only reasonable inference drawn from an alleged lack of CLAs is there were no

4890-7686-1031.5

PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON THEIR DMCA CLAIM AND DEFENDANTS'
BREACH OF CONTRACT COUNTERCLAIM AND UNCLEAN HANDS DEFENSE                    5:18-CV-07182-EJD

1  *Cal. Darts Ass'n v. Zaffina*, 762 F.3d 921, 932 (9th Cir. 2014); *Tveter v. AB Turn–O–Matic*, 633 F.2d

2  831, 839 (9th Cir. 1980).

3        Defendants further argue that Neo4j USA somehow engaged in unclean hands because

4  "Neo4j Sweden had other license options" instead of simply adding the Commons Clause to the

5  AGPLv3.  Opp. at 19:20-20:3, 20:12-23.  Defendants made the same argument in opposition to

6  Plaintiffs' first motion for summary judgment (Dkt. No. 100 at 30:9-16), which this Court rejected

7  (Dkt. No. 118 at 24:16-25:19).  More importantly, as conclusively determined by this Court, Neo4j

8  Sweden did not "violate" the AGPL by adding the Commons Clause to create the Neo4j Sweden

9  Software License.  *See* Dkt. No. 118 at 22:23-28:24, *aff'd* Dkt. No. 140; *see also Neo4j, Inc.*, 2020

10  WL 6700480, at *4.  Thus, even if Defendants could show an immediate and necessary relationship

11  with Neo4j USA's trademark usage and Neo4j Sweden's copyright licensing practices, which they

12  cannot, Defendants still cannot show any inequitable conduct related thereto. *See Pinkette Clothing,*

13  *Inc. v. Cosm. Warriors Ltd.*, 894 F.3d 1015, 1029 (9th Cir. 2018) ("only a showing of wrongfulness,

14  willfulness, bad faith, or gross negligence, proved by clear and convincing evidence, will establish

15  sufficient culpability for invocation of the doctrine of unclean hands.").

16        Defendants also cite to Neo4j USA's 2012 "Fair Trade Licensing" article as a "false

17  interpretation" of the AGPL.  Opp. at 3:11-4:6, 21:8-13.  This relates to Neo4j Sweden's licensing

18  of Neo4j® EE, not Neo4j USA's alleged use of the Neo4j Mark in a way that deceived consumers.

19  Moreover, Neo4j USA's use of this article in conjunction with the parties' dispute over the IRS

20  contract occurred in April 2017.  *See* Suhy Decl., Ex. 22.  This predates Neo4j Sweden's first use of

21  the Neo4j Sweden Software License by more than a year.  *See* UDF No. 4.  It also predates

22  Defendants' infringement of the Neo4j® Mark, which only dates back to November 2017.  *See* Dkt.

23  _____

24  third party contributors to the source code associated with the 28 LICENSE.txt files subject to the

25  DMCA claim.  More importantly, Defendants *reconfirm* that Neo4j® EE v3.4 and v3.5 contained

26  at least 182 source code files that were never released under either the GPL or AGPL, and were

27  instead released for the first time under the Neo4j Sweden Software License making Neo4j Sweden

28  the sole copyright owner of those files.  *See* UDF Nos. 13, 15; *see also* Dkt. No. 118 at 6:18-21; Dkt.

No. 98-1, Ex. 38 at 6:22-7:1, 8:4-16:24; Dkt. No. 98-2, ¶ 29.

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ REDWOOD CITY

4890-7686-1031.5                                     - 9 -
PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON THEIR DMCA CLAIM AND DEFENDANTS'
BREACH OF CONTRACT COUNTERCLAIM AND UNCLEAN HANDS DEFENSE                                    5:18-CV-07182-EJD

1  No. 90 at ¶ 41; Dkt. No. 98-1, ¶¶ 16-20, 22 and Exs. 14-18, 20.  As noted in Plaintiffs' moving papers,

2  these alleged acts do not bear the requisite temporal relationship to Neo4j USA's Lanham Act claims,

3  and as a result, cannot support an unclean hands defense.  *See* Dkt. No. 183 at 19:7-24.

4       Finally, in recognition that their unclean hands defense bears no relationship to Neo4j USA's

5  trademark claims, Defendants argue that Neo4J USA's "misrepresentations of time of use, ownership

6  of trademark and failure to correct those misrepresentations is unclean hands under the PTO's

7  standards." Opp. at 19:16-19; *see also id.* at 7:9-17.  Remarkably, Defendants **admit** these are the

8  same facts underpinning their twice-stricken cancellation/fraud on the PTO defense, and then

9  blatantly misrepresent that "[w]hile Defendants are presently foreclosed from invalidating the

10  trademark, the facts remain to support an unclean hands defense." *Id.* at 19:25, fn 4.

11       Defendants' reassertion of these same facts is in direct violation of the Court's prior warning

12  that "Defendants are not permitted to reassert **any affirmative defense** or counterclaim in this action

13  based on the cancellation or abandonment theories asserted in the stricken defenses." Dkt. No. 110

14  at 5:16-6:4 (emphasis added).  This Court also held in granting summary judgment on Neo4j USA's

15  Lanham Act claims that Neo4j USA was the owner of the Neo4j Mark. Dkt. No. 118 at 11:16-12:26,

16  13:18-18:1 *aff'd* Dkt. No. 140.  Since the Defendants did not heed this Court's clear admonition, it

17  should (a) grant summary judgment in favor of Plaintiffs on Defendants' unclean hands defense; and

18  (b) issue an Order to Show Cause why sanctions in the form of paying Plaintiffs' attorneys' fees

19  should not be levied against Defendants pursuant to FRCP 11.  *See Sneller v. City of Bainbridge*

20  *Island*, 606 F.3d 636, 638-39 (9th Cir. 2010).

21  **VI.  THE COURT SHOULD GRANT SUMMARY JUDGMENT IN FAVOR OF NEO4J**
22  **USA ON PURETHINK'S BREACH OF EXCLUSIVITY CONTRACT CLAIM**

23       **A.  Defendants' Opposition Confirms the Lack of Mutual Assent**

24       PureThink argues that the Neo4j USA "consented" to an April 11, 2015 letter, which purports

25  to be a separate agreement from the SPA. Opp. at 21:20-25.  The only evidence they cite in support

26  is the letter using the word "agreement" and not mentioning the SPA, along with Suhy's testimony

27  confirming the same. *Id.* at 22:4-15.  Assuming this were true, the lack of any reference to the SPA

28  means that the parties did not contemplate altering their obligations or entering into an agreement

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ REDWOOD CITY

4890-7686-1031.5                                                                                    - 10 -
PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON THEIR DMCA CLAIM AND DEFENDANTS'
BREACH OF CONTRACT COUNTERCLAIM AND UNCLEAN HANDS DEFENSE                        5:18-CV-07182-EJD

SER_0953

1   separate from the SPA at the time they signed the April 11, 2015 letter.  *See* Cal. Civ. Code § 1636

2   ("A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed

3   at the time of contracting"); Cal. Civ. Code § 1639 ("When a contract is reduced to writing, the

4   intention of the parties is to be ascertained from the writing alone, if possible.").

5         Further, "[m]utual assent is determined from the reasonable meaning of the words and acts

6   of the parties, and not from their unexpressed intentions or understandings."  *Netbula, LLC v.*

7   *Bindview Dev. Corp*., 516 F. Supp. 2d 1137, 1155 (N.D. Cal. 2007).  In this regard, extrinsic evidence

8   is admissible to determine whether contracting parties achieved mutual assent for purposes of

9   formation.  *See* Cal. Civ. Proc. Code § 1856(f)-(g); *accord Banner Entm't, Inc. v. Sup. Court,* 62 Cal.

10  App. 4th 348, 358 (1998) ("[e]vidence as to the parties' understanding and intent … is admissible to

11  ascertain when or whether a binding agreement was ever reached") (citing same).

12        Despite having the burden of proof to establish the existence of an enforceable contract,

13  PureThink fails to offer competent evidence establishing that ***both*** parties understood that the

14  April 11, 2015 letter was a separate agreement rather than simply a tool to seek sole-source

15  procurements.  *See* UDF Nos. 65-67.  Indeed, none of the emails cited by PureThink establish the

16  existence of an enforceable contract separate from the SPA.  *See* Suhy Decl., Ex. 16; Beene Decl.,

17  Exs. 13-15, 18.  Conversely, Suhy's indisputable written representations made immediately before

18  and after the April 11, 2015 letter confirm that there was no contract apart from the SPA.  *See, e.g.*,

19  Dkt. No. 98-1, Ex. 6 (yellow highlights); Dkt. No. 183-1, Exs. 6-8, 10-12, 14 (yellow highlights).

20        The undisputed evidence also shows that ***Suhy told*** Neo4j USA that the alleged "exclusivity

21  agreement" consisted of ***two letters***: "one that we give to agencies on your letterhead [], and 1

22  between us that says you can cancel at any time for any reason." Dkt. No. 183-1, Ex. 7 (green

23  highlights).  Suhy then sent proposed drafts of those letters in an April 10, 2015 email where the

24  internal version stated "[Neo4j USA] has the right to cancel this exclusivity agreement at any time

25  and for any reason." *Id.*, Ex. 8 (green highlights).   Suhy instructed Neo4j USA to "copy and paste"

26  that language in the internal version.  *Id.*  Consistent with Suhy's representations, Neo4j USA created

27  and signed both letters on April 11, 2015, with the internal letter providing that "Neo Technology

28  has the right to cancel this exclusivity agreement at any time and for any reason."  *Id.*, ¶ 11 and Ex.

4890-7686-1031.5                                    - 11 -

1   9 (green highlight); *see also id.,* Exs. 12-13.  Suhy confirmed receipt without objection and assured

2   Neo4j USA that he would sign them.  *See* Ratinoff Reply Decl., ¶¶ 9-10 and Exs. G-H.

3         PureThink now seeks to disavow the unilateral termination provision by claiming that Suhy

4   never signed the internal letter.  *See* UDF No. 69-72.  However, the lack of a party's signature does

5   not make a contract unenforceable.  *Performance Plastering v. Richmond Am. Homes of California,*

6   *Inc*., 153 Cal.App. 4th 659, 668 (2007).  Nevertheless, if PureThink contends it refused to sign the

7   internal letter because of that provision, then there was no mutual consent to a fully executed,

8   enforceable contract.  *See Bustamante v. Intuit, Inc*., 141 Cal. App. 4th 199, 209, 215 (2006)

9   (affirming summary judgment for defendant, holding that "the undisputed facts here show no meeting

10  of the minds as to the essential structure and operation of the alleged joint venture, even if there was

11  agreement on some of the terms"); *see also RHUB Commc'ns, Inc. v. Karon, No. 16-CV-06669-BLF,*

12  2019 WL 8267743, at *4 (N.D. Cal. Nov. 22, 2019) ("failure to reach a meeting of the minds on all

13  material points prevents the formation of a contract even though the parties have orally agreed upon

14  some of the terms, or have taken some action related to the contract") (internal citation omitted).

15        Lastly, the email Defendants rely on to argue that Neo4j USA did not have the unilateral right

16  to terminate the Gov't Edition was sent by Suhy on June 20, 2017 in response to Neo4j USA's

17  cancelation of Neo4j Gov't edition and a month after providing notice of PureThink's breach of the

18  PSA. *See* Beene Decl., Ex. 13 ("I believe our contract requires us to be part of the decision to retire

19  it…. Of course I am assuming you don't agree to this, so just another thing to add to the list for

20  court."); Dkt. No. 118 at 4:13-15 (citing Dkt. No. 98-1, Ex. 9).  This does not create a disputed issue

21  of fact since Suhy sent it in anticipation of litigation and in direct contradiction to the representations

22  he made to Neo4j USA prior to a dispute arising.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007) (an

23  assertion that is "blatantly contradicted by the record, so that no reasonable jury could believe it" will

24  not create a genuine issue of material fact at summary judgment); *Warner Constr. Corp. v. City of*

25  *Los Angeles*, 2 Cal.3d 285, 296–97 (1970) (refusing to admit "negotiations" after the date on which

26  "the parties had reached a stage of clear disagreement on the crucial question"); *accord Wolsey, Ltd.*

27  *v. Foodmaker, Inc.*, 144 F.3d 1205, 1210 (9th Cir. 1998) (recognizing that the principle of "practical

28  construction" only applies to acts before any dispute has arisen) (citing same).

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ REDWOOD CITY

4890-7686-1031.5                                                      - 12 -
PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON THEIR DMCA CLAIM AND DEFENDANTS'
BREACH OF CONTRACT COUNTERCLAIM AND UNCLEAN HANDS DEFENSE                             5:18-CV-07182-EJD

SER_0955

**B.   Defendants Cannot Invent an Oral Agreement to Prevent Summary Judgment**

Defendants attempt to invent from whole cloth a subsequent oral "exit agreement" (or oral modification to the April 11, 2015 letters) that purportedly required the discontinuation of the Gov't Edition to be "unanimous" and for Neo4j USA to compensate PureThink.  *See* UDF No. 65 (citing Suhy Decl., ¶ 10).  Defendants admit that no such written instrument executed by the parties exists, and instead rely upon a declaration describing this purported agreement.  *Id.*  Notably, there is no reference to any alleged second oral agreement or modification in any of the ***four*** iterations of Defendants' counterclaims.  *See* Dkt. No. 22, ¶¶ 14-15; Dkt. No. 55, ¶¶ 16-17, 40-53; Dkt. No. 72, ¶¶ 16-17, 49-53; Dkt. No. 171, ¶¶ 16-17, 53-57.  Since they never alleged that such an agreement or modification existed, they cannot "advance new theories presented for the first time in [] opposition to summary judgment."  *Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 968–69 (9th Cir. 2006); *accord Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006).

Even if Defendants could do so, Suhy's "conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact."  *F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997); *accord GoE3 LLC v. Eaton Corp.*, 798 F. App'x 998, 999 (9th Cir. 2020) (affirming summary judgment for defendant where the district court disregarded plaintiff's self-serving declaration that failed to identify evidence that defendant accepted certain terms as part of the original contract terms or as part of a subsequent contractual modification) (citing same); *Bullard v. Wastequip Mfg. Co. LLC*, 2015 WL 12766467, at *12 (C.D. Cal. Apr. 14, 2015) (prohibiting party from defeating summary judgment by asserting oral contract theory not alleged in the operative pleading); *see also Hansen v. United States*, 7 F.3d 137, 138 (9th Cir. 1993) ("[w]hen the nonmoving party relies only on its own affidavits to oppose summary judgment, it cannot rely on conclusory allegations unsupported by factual data to create an issue of material fact").

In this regard, PureThink fails to offer competent evidence establishing ***when*** Neo4j USA consented to such an oral agreement or modification, ***who*** consented on behalf of Neo4j USA, ***how*** much compensation would be, and ***what*** additional consideration PureThink offered.  Thus, no such oral agreement or modification can exist.  *See Hohs v. Allstate Ins. Co.*, 2010 WL 11706760, at *5-

4890-7686-1031.5                                    - 13 -
PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON THEIR DMCA CLAIM AND DEFENDANTS'
BREACH OF CONTRACT COUNTERCLAIM AND UNCLEAN HANDS DEFENSE                          5:18-CV-07182-EJD

6 (N.D. Cal. Feb. 10, 2010) (granting summary judgment where plaintiff failed to provide evidence of when the oral contract was entered into and defendant's consent to the terms thereof); *Kahn Creative Partners, Inc. v. Nth Degree, Inc.*, 2011 WL 1195680, at *3-5 (C.D. Cal. Mar. 29, 2011) (same); *see also Stanford Hosp. & Clinics v. Multinat'l Underwriters, Inc*., 2008 WL 5221071, at *7 (N.D. Cal. Dec. 12, 2008) (finding no mutual consent to oral agreement because plaintiff only offered evidence of its own state of mind); *Davidson v. ConocoPhillips Co*., 2009 WL 2136535, at *3 (N.D. Cal. July 10, 2009) (granting summary judgment for defendant where plaintiffs failed to show the oral modification to a written contract was supported by new consideration).

### C.   Defendants Fail to Establish a Breach of the Alleged Exclusivity Agreement

Defendants argue that because the external April 11, 2015 letter does not contain the unilateral termination provision, Neo4j USA is "not free to insert one so purely in their favor." Opp. at 22:17-23:23. However, this is exactly what PureThink is doing by disavowing the internal letter that ***Suhy proposed contain that provision*** and Neo4j USA's reliance thereon when it signed both letters. PureThink cannot have it both ways. Either the two letters constituted parties' exclusivity agreement and gave Neo4j USA the unilateral right to terminate without having to pay PureThink, or there was never a meeting of the minds on any alleged agreement. Under both scenarios, PureThink cannot establish any breach thereof by Neo4j USA.

### D.   PureThink Fails to Provide Competent Evidence of Its Alleged Damages

Defendants do not indicate they intend to seek any nominal damages, and instead confirm that they are seeking monetary damages based on the alleged "full time" effort Suhy put into developing the add-ons to Neo4j® EE to create the Gov't Edition. Opp. at 24:4-12. However, Defendants do not offer competent evidence that would allow a trier of fact to determine the actual time spent and the value of that time. *See* UDF Nos. 85, 109. Defendants further admit that PureThink's financial statements "do not reflect the expenses which came in the form of paying Mr. Suhy to focus full time on the [Gov't Edition]," while they fail to cite to any evidence such as paychecks or bank records that would support such expenses. *See* UDF No. 86. PureThink thus cannot make the required showing with "reasonable certainty and probability." *See McGlinchy v. Shell Chem. Co.,* 845 F.2d 802, 809 (9th Cir. 1988) (affirming summary judgment where plaintiffs

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ REDWOOD CITY

4890-7686-1031.5                                                    - 14 -
PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON THEIR DMCA CLAIM AND DEFENDANTS'
BREACH OF CONTRACT COUNTERCLAIM AND UNCLEAN HANDS DEFENSE                5:18-CV-07182-EJD

1    failed to submit evidence "upon which a finder of fact could reasonably conclude that [they] actually

2    suffered damages, caused by [] defendants, in any quantifiable amount").

3         PureThink's attempt to recover $1.3 million in damages for the alleged loss of the CKGE

4    Contract with the IRS is also untenable.  *See* Opp. at 24:13-14.  By agreeing to dismiss their IIPEA

5    claim with prejudice in the face of a motion to dismiss, Defendants conceded that Neo4j USA had a

6    constitutional right to protest that award.  *See* Dkt. Nos. 171, 172 and 176; *see also* UDF No. 57.

7    Moreover, it is undisputed that the IRS continued to use the Gov't Edition and PureThink's support

8    services after Neo4j notified all concerned that it was discontinuing the Gov't Edition and terminating

9    PureThink as Solutions Partner. *See* UDF Nos. 52-53, 74, 77, 88.  Consequently, Defendants cannot

10   establish a causal connection between Neo4j USA's alleged breach of the exclusivity agreement and

11   the IRS's subsequent decision to award the CKGE Contract to Suhy via one of his other entities,

12   eGovernment Solutions. *See* UDF No. 25-26.

13        Finally, Defendants cite to a spreadsheet of Neo4j USA's government sales as somehow

14   establishing its alleged damages.  *See* Opp. at 24:13-14.  This is insufficient to establish damages

15   because Defendants fail to offer evidence establishing that but for the termination, PureThink would

16   have sold the Gov't Edition to them.  Without any evidence of a causal connection, PureThink cannot

17   rely on speculation that they would have made any of those sales. *See McGlinchy,* 845 F.2d at 809;

18   *Codding v. Pearson Educ., Inc.*, 2019 WL 5864579, at *12 (N.D. Cal. Nov. 8, 2019), *aff'd*, 842 F.

19   App'x 70 (9th Cir. 2021) (granting summary judgment in favor of defendant where plaintiff failed to

20   provide evidence "establish[ing] a causal connection between the breach and the damages sought").

21   **VII.   CONCLUSION**

22        For the reasons set forth herein and in their opening brief, Plaintiffs respectfully request that

23   the Court grant summary judgment in favor of Neo4j USA on all grounds sought.

24   Dated:  June 29, 2023                          HOPKINS & CARLEY, ALC

25

26                                          By: */s/ Jeffrey M. Ratinoff*
                                                Jeffrey M. Ratinoff
27                                              Attorneys for Plaintiffs and Counter-
                                                Defendants NEO4J, INC. and NEO4J
28                                              SWEDEN AB

4890-7686-1031.5                              - 15 -

PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON THEIR DMCA CLAIM AND DEFENDANTS'
BREACH OF CONTRACT COUNTERCLAIM AND UNCLEAN HANDS DEFENSE                               5:18-CV-07182-EJD