**No. 24-5538**
_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
_____

NEO4J, INC., NEO4J SWEDEN AB,

*Plaintiffs-Appellees,*

v.

JOHN MARK SUHY,

*Defendant-Appellant.*

On Appeal from the United States District Court
For the Northern District of California
No. 5:18-cv-07182-EJD
Hon. Edward J. Davila
_____

## APPELLEES' EXCERPTS OF RECORD
## Volume 5 of 18
_____

John V. Picone III (State Bar No. 187226)
jpicone@spencerfane.com
Jeffrey M. Ratinoff (State Bar No. 197241)
jratinoff@spencerfane.com
Jeremy A. Moseley (MT Bar No. 44830177)
jmoseley@spencerfane.com

*Attorneys for Appellees*
Neo4j, Inc. and Neo4j Sweden AB

**PLAINTIFFS' REPLY TO DEFENDANTS RESPONSIVE SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS**

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| **Defendants' Violation of the DMCA [17 U.S.C. § 1202(b)(1)]** | | |
| 1. the existence of CMI on the infringed work; | **Fact 1:** Neo4j Sweden is the owner of all copyrights related to the Neo4j® graph database platform, including the source code, and has licensed those copyrights to Neo4j USA in connection with the making, use, creation of derivative works, sale, offer to sell, importation, performance, display, reproduction and distribution of the copyrighted material, and the sublicensing of such rights in the United States. Dkt. No. 98-2, ¶¶ 3-4; Dkt. No. 118 at 2:15-18 (citing same). | **DISPUTED** Neo4j does not own all the code to the Neo4j software. Beene Decl., Ex. 27. <br><br> Hundreds of committers to Neo4j code do not appear to be associated with Neo4j Sweden, and Neo4j Sweden does not have assignments from committers or authors of Neo4j Software. Copies of assignments were requested in discovery but not provided Suhy Decl. ¶¶13-14, Beene Dec., Ex 32. |
| | **Additional Fact:** The Court previously found it was undisputed that "Neo4j Sweden owns of all copyrights related to the Neo4j graph database platform, including the source code." Dkt. No. 118 at 2:16-18; *accord* Fact 15 ("UNDISPUTED that Mr. Suhy knew that Neo4j Sweden owned the copyright for Neo4j EE"). <br><br> **Additional Fact:** Neo4j® EE v3.4 and v3.5 contained at least 182 source code files that were never released under either the GPL or AGPL, and were instead release for the first time under the Neo4j Sweden Software License making Neo4j Sweden the sole copyright owner of those files that are subject to Plaintiffs' DMCA claim. Dkt. No. 98-1, Ex. 38 at 6:23-16:24, 8:4-16:24; (iGov's verified interrogatory response identifying at least 182 source code files in Neo4j® EE that had not previously been released under the AGPL); Fact 13 ("**UNDISPUTED** that there were at least 182 source code files released under AGPL + Commons clause"); Dkt. No. 118 at 6:18-21 ("GFI released ONgDB v3.5.1, which contained at least 182 source code files that had only been previously released under the Neo4j Sweden Software License in a publicly available beta version of Neo4j EE 3.5"); *accord* Dkt. No. 98-2, ¶¶ 27-30. | |
| | **Fact 2:** Prior to May 2018, Plaintiffs offered a free and open source version of the Neo4j® graph database platform, Neo4j® Community Edition ("Neo4j® CE"), under the GNU General Public License version 3 ("GPL") license. Dkt. No. 118 at 3:1-4 (citing Dkt. No. 98-2, ¶¶ 4-5). | **DISPUTED** Prior to May 2018 Plaintiffs also released Neo4j Enterprise Edition under the vanilla AGPL open source license. Neo4j Enterprise under the AGPL and Neo4j Enterprise under the commercial license were the |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | Neo4j® CE is limited in its feature set and does not come with technical or administrative support. Dkt. No. 118 at 3:4-5 (citing Dkt. No. 98-2, ¶¶ 5-6). Plaintiffs also offered a more advanced commercial version, which included additional features and support services, known as the Neo4j Enterprise Edition ("Neo4j® EE"). Dkt. No. 118 at 3:5-7 (citing Dkt. No. 98-2, ¶ 8). | same physical software as they were compiled from the same source code.<br><br>See Suhy Decl., ¶2. |
| | <u>Fact 3:</u> Plaintiffs originally offered Neo4j® EE under both a paid-for commercial license and for free under the GNU Affero General Public License, version 3 ("AGPL"). Dkt. No. 118 at 3:7-9 (citing Dkt. No. 98-2, ¶ 8). A commercial license to Neo4j® EE entitled the purchaser to use it in a proprietary setting with industry standard terms, receive support or professional services from Neo4j USA, and the right to receive software updates, which included feature updates, bug fixes and assistance. Dkt. No. 98-2, ¶¶ 7-9. | **UNDISPUTED** that Neo4j EE was available under both a commercial and free open source AGPL license and that a commercial license came with support.<br><br>**DISPUTED** that the commercial license was the only license which allowed Neo4j EE to be used in a proprietary setting or receive updates. Neo4j Enterprise under the open source AGPL (< v3.4) as well as under AGPL + Commons clause (v3.4) could be used in a proprietary setting for free, and since the code was the same for the commercial and open-source versions, they both received updates together.<br>See Suhy Decl., Ex. 2 |
| | <u>Fact 4:</u> On May 17, 2018, Neo4j Sweden released Neo4j® EE v3.4 and replaced the AGPL with a stricter license, which included the terms from the AGPL and additional commercial restrictions provided by the Commons Clause ("Neo4j Sweden Software License"). Dkt. No. 118 at 3:9-12 (citing Dkt. No. 98-2, ¶ 11 and Ex. 3). | **UNDISPUTED** that Neo4j Sweden released Neo4j® EE v3.4 on May 17, 2018 which was the AGPL with the commons clause which added prohibited the non-paying public from engaging in commercial resale and support services.<br><br>**DISPUTED** that this was ever called "Neo4j Sweden Software License" outside of court. The License terms include the AGPL preamble and the NOTICE states: "The Software is subject to the terms of the GNU AFFERO GENERAL PUBLIC LICENSE Version 3 (http://www.fsf.org/licensing/licenses/agpl-3.0.html), included in the LICENSE.txt file, with the Commons Clause." See Suhy Decl., Ex. 3<br><br>**DISPUTED** that the AGPL was replaced with a stricter license. The AGPL was not replaced. The AGPL License file had the full preamble, stated it was copyrighted to the free software foundation. The commons clause was appended to the AGPL terms. Note, the commons clause did not affect end-users |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | wishing to use the software, it was targeted at anyone trying to sell or offer a competing support offering as Neo4j USA offered. See Suhy Decl., Exs. 2-3 |
| | **Fact 5:** The Neo4j Sweden Software License, while still allowing code to be publicly viewable and used within a certain licensed scope, prohibited the non-paying public from engaging in commercial resale and support services.  Dkt. No. 118 at 3:12-13; Dkt. No. 98-2, ¶¶ 11-12 and Ex. 3. | **UNDISPUTED** that the commons clause states that it prohibited the non-paying public from engaging in commercial resale and support services.<br><br>**DISPUTED** that there was ever a reference outside of court of a license called  "The Neo4j Sweden Software License".   The License was always referred to as AGPL, even when the commons clause was appended to the AGPL terms.<br><br>**DISPUTED** that "The Neo4j Sweden Software License" had a certain licensed scope for use.  The commons clause stated that it prevented others from selling or offering certain services, but did it did not affect the end-users who were using the software under the license.<br><br>See Suhy Dec., Exs. 2-3 |
| | **Fact 6:** The NOTICE provision in the Neo4j Sweden Software License states that Neo4j® EE is developed and owned by Neo4j Sweden… and is subject to the terms of the [AGPL], with the Commons Clause as follows…." Dkt. No. 98-2, ¶ 11 and Ex. 3.  It also provides additional information, such as the title of the work, terms and conditions for use of the work, and other identifying information about Neo4j Sweden and how to obtain a commercial license for the use of Neo4j® EE.  *Id.* | **UNDISPUTED**  The NOTICE provision was found in a separate file called NOTICE.txt which was always present next to the AGPL License file called LICENSE.txt<br><br>Every directory in the enterprise source code that has a LICENSE.txt file also has the corresponding NOTICE.txt.<br><br>See Suhy Dec., ¶ 3. and Exs. 1,3 |
| | **Fact 7:** In November 2018, Plaintiffs officially released of Neo4j® EE v3.5 solely under a commercial license. Dkt. No. 98-2, ¶ 13 and Ex. 4; Dkt. No. 118 at 3:13-15 (citing same). This meant that Plaintiffs were no longer publishing the source code for Neo4j® EE and offering it on an open source basis. *Id.*  This was done to simplify the licensing model, as well as prevent bad actors from profiting by providing commercial support services in closed, proprietary projects.  Dkt. No. 98-2, ¶ 13. | **UNDISPUTED** that Plaintiffs officially released of Neo4j® EE v3.5 solely under a commercial license.<br><br>**DISPUTED** that plaintiffs were no longer publishing the source code for Neo4j EE or offering it on an open source basis.  All Neo4j EE versions prior to v3.5 were public and received updates from Neo4j Sweden. |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | **DISPUTED** that this was done to simply the licensing model, as well as prevent bad actors from profiting by providing commercial services in closed, proprietary projects.<br><br>See Suhy Decl., ¶ 4. |
| | <u>Fact 8</u>: Prior to the official release of Neo4j® EE v3.5, Plaintiffs published several beta versions via their GitHub repository subject to the Neo4j Sweden Software License. Dkt. No. 118 at 6:18-21; Dkt. No. 98-2, ¶ 14. | **UNDISPUTED** that plaintiffs published several beta versions of EE v3.5 via their GitHub repository.<br><br>**DISPUTED** that the license was ever called "Neo4j Sweden Software License." outside of court proceedings.  The beta versions were licensed under the AGPL and had the commons clause restriction appended to the AGPL license file. |
| | <u>Fact 9</u>: Neo4j® EE v3.5.0-RC1 was the last pre-release version available to Defendants via GitHub. Thereafter, only the source code for Neo4j® CE was made publicly available under the GPL via GitHub. *Id.* | **UNDISPUTED** Note that all prior versions of Neo4j EE remain publicly available on the Neo4j GitHub repository.<br><br>See Suhy Decl., ¶ 2. |
| 2. Defendants' intentional removal and/or alteration of CMI without the authorization of Neo4j Sweden | <u>Fact 10</u>: Following the release of Neo4j® EE v3.4, Suhy worked with Brad and Ben Nussbaum to form Graph Foundation, Inc. ("GFI") in June 2018.  Dkt. No. 118 at 6:2-7 (citing Dkt. No. 98-1, Exs. 27-29); Dkt. No. 98-1, ¶¶ 24-26 and Exs. 22-24. | **DISPUTED** that Mr. Suhy worked to form the Graph Foundation, Inc. ("GFI").  Mr. Suhy was part of the volunteer committer team, and gave guidance as an open source advocate, but was not involved in forming the GFI entity.  Mr. Suhy declined any official role with the foundation.   There are no legal documents and Plaintiff's have not shown any official documents, or business records that show Mr. Suhy being involved in the formation of the GFI or serving as any official officer or director.<br><br>Plaintiff has not produced any business records, certificates, or any evidence that Mr. Suhy had a formal role in the GFI other than being on the volunteer committer team.<br><br>Beene Dec. Ex 30, Brad Nussbaum Deposition, 40:7-16, 42:9-14, 44:6-8, 78:19-24 |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | **Additional Fact:** Defendants literally *admit* "that Mr. Suhy worked to form the Graph Foundation, Inc. ("GFI")." Further, a month after GFI was formed, Suhy sent an email to the Nussbaums stating, "We work together as one company. We all are the founders of the Graph Foundation." Dkt. No. 98-1, Exs. 29-30. | |
| | Fact 11: After Suhy helped form GFI, Defendants began offering and promoting a graph database software called "ONgDB." Dkt. No. 118 at 6:2-7 (citing Dkt. No. 98-1, Ex. 27-29); Dkt. No. 98-1, ¶ 26 and Ex. 24. | **DISPUTED** that Suhy helped form GFI. See Fact 10.<br><br>**UNDISPUTED** that GFI began offering and promoting a graph database software called "ONgDB".<br><br>**UNDISPUTED** that Mr. Suhy promoted ONgDB as part of his open-source advocacy activities. Mr. Suhy also promotes other open source innovative technologies. |
| | Fact 12: To create ONgDB, Suhy downloaded the source code for Neo4j® EE v3.4 from Neo4j's GitHub repository and impermissibly replaced the more restrictive Neo4j Sweden Software License with a generic copy of the AGPL, which removed (a) the valid legal notices identifying Neo4j Sweden as the copyright holder and licensor in the NOTICE provision; and (b) the commercial restrictions imposed by the Commons Clause. Dkt. No. 118 at 6:7-11 (citing Dkt. No. 98-1, Ex. 3 at 28:25-29:11; Exs. 24-26, 28; Ex. 31 at 87:24-90:9); Dkt. No. 98-1, Ex. 3 at 171:23-172:23; Dkt. No. 98-2, ¶¶ 11-12, 27. | **DISPUTED.** Mr. Suhy did not create ONgDB, he was on the volunteer team of committers and gave the guidance on how to set it up, but GFI came up with the name and created the GitHub repositories.<br><br>**DISPUTED.** Mr. Suhy did not make any modifications to the source code in v3.4 code related to the AGPL in any way.<br>See Suhy Decl., Exs. 1-4, 9 |
| | **Additional Fact/Objection**: Suhy testified under oath that when he created ONgDB v3.4 from Neo4j® EE v3.4, he replaced the Neo4j Sweden Software License found in LICENSE.txt files with "verbatim" copies of the AGPL thereby removing Neo4j Sweden's CMI. Dkt. No. 98-1, Ex. 3 at 171:23-172:23; Ratinoff Decl., Ex. 1 at 199:14-201:16. This is consistent with contemporaneous statements Suhy made to potential customers. *See, e.g.*, Dkt. No. 98-1, ¶ 27 and Ex. 25 (Check out https://graphfoundation.org [] All the Neo4j enterprise distributions we package from now on will come from the foundation and have the standard vanilla AGPLv3 open source license"). This is also consistent with Plaintiffs' inspection of ONgDB v3.4 around the time of its release in 2018. Dkt. No. 98-2, ¶ 27. | |
| | Fact 13: ONgDB v3.5 contained at least 182 source code files that had only been previously released by Neo4j Sweden under the Neo4j Sweden Software License in the last publicly available beta version of Neo4j® EE | **UNDISPUTED** that there were at least 182 source code files released under AGPL + Commons clause. |

5

**SER_0964**

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | 3.5.  Dkt. No. 118 at 6:18-21; Dkt. No. 98-1, Ex. 38 at 6:22-7:1, 8:4-16:24; Dkt. No. 98-2, ¶¶ 13-14, 29. | **DISPUTED** that the AGPL + Commons was ever called "Neo4j Sweden Software License" outside of court proceedings.   The files were released under AGPL + Commons clause.<br><br>See Suhy Decl., Exs. 2-3<br><br>See Fact 12 |
| | **Additional Fact:** In particular, ONgDB v3.5.9 contained 247 Java classes that were released for the first time under the Neo4j Sweden Software License either in (a) Neo4j® EE version 3.4 and were incorporated into Neo4j® EE version 3.5; or (b) Neo4j® EE version 3.5.0-RC1, and were therefore never previously licensed under the AGPLv3.   Additionally, the full underlying source code for the enterprise-only components of Neo4j® EE version 3.5.9 was never made available or released under the Neo4j Sweden Software License, or any open source license. Dkt. No. 98-2, ¶ 29. | |
| | Fact 14: Suhy again replaced the more restrictive Neo4j Sweden Software License with a generic copy of the AGPL in ONgDB v3.5, where (a) stripped out valid legal notices identifying Neo4j Sweden as the copyright holder and licensor; and (b) removed the commercial restrictions imposed by the Commons Clause in 28 LICENSE.txt files. Dkt. No. 118 at 6:21-26 (citing Dkt No. 98-1, Ex. 31 at 159:3-10 and Exs. 39-40; Dkt. No. 98-2, ¶ 30; Dkt. No. 91 at 19:2-25); Dkt. No. 98-1, ¶ 41 and Ex. 39.<br><br>**Additional Fact/Objection**:  Suhy testified under oath that when he created ONgDB v3.4 from Neo4j® EE v3.4, he replaced the Neo4j Sweden Software License found in LICENSE.txt files with "verbatim" copies of the AGPL thereby removing Neo4j Sweden's CMI.  *See* Additional Fact 12, *supra.*<br><br>**Additional Fact**:  The cited source code headers and NOTICE.txt files do not contain the Commons Clause.  Rather, they merely direct a user to the LICENSE.txt, which originally contained the Commons Clause.  *See* Suhy Decl., ¶¶ 18-19, 22-23 and Exs. 3-4, 7-8. Once Suhy replaced the Neo4j Sweden Software License with a generic copy of the AGPL, the Commons Clause (along with the other notices, terms and conditions listed by Neo4j Sweden) ceased to exist in those LICENSE.txt files, thereby rendered the cross-references in the NOTICE.txt files | **DISPUTED.**<br>Mr. Suhy had not previously replaced anything relating to the AGPL and commons for v3.4 of Neo4j Enterprise.   See Fact 12 above.<br><br>The NOTICE provision in the NOTICE.txt files which corresponded to each LICENSE.txt files, along with the 1000s of source code files which also had Neo4j Sweden CMI and the commons clause were untouched by Mr. Suhy and still clearly shows that the commons clause was present.<br><br>The only files Mr. Suhy touched were the AGPL LICENSE.txt files which clearly stated that the copyright to the file / license was to the free software foundation.<br><br>See Suhy Decl.,  Ex. 2<br><br>"Copyright (C) 2007 Free Software Foundation, Inc. <http://fsf.org/> Everyone is permitted to copy and distribute verbatim copies of this license document, but changing it is not allowed." |

SER_0965

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | meaningless. Dkt. No. 98-2, ¶¶ 27, 29-30; Dkt. No. 98-1, ¶ 41 and Ex. 39; *accord* Suhy Decl., ¶¶ 21, 24-25 and Exs. 6, 9-10.<br><br>**Additional Fact**: The commit to the GitHub repository for ONgDB v3.5 cited by Defendants shows that Suhy replaced 28 LICENSE.txt files consisting of the Neo4j Sweden Software License with 28 LICENSE.txt files consisting of generic copies of the AGPL, which deleted *all* of Neo4j Sweden's CMI in those files. Dkt. No. 98-1, ¶ 41 and Ex. 39 (3/1/19 commit titled "Updated the LICENSE.txt file to be pure AGPL as to not violate the fsf copyright and to be in line with the AGPL license"); Dkt. No. 98-2, ¶ 30 (referencing same commit that replaced the 28 LICENSE.txt files). | The NOTICE.txt files and all source code files still had the legal notices identifying Neo4j Sweden as the copyright holder and licensor, and also stated the license was AGPL + Commons.<br><br>See Suhy Decl., Ex. 3<br><br>"The Software is subject to the terms of the GNU AFFERO GENERAL PUBLIC LICENSE Version 3 (http://www.fsf.org/licensing/licenses/agpl-3.0.html), included in the LICENSE.txt file, with the Commons Clause."<br><br>See Suhy Decl., Exs. 1-10 |
| | <u>Fact 15:</u> Suhy knew that Neo4j Sweden owned the copyright for Neo4j® EE, that Neo4j Sweden controlled the licensing thereof, and he could not replace the Neo4j Sweden Software License with the AGPL without Neo4j Sweden's authorization. Dkt. No. 98-1, ¶ 36 and Ex. 34 ("As the copyright holder, is Neo4j allowed to add the specific additional terms mentioned above to the License.txt file …?"); *id.,* ¶ 58 and Ex. 56 (yellow highlights); *id.*, Ex. 3 at 183:12-25, 187:12-188:15, 189:1-191:3.<br><br>**Additional Fact**: The cited source code headers and NOTICE.txt files do not contain the Commons Clause. Rather, they merely direct a user to the LICENSE.txt, which originally contained the Commons Clause. *See* Suhy Decl., ¶¶ 18-19, 22-23 and Exs. 3-4, 7-8. Once Suhy replaced the Neo4j Sweden Software License with a generic copy of the AGPL, the Commons Clause (along with the other notices, terms and conditions listed by Neo4j Sweden) ceased to exist in those LICENSE.txt files, thereby rendered the cross-references in the NOTICE.txt files meaningless. Dkt. No. 98-2, ¶¶ 27, 29-30; Dkt. No. 98-1, ¶ 41 and Ex. 39; *accord* Suhy Decl., ¶¶ 21, 24-25 and Exs. 6, 9-10.<br><br>**Additional Fact**: The commit to the GitHub repository for ONgDB v3.5 cited by Defendants shows that Suhy replaced 28 LICENSE.txt consisting of the Neo4j Sweden Software License with LICENSE.txt consisting of generic copies of the AGPL, which deleted *all* of Neo4j Sweden's CMI in those files. Dkt. No. 98-1, ¶ 41 and Ex. 39 (3/1/19 commit titled "Updated the LICENSE.txt file to be pure AGPL as to not violate the fsf | UNDISPUTED that Mr. Suhy knew that Neo4j Sweden owned the copyright for Neo4j EE.<br><br>DISPUTED that Mr. Suhy replaced anything called the Neo4j Sweden Software License. He only made the AGPL License file verbatim as the copyright holder, the free software foundation instructed. He did not replace the NOTICE.txt (notice provision) or any source code CMI which clearly stated that the software was copyrighted to Neo4j Sweden and had additional restrictions in the form of the common clause.<br><br>Mr. Suhy's commit message which is used to explain why a commit / change was made states: "Updated the LICENSE.txt file to be pure AGPL as to not violate the fsf copyright and to be in line with the AGPL license." See Suhy Decl., Ex. 9<br><br>See Fact 14.<br><br>See Suhy Decl., Exs. 1-10<br><br>Neo4J Sweden does not own 100% of the code for Neo4J and the AGPL control how the software is licensed. Neo4J Sweden's misused the AGPL and Suhy corrected that. See response to Fact 1 and Facts 94 and |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | copyright and to be in line with the AGPL license"); Dkt. No. 98-2, ¶ 30 (referencing same commit that replaced the 28 LICENSE.txt files). | 100. |
| | **Fact 16:** Neo4j Sweden never gave Suhy permission to remove Commons Clause, rename it "ONgDB" and offer it for free under the AGPL.  Dkt. No. 98-1, ¶¶ 11-14, 27, 29-30. | **UNDISPUTED** that Neo4j Sweden never gave Suhy permission to remove Commons Clause or rename "it" ONgDB.<br><br>**DISPUTED** that Mr. Suhy renamed anything ONgDB. Mr. Suhy did not have any part in coming up with the name ONgDB.<br><br>**DISPUTED** that Mr. Suhy offered ONgDB – this is a project that is sponsored and offered by GFI.<br><br>The AGPL authorizes licensee to remove any additional terms. See Suhy Dec., Ex. 6. |
| | **Fact 17:** Suhy has been the sole officer and director of PureThink since he formed the corporation.  Ratinoff Decl., Ex. 2 at 176:4-11; *see also* Dkt. No. 98-1, ¶ 16 and Ex. 14 ("[t]he principle behind PureThink … has created a new corporate entity called iGov Inc."). | **DISPUTED.** Mr. Suhy has had other partners who served as officers and directors since PureThink was formed in 2002.<br><br>See Suhy Decl., ¶ 8. |
| | **Additional Fact**: Defendants state "PureThink is a single person company filing as an s-corporation for tax purposes."  *See* Fact 86, *infra*. | |
| | **Fact 18:** Suhy has been the sole officer and director of iGov Inc. since he formed the corporation.  Dkt. No. 98-1, ¶ 12 and Ex. 10; *id.,* Ex. 3 at 21:20-23:25. | **UNDISPUTED** |
| 3. Defendants Distributed Neo4j Sweden's Works with its CMI Removed | **Fact 19:** Suhy made Neo4j Sweden's source code with its CMI removed publicly available via GFI's website and GitHub repository for ONgDB. Dkt. No. 98-1, Ex. 24 ("IRS is adopting the open source Neo4j Enterprise distributions we are transfered [sic] to [GFI]"); *id.,* ¶¶ 27 and Ex. 25 ("All the Neo4j enterprise distributions we package from now on will come from [GFI] and have the standard vanilla AGPLv3 open source license."); *id.,* ¶¶ 28 and Ex. 26 ("I manage the Neo4j Enterprise open source distributions used by the Treasury, DHS, etc. [] Our open-source fork we manage can be found at https://graphfoundation.org"); *id.,* Ex. 3 at 172:4-23, 200:9-25, 211:7-24; *id.,* ¶¶ 41 and Ex. 39 (GFI GitHub commit); Dkt. No. 98-2, ¶¶ 27, 29-30.  This resulted in users downloading infringing ONgDB over 14,000 times by December 2020.  Dkt. No. 118 at 8:13-15. | **DISPUTED** – Mr. Suhy does not control or run the GFI website or GFI Github repositories.  He is one of many volunteer open source committers on the team.<br><br>Beene Dec. Ex 30, Brady Nussbaum Deposition, 40:7-16, 42:9-14, 44:6-8, 78:19-24<br><br>The CMI is not (its) Neo4J Sweden's CMI. The copyright to the AGPL is owned by FSF. Neo4J Sweden's violation of FSF's copyright means the CMI was false in violation of the DMCA. Suhy corrected that violation with the removal of the commons clause. See |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | Fact 98. |
| | **Additional Fact**: On July 9, 2018, Suhy offered a sponsor of GFI an "explain[ation] why [GFI] was created and **how we package Neo4j Enterprise (We call ONgDB) distributions that are being adopted at IRS** and most likely DHS as they are already using the open source distributions we packaged before we assigned them to [GFI]." Dkt. No. 98-1, ¶ 26 and Ex. 24 (emphasis added). GFI also confirmed Suhy was involved in the initial development of ONgDB, including making commits and developing solutions for that software.  Ratinoff Reply Decl., Ex. B at 82:20-25. | |
| | **Fact 20:** Suhy provided hyperlinks to potential users of Neo4j® EE to download ONgDB from GFI's website and GitHub repository from his jmsuhy@purethink.com email account. Dkt. No. 98-1, Ex. 26 ("I manage the Neo4j Enterprise open source distributions used by the Treasury, DHS, etc. [] Our open-source fork we manage can be found at https://graphfoundation.org"); Ex. 40 ("I just wanted to let you know that for ONgDB 3.5 - we merged the build framework and enterprise code back into the code repository like it used to be before Neo started stripping it out. [] See: https://github.com/GraphFoundation/ongdb"); Ex. 41 (landing page for https://github.com/graphfoundation/ongdb); Ex. 45 (emailing hyperlink to https://graphfoundation.org/ongdb/); Dkt. No. 98-1, ¶¶ 43, 60 and Exs. 41, 58 (landing page for https://github.com/graphfoundation/ongdb). | UNDISPUTED that Mr. Suhy provided hyperlinks references for users of the website to view the source code and download distributions.   These links sent the users who clicked on them to the GFI website, which Mr. Suhy has no official role, has no control over, and whom is just one of the many volunteer committers who volunteers time to make the software better for the open source community.<br><br>Note: Dkt. No. 98-1, Ex. 26 shows date of 08/28/2018<br><br>The code still had commons as of Nov 2019.<br><br>See Suhy Decl.,  Exs. 1-4 |
| | **Fact 21:** Suhy also provided hyperlinks to potential users of Neo4j® EE to download ONgDB from GFI's website and GitHub repository from his jmsuhy@igovsol.com email account.  Dkt. No. 98-1, ¶ 43 and Ex. 41 (landing page for https://github.com/graphfoundation/ongdb); *id*., ¶ 59 and Ex. 57 (GFI webpage https://github.com/graphfoundation/ongdb), Exs. 44, 46, 54, 76-77 (emails with hyperlinks); Ratinoff Decl., Ex. 70 (email with hyperlink to https://graphfoundation.org/ongdb/).  He also tweeted and retweeted links to GFI's ONgDB webpage. Dkt. No. 98-1, Exs. 98-100, 102-104 (tweets); Exs. 105-111 (retweets). | UNDISPUTED – see Fact 20 above. |
| | **Fact 22:** iGov's website provided links to potential users of Neo4j® EE to download ONgDB directly from iGov and from GFI's website.  Dkt. No. 98-1, ¶¶ 65-72 and Exs. 63-70; Dkt. No. 98-2, ¶ 27. | UNDISPUTED – it should be noted that all the downloads from GFI and from the mirror site I setup on iGov's website had the commons clause in the AGPL |

4853-5930-0200.2

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | license files. |
| | **Fact 23:** iGov used a "Download Neo4j Enterprise" hyperlink on its "downloads" page to redirect consumers to download links for ONgDB until July 27, 2020. Dkt. No. 118 at 27:12-28:1; Dkt. No. 98-1, Exs. 66-68 (highlighted in red); *id.,* Ex. 13 at RFA Nos. 10, 14. | UNDISPUTED that the hyperlink was on the iGov downloads page. It was a mistake and should have said "Download ONgDB Enterprise". The link was fixed as soon as it was brought to Mr. Suhy's attention.<br><br>See Fact 22 above. |
| | **Fact 24:** On May 22, 2018, Suhy emailed the IRS telling them the addition of the Common Clause to the license for Neo4j® EE v3.4 was improper and sought to convince the IRS to move to an unrestricted version of Neo4j® EE 3.4. Ratinoff Decl., ¶ 31 and Ex. 29. The IRS did not obtain an independent legal opinion on Suhy's representations regarding the alleged impropriety of adding commercial restrictions to the AGPL. *Id.,* Ex. 4 at 96:6-98:21.<br><br>**Additional Fact:** Defendants admit, "the AGPL with the commons clause … prohibited the non-paying public from engaging in commercial resale and support services." *See* Facts 4-5. The word "unrestricted" also means "freely available for use …." https://www.merriam-webster.com/thesaurus/unrestricted. | DISPUTED the reference in Ratinoff Decl., ¶ 31 and Ex. 29.<br>Does not mention anything related to trying to get IRS to move to an "unrestricted" version. Furthermore, Plaintiffs have never shown Mr. Suhy ever used the terms "unrestricted" or "restrictions" in describing the AGPL license without the commons clause.<br><br>Mr. Suhy has only used the word "restriction" in only 2 scenarios. 1. when explaining that the commercial license adds restrictions, and 2. around physical restrictions of software itself relating to number of cores, instances, or other physical attributes of Neo4j Enterprise.<br><br>See: Dkt. No. 98-1, Exs. 68,75<br>"no limitations on causal cluster instances, cores, or production usage."<br><br>Dkt. No. 98-1, ¶¶ 45 and Ex. 43<br>"ONgDB takes Neo4j core (which is open source) and adds enterprise features into it, all 100% free and open, with no limits on cores or cluster instances that 'commercial subscriptions' impose."<br><br>Further, the commons clause does not prevent IRS from using Neo4j v3.4 in production. Mr. Suhy stated this in the email. |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | "Again this does not effect IRS in any way, even if the term was enforceable." See Ratinoff Decl., ¶ 31 and Ex. 29.<br><br>The email referenced in Ex. 29 above, was sent May 22nd, 2018.<br>At this date, even the AGPL license files had the references to the commons clause.<br><br>See Suhy Decl., Exs. 1-4,9 |
| | **Fact 25:** On May 24, 2018, the IRS awarded another entity that Suhy had an ownership interest in at the time, eGovernment Solutions ("eGov Sol"), a contract for the development and support of the CDW Knowledge Graph Environment ("CKGE"), which used open source Neo4j® EE software as a main component. Ratinoff Decl., ¶¶ 30, 32 and Exs. 28, 30; *id.*, Ex. 4 at 71:2-74:21, 75:14-76:14, 77:7-78:16, 85:3-18, 126:5-127:15; *id.*, Ex. 3 at 47:14-50:8, 50:14-54:3.<br><br>**Additional Fact:** Prior to the award of the CKGE Contract, Suhy sent an email to the IRS stating, "[t]he current CKGE environment will require any potential vendor to provide 2 critical components 1) The Government Package / Suite for Neo4j and 2) professional services for continued development." Ratinoff Decl., ¶ 32 and Ex. 30 (yellow highlight). | UNDISPUTED that IRS awarded eGovernment Solutions a contract to develop and support the CDW Knowledge Graph ("CKGE") environment which used an open source Neo4j software.<br><br>DISPUTED that Neo4j was a main component in the platform. It was in fact just one small component of one service that made up the complex platform.<br><br>The SOW for the CKGE project does not have anything referencing Neo4j EE as a component, let alone the main component of CKGE.<br><br>"The CKGE framework includes a graph database: elastic search capabilities; java-script based, user-interface; and microservices components."<br><br>The only time the word Neo4j was mentioned was under the "skills section" of the SOW. (underlined below)<br>"The vendor will need to work with the following components: React, Angularjs, Neo4j, JAVA, micro-services architecture, and Hadoop/Spark, Elastic Search, Kafta, Agile methodology, GitLab, and Plottable."<br>See Suhy Decl., Ex. 11 |

4853-5930-0200.2

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | See Suhy Decl., ¶ 5. |
| | **Fact 26:** Before the IRS awarded the CKGE contract to eGov Sol, Suhy made clear that he would be performing the work through iGov. *See* Ratinoff Decl., Ex. 4 at 61:11-64:23, 72:2-74:21, 75:14-76:14, 77:7-78:11, 85:3-18; *id*, Ex. 3 at 30:8-31:21, 32:9-37:14, 50:14-54:3; *id., Ex. 2* at 188:10-193:25; *id.,* ¶ 30 and Ex. 28. | |
| | **Fact 27:** eGov Sol viewed the CKGE contract as belonging to Suhy to which he had sole responsibility for and control over. Ratinoff Decl., Ex. 3 at 30:8-32:23, 34:1-37:14, 50:14-51:20; *id.,* ¶ 37 and Ex. 35 at §§ 5, 5.1, 5.2 and 5.3.<br><br>**Additional Fact:** Consistent with the testimony of eGov Sol, Section 5.2 of the stock purchase agreement cited by Defendants states "eGovernment Solutions Inc will give John Mark Suhy the authority to drive the direction of the project (Section 5) and is given the authority to enter into agreements on behalf of eGovernment Solutions relating to this project…." *Compare* Ratinoff Decl., Ex. 35 at §5.2 *and id.,* Ex. 3 at 30:8-32:23, 34:1-37:14, 50:14-51:20. | DISPUTED: The stock purchase agreement between Mr. Suhy and eGovernment Solutions does not state anywhere that Mr. Suhy has the sole responsibility or sole control. The stock purchase agreement gave Mr. Suhy the authority to drive the direction, but not absolute control.<br><br>"5.1 eGovernment Solutions Inc hereby hires John Mark Suhy as an Independent Contractor for all option years that are exercised on the CKGE contract. His compensation will be $200,000 per year paid when eGovernment Solutions gets paid…"<br><br>"5.2 eGovernment Solutions Inc will give John Mark Suhy the authority to drive the direction of the project (Section 5) and is given the authority to enter into agreements on behalf of eGovernment Solutions Inc relating to this project as long as the agreements are in line with government contracting laws and hubzone regulations."<br><br>See Ratinoff Decl., ¶ 37 and Ex. 35 |
| | **Fact 28:** The IRS paid a total of $1,316,000 to eGov Sol under the CKGE contract, which in turn eGov paid to Suhy and iGov. Ratinoff Decl., Ex. 3 at 54:10-59:5, 59:18-62:3, 63:13-65:25, 67:7-69:11, 69:16-70:19, 71:17-79:12; *id.*, ¶¶ 38-44 and Exs. 36-42. | UNDISPUTED that IRS paid a total of $1,316,000 to eGovernment Solutions under the CKGE contract.<br><br>DISPUTED that eGovernment Solutions turned around and paid that amount to Mr. Suhy and/or iGov Inc. |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | eGovernment Solutions paid a $200,000 to support the CKGE contract, act as the official facility clearance officer for eGovernment Solutions because Mr. Suhy had an active clearance, and help with business development.  See Fact 27 and Ratinoff Decl., ¶ 37 and Ex. 35<br><br>Over $251,450 of the revenue from IRS did not go to Mr. Suhy in any manner.<br><br>The total payments made to iGov Inc were $1,064,550.00<br><br>See Suhy Decl., ¶¶ 6,7 |
| | **Fact 29:** Suhy was entitled to all the payments eGov Sol received from the IRS on the CKGE contract.  Ratinoff Decl., Ex. 3 at 30:13-32:25, 36:15-37:14, 39:18-40:18, 42:14-19, 50:14-54:3, 71:17-79:12, 81:6-82:17; *id.*, ¶ 44 and Ex. 42.<br><br>**Additional Fact:** eGov Sol confirmed that Suhy was entitled to the $200,000 payments referenced in Section 5.1 of the stock purchase agreement, which reflected the option year payments made by the IRS under the CKGE Contact.  Dkt. No. 183, Ex. 3 at 31:7-32:21, 34:1-37:14, 50:14-53:4. | **DISPUTED** that Mr. Suhy was entitled to all payments eGov Sol received from the IRS on the CKGE contract. See Facts 27-28, See Suhy Decl., ¶¶ 6,7<br><br>"**5.1 eGovernment Solutions Inc hereby hires John Mark Suhy as an Independent Contractor for all option years that are exercised on the CKGE contract. His compensation will be $200,000 per year paid when eGovernment Solutions gets paid. eGovernment Solutions will not be liable to pay John Mark Suhy for any work done on this contract in the event they donot get paid from the client. If the payment for the project is received all at once, then John Mark Suhy will also be paid his total salary for the option year up front, otherwise salary will be paid as eGovernment Solutions Inc get paid by the Treasury.**"<br><br>See Ratinoff Decl., ¶ 37 and Ex. 35 |
| | **Fact 30:** eGov Sol maintained a bank account for all the payments received from the IRS, which Suhy had access to and was authorized to disburse the payments made by the IRS as he saw fit.  Ratinoff Decl., Ex. 3 at 42:14-19, 62:1-63:12, 66:1-15. | **UNDISPUTED** that eGovernment Solutions had a bank account that received payments from clients including IRS. Mr. Suhy had access to the account because it had not been |

13

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | removed when he sold his shares. Mr. Suhy just happened to still have checks and helped out of convenience since there was a bank branch near his home.<br><br>**DISPUTED** Mr. Suhy was not authorized to disburse the payments made by the IRS as he saw fit. He had to request permission anytime he wanted to write a check for his salary.<br><br>See Facts 27-29<br>See Ratinoff Decl., ¶ 37 and Ex. 35 |
| | **Fact 31:** In July 2018, a sales representative from Neo4j USA met with the IRS and then provided a one-year $156,000 quote for a Neo4j® EE v3.4 subscription on then-current requirements of CKGE. Ratinoff Decl., ¶ 34 and Ex. 32; *id.*, Ex. 4 at 113:5-115:20, 116:5-117:21. | **DISPUTED** that CKGE had any requirement for Neo4j EE at all.<br><br>Otherwise **UNDISPUTED** that a sales representative from Neo4j USA met with IRS and provided the quote mentioned. |
| | **Fact 32:** As of August 2018, the IRS understood that Neo4j® CE had a performance limitations, while Neo4j® EE had enterprise-only features, came with professional services and subscriptions. The IRS ultimately decided to not allocate $156,000 for a license for Neo4j® EE because ONgDB was a free unrestricted alternative. Ratinoff Decl., Ex. 4 at 103:2-104:12, 121:18-124:4, 126:5-129:25, 130:9-132:1. | **DISPUTED.** Plaintiff's do not provide any evidence citing a "reason"" to why IRS did not allocate money for a Neo4j EE license. See Fact 24.<br><br>**UNDISPUTED** that Neo4j EE had enterprise only features compared to Neo4j CE, and that the Neo4j EE commercial license came with support.<br><br>Zagalsky of Neo4J USA misrepresented a Fare Trade Licensing document as applying to the AGPL code on 4-4-2017 before the IRS to decline to do business with Neo4J USA. There is no obligation under the AGPL to make a project open when using AGPL licensed software. AGPL §2, Suhy Dec. Ex 22.<br><br>There is no evidence the IRS conveyed its copy of Neo4J software used under the terms of the AGPL and had no obligation to provide the source code to any licensee. AGPL §2. |
| | **Fact 33:** In August 2018, Suhy convinced the IRS integrate ONgDB v3.4 rather than Neo4j® EE v3.4 into the CKGE platform based, in part, on | **DISPUTED** |

4853-5930-0200.2

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | misrepresentations about GFI being the copyright holder and licensor of ONgDB. Ratinoff Decl., Ex. 4 at 126:5-129:25, 132:2-23, 133:15-138:2, 138:22-140:20, 141:8-24, 142:15-143:20; *id.*, ¶¶ 35-36 and Exs. 33-34.<br><br>**Additional Fact:** The testimony cited by Defendants is consistent with the foregoing. On August 13, 2018, Suhy sent an email to the IRS stating "ONgDB open source licenses come directly from the Graph Foundation as well, not from Neo4j Inc…." Ratinoff Decl., ¶35 and Ex. 33. Mr. Dunn confirmed the IRS understood from this email and conversations with Suhy that GFI added the source code for the enterprise features to Neo4j® CE (core) to create ONgDB and the open source license for those features came from GFI. Ratinoff Decl., Ex. 4 at 132:2-19, 133:15-137:6. | Mr. Suhy never claimed GFI was the copyright holder. The only place in Ex. 4 that even mentions the word "copyright" shows that IRS knew the copyright holder was Neo4j.<br><br>**"Q. So the Neo4j source code, Neo4j would own the copyright to that. Correct?**<br>**A. Yes. I would assume it would be available based on whatever Neo4j allowed it to be used from."** Ratinoff Decl., Ex. 4 at 130:1-4<br><br>IRS was not even sure about who the license came from, and did not associate the license to be anything related to copyright.<br><br>**"A. My understanding it was not the Enterprise. It was the core source code from GitLab, Neo4j's GitLab, whatever that licensing was of that core source code brought over, and then the additional elements, whatever elements ONgDB, The Graph Foundation added onto that. That's how I understood from my point of view who was -- who was distributing and licensing it and the follow-through from whatever the licensing was of the Neo4j core that was off of GitLab. That's how I understood it."** Ratinoff Decl., Ex. 4 at 135:14-23<br><br>The source code for v3.4 clearly stated that Neo4j Sweden was the copyright holder.<br><br>"Neo4j Copyright © 2002-2018 Neo4j Sweden AB (referred to in this notice as "Neo4j") [http://neo4j.com]<br>This product includes software ("Software") developed and owned by Neo4j." Suhy Decl., and Ex. 3<br><br>See also Suhy Decl., Exs. 1-4 |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | There is no evidence that shows that IRS was convinced by Mr. Suhy. <br><br> See Fact 24 <br><br> There is no evidence the IRS conveyed its copy of Neo4J software used under the terms of the AGPL and had no obligation to provide the source code to any licensee.  AGPL §2. |
| | **Fact 34:** While working under the CKGE contract, Suhy and iGov were responsible for supporting, maintaining and updating ONgDB on an internal repository at the IRS.  Dkt. No. 98-1, Ex. 38 at 23:14-24:4; Ratinoff Decl., Ex. 3 at 366:13-368:9; *id.,* Ex. 4 at 75:14-77:24, 126:5-128:24, 142:15-143:20, 179:4-23, 204:4-206:9, 207:10-209:11; *id.,* ¶ 36 and Ex. 34; *id.,* ¶ 47 and Ex. 45 (yellow highlights). | **DISPUTED** Suhy and iGov were NOT responsible for supporting, maintaining, and updating ONgDB on the internal repository. <br><br> The Statement of Work for the CKGE project had no requirement to support, maintain or update ONgDB.  See Suhy Decl., Ex. 11 <br><br> Mr. Suhy helped IRS with technologies on his own time and not as part of any paid consulting.  Mr. Suhy also assisted with other technologies that he had expertise around when time permitted. <br><br> Mr. Suhy simply helped IRS get the source code into the IRS internal repository so that IRS could perform security scanning outside any contractual obligation between IRS and eGovernment Solutions Inc.  This happened around the time that a serious Log4j Vulnerability was found to exist in Neo4j. <br><br> There is no evidence the IRS conveyed its copy of Neo4J software used under the terms of the AGPL and had no obligation to provide the source code to any licensee.  AGPL §2. |
| | **Fact 35:** Suhy and iGov helped the IRS upgrade the CKGE platform to ONgDB v3.5 and continued to integrate subsequent subversions through at least April 2022.  Dkt. No. 98-1, Ex. 3 at 224:13-23; Ratinoff Decl., Ex. 4 at 207:7-209:15, 210:5-211:20, 213:1-216:8; *id.,* ¶¶ 45-49 and Exs. 43-47 (yellow highlights). | **DISPUTED**  The CKGE platform does not require upgrades to use specific graph databases. <br><br> The CKGE platform is suite of micro-services, many of which have nothing to do with graphs. The only service that |

16

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | end-users used which even touched the graph was called the graph explorer.  It provides a way to explore graph structure through visualization.  It is not dependent on any specific underlying graph database and does not require any sort of upgrade to switch between backend graph and non-graph databases.

See also Fact 34.

There is no evidence the IRS conveyed its copy of Neo4J software used under the terms of the AGPL and had no obligation to provide the source code to any licensee.  AGPL §2. |
| | **Fact 36:** After April 2022, the IRS started calling ONgDB just "GDB," which still used Neo4j® EE 3.5 source code improperly licensed under the AGPL, which Suhy compiled on the IRS's internal GitLab repository. Ratinoff Decl., Ex. 4 at 175:6-176:21, 193:9-198:15.

**Additional Fact:** The IRS confirmed what it calls "GDB" was licensed under the AGPL without the Commons Clause, which was compiled from Neo4j® EE 3.5 source code by Suhy.  Ratinoff Decl., Ex. 4 at 195:2-198:15; Fact 14, *supra*.  Specifically, Mr. Dunn testified:

> **Q.** So you're saying that -- okay. So you're saying that for in 2022 that the version of ONgDB that was being run on the servers showed up as being Neo4j source code version 3.5.2.6? Is that fair?
> **A.** Yes. Yes. [] But your main point there is what I understand when I talked with Puru, and he looked at the code base of the graph database, and it's referred to as Neo4j 3.5, and if it's 2.6, that's what it would be. Does that make sense?

> **Q.** Yeah. I think so. And you said the different name. So from the IRS's perspective, the program is the same, it's just the names have changed from ONgDB to GDB. Is that correct?
> **A.** Yeah.

Ratinoff Decl., Ex. 4 at 195:2-13

> **Q.** So where did that Neo4j source code that is now maintained | **DISPUTED.**  There is not any ONgDB, GDB, Neo4j, or other source code based on Neo4j in use at IRS which is "improperly licensed".  All the source code within IRS clearly states that the license is AGPL + Commons.   Plaintiff has provided no evidence to the contrary.

See Suhy Decl., ¶ 9

**"Q.  I didn't get -- I didn't quite follow that. I apologize.  To clarify, so you understood -- so you understood that the license that ONgDB was under was the AGPL version 3 but with the Commons Clause removed by Mr. Suhy?**

 **A.  Yeah.  I don't -- I don't remember if he removed it.  I don't remember it being discussed.  I just remember the description of taking the core source code from GitLab, compiling it, and then, as we discussed, adding the additional capabilities that would be the ONgDB release.**

**So I can't remember the Commons Clause being part of the discussion.  I can't remember if he said that he** |

4853-5930-0200.2

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | internally come from?<br>**A.** John Mark Suhy.<br><br>**Q.** And to your knowledge, what license is that source code under? Is it under the AGPL?<br>**A.** As far as I know. Yeah. I haven't been informed of any other requirements.<br><br>**Q.** And it's not under the AGPL clause comm[ons]?<br>**A.** I'm not -- as far as I know, no.<br><br>*Id.*, Ex. 4 at 198:5-13 | took it out or what, but I can't say that. Yeah. I just can't say that. In my mind, I'm tracing it from the GitLab source code, whatever that licensing was, and then released by ONgDB under their licensing."<br>Ratinoff Decl., Ex. 4 at 133:14-134:6<br><br>**UNDISPUTED** that IRS started calling ONgDB just "GDB,"<br><br>**DISPUTED** that the graph used Neo4j EE 3.5 source code, as Neo4j did not release the enterprise source code for v3.5 after the pre-releases. |
| | Fact 37: Between August 2018 and April 2022, they facilitated the use of four instances of ONgDB on at least three servers within the CKGE platform (a/k/a "main graph") environment. Ratinoff Decl., Ex. 4 at 152:21-156:16, 157:23-158:11, 161:23-163:4, 166:19-167:4, 168:24-172:10, 174:19-175:5, 179:13-23. | **DISPUTED** that Mr. Suhy or iGov Inc facilitated the use of four instances of ONgDB. Mr. Suhy gave guidance on the servers needed for the entire CKGE stack, which the graph database was not the main piece of. Furthermore, the references Plaintiff give show that the person being deposed was not sure of the number of ONgDB instances, and was guessing.<br><br>There is no evidence the IRS conveyed its copy of Neo4J software used under the terms of the AGPL and had no obligation to provide the source code to any licensee. AGPL §2. |
| | Fact 38: iGov operated www.graphstack.io to further promote ONgDB over Neo4j® EE and allowed consumers to directly download ONgDB without any restrictions. *See* Dkt. No. 98-1, ¶ 77 and Ex. 75 ("iGov Inc is the company behind GraphStack" and that "iGov Inc offers production support packages for Neo4j / ONgDB Enterprise open source distributions for US government agencies"); *id.*, Ex. 13 (RFA No. 40); *see also* Ratinoff Decl., ¶¶ 50-54 and Exs. 48-52. | **DISPUTED** www.graphstack.io was not operated just to promote ONgDB over Neo4j EE. The website promoted a stack of tools that abstracted out knowledge graphs from the underlying implementation.<br><br>The term "restrictions" mentioned are in the context of physical restrictions and have nothing to do with license restrictions.<br><br>*See* Dkt. No. 98-1, ¶ 77 and Ex. 75<br>"Open Native Graph DB (ONgDB) is a non-restrictive fork of Neo4j managed by the Non profit Graph Foundation. ONgDB is 100% free and open, and **there are no limitations** |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | on instances in clusters, cores, etc!" <br><br> "What is GraphStack? <br> **GraphStack is a development suite that allows teams to build large scale graph apps.**" <br><br> See also Fact 24. |
| 3. Defendants had reason to know that their actions would induce, enable, facilitate, or conceal copyright infringement | <u>Fact 39:</u> Defendants knew or had reasonable grounds to know that they could not replace the Neo4j Sweden Software License with the AGPL without Neo4j Sweden's authorization. *See* Ratinoff Decl., Ex. 1 at 178:17-179:8, 186:5-184:10.  This is further evidenced by their failure to seek competent legal advice, and reliance on Suhy's unqualified analysis of the provisions of the AGPL and "internet research" that he admitted was inconclusive. *Id.* at 196:22-201:16. <br><br> <u>**Additional Fact:**</u> Suhy did not seek legal advice concerning whether he could remove the Commons Clause from the Neo4j Sweden Software License.  *See* Facts 40-42. GFI also did not obtain a legal opinion on whether it could remove the Commons Clause as "further restriction" from the Neo4j Sweden Software License before GFI and Suhy replaced the Neo4j Sweden Software License with the AGPL in ONgDB.  Ratinoff Reply Decl., Ex. B at 117:8-118:11; *id.,* Ex. C at 288:14-24. | **DISPUTED** defendants only created a commit to make the AGPL LICENSE.txt files verbatim as instructed in the AGPL preamble  by the copyright holder,  the free software foundation.  Suhy Dec., Ex. 6 <br><br> The commit message shows the intent. <br><br> Furthermore, the defendants did not replace anything called "Neo4j Sweden Software License".  The license has always been called the AGPL, even when the commons clause was appended to it. <br><br> Mr. Suhy was speaking of the files owned by the FSF only. <br><br> Mr. Nussbaum from the Graph Foundation did get independent legal guidance which was communicated to Mr. Suhy as well. <br><br> **"We have been advised by The Free Software Foundation in a non-legal capacity and have verified with our legal counsel independently that the Commons Clause is a "further restriction" to AGPLv3 and may be removed according to this clause of AGPLv3".** See also Suhy Decl.,  Ex. 12 |
| | <u>Fact 40:</u> Suhy participated in a discussion thread on Plaintiffs' GitHub repository in May 2018 where a person claiming to represent Neo4j told him that his interpretation of Section 7 was wrong for reasons similar to those found by this Court. Dkt. No. 98-1, ¶ 119 and Ex. 117; Ratinoff Decl., Ex. 1 at 201:18-205:16.  Suhy "didn't have time to go and dive into it" and chose not to seek legal advice concerning those views despite not understanding Plaintiffs' legal position on the interpretation of the AGPL. | **UNDISPUTED** that Mr. Suhy participated in a discussion thread on Plaintiffs' Github repository in May 2018. <br><br> DISPUTED that Mr. Suhy chose not to seek legal advice concerning those views.  The Graph Foundation did get independent legal advice and communicated that to Mr. |

19

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | Ratinoff Decl., Ex. 1 at 205:17-206:11. | Suhy.<br><br>Furthermore, Mr. Suhy did do quite a bit of due diligence which is one of the reasons that he only followed the instructions in the files that specifically stated they were copyrighted to the free software foundation. |
| | **Fact 41:** When Suhy sought guidance from the FSF on the removal of the Commons Clause, the FSF told him "[t]he copyright holder on a work is the one with the power to enforce the terms of the license" and "[i]f a work was previously available under a free license, and later that license is changed, users can always use that earlier version under the terms of the free license." Dkt. No. 98-1, ¶ 36 and Ex. 34 (yellow highlights). The FSF also warned that "we cannot provide you with legal advice" and that he should "talk with legal counsel." *Id.* | UNDISPUTED the free software foundation gave the guidance which Mr. Suhy followed. |
| | **Fact 42:** Suhy ignored the FSF's admonitions, and did not consult an attorney before removing the Commons Clause. Ratinoff Decl., Ex. 1 at 183:2-184:9, 187:12-188:15, 189:1-191:3, 192:18-193:24, 196:22-24. | **DISPUTED** Mr. Suhy did not remove the commons clause from Neo4j. In March 2019, he only made the AGPL License file verbatim as the copyright holder of the file, the free software foundation, instructed in the preamble.  The commons clause was still present in all NOTICE provisions and source code headers.<br><br>See also Fact 14 |
| | **Fact 43:** Suhy understood that the Common Clause imposed commercial restrictions on the use of Neo4j® EE.  Dkt. No. 98-1, ¶ 27 and Ex. 25 ("[Neo4j Sweden] tried adding a 'commons clause' to the AGPL license, trying to precent [sic] companies from selling (and competing against them on procurements)"); *id.,* ¶ 31 and Ex. 29 ("People can pay money for a restrictive commercial license, or use Neo4j Enterprise for free under it's open source license"); *id.,* ¶¶ 44-45; Exs. 42-43 (yellow highlights); Ratinoff Decl., Ex. 1 at 154:22-156:1. | **DISPUTED** Mr. Suhy did not use the term "commercial restrictions" in relationship to the commons clause.  Mr. Suhy knew that the commons clause forbid re-selling, but was unsure about the rest as the language of the commons clause did not define what "support services" was exactly. |
| | **Additional Fact:** Defendants admit that "the AGPL with the commons clause … prohibited the non-paying public from engaging in commercial resale and support services." *See* UDF Nos. 4-5. | |
| | **Fact 44:** Suhy removed the Commons Clause to induce end-users to use ONgDB in commercial applications for free and then use the cost savings to pay Defendants to provide support services to those users.  Dkt. No. | **DISPUTED**  Mr. Suhy removed the commons clause from only the AGPL License files and gave the reason for the removal clearly in the commit message.  The commons |

20

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | 98-1, ¶ 31 and Ex. 29; *id.,* ¶¶ 64-68 and Exs. 62-66; *id.,* ¶ 128 and Ex. 126; *see also* Dkt. No. 118 at 5:24-6:1, 6:11-7:5, 29:4-11; Dkt. No. 98-1, ¶¶ 44-45, 49 and Exs. 42-43, 47; *id.,* ¶ 49 and Ex. 47; *id.,* ¶ 56 and Ex. 54; *id.,* ¶¶ 128 and Ex. 126; *id.,* ¶¶ 132-134 and Exs. 130-132.<br><br>**Additional Fact:** The cited source code headers and NOTICE.txt files do not contain the Commons Clause. Rather, they merely direct a user to the LICENSE.txt, which originally contained the Commons Clause prior Suhy's removal thereof. *See* Suhy Decl., ¶¶ 18-19, 22-23 and Exs. 3-4, 7-8; *see also* Facts 14-15. Defendants further admit that the Commons Clause "prohibited the non-paying public from engaging in commercial resale and support services." *See* Facts 4-5, *supra.* | clause was not removed from the NOTICE provision (NOTICE.txt) or any source code files. See Fact 14.<br><br>Mr. Suhy's commit message which is used to explain why a commit / change was made states: "**Updated the LICENSE.txt file to be pure AGPL as to not violate the fsf copyright and to be in line with the AGPL license.**" See Suhy Decl., Ex. 9<br><br>Furthermore, the commons clause did not prevent end-users from using Neo4j EE for free in commercial applications or elsewhere. Plain |
| | **Fact 45:** Defendants used the IRS's adoption of ONgDB to encourage other government agencies and contractors to do the same and pay them for support services. Dkt. No. 98-1, ¶¶ 26, 44-49 and Exs. 24, 42-47.<br><br>**Additional Fact:** iGov, AtomRain and GraphGrid worked together to provide paid support services to users of ONgDB, as confirmed by Suhy:<br><br>Once you are supporting Airforce with Neo4j, then there is a large potential for custom software development services. Since Neo4j partners are usually forbidden from using Neo4j under it's open source license - this puts you in a very unique position for anyone who wants custom Neo4j development. We could support you on all development tasks, and bring past performance from our other federal Neo4j projects.<br>* * *<br>Our team: iGov Inc, GraphGrid (https://graphgrid.com), and AtomRain (https://atomrain.com). We work together as one company."<br><br>Dkt. No. 98-1, Ex. 29. | UNDISPUTED that defendants referenced IRS's adoption.<br><br>DISPUTED – that defendants did this in order for agencies and contractors to pay defendants.<br><br>In all the references given by plaintiff for Fact 46, only one was related to trying to get paid, and it was for a package of software. "**Neo4J Server including the Graphsware PHP-Neo4J Client (Guzzlehttp, Heoku, Myclabs, Pimple, Psr, Silex, Symfony, and Composer**"<br>Dkt. No. 98-1, ¶ 44 and Ex. 42<br><br>Not only did defendants not encourage agencies or contractors to pay them, they told them they could find companies with past performance such as AtomRain and GraphGrid.<br><br>"**Usually which one you go with falls to the cost of production support. From a past performance perspective, the open source distributions are actually in production in the Federal government and there are companies such as us , AtomRain, GraphGrid, etc all have past performance providing production support for federal agencies for Neo4j Enterprise open source licenses.**" Dkt. No. 98-1, ¶ 49 and Ex. 47 |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | Furthermore, Defendants were promoting the open and free nature of ONgDB.<br><br>"**I wanted to make sure you knew that you can use Neo4j Enterprise AGPL distributions at no cost, and with no limitations.**" Dkt. No. 98-1, ¶ 47 and Ex. 45<br><br>"**1. You do not have to pay any licensing fees for the software you requested. Neo4j Enterprise < 3.5 and ONgDB (Open Native Graph Database) Enterprise (all versions) are available to use 100% free, in production.**" Dkt. No. 98-1, ¶ 45 and Ex. 43 |
| | <u>Fact 46:</u> Suhy also convinced another company, Greystones Consulting Group, LLC ("Greystones"), to implement ONgDB in an analytics platform branded by Greystones as "GreyRaven" and worked with them to solicit government agencies.  Ratinoff Decl., ¶¶ 55-60 and Exs. 53-58. | **DISPUTED**  None of the evidence provided by plaintiff relating to this fact suggest that Mr. Suhy convinced Greystones Consulting Group, LLC to implement ONgDB. |
| | **Additional Fact:** Suhy worked with Greystone in marketing "GreyRaven" and ONgDB to the U.S. Army.  *See* Ratinoff Decl., ¶¶ 56-59 and Exs. 54-57. | |
| | <u>Fact 47:</u> The United States Air Force awarded Greystones two SBIR contracts based on its GreyRaven platform, which Greystones touted as being based on ONgDB.  Ratinoff Decl., ¶¶ 61-62 and Exs. 59-60.<br><br>**Additional Fact:** Suhy told the U.S. Army that Greystones was "working with Neo4j / ONgDB open source distributions" and Greystones confirmed, "Our GreyRAVEN platform is based on ONgDB." Ratinoff Decl., ¶¶ 58-59 and Exs. 56-57. | **UNDISPUTED**<br>Note however that GreyRaven was not based on ONgDB.<br><br>This was a marketing mistake and the website was updated once it was brought to GreyStone's attention. |
| | <u>Fact 48:</u> The Maryland Procurement Office (a/k/a the National Security Agency, the NSA and the MPO) tasked Next Century to analyze available graph database technologies, including Neo4j® EE.  Ratinoff Decl., Ex. 5 at 19:5-20:8, 28:10-31:21. | **UNDISPUTED** |
| | <u>Fact 49:</u> After the release of ONgDB v3.4, Suhy told Next Century that the MPO could use ONgDB under the AGPL without restrictions or paying Plaintiffs for a commercial license, as advertised on the iGov's | **DISPUTED** as this mischaracterizes the evidence,  there were no restrictions on the number of cluster instances and cores, however the Software resticted under the AGPL |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | website. Ratinoff Decl., Ex. 5 at 35:7-37:3, 40:3-42:3, 42:16-48:22, 49:9-51:14, 51:23-25, 54:7-56:21, 57:18-62:12; *id.*, ¶¶ 63-66 and Exs. 61-63; *see also* Dkt. No. 98-1, ¶¶ 49 and Ex. 47. | license terms. Dkt. No. 98-1, ¶¶ 64 and Ex. 62; **"Are you aware that, unlike the commercial licensed options, the Neo4j Enterprise open source AGPL license does not place any restrictions on the number of cluster instances and cores?"** |
| | **Fact 50:** Suhy confirmed that ONgDB v3.5 had the same closed enterprise features as Neo4j® EE v3.5, and Next Century could use it without restrictions or paying Neo4j for a commercial license. *See* Ratinoff Decl., Ex. 5 at 62:13-65:17; *id.*, ¶ 66 and Ex. 64. This led Next Century to upgrade to ONgDB v3.5. Dkt. No. 98-1, ¶ 122 and Ex. 120.<br><br>**Additional Fact:** Next Century informed Neo4j USA that open-sourced (non-commercial) ONgDB builds from the Neo4j® EE source code "provide the clustering and security requirements needed in our environment." Ratinoff Reply Decl., Ex. E; *see also id.*, Ex. F ("we're pursuing an open-source alternative (the same Neo4j source code but built and licensed separately) which bundles all the same features as the Neo4j enterprise version but without the costs"); *id.*, Ex. D at 65:18-67:21, 69:11-70:19, 73:21-74:3, 76:11-78:14, 80:10-83:9. | DISPUTED It is not known what led Next Century to upgrade to ONgDB v3.5.<br><br>There is nothing in the evidence provided by plaintiff that "restrictions" had anything to do with the commons clause. In fact Next Century mentions open source and free as being important to them, and this, for example, could have led to them upgrading to ONgDB v3.5<br><br>Dkt. No. 98-1, ¶¶ 64 and Ex. 62; **"Are you aware that, unlike the commercial licensed options, the Neo4j Enterprise open source AGPL license does not place any restrictions on the number of cluster instances and cores?"** |
| | **Fact 51:** As result of Defendants' removal of Neo4j Sweden's CMI and false statements about the same, Neo4j USA lost a multi-year $2.2 million deal when the MPO chose ONgDB instead of paying for a subscription to Neo4j® EE. Dkt. No. 118 at 29:19-30:6; Dkt. No. 98-3, ¶¶ 22-24 and Exs. 12-13.<br><br>**Additional Fact:** Next Century confirmed that the MPO chose ONgDB over Neo4j® EE based on not having to pay Neo4j USA for a license. Ratinoff Reply Decl., Ex. D at 80:10-83:9, 85:11-88:3, 107:5-108:1, 110:11-111:24. | DISPUTED Defendants did not remove any "Neo4j Sweden's CMI" nor made any false statements about the same. See Fact 14 above.<br><br>The commons clause does not prevent the MPO from using the software for free in their projects. Next Century stated that cost and being open source were 2 important criteria. There was another open source alternative to Neo4j called JanusGraph on the list of databases NextCentury was evaluating for the MPO.<br><br>No-where in the evidence provided by plaintiff does the MPO say they would have purchased Neo4j Enterprise if ONgDB was not available.<br><br>**"Q. And was this -- sorry. Strike that. What graph** |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | database technologies did Next Century consider for Task Order 39?<br><br>A. Several, including -- so there was -- Neo4j was one, Oracle was a second one, DataStax and <u>JanusGraph</u> were others that were the primary thrust. There were several others that I don't have the names of that -- that were also under initial consideration." See Ratinoff Decl., Ex. 5 at 29:19-30:1<br><br>"The analysis started with the teams reviewing  other implementations of graph database technologies at the NSA and in other -- other applications to assess the performance, the security, lessons learned, <u>and costs</u> of the wide range of initial technologies under consideration." See Ratinoff Decl., Ex. 5 at 31:16-21<br><br>"<br>Q. All right. And did the NSA provide any guidance on -- on pricing for the graph database software or the -- strike that. Were you provided any instructions from on pricing considerations for the graph database software that was being considered?<br>A. The NSA asked us to provide an analysis alternatives that <u>considered cost as one of the many factors</u>, and we were tasked to provide -- not provide -- <u>to consider cost as one of the factors</u>." See Ratinoff Decl., Ex. 5 at 44:9-18<br><br>"<br>A. An alternative to the Neo4j Enterprise solution.<br>Q. And how was it an alternative?<br>A. <u>Similar features, less cost.</u><br>Q. And when you say "less cost," there was no cost for a license to iGov's offering of Neo4j Enterprise, correct?<br>A.  Not to my knowledge.<br>" See Ratinoff Decl., Ex. 5 at 50:15-22 |

24

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | It was clear that government preferred free, no cost and open source licenses over paid.<br><br>"**A. Our government customer was interested in open-source technologies.**" See Ratinoff Decl., Ex. 5 at 56:10-11<br><br>Next Century was not even sure what the license ONgDB came under. Plaintiff's attorney had to guide the answer.<br><br>"     **Q.  And what license did Next Century understand that ONgDB was distributed under?**<br>     **A.  The -- (unintelligible.)**<br>        **THE REPORTER:  I'm sorry.  One more time?**<br>        **THE WITNESS:  GPLv3 license.**<br>        **BY MR. RATINOFF:**<br>     **Q.  AGPL Version 3; is that correct?**<br>     **A.  Yes.**" See Ratinoff Decl., Ex. 5 at 59:10-17<br><br>On Jan 2019, Mr. Suhy had not even replaced the AGPL License file with the verbatim version.   See Fact #14 above.<br><br>"     **Q.  So as of January 2019, had Next Century been using ONgDB to the exclusion of Neo4j Enterprise?**<br>     **A.  I don't know that it was to the exclusion of Neo4j.**<br>     **Q.  But at that time, Next Century hadn't obtained an commercial license for a copy of -- or an installation of Neo4j Enterprise, correct?**<br>**A. Correct.**" See Ratinoff Decl., Ex. 5 at 64:2-9<br><br>Suhy did not remove Neo4J Swedens' CMI. The CMI is FSF's copyrighted license. Neo4J was obligated to use only a compliant AGPL license and used false CMI instead. |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| **Defendants' Violation of the DMCA [17 U.S.C. § 1202(b)(3)]** | | |
| 1. the existence of CMI on the infringed work; | *See* Facts 1-9. | **DISPUTED** – See responses to Facts 1-9 |
| 2. Defendants distributing that material knew that CMI had been removed or altered without authority of the copyright owner; and | *See* Facts 10-18. | **DISPUTED** – See responses to facts 14, 10-18 Defendants never distributed any material that had modifications to Neo4j Sweden's CMI.  In fact – the mirror downloads provided by Defendants had the full commons in the LICENSE files of the distribution.   Other than the mirrors, defendants only shared links to GFI and were not aware of any wrong doing. |
| | **Additional Fact**:  Suhy testified that when he created ONgDB v3.4 from Neo4j® EE v3.4, he replaced the Neo4j Sweden Software License found in LICENSE.txt files with "verbatim" copies of the AGPL thereby removing Neo4j Sweden's CMI. Dkt. No. 98-1, Ex. 3 at 171:23-172:23; Ratinoff Decl., Ex. 1 at 199:14-201:16. This is consistent with contemporaneous statements Suhy made to potential customers. *See, e.g.,* Dkt. No. 98-1, ¶ 27 and Ex. 25 (Check out https://graphfoundation.org [] All the Neo4j enterprise distributions we package from now on will come from the foundation and have the standard vanilla AGPLv3 open source license"). This is also consistent with Plaintiffs' inspection of ONgDB v3.4 around the time of its release in 2018. Dkt. No. 98-2, ¶ 27. | |
| | **Additional Fact**: The commit to the GitHub repository for ONgDB v3.5 cited by Defendants shows that Suhy replaced 28 LICENSE.txt consisting of the Neo4j Sweden Software License with LICENSE.txt consisting of generic copies of the AGPL, which deleted all of Neo4j Sweden's CMI in those files.  Dkt. No. 98-1, ¶ 41 and Ex. 39 (3/1/19 commit titled "Updated the LICENSE.txt file to be pure AGPL as to not violate the fsf copyright and to be in line with the AGPL license"); Dkt. No. 98-2, ¶ 30 (referencing same commit that replaced the 28 LICENSE.txt files). | |
| 3. Defendants knew or had | *See* Facts 39-52. | |

26

SER_0985

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| reason to know that distributing works without CMI would "induce, enable, facilitate or conceal an infringement. | | |
| **Defendants' Unclean Hands Defense** | | |
| 1. Defendants cannot establish that Neo4j USA's conduct is inequitable; and | **Fact 52:** On July 11, 2017, Neo4j USA notified the IRS that it had terminated its partnership with PureThink, and advised the IRS that PureThink was contractually restricted from providing support services for open source versions of Neo4j® software for 36 months.  Ratinoff Decl., ¶ 24 and Ex. 22. | **UNDISPUTED** Note that the SOW for the contract work did not require support of any of the graphs the platform could explore. |
| | **Fact 53:** Despite Neo4j USA's warnings, the IRS continued to use Neo4j® EE for free under the AGPL and allowed Suhy to perform under PureThink's support contract.  Ratinoff Decl., Ex. 4 at 40:16-43:13; 55:10-59:24; 69:8-70:25, 78:5-16; *id.*, ¶ 27 and Ex. 25. | **UNDISPUTED.**  IRS was able to use Neo4j EE free both under the AGPL as well as under the AGPL with the commons clause.<br><br>Note that the PureThink SOW for the contract work did not require support of any of the graphs the platform could explore. |
| | **Fact 54:** Suhy specifically targeted the IRS to transition to iGov's Government Package for Neo4j, and as a result in late July 2017, the IRS invited iGov to provide a quote for a sole-source contract for the development and support of the CKGE, which used an open source version of Neo4j® EE software as a main component.  Dkt. No. 171, ¶ 23; Ratinoff Decl., ¶ 27 and Ex. 25; *id.*, ¶ 28 and Ex. 26 (blue highlights at IGOV0001570513.001–IGOV0001570513.002); *id.*, Ex. 4 at 71:1-73:4.<br><br>**Additional Fact:** Prior to the award of the CKGE Contract, Suhy sent an email to the IRS stating, "[t]he current CKGE environment will require any potential vendor to provide 2 critical components 1) The Government Package / Suite for Neo4j and 2) professional services for continued development."  Ratinoff Decl., ¶ 32 and Ex. 30 (yellow highlight). | **DISPUTED** that CKGE used Neo4j EE or any other graph database as a "main component".   Out of the many components and services inside CKGE, only one graph explorer even connected to a graph to allow for visual exploration.  See Suhy Decl., ¶ 5.<br><br>None of the references provided by Plaintiff show Neo4j EE as being a main component of CKGE. "The CKGE framework includes a Neo4j's Enterprise Edition open-source version2, Elastic Search capabilities, and micro-services components useful for supporting graph-related research; " Ratinoff Decl., ¶ 28 and Ex. 26  at IGOV0001570513.001 |

27

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | |
| | **Fact 55:** It was immaterial to the IRS who was the contracting entity so long as Suhy was the individual providing them.  Ratinoff Decl., Ex. 4 at 61:11-64:23. | **DISPUTED.**  Although IRS wanted to work with Mr. Suhy, the IRS had to properly procure the requirement under the FAR. Ratinoff Decl., Ex. 4 at 63:23-64:21 shows that Plaintiff's attorney tried to get IRS to make this statement but the IRS response was unclear and did not show that it was immaterial who the contracting entity was.<br><br>IRS was planning on competing the opportunity. "**And then we started a new procurement process for <u>new competition</u>**" Ratinoff Decl., Ex. 4 at 69:23-25<br><br>"**A.  Yes.  It was a new procurement order that had started -- or was executed for sort of open competition.  <u>I believe it was AA companies or small business companies originally, but it was open competition</u>, and it was awarded to eGov for professional services to work, you know, to further the development of CKGE.**" Ratinoff Decl., Ex. 4 at 74:4-10 |
| | **Fact 56:** On September 5, 2017, the IRS announced its intent to award a sole-source contract to iGov based on that quote.  Dkt. No. 171, ¶ 23; Dkt. No. 98-2, ¶ 23. | **UNDISPUTED** |
| | **Fact 57:** Neo4j USA filed an official protest with the IRS, which the IRS agreed with Neo4j USA that it had improperly awarded the contract to iGov on a sole source basis and canceled it for that reason. Dkt. No. 98-2, ¶ 23; Dkt. No. 172-1, ¶¶ 5-7 and Ex. 3; Ratinoff Decl., Ex. 4 at 69:20-70:9, 71:1-74:1.  After cancelling the award to iGov, the IRS awarded iGov and Suhy the CKGE contract via eGov Sol.  *See* Facts 25-30. | **DISPUTED**<br>IRS did not award any contract to iGov and Suhy through eGov Sol.<br>eGovernment Solutions paid Mr. Suhy a salary for a range of services.<br><br>See Suhy Decl., ¶ 7<br>See fact  28 |
| 2. Defendants cannot establish that Neo4j USA's conduct relates to | **Fact 58:** Neo4j USA's alleged "bad acts" pertain to the licensing of Neo4j® EE.  *See* Dkt. No. 91 at 16:21-19:7.  However, Neo4j Sweden owns the copyright to Neo4j® EE and was licensor of that software under the GPL and AGPL, and not Neo4j USA. Dkt. No. 98-2, ¶¶ 3-4; Dkt. No. | See Fact 1 |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| the subject matter of its Lanham Act claims. | 118 at 2:11-16 (citing same). | |
| | **Additional Fact**: Neo4j Sweden wholly owns the copyrights to and was the licensor of the 182 source code files release for the first time under the Neo4j Sweden Software License that are subject to the DMCA claim. *See* Additional Facts in Fact 1. | |
| | Fact 59: The GPL, AGPL and Neo4j Sweden Software Licenses are copyright licenses and not trademark licenses. Dkt. No. 85 at 7:27-8:7. | UNDISPUTED |
| | Fact 60: Neo4j Sweden release Neo4j® EE v3.4 (the first version subject to the more restrictive Neo4j Sweden Software License) in May 2018, and as a result, ceased licensing Neo4j® EE under the AGPL at that time. Dkt. No. 118 at 3:9-12; Dkt. No. 98-2, ¶¶ 11-12, Ex. 3. | **DISPUTED**. Neo4j EE v3.4 clearly stated its license was AGPL + commons clause. They did not "cease" licensing under AGPL.   Neo4j Sweden used the full AGPL preamble and called the License AGPL. They never called it "Neo4j Sweden Software License" until the court case started. |
| | Fact 61: The inclusion of the Commons Clause in Neo4j® EE v3.4 does not amount to inequitable conduct because the Court already held that as the copyright holder Neo4j Sweden could license Neo4j® EE how it saw fit.  Dkt. No. 118 at 24:7-25:19, *aff'd* Dkt. No. 140 at 3. | **Objection**, this is not a fact, the law of the case doctrine does not apply to interlocutory orders. |
| | Fact 62: By May 2018, Neo4j® EE v3.4 included advanced scalability, availability, security, and operational features that were not previously available under the GPL or AGPL, and at least 182 files that were never released under either license. Dkt. No. 118 at 3:1-15; Dkt. No. 98-2, ¶¶ 6-7, 10-11; Dkt. No. 98-1, Ex. 38 at 6:22-7:1, 8:6-16:24. | DISPUTED  See Fact 61.The 182 files licensed under the AGPL + commons clause was still referred to as AGPL and had the full AGPL preamble. |
| | Fact 63: Defendants released ONgDB sometime in July 2018 and their promotion thereof amounted to trademark infringement, false advertising and false designation of origin in violation of the Lanham Act and UCL. *See* Dkt. No. 118 at 6:2-7 (citing Dkt. No. 98-1, Ex. 28); Dkt. No., 98-1, ¶ 26 and Ex. 24; Dkt. No. 118 at 18:2-32:14. | DISPUTED  Defendants did not release ONgDB.  The Graph Foundation did.   Beene Dec., Ex. 30. |
| | **Additional Fact**: Suhy was involved in the initial development of ONgDB, including making commits and developing solutions for that software. Ratinoff Reply Decl., Ex. B at 82:20-25.  On July 9, 2018, Suhy told a potential sponsor of GFI that they had ***assigned*** to GFI the "Neo4j Enterprise (We call ONgDB) distributions that are being adopted at IRS | |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | and most likely DHS." Dkt. No. 98-1, ¶ 26 and Ex. 24. | |
| | **Fact 64:** Neo4j Sweden ceased its dual licensing model under the GPL and AGPL in **May 2018** and Neo4j USA's alleged false statements about the IRS needing to obtain a commercial license for Neo4j® EE were made before **October 2017**. *See* Ratinoff Decl., Ex. 65 at 14:9-15:28, 17:1-27:7; *see also* Dkt. No. 118 at 3:17-4:22; Dkt. No. 177 at ¶¶ 20-21. | DISPUTED – In May 2018 Neo4j released enterprise under AGPL with the commons clause.  After v3.4 – the source code clearly showed that it was using the AGPL license with commons along with the full AGPL preamble.<br><br>See Suhy Decl., Exs 1-8 |
| **PureThink's Claim for Breach of Exclusivity Contract** | | |
| 1. No enforceable contract existed; | **Fact 65:** There is no contract consented to or signed by Neo4j USA giving PureThink ownership rights in the Gov't Edition, the right to be paid for the development thereof, or the right to be compensated for that development work upon termination.  Instead, Suhy repeatedly told Neo4j USA – both before and after April 11, 2015 – that the Gov't Edition was a "concept" for PureThink to bypass protracted mandatory competitive bidding processes and take advantage of a faster sole-source procurement track. Dkt. No. 98-1, ¶¶ 7-8 and Exs. 5-6; Ratinoff Decl., ¶¶ 8, 10, 12-14, 17, 19 and Exs. 6, 8, 10-12, 15, 17 (yellow highlights).<br><br>**Additional Fact/Objection:** The October 26, 2015 email and attachment (Ratinoff Decl., Ex. 15) cited by Defendants was sent by Suhy over six months after the parties allegedly entered into the exclusivity agreement to John Broad, who had just joined Neo4j USA and thus was not privy to any prior discussions relating thereto (Ratinoff Reply Decl., ¶ 11 and Ex. I).  Suhy described the attachment as something he just wrote to "lay[] out some concepts … from PureThink's perspective." Ratinoff Decl., Ex. 15 pp. 1, 4.  Consequently, this is not competent evidence of mutual assent to an alleged "exit agreement" because at most it merely establishes Suhy's state of mind, while Defendants fail offer evidence that Neo4j USA had the same understanding. *See Stanford Hosp. & Clinics v. Multinat'l Underwriters, Inc.,* 2008 WL 5221071, at *7 (N.D. Cal. Dec. 12, 2008) (finding no mutual consent to oral agreement because plaintiff only offered evidence of its own state of mind). | **UNDISPUTED** that PureThink did not have ownership rights to the Government Edition.   The Exclusivity agreement was designed to ensure Neo4j Inc had the proper rights to make business decisions, while still protecting PureThink's investment.<br><br>**DISPUTED**  The Government Edition Exclusivity agreement had an "exit agreement" that was designed to protect PureThink's investment and ensure PureThink would recognize a return on investment and be compensated in an "exit" situation ("Exit Agreement").<br><br>Until the exit clause algorithm could be put down in writing, Neo4j Inc and PureThink agreed that all decisions relating to the Government Edition and the Government Edition Exclusivity agreement would have to be agreed on unanimously by both parties. ("unanimous agreement") See Suhy Decl., ¶ 10.<br><br>Mr. Suhy's references the "unanimous agreement" requiring unanimous approval in communications with Neo4j.<br><br>"**Neo Technology <u>can request to revoke exclusivity</u> and assign to another company**." Ratinoff Decl., ¶ 17 and Ex. 15 page 4 paragraph 2 under Important Concepts. |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | **Additional Fact/Objection:** The June 20, 2017 email (Beene Decl., Ex. 13) cited by Defendants does not establish that Neo4j USA was required to obtain PureThink's consent before termination. It was sent more than two years after the alleged formation of the exclusivity agreement in response to Neo4j USA's discontinuation of Neo4j Gov't and in anticipation of litigation: "I believe our contract requires us to be part of the decision to retire it…. Of course I am assuming you don't agree to this, so just another thing to add to the list for court." *See Warner Constr. Corp. v. City of Los Angeles*, 2 Cal.3d 285, 296–97 (1970) (refusing to admit "negotiations" after the date on which "the parties had reached a stage of clear disagreement on the crucial question"); *accord Wolsey, Ltd. v. Foodmaker, Inc.*, 144 F.3d 1205, 1210 (9th Cir. 1998) (recognizing that the principle of "practical construction" only applies to acts before any dispute has arisen) (citing same). | Adron Decl., Ex. 13, green highlights<br><br>The Government Edition is not just a concept. It is a software product combined with services which were specifically designed to address the shortcomings that Neo4j Enterprise had at the time relating to US government security and accessibility needs.<br><br>Adron Decl., Exs. 14, 15<br><br>**"Neo4j US Government Edition is an "officially sponsored" package of offerings strategically designed to drive Neo4j adoption in the US Government market by drastically cutting overall cost of ownership, addressing critical government specific requirements, providing an efficient sole source path (sole source), and more…"** Suhy Decl., Ex. 16<br><br>**"Purpose of US Government Edition**<br><br>**Why the approach of defining a new edition compared to other approaches? This approach lowers the barrier of entry for Neo4j into the archaic us government market. How?**<br><br>**- Fast, Efficient Procurement (Sole source - no timely competitive procurements.) This has already been proven - every US Government sale has been through sole source.**<br><br>**- Drastically cuts down the total cost of ownership for an agency by addressing FISMA via features and support. Infact, this also applies to the community edition. The total cost of ownership for Neo4j Community Edition compared to Neo4j Government Edition can now be compared because of the high** |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | costs of FISMA. (This is one focus we address during the sales cycle - when a lead agency is considering the community edition, ignoring all the enterprise benefits they receive.)" Suhy Decl., Ex. 16 <br><br> Adron Decl., Ex. 18 <br><br> UNDISPUTED that Neo4j USA had the ownership rights of the Neo4j Government Edition.   The government edition was built for Neo4j Inc under the government edition exclusivity agreement. <br><br> -------- <br> UNDISPUTED that Neo4j USA had the ownership rights of the Neo4j Government Edition.   The government edition was built for Neo4j Inc under the government edition exclusivity agreement.  In return for Neo4j USA owning the software and benefiting from the business plan, an "exit agreement" was in place to ensure a return on investment would be recognized by PureThink that addressed re-assignment, retirement, or termination.  Suhy Decl., ¶ 10 |
| | Fact 66: Suhy told third parties Gov't Edition was only created for sole-source justification.  Ratinoff Decl., ¶ 16 and Ex. 14 (yellow highlights). | DISPUTED <br><br> The government edition was created to address more than just sole source justification.  It was created to address requirements that the US Government needed and which Neo4j Enterprise did not have.   The ability to sole source was one important aspect,  but not the only reason for creating the government edition.  See Fact 66 above. |
| | Fact 67: The letter purporting to be a separate agreement between Neo4j USA and PureThink was simply the means for PureThink to establish sole source justification. Dkt. No. 98-1, ¶ 8 and Ex. 6; Ratinoff Decl., ¶¶ 14, 18-19 and Exs. 12, 16-17 (yellow highlights). | DISPUTED <br> The agreement between PureThink and Neo4j USA was specifically focused on exclusivity around the Neo4j Government Edition.  This agreement itself protected PureThink's investment into the Government Edition and ensured it could see a return on the investment.  The agreement also allowed for sole source justification, but that was not its sole purpose. |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | See Fact 66. |
| | **Fact 68:** Suhy repeated confirmed and assured Neo4j USA that it owned the intellectual property making up the Gov't Edition, as well could terminate PureThink as the exclusive reseller *at any time and for any reason*. Dkt. No. 98-1, Ex. 6 (yellow highlights); Ratinoff Decl., ¶¶ 9-10, 14, 17, 19 and Exs. 7-8, 12, 15, 17 (green highlights).<br><br>**Additional Fact/Objection:** The October 26, 2015 email and attachment (Ratinoff Decl., Ex. 15) cited by Defendants was sent by Suhy over six months after the parties allegedly entered into the exclusivity agreement to John Broad, who had just joined Neo4j USA and thus was not privy to any prior discussions relating thereto (Ratinoff Reply Decl., ¶ 11 and Ex. I). Suhy described the attachment as something he just wrote to "lay[] out some concepts … from PureThink's perspective." Ratinoff Decl., Ex. 15 pp. 1, 4. Consequently, this is not competent evidence of mutual assent because at most it merely establishes Suhy's state of mind, while Defendants fail offer evidence that Neo4j USA had the same understanding. *See Stanford Hosp. & Clinics,* 2008 WL 5221071, at *7.<br><br>**Additional Fact/Objection:** The June 20, 2017 email (Beene Decl., Ex. 13) cited by Defendants does not establish that Neo4j USA was required to obtain PureThink's consent before termination. It was sent more than two years after the alleged formation of the exclusivity agreement in response to Neo4j USA's discontinuation of Neo4j Gov't and in anticipation of litigation: "I believe our contract requires us to be part of the decision to retire it…. Of course I am assuming you don't agree to this, so just another thing to add to the list for court." *See Warner Constr.,* 2 Cal.3d at 296–97 (1970); *accord Wolsey, Ltd.,* 144 F.3d at 1210. | **UNDISPUTED** that Neo4j USA owned the intellectual property making up the Gov't Edition. Under the Neo4j Government Exclusivity Agreement, PureThink built the Government Edition for Neo4j as part of the agreement.<br><br>**DISPUTED** that Neo4j USA could terminate PureThink as the exclusive reseller at any time and for any reason.<br><br>PureThink and Neo4j Inc agreed that until the exit agreement would be written down, both PureThink and Neo4j USA had to both fully agree on any changes to the Government Edition and the agreement which included revoking, retirement, re-assignment, or termination of any kind. This was done to protect the investment PureThink was making into the Government Edition Exclusivity agreement.<br><br>See Fact 66.<br><br>**"Neo Technology <u>can request to revoke exclusivity</u> and assign to another company."** Ratinoff Decl., ¶ 17 and Ex. 15 page 4 paragraph 2 under Important Concepts.<br><br>Adron Decl Ex. 13, green highlights |
| | **Fact 69:** Consistent with his prior representations, Suhy sent proposed language for the external and internal versions of the sole-source justification letters to Neo4j USA on April 10, 2015, with the internal version stating "Neo4j Technologies has the right to cancel this exclusivity agreement at any time and for any reason." Ratinoff Decl., ¶ 10 and Ex. 8 (green highlight); *see also id.,* ¶ 9 and Ex. 7 (green highlights).<br><br>**Additional Fact:** There is no evidence cited establishing that the parties agreed to drop the language that Neo4j USA could cancel at any time for any reason. Rather, as demonstrated by the internal April 11, 2015 letter that was returned with Mr. Nordwall's signature contained this language. | **UNDISPUTED** that Suhy sent proposed language for an internal version of the agreement, which stated that the agreement could be canceled at any time for any reason. However, this language was dropped and was not executed. See Fact 66<br><br>**DISPUTED** that there were prior representations relating to being able to cancel the agreement at any time. The exhibits referenced by plaintiff were the first documents related to the planning of the government edition. Mr. Suhy proposed this |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
|  | *See* Ratinoff Decl., ¶ 11 and Ex. 9.  After Neo4j USA returned the signed letters for a second time, Suhy acknowledged receipt and assured Neo4j USA that he would be signing.  Ratinoff Reply Decl., ¶¶ 9-10 and Exs. G-H.<br><br>**Additional Fact/Objection:** The October 26, 2015 email and attachment (Ratinoff Decl., Ex. 15) cited by Defendants was sent by Suhy over six months after the parties allegedly entered into the exclusivity agreement to John Broad, who had just joined Neo4j USA and thus was not privy to any prior discussions relating thereto (Ratinoff Reply Decl., ¶ 11 and Ex. I).  Suhy described the attachment as something he just wrote to "lay[] out some concepts … from PureThink's perspective." Ratinoff Decl., Ex. 15 pp. 1, 4.  Consequently, this is not competent evidence of mutual assent because at most it merely establishes Suhy's state of mind, while Defendants fail offer evidence that Neo4j USA had the same understanding.  *See Stanford Hosp. & Clinics*, 2008 WL 5221071, at *7.<br><br>**Additional Fact/Objection:** The June 20, 2017 email (Beene Decl., Ex. 13) cited by Defendants does not establish that Neo4j USA was required to obtain PureThink's consent before termination.  It was sent more than two years after the alleged formation of the exclusivity agreement in response to Neo4j USA's discontinuation of Neo4j Gov't and in anticipation of litigation: "I believe our contract requires us to be part of the decision to retire it…. Of course I am assuming you don't agree to this, so just another thing to add to the list for court." *See Warner Constr.*, 2 Cal.3d at 296–97 (1970); *accord Wolsey, Ltd.*, 144 F.3d at 1210. | language, but that was dropped after speaking to Mr. Tim Brown, who pointed out that having that in there without a corresponding exit agreement would not make sense.<br><br> "I am sending it to Tim Brown who is our Govt procurement expert to see if the version we send to them is suitable." Ratinoff Decl., ¶ 9 and Ex. 7<br><br>After a discuss with Neo4j Inc, the wording to cancel the exclusivity agreement at any time for any reason was never signed or executed.<br><br>The only exclusivity agreement signed and executed had no mention of being able to cancel.  Furthermore, the same exclusivity agreement was re-signed on June 23rd, 2016, a year later, with no mention of being able to cancel.   See Suhy Decl., Ex. 20<br><br>Until the exit agreement was written down, Neo4j and PureThink agreed that any changes to the agreement would require both parties to approve until the exit agreement was written down.<br><br>"**Neo Technology <u>can request to revoke exclusivity</u> and assign to another company**." Ratinoff Decl., ¶ 17 and Ex. 15 page 4 paragraph 2 under Important Concepts.<br><br>Adron Decl.,  Ex. 13 |
|  | <u>Fact 70:</u> The internal version of the April 11, 2015 sole-source letter signed by Lars Nordwall on behalf of Neo4j USA expressly stated that "Neo Technology has the right to cancel this exclusivity agreement at any time and for any reason." Ratinoff Decl., ¶ 11 and Ex. 9 (green highlight). | **DISPUTED**<br>An internal version of the sole source letter was never executed or agreed upon.<br><br>Ratinoff Decl., ¶ 11 and Ex. 9 simply shows 2 documents sent to Mr. Suhy for review but not executed on behalf of PureThink.<br><br>Mr. Suhy did not agree or sign the document stating that exclusivity agreement could be canceled. |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | The only exclusivity agreement signed and executed had no mention of being able to cancel. Furthermore, the same exclusivity agreement was re-signed on June 23rd, 2016, a year later, with no mention of being able to cancel. See Suhy Decl., Ex. 20<br><br>See fact 66, 70. |
| | **Fact 71:** The internal version of the April 11, 2015 letter signed by Neo4j USA omitted Suhy's proposed language "[t]his agreement supersedes any other agreements." *Compare* Ratinoff Decl., ¶ 10 and Ex. 8 (red highlight) *and id.*, ¶ 11 and Ex. 9 at p. 3. | **DISPUTED**<br>The document was not executed by Mr. Suhy or PureThink.<br><br>See fact 71. |
| | **Fact 72:** Erik Nolten of Neo4j USA shared the same understanding that Neo4j USA owned the Gov't Edition and had the right to cancel PureThink's status as an exclusive reseller thereof any time and for any reason based on Suhy's representations made before April 11, 2015 (Ratinoff Decl., ¶¶ 8-10 and Exs. 6-8) and from the express language of the sole-source letters signed by Lars Nordwall (*id.*, ¶ 15 and Ex. 13). | **DISPUTED** The executed agreements, both signed on April 11th, 2015 then on June 23rd, 2016 (Suhy Decl., Ex. 20 ) do not say anything about being able to cancel the exclusivity agreement.<br><br>Ratinoff Decl., ¶ 15 and Ex. 13 simply shows Erik Nolten sending unsigned documents to Charles Fischer on July 31st, 2015. |
| | **Fact 73:** After meeting with Neo4j's new Vice President of Strategic Alliances and Channels, John Broad, in October 2015, Suhy prepared documents for him reconfirming that Neo4j USA owned the Gov't Edition and had the right to cancel PureThink's status as the exclusive reseller thereof any time and for any reason. Ratinoff Decl., ¶ 17 and Ex. 15 (green highlights).<br><br>**Additional Fact/Objection:** The October 26, 2015 email and attachment (Ratinoff Decl., Ex. 15) cited by Defendants was sent by Suhy over six months after the parties allegedly entered into the exclusivity agreement to John Broad, who had just joined Neo4j and thus was not privy to any prior discussions relating thereto (Ratinoff Reply Decl., ¶ 11 and Ex. I). Suhy described the attachment as something he just wrote to "lay[] out some concepts … from PureThink's perspective." Ratinoff Decl., Ex. 15 pp. 1, 4. Consequently, this is not competent evidence of mutual assent because at most it merely establishes Suhy's state of mind, while Defendants fail offer evidence that Neo4j USA had the same | **DISPUTED**<br>Nowhere in the email referenced in Ratinoff Decl., ¶ 17 and Ex. 15 does it say anything about Neo4j USA having the right to cancel PureThink's status as exclusive reseller any time or any reason. It in fact highlights that the "unanimous agreement" was in place. Mr. Suhy told Mr. Broad – that Neo4j could request to revoke and assign to another company. The agreement was specifically designed to ensure both parties had to agree.<br><br>"**Neo Technology <u>can request to revoke exclusivity</u> and assign to another company**." Ratinoff Decl., ¶ 17 and Ex. 15 page 4 paragraph 2 under Important Concepts.<br><br>**UNDISPUTED** that Neo4j USA owned the |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | understanding. *See Stanford Hosp. & Clinics*, 2008 WL 5221071, at *7. | Government Edition.<br>See fact 66. |
| 2. PureThink's performance or excuse for nonperformance; | **Fact 74:** In conjunction with terminating the Gov't Edition on June 19, 2015, Neo4j USA informed PureThink that it was "no longer authorized to market, resell, demonstrate or provide training on the Neo4j Government Edition." Ratinoff Decl., ¶ 21 and Ex. 19. | **DISPUTED**: The Government Edition was discontinued, not terminated on June 19th, 2015.<br><br>Ratinoff Decl., ¶ 21 and Ex. 19 "Neo4j is hereby providing notice that Neo4j is **discontinuing Neo4j Government Edition..**"<br><br>**UNDISPUTED** that Neo4j USA sent an email stating that PureThink was no longer authorized to market, resell, demonstrate or provide training on the Neo4j Government Edition. |
| | **Fact 75:** Suhy acknowledged the termination of the Gov't Edition and agreed to remove all references from PureThink's website. Ratinoff Decl., ¶¶ 22 and Ex. 20. | **DISPUTED**<br>The Government Edition was discontinued, not "terminated". See Fact 75.<br><br>Mr. Suhy's email referenced in Ratinoff Decl., ¶¶ 22 and Ex. 20. Simply states: "We are removing references from the website. It hurts you guys as well but it does no good leaving it up as of now. There is no acknowledgement or acceptance of any of Neo4j's actions as PureThink did not agree to this as was required in the Neo4j Government Exclusivity agreement.<br><br>**UNDISPUTED** that Suhy removed the references on the website. |
| | **Fact 76:** After Neo4j USA terminated the SPA, Defendants targeted same federal agencies that PureThink previously solicited under the SPA by offering "Government Packages for Neo4j." Dkt. No. 118 at 4:24-5:20 (citing Dkt. No. 98-1, Exs. 14-19). | **DISPUTED** that Neo4j USA terminated the service provider agreement (SPA).<br><br>The Government Packages for Neo4j were not the same packages that PureThink offered. |
| | **Fact 77:** iGov's "Government Packages for Neo4j" included the same framework and FISMA security add-ons the Gov't Edition. Ratinoff | **DISPUTED** – Though originally in the marketing material, the Government Package for Neo4j did not ever bring |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | Decl., ¶ 23 and Ex. 21; *id.*, ¶¶ 25-26 and Ex. 23-24.  The only difference was it included Neo4j® EE for free under the AGPL. *Id.* | anything over from PureThink or the Government Edition. Though this was originally the plan, it was never executed. The Government Packages for Neo4j were never sold.<br><br>See Suhy Decl., ¶ 11 |
| | **Additional Fact**:  Despite admitting "Neo4j USA owned the intellectual property making up the Gov't Edition," PureThink, continued to support the IRS's use of the Gov't Edition after Neo4j USA discontinued the Gov't Edition and terminated the PSA.  *See* Fact 68; Ratinoff Decl., ¶¶ 27, 29 and Exs. 25, 27 (yellow highlights).  iGov also told the IRS it intended to continue the use that same intellectual property under the CKGE Contract.  *See* Ratinoff Decl., ¶ 30 and Ex. 28. | |
| | **Fact 78:**  On July 11, 2017, the same day Neo4j USA terminated the SPA, Suhy emailed government contractors and agencies confirming that iGov was reusing the framework and add-ons developed for the Gov't Edition (contrary to his prior admissions that Neo4j USA owned them). Dkt. No. 98-1, ¶ 14 and Ex. 12; Ratinoff Decl., ¶¶ 25-26 and Exs. 23-24. | **DISPUTED** the emails referenced in Ratinoff Decl., ¶¶ 25-26 and Exs. 23-24.  Only show what was planned.  The plan was scrapped however and no packages were ever sold. |
| | **Fact 79:**  Defendants made clear on iGov and PureThink's websites that the "Government Package for Neo4j" was from the same "principle" behind PureThink and Gov't Edition. Dkt. No. 98-1, Exs. 14-15. | **UNDISPUTED** – The same "principle" behind PureThink and the Gov't Edition was John Mark Suhy. |
| | **Fact 80:**  Suhy and PureThink formed iGov to evade the restrictions in the Partner Agreement.  Dkt. No. 98-1, ¶ 13 and Ex. 11; *id.*, ¶¶ 16-17 and Exs. 14-15 ("The principle behind PureThink and the Government Package has created a new corporate entity called iGov Inc, which is not a Neo4j Solution Partner. Because iGov Inc is not a solution partner, it can offer packages at great cost savings to US Government Agencies as it has no restrictions on working with Neo4j Enterprise open source licenses!"); Dkt. No. 118 at 24-5:7 (citing same); Dkt. No. 177 at 10:3-6. | **DISPUTED**:  iGov did not need to evade any restrictions, as it was not part of the "partner agreement" also known as "service provider agreement (SPA)". There are no terms in the SPA / partner agreement which forbid Mr. Suhy from creating a new company that would not be restricted by the SPA.<br><br>Note: Plaintiff's using the term. "partner agreement" here, but in Fact #77 above, they use the term "SPA". |
| | **Fact 81:**  iGov thereafter operated as PureThink's successor-in-interest. Ratinoff Decl., ¶ 27 and Ex. 25 ("[S]ince iGov Inc has no limitations on supporting or providing services for Neo4j Enterprise open source licenses, we can just have iGov Inc. assume over all [PureThink's] obligations of the current contract now instead of waiting for the next procurement. Nothing would change, we would have the same team, | DISPUTED:  iGov was not PureThink's successor-in-interest. iGov was created from scratch and no assets, or IP was transferred from PureThink.<br><br>Mr. Suhy was the only member of both companies at the |

37

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | locations and would keep working as we always have."); Ratinoff Decl., Ex. 27 ("US Treasury has decided to make the move to our new company iGov Inc and the new Government Packages for Neo4j Enterprise"); *id.,* ¶¶ 29-30 and Ex. 27-28 (yellow highlights); Dkt. No. 98-1, ¶¶ 13, 16-17 and Exs. 11, 14-15; *see also* Facts 17, 77-80. | time. |
| | **Additional Fact:** Suhy admitted to forming iGov to evade the restrictions in the PSA imposed on PureThink. Dkt. No. 98-1, Exs. 11, 14-15; accord Dkt. No. 118 at 24-5:7 (citing same); Dkt. No. 177 at 10:3-6. Suhy also informed the IRS that iGov was effectively PureThink's successor-in-interest, and iGov would be providing the same technology and know-how for the CKGE Contract. See Ratinoff Decl., Ex. 25, 27-28 (yellow highlights). Defendants further admit that Suhy is the sole shareholder of both Purethink and iGov, which is consistent with his representations to the IRS, making Suhy the sole beneficiary. *See* Facts 18, 86. | |
| | Fact 82: Defendants continued to actively market "Government Package for Neo4j" until they released ONgDB. Dkt No. 118 at 4:24-5:20 (citing Dkt. No. 98-1, Exs. 14-19, 21, 62-64, 67-69); Dkt. No. 118 at 19:13-20:24.<br><br>**Additional Fact/Objection:** There is no evidence to support Defendants' statement. Suhy was involved in the initial development of ONgDB, including making various commits and developing various solutions for that software. Ratinoff Reply Decl., Ex. B at 82:20-25. On July 9, 2018, Suhy told a potential sponsor of GFI that they had ***assigned*** to GFI the "Neo4j Enterprise (We call ONgDB) distributions that are being adopted at IRS and most likely DHS." Dkt. No. 98-1, ¶ 26 and Ex. 24. | **DISPUTED**<br>Defendants did not release ONgDB. The Graph Foundation is the owner of ONgDB and responsible for its development and release.<br><br>Though the graph foundation was once part of the case, it has since settled with plaintiff and is no longer part of the case.<br><br>Mr. Suhy is only one of several volunteer committers and has no control or official position with the Graph Foundation. |
| 3. Neo4j USA did not breach the alleged exclusivity agreement; and | Fact 83: Assuming a separate exclusivity agreement existed, Neo4j USA had the unfettered right to discontinue the Gov't Edition and terminate PureThink as its exclusive reseller without cause and without compensating PureThink. *See* Facts 69-74.<br><br>**Additional Fact/Objection:** Defendants fail to offer competent evidence of Neo4j USA consented to an "exit agreement" requiring it to obtain PureThink's consent to discontinue the Gov't Edition. *See* Fact 66. | **DISPUTED**.<br>Neo4j USA had to get PureThink's agreement to make any changes which would have included cancellation, retirement, discontinuation, or any other activities that could risk the investment and expected return on the investment PureThink had.<br><br>See Fact 66. |

4853-5930-0200.2

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| 4. There are no resulting damages to PureThink. | **Fact 84:** PureThink could not have suffered $1.3 million in damages since the IRS ultimately awarded the CKGE contract for the same amount to its successor-in-interest iGov via eGovernment Solutions in order for it to continue developing the CKGE the framework that PureThink had started with the Gov't Edition under the prior contract. *See* Facts 25-30.<br><br>**Additional Fact:** Suhy told the IRS that iGov was acting as PureThink's successor-in-interest, and iGov would be providing the same technology and know-how for the CKGE Contract. See Ratinoff Decl., Ex. 25, 27-28 (yellow highlights).  Defendants also admit that Suhy is the sole shareholder of PureThink and iGov, which is consistent with what he told the IRS, making Suhy the sole beneficiary. *See* Facts 18, 86. | DISPUTED<br>iGov is not the successor in interest to PureThink.<br><br>IRS did not award anything to iGov.<br><br>eGovernment  Solutions paid Mr. Suhy a salary, the revenue from IRS was not passed through to iGov.<br><br>See Suhy Decl., ¶ 7<br>See fact  28 |
| | **Fact 85:**  PureThink did not maintain any time sheets that could support their claim that PureThink "spent an equivalent to $650,000 to design, develop, and build" the Gov't Edition.  Ratinoff Decl., Ex. 2 at 173:15-177:17.<br><br>**Additional Fact:** Suhy speculated that PureThink might have other records reflecting time he spent allegedly working on the Gov't Edition, but could not specifically identify them.  Ratinoff Decl., Ex. 2 at 173:15-178:24.  Defendants did not produce such records during discovery and do not attach any to their opposition. | **DISPUTED**<br>PureThink told Neo4j that they would be working full time on the Government Edition.   Full time means at or over 40 hours a week. See Adron Decl., Ex. 17 |
| | **Fact 86:** PureThink's financial statements showed it did not incur any expenses or overhead for the development of the Gov't Edition.  Ratinoff Decl., Ex. 2 at 59:6-63:15; *id.,* ¶¶ 68-69 and Exs. 66-67.<br><br>**Additional Fact/Objection:** Defendants fail to offer competent evidence showing that PureThink "reinvested" any revenue into developing the Gov't Edition, and confirm that PureThink's financial statements do not show the alleged "reinvestment" made and expenses incurred in having Suhy allegedly work on the Gov't Edition. The fact that PureThink is an s-corporation, by definition, means Suhy as the sole shareholder is the receipt and beneficiary of all income received by PureThink.  *See* 26 U.S.C. §§ 1361, 1366. | DISPUTED – PureThink is a single person company filing as an s-corporation for tax purposes.  All the money remaining was invested into building the Government Edition by paying Mr. Suhy for his focus.    The references in Exs 66-77 do not reflect the expenses which came in the form of paying Mr. Suhy to focus full time on the Government Edition.<br><br>**"The partner fees we receive from non-partner government sales help support these initiatives - they are not looked at as 'commissions'. For example - as government adoption grows and many more sales come in - we understand if the fees must be cut to help drive your growth - and since the fees only go towards 'funding' our execution of the initiatives. They are not part of our** |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | future business modeling outside of operating costs. " Ratinoff Decl., ¶ 17 and Ex. 15 page 4 paragraph 1 under Important Concepts.<br><br>PureThink's re-invested its money and time into building out the government edition.<br>"**Unlike other partners, we plan on re-investing revenue from the partner fees made from sales to help drive the expansion and adoption of Neo4j in the US Government. This is a key differentiator between us and other partners.**"  See Suhy Decl., Ex. 19 |
| | Fact 87: PureThink did not spend any money to develop the Gov't Edition.  Ratinoff Decl., Ex. 2 at 170:10-171:13.<br><br>Additional Fact/Objection: Defendants fail to offer competent evidence showing that PureThink "reinvested" any revenue into developing the Gov't Edition, and confirm that PureThink's financial statements do not show the alleged "reinvestment" made and expenses incurred in having Suhy allegedly work on the Gov't Edition. See Fact 86. | DISPUTED<br>PureThink reinvested the revenue from the partner fees into developing the government edition and performing the tasks required to uphold PureThink's side of the agreement.  The money paid Mr. Suhy to focus full time on the Government Edition.<br><br>See fact 87. |
| | Fact 88: Suhy used PureThink's work product from the Gov't Edition for iGov's "Government Packages for Neo4j." Ratinoff Decl., Ex. at 186:14-24; id., ¶¶ 25-26 and Exs. 23-24 ("We've simply taken the framework and services that made a Neo4j Enterprise (Commercial only) into Neo4j Government Edition and made them available as a stand alone package we call (Government Package for Neo4j)"); id., ¶¶ 29-20 and Exs. 27-28. | DISPUTED<br>Suhy did not use PureThink's work product from the Government Edition for iGov's "Government Packages for Neo4j".   The statements made were incorrect and iGov never used any work product from the Government Edition, nor did iGov ever sell any of these packages.<br><br>See fact 78<br>See Suhy Decl., ¶ 11 |
| | Additional Fact:  Despite admitting "Neo4j USA owned the intellectual property making up the Gov't Edition," PureThink, continued to support the IRS's use of the Gov't Edition after Neo4j USA discontinued the Gov't Edition and terminated the PSA.  See Fact 68; Ratinoff Decl., ¶¶ 27, 29 and Exs. 25, 27 (yellow highlights).  iGov also told the IRS it intended to continue the use that same intellectual property under the CKGE Contract.  See Ratinoff Decl., ¶ 30 and Ex. 28. | |

40

## PLAINTIFFS' RESPONSE TO DEFENDANTS STATEMENT OF UNDISPUTED MATERIAL FACTS

| Claim or Defense | Opposing Party's Undisputed Facts/Supporting Evidence | Moving Parties' Response/Supporting Evidence |
|---|---|---|
| **Defendants' did not violate the DMCA [17 U.S.C. § 1202(b)(1)]; [17 U.S.C. § 202(b)(3)]** | | |
| | <u>Fact 90:</u> Neo4J does not license the commercial product under the AGPL. Beene Dec. Ex 26 | **UNDISPUTED**: Plaintiffs originally offered Neo4j® EE under both a paid-for commercial license and for free under the AGPL. Dkt. No. 118 at 3:7-9 (citing Dkt. No. 98-2, ¶ 8). As of May 17, 2018, Neo4j stopped licensing Neo4j® EE under the AGPL. Dkt. No. 118 at 3:9-12. |
| | <u>Fact 91:</u> The Amended and Restated License Agreement which Neo4J Sweden licensed Neo4J software to Neo4J USA is not an AGPL license. Been Dec. Ex. 28 | **UNDISPUTED**: However, this is not a material fact that is relevant to Plaintiffs' DMCA claim. |
| | <u>Fact 92:</u> The Amended and Restated License Agreement which Neo4J Sweden licensed Neo4J software to Neo4J USA is not an AGPL license. Been Dec. Ex. 28 | **UNDISPUTED**: However, this is not a material fact that is relevant to Plaintiffs' DMCA claim. |
| | <u>Fact 93:</u> the Amended and Restated License Agreement required NEO4 J USA to comply with all third party software licenses including licenses approved by the Open Source Initiative such as the AGPL. Beene Dec. Ex 28, Section 2.1.3. | **DISPUTED**: This is a legal argument and conclusion, and is not a material fact relevant to Plaintiffs' DMCA claim. Neo4j Sweden is the licensor under the Neo4j Sweden Software License, which contains the only CMI subject to the DMCA claim. *See* Dkt. No. 98-2, ¶¶ 3-4, 11 and Ex. 3; Dkt. No. 118 at 2:15-18. |
| | <u>Fact 94:</u> Neo4J does not own all the code to Neo4J software. Beene Dec. Ex 27. Since Neo4J Sweden does not own the complete code, licensing it to Neo4J USA with a non GPL/AGPL license is a violation of the AGPL. Beene Dec., Ex. 33, Kuhn Expert Report ¶¶99-107. Suhy Dec. Exs. 6, 21. | **DISPUTED**: This is not a material fact that is relevant to Plaintiffs' DMCA claim. *See Echostar Satellite, L.L.C. v. Viewtech, Inc.*, 543 F. Supp. 2d 1201, 1205 (S.D. Cal. 2008) ("Nothing in the DMCA limits standing to the copyright owner"). Defendants further admit "Mr. Suhy knew that Neo4j Sweden owned the copyright for Neo4j EE." *See* Fact 15; *accord* Dkt. No. 118 at 2:16-18 ("Neo4j Sweden owns of all copyrights related to the |

| Claim or Defense | Opposing Party's Undisputed Facts/Supporting Evidence | Moving Parties' Response/Supporting Evidence |
|---|---|---|
| | | Neo4j graph database platform, including the source code"). Moreover, the alleged DMCA violation is Defendants' unauthorized removal of CMI from 28 copies of the Neo4j Sweden Software License that governed 182 source code files in Neo4j® EE. Dkt. No. 90 at ¶¶ 76-78, 166-173; Dkt. No. 183 at 6:18-7:4, 9:27-10:10. In that regard, it is undisputed Neo4j Sweden owns the copyright to and released those 182 files for the first time under the Neo4j Sweden Software License. Fact 13; Dkt. No. 98-1, Ex. 38 at 6:23-16:24. |
| | Fact 95: Neo4J told the IRS they could only use the AGPL version if they made the project open in violation of the terms of the AGPL. Suhy Dec. Exs. 22, 23 | DISPUTED: This is not a material fact that is relevant to Plaintiffs' DMCA claim, which is based on Defendants' violations that occurred after May 2018. *See* Facts 4-15. The communications cited by Defendants occurred on April 4, 2017, and thus pre-date and do not bear any relationship to Neo4j Sweden's subsequent release of Neo4j® EE v3.4 under the Neo4j Sweden Software License in May 2018. *See* Facts 4, 7. |
| | Fact 96: The Fair Trade License document is a misrepresentation of the terms of the AGPL. Suhy Dec. Exs. 22, 23. Under the AGPL, anyone is licensed to use the software. The obligation to provide modified source code is only on conveyance. AGPL sections 2, 5 and 6. Suhy Dec., Ex 6. | DISPUTED: This is a legal argument, and is a not a material fact that is relevant to Plaintiffs' DMCA claim, which is based on Defendants' violations that occurred after May 2018. *See* Facts 4-15. The cited Fair Trade License document is from 2012 and the referenced communications are from April 2017, and as a result do not bear any relationship to the subsequent release of Neo4j® EE under the Neo4j Sweden Software License. *Compare* Suhy Decl., Exs. 22-23 *and* Dkt. No. 98-2, ¶¶ 11-13. |
| | Fact 97: There is no obligation under the AGPL to make use of Neo4J software an open project. AGPL, Suhy Dec., Ex 6. | DISPUTED: This is a legal argument, and is a not a material fact that is relevant to Plaintiffs' DMCA claim and Suhy's removal of Neo4j Sweden's CMI. Defendants do not cite to this "fact" in their opposition. It is also unclear what Defendants mean by "to make use of Neo4J software an open project." |

42

SER_1001

| Claim or Defense | Opposing Party's Undisputed Facts/Supporting Evidence | Moving Parties' Response/Supporting Evidence |
|---|---|---|
| | Fact 98: The AGPL trademark is owned by FSF. AGPL, Suhy Dec., Ex 6. | DISPUTED: This is not a material fact that is relevant to Plaintiffs' DMCA claim.  The Court previously rejected "'the notion that the terms drawn from the AGPLv3, on which the Neo4j Sweden Software License is based, somehow limit the rights of Neo4j Sweden to include the Commons Clause or any other additional restriction in its own copyright license.'"  Dkt. No. 118 at 24:16-25:12, *quoting Neo4j, Inc. v. Graph Found.*, Inc., No. 5:19-CV-06226-EJD, 2020 WL 6700480, at *4 (N.D. Cal. Nov. 13, 2020), *aff'd* Dkt. No. 140. |
| | Fact 99: The license grant to use AGPL license restricts changes:  AGPL "Everyone is permitted to copy and distribute verbatim copies of this license Document, but changing is not allowed." Suhy Dec., Ex 6. | DISPUTED: This is a legal argument that the Court previously rejected.  Dkt. No. 100 at 27:18-29:23; Dkt. No. 118 at 24:16-25:19, *aff'd* Dkt. No. 140. |
| | Fact 100: Neo4J Sweden violated the AGPL by changing the AGPL adding the commons clause. Suhy Dec., Ex 6. | DISPUTED: This is a legal argument and conclusion that the Court previously rejected.  Dkt. No. 100 at 27:18-29:23; Dkt. No. 118 at 24:16-25:19, *aff'd* Dkt. No. 140. |
| | Fact 101: Neo4J Sweden inclusion of the commons clause violated FSF' AGPL license terms. Suhy Dec., Ex 6. | DISPUTED: This is a legal argument and conclusion that the Court previously rejected.  Dkt. No. 100 at 27:18-29:23; Dkt. No. 118 at 24:16-25:19, *aff'd* Dkt. No. 140. |
| | Fact 102: Neo4J USA failed to provide verbatim copies of the AGPL license with its commercial license as required under the AGPL section 4.  Suhy Dec. Exs. 6, 24; Beene Ex. 26 | DISPUTED: This is a legal argument that the Court previously rejected.  Dkt. No. 100 at 27:18-29:23; Dkt. No. 118 at 24:16-25:19, *aff'd* Dkt. No. 140. |
| Plaintiffs Acted With Unclean Hands | See Facts 90-102 | *See* Facts 90-102 |
| | Fact 103: No communication shows Neo4j, Inc. advised the PTO they did not own the NEO4J Trademark or change the date of first use. Suhy Dec., ¶15 | DISPUTED:  This is not a material fact.  The Court already dismissed/struck with prejudice Defendants' counterclaim and affirmative defense based on Neo4j USA allegedly misrepresenting the date of first use and |

| Claim or Defense | Opposing Party's Undisputed Facts/Supporting Evidence | Moving Parties' Response/Supporting Evidence |
|---|---|---|
| | | its ownership of the Neo4j Mark. Dkt. No. 70 at 8:4-18. The Court further held that Defendants could not base **any** affirmative defense on such facts. Dkt. No. 110 at 5:16-6:4. Moreover, as affirmed by the Ninth Circuit, Neo4j USA was and is the owner of the Neo4j Mark for purposes of registration in the United States. Dkt. No. 118 at 11:16-12:26, 13:18-18:1 *aff'd* Dkt. No. 140. |
| **Neo4j USA Breached the Exclusivity Agreement** | | |
| | Fact 104: Neo4j consented to an Exclusivity Agreement with PureTink LLC. Suhy Dec., Ex. 20 | **DISPUTED:** This is a legal conclusion unsupported by competent evidence of Neo4j USA's consent to the terms described in the Suhy Declaration. Suhy told Neo4j USA that the alleged exclusivity agreement consisted of <u>two</u> letters: "one that we give to agencies on your letterhead [], and 1 between us that says you can cancel at any time for any reason." Ratinoff Decl., Ex. 7 (green highlights). Suhy sent proposed drafts of those letters in an April 10, 2015 email where the internal letter stated "[Neo4j USA] has the right to cancel this exclusivity agreement at any time and for any reason." *Id.*, Ex. 8 (green highlights). Consistent with Suhy's representations, Neo4j USA signed two letters on April 11, 2015 with the internal letter containing provision giving Neo4j USA the unilateral and unconditional right to cancel the arrangement. *Id.*, Exs. 9, 13. After Neo4j USA returned the signed letters for a second time, Suhy acknowledged receipt and assured Neo4j USA that he would be signing. Ratinoff Reply Decl., ¶¶ 9-10 and Exs. G-H. |
| | Fact 105: The Exclusivity Agreement was separate from the SPA. Beene Dec. Ex 31, Deposition of John Mark Suhy, 43:17 – 45:3 | **DISPUTED:** Defendants fail to cite to competent evidence establishing that Neo4j USA understood that there was an enforceable exclusivity agreement separate from the SPA and consented to the same, which is necessary to establish mutual consent. *See Stanford Hosp. & Clinics v. Multinat'l Underwriters, Inc.*, 2008 |

44

SER_1003

| Claim or Defense | Opposing Party's Undisputed Facts/Supporting Evidence | Moving Parties' Response/Supporting Evidence |
|---|---|---|
| | | WL 5221071, at *7 (N.D. Cal. Dec. 12, 2008) (finding no mutual consent to oral agreement because plaintiff only offered evidence of its own state of mind); *see also Hohs v. Allstate Ins. Co.,* 2010 WL 11706760, at *5-6 (N.D. Cal. Feb. 10, 2010); *Kahn Creative Partners, Inc. v. Nth Degree, Inc.*, 2011 WL 1195680, at *3-5 (C.D. Cal. Mar. 29, 2011). |
| | Fact 106: The Exclusivity Agreement was subject to an exit clause. Suhy Dec. ¶10, Ex. 20 | DISPUTED: There is no exit clause in Exhibit 20 to the Suhy Declaration, and Defendants fail to offer any competent evidence establishing that Neo4j USA agreed to one when it allegedly entered into the exclusivity agreement on April 11, 2015. Likewise, Defendants fail to cite to any competent evidence that Neo4j USA assented to subsequent oral "exit agreement." The uncontroverted evidence also suggests the contrary. *See* UDF No. 104. |
| | Fact 107: iGov is not a successor in interest to PureThink. The work scope for PureThink and iGov were substantially different. Beene Dec. Ex 31, Deposition of John Mark Suhy, 53:19-54:4. iGove did not use any assets of PureThink. Beene Dec. Ex 31, Deposition of John Mark Suhy, 52:5-8. | DISPUTED: Suhy admitted to forming iGov to evade the restrictions in the PSA imposed on PureThink. Dkt. No. 98-1, Exs. 11, 14-15; *accord* Dkt. No. 118 at 24-5:7 (citing same); Dkt. No. 177 at 10:3-6. Suhy also informed the IRS that iGov was effectively PureThink's successor-in-interest, and iGov would be providing the same technology and know-how for the CKGE Contract. *See* Ratinoff Decl., Ex. 25, 27-28 (yellow highlights). Defendants further admit that Suhy is the sole shareholder of both Purethink and iGov, which is consistent with his representations to the IRS, making Suhy the sole beneficiary. *See* Facts 18, 86. |
| | Fact 108: Neo4j USA prevented PureThink's performance by prohibiting it from engaging with government agencies. Dkt. No. 177, Ex. D | DISPUTED: PureThink was restricted by Section 4.3.1 of the SPA from providing paid support services to government agencies using open source versions of Neo4j® softer. By agreeing to dismiss their IIPEA claim with prejudice in the face of a motion to dismiss, Defendants conceded the validity of those restrictions. |

| Claim or Defense | Opposing Party's Undisputed Facts/Supporting Evidence | Moving Parties' Response/Supporting Evidence |
|---|---|---|
| | | *See* Dkt. No. 171, ¶¶ 22-47; Dkt. Nos. 172, 176. |
| | Fact 109: Mr. Suhy worked full time under the Exclusivity Agreement. Beene Decl., Ex. 17 | DISPUTED: This assertion is not supported by competent evidence. PureThink did not maintain any time sheets that could support this assertion. Ratinoff Decl., Ex. 2 at 173:15-178:24. Defendants also do not provide any other records accounting for the time he spent allegedly working on the Gov't Edition. *See* Ratinoff Reply Decl., Ex. A at 177:7-178:14. |
| | Fact 110: Plaintiffs have made substantial government sales. Beene Dec., Ex. 29 | UNDISPUTED: However, this is not a material fact that is relevant to PureThink's breach of contract claim. |

I attest that the evidence cited herein by Plaintiffs fairly and accurately supports the facts as asserted by Plaintiffs.

Dated:  June 29, 2023                    By:  /s/ Jeffrey M. Ratinoff
                                                Jeffrey M. Ratinoff, Attorney for Plaintiffs

Adron W. Beene SB# 129040
Adron G. Beene SB# 298088
Attorney at Law
7960 Soquel Drive Ste B #296
Aptos CA 95003
Tel: (408) 392-9233
adron@adronlaw.com

Attorneys for defendants:
PURETHINK LLC, a Delaware limited
liability company, IGOV INC., a Virginia
corporation, and JOHN MARK SUHY

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEO4J, INC., a Delaware corporation, and NEO4J SWEDEN AB, a Swedish corporation,<br>Plaintiffs,<br>v.<br><br>PURETHINK LLC, a Delaware limited liability company, IGOV INC., a Virginia corporation, and JOHN MARK SUHY, an individual,<br>Defendants.<br><br>AND RELATED COUNTERCLAIMS | CASE NO. 5:18-CV-7182 EJD<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON THEIR DCMA CLAIM AND DEFENDANTS' BREACH OF CONTRACT COUNTERCLAIM AND UNCLEAN HANDS DEFENSE**<br><br>Date: July 27, 2023<br>Time: 9:00 a.m.<br>Dept. Courtroom 4, 5th floor<br>Judge: Hon. Edward J. Davila<br><br>Trial Date November 14, 2023 |

DEFENDANTS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
CASE NO. 5:18-cv-7182 EJD

i

1

## <u>TABLE OF CONTENTS</u>

2

I.   INTRODUCTION ......................................................................... 2

3

II.  STANDARD FOR SUMMARY JUDGMENT ............................... 8

4

III. ARGUMENT ............................................................................. 10

5

A.   The Court Should Deny Summary Judgment on the DCMA Claims. 10

6

   1.   The Law of The Case Doctrine Does Not Apply To Interim Orders 10

7

   2.   Removal of the Commons Clause Was Proper. ................................. 11

8

   3.   Removal of the Common Clause Prevents Further Infringement of

9

   FSF's copyright. ............................................................................. 14

10

   4.   Defendants do not control the GFI Website or Github. ................... 17

11

B.   Plaintiffs Have Acted with Unclean Hands ......................................... 17

12

C.   Plaintiffs Are Not Entitled To Summary Judgment Purethink's On

13

Breach Of Exclusively Contract Counterclaim ............................................ 21

14

   1.   The Parties Consented to a Separate Exclusivity Agreement ......... 22

15

   2.   Neo4j USA Breached the Exclusivity Agreement. .......................... 22

16

   3.   Purethink Performed its Obligations Under the Exclusivity

17

   Agreement........................................................................................ 23

18

   4.   PureThink Has Been Damaged in Excess of $1.3M ........................ 24

19

IV. INJUNCTION ......................................................................... 24

20

21

22

23

24

25

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ............................ 8, 9

*Braxton-Secret v. A.H. Robins Co.* (9th Cir. 1985) 769 F2d 528, 531 ............... 9

*Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) ............................................. 8

*Chevron Corp. v. Pennzoil Co.*, 974 F.2dll56, 1161 (9th Cir. 1992).................... 8

*Columbia Pictures Industries v. Redd Horne*, 749 F.2d 154, 160 (3d Cir. 1984)
.......................................................................................................................... 13

Dollar Sys., Inc. v. Avcar Leasing Sys., Inc., 890 F.2d 165, 173 (9th Cir.1989)
.......................................................................................................................... 17

*Eastman Kodak Co. v. Image Technical Services, Inc.* (1992) 504 US 451, 112
S.Ct. 2072 ......................................................................................................... 9

Fuddruckers, Inc. v. Doc's B.R. Others, Inc., 826 F.2d 837, 847 (9th Cir.1987)
.......................................................................................................................... 17

*Gordon v. Nextel Commc'ns. & Mullen Advert., Inc.*, 345 F.3d 922, 927 (6th
Cir. 2003)........................................................................................................... 12

*Japan Telecom, Inc. v. Japan Telecom America Inc.* (9th Cir. 2002) 287 F.3d
866 ..................................................................................................................... 17

*Langevine v. District of Columbia* (D.C. Cir. 1997) 106 F.3d 1018................... 10

*Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir. 1990)........................................ 8

*Ray Thomas, Inc., v. Cowan,* 99 Cal.App. 140 [ 277 P. 1086]. ........................ 24

*S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.*, 690
F.2d 1235............................................................................................................ 9

*Taylor v. Sapritch,* 38 Cal.App.2d 478, 481 (Cal. Ct. App. 1940)................... 24

*United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1992) .................................. 8

SER_1008

Wells Fargo & Co. v. Stagecoach Props., Inc., 685 F.2d 302, 308 (9th Cir.1982) ........................................................................................................ 17

Worden v. Cal. Fig Syrup Co., 187 U.S. 516, 528, 23 S.Ct. 161, 47 L.Ed. 282 (1903)................................................................................................ 17, 21

*Zee Medical Distributor Assn. Inc. v. Zee Medical, Inc.,* 80 Cal.App.4th 1, 10 (Cal. Ct. App. 2000) ............................................................................ 22

**Statutes**

17 U.S.C. § 1202(b)(1) .......................................................................... 11

Cal. Civ. Proc. Code § 1856 ................................................................. 22

FRCP 54 ................................................................................................ 10

FRCP 56 ............................................................................................ 8, 9

FRCP 59 ................................................................................................ 11

## I.      INTRODUCTION

Defendants and Counterclaimants Purethink LLC, John Mark Suhy and IGOV INC., ("Defendants") oppose Plaintiff and Counter defendant Neo4J, Inc.'s and Neo4j Sweden AB's motion Motion For Summary Judgment On Neo4J Swedens' DMCA Claim, Defendants' Breach of Contract Counterclaim and Unclean Hands Defense.

Plaintiffs rely on the Phase 1 summary judgment ruling to improperly conclude Phase 2 issues. Plaintiffs improperly brought the review of the AGPL clauses into the Phase 1 dispositive motions. See Dkt. 100, 25:3-11. This has resulted in a chain of critical errors, which Defendants may properly seek to correct.

As shown by the unopposed[1] Expert Report of Bradley M. Kuhn, Defendant's removal of the commons clause from the AGPL was proper. Declaration of Adron G. Beene ("Beene Dec."), Exhibit 33 ("Kuhn Expert Report"), ¶¶71-78. As the facts surrounding the removal of the commons clause are in clear dispute, no summary judgment should be granted on Plaintiffs' DMCA claim.

The DMCA claim lacks merit as Neo4J Sweden does not own the copyright to the AGPL license. The GPL and AGPL licenses were created, copyrighted, and trademarked by the Free Software Foundation ("FSF"). That is what the licenses say.

Neo4J Sweden uses FSF trademark and AGPL license under a license from FSF. That license grants Neo4J Sweden the license to use the copyrighted license under stated restrictions. "Everyone is permitted to copy

---

[1] Plaintiffs have not disclosed any contra-expert, and the deadline for doing so has passed.

CASE NO. 5:18-cv-7182 EJD                                                      2

1    and distribute verbatim copies of this license document, but changing it is not

2    allowed." Neo4J Sweden's addition of the commons clause is a violation of

3    FSF' copyright license. Neo4J Sweden's adding the commons clause is false

4    copyright management information which violates 17 U.S. Code §1202 (a).

5        That is a copyright infringement violating FSF's copyright. Suhy's

6    removal of the commons clause, which is of the infringing addition, prevents

7    further copyright infringement and stops contributory infringement. FSF,

8    owner of the copyright to the AGPL, provides this permission in the AGPL

9    license agreement. Removal of Neo4J's Sweden's infringing terms, is not a

10   violation of the DMCA.

11       There is clear evidence that Neo4j USA and Neo4J Sweden has acted

12   with unclean hands. Neo4j Sweden started licensing Neo4J software under

13   FSF's GPL and AGPL licenses. In 2012, Neo4J published a Fair Trade

14   Software Licensing document to claim an intention of only allowing use of

15   open source software for open projects. The claim is any use of Neo4J

16   software requires the user to make the source code available to "benefit the

17   world at large." If that was Neo4J's intention, they should not have used the

18   GPL and AGPL licenses. Neo4J cannot join the GPL and AGPL community,

19   using FSF's license and Trademarks then claim the license means other than

20   what it does.

21       The Fair Trade Licensing concept is inconsistent with FSF's GPL and

22   AGPL licenses.  Under the AGPL, the license granted in §2 broad (You may

23   make, run and propagate covered works that you no convey without

24   conditions so long as you license otherwise remains in force.) Under the GPL

25   and AGPL licenses, the copyleft requirement (providing a license to all source

CASE NO. 5:18-cv-7182 EJD                                           3

code) only applies on conveyance- distribution. If a licensee under a GPL or AGPL, modifies the source code but never distributes it, there is no copyleft requirement. A licensee may modify the source code and never has the obligation, as Neo4J claims, to make the project open and share the modifications for the benefit of the world. The falsity of Neo4J's purported intention is shown in the GNU.org FAQ:

**Does the GPL require that source code of modified versions be posted to the public?** (#GPLRequireSourcePostedPublic)

> The GPL does not require you to release your modified version, or any part of it. You are free to make modifications and use them privately, without ever releasing them. This applies to organizations (including companies), too; an organization can make a modified version and use it internally without ever releasing it outside the organization.
>
> But *if* you release the modified version to the public in some way, the GPL requires you to make the modified source code available to the program's users, under the GPL.
>
> Thus, the GPL gives permission to release the modified program in certain ways, and not in other ways; but the decision of whether to release it is up to you.

https://www.gnu.org/licenses/gplfaq.html#GPLRequireSourcePostedPublic

Under the AGPL, §5 states the rule for Conveying Modified Source Versions: "You must convey the entire work, as a whole under this License to anyone who comes into possession of a copy." In §6, if you convey Non-Source Forms, you must also provide the Corresponding Source. The obligation to provide modified source code is only when it is conveyed. There is no term in the GPL/AGPL that can be construed to mean whenever you use or modify the source, you must publish it to the world.  Neo4J USA told the IRS, "If you

CASE NO. 5:18-cv-7182 EJD                                                 4

SER_1012

1   choose to open source your Neo4J-based application…" you can use the

2   AGPL. This is a false claim by Neo4J USA.

3        Neo4J's Fair Trade Licensing concept was to scare people to purchase

4   Neo4J out of concern they would have to make any use of their open source

5   public. See Suhy Dec. Ex 21, (Zagalsky email to Dunn IRS 4-4-2017).  Neo4J

6   USA bolstered this false claim with litigation ""[we] do expect that a court

7   would rule based on the intent of the owner of the copyright [Neo

8   Technology]." This false statement conflates Neo4J's partial copyright

9   ownership of the software with the FSF' copyright ownership of the

10  GPL/AGPL license.

11       Neo4J has no basis to claim they can state the intention of FSF in

12  creating the GPL/AGPL licenses. Nor is intention relevant when the terms of

13  the GPL/AGPL state that conveying the software is the only time the source

14  code must be provided to the licensee. There is no duty in the GPL/AGPL to

15  grant a worldwide license to modifications to the source code at all. There is

16  no obligation to provide modifications of the source code when the software is

17  not conveyed.

18       The IRS' decision to use the AGPL version of Neo4J software is more

19  than likely the result of Neo4J's false claims. The IRS was familiar with the

20  AGPL and could glean Mr. Zagalsky's statements were false. It is Neo4J

21  USA's unclean hands that loses business.

22       If it was Neo4J's intention to require such an obligation that any use of

23  AGPL software had to be open, they used the wrong license form. They

24  cannot promote they use the GPL/AGPL trademarks and licenses, then claim

25

CASE NO. 5:18-cv-7182 EJD                                          5

1  to change the terms of the GPL/AGPL licenses. Such practice violates FSF's

2  copyright license:

3  Copyright © 2007 Free Software Foundation, Inc. <https://fsf.org/>
   Everyone is permitted to copy and distribute verbatim copies of this
4  license document, but changing it is not allowed.

5  While the AGPL has been referred to as Neo4J Sweden's license, it is

6  not. It is the license they choose to use. The AGPL defines the license in §0

7  as: "This License" refers to version 3 of the GNU Affero General Public

8  License. The Program is defined as: "The Program" refers to any

9  copyrightable work licensed under this License. Each licensee is addressed as

10 "you". "Licensees" and "recipients" may be individuals or organizations.

11 The basic rights granted under §2 of the AGPL is: All rights granted

12 under this License are granted for the term of copyright on the Program, and

13 are irrevocable provided the stated conditions are met. Applying this to the

14 Neo4J software, All rights granted under this AGPL license are granted for

15 the term of the copyright in Neo4J software and are irrevocable. This License

16 [AGPL] explicitly affirms your unlimited permission to run the unmodified

17 Program.

18 The AGPL limits how software licensed under the AGPL may be

19 conveyed: "Conveying under any other circumstances is permitted solely

20 under the conditions stated below."

21 Ironically, Neo4J Sweden's license to Neo4J USA violates the AGPL.

22 Under §4 of the AGPL, all licenses to the Program must be under the AGPL

23 license. Neo4J Sweden licensed Neo4J software and trademark to Neo4J

24 USA. This creates two distinct problems. First, software licensed under the

25 GPL/AGPL, may only be licensed under the GPL/AGPL. GPL/AGPL §4. The

CASE NO. 5:18-cv-7182 EJD                                        6

1    license from Neo4J Sweden for Neo4J software was not the GPL or AGPL.

2    See Beene Dec. Ex. 28 That license is a standard non-exclusive software and

3    trademark license. There is no compliance with the GPL/AGPL. Neo4J USA

4    further violates the GPL/AGPL license by not licensing NEO4J software

5    under the GPL or AGPL and only licenses in binary and does not provide the

6    source code. See N4J 001735. It's an object code only and no source is

7    provided.  Neo4J USA's licenses violates §6 of the GPL/AGPL. Suhy Dec. Ex.

8    24; Beene Dec., Ex 26,

9        The foundation for the trademark claim is unclean hands. Sweden's

10   Neo4J licensed its Neo4J trademark to Neo4J USA on a nonexclusive basis.

11   Beene Dec. Ex. 28, § 2.1.1. When Neo4J USA applied for registration with the

12   PTO, they claimed they owned the trademark and had been using it in

13   commerce before they existed. When these false statements were called into

14   question in this litigation, Neo4J USA did not bring these misrepresentations

15   in the trademark application to the attention of the PTO. See DKT 95 3:17-

16   23, 6:8-20, DKT 95-1; DKT 100, 12:13-14:9. The foundation of the trademark

17   claim is two lies and a concealment.

18       Neo4J USA failed to start with the correct license to close source its

19   software. Kuhn Expert Report ¶98. Instead, plaintiffs have sought to

20   threaten open source users improperly, prevent third parties from providing

21   services to open source code users. These acts are unclean hands barring the

22   Lanham act claims.

23        Further, Neo4j USA cannot escape its obligations under the exclusivity

24   agreement. The internal drafts are not the agreement and should be

25   disregarded. Neo4j USA is estopped from denying the April 11, 2015

CASE NO. 5:18-cv-7182 EJD                                              7

1   agreement as PureThink was induced by the agreement to develop the

2   Government Edition for the exclusive sale by PureThink.  PureThink has

3   incurred substantial damages due to Neo4j USA's breach of the exclusivity

4   agreement.

5        Movant improperly uses excessive immaterial facts to create a burden

6   on the opposition and this court. Burch v. Regents of Univ. of California, 433

7   F. Supp. 2d 1110, 1119 (E.D. Cal. 2006). Following Burch, defendants decline

8   to accept the burden and further burden the court. Defendants address the

9   material facts as those are all that are proper on a Rule 56 motion.

10        Plaintiffs' motion for summary judgment should be denied in its

11   entirety.

12 **II.**   **STANDARD FOR SUMMARY JUDGMENT**

13        Summary judgment is proper if "the movant shows that there is no

14   genuine dispute as to any material fact and the movant is entitled to

15   judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is to

16   be granted cautiously, with due respect for a party's right to have its

17   factually grounded claims and defenses tried to a jury. *Celotex Corp. v.*

18   *Catrett*, 477 U.S. 317, 327 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

19   242, 255 (1986). A court must view the facts and draw inferences in the

20   manner most favorable to the non-moving party. *United States v. Diebold,*

21   *Inc.*, 369 U.S. 654, 655 (1992); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d ll56,

22   1161 (9th Cir. 1992). The moving party bears the initial burden of

23   demonstrating the absence of a genuine issue of material fact for trial, but it

24   need not disprove the other party's case. *Celotex*, 477 U.S. at 323. When the

25   non-moving party bears the burden of proving the claim or defense, the

CASE NO. 5:18-cv-7182 EJD          8

1    moving party can meet its burden by pointing out that the non-moving party

2    has failed to present any genuine issue of material fact as to an essential

3    element of its case. See *Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir. 1990).

4        Once the moving party meets its burden, the burden shifts to the

5    opposing party to set out specific material facts showing a genuine issue for

6    trial. See *Liberty Lobby*, 477 U.S. at 248-49. A "material fact" is one which

7    "might affect the outcome of the suit under the governing law ...." *Id.* at 248.

8    A party cannot create a genuine issue of material fact simply by making

9    assertions in its legal papers. *S.A. Empresa de Viacao Aerea Rio Grandense v.*

10    *Walter Kidde & Co., Inc.*, 690 F.2d 1235, 1238 (9th Cir. 1982). Rather, there

11    must be specific, admissible, evidence identifying the basis for the dispute.

12    See id. The Court need not "comb the record" looking for other evidence; it is

13    only required to consider evidence set forth in the moving and opposing

14    papers and the portions of the record cited therein. Fed. R. Civ. P. 56(c)(3);

15    *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001). The

16    court must view the evidence presented on the motion in the light most

17    favorable to the opposing party: "The evidence of the non-movant is to be

18    believed, and all justifiable inferences are to be drawn in his favor."

19    [*Anderson v. Liberty Lobby, Inc.*, supra, 477 US at 255, 106 S.Ct. at 2513.  At

20    the summary judgment stage, the nonmovant's version of any disputed issue

21    of fact is presumed correct. *Eastman Kodak Co. v. Image Technical Services,*

22    *Inc.* (1992) 504 US 451, 112 S.Ct. 2072. A person's state of mind (motive,

23    intent, knowledge, etc.) may be inferred from his or her conduct. But

24    summary judgment is improper where conflicting inferences can be drawn

25    from such conduct (i.e., where reasonable minds could disagree as to a

CASE NO. 5:18-cv-7182 EJD                               9

1  person's motives, etc.). See, *Braxton-Secret v. A.H. Robins Co.* (9th Cir. 1985)

2  769 F2d 528, 531

3  **III.   ARGUMENT**

4  **A.   The Court Should Deny Summary Judgment on the DCMA**

5  **Claims**

6  **1.   The Law of The Case Doctrine Does Not Apply To**

7  **Interim Orders**

8  Plaintiffs assert AGPL issues have been conclusively decided under the

9  The Law of the Case Doctrine. This position is inaccurate. The Law of the

10  Case Doctrine does not apply to interlocutory orders. *Langevine v. District of*

11  *Columbia* 106 F.3d 1018, 1023 (D.C. Cir. 1997).  Interlocutory orders are not

12  subject to the law of the case doctrine and may "always be reconsidered prior

13  to final judgment." The ruling on the summary judgment motion was a

14  partial ruling. As the standard authority explains, this is an interlocutory

15  order:

16  > [14:35] **Effect of "partial summary judgment":** Unlike a
17  > summary judgment, a "partial summary judgment" does not
18  > terminate the action. It is merely an interlocutory order and is
19  > subject to revision. It is *not* immediately appealable without a
20  > specific judicial finding (FRCP 54(b), ¶ 14:377); and is *not* entitled
21  > to res judicata or collateral estoppel effect in other litigation.
22  > [*Information Resources, Inc. v. Dun & Bradstreet Corp.* 294 F3d
23  > 447, 452-453 (2nd Cir. 2002); *Solis v. Jasmine Hall Care Homes,*
24  > *Inc.* 610 F3d 541, 543-544 (9th Cir. 2010); *Burge v. Parish of St.*
25  > *Tammany* 187 F3d 452, 467 (5th Cir. 1999)]

A. General Considerations, Rutter Group Prac. Guide Fed. Civ. Pro.
Before Trial Ch. 14-A

This follows FRCP 54. The Court's interlocutory ruling may be revised
before final judgment. The other rulings in this case are not final and are not
subject to the Law of the Case Doctrine either.

CASE NO. 5:18-cv-7182 EJD                                    10

1    Plaintiffs claim the summary judgment ruling was decided on appeal.

2  They conflate the name of the order with the nature of the appeal.

3  Defendants appealed the order on the preliminary injunction. A partial

4  summary judgment ruling is not appealable.

5    There is a further anomaly, as the AGPL Further Restrictions Clause

6  issue was relegated to Phase 2, yet Neo4J moved forward on the issue in

7  Phase 1. The Court relied on a pleading motion in another case (Graph

8  Foundation 5:19-CV-06226-EJD) and noted nothing new was added. That is

9  because Neo4J prematurely moved forward with an issue for Phase 2 in

10  Phase 1. The party in the other case settled out and added nothing new. This

11  procedure is not appropriate.

12    Defendants intend to address this in a FRCP 59 motion, unless the

13  Court is inclined to consider the issue earlier. Plaintiffs seek to exclude the

14  evidence of why the further restriction clause allows removal of improper

15  terms. Licensees may not be able to enforce FSF copyright violations but

16  have permission to remove offending terms under the Further Restrictions

17  clause.

18    **2.    Removal of the Commons Clause Was Proper.**

19    Even given the prior interim rulings of this court, Mr. Suhy did not

20  engage in some improper intentional act in removing the non-permissive

21  additional clause from the AGPL. Section 1202(b)(1) of the DMCA

22  prohibits, *inter alia*, "intentionally remov[ing] or alter[ing] any copyright

23  management information" with the knowledge, or with "reasonable grounds

24  to know, that it will induce, enable, facilitate, or conceal an infringement of

25  any right under this title." 17 U.S.C. § 1202(b)(1).

CASE NO. 5:18-cv-7182 EJD                                                                11

1   "A section 1202(b)(1) violation occurs when a person (i) without

2   authority of the copyright owner or the law (ii) intentionally removes or alters

3   any copyright management information (iii) knowing or having reasonable

4   grounds to know that it will induce, enable, facilitate, or conceal an

5   infringement of the federal copyright laws." *Gordon v. Nextel Commc'ns. &*

6   *Mullen Advert., Inc.*, 345 F.3d 922, 927 (6th Cir. 2003).

7   Neo4J Sweden does not own the CMI as it claims. The license is owned

8   by FSF. FSF, in in the AGPL gives permission for the licensee to remove

9   additional restrictions. As discussed above, "you" means licensee under the

10   GPL/AGPL. The right to remove additional terms is triggered when the

11   Program owner uses the GPL/AGPL. The court has ruled that only the person

12   using the license -the licensor-has that right. Mr. Kuhn explains the genesis

13   and basis of the Further Restrictions clause and opines that Mr. Suhy

14   followed the permission granted in the AGPL when removing the commons

15   clause.

16   If the licensor is the only person who can remove an addition, as the

17   court has ruled, then the license agreement has been changed by Neo4J

18   Sweden. But, under the copyright license for the AGPL, FSF which owns the

19   copyright, granted a license allowing only verbatim copies with no changes

20   allowed:

21
**GNU AFFERO GENERAL
PUBLIC LICENSE**
Version 3, 19 November 2007

22

23   Copyright © 2007 Free Software Foundation, Inc. <http://fsf.org/> Everyone
is permitted to copy and distribute verbatim copies of this license document,
but changing it is not allowed.

24

25   Suhy Decl. Ex. 2.

CASE NO. 5:18-cv-7182 EJD                                    12

1    Neo4J Sweden's addition of the Commons Clause is not a verbatim copy

2    of the AGPL and is change. Mr. Suhy did not remove the AGPL. He removed

3    the common clause as allowed and which violated the AGPL. Neo4J's use of

4    the commons clause violates the AGPL. This is a copyright violation of FSF's

5    copyright to the AGPL. Neo4J Sweden was only licensed to use the AGPL

6    form without change. Neo4J Sweden violated the terms of the AGPL license

7    scope in its use of the FSF form.

8    As Neo4J Sweden does not own the copyright to the AGPL, they cannot

9    meet the requirements for a DCMA claim (ownership of the copyright). While

10   Suhy does not have standing to assert FSF's copyright[2], he does have a duty

11   to **not** contribute to Neo4J' Sweden's copyright infringement:  " 'one who,

12   with knowledge of the infringing activity, induces, causes or materially

13   contributes to the infringing activity of another, may be held liable as a

14   "contributory" infringer' " *Columbia Pictures Industries v. Redd Horne*, 749

15   F.2d 154, 160 (3d Cir. 1984), *quoting Gershwin Publishing Corp. v. Columbia*

16   *Artists Management, Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971)

17   Neo4J Sweden violated FSF's copyright in the AGPL license by adding

18   the common clause. Suhy prevented further infringement by removing the

19   offending terms.

20   Since Neo4J software is licensed under the GPL and AGPL license,

21   licensees have express permission under the terms of the FSF license to

22   remove the additional terms.[3] This right is granted for permissive and non-

23   permissive terms. Any licensee has the right to license the Program only

24

25

[3] This is an express right to remove terms that violate FSF's copyright.

CASE NO. 5:18-cv-7182 EJD                                              13

1  under the GPL/AGPL without additional terms. AGPL §7. That is what Suhy

2  did which is not a violation of FSF's copyright.

3      By choosing to use the GPL/AGPL license for Neo4J software, FSF ,the

4  copyright holder, permits removal of additional terms. With the copyright

5  holder's permission, no claim under 17 U.S. Code §1202. Suhy has permission

6  for FSF, the copyright holder. "No person shall, **without the authority of**

7  **the copyright owner** or the law—" [Emphasis added] Suhy has express

8  permission to remove additional clauses from FSF in the FSF's AGPL license.

9  As Mr. Suhy avoided Neo4J Sweden's violation of FSF's copyrighted license

10  and did what is permitted under the terms of the FSF's license, there is no

11  DMCA claim.

12        **3.    Removal of the Common Clause Prevents Further**

13              **Infringement of FSF's copyright.**

14      Neo4J Sweden choose to use the FSF copyrighted AGPL license

15  agreement. Neo4J Sweden has the burden of proof to show that Mr. Suhy

16  intended to violate Neo4J's copyright. But the copyright to the license is

17  owned by FSF. While Neo4J Sweden claims the license is its to do what it

18  wants. It is not. Neo4J Sweden could not change the license terms unless, as

19  Mr. Kuhn states, they complied with change provisions. Kuhn Expert Report,

20  ¶85. (change the name of the license and delete the preamble).

21      Neo4J Sweden cannot enjoy the benefits of using the GPL/AGPL

22  without the burdens of complying with the terms of the GPL/AGPL. Under

23  the terms of the License form Neo4J choose to use, they must comply with the

24  restriction, "no changes are permitted", and live up to the irrevocable license

25  grant.

CASE NO. 5:18-cv-7182 EJD                                          14

1    "All rights granted under this License are granted for the term of

2    copyright on the Program, and are irrevocable provided the stated

3    conditions are met." §2 GPL.

4        Neo4J Sweden did not modify the license by removing references to the

5    GPL/AGPL and removing of the preamble. Exhibits 2 and 21 to Mr. Suhy's

6    declaration shows the licenses Neo4J Sweden used. Neo4J Sweden references

7    the GNU AFFERO GENERAL PUBLIC LICENSE VERSION and includes

8    the Preamble. Neo4J Sweden uses FSF trademark and copyrighted license

9    which means Neo4J Sweden is obligated to comply with the GPL/AGPL

10   license terms.

11       Mr. Kuhn's opinion is Mr. Suhy's conduct in removing the Common

12   Clause was customary, permissible and widely encouraged:

13       In my opinion, when John Mark Suhy encountered the Neo4j
         Sweden Software License, his removal of the CC and redistribution
14       of the Covered Work under pure AGPLv3 would be considered
         customary, permissible, and even widely encouraged in the field of
15       FOSS.

16   Kuhn Expert Report ¶75.

17       The AGPL term at issue on the Further Restrictions aspect of his

18   opinions is "**All other non-permissive additional terms are considered**

19   **"further restrictions" within the meaning of section 10. If the**

20   **Program as you received it, or any part of it, contains a notice**

21   **stating that it is governed by this License along with a term that is a**

22   **further restriction, you may remove that term**." There appear two

23   interpretations of that term. The question is who is the "you" who may

24   remove further restrictions. The Court ruled on this issue based on a

25   pleading motion in another case without the benefit of evidence on this term.

CASE NO. 5:18-cv-7182 EJD                                              15

The AGPL states in the definition of The Program §0,  Each licensee is addressed as "you". The license is defined as the GNU General Public License or the GNU Affero General Public License. Neo4J Sweden provides a notice that the Neo4J software (Program) is licensed under the GPL and AGPL. Thus, Mr. Suhy ("you") received Neo4J software (Program) governed by the AGPL and had permission to remove the terms of further restrictions.

Prior rulings were based on a concept the license was Neo4J' license and they are free to do what they want with it. This omits the foundation that the license is FSF's license Neo4J Sweden choose to use. They could have used any other license form but by the election to use FSF's license, Neo4J Sweden is bound by it and must comply with it.

Mr. Suhy relied on the standard of industry reading of the AGPL license. The existence of a license is a defense to a claim for copyright infringement. *CMS Software Design Sys., Inc. v. Info Designs, Inc.*, 785 F.2d 1246, 1248 (5th Cir. 1986). Suhy was licensed under the GPL/AGPL. The "you" in the further restrictions clause is the licensee, the person reading it. He did not think that meant the person who uses the FSF license form. His understanding is supported by Mr. Kuhn and the definition of you in the FSF license.

Mr. Kuhn was involved in the addition of the "Further Restriction" clause and reasons for it. Kuhn Expert Report ¶¶27-74.  He opines that Mr. Suhy's removal of the Commons Clause was customary and permissible and even widely encouraged in the field of FOSS. Kuhn Expert Report ¶75 and permitted under the terms of the "Neo4J Sweden license". Kuhn Expert Report ¶78.

CASE NO. 5:18-cv-7182 EJD                                                     16

4. **Defendants do not control the GFI Website or Github.**

Plaintiffs claim that Defendants are responsible for making ONgDB publicly available, and responsible for it being downloaded over 14,000 times. However, Defendants do not control GFI, nor control what is placed on GFI's Github or website. See RUDF 19. As they do not control GFI's dissemination of ONgDB, Defendants cannot be responsible for its distribution.

B. **Plaintiffs Have Acted with Unclean Hands**

"Unclean hands is a defense to a Lanham Act infringement suit." *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 847 (9th Cir.1987).Trademark law's unclean hands defense springs from the rationale that "it is essential that the plaintiff should not in his trade mark, or in his advertisements and business, be himself guilty of any false or misleading representation." *Worden v. Cal. Fig Syrup Co.*, 187 U.S. 516, 528, 23 S.Ct. 161 (1903). To make out an unclean hands defense, a trademark defendant "must demonstrate that the plaintiff's conduct is inequitable and that the conduct relates to the subject matter of its claims." *Fuddruckers*, 826 F.2d at 847. To show that a trademark plaintiff's conduct is inequitable, defendant must show that plaintiff used the trademark to deceive consumers. *See Dollar Sys., Inc. v. Avcar Leasing Sys., Inc.*, 890 F.2d 165, 173 (9th Cir.1989) ("Bad intent is the essence of the defense of unclean hands.") (citing *Wells Fargo & Co. v. Stagecoach Props., Inc.*, 685 F.2d 302, 308 (9th Cir.1982)).

*Japan Telecom, Inc. v. Japan Telecom America Inc.* 287 F.3d 866, 870–871 (9th Cir. 2002).

Neo4J USA's business is built on a license of the Neo4J trademark and Neo4J software from Neo4J Sweden. That software is subject to the terms of the AGPL license. Neo4J USA is using the Neo4J trademark to sell the Neo4J software through the misuse of the AGPL license.

CASE NO. 5:18-cv-7182 EJD                                                                 17

SER_1025

1    Mr. Kuhn contrasts Neo4J Sweden's' misuse of the AGPL with how

2  MongoDB converted from open source to proprietary.  Kuhn Expert Report

3  ¶¶90-98.

4    Neo4J Sweden took the Neo4J software licensed under the AGPL and

5  licensed it to Neo4J USA, but not under the terms of the AGPL. Then Neo4J

6  USA licenses the Neo4J software under a non AGPL license in binary code

7  only and does not provide the source code of modification. This is a violation

8  of the AGPL §6. Neo4J USA licensing only the binary code under a non AGPL

9  license is a violation of the AGPL too.

10    Kuhn contrast Neo4J wrong way with the correct way MondoDB closed

11  its source code. MondoDB used the terms of the AGPL but did not use FSF's

12  trademark. They named the license a Server Side Public License. MongoDB

13  did not include the AGPL preamble. See Exhibit K to Kuhn Expert Report.

14  This means MondoDB complied with FSF rules for modifications of the

15  AGPL. Kuhn Expert Report ¶90-93.  The further restriction removal right

16  only applies when the Program states it is governed by the AGPL license.

17  AGPL §7. MondoDB changed the name of its license and did not say it was

18  governed by the AGPL so the right to remove would not apply. Neo4J Sweden

19  references the AGPL license, so the removal right does apply.

20    The evidence shows, Neo4J Sweden does not own the complete code to

21  the Neo4J software. See RUDF 1.  They did not produce contribution

22  agreements from all the authors of the code. *Id.* Under the Copyright Act, 17

23  U.S.C. §204 (a), transfers of copyright ownership requires a writing signed by

24  the owner. Neo4J Sweden had a community of people working on the

25  GPL/AGPL versions of Neo4J software for free. Those contributors are part

CASE NO. 5:18-cv-7182 EJD                                          18

authors of Neo4J software. Without agreements from the authors, Neo4J Sweden did not own 100% of the copyright to Neo4J software and had no right to license Neo4J software outside of the GPL/AGPL license. Since Neo4J Sweden does not own the complete code, licensing it to Neo4J USA with a non GPL/AGPL license is a violation of the AGPL. Kuhn Expert Report ¶¶99-107.

By embarking on using the GPL/AGPL license and community of free developers, Neo4J cut a deal, they got free development help but lost ownership in all the code. That is the GPL/AGPL bargain. Neo4J is not allowed to use free development efforts over the years from the open source community under the guise of a GPL/AGPL license, take the copyright of others to sell commercially. This is unclean hands in the operation of the business under the Neo4J trademark.

Plaintiffs' violation of FSF trademark, copyright, the AGPL license terms and use of the Neo4J trademark to improperly license Neo4J software is unclean hands.  Neo4J USA misrepresentations of time of use, ownership of trademark and failure to correct those misrepresentation is unclean hands under the PTO's standards.[4] See DKT 95 3:17-23, 6:8-20; DKT 91-1; *Chutter v. Great Mgmt. Group*, 2021 U.S.P.Q.2d 1001 (T.T.A.B. 2021).

Kuhn confirms Neo4J Sweden had other license options. Defendants agree Kuhn may not speculate on the reasons Neo4J choose to use FSF's license. But they certainly had other license forms to choose-and could make up their own. That is what MongoDB did. MongoDB modified the AGPL

---

[4] While Defendants are presently foreclosed from invalidating the trademark, the facts remain to support an unclean hands defense.

CASE NO. 5:18-cv-7182 EJD                                                      19

1   created and called it the SS Public license. That license complies with FSF's

2   rules. Kuhn Expert Report ¶93. Neo4J Sweden' misuse of the FSF license

3   does not.

4          Kuhn also explains that unless a licensor, such as Neo4J Sweden, has

5   all the rights to the software, they cannot relicense on the software on a

6   proprietary bases. Kuhn Expert Report ¶¶99-107. The evidence in this case is

7   Neo4J did not have ownership of all code to allow license to Neo4J USA.

8   RUDF 1, Suhy Decl., ¶¶13-14 , Beene Dec., Ex. 32 (Defendants asked for

9   copies of each assignment from the other authors and Neo4J Sweden did not

10  produce them).  Neo4J's USA licensing of the software on a commercial basis

11  is a violation of the AGPL.

12         Neo4J Sweden choose to license and use FSF's license form.  FSF states

13  a party may use the GPL terms if they call the license another name and do

14  not include the GPL preamble or mention GNU. Kuhn Expert Report ¶85.

15  Neo4J Sweden did do that.  Neo4J Sweden used the FSF trademarks, the

16  entire FSF agreement and did not remove the preamble. With that election,

17  the terms of the FSF license (GPL and AGPL) apply to all Neo4J software

18  and Neo4J Sweden is not allowed, under the AGPL, to change the license or

19  license it other than through the AGPL. Neo4J USA, a licensee is not allowed

20  to change the AGPL either: "Each time you convey a covered work, the

21  recipient automatically receives a license from the original licensors, to run,

22  modify and propagate that work, subject to this **License**." [Emphasis added]

23  AGPL §10.

24         The heart of unclean hands is "[It is essential that the plaintiff should

25  not in his trade mark, or in his advertisements and business, be himself

CASE NO. 5:18-cv-7182 EJD                                          20

1  guilty of any false or misleading representation." *Worden v. Cal. Fig Syrup*

2  *Co.,* 187 U.S. 516, 528, 23 S.Ct. 161 (1903). Neo4J Sweden and Neo4J USA

3  have marketed Neo4J software in violation of the AGPL. This is false and

4  misleading use of the Neo4J trademark.

5      Neo4J USA through false representations obtained its trademark

6  registration in violations of PTO rules. USA obtained the Neo4J software

7  through violation of the GPL/AGPL licenses. USA conveys the Neo4J

8  software through violation of the GPL/AGPL. USA falsely claims using

9  GPL/AGPL software must comply with a " Fair Trade Licensing" option

10  which 1) is a false interpretation of the GPL/AGPL or 2) a violation of §10 of

11  the AGPL which states, "You may not impose any further restrictions on the

12  exercise of the rights granted or affirmed under this License." Neo4J USA's

13  marketing under the Neo4J trademark is false. See Suhy Dec. Ex 22.

14      Neo4J Sweden may not license under the GPL/AGPL then have Neo4J

15  USA proclaim the license cannot be used under threat of litigation. Neo4J

16  Sweden's' grant is for the life of the copyright and irrevocable and may not

17  be restricted- by anyone. AGPL §2.

18  **C.    Plaintiffs Are Not Entitled To Summary Judgment**

19  **Purethink's On Breach Of Exclusively Contract Counterclaim**

20  The contract is clear:
    To whom it may concern,

21

22  PureThink LLC a Delaware Company, is the only Neo4j
    Government Edition reseller that is certified to resell and support
    to the US Federal Government, Department of Defense (DOD),
23  and Intelligence Agencies.

24  This agreement can be provided to Government Agencies to
    support any Federal Acquisition Regulation (FAR) regulations.
25

CASE NO. 5:18-cv-7182 EJD                                    21

Suhy Dec., Ex 20 (the "Exclusivity Agreement.")

### 1. The Parties Consented to a Separate Exclusivity Agreement

Neo4j USA consented to the Exclusivity Agreement. The terms include the words "This agreement." *Id.* Neo4j USA does not dispute that Lars Nordwall signed the Exclusivity Agreement on their behalf. *See* UDF 73, "signed by Lars Nordwall."

The terms of the Exclusivity Agreement make no mention of the SPA, and Mr. Suhy confirmed at deposition that the Exclusivity Agreement was separate from the SPA. Beene Dec. Ex 31, Deposition of John Mark Suhy, 43:17 – 45:3

Plaintiffs attempt to extricate themselves from this unambiguous agreement based on contradictory parol evidence. The internal Neo4j USA drafts and communications are not the Exclusivity Agreement and should be disregarded. Cal. Civ. Proc. Code § 1856

### 2. Neo4j USA Breached the Exclusivity Agreement.

While the Exclusivity Agreement contains no termination clause, Plaintiffs are not free to insert one so purely in their favor. Without an express term, "The court determines whether one can be implied from the nature and circumstances of the contract." *Zee Medical Distributor Assn. Inc. v. Zee Medical, Inc.,* 80 Cal.App.4th 1, 10 (Cal. Ct. App. 2000)

The nature of government contracting involves substantial up-front work, which would be recovered over a long-term relationship. This is contemplated when Mr. Suhy states "Neo Technology can **request** to revoke exclusivity" and "our contract requires us to be part of the decision to retire

CASE NO. 5:18-cv-7182 EJD                                    22

1  it." Ratinoff Dec. Ex 15, pg. 4 [emphasis added]; Beene Dec., Ex 13 pg. 1.

2  Termination of the Exclusivity Agreement would include necessarily include

3  protections for PureThink LLC's investment on an exit. Suhy Dec. ¶10.

4      A fair analysis of the nature and circumstances of the Exclusivity

5  Agreement would not permit a termination clause that permitted Neo4j USA

6  to "terminate PureThink as the exclusive reseller thereof without cause and

7  without further compensating PureThink." DKT 183, 23:13-14

8      As Neo4j USA impermissibly terminated the Exclusivity Agreement,

9  its actions to take features developed by PureThink, incorporate it into

10  NEO4Jthe sell Neo4J software and services directly to the US government,

11  Department of Defense and intelligence Agencies, is a breach of the

12  Exclusivity Agreement.

### 3.   Purethink Performed its Obligations Under the Exclusivity Agreement

15      Plaintiffs argue that PureThink did not perform its obligations, as

16  iGov, as successor in interest continued to use Gov't Edition. But iGov is not

17  a party to the Exclusivity Agreement, there is no evidence that the

18  agreement was assigned from PureThink to iGov. iGov is not a successor in

19  interest, it is a separate entity that did not use any assets of PureThink.

20  Beene Dec. Ex 31, Deposition of John Mark Suhy, 52:5-8. It is not disputed

21  that Purethink sought to and was successful in reselling to the Gov't Edition.

22      But even if the court finds PureThink did not perform all its

23  obligations, its performance is excused as Neo4j USA prevented PureThink's

24  performance by prohibiting it from engaging with government agencies. Dkt.

25

CASE NO. 5:18-cv-7182 EJD                                              23

1   No. 177, Ex. D; *Ray Thomas, Inc., v. Cowan,* 99 Cal.App. 140 [ 277 P. 1086]."

2   *Taylor v. Sapritch,* 38 Cal.App.2d 478, 481 (Cal. Ct. App. 1940)

### 4.   PureThink Has Been Damaged in Excess of $1.3M

As discussed above PureThink and IGOV are separate entities and no assets were transferred, so the successor in interest theory does not work. The work scope for PureThink and IGOV were substantially different. Beene Dec. Ex 31, Deposition of John Mark Suhy, 53:19-54:4. Mr. Suhy worked full time for PureThink See Adron Decl., Ex. 17, The value of that effort, determining the government requirements using the software and creating it along with the amount of damages for breach of the Exclusivity Agreement, is a disputed issue of material fact, that no timecards were kept is not dispositive of the damages. RUDF 85.

In addition to the loss of revenue related to the IRS, there are other substantial government sales, as shown in Exhibit 29.

As there are disputed issues of material fact as to each element of the breach of exclusive contract cause of action, summary judgment should not be granted.

## IV.   INJUNCTION

Neo4J USA seeks the courts injunction to support a trademark obtained through violation of the PTO requirements and an invalid DMCA claim. They seek injunction to support persistent violation of FSF's trademarks and copyright in the GPL/AGPL. While Neo4J claim this case is only against the defendants, they want to obtain an injunction to prevent everyone from questioning how they converted a GPL/AGPL license to a commercial license. The case has far reaching impact.

CASE NO. 5:18-cv-7182 EJD                                                      24

1    The ruling on this motion is existential to the future of the GPL/AGPL

2  license. If Neo4J Sweden can change the license terms in contraction to the

3  license grant, if they can add contradiction terms no licensee can remove, and

4  license rights they do not own, everyone can use Neo4J's bait and switch

5  method. Anyone can lure people into using, supporting, and developing

6  software under the GPL/AGPL open source model and then be cut off when

7  the company wants to make money off of other people's labor. The GPL/AGPL

8  does not allow this practice and this practice should not be supported by the

9  court.

10    Dated: June 1, 2023

11                     __/s/ Adron W. Beene_____
                       Adron W. Beene SB# 129040
12                     Adron G. Beene SB# 298088
                       Attorneys At Law
13                     7960 Soquel Drive, Suite B #296
                       Aptos, CA 95003
14                     Tel: (408) 392-9233
                       adron@adronlaw.com
15
16
17                     Attorneys for Defendants
                       PURETHINK LLC, a Delaware limited
18                     liability company, IGOV INC., a Virginia
                       corporation, and JOHN MARK SUHY
19

20

21

22

23

24

25

CASE NO. 5:18-cv-7182 EJD                              25

1  **ATTESTATION OF E-FILED SIGNATURE**

2  Pursuant to Local Rule 5-1(i)(3), I hereby certify that I have obtained the concurrence in the

3  filing of this document from all signatories for whom a signature is indicated by a "conformed"

4  signature (/s/) within this electronically filed document and I have on file records to support this

5  concurrence for subsequent production to the Court if so ordered or for inspection upon request.

6  Dated:  June 1, 2023

7                                                    /s/ Adron G. Beene
                                          Adron W. Beene
8                                          Adron G. Beene
                                          Attorneys At Law
9                                          7960 Soquel Drive, Suite B #296
                                          Aptos, CA 95003
10                                          Tel: (408) 392-9233

11                                          Attorneys for Defendants and
                                          Counter-Claimants
12                                          PURETHINK LLC, IGOV INC., and
                                          JOHN MARK SUHY

13

14

15

16

17

18

19

20

21

22

23

24

25

CASE NO. 5:18-cv-7182 EJD                                                    26

**DEFENDANTS RESPONSE TO PLAINTIFFS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS**

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| **Defendants' Violation of the DMCA [17 U.S.C. § 1202(b)(1)]** | | |
| 1. the existence of CMI on the infringed work; | **Fact 1:** Neo4j Sweden is the owner of all copyrights related to the Neo4j® graph database platform, including the source code, and has licensed those copyrights to Neo4j USA in connection with the making, use, creation of derivative works, sale, offer to sell, importation, performance, display, reproduction and distribution of the copyrighted material, and the sublicensing of such rights in the United States. Dkt. No. 98-2, ¶¶ 3-4; Dkt. No. 118 at 2:15-18 (citing same). | **DISPUTED** Neo4j does not own all the code to the Neo4j software. Beene Decl., Ex. 27. Hundreds of committers to Neo4j code do not appear to be associated with Neo4j Sweden, and Neo4j Sweden does not have assignments from committers or authors of Neo4j Software. Copies of assignments were requested in discovery but not provided Suhy Decl. ¶¶13-14, Beene Dec., Ex 32. |
| | **Fact 2:** Prior to May 2018, Plaintiffs offer a free and open source version of the Neo4j® graph database platform, Neo4j® Community Edition ("Neo4j® CE"), under the GNU General Public License version 3 ("GPL") license. Dkt. No. 118 at 3:1-4 (citing Dkt. No. 98-2, ¶¶ 4-5). Neo4j® CE is limited in its feature set and does not come with technical or administrative support. Dkt. No. 118 at 3:4-5 (citing Dkt. No. 98-2, ¶¶ 5-6). Plaintiffs also offered a more advanced commercial version, which included additional features and support services, known as the Neo4j Enterprise Edition ("Neo4j® EE"). Dkt. No. 118 at 3:5-7 (citing Dkt. No. 98-2, ¶ 8). | **DISPUTED** Prior to May 2018 Plaintiffs also released Neo4j Enterprise Edition under the vanilla AGPL open source license. Neo4j Enterprise under the AGPL and Neo4j Enterprise under the commercial license were the same physical software as they were compiled from the same source code. See Suhy Decl., ¶2. |
| | **Fact 3:** Plaintiffs originally offered Neo4j® EE under both a paid-for commercial license and for free under the GNU Affero General Public License, version 3 ("APGL"). Dkt. No. 118 at 3:7-9 (citing Dkt. No. 98-2, ¶ 8). A commercial license to Neo4j® EE entitled the purchaser to use it in a proprietary setting with industry standard terms, receive support or professional services from Neo4j USA, and the right to receive software updates, which included feature updates, bug fixes and assistance. Dkt. No. 98-2, ¶¶ 7-9. | **UNDISPUTED** that Neo4j EE was available under both a commercial and free open source AGPL license and that a commercial license came with support. **DISPUTED** that the commercial license was the only license which allowed Neo4j EE to be used in a proprietary setting or receive updates. Neo4j Enterprise under the open source AGPL (< v3.4) as well as under AGPL + Commons clause (v3.4) could be used in a proprietary setting for free, and since the code was the same for the commercial and open-source versions, they both received updates together. See Suhy Decl., Ex. 2 |

1

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | Fact 4: On May 17, 2018, Neo4j Sweden released Neo4j® EE v3.4 and replaced the AGPL with a stricter license, which included the terms from the AGPL and additional commercial restrictions provided by the Commons Clause ("Neo4j Sweden Software License"). Dkt. No. 118 at 3:9-12 (citing Dkt. No. 98-2, ¶ 11 and Ex. 3). | UNDISPUTED that Neo4j Sweden released Neo4j® EE v3.4 on May 17, 2018 which was the AGPL with the commons clause which added prohibited the non-paying public from engaging in commercial resale and support services.<br><br>DISPUTED that this was ever called "Neo4j Sweden Software License" outside of court. The License terms include the AGPL preamble and the NOTICE states: "The Software is subject to the terms of the GNU AFFERO GENERAL PUBLIC LICENSE Version 3 (http://www.fsf.org/licensing/licenses/agpl-3.0.html), included in the LICENSE.txt file, with the Commons Clause." See Suhy Decl., Ex. 3<br><br>DISPUTED that the AGPL was replaced with a stricter license. The AGPL was not replaced. The AGPL License file had the full preamble, stated it was copyrighted to the free software foundation. The commons clause was appended to the AGPL terms. Note, the commons clause did not affect end-users wishing to use the software, it was targeted at anyone trying to sell or offer a competing support offering as Neo4j USA offered.<br>See Suhy Decl., Exs. 2-3 |
| | Fact 5: The Neo4j Sweden Software License, while still allowing code to be publicly viewable and used within a certain licensed scope, prohibited the non-paying public from engaging in commercial resale and support services. Dkt. No. 118 at 3:12-13; Dkt. No. 98-2, ¶¶ 11-12 and Ex. 3. | UNDISPUTED that the commons clause states that it prohibited the non-paying public from engaging in commercial resale and support services.<br><br>DISPUTED that there was ever a reference outside of court of a license called "The Neo4j Sweden Software License". The License was always referred to as AGPL, even when the commons clause was appended to the AGPL terms.<br><br>DISPUTED that "The Neo4j Sweden Software License" had a certain licensed scope for use. The commons clause stated that it prevented others from selling or offering certain services, but did it did not affect the end-users who were using the software under the license. |

2

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | See Suhy Dec., Exs. 2-3 |
| | **Fact 6:** The NOTICE provision in the Neo4j Sweden Software License states that Neo4j® EE is developed and owned by Neo4j Sweden… and is subject to the terms of the [AGPL], with the Commons Clause as follows…." Dkt. No. 98-2, ¶ 11 and Ex. 3. It also provides additional information, such as the title of the work, terms and conditions for use of the work, and other identifying information about Neo4j Sweden and how to obtain a commercial license for the use of Neo4j® EE. *Id.* | **UNDISPUTED** The NOTICE provision was found in a separate file called NOTICE.txt which was always present next to the AGPL License file called LICENSE.txt<br><br>Every directory in the enterprise source code that has a LICENSE.txt file also has the corresponding NOTICE.txt.<br><br>See Suhy Dec., ¶ 3. and Exs. 1,3 |
| | **Fact 7:** In November 2018, Plaintiffs officially released of Neo4j® EE v3.5 solely under a commercial license. Dkt. No. 98-2, ¶ 13 and Ex. 4; Dkt. No. 118 at 3:13-15 (citing same). This meant that Plaintiffs were no longer publishing the source code for Neo4j® EE and offering it on an open source basis. *Id.* This was done to simplify the licensing model, as well as prevent bad actors from profiting by providing commercial support services in closed, proprietary projects. Dkt. No. 98-2, ¶ 13. | **UNDISPUTED** that Plaintiffs officially released of Neo4j® EE v3.5 solely under a commercial license.<br><br>**DISPUTED** that plaintiffs were no longer publishing the source code for Neo4j EE or offering it on an open source basis. All Neo4j EE versions prior to v3.5 were public and received updates from Neo4j Sweden.<br><br>**DISPUTED** that this was done to simply the licensing model, as well as prevent bad actors from profiting by providing commercial services in closed, proprietary projects.<br><br>See Suhy Decl., ¶ 4. |
| | **Fact 8:** Prior to the official release of Neo4j® EE v3.5, Plaintiffs published several beta versions via their GitHub repository subject to the Neo4j Sweden Software License. Dkt. No. 118 at 6:18-21; Dkt. No. 98-2, ¶ 14. | **UNDISPUTED** that plaintiffs published several beta versions of EE v3.5 via their GitHub repository.<br><br>**DISPUTED** that the license was ever called "Neo4j Sweden Software License." outside of court proceedings.  The beta versions were licensed under the AGPL and had the commons clause restriction appended to the AGPL license file. |
| | **Fact 9:** Neo4j® EE v3.5.0-RC1 was the last pre-release version available to Defendants via GitHub. Thereafter, only the source code for Neo4j® CE was made publicly available under the GPL via Github. *Id.* | **UNDISPUTED** Note that all prior versions of Neo4j EE remain publicly available on the Neo4j GitHub repository.<br><br>See Suhy Decl., ¶ 2. |
| 2. Defendants' intentional removal and/or | **Fact 10:** Following the release of Neo4j® EE v3.4, Suhy worked with Brad and Ben Nussbaum to form Graph Foundation, Inc. ("GFI") in June | **DISPUTED** that Mr. Suhy worked to form the Graph Foundation, Inc. ("GFI").  Mr. Suhy was part of the volunteer committer team, and gave guidance as an |

3

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| alteration of CMI without the authorization of Neo4j Sweden | 2018. Dkt. No. 118 at 6:2-7 (citing Dkt. No. 98-1, Exs. 27-29); Dkt. No. 98-1, ¶¶ 24-26 and Exs. 22-24. | open source advocate, but was not involved in forming the GFI entity.  Mr. Suhy declined any official role with the foundation.   There are no legal documents and Plaintiff's have not shown any official documents, or business records that show Mr. Suhy being involved in the formation of the GFI or serving as any official officer or director.<br><br>Plaintiff has not produced any business records, certificates, or any evidence that Mr. Suhy had a formal role in the GFI other than being on the volunteer committer team.<br><br>Beene Dec. Ex 30, Brad Nussbaum Deposition, 40:7-16, 42:9-14, 44:6-8, 78:19-24 |
| | **Fact 11:** After Suhy helped form GFI, Defendants began offering and promoting a graph database software called "ONgDB." Dkt. No. 118 at 6:2-7 (citing Dkt. No. 98-1, Ex. 27-29); Dkt. No. 98-1, ¶ 26 and Ex. 24. | **DISPUTED** that Suhy helped form GFI.  See Fact 10.<br><br>**UNDISPUTED** that GFI began offering and promoting a graph database software called "ONgDB".<br><br>**UNDISPUTED** that Mr. Suhy promoted ONgDB as part of his open-source advocacy activities. Mr. Suhy also promotes other open source innovative technologies. |
| | **Fact 12:** To create ONgDB, Suhy downloaded the source code for Neo4j® EE v3.4 from Neo4j's GitHub repository and impermissibly replaced the more restrictive Neo4j Sweden Software License with a generic copy of the AGPL, which removed (a) the valid legal notices identifying Neo4j Sweden as the copyright holder and licensor in the NOTICE provision; and (b) the commercial restrictions imposed by the Commons Clause. Dkt. No. 118 at 6:7-11 (citing Dkt. No. 98-1, Ex. 3 at 28:25-29:11; Exs. 24-26, 28; Ex. 31 at 87:24-90:9); Dkt. No. 98-1, Ex. 3 at 171:23-172:23; Dkt. No. 98-2, ¶¶ 11-12, 27. | **DISPUTED.** Mr. Suhy did not create ONgDB, he was on the volunteer team of committers and gave the guidance on how to set it up, but GFI came up with the name and created the GitHub repositories.<br><br>**DISPUTED.** Mr. Suhy did not make any modifications to the source code in v3.4 code related to the AGPL in any way.<br>See Suhy Decl., Exs. 1-4, 9 |
| | **Fact 13:** ONgGB v3.5 contained at least 182 source code files that had only been previously released by Neo4j Sweden under the Neo4j Sweden Software License in the last publicly available beta version of Neo4j® EE 3.5.  Dkt. No. 118 at 6:18-21; Dkt. No. 98-1, Ex. 38 at 6:22-7:1, 8:4-16:24; Dkt. No. 98-2, ¶¶ 13-14, 29. | **UNDISPUTED** that there were at least 182 source code files released under AGPL + Commons clause.<br><br>**DISPUTED** that the AGPL + Commons was ever called "Neo4j Sweden Software License" outside of court proceedings.   The files were released under AGPL + Commons clause. |

4

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | See Suhy Decl., Exs. 2-3<br><br>See Fact 12. |
| | **Fact 14:** Suhy again replaced the more restrictive Neo4j Sweden Software License with a generic copy of the AGPL in ONgDB v3.5, which (a) stripped out valid legal notices identifying Neo4j Sweden as the copyright holder and licensor; and (b) removed the commercial restrictions imposed by the Commons Clause in 28 LICENSE.txt files. Dkt. No. 118 at 6:21-26 (citing Dkt No. 98-1, Ex. 31 at 159:3-10 and Exs. 39-40; Dkt. No. 98-2, ¶ 30; Dkt. No. 91 at 19:2-25); Dkt. No. 98-1, ¶ 41 and Ex. 39. | **DISPUTED.**<br>Mr. Suhy had not previously replaced anything relating to the AGPL and commons for v3.4 of Neo4j Enterprise.  See Fact 12 above.<br><br>The NOTICE provision in the NOTICE.txt files which corresponded to each LICENSE.txt files, along with the 1000s of source code files which also had Neo4j Sweden CMI and the commons clause were untouched by Mr. Suhy and still clearly shows that the commons clause was present.<br><br>The only files Mr. Suhy touched were the AGPL LICENSE.txt files which clearly stated that the copyright to the file / license was to the free software foundation.<br><br>See Suhy Decl., Ex. 2<br><br>"Copyright (C) 2007 Free Software Foundation, Inc. <http://fsf.org/> Everyone is permitted to copy and distribute verbatim copies of this license document, but changing it is not allowed."<br><br>The NOTICE.txt files and all source code files still had the legal notices identifying Neo4j Sweden as the copyright holder and licensor, and also stated the license was AGPL + Commons.<br><br>See Suhy Decl., Ex. 3<br><br>"The Software is subject to the terms of the GNU AFFERO GENERAL PUBLIC LICENSE Version 3 (http://www.fsf.org/licensing/licenses/agpl-3.0.html), included in the LICENSE.txt file, with the Commons Clause."<br><br>See Suhy Decl., Exs. 1-10 |

5

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | **Fact 15:** Suhy knew that Neo4j Sweden owned the copyright for Neo4j® EE, that Neo4j Sweden controlled the licensing thereof, and he could not replace the Neo4j Sweden Software License with the APGL without Neo4j Sweden's authorization. Dkt. No. 98-1, ¶ 36 and Ex. 34 ("As the copyright holder, is Neo4j allowed to add the specific additional terms mentioned above to the License.txt file …?"); *id.,* ¶ 58 and Ex. 56 (yellow highlights); *id.,* Ex. 3 at 183:12-25, 187:12-188:15, 189:1-191:3. | UNDISPUTED that Mr. Suhy knew that Neo4j Sweden owned the copyright for Neo4j EE.<br><br>DISPUTED that Mr. Suhy replaced anything called the Neo4j Sweden Software License. He only made the AGPL License file verbatim as the copyright holder, the free software foundation instructed. He did not replace the NOTICE.txt (notice provision) or any source code CMI which clearly stated that the software was copyrighted to Neo4j Sweden and had additional restrictions in the form of the common clause.<br><br>Mr. Suhy's commit message which is used to explain why a commit / change was made states: "Updated the LICENSE.txt file to be pure AGPL as to not violate the fsf copyright and to be in line with the AGPL license." See Suhy Decl., Ex. 9<br><br>See Fact 14.<br><br>See Suhy Decl., Exs. 1-10<br><br>Neo4J Sweden does not own 100% of the code for Neo4J and the AGPL control how the software is licensed. Neo4J Sweden's misused the AGPL and Suhy corrected that. See response to Fact 1 and Facts 94 and 100. |
| | **Fact 16:** Neo4j Sweden never gave Suhy permission to remove Commons Clause, rename it "ONgDB" and offer it for free under the AGPL. Dkt. No. 98-1, ¶¶ 11-14, 27, 29-30. | **UNDISPUTED** that Neo4j Sweden never gave Suhy permission to remove Commons Clause or rename "it" ONgDB.<br><br>**DISPUTED** that Mr. Suhy renamed anything ONgDB. Mr. Suhy did not have any part in coming up with the name ONgDB.<br><br>**DISPUTED** that Mr. Suhy offered ONgDB – this is a project that is sponsored and offered by GFI.<br><br>The AGPL authorizes licensee to remove any additional terms. See Suhy Dec., Ex. 6. |

6

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | **Fact 17:** Suhy has been the sole officer and director of PureThink since he formed the corporation. Ratinoff Decl., Ex. 2 at 176:4-11; see also Dkt. No. 98-1, ¶ 16 and Ex. 14 ("[t]he principle behind PureThink … has created a new corporate entity called iGov Inc."). | **DISPUTED.** Mr. Suhy has had other partners who served as officers and directors since PureThink was formed in 2002.<br><br>See Suhy Decl., ¶ 8. |
| | **Fact 18:** Suhy has been the sole officer and director of iGov Inc. since he formed the corporation. Dkt. No. 98-1, ¶ 12 and Ex. 10; *id.,* Ex. 3 at 21:20-23:25. | **UNDISPUTED** |
| 3. Defendants Distributed Neo4j Sweden's Works with its CMI Removed | **Fact 19:** Suhy made Neo4j Sweden's source code with its CMI removed publicly available via GFI's website and Github repository for ONgDB. Dkt. No. 98-1, Ex. 24 ("IRS is adopting the open source Neo4j Enterprise distributions we are transfered [sic] to [GFI]"); *id.*, ¶¶ 27 and Ex. 25 ("All the Neo4j enterprise distributions we package from now on will come from [GFI] and have the standard vanilla AGPLv3 open source license."); *id.*, ¶¶ 28 and Ex. 26 ("I manage the Neo4j Enterprise open source distributions used by the Treasury, DHS, etc. [] Our open-source fork we manage can be found at https://graphfoundation.org"); *id.*, Ex. 3 at 172:4-23, 200:9-25, 211:7-24; *id.*, ¶¶ 41 and Ex. 39 (GFI Github commit); Dkt. No. 98-2, ¶¶ 27, 29-30. This resulted in users downloading infringing ONgDB over 14,000 times by December 2020. Dkt. No. 118 at 8:13-15. | **DISPUTED** – Mr. Suhy does not control or run the GFI website or GFI Github repositories. He is one of many volunteer open source committers on the team.<br><br>Beene Dec. Ex 30, Brady Nussbaum Deposition, 40:7-16, 42:9-14, 44:6-8, 78:19-24<br><br>The CMI is not (its) Neo4J Sweden's CMI. The copyright to the AGPL is owned by FSF. Neo4J Sweden's violation of FSF's copyright means the CMI was false in violation of the DMCA. Suhy corrected that violation with the removal of the commons clause. See Fact 98. |
| | **Fact 20:** Suhy provided hyperlinks to potential users of Neo4j® EE to download ONgDB from GFI's website and GitHub repository from his jmsuhy@purethink.com email account. Dkt. No. 98-1, Ex. 26 ("I manage the Neo4j Enterprise open source distributions used by the Treasury, DHS, etc. [] Our open-source fork we manage can be found at https://graphfoundation.org"); Ex. 40 ("I just wanted to let you know that for ONgDB 3.5 - we merged the build framework and enterprise code back into the code repository like it used to be before Neo started stripping it out. [] See: https://github.com/GraphFoundation/ongdb"); Ex. 41 (landing page for https://github.com/graphfoundation/ongdb); Ex. 45 (emailing hyperlink to https://graphfoundation.org/ongdb/); Dkt. No. 98-1, ¶¶ 43, 60 and Exs. 41, 58 (landing page for https://github.com/graphfoundation/ongdb). | UNDISPUTED that Mr. Suhy provided hyperlinks references for users of the website to view the source code and download distributions. These links sent the users who clicked on them to the GFI website, which Mr. Suhy has no official role, has no control over, and whom is just one of the many volunteer committers who volunteers time to make the software better for the open source community.<br><br>Note: Dkt. No. 98-1, Ex. 26 shows date of 08/28/2018<br><br>The code still had commons as of Nov 2019.<br><br>See Suhy Decl., Exs. 1-4 |
| | **Fact 21:** Suhy also provided hyperlinks to potential users of Neo4j® EE to download ONgDB from GFI's website and GitHub repository from his jmsuhy@igovsol.com email account. Dkt. No. 98-1, ¶ 43 and Ex. 41 (landing page for https://github.com/graphfoundation/ongdb); *id.*, ¶ 59 | UNDISPUTED – see Fact 20 above. |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | and Ex. 57 (GFI webpage https://github.com/graphfoundation/ongdb), Exs. 44, 46, 54, 76-77 (emails with hyperlinks); Ratinoff Decl., Ex. 70 (email with hyperlink to https://graphfoundation.org/ongdb/). He also tweeted and retweeted links to GFI's ONgDB webpage. Dkt. No. 98-1, Exs. 98-100, 102-104 (tweets); Exs. 105-111 (retweets). | |
| | **Fact 22:** iGov's website provided links to potential users of Neo4j® EE to download ONgDB directly from iGov and from GFI's website. Dkt. No. 98-1, ¶¶ 65-72 and Exs. 63-70; Dkt. No. 98-2, ¶ 27. | UNDISPUTED – it should be noted that all the downloads from GFI and from the mirror site I setup on iGov's website had the commons clause in the AGPL license files. |
| | **Fact 23:** iGov used a "Download Neo4j Enterprise" hyperlink on its "downloads" page to redirect consumers to download links for ONgDB until July 27, 2020. Dkt. No. 118 at 27:12-28:1; Dkt. No. 98-1, Exs. 66-68 (highlighted in red); *id.,* Ex. 13 at RFA Nos. 10, 14. | UNDISPUTED that the hyperlink was on the iGov downloads page. It was a mistake and should have said "Download ONgDB Enterprise". The link was fixed as soon as it was brought to Mr. Suhy's attention.<br><br>See Fact 22 above. |
| | **Fact 24:** On May 22, 2018, Suhy emailed the IRS telling them the addition of the Common Clause to the license for Neo4j® EE v3.4 was improper and sought to convince the IRS to move to an unrestricted version of Neo4j® EE 3.4. Ratinoff Decl., ¶ 31 and Ex. 29. The IRS did not obtain an independent legal opinion on Suhy's representations regarding the alleged impropriety of adding commercial restrictions to the AGPL. *Id.,* Ex. 4 at 96:6-98:21. | DISPUTED the reference in Ratinoff Decl., ¶ 31 and Ex. 29.<br>Does not mention anything related to trying to get IRS to move to an "unrestricted" version. Furthermore, Plaintiffs have never shown Mr. Suhy ever used the terms "unrestricted" or "restrictions" in describing the AGPL license without the commons clause.<br><br>Mr. Suhy has only used the word "restriction" in only 2 scenarios. 1. when explaining that the commercial license adds restrictions, and 2. around physical restrictions of software itself relating to number of cores, instances, or other physical attributes of Neo4j Enterprise.<br><br>See: Dkt. No. 98-1, Exs. 68,75<br>"no limitations on causal cluster instances, cores, or production usage." |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | Dkt. No. 98-1, ¶¶ 45 and Ex. 43<br>"ONgDB takes Neo4j core (which is open source) and adds enterprise features into it, all 100% free and open, with no limits on cores or cluster instances that 'commercial subscriptions' impose."<br><br>Further, the commons clause does not prevent IRS from using Neo4j v3.4 in production.  Mr. Suhy stated this in the email.<br><br>"Again this does not effect IRS in any way, even if the term was enforceable." See Ratinoff Decl., ¶ 31 and Ex. 29.<br><br>The email referenced in Ex. 29 above, was sent May 22nd, 2018.<br>At this date, even the AGPL license files had the references to the commons clause.<br><br>See Suhy Decl., Exs. 1-4,9 |
| | Fact 25: On May 24, 2018, the IRS awarded another entity that Suhy had an ownership interest in at the time, eGovernment Solutions ("eGov Sol"), a contract for the development and support of the CDW Knowledge Graph Environment ("CKGE"), which used an open source Neo4j® EE software as a main component.  Ratinoff Decl., ¶¶ 30, 32 and Exs. 28, 30; *id.,* Ex. 4 at 71:2-74:21, 75:14-76:14, 77:7-78:16, 85:3-18, 126:5-127:15; *id.,* Ex. 3 at 47:14-50:8, 50:14-54:3. | UNDISPUTED that IRS awarded eGovernment Solutions a contract to develop and support the CDW Knowledge Graph ("CKGE") environment which used an open source Neo4j software.<br><br>DISPUTED that Neo4j was a main component in the platform.  It was in fact just one small component of one service that made up the complex platform.<br><br>The SOW for the CKGE project does not have anything referencing Neo4j EE as a component, let alone the main component of CKGE. |

9

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | "The CKGE framework includes a graph database: elastic search capabilities; java-script based, user-interface; and microservices components." <br><br> The only time the word Neo4j was mentioned was under the "skills section" of the SOW. (underlined below) "The vendor will need to work with the following components: React, Angularjs, Neo4j, JAVA, micro-services architecture, and Hadoop/Spark, Elastic Search, Kafta, Agile methodology, GitLab, and Plottable." See Suhy Decl., Ex. 11 <br><br> See Suhy Decl., ¶ 5. |
| | **Fact 26:** Before the IRS awarded the CKGE contract to eGov Sol, Suhy made clear that he would be performing the work through iGov.  *See* Ratinoff Decl., Ex. 4 at 61:11-64:23, 72:2-74:21, 75:14-76:14, 77:7-78:11, 85:3-18; *id*, Ex. 3 at 30:8-31:21, 32:9-37:14, 50:14-54:3; *id.,* Ex. 2 at 188:10-193:25; *id.,* ¶ 30 and Ex. 28. | |
| | **Fact 27:** eGov Sol viewed the CKGE contract as belonging to Suhy to which he had sole responsibility for and control over.  Ratinoff Decl., Ex. 3 at 30:8-32:23, 34:1-37:14, 50:14-51:20; *id.,* ¶ 37 and Ex. 35 at §§ 5, 5.1, 5.2 and 5.3. | DISPUTED:  The stock purchase agreement between Mr. Suhy and eGovernment Solutions does not state anywhere that Mr. Suhy has the sole responsibility or sole control.  The stock purchase agreement gave Mr. Suhy the authority to drive the direction, but not absolute control. <br><br> "5.1 eGovernment Solutions Inc hereby hires John Mark Suhy as an Independent Contractor for all option years that are exercised on the CKGE contract. His compensation will be $200,000 per year paid when eGovernment Solutions gets paid…" <br><br> "5.2 eGovernment Solutions Inc will give John Mark Suhy the authority to drive the direction of the project |

10

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | (Section 5) and is given the authority to enter into agreements on behalf of eGovernment Solutions Inc relating to this project as long as the agreements are in line with government contracting laws and hubzone regulations." <br><br> See Ratinoff Decl., ¶ 37 and Ex. 35 |
| | Fact 28: The IRS paid a total of $1,316,000 to eGov Sol under the CKGE contract, which in turn eGov paid to Suhy and iGov. Ratinoff Decl., Ex. 3 at 54:10-59:5, 59:18-62:3, 63:13-65:25, 67:7-69:11, 69:16-70:19, 71:17-79:12; id., ¶¶ 38-44 and Exs. 36-42. | UNDISPUTED that IRS paid a total of $1,316,000 to eGovernment Solutions under the CKGE contract. <br><br> DISPUTED that eGovernment Solutions turned around and paid that amount to Mr. Suhy and/or iGov Inc. <br><br> eGovernment Solutions paid a $200,000 to support the CKGE contract, act as the official facility clearance officer for eGovernment Solutions because Mr. Suhy had an active clearance, and help with business development.  See Fact 27 and Ratinoff Decl., ¶ 37 and Ex. 35 <br><br> Over $251,450 of the revenue from IRS did not go to Mr. Suhy in any manner. <br><br> The total payments made to iGov Inc were $1,064,550.00 <br><br> See Suhy Decl., ¶¶ 6,7 |
| | Fact 29: Suhy was entitled to all the payments eGov Sol received from the IRS on the CKGE contract.  Ratinoff Decl., Ex. 3 at 30:13-32:25, 36:15-37:14, 39:18-40:18, 42:14-19, 50:14-54:3, 71:17-79:12, 81:6-82:17; id., ¶ 44 and Ex. 42. | DISPUTED that Mr. Suhy was entitled to all payments eGov Sol received from the IRS on the CKGE contract. See Facts 27-28, See Suhy Decl., ¶¶ 6,7 <br><br> "**5.1 eGovernment Solutions Inc hereby hires John Mark Suhy as an Independent Contractor for all option years that are exercised on the CKGE contract. His compensation will be $200,000 per year paid when** |

11

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | eGovernment Solutions gets paid. eGovernment Solutions will not be liable to pay John Mark Suhy for any work done on this contract in the event they donot get paid from the client. If the payment for the project is received all at once, then John Mark Suhy will also be paid his total salary for the option year up front, otherwise salary will be paid as eGovernment Solutions Inc get paid by the Treasury."<br><br>See Ratinoff Decl., ¶ 37 and Ex. 35 |
| | **Fact 30:** eGov Sol maintained a bank account for all the payments received from the IRS, which Suhy had access to and was authorized to disburse the payments made by the IRS as he saw fit.  Ratinoff Decl., Ex. 3 at 42:14-19, 62:1-63:12, 66:1-15. | **UNDISPUTED** that eGovernment Solutions had a bank account that received payments from clients including IRS. Mr. Suhy had access to the account because it had not been removed when he sold his shares.   Mr. Suhy just happened to still have checks and helped out of convenience since there was a bank branch near his home.<br><br>**DISPUTED** Mr. Suhy was not authorized to disburse the payments made by the IRS as he saw fit.  He had to request permission anytime he wanted to write a check for his salary.<br><br>See Facts 27-29<br>See Ratinoff Decl., ¶ 37 and Ex. 35 |
| | **Fact 31:** In July 2018, a sales representative from Neo4j USA met with the IRS and then provided a one-year $156,000 quote for a Neo4j® EE v3.4 subscription on then-current requirements of CKGE.  Ratinoff Decl., ¶ 34 and Ex. 32; *id.*, Ex. 4 at 113:5-115:20, 116:5-117:21. | **DISPUTED** that CKGE had any requirement for Neo4j EE at all.<br><br>Otherwise **UNDISPUTED** that a sales representative from Neo4j USA met with IRS and provided the quote mentioned. |
| | **Fact 32:** As of August 2018, the IRS understood that Neo4j® CE had a performance limitations, while Neo4j® EE had enterprise-only features, came with professional services and subscriptions.  The IRS ultimately decided to not allocate $156,000 for a license for Neo4j® EE because ONgDB was a free unrestricted alternative.  Ratinoff Decl., Ex. 4 at 103:2-104:12, 121:18-124:4, 126:5-129:25, 130:9-132:1. | **DISPUTED.**  Plaintiff's do not provide any evidence  citing a  "reason"" to why IRS did not allocate money for a Neo4j EE license.   See Fact 24.<br><br>**UNDISPUTED** that Neo4j EE had enterprise only features compared to Neo4j CE, and that the Neo4j EE commercial license came with support.<br><br>Zagalsky of Neo4J USA misrepresented a Fare Trade |

12

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | Licensing document as applying to the AGPL code on 4-4-2017 before the IRS to decline to do business with Neo4J USA. There is no obligation under the AGPL to make a project open when using AGPL licensed software. AGPL §2, Suhy Dec. Ex 22.<br><br>There is no evidence the IRS conveyed its copy of Neo4J software used under the terms of the AGPL and had no obligation to provide the source code to any licensee. AGPL §2. |
| | **Fact 33:** In August 2018, Suhy convinced the IRS integrate ONgDB v3.4 rather than Neo4j® EE v3.4 into the CKGE platform based, in part, on misrepresentations about GFI being the copyright holder and licensor of ONgDB. Ratinoff Decl., Ex. 4 at 126:5-129:25, 132:2-23, 133:15-138:2, 138:22-140:20, 141:8-24, 142:1-143:20; *id.*, ¶¶ 35-36 and Exs. 33-34. | **DISPUTED**<br><br>Mr. Suhy never claimed GFI was the copyright holder. The only place in Ex. 4 that even mentions the word "copyright" shows that IRS knew the copyright holder was Neo4j.<br><br>**"Q. So the Neo4j source code, Neo4j would own the copyright to that. Correct?**<br>**A. Yes. I would assume it would be available based on whatever Neo4j allowed it to be used from."**<br>Ratinoff Decl., Ex. 4 at 130:1-4<br><br>IRS was not even sure about who the license came from, and did not associate the license to be anything related to copyright.<br><br>**"A. My understanding it was not the Enterprise. It was the core source code from GitLab, Neo4j's GitLab, whatever that licensing was of that core source code brought over, and then the additional elements, whatever elements ONgDB, The Graph Foundation added onto that. That's how I understood from my point of view who was -- who was distributing and licensing it and the follow-through from whatever the licensing was of the Neo4j core that was off of GitLab. That's how I understood it."** Ratinoff Decl., Ex. 4 at 135:14-23 |

13

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | The source code for v3.4 clearly stated that Neo4j Sweden was the copyright holder. <br><br> "Neo4j Copyright © 2002-2018 Neo4j Sweden AB (referred to in this notice as "Neo4j") [http://neo4j.com] <br> This product includes software ("Software") developed and owned by Neo4j."  Suhy Decl., and Ex. 3 <br><br> See also Suhy Decl., Exs. 1-4 <br><br> There is no evidence that shows that IRS was convinced by Mr. Suhy. <br><br> See Fact 24 <br><br> There is no evidence the IRS conveyed its copy of Neo4J software used under the terms of the AGPL and had no obligation to provide the source code to any licensee.  AGPL §2. |
| | Fact 34: While working under the CKGE contract, Suhy and iGov were responsible for supporting, maintaining and updating ONgDB on an internal repository at the IRS.  Dkt. No. 98-1, Ex. 38 at 23:14-24:4; Ratinoff Decl., Ex. 3 at 366:13-368:9; *id.,* Ex. 4 at 75:14-77:24, 126:5-128:24, 142:15-143:20, 179:4-23, 204:4-206:9, 207:10-209:11; *id.,* ¶ 36 and Ex. 34; *id.,* ¶ 47 and Ex. 45 (yellow highlights). | **DISPUTED** Suhy and iGov were NOT responsible for supporting, maintaining, and updating ONgDB on the internal repository. <br><br> The Statement of Work for the CKGE project had no requirement to support, maintain or update ONgDB.  See Suhy Decl., Ex. 11 <br><br> Mr. Suhy helped IRS with technologies on his own time and not as part of any paid consulting.  Mr. Suhy also assisted with other technologies that he had expertise around when time permitted. <br><br> Mr. Suhy simply helped IRS get the source code into the IRS internal repository so that IRS could perform security |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | scanning outside any contractual obligation between IRS and eGovernment Solutions Inc.  This happened around the time that a serious Log4j Vulnerability was found to exist in Neo4j.<br><br>There is no evidence the IRS conveyed its copy of Neo4J software used under the terms of the AGPL and had no obligation to provide the source code to any licensee.  AGPL §2. |
| | <u>Fact 35:</u> Suhy and iGov helped the IRS upgrade the CKGE platform to ONgDB v3.5 and continued to integrate subsequent subversions through at least April 2022.  Dkt. No. 98-1, Ex. 3 at 224:13-23; Ratinoff Decl., Ex. 4 at 207:7-209:15, 210:5-211:20, 213:1-216:8; *id.,* ¶¶ 45-49 and Exs. 43-47 (yellow highlights). | **DISPUTED**  The CKGE platform does not require upgrades to use specific graph databases.<br><br>The CKGE platform is suite of micro-services, many of which have nothing to do with graphs. The only service that end-users used which even touched the graph was called the graph explorer.  It provides a way to explore graph structure through visualization.   It is not dependent on any specific underlying graph database and does not require any sort of upgrade to switch between backend graph and non-graph databases.<br><br>See also Fact 34.<br><br>There is no evidence the IRS conveyed its copy of Neo4J software used under the terms of the AGPL and had no obligation to provide the source code to any licensee.  AGPL §2. |
| | <u>Fact 36:</u> After April 2022, the IRS started calling ONgDB just "GDB," which still used Neo4j® EE 3.5 source code improperly licensed under the AGPL, which Suhy compiled on the IRS's internal GitLab repository. Ratinoff Decl., Ex. 4 at 175:6-176:21, 193:9-198:15. | **DISPUTED.**  There is not any ONgDB, GDB, Neo4j, or other source code based on Neo4j in use at IRS which is "improperly licensed".  All the source code within IRS clearly states that the license is AGPL + Commons.   Plaintiff has provided no evidence to the contrary.<br><br>See Suhy Decl., ¶ 9 |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | "Q.  I didn't get -- I didn't quite follow that.  I apologize.  To clarify, so you understood -- so you understood that the license that ONgDB was under was the AGPL version 3 but with the Commons Clause removed by Mr. Suhy?<br><br> A.  Yeah.  I don't -- I don't remember if he removed it.  I don't remember it being discussed.  I just remember the description of taking the core source code from GitLab, compiling it, and then, as we discussed, adding the additional capabilities that would be the ONgDB release.<br><br>So I can't remember the Commons Clause being part of the discussion.  I can't remember if he said that he took it out or what, but I can't say that.  Yeah.  I just can't say that.  In my mind, I'm tracing it from the GitLab source code, whatever that licensing was, and then released by ONgDB under their licensing."  Ratinoff Decl., Ex. 4 at 133:14-134:6<br><br>UNDISPUTED that IRS started calling ONgDB just "GDB,"<br><br>DISPUTED that the graph used Neo4j EE 3.5 source code, as Neo4j did not release the enterprise source code for v3.5 after the pre-releases. |
| | Fact 37: Between August 2018 and April 2022, they facilitated the use of four instances of ONgDB on at least three servers within the CKGE platform (a/k/a "main graph") environment. Ratinoff Decl., Ex. 4 at 152:21-156:16, 157:23-158:11, 161:23-163:4, 166:19-167:4, 168:24-172:10, 174:19-175:5, 179:13-23. | DISPUTED that Mr. Suhy or iGov Inc facilitated the use of four instances of ONgDB.  Mr. Suhy gave guidance on the servers needed for the entire CKGE stack, which the graph database was not the main piece of.  Furthermore, the references Plaintiff give show that the person being deposed |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | was not sure of the number of ONgDB instances, and was guessing.<br><br>There is no evidence the IRS conveyed its copy of Neo4J software used under the terms of the AGPL and had no obligation to provide the source code to any licensee.  AGPL §2. |
| | **Fact 38:** iGov operated www.graphstack.io to further promote ONgDB over Neo4j® EE and allowed consumers to directly download ONgDB without any restrictions.  *See* Dkt. No. 98-1, ¶ 77 and Ex. 75 ("iGov Inc is the company behind GraphStack" and that "iGov offers production support packages for Neo4j / ONgDB Enterprise open source distributions for US government agencies"); *id.*, Ex. 13 (RFA No. 40); *see also* Ratinoff Decl., ¶¶ 50-54 and Exs. 48-52. | **DISPUTED**  www.graphstack.io was not operated just to promote ONgDB over Neo4j EE.  The website promoted a stack of tools that abstracted out knowledge graphs from the underlying implementation.<br><br>The term "restrictions" mentioned are in the context of physical restrictions and have nothing to do with license restrictions.<br><br>*See* Dkt. No. 98-1, ¶ 77 and Ex. 75 "Open Native Graph DB (ONgDB) is a non-restrictive fork of Neo4j managed by the Non profit Graph Foundation. ONgDB is 100% free and open, and **there are no limitations on instances in clusters, cores, etc!**"<br><br>"What is GraphStack? **GraphStack is a development suite that allows teams to build large scale graph apps.**"<br><br>See also Fact 24. |
| 3. Defendants had reason to know that their actions would induce, enable, facilitate, or conceal copyright infringement | **Fact 39:** Defendants knew or had reasonable grounds to know that they could not replace the Neo4j Sweden Software License with the AGPL without Neo4j Sweden's authorization. *See* Ratinoff Decl., Ex. 1 at 178:17-179:8, 186:5-184:10.  This is further evidenced by their failure to seek competent legal advice, and reliance on Suhy's unqualified analysis of the provisions of the AGPL and "internet research" that he admitted was inconclusive.  *Id.* at 196:22-201:16. | **DISPUTED** defendants only created a commit to make the AGPL LICENSE.txt files verbatim as instructed in the AGPL preamble  by the copyright holder,  the free software foundation.  Suhy Dec., Ex. 6<br><br>The commit message shows the intent.<br><br>Furthermore, the defendants did not replace anything called |

17

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | "Neo4j Sweden Software License". The license has always been called the AGPL, even when the commons clause was appended to it.<br><br>Mr. Suhy was speaking of the files owned by the FSF only.<br><br>Mr. Nussbaum from the Graph Foundation did get independent legal guidance which was communicated to Mr. Suhy as well.<br><br>**"We have been advised by The Free Software Foundation in a non-legal capacity and have verified with our legal counsel independently that the Commons Clause is a "further restriction" to AGPLv3 and may be removed according to this clause of AGPLv3"**. See also Suhy Decl., Ex. 12 |
| | Fact 40: Suhy participated in a discussion thread on Plaintiffs' Github repository in May 2018 where a person claiming to represent Neo4j told him that his interpretation of Section 7 was wrong for reasons similar to those found by this Court. Dkt. No. 98-1, ¶ 119 and Ex. 117; Ratinoff Decl., Ex. 1 at 201:18-205:16. Suhy "didn't have time to go and dive into it" and chose not to seek legal advice concerning those views despite not understanding Plaintiffs' legal position on the interpretation of the AGPL. Ratinoff Decl., Ex. 1 at 205:17-206:11. | **UNDISPUTED** that Mr. Suhy participated in a discussion thread on Plaintiffs' Github repository in May 2018.<br><br>DISPUTED that Mr. Suhy chose not to seek legal advice concerning those views. The Graph Foundation did get independent legal advice and communicated that to Mr. Suhy.<br><br>Furthermore, Mr. Suhy did do quite a bit of due diligence which is one of the reasons that he only followed the instructions in the files that specifically stated they were copyrighted to the free software foundation. |
| | Fact 41: When Suhy sought guidance from the FSF on the removal of the Commons Clause, the FSF told him "[t]he copyright holder on a work is the one with the power to enforce the terms of the license" and "[i]f a work was previously available under a free license, and later that license is changed, users can always use that earlier version under the terms of the free license." Dkt. No. 98-1, ¶ 36 and Ex. 34 (yellow highlights). The FSF also warned that "we cannot provide you with legal advice" and that he should "talk with legal counsel." *Id.* | UNDISPUTED the free software foundation gave the guidance which Mr. Suhy followed. |

18

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | |
| | **Fact 42:** Suhy ignored the FSF's admonitions, and did not consult an attorney before removing the Commons Clause. Ratinoff Decl., Ex. 1 at 183:2-184:9, 187:12-188:15, 189:1-191:3, 192:18-193:24, 196:22-24. | **DISPUTED** Mr. Suhy did not remove the commons clause from Neo4j.  In March 2019, he only made the AGPL License file verbatim as the copyright holder of the file, the free software foundation, instructed in the preamble.   The commons clause was still present in all NOTICE provisions and source code headers.<br><br>See also Fact 14 |
| | **Fact 43:** Suhy understood that the Common Clause imposed commercial restrictions on the use of Neo4j® EE.  Dkt. No. 98-1, ¶ 27 and Ex. 25 ("[Neo4j Sweden] tried adding a 'commons clause' to the AGPL license, trying to precent [sic] companies from selling (and competing against them on procurements)"); *id.*, ¶ 31 and Ex. 29 ("People can pay money for a restrictive commercial license, or use Neo4j Enterprise for free under it's open source license"); *id.*, ¶¶ 44-45; Exs. 42-43 (yellow highlights); Ratinoff Decl., Ex. 1 at 154:22-156:1. | **DISPUTED** Mr. Suhy did not use the term "commercial restrictions" in relationship to the commons clause.   Mr. Suhy knew that the commons clause forbid re-selling, but was unsure about the rest as the language of the commons clause did not define what "support services" was exactly. |
| | **Fact 44:** Suhy removed the Commons Clause to induce end-users to use ONgDB in commercial applications for free and then use the cost savings to pay Defendants to provide support services to those users.  Dkt. No. 98-1, ¶ 31 and Ex. 29; *id.*, ¶¶ 64-68 and Exs. 62-66; *id.*, ¶ 128 and Ex. 126; *see also* Dkt. No. 118 at 5:24-6:1, 6:11-7:5, 29:4-11; Dkt. No. 98-1, ¶¶ 44-45, 49 and Exs. 42-43, 47; *id.*, ¶ 49 and Ex. 47; *id.*, ¶ 56 and Ex. 54; *id.*, ¶¶ 128 and Ex. 126; *id.*, ¶¶ 132-134 and Exs. 130-132. | **DISPUTED**  Mr. Suhy removed the commons clause from only the AGPL License files and gave the reason for the removal clearly in the commit message.  The commons clause was not removed from the NOTICE provision (NOTICE.txt) or any source code files.   See Fact 14.<br><br>Mr. Suhy's commit message which is used to explain why a commit / change was made states: "**Updated the LICENSE.txt file to be pure AGPL as to not violate the fsf copyright and to be in line with the AGPL license.**" See Suhy Decl., Ex. 9<br><br>Furthermore, the commons clause did not prevent end-users from using Neo4j EE for free in commercial applications or elsewhere.  Plain |

19

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | **Fact 45:** Suhy concealed the infringing nature of ONgDB and misled the IRS to believe that GFI licensed the software rather than Neo4j Sweden exemplifies their actual knowledge that the removal of Neo4j Sweden's CMI would result in copyright infringement. Ratinoff Decl., ¶ 35 and Ex. 33 ("ONgDB open source licenses come directly from the Graph Foundation as well, not from Neo4j Inc"); *id.*, Ex. 4 at 127:19-129:25, 132:2-133:13, 134:7-136:9, 137:24-138:11, 139:22-141:17. | DISPUTED Mr. Suhy was not aware that ONgDB was infringing on anything and would have called out the Graph Foundation had he thought this. <br><br> The Graph Foundation Inc communicated to Mr. Suhy and others that their legal counsel had given them the guidance as well. <br><br> **"We have been advised by The Free Software Foundation in a non-legal capacity and have verified with our legal counsel independently that the Commons Clause is a "further restriction" to AGPLv3 and may be removed according to this clause of AGPLv3"**. See also Suhy Decl., Ex. 12 <br><br> Mr. Suhy clearly stated the reason for replacing only the AGPL License file with the verbatim AGPL, while leaving all Neo4j CMI untouched. See Fact 14 and 44. <br><br> Plaintiffs have not shown that IRS was misled in any way. <br><br> Mr. Suhy never misled or stated that the copyright came from GFI.    See Fact 36 <br><br> Ratinoff Decl., ¶ 35 and Ex. 33, Shows an email dated 08/13/2018.  No modifications to the AGPL code were done as before March 2nd, 2019. See Suhy Decl., Exs. 1-4 <br><br> Suhy removed Neo4J Sweden's infringement of FSF' AGPL license and did not conceal that. |
| | **Fact 46:** Defendants used the IRS's adoption of ONgDB to encourage other government agencies and contractors to do the same and pay them for support services. Dkt. No. 98-1, ¶¶ 26, 44-49 and Exs. 24, 42-47. | UNDISPUTED that defendants referenced IRS's adoption. <br><br> DISPUTED – that defendants did this in order for agencies and contractors to pay defendants. <br><br> In all the references given by plaintiff for Fact 46, only one was related to trying to get paid, and it was for a package of |

20

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | software. **"Neo4J Server including the Graphsware PHP-Neo4J Client (Guzzlehttp, Heoku, Myclabs, Pimple, Psr, Silex, Symfony, and Composer"** Dkt. No. 98-1, ¶ 44 and Ex. 42 <br><br> Not only did defendants not encourage agencies or contractors to pay them, they told them they could find companies with past performance such as AtomRain and GraphGrid. <br><br> **"Usually which one you go with falls to the cost of production support. From a past performance perspective, the open source distributions are actually in production in the Federal government and there are companies such as us , AtomRain, GraphGrid, etc all have past performance providing production support for federal agencies for Neo4j Enterprise open source licenses."** Dkt. No. 98-1, ¶ 49 and Ex. 47 <br><br> Furthermore, Defendants were promoting the open and free nature of ONgDB. <br><br> **"I wanted to make sure you knew that you can use Neo4j Enterprise AGPL distributions at no cost, and with no limitations."** Dkt. No. 98-1, ¶ 47 and Ex. 45 <br><br> **"1. You do not have to pay any licensing fees for the software you requested. Neo4j Enterprise < 3.5 and ONgDB (Open Native Graph Database) Enterprise (all versions) are available to use 100% free, in production."** Dkt. No. 98-1, ¶ 45 and Ex. 43 |
| | <u>Fact 47</u>: Suhy also convinced another company, Greystones Consulting Group, LLC ("Greystones"), to implement ONgDB in an analytics platform branded by Greystones as "GreyRaven" and worked with them to solicit government agencies.  Ratinoff Decl., ¶¶ 55-60 and Exs. 53-58. | **DISPUTED**  None of the evidence provided by plaintiff relating to this fact suggest that Mr. Suhy convinced Greystones Consulting Group, LLC to implement ONgDB. |

21

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | |
| | **Fact 48:** The United States Air Force awarded Greystones two SBIR contracts based on its GreyRaven platform, which Greystones touted as being based on ONgDB.  Ratinoff Decl., ¶¶ 61-62 and Exs. 59-60. | **UNDISPUTED** Note however that GreyRaven was not based on ONgDB.  This was a marketing mistake and the website was updated once it was brought to GreyStone's attention. |
| | **Fact 49:** The Maryland Procurement Office (a/k/a the National Security Agency, the NSA and the MPO) tasked Next Century to analyze available graph database technologies, including Neo4j® EE.  Ratinoff Decl., Ex. 5 at 19:5-20:8, 28:10-31:21. | **UNDISPUTED** |
| | **Fact 50:** After the release of ONgDB v3.4, Suhy told Next Century that the MPO could use ONgDB under the AGPL without restrictions or paying Plaintiffs for a commercial license, as advertised on the iGov's website.  *Id.,* Ex. 5 at 35:7-37:3, 40:3-42:3, 42:16-48:22, 49:9-51:14, 51:23-25, 54:7-56:21, 57:18-62:12; *id.,* ¶¶ 63-66 and Exs. 61-63; *see also* Dkt. No. 98-1, ¶¶ 49 and Ex. 47. | **DISPUTED** as this mischaracterizes the evidence,  there were no restrictions on the number of cluster instances and cores, however the Software resticted under the AGPL license terms. Dkt. No. 98-1, ¶¶ 64 and Ex. 62; **"Are you aware that, unlike the commercial licensed options, the Neo4j Enterprise open source AGPL license does not place any restrictions on the number of cluster instances and cores?"** |
| | **Fact 51:**  Suhy confirmed that ONgDB v3.5 had the same closed enterprise features as Neo4j® EE v3.5, and Next Century could use it without restrictions or paying Neo4j for a commercial license.  *See* Ratinoff Decl., Ex. 5 at 62:13-65:17; *id.,* ¶ 66 and Ex. 64.  This led Next Century to upgrade to ONgDB v3.5.  Dkt. No. 98-1, ¶ 122 and Ex. 120. | DISPUTED It is not known what led Next Century to upgrade to ONgDB v3.5.  There is nothing in the evidence provided by plaintiff that "restrictions" had anything to do with the commons clause. In fact Next Century mentions open source and free as being important to them, and this, for example,  could have led to them upgrading to ONgDB v3.5  Dkt. No. 98-1, ¶¶ 64 and Ex. 62; **"Are you aware that, unlike the commercial licensed options, the Neo4j Enterprise open source AGPL license does not place any restrictions on the number of cluster instances and cores?"** |

22

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | |
| | **Fact 52:** As result of Defendants' removal of Neo4j Sweden's CMI and false statements about the same, Neo4j USA lost a multi-year $2.2 million deal when the MPO chose ONgDB instead of paying for a subscription to Neo4j® EE.  Dkt. No. 118 at 29:19-30:6; Dkt. No. 98-3, ¶¶ 22-24 and Exs. 12-13. | **DISPUTED** Defendants did not remove any "Neo4j Sweden's CMI" nor made any false statements about the same.  See Fact 14 above.<br><br>The commons clause does not prevent the MPO from using the software for free in their projects. Next Century stated that cost and being open source were 2 important criteria. There was another open source alternative to Neo4j called JanusGraph on the list of databases NextCentury was evaluating for the MPO.<br><br>No-where in the evidence provided by plaintiff does the MPO say they would have purchased Neo4j Enterprise if ONgDB was not available.<br><br>**"Q. And was this -- sorry. Strike that. What graph database technologies did Next Century consider for Task Order 39?**<br><br>**A. Several, including -- so there was -- Neo4j was one, Oracle was a second one, DataStax and JanusGraph were others that were the primary thrust. There were several others that I don't have the names of that -- that were also under initial consideration."** See Ratinoff Decl., Ex. 5 at 29:19-30:1<br><br>**"The analysis started with the teams reviewing  other implementations of graph database technologies at the NSA and in other -- other applications to assess the performance, the security, lessons learned, and costs of the wide range of initial technologies under consideration."** See Ratinoff Decl., Ex. 5 at 31:16-21<br><br>" |

23

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | **Q. All right. And did the NSA provide any guidance on -- on pricing for the graph database software or the -- strike that. Were you provided any instructions from on pricing considerations for the graph database software that was being considered?** <br> **A. The NSA asked us to provide an analysis alternatives that** <u>considered cost as one of the many factors</u>**, and we were tasked to provide -- not provide --** <u>to consider cost as one of the factors.</u>" See Ratinoff Decl., Ex. 5 at 44:9-18 <br><br> " <br> **A. An alternative to the Neo4j Enterprise solution.** <br> **Q. And how was it an alternative?** <br> **A.** <u>Similar features, less cost.</u> <br> **Q. And when you say "less cost," there was no cost for a license to iGov's offering of Neo4j Enterprise, correct?** <br> **A.  Not to my knowledge.** <br> " See Ratinoff Decl., Ex. 5 at 50:15-22 <br><br> It was clear that government preferred free, no cost and open source licenses over paid. <br><br> **"A. Our government customer was interested in open-source technologies.**" See Ratinoff Decl., Ex. 5 at 56:10-11 <br><br> Next Century was not even sure what the license ONgDB came under. Plaintiff's attorney had to guide the answer. <br><br> "   **Q.  And what license did Next Century understand that ONgDB was distributed under?** <br>    **A.  The -- (unintelligible.)** <br>    THE REPORTER:  I'm sorry.  One more time. <br>    THE WITNESS:  GPLv3 license. <br>    BY MR. RATINOFF: <br> **Q.  AGPL Version 3; is that correct?** <br> **A.  Yes.**" See Ratinoff Decl., Ex. 5 at 59:10-17 |

24

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | On Jan 2019, Mr. Suhy had not even replaced the AGPL License file with the verbatim version.   See Fact #14 above.<br><br>"   **Q. So as of January 2019, had Next Century been using ONgDB to the exclusion of Neo4j Enterprise?**<br>**A. I don't know that it was to the exclusion of Neo4j.**<br>**Q. But at that time, Next Century hadn't obtained a commercial license for a copy of -- or an installation of Neo4j Enterprise, correct?**<br>**A. Correct."** See Ratinoff Decl., Ex. 5 at 64:2-9<br><br>Suhy did not remove Neo4J Swedens' CMI. The CMI is FSF's copyrighted license. Neo4J was obligated to use only a compliant AGPL license and used false CMI instead. |
| **Defendants' Violation of the DMCA [17 U.S.C. § 1202(b)(3)]** | | |
| 1. the existence of CMI on the infringed work; | *See* Facts 1-9. | **DISPUTED** – See responses to Facts 1-9 |
| 2. Defendants distributing that material knew that CMI had been removed or altered without authority | *See* Facts 10-18. | **DISPUTED** – See responses to facts 14, 10-18 Defendants never distributed any material that had modifications to Neo4j Sweden's CMI.  In fact – the mirror downloads provided by Defendants had the full commons in the LICENSE files of the distribution.   Other than the |

25

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| of the copyright owner; and | | mirrors, defendants only shared links to GFI and were not aware of any wrong doing. |
| 3. Defendants knew or had reason to know that distributing works without CMI would "induce, enable, facilitate or conceal an infringement. | *See* Facts 39-52. | DISPUTED – See responses to facts 14,39-52. |
| **Defendants' Unclean Hands Defense** | | |
| 1. Defendants cannot establish that Neo4j USA's conduct is inequitable; and | Fact 53: On July 11, 2017, Neo4j USA notified the IRS that it had terminated its partnership with PureThink, and advised the IRS that PureThink was contractually restricted from providing support services for open source versions of Neo4j® software for 36 months. Ratinoff Decl., ¶ 24 and Ex. 22. | **UNDISPUTED** Note that the SOW for the contract work did not require support of any of the graphs the platform could explore. |
| | Fact 54: Despite Neo4j USA's warnings, the IRS continued to use Neo4j® EE for free under the AGPL and allowed Suhy to perform under PureThink's support contract. Ratinoff Decl., Ex. 4 at 40:16-43:13; 55:10-59:24; 69:8-70:25, 78:5-16; *id.*, ¶ 27 and Ex. 25. | **UNDISPUTED**. IRS was able to use Neo4j EE free both under the AGPL as well as under the AGPL with the commons clause.  Note that the PureThink SOW for the contract work did not require support of any of the graphs the platform could explore. |
| | Fact 55: Suhy specifically targeted the IRS to transition to iGov's Government Package for Neo4j, and as a result in late July 2017, the IRS invited iGov to provide a quote for a sole-source contract for the development and support of the CKGE, which used an open source version of Neo4j® EE software as a main component. Dkt. No. 171, ¶ 23; Ratinoff Decl., ¶ 27 and Ex. 25; *id.*, ¶ 28 and Ex. 26 (blue highlights at IGOV0001570513.001–IGOV0001570513.002); *id.*, Ex. 4 at 71:1-73:4. | **DISPUTED** that CKGE used Neo4j EE or any other graph database as a "main component".  Out of the many components and services inside CKGE, only one the graph explorer even connected to a graph to allow for visual exploration.  See Suhy Decl., ¶ 5.  None of the references provided by Plaintiff show Neo4j EE as being a main component of CKGE. |

26

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
|  |  | "The CKGE framework includes a Neo4j's Enterprise Edition open-source version2, Elastic Search capabilities, and micro-services components useful for supporting graph-related research; " Ratinoff Decl., ¶ 28 and Ex. 26 at IGOV0001570513.001 |
|  | Fact 56: It was immaterial to the IRS who was the contracting entity so long as Suhy was the individual providing them.  Ratinoff Decl., Ex. 4 at 61:11-64:23. | DISPUTED.  Although IRS wanted to work with Mr. Suhy, the IRS had to properly procure the requirement under the FAR. Ratinoff Decl., Ex. 4 at 63:23-64:21 shows that Plaintiff's attorney tried to get IRS to make this statement but the IRS response was unclear and did not show that it was immaterial who the contracting entity was.  IRS was planning on competing the opportunity. "**And then we started a new procurement process for new competition**" Ratinoff Decl., Ex. 4 at 69:23-25  "**A.  Yes.  It was a new procurement order that had started -- or was executed for sort of open competition.  I believe it was AA companies or small business companies originally, but it was open competition, and it was awarded to eGov for professional services to work, you know, to further the development of CKGE.**" Ratinoff Decl., Ex. 4 at 74:4-10 |
|  | Fact 57: On September 5, 2017, the IRS announced its intent to award a sole-source contract to iGov based on that quote.  Dkt. No. 171, ¶ 23; Dkt. No. 98-2, ¶ 23. | UNDISPUTED |
|  | Fact 58: Neo4j USA filed an official protest with the IRS, which the IRS agreed with Neo4j USA that it had improperly awarded the contract to iGov on a sole source basis and canceled it for that reason. Dkt. No. 98-2, ¶ 23; Dkt. No. 172-1, ¶¶ 5-7 and Ex. 3; Ratinoff Decl., Ex. 4 at 69:20-70:9, 71:1-74:1.  After cancelling the award to iGov, the IRS awarded iGov and Suhy the CKGE contract via eGov Sol. *See* Facts 25-30. | DISPUTED IRS did not award any contract to iGov and Suhy through eGov Sol. eGovernment Solutions paid Mr. Suhy a salary for a range of services.  See Suhy Decl., ¶ 7 See fact  28 |

27

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | |
| 2. Defendants cannot establish that Neo4j USA's conduct relates to the subject matter of its Lanham Act claims. | **Fact 59:** Neo4j USA's alleged "bad acts" pertain to the licensing of Neo4j® EE. *See* Dkt. No. 91 at 16:21-19:7. However, Neo4j Sweden owns the copyright to Neo4j® EE and was licensor of that software under the GPL and AGPL, and not Neo4j USA. Dkt. No. 98-2, ¶¶ 3-4; Dkt. No. 118 at 2:11-16 (citing same). | See Fact 1 |
| | **Fact 60:** The GPL, AGPL and Neo4j Sweden Software Licenses are copyright licenses and not trademark licenses. Dkt. No. 85 at 7:27-8:7. | UNDISPUTED |
| | **Fact 61:** Neo4j Sweden release Neo4j® EE v3.4 (the first version subject to the more restrictive Neo4j Sweden Software License) in May 2018, and as a result, ceased licensing Neo4j® EE under the AGPL at that time. Dkt. No. 118 at 3:9-12; Dkt. No. 98-2, ¶¶ 11-12, Ex. 3. | **DISPUTED**. Neo4j EE v3.4 clearly stated its license was AGPL + commons clause. They did not "cease" licensing under AGPL. Neo4j Sweden used the full AGPL preamble and called the License AGPL. They never called it "Neo4j Sweden Software License" until the court case started. |
| | **Fact 62:** The inclusion of the Commons Clause in Neo4j® EE v3.4 does not amount to inequitable conduct because the Court already held that as the copyright holder Neo4j Sweden could license Neo4j® EE how it saw fit. Dkt. No. 118 at 24:7-25:19, *aff'd* Dkt. No. 140 at 3. | **Objection**, this is not a fact, the law of the case doctrine does not apply to interlocutory orders. |
| | **Fact 63:** By May 2018, Neo4j® EE v3.4 included advanced scalability, availability, security, and operational features that were not previously available under the GPL or AGPL, and at least 182 files that were never released under either license. Dkt. No. 118 at 3:1-15; Dkt. No. 98-2, ¶¶ 6-7, 10-11; Dkt. No. 98-1, Ex. 38 at 6:22-7:1, 8:6-16:24. | DISPUTED See Fact 61.The 182 files licensed under the AGPL + commons clause was still referred to as AGPL and had the full AGPL preamble. |
| | **Fact 64:** Defendants released ONgDB sometime in July 2018 and their promotion thereof amounted to trademark infringement, false advertising and false designation of origin in violation of the Lanham Act and UCL. *See* Dkt. No. 118 at 6:2-7 (citing Dkt. No. 98-1, Ex. 28); Dkt. No., 98-1, ¶ 26 and Ex. 24; Dkt. No. 118 at 18:2-32:14. | DISPUTED Defendants did not release ONgDB. The Graph Foundation did. Beene Dec., Ex. 30. |
| | **Fact 65:** Neo4j Sweden ceased its dual licensing model under the GPL and AGPL in ***May 2018*** and Neo4j USA's alleged false statements about | DISPUTED – In May 2018 Neo4j released enterprise under AGPL with the commons clause. After v3.4 – the source |

28

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | the IRS needing to obtain a commercial license for Neo4j® EE were made before **October 2017**.  *See* Ratinoff Decl., Ex. 65 at 14:9-15:28, 17:1-27:7; *see also* Dkt. No. 118 at 3:17-4:22; Dkt. No. 177 at ¶¶ 20-21. | code clearly showed that it was using the AGPL license with commons along with the full AGPL preamble.<br><br>See Suhy Decl., Exs 1-8 |
| **PureThink's Claim for Breach of Exclusivity Contract** | | |
| 1. No enforceable contract existed; | Fact 66: There is no contract consented to or signed by Neo4j USA giving PureThink ownership rights in the Gov't Edition, the right to be paid for the development thereof, or the right to be compensated for that development work upon termination.  Instead, Suhy repeatedly told Neo4j USA – both before and after April 11, 2015 – that the Gov't Edition was a "concept" for PureThink to bypass protracted mandatory competitive bidding processes and take advantage of a faster sole-source procurement track.  Dkt. No. 98-1, ¶¶ 7-8 and Exs. 5-6; Ratinoff Decl., ¶¶ 8, 10, 12-14, 17, 19 and Exs. 6, 8, 10-12, 15, 17 (yellow highlights). | **UNDISPUTED** that PureThink did not have ownership rights to the Government Edition.   The Exclusivity agreement was designed to ensure Neo4j Inc had the proper rights to make business decisions, while still protecting PureThink's investment.<br><br>**DISPUTED**  The Government Edition Exclusivity agreement had an "exit agreement" that was designed to protect PureThink's investment and ensure PureThink would recognize a return on investment and be compensated in an "exit" situation ("Exit Agreement").<br><br>Until the exit clause algorithm could be put down in writing, Neo4j Inc and PureThink agreed that all decisions relating to the Government Edition and the Government Edition |

29

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | Exclusivity agreement would have to be agreed on unanimously by both parties. ("unanimous agreement") See Suhy Decl., ¶ 10. |
| | | Mr. Suhy's references the "unanimous agreement" requiring unanimous approval in communications with Neo4j. |
| | | "**Neo Technology <u>can request to revoke exclusivity</u> and assign to another company**." Ratinoff Decl., ¶ 17 and Ex. 15 page 4 paragraph 2 under Important Concepts. |
| | | Adron Decl., Ex. 13, green highlights |
| | | The Government Edition is not just a concept.  It is a software product combined with services which were specifically designed to address the shortcomings that Neo4j Enterprise had at the time relating to US government security and accessibility needs. |
| | | Adron Decl.,  Exs. 14, 15 |
| | | "**Neo4j US Government Edition is an "officially sponsored" package of offerings strategically designed to drive Neo4j adoption in the US Government market by drastically cutting overall cost of ownership, addressing critical government specific requirements, providing an efficient sole source path (sole source), and more…**" Suhy Decl.,  Ex. 16 |
| | | "**Purpose of US Government Edition** |
| | | **Why the approach of defining a new edition compared to other approaches? This approach lowers the barrier of entry for Neo4j into the archaic us government market. How?** |
| | | **- Fast, Efficient Procurement (Sole source - no timely** |

30

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | competitive procurements.) This has already been proven - every US Government sale has been through sole source.<br><br>- Drastically cuts down the total cost of ownership for an agency by addressing FISMA via features and support. Infact, this also applies to the community edition. The total cost of ownership for Neo4j Community Edition compared to Neo4j Government Edition can now be compared because of the high costs of FISMA. (This is one focus we address during the sales cycle - when a lead agency is considering the community edition, ignoring all the enterprise benefits they receive.)" Suhy Decl., Ex. 16<br><br>Adron Decl., Ex. 18<br><br>UNDISPUTED that Neo4j USA had the ownership rights of the Neo4j Government Edition.   The government edition was built for Neo4j Inc under the government edition exclusivity agreement.<br><br>--------<br>UNDISPUTED that Neo4j USA had the ownership rights of the Neo4j Government Edition.   The government edition was built for Neo4j Inc under the government edition exclusivity agreement.  In return for Neo4j USA owning the software and benefiting from the business plan, an "exit agreement" was in place to ensure a return on investment would be recognized by PureThink that addressed re-assignment, retirement, or termination.  Suhy Decl., ¶ 10 |

31

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | **Fact 67:** Suhy told third parties Gov't Edition was only created for sole-source justification. Ratinoff Decl., ¶ 16 and Ex. 14 (yellow highlights). | **DISPUTED**<br><br>The government edition was created to address more than just sole source justification. It was created to address requirements that the US Government needed and which Neo4j Enterprise did not have. The ability to sole source was one important aspect, but not the only reason for creating the government edition. See Fact 66 above. |
| | **Fact 68:** The letter purporting to be a separate agreement between Neo4j USA and PureThink was simply the means for PureThink to establish sole source justification. Dkt. No. 98-1, ¶ 8 and Ex. 6; Ratinoff Decl., ¶¶ 14, 18-19 and Exs. 12, 16-17 (yellow highlights). | **DISPUTED**<br>The agreement between PureThink and Neo4j USA was specifically focused on exclusivity around the Neo4j Government Edition. The agreement itself protected PureThink's investment into the Government Edition and ensured it could see a return on the investment. The agreement also allowed for sole source justification, but that was not its sole purpose.<br><br>See Fact 66. |
| | **Fact 69:** Suhy repeated confirmed and assured Neo4j USA that it owned the intellectual property making up the Gov't Edition, as well could terminate PureThink as the exclusive reseller *at any time and for any reason*. Dkt. No. 98-1, Ex. 6 (yellow highlights); Ratinoff Decl., ¶¶ 9-10, 14, 17, 19 and Exs. 7-8, 12, 15, 17 (green highlights). | **UNDISPUTED** that Neo4j USA owned the intellectual property making up the Gov't Edition. Under the Neo4j Government Exclusivity Agreement, PureThink built the Government Edition for Neo4j as part of the agreement.<br><br>**DISPUTED** that Neo4j USA could terminate PureThink as the exclusive reseller at any time and for any reason.<br><br>PureThink and Neo4j Inc agreed that until the exit agreement would be written down, both PureThink and Neo4j USA had to both fully agree on any changes to the Government Edition and the agreement which included revoking, retirement, re-assignment, or termination of any kind. This was done to protect the investment PureThink was making into the |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | Government Edition Exclusivity agreement.<br><br>See Fact 66.<br><br>"**Neo Technology <u>can request to revoke exclusivity</u> and assign to another company**." Ratinoff Decl., ¶ 17 and Ex. 15 page 4 paragraph 2 under Important Concepts.<br><br>Adron Decl Ex. 13, green highlights |
| | Fact 70:  Consistent with his prior representations, Suhy sent proposed language for the external and internal versions of the sole-source justification letters to Neo4j USA on April 10, 2015, with the internal version stating "Neo Technologies has the right to cancel this exclusivity agreement at any time and for any reason."  Ratinoff Decl., ¶ 10 and Ex. 8 (green highlight); *see also id.*, ¶ 9 and Ex. 7 (green highlights). | **UNDISPUTED** that Suhy sent proposed language for an internal version of the agreement, which  stated that the agreement could be canceled at any time for any reason. However, this language was dropped and was not executed. See Fact 66<br><br>**DISPUTED** that there were prior representations relating to being able to cancel the agreement at any time.  The exhibits referenced by plaintiff were the first documents related to the planning of the government edition.  Mr. Suhy proposed this language, but that was dropped after speaking to Mr. Tim Brown, who pointed out that having that in there without a corresponding exit agreement would not make sense.<br><br>"I am sending it to Tim Brown who is our Govt procurement expert to see if the version we send to them is suitable." Ratinoff Decl., ¶ 9 and Ex. 7<br><br>After a discuss with Neo4j Inc, the wording to cancel the exclusivity agreement at any time for any reason was never signed or executed. |

33

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | The only exclusivity agreement signed and executed had no mention of being able to cancel.   Furthermore, the same exclusivity agreement was re-signed on June 23rd, 2016, a year later, with no mention of being able to cancel.   See Suhy Decl., Ex. 20<br><br>Until the exit agreement was written down, Neo4j and PureThink agreed that any changes to the agreement would require both parties to approve until the exit agreement was written down.<br><br>"**Neo Technology <u>can request to revoke exclusivity</u> and assign to another company**." Ratinoff Decl., ¶ 17 and Ex. 15 page 4 paragraph 2 under Important Concepts.<br><br>Adron Decl.,  Ex. 13 |
| | Fact 71: The internal version of the April 11, 2015 sole-source letter signed by Lars Nordwall on behalf of Neo4j USA expressly stated that "Neo Technology has the right to cancel this exclusivity agreement at any time and for any reason." Ratinoff Decl., ¶ 11 and Ex. 9 (green highlight) | **DISPUTED**<br>An internal version of the sole source letter was never executed or agreed upon.<br><br>Ratinoff Decl., ¶ 11 and Ex. 9 simply shows 2 documents sent to Mr. Suhy for review but not executed on behalf of PureThink.<br><br>Mr. Suhy did not agree or sign the document stating that exclusivity agreement could be canceled.<br><br>The only exclusivity agreement signed and executed had no mention of being able to cancel.   Furthermore, the same exclusivity agreement was re-signed on June 23rd, 2016, a year later, with no mention of being able to cancel.   See Suhy Decl.,  Ex. 20<br><br>See fact 66, 70. |

34

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | Fact 72: The internal version of the April 11, 2015 letter signed by Neo4j USA omitted Suhy's proposed language "[t]his agreement supersedes any other agreements." *Compare* Ratinoff Decl., ¶ 10 and Ex. 8 (red highlight) *and id.*, ¶ 11 and Ex. 9 at p. 3. | **DISPUTED** The document was not executed by Mr. Suhy or PureThink. See fact 71. |
| | Fact 73: Erik Nolten of Neo4j USA shared the same understanding that Neo4j USA owned the Gov't Edition and had the right to cancel PureThink's status as an exclusive reseller thereof any time and for any reason based on Suhy's representations made before April 11, 2015 (Ratinoff Decl., ¶¶ 8-10 and Exs. 6-8) and from the express language of the sole-source letters signed by Lars Nordwall (*id.*, ¶ 15 and Ex. 13). | **DISPUTED**  The executed agreements, both signed on April 11th, 2015 then on June 23rd, 2016 (Suhy Decl., Ex. 20 ) do not say anything about being able to cancel the exclusivity agreement. Ratinoff Decl., ¶ 15 and Ex. 13 simply shows Erik Nolten sending unsigned documents to Charles Fischer on July 31st, 2015. |
| | Fact 74: After meeting with Neo4j's new Vice President of Strategic Alliances and Channels, John Broad, in October 2015, Suhy prepared documents for him reconfirming that Neo4j USA owned the Gov't Edition and had the right to cancel PureThink's status as the exclusive reseller thereof any time and for any reason.  Ratinoff Decl., ¶ 17 and Ex. 15 (green highlights). | **DISPUTED** Nowhere in the email referenced in Ratinoff Decl., ¶ 17 and Ex. 15 does it say anything about Neo4j USA having the right to cancel PureThink's status as exclusive reseller any time or any reason.  It in fact highlights that the "unanimous agreement" was in place. Mr. Suhy told Mr. Broad – that Neo4j could request to revoke and assign to another company.  The agreement was specifically designed to ensure both parties had to agree.<br><br>"**Neo Technology <u>can request to revoke exclusivity</u> and assign to another company**." Ratinoff Decl., ¶ 17 and Ex. 15 page 4 paragraph 2 under Important Concepts.<br><br>**UNDISPUTED** that Neo4j USA owned the Government Edition. See fact 66. |

35

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | |
| 2. PureThink's performance or excuse for nonperformance; | **Fact 75:** In conjunction with terminating the Gov't Edition on June 19, 2015, Neo4j USA informed PureThink that it was "no longer authorized to market, resell, demonstrate or provide training on the Neo4j Government Edition." Ratinoff Decl., ¶ 21 and Ex. 19. | **DISPUTED**: The Government Edition was discontinued, not terminated on June 19th, 2015.<br><br>Ratinoff Decl., ¶ 21 and Ex. 19 "Neo4j is hereby providing notice that Neo4j is **discontinuing Neo4j Government Edition**.."<br><br>**UNDISPUTED** that Neo4j USA sent an email stating that PureThink was no longer authorized to market, resell, demonstrate or provide training on the Neo4j Government Edition. |
| | **Fact 76:** Suhy acknowledged the termination of the Gov't Edition and agreed to remove all references from PureThink's website. Ratinoff Decl., ¶¶ 22 and Ex. 20. | **DISPUTED**<br>The Government Edition was discontinued, not "terminated". See Fact 75.<br><br>Mr. Suhy's email referenced in Ratinoff Decl., ¶¶ 22 and Ex. 20. Simply states: "We are removing references from the website. It hurts you guys as well but it does no good leaving it up as of now. There is no acknowledgement or acceptance of any of Neo4j's actions as PureThink did not agree to this as was required in the Neo4j Government Exclusivity agreement.<br><br>**UNDISPUTED** that Suhy removed the references on the website. |
| | **Fact 77:** After Neo4j USA terminated the SPA, Defendants targeted same federal agencies that PureThink previously solicited under the SPA by offering "Government Packages for Neo4j." Dkt. No. 118 at 4:24-5:20 (citing Dkt. No. 98-1, Exs. 14-19). | **DISPUTED** that Neo4j USA terminated the service provider agreement (SPA).<br><br>The Government Packages for Neo4j were not the same packages that PureThink offered. |
| | **Fact 78:** iGov's "Government Packages for Neo4j" included the same framework and FISMA security add-ons the Gov't Edition. Ratinoff Decl., ¶ 23 and Ex. 21; *id.*, ¶¶ 25-26 and Ex. 23-24. The only difference was it included Neo4j® EE for free under the AGPL. *Id.* | **DISPUTED** – Though originally in the marketing material, the Government Package for Neo4j did not ever bring anything over from PureThink or the Government Edition. |

36

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | | Though this was originally the plan, it was never executed. The Government Packages for Neo4j were never sold.<br><br>See Suhy Decl., ¶ 11 |
| | **Fact 79:** On July 11, 2017, the same day Neo4j USA terminated the SPA, Suhy emailed government contractors and agencies confirming that iGov was reusing the framework and add-ons developed for the Gov't Edition (contrary to his prior admissions that Neo4j USA owned them). Dkt. No. 98-1, ¶ 14 and Ex. 12; Ratinoff Decl., ¶¶ 25-26 and Exs. 23-24. | **DISPUTED** the emails referenced in Ratinoff Decl., ¶¶ 25-26 and Exs. 23-24.  Only show what was planned.  The plan was scrapped however and no packages were ever sold. |
| | **Fact 80:** Defendants made clear on iGov and PureThink's websites that the "Government Package for Neo4j" was from the same "principle" behind PureThink and Gov't Edition.  Dkt. No. 98-1, Exs. 14-15. | **UNDISPUTED** – The same "principle" behind PureThink and the Gov't Edition was John Mark Suhy. |
| | **Fact 81:** Suhy and PureThink formed iGov to evade the restrictions in the Partner Agreement.  Dkt. No. 98-1, ¶ 13 and Ex. 11; *id.*, ¶¶ 16-17 and Exs. 14-15 ("The principle behind PureThink and the Government Package has created a new corporate entity called iGov Inc, which is not a Neo4j Solution Partner.  Because iGov Inc is not a solution partner, it can offer packages at great cost savings to US Government Agencies as it has no restrictions on working with Neo4j Enterprise open source licenses!"); Dkt. No. 118 at 24-5:7 (citing same); Dkt. No. 177 at 10:3-6. | **DISPUTED:**  iGov did not need to evade any restrictions, as it was not part of the "partner agreement" also known as "service provider agreement (SPA)".  There are no terms in the SPA / partner agreement which forbid Mr. Suhy from creating a new company that would not be restricted by the SPA.<br><br> Note: Plaintiff's using the term. "partner agreement" here, but in Fact #77 above, they use the term "SPA". |
| | **Fact 82:** iGov thereafter operated as PureThink's successor-in-interest. Ratinoff Decl., ¶ 27 and Ex. 25 ("[S]ince iGov Inc has no limitations on supporting or providing services for Neo4j Enterprise open source licenses, we can just have iGov Inc. assume over all [PureThink's] obligations of the current contract now instead of waiting for the next procurement. Nothing would change, we would have the same team, locations and would keep working as we always have."); Ratinoff Decl., Ex. 27 ("US Treasury has decided to make the move to our new company iGov Inc and the new Government Packages for Neo4j Enterprise"); *id.*, ¶¶ 29-30 and Ex. 27-28 (yellow highlights); Dkt. No. 98-1, ¶¶ 13, 16-17 and Exs. 11, 14-15; *see also* Facts 17, 77-80. | DISPUTED:  iGov was not PureThink's successor-in-interest.<br>iGov was created from scratch and no assets, or IP was transferred from PureThink.<br><br>Mr. Suhy was the only member of both companies at the time. |
| | **Fact 83:** Defendants continued to actively marketed "Government Package for Neo4j" until they released ONgDB.  Dkt No. 118 at 4:24- | **DISPUTED**<br>Defendants did not release ONgDB.  The Graph Foundation is the owner of ONgDB and responsible for its development |

37

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | 5:20 (citing Dkt. No. 98-1, Exs. 14-19, 21, 62-64, 67-69); Dkt. No. 118 at 19:13-20:24. | and release.<br><br>Though the graph foundation was once part of the case, it has since settled with plaintiff and is no longer part of the case.<br><br>Mr. Suhy is only one of several volunteer committers and has no control or official position with the Graph Foundation. |
| 3. Neo4j USA did not breach the alleged exclusivity agreement; and | Fact 84: Assuming a separate exclusivity agreement existed, Neo4j USA had the unfettered right to discontinue the Gov't Edition and terminate PureThink as its exclusive reseller without cause and without compensating PureThink. *See* Facts 69-74. | **DISPUTED**.<br>Neo4j USA had to get PureThink's agreement to make any changes which would have included cancellation, retirement, discontinuation, or any other activities that could risk the investment and expected return on the investment PureThink had.<br><br>See Fact 66. |
| 4. There are no resulting damages to PureThink. | Fact 85: PureThink could not have suffered $1.3 million in damages since the IRS ultimately awarded the CKGE contract for the same amount to its successor-in-interest iGov via eGovernment Solutions in order for it to continue developing the CKGE the framework that PureThink had started with the Gov't Edition under the prior contract. *See* Facts 25-30. | DISPUTED<br>iGov is not the successor in interest to PureThink.<br><br>IRS did not award anything to iGov.<br><br>eGovernment Solutions paid Mr. Suhy a salary, the revenue from IRS was not passed through to iGov.<br><br>See Suhy Decl., ¶ 7<br>See fact 28 |
| | Fact 86: PureThink did not maintain any time sheets that could support their claim that PureThink "spent an equivalent to $650,000 to design, develop, and build" the Gov't Edition.  Ratinoff Decl., Ex. 2 at 173:15-177:17. | **DISPUTED**<br>PureThink told Neo4j that they would be working full time on the Government Edition.   Full time means at or over 40 hours a week. See Adron Decl., Ex. 17 |

38

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | <u>Fact 87:</u> PureThink's financial statements showed it did not incur any expenses or overhead for the development of the Gov't Edition.  Ratinoff Decl., Ex. 2 at 59:6-63:15; *id.,* ¶¶ 68-69 and Exs. 66-67. | DISPUTED – PureThink is a single person company filing as an s-corporation for tax purposes.  All the money remaining was invested into building the Government Edition by paying Mr. Suhy for his focus.   The references in Exs 66-77 do not reflect the expenses which came in the form of paying Mr. Suhy to focus full time on the Government Edition.<br><br>"**The partner fees we receive from non-partner government sales help support these initiatives - they are not looked at as 'commissions'. For example - as government adoption grows and many more sales come in - we understand if the fees must be cut to help drive your growth - and since the <u>fees only go towards 'funding' our execution of the initiatives</u>. They are not part of our future business modeling outside of operating costs.** "  Ratinoff Decl., ¶ 17 and Ex. 15 page 4 paragraph 1 under Important Concepts.<br><br>PureThink's re-invested its money and time into building out the government edition.<br>"**Unlike other partners, we plan on re-investing revenue from the partner fees made from sales to help drive the expansion and adoption of Neo4j in the US Government. This is a key differentiator between us and other partners.**"  See Suhy Decl., Ex. 19 |
| | <u>Fact 88:</u> PureThink did not spend any money to develop the Gov't Edition.  Ratinoff Decl., Ex. 2 at 170:10-171:13. | **DISPUTED**<br>PureThink reinvested the revenue from the partner fees into developing the government edition and performing the tasks required to uphold PureThink's side of the agreement.  The money paid Mr. Suhy to focus full time on the Government Edition.<br><br>See fact 87. |
| | <u>Fact 89:</u> Suhy used PureThink's work product from the Gov't Edition for iGov's "Government Packages for Neo4j." Ratinoff Decl., Ex. at 186:14-24; *id.,* ¶¶ 25-26 and Exs. 23-24 ("We've simply taken the framework | **DISPUTED**<br>Suhy did not use PureThink's work product from the Government Edition for iGov's "Government Packages for |

| Claim or Defense | Moving Party's Undisputed Facts/Supporting Evidence | Opposing Parties' Response/Supporting Evidence |
|---|---|---|
| | and services that made a Neo4j Enterprise (Commercial only) into Neo4j Government Edition and made them available as a stand alone package we call (Government Package for Neo4j)"); *id.*, ¶¶ 29-20 and Exs. 27-28. | Neo4j".   The statements made were incorrect and iGov never used any work product from the Government Edition, nor did iGov ever sell any of these packages.<br><br>See fact 78<br>See Suhy Decl., ¶ 11 |

40

**DEFENDANTS UNDISPUTED MATERIAL FACTS**

| Claim or Defense | Opposing Party's Undisputed Facts/Supporting Evidence | Moving Parties' Response/Supporting Evidence |
|---|---|---|
| **Defendants' did not violate the DMCA [17 U.S.C. § 1202(b)(1)]; [17 U.S.C. § 202(b)(3)]** | | |
| | Fact 90: Neo4J does not license the commercial product under the AGPL. Beene Dec. Ex 26 | |
| | Fact 91: The Amended and Restated License Agreement which Neo4J Sweden licensed Neo4J software to Neo4J USA is not an AGPL license. Been Dec. Ex. 28 | |
| | Fact 92: The Amended and Restated License Agreement which Neo4J Sweden licensed Neo4J software to Neo4J USA is not an AGPL license. Been Dec. Ex. 28 | |
| | Fact 93: the Amended and Restated License Agreement required NEO4 J USA to comply with all third party software licenses including licenses approved by the Open Source Initiative such as the AGPL. Beene Dec. Ex 28, Section 2.1.3. | |
| | Fact 94: Neo4J does not own all the code to Neo4J software. Beene Dec. Ex 27. Since Neo4J Sweden does not own the complete code, licensing it to Neo4J USA with a non GPL/AGPL license is a violation of the AGPL. Beene Dec., Ex. 33, Kuhn Expert Report ¶¶99-107. Suhy Dec. Exs. 6, 21. | |
| | Fact 95: Neo4J told the IRS they could only use the AGPL version if they made the project open in violation of the terms of the AGPL. Suhy Dec. Exs. 22, 23 | |
| | Fact 96: The Fair Trade License document is a misrepresentation of the terms of the AGPL. Suhy Dec. Exs. 22, 23. Under the AGPL, anyone is licensed to use the software. The obligation to provide modified source code is only on conveyance. AGPL sections 2, 5 and 6. Suhy Dec., Ex 6. | |
| | Fact 97: There is no obligation under the AGPL to make use of Neo4J software an open project. AGPL, Suhy Dec., Ex 6. | |
| | Fact 98: The AGPL trademark is owned by FSF. AGPL, Suhy Dec., Ex 6. | |

41

| Claim or Defense | Opposing Party's Undisputed Facts/Supporting Evidence | Moving Parties' Response/Supporting Evidence |
|---|---|---|
| | Fact 99: The license grant to use AGPL license restricts changes: AGPL "Everyone is permitted to copy and distribute verbatim copies of this license Document, but changing is not allowed." Suhy Dec., Ex 6. | |
| | Fact 100: Neo4J Sweden violated the AGPL by changing the AGPL adding the commons clause. Suhy Dec., Ex 6. | |
| | Fact 101: Neo4J Sweden inclusion of the commons clause violated FSF' AGPL license terms. Suhy Dec., Ex 6. | |
| | Fact 102: Neo4J USA failed to provide verbatim copies of the AGPL license with its commercial license as required under the AGPL section 4. Suhy Dec. Exs. 6, 24; Beene Ex. 26 | |
| Plaintiffs Acted With Unclean Hands | See Facts 90-102 | |
| | Fact 103: No communication shows Neo4j, Inc. advised the PTO they did not own the NEO4J Trademark or change the date of first use. Suhy Dec., ¶15 | |
| Neo4j USA Breached the Exclusivity Agreement | | |
| | Fact 104: Neo4j consented to an Exclusivity Agreement with PureTink LLC. Suhy Dec., Ex. 20 | |
| | Fact 105: The Exclusivity Agreement was separate from the SPA. Beene Dec. Ex 31, Deposition of John Mark Suhy, 43:17 – 45:3 | |
| | Fact 106: The Exclusivity Agreement was subject to an exit clause. Suhy Dec. ¶10, Ex. 20 | |
| | Fact 107: iGov is not a successor in interest to PureThink. The work scope for PureThink and iGov were substantially different. Beene Dec. Ex 31, Deposition of John Mark Suhy, 53:19-54:4. iGove did not use any assets of PureThink. Beene Dec. Ex 31, Deposition of John Mark Suhy, 52:5-8. | |
| | Fact 108: Neo4j USA prevented PureThink's performance by prohibiting it from engaging with government agencies. Dkt. No. 177, Ex. D | |
| | Fact 109: Mr. Suhy worked full time under the Exclusivity Agreement. Beene Decl., Ex. 17 | |

42

| Claim or Defense | Opposing Party's Undisputed Facts/Supporting Evidence | Moving Parties' Response/Supporting Evidence |
|---|---|---|
|  | Fact 110: Plaintiffs have made substantial government sales. Beene Dec., Ex. 29 |  |

I attest that the evidence cited herein fairly and accurately supports the facts as asserted by Defendants.

Dated:  June 1, 2023                      By:  _/s/ Adron G. Beene_

Adron G. Beene, Attorney for Defendants

43

1   John V. Picone III, Bar No. 187226
    jpicone@hopkinscarley.com
2   Jeffrey M. Ratinoff, Bar No. 197241
    jratinoff@hopkinscarley.com
3   Arthur E. Rothrock, Bar No. 312704
    arothrock@hopkinscarley.com
4   HOPKINS & CARLEY
    A Law Corporation
5   The Letitia Building
    70 South First Street
6   San Jose, CA  95113-2406

7   *mailing address:*
    P.O. Box 1469
8   San Jose, CA 95109-1469
    Telephone:    (408) 286-9800
9   Facsimile:    (408) 998-4790

10  Attorneys for Plaintiffs and Counter-Defendants
    NEO4J, INC. and NEO4J SWEDEN AB

11

12                  UNITED STATES DISTRICT COURT

13              NORTHERN DISTRICT OF CALIFORNIA

14  NEO4J, INC., a Delaware corporation, and       CASE NO.  5:18-cv-07182-EJD
    NEO4J SWEDEN AB, a Swedish
15  corporation,                                    **DECLARATION OF JEFFREY M.
                                                    RATINOFF IN SUPPORT OF
16                      Plaintiffs,                  PLAINTIFFS' MOTION FOR SUMMARY
                                                    JUDGMENT ON THEIR DMCA CLAIM
17          v.                                      AND DEFENDANTS' BREACH OF
                                                    CONTRACT COUNTERCLAIM AND
18  PURETHINK LLC, a Delaware limited               UNCLEAN HANDS DEFENSE**
    liability company, IGOV INC., a Virginia
19  corporation, and JOHN MARK SUHY, an             Date:       July 27, 2023
    individual,                                     Time:       9:00 a.m.
20                                                  Dept:       Courtroom 4, 5th Floor
                        Defendants.                 Judge:      Hon. Edward J. Davila
21
                                                    Trial Date:  November 14, 2023
22
    AND RELATED COUNTERCLAIM.
23

24

25

26

27

28

4869-6111-7779.4

DECLARATION OF JEFFREY M. RATINOFF IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 5:18-CV-07182-EJD

SER_1078

I, Jeffrey M. Ratinoff, declare as follows:

1. I am an attorney at law, duly licensed to practice before all courts of the State of California, and am of counsel with Hopkins & Carley, a Law Corporation, attorney of record for Plaintiff Neo4j, Inc. and Neo4j Sweden AB (collectively "Plaintiffs") in the above-captioned matter. I make this declaration in support of Plaintiffs' Motion for Summary Judgment on Their DMCA Claim and Defendants' Breach of Contract Counterclaim and Unclean Hands Defense concurrently filed herewith.

2. The facts stated herein are based on my personal knowledge, except with respect to those matters stated to be on information and belief, and as to those matters, I believe them to be true. If called upon to testify as a witness in this matter, I could and would do so competently.

3. Attached hereto as **Exhibit 1** is a true and correct copy of relevant pages from the transcript of the FRCP 30(b)(6) deposition of John Mark Suhy as representative of iGov Inc. taken by Plaintiffs on October 22, 2020. The parties stipulated that this testimony would be binding on Defendants PureThink LLC, iGov Inc. and John Mark Suhy in his individual capacity (collectively "Defendants"). *See* Dkt. No. 155.

4. Attached hereto as **Exhibit 2** is a true and correct copy of relevant pages from the transcript of the Deposition of PureThink LLC, iGov Inc. and John Mark Suhy taken by Plaintiffs on November 29, 2022. The parties stipulated that this testimony would be binding on all Defendants. *See* Dkt. No. 155.

5. Attached hereto as **Exhibit 3** is a true and correct copy of the relevant pages from the transcript of the Deposition of Ashwani Mayur taken by Plaintiffs on October 15, 2022. eGovernment Solutions, Inc. ("eGov Sol" or "eGovernment Solutions") produced Mr. Mayur as its designated witness on the topics of examination included in a deposition subpoena served on eGovernment Solutions by Plaintiffs.

6. Attached hereto as **Exhibit 4** is a true and correct copy of the relevant pages from the transcript of the Deposition of Michael C. Dunn taken by Plaintiffs on November 17, 2022. The Internal Revenue Service (IRS) produced Mr. Dunn as its designated witness on the topics of examination included in a deposition subpoena served on the IRS by Plaintiffs.

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ REDWOOD CITY

4869-6111-7779.4                                         - 1 -
DECLARATION OF JEFFREY M. RATINOFF IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 5:18-CV-07182-EJD

SER_1079

7. Attached hereto as **Exhibit 5** is a true and correct copy of the relevant pages from the transcript of the Deposition of Jim Weyant of CACI International, Inc. ("CACI") taken by Plaintiffs on September 16, 2022. CACI produced Mr. Weyant as its designated witness on the topics of examination included in a deposition subpoena served by Plaintiffs on Next Century, which was acquired by CACI International, Inc. in October 2019.

8. Attached hereto as **Exhibit 6** is a true and correct copy of a February 13, 2015 email sent by John Mark Suhy (jmsuhy@purethink.com) to Erik Nolten of Neo4j USA, which was produced by Defendants on or about September 11, 2019 in native format and bears the Bates Nos. PT00003444.001–PT00003444.002. The portions referenced by and/or that are most relevant to Plaintiffs' Motion are highlighted in yellow.

9. Attached hereto as **Exhibit 7** is a true and correct copy of an April 9, 2015 email and an attachment sent by John Mark Suhy (jmsuhy@purethink.com) to Erik Nolten, which were produced by Defendants on or about September 11, 2019 in native format and bear the Bates No. PT00003382.001 and PT00003383.001–PT00003383.002. The portions referenced by and/or that are most relevant to Plaintiffs' Motion are highlighted in yellow and green.

10. Attached hereto as **Exhibit 8** is a true and correct copy of an April 10, 2015 email exchange between John Mark Suhy (jmsuhy@purethink.com) and Erik Nolten of Neo4j USA, which was produced by Defendants on or about September 11, 2019 in native format and bears the Bates Nos. PT00003380.001–PT00003380.002. The portions referenced by and/or that are most relevant to Plaintiffs' Motion are highlighted in yellow, green and red.

11. Attached hereto as **Exhibit 9** is a true and correct copy of an April 10, 2015 email and two attachments sent by Erik Nolten to John Mark Suhy (jmsuhy@purethink.com), which were produced by Defendants on or about September 11, 2019 in native format and bear the Bates Nos. PT00003371.001, PT00003372.001 and PT00003373.001. The portions referenced by and/or that are most relevant to Plaintiffs' Motion are highlighted in green.

12. Attached hereto as **Exhibit 10** is a true and correct copy of a April 15, 2015 email from John Mark Suhy (jmsuhy@purethink.com) and Utpal Bhatt of Neo4j USA (and prior emails exchanged between them), which was produced by Defendants on or about September 11, 2019 in

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ REDWOOD CITY

4869-6111-7779.4                                      - 2 -
DECLARATION OF JEFFREY M. RATINOFF IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 5:18-CV-07182-EJD

SER_1080

1    native format and bears the Bates Nos. PT00003363.001–PT00003363.002.  The portions

2    referenced by and/or that are most relevant to Plaintiffs' Motion are highlighted in yellow.

3        13.    Attached hereto as **Exhibit 11** is a true and correct copy of a July 14, 2015 email

4    sent by John Mark Suhy (jmsuhy@purethink.com) to David Fauth of Neo4j USA, which was

5    produced by Defendants on or about September 11, 2019 in native format and bears the Bates No.

6    PT00003112.001.  The portions referenced by and/or that are most relevant to Plaintiffs' Motion

7    are highlighted in yellow.

8        14.    Attached hereto as **Exhibit 12** is a true and correct copy of a July 28, 2015 email

9    and an attachment sent by John Mark Suhy (jmsuhy@purethink.com) to Charles Fischer of Neo4j

10    USA, which were produced by Defendants on or about September 11, 2019 in native format and

11    bear the Bates Nos. PT00003056.001–PT00003056.002 and PT00003057.001.  The portions

12    referenced by and/or that are most relevant to Plaintiffs' Motion are highlighted in yellow and

13    green.

14        15.    Attached hereto as **Exhibit 13** is a true and correct copy of a July 31, 2015 email

15    exhange between Erik Nolten and Charles Fischer and two attachments, which Neo4j USA

16    produced in this litigation with the Bates Nos. N4J_002105–N4J_002107.

17        16.    Attached hereto as **Exhibit 14** is a true and correct copy of a September 9, 2015

18    email from John Mark Suhy (jmsuhy@purethink.com) to Scott Colip of KSM Consulting (and

19    prior emails between them), which was produced by Defendants on or about September 11, 2019

20    in native format and bears the Bates Nos. PT00002924.001–PT00002924.006.  The portions

21    referenced by and/or that are most relevant to Plaintiffs' Motion are highlighted in yellow.

22        17.    Attached hereto as **Exhibit 15** is a true and correct copy of an October 26, 2015

23    email and two attachments from John Mark Suhy (jmsuhy@purethink.com) to John Broad of

24    Neo4j USA (and a prior email sent by Mr. Broad), which were produced by Defendants on or

25    about September 11, 2019 in native format and bear the Bates Nos. PT00002684.001–

26    PT00002684.002, PT00002685.001–PT00002685.004 and PT00002686.001–PT00002686.002.

27    The portions referenced by and/or that are most relevant to Plaintiffs' Motion are highlighted in

28    yellow and green.

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦REDWOOD CITY

4869-6111-7779.4                                     - 3 -
DECLARATION OF JEFFREY M. RATINOFF IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 5:18-CV-07182-EJD

SER_1081

18.    Attached hereto as **Exhibit 16** is a true and correct copy of a January 28, 2016 email from John Mark Suhy (jmsuhy@purethink.com) to David Fauth of Neo4j USA (without the referenced attachments), which was produced by Defendants on or about September 11, 2016 in native format and bears the Bates No. PT00000160.001.  The portions referenced by and/or that are most relevant to Plaintiffs' Motion are highlighted in yellow and blue.

19.    Attached hereto as **Exhibit 17** is a true and correct copy of an August 25, 2016 email from John Mark Suhy (jmsuhy@purethink.com) to David Mohr of Neo4j USA (and prior emails exchanged between them, without attachments), which was produced by Defendants on or about September 11, 2019 in native format and bears the Bates Nos. PT00001226.001– PT00001226.005.  The portions referenced by and/or that are most relevant to Plaintiffs' Motion are highlighted in yellow and green.  The blue highlights were in the original native file produced by Defendants.

20.    Attached hereto as **Exhibit 18** is a true and correct copy of a September 23, 2016 Order for Supplies or Services for Contract No. TIRNO-16-P-00202, which was produced by Defendants on or about July 11, 2019 and bears the Bates Nos. 000105–000113.  It was also authenticated and marked for identification as Deposition Exhibit 159 and authenticated by Mr. Dunn during his November 29, 2022 deposition.  *See* Exhibit 4 at 40:5-40:21, 41:1-42:6.  The IRS designated this document as "Confidential" during Mr. Dunn's deposition, but subsequently agreed to withdraw that designation.

21.    Attached hereto as **Exhibit 19** is a true and correct copy of a June 19, 2017 email sent by John Broad to John Mark Suhy (jmsuhy@purethink.com), which was produced by Defendants on or about September 11, 2019 in native format with the file name PT00000482.001.

22.    Attached hereto as **Exhibit 20** is a true and correct copy of a June 29, 2017 email sent by John Mark Suhy (jmsuhy@purethink.com) to John Broad in response to the above June 19, 2017 email, which was produced by Defendants on or about September 11, 2019 in native format and bears the Bates No. PT00000467.001.

23.    Attached hereto as **Exhibit 21** is a true and correct copy of a July 5-6, 2017 email exchange between John Mark Suhy (jmsuhy@purethink.com) and Sascha Moccozet of the

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ REDWOOD CITY

4869-6111-7779.4                                   - 4 -
DECLARATION OF JEFFREY M. RATINOFF IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 5:18-CV-07182-EJD

National Institute of Standards and Technology (NIST), which was produced by Defendants on or about November 19, 2019 and bears the Bates No. IGOV0001570573.001–IGOV0001570573.004. The portions referenced by and/or that are most relevant to Plaintiffs' Motion are highlighted in yellow.

24.     Attached hereto as **Exhibit 22** is a true and correct copy of a July 11, 2017 email sent by Jason Zagalsky to Michael Dunn of the IRS, which Neo4j USA produced in this litigation with the Bates Nos. N4J_010916–N4J_010917.  This was also authenticated and marked for identification as Deposition Exhibit 161 during the deposition of Michael Dunn.  *See* Exhibit 4 at 55:10-59:24.  Neo4j USA has de-designated this email.  The IRS designated this document as "Confidential" during Mr. Dunn's deposition, but subsequently agreed to withdraw that designation.

25.     Attached hereto as **Exhibit 23** is a true and correct copy of a July 11, 2017 email (without the referenced attachments) sent by John Mark Suhy (jmsuhy@igovsol.com) to Brian Rodrigue of Excella, which was produced by Defendants on or about November 19, 2019, and bears the Bates No. IGOV0001573919.001–IGOV0001573919.002. The portions referenced by and/or that are most relevant to Plaintiffs' Motion are highlighted in yellow.

26.     Attached hereto as **Exhibit 24** is a true and correct copy of a July 11, 2017 email (without the referenced attachments) sent by John Mark Suhy (jmsuhy@igovsol.com) to Sascha Moccozet of the National Institute of Standards and Technology (NIST), which was produced by Defendants on or about November 19, 2019, and bears the Bates No. IGOV0001573922.001– IGOV0001573922.002.  The portions referenced by and/or that are most relevant to Plaintiffs' Motion are highlighted in yellow.

27.     Attached hereto as **Exhibit 25** is a true and correct copy of a July 12, 2017 email exchange between John Mark Suhy (jmsuhy@purethink.com) and Michael Dunn of the IRS. Defendants produced this document on or about November 19, 2019, and bears the Bates Nos. IGOV0001570544.001–IGOV0001570544.007. This was also authenticated and marked for identification as Deposition Exhibit 162 during the deposition of Michael Dunn.  *See* Exhibit 4 at 64:24-65:21.  The IRS designated this document as "Confidential" during Mr. Dunn's deposition,

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ REDWOOD CITY

4869-6111-7779.4                                    - 5 -
DECLARATION OF JEFFREY M. RATINOFF IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 5:18-CV-07182-EJD

SER_1083

1    but subsequently agreed to withdraw that designation.  The portions referenced by and/or that are

2    most relevant to Plaintiffs' Motion are highlighted in yellow.

3         28.     Attached hereto as **Exhibit 26** is a true and correct copy of a July 27, 2017 email

4    (with two attachments) sent by Vivian Daniels of the IRS to John Mark Suhy

5    (jmsuhy@purethink.com).  Defendants produced these documents on or about November 19,

6    2019, and bear the Bates Nos. IGOV0001570511.001, IGOV0001570512.001-

7    IGOV0001570512.007 and IGOV0001570513.001–IGOV0001570513.004. This was also

8    authenticated and marked for identification as Deposition Exhibit 163 during the deposition of

9    Michael Dunn.  *See* Exhibit 4 at 71:1-73:4.  The IRS designated this document as "Confidential"

10   during Mr. Dunn's deposition, but subsequently agreed to withdraw that designation.  The portions

11   referenced by and/or that are most relevant to Plaintiffs' Motion are highlighted in blue, while the

12   remaining highlights were present in the documents as originally produced.

13        29.     Attached hereto as **Exhibit 27** is a true and correct copy of August 3, 2017 email

14   from John Mark Suhy (jmsuhy@igovsol.com) to Sascha Moccozet of the NIST, which was

15   produced by Defendants on or about November 19, 2019, and bears the Bates Nos.

16   IGOV0001573905.001–IGOV0001573905.002. The portions referenced by and/or that are most

17   relevant to Plaintiffs' Motion are highlighted in yellow.

18        30.     Attached hereto as **Exhibit 28** is a true and correct copy of an October 4, 2017

19   email exchange between Michael Dunn and John Mark Suhy via his eGovernment Solutions email

20   account (jmsuhy@egovsol.com).  Defendants produced this document on or about November 19,

21   2019, and bears the Bates Nos. IGOV0001573249.001–IGOV0001573249.002.  This was also

22   authenticated and marked for identification as Deposition Exhibit 214 during Defendants'

23   November 29, 2022 deposition.  *See* Exhibit 2 at 188:10-193:10.  The portions referenced by

24   and/or that are most relevant to Plaintiffs' Motion are highlighted in yellow.

25        31.     Attached hereto as **Exhibit 29** is a true and correct copy of a May 22, 2018 email

26   sent by John Mark Suhy via his eGovernment Solutions email account (jmsuhy@egovsol.com) to

27   Michael Dunn of the IRS, which Defendants produced on or about November 19, 2019, and bears

28   the Bates Nos. IGOV0001573245.001–IGOV0001573245.002.  This was also authenticated and

4869-6111-7779.4                                          - 6 -

1    marked for identification as Deposition Exhibit 165 during the deposition of Michael Dunn. *See*

2    Exhibit 4 at 96:4-20. The IRS designated this document as "Confidential" during Mr. Dunn's

3    deposition, but subsequently agreed to withdraw that designation.

4        32.     Attached hereto as **Exhibit 30** is a true and correct copy of a May 24, 2018

5    Order for Supplies or Services, Order No. 2032H8-18-P-00151 that eGovernment Solutions

6    produced this document in response to Plaintiffs' document subpoena, which bears the Bates Nos.

7    EGOVS_000015–EGOVS_000020.  This was also authenticated and marked for identification as

8    Deposition Exhibit 103 during Mr. Mayur's October 15, 2022 deposition. *See* Exhibit 3 at 50:14-

9    54:3.

10       33.     Attached hereto as **Exhibit 31** is a true and correct copy of a June 29, 2018 email

11   sent by John Mark Suhy from his eGovernment Solutions email account (jmsuhy@egovsol.com)

12   to Michael Dunn of the IRS.  Defendants produced this document on or about November 19, 2019,

13   and bears the Bates No. IGOV0001573225.

14       34.     Attached hereto as **Exhibit 32** is a true and correct copy of a July 18-27, 2018

15   email exchange between Jason Zagalsky and Lisa Rosenmerkel of the IRS, which Neo4j USA

16   produced in this litigation with the Bates Nos. N4J_020130–N4J_020133.  This was also

17   authenticated and marked for identification as Deposition Exhibit 168 during the deposition of

18   Michael Dunn. *See* Exhibit 4 at 113:5-115:20, 116:5-117:21.   The IRS designated this document

19   as "Confidential" during Mr. Dunn's deposition, but subsequently agreed to withdraw that

20   designation.

21       35.     Attached hereto as **Exhibit 33** is a true and correct copy of an August 13, 2018

22   email exchange between Michael Dunn and John Mark Suhy (jmsuhy@egovsol.com), copying

23   Lisa Rosenmerkel among other individuals at the IRS.  Defendants produced this document on or

24   about November 19, 2019, and bears the Bates Nos. IGOV0001573217.0001 –

25   IGOV0001573217.0002.  This was also authenticated and marked for identification as Deposition

26   Exhibit 169 during the deposition of Michael Dunn. *See* Exhibit 4 at 127:18-129:7. The IRS

27   designated this document as "Confidential" during Mr. Dunn's deposition, but subsequently

28   agreed to withdraw that designation.

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ REDWOOD CITY

4869-6111-7779.4                                         - 7 -

36.     Attached hereto as **Exhibit 34** is a true and correct copy of an August 13-14, 2018 email exchange between Michael Dunn and John Mark Suhy (jmsuhy@egovsol.com), copying Lisa Rosenmerkel among other individuals at the IRS.  Defendants produced this document on or about November 19, 2019, and bears the Bates Nos. IGOV0001573216.001–IGOV0001573216.002.  This was also authenticated and marked for identification as Deposition Exhibit 170 during the deposition of Michael Dunn.  *See* Exhibit 4 at 142:15-143:20.  The IRS designated this document as "Confidential" during Mr. Dunn's deposition, but subsequently agreed to withdraw that designation.

37.     Attached hereto as **Exhibit 35** is a true and correct copy of a December 31, 2018 Stock Purchase Agreement between John Mark Suhy on one hand, and Ashwani Mayur and Nikhil Budhiraja on the other.  Defendants produced this document during discovery on or about October 20, 2022.  This was also authenticated and marked for identification as Deposition Exhibit 100 during the deposition of Ashwani Mayur.  *See* Exhibit 3 at 30:8-32:23.

38.     Attached hereto as **Exhibit 36** is a true and correct copy of a May 31, 2018 Amendment of Solicitation/Modification of Contract, correcting OF 347 block 3 order number Smart ID from 2032H8-18-P-00151 to 2032H8-18-P-00168.  eGovernment Solutions produced this document in response to Plaintiffs' document subpoena , which bears the Bates No. EGOVS_000021.  This was also authenticated and marked for identification as Deposition Exhibit 104 during the deposition of Ashwani Mayur.  *See* Exhibit 3 at 54:10-56:15.

39.     Attached hereto as **Exhibit 37** is a true and correct copy of a May 24, 2019 Amendment of Solicitation/Modification of Contract No. 2032H8-18-P-00168 to exercise option year 1 in the amount of $200,000.00.  eGovernment Solutions produced this document in response to Plaintiffs' document subpoena, which bears the Bates Nos. EGOVS_000030–EGOVS_000031.  This was also authenticated and marked for identification as Deposition Exhibit 105 during the deposition of Ashwani Mayur.  *See* Exhibit 3 at 56:16-59:5.

40.     Attached hereto as **Exhibit 38** is a true and correct copy of a September 26, 2019 Amendment of Solicitation/Modification of Contract No. 2032H8-18-P-00168 to increase the funding for option year 1 by $216,000.00.  eGovernment Solutions produced this document in

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ REDWOOD CITY

4869-6111-7779.4                    - 8 -
DECLARATION OF JEFFREY M. RATINOFF IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 5:18-CV-07182-EJD

SER_1086

1   response to Plaintiffs' document subpoena, which bears the Bates Nos. EGOVS_000034–

2   EGOVS_000035.  This was also authenticated and marked for identification as Deposition Exhibit

3   106 during the deposition of Ashwani Mayur.  *See* Exhibit 3 at 59:18-62:3.

4        41.    Attached hereto as **Exhibit 39** is a true and correct copy of a May 24, 2020

5   Amendment of Solicitation/Modification of Contract No. 2032H8-18-P-00168 to exercise option

6   year 2 in the amount of $200,000.00.  eGovernment Solutions produced this document in response

7   to Plaintiffs' document subpoena, which bears the Bates Nos. EGOVS_000042–EGOVS_000045.

8   This was also authenticated and marked for identification as Deposition Exhibit 107 during the

9   deposition of Ashwani Mayur.  *See* Exhibit 3 at 63:13-65:25.

10        42.    Attached hereto as **Exhibit 40** is a true and correct copy of a May 24, 2021

11   Amendment of Solicitation/Modification of Contract No. 2032H8-18-P-00168 to exercise option

12   year 3 in the amount of $200,000.00.  eGovernment Solutions produced this document in response

13   to Plaintiffs' document subpoena, which bears the Bates No. EGOVS_000058–EGOVS_000061.

14   This was also authenticated and marked for identification as Deposition Exhibit 108 during the

15   deposition of Ashwani Mayur.  *See* Exhibit 3 at 67:7-69:11.

16        43.    Attached hereto as **Exhibit 41** is a true and correct copy of a May 24, 2022

17   Amendment of Solicitation/Modification of Contract No. 2032H8-18-P-00168 to exercise option

18   year 4 in the amount of $200,000.00.  eGovernment Solutions produced this document in response

19   to Plaintiffs' document subpoena, which bears the Bates No. EGOVS_000062–EGOVS_000064.

20   This was also authenticated and marked for identification as Deposition Exhibit 109 during the

21   deposition of Ashwani Mayur.  *See* Exhibit 3 at 69:16-70:19.

22        44.    Attached hereto as **Exhibit 42** is a true and correct copies of Invoice Nos. 817, 827,

23   901, 955, 960, 912 issued to the IRS by Mr. Suhy.  eGovernment Solutions produced this

24   document in response to Plaintiffs' document subpoena, which bears the Bates No.

25   EGOVS_000068–EGOVS_000074.  This was also authenticated and marked for identification as

26   Deposition Exhibit 110 during the deposition of Ashwani Mayur.  *See* Exhibit 3 at 71:17-76:15.

27        45.    Attached hereto as **Exhibit 43** is a true and correct copy of an April 23-24, 2019

28   email exchange between Patrick Martin at the IRS and John Mark Suhy (john.m.suhy@irs.gov),

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ REDWOOD CITY

4869-6111-7779.4                                      - 9 -
DECLARATION OF JEFFREY M. RATINOFF IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 5:18-CV-07182-EJD

SER_1087

1   which the IRS produced with Bates No. IRS_PROD_00001638 in response to a subpoena issued

2   by Plaintiffs. The portions referenced by and/or that are most relevant to Plaintiffs' Motion are

3   highlighted in yellow and red. The portions highlighted in red are also Sensitive But Unclassified

4   (SBU) Information in accordance with IRS/Treasury regulations, which the IRS has designated as

5   Confidential under the Protective Order and requested be sealed.

6       46.     Attached hereto as **Exhibit 44** is a true and correct copy of a September 13, 2019

7   email exchange between Nathan Gire at the IRS and John Mark Suhy (john.m.suhy@irs.gov),

8   which the IRS produced with Bates Nos. IRS_PROD_00002010–IRS_PROD_00002011 in

9   response to a subpoena issued by Plaintiffs. The portions referenced by and/or that are most

10  relevant to Plaintiffs' Motion are highlighted in yellow and red. The portions highlighted in red

11  are also Sensitive But Unclassified (SBU) Information in accordance with IRS/Treasury

12  regulations, which the IRS has designated as Confidential under the Protective Order and

13  requested be sealed.

14      47.     Attached hereto as **Exhibit 45** is a true and correct copy of a September 17, 2019

15  email exchange between Joshua Porter at the IRS and John Mark Suhy (john.m.suhy@irs.gov),

16  which the IRS produced with Bates Nos. IRS_PROD_00002201–IRS_PROD_00002202 in

17  response to a subpoena issued by Plaintiffs. This was also authenticated and marked for

18  identification as Deposition Exhibit 178 during the deposition of Michael Dunn. *See* Exhibit 4 at

19  193:9-20. The portions referenced by and/or that are most relevant to Plaintiffs' Motion are

20  highlighted in yellow and red. The portions highlighted in red are also Sensitive But Unclassified

21  (SBU) Information in accordance with IRS/Treasury regulations, which the IRS has designated as

22  Confidential under the Protective Order and requested be sealed.

23      48.     Attached hereto as **Exhibit 46** is a true and correct copy of a September 20, 2019

24  email from Michael Dunn to a number of individuals with @irs.gov email address, including John

25  Mark Suhy, Michael Stavrianos, and Brian Bird, and the same email forwarded by Mr. Bird to

26  Deborah Tylor, Mr. Stavrianos and John Mark Suhy. The IRS produced this document with Bates

27  Nos. IRS_PROD_00001292–IRS_PROD_00001293 in response to a subpoena issued by

28  Plaintiffs. This was also authenticated and marked for identification as Deposition Exhibit 149

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ REDWOOD CITY

1  during the deposition of Michael Stavrianos of ASR Analyicts, LLC and Michael Dunn.  *See*

2  Exhibit 4 at 207:7-209:15.  The portions referenced by and/or that are most relevant to Plaintiffs'

3  Motion are highlighted in yellow and red.  The portions highlighted in red are also Sensitive But

4  Unclassified (SBU) Information in accordance with IRS/Treasury regulations, which the IRS has

5  designated as Confidential under the Protective Order and requested be sealed.

6      49.    Attached hereto as **Exhibit 47** is a true and correct copy of a November 8-12, 2019

7  email exchange between, Aaron Katch and Hai Huynh at the IRS and John Mark Suhy

8  (john.m.suhy@irs.gov), which the IRS produced with Bates Nos. IRS_PROD_00000473–

9  IRS_PROD_00000474 in response to a subpoena issued by Plaintiffs. This was also authenticated

10  and marked for identification as Deposition Exhibit 181 during the deposition of Michael Dunn.

11  *See* Exhibit 4 at 210:13-211:20.  The portions referenced by and/or that are most relevant to

12  Plaintiffs' Motion are highlighted in yellow and red.  The portions highlighted in red are also

13  Sensitive But Unclassified (SBU) Information in accordance with IRS/Treasury regulations, which

14  the IRS has designated as Confidential under the Protective Order and requested be sealed.

15      50.    Attached hereto as **Exhibit 48** is a true and correct copy of a March 5, 2021 capture

16  of iGov's https://graphstack.io webpage from the Wayback Machine, a digital archive of the

17  World Wide Web (https://web.archive.org), which I printed out on February 27, 2023.

18      51.    Attached hereto as **Exhibit 49** is a true and correct copy of an April 3, 2021 tweet

19  issued from John Mark Suhy's Twitter account in response to other tweets, which I printed out on

20  March 22, 2023.  The portions referenced by and/or that are most relevant to Plaintiffs' Motion are

21  highlighted.

22      52.    Attached hereto as **Exhibit 50** is a true and correct copy of a December 3, 2021

23  capture of iGov's https://graphstack.io webpage from the Wayback Machine, a digital archive of

24  the World Wide Web (https://web.archive.org), which I printed out on December 1, 2022.

25      53.    Attached hereto as **Exhibit 51** is a true and correct copy of a March 31, 2022

26  capture of iGov's https://graphstack.io webpage from the Wayback Machine, a digital archive of

27  the World Wide Web (https://web.archive.org), which I printed out on February 27, 2023.

28

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ REDWOOD CITY

4869-6111-7779.4                                   - 11 -
DECLARATION OF JEFFREY M. RATINOFF IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 5:18-CV-07182-EJD

54. Attached hereto as **Exhibit 52** is a true and correct copy of a March 4, 2021 email exchange between John Mark Suhy (jmsuhy@igovsol.com) and Philip Kreismayr of Lemon42 GmbH. Defendants produced this document on or about November 19, 2019, which bears the Bates Nos. IGOV0002956759.001- IGOV0002956759.002. The portions referenced by and/or that most relevant to Plaintiffs' Motion are highlighted.

55. Attached hereto as **Exhibit 53** is a true and correct copy of an April 30-May 1, 2019 email exchange (with attachments) between, Sheila Duffy (SDuffy@greystonesgroup.com) and Kelly Crowley (kelly.a.crowley@uscis.dhs.gov), which the Department of Homeland Security produced in response to a subpoena issued by Plaintiffs. This was also authenticated and marked for identification as Deposition Exhibit 244 during the deposition of Turin Pollard of Greystones Group, LLC. The portions referenced by and/or that are most relevant to Plaintiffs' Motion are highlighted in yellow.

56. Attached hereto as **Exhibit 54** is a true and correct copy of an August 2, 2019 email exchange between Sheila Duffy (sduffy@greystonesgroup.com) and John Mark Suhy (jmsuhy@igovsol.com). Defendants produced this document on or about November 19, 2019, which bears the Bates Nos. IGOV0001573322.001–IGOV0001573322.002. The portions referenced by and/or that are most relevant to Plaintiffs' Motion are highlighted in yellow.

57. Attached hereto as **Exhibit 55** is a true and correct copy of an August 5, 2019 email exchange between Sheila Duffy (sduffy@greystonesgroup.com) and John Mark Suhy (jmsuhy@igovsol.com). Defendants produced this document on or about November 19, 2019 and bears the Bates No. IGOV0001573317.001. The portions referenced by and/or that are most relevant to Plaintiffs' Motion are highlighted in yellow.

58. Attached hereto as **Exhibit 56** is a true and correct copy of an August 2-5, 2019 email exchange (without attachments) between Sheila Duffy (sduffy@greystonesgroup.com), Colleen Delawder (colleen.m.delawder.ctr.@mail.mil) and John Mark Suhy (jmsuhy@igovsol.com), which Defendants produced on or about November 19, 2019 and bears the Bates Nos. IGOV0001573316.001–IGOV0001573316.009. The portions referenced by and/or that are most relevant to Plaintiffs' Motion are highlighted in yellow.

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ REDWOOD CITY

4869-6111-7779.4                                                    - 12 -
DECLARATION OF JEFFREY M. RATINOFF IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 5:18-CV-07182-EJD

1    59.    Attached hereto as **Exhibit 57** is a true and correct copy of an August 2-5, 2019

2    email exchange (without attachments) between Sheila Duffy (sduffy@greystonesgroup.com),

3    Colleen Delawder (colleen.m.delawder.ctr.@mail.mil) and John Mark Suhy

4    (jmsuhy@igovsol.com), which Defendants produced on or about November 19, 2019 and bears

5    the Bates Nos. IGOV0001573313.001–IGOV0001573313.011. The portions referenced by and/or

6    that are most relevant to Plaintiffs' Motion are highlighted in yellow.

7    60.    Attached hereto as **Exhibit 58** is a true and correct copy of an October 29, 2020

8    capture of a webpage (https://greystonesgroup.com/solutions/data-analytics/) from Greystones

9    Group's website.  I printed this capture out from the Wayback Machine, a digital archive of the

10    World Wide Web (https://web.archive.org) on March 23, 2023. The portions referenced by and/or

11    that are most relevant to Plaintiffs' Motion are highlighted in yellow.

12    61.    Attached hereto as **Exhibit 59** is a true and correct copy of a March 1, 2021 capture

13    of a webpage (https://greystonesgroup.com/greystones-group-announces-award-of-a-phase-ii-

14    small-business-innovation-research-sbir-contract/) from Greystones Group's website consisting of

15    a March 6, 2019 press release, titled "Greystones Group Awarded Small Business Innovative

16    Research (SBIR) Contract."  I printed this capture out from the Wayback Machine, a digital

17    archive of the World Wide Web (https://web.archive.org) on March 23, 2023. The portions

18    referenced by and/or that are most relevant to Plaintiffs' Motion are highlighted in yellow.

19    62.    Attached hereto as **Exhibit 60** is a true and correct copy of an October 29, 2020

20    capture of a webpage (https://greystonesgroup.com/greystones-group-announces-award-of-a-

21    phase-ii-small-business-innovation-research-sbir-contract/) from Greystones Group's website

22    consisting of a June 10, 2020 press release, titled "Greystones Group Awarded Small Business

23    Innovative Research (SBIR) Contract."  I printed this capture out from the Wayback Machine, a

24    digital archive of the World Wide Web (https://web.archive.org) on March 23, 2023. The portions

25    referenced by and/or that are most relevant to Plaintiffs' Motion are highlighted in yellow.

26    63.    Attached hereto as **Exhibit 61** is a true and correct copy of an October 1, 2018

27    email from Diane Griffith (diane.griffith@nextcentury.com) to Shahak Nagiel

28    (shahak.nagiel@nextcentury.com).  Next Century/CACI produced this document on or about

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ REDWOOD CITY

4869-6111-7779.4    - 13 -
DECLARATION OF JEFFREY M. RATINOFF IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 5:18-CV-07182-EJD

1   September 15, 2022, which bears the Bates No. CACI00005178, in response to Plaintiffs'

2   document subpoena. Next Century/CACI designated this document as "Confidential" under the

3   Protective Order when produced, but subsequently agreed to withdraw that designation.  This was

4   also authenticated and marked for identification as Deposition Exhibit 43 during the deposition of

5   James Weyant.  *See* Exhibit 5 at 35:7-37:3.  The portions referenced by and/or that are most

6   relevant to Plaintiffs' Motion are highlighted in yellow.

7        64.    Attached hereto as **Exhibit 62** is a true and correct copy of an October 16-17, 2018

8   email exchange between Shahak Nagiel (shahak.nagiel@nextcentury.com) and Diane Griffith

9   (diane.griffith@nextcentury.com).  Next Century/CACI produced this document on or about

10  September 15, 2022, which bears the Bates Nos. CACI00004994–CACI00004995, in response to

11  Plaintiffs' document subpoena. Next Century/CACI designated this document as "Confidential"

12  under the Protective Order when produced, but subsequently agreed to withdraw that designation.

13  This was also authenticated and marked for identification as Deposition Exhibit 44 during the

14  deposition of James Weyant.  *See* Exhibit 5 at 44:24-51:14.  The portions referenced by and/or that

15  are most relevant to Plaintiffs' Motion are highlighted in yellow.

16       65.    Attached hereto as **Exhibit 63** is a true and correct copy of an October 22, 2018

17  email exchange between Shahak Nagiel (shahak.nagiel@nextcentury.com) and John Mark Suhy

18  (jmsuhy@igovsol.com).  Next Century/CACI produced this document on or about September 15,

19  2022, which bears the Bates Nos. CACI00004966–CACI00004967, in response to Plaintiffs'

20  document subpoena.  Next Century/CACI designated this document as "Confidential" under the

21  Protective Order when produced, but subsequently agreed to withdraw that designation.  This was

22  also authenticated and marked for identification as Deposition Exhibit 45 during the deposition of

23  James Weyant.  *See* Exhibit 5 at 51:23-25, 54:7-56:21.  The portions referenced by and/or that are

24  most relevant to Plaintiffs' Motion are highlighted in yellow.

25       66.    Attached hereto as **Exhibit 64** is a true and correct copy of an October 22, 26 and

26  29, 2018 and January 4, 2019 email exchange between Shahak Nagiel

27  (shahak.nagiel@nextcentury.com) and John Mark Suhy (jmsuhy@igovsol.com).  Next

28  Century/CACI produced this document on or about September 15, 2022, which bears the Bates

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ REDWOOD CITY

4869-6111-7779.4                           - 14 -
DECLARATION OF JEFFREY M. RATINOFF IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 5:18-CV-07182-EJD

SER_1092

1   Nos. CACI00003832–CACI00003837, in response to Plaintiffs' document subpoena.  Next

2   Century/CACI designated this document as "Confidential" under the Protective Order when

3   originally produced, but subsequently agreed to withdraw that designation.  This was also

4   authenticated and marked for identification as Deposition Exhibit 47 during the deposition of

5   James Weyant.  *See* Exhibit 5 at 62:13-65:17.  The portions referenced by and/or that are most

6   relevant to Plaintiffs' Motion are highlighted in yellow.

7           67.      Attached hereto as **Exhibit 65** is a true and correct copy of the relevant pages of

8   Purethink LLC and iGov Inc.'s Amended Response to Neo4j, Inc.'s First Set of Interrogatories to

9   Purethink LLC and iGov Inc. and John Mark Suhy's verification thereof, both dated November 22,

10  2019.

11          68.      Attached hereto as **Exhibit 66** is a true and correct copy of PureThink LLC's Profit

12  and Loss Statement for 2015, which was produced by Defendants on or about November 19, 2019

13  and bears the Bates No. IGOV0001569058.001. This was also authenticated and marked for

14  identification as Deposition Exhibit 198 during the deposition of Defendants.  *See* Exhibit 2 at

15  59:6-22.

16          69.      Attached hereto as **Exhibit 67** is a true and correct copy of PureThink LLC's Profit

17  and Loss Statement for 2016, which was produced by Defendants on or about November 19, 2019

18  and bears the Bates No. IGOV0001569057.001. This was also authenticated and marked for

19  identification as Deposition Exhibit 199 during the deposition of Defendants.  *See* Exhibit 2 at

20  61:9-62:23.

21          70.      Attached hereto as **Exhibit 68** is a true and correct copy of a January 25, 2019

22  email from John Mark Suhy (jmsuhy@igovsol.com) to Ron Turner

23  (Ron.Turner@XpressRules.com), which was produced by Defendants on or about December 8,

24  2022 and bears the Bates No. IGOV0002860445.001.

25          71.      Attached hereto as **Exhibit 69** is a true and correct copy of a December 18-20, 2019

26  and January 4, 2020 email exchange between John Mark Suhy (jmsuhy@igovsol.com), Brad

27  Nussbaum (brad@atomrain.com), Calro Gazzaneo (cgazzaneo@softstrategy.it) and Francesco

28  Faenzi (ffaenzi@softstrategy.it), which was produced by Defendants on or about December 8,

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ REDWOOD CITY

4869-6111-7779.4                                    - 15 -
DECLARATION OF JEFFREY M. RATINOFF IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 5:18-CV-07182-EJD

1    2022 and bears the Bates Nos. IGOV0002987106.001–IGOV0002987106.003. The portions

2    referenced by and/or that are most relevant to Plaintiffs' Motion are highlighted in yellow.

3        72.    Attached hereto as **Exhibit 70** is a true and correct copy of a January 23-24, 2020

4    email exchange between John Mark Suhy (jmsuhy@igovsol.com), Brad Nussbaum

5    (brad@graphgrid.com) and Sergio Pires, which was produced by Defendants on or about

6    December 8, 2022 and bears the Bates No. IGOV0002856686.001.

7        73.    Attached hereto as **Exhibit 71** is a true and correct copy of a April 9-10, 2020 email

8    exchange between John Mark Suhy (jmsuhy@igovsol.com) and Ravi Pappu, which was produced

9    by Defendants on or about December 8, 2022 and bears the Bates No. IGOV0002856672.001–

10   IGOV0002856672.002.

11       I declare under penalty of perjury under the laws of the United States of America that the

12   foregoing is true and correct, and that this declaration was executed on this 20th day of April 2023,

13   at San Jose, California.

14

15                                         _/s/ Jeffrey M. Ratinoff_____

16                                         Jeffrey M. Ratinoff

17

18

19

20

21

22

23

24

25

26

27

28

4869-6111-7779.4                                    - 16 -

DECLARATION OF JEFFREY M. RATINOFF IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 5:18-CV-07182-EJD

# EXHIBIT 1

# DOCUMENT PROVISIONALLY FILED UNDER SEAL

# EXHIBIT 2

SER_1096

UNITED STATES DISTRICT COURT
NORTHER DISTRICT OF CALIFORNIA


NEO4J, INC., a Delaware
corporation; and NEO4J
SWEDEN AB, a Swedish
corporation,                        CASE NO.
                                    5:18-cv-07182-EJD

          Plaintiffs,

vs.

PureThink, LLC, a Delaware
limited liability company;
IGOV, INC., a Virginia
corporation; and JOHN MARK
SUHY, an individual,

          Defendants.
_____/


  REMOTE VIDEOTAPED DEPOSITION OF JOHN MARK SUHY, JR.
    INDIVIDUALLY AND AS PERSON MOST KNOWLEDGEABLE
         PURSUANT TO FED. R. CIV. P. 30(b)(1)
           FOR IGOV INC. AND PURETHINK LLC


DATE:          November 29, 2022

TIME:          8:06 a.m. PST

LOCATION:      Via Zoom Videoconference

REPORTED       KAREN L. BUCHANAN
BY:            CSR No. 10772
               CLR No. 031106-04


1

JOHN MARK SUHY                                                    November 29, 2022

1    of that to Neo4j under the Partner Agreement?  Is

2    that fair?

3         A.  Yes.  In this scenario, yes.

4              MR. RATINOFF:  Now, we were looking at the

5    MPO order form.  24 -- I'm sorry.  Strike that.

6    Okay.  And then let me move on to Exhibit -- what

7    will be marked as Exhibit 198.

8              (Plaintiffs' Exhibit 198 was marked for

9    identification.)

10             MR. RATINOFF:  I'll put this in the chat

11   for you.

12             MR. BEENE:  Okay.  It's open.

13   BY MR. RATINOFF:

14        Q.  Yes.  This is another document.  It's Bates

15   numbered iGov, got an iGov Bates number.  It's

16   entitled "PureThink LLC Profit and Loss, January

17   through December 2015."  Do you recognize this

18   document?

19        A.  Yes.

20        Q.  What is it?

21        A.  It's a Profit and Loss report for 2015 for

22   PureThink.

23        Q.  Okay.  And then looking at the -- under

24   Income, it says "Sales - Software, $320,987.50."  Do

25   you see that?

                                                          59

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS   408-287-7500

SER_1098

JOHN MARK SUHY                                                    November 29, 2022

1          A.  Yes.

2          Q.  And that income would be for commercial

3    software licenses for Neo4j Enterprise or Government

4    Edition that PureThink sold under the Partner

5    Agreement?

6          A.  I believe so.  That was the only thing we

7    were focusing on.

8          Q.  And looking under the expense, it says

9    "Software reseller license cost."  Do you see that

10   it's for $242,715.52?

11         A.  Yes, I see that.

12         Q.  And that would be for the 75 percent that

13   would be owed to Neo4j under the Partner Agreement?

14         A.  I assume that's what that's for.

15         Q.  No reason to believe it isn't?

16         A.  Not off the top of my head, no.

17         Q.  And I believe the FBI and Sandia contracts

18   were for -- from the year 2015, so the sales would

19   be for those licenses?

20         A.  That sounds right.

21         Q.  Any reason to believe it isn't?

22         A.  I would have to go in and look at my

23   documents to verify it, but it sounds -- sounds like

24   that's the reason for these numbers.

25         Q.  PureThink wasn't doing anything else at the

                                                              60

1    time, though?

2         A.  Nothing major, no.

3         Q.  It wasn't selling any -- it wasn't selling

4    any other software other than the Neo4j Government

5    Edition?

6         A.  I don't believe so.  I think we were just

7    focused on the Government Edition at this time

8    period, yeah.

9         MR. RATINOFF:  Okay.  We can go ahead and

10   mark the next exhibit.  It's -- it will be marked as

11   Exhibit 199.

12         (Plaintiffs' Exhibit 199 was marked for

13   identification.)

14   BY MR. RATINOFF:

15        Q.  It should be tab 503 in the chat.

16        A.  Okay.  It's open.

17        Q.  Okay.  What we've marked as Exhibit 199 is

18   a document entitled "PureThink LLC Profit and Loss,

19   January through December 2016."

20        A.  Yes, I see that.

21        Q.  And it's got a Bates number at the bottom,

22   IGOV 1569057.001 on the first page?

23        A.  Yes, I see that.

24        Q.  And do you recognize this document?

25        A.  Yes.  It looks like the same as the other

61

1   documents but for 2016.

2       Q.  So Purethink's Profit and Loss Statement

3   for that year, 2016?

4       A.  Yes.  I'm just looking at it to see.  It

5   looks like it's marked for -- "Sales - Software" is

6   probably the wrong category for it.

7       Q.  Category for what?

8       A.  Category for whatever that is.  This would

9   have been -- I'm looking at the expense.  Since

10  there was no expenses, this might have been for IRS,

11  which was the consulting project.  I'm not positive,

12  but it looks -- if it was, it definitely is

13  miscategorized.

14      Q.  So PureThink didn't sell software in 2016?

15      A.  I have to go look and see, because I know

16  that when we started IRS, that was a consulting

17  project.  So I don't -- I think that was in 2016.

18  I'm not sure, but that's what it looks like this

19  might be representing.

20      Q.  This document was prepared by PureThink,

21  correct?

22      A.  Yeah.  I believe I would have done this,

23  yeah.

24      Q.  And as you note, there is no software

25  license fee that was under Expenses that we saw in

62

1   the prior Profit and Loss Statements, correct?

2       A.  Yes.  That's why I think this is for IRS,

3   which wasn't a software license sale.  That's why I

4   believe that that's what this represents.

5       Q.  But there is only a mark for -- I'm sorry,

6   the only income here is showing sales for software

7   and not consulting, correct?

8           MR. BEENE:  Objection to form.

9   BY MR. RATINOFF:

10      Q.  You can answer the question.

11      A.  Well, now, this is -- this definitely is

12  for consulting.

13      Q.  But it's listed as sales and software in

14  this document, correct?

15      A.  It says "Sales - Software"; that's correct.

16      Q.  Now, I'd like to show you the 2017

17  Profit and Loss Statement, but one wasn't produced.

18  Did PureThink prepare a Profit and Loss Statement

19  for 2017?

20      A.  We should have, because that's what I used

21  for taxes, so . . . .

22      Q.  So PureThink was still in business in 2017?

23      A.  Yes.  PureThink is still in business now.

24      Q.  So it should -- it filed its tax return in

25  2017?

63

JOHN MARK SUHY                                                November 29, 2022

1          THE VIDEOGRAPHER:  Off the record?

2          MR. RATINOFF:  Sure.  Let's go off the

3    record.

4          THE VIDEOGRAPHER:  We are now off the

5    record at 12:29.

6          (Break taken from 12:29 to 12:31 p.m.)

7          THE VIDEOGRAPHER:  We are now on the record

8    at 12:31.

9    BY MR. RATINOFF:

10      Q.  Okay.  I'm going to turn back to

11   Exhibit 202, which was marked as -- originally as

12   tab 485.  It's the amended interrogatory responses.

13   And if you could turn your attention to page 11.

14      A.  One moment.  I'm at page 11.

15      Q.  Okay.  And you'll see interrogatory No. 2,

16   it says:

17          "Identify all facts and documents

18          supporting your contention in

19          Paragraph 15 of your Counterclaim that

20          PureThink" -- sorry, "PureThink spent

21          an equivalent of 650,000 to design,

22          develop, and build a new Neo4j

23          Government Package software based on

24          Mr. Nordwall's representations that

25          PureThink would have continuing

                                                          170

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS  408-287-7500

1          exclusivity with the government sales

2          and support contracts."

3          Do you see that?

4      A.   Yes, I do.

5      Q.   And you understand that's referring to the

6  exclusivity agreement we just talked about in the

7  counterclaims?

8      A.   Yes.

9      Q.   And you'll see -- I'm sorry, in response

10  2.2, it says, "PureThink spent an equivalent of

11  $650,000 to" -- sorry, "spent an equivalent of

12  $650,000."  What do you mean by "equivalent"?

13      A.   So we didn't spend money.  We dedicated

14  full time to building out this framework that would

15  surround Neo4j Enterprise and make it into what was

16  called the Neo4j for Government Edition.  So it was

17  a suite of software, addressed FISMA, modules,

18  documentation, business plan.  It was our full

19  focus.

20          And I needed to make sure that before we

21  focused 100 percent, dropped everything else and

22  focused on this that we were on the same line, that

23  we understood each other, that hey, we're building

24  this Government Edition, it's going to take off,

25  because it allows us to do sole sourcing.  And that

171

1    us to run the government, I guess you'd say,

2    marketing, procurement, and help Neo4j for that.  So

3    this is something beyond what the Partner Agreement

4    would have asked anybody to do.

5        Q.  Didn't the Partner Agreement contemplate

6    requiring PureThink to market and develop business

7    related to Neo4j Enterprise?

8        A.  I don't remember if it says that or not.

9    You can show me.

10       Q.  So what was your understanding of your

11   obligations under the Partner Agreement?

12       A.  I'd have to read it again, because once

13   this was a government -- an exclusivity contract

14   came, that's all that I focused on.

15       Q.  Prior to April 2015 when this exclusivity

16   agreement, as you call it, came in existence, were

17   you spending your time marketing and developing

18   business with respect to Neo4j Enterprise?

19       A.  Some, but not to the level that this

20   required.

21       Q.  But you were developing or attempting to

22   develop business for Neo4j Enterprise under the

23   Partner Agreement prior to April 2015, correct?

24           MR. BEENE:  Objection to form.

25           THE WITNESS:  Yes, but we ran into the

173

SER_1105

JOHN MARK SUHY                                                    November 29, 2022

1    issue that it wasn't going to work with the

2    government because of the FAR rules and that we had

3    to come up with a different approach to get Neo4j

4    into the government.  And that's where this

5    agreement came.

6            And that's why it took so much dedication

7    to it.  No other teams or companies would go and

8    dedicate this much effort into something that was

9    not guaranteed to bring revenue.  I mean this is an

10   investment, and I don't think the Partner Agreement

11   says you have to drop all your business and only

12   focus on this, and we did for this, and we did it

13   because of the exclusivity agreement.

14   BY MR. RATINOFF:

15       Q.  Looking at the financial statements that we

16   did for PureThink in 2014, you testified, I believe,

17   that revenue generated in 2014 was based on only

18   sales of Neo4j Enterprise Edition, correct?

19       A.  Yes, in which we only got the

20   revenue 25,000 -- we made 25,000 or 25 percent of

21   whatever that total sale was, which was not a lot.

22       Q.  But between 2014 and 2015, April, PureThink

23   was solely focused on developing business under the

24   Partner Agreement, correct?

25       A.  I believe so.  Yes.  That was our -- that

174

1  was our focus.

2        Q.  And in looking at the next page in the

3  interrogatory responses, 2.3, it says:

4              "The hourly rate Neo4j charged for

5              resources that were at or below the

6              expertise level of John Mark Suhy was

7              $300 an hour for a subject matter

8              expert."

9        A.  Yes.

10       Q.  "These rates are used to justify many of

11  the costs."

12       A.  Yes.

13       Q.  Did you take $300 and multiply that by a

14  certain number of hours to come up with $650,000?

15  In other words, if I divide $650,000 by 300 and got

16  approximately 2166 hours, that's what you're saying

17  is the time you spent on Neo4j Government Edition?

18       A.  I believe that's part of it.  Remember that

19  when we're doing business development and marketing

20  and whatnot, that time is not something that's

21  covered under those hourly rates.  The $300 an hour

22  rate is something that Neo4j charges and what we

23  could have done consulting for instead of doing

24  this.

25       Q.  Do you understand that Neo4j charged $300

175

SER_1107

JOHN MARK SUHY                                          November 29, 2022

1    an hour to its customers, but that's not what its

2    actual employees who do the consulting make?

3         A.  Well, I don't know any of that.

4         Q.  Isn't it normal in business that if a

5    company charges consulting rates, it's not paying

6    its employee the same amount that it's charging the

7    client?

8              MR. BEENE:  Objection to form.

9              THE WITNESS:  I'm one person, and this is

10   PureThink.  So everything would come back to me

11   anyway in some way or another.

12   BY MR. RATINOFF:

13        Q.  But you don't charge your clients $300 an

14   hour for consulting, do you?

15        A.  It depends on what we're doing, and it

16   depends on if they can afford us.  Sometimes we will

17   give them much less rates just because we feel that

18   it's worthwhile being involved with them so we can,

19   you know, identify their opportunities.  So there is

20   always a balance.

21        Q.  But you don't know whether Neo4j charges

22   its clients $300 an hour and then in turn pays its

23   employees $300 for work per hour, correct?

24        A.  I have no idea about how Neo4j operates.

25        Q.  So then are you saying that you have a way

                                                     176

1  of tracking the 2166 hours plus that you spent

2  between May of 2015 and 2017?

3      A.  Yeah.  I basically was working full time

4  and more than eight hours a day just to get

5  everything done.  And that's how we came up with the

6  dates, the times, the amounts, everything.

7      Q.  Do you have time sheets to evidence that

8  time spent?

9      A.  Hmm -- not time sheets, but I'm sure that

10  you get repos and commits, and all the documents and

11  whatnot would kind of show that.  Writing a 15-page

12  marketing document on how we're going to approach

13  government and whatnot takes days to do.

14      Q.  But you didn't actually keep any official

15  records to track that time, did you?

16      A.  I don't believe we would have needed to,

17  because it was full time, fully dedicated.

18      Q.  Do you have --

19      A.  We're not charging -- you know, usually you

20  track -- you track hours when you're charging

21  someone and billing the rates.  This was an

22  investment on our end, so there would have been no

23  need to do that.  So our goal was to be 100-percent

24  focused on this.

25      Q.  So the $650,000 is essentially just an

177

JOHN MARK SUHY                                    November 29, 2022

```
1   related to their GSA for staffing.

2            You know, the goal is to get business out

3   of this, and that's why sometimes you do stuff for

4   free.  And I do a lot of stuff for zero dollars.

5   You know, if it leads to us making money, then

6   that's the whole purpose of the investment is we

7   aren't doing it for the current -- the now.  We're

8   doing it for the future.

9       Q.  All right.  I want to go ahead and move on

10  to -- we talked about the protest and then the

11  cancellation of the -- or the pre-award protest.

12  And you believe that the -- sorry.  Let me start

13  over.

14           So it's PureThink's contention that it lost

15  out on continuing with the Government Edition?

16      A.  Well, it did, because they, Neo4j, canceled

17  the Government Edition and told our clients that

18  they couldn't work with us.

19      Q.  Did you give back all the work that you did

20  to Neo4j, all the working documents and the business

21  development and all the work that you did?  Did you

22  just say here you go, it's yours?

23      A.  I don't believe so.  I don't think that

24  would be theirs.

25      Q.  So you kept all that work?
```

                                                      186

1    the different modules that we had created.  I have

2    no idea if they took our work and integrated it.

3           Because I do remember that -- what is his

4    name, the lead, the head of the software

5    development, I'm forgetting right now, for Neo4j

6    said that there is a lot of the features they wanted

7    to integrate into Neo4j Enterprise that we had done

8    with this.  I don't know if they took our work or if

9    they just created it from the beginning.

10          MR. RATINOFF:  And then on this next

11   exhibit, it's going to be marked for identification

12   as Exhibit 214, tab 504, will be in your chat.

13          (Plaintiffs' Exhibit 214 was marked for

14   identification.)

15          THE WITNESS:  I'm looking at this.

16   BY MR. RATINOFF:

17      Q.  And this is an e-mail.  The last e-mail in

18   exchange is dated October 4th, 2017.  It's from

19   Michael Dunn to John Mark Suhy at egovsol.com.  And

20   the Bates on the first page is -- ends with

21   3249.001.  Do you see that?

22      A.  Yes, I do.

23      Q.  Is this an e-mail exchange you had with

24   Mr. Dunn?

25      A.  Yes, it looks to be.

                                                    188

JOHN MARK SUER                                         November 29, 2022

1      Q.  And why did you send this e-mail to

2  Mr. Dunn?  At the beginning here, it says, "Hello

3  Michael.  Here is some information for market

4  research regarding eGovernment Solutions, Inc."

5      A.  It sounds like I was giving him information

6  for market research.

7      Q.  Why were you giving him market research

8  information about eGovernment Solutions?

9      A.  Usually the government will reach out

10  saying they're doing market research and ask you for

11  information.  And that's what it looks like they

12  did, and that was the response.

13      Q.  And at this time, were you part owner of

14  eGovernment Solutions?

15      A.  October 2017?  I might have been.  I don't

16  remember when I sold my shares.  But I might have

17  been.

18      Q.  But you were working under the eGovernment

19  Solutions name at this point, correct?

20          MR. BEENE:  Objection to form.

21          THE WITNESS:  I was answering from

22  eGovernment Solutions, so it seems to be that's what

23  this e-mail is from.

24  BY MR. RATINOFF:

25      Q.  And then it says, if you go down towards

                                                        189

the bottom of the first page:

        "The current CKGE environment will

        require any potential vendor to

        provide 2 critical components:  1) the

        Government Package/Suite for Neo4j and

        2) professional services for continued

        development."

And it continues:

        "Other vendors may be able to offer

        the professional services, but only

        iGov Inc. can fulfill the Government

        Package/Suite for Neo4j requirement."

        What are you referring to as the Government

Package/Suite for Neo4j requirement?

    A.  I believe we're talking about the bisma and

all the auditing that needs to be put in place, and

that knowledge we gained by working with IRS at the

beginning.  We knew how to apply that, so we could

reapply everything.

        I don't think any other vender -- and I

think it would be obvious that other vendors that

would come in would not have that knowledge that

would be able to help them wrap up and get moving.

So it was basically because of me and my knowledge.

    Q.  And that's the knowledge that you gained

190

1    working as PureThink under the PureThink/IRS

2    contract we talked about earlier, correct?

3            MR. BEENE:  Objection to form.

4            THE WITNESS:  It's knowledge, but not

5    necessarily software.

6    BY MR. RATINOFF:

7        Q.  And it says, "The same team members," and

8    this is on the second page, halfway down:

9                "The same team members from the past

10               contract would be able to stay on

11               under eGovernment Solutions Inc.  All

12               of the development environment, tools,

13               et cetera would also be maintained

14               meaning there would be no ramp-up

15               time."

16       A.  I see that.

17       Q.  When you say the same team members, are you

18   talking about PureThink on the past contract that we

19   previously discussed between the IRS and PureThink?

20       A.  No.  I believe I'm talking about myself

21   only.

22       Q.  Okay.  But you're talking about the work

23   that you performed for the IRS under PureThink and

24   the contract we discussed earlier, correct?

25       A.  Yes.  I believe I would be showing them

                                                      191

JOHN MARK SUHY    November 29, 2022

1    that, hey, I have all this experience that I bring

2    to the table with this company.

3        Q.  And it says "All of the development

4    environment tools, et cetera will also be maintained

5    meaning there would be no ramp-up time."  Are you

6    referring to the work that you previously did with

7    the IRS under PureThink?

8        A.  Yes.  The software that they actually

9    owned, they have a lot of work product.

10       Q.  And that was what you developed for the

11   IRS, correct?

12       A.  Some of it was.  Some of it was done by

13   other teams, and we helped them integrate it.

14       Q.  Then at the bottom, it says:

15           "I am a minority partner in

16           eGovernment Solutions, and a majority

17           partner (only partner) in iGov Inc.

18           IGov Inc. holds the rights and sells

19           and supports the Neo4j Government

20           Package/Suite."

21           Do you see that?

22       A.  Yes.

23       Q.  And are you at this time now clearly still

24   an owner or part owner of eGovernment Solutions at

25   this time?

192

JOHN MARK SUHY                                                      November 29, 2022

A.  Yes.  If I said that, then I was still an owner.

Q.  And it says, "iGov holds the rights and sells and supports the Neo4j Government Package/Suite."

A.  Yes, that's a solution that's an offering. It's not a product.  The Neo4j Government Edition was the product.  The Neo4j Government Package/Suite is a suite of services and support focused on FISMA, addressing other needs that U.S. governments need.

And it's important because if you're using Neo4j Community, whatever version you're using, you need to follow these security guidelines and whatnot.  And that's what -- that's the expertise that I bring to the table now, because I gained all that knowledge, you know, what requirements are needed for IRS, what their 508 compliance requirements are and whatnot.

Q.  And you gained that knowledge through the prior work that you did under PureThink with the PureThink/IRS contract that we talked about, correct?

MR. BEENE:  Objection to form.

THE WITNESS:  That as well as I've have other contracts with IRS years before, subcontracts.

193

SER_1116

JOHN MARK SUHY                                                November 29, 2022

```
 1        Q.  After that, did you provide a version of
 2   ONgDB to the IRS to use in the CKGE framework?
 3        A.  I believe he -- he didn't say it correctly.
 4   You don't -- you don't deploy it to the framework.
 5   You just have your own data sources, and the
 6   framework has tools that can connect to it.
 7        Q.  So then did you start using ONgDB at the
 8   IRS in relationship to the CKGE framework or
 9   environment, whatever you like to call it?
10        A.  I didn't.  The teams did, the teams that
11   manage graphs, I'm sure.  Because this says let's go
12   ahead and do it.
13        Q.  Where did ONgDB software come from for the
14   IRS?  Was it downloaded from the iGov website?
15        A.  The Graph Foundation.
16        Q.  And at that time, was the IRS using an
17   internal gitlab repository to maintain its graph
18   database software it was using?
19        A.  I don't remember at that time if they had
20   it.
21        Q.  At some point did the IRS begin using an
22   internal gitlab repository to maintain versions of
23   ONgDB?
24        A.  No, not to maintain versions, but I think
25   it was to be able to run their own code scans.  So
```

                                                          366

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS  408-287-7500

1   any time they had software, they had source course

2   available.  They wanted it to be in there so they

3   can run code scan tools.

4        Q.  What are code scan tools?

5        A.  They're tools that can do static secure

6   code.  So it can do static code scanning.  It can

7   identify specific types of vulnerabilities that you

8   can recognize by looking at actual source code.

9        Q.  So they --

10       A.  Tools for that.

11       Q.  So before using that version of ONgDB, it

12  would be loaded into the gitlab, and the IRS would

13  scan it to make sure it didn't have any security

14  vulnerabilities?

15       A.  Sorry, repeat that again.

16       Q.  Yeah.  So for instance, if there was a new

17  version of ONgDB to be used, it would be uploaded to

18  the gitlab in the IRS, and they would run scans on

19  it to make sure it was secure and didn't have any

20  security vulnerabilities?  Is that what you're

21  saying?

22       A.  That's one thing they would do, yes.  But

23  it wasn't mandatory to do it.  It was more that,

24  hey, they have a tool that will scan all the repos,

25  let's make sure everything is there in case there

367

1   was something that wasn't reported to us in gitlab.

2       Q.  Did you ever upload any version of ONgDB to

3   the IRS's gitlab repository?

4       A.  I believe I'm the one that did it, but I

5   don't remember.  I'm the one that's responsible for

6   making sure that any of the software that's being

7   used can all be found in a certain area, in a

8   certain location.  So I think I would have done

9   that.

10      Q.  Is that something you continued to do

11  throughout the eGovernment Solutions contract?

12      A.  No.  I think it was something that I

13  started to help with, and then since it's unpaid,

14  just no time to keep doing it.

15      Q.  To this day, you have access to that gitlab

16  repository that the IRS maintains?

17      A.  I believe so.  I should have it.  I haven't

18  checked it for a while, so . . . .

19      Q.  And do you know whether the IRS switched

20  over to ONgDB for its YK1 platform?

21      A.  I'm not positive.

22      Q.  Take a look at what's been previously

23  marked as Exhibit 174.  Oh, I'm sorry.  I think I

24  put the wrong e-mail in.  Let me back up here.

25  Yeah.  Why don't you hold off on that one.  Let me

                                                    368

1                      REPORTER'S CERTIFICATE
              The undersigned Certified Shorthand
2    Reporter licensed in the State of California does
     hereby certify:
3             I am authorized to administer oaths or
     affirmations pursuant to Code of Civil Procedure,
4    Section 2093(b), and prior to being examined, the
     witness was duly administered an oath by me.
5             I am not a relative or employee or attorney
     or counsel of any of the parties, nor am I a
6    relative or employee of such attorney or counsel,
     nor am I financially interested in the outcome of
7    this action.
              I am the deposition officer who
8    stenographically recorded the testimony in the
     foregoing deposition, and the foregoing transcript
9    is a true record of the testimony given by the
     witness.
10            Before completion of the deposition, review
     of the transcript [x] was [^ ] was not requested.
11   If requested, any changes made by the deponent (and
     provided to the reporter) during the period allowed
12   are appended hereto.
              In witness whereof, I have subscribed my
13   name this 5th day of December, 2022.
14
15
16
17
18   
19   _____
20   KAREN L. BUCHANAN
21   CSR No. 10772
22
23   CLR No. 031106-04
24
25

                                                            410

SER_1120



# EXHIBIT 3

SER_1121

UNITED STATES DISTRICT COURT
NORTHER DISTRICT OF CALIFORNIA


NEO4J, INC., a Delaware
corporation; and NEO4J
SWEDEN AB, a Swedish
corporation,                          CASE NO.
                                      5:18-cv-07182-EJD

              Plaintiffs,

vs.

PURETHINK, LLC, a Delaware
limited liability company;
IGOV INC., a Virginia
corporation; and JOHN MARK
SUHY, an individual,

              Defendants.
_____/


    REMOTE VIDEOTAPED DEPOSITION OF ASHWANI MAYUR
AS PERSON MOST KNOWLEDGEABLE FOR EGOVERNMENT SOLUTIONS


 DATE:          October 25, 2022

 TIME:          8:03 a.m.

 LOCATION:      Via Zoom Videoconference

 REPORTED       KAREN L. BUCHANAN
 BY:            CSR No. 10772
                CLR No. 031106-04



                                                        1

ASHWANI MAYUR                                        October 15, 2022

1    Q.   Okay.  And what time was that?

2    A.   I believe it should be 2013 or 2014.

3    Q.   So it was definitely -- but it was after?

4    I'm looking back at Exhibit 99, and Mr. Siegler is

5    listed as of January 29, 2014, so the buyout would

6    have been in 2014?

7    A.   That sounds about right.

8    Q.   And then was there a point in time where

9    Mr. Suhy was bought out of his shares of eGovernment

10   Solutions?

11   A.   That is correct.  That is December 31st,

12   2018.

13   Q.   And what was the reason for buying Mr. Suhy

14   out of his shares of eGovernment Solutions?

15   A.   Well, for many, many years nothing happened

16   in the company.  And Mr. Suhy's interest had always

17   been in projects.  And as I mentioned, my partner,

18   Nikhil, my present partner, Nikhil and I, we have a

19   background which is related to staffing.  And we

20   wanted to do something in the federal space.  We

21   wanted to identify some projects where we can

22   realize the company to do staffing, technology

23   staffing, to partner with the larger contracting

24   companies which are based out of this area.  So that

25   is the time Mr. Suhy decided to sell his shares to

                                                              30

1    us.

2          Q.  And was there a purchase price discussed?

3          A.  Yes.

4          Q.  And do you recall what that purchase price

5    was?

6          A.  I believe it was $20,000.

7          Q.  And then how did -- how did the remaining

8    shareholders and Mr. Suhy come to that number?

9          A.  So at that time, I think the IRS project

10   was also won in the eGovernment Solution, which

11   everything was done by Mr. Suhy.  And when we

12   decided that, hey, we would like to buy the share

13   and the agreement was this project belongs to you,

14   we have no idea what it is, and you can continue to

15   use it.  If we get the money from IRS, we will pay

16   it to you without keeping anything out of that.

17   That was the agreement with him.  And we decided

18   that 20,000 is a fair share.

19         Q.  And was there a written agreement that

20   reflected the purchase of Mr. Suhy's shares?

21         A.  Yes.

22         MR. RATINOFF:  All right.  Please go ahead

23   and take a look at the chat.  I dropped another

24   document in there.  This will be Exhibit 100.

25         (Plaintiffs' Exhibit 100 was marked for

                                                        31

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS  408-287-7500

1    identification.)

2           THE WITNESS:  It's downloading.  One

3    second.

4    BY MR. RATINOFF:

5        Q.  The title of this document is Stock

6    Purchase Agreement, so let me know when you've had a

7    chance to open it and take a look at it.

8        A.  Yes.  Now I have.

9        Q.  And do you recognize what has been marked

10   as Exhibit 100?

11       A.  The buy-sell agreement?

12       Q.  Yeah.  The title is Stock Purchase

13   Agreement.  That's Exhibit 100.

14       A.  Yes.

15       Q.  And do you recognize this document?

16       A.  Yes.

17       Q.  What is it?

18       A.  This is a Stock Purchase Agreement which --

19   where we agreed to buy Mr. Suhy's stock from the

20   company, shares from the company.

21       Q.  And then you mentioned the purchase price

22   of 20,000.  If you look at section 2.1 --

23       A.  Yes.

24       Q.  -- that's reflected there in that section,

25   the purchase price.

                                                            32

1    A.  That is correct.

2    Q.  And I'm looking at -- I don't know if it's

3  a section or paragraph, I'll call it section,

4  section 4, it says "John Mark Suhy will continue to

5  act as Facility Security Officer or assistant

6  Facility Security Officer for eGovernment Solutions,

7  Inc."  Do you see that?

8    A.  Yes.

9    Q.  What's a Facility Security Officer?

10   A.  So my understanding is if you're doing any

11 project for the federal government and you need

12 certain clearance for that, there are secret, top

13 secret, different kind of clearances.

14      This project required a secret level

15 clearance, I believe.  John Mark was the only one at

16 that time who had the clearance in the company.  So

17 you have to identify some individual who can work as

18 a security officer.  What does that means is it

19 doesn't matter who the owner is, if I'm not cleared,

20 I'm not supposed to look at any of the documents

21 coming for that project.

22   Q.  So it was necessary for him to remain the

23 Facility Security Officer to keep servicing IRS

24 under the contract you mentioned?

25   A.  That is correct.  That is my impression.

33

SER_1126

ASHWANI MAYUR                                           October 15, 2022

```
 1          Q.   Okay.  And if we look at the next page,
 2     there is a paragraph 5.
 3          A.   Mm-hmm.
 4          Q.   It says Treasury Contract 2032H, as in
 5     hotel, 8-18-P, as in papa, dash 00151.  Do you see
 6     that?
 7          A.   Yes.
 8          Q.   Is that the project that you had mentioned
 9     earlier?
10          A.   That is correct.
11          Q.   I think the numbers are kind of a mouthful.
12     So is it okay -- it says aka CKGE Knowledge
13     Environment contract right next to that number I
14     just read off.  Do you see that?
15          A.   That is correct.
16          Q.   Can we just call it the "CKGE contract" for
17     short?  Do you understand if we use that word,
18     that's that contract?
19          MR. BEENE:  Objection to form.
20     BY MR. RATINOFF:
21          Q.   Can we call the Treasury Contract
22     2032H8-18-P-00151 the "CKGE contract" for short?
23          A.   Is that a question for me?
24          Q.   Yes.
25          A.   Yes, you can.
```

                                                              34

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS   408-287-7500

Case 5:18-cv-07182-EJD    Document 183-4    Filed 04/20/23    Page 8 of 49    October 15, 2022

1    Q.  You'll understand what I'm talking about?

2    A.  Yes.  The project from the -- the contract

3    from the IRS.

4    Q.  Now, you mentioned Mr. Suhy would keep

5    working on the contracts.  Looking at paragraph 511

6    or section 5.1, it says:

7            "EGovernment Solutions, Inc., hereby

8            hires John Mark Suhy as an independent

9            contractor for all option years that

10           are exercised on the CKGE contract."

11   Do you see that?

12   A.  Yes, I do.

13   Q.  And it says, "His compensation will be

14   200,000 per year paid when eGovernment Solutions

15   gets paid"?

16   A.  That is correct.

17   Q.  When it says eGovernment Solutions gets

18   paid, that means paid by the IRS under the CKGE

19   contract?

20   A.  That is correct.

21   Q.  And again, the reason I think you testified

22   earlier that the money would be paid to Mr. Suhy is

23   he was the only one in eGovernment Solutions that

24   was able to fulfill that contract?

25   A.  That is correct.

35

1    Q.  And looking at paragraph 5.2 or section

2    5.2, "eGovernment Solutions will give John Mark Suhy

3    the authority to drive the direction of the project,

4    (Section 5)," I assume that's referring to the CKGE

5    contract; is that correct?

6    A.  That's correct.

7    Q.  And from that point up until this contract

8    and the Stock Purchase Agreement, did Mr. Suhy have

9    full authority on the CKGE contract?

10    A.  Yes.

11    Q.  And the purpose of this agreement was to

12    allow him to continue to have full authority under

13    that contract as an independent contractor?

14    A.  That is correct.

15    Q.  Now, looking at paragraph 5.3, it mentions

16    option years.  And then there is a list of years 1,

17    2, 3 and 4.  What does that mean as far as option

18    years?

19    A.  So my impression is when this project was

20    won, John Mark Suhy did mention that there would be

21    an extension on this project.  There would be

22    multiple years.  And I believe it goes to five

23    years.

24        So we wanted to be fair, if anything coming

25    out of the project, any money -- because he is the

36

SER_1129

1   one who won that, he was the one who is working on

2   it, so anything that comes from IRS, we felt

3   obligated, we wanted to give to him.  Now, if the

4   money would come, we will pay him.  If the money

5   would not come, I will assume that service is not

6   provided to IRS, so there is no more money coming.

7       Q.  But as far as if the IRS did pay the full

8   amount that was due in the contract, that money

9   would be in turn paid to Mr. Suhy?

10      A.  That is correct.

11      Q.  And so eGovernment Solutions didn't take a

12  commission or anything off of any payments from the

13  IRS?

14      A.  No.

15      Q.  And in looking at paragraph 6, it says:

16          "Profit on any future contracts with

17          the Department of Treasury the CACI

18          Army contract (prime award, teaming,

19          or subcontracts) shall be subject to a

20          1/3 commission on Net Profit to John

21          Mark Suhy."

22          Do you see that paragraph or section?

23      A.  Yes.

24      Q.  Was the Department of Treasury future --

25  sorry.  Were there any other Department of Treasury

37

SER_1130

1    Q.  Okay.  So it was a staffing contract?

2    A.  That is correct.

3    Q.  It wasn't a contract for the installation

4    of any type of software?

5    A.  I'm not aware of that.

6    Q.  Okay.

7    A.  It is a 250 million -- I don't want to give

8    any amount.  It's a large contract with the Army, so

9    I'm sure they would have hundreds of technologies

10   there.

11   Q.  Okay.  And what was Mr. Suhy's role with

12   that contract?

13   A.  So in the beginning, because we are a small

14   business, we wanted to convey to CACI that we would

15   be able to fulfill some of those positions in some

16   specific technology.  And he is the one who brought

17   in that contract.

18   Q.  Okay.  And then for some reason, there

19   seems to be two copies of the agreement in this

20   document.  So I'm going to scroll down to what's the

21   signature page.  And you'll see there are some

22   signatures on the left column.  Do you see that?

23   A.  Yes.

24   Q.  And is that Mr. Suhy's signature, to your

25   knowledge?

39

```
 1           A.  I believe that is his signature.

 2           Q.  Is that Mr. Budhiraja's signature?

 3           A.  Yes.

 4           Q.  I notice there is two spots for your

 5    signature.  Do you see that?

 6           A.  That is correct.  I think I may have missed

 7    it.

 8           Q.  Did you end up signing this document, this

 9    Stock Purchase Agreement?

10           A.  Yes.

11           Q.  Just -- I'll represent that we received a

12    copy of this from you, also from Mr. Suhy, and

13    neither had your signature on it.  Do you have a

14    copy of it with your signature?

15           A.  I can sign one, I'm sure.

16           Q.  But it was understood this contract was

17    fully executed?

18           A.  Yes.

19           Q.  And Mr. Suhy transferred his shares in the

20    company to the remaining shareholders?

21           A.  That is correct.

22           Q.  And how were those shares distributed

23    between the remaining shareholders?

24           A.  I think there is some more documents here.

25    I think Nikhil and I are equal partners on that now.
```

                                                        40

1    contract on behalf of eGovernment Solutions?

2        A.   I believe there may be another company

3    which was working, but John Mark Suhy would know all

4    about that.

5        Q.   As of 2018, you think there may have been

6    another company working on that contract on

7    eGovernment Solutions' behalf?

8        A.   So recently I was looking at the document,

9    and one of the e-mails from John Mark Suhy mentioned

10   there is a company who was supporting him in the

11   beginning.

12       Q.   Do you recall the name of that company?

13       A.   I think it's called AtomRain.

14       Q.   Is the CKGE contract still active?

15       A.   I have to check that.  I mean we have to

16   check that with John Mark Suhy.  The only thing I

17   remember is we received the last money.  The moment

18   the money comes, John Mark Suhy takes the money out.

19   So I would not know anything about the project.

20       Q.   And other than being the FSO, Facilities

21   Security Officer -- we'll just call it FSO, if

22   that's okay.

23       A.   I'm okay with that.

24       Q.   Did Mr. Suhy retain any other position at

25   eGovernment Solutions after he sold his shares?

42

SER_1133

STEPHANIE MANN                                    October 15, 2022

1    currently working on?

2         A.  So we have three individuals working

3    with -- as a subcontract with a different

4    department.

5         Q.  And do any of those contracts involve

6    Mr. Suhy?

7         A.  No.  They were building staffing projects.

8         Q.  Do any of those contracts involve Neo4J

9    software?

10        A.  No.

11             (Reporter interruption.)

12             MR. RATINOFF:  Neo4J software.

13             THE REPORTER:  Thank you.

14             MR. RATINOFF:  Okay.  I'm going to go ahead

15    and mark the next exhibit as I put it in the chat as

16    Exhibit 102.

17             (Plaintiffs' Exhibit 102 was marked for

18    identification.)

19    BY MR. RATINOFF:

20        Q.  This is a document that was produced by

21    eGovernment Solutions.  And it starts with a Bates

22    number of EGOVS with the number 1.  Are you in

23    there?

24        A.  Which page should I look?

25        Q.  Just the first page will be fine, thanks.

                                                          47

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS   408-287-7500

STEWART MADOR                                                October 15, 2022

 1      I mean take a look at the whole document too.

 2          A.   This is IRS Price Quotation Sheet?

 3          Q.   Correct.  Do you remember this document?

 4          A.   I did see this document, first time in the

 5      last two weeks.

 6          Q.   Okay.  But it was produced by eGovernment

 7      Solutions?

 8          A.   It is produced by John Mark Suhy on behalf

 9      of eGovernment Solutions.

10          Q.   So you got -- you asked Mr. Suhy for

11      documents related to the CKGE contract, correct?

12          A.   I believe my attorney asked for them.

13          Q.   And this is the -- one of the documents you

14      received?

15          A.   That is correct.

16          Q.   And to your knowledge, does this quotation

17      relate to the IRS project we've been talking about?

18          A.   I believe so.

19          Q.   And was this a quote prior to that contract

20      being issued that was submitted by eGovernment

21      Solutions?

22          A.   I mean as I mentioned, I just see this

23      document a few weeks back, so I guess that is

24      correct.

25          Q.   Going and looking at what's marked as Bates

                                                          48

JOHN MARK SUHY                                          October 15, 2022

```
1    numbers number 11, do you want to go to that?
2         A.  I'm on that page.
3         Q.  Okay.  It says "Offeror name:  EGovernment
4    Solutions, Inc."
5         A.  Yes.
6         Q.  Do you see that?
7         A.  Yes.
8         Q.  So is it fair to say this document was
9    submitted to the IRS on behalf of eGovernment
10   Solutions?
11        A.  That is correct.
12        Q.  Looking at the next page, Bates No. 12.
13        A.  Mm-hmm.
14        Q.  Sorry, you'll have to use an audible "yes"
15   or "no."
16        A.  Yes.  Sorry.
17        Q.  No problem.  I know it's hard.  Sometimes
18   we slip into normal conversation.
19             Looking at the signature name here, it says
20   "Insert print name:  John Mark Suhy," and there is
21   an April 3rd, 2018, is the date.  Do you see that?
22        A.  I do see that.
23        Q.  Is that Mr. Suhy's signature?
24        A.  I believe that's his signature.
25        Q.  Mr. Suhy was signing this quote on behalf
```

49

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS   408-287-7500

1  eGovernment Solutions, correct?

2       A.  That is correct.

3       Q.  And to eGovernment Solutions' knowledge,

4  this was submitted to the IRS?

5       A.  Yes.

6       Q.  But no one else in the company had any

7  input into this quote, just Mr. Suhy?

8       A.  That is correct.

9       Q.  And we were talking about it a little

10  earlier.  To eGovernment -- sorry, eGovernment

11  Solution's knowledge, this quote was accepted by the

12  IRS?

13       A.  That's correct.

14       MR. RATINOFF:  And now I'm going to go

15  ahead and put the next exhibit into the chat.  I

16  believe this would be Exhibit 103.

17       (Plaintiffs' Exhibit 103 was marked for

18  identification.)

19  BY MR. RATINOFF:

20       Q.  Let me know when you've had a chance to --

21       A.  I'm looking at it right now.

22       Q.  Let me know when you're done.

23       A.  Yes.

24       Q.  Okay.  Looking at what's been marked as

25  Exhibit 103, it says "Order for Supplies or

50

1   Services." And you'll see there is a box 3, and it's

2   got the order No. 20232H8-18-P-00151.  Do you see

3   that?

4        A.  Yes, I do.

5        Q.  And is that the same contract number that

6   was referenced in the Stock Purchase Agreement?

7        A.  That is correct.

8        Q.  And then what's your understanding of what

9   this order for supplies or services is?

10       A.  This is a project which was won by John

11   Mark Suhy on behalf of eGovernment Solutions for

12   IRS.

13       Q.  And that is what we've been calling the

14   CKGE --

15       A.  That is correct.

16       Q.  -- contract?

17       A.  Yes.

18       Q.  And this is the same contract that is in

19   the Stock Purchase Agreement?

20       A.  That is correct.

21       Q.  And looking at the next page, you'll see

22   there is a list of Line Item Table.

23       A.  Yes.

24       Q.  If you look at the item number 1, it's CDW

25   Graphic Environment Continued development and

51

1    operations, et cetera. Do you see that?

2         A. Yes, I do.

3         Q. And the base is listed as the year or the

4    dates, 5/24/18 to 5/23 -- and it looks like there's

5    a typo, 2029.

6         A. I see that.

7         Q. Is it your understanding this line item 1

8    with the price of 300,000 was the first year of the

9    IRS contract for the Stock Purchase Agreement?

10        A. That's correct.

11        Q. And I believe you mentioned there was some

12   option years listed in the Stock Purchase Agreement;

13   is that correct?

14        A. That's correct.

15        Q. And looking at items 1001, 2001, 3001 and

16   4001, is that the option years that were referring

17   to in the contract?

18        A. That is correct.

19        Q. And when I say contract, I mean the Stock

20   Purchase Agreement. Sorry.

21        A. Yes.

22        Q. And the price or the value of each one of

23   those option years is $200,000, correct?

24        A. That is correct.

25        Q. And as you testified before with the Stock

                                                          52

SER_1139

ANTHONY MAYER                                          October 15, 2022

 1    Purchase Agreement, the idea was that if each one of

 2    these option years is exercised for $200,000, that

 3    money would be ultimately paid to Mr. Suhy?

 4         A.  That is correct.

 5         Q.  And as of the time of the -- you'll see the

 6    date on this is at the very bottom.  It's signed on

 7    May 31st, 2018.

 8         A.  Which page?

 9         Q.  I'm sorry.  I jumped ahead there.  Strike

10    that question.  Let me go back.  Sorry.  On the

11    first page.

12         A.  Same document?

13         Q.  Yeah.  Same document.  First page, you'll

14    see it was signed on May -- it's very small under

15    the 22 box, it's a signature that says digitally

16    signed dated 2018.05.24.  Do you understand to be

17    May 24, 2018?

18         A.  Yes.  I see that.

19         Q.  And is that your understanding of when the

20    contract was awarded?

21         A.  I believe that may be the correct date.

22         Q.  And was there a $300,000 payment made to

23    eGovernment Solutions by the IRS after this contract

24    was awarded?

25         A.  Yes.

                                                          53

STEWART MADER                                                    October 15, 2022

1        Q.  And was the entire $300,000 then paid to

2    Mr. Suhy?

3        A.  That is correct.

4        Q.  We've been going for about an hour.  Are

5    you doing okay, or do you need to take a break?

6        A.  I'm doing fine.

7        Q.  We'll go a few more questions and take a

8    break, because I know there's other folks on this

9    that probably do want to take a break.

10       MR. RATINOFF:  Okay.  The next document is

11   going to be marked as Exhibit 104.

12       (Plaintiffs' Exhibit 104 was marked for

13   identification.)

14   BY MR. RATINOFF:

15       Q.  I'm going to drop this in the chat.  You'll

16   see this document is entitled Amendment

17   Solicitation/Modification of Contract.

18       A.  I see that.

19       Q.  And I'll represent to you this is provided

20   to us by your counsel.

21       A.  What?  I didn't get that.

22       Q.  This document, you'll see there is a Bates

23   number on the bottom.  This is produced by your

24   counsel.  Do you understand that?

25       A.  Yes.

54

ASHWANI MAYUR                                           October 15, 2022

```
 1          Q.  And do you recognize what's been marked as
 2     Exhibit 104?
 3          A.  I'm sorry.  I'm looking at some specific
 4     number?
 5          Q.  Yeah.  Look at -- I'll help you out here.
 6     If you take a look at Box 10A, it says Modification
 7     for Contract Order Number.
 8          A.  Yes, that is correct.
 9          Q.  And then looking down actually at Box 14, I
10     think it's a little bit more descriptive.  It says,
11     "The purpose of this modification is to correct OF
12     347 block 3 order number Smart ID from
13     2032H8-18-P-00151 to 2032H8-18-P-00168."
14          Do you see that?
15          A.  Yes, I do.
16          Q.  And do you understand that this amendment
17     was changing the contract number for the CKGE
18     contract?
19          A.  Based on the document, it looks like that
20     is the case.  But I never saw this document before.
21     When I say before, it means before the subpoena.
22          Q.  And did you obtain this document from
23     Mr. Suhy?
24          A.  My counsel did.
25          Q.  And you see the name and address of the
```

                                                           55

1    contractor says eGovernment Solutions?

2         A.  That is correct.

3         Q.  So to your knowledge, this was an amendment

4    to the original CKGE contract we've been talking

5    about?

6         A.  Based on the document, that sounds right.

7    That sounds right.

8         Q.  But you don't have any reason to believe

9    it's not correct?

10        A.  No, I don't.

11        Q.  And based on what this document states, you

12   understand that the contract number -- just the

13   contract number has been changed by this amendment,

14   correct?

15        A.  Yes.

16             MR. RATINOFF:  The next document I'm going

17   to mark is Exhibit 105.

18             (Plaintiffs' Exhibit 105 was marked for

19   identification.)

20   BY MR. RATINOFF:

21        Q.  I just dropped that in the chat.  And this

22   document is entitled Amendment of

23   Solicitation/Modification of Contract, and it starts

24   with the Bates number EGOVS000030.  Do you see that?

25        A.  Yes, I do see that.

56

1    Q.  And I'll represent to you this is produced

2  by your counsel.

3    A.  That is correct.

4    Q.  And what is your understanding of this

5  document?

6    A.  It looks like the initial price has

7  increased from 300,000 to 500,000.

8    Q.  Okay.  And that's by 200,000 essentially?

9    A.  That is correct.

10    Q.  And it says on the second page, it sounds

11  like you might already be there, it says, "Option to

12  extend services."  Do you see that?

13    A.  Yes.

14    Q.  Is it your understanding that this is the

15  option 1 year in the CKGE contract that we've been

16  talking about?

17    A.  I believe so.

18    Q.  You can see, "The purpose for this

19  modification," box 14, "is to exercise option year 1

20  in the amount of $200,000 with the period of

21  performance is 5/24/19 to 5/23/2020."  Do you see

22  that?

23    A.  Yes.  Looking at this document, that sounds

24  right.

25    Q.  And looking back -- just so we're on the

                                                           57

1   same page, looking back at Exhibit 100, I don't know

2   if you have that handy, it would be tab 366 in the

3   chat if you needed to go back and look at that.  I'm

4   sorry.  365.  Do you have that open?

5        A.  I do have it open.

6        Q.  Okay.  So just so we're clear -- I'm sorry.

7   I'm off by one.  It is 366.  I'm looking at -- I'm

8   looking at the Stock Purchase Agreement,

9   Exhibit 100, and you'll see there is an option

10  year 1, 5/24/2019 to 5/23/2020.  Do you see that?

11  It's in section 5.3.

12       A.  I do see that.

13       Q.  So is it fair to say that what we've been

14  looking at as an amendment is the option year 1

15  that's referenced in the Stock Purchase Agreement?

16       A.  I'm afraid I didn't understand the

17  question.

18       Q.  So I'm just asking whether it's your

19  understanding that Exhibit 105 which says option

20  year 1 for $200,000 is the same option year that's

21  referred to in section 5.3 in the Stock Purchase

22  Agreement.

23       A.  That is correct.

24       Q.  Turning back to Exhibit 105, the amendment,

25  it references $200,000.  Was that money, 200,000,

58

ANTHONY MAYOR                                                    October 15, 2022

1    paid by the IRS to eGov Solutions?

2        A.  Yes.

3        Q.  And to your knowledge, was that $200,000,

4    was that paid to Mr. Suhy?

5        A.  Yes.  We paid it to him.

6            MR. RATINOFF:  Okay.  I think I want to

7    take just a quick five-minute break, because I know

8    the Court Reporter and videographer probably

9    appreciate that, if you don't mind.  So let's take a

10   five-minute break.  It's 9:14 my time, so come back

11   at 9:20 Pacific.  Does that work for everyone?

12           THE WITNESS:  Yeah, that works for me.

13           THE VIDEOGRAPHER:  Thank you.  We're now

14   going off the video record.  The time is 9:14 a.m.

15           (Break taken from 9:14 to 9:22 a.m.)

16           THE VIDEOGRAPHER:  We are now back on the

17   video record.  The time is 9:22 a.m.

18           MR. RATINOFF:  All right.  I'm going to go

19   ahead and put another document in the chat.  This is

20   going to be marked as Exhibit 106.

21           (Plaintiffs' Exhibit 106 was marked for

22   identification.)

23   BY MR. RATINOFF:

24       Q.  And the title of this document is also a

25   Amendment of Solicitation/Modification of Contract,

59

STEWART MAYOR                                                    October 15, 2022

1    and it's got an Amendment Modification No. 10.  Do

2    you see that, Box 2, with an effective date of

3    September 26th, 2019?  And this bears the Bates

4    number EGOVS000034.  That's the beginning Bates

5    number.  Do you see that document that's been marked

6    as Exhibit 106?

7        A.  I do see the document.

8        Q.  And do you have an understanding what this

9    document is?

10       A.  That is correct.

11       Q.  Okay.  Let me point you to contract order

12   No. 2032H8-18-P-00168.

13       A.  Yes.

14       Q.  Do you see that number?  And you recall

15   that we talked about an amendment to the -- to a

16   contract that was Exhibit 103, so you understand --

17   strike that.

18           Do you understand that this is a further

19   amendment of the CKGE contract we've been talking

20   about?

21       A.  Yes, I do understand.

22       Q.  And if you look at under box 14, it says:

23           "The purpose for this modification

24           is to increase the funding for option

25           year 1 by $216,000 and revise the

                                                          60

1           Statement of Work.  The total

2           obligated on the order is changed from

3           500,000 by 216,000 to [a total of]

4           716,000."

5           Do you see that?

6      A.  Yes, I do see that.

7      Q.  For the record, I added "total" in there.

8  That's not actually in the document.

9           So do you understand that this document

10  increased the option year 1 from 200,000 to 416,000?

11      A.  Yes.

12      Q.  And looking at the date signed box, 15B,

13  and the date is 09/26/2019, do you understand that

14  to be Mr. Suhy's signature?

15      A.  That is correct.

16      Q.  And do you know why the IRS increased the

17  contract option year 1 by 216,000?

18      A.  No, I don't remember that.

19      Q.  And was there an additional payment for

20  option year 1 made to eGov Solutions by the IRS for

21  216,000?

22      A.  Yes.

23      Q.  And after eGovernment Solutions received

24  that 216,000, where did that money go?

25      A.  That money was paid to John Mark Suhy.

61

1       Q.  So for option year 1, Mr. Suhy was paid by

2  eGovernment Solutions a total of 416,000?

3       A.  That is correct.

4       Q.  And at this point in time, was eGovernment

5  Solutions paying anyone else to work on the CKGE

6  contract?

7       A.  So in the last couple of weeks, I went back

8  and I checked all of our payments which were

9  outgoing, because this account was -- all of the

10  money coming in from IRS, John Mark Suhy was allowed

11  to use this account to pay to himself for iGov.  And

12  I recently noticed in 2019, all of the money went to

13  iGovsol.

14       Q.  So the bank account that this payment went

15  to, Mr. Suhy had access to; is that correct?

16       A.  Yes.

17       Q.  But this is an eGovernment Solutions

18  account?

19       A.  That is correct.

20       Q.  What is -- the eGovernment Solutions

21  account that the payments were made, did anyone else

22  have access to that account?

23       A.  I did.

24       Q.  So just you and Mr. Suhy?

25       A.  Yes.

                                                        62

1      Q.  And Mr. Suhy was allowed to make whatever

2  payments out of that account was needed; is that

3  correct?

4      A.  Because all of the money coming from the

5  IRS project was his money, so we had him access to

6  that account.

7      Q.  So that account was specifically set up

8  just for the IRS project?

9      A.  That is the only project the company had at

10 that time, and that account had no other income

11 other than the IRS project.  So we let him operate

12 that account.

13         MR. RATINOFF:  Okay.  I'm going to go ahead

14 and put the next document in the chat.  This will be

15 marked as Exhibit 107.

16         (Plaintiffs' Exhibit 107 was marked for

17 identification.)

18         THE WITNESS:  I see that.

19 BY MR. RATINOFF:

20     Q.  This is also entitled Amendment of

21 Solicitation/Modification Contract, in box 2,

22 Amendment 14.  Box 3, Effective Date of May 24,

23 2020.  Bates number at the bottom of the first page

24 is EGOVSOL -- I'm sorry, EGOVS, and the last two

25 digits are 42.  Do you see that?

63

STEWART MAYOR                                                    October 15, 2022

1        A.  Yes.

2        Q.  And I'll represent to you this was produced

3    by your counsel in response to the subpoena.

4        A.  That is correct.

5        Q.  And do you have an understanding of what

6    this document is?

7        A.  I believe this is an extension for another

8    year and a payment amount for that.

9        Q.  And looking at box 14, it says:

10            "The purpose of this modification is

11            to exercise CLIN 2001A option year 2

12            for a period of performance of

13            5/24/2020 through 5/23/2021."

14            And then it further states that it's fully

15    funded in the amount of 200,000; is that correct?

16        A.  That's correct.

17        Q.  And is it your understanding that this was

18    the contract extension for option year 2 that was

19    referenced in the Stock Purchase Agreement which was

20    Exhibit 100?

21        A.  That is correct.

22        Q.  And you'll see box 14, the last sentence

23    says, "The purchase order funding is hereby

24    increased from 716,000 by 200,000 to 916,000."  Do

25    you see that?

                                                            64

1    A.  Correct.

2    Q.  So was that 200,000 that's contemplated by

3  this document, was that paid by the IRS to

4  eGovernment Solutions?

5    A.  That is correct.

6    Q.  If you look at the next page, you'll see

7  there is a Line Item Table referencing that $200,000

8  payment.  Do you see that?

9    A.  Page No. 4?

10    Q.  Yeah.  2 of 4, the next page.  You'll see

11  there is a box that says Line Item Table.

12    A.  Yes, I do.

13    Q.  And it references a unit price of 200,000?

14    A.  Yes.

15    Q.  And that amount was -- that was paid after

16  it was paid by the IRS to eGovernment Solutions, was

17  that then paid to Mr. Suhy?

18    A.  That is correct.  And this is for the year

19  2020.

20    Q.  Correct.  The second year option.

21    A.  Yes.

22    Q.  And it looks like the total paid out thus

23  far on the IRS CKGE contract was 916,000.  Is that

24  correct, as of this time?

25    A.  That is correct.

                                                      65

1    Q.  And then each time a payment was paid from

2  eGovernment Solutions to Mr. Suhy in relation to the

3  CKGE contract, how were those payments made?

4    A.  John Mark Suhy wrote the checks or he went

5  to the bank branch and he -- I guess he cashed it

6  via a draft or something like this.  Because when I

7  went back, I did see some of the check numbers are

8  different than the others.  So my assumption is he

9  went there and he put in some form and got the

10 money.

11   Q.  And did -- how did -- how did eGovernment

12 Solutions book the payments?

13   A.  So end of the year when we go back and we

14 saw what are the money taken out, we would put that

15 in the books.

16   Q.  It would be booked as -- I'm sorry, let me

17 ask the question.  How were the payments treated to

18 Mr. Suhy by eGovernment Solutions?

19      MR. GOLDSTEIN:  Just for the record, object

20 just on the scope issue.  I'm not sure how far

21 you're going to go into this, but I don't think

22 that's within the scope of any of the particular

23 subject areas of the notice.  But the witness can

24 answer the question, but I don't want to get too far

25 afield.

66

SER_1153

KEVIN C. MAYOR                                          October 15, 2022

```
 1   BY MR. RATINOFF:
 2       Q.  Okay.  You can answer the question.  I
 3   probably don't remember what it was, so I'll just
 4   reask it, and I'm sure Counsel will just make the
 5   same objection quickly.  Actually, let's go ahead
 6   and move on.  I'll come back to that.
 7           MR. RATINOFF:  I think I'm going to mark
 8   the next exhibit as Exhibit 108.
 9           (Plaintiffs' Exhibit 108 was marked for
10   identification.)
11   BY MR. RATINOFF:
12       Q.  I'm sorry.  I just put the wrong document
13   in there.  Just bear with me a second.  You'll see
14   it's tab 378.  It should be the last document in the
15   chat.  I'm going to mark that as Exhibit 108.
16           THE WITNESS:  Is it 378 or 379?
17   BY MR. RATINOFF:
18       Q.  378.  Got too many windows open.  It's the
19   blessing of having two screens or two monitors.  You
20   can see it all, but you can put more up.
21           Okay.  So what's been marked as Exhibit 108
22   has the beginning Bates number of 58, and then it
23   would be Amendment 16 for box 2.  Do you see that?
24       A.  Yes.
25       Q.  The effective date is 5/24/21.  Do you see
```

67

STEWART MAYOR                                    October 15, 2022

```
 1   that?
 2        A.  Yes.
 3        Q.  And this was produced by your counsel on
 4   behalf of eGovernment Solutions.  Is that your
 5   understanding?
 6        A.  That is correct.
 7        Q.  And do you understand what this document
 8   is?
 9        A.  Yes.
10        Q.  And what is that?
11        A.  That's another option year, the contract
12   for another 200,000.
13        Q.  And when you say the contract, you're
14   talking about the CKGE contract that's referenced in
15   the Stock Purchase Agreement?
16        A.  That is correct.
17        Q.  And looking at box 14, it says:
18             "The purpose of this modification is
19             to exercise CLIN 3001 option year 3
20             for a period of performance of
21             5/24/2021 through 5/23/2022."
22        And it says it's "fully funded in the
23   amount of $200,000."  Do you see that?
24        A.  Yes.
25        Q.  So for the option year 3 of the CKGE
```

68

STEWART MAYDA                                                    October 15, 2022

1    contract, the IRS paid eGovernment Solutions

2    200,000?

3         A.  That is correct.

4         Q.  And then again that money for the Stock

5    Purchase Agreement was then paid to Mr. Suhy?

6         A.  That is correct.

7         Q.  And at this point through option year 3

8    with all the modifications, the total amount paid to

9    eGovernment Solutions was 1,116,000; is that

10   correct?

11        A.  That is correct.

12        MR. RATINOFF:  Okay.  I already dropped it

13   into the chat, so that's going to be tab 379.  So

14   just go back one, the PDF.  I'm going to mark that

15   as Exhibit 109.

16             (Plaintiffs' Exhibit 109 was marked for

17   identification.)

18   BY MR. RATINOFF:

19        Q.  Let me know if you've got it open.

20        A.  Yes, I see that document.

21        Q.  And this one is -- in box 2, it shows

22   amendment 17.  Do you see that?

23        A.  Yes.

24        Q.  And the effective date is 5/24/2022.

25        A.  That's correct.

                                                    69

1    Q.  And I'll represent to you this was produced

2    by your counsel on behalf of eGovernment Solutions.

3    Is that your understanding?

4    A.  Yes.

5    Q.  And then do you know what this document is?

6    A.  This is another option year where another

7    200,000 was awarded for the same project.

8    Q.  And looking at box 14, it says option year

9    4.  Is that the same option year 4 that was

10   referenced in the Stock Purchase Agreement?

11   A.  That is correct.

12   Q.  And the $200,000 that's referenced in here

13   on page 2 of 3, was that paid by the IRS to

14   eGovernment Solutions?

15   A.  That is correct.

16   Q.  And through option year 4 with all the

17   amendments we've looked at, the total then paid to

18   eGovernment Solutions was 1,316,000?

19   A.  That is correct.

20   Q.  And are you aware -- I think there was only

21   four option years in the original Stock Purchase

22   Agreement, correct?

23   A.  That is correct.

24   Q.  Are you aware if there has been any

25   renewals or additional option years that have been

70

STEWART TAYLOR                                               October 15, 2022

1    awarded for the CKGE contract?

2         A.  I wouldn't know that.

3         Q.  Who would know that?

4         A.  John Mark Suhy.

5         Q.  Since the Stock Purchase Agreement doesn't

6    contemplate any additional option years, how would

7    any additional option years be handled by

8    eGovernment Solutions?

9         A.  I would ask John Mark Suhy to use another

10   entity and not use eGovernment Solutions, because

11   the promise was to complete this project, because it

12   was awarded to eGovernment Solutions.

13        Q.  So at this point in time, then, you would

14   consider eGovernment Solutions' relationship

15   finished with John Mark Suhy?

16        A.  In regard to this project, yes.

17             MR. RATINOFF:  Okay.  I'm going to go ahead

18   and mark the next exhibit as Exhibit 110.

19             (Plaintiffs' Exhibit 110 was marked for

20   identification.)

21   BY MR. RATINOFF:

22        Q.  And this is a series of invoices that were

23   produced by eGovernment Solutions and the beginning

24   Bates number is 68.

25        A.  I see this.

                                                              71

1    Q.  And do you have an understanding of what

2    this document -- or I should restart that.

3        Do you understand what this file system of

4    combined documents or docs is?

5    A.  Yes.

6    Q.  And what's your understanding?

7    A.  These are the invoices produced by

8    eGovernment Solutions to the IRS, and my counsel

9    received these from John Mark Suhy.

10   Q.  Okay.  So they state eGovernment Solutions

11   on them, but they were actually generated by

12   Mr. Suhy?

13   A.  That is correct.

14   Q.  And it's your understanding that these were

15   submitted on behalf of eGovernment Solutions to the

16   IRS for payment under the CKGE contract?

17   A.  That is correct.

18   Q.  So looking at invoice 817, and it says

19   "Contact Name:  John Mark Suhy," invoice date is

20   June 15, 2018.  Do you see that?

21   A.  Yes.

22   Q.  And this was for the $300,000 initial

23   payment that we talked about in the first year of

24   the CKGE contract, correct?

25   A.  That is correct.

72

STEWART MAYOR                                        October 15, 2022

1    Q.  And then looking at the next invoice, 827,

2    was this invoice also created by Mr. Suhy and issued

3    to the IRS on behalf of eGovernment Solutions?

4    A.  Yes.

5    Q.  And Mr. Suhy was authorized to issue this

6    invoice on behalf of eGovernment Solutions?

7    A.  Yes.

8    Q.  And do you have an understanding of what

9    this invoice is for?

10   A.  That is the continuation of the same

11   project, option year 1.

12   Q.  Looking at invoice -- the next one, 901,

13   with a date of January 4, 2020, you'll see that the

14   invoice is in the amount of $216,000.

15   A.  I do see that.

16   Q.  Okay.  And what's your understanding of

17   this invoice?

18   A.  That is the continuation of the same

19   project.  I believe there was some modification.

20   Q.  Okay.  This is the $216,000 modification

21   that we were previously talking about with respect

22   to option year 1?

23   A.  Correct.

24   Q.  And Mr. Suhy was authorized by eGovernment

25   Solutions to issue this invoice to the IRS?

73

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS   408-287-7500

SER_1160

1      A.  Yes.

2      Q.  And looking at invoice 955, do you see

3   that?

4      A.  I do see that.

5      Q.  Okay.  And this is dated May 27th, 2020.

6      A.  Correct.

7      Q.  And do you have an understanding what this

8   invoice is?

9      A.  This is the continuation of the same

10   project.

11      Q.  The CKGE contract?

12      A.  Contract, yes.

13      Q.  And you'll see it says option year 2.

14      A.  Yes, I do see that.

15      Q.  For 200,000?

16      A.  Yes.

17      Q.  And is this the invoice that was issued for

18   the renewal for option year 2 to the IRS?

19      A.  That is correct.

20      Q.  And Mr. Suhy was authorized to issue this

21   invoice to the IRS on behalf of eGovernment

22   Solutions?

23      A.  That is correct.

24      Q.  Going to the next invoice, 960, do you see

25   that?

74

1          A.  Yes, I see that.

2          Q.  And the date on this invoice is June 3rd,

3     2021?

4          A.  Yes.

5          Q.  Looking at line item 5, it says "Option

6     Year 3," and continues with the date, and "CDW

7     Graphic Environment . . . Continued development and

8     operations."  Do you see that?

9          A.  I do see that.

10          Q.  What's your understanding of this invoice?

11          A.  It's a continuation of the same project,

12     option year 3.

13          Q.  And that's the same option year 3 that we

14     looked at in the amendment and also talked about

15     with the Stock Purchase Agreement?

16          A.  That is correct.

17          Q.  And was Mr. Suhy responsible for issuing

18     this invoice to the IRS on behalf of eGovernment

19     Solutions?

20          A.  Yes.

21          Q.  And looking at invoice 912, the next

22     invoice.  Do you see that?

23          A.  I do see that.

24          Q.  The date on that is May 31st, 2020.

25          A.  That is correct.

                                                        75

1    Q.  And do you have an understanding of what

2    this invoice is?

3    A.  This is option year 4, continuation of the

4    same project.

5    Q.  This is the line item says "Option year 4,

6    200,000."  This is the 200,000 option year 4 that

7    was referenced in the Stock Purchase Agreement?

8    A.  Yes.

9    Q.  And also with that memo we just looked at,

10   105, Exhibit 105?

11   A.  That is correct.

12   Q.  And to your and eGovernment Solutions'

13   knowledge, those invoices we just went through were

14   all issued to the IRS by Mr. Suhy?

15   A.  That is correct.

16   Q.  Looking at the last page of this document,

17   it says "Related Documents - PO."  Do you see that?

18   A.  I do see that.

19   Q.  And what is this summary that's titled

20   Related Documents?

21   A.  Honestly, I didn't see that back at this

22   time.  Looking at it, it looks like it may be

23   something we received from the IRS by John Mark

24   Suhy.

25   Q.  So this wasn't generated by eGovernment

76

SER_1163

```
 1   Solutions?
 2        A.  No.
 3        Q.  It was either generated by John Mark or the
 4   IRS?
 5        A.  That is correct.
 6        Q.  And you'll see that -- you'll see there is
 7   an invoice number column, the first in the Invoice
 8   and Credit Memos section.  Do you see that?
 9        A.  Yes.
10        Q.  You'll see starting at the bottom, invoice
11   817, 300,000, that's marked paid?
12        A.  That is correct.
13        Q.  That was, in fact, paid to eGovernment
14   Solutions by the IRS?
15        A.  That is correct.
16        Q.  And looking at invoice 827 for 200,000 --
17            (Reporter interruption.)
18   BY MR. RATINOFF:
19        Q.  I'm sorry.  Let me start over.
20            In looking at the next invoice, No. 827,
21   the line for that, it has a $200,000 number there.
22   Do you see that?
23        A.  Is that for me?
24        Q.  Is it your understanding that the IRS
25   paid --
```

77

1       A.  Yes.

2       Q.  -- that?  And the same with the line item

3  or invoice 901 for 216,000, the IRS paid?

4       A.  Yes.

5       Q.  And the same for invoice 955, $200,000 was

6  paid, as well?

7       A.  That is correct.

8       Q.  And then for invoice 960, it's listed as

9  $200,000 being paid, as well; is that correct?

10       A.  Yes.

11       Q.  And finally for invoice 912, that $200,000

12  was recently paid, correct?

13       A.  That is correct.

14       Q.  If you look at the next ones that are

15  rejected in the invoice history, do you have any

16  understanding why there is two $300,000 invoices for

17  the same number that were rejected?

18       A.  I'm not aware of that.  I don't understand

19  exactly why that is in there.

20       Q.  Do you believe either Mr. Suhy or the IRS

21  would have an understanding?

22       A.  That is correct.

23       Q.  It wasn't clear to me.  Did this document

24  come from Mr. Suhy, or did you ask Mr. Suhy for

25  invoices and payments and you received this

78

SER_1165

1   document, the related document?

2       A.  My counsel received this document from John

3   Mark Suhy.

4       Q.  Why did your counsel have to ask John Mark

5   Suhy for these invoices?  Do you know why?

6       A.  I believe we wanted to make sure that

7   whatever money we had received or that we have

8   invoiced were there.

9       Q.  So it's up to Mr. Suhy to account for all

10  the invoices issued to the IRS and payments received

11  by the IRS are accounted for for the CKGE contract?

12      A.  That is correct.

13      Q.  And then how did eGov Solutions account for

14  the payments that were made to Mr. Suhy for tax

15  purposes?

16          MR. GOLDSTEIN:  I'm just going to object.

17  I think that's outside the scope of the deposition

18  subpoena, Jeff, internal accounting within the

19  company.

20          MR. RATINOFF:  Well, it relates --

21          MR. GOLDSTEIN:  Might be a different topic

22  area.

23          MR. RATINOFF:  It relates to payments that

24  were made to Mr. Suhy.  So I think it's fairly

25  within the scope.  I can look --

                                                    79

ASHWINI MAYUR                                           October 15, 2022

1   let me go ahead and mark this next document as

2   Exhibit 111.

3           (Plaintiffs' Exhibit 111 was marked for

4   identification.)

5   BY MR. RATINOFF:

6       Q.  Go ahead and take a look at Exhibit 111.

7       A.  I have that in front of me.

8       Q.  Do you understand what Exhibit 111 is?

9       A.  It's a 1099 prepared for iGov Inc. for

10  2018.

11      Q.  What's iGov Inc.?

12      A.  That is a company owned by John Mark Suhy.

13      Q.  And at some point, was there a decision

14  or -- sorry, at some point was there an agreement

15  made between eGovernment Solutions and Mr. Suhy that

16  the payments for the CKGE contract would go to iGov

17  Inc. instead of Mr. Suhy?

18      A.  There is no formal agreement, but yes,

19  anything coming from that particular project was

20  supposed to be paid to him.  And he said pay it to

21  iGov Sol -- iGov Inc., so we paid it to iGov Inc.

22      Q.  So all the payments in the Stock Purchase

23  Agreement that we've been talking about were

24  actually paid to iGov Inc. rather than to Mr. Suhy

25  personally, correct?

                                                        81

1    A.  I think nothing was paid to Mr. Suhy

2    personally.

3    Q.  So all of the payments that were received

4    by the IRS and then were in turn paid to Mr. Suhy

5    were actually paid to his entity iGov Inc., correct?

6    MR. GOLDSTEIN:  Object to the form of the

7    question of the question.  I think you got a little

8    confused on that in the middle, Jeff.

9    BY MR. RATINOFF:

10    Q.  Okay.  So once the IRS paid eGovernment

11    Solutions under the CKGE contract, the payments that

12    were contemplated by the Stock Purchase Agreement

13    were actually made to iGov Inc. instead of Mr. Suhy.

14    Is that how it worked?

15    A.  That's a question for me or for Jeff?

16    Q.  It's for you.

17    A.  Oh, yes.  It was paid to iGov Inc.

18    Q.  So looking at what we just marked as

19    Exhibit 111, it's a 2018 1099.  It's -- the amount

20    is 285,700.  Do you see that?

21    A.  Yes.

22    Q.  And previously we talked about there being

23    a $300,000 payment being made by the IRS; is that

24    correct?

25    A.  Yes.

82

SER_1168

```
 1                    REPORTER'S CERTIFICATE

 2           The undersigned Certified Shorthand Reporter

 3      licensed in the State of California does hereby certify:

 4           I am authorized to administer oaths or

 5      affirmations pursuant to Code of Civil Procedure,

 6      Section 2093(b), and prior to being examined, the

 7      witness was duly administered an oath by me.

 8           I am not a relative or employee or attorney or

 9      counsel of any of the parties, nor am I a relative or

10      employee of such attorney or counsel, nor am I

11      financially interested in the outcome of this action.

12           I am the deposition officer who

13      stenographically recorded the testimony in the foregoing

14      deposition, and the foregoing transcript is a true

15      record of the testimony given by the witness.

16           Before completion of the deposition, review of

17      the transcript [ ] was [x] was not requested.  If

18      requested, any changes made by the deponent (and

19      provided to the reporter) during the period allowed are

20      appended hereto.

21           In witness whereof, I have subscribed my

22      name this 28th day of October, 2022.

23

24      _____

25           Karen L. Buchanan, CSR 10772
```

144

# EXHIBIT 4

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA


NEO4J, INC., a Delaware     )   CASE NO.
corporation; and NEO4J SWEDEN )  5:18-cv-07182-EJD
AB, a Swedish corporation,  )
                            )
        Plaintiffs,         )
                            )
vs.                         )
                            )
PURETHINK, LLC, a Delaware  )
limited liability company;  )
IGOV, INC., a Virginia      )
corporation; and JOHN MARK  )
SUHY, an individual,        )
                            )
        Defendants.         )
                            )

***EXHIBITS ONLY DESIGNATED CONFIDENTIAL***

REMOTE VIDEOTAPED DEPOSITION OF INTERNAL REVENUE

SERVICE THROUGH ITS DESIGNEE MICHAEL C. DUNN

PAGES 1 - 293

_____

8:10 A.M.

Thursday, November 17, 2022

_____


REPORTED BY:    Shelley M. Sailor, CSR No. 10254

1

MICHAEL C. DUNN                                    November 17, 2022

1    were talking about the licensing of Enterprise

2    itself and how the cores and such -- you know, how

3    many cores and sizing you get for the price.  I

4    remember that conversation.

5        Q.  Let me go ahead and mark the next exhibit.

6    I believe we're at 159.

7            (Exhibit 159 is introduced.)

8            THE WITNESS:  Okay.

9    BY MR. RATINOFF:

10       Q.  Do you have what's been marked as Exhibit

11   159 open?

12       A.  I do.

13       Q.  It says dated 9/23/2016.  Then there's the

14   contract number TIRNO-16-P-00202.

15       A.  Yes.

16       Q.  Do you recognize what's been marked as

17   Exhibit 159?

18       A.  I'm familiar with it.  I can't remember it

19   specifically from that time, but it looks like our

20   contract with PureThink and how it would be set up.

21   Yeah.  Vivian Daniels has the core.  Yeah.

22       Q.  Okay.  Who is Vivian Daniels?

23       A.  She was the contracting officer

24   representative.  Hang on.  I can't see.  So she's

25   IRS contracting officer representative.

                                                          40

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS   408-287-7500

1    Q.  Then do you see under Schedule 17 it

2    says -- and then under item 0001 it says,

3    "Implementation of Government Edition Neo4j

4    project"?

5    A.  What page?

6    Q.  On the first page.

7    A.  Oh.  Just up there.  Yeah.

8    Q.  Does that help --

9    A.  Yeah.  Implementation of the Government

10   Edition Neo4j project.  Yeah.

11   Q.  And you'll see there's a unit price of

12   $229,000?

13   A.  Uh-huh.

14   Q.  Yes?

15   A.  Yes.  I do.

16   Q.  And was that payment for -- made for the

17   Government Edition for Neo4j?

18   A.  Yes.  To PureThink.

19   Q.  And was it your understanding that this

20   contract included a license to use the Neo4j

21   Government Edition?

22   A.  Yeah.  I would think so.  Whatever the

23   agreement was with PureThink and Neo4j.  But we got,

24   you know, we were able to use the Government

25   Edition, which would include the Neo4j database that

41

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS  408-287-7500

1    came with it during this period of performance.

2         Q.  When you mean the Neo4j database, are you

3    referring to Neo4j Enterprise database software?

4         A.  Yeah.  I would if that's what came with --

5    and which I'm assuming came with the Government

6    Edition.  So yeah.

7         Q.  So the Government Edition didn't come with

8    Community Edition, then.

9         A.  No.  I'm -- I'm certain of that.  Yeah.  So

10   it must have been the Enterprise Edition if those

11   were the two flavors.

12        Q.  And then you see -- if you go to the next

13   page under "Statement of Work."

14        A.  Yes.

15        Q.  Do you see "Introduction/Overview," it says

16   this contract will provide -- and then I guess

17   that's a typo-- provide facilitate the deployment,

18   for testing and feasibility of the Neo4j Edition NGE

19   via a one-year use of Neo4j Government Edition?

20        A.  Yes.

21        Q.  Which both the software use and

22   professional services?

23        A.  That's correct.

24        Q.  So you understand, then, that it was a

25   one-year license, then, for Neo4j Enterprise?

42

SER_1174

1      A.  That's correct.

2      Q.  And to your knowledge, did Mr. Suhy -- I

3  guess -- let me backtrack a little bit.

4          You mentioned PureThink.  What's PureThink?

5      A.  PureThink was, my mind, John Mark Suhy's

6  company that was in partnership with Neo4j, Inc.

7      Q.  And are you aware of any other -- or were

8  you aware of anyone else affiliated with PureThink

9  at that time in 2016?

10     A.  No.

11     Q.  So essentially PureThink was John Mark Suhy

12  in your mind?

13     A.  Yeah.  That's fine.  I agree.

14     Q.  And then this is signed by Genevieve

15  Colvin.  Who is Genevieve Colvin?

16     A.  She would probably -- she would have been

17  the contracting officer representative.  Wait a

18  minute.  Sorry.  Sorry.

19          She would have been the contracting

20  officer.  So she would sign it as via procurement.

21     Q.  And as far as -- and you mentioned the

22  CKGE.  Did the CKGE exist at the time of this

23  contract in September --

24     A.  It did not.  No.  It did not.

25     Q.  So was this contract a precursor so to

43

MICHAEL C. DUNN                                    November 17, 2022

1    a break, too.

2        Q.  Yeah.  I know the videographer and court

3    reporter would also appreciate that.  So let me go

4    ahead and put one more exhibit in the chat here.

5    We'll mark it, ask a few questions, and then we can

6    take a quick break for everyone.

7        A.  Okay.  I see it.  916?  916?

8        Q.  916, no.  It should be -- oh, yeah.  The

9    end of the Bates number.  Gotcha.  I was looking at

10   tab 444, but yes.  That is correct.  So this is

11   going to be -- we'll just call it Exhibit 161, then.

12       A.  Okay.  I opened it up.  Yes.

13           (Exhibit 161 is introduced.)

14   BY MR. RATINOFF:

15       Q.  You'll see this is an email, and this

16   represents Neo4j --

17       A.  Yes.

18       Q.  -- Zagalsky --

19       A.  Yes.

20       Q.  -- yourself and --

21           (Reporter interruption.)

22   BY MR. RATINOFF:

23       Q.  We've got to kind of give each other a

24   chance.  You know, we've kind of been going fast and

25   furious here, so I'll slow down just a little bit.

                                                      55

1   Sorry about that.  Let me start over again.

2           I just marked what's Exhibit 161.  It's an

3   email from Jason Zagalsky of Neo4j to yourself,

4   Ms. Daniels, who I think we talked about, as well as

5   John Broad.  And the subject is "Termination of

6   Neo4j Solution Partner PureThink LLC."  And it's

7   dated July 11, 2017.  Does this -- do you recognize

8   this email?

9       A.  I -- yeah.  I do.

10      Q.  And what does -- what did it mean to you?

11      A.  So I believe that was Jason just

12  officially, you know, letting us know that they had

13  terminated the partnership and sort of giving us

14  notice of that situation.

15      Q.  And then it says in the third paragraph

16  regarding the IRS's purchase of a Neo4j subscription

17  Neo still has not received a purchase order from

18  PureThink.  Do you have an understanding of what

19  that is in reference to?

20      A.  I think.  I think this goes back to there

21  was a dispute between -- this is what I think part

22  of the dispute may be, but this is, again, tell me

23  if I'm speculating but --

24      Q.  I don't want you to speculate.  So if

25  you're speculating then --

56

MICHAEL C. DUNN                                    November 17, 2022

```
1        A.  Well -- I -- I think -- my belief is that
2   this was regarding part of the dispute that John
3   Mark had not paid for or sent money to Neo4j based
4   on, you know, what was contracted to PureThink.  So
5   if I could summarize it like that.
6        Q.  Are you referring to payment for the
7   license for the Neo4j Government Edition?
8        A.  Yeah.  I think so.  Yes.
9        Q.  And if you look to the next -- I guess it's
10  the paragraph that says, "Regarding the consulting
11  services."  Do you see that paragraph?
12       A.  Yes.
13       Q.  And it says while the IRS has stated its
14  intention to proceed with the AGPL-licensed
15  Enterprise Edition, please understand that Neo's
16  agreements with its partners, including PureThink,
17  prohibit them from providing any consulting services
18  on these products during the term of their agreement
19  for a period of 36 months following termination.  Do
20  you see that?
21       A.  Right.
22       Q.  And what was your understanding of what
23  those restrictions were?
24       A.  This was about PureThink not being able to
25  operate and do work with anything to do with Neo4j.
```

57

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS    408-287-7500

1    Q.  And what did the IRS do when it received

2  this letter?

3    A.  I -- so when I got the letter, I told the

4  director of DMD about the situation, and then --

5  well, Vivian got the letter, too, so I think -- I

6  believe -- I'm going to -- I believe that the

7  director of DMD, you know, was not -- wanted to have

8  either procurement or an official statement that

9  PureThink could not do the work.  Meaning our

10  contract was with PureThink, and so we would have to

11  have, you know, something official through the

12  procurement channels that says that they can't

13  finish their work.

14    Q.  And when you say finish their work, you

15  mean under the contract --

16    A.  Under this period of performance, this

17  contract.  Yes.

18    Q.  And going back to I think it was

19  Exhibit 159, that contract expired or was set to

20  expire about when?

21    A.  September.  September of that year.

22    Q.  So a year contract.  So September to

23  September -- September 2016 to September 2017.

24    A.  Yeah.

25    Q.  Okay.  And then -- but Mr. Suhy did

58

SER_1179

1  actually continue to perform under that contract.

2  Correct?

3       A.  Yes.

4       Q.  So the IRS never officially took the

5  position that he couldn't continue to work on that

6  contract?

7       A.  Not that I know of or was told of or

8  anything.  No.

9       Q.  And so PureThink was -- finished out its

10  obligations under that contract?

11       A.  Yes.

12       Q.  And why did the IRS not -- why did the IRS

13  decide to continue to work with Mr. Suhy and

14  PureThink?

15       A.  From my understanding and direction, it was

16  that the, you know, officially the procurement has

17  to be the channel in which the work stoppage is

18  formally, you know, announced or take action of.  So

19  even though it was sent to them, I mean, we -- we

20  let them know, but my director's stance was that we

21  had to have, you know, procurement say that the, you

22  know, the work could not continue and stop it.

23       Q.  And they never said one way or the other?

24       A.  No.  Never heard.  No.

25            MR. RATINOFF:  All right.  This is a good

59

MICHAEL WIDANA                                    November 17, 2022

 1    that up.

 2         Q.   Okay.  Were we actually on the record?

 3              THE REPORTER:  Yes.

 4              THE WITNESS:  I think so.  Yeah, I waited

 5    until that to bring it up.  But that was it.  But I

 6    just remembered that so I wanted to bring it up.

 7              (Off the record.)

 8              THE WITNESS:  Do you need me to repeat it?

 9    BY MR. RATINOFF:

10         Q.   No.  No.  I think we got it.

11              So going back to the July, August time

12    period, was the IRS looking to continue working with

13    Mr. Suhy after the expiration of the contract with

14    PureThink?

15         A.   Yeah.  I think we were.  And we felt

16    like -- again, sort of the -- one of the primary

17    things that was of interest was dealing with the

18    user interface.  And there seemed to be, from what I

19    remember of all the stakeholders, you know, that

20    that was moving along nicely with being able to

21    customize it, et cetera.  So there was interest to

22    continue working with those elements of what I'll

23    call at that time was, for lack of a better term,

24    the Government Edition.  Those stack elements.

25         Q.   And at this point did the CKGE, at least in

                                                          61

1   concept, exist at that time?

2       A.  Primarily, you know, in that formative

3   stage, there is that set of technology and what was

4   happening.  Yes.  And I think -- I don't know if

5   people were using the term "CKGE" at that time.  I

6   believe people were still -- we may have been using

7   something along those lines, but the idea of using

8   that -- you know, the UI and all of that as sort of

9   a new basis was there amongst the project members.

10  Does that make sense?

11      Q.  Yeah.  I think it does.  Was there a new

12  contract -- I'm not best at government contracting,

13  but was there a new RFQ put out at that point for

14  the next phase?

15      A.  Well, yeah.  So what -- so -- understood

16  that what was happening with PureThink and all of

17  that was -- whatever was happening was not tenable.

18  And so the original intent was through, I think it

19  was -- I think it was eGov or iGov, a company that

20  John Mark had -- a small business company that John

21  Mark had that was separate through his professional

22  services was at the beginning sort of what we were

23  going to request for professional services to

24  continue primarily, again, working on the UI, the

25  security features, et cetera.  And -- and I don't --

62

1    at that time, the decision by our director was to

2    use that money that we had for those professional

3    services instead of getting an Enterprise Edition

4    where we wouldn't have -- we would only have the

5    database -- those database elements and not the UI

6    and the rest of it.  And that was primarily the main

7    interest at that time.  And so that's what we were

8    going out with a contract.  Originally it was sole

9    source.  It was a sole source that went through

10   procurement, and I believe Neo4j contested that.

11   And then we ended up going through, again, sort of,

12   I believe it's 8A or one of the small business was

13   what procurement likes to go first through one of

14   John -- out for open bid for those professional

15   services dealing with -- dealing with technology to

16   do CKGE.

17       Q.  Okay.  So I know there's some similar

18   company names that you mentioned, but in the IRS's

19   mind, all of those companies were essentially John

20   Mark Suhy, that's who you were --

21       A.  He was --

22           (Reporter interruption.)

23   BY MR. RATINOFF:

24       Q.  I've got to finish my question.  Let me

25   start over.  We'll clear up the record.

63

SER_1183

So from the IRS's perspective, the company names were sort of less important as to continuing to work with John Mark Suhy. That's what was important to the IRS at that point?

A. That was our primary interest starting off, and then -- so I would say yes. It was his skill set was -- was something that we were interested in leveraging.

Q. So any disputes he had through PureThink with Neo4j was irrelevant to continue working with them?

A. I don't -- I don't want to say relevant. If we put forward the solicitation, and he is able to bid on it, so I guess there is some relevancy on whether he was able to work with -- I guess in this case with Neo4j itself and whatever that would be. But I think that was secondary to with his skills of using the security. Those elements of the Government Edition that were not Neo4j itself. Those capabilities were the primary interest and his skill set in doing that.

Q. And you mentioned iGov. That's iGov, Inc.?

A. Yes. I believe it's Inc. Yeah. IGov.

Q. Let me go ahead and mark this next exhibit.

(Exhibit 162 is introduced.)

64

MICHAEL DUNN                                      November 17, 2022

1        A.  No.  He was the director of DMD.

2        Q.  So he would be the person that Lisa

3   would -- reported to?

4        A.  Correct.

5        Q.  So the hierarchy would have been Jeff,

6   Lisa, and then yourself more or less?

7        A.  Yes.  Yes.  That's fine.  Yeah.

8        Q.  And then I guess looking at your email on

9   July 12, 2017, I would like to know from my

10  perspective that I appreciate your communication and

11  involvement helping clarify and work on options.

12  I'll let procurement talk to anything regarding the

13  nature of the SOW arrangements and needs.

14        That's what you're referring to as

15  different procurement?

16        A.  Yes.

17        Q.  Mr. Suhy confirms there would be no work

18  stoppage under the 2016 contract?

19        A.  That's how I interpreted it.  Yes.

20        Q.  And then you mentioned there is a new

21  contract, which you said it was sole sourced to

22  iGov.  Is that correct?

23        A.  No.  It was not -- Neo4j disputed that and

24  so it was not executed.  And then we started a new

25  procurement process for new competition.  It went

69

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS  408-287-7500

SER_1185

1    out as -- I call it, you know -- I don't want to use

2    the -- it went out as a bid.

3         Q.  Okay.  So just to back up, there was a sole

4    source RFQ put out in what, July, August of 2017?

5         A.  Yeah.  That seems about right.

6         Q.  And that was -- that was the sole source to

7    iGov.  Correct?

8         A.  Correct.  That was using iGov, the sole

9    source to them for the professional services.

10        Q.  Okay.  And then this -- but professional

11   services using Neo4j Enterprise software?

12        A.  Not necessarily.  No.

13        Q.  At that time the Government Edition that

14   the IRS was using included Neo4j Enterprise.

15   Correct?

16        A.  But we weren't -- we weren't using the

17   Government Edition.  It was still in, call it

18   development.  So as long as you're okay with that,

19   then yeah.  It wasn't the regular use by other

20   people.  It was just being developed, worked on,

21   et cetera.

22        Q.  But the version at Neo4j that was being

23   used in development was Neo4j Enterprise.

24        A.  Yes.  As far as I know in that edition.

25   Yes.

                                                    70

1      Q.  All right.  And then I'm going to go ahead

2   and drop another document into the chat here.  So be

3   Exhibit 163.  It's a lengthy document.  And I just

4   wanted to see if this refreshes your recollection.

5          (Exhibit 163 is introduced.)

6   BY MR. RATINOFF:

7      Q.  It's not letting me drag it into the chat.

8   Hold on just a second.  Let me give it one more

9   time.  Here we go.

10     A.  I see it.

11     Q.  I believe this will be Exhibit 163.  You'll

12  see it's an email from Ms. Daniels to Mr. Suhy dated

13  2017?

14     A.  Yeah.  Yes.  I do.  I see it.

15     Q.  And it's -- the subject's SF18

16  TIRNO-17-Q-00209.  Is that -- is that the sole

17  source contract we were just talking about that's

18  referenced in the subject of this email?

19     A.  I would think so.  Yeah.

20     Q.  If you scroll down, I'm looking at -- its

21  quite a ways down.  It would be actually 9 out of 12

22  in the PDF itself.  The Bates number at the bottom

23  is 1570513.001.  Do you see that?

24     A.  What page is it?

25     Q.  9 out of 12 in the PDF.

71

1      A.  Okay.  I'm there.

2      Q.  The title is "Statement of Work/Performance

3   Work."

4      A.  Yep.

5      Q.  And then it says in

6   "Introduction/Overview," "The contract will

7   facilitate the continued development and O&M support

8   needs of DMD's CDW Knowledge Graph Environment

9   (CKGE)."  Do you see that?

10     A.  Yes.  I do.

11     Q.  Does that help refresh your recollection as

12  to where the CKGE was at at that time?

13     A.  Yeah.  It would -- that environment that

14  was being -- that had been started under PureThink.

15     Q.  Okay.  Then going down to the last

16  paragraph, "The CKGE framework."  Do you see that?

17     A.  Right.

18     Q.  So "The CKGE framework includes Neo4j's

19  Enterprise Edition open source version, Elastic

20  Search capabilities, and micros-service components

21  useful for supporting graph-related research."  Do

22  you see that?

23     A.  Yes.  Yes.

24     Q.  So at that time the IRS was using Neo4j

25  Enterprise under an open source license?

                                                    72

SER_1188

1      A.  I don't know if it -- in my mind, it would

2   have been whatever the edition was that was part of

3   the Government Edition that had been started by

4   PureThink.

5      Q.  You mentioned that this contract was

6   awarded to iGov.  Is that correct?

7      A.  No.  This was -- this was not.

8      Q.  Okay.  What I mean is it was awarded but

9   then protested by Neo4j.

10      A.  Yes.  So this -- if this was a statement of

11   work, which I'm assuming it is, it would have gone

12   out to iGov, and that's what was protested.  So yes.

13      Q.  Okay.  So it was never awarded.  It was

14   just the statement of work was protested.

15      A.  I actually think the -- I think it was

16   going to be awarded, and I thought that's what was

17   protested.  Saying that other people could work on,

18   if I remember right -- I believe I do in my mind.

19   That other people -- Neo4j said something to the

20   effect of other people could be work -- could have

21   the technical skills to work with Neo4j.  That's

22   what was the point of dispute.

23      Q.  And IRS sided with Neo4j on that?

24      A.  Yes.  That is true.  There is other people

25   that can work on Neo4j.  So we just did an award

73

SER_1189

1   contract.

2       Q.  But then the work was eventually awarded to

3   Mr. Suhy via a different contract vehicle?

4       A.  Yes.  It was a new procurement order that

5   had started -- or was executed for sort of open

6   competition.  I believe it was AA companies or small

7   business companies originally, but it was open

8   competition, and it was awarded to eGov for

9   professional services to work, you know, to further

10  the development of CKGE.

11      Q.  Okay.  When you say eGov, you mean

12  eGovernment Solutions?

13      A.  Yes.  That's fine.  That's correct.

14      Q.  I will probably refer to it as eGovernment

15  Solutions just because it's so -- you say eGov and

16  iGov is so similar, if that's okay.

17      A.  Fair enough.

18      Q.  I think the court reporter would appreciate

19  that.

20      A.  Fair enough.  Yeah.  EGovernment.  That's

21  fine.

22      Q.  Let me go ahead and drop in the next

23  exhibit.  This has previously been marked as

24  Exhibit 103.

25          (Previously marked Exhibit 103 is

74

1    referenced.)

2         THE WITNESS:  Jonathan just put something

3    into the chat.

4         MR. RATINOFF:  Yeah.  I appreciate it,

5    Jonathan, but we can't have him testifying on your

6    behalf, though.  I don't think the IRS wants the

7    lawyers to be up on the stand and have the privilege

8    waived.

9         MR. TEPPER:  We do not.  I just wanted to

10   provide clarification if needed.

11   BY MR. RATINOFF:

12        Q.  All right.  Thank you.  I didn't think that

13   was your intent.

14        I just put in what was previously marked as

15   Exhibit 103.  The title of the document is Order for

16   Supplies or Services.  The date of the order is

17   05/24/2018, Order No. 2032H8-18-P-00151 with the

18   issuing office being Vivian Daniels at the IRS

19   procurement office.  Do you see that?

20        A.  Okay.  Sorry.  Let me -- I had so many tabs

21   of exhibits.  Let me -- let me just go back and make

22   sure I'm looking at -- okay.  I think I got it.

23   Okay.  I see -- did you say it was a procurement

24   order dated 05/24/18?  Is that the one you're

25   talking about?

                                                      75

1     Q.  Yes.

2     A.  Okay.  I got it open.

3     Q.  Okay.  Now, this Order for Supplies or

4  Services, is this the contract that you mentioned

5  was awarded to eGovernment Solutions?

6     A.  That's correct.  Yes.

7     Q.  And then the actual name of the contractor

8  being Mr. Suhy?

9     A.  Correct.

10     Q.  And this was to continue the work that

11  Mr. Suhy had been doing for the CKG under the prior

12  contract?

13     A.  Yes.  Yes.  Continuing on with that type of

14  work.

15     Q.  Did Mr. Suhy in between July, August 2017

16  from the time this contract was awarded, was he

17  continuing to work with the IRS?

18     A.  No.  After the period of performance for

19  PureThink, he was not.

20     Q.  But then he started up with the same work

21  again in May of 2018?

22     MR. BEENE:  Objection to form.

23     THE WITNESS:  He -- I'm not sure what --

24  let me -- I'm not sure what the object to form is --

25  ///

76

BY MR. RATINOFF:

Q.  Don't worry about it.

A.  -- but --

Q.  We're going to argue later on if we're going to use your testimony.  So let me ask the question again so the record is clear.

The Order for Supplies or Services we're looking at, once this was awarded to eGovernment Solutions, Mr. Suhy continued the work that he was doing on the CKGE with Neo4j?

MR. BEENE:  Same objection.

THE WITNESS:  He continued to work.  I believe at that time we were not using -- we had not started to use Neo4j.  I believe we had -- they brought up ONgDB.  And so we worked -- so eventually -- and it was not immediate, given some background clearances and other stuff that had to be reactivated and all that.  But around that point in time, I believe ONgDB was discussed with us along with GraphGrid as sort of the larger set of technical capabilities.  So I don't -- I cannot say with certainty that that version of Enterprise Edition that was prior was used when the work started up again.

///

77

BY MR. RATINOFF:

Q.  Okay.  That wasn't quite what I was asking --

A.  Okay.

Q.  Let me ask a different question.  So when the Order for Supplies or Services was awarded to Mr. Suhy at eGovernment Solutions, Mr. Suhy began working again with the development of the CKGE platform.  Correct?

A.  Yes.  Correct.  Sorry if I overcomplicated it.

Q.  And at that time, the IRS was still using some form of Neo4j Enterprise software?

A.  Yeah.  We were still using the prior graph database and UIs that we had before.  We were still continuing to let users work with that.

Q.  And then you were -- okay.  And then at that point the CKGE was still in development phase?

A.  Correct.  Yes.

Q.  So there was only -- when you said development phase, what does that mean in terms of versus production?

A.  So it was not for regular use.  So I contrast that with sort of those two, you know, those two things I was talking about that we started

78

1   CKGE, which is that stack that came out of the

2   Government Edition development work.

3        Q.  Okay.  So just so we're clear, when

4   eGovernment Solutions got the award, it was to

5   essentially start work on the CKGE that had been

6   left off with PureThink.  Is that correct?

7        A.  That's correct.  Yes.  Those components.

8   Yes.  But didn't necessarily mean that it was -- I

9   don't remember at the time particularly what we were

10  going to do with the Neo4j.  I don't know if we

11  were -- I think there was even discussion, I

12  believe -- now I'm speculating.  Never mind.

13       Q.  Okay.  Yeah.  We don't want you to do that.

14            So in May of 2018 when Mr. Suhy was brought

15  back, was part of his statement of work was for him

16  to continue working on integrating the UI in Neo4j

17  into what was going to be the CKGE?

18       A.  Yeah.  It's just I don't know -- I can't

19  remember what exactly was going to be the subject of

20  Neo4j, though.  And by that I mean what version or

21  anything we were going to use.  It was -- again,

22  sort of the primary focus was on the user interface

23  and some of the security stuff, and I don't even

24  know if it -- what version of Neo4j it was even

25  discussed as what to use or not to use at that

85

Case 5:21-cv-07100-EJD   Document 183-5   Filed 04/20/23   Page 37 of 98   November 17, 2022

1   it's probably 2019, 2020.  I'm still in 2018.

2          So for 2018's purpose, or at that time

3   the -- let me actually, maybe this will help.

4   Actually, let me ask you about this email real

5   quick, and then we can move to that.

6          You'll see this is an email from Mr. Suhy

7   to yourself --

8       A.  Okay.

9       Q.  -- dated May 22nd, 2018.

10      A.  Okay.  Yes.  I see it.

11          (Exhibit 165 is introduced.)

12   BY MR. RATINOFF:

13      Q.  We'll mark it Exhibit 165.  This email was

14   produced by Mr. Suhy or one of his entities.  Do you

15   have any reason to believe this isn't an email that

16   was sent to you by Mr. Suhy?

17      A.  I don't think -- no.  I don't.

18      Q.  No reason to believe this isn't a true and

19   correct copy of an email?

20      A.  No.  I don't.  No issues.

21      Q.  Do you understand why Mr. Suhy was sending

22   you this email from your perspective?

23      A.  I have to --

24      Q.  Go ahead and take a minute.

25      A.  Okay.  I've read it.  Yeah.  So he's -- if

96

MICHAEL R. DUNN    November 17, 2022

1   I'm reading this right, he's describing sort of

2   using what's called the Neo4j Enterprise open source

3   version and what that means as it relates to AGPL

4   and then the Free Software Foundation's guidance on

5   the matter, et cetera.

6       Q.  And did you have an understanding between

7   what we were just looking at as Exhibit 164 and 165

8   that there was two different versions of Neo4j 3.4

9   Enterprise Edition?

10      A.  There were two different versions?  I

11  don't --

12      Q.  Let me ask it a different way.

13          Did you understand that there was two

14  different licensing models for Neo4j 3.4 Enterprise

15  Edition?

16      A.  I can't say that I did.  No.

17      Q.  Did the IRS have any -- or did the IRS look

18  into anything related to whether Neo4j could add the

19  Commons Clause to its Enterprise Edition software

20  under the AGPL?

21      A.  I -- I don't believe it was done.  No.

22      Q.  So did the IRS ever contact the Free

23  Software Foundation to see if Neo4j was wronging

24  Mr. Suhy in adding the Commons Clause to the AGPL?

25      A.  I never did and I don't know any -- I don't

97

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS   408-287-7500

SER_1197

1    remember anybody else contacting them or anything.

2    No.

3        Q.  Did the IRS take anything that Mr. Suhy

4    represented as far as Neo4j adding the Commons

5    Clause, that being improper?  Just assumed that

6    Mr. Suhy was correct?

7        A.  I -- I don't -- I don't feel like anybody

8    assumed -- the way I would express it is I don't

9    feel like anybody assumed necessarily one way or the

10   other.

11       Q.  You mean -- you say assume.  You mean the

12   IRS --

13       A.  Yeah.  Yeah.  Reading his -- reading his

14   email or that kind of stuff, you know, taking a

15   particular side at that point or anything.

16       Q.  So as of that time in May 2018, the IRS

17   didn't have an opinion on or position on whether

18   Neo4j adding the Commons Clause to the AGPL version

19   3.4 was improper or not?

20       A.  I don't think so.  No.  I don't feel that

21   way.

22       Q.  Hold on just a second.  I'll put the next

23   exhibit in.  This maybe will help clarify what

24   version the IRS was using at that point.

25       A.  Okay.  Email dated 6/14/2018?

                                                    98

Case 5:18-cv-07182-EJD   Document 183-5   Filed 04/20/23   Page 39 of 98   November 17, 2022

1   what time that was, and I can't remember that.

2       Q.  Yeah.  We'll get there.  I'm just trying to

3   go in a linear fashion.

4       A.  I know.  I'm sorry.

5       Q.  That's okay.

6       A.  I'm trying to fit things together.  But

7   what I see there is whatever was happening was that

8   discussion.  And again, I was -- I was looking at it

9   from the point of Community Edition just being

10  sufficient.  And I think he was arguing that this

11  open source fork one was available and would have

12  these, you know, would have these additional

13  features.

14      Q.  Then as far as, as far as the Enterprise

15  Edition went, did you have an understanding at that

16  time that a commercial subscription to Neo4j

17  Enterprise would come with support?

18      A.  Yes.  Yes.  I believe there was some

19  professional services -- yeah.  As far as I know,

20  yes, in my mind.  There was some degree of

21  professional services, or I call professional

22  services that comes with the licensing.

23      Q.  So if you buy a commercial license, it's

24  not just -- for Neo4j Enterprise, it was not just

25  about additional features.  It's also about -- it

103

SER_1199

1    also includes support services.  Correct?

2        A.  Yes.

3        Q.  So there's more of a benefit than just the

4    features themselves to the purchasing a commercial

5    subscription to Neo4j Enterprise, then.  Correct?

6    In other words, if you're not using the features,

7    you're still getting additional benefits.

8        A.  From like the professional services help,

9    those kinds of stuff, yes.  So I think you can

10   get -- those are -- those are additional features --

11   those are additional benefits to it than just the

12   features.  Yes.

13       Q.  And then moving on to the bottom of this,

14   you'll see -- I think you might have referenced this

15   before, but it says, "I.e., GraphStack (renamed from

16   Neo4j Government Edition) is a competing platform

17   alternative to Neo4j Enterprise commercial

18   packages - with exact feature set because of the

19   open source nature of Neo4j."

20           What was your understanding of what

21   Mr. Suhy was referring to, this GraphStack?

22       A.  Sorry.  I'm just looking over it.  Okay.

23   So the GraphStack at that point was, I would assume,

24   involving that version of Neo4j.  And I don't know

25   at that time how -- I really don't know how I would

104

MICHAEL DUNN                                    November 17, 2022

```
 1        Q.  All right.  Do you recall having a meeting
 2   with Jason within the next couple months after May,
 3   so say July 2018?
 4        A.  No.
 5        Q.  Let me go ahead and drop this next exhibit.
 6   It will be Exhibit 168.
 7            (Exhibit 168 is introduced.)
 8            THE WITNESS:  Okay.  File 130?
 9   BY MR. RATINOFF:
10        Q.  Yeah.
11        A.  Okay.
12        Q.  I'm sorry.  You said file 130?
13        A.  Yes.  I'm looking at file --
14        Q.  Oh.  Bates number ending in 130.  Correct.
15   Let me just get it clear for the record so we're
16   talking about the same thing.
17            So I just marked as Exhibit 168 an email
18   that ends in a chain dated July 27th, 2018.  Bates
19   number at the bottom of the first page is 20130.
20   This is an email produced by Neo4j.  And you'll go
21   ahead and look now -- let's go down to the bottom of
22   this email chain, so this is going to be starting
23   page 133 or Bates number ending in 133.  And you'll
24   see --
25        A.  Okay.  Very bottom.  Right.
```

                                                        113

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS   408-287-7500

Case 5:18-cv-07182-EJD   Document 183-5   Filed 04/20/23   Page 32 of 98

MICHAEL DUNN                                    November 17, 2022

1       Q.  Sure.  And it starts off actually on 132.

2   It's an original appointment from Michael Dunn sent

3   on May 24th, 2018, and you'll see there's a list of

4   recipients including yourself, Lisa, Jeff Butler,

5   there is a JC Garnish, Brian Raub, Jason --

6       A.  Yep.

7       Q.  -- and Chris Hess and then Matthew Scoffic.

8       A.  Yep.  Matt Scoffic.  Yes.

9       Q.  Subject:  Discussion of Neo4j options.

10      A.  Yep.  Yes.

11      Q.  Do you have a recollection now of setting

12  up a meeting with Neo4j in July of 2018 to talk

13  about Neo4j products and seeing a demo of the newer

14  Neo4j Enterprise software?

15      A.  I still don't.  No.  Was I there?

16      Q.  I don't know.

17      A.  I said --

18      Q.  I assume that, you know, is it a safe

19  assumption that you were the one who organized the

20  meeting if you're the sender of the appointment?

21      A.  I'm -- on that email, it looks like I

22  sent -- on that, yeah, on that email looks like I

23  sent it out to everybody, and then I said Lisa is

24  going to pick everybody up at the guard's desk.  So

25  I -- I don't think I was there.

114

Q.  Okay.  Going up to Lisa's next email, it
says, "Hi Jason - I spoke with Mike about your
concerns regarding the amount of storage included in
the quote information.  Mike estimates we are
currently using about 300 gigabytes."  Do you see
that?

A.  Yes.  I see that line.

Q.  Do you have an understanding what she's
referring to your estimate?  I'm assuming Mike is
you.  Is that correct?

A.  Yeah.  Must have been me.  I can't think of
anybody else.

Q.  300 gigabytes, is that in reference to
memory?

A.  Probably, because if that was the size of
the graph -- the data together, I think we were
estimating like how much would be in memory or how
much storage it would be.  So that -- that seems to
fit with sort of the size of the data we were
talking about.

Q.  Okay.  By the way, I just noticed this
document wasn't designated as confidential, so I
just want to make sure -- maybe we can substitute
during the break or get it stamped, but I wanted to
let everyone know that this document should be

115

1  designated by Neo4j as confidential.  I'm really

2  sure why it's not actually stamped on the document.

3  It should be treated as such under the protective

4  order.

5          Then you'll see Jason responds to Lisa,

6  "For large memory configs, we build in blocks of 24

7  cores/256 gigabytes RAM.  So even if you don't need

8  more than 12 cores, with 512 gigabytes of memory

9  (gives you some headroom on the 300 gigabytes you

10  have), you will be licensed for up to 48 cores, if

11  you want to cut your servers back from 1 terabyte of

12  RAM to 512 gigabytes of RAM."

13          (Reporter interruption.)

14  BY MR RATINOFF:

15      Q.  So looking at the email where Lisa says we

16  build -- sorry -- where Jason says we build in

17  blocks of 24 cores, then there's a reference to 300

18  gigabytes, do you have a better understanding of

19  what the 300 gigabytes was in reference to as far as

20  the server memory versus storage memory?

21      A.  Yeah.  Let me just read it -- I think I

22  agree.  Yeah.  So when I told Lisa 300 gigabytes, it

23  was -- it was -- when I would have thought that I

24  would have replied to her was how big of, you know,

25  RAM or storage, and since to bring the graph into

116

1 memory, if you brought the whole graph in, we are

2 essentially saying, well, we have about 300

3 gigabytes of data, so that's what would be brought

4 in.  I figure she's passing that on to Jason and

5 kind of talking about those parameters.  And then

6 Jason is replying sort of, okay, taking that

7 information, here's how we would price that out

8 and -- and sort of here's what the pricing would be.

9    Q.  Okay.  From what Jason's written here, is

10 that a pretty comprehensive estimate of what the

11 CKGE needs were at that time?

12    A.  Yeah.  Because this is the way that I'm

13 reading it is we were talking about the size, 300

14 gigabytes.  And then where he says even if you don't

15 need more than 12 cores.  So I'm assuming we were

16 still talking about like 12 cores.  Or somebody was

17 telling him about 12 cores that brought it up.  I

18 mean, I remember -- like I said, going back in time,

19 I was using 12 cores.  So I'm sure it was discussed

20 then, and he's replying yeah, even if not 12 cores,

21 here's the options.

22    Q.  Okay.  And then so as of -- I know we

23 talked about cores in 2017, but in July of 2018, was

24 the IRS still using only 12 cores for the CKGE

25 platform?

117

1    Do you have an understanding of why pricing

2 was important to the IRS for planning purposes at

3 that time?

4   A.  Well, if -- if there was availability of

5 money ahead, if we had the money ahead, would -- you

6 know, and we felt like we, you know, needed some

7 additional capabilities, my -- my -- I'm

8 interpreting her as we have this in case something

9 changes ahead for us, and that way we know sort of

10 the cost and what you get with it, et cetera.

11   Q.  So in other words, there's an understanding

12 that the paid commercial license with Neo4j wouldn't

13 necessarily increase whatever amount was budgeted

14 for the CKGE if the IRS were to go forward with a

15 paid subscription?

16   A.  I'm sorry.  Can you say it one more time,

17 please?

18   Q.  Sure.  So another way of looking at it is a

19 commercial subscription to Neo4j Enterprise would

20 necessarily increase whatever budget was needed for

21 continuing to develop the CKGE platform.  Correct?

22   A.  Yeah.  We would have to have additional

23 money.

24   Q.  At that time did the IRS -- or did your

25 particular division see if any additional money was

121

SER_1206

1   available for commercial subscription for Neo4j

2   Enterprise?

3       A.  So I feel like that was -- where she was

4   talking about I have spoken at length with Jeff, so

5   my -- you know, they would have been talking about

6   what monies were available, what were already

7   obligated.  So I'm assuming that that was part of

8   that conversation.

9       Q.  But you weren't part of that conversation.

10      A.  I don't -- she was saying she spoke -- she

11  had her own conversations with Jeff.  I mean, I -- I

12  was part of conversations about, you know, as we

13  were discussing there, how much sizing and

14  et cetera, usage.  I feel like -- I don't know if --

15  I don't remember being there with Lisa -- I remember

16  being there in a number of conversations about sort

17  of using the money and how much money we had and

18  talking to Jeff, but I don't know if that was that

19  exact conversation.

20      Q.  Okay.  So you aren't privy to any

21  conversation where it was decided that an additional

22  156,000 per year for Neo4j Enterprise subscription

23  would have been a problem as far as obtaining funds?

24      A.  I was in a conversation with Jeff and

25  others that were providing sort of the pros and cons

122

1  of different, you know, options or what -- what

2  could be done.  So I was in at least one meeting

3  with Jeff and others as we were discussing it.  And

4  I don't know if that was -- let me see if I -- it

5  must have been somewhere around there because this

6  was what, June?

7      Q.  July.

8      A.  July 27th.

9      Q.  2018.

10     A.  Yeah.  So I would have been -- I would have

11 been involved at least a conversation.  And I know I

12 was involved with one conversation where we were

13 talking about just the options, and Jeff was sort of

14 listening to different people's view.  And then I

15 think Jeff -- Jeff would have decided at that point,

16 you know, we didn't have -- we didn't have the, you

17 know -- I think it was in the context of, you know,

18 what about the options of any open source and how to

19 use that money.  And I think Jeff determined that at

20 that point not to spend on the Enterprise Edition.

21 And -- and either look at other options.

22     Q.  Other options being just continuing to use

23 open source Neo4j for free?

24     A.  Yeah.  One of those -- I don't think -- I

25 don't think there was any -- I don't think at that

123

1   time we were talking about any other graph databases

2   and stuff.  So I feel like it was just what to do

3   with that, and he was thinking about how to spend

4   the different money.

5           MR. RATINOFF:  Okay.  All right.  I think

6   this is a good time to take a break.  It's 11:42.  I

7   know it's sort of lunchtime or past lunchtime.  Do

8   you want to take a little bit longer break right

9   now?  I still have quite a bit of ground to cover,

10  so I want to make sure you're doing okay on your

11  end.

12          THE WITNESS:  I'm okay.  I'm just -- I'm

13  just hoping to answer your questions as fast as I

14  can so I can get back to work.

15          MR. RATINOFF:  Understood.  So I know we're

16  kind of at lunchtime on the West Coast, too.  It's

17  11:43.  Does everyone want to just take a half an

18  hour break?  Is that fair?

19          MR. TEPPER:  Before we make a determination

20  about a half-hour break or anything, I'm going to

21  ask, you know, Michael what time does -- you know,

22  because it's 2:42 where we are.  What time do you

23  typically finish up your day?

24          THE WITNESS:  Well, it would be -- you

25  know, I guess I can normally clock off at 3:30.  But

124

1    AFTERNOON SESSION

2    THE VIDEOGRAPHER:  We are now back on the

3    video record.  The time is 12:16 p.m.

4    BY MR. RATINOFF:

5    Q.  Let's go ahead and pick up where we left

6    off.  I believe we were in the summer of 2018.

7    Definitely in summer of 2018 the IRS had gone

8    forward with working with Mr. Suhy via eGovernment

9    Solutions.  Correct?

10    A.  Correct.  I think at the time we're at the

11    award has been made, and he's, you know, being

12    on-boarded and starting to talk about sort of ideas

13    and stuff.

14    Q.  Okay.  And then the ideas as far as where

15    the CKGE environment was going as far as --

16    A.  Yeah.  Yes, sir.  What the interests were,

17    you know those kinds of things, what the project

18    team was interested in, plans, that kind of stuff.

19    Q.  And so was he being asked or he was taking

20    input from the IRS to come up with some sort of

21    architecture for what the CKGE environment would

22    look like?

23    A.  Yes.

24    Q.  All right.  Let me -- as far as the CKGE

25    environment, it was still decided to use some form

126

MICHAEL DUNN                                  November 17, 2022

1   of Neo4j graph database software.  Is that the graph

2   database for the CKGE?

3       A.  Yes.  Sorry.  Yes.  Because, again, I'm

4   trying to remember when GraphGrid and all that came

5   into context, which was either around this time or,

6   you know, shortly -- shortly thereafter where we

7   started getting into ONgDB.  But whatever we had at

8   that time would have been sitting there.  But I

9   believe John Mark would have been cleared, because

10  he would have still had his clearance.  So we would

11  have been sort of -- sort of talking about, you

12  know, plans, future requirements, all of that, and

13  would have been, you know, talking about whatever --

14  whatever graph that database, whatever version it

15  was that we had.

16      Q.  Okay.  So let me pinpoint that time for

17  you.  Here's what I'm dropping in the chat.

18      A.  Okay.

19      Q.  It should be tab 454, which I'm going to

20  mark as Exhibit 169.  You'll see it's an email

21  exchange between yourself and Mr. Suhy.

22      A.  Okay.

23          (Exhibit 169 is introduced.)

24  BY MR. RATINOFF:

25      Q.  With the last email dated August 13th,

                                                      127

1    2018.  You see that?

2        A.  Okay.  I got it up.  Yes.

3        Q.  Do you have any reason to believe this

4    isn't a true and correct copy of an email exchange

5    between yourself and Mr. Suhy?

6        A.  I have no issues.  Yes.

7        Q.  And just for the record, this was an email

8    that was produced by iGov, Inc.?

9        A.  Okay.  Yes.

10        Q.  You'll see at the very bottom of the email

11    exchange -- at the very beginning I guess, so that

12    would be on 217.0002.

13        A.  Okay.  I'm there.

14        Q.  You ask John Mark would it be easier to go

15    ahead and use ONgDB now in CKGE or wait and deploy

16    CKGE with Neo4j 3.3.2 we have, and then later

17    transition to ONgDB.  Why were you asking him that?

18        A.  I mean I -- go ahead and use ...  Maybe

19    just level of effort and complexity.  Sort of

20    proposing cons of each.  Because my assumption would

21    be by this time the topic of ONgDB is there and the

22    decision was made, I'm assuming at this time, that

23    we were -- we would go with ONgDB.  If not, it was

24    just talking about sort of the pros and cons of it.

25        Q.  And what was your understanding of what

128

MICHELLE DUNN                                            November 17, 2022

1   ONgDB was at that point?

2       A.  At that point, my understanding was ONgDB

3   was an open source available graph database that

4   was -- that used the GitHub core source code

5   compiled and then additional plug-ins were added to

6   it and made available through The Graph Foundation's

7   website.  Or through there.  Sorry.

8       Q.  Okay.  Let's break that down.  So as far as

9   when you say ONgDB core source code, are you

10  referring to Neo4j Community Edition?

11      A.  I didn't -- it was not the binaries.  It

12  was my understanding from -- and this was from John

13  Mark Suhy.  I believe at that time because we were

14  talking about GraphGrid, and it was part of the

15  GraphGrid bundle.  Ben Nussbaum may have been on the

16  line, too, but it was a description that there

17  was -- it was not the binaries.  It was the source

18  code itself that came from a GitHub repository that

19  Neo4j had.  And that source code was taken and

20  compiled into binaries and added the plug-in to make

21  the ONgDB version that was made available.  Does

22  that make sense?

23      Q.  Sure.  So it was your understanding that

24  ONgDB was based on Neo4j source code.  Correct?

25      A.  Yes.  Git -- sorry.  Go ahead.

129

SER_1213

1      Q.  So the Neo4j source code, Neo4j would own

2  the copyright to that.  Correct?

3      A.  Yes.  I would assume it would be available

4  based on whatever Neo4j allowed it to be used from.

5      Q.  When you are talking about the plug-ins,

6  are you referring to Enterprise-level features that

7  are enabled by plug-ins?

8      A.  Yeah.  I think so.  That makes sense.

9      Q.  Okay.  So your understanding was then ONgDB

10  was essentially the feature equivalent of Neo4j

11  Enterprise at that time?

12      A.  I don't know if I could say it was one for

13  one.  I just understood that there were the

14  Enterprise -- there were Enterprise features that

15  were added to the core -- the Neo4j core source

16  code, compiled, and then added to it to make the

17  ONgDB in that those were, or I guess somehow could

18  be connected to Enterprise version.  I feel like

19  that that term was used or at least the types of,

20  you know, with the -- I guess clustering and all

21  that stuff.  So I'd say yes, I think.  I would think

22  it had similar features.

23      Q.  Okay.  Features meaning Enterprise-level

24  features?

25      A.  Yeah.

130

SER_1214

MICHAEL DUNN                                            November 17, 2022

1      Q.  Then as far as -- going back to the Neo4j
2  Community Edition, I had asked you whether you
3  understood there was a limitation of cores, and
4  maybe I wasn't as artful about it.  But did you
5  understand Neo4j Community Edition only allowed up
6  to the use of, from a performance standpoint, four
7  cores?
8      A.  I can't remember that, but I don't see any
9  reason that I would have known that at some prior
10 point in time.  So I would say yes, probably at that
11 point I would have known or been aware of it.  Yes.
12     Q.  Did you have any understanding of whether
13 there was any limitations on the number of cores you
14 could use with ONgDB?
15     A.  No.  I -- I did not -- I don't remember
16 ever hearing about limitations of cores.
17     Q.  But you understood that as far as
18 purchasing a Neo4j Enterprise subscription, the
19 pricing would be based on the number of cores at
20 least in part.  Correct?
21     A.  Yeah, I think so based on what we went over
22 today and stuff, yeah, it would be, there is a core
23 element to the Enterprise pricing.  Yes.
24     Q.  In addition to obviously the add-ons, like
25 the support and whatnot.

131

MICHAEL DUNN                                     November 17, 2022

1          A.  Yes.

2          Q.  All right.  So turning back to this email,

3    Mr. Suhy recommends to go with ONgDB version 3.4.x.

4    Was that the current version of ONgDB at that time

5    that you were aware of?

6          A.  Yes.  What -- yeah.

7          Q.  And what license -- and what licenses did

8    you understand that ONgDB was offered under?

9          A.  I -- I don't know if it was -- I can't

10   remember exactly what the ONgDB -- if The Graph

11   Foundation had a particular licensing, I can't

12   remember what that would be.  But I understood it to

13   be, you know, open source in that the -- the

14   requirements it was stated that, you know, we would

15   meet our requirements and we could use it.

16         Q.  For free.

17         A.  Yes.  For free.  It was -- it was

18   downloadable from The Graph Foundation website.  You

19   could use it for free.

20         Q.  Was the -- to your knowledge, was it

21   licensed under the AGPL version 3?  ONgDB, that is?

22         A.  It probably was.  I can't remember exactly,

23   but I don't -- that probably makes sense.

24         Q.  And if you remember before the break we

25   were talking about couple of emails, one sent by

                                                       132

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS   408-287-7500

SER_1216

1   Jason and one sent by Mr. Suhy.  There was reference

2   to Commons Clause.  Do you recall those emails?

3        A.  Yes.

4        Q.  And were you aware of whether at that time

5   that The Graph Foundation or Mr. Suhy had removed

6   the Commons Clause from the license that was

7   governing ONgDB 3.4?

8        A.  Yeah, because I don't -- yes.  Because I

9   don't remember it being discussed.  So it would have

10  been removed or whatever, was taken from the source

11  code off of GitLab, whatever that was releasable by.

12  That's how I understood was carried forward from

13  that.

14       Q.  I didn't get -- I didn't quite follow that.

15  I apologize.  To clarify, so you understood -- so

16  you understood that the license that ONgDB was under

17  was the AGPL version 3 but with the Commons Clause

18  removed by Mr. Suhy?

19       A.  Yeah.  I don't -- I don't remember if he

20  removed it.  I don't remember it being discussed.  I

21  just remember the description of taking the core

22  source code from GitLab, compiling it, and then, as

23  we discussed, adding the additional capabilities

24  that would be the ONgDB release.  So I can't

25  remember the Commons Clause being part of the

133

MICHAEL DUNN                                    November 17, 2022

1    discussion.  I can't remember if he said that he

2    took it out or what, but I can't say that.  Yeah.  I

3    just can't say that.  In my mind, I'm tracing it

4    from the GitLab source code, whatever that licensing

5    was, and then released by ONgDB under their

6    licensing.

7         Q.  Okay.  So you understood that ONgDB was

8    released under a license issued from The Graph

9    Foundation?

10        A.  Yeah.  Well, yes.  In this sense, that for

11   a member of the ONgDB or Graph Foundation website,

12   they were saying they were releasing it under

13   this -- this licensing agreement.  The Graph

14   Foundation itself.

15        Q.  So you understood The Graph Foundation was

16   the licensor for the ONgDB?

17        A.  Yes.  That was -- that was -- yes.  I think

18   so.  Yeah.

19        Q.  And it wasn't -- Neo4j was not the

20   licensee -- sorry.  Strike that.

21            So in other words, Neo4j was not the

22   licensor for ONgDB.

23        A.  Say that one more time, please.

24        Q.  So Neo4j, in your mind, was not the

25   licensor of ONgDB.  Meaning Neo4j -- Neo4j wasn't --

                                                      134

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS  408-287-7500

SER_1218

1    wasn't -- wasn't the -- wasn't the entity that was

2    licensing ONgDB.

3        A.   Right.  The Graph Foundation was.

4        Q.   I see.  Okay.  And where did you -- how did

5    you come to that conclusion?

6        A.   Well -- well, I mean, we had -- I remember

7    having conversations with John Mark Suhy walking

8    through, talking about the Graph Foundation, the

9    licensing, the entity itself and so -- you know, it

10   was sort of -- I was -- I guess I was looking at it

11   as -- as what the Graph Foundation was doing.

12       Q.   But to your knowledge, the actual software

13   functionally, ONgDB, was Neo4j Enterprise?

14       A.   My understanding it was not the Enterprise.

15   It was the core source code from GitLab, Neo4j's

16   GitLab, whatever that licensing was of that core

17   source code brought over, and then the additional

18   elements, whatever elements ONgDB, The Graph

19   Foundation added onto that.  That's how I understood

20   from my point of view who was -- who was

21   distributing and licensing it and the follow-through

22   from whatever the licensing was of the Neo4j core

23   that was off of GitLab.  That's how I understood it.

24       Q.   Okay.  And as far as the -- you said the

25   core, then there was the additional features that

135

SER_1219

MICHAEL VON DRAN                                            November 17, 2022

1   Graph Foundation enabled.  Was it your understanding

2   that they were creating Enterprise features that are

3   equivalent to what was in Neo4j Enterprise

4   independently?

5        A.  Yeah.  I would -- I think -- yeah.  I mean,

6   I understood that they were adding in things that

7   the Neo4j, Inc. Enterprise Edition had as Enterprise

8   features.  They were in ONgDB.  That was being added

9   to the core that was compiled.

10       Q.  Okay.  So then the source code for the

11  Enterprise features didn't, in your mind, come from

12  Neo4j?

13       A.  No.  I don't think.  I mean, I -- I -- no.

14  I can't offhand think that, oh, they downloaded them

15  somehow or what have you from Neo4j itself.

16       Q.  Did the IRS ever do any independent

17  investigation to determine whether ONgDB was

18  entirely based on Neo4j's source code?

19       A.  I don't believe so.  I think the conver --

20  not on the source code.  It was a walk-through,

21  again, with sort of John Mark Suhy, I think Ben

22  Nussbaum was there at least for one, describing sort

23  of what The Graph Foundation was, what they were

24  doing, the process to what was distributed.  And the

25  only thing I remember is adding in plug-ins and code

136

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS    408-287-7500

SER_1220

1   to the core, and that became sort of the ONgDB.  So

2   that was -- that was the group, you know, having

3   John Mark walk through that process, and then

4   understanding The Graph Foundation was established

5   as an entity and, you know, making the product

6   available, you know, as open source.  I can't hear

7   you.

8          Q.  I apologize.  I had a bus going by.  I'm

9   right on the street.  So I tried to mute that while

10  you were testifying.

11         So what are your conversations with

12  Mr. Suhy about The Graph Foundation?  What did he

13  tell you about The Graph Foundation?

14         A.  Well, I believe he would have walked

15  through sort of the entity itself.  You know, the

16  elements of sort of it being, you know, what they

17  were trying to do, the formal setup of it, and then

18  what the -- you know, what the ONgDB product, I'll

19  call it product, was and how it was made and under

20  what reasoning and basis.  That's about what I

21  remember just going through that.  Not just myself

22  but, you know, there were others who listened in and

23  sort of wanted to know about it and its setup.

24         Q.  And was it your understanding that Mr. Suhy

25  was one of founders of Graph Foundation?

137

1    A.  Yeah.  That's how I would -- I would --
2  yeah.
3    Q.  Now, as far as The Graph Foundation, when I
4  asked about your understanding, did he tell you it
5  was an open source organization, or how did he
6  describe The Graph Foundation?
7    A.  An open source foundation -- I mean, I feel
8  like -- I mean, it was a foundation that was
9  crowd-sourcing the ONgDB development and making it
10  available for, you know, as open source use for
11  people.
12    Q.  Did he tell you that it was formed
13  partially in response to Neo4j Enterprise Edition
14  license?
15    A.  I don't know if he would have -- I can't
16  remember if he said it specifically, but I guess --
17  I mean, it -- you know, I'm -- I understood it
18  was -- it was their interest to make -- you know, do
19  an open source product.  And so I would guess I --
20  it makes sense that I guess they were -- it was
21  contention with Neo4j.
22    Q.  Okay.  And so looking back at this email on
23  August 13th, 2018, looks like you write, "Thanks
24  John Mark.  Making sure Lisa is looped in on this,
25  and ask her if we're okay to go ahead and just use



138

1 ONgDB from now on in the CKGE environment."

2         Do you see that?

3     A.  Yes.

4     Q.  Why were you referring to Lisa on the

5 decision to go forward on ONgDB?

6     A.  Because that -- that type of decision

7 needs, you know, either her or Jeff to make that

8 decision.  I can't make that call.

9     Q.  And did they make the decision to go

10 forward with ONgDB?

11     A.  Probably.  I mean at the -- I can't

12 remember that we didn't.  Does the email tell us?

13     Q.  I might have one for you.  We'll get there.

14 You can't remember offhand.

15     A.  Sorry.  Sorry.  Not to get ahead.  But I

16 would think that -- I don't -- in my mind, it has to

17 be around that time frame.  So that we would have

18 switched over to ONgDB.  Because I feel like it was

19 during the summer where we had these conversations

20 about ONgDB and then ultimately GraphGrid and that

21 kind of stuff.

22     Q.  So then going back to this email, you'll

23 see Mr. Suhy responds to your email addressing, it

24 looks like to Lisa Rosenmerkel, and you'll see he

25 says about two-thirds of the way down, "ONgDB open

139

1   source licenses come directly from The Graph

2   Foundation as well, not from Neo4j, Inc., which is a

3   huge benefit based on their past behavior."  Do you

4   see that?

5       A.  Yeah.  It's -- yeah.  Right.  So that's --

6   I mean that -- I guess in my mind that's where I'm

7   thinking, well, what is, what is The Graph

8   Foundation, you know, making this product available,

9   what is the data rights or whatever you call it, the

10  licensing, The Graph Foundation is.

11      Q.  So you took the representation that ONgDB

12  open source licenses were coming from Graph

13  Foundation and not Neo4j?

14      A.  Yeah.  I think ONgDB coming from Graph

15  Foundation.

16      Q.  You mean the licenses themselves, not just

17  the software?

18      A.  Yeah, because I -- if I remember, yes.  I

19  mean, I would -- I would -- I think I would have

20  assumed that.  Yes.

21      Q.  Again, so you took this at face value, that

22  ONgDB open source licenses come directly from Graph

23  Foundation and not from Neo4j, Inc.

24      A.  Well, I don't -- I don't know if it was at

25  face value, and this is why I say that is, you know,

                                                    140

Case 5:18-cv-07182-EJD    Document 183-5    Filed 04/20/23    Page 56 of 98    November 17, 2022

1  in hearing I guess -- having to walk through the

2  development of the ONgDB, seeing the -- being told

3  this is where the Neo4j source code is coming from,

4  not GitLab.  So it was walking through that.  That

5  was -- at least I don't remember anybody having --

6  you know, that was sort of what I remember everybody

7  sort of basing a decision on with that.

8      Q.  You say basing a decision on.  You mean

9  going with ONgDB in CKGE?

10      A.  Yes.

11      Q.  Again, I want to be really precise in my

12  question.  I'm not asking about the source code or

13  GitLab or GitHub.  From the IRS's perspective, you

14  understood from Mr. Suhy that ONgDB's open source

15  licenses were coming from Graph Foundation and not

16  from Neo4j, Inc.

17      A.  Yes.

18      Q.  As far as it says the upgrade would be a

19  low risk move in our opinion, now that upgrade

20  meaning what you had asked originally was Neo4j

21  Enterprise 3.3 to ONgDB 3.4?

22      A.  Yeah, because I'm asking can we just go

23  ahead and -- yeah.  I can't think of what else it

24  would be about where he says that.

25      Q.  And as far as at that time, I think there's

141

1  a reference to deployment of the CKGE.  Was that the

2  point in time where CKGE sort of moved out of its

3  development phase into a more production

4  environment?

5       A.  No.  Unfortunately not.  We did -- I -- in

6  my opinion, we did not get to bringing in regular

7  users until the spring of 2019 at this time.

8           (Simultaneous speaking.)

9           THE WITNESS:  Yeah.  It was -- it was done

10  in phases, so not everybody was brought on until

11  let's say the end of the summer of 2019.  But in my

12  opinion, we started people for regular use in the

13  spring.  So as you said, about six months or so

14  later.  So I think that makes sense.

15           (Exhibit 170 is introduced.)

16  BY MR. RATINOFF:

17       Q.  Let me go ahead and put the next exhibit in

18  the chat here.  So be Exhibit 170.

19           What I have put in there is an email also

20  produced by iGov in this litigation.

21       A.  Okay.

22       Q.  You'll see it's an email from --

23  starting -- or ending from yourself to Mr. Suhy

24  amongst others, cc's, dated August 14th, 2018.  And

25  it you'll look, you'll see at the bottom it's sort

                                                    142

1    of a continuation of the original thread.

2        A.  Yeah.  Yes.

3        Q.  You would agree with that?

4        A.  Yes.

5        Q.  And do you have any reason to believe this

6    email isn't true and correct copy of an exchange

7    between you and Mr. Suhy among others?

8        A.  I don't.

9        Q.  Then looking at the top here it says, "John

10   Mark, go ahead and integrate the ONgDB into the CKGE

11   framework we'll deploy"?

12       A.  That's right.  Yes.

13       Q.  So safe to say that you got approval from

14   Jeff and Lisa to tell John Mark to go ahead and

15   integrate ONgDB?

16       A.  I do.  Yes.

17       Q.  And then at that point that's essentially

18   when CKGE started using ONgDB was in about August

19   2018?

20       A.  Yes.  I would agree with that.

21       Q.  See, I told you I would be able to help get

22   your memory squared away.

23       A.  Look, I'm completely perplexed at how bad

24   my memory is.

25       Q.  No.  You know, the lawyers in the case

143

1    Q.  Like IT basically?

2    A.  Yeah.  I mean, working on the server

3    itself, you know, operating system installs, those

4    kinds of things.  So he had that kind of function.

5    Q.  All right.  Then do you know why the IRS

6    was wanting to move Neo4j Enterprise from those

7    servers?

8    A.  Probably just -- it looks like we weren't

9    using them and just get rid of them.  They were

10   probably left on there.

11   Q.  That's because the IRS had moved to ONgDB?

12   A.  Yeah.  We would have been using that.  So

13   the way I'm interpreting this is that they are

14   talking about cleaning up.  Where it says, like I

15   think it's an old project, I say remove it.  So this

16   was probably me saying yeah, I don't know why it's

17   there, what it's being used for.  And yes, at this

18   time I'm still assuming we were using ONgDB.

19        (Exhibit 173 is introduced.)

20   BY MR. RATINOFF:

21   Q.  And then I'm going to go ahead and put the

22   next exhibit in the chat.  This will be marked as

23   Exhibit 173.  And what I've put -- marked as

24   Exhibit 173 is an email exchange between Mr. Suhy

25   and Mr. Martin with you copied.  First email.



152

SER_1228

1  Starting on December 6, 2018 through December 11th,

2  2018 with the title "CKGE memory usage."

3       A.  Yes.  I see it.

4       Q.  Any reason to believe this wasn't a true

5  and correct copy of this email exchange that was

6  produced by the IRS?

7       A.  No.  I don't.

8       Q.  Okay.  Starting at the beginning of this

9  email exchange, it says, "Hey John Mark, Between the

10  environment and the future growth of adding YK1,

11  what memory usage are you estimating for production

12  servers?  We had talked about dedicating all DL 380s

13  instead of the current half VM/half DL380 we have

14  now.  Would four DL380s with 256GB or 512GB be

15  sufficient?"

16       Starting with what's a DL380?

17       A.  It's a type of server.  It's a HP.  DL380

18  just represents the type of server.

19       Q.  At that time in December of 2018 for the

20  CKGE, was it running on at least one DL380?

21       A.  See, I don't know if it was 380.  I can't

22  remember what Minerva and Athena were.  I thought

23  those were 580s.  So -- that's my -- that's my view.

24  Both of those I believe were 580s.  So my

25  interpretation of this is -- and I know Patrick was

153

SER_1229

Case 5:21-cv-07108-EJD   Document 183-5   Filed 04/20/23   Page 61 of 98   MICHAEL C. DUNN   November 17, 2022

1    working on sort of requirements, sizing, and I think
2    he's talking back and forth about with, you know,
3    with four DL380s would this information be
4    sufficient.  You know, instead of the half or VM.
5    So I think they're talking about adding servers to
6    the environment and then how they would be used.
7        Q.  So in other words, because CKGE was going
8    into production, there was going to be a need to add
9    additional servers for the number of users?
10       A.  Yes.  And also I saw the word "Kafka" in
11   there.  I was just trying to go back and -- yeah.
12   It said, I can tell you regarding SS drives.  This
13   is John Mark.  It will be important event around the
14   ETL-related stack components (Kafka, et cetera)."
15   So how -- so the GraphStack, as I mentioned -- we
16   were talking about that earlier.  So the GraphStack
17   is made up of a number of components.  He was
18   talking about Kafka there.  There's Keycloak,
19   Prometheus -- there's a number of software
20   components that make up that bundle.  And so
21   Elasticsearch being another component.  So all --
22   all of those have to be taken into account from a
23   sizing standpoint, so not just the graph database
24   itself.  Does that make sense?
25       Q.  Sure.  So because there was other RAAS on

154

1   the environment, there needed to be a sufficient

2   service to run not just the graph database but also

3   the other components of the environment.

4       A.  Yes.  That's how I see it and would have

5   seen it at that time, and they sort of back and

6   forth on that.

7       Q.  And Mr. Suhy had input on hardware

8   requirements as part of his work?

9       A.  He did.  He did.  Yes.

10      Q.  And then you go off to the -- it would be

11  the first page.  It's the email where Patrick Martin

12  says, "Let's start with CKGE.  Would you expect four

13  DL380, 32-core, 256 gigabyte RAM to be enough or

14  would four DL380, 32-core, 512 RAM be more

15  appropriate."  And then he talks about could there

16  be a mix -- or a mix if needed of Prod1 and 2 need

17  to be 512 and Prod3 /Dev/Test could be 256.  Do you

18  see that?

19      A.  Yes.  I do.  At 9:04 a.m.

20      Q.  Correct.

21      A.  Correct.

22      Q.  He's referring to four DL380s, so that

23  means four DL380 servers?

24      A.  Correct.

25      Q.  And that would be each one of those having

155

1    32 cores and 256 gigabytes of RAM?

2        A.  Yes.  That's right.

3        Q.  The same would be the alternative of four

4    DL380s with 32 cores each and then 512 RAM --

5        A.  Correct.  Yeah.  I think it asks about

6    either/or.

7        Q.  Sure.  Was it determined at that time that

8    there would be a need for four servers to run the

9    CKGE environment?

10        A.  Yeah.  I believe it was both production and

11    all of that that that entailed, and then something I

12    saw that I just wanted to -- yeah, where Prod1 and

13    2.  So sort of being able to work in both of those

14    stacks.  And then there's a Prod3/Dev/Test.  So,

15    which I'm interpreting as a separate server.  So

16    three, three servers.

17        Q.  Okay.  So there would be three servers and

18    each consisting -- well, Prod1 and 2 and 3, were

19    those three different servers, or are those three

20    different clusters?

21        A.  Yeah, I don't know if -- if Prod1 and 2

22    would be on the same server or not or whether they

23    would be on separate servers.

24        Q.  But there is a -- sorry.  Strike that.

25            So at that time the design, architectural

156

SER_1232

design for the CKGE environment was to have three

production servers?  Would that be the accurate way

to describe it?

     A.  Yeah.  I mean, I can't think of -- and what

I remember is and how this is being discussed is

Prod1, Prod2 being two stacks.  And the way that I

remember it being set up is we had copies of the

database, and so Prod1 and 2, 1 may have been --

let's say 1 was the primary.  That's the way people

were normally going to use it.  Prod2 may have had a

stack, and it was in case Prod1, you know, something

happened to it as backup.

     Q.  Okay.  So would that be like a hot backup

for Prod1 theoretically?

     A.  Is it a hot backup.  I don't -- I

believe -- I don't know.  I don't know if I would

call it a hot backup.  But I -- I think it -- I

think you could through the user interface, if

something happened to Prod1, it would -- it would

switch to Prod2.  So in that sense, you know, it's a

hot backup.  And in that way.  So I believe the

configuration was set up like that.  Yes.

     Q.  All right.  So that each Prod launch the

stack and Prod1 and Prod2 each would be running a

separate instance of ONgDB?



157

SER_1233

1    A.  At that time we were -- only one of them
2  was actively used.  We started later on using
3  another instance of ONgDB which would allow users
4  that were connecting directly to the graph database
5  using R and Python.  And so in this case I think it
6  was just some redundancy.
7    Q.  But in order to have redundancy between
8  Prod1 and 2, each one would be running ONgDB?
9    A.  Each one.  Yes.  I'm sorry if I
10  misunderstood.  Yes.  Each one of them had an
11  instance of ONgDB.  Yes.
12    Q.  How would -- at this point, how did
13  Prod3/Dev/Test fit into that architecture?
14    A.  Since it's Prod/Dev/Test, this would be,
15  you know, being able to use it as some kind of just
16  testing on changes0, on what would -- you would be
17  sort of doing changes and other kinds of activities
18  that were not static that the end users would be
19  working with.
20    Q.  Okay.  And since there was a question about
21  using four servers, would then there be one server,
22  one DL380 for Prod1, one DL380 for Prod2, then the
23  other two would be used to support the
24  Prod3/Dev/Test?  Is that accurate?
25    A.  Yeah.  And it looks like in the last

158

SER_1234

1  Test, that would be running another instance of

2  ONgDB?

3      A.  Yes.  I would think yes.

4      Q.  And to your knowledge, was this, at least

5  in December of 2018 or shortly thereafter, was

6  this -- were these servers adopted in this

7  structure, Prod1, Prod2, and Prod3?

8      A.  I would think so.  Yeah.  If they were --

9  if Patrick and John Mark were working on it, I

10 would -- they would be working towards getting that

11 set up.  So I don't see any reason not to believe

12 around this time.

13     Q.  Okay.  And then do you know as of now what

14 the initial server requirements or specs were for

15 CKGE?  Let's just say beginning of 2019.

16     A.  Not offhand.  I mean, this would give me

17 my -- probably the best view here.  I don't have any

18 other ideas offhand of anything different than this.

19     Q.  So at minimum, then, the design for CKGE

20 would have been having the four DL380s, at least 32

21 cores, and 256 gigs each?

22     A.  Yeah.  I think that's fair.

23     Q.  All right.  Let me go ahead and drop in the

24 next exhibit.

25          (Exhibit 174 is introduced.)



161

SER_1235

BY MR. RATINOFF:

Q.  So this is another email exchange produced
by the IRS.  You'll see the first page ending with
1738, and it's a email exchange between Mr. Suhy and
Mr. Martin.  A short one.  You'll see at the bottom
Patrick is asking John Mark within the CKGE is ONgDB
installed on all the DB servers or AS servers or
both.  Do you have an understanding what he means
between DB servers versus AS servers?

A.  Not --

Q.  Maybe the next email of Mr. Suhy's response
will help.

A.  Okay.  I see what you're going up -- okay.
Applications servers.  Okay.  So the GDB servers
versus the application servers.  The ES servers --
what is ES.

Q.  So it says ES --

A.  Oh.  Elasticsearch.  Okay.  Elasticsearch.
Yes.  Sorry.

Q.  So from this email exchange, is it fair to
say, then, that there were separate servers running
ONgDB from what you referred to as the Elasticsearch
and then the other applications in the stack?  Is
that accurate?

A.  Yeah.  I think so.  Yes.

162

SER_1236

MICHAEL DUNN                                        November 17, 2022

1          Q.  So there was dedicated -- multiple

2    dedicated graph database servers running ONgDB.  Is

3    that correct?

4          A.  Yes.  That's how I'm -- how I'm reading it.

5          Q.  Then you'll see that Mr. Suhy at the top of

6    that email on March 11th, 2019 at 10:35 a.m. says,

7    "I actually have a mapping document in the CKGE

8    docs.  I'll send you the direct link to that on

9    GitLab."

10         A.  Yes.  I see it.

11         Q.  Is there -- is there like a document

12   repository with CKGE documents that's kept by your

13   group?

14         A.  There is a GitLab project repository.  So

15   yes, there are that contain, you know, the code and

16   information, those kinds of things.  So that's

17   what's -- when it says GitLab, it's talking about

18   the GitLab project server that he was putting this

19   file and information on.

20         Q.  Okay.  So then there's an actual GitLab in

21   terms of GitLab repository that the CKGE environment

22   is kept on as far as you said source code and then

23   related documents to the --

24         A.  Yes.  Yes.

25         Q.  And by the reference here mapping document,

                                                          163

MICHELE DUHN                                          November 17, 2022

1    IRS employees.

2        Q.  And Puru I think you mentioned you had

3    spoken --

4        A.  Yeah.

5        Q.  -- to him earlier about bad things about

6    CKGE.  Was the server mapping one of the things you

7    talked to him about?

8        A.  No.  I did not talk to him about that.  I

9    talked to him about basically, you know, were the

10   graph database installed in a docking container or

11   are they on bare metal.  You know, we were talking

12   about sizing, that kind of stuff.  So I didn't talk

13   to him about a mapping document.

14       Q.  But as of this email March of 2019 that

15   we're looking at, how many -- how many graph

16   database servers -- let me actually start over.

17           So GDB stands for graph database?

18       A.  Yes.  Correct.

19       Q.  So at that time in March of 2019, how many

20   graph database servers were running ONgDB in CKGE?

21       A.  I would think at least three.  We may have

22   had -- I believe at that time there was another

23   project team that wanted to test out some ideas for

24   a project, and I believe they were using it.  So my

25   estimation would be four.

                                                    166

SER_1238

1    Q.  Okay.  So in 2019 there was four separate
2  servers running ONgDB?

3    A.  Not separate servers but instances of
4  ONgDB.

5    Q.  Okay.  And did that change in 2020?

6    A.  Yes.  Okay.  So around the summer of 2019,
7  there was another project that stood up dealing with
8  what I'll call a corp graph, corporate graph.  And
9  so they were starting with I believe it was 20 --
10  yeah, sometime around there would have been another
11  corporate graph.  They may have started a little bit
12  earlier than that, but somewhere around there the
13  corporate graph project stood up, and they were
14  their own project.

15    Q.  Okay.  So in the beginning of 2019 there
16  was four instances of ONgDB running within the CKGE
17  environment, and then you're saying there was a
18  fifth instance that was set up for the corporate
19  graph environment?

20    A.  Yeah.  It must have been sometime around
21  there, because the -- because the corporate graph
22  project started I believe in the fall of 2018.  And
23  eventually at some point in there, they would have
24  been, you know, starting to test out graph ideas and
25  using their own graph instance.

167

SER_1239

1    Q.  And then did that change -- I know you said

2    that was the middle of 20 -- I'm sorry, 2019, so

3    moving on to 2020, was the setup the same with the

4    four instances running ONgDB for the CKGE, and then

5    the fifth for a corporate graph, did that change in

6    2020, or was it still the same?

7    A.  There -- there should have been at least --

8    I believe at that time YK1 and excise graph were

9    switched over and using ONgDB at some point at that

10   time.  So that would have been what, two more.

11   Q.  And the YK1 would have been a separate

12   server?

13   A.  Yes.  That would have been its own

14   instance.  Yes.

15   Q.  And then what was -- what was the other

16   one, I'm sorry, you mentioned?

17   A.  Excise graph.  E-x-c-i-s-e.

18   Q.  What is excise graph?

19   A.  It's a separate graph that a particular

20   unit uses to look at excise tax relationships.

21   Q.  And is that running its own instance of

22   ONgDB?

23   A.  Yes.

24   Q.  So let me just make sure I got my math

25   correct.  This is as of 2020, there was four



168

SER_1240

1   instances running on the CKGE environment.  There

2   was a fifth instance for corporate graph.  And then

3   there was a sixth would have been for YK1, and then

4   a seventh for excise?

5        A.  So four for -- and when I'm -- this may be

6   help.  The first ones that we talked about, let's

7   call those the main graph.

8        Q.  Okay.  That's production 1, 2, and 3?

9        A.  Yes.  And, you know, the development stuff.

10  So that includes main graph.  So then -- so then

11  there was another project.  Analytics project.

12  We'll call them -- just call it a fraud project.

13  And then the excise graph.  The YK1 at some point

14  was started during that time, was developing the YK1

15  graph.  And then at the same time the corporate

16  graph was being worked on.  Development.

17       Q.  Okay.  So we've got the main graph, the

18  excise graph, the YK1 graph, and then the corporate

19  graph.

20       A.  Yes.  And so the regular use or what we

21  could call production was excise, the main graph,

22  and at some point at that time YK1 would have been

23  in production, meaning regularly used.  The

24  corporate graph and the other ones were just test --

25  they were still just testing out stuff.

169

SER_1241

1      Q.  Okay.  As far as main graph goes, when you

2  say main graph, that's main graph in the CKGE

3  environment.

4      A.  Yeah, and the reason I was doing that is in

5  fact a corporate graph is part of CKGE as an

6  environment as if you drew a little line.  So I just

7  wanted to help trying to -- try using the same

8  terms, and I didn't want to confound stuff.  So

9  that's why it's just easier.  People call it the

10  main graph.

11      Q.  Okay.  How many instances of ONgDB was the

12  main graph running in 2019?

13      A.  I would say three.

14      Q.  Then was that the same in 2021?  I'm sorry,

15  2020, the main graph was running three instances of

16  ONgDB?

17      A.  Yeah, I don't think -- yes.  Because at

18  that time we were using one for the investigators,

19  one of the analyst graph, and then there would have

20  been like a backup or something.  So those would

21  have been sort of the production.

22      Q.  Okay.  And in addition to production, there

23  may have been some testing or development use --

24      A.  Yes.

25      Q.  -- on a separate server?

                                                          170

1    A.  Yes.  Yeah.

2    Q.  So potentially four -- four instances of

3  ONgDB in relation to main graph.  Three being

4  production, one being some sort of testing --

5    A.  At least one if not maybe two.

6    Q.  And then moving to 2020 -- that was for

7  2020.  So for 2021, did things change as far as the

8  number of instances for main graph, excise, YK1, and

9  corporate graph?

10    A.  Yeah, I don't -- I don't remember any

11  changes.  I was trying to think is there any -- I

12  believe, not in production.  I think there may have

13  been some other projects using ONgDB to do some

14  testing or ideas like that, but production was

15  staying in my mind around three.  And then there

16  was -- let's see, 2020, '21, so around that time we

17  started another graph project called COVID graph.

18    Q.  I'm sorry, that was 2021?

19    A.  Yeah.  It would have been after the Cares

20  Act.  So that would have been when COVID first hit.

21  So when was that.  Let's say the summer of 2020.  So

22  that would have been like 2020 starting and then

23  doing, you know, starting to test things out,

24  et cetera, going into '21.

25    Q.  And these are all running ONgDB.

171

SER_1243

1    A.  Yes.

2    Q.  Okay.  So then -- so for 2021, just to make

3  sure I've got everything down, we've got main graph

4  running three production instances of ONgDB plus one

5  or two additional development/testing environments

6  on ONgDB.  You've got one instance of ONgDB for the

7  excise graph, one instance of ONgDB for YK1, and one

8  instance for corporate graph, plus an additional

9  instance of ONgDB for the COVID.

10    A.  Yes.  And then --

11    Q.  That's for 2021.  So then --

12    A.  Well, I'm trying to use what I understood

13  now from what we have up, you know, existing that I

14  was told and working back in time.  So around 2021

15  we had policy net, which uses ONgDB.  That was a

16  development project that's sort of happening.  Just

17  call it policy net.  And then, let's see, I'm trying

18  to remember when some of these projects -- because I

19  don't work with all these projects, so I'm trying to

20  like, in my own mind, remember when things started.

21  As I said, I -- you know, I just don't work on all

22  these projects.  I don't really know what they're

23  doing.  At least in '21 there was another instance

24  of what is called the individual graph that started

25  to be a project.  And then -- now, these two I think

172

SER_1244

BY MR. RATINOFF:

Q.   Well, I think they're fair game, and we can about that off the record.

A.   Look, this was just my notes as I was -- it was being described to me over our telephone conversation.

Q.   Okay.  Who were you talking to?

A.   Puru Komaravolu.

Q.   All right.  So then let's see here.  Okay.  So then I might have to go back and start from the beginning just to make sure we've got everything accurate.

Is it easier for you to work backwards, or would it be easier to start -- I just want to go through it one more time just so we're clear.

A.   Yeah.  Let me start what -- when I asked sort of how many instances we had now, and you can see what you have.  So --

Q.   Start with 2022, and we're going to work backwards?

A.   Sure.  Okay.  So --

Q.   Just to be clear for the record, this is instances of ONgDB.

A.   Correct.

Q.   Okay.

174

1        A.  So main graph, there are two instances

2    right now of main graph.  There is one instance of

3    COVID.  Those are in production.  There are -- for

4    YK1, there are two instances in production, two

5    instances dev/test.  Tell me when you're ready.

6        Q.  Go ahead.  This is for 2022 instances of

7    ONgDB.  We've got main graph, COVID, and YK1 so far.

8        A.  And then one instance of excise graph.

9        Q.  That's in production?

10       A.  Yes.  And then the ones in -- considered

11   development are individual graph, CPEO, ghost

12   preparer, corporate, and policy net.

13       Q.  And then so for CPEO, ghost, corporate, and

14   policy, those are all in dev -- ONgDB dev

15   environment?

16       A.  Yes.  And similar with individual graph.

17       Q.  Got it.  As of 2022, are you aware of what

18   version ONgDB each one of these instances is?

19       A.  Yes.  The code is -- has Neo4j 3.5.2.6.

20       Q.  Okay.  So let's go through -- for all of

21   these instances we've just gone through it's 3.5.6?

22       A.  Yes.

23       Q.  Okay.  So for main graph two instances of

24   ONgDB 3.5.6?

25       A.  Correct.

175

1    (Reporter asks for clarification.)

2    MR. RATINOFF:  It's 3.5.6.

3    THE WITNESS:  It's 2.6.  Sorry.  It's

4    3.5.2.6.

5    (Discussion off the stenographic record.)

6    THE WITNESS:  Wait.  Here.  Let me type it

7    in.  3.5.2.6.

8    BY MR. RATINOFF:

9    Q.  So for each one of the instances of ONgDB

10   we've gone over for 2022, each one of these

11   instances as running ONgDB version 3.5.2.6?

12   A.  Yes.  But it's not ONgDB because everything

13   is compiled inside the IRS.  I believe John Mark

14   didn't want to call it ONgDB because it's not being

15   received by The Graph Foundation.  Or compiled by

16   The Graph Foundation.  So it's not being called

17   ONgDB.  It's just graph database.

18   Q.  Okay.  Is it possible that the version is

19   actually 3.5.26?

20   A.  It could be.  I could have mistaken it.  I

21   was writing it down over the phone.

22   Q.  Okay.  I have a document we'll get to.  I

23   think we can clarify that.  Okay.  So then going

24   back, that takes care of 2022.  So going to 2021,

25   let's go ahead and do that.

176

1    A.  Yes.

2    Q.  And that was also dev?

3    A.  Yes.

4    Q.  And then for all of these instances in 2021

5    that we just talked about, what version of ONgDB

6    were they running?

7    A.  I don't know.

8    Q.  It was something either that was -- it was

9    a 3.5 instance of ONgDB?

10    A.  I don't know.  I really -- I don't.  I only

11    know of as of right now because of just asking.  So

12    I don't -- I don't know -- I would -- I don't know.

13    Q.  Okay.  How would you be able to find out

14    what the historical version of ONgDB was?  Could

15    GitLab provide that information?

16    A.  I don't know if it would.  I mean, the best

17    person would be John Mark Suhy.

18    Q.  Because he was primarily responsible for

19    keeping ONgDB in the GitLab?

20    A.  Yeah.  He was the primary person with, you

21    know, working with the software, coming in that

22    represented sort of that bundle coming from

23    GraphGrid.

24    Q.  Okay.  Now, we talked about Athena and

25    Minerva as servers.  Were those legacy servers, not

179

```
 1   which I think we talked about being a -- at least at
 2   one point a dev -- becoming a dev server.  You'll
 3   see this is going back to that same September 2019
 4   time period we were talking about earlier.  I just
 5   dropped in a new exhibit tab 462.
 6              (Exhibit 178 is introduced.)
 7              THE WITNESS:  I see it.  I'm on it.
 8   BY MR. RATINOFF:
 9       Q.  That will be marked as Exhibit 178.  Let me
10   know when you've had a chance to take a look at this
11   email.  I think you'll see the title of this is
12   "Athena CKGE-v2 resync" -- or, I'm sorry, "rsync."
13       A.  Right.
14       Q.  It's dated, the last email, September 17th,
15   2019.  This is produced by the IRS with the Bates
16   number ending in 2201.
17       A.  That's correct.
18       Q.  Do you believe this is a true and correct
19   copy of an email produced by the IRS?
20       A.  No issue.
21       Q.  And you'll see that you're at least copied
22   on this email exchange?
23       A.  Yep.  I do.  Yes.
24       Q.  And then you'll see there's a reference in
25   the very first email, which would be on
```

193

1   September 17th at 2:58 p.m. at the bottom, "Hey John

2   Mark, do you happen to have a newer version of ONgDB

3   available?  We are using 3.5.3 for everything, but

4   it looks like there was a bug fix in 3.5.6 that

5   could help address some issues we're having."

6        A.  Yes.  I see that.

7        Q.  Okay.  I'm just trying to make sure I've

8   got the version number correct.  So I think you said

9   you thought that the 2022 ONgDB was 3.5.2.6.  Do you

10  think because -- at least in September of 2019, is

11  it fair to say that there is a later version being

12  run in 2022?

13       A.  The way that I am interpreting this is my

14  understanding was ONgDB had its own numbering

15  scheme, and so they're referring to the ONgDB

16  version.  I don't know -- I don't know how that

17  relates to anything Neo4j so --

18       Q.  Understood.  I think we had some confusion

19  whether -- when you talked about what version of

20  ONgDB all the servers were running in 2022, you said

21  you thought it was 3.5.2.6 --

22       A.  Sorry.  I missed -- I didn't mean to imply

23  that.  It was the -- what I said with 3.5 and if

24  it's 2.6, that's the Neo4j version that's found

25  within the code.  It's not the ONgDB version.  It's

194

1   what -- does that make sense?

2       Q.  So you're saying that -- okay.  So you're

3   saying that for in 2022 that the version of ONgDB

4   that was being run on the servers showed up as being

5   Neo4j source code version 3.5.2.6?  Is that fair?

6       A.  Yes.  Yes.  As long as -- my understanding

7   is we're not supposed to use ONgDB term now.  We're

8   using graph database.  But your main point there is

9   what I understand when I talked with Puru, and he

10  looked at the code base of the graph database, and

11  it's referred to as Neo4j 3.5, and if it's 2.6,

12  that's what it would be.  Does that make sense?

13      Q.  Yeah.  I think so.  And you said the

14  different name.  So from the IRS's perspective, the

15  program is the same, it's just the names have

16  changed from ONgDB to GDB.  Is that correct?

17      A.  Yeah.  The way that I understand it from

18  John Mark is that we have all the source code that

19  makes up this graph database, and because it's

20  compiled inside the IRS, because we wanted a copy of

21  the source code from the distribution, his statement

22  was you can't call it GraphStack GDB nor ONgDB

23  because ONgDB is compiled by The Graph Foundation,

24  released by them.  So I'm trying to use the names

25  that -- as I understand how to call them.

195

SER_1251

1      Q.   Okay.

2      A.   Does that make sense?

3      Q.   Sure.  So then actually what software is

4  being run on the servers in 2022 is what would be

5  called internally GDB 3.5.2.6.

6      A.   Yeah, but I don't think we call them by

7  that versioning.  We just have the GDB version.  I

8  don't even know myself what GDB version we would

9  have.  I think John -- there was still discussion

10  what to call it because it's compiled internally.

11  But it's -- the Neo4j source code says Neo4j 3.5.2.6

12  is what I understand from Puru.

13      Q.   Did he say whether that was Neo4j

14  Enterprise source code?

15      A.   He couldn't tell.

16      Q.   As far as you know, it was a derivative of

17  what was previously called ONgDB?

18      A.   Or at least the process is the same.  I

19  don't -- I don't know how -- how it aligns back to,

20  because I understood in March or April of this year

21  when John Mark Suhy mentioned that what we have is

22  not ONgDB anymore because the ONgDB version is

23  version 1 that's available through The Graph

24  Foundation, and we were using some version, at that

25  time I thought he said GraphStack, but it's compiled

196

1  through I thought the GraphStack.  But now because

2  we have the source code that -- brought in and he's

3  compiling it, we're just calling it GDB.

4      Q.  Okay.  So then in other words, the IRS

5  didn't roll back ONgDB 1.0.  They kept using

6  whatever source code it had on hand at that time in

7  March or April that Mr. Suhy kept on updating.

8      A.  Yes.  We did not -- all I remember from

9  March and April was John Mark said that whatever,

10  you know, whatever happened with the legal issues,

11  that's when I found out that something happened, was

12  in March or April of this year.  And we weren't

13  using ONgDB.  He was bringing in a GraphStack, and

14  so we couldn't call it ONgDB.  That's what I

15  understood.

16      Q.  Okay.  So other than the name, though, were

17  you aware of any changes to --

18      A.  I wasn't -- yeah.  I wasn't -- oh.  Sorry.

19      Q.  I was going to say so there wasn't a

20  switch-over to official Neo4j Enterprise 3.5.2.6 at

21  that time.

22      A.  No.  No.  We didn't switch to Enterprise or

23  anything at that time.  I just understood that the

24  version that we were using in March or April was --

25  I called it GraphStack GDB or something, and then

197

1   later this past summer mentioned that with the code
2   being, as I said, brought in and compiled there, it
3   just needed to be another name.  That's how I was
4   interpreting it.
5       Q.  So where did that Neo4j source code that is
6   now maintained internally come from?
7       A.  John Mark Suhy.
8       Q.  And to your knowledge, what license is that
9   source code under?  Is it under the AGPL?
10      A.  As far as I know.  Yeah.  I haven't been
11  informed of any other requirements.
12      Q.  And it's not under the AGPL clause
13  comments?
14      A.  I'm not -- as far as I know, no.  I have
15  not been told that or brought up or anything.  No.
16      Q.  Okay.  I'm going to go ahead and mark the
17  next exhibit.  Sorry.  I'm trying to do this as
18  quickly as possible.
19          (Exhibit 179 is introduced.)
20          THE WITNESS:  Okay.  I have it up.
21  BY MR. RATINOFF:
22      Q.  This will be Exhibit 179, and this is an
23  email that was also produced by the IRS.  And you'll
24  see it is -- there's a scrambled from, but you see
25  it's to yourself and LuLu.  I can't remember if you

198

```
 1         A.  Yes.  Yes.  That's correct.
 2         Q.  Or what's now called GDB?
 3         A.  Yes.
 4         Q.  You'll be happy to know I'm going to skip
 5    over a few exhibits.  Now, we talked a little bit
 6    about YK1.  Was there an initiative -- or is there
 7    an initiative to merge YK1 into CKGE?
 8         A.  Yeah.  There have been for a couple of
 9    years.  And the original integration is -- has been
10    sort of back-end stuff, accounts management or
11    logging.  Those have been thrown around as ideas.
12    At the current time even it's -- nothing's happened.
13    It's sort of operated as its own entity.  There's --
14    I don't think they've integrated anything.  But by
15    integration, as I said, that's starting off to be
16    sort of back-end stuff, accounts management,
17    bringing in the YK1 UI and seeing if it could be
18    part of the app.  That's where the home page is
19    where people go to when they first log in to the CKG
20    UI.  Those kinds of things.
21         Q.  As of now, as you said, I guess starting in
22    I think, according to my notes, starting in 2019 at
23    least, the YK1 was running ONgDB independently on
24    its own server and still is to this day.  Correct?
25         A.  Correct.  It's still is on its own sort of
```

204

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS  408-287-7500

1  environment.  And as far as I know, they're running

2  it on its own server or -- whatever they have it

3  installed on in YK1, those two prod and two dev

4  tests.

5       Q.  And has Mr. Suhy been involved in

6  supporting the ONgDB installations in the YK1

7  servers?

8       A.  Probably early on.  I would think yes.  The

9  way that it happened was there was a particular task

10  order to have some contractors help develop that YK1

11  database.  They were doing the work.  John Mark Suhy

12  may have consulted with them, helped them as part of

13  his eGov services.  But there was a -- there was a

14  separate group that stood up the first version, and

15  there's been separate people actually just updating

16  the data since then.

17       Q.  Okay.  As far as the YK1's version of

18  ONgDB, do they obtain that, the updates on the

19  software from the same source of CKG from the GitLab

20  that you mentioned?

21       A.  They would -- yeah, you would get it from

22  the same source here internally when it's brought

23  in.

24       Q.  So which would be brought in by Mr. Suhy,

25  then.

205

BELL & MYERS COURT REPORTERS AND LEGAL VIDEOGRAPHERS  408-287-7500

SER_1256

1       A.  Yes.  He's still the primary one.  Yes.

2       Q.  So he still has the primary responsibility

3   for maintaining the -- what was ONgDB and is now

4   GDB?

5       A.  Yes.  Or -- yes.

6       Q.  What contract is that under?

7       A.  It's still eGov.

8       Q.  The one we talked about earlier today?

9       A.  That's correct.  Yes.

10      Q.  Okay.  We've been going for I don't know

11  how long.  Want to take a quick five-minute break?

12  I think Shelley's saying yes.

13      A.  Okay.

14      Q.  I'm going to switch topics here, and I'm

15  actually getting closer to end here, which is good

16  news.  So I think it would be a good time to take a

17  break.  Also I noticed it's getting dark there on

18  the East Coast.  It's a little dark on the video.

19  So I don't know if you have another light you can

20  put on when we come back.

21      A.  Yeah.  Let me see what I can do.  I see

22  what you're saying.  Okay.  Yeah.  Let me see if I

23  can work on something.

24          MR. RATINOFF:  It's 2:37 now.  Let's come

25  back at 5:45.  Little longer than five minutes.

206

```
 1              THE WITNESS:  Okay.
 2              THE VIDEOGRAPHER:  We are now going off the
 3    video record.  The time is 2:37 p.m.
 4              (A recess was taken.)
 5              THE VIDEOGRAPHER:  We are now back on the
 6    video record.  The time is 2:56 p.m.
 7              (Previously marked Exhibit 149 is
 8    referenced.)
 9    BY MR. RATINOFF:
10       Q.  I just want to keep moving along here.  I
11    know it's late on your end.  I'm going to drop the
12    next document in the chat.  This is previously
13    marked as Exhibit 149.  It's an email produced by
14    the IRS.  The last email being I believe dated on
15    September 28th, 2019.  The subject is "ONgDB
16    deepwalk and new graph analytics library,
17    et cetera."  You'll see there's a Bates number 1292.
18    So I'll represent to you this is produced by the
19    IRS.  And do you believe this is a true and correct
20    copy produced by the IRS other than the exhibit
21    sticker on there?
22       A.  Yep.  No issue.
23       Q.  Okay.  Then taking a look at the email that
24    you sent in the beginning here, you'll see that it's
25    sent a whole host of folks.  It says, "Hi, The team
```

                                                    207

SER_1258