No. 24-5538

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____

NEO4J, INC., NEO4J SWEDEN AB,

*Plaintiffs-Appellees*,

v.

JOHN MARK SUHY,

*Defendant-Appellant.*

On Appeal from the United States District Court
For the Northern District of California
No. 5:18-cv-07182-EJD
Hon. Edward J. Davila

_____

## APPELLEES' EXCERPTS OF RECORD
## Volume 7 of 18

_____

John V. Picone III (State Bar No. 187226)
jpicone@spencerfane.com
Jeffrey M. Ratinoff (State Bar No. 197241)
jratinoff@spencerfane.com
Jeremy A. Moseley (MT Bar No. 44830177)
jmoseley@spencerfane.com

*Attorneys for Appellees*
Neo4j, Inc. and Neo4j Sweden AB

# EXHIBIT 57

SER_1550

**From:**      Sheila Duffy (sduffy@greystonesgroup.com)
**To:**        Delawder, Colleen M CTR USARMY NGIC (USA) colleen.m.delawder.ctr@mail.mil
**CC:**        Stinemire, Daniel J CTR USARMY NGIC (USA) daniel.j.stinemire.ctr@mail.mil, John Mark Suhy
               jmsuhy@igovsol.com, Navaneeth Muthu nmuthu@greystonesgroup.com
**BCC:**
**Subject:**   RE: Neo4j Followup : Introduction GreyStones Group
**Sent:**      08/05/2019 09:55:48 AM -0700 (PST)
**Attachments:** Greystones Capability Statement - 1 Page.pdf; Greystones SBIR 20May2019.pdf;

---

Hi Colleen, good to virtually meet you! Attached are some materials about
our capabilities and our SBIR contract vehicle that might be helpful. Our
customers are excited about the SBIR contract vehicle as it offers speed and
flexibility.

I had a brief conversation with John Mark, and we would welcome the
opportunity to discuss ONgDB, Hume, Neo4j, ATOs and/or how we might be able
to support. Our GreyRAVEN platform is based on ONgDB and incorporates the
functionality that Hume offers.

Very Respectfully,

Sheila

-----Original Message-----
From: John Mark Suhy
Sent: Monday, August 5, 2019 12:41 PM
To: Delawder, Colleen M CTR USARMY NGIC (USA)

Cc: Stinemire, Daniel J CTR USARMY NGIC (USA)
; Sheila Duffy
Subject: Neo4j Followup : Introduction GreyStones Group

It was nice meeting you and your team today. As promised, virtual
introduction to Sheila Duffy from GreyStones Group, a TS cleared EDWOSB.
Their website is: https://www.greystonesgroup.com/

Greystones Group has active contract vehicles with Army, just won a recent
SBIR contract vehicle that supports AI and Graph scope, and are working with
Neo4j / ONgDB open source distributions.

Your teams should talk ASAP because you may be working on similar
certifications and functionality around Neo4j.

I will send you another email with the links for the open source
distribution downloads by tomorrow morning.

Have a great day,

Respectfully,

John Mark Suhy
iGov Inc
jmsuhy@igovsol.com
703-862-7780
https://igovsol.com

On Fri, Aug 2, 2019 at 3:11 PM Delawder, Colleen M CTR USARMY NGIC
(USA) wrote:
>
> CLASSIFICATION: UNCLASSIFIED

IGOV0001573313.001

SER_1551

> CLASSIFICATION: UNCLASSIFIED
>
>
>
> John,
>
>
>
> Great, thanks! We look forward to talking to you Monday. Enjoy your
> weekend as well!
>
>
>
> Best,
>
> Colleen
>
>
>
> Colleen Delawder, CTR
>
> Lead Senior Systems Engineer
>
> NGIC Mission Systems Engineering (NMSE) II
>
> Phone: 434-951-1643
>
> NIPR: colleen.m.delawder.ctr@mail.mil
>
> SIPR: colleen.m.delawder.ctr@mail.smil.mil
>
> JWICS: frdelcm@army.ic.gov
>
>
>
> From: John Mark Suhy
> Sent: Friday, August 2, 2019 3:01 PM
> To: Delawder, Colleen M CTR USARMY NGIC (USA)
>
> Cc: Stinemire, Daniel J CTR USARMY NGIC (USA)
>
> Subject: Re: [Non-DoD Source] Re: Questions (UNCLASSIFIED)
>
>
>
> All active links contained in this email were disabled. Please verify the
> identity of the sender, and confirm the authenticity of all links
> contained within the message prior to copying and pasting the address to a
> Web browser.
>
> _____
>
>
>
> Monday at 11:30 works for me.
>
>
>
> I am free all Monday so it is ok if you need to make any last minute
> changes.
>
>
>
>

> The best number to reach me is my personal mobile :
>
>
>
> (571) 551-8935
>
>
>
> Have a good weekend ,
>
>
>
> John Mark Suhy
>
>
>
> On Fri, Aug 2, 2019 at 8:54 PM Delawder, Colleen M CTR USARMY NGIC (USA)
> > Caution- mailto:colleen.m.delawder.ctr@mail.mil > > wrote:
>
> CLASSIFICATION: UNCLASSIFIED
>
>
>
> Sorry, how about 11:30 instead?
>
>
>
> Colleen
>
>
>
> Colleen Delawder, CTR
>
> Lead Senior Systems Engineer
>
> NGIC Mission Systems Engineering (NMSE) II
>
> Phone: 434-951-1643
>
> NIPR: colleen.m.delawder.ctr@mail.mil <
> Caution- mailto:colleen.m.delawder.ctr@mail.mil >
>
> SIPR: colleen.m.delawder.ctr@mail.smil.mil <
> Caution- mailto:colleen.m.delawder.ctr@mail.smil.mil >
>
> JWICS: frdelcm@army.ic.gov < Caution- mailto:frdelcm@army.ic.gov >
>
>
>
> From: Delawder, Colleen M CTR USARMY NGIC (USA)
> Sent: Friday, August 2, 2019 2:51 PM
> To: 'John Mark Suhy' > Caution- mailto:jmsuhy@igovsol.com > >
> Cc: Stinemire, Daniel J CTR USARMY NGIC (USA)
> > Caution- mailto:daniel.j.stinemire.ctr@mail.mil > >
> Subject: RE: [Non-DoD Source] Re: Questions (UNCLASSIFIED)
>
>
>
> CLASSIFICATION: UNCLASSIFIED
>
>
>
>
> John

IGOV0001573313.003

SER_1553

> John,
>
>
>
> How about 10:00 on Monday? We can call you at your 703 number below.
>
>
>
> Best,
>
> Colleen
>
>
>
> Colleen Delawder, CTR
>
> Lead Senior Systems Engineer
>
> NGIC Mission Systems Engineering (NMSE) II
>
> Phone: 434-951-1643
>
> NIPR: colleen.m.delawder.ctr@mail.mil <
> Caution-mailto:colleen.m.delawder.ctr@mail.mil >
>
> SIPR: colleen.m.delawder.ctr@mail.smil.mil <
> Caution-mailto:colleen.m.delawder.ctr@mail.smil.mil >
>
> JWICS: frdelcm@army.ic.gov < Caution-mailto:frdelcm@army.ic.gov >
>
>
>
> From: John Mark Suhy > Caution-mailto:jmsuhy@igovsol.com > >
> Sent: Friday, August 2, 2019 2:32 PM
> To: Delawder, Colleen M CTR USARMY NGIC (USA)
> > Caution- mailto:colleen.m.delawder.ctr@mail.mil > >
> Cc: Stinemire, Daniel J CTR USARMY NGIC (USA)
> > Caution- mailto:daniel.j.stinemire.ctr@mail.mil > >
> Subject: Re: [Non-DoD Source] Re: Questions (UNCLASSIFIED)
>
>
>
> All active links contained in this email were disabled. Please verify the
> identity of the sender, and confirm the authenticity of all links
> contained within the message prior to copying and pasting the address to a
> Web browser.
>
> _____
>
>
>
> Sure,
>
>
>
> Let me know a time that works best for you.
>
>
>
> I am available anytime Monday.
>
>
>

> Have a good weekend,
>
>
>
> John Mark Suhy
>
>
>
>
>
>
>
> On Fri, Aug 2, 2019 at 8:24 PM Delawder, Colleen M CTR USARMY NGIC (USA)
> > Caution-mailto:colleen.m.delawder.ctr@mail.mil > <
> Caution-Caution-mailto:colleen.m.delawder.ctr@mail.mil <
> Caution-mailto:colleen.m.delawder.ctr@mail.mil > > wrote:
>
> CLASSIFICATION: UNCLASSIFIED
>
>
>
> John,
>
>
>
> No, he sure didn't mention a free Enterprise addition. Would we be able
> to talk to you Monday morning sometime?
>
>
>
> Best,
>
> Colleen
>
>
>
> Colleen Delawder, CTR
>
> Lead Senior Systems Engineer
>
> NGIC Mission Systems Engineering (NMSE) II
>
> Phone: 434-951-1643
>
> NIPR: colleen.m.delawder.ctr@mail.mil <
> Caution-mailto:colleen.m.delawder.ctr@mail.mil > <
> Caution-Caution-mailto:colleen.m.delawder.ctr@mail.mil <
> Caution-mailto:colleen.m.delawder.ctr@mail.mil > >
>
> SIPR: colleen.m.delawder.ctr@mail.smil.mil <
> Caution-mailto:colleen.m.delawder.ctr@mail.smil.mil > <
> Caution-Caution-mailto:colleen.m.delawder.ctr@mail.smil.mil <
> Caution-mailto:colleen.m.delawder.ctr@mail.smil.mil > >
>
> JWICS: frdelcm@army.ic.gov < Caution-mailto:frdelcm@army.ic.gov > <
> Caution-Caution-mailto:frdelcm@army.ic.gov <
> Caution-mailto:frdelcm@army.ic.gov > >
>
>
>
> From: John Mark Suhy > Caution-mailto:jmsuhy@igovsol.com > <
> Caution-Caution-mailto:jmsuhy@igovsol.com <
> Caution-mailto:jmsuhy@igovsol.com > >

IGOV0001573313.005

SER_1555

> Caution- mailto:jmsuny@igovsol.com > > >
> Sent: Friday, August 2, 2019 1:11 PM
> To: Delawder, Colleen M CTR USARMY NGIC (USA)
> > Caution- mailto:colleen.m.delawder.ctr@mail.mil > <
> Caution- Caution- mailto:colleen.m.delawder.ctr@mail.mil <
> Caution- mailto:colleen.m.delawder.ctr@mail.mil > > >
> Subject: Re: [Non-DoD Source] Re: Questions (UNCLASSIFIED)
>
>
>
> All active links contained in this email were disabled. Please verify the
> identity of the sender, and confirm the authenticity of all links
> contained within the message prior to copying and pasting the address to a
> Web browser.
>
> _____
>
>
>
> If you talked to a Neo4j employee it is highly unlikely that they
> mentioned that Neo4j and the Neo4j Enterprise fork: ONgDB (Open Native
> Graph Database) are free and open source and require no licenses in
> production if you don't want phone and email support from them directly.
>
>
>
> Neo4j Staff only sell Neo4j Commercial packages and forbid their vendors
> from discussing or promoting the open source licensed options - so you
> only learned about part of the options.
>
>
>
> If you are working on any support for brand justification then you will
> want to know all your options.
>
>
>
> I am happy to give you a quick update of all your options to help you make
> an informed decision , especially since you have free options that have no
> limits on cores, cluster options, etc.
>
>
>
> Have a good weekend,
>
>
>
> John Mark Suhy
>
>
>
>
>
>
>
>
>
>
>
>
> On Fri, Aug 2, 2019 at 5:55 PM Delawder, Colleen M CTR USARMY NGIC (USA)
> > Caution- mailto:colleen.m.delawder.ctr@mail.mil > <

> Caution-Caution-mailto:colleen.m.delawder.ctr@mail.mil <
> Caution-mailto:colleen.m.delawder.ctr@mail.mil > > <
> Caution-Caution-Caution-mailto:colleen.m.delawder.ctr@mail.mil <
> Caution-mailto:colleen.m.delawder.ctr@mail.mil > <
> Caution-Caution-mailto:colleen.m.delawder.ctr@mail.mil <
> Caution-mailto:colleen.m.delawder.ctr@mail.mil > > > wrote:
>
> CLASSIFICATION: UNCLASSIFIED
>
>
>
> John,
>
>
>
> I actually just got in contact with Gary Mann at Neo4j who was able to
> answer all my questions. Thanks, though, and enjoy your weekend!
>
>
>
> Best regards,
>
> Colleen
>
>
>
> Colleen Delawder, CTR
>
> Lead Senior Systems Engineer
>
> NGIC Mission Systems Engineering (NMSE) II
>
> Phone: 434-951-1643
>
> NIPR: colleen.m.delawder.ctr@mail.mil <
> Caution-mailto:colleen.m.delawder.ctr@mail.mil > <
> Caution-Caution-mailto:colleen.m.delawder.ctr@mail.mil <
> Caution-mailto:colleen.m.delawder.ctr@mail.mil > > <
> Caution-Caution-Caution-mailto:colleen.m.delawder.ctr@mail.mil <
> Caution-mailto:colleen.m.delawder.ctr@mail.mil > <
> Caution-Caution-mailto:colleen.m.delawder.ctr@mail.mil <
> Caution-mailto:colleen.m.delawder.ctr@mail.mil > > >
>
> SIPR: colleen.m.delawder.ctr@mail.smil.mil <
> Caution-mailto:colleen.m.delawder.ctr@mail.smil.mil > <
> Caution-Caution-mailto:colleen.m.delawder.ctr@mail.smil.mil <
> Caution-mailto:colleen.m.delawder.ctr@mail.smil.mil > > <
> Caution-Caution-Caution-mailto:colleen.m.delawder.ctr@mail.smil.mil <
> Caution-mailto:colleen.m.delawder.ctr@mail.smil.mil > <
> Caution-Caution-mailto:colleen.m.delawder.ctr@mail.smil.mil <
> Caution-mailto:colleen.m.delawder.ctr@mail.smil.mil > > >
>
> JWICS: frdelcm@army.ic.gov < Caution-mailto:frdelcm@army.ic.gov > <
> Caution-Caution-mailto:frdelcm@army.ic.gov <
> Caution-mailto:frdelcm@army.ic.gov > > <
> Caution-Caution-Caution-mailto:frdelcm@army.ic.gov <
> Caution-mailto:frdelcm@army.ic.gov > <
> Caution-Caution-mailto:frdelcm@army.ic.gov <
> Caution-mailto:frdelcm@army.ic.gov > > >
>
>
>

> From: John Mark Suhy > Caution-mailto:jmsuhy@igovsol.com > > <
> Caution-Caution- mailto:jmsuhy@igovsol.com > <
> Caution- mailto:jmsuhy@igovsol.com > > <
> Caution-Caution- Caution- mailto:jmsuhy@igovsol.com <
> Caution-mailto:jmsuhy@igovsol.com > < >
> Caution-Caution- mailto:jmsuhy@igovsol.com <
> Caution-mailto:jmsuhy@igovsol.com > > > >
> Sent: Friday, August 2, 2019 11:53 AM
> To: Delawder, Colleen M CTR USARMY NGIC (USA)
> > Caution-mailto:colleen.m.delawder.ctr@mail.mil > <
> Caution-Caution- mailto:colleen.m.delawder.ctr@mail.mil <
> Caution-mailto:colleen.m.delawder.ctr@mail.mil > > <
> Caution-Caution- Caution- mailto:colleen.m.delawder.ctr@mail.mil <
> Caution-mailto:colleen.m.delawder.ctr@mail.mil > <
> Caution- mailto:colleen.m.delawder.ctr@mail.mil <
> Caution-mailto:colleen.m.delawder.ctr@mail.mil > > > >
> Subject: [Non-DoD Source] Re: Questions (UNCLASSIFIED)
>
>
>
> All active links contained in this email were disabled. Please verify the
> identity of the sender, and confirm the authenticity of all links
> contained within the message prior to copying and pasting the address to a
> Web browser.
>
> _____
>
>
>
> Hello Colleen,
>
>
>
> I can try giving you a call after 4 PM EST today. If I can't reach you
> then , I can try again Monday.
>
>
>
> Thank you,
>
>
>
> John Mark Suhy
>
> iGov Inc
>
> 703-862-7780
>
> jmsuhy@igovsol.com < Caution-mailto:jmsuhy@igovsol.com > <
> Caution-Caution- mailto:jmsuhy@igovsol.com <
> Caution- mailto:jmsuhy@igovsol.com > > <
> Caution-Caution- Caution- mailto:jmsuhy@igovsol.com <
> Caution-mailto:jmsuhy@igovsol.com > < >
> Caution-Caution- mailto:jmsuhy@igovsol.com <
> Caution-mailto:jmsuhy@igovsol.com > > > <
> Caution-Caution- Caution- Caution- mailto:jmsuhy@igovsol.com <
> Caution-mailto:jmsuhy@igovsol.com > <
> Caution- Caution- mailto:jmsuhy@igovsol.com <
> Caution-mailto:jmsuhy@igovsol.com > > <
> Caution- Caution- Caution- mailto:jmsuhy@igovsol.com <
> Caution-mailto:jmsuhy@igovsol.com > <
> Caution-Caution- mailto:jmsuhy@igovsol.com <
> Caution-mailto:jmsuhy@igovsol.com > > > >

IGOV0001573313.008

SER_1558

> Caution-Caution-Caution-Caution-https://igovsol.com <
> Caution-https://igovsol.com > > < Caution-Caution-https://igovsol.com <
> Caution-https://igovsol.com > > <
> Caution-Caution-Caution-https://igovsol.com <
> Caution-https://igovsol.com > > < Caution-Caution-https://igovsol.com <
> Caution-https://igovsol.com > > > <
> Caution-Caution-Caution-Caution-https://igovsol.com <
> Caution-https://igovsol.com > > < Caution-Caution-https://igovsol.com <
> Caution-https://igovsol.com > > <
> Caution-Caution-Caution-https://igovsol.com <
> Caution-https://igovsol.com > > < Caution-Caution-https://igovsol.com <
> Caution-https://igovsol.com > > > >
>
>
>
> On Fri, Aug 2, 2019, 4:22 PM Delawder, Colleen M CTR USARMY NGIC (USA)
> > Caution-mailto:colleen.m.delawder.ctr@mail.mil > <
> Caution-Caution-mailto:colleen.m.delawder.ctr@mail.mil > > <
> Caution-Caution-Caution-mailto:colleen.m.delawder.ctr@mail.mil <
> Caution-mailto:colleen.m.delawder.ctr@mail.mil > <
> Caution-Caution-mailto:colleen.m.delawder.ctr@mail.mil <
> Caution-mailto:colleen.m.delawder.ctr@mail.mil > > > <
> Caution-Caution-Caution- mailto:colleen.m.delawder.ctr@mail.mil <
> Caution-mailto:colleen.m.delawder.ctr@mail.mil > <
> Caution-Caution-mailto:colleen.m.delawder.ctr@mail.mil <
> Caution-mailto:colleen.m.delawder.ctr@mail.mil > > <
> Caution-Caution-Caution- mailto:colleen.m.delawder.ctr@mail.mil <
> Caution-mailto:colleen.m.delawder.ctr@mail.mil > <
> Caution-Caution-mailto:colleen.m.delawder.ctr@mail.mil <
> Caution-mailto:colleen.m.delawder.ctr@mail.mil > > > > > wrote:
>
> CLASSIFICATION: UNCLASSIFIED
>
> Sir/Ma'am,
>
> Good morning! I received your email address from Mr. David Waugh who has
> been in contact with you concerning Neo4j. I am trying to gather
> information and answer some questions about Neo4j as well. Could you
> please give me a call at 434-951-1643 at your convenience?
>
> Thank you,
>
> Colleen
>
> Colleen Delawder, CTR
> Lead Senior Systems Engineer
> NGIC Mission Systems Engineering (NMSE) II
> Phone: 434-951-1643
> NIPR: colleen.m.delawder.ctr@mail.mil <
> Caution-mailto:colleen.m.delawder.ctr@mail.mil > <
> Caution-Caution-mailto:colleen.m.delawder.ctr@mail.mil <
> Caution-mailto:colleen.m.delawder.ctr@mail.mil > > <
> Caution-Caution-Caution-mailto:colleen.m.delawder.ctr@mail.mil <
> Caution-mailto:colleen.m.delawder.ctr@mail.mil > <
> Caution-Caution-mailto:colleen.m.delawder.ctr@mail.mil <
> Caution-mailto:colleen.m.delawder.ctr@mail.mil > > > <
> Caution-Caution-Caution-Caution-mailto:colleen.m.delawder.ctr@mail.mil
> < Caution-mailto:colleen.m.delawder.ctr@mail.mil > <
> Caution-Caution-mailto:colleen.m.delawder.ctr@mail.mil <
> Caution-mailto:colleen.m.delawder.ctr@mail.mil > > <

```
> Caution-Caution-Caution-mailto:colleen.m.delawder.ctr@mail.mil <
> Caution-mailto:colleen.m.delawder.ctr@mail.mil > <
> Caution-Caution- mailto:colleen.m.delawder.ctr@mail.mil <
> Caution-mailto:colleen.m.delawder.ctr@mail.mil > > >
> SIPR: colleen.m.delawder.ctr@mail.smil.mil <
> Caution-mailto:colleen.m.delawder.ctr@mail.smil.mil > <
> Caution-mailto:colleen.m.delawder.ctr@mail.smil.mil <
> Caution-mailto:colleen.m.delawder.ctr@mail.smil.mil > > <
> Caution-Caution- Caution- mailto:colleen.m.delawder.ctr@mail.smil.mil <
> Caution-mailto:colleen.m.delawder.ctr@mail.smil.mil > <
> Caution-Caution-mailto:colleen.m.delawder.ctr@mail.smil.mil <
> Caution-mailto:colleen.m.delawder.ctr@mail.smil.mil > > > <
> Caution-Caution- Caution- Caution- mailto:colleen.m.delawder.ctr@mail.smi
l.mil < Caution-mailto:colleen.m.delawder.ctr@mail.smil.mil > <
> Caution-mailto:colleen.m.delawder.ctr@mail.smil.mil <
> Caution-mailto:colleen.m.delawder.ctr@mail.smil.mil > > <
> Caution-Caution-mailto:colleen.m.delawder.ctr@mail.smil.mil <
> Caution-mailto:colleen.m.delawder.ctr@mail.smil.mil > <
> Caution-Caution-mailto:colleen.m.delawder.ctr@mail.smil.mil <
> Caution-mailto:colleen.m.delawder.ctr@mail.smil.mil > > > >
> JWICS: frdelcm@army.ic.gov < Caution-mailto:frdelcm@army.ic.gov > <
> Caution-mailto:frdelcm@army.ic.gov <
> Caution-mailto:frdelcm@army.ic.gov > > <
> Caution-Caution- Caution- mailto:frdelcm@army.ic.gov <
> Caution-mailto:frdelcm@army.ic.gov > <
> Caution-Caution- mailto:frdelcm@army.ic.gov <
> Caution-mailto:frdelcm@army.ic.gov > > <
> Caution-Caution- Caution- Caution- mailto:frdelcm@army.ic.gov <
> Caution-mailto:frdelcm@army.ic.gov > <
> Caution-Caution-mailto:frdelcm@army.ic.gov <
> Caution-mailto:frdelcm@army.ic.gov > > <
> Caution-Caution- Caution- mailto:frdelcm@army.ic.gov <
> Caution-mailto:frdelcm@army.ic.gov > <
> Caution-mailto:frdelcm@army.ic.gov <
> Caution-mailto:frdelcm@army.ic.gov > > > >
>
>
>
> CLASSIFICATION: UNCLASSIFIED
>
>
>
>
>
> CLASSIFICATION: UNCLASSIFIED
>
> --
>
> John Mark Suhy
>
> iGov Inc
>
> jmsuhy@igovsol.com < Caution-mailto:jmsuhy@igovsol.com > <
> Caution-Caution-mailto:jmsuhy@igovsol.com <
> Caution-mailto:jmsuhy@igovsol.com > > <
> Caution-Caution- Caution- mailto:jmsuhy@igovsol.com <
> Caution-mailto:jmsuhy@igovsol.com > <
> Caution-Caution-mailto:jmsuhy@igovsol.com <
> Caution-mailto:jmsuhy@igovsol.com > > >
>
> 703-862-7780
>
```

> Caution-Caution-Caution-https://igovsol.com <
> Caution-https://igovsol.com > < Caution-Caution-https://igovsol.com <
> Caution-https://igovsol.com > > <
> Caution-Caution-Caution-https://igovsol.com <
> Caution-https://igovsol.com > < Caution-Caution-https://igovsol.com <
> Caution-https://igovsol.com > > >
>
>
>
>
> CLASSIFICATION: UNCLASSIFIED
>
> --
>
> John Mark Suhy
>
> iGov Inc
>
> jmsuhy@igovsol.com < Caution-mailto:jmsuhy@igovsol.com > <
> Caution-Caution-mailto:jmsuhy@igovsol.com <
> Caution-mailto:jmsuhy@igovsol.com > >
>
> 703-862-7780
>
> Caution-Caution-https://igovsol.com < Caution-https://igovsol.com > <
> Caution-Caution-https://igovsol.com < Caution-https://igovsol.com > >
>
>
>
>
> CLASSIFICATION: UNCLASSIFIED
>
>
>
>
>
> CLASSIFICATION: UNCLASSIFIED
>
> --
>
> John Mark Suhy
>
> iGov Inc
>
> jmsuhy@igovsol.com < Caution-mailto:jmsuhy@igovsol.com >
>
> 703-862-7780
>
> Caution-https://igovsol.com < Caution-https://igovsol.com >
>
>
>
>
> CLASSIFICATION: UNCLASSIFIED

# EXHIBIT 58

SER_1562

Data Analytics and Decision Support | Greystones Group



HOME    ABOUT US    **SOLUTIONS**    CONTRACT VEHICLES    CAREERS    NEWS & MEDIA

# Data Analytics and Decision Support

| SOLUTIONS |
| --- |
| **Data Analytics and Decision Support** |
| Cybersecurity & Electronic Warfare |
| Information Technology Solutions |
| Mission Planning and Operational Support |
| Leader Development and Education |

**Start your Career with Greystones!**

Browse available positions and submit your resume, quick and easy



**Transforming Massive Data Sets into Actionable Intelligence with AI/ML/NLP**

GreyRAVEN© is a highly customizable TRL 9 COTS based open architecture AI platform based on Graph Model-Open Native Graph Database (ONgDB) that ingests, fuses and provides visualization and search capability for large data sets including unstructured message traffic, structured identity data, link charts, spreadsheets, telephony, documents, network data, sensor data—even full motion video. Searches are intuitive, without the need for a specialized query language.

The platform is currently deployed at the US Air Force,  US Department of Treasury and Defense Logistics Agency as well as globally at multiple Fortune 500 companies to support real time decision making. The platform is based on microservices architecture, components are software defined, can be deployed on premises and/or cloud. The platform is adaptive, resilient, and highly scalable and rapidly manages and disseminates highly-connected text, image and sensor data and complex queries. Benefits include resiliency, flexibility for evolving data structures, faster processing speed, and AI enhanced decision making. The platform is currently globally deployed and supports 1B + notes and edges, 1M+ edge densities, 1B+ writes/day and 100+ instance clusters.

## Performance Highlights

• Platform recognized by AFCEA as "The future architecture for big data" by AFCEA as "The future architecture for big data"
• Awarded Small Business Innovative Research (SBIR) Phase 2
• Finalist for the AF Multi Domain Operations Challenge
• Selected to exhibit at SOFWERX Data Engineering Lab Opening Event
• Selected as finalist for CYBERCOM Challenge
• Selected as 1 of 18 companies worldwide to exhibit at the SOFIC Ignite Platform

## GreyRaven Benefits

- Optimized for Interoperability
- Supports Rapid Operationalization of Capabilities
- Open Architecture



SER_1563



SER_1564

# EXHIBIT 59

SER_1565

Case 5:18-cv-07182-EJD    Document 183-60    Filed 04/30/23    Page 2 of 3



The Wayback Machine - https://web.archive.org/web/20210301122004/https://greystonesgroup.com/greystones-group-awarded-small-business-innovative-research-sbir-contract/

## GREYSTONES

HOME   ABOUT US   SOLUTIONS   CONTRACT VEHICLES   CAREERS   NEWS & MEDIA

# Greystones Group Awarded Small Business Innovative Research (SBIR) Contract

MARCH 6, 2019   |   GREYSTONESGROUP   |   NEWS RELEASE



**Washington, D.C.** – Greystones Group, the D.C. based professional Consulting, Information Technology and Engineering firm was awarded a competitive contract by Air Force Research Labs for GreyRAVEN©, a proven Commercial Off the Shelf (COTS) big data analytics managed services platform, to provide data analytics support and cloud migration services.  GreyRAVEN is a TRL 9 COTS based open architecture AI platform based on Graph Model-Open Native Graph Database (ONgDB) that ingests, fuses and provides visualization of large data sets. It has been deployed at multiple locations since 2013, including US Department of Treasury, Defense Logistics Agency and globally at multiple Fortune 500 companies to support real time decision making. The platform is based on microservices architecture, components are software defined, can be deployed on premises and/or cloud. The platform is adaptive, resilient, and highly scalable and rapidly manages and disseminates highly-connected text, image and sensor data and complex queries. Benefits include resiliency, flexibility for evolving data structures, faster processing speed, and AI enhanced decision making. The platform is currently globally deployed and supports 1B+ notes and edges, 1M+ edge densities, 1B+ writes/day and 100+ instance clusters.

Facebook    Twitter    Google+    LinkedIn    E-Mail

### Recent Posts

Mike Murphy joins Greystones Group as Chief Operating Officer

Greystones Group and Peake Awarded Admiral Gooding Center Support Contract

Greystones Group Announces Award of a Phase II Small Business Innovation Research (SBIR) contract

Greystones Group Selected to Exhibit at Ignite/SOFIC

Greystones Group Selected to Exhibit at Pioneering SOFWERX Data Engineering Lab Opening Event

### Archives

August 2020
June 2020
March 2020
September 2019
August 2019
June 2019
March 2019
September 2018
November 2017
August 2017
July 2017
April 2017
March 2017
November 2016

**Start your Career with Greystones!** Browse available positions and submit your resume, quick and easy

SER_1566

Case 5:18-cv-07182-EJD     Document 183-60     Filed 04/20/23     Page 3 of 3

© COPYRIGHT 2017 GREYSTONES. ALL RIGHTS RESERVED.     PRIVACY POLICY  •  TERMS AND CONDITIONS  •  CONTACT US

FACEBOOK   TWITTER   LINKEDIN   SITE DESIGN BY ACS CREATIVE

SER_1567

# EXHIBIT 60

SER_1568



HOME   ABOUT US   SOLUTIONS   CONTRACT VEHICLES   CAREERS   NEWS & MEDIA

## Recent Posts

Mike Murphy joins Greystones Group as Chief Operating Officer

Greystones Group and Peake Awarded Admiral Gooding Center Support Contract

Greystones Group Announces Award of a Phase II Small Business Innovation Research (SBIR) contract

Greystones Group Selected to Exhibit at Ignite/SOFIC

Greystones Group Selected to Exhibit at Pioneering SOFWERX Data Engineering Lab Opening Event

## Archives

August 2020

June 2020

March 2020

September 2019

August 2019

June 2019

March 2019

September 2018

November 2017

August 2017

July 2017

April 2017

March 2017

November 2016

**Start your Career with Greystones!**

Browse available positions and submit your resume, quick and easy

# Greystones Group Announces Award of a Phase II Small Business Innovation Research (SBIR) contract

JUNE 10, 2020   |   GREYSTONESGROUP   |   GREYSTONES UPDATE, NEWS RELEASE

Under the 1-year contract sponsored by Air Force Research Labs (AFRL), Greystones will deliver real-time, AI/ML/NLP-based analysis of Multi-Domain data to the AF, DoD & Allied Forces using GreyRAVEN© – a TRL 9, COTS-based collaboration platform providing real-time analysis and decision support via Knowledge Graph-driven AI, deep learning neural networks and Natural Language Processing technologies. The open architecture platform is optimized for scalability, interoperability with legacy infrastructure/systems and the rapid operationalization of mission solutions – at the tactical edge and enterprise level – generating AI/ML-derived actionable insights in days versus months/years. The platform includes thousands of highly customizable data sources (including all major social media venues), algorithms, applications and user interface templates and is currently globally deployed and supports 1B+ notes and edges, 1M+ edge densities, 1B+ writes/day and 100+ instance clusters.

The GreyRAVEN architecture is recognized by AFCEA as the "Big Data architecture of the future," and GreyRAVEN was selected as finalist for both the AF Multi-Domain Operations Challenge and CYBERCOM Challenge and selected to exhibit at the SOFWERX Data Engineering Lab opening event.   "Our people and technology are highly sought after around the world to solve the difficult AI/ML challenges and we are excited to expand this expertise within the DoD", said Sheila Duffy, Greystones Group CEO and Founder.  "Given the logarithmic increase in speed and volume of data collection, DoD recognizes the value and critical importance of proven technology that can integrate and adapt quickly, cost-effectively and securely with existing DoD infrastructure."

Greystones Group is a TS Cleared EDWOSB, proudly supporting IC, DoD & Civilian agency clients since 2000.

f Facebook    ✗ Twitter    G+ Google+    in LinkedIn    ✉ E-Mail

SER_1569

Case 5:18-cv-07182-EJD    Document 183-61    Filed 04/20/23    Page 3 of 3

# GREYSTONES

HOME    ABOUT US    SOLUTIONS    CONTRACT VEHICLES    CAREERS    NEWS & MEDIA

FACEBOOK    TWITTER    LINKEDIN    SITE DESIGN BY ACS CREATIVE



‹    ›

SER_1570

# EXHIBIT 61

SER_1571

**From:**    Diane Griffith(/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients
/cn=dfc2720e2fca40879270e967fa9ea97d-Diane Griff)
**To:**    Seth Cooper; Shahak Nagiel
**CC:**    Sean Graff; Rebecca Butterfield
**BCC:**
**Subject:**    Neo4j GSA pricing information links
**Sent:**    10/01/2018 08:55:06 AM -0700 (PST)
**Attachments:**

---

I did not talk to Neo4j. I used GSA pricing I was able to find published already for intro to their pricing. Neo4j prices by instance and cores but has bundles.

Where I found the GSA pricing link was off of a blog entry by iGov Solutions:
https://blog.igovsol.com/2018/01/10/Neo4j-Commercial-Prices.html

It links to the GSA pricing that is available:
https://drive.google.com/file/d/0B7w76NCg0bmVd2dpcU5ITjBsQWs/view

And iGov publishes some information of their packaging and general comparision chart on this page for Neo4j:
https://igovsol.com/neo4j.html

Again nothing was downloaded and imported on this product either.

iGov maintains a site and mirror as well as an amazon mirror to give access to Neo4j Enterprise at open source level vs the bundles that give you community licensing. They have information available on this at their website:
https://graphstack.io/

Just sharing source of that pricing information.

Diane



Witness:
Jim Weyant 30(b)(6)

**EX 43**

9/16/2022 B. Gerald

CONFIDENTIAL

CACI00005178

# EXHIBIT 62

**From:**      Diane Griffith(/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients
/cn=dfc2720e2fca40879270e967fa9ea97d-Diane Griff)
**To:**        Shahak Nagiel
**CC:**        Peter Loats; Jim Mantheiy
**BCC:**
**Subject:**   Re: Neo4j licensing
**Sent:**      10/17/2018 01:13:42 AM -0700 (PST)
**Attachments:**

Witness:
Jim Weyant 30(b)(6)
**EX 44**
9/16/2022 B. Gerald

Up front, some reasons why we may need the neo4j distro that has a license giving access to the neo4j enterprise features (so neo4j ccommercial license or the enterprise free bundle from iGov/GraphStack), can be found here but reasons that apply include:
- Casual clustering
- HA availability
- IntraCluster Encryption to secure traffic between nodes/datacenters
- Unlock number of cores allowed
- Claims cypher performance increases
- Potential of some of the property level constraints and security abilities if we can find the right hook

Specifically on iGov/GraphStacK, why did I think we needed to pay them if we wanted to use Neo4j and get the enterprise features? It has to do with the blog that explains what iGov bundles and makes available and what Neo4j did to sort of hide the enterprise edition which you can read here, but snippet that explained we still needed one more piece beyond the download from GraphStack is:

"Right now the only difference between the paid Neo4j Enterprise (commercial) binary and Neo4j Enterprise (open source) binary (we compile from source) is that intra-cluster encryption is still off by default in the AGPLv3 version.

We turn it back on for our federal customers via a new component in our FISMA framework, which will be available on github for everyone to use soon."
This lead me to believe FISMA bundling (not the 508 toolkit) is what gives us the casual clustering and/or encryption features back. I believe this is important and wanted to guarantee the encryption between nodes versus some more complex ssh tunneling needs between nodes. When I talked about this in the one standup Chris Stepntiz even said that would be important given the tunneling they had to do between elastic nodes. I believe the SSP and even all the securing requirements would dictate that some sort of encryption be necessary if clustered and we would have a need for clustering in the architecture.
I haven't found their FISMA piece yet (i.e. that blog said which will be available on github for everyone to use soon). I am waiting on information back from iGov on their pricing structure and to verify that is how one gets the encrpyption back. I need to verify we still have access to the HA features. There are scenarios that describe if one would want to use casual clustering or HA clusters:
https://www.1and1.com/cloud-community/use/database/neo4j/use-case-neo4j-causal-vs-high-availability-cluster/
And some applicable documentation parts from Neo4j may include:
https://neo4j.com/docs/operations-manual/current/clustering/introduction/
https://neo4j.com/docs/operations-manual/current/clustering/multi-data-center/design/
Do does that help clean up the whole FISMA thing, what I think may be important features for Neo4j and some complexities to their bundling that Is going on?
It is really unclear to me if any other features disappear from a non commercial but still enterprise bundle of neo4j (like the cypher query increases). I want to say no but I was trying to get clarification from iGov on that too.
But yes with commercial Neo4j license one for sure gets the enterprise features, gets access to Neo4j Desktop with real license and Neo4j bloom (unclear if one activation key would unlock bloom and desktop for all developers on the high side, etc), but then have to deal with how many cores are paid for, now many instances, etc.
Diane
(Side note, I installed the iGov/GraphStack enterprise bundle on karmasoul servers but I think the ad hoc queries were done against maybe a commercial license neo4j on one of our laptops vs enterprise version. I can confirm this if you want

CACI00004994

and we can decide if the queries get run against the karmasoul servers)

From: Shahak Nagiel <shahak.nagiel@nextcentury.com>
Date: Tuesday, October 16, 2018 at 10:38 PM
To: Diane Griffith <diane.griffith@nextcentury.com>
Cc: Peter Loats <peter.loats@nextcentury.com>, Jim Mantheiy <jim.mantheiy@nextcentury.com>
Subject: Neo4j licensing

Diane,

From what I can gather via GraphStack, all the capabilities of Neo4j Enterprise are available under the AGPL 3.0 FOSS license, right?

The iGov page seems to reference the $25k+ (one time, not annual) "development package" they offer for government customers, but they do not appear to be a licensed Neo4j distributor/reseller; they are simply offering the open-sourced (AGPLv3) software and bundling some of their own consulting services and utilities on top, as far as I can tell? Maybe this would be worthwhile...but maybe not? It's not clear what the "+" means in $25k+ (what is that based on?), and how long the consulting services are good for? (Or if they're even worthwhile?)

As for the FISMA and 508 compliant stuff they mention...

(a) I'm not sure whether it's really necessary (FISMA I've never heard of as a requirement in our work, and 508 only applies to UI tools to my knowledge), and
(b) these aren't any Neo4j capabilities they're unlocking; they simply appear to be some iGov consulting or utilities specifically aimed at satisfying these regulations somehow.

So...about the only things that a commercial license subscription from Neo4j seems to really buy are:

(a) professional services, and

(b) the Desktop set of tools (including Bloom)...which are cool but hardly critical, IMHO.

Am I missing anything?



**Shahak Nagiel**
Principal Engineer
w (240) 297-5089 | c (413) 274-2425
shahak.nagiel@nextcentury.com



2701 Technology Drive, Suite 300 | Annapolis Junction, MD 20701
main: 443.545.3100 | fax: 240.456.0010 | www.nextcentury.com



CONFIDENTIALITY NOTICE: This message is intended only for the use of the individual or to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the intended recipient, or the employee or agent responsible for the intended recipient, please be advised that any disclosure, copying, distribution, or taking of action based on the contents of this message is prohibited. If you have received this transmission in error, please notify the sender immediately.

CONFIDENTIAL

# EXHIBIT 63

SER_1576

**From:**        John Mark Suhy(jmsuhy@igovsol.com)
**To:**          Shahak Nagiel
**CC:**          Diane Griffith
**BCC:**
**Subject:**     Re: Neo4j licensing
**Sent:**        10/22/2018 06:50:27 PM -0700 (PST)
**Attachments:**

Witness:
Jim Weyant 30(b)(6)
**EX 45**
9/16/2022 B. Gerald

Good evening,

The 'closed source components' referenced actually do have the related source code in the git repositories. Neo4j Inc removed the code from the current branches but they were still in the history.

We actually package these feature's source code back into the open source distributions. Turning features such as causal clustering encryption back on.
See: https://github.com/GraphFoundation/neo4j-oe
Also, you can read the following post to understand more about what they have done.
See: https://blog.igovsol.com/2017/11/14/Neo4j-330-is-out-but-where-are-the-open-source-enterprise-binaries.html

These are just some of the reasons brand name justification for Neo4j Enterprise commercial packages is hard to support. Not to mention the US Treasury has now adopted ONgDB Enterprise - which is the same code base, with just a different name and removal of the commons clause.

Even more, a side by side comparison of the commercial and open source enterprise distributions don't give an advantage from a technical perspective to the commercial side because they have the same feature parity as they come from the same core code base.

In fact the open source distributions have no limits on the number of cluster instances, cores, etc - not to mention they are 100% free.

Usually which one you go with falls to the cost of production support. From a past performance perspective, the open source distributions are actually in production in the Federal government and there are companies such as us , AtomRain, GraphGrid, etc all have past performance providing production support for federal agencies for Neo4j Enterprise open source licenses.

One thing you will find in your research is that Neo4j partners are not allowed to promote or support the open source licenses, and furthermore , Neo4j Inc usually assigns a single partner to a specific deal, so from the commercial perspective, you actually have less options.

I would be happy to connect you with the US Treasury team we work with who are some of the original teams who moved to the open source enterprise distributions of Neo4j. They have met with other agencies in the past to share their experience.

Feel free to call me anytime if you have more questions.


John Mark Suhy
iGov Inc
jmsuhy@igovsol.com
703-862-7780
https://igovsol.com


On Mon, Oct 22, 2018 at 8:50 PM Shahak Nagiel <shahak.nagiel@nextcentury.com> wrote:

CONFIDENTIAL

Hi John,

I am trying to better understand the licensing nuances of Neo4j Enterprise Edition, and came across some posts you made on StackOverflow.

Neo4j's github repo includes this at the bottom in the License section (emphasis mine):

> Neo4j Enterprise consists of modules from Neo4j Community Edition and modules licensed under AGPLv3 with the Commons Clause in this repository, and other closed source components not present in this repository.
>
> When packaged as a binary, Enterprise Edition includes additional closed-source components *not available in this repository* and requires a commercial license from Neo4j Sweden AB or one of its affiliates.

I'm curious whether you're familiar with what this means (i.e. what's excluded), especially given that one of the sub-modules seems to be the Enterprise bundle?



**Shahak Nagiel**
Principal Engineer
w (240) 297-5089 | c (413) 274-2425

shahak.nagiel@nextcentury.com

   

2701 Technology Drive, Suite 300 | Annapolis Junction, MD 20701
main: 443.545.3100 | fax: 240.456.0010 | www.nextcentury.com

CONFIDENTIALITY NOTICE: This message is intended only for the use of the individual or to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the intended recipient, or the employee or agent responsible to the intended recipient, please be advised that any disclosure, copying, distribution, or taking of action based on the contents of this message is prohibited. If you have received this transmission in error, please notify the sender immediately.

CACI00004967
**SER_1578**

# EXHIBIT 64

**Witness:**
Jim Weyant 30(b)(6)
**EX 47**
9/16/2022 B. Gerald

| | |
|---|---|
| **From:** | John Mark Suhy(jmsuhy@igovsol.com) |
| **To:** | Shahak Nagiel |
| **CC:** | |
| **BCC:** | |
| **Subject:** | Re: Neo4j licensing |
| **Sent:** | 01/04/2019 05:54:54 AM -0800 (PST) |
| **Attachments:** | |

Good afternoon and Happy New year to you as well.

We jumped right to ONgDB 3.5.1 and it is in testing right now.

Everything is looking good so far.

I am meeting with the team Monday and should have a release date then.

This first 3.5 release took longer than normal minor release versions. We merged all the enterprise code base back into the fork now (instead of maintaining it as a seperate module) now that Neo4j has gone closed around enterprise.

We aim at having minor releases ready after Neo4j tags the release in their repo.

Feel free to reach out anytime.

We have a public slack group setup as well, which we will announce soon.

Thank you,

John Mark


On Wed, Jan 2, 2019, 11:08 AM Shahak Nagiel <shahak.nagiel@nextcentury.com wrote:
> Hi John. Happy New Year.
>
> Any idea when the 3.5.0 release of ONgDB is expected?



**Shahak Nagiel**
Principal Engineer
w (240) 297-5089 | c (413) 274-2425
shahak.nagiel@nextcentury.com



2701 Technology Drive, Suite 300 | Annapolis Junction, MD 20701
main: 443.545.3100 | fax: 240.456.0010 | www.nextcentury.com

   

CONFIDENTIALITY NOTICE: This message is intended only for the use of the individual or to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the intended recipient, or the employee or agent responsible to the intended recipient, please be advised that any disclosure, copying, distribution, or taking of action based on the contents of this message is prohibited. If you have received this transmission in error, please notify the sender immediately.

CONFIDENTIAL

From: John Mark Suhy <jmsuhy@igovsol.com>
Sent: Monday, October 29, 2018 10:01 AM
To: Shahak Nagiel
Subject: Re: Neo4j licensing

There are now 7 companies who are sponsoring the Graph Foundation , and a growing team of people who are going to start helping manage the distribution process.

If or when Neo4j Inc takes Neo4j closed source, or starts adding a large number of proprietary add-ons, then the foundation has a team of paid, and open source contributors who will be ensuring feature parity across ONgDB and Neo4j.

The goal of the Graph Foundation is to ensure that this technology stays free and open. It sets up an Apache style governance model with the goal of ensuring no single company or person has control over it.

If your company would like to be involved in the foundation, let me know and I can connect you with the appropriate contact at the foundation.

My company helps manage the distributions right now while the Foundation elects the new distribution team for 2019. We also donated our neo4j-oe project to the foundation.

Here are the most current sponsors of the foundation. https://www.graphfoundation.org/support/thanks/

Thanks,

John Mark

John Mark Suhy
iGov Inc
jmsuhy@igovsol.com
703-862-7780
https://igovsol.com


On Sat, Oct 27, 2018 at 5:38 PM Shahak Nagiel <shahak.nagiel@nextcentury.com> wrote:
  Thanks, John.

  Out of curiosity: How many partners/contributors are involved with ONgDB?



  **Shahak Nagiel**
  Principal Engineer
  w (240) 297-5089 | c (413) 274-2425
  shahak.nagiel@nextcentury.com

  2701 Technology Drive, Suite 300 | Annapolis Junction, MD 20701
  main: 443.545.3100 | fax: 240.456.0010 | www.nextcentury.com

CONFIDENTIAL

   

CONFIDENTIALITY NOTICE: This message is intended only for the use of the individual or to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the intended recipient, or the employee or agent responsible for the intended recipient, please be advised that any disclosure, copying, distribution, or taking of action based on the contents of this message is prohibited. If you have received this transmission in error, please notify the sender immediately.

From: John Mark Suhy <jmsuhy@igovsol.com>
Sent: Friday, October 26, 2018 8:48:30 PM
To: Shahak Nagiel
Cc: Diane Griffith
Subject: Re: Neo4j licensing

Good evening,

Yes, the open source enterprise distributions we package have the this feature. (ONgDB does as well)

Simply set the property to true and the features are enabled.

Have a good evening.


John Mark Suhy


On Fri, Oct 26, 2018 at 3:05 PM Shahak Nagiel <shahak.nagiel@nextcentury.com> wrote:

Hi John,

Can you comment on the iGov-packaged enterprise distribution specifically with respect to multi-data centers? As stated:

> In order to confirm that you are operating under a suitable license, you must explicitly set the following in neo4j.conf:
>
> `causal_clustering.multi_dc_license=true`
>
> Without this configuration all of the multi-data center features will remain disabled.

Have you verified this works without the commercial license?



**Shahak Nagiel**
Principal Engineer
w (240) 297-5089 | c (413) 274-2425
shahak.nagiel@nextcentury.com


CACI00003834
SER_1582

[2701 Technology Drive, Suite 300](#) | [Annapolis Junction, MD 20701](#)
main: 443.545.3100 | fax: 240.456.0010 | [www.nextcentury.com](#)

   

CONFIDENTIALITY NOTICE: This message is intended only for the use of the individual or to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the intended recipient, or the employee or agent responsible to the intended recipient, please be advised that any disclosure, copying, distribution, or taking of action based on the contents of this message is prohibited. If you have received this transmission in error, please notify the sender immediately.

From: John Mark Suhy <[jmsuhy@igovsol.com](mailto:jmsuhy@igovsol.com)>
Sent: Monday, October 22, 2018 10:10 PM

To: Shahak Nagiel
Cc: Diane Griffith
Subject: Re: Neo4j licensing

If they are planning on adding many more proprietary components , then I would suspect it would have to be in future releases such as 3.5 and beyond in the roadmap.
Not in the 3.4.x versions which are incredibly powerful.

There is actually a team in place at the GraphFoundation that will ensure the future Neo4j open source enterprise distributions have feature parity with the commercial distributions if Neo4j Inc does try to take future features closed source. It will be hard to compete with themselves, as 3.4 is incredibly powerful and fast.

On another note, have you also looked at TigerGraph? It may be a technology you may want to also through into the evaluations, especially if you are considering closed source graph databases.


Have a good evening,

John Mark Suhy




John Mark Suhy
iGov Inc
[jmsuhy@igovsol.com](mailto:jmsuhy@igovsol.com)
703-862-7780
[https://igovsol.com](https://igovsol.com)


On Mon, Oct 22, 2018 at 9:50 PM Shahak Nagiel <[shahak.nagiel@nextcentury.com](mailto:shahak.nagiel@nextcentury.com)> wrote:
> A little more reading...

CACI00003835

SER_1583

https://blog.igovsol.com/2017/11/14/Neo4j-330-is-out-but-where-are-the-open-source-enterprise-binaries.html

So has anything changed since then, to your knowledge (ie only the causal cluster encryption)?

Get Outlook for Android

---

From: Shahak Nagiel
Sent: Monday, October 22, 2018 8:50:18 PM
To: jmsuhy@purethink.com
Cc: Diane Griffith
Subject: Neo4j licensing
Hi John,

I am trying to better understand the licensing nuances of Neo4j Enterprise Edition, and came across some posts you made on StackOverflow.

Neo4j's github repo includes this at the bottom in the License section (emphasis mine):

> Neo4j Enterprise consists of modules from Neo4j Community Edition and modules licensed under AGPLv3 with the Commons Clause in this repository, and other closed source components not present in this repository.
>
> When packaged as a binary, Enterprise Edition includes additional closed-source components *not available in this repository* and requires a commercial license from Neo4j Sweden AB or one of its affiliates.

I'm curious whether you're familiar with what this means (i.e. what's excluded), especially given that one of the sub-modules seems to be the Enterprise bundle?



**Shahak Nagiel**
Principal Engineer
w (240) 297-5089 | c (413) 274-2425
shahak.nagiel@nextcentury.com



2701 Technology Drive, Suite 300 | Annapolis Junction, MD 20701
main: 443.545.3100 | fax: 240.456.0010 | www.nextcentury.com

   

CONFIDENTIALITY NOTICE: This message is intended only for the use of the individual or to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the intended recipient, or the employee or agent responsible to the intended recipient, please be advised that any disclosure, copying, distribution, or taking of action based on the contents of this message is prohibited. If you have received this transmission in error, please notify the sender immediately.

--
John Mark Suhy
iGov Inc
jmsuhy@igovsol.com
703-862-7780
https://igovsol.com

--
John Mark Suhy
iGov Inc
jmsuhy@igovsol.com
703-862-7780
https://igovsol.com

CONFIDENTIAL

CACI00003837

**SER_1585**

# EXHIBIT 65

Adron W. Beene SB# 129040
Adron G. Beene SB# 298088
Attorney at Law
1754 Technology Drive, Suite 228
San Jose, CA 95110
Tel: (408) 392-9233
Fax: (866) 329-0453
adron@adronlaw.com

Attorneys for Defendants and Counter
Claimants:
PURETHINK LLC, a Delaware limited
liability company, IGOV INC., a Virginia
corporation, and JOHN MARK SUHY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEO4J, INC., a Delaware corporation,<br><br>        Plaintiff,<br><br>    v.<br><br>PURETHINK LLC, a Delaware limited liability company, IGOV INC., a Virginia corporation, and JOHN MARK SUHY, an individual,<br><br>        Defendants.<br><br>AND RELATED COUNTERCLAIM. | CASE NO. 5:18-cv-07182-EJD<br><br>**PURETHINK LLC AND IGOV INC.'S AMENDED RESPONSE TO NEO4J, INC.'S FIRST SET OF INTERROGATORIES TO PURETHINK LLC AND IGOV INC.** |

**PROPOUNDING PARTY:**      **NEO4J, INC.**

**RESPONDING PARTY:**      **PURETHINK LLC and IGOV INC.**

**DISCOVERY:**      **Interrogatories**

**SET:**      **One – Amended Response**

SER_1587

1    Ohio

2    Philip Rathle : Neo4j Inc

3    Emil Eifrem : Neo4j Inc

4

5    Other Related Documents:

6    See: https://github.com/neo4j/neo4j

7

8    **INTERROGATORY NO. 4:**

9    *IDENTIFY all facts and DOCUMENTS supporting YOUR contention in Paragraph 18 of*

10   *the YOUR COUNTERCLAIM that "when the IRS asked PureThink the difference between Neo4j*

11   *open source and NEO4J, Inc.'s commercial version, NEO4J, Inc. told PureThink to tell the IRS*

12   *the open source version had to be an open use. When PureThink would not make this statement to*

13   *IRS, NEO4J, Inc. then proceeded to reach out directly to IRS personnel directly with this*

14   *message," and the four (4) persons most knowledgeable about such facts.*

15   **RESPONSE:**

16

17   -   4.1 Removed.

18

19   -   4.2 On or about March 15, 2017:  Mike Dunn from IRS had a phone call with John

20       Mark Suhy and told him that Jason Zagalsky and John Broad had several discussions

21       with IRS employees including Mike Dunn, where they told IRS that they could not

22       use Neo4j Enterprise under the AGPL license in production or in the current or any

23       future projects that were not open source.

24

25   -   4.4 On or about March 29, 2017 – John Mark Suhy had a phone call with John Broad

26       and Jason Zagalsky regarding IRS asking about Neo4j Enterprise and AGPL On that

27       call, and in one or more follow up calls the following days,  John Mark Suhy was told

28

- 14 -

PURETHINK LLC AND IGOV INC.'S AMENDED RESPONSE TO NEO4J, INC.'S FIRST SET OF
INTERROGATORIES

SER_1588

1        to dodge the question about AGPL and instead talk about Neo4j Inc's intent. John

2        Broad and/or Jason Zagalsky also told John Mark Suhy that there was a document

3        their sales teams could use if the question of AGPL came up. It was called the "Fair

4        Trade" license or document.  John Mark Suhy was guided to tell IRS that they could

5        not use Neo4j Enterprise AGPL licensed distributions in production, and that they had

6        to purchase the Neo4j Enterprise Government Edition package.

7

8    -   4.5 On April 4, 2017 – John Broad sent John Mark Suhy an email following up on the

9        previous discussions. John Broad asked if John Mark was "with them" in

10       communicating their misleading interpretation of AGPL to IRS. John Mark Suhy was

11       not "with them".

12       See file: INTEROGS-PURETHINK-IGOV-1/000191-000191.pdf

13

14   -   4.6 IRS was a client of PureThink, not of Neo4j Inc.

15

16   -   4.7 On or about April 4, 2017, without consulting John Mark Suhy, Jason Zagalsky

17       sent an email to IRS making the misleading statements John Mark Suhy would not

18       agree to. John Mark Suhy responded to the email explaining that Jason was wrong,

19       and that IRS could indeed use Neo4j Enterprise AGPL distributions in production and

20       for non-open source projects as allowed by the AGPL license. Jason Zagalsky

21       responded to John Mark's response in which he wrote:

22       "*John Mark,*

23       *Do you realize that you replied-all including IRS folks? Why are you advising them*

24       *based on your incorrect interpretation of Neo's intent? Did you even read my email*

25       *and the links and the document? They cannot use AGPL for EE... Period. Unless they*

26       *are open sourcing their application, which I expect they can not and will not. Again,*

27       *you should NOT be advising them that they can use EE under AGPL.*

28       *I suggest that you quickly reply-all telling them to disregard your reply.*"

PURETHINK LLC AND IGOV INC.'S AMENDED RESPONSE TO NEO4J, INC.'S FIRST SET OF
INTERROGATORIES

1

2        See files: INTEROGS-PURETHINK-IGOV-1/000193-000204.pdf, INTEROGS-

3        PURETHINK-IGOV-1/000205-000205.pdf, INTEROGS-PURETHINK-IGOV-

4        1/000206-000206.pdf

5

6        People knowledgeable of facts:

7        John Mark Suhy
         703-862-7780
8        jmsuhy@purethink.com
9        Alexandria, VA

10       John Broad: Neo4j Inc.

11       Jason Zagalsky: Neo4j Inc.

12       Michael Dunn
         IRS Employee
13       850 Trafalgar Ct
14       Maitland, FL 32751
         Michael.C.Dunn@irs.gov
15       321-253-7609

16       Jeff Butler
17       IRS (Manager)
         77 K St NE
18       Washington, DC 20002
         jeff.butler@irs.gov
19

20       Rahul Tikekar
         IRS
21       77 K St NE
         Washington, DC 20002
22       Rahul.Tikekar@irs.gov

23

24       Other Related Files:

         000191-000191.pdf
25

26       000193-000204.pdf

27

28
                                            - 16 -
         PURETHINK LLC AND IGOV INC.'S AMENDED RESPONSE TO NEO4J, INC.'S FIRST SET OF
         INTERROGATORIES

**INTERROGATORY NO. 5:**

   IDENTIFY all facts, DOCUMENTS and the legal basis supporting YOUR contention in *Paragraph 18 of the YOUR COUNTERCLAIM that "NEO4J, Inc. unlawfully restricts third parties from supporting the free open source version so NEO4J, Inc. can license and support the same software under an expensive commercial license without fear of honest competition," and the four (4) persons most knowledgeable about such facts.*

   **RESPONSE:**

- 5.1 Neo4j Inc. has restricted PureThink and John Suhy from using the open source version of Neo4j by telling third parties they cannot do business with them under the restrictive terms of the Partner Agreement ( Sections 4.3.1 and 4.3.2 Exhibit B to the Counterclaim) which is violation of California Business and Professions Code §16600 and responding parties have a license from the owner of the software, Neo4J Sweden AB, to license and support the open source software which Neo4j Inc. has no right to restrict.

- 5.2 On or about April 2016 PureThink and Neo4j Inc. entered into an agreement over an upcoming IRS procurement. Over the previous year Neo4j Inc. had been trying to get IRS to procure a Neo4j Enterprise package.  IRS was using Neo4j Community Edition under its open source license already and did not see the benefit of paying a large amount of money for support when their existing system was being operated and supported already.   IRS indicated they were not interested in purchasing a Neo4j subscription around March-April 2016 because they needed a solution built before they could pay to have anything supported for the solution. See file: INTEROGS-PURETHINK-IGOV-1/00005893-A001-A010.pdf

   John Mark Suhy spoke with Neo4j and proposed that PureThink submit a proposal to build the solution they needed, which would lead to re-occurring revenue in the follow up years from Neo4j Government Edition package subscriptions.   Over many emails and phone conversations, John Mark convinced the Neo4j Team that not taking the

- 17 -

SER_1591

retired and that they could work with IRS to find another solution for their needs.

- 5.16 On or about June 30, 2017 – PureThink responded to the breach accusations. John Broad responded that he was not happy we did not respond quickly.  We had responded within the time given, and there were no breaches we knew of that could be fixed.  See file: INTEROGS-PURETHINK-IGOV-1/000222-000266.pdf

- 5.17 On or about June 30, 2017, a few hours after John Mark Suhy sent the breach response letter, and still within the 30-day limit to fix the any breaches, John Broad sent a termination letter signed by Lars Nordwall.  There was no attempt to answer the questions or discuss concerns we had sent in the breach response email above. See file: INTEROGS-PURETHINK-IGOV-1/000222-000266.pdf

- 5.18 On or about July 6, 2017 – John Broad sent an email indicating the termination was rescinded.   See file: INTEROGS-PURETHINK-IGOV-1/000222-000266.pdf

- 5.19 On or about July 11, 2017 – John Broad sent PureThink an email with a new termination letter.     Jason Zagalsky sent the termination letter to PureThink's client (IRS) before sending it to PureThink.  Jason had no reason or right to discuss these concerns with our client, this was a legal matter between PureThink and Neo4j Inc. See files: INTEROGS-PURETHINK-IGOV-1/000222-000266.pdf , INTEROGS-PURETHINK-IGOV-1/000298-000299.pdf

- 5.20 On or about July 17, 2017 Jason Zagalsky sent a follow up email to Mike Dunn regarding PureThink's termination. In this email he made several false statements including the following: "Until Neo receives such a purchase order, please be advised that IRS does not have a license to use the Government Edition or Enterprise Edition of Neo4j.".  This is a false statement.  The Neo4j Enterprise license file states "If you

- 23 -

1    have not executed a Commercial Agreement with Neo Technology, the Software is

2    subject to the terms of the GNU AFFERO GENERAL PUBLIC LICENSE"

3    See files: INTEROGS-PURETHINK-IGOV-1/00007613-00007617.pdf,  INTEROGS-

4    PURETHINK-IGOV-1/00035009-00035019.pdf

5

6    -    5.21 John Mark Suhy had several phone conversations with Mike Dunn and other IRS

7         employees about Jason Zagalsky's behavior.  They were confused why he was

8         reaching out to IRS, as IRS had a contract with PureThink, not with Neo4j Inc.  IRS

9         told John Mark Suhy that the legal issues were between PureThink and Neo4j Inc.

10        John Mark Suhy told IRS that he had no control over Jason as Jason did not work for

11        PureThink.

12

13   -    5.22 PureThink and DHS:  In 2017 Brian Rodrigue had a phone call with John Mark

14        Suhy where he explained why PureThink did not get the award.

15

16   -    5.23 On or about May to July 2017 –  Neo4j Inc. employees had a phone conversation

17        with the DHS USCIS who had reached out to Neo4j to gather / and or verify some

18        details for the Neo4j Government Edition procurement. At this point, Brian Rodrigue

19        had already told John Mark Suhy via email, that the recommendation was to procure

20        Neo4j Government Edition with PureThink.

21        On the phone call, Neo4j Inc. was told that DHS had decided to procure Neo4j

22        Government Edition through PureThink.  The Neo4j people on the phone told DHS

23        team that DHS could not work with PureThink and had to go through another vendor.

24        Brian Rodrigue (DHS Team) who told John Mark about the incident, and who was on

25        the call said it was an uncomfortable situation and caught the DHS team by surprise as

26        the recommendation to go with Neo4j  because in part because of PureThink's time

27        and effort helping around the procurement / research process.

28        See file: INTEROGS-PURETHINK-IGOV-1/000304-000306.pdf

- 5.24 On information and belief similar interference as to the above statements is believed to have occurred with other agencies to include but not limited to NGA, other DHS organizations, Airforce, Northrup Grumman, and unknown organizations which would have considered PureThink as part of the government procurement process.

- 5.25 In a September 19, 2017 letter to the IRS, Counsel for Neo4j Inc. represented that

    "PureThink, is not authorized to provide the solicited graph database software and services in support of the CKGE."

    and

    "Neo owns software that meets all requirements for the continued operation of the CKGE to meet user demands...".

    The statement above is false as Neo4j was just one piece of CKGE and Neo4j Inc. did not own the other software that made up or could have been dropped in to make CKGE.

    See file: INTEROGS-PURETHINK-IGOV-1/000267-000279.pdf

- 5.26 On or about 2018 John Mark Suhy spoke with Steven Baker via skype. Steven worked for Neo4j Inc.  Steven told John Mark that Neo4j Inc. was "out to get him" and that PureThink and John Mark were hated at Neo4j Inc.   He stated that he was told that John Mark's promotion of open source licenses was causing Neo4j Inc.to lose a lot of money.  He also said that Neo4j had been planning on trying to sue John Mark Suhy with the expectation that he would not have the money to "lawyer up".  He said they expected a quick settlement which would take John Mark and his companies out of the picture.   He said they told employees they would go after John Mark and his company(s) using trademark law.

- 5.27 On or about March 15, 2017:  Mike Dunn from IRS had a phone call with John Mark Suhy and told him that Jason Zagalsky and John Broad had several discussions

PURETHINK LLC AND IGOV INC.'S AMENDED RESPONSE TO NEO4J, INC.'S FIRST SET OF INTERROGATORIES

1    with IRS employees including Mike Dunn, where they told IRS that they could not

2    use Neo4j Enterprise under the AGPL license in production or in the current or any

3    future projects that were not open source.

4

5    -    5.28 On or about March 29, 2017 – John Mark Suhy had a phone call with John Broad

6    and Jason Zagalsky regarding IRS asking about Neo4j Enterprise and AGPL On that

7    call, and in one or more follow up calls the following days,  John Mark Suhy was told

8    to dodge the question about AGPL and instead talk about Neo4j Inc's intent.  John

9    Broad and/or Jason Zagalsky also told John Mark Suhy that there was a document

10    their sales teams could use if the question of AGPL came up.  It was called the "Fair

11    Trade" license or document.   John Mark Suhy was guided to tell IRS that they could

12    not use Neo4j Enterprise AGPL licensed distributions in production, and that they had

13    to purchase the Neo4j Enterprise Government Edition package.

14

15    -    5.29 On April 4, 2017 – John Broad sent John Mark Suhy an email following up on

16    the previous discussions.  John Broad asked if John Mark was "with them" in

17    communicating their misleading interpretation of AGPL to IRS.  John Mark Suhy was

18    not "with them".

19    See file: INTEROGS-PURETHINK-IGOV-1/000191-000191.pdf

20

21    -    5.30 IRS was a client of PureThink, not of Neo4j Inc.

22

23    -    5.31On or about April 4, 2017, without consulting John Mark Suhy, Jason Zagalsky

24    sent an email to IRS making the misleading statements John Mark Suhy would not

25    agree to.  John Mark Suhy responded to the email explaining that Jason was wrong,

26    and that IRS could indeed use Neo4j Enterprise AGPL distributions in production and

27    for non-open source projects as allowed by the AGPL license.  Jason Zagalsky

28    responded to John Mark's response in which he wrote:

PURETHINK LLC AND IGOV INC.'S AMENDED RESPONSE TO NEO4J, INC.'S FIRST SET OF
INTERROGATORIES

1      "*John Mark,*

2      *Do you realize that you replied-all including IRS folks?  Why are you advising them*

3      *based on your incorrect interpretation of Neo's intent?  Did you even read my email*

4      *and the links and the document?  They cannot use AGPL for EE... Period.  Unless they*

5      *are open sourcing their application, which I expect they can not and will not.  Again,*

6      *you should NOT be advising them that they can use EE under AGPL.*

7      *I suggest that you quickly reply-all telling them to disregard your reply.*"

8

9      See files:  INTEROGS-PURETHINK-IGOV-1/000193-000204.pdf,  INTEROGS-

10      PURETHINK-IGOV-1/000205-000205.pdf, INTEROGS-PURETHINK-IGOV-

11      1/000206-000206.pdf

12

13

14      <u>People knowledgeable of facts:</u>

15

16      John Mark Suhy
    703-862-7780

17      jmsuhy@purethink.com
    Alexandria, VA

18

19      John Broad : Neo4j Inc.

20      Jason Zagalsky : Neo4j Inc

21      Lars Nordwall: Neo4j Inc.

22      Michael Dunn
    IRS Employee

23      850 Trafalgar Ct
    Maitland, FL 32751

24      Michael.C.Dunn@irs.gov

25      321-253-7609

26      Chris Hess
    IRS (Manager)

27      77 K St NE

28      Washington, DC 20002

- 27 -

PURETHINK LLC AND IGOV INC.'S AMENDED RESPONSE TO NEO4J, INC.'S FIRST SET OF
INTERROGATORIES

1   goods and services sold under the trademark are maintained. Uncontrolled licensing is called

2   naked licensing and results in abandonment of the trademark.  Neo4j Inc. claims to own the

3   trademark to NEO4J. Yet a software product names NEO4J, without any ® designation is

4   licensed and freely available for download on GitHub-a repository for open source software-

5   without any quality controls over the software. Anyone may then download the software and

6   modify it without any quality control standards imposed by anyone. Thus, Neo4j Inc. has not

7   imposed any quality standards over a product bearing its trademark and has abandoned the

8   trademark.    People who have read the AGPL license and understands that Neo4j Inc. claims to

9   own the trademark but the software is licensed by a third party and that the source code to the

10  software may be modified in any fashion and there are no quality controls in the license and

11  owner of the software imposes no quality controls over use or modification of the software.

12

13          People knowledgeable of facts:

14      John Mark Suhy

15      703-862-7780
        jmsuhy@purethink.com
16      Alexandria, VA

17

18  Discovery is ongoing, Responding party reserves the right to supplement its response to this

19  interrogatory.

20  Dated: November 22, 2019

        _____
21      Adron W. Beene SB# 129040
        Adron G. Beene SB# 298088
22      Attorney At Law
        1754 Technology Drive, Suite 228
        San Jose, CA 95110
23      Tel: (408) 392-9233
        Fax: (866) 329-0453
24      adron@adronlaw.com

25      Attorney For Defendants and Counter
        Claimants PURETHINK LLC, a Delaware
26      Limited Liability Company, IGOV INC., a
        Virginia Corporation, and JOHN MARK
27      SUHY

28

- 80 -

PURETHINK LLC AND IGOV INC.'S AMENDED RESPONSE TO NEO4J, INC.'S FIRST SET OF
INTERROGATORIES

## Verification

I, John Mark Suhy, am a defendant, and an officer for defendants Purethink LLC and IGOV Inc. in the above cause of action. I have read the following:

**PURETHINK LLC AND IGOV INC.'S AMENDED RESPONSE TO NEO4J, INC.'S FIRST SET OF INTERROGATORIES TO PURETHINK LLC AND IGOV INC.**

I am familiar with the contents of the above.

I declare under penalty of perjury under the laws of the United Stated of America that the foregoing responses are true and correct, except as to those matters which are therein stated to be on information or belief, and as to those matters, I believe them to be true.

Signed in Tampa Bay, Florida on November 22, 2019.

_____
John Mark Suhy

PURETHINK LLC AND IGOV INC.'S AMENDED RESPONSE TO NEO4J, INC.'S FIRST SET OF INTERROGATORIES

Re:     *NEO4J, INC. v. PURETHINK LLC et al.* UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, Case No. 5:18-cv-7182 EJD

1

PROOF OF SERVICE

2

I am a citizen of the United States. My business address is 1754 Technology Drive, Suite 228, San Jose, CA 95110. I am over the age of eighteen years and not a party to the within action.

3

On the date stated below, I served the attached:

4

**PURETHINK LLC AND IGOV INC.'S AMENDED RESPONSE TO NEO4J, INC.'S FIRST SET OF INTERROGATORIES TO PURETHINK LLC AND IGOV INC.**

5

6

On the parties listed below at the addresses listed:

7

**to NEO4J, INC., a Delaware corporation, attorneys of record:**

8

Jeffrey M. Ratinoff

9

jratinoff@hopkinscarley.com

John V. Picone III

10

jpicone@hopkinscarley.com

Hopkins & Carley, a Law Corporation

11

70 South First Street

San Jose, CA 95113

12

Telephone: (408) 286-9800

Facsimile (408) 998-4790

13

14

__ (By Mailing) I caused a true copy of each document identified above to be placed in a sealed envelope with first class postage affixed. Each such envelope was deposited for collection and mailing that same day in the ordinary course of business in the United States Mail at San Jose, California.

15

16

___(By Personal Service) I caused a true copy of each documents identified above to be delivered by hand to the offices of each addressee above.

17

___(By Overnight Delivery) I caused a true copy of each documents identified above to be sealed in an envelope to be delivered to an overnight carrier with delivery fees provided for, addressed of each addressee above.

18

_X__ (By Electronic Service) by transmitting via my electronic service address (adronjr@adronlaw.com) the document(s) listed above to the persons at the e-mail addresses set forth above.

19

20

21

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

22

23

24

Dated: 11-22-19                           _____

25

Adron G. Beene

26

27

28

# EXHIBIT 66

SER_1600

**1:57 PM**

**09/10/19**

**Accrual Basis**

# PureThink LLC
# Profit & Loss
### January through December 2015

| | Jan - Dec 15 |
|---|---:|
| **Ordinary Income/Expense** | |
| **Income** | |
| Sales - Software | 320,987.50 |
| **Total Income** | 320,987.50 |
| | |
| **Gross Profit** | 320,987.50 |
| **Expense** | |
| Advertising and Promotion | 178.86 |
| Bank Service Charges | 42.45 |
| Business Services | 2,429.99 |
| Communications | 656.61 |
| Computer and Internet Expenses | 1,967.54 |
| Insurance Expense | 326.12 |
| Meals and Entertainment | 219.08 |
| Miscellaneous Expense | 213.05 |
| Office Supplies | 2,361.18 |
| Software Reseller License Costs | 242,715.52 |
| Travel Expense | 3,644.97 |
| **Total Expense** | 254,755.37 |
| | |
| **Net Ordinary Income** | 66,232.13 |
| | |
| **Net Income** | **66,232.13** |



Witness:
John Mark Suhy
**EX 198**
11/29/2022 K. Buchanan

# EXHIBIT 67

SER_1602

**1:57 PM**

**09/10/19**

**Accrual Basis**

# PureThink LLC
# Profit & Loss
### January through December 2016

|  | Jan - Dec 16 |
|---|---|
| **Ordinary Income/Expense** | |
| **Income** | |
| Sales - Software | 229,000.00 |
| **Total Income** | 229,000.00 |
| **Gross Profit** | 229,000.00 |
| **Expense** | |
| Bank Service Charges | 6.13 |
| Business Licenses and Permits | 524.67 |
| Business Services | 2,892.92 |
| Communications | 2,733.13 |
| Meals and Entertainment | 221.89 |
| Miscellaneous Expense | 211.85 |
| Office Supplies | 1,735.22 |
| Travel Expense | 883.73 |
| **Total Expense** | 9,209.54 |
| **Net Ordinary Income** | 219,790.46 |
| **Net Income** | **219,790.46** |



Witness:
John Mark Suhy
**EX 199**
11/29/2022 K. Buchanan

IGOV0001569057.001
**SER_1603**

# EXHIBIT 68

**From:**      John Mark Suhy(jmsuhy@igovsol.com)
**To:**        Ron.Turner@XpressRules.com
**CC:**
**BCC:**
**Subject:**   SBIR award with Neo4j
**Sent:**      01/25/2019 08:27:41 PM -0800 (PST)
**Attachments:**

---

Hello Ron,

I came across your SBIR award and saw you were using Neo4j.

I wanted to bring to your attention that if you want to use Neo4j Enterprise ( up through the latest 3.4 release ) under it's open source license , you can do so in a closed source project for free.  This is counter to what you probably have been told by Neo based on their last behavior.

As of Neo4j 3.5 , if you want to use enterprise features (causal clustering, etc) for free with no limitations, then you would want to use the Open Native Graph Database (ONgDB) as a drop in replacement (using same version number) - it adds in the enterprise features Neo4j removed from their code base a few weeks ago.

ONgDB is in production at Treasury for example, it is just not well known yet.

https://www.graphfoundation.org/projects/ongdb/

Below is a blog post I wrote about pricing so you understand why this information could really help you with your commercialization strategy.

https://blog.igovsol.com/2018/01/10/Neo4j-Commercial-Prices.html

Feel free to reach out to me anytime, I am in the Washington DC metro area.

Have a good weekend,


John Mark

IGOV0002860445.001
**SER_1605**

# EXHIBIT 69

| | |
|---|---|
| **From:** | Carlo Gazzaneo(cgazzaneo@softstrategy.it) |
| **To:** | Brad Nussbaum; John Mark Suhy; Benjamin Nussbaum |
| **CC:** | Francesco Faenzi |
| **BCC:** | |
| **Subject:** | Re: Soft Strategy contacts |
| **Sent:** | 01/04/2020 04:29:20 AM -0800 (PST) |
| **Attachments:** | |

Good morning gentlemen and happy new year,
we have spent the last few days testing ONgDB 3.5.12 and we have achieved very good results.
we also completed a successful migration test from neo4j to ONgDB.

In the next period we will test version 4 of neo4j which presents new features such as the ability to manage multiple databases simultaneously.

Regarding version 4 of neo4j and ONgDB we have some questions:
Witch activities have you planned?
Do you plan to integrate the new features offered by neo4j 4 enterprise into ONgDB?Witch one?
What about compatibility?

Looking forward to your kindly reply
Thanks


Scarica Outlook per Android
_____

From: Brad Nussbaum <brad@atomrain.com>
Sent: Friday, December 20, 2019 6:27:04 PM
To: Francesco Faenzi <ffaenzi@softstrategy.it>; John Mark Suhy <jmsuhy@igovsol.com>
Cc: Benjamin Nussbaum <ben@atomrain.com>; Carlo Gazzaneo <cgazzaneo@softstrategy.it>
Subject: Re: Soft Strategy contacts

Hi Francesco,

Thank you for reaching out and we look forward to connecting in the New Year as well. Wishing you a Merry Christmas and a Happy New Year!

Best,
Brad
_____

From: Francesco Faenzi <ffaenzi@softstrategy.it>
Date: Friday, December 20, 2019 at 2:47 AM
To: John Mark Suhy <jmsuhy@igovsol.com>
Cc: Ben Nussbaum <ben@atomrain.com>, Brad Nussbaum <brad@atomrain.com>, Carlo Gazzaneo <cgazzaneo@softstrategy.it>
Subject: R: Soft Strategy contacts

Hello John thank you for the kind introduction
Good morning gentlemen, pleased to meet you.

Right now we are packing up things before Christmas holiday period and I guess you are about to do the same. I'll promise

IGOV0002987106.001

SER_1607

we'll catch up around middle of January, since we're willing to explore how ONGDB works, how to keep in touch and possibly share knowledge.

Thank you
Merry Christmas and Happy New Year

--

Francesco Faenzi

Soft Strategy S.p.A.
Digital Trust
Director

Mobile: (+39) 335 8311303
Office: (+39) 02 87259849
Via Copernico 38, Milano
ffaenzi@softstrategy.it

---

Da: John Mark Suhy
Inviato: mercoledì 18 dicembre 2019 23:54
A: Francesco Faenzi
Cc: Benjamin Nussbaum; Brad Nussbaum; Carlo Gazzaneo
Oggetto: Re: Soft Strategy contacts

I have copied Brad and Ben Nussbaum who are part of the graph foundation team.

Carlo and Francesco are with a company in Italy who are currently using Neo4j. I told them I would connect them with you so you could tell them more about the foundation,  the future of ONgDB, etc.

Have a good evening everyone,

John Mark Suhy

On Wed, Dec 18, 2019 at 3:41 AM Francesco Faenzi <ffaenzi@softstrategy.it> wrote:

> Hello John
> Thank you for your kind availability Yesterday.
> Please feel free to introduce Carlo and me to the ONGDB Foundation.
> Kind regards
>
> --
>
> Francesco Faenzi
>
> Soft Strategy S.p.A.
> Digital Trust

IGOV0002987106.002
SER_1608

Director

Mobile: (+39) 335 8311303
Office: (+39) 02 87259849
Via Copernico 38, Milano
ffaenzi@softstrategy.it

--
John Mark Suhy
iGov Inc
jmsuhy@igovsol.com
703-862-7780
https://igovsol.com

IGOV0002987106.003
SER_1609

# EXHIBIT 70

SER_1610

| | |
|---|---|
| **From:** | John Mark Suhy(jmsuhy@igovsol.com) |
| **To:** | sergio@mobiware.com.br |
| **CC:** | |
| **BCC:** | |
| **Subject:** | Re: Problems with setup |
| **Sent:** | 01/24/2020 05:44:57 PM -0800 (PST) |
| **Attachments:** | |

I believe there was an issue with the 3.5.3 ONgDB windows bin scripts. Have you tried 3.5.14?

https://GraphFoundation.org/ongdb/

That version should be fixed.

Let me know

On Thu, Jan 23, 2020 at 7:14 AM <sergio@mobiware.com.br> wrote:

> Hi eveyone.
>
> I'm trying to setup the ongdb-enterprise-3.5.3-windows version on my system, and I've followed all the instruction, as I think, to make it run, but I receive the message from powershell:
>
> "Não foi possível localizar nem carregar a classe principal org.neo4j.server.enterprise.EnterpriseEntryPoint"
>
> which I free translate as
>
> "It was not possible to find or load the main class org.neo4j.server.enterprise.EnterpriseEntryPoint"
>
> Can you teach me the way to solve it?
>
> Thanks a lot.
>
> Also, our company are really interested in using this version of neo4j in production environment. We are a startup company in Brazil, and we would llike to be sure that this version is realy free for commercial use before dedicating more time to it. What you can say about it? Will you continue to supply neo4j free enterprise versions?
>
> Thanks in advance.
>
>
> Sergio R Pires
> +55 11 99425-8731

--
John Mark Suhy
iGov Inc
jmsuhy@igovsol.com
703-862-7780
https://igovsol.com

IGOV0002856686.001
**SER_1611**

# EXHIBIT 71

| | |
|---|---|
| **From:** | Brad Nussbaum(brad@graphgrid.com) |
| **To:** | Pappu, Ravi |
| **CC:** | |
| **BCC:** | |
| **Subject:** | Re: Question re. your offerings |
| **Sent:** | 04/10/2020 09:08:34 AM -0700 (PST) |
| **Attachments:** | |

---

John Mark,
Thank you for the introduction and continued help in advancing the open source work we are all doing. Very much appreciated.


Ravi,
Its very nice to meet you and I look forward to helping you with the transition from Neo4j to ONgDB. I am on EST and have the following times available next week:

T/W/Th: 9-10am, 11-12pm EST
T/W: 1-3pm EST

Do any of these times work for you?

Best,
Brad

---

From: John Mark Suhy <jmsuhy@igovsol.com>
Date: Friday, April 10, 2020 at 11:57 AM
To: "Pappu, Ravi" <rpappu@iqt.org>
Cc: "brad@graphgrid.com" <brad@graphgrid.com>
Subject: Re: Question re. your offerings

Hello Ravi,

I want to send you over to the GraphGrid team. They can help you with your transition and support needs.

iGov Inc only focuses on US government support.

I copied Brad Nussbaum who is part of the GraphFoundation and GraphGrid, he will be able to help you with the transition.

Make sure to let him know when your enterprise subscription expires as you may need to notify Neo4j Inc that you don't plan on renewing within 30 days of your expiration date.

Brad will guide you through the process.


Have a good weekend,

John Mark Suhy
iGov Inc.
jmsuhy@igovsol.com

IGOV0002856672.001
SER_1613

703.862.7780
https://igovsol.com


On Thu, Apr 9, 2020 at 8:22 PM Pappu, Ravi <rpappu@iqt.org> wrote:

Hi,

We are a Neo4j Enterprise customer and came across your company. I would like to have a short call with you discuss transitioning from Neo4j Enterprise to ONGDB and learn about your support offerings. Please advise when you have some availability to do a short call. Thanks!

Best,

Ravi


------
Ravi Pappu / CTO / rpappu@iqt.org


"This e-mail, and any attachments hereto, may contain information that is privileged, proprietary, confidential and/or exempt from disclosure under law and are intended only for the designated addressee(s). If you are not the intended recipient of this message, or a person authorized to receive it on behalf of the intended recipient, you are hereby notified that you must not use, disseminate, copy in any form, or take any action based upon the email or information contained therein.

If you have received this email in error, please permanently and immediately delete it and any copies of it, including any attachments, and promptly notify the sender at In-Q-Tel by reply e-mail, fax: 703-248-3001, or phone: 703-248-3000. Thank you for your cooperation.

For information about how we use personal data that you provide to us either directly or that we collect through your use of this Website, and applicable rights under the EU GDPR, please see our Privacy Policy, which can be found here http://www.iqt.org/privacy-policy. "

--
John Mark Suhy
iGov Inc
jmsuhy@igovsol.com
703-862-7780
https://igovsol.com

IGOV0002856672.002

SER_1614

1  John V. Picone III, Bar No. 187226
   jpicone@hopkinscarley.com
2  Jeffrey M. Ratinoff, Bar No. 197241
   jratinoff@hopkinscarley.com
3  Arthur E. Rothrock, Bar No. 312704
   arothrock@hopkinscarley.com
4  HOPKINS & CARLEY
   A Law Corporation
5  The Letitia Building
   70 South First Street
6  San Jose, CA 95113-2406

7  *mailing address:*
   P.O. Box 1469
8  San Jose, CA 95109-1469
   Telephone:    (408) 286-9800
9  Facsimile:    (408) 998-4790

10  Attorneys for Plaintiffs and Counter-Defendants
    NEO4J, INC. and NEO4J SWEDEN AB

11

12              UNITED STATES DISTRICT COURT

13              NORTHERN DISTRICT OF CALIFORNIA

14  NEO4J, INC., a Delaware corporation, and      CASE NO. 5:18-cv-07182-EJD
    NEO4J SWEDEN AB, a Swedish
15  corporation,                                   **DECLARATION OF JEFFREY M.
                                                   RATINOFF IN SUPPORT OF
16                          Plaintiffs,            PLAINTIFFS' MOTION TO STRIKE THE
                                                   REPORT AND EXCLUDE THE
17              v.                                 TESTIMONY OF BRADLEY M. KUHN**

18  PURETHINK LLC, a Delaware limited             Date:       July 27, 2023
    liability company, IGOV INC., a Virginia      Time:       9:00 a.m.
19  corporation, and JOHN MARK SUHY, an           Dept:       Courtroom 4, 5th Floor
    individual,                                    Judge:      Hon. Edward J. Davila
20                          Defendants.
                                                   Trial Date: November 14, 2023
21

22  AND RELATED COUNTERCLAIM.

23

24

25

26

27

28

4894-0563-7970.1
DECLARATION OF JEFFREY M. RATINOFF IN SUPPORT OF PLAINTIFFS' MOTION TO STRIKE THE REPORT AND EXCLUDE THE TESTIMONY OF BRADLEY M. KUHN; CASE NO. 5:18-CV-07182-EJD

I, Jeffrey M. Ratinoff, declare as follows:

1.      I am an attorney at law, duly licensed to practice before all courts of the State of California, and am of counsel with Hopkins & Carley, a Law Corporation, attorney of record for Plaintiff Neo4j, Inc. and Neo4j Sweden AB (collectively "Plaintiffs") in the above-captioned matter.  I make this declaration in support of Plaintiffs' Motion to Strike the Report and Exclude the Testimony of Bradley M. Kuhn concurrently filed herewith.

2.      The facts stated herein are based on my personal knowledge, except with respect to those matters stated to be on information and belief, and as to those matters, I believe them to be true.  If called upon to testify as a witness in this matter, I could and would do so competently.

3.      Attached hereto as **Exhibit 1** is a true and correct copy of the Expert Report of Bradley M. Kuhn 22 December 2022.  This report was served by Defendants on December 22, 2022.  However, they did not publicly file this report in this action.

4.      On January 13, 2023, I sent to counsel for Defendants a letter detailing why Mr. Kuhn's report was improper and inadmissible.  A true and correct copy of this letter is attached hereto as **Exhibit 2**.

5.      Attached hereto as **Exhibit 3** is a true and correct copy of a January 20, 2023 letter sent by Adron W. Beene, counsel for Defendants, in response to my January 13, 2023 letter.

6.      Attached hereto as **Exhibit 4** is a true and correct copy of the relevant pages from Appellants' Opening Brief, Docket Entry No. 14 in *Neo4j, Inc., et al. v. PureThink, LLC et al*., No. 21-16029 (9th Cir. 2021).

7.      Attached hereto as **Exhibit 5** is a true and correct copy of the relevant pages from Appellees' Answering Brief, Docket Entry No. 30 in *Neo4j, Inc., et al. v. PureThink, LLC et al*., No. 21-16029 (9th Cir. 2021).

8.      Attached hereto as **Exhibit 6** is a true and correct copy of the relevant pages from Appellants' Rely Brief, Docket Entry No. 39 in Neo4j, Inc., et al. v. PureThink, LLC et al., No. 21-16029 (9th Cir. 2021).

/ / /

/ / /

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ REDWOOD CITY

4894-0563-7970.1                                                   - 1 -

DECLARATION OF JEFFREY M. RATINOFF IN SUPPORT OF PLAINTIFFS' MOTION TO STRIKE THE REPORT AND EXCLUDE THE TESTIMONY OF BRADLEY M. KUHN; CASE NO. 5:18-CV-07182-EJD

SER_1616

9.     Attached hereto as **Exhibit 7** is a true and correct copy of a November 17, 2020 email sent by John Mark Suhy to the Free Software Foundation, which attached this Court's November 11, 2020 Order Granting in Part and Denying in Part Defendants' Motion to Dismiss in *Neo4j, Inc. v. Graph Foundation, Inc*., Case No. 5:19-cv-06226-EJD (N.D. Cal.).  Defendants produced this email (which bears the Bates Nos. IGOV0002997652.001– IGOV0002997652.002) and the attachment (which bears the Bates Nos. IGOV0002997653.001– IGOV0002997653.015) during discovery.  The portions referenced by and/or that are most relevant to Plaintiffs' Motion are highlighted in yellow.

10.     Attached hereto as **Exhibit 8** is a true and correct copy of a November 17, 2020 email sent by John Mark Suhy to "Geoffrey" at the Free Software Foundation, which attached this Court's November 11, 2020 Order Granting in Part and Denying in Part Defendants' Motion to Dismiss in *Neo4j, Inc. v. Graph Foundation, Inc*., Case No. 5:19-cv-06226-EJD (N.D. Cal.). Defendants produced this email (which bears the Bates Nos. IGOV0002997658.001– IGOV0002997658.002) and the attachment (which bears the Bates Nos. IGOV0002997659.001– IGOV0002997659.015) during discovery.  The portions referenced by and/or that are most relevant to Plaintiffs' Motion are highlighted in yellow.

11.     Attached hereto as **Exhibit 9** is a true and correct copy of a November 23, 2020 email sent by John Mark Suhy to the Free Software Foundation.  Defendants produced this email during discovery and bears the Bates No. IGOV0002997701.001.  The portions referenced by and/or that are most relevant to Plaintiffs' Motion are highlighted in yellow.

12.     I reviewed the exhibits attached to Mr. Kuhn's report, including the markups and comments from the drafting of the GPLv3.  I have reviewed and am familiar with the document productions made by Defendants in this case.  I am unaware of any of the markups attached to Mr. Kuhn's report being produced by either Defendants (FSF) prior to the close of fact discovery. Defendants also did not subpoena the FSF to obtain or authenticate these materials.

13.     Exhibits 7-9 were produced by Defendants as part of a larger native production of emails from John Mark Suhy's jmsuhy@igovsol.com email account. We maintain these emails in an e-discovery database, which allows Boolean and keyword searching, as well as searches by

DECLARATION OF JEFFREY M. RATINOFF IN SUPPORT OF PLAINTIFFS' MOTION TO STRIKE THE REPORT AND EXCLUDE THE TESTIMONY OF BRADLEY M. KUHN; CASE NO. 5:18-CV-07182-EJD

1    specific senders and recipients of email.  This database is also capable of identifying related

2    emails in a particular chain, which is commonly known as "email threading".  The database was

3    unable to locate any emails sent by Free Software Foundation in response to Exhibits 7-9.  I was

4    also unable to locate any emails sent by the FSF in response via manual searches using the term

5    "@fsf.com", the phrase "case regarding AGPL precedent" and "question regarding AGPL."

6           14.     Attached hereto as **Exhibit 10** is a true and correct copy of a March 30, 2022

7    article written by Bradley M. Kuhn, titled "An Erroneous Preliminary Injunction Granted in

8    Neo4j v. PureThink." I located this article on the Software Freedom Conservancy's website, and

9    printed it on December 23, 2022.  This article is also listed as a publication in Exhibit M to Mr.

10   Kuhn's report with the URL: https://sfconservancy.org/blog/2022/mar/30/neo4j-v-purethink-

11   open-source-affero-gpl/.

12          15.     Attached hereto as **Exhibit 11** is a true and correct copy of an April 2, 2022 article

13   written by Thomas Claburn, titled "Court erred in Neo4j source license ruling, says Software

14   Freedom Conservancy" (https://www.theregister.com/2022/04/02/court_neo4j_ruling/).  This was

15   published online by the Register, which touts itself as "a leading and trusted global online

16   enterprise technology news publication, reaching roughly 40 million readers worldwide"

17   (https://www.theregister.com/Profile/about_the_register/).  I located this article on the Software

18   Freedom Conservancy's "Our Issues in the News" subpage under the heading "Copyleft

19   Licensing" (https://sfconservancy.org/press/inthenews.html).

20          16.     Attached hereto as **Exhibit 12** is a true and correct copy of an April 27, 2022 email

21   sent by John Mark Suhy from his eGovernment Solutions email account to Puru Komaravolu and

22   Michael Dunn at the Internal Revenue Service, which provides the URL for the article attached

23   hereto as Exhibit 10.  This email was produced by eGovernment Solutions Inc. in response to a

24   document subpoena served by Plaintiffs and bears the Bates No. EGOVS_000210.

25          17.     Attached hereto as **Exhibit 13** is a true and correct copy of a February 2, 2023

26   article titled "SFC's Policy Fellow Files Expert Report in Neo4j v. PureThink"

27   (https://sfconservancy.org/news/2023/feb/09/kuhn-neo4j-purethink-expert-report/).  I located this

28   article on the Software Freedom Conservancy's home page and printed it on February 17, 2023.

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ REDWOOD CITY

4894-0563-7970.1                                    - 3 -

DECLARATION OF JEFFREY M. RATINOFF IN SUPPORT OF PLAINTIFFS' MOTION TO STRIKE THE REPORT AND EXCLUDE THE
TESTIMONY OF BRADLEY M. KUHN; CASE NO. 5:18-CV-07182-EJD

1    There is hyperlink to https://sfconservancy.org/docs/kuhn_expert-report-in-neo4j_5-18-cv-

2    07182.pdf embedded the text "This expert report" that pulls up a copy of Mr. Kuhn's report.

3         18.    Attached hereto as **Exhibit 14** is a true and correct copy of an February 12, 2023

4    article written by Thomas Claburn, titled "How this database legal war could be decided by the

5    name given to this license."  This was published online by the Register at

6    (https://www.theregister.com/2023/02/12/software_freedom_conservancy_fights_agplv3/).  There

7    is hyperlink to https://sfconservancy.org/docs/kuhn_expert-report-in-neo4j_5-18-cv-07182.pdf

8    embedded the text "expert report" that pulls up a copy of Mr. Kuhn's report.

9         I declare under penalty of perjury under the laws of the United States of America that the

10    foregoing is true and correct, and that this declaration was executed on this 20th day of April

11    2023, at San Jose, California.

12

13                                        _/s/Jeffrey M. Ratinoff_____
                                            Jeffrey M. Ratinoff

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4894-0563-7970.1                                    - 4 -

DECLARATION OF JEFFREY M. RATINOFF IN SUPPORT OF PLAINTIFFS' MOTION TO STRIKE THE REPORT AND EXCLUDE THE
TESTIMONY OF BRADLEY M. KUHN; CASE NO. 5:18-CV-07182-EJD

# EXHIBIT 1

SER_1620

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Neo4j, Inc., , a Delaware corporation, | CASE NO. 5:18-cv-07182 |
| Plaintiff, | |
| v. | |
| PureThink, LLC, a Delaware limited liability company, | **EXPERT REPORT OF** |
| IGOV, INC., a Virginia corporation, and | **BRADLEY M. KUHN** |
| JOHN MARK SUHY, an individual. | |
| Defendants. | |

EXPERT REPORT OF BRADLEY M. KUHN
22 DECEMBER 2022

SER_1621

## Introduction

1. I am providing this expert report in support of Defendants: PureThink, LLC, IGOV, Inc. and John Mark Suhy.

2. This expert report primarily discusses the issues of the removal of the Commons Clause ("CC") from the "Neo4j Sweden Software License" and Suhy's and/or PureThink, LLC's and/or IGOV, Inc.'s redistribution of the Neo4j software under the AGPLv3 with CC removed.

3. I am appearing as an expert in this case *pro bono publico*. I have asked Defendants' counsel only to cover direct costs of travel expenses to attend depositions and/or the trial (— should I be deposed and/or appear as a witness at trial in this case).

## Qualifications

4. I am currently employed as the Policy Fellow of the Software Freedom Conservancy, Inc. ("SFC"), a 501(c)(3) not-for-profit organization founded in New York. SFC is a nonprofit organization centered around ethical technology. SFC's mission is to ensure the right to repair, improve and reinstall software. SFC promotes and defends these rights through fostering free and open source software (FOSS) projects, driving initiatives that actively make technology more inclusive, and advancing policy strategies that defend FOSS (such as copyleft).

5. My interest in computing began as a child, when I received my first computer as a gift from my parents and began to regularly write new software for it and share that software with my friends, who helped me improve it.

6. As an undergraduate, I studied Computer Science at Loyola College in Maryland (now called the Loyola University Maryland). I received from there in 1995 a summa cum laude Bachelor's Degree in Computer Science, and the James D. Rozics Computer Science Medal, which is an award given to the year's top student in Computer Science at each graduation. I was furthermore elected into Upsilon Pi Epsilon (the National Computer Science Honors Society) and the Phi Beta Kappa honors society, which is the USA's oldest academic honors society for the liberal arts.

7. From 1991 through 2001, I worked consistently on a part-time (while studying) and then a full-time (when not in school) basis as a system administrator and software developer. I administered, configured, programmed, and debugged a variety of Unix and Unix-like operating systems[1] and software for those

---

[1] Unix was a computer operating system developed by AT&T in the early 1970s. Many systems were later developed that operated similarly like Unix, and are typically called "Unix-like" operating systems.

2

SER_1622

systems. My work experience spans the wide array of possible occupations that are typical for individuals trained in computer science.

8. From 1991-1995, while working as a programmer for the Baltimore Rh Typing Laboratories, Inc. (aka BRT Laboratories), I downloaded, configured, modified, and installed numerous Free and Open Source[2] (FOSS) programs. I became at that time an active participant in Usenet[3], and, at the encouragement of my employer, began sharing code that I improved with others who sought to solve similar tasks, and collaborated with other developers online to improve that code.

9. I have continued my code contributions to FOSS on a semi-regular basis since that time. I have submitted patches — derivative modification of the software, sent back to the original author for later inclusion – to various projects. I have also served as the co-maintainer of FOSS projects at times.

10. In 1992, I began using the Linux-based systems. I downloaded in 1992 the "Soft Landing System", an early GNU/Linux distribution put together by volunteers, and installed it on my personal computer. My professors saw the value in this software, and requested that I install this software throughout the computer lab at my undergraduate institution. I did so, and was later employed by Loyola's computer science department to continue maintaining, modifying and administering these systems until I graduated.

11. In 1997, I began a graduate program in Computer Science at the University of Cincinnati. In early 2001, I graduated from that program, completing a Master's Degree with thesis. My thesis dealt with programming language topics related to the Open Source and Free Software programming language named Perl. This work required me to participate heavily in the Perl community and contribute libraries and modification to the internals of the Perl language implementation. The original inventor and author of Perl, Larry Wall, served on my thesis committee. My thesis was later used by Wall as one of the justifications for the launch of another related Open Source project, called the Parrot Virtual Machine.

12. In 1996, I began volunteering for the Free Software Foundation, Inc. ("FSF"). Initially, Richard M. Stallman, President of the FSF, asked me to serve as a webmaster for the FSF and GNU websites. (GNU is an independent project that is fiscally sponsored by the FSF.)

13. As webmaster, I assisted in creation and editing of the initial "license list" page on the GNU website. This page, a version of which is still available today on the GNU website, explains the details of various software licenses and whether they meet GNU's criteria for Free Software licenses — meaning they give

---

[2] The term "Open Source" did not come into common usage until 1999, so it is somewhat anachronistic to use it referring to events that took place before then. However, I include here as it is a term more familiar to those outside of the field of computer science.

[3] Usenet was a worldwide discussion forum that was widely used by scientists, researchers, and programmers in the 1980s and early 1990s.

3

SER_1623

users the freedom to copy, share, modify and redistribute the software — and whether the licenses are compatible with the FSF's own licenses. In assisting Dr. Stallman with this type of work, as I have done on a regular basis from the late 1990s through October 2019, I first developed and then improved my expertise interpreting the requirements and details of FOSS licenses.

14. As time went on in my career, I began to specialize specifically in the specific sub-area of FOSS licenses called "copyleft licensees". Copyleft licenses are FOSS licenses that have specific requirements that assure users' and consumers' right to copy, modify, and redistribute the software — both non-commercially and commercially (i.e., as part of a business endeavor).

15. In 2000, I was hired to work for the FSF, initially remotely from Cincinnati, and then on-site in Boston upon completion of my Master's thesis in 2001. I was promoted multiple times, and eventually became Executive Director of the FSF, a role which I served in until March 2005.

16. During my time as an employee of FSF, I assisted in various types of work related to software licensing and compliance with the GNU General Public License ("GPL"), the GNU Lesser General Public License ("LGPL") and other related and similar licenses. It was typical by the time of my departure that I led the resolution of thirty or more GPL violation matters each year, including a number that were made public, such as the OpenTV GPL violation and the original Linksys WRT54G violation.

17. In 2006, I volunteered to be the President of the SFC. Once the SFC began to receive funding, I became SFC's first employee. I have held multiple roles and positions at SFC.

18. In 2006 and 2007, I participated in the public process to comment on, evaluate, and make suggestions for the new version of the GPL (version 3). This work included many direct discussions with the GPLv3 drafters themselves.

19. In March 2010, I was elected to the Board of Directors of the FSF. I held a position on FSF's Board of Directors until October 2019. My CV is attached as Exhibit L and list of publications is provided as Exhibit M. A true and correct copy of my Expert Report in an enforcement action is attached as Exhibit N.

20. Throughout my long affiliation with the FSF, and also through my daily work at SFC, my primary focus and expertise centers around issues related to "copyleft" licenses such as the GPL and the Affero General Public License ("AGPL").

21. While Executive Director of the FSF circa 2002, I was involved in many discussions internally at the FSF and with the public about what was then called the "web services loophole" in the GPL. Namely, since the copyleft terms of the traditional GPL triggered only on software *distribution*, and typical deployment on a

SER_1624

website (for server-side software) did not involve distribution to the software's users, no copyleft requirements were triggered.

22. Circa early 2002, based on the Computer Science concept called a "quine", I invented what is now known as the "Affero Clause". This idea was written up by others and used as part of the AGPL, version 1 ("AGPLv1"). The Affero Clause requires that users of software via a web interface must have the opportunity to request and receive the "Corresponding Source" of the software.

23. During the early stages of the public comment process for the GPLv3, I was involved in various discussions regarding whether the Affero Clause would be incorporated into GPLv3 itself, or if it would remain a separate license from the main GPLv3.

24. As part of the public comment process for drafting the GPLv3 (and, ultimately, the AGPLv3), four public, invite-only committees ("A" – "D") were formed for draft discussion. I was invited to participate in "Committee D".

25. After the drafters of GPLv3 decided that the Affero Clause would not be included, and after the GPLv3 was officially published, I worked directly with the drafters to suggest and propose text for AGPLv3 §13 — the only term of AGPLv3 that differs from the GPLv3, and the section which includes the "Affero Clause".

26. During my time as an employee at the FSF from the late 1990s until March 2005, I led and participated in many discussions with the general public about concerns, ideas, and issues related to copyleft licensing. I have continued that work both as a volunteer and employee at other organizations since then.

27. A key issue of study and concern was the issue of "Further Restrictions" that licensors attempted to place outside of the requirements of the GPL.

28. The issue of "Further Restrictions", and what terms copyleft licenses should incorporate to prevent the imposition of "Further Restrictions" became one of the many issues on which I developed expertise.

SER_1625

### History of The "Further Restrictions" Copyleft Licensing Issue

29. The FOSS ecosystem depends heavily on the ability of third parties to understand their rights and engage in the unfettered freedom and right to copy, modify and redistribute software, in both non-commercial and commercial contexts.

30. A key policy tenet of copyleft licensing is assuring that copyleft license texts cannot be used to impose "Further Restrictions" on downstream recipients.

31. Imposition of Further Restrictions completely undermines the entire purpose of a copyleft license. Copyleft licenses are drafted carefully to guarantee rights of both individuals and firms that may receive the copyleft-licensed software after it has passed through (and been modified, repurposed, reconfigured and improved by) many different other entities.

32. The functioning of the FOSS ecosystem relies on individuals and firms to determine that when they receive a copy of FOSS software licensed under a specific FOSS license, that they can feel confident that the rights embodied in that license are unfettered and that there is no ambiguity or confusion about those rights.

33. Copyleft licenses go even a step further: they are designed and drafted to assure that no one in that entire distribution chain can change the terms of the license. The terms of the licenses guarantee that everyone who receives the software under that license has the precise same rights and permissions as everyone else.

34. Starting as early as 1996, and possibly earlier, I became aware in my work as a FOSS activist that there was a problematic practice in copyleft licenses. At the time, activists tended to call this the "no military use problem", because the issue came up most with regard to software authors who were also anti-war activists.

35. It was common throughout the late 1990s and into the early 2000s for anti-war activists who were also software authors to license their software under licenses that gave wide permissions, but prohibited any use by the any military (or, sometimes, specifically the USA military).

36. While many FOSS activists (including myself) were sympathetic to their concerns about FOSS being used in the military industrial complex, we nonetheless felt strongly that the rights and permissions to copy, modify and redistribute should remain unfettered — even for those who applied the software to activities that some of us found abhorrent. Thus, restrictions on military use, or really any specific application of the software, was never included in any widely adopted copyleft license.

6

SER_1626

37. However, it became quite common between circa 1996–2005 for anti-war activists to license their software under a potentially ambiguous license —- often formulated as "GPL, but military use is prohibited" (or some similar formulation).

38. During my time as an employee of the FSF from 1997–2004, I regularly handled community discussions, requests, and (most importantly) complaints from users who expressed that this Further Restriction of "military use prohibited" was problematic for the copyleft ecosystem for various reasons.

39. While the "military use prohibited" clauses were the most common, during the time frame of 1997–2004, I recall seeing many different formulations of Further Restrictions tacked onto the GPLv2 in various ways. I specifically recall seeing Further Restriction targeted at specific companies, or (quite ironically), I recall at least once seeing "GPL, non-commercial use only" as a license for software.

40. During this period, my standard answer (which as FSF's Executive Director, I made the official response for all such inquiries) was to inform those who complained and/or inquired that software under such a license (— one that referenced the main GPL, version 2 ("GPLv2") text but then added a Further Restriction – ) was software that was ultimately *not FOSS*.

41. Our reasoning for this conclusion was that the license might be construed and/or perceived as somewhat ambiguous. On one hand, the GPLv2 assured even the military's right to copy, modify, and redistributed the software — provided they continued to provide all who received distribution of the software the Corresponding Source. On the other hand, a term had been added to the overarching license that contradicted those terms. Furthermore, the GPLv2 explicitly prohibited the imposition of Further Restrictions, but provided no remedy for what downstream recipients should do in that situation. Users were simply advised to completely avoid software under such a license.

42. Frustrated at the lack of a better solution, everyone that I knew involved in copyleft license policy (including various past and current employees, Directors, and others at the FSF itself) agreed that this issue should be resolved by a provision in future versions of the GPL.

43. The problem continued in the FOSS community after I left the employment of the FSF in March 2005. On or about 2006-08-14, a (now defunct) project named "GPU" was actively covered in the press because the project has had added an Further Restriction prohibiting military use. A true and correct copy of an article written by the (then) journalist Tina Gasperson for linux.com is included in Exhibit A.

7

**The Public GPLv3 Drafting Process and Relevant Historical Records Online**

44. The GPLv3/AGPLv3 drafting process was (primarily) a public process run by the FSF from circa late 2005 through the release of the AGPLv3 on 2007-11-19. The FSF released a comprehensive archive of all public materials related to the drafting process. Then entire archive can be downloaded from:

`https://gplv3.fsf.org/gplv3-archive.tar.gz`

That large archive file is linked from `https://www.fsf.org/licensing/gplv3-archive`. For purposes of this report, I extracted all exhibits and materials regarding the GPLv3/AGPLv3 drafting process from that archive, which I verified on 2022-12-20 was downloadable from FSF's website. I refer to this archive in the remainder of this report as the "GPLv3 Archive".

45. On 2006-01-16, the FSF released the first public discussion draft of the GPLv3. Exhibit B is a true and correct copy of the document the following file found in the GPLv3 archive:

`gplv3.fsf.org/gpl-draft-2006-01-16.txt/download`.

46. On or about 2006-07-26, the FSF released the second public discussion draft of the GPLv3. A true and correct copy of the FSF's published change-tracked markup (from discussion draft 1) — which includes footnotes for rationale of changes. Exhibit C is a true and correct this copy of the following file found in the GPLv3 archive: `gplv3.fsf.org/gpl3-dd1to2-markup-rationale.pdf/download`.

47. On 2006-08-03, the FSF published a supplementary opinion on the "Additional Terms" section of GPLv3 at `https://gplv3.fsf.org/additional-terms-dd2.html` Exhibit D is a true and correct copy of that document, which appears in the GPLv3 Archive:

`gplv3.fsf.org/additional-terms-dd2.pdf/download`

48. On 2007-03-28, the FSF released the third public discussion draft of the GPLv3. A true and correct copy of the FSF's published change-tracked markup (from discussion draft 2) is found in Exhibit F, which is found in the GPLv3 Archive at: `gplv3.fsf.org/gpl3-dd2to3.pdf/download`.

49. On 2007-11-19, the FSF released the Affero GPL version 3 ("AGPLv3"). A true and correct copy of the AGPLv3, as downloaded from `https://www.gnu.org/licenses/agpl-3.0.txt` is in Exhibit H.

50. While the FSF began providing on 2021-11-17 the comprehensive archive file ("GPLv3 Archive") for archival convenience of researchers and licensing practitioners, to my knowledge and recollection, the FSF has *also* continuously made available these aforementioned discussion drafts, license texts, and rationale documents in an easily accessible and browsable format on the website `https://gplv3.fsf.org` — from their publication dates until present day.

8

SER_1628

**History of AGPLv3§7¶3 and its Prohibition On "Further Restrictions"**

51. The first public discussion draft of GPLv3, released on 2006-01-16, presented to the public the first attempt at the "Further Restrictions" clause: "No other additional conditions are permitted in your terms; therefore, no other conditions can be present on any work that uses this License."

52. I recall that there was substantial discussion between publication of the first and second discussion draft — informed by experiences that the FSF, I, and others had advising the community (described above in ¶ 41 and earlier paragraphs) — about developing a method for GPLv3 that would liberate downstream users and redistributors to address the problem themselves.

53. In the second discussion draft of GPLv3, the FSF presented a Further Restriction clause that stated: "Additional requirements are allowed only as stated in subsection 7b. If the Program as you received it purports to impose any other additional requirement, you may remove that requirement" (Exhibit C, page 20).

54. In the contemporaneously published public rationale document for this draft term, the FSF stated: "Here we are particularly concerned about the practice of program authors who purport to license their works under the GPL with an additional requirement that contradicts the terms of the GPL, such as a prohibition on commercial use. Such terms can make the program non-free, and thus contradict the basic purpose of the GNU GPL; but even when the conditions are not fundamentally unethical, adding them in this way invariably makes the rights and obligations of licensees uncertain" (Exhibit C, page 20).

55. In a follow-up opinion a few weeks later, the FSF wrote: "if a user receives GPL'd code that purports to include an additional requirement not in the [GPLv3§]7b list, the user may remove that requirement. Here we were particularly concerned to address the problem of program authors who purport to license their works in a misleading and possibly self-contradictory fashion, using the GPL together with unacceptable added restrictions that would make those works non-free software" (Exhibit D, page 3).

56. In the third public discussion draft of GPLv3, the FSF presented a modified "Further Restrictions Clause" as follows: "If the Program as you received it, or any part of it, purports to be governed by this License, supplemented by a term that is a further restriction, you may remove that term" (Exhibit F, page 15). This clause is carried forward, without further modification, into the fourth discussion draft in 2007-05-31, and to the final official release of GPLv3 on 2007-06-29.

57. As with any public comment process, there were differing views throughout the drafting process on the relative merits of the Further Restrictions Clause. Ultimately, as can be seen in the final draft, the Clause

SER_1629

was *included*. In my opinion, the drafting process bore out the best option for the copyleft community. The FSF clearly agreed, since they included the Clause in the final version of the license.

58. Other participants clearly agreed as well. For example, on 2007-06-01, the day after the release of the fourth discussion draft, User "frx", whom I recall was a regular public commentor throughout the GPLv3 drafting process, submitted comment 3,220 in the GPLv3 process – commenting specifically on the Further Restrictions Clause: "I'm glad to see that this is explicitly stated: every attempt to license a work under the terms of GPLv3 with further restrictions is equivalent to licensing under the plain GPLv3. This is good, since there are unfortunately many people that license works in inconsistent manners (such as GPLv2 + additional restrictions); creating a rule that resolves this kind of inconsistencies for the better is a good thing to do". A record of this comment is available at:

`https://gplv3.fsf.org/comments/rt/readsay.html?filename=gplv3-draft-4&id=3220`

A true and correct copy of that comment can be found in Exhibit E.

59. The AGPLv3 contains the same Further Restrictions Clause — unmodified from the version as it appeared in third public discussion draft of GPLv3.

60. The public who uses the text of the AGPLv3 and GPLv3 have been on notice by the FSF since (at least) 2007-03-28 that this term is an important and essential part of the license. Furthermore, the FSF transparently and publicly communicated the intent and expectations for utilization of the Further Restrictions Clause in their license drafting rationale documents that led up to the final draft of that Clause.

61. I conclude based on these documents, plus my recollection of the GPLv3 and AGPLv3 drafting process in which I participated, and my extensive work with the FSF and SFC in copyleft licensing, that the Further Restrictions Clause was specifically design to allow removal of an additional term when a licensor chose to use the text of the GPLv3 and/or AGPLv3 along with a term that the licensee viewed as a "Further Restriction".

### On Removal and Modification of FOSS Terms By Downstream Users

62. In the world of proprietary software licensing, it is undoubtedly exceedingly rare that a downstream user has permission to modify the terms upon redistribution.

63. In FOSS, this practice is quite common. Such modification of terms occurs both implicitly and explicitly.

64. Implicitly, it is widely understood that certain non-copyleft licenses, such as the widely used MIT license, are "Compatible" with copyleft licenses such as the AGPLv3.

10

65. Individual developers, commercial software firms, and hobbyists routinely include MIT-licensed software in larger AGPLv3'd works. When doing so, they implicitly relicense those MIT-licensed works under the AGPLv3.

66. Authors of MIT-licensed works encourage other developers and firms to incorporate these works not only in AGPLv3'd works, but also in proprietary software works as well. In effect, their license implicitly encourages such incorporation.

67. Copyleft licenses, being more complex, have explicit terms for Compatibility that require downstream users to take explicit actions to combine works under different licensing terms.

68. For example, the Lesser General Public License, v2.1 (LGPLv2.1) in its §3 states: "You may opt to apply the terms of the ordinary GNU General Public License instead of this License to a given copy of the Library. To do this, you must alter all the notices that refer to this License, so that they refer to the ordinary GNU General Public License, version 2, instead of to this License".

69. LGPLv2.1 is just one example where the downstream user is required and encouraged to make changes to the license notices of a copyleft license.

70. As such, changing and modifying license notices based on instructions given in a larger document is customary and normal activity for FOSS developers, and has been so at least since the publication of LGPLv2.1 in February 1999.

### The "Further Restrictions" And Their Removal

71. I have reviewed the document `enterprise/neo4j-enterprise/LICENSE.txt`.

This document appears on `https://github.com/neo4j/neo4j` at 2018-05-20 in

Git revision `47d845925e639297ab2564965ba68105d897e818`.

A true and correct copy of this license, appears as Exhibit G. This is the entirety of AGPLv3 as published by the FSF in Exhibit H, with the addition of the further restrictions outlined in the Commons Clause ("CC"). I understand from this litigation that the Court prefers to refer to this document as the "Neo4j Sweden Software License". For consistency, this report also refers to this document by that name.

72. In my professional opinion, the Neo4j Sweden Software License is structured and presented precisely in the manner that the Further Restrictions Clause anticipated.

11

SER_1631

73. Specifically, I believe that the AGPLv3 contemplated this precise situation: namely, a licensor licenses under the unmodified text of the AGPLv3, but also includes another term that contradicts, limits, and/or restricts the permissions granted under the AGPLv3.

74. If I had encountered the "Neo4j Sweden Software License" during the normal course of my work as a FOSS activist and FOSS licensing expert, I would have felt removal of the CC portion, upon redistribution of the software, was permitted by the AGPLv3's Further Restrictions Clause.

75. In my opinion, when John Mark Suhy encountered the Neo4j Sweden Software License, his removal of the CC and redistribution of the Covered Work under pure AGPLv3 would be considered customary, permissible, and even widely encouraged in the field of FOSS.

### Neo4j's Own Licensing Choice Permitted Removal of "Commons Clause"

76. In my opinion, the Neo4j Sweden Software License itself gave Suhy, PureThink, LLC, and IGOV, Inc. this permission explicitly. Specifically, even if one firm is the only copyright holder and therefore sole licensor of the work[4], the Neo4j Sweden Software License has the entire the AGPLv3 entirely *intact*, *including* its Further Restrictions Clause.

77. Akin to text of the LGPLv2.1, the Neo4j Sweden Software License states the two following facts:

- "[This software] is subject to the terms of the GNU AFFERO GENERAL PUBLIC LICENSE Version 3, with the Commons Clause as follows:" . . .

- "If the Program as you received it, or any part of it, contains a notice stating that it is governed by this License along with a term that is a further restriction, you may remove that term"

78. In my opinion, given the common FOSS practices of either explicitly or implicitly changing terms upon redistribution within the confines and requirements stated in the license, any reasonable party would determine that the Neo4j Sweden Software License intends — given that it was intentionally drafted to include the Further Restrictions Clause — that the CC can be removed by anyone who engages in redistribution (be it commercial or non-commercial) of the software covered by the Neo4j Sweden Software License.

### Other Licensing Options for Neo4j Software

79. In the FOSS community, the "GNU Affero General Public License" and "GNU General Public License" are well-known brands (owned by the FSF). These are held in high esteem by software developers who care about the political issue of software rights and freedom.

---

[4] ¶ 99 and following discusses the potential outcomes if, in fact, there is *not* a sole licensor of the work

SER_1632

80. Developers routinely look to confirm that software is licensed under the AGPLv3 or GPLv3 before using or relying on the software.

81. Based on my personal knowledge and discussions with staff and Board members of the FSF, the FSF is aware of the power of their brand recognition and, as an organization, the FSF cares deeply that developers can rely on the permissions and clauses in all versions of the GPL.

82. The FSF is a very small non-profit organization with extremely limited resources. I recall from my experience as a past employee that the FSF simply does not have sufficient resources to police trademark infringement of its registered trademark on "GNU" and its common-law trademark on "GNU Affero General Public License".

83. I believe that the Further Restrictions Clause was, in part, included in the GPLv3 and AGPLv3 to assure that the community could rely on the fact that if the text of the entire AGPLv3 was included in the licensing of some software, that Further Restrictions could not be placed on that software.

84. The FSF does permit licensors to reuse various portions of their license texts, *provided that* the licensors do not use the brand names of the GNU licenses, and do not include the preamble text.

85. Specifically, the FSF states in their GPL FAQ: "You can legally use the GPL terms (possibly modified) in another license provided that you call your license by another name and do not include the GPL preamble, and provided you modify the instructions-for-use at the end enough to make it clearly different in wording and not mention GNU". Exhibit I is a true and correct copy the relevant FAQ text as found at:

`https://www.gnu.org/licenses/gpl-faq.en.html#ModifyGPL`

86. According to The Internet Archive, similar text has appeared on FSF's GNU website since 2012-01-07. Exhibit J is a true and correct copy of the relevant FAQ text as it was indexed by the Internet Archive at the following link:

`https://web.archive.org/web/20120107170516/https://www.gnu.org/licenses/gpl-faq.en.html#ModifyGPL`

87. I confirm that in the field of FOSS licensing, FSF's policy is well-known and oft discussed. Commonly, provisions, terms, and clauses from the GPL routinely are reused in other FOSS (and non-FOSS) licenses, with permission from the FSF via their public statement quoted in ¶ 85.

88. Given this, it is reasonable and customary for FOSS developers and firms that use FOSS to rely on FOSS licensing information as presented when text from the AGPLv3 is involved. Specifically, when software users and/or redistributors encounters the full, unmodified text of the AGPLv3 (even with a Further Restriction),

13

the users and/or redistributors customarily believe in good faith that the choice of licensing in this manner was intentional.

89. Users and/or redistributors are keenly aware that software providers do have the option to construct their own license using terms similar to the AGPLv3 under a different name and without the preamble. Therefore, if a license that has the full text of the unmodified AGPLv3, users and/or redistributors have a good faith basis to exercise any and all clauses of the AGPLv3 — including the Further Restrictions Clause and its permission to strike and remove additional restriction clauses.

### MongoDB's Modified AGPLv3

90. MongoDB, Inc. ("MongoDB") is well-known and has a software offering (itself also called MongoDB) that competes with the Neo4j software in the field of NoSQL database software.

91. For many, MongoDB licensed their primary software product under the terms of the AGPLv3.

92. On 2018-10-16, MongoDB announced that the product would be licensed under a new licensed, which they named the Server-Side Public License ("SS Public License"). A true and correct copy of that license appears in Exhibit K, which was printed from:

`https://www.mongodb.com/licensing/server-side-public-license`

93. The SS Public License is textually nearly identical to the AGPLv3; however, MongoDB clearly followed the requirements of the FSF described in ¶ 85.

94. While the FOSS community widely rejected the SS Public License, MongoDB was widely considered to be operating under the permissions and rules established by the FSF for reuse of their license text.

95. It is notable that the release and promotion (widely covered in the technology press) of the SS Public License was nearly contemporaneous with the surreptitious licensing change that created Neo4j Sweden Software License.

96. In my opinion, it seems highly unlikely that the drafters of the Neo4j Sweden Software License were unaware of MongoDB's approach to their license change. As such, drafters of the Neo4j Sweden Software License was almost surely aware that they had the options presented under ¶ 85 to produce a fully modified AGPLv3 — sans the preamble and with no mention of FSF's trademark "GNU" — instead of the Neo4j Sweden Software License.

97. In my opinion, this speaks to clear intentionally in choosing a license that included the Further Restrictions Clause. In my opinion, after my many years of carefully monitoring use of the AGPLv3 and its

14

modifications in the industry, the Neo4j Sweden Software License was structured and promoted to give users the **incorrect** impression that the CC could not be removed from those terms — even though the Further Restrictions Clause was present. The Neo4j Sweden Software License also gives the impression to the unwary that the software is still available under the AGPLv3, as it had been before.

98. In essence, my opinion is that the Neo4j Sweden Software License attempted to inappropriately capitalize on the goodwill, power, and notoriety of the "GNU" and "AGPLv3" brands while also frightening commercial redistributors with the addition of the CC. In my opinion, the Neo4j Sweden Software License unfairly confuses users by including the entire text of the AGPLv3 (unmodified). I firmly believe that Neo4j hoped that no one would notice the Further Restrictions Clause remained included, and thereby realize that CC could, in fact, be removed and that commercial activity by downstream redistributors could therefore continue under pure AGPLv3.

### Violation of AGPLv3 If Not Sole Licensor

99. I am very familiar with the business model of "Proprietary Relicensing" — whereby a single firm holds rights to relicense all copyrights contained in a work so that they can simultaneously issue a copyleft license and a proprietary one. I first encountered this business model in the early 1990s when it was employed by a company called MySQL AB (now owned by Oracle), and have often seen it utilized since then by many companies, including MongoDB and with the Neo4j software.

100. Permission to engage in Proprietary Relicensing is completely predicated on universal collection of permissions and rights sufficient to act as sole licensor of the Covered Work under AGPLv3.

101. This process runs counter to the typical method of FOSS contribution, which is often called "inbound=outbound". In the inbound=outbound FOSS contribution method, third-party contributors license their works under the project's primary license (in the case of the Neo4j software, AGPLv3). The upstream project coordinator is then bound by AGPLv3 as a redistributor of these third party works. The upstream project coordinator is often a major (and sometimes even majority) author of the entire work, but typically substantial portions are copyrighted by other contributors and licensed to the upstream project coordinator only under the project's license.

102. To engage in Proprietary Relicensing, a firm must studiously, diligently and carefully avoid the standard inbound=outbound approach to FOSS collaboration. Typically, firms accomplish this task by requiring all contributors to formally and officially assent to a Copyright Assignment Agreement or a Contributor Licensing Agreement that grants (either exclusive or non-exclusive) rights to the firm to issue licenses for the work other than the project's outbound FOSS license.

15

SER_1635

103. If a firm fails to properly gather such rights from all contributors — going back to the very beginning of the project — then the copyleft license (in this case, the AGPLv3) explicitly prohibits the firm from engaging in Proprietary Relicensing.

104. If rights from every contributor to the Covered Work that constitutes the Neo4j software offerings were not properly gathered and consolidated under the control of a single entity, then distribution of the Neo4j software under any license other than AGPLv3 is, itself, a violation of the AGPLv3. In that case, every license issued that is not strictly AGPLv3 would, in my opinion, constitute a violation of the license.

105. Specifically, if the primary authors of the Neo4j software failed to universally collect relicensing permission for all secondary authors and contributors to the Covered Work, then addition of CC to the Neo4j Sweden Software License is outright prohibited for this additional reason — a reason orthogonal to downstream users' right to remove CC pursuant to AGPLv3's Further Restrictions Clause.

106. Meanwhile, assent from all contributors to issue licenses other than AGPLv3 was properly collected and consolidated into one entity, then that provides further indication that a license other than AGPLv3 could confidently be issued.

107. For example, with such collected and consolidate rights, assents and permissions, the rights holder could instead follow MongoDB's example and issue an entirely new public license for their software — provided they followed the rules and permissions granted to them by the FSF ¶ 85.

**Conclusion**

108. Based on all the material that I have reviewed, combined with my detailed knowledge and familiarity with FOSS licensing and how firms typically use FOSS licensing and engage in and with contributors and downstream redistributors, I conclude the following:

109. In my opinion, the Neo4j Sweden Software License intentionally includes the Further Restrictions Clause as a term of that license.

110. In my opinion, there is widespread understanding in the FOSS community of the purpose and function of the Further Restrictions Clause. As such, Suhy acted in a reasonable, customary, good faith, and correct manner when removing CC from the Neo4j Sweden Software License and licensing the software under AGPLv3 to his customers and/or the public.

111. In my opinion, given the extensive publicity of MongoDB's SS Public License, FSF's FAQ, and other widely understood licensing knowledge regarding AGPLv3, those who promulgated the Neo4j Sweden Soft-

16

SER_1636

ware License were (or should have been) aware that they could construct their own license, picking and choosing their preferred clauses from the AGPLv3 under the rules outlined by the FSF in ¶ 85.

112. In my opinion, it is reasonable, customary, in good faith, and correct for redistributors to believe that the Neo4j Sweden Software License intentionally included the Further Restrictions Clause. The authors of the Neo4j Sweden Software License should have expected that the Further Restrictions Clause would be used to remove CC from the Neo4j Sweden Software License. If they wanted to prevent that behavior, they should have (and could have, provided they had sufficient rights to all contributions to be licensed) removed the Further Restrictions Clause.

113. In my opinion, if a single firm failed to diligently and formally collect explicit, written relicensing permission from all contributors to all code that was licensed under AGPLv3, that distribution of the Neo4j software under the Neo4j Sweden Software License is in violation of AGPLv3 (wholly unrelated to the Further Restrictions Clause). If such rights have not been diligently and carefully collected and consolidated, no entity may engage in Proprietary Relicensing business nor issue the Neo4j Sweden Software License legitimately. In other words, without such consolidation of rights, the only legitimate license of the Neo4j software is AGPLv3.

I declare under penalty of perjury under the laws of the United States of America that all statements and affirmations made herein of my own knowledge are true and correct, and all statements made on information and belief are believed to be true and correct.

Executed on 22 December 2022

By: _____

SER_1637

# Exhibit A

## Expert Report of Bradley M. Kuhn

## 22 December 2022

"Open source project adds 'no military use' clause to the GPL" by Tina Gasperson, published on

2006-08-14.



# Open source project adds "no military use" clause to the GPL

By  -  August 14, 2006

Author: Tina Gasperson

GPU is a Gnutella client that creates ad-hoc supercomputers by allowing individual PCs on the network to share CPU resources with each other. That's intriguing enough, but the really interesting thing about GPU is the license its developers have given it. They call it a "no military use" modified version of the GNU General Public License (GPL).

Tiziano Mengotti and Rene Tegel are the lead developers on the GPU project. Mengotti is the driving force behind the license "patch," which says "the program and its derivative work will neither be modified or executed to harm any human being nor through inaction permit any human being to be harmed."

Mengotti says the clause is specifically intended to prevent military use. "We are software developers who dedicate part of our free time to open source development. The fact is that open source is used by the military industry. Open source operating systems can steer warplanes and rockets. [This] patch should make clear to users of the software that this is definitely not allowed by the licenser."

He says some might think an attempt to prevent military use might be "too idealistic" and would not work in practice, but he references the world of ham radio, whose rules specify that the technology is not to be used commercially. "Surprisingly enough, this rule is respected by almost every ham operator."

The developers readily acknowledge that the "patch" contradicts the original intention of the GPL, to provide complete freedom for users of software and source code licensed under it. "This license collides with paragraph six of the Open Source Definition," is how they word it in the license preamble.



users of the software that this is definitely not allowed by the licenser."

He says some might think an attempt to prevent military use might be "too idealistic" and would not work in practice, but he references the world of ham radio, whose rules specify that the technology is not to be used commercially. "Surprisingly enough, this rule is respected by almost every ham operator."

The developers readily acknowledge that the "patch" contradicts the original intention of the GPL, to provide complete freedom for users of software and source code licensed under it. "This license collides with paragraph six of the Open Source Definition," is how they word it in the license preamble.

Richard Stallman, the founder of the Free Software movement and author of the GPL, says that while he doesn't support the philosophy of "open source," neither does he believe software developers or distributors have the right to try to control other people's activities through restricting the software they run. "Nonetheless, I don't think the requirement is entirely vacuous, so we cannot disregard it as legally void."

"As a pacifist, I sympathize with their goals," says Russ Nelson, a founding board member of the Open Source Initiative (OSI). "People who feel strongly about war will sometimes take actions which they realize are ineffectual, but make it clear that they are not willing to take action which directly supports war."

Tegel says he doesn't fully agree with the inclusion of the clause in GPU's license. "I see the point, and my personal opinion supports it, but I am not sure if it fits in a license," he says. "Like our Dutch military: I can say it is bad because it kills people and costs money. But on the other hand, we were taught by both our leftist and rightist teachers to enjoy our freedom due to the alliance freeing us from Nazis, a thing which I appreciate very much."

Both developers do agree about one aspect of their license clause. It is based on the first of science fiction writer Isaac Asimov's Three Law of Robotics, which states, "A robot may not harm a human being, or, through inaction, allow a human being to come to harm." That, they say, is a good thing, "because the guy was right," Tegel says, "and he showed the paradox that almost any technological development has to solve, whether it is software or an atom bomb. We must discuss now what ethical problems we may raise in the future."

**Category:**

- Legal

Case 5:18-cv-07182-EJD     Document 181-2     Filed 04/20/23     Page 22 of 181

# Exhibit B

## Expert Report of Bradley M. Kuhn

## 22 December 2022

First discussion draft of the GPLv3, as published by the FSF on 2006-01-16.

SER_1641

```
                    GNU GENERAL PUBLIC LICENSE
                  Discussion Draft 1 of Version 3, 16 Jan 2006

THIS IS A DRAFT, NOT A PUBLISHED VERSION OF THE GNU GENERAL PUBLIC LICENSE.

 Copyright (C) 2006 Free Software Foundation, Inc.
    51 Franklin Street, Fifth Floor, Boston, MA 02110-1301 USA
 Everyone is permitted to copy and distribute verbatim copies
 of this license document, but changing it is not allowed.

                             Preamble

  The licenses for most software are designed to take away your
freedom to share and change it.  By contrast, the GNU General Public
License is intended to guarantee your freedom to share and change free
software--to make sure the software is free for all its users.  We,
the Free Software Foundation, use the GNU General Public License for
most of our software; it applies also to any other program whose
authors commit to using it.  (Some Free Software Foundation software
is covered by the GNU Lesser General Public License instead.)  You
can apply it to your programs, too.

  When we speak of free software, we are referring to freedom, not
price.  Our General Public Licenses are designed to make sure that you
have the freedom to distribute copies of free software (and charge for
this service if you wish), that you receive source code or can get it
if you want it, that you can change the software or use pieces of it
in new free programs; and that you know you can do these things.

  To protect your rights, we need to make requirements that forbid
anyone to deny you these rights or to ask you to surrender the rights.
These restrictions translate to certain responsibilities for you if you
distribute copies of the software, or if you modify it.

  For example, if you distribute copies of such a program, whether
gratis or for a fee, you must give the recipients all the rights that
you have.  You must make sure that they, too, receive or can get the
source code.  And you must show them these terms so they know their
rights.

  Developers that use the GNU GPL protect your rights with two steps: (1)
assert copyright on the software, and (2) offer you this License which
gives you legal permission to copy, distribute and/or modify the software.

  For the developers' and author's protection, the GPL clearly explains
that there is no warranty for this free software.  If the software is
modified by someone else and passed on, the GPL ensures that recipients
are told that what they have is not the original, so that any problems
introduced by others will not reflect on the original authors'
reputations.

  Some countries have adopted laws prohibiting software that enables users
to escape from Digital Restrictions Management.  DRM is fundamentally
incompatible with the purpose of the GPL, which is to protect users'
freedom; therefore, the GPL ensures that the software it covers will
neither be subject to, nor subject other works to, digital restrictions
from which escape is forbidden.

  Finally, every program is threatened constantly by software patents.  We
wish to avoid the special danger that redistributors of a free program will
individually obtain patent licenses, in effect making the program
proprietary.  To prevent this, the GPL makes it clear that any patent must
be licensed for everyone's free use or not licensed at all.
```

The precise terms and conditions for copying, distribution and modification follow.

GNU GENERAL PUBLIC LICENSE
TERMS AND CONDITIONS FOR COPYING, DISTRIBUTION AND MODIFICATION

0.  Definitions.

A "licensed program" means any program or other work distributed under this License.  The "Program" refers to any such program or work, and a "work based on the Program" means either the Program or any derivative work under copyright law: that is to say, a work containing the Program or a portion of it, either modified or unmodified.  Throughout this License, the term "modification" includes, without limitation, translation and extension.  A "covered work" means either the Program or any work based on the Program.  Each licensee is addressed as "you".

To "propagate" a work means doing anything with it that requires permission under applicable copyright law, other than executing it on a computer or making private modifications.  This includes copying, distribution (with or without modification), sublicensing, and in some countries other activities as well.

1. Source Code.

The "source code" for a work means the preferred form of the work for making modifications to it.  "Object code" means any non-source version of a work.

The "Complete Corresponding Source Code" for a work in object code form means all the source code needed to understand, adapt, modify, compile, link, install, and run the work, excluding general-purpose tools used in performing those activities but which are not part of the work.  For example, this includes any scripts used to control those activities, and any shared libraries and dynamically linked subprograms that the work is designed to require, such as by intimate data communication or control flow between those subprograms and other parts of the work, and interface definition files associated with the program source files.

Complete Corresponding Source Code also includes any encryption or authorization codes necessary to install and/or execute the source code of the work, perhaps modified by you, in the recommended or principal context of use, such that its functioning in all circumstances is identical to that of the work, except as altered by your modifications.  It also includes any decryption codes necessary to access or unseal the work's output. Notwithstanding this, a code need not be included in cases where use of the work normally implies the user already has it.

Complete Corresponding Source Code need not include anything that users can regenerate automatically from other parts of the Complete Corresponding Source Code.

As a special exception, the Complete Corresponding Source Code need not include a particular subunit if (a) the identical subunit is normally included as an adjunct in the distribution of either a major essential component (kernel, window system, and so on) of the operating system on which the executable runs or a compiler used to produce the executable or an object code interpreter used to run it, and (b) the subunit (aside from possible incidental extensions) serves only to enable use of the work with that system component or compiler or interpreter, or to implement a widely used or standard interface, the implementation of which requires no patent license not already

SER_1643

generally available for software under this License.

2. Basic Permissions.

  All rights granted under this License are granted for the term of
copyright on the Program, and are irrevocable provided the stated
conditions are met.  This License explicitly affirms your unlimited
permission to run the Program.  The output from running it is covered by
this License only if the output, given its content, constitutes a work
based on the Program.  This License acknowledges your rights of "fair use"
or other equivalent, as provided by copyright law.

  This License gives unlimited permission to privately modify and run the
Program, provided you do not bring suit for patent infringement against
anyone for making, using or distributing their own works based on the
Program.

  Propagation of covered works is permitted without limitation provided it
does not enable parties other than you to make or receive copies.
Propagation which does enable them to do so is permitted, as
"distribution", under the conditions of sections 4-6 below.

3. Digital Restrictions Management.

  As a free software license, this License intrinsically disfavors
technical attempts to restrict users' freedom to copy, modify, and share
copyrighted works.  Each of its provisions shall be interpreted in light of
this specific declaration of the licensor's intent.  Regardless of any
other provision of this License, no permission is given to distribute
covered works that illegally invade users' privacy, nor for modes of
distribution that deny users that run covered works the full exercise of
the legal rights granted by this License.

  No covered work constitutes part of an effective technological protection
measure: that is to say, distribution of a covered work as part of a system
to generate or access certain data constitutes general permission at least
for development, distribution and use, under this License, of other
software capable of accessing the same data.

4.[1] Verbatim Copying.

 You may copy and distribute verbatim copies of the Program's source
code as you receive it, in any medium, provided that you conspicuously
and appropriately publish on each copy an appropriate copyright
notice; keep intact all license notices and notices of the absence of
any warranty; give all recipients of the Program a copy of this
License along with the Program; and obey any additional terms present
on parts of the Program in accord with section 7.

You may charge a fee for the physical act of transferring a copy, and
you may at your option offer warranty protection for a fee.

5.[2] Distributing Modified Source Versions.

  Having modified a copy of the Program under the conditions of section
2, thus forming a work based on the Program, you may copy and distribute
such modifications or work in the form of source code under the terms of
Section 4 above, provided that you also meet all of these conditions:

    a) The modified work must carry prominent notices stating that you
    changed the work and the date of any change.

    b) You must license the entire modified work, as a whole, under

SER_1644

this License to anyone who comes into possession of a copy.  This
License must apply, unmodified except as permitted by section 7
below, to the whole of the work.  This License gives no permission
to license the work in any other way, but it does not invalidate
such permission if you have separately received it.

c) If the modified work has interactive user interfaces, each must
include a convenient feature that displays an appropriate
copyright notice, and tells the user that there is no warranty for
the program (or that you provide a warranty), that users may
redistribute the modified work under these conditions, and how to
view a copy of this License together with the central list (if any) of
other terms in accord with section 7.  If the interface presents a
list of user commands or options, such as a menu, a command to
display this information must be prominent in the list.
Otherwise, the modified work must display this information at
startup--except in the case that the Program has such
interactive modes and does not display this information at
startup.

These requirements apply to the modified work as a whole.  If
identifiable sections of that work, added by you, are not derived from
the Program, and can be reasonably considered independent and separate
works in themselves, then this License, and its terms, do not apply to
those sections when you distribute them as separate works for use not
in combination with the Program.  But when you distribute the same
sections for use in combination with covered works, no matter in what
form such combination occurs, the whole of the combination must be
licensed under this License, whose permissions for other licensees
extend to the entire whole, and thus to every part of the whole.  Your
sections may carry other terms as part of this combination in limited
ways, described in section 7.

Thus, it is not the intent of this section to claim rights or contest
your rights to work written entirely by you; rather, the intent is to
exercise the right to control the distribution of derivative or
collective works based on the Program.

A compilation of a covered work with other separate and independent
works, which are not by their nature extensions of the covered work,
in or on a volume of a storage or distribution medium, is called an
"aggregate" if the copyright resulting from the compilation is not
used to limit the legal rights of the compilation's users beyond what
the individual works permit.  Mere inclusion of a covered work in an
aggregate does not cause this License to apply to the other parts of
the aggregate.

6.[3] Non-Source Distribution.

  You may copy and distribute a covered work in Object Code form under the
terms of Sections 4 and 5, provided that you also distribute the
machine-readable Complete Corresponding Source Code (herein the
"Corresponding Source") under the terms of this License, in one of these
ways:

    a) Distribute the Object Code in a physical product (including a
    physical distribution medium), accompanied by the Corresponding Source
    distributed on a durable physical medium customarily used for software
    interchange; or,

    b) Distribute the Object Code in a physical product (including a
    physical distribution medium), accompanied by a written offer, valid
    for at least three years and valid for as long as you offer spare parts

or customer support for that product model, to give any third party, for a price no more than ten times your cost of physically performing source distribution, a copy of the Corresponding Source for all the software in the product that is covered by this License, on a durable physical medium customarily used for software interchange; or,

c) Privately distribute the Object Code with a copy of the written offer to provide the Corresponding Source.  This alternative is allowed only for occasional noncommercial distribution, and only if you received the Object Code with such an offer, in accord with Subsection b above.  Or,

d) Distribute the Object Code by offering access to copy it from a designated place, and offer equivalent access to copy the Corresponding Source in the same way through the same place. You need not require recipients to copy the Corresponding Source along with the Object Code.

[If the place to copy the Object Code is a network server, the Corresponding Source may be on a different server that supports equivalent copying facilities, provided you have explicitly arranged with the operator of that server to keep the Corresponding Source available for as long as needed to satisfy these requirements, and provided you maintain clear directions next to the Object Code saying where to find the Corresponding Source.]

Distribution of the Corresponding Source in accord with this section must be in a format that is publicly documented, unencumbered by patents, and must require no special password or key for unpacking, reading or copying.

The Corresponding Source may include portions which do not formally state this License as their license, but qualify under section 7 for inclusion in a work under this License.

7. License Compatibility.

  When you release a work based on the Program, you may include your own terms covering added parts for which you have, or can give, appropriate copyright permission, as long as those terms clearly permit all the activities that this License permits, or permit usage or relicensing under this License.  Your terms may be written separately or may be this License plus additional written permission.  If you so license your own added parts, those parts may be used separately under your terms, but the entire work remains under this License.  Those who copy the work, or works based on it, must preserve your terms just as they must preserve this License, as long as any substantial portion of the parts they apply to are present.

  Aside from additional permissions, your terms may add limited kinds of additional requirements on your added parts, as follows:

    a) They may require the preservation of certain copyright notices, other legal notices, and/or author attributions, and may require that the origin of the parts they cover not be misrepresented, and/or that altered versions of them be marked in the source code, or marked there in specific reasonable ways, as different from the original version.

    b) They may state a disclaimer of warranty and liability in terms different from those used in this License.

c) They may prohibit or limit the use for publicity purposes of specified names of contributors, and they may require that certain specified trademarks be used for publicity purposes only in the ways that are fair use under trademark law except with express permission.

d) They may require that the work contain functioning facilities that allow users to immediately obtain copies of its Complete Corresponding Source Code.

e) They may impose software patent retaliation, which means permission for use of your added parts terminates or may be terminated, wholly or partially, under stated conditions, for users closely related to any party that has filed a software patent lawsuit (i.e., a lawsuit alleging that some software infringes a patent).  The conditions must limit retaliation to a subset of these two cases: 1. Lawsuits that lack the justification of retaliating against other software patent lawsuits that lack such justification. 2. Lawsuits that target part of this work, or other code that was elsewhere released together with the parts you added, the whole being under the terms used here for those parts.

  No other additional conditions are permitted in your terms; therefore, no other conditions can be present on any work that uses this License.  This License does not attempt to enforce your terms, or assert that they are valid or enforceable by you; it simply does not prohibit you from employing them.

  When others modify the work, if they modify your parts of it, they may release such parts of their versions under this License without additional permissions, by including notice to that effect, or by deleting the notice that gives specific permissions in addition to this License.  Then any broader permissions granted by your terms which are not granted by this License will not apply to their modifications, or to the modified versions of your parts resulting from their modifications.  However, the specific requirements of your terms will still apply to whatever was derived from your added parts.

  Unless the work also permits distribution under a previous version of this License, all the other terms included in the work under this section must be listed, together, in a central list in the work.

  8.[4] Termination.

  You may not propagate, modify or sublicense the Program except as expressly provided under this License.  Any attempt otherwise to propagate, modify or sublicense the Program is void, and any copyright holder may terminate your rights under this License at any time after having notified you of the violation by any reasonable means within 60 days of any occurrence.  However, parties who have received copies, or rights, from you under this License will not have their licenses terminated so long as they remain in full compliance.

  9.[5] Not a Contract.

  You are not required to accept this License in order to receive a copy of the Program.  However, nothing else grants you permission to propagate or modify the Program or any covered works.  These actions infringe copyright if you do not accept this License.  Therefore, by modifying or propagating the Program (or any covered work), you indicate your acceptance of this License to do so, and all its terms and conditions.

  10.[6] Automatic Licensing of Downstream Users.

  Each time you redistribute a covered work, the recipient automatically

receives a license from the original licensors, to propagate and modify
that work, subject to this License, including any additional terms
introduced through section 7.  You may not impose any further restrictions
on the recipients' exercise of the rights thus granted or affirmed, except
(when modifying the work) in the limited ways permitted by section 7.  You
are not responsible for enforcing compliance by third parties to this
License.

  11. Licensing of Patents.

  When you distribute a covered work, you grant a patent license to
the recipient, and to anyone that receives any version of the work,
permitting, for any and all versions of the covered work, all
activities allowed or contemplated by this License, such as
installing, running and distributing versions of the work, and using
their output.  This patent license is nonexclusive, royalty-free and
worldwide, and covers all patent claims you control or have the right
to sublicense, at the time you distribute the covered work or in the
future, that would be infringed or violated by the covered work or any
reasonably contemplated use of the covered work.

  If you distribute a covered work knowingly relying on a patent license,
you must act to shield downstream users against the possible patent
infringement claims from which your license protects you.

  12.[7] Liberty or Death for the Program.

  If conditions are imposed on you (whether by court order, agreement or
otherwise) that contradict the conditions of this License, they do not
excuse you from the conditions of this License.  If you cannot distribute
the Program, or other covered work, so as to satisfy simultaneously your
obligations under this License and any other pertinent obligations, then as
a consequence you may not distribute it at all.  For example, if a patent
license would not permit royalty-free redistribution by all those who
receive copies directly or indirectly through you, then the only way you
could satisfy both it and this License would be to refrain entirely from
distribution.

It is not the purpose of this section to induce you to infringe any
patents or other exclusive rights or to contest their legal validity.
The sole purpose of this section is to protect the integrity of the
free software distribution system.  Many people have made generous
contributions to the wide range of software distributed through that
system in reliance on consistent application of that system; it is up
to the author/donor to decide if he or she is willing to distribute
software through any other system and a licensee cannot impose that
choice.

  [13.[8] Geographical Limitations.

  If the distribution and/or use of the Program is restricted in certain
countries either by patents or by copyrighted interfaces, the original
copyright holder who places the Program under this License may add an
explicit geographical distribution limitation excluding those countries,
so that distribution is permitted only in or among countries not thus
excluded.  In such case, this License incorporates the limitation as if
written in the body of this License.]

  14.[9] Revised Versions of this License.

  The Free Software Foundation may publish revised and/or new versions of
the GNU General Public License from time to time.  Such new versions will
be similar in spirit to the present version, but may differ in detail to

address new problems or concerns.

Each version is given a distinguishing version number.  If the Program specifies that a certain numbered version of this License "or any later version" applies to it, you have the option of following the terms and conditions either of that numbered version or of any later version published by the Free Software Foundation.  If the Program does not specify a version number of this License, you may choose any version ever published by the Free Software Foundation.

  15.[10] Requesting Exceptions.

  If you wish to incorporate parts of the Program into other free programs whose distribution conditions are different, write to the author to ask for permission.  For software which is copyrighted by the Free Software Foundation, write to the Free Software Foundation; we sometimes make exceptions for this.  Our decision will be guided by the two goals of preserving the free status of all derivatives of our free software and of promoting the sharing and reuse of software generally.

                          NO WARRANTY

  16.[11] There is no warranty for the Program, to the extent permitted by applicable law.  Except when otherwise stated in writing the copyright holders and/or other parties provide the Program "as is" without warranty of any kind, either expressed or implied, including, but not limited to, the implied warranties of merchantability and fitness for a particular purpose.  The entire risk as to the quality and performance of the Program is with you.  Should the Program prove defective, you assume the cost of all necessary servicing, repair or correction.

  17.[12] In no event unless required by applicable law or agreed to in writing will any copyright holder, or any other party who may modify and/or redistribute the Program as permitted above, be liable to you for damages, including any general, special, incidental or consequential damages arising out of the use or inability to use the Program (including but not limited to loss of data or data being rendered inaccurate or losses sustained by you or third parties or a failure of the Program to operate with any other programs), even if such holder or other party has been advised of the possibility of such damages.

  18. Unless specifically stated, the Program has not been tested for use in safety critical systems.

                  END OF TERMS AND CONDITIONS

          How to Apply These Terms to Your New Programs

  If you develop a new program, and you want it to be of the greatest possible use to the public, the best way to achieve this is to make it free software which everyone can redistribute and change under these terms.

  To do so, attach the following notices to the program.  It is safest to attach them to the start of each source file to most effectively convey the exclusion of warranty; and each file should have at least the "copyright" line and a pointer to where the full notice is found.

    <one line to give the program's name and a brief idea of what it does.>
    Copyright (C) <year>  <name of author>

    This program is free software; you can redistribute it and/or modify
    it under the terms of the GNU General Public License as published by
    the Free Software Foundation; either version 3 of the License, or

```
    (at your option) any later version.

    This program is distributed in the hope that it will be useful,
    but WITHOUT ANY WARRANTY; without even the implied warranty of
    MERCHANTABILITY or FITNESS FOR A PARTICULAR PURPOSE.  See the
    GNU General Public License for more details.

    You should have received a copy of the GNU General Public License
    along with this program; if not, write to the Free Software Foundation,
    Inc., 51 Franklin Street, Fifth Floor, Boston, MA 02110-1301  USA


Also add information on how to contact you by electronic and paper mail.

If the program does terminal interaction, make it output a short
notice like this when it starts in an interactive mode:

    Gnomovision version 69, Copyright (C) year  name of author
    Gnomovision comes with ABSOLUTELY NO WARRANTY; for details type `show w'.
    This is free software, and you are welcome to redistribute it
    under certain conditions; type `show c' for details.

The hypothetical commands `show w' and `show c' should show the appropriate
parts of the General Public License.  Of course, the commands you use may
be called something other than `show w' and `show c'; for a GUI interface,
you would use an "About box" instead.

You should also get your employer (if you work as a programmer) or your
school, if any, to sign a "copyright disclaimer" for the program, if
necessary.  Here is a sample; alter the names:

  Yoyodyne, Inc., hereby disclaims all copyright interest in the program
  `Gnomovision' (which makes passes at compilers) written by James Hacker.

  <signature of Ty Coon>, 1 April 1989
  Ty Coon, President of Vice

For more information on how to apply and follow the GNU GPL, see
http://www.gnu.org/licenses.

The GNU General Public License does not permit incorporating your program
into proprietary programs.  If your program is a subroutine library, you
may consider it more useful to permit linking proprietary applications with
the library.  If this is what you want to do, use the GNU Lesser General
Public License instead of this License.
```

# Exhibit C
## Expert Report of Bradley M. Kuhn
## 22 December 2022

Second discussion draft (and rationale therefor) for the GPLv3, as published by the FSF on or about

2006-07-26.

SER_1651

# GPLv3 Second Discussion Draft Rationale

This document states the rationale for the changes in the second discussion draft of GPLv3. We present the changes themselves in the form of markup, with ~~strikeout~~ indicating text we have removed from the draft and **bold** indicating text we have added. Footnotes state the reasons for specific changes. Several of these reasons refer to opinions we are releasing with the second discussion draft.

We refer to the first and second discussion drafts of GPLv3 as "Draft1" and "Draft2," respectively.

1

SER_1652

# GNU General Public License

Discussion Draft ~~1~~ **2** of Version 3, ~~16 Jan~~ **27 July** 2006

THIS IS A DRAFT, NOT A PUBLISHED VERSION OF THE
GNU GENERAL PUBLIC LICENSE.

Copyright © 2006 Free Software Foundation, Inc.
51 Franklin Street, Fifth Floor, Boston, MA 02110-1301 USA
Everyone is permitted to copy and distribute verbatim copies of this
license document, but changing it is not allowed.

## Preamble

The licenses for most software are designed to take away your freedom to share and change it. By contrast, the GNU General Public License is intended to guarantee your freedom to share and change free software—to make sure the software is free for all its users. We, the Free Software Foundation, use the GNU General Public License for most of our software; it applies also to any other program whose authors commit to using it. ~~(Some Free Software Foundation software is covered by the GNU Lesser General Public License instead.)~~[1] You can apply it to your programs, too.

When we speak of free software, we are referring to freedom, not price. Our General Public Licenses are designed to make sure that you have the freedom to distribute copies of free software (and charge for this service if you wish), that you receive source code or can get it if you want it, that you can change the software or use pieces of it in new free programs~~;~~**,** and that you know you can do these things.

To protect your rights, we need to make requirements that forbid anyone to deny you these rights or to ask you to surrender the rights. ~~These~~

---

[1]This parenthetical reference to the GNU LGPL is unnecessary and is less relevant now that we have written the new version of the LGPL as a set of permissive exceptions to the GNU GPL in accord with section 7.

2

SER_1653

~~restrictions translate to~~ **Therefore, you have** certain responsibilities ~~for you~~ if you distribute copies of the software, or if you modify it.

For example, if you distribute copies of such a program, whether gratis or for a fee, you must give the recipients all the rights that you have. You must make sure that they, too, receive or can get the source code. And you must show them these terms so they know their rights.

Developers that use the GNU GPL protect your rights with two steps: (1) assert copyright on the software, and (2) offer you this License which gives you legal permission to copy, distribute and/or modify the software.

For the developers' and ~~author's~~ **authors'** protection, the GPL clearly explains that there is no warranty for this free software. ~~If the software is modified by someone else and passed on, the GPL ensures that recipients are told that what they have is not the original, so that any problems introduced by others will not reflect on the original authors' reputations.~~ **For both users' and authors' sake, the GPL requires that modified versions be marked as changed, so that their problems will not be associated erroneously with the original version.**

~~Some countries have adopted laws prohibiting software that enables users to escape from Digital Restrictions Management.~~ **Some computers are designed to deny users access to install or run modified versions of the software inside them.** ~~DRM~~ **This** is fundamentally incompatible with the purpose of the GPL, which is to protect users' freedom~~;~~ **to change the software.** ~~therefore~~ **Therefore**, the GPL ensures that the software it covers will ~~neither be subject to, nor subject other works to, digital restrictions from which escape is forbidden~~ **not be restricted in this way**.[2]

Finally, every program is threatened constantly by software patents. **States should not allow patents to restrict development and use of software on general-purpose computers, but in places where they do, we** ~~We~~ wish to avoid the special danger that redistributors of a free program will individually obtain patent licenses, in effect making the program proprietary. To prevent this, the GPL ~~makes it clear~~ **assures** that ~~any patent must be licensed for everyone's free use or not licensed at all~~ **patents**

---

[2]DRM becomes nastier when based on Treacherous Computing and other changes in computer hardware which deny users the possibility of running modified or alternate programs. When these measures are applied to GPL-covered software, the freedom to run the program becomes a sham. In the statement on DRM in the Preamble we now emphasize this fact rather than the imposition of laws used to enforce and supplement these technical restrictions.

SER_1654

cannot be used to render the program non-free.[3]

~~The precise terms and conditions for copying, distribution and modification follow.~~[4]

~~GNU GENERAL PUBLIC LICENSE~~

TERMS AND CONDITIONS ~~FOR COPYING, DISTRIBUTION AND MODIFICATION~~[5]

## 0.  Definitions.

~~A "licensed program" means any program or other work distributed under this License.~~[6] ~~"The Program" refers to any such program or work, and a "work based on the Program" means either the Program or any derivative work under copyright law: that is to say, a work containing the Program or a portion of it, either modified or unmodified.~~[7] **In this License, each licensee is addressed as "you," while "the Program" refers to any work of authorship licensed under this License.** ~~Throughout this License, the term "modification" includes, without limitation, translation and extension.~~ **A "modified" work includes, without limitation, versions in which material has been translated or added.**[8] **A work**

---

[3]The patent licensing practices that section 7 of GPLv2 (corresponding to section 12 of GPLv3) was designed to prevent are one of several ways in which software patents threaten to make free programs non-free and to prevent users from exercising their rights under the GPL. GPLv3 takes a more comprehensive approach to combatting the danger of patents.

[4]This statement is redundant and therefore unnecessary. In addition, while the requirements of the GPL specifically concern copying, distribution, and modification, as these terms are commonly understood by free software users, the GPL speaks of other aspects of users' rights, as for example in affirming the right to run the unmodified Program.

[5]See n. 4.

[6]In Draft1 the term "licensed program" was defined but never used.

[7]Our efforts to internationalize the terminology of GPLv3 were incomplete in Draft1, as can be seen in the definition of "work based on the Program," which continued to use the United States copyright law term of art "derivative work." Some have suggested that the use of "containing" in this definition is not clear. We replace this definition with a generalized definition of "based on" that is neutral with respect to the vocabularies of particular national copyright law systems. See Opinion on Denationalization of Terminology.

[8]We replace the definition of "modification" with a definition of "modified" (work), which we then use as the basis for our new generalized definition of "based on." This in turn provides us with an alternative to the definitions in GPLv2 and Draft1 that incorporated the United States copyright law term "derivative work." See Opinion on Denationalization of Terminology.

We regard the well-established term "extension" (of a program), used in the now-replaced definition of "modification," to be equivalent to adding material to the program.

SER_1655

**"based on" another work means any modified version, formation of which requires permission under applicable copyright law.** A "covered work" means either the **unmodified** Program or ~~any~~ **a** work based on the Program.[9] ~~Each licensee is addressed as "you".~~

To "propagate" a work means doing anything with it that requires permission under applicable copyright law, ~~other than~~ **except** executing it on a computer**, or making** ~~private~~ modifications **that you do not share.**[10] ~~This~~ **Propagation** includes copying, distribution (with or without modification), **making available to the public,**[11] ~~sublicensing,~~ and in some countries other activities as well. **To "convey" a work means any kind of propagation that enables other parties to make or receive copies, excluding sublicensing.**[12]

A party's **"essential patent claims"** in a work are all patent claims that the party can give permission to practice, whether already acquired or to be acquired, that would be infringed by making, using, or selling the work.[13]

---

We note that copyright law, and not arbitrary file boundaries, defines the extent of the Program.

[9]See nn. 7–8 and Opinion on Denationalization of Terminology. We have generalized the definition of "based on" beyond "work based on the Program"; note that a "work based on the Program" no longer includes the Program.

[10]We replace the term "private" in the definition of "propagate" with wording that describes behavior. "Private" has many, often conflicting, meanings in legal and common usage.

[11]The copyright laws of many countries other than the United States, as well as certain international copyright treaties, recognize "making available to the public" or "communication to the public" as one of the exclusive rights of copyright holders. See Opinion on Denationalization of Terminology.

[12]See Opinion on Denationalization of Terminology. In Draft1 we defined "propagate" in order to free the license from dependence on national copyright law terms of art. However, Draft1 continued to use the term "distribute," a term that varies in scope in those copyright law systems that recognize it, while applying the conditions for distribution to all kinds of propagation that enable other parties to make or receive copies. This approach proved confusing, and showed the incompleteness of our efforts to internationalize the license. Draft2 now provides a new definition of "convey" and replaces "distribute" with "convey" throughout its terms and conditions, apart from a few idiomatic references to software distribution that are not meant to incorporate the copyright law term of art.

Because we now expressly prohibit sublicensing under section 2 (see n. 34), we have also excluded it from the definition of the new term "convey" (and removed it as an illustrative example of propagation).

[13]As part of our effort to clarify the wording of the express patent license of Draft1, resulting in the covenant not to assert patent claims of Draft2, we provided a new definition of "essential patent claims" to specify, more precisely than we did in Draft1, the set of patent claims that are licensed (or, as we now formulate it, subject to the covenant not to

SER_1656

## 1. Source Code.

The "source code" for a work means the preferred form of the work for making modifications to it. "Object code" means any non-source version of a work.

**The "System Libraries"[14] of an executable work[15] include every subunit such that (a) the identical subunit is normally included as an adjunct in the distribution of either a major essential component (kernel, window system, and so on) of the specific operating system (if any) on which the object code runs, or a compiler used to produce the object code, or an object code interpreter used to run it, and (b) the subunit (aside from possible incidental extensions) serves only to enable use of the work with that system component or compiler or interpreter, or to implement a widely used or standard interface for which an implementation is available to the public in source code form.[16]**

The "~~Complete~~ Corresponding Source ~~Code~~"[17] for a work in object code form means all the source code needed to ~~understand, adapt, modify,~~

---

assert). Most notably, we removed the reference to "reasonably contemplated use," which several members of our discussion committees argued was unclear. We also used the verbs that, in most countries, define the basic exclusive powers of patent holders (making, using, and selling the claimed invention). See Opinion on Covenant Not to Assert Patent Claims.

Having factored out and revised the definition of "essential patent claims," we realized that we could also use it to clarify the patent retaliation clause of section 2. See Opinion on Patent Retaliation.

[14]The definition of Corresponding Source ("Complete Corresponding Source Code" in Draft1) is the most complex definition in the license. In our efforts to make the definition clearer and easier to understand, we removed the exception in the final paragraph of section 1 and rewrote it as the definition of the new term "System Libraries," which we then use in the first paragraph of the definition of Corresponding Source.

[15]The definition of System Libraries is inapplicable to non-executable object code works; with this definition, such works have no System Libraries.

[16]In Draft1, a system component that implemented a standard interface qualified for the system library exception if the implementation required "no patent license not already generally available for software under this License." This wording was read by many to mean that the system library exception imposed an affirmative duty to investigate third-party patents, something which we had never intended. Our general concern was to ensure that there would be no obstacle to supporting the implementation in free software; now we have specified this without explicit reference to patents. The revised wording in the definition of System Libraries removes the reference to patents while requiring the interface to have a freely-available reference implementation.

[17]We made the trivial change of shortening "Complete Corresponding Source Code" to "Corresponding Source," an abbreviation we had already used in section 6 of Draft1.

6

SER_1657

~~compile, link~~ **generate**, install, and **(for an executable work)**[18] run the **object code and to modify the** work,[19] ~~excluding~~ **except its System Libraries, and except** general-purpose tools **or generally available free programs which are** used **unmodified** in performing those activities but which are not part of the work. For example, ~~this~~ **Corresponding Source** includes ~~any~~ scripts used to control those activities, **interface definition files associated with the program source files,** and ~~any~~ **the source code for** shared libraries and dynamically linked subprograms that the work is **specifically** designed to require,[20] such as ~~by~~ ~~intimate~~ **complex** data communication[21] or control flow between those subprograms and other parts of the work~~, and interface definition files associated with the program source files~~.

**The** ~~Complete~~ Corresponding Source ~~Code~~ also includes any encryption or authorization ~~codes~~ **keys**[22] necessary to install and/or execute ~~the~~ **modified versions from** source code ~~of the work, perhaps modified by you,~~ in the recommended or principal context of use, such that ~~its functioning in all circumstances is identical to that of the work, except as altered by your modifications~~ **they can implement all the same functionality in the same range of circumstances.**[23] **(For instance, if the work is a DVD player and can play certain DVDs, it must be possible for modified versions to play those DVDs. If the work communicates with an online service, it must be possible for modified versions to communicate with the same online service in the same way such that the service cannot distinguish.)**[24] ~~It also includes any decryption~~

---

[18]For non-software works covered by the GPL, the concept of "running" of object code will generally be meaningless.

[19]In revising this part of the definition of Corresponding Source, we have responded to concerns that some of our wording, which we meant to be expansive, and particularly the verbs "understand" and "adapt," was too vague or open-ended. In defining what source code is included in Corresponding Source, we now focus on source code that is necessary to generate and (if applicable) execute the object code form of the work and to develop, generate and run modified versions.

[20]We clarify that the shared libraries and dynamically linked subprograms that are included in Corresponding Source are those that the work is "specifically" designed to require, making it clearer that they do not include libraries invoked by the work that can be readily substituted by other existing implementations.

[21]We substitute "complex" for "intimate," which some readers found unclear.

[22]We replaced the term "codes" with "keys" to avoid confusion with source code and object code.

[23]We believe that this wording is clearer than the wording it replaces.

[24]The previous version of this paragraph was read more broadly than we had intended. We now provide specific examples to illustrate to readers the kinds of circumstances in

SER_1658

~~codes necessary to access or unseal the work's output.~~[25]  ~~Notwithstanding this, a code~~ **A key** need not be included in cases where use of the work normally implies the user already has ~~it~~ **the key and can read and copy it, as in privacy applications where users generate their own keys. However, the fact that a key is generated based on the object code of the work or is present in hardware that limits its use does not alter the requirement to include it in the Corresponding Source.**[26]

**The Corresponding Source may include portions which do not formally state this License as their license, but qualify under section 7 for inclusion in a work under this License.**[27]

The ~~Complete~~ Corresponding Source ~~Code~~ need not include anything that users can regenerate automatically from other parts of the ~~Complete~~ Corresponding Source ~~Code~~.

~~As a special exception, the Complete Corresponding Source Code need not include a particular subunit if (a) the identical subunit is normally included as an adjunct in the distribution of either a major essential component (kernel, window system, and so on) of the operating system on which the executable runs or a compiler used to produce the executable or an object code interpreter used to run it, and (b) the subunit (aside from possible incidental extensions) serves only to enable use of the work with that system component or compiler or interpreter, or to implement a widely used or standard interface, the implementation of which requires no patent license~~

---

which users must receive keys along with the source code in order for their ability to modify software to be real rather than nominal. See Opinion on Digital Restrictions Management.

[25]Our reference to decryption codes generated much comment, and was misunderstood by many readers. It was intended to ensure that the program was not limited to production of encrypted data that the user was unable to read. We eventually concluded that this is unnecessary; as long as users are truly in a position to install and run their modified versions of the program, they could if they wish modify the original program to output the data without encrypting it. We have decided, therefore, to remove this sentence from the draft.

[26]The mere fact that use of the work implies that the user *has* the key may not be enough to ensure the user's freedom in using it. The user must also be able to read and copy the key; thus, its presence in a special register inside the computer does not satisfy the requirement. In an application in which the user's personal key is used to protect privacy or limit distribution of personal data, the user clearly has the ability to read and copy the key, which therefore is not included in the Corresponding Source. On the other hand, if a key is generated based on the object code, or is present in hardware, but the user cannot manipulate that key, then the key must be provided as part of the Corresponding Source.

[27]This paragraph was previously the final paragraph of section 6; it is more appropriately included in the definition of Corresponding Source.

SER_1659

~~not already generally available for software under this License.~~[28]

## 2.  Basic Permissions.

All rights granted under this License are granted for the term of copyright on the Program, and are irrevocable provided the stated conditions are met. This License explicitly affirms your unlimited permission to run the **unmodified**[29] Program. The output from running it is covered by this License only if the output, given its content, constitutes a ~~work based on the Program~~ **covered work**. This License acknowledges your rights of "fair use" or other equivalent, as provided by copyright law.

This License ~~gives unlimited~~[30] ~~permission~~ **permits you** to ~~privately modify~~ **make** and run **privately modified versions of** the Program,[31] **or have others make and run them on your behalf.**[32] ~~provided you do not~~ **However, this permission terminates, as to all such versions, if you** bring suit **against anyone** for patent infringement ~~against anyone~~ **of any of your essential patent claims in any such version,** for making, using**, selling** or ~~distributing~~ **otherwise conveying** ~~their own works~~ **a work** based on the Program **in compliance with this License.**[33]

Propagation of covered works **other than conveying** is permitted without limitation ~~provided it does not enable parties other than you to make or receive copies~~. **Sublicensing is not allowed; section 10 makes it unnecessary.**[34] ~~Propagation which does enable them to do so~~ **Conveying**

---

[28]As we point out in n. 14, we replaced this paragraph with our new definition of "System Libraries" in the second paragraph of section 1.

[29]We add "unmodified," even though "the Program" is defined as the work as it is received by the licensee, to more clearly distinguish this permission from the permission in the following paragraph, which is subject to patent retaliation.

[30]Strictly speaking, this permission, unlike the permission to run the unmodified Program, is not unlimited, since it may be terminated under the conditions stated in this paragraph.

[31]As we explain further in the Opinion on Patent Retaliation, we have revised this wording for clarity.

[32]Inherent in the right to modify a work is the right to have another party modify it on one's behalf. We mention this explicitly to make clear that one cannot avoid the effects of the patent retaliation clause by contracting out the development of the modified version.

[33]See Opinion on Patent Retaliation. The changes we have made in this paragraph more precisely define the permission as well as the kind of lawsuit that activates termination of the permission. For example, as noted in n. 13, we make use of the new defined term "essential patent claims."

[34]The explicit prohibition of sublicensing ensures that enforcement of the GPL is always by the copyright holder. Usually, sublicensing is regarded as a practical convenience or

SER_1660

is permitted ~~, as "distribution",~~ under the conditions ~~of sections 4-6~~ **stated** below.[35]

## 3. ~~Digital Restrictions Management~~ No Denying Users' Rights Through Technical Measures.[36]

~~As a free software license, this License intrinsically disfavors technical attempts to restrict users' freedom to copy, modify, and share copyrighted works. Each of its provisions shall be interpreted in light of this specific declaration of the licensor's intent.~~[37] Regardless of any other provision of this License, no permission is given ~~to distribute covered works that illegally invade users' privacy, nor~~[38] for modes of ~~distribution~~ **conveying** that deny users that run covered works the full exercise of the legal rights granted by this License.

No covered work constitutes part of an effective technological **"protection"** measure **under section 1201 of Title 17 of the United States Code.**~~; that is to say, distribution of a covered work as part of a system to generate or access certain data constitutes general permission at least for development, distribution and use, under this License, of other software capable of accessing the same data.~~ **When you convey a covered work, you waive any legal power to forbid circumvention of technical measures that include use of the covered work, and you disclaim any intention to**

---

necessity for the licensee, to avoid having to negotiate a license with each licensor in a chain of distribution. The GPL solves this problem in another way, through its automatic licensing provision.

[35]To simplify and clarify the text, we make use of the new defined term "conveying." See n. 12 and Opinion on Denationalization of Terminology.

[36]In Draft1 only part of this section concerned Digital Restrictions Management, so the title was misleading. In Draft2 none of the section directly concerns DRM; parts of it are designed to thwart legal means of stopping users from changing free software that comes with DRM, but that is an indirect connection. We have retitled the section to state its direct focus. Our license must do what it can to resist the effects of technical measures to deny users' rights to copy, modify, and share software, and of the laws that prohibit escape from these measures. See Opinion on Digital Restrictions Management.

[37]These sentences were intended to guide judicial interpretation of the license to resolve any ambiguities in favor of protecting users against technical restrictions on their freedom. We deleted this sentence as part of focusing the GPL's requirements on protecting the freedom to modify DRM-ridden software, rather than at the DRM itself.

[38]The clause referring to illegal invasions of users' privacy was intended to provide developers a weapon, based in copyright, to combat spyware and malware, in order to supplement enforcement efforts of public authorities. The considerable public reaction to this provision, however, was overwhelmingly negative, and we therefore have decided to remove it.

10

SER_1661

**limit operation or modification of the work as a means of enforcing the legal rights of third parties against the work's users.**[39]

## 4.[1]   Verbatim Copying.

You may copy and ~~distribute~~ **convey** verbatim copies of the Program's source code as you receive it, in any medium, provided that you conspicuously and appropriately publish on each copy an appropriate copyright notice; keep intact all license notices and notices of the absence of any warranty; **and** give all recipients**,** ~~of~~ **along with** the Program**,** a copy of this License ~~along with the Program;~~ and ~~obey any additional terms present on parts of the Program in accord with~~ **the central list (if any) required by** section 7. **The recipients of these copies will possess all the rights granted by this License (with any added terms under section 7).**[40]

You may charge ~~a fee~~ **any price or no price** for ~~the physical act of transferring a copy~~ **each copy that you convey**,[41] and you may ~~at your~~

---

[39]We revised the second paragraph of section 3 extensively, breaking it up into two sentences. The first sentence now makes specific reference to the anticircumvention provisions of the U.S. Digital Millennium Copyright Act. The second sentence is more generally directed, but its waiver and disclaimer respond specifically to the features of the anticircumvention provisions of the European Union Copyright Directive and its associated implementing legislation. Although our general approach in drafting GPLv3 has been to remove references to particular regimes of copyright law, and particularly those of the United States, the peculiar features of the different U.S. and European approaches to anticircumvention, and the graveness of the danger these laws pose to free software, demanded a more specialized solution. In particular, the EUCD appears to give implementers of technical restriction measures the power to waive the operation of anticircumvention law. The DMCA is worded differently; we believe its effects are best resisted by way of a declaration that covered works are not part of its "protection" measures. See Opinion on Digital Restrictions Management.

[40]The principal changes in the first paragraph of section 4 concern the possible presence of additional terms on all or part of the Program. We removed wording that was inconsistent with section 7; the job it did is now done in section 7 itself. We also added wording that makes clear that the conveyor must provide the central list of additional terms required by section 7, and that recipients receive full GPL rights, supplemented by any additional terms that were placed on the Program.

[41]The original wording of this clause was meant to make clear that the GPL permits one to charge for the distribution of software. Despite our efforts to explain this in the license and in other documents, there are evidently some who believe that the GPL allows charging for services but not for selling software, or that the GPL requires downloads to be gratis. We referred to charging a "fee"; the term "fee" is generally used in connection with services. Our original wording also referred to "the physical act of transferring." The intention was to distinguish charging for transfers from attempts to impose licensing fees on all third parties. "Physical" might be read, however, as suggesting "distribution in a

11

~~option~~ offer **support or** warranty protection for a fee.[42]

### 5.[2]   ~~Distributing~~ **Conveying** Modified Source Versions.

~~Having modified a copy of the Program under the conditions of section 2, thus forming a work based on the Program, you~~ **You** may copy and ~~distribute~~ **convey** ~~such modifications or~~ **a** work **based on the Program, or the modifications to produce it from the Program,**[43] in the form of source code under the terms of section 4 above, provided that you also meet all of these conditions:

a. The modified work must carry prominent notices stating that you changed the work and the date of any change.

b. You must license the entire ~~modified~~ work, as a whole, under this License to anyone who comes into possession of a copy. This License must apply, unmodified except as permitted by section 7 below, to the whole of the work**, and all its parts, regardless of how they are packaged**.[44] This License gives no permission to license the work in any other way, but it does not invalidate such permission if you have separately received it.

c. If the modified work has interactive user interfaces, each must include a convenient feature that displays an appropriate copyright notice, and tells the user that there is no warranty for the program (or that you provide a warranty), that users may ~~redistribute~~ **convey** the modified work under ~~these conditions~~ **this License**, and how to view a copy of this License together with the central list (if any) of other terms in accord with section 7. **Specifically,** ~~If~~ **if** the interface presents a list of user commands or options, such as a menu, a command to display this information must be prominent in the list~~.;~~ ~~Otherwise~~ **otherwise**,

---

physical medium only." In our revised wording we use "price" in place of "fee," and we remove the term "physical."

[42]There is no harm in explicitly pointing out what ought to be obvious: that those who convey GPL-covered software may offer commercial services for the support of that software.

[43]Conveying a patch that is used to produce a modified version is equivalent to conveying the modified version itself.

[44]We add to subsection 5b a simpler restatement of a point that was previously made in a more cumbersome way in the text following subsection 5c. Distributors may not use artful subdivision of a modified work to evade the GPL's copyleft requirement.

12

the modified work must display this information at startup ~~except in the case that the Program has such interactive modes and does not display this information at startup~~. **However, if the Program has interactive interfaces that do not comply with this subsection, your modified work need not make them comply.**[45]

~~These requirements apply to the modified work as a whole.~~[46] ~~If~~ **To the extent that** identifiable sections of ~~that~~ **the modified** work, added by you, are not derived from the Program, and can be reasonably considered independent and separate works in themselves, then this License, and its terms, do not apply to those sections when you ~~distribute~~ **convey** them as separate works, **not specifically** for use ~~not~~ in combination with the Program.[47] ~~But when you distribute the same sections for use in combination with covered works, no matter in what form such combination occurs, the whole of the combination must be licensed under this License, whose permissions for other licensees extend to the entire whole, and thus to every part of the whole. Your sections may carry other terms as part of this combination in limited ways, described in section 7.~~[48]

~~Thus, it is not the intent of this section to claim rights or contest your rights to work written entirely by you; rather, the intent is to exercise the right to control the distribution of derivative or collective works based on the Program.~~[49]

A compilation of a covered work with other separate and independent works, which are not by their nature extensions of the covered work, in or on a volume of a storage or distribution medium, is called an "aggregate" if the **compilation and its resulting** copyright ~~resulting from the compilation is~~ **are** not used to limit the **access or** legal rights of the compilation's users beyond what the individual works permit. ~~Mere inclusion~~ **Inclusion** of a covered work in an aggregate does not cause this License to apply to the other parts of the aggregate.

---

[45]Responding to several public comments, we have rewritten the last sentence of subsection 5c to make it clearer. The substance is unchanged.

[46]Subsection 5b makes this sentence redundant.

[47]A separately-conveyed component that is designed only to be used in combination with and as part of a specific GPL-covered work ought to be considered part of that work, and not as a separate work.

[48]The paragraph following subsection 5c was needlessly abstruse, as was made clear to us during the discussion process. We have made it shorter and, we think, clearer, removing wording duplicative of statements made elsewhere (such as in subsection 5b) and limiting use of the term "combination," which troubled many readers.

[49]We have deleted this statement of intent; we consider it unnecessary. It also had the disadvantage of using terminology specific to U.S. copyright law.

13

## 6.[3]  **Conveying** Non-Source ~~Distribution~~ **Forms.**

You may copy and ~~distribute~~ **convey** a covered work in ~~Object Code~~ **object code** form under the terms of sections 4 and 5, provided that you also ~~distribute~~ **convey** the machine-readable ~~Complete~~ Corresponding Source ~~Code (herein the "Corresponding Source")~~ under the terms of this License, in one of these ways:

    a. ~~Distribute~~ **Convey** the ~~Object Code~~ **object code** in a physical product (including a physical distribution medium), accompanied by the Corresponding Source ~~distributed~~ **fixed** on a durable physical medium customarily used for software interchange**.**~~; or,~~

    b. ~~Distribute~~ **Convey** the ~~Object Code~~ **object code** in a physical product (including a physical distribution medium), accompanied by a written offer, valid for at least three years and valid for as long as you offer spare parts or customer support for that product model, to give any third party~~, for a price no more than ten times your cost of physically performing source distribution,~~ a copy of the Corresponding Source for all the software in the product that is covered by this License, on a durable physical medium customarily used for software interchange**, for a price no more than your reasonable cost of physically performing this conveying of source.**[50]~~; or,~~

    [b1. **Convey the object code in a physical product (including a physical distribution medium), accompanied by a written offer, valid for at least three years and valid for as long as you offer spare parts or customer support for that product model, to provide access to copy the Corresponding Source from a network server at no charge.**][51]

---

[50]Responding to arguments made in several public comments, we have decided to restore the requirement, relaxed in Draft1, that the price of the copy of the Corresponding Source be limited to the reasonable cost of physically performing source distribution.

[51]We present for consideration and discussion this proposed new option for providing Corresponding Source by a written offer to make the Corresponding Source available for download from a network server. In the past, downloading was not a convenient option for most users in most circumstances. This is no longer true in many places where broadband net access is common.

Moreover, there are now services that will download material, store it on a CD or DVD, and mail it to the customer for a reasonable price, comparable to the cost of occasionally preparing and mailing a source disk. (For example, we know of one business that charges U.S. $8.52 to burn and ship a DVD containing between 2GB and 4.7GB of data from

SER_1665

c. ~~Privately distribute~~ **Convey individual copies of** the ~~Object Code~~ **object code** with a copy of the written offer to provide the Corresponding Source. This alternative is allowed only ~~for occasional noncommercial distribution~~ **occasionally and noncommercially**, and only if you received the ~~Object Code~~ **object code** with such an offer, in accord with ~~Subsection b above~~ **subsection 6b or 6b1**.[52] ~~Or,~~

d. ~~Distribute~~ **Convey** the ~~Object Code~~ **object code** by offering access ~~to copy it~~ from a designated place, and offer equivalent access to ~~copy~~ the Corresponding Source in the same way through the same place **at no extra charge**.[53] You need not require recipients to copy the Corresponding Source along with the ~~Object Code~~ **object code**.

   [If the place to copy the ~~Object Code~~ **object code** is a network server, the Corresponding Source may be on a different server that supports equivalent copying facilities, provided you have explicitly arranged with the operator of that server to keep the Corresponding Source available for as long as needed to satisfy these requirements, and provided you maintain clear directions next to the ~~Object Code~~ **object code** saying where to find the Corresponding Source.]

e. **Convey the object code using peer-to-peer transmission provided you know that, and inform other peers where, the object code and Corresponding Source of the work are being offered to the general public at no charge under subsection 6d.**[54]

~~Distribution of the~~ **The** Corresponding Source **conveyed** in accord with this section must be in a format that is publicly documented, ~~unencumbered by patents,~~ **with an implementation available to the public in source code form,**[55] and must require no special password or key for unpacking,

---

the U.S. to any country outside the U.S.) The availability of such services suggests that option 6b1 will be no worse than option 6b, even for users in countries where access to broadband is uncommon.

[52] We have revised the wording of this option for clarity. The subsection is meant to facilitate personal, noncommercial sharing of copies between individuals.

[53] We now specify what we believe was previously implicit: if binaries are offered for download from a network server, the Corresponding Source made available through the network server in accord with this subsection must be offered at no extra charge.

[54] See Opinion on BitTorrent Propagation.

[55] Our primary objective here was to ensure that the distributor use a generally-recognized mechanism for packaging source code. However, many read the requirement

15

SER_1666

reading or copying.

~~The Corresponding Source may include portions which do not formally state this License as their license, but qualify under section 7 for inclusion in a work under this License.[56]~~

**A separable portion of the object code, whose source code is excluded from the Corresponding Source as a System Library, need not be included in conveying the object code work.[57]**

## 7.   ~~License Compatibility~~ **Additional Terms**.[58]

~~When you release a work based on the Program, you may include your own terms covering added parts for which you have, or can give, appropriate copyright permission, as long as those terms clearly permit all the activities that this License permits, or permit usage or relicensing under this License. Your terms may be written separately or may be this License plus additional written permission. If you so license your own added parts, those parts may be used separately under your terms, but the entire work remains under this License. Those who copy the work, or works based on it, must preserve your terms just as they must preserve this License, as long as any substantial portion of the parts they apply to are present.~~

**You may have received the Program,[59] or parts of it, under terms that supplement the terms of this License.  These additional terms may include additional permissions, as provided in subsection 7a, and additional requirements, as provided in subsection 7b.  When you convey copies of a covered work, unless the work also permits use under a previous version of this License, it**

---

that the distribution format be "unencumbered by patents" as creating a duty to investigate third-party patents. In Draft2, as with the clause in the system library exception (now the definition of System Libraries) concerning standard implementations, we have removed the reference to patents and instead require the public availability of an implementation in source code form.

[56]We have moved this sentence to the definition of Corresponding Source in section 1.

[57]We made this change, taking advantage of the definition of System Libraries, to make explicit what has been implicit: that the object code distribution of a GPL-covered work does not imply responsibility to distribute any System Library on which the work depends.

[58]As we explain in the Opinion on Additional Terms, we have extensively rewritten section 7. We changed the section title because license compatibility as it is conventionally understood is only one of several aspects of the issue of placement of additional terms on a GPL-covered program.

[59]In Draft1 section 7 did not directly address the possibility of additional terms being placed on the entire Program by the original author. See Opinion on Additional Terms.

16

SER_1667

must list, in one central place in the source code, the complete set of additional terms governing all or part of the work.[60]

### a.  Additional Permissions.

Additional permissions make exceptions from one or more of the requirements of this License.[61]  A license document containing a clause that permits relicensing or conveying under this License shall be treated as a list of additional permissions, provided that the license document makes clear that no requirement in it survives such relicensing or conveying.[62]

Any additional permissions that are applicable to the entire Program are treated as though they were included in this License, as exceptions to its conditions, to the extent that they are valid under applicable law.  If additional permissions apply only to part of the Program, that part may be used separately under those permissions, but the entire Program remains governed by this License without regard to the additional terms.[63]

~~Aside from additional permissions, your terms may add limited kinds of additional requirements on your added parts, as follows:~~

---

[60]This is a restatement of the central list requirement, along with the exception for "version 2 or later" works, that was previously placed at the end of section 7. It recognizes that additional terms may cover the whole work as well as parts of it.

[61]We offer version 3 of the GNU LGPL as a model for the use of additional permissions as exceptions from requirements of the GPL.

[62]Free software licenses that are nominally permissive and non-copyleft either are assumed to contain an implied relicensing clause or expressly permit distribution "under another license." Some of these licenses, however, fail to make clear whether all of their requirements are extinguished by the relicensing clause, or whether some of the requirements continue to burden downstream users of code that is nominally distributed under the terms of some other license.

We address this problem in subsection 7a. A formal license containing a relicensing clause is automatically compatible with GPLv3, as though that formal license contained no additional requirements, but only if that license makes clear that the relicensing clause extinguishes all additional requirements in it. Otherwise, the relicensing clause is ignored for purposes of analyzing compatibility with GPLv3; each additional requirement must be considered to determine whether it falls within the list of allowed additional requirements given in subsection 7b.

[63]The second sentence of this paragraph restates more clearly what was stated in the first paragraph of Draft1 section 7. The first sentence of this paragraph is new; it describes the effect of an additional permission that applies to the whole work.

17

SER_1668

### b. Additional Requirements.

**Additional requirements are terms that further constrain use, modification or propagation of covered works. This License affects only the procedure for enforcing additional requirements, and does not assert that they can be successfully enforced by the copyright holder.[64]  Only these kinds of additional requirements are allowed by this License:[65]**

0) ~~a) They may~~ **terms that** require ~~the~~ preservation of ~~certain copyright notices, other~~ **specified reasonable** legal notices~~, and/or~~ **or** author attributions~~.~~**; or**

1) ~~and may~~ **terms that** require that the origin of the ~~parts~~ **material** they cover not be misrepresented, ~~and/or~~ **or** that ~~altered~~ **modified** versions of ~~them~~ **that material** be marked ~~in the source code, or marked there~~ in specific reasonable ways~~,~~ as different from the original version~~.~~**; or**

2) ~~b) They may state a disclaimer of~~ warranty ~~and~~ **or** liability **disclaimers** ~~in terms different~~ **that differ** from ~~those used~~ **the disclaimers** in this License~~.~~**; or**

3) ~~c) They may~~ **terms that** prohibit or limit the use for publicity purposes of specified names of ~~contributors~~ **licensors or authors**,[66] ~~and they may~~ **or that** require that certain specified **trade names,** trademarks, **or service marks not** be used for publicity purposes **without express permission, other than** ~~only~~ in ~~the~~ ways that are fair use under **applicable** trademark law; ~~except with express permission.~~ **or**

4) ~~d) They may~~ **terms that** require**,** ~~that the work contain functioning facilities that allow~~ **if a modified version of the material they cover is a work intended to interact with users through a computer network, that those** users **be able** to ~~immediately~~ obtain copies of ~~its~~ **the** ~~Complete~~ Corresponding Source ~~Code.~~ **of the**

---

[64]We require enforcement of additional requirements to be by the procedure given in section 8.

[65]We have rewritten the list of allowed additional requirements for clarity, and we have added a catchall requirement category.

[66]"Contributor" is a term defined in several other free software licenses, but not used in our licenses. We replace it here with the equivalent terms of art "licensor" and "author."

18

work through the same network session;[67] or

5) ~~e) They may impose software patent retaliation, which means~~ **terms that wholly or partially terminate, or allow termination of,** permission for use of ~~your added parts terminates or may be terminated, wholly or partially, under stated conditions,~~ **the material they cover,** for ~~users closely related to any party that has filed~~ **a user who files** a software patent lawsuit (~~i.e.~~**that is,** a lawsuit alleging that some software infringes a patent)~~.~~ **not filed in retaliation or defense against the earlier filing of another software patent lawsuit, or in which the allegedly infringing software includes some of the covered material, possibly in combination with other software; or** ~~The conditions must limit retaliation to a subset of these two cases: 1. Lawsuits that lack the justification of retaliating against other software patent lawsuits that lack such justification. 2. Lawsuits that target part of this work, or other code that was elsewhere released together with the parts you added, the whole being under the terms used here for those parts.~~[68]

6) **terms that are precisely equivalent in type and extent to a requirement expressly stated in this License, or that deny permission for activities that are clearly not permitted, expressly or otherwise, by this License.**[69]

~~No other additional conditions are permitted in your terms; therefore, no other conditions can be present on any work that uses this License. This License does not attempt to enforce your terms, or assert that they are valid or enforceable by you; it simply does not prohibit you from employing them.~~

**All other additional requirements, including attorney's fees provisions, choice of law, forum, and venue clauses, arbitration clauses, mandatory contractual acceptance clauses, requirements**

---

[67]We have addressed concerns regarding the phrase "functioning facilities" and the potential applicability of the wording of subsection 7d of Draft1 to modified code not intended for public network use.

[68]The wording of subsection 7e of Draft1, concerning compatible patent retaliation clauses, was particularly difficult for readers to understand. We have entirely rewritten it, without changing any of its substance.

[69]We add this catchall category for other requirements that do not fall neatly into one of the previously listed categories but which, in a sense, are not "additional" because the GPL clearly makes the same requirement, or clearly does not permit what the requirement prohibits. This category might include certain requirements, worded differently from but exactly equivalent to those of the GPL, contained in the terms of other license documents.

SER_1670

regarding changes to the name of the work, and terms that require that conveyed copies be governed by a license other than this License, are prohibited.[70]

### c. Terms Added or Removed By You.

~~When others modify the work, if they modify your parts of it, they may release such parts of their versions under this License without additional permissions, by including notice to that effect, or by deleting the notice that gives specific permissions in addition to this License. Then any broader permissions granted by your terms which are not granted by this License will not apply to their modifications, or to the modified versions of your parts resulting from their modifications. However, the specific requirements of your terms will still apply to whatever was derived from your added parts.~~

When you convey a copy of a covered work, you may at your option remove any additional permissions from that copy, or from any part of it.[71] Some additional permissions require their own removal in certain cases when you modify the work.[72]

Additional requirements are allowed only as stated in subsection 7b. If the Program as you received it purports to impose any other additional requirement, you may remove that requirement.[73]

You may place additional permissions, or additional requirements as allowed by subsection 7b, on material, added by you to a covered work, for which you have or can give appropriate copy-

---

[70]We now provide a non-exhaustive list of examples of other kinds of conditions that are disallowed additional requirements under the GPL. Questions commonly arise about whether certain of these terms, such as attorney's fees provisions and choice of law clauses, are compatible with the GPL. Some such provisions are typically found in license documents drafted from a contract-oriented perspective; to the drafters or users of these licenses it may not be obvious why we consider them to be requirements in the context of a pure copyright license.

[71]We no longer formally require removal of an additional permission to be by one who modifies.

[72]See, for example, subsection 2b of LGPLv3.

[73]Unlike additional permissions, additional requirements that are allowed under subsection 7b may not be removed. The revised section 7 makes clear that this condition does not apply to any other additional requirements, however, which are removable just like additional permissions. Here we are particularly concerned about the practice of program authors who purport to license their works under the GPL with an additional requirement that contradicts the terms of the GPL, such as a prohibition on commercial use. Such terms can make the program non-free, and thus contradict the basic purpose of the GNU GPL; but even when the conditions are not fundamentally unethical, adding them in this way invariably makes the rights and obligations of licensees uncertain.

20

SER_1671

**right permission. Adding requirements not allowed by subsection 7b is a violation of this License that may lead to termination of your rights under section 8.**

If you add terms to a covered work in accordance with this section, you must place, in the relevant source files, a statement of the additional terms that apply to those files, or a notice indicating where to find the applicable terms.[74]

~~Unless the work also permits distribution under a previous version of this License, all the other terms included in the work under this section must be listed, together, in a central list in the work.~~

## 8.[4]  Termination.

You may not propagate~~,~~ **or** modify ~~or sublicense~~[75] the Program except as expressly provided under this License. Any attempt otherwise to propagate~~,~~ **or** modify ~~or sublicense~~ the Program is void~~, and any copyright holder may terminate your rights under this License at any time after having notified you of the violation by any reasonable means within 60 days of any occurrence~~. **If you violate this License, any copyright holder may put you on notice by notifying you of the violation, by any reasonable means, provided 60 days have not elapsed since the last violation. Having put you on notice, the copyright holder may then terminate your license at any time.**[76]  However, parties who have received copies, or rights, from you under this License will not have their licenses terminated so long as they remain in full compliance.

---

[74]The version of section 7 in Draft1 required additional terms to be in writing. The final paragraph of section 7 in Draft2 states in further detail how the written notice of applicable additional terms must be provided.

[75]Because sublicensing is now expressly prohibited under section 2, section 8 need not refer to it.

[76]We have rephrased the non-automatic termination procedure to make it easier to understand.

21

SER_1672

### 9.[5]  ~~Not a Contract~~ **Acceptance Not Required for Having Copies.**[77]

You are not required to accept this License in order to receive **or run**[78] a copy of the Program. **Ancillary propagation of a covered work occurring solely as a consequence of using peer-to-peer transmission to receive a copy likewise does not require acceptance.**[79] However, nothing else grants you permission to propagate or modify the Program or any covered works. These actions infringe copyright if you do not accept this License. Therefore, by modifying or propagating the Program (or any covered work), you indicate your acceptance of this License to do so, and all its terms and conditions.

### 10.[6]  Automatic Licensing of Downstream Users.

Each time you ~~redistribute~~ **convey** a covered work, the recipient automatically receives a license from the original licensors, to ~~propagate and~~ **run**, modify **and propagate** that work, subject to this License, including any additional terms introduced through section 7. You may not impose any further restrictions on the recipients' exercise of the rights thus granted or affirmed, except ~~(when modifying the work)~~ in the limited ways permitted by section 7. **Therefore, you may not impose a license fee, royalty, or other charge for exercise of rights granted under this License.**[80]

---

[77]We received a number of forceful objections to the title of section 9 of Draft1, principally from lawyers. This surprised us, since our section titles were not intended to have legal significance, and, moreover, the content of section 9 was essentially unchanged from section 5 of GPLv2. We have changed the title of section 9 to one that summarizes the first sentence of the section.

Section 9 means what it says: mere receipt or execution of code neither requires nor signifies contractual acceptance under the GPL. Speaking more broadly, we have intentionally structured our license as a unilateral grant of copyright permissions, the basic operation of which exists outside of any law of contract. Whether and when a contractual relationship is formed between licensor and licensee under local law do not necessarily matter to the working of the license.

[78]The GPL makes no condition on execution of the Program, as section 2 affirms, just as it makes no condition on receipt of the Program.

[79]See Opinion on BitTorrent Propagation.

[80]Draft1 removed the words "at no charge" from what is now subsection 5b, the core copyleft provision, for reasons related to our current changes to the second paragraph of section 4: it had contributed to a misconception that the GPL did not permit charging for distribution of copies. The purpose of the "at no charge" wording was to prevent attempts to collect royalties from third parties. The removal of these words created the danger that

SER_1673

You are not responsible for enforcing compliance by third parties to this License.

**If propagation results from a transaction transferring control of an organization, each party to that transaction who receives a copy of the work also receives a license and a right to possession of the Corresponding Source of the work from the party's predecessor in interest.**[81]

## 11.    ~~Licensing of~~ Patents.[82]

~~When you distribute a covered work, you grant a patent license~~[83] ~~to the~~

---

the imposition of licensing fees would no longer be seen as a license violation.

We therefore have added a new explicit prohibition on imposition of licensing fees or royalties in section 10. This section is an appropriate place for such a clause, since it is a specific consequence of the general requirement that no further restrictions be imposed on downstream recipients of GPL-covered code.

[81]The parties in mergers and acquisitions of businesses place a premium on reduction of uncertainty regarding the rights and liabilities being transferred. This is, of course, true of transactions involving businesses with assets that include GPL-covered software. There appears to be particular concern about whether and when such transactions activate the distribution-related requirements of the GPL for software that previously has been used and modified internally. With such concerns in mind, some members of our discussion committees have proposed that we allow assignment of the GPL, while others have suggested complex changes to the definition of propagation or licensee.

For our part, we agree entirely that the GPL should not create obstacles in corporate control transactions, but we do have concerns about the clever structuring of transactions specifically to avoid the consequences of the GPL. As one example, a business that uses certain GPL-covered software internally may seek to sell a division but keep control of a trade secret embodied in its improvements to that software. In such a case, the business might attempt to keep the source code for itself and give only the binary to the buyer. This, we believe, should not be allowed.

In Draft2 we have addressed these issues not by altering definitions of terms or allowing assignment, both of which we believe might have undesirable consequences, but by treating control transactions as a special case to be handled by automatic licensing. Under the new second paragraph of section 10, a party to a control transaction who receives any part or form of a GPL-covered work automatically receives, in addition to all upstream licenses in the chain of propagation, a license and a right to possession of the Corresponding Source from the predecessor in interest.

[82]We removed the reference to "licensing" in the title of this section. Section 11 is no longer concerned solely with granting of and distribution under patent licenses. We have replaced the express patent license grant with a covenant not to assert patent claims, and the new paragraph on reservation of implied rights is not limited to implied patent licenses.

[83]The patent license grant of Draft1 is replaced in Draft2 with a covenant not to assert patent claims. See n. 87 and Opinion on Covenant Not to Assert Patent Claims.

23

SER_1674

~~recipient, and to anyone that receives any version of the work, permitting, for any and all versions of the covered work, all activities allowed or contemplated by this License, such as installing, running and distributing versions of the work, and using their output.~~[84]  ~~This patent license is nonexclusive, royalty-free and worldwide,~~[85]  ~~and covers all patent claims you control or have the right to sublicense, at the time you distribute the covered work or in the future, that would be infringed or violated by the covered work or any reasonably contemplated use of the covered work.~~[86]

**You receive the Program with a covenant from each author and conveyor of the Program, and of any material, conveyed under this License, on which the Program is based, that the covenanting party will not assert (or cause others to assert) any of the party's essential patent claims in the material that the party conveyed, against you, arising from your exercise of rights under this License. If you convey a covered work, you similarly covenant to all recipients, including recipients of works based on the covered work, not to assert any of your essential patent claims in the covered work.**[87]

If you ~~distribute~~ **convey** a covered work**,** knowingly relying on a **non-sublicensable** patent license **that is not generally available to all,**[88] you must **either (1)** act to shield downstream users against the possible patent infringement claims from which your license protects you**, or (2) ensure that anyone can copy the Corresponding Source of the**

---

[84]In the corresponding wording of the covenant not to assert we refer simply to "your exercise of rights under this License."

[85]These qualifications are unnecessary when the formalism of a patent license is replaced with a covenant, as it is here, or with a warranty.

[86]The last part of the last sentence of the express patent license is replaced, in the covenant not to assert, by the reference to essential patent claims, defined in section 0.

[87]As we explain further in the Opinion on Covenant Not to Assert Patents, we have redrafted the express patent license of Draft1 as a covenant not to assert patent claims. We believe that the new wording, which makes use of the defined terms "essential patent claims" and "based on," is simpler and clearer than the wording of the patent license, and is responsive to the extensive commentary on the express patent license that we received from the public and the discussion committees.

In Draft1, no express patent license was given by the author of the Program. Under the covenant of Draft2, however, the original licensor undertakes to make the same covenant as any other subsequent conveyor. It is primarily for this reason that the covenant is structured in two parts (specifying the rights of the licensee as covenantee, and the obligations of the licensee as covenantor).

[88]If patent licenses are sublicensable or generally available to all, they do not give rise to the problem of shifting risk of patent infringement liability downstream, which this paragraph is intended to target.

24

**covered work, free of charge and under the terms of this License, through a publicly-available network server or other readily accessible means.**[89]

Nothing in this License shall be construed as excluding or limiting any implied license or other defenses to infringement that may otherwise be available to you under applicable patent law.[90]

## 12.[7]    ~~Liberty or Death for the Program~~ No Surrender of Others' Freedom.[91]

If conditions are imposed on you (whether by court order, agreement or otherwise) that contradict the conditions of this License, they do not excuse you from the conditions of this License. If you cannot ~~distribute~~ **convey** the Program, or other covered work, so as to satisfy simultaneously your obligations under this License and any other pertinent obligations, then as a consequence you may not ~~distribute~~ **convey** it at all. For example, if **you accept** a patent license ~~would not permit~~ **that prohibits** royalty-free ~~redistribution~~ **conveying** by ~~all~~ those who receive copies directly or indirectly through you, then the only way you could satisfy both it and this License would be to refrain entirely from ~~distribution~~ **conveying the Program.**[92]

---

[89]After gathering opinion on the second paragraph of section 11 during the discussion process, we decided to offer a specific form of shielding that would satisfy the objectives of the paragraph. A distributor of a covered work under benefit of a patent license can ensure that the Corresponding Source is made publicly available, free of charge, for all to access and copy, such as by arranging for the Corresponding Source to be available on a public network server. We keep the more general shielding requirement as an option because we do not wish to insist upon public distribution of source code. Distributors complying with this section may prefer to provide other means of shielding their downstream recipients.

[90]Without this provision, it might be argued that any implied patent licenses or other patent infringement defenses otherwise available by operation of law are extinguished by, for example, the express covenant not to assert. We consider it important to preserve these rights and defenses for users to the extent possible. Moreover, the availability of implied licenses or similar rights may be necessary in order for certain kinds of shielding under the second paragraph to be effective.

[91]We have replaced the title of this section with one that more closely reflects its purpose and effect, which is to prevent distribution that operates to give recipients less than the full set of freedoms that the GPL promises them. The previous title was not entirely accurate, in that the program is not necessarily "dead" if an attempt to distribute by one party under a particular set of circumstances activates the section. The program may remain free for other users facing other circumstances.

[92]The example given here is reworded slightly to make it clearer that it is acceptance of the patent license (a self-imposition of conditions) that activates the section, and that the

25

~~It is not the purpose of this section to induce you to infringe any patents or other exclusive rights or to contest their legal validity. The sole purpose of this section is to protect the integrity of the free software distribution system. Many people have made generous contributions to the wide range of software distributed through that system in reliance on consistent application of that system; it is up to the author/donor to decide if he or she is willing to distribute software through any other system and a licensee cannot impose that choice.~~[93]

## [13.[8]   Geographical Limitations.

If the ~~distribution~~ **conveying** and/or use of the Program is restricted in certain countries either by patents or by copyrighted interfaces, the original copyright holder who places the Program under this License may add an explicit geographical ~~distribution~~ limitation **on conveying,** excluding those countries, so that ~~distribution~~ **conveying** is permitted only in or among countries not thus excluded. In such case, this License incorporates the limitation as if written in the body of this License.]

## 14.[9]   Revised Versions of this License.

The Free Software Foundation may publish revised and/or new versions of the GNU General Public License from time to time. Such new versions will be similar in spirit to the present version, but may differ in detail to address new problems or concerns.

Each version is given a distinguishing version number. If the Program specifies that a certain numbered version of this License "or any later version" applies to it, you have the option of following the terms and conditions either of that numbered version or of any later version published by the Free Software Foundation. If the Program does not specify a version number of this License, you may choose any version ever published by the Free Software Foundation.

---

effective terms of the patent license must actually prohibit exercise of GPL freedoms by downstream recipients. A distributor who accepts a patent license that does not activate this section may nonetheless be required to comply with the second paragraph of section 11.

[93]This paragraph provides a statement of purpose but does not contain a substantive term or condition. Our experience with GPLv2 convinces us that it is no longer necessary, if indeed it ever was.

26

## [15.[10]   Requesting Exceptions.[94]

If you wish to incorporate parts of the Program into other free programs ~~whose distribution conditions are different~~ **under other licenses**, write to the author to ask for permission. For software which is copyrighted by the Free Software Foundation, write to the Free Software Foundation; we sometimes make exceptions for this. Our decision will be guided by the two goals of preserving the free status of all derivatives of our free software and of promoting the sharing and reuse of software generally.]

## NO WARRANTY

## 16.[11]   **Disclaimer of Warranty.**[95]

There is no warranty for the Program, to the extent permitted by applicable law. Except when otherwise stated in writing the copyright holders and/or other parties provide the Program "as is" without warranty of any kind, either expressed or implied, including, but not limited to, the implied warranties of merchantability and fitness for a particular purpose. The entire risk as to the quality and performance of the Program is with you. Should the Program prove defective, you assume the cost of all necessary servicing, repair or correction.

## 17.[12]   **Limitation of Liability.**[96]

In no event unless required by applicable law or agreed to in writing will any copyright holder, or any other party who may modify and/or ~~redistribute~~ **convey** the Program as permitted above, be liable to you for damages, including any general, special, incidental or consequential damages arising out of the use or inability to use the Program (including but not limited to loss of data or data being rendered inaccurate or losses sustained by you or third parties or a failure of the Program to operate with any other programs),

---

[94]We have bracketed section 15 for possible removal from the final version of GPLv3. Though this section has value in teaching users that authors may grant permissive exceptions to the strong copyleft of the GPL, we now provide a framework for such exceptions within the license, in section 7. Section 15 is, in a sense, a provision that exists outside the terms of the GPL (it is neither a permission nor a requirement). It may be more appropriate to transfer it to a FAQ or other educational document.

[95]We added a descriptive title for this section.

[96]We added a descriptive title for this section.

27

SER_1678

even if such holder or other party has been advised of the possibility of such damages.

~~18.~~[97]

~~Unless specifically stated, the Program has not been tested for use in safety critical systems.~~

END OF TERMS AND CONDITIONS[98]

---

[97]We added the new disclaimer of section 18 assuming that it would be welcomed by developers and distributors of safety-critical free software. The reaction to section 18 from this constituency has instead generally been negative. Companies involved in distributing safety-critical applications have recommended that we remove the disclaimer, pointing out that it may be preferable to rely on the general warranty and liability disclaimers of sections 16 and 17 in the usual case and to add a special disclaimer under section 7 when appropriate. In light of these comments, we have decided to remove section 18 from the GPLv3 draft.

[98]We have removed from this draft the appended section on "How to Apply These Terms to Your New Programs." For brevity, the license document can instead refer to a web page containing these instructions as a separate document.

SER_1679

Case 5:18-cv-07182-EJD     Document 181-2     Filed 04/20/23     Page 61 of 181

# Exhibit D

## Expert Report of Bradley M. Kuhn

## 22 December 2022

"Additional Terms Opinion" as published by the FSF on 2008-08-03.

# Opinion on Additional Terms

## Introduction

The wording of section 7 in Draft 1 proved difficult for many readers to understand. In Draft 2 section 7 has been entirely rewritten and bears a new title that more accurately reflects its scope. The new section 7 is longer than the first version, but it is no less concise; it now explicitly addresses certain issues regarding the presence and validity of additional terms that were not covered in the first version. It is meant to be clear, comprehensible, and comprehensive. Because most of the comments we received on section 7 were, in effect, questions about its meaning and interpretation, we use this opinion to explain how section 7 provides a framework for the analysis and treatment of additional terms under the GPL.

The GPL is a statement of permissions, some of which have conditions. Additional terms, terms that supplement those of the GPL, may come to be placed on, or removed from, GPL-covered code in certain common ways. We consider those added terms "additional permissions" if they grant exceptions from the conditions of the GPL, and "additional requirements" if they add conditions to the basic permissions of the GPL. The treatment of additional permissions and additional requirements under GPLv3 is necessarily asymmetrical, because they do not raise the same ethical and interpretive issues; in particular, additional requirements, if allowed without careful limitation, could transform a GPL'd program into a non-free one. With these principles in the background, section 7 answers the following questions: (1) How do the presence of additional terms on all or part of a GPL'd program affect users' rights? (2) When and how may a licensee add terms to code being distributed under the GPL? (3) When may a licensee remove additional terms?

## Additional Permissions

Additional permissions present the easier case. We have licensed some of our own software under GPLv2 with permissive exceptions that allow combination with non-free code, and that allow removal of those permissions by downstream recipients; similarly, LGPLv2.1 is in essence a permissive variant of GPLv2, and it permits relicensing under the GPL. We have generalized these practices in section 7. A licensee may remove any additional permission from a covered work, whether it was placed by the original author or by an upstream distributor. A licensee may also add any kind of additional permission to any part of a work for which the licensee has, or

1

SER_1681

can give, appropriate copyright permission. For example, if the licensee has written that part, the licensee is the copyright holder for that part and can therefore give additional permissions that are applicable to it. Alternatively, the part may have been written by someone else and licensed, with the additional permissions, to that licensee. Any additional permissions on that part are, in turn, removable by downstream recipients. As subsection 7a explains, the effect of an additional permission depends on whether the permission applies to the whole work or a part.

We have drafted version 3 of the GNU LGPL, which we have released with Draft 2 of GPLv3, as a simple list of additional permissions supplementing the terms of GPLv3. Section 7 has thus provided the basis for recasting a formally complex license as an elegant set of added terms, without changing any of the fundamental features of the existing LGPL. We offer this draft of LGPLv3 as a model for developers wishing to license their works under the GPL with permissive exceptions. The removability of additional permissions under section 7 does not alter any existing behavior of the LGPL; the LGPL has always allowed relicensing under the ordinary GPL.

## Additional Requirements and License Compatibility

We broadened the title of section 7 because license compatibility, as it is conventionally understood, is only one of several facets of the placement of additional terms on GPL'd code. The license compatibility issue arises from three reasons. First, the GPL is a strong copyleft license, requiring modified versions to be distributed under the GPL. Second, the GPL states that no further restrictions may be placed on the rights of recipients. Third, all other free software licenses in common use contain certain requirements, many of which are not conditions made by the GPL. Thus, when GPL'd code is modified by combination with code covered by another formal license that specifies other requirements, and that modified code is then distributed to others, the freedom of recipients may be burdened by additional requirements in violation of the GPL. It can be seen that additional permissions in other licenses do not raise any problems of license compatibility.

Section 7 relaxes the prohibition on further restrictions slightly by enumerating, in subsection 7b, a limited list of categories of additional requirements that may be placed on code without violating GPLv3. The list includes the items that were listed in Draft 1, though rewritten for clarity. It also includes a new catchall category for terms that might not obviously fall within one of the other categories but which are precisely equivalent

2

SER_1682

to GPLv3 conditions, or which deny permission for activities clearly not permitted by GPLv3. We have carefully considered but rejected proposals to expand this list further. We have also rejected suggestions, made by some discussion committee members, that the Affero clause requirement (7d in Draft 1 and 7b4 in Draft 2) be removed, though we have revised it in response to certain comments. We are unwavering in our view that the Affero requirement is a legitimate one, and we are committed to achieving compatibility of the Affero GPL with GPLv3.

A GPL licensee may place an additional requirement on code for which the licensee has or can give appropriate copyright permission, but only if that requirement falls within the list given in subsection 7b. Placement of any other kind of additional requirement continues to be a violation of the license. Additional requirements that are in the 7b list may not be removed, but if a user receives GPL'd code that purports to include an additional requirement not in the 7b list, the user may remove that requirement. Here we were particularly concerned to address the problem of program authors who purport to license their works in a misleading and possibly self-contradictory fashion, using the GPL together with unacceptable added restrictions that would make those works non-free software.

Section 7 points out that GPLv3 itself makes no assertion that an additional requirement is enforceable by the copyright holder. However, section 7 makes clear that enforcement of such requirements is expected to be by the termination procedure given in section 8 of GPLv3.

## Conclusion

Some have questioned whether section 7 is needed, and some have suggested that it creates complexity that did not previously exist. We point out to those readers that there is already GPLv2-licensed code that carries additional terms. One of the objectives of section 7 is to rationalize existing practices of program authors and modifiers by setting clear guidelines regarding the removal and addition of such terms. With its carefully limited list of allowed additional requirements, section 7 accomplishes additional objectives, permitting the expansion of the base of code available for GPL developers, while also encouraging useful experimentation with requirements we do not include in the GPL itself.

SER_1683

Case 5:18-cv-07182-EJD    Document 181-2    Filed 04/20/23    Page 65 of 181

# Exhibit E

## Expert Report of Bradley M. Kuhn

## 22 December 2022

Comment number 3,320 on in the GPLv3 Process by user "frx".

SER_1684



Showing comment 3220 [rss] [see on license] search                          you could login

## Log in  : Register

# DISABLES ADDITIONAL ACTIONS FOR DRAFTERS

## Comment 3220: Good: further restrictions are void

**Regarding the text:** *"If the Program as you received it, or any part of it, purports to be governed by this License, supplemented by a term that is a further restriction, you may remove that term"*
**In section:** gpl3.licensecompat.p8.s2
**Submitted by:** frx on 2007-06-02 at 12:01 EDT
0 agree:
**noted by** frx on 2007-06-02 at 12:01 EDT:

> I'm glad to see that this is explicitly stated: every attempt to license a work under the terms of GPLv3 with further restrictions is equivalent to licensing under the plain GPLv3. This is good, since there are unfortunately many people that license works in inconsistent manners (such as GPLv2 + additional restrictions); creating a rule that resolves this kind of inconsistencies for the better is a good thing to do.

SER_1685

Case 5:18-cv-07182-EJD      Document 181-2      Filed 04/20/23      Page 67 of 181

# Exhibit F

## Expert Report of Bradley M. Kuhn

## 22 December 2022

The third discussion draft of the GPLv3, as published by the FSF on 2007-03-28.

SER_1686

# GPLv3 Third Discussion Draft
# Markup of Changes from Second
# Discussion Draft

## Free Software Foundation

Copyright © 2007 Free Software Foundation, Inc., 51 Franklin Street, Fifth Floor, Boston, MA 02110-1301, USA

Verbatim copying and distribution of this entire article are permitted worldwide, without royalty, in any medium, provided this notice is preserved.

SER_1687

2

# GNU General Public License

Discussion Draft ~~2~~ **3** of Version 3, ~~27 July~~ **28 March** ~~2006~~ **2007**

THIS IS A DRAFT, NOT A PUBLISHED VERSION OF THE
GNU GENERAL PUBLIC LICENSE.

Copyright © ~~2006~~ **2007** Free Software Foundation, Inc. **(http://fsf.org)**
51 Franklin Street, Fifth Floor, Boston, MA 02110-1301 USA
Everyone is permitted to copy and distribute verbatim copies of this
license document, but changing it is not allowed.

## Preamble

**The GNU General Public License is a free, copyleft license for software and other kinds of works.**

The licenses for most software **and other practical works** are designed to take away your freedom to share and change ~~it~~ **the works**. By contrast, the GNU General Public License is intended to guarantee your freedom to share and change free software—to make sure the software is free for all its users. We, the Free Software Foundation, use the GNU General Public License for most of our software; it applies also to any other program whose authors commit to using it. You can apply it to your programs, too.

When we speak of free software, we are referring to freedom, not price. Our General Public Licenses are designed to make sure that you have the freedom to distribute copies of free software (and charge for this service if you wish), that you receive source code or can get it if you want it, that you can change the software or use pieces of it in new free programs, and that you know you can do these things.

To protect your rights, we need to make requirements that forbid anyone to deny you these rights or to ask you to surrender the rights. Therefore, you have certain responsibilities if you distribute copies of the software, or if you modify it.

3

SER_1689

For example, if you distribute copies of such a program, whether gratis or for a fee, you must ~~give~~ **pass on to** the recipients ~~all~~ the **same** ~~rights~~ **freedoms** that you ~~have~~ **received**. You must make sure that they, too, receive or can get the source code. And you must show them these terms so they know their rights.

Developers that use the GNU GPL protect your rights with two steps: (1) assert copyright on the software, and (2) offer you this License which gives you legal permission to copy, distribute and/or modify the software.

For the developers' and authors' protection, the GPL clearly explains that there is no warranty for this free software. For both users' and authors' sake, the GPL requires that modified versions be marked as changed, so that their problems will not be associated erroneously with the ~~original version~~ **previous versions**.

Some ~~computers~~ **devices** are designed to deny users access to install or run modified versions of the software inside them**, although the manufacturer can do so**. This is fundamentally incompatible with the purpose of the GPL, which is to protect users' freedom to change the software **where changes are possible**. **The systematic pattern of such abuse occurs in the area of products for individuals to use, which is precisely where it is most unacceptable.** Therefore, ~~the GPL ensures that the software it covers will not be restricted in this way~~ **we have designed this version of the GPL to prohibit the practice for those products. If such problems arise substantially in other domains, we stand ready to extend this provision to those domains in future versions of the GPL, as needed to protect the freedom of users.**

Finally, every program is threatened constantly by software patents. States should not allow patents to restrict development and use of software on general-purpose computers, but in places where they do, we wish to avoid the special danger that ~~redistributors of~~ **patents applied to** a free program ~~will individually obtain patent licenses, in effect making the program~~ **could make it effectively** proprietary. To prevent this, the GPL assures that patents cannot be used to render the program non-free.

**The precise terms and conditions for copying, distribution and modification follow.**

TERMS AND CONDITIONS

4

**SER_1690**

## 0.   Definitions.

**"This License" refers to version 3 of the GNU General Public License.**

   **"Copyright" also means copyright-like laws that apply to other kinds of works, such as semiconductor masks.**

   ~~In this License, each licensee is addressed as "you," while "the~~ **"The** Program" refers to any **copyrightable** work ~~of authorship~~ licensed under this License. **Each licensee is addressed as "you." "Licensees" and "recipients" may be individuals or organizations.**

   ~~A "modified" work includes, without limitation, versions in which material has been translated or added. A work "based on" another work means any modified version, formation of which requires permission under applicable copyright law.~~ **To "modify" a work means to copy from or adapt all or part of the work in a fashion requiring copyright permission, other than the making of a verbatim copy. The resulting work is called a "modified version" of the earlier work or a work "based on" the earlier work.** A "covered work" means either the unmodified Program or a work based on the Program.

   **A "contributor" is a party who licenses under this License a work on which the Program is based. Such a work is called the party's "contribution."**

   To "propagate" a work means ~~doing~~ **to do (or cause others to do)** anything with it that requires permission under applicable copyright law, except executing it on a computer~~,~~ or making modifications that you do not share. Propagation includes copying, distribution (with or without modification), making available to the public, and in some countries other activities as well. To "convey" a work means any kind of propagation that enables other parties to make or receive copies, excluding sublicensing. **Mere interaction with a user through a computer network, with no transfer of a copy, is not conveying.**

   A party's "essential patent claims" in a work are all patent claims ~~that the party can give permission to practice~~ **owned or controlled by the party**, whether already acquired or ~~to be~~ **hereafter** acquired, that would be infringed by **some manner, permitted by this License, of** making, using, or selling the work**, but do not include claims that would be infringed only as a consequence of further modification of the work**. **For purposes of this definition, "control" includes the right to grant sublicenses in a manner consistent with the requirements of this License.**

5

SER_1691

## 1.   Source Code.

The "source code" for a work means the preferred form of the work for making modifications to it.  "Object code" means any non-source ~~version~~ **form** of a work.

**A "Standard Interface" means an interface that either is an official standard defined by a recognized standards body, or, in the case of interfaces specified for a particular programming language, one that is widely used among developers working in that language.**

The "System Libraries" of an executable work include ~~every subunit such~~ **anything, other than the work as a whole,** that (a) ~~the identical subunit~~ is normally included ~~as an adjunct~~ in the distribution of ~~either~~ a ~~major essential component (kernel, window system, and so on) of the specific operating system (if any) on which the object code runs, or a compiler used to produce the object code, or an object code interpreter used to run it~~ **Major Component**, **but which is not part of that Major Component,** and (b) ~~the subunit (aside from possible incidental extensions)~~ serves only to enable use of the work with that ~~system component or compiler or interpreter~~ **Major Component**, or to implement a ~~widely used or standard interface~~ **Standard Interface** for which an implementation is available to the public in source code form. **A "Major Component", in this context, means a major essential component (kernel, window system, and so on) of the specific operating system (if any) on which the executable work runs, or a compiler used to produce the work, or an object code interpreter used to run it.**

The "Corresponding Source" for a work in object code form means all the source code needed to generate, install, and (for an executable work) run the object code and to modify the work, ~~except its~~ **including scripts to control those activities.  However, it does not include the work's** System Libraries ~~and except~~ **or** general-purpose tools or generally available free programs which are used unmodified in performing those activities but which are not part of the work. For example, Corresponding Source includes ~~scripts used to control those activities,~~ interface definition files associated with ~~the program~~ source files **for the work**, and the source code for shared libraries and dynamically linked subprograms that the work is specifically designed to require, such as by ~~complex~~ **intimate** data communication or control flow between those subprograms and other parts of the work.

~~The Corresponding Source also includes any encryption or authorization keys necessary to install and/or execute modified versions from source code~~

6

SER_1692

~~in the recommended or principal context of use, such that they can implement all the same functionality in the same range of circumstances. (For instance, if the work is a DVD player and can play certain DVDs, it must be possible for modified versions to play those DVDs. If the work communicates with an online service, it must be possible for modified versions to communicate with the same online service in the same way such that the service cannot distinguish.) A key need not be included in cases where use of the work normally implies the user already has the key and can read and copy it, as in privacy applications where users generate their own keys. However, the fact that a key is generated based on the object code of the work or is present in hardware that limits its use does not alter the requirement to include it in the Corresponding Source.~~

~~The Corresponding Source may include portions which do not formally state this License as their license, but qualify under section 7 for inclusion in a work under this License.~~

The Corresponding Source need not include anything that users can regenerate automatically from other parts of the Corresponding Source.

**The Corresponding Source for a work in source code form is that same work.**

## 2.   Basic Permissions.

All rights granted under this License are granted for the term of copyright on the Program, and are irrevocable provided the stated conditions are met. This License explicitly affirms your unlimited permission to run the unmodified Program. The output from running ~~it~~ **a covered work** is covered by this License only if the output, given its content, constitutes a covered work. This License acknowledges your rights of ~~"~~fair use~~"~~ or other equivalent, as provided by copyright law.

~~This License permits you to make and run privately modified versions of the Program, or have others make and run them on your behalf. However, this permission terminates, as to all such versions, if you bring suit against anyone for patent infringement of any of your essential patent claims in any such version, for making, using, selling or otherwise conveying a work based on the Program in compliance with this License.~~

Propagation of covered works ~~other than conveying~~ **that you do not convey, and making modified versions of the Program that you do not convey,** ~~is~~ **are** permitted without ~~limitation~~ **conditions, so long as your license otherwise remains in force. Conveying is permitted**

7

SER_1693

**under the conditions stated below.** Sublicensing is not allowed; section 10 makes it unnecessary. ~~Conveying is permitted under the conditions stated below.~~

## 3.   No Denying Users' Rights through Technical Measures.

~~Regardless of any other provision of this License, no permission is given for modes of conveying that deny users that run covered works the full exercise of the legal rights granted by this License.~~

No covered work ~~constitutes~~ **shall be deemed** part of an effective technological ~~"protection"~~ measure under ~~section 1201 of Title 17 of the United States Code~~ **any applicable law fulfilling obligations under article 11 of the WIPO copyright treaty adopted on 20 December 1996, or similar laws prohibiting or restricting circumvention of such measures**.

When you convey a covered work, you waive any legal power to forbid circumvention of technical measures ~~that include use of~~ **to the extent such circumvention is effected by exercising rights under this License with respect to** the covered work, and you disclaim any intention to limit operation or modification of the work as a means of enforcing, **against the work's users, your or third parties'** ~~the~~ legal rights ~~of third parties against the work's users~~ **to forbid circumvention of technical measures**.

## 4.~~[1]~~   **Conveying** Verbatim ~~Copying~~ **Copies**.

You may ~~copy and~~ convey verbatim copies of the Program's source code as you receive it, in any medium, provided that you conspicuously and appropriately publish on each copy an appropriate copyright notice; keep intact all ~~license~~ notices **stating that this License and any non-permissive terms added in accord with section 7 apply to the code;** ~~and~~ **keep intact all** notices of the absence of any warranty; and give all recipients~~, along with the Program,~~ a copy of this License **along with the Program** ~~and the central list (if any) required by section 7. The recipients of these copies will possess all the rights granted by this License (with any added terms under section 7).~~

You may charge any price or no price for each copy that you convey, and you may offer support or warranty protection for a fee.

8

SER_1694

### 5.[2]   Conveying Modified Source Versions.

You may ~~copy and~~ convey a work based on the Program, or the modifications to produce it from the Program, in the form of source code under the terms of section 4 above, provided that you also meet all of these conditions:

a) The ~~modified~~ work must carry prominent notices stating that you ~~changed the work~~ **modified it,** and ~~the date of any change~~ **giving a relevant date**.

**b) The work must carry prominent notices stating that it is released under this License and any conditions added under section 7. This requirement modifies the requirement in section 4 to "keep intact all notices".**

~~b~~ **c**) You must license the entire work, as a whole, under this License to anyone who comes into possession of a copy. This License ~~must~~ **will therefore** apply, unmodified except as permitted by section 7 ~~below~~, to the whole of the work, and all its parts, regardless of how they are packaged. This License gives no permission to license the work in any other way, but it does not invalidate such permission if you have separately received it.

~~e~~ **d**) If the ~~modified~~ work has interactive user interfaces, each must include a convenient feature that displays an appropriate copyright notice, and tells the user that there is no warranty for the ~~program~~ **work** (~~or that~~ **unless** you provide a warranty), that ~~users~~ **licensees** may convey the ~~modified~~ work under this License, and how to view a copy of this License ~~together with the central list (if any) of other terms in accord with section 7~~. Specifically, if the interface presents a list of user commands or options, such as a menu, a command to display this information must be prominent in the list; otherwise, the ~~modified~~ work must display this information at startup. However, if the Program has interactive interfaces that do not comply with this subsection, your ~~modified~~ work need not make them comply.

~~To the extent that identifiable sections of the modified work, added by you, are not derived from the Program, and can be reasonably considered independent and separate works in themselves, then this License, and its terms, do not apply to those sections when you convey them as separate works, not specifically for use in combination with the Program.~~

9

SER_1695

A compilation of a covered work with other separate and independent works, which are not by their nature extensions of the covered work, in or on a volume of a storage or distribution medium, is called an "aggregate" if the compilation and its resulting copyright are not used to limit the access or legal rights of the compilation's users beyond what the individual works permit. Inclusion of a covered work in an aggregate does not cause this License to apply to the other parts of the aggregate.

## 6.[3]   Conveying Non-Source Forms.

You may ~~copy and~~ convey a covered work in object code form under the terms of sections 4 and 5, provided that you also convey the machine-readable Corresponding Source under the terms of this License, in one of these ways:

a) Convey the object code in**, or embodied in,** a physical product (including a physical distribution medium), accompanied by the Corresponding Source fixed on a durable physical medium customarily used for software interchange.

b) Convey the object code in**, or embodied in,** a physical product (including a physical distribution medium), accompanied by a written offer, valid for at least three years and valid for as long as you offer spare parts or customer support for that product model, **either (1)** to give ~~any third party~~ **anyone who possesses the object code** a copy of the Corresponding Source for all the software in the product that is covered by this License, on a durable physical medium customarily used for software interchange, for a price no more than your reasonable cost of physically performing this conveying of source~~.~~**, or (2)**

~~[b1) Convey the object code in a physical product (including a physical distribution medium), accompanied by a written offer, valid for at least three years and valid for as long as you offer spare parts or customer support for that product model,~~ to provide access to copy the Corresponding Source from a network server at no charge.~~]~~

c) Convey individual copies of the object code with a copy of the written offer to provide the Corresponding Source. This alternative is allowed only occasionally and noncommercially, and only if you received the object code with such an offer, in accord with subsection 6b ~~or 6b1~~.

SER_1696

d) Convey the object code by offering access from a designated place **(gratis or for a charge)**, and offer equivalent access to the Corresponding Source in the same way through the same place at no ~~extra~~ **further** charge. You need not require recipients to copy the Corresponding Source along with the object code.

[If the place to copy the object code is a network server, the Corresponding Source may be on a different server **(operated by you or a third party)** that supports equivalent copying facilities, ~~provided you have explicitly arranged with the operator of that server to keep the Corresponding Source available for as long as needed to satisfy these requirements, and~~ provided you maintain clear directions next to the object code saying where to find the Corresponding Source.] **Regardless of what server hosts the Corresponding Source, you remain obligated to ensure that it is available for as long as needed to satisfy these requirements.**

e) Convey the object code using peer-to-peer transmission**,** provided you ~~know that, and~~ inform other peers where~~,~~ the object code and Corresponding Source of the work are being offered to the general public at no charge under subsection 6d.

~~The Corresponding Source conveyed in accord with this section must be in a format that is publicly documented, with an implementation available to the public in source code form, and must require no special password or key for unpacking, reading or copying.~~

A separable portion of the object code, whose source code is excluded from the Corresponding Source as a System Library, need not be included in conveying the object code work.

**A "User Product" is either (1) a "consumer product", which means any tangible personal property which is normally used for personal, family, or household purposes, or (2) anything designed or sold for incorporation into a dwelling. [In cases of doubt concerning whether an item is a "consumer product", the interpretation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.*, shall provide the basis for interpretation, regardless of the choice of law determination for this License as a whole.]**

**"Installation Information" for a User Product means any methods, procedures, authorization keys, or other information required to install and execute modified versions of a covered work in that User Product from a modified version of its Corresponding Source.**

11

SER_1697

The information must suffice to ensure that the continued functioning of the modified object code is in no case prevented or interfered with solely because modification has been made.

If you convey an object code work under this section in, or with, or specifically for use in, a User Product, and the conveying occurs as part of a transaction in which the right of possession and use of the User Product is transferred to the recipient in perpetuity or for a fixed term (regardless of how the transaction is characterized), the Corresponding Source conveyed under this section must be accompanied by the Installation Information. But this requirement does not apply if neither you nor any third party retains the ability to install modified object code on the User Product (for example, the work has been installed in ROM).

The requirement to provide Installation Information does not include a requirement to continue to provide support service, warranty, or updates for a work that has been modified or installed by the recipient. Network access may be denied when the modification itself materially and adversely affects the operation of the network or violates the rules and protocols for communication across the network.

Corresponding Source conveyed, and Installation Information provided, in accord with this section must be in a format that is publicly documented, with an implementation available to the public in source code form, and must require no special password or key for unpacking, reading or copying.

## 7.   Additional Terms.

~~You may have received the Program, or parts of it, under terms that supplement the terms of this License. These additional terms may include additional permissions, as provided in subsection 7a, and additional requirements, as provided in subsection 7b. When you convey copies of a covered work, unless the work also permits use under a previous version of this License, it must list, in one central place in the source code, the complete set of additional terms governing all or part of the work.~~

### ~~a.~~  ~~Additional Permissions.~~

"Additional permissions" are terms that supplement the terms of this License by ~~make~~ making exceptions from one or more of ~~the requirements~~

12

SER_1698

of this License ~~its conditions~~. ~~A license document containing a clause that permits relicensing or conveying under this License shall be treated as a list of additional permissions, provided that the license document makes clear that no requirement in it survives such relicensing or conveying.~~

Any ~~additional~~ **Additional** permissions that are applicable to the entire Program shall be treated as though they were included in this License, ~~as exceptions to its conditions,~~ to the extent that they are valid under applicable law. If additional permissions apply only to part of the Program, that part may be used separately under those permissions, but the entire Program remains governed by this License without regard to the additional ~~terms~~ **permissions**.

b. ~~Additional Requirements.~~

~~Additional requirements are terms that further constrain use, modification or propagation of covered works. This License affects only the procedure for enforcing additional requirements, and does not assert that they can be successfully enforced by the copyright holder. Only these kinds of additional requirements are allowed by this License:~~

~~0) terms that require preservation of specified reasonable legal notices or author attributions; or~~

~~1) terms that require that the origin of the material they cover not be misrepresented, or that modified versions of that material be marked in specific reasonable ways as different from the original version; or~~

~~2) warranty or liability disclaimers that differ from the disclaimers in this License; or~~

~~3) terms that prohibit or limit the use for publicity purposes of specified names of licensors or authors, or that require that certain specified trade names, trademarks, or service marks not be used for publicity purposes without express permission, other than in ways that are fair use under applicable trademark law; or~~

~~4) terms that require, if a modified version of the material they cover is a work intended to interact with users through a computer network, that those users be able to obtain copies of the Corresponding Source of the work through the same network session; or~~

13

SER_1699

5) ~~terms that wholly or partially terminate, or allow termination of, permission for use of the material they cover, for a user who files a software patent lawsuit (that is, a lawsuit alleging that some software infringes a patent) not filed in retaliation or defense against the earlier filing of another software patent lawsuit, or in which the allegedly infringing software includes some of the covered material, possibly in combination with other software; or~~

6) ~~terms that are precisely equivalent in type and extent to a requirement expressly stated in this License, or that deny permission for activities that are clearly not permitted, expressly or otherwise, by this License.~~

~~All other additional requirements, including attorney's fees provisions, choice of law, forum, and venue clauses, arbitration clauses, mandatory contractual acceptance clauses, requirements regarding changes to the name of the work, and terms that require that conveyed copies be governed by a license other than this License, are prohibited.~~

c. ~~Terms Added or Removed by You.~~

When you convey a copy of a covered work, you may at your option remove any additional permissions from that copy, or from any part of it. (~~Some additional~~ **Additional** permissions **may be written to** require their own removal in certain cases when you modify the work.) **You may place additional permissions on material, added by you to a covered work, for which you have or can give appropriate copyright permission.** Notwithstanding any other provision of this License, you may supplement the terms of this License with terms effective under, or drafted for compatibility with, local law:

a. disclaiming warranty or limiting liability differently from the terms of section 15 of this License; or

b. requiring preservation of specified reasonable legal notices or author attributions in source or object code forms of material added by you to a covered work; or

c. prohibiting misrepresentation of the origin of material added by you to a covered work, or requiring that modified versions of such material be marked in reasonable ways as different from the original version; or

14

    d. **limiting the use for publicity purposes of specified names of licensors or authors, or of specified trade names, trademarks, or service marks, to the extent otherwise permitted by law.**

~~Additional requirements are allowed only as stated in subsection 7b.~~ **All other non-permissive additional terms are considered "further restrictions" within the meaning of section 10.** If the Program as you received it**, or any part of it,** purports to ~~impose any other additional requirement~~ **be governed by this License, supplemented by a term that is a further restriction**, you may remove that ~~requirement~~ **term**. **If a license document contains a further restriction but permits relicensing or conveying under this License, you may add to a covered work material governed by the terms of that license document, provided that the further restriction does not survive such relicensing or conveying.**

~~You may place additional permissions, or additional requirements as allowed by subsection 7b, on material, added by you to a covered work, for which you have or can give appropriate copyright permission. Adding requirements not allowed by subsection 7b is a violation of this License that may lead to termination of your rights under section 8.~~

If you add terms to a covered work in accordance with this section, you must place, in the relevant source files, a statement of the additional terms that apply to those files, or a notice indicating where to find the applicable terms.

## 8.[4]  Termination.

You may not propagate or modify ~~the Program~~ **a covered work** except as expressly provided under this License. Any attempt otherwise to propagate or modify ~~the Program~~ **it** is void. If you violate this License, any copyright holder may put you on notice by notifying you of the violation, by any reasonable means, provided 60 days have not elapsed since the ~~last~~ **most recent** violation. Having put you on notice, the copyright holder may**,** ~~then terminate your license~~ at any time, **terminate the rights (including any patent rights) that the copyright holder has granted to you under this License**.

**However, if this is your first violation of this License with respect to a given copyright holder, and you cure the violation within 30 days following your receipt of the notice, then your license is automatically reinstated.**

15

SER_1701

~~However,~~ **In the event that your rights are terminated under this section,** parties who have received copies, or rights, from you under this License will not have their licenses terminated so long as they remain in full compliance.

## 9.[5]   Acceptance Not Required for Having Copies.

You are not required to accept this License in order to receive or run a copy of the Program. Ancillary propagation of a covered work occurring solely as a consequence of using peer-to-peer transmission to receive a copy likewise does not require acceptance. However, nothing ~~else~~ **other than this License** grants you permission to propagate or modify ~~the Program or~~ any covered ~~works~~ **work**. These actions infringe copyright if you do not accept this License. Therefore, by modifying or propagating ~~the Program (or any~~ **a** covered work~~)~~, you indicate your acceptance of this License to do so~~, and all its terms and conditions~~.

## 10.[6]   Automatic Licensing of Downstream ~~Users~~ **Recipients**.

Each time you convey a covered work, the recipient automatically receives a license from the original licensors, to run, modify and propagate that work, subject to this License~~, including any additional terms introduced through section 7. You may not impose any further restrictions on the recipients' exercise of the rights thus granted or affirmed, except in the limited ways permitted by section 7. Therefore, you may not impose a license fee, royalty, or other charge for exercise of rights granted under this License.~~ You are not responsible for enforcing compliance by third parties ~~to~~ **with** this License.

**An "entity transaction" is a transaction transferring control of an organization, or substantially all assets of one, or subdividing an organization, or merging organizations.** If propagation **of a covered work** results from ~~a transaction transferring control of an organization~~ **an entity transaction**, each party to that transaction who receives a copy of the work also receives ~~a license~~ **whatever licenses to the work the party's predecessor in interest had or could give under the previous paragraph, plus** ~~and~~ a right to possession of the Corresponding Source of the work from the ~~party's~~ predecessor in interest.

**You may not impose any further restrictions on the exercise of the rights granted or affirmed under this License. For example,**

16

SER_1702

you may not impose a license fee, royalty, or other charge for exercise of rights granted under this License, and you may not initiate litigation (including a cross-claim or counterclaim in a lawsuit) alleging that any patent claim is infringed by making, using, selling, offering for sale, or importing the Program (or the contribution of any contributor).

## 11.   Patents.

~~You receive the Program with a covenant from each author and conveyor of the Program, and of any material, conveyed under this License, on which the Program is based, that the covenanting party will not assert (or cause others to assert) any of the party's essential patent claims in the material that the party conveyed, against you, arising from your exercise of rights under this License. If you convey a covered work, you similarly covenant to all recipients, including recipients of works based on the covered work, not to assert any of your essential patent claims in the covered work.~~

**Each contributor grants you a non-exclusive, worldwide, royalty-free patent license under the contributor's essential patent claims in its contribution, to make, use, sell, offer for sale, import and otherwise run, modify and propagate the contribution.**

**For purposes of the following three paragraphs, a "patent license" means a patent license, a covenant not to bring suit for patent infringement, or any other express agreement or commitment, however denominated, not to enforce a patent.**

If you convey a covered work, knowingly relying on a ~~non-sublicensable~~ patent license ~~that is not generally available to all~~, **and the Corresponding Source of the work is not available for anyone to copy, free of charge and under the terms of this License, through a publicly available network server or other readily accessible means, then** you must either ~~(1) act to shield downstream users against the possible patent infringement claims from which your license protects you, or (2) ensure that anyone can copy the Corresponding Source of the covered work, free of charge and under the terms of this License, through a publicly available network server or other readily accessible means~~ **(1) cause the Corresponding Source to be so available, or (2) disclaim the patent license for this particular work, or (3) arrange, in a manner consistent with the requirements of this License, to extend the patent license to downstream recipients.** "Knowingly relying" means you

17

SER_1703

have actual knowledge that, but for the patent license, your conveying the covered work in a country, or your recipient's use of the covered work in a country, would infringe one or more identifiable patents in that country that you have reason to believe are valid.

If, pursuant to or in connection with a single transaction or arrangement, you convey, or propagate by procuring conveyance of, a covered work, and grant a patent license providing freedom to use, propagate, modify or convey a specific copy of the covered work to any of the parties receiving the covered work, then the patent license you grant is automatically extended to all recipients of the covered work and works based on it.

You may not convey a covered work if you are a party to an arrangement with a third party that is in the business of distributing software, under which you make payment to the third party based on the extent of your activity of conveying the work, and under which the third party grants, to any of the parties who would receive the covered work from you, a patent license (a) in connection with copies of the covered work conveyed by you, and/or copies made from those, or (b) primarily for and in connection with specific products or compilations that contain the covered work, which license does not cover, prohibits the exercise of, or is conditioned on the non-exercise of any of the rights that are specifically granted to recipients of the covered work under this License[, unless you entered into that arrangement, or that patent license was granted, prior to March 28, 2007].

Nothing in this License shall be construed as excluding or limiting any implied license or other defenses to infringement that may otherwise be available to you under applicable patent law.

## 12.[7]   No Surrender of Others' Freedom.

If conditions are imposed on you (whether by court order, agreement or otherwise) that contradict the conditions of this License, they do not excuse you from the conditions of this License. If you cannot convey the Program, or other covered work, so as to satisfy simultaneously your obligations under this License and any other pertinent obligations, then as a consequence you may not convey it at all. For example, if you ~~accept a patent license that prohibits royalty-free conveying by those who receive copies directly or indirectly through you~~ **agree to terms that obligate you to collect a**

18

**royalty for further conveying from those to whom you convey the Program**, ~~then~~ the only way you could satisfy both ~~it~~ **those terms** and this License would be to refrain entirely from conveying the Program.

## 13.   Use with the Affero General Public License.

**Notwithstanding any other provision of this License, you have permission to link any covered work with a work licensed under version 2 of the Affero General Public License, and to convey the resulting combination.  The terms of this License will continue to apply to your covered work but will not apply to the work with which it is linked, which will remain governed by the Affero General Public License.**

## [~~13.~~[8]   ~~Geographical Limitations.~~

~~If the conveying and/or use of the Program is restricted in certain countries either by patents or by copyrighted interfaces, the original copyright holder who places the Program under this License may add an explicit geographical limitation on conveying, excluding those countries, so that conveying is permitted only in or among countries not thus excluded. In such case, this License incorporates the limitation as if written in the body of this License.]~~

## 14.[9]   Revised Versions of this License.

The Free Software Foundation may publish revised and/or new versions of the GNU General Public License from time to time. Such new versions will be similar in spirit to the present version, but may differ in detail to address new problems or concerns.

   Each version is given a distinguishing version number. If the Program specifies that a certain numbered version of ~~this~~ **the GNU General Public** License "or any later version" applies to it, you have the option of following the terms and conditions either of that numbered version or of any later version published by the Free Software Foundation. If the Program does not specify a version number of ~~this~~ **the GNU General Public** License, you may choose any version ever published by the Free Software Foundation.

   **If the Program specifies that a proxy can decide whether future versions of the GNU General Public License shall apply, that**

19

SER_1705

proxy's public statement of acceptance of any version is permanent authorization for you to choose that version for the Program.

## 15.[10]  Requesting Exceptions.

If you wish to incorporate parts of the Program into other free programs under other licenses, write to the author to ask for permission. For software which is copyrighted by the Free Software Foundation, write to the Free Software Foundation; we sometimes make exceptions for this. Our decision will be guided by the two goals of preserving the free status of all derivatives of our free software and of promoting the sharing and reuse of software generally.]

NO WARRANTY

## 16 15.[11, 12]  Disclaimer of Warranty **and Limitation of Liability**.

There is no warranty for the Program, to the extent permitted by applicable law. Except when otherwise stated in writing the copyright holders and/or other parties provide the Program "as is" without warranty of any kind, either expressed or implied, including, but not limited to, the implied warranties of merchantability and fitness for a particular purpose. The entire risk as to the quality and performance of the Program is with you. Should the Program prove defective, you assume the cost of all necessary servicing, repair or correction.

**THERE IS NO WARRANTY FOR THE PROGRAM, TO THE EXTENT PERMITTED BY APPLICABLE LAW. EXCEPT WHEN OTHERWISE STATED IN WRITING THE COPYRIGHT HOLDERS AND/OR OTHER PARTIES PROVIDE THE PROGRAM "AS IS" WITHOUT WARRANTY OF ANY KIND, EITHER EXPRESSED OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. THE ENTIRE RISK AS TO THE QUALITY AND PERFORMANCE OF THE PROGRAM IS WITH YOU. SHOULD THE PROGRAM PROVE DEFECTIVE, YOU ASSUME THE COST OF ALL NECESSARY SERVICING, REPAIR OR CORRECTION.**

20

## 17.[12]   Limitation of Liability.

In no event unless required by applicable law or agreed to in writing will any copyright holder, or any other party who may modify and/or convey the Program as permitted above, be liable to you for damages, including any general, special, incidental or consequential damages arising out of the use or inability to use the Program (including but not limited to loss of data or data being rendered inaccurate or losses sustained by you or third parties or a failure of the Program to operate with any other programs), even if such holder or other party has been advised of the possibility of such damages.

IN NO EVENT UNLESS REQUIRED BY APPLICABLE LAW OR AGREED TO IN WRITING WILL ANY COPYRIGHT HOLDER, OR ANY OTHER PARTY WHO MODIFIES AND/OR CONVEYS THE PROGRAM AS PERMITTED ABOVE, BE LIABLE TO YOU FOR DAMAGES, INCLUDING ANY GENERAL, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF THE USE OR INABILITY TO USE THE PROGRAM (INCLUDING BUT NOT LIMITED TO LOSS OF DATA OR DATA BEING RENDERED INACCURATE OR LOSSES SUSTAINED BY YOU OR THIRD PARTIES OR A FAILURE OF THE PROGRAM TO OPERATE WITH ANY OTHER PROGRAMS), EVEN IF SUCH HOLDER OR OTHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

If the disclaimer of warranty and limitation of liability provided above cannot be given local legal effect according to their terms, reviewing courts shall apply local law that most closely approximates an absolute waiver of all civil liability in connection with the Program, unless a warranty or assumption of liability accompanies a copy of the Program in return for a fee.

END OF TERMS AND CONDITIONS

21

SER_1707

Case 5:18-cv-07182-EJD    Document 181-2    Filed 04/20/23    Page 89 of 181

# Exhibit G

## Expert Report of Bradley M. Kuhn

## 22 December 2022

The Neo4j Sweden Software License

NOTICE
This package contains software licensed under different
licenses, please refer to the NOTICE.txt file for further
information and LICENSES.txt for full license texts.

Neo4j Enterprise object code can be licensed independently from
the source under separate commercial terms. Email inquiries can be
directed to: licensing@neo4j.com. More information is also
available at:https://neo4j.com/licensing/

The software ("Software") is developed and owned by Neo4j Sweden AB
(referred to in this notice as âM-^@M-^\Neo4jâM-^@M-^]) and is subject to the te
rms
of the GNU AFFERO GENERAL PUBLIC LICENSE Version 3, with the Commons Clause as f
ollows:


                 GNU AFFERO GENERAL PUBLIC LICENSE
                    Version 3, 19 November 2007

 Copyright (C) 2007 Free Software Foundation, Inc. <http://fsf.org/>
 Everyone is permitted to copy and distribute verbatim copies
 of this license document, but changing it is not allowed.

                           Preamble

  The GNU Affero General Public License is a free, copyleft license
for software and other kinds of works, specifically designed to ensure
cooperation with the community in the case of network server software.

  The licenses for most software and other practical works are
designed to take away your freedom to share and change the works.  By
contrast, our General Public Licenses are intended to guarantee your
freedom to share and change all versions of a program--to make sure it
remains free software for all its users.

  When we speak of free software, we are referring to freedom, not
price.  Our General Public Licenses are designed to make sure that you
have the freedom to distribute copies of free software (and charge for
them if you wish), that you receive source code or can get it if you
want it, that you can change the software or use pieces of it in new
free programs, and that you know you can do these things.

  Developers that use our General Public Licenses protect your rights
with two steps: (1) assert copyright on the software, and (2) offer
you this License which gives you legal permission to copy, distribute
and/or modify the software.

  A secondary benefit of defending all users' freedom is that
improvements made in alternate versions of the program, if they
receive widespread use, become available for other developers to
incorporate.  Many developers of free software are heartened and
encouraged by the resulting cooperation.  However, in the case of
software used on network servers, this result may fail to come about.
The GNU General Public License permits making a modified version and
letting the public access it on a server without ever releasing its
source code to the public.

  The GNU Affero General Public License is designed specifically to
ensure that, in such cases, the modified source code becomes available
to the community.  It requires the operator of a network server to
provide the source code of the modified version running there to the

users of that server.  Therefore, public use of a modified version, on
a publicly accessible server, gives the public access to the source
code of the modified version.

   An older license, called the Affero General Public License and
published by Affero, was designed to accomplish similar goals.  This is
a different license, not a version of the Affero GPL, but Affero has
released a new version of the Affero GPL which permits relicensing under
this license.

   The precise terms and conditions for copying, distribution and
modification follow.

                         TERMS AND CONDITIONS

   0. Definitions.

   "This License" refers to version 3 of the GNU Affero General Public
License.

   "Copyright" also means copyright-like laws that apply to other kinds
of works, such as semiconductor masks.

   "The Program" refers to any copyrightable work licensed under this
License.  Each licensee is addressed as "you".  "Licensees" and
"recipients" may be individuals or organizations.

   To "modify" a work means to copy from or adapt all or part of the work
in a fashion requiring copyright permission, other than the making of an
exact copy.  The resulting work is called a "modified version" of the
earlier work or a work "based on" the earlier work.

   A "covered work" means either the unmodified Program or a work based
on the Program.

   To "propagate" a work means to do anything with it that, without
permission, would make you directly or secondarily liable for
infringement under applicable copyright law, except executing it on a
computer or modifying a private copy.  Propagation includes copying,
distribution (with or without modification), making available to the
public, and in some countries other activities as well.

   To "convey" a work means any kind of propagation that enables other
parties to make or receive copies.  Mere interaction with a user through
a computer network, with no transfer of a copy, is not conveying.

   An interactive user interface displays "Appropriate Legal Notices"
to the extent that it includes a convenient and prominently visible
feature that (1) displays an appropriate copyright notice, and (2)
tells the user that there is no warranty for the work (except to the
extent that warranties are provided), that licensees may convey the
work under this License, and how to view a copy of this License.  If
the interface presents a list of user commands or options, such as a
menu, a prominent item in the list meets this criterion.

   1. Source Code.

   The "source code" for a work means the preferred form of the work
for making modifications to it.  "Object code" means any non-source
form of a work.

   A "Standard Interface" means an interface that either is an official
standard defined by a recognized standards body, or, in the case of

interfaces specified for a particular programming language, one that
is widely used among developers working in that language.

   The "System Libraries" of an executable work include anything, other
than the work as a whole, that (a) is included in the normal form of
packaging a Major Component, but which is not part of that Major
Component, and (b) serves only to enable use of the work with that
Major Component, or to implement a Standard Interface for which an
implementation is available to the public in source code form.  A
"Major Component", in this context, means a major essential component
(kernel, window system, and so on) of the specific operating system
(if any) on which the executable work runs, or a compiler used to
produce the work, or an object code interpreter used to run it.

   The "Corresponding Source" for a work in object code form means all
the source code needed to generate, install, and (for an executable
work) run the object code and to modify the work, including scripts to
control those activities.  However, it does not include the work's
System Libraries, or general-purpose tools or generally available free
programs which are used unmodified in performing those activities but
which are not part of the work.  For example, Corresponding Source
includes interface definition files associated with source files for
the work, and the source code for shared libraries and dynamically
linked subprograms that the work is specifically designed to require,
such as by intimate data communication or control flow between those
subprograms and other parts of the work.

   The Corresponding Source need not include anything that users
can regenerate automatically from other parts of the Corresponding
Source.

   The Corresponding Source for a work in source code form is that
same work.

   2. Basic Permissions.

   All rights granted under this License are granted for the term of
copyright on the Program, and are irrevocable provided the stated
conditions are met.  This License explicitly affirms your unlimited
permission to run the unmodified Program.  The output from running a
covered work is covered by this License only if the output, given its
content, constitutes a covered work.  This License acknowledges your
rights of fair use or other equivalent, as provided by copyright law.

   You may make, run and propagate covered works that you do not
convey, without conditions so long as your license otherwise remains
in force.  You may convey covered works to others for the sole purpose
of having them make modifications exclusively for you, or provide you
with facilities for running those works, provided that you comply with
the terms of this License in conveying all material for which you do
not control copyright.  Those thus making or running the covered works
for you must do so exclusively on your behalf, under your direction
and control, on terms that prohibit them from making any copies of
your copyrighted material outside their relationship with you.

   Conveying under any other circumstances is permitted solely under
the conditions stated below.  Sublicensing is not allowed; section 10
makes it unnecessary.

   3. Protecting Users' Legal Rights From Anti-Circumvention Law.

   No covered work shall be deemed part of an effective technological
measure under any applicable law fulfilling obligations under article

11 of the WIPO copyright treaty adopted on 20 December 1996, or similar laws prohibiting or restricting circumvention of such measures.

  When you convey a covered work, you waive any legal power to forbid circumvention of technological measures to the extent such circumvention is effected by exercising rights under this License with respect to the covered work, and you disclaim any intention to limit operation or modification of the work as a means of enforcing, against the work's users, your or third parties' legal rights to forbid circumvention of technological measures.

  4. Conveying Verbatim Copies.

  You may convey verbatim copies of the Program's source code as you receive it, in any medium, provided that you conspicuously and appropriately publish on each copy an appropriate copyright notice; keep intact all notices stating that this License and any non-permissive terms added in accord with section 7 apply to the code; keep intact all notices of the absence of any warranty; and give all recipients a copy of this License along with the Program.

  You may charge any price or no price for each copy that you convey, and you may offer support or warranty protection for a fee.

  5. Conveying Modified Source Versions.

  You may convey a work based on the Program, or the modifications to produce it from the Program, in the form of source code under the terms of section 4, provided that you also meet all of these conditions:

    a) The work must carry prominent notices stating that you modified it, and giving a relevant date.

    b) The work must carry prominent notices stating that it is released under this License and any conditions added under section 7.  This requirement modifies the requirement in section 4 to "keep intact all notices".

    c) You must license the entire work, as a whole, under this License to anyone who comes into possession of a copy.  This License will therefore apply, along with any applicable section 7 additional terms, to the whole of the work, and all its parts, regardless of how they are packaged.  This License gives no permission to license the work in any other way, but it does not invalidate such permission if you have separately received it.

    d) If the work has interactive user interfaces, each must display Appropriate Legal Notices; however, if the Program has interactive interfaces that do not display Appropriate Legal Notices, your work need not make them do so.

  A compilation of a covered work with other separate and independent works, which are not by their nature extensions of the covered work, and which are not combined with it such as to form a larger program, in or on a volume of a storage or distribution medium, is called an "aggregate" if the compilation and its resulting copyright are not used to limit the access or legal rights of the compilation's users beyond what the individual works permit.  Inclusion of a covered work in an aggregate does not cause this License to apply to the other parts of the aggregate.

  6. Conveying Non-Source Forms.

  You may convey a covered work in object code form under the terms
of sections 4 and 5, provided that you also convey the
machine-readable Corresponding Source under the terms of this License,
in one of these ways:

  a) Convey the object code in, or embodied in, a physical product
  (including a physical distribution medium), accompanied by the
  Corresponding Source fixed on a durable physical medium
  customarily used for software interchange.

  b) Convey the object code in, or embodied in, a physical product
  (including a physical distribution medium), accompanied by a
  written offer, valid for at least three years and valid for as
  long as you offer spare parts or customer support for that product
  model, to give anyone who possesses the object code either (1) a
  copy of the Corresponding Source for all the software in the
  product that is covered by this License, on a durable physical
  medium customarily used for software interchange, for a price no
  more than your reasonable cost of physically performing this
  conveying of source, or (2) access to copy the
  Corresponding Source from a network server at no charge.

  c) Convey individual copies of the object code with a copy of the
  written offer to provide the Corresponding Source.  This
  alternative is allowed only occasionally and noncommercially, and
  only if you received the object code with such an offer, in accord
  with subsection 6b.

  d) Convey the object code by offering access from a designated
  place (gratis or for a charge), and offer equivalent access to the
  Corresponding Source in the same way through the same place at no
  further charge.  You need not require recipients to copy the
  Corresponding Source along with the object code.  If the place to
  copy the object code is a network server, the Corresponding Source
  may be on a different server (operated by you or a third party)
  that supports equivalent copying facilities, provided you maintain
  clear directions next to the object code saying where to find the
  Corresponding Source.  Regardless of what server hosts the
  Corresponding Source, you remain obligated to ensure that it is
  available for as long as needed to satisfy these requirements.

  e) Convey the object code using peer-to-peer transmission, provided
  you inform other peers where the object code and Corresponding
  Source of the work are being offered to the general public at no
  charge under subsection 6d.

  A separable portion of the object code, whose source code is excluded
from the Corresponding Source as a System Library, need not be
included in conveying the object code work.

  A "User Product" is either (1) a "consumer product", which means any
tangible personal property which is normally used for personal, family,
or household purposes, or (2) anything designed or sold for incorporation
into a dwelling.  In determining whether a product is a consumer product,
doubtful cases shall be resolved in favor of coverage.  For a particular
product received by a particular user, "normally used" refers to a
typical or common use of that class of product, regardless of the status
of the particular user or of the way in which the particular user
actually uses, or expects or is expected to use, the product.  A product
is a consumer product regardless of whether the product has substantial
commercial, industrial or non-consumer uses, unless such uses represent
the only significant mode of use of the product.

"Installation Information" for a User Product means any methods, procedures, authorization keys, or other information required to install and execute modified versions of a covered work in that User Product from a modified version of its Corresponding Source. The information must suffice to ensure that the continued functioning of the modified object code is in no case prevented or interfered with solely because modification has been made.

If you convey an object code work under this section in, or with, or specifically for use in, a User Product, and the conveying occurs as part of a transaction in which the right of possession and use of the User Product is transferred to the recipient in perpetuity or for a fixed term (regardless of how the transaction is characterized), the Corresponding Source conveyed under this section must be accompanied by the Installation Information. But this requirement does not apply if neither you nor any third party retains the ability to install modified object code on the User Product (for example, the work has been installed in ROM).

The requirement to provide Installation Information does not include a requirement to continue to provide support service, warranty, or updates for a work that has been modified or installed by the recipient, or for the User Product in which it has been modified or installed. Access to a network may be denied when the modification itself materially and adversely affects the operation of the network or violates the rules and protocols for communication across the network.

Corresponding Source conveyed, and Installation Information provided, in accord with this section must be in a format that is publicly documented (and with an implementation available to the public in source code form), and must require no special password or key for unpacking, reading or copying.

7. Additional Terms.

"Additional permissions" are terms that supplement the terms of this License by making exceptions from one or more of its conditions. Additional permissions that are applicable to the entire Program shall be treated as though they were included in this License, to the extent that they are valid under applicable law. If additional permissions apply only to part of the Program, that part may be used separately under those permissions, but the entire Program remains governed by this License without regard to the additional permissions.

When you convey a copy of a covered work, you may at your option remove any additional permissions from that copy, or from any part of it. (Additional permissions may be written to require their own removal in certain cases when you modify the work.) You may place additional permissions on material, added by you to a covered work, for which you have or can give appropriate copyright permission.

Notwithstanding any other provision of this License, for material you add to a covered work, you may (if authorized by the copyright holders of that material) supplement the terms of this License with terms:

    a) Disclaiming warranty or limiting liability differently from the terms of sections 15 and 16 of this License; or

    b) Requiring preservation of specified reasonable legal notices or author attributions in that material or in the Appropriate Legal Notices displayed by works containing it; or

c) Prohibiting misrepresentation of the origin of that material, or requiring that modified versions of such material be marked in reasonable ways as different from the original version; or

d) Limiting the use for publicity purposes of names of licensors or authors of the material; or

e) Declining to grant rights under trademark law for use of some trade names, trademarks, or service marks; or

f) Requiring indemnification of licensors and authors of that material by anyone who conveys the material (or modified versions of it) with contractual assumptions of liability to the recipient, for any liability that these contractual assumptions directly impose on those licensors and authors.

  All other non-permissive additional terms are considered "further restrictions" within the meaning of section 10.  If the Program as you received it, or any part of it, contains a notice stating that it is governed by this License along with a term that is a further restriction, you may remove that term.  If a license document contains a further restriction but permits relicensing or conveying under this License, you may add to a covered work material governed by the terms of that license document, provided that the further restriction does not survive such relicensing or conveying.

  If you add terms to a covered work in accord with this section, you must place, in the relevant source files, a statement of the additional terms that apply to those files, or a notice indicating where to find the applicable terms.

  Additional terms, permissive or non-permissive, may be stated in the form of a separately written license, or stated as exceptions; the above requirements apply either way.

  8. Termination.

  You may not propagate or modify a covered work except as expressly provided under this License.  Any attempt otherwise to propagate or modify it is void, and will automatically terminate your rights under this License (including any patent licenses granted under the third paragraph of section 11).

  However, if you cease all violation of this License, then your license from a particular copyright holder is reinstated (a) provisionally, unless and until the copyright holder explicitly and finally terminates your license, and (b) permanently, if the copyright holder fails to notify you of the violation by some reasonable means prior to 60 days after the cessation.

  Moreover, your license from a particular copyright holder is reinstated permanently if the copyright holder notifies you of the violation by some reasonable means, this is the first time you have received notice of violation of this License (for any work) from that copyright holder, and you cure the violation prior to 30 days after your receipt of the notice.

  Termination of your rights under this section does not terminate the licenses of parties who have received copies or rights from you under this License.  If your rights have been terminated and not permanently reinstated, you do not qualify to receive new licenses for the same material under section 10.

9. Acceptance Not Required for Having Copies.

  You are not required to accept this License in order to receive or run a copy of the Program.  Ancillary propagation of a covered work occurring solely as a consequence of using peer-to-peer transmission to receive a copy likewise does not require acceptance.  However, nothing other than this License grants you permission to propagate or modify any covered work.  These actions infringe copyright if you do not accept this License.  Therefore, by modifying or propagating a covered work, you indicate your acceptance of this License to do so.

  10. Automatic Licensing of Downstream Recipients.

  Each time you convey a covered work, the recipient automatically receives a license from the original licensors, to run, modify and propagate that work, subject to this License.  You are not responsible for enforcing compliance by third parties with this License.

  An "entity transaction" is a transaction transferring control of an organization, or substantially all assets of one, or subdividing an organization, or merging organizations.  If propagation of a covered work results from an entity transaction, each party to that transaction who receives a copy of the work also receives whatever licenses to the work the party's predecessor in interest had or could give under the previous paragraph, plus a right to possession of the Corresponding Source of the work from the predecessor in interest, if the predecessor has it or can get it with reasonable efforts.

  You may not impose any further restrictions on the exercise of the rights granted or affirmed under this License.  For example, you may not impose a license fee, royalty, or other charge for exercise of rights granted under this License, and you may not initiate litigation (including a cross-claim or counterclaim in a lawsuit) alleging that any patent claim is infringed by making, using, selling, offering for sale, or importing the Program or any portion of it.

  11. Patents.

  A "contributor" is a copyright holder who authorizes use under this License of the Program or a work on which the Program is based.  The work thus licensed is called the contributor's "contributor version".

  A contributor's "essential patent claims" are all patent claims owned or controlled by the contributor, whether already acquired or hereafter acquired, that would be infringed by some manner, permitted by this License, of making, using, or selling its contributor version, but do not include claims that would be infringed only as a consequence of further modification of the contributor version.  For purposes of this definition, "control" includes the right to grant patent sublicenses in a manner consistent with the requirements of this License.

  Each contributor grants you a non-exclusive, worldwide, royalty-free patent license under the contributor's essential patent claims, to make, use, sell, offer for sale, import and otherwise run, modify and propagate the contents of its contributor version.

  In the following three paragraphs, a "patent license" is any express agreement or commitment, however denominated, not to enforce a patent (such as an express permission to practice a patent or covenant not to sue for patent infringement).  To "grant" such a patent license to a party means to make such an agreement or commitment not to enforce a patent against the party.

If you convey a covered work, knowingly relying on a patent license,
and the Corresponding Source of the work is not available for anyone
to copy, free of charge and under the terms of this License, through a
publicly available network server or other readily accessible means,
then you must either (1) cause the Corresponding Source to be so
available, or (2) arrange to deprive yourself of the benefit of the
patent license for this particular work, or (3) arrange, in a manner
consistent with the requirements of this License, to extend the patent
license to downstream recipients. "Knowingly relying" means you have
actual knowledge that, but for the patent license, your conveying the
covered work in a country, or your recipient's use of the covered work
in a country, would infringe one or more identifiable patents in that
country that you have reason to believe are valid.

If, pursuant to or in connection with a single transaction or
arrangement, you convey, or propagate by procuring conveyance of, a
covered work, and grant a patent license to some of the parties
receiving the covered work authorizing them to use, propagate, modify
or convey a specific copy of the covered work, then the patent license
you grant is automatically extended to all recipients of the covered
work and works based on it.

A patent license is "discriminatory" if it does not include within
the scope of its coverage, prohibits the exercise of, or is
conditioned on the non-exercise of one or more of the rights that are
specifically granted under this License.  You may not convey a covered
work if you are a party to an arrangement with a third party that is
in the business of distributing software, under which you make payment
to the third party based on the extent of your activity of conveying
the work, and under which the third party grants, to any of the
parties who would receive the covered work from you, a discriminatory
patent license (a) in connection with copies of the covered work
conveyed by you (or copies made from those copies), or (b) primarily
for and in connection with specific products or compilations that
contain the covered work, unless you entered into that arrangement,
or that patent license was granted, prior to 28 March 2007.

Nothing in this License shall be construed as excluding or limiting
any implied license or other defenses to infringement that may
otherwise be available to you under applicable patent law.

12. No Surrender of Others' Freedom.

If conditions are imposed on you (whether by court order, agreement or
otherwise) that contradict the conditions of this License, they do not
excuse you from the conditions of this License.  If you cannot convey a
covered work so as to satisfy simultaneously your obligations under this
License and any other pertinent obligations, then as a consequence you may
not convey it at all.  For example, if you agree to terms that obligate you
to collect a royalty for further conveying from those to whom you convey
the Program, the only way you could satisfy both those terms and this
License would be to refrain entirely from conveying the Program.

13. Remote Network Interaction; Use with the GNU General Public License.

Notwithstanding any other provision of this License, if you modify the
Program, your modified version must prominently offer all users
interacting with it remotely through a computer network (if your version
supports such interaction) an opportunity to receive the Corresponding
Source of your version by providing access to the Corresponding Source
from a network server at no charge, through some standard or customary
means of facilitating copying of software.  This Corresponding Source

shall include the Corresponding Source for any work covered by version 3 of the GNU General Public License that is incorporated pursuant to the following paragraph.

Notwithstanding any other provision of this License, you have permission to link or combine any covered work with a work licensed under version 3 of the GNU General Public License into a single combined work, and to convey the resulting work. The terms of this License will continue to apply to the part which is the covered work, but the work with which it is combined will remain governed by version 3 of the GNU General Public License.

14. Revised Versions of this License.

The Free Software Foundation may publish revised and/or new versions of the GNU Affero General Public License from time to time. Such new versions will be similar in spirit to the present version, but may differ in detail to address new problems or concerns.

Each version is given a distinguishing version number. If the Program specifies that a certain numbered version of the GNU Affero General Public License "or any later version" applies to it, you have the option of following the terms and conditions either of that numbered version or of any later version published by the Free Software Foundation. If the Program does not specify a version number of the GNU Affero General Public License, you may choose any version ever published by the Free Software Foundation.

If the Program specifies that a proxy can decide which future versions of the GNU Affero General Public License can be used, that proxy's public statement of acceptance of a version permanently authorizes you to choose that version for the Program.

Later license versions may give you additional or different permissions. However, no additional obligations are imposed on any author or copyright holder as a result of your choosing to follow a later version.

15. Disclaimer of Warranty.

THERE IS NO WARRANTY FOR THE PROGRAM, TO THE EXTENT PERMITTED BY APPLICABLE LAW. EXCEPT WHEN OTHERWISE STATED IN WRITING THE COPYRIGHT HOLDERS AND/OR OTHER PARTIES PROVIDE THE PROGRAM "AS IS" WITHOUT WARRANTY OF ANY KIND, EITHER EXPRESSED OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. THE ENTIRE RISK AS TO THE QUALITY AND PERFORMANCE OF THE PROGRAM IS WITH YOU. SHOULD THE PROGRAM PROVE DEFECTIVE, YOU ASSUME THE COST OF ALL NECESSARY SERVICING, REPAIR OR CORRECTION.

16. Limitation of Liability.

IN NO EVENT UNLESS REQUIRED BY APPLICABLE LAW OR AGREED TO IN WRITING WILL ANY COPYRIGHT HOLDER, OR ANY OTHER PARTY WHO MODIFIES AND/OR CONVEYS THE PROGRAM AS PERMITTED ABOVE, BE LIABLE TO YOU FOR DAMAGES, INCLUDING ANY GENERAL, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF THE USE OR INABILITY TO USE THE PROGRAM (INCLUDING BUT NOT LIMITED TO LOSS OF DATA OR DATA BEING RENDERED INACCURATE OR LOSSES SUSTAINED BY YOU OR THIRD PARTIES OR A FAILURE OF THE PROGRAM TO OPERATE WITH ANY OTHER PROGRAMS), EVEN IF SUCH HOLDER OR OTHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

17. Interpretation of Sections 15 and 16.

```
    If the disclaimer of warranty and limitation of liability provided
above cannot be given local legal effect according to their terms,
reviewing courts shall apply local law that most closely approximates
an absolute waiver of all civil liability in connection with the
Program, unless a warranty or assumption of liability accompanies a
copy of the Program in return for a fee.

                    END OF TERMS AND CONDITIONS

              How to Apply These Terms to Your New Programs

   If you develop a new program, and you want it to be of the greatest
possible use to the public, the best way to achieve this is to make it
free software which everyone can redistribute and change under these terms.

   To do so, attach the following notices to the program.  It is safest
to attach them to the start of each source file to most effectively
state the exclusion of warranty; and each file should have at least
the "copyright" line and a pointer to where the full notice is found.

      <one line to give the program's name and a brief idea of what it does.>
      Copyright (C) <year>  <name of author>

      This program is free software: you can redistribute it and/or modify
      it under the terms of the GNU Affero General Public License as
      published by the Free Software Foundation, either version 3 of the
      License, or (at your option) any later version.

      This program is distributed in the hope that it will be useful,
      but WITHOUT ANY WARRANTY; without even the implied warranty of
      MERCHANTABILITY or FITNESS FOR A PARTICULAR PURPOSE.  See the
      GNU Affero General Public License for more details.

      You should have received a copy of the GNU Affero General Public License
      along with this program.  If not, see <http://www.gnu.org/licenses/>.

Also add information on how to contact you by electronic and paper mail.

   If your software can interact with users remotely through a computer
network, you should also make sure that it provides a way for users to
get its source.  For example, if your program is a web application, its
interface could display a "Source" link that leads users to an archive
of the code.  There are many ways you could offer source, and different
solutions will be better for different programs; see section 13 for the
specific requirements.

   You should also get your employer (if you work as a programmer) or school,
if any, to sign a "copyright disclaimer" for the program, if necessary.
For more information on this, and how to apply and follow the GNU AGPL, see
<http://www.gnu.org/licenses/>.


"Commons Clause" License Condition

The Software is provided to you by the Licensor under the License, as
defined below, subject to the following condition. Without limiting
other conditions in the License, the grant of rights under the License
will not include, and the License does not grant to you, the right to
Sell the Software.  For purposes of the foregoing, "Sell" means
practicing any or all of the rights granted to you under the License
to provide to third parties, for a fee or other consideration,
a product or service that consists, entirely or substantially,
of the Software or the functionality of the Software. Any license
```

notice or attribution required by the License must also include
this Commons Cause License Condition notice.

Case 5:18-cv-07182-EJD    Document 181-2    Filed 04/20/23    Page 102 of 181

# Exhibit H
## Expert Report of Bradley M. Kuhn
## 22 December 2022

The Affero General Public License, version 3.

GNU AFFERO GENERAL PUBLIC LICENSE
Version 3, 19 November 2007

Copyright (C) 2007 Free Software Foundation, Inc. <https://fsf.org/>
Everyone is permitted to copy and distribute verbatim copies
of this license document, but changing it is not allowed.

Preamble

  The GNU Affero General Public License is a free, copyleft license for
software and other kinds of works, specifically designed to ensure
cooperation with the community in the case of network server software.

  The licenses for most software and other practical works are designed
to take away your freedom to share and change the works.  By contrast,
our General Public Licenses are intended to guarantee your freedom to
share and change all versions of a program--to make sure it remains free
software for all its users.

  When we speak of free software, we are referring to freedom, not
price.  Our General Public Licenses are designed to make sure that you
have the freedom to distribute copies of free software (and charge for
them if you wish), that you receive source code or can get it if you
want it, that you can change the software or use pieces of it in new
free programs, and that you know you can do these things.

  Developers that use our General Public Licenses protect your rights
with two steps: (1) assert copyright on the software, and (2) offer
you this License which gives you legal permission to copy, distribute
and/or modify the software.

  A secondary benefit of defending all users' freedom is that
improvements made in alternate versions of the program, if they
receive widespread use, become available for other developers to
incorporate.  Many developers of free software are heartened and
encouraged by the resulting cooperation.  However, in the case of
software used on network servers, this result may fail to come about.
The GNU General Public License permits making a modified version and
letting the public access it on a server without ever releasing its
source code to the public.

  The GNU Affero General Public License is designed specifically to
ensure that, in such cases, the modified source code becomes available
to the community.  It requires the operator of a network server to
provide the source code of the modified version running there to the
users of that server.  Therefore, public use of a modified version, on
a publicly accessible server, gives the public access to the source
code of the modified version.

  An older license, called the Affero General Public License and
published by Affero, was designed to accomplish similar goals.  This is
a different license, not a version of the Affero GPL, but Affero has
released a new version of the Affero GPL which permits relicensing under
this license.

  The precise terms and conditions for copying, distribution and
modification follow.

TERMS AND CONDITIONS

  0. Definitions.

  "This License" refers to version 3 of the GNU Affero General Public License.

"Copyright" also means copyright-like laws that apply to other kinds of works, such as semiconductor masks.

"The Program" refers to any copyrightable work licensed under this License.  Each licensee is addressed as "you".  "Licensees" and "recipients" may be individuals or organizations.

To "modify" a work means to copy from or adapt all or part of the work in a fashion requiring copyright permission, other than the making of an exact copy.  The resulting work is called a "modified version" of the earlier work or a work "based on" the earlier work.

A "covered work" means either the unmodified Program or a work based on the Program.

To "propagate" a work means to do anything with it that, without permission, would make you directly or secondarily liable for infringement under applicable copyright law, except executing it on a computer or modifying a private copy.  Propagation includes copying, distribution (with or without modification), making available to the public, and in some countries other activities as well.

To "convey" a work means any kind of propagation that enables other parties to make or receive copies.  Mere interaction with a user through a computer network, with no transfer of a copy, is not conveying.

An interactive user interface displays "Appropriate Legal Notices" to the extent that it includes a convenient and prominently visible feature that (1) displays an appropriate copyright notice, and (2) tells the user that there is no warranty for the work (except to the extent that warranties are provided), that licensees may convey the work under this License, and how to view a copy of this License.  If the interface presents a list of user commands or options, such as a menu, a prominent item in the list meets this criterion.

1. Source Code.

The "source code" for a work means the preferred form of the work for making modifications to it.  "Object code" means any non-source form of a work.

A "Standard Interface" means an interface that either is an official standard defined by a recognized standards body, or, in the case of interfaces specified for a particular programming language, one that is widely used among developers working in that language.

The "System Libraries" of an executable work include anything, other than the work as a whole, that (a) is included in the normal form of packaging a Major Component, but which is not part of that Major Component, and (b) serves only to enable use of the work with that Major Component, or to implement a Standard Interface for which an implementation is available to the public in source code form.  A "Major Component", in this context, means a major essential component (kernel, window system, and so on) of the specific operating system (if any) on which the executable work runs, or a compiler used to produce the work, or an object code interpreter used to run it.

The "Corresponding Source" for a work in object code form means all the source code needed to generate, install, and (for an executable work) run the object code and to modify the work, including scripts to control those activities.  However, it does not include the work's System Libraries, or general-purpose tools or generally available free

programs which are used unmodified in performing those activities but which are not part of the work.  For example, Corresponding Source includes interface definition files associated with source files for the work, and the source code for shared libraries and dynamically linked subprograms that the work is specifically designed to require, such as by intimate data communication or control flow between those subprograms and other parts of the work.

  The Corresponding Source need not include anything that users can regenerate automatically from other parts of the Corresponding Source.

  The Corresponding Source for a work in source code form is that same work.

  2. Basic Permissions.

  All rights granted under this License are granted for the term of copyright on the Program, and are irrevocable provided the stated conditions are met.  This License explicitly affirms your unlimited permission to run the unmodified Program.  The output from running a covered work is covered by this License only if the output, given its content, constitutes a covered work.  This License acknowledges your rights of fair use or other equivalent, as provided by copyright law.

  You may make, run and propagate covered works that you do not convey, without conditions so long as your license otherwise remains in force.  You may convey covered works to others for the sole purpose of having them make modifications exclusively for you, or provide you with facilities for running those works, provided that you comply with the terms of this License in conveying all material for which you do not control copyright.  Those thus making or running the covered works for you must do so exclusively on your behalf, under your direction and control, on terms that prohibit them from making any copies of your copyrighted material outside their relationship with you.

  Conveying under any other circumstances is permitted solely under the conditions stated below.  Sublicensing is not allowed; section 10 makes it unnecessary.

  3. Protecting Users' Legal Rights From Anti-Circumvention Law.

  No covered work shall be deemed part of an effective technological measure under any applicable law fulfilling obligations under article 11 of the WIPO copyright treaty adopted on 20 December 1996, or similar laws prohibiting or restricting circumvention of such measures.

  When you convey a covered work, you waive any legal power to forbid circumvention of technological measures to the extent such circumvention is effected by exercising rights under this License with respect to the covered work, and you disclaim any intention to limit operation or modification of the work as a means of enforcing, against the work's users, your or third parties' legal rights to forbid circumvention of technological measures.

  4. Conveying Verbatim Copies.

  You may convey verbatim copies of the Program's source code as you receive it, in any medium, provided that you conspicuously and appropriately publish on each copy an appropriate copyright notice; keep intact all notices stating that this License and any non-permissive terms added in accord with section 7 apply to the code;

SER_1724

keep intact all notices of the absence of any warranty; and give all recipients a copy of this License along with the Program.

You may charge any price or no price for each copy that you convey, and you may offer support or warranty protection for a fee.

5. Conveying Modified Source Versions.

You may convey a work based on the Program, or the modifications to produce it from the Program, in the form of source code under the terms of section 4, provided that you also meet all of these conditions:

a) The work must carry prominent notices stating that you modified it, and giving a relevant date.

b) The work must carry prominent notices stating that it is released under this License and any conditions added under section 7. This requirement modifies the requirement in section 4 to "keep intact all notices".

c) You must license the entire work, as a whole, under this License to anyone who comes into possession of a copy. This License will therefore apply, along with any applicable section 7 additional terms, to the whole of the work, and all its parts, regardless of how they are packaged. This License gives no permission to license the work in any other way, but it does not invalidate such permission if you have separately received it.

d) If the work has interactive user interfaces, each must display Appropriate Legal Notices; however, if the Program has interactive interfaces that do not display Appropriate Legal Notices, your work need not make them do so.

A compilation of a covered work with other separate and independent works, which are not by their nature extensions of the covered work, and which are not combined with it such as to form a larger program, in or on a volume of a storage or distribution medium, is called an "aggregate" if the compilation and its resulting copyright are not used to limit the access or legal rights of the compilation's users beyond what the individual works permit. Inclusion of a covered work in an aggregate does not cause this License to apply to the other parts of the aggregate.

6. Conveying Non-Source Forms.

You may convey a covered work in object code form under the terms of sections 4 and 5, provided that you also convey the machine-readable Corresponding Source under the terms of this License, in one of these ways:

a) Convey the object code in, or embodied in, a physical product (including a physical distribution medium), accompanied by the Corresponding Source fixed on a durable physical medium customarily used for software interchange.

b) Convey the object code in, or embodied in, a physical product (including a physical distribution medium), accompanied by a written offer, valid for at least three years and valid for as long as you offer spare parts or customer support for that product model, to give anyone who possesses the object code either (1) a copy of the Corresponding Source for all the software in the product that is covered by this License, on a durable physical medium customarily used for software interchange, for a price no

more than your reasonable cost of physically performing this conveying of source, or (2) access to copy the Corresponding Source from a network server at no charge.

c) Convey individual copies of the object code with a copy of the written offer to provide the Corresponding Source.  This alternative is allowed only occasionally and noncommercially, and only if you received the object code with such an offer, in accord with subsection 6b.

d) Convey the object code by offering access from a designated place (gratis or for a charge), and offer equivalent access to the Corresponding Source in the same way through the same place at no further charge.  You need not require recipients to copy the Corresponding Source along with the object code.  If the place to copy the object code is a network server, the Corresponding Source may be on a different server (operated by you or a third party) that supports equivalent copying facilities, provided you maintain clear directions next to the object code saying where to find the Corresponding Source.  Regardless of what server hosts the Corresponding Source, you remain obligated to ensure that it is available for as long as needed to satisfy these requirements.

e) Convey the object code using peer-to-peer transmission, provided you inform other peers where the object code and Corresponding Source of the work are being offered to the general public at no charge under subsection 6d.

  A separable portion of the object code, whose source code is excluded from the Corresponding Source as a System Library, need not be included in conveying the object code work.

  A "User Product" is either (1) a "consumer product", which means any tangible personal property which is normally used for personal, family, or household purposes, or (2) anything designed or sold for incorporation into a dwelling.  In determining whether a product is a consumer product, doubtful cases shall be resolved in favor of coverage.  For a particular product received by a particular user, "normally used" refers to a typical or common use of that class of product, regardless of the status of the particular user or of the way in which the particular user actually uses, or expects or is expected to use, the product.  A product is a consumer product regardless of whether the product has substantial commercial, industrial or non-consumer uses, unless such uses represent the only significant mode of use of the product.

  "Installation Information" for a User Product means any methods, procedures, authorization keys, or other information required to install and execute modified versions of a covered work in that User Product from a modified version of its Corresponding Source.  The information must suffice to ensure that the continued functioning of the modified object code is in no case prevented or interfered with solely because modification has been made.

  If you convey an object code work under this section in, or with, or specifically for use in, a User Product, and the conveying occurs as part of a transaction in which the right of possession and use of the User Product is transferred to the recipient in perpetuity or for a fixed term (regardless of how the transaction is characterized), the Corresponding Source conveyed under this section must be accompanied by the Installation Information.  But this requirement does not apply if neither you nor any third party retains the ability to install modified object code on the User Product (for example, the work has been installed in ROM).

SER_1726

The requirement to provide Installation Information does not include a requirement to continue to provide support service, warranty, or updates for a work that has been modified or installed by the recipient, or for the User Product in which it has been modified or installed.  Access to a network may be denied when the modification itself materially and adversely affects the operation of the network or violates the rules and protocols for communication across the network.

Corresponding Source conveyed, and Installation Information provided, in accord with this section must be in a format that is publicly documented (and with an implementation available to the public in source code form), and must require no special password or key for unpacking, reading or copying.

7. Additional Terms.

"Additional permissions" are terms that supplement the terms of this License by making exceptions from one or more of its conditions. Additional permissions that are applicable to the entire Program shall be treated as though they were included in this License, to the extent that they are valid under applicable law.  If additional permissions apply only to part of the Program, that part may be used separately under those permissions, but the entire Program remains governed by this License without regard to the additional permissions.

When you convey a copy of a covered work, you may at your option remove any additional permissions from that copy, or from any part of it.  (Additional permissions may be written to require their own removal in certain cases when you modify the work.)  You may place additional permissions on material, added by you to a covered work, for which you have or can give appropriate copyright permission.

Notwithstanding any other provision of this License, for material you add to a covered work, you may (if authorized by the copyright holders of that material) supplement the terms of this License with terms:

    a) Disclaiming warranty or limiting liability differently from the terms of sections 15 and 16 of this License; or

    b) Requiring preservation of specified reasonable legal notices or author attributions in that material or in the Appropriate Legal Notices displayed by works containing it; or

    c) Prohibiting misrepresentation of the origin of that material, or requiring that modified versions of such material be marked in reasonable ways as different from the original version; or

    d) Limiting the use for publicity purposes of names of licensors or authors of the material; or

    e) Declining to grant rights under trademark law for use of some trade names, trademarks, or service marks; or

    f) Requiring indemnification of licensors and authors of that material by anyone who conveys the material (or modified versions of it) with contractual assumptions of liability to the recipient, for any liability that these contractual assumptions directly impose on those licensors and authors.

All other non-permissive additional terms are considered "further restrictions" within the meaning of section 10.  If the Program as you received it, or any part of it, contains a notice stating that it is

governed by this License along with a term that is a further
restriction, you may remove that term.  If a license document contains
a further restriction but permits relicensing or conveying under this
License, you may add to a covered work material governed by the terms
of that license document, provided that the further restriction does
not survive such relicensing or conveying.

   If you add terms to a covered work in accord with this section, you
must place, in the relevant source files, a statement of the
additional terms that apply to those files, or a notice indicating
where to find the applicable terms.

   Additional terms, permissive or non-permissive, may be stated in the
form of a separately written license, or stated as exceptions;
the above requirements apply either way.

   8. Termination.

   You may not propagate or modify a covered work except as expressly
provided under this License.  Any attempt otherwise to propagate or
modify it is void, and will automatically terminate your rights under
this License (including any patent licenses granted under the third
paragraph of section 11).

   However, if you cease all violation of this License, then your
license from a particular copyright holder is reinstated (a)
provisionally, unless and until the copyright holder explicitly and
finally terminates your license, and (b) permanently, if the copyright
holder fails to notify you of the violation by some reasonable means
prior to 60 days after the cessation.

   Moreover, your license from a particular copyright holder is
reinstated permanently if the copyright holder notifies you of the
violation by some reasonable means, this is the first time you have
received notice of violation of this License (for any work) from that
copyright holder, and you cure the violation prior to 30 days after
your receipt of the notice.

   Termination of your rights under this section does not terminate the
licenses of parties who have received copies or rights from you under
this License.  If your rights have been terminated and not permanently
reinstated, you do not qualify to receive new licenses for the same
material under section 10.

   9. Acceptance Not Required for Having Copies.

   You are not required to accept this License in order to receive or
run a copy of the Program.  Ancillary propagation of a covered work
occurring solely as a consequence of using peer-to-peer transmission
to receive a copy likewise does not require acceptance.  However,
nothing other than this License grants you permission to propagate or
modify any covered work.  These actions infringe copyright if you do
not accept this License.  Therefore, by modifying or propagating a
covered work, you indicate your acceptance of this License to do so.

   10. Automatic Licensing of Downstream Recipients.

   Each time you convey a covered work, the recipient automatically
receives a license from the original licensors, to run, modify and
propagate that work, subject to this License.  You are not responsible
for enforcing compliance by third parties with this License.

   An "entity transaction" is a transaction transferring control of an

organization, or substantially all assets of one, or subdividing an
organization, or merging organizations.  If propagation of a covered
work results from an entity transaction, each party to that
transaction who receives a copy of the work also receives whatever
licenses to the work the party's predecessor in interest had or could
give under the previous paragraph, plus a right to possession of the
Corresponding Source of the work from the predecessor in interest, if
the predecessor has it or can get it with reasonable efforts.

  You may not impose any further restrictions on the exercise of the
rights granted or affirmed under this License.  For example, you may
not impose a license fee, royalty, or other charge for exercise of
rights granted under this License, and you may not initiate litigation
(including a cross-claim or counterclaim in a lawsuit) alleging that
any patent claim is infringed by making, using, selling, offering for
sale, or importing the Program or any portion of it.

  11. Patents.

  A "contributor" is a copyright holder who authorizes use under this
License of the Program or a work on which the Program is based.  The
work thus licensed is called the contributor's "contributor version".

  A contributor's "essential patent claims" are all patent claims
owned or controlled by the contributor, whether already acquired or
hereafter acquired, that would be infringed by some manner, permitted
by this License, of making, using, or selling its contributor version,
but do not include claims that would be infringed only as a
consequence of further modification of the contributor version.  For
purposes of this definition, "control" includes the right to grant
patent sublicenses in a manner consistent with the requirements of
this License.

  Each contributor grants you a non-exclusive, worldwide, royalty-free
patent license under the contributor's essential patent claims, to
make, use, sell, offer for sale, import and otherwise run, modify and
propagate the contents of its contributor version.

  In the following three paragraphs, a "patent license" is any express
agreement or commitment, however denominated, not to enforce a patent
(such as an express permission to practice a patent or covenant not to
sue for patent infringement).  To "grant" such a patent license to a
party means to make such an agreement or commitment not to enforce a
patent against the party.

  If you convey a covered work, knowingly relying on a patent license,
and the Corresponding Source of the work is not available for anyone
to copy, free of charge and under the terms of this License, through a
publicly available network server or other readily accessible means,
then you must either (1) cause the Corresponding Source to be so
available, or (2) arrange to deprive yourself of the benefit of the
patent license for this particular work, or (3) arrange, in a manner
consistent with the requirements of this License, to extend the patent
license to downstream recipients.  "Knowingly relying" means you have
actual knowledge that, but for the patent license, your conveying the
covered work in a country, or your recipient's use of the covered work
in a country, would infringe one or more identifiable patents in that
country that you have reason to believe are valid.

  If, pursuant to or in connection with a single transaction or
arrangement, you convey, or propagate by procuring conveyance of, a
covered work, and grant a patent license to some of the parties
receiving the covered work authorizing them to use, propagate, modify

or convey a specific copy of the covered work, then the patent license you grant is automatically extended to all recipients of the covered work and works based on it.

  A patent license is "discriminatory" if it does not include within the scope of its coverage, prohibits the exercise of, or is conditioned on the non-exercise of one or more of the rights that are specifically granted under this License.  You may not convey a covered work if you are a party to an arrangement with a third party that is in the business of distributing software, under which you make payment to the third party based on the extent of your activity of conveying the work, and under which the third party grants, to any of the parties who would receive the covered work from you, a discriminatory patent license (a) in connection with copies of the covered work conveyed by you (or copies made from those copies), or (b) primarily for and in connection with specific products or compilations that contain the covered work, unless you entered into that arrangement, or that patent license was granted, prior to 28 March 2007.

  Nothing in this License shall be construed as excluding or limiting any implied license or other defenses to infringement that may otherwise be available to you under applicable patent law.

  12. No Surrender of Others' Freedom.

  If conditions are imposed on you (whether by court order, agreement or otherwise) that contradict the conditions of this License, they do not excuse you from the conditions of this License.  If you cannot convey a covered work so as to satisfy simultaneously your obligations under this License and any other pertinent obligations, then as a consequence you may not convey it at all.  For example, if you agree to terms that obligate you to collect a royalty for further conveying from those to whom you convey the Program, the only way you could satisfy both those terms and this License would be to refrain entirely from conveying the Program.

  13. Remote Network Interaction; Use with the GNU General Public License.

  Notwithstanding any other provision of this License, if you modify the Program, your modified version must prominently offer all users interacting with it remotely through a computer network (if your version supports such interaction) an opportunity to receive the Corresponding Source of your version by providing access to the Corresponding Source from a network server at no charge, through some standard or customary means of facilitating copying of software.  This Corresponding Source shall include the Corresponding Source for any work covered by version 3 of the GNU General Public License that is incorporated pursuant to the following paragraph.

  Notwithstanding any other provision of this License, you have permission to link or combine any covered work with a work licensed under version 3 of the GNU General Public License into a single combined work, and to convey the resulting work.  The terms of this License will continue to apply to the part which is the covered work, but the work with which it is combined will remain governed by version 3 of the GNU General Public License.

  14. Revised Versions of this License.

  The Free Software Foundation may publish revised and/or new versions of the GNU Affero General Public License from time to time.  Such new versions will be similar in spirit to the present version, but may differ in detail to address new problems or concerns.

Each version is given a distinguishing version number.  If the
Program specifies that a certain numbered version of the GNU Affero General
Public License "or any later version" applies to it, you have the
option of following the terms and conditions either of that numbered
version or of any later version published by the Free Software
Foundation.  If the Program does not specify a version number of the
GNU Affero General Public License, you may choose any version ever published
by the Free Software Foundation.

If the Program specifies that a proxy can decide which future
versions of the GNU Affero General Public License can be used, that proxy's
public statement of acceptance of a version permanently authorizes you
to choose that version for the Program.

Later license versions may give you additional or different
permissions.  However, no additional obligations are imposed on any
author or copyright holder as a result of your choosing to follow a
later version.

15. Disclaimer of Warranty.

THERE IS NO WARRANTY FOR THE PROGRAM, TO THE EXTENT PERMITTED BY
APPLICABLE LAW.  EXCEPT WHEN OTHERWISE STATED IN WRITING THE COPYRIGHT
HOLDERS AND/OR OTHER PARTIES PROVIDE THE PROGRAM "AS IS" WITHOUT WARRANTY
OF ANY KIND, EITHER EXPRESSED OR IMPLIED, INCLUDING, BUT NOT LIMITED TO,
THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR
PURPOSE.  THE ENTIRE RISK AS TO THE QUALITY AND PERFORMANCE OF THE PROGRAM
IS WITH YOU.  SHOULD THE PROGRAM PROVE DEFECTIVE, YOU ASSUME THE COST OF
ALL NECESSARY SERVICING, REPAIR OR CORRECTION.

16. Limitation of Liability.

IN NO EVENT UNLESS REQUIRED BY APPLICABLE LAW OR AGREED TO IN WRITING
WILL ANY COPYRIGHT HOLDER, OR ANY OTHER PARTY WHO MODIFIES AND/OR CONVEYS
THE PROGRAM AS PERMITTED ABOVE, BE LIABLE TO YOU FOR DAMAGES, INCLUDING ANY
GENERAL, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF THE
USE OR INABILITY TO USE THE PROGRAM (INCLUDING BUT NOT LIMITED TO LOSS OF
DATA OR DATA BEING RENDERED INACCURATE OR LOSSES SUSTAINED BY YOU OR THIRD
PARTIES OR A FAILURE OF THE PROGRAM TO OPERATE WITH ANY OTHER PROGRAMS),
EVEN IF SUCH HOLDER OR OTHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF
SUCH DAMAGES.

17. Interpretation of Sections 15 and 16.

If the disclaimer of warranty and limitation of liability provided
above cannot be given local legal effect according to their terms,
reviewing courts shall apply local law that most closely approximates
an absolute waiver of all civil liability in connection with the
Program, unless a warranty or assumption of liability accompanies a
copy of the Program in return for a fee.

                    END OF TERMS AND CONDITIONS

              How to Apply These Terms to Your New Programs

If you develop a new program, and you want it to be of the greatest
possible use to the public, the best way to achieve this is to make it
free software which everyone can redistribute and change under these terms.

To do so, attach the following notices to the program.  It is safest
to attach them to the start of each source file to most effectively
state the exclusion of warranty; and each file should have at least
the "copyright" line and a pointer to where the full notice is found.

```
    <one line to give the program's name and a brief idea of what it does.>
    Copyright (C) <year>  <name of author>

    This program is free software: you can redistribute it and/or modify
    it under the terms of the GNU Affero General Public License as published by
    the Free Software Foundation, either version 3 of the License, or
    (at your option) any later version.

    This program is distributed in the hope that it will be useful,
    but WITHOUT ANY WARRANTY; without even the implied warranty of
    MERCHANTABILITY or FITNESS FOR A PARTICULAR PURPOSE.  See the
    GNU Affero General Public License for more details.

    You should have received a copy of the GNU Affero General Public License
    along with this program.  If not, see <https://www.gnu.org/licenses/>.

Also add information on how to contact you by electronic and paper mail.

  If your software can interact with users remotely through a computer
network, you should also make sure that it provides a way for users to
get its source.  For example, if your program is a web application, its
interface could display a "Source" link that leads users to an archive
of the code.  There are many ways you could offer source, and different
solutions will be better for different programs; see section 13 for the
specific requirements.

  You should also get your employer (if you work as a programmer) or school,
if any, to sign a "copyright disclaimer" for the program, if necessary.
For more information on this, and how to apply and follow the GNU AGPL, see
<https://www.gnu.org/licenses/>.
```

# Exhibit I

## Expert Report of Bradley M. Kuhn

## 22 December 2022

Relevant portion of the GNU FAQ regarding modification of FSF's licenses, as it appeared on the GNU

website on 2022-12-21.



**Can I modify the GPL and make a modified license?** (#ModifyGPL)

It is possible to make modified versions of the GPL, but it tends to have practical consequences.

You can legally use the GPL terms (possibly modified) in another license provided that you call your license by another name and do not include the GPL preamble, and provided you modify the instructions-for-use at the end enough to make it clearly different in wording and not mention GNU (though the actual procedure you describe may be similar).

If you want to use our preamble in a modified license, please write to <licensing@gnu.org> for permission. For this purpose we would want to check the actual license requirements to see if we approve of them.

Although we will not raise legal objections to your making a modified license in this way, we hope you will think twice and not do it. Such a modified license is almost certainly incompatible with the GNU GPL, and that incompatibility blocks useful combinations of modules. The mere proliferation of different free software licenses is a burden in and of itself.

Rather than modifying the GPL, please use the exception mechanism offered by GPL version 3.

**If I use a piece of software that has been obtained under the GNU GPL, am I allowed to modify**

# Exhibit J

## Expert Report of Bradley M. Kuhn

## 22 December 2022

Internet Archive the relevant portion of the GNU FAQ regarding modification of FSF's licenses, as captured from the GNU website on 2012-01-07.

SER_1735



**Can I modify the GPL and make a modified license?** (#ModifyGPL)

You can use the GPL terms (possibly modified) in another license provided that you call your license by another name and do not include the GPL preamble, and provided you modify the instructions-for-use at the end enough to make it clearly different in wording and not mention GNU (though the actual procedure you describe may be similar).

If you want to use our preamble in a modified license, please write to <licensing@gnu.org> for permission. For this purpose we would want to check the actual license requirements to see if we approve of them.

Although we will not raise legal objections to your making a modified license in this way, we hope you will think twice and not do it. Such a modified license is almost certainly incompatible with the GNU GPL, and that incompatibility blocks useful combinations of modules. The mere proliferation of different free software licenses is a burden in and of itself.

# Exhibit K

## Expert Report of Bradley M. Kuhn

## 22 December 2022

The Server Side Public License as published by MongoDB, Inc. on 2018-10-16.

{Blog} MongoDB named as a leader in the Forrester Wave™: Translytical Data Platforms, Q4 2022 — learn more

 MongoDB.

# Server Side Public License (SSPL)

- Frequently Asked Questions about the Server Side Public License (SSPL)
- Comparison of GNU Affero General Public License v3 to SSPL

---

## Server Side Public License

VERSION 1, OCTOBER 16, 2018

Copyright © 2018 MongoDB, Inc.

Everyone is permitted to copy and distribute verbatim copies of this license document, but changing it is not allowed.

## TERMS AND CONDITIONS

## 0. Definitions.

"This License" refers to Server Side Public License.

"Copyright" also means copyright-like laws that apply to other kinds of works, such as semiconductor masks.

"The Program" refers to any copyrightable work licensed under this License. Each licensee is addressed as "you". "Licensees" and "recipients" may be individuals or organizations.

To "modify" a work means to copy from or adapt all or part of the work in a fashion requiring copyright permission, other than the making of an exact copy. The resulting work is called a "modified version" of the earlier work or a work "based on" the earlier work.

A "covered work" means either the unmodified Program or a work based on the Program.

To "propagate" a work means to do anything with it that, without permission, would make you directly or secondarily liable for infringement under applicable copyright law, except executing it on a computer or modifying a private copy. Propagation includes copying, distribution (with or without modification), making available to the public, and in some countries other activities as well.

SER_1738

To "convey" a work means any kind of propagation that enables other parties to make or receive copies. Mere interaction with a user through a computer network, with no transfer of a copy, is not conveying.

An interactive user interface displays "Appropriate Legal Notices" to the extent that it includes a convenient and prominently visible feature that (1) displays an appropriate copyright notice, and (2) tells the user that there is no warranty for the work (except to the extent that warranties are provided), that licensees may convey the work under this License, and how to view a copy of this License. If the interface presents a list of user commands or options, such as a menu, a prominent item in the list meets this criterion.

# 1. Source Code.

The "source code" for a work means the preferred form of the work for making modifications to it. "Object code" means any non-source form of a work.

A "Standard Interface" means an interface that either is an official standard defined by a recognized standards body, or, in the case of interfaces specified for a particular programming language, one that is widely used among developers working in that language.

The "System Libraries" of an executable work include anything, other than the work as a whole, that (a) is included in the normal form of packaging a Major Component, but which is not part of that Major Component, and (b) serves only to enable use of the work with that Major Component, or to implement a Standard Interface for which an implementation is available to the public in source code form. A "Major Component", in this context, means a major essential component (kernel, window system, and so on) of the specific operating system (if any) on which the executable work runs, or a compiler used to produce the work, or an object code interpreter used to run it.

The "Corresponding Source" for a work in object code form means all the source code needed to generate, install, and (for an executable work) run the object code and to modify the work, including scripts to control those activities. However, it does not include the work's System Libraries, or general-purpose tools or generally available free programs which are used unmodified in performing those activities but which are not part of the work. For example, Corresponding Source includes interface definition files associated with source files for the work, and the source code for shared libraries and dynamically linked subprograms that the work is specifically designed to require, such as by intimate data communication or control flow between those subprograms and other parts of the work.

The Corresponding Source need not include anything that users can regenerate automatically from other parts of the Corresponding Source.

The Corresponding Source for a work in source code form is that same work.

# 2. Basic Permissions.

All rights granted under this License are granted for the term of copyright on the Program, and are irrevocable provided the stated conditions are met. This License explicitly affirms your unlimited permission to run the unmodified Program, subject to section 13. The output from running a covered work is covered by this License only if the output, given its content, constitutes a covered work. This License acknowledges your rights of fair use or other equivalent, as provided by copyright law.

Subject to section 13, you may make, run and propagate covered works that you do not convey, without conditions so long as your license otherwise remains in force. You may convey covered works to others for the sole purpose of having them make modifications exclusively for you, or provide you with facilities for running those works, provided that you comply with the terms of this License in conveying all material for which you do not control copyright. Those thus making or running the covered works for you must do so exclusively on your behalf, under your direction and control, on terms that prohibit them from making any copies of your copyrighted material outside their relationship with you.

Conveying under any other circumstances is permitted solely under the conditions stated below. Sublicensing is not allowed; section 10 makes it unnecessary.

## 3. Protecting Users' Legal Rights From Anti-Circumvention Law.

No covered work shall be deemed part of an effective technological measure under any applicable law fulfilling obligations under article 11 of the WIPO copyright treaty adopted on 20 December 1996, or similar laws prohibiting or restricting circumvention of such measures.

When you convey a covered work, you waive any legal power to forbid circumvention of technological measures to the extent such circumvention is effected by exercising rights under this License with respect to the covered work, and you disclaim any intention to limit operation or modification of the work as a means of enforcing, against the work's users, your or third parties' legal rights to forbid circumvention of technological measures.

## 4. Conveying Verbatim Copies.

You may convey verbatim copies of the Program's source code as you receive it, in any medium, provided that you conspicuously and appropriately publish on each copy an appropriate copyright notice; keep intact all notices stating that this License and any non-permissive terms added in accord with section 7 apply to the code; keep intact all notices of the absence of any warranty; and give all recipients a copy of this License along with the Program.

You may charge any price or no price for each copy that you convey, and you may offer support or warranty protection for a fee.

## 5. Conveying Modified Source Versions.

You may convey a work based on the Program, or the modifications to produce it from the Program, in the form of source code under the terms of section 4, provided that you also meet all of these conditions:

- a) The work must carry prominent notices stating that you modified it, and giving a relevant date.
- b) The work must carry prominent notices stating that it is released under this License and any conditions added under section 7. This requirement modifies the requirement in section 4 to "keep intact all notices".
- c) You must license the entire work, as a whole, under this License to anyone who comes into possession of a copy. This License will therefore apply, along with any applicable section 7 additional terms, to the whole of the work, and all its parts, regardless of how they are packaged. This License gives no permission to license the work in any other way, but it does not invalidate such permission if you have separately received it.

SER_1740

- d) If the work has interactive user interfaces, each must display Appropriate Legal Notices; however, if the Program has interactive interfaces that do not display Appropriate Legal Notices, your work need not make them do so.

A compilation of a covered work with other separate and independent works, which are not by their nature extensions of the covered work, and which are not combined with it such as to form a larger program, in or on a volume of a storage or distribution medium, is called an "aggregate" if the compilation and its resulting copyright are not used to limit the access or legal rights of the compilation's users beyond what the individual works permit. Inclusion of a covered work in an aggregate does not cause this License to apply to the other parts of the aggregate.

## 6. Conveying Non-Source Forms.

You may convey a covered work in object code form under the terms of sections 4 and 5, provided that you also convey the machine-readable Corresponding Source under the terms of this License, in one of these ways:

- a) Convey the object code in, or embodied in, a physical product (including a physical distribution medium), accompanied by the Corresponding Source fixed on a durable physical medium customarily used for software interchange.
- b) Convey the object code in, or embodied in, a physical product (including a physical distribution medium), accompanied by a written offer, valid for at least three years and valid for as long as you offer spare parts or customer support for that product model, to give anyone who possesses the object code either (1) a copy of the Corresponding Source for all the software in the product that is covered by this License, on a durable physical medium customarily used for software interchange, for a price no more than your reasonable cost of physically performing this conveying of source, or (2) access to copy the Corresponding Source from a network server at no charge.
- c) Convey individual copies of the object code with a copy of the written offer to provide the Corresponding Source. This alternative is allowed only occasionally and noncommercially, and only if you received the object code with such an offer, in accord with subsection 6b.
- d) Convey the object code by offering access from a designated place (gratis or for a charge), and offer equivalent access to the Corresponding Source in the same way through the same place at no further charge. You need not require recipients to copy the Corresponding Source along with the object code. If the place to copy the object code is a network server, the Corresponding Source may be on a different server (operated by you or a third party) that supports equivalent copying facilities, provided you maintain clear directions next to the object code saying where to find the Corresponding Source. Regardless of what server hosts the Corresponding Source, you remain obligated to ensure that it is available for as long as needed to satisfy these requirements.
- e) Convey the object code using peer-to-peer transmission, provided you inform other peers where the object code and Corresponding Source of the work are being offered to the general public at no charge under subsection 6d.

A separable portion of the object code, whose source code is excluded from the Corresponding Source as a System Library, need not be included in conveying the object code work.

A "User Product" is either (1) a "consumer product", which means any tangible personal property which is normally used for personal, family, or household purposes, or (2) anything designed or sold for incorporation into a dwelling. In determining whether a product is a consumer product, doubtful cases shall be resolved in favor of coverage. For a particular product received by a particular user, "normally used" refers to a typical or common use of that class of product, regardless of the status of the particular user or of the way in which the particular user actually uses, or expects or is expected to use, the product. A product is a consumer product regardless of whether the product has substantial commercial, industrial or non-consumer uses, unless such uses represent the only significant mode of use of the product.

"Installation Information" for a User Product means any methods, procedures, authorization keys, or other information required to install and execute modified versions of a covered work in that User Product from a modified version of its Corresponding Source. The information must suffice to ensure that the continued functioning of the modified object code is in no case prevented or interfered with solely because modification has been made.

If you convey an object code work under this section in, or with, or specifically for use in, a User Product, and the conveying occurs as part of a transaction in which the right of possession and use of the User Product is transferred to the recipient in perpetuity or for a fixed term (regardless of how the transaction is characterized), the Corresponding Source conveyed under this section must be accompanied by the Installation Information. But this requirement does not apply if neither you nor any third party retains the ability to install modified object code on the User Product (for example, the work has been installed in ROM).

The requirement to provide Installation Information does not include a requirement to continue to provide support service, warranty, or updates for a work that has been modified or installed by the recipient, or for the User Product in which it has been modified or installed. Access to a network may be denied when the modification itself materially and adversely affects the operation of the network or violates the rules and protocols for communication across the network.

Corresponding Source conveyed, and Installation Information provided, in accord with this section must be in a format that is publicly documented (and with an implementation available to the public in source code form), and must require no special password or key for unpacking, reading or copying.

## 7. Additional Terms.

"Additional permissions" are terms that supplement the terms of this License by making exceptions from one or more of its conditions. Additional permissions that are applicable to the entire Program shall be treated as though they were included in this License, to the extent that they are valid under applicable law. If additional permissions apply only to part of the Program, that part may be used separately under those permissions, but the entire Program remains governed by this License without regard to the additional permissions.

When you convey a copy of a covered work, you may at your option remove any additional permissions from that copy, or from any part of it. (Additional permissions may be written to require their own removal in certain cases when you modify the work.) You may place additional permissions on material, added by you to a covered work, for which you have or can give appropriate copyright permission.

Notwithstanding any other provision of this License, for material you add to a covered work, you may (if authorized by the copyright holders of that material) supplement the terms of this License with terms:

- a) Disclaiming warranty or limiting liability differently from the terms of sections 15 and 16 of this License; or
- b) Requiring preservation of specified reasonable legal notices or author attributions in that material or in the Appropriate Legal Notices displayed by works containing it; or
- c) Prohibiting misrepresentation of the origin of that material, or requiring that modified versions of such material be marked in reasonable ways as different from the original version; or
- d) Limiting the use for publicity purposes of names of licensors or authors of the material; or
- e) Declining to grant rights under trademark law for use of some trade names, trademarks, or service marks; or
- f) Requiring indemnification of licensors and authors of that material by anyone who conveys the material (or modified versions of it) with contractual assumptions of liability to the recipient, for any liability that these contractual assumptions directly impose on those licensors and authors.

All other non-permissive additional terms are considered "further restrictions" within the meaning of section 10. If the Program as you received it, or any part of it, contains a notice stating that it is governed by this License along with a term that is a further restriction, you may remove that term. If a license document contains a further restriction but permits relicensing or conveying under this License, you may add to a covered work material governed by the terms of that license document, provided that the further restriction does not survive such relicensing or conveying.

If you add terms to a covered work in accord with this section, you must place, in the relevant source files, a statement of the additional terms that apply to those files, or a notice indicating where to find the applicable terms.

Additional terms, permissive or non-permissive, may be stated in the form of a separately written license, or stated as exceptions; the above requirements apply either way.

## 8. Termination.

You may not propagate or modify a covered work except as expressly provided under this License. Any attempt otherwise to propagate or modify it is void, and will automatically terminate your rights under this License (including any patent licenses granted under the third paragraph of section 11).

However, if you cease all violation of this License, then your license from a particular copyright holder is reinstated (a) provisionally, unless and until the copyright holder explicitly and finally terminates your license, and (b) permanently, if the copyright holder fails to notify you of the violation by some reasonable means prior to 60 days after the cessation.

Moreover, your license from a particular copyright holder is reinstated permanently if the copyright holder notifies you of the violation by some reasonable means, this is the first time you have received notice of violation of this License (for any work) from that copyright holder, and you cure the violation prior to 30 days after your receipt of the notice.

Termination of your rights under this section does not terminate the licenses of parties who have received copies or rights from you under this License. If your rights have been terminated and not permanently reinstated, you do not qualify to receive new licenses for the same material under section 10.

## 9. Acceptance Not Required for Having Copies.

You are not required to accept this License in order to receive or run a copy of the Program. Ancillary propagation of a covered work occurring solely as a consequence of using peer-to-peer transmission to receive a copy likewise does not require acceptance. However, nothing other than this License grants you permission to propagate or modify any covered work. These actions infringe copyright if you do not accept this License. Therefore, by modifying or propagating a covered work, you indicate your acceptance of this License to do so.

## 10. Automatic Licensing of Downstream Recipients.

Each time you convey a covered work, the recipient automatically receives a license from the original licensors, to run, modify and propagate that work, subject to this License. You are not responsible for enforcing compliance by third parties with this License.

An "entity transaction" is a transaction transferring control of an organization, or substantially all assets of one, or subdividing an organization, or merging organizations. If propagation of a covered work results from an entity transaction, each party to that transaction who receives a copy of the work also receives whatever licenses to the work the party's predecessor in interest had or could give under the previous paragraph, plus a right to possession of the Corresponding Source of the work from the predecessor in interest, if the predecessor has it or can get it with reasonable efforts.

You may not impose any further restrictions on the exercise of the rights granted or affirmed under this License. For example, you may not impose a license fee, royalty, or other charge for exercise of rights granted under this License, and you may not initiate litigation (including a cross-claim or counterclaim in a lawsuit) alleging that any patent claim is infringed by making, using, selling, offering for sale, or importing the Program or any portion of it.

## 11. Patents.

A "contributor" is a copyright holder who authorizes use under this License of the Program or a work on which the Program is based. The work thus licensed is called the contributor's "contributor version".

A contributor's "essential patent claims" are all patent claims owned or controlled by the contributor, whether already acquired or hereafter acquired, that would be infringed by some manner, permitted by this License, of making, using, or selling its contributor version, but do not include claims that would be infringed only as a consequence of further modification of the contributor version. For purposes of this definition, "control" includes the right to grant patent sublicenses in a manner consistent with the requirements of this License.

Each contributor grants you a non-exclusive, worldwide, royalty-free patent license under the contributor's essential patent claims, to make, use, sell, offer for sale, import and otherwise run, modify and propagate the contents of its contributor version.

In the following three paragraphs, a "patent license" is any express agreement or commitment, however denominated, not to enforce a patent (such as an express permission to practice a patent or covenant not to sue for patent infringement). To "grant" such a patent license to a party means to make such an agreement or commitment not to enforce a patent against the party.

If you convey a covered work, knowingly relying on a patent license, and the Corresponding Source of the work is not available for anyone to copy, free of charge and under the terms of this License, through a publicly available network server or other readily accessible means, then you must either (1) cause the Corresponding Source to be so available, or (2) arrange to deprive yourself of the benefit of the patent license for this particular work, or (3) arrange, in a manner

SER_1744

consistent with the requirements of this License, to extend the patent license to downstream recipients. "Knowingly relying" means you have actual knowledge that, but for the patent license, your conveying the covered work in a country, or your recipient's use of the covered work in a country, would infringe one or more identifiable patents in that country that you have reason to believe are valid.

If, pursuant to or in connection with a single transaction or arrangement, you convey, or propagate by procuring conveyance of, a covered work, and grant a patent license to some of the parties receiving the covered work authorizing them to use, propagate, modify or convey a specific copy of the covered work, then the patent license you grant is automatically extended to all recipients of the covered work and works based on it.

A patent license is "discriminatory" if it does not include within the scope of its coverage, prohibits the exercise of, or is conditioned on the non-exercise of one or more of the rights that are specifically granted under this License. You may not convey a covered work if you are a party to an arrangement with a third party that is in the business of distributing software, under which you make payment to the third party based on the extent of your activity of conveying the work, and under which the third party grants, to any of the parties who would receive the covered work from you, a discriminatory patent license (a) in connection with copies of the covered work conveyed by you (or copies made from those copies), or (b) primarily for and in connection with specific products or compilations that contain the covered work, unless you entered into that arrangement, or that patent license was granted, prior to 28 March 2007.

Nothing in this License shall be construed as excluding or limiting any implied license or other defenses to infringement that may otherwise be available to you under applicable patent law.

## 12. No Surrender of Others' Freedom.

If conditions are imposed on you (whether by court order, agreement or otherwise) that contradict the conditions of this License, they do not excuse you from the conditions of this License. If you cannot use, propagate or convey a covered work so as to satisfy simultaneously your obligations under this License and any other pertinent obligations, then as a consequence you may not use, propagate or convey it at all. For example, if you agree to terms that obligate you to collect a royalty for further conveying from those to whom you convey the Program, the only way you could satisfy both those terms and this License would be to refrain entirely from conveying the Program.

## 13. Offering the Program as a Service.

If you make the functionality of the Program or a modified version available to third parties as a service, you must make the Service Source Code available via network download to everyone at no charge, under the terms of this License. Making the functionality of the Program or modified version available to third parties as a service includes, without limitation, enabling third parties to interact with the functionality of the Program or modified version remotely through a computer network, offering a service the value of which entirely or primarily derives from the value of the Program or modified version, or offering a service that accomplishes for users the primary purpose of the Program or modified version.

"Service Source Code" means the Corresponding Source for the Program or the modified version, and the Corresponding Source for all programs that you use to make the Program or modified version available as a service, including, without limitation, management software, user interfaces, application program interfaces, automation software, monitoring software, backup software, storage software and hosting software, all such that a user could run an instance of the service using the Service Source Code you make available.

## 14. Revised Versions of this License.

MongoDB, Inc. may publish revised and/or new versions of the Server Side Public License from time to time. Such new versions will be similar in spirit to the present version, but may differ in detail to address new problems or concerns.

Each version is given a distinguishing version number. If the Program specifies that a certain numbered version of the Server Side Public License "or any later version" applies to it, you have the option of following the terms and conditions either of that numbered version or of any later version published by MongoDB, Inc. If the Program does not specify a version number of the Server Side Public License, you may choose any version ever published by MongoDB, Inc.

If the Program specifies that a proxy can decide which future versions of the Server Side Public License can be used, that proxy's public statement of acceptance of a version permanently authorizes you to choose that version for the Program.

Later license versions may give you additional or different permissions. However, no additional obligations are imposed on any author or copyright holder as a result of your choosing to follow a later version.

## 15. Disclaimer of Warranty.

THERE IS NO WARRANTY FOR THE PROGRAM, TO THE EXTENT PERMITTED BY APPLICABLE LAW. EXCEPT WHEN OTHERWISE STATED IN WRITING THE COPYRIGHT HOLDERS AND/OR OTHER PARTIES PROVIDE THE PROGRAM "AS IS" WITHOUT WARRANTY OF ANY KIND, EITHER EXPRESSED OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. THE ENTIRE RISK AS TO THE QUALITY AND PERFORMANCE OF THE PROGRAM IS WITH YOU. SHOULD THE PROGRAM PROVE DEFECTIVE, YOU ASSUME THE COST OF ALL NECESSARY SERVICING, REPAIR OR CORRECTION.

## 16. Limitation of Liability.

IN NO EVENT UNLESS REQUIRED BY APPLICABLE LAW OR AGREED TO IN WRITING WILL ANY COPYRIGHT HOLDER, OR ANY OTHER PARTY WHO MODIFIES AND/OR CONVEYS THE PROGRAM AS PERMITTED ABOVE, BE LIABLE TO YOU FOR DAMAGES, INCLUDING ANY GENERAL, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF THE USE OR INABILITY TO USE THE PROGRAM (INCLUDING BUT NOT LIMITED TO LOSS OF DATA OR DATA BEING RENDERED INACCURATE OR LOSSES SUSTAINED BY YOU OR THIRD PARTIES OR A FAILURE OF THE PROGRAM TO OPERATE WITH ANY OTHER PROGRAMS), EVEN IF SUCH HOLDER OR OTHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

## 17. Interpretation of Sections 15 and 16.

If the disclaimer of warranty and limitation of liability provided above cannot be given local legal effect according to their terms, reviewing courts shall apply local law that most closely approximates an absolute waiver of all civil liability in connection with the Program, unless a warranty or assumption of liability accompanies a copy of the Program in return for a fee.

END OF TERMS AND CONDITIONS

# Exhibit L

## Expert Report of Bradley M. Kuhn

## 22 December 2022

Curriculum Vitae of Bradley M. Kuhn

*Curriculum Vitae of*
**BRADLEY M. KUHN**
bkuhn@ebb.org ● http://www.ebb.org/bkuhn

**Experience:**

3/2006 – present    *Software Freedom Conservancy*  (Multiple positions.)    USA-based telecommute

3/2014 – present    POLICY FELLOW, HACKER-IN-RESIDENCE, AND MEMBER OF THE BOARD OF DIRECTORS.

Mentors staff in all aspects of Free and Open Source Software (FOSS) politics, advocacy, services, coordination, and logistics. Participates in cross-organizational initiatives regarding license compliance. Annually co-coordinates the "Legal and Policy" track at the annual Free and Open Source Developers' Meeting (FOSDEM) — the largest FOSS conference in the world with more than 5,000 attendees annually.

Analyzes and plans strategic initiatives related to all aspects of FOSS advocacy, with a key focus on FOSS licensing policy. Leads and coordinates litigation in *Software Freedom Conservancy v. Vizio* — the first third-party beneficiary litigation seeking specific performance of source code disclosure under a copyleft license, the General Public License (GPL).

3/2006 – 3/2014    FOUNDING PRESIDENT.

Co-founded this 501(c)(3) non-profit charitable organization. Worked relentlessly as a volunteer for five years, and eventually became its first paid employee (in 2011). Created, planned, managed, and build out all organizational activities, in the primary focus areas of fiscal sponsorship for Free and Open Source Software (FOSS) projects, and license compliance, enforcement, and litigation regarding copyleft license (including the GPLv2, GPLv3, and AGPLv3).

Negotiated and built advocacy coalitions with key individuals in leadership positions of major FOSS projects and FOSS organizations. Coordinated cross-organizational resources to receive volunteer labor and pro-bono legal assistance for the organization.

Deposed as organization's 30(b)(6) witness, and wrote the expert report in the *Software Freedom Conseravncy, et al. v. Best Buy, et al* lawsuit (commonly referred to as the *Busybox case*) in the Southern District of New York.

Strategically planned and executed on fundraising strategy that built the organization from a purely volunteer organization to a staffed organization of four (by 2014). Keenly aware of the dangers of Founders' Syndrome in non-profit charities, recruited and hired a highly qualified Executive Director, Karen Sandler, and gladly stepped down from role of chief executive to assure sustainability and growth for the organization.

SER_1748

**Experience** (continued)**:**

1/2000 – 3/2005    *Free Software Foundation*  (Multiple positions.)                Boston, MA

3/2002 – 3/2005    EXECUTIVE DIRECTOR.

Handled all day-to-day senior management tasks for a staff of nine employees. Scheduled and directed all projects and departments, which included: archival research, book publishing, legal consulting, fund-raising, software development, and system administration. Mentored staff through turbulent organizational changes.

Formalized existing GPL compliance activity into its own department. Worked closely with the general counsel and staff to design and implement successful strategies for the new department. Led existing staff to increase violation case closure from a few per year to approximately thirty per year.

Carried out diplomacy throughout the technology industry to generate goodwill and secure contributions of software copyrights and funding. Leveraged strong technological background to negotiate decisively with executives and lawyers at both for-profit companies and non-profit organizations.

Directed, guided and assisted staff to design and implement an associate membership program, which included an online self-service system for donors. Convinced the board of directors to adopt this as the organization's primary fundraising effort. Led the implementation of the program, which yielded record-breaking fund-raising returns, despite a widely documented economic downturn for non-profits during the period.

1/2001 – 3/2002    VICE PRESIDENT.

Reorganized management and departmental structure of the Foundation. Handled and resolved employee performance situations. Hired staff as necessary. Coordinated closely with board of directors to build consensus for organizational changes.

Represented the Foundation in the press, including interviews with The New York Times, The Boston Globe, and throughout the technology press. Revamped the press image of the Foundation, including launching a successful ongoing response to direct press attacks by Microsoft in May 2001.

1/2000 – 12/2001   ASSISTANT TO THE PRESIDENT.

Coordinated with Foundation's president to handle communication with the press and volunteer community. Personally handled much of the Foundation's external email communication and routed necessary communication to the president and other staff.

Answered FOSS licensing questions and investigated violations of the GPL. Researched and prepared reports on licensing situations for the president and general counsel.

**SER_1749**

**Experience** (continued)**:**

| | |
|---|---|
| 7/1998, 3/1999 | TECHNICAL TRAINER. |

*Synapsis Solutions, Inc.*                                     Berkeley, CA

Designed and wrote course materials for a four-day course entitled "Introduction to Perl for Programmers". Taught the course twice on site at Synapsis' client, Autodesk.

| | |
|---|---|
| 8/1998 – 6/1999 | TEACHER. |

*Walnut Hills High School*
*Cincinnati Public School System*                              Cincinnati, OH

Designed, prepared, and taught an Advanced Placement Computer Science course in C++ to junior and senior high school students.

| | |
|---|---|
| 9/1997 – 7/1998 | SYSTEM ADMINISTRATOR. |

*Center for Geographic Information Systems*
*University of Cincinnati*                                     Cincinnati, OH

Served as the head system administrator for a network of machines that included SGI Irix, Sun Solaris and Intel-based Windows NT systems. Developed and implemented a computer usage policy. Designed and implemented department-wide file sharing, user account, email and web server systems.

| | |
|---|---|
| 7/1996 – 8/1997 | NETWORK AND SYSTEM ADMINISTRATOR. |

Work contracted to:
*Westinghouse Wireless Solutions Company*                      Linthicum, MD

Performed all administration tasks for a LAN of Sun workstations running Solaris 2.4 and 2.5.1, including: implementation of security measures and backup procedures, installation and integration of new hardware and software, extensive script writing in Perl and Korn shell to assist users, interacting with software and hardware vendors for ordering, pricing and service calls, and assisting users with the use of a Unix environment to perform software development tasks. Handled all user support requests for a department of fifty users. Served as the technical lead on the site's system administration team.

Performed all administration duties for machines running Red Hat GNU/Linux. These machines served as the DNS server, the mail server, and the Usenet news server for the entire site and subdomain. Configured Sendmail to suit mail services at the site.

**SER_1750**

**Experience** (continued)**:**

| | |
|---|---|
| 6/1991 – 7/1996 | SOFTWARE DEVELOPER.   (Multiple clients.) |

3/1996 – 7/1996    Work contracted to:
*Lucent Technologies*                                                          Cockeysville, MD

Participated in a short term contract to reengineer a legacy software system. Evaluated configuration management and CASE tools. Worked on a development team using Booch OOA/OOD methodology and C++ with the Standard Template Library.

12/1995 – 3/1996    Work contracted to:
*dakota imaging, inc.*                                                          Columbia, MD

Assisted in establishing a policy for maintaining software development under the Atria ClearCase environment. Designed and implemented a set of programs and Imakefiles that worked in concert with the ClearCase environment to implement that policy. Wrote Perl programs to generate reports for an OCR data retrieval system. Developed client/server imaging software in C.

6/1991 – 9/1995    Work contracted to:
*The Baltimore RH Typing Laboratory*                                   Baltimore, MD

Assisted with system administration tasks for an AT&T 3B2/600 running Unix System V Release 3.2.3. Configured and installed numerous Free Software tools.

Designed, implemented, maintained and augmented a large suite of software in Perl, Tcl, Bourne Shell, C, SQL, and Informix-4GL. This software provided end-user applications, middleware, data warehousing, and account management functions for the entire blood laboratory.

Designed and implemented an interface between the Tcl language and Informix database products using Informix-ESQL/C. Augmented Tcl to better to suit the needs of the client.

Designed and implemented a system that produced statistical calculations using genetic blood typing results retrieved from an SQL database. Maintained and augmented that system for two years.

**SER_1751**

**Education:**

| | | |
|---|---|---|
| 9/1997 – 1/2001 | THE UNIVERSITY OF CINCINNATI | Cincinnati, OH |

M.S. in Computer Science, January 2001.
GPA: 3.93
Advisor: John Franco, PhD.
Thesis Title: *Considerations on Porting Perl to the Java Virtual Machine*

| | | |
|---|---|---|
| 9/1995 – 12/1995 | THE UNIVERSITY OF DELAWARE | Newark, DE |

Studied for one semester as a funded graduate student in the Computer and Information Sciences graduate program.
GPA: 4.00

| | | |
|---|---|---|
| 9/1991 – 5/1995 | LOYOLA UNIVERSITY MARYLAND | Baltimore, MD |

(formerly named LOYOLA COLLEGE IN MARYLAND)
B.S. (summa cum laude) in Computer Science, May 1995
Major GPA: 3.98   Overall GPA: 3.83

Graduated first in Computer Science class of 1995. Maryland Distinguished Scholar, Loyola Presidential Scholar, Maryland House of Delegates Scholar. Dean's List throughout attendance. Academic Achievement Award in Computer Science received each year of attendance. Upsilon Pi Epsilon (Computer Science Honors Society) member. Phi Beta Kappa member.

Administrated a local network of Computer Science department machines running Slackware GNU/Linux. Configured and installed Free Software. Set up and maintained campus-wide Usenet news server.

Conducted research on compiler optimizations for C++. Programmed extensively in Perl.

Received the Hauber Summer Research Fellowship in 1993 and 1994. Conducted research on embeddable command languages. Programmed extensively in Tcl/Tk.

**Other Interests:** Ethics, Social Activism, Poker.

**SER_1752**

# Exhibit M

## Expert Report of Bradley M. Kuhn

### 22 December 2022

List of Publications

**Publications**

I'm the co-author of a book that was published online and is routinely updated, the last extensive rewrite was in 2018:

"Copyleft and the GNU General Public License: A Comprehensive Tutorial and Guide" published at https://copyleft.org/guide/

"Trademark Was Made to Prevent Attack of the "Clones" Problem in App Stores", an article published on July 11, 2022.

https://sfconservancy.org/blog/2022/jul/11/app-store-clones-trademark-approach/

"An Erroneous Preliminary Injunction Granted in Neo4j v. PureThink", an article published on March 30, 2022 .

https://sfconservancy.org/blog/2022/mar/30/neo4j-v-purethink-open-source-affero-gpl/

"Copyleft Won't Solve All Problems, Just Some of Them: Toward a Broad Ethical Software Licensing Coalition" on March 17, 2022.

https://sfconservancy.org/blog/2022/mar/17/copyleft-ethical-source-putin-ukraine/

"If Software is My Copilot, Who Programmed My Software?", an article published on February 3, 2022. This article was chosen by the Free Software Foundation as a featured article on its series related to the GitHub CoPilot licensing issue.

https://sfconservancy.org/blog/2022/feb/03/github-copilot-copyleft-gpl/

https://www.fsf.org/licensing/copilot/if-software-is-my-copilot-who-programmed-my-software

"'Tivoization' and Your Right to Install Under Copyleft"
published on on July 23, 2021.
https://sfconservancy.org/blog/2021/jul/23/tivoization-and-the-gpl-right-to-install/

I coauthored (with my colleagues at SFC) three DMCA exemption requests, submitted to the USA Copyright Office in September 2020.  Details are here:
https://sfconservancy.org/blog/2020/sep/16/dmca-exemptions-2020/

Toward Copyleft Equality for All"
published on January 6, 2020
https://sfconservancy.org/blog/2019/sep/20/sotm2019-karen/

**Key Talk:**

"Understanding The Complexity of Copyleft Defense" a Keynote in March 2017 at the Free and Open Source Software Developers' Meeting (FOSDEM), a conference attended by 5000+ people.
https://fosdem.org/2017/schedule/event/copyleft_defense/

# Exhibit N

## Expert Report of Bradley M. Kuhn

## 22 December 2022

Expert Report of Bradley M. Kuhn in 09-CV-10155

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| SOFTWARE FREEDOM CONSERVANCY, INC., and ERIK ANDERSEN, Plaintiffs, | **ECF CASE** Civil Action No. 09-CV-10155 (SAS) |
| -against- | |
| BEST BUY CO., INC., SAMSUNG ELECTRONICS AMERICA, INC., WESTINGHOUSE DIGITAL ELECTRONICS, LLC, JVC AMERICAS CORPORATION, WESTERN DIGITAL TECHNOLOGIES, INC., ROBERT BOSCH LLC, PHOEBE MICRO, INC., HUMAX USA INC., COMTREND CORPORATION, DOBBS-STANFORD CORPORATION, VERSA TECHNOLOGY INC., ZYXEL COMMUNICATIONS INC., ASTAK INC., and GCI TECHNOLOGIES CORPORATION, Defendants. | |

# Expert Report of Bradley M. Kuhn
# 11 May 2011

SER_1756

**Introduction**

1. As the Court is aware from my previous declarations in this matter, I am the President and Executive Director of Plaintiff Software Freedom Conservancy, Inc.

2. As part of my work at the Conservancy in this litigation, I have reviewed in detail the original software releases by Best Buy Co., Inc. ("Best Buy") that led to our filing of this litigation, as well as materials provided by Best Buy. I have also reviewed the "Expert Report of Jake Richter" provided to my attorneys.

3. I have been reviewing on an ongoing basis all technical material, including but not limited to source code (both BusyBox's own releases and Best Buy's candidate source releases provided during this litigation), as well as the binary firmware distributions by Best Buy. I have come to certain conclusions as to the technical facts about Best Buy's distributions and how they relate to Erik Andersen's and other BusyBox copyrights holders' work. My opinions and the bases therefore are set forth in this Report.

4. I continue to perform ongoing review of new information that comes to light in this case, and therefore this Report represents my conclusions as of this date. Also, as is always true with technical matters, different methodology can always be employed to provide other views of data. Therefore, my work in this regard remains ongoing, and I understand that additional work of this nature will be exchanged between us and the Defendants as trial approaches. In particular, I have been informed that I will be given the opportunity to analyze additional claims and opinions submitted by Mr. Richter and respond to those at a later date. I therefore reserve the right to modify, supplement, or otherwise alter this report and the opinions contained herein if I find it appropriate to do so in light of any additional information.

2

**Qualifications**

5. I am currently Executive Director and President of the Software Freedom Conservancy, Inc., a 501(c)(3) not-for-profit organization in New York. Conservancy's purpose is to provide fiscal sponsorship and various other non-profit organizational services to volunteer-based, community-oriented Open Source and Free Software projects.

6. My role at Conservancy includes a variety of duties, as I am its only full-time employee and therefore handle most of the operations of Conservancy, which include both technical and administrative matters.

7. My interest in computing began as a child, when I received my first computer as a gift from my parents and began to regularly write new software for it and share that software with my friends, who helped me improve it.

8. As an undergraduate, I studied Computer Science at Loyola College in Maryland (now called the Loyola University Maryland). I received from there in 1995 a summa cum laude Bachelor's Degree in Computer Science, and the James D. Rozics Computer Science Medal, which is an award given to the year's top student in Computer Science at each graduation. I was furthermore elected into Upsilon Pi Epsilon (the National Computer Science Honors Society) and the Phi Beta Kappa honors society, which the USA's oldest academic honors society for the liberal arts.

9. From 1991 through 2001, I worked consistently on a part-time (while studying) and then a full-time (when not in school) basis as a system administrator and software developer. I administered, configured, programmed, and debugged a variety of Unix and Unix-like operating systems[1] and software for those systems. My work experience spans the wide array of possible occupations that are typical for individuals trained in computer science.

---

[1] Unix was a computer operating system developed by AT&T in the early 1970s. Many systems were later developed that operated similarly like Unix, and are typically called "Unix-like" operating systems.

SER_1758

10. From 1991-1995, while working as a programmer for the Baltimore Rh Typing Laboratories, Inc. (aka BRT Laboratories), I downloaded, configured, modified, and installed numerous Open Source[2] and Free Software programs. I became at that time an active participant in Usenet[3], and, at the encouragement of my employer, began sharing code that I improved with others who sought to solve similar tasks, and collaborated with other developers online to improve that code.

11. I have continued my code contributions to Open Source and Free Software on a semi-regular basis since that time. I have submitted patches to various projects, including rsync and BusyBox itself. I have also served as the co-maintainer of Open Source and Free Software projects at times.

12. In 1992, I began using the GNU/Linux system, which is sometimes confusingly referred to as just "Linux". The GNU project had begun the work of creating a Unix-like operating system in 1984. In 1991, Linus Torvalds began creating a specific operating system component, called a kernel, that was later named "Linux". Putting together the incomplete parts of GNU with Linux made a complete operating system usable on PC computers.

13. I downloaded in 1992 the "Soft Landing System", an early GNU/Linux distribution put together by volunteers, and installed it on my personal computer. My professors saw the value in this software, and requested that I install this software throughout the computer lab at my undergraduate institution. I did so, and was later employed by Loyola's computer science department to continue maintaining, modifying and administering these systems until I graduated.

14. In 1997, I began a graduate program in Computer Science at the University of Cincinnati. In early 2001, I graduated from that program, completing a Master's Degree with thesis. My

---

[2]The term "Open Source" did not come into common usage until 1999, so it is somewhat anachronistic to use it referring to events that took place before then. However, I include here as it is a term more familiar to those outside of the field of computer science.

[3]Usenet was a worldwide discussion forum that was widely used by scientists, researchers, and programmers in the 1980s and early 1990s.

4

thesis topic dealt with programming language topics related to the Open Source and Free Software programming language named Perl. This work required me to participate heavily in the Perl community and contribute libraries and modification to the internals of the Perl language implementation. The original inventor and author of Perl, Larry Wall, served on my thesis committee. My thesis was later used by Wall as one of the justifications for the launch of another related Open Source project, called the Parrot Virtual Machine.

15. In 1996, I began volunteering for the Free Software Foundation, Inc. ("FSF"). Initially, Richard M. Stallman, President of the FSF, asked me to serve as a webmaster for the FSF website.

16. As webmaster, I assisted in creation and editing of the initial "license list" page on the FSF website. This page, a version of which is still available today on FSF's website, explains the details of various software licenses and whether they meet the FSF's criteria for Free Software licenses — meaning they give users the freedom to copy, share, modify and redistribute the software — and whether the licenses are compatible with the FSF's own licenses. In assisting Dr. Stallman with this type of work, as I have done on a regular basis from the late 1990s through the present day, I have developed expertise in the interpreting the requirements and details of software copyright licenses, and how they interact with the technical details of putting together and distributing software packages.

17. In 2000, I was hired to work for the FSF, initially remotely from Cincinnati, and then on-site in Boston upon completion of my Master's thesis in 2001. I was promoted multiple times, and eventually became Executive Director of the FSF, a role which I served in until March 2005.

18. During my time as an employee of FSF, I assisted in various types of work related to software licensing and compliance with the GNU General Public License ("GPL"), the GNU Lesser General Public License ("LGPL") and other related and similar licenses. It was typical by the time of my departure that I led the resolution of thirty or more GPL violation

5

matters each year, including a number that were made public, such as the OpenTV GPL violation and the original Linksys WRT54G violation.

19. In March 2005, I took a job working for the Software Freedom Law Center ("SFLC"), the law firm representing the Plaintiffs in this action. As part of my duties at the SFLC, I assisted with and performed GPL enforcement actions. I researched, confirmed, enforced, or otherwise assisted with hundreds of GPL violation and compliance matters while an employee at SFLC.

20. In 2006, I volunteered to be the President of the Software Freedom Conservancy, Inc. ("Conservancy"), a separate and independent organization that SFLC helped form to serve as a fiscal sponsor and non-profit home for Open Source and Free Software projects. The BusyBox project, led by Erik Andersen, was among the earliest members of the Conservancy.

21. In 2006 and 2007, I participated in the public process to comment on, evaluate, and make suggestions for the new version of the GPL (version 3). This work included many direct discussions with the GPLv3 drafters themselves.

22. My employment with SFLC ended in September 2010, and I have since then focused my full-time attention on Conservancy, which includes GPL enforcement on behalf of our member projects. I am currently tracking more than 300 GPL violations, which I work as diligently as possible (given the limited time available to a resource-strapped non-profit) to resolve in a collaborative way with the parties in question.

23. In March 2010, I was elected to the Board of Directors of the Free Software Foundation and my service there is ongoing.

**Technical Terminology and Technical Concepts**

24. This litigation deals with computer software. Software is digital information stored on a computer's storage device, such as a hard disk, flash drive or other non-volatile memory, which is loaded in to volatile memory as needed to operate the computer.

6

25. Volatile memory, such as RAM, is erased every time a computer is turned off. Non-volatile memory, like hard disks and flash drives, retains its contents even when the computer is turned off.

26. Companies and non-profit organizations typically provide software in a variety of different ways to the general public. Computers often come with software already installed on it. In addition, consumers can download and install new software to receive updates.

27. A programmer creates software in a form called "source code" (sometimes called just "source"). Source code is written in a textual format that humans (trained in computer science) can read and comprehend. Source code is the instructions that the programmer gives the computer to do some specific job, or (more often) a large group of different types of jobs that work in tandem to perform some useful task at the user's request.

28. Before a computer can execute the programmer's instructions, the source code must be translated or interpreted into the native language of the computer. That language is binary, which consists of a series of 1's and 0's sequenced such that they cause the computer to perform useful operations.

29. A programmer often uses a helper program, called a "compiler", to translate and modify the programmer's source code into the binary data that the computer expects. This translation process is called "compilation".

30. There are often intermediate forms of binary data that are produced at various stages of the compilation process. For example, "object code" is an intermediate binary form that is produced by the penultimate stage of compilation. The final stage of compilation is called "linking", which typically takes "object code" and puts it all together into a final binary program. The final binary program is sometimes also called the "executable".

31. Thus, a given program can be modified to appear in many forms — source, object, or binary code. Typically, the program starts as source code, and then is modified by the

7

SER_1762

compiler (as instructed by the programmer) to produce object and binary code as needed.

32. Once a programmer has used the compiler to modify and translate the source code into a binary program, for it to be useful to the user, the binary program must be installed onto the computer. The process of installation varies depending on the details of the type of computer involved. However, typically, installing a binary at the very least involves taking a copy of the binary program and placing it to a specific place on the computer or target device. Often, installation requires careful placement of the binary in a place where other programs that rely on it can find the new version.

33. An "operating system" is the base software that every computer needs to run. An operating system is usually separated into various parts. Typically, these parts include (a) the software that regulates and organizes the hardware for other software (often called the "kernel"), (b) various low-level programs that are required for all computers, such as the basic file operations (such as copy, move, rename), and (c) core library programs that all applications on the system need to operate properly on that particular operating system.

34. Software for use in an embedded computer (such as the Blu-ray DVD players at issue in this case) is commonly referred to as "firmware". For modern systems, a firmware file typically comprises the entire set of programs to be stored on the computer, including all parts of the operating system and any applications, usually organized into a format that allows for easy installation onto the computer.

**Source Code Repositories and Revision Control Systems**

35. It is generally considered best practice for programmers to store their work in a source code repository managed by a revision control system. A code repository is usually a designated place (which, for Open Source and Free Software projects, is usually publicly available on the Internet), where all versions, revisions, and improvements to source code are published.

8

36. Revision control systems, sometimes called version control systems, keep detailed records of each change made by each developer who contributes to the code repository. When a developer submits new code or modifications ("commits") to the code repository, a log entry describing the commit is stored in the revision control system.

37. Commits vary in size. A commit might represent a small change to a single file, or might contain substantial modifications to several files.

38. In the revision control system's logs, each commit is associated with the name (or username) of the developer, the exact date and time the commit took place, the actual textual changes to the software made by the commit and a free-form commit message (sometimes called a "commit log message") written by the developer.

39. Developers typically use commit messages to explain succinctly the changes to the software made by the commit. They also routinely include thank-yous or credits to developers that assisted them in producing the code committed. Sometimes, developers commit on behalf of another developer, noting in the commit message that the commit is on behalf of another developer. (This latter process is discussed in detail in ¶ 47 and following paragraphs.)

40. The changes stored in each commit are usually viewed in a format that shows the differences between an affected file before and after the commit, i.e. a "diff" format. The typical diff format is called "unified diff format", and can be generated with a utility, which is also called "diff". This format shows (a) a short context of where the change occurred, (b) the lines that were added by the commit (preceded with a "+"), and (c) the lines that were removed by the commit (preceded by a "−"). This format is also sometimes called a "patch" format, because the "patch" program can be used to read and apply these diffs.

41. The "patch" program was originally written in the mid 1980s by Larry Wall, who later passed its maintainership to the GNU project. The patch program can take a diff and "apply"

9

the changes represented in that diff to a codebase. For example, suppose a developer has made some changes to BusyBox. The developer can use the diff utility to generate a patch which would show the differences between the original version of BusyBox and the derivative version that the developer has just created. Someone else can then use the patch program to apply that "patch" to their version of BusyBox, thus incorporating the new changes.

42. Because of the convenience for collaborative development provided by the diff/patch workflow described in ¶ 41, by the late 1980s, "sharing patches" became the standard way that Open Source and Free Software developers share, discuss, debate, and apply improvements to software. That workflow (sometimes with minor tweaks) is still the standard today in nearly all Open Source and Free Software projects, including BusyBox.

**Open Source and Free Software Community Processes**

43. Open Source and Free Software is almost always developed in full public view — in public code repositories, via public mailing lists, etc. — typically by developers posting patches to mailing lists and discussing their merits.

44. The "maintainer" (who can be a single individual or a group) of an Open Source and Free Software project decides which patches are ultimately accepted and become part of official releases. The maintainer's editorial, stylistic, and decision-making authority is generally considered the final say by other developers, although the best maintainers listen carefully to any arguments and disagreements among developers and seek any technical compromises that are best for the project.

45. Project maintainers typically do a substantial amount of development themselves, particularly when a project is young or is going through a major code rewrite, reorganization and/or transition. BusyBox underwent such a transition in 2001 and 2002, while Andersen was maintainer of the project.

SER_1765

46. Maintainers often grant some experienced developers with a history of writing good patches direct "commit access" to the project. In concrete terms, this usually means that such developers have permission to commit code directly to the revision control system, under their own name, without prior approval from the maintainer.

47. Participating developers without commit access typically post their patches to the project's public mailing list (or, occasionally, email such patches directly to the maintainer). The maintainer reviews the patch, often giving public or private feedback to the developer about any problems or better approaches that could be used to improve the patch.

48. Ultimately, the maintainer, sometimes after a few revisions based on feedback from the maintainer to the other developer, either rejects or accepts the patch. If the patch is rejected, the patch is usually not committed to the revision control system at all. If accepted, the maintainer applies the patch to the maintainer's private copy of the codebase.

49. From there, the maintainer will test and verify that the patch functions correctly. The maintainer will quite often make final changes to the patch to integrate it well into the software. For example, some very new changes may have been made by the maintainer since the other developer wrote the patch, and the maintainer's subsequent changes might in turn affect certain details and require adaptation of the patch before integration. Such integration work is sometimes quite substantial.

50. Once all integration and editing by the maintainer is complete, the maintainer will commit the patch and the maintainer's modifications as a single commit. The maintainer will note in the commit log the name and/or email address of the developer who offered the patch.

**History of Revision Control Systems**

51. The first Open Source and Free Software revision control system was plainly called "Revision Control System", usually abbreviated to "RCS". RCS could keep track of revisions

11

on single files, and it required that all developers have access to a single machine where the source files were stored. Only one developer could work on any particular file at a time. Each commit was specific to an individual file.

52. In 1990, the first version of the "Concurrent Versioning System" (usually abbreviated to "CVS") was released. CVS used the RCS file format internally to store its data, but implemented a layer above that allowed each developer to keep a private copy of all files in the repository. After making changes privately, developers could then commit entire units of work that spanned many files across many directories.

53. Beginning in 2000, CVS was gradually superceded by the revision control system Subversion ("SVN"), which provided similar functionality to CVS but was generally more capable and better designed. As developers begin transitioning from CVS to SVN, various importing utilities were created to convert the revision history stored in CVS into an SVN repository. As SVN eclipsed CVS, these tools were widely used by developers to transition their CVS repositories to SVN.

54. While SVN is still in wide use today, it too is being gradually superceded by a new generation of revision control systems. The most popular of those systems is Git. As previously occurred with the CVS to SVN transition, by the time Git was ready for use, SVN was in widespread use. Consequently, there are many conversion utilities available that can convert an SVN repository into a Git repository.

55. These repository conversion technologies were widely used by the entire Open Source and Free Software community as we transitioned from CVS to SVN, and then later from SVN to Git. I am not aware of any reports of these conversion utilities causing any data loss as they convert repositories from one format to another. Information sufficient to identify the committer, the date of the commit, and the patch that was committed is invariably preserved in the conversion.

SER_1767

56. There are minor differences between the way this data is stored in each revision system. For example, CVS and SVN rely on username to identify the committer. Git, by contrast, stores the full name and email address of the committer. Therefore, the Git conversion utility prompts the user to enter a full name and email address for each username represented in the SVN repository. Even if the person entering this information made a mistake, it is a straightforward process to understand what has occurred. The information available in the Git repository is usually sufficient information to uniquely identify the developer responsible for the commit. The other conversions done during SVN to Git repository are automatically done by software.

**BusyBox Project's Use of Revision Control Systems**

57. Andersen stated (see Andersen Dep. 234:24-235:9, Oct. 29, 2010) that in 1999, he set up a CVS repository for the BusyBox project. Andersen further stated that in the early 2000s, he converted the CVS repository to an SVN repository. (Id. at 235:15-22).

58. On 29 April 2009, the current BusyBox maintainer, Denys Vlasenko, converted the SVN repository to Git. The historical SVN repository has since remained available for public review at `svn://busybox.net/trunk/busybox`, although new code is not committed here but to the Git repository.

59. I am not aware of any reason to believe that the information in today's BusyBox Git repository does not preserve all commit information from both the original CVS repository and the SVN repository.

60. Over the last three years, I have routinely reviewed various parts of the archive of the BusyBox repository using the modern Git interface. In these years of review, I have noticed no substantial discrepancy that caused me to question the veracity and certainty of archival details. I have noticed only one minor discrepancy. Namely, when performing the user-controlled part of the SVN to Git conversion described in ¶ 56, Mr. Vlasenko apparently misspelled Mr. Andersen's first name, using a "c" in place of a "k".

13

SER_1768

61. Other than this trivial discrepancy, all data imported from the SVN repository appears to be properly imported into the modern Git repository. In my three years of regular study of the BusyBox Git repository, I have seen no evidence whatsoever that any substantive discrepancies, misattributions, or otherwise corrupted or incorrect data has been caused by the various conversions between revision control systems. It is therefore my opinion that the information in the current repository is accurate and reliable.

**Unix, GNU, Linux, and BusyBox**

62. Unix is an operating system that was initially developed by AT&T and then licensed to many other companies and universities.

63. Dr. Stallman founded the GNU project in 1984 with a philosophical goal: he wanted to create operating system software that everyone could use, improve, modify, share and redistribute, both non-commercially and commercially. The requirement that he placed on this software, the details of which are embodied in the text of the copyright license, the GPL, was that those who distributed the software further make sure that everyone else had equal rights to also modify, improve and redistribute the software.

64. The GNU project sought to create an operating system that worked just like Unix, but was written from scratch by programmers, so that it could be licensed under the GPL (or, the LGPL, as appropriate).

65. During the intervening years, the way Unix works was standardized by the Institute of Electrical and Electronics Engineers (IEEE). This standard made it possible for those who, like GNU, wished to rewrite Unix from scratch could test and verify it against a standard. That standard is called POSIX.

66. A POSIX-compliant operating system typically has three fundamental components: (a) a kernel, which is the component that talks directly to the hardware and manages peripherals; (b) a "C library", which is provides a standard interface for everything else on the system

14

SER_1769

to communicate requests to the kernel; and (c) a set of programs that provide a POSIX-compliant environment. The latter is sometimes called the "userspace tools", meaning that they share a memory space with user applications rather than the kernel, which runs in a separate memory space.

67. Linux is a kernel that is licensed freely under the terms of GPL. Initially, Linux only functioned in tandem with the components from the GNU operating system. Most references to the term "Linux" typically refer to the use of three components together: the kernel named Linux, the GNU C Library, and the GNU userspace tools.

68. BusyBox is full-fledged replacement for the GNU userspace tools designed in a radically different way. Namely, BusyBox includes all the POSIX-required GNU userspace tools in one single binary program. BusyBox provides easy configurations for programmers to choose which parts of the userspace they actually want or need to have on their operating system. BusyBox is written to be as small as possible (i.e., to occupy as little volatile and non-volatile memory as possible). BusyBox is also designed to run quickly, and thus, to be as fast an implementation of the userspace tools as possible.

69. Since BusyBox is so highly configurable and adaptable, and is such a small and fast implementation, many who want smaller installations of a POSIX-compliant operating system use BusyBox along with the Linux kernel (and a C library of their choice) to construct a tailored Unix-like operating system for specific purposes. I often call such systems "Busy-Box/Linux" systems to distinguish them from the "GNU/Linux" systems and avoid the confusion of calling the three very different components described above by just the name "Linux".

70. The particular size advantage to BusyBox/Linux is that the manufacturer can chose how much of the POSIX-compliant environment they need for their given plans. Application programs can expect whatever parts of POSIX to be present, and BusyBox can be configured to *only* provide those that are necessary.

SER_1770

71. Thus, the authors of BusyBox offer the software as a complete implementation of a POSIX userspace, but allow the downstream user to adapt that work to be precisely the subset of POSIX they need. This adaption process is done affirmatively by the programmer who wishes to use BusyBox.

72. Before BusyBox can be compiled, it must be configured using BusyBox's "`make config`" system. This system prompts the programmer to specify which features of BusyBox and which parts of POSIX the programmer wishes to use. The output of this process is a file called BusyBox's `.config` (pronounced "dot config").

73. Once the programmer creates a `.config` file, that file is used as a script to control the compilation (along with other such scripts) for BusyBox and together they create the adapted BusyBox binary that contains only those features the programmer requested.

74. This configurable size and fine-grained control of included features is widely considered the most innovative and creative idea expressed in the BusyBox codebase. This configurability was implemented by the careful and painstaking placement of special directives throughout the source code. This allows for quick and easy production of the exact BusyBox features the programmer desires.

**Embedded Computing And Upgrades**

75. Years ago, making specialized, small electronic devices required building specialized computers. Such specialized computers were built specifically to solve a particular task, and the same components were often not reusable for other types of products. As general purpose computers got smaller, it became possible to "embed" a general purpose computer in an electronic device. Such computers are called "embedded computers". Embedded computers are virtually no different from desktops and laptops, although embedded computers typically have slower CPUs and less memory and storage.

16

76. Embedded computers are now commonplace. Today, general purpose computing chipsets are very cheap. Therefore, the same types of general purpose computer components found in desktops and laptops are now also in DVD players, televisions, digital media players, phones, and many other small electronic devices.

77. If a device uses a general purpose computer rather than a specialized computer, the features of the device can often be implemented in software running on the general purpose computer, rather than by designing special hardware. This allows the software to stay much the same across different devices of the same type (e.g., all DVD players), and allows for new features to be easily implemented, and bug and problem fixes to occur in software rather than by changing hardware components.

78. Furthermore, general purpose computing devices are generally "field upgradable". That means that the device does not need to be sent to a repair shop or back to the manufacturer to perform upgrades or fixes. Typically, the consumers can themselves perform the upgrade by placing the "firmware" on a USB drive or CD and putting that media into the device. If the device is Internet-connected, such upgrades and fixes can even be performed automatically across the Internet. Such field upgrades are extremely common and easy to do; most manufacturers have a one page tutorial to explain to their customers how to do so. In short, manufacturers routinely tell their users how to replace the binary programs on their devices at home.

79. BusyBox/Linux has become a very common choice of operating system for embedded computers. While embedded computers are indeed general purpose computers, and could therefore run a wide variety of different operating systems, manufacturers often choose Busy-Box/Linux because the non-volatile storage space on such devices is limited.

80. While a particular device's operating system may be configured by its manufacturer for a specific task, that does not change the nature of computer inside the device: it could do virtually any operations that are typically done by other types of computers. Configuring

17

a BusyBox/Linux computer to behave as a DVD player is akin to configuring a desktop computer for use as an Automated Teller Machine or a web-browsing kiosk (both of which are very common). Such computers are general purpose computers that are "pared down" to perform some specified, narrow set of tasks, but the device could always be repurposed later to perform wholly different, or slightly different and improved tasks, should the owner of the device wish to do so.

**The GPL**

81. During my years of work with Dr. Stallman, the GPL's original author, he has communicated to me his intentions regarding the meaning of the GPL.

82. A central purpose of the GPL is to ensure that users could engage in the activities of modifying, sharing and redistributing their software. The text of the GPL was written to express these rights in a way that would allow any user of the software to take advantage of them.

83. The GPL is a copyright license designed to use the copyright controls granted to authors by the copyright statue to ensure that all the subsequent users of the software can engage in all activities mentioned above, and to end copyright permissions for any entity or individual that fails to ensure those rights for all subsequent users (by terminating the license of violators through GPLv2 §4).

84. Dr. Stallman wrote the GPL to be as forward-looking as possible. Obviously, no one can see the future, but his goal was to anticipate all possible uses, deployments, distributions and modifications of the software and ensure that no matter what happened, each person who received a copy of the software would have the ability to modify, improve, share, and distribute that software to the maximum extent.

85. The specific version of the GPL at issue in this particular litigation is version 2 ("GPLv2"), as that is the version of the license under which BusyBox is distributed.

SER_1773

86. GPLv2 §3 describes the requirements regarding distribution of binary and object code versions of software licensed under GPL. All three possible options require that the distributor in some way make arrangements for the recipient of binary or object code to receive the source code for the software as well.

87. GPLv2 §3 further details what the license means when it refers to source code, particularly when the distributed form of the software is in binary. In particular, the GPLv2 §3 requires inclusion of "the scripts used to control compilation and installation of the executable".

88. GPL requires that these scripts be included as part of the source code so that the user can take full advantage of the ability to modify the software. Without these scripts, the user might be able to modify the source code of one of the programs, but would still be unable to compile it, install it onto their device, and make use of their new changes and ideas on the device.

**Compilation and Installation Scripts**

89. Compilation and installation scripts can take many forms. The form of these scripts varies from one programming language or system to another, and over time as industry practice develops and new technology emerges. GPL does not specify which forms these scripts should take, because the requirement is intended to encompass all methodologies in use and anticipate those that might come into existence later.

90. The required "script" might simply be a human-language list of actions to take to compile and install the software. More commonly, however, a script is itself a program which defines the sequence of steps necessary to compile and install some software.

91. Since instructing a computer to compile and install a very large set of software, such an operating system, can be complex, programmers often write such programs to assist in this task. These programs could themselves be written in any programming language, but are

19

frequently written in specialized programming languages for the purpose of compilation and installation, such as Makefiles or autoconf.

92. Some programs, such as BusyBox, have their own custom-made configure system that helps the programmer generate the compilation script. Specifically, BusyBox has a .config file that is generated when the programmer chooses what parts of the POSIX-like system to utilize in the operating system. This file is an essential piece of information for building BusyBox.

93. In addition to scripts for compiling each individual part of the software, there are often "overarching" scripts that guide the entire build process. For example, in building an operating system comprised of uClibc (a commonly used C library), Linux, and BusyBox, in addition to scripts to build each of the individual components, another script will typically be used to define the specific order of compilation, or perform some rote configuration tasks before attempting to compile the individual programs.

94. Once a programmer has used whatever scripts to compile the software, the software must be installed on the device. Installation is usually very straightforward on a desktop or laptop computer, so much so that a skilled user can often guess where the program should be installed. On embedded computers, the task is much more specialized and detailed scripts are essential.

95. Specifically, on embedded computers, the software for the operating system, along with any applications, are typically collected in a precise way into a single file image. For example, my initial analysis of Best Buy's Blu-ray Disc player firmwares indicates that they seem to collect all the userspace software (including BusyBox) and the C library into what is called a "squashfs" filesystem — a compressed collection of files organized in a particular way. They then give the binary copy of Linux a special name, add a few files whose format is unknown to me, and place all of these pieces into an "ISO image" (i.e. a storage format for an archive of files).

20

96. While it's possible to examine a binary firmware and discover these basic facts about it, it is exceedingly difficult to construct a duplicate from a modified version of the software without detailed scripts explaining how to do it. Dr. Stallman designed GPL to ensure there would not be such guesswork for users who wished to install new versions of the software, and if such guesswork is required, the distributor has not provided adequate "scripts used to control . . . installation of the executable".

**Examination of Automated NS-WBRDVD Firmware Distribution by Best Buy**

97. Most of Best Buy's Insignia Blu-ray disc players can be connected to the Internet. Best Buy has configured these devices to upgrade the firmware on the embedded computer inside the Blu-ray disc player when the device is connected. I have confirmed with the help of my technical staff that this distribution is ongoing, as of 5 May 2011.

98. Using an NS-WBRDVD purchased on the open market and Best Buy's USB-key method of firmware installation, an NS-WBRDVD was downgraded to an older firmware version, specifically:

20091022_NS_WBRDVD_BBY_52_6902_22.iso

which has a sha1sum[4] of 20a2bc323a0495b1cd7507c750ac80fd3204f0b4.

99. After the older firmware was installed on the NS-WBRDVD, the device was rebooted, and the on-screen option was selected to permit Internet upgrade. Before selecting the upgrade option, network packet capture software was started on the same local network with the NS-WBRDVD. The network packet capture software allows for determining what URLs the NS-WBRDVD is automatically downloading when the upgrade option is selected.

100. The packet capture revealed that the NS-WBRDVD made an HTTP GET request to 170.65.129.162 (insigniaproducts.com) for the URL:

---

[4]A sha1sum is a "hash" of a file. In Computer Science, hash algorithms can compute a specific signature, or footprint, for a file. Secure hash algorithms, like SHA-1, can be used to uniquely identify a file. Even changing a single bit (i.e., changing a "1" to a "0") in a file will cause the file to have a different sha1sum.

21

```
http://insigniaproducts.com/cms/software-updates/NS-WBRDVD/

20101222_NSWBRDVD_BBY_B052_109_34.iso
```

and downloaded that entire file, which has sha1sum of:

```
b902e3a476ba6f8627befc67935f6f9e3702ccf2
```

, and is thus the exact same file discussed and analyzed in detail in ¶ 105 and following. (The entire network packet capture file is quite large and is therefore not attached as an exhibit. This data is on file with Conservancy's counsel.)

101. After NS-WBRDVD download the entire file from that URL, it performed an upgrade automatically to that version of the firmware. Note that URL is exactly the same URL provided at:

```
http://insigniaproducts.com/products/dvd-players-recorders/NS-WBRDVD.html
```

in the Support/Downloads tab.

### Examination of BusyBox distributed by Best Buy

102. In my Declaration executed on 26 January 2011, I identified that Best Buy distributes BusyBox 1.2.1 in the firmwares for its Insignia Blu-ray disc player products, using a standard and common method for identifying BusyBox. I believe that method to conclusively identify the version of BusyBox used in a firmware, and Best Buy has not disputed the that it distributes BusyBox 1.2.1 in the firmwares for its Insignia Blu-ray disc player products.

103. However, herein I will describe another technique to demonstrate that the firmware images distributed by Best Buy for their Insignia Blu-ray disc players contain a binary copy of BusyBox 1.2.1. I describe in full detail the technical work that was done and how it confirms the presence of BusyBox.

22

104. The BusyBox source code for version 1.2.1 of BusyBox is available publicly from the BusyBox website at the URL:

`http://www.busybox.net/downloads/busybox-1.2.1.tar.bz2`

The file has a sha1sum of `487ef51209e253d3aa981dc0b0645063a804f4c7`.

105. The current firmware for Best Buy's NS-WBRDVD product is available via the URL, `http://www.insigniaproducts.com/cms/` `software-updates/NS-WBRDVD/20101222_NSWBRDVD_BBY_B052_109_34.iso`. This file has a sha1sum of `b902e3a476ba6f8627befc67935f6f9e3702ccf2`. This is a file that a Best Buy's customers are instructed to copy onto a CD to upgrade the software on their NS-WBRDVD DVD player.

106. Best Buy provided Conservancy with a candidate source release for this firmware on 5 November 2010. This candidate release was in a file called:

`BusyBox 2010-11-05 Release.zip`

This file has a sha1sum of `4badcfa8d0e8d631e7e72b5c03e69aa2490d03e5`. This candidate includes some source code for BusyBox.

107. Comparing the sources provided in the candidate source release to the official BusyBox 1.2.1 source code, some small differences can be found. The differences are shown in Exhibit A in patch format. The patch shows that there are a total of ten lines of code changed in the sources.

108. This patch can be applied to the BusyBox 1.2.1 sources as they are received from the BusyBox developers. In other words, the ten lines of changes can be made to the 1.2.1 sources.

23

109. Upon doing so, the newly modified BusyBox source code can be built to produce a binary program. That binary program can then be disassembled, using the command `mips-linux-objdump -d busybox`. This command takes a binary program as input, in this case the program called `busybox`, and outputs the low-level computer instructions contained in that binary, which are expressed in what is called an assembler language.

110. The same command can similarly be run on the binary program named `busybox` contained in the NS-WBRDVD firmware available from Best Buy's website.

111. When comparing the output of the two commands, it can bee seen that the binaries contain the identical set of computer instructions at the assembler level.

112. Any reasonable programmer, in my view, would conclude upon seeing that output that the two binaries are essentially identical programs.

113. Based on this analysis, it is my conclusion that Best Buy included a binary program, which was derived by compiling sources that were substantially similar to the BusyBox 1.2.1 sources (after first applying the patch that appears in Exhibit A).

114. Furthermore, it is my conclusion that BusyBox 1.2.1 source code itself was modified before it was distributed by Best Buy in the NS-WBRDVD firmware. Those modifications can be seen in patch form in Exhibit A.

**Examination of Andersen's Contributions to BusyBox 0.60.3 and 1.2.1**

115. In my declaration executed on 21 March 2011, I identified various findings regarding the number of lines of C code that Andersen contributed to BusyBox at various dates and times and for various versions of BusyBox. Due to length constraints imposed by the Court for that declaration, I was not able to fully include the entire technical details of how the analysis was performed.

116. In reviewing the details of that declaration for this report, I noticed that I made a minor transposition error when calculating the extent of the similarity between versions

24

of BusyBox. Specifically, the second version number of BusyBox being examined in that declaration was "1.1.2", rather than "1.2.1," which is the version distributed by Best Buy. Therefore, all findings represented there pertained to a different version of BusyBox than that found in Best Buy's Insignia Blu-ray disc players.

117. To correct this error for this report, I have performed anew the entire analysis discussed in my declaration against different versions of BusyBox. I have also included all supporting materials that would allow anyone sufficiently skilled with Git, Perl, and POSIX utilities to independently verify this analysis.

118. However, since BusyBox 1.2.1 was released only a few months after BusyBox 1.1.2, the results of this corrected analysis vary only minimally from my original report. Therefore, my conclusions regarding the extent of Andersen's contribution to BusyBox based on various different criteria have not changed. Namely, Mr. Andersen has a large number contributions to both 0.60.3 and 1.2.1, and a significant portion of both his own 0.60.3 code and the code of other 0.60.3 contributors have survived into 1.2.1.

119. My analysis centers around the use of a facility provided by Git (using version 1.5.6.5) called `git blame`. "Blame" features are commonly found in many revision control systems, and existed at least as far back as CVS. Blame is used to search the repository archives to determine, for each line of text (in this case, C code) that appears in the repository, who was the last person to commit a change, improvement, or to move that line around within the repository.

120. More specifically, my analysis centers around running the following command for each file in the repository:

```
git blame -l -M -C -C -C -w -f -n
```

This `git blame` command generates a report listing the last person to edit each line of code. Some commits involve one developer simply copying or moving code (written by

SER_1780

someone else) from one place to another, and therefore do not contain any new code from the commiter; the options exclude these such cases.

121. To gather the initial data for this process, I wrote the program whose source code is provided in Exhibit B. That program produces a large file containing output of the `git blame` command above for all of the files with names ending in `.c` and `.h`[5] in BusyBox 0.60.3 and BusyBox 1.2.1. The output from this data-gathering program is tens of megabytes, so it is not included as an exhibit. It is on file with Conservancy's counsel.

122. To determine the number of lines that Andersen was the last to edit in 0.60.3 made between September 2001 and April 2002 (the exact range date range being 7 September 2001 04:00:00 UTC to 27 April 2002 06:06:12 UTC), I wrote the program found in Exhibit C, giving it as input the 0.60.3 blame data gathered in ¶ 121. This process showed that Andersen added or was the last person to edit at least 8,897 lines of code between those dates. The program in Exhibit C works by fetching the 0.60.3 sources from Git, running the `git blame` command described ¶ 120, and output only those output lines where Erik Andersen is listed as the author, and the change was made between the dates September 7, 2001 at 04:00:00 UTC and April 27, 2002 at 06:06:12 UTC.

123. As discussed above in ¶ 47, maintainers sometimes commit patches on behalf of other developers, after examining, editing and adapting those patches as needed. Andersen did this for developers who did not have commit access to the BusyBox revision control system. When he did, Andersen noted in the commit log who authored the patch. Since Andersen noted these facts in the commit log entry (a free form text field), these commits must be identified via human review. To that end, I ran the following command to generate a report of all of Andersen's commits:

```
git log --author="Andersen" \
```

---

[5]Typically, when using the C programming language, the programmer stores all C programming code in files that end in either `.c` or `.h`.

SER_1781

```
--since="2001-09-07 04:00:00" --until="2002-04-27 06:06:12"
```

I examined each commit message and compiled a list of commits that Andersen did not credit to another developer in the corresponding log entry. The list of commit identifiers in this time period that Andersen did not attribute in any way to another developer are listed in Exhibit D.

124. Despite the conservative approach taken here, it is quite likely that Andersen contributed important material to these patches written by others. As he stated (see Andersen Dep. 249:9-250:16, Oct. 29, 2010), Andersen operated like a typical project maintainer — he often edited the patches for content, form, and optimization before committing them. Furthermore, as maintainer, Andersen maintained complete editorial control over the code repository, and therefore decided which submitted patches were appropriate and which should not be included. He also decided how and where to incorporate patches.

125. Using the list of commits built in ¶ 123 and the program in Exhibit E, giving it as input the 0.60.3 blame data gathered in ¶ 121, I determined that Andersen added or was the last person to edit 5,794 lines between the aforementioned dates, even when excluding those situations where Andersen noted in the log that he was contributing a patch written (in part or in whole) by another developer. The program in Exhibit E is very similar to the program in Exhibit C, however, it outputs only those `git blame` lines that meet the previous criteria and can be found in the list of Andersen's commits found in Exhibit D.

126. Using the program in Exhibit C, giving it as input the 1.2.1 blame data gathered in ¶ 121, I determined that of the 8,897 lines of code Andersen added or was the last to edit in BusyBox version 0.60.3, 5,377 lines remain unchanged in BusyBox version 1.2.1. Specifically, since the program in Exhibit C finds only those lines of source code which Andersen committed between the dates September 7, 2001 at 04:00:00 UTC and April 27, 2002 at 06:06:12 UTC. By running that program with the 1.2.1 blame data as input, we see which lines meeting that criteria remain in the 1.2.1 codebase.

127. Using the list of commits built in ¶ 123 and the program in Exhibit E, giving it as input the 1.2.1 blame data gathered in ¶ 121, I determined that of the 5,794 lines of code that were found in a ¶ 125 Andersen added or was the last to edit (excluding those commits written, in whole or in part, by another developer), 3,590 of those lines remained in BusyBox 1.2.1. Specifically, since the program in Exhibit E finds only those lines of source code which Andersen committed between the dates September 7, 2001 at 04:00:00 UTC and April 27, 2002 at 06:06:12 UTC where I have identified that Andersen did not attribute any of the work to another developer, by running that program with the 1.2.1 blame data as input, we see which lines meeting those criteria remain in the 1.2.1 codebase.

128. Using the program in Exhibit F, giving it as input the 1.2.1 blame data gathered in ¶ 121, I determined that 53,821 lines of code that originally appeared in BusyBox 0.60.3 still appear in BusyBox 1.2.1. Specifically, taking the 1.2.1 blame data as input, the program in Exhibit F prints out all `git blame` lines that indicate the line has not been edited and/or changed in the code repository since April 27, 2002 06:06:12, the release date of 0.60.3.

129. Given the findings in ¶ 128 and that BusyBox 1.2.1 only contains approximately 185,848 lines of C code, which can be determined with the command:

```
wc `find . -name "*.[ch]" -print`
```

I conclude that at least 28% of the C code sources of BusyBox 1.2.1 is identical to the C code sources of BusyBox 0.60.3. That estimation is extremely conservative, since it considers only lines of code that have survived identically as they stood in 0.60.3 and completely ignores lines that have were changed in 1.2.1 but would, upon inspection by a human, prove to be clearly derivative of similar code in 0.60.3. It is thus my opinion that BusyBox 1.2.1 is heavily derived from BusyBox 0.60.3.

130. Using the program in Exhibit G, giving it as input the 1.2.1 blame data gathered in ¶ 121, I determined that Andersen added or was the last person to edit at least 29,644

lines of source code in the repository between the dates of September 7, 2001 04:00:00 UTC and April 10, 2006 20:37:29 UTC. This indicates that Andersen added or was the last person to edit 29,644 of those 185,848 lines of source code in BusyBox 1.2.1, which is 15% of the total C source code in BusyBox 1.2.1.

I declare under penalty of perjury under the laws of the United States of America that all statements and affirmations made herein of my own knowledge are true and correct, and all statements made on information and belief are believed to be true and correct.

Executed on 11 May 2011

By: _____

29

Case 5:18-cv-07182-EJD    Document 181-2    Filed 04/20/23    Page 166 of 181

# Exhibit A
## Expert Report of Bradley M. Kuhn
## 11 May 2011

SER_1785

| May 11, 11 15:58 | **busybox‑1‑2‑1_to_bestbuy‑ccs‑candidate.patch** | Page 1/1 |

```
diff -ruN busybox-1.2.1-downloaded-pristine/Makefile busybox-1.2.1-bestbuy-prist
ine/Makefile
--- busybox-1.2.1-downloaded-pristine/Makefile   2006-07-28 18:53:44.000000000 -0
400
+++ busybox-1.2.1-bestbuy-pristine/Makefile      2011-04-28 01:34:58.000000000 -0
400
@@ -4,6 +4,8 @@
#
# Licensed under GPLv2, see the file LICENSE in this tarball for details.
#
# Modified by Broadcom (BRCM)  2006-08-29T22:12:57-04
#

# You shouldn't have to edit anything in this file for configuration
# purposes, try "make help" or read http://busybox.net/FAQ.html.
@@ -346,6 +348,8 @@
busybox.links: $(top_srcdir)/applets/busybox.mkll include/bb_config.h $(top_srcd
ir)/include/applets.h
        $(Q)-$(SHELL) $^ >$@

romfs: install

install: $(top_srcdir)/applets/install.sh busybox busybox.links
        $(Q)DO_INSTALL_LIBS="$(strip $(LIBBUSYBOX_SONAME) $(DO_INSTALL_LIBS))" \
                $(SHELL) $< $(PREFIX) $(INSTALL_OPTS)
diff -ruN busybox-1.2.1-downloaded-pristine/networking/tftp.c busybox-1.2.1-best
buy-pristine/networking/tftp.c
--- busybox-1.2.1-downloaded-pristine/networking/tftp.c 2006-06-30 18:42:02.0000
00000 -0400
+++ busybox-1.2.1-bestbuy-pristine/networking/tftp.c    2011-04-28 01:34:59.0000
00000 -0400
@@ -19,6 +19,9 @@
 * Licensed under GPLv2 or later, see file LICENSE in this tarball for details.
 * -------------------------------------------------------------------- */

 /*
  * modified by Broadcom (BRCM)  2007-07-25T16:11:00-04
  */
#include <stdio.h>
#include <stdlib.h>
#include <string.h>
@@ -547,7 +550,8 @@
        if (localfile == NULL || strcmp(localfile, "-") == 0) {
                fd = (cmd == tftp_cmd_get) ? STDOUT_FILENO : STDIN_FILENO;
        } else {
                fd = open(localfile, flags, 0644); /* fail below */
                /* BRCM: make localfile executable */
                fd = open(localfile, flags, 0755); /* fail below */
        }
        if (fd < 0) {
                bb_perror_msg_and_die("local file");
```

**SER_1786**

# Exhibit B

## Expert Report of Bradley M. Kuhn

## 11 May 2011

SER_1787

Case: 24-5538, 02/24/2025, DktEntry: 52.8, Page 240 of 283

Case 5:18-cv-07182-EJD    Document 181-2    Filed 04/20/23    Page 169 of 181
Printed by Bradley M. Kuhn

| May 11, 11 19:26 | **build–blame–output–for–a–version.plx** | Page 1/1 |

```perl
#!/usr/bin/perl

use warnings;
use strict;

use File::Find;

my $VERBOSE = 1;
if (@ARGV != 2) {
  print STDERR "usage: $0 <WORKING_DIRECTORY> <TAG>\n";
  exit 1;
}

my($WORKING_DIRECTORY, $TAG) = @ARGV;

chdir $WORKING_DIRECTORY or die "unable to chdir to $WORKING_DIRECTORY: $!";

system("git clone git://busybox.net/busybox.git busybox_with_tag_$TAG 1>&2");
die "error cloning git repository in $WORKING_DIRECTORY: $!" if ($? != 0);

chdir("busybox_with_tag_$TAG") or die "unable to enter busybox_with_tag_$TAG: $!";

system("git checkout $TAG 1>&2");
die "error checking out $TAG in $WORKING_DIRECTORY: $!" if ($? != 0);

my @files;
my $buildList = sub {
  my $val = $_;
  chomp $val;
  push(@files, $val) if -f $val and $val =~ /\.[ch]\s*$/;
};
find({ wanted => $buildList, no_chdir => 1}, ".");

foreach my $file (sort {$a cmp $b } @files) {
  print STDERR "Processing $file ..." if $VERBOSE > 0;
  open(BLAME, "-|", "git blame –l –M –C –C –C –w –f –n –– $file") or die "unable to run blame on fil
e $file: $!";
  while (my $line = <BLAME>) { print "$file: $line"; }
  print STDERR "\n" if $VERBOSE > 0;
}
#
# Local variables:
# compile-command: "perl -c build-blame.plx"
# End:
```

**SER_1788**

# Exhibit C

## Expert Report of Bradley M. Kuhn

## 11 May 2011

Printed by Bradley M. Kuhn

| May 11, 11 22:21 | **commits−between−relevant−0−60−3−dates.plx** | Page 1/1 |

```perl
#!/usr/bin/perl

use warnings;
use strict;


use Date::Manip;

Date_Init("TZ=UTC");

my $startDate = ParseDate("September 7, 2001 04:00:00");
my $endDate   = ParseDate("April 27, 2002 06:06:12");

while (my $line = <>) {
  die "invalid line: $line in blame output" unless ($line =~
  /^\s*(\S+)\s*:\s*\S+\s+\S+\s+\d+\s+\((.+)\s+(\d{4,4}\-\d{2,2}\-\d{2,2}\s+\d{2,2}:\d{2,2}:\d{2,2})\s+([\+\-\d]+)/);
  my($file, $name, $date, $tz) = ($1, $2, $3, $4);
  my $parsedDate = ParseDate($date);
  die "Unable to parse date information in $date found in git blame"
    if (not defined $parsedDate);

  die "time input not in UTC from blame in $line" if ($tz ne "−0000" and $tz ne "+0000");

  if ($parsedDate gt $startDate and $parsedDate lt $endDate and
      $name =~ /^\s*Eri[ck]+\s+Andersen/) {
    print $line;
  }
}
#
# Local variables:
# compile-command: "perl -c commits-between-dates.plx"
# End:
```

SER_1790

# Exhibit D
## Expert Report of Bradley M. Kuhn
## 11 May 2011

SER_1791

Printed by Bradley M. Kuhn

| May 05, 11 2:26 | **andersen–solo–commits–in–date–range.ids** | Page 1/2 |
|---|---|---|

```
b1591d1f8b9444c770771c9482d708dd5e497829
416340642df18d92600998566ccb1bec25b10d4b
1c31501b1bacd5d3a2a156dfd6833fe174fff9d1
467a18b1d94dbcdc9f750e52d09f6579037fbff5
c57e42b8f0aaeb44952284ade29717a36ee43e49
c3657428d3207d35cda634adbe23f75457f7912b
f4c208937c997f9b65e77b9304a527b03349d219
d63dee4019a62d1c5bb31755d9866ef921aff76b
f8f6e624bb5b0cbe418356e02a8a61b445c5bd66
43626d7671cf1b4c7adac777d421ad784a400422
d81891a2e6d52a35b3b633f95716d7a3a88f60c9
55805bcba49abf296435be5282eca69c6bd4bb72
6f8b7ea452656faf0183e378cb9fd457ffd9b8d6
d75ac02a4ffb6c843794d8f7d745ee083bdb0516
a66a43e8ef1e55c2415aa7084365cce3fb8f931a
db7d5fca5f6a98a68a16bbea7cd71593791c43dc
3e6908b5865d8e3ab3a986cd5a5ad86c4cea7ff5
19732c6226e9f2f89b9294e3c23af2bfbb084cec
c8459a5a8f692faead7f26a6905b056805767bab
ef38b392627b31abf6b99273311d2a155023e73a
50e4d660ace54d8da2cb09d537138447a92c68bd
6d13964714c36ef6ea8d698b64fd7caea77969f9
79a466f1285509853b2fa37351219d58506c58c4
38ddbed4c1144370169611bd94d3b0662961dfbb
744a194f53b0e524814a4e40e05d621e6c4222a0
94f19a838518293810a0fc0c4dca926ca8caff57
282671bf76bd7e3644b730673ca748947913b911
dba4e6f0468ee3ec9cd3825404e85eeba3795c24
45784febaf5e5f635bedb831b9609655ce33b525
9c6b5fcb0a624423dc3fb4de808f4ea3118a4ad3
fedce06b7fa53989df8a7994dcd2b24ed5ccf51a
c265b17550dc90237c7dc03da7b58ceea8c74bbf
8e392922b09dff10cd7e1e5a83c578000bf34fe5
c94e89d81f9a5cbbbb9c1cbdcb52e3379173a5a7
038cbc74429f8c3c74a505314bc3eca5b44c342c
72f9a4277fe5ad7c6c6b9a9810d469cc7fcc3c71
4acf8f848161cb321130cbc014113a91b061a1db
0ee0a8d5396c9da17ba47991715da3ff8ea484f1
463304edfd2f727522420022676ebbac31d31a00
06656f363de87846086f03c5e12541a66637858e
b24d65659f193cd7497dfdae4d8aa1bc91dbf343
11fdb8a4c79752157a8263fbcf583916b5ec0347
8acbf1d3079e9ed6d15c39bd57135b13ecb4076f
74400ccfd08e8ff72b9147951dd437dd3bb7abb1
a0f0ae5a7acd71c3c56df5183e38c189c3151c98
8eaa7b36985e6be193ed0ad1e4cbc493aa8d3cbc
f3f9062ecfb6893ca55094861c0a5e9f5ddba607
0298be88aece2a10b04c71db34fb154bdbbc45c9
c36642195cb97c1a632b85d4f473058f1409aaed
81ee96fe62916e9bd571cf3456d87cb1bba4c210
f435a918fab2a315981c185a3135b97388b572c4
5f6873621d58e879d06b9a1ef7ea28b6d84c4b43
d35c5df08c7ca8ad506a418555538a9270411c42
b159146fa6bbc779c5d9f01e3058cd0a9a6f2e8f
b5474c48b158f4a7d60f4b4faa40129c7eda6e9f
89de1e7930a752e0a444d30172ca508f58f02365
5a406510466943f9c70b88bd1a9398147e20470f
b0cc0a6ca879781c3899731c70eb3261252c7fe3
c7a3fb96d0936bbbedc428eafd3701edd219f70a
```

SER_1792

Printed by Bradley M. Kuhn

| May 05, 11 2:26 | **andersen–solo–commits–in–date–range.ids** | Page 2/2 |
|---|---|---|

```
27eff033d20198f04ecf44af93988b89363650e4
2480e3a30a063fb400a0912ddf513dff03ebc641
9260fc5552a3ee52eb95823aa6689d52a1ffd33c
bdfd0d78bc44e73d693510e70087857785b3b521
3cd2760ba1b235f3ead9feaaa1d3c41def3fb3bc
1a10eec17846b864a89834239a0533040cb504e7
371ca19f5346d626f0c75c8d53aa5e3fb2e85c43
fd35de564ea822e7fec620eaf402783946dfbf63
eaecbf33f70c0eed2f9a60b392e5782e03a9be2f
1552ff7efb760214eb4e5afc97f200136a935643
63ae66198d3f2d51d077a8fbcdaf1e5fe80a210f
20d739adf7fb1542015537dbdb969689118ceb02
```

SER_1793

# Exhibit E
## Expert Report of Bradley M. Kuhn
## 11 May 2011

Printed by Bradley M. Kuhn

| May 11, 11 19:09 | **commits-between-relevant-0-60-3-dates_with-include-only-list.plx** | Page 1/1 |

```perl
#!/usr/bin/perl

use warnings;
use strict;


use Date::Manip;

if (@ARGV != 1) {
  print STDERR "usage: $0 <COMMIT_EXCLUDE_LIST>";
}
Date_Init("TZ=UTC");

my %includeOnlyCommits;

open(COMMIT_LIST, "<", $ARGV[0]) or die "unable to open file $ARGV[0] for reading: $!";

while (my $line = <COMMIT_LIST>) {
  chomp $line;
  die "invalidly formatted commit id in $ARGV[0]: $line"
    unless ($line =~ /^[a-zA-Z\d]+$/);
  my $commit = "\L$line\E";
  $includeOnlyCommits{$commit}  = $line;
}

Date_Init("TZ=UTC");

my $startDate = ParseDate("September 7, 2001 04:00:00");
my $endDate   = ParseDate("April 27, 2002 06:06:12");

while (my $line = <STDIN>) {

  die "invalid line: $line in blame output" unless ($line =~
/^\s*(\S+)\s*:\s*(\S+)\s+\S+\s+\d+\s+\((.+)\s+(\d{4,4}\-\d{2,2}\-\d{2,2}\s+\d{
2,2}:\d{2,2}:\d{2,2})\)\s+([\-\+\-\d]+)/);
  my($file, $commit, $name, $date, $tz) = ($1, $2, $3, $4, $5);

  $commit =~ s/^\^//;
  $commit = "\L$commit\E";
  die "invalid commit id in $line" unless $commit =~ /^[\da-z]+$/;

  my $parsedDate = ParseDate($date);
  die "Unable to parse date information in $date found in git blame"
    if (not defined $parsedDate);

  die "time input not in UTC from blame in $line" if ($tz ne "-0000" and $tz ne "+0000");

  if ($parsedDate ge $startDate and $parsedDate le $endDate and
      $name =~ /^\s*Eri[ck]+\s+Andersen/ and
      (defined $includeOnlyCommits{$commit}) ) {
    print $line;
  }
}
#
# Local variables:
# compile-command: "perl -c commits-between-dates-with-exclude-list.plx"
# End:
```

SER_1795

# Exhibit F

## Expert Report of Bradley M. Kuhn
## 11 May 2011

Case 5:18-cv-07182-EJD    Document 181-2    Filed 04/20/23    Page 178 of 181
Printed by Bradley M. Kuhn

| May 11, 11 19:20 | **surviving–code–since–0–60–3–release.plx** | Page 1/1 |

```perl
#!/usr/bin/perl

use warnings;
use strict;


use Date::Manip;

Date_Init("TZ=UTC");

my $endDate   = ParseDate("April 27, 2002 06:06:12");

while (my $line = <>) {
  die "invalid line: $line in blame output" unless ($line =~
  /^\s*(\S+)\s*:\s*\S+\s+\S+\s+\d+\s+\((.+)\s+(\d{4,4}\-\d{2,2}\-\d{2,2}\s+\d{2,
2}:\d{2,2}:\d{2,2})\s+([\+\-\d]+)/);
  my($file, $name, $date, $tz) = ($1, $2, $3, $4);
  my $parsedDate = ParseDate($date);
  die "Unable to parse date information in $date found in git blame"
    if (not defined $parsedDate);

  die "time input not in UTC from blame in $line" if ($tz ne "-0000" and $tz ne "+0000");

  if ($parsedDate lt $endDate) {
    print $line;
  }
}
#
# Local variables:
# compile-command: "perl -c commits-between-dates.plx"
# End:
```

**SER_1797**

# Exhibit G
## Expert Report of Bradley M. Kuhn
## 11 May 2011

SER_1798

Case 5:18-cv-07182-EJD    Document 181-2    Filed 04/20/23    Page 180 of 181
Printed by Bradley M. Kuhn

| May 11, 11 19:21 | **commits–between–relevant–1–2–1–dates.plx** | Page 1/1 |
|---|---|---|

```perl
#!/usr/bin/perl

use warnings;
use strict;


use Date::Manip;

Date_Init("TZ=UTC");

my $startDate = ParseDate("September 7, 2001 04:00:00");
my $endDate   = ParseDate("April 10, 2006 20:37:29");

while (my $line = <>) {
  die "invalid line: $line in blame output" unless ($line =~
  /^\s*(\S+)\s*:\s*\S+\s+\S+\s+\d+\s+\((.+)\s+(\d{4,4}\-\d{2,2}\-\d{2,2}\s+\d{2,
2}:\d{2,2}:\d{2,2})\s+([\+\-\d]+)/);
  my($file, $name, $date, $tz) = ($1, $2, $3, $4);
  my $parsedDate = ParseDate($date);
  die "Unable to parse date information in $date found in git blame"
    if (not defined $parsedDate);

  die "time input not in UTC from blame in $line" if ($tz ne "-0000" and $tz ne "+0000");

  if ($parsedDate gt $startDate and $parsedDate lt $endDate and
      $name =~ /^\s*Eri[ck]+\s+Andersen/) {
    print $line;
  }
}
#
# Local variables:
# compile-command: "perl -c commits-between-reelvant-1-2-1-dates.plx"
# End:
```

SER_1799

Re:   *NEO4J, INC. v. PURETHINK LLC et al.* UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, Case No. 5:18-cv-7182 EJD

PROOF OF SERVICE

I am a citizen of the United States. My business address is 7960 Soquel Drive, Ste B #296 Aptos, CA 95003. I am over the age of eighteen years and not a party to the within action. On the date stated below, I served the attached:

1.  **Expert Report of Bradley M. Kuhn**

On the parties listed below at the addresses listed:

**to NEO4J, INC., a Delaware corporation, NEO4J SWEDEN AB,** attorneys of record:

Jeffrey M. Ratinoff
jratinoff@hopkinscarley.com
John V. Picone III
jpicone@hopkinscarley.com
Arthur E. Rothrock
arothrock@hopkinscarley.com
Hopkins & Carley, a Law Corporation
70 South First Street
San Jose, CA 95113
Telephone: (408) 286-9800
Facsimile (408) 998-4790

__ (By Mailing) I caused a true copy of each document identified above to be placed in a sealed envelope with first class postage affixed. Each such envelope was deposited for collection and mailing that same day in the ordinary course of business in the United States Mail at San Jose, California.

___(By Personal Service) I caused a true copy of each documents identified above to be delivered by hand to the offices of each addressee above.

___(By Overnight Delivery) I caused a true copy of each documents identified above to be sealed in an envelope to be delivered to an overnight carrier with delivery fees provided for, addressed of each addressee above.

_X__ (By Electronic Service) by transmitting via my electronic service address (adronjr@adronlaw.com) the document(s) listed above to the persons at the e-mail addresses set forth above.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Dated: 12-22-22                                           _____
                                                                    Adron G. Beene

# EXHIBIT 2

SER_1801

# hopkins carley

**San Jose**
70 South First Street
San Jose, CA  95113
T.  408.286.9800
F.  408.998.4790

January 13, 2023

Jeffrey M. Ratinoff
jratinoff@hopkinscarley.com
T. 408.299.1336
F. 408.998.4790

*Via Electronic Mail*

Adron W. Beene
Adron G. Beene
Law Offices of Adron W. Beene
7960 Soquel Drive, Suite B #296
Aptos, CA 95003

> **Re:    *Neo4j, Inc. v. PureThink LLC, et al.,* Case No.: 5:18-cv-07182-EJD**

Dear Counsel:

I am writing regarding the purported "expert" report authored by Bradley M. Kuhn and to meet and confer in the hope of avoiding the need for Plaintiffs to file a *Daubert* motion to exclude Mr. Kuhn's proposed testimony.

## Mr. Kuhn's Opinions Violate the Law of the Case Doctrine

Mr. Kuhn's opinions are squarely premised on his interpretation of the language in Section 7 of the AGPLv3 (which he calls the "Further Restriction Clause") and the propriety of Defendants' removal of the Commons Clause from the Neo4j Sweden Software License as a "further restriction."  For example, in Paragraph 61, Mr. Kuhn states "I conclude … that the Further Restrictions Clause [in Section 7] was specifically design [sic] to allow removal of an additional term when a licensor chose to use the text of the GPLv3 and/or AGPLv3 along with a term that the licensee viewed as a 'Further Restriction'."

The following further confirms that Mr. Kuhn is merely providing his interpretation of Section 7 of the Neo4j Sweden Software License under the guise of "industry custom" and that Mr. Suhy's removal of the Commons Clause is consistent with his understanding thereof:

> In my professional opinion, the Neo4j Sweden Software License is structured and presented precisely in the manner that the Further Restrictions Clause anticipated.

> Specifically, I believe that the AGPLv3 contemplated this precise situation: namely, a licensor licenses under the unmodified text of the AGPLv3, but also includes another term that contradicts, limits, and/or restricts the permissions granted under the AGPLv3.

Adron W. Beene
Adron G. Beene
January 13, 2023
Page 2

> If I had encountered the "Neo4j Sweden Software License" during the normal course of my work as a FOSS activist and FOSS licensing expert, I would have felt removal of the CC portion, upon redistribution of the software, was permitted by the AGPLv3's Further Restrictions Clause.
>
> In my opinion, when John Mark Suhy encountered the Neo4j Sweden Software License, his removal of the CC and redistribution of the Covered Work under pure AGPLv3 would be considered customary, permissible, and even widely encouraged in the field of FOSS.

Kuhn Report, ¶¶ 72-76.

Under the law of the case doctrine, a court is ordinarily precluded from reexamining an issue previously decided by the same court, or a higher court, in the same case." *Richardson v. United States*, 841 F.2d 993, 996 (9th Cir.1988). Likewise, a party may neither "revisit theories that it raises but abandons," nor "offer up successively different legal or factual theories that could have been presented in a prior request for review." *Sec. Investor Prot. Corp. v. Vigman*, 74 F.3d 932, 937 (9th Cir.1996) (quotations and citations omitted).

As you know, the parties fully and completely litigated the meaning of "further restrictions" within the Neo4j Sweden Software License on summary judgment. *See* Dkt. No. 98 at 30:19-31:9; Dkt. No. 100 at 27:18-30:16; Dkt. No. 109 at 18:13-22:3. Judge Davila considered Defendants' arguments and rejected them: "Defendants argue that there is a reasonable interpretation of the Neo4j Sweden Software License that permits licensees, like GFI or Defendants, to remove the Commons Clause and redistribute the software under the standardized AGPL license. Cross-Motion at 27-30. The Court disagrees." Dkt. No. 118 at 24:7-25:12. Judge Davila further found that Defendants failed to address the Court's reasoning in *Neo4j, Inc. v. Graph Found., Inc.*, No. 5:19-CV-06226-EJD, 2020 WL 6700480, at *4 (N.D. Cal. Nov. 13, 2020) "that 'further restriction' refers only to further restrictions imposed by a licensee, not the licensor." Dkt. No. 118 at 25:16-19.

In their appeal, Defendants made similar arguments in challenging one of the underlying bases for Judge Davila's issuance of a preliminary injunction. *See* Appellant's Opening Brief, pp. 37-40. Plaintiffs substantively addressed these in response. *See* Appellees' Answering Brief, pp. 49-54. The Ninth Circuit **conclusively affirmed** Judge Davila's findings regarding the disputed provisions of the Neo4j Sweden Software License, and expressly found that "Defendants' representation that ONgDB is a 'free and open-source' version of Neo4j® EE was literally false, because Section 7 of the Sweden Software License only permits a downstream licensee to remove "further restrictions" added by an upstream licensee to the original work." Memorandum Opinion, p. 3.

To be sure, the Memorandum Opinion indicated that it was precedential for purposes, *inter alia*, of the doctrine of law of the case. *See id.* p. 1 ("This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3"). Consequently, Defendants' attempt to offer Mr. Kuhn's testimony at trial and then seek

Adron W. Beene
Adron G. Beene
January 13, 2023
Page 3

reconsideration of the Court's prior summary judgment order pursuant FRCP 59(e) is clearly for an improper purpose in violation of the law of the case.

### Mr. Kuhn Cannot Opine on the Meaning of Contractual Provisions

Even if the meaning of the relevant provisions in the Neo4j Sweden Software License were not settled law of the case, Mr. Kuhn's proposed testimony would still be inadmissible because, his opinions all hinge on the interpretation of Section 7 thereof. The Ninth Circuit has made clear that an expert witness cannot give an opinion as to her legal conclusion, such as providing legal meaning to contracts as written.  *See, e.g., McHugh v. United Serv. Auto. Ass'n*, 164 F.3d 451, 454 (9th Cir. 1999) ("[expert] testimony cannot be used to provide legal meaning or interpret the [contracts] as written.");  *accord AMTAX Holdings 279, LLC v. Montalvo Assocs.*, LLC, 2022 WL 2784456, at *4 (S.D. Cal. June 6, 2022) ("[t]he interpretation of the contract is a matter of law, one this Court is more than capable of handling without the assistance of a so-called expert witness testimony") (citing *Nationwide Transport Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008)).

Mr. Kuhn's purported "expert" opinion about what is customary in the open source "industry" does not override the Court's exclusive province to determine the actual language concerning "further restrictions" as defined in Section 7 when read in conjunction with Section 10 as a matter of law.  Thus, the opinions in Paragraphs 51-61, 71-75, 76-78, 79-89, 97 and 109-110 in Mr. Kuhn's report are inadmissible because they are rooted in the legal interpretation of the provisions of the Neo4j Sweden Software License.

### Mr. Kuhn Cannot Offer an Opinion on the State of Mind of Mr. Suhy and Plaintiffs

It is well-established in the Ninth Circuit and the Northern District of California that an expert may not opine or speculate regarding a party's mental state, such as intent, motive, or knowledge. *See, e.g, Nationwide Transp. Fin. v. Cass Info Sys. Inc.*, 523 F.3d 1051, 1058 (9th Cir 2008) (excluding, *inter alia*, sections of expert report that identify the parties' actions as "wrongful" or "intentional" under the law); *SA Music LLC v. Apple, Inc.*, 592 F.Supp.3d 869, 903 (N.D. Cal. 2022) (excluding expert opinion that concluded infringement was willful because experts cannot opine about a party's mental state); *Tessera, Inc. v. Toshiba Corp.*, No. 15-CV-02543-BLF, 2019 WL 5395158, at *14 (N.D. Cal. Oct. 22, 2019) (striking portions of an expert report that plaintiff's intent, motive, and state of mind because "[s]uch testimony is not appropriate expert testimony").  The rationale for this rule is that juries are fully capable of deciding what inferences to draw from the evidence, and expert testimony on state of mind substitutes the expert's judgment for the judgment of the jury.  *See id.*

Mr. Kuhn has simply repackaged the same arguments made by Defendants under the guise of an expert opinion on his understanding of "further restrictions" as defined in Section 7 of the AGPLv3, what is "customary" in the open source software space on the removal of "further restrictions," and Suhy's purported good faith belief in removing the Commons Clause based on that same understanding.  *See, e.g.,* Kuhn Report, ¶¶ 71-75, 76-78, 79-89, 97, 110, 112. However, Mr. Kuhn cannot opine on Mr. Suhy's subjective intent in removing the

4876-3063-2264.2

Adron W. Beene
Adron G. Beene
January 13, 2023
Page 4

Commons Clause from the Neo4j Sweden Software license.  *See Nationwide Transp.*, 523
F.3d at 1058; *SA Music*, 592 F.Supp.3d at 903.

Mr. Kuhn also provides the following impermissible opinions on Neo4j Sweden's state
of mind:

- "In my opinion, it seems highly unlikely that the drafters of the Neo4j Sweden Software License were unaware of MongoDB's approach to their license change. As such, drafters of the Neo4j Sweden Software License was almost surely aware that they had the options presented under ¶ 85 to produce a fully modified AGPLv3 — sans the preamble and with no mention of FSF's trademark "GNU" — instead of the Neo4j Sweden Software License."  Kuhn Report, ¶ 96.
- "In my opinion, this speaks to clear intentionally [sic] in choosing a license that included the Further Restrictions Clause." *Id.* at ¶ 97.
- In my opinion … the Neo4j Sweden Software License was structured and promoted to give users the incorrect impression that the CC could not be removed from those terms — even though the Further Restrictions Clause was present." *Id.*
- "In essence, my opinion is that the Neo4j Sweden Software License attempted to inappropriately capitalize on the goodwill, power, and notoriety of the "GNU" and 'AGPLv3' brands while also frightening commercial redistributors with the addition of the CC." *Id.*, ¶ 98
- "I firmly believe that Neo4j hoped that no one would notice the Further Restrictions Clause remained included, and thereby realize that CC could, in fact, be removed and that commercial activity by downstream redistributors could therefore continue under pure AGPLv3." *Id.*
- "In my opinion, given the extensive publicity of MongoDB's SS Public License, FSF's FAQ, and other widely understood licensing knowledge regarding AGPLv3, those who promulgated the Neo4j Sweden Software License were (or should have been) aware that they could construct their own license, picking and choosing their preferred clauses from the AGPLv3 under the rules outlined by the FSF in ¶ 85." *Id.*, ¶ 111.
- "The authors of the Neo4j Sweden Software License should have expected that the Further Restrictions Clause would be used to remove CC from the Neo4j Sweden Software License. If they wanted to prevent that behavior, they should have (and could have, provided they had sufficient rights to all contributions to be licensed) removed the Further Restrictions Clause." *Id.*, ¶ 112.

For the same reasons stated above, Mr. Kuhn's gross speculation about Neo4j Sweden's
intent, motive, and knowledge at the time it created the Neo4j Sweden Software License is
improper and inadmissible.  *See Nationwide Transp.*, 523 F.3d at 1058; *SA Music*, 592
F.Supp.3d at 903.

4876-3063-2264.2

Adron W. Beene
Adron G. Beene
January 13, 2023
Page 5

* * *

In sum, any attempt by Defendants to offer Mr. Kuhn's testimony at trial as disclosed in his expert report would be for an improper purpose and would be contrary to controlling law concerning inadmissibility. While Plaintiffs are not required to meet and confer prior to filing a *Daubert* motion, we are hoping to avoid unnecessary motion practice and an accompanying request for sanctions.

This is not the first time Defendants have sought an end-around of a dispositive ruling. Recall that when Defendants attempted to reassert affirmative defenses for cancellation and abandonment that had been stricken/dismissed with prejudice, one of the arguments made by Plaintiffs was that Defendants ignored the law of the case doctrine in reasserting those defenses. In granting Plaintiffs' motion, the Court noted that Defendants had ignored that doctrine in their opposition, which suggested "they had no good faith grounds for reasserting the stricken defenses." *See* Dkt. No. 110 at 6:6-7:6. Giving Defendants the benefit of the doubt in choosing not to issue an order to show cause for sanctions at that time, the Court warned that "[m]oving forward, the Court expects that Defendants will only advance claims and defenses that are supported by law and evidence and will generally adhere to the proper standard of practice in Federal Court." *Id.* at 7:7-12.

Plaintiffs do not believe that the Court will give Defendants the benefit of the doubt in issuing sanctions under Rule 11 or its inherent powers should Plaintiffs be required to file a motion to exclude the testimony of Mr. Kuhn. Accordingly, please confirm by January 20, 2023 whether Defendants will voluntarily withdraw Mr. Kuhn as an expert witness. We are also available for a telephonic meet and confer should you wish to discuss any of the foregoing.

Sincerely,

HOPKINS & CARLEY
A Law Corporation

Jeffrey M. Ratinoff

JMR/dlh

cc:    Richard E. Starr (richardestarr@starrlaw.biz)

# EXHIBIT 3

SER_1807

# ADRON W. BEENE
ATTORNEY AT LAW

7960 SOQUEL DRIVE
SUITE B #296
APTOS, CALIFORNIA 95003
(408) 392-9233
adron@adronlaw.com

January 20, 2023

Jeffrey M. Ratinoff, Esq.
Hopkins Carley
70 South First Street
San Jose, CA 95113

Re: Neo4j, Inc. v. Pure Think LLC, et al., Case No.: 5:18-cv-07182-EJD

Mr. Ratinoff:

This letter is in response to yours dated 1-13-2023. Your letter was sent on 3:14 pm on Friday before the three-day weekend then demanded a response by January 20, 2023. We assume you intended to force defendants to immediately reply in a limited time frame or face a suggestion we did not meet and confer. Still, we will not withdraw Mr. Kuhn's opinion. Without waiver of other positions, because we have had limited time to respond to your 5 page letter, we provide these points which seem the most material to your position. If there is more you wish to know, let me know.

**The Law of the Case Doctrine does not apply as the partial summary judgment ruling is an interlocutory order.**

You suggest the Law of the Case Doctrine prevents Mr. Kuhn's testimony. The ruling on the summary judgment motion was a partial ruling. As the standard authority explains, this is an interlocutory order:

[14:35] **Effect of "partial summary judgment":** Unlike a summary judgment, a "partial summary judgment" does not terminate the action. It is merely an interlocutory order and is subject to revision. It is *not* immediately appealable without a specific judicial finding (FRCP 54(b), ¶ 14:377); and is *not* entitled to res judicata or collateral estoppel effect in other litigation. [*Information Resources, Inc. v. Dun & Bradstreet Corp.* (2nd Cir. 2002) 294 F3d 447, 452-453; *Solis v. Jasmine Hall Care Homes, Inc.* (9th Cir. 2010) 610 F3d 541, 543-544; *Burge v. Parish of St. Tammany* (5th Cir. 1999) 187 F3d 452, 467]

1

SER_1808

A. General Considerations, Rutter Group Prac. Guide Fed. Civ. Pro. Before Trial Ch. 14-A

The Law of the Case Doctrine does not apply to interlocutory orders. *Langevine v. District of Columbia* (D.C. Cir. 1997) 106 F.3d 1018, 1023. ( Interlocutory orders are not subject to the law of the case doctrine and may always be reconsidered prior to final judgment.) This follows FRCP 54. The Court's interlocutory ruling may be revised. The other rulings in this case are not final and are not subject to the Law of the Case Doctrine either.

We have a further anomaly, as the AGPL Further Restrictions Clause issue was relegated to Phase 2, yet Neo4J moved forward on the issue in Phase 1 over defendant's objection. The Court relied on a pleading motion in another case and noted nothing new was added. That is because Neo4J jumped the gun and moved forward with an issue for Phase 2 in Phase 1. The party in the other settled out and added nothing new. This procedure is not appropriate. We are intent to address that in our Rule 59 motion unless the court is inclined to consider the issue earlier.

Defendants are not seeking a second or third bite at the apple. They will seek due process and a first bite at the phase 2 issue under FRCP Rule 59 armed with the author of the AGPL clause and the person involved in the Further Restrictions Clause. Nothing is improper in defendant's efforts to raise an issue not fully litigated to date. As Mr. Kuhn is the author of the AGPL clause and was part of the Further Restrictions Clause addition to the AGPL, his opinion and the extensive factual support for it are clear.

Mr. Kuhn's opinion is relevant and supports the Unclean Hands Defense and the DCMA claim. It will also be used for our post trial Rule 59 motion. On the DCMA claim, Mr. Suhy did not engage in some improper intentional act in removing the non-permissive additional clause from the AGPL. Neo4J Sweden choose to use the Free Software Foundation, Inc.'s copyrighted AGPL license agreement. Neo4J Sweden has the burden of proof to show that Mr. Suhy intended to violate Neo4J's copyright. Mr. Kuhn's opinion is Mr. Suhy's conduct was permissible:

75. In my opinion, when John Mark Suhy encountered the Neo4j Sweden Software License, his removal of the CC and redistribution of the Covered Work under pure AGPLv3 would be considered customary, permissible, and even widely encouraged in the field of FOSS.

This follows your position stated in DKT No. 62 pg 6:8-9. "Rather, he claims to have a legal right to do so pursuant to the terms of an underlying open source license agreement." Mr. Kuhn's opinion support's Mr. Suhy's position.  Mr. Suhy was legally correct in removing the terms as the AGPL provides.  Neo4J's copyright infringement of the Free Software Foundation, Inc's copyrighted license agreement, was prevented.


**Mr. Kuhn's opinion is based on his own acts and personal knowledge as he is not some so called expert guessing at the AGPL agreement.**

2

Mr. Kuhn wrote the AGPL term. He was involved in the Further Restriction Clause addition to the revised AGPL. His testimony is not only well supported, but it is also based on personal knowledge which may allow the Court and tryer of fact to understand the issue. The AGPL term at issue is "**All other non-permissive additional terms are considered "further restrictions" within the meaning of section 10. If the Program as you received it, or any part of it, contains a notice stating that it is governed by this License along with a term that is a further restriction, you may remove that term**." There are two interpretations of that term. The question is who is the "you" who may remove further restrictions. The court ruled on this issue based on a pleading motion in another case without the benefit of evidence on this ambiguous term. In determining the admissibility of expert testimony, including testimony intended to aid the jury to understand the meaning of an ambiguous, disputed contractual term, a district court must "determine whether the proffered expert testimony 'is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.' " *Ambrosini*, 101 F.3d at 134 (quoting *Daubert*, 509 U.S. at 591, 113 S.Ct. 2786). *Bazarian International Financial Associates, LLC v. Desarrollos Aerohotelco, C.A.* (D.D.C. 2018) 315 F.Supp.3d 101, 117

Mr. Kuhn's opinion is based on his personal involvement in the AGPL license and the Further Restriction Clause.  His opinion is directly tied to the facts and will aid a jury resolve the factual dispute. His expert testimony is appropriate.

**Mr. Kuhn is not testifying about Mr. Suhy's state of mind.**

Part of Mr. Kuhn opinion is stating the nature of the AGPL license agreement and the way it was changed to prevent further clauses. His opinion support's the basis for Mr. Suhy's removal non-permissive terms Neo4J Sweden added to Free Software Foundation, Inc.'s copyrighted AGPL license agreement. Mr. Kuhn does not opine on Mr. Suhy's state of mind. It is up to the jury to decide if Neo4J can meet the elements of the DCMA claim.

**Mr. Kuhn is not testifying about Neo4J Sweden's state of mind.**

Mr. Kuhn's opinions on Neo4J's conduct is based on conclusions from the evidence and Neo4J Sweden's election to use Free Software Foundation, Inc.'s copyrighted AGPL license agreement. With limited time in this response, we could change some points you raise. Perhaps you could point out the material issues you have and we could amend the report to change material issues you may have.

**Sanctions**

As for your threat of sanctions, as we have explained before, the 9th circuit has expressed concerns that litigants should not face threats of sanctions to preserve matters on appeal.

3

*Lacey v. Maricopa County* (9th Cir. 2012) 693 F.3d 896, 927. As the law states interlocutory rulings are not subject to the Law of the Case Doctrine, your use of the doctrine and the results achieved, as a matter of law, are wrong. Threatening sanctions against defendants for your improper use of the doctrine is inappropriate.

Sincerely,

Adron W. Beene

SER_1811

Case 5:18-cv-07182-EJD     Document 181-5     Filed 04/20/23     Page 1 of 20

# EXHIBIT 4

No. 21-16029

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

---

**NEO4J, INC., et al.,**

*Plaintiff and Appellee,*

v.

**PURETHINK, LLC, et al.,**

*Defendant and Appellant.*

---

Appeal From a Judgment of the United States District Court
For the Northern District of California
Hon. Edward J. Davila
United States District Judge
N. D. Cal. No. 5:18-cv-07182 EJD

---

**APPELLANTS' OPENING BRIEF**

---

ADRON W. BEENE, CA Bar # 129040
ADRON G. BEENE, CA Bar # 298088
1754 Technology Drive, Ste. 228
San Jose, CA  95110
Tel.: (408) 392-9233
Fax: (866) 329-0453
adron@adronlaw.com

Joseph A. Hearst, CA Bar # 130286
1569 Solano Ave. #525
Berkeley, CA  94707
Telephone: (510) 528-6863
Facsimile: (510) 280-2556
jahearst@pacbell.net

Attorneys for defendants, cross-
complainants and appellants John Mark
Mr. Suhy, PureThink,LLC and iGov,
Inc.

# TABLE OF CONTENTS

I.       INTRODUCTION ........................................................................1

II.      JURISDICTIONAL STATEMENT ............................................3

III.     ISSUES PRESENTED ................................................................3

IV.      STATEMENT OF THE CASE ...................................................4

V.       STATEMENT OF FACTS ..........................................................7

VI.      SUMMARY OF ARGUMENT .................................................15

VII.     ARGUMENT ............................................................................17

    A.   Standard Of Review. ........................................................17

    B.   Neo4j USA Lacks An Ownership Interest That Would Give It Standing To Sue For Trademark Infringement ...............................18

    C.   Assuming For The Sake Of Argument That Neo4j Usa Had Standing, There Was No Infringement Because Defendants' Use Of The Mark Was Nominative Fair Use. ......................................22

    D.   The Court's Finding That Defendants Engaged In False Advertising And False Designation Of Origin Overlooks How Consumers Would View The Igov Website. ...........................................34

    E.   References To Ongdb As "Free And Open-Source" Are Accurate. ........36

    F.   Descriptions Of Ongdb As A "Drop-In" Replacement For An Existing Commercially Licensed Distribution Of The Same Version Number Of Neo4j Are Accurate. ............................................40

    G.   The Court's Finding Of False Designation Of Origin Is Fatally Flawed. ......................................43

VIII.    CONCLUSION .........................................................................47

**SER_1814**

PureThink, iGov and Mr. Suhy filed their notice of appeal on June 16, 2021. 9-ER-2159.

## V. STATEMENT OF FACTS

Neo4j Sweden created and supports a graph platform for connected data distributed under the Neo4j mark. Sweden's software initially, and for many years, was distributed free under the Free Software Foundation's open-source GPL (General Public License) and AGPL (Affero General Public License) licenses. 6-ER-1378, ¶¶ 5-7. Because Neo4j was free and open-source, its use grew widely; contributors created more than 2000 forks/derivatives of the Neo4j software.

Neo4j Sweden decided to monetize its software by creating commercial versions of its program. Neo4j Sweden organized Neo Technology, Inc. in the United States, which eventually changed its name to Neo4j, Inc. ("Neo4j USA"). Neo4j USA then became the corporate parent of Neo4j Sweden. Neo4j Sweden granted Neo4j USA a non-exclusive license to use the Neo4j mark in the United States. 11-ER-2414. Notwithstanding that it was neither an owner nor exclusive licensee, Neo4j USA obtained a United States registration for the Neo4j mark. 2-ER-189.

Prior to November 2018, Neo4j offered free open-source versions known as Neo4j Community Edition (sometimes, hereafter "Neo4j CE") under the GPL open source license and Neo4j Enterprise Edition (sometimes, hereafter "Neo4j EE")

7

SER_1815

under the AGPL open source license.  6-ER-1368 ¶¶ 12-14; 6-ER-1369 ¶¶ 6-8.

Neo4j USA also offered a commercial edition with commercial support also

(confusingly) named Neo4j Enterprise Edition (sometimes, hereafter "Neo4j

CEE").  6-ER-1368, ¶¶ 5-8.  Historically, there was no difference between Neo4j

EE under its AGPL open-source license and Neo4j EE under its commercial

license; the latter was simply packaged and sold as a support solution.  *See* 6-ER-

1369 ¶ 9.  Until Neo4j Enterprise 3.5.0 was released, Neo4j Enterprise open-source

distributions and Neo4j Enterprise commercially licensed distributions were

compiled from the same official Neo4j public GitHub repository. 6-ER-281.

Up through the "beta" and testing versions of Neo4j EE version 3.4, all

Neo4j EE products were offered on an open-source basis under the AGPL license;

later, when Neo4j officially released Neo4J EE 3.4, it added restrictions on the

AGPL through what the parties referred to as the "Commons Clause."  *See* 6-ER-

1370, ¶ 11.  The new terms prohibited the non-paying public from engaging in

commercial resale and certain support services.[3]  6-ER-1370, ¶ 11; *see* 6-ER-1415

(text of Commons Clause).  Neo4j USA released Neo4j EE versions 3.5 and later

under a commercial license only, and Neo4j Sweden no longer released the

enterprise source code to the public on the Neo4j GitHub repository.  6-ER-1371, ¶

---

[3]     The propriety of adding the Commons Clause to the AGPL license was a
matter of dispute and is discussed further in the Argument.

8

13.  Neo4j software under the unmodified AGPL license, through version 3.4 beta and testing versions, is still in use and available under that license at GitHub to this day.  *See* 6-ER-1369, ¶ 9.

John Mark Suhy's company, PureThink, became a Neo4j reseller under a Solution Partner Agreement ("SPA") with Neo4j USA in 2014, receiving a non-exclusive license to use the Neo4j mark.  2-ER-197.  PureThink, with Neo4j's approval, designed and developed a government edition that would streamline government procurements.  PureThink offered this software package under the name Neo4j Government Edition and had an exclusive agreement to resell it to the government.  *See* 8-ER-2085.

Neo4j USA had been trying to get the IRS to purchase a Neo4j EE commercial license.  *See* 1-ER-6.  As the procurement deadline loomed, the IRS informed PureThink that it was not interested in purchasing a commercial license with support.  Rather than lose the possibility of a subscription from the IRS, Mr. Suhy informed Neo4j USA that he wanted to build the solution the IRS needed during the first year, so that follow up years could generate commercial license revenues.  USA agreed, and PureThink entered into an agreement with the IRS and signed a contract for consulting services to build out a solution for them.  9-ER-2087, 2090.

9

As the initial IRS contract was ending, the IRS informed Mr. Suhy that government policy was to use open-source software to save taxpayer dollars. The IRS asked Mr. Suhy about the Neo4j open-source license. Neo4j USA instructed Mr. Suhy to lie and tell the IRS that it could not use open-source versions of the software. USA contacted the IRS and informed it that it could not use Neo4j EE in any version. Mr. Suhy, on the other hand, refused to lie and informed the IRS that Neo4j EE was available under an open-source license for version 3.4 and earlier, leading to a rift between Mr. Suhy and Neo4j USA. As a result, Neo4j USA terminated the SPA agreement with PureThink.

Neo4j USA retaliated against Mr. Suhy and informed the IRS that PureThink could not provide any services on open-source versions of Neo4j because the SPA had a three-years-after-termination bar on providing services. 7-ER-1660-62. Because the IRS was still only interested in open-source versions, Mr. Suhy set up a new company, iGov, Inc., to be able to work with open-source versions of the software.

After PureThink's termination, Mr. Suhy and iGov changed direction and focused on offering consulting services focused on Neo4j and forks of Neo4j such as GFI's ONgDB. Mr. Suhy created a new offering called the Government Package for Neo4j which was marketed to government agencies as a consulting package. *See* 2-ER-235. It provided consulting, support, and tools focused

10

specifically on government needs relating to solutions development around Neo4j open-source software.

> iGov's website stated:

> The principle [*sic*] behind PureThink and the Government Package has created a new corporate entity called iGov Inc**., which is not a Neo4j Solution Partner.  Because iGov Inc. is not a solution partner**, it can offer packages at great cost saving to US Government Agencies as it has no restrictions on working with Neo4j Enterprise ***open-source licenses***.

> …

> iGov Inc's new Government Package for Neo4j can be added to any Neo4j instance making it a "Government Edition."  By default, all Government Packages for Neo4j now come[] with Neo4j Enterprise included under it's [*sic*] open-source license!

2-ER-235 (emphasis added).

The iGov website noted that it offered a "Government Package for Neo4j" and "Government Development Package with Neo4j Enterprise."  2-ER-235; 2-ER-253.  The website stated that iGov was "the only US Federal contractor providing Neo4j Enterprise binaries packaged with it's [*sic*] free Open-source License!"  2-ER-264.  The website also used Neo4j in URLs and displayed a "Request Procurement Document Package" link with an email address of mailto:Neo4j@igovsol.com.  5-ER-946.

The court below stated that "[i]t is undisputed that PureThink and iGov initially marketed a product called 'Neo4j Enterprise,' and a 'Government Package for Neo4j,' before rebranding Neo4j Enterprise as ONgDB."  1-ER-21.  This

SER_1819

statement mischaracterizes both what iGov and PureThink marketed and who controlled ONgDB. iGov offered consulting services, not software products. There is no evidence that iGov ever offered Neo4j Enterprise alone—it marketed the "Government Package for Neo4j" by stating, in part, that "iGov Inc.'s open-source enterprise packages provide a better value than Neo4j Enterprise commercial support subscriptions because 100% of the cost goes to support and development services, not un[n]ecessary and more restrictive commercial licenses," and "[w]e offer the same support features and SLAs as the Neo4j Enterprise commercial subscriptions offered by Neo4j Inc. partners, *but for the open-source licenses enterprise distributions.*" 4-ER-935; 5-ER-937 (emphasis added). In other words, the iGov website made clear that it was *not* offering the commercially-licensed version of Neo4j EE, but rather a consulting package focused on open-source-licensed versions of Neo4j EE or forks such as GFI's ONgDB. Further, the website stated that iGov packages included an optional Neo4j Enterprise distribution that iGov had compiled for the community from the unmodified source code taken directly from Neo4j Sweden's official GitHub repository. 2-ER-276, 279.

Following release of Neo4j EE version 3.5, which Neo4j USA offered only in a commercial version, Brad and Ben Nussbaum, owners of Atom Rain, Inc. and GraphGrid, Inc., formed Graph Foundation, Inc. ("GFI"), the purpose of which

12

was to develop Neo4j on a non-profit basis using open-source versions of the software.[4] 2-ER-314, 315 . The fork of Neo4j which GFI eventually created was named ONgDB (Open Native Graph Database).

The Court's statement that PureThink and iGov had "rebranded" Neo4j Enterprise as ONgDB is not supported by the record. GFI created and controlled ONgDB; there is no evidence PureThink or iGov had anything to do with the way GFI might have marketed ONgDB. Rather, the iGov website recommended ONgDB for clients who did not need the support solutions offered either by iGov or Neo4j USA. 4-ER-935. The website suggested that consumers who did not want to obtain a commercial license for Neo4j Enterprise could use ONgDB as a fork of Neo4j that offered many of the same features as Neo4j Enterprise. 4-ER-935.

GFI began promoting ONgDB, which was available for free. 6-ER-1315, 1322. Mr. Suhy, as a volunteer contributor, replaced the modified AGPL license (*i.e.*, the AGPL license with the Commons Clause) under which Neo4j Sweden released Neo4j EE 3.4 with the unmodified AGPL because he believed that the

---

[4]    The Neo4J entities sued GFI at the same time as PureThink, iGov and Mr. Suhy. GFI settled out shortly before the summary judgment was entered.

13

Commons Clause was not a permitted change for the AGPL.[5]  3-ER-478; 7-ER-1651, ¶ 29.  The propriety of this change is discussed in the Argument.

The "landing page" for GFI's ONgDB website was titled "ONgDB—Neo4j Enterprise Fork: Graphs for everyone."  4-ER-861.  Mr. Suhy promoted GFI's ONgDB fork of Neo4j as "100% free and open" without the limitations imposed by the commercially licensed edition of Neo4jEE v. 3.5.x.  *See, e.g.*, 4-ER-871.  GFI's ONgDB website further declared that "ONgDB distributions are licensed under AGPLv3 as a free and open drop-in replacements of Neo4j Enterprise commercial licensed distributions with the same version number."  4-ER-915.  On the "downloads" page, GFI again described ONgDB 3.5.5 as a "drop-in replacement for Neo4j Core and Enterprise 3.5.5."[6]  iGov's website made similar statements—but noted that ONgDB was a drop in replacement for Neo4j Community and Neo4j Enterprise commercial distributions.  5-ER-1012.  Neo4j Community Edition does not have enterprise features.

By December 2020, ONgDB v 3.5.1 had been downloaded over 14,000 times.  *See* 1-ER-10.  Neo4j USA provided evidence that a handful of customers

---

[5]     Mr. Suhy only removed the Commons Clause from license texts that indicated that the Free Software Foundation held the copyright and which had directions to users to insert the AGPL content verbatim.  7-ER-1651, ¶ 29.  Other contributors later may have removed the Commons Clause from other licenses.

[6]     The parties disagreed about what a "drop-in replacement" actually means— we discuss this dispute in the Argument.

14

who encountered issues with ONgDB have directed questions to Neo4j USA.  5-ER-1138, 1162, 1170, 1186.

## VI. SUMMARY OF ARGUMENT

The court determined that Neo4j USA had standing to bring a trademark infringement claim notwithstanding that it is not the owner or exclusive licensee of the Neo4j mark.  It did so based upon the "related companies doctrine," which, in certain circumstances, allow uses by a related entity to inure to the benefit of the trademark registrant.  But the related companies doctrine does not apply here because Neo4j Sweden, the owner of the mark, did not control the use of the mark by Neo4j USA.

Even assuming that Neo4j USA had standing, the court's conclusion that defendants had infringed misapplied the nominative fair use doctrine.  Under that doctrine, a use of a trademark to describe plaintiffs' mark by the defendants is not infringing.  The court rejected application of the doctrine here because it believed that defendants were misusing plaintiffs' mark to dupe consumers into believing that the products and services defendants offered were somehow affiliated with plaintiffs.  However, the court overlooked the context of how open-source software is used.  Defendants here described their offerings as based on open-source versions of Neo4j.  That was an accurate description of what plaintiffs offered, and the language of defendants' websites made clear that defendants worked only with

15

**D.**  **The Court's Finding That Defendants Engaged In False Advertising And False Designation Of Origin Overlooks How Consumers Would View The iGov Website.**

In addition to finding trademark infringement under 15 U.S.C. § 1114, the court below determined that defendants had engaged in false designation of origin and false advertising under 15 U.S.C. § 1125.  A plaintiff need not have a direct ownership interest in a mark to bring a claim for false advertising under § 1125. Rather, to maintain a claim under § 1125(a), the plaintiff must show that it has a commercial interest in the allegedly misused mark that is "likely to be damaged" by the defendant's use of the mark.  *Waits v. Frito-Lay, Inc.*, 978 F.2d 1093, 1109 (9th Cir. 1992).

The court below stated that "[d]efendants have made numerous misrepresentations in their advertisement and promotion of ONGDB."  1-ER-26. According to the court, these misrepresentations consist of two separate types: (1) that ONgDB and Neo4j Enterprise are "free and open-source" versions of or alternatives to commercially licensed Neo4j EE; and (2) statements that ONgDB is a "drop-in replacement" for an existing commercial license distribution of the same version number of Neo4j.  1-ER-26.  In each instance, the court ignored that defendants did not have a product called ONgDB (GFI did), and how defendants might legitimately describe a consulting package focused on Neo4j open source licenses and ONgDB.

34

Before turning to the court's reasoning, it is necessary to point out that the evidence on which the court relied for these conclusions consists largely of statements made on the *GFI website*, not on the iGov or PureThink sites.  *See* 1-ER-26, referring to pp. 29-30 of plaintiffs' memo, which in turn cites to 4-ER 919, 927, *etc.*  The iGov website does contain statements "similar" to those the court relies upon, to the effect that a user who did not "need ONgDB Enterprise or Neo4j Enterprise open-source licensed distribution" could "simply download ONgDB Enterprise … as a drop-in replacement for an existing commercial licensed distribution of the same version number."  4-ER-935.  But this statement does not imply that ONgDB is a feature-for-feature replacement for the commercial enterprise versions of Neo4j, since it states that ONgDB is a "drop-in replacement" *for users who don't need the support offered for commercial editions*.

Furthermore, the iGov website also states "ONgDB is a drop in replacement for the Neo4j Community and Enterprise branded distributions."  5-ER-1012.  Since Neo4j Enterprise has many features not present in Neo4j Community, it is difficult to see how users could believe that, by calling ONgDB a drop-in replacement, iGov was asserting that ONgDB was a feature-for-feature copy of Neo4j Enterprise.

### E.    References to ONgDB As "Free and Open-Source" Are Accurate.

Moreover, the court's determination that references to ONgDB and Neo4j Enterprise as "free and open-source" versions of Neo4j somehow misrepresent what consumers are actually receiving does not, in fact, describe how these references are misleading. The versions of Neo4j which GFI's ONgDB fork uses are *not* the commercial versions of that software, and nothing in the descriptions of that software on the iGov website implies that they are. Rather, the iGov website accurately describes ONgDB as a fork of the *free* versions of Neo4j.

Neo4j USA, having decided that it wishes to monetize a software program that had previously been free and open-source, is now attempting to shut down any uses of the free and open-source versions, without removing any of those versions from Neo4j Sweden's free and open-source iterations on GitHub.

Consumers interested in Neo4j have options: They can obtain an open-source forked version of the software for free (without service); they can compile Neo4j Enterprise directly from the official Neo4j Sweden GitHub repository or have someone do it for them; or they can pay for the commercial version of the software, with service provided by Neo4j USA. Neo4j USA *cannot* prevent those who create forks of the free software from informing users that (1) there are forks of the Neo4j software that are not subject to expensive licenses and (2) the "open-

36

source" forks of Neo4j can be obtained without obtaining a license from Neo4j USA.

As the court pointed out, plaintiffs' arguments about whether ONgDB is free and open-source largely depend upon whether defendants properly removed the so-called Commons Clause that Neo4j Sweden added to versions 3.4 and later of Neo4j under the AGPL. 1-ER-8, 26-27; *see* 6-ER-1415 (text of Commons Clause). However, defendants argued that, the software is free and open-source and by its own terms, the AGPL license (even with the Commons Clause added by Neo4j Sweden) allowed defendants to inform possible consumers that it was possible— indeed desirable—to use versions of Neo4j EE versions 3.4 and earlier, but did not indicate that iGov or GFI's ONgDB were offerings by Neo4j USA.

In any event, the court's conclusion concerning removal of the Commons Clause is fatally flawed. The court noted that AGPL versions 3.4 and later (which are incorporated into the Neo4j Sweden software license) state, in Section 7, that

> non-permissive additional terms [in this License] are considered 'further restrictions' within the meaning of section 10. If the Program as you received it, or any part of it, contains a notice stating that it is governed by this License along with a term that is a further restriction, you may remove that term "You may not impose any further restrictions on the exercise of rights granted or affirmed under this License.

Furthermore, section 10 states that "[y]ou may not impose any further restrictions on the exercise of the rights granted or affirmed under this License." 1-ER 26; 6-ER-1411-13.

SER_1827

Together, these provisions state that if a licensee receives the work (*i.e.*, Neo4j in any version covered by the license, including Neo4j EE 3.4 and later) with restrictive "non-permissive additional terms," they can be removed under section 7. Thus, defendants argued below that the Commons Clause which Neo4j Sweden added to the AGPL license from versions 3.4 onward could be removed as more restrictive than the AGPL license itself.

The court rejected this argument on the grounds that the license states that "[e]ach licensee is addressed as 'you'," and therefore "Sections 7 and 10 [of the AGPL] prohibit a *licensee* from imposing further restrictions, but do not prohibit a *licensor* [*i.e.*, Neo4j USA, in the court's view] from doing so." 1 ER-26-27. But even assuming the court's construction is correct, the court overlooks the way the license uses "you." The license states "[i]f the Program as *you* received it, or any part of it, contains a notice stating that it is governed by this License along with a term that is a further restriction, *you* may remove that term." 6-ER-1412 (emphasis added). Even if the AGPL permitted Neo4j to add the Commons Clause, the court does not explain why the licensee was prohibited from removing more restrictive terms.

Moreover, the court's construction has a glaring flaw. The court did not ask who was the copyright holder. Under the AGPL, the Free Software Foundation is the holder of the copyright. This is made clear in the Preamble, which states that

38

the FSF has a 2007 copyright on the document, and that "[e]veryone is permitted to copy and distribute verbatim copies of this license document, but changing it is not allowed." 6-ER-1408. Thus, when the AGPL states that each licensee is addressed as "you," that designation included Neo4j Sweden as a licensee of the copyright holder *and* those who sub-licensed from it. And there is no doubt that anyone using the AGPL to copyright their work is prohibited from adding more restrictive terms and that "downstream" users thus had a right to remove those restrictive terms.

In any event, the district court's conclusions do not distinguish between Neo4j Sweden—which imposes the Commons Clause—and Neo4j USA, which seeks to take advantage of that clause. As noted, Sweden is *not* the plaintiff on any of the trademark-related claims. Thus, Neo4j USA is attempting to enforce rights granted to Neo4j Sweden, with no showing that Neo4j USA had been assigned any of the rights granted under the license which included the Commons Clause.

While the question whether it was illegitimate for ONgDB to have removed the Commons Clause may be difficult, there can be no argument that Neo4j USA had any right to determine whether the Commons Clause applies to the versions of ONgDB offered in the United States. If Neo4j Sweden wished to prove that instances of Neo4j as described on the ONgDB website were not genuine editions of Neo4j, it could have registered the mark and brought a claim for infringement.

SER_1829

What it could *not* do was require that instances of the Commons Clause should be applied to software offered by Neo4j USA even though Neo4j Sweden was the author of the versions listed on the website and there was no showing that Neo4j USA had any ownership interest in the versions which involved the Commons Clause.

### F.   Descriptions Of ONgDB As A "Drop-In" Replacement For An Existing Commercially Licensed Distribution Of The Same Version Number of Neo4j Are Accurate.

One of the most contentious of the disputes between Neo4j USA and defendants has to do with defendants' descriptions of ONgDB as a "drop-in replacement" for Neo4j EE.  As the court recognized, plaintiffs argued that "because the software was not of the same quality and did not contain all of the features of Neo4j EE," it was misleading for defendants to describe it as a "drop-in" replacement.[13]  1-ER-27.  Even assuming that plaintiffs' characterization of ONgDB as being of inferior quality or lacking certain features is accurate, the court's resolution of the issue usurps the role of the jury.

We note first that the assertion that ONgDB was an inferior product was based upon a claim from Philip Rathle, the Vice President of Products at Neo4j

---

[13]     As noted, the court overlooked the fact that iGov made statements that ONgDB is a drop in replacement for both Community and Enterprise editions.  5-ER-1012.  This implies that ONgDB is *not* a feature-for-feature reproduction of Neo4j, since the Enterprise and Community editions have different features.

40

*Sleekcraft.*  This Court should therefore remand for a determination of the likelihood of consumer confusion under *Sleekcraft.*

## VIII.  CONCLUSION

For the foregoing reasons this Court should reverse the summary judgment entered against appellants and vacate the preliminary injunction based upon it, with a remand to the district court to set the issues for trial.

Respectfully submitted,

Dated:  August 16, 2021

_____/s/_____
Joseph A. Hearst

Counsel for Appellants John Mark Mr. Suhy, PureThink, LLC
And iGov, Inc.

47